# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>**Re: ECF No. 19346**<br><br>(Jointly Administered) |
| Luis F. Pabón Bosques, Raul Martinez Perez, Elvin A. Rosado Morales, Carlos A. Rojas Rosario y Rafael Torres Ramos,<br><br>                Movants,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                Respondent. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>**This Objection relates only to the Commonwealth and shall only be filed in the lead Case No. 17 BK 3283-LTS.** |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA", and together with the Commonwealth, COFINA, HTA, ERS, and PREPA, the "Debtors") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**OBJECTION OF COMMONWEALTH OF PUERTO RICO AND
EMPLOYEES RETIREMENT SYSTEM OF GOVERNMENT
OF COMMONWEALTH OF PUERTO RICO, TO MOTION FOR
RELIEF FROM STAY FILED BY LUIS F. PABÓN BOSQUES,
RAUL MARTINEZ PEREZ, ELVIN A. ROSADO MORALES,
<u>CARLOS A. ROJAS ROSARIO Y RAFAEL TORRES RAMOS</u>**

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ...............................................................................1

BACKGROUND ....................................................................................................5

    A.    RELEVANT HISTORY OF THE ERS ...............................................5

    B.    COMMONWEALTH AND ERS TITLE III CASE ..............................6

    C.    THE ENACTMENT OF ACT 81 AND THE GOVERNMENT'S
        AGREEMENT NOT TO IMPLEMENT SUCH ACT ABSENT
        OVERSIGHT BOARD APPROVAL .......................................................6

    D.    COMMONWEALTH AND ERS PLAN OF ADJUSTMENT ...........15

OBJECTION.........................................................................................................17

    I.    ACT 81 CONTRAVENES PROMESA, THE PLAN, AND THE FISCAL PLAN,
        AND IS THUS NOT ENFORCEABLE....................................................19

    II.    FAILURE TO PAY A DISPUTED, UNSECURED DEBT IS NOT A
        TAKING FOR WHICH JUST COMPENSATION COULD BE DUE................23

    III.    BECAUSE ACT 81 DOES NOT LEGALLY INCREASE
        MOVANTS' PENSION RIGHTS ABOVE THOSE PROVIDED
        IN THE PLAN, AND NO PROPERTY IS BEING TAKEN, MOVANTS FAIL
        TO ESTABLISH CAUSE UNDER SONNAX....................................................25

CONCLUSION.....................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asoc. de Maestros v. Sistema de Retiro para Maestros*,
190 D.P.R. 854 (2014) ...................................................................................24

*Bayrón Toro v. Serra*,
19 P.R. Offic. Trans. 646 (P.R. 1987)...........................................................24

*Brigade Leveraged Cap. Structures Fund Ltd. v. Garcia-Padilla*,
217 F. Supp. 3d 508 (D.P.R. 2016)...........................................................26, 27

*Butner v. United States*,
440 U.S. 48 (1979)........................................................................................24

*City Ins. Co. v. Mego Int'l, Inc. (In re Mego Int'l, Inc.)*,
28 B.R. 324 (Bankr. S.D.N.Y. 1983)............................................................31

*Fin. Oversight & Mgmt. Bd. v. Ad Hoc Grp. of Prepa Bondholders (In re Fin.
Oversight & Mgmt. Bd. for Puerto Rico)*,
899 F.3d 13 (1st Cir. 2018)......................................................................18, 26

*Goya Foods v. Unanue-Casal (In re Unanue-Casal)*,
159 B.R. 90 (D.P.R. 1993),
*aff'd without opinion sub nom. Unanue v. Unanue-Casal (In re Unanue-
Casal)*, 23 F.3d 395 (1st Cir. 1994) ...........................................................18

*Grayson v. WorldCom, Inc. (In re WorldCom, Inc.)*,
No. 05 Civ. 5704, 2006 U.S. Dist. LEXIS 55284 (S.D.N.Y. Aug 4, 2006) ...........................31

*In re 234-6 West 22nd St. Corp.*,
214 B.R. 751 (Bankr. S.D.N.Y. 1997).........................................................18

*In re BFW Liquidation, LLC*,
No. 09-00634-BGC-11, 2009 WL 8003536 (Bankr. N.D. Ala. Sept. 14, 2009) ...................29

*In re Breitburn Energy Partners LP*,
571 B.R. 59 (Bankr. S.D.N.Y. 2017)............................................................27

*In re City of Stockton, California*,
526 B.R. 35 (Bankr. E.D. Cal. 2015).............................................................25

*In re Cummings*,
221 B.R. 814 (Bankr. N.D. Ala. 1998) ..........................................................27

*In re City of Detroit*,
504 B.R. 97 (Bankr. E.D. Mich. 2015)..........................................................25

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*In re Gatke Corp.*,
117 B.R. 406 (Bankr. N.D. Ind. 1989) ...................................................................................30

*In re Jefferson Cnty.*,
491 B.R. 277 (Bankr. N.D. Ala. 2013) ..................................................................................18

*In re Northwest Airlines Corp.*,
No. 05-17930, 2006 WL 694727 (Bankr. S.D.N.Y. Mar. 13, 2006) ......................................30

*In re Residential Capital, LLC*,
No. 12-12020, 2012 Bankr. LEXIS 3641 (Bankr. S.D.N.Y. Aug 8, 2012) ............................31

*In re WorldCom, Inc.*,
No. 05 Civ. 5704, 2006 WL 2255071 (S.D.N.Y. Aug. 4, 2006) ...........................................27

*Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.)*,
No. 09- 50026, 2010 WL 4630327 (S.D.N.Y. Nov. 8, 2010)................................................32

*Mass. Dep't of Revenue v. Crocker (In re Crocker)*,
362 B.R. 49 (B.A.P. 1st Cir. 2007).......................................................................................18

*Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*,
474 U.S. 494 (1986) ............................................................................................................17

*Montalvo v. Autoridad de Acueductos y Alcantarillados (In re Montalvo)*,
537 B.R. 128 (Bankr. D.P.R. 2015) ......................................................................................17

*Murrin v. Hanson (In re Murrin)*,
477 B.R. 99 (D. Minn. 2012) ...............................................................................................27

*Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*,
980 F.2d 110 (2d Cir. 1992)..................................................................................................29

*Soares v. Brockton Credit Union (In re Soares)*
107 F.3d 969 (1st Cir. 1997)................................................................................................17

*Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*,
907 F.2d 1280 (2d Cir. 1990)................................................................................17, 19, 26

*Trinidad Hernández v. E.L.A.*,
188 D.P.R. 828 (2013) .........................................................................................................24

iii

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Truebro, Inc. v. Plumberex Specialty Prods., Inc. (In re Plumberex Specialty*
*Prods., Inc.)*,
311 B.R. 551 (Bankr. C.D. Cal. 2004)...................................................................32

*Unisys Corp. v. Dataware Prods., Inc.*,
848 F.2d 311 (1st Cir. 1988)..................................................................................18

**Statutes**

11 U.S.C. § 362.........................................................................................2, 6, 17, 18

11 U.S.C. § 944...............................................................................................2, 20

PROMESA § 104..............................................................................................2, 8, 9

PROMESA § 108........................................................................................... *passim*

PROMESA § 204........................................................................................... *passim*

PROMESA § 207........................................................................................... *passim*

PROMESA § 301.........................................................................................2, 17, 20

PROMESA § 304..................................................................................................6

PROMESA § 312............................................................................................3, 28

PROMESA § 313............................................................................................3, 28

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth") and the Employees Retirement System for the Government of Puerto Rico ("ERS," and together with the Commonwealth, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Debtors' sole Title III representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), respectfully submit this objection (the "Objection") to the *Motion for Relief from Automatic Stay* [ECF No. 19346][2] (the "Motion") filed by Luis F. Pabón Bosques, Raul Martinez Perez, Elvin A. Rosado Morales, Carlos A. Rojas Rosario, and Rafael Torres Ramos (collectively, the "Movants"), plaintiffs in *Pabón Bosques, et al. v. Pierluisi Urrutia, et al.*, Case No 2021-CV-01112 (the "Lawsuit"), currently stayed before the Court of First Instance for San Juan, Puerto Rico (the "Commonwealth Court").  The Debtors respectfully request that the Court deny the Motion for the reasons set forth below.

## PRELIMINARY STATEMENT

1.     After completion of weeks of hearings to consider confirmation of the Debtors' proposed joint Title III plan of adjustment for the Commonwealth, ERS, and PBA (the "Plan"), Movants filed the Motion in a renewed attempt to force the government for the Commonwealth of Puerto Rico (the "Government") to implement Act 81-2020 ("Act 81"), which would enhance the treatment of their pension claims at odds with the treatment set forth in the Plan.  Act 81 purports to, among other things, amend Act 447-1951 ("Act 447") and Act 1-1990 ("Act 1") to accelerate the age of retirement eligibility for certain public employees and entitle such employees to

---

[2] Unless otherwise specified, all ECF references herein refer to the docket for the Title III Case for the Commonwealth of Puerto Rico (Case No. 17-3283).

increased lifetime pension benefits above the benefits accrued by eligible employees when the

ERS defined benefit plan was frozen in 2013.  The Motion should be denied because:

   a.  If the currently proposed Plan is confirmed, Movants' claims will be discharged
       pursuant to Bankruptcy Code § 944, and Movants will be entitled to the treatment
       provided in the Plan on account of their pension claims;

   b.  Pursuant to PROMESA § 108(a)(2), enactment and implementation of Act 81 are
       barred because the Government was notified by the Oversight Board that Act 81
       impairs or defeats PROMESA's purposes as determined by the Oversight Board;

   c.   The proposed Plan is *sub judice* and among the issues to be determined is whether
       Act 81 is preempted and its implementation is enjoined, which determination may
       moot Movants' Motion and the Lawsuit they seek to prosecute;

   d.  Even if Act 81 is not preempted under the Plan, it is subject to nullification pursuant
       to PROMESA §§ 104(k), 108(a)(2), and 204, which relief will be litigated between
       the Oversight Board and the Government;

   e.  Failure to pay a disputed, unsecured debt is not a taking for which just
       compensation could be due; and

   f.  Based on the foregoing, Movants do not have cause for stay relief pursuant to
       Bankruptcy Code § 362(d), made applicable by PROMESA § 301(a) and do not
       satisfy the *Sonnax* factors.

2.      Act 81, along with its related acts, Act 80-2020 and Act 82-2020 (collectively, the

"Pension Acts"), is an attempt to partially unfreeze the ERS defined benefit plan and, in doing so,

to return the Commonwealth to the fiscal mismanagement that existed before PROMESA that left

Puerto Rico with over $120 billion in outstanding debt, including $55 billion of unfunded pension

obligations.  Repeating history, the Pension Acts would create billions of dollars in new pension

obligations for the Commonwealth with no viable funding source or method to cover the increased

costs and without Oversight Board approval.   Act 81 is significantly inconsistent with the

Commonwealth's certified Fiscal Plan and budget, and in violation of PROMESA § 204(a),

because it purports to increase the benefits paid to its subject retirees as a percentage of their final

salaries, without identifying any feasible way to fund this increase on top of payroll reductions

already provided for in the Fiscal Plan.

3.     Moreover, a Puerto Rico statute is preempted if it is inconsistent with PROMESA. Such preemption is automatic. Among the statutes preempted by PROMESA are those listed on Exhibit K to the Plan, including Act 81. Act 81 is preempted by PROMESA §§ 207, 312(a), 313, and 314. Pre-PROMESA debt cannot be modified without Oversight Board approval and modification of such debt cannot be done without complying with PROMESA Title III. Act 81 purports to determine the treatment of pension claims in violation of all those sections. Act 81 increases pension benefits for prepetition services of certain ERS participants beyond the amounts provided for in the Plan, which provides for no cuts to pension benefits that accrue through the Plan effective date. Thus, Act 81 would effectively result in pension claims being paid in excess of 100% of their accrued prepetition amounts, which is a fundamental violation of Title III.

4.     Implementation of Act 81 is also barred by PROMESA § 108(a)(2) because Act 81 impairs or defeats the purposes of PROMESA, as determined by the Oversight Board. Manifestly, by purporting to pay claims more than in full, Act 81 defies PROMESA Title III.

5.     The Oversight Board engaged extensively with the Legislature, AAFAF, and the Governor concerning Act 81. The Oversight Board informed the Government, before and after Act 81 was enacted, the Act impairs or defeats the purposes of PROMESA. In November 2020, the Oversight Board provided its analysis to the Governor and AAFAF making clear Act 81 would increase the Commonwealth's pension costs by billions of dollars beyond those provided in the certified Fiscal Plan. The Oversight Board also made clear it was prepared to commence litigation to bar implementation of the Pension Acts, including Act 81. In response, and to avoid litigation, AAFAF and the Governor agreed not to implement the Pension Acts, including Act 81, until the Oversight Board agreed. Since that agreement in November 2020, the Governor and AAFAF have not provided to the Oversight Board any proposed path or basis to implement Act 81.

6.      Act 81 is also barred under PROMESA § 207.  Act 81 modifies existing debt by purporting to unfreeze the ERS pension plan for certain ERS participants and increase pension benefits by billions of dollars over the next thirty years, without the Oversight Board's approval.

7.      Additionally, Act 81 is barred under PROMESA § 204(c).  Act 81 would increase costs by billions of dollars with no viable method of paying for it, creating a revenue deficiency the Government would need to remedy through reprogramming that has neither been requested nor authorized by the Oversight Board, as required under PROMESA § 204(c).

8.      Movants have shown no cause for stay relief.  They simply want to enforce a new law that would pay them more, if the law were implemented.  Lifting the automatic stay would serve only to occupy this Court's and the Debtors' time unnecessarily, and cause the Commonwealth to incur significant legal expense, to litigate rights already being determined through the Title III Plan that, if confirmed, would render the Lawsuit moot.  Moreover, Movants have failed to demonstrate any harm they suffer from maintaining the automatic stay to prevent Movants from litigating to enforce Act 81 whose implementation is barred.

9.      Further, Movants did not rely on these increased benefits in performing their work for the Commonwealth, as Act 81 was no more than an unanticipated legislative benefit that had not been passed until last year and which remains unimplemented.  In contrast, the Commonwealth would suffer significant impairment through the incurrence of additional legal fees and distraction of the Debtors' principals and advisors at a critical time when all Commonwealth liabilities, including those owed to its pensioners and employees with accrued benefits, are being administered and determined through the Plan.  Therefore, the Debtors respectfully submit the Motion should be denied.

## BACKGROUND

### A. Relevant History of the ERS

10. The ERS was established as a statutory trust, initially created by Act No. 447 of May 15, 1951 (as amended, "Act 447"). ERS's purpose was to provide pension and other benefits to retired employees of the Commonwealth (other than teachers and judges), its municipalities, and most of its public corporations. Employees covered by the ERS pension plan include police and other emergency responders. As initially established, ERS was a traditional defined benefit plan, the benefits of which were determined based on the relevant employees' years of service and compensation levels prior to their date of retirement.

11. In 1999, already facing financial challenges, the ERS benefit structure was amended by Act 305-1999. Pursuant to the amendment, ERS employees hired on or after January 1, 2000 were automatically enrolled in "hybrid," or notional retirement accounts ("System 2000"), whereby employee contributions were to be directed into individual retirement accounts and accrue interest until retirement, at which time the account would be converted into a lifetime annuity. Despite this amendment, ERS continued to struggle under its mounting unfunded pension liabilities. To help rein in these liabilities, on April 4, 2013, through the enactment of Act-3 2013, the Government froze the ERS defined benefit plan as of June 30, 2013 for employees still participating in that plan, i.e. those hired before 2000. Accordingly, as of 2013, no employees were entitled to any further pension accruals—they were either entitled to the pensions they had accrued through that date or, if hired on or after January 1, 2000, entitled to the annuity supported by their System 2000 account. Movants are all in the former category and upon retirement are entitled to receive the defined benefit pensions that they had accrued through 2013.

12.     Unfortunately, these measures remained insufficient to address ERS's fiscal issues; by 2016 its assets had almost entirely depleted.  As a result of the excessive debt faced by Puerto Rico, including approximately $55 billion in pension liabilities, Congress passed PROMESA to provide the Commonwealth and its instrumentalities with a framework to resolve its fiscal crisis.

**B.  Commonwealth and ERS Title III Case**

13.     On May 3, 2017, the Oversight Board filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing a case under Title III thereof. Shortly thereafter, on May 21, 2017, the Oversight Board filed a voluntary petition for relief for ERS and commenced its Title III case.  Upon commencement of a Title III case, Bankruptcy Code section 362(a) provides for a stay of certain actions by non-debtor third parties including, among other things, the enforcement against the debtor "of a judgment obtained before the commencement of the case" and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case." 11 U.S.C. § 362(a).  The application of Bankruptcy Code section 362(a) to the Commonwealth's Title III case was specifically confirmed by this Court pursuant to the *Order Pursuant to PROMESA Section 301(a) and Bankruptcy Code Sections 105(a), 362(a), 365 and 922 Confirming (I) Application of the Automatic Stay to Government Officers, Agents, and Representatives, (II) Stay of Prepetition Lawsuits, and (III) Application of Contract Protections* [ECF No. 543] (the "Title III Stay Order").

**C.  The Enactment of Act 81 and the Government's Agreement Not To Implement Act 81 Absent Oversight Board Approval**

14.     In August 2020, the Government enacted Act 81 and the other Pension Acts, each of which the Oversight Board concluded would add billions of dollars of new pension liabilities to the Commonwealth not provided for by the Fiscal Plan or the certified budget.  Before its enactment, the Oversight Board warned the Government in writing against passage of the Senate

6

bill that would become Act 81, and did the same for the Senate bill that would become Act 80-2020.  *See* Exs. 1 and 2.

15.     Act 81 would amend Act 447 and Act 1, which collectively govern ERS's defined benefit plan, to allow the following categories of public employees who participate in the ERS retirement system (collectively, "Public Emergency Employees") hired before January 1, 2000 to retire at 55, provided they serve for at least 30 years:  (i) members of the Puerto Rico Police Bureau; (ii) members of the Firefighters Corps Bureau; (iii) members of the Custodial Officers Corps; and (iv) Emergency Medical Technicians who are members of either the Medical Emergency Corps Bureau or the Municipal Medical Emergencies System.  As stated by AAFAF, the purpose of the Pension Acts is to provide eligible employees with "greater benefits than those currently in place."[3]

16.     Prior to Act 81, Public Emergency Employees in the ERS pension plan covered by Act 447 were entitled to receive annually an average of approximately 40% of their final salaries in pension compensation, while those covered by Act 1 were entitled to receive an average of approximately 29% of final salaries.  Under Act 81, however, Public Emergency Employees would be entitled to receive 45%-55% of their final salaries, depending on when they entered ERS and their age at retirement.  They would also receive a lifetime employer contribution of $100 per month to their chosen health-insurance plan.  Despite Act 81 modifying existing pension obligations of the Commonwealth, the Oversight Board has not received a request to approve Act 81, as required by PROMESA § 207.

17.     Given the significant financial risks—specifically the unfunded, increased pension obligations created by Act 81 and the other Pension Acts—the Oversight Board engaged

---

[3] *See The Puerto Rico Fiscal Agency And Financial Advisory Authority's Objection To The Inclusion Of Acts 80, 81 And 82 On Exhibit C To The Revised Proposed Order And Judgment Confirming Modified Eighth Amended Title III Joint Plan Of Adjustment Of The Commonwealth Of Puerto Rico, et al.* [ECF No. 19319] at ¶ 10 (describing purpose of Act 80-2020, which is similar in effect to Act 81).

extensively with the Legislature, AAFAF, and the Governor both before and after Act 81 was enacted.  On June 24, 2020, the Oversight Board advised Governor Vázquez Garced, Senate President Rivera Schatz, and House Speaker Núñez that, while the Senate bill "ha[d] the effect of significantly increasing the retirement costs associated with police officer retirement," it provided no means of paying for the increases other than through payroll savings from new cadets replacing retired officers, for which the Fiscal Plan was already requiring to pay for pre-Act 81 benefits. *See* Ex. 2 at 1.  Further, the Oversight Board warned the Senate bill's "reinstatement of a defined benefit pension accrual could undo the work of Act 71-2019," which made police officers eligible for social security, and thus "potentially disqualify police officers from Social Security participation" in contravention of the Fiscal Plan. *Id.* at 2.

18.     Accordingly, the Oversight Board advised the government parties the Senate bill, if enacted, would be "significantly inconsistent" with the Fiscal Plan and would "impair or defeat" the purposes of PROMESA, including the Oversight Board's exclusive right to determine the treatment of pension claims in a plan of adjustment. *Id.*  The Oversight Board therefore requested additional information pursuant to PROMESA § 104(c) to analyze whether, for example, "the cost of the enhanced benefits payable over the lifetime of the pensioners would be fully paid for by any savings generated by hiring new cadets sooner than anticipated" in the Fiscal Plan. *Id.*

19.     The Government never followed up with the Oversight Board concerning Act 81. Instead, ignoring the Oversight Board's clear warnings, Governor Vázquez Garced signed Act 81 and the other Pension Acts into law on August 3, 2020.

20.     Having signed the Pension Acts into law on that date, Governor Vázquez Garced was required under PROMESA § 204(a)(1) and (a)(2) to submit to the Oversight Board by August 12, 2020 a certificate including a "formal estimate" of each act's impact on expenditures and

revenues and a "certification" of whether each act was or was not "significantly inconsistent with the Fiscal Plan for the fiscal year." No such estimate or certification was timely submitted.

21.     On August 18, 2020, the Oversight Board sent a letter to AAFAF inquiring about the missing formal estimates and certifications for the Pension Acts. *See* Ex. 3 at 1. The Oversight Board noted that it had expressed "grave concerns" about Acts 80 and 81 months earlier and requested further information, but the Government had ignored its requests. *Id.* Given the Government's failure to comply with PROMESA §§ 104(c) and 204(a), the Oversight Board advised AAFAF of its determination under PROMESA § 108(a)(2) the Pension Acts impaired or defeated the purposes of PROMESA and directed the Governor not to enforce the Pension Acts "unless the Oversight Board has determined the [Pension] Acts do not violate PROMESA sections 108(a), 204, and 207." *Id.* at 2.

22.     On August 19, 2020, Governor Vázquez Garced and AAFAF submitted to the Oversight Board certifications for the Pension Acts. Exs. 4-6. They also submitted actuarial reports from a third party, Integrum LLC ("Integrum"), upon which the certifications for Acts 80 and 81 were based and which purported to "assess the impact" of those Pension Acts based on provisions of the Senate bills that preceded their enactment.

23.     The Governor's certification for each Pension Act stated that the law was "not significantly inconsistent with the 2020 Fiscal Plan." *See* Exs. 4-6. For Act 81, the certification estimated a "budgetary neutral" implementation "by limiting the hiring of new recruits" but stated that, if necessary, a request for reprogramming would be made to the Oversight Board. *See* Ex. 5 at 2. Notwithstanding the certifications, in a separate letter sent on the same day, AAFAF informed the Oversight Board "that, for the moment, the Government will not accept applications from public employees under the . . . [Pension] Acts." *See* Ex. 7 at 1.

24.     On August 28, 2020, the Oversight Board notified Governor Vázquez Garced, Senate President Rivera Schatz, and House Speaker Núñez that the certifications and estimates for the Pension Acts were untimely under PROMESA § 204(a)(1) and deficient under PROMESA § 204(a)(2)(A).  *See* Ex. 8 at 1.  The Oversight Board explained the formal estimates for Acts 80 and 81 were impermissibly based on the Senate bills that were later "amended during the legislative process prior to enactment of the acts," rather than "the laws themselves."  *Id.* at 1–2. The Oversight Board thus advised that the required "formal estimates" were missing for each act pursuant to PROMESA § 204(a)(3)(A) and directed the Governor, pursuant to PROMESA § 204(a)(4)(A), to provide the missing formal estimates by September 1, 2020.  *Id.* at 2.

25.     Based on its own analysis of the information available at the time that the Pension Acts would likely cost more than $3 billion over a 30-year period, and because the Government's estimates were patently deficient, the Oversight Board concluded the Pension Acts were significantly inconsistent with the Fiscal Plan.  *Id.* at 2.  The Oversight Board further determined implementation of the Pension Acts would impair or defeat PROMESA's purposes because "the implementation of laws with wide-ranging impacts on the Commonwealth's pension system without a full understanding the financial implications of such measures is the antithesis of financial responsibility."  *Id.* at 4.

26.     With respect to Act 81, the Oversight Board advised the Government's estimated cost savings could be achieved only by significant and permanent reductions in headcount of at least 1,835 positions above and beyond those required by the Fiscal Plan.  *See* Ex. 9 at 3.  The Oversight Board noted such reductions seemed "highly improbable and impossible to achieve without negatively impacting the Government's ability to provide essential services."  *Id*.  The Oversight Board, however, offered to discuss with the Government ways of implementing the

10

Pension Acts in a manner consistent with the Fiscal Plan and compliant with PROMESA. *Id.* at

5. To do so, it invited AAFAF to "present a substantive program" by which the Pension Acts

(i) "would not impose net costs incremental to the Fiscal Plan" and (ii) "would be implemented in

a fiscally responsible manner that ensures adequate essential services." *Id.* at 3, 4.

27.     On October 27, 2020—nearly three months after a valid certification was due—

AAFAF provided the Oversight Board with a "Supplemental Certification" for Act 81, including

an updated actuarial report. Ex. 10. As before, however, the certification assumed a "budgetary

neutral" implementation by "limiting the hiring of new recruits," and it again stated that a

reprogramming request would be made if necessary. *Id.* at 2. Nothing in Act 81 limited hiring

new recruits, and the supplemental certification contained no concrete commitment or plan to

change hiring practices over the next 30 or 40 years.

28.     By letter dated November 9, 2020, the Oversight Board indicated AAFAF had not

responded to its "direction to cease implementation of the [Pension] Acts" or its "request for

specific information and a program for achieving the savings necessary to make the [Pension] Acts

revenue neutral." *See* Ex. 11 at 1. The Oversight Board also included detailed analyses of each

of the Pension Acts and support for its findings that retirements under the Pension Acts create costs

not anticipated in the Fiscal Plan. *Id.* at 2–4.

29.     The Oversight Board reiterated "the [Pension] Acts must not be implemented until

their true costs and means of paying for them are known and approved," and requested specific

information and commitments regarding each of the [Pension] Acts. *Id.* at 4–5. The Oversight

Board also directed the Government to notify all employees through a public statement that "the

benefits provided under the [Pension] Acts are conditional and may never accrue." *Id.* at 5.

30.     On November 19, 2020, the Oversight Board met with its advisers to (*i*) review the effects of the Pension Acts, including their costs; (*ii*) discuss the status of the Oversight Board's discussions with the Government; and (*iii*) determine a path forward.

31.     During the meeting, the Oversight Board concluded as follows:

a.      the Government had not provided sufficient support for its certification that each of the Pension Acts was not significantly inconsistent with the Fiscal Plan;

b.      the Oversight Board had engaged in comprehensive and robust discussions with the Government to understand the fiscal impact of each of the Pension Acts and to rectify the deficiencies in the Government's data, analysis, and conclusions;

c.      each of the Pension Acts would result in significant additional costs—potentially totaling hundreds of millions of dollars per year beyond the costs set forth in the Fiscal Plan;

d.      the Government had failed not only to account for these incremental costs but to provide a method for covering them; and

e.      the Government was repeating past mistakes of promising increased defined-pension benefits with no plan or funds to pay for them.

32.     Based on these conclusions and following its extensive engagement with the Government, the Oversight Board confirmed its determination under PROMESA § 108(a)(2) that each of the Pension Acts impairs or defeats the purposes of PROMESA.  The Oversight Board also determined the Government failed to comply with § 204(a) of PROMESA by, among other things, failing to provide timely, complete, and accurate formal estimates of the impact of each law on expenditures and revenues.  The Oversight Board further determined the Government violated § 204(c) of PROMESA because Act 81 creates a revenue deficiency in the budget that the Government would likely need to remedy through reprogramming that has neither been requested nor authorized.  Finally, the Oversight Board determined the Government violated § 207 of PROMESA because each of the Pension Acts modifies existing Commonwealth debt by un-

freezing pension plans to provide billions of dollars in new pension benefits and significantly increasing the Commonwealth's pension obligations, all without the Oversight Board's approval.

33.     As a result, the Oversight Board decided it would vote, at its public meeting the following day, to commence litigation against the Government to prevent implementation of and to nullify the Pension Acts.  Later that same day, the Oversight Board provided AAFAF an advance copy of the presentation materials it intended to use at its public meeting.  Ex. 12.[4]

34.     AAFAF sent a letter[5] to the Oversight Board early the following morning in response to the Oversight Board's November 9 and 16 letters.  Ex. 13.  AAFAF (i) complained about the Oversight Board's information requests concerning the Pension Acts; (ii) contended that it needed more time to collect information and respond to the requests; and (iii) stated that, by November 25, 2020, it would "provide an update and an appropriate timeframe to respond."  *Id.* at 2.  As such, AAFAF gave every indication it intended to proceed with implementing the Pension Acts and it would provide at a later to-be-determined date the information and answers the Oversight Board had requested.  *Id.*

35.     Later that same morning, however, AAFAF reversed its position.  After reviewing the Oversight Board's presentation for the public meeting (scheduled for later that morning), AAFAF's Executive Director called the Oversight Board's Executive Director and offered not to implement the Pension Acts—thereby avoiding litigation—until the Oversight Board agreed they could be implemented in a fiscally sound manner consistent with PROMESA.  AAFAF followed up with a letter stating the Pension Acts would not be implemented "until an agreement is reached with the Oversight Board."  Ex. 14 at 1.

---

[4]  The Oversight Board's analysis of the Pension Acts may be found at pages 28-41.

[5]  Despite being dated November 18, 2020, the Oversight Board did not receive the letter until November 20.

36.     Thereafter, during the public meeting, the Oversight Board's Executive Director reviewed the impact of each of the Pension Acts on the Commonwealth's finances.  AAFAF's Executive Director, in turn, publicly agreed the Government would not implement the Pension Acts without an agreement with the Oversight Board.  Based on AAFAF's express agreement— in writing and at the public meeting—not to implement the Pension Acts absent an agreement with the Oversight Board, the Oversight Board deferred a decision on commencing litigation to prevent implementation of and to nullify each of the Pension Acts.

37.     Thereafter, on November 23, 2020, the Oversight Board sent a follow-up letter to AAFAF to confirm "the agreement we reached during the Oversight Board's public meeting on November 20, 2020."  *See* Ex. 15 at 1.  The Oversight Board also assented to AAFAF providing updated information about each of the Pension Acts by November 25, as it had promised in its letter.  *Id.*  Despite its assurances, AAFAF did not provide any such additional information.

38.     On December 15, 2020, AAFAF notified the Oversight Board that ERS had amended Circular Letter 2020-01 regarding implementation of Act 80.  *See* Ex. 16 at 1.  According to AAFAF, the changes "in no way represented a modification to the Government's agreement to not implement phase three until an agreement is reached with the Oversight Board."  *Id.*

39.     By letter dated December 22, 2020, the Oversight Board expressed concern that AAFAF had expressly agreed not to implement Act 80 but "fail[ed] to state that Act 81 and 82 will not be implemented until an agreement is reached with the Oversight Board."  Ex. 17 at 1. Seeing "no path to avoid incremental pension costs," the Oversight Board thus requested Acts 81 and 82 "be repealed or amended to provide for revenue-neutrality" and demanded that, by December 28, 2020, the Government "clearly communicate to the public that, like Act 80, Acts 81 and 82 will not be implemented until an agreement is reached with the Oversight Board."  *Id*. at 2.

14

40.     AAFAF failed to communicate to the public by December 28, 2020 that Acts 81 and 82 would not be implemented absent an agreement with the Oversight Board.  Nevertheless, on January 15, 2021, AAFAF confirmed to the Oversight Board "the Government will not implement Act 81-2020 until it reaches an agreement with the Oversight Board." See Ex. 18 at 1. While the parties have since continued to discuss the Pension Acts, the Government has failed to propose any method to implement Act 81 in whole or in part.

**D.  Commonwealth and ERS Plan of Adjustment**

41.     The Oversight Board certified a fiscal plan for the Commonwealth on April 23, 2021.  *See* Ex. 19 (the "Fiscal Plan").[6]  As with prior fiscal plans, the Fiscal Plan included several pension reform initiatives expected to result in significant savings.  "To avoid creating future pension liabilities and to adequately fund the pensions [of] future retirees," the Fiscal Plan provides "the JRS and remaining TRS benefit accruals must be frozen." Fiscal Plan at 274.  The Fiscal Plan also called for a pension-benefit reduction for all accrued pensions of up to 8.5%, subject to a $1,500 per month threshold.  *Id.* at 275-76.  The Fiscal Plan does not contemplate any increase in benefits for any active ERS participants.

42.     On July 31, 2021, the Oversight Board filed the seventh amended plan of adjustment for the Commonwealth, ERS, and PBA (the "Seventh Amended Plan") to resolve a multitude of disputes surrounding the Debtors' funded debt and other liabilities, including over $55 billion of unfunded pension liabilities, thus ending the uncertainty surrounding such claims, greatly reducing the Commonwealth's funded indebtedness, and moving significantly closer to restoring fiscal responsibility to the Island for the benefit of all its residents.  Consistent with the Fiscal Plan, the Seventh Amended Plan proposed, among other things, to (i) reduce all accrued

---

[6] "Fiscal Plan" shall also mean, for all dates between May 27, 2020 and April 23, 2021, the Commonwealth fiscal plan certified by the Oversight Board on May 27, 2020.

pensions in the three Commonwealth pension systems by up to 8.5%, subject to a $1,500 per month

floor (the "Monthly Benefit Modification"), and (ii) freeze the accrual of further defined benefits

for the two pension systems not yet frozen (the "Pension Freeze").

43.     In advance of the hearing to consider confirmation of the Plan, and following

extensive negotiations with the Government regarding the treatment of pensions thereunder, the

Seventh Amended Plan was amended.  Accordingly, the Plan currently *sub judice* (i) provides for

payment in full of accrued pension benefits by removing the Monthly Benefit Modification, but

(ii) maintains the Pension Freeze as integral to the Commonwealth's restructuring.  *See

Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title

III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* [ECF No. 19058], ¶ 7.

44.     Additionally, the Plan includes as Exhibit K a list of statutes the Oversight Board

has concluded are inconsistent with PROMESA, rendering them preempted by PROMESA.  Act

81 and the other Pension Acts are among the preempted statutes, as they are wholly inconsistent

with PROMESA by ignoring PROMESA §§ 201, 202, 207, and Title III.  They effectively

unfreeze ERS and collectively add several billion dollars of unfunded pension liabilities.  *See* Nov.

17, 2021 Hr'g. TR 93:24-94:3.  Further, the proposed order confirming the Plan [ECF No. 19368]

(the "Proposed Confirmation Order") contains a similar list of preempted statutes at Exhibit C

thereto and contains language forbidding the Government from unilaterally increasing pensions

post-effective date of the Plan, including under existing laws.  The Oversight Board determined

enjoining these efforts for a period of ten years under the terms of paragraph 62 of the Proposed

Confirmation Order is essential to the success of the Plan and the Oversight Board's mission of

returning the Commonwealth to fiscal responsibility.

45.     On November 23, 2021, the day the confirmation hearing concluded, Movants filed the Motion seeking to lift the automatic stay to proceed with the Lawsuit against the Oversight Board to enforce the provisions of the challenged law and increase pensions despite the Plan and Proposed Confirmation Order currently under Court consideration.

46.     For the reasons set forth herein, the Oversight Board submits Movants' Motion should be denied because (i) Act 81 is not enforceable because it is preempted and conflicts with the Plan, impairs the Fiscal Plan, and violates PROMESA, and therefore (ii) the *Sonnax*[7] factors weigh heavily against modifying the automatic stay to allow enforcement of Act 81.

## OBJECTION

47.     Upon commencement of a Title III case, Bankruptcy Code section 362(a), made applicable by section 301(a) of PROMESA, provides for an automatic stay of certain actions by non-debtor third parties including, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The application of Bankruptcy Code section 362(a) to the Commonwealth's Title III case was specifically confirmed by this Court pursuant to the Title III Stay Order.

48.     "The automatic stay is among the most basic of debtor protections under bankruptcy law." *Soares v. Brockton Credit Union (In re Soares)* 107 F.3d 969, 975 (1st Cir. 1997) (citing *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl. Protection*, 474 U.S. 494, 503 (1986). The stay "is extremely broad in scope and, 'aside from the limited exceptions of subsection (b), applies to almost any type of formal or informal action taken against the debtor or the property of the estate.'" *Montalvo v. Autoridad de Acueductos y Alcantarillados (In re Montalvo)*, 537 B.R. 128, 140 (Bankr. D.P.R. 2015) (citation omitted). The broad scope of the automatic stay serves

---

[7]  *Sonnax Indus., Inc. v. TriComponent Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990).

one of the cardinal purposes of bankruptcy and provides the debtor with a "breathing spell" essential to (a) the preservation of the debtor's property for the collective benefit of the creditors and (b) the debtor's ability to administer its case and engage in restructuring efforts without undue distraction or interference. *See Unisys Corp. v. Dataware Prods., Inc.*, 848 F.2d 311, 313 (1st Cir. 1988) ("[T]he automatic stay gives the debtor a 'breathing spell from his creditors' and forestalls a 'race of diligence by creditors for the debtor's assets.'") (citation omitted); *In re Jefferson Cnty.*, 491 B.R. 277, 285 (Bankr. N.D. Ala. 2013) (explaining that a key purpose of municipal bankruptcy is "the breathing spell provided by the automatic stay" and stating "[i]f the automatic stay is to be lifted routinely to allow claimants to assert their claims in state court, a municipality will not have the time, opportunity or ability to confirm a plan") (citation omitted); *Mass. Dep't of Revenue v. Crocker (In re Crocker)*, 362 B.R. 49, 56 (B.A.P. 1st Cir. 2007) ("[O]ne of the fundamental purposes of the automatic stay is to give the debtor 'a breathing spell from his creditors' and 'to be relieved of the financial pressures that drove him into bankruptcy.'") (quoting H.R. Rep. No. 95-595 at 340 (1977)).

49.    An order lifting the automatic stay is an "extraordinary remedy." *In re 234-6 West 22nd St. Corp.*, 214 B.R. 751, 757 (Bankr. S.D.N.Y. 1997). Bankruptcy Code section 362(d)(1) provides a court may grant relief from the automatic stay "for cause." *See* 11 U.S.C. § 362(d)(1). "Cause" is not defined in the Bankruptcy Code. *Goya Foods v. Unanue-Casal (In re Unanue-Casal)*, 159 B.R. 90, 95–96 (D.P.R. 1993), *aff'd without opinion sub nom. Unanue v. Unanue-Casal (In re Unanue-Casal)*, 23 F.3d 395 (1st Cir. 1994). Consistent with the First Circuit's ruling in *In re Fin. Oversight & Mgmt. Bd. for P.R. v. Ad Hoc Grp. Of PREPA Bondholders (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 899 F.3d 13, 23 (1st  Cir. 2018), to determine whether "cause" exists to grant relief from the stay, courts usually examine numerous factors, including those set

forth in *Sonnax Indus., Inc. v. Tri Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir. 1990).

50.    Here, the Oversight Board submits the Motion should be denied before ever getting to the *Sonnax* factors because Movants seek stay relief to enforce a statute violating PROMESA in all the ways explained above.  Movants seek to procure treatment for their pension claims in excess of the treatment provided them under the Plan and Proposed Confirmation Order, but they are barred from such relief procedurally and substantively.  Movants failed to object to confirmation or appear before the Court during any portion of the confirmation hearing to contest the treatment of their claims under the Plan.  Movants' Motion fails on its face because Movants already forfeited their rights to object to the Plan and cannot simply sue to obtain a better treatment than the Plan provides.  This is particularly true here, where Movants attempt to sue to enforce a law providing for more than payment in full of their prepetition pension claims.  That is yet another reason Act 81 impairs and defeats the purposes of PROMESA.  In any case, the Motion should be denied as Movants cannot demonstrate cause exists to lift the automatic stay.

**I.    Act 81 Contravenes PROMESA, the Plan, and the Fiscal Plan, and Is Thus Not Enforceable.**

51.    The Plan provides for treatment of all claims against the Commonwealth, including accrued pension claims.  ERS participants, including Movants, receive highly favorable treatment compared to all other creditors; they receive payment in full for all pension obligations accrued through the date ERS was frozen in 2013.  Act 81 provides ERS participants more than payment in full, which is discriminatory when other creditors are suffering losses under the Plan.  The Plan does not include payment on account of alleged additional benefits provided under Act 81 or the other Pension Acts.  All three Pension Acts appear among the list of preempted statutes attached as Exhibit K to the Plan and Exhibit C to the Proposed Confirmation Order and as described above

19

their implementation would be detrimental to the Commonwealth and impair the purposes of PROMESA.

52.     The Oversight Board recognizes that from Movants' perspective, they are simply asking to enforce a law the Government purported to enact.  This is exactly why the Oversight Board implored the Government to fully disclose the problems with the Pension Acts so that employees would not form unrealistic expectations.   In any event, Movants seek to enforce additional pension obligations not contemplated by the Plan and which the Government is prohibited from implementing under the Plan.  *See* Plan [ECF No. 19365] § 83.4 ("the Government . . . shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source."); *see also* Proposed Confirmation Order ¶ 62 (same).  Movants request Court authority to litigate their rights to pension obligations, which rights will be determined as part of the Plan and Proposed Confirmation Order.   Pursuant to Bankruptcy Code § 944, made applicable by PROMESA § 301, should the Court enter the Proposed Confirmation Order, the Debtors will be discharged from such obligations and the Motion and Lawsuit will be moot.  Moreover, Movants will be required to dismiss the Lawsuit with prejudice.  *See* Proposed Confirmation Order ¶ 3(B).  Because enforcement of Act 81 would also violate the Plan and Proposed Confirmation Order, the Motion should be denied.

53.     In addition to violating the Plan, Act 81 is significantly inconsistent with the Fiscal Plan and risks creating up to $2.5 billion in incremental costs not provided for thereunder.  *See* Ex. 12 at 32.  As described in detail above, Act 81 effectively unfreezes ERS for certain Public Emergency Employees and increases their defined benefit pensions in contravention of the pension

treatment under the Fiscal Plan. These increases repeat the Government's history of over-promising benefits to public employees. These mistakes are among the reasons the Oversight Board was appointed and are among the issues addressed in the Plan and Fiscal Plan.

54.     More importantly, the Government's proposal to pay for Act 81 by reducing hiring is also directly contrary to the Fiscal Plan. The Fiscal Plan makes plain the Commonwealth must hire *more* officers and transition officers from administrative roles into field positions to "ensure [the Commonwealth] can move more sworn officers onto the streets to improve public safety on the Island." Ex. 19 at 219. The Fiscal Plan further notes the Puerto Rico Police Bureau is suffering from "a combination of high historic attrition rates . . . and a push for headcount reductions through Voluntary Transition Programs (VTP) has led to a shortage of field officers." *Id.* at 217. Despite recruiting more than 250 cadets to fill these shortages, the Police Bureau continues to struggle "to enable more cadets and sworn officers to move into field roles." *Id.* Act 81 would only exacerbate these problems. By creating billions of dollars of liabilities to be paid through extensive additional headcount reductions at the expense of public safety, Act 81 is significantly inconsistent with the Fiscal Plan. Accordingly, Act 81 violates PROMESA §§ 204(a), 204(c), 207, and 108(a)(2) by imposing billions of dollars in new liabilities outside the Fiscal Plan by modifying existing pension obligations (*i.e.*, debt) without identifying an adequate method of paying for them or obtaining prior Oversight Board approval.

55.     PROMESA § 204(a)(1) requires the Governor to submit to the Oversight Board new legislation within seven business days of its enactment, and § 204(a)(2) requires the Governor to include with the submission a "formal estimate" of the law's impact on the Commonwealth's expenditures and revenues and a "certification" of whether the law is or is not "significantly inconsistent" with the certified fiscal plan.

56.     Former Governor Vázquez Garced initially failed to provide the requisite formal estimate of Act 81's impact on expenditures and revenues required by PROMESA § 204(a)(2). Indeed, the estimate was based on a prior draft of the Senate bill and focused only on police personnel rather than the complete range of safety professionals covered by the law.  Because Governor Vázquez Garced relied on that data in certifying Act 81 as not significantly inconsistent with the Fiscal Plan, the certification was deficient under PROMESA § 204(a)(2).

57.     Pursuant to PROMESA § 204(a)(3)(A), the Oversight Board notified Governor Vázquez Garced of these deficiencies and, pursuant to PROMESA § 204(a)(4)(A), directed her to provide the missing formal estimate.  In addition, because the estimate was patently deficient and because the law would increase costs to the Commonwealth, the Oversight Board advised that Act 81 was significantly inconsistent with the Fiscal Plan.

58.     Over ten weeks after the submission deadline, AAFAF provided a "supplemental certification" estimating—based on an updated actuarial analysis from Integrum—Act 81 would incur $852 million in pension costs not provided for by the Fiscal Plans over a thirty-to-forty-year period.  Ex. 10 at 1.  Despite this finding, the supplemental certification again certified Act 81 as being not "significantly inconsistent" with the Fiscal Plan because the Government indicated it would "limit[] the hiring of new recruits or . . . hir[e] at lower rates and, therefore, limit[] new payroll expenditures for about $852 million during a period of 30-40 years."  *Id.* at 2.  Act 81 contained no provisions to so limit new recruits or otherwise reduce hiring.

59.     Based on the Government's data and the Oversight Board's analysis, Act 81 will cost more than it purports to save, and the Commonwealth will have to resort to reprogramming funds allocated for other purposes to cover the costs, but the Government has not requested any such reprogramming, nor has it been authorized by the Oversight Board as required under

PROMESA § 204(c).  Moreover, the Oversight Board has received no request to approve Act 81 pursuant to PROMESA § 207, even though the law modifies the Commonwealth's existing pension obligations by unfreezing ERS for certain participants and providing them with additional unfunded benefits.  The Oversight Board repeatedly advised the Government of its determinations that the Acts would impair or defeat PROMESA's purposes and clearly directed them not to enact or implement the laws.

60.     The Government agreed in November 2020 not to implement the Pension Acts unless and until the Oversight Board consented.  After over a year of correspondence and cooperation with the Government to determine the true fiscal impact of the Pension Acts and to seek a fiscally responsible path for implementation, the Oversight Board reaffirmed its prior determination that the Pension Acts impair and defeat PROMESA's purpose of achieving fiscal responsibility by (*i*) increasing the Commonwealth's pension obligations without ensuring corresponding savings, and (*ii*) reversing the freeze of the ERS pension system that occurred prior to the Commonwealth's Title III case.  *See* Ex. 20 at 2.  PROMESA § 108(a)(2) statutorily bars the Government from enacting or implementing the Pension Acts once the Oversight Board advised the Government they impaired or defeated the purposes of PROMESA.  Accordingly, Act 81 is unenforceable and the Motion premised on it should be denied.

## II.     Failure to Pay a Disputed, Unsecured Debt Is Not a Taking For Which Just Compensation Could Be Due.

61.     Movants allege Act 81 created a property right in Act 81's increased pension benefits which allegedly vested upon Movants' retirement and which cannot be taken by the government without "just compensation" under Article V of the Constitution.  Motion ¶¶ 24-26.  But, even if Act 81 is not preempted by PROMESA and is not found inconsistent with the Fiscal

Plan, any payments not made thereunder since Movants' retirement are no more than a disputed unsecured debt, not a taking.

62.     A pensioner's interest in a public pension benefit plan is a contract right.  While contract rights are property, failure to pay unsecured contractual obligations does not give rise to entitlements to just compensation constituting payment in full.  If a government's failure to pay did constitute a taking, no unsecured debt could be restructured for less than payment in full.

63.     The existence of property rights is determined by the Title III court pursuant to Puerto Rico law, except to the extent local law is overridden by federal policy.  *See Butner v. United States*, 440 U.S. 48, 54-55 (1979).  Puerto Rico case law indicates retirement benefits are considered contractual rights, and therefore are only subject to a Contracts Clause analysis, and not a "takings analysis," as Movants contend.  *See Bayrón Toro v. Serra*, 19 P.R. Offic. Trans. 646 (P.R. 1987).  In *Bayrón Toro*, the Puerto Rico Supreme Court analyzed the status of employee pension benefits and upheld the modification of promised pension benefits as a reasonable effort toward furthering the actuarial solvency of the pension system, while finding pensioners had a "property interest of a *contractual nature* protected by the constitutional guarantee against *impairment of contractual obligations*."  *Id*. at 649, 663 (emphasis added).  In ruling that pension benefits are not state gratuities, the Puerto Rico Supreme Court stated "that Government pension plans are obligations in the nature of contracts."  *Id*. at 663.  Puerto Rico case law makes clear that no "taking" can occur because pensioners' interests in their pension benefits are contractual. Recent case law has reaffirmed this principle, analyzing potential pension modifications under a Contract Clause analysis. *Asoc. de Maestros v. Sistema de Retiro para Maestros*, 190 D.P.R. 854 (2014); *Trinidad Hernández v. E.L.A.*, 188 D.P.R. 828 (2013) (certified English Translation at No. 18-00091, ECF No. 23-7).  The bottom line is Movants have contract rights that are property, but

24

in Title III, such contract rights can be impaired.  Movants' prepetition contract rights are being

paid in full.  They do not, however, have takings claims arising from the Commonwealth's

enactment of Act 81 violating multiple provisions of PROMESA.

64.     Recent chapter 9 cases demonstrate similarly that a city's contractual pension

obligations can be impaired under a plan of adjustment.  *See In re City of Stockton, California*, 526

B.R. 35, 39 (Bankr. E.D. Cal. 2015) (authorizing the rejection of the pension servicing contract of

CalPERS because "the California statute forbidding rejection of a contract with CalPERS in a

chapter 9 case is constitutionally infirm in the face of the exclusive power of Congress to enact

uniform laws on the subject of bankruptcy under Article 1, Section 8 of the U.S. Constitution – the

essence of which laws is the impairment of contracts – and of the Supremacy Clause.").  Similarly,

in Detroit's chapter 9 case, the bankruptcy court held Detroit's pension obligations owed to both

active employees and retirees, contractual interests under Michigan's Constitution, are subject to

impairment in a federal bankruptcy case.  *See In re City of Detroit*, 504 B.R. 97, 154 (Bankr. E.D.

Mich. 2015).  Here too, the Commonwealth has the ability to impair public pension benefits due

to their contractual nature without constituting any form of a "taking."  As it turns out, the

prepetition pension claims are being paid in full.  Only the Act 81 claims are being impaired

because Act 81 violates PROMESA in the first place and the prepetition claims will be treated in

accordance with a confirmed plan of adjustment, not in accordance with preempted local law.

**III.   Because Act 81 Does Not Legally Increase Movants' Pension Rights Above Those Provided In The Plan, And No Property Is Being Taken, Movants Fail To Establish Cause Under *Sonnax*.**

65.     Because Movants want leave to enforce Act 81 which violates PROMESA for all

the reasons set forth above, the Motion should be denied because Movants fail to establish, or even

plead, "cause" exists to modify the automatic stay, and cause cannot exist to do something to

enforce a law violating PROMESA.  Logically, the *Sonnax* factors corroborate the absence of cause.

66.    The *Sonnax* factors are as follows:

(1)    whether relief would result in complete or partial resolution of the issues;

(2)    the lack of any connection with or interference with the bankruptcy case;

(3)    whether the foreign proceeding involves the debtor as fiduciary;

(4)    whether a specialized tribunal has been established to hear the cause of action at issue;

(5)    whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;

(6)    whether the action essentially involves third parties rather than the debtor;

(7)    whether the litigation could prejudice the interest of other creditors;

(8)    whether a judgment in the foreign action is subject to equitable subordination;

(9)    whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor;

(10)    the interest of judicial economy and the expeditious and economical determination of litigation for the parties;

(11)    whether the foreign proceedings have progressed to the point where the parties are prepared for trial; and

(12)    the impact of the stay on the parties and the "balance of harm."

*In re Sonnax Indus.,* 907 F.2d at 1286.

67.    Courts in this Circuit have adopted the *Sonnax* standard for stay relief.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 899 F.3d at 23 ("We agree with the parties that the factors identified by the Second Circuit in *Sonnax* and recited by the Title III court provide a helpful framework for considering whether the Title III court should permit litigation to proceed in a different forum."); *Brigade Leveraged Cap. Structures Fund Ltd. v. Garcia-Padilla*, 217 F. Supp. 3d 508, 518 (D.P.R. 2016) ("To help guide their analysis of whether to enforce or vacate the stay, some courts, including those in this district, have relied upon a laundry list of assorted factors.") (citing *Sonnax*, 907 F.2d at 1286).

26

68.     No one factor is dispositive; instead, courts "engage in an equitable, case-by-case balancing of the various harms at stake" and will lift the stay only if the harm engendered by allowing the stay to remain in place outstrips the harm caused by lifting it.  *Brigade*, 217 F. Supp. 3d at 518.  Movants bear the burden of establishing cause, *id.*, and when the movant is not a secured claimholder asserting a lack of adequate protection, that burden is a high one.  *See In re Breitburn Energy Partners LP*, 571 B.R. 59, 65 (Bankr. S.D.N.Y. 2017).  Here, the *Sonnax* factors squarely support maintaining the automatic stay.

69.     ***Sonnax* Factor 1:**  The first *Sonnax* factor, "whether relief will result in a partial or complete resolution of the issues," weighs against lifting the automatic stay.  The first *Sonnax* factor does not focus on the issues in the stayed litigation.  If it did, the first *Sonnax* factor would always favor lifting the stay because every lawsuit eventually resolves the issues in that particular proceeding.  Instead, the first *Sonnax* factor primarily focuses on whether the separate litigation would expeditiously resolve issues relevant to the bankruptcy case.  *See, e.g., Murrin v. Hanson (In re Murrin)*, 477 B.R. 99, 109 (D. Minn. 2012) ("In making the determination of whether to grant relief from the stay, the court must balance the potential prejudice to the debtor, to the bankruptcy estate, and to the other creditors against the hardship to the moving party if it is not allowed to proceed in state court.") (citation omitted); *In re WorldCom, Inc.*, No. 05 Civ. 5704 2006 WL 2255071, at *8-9 (S.D.N.Y. Aug. 4, 2006) (affirming bankruptcy court's application of *Sonnax* Factor 1 in debtor's favor because any funds sought by plaintiff were property of the estate subject to the jurisdiction of the bankruptcy court and disposition under a chapter 11 plan); *In re Cummings*, 221 B.R. 814, 818 (Bankr. N.D. Ala. 1998) (characterizing this factor as whether the non-bankruptcy proceeding would result in "the resolution of preliminary bankruptcy issues").

70.     Here, the Movants are seeking increased benefits under a law that has not yet been implemented and which is inconsistent with PROMESA, the Plan, and the Fiscal Plan; therefore this issue would not be resolved by lifting the automatic stay and letting the Lawsuit proceed because their rights under Act 81 would not be resolved as a result.  The Proposed Confirmation Order, if entered, would preclude implementation of the subject law.

71.     Even if this relief were not granted as part of the Proposed Confirmation Order, the implementation of Act 81 is barred under PROMESA §§ 108(a)(2), 204(a), 204(c), and 207, as described in detail above.  As a result, the Oversight Board is prepared to commence an adversary proceeding to nullify Act 81 and the other Pension Acts, and bar the implementation. Either way, Movants' rights will be resolved in this Court, not through the Lawsuit.

72.     Moreover, even if Act 81 were implemented, and the Proposed Confirmation Order not entered, Act 81 is preempted by both PROMESA §§ 312(a)[8] and 313[9] which grant the Oversight Board the sole right to propose and to modify a plan of adjustment.  The Plan provides for the treatment of accrued pension obligations to retirees and active employees, and dictates the amount each retiree receives.  Act 81 changes the amounts provided for under the Plan and provides greater benefits in contravention of the Plan and in violation of PROMESA.  *Supra* ¶¶ 14-17.  Granting relief from the automatic stay would neither partially nor completely resolve this issue.  Therefore, the first *Sonnax* factor weighs heavily in favor of denying the Motion.

73.     ***Sonnax* Factor 2**:  The second *Sonnax* factor—the lack of any connection with or interference with the bankruptcy case—does not support lifting or modifying the stay, but rather

---

[8]  PROMESA § 312(a) provides "[o]nly the Oversight Board, after the issuance of a certificate pursuant to section 104(j) of this Act, may file a plan of adjustment of the debts of the debtor."

[9]  PROMESA § 313 provides "[t]he Oversight Board, after the issuance of a certification pursuant to section 104(j) of this Act, may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of this title.  After the Oversight Board files a modification, the plan as modified becomes the plan."

weighs heavily against it.  First, lifting or modifying the automatic stay to allow Movants to enforce Act 81 against the Commonwealth would severely interfere with the successful adjustment of the Commonwealth's liabilities in its Title III case.  Movants seek a determination they are entitled to increased pension benefits beyond what they were entitled to when the Commonwealth, rightly, enacted legislation to freeze ERS, pursuant to a law that the Government has not implemented. Allowing Movants to pursue such a determination before a decision regarding the Proposed Confirmation Order and in clear contravention of the Plan and Fiscal Plan would undermine the centralized debt restructuring provided under Title III and upend the "strong bankruptcy code policy that favors centralized and efficient administration of all claims in the bankruptcy court . . . ."  *See Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.)*, 980 F.2d 110, 117 (2d Cir. 1992) (citations omitted); *see also In re BFW Liquidation, LLC*, No. 09-00634-BGC-11, 2009 WL 8003536, at *3 (Bankr. N.D. Ala. Sept. 14, 2009).

74.    Lifting the automatic stay would also interfere with these Title III cases by encouraging other claimants under Act 81 and the other Pension Acts—each of which the Oversight Board has declared contrary to PROMESA, the Plan, and the Fiscal Plan—to seek similar relief and risk subjecting the Debtors to unnecessary litigation, which might otherwise be addressed upon entry of the Proposed Confirmation Order.  Even if the Court were to decline to enjoin the Pension Acts under the Plan, the Oversight Board will seek such relief  in an alternative action against the Government under PROMESA §§ 108, 204, and 207.  Movants' asserted rights to increased pension benefits will therefore be addressed, one way or another, in proceedings that are or will be properly before this Court.  The Debtors should not be required to defend themselves in piecemeal litigation to enforce laws subject to serious challenges.  *In re Gatke Corp.,* 117 B.R. 406, 410 (Bankr. N.D. Ind. 1989) (denying motion to lift stay to allow state court suit to proceed

against debtor, even though stay of litigation would cause hardship to defendant, because granting

relief from stay would, among other things, encourage the filing of "similar requests for relief by

plaintiffs of pending lawsuits"); *In re N.W. Airlines Corp.*, 2006 WL 694727, at *2 (Bankr.

S.D.N.Y. Mar. 13, 2006) ("To allow the automatic stay to be lifted with respect to this action at

this time would prompt similar motions and require the Debtors to spend an inordinate amount of

time and money on litigation and detract from the Debtors' attempts to restructure . . . interfer[ing]

with judicial economy and the Debtors' process of reorganization.") (citations omitted).

75.     Because lifting the automatic stay would require the Debtors to expend resources

to litigate the same issues that have already resolved under the Plan and Proposed Confirmation

Order, the request for stay relief should be denied.  Further, all Movants' asserted rights rest on

the premise that Act 81 is valid and will be implemented by the Government, which is unlikely

because Act 81 is inconsistent with both PROMESA and the Fiscal Plan.  Lifting the stay and

allowing the litigation "necessarily would consume the time and attention" of the Commonwealth,

which has "intense focus" on the resolution of the Title III cases and the successful restructuring

of the Commonwealth.  Additionally, the Court's time and resources would be wasted.  Thus,

*Sonnax* factor 2 weighs in favor of denying the Motion.

76.     ***Sonnax* Factor 4**:  The fourth *Sonnax* factor—whether a specialized tribunal has

been established to hear the cause of action at issue—does not support granting the Motion.  No

specialized tribunal has been established to hear the Lawsuit, which is pending before the

Commonwealth Court.  Furthermore, the Movants are seeking to litigate confirmation issues that

have already been properly heard as part of the Commonwealth's Title III case.  Thus, *Sonnax*

factor 4 weighs in favor of denying the Motion.

77.     ***Sonnax* Factor 5**:  The fifth *Sonnax* factor—whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation—does not support granting the Motion.  No insurer of the Debtors has assumed any financial responsibility for defending the Lawsuit, and Movants do not allege any facts to the contrary.  Thus, *Sonnax* factor 5 weighs in favor of denying the Motion.

78.     ***Sonnax* Factor 6**:   The sixth *Sonnax* factor—whether the action essentially involves third parties rather than the debtor—does not support granting the Motion.  This factor is not based on whether third parties are involved, but rather whether the Lawsuit primarily involves third parties *rather than* the debtor.  *See In re Residential Capital, LLC*, No. 12-12020, 2012 Bankr. LEXIS 3641, at *20 (Bankr. S.D.N.Y. Aug 8, 2012) ("The court should not grant relief from the stay under the sixth *Sonnax* factor if the debtor is the main party to the litigation."); *Grayson v. WorldCom, Inc. (In re WorldCom, Inc.)*, No. 05-Civ-5704, 2006 U.S. Dist. LEXIS 55284, at *33 (S.D.N.Y. Aug 4, 2006) ("Grayson offers no argument or claim to show how the Bankruptcy Court abused its discretion in determining that Grayson's claim in this action did not primarily involve third parties.").

79.     Here, the Lawsuit names both the Commonwealth and the ERS as the primary defendants.  The Lawsuit squarely targets claims against the Commonwealth and ERS that are subject to adjustment pursuant to the Plan and Proposed Confirmation Order.  Therefore, *Sonnax* factor 6 weighs in favor of denying the Motion.  *See City Ins. Co. v. Mego Int'l, Inc. (In re Mego Int'l, Inc.)*, 28 B.R. 324, 326 (Bankr. S.D.N.Y. 1983) (denying motion to lift the stay where debtor was more than a mere conduit for the flow of proceeds and the action impacted the "property and administration of [the debtor's estate].").

80. __*Sonnax* Factor 7__: The seventh *Sonnax* factor—whether the litigation could prejudice the interest of other creditors—does not support granting the Motion. It does prejudice all other creditors by jeopardizing the feasibility of the Plan. If Movants were to succeed in convincing the Court to lift the automatic stay and were allowed to enforce Act 81 in the Commonwealth Court, other creditors would be prejudiced because, were Movants to succeed, the Plan may well be rendered infeasible, to the obvious detriment of the vast majority of bond and other creditors who reached agreements with the Debtors over the adjustment of their claims. Additionally, even without enforcement of Act 81, to the extent the Court grants relief to one claimant, a myriad of other claimants would certainly follow suit and seek stay relief to be paid far more than the Plan provides, including those seeking additional payments under Act 81 and the other Pension Acts. The Oversight Board, on behalf of the Commonwealth, would have to expend considerable time and expense to litigate not only this Lawsuit, but countless other forthcoming actions seeking increased pension benefits that would be subsequently filed after just having litigated the treatment of pension claims in the Plan confirmation proceedings. Courts have denied requests to lift the automatic stay where the debtor would be required to expend its limited resources to defend against litigation. *See, e.g., Truebro, Inc. v. Plumberex Specialty Prods., Inc. (In re Plumberex Specialty Prod., Inc.)*, 311 B.R. 551, 563-64 (Bankr. C.D. Cal. 2004) (rejecting effort to lift stay in part because "the cost of protracted litigation of a separate proceeding in a non-bankruptcy forum would prejudice the interests of other creditors of the estate"); *Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, No. 09- 50026, 2010 WL 4630327, at *4 (S.D.N.Y. Nov. 8, 2010) (finding no abuse of discretion where bankruptcy court concluded in denying lift-stay motion that "allowing Appellant to proceed with the ERISA suit would force [debtor] to expend estate resources to defend that" and thus "would prejudice the interests of other

creditors"). Here, the depletion of the Commonwealth's resources to defend against yet another lawsuit with many others sure to follow, and the diversion of the Commonwealth's attention from hopefully consummating the Plan would inure to the detriment of the Commonwealth's other creditors—especially where, as here, treatment of such claims will have already been decided under the Plan. Accordingly, *Sonnax* factor 7 weighs heavily against granting the Motion.

81. ***Sonnax* Factors 10 and 11:** The interests of judicial economy and the status of the Lawsuit also weigh against stay relief. The relief Movants request would open the floodgates to other claimants who would pursue their own asserted rights under the Pension Acts against the Commonwealth in other courts. The interest of judicial economy, not to mention the fundamental policy of PROMESA and the Bankruptcy Code, do not support granting relief, especially here where the Plan process—which is the ultimate goal of a Title III case—has already been completed and is currently under Court consideration. Subjecting the Commonwealth to litigation over pension claims that will be determined through the Plan would not support judicial economy and would interfere with the collective action proceedings that are the purpose of PROMESA. This would severely impede the progress of the Debtors' Title III cases on what may well be the eve of Plan confirmation, and harm the strides already made towards restructuring the Commonwealth's finances to create a successful and thriving Puerto Rico economy.

82. The Plan would provide fair treatment of the Movants' pension rights, through payment in full of accrued pension benefits when due, and confirms the preemption and invalidation of the Pension Acts. Alternatively, if necessary the Oversight Board will pursue litigation in this Court to nullify the Pension Acts. Any other litigation outside this Court to enforce the Pension Acts would be superfluous and contrary to judicial economy. Accordingly, *Sonnax* factors 10 and 11 weigh heavily against granting the motion for stay relief.

83.   ***Sonnax* Factor 12:** [10]   Balancing the harms clearly favors denial of the Motion. The impact on the Commonwealth, ERS, and the completion of their restructuring efforts if the Motion were to be granted would greatly outweigh any harm Movants would suffer if the automatic stay remains in place.   Over the past four and a half years, the Oversight Board has negotiated and litigated with its many creditors and creditor groups over their rights, ultimately culminating in the Plan before the Court.   Many creditors have sought to file lawsuits against the Debtors to assert their claims should receive preferential treatment or be paid higher recoveries, with the automatic stay operating to keep these Title III Cases on track to reach a confirmation hearing.   All the while, retired ERS participants have been receiving payments in full and, under the Plan, they will continue to do so, while active ERS participants will receive full payment of accrued benefits when due upon retirement.   The Plan and Fiscal Plan do not contemplate the inclusion of enhanced benefits under the Pension Acts in accrued pension benefits under the Plan because the Oversight Board has determined, without credible rebuttal from the Government or anyone else, doing so would add several billion dollars in pension liabilities the Commonwealth cannot afford.

84.   Lifting the automatic stay to permit the Movants to proceed with the Lawsuit to receive increased pension benefits would risk derailing the Plan process near its conclusion, diverting Commonwealth resources and the time and attention of the Oversight Board's members and advisors at a critical juncture in this case, and would prejudice the interests of other similarly situated creditors who may also seek relief from the automatic stay to pursue their parochial interests.   All these factors weigh against modifying the automatic stay in Movants' favor.

---

[10]   *Sonnax* factors (3) (whether the debtor is serving in a fiduciary capacity), (8) (whether a judgment in the foreign action is subject to equitable subordination), and (9) (whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor) are not addressed as they are inapplicable here.

85.     In contrast, Movants will suffer little to no harm if the stay remains in place.  First and foremost, the purported rights asserted by the Movants rest entirely on Act 81, which has yet to be implemented, and is both preempted by PROMESA and inconsistent with the Fiscal Plan. The Plan requests from the Court a ruling that Act 81 is preempted by PROMESA, which would thus render the Lawsuit moot.  Even if it were found otherwise, the Oversight Board will commence litigation against the Government to enjoin implementation of Act 81 as inconsistent with the Fiscal Plan, further obviating Movants' Lawsuit.  Either way, this Court will render a decision on the enforceability of Act 81.  Thus, *Sonnax* factor 12 weighs in favor of denying the Motion.

## **CONCLUSION**

86.     For the foregoing reasons, the Court should deny the Motion.

*[Signature Page Follows]*

Dated:  December 7, 2021
        San Juan, Puerto Rico

Respectfully submitted,

*/s/ Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
Email: hermann.bauer@oneillborges.com

/s/ Martin J. Bienenstock
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Timothy W. Mungovan (*pro hac vice*)
Paul V. Possinger (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email: mbienenstock@proskauer.com
Email : brosen@proskauer.com
Email: tmungovan@proskauer.com
Email : ppossinger@proskauer.com

*Attorneys for the Financial Oversight and*
*Management Board for Puerto Rico, as*
*representative of the Commonwealth of Puerto Rico*

**<u>Exhibit 1</u>**

# FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
# FOR PUERTO RICO



José B. Carrión III
Chair

*Members*
*Andrew G. Biggs*
*Carlos M. García*
*Arthur J. González*
*José R. González*
*Ana J. Matosantos*
*David A. Skeel, Jr.*

*Natalie A. Jaresko*
Executive Director

**BY ELECTRONIC MAIL**

June 23, 2020

The Honorable Wanda Vázquez Garced
Governor of Puerto Rico

The Honorable Thomas Rivera Schatz
President of the Senate of Puerto Rico

The Honorable Carlos J. Méndez Núñez
Speaker of the House of Representatives of Puerto Rico

Dear Governor Vázquez Garced, President Rivera Schatz, Speaker Méndez Núñez:

The Oversight Board has become aware of Senate Bill 1616 ("SB 1616"), which proposes to create incentives for public employees to retire before reaching their retirement age, and imposes restrictions on the ability of agencies to replace public employees who accept early retirement, with certain exceptions purportedly structured to maintain the ability of the  Commonwealth of Puerto Rico  Government (the "Government") to perform essential services.

As proposed, it appears that SB 1616 would be significantly inconsistent with the 2020 Fiscal Plan, and it should not be enacted until the information requested in this letter is provided to the Oversight Board.

The Oversight Board recognizes that SB 1616 intends to improve retiree benefits to certain currently active employees while simultaneously paying for the increased benefits by freezing/eliminating certain of the positions held by early retirees.  However, the affordability of the proposed benefit improvements is dependent on the elimination of a certain number of these positions.  Thus, failure to achieve the required down-sizing could potentially cause significant increases in long-term costs to the Government.  Moreover, provisions in SB 1616 that allow agencies to rehire for "essential" positions or allow participants to participate on a deferred basis would potentially allow agencies to provide improved retirement benefits without generating associated payroll savings, resulting in cost increases. We note the Commonwealth has offered public employees over 20 early retirement windows since 1994, which have hampered the

Honorable Wanda Vázquez Garced
Honorable Thomas Rivera Schatz
Honorable Carlos J. Méndez Núñez
June 23, 2020
Page 2 of 2

government's ability to execute and many of these programs failed to realize significant savings. Downsizing is based on efficiencies in back-office work (administration and support personnel), not front office. Another example of programs such as the proposed in SB 1616 is Senate Bill 1623, which proposes a retirement program to the members of the Rank System of the Puerto Rico Police.

Further, the Fiscal Plan already includes an expectation that various agency headcounts/payroll will reduce over the next few years due to Fiscal Plan rightsizing measures. The Oversight Board requires that achieving agency reductions through improved benefits would at least meet the rightsizing requirements without reducing the ability of the agencies to provide essential services and also pay for the cost of any additional benefits. This determination must be made on a long-term basis, taking into consideration the fact that early retirees under the proposed program could receive the enhanced pension benefits for decades after retirement.

Given that SB 1616 appears to be significantly inconsistent with the fiscal plan, the Oversight Board requires a complete analysis of the outcomes SB 1616 is intended to achieve and the likelihood they will be achieved, as part of the Board's evaluation under Section 204(a)(4)(B) of PROMESA. In addition, the Oversight Board requests additional information, pursuant to Section 104(c) of PROMESA, including all actuarial reports and any documentation evaluated that provide support for the savings and number of affected employees described in this bill, including analysis regarding the impact on individual agencies. The Oversight Board is requesting that this information be provided as soon as possible to allow for timely review of the proposed bill.

Finally, and independently of PROMESA Section 204, we remind you that enacting or implementing SB 1616 would violate PROMESA Section 108(a)(2) because it impairs or defeats purposes of PROMESA such as the Board's exclusive right to determine treatment of pension claims in a plan of adjustment. Indeed, the law would be contrary to the currently proposed plan of adjustment.

We look forward to continuing to work together for the benefit of the people of Puerto Rico.

Sincerely,

Natalie A. Jaresko

CC:   Mr. Omar Marrero Díaz

**<u>Exhibit 2</u>**

**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD**
**FOR PUERTO RICO**



*José B. Carrión III*
Chair

*Members*
*Andrew G. Biggs*
*Carlos M. García*
*Arthur J. González*
*José R. González*
*Ana J. Matosantos*
*David A. Skeel, Jr.*

*Natalie A. Jaresko*
Executive Director

**BY ELECTRONIC MAIL**

June 24, 2020

The Honorable Wanda Vázquez Garced
Governor of Puerto Rico

The Honorable Thomas Rivera Schatz
President of the Senate of Puerto Rico

The Honorable Carlos J. Méndez Núñez
Speaker of the House of Representatives of Puerto Rico

Dear Governor Vázquez Garced, President Rivera Schatz, Speaker Méndez Núñez:

We have become aware of Senate Bill 1623 ("SB 1623"), which proposes to amend Section 5-103 of Act 447-1951 (the Employee Retirement System) to create pension benefits for police officers hired before January 1, 2000. Based on our preliminary review, it appears SB 1623 is significantly inconsistent with the 2020 Commonwealth Fiscal Plan. Accordingly, we request the following additional information concerning SB 1623.

Currently, police officers hired before January 1, 2000 participate in the New Defined Contribution Plan, created by Act 106-2017, and are entitled to receive pension benefits accrued based on the compensation and service time as of June 30, 2013 plus an annuity under System 2000 accrued from 2013 to 2017. Under the provisions of SB 1623, qualifying police officers would instead receive a pension ranging between 50% to 60% of their retirement-year compensation and a lifetime employer contribution of $100 per month to their health insurance plan. SB 1623 also provides the cost of the increased retirement benefits will be paid by the General Fund largely through savings generated as a result of payroll reductions for retiring police officers.

SB 1623 has the effect of significantly increasing the retirement costs associated with police officer retirement. Upon first eligibility for an enhanced pension under SB 1623, police pensions would more than double (from 25% to 55% on average) the percent of retirement-level compensation paid as a pension, and would increase further for participants that retire at age 58 or later. On average, compensation for new recruits is less than 50% of the compensation for more experienced officers that would be eligible for the benefit enhancement. However, the fiscal plan already

Hon. Wanda Vázquez Garced
Hon. Thomas Rivera Schatz
Hon. Carlos J. Méndez Núñez
June 24, 2020
Page 2 of 2

includes an expectation that new cadets replace the older officers over time. Therefore, analysis would be needed to demonstrate that the cost of the enhanced benefits payable over the lifetime of the pensioners would be fully paid for by any savings generated by hiring new cadets sooner than anticipated.

It will also be necessary to assess whether or not the additional accrual in police pension will impact the ability of the police officers' earnings to be credited towards Social Security. Currently, as a result of Act 71-2019, most police officers began contributing to Social Security effective January 1, 2020. As it is important to the retirement security of the police officers, Act 71-2019 accomplished this change by modifying contributions to the New Defined Contribution Plan to a level that, when coupled with the fact that police are not currently accruing defined benefit plan benefits, requires participation in Social Security. The Oversight Board supported this action and the fiscal plan reflected funds to pay the Commonwealth's portion of the Social Security contributions. The reinstatement of a defined benefit pension accrual could undo the work of Act 71-2019 and potentially disqualify the police officers from Social Security participation.

As part of the Oversight Board's responsibilities under Section 204(a), the Oversight Board must review financial materials to determine whether the measure is significantly inconsistent with the Fiscal Plan. To do so, the Oversight Board must review any and all supporting analyses, information, and data relied on by the Legislature to assess whether the contemplated General Fund's savings are consistent with the provisions of SB 1623. The Oversight Board is requesting that this information be provided pursuant to Sections 104(c) and 204(a) as soon as possible to allow for timely review of the pending SB 1623.

Independently of Section 204, we believe that SB 1623 is contrary to the treatment of pensions in the proposed Commonwealth Title III plan of adjustment and impairs or defeats the purposes of PROMESA. Accordingly, if the Governor and Legislature proceed to pass and enact SB 1623, the Oversight Board may seek judicial relief pursuant to Section 108(a)(2).

We look forward to continuing to work together for the benefit of the people of Puerto Rico.

Sincerely,

Natalie A. Jaresko

CC:   Mr. Omar Marrero Díaz

**Exhibit 3**

# FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
# FOR PUERTO RICO



*José B. Carrión III*
Chair

Members
*Andrew G. Biggs*
*Carlos M. García*
*Arthur J. González*
*José R. González*
*Ana J. Matosantos*
*David A. Skeel, Jr.*

*Natalie A. Jaresko*
Executive Director

## BY ELECTRONIC MAIL

August 18, 2020

Omar J. Marrero Díaz
Executive Director
Puerto Rico Fiscal Agency and
Financial Advisory Authority

Dear Mr. Marrero Díaz:

I am following up on the Oversight Board's letter to you dated August 14, 2020 regarding Acts 80-2020, 81-2020, and 82-2020 (the "Acts").

You did not respond to the Oversight Board's letter, and the Oversight Board has yet to receive certifications of compliance and formal estimates for the Acts, even though they were due, pursuant to PROEMSA section 204(a), on August 12, 2020.

The Governor's failure to comply with PROMESA section 204(a) is always troubling, but it is especially so under the circumstances here. The Oversight Board has already expressed grave concerns about these Acts. Among other things, they appear to be significantly inconsistent with the fiscal plan and budget and may also interfere with the Oversight Board's authority related to debt issuance in violation of PROMESA section 207. The Oversight Board raised these and other concerns almost two months ago, and requested clarifying details and basic supporting information regarding SB 1616 (now Act 80-2020) and SB 1623 (now Act 81-2020) – but the Government never provided the requested information and never even responded to the Oversight Board's letter concerning SB 1623. Now, public employees are looking to make retirement decisions based on these new Acts, even though they may never be fully implemented because of the Oversight Board's concerns and the Governor's failure to comply with PROMESA sections 204(a) and 104(c).

Given the circumstances, the Oversight Board directs you, pursuant to PROMESA section 204(a)(4), to provide the overdue formal estimates and certifications for the Acts, along with the information requested in June pursuant to PROMESA section 104(c) for Act 80 and Act 81, no later than August 19, 2020 at 5:00 PM AST. In addition, for Act 82-2020, the Oversight Board

Mr. Omar J. Marrero Díaz
August 18, 2020
Page 2 of 2

requests all actuarial reports and any documentation evaluated that provides support for any
asserted savings as well as information identifying the number of affected employees, by no later
than August 21, 2020 at 5:00 PM AST.

Finally, please be advised that, under the current circumstances, where the Government has failed
to comply with PROMESA sections 204(a) and 104(c) and where public employees are attempting
to make retirement decisions, these Acts impair and/or defeat the purposes of PROMESA, as
determined by the Oversight Board.  Accordingly, pursuant to PROMESA section 108(a)(2), the
Governor shall not enforce these Acts until such time as the Governor has provided the information
required under PROMESA and unless the Oversight Board has determined the Acts do not violate
PROMESA sections 108(a), 204, and 207.

We look forward to continuing to work together for the benefit of the people of Puerto Rico.

Sincerely,

Natalie A. Jaresko

CC:    Hon. Wanda Vázquez Garced

**Exhibit 4**

  

# Certificate of New Law Pursuant to 48 U.S.C. §2144(2)(B)

**Legislative Measure Number:**

- Act No. 80-2020 ("Act 80"), herein attached.
- Act 80 establishes the *Incentivized Retirement Program and for Justice to Our Public Servants Act*. In general, the Act establishes an incentivized retirement program for eligible public employees either under Act 447-1951 or Act 1-1990. Additionally, the Act provides for a guaranteed pension amounting to 50% of a qualifying employee's highest salary during the last three years. Act 80, among other benefits, also provides for a permanent employer contribution of $100 for purposes of acquiring health insurance.
- Act 80 requires the Office of Management and Budget to freeze all vacancies produced by the retirement of employees and allows for the exceptional recruitment of essential employees.
- Prior to the adoption of Act 80, the Retirement System Administration commissioned an actuarial report to Integrum LLC ("Integrum report") in order to assess the impact of an early retirement initiative. And, according to the Integrum report, the implementation of the early retirement initiative should produce aggregate savings on payroll expenditures for $1.4 billion dollars during a period of 30-40 years. See attached. The savings breakdown is as follows:

  - Employees covered by Act 447-1951 ($1 billion)
    - Payroll savings for first year- $190 millions
    - Payroll savings spread over the 29 years - $820 millions

  - Employees covered by Act 1-1990 ($485 millions)
    - Payroll savings for the first year -$55 millions
    - Payroll savings during the initial 5 years - $285 millions

- It should be noted, however, that the Integrum report was based on the provisions of Senate Bill 1616 prior to being amended during the legislative process.

- Lastly, the Government reserves the right to, if needed, update or modify the actuarial report, attached to this certification, as well as to provide further information, in order to assist in the overall impact assessment of Act 80.

**Estimate of Impact of the Legislative Measure on Expenditures and Revenues for the fiscal years covered by the Fiscal Plan:**

1

  

- Act 80 promotes aggregate savings on payroll expenditures of approximately $1.4 billion dollars during a period of 30 – 40 years.
- Act 80 has no impact on revenues.

**<u>Determination of the Legislative Measure's Compliance with the Fiscal Plan:</u>**

- Act 80 is not significantly inconsistent with the 2020 Fiscal Plan for Puerto Rico.

2

**<u>Exhibit 5</u>**

  

## Certificate of New Law Pursuant to 48 U.S.C. §2144(2)(B)

**Legislative Measure Number:**

- Act No. 81-2020 ("Act 81"), herein attached.
- Act 81 establishes an act to provide a "dignified retirement" for police officers, firefighters, custody officers and emergency technicians (collectively, "public safety employees"). In general, Act 81 amends the retirement benefits of certain public safety employees either under Act 447-1951 or Act 1-1990. In sum, the Act provides the following guaranteed pension (representing a percentage of their last salary) for those workers with at least 30 years of credited work:

  - Employees covered by Act 447-1951
    - 55 years old= 50% of salary
    - 58 years old= 55% of salary

  - Employees covered by Act 1-1990
    - 55 years old= 45% of salary
    - 58 years old= 50% of salary

- Act 81 also provides for a permanent employer contribution of $100 for purposes of acquiring health insurance.
- Prior to the adoption of Act 81, the Retirement System Administration commissioned an actuarial report to Integrum LLC ("Integrum report") in order to assess the impact of the initiative at the Puerto Rico Police Bureau ("PRPB"). And, according to the Integrum report, the implementation of the legislation could be satisfied by limiting the hiring of new recruits. Thus, achieving budget neutrality. See attached. The breakdown is as follows:

  - Employees covered by Act 447-1951
    - Limiting hiring of new recruits for about $89 millions over a period of 30 years.
  - Employees covered by Act 1-1990
    - Limiting hiring of new recruits for about $500 millions over a period of 40 years.

- It should be noted, however, that the Integrum report was based on the provisions of Senate Bill 1623 prior to being amended during the legislative process (which originally only provided for improved benefits at the PRPB).
- Lastly, the Government reserves the right to update, if needed, the actuarial report, attached to this certification, as well as to provide further information, in order to assist in the overall impact assessment of Act 81.

1

  

## Estimate of Impact of the Legislative Measure on Expenditures and Revenues for the fiscal years covered by the Fiscal Plan:

- Act 81 will be implemented in a budgetary neutral form, as recommended by the Integrum report. Specifically, the PRPB will implement Act 81 by limiting the hiring of new recruits and, therefore, limit new payroll expenditures for about $589 millions during a period of 30-40 years.
- The Government of Puerto Rico will implement the legislation using budgeted resources for the pertinent fiscal years covered by the Fiscal Plan. In the event that a reprogramming of budgeted resources is needed, the appropriate agency will submit to the Financial Oversight and Management Board for Puerto Rico a formal request in accordance with the provisions of PROMESA.
- Act 81 has no impact on revenues.

## Determination of the Legislative Measure's Compliance with the Fiscal Plan:

- Act 81 is not significantly inconsistent with the 2020 Fiscal Plan for Puerto Rico.

**<u>Exhibit 6</u>**

  

# Certificate of New Law Pursuant to 48 U.S.C. §2144(2)(B)

**Legislative Measure Number:**

- Act No. 82-2020 ("Act 82"), herein attached.
- Act 82 amends Act 26-2017, to allow teachers of the Puerto Rico Department of Education to credit their license of sick days (balance or excess) to their retirement pensions as "time worked" for proposes of estimating their retirement benefits.
- The Retirement System Administration certified that the implementation of Act 82 would have no impact on the agency's certified budget.
- The 2020 Fiscal Plan forbids the liquidation of sick days in excess of the amount allowed by law and Act 82 does not allow for the liquidation of the license. See 2020 Certified Fiscal Plan for Puerto Rico, at 151.

**Estimate of Impact of the Legislative Measure on Expenditures and Revenues for the fiscal years covered by the Fiscal Plan:**

- Act 82 has no impact on expenditures since no liquidations are required.
- Act 82 has no impact on revenues.

**Determination of the Legislative Measure's Compliance with the Fiscal Plan:**

- Act 82 is not significantly inconsistent with the 2020 Fiscal Plan for Puerto Rico.

**Exhibit 7**

# GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial
Advisory Authority**

August 19, 2020

**VIA ELECTRONIC MAIL**

Mrs. Natalie Jaresko
Executive Director
The Financial Oversight and
Management Board for Puerto Rico
P.O. Box 192018
San Juan, PR 00919-2018

*Re:    Compliance Certifications Act 80, 81, 82-2020 (collectively the "Retirement Acts")*

Dear Mrs. Jaresko:

This responds to your August 18, 2020 letter regarding the Section 204 Compliance Certifications for the Retirement Acts. Today, in compliance with Section 204(a) of PROMESA, the Government of Puerto Rico, (the "Government") has submitted to the Oversight Board the corresponding Section 204 Compliance Certifications, with supporting documents, for each of the Retirement Acts. I hereby inform you that, for the moment, the Government will not accept applications from public employees under the Retirement Acts.  As always, the Government is available to discuss any doubts or questions the Oversight Board may have concerning the implementation of the retirement acts or its corresponding compliance certifications.

As you know, it is emphatically the public policy of the Government to comply with Section 204 of PROMESA. The progress in submitting Section 204 Compliance Certifications has been such that the Oversight Board was unable to prevail at the summary judgment stage during the Act-29 litigation, where it incorrectly argued that the Government has a policy of non-compliance with Section 204 of PROMESA.  As has been the case with several other laws, and recognizing the statutory language of PROMESA, the Government requested an extension to submit Section 204 Compliance Certifications for the Retirement Acts in order to conclude the required analysis.  As discussed above, today the Government has submitted the corresponding certifications for the Retirement Acts.

However, in your August 18, 2020 letter, you state that "under the circumstances", the Oversight Board has *already* determined that the Retirement Acts impair or defeat the purposes of PROMESA, and as such, has preemptively enjoined the implementation of these acts. This is a troubling determination by the Oversight Board, since the process established in Section 204(a) of PROMESA has not concluded. It would appear again that



2

the Oversight Board has violated PROMESA by not even analyzing a Section 204 Compliance Certificate submitted by the Government, *prior* to determining whether or not duly enacted laws by the Government of Puerto Rico are significantly inconsistent with the fiscal plan.  It is a concerning turn of events when the Oversight Board considers the Section 204 process to be superfluous and disregards the statutory language of PROMESA. Again, nothing in PROMESA permits the Oversight Board to unilaterally enjoin the implementation of duly enacted laws without even analyzing the corresponding Section 204 Compliance certificates.

As always, we look forward to working with the Oversight Board to reach consensus where possible for the benefit of the people of Puerto Rico as it should be in this case.

Very truly yours,

Omar J. Marrero Díaz
Executive Director

**<u>Exhibit 8</u>**

# FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
## FOR PUERTO RICO



*José B. Carrión III*
Chair

*Members*
*Andrew G. Biggs*
*Carlos M. García*
*Arthur J. González*
*José R. González*
*Ana J. Matosantos*
*David A. Skeel, Jr.*

*Natalie A. Jaresko*
Executive Director

## BY ELECTRONIC MAIL

August 28, 2020

Omar J. Marrero Díaz
Executive Director
Puerto Rico Fiscal Agency and
Financial Advisory Authority

Dear Mr. Marrero Díaz:

I am writing to you regarding Acts 80-2020, 81-2020, and 82-2020 (the "Acts").  As I have indicated in prior letters, the Oversight Board has grave concerns about the impact of these Acts on the Fiscal Plan and on the finances of the Commonwealth of Puerto Rico.  These Acts create new retirement benefits for thousands of public employees at a cost to the Commonwealth that runs into the billions of dollars over the next thirty years.  Given the financial impact of these Acts, the Government should have engaged earlier and more meaningfully with the Oversight Board to review the proposed laws and their impact on the Fiscal Plan and the longer-term fiscal health of the Commonwealth.  In summary, the Oversight Board has determined these Acts, and the process by which they were enacted, impair or defeat PROMESA's purposes.   In addition, the documentation that the Governor has provided, as required by PROMESA, is wholly inadequate. Accordingly, the Acts must not be implemented at this time.

On August 19, 2020, the Governor provided submissions containing what she contends constitute the formal estimates and certifications required by PROMESA section 204(a).  These submissions were late, in violation of PROMESA section 204(a)(1).  In addition, the submissions do not satisfy the requirements of PROMESA section 204(a).  For Acts 80-2020 and 81-2020, the Governor submitted actuarial reports from a third party, Integrum LLC, presumably to comply with PROMESA's formal estimate requirement.  However, none of these reports assess the laws themselves.   Rather, the Integrum reports assess Senate Bills which, as the Governor's certifications and the Integrum reports acknowledge, were amended during the legislative process prior to the enactment of the Acts.  With respect to Act 81-2020, the Governor's 204(a) certification acknowledges that the Integrum report is incomplete because it addressed only the impact on the police, and not the other safety officers covered by Act 81-2020.  Both certifications

Mr. Omar Marrero Díaz
August 28, 2020
Page 2 of 4

implicitly concede the deficiency of these estimates, as they expressly "reserve[] the right" of the
Government "to, if needed, update or modify the actuarial report, attached to this certification…."

As for Act 82-2020, the "formal estimate" is limited to a conclusory statement regarding the law's
impact on the Retirement System Administration's "certified budget" and the observation that,
because the law seeks to credit sick time balances in calculating employees' "time worked" for
retirement benefit calculations (as opposed to allowing employees to cash out such time upon
retirement), the law has no impact on expenditures.  But that is not the formal estimate required
under PROMESA.  Rather, Section 204(a) demands a formal estimate "of the impact, if any, that
the law will have on expenditures or revenues" without limitation to a particular agency's budget.
Clearly, Act 82-2020, by adjusting the method of calculating employees' time worked in a manner
that can only increase that metric and thereby expand the employee's pension benefits, impacts
expenditures.  The impact of such increased expenditures must be estimated – and such an estimate
(formal or otherwise) is missing from the Governor's submission.

Accordingly, pursuant to Section 204(a)(3)(A), the Oversight Board notifies the Government that
the Governor's submissions failed to provide the required formal estimate for any of the Acts.
Further, pursuant to Section 204(a)(4)(A), the Oversight Board directs the Governor to provide the
missing formal estimates for each Act no later than September 1, 2020.

The Oversight Board has initiated its own analysis of the Acts.  Based on the information currently
available to it, the Oversight Board estimates these Acts will increase costs in an amount that could
exceed $3 billion over the next thirty years.  Based on these estimates, and the defects in the
Government's estimates, the Oversight Board believes that the Acts are significantly inconsistent
with the Fiscal Plan, contrary to the Governor's certifications.

Nevertheless, the Oversight Board is prepared to cooperate with the Government to examine more
closely and understand more fully the impact of these Acts on the Fiscal Plan and the
Commonwealth's finances.  Accordingly, pursuant to PROMESA section 104(c), the Oversight
Board requests the following information:

Act 80-2020

  a) Headcount of eligible participants for each applicable agency, organized by whether Act 1
     or Act 447 governs;
  b) Headcount of expected number of participants to take the retirement window for each
     applicable agency, including the number of employees expected to be deemed "essential"
     such that they receive the enhanced benefits but do not accelerate their retirement date;
  c) Text of the Act provided to Integrum on which they performed the estimates included in
     the Governor's certification;
  d) For each applicable agency, a listing of eligible participants, including gender, date of birth,
     current service, current salary, frozen benefits from Act 1 or Act 447, and balance of Act
     3 contributions in their Act 3 hybrid account (for both the data provided to Integrum for
     their analysis as well as any update as of July 1, 2020); and

Mr. Omar Marrero Díaz
August 28, 2020
Page 3 of 4

e) Social Security numbers or any alternative mapping to item (d) above that allows data to be mapped to the latest Milliman data (from July 1, 2016) provided to the Oversight Board.

Act 81-2020

a) For each applicable agency, the headcount of eligible participants, including job classifications eligible for participation;

b) Pay scale for eligible employees (such as police officers, firefighters, correctional officers, EMS, etc.);

c) Text of the Act provided to Integrum on which they performed the estimates included in the Governor's certification;

d) Because the Act 81-2020 Certification indicates that costs will be offset by reductions in rookie salaries and headcount reduction, please indicate the amount by which rookie salaries will be reduced to demonstrate offsetting costs on an individual level as well as the amount by which police headcount will be reduced to offset costs;

e) Listing of individuals currently active and eligible to potentially receive Act 81-2020 benefits in the future, including each potential participant's gender, date of birth, current service, current salary, frozen benefits from Act 1 or Act 447, and balance of Act 3 contributions in their Act 3 hybrid account (for both the data provided to Integrum for their analysis as well as any update as of July 1, 2020);

f) Analysis performed to confirm that the additional benefits would not put police participation in Social Security at risk; and

g) Social Security numbers or any alternative unique identifier to item (f) above that allows data to be mapped to the latest Milliman data (from July 1, 2016) provided to the Oversight Board.

Act 82-2020

a) Current sick leave balances for all teachers who would be potentially eligible for benefits contemplated by the Act;

b) Formula by which new leave will be credited from sick balances (e.g., one month credit for every fifteen days of sick leave);

c) Assumed rates of retirement under new Act, and description of how these assumptions differ from previous assumptions; and

d) Social Security numbers or any alternative unique identifier that allows sick leave balance to be mapped to the latest Milliman data (from July 1, 2016) provided to the Oversight Board.

Please provide this information by September 1, 2020. Because this information is essential to fully understanding the impact of the Acts on revenues and expenditures, the Oversight Board expects no delay in providing this information and expects the Government to factor this information into the corrected formal estimates the Governor has been directed to provide.

Under the current circumstances, considering the deficiencies in the formal estimates provided regarding the Acts, as well as the numerous and critical outstanding questions, the Oversight Board

Mr. Omar Marrero Díaz
August 28, 2020
Page 4 of 4

has determined that implementation of these Acts would impair or defeat the purposes of PROMESA, as determined by the Oversight Board. Among other things, the implementation of laws with wide-ranging effects on the Commonwealth's pension system without a full understanding of the financial implications of such measures is the antithesis of financial responsibility.

You have already advised, by letter dated August 19, 2020, that the Acts are not being implemented. By separate correspondence, we have asked to be provided fourteen (14) days' advance notice should that decision change. However, be advised that the Governor should not enforce these Acts unless and until such time as the Governor has provided appropriate formal estimates and the Oversight Board determines the Acts do not violate PROMESA. The Oversight Board further reserves the right to take such actions as it deems necessary, consistent with PROMESA sections 108(a), 204, and 207, including seeking remedies to prevent the implementation and enforcement of the Acts and for any wrongful implementation of them.

We look forward to continuing to work together for the benefit of the people of Puerto Rico.

Sincerely,

Natalie A. Jaresko

CC:    Hon. Wanda Vázquez Garced
       Hon. Thomas Rivera Schatz
       Hon. Carlos J. Méndez Núñez

**Exhibit 9**



# FINANCIAL OVERSIGHT & MANAGEMENT BOARD
## FOR PUERTO RICO

Members
Ana J. Matosantos
Andrew G. Biggs
Justin Peterson

David A. Skeel, Jr.
Chair

Natalie A. Jaresko
Executive Director

**BY ELECTRONIC MAIL**

October 21, 2020

Omar J. Marrero Díaz
Executive Director
Puerto Rico Fiscal Agency and
Financial Advisory Authority

Dear Mr. Marrero Díaz:

I write in response to your October 15, 2020 letter regarding Acts 80-2020, 81-2020, and 82-2020 (the "Acts").

As you know, the Acts provide for substantially enhanced retirement benefits for large categories of public employees.  In your October 15, 2020 letter, you state that "today the Employees Retirement System (ERS) and the Office of Management and Budget (OMB) will begin implementing Act 80-2020[] and 82-2020."  Doing so without any realistic plan to pay for their increased costs raises serious concerns and, as you are aware from our prior correspondence, violates PROMESA.

In our prior correspondence, we have explained that the Government has not complied with PROMESA with respect to these laws.  For example, the Government initially submitted untimely certifications lacking any substantive financial estimates of the cost of the new laws, in violation of PROMESA section 204(a).  Given these failures, the Oversight Board conducted its own analysis.  The Oversight Board has determined these Acts in the aggregate will increase the Government's costs by as much as $8.3 billion over the next 30 years by enhancing existing retirement benefits for thousands of public employees in retirement systems that are already insolvent, in one case frozen, and in "pay as you go" status.  As a result, the Oversight Board has concluded that each Act is significantly inconsistent with the Commonwealth Fiscal Plan and the Government's enactment and implementation of the Acts violates PROMESA.

Nevertheless, to the extent the Government is committed to increasing pension benefits despite the Oversight Board's repeated notifications of its concerns about costs, the Oversight Board requires the Government to provide fiscally responsible and realistic approaches that would permit the

Mr. Marrero Díaz
October 21, 2020
Page 2 of 6

implementation of the Acts (in whole or in part) in a manner consistent with the certified fiscal plans.

To be clear, the Oversight Board does not consent to the implementation of any of the Acts until and unless the Commonwealth certifies the implementation of a plausible plan for achieving the necessary savings based on the guidance below and the Oversight Board notifies you that it finds the plan plausible. Should the Government commence or continue to implement measures under these Acts inconsistent with the Fiscal Plan and PROMESA, the Oversight Board reserves the right to take such actions as it considers necessary, consistent with its powers under PROMESA, to prevent further harm to the Commonwealth's financial future.

*          *          *          *          *

### Act 80

Act 80 seeks to create an Incentivized Retirement Program (the "IRP"), offering qualifying employees a "lifetime retirement pension equivalent to fifty percent (50%) of the compensation equivalent to the highest annual gross compensation accrued in any of the last three (3) years prior to the moment they availed themselves of this Program," as well as an employer health insurance contribution. To pay for the new benefits, Act 80 would freeze all positions vacated by retirees with the possible exception of "vacant positions that are determined to provide essential services for the operation of the agency."[1]

The Government's revised analysis, after revising several Integrum actuarial reports that did not actually analyze Act 80, determined the Act would save the Commonwealth $2.6 billion over the next thirty to fifty years. In conducting its own analysis, the Oversight Board determined both sets of Integrum reports substantially overstated Act 80's savings. In total, the Oversight Board estimates the law could potentially cost as much as $4.2 billion. The Oversight Board estimates the incremental cost on the Commonwealth's certified Fiscal Plan alone could be as much as $2.2 billion. The Oversight Board's analysis shows the law will result in an overall cost increase <u>unless the Government makes significant and permanent reductions in headcount and compensation for its workforce – above and beyond those required by the Commonwealth's certified Fiscal Plan</u>.

The various certified fiscal plans currently assume headcount reductions as a result of attrition in all forms, including retirement. For example, the Commonwealth's certified Fiscal Plan already assumes a 6.2% headcount reduction over the next 2 years. This equates to approximately 3,215 in personnel reductions, excluding teachers and police who are not eligible for Act 80 benefits. Total payroll is already adjusted, in part, to reflect these reductions. Therefore, increasing the cost of the retirements beyond those in the currently frozen Employment Retirement System (ERS) pension plan as reflected in the certified fiscal plans requires incremental savings to those in the certified fiscal plans. To achieve long-term fiscal plan cost-neutrality through headcount reductions, the Commonwealth agencies alone must eliminate nearly 1,500 positions above and beyond (i) the personnel right-sizing reductions already included in the Commonwealth's Certified Fiscal Plan and (ii) future reductions in headcount contemplated by additional fiscal plans by the

---

[1] Act 80, § 9(b).

Mr. Marrero Díaz
October 21, 2020
Page 3 of 6

impacted agencies.  Therefore, to achieve the savings necessary to pay for the incremental and unbudgeted retirement benefits outlined in Act 80 for the Commonwealth alone, over 4,700 positions must be permanently eliminated – the equivalent of 9.0% of a total of 51,949 jobs. Similar further reductions would be required to offset the costs for each of the non-fiscal plan entities with employees eligible under Act 80.

These headcount reductions seem highly improbable and impossible to achieve without negatively impacting the Government's ability to provide essential services.  The Government may therefore have to replace some retired workers to ensure essential services are provided, depending on the actual take-rate (*i.e.,* the number of employees who decide to retire based on Act 80).  Act 80 and the associated circular letter clearly state that agencies can unilaterally determine that positions eliminated are essential, and therefore add personnel back to fill those vacated positions.  This alone has the potential to add considerable cost to the implementation of Act 80, as opposed to the net savings projected by the Government.

Accordingly, if the Government wishes to proceed with implementation of Act 80 it must present a substantive program, to which the Oversight Board can hold the Government accountable, by which Act 80 (i) would not impose net costs incremental to the Fiscal Plan, and (ii) would be implemented in a fiscally responsible manner that ensures adequate essential services.

## Act 81

Act 81 amends existing pension regimes to allow certain public employees (the "Public Emergency Employees") to retire early with 45 to 55 percent of their final salaries as pension benefits as well as a $100 per month medical contribution from their employer.  These increased benefits are incremental to the retirement costs already assumed in the Commonwealth's Certified Fiscal Plan.

The Governor's certification, which relies on outdated actuarial reports, determines Act 81 will save $589 million in payroll expenditures over a period of 30-40 years.  Such savings purportedly result from hiring reduced numbers of police and by lowering the rookie pay scale.  When the Government provided updated information in September 2020, some but not all of the prior reports' errors were remedied.  We look forward to receiving an updated section 204(a) certification for Act 81 shortly, as promised in your October 15, 2020 letter.

The Oversight Board's own independent analysis found not only that Act 81 achieves no savings, but also that the additional cost of providing Act 81's enhanced benefits is significant, and thus inconsistent with the Commonwealth's certified Fiscal Plan.  The costs of providing enhanced benefits to the approximately 8,640 participants expected to meet Act 81's eligibility requirements at retirement is $2.4 billion.  The Oversight Board estimates that the reductions needed to offset this cost would be approximately 1,360 employees *above and beyond* what is currently contemplated in the Fiscal Plan, if positions are eliminated immediately.  These additional reductions, beyond the Fiscal Plan, amount to 5.9% of a total of 22,913 Public Emergency Employee jobs.  If instead the positions are eliminated at the end of the 5-year fiscal plan horizon, the number of positions that need to be eliminated is 1,600.  Under this scenario, this would mean that for every ten Public Emergency employees who retire under Act 81, the Government would

Mr. Marrero Díaz
October 21, 2020
Page 4 of 6

be limited to refilling the positions of just 8, reducing the number of employees by 20% of those departing under the Act.  In the police department in particular, headcounts were only expected to be reduced over 2 years by FY 23 from 13,388 to 13,366, and the additional reductions required to implement Act 81 would reduce police staffing to 12,279.

Over the past several years, agencies responsible for public safety of the Commonwealth have already experienced significant workforce declines, reaching the point beyond which their ability to provide essential services effectively and efficiently is tenuous.  Act 81's required terminations would come after 2,556 public safety employees have already left the public safety sector over the past five years.  For three years, the Commonwealth's certified Fiscal Plan has paved a route for the Government to improve the compensation of police in order to, among other things, reverse the high level of attrition and ensure public safety on the Island.  Implementing the reductions necessary to ensure Law 81 is consistent with the Fiscal Plan are contrary to these efforts.  The Oversight Board does not believe the drastic cuts to police headcount required to pay for Act 81 would be consistent with providing essential public services, or even possible to achieve.

Accordingly, if the Government wishes to proceed with implementation of Act 81 it must present a substantive program, to which the Oversight Board can hold the Government accountable, by which Act 81 (i) would not impose net costs incremental to the Fiscal Plan, and (ii) would be implemented in a fiscally responsible manner that ensures adequate essential services.

### Act 82

Act 82 enables participants of the Teachers Retirement System ("TRS") to apply unused sick leave towards their retirement eligibility and pension benefit level.  The enhanced pension benefits as well as the likely and unplanned acceleration in the timing of teacher retirements generate costs and staffing gaps not contemplated by the Fiscal Plan.

The Government's certification for Act 82 is not supported by any financial analysis or formal estimate.  Instead, the certification grounds its determinations on the belief that, because employees cannot liquidate their unused sick time, there will be no immediate costs associated with the law.  When the Government later provided ERS's internal analysis, it became clear that its internal service purchase mechanism would permit a TRS participant with 108 unused sick days to "purchase" 60 months (*i.e.,* five years) of service credit.  As such, the Oversight Board's independent analysis showed that implementing Act 82 will cost the Commonwealth between $635 million and $1.57 billion over the next thirty years, assuming that as a result TRS participants receive between two and five years of additional service credit.

These costs associated with Act 82 will always be incremental to the Fiscal Plan as teachers do not currently have the ability to use accumulated sick days to increase pension benefits.  The Government has yet to identify how the cost of providing these benefits will be offset to retain neutrality with the Fiscal Plan.  Therefore, the Oversight Board has determined that Act 82 is significantly inconsistent with the Fiscal Plan.

Mr. Marrero Díaz
October 21, 2020
Page 5 of 6

With this background, if the Government remains committed to implementing Act 82, it must first explain specifically how it intends to achieve the savings necessary to make Act 82 revenue neutral.  Unless and until the Government provides this information and commits to achieving the requisite targets, any implementation of Act 82 will be in violation of PROMESA and should not take place.

\*          \*          \*          \*          \*

We believe the discrepancies highlighted above as well as the Governor's conduct demonstrate that all three Acts violate numerous sections of PROMESA, including 204, 207, and 108(a)(2). As we have seen no realistic plan by which these Acts may be implemented within the bounds of the Fiscal Plan or PROMESA, the Government should reverse its decision and immediately cease any implementation of the Acts.

However, if the Government remains committed to implementing these Acts notwithstanding their costs, upon receipt from the Government of a certification of implementation of a plausible plan, including headcount reduction and a process for tracking incurred costs vs. positions eliminated[2] on an agency-by-agency basis, that the Oversight Board determines will reduce costs as needed without sacrificing the level of public services required by the Commonwealth Fiscal Plan, the Oversight Board will incorporate such reductions into certified fiscal plans, as well as reduced payroll in certified budgets.  The Oversight Board does not consent to any implementation unless and until it notifies you that it finds plausible the savings plans described above.

Please provide the information requested in this letter – including any substantive cost-savings plans for the Acts – by October 28, 2020.  Given your stated intent to implement Acts 80 and 82, we also seek your confirmation that implementation of these measures has ceased by 5:00 PM on October 22, 2020.

Should the Governor continue with her plan to implement Acts 80 and 82, the Oversight Board reserves the right to take such actions as it considers necessary, consistent with PROMESA sections 204, 207, and 108(a)(2), including preventing the enforcement or implementation of the Acts.  We hope that will be unnecessary.

We look forward to continuing to work together for the benefit of the people of Puerto Rico.

Sincerely,

Natalie A. Jaresko

---

[2] This would include information by agency identifying: how many people elect the window, whether their position was deemed essential such that they could continue to work for a short period of time after applying, confirmation that their position was frozen, and what is their benefit amount with and without the window.

Mr. Marrero Díaz
October 21, 2020
Page 6 of 6


CC:   Hon. Wanda Vázquez Garced
       Hon. Thomas Rivera Schatz
       Hon. Carlos J. Méndez Núñez

**<u>Exhibit 10</u>**

  

# Supplemental Certificate of New Law Pursuant to 48 U.S.C. §2144(2)(B)

**Legislative Measure Number:**

- On August 19, 2020, the Government submitted a Section 204 Certification ("Certification") for Act 81 of 2020 ("Act 81"). As expressly stated in such Certification, the Government hereby supplements and updates the same, as well as the actuarial report.

- As previously discussed in the submitted Certification, Act 81 establishes an act to provide a "dignified retirement" for police officers, firefighters, custody officers and emergency technicians (collectively, "public safety employees"). In general, Act 81 amends the retirement benefits of certain public safety employees either under Act 447-1951 or Act 1-1990. The Act provides the following guaranteed pension (representing a percentage of their last salary) for those covered employees:

  - Employees covered by Act 447-1951
    - 55 years old= 50% of salary
    - 58 years old= 55% of salary

  - Employees covered by Act 1-1990
    - 55 years old= 45% of salary
    - 58 years old= 50% of salary

  - Permanent employer contribution of $100 for health insurance.

- The Retirement System Administration commissioned an updated actuarial report to Integrum LLC ("updated Integrum report") in order to assess the impact of Act 81 as enacted. See attached. According to the updated Integrum report, the implementation of said legislation could be satisfied by limiting the hiring of new recruits to fill the vacant posts or by hiring at lower rates. Thus, achieving budget neutrality. See attached. The updated breakdown is as follows:

  - Employees covered by Act 447-1951
    - Limiting hiring of new recruits for about $124 million over a period of 30 years.
  - Employees covered by Act 1-1990
    - Limiting hiring of new recruits for about $728 million over a period of 40 years.

1

  

**DEPARTAMENTO DE HACIENDA**
GOBIERNO DE PUERTO RICO

**Estimate of Impact of the Legislative Measure on Expenditures and Revenues for the fiscal years covered by the Fiscal Plan:**

- Act 81 will be implemented in a budgetary neutral form, as recommended by the updated Integrum report. Specifically, the corresponding agencies will implement Act 81 by limiting the hiring of new recruits or by hiring at lower rates and, therefore, limiting new payroll expenditures for about $852 million during a period of 30-40 years.
- The Government of Puerto Rico will implement the legislation using budgeted resources for the pertinent fiscal years covered by the Fiscal Plan. In the event that a reprogramming of budgeted resources is needed, the appropriate agency will submit to the Financial Oversight and Management Board for Puerto Rico a formal request in accordance with the provisions of PROMESA.
- Act 81 has no impact on revenues.

**Determination of the Legislative Measure's Compliance with the Fiscal Plan:**

- Act 81 is not significantly inconsistent with the 2020 Fiscal Plan for Puerto Rico.

**Exhibit 11**



**FINANCIAL OVERSIGHT & MANAGEMENT BOARD
FOR PUERTO RICO**

Members
Ana J. Matosantos
Andrew G. Biggs
Justin Peterson

David A. Skeel, Jr.
Chair

Natalie A. Jaresko
Executive Director

**BY ELECTRONIC MAIL**

November 9, 2020

Omar J. Marrero Díaz
Executive Director
Puerto Rico Fiscal Agency and
Financial Advisory Authority

Dear Mr. Marrero Díaz:

I am writing in response to your letter dated October 28, 2020 (attached as Attachment 1) regarding the implementation of Acts 80-2020, 81-2020, and 82-2020 (the "Acts"). The Government was not responsive to the Oversight Board's (i) direction to cease implementation of the Acts and (ii) request for specific information and a program for achieving the savings necessary to make the Acts revenue neutral.

Each of the Acts offers enhanced retirement benefits to government employees and will generate costs incremental to the Fiscal Plan,[1] as well as the applicable fiscal plans of PRASA, HTA, municipalities, and other public employers whose employees would be eligible for these enhanced benefits. No matter how many employees retire under each Act, these enhanced benefits are still incremental to the applicable fiscal plans. The Oversight Board has concluded that, together, these Acts could cost the Commonwealth and other public employers as much as $8.3 billion over the next thirty years.

Despite repeated requests, the Government has failed to show how it will pay for these costs. Your newly proposed phased approach does not answer this question and is not responsive to the Oversight Board's October 21, 2020 letter.

---

[1] References to the Fiscal Plan mean the Certified Fiscal Plan for the Commonwealth of Puerto Rico dated May 27, 2020.

Mr. Omar Marrero Díaz
November 9, 2020
Page 2 of 6

## Act 80

The Oversight Board has determined that each retirement under Act 80 will create an incremental cost not covered by any of the applicable fiscal plans.  If 100% of the eligible participants elect to retire and receive the benefits provided by Act 80, as the Government's own analysis assumes, Act 80 will cost as much as $4.2 billion over the next 30 years, with $2.2 billion of that related to Commonwealth employees and $1.4 billion for municipalities alone.  The Government has stated that it will pay for these costs by eliminating the positions of those who retire under Act 80. However, the Oversight Board has serious concerns about the Government's ability to achieve these necessary offsetting savings through payroll reductions, especially given provisions under Act 80 which allow certain positions to be deemed essential and replaced, at an agency's discretion.

For example, the Commonwealth Fiscal Plan already *requires* the Government to eliminate 3,200 positions[2], so the Government cannot rely on the payroll savings generated from the first 3,200 retirements under Act 80 to generate the savings it is claiming.  If all 7,400 eligible Commonwealth employees retire[3], the Government must identify $2.2 billion in additional savings, which, if achieved through payroll reductions, equates to $65 million in annual payroll reduction, indexed with inflation, over the 30-year Fiscal Plan.  We estimate achieving this level of savings exclusively through payroll reductions would require the permanent elimination of an additional 1,500 positions upon retirement at the Commonwealth alone, for a total of 4700 retirees not replaced.  Otherwise, the Government must identify the equivalent savings elsewhere in the budget and Fiscal Plan to generate the savings necessary to make Act 80 revenue neutral under the Commonwealth's Fiscal Plan.

Other public corporation employers with eligible employees (such as those at PRASA, HTA, CRIM, COSSEC, Ponce Muelle, AEELA, Metropistas, and the municipalities) would need to generate approximately $2.0 billion in additional savings, which equates to $60M in annual payroll reduction, indexed with inflation over the 30-year period, to pay for Act 80 benefits for their own retirees, either by permanently reducing headcount in excess of the reductions already required in their respective fiscal plans, or identifying other specific savings to ensure revenue neutrality and compliance with their fiscal plans.  Under no circumstance can or should the central government pay the incremental cost on any of those entities' behalf.  Please advise us if your computation of savings took into account the elimination of 3,200 positions at the Commonwealth under the Fiscal Plan and other positions required to be eliminated under the other public employers' fiscal plans regardless of Act 80, and that the elimination of these positions as a result of retirements under Act 80 would provide no savings incremental to the Commonwealth Fiscal Plan.

---

[2] These figures are based on average payroll for the covered group. Total number of positions that need to be eliminated will depend on the actual payroll of each impacted position.

[3] Commonwealth employees covered by the Fiscal Plan exclusive of those in the PRDE and Police Bureau.

Mr. Omar Marrero Díaz
November 9, 2020
Page 3 of 6

## Act 81

The Oversight Board has determined that each retirement under Act 81 will create an incremental cost not covered by the Commonwealth's Fiscal Plan. If every eligible participant receives the benefits provided by Act 81, Act 81 will cost as much as $2.4 billion over the next 30 years. To cover these incremental costs, and to make Act 81 revenue neutral under the Fiscal Plan, the Government would need to generate the same amount in savings over the next 30 years. To achieve this level of savings would require permanently eliminating $70 million in costs through annual payroll reduction, indexed for inflation over the 30-year Fiscal Plan, or the equivalent of approximately 1,360 positions. The Fiscal Plan for the Commonwealth already *requires* the Government to eliminate 475 of these positions based on budgeted payroll. To find the savings solely in payroll, the Government would need to eliminate at least 1,835 total positions of those who retire under Act 81 to generate the savings necessary to make Act 81 revenue neutral under the certified Fiscal Plan. Otherwise, the Government will need to identify equivalent savings under the Fiscal Plan to ensure consistency and revenue neutrality.

The Oversight Board also fails to see how a phased approach to implementing Act 81 will assist in ensuring the Act is not significantly inconsistent with the Certified Fiscal Plan. Under Act 81, an applicant can retire with a higher benefit whenever they reach retirement age. Therefore, a phased implementation does not provide any enhanced clarity or ability to tailor headcount levels or find other savings based on participation in Act 81 retirement (as in Act 80), because participation will be ongoing and thus the Government will not know the total cost of the increased benefits under Act 81 on any particular timeframe. As with Act 80, every employee who retires with Act 81's benefits will create costs incremental to the Fiscal Plan. Moreover, the enhanced benefit will apply to all 8,640 participants expected to meet Act 81's eligibility requirements. As such, the Government must create a plan to cover those additional costs to achieve consistency with the Certified Fiscal Plan.

## Act 82

Your explanation of how Act 82 will work is not clear from the law itself and it is inconsistent with ERS's internal analysis (which the Government provided). The Oversight Board's understanding is that ERS's internal service purchase mechanism would permit a TRS participant with 108 unused sick days to "purchase" 60 months of service credit and retire up to five years earlier.

Even under your new interpretation, Act 82 seems likely to create additional costs in all events. Even simply allowing teachers to retire earlier without any increase in pension benefits (which we believe is not the case given the guidance from ERS and the language of the Act), is likely to result in additional incremental costs because teachers will then receive retirement benefits for a longer period of time. At a minimum, an actuarial analysis is required to assess whether the benefits under the Act, such as a longer service period, will increase costs. To date, the Government has not provided any such analysis or estimate and has not offered any plan to offset such costs.

Mr. Omar Marrero Díaz
November 9, 2020
Page 4 of 6

Finally, as with Act 81, the Oversight Board fails to see how a phased approach to implementing Act 82 will assist in ensuring that the Act is not significantly inconsistent with the certified Fiscal Plan. A phased implementation does not provide any enhanced clarity or ability to tailor headcounts to cover the cost because Act 82's benefits will become fixed and permanent, and the effects will continue to play out over the next 20 to 30 years under current Puerto Rico law.

*      *      *

We reiterate that the Acts must not be implemented until their true costs and means of paying for them are known and approved by the Oversight Board.

Based on your letter and the concerns set forth above, the Oversight Board specifically requires the following for each Act:

**Act 80**
1. Confirmation from the Government that it understands the payroll and headcount reductions expected to be achieved under the Fiscal Plan, or identification of additional information that would be required to attain such understanding, to be able to factor these into any future savings calculations.
2. A commitment from the Government to provide the Oversight Board with election data once Phase 1 is complete and also not to implement Phase 3, as described in your letter, unless and until the Government and the Oversight Board agree on (i) the costs of implementing Act 80 and (2) the plan necessary to make Act 80 cost neutral under the applicable fiscal plans, including for the Commonwealth, HTA, PRASA, and other subject employers.
3. An agreement from the Government that budgets for the agencies in future fiscal plans/budgets will be reduced in addition to the reductions already contemplated by the relevant fiscal plans by the payroll reductions or other identified budget reductions identified in Phase 2 of your letter to pay for the costs of the law. In light of the seeming intent to pay the enhanced benefits as part of payroll, rather than PayGo, this acknowledgement must include demonstration of a plan for tracking benefits paid and retiree status, even in the case of agency closures or mergers, to ensure that no fraudulent benefits are paid and that the costs of paying these benefits are not shifted to the General Fund.
4. A clear statement that the central government cannot and will not be able to cover the cost for the enhanced retirement benefits of municipal employees or public corporation employers as applicable (such as PRASA, HTA, CRIM, COSSEC, Ponce Muelle, AEELA, and Metropistas) that also participate in ERS.

**Act 81**
1. An implementation plan to offset Act 81's costs to which the Government can be held accountable, including a detailed analysis demonstrating that such savings are achievable over the extended timeframe, and whether any emergency services positions could be eliminated without jeopardizing essential police, firefighter, and other emergency services.

Mr. Omar Marrero Díaz
November 9, 2020
Page 5 of 6

**Act 82**

1. Clarification of the information in Exhibit A hereto to be able to properly calculate the potential impact of Act 82 and a corresponding amendment to the Act.
2. An updated certification under section 204(a) of PROMESA, including an actuarial analysis of the impact of the law based on the responses to Exhibit A.
3. A detailed plan to offset any costs identified in the actuarial analysis to which the Government can be held accountable.

The Oversight Board remains deeply concerned that the Government is creating uncertainty and anxiety among the public employees, particularly in light of the November 5, 2020 Human Resources Circular 20 – 48 sent to public employees. The Government must not allow retirees to leave their jobs and sign up for retirement programs that violate PROMESA, only to later lose those benefits if the Acts are invalidated, after having left their jobs. To mitigate that risk, the Government must notify all employees through a public statement that:

1. The benefits provided under the Acts are conditional and may never accrue in fact;
2. Anyone who applies for benefits may never receive the benefits promised by the Acts because each Act is at risk of non-implementation or nullification; and
3. No one should make retirement plans or career decisions based on the Acts until the Government and the Oversight Board agree on an implementation plan for each Act.

The Oversight Board remains willing to work cooperatively with the Government to analyze the Acts and explore possible implementation approaches that would make them revenue neutral under the applicable fiscal plans. Notwithstanding the foregoing, the Oversight Board believes the Acts are significantly inconsistent with the Fiscal Plan and impair and defeat the purposes of PROMESA by adding expense and jeopardizing services inconsistently with fiscal responsibility and the Fiscal Plan.

The Acts individually and together appear to be an attempt to circumvent or undermine the prior and pending freezes of pension benefits, including those required by the Fiscal Plan and the proposed plan of adjustment for the Commonwealth, by enhancing accrued benefits under plans that have been or will be frozen in various ways and by purporting to pay benefits through payroll (instead of PayGo). Please be advised that any benefits under these Acts are subject to the terms of the plan of adjustment, whether the benefits are paid through payroll or PayGo. The Oversight Board does not waive any of its rights, under PROMESA or otherwise, to bring appropriate legal action to enforce PROMESA's mandates and protect the people and the finances of the Commonwealth of Puerto Rico.

Finally, these Acts risk creating a precedent for all public employees who are not otherwise eligible for these enhanced benefits. The Oversight Board is concerned that the Acts will cause all other governmental employees not covered by these Acts to demand the same treatment, including early retirement, increased benefit payments, and sick day credit. If you believe other employees will not demand the same treatment, please explain why.

Mr. Omar Marrero Díaz
November 9, 2020
Page 6 of 6

We look forward to continuing to work together for the benefit of people of Puerto Rico.

Sincerely,

Natalie A. Jaresko

CC:   Hon. Wanda Vázquez Garced
      Hon. Thomas Rivera Schatz
      Hon. Carlos "Johnny" Mendez

**Exhibit A – Additional explanations for Act 82**

The following additional information is requested to clarify the Government's expectations as to how Act 82 would be implemented:

On September 25, 2020 the Government provided, in 'ERS Response to FOMB Sept. 21 Add. Retirement Acts Requests.pdf' (Section: Act 82, item: b), an explanation of a formula that would be used to credit sick balances as time worked in determining the participant's pension benefit. The methodology stated is a purchase of service. This methodology, and the specific example chosen (a participant earning sufficient service to qualify for the higher age/service benefit pension), implies that benefits will in fact potentially increase and be accelerated by the law. On October 28, 2020, however, the Government's letter to the FOMB stated "Finally, as to Act 82-2020, it is worthy to reiterate that such statute does not increase pension benefits".

As the law itself only specifies that "excess sick leave be taken into account as time worked," please clarify the Government's view of how the time worked that is credited is utilized in the determination of each of the following:
   a. eligibility for a particular benefit formula (1.8% of lifetime monthly income per year of service vs 75%/65% of pay benefit); and
   b. number of years used in 1.8% of lifetime monthly income per year of service benefit.

Furthermore, in order to provide clarity on how the law will be implemented, please fill in the following chart demonstrating how the calculation will be performed on the following sample participants. (For simplicity, assume that these participants have the same salary for all years)

|  |  | Participant A | Participant B | Participant C | Participant D |
|---|---|---|---|---|---|
| a. | Age at January 1, 2021 | 50 | 55 | 60 | 48 |
| b. | Monthly salary (for all time worked) | $2,796.67 | $2,796.67 | $2,796.67 | $2,796.67 |
| c. | Credited Service at January 1, 2021 (without regard to Act 82) | 29 years, 1 month | 24 years, 1 month | 10 years | 29 years, 1 month |
| d. | Days of sick leave | 25 | 25 | 80 | 80 |

**ASSUME NO ACT 82**

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| e. | Retirement eligible at January 1, 2021? |  |  |  |  |
| f. | If eligible at January 1, 2021, what benefit is payable if participant retires at January 1, 2021? |  |  |  |  |

Mr. Omar Marrero Díaz
November 9, 2020
Page 2 of 2

| | | | | |
|---|---|---|---|---|
| g. | If not eligible at January 1, 2021, what date is the participant first eligible to retire? | | | |
| h. | If not eligible at January 1, 2021, what benefit is payable if the participant retires at first eligibility? | | | |

**BENEFIT WITH ACT 82**

| | | | | |
|---|---|---|---|---|
| i. | Number of months of additional time work credited | | | |
| j. | Credited service at January 1, 2021 | | | |
| k. | Retirement eligible at January 1, 2021? | | | |
| l. | If eligible at January 1, 2021, what benefit is payable if participant retires at January 1, 2021? | | | |
| m. | If not eligible at January 1, 2021, what date is the participant first eligible to retire? | | | |
| n. | If not eligible at January 1, 2021, what benefit is payable if the participant retires at first eligibility? | | | |

**Exhibit 12**



# Section 204(c)
## Budgetary Adjustments
### November 20, 2020

# Reapportionments Requests – From October 30, 2020 to November 19, 2020

| Gov Request Number (PP) | Entity | Resolution | Approved Amount | Request Description |
|---|---|---|---|---|
| 17774 | Institute of Puerto Rican Culture | Approve | $ 13,000 | Approve a SRF budget increase of $13K from donations received in FY21 to create a mobil app for Puerto Rican crafts and workshops and to perform inventory of the General Correspondence of the Fortaleza Archive. |
| 07326 | Institute of Puerto Rican Culture | Approve | $ 59,000 | Approve a fund release and budget increase of $59K related to prior year insurance claim funds to cover professional services for restoration and conservation of art pieces that were affected by hurricane Maria. |
| 16378 | Office of the Election Comptroller | Approve | $ 61,000 | Approve a prior year fund release and SRF budget increase in order to meet operating needs. Funds come from anonymous donations to political campaigns in excess of allowed contributions and will be use for Purchase Services, Professional Services and Materials and Suppplies. Payroll expenses request was denied. |
| 18197 | Appropriations under the custody of the Treasury | Approve | $ 36,000,000 | Approve request to create APPROP account and SRF increase to make payments to the vehicle insurance providers in connection with the compulsory state-wide coverage as mandated by Act 253-1995. |
| 18277 | Puerto Rico Traffic Safety Commission | Partially Approve | $ 3,000 | Partially approve reapportionment from PayGo to Equipment to cover FY20 debts for hardware purchase. |
| 14897 | Puerto Rico Department of Justice | Approve | $ 13,000 | Approve interagency transfer from Assignments Under the Custody of OMB to cover payments for judgements against the State. |
| 14438 | Puerto Rico Police Department | Approve | $ 77,000 | Approve inter-agency transfer to comply with an agreement between PRPB and the Department of Justice for service payment to Datamaxx Applied Technologies Inc. |
| 18358 | Puerto Rico Police Department | Approve | $ 83,000 | Approve reapportionment from Payroll to Donations, Subsidies and Other Distributions to cover the additional balance needed for the payment of the fifth installment as required by the Thomas E. Pérez federal case. |
| 18103 | Puerto Rico Infrastructure Financing Authority | Approve | $ 108,000 | Approve intergovernmental transfer from assignments under OMB Custody for payment of two judgments awarded by the Court. |
| 10517 | Puerto Rico Public Broadcasting Corporation | Approve | $ 251,000 | Approve an interagency transfer to be able to make the payment of payroll of the former employees admitted to the early retirement program established by Law 70-2010 |
| 16877 | Department of Correction and Rehabilitation | Approve | $ 34,000 | Approve a fund release of funds to reimburse not guilty defendants for the use of electric shackles. |
| 18367 | Department of Education | Approve | $ 20,000,000 | Requests a reapportionment to reallocate funds amongst its FY21 General Fund Budget. The purpose of the reallocation is to cover the cost of repairs for 428 facilities, including 422 schools, 1 Special Education Center, 2 closed schools currently used for the adult program, and 3 closed schools currently used for administrative purposes. |
| 17946 | Department of Health | Approve | $ 106,379,000 | Approve reapportionment among its programs in order to classify CAPEX funds to the corresponding programs such as the Pediatric University Hospital, Adult University Hospital, Intellectual Disability Program, among others. |
| 18863 | Department of Health | Approve | $ 910,000 | Approve full amount in order for the Department to fullfill its Certified Fiscal Plan requirement of combating the Opiod Crisis in Puerto Rico |
| 01752 | Department of Natural and Environmental Resources | Approve | $ 300,000 | Approve fund release of account 793-0500133-081-2020 to remit payments related to FY20 debts. |
| UPR-003 | Department of Natural and Environmental Resources | Partially Approve | $ 127,000 | Approve a fund release to remit payments related to prior years debts (security, office supplies, ect). Only encumbered debts approved. Deny $37k as it pertains to Invoices from FY15 & FY16 that are covered by the stipulations of Title III of PROMESA. |

1

# Reapportionments Requests – From October 30, 2020 to November 19, 2020

| Gov Request Number (PP) | Entity | Resolution | Approved Amount | Request Description |
|---|---|---|---|---|
| 18214 | Economic Development Bank of PR | Approve | $ 210,000 | Approve reapportionment from Purchased Services to Professional Services to cover the costs of FY18, FY19 and FY20 external audits as well as additional legal services needed. |
| 18575 | Fine Arts Center Corporation | Partially Approve | $ 840,000 | Approve the use of $840,000 from previous year revenue to cover immediate payroll need, utiliy costs, professional services for external audit and legal services, materials and equipment. Additional funds would allow the agency to cover expenses through March 2021 and potential revenue could help alleviate more of the deficit before reevaluating budget needs in early 2021. |
| 17657 | Office of Management and Budget | Approve | $ 284,000 | Approve an intragovernmental transfer ($284k) from Assignments Under the Custody of OMB to cover the costs of licenses needed to continue the implementation of the Government-Wide Public Finance Management Project Plan (PFM). |
| 17488 | Office of Socioeconomic Development | Deny | $ - | Deny request as funds were transferred to Land Administration and ADEA for a restricted use under JR 66-2018. |
| 17497 | Public Service Regulatory Board | Partially Approve | $ 1,122,000 | Approve Puerto Rico Energy Bureau (PREB) request for a budget reapportionment in order to create 22 career positions and fund 7 trust positions that are currently vacant and not included in JRSP budget, given that Puerto Rico Energy Bureau is currently mandated to transition from its current position structure to one with no less than 75% civil servant employees and no more than 25% trust employees of the total employee roster according to the Fiscal Plan.⬚ |
| PRASA-FY21-003 | Puerto Rico Aqueduct and Sewer Authority | Deny | $ - | Deny request to reprogram $3M from "Pension Pay-Go" line item to the "Christmas Bonus" line items to "prefund" Christmas Bonus expenditures accrued during FY21 and destined to be disbursed during FY22. Prefunding of the Christmas Bonus accrual was rejected. Nonetheless, PRASA may submit future request to recognize Christmaas Bonus expenditures in FY21 if it identifies savings within "Payroll & Related". |
| 17879 | Puerto Rico Department of Labor and Human Resources | Approve | $ 149,000 | Approve request to pay for Main Building -Lead and Asbestos removal. |
| UPR-002 | Puerto Rico Federal Affairs Administration | Partially Approve | $ 327,000 | Partially approve reprograming of funds within its current FY21 GF budget for payroll, purchase services, transportation and other operating expenses in order to meet agency needs and operations. |
| 10485 | Puerto Rico Police Bureau | Partially Approve | $ 876,000 | Partially approve reapportionment request from Payroll/Salaries to cover Prior Year Debts fromFY20 related to fuel expenses owed to GSA and for the payment of overtime expenses related to the Task Force. |
| 14876 | Puerto Rico Police Department | Deny | $ - | Amount was rejected since GF is closed and agency must use FY21 budget to backpay obligations. This is for the payment to the Department of Labor corresponding to unclaimed and expired checks. |
| 17743 | Retirement Board of the Government of Puerto Rico | Deny | $ - | Deny the request to use profits from private equity investments to fund their operational costs as these might be subject to bondholders claims. |
| 17829 | University of Puerto Rico | Approve | $ 29,273 | Approve request to transfer $29.23M from Joint Resolution (Pass Through) Funds to Payroll and Related Costs, Materials and Supplies, Scholarships and Donations, and Other Operating Payments. |
| 18394 | University of Puerto Rico | Deny | $ - | Deny request due to UPR reporting expenses in the B2A line items (Salaries – Transitory / Part-Time Employees and Overtime) such that decreasing budget to zero in these line items could trigger noncompliance with Certified Budget for FY21 and  is not representative of the actual expense UPR is reporting. |
| PREPA-FY21-002 | Puerto Rico Electric Power Authority | Approve | $ 3,300,000 | Approve reporgramming of $3.3M from "Pension & Benefits" line item to fund a Christmas Bonus payment in FY21. |
| HTA-FY21-02 | Puerto Rico Highways and Transportation Authority ("HTA") | Approve | $ 550,000 | Approve reprogram request of $550,000 from "Pension Contributions" ($219,000) and "Administrative Costs (Pension)" ($331,000) line items to fund a Christmas Bonus payment in FY21. |
| 0004M | Office of Management and Budget | Approve | $ 66,000,000 | Approve OMB request from November 14, 2020 in the amount of $66M to pay Christmas Bonus to Government employees. |
| UPR-004 | University of Puerto Rico | Approve | $ 6,719,000 | Approve request to transfer funds of Realized Savings from Purchased Services, Transportation Services, and Facilities and Public Services to Christmas Bonus Expense. |

| | | Count | 33 | $ 244,824,273 |

2

November 2020 Public Meeting – Section 204(b) Contract Review



# Section 204(b)

## Contract Review

### November 20, 2020

# Puma Diesel Supply Contract Extension

November 19, 2020



Pre-Decisional | Privileged & Confidential Draft | Analysis Subject to Material Change

# Context: Diesel supply contract extension

**Vendor:** Puma Energy Caribe, LLC

**Context**

- Fuel purchases make up a significant part (~40%) of PREPA's expenses as detailed in the certified budget for FY21. Diesel purchases specifically, projected at ~570 thousand bbl for FY21, account for ~17% of the fuel budget (~$188M out of the projected ~$1.1B total cost of fuel)

- To secure its fuel supply, PREPA entered a one-year supply agreement for diesel fuel (distillate No.2) with Puma Energy Caribe, LLC (Puma) on November 21, 2019, for the following units: San Juan, Palo Seco, Aguirre, Mayagüez, Cambalache, and Gas Turbine Generation Stations
  - The contract expires on November 20, 2020
  - It is subject to an automatic renewal of one year unless one party notifies the other of their intent to not renew the contract 120 days prior to the contract expiration date. The contract extension is scheduled to begin on November 21, 2020 and expires on November 20, 2021

- In August 2020 PREPA conducted a RFI for diesel fuel but by the closing date had only received responses from 6 companies (incl. Puma). PREPA concluded that "there is limited interest from market participants to supply diesel fuel to PREPA"

- In November 2020, PREPA proposed to the Oversight Board to extend the existing contract by one year through a contract amendment. Beyond the 1-year extension, the proposed amendment includes a 1-year automatic renewal clause, subject to the same automatic renewal conditions as the current contract

- The Fiscal Plan requires PREPA to continue to proactively and periodically explore opportunities to improve fuel procurement and delivery terms

Pre-Decisional | Privileged & Confidential Draft | Analysis Subject to Material Change



# Section 204

## PRASA - GDB Debt Recovery Authority

### November 20, 2020

November 2020 Public Meeting - Section 204(b) Contract Review

# PRASA - GDB Debt Recovery Authority

**Overview:**

On November 29, 2018, the obligations of the Government Development Bank for Puerto Rico were restructured as a Qualifying Modification under Title VI of PROMESA (the "GDB Qualifying Modification"). As part of the GDB Qualifying Modification, PRASA's obligations to GDB under the  Loan Agreement were transferred to the GDB Debt Recovery Authority (the "DRA").

Proposed Contract is a Settlement Agreement for an outstanding loan between PRASA and the Government Development Bank for Puerto Rico. PRASA's obligations under the Loan Agreement are currently estimated at approximately $78 million (the sum of $57.7 million in principal plus accrued interest as of October 31, 2020).

On November 10, 2020, AAFAF, PRASA and the DRA agreed in principle to fully and finally settle PRASA's current contractual obligations under the Loan Agreement for a settlement payment of $20.5 million (representing a reduction of $57.5 million, or 74%, to the outstanding obligation inclusive of accrued interest), through the execution of a Settlement Agreement.

**Value: $20,500,000**



# PRASA - GDB Debt Recovery Authority

**Budget Compliance:**
Payment will be made from PRASA cash on hand, reflecting an extraordinary payment to fully resolve the balance.
Current Expense Fund balance as of November 10, 2020: $186,249,908.34

**Fiscal Plan Compliance:**
- Full Resolution at a Substantial Discount: Proposed settlement represents a 74% discount to outstanding claim and contractual obligation.
- Removes associated litigation risk
- Facilitates PRASA's ability to access the capital markets.
- Clears path for Proposed Refunding by removing any unnecessary noise resulting from efforts by the DRA to disrupt the process.
- Cleans PRASA's balance sheet.

**Recommendation**
- Approval with Observations

The obligations of PRASA under the PRASA DRA Loan represent less than 2% of PRASA's overall debt obligations. Without a settlement, the PRASA-DRA Loan will remain outstanding, is post maturity, and will continue to accrue interest (including potentially at the default rate of Prime + 150 bps, subject to a 6.00% floor) until fully resolved, unless discharged



November 2020 Public Meeting - Section 207 - Debt Issuance



# Section 207

## Debt Issuance

November 20, 2020

## Summary of Potential PRASA Refinancing for Savings and Resolution of DRA Loan

- **PRASA has hired Barclays to lead a syndicate to execute a potential refunding of certain outstanding PRASA Bonds subject to market conditions at the time of issuance**

  - Given the lack of updated disclosure, among other items, the Underwriter's will pursue a limited public offering to no more than 35 accredited investors with Refunding Bonds on parity with other indebtedness

  - Subject to market conditions, the refunding bonds are expected to amortize in a similar manner of Refunded Bonds with no maturity extension

    o No Front loading of savings and savings will be generally level throughout the existing maturity profile

      ✓ PRASA will use the annual savings to supplement their Capital Improvement Program or close the financial gap included in PRASA's fiscal plan

  - Refunding PV savings threshold for Senior / Subordinate Lien of 5% and 10%, respectively

  - Subject to market conditions, the Refunding Bonds will be fixed rate debt with a 10-year par call and that the issue will be sold without ratings

  - Subject to market conditions, the Refunding Bonds will be sold without a debt service reserve fund

  - Anticipated timing will be to bring the transaction to the market as soon as possible

- **The issue will be solely for the refunding with no New Money proceeds**

- **Resolution with GDB DRA**

  - PRASA / AFFAF and the GDB DRA have reached agreement to settle an outstanding loan for a $20.5 million payment

    o This represents reduction of $57.5 million or 74% of the outstanding obligation inclusive of accrued interest



*Preliminary and subject to change; additional information regarding the potential refinancing was disclosed on EMMA: https://emma.msrb.org/P11424408-P11105243-P11515291.pdf

# Gurabo 207 Request Overview



# Gurabo maintains surplus CAE funds after modification of existing debt

The Municipality of Gurabo (the "Municipality") is requesting authorization to **modify the use of the remaining proceeds** of the 2013 Series A, B and C General Obligation Refinancing Bonds with FirstBank, which total $541,773.75

| Description | Series | Original Amount | Remaining Amount |
|---|---|---|---|
| General Obligation Refinancing Bond 2013 | A | 7,308,975 | 479,713.81 |
| General Obligation Refinancing Bond 2013 | B | 3,379,175 | 57,736.00 |
| General Obligation Refinancing Bond 2013 | C | 1,835,325 | 4,323.94 |
| **Total** | | **$12,523,475** | **$541,773.75** |

The $541,773.75 will be **used for road resurfacing**, which is needed to restore damage caused to public roads by Hurricanes Irma and Maria

- The original amount, including the $541,773.75, was received in 2013 and it is **recognized as current debt** by the Municipality. The Municipality has been servicing the debt since 2013 using CAE funds
- The request to modify the use of remaining funds will **not increase the Municipality's debt levels** as this is not a new debt issuance
- Based on our analysis, the Municipality has **sufficient capacity to repay its current debt** with its CAE tax collection[1,2]

### *Projected Repayment Capacity FY21-FY28 ($ in 000's)*



| | FY21 | FY22 | FY23 | FY24 | FY25 | FY26 | FY27 | FY28 |
|---|---|---|---|---|---|---|---|---|
| | **5,794** | **6,440** | **6,000** | **5,565** | **5,132** | **4,739** | **4,868** | **5,051** |
| Surplus CAE | 2,804 | 3,143 | 2,705 | 2,272 | 1,881 | 2,012 | 2,192 | 2,453 |
| Existing Debt Repayment | 2,990 | 3,297 | 3,295 | 3,293 | 3,251 | 2,727 | 2,676 | 2,598 |

■ Existing Debt Repayment   ▫ Surplus CAE

The modification of debt will not impact the Municipality's current debt levels, which are projected to be paid with CAE tax collections. Therefore, the Oversight Board should approve this request

1. AAFAF's analysis on the capacity of repayment is based on FY20 cash flow revenues
2. AAFAF uses a CAE revenue of $4,717,744 for Gurabo; the CRIM FP shows a FY20 CAE cash flow of $4,764,000

November 2020 Public Meeting - Discussion on Laws 80-81-82



# Section 204(a)

## Submission of Legislative Acts to Oversight Board

### November 20, 2020

# Act 80, 81, 82 Analysis

November 20, 2020



Pre-Decisional | Privileged & Confidential Draft | Analysis Subject to Material Change

# Executive Summary of Acts 80, 81, and 82

**Acts 80, 81, and 82 will all likely have an incremental cost to the government**

**①**      **②**      **③**

| Act 80-2020 | Act 81-2020 | Act 82-2020 |
|---|---|---|

**Act 80-2020**

- **Provides early retirement window for employees across the government**, including public corporations (PRASA, HTA, COSSEC, AEELA) and municipalities

- The fiscal plan **already assumes savings via 3,200 headcount reduction** by FY 2023

  - The government <u>must not double count this value</u>

- The incremental cost is primarily driven **by enhanced retirement benefits paid out**

- **Analysis has not been performed by the Government** to support feasibility of high level of headcount reduction required

**Act 81-2020**

- **Provides enhanced retirement benefits** to police, firefighters, paramedics and correctional officers

- The incremental cost is primarily **driven by enhanced retirement benefits paid out**

**Act 82-2020**

- **Amends Law 26-2017 to authorize use of sick leave** towards teacher retirement eligibility and pension benefits

- The incremental cost is primarily **driven by the ability to buy up additional years of service** and the associated pension benefits derived from those additional service credits

2

# The Oversight Board has several key concerns with Acts 80, 81, 82

| The Government has not provided sufficient support for the Oversight Board to conclude that the laws are consistent with the certified fiscal plan |
|---|

**1 — Very expensive / Paid for with jobs**
- The enhanced benefits are very costly, potentially costing as much as $8.3 billion that must be offset by payroll savings or other savings. Pay for work and services is being converted into pay for retirement
- Government 204 certification relies on the elimination of positions under Act 80 or decreased hiring under Act 81 to pay for the cost of enhanced benefits

**2 — Cannot double fiscal plan savings**
- Reducing headcount / payroll up to Fiscal Plan forecasts produces no savings i.e. reduction from "100%" of pay is already assumed for these positions
- Any costs incurred to achieve these savings are not in the fiscal plan i.e. "50%" cost alone, but not payroll savings, is incremental to the Fiscal Plan

**3 — Laws don't ensure savings**
- Acts 81/82 do not require positions of retiring employees to be eliminated
- Even Act 80 allows Gov't to preserve positions if needed to provide essential services
- Some agencies and municipalities have already indicated that they will not be able to eliminate most positions.  If so, "100%" savings will not be achieved but "50%" cost will still exist

**4 — Unfreezes ERS System**
- Effectively unfreezes the government's ERS pension system freeze (upheld by the PR Supreme Court in 2013), undermining the Plan of Adjustment claims process and underlying Plan of Adjustment assumptions by increasing previously frozen PayGo obligation
- If Legislature can undo this reform, it sets a precedent on the ability to achieve other forecasted reforms

**5 — Imposes cost burden on others**
- Imposes considerable additional cost burden on non-central government ERS employers, including municipalities, HTA, PRASA, AEELA, and Ponce Muelle
- Some of those employers have already said the cannot achieve required savings

**6 — Federal funds**
- Could potentially jeopardize ability to access Federal Funds, particularly at agencies with payroll funded in part by Federal monies, such as the Department of Families

**7 — Repeating past mistakes**
- The Government has a history of promising benefits to employees that it cannot afford, which is what led to the bankruptcy of the pension systems in general and required the freezing of ERS in particular
- The Government must not mislead its workers again and promise them benefits they cannot afford to pay

# The Oversight Board engaged in a comprehensive and robust process under Section 204 of PROMESA to understand the fiscal impact and rectify the deficiencies

**1**    **2**    **3**    **4**

| FOMB expressed significant concern pre- enactment | Government submits incomplete data | Government again submits incomplete data | Government implements the laws in violation of PROMESA | |
|---|---|---|---|---|
| **June 2020** | **August 2020** | **September 2020** | **October 2020** | **November 2020** |

**June 2020**
- **FOMB sent letter on S.B. 1616** (Precursor to Act 80). Stated cost inconsistent with Fiscal Plan
- **FOMB sent letter on S.B 1623** (Precursor to Act 81). Stated police retirement benefit increase lacked cost analysis

**August 2020**
- **Gov't submitted incomplete certification** on cost for Act 80, 81 & 82
- **FOMB sent letter** noting incomplete certification by AAFAF. Requested 14-day notification
- **FOMB requested additional data** to support cost analysis of Act 80, 81 & 82

**September 2020**
- **Gov't submitted additional information** at Oversight Board's request
- **FOMB sent letter** noting Act certification still does not comply with PROMESA
- **FOMB issued statement** gov't should stop fiscally irresponsible retirement promises
- **FOMB received additional information** at month end; calculations revealed substantial potential cost
- Gov't issued revised Act 80 certification – still omits key items in analysis

**October 2020**
- **Gov't issued letter** notifying Board it will implement Acts 80/82
- **FOMB sent** letter to Gov't requiring data **showing laws have no costs**
- **Gov't issued revised Act 81 cert. –** still no specific savings analysis
- **Gov't issued circular letter n**otifying ERS employers of the Act 80 implementation / benefit
- **Gov't issued letter** with phased approach for Act 80 implementation

**November 2020**
- **FOMB sent** letter responding to the phased approach and reiterated requirement for Gov't. to **explicitly explain how acts would be paid for**
- **Gov't issued revisions to circular letter** clarifying no retirements in phase 1 for Act 80

# Each law has a significant potential costs the Government has not offset

| | Act 80-2020 | Act 81-2020 | Act 82-2020 |
|---|---|---|---|
| **Sources of cost** | **Enhanced Benefits**<br>• Benefits increased to 50% of current pay<br><br>• Retirement occurs immediately, accelerating pension costs<br><br>• Current benefit structure (frozen) is a percent of 2-5 year pay average from 2013, which is typically lower than current pay level used to calculate benefit under Act 80<br><br>• Extra $100/month medical benefit to age 62 | **Enhanced Benefits**<br>• Benefits generally increased to 45% to 55% of pay retirement (tiered)<br><br>• Benefits will increase further with future pay increases since benefit is based on pay at retirement<br><br>• Extra $100/month medical benefit for the life of the beneficiary<br><br>• Benefits available to all future retirees that qualify, not just for a limited window | **Years of Service Credit**<br>• Use sick leave to buy up to 5 additional years of service credit<br><br>• Additional service may accelerate timing of benefit and may cause earlier eligibility for improved pension formula<br><br>• Government has not provided clarity as to how service credit will be applied |
| **Cost of benefits** | • Up to $4.2B for Gov't, agencies, and municipalities<br><br>• $2.2B for PR Gov't alone | • Up to $2.5B | • Up to $1.6B |
| **Potential offsetting savings** | • Elimination of positions in excess of the 3,200 people already contemplated in the fiscal plan<br><br>• Reduction of 1,500 heads beyond fiscal plan is cost neutral<br><br>• All municipalities and public corporations must pay higher costs in full; the central gov't. cannot subsidize this cost for them | • Reduction of 1,300 emergency personnel in FY22 beyond fiscal plan is cost neutral<br><br>• Eliminating positions after FY22 results in fewer savings, requiring greater reductions. For example, if delayed to FY27, headcount reduction increases to 1,600<br><br>• No specific plan proposed | • None proposed |

5

32

November 2020 Public Meeting - Discussion on Laws 80-81-82

# The certified fiscal plan assumes personnel savings

## Key Considerations

- The fiscal plan already includes personnel cost reductions that must be achieved

- Using average salaries, this translates to a headcount reduction of ~3,200 people between FY21 and FY23, down from current levels of about 52,000 people. Down from 58,500 people in FY17

- For the Government to achieve "savings" from these new laws, it must achieve sufficient savings beyond the fiscal plan reductions already contemplated

- The fiscal plan assumes a careful balance between personnel reductions and the continued need for investment and provision of Government services

## Fiscal Plan Personnel Payroll



*$ in millions*

FY17: $2,638
FY21: $2,148
FY22: $2,033
FY23: $2,022
FY24: $2,041
FY25: $2,062
FY26: $2,084

*FY24-FY26 grows by inflation*

## Fiscal Plan Headcount (implied)



*Count*

FY17: 58,504
FY21: 51,949
FY22: 49,256
FY23: 48,734
FY24: 48,772
FY25: 48,804
FY26: 48,845

6

33

# Considerable costs are projected for Commonwealth agencies by Acts 80, 81, and 82[1]



- Act 80 incremental costs cause a large impact immediately as benefits are accelerated by the retirement window.  Costs decline as employees reach the age that they otherwise would have been assumed to retire.

- Act 81 and 82 apply to all future retirees and therefore costs increase gradually as employees retire with increased benefits.

- Payment of costs over lifetime of laws not likely to directly match cost patterns.  Payroll reductions to cover Act 80, for example, will be larger in later years.  Therefore, headcount reductions sufficient to offset Act 80 cost over 30 years still will not be enough to offset incremental costs under Act 80 in earlier years.

[1] Act 80 costs for Commonwealth Agencies excluding PRDE and Police Bureau
[2] Act 82 costs assuming increased service considered both for benefit eligibility and benefit amount

# Acts 80, 81, and 82 repeat past mistakes

| **The Government repeatedly increased benefits without adequate funding.**<br>**It bankrupted the pension systems** |
|---|

| | |
|---|---|
| **Past Ad Hoc Increases** | The Legislature, from time to time, increased pensions for certain retirees |
| **Additional Minimum Pension Benefits** | Benefits paid to retirement plan participants that supplement the core pension benefit the participant receives, who retired prior to July/Aug 2013 (ERS, TRS resp.) and Dec 2013 for JRS |
| **Christmas Bonuses** | Annual $200 bonus for each retiree, beneficiary, and disabled member for ERS members that retired prior to certain days, instituted with Act 98-1980 |
| **Medication Bonuses** | Annual $100 bonus for each retiree, beneficiary, and disabled member to cover health costs paid in July provided the member retired prior to certain retirement dates |
| **Summer Bonuses** | JRS retirees, hired before Dec 24, 2014 receive an annual $100 bonus paid in July |
| **Cost–of–Living Adjustments (COLAs)** | Legislature increased pensions by 3% for retired and disabled members, starting with the signing of Act 10-1992, with 3% increases occurring every 3rd year since.  Since 2007 ERS and TRS retirees have not received this increase |
| **Disability Benefits for High–Risk Positions** | Police, firefighters, and other employees in specified high–risk positions who are disabled in the line of work receive 80% (100% for Act 447 members) of compensation as of the date of the disability, payable as an annuity |
| **Additional Minimum Death Benefits** | Certain beneficiaries of deceased participants were entitled to certain benefit payments that shall be no less than $1,000 |

8

# Act 80-2020 Incremental Cost Analysis

November 2020 Public Meeting - Discussion on Laws 80-81-82

## Illustrative Act 80 cost estimate using average participant statistics[1]
### Demonstrates how employee listings provided by AAFAF generate costs cited by FOMB

| Components of cost | Exhibit A – Act 447 eligible | Exhibit B – Act 1 eligible (non-municipality) | Exhibit C – Act 1 eligible (municipality) | Total |
|---|---|---|---|---|
| **A.  Cost due to retirement benefits being received earlier** | | | | |
| 1. Number of employees | 7,180 | 4,120 | 5,650 | |
| 2. Expected retirement age | 65 | 65 | 65 | |
| 3. Average age of eligible population | 59 | 54 | 56 | |
| 4. Average number of years participant receives their benefit early (2 - 3) | 6 | 11 | 9 | |
| 5. Average benefit being received under Act 80 | | | | |
| a. Average salary | $34,450 | $44,350 | $22,750 | |
| b. 50% of average salary (50% x a) | $17,225 | $22,175 | $11,375 | |
| **6. Total early payments (1 x 4 x 5b)** | **$740M** | **$1,005M** | **$580M** | **$2,325M** |
| **B. Cost of higher Act 80 benefits after age 65** | | | | |
| 7. Act 80 benefit (5b) | $17,225 | $22,175 | $11,275 | |
| 8. Average current benefit prior to Act 80 | $12,500 | $10,700 | $5,600 | |
| 9. Incremental benefit (7 - 8) | $4,725 | $11,475 | $5,675 | |
| 10. Average life expectancy | 24 | 24 | 24 | |
| 11. Expected lifetime beyond expected retirement age (10 - 4) | 18 | 13 | 15 | |
| **12. Total higher benefits (1 x 9 x 11)** | **$610M** | **$615M** | **$480M** | **$1,705M** |
| **C. Cost of medical benefit payable to age 62** | | | | |
| 13. Years of benefit  (age 62 - 3) | 3 | 8 | 6 | |
| **14. Total benefit ($1,200 x 1 x 12)** | **$25M** | **$40M** | **$40M** | **$105M** |
| **D. Total value of benefit enhancement under Act 80 (6 + 12 + 14)** | **$1,375M** | **$1,660M** | **$1,100M** | **$4,135M** |

[1] Basic demographic data for all Act 80 ERS eligible employees as provided in the noted Exhibits provided to FOMB by AFAAF on 9/25/2020.  Substituting average participant statistics quoted by Integrum will produce approximately the same costs as the Integrum report, or approximately $5,300M

10

November 2020 Public Meeting - Discussion on Laws 80-81-82

# Act 81-2020 Incremental Cost Analysis

November 2020 Public Meeting - Discussion on Laws 80-81-82

# Illustrative Act 81 cost estimate using average participant statistics[1]
## *Demonstrates how employee listings provided by AAFAF generate costs cited by FOMB*

| Components of cost | Exhibits D-G: All Act 81 employees |
|---|---|
| **A. Cost of higher Act 81 benefits at same average retirement age as assumed in fiscal plan** | |
| 1. Number of employees | 8,640 |
| 2. Average age | 50 |
| 3. Average number of years participant receives benefits by FY 2049[2] | 20 |
| 4. Average benefit being received under Act 81 | |
| a. Average salary | $44,500 |
| b. 50% of average salary[3] (50% x 4a) | $22,250 |
| 5. Average current benefit | $9,500 |
| 6. Incremental benefit from Act 81 (5 - 4b) | $12,750 |
| **7. Estimated value of enhancement (1 x 3 x 6)** | **$2,200M** |
| **B. Cost of medical benefit payable for life** | |
| 8. Medical annual benefit | $1,200 |
| 9. Average number of years participant receives benefits by FY 2049 | 20 |
| **10. Value of medical benefit (1 x 8 x 9)** | **$200M** |
| **C. Total value of benefit enhancement under Act 81 (7 + 10)** | **$2,400M** |

[1] Basic demographic data for all Act 81 ERS eligible employees as provided in the noted Exhibits provided to FOMB by AFAAF on 9/25/2020. Substituting average participant statistics quoted by Integrum will produce approximately the same costs as the Integrum report, or approximately $1,400M
[2] Expected lifetime, limited by fiscal plan measurement period (primarily impacting those who retire in future years)
[3] Actual % depends on law governing individual retirement and age at retirement. Act 81 benefit ranges from 45% to 55% of salary.

12

November 2020 Public Meeting - Discussion on Laws 80-81-82

# Act 82-2020 Incremental Cost Analysis

13

# Government has communicated inconsistent interpretations of Act 82-2020

| Government's communication | Description of Government claim |
|---|---|
| 8/19/2020: 204 certification | • Claims no cost of law<br>• Cites fact no cash payment made for sick leave upon termination<br>• Ignores / provides no commentary on pension impact |

**Correspondence with FOMB**

| | |
|---|---|
| 8/21/2020 | • Confirms no actuarial analysis performed |
| 9/11/2020 | • Claims 20 sick days equal 11 months credit |
| 9/25/2020 | • Details calculation of time worked credited as service purchase<br>• Explicitly uses example how service purchase could be used to hit 30 year mark which provides enhanced benefit formula |
| 10/28/2020 | • Indicates no benefit amounts will be increased, only payments accelerated through using increased service to reach retirement eligibility sooner<br>• Law does not make this distinction |

## Oversight Board position on Act 82

• Act 82 credit of sick leave as time worked, as credited through service purchase, suggests both benefit improvement and acceleration of benefits

• Overall cost of law as much as $1.6 billion if teachers get full credit for service using maximum service purchase outlined by the Government

• Any improvement in benefit levels or timing is an increase in pension payments relative to the fiscal plan, even if future clarification lowers cost estimate

• The Government has not proposed any mechanism by which costs of Act 82 will be paid

14



# Public Board Meeting:
# Counterproposal Summary Materials

November 20, 2020



# October 30, 2020 Revised Proposed Plan of Adjustment

**Subsequent to reaching an agreement with holders of over $10.6 billion of General Obligation bonds in February, COVID has caused the FOMB to revisit the Fiscal Plan, upon which the Plan of Adjustment was premised**

- Based upon that review, the Board engaged in mediation in August to revise the previously-agreed terms to reflect the increased uncertainty with respect to the Puerto Rican economy
- Mediation ended on September 30 with public disclosure of the August 18 FOMB Proposal and the August 24 Creditor Counter

**In light of the FOMB's judgment that the long-term viability of Puerto Rico would require a reduction in previously-agreed consideration and further de-risking, the FOMB's October 30, 2020 Proposal included a contingent instrument in order to compensate creditors in the case of potential outperformance**

| ($ in millions) | February 9, 2020 Plan of Adjustment[1] (Pre-COVID) | October 30, 2020 Public Meeting Proposal (Post-COVID) |
|---|---|---|
| **Cash** | - $5,861 | - $5,984 |
| **Debt** | - $9,353<br>　— $1,472 maximum annual debt service[2]<br>　— 50% General Obligation / 50% secured[3] | - $4,980<br>　— $1,050 maximum annual debt service[2]<br>　— 100% General Obligation |
| **CVI** | - None | - Based on outperformance of Sales and Use Tax collections<br>- $1,000 maximum<br>　— $50 annual cap; unused amounts do not carry forward into future years |
| **Blended Aggregate Recovery** | - 41.3% | - 34.1% including max. value of CVI |
| **Pension** | - Benefits less than $1,200 per month not affected[4]<br>- Benefits greater than $1,200 per month reduced by 8.5% | - Benefits less than $1,500 per month not affected<br>- Benefits greater than $1,500 per month reduced by 8.5% |

(1) February 9, 2020 Plan of Adjustment shown assuming effective date of July 1, 2021.
(2) Inclusive of COFINA debt service.
(3) COFINA Jr.
(4) No pension will fall under $1,200.



2

43

## Proposed Plan of Adjustment: Board-Proposed CVI

**The Board's proposed Contingent Value Instrument is subject to both annual and lifetime payment caps and will only pay out in the event that the SUT outperforms the May 2020 Certified Fiscal Plan.**

**Assumptions**

- Contingent instrument limited to sharing of outperformance of the 5.5% SUT relative to the May 2020 Fiscal Plan projections

- Sharing of outperformance subject to both annual and lifetime caps

- Creditors to receive 40% of outperformance above Fiscal Plan projections of projected 5.5% pledged SUT collections

  - Remaining 60% of outperformance to accrue to the Commonwealth

  - Attachment point (i.e., strike price) at 100% of May 2020 Fiscal Plan projections (i.e., status quo)

| | Description |
|---|---|
| **Source of Repayment** | ▪ 5.5% Pledged Sales and Use Taxes (SUT) |
| **Structure of Instrument** | ▪ $1,000mm face GO Issuance<br>▪ Face value reduced by $50mm annually, regardless of actual contingent cash payment |
| **Sharing of Outperformance** | ▪ 60% Commonwealth / 40% CVI |
| **Annual Cap** | ▪ $50mm<br>▪ Unused amounts do not carry forward into future years |
| **Lifetime Cap** | ▪ $1,000mm |
| **Term** | ▪ 20 years |



3

**Exhibit 13**

# GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

**BY ELECTRONIC MAIL**

November 18, 2020

**Natalie Jaresko**
Executive Director
Financial Oversight and Management Board for Puerto Rico

***Re:    Acts 80-2020, 81-2020, and 82-2020 (collectively the "Retirement Acts")***

Dear Ms. Jaresko:

We hereby respond to your letters dated November 9 and 16, 2020 , regarding the Retirement Acts ("November 16 Letter").

First of all, it should be noted that your November 9 Letter did not include a timeframe or deadline to respond and, once again, incorporated *new* requests for information, including an actuarial analysis of the impact of Act 82-2020. As you are most surely aware, the Government of Puerto Rico has been fully immersed in the government transition process and hearings that commenced on November 16, 2020 to ensure a complete and responsible transfer of power, essential to democracy. Accordingly, your sudden demand for the Government to respond to the November 9 Letter within one business day, is wholly unreasonable.

On AAFAF's October 28, 2020 letter, we proposed a phased approach to implementation of the Retirement Acts. In particular, with respect to Act 81-2020, phase I (which contemplates commencing and completing the process for applications of the qualifying public employee participants) is currently underway. As to Acts 81-2020 and 82-2020, the Government advised it expects to implement a similar phased framework in order to be in a better position to evaluate qualifying participants and confirm the expected amount of aggregate savings; any other approach would provide speculative results. Since the October 28 letter, there has been no material change in the framework that warrants an immediate Government response.

Notwithstanding the aforementioned, we address some of your specific requests as to Act 80 below:

1.  The Government understands the measures contemplated in the Fiscal Plan.

2.  The Government will provide election data from phase I, once phase II is completed or near completion.

---

PO Box 42001  •  San Juan, PR 00940-2001  •  Telephone (787) 722-2525



2

3. The Government is committed to being efficient in the development of the budgets, so budgets will reflect any savings that result from the phased implementation of the act.

4. As you are aware, Act 80 benefits will be paid from payroll; that is also true as to municipalities and public corporations' qualifying participants.

As to the rest of your specific requests in the November 9 Letter, in light of the ongoing government transition and the upcoming holidays, the Government requires additional time to collect the information and/or respond. The Government will provide an update and an appropriate timeframe to respond by November 25, 2020.

As always, the Government of Puerto Rico is committed to collaborating with the Oversight Board to reach consensus on these matters for the benefit of the people of Puerto Rico.

Respectfully,

Omar J. Marrero Díaz
Executive Director

**<u>Exhibit 14</u>**

# GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

**BY ELECTRONIC MAIL**

November 20, 2020

**Natalie Jaresko**
Executive Director
Financial Oversight and Management Board for Puerto Rico

*Re:    Acts 80-2020, 81-2020, and 82-2020 (collectively the "Retirement Acts")*

Dear Ms. Jaresko:

As you know, the Retirement Acts pursue social justice policies targeted at vulnerable and important components of the public employees sector. To date, the Government of Puerto Rico (the "Government") has responded to multiple Oversight Board requests for information and has provided thousands of documents to support the Government's conclusion that these acts represent billions of dollars in savings. As you know, the Government has even provided actuarial studies to the Oversight Board, which explain the savings provided for in the Retirement Acts. It is important to note these acts do not represent pension benefit increases, since the benefits will be paid out of the payroll line item budget of the different agencies, corporations and municipalities.

In light of the most recent actions and public comments by the Oversight Board, which threaten public employees that make use of the benefits of the Retirements Acts, we hereby confirm the Government of Puerto Rico (the "Government") will continue to identify the interested employees that wish to make use of the benefits of the Retirement Acts, as described in my previous correspondence regarding this matter. However, to ensure public employee's rights, and to provide certainty to the ongoing processes in the debt negotiation front, the Government will not implement the Retirement Acts until an agreement is reached with the Oversight Board concerning these important public policy acts.

As always, the Government of Puerto Rico is committed to collaborating with the Oversight Board to reach consensus on these matters for the benefit of the people of Puerto Rico.

Respectfully,

Omar J. Marrero Díaz
Executive Director

PO Box 42001 • San Juan, PR 00940-2001 • Telephone (787) 722-2525



**Exhibit 15**



# FINANCIAL OVERSIGHT & MANAGEMENT BOARD
## FOR PUERTO RICO

Members
Ana J. Matosantos
Andrew G. Biggs
Justin Peterson

David A. Skeel, Jr.
Chair

Natalie A. Jaresko
Executive Director

**BY ELECTRONIC MAIL**

November 23, 2020

Omar J. Marrero Díaz
Executive Director
Puerto Rico Fiscal Agency and
Financial Advisory Authority

Dear Mr. Marrero Díaz:

In respect of your letters dated November 18, 2020, and November 20, 2020, concerning Acts 80-2020, 81-2020, and 82-2020 (the "Acts"), I am writing to confirm the agreement we reached during the Oversight Board's public meeting on November 20, 2020: the Government will not implement the Acts until an agreement is reached with the Oversight Board concerning the Acts. Based on your November 20, 2020 letter and that agreement, the Oversight Board decided not to consider a resolution at the meeting authorizing the commencement of litigation against the Government concerning the Acts together with appropriate injunctive relief.

With respect to your letter dated November 18, 2020, the Oversight Board grants the Government's request that it have until November 25, 2020, to provide an update and appropriate time frame to collect the information requested by the Oversight Board in its November 9 letter.

We look forward to continuing to work together for the benefit of the people of Puerto Rico.


Sincerely,


Natalie A. Jaresko

CC:    Hon. Wanda Vázquez Garced

**<u>Exhibit 16</u>**

# GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

**BY ELECTRONIC MAIL**

December 15, 2020

**Natalie Jaresko**
Executive Director
Financial Oversight and Management Board for Puerto Rico

*Re:      Acts 80-2020, 81-2020, and 82-2020 (collectively the "Retirement Acts")*

Dear Ms. Jaresko:

As you are aware, during the last months, the Government of Puerto Rico ("Government") and the Oversight Board have been engaged in discussions regarding the Oversight Board's concerns with the Retirement Acts. As per our November 20, 2020 correspondence, the Government agreed to continue the proposed phased implementation of phases one and two to identify the interested employees that wish to make use of the benefits of the Retirement Acts; and to not implement phase three until an agreement is reached with the Oversight Board concerning these important public policy acts.

In connection therewith, we hereby notify that the Employees Retirement Systems ("ERS") and the Office of Management and Budget ("OMB") issued a second amendment to Circular Letter 2020-01 (the "Amended Circular Letter"). See **Exhibit 1**. In sum, the Amended Circular Letter: (1) informs Government entities of the phased implementation of Act 80-2020 by which the Government will first complete the Election Period, quantify the amount of employees that wish to make use of Act 80's benefits; and validate the projected savings; (2) extends the Election Period (as defined by Act 80-2020) until January 22, 2021; and (3) advises the program will not go into effect until ERS and OMB so allows via circular letter to those effects.

Please note the Amended Circular Letter only extends the Election Period by one month and in no way represents a modification to the Government's agreement to not implement phase three until an agreement is reached with the Oversight Board. To confirm, no employee will be allowed to leave public service under the Retirement Acts, until an agreement is reached with the Oversight Board. Please don't hesitate to contact AAFAF should you have any questions.

As always, the Government is fully committed to collaborating with the Oversight Board on these matters for the benefit of the people of Puerto Rico.

Respectfully,

Omar J. Marrero Díaz
Executive Director

PO Box 42001  •  San Juan, PR 00940-2001  •  Telephone (787) 722-2525



 

14 de diciembre de 2020

CARTA CIRCULAR NÚM. 2021-03           CARTA  CIRCULAR  NÚM.  014-2020
*Administración de los Sistemas de Retiro*        *Oficina de Gerencia y Presupuesto*

SECRETARIOS, DIRECTORES, JEFES(AS) DE AGENCIA, DEPARTAMENTOS, OFICINAS, COMISIONES, ADMINISTRACIONES, ORGANISMOS, INSTRUMENTALIDADES, CORPORACIONES PÚBLICAS Y CUALQUIER OTRA ENTIDAD GUBERNAMENTAL, ASÍ COMO ALCALDES, PRESIDENTES DE LOS CUERPOS LEGISLATIVOS, CONTRALORA DE PUERTO RICO, DIRECTOR DE LA OFICINA DE ADMINISTRACIÓN DE LOS TRIBUNALES (OAT) Y DIRECTOR(A) EJECUTIVO(A) DE LA ASOCIACIÓN DE EMPLEADOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO (AEELA).

Lcdo. Luis M. Collazo Rodríguez           Sra. Iris E. Santos Díaz
Administrador                             Directora
Administración de los Sistemas de Retiro   Oficina de Gerencia y Presupuesto

**SEGUNDA ENMIENDA A CARTA CIRCULAR ASR NÚM. 2021-01/OGP NÚM. 012-2020 DE 14 DE AGOSTO DE 2020 SOBRE PROCEDIMIENTO PARA LA IMPLEMENTACIÓN DE LA LEY NÚM. 80 DEL 3 DE AGOSTO DE 2020**

El 3 de agosto de 2020 entró en vigor la *Ley del Programa de Retiro Incentivado y de Justicia para Nuestros Servidores Públicos,* Ley Núm. 80 del 2020 (la "Ley 80-2020") para permitir que empleados elegibles del Gobierno de Puerto Rico puedan, voluntariamente, separarse de forma incentivada de su empleo antes de la edad de retiro. Según se establece en la exposición de motivos, además de hacer justicia a nuestros servidores públicos, mediante la implantación de dicha medida se proyectan ahorros al Fondo General del Gobierno, así como a los presupuestos de municipios y corporaciones públicas, de hasta $1,400 millones durante los próximos 30 años.

Por otro lado, el estatuto dispone que la Directora de la Oficina de Gerencia y Presupuesto junto al Administrador del Sistema de Retiro tendrán todos los poderes necesarios y convenientes para implementar dicha Ley. A esos efectos, establecerán mediante carta

1




circular conjunta el procedimiento, los términos y formularios para la implementación del Programa de Retiro Incentivado (el "Programa") y las disposiciones de la Ley 80-2020.

Conforme a lo anterior, el 14 de octubre de 2020 se promulgó la Carta Circular ASR Núm. 2021-01/OGP Núm. 012-2020 para establecer el procedimiento para la implementación inmediata del Programa dispuesto en la Ley 80-2020 (la "Carta Circular"). Posteriormente, el 9 de noviembre de 2020 se enmendó la Carta Circular para disponer que la separación del servicio de los empleados que se acojan al Programa comenzará luego de concluido el Periodo de Elección, sujeto a los planes adoptados por las Agencias.

Desde la aprobación de la Ley 80-2020, y continuando luego de emitirse la Carta Circular, tanto la ASR, como OGP y AAFAF han mantenido constantes conversaciones y producciones de información a la Junta de Supervisión y Control Fiscal ("FOMB", por sus siglas en inglés) para atender varias preocupaciones expresadas por FOMB con relación a los ahorros proyectados mediante la implantación del Programa y su compatibilidad con los Planes Fiscales del Gobierno de Puerto Rico bajo la Ley PROMESA. Como parte de dichas negociaciones, se notificó a FOMB que el Gobierno completará el Periodo de Elección para que los empleados elegibles se acojan al Programa completando los *Formularios de Elección* entregados por su patrono. Una vez se reciban los *Formularios de Elección* completados se cuantificará el número de empleados que se acogieron al Programa, a base de lo cual se procederá a validar la proyección de ahorros al presupuesto del Gobierno y se evaluarán las medidas de reorganización o planes de acción necesarios para el cumplimiento de los Planes Fiscales.

Mediante comunicación del 9 de noviembre de 2020, la FOMB autorizó al Gobierno a completar el Periodo de Elección y realizar el análisis de las proyecciones de ahorros reales a base del número de empleados que se hayan acogido al Programa. Mientras tanto, el Programa no surtirá efecto legal ni entrará en vigor hasta que el Gobierno y FOMB lleguen a un acuerdo final en cuanto a los impactos presupuestarios asociados al Programa, así como las medidas necesarias para asegurar el cumplimiento de la Ley 80-2020 con los Planes Fiscales aplicables.

Por lo tanto, y en atención a la incertidumbre general surgida con relación a la implementación del Programa, así como los días festivos venideros durante la temporada navideña, se enmienda la Carta Circular a los efectos de establecer que el Periodo de Elección para los empleados elegibles que deseen acogerse al Programa se extenderá hasta el 22 de enero de 2021. No obstante, y si bien la elección del empleado de participar en el Programa será final e irrevocable, la misma no será efectiva ni se procederá con la




separación de empleo hasta tanto la ASR y OGP emitan una directriz específica a esos efectos. Sin embargo, es importante recalcar que solo aquellos empleados que completen el *Formulario de Elección* podrán participar en el Programa una vez se proceda autorizar su implementación final. Los empleados que no completen el *Formulario de Elección* durante el Periodo de Elección no podrán disfrutar de los beneficios del Programa en caso de proceder con la implementación del mismo. Por consiguiente, se exhorta a los empleados elegibles interesados en participar del Programa a completar el *Formulario de Elección*, aclarando que dicha elección no comprometerá su estatus, derechos o condiciones de trabajo actuales, ni tampoco tendrá efecto legal alguno, en caso de no completarse la implementación del Programa.

Por otro lado, una vez completado el Periodo de Elección las Agencias deberán remitir a la ASR y OGP, dentro de los treinta (30) días subsiguientes, el *Registro de Participantes Elegibles* con la información completada en las columnas AJ y AK, los *Formularios de Elección* y el *Formulario de Impacto Fiscal y Ahorros* debidamente completados, el Plan de Retiro, y el Plan Escalonado si alguno. Se advierte a las Agencias que no podrán separar de empleo a los empleados que se acojan al Programa hasta tanto ASR y OGP expresamente lo autoricen mediante carta circular con directriz a esos efectos.

En la medida que una disposición de la Carta Circular emitida el 15 de octubre de 2020 conflija con lo aquí establecido, deberá considerase como enmendada de conformidad. Se mantienen inalteradas las demás disposiciones normativas contenidas en la Carta Circular. Para atender cualquier trámite posterior, se podrán emitir directrices adicionales.

Las disposiciones de esta enmienda a la Carta Circular entrarán en efecto inmediatamente.

**Exhibit 17**



# FINANCIAL OVERSIGHT & MANAGEMENT BOARD
## FOR PUERTO RICO

Members
Andrew G. Biggs
Betty E. Rosa
John E. Nixon
Justin Peterson

David A. Skeel, Jr.
Chair

Natalie A. Jaresko
Executive Director

**BY ELECTRONIC MAIL**

December 22, 2020

Omar J. Marrero Díaz
Executive Director
Puerto Rico Fiscal Agency and
Financial Advisory Authority

Re: Acts 80-2020, 81-2020, and 82-2020 (collectively, the "Retirement Acts")

Dear Mr. Marrero Díaz:

I am writing in response to your letter dated December 15, 2020. Thank you for confirming again our agreement reached during the Oversight Board's public meeting on November 20, 2020 that the Government will not implement the Retirement Acts until an agreement is reached with the Oversight Board.

The Oversight Board continues to conclude that each of the Retirement Acts is significantly inconsistent with the certified Fiscal Plan. The Oversight Board acknowledges the Government is proceeding with the first two phases of Act 80's conditional implementation to evaluate whether the Act will generate savings over and above the savings required under the Commonwealth's certified Fiscal Plan, or at least be cost neutral to the certified Fiscal Plan. As to Acts 81 and 82, the Government has not provided any information establishing these Acts could ever be implemented in a manner that is revenue-neutral, let alone one that generates savings over and above the certified Fiscal Plan.

Under the current circumstances, the Oversight Board remains concerned about the risk of uncertainty and confusion among public employees as to whether the Retirement Acts will be implemented. For example, as to Act 80, on your second amendment to Circular Letter 2020-01 (the "Amended Act 80 Circular Letter") we note that you specifically state that you will not implement said law until the Government reaches an agreement with the Oversight Board. However, you fail to state that Act 81 and 82 will not be implemented until an agreement is reached with the Oversight Board. Thus, as to Acts 81 and 82, with no path to avoid incremental pension costs, the Oversight Board believes these Acts should be repealed or amended to provide for revenue-neutrality.

Mr. Marrero Díaz
December 22, 2020
Page 2 of 2

At a minimum, the Government must clearly communicate to the public that, like Act 80, Acts 81 and 82 will not be implemented until an agreement is reached with the Oversight Board.  The Oversight Board requests that such notice be given, particularly to the public employees potentially affected by Acts 81 and 82, by December 28, 2020.

We look forward to continuing to work together for the benefit of the people of Puerto Rico.

Sincerely,

Natalie A. Jaresko

CC:     Hon. Wanda Vázquez Garced
          Mr. Luis M. Collazo Rodriguez
          Ms. Iris E. Santos Díaz

**Exhibit 18**

# GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

**BY ELECTRONIC MAIL**

January 15, 2021

**Natalie Jaresko**
Executive Director
Financial Oversight and Management Board for Puerto Rico

*Re:   Acts 81-2020 and 82-2020*

Dear Ms. Jaresko:

As you know, in our letter dated November 20, 2020 ("November 20 Letter"), the Government of Puerto Rico ("Government") agreed to not implement the Retirement Acts[1] until an agreement is reached with the Oversight Board concerning these important public policy acts. See **Exhibit 1**. Per your request, we hereby confirm that—as we communicated in the November 20 Letter—the Government will not implement Acts 81-2020 and Acts 82-2020 until it reaches an agreement with the Oversight Board.

As always, the Government is committed to collaborating with the Oversight Board to reach consensus on these matters.

Respectfully,

Omar J. Marrero Díaz
Executive Director

---

[1] Defined therein as Acts 80-2020, 81-2020 and 82-2020.

PO Box 42001 • San Juan, PR 00940-2001 • Telephone (787) 722-2525



**Exhibit 19**

**2021 Fiscal Plan for Puerto Rico**

# Restoring Growth and Prosperity

**As certified by the Financial Oversight and Management Board for Puerto Rico**

April 23, 2021

DISCLAIMER

The Financial Oversight and Management Board for Puerto Rico (the "FOMB," or "Oversight Board") has formulated this 2021 Fiscal Plan based on, among other things, information obtained from the Commonwealth of Puerto Rico (the "Commonwealth," or the "Government").

This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Oversight Board cannot express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

This 2021 Fiscal Plan is directed to the Governor and Legislature of Puerto Rico based on underlying data obtained from the Government. No representations or warranties, express or implied, are made by the Oversight Board with respect to such information.

This 2021 Fiscal Plan is not a Title III plan of adjustment. It does not specify classes of claims and treatments. It neither discharges debts nor extinguishes liens.

The 2021 Fiscal Plan may be amended from time to time, as appropriate in the sole discretion of the Oversight Board.

This 2021 Fiscal Plan is based on what the Oversight Board believes is the best information currently available to it. To the extent the Oversight Board becomes aware of additional information after it certifies this 2021 Fiscal Plan that the Oversight Board determines warrants a revision of this 2021 Fiscal Plan, the Oversight Board will so revise it.

For the avoidance of doubt, the Oversight Board does not consider and has not considered anything in the 2021 Fiscal Plan as a "recommendation" pursuant to Section 205(a). Nevertheless, to the extent that anything in the 2021 Fiscal Plan is ever deemed by the Governor or Legislature or determined by a court having subject matter jurisdiction to be a "recommendation" pursuant to Section 205(a), the Oversight Board hereby adopts it in the 2021 Fiscal Plan pursuant to PROMESA Section 201(b).

Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various legal, financial, social, economic, environmental, governmental and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Government and the Oversight Board, but also by other third-party entities such as the government of the United States. Examples of these factors include, but are not limited to:

–   *Any future actions taken or not taken by the United States government related to Medicaid or the Affordable Care Act;*

–   *The amount and timing of receipt of any distributions from the Federal Emergency Management Agency and private insurance companies to repair damage caused by Hurricanes María and Irma;*

–   *The amount and timing of receipt of any amounts allocated to Puerto Rico and provided under the Community Disaster Loans Program;*

–   *The amount and timing of any additional amounts appropriated by the United States government to address the impacts of the COVID-19 pandemic;*

–   *The amount and timing of receipt of any additional amounts appropriated by the United States government to address the funding gap described herein;*

–   *The timeline for completion of the work being done by the Puerto Rico Electric Power Authority ("PREPA") to repair PREPA's electric system and infrastructure and the impact of any future developments or issues related to PREPA's electric system and infrastructure on Puerto Rico's economic growth;*

–   *The impact of the COVID-19 pandemic on the financial, social, economic, and demographic condition of Puerto Rico;*

–   *The impact of the measures described herein on outmigration; and*

–   *The impact of the resolution of any pending litigation in the Title III cases*

Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied warranty of facts or future events; provided, however, that the Government is required to implement the measures in this 2021 Fiscal Plan and the Oversight Board reserves all its rights to compel compliance. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a course of action or transaction, to purchase or sell any security, or to make any investment decision.

By receiving this document, the recipient is deemed to have acknowledged the terms of these limitations. This document may contain capitalized terms that are not defined herein or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should refer questions to the Oversight Board at comments@promesa.gov should clarification be required.

**List of Acronyms and Key Terms**

| | |
|---|---|
| AAFAF | Puerto Rico Fiscal Agency and Financial Advisory Authority (Spanish acronym) |
| AAR | Annual Audited Report |
| ACA | Affordable Care Act |
| ADEA | Agricultural Enterprise Development Administration (Spanish acronym) |
| ADSEF | Family Socio-Economic Development Administration (Spanish acronym) |
| ACFR | Annual Comprehensive Financial Report |
| AFSCME | American Federation of State, County and Municipal Employees |
| AMA | Metropolitan Bus Authority (Spanish acronym) |
| AMPR | Puerto Rico Teachers' Association (Spanish acronym) |
| April 2018 Fiscal Plan | Fiscal Plan certified by the Oversight Board in April 2018 |
| ARP | American Rescue Plan Act of 2021 |
| ASEM | Puerto Rico Medical Services Administration (Spanish acronym) |
| ASES | Puerto Rico Health Insurance Administration (Spanish acronym) |
| ASSMCA | Mental Health and Anti-Addiction Services Administration (Spanish acronym) |
| ATM | Maritime Transportation Authority (Spanish acronym) |
| BBA | Bipartisan Budget Act of 2018 |
| CAF | (FCC) Connect America Fund |
| CAGR | Compound Annual Growth Rate |
| CARES | Coronavirus Aid, Relief, and Economic Security Act |
| CASA | Sustainable Support to Students Centers Project (Spanish acronym) |
| CAT bond | Catastrophe bond |
| CBO | Congressional Budget Office |
| CDBG | Community Development Block Grant |
| CDBG-DR | Community Development Block Grant – Disaster Relief |
| CBDG-MIT | Community Development Block Grant – Mitigation |
| CCPRC | Cardiovascular Center of Puerto Rico and the Caribbean |
| CDPR | Center for Research, Education, and Medical Services for Diabetes |
| CDT | Diagnostic and Treatment Center (Spanish acronym) |
| CEE | State Elections Commission (Spanish acronym) |
| CHIP | Children's Health Insurance Program |
| CILT | Contribution-in-lieu of Taxes |
| CINE | Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico (Spanish acronym) |
| CMS | The Centers for Medicare and Medicaid Services |
| COFIM | Municipal Finance Corporation (Spanish acronym) |
| COFINA | Puerto Rico Sales Tax Financing Corporation (Spanish acronym) |
| COSSEC | Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives (Spanish acronym) |
| COR3 | Central Office for Recovery, Reconstruction, and Resiliency |
| CRF | Coronavirus Relief Funds |
| CRIM | The Municipal Revenue Collection Center (Spanish acronym) |
| CRRSA | Coronavirus Response and Relief Supplemental Appropriations Act |
| CTC | Child Tax Credit |
| CUB | Land Use Consult |
| DCR | Department of Corrections and Rehabilitation |
| DB | Defined Benefit pension plan |
| DC | Defined Contribution pension plan |
| DDEC | Puerto Rico Department of Economic Development Commerce (Spanish acronym) |
| DDP | Permitting Performance Dashboard |
| DEC | Determination of Categorical Exclusion |
| DMO | Destination Marketing Organization |
| DOH | Department of Health |
| DOJ | Department of Justice |
| DOJ-PR | Department of Justice – Property Registry |
| DOS | Department of State |
| DNER | Department of Natural and Environmental Resources |
| DPR | Discover Puerto Rico |
| DPS | Department of Public Safety |
| DRD | The Sports and Recreation Department (Spanish acronym) |
| DRF | Disaster Relief Fund |
| DRG | Diagnosis-Related Group |
| DSA | Debt Sustainability Analysis |
| DTOP | Department of Transportation and Public Works (Spanish acronym) |
| EA | Environmental Assessment |
| eFMAP | Enhanced FMAP |
| EIP | Economic Impact Payments |
| EITC | Earned Income Tax Credit |
| EPA | Environmental Protection Authority |
| ERP | Enterprise Resource Planning |
| ERS | Employee Retirement System |
| ESSER | Elementary and Secondary School Emergency Relief fund |
| FAM | Municipal Administration Fund (Spanish Acronym) |

3

| | |
|---|---|
| FCC | Federal Communications Commission |
| FDI | Foreign Direct Investment |
| FEDE | Special Fund for Economic Development (Spanish acronym) |
| Federal Government | The U.S. Federal Government |
| FEMA | Federal Emergency Management Agency |
| FEMP | Federal Energy Management Program |
| FFCRA | Families First Coronavirus Response Act |
| FHWA | Federal Highway Administration |
| FICA | Federal Insurance Contributions Act |
| FIE | Economic Incentive Funds (Spanish acronym) |
| FMAP | Federal Medical Assistance Percentage (FMAP) |
| FMM | Municipal Improvement Fund (Spanish acronym) |
| FOMB | Financial Oversight and Management Board for Puerto Rico |
| FPUC | Federal Pandemic Unemployment Compensation |
| FQHC | Federally Qualified Health Center |
| FTA | Federal Transit Administration |
| FTE | Full-Time Employee |
| FTZ | Foreign-Trade Zone |
| FY | Fiscal Year |
| FYTD | Fiscal-Year-To-Date |
| GAO | US Government Accountability Office |
| GASB | Governmental Accounting Standards Board |
| GDB | Government Development Bank for Puerto Rico |
| GDP | Gross Domestic Product |
| GF | General Fund |
| GNP | Gross National Product |
| Government | Government of Puerto Rico |
| Governor | Governor Pedro Pierluisi |
| GSA | General Services Administration |
| Hacienda | Puerto Rico Department of Treasury |
| HHS | US Department of Health and Human Services |
| HHS-OIG | Office of Inspector General at the U.S. Department of Health and Human Services |
| HIT | Health Insurance Tax |
| HMO | Health Maintenance Organization |
| HMS | HMS Ferries, LLC |
| HOPU | University Pediatric Hospital (Spanish acronym) |
| HPSA | Health Professional Service Areas |
| HRM | Human Resource Management |
| HTA | Highways and Transportation Authority |
| HUD | US Department of Housing and Urban Development |
| IEEE | Institute of Electrical and Electronics Engineers |
| IEP | Individualized Education Plan |
| IFCU | Independently Forecasted Component Units |
| IMF | International Monetary Fund |
| IPA | Investment Promotion Agency |
| IPR | Invest Puerto Rico |
| IRP | Integrated Resource Plan |
| Island | Puerto Rico |
| JP | Planning Board (Spanish acronym) |
| JRS | Judiciary Retirement System |
| KPIs | Key Performance Indicators |
| LEA | Local Education Agency |
| LUMA | LUMA Energy, LLC |
| M&A | Merger and Acquisition |
| March 2017 Fiscal Plan | Fiscal Plan certified by the Oversight Board in March 2017 |
| MADS | Maximum Annual Debt Service |
| MCOs | Managed Care Organizations |
| MDRP | Medicaid Drug Reimbursement Program |
| MFCU | Medicaid Fraud Control Units |
| MICE | Meetings, Incentives, Conferences, and Exhibitions |
| MiPE | Mi Portal Especial |
| Mi Salud | Medicaid program in Puerto Rico (now called VITAL) |
| MMIS | Medicaid Management Information System |
| MOU | Memorandum of Understanding |
| MTSS | Multi-Tiered System of Support |
| NAP | Nutrition Assistance Program (Spanish: Programa de Asistencia Nutricional, PAN) |
| NRW | Non-Resident Withholdings |
| NTSP | Transportation and Public Services Bureau (Spanish acronym) |
| OATRH | Office of the Administration and Transformation of Human Resources |
| OCFO | Office of the CFO |
| October 2018 Fiscal Plan | Fiscal Plan certified by the Oversight Board in October 2018 |

4

| | |
|---|---|
| O&M | Operations and maintenance |
| OECD | Organization for Economic Cooperation and Development |
| OGP | Office of Management and Budget (Spanish acronym) |
| OGPe | Permits Management Office (Spanish acronym) |
| OIPC | Independent Office of Consumer Protection (Spanish acronym) |
| OMA | Operations and Maintenance Agreement |
| OMB | Office of Management and Budget |
| OMEP | Office for Public School Improvement (Spanish acronym) |
| OPEB | Pension and Other Post-Employment Benefits (Spanish acronym) |
| P3 | Public Private Partnerships |
| P3 Authority | Public Private Partnership Authority |
| PA | Public Assistance |
| Parties | AAFAF and the Government |
| PayGo | Defined benefit actuarial responsibility program by which agencies and instrumentalities are responsible for paying their pensions obligations on an annual basis via a "PayGo Charge" |
| PBA | Public Buildings Authority |
| PBL | Project-Based Learning |
| PCOC | Consolidated construction permit (Spanish acronym) |
| PDMP | Prescription Drug Monitoring Program |
| PERM | Payment Error Rate Measurement |
| PEUC | Pandemic Emergency Unemployment Compensation |
| PIA | Pharmaceutical Industry Association |
| PISA | Program for International Student Assessment |
| Platino | Medicare Advantage program that also provides Medicaid wraparound services equivalent to Mi Salud / VITAL program |
| PMO | Program Management Office |
| PMPM | Per Member Per Month |
| POA | Plan of Adjustment |
| PPOA | Power purchase and operating agreement |
| PPP | Public Private Partnership |
| PPT | Pilot Project Team |
| PRASA | Puerto Rico Aqueduct and Sewer Authority |
| PRCCDA | Puerto Rico Convention Center District Authority |
| PRDE | Puerto Rico Department of Education |
| PREB | Puerto Rico Energy Bureau |
| PREMA | Puerto Rico Emergency Management Agency |
| PREPA | Puerto Rico Electric and Power Authority |
| PRHFA (or HFA) | Puerto Rico Housing Finance Authority |
| PRHTA (or HTA) | Puerto Rico Highway and Transportation Authority |
| PRIDCO | Puerto Rico Industrial Development Company |
| PRITA | Puerto Rico Integrated Transit Authority |
| PRITS | Puerto Rico Information Technology Service |
| PROMESA | Puerto Rico Oversight, Management and Economic Stability Act |
| PRPB | Puerto Rico Police Bureau |
| PRPL | Puerto Rico Poverty Line |
| PRTC | Puerto Rico Tourism Corporation |
| PSC | Puerto Rico Public Service Commission |
| PSRB | Public Service Regulatory Board |
| PU | Single business permit (Spanish acronym) |
| PUA | Pandemic Unemployment Assistance |
| PYMEs | Small and Medium Enterprises (Spanish Acronym) |
| RCM | Revenue Cycle Management |
| RFP | Request for Proposal |
| RR | Roosevelt Roads |
| RSA | Restructuring Support Agreement |
| SAEE | Associate Secretary for Special Education (Spanish education) |
| SAIDI | System Average Interruptions Duration Index |
| SAIFI | System Average Interruptions Frequency Index |
| SBP | Single Business Portal |
| SCO | State Coordinating Officer |
| SEAs | State Education Agencies |
| SIFC | State Insurance Fund Corporation |
| SIFDE | Financial Information System of the Department of Education (Spanish acronym) |
| SOGR | State of Good Repair |
| SRF | Special Revenue Fund |
| SR | Structural Reform |
| SRI | Infrastructure Agency Recommendation |
| ST ratio | Student-to-Teacher ratio |
| SURI | Internal Revenue Unified System (Spanish acronym) |
| SUT | Sales and Use Tax |
| SWIS | State Wage Interchange System |
| T&A | Time and Attendance |

| | |
|---|---|
| TAMP | Transportation Asset Management Plan |
| TANF | Temporary Assistance for Needy Families |
| TNC | Transportation network companies |
| TPB | Transportation Policy Board |
| TPFA | Third-Party Fiduciary Agent |
| TRS | Teachers' Retirement System |
| TU | Urban Train (Spanish acronym) |
| UDH | University District Hospital for Adults |
| UPR | University of Puerto Rico |
| URP | Uniform Remuneration Plan |
| USDA | United States Department of Agriculture |
| USDE | United States Department of Education |
| VITA | Volunteer income tax assistance |
| WIOA | Workforce Innovation and Opportunity Act |
| WIPR | Public Broadcasting Corporation (Spanish acronym) |
| 2019 Fiscal Plan | Fiscal Plan certified by the Oversight Board in May 2019 |
| 2020 Fiscal Plan | Fiscal Plan certified by the Oversight Board in May 2020 |

# Table of Contents

**Executive Summary** ........................................................................................ **10**

**PART I: Context for Puerto Rico's current economic and fiscal challenges** ...... **16**

*Chapter 1. Long-term economic trends in Puerto Rico* ........................................................ *16*

*Chapter 2. Context for PROMESA and the creation of the Oversight Board* ........................ *17*

    2.1    Enactment of PROMESA ................................................................................18

    2.2    Fiscal plans, budgets, and other Oversight Board tools ........................................19

    2.3    Conditions for termination of the Oversight Board..............................................20

*Chapter 3. Fiscal Plan updates due to natural disasters and emergencies* .......................... *25*

**PART II. Puerto Rico's path to fiscal and economic sustainability** .................... **28**

*Chapter 4. Macroeconomic and demographic trajectory* ..................................................... *28*

    4.1    Impact of the global COVID-19 pandemic ..........................................................30

    4.2    Federal and local relief spending for Hurricanes Maria and Irma, earthquakes, and the global COVID-19 pandemic ......................................................................... 31

    4.3    Impact of fiscal or government efficiency measures .............................................39

    4.4    Impact of structural reforms ............................................................................ 40

    4.5    Population projections......................................................................................41

*Chapter 5. Fiscal Plan financial projections (FY2022-FY2026)* ........................................ *42*

    5.1    Baseline revenue forecast ................................................................................43

    5.2    Baseline expenditure forecast........................................................................... 51

    5.3    Surplus potentially not available for the Commonwealth.......................................58

*Chapter 6. Long-term projections and Debt Sustainability Analysis (DSA)* ........................ *59*

    6.1    Long-term macroeconomic, revenue, and expenditure projections .....................59

    6.2    Debt Sustainability Analysis (DSA) ...................................................................64

**PART III: Restoring growth to the Island** ........................................................ **72**

*Chapter 7. Human capital and welfare reform* .................................................................. *74*

    7.1    Basis for human capital and welfare reforms .....................................................74

    7.2    Expand and broadly publicize the Earned Income Tax Credit (EITC) by leveraging ARP Act federal funding .................................................................................76

    7.3    Introduce a Nutritional Assistance Program (NAP) work/volunteer requirement79

    7.4    Create high-quality workforce development programs.......................................... 81

*Chapter 8. K-12 education reform* ................................................................................... *88*

    8.1    Implement a strategic plan to guide reforms ...................................................... 91

    8.2    Launch evidence-based curriculum reforms ........................................................92

    8.3    Create a post-COVID-19 back-to-school plan and stand up distance learning capabilities ...................................................................................................94

    8.4    Improve professional development opportunities for directors and teachers......97

    8.5    Make targeted investments to boost family engagement ....................................100

    8.6    Systematically collect, manage, and leverage data .............................................102

*Chapter 9. Ease of doing business reform* ....................................................................... *103*

    9.1    Current state of business regulation, investment promotion, and tourism attraction 103

    9.2    Streamline permits to promote business activity and public safety................... 107

9.3    Overhaul property registration to facilitate financial transactions and promote disaster-preparedness.........................................................................................112

9.4    Simplify paying taxes to spur economic activity....................................................115

9.5    Reduce occupational licensing to facilitate labor force participation .................117

9.6    Deregulate on-Island freight................................................................................ 118

9.7    Strengthen offshore investment attraction efforts ..............................................121

9.8    Prime tourism attraction efforts for success........................................................ 124

*Chapter 10. Power sector reform ...................................................................................... 127*

10.1    Introduction and context for energy reform........................................................ 127

10.2    Vision for power sector transformation................................................................ 129

10.3    Implementation and enforcement of power sector reform .................................. 142

*Chapter 11. Infrastructure reform ..................................................................................... 144*

11.1    Current structure of Puerto Rico's transportation system ................................. 146

11.2    The future of Puerto Rico's transportation system.............................................. 149

11.3    Implementation of the transportation system reform ....................................... 154

**Part IV. Investments to revitalize Puerto Rico ...............................................155**

*Chapter 12. Strengthening Puerto Rico's technology sector .............................................. 156*

12.1    Broadband infrastructure.................................................................................... 156

12.2    21st Century Technical and Business Education Fund......................................... 160

*Chapter 13. Cultivating a high-performing public workforce ........................................... 162*

13.1    The need for Civil Service Reform in Puerto Rico .............................................. 162

13.2    Civil Service Reform approach ............................................................................ 163

13.3    Financial management and reporting within the Commonwealth .................... 164

13.4    A human capital pilot to enable timely and effective financial reporting processes in the Government .......................................................................................................... 164

13.5    Oversight Board and pilot implementation collaboration .................................. 165

13.6    From pilot to government-wide Civil Service Reform implementation............. 166

13.7    Funding the program.......................................................................................... 166

**PART V: Transforming government to better serve the residents ................. 168**

*Chapter 14. Office of the Chief Financial Officer (OCFO)................................................. 170*

14.1    OCFO design parameters..................................................................................... 172

14.2    OCFO structure and agency efficiency measures ................................................ 176

14.3    Looking ahead – efficiency savings to be achieved and required implementation actions ........................................................................................................................180

*Chapter 15. Agency efficiency measures.......................................................................... 181*

15.1    Agency operational efficiencies and improvements ............................................184

15.2    Investing to support agency efficiency and recovery.......................................... 187

15.3    Department of Education (PRDE)........................................................................188

15.4    Department of Health (DOH) ............................................................................ 204

15.5    Department of Public Safety (DPS) ................................................................... 216

15.6    Department of Corrections and Rehabilitation (DCR)......................................222

15.7    Department of Economic Development and Commerce (DDEC) .....................228

15.8    Puerto Rico Innovation and Technology Services (PRITS) ............................... 231

15.9    Legislative Assembly...........................................................................................234

15.10  General Court of Justice ................................................................................235
15.11  State Elections Commission ..........................................................................235
15.12  Agencies that promote public integrity and transparency ................................237
15.13  All other agencies.......................................................................................237
Chapter 16. Medicaid investments and reform ..........................................................239
16.1  Current State of Puerto Rico's Medicaid program...........................................239
16.2  Medicaid investments.................................................................................. 240
16.3  Medicaid reform measures ..........................................................................242
16.4  Joining the Medicaid Drug Rebate Program: Opportunities and drawbacks .....246
Chapter 17. Tax compliance and fees enhancement ...................................................247
17.1  Current state and future vision for tax environment........................................247
17.2  Administrative tax initiatives to increase revenue collections ..........................247
17.3  Implementation and enforcement of revenue measures...................................250
Chapter 18. Reduction in appropriations to UPR ......................................................256
18.1  Current state and vision...............................................................................256
18.2  Key initiatives to reduce appropriations.........................................................257
18.3  Establish an independent needs-based scholarship fund for UPR ....................258
Chapter 19. Municipal services reform......................................................................258
19.1  Current state ...............................................................................................258
19.2  Disaster relief and the COVID-19 pandemic ..................................................263
19.3  Vision and reform needed to transform municipal services ..............................267
Chapter 20. Pension reform.....................................................................................271
20.1  Current state of and required changes to pension reform.................................271
20.2  Proposed pension reform initiatives...............................................................274
20.3  Implementation and enforcement of pensions measures .................................279
20.4  PayGo Compliance.......................................................................................281
Chapter 21. Ensuring successful implementation and fiscal controls ...........................285
21.1  Implementation architecture.........................................................................285
21.2  Oversight Board and OCFO implementation collaboration..............................286
21.3  Reporting on Fiscal Plan reforms .................................................................286
21.4  Ensuring fiscal controls and transparency ......................................................287
**PART VI. Conclusion.............................................................................................296**

**Appendix .............................................................................................................297**

Chapter 22. Model presentation ..............................................................................297
Chapter 23. Macroeconomic projections...................................................................299
23.1  Economic and demographic trends................................................................299
Chapter 24. Financial projections.............................................................................301
24.1  Detailed financial projections.......................................................................301
24.2  Debt policy revenues...................................................................................304
Chapter 25. Fiscal measures ...................................................................................305
25.1  Agency efficiencies......................................................................................305
25.2  Agency groupings and consolidation progress ................................................306

# Executive Summary

**The people of Puerto Rico need and deserve plentiful good jobs, a dynamic and prosperous economy, affordable and reliable electricity, and an efficient and responsive public sector—but have not had any of these things for more than a decade.** Instead, since 2005, the economy has shrunk, the number of people living under the poverty line has increased, electricity has remained expensive and unreliable, labor market regulations have remained burdensome, the business environment has remained complicated and difficult, and the public sector has provided declining levels of service at a high cost to residents.

In addition, over the last four years, the people of Puerto Rico have come through unprecedented hardships, including catastrophic hurricanes, political upheaval, earthquakes, and now the worldwide COVID-19 pandemic.  The Island has shown remarkable resilience and appears to be on the brink of emerging from the health and economic emergency.

The Federal Government's response to the crises – including over $100 billion in disaster recovery and COVID-19 response funding – provides a window of opportunity for the Government of Puerto Rico to take the transformative steps needed to create the conditions for growth, spur private sector innovation and investments, and improve opportunity and quality of life for residents.  The 2021 Fiscal Plan builds on that support and investment, while providing a comprehensive roadmap of reforms, investments, and measures to allow the Island achieve these critical objectives and ensure that the Government is sustainable and effective for the residents of the Island going forward.

*   *   *

To enable progress, the 2021 Fiscal Plan includes the steps necessary to address the longstanding fiscal management challenges that were contributing to growing forecasted deficits before the Fiscal Plan (See *Exhibit 1*). This deficit was difficult to forecast with certainty because of the protracted delays in issuing annual audited financial statements, lack of proper fiscal controls, lack of centralized financial records, and inefficient financial management. Puerto Rico had also been in an economic structural decline for over a decade, which led to an eroding tax base. To finance these primary deficits, Puerto Rico had resorted to issuing debt, which became unsustainable. As the Oversight Board began its work in late 2016, the Commonwealth was projected to run structural annual deficits exceeding $7 billion, or $3 billion before debt service.

EXHIBIT 1: PROJECTED PRE-FISCAL PLAN DEFICIT (BEFORE THE HURRICANES)



On top of these longstanding economic challenges, multiple large-scale natural disasters—including the 2017 hurricanes, 2019 and 2020 earthquakes, and recently the COVID-19 pandemic—have struck Puerto Rico in the last five years, testing the resiliency of public, private and social sector institutions like never before.

For nearly five years, the Financial Oversight and Management Board for Puerto Rico ("FOMB" or the "Oversight Board") has worked to fulfill the mandate of PROMESA—to ensure fiscal sustainability and restore access to capital markets—by developing a roadmap to institute robust structural reforms to spur economic growth, make strategic investments to improve the Island's resilience against natural disasters, and implement fiscal measures to improve government efficiency.

**First, the 2021 Fiscal Plan lays out a set of structural reforms that, if successfully implemented, would enable Puerto Rico to begin to grow again, countering the negative growth trajectory that has plagued the Island for over a decade.** These include human capital, welfare, and education reforms to advance successful participation in the formal labor market, reforms to streamline core business processes (e.g., paying taxes, registering property, and obtaining permits) to enable job creation by attracting greater levels of investment into the economy, and reforms to facilitate reliable power and stable infrastructure for businesses and households. Each of these are elements required for Puerto Rico to compete within the United States and globally, and to stem outmigration from the Island:

- **Human capital and welfare reform:** Promoting participation in the formal labor force by creating incentives to work through Earned Income Tax Credit (EITC) benefits and Nutritional Assistance Program (NAP) reform, as well as providing comprehensive workforce development opportunities to improve skills and ensure workforce is prepared for the jobs of tomorrow. EITC and NAP reform are projected to increase the economic growth rate by 0.15% in FY2025.

- **K-12 education reform:** Transforming the K-12 education system to dramatically improve student outcomes and contribute to an effective workforce in the long-term. Education reforms are projected to add 0.15% to the GNP growth rate between FY2037-FY2051.

- **Ease of doing business reform:** Improving the competitiveness and attractiveness of Puerto Rico's economy by reducing obstacles to starting and sustaining a business through improvements to processes to obtain permits, register property, and pay taxes; and by establishing best-in-class entities to attract investment and increase tourism. These reforms are projected to drive a 0.30% uptick in overall growth by FY2026.

- **Power sector reform:** Providing lower cost and more reliable energy through the transformation of PREPA, the establishment of an independent, expert, and well-funded energy regulator, and the development of cleaner and lower cost power generation. This reform is projected to increase growth by 0.30% by FY2026.

- **Infrastructure reform:** Integrating all transit assets under PRITA, so it can act as a unitary transit authority managing all transit assets on the Island (e.g., all buses, ferries, Tren Urbano), and reforming the public transportation sector more broadly.

EXHIBIT 2: IMPACT OF STRUCTURAL REFORMS



Impact of structural reforms, $M

**The 2021 Fiscal Plan has also allocated strategic investments to enhance economic growth, enable government response to emergencies, and enhance frontline service delivery.** Fiscal Plans have included funds for an Earned Income Tax Credit to encourage more formal labor market participation on the Island and needs-based scholarships for UPR to ensure every student on the Island can access higher education. To support frontline service delivery, Fiscal Plans have included raises for teachers, principals, firefighters, and police officers to ensure salaries for these critical frontline roles are more competitive. Strategic capital investments have been made in hospitals, correctional institutions, public safety equipment, and other infrastructure. After each natural disaster and crisis, the Oversight Board has worked with Government to make funds available to help individuals, businesses, and agencies navigate the crisis and recover, including pausing most fiscal measures for FY2021 to enable agencies to combat the COVID-19 crisis and allowing more time to implement operational changes. Finally, Fiscal Plans have established emergency reserves to enable the Government of Puerto Rico to act immediately to support the people of the Island during crises.

Moreover, to help the Commonwealth rebuild its infrastructure, strengthen its economy and improve the lives of local residents, the 2021 Fiscal Plan includes investments aimed at strengthening the ability of the Island to benefit from the growing importance of technology in every facet of life and business, as well as ensure a qualified, trained work force able to respond to the needs of this ever growing segment of the economy. The 2021 Fiscal Plan allocates $400 million to incentivize private sector investments in broadband build-out and to improve access to

faster speed offerings in underserved areas. These investments should help overcome barriers to broadband expansion and ensure that all residents and enterprises in Puerto Rico benefit from this capacity. It also allocates $50 million for a 21st century Technical and Business Education Fund to invest in local residents acquiring technical and business skills so that the people of Puerto Rico are able to compete in a global economy. Finally, the sustainability and quality of public services requires a comprehensive civil service reform to resolve the underlying problems and challenges of human resources management in the Government. The 2021 Fiscal Plan outlines a comprehensive plan to improve the civil service, starting with a pilot for financial management personnel. The 2021 Fiscal Plan includes almost $800 million in investment (FY22-51) in order to improve strategic human capital planning, recruitment, performance management and evaluations, and succession planning, as well as hiring of additional staff and salary increases for key personnel (where deemed necessary). Civil service reform is critical to address the root causes behind the lack of execution on important initiatives by the Government of Puerto Rico in the past. Without it positive sustainable change is not possible.

**In addition to these investments, the Fiscal Plan focuses on improving the responsiveness, efficiency, and affordability of the Government.** Fiscal Plans have included a set of fiscal measures that aim to create robust fiscal controls and accountability through the establishment of the Office of the CFO, consolidation and streamlining of agency operations, reduction of the ever-escalating costs of Medicaid and pensions, increasing revenue collections through improved compliance, and enhancing the fiscal self-sufficiency of the University of Puerto Rico and municipalities. The Oversight Board has worked hand-in-hand with Government agencies to craft clear pathways for each reform and reduce barriers to change.

These measures include:

- **Creation of Office of the CFO**: Instituting fiscal controls, centralizing fiscal authority, and improving governance, accountability, and transparency over budgets, reform implementation, procurement, and personnel to ensure the Government is an efficient and effective steward of its resources

- **Agency efficiencies**: Consolidating agencies to leverage valuable human and financial resources; centralizing procurement to achieve greater purchasing power and transparency; and transforming processes and deploying new management practices to deliver better governmental services for substantially lower cost

- **Medicaid reform**: Taking the necessary steps to curb fraud, waste, and abuse in the healthcare system, ensuring that resources are directed to those in need of health services, and improving health outcomes on the Island

- **Enhanced tax compliance and optimized taxes and fees**: Employing new technology and data to broaden the tax base, reducing non-compliance, and improving fairness to boost overall tax revenues while adjusting existing taxes and fees to capture revenues from under-leveraged sources

- **Reduction of appropriations**: Encouraging sound fiscal self-management and revenue generation among municipalities and the University of Puerto Rico by reducing central government appropriations, while meeting the needs of students facing financial challenges with the creation of an independently-managed, means-tested scholarship fund

- **Comprehensive pension reform**: Improving the financial stability of public employees through reforms that maintain enough funds to comply with the payment of pension benefits and provide the administration necessary to create a defined contribution plan for employees

The impact of these measures on revenues and expenditures is demonstrated in *Exhibit 3*.

13

EXHIBIT 3: IMPACT OF REVENUE AND EXPENDITURE MEASURES ON OWN REVENUES AND EXPENDITURES



Impact of measures on Government revenues and expenditures, $M

1 Own revenues includes all Commonwealth-collected revenues excluding gross up items included in the 2021 Fiscal Plan and excludes all federal transfers; includes impact of COFINA settlement
2 Own expenditures includes total Commonwealth funded operating expenditures, excluding federally-funded Medicaid and Social Programs; own expenditures increase during FY22 due to Medicaid Supplemental Funding phase out
3 Comprised only of fiscal measures attributable to the Commonwealth. Figures represent the net of expense measures and new investments

**Since certifying the first Fiscal Plan in 2017, and notwithstanding the emergencies, the Oversight Board has worked with the Government to make initial progress toward the objectives supporting the fiscal measures.** This has resulted in the ability of the Government to increase expenditures at a time of crisis, while ensuring total expenditure levels remain within total available revenues, rather than be forced to cut budgets that have not been carefully managed, as other states have been forced to do as COVID-19 has caused revenues to drop. There is a new level of transparency and control over government spending, including the elimination of multi-year appropriations that permitted overspending; controls over the reapportionment of funding between concepts of spend to eliminate the defunding of accrued liabilities; and regular reporting on revenues and expenses. Moreover, the fiscal year 2020 and 2021 budgets were built at a granular "concept code" level (e.g., differentiating between spend on professional IT services versus advisory services). The Oversight Board has been able to reject contracts that could have led to overspending, such as the proposal to externalize Puerto Rican prisons, and the Government has been held accountable to its implementation requirements via public hearings, such as those held on education, public safety, corrections, and economic development.

**These actions by the Oversight Board are the reason that the Commonwealth has been able to accumulate substantial surpluses,** which serve as a foundational element of the Commonwealth's progress in providing for investment, economic growth, and satisfaction of claims of all stakeholders.

14

EXHIBIT 4: 2021 FISCAL PLAN PROJECTED TOTAL SURPLUS BEFORE AND AFTER MEASURES AND STRUCTURAL REFORMS (EXCLUDING DEBT SERVICE)



Gap/surplus before and after measures and structural reforms, $M

\* \* \*

Though much progress has been made, diligent and focused efforts are needed in the coming years to accelerate momentum and reach a more sustainable path. While natural disasters and the pandemic have been incredibly damaging and disruptive to lives and livelihoods of the residents on the Island, they have been accompanied with over $100 billion in federal relief funding for disaster relief and recovery, and to respond to the COVID-19 pandemic.

**In conclusion, this unprecedented level of federal support—which represents over 100% of Puerto Rico's Gross National Product—**provides a once in a generation opportunity to build resilient infrastructure, invest in economic growth, improve government services, and rebound from the effect of the pandemic on residents, businesses, and the not-for-profit sector. The investments can also unlock creativity, entrepreneurship, and private sector investment when coupled with the much needed reforms to the business climate outlined in the Fiscal Plan. Finally, the near term support enables a window of opportunity to build a more effective government to serve the people. Taken together, these actions – if fully implemented – can help to stem the demographic outflow, improve quality of life, and return Puerto Rico to growth.

# PART I: Context for Puerto Rico's current economic and fiscal challenges

## Chapter 1. Long-term economic trends in Puerto Rico

Even before suffering a series of natural disasters in the form of hurricanes, earthquakes, and the COVID-19 pandemic from 2017-2020, Puerto Rico's economy had been in an acute structural decline for over a decade. The Government had defaulted on much of its debt, and nearly half of local residents lived below the national poverty line. The reasons for these problems are multiple, but the root causes stretch back 40 years.

In the 1940s and 1950s, led by Operation Bootstrap, Puerto Rico's economy grew rapidly and productivity increased by 5% per annum as it transitioned from an agricultural-led to a manufacturing-led economy. However, as economic performance began to decline in the 1970s, the Federal Government adopted two significant policies to help Puerto Rico shore up its economy.

First, transfer programs increased dramatically, particularly as Puerto Rico started receiving Nutritional Assistance Program (NAP) funding, eventually providing, in aggregate, a proportion of residents' personal income that was twice the U.S. mainland average. In addition to raising costs for the Government, these programs, at times, created disincentives to work due to benefits that were high relative to wages available in the formal labor market.

Second, in 1976, Section 936 of the federal tax code was introduced to promote investments by companies that could transfer their "intangible assets" to Puerto Rico, and thereby shift profits to the Island. These Section 936 companies, which were mostly in pharmaceuticals and life sciences, became a pillar of Puerto Rico's economy, creating valuable local supply chains and local banking deposits, and contributing substantial tax revenue. In the same year, Puerto Rico passed Law 80, which instituted protections against wrongful discharge for local workers and mandated severance for firms attempting to remove employees. This law made Puerto Rico's labor market significantly more rigid and placed it out of step with the prevailing labor markets in the U.S.

In 1996, Congress decided to end Section 936, gradually phasing it out by 2006. In the face of an anemic local private sector, the Government also expanded its employment to the point that, by 2000, 30% of Puerto Rico's jobs were in government and a full 40% of workers with college degrees worked in the public sector. Major sectors such as water, electricity, and ports are still run by public corporations, and have consistently created a drain on the economy by delivering lower quality services at high costs while crowding out private investment. There was also pervasive cross-subsidization among the Commonwealth, public corporations, and other parts of the public sector that obfuscates financial management and accountability. Finally, there was a high degree of political interference in decisions that affect every aspect of life in Puerto Rico. As a result, Puerto Rico underperformed on all important measures of a modern economy, including educational attainment, cost of electricity, quality of water, tax compliance, and labor market participation.

To promote the private sector, the Government undertook a broad tax incentives policy that led to a highly complex web of non-transparent subsidies and special tax arrangements. These actions neither promoted growth nor treated companies equitably, often discriminating against Puerto Rican companies in favor of multinational companies. Moreover, this system created no inducement for new investment without similar tax incentives, further eroding the potential tax base. In addition, generous government and federal transfer programs, taken together, produced disincentives to formal work, given the potential loss of housing and/or healthcare, while

increasing the share of the informal economy. Tax compliance has never been adequate in Puerto Rico, and it became increasingly difficult in this environment.

Government revenues suffered and became increasingly hard to forecast. Taken together with unmanageable and unconnected systems of accounting across government entities, as well as delayed financial audits, fiscal discipline eroded. To make up for this recurring and growing budgetary shortfall, the Commonwealth turned to debt markets. Puerto Rico bonds found themselves in every corner of the U.S. bond market and, as investor appetite began to wane, the Government turned to securing new debt by conditionally pledging various revenue streams. The result was a highly complex financial structure that limited transparency as well as financial accountability and management.

When the financial crisis hit in 2008, Puerto Rico's economy was already in a fragile fiscal and financial position. Since then, the economy has continued to worsen. Puerto Rico has seen its gross national product (GNP) shrink by 17%, labor force participation fall to a record low of 39%, and population decline by 15%.[1] Puerto Rico is much poorer relative to the mainland U.S. today than it was in 1970.

# Chapter 2. Context for PROMESA and the creation of the Oversight Board

In the context of these long-term economic and demographic trends, government spending lacked transparency and did not adjust to the new reality. As a result, before the establishment of the Puerto Rico Oversight, Management and Economic Stability Act (PROMESA), the Government was running large, long-term structural deficits (*Exhibit 5*).

EXHIBIT 5: LONG-TERM STRUCTURAL DEFICITS

Long-Term Historical Structural Deficits, $M



SOURCE: Audited financial statements

Although some changes were made to reduce government spending in the years leading up to PROMESA, contributions to the pension systems were persistently far below necessary levels. As shown in *Exhibit 6*, over the past two decades, the actuarial annual required contributions to the pension systems were far greater than the actual employer contributions made. In fact, as early as 2007, system actuaries had expressed that statutory contribution requirements were not sufficient to meet future plan needs. Despite that reality, while various steps were taken to

---

1   GNP and population decline represent the change between 2008 and 2018 per data from the World Bank Group's World Development Indicators

improve the funded status of the Retirement Systems over time, these large annual financial and operational shortfalls directly led to the depletion of the fund assets to a point where the pension systems were no longer viable.

EXHIBIT 6: EMPLOYEES AND TEACHERS RETIREMENT SYSTEM REQUIRED AND ACTUAL CONTRIBUTION




1 In 2015 the systems began reporting under GASB 67, which did not require calculations of the ARC if the contributions were made on a statutory basis. Thus, the system actuaries no longer computed the ARC for the pension benefits. ARCs after 2014 have been estimated based on the Total Pension Liability, Fiduciary Net Position and Service Costs disclosed in the GASB 67 valuation reports.

By 2016, Puerto Rico was in the midst of an irreconcilable liquidity, fiscal, and economic crisis. The Commonwealth was being crushed under the weight of public debt that was larger than its GNP, it had started to default on its debt obligations, and it had lost access to external financing. All of the overspending drew down the Government's bank account balances, leading to dangerously low liquidity levels and revenue shortfalls. At one point, the Government's primary cash account, the Treasury Single Account (TSA), fell to as little as $15 million. Even worse, these calamitous financial circumstances threatened to create a humanitarian crisis for the over 3 million residents living on Island. As the U.S. Secretary of the Treasury at the time observed, the Commonwealth's ability to provide basic healthcare, legal, and education services was in serious doubt. No multi-year, coordinated strategy existed to restore growth and opportunity to the people of Puerto Rico.

## 2.1   Enactment of PROMESA

On June 30, 2016, President Obama signed into law the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), 48 U.S.C. § 2101 et seq., to work toward a remedy to the ongoing fiscal and humanitarian crisis in Puerto Rico. The goal of PROMESA is to meet Puerto Rico's immediate need to provide its residents effective services, to formulate a debt restructuring, and to implement fiscal and structural reforms leading to a sustainable economy, fiscal responsibility, and market access.

PROMESA establishes two primary mechanisms for restoring fiscal responsibility. First, Titles I, II, IV, and V of PROMESA create the Financial Oversight and Management Board (FOMB or Oversight Board) for Puerto Rico and provide it powers and duties governing the review and certification of multi-year fiscal plans, annual budgets, major contracts and strategic infrastructure projects. Second, Titles III and VI of PROMESA provide for debt restructurings, similar to bankruptcy cases and out-of-court restructurings, respectively, for Puerto Rico and its instrumentalities. By incorporating many provisions of Title 11 of the United States Code (the "Bankruptcy Code") into Title III of PROMESA, which provides for restructurings similar to

18

restructurings under chapters 9 and 11 of the Bankruptcy Code, the statute also protects the debtors from creditor debt-enforcement actions that otherwise could prematurely extract billions of dollars from the Commonwealth and inflict irreparable damage on Puerto Rico's economy. The statute includes unique attributes, such as an automatic stay on debt that was triggered once the bill was signed into law. The Oversight Board is the sole representative of any debtor entity in a Title III case, with the exclusive authority to propose a Plan of Adjustment. PROMESA Title VI provides an alternate, out-of-court restructuring process conditioned on voting thresholds.

It should be noted that the Oversight Board is an independent entity within the territorial Government, rather than a department, agency, establishment, or instrumentality of the Federal Government. It is statutorily charged with restoring fiscal responsibility and market access to the Commonwealth.

## 2.2    Fiscal plans, budgets, and other Oversight Board tools

Under PROMESA, covered territorial instrumentalities/entities can be required by the Oversight Board to prepare and submit annual fiscal plans, who then reviews and either rejects or certifies them. The Oversight Board certifies fiscal plans and budgets to achieve PROMESA's goals to provide a method to achieve fiscal responsibility and access to the capital markets. The Oversight Board then tracks Government implementation of the fiscal plans to ensure compliance.

The certification and timely implementation of fiscal plans and balanced budgets are invaluable tools to achieve fiscal responsibility and restore Puerto Rico's access to the capital markets. Among other things, the certified fiscal plans and budget provide for estimates of revenues and expenditures in conformance with agreed accounting standards; funds essential public services; provides adequate funding for public pension systems; provides for the elimination of structural deficits; improves fiscal governance, accountability, and internal controls; and provides for capital expenditures and investments necessary to promote economic growth. Fiscal plans provide a route to direct the economy and finances of the Government of Puerto Rico towards economic growth and fiscal accountability. This is crucial for Puerto Rico to avoid repeating the mistakes of the past.

To ensure that covered entities deliver against fiscal plan measures, the Oversight Board has a variety of potential tools available, including:

- **Setting budgets:** The Oversight Board can certify the budget of the Government and its instrumentalities by type of expense and fund type. The Oversight Board has required more detailed budgets to prevent certain expenditures inconsistent with the current fiscal plan, understand consultant spending and enable measurements and monitoring of federal consent decrees or requirements (e.g., special education, juvenile detention).

- **Budget and fiscal plan compliance:** Official letters are written by the Oversight Board to the Office of the Chief Financial Officer (OCFO) and agencies if something is not in compliance of certified budget and fiscal plans (e.g., letters pursuant to Sections 203 and 204 of PROMESA).

- **Approval and review of contracts, legislation, executive orders, administrative orders, rules, and regulations:** The Oversight Board must review and approve all contracts with a value of $10 million or more to ensure Fiscal Plan compliance, and has the authority to refuse contracts and suggest the terms the new contract is required to meet. In addition, the Oversight Board may select to review contracts below the $10 million threshold for these purposes, on a random basis or at its own discretion.

- **Recommendations:** Per Section 205 of PROMESA, the Oversight Board drafts letters to the U.S. President and Congressional leadership, outlining recommendations for fiscal and financial management practice improvements, requiring a response from the Governor.

19

- **Public hearings:** The Oversight Board can hold hearings with agency representatives to publicly discuss progress on efficiency measures and related matters (i.e., use of reapportionments, budget requests). In the last years, the Board has convened several public hearings to bring attention to core issues related to Government reform.

- **Implementation tracking with monthly and quarterly reporting:** Agencies receive a template that they must use to report on headcount, Key Performance Indicators (KPIs), and milestone implementation actions, among other requirements. Monthly reports are drafted evaluating implementation progress and budget to actual analysis.

- **Working group meetings:** Agencies/reforms meet with implementation team with prepared materials, answer questions and requests. Often, Oversight Board may invite the Secretaries and Executive Directors of agencies to present status of implementation of efficiency measures during such working group meetings.

- **Stakeholder Engagement:** The Oversight Board undertakes stakeholder engagement efforts throughout the year with members of the Government, private sector, and nonprofit sector of the Island. These efforts help the Oversight Board better understand stakeholders' opinions, concerns and values. This allows the Oversight Board to incorporate stakeholder input into PROMESA plans and processes. Stakeholders efforts include meetings, webinars, workshops, and public panel discussions.

- **Policy Research and Data Analysis:** The Oversight Board conducts research, public policy analysis, and program evaluation to help bring more informed policymaking to Puerto Rico. It also presents policy ideas, reform proposals, and data analysis to support the public debate about what changes Puerto Rico needs to prosper.[2]

- **Publication of documents:** The Oversight Board can publish any materials submitted to them by the Commonwealth Government.

## 2.3   Conditions for termination of the Oversight Board

The Oversight Board was designed to have a finite life, defined objectives, and defined tools and authorities to achieve those objectives. Every action taken by the Oversight Board over the past five years has been dedicated specifically and exclusively to completing its mission as stated in the law as soon as possible. The Oversight Board seeks to complete its work under PROMESA promptly, so that fiscal controls, fiscal sustainability, and economic prosperity and growth can return to Puerto Rico.

PROMESA is specific in terms of how and when the Oversight Board can be terminated. The two provisions, found in Section 209 of PROMESA, that define when the Oversight Board can be dissolved, were incorporated into the federal law to ensure the board disappeared, for good, once Puerto Rico's financial outlook stabilized and better financial management processes have been put in place.

---

2   Financial Oversight and Management Board of Puerto Rico, Research And Public Policy Department

Section 209 of PROMESA (Termination of the Oversight Board) states the following:

> *An Oversight Board shall terminate upon certification by the Oversight Board that:*
>
> 1) *the applicable territorial government has adequate access to short-term and long-term credit markets at reasonable interest rates to meet the borrowing needs of the territorial government; and*
> 2) *for at least 4 consecutive fiscal years--*
>     A. *the territorial government has developed its Budgets in accordance with modified accrual accounting standards; and*
>     B. *the expenditures made by the territorial government during each fiscal year did not exceed the revenues of the territorial government during that year, as determined in accordance with modified accrual accounting standards.*

EXHIBIT 7: REQUIREMENTS FOR THE TERMINATION OF THE OVERSIGHT BOARD

| Category | Details | |
|---|---|---|
| **1. Adequate access to credit markets at reasonable interest rates** | **Complete Sustainable Debt Restructuring** | • Exchanged / new bonds trading well in the public markets<br>• Interest from traditional, institutional municipal bond buyers<br>• Evidence investors ready to invest in Puerto Rico again |
| | **Timely Financial Reporting** | • Publication of past due audited financials (ACFRs)<br>• Reasonable expectations future audited financial (ACFRs) will be issued on a timely basis |
| **2(A). The territorial government has developed its Budgets in accordance with modified accrual accounting standards for at least 4 consecutive fiscal years** | **Accrual budget** | • Establishment of budget on accrual basis, not cash basis |
| | **Revenue/Expenses** | • Changes in revenues/expenditures should be monitored against the forecast during course of year making necessary adjustments |
| | **Payroll Systems** | • 5 different payroll systems must be integrated into central accounting and budget systems, improving ability to control and limit personnel spending |
| | **Accounts Payable** | • Maintain an accounts payable ledger |
| | **Purchase Orders** | • Registration of purchase orders, professional serviced contracts, prior to service being supplied |
| | **Other Funds** | • Funding sources outside of the General Fund must be budgeted/evaluated by OMB and Legislature, especially those that are comingled in TSA |
| **2(B). Balanced budgets (expenditures did not exceed revenues) for least 4 consecutive fiscal years, as determined in accordance with modified accrual accounting** | **Accounting** | • Monthly closing and bank reconciliations<br>• Perform required activities to record cash transactions, A/P recording, budget transfers and month end close adjustments<br>• Understanding of economic conditions affecting revenue generation<br>• Measures to increase government efficiency and cost reduction |
| | **Systems** | • Up-to-date systemwide financial information system<br>• Integration between various accounting systems shift from manually executed to using system capabilities<br>• Visibility into all spending<br>• Real time spend reporting and review by leadership |
| | **Controls** | • Adequate real time spending controls<br>• Standardize Government-wide Financial accounting processes removing inconsistent adoption by agencies<br>• Implement change management to achieve closing cadence |

The Oversight Board has worked tirelessly to help the Government move quickly towards the accomplishment of all these requirements.

### 2.3.1   Progress on requirement #1: Adequate access to credit markets at reasonable interest rates

*Sustainable debt restructuring*

The Oversight Board has and is following a "once and done" approach to the restructurings, to ensure Puerto Rico will not be insolvent again. Together with the Government of Puerto Rico, the Oversight Board has made substantial progress in adjusting Puerto Rico's debt, the largest debt

restructuring in the history of the municipal bond market. The restructuring of more than a third of the outstanding debt has already been completed, totaling $27 billion, Plan Support Agreements have been announced for $35 billion in claims and over $50 billion in pension liabilities.

In May 2017, the Puerto Rico Government and the Government Development Bank (GDB) signed a Restructuring Support Agreement (RSA) with a significant portion of GDB creditors to restructure GDB's debt under PROMESA's Title VI. The RSA, as amended in April 2018, reduced about $5 billion of debt to about $3 billion, reducing the face value of claims by 45%. The debt payments are secured by GDB cash flow from certain legacy assets without recourse to the Puerto Rico Government. This restructuring cushioned municipalities by offsetting the loans they owed to the GDB by the full amount of their deposits at GDB.

In February 2019, the U.S. District Court approved the Plan of Adjustment for the Puerto Rico Sales Tax Financing Corporation (COFINA), the first debt restructuring completed under PROMESA's Title III. It reduced COFINA debt by $6 billion, from $18 billion to $12 billion. Furthermore, it reduced debt service payments by 32%, saving the people of Puerto Rico approximately $17.5 billion that will now be available to support the financial needs of the Commonwealth.

In August 2019, the Puerto Rico Aqueduct and Sewer Authority (PRASA) and the Government of Puerto Rico reached an agreement with the U.S. Environmental Protection Agency (EPA) and U.S. Department of Agriculture (USDA) to a consensual modification of about $1 billion of outstanding loans under PROMESA's Section 207. This agreement lowers PRASA's debt service payments on the U.S. Government program loans by about $380 million over the next 10 years and eliminates approximately $1 billion in guaranty claims against the Puerto Rico Government. Additionally, it provides PRASA with access to $400 million in new federal funding through various clean water programs over the next five years to support PRASA's ongoing effort to improve water quality and safety for the people of Puerto Rico.

On March 8, 2021, the Oversight Board  filed an amended Plan of Adjustment (POA) to restructure approximately $35 billion of debt and other claims against the Commonwealth of Puerto Rico, the Public Buildings Authority (PBA), and the Employee Retirement System (ERS); and more than $50 billion of pension liabilities. The amended plan, filed with the U.S. District Court for the District of Puerto Rico, provides a path to exit bankruptcy as early as the end of calendar year 2021 and creates a foundation for Puerto Rico's recovery and economic growth. An agreement in principle has been reached with certain monoline bond insurers with clawback claims. Efforts to transform the agreement in principle into a binding agreement are ongoing. An agreement has been reached with holders of Employee Retirement System bonds as well. Mediation continues with holders of general unsecured claims, certain other monoline bond insurers with clawback claims, and creditors holding other claims against the Government of Puerto Rico.

Key to the sustainability of any debt restructuring is the growth of the Puerto Rico economy.  The Oversight Board has stressed for the past five years that returning to economic growth requires structural reforms to enhance the reliability of power; improve educational outcomes, labor market participation and labor productivity; enhance the ease of doing business on the Island; and generate more effective returns on capital investments and infrastructure. All of these aim to strengthen Puerto Rico's competitiveness in the global marketplace, attract new private capital, the creation of jobs, and ultimately a better life for the residents of the Island.

*Timely financial reporting*

The requirement related to timely financial reporting includes expectations that the Government publish past due audited financials begin issuing audited financial statements on a best practice basis (e.g., issue audited financial statements within six months after the fiscal year ends).

The Government of Puerto Rico has yet to produce long past due Annual Comprehensive Financial Report (ACFRs) for FY2018-FY2020. The Oversight Board has continuously encouraged the Government to finalize and publish its past due audited financial statements, including spending time at two recent public board meetings on the topic and providing increased funding for required personnel at Hacienda. The Commonwealth published fiscal year 2017 audited financial statements on August 31, 2020, taking more than 1,158 days (~38 months) to issuance. According to a study by the Governmental Accounting Standards Board (GASB), state governments issued their annual audited financial reports (ACFRs) on average 189 days after fiscal year-end during 2012-2014 and 199 days during 2015-2017.[3] Best practice calls for annual comprehensive financial reports (ACFRs) to be made public approximately 180 days or 6 months after the close of the fiscal year. Some states, like Michigan, have taken less than 100 days to release their ACFRs.

To achieve timely financial reporting the Government must, among other things, provide a detailed timeline and implementation plan, positioning Hacienda to successfully oversee the publication of the ACFRs, and signing a multi-year master audit contract. Perhaps most importantly, the Government must transition to implementing monthly closing procedures over its books and records and implement strict monitoring over the process with consequences for agencies that fall behind. Without implementing these changes, ACFR issuance will continue to be delayed and unpredictable.

As seen in *Exhibit 8*, the Government is behind on meeting many of these requirements, but with steadfast political will and leadership, the Oversight Board is convinced that these objectives can be reached, past due ACFRs can be issued within the next two years, and a system can be put in place that assures continued timely issuance as expected by the credit markets.

### 2.3.2  Progress on requirement #2: Four years of budgets developed with modified accrual accounting principles and expenditures which have not exceeded revenues

*Four years of developing budgets in line with modified accrual accounting standards*

The Government is expected to develop and implement a budget in accordance with modified accrual accounting standards for four consecutive years, according to accounting practices recommended by the GASB for municipal financial statements, including by publishing ACFRs. There are numerous benefits of transitioning from cash accounting to modified accrual accounting. A modified accrual accounting method is more conservative since it requires recognition of revenues when measurable and promised payments when liabilities are incurred. Consequently, the books and records will present a more realistic picture of spending and help Puerto Rico avoid overspending and present an accurate financial picture to Government managers, taxpayers and other stakeholders. Furthermore, it would eliminate many one-time maneuvers and lead to genuinely balanced budgets once all the debt restructurings are consummated. The transition to modified accrual budgeting was one element that led to New York City's financial recovery in the 1970's, helping to establish stricter budgetary discipline on the city.

*Four years of balanced budgets according to accrual based accounting method*

Before PROMESA, Puerto Rico had a history of overstating revenues and understating, misstating, or not stating all of its expenditures in a given year.  This lack of budgetary control enabled budgets which appeared to be balanced consistent with the Puerto Rico Constitution's requirements, to cause deficits and force borrowing, and resulted in the situation the Government faces today.

The key principles that will need to be met for the Government to achieve this requirement are the formulation of an accrual based budget, better monitoring of revenue and expenses,

---

[3]  Financial Oversight and Management Board of Puerto Rico, Research and Public Policy Department reporting

integration of the payroll systems, maintenance of an accounts payable ledger, and registration of purchase orders and budgeting for all other funds, not just the General Fund.

To fully implement accrual budgeting, the Government would need to adopt policies and train employees to record expenses, make sure adjusting entries are communicated and coordinated across agencies, and shift to having accruals and interagency reconciliations automated. Furthermore, revenues and expenditures must be periodically reviewed against the forecast to respond to changes and there must be detailed resolution certifications and expense system registration. Additionally, payroll must be adequately tracked, controlled, and integrated. Accounts payable must be automated and follow clear procedures. Purchase orders and other encumbrances must be booked for the entire year, at the beginning of the year, and as many special revenue funds as possible must be eliminated.

The Government has unfortunately not yet demonstrated meaningful progress in many of the key requirements for the termination of the Oversight Board. As shown in *Exhibit 8*, rapid progress will be needed across a number of dimensions to meet the key requirements under PROMESA.

EXHIBIT 8: PROGRESS TOWARDS ACHIEVING KEY REQUIREMENTS FOR THE TERMINATION OF THE OVERSIGHT BOARD

| Requirement | Detail | | Current Progress |
|---|---|---|---|
| | | ● Not started   ● Some Progress   ● Completed | |
| **Complete Sustainable Debt Restructuring** | Exchanged/ New Debt | • Exchanged / new bonds trading well in the public markets | ● (yellow) |
| | Muni bond market/ buyers | • Interest from traditional, institutional municipal bond buyers | ● (red) |
| | Investors | • Evidence investors ready to invest in Puerto Rico again | ● (red) |
| **Timely Financial Reporting** | Timeline and Action Plan | • Provide detailed timeline and implementation plan for issuance financial statements | ● (yellow) |
| | Financial reporting division | • Adequately position Hacienda's financial reporting division to oversee completion of all financial reporting, including component units | ● (red) |
| | Multiyear master audit contract | • Secure multi-year contracts with auditors and other essential contractors in conformance with best practices | ● (red) |
| | Implement monthly closing procedures | • Short-term: Implement / monitor a rigorous process for circular letters, administrative determinations, procedures, and regulations (manual closings)<br>• Medium-term: Implement ERP system (quarterly closing procedure)<br>• Longer-term: ERP system fully implemented (monthly closing procedures) | ● (red) |
| | Strict monitoring and publish delays | • Set up strict monitoring and escalation procedures with consequences and published schedules noting agency and component unit delays | ● (red) |
| **Budgets in accordance with modified accrual accounting standards** | Accrual Budgeting | • Adopt policies and train employees to book budget and book expenses<br>• Adjusting entries are communicated and coordinated across agencies<br>• Accruals and interagency reconciliations automated | ● (red) |
| | Revenue/Expenses | • Incorporate a periodic review of revenues and expenditures against the forecast to respond to changes<br>• Detailed resolution certifications and expense system registration | ● (yellow) |
| | Payroll Systems | • Appropriations for termination of payroll accruals<br>• Integrate systemwide payroll system into a financial reporting system | ● (red) |
| | Accounts Payable | • Maintain government wide monthly accounts payable procedures<br>• Automate process and journal entries | ● (yellow) |
| | Purchase Orders | • Book encumbrances for entire year when contract is approved<br>• Multi-year contract encumbered at the beginning of subsequent years | ● (red) |
| | Other Funds | • Eliminate as many special revenue funds as possible; better maintained through annual General Fund appropriation procedures<br>• Track and record all expenses and standardize chart of accounts | ● (yellow) |
| **Implementing a balanced budget** | Payroll spending | • Connect time and expense to payroll systems | ● (red) |
| | Closing of books | • Reconcile bank balances and monies held outside of the TSA<br>• Issue consistent systemwide guidance | ● (red) |
| | Real time spending reports | • Perform quarterly budget to actual review by senior leadership<br>• Issue public reporting and strategic guidance to stay within means | ● (yellow) |
| | Visibility into all funds | • Gain visibility into special revenue funds and federal funds<br>• Require reporting and sweep back unused general fund appropriations | ● (red) |
| | Financial accounting systems | • Integrate financial systems<br>• Ensure reporting is consistent across all agencies | ● (red) |

The 2021 Fiscal Plan includes a number of related actions that the Government must take to create the capabilities and momentum toward achieving these objectives. A strong, legislatively established, centralized Office of the Chief Financial Officer (OCFO) as outlined in *Chapter 15* will create the framework for strong financial management across the ~100 agencies and public corporations that make up the Commonwealth. Civil service reform, with particular focus on

financial management roles, can also help the Government attract and retain the workforce needed to implement and sustain the changes needed.

# Chapter 3. Fiscal Plan updates due to natural disasters and emergencies

In recent years, the people of Puerto Rico have endured a series of natural disasters and emergencies without precedent in modern history.

On September 6, 2017 and September 20, 2017, respectively, Hurricanes Irma and Maria struck Puerto Rico, causing unprecedented humanitarian, economic, and infrastructure-related damages and upending the daily lives of Puerto Rico's over three million residents. Thousands of residents were left homeless, basic utilities were completely shut down, and schools, hospitals, and businesses were destroyed. Tens of thousands of local residents fled the Island. The Federal Government's response has become one of the largest and most complex disaster relief efforts in U.S. history.

The damage inflicted on Puerto Rico by the Hurricanes required the March 2017 Fiscal Plan to be revised. Therefore, on October 31, 2017, the Oversight Board formally requested that the Government submit a revised Fiscal Plan for the Commonwealth and its instrumentalities based on the new post-hurricane realities. After months of hard work, engagement with stakeholders, and intense negotiations with the Government, the Oversight Board developed and certified the April 2018 Fiscal Plan to reflect the post-hurricane environment. This Fiscal Plan also provided for the implementation of incremental structural reforms, in particular focusing on improving the competitiveness of the local labor market.

As a result of Government and Oversight Board discussions concerning the necessary legislative actions to deregulate and make the private sector labor market more competitive, the Oversight Board certified an updated Fiscal Plan in May 2018. This Fiscal Plan provided for a series of investments that would be contingent upon the successful implementation of key labor market reforms. Unfortunately, the lack of political will to enact this much needed private sector labor reform required the Oversight Board to update and certify another Fiscal Plan in June 2018 to reflect the removal of this element of structural reform from the plan and the growth forecasts. The October 2018 Fiscal Plan was subsequently certified to reflect actual revenue and expenditure numbers, refined healthcare projections based on actuarial estimates, new federal funding estimates, and changes in the Government's economic growth policy objectives.

The budgetary process under PROMESA requires the annually-certified budget to be consistent with the certified Fiscal Plan. In light of the many variables in the forecasts, the Oversight Board has chosen to annually update and certify a Fiscal Plan for accuracy and to serve as the most updated information for the purposes of certifying an annual budget. As a result, prior to the adoption of the FY2020 Certified Budget, the Oversight Board certified the 2019 Fiscal Plan, which incorporated updates for new information and data from a wide variety of sources. It revised the macroeconomic and population forecast in light of slower disaster relief funding roll out, faster unwinding of the associated stimulus, and more recent federal and Puerto Rico economic statistics. It also updated the forecasted economic impact of structural reforms to reflect slower than expected implementation. Finally, it re-balanced spending across agencies to enable investments in police and public safety, healthcare, and education.

In December 2019, just after the Oversight Board and Government had launched the 2020 Fiscal Plan process, an earthquake registering at a magnitude of 4.7 on the Richter scale hit Puerto Rico. This earthquake represented one of 1,000 overall earthquakes of magnitude 3 or greater that would hit the Island over the next couple months, with six being over magnitude 5.5 and one being the most destructive in Puerto Rico's history. Hundreds of structures, including homes, local

government institutions, small businesses, and houses of worship, have been damaged or destroyed by these devastating shocks.

In March 2020, on top of the Hurricanes and earthquakes, Puerto Rico confronted the COVID-19 pandemic, which created an unprecedented public health crisis. As of April 2020, the Island had officially confirmed 1,539 cases and 92 deaths.[4] To counter the spread of the disease, the Government instituted the closure of businesses and established a curfew. The Oversight Board quickly made available $787 million in funds for the Government, individuals and businesses. These funds were used to provide: direct economic support payments to self-employed individuals and small businesses, bonuses to frontline workers (including, nurses, police officers, firefighters, emergency medical services personnel, among others), funding for medical supplies, support to municipalities, resources for PRDE to purchase equipment to facilitate distance learning, and coverage for other incremental expenditures, such as additional public safety investments, health services spending in corrections, and funding for UPR's COVID-19-related research and development.

Soon after, the U.S. Federal Government approved several pieces of legislation—including the Families First Coronavirus Response Act and the Coronavirus Aid, Relief, and Economic Security Act (CARES Act)—providing ~$18B in federal funds to the Island[5]. This relief package funded direct income support for individuals through expanded unemployment insurance benefits and a broad economic impact payments program, provided financial assistance to small businesses, included additional resources for education, healthcare, nutrition and housing assistance, delivered funds to support the local government, and supplied incremental funding to support strategic government services like transit and transportation, law enforcement, and justice.

It was in the midst of this unprecedented change to the economic and public health climate that the 2020 Fiscal Plan was certified. As with prior Fiscal Plans, it included updates for new information about government revenues, expenditures, and reform implementation efforts. It also included the projected impacts of the earthquakes and the COVID-19 pandemic. Given the pressures facing the Government in the context of the crisis, the Fiscal Plan provided a one year pause in incremental government efficiency savings expectations to allow the Government to focus on the implementation of needed efficiency and structural reforms. In light of the healthcare focus that the situation required, the 2020 Fiscal Plan included a full set of investments that aimed to strengthen the healthcare system in Puerto Rico, comprising capital expenses to enhance and expand health facilities across the Island, improve its digital infrastructure, and fund newly created programs designed to extend healthcare services coverage in public schools and rural areas. Finally, the 2020 Fiscal Plan also provided new investments to further bolster the education and public safety systems; funds to support municipal consolidations and to expand the technology sector and broadband access.

Roughly a year after the certification of the 2020 Fiscal Plan, the U.S. mainland and Puerto Rico have seen several changes. The effects of the COVID-19 public health crisis have been far reaching and devastating – both as a humanitarian crisis and economically. As of March 2021, Puerto Rico has experienced 97,713 cases of COVID-19 and 2,113 deaths due to the disease.[6] The economy has suffered: as the risks of travel kept tourists at bay, hotel registrations fell by 95% from February to April 2020, and are just now starting to recover.[7] Unemployment in Puerto Rico reached ~460,000 individuals at its peak, two times the previous number of individuals unemployed.[8]

---

4  Gobierno de Puerto Rico Departamento de Salud. "Informe de casos positivos COVID-19 (30 abril 2020)," Accessed 8 April 2021
5  This includes funds for Unemployment Insurance benefits, which are funded by both, the Federal Government and the regular local program funds
6  Gobierno de Puerto Rico Departamento de Salud, "Informe de casos positivos COVID-19 (31 marzo 2021)" Accessed 12 April 2021
7  Discover Puerto Rico, "Industry Update COVID-19 – May 1, 2020", 2020
8  Gobierno de Puerto Rico Departamento del Trabajo y Recursos Humanos, "Empleo y Desempleo en Puerto Rico," in Información del Mercado Laboral, 2021, and U.S. Bureau of Labor Statistics, "Employed persons by class of worker and part-time status" 2021

The effects of this sudden constriction in household income was felt across the Island; retail sales plummeted in April 2020 to just 38% of February 2020 levels, the lowest since 2012.[9]

Fortunately, vaccinations became available on the Island at the end of December 2020. As of April 13, 2021, Puerto Rico ranks in the top 6 globally for vaccinations[10], with more than 16% of the total population fully vaccinated.[11] The Island also received additional federal support, with the Coronavirus Response and Relief Supplemental Appropriations Act (CRRSA)[12] and American Rescue Plan (ARP) Act bringing around $7 and $18 billion[13], respectively, in federal funding to be available for recovery efforts in 2021. Significantly, the ARP Act created new and permanent economic support programs for the Island: an expanded Earned Income Tax Credit (EITC) program, with up to $600 million in federal support, and permanent expansion of eligibility criteria of the Child Tax Credit (CTC). Both are projected to have permanent effects on income and growth, and the EITC expansion is expected to support timely realization of the human capital and welfare structural reform benefits. Finally, Puerto Rico saw a gubernatorial transition, with many agencies still working to return to normal while experiencing new leadership and staff.

The 2021 Fiscal Plan, like previous Fiscal Plans, includes updates for new information about the macroeconomic environment as well as Government revenues, expenditures and reform efforts. The Plan accounts for the effects of prolonged heightened unemployment rates on Island, as well as the impacts of federal and local stimulus countering economic shocks from COVID-19. The Plan outlines recent implementation progress on operational and structural reforms, and restores fiscal measures for FY2022 that had been paused in FY2021. Finally, the Plan includes targeted investments in Civil Service Reform and stated Government needs.

Looking ahead, the Island is still in need of support as it recovers from the pandemic. The Government must center all efforts on making the necessary changes to how the Government operates and delivers government services, as well as taking steps to improve the conditions for investment in the economy in a post-COVID-19 world. Now, more than ever, it is essential that the Government focus all of its attention and capacity on implementation to better serve the people of Puerto Rico in need of efficient government services and to eliminate barriers to economic development and recovery from the unprecedented economic damage caused by this series of disasters.

---

9   Banco de Desarrollo Económico para Puerto Rico, "Retail Sales," on Puerto Rico Economic Indicators, December 2020
10  Covid-19 vaccine tracker: the global race to vaccinate, Financial Times. Accessed 13 April 2021
11  Centers for Disease Control and Prevention, "COVID-19 Vaccinations in the United States" on COVID Data tracker. Accessed 12 April 2021
12  Representing Divisions M and N of the Consolidated Appropriations Act, 2021 H. R. 133
13  These amounts include funding for Unemployment Insurance benefits, which are funded by both, the Federal Government and the regular local program funds

# PART II. Puerto Rico's path to fiscal and economic sustainability

## Chapter 4. Macroeconomic and demographic trajectory

The 2021 Fiscal Plan includes an updated macroeconomic forecast reflecting the abrupt impact of the COVID-induced recession at the end of FY2020, followed by a rebound and recovery in FY2021 and expected to continue into FY2022.

The baseline economic outlook model, which forecasts real gross national product (GNP) growth, primarily relies on a comprehensive dataset of the Puerto Rican economy from 1965 to 2017. It includes dozens of variables that collectively describe the Puerto Rican economy (e.g., growth, population, capital stock, etc.), and is largely impacted by four major factors: (a) the pre-hurricane trendline of Puerto Rico, (b) impacts from the shocks of hurricanes, earthquakes, and COVID-19 on economic activity, employment and the capital stock, (c) the stimulative impact of federal and local relief assistance for hurricanes, earthquakes, and COVID-19 (discussed in *Section 4.2.3*), and (d) proposed government efficiency measures, investments, and structural reforms (discussed in *Part IV*).[14]

The COVID-19 pandemic has been a devastating and unprecedented health crisis for the Island, causing over 2,000 deaths and spikes in unemployment due to impacts on the tourism industry and Government lockdowns put in place to curb the spread of the disease. The shock of the pandemic on employment, as well as related local and federal stimulus funding, impacted Puerto Rico's economy in a variety of dimensions and directions. While economic activity was severely reduced, extraordinary unemployment insurance and other direct transfer programs more than offset the estimated income loss due to less activity. As a result, personal income has temporarily increased on a net basis.

The 2021 Fiscal Plan has incorporated a real growth series that is adjusted for these short-term income effects for the purposes of forecasting tax receipts. The increased level of income is associated with higher levels of consumption and income tax collection in the short-term.

*Exhibit 9* shows the real GNP growth rate projection and the adjusted growth rate with income effects, after the impact of measures, structural reforms, and disaster relief funding.

---

14  The forecast relies on a 60-year comprehensive dataset and applying statistical regressions to show the effects of multiple yet distinct inter-related components of past hurricanes, exogenous developments, and economic policies on growth and inflation

EXHIBIT 9: ECONOMIC GROWTH RATE AFTER MEASURES, STRUCTURAL REFORMS, AND DISASTER RELIEF FUNDING



1  Adjustment reflects the increase in personal income due to successive rounds of income support from federal COVID response legislation

Additionally, the 2021 Fiscal Plan includes the most recently published revision to the International Monetary Fund (IMF) Fiscal Affairs Department's estimates of capital depreciation. The IMF publishes estimates of capital depreciation of public and private capital stocks, as well as capital stocks from public private partnerships (PPPs), drawn from analyzing a comprehensive sample of around 170 countries starting from 1960 until 2017. The IMF now estimates a lower rate of depreciation, which in turn increases Puerto Rico's capital stock and consequent expected growth rate going forward.

The 2021 Fiscal Plan also uses Congressional Budget Office (CBO) U.S. inflation projections along with global forecasts of oil and food prices from the IMF's World Economic Outlook. Puerto Rico inflation projections are summarized in *Exhibit 10* and have been updated to reflect the latest inflation trend prior to the onset of COVID-19, as well as the collapse in world oil prices and the demand shock due to COVID-19.

EXHIBIT 10: ANNUAL PUERTO RICO INFLATION RATE



## 4.1    Impact of the global COVID-19 pandemic

The COVID-19 pandemic created economic dislocation around the world.  For Puerto Rico, the economic shock from COVID-19 came on top of multiple prior shocks in the last four years. Hurricanes Irma and Maria struck with devastating impact in September 2017, and the southern part of the Island was hit by the strongest earthquakes that the Island had seen in decades at the end of 2019. With the onset of the pandemic the economy of Puerto Rico virtually ground to a halt, as the public health imperative for people to stay home has left all but the most essential workers unable to travel to their places of business. The economy responded to the vast amount of local and federal stimulus funding, and an economic recovery is now underway, though there is still significant uncertainty about the future of the global, U.S. mainland, and Puerto Rican economies.

The Oversight Board has consulted numerous data sources and expert economists in both Puerto Rico and the U.S. mainland to obtain the best insights possible into the current economic conditions and prospects for recovery. However, there is no precedent for COVID-19 in the historical dataset that informs the 2021 Fiscal Plan's macroeconomic model. As such, the Oversight Board recognizes that there is considerable uncertainty around the near-term economic outlook, as even today there remains a wide range of potential public health and economic outcomes for Puerto Rico, the nation, and the world. Notwithstanding this uncertainty, the Oversight Board has worked to develop a reasonable forecast of the path forward with the information and experience currently available.

### 4.1.1    Impact of COVID-19 on the U.S. economy

Consistent with past practice, the Oversight Board primarily relies on U.S. government economic forecasts to establish the general economic conditions within which the economy of Puerto Rico evolves. The 2021 Fiscal Plan uses the latest Congressional Budget Office forecasts for U.S. GDP growth and inflation available as of April 2021[15] as key inputs to create the forecast for the economy of Puerto Rico.[16] CBO currently projects a stronger U.S. economy than it did in 2020, in large part because the downturn was not as severe as expected and because the first stage of the recovery took place sooner and was stronger than expected. These estimates are based on the assumption that the U.S. real gross domestic product (GDP) will reach pre-pandemic levels by this summer and employment levels will return to pre COVID-19 levels by 2024, as vaccination stays on track with what was observed by the beginning of February. The revised higher U.S. growth from CBO also translates into higher growth and revenues for the Commonwealth, as U.S. real GDP growth is a major input for the macroeconomic projection used in the 2021 Fiscal Plan.

### 4.1.2    Specific impacts of COVID-19 on the economy of Puerto Rico

After incorporating U.S. mainland growth estimates, the 2021 Fiscal Plan factors in certain economic effects that are specific to Puerto Rico. The approach accounts for two primary factors, which are outlined below: (i) lost income from an enduring spike in unemployment, and (ii) the relative amount of income that will be replaced by extraordinary Federal Government support.

To determine the lost income due to COVID-19, the Oversight Board has analyzed available public and private sector forecasts of U.S. unemployment and data from the Government of Puerto Rico and the U.S. Department of Labor on initial unemployment claims.

*Exhibit 11* illustrates the unemployment forecast that the 2021 Fiscal Plan uses to estimate income loss on the Island. The forecast includes a gradual easing of unemployment figures through

---

[15]  The CBO last published projections for U.S. GDP growth in March 2021.

[16]  Congressional Budget Office, Long-Term Economic Projections, March 2021.

FY2021, though unemployment levels at the end of FY2021 are projected to be around 2.5 percentage points higher than at the onset of the crisis.

EXHIBIT 11: PUERTO RICO UNEMPLOYMENT FORECAST



In light of the economic hardship for the people of Puerto Rico, and the U.S. as a whole, the Federal and local governments have stepped in to provide much needed economic support for residents on the Island. The following sections describe how the 2021 Fiscal Plan treats the combined impact of ongoing disaster relief funding, as well as more recent economic support in light of COVID-19.

## 4.2     Federal and local relief spending for Hurricanes Maria and Irma, earthquakes, and the global COVID-19 pandemic

### 4.2.1     Disaster relief spending from the 2017 hurricanes

Disaster spending tends to have a short-term stimulative effect on an economy post-crisis, though not in the long term. In Puerto Rico, the level of committed public and private disaster relief spending is significant when compared to the overall size of the economy. Public and private disaster relief spending has and will continue to impact the economy in two ways:

- **Stimulative impact from post-hurricane disaster relief spending coming from aid packages equivalent to more than 100% of the Island's GNP.** This stimulus can come in multiple forms, such as construction companies hiring local, unemployed workers or workers from the mainland U.S. paying local withholding taxes and spending money for food and lodging.

- **Expected reconstruction of the capital stock on the Island.** The 2021 Fiscal Plan factors in significant damage to capital stock that is repaired, in large part, by this extraordinary infusion of federal and private monies, contributing to growth in the long-term.

- **The 2021 Fiscal Plan projects that ~$84 billion of disaster relief funding in total,** from federal and private sources, will be disbursed in the reconstruction effort over a period of 18 years (FY2018 to FY2035). It will be used for a mix of funding for individuals (e.g.,

31

reconstruction of houses, personal expenditures related to the hurricane such as clothing and supplies), funding for the public (e.g., reconstruction of major infrastructure, roads, and schools), and to cover part of the Commonwealth's share of the cost of disaster relief funding (recipients often must match some portion of federal public assistance spend) (*Exhibit 12*).[17]

Of the total, ~$47 billion is estimated to come from the Federal Emergency Management Agency (FEMA) Disaster Relief Fund (DRF) for Public Assistance, Hazard Mitigation, Mission Assignments, and Individual Assistance. An estimated $7 billion will come from private and business insurance pay outs, and $8 billion is related to other sources of federal funding.

The 2021 Fiscal Plan includes ~$20 billion from the federal Housing and Urban Development (HUD) Community Development Block Grant - Disaster Recovery (CDBG-DR) program, of which ~$2.7 billion is estimated to be allocated to offset the Commonwealth and its associated entities' expected FEMA-related cost-share requirements.[18] This portion of CDBG-DR funding will go towards covering part of the ~10% cost-share burden on expenditures attributable to the Commonwealth, PREPA, PRASA, and HTA from FY2019 to FY2032. The 2021 Fiscal Plan allocates $4.2 billion for Puerto Rico's cost-match responsibility. After the CDBG-DR funds, out-of-pocket cost-share is reduced to $1.5 billion for Puerto Rico, of which $1 billion is attributable to the Commonwealth.

EXHIBIT 12: PROJECTED PRIVATE AND PUBLIC DISASTER RELIEF FUNDING ROLL OUT



| | FY18, $M, % | FY19, $M, % | FY20, $M, % | FY21, $M, % | FY22, $M, % | FY23, $M, % | FY24, $M, % | FY25-FY35 $M, % | Total, $M | Total, % |
|---|---|---|---|---|---|---|---|---|---|---|
| **FEMA Public Assistance, Hazard Mitigation, Mission Assignments[1]** | 3,607 | 3,773 | 544 | 1,028 | 2,106 | 3,309 | 2,440 | 29,070 | **45,877** | **55%** |
| | 8% | 8% | 1% | 2% | 5% | 7% | 5% | 63% | | |
| **FEMA Individual Assistance[1]** | 2,050 | 241 | 145 | 52 | 50 | 50 | - | - | **2,587** | **3%** |
| | 79% | 9% | 6% | 2% | 2% | 2% | 0% | 0% | | |
| **CDBG-DR** | - | - | - | 125 | 737 | 1,328 | 1,618 | 16,416 | **20,223** | **24%** |
| | 0% | 0% | 0% | 1% | 4% | 7% | 8% | 81% | | |
| **Private insurance** | 3,001 | 2,895 | 606 | 936 | - | - | - | - | **7,437** | **9%** |
| | 40% | 39% | 8% | 13% | 0% | 0% | 0% | 0% | | |
| **Other federal funding** | 509 | 1,237 | 1,014 | 704 | 1,058 | 632 | 624 | 1,963 | **7,740** | **9%** |
| | 7% | 16% | 13% | 9% | 14% | 8% | 8% | 25% | | |
| **Total** | 9,168 | 8,146 | 2,308 | 2,844 | 3,950 | 5,318 | 4,681 | 47,449 | **83,865** | **100%** |
| **CDBG cost share** | - | - | - | 21 | 96 | 177 | 216 | 2,700 | | |

Disaster aid by source of funding, $M

1 Includes federal assistance for 2019/2020 earthquakes

The major sources of disaster relief funding are detailed below:

- **FEMA Disaster Relief Fund:** FEMA provides Individual Assistance to individuals and families who have sustained uncovered losses due to disasters. FEMA also provides Public Assistance to state and local governments and certain types of private not-for-profits for

---

17  Puerto Rico's cost-match responsibility was estimated using FEMA-provided data, adjusted by category as necessary for waivers and exceptions

18  Estimate based on early assessment of CDBG-DR and CDBG-MIT Action Plans for Puerto Rico (with public data as of March 15, 2021), as well as patterns of cost share coverage from CDBG-DR in previous storms

debris removal, emergency protective measures, and permanent repair to damaged or destroyed infrastructure. Through both its Public Assistance Program and Hazard Mitigation Grant Program, FEMA funds projects to reduce or eliminate long-term risks to people or property from future disasters.[19]

■ **The U.S. Department of Housing and Urban Development (HUD) CDBG-DR:** HUD provides CDBG-DR funding that can be used for assistance to individuals, businesses, state agencies, non-profit organizations, and economic development agencies. Funds are to be used in the most impacted and distressed areas for disaster relief, long-term recovery, restoration of infrastructure, housing assistance, and economic revitalization. The 2021 Fiscal Plan uses Action Plans approved by HUD to estimate the allocation of these funds, with ~$10 billion for disaster relief related activities, ~$8 billion to be used towards mitigating risks and potential losses in the event of a future disaster and ~$2 billion expected to be used to repair the Island's electric infrastructure. The total ~$18 billion in disaster relief and mitigation funds include ~$2.7 billion to cover cost-share for the Commonwealth and its instrumentalities.[20]

■ **Private insurance funding:** Large personal property and casualty losses have been incurred in the aftermath of Hurricanes Maria and Irma. An analysis of data from the Office of the Insurance Commissioner of Puerto Rico, adjusted for self-insured and other types of coverage, was used to determine the amount that has been paid out to individuals and businesses for major damages.

■ **Other supplemental federal funding:** Additional federal funding has been appropriated to various agencies and projects in Puerto Rico following the hurricane. This money is directed at a wide range of recovery efforts, from reconstruction of damaged buildings (for example, funding to repair damage to Job Corps centers in Puerto Rico) to funding for health programs and environmental management (e.g., U.S. Department of Agriculture (USDA) funding to repair water systems in rural areas) to additional funds for the Nutritional Assistance Program (NAP).

Disaster roll out for FEMA funds has been projected by subcategory to account for differences in when funds are spent:

■ Individual Assistance from FEMA was spent in the immediate aftermath of the storm

■ Public Assistance Categories A & B and Mission Assignments are used for debris removal and emergency work, and therefore exhausted in the early years of the recovery

■ FEMA Categories C-G and Hazard Mitigation are longer-term funding streams that are spread out over 18 years, based on the latest estimates regarding the time that it will take to finalize reconstruction

The 2021 Fiscal Plan incorporates the available data from the Central Office for Recovery, Reconstruction, and Resiliency (COR3) and Vivienda on disbursements of FEMA and CDBG-DR funds (i.e., for FY2018 to the first half of FY2021). The roll out of remaining FEMA funds is informed by the historical disbursement pace of FEMA funds in Puerto Rico, spending patterns in other jurisdictions impacted by major storms (e.g., Hurricane Katrina), and the spend plans developed by major subrecipients (e.g. PREPA, PRASA) specifically for the use of FEMA public assistance funding received. In the case of CDBG-DR funds, they are assumed to be disbursed through FY2035, informed by Puerto Rico Department of Housing's latest projections, with program types as published in the latest available Action Plans.

---

19  The 2021 Fiscal Plan does not attribute economic impact to FEMA's Administrative funding, which is used for FEMA's personnel (primarily outside of Puerto Rico), travel, and other internal costs

20  As per the Puerto Rico Disaster Recovery Action Plan, April 2020, "the cost share matching requirements of many of these [FEMA] programs create a financial burden on subrecipients that will dramatically hinder the recovery process without supplemental funding. To substantially reduce this burden, PRDOH intends to leverage CDBG-DR to meet these matching fund requirements…"

The 2021 Fiscal Plan posits that, based on how disaster relief funds are spent, these funds will impact the economy in various ways: to build the capital stock of the Island through constructing and repairing buildings or utilities, to directly impact the economy through spurring consumption of goods and services on the Island, or to fund programs and services on the Island. The 2021 Fiscal Plan estimates a different rate of pass-through to the economy for each of these different types of funding as follows:[21]

- A 15.5% pass-through rate is assumed for funding that is used to construct and repair utilities, given the reliance on specialized labor and materials for such projects (e.g., FEMA Category F Public Assistance funding towards constructing public utilities). The rest of this funding flows to the Puerto Rico capital stock and therefore contributes to long-term growth.

- A 23.5% pass-through rate is used for funding that is employed to construct and repair residential, commercial, and school buildings given the ability to rely more on local labor and materials (e.g., repair to public facilities damaged by the storm). The rest of this funding flows to the Puerto Rico capital stock and therefore contributes to long-term growth.

- A 23.5% pass-through rate is assumed for funding that is directed towards programs and services (e.g., private insurance payments to reimburse personal auto expenditures), as this funding hits the Puerto Rico economy through the labor associated with importing and transporting. This type of spending does not contribute to the capital stock on the Island, and therefore does not contribute to long-term growth.

- A 100% pass-through rate is assumed for funding that is used directly and in full to replace income or stimulate spending on goods and services originating on the Island (e.g., disaster nutrition assistance). This type of spending does not contribute to the capital stock on the Island, and therefore does not contribute to long-term growth.

- CDBG-DR funds put toward cost-share are not passed-through to the economy. These funds are used towards the local share of FEMA projects whose value is already accounted for in the respective categories.

The 2021 Fiscal Plan also projects that $750 million in working capital will be made available to address the liquidity constraints associated with the reimbursement nature of disaster relief programs. This will help to accelerate FEMA-approved reconstruction projects, particularly for permanent projects.[22]

### 4.2.2   *Federal and local economic support in response to the earthquakes*

As shown in *Exhibit 12*, funding for the 2019 and 2020 earthquakes includes $947 million in Public Assistance funding, of which $440 million is for Category B – Protective Measures, $231 million is for Category E – Public Buildings, and $101 million is for Public Assistance Management Costs. The remaining amounts are divided between Hazard Mitigation ($167 million), Individual Assistance ($103 million), and Mission Assignments ($6 million). The 2021 Fiscal Plan applies a 23.5% pass-through rate on these funds as they are directed toward the reconstruction of public buildings and facilities (see *Section 4.2.1*). The earthquake-related federal funding is assumed to impact the economy from FY2021 through FY2023.

### 4.2.3   *Federal and local economic support in response to the COVID-19 pandemic*

In response to the COVID-19 pandemic, both the Federal Government and Puerto Rico Government have launched major relief packages to contain and mitigate the spread of the virus, support residents and frontline workers, and help the Island's economy rebound.

---

21  Estimated using local contracts for PREPA, residential construction and school construction. These contracts were estimated to have between 10% and 18% pass-through on the economy, respectively, which was then augmented by 5.5% average spend on transportation and logistics on construction projects, which rely on 100% domestic labor

22  The working capital facility is considered a use of the Commonwealth balance sheet, not a Fiscal Plan expense

There have been multiple rounds of federal assistance which have included direct assistance to individuals and families, as well as funding provided to local governments to assist with pandemic response.

On March 18, 2020, the Families First Coronavirus Response Act was signed into law. The bill includes free COVID-19 testing for uninsured individuals, emergency paid sick leave, expanded family and medical leave programs, unemployment assistance, food aid, and federal funding for Medicaid.

On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law. The relief package allocated an estimated $2.2 trillion to battle the harmful effects of the COVID-19 pandemic. The package was the largest fiscal stimulus package in modern American history and aimed to financially support both governments and businesses, provide relief to individuals, and expand COVID-19 response measures, as well as build future resiliency. The law provided $150 billion of direct support to state and local governments. In addition, eligible individuals received a $1,200 direct payment, as well as an additional $500 for each dependent child, in each case subject to income phase-outs. The law also provided additional unemployment insurance benefits for individuals impacted by COVID-19, including incremental benefits of $600 per week through July 31, 2020 and a 13-week extension in the amount of time that an individual could collect benefits (from 26 to 39 weeks). On April 24, 2020, Congress passed the Paycheck Protection Program and Health Care Enhancement Act, which extended certain provisions of the CARES Act. This package provides an additional $482 billion for small businesses, healthcare providers, and expanded testing to address the COVID-19 pandemic.

On April 2, 2020, through collaboration with the Puerto Rico Government, the Oversight Board certified a $787 million emergency measures support package, which offered direct assistance to workers and businesses (see *Exhibit 13*). The package was funded through $500 million of incremental new spending (made available via a special appropriation), $131 million for education related materials through existing federally-funded government contracts, and $157 million through a reapportionment within the FY2020 Commonwealth General Fund budget.

EXHIBIT 13: PUERTO RICO EMERGENCY MEASURES SUPPORT PACKAGE PROVISIONS

| | Category | Description | Total allocated, $M | Disbursed as of April, $M |
|---|---|---|---|---|
| Direct Payment to Self-Employed | Self-Employed | $500 one-time cash payment for approximately 200,000 self-employed individuals | 100.0 | 94.4 |
| Direct payment to small businesses | Small businesses | $1,500 one-time cash payment for approximately 40,000 small businesses | 60.0 | 59.8 |
| Bonus for Medical and Support Staff | Public Nurses | $4,000 bonus per nurse (not including 272 Dept. of Correctional Health nurses) | 23.2 | 14.9 |
| | Private Sector Nurses | Bonus for private sector nurses | 73.4 | 73.3 |
| | Professional services nurses | Bonus for professional services nurses | 22.6 | 13.8 |
| | Dept of Correctional Health nurses | $4,000 bonus per nurse | 1.1 | 1.0 |
| | Technicians | $2,500 bonus for 600 technicians | 1.5 | 0.1 |
| | Others | Public sector pharmacists (116), medical technologists (3,834), Residents-MD (605) | 4.8 | 4.2 |
| Bonus for Certain DPS Employees | EMS personnel | 581 staff | 2.0 | 1.7 |
| | Police Officers | 11,650 front office roles (does not include 600 currently reported under leave of absence) | 46.6 | 45.2 |
| | Firefighters | 1,455 front office roles (does not include 65 reported under leave of absence) | 5.1 | 5.1 |
| | Emergency Management | 112 front office roles (does not include 12 reported under leave of absence) | 0.4 | 0.4 |
| | 911 service | 154 front office roles (does not include 2 reported under leave of absence) | 0.5 | 0.5 |
| | Special Investigations Unit | 74 front office roles | 0.3 | 0.1 |
| | Forensics | 220 front office roles | 0.8 | 0.8 |
| | Municipal police | $4,000 bonus for 3,428 officers | 11.8 | 11.2 |
| | Municipal firefighters | $3,500 bonus for 50 officers | 0.4 | 0.1 |
| Bonus for Court Staff | Court staff on duty | $1,000 bonus for 400 officers | 0.8 | 0.8 |
| Bonus for Hacienda Internal Revenue Agents | Internal revenue agents on duty | $2,000 bonus for 250 agents | 0.5 | 0.5 |
| Materials for the Department of Education | Dept. of Education teachers, students, and directors | Purchase of tablets, software, training for approximately 325,000 individuals | 124.3 | 52.0 |
| | | Materials for 159,330 individuals will be paid by the U.S. Department of Education through two contracts | 130.6 | 124.0 |
| Hospital Investments | Public Hospitals | $15M per month for two months for medical supplies not directly related to COVID-19 | 30.0 | 13.5 |
| Public Safety Investments | Department of Public Safety | $20M for equipment and capital expenditures | 20.0 | 7.3 |
| Support to the Municipalities | Municipalities | $50M per month for two months based on population by municipality (3-tier division) | 100.0 | 100.0 |
| Bonus for Corrections Employees | Department of Corrections | $3,500 bonus per front-line Corrections staff | 16.8 | 15.0 |
| | Correctional Health | $3,500 bonus per front-line Correctional Health staff (non-nurses) | 0.5 | 0.4 |
| HTA | Cost of moratorium on tolls | Loss of outstanding $3M monthly receipts for two months | 6.0 | 0.6 |
| UPR | UPR COVID-19 R&D | Funding for COVID-19-related research and development in UPR | 1.7 | 0.0 |
| Reserve | Reserve | Reserve (will be transferred to first responders and healthcare agencies on an as-needed basis to cover any deficiency in the distribution of the cash incentives. | 2.0 | 1.8 |
| Total Local Funding | | | 787.7 | 643.5 |

These funds have played an essential role in helping to mitigate the unprecedented economic damage from the sudden economic shock caused by the pandemic.

On December 27, 2020, the Coronavirus Response and Relief Supplemental Appropriations Act of 2021 (CRRSA) was signed into law. The law provided an additional $900 billion in COVID-19 relief. The CRRSA Act allocated no additional funds to states and territories, but it extended the deadline to use Coronavirus Relief Funds, Title V of the CARES Act, by one year. It also provided economic support to businesses and funding to promote testing, contact tracing and vaccine distribution. The 2021 Fiscal Plan includes an estimate of what portion of these federal funds are estimated to be allocated to Puerto Rico.

On March 11, 2021, the American Rescue Plan (ARP) Act of 2021 was signed into law. This COVID-19 relief package allocates $1.9 trillion to provide direct relief to Americans, reopen schools, and support a national vaccination program. Major components of the bill include:

- **Economic Impact Payments (EIP):** Eligible individuals will each receive a $1,400 direct payment, as well as an additional $1,400 for each dependent, in each case subject to income phase-outs. For example, married filers with two dependents that qualify for the program will receive $5,600. It is estimated that more than 85% of households will receive a direct payment. Additionally, the definition of qualifying dependents expanded to include full-time students younger than 24 as well as any adult dependents such as adults with disabilities or grandparents.

- **Expanded Unemployment Benefits:** The law extends the current, expanded unemployment benefits through September 6, 2021 to continue addressing unemployment caused by the COVID-19 public health emergency. This extension includes the Pandemic Unemployment Assistance (PUA), the Federal Pandemic Unemployment Compensation (FPUC), and the Pandemic Emergency Unemployment Compensation (PEUC). Furthermore,

36

the law extends the Families First Coronavirus Response Act (FFCRA) unemployment provisions that ensure full federal financing of extended benefits through September 6, 2021.

■ **Child Tax Credit (CTC):** The bill permanently removes the provision that requires a three (3) child minimum for Puerto Rico residents to claim the Child Tax Credit, and removes the phase-in for the credit for calendar year 2021. The Child Tax Credit typically begins phasing in for incomes above $2,500, at a rate of 15% per dollar above the $2,500 threshold until the maximum credit is reached. When filing federal taxes for tax year 2021, Puerto Rico residents below the phase-out rate will receive the full Child Tax Credit for all children. Additionally, and for tax year 2021 only, eligible filers will receive an increased Child Tax Credit of $3,600 per child under six (6) years of age and a Child Tax Credit of $3,000 per child six (6) years of age through 17 years of age. For example, married filers below the phase-out rate with children aged four (4) and twelve (12) will receive $6,600. When filing federal taxes for tax year 2022, the Child Tax Credit for Puerto Rico families is reduced back to $1,400 per child, but the three-child minimum requirement has been permanently lifted. This means that when filing federal taxes for tax year 2022, the same family as before (given the family has enough income to be above the phase-in level),  now with children aged five (5) and thirteen (13) will receive $2,800. Under the previous regulations, that family would not have been eligible for any Child Tax Credit.

■ **Earned Income Tax Credit (EITC):** In the mainland, the ARP significantly increases the maximum credit amount for previously excluded adults without children for tax year 2021. For Puerto Rico, the law includes up to $600 million in annual federal fund matching to incentivize the Government to permanently expand the local EITC program. That amount would be delivered in the form of a reimbursable grant equivalent to three times (3X) the local spending, and indexed for U.S. inflation after the first year, thereby drastically expanding the size of the EITC program (which is currently supported by only $200 million per year in local Government funds) on Island.

■ **Elementary and Secondary School Emergency Relief Fund (ESSER):** The law expanded upon the education provisions outlined in the CRRSAA and provides additional funding to elementary and secondary education, which remains available for obligation through September 30, 2023. The use of these funds remains flexible, meaning State Education Agencies (SEAs) and Local Education Agencies (LEAs) can use them to address a variety of needs. These include, but are not limited to, addressing learning loss, maintaining social distancing, hiring support staff, and enhancing ventilation systems. In April 2021 the U.S. Department of Education released additional formal guidance on how to calculate the Maintenance of Effort (MOE) requirements associated with this fund and the Governor's Emergency Education Relief (GEER) Fund, also provided under the CARES and CRRSA Acts. The guidance explains how states and territories should determine what level of state spending on elementary, secondary, and higher education is required in order to comply with the MOE requirements in these relief packages, as well as procedures for seeking waivers. The Oversight Board is analyzing this guidance to determine what, if any, implications the MOE requirements have on the Commonwealth, UPR, and PRDE funding provided in the 2021 Fiscal Plan and FY2022 Commonwealth Budget.

■ **State and Local Aid:** The law includes $360 billion in direct support to state and local governments. Puerto Rico's share of funds are split between the territory, counties, metropolitan cities, and towns with fewer than 50,000 people. These funds will be used to cover costs incurred by December 31, 2024, and the funds allow Puerto Rico flexibility to respond to and address local needs. The Government is in the process of designing a disbursement program for these funds. But it will ultimately depend on further guidance from the U.S. Treasury on how it can use these funds.

The 2021 Fiscal Plan includes an estimate, shown in *Exhibit 14* below, of what portion of federal funds included in the aforementioned bills will be allocated to Puerto Rico, based on a variety of sources. The American Rescue Plan (ARP) Act requires the lead federal agencies for each program

to establish the terms and conditions that will provide additional guidance on how the funds will be allocated as well as eligible uses. The Oversight Board expects the Government to apply forthcoming guidance to maximize the impact of these federal funds on Island, and will work to identify current or incremental expenditures that could be covered by extraordinary federal funds. Given the terms and conditions and allocations of these funds are not finalized, the figures in the exhibit are subject to change.

EXHIBIT 14: ESTIMATED COVID-19-RELATED FEDERAL FUNDS ALLOCATED TO PUERTO RICO

| Stimulus phase | Category | Estimated Puerto Rico Funding, $M |
|---|---|---|
| **Phase 1&2  (03/06 and 03/18/20)** | Phase 1: Preparedness & Response Supplemental Appropriations Act | 31 |
| | Phase 2: Families First Coronavirus Response Act | 377 |
| | **Sub-Total, Phase 1 & 2** | **408** |
| **Phase 3 CARES Act (03/27/20)** | Unemployment Insurance (includes Regular UI program and FPUC, PEUC, PUA, EB, and LWA programs)[1] | 6,632 |
| | Small Business Support programs (Paycheck Protection Program, Economic Injury Disaster Loan Program) | 3,205 |
| | State and local governments support (Coronavirus Relief Fund) | 2,241 |
| | Economic Impact Payments ($1,200 checks) | 2,736 |
| | Education funds (includes ESSER, GEER, and HEER funds) | 760 |
| | Disaster Relief Funds (allocated to states and territories by FEMA) | 738 |
| | Economic Stabilization Loans | 73 |
| | Nutrition and housing assistance | 428 |
| | Hospitals and healthcare funding | 494 |
| | Business and individual tax incentives | 335 |
| | Transit and infrastructure funding | 226 |
| | National Guard, Law Enforcement, and Justice funds | 16 |
| | Other Division B programs | 144 |
| | **Sub-Total, CARES Act** | **18,029** |
| **Phase 4 CRRSA Act (12/27/20)** | Unemployment Insurance (includes Regular UI program and FPUC, PEUC, PUA, EB programs)[1] | 1,200 |
| | Small Business Support programs (Paycheck Protection Program, Economic Injury Disaster Loan Program) | 1,136 |
| | Economic Impact Payments ($600 checks) | 1,493 |
| | Education funds (includes ESSER, GEER, and HEER funds) | 1,924 |
| | Nutrition and housing assistance | 1,024 |
| | Hospitals and healthcare funding | 395 |
| | Transit and infrastructure funding | 96 |
| | Other CRRSA Act minor programs | 100 |
| | **Sub-Total, CRRSA Act** | **7,368** |
| **Phase 5 ARP Act (03/11/21)** | Unemployment Insurance (includes Regular UI program and FPUC, PEUC, PUA, EB programs)[1] | 2,812 |
| | Economic Impact Payments ($1,400 checks) | 3,609 |
| | Education funds (includes ESSER and HEER funds) | 3,714 |
| | State and local governments support (includes funds for municipalities) | 4,209 |
| | Nutrition and housing assistance | 1,319 |
| | Hospitals and healthcare funding | 1,352 |
| | Public transit funding | 184 |
| | Other ARP Act minor programs | 528 |
| | **Sub-Total, ARP Act** | **17,727** |
| **Total** | **Total Federal Funding** | **43,532** |

1 Additional payouts will come from Commonwealth spending, but are grouped together here as stimulus along with the related Unemployment Insurance items in the CARES act

The 2021 Fiscal Plan incorporates the combined effect of federal and local economic support in three ways. First, certain types of funding intended to prevent revenue and job loss are assumed to mitigate what otherwise would have been even higher unemployment and revenue loss had those funds not been provided. These funds are implicitly reflected in the 2021 Fiscal Plan because, without them, the income loss estimates would have been larger. The federal Paycheck Protection Program, which is designed to encourage businesses to keep employees on the payroll, is one example of this type of funding.

The second type of funds are those administered through economic support programs designed to provide income support directly from the Federal or local government. Examples include unemployment benefits, economic impact payments, and direct payments through increased benefits of regular Nutrition and Rental assistance programs.

The total amount of income replacement funds included in the 2021 Fiscal Plan is estimated to more than offset the forecasted income loss due to the COVID-19 pandemic. Based on recent research on stimulus funds spending,[23] the 2021 Fiscal Plan estimates that around 60% of income

---

23 Federal Reserve Bank of New York, "How Have Households Used Their Stimulus Payments and How Would They Spend the Next?," 2020

support funding will be spent over the FY2020-FY2023 period.[24] The remaining 40% of funds is projected to be saved and/or used to pay down debt, and then is spent over a 30-year period according to the long-term consumption smoothing concept.[25]

Finally, for *government expenditures and programs funded by federal and local economic support programs,* the 2021 Fiscal Plan uses the same approach as it does in estimating the pass-through of these expenditures to Puerto Rico as has been used for other types of economic stimulus funding such as disaster-recovery spending. Specific pass-through rates used on this funding are detailed below:

- A 23.5% pass-through rate is applied to spending on government programs and services. Examples include funding for law enforcement and the National Guard in Puerto Rico.
- A 5.5% pass-through rate is assumed for funding that is primarily directed to acquisition of goods that will predominantly be sourced off-Island. This funding impacts the Puerto Rican economy only through the on-Island transportation of such goods. Examples of this are testing and medical equipment, or educational supplies to facilitate distance learning.

Additionally, the 2021 Fiscal Plan accounts for the impact on growth that permanent changes in EITC and CTC programs are expected to deliver. The expanded EITC program is expected to represent an inflow of up to $600 million per year. This positive impact on the economy and growth, however has an additional fiscal cost of increased local funding required to fund the minimum local spending requirement to attain the maximum federal funds available under the ARP Act. The CTC program is expected to have a positive impact on GNP in the short-term due to temporary benefits under the ARP Act, and in the long-term due to the recurring additional funds that it will provide to beneficiaries.

## 4.3    Impact of fiscal or government efficiency measures

**Government efficiency measures seek to streamline and transform the Government of Puerto Rico** to deliver critical government services to the population and business sector more efficiently by optimizing revenue collection and reducing government-wide expenditures, while ensuring sustainability of those services over time given population trends. Such policy actions will generate a contractionary impact on the economy in the short term but are necessary to drive government efficiency and fiscal sustainability, as well as improve service delivery, in the long term. The net effect of these two forces is still significantly positive from a fiscal savings perspective through FY2051. The short-term macroeconomic impact of the measures is summarized in *Exhibit 15.*

---

[24] National Bureau of Economic Research, "Transfer Payments and the Macroeconomy: The effects of Social Security benefit changes," 2014

[25] The duration of the period was calculated as the difference between the average life expectancy for people over 18 years of age in Puerto Rico and the average age of people over 18 years of age in Puerto Rico

EXHIBIT 15: MACROECONOMIC IMPACT OF FISCAL MEASURES



Fiscal Measures Effect on Real GNP, %

The 2021 Fiscal Plan assumes that the fiscal impact of disaster relief spending and fiscal measures is not permanent, but rather is unwound over the course of several years. The 2021 Fiscal Plan unwinds these over five years, as model-based and econometric studies find that the output effect of an exogenous fiscal shock typically disappears within five years, even if fiscal measures are permanent.[26]

## 4.4   Impact of structural reforms

The estimated impact of **structural reforms** is based on work done by the International Monetary Fund on labor reforms implemented in Europe (e.g., Spain and Estonia) and South America (e.g., Peru and Colombia), among other jurisdictions; utilities reform in Latin America; broadly-accepted metrics for measuring improvement in the World Bank's Doing Business Rankings (as well as examples of growth experienced by countries that have implemented such reforms); and education reforms in Europe and elsewhere. Structural reform benchmarks, to the extent possible, come from nations or jurisdictions that face similar constraints to Puerto Rico (e.g., limited monetary policy options, high informal labor markets).

Energy and ease of doing business reforms are projected to increase GNP by 0.60% by FY2026, and human capital and welfare reform is expected to add another 0.15% in FY2025 (*Exhibit 16*). Finally, K-12 education reforms add an additional 0.01% annual impact beginning in FY2037, **resulting in total GNP increase from structural reforms of 0.75% by FY2026 and 0.90% by FY2051.** The anticipated timing of the incremental positive impact of these reforms has been delayed in this 2021 Fiscal Plan given the delay in the Government's implementation efforts.

---

26  Batini, N. Eyraud, L. and Weber, A. "A Simple Method to Compute Fiscal Multipliers", IMF Working Paper WP/14/93, as well as Mountford, A. and Uhlig, H. "What are the Effects of Fiscal Policy Shocks?" Journal of Applied Econometrics, 24: 960-992 (2009) and Jorda, O. and Taylor, A. "The Time for Austerity: Estimating the Average Treatment Effect of Fiscal Policy," Economic Journal, 126: 219-255, February 2015

EXHIBIT 16: MACROECONOMIC IMPACT OF STRUCTURAL REFORMS



Structural Reform Effect on GNP, %

By FY2051, K-12 Education reforms add 0.15% cumulative impact, resulting in 0.90% annual impact on GNP

## 4.5   Population projections

Even before Hurricanes Maria and Irma hit the Island in 2017, Puerto Rico's population had been trending downward by 1-2% every year as residents have left to seek opportunities elsewhere and birth rates declined. In 2016, the U.S. Census Bureau's official forecast, projected a worsening population outlook due in large part to Puerto Rico's rapidly-aging population. This high average age range results from extremely low age-adjusted birth rates and outmigration of younger people. Indeed, in 2016, Puerto Rico began to experience negative natural population change (a higher number of deaths than births). This negative natural change has continued unabated into 2021.

Hurricanes Irma and Maria served to compound the problem, spurring an additional outflow of people just as natural population decline has set in, as many residents lost houses, jobs, and loved ones. While some of these people have returned, the population is still projected to decline over the course of the 2021 Fiscal Plan period and beyond. Further disasters, such as the series of earthquakes experienced in 2020, have not made a swift return to balanced migration any more likely. But while net migration is a larger driver of population change in the short term, this factor is volatile; in the long run, net migration is projected to return to more balanced trends. Meanwhile, natural population change is not guaranteed to rebalance at any point, and births are likely to continue declining, while deaths are projected to slowly rise in the mid-term. COVID-19 has suppressed air traffic between Puerto Rico and the mainland, and thus impacted migration, but this effect is expected to  be transitory.

As outlined in *Exhibit 17* below, this 2021 Fiscal Plan projects that by FY2026, there will be almost 10% fewer people living on the Island than in FY2019, and that by FY2051, the drop will grow to 33%.

41

EXHIBIT 17: PROJECTED POPULATION CHANGE



Annual population[1], thousands of people

% annual decline

| | -1.6% | -1.6% | -1.5% | -1.5% | -1.2% |
| | 2,928 | 2,883 | 2,839 | 2,798 | 2,764 |
| | **FY22** | **FY23** | **FY24** | **FY25** | **FY26** |

| For reference, the population was 3.09M, 3.08M, and 3.03M in FY18, FY19, and FY20, respectively

# Chapter 5. Fiscal Plan financial projections (FY2022-FY2026)

In the past several years, Puerto Rico has endured a tumultuous economic climate due to natural disasters and the COVID-19 pandemic.  This has had a direct impact on economic growth and, ultimately, on Government revenues. The impact to Puerto Rico has been a real GNP decline in FY2020 followed by a rebound in FY2021 and FY2022 as the full impact of the federal economic support takes hold.

Before measures (i.e., in the "baseline forecast"), there is a pre-contractual debt service deficit starting in FY2023 in the 2021 Fiscal Plan.[27] This deficit gets worse over time, as federal disaster relief funding slows down, Supplemental Medicaid funding phases out, Act 154 and Non-Resident Withholding revenues decline, and healthcare expenditures rise.

The fiscal measures and structural reforms contained in the 2021 Fiscal Plan are the main drivers of a significant portion of the surplus in the 2021 Fiscal Plan. Fiscal measures will drive ~$10.0 billion in savings and extra revenue over FY2022-FY2026 and structural reforms will drive a cumulative 0.90% increase in growth by FY2051 (equal to ~$30.7 billion). However, even after fiscal measures and structural reforms, and before contractual debt service, there is an annual deficit reflected in the projections starting in FY2036. This is, in large part, due to insufficient implementation of structural reforms proposed in previous fiscal plans, including continued highly regulated and restrictive private sector labor market policies that prevent higher growth, a delay in rolling out the NAP work requirement to increase labor force participation rates, and a lack of progress implementing more meaningful ease of doing business reforms to improve the economy's competitiveness and attract greater levels of investment and job creation. *Exhibit 18* illustrates the projected deficit / surplus through FY2026.

Projections for FY2027 onwards are included in *Chapter 6.*

---

27  The baseline forecast also reflects the pledge of a portion of annual SUT revenues to COFINA creditors as per the terms of the COFINA Title III Plan of Adjustment

EXHIBIT 18: PROJECTED DEFICIT / SURPLUS PRE- AND POST-MEASURES



Projected deficit / surplus pre- and post-measures[1], $M

| | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|---|---|---|---|
| Revenue pre-measures[2] | 22,335 | 23,844 | 21,377 | 22,202 | 21,048 | 20,010 | 19,798 | 20,137 | 20,455 |
| Expenditures pre-measures[2] | (20,118) | (20,464) | (20,026) | (20,688) | (20,822) | (20,570) | (20,775) | (21,066) | (21,339) |
| Surplus/deficit pre-measures | 2,217 | 3,380 | 1,351 | 1,513 | 226 | (560) | (977) | (929) | (883) |
| Measures | 87 | 845 | 242 | 321 | 1,490 | 1,880 | 2,048 | 2,194 | 2,217 |
| Surplus post-measures/SRs | 2,304 | 4,225 | 1,593 | 1,834 | 1,716 | 1,320 | 1,071 | 1,265 | 1,334 |

1 Values presented assume full and timely implementation of structural reforms and reflect GNP uplift due to these reforms
2 Revenues and expenditures excluding gross up adjustments; revenues do not include Earned Income Tax Credit

## 5.1   Baseline revenue forecast

Major revenue streams (*Exhibit 19*) include non-export sector General Fund revenues (including individual, corporate, and sales and use taxes) and export sector revenues (including Act 154 excise taxes paid by multinationals operating on the Island, and Non-Resident Withholdings), as well as federal funding. The 2021 Fiscal Plan also includes certain Commonwealth revenues that prior to PROMESA the Commonwealth appropriated to certain instrumentalities pursuant to statutes enacted by prior legislatures; the inclusion of these revenues in the 2021 Fiscal Plan is based on the Oversight Board's legal conclusions that (i) such monies are property of the Commonwealth, (ii) each pre-PROMESA statute appropriating or transferring such monies to instrumentalities of the Commonwealth is preempted by PROMESA, (iii) such statutes were enacted by prior legislatures that cannot bind the current legislature, and (iv) in any event, absent PROMESA under the Puerto Rico Constitution, such monies would not be transferred to the instrumentalities while General Obligation debt is not being paid according to its terms.

There is expected to be significant near-term uncertainty in the level of revenue collections, as the post-COVID recovery is constantly evolving. Since the 2020 Fiscal plan, there have been multiple rounds of additional federal economic support, which has contributed to faster than expected economic recovery at the national and local level.  As a result, tax collections have been generally higher than forecasted in the 2020 Fiscal Plan. Relative to the 2020 Fiscal Plan, General Fund revenues are expected to be ~14% higher in FY2021 and ~9% higher in FY2022.

EXHIBIT 19: MAJOR REVENUE STREAMS POST MEASURES

**Key general fund revenue drivers, post-measures,** $M

| | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|
| Personal income tax[1] | 2,105 | 2,115 | 2,116 | 2,173 | 2,219 |
| Corporate income tax | 2,054 | 2,017 | 1,997 | 2,069 | 2,110 |
| Sales and use tax[2] | 2,239 | 2,219 | 2,214 | 2,253 | 2,292 |
| Act 154 | 1,631 | 1,447 | 1,199 | 1,199 | 1,199 |
| Non-resident withholdings | 349 | 349 | 350 | 354 | 358 |
| Other general fund revenues[3] | 1,829 | 1,730 | 1,677 | 1,699 | 1,726 |
| FAM portion of SUT | 130 | 130 | 130 | 133 | 136 |
| Incremental excise taxes on off-shore rum | 175 | 141 | 143 | 144 | 146 |
| Petroleum, gasoline, diesel taxes | 562 | 637 | 636 | 637 | 638 |
| Vehicle license fees | 134 | 132 | 131 | 132 | 133 |
| CRIM property tax inflows | 140 | 146 | 148 | 150 | 153 |
| Miscellaneous other | 233 | 215 | 215 | 217 | 219 |
| **Total** | 11,582 | 11,278 | 10,957 | 11,160 | 11,330 |

1 Includes expense related to EITC
2 Sales and use tax (SUT) reflects collections after payout of the COFINA settlement
3 'Other' general fund revenues include cigarette, rum, motor vehicles, alcoholic beverages, and other GF taxes; exclude adjustments for revenue gross up

Additional details on the 2021 fiscal plan revenue streams are provided below, with details on the financial projections included in the Appendix. The following sections describe the approach to estimating revenues for key revenue streams.

### 5.1.1    Non-export sector General Fund revenue projections

**Individual income taxes:** Individual income taxes are highly concentrated, with 78.2% of revenues coming from the 8.7% of tax returns reporting income above $60,000 in FY2018.[28] The 2021 Fiscal Plan incorporates the expected incremental individual income tax collections associated with disaster relief spending, as well as the performance of individual income tax collections that have been more resilient in FY2021 than forecast in the 2020 Fiscal Plan. The 2021 Fiscal Plan projects that disaster relief spending will continue to contribute to the income tax base, either through mainland workers temporarily working in Puerto Rico or from Puerto Rican residents entering the formal economy as a result of disaster relief projects.

**Corporate income taxes:** There is also concentration in tax receipts among the largest corporations operating in Puerto Rico (e.g., ~29% of corporate income taxes are paid by 20 corporate taxpayers).[29] Historical aggregated data from Hacienda show that in the aftermath of the 2017 hurricanes, there was an influx of corporate activity spurred by reconstruction funding and mainland-based firms entering the Island's economy. This had led to higher corporate income taxes relative to GNP in FY2018 and FY2019, and this trend was continuing in FY2020 prior to the onset of COVID-19. The 2021 Fiscal Plan incorporates the contribution of disaster relief spending to the corporate tax base into future years. Further, the 2021 Fiscal Plan reflects certain adjustments to corporate income tax revenues attributable to one-time M&A activity, which

---

28   Hacienda historical reports as of April 2018
29   Ibid.

resulted in a non-recurring $488 million of revenues in FY2020 and ~$39 million in reduced corporate income taxes starting in FY2021, as projected by Hacienda.

**Sales and use taxes (SUT):** As with corporate and personal income taxes, SUT outperformed relative to GNP in FY2018 and FY2019, likely boosted by the increased economic activity resulting from the post-disaster reconstruction process (including through the replacement of lost inventory) and higher SUT compliance by larger firms less impacted by natural disasters. The 2021 Fiscal Plan incorporates incremental tax collections as disaster relief continues in future years. A portion of SUT collections will also be used to fund COFINA's obligations under its Plan of Adjustment going forward. This portion reaches ~$1 billion annually starting in FY2041.

**Partnership income taxes:** Act 60-2019 extended an alternative tax election for taxpayers to pay income taxes at the Partnership level at preferential tax rates. This change in tax administration resulted in a new category of revenue collections of ~$205 million[30] for FY2021 (as of February 2021). These payments largely reflect payments that otherwise would have been made by the partners in these entities and therefore would have been reported as personal or corporate income tax. A portion of the incremental collections have been considered non-recurring given the concentration of the payments in a small number of taxpayers and sectors. The 2021 Fiscal Plan forecasts ~$100 million of the increase in collections to be recurring.

**Other General Fund revenue (including Motor Vehicles, Alcoholic Beverages, and Cigarettes):** Motor vehicle revenue tax receipts surged in FY2018 and this trend continued into FY2021, as residents continued to accelerate motor vehicles purchases in the aftermath of the 2017 hurricanes and during the COVID-19 pandemic as federal stimulus payments reached the Island. The 2021 Fiscal Plan forecasts that elevated purchasing of motor vehicles will continue into FY2022, but purchases then return to historical trends over the following years. In addition, since FY2019 there has been a persistent increase in "other excise tax" collections, as these taxes were migrated to the new Internal Revenue Unified System (SURI by its Spanish acronym) platform. Hacienda has reported that it is challenging within the new platform to properly classify a component of these revenues according to their appropriate excise tax classification (e.g., motor vehicles, alcoholic beverages). Accordingly, the agency has created a suspense account to recognize these collections until the corresponding return is received and reconciled. The Oversight Board has requested corrective action be taken to accurately and in a timely manner recognize revenues in their appropriate revenue accounts to reduce the accumulation of unclassified excise taxes, and better isolate how much of the elevated collections come from re-classified taxes versus improved compliance. The 2021 Fiscal Plan includes an updated forecast of other General Fund tax revenues to reflect the expected continued elevated collections relative to prior year forecasts. The Oversight Board will continue to work with Hacienda to decompose this category of revenue and improve the granularity of future year forecasts.

**Export sector revenue projections:** Act 154 and Non-Resident Withholding (NRW) tax revenues are concentrated in a small number of multinational corporations. From FY2017 to FY2024, the 2021 Fiscal Plan estimates that Act 154 and NRW revenues will erode due to U.S. federal tax reform (reducing Puerto Rico's attractiveness as a low tax jurisdiction for multinationals), global supply chain diversification, and patent expirations. During FY2021, the Government submitted comments for the U.S. Treasury's consideration in response to the IRS notice of proposed rulemaking REG-101657-20 publication. In addition, the U.S. Treasury has publicly proposed reforms to the global corporate tax regime that could impact Puerto Rico, if enacted. The Oversight Board will closely monitor developments in the event they impact the 2021 Fiscal Plan.

---

[30] Does not include deferred taxes from FY2020 collected during FY2021

### 5.1.2   Medicaid funding

On a steady-state basis (i.e., in the absence of supplemental federal legislation), Medicaid costs are funded primarily by the Commonwealth, as there is a cap on available federal funding. Typical annual federal funding streams for the Commonwealth are the following, and are projected based on current law and statutory growth rates:

- **Standard annual federal Medicaid funding.** Although Puerto Rico has a 55% federal medical assistance percentage (FMAP), the amount of annual federal funding received under Section 1108 is capped each year. For FY2022, this funding stream is expected to be capped at ~$403 million, and though the cap grows each year according to the Medical Consumer Price Index for All Urban Consumers (CPI-U), it does not keep pace with healthcare expenditure growth.[31] Each year, ~$100 million of these funds are not available to cover premium expenses, but rather are transferred to the Department of Health to cover disbursements to Federally Qualified Health Centers ("Centros 330" or "FQHC") and Medicaid Program operations.

- **Increases in available Medicaid funding from federal legislation:** Since 2011, Puerto Rico has received temporary relief from rising healthcare costs through increased levels of federal reimbursement made available through the passage of the Affordable Care Act and the Bipartisan Budget Act of 2018. In December 2019, the Further Consolidated Appropriations Act was passed, which provides supplemental federal funding (up to $5.7 billion in total) to Puerto Rico's Medicaid program through September 30, 2021 (i.e., the first quarter of FY2022). In addition, the law raises the FMAP—the portion of Medicaid expenditures that federal funds can cover—from the standard level of 55% to 76% for most populations. Finally, in response to the COVID-19 pandemic, the Families First Coronavirus Response Act was passed in March 2020, further increasing both the available federal funds (adding an additional $183 million) and the FMAP (increased by an additional 6.2% for most populations). The available supplemental federal funds and higher FMAP will both return to standard levels in October 2021 (Q1 FY2022) in the absence of new federal legislation. Accordingly, the Commonwealth will hit a "Medicaid fiscal cliff," whereby it will be responsible for multi-billion-dollar annual healthcare expenditures that had previously been covered by federal funding since 2011. The 2021 Fiscal Plan does not assume future changes in federal legislation for this funding. The 2021 Fiscal Plan ensures that the Commonwealth is fiscally responsible under current law, and factors in the cost of Medicaid going forward in the absence of incremental legislation. To provide healthcare for a substantial part of the population, the Commonwealth must be able to pay and manage these critical costs, which grow faster than inflation, regardless of the future federal legislative environment. In the event that supplemental federal funds become available during any future fiscal year, and depending on the conditions imposed on the federal funds granted, the projected General Fund appropriation for the Puerto Rico Health Insurance Administration (ASES, by its Spanish acronym) would be revised downward.

- **Children's Health Insurance Program (CHIP) funding.** CHIP funding is not subject to a federal funding cap. Without additional legislation, the CHIP matching rate, also known as the Enhanced FMAP or eFMAP, for Puerto Rico is statutorily set at a minimum of 68.5% under Title XXI of the Social Security Act. Post passage of the Affordable Care Act, starting in FFY16, the eFMAP for Puerto Rico was raised to 91.5% through September 30, 2019. Subsequently, the eFMAP increased to 99% through a combination of legislative activity including the HEALTHY KIDS Act and Families First Act. The former expired in September 2020, dropping the eFMAP to 87.5%. The latter will remain in effect through the end of the public health emergency, which is currently extended through the close of calendar year 2021.

---

31  According to §1108(g) of the Social Security Act., from 2011 to 2016, the cap grows by the medical component of CPI-U as reported by BLS each year. From FY2011-FY2016, this growth averaged 2.9%. This inflation rate differs from the healthcare inflation index for Medicaid and Medicare used elsewhere in the 2021 Fiscal Plan (4.5% to 5.5% from FY2020-FY2022, decreasing to 4.75% in FY2049). Instead, the medical component of CPI-U includes other factors that lower the inflation rate by approximately 3-5 percentage-points, meaning the increase in the federal funding cap will not keep up with actual increases in expenditures

The Families First Act adds approximately 4.3% to the eFMAP. When the emergency health period is ended, the federal cost share is projected to decrease to the 68.5%.[32]

- **Special Revenue Fund revenues from municipalities:** Additional revenue for the Medicaid program comes from municipal intra-governmental transfers. See *Section 5.1.4* below for more information.

- **Special Revenue Funds revenues from prescription drug rebate:** Under the Centers for Medicare and Medicaid Services (CMS) Rule 84 FR 64783, U.S. Territories will be required to join the federal Medicaid Drug Rebate Program (MDRP) on April 1, 2022,[33] unless they apply for and receive a waiver. Currently, Puerto Rico operates its own drug rebate program whereby the Commonwealth negotiates or utilizes pre-negotiated agreements with drug manufacturers to return a portion of cost for prescription drugs (expected to be $264 million in FY2022). These funds enter the Commonwealth budget as Special Revenue Funds and are applied directly against the costs of Medicaid premiums. However, Puerto Rico has expressed its intention to join the MDRP program in the next fiscal year. Puerto Rico's potential entry into the MDRP is expected to yield higher rebate rates from drug manufacturers compared to those the Commonwealth currently has in place. Partly to enable entry into the federal program, the Government has also indicated its intention to update its accounting systems and the methodology by which it reports prescription drug utilization to the Centers for Medicare and Medicaid Services (CMS). In doing so, Puerto Rico will also begin sharing a portion of the rebate revenue with the Federal Government to the extent it reduces the costs eligible for federal matching. The Board is working with the Government to estimate the net financial impact and timing of the shift to the MDRP, including by seeking guidance from CMS on what revenues, if any, must be shared with the Federal Government.

*Exhibit 20* outlines expected Medicaid federal fund receipts. After the first quarter of FY2022 (ending September 30, 2021), supplemental federal funding is projected to phase out, in accordance with currently enacted legislation. This "funding cliff" further exacerbates the imperative and urgent need to implement cost-saving measures to reduce long-term Medicaid costs. Medicaid expenditures are discussed in detail in *Chapter 16*.

EXHIBIT 20: BASELINE FEDERAL FUNDS RECEIPT PROJECTIONS



Medicaid Federal funding sources, $M

■ Social Security Section 1108, CHIP, and other standard Federal allocations
■ 2018 Bipartisan Budget Act & Affordable Care Act funding (temporary)
■ 2020 Further Consolidated Appropriations Act & subsequent relief funding (temporary)

---

[32]  MACPAC: "Medicaid and CHIP in the Territories" (April 2020)

[33]  "Medicaid Program; Covered Outpatient Drug; Further Delay of Inclusion of Territories in Definitions of States and United States." Federal Register, 11 November 2019. Accessed 16 April 2021

### 5.1.3    Other federal funding

In addition to Medicaid funding, Puerto Rico receives other federal funds on a regular basis. These are not to be confused with disaster relief funds, which are directly tied to Hurricane Maria and earthquake reconstruction activity, or with COVID-19 response and relief funds, which are meant to cover incremental government spending to respond to the global pandemic. These funds cover both social benefits and operational expenditures. In the 2021 Fiscal Plan, these funds have been modeled based on what types of costs they cover (e.g., benefits or operations) as well as statutory formulas that define the size of Puerto Rico's allotment. For example, while Temporary Assistance for Needy Families (TANF) funds are typically pass-through (e.g., none of these funds go to operational costs), some Title I education funds are projected to be used for operational purposes (e.g., teachers' salaries, school supplies for programs for students with special needs, etc.). For the former, federal fund inflows and outflows mirror each other (as benefit needs decline, so do funds). For the latter, though inflows may decline, it does not necessarily mean expenditures decline as well – as expenditures are based on operations, not on benefits formulas, and the Commonwealth may have to cover operational expenditures via the General Fund should they outpace reduced federal funding. Meanwhile, while Head Start funds are allocated from the Federal Government based on the number of children living in poverty, NAP funds are provided through a block grant that is capped. The former, therefore, should change by population, while the latter should only grow with inflation, regardless of population changes.

### 5.1.4    Special Revenue Funds

**Commonwealth agency Special Revenue Fund (SRF) revenues:** The Commonwealth collects a significant portion of its revenues through Special Revenue Funds, which are funded from, among other sources, tax revenues transferred by statutes, fees and charges for services by agencies, and dividends from public corporations, and financing proceeds. Government tracking and reporting of these SRF revenues, associated expenses, and resulting surpluses or deficits has historically been incomplete and inconsistent. The baseline level of SRF revenues of Commonwealth agencies (excluding Independently Forecasted Component Units or IFCUs) has been updated in this 2021 Fiscal Plan by agency. The 2021 Fiscal Plan does not further detail SRF by type (special state funds, own revenues and other revenues), as Commonwealth agencies (excluding IFCUs) do not report this level of detail consistently. Future budget and Fiscal Plan processes will aim to further clarify Special Revenue Funds and apply controls to ensure transparency and accountability for these revenues. SRF revenues from fees and collections are also expected to be negatively affected by the COVID-19 pandemic, as agencies face decreased demand for services as a result of the lockdown. In order to achieve greater transparency and controls over SRF, the Government must identify all SRF sources at a granular level, and produce a revenues and expenditures report on a monthly basis, including a profit and loss statement for each Special Revenue Fund.

**Independently Forecasted Component Unit (IFCU) revenues:** The Commonwealth contains twelve Independently Forecasted Component Units, which range from public corporations (e.g., the State Insurance Fund Corporation) to public hospitals (e.g., the Cardio Center). These entities are mostly funded by Special Revenue Funds and may also receive General Fund appropriations. Through the annual budget process and tracking of actual receipts and expenditures, the Oversight Board has been able to gain more insight into the specific revenue streams for these entities to further refine the IFCU revenue projections. While most IFCU revenues are projected using GNP, given the unique nature of each IFCU, certain revenue streams are grown by other factors, such as inflation, population, or as governed by legislation.

**Municipal contributions to PayGo and the Puerto Rico Health Insurance Administration (ASES by its Spanish Acronym):** The 2021 Fiscal Plan includes receipts from municipalities to cover retirement and healthcare expenses incurred by the Commonwealth on their behalf. Since the passage of Act 72-1993, ASES has received funding from municipalities for the administration and delivery of the Government Health Plan on their behalf. Similarly,

48

since the passage of Act 106-2017, municipalities that participate in ERS are financially responsible for PayGo expenditures covered by the Commonwealth. The passage of Act 29-2019 disrupted this model and required the Government to fund municipalities' PayGo and Medicaid costs from the General Fund without receiving reimbursement from the municipalities. However, following legal proceedings initiated by the Oversight Board challenging the validity of Act 29-2019 under PROMESA, the Title III court ruled that Act 29-2019 violated PROMESA and nullified the law, thereby reinstating the municipalities' obligation to cover PayGo and healthcare payments for their employees. As a result of this ruling, the Commonwealth is entitled to seek reimbursement for prior payments made under Act 29-2019 and is empowered to act if these contributions are not received (e.g., to withhold payments for utilities, appropriations). The effective date of the court's ruling was delayed to May 7, 2020 to allow for the parties to discuss potential solutions to the financial challenges faced by municipalities, particularly in light of the COVID-19 pandemic. Accordingly, the 2021 Fiscal Plan assumes that municipalities fund their respective contributions for PayGo and healthcare expenditures going forward. In calculating municipalities' healthcare expenditures, however, the 2021 Fiscal Plan does take into account the incremental federal funding support in FY2021 and FY2022 made available through the 2020 Further Consolidated Appropriations Act. Given that this funding stream expires in FY2022, the 2021 Fiscal Plan assumes that contributions from municipalities thereafter will return to previous levels, but the Oversight Board will utilize the same approach in future years if additional federal funding is again provided.

**Public Corporation PayGo receipts:** The 2021 Fiscal Plan includes receipts from public corporations (e.g., PRASA) that participate in the Employee Retirement System (ERS) to cover PayGo expenditures covered by the Commonwealth. The Commonwealth shall be reimbursed for these payments and will act if these contributions are not received (e.g., will withhold payments for utilities).

**FAM:** The Municipal Administration Fund (FAM) collects 0.5% of the SUT which is distributed into three funds: (1) 0.2% to the Municipal Development Fund; (2) 0.2% to the Municipal Redemption Fund; and (3) 0.1% to the Municipal Improvement Fund (referred to as the FMM). Pursuant to Section 4050.09 of Act 1-2011, the FMM are to be distributed through annual legislation and appropriated for select capital works and improvement projects for the municipalities (e.g., public housing, schools). The legislature passes resolutions each year to allocate the FMM. These resolutions must be consistent with the 2021 Fiscal Plan and the applicable special revenue funds included in the Certified Budget.

### 5.1.5    Gross-up for tax credits

**Gross-up of revenues to reflect potential revenues without payment of tax incentives:** In addition to offering preferential tax rates, tax exemptions, tax abatements, and cash grants, the Government of Puerto Rico provides hundreds of millions of dollars in tax credits to corporations and individuals each year. Some of these tax credits function as entitlement programs: any business that meets the requirements set forth in law is entitled to the benefit. Other tax credits give government officials considerable discretion on which projects will receive incentives. Many of these tax credits are intended to pursue certain policy goals such as stimulating employment, stimulating economic activity and economic development, encouraging investment, and protecting local industries. Unlike traditional expenditures, however, tax credits are not incurred in a transparent fashion, and, with only a few exceptions, are currently uncapped by any aggregate amount of benefits conveyed. The issuance of tax credits also tends to be done in an ad hoc manner, with unclear economic justification for the costs incurred and without monitoring of the goals described above (i.e., how many jobs in any particular year were created). This leads to an unpredictable, and potentially costly, foregone revenue stream each year.

Uncapped and unpredictable issuance of tax credits can have a materially negative fiscal impact. Several states have faced challenges with unexpected levels of expense from tax

expenditures, such as Michigan (the Michigan Economic Growth Authority tax credits), Louisiana (tax credit for horizontal natural gas drilling), and New York ("brownfields" tax credits). The examples from these states are not uncommon and they reinforce the uncertainty and risk associated with the establishment of tax credits.

Policy makers in Puerto Rico must understand both the budget implications of current and proposed tax expenditures and should manage the size of tax incentives by setting limits on their annual cost and eliminating tax credits with negative returns. The issuance of reliable cost estimates, including a detailed analysis of the budget implications from each tax incentive and annual cost controls will help Puerto Rico avoid unexpected negative outcomes. Otherwise, the Government will remain powerless to manage the cost of these incentives and keep the incentives from growing uncontrollably.

Recognizing the importance of this question to the fiscal sustainability of Puerto Rico, the 2021 Fiscal Plan includes a forecast of gross revenues inclusive of the value of tax credits to show the foregone revenue associated with these credits. The 2021 Fiscal Plan includes a forecast of gross revenues based on the historical level of certain tax credits claimed on income tax filings for individual filers, regular corporation filers, and incentive tax filers, as provided by Hacienda. As shown in the period of the report *Exhibit 21*, over nine tax years (2010-2018), tax credits claimed across all tax filers averaged $261 million annually. The 2021 Fiscal Plan recommends all reporting going forward include monthly and quarterly reports as to the gross revenues, tax credits claimed, and the net revenues received for the period of the report.

EXHIBIT 21: TAX CREDITS BY YEAR

| Projection, $M | FY10 | FY11 | FY12 | FY13 | FY14 | FY15 | FY16 | FY17 | FY18 |
|---|---|---|---|---|---|---|---|---|---|
| Regular Corporations | 94 | 48 | 89 | 89 | 140 | 66 | 75 | 82 | 18 |
| Incentive Corporations | 135 | 147 | 133 | 158 | 116 | 78 | 70 | 56 | 66 |
| Individuals | 59 | 37 | 90 | 69 | 65 | 66 | 61 | 89 | 157 |
| **Total Tax Credits Claimed** | **288** | **232** | **312** | **316** | **321** | **210** | **206** | **227** | **241** |
| **9-Year Average** | | | | | | | | | **261** |

SOURCE: Hacienda

The Government must also adopt a transparent limit to the amount of tax credits issued and claimed at an amount below $261 million by, for example, capping the notional amount, restricting the number of companies and individuals that can claim credits annually, including sunset provisions, or inserting time bound clauses upon which each tax credit will expire. This is similar to the approach that other states have taken to limit the use or issuance of tax expenditures, including Arizona, California, Florida, Illinois, Massachusetts, Minnesota, New York, Ohio, and Pennsylvania. This limit is separate and incremental to the cash grants that corporations and individuals also receive, which will be captured in Certified Budgets going forward. Future Fiscal Plans should also be expanded to include limitations on foregone revenues due to preferential tax rates and exemptions, including municipal exemptions.

These forecasts should be maintained and updated by leveraging the work that Hacienda has undertaken to produce and maintain a more comprehensive measurement of tax expenditures over time through the annual Tax Expenditures Report. As discussed in more detail in *Section 17.3.1*, the publication of the initial Tax Expenditures Report in September 2019 provided, for the first time, better visibility into the full scope of tax expenditures being offered, together with a description and approximate cost of each expenditure.

For tax expenditures reporting to maintain relevance and maximize its impact on the policy making process, regular reviews of each tax incentive should be completed to assess whether each incentive is meeting its policy objective (and an assessment of benefits along with costs). This was missing from the inaugural report and detracts from the ability of the report to provide proper context from which to inform budgetary decision-making.

The estimates in the tax expenditures report should also be systematically incorporated into the annual fiscal plan and budget review process. This means they need to be considered in conjunction with consideration of direct spending proposals at the executive review and legislative levels and the agencies responsible for programs.

To achieve the objectives above, the tax expenditure report must be produced annually on a timely and efficient basis. In fact, the publication of the first tax expenditures report, in September 2019, stated the second annual report would be published in March 2020, yet it has not been published. Rationalizing the amount of tax expenditures offered by the Government is smart and prudent fiscal management. This can only be done in a comprehensive way through the production of the annual tax expenditure report on a timely basis.

The Government has also taken initial steps to provide transparency around, and control these expenditures through its proposed reforms to the Incentives Code. By targeting a limit on the amount of tax expenditures that can be spent each year, the Government would retain control over the cost and enable public debate about the value of this type of spending in light of the various needs on the Island.

### 5.1.6   Gross-up for COFIM receipts

The Municipal Finance Corporation (COFIM, by its Spanish acronym) is the public corporation that collects the 1% Municipal SUT established by law for certain municipalities. The 2021 Fiscal Plan includes projections of this 1% revenue stream, along with exactly offsetting expenses. COFIM is not an entity that receives appropriations from the General Fund, but rather relies solely on municipal SUT.

## 5.2   Baseline expenditure forecast

The trend of **"baseline expenditures"** (or, the forecast of projected expenditures assuming no measures and structural reforms), is summarized in *Exhibit 22*.

EXHIBIT 22: MAJOR OPERATING EXPENDITURE CATEGORIES PRE-MEASURES

Key baseline expenditure drivers (pre-measures), $M

| | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|
| Payroll (General Fund) | 3,134 | 3,179 | 3,228 | 3,279 | 3,330 |
| Operating expenditures (General Fund) | 1,964 | 1,893 | 1,933 | 1,965 | 1,990 |
| CW appropriations | 1,193 | 1,179 | 1,125 | 1,142 | 1,128 |
| Commonwealth Medicaid expenditures | 1,968 | 2,654 | 2,754 | 2,856 | 2,974 |
| Pension expenditures | 2,259 | 2,237 | 2,233 | 2,224 | 2,215 |
| IFCU & CW SRF Expenditures | 2,279 | 2,297 | 2,320 | 2,357 | 2,400 |
| Federally funded expenditures | 5,706 | 4,935 | 5,000 | 5,072 | 5,150 |
| Other[1] | 446 | 339 | 300 | 259 | 210 |
| Total CW funded operating expenditures[2] | 18,949 | 18,712 | 18,894 | 19,154 | 19,397 |

1 Includes Disaster Recovery Cost Match, Restructuring / Title III costs, Social Programs CW funded, Reserve for emergency fund and Budget incentives
2 Does not include capital expenditures, enterprise funds, disbursements to entities outside the 2021 Fiscal Plan, and other non-recurring expenditures

### 5.2.1    General fund payroll and non-personnel operating expenditures

**Payroll expenditures:** Despite progress made through the FY2021 budget process, consistent granular payroll data continues to be a challenge for the Government. FY2018 payroll numbers reflect actual expenditures where available and the Certified Budget in cases where actual data was not available (adjusted to reflect reapportionments among agencies). FY2019 was assumed to be equal to FY2018 given the Fiscal Plan Compliance Act, which enacted a payroll freeze except for certain agency-specific adjustments. Beginning in FY2020, base payroll has been assumed to grow by Puerto Rico inflation. As part of the FY2020 and FY2021 budget certification processes, key agencies were analyzed to develop detailed payroll estimates based on agency rosters, actual payroll run rates and anticipated changes to headcount and salaries. Any reduction to baseline payroll expenditure projections from attrition, absenteeism, or workforce reductions is captured through fiscal measures.

**Non-personnel operating expenditures:** Non-personnel operating expenditures in FY2019 were also assumed to be equal to FY2018 budgeted levels. Thereafter, non-personnel operating expenditures are assumed to grow by Puerto Rico inflation, with select adjustments as necessary. For example, the 2021 Fiscal Plan includes a 10% reduction to FY2022 Special Fund for Economic Development (FEDE, by its Spanish acronym) and Economic Incentive Funds (FIE), Cruise Industry Incentives, Renewable Energy, Export Development, and Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico (CINE) expenditures, an amount which is then taken out of all future years. (In FY2022, these select expenditures reductions are $10 million total.)

### 5.2.2    Special Revenue Funds

**Commonwealth agency Special Revenue Fund (SRF) operational expenditures:** The Commonwealth funds a significant portion of its expenses with Special Revenue Funds and previously did not report on these expenses transparently in a consistent manner. Given that SRF

revenues and expenditures are not part of the General Fund for budgeting purposes, they are not included in the General Fund budget resolutions approved by the Legislature. However, the Oversight Board has certified SRF expenditures starting with the FY2019 budget process, with the objective of applying controls and reporting requirements to ensure transparency and accountability for these revenues and expenditures. With data made available by the Commonwealth, the baseline level of SRF expenses of Commonwealth agencies (excluding IFCUs) has been updated and allocated across agencies (by payroll and non-payroll expenditures). Given the mandate of the Office of the CFO to place controls on SRF expenditures, baseline SRF expenses are forecasted to be equal to the estimated revenues in each year before fiscal measures.

**Independently Forecasted Component Unit (IFCU) operational expenditures**: Most IFCU payroll and non-payroll expenses grow by inflation, with exceptions for certain expense categories (e.g., healthcare costs grow with medical inflation, variable costs that grow in line with revenues).

The baseline expenditures include **municipality and public corporation PayGo, COFIM, and FAM expenditures**, including all the conditions outlined in *Section 5.1.4*.

### 5.2.3    Other federal funding

Most federal funds received by the Commonwealth are passed through to residents directly in the form of social benefits (e.g., TANF, WIC), but federal funds are also used to cover operating expenditures in many agencies. Expenditures related to pass-through federal funds are set equal to the associated revenue stream. Baseline expenditures related to operating expenditures are set based on the FY2018 federal funds budget reported by the Government (updated in select cases for new information received FY2019-2021) and grow with inflation (and in some cases population). In the case of Community School Program (largely Title I funding), revenues will grow with growth in total federal funding - presumed to track  U.S. inflation - but decline with decreasing enrollment, which is the most salient determinant of Puerto Rico's annual allocation. At the same time, the 2021 Fiscal Plan assumes fixed costs associated with providing these services may not decline at the same rate given historical Commonwealth behavior of maintaining infrastructure such as schools and program staff despite population decline. Therefore, the 2021 Fiscal Plan assumes that—without fiscal measures—the General Fund will cover any cost increases that continue despite declining Title I federal support.

### 5.2.4    Medicaid expenditures

Medicaid costs are projected to reach nearly $3.5 billion annually by FY2026. These costs are primarily driven by premiums, calculated by multiplying the weighted-average cost per member per month (PMPM) by the estimated number of people enrolled in the Medicaid (federal and Commonwealth-qualified), CHIP, and Platino dual-eligible programs. Projections also include other direct health expenditures (e.g., Hepatitis C, HIV, and pulmonary programs) that do not flow through managed care. These costs are exclusive of non-medical administrative costs to ASES and the Department of Health.

**PMPM costs** are projected to grow at 8.9% in FY2021 as a result of increased healthcare utilization following the pandemic. Relatedly, actual PMPM growth is now projected to have been just 1.6% from FY2019 to FY2020. As healthcare utilization resumes to normal levels, growth rates are expected to return to previous projections (of 5.15%) by FY2025. In the long term, costs increase according to an age-mix-adjusted PMPM growth rate (of 4.75% by FY2051, for example), which reflects a shift to a younger enrollment population.

**Enrollment rates** are primarily tied to overall population decline on the Island. However, the first half of FY2022 is projected to see an enrollment increase, independent of overall Island population changes. In the first quarter, this change is primarily related to the decision to raise the Puerto Rico Poverty Line (PRPL) through September 30, 2021. Since the PRPL is a partial

determinant of Medicaid eligibility, this increase allowed previously unenrolled residents to enroll during the COVID-19 pandemic. This COVID-19-related increase is projected to persist into the second quarter of FY2022 to a slightly lesser degree, before returning to baseline healthcare population projections by January 1, 2022 (Q2 FY2022). The effects of this increased enrollment during FY2022 can be seen in *Exhibit 23*.

EXHIBIT 23: PROJECTIONS FOR MEDICAID AND CHIP BASELINE PREMIUM EXPENDITURES AND ENROLLMENT (NOT INCLUDING PLATINO)



Medicaid projected enrollment and expenditures, $M total cost, M enrollees

Note: Only includes Medicaid (CHIP, Commonwealth- and federally-funded). Excludes Platino dual-eligible, as well as non-direct premium costs (e.g., HIV/PDP, Health Insurance Provider Fee, Air Ambulance, MC21 Administrative Fee, Super Utilizers, and Pulmonary).

**Other Commonwealth Medicaid expenditures**, which include, HIV/PDP, Air Ambulance, MC21 administrative fee, Super Utilizers, and Pulmonary, among others, are projected to grow at the rate of Puerto Rico healthcare inflation. Separate from those costs is the Health Insurance Tax (HIT), calculated each year by the Federal Government and estimated here to be 1.80% of the prior year's total premiums.[34] The Further Consolidated Appropriations Act, 2020 repealed the HIT requirement. Thus, the 2021 Fiscal Plan only reflects the estimated HIT fee anticipated to be required to be paid in FY2021 on FY2020 premium expenditures. Thereafter, the HIT fee is eliminated from projections.

**"Platino" dual-eligible** program expenditures were estimated using a consistent $10 PMPM over FY2019-FY2024 representing payment for wrap-around services supplementing main Medicare coverage (from FY2024 onwards, this cost grows by the PMPM growth rate). Enrollment is projected to be affected similarly to Medicaid enrollment. "Platino" costs are expected to remain between $29 million and $31 million from FY2021-FY2024, at which point they grow consistently over the remainder of the period.

### 5.2.5    *Commonwealth pension expenditures*

**Baseline pension costs:** Projections rely on demographic and actuarial estimations for Employees' Retirement System (ERS), Teachers' Retirement System (TRS), and Judiciary Retirement System (JRS) populations and benefit obligations. Since FY2018, pension benefits for all plans have been paid on a pay-as-you-go basis. Starting in FY2022, pensions baseline costs (reflecting System 2000 segregation) are projected to decrease progressively from $2.3 billion in FY2022 to $1.2 billion in FY2051, with an average annual cost across the period of $1.9 billion. The 2021 Fiscal Plan baseline pension expenses are ~$1.4 billion lower (FY2022-FY2051) than in the 2020 Fiscal Plan, primarily driven by updates incorporating new census and mortality data.

---

34  Sec 4003 of Public Law 115-120—Jan. 22, 2018. "Fourth continuing appropriations for Fiscal Year 2018, Federal Register Printing Savings, Healthy kids, health related taxes, and Budgetary effects," at Based on actuarial estimates provided by ASES

### 5.2.6   Appropriations

**Municipalities:** Baseline municipal appropriations are projected to remain constant at ~$220 million annually, which represents the FY2018 appropriation level exclusive of a $78 million *one-time* allotment to municipalities made in the aftermath of Hurricanes Irma and Maria.

**University of Puerto Rico (UPR):** The UPR baseline appropriation is $717 million from FY2019 to FY2023 and grows by inflation starting in FY2024.

**Highways and Transportation Authority (HTA):** HTA is currently funded through a combination of own revenues, federal funds, and Commonwealth funds (including both a capital appropriation and an operating appropriation). Within the 2020 HTA Fiscal Plan, toll fares are used to cross-subsidize capital and operating expenditures on non-toll roads. The 205(a) letter of January 29, 2021 recommended that HTA be reorganized into a toll road entity, with non-toll roads managed by DTOP and transit assets managed by PRITA. Therefore, consistent with the 205(a) letter recommendation, the 2021 Fiscal Plan increases the HTA operating transfer to cover the full cost of non-toll assets, marking the first step towards the implementation of the Transportation System Reform outlined in *Chapter 11*. The appropriation does not include funding for the HTA emergency reserve, nor does it draw down existing balances. It also assumes toll roads have access to federal funds until reorganization is complete (assumed FY2023), but not thereafter. As a result, over FY2025-FY2051, the 2021 Fiscal Plan includes an average annual operating appropriation of ~$133 million and average capital appropriation of $68 million per year. The Commonwealth operating transfer may be reduced in a proportionate amount should the Federal Highway Administration (FHWA) federal funding for non-toll assets appropriated to HTA increase.

The HTA operating transfer is intended to be used by HTA solely to fund costs associated to non-toll assets and is not available to be used for any other purposes, including funding costs and projects above and beyond those contemplated in HTA's Certified Fiscal Plan.

### 5.2.7   Other operating and capital expenditures

**Utilities:** The 2021 Fiscal Plan uses the estimated billings for electric and water costs provided by PREPA and PRASA, respectively on agency level. Estimated water billings from PRASA are projected to grow at the same rate as water rate increases over the period of FY2021-FY2025; thereafter, PRASA billings are projected to grow at water rate increases and then according to inflation. Estimated electric billings from PREPA are projected to grow at the same rate as power rate increases over the period of FY2021-FY2051.

**Parametric insurance:** The 2021 Fiscal Plan includes an annual investment of ~$35 million to cover the Commonwealth's portion of the annual cost of parametric insurance. The parametric insurance program is supplemental to the existing budgeted premiums for renewing current traditional insurance policies. The following conditions applicable to Commonwealth entities are placed on the requested funding:

- Develop a sophisticated insurance plan with a comprehensive program that considers the available markets, costs, meeting Operations and Maintenance (O&M) requirements, and levels of coverage. This would include conducting a risk assessment; analyzing expected O&M costs on a building by building basis; identifying the types of insurance needed to protect against risk; identifying insurance gaps, selecting the authority needed to develop, implement and enforce the plan; and crafting the financial arrangement structure for funding the plan and paying for losses

- Strategically consider and prioritize options to supplement the existing insurance coverage (including identifying how the Commonwealth will meet flood insurance requirements and considering expanded limits on existing policies, a separate excess insurance policy above current limits, or a Parametric policy and/or Catastrophe ("CAT") bond)

55

■  Engage the Insurance Commissioner on certification criteria

**Insurance (PRIMAS)**: The Commonwealth bears costs related to insurance premiums (e.g., property insurance, liability insurance). Government reporting on these costs has not been transparent or consistent over time (e.g., not all agencies report these costs independently of other operating expenses, reporting is not consolidated across General Fund and Special Revenue Funds). The Government reported that insurance costs increased from FY2018 to FY2020 due to Hurricanes Maria and Irma.  Adjustments were made based on agency reported needs for FY2021 and FY2022 (e.g., costs for Department of Housing  have been reduced, costs for PRDE and Institute of Puerto Rican Culture have been increased).

**Capital expenditures:** Centrally-funded General Fund maintenance and capital expenditures of the Commonwealth (excluding PREPA, PRASA, HTA self-funded capital expenditures and one-time transfers) are expected to grow by inflation from a baseline of $337 million FY2022 to FY2040, at which point maintenance capital expenditures increase to $677 million[35] (1.9% of GNP[36]) and growth with GNP, to account for the new level of capital stock the Commonwealth will be responsible for maintaining post-disaster reconstruction (see *Section 4.2* for more information). In FY2022, ~$53 million of the baseline expenses will be appropriated to HTA (as part of the total appropriations), with the remaining ~$284 million for use by the Commonwealth. The 2021 Fiscal Plan includes annual Special Revenue Fund capital expenditures for the Commonwealth agencies (and the Public Buildings Authority) of $6 million for FY2022 and $22 million (based on historical agency needs) for FY2023 onwards.[37]

### 5.2.8   *Reconstruction and restructuring related expenditures*

**Cost-share for disaster relief funding:** Federal funds for FEMA's Public Assistance, Individual Assistance and Hazard Mitigation programs typically require a local match from the entity receiving them (anywhere from 10-25% of funds). In the case of Puerto Rico, the 2021 Fiscal Plan projects that the Commonwealth will need to cover an estimated ~10% of federal Public and Individual Assistance funds that are obligated to them, amounting to $2.6 billion from FY2018-FY2035. (Based on obligation data, instrumentalities are assumed to shoulder a further $1.6 billion in total cost-match expenditures during the same period). A portion of the Commonwealth and instrumentalities' cost-match expenditures are projected to be covered by CDBG funds from FY2020 to FY2035, which amounts to $2.7 billion. As a result, instrumentalities and the Commonwealth are anticipated to need to cover $500 million and $1 billion, respectively, out of pocket.

After accounting for excess funds budgeted for cost share in FY2018- FY2021 (when DRF disbursements were anticipated to be higher), as well as $135 million in unspent cost share funds considered available for future cost share needs, the ultimate out-of-pocket cost share burden for the Commonwealth is $1.2 billion. Moving forward, cost share matching funds are to be used only on approved projects/ requirements under FEMA's Individual Assistance, Public Assistance, and Hazard Mitigation programs.  Any unused cost share matching funds in a given fiscal year are to be rolled over the following fiscal year and remain available for use in meeting cost share requirements for approved projects/requirements under FEMA's programs. The restriction of use of cost share matching funds is applicable to funds in the current fiscal year as well as any funds rolled over to the subsequent years.  The use of these funds must be coordinated with CDBG-DR and CDBG-MIT in meeting cost share requirements.

**Restructuring-related costs:** Commonwealth restructuring-related expenditures are projected to be $622 million for the period FY2022 to FY2025, and are comprised of all professional fees, including those of the Unsecured Creditors' Committee, the Retiree Committee,

---

[35]  Includes General Fund portion of 1.9% of GNP and the HTA Capex appropriation (with the 10% reduction on General Fund unallocated Capex)

[36]  Corresponds to the state average of capex as percentage of GNP

[37]  Of this amount, $2 million per year goes to Public Buildings Authority (an IFCU) for recurring needs

the Government (mostly the Puerto Rico Fiscal Agency and Financial Advisory Authority, or AAFAF by its Spanish acronym), and the Oversight Board. The estimate for professional fees in the 2021 Fiscal Plan was developed based on estimates prepared by the Oversight Board and fees provided by the Government as part of the Government's submitted 2021 Fiscal Plan. Fees were also benchmarked versus comparable restructuring situations that yield an average professional-fee-to-funded-debt ratio of 2.08% and median ratio of 2.33% relative to 2.48% projected for the Commonwealth (*Exhibit 24*) In total, for the period from FY2018 to FY2026, the restructuring-related expenditures projection is ~$1.6 billion. Uncertainty stemming from the series of recent natural disasters and ongoing COVID-19 pandemic has resulted in an extended restructuring process contributing to the overall estimate. For some perspective, the City of Detroit restructuring (the largest municipal restructuring prior to the Commonwealth of Puerto Rico) took 17 months (July 2013 to December 2014); while the restructuring of the Commonwealth is now approaching 4 years after experiencing hurricanes, earthquakes and the impact of COVID-19. With respect to the Oversight Board's operating costs, they are forecast to be $75 million per year from FY2022 to FY2026 on a *pre-measures* basis (or $65 million after measures).

EXHIBIT 24: PROJECTED PROFESSIONAL FEES RELATIVE TO OTHER MAJOR RESTRUCTURINGS

Professional fees for restructuring

| | Date filed | Outstanding debt, $ | Total fees and expenses, $ | Fees to funded debt, % |
|---|---|---|---|---|
| **City of Detroit, Michigan** | Jul. 2013 | 6,400,000,000[1] | 177,910,000 | 2.8 |
| **Residential Capital, LLC** | May. 2012 | 15,000,000,000 | 409,321,308 | 2.7 |
| **Sabine Oil & Gas Corp.** | Jul. 2015 | 2,800,000,000 | 78,553,223 | 2.8 |
| **Caesars Entertainment Operating Company** | Jan. 2015 | 18,000,000,000 | 258,278,005 | 1.4 |
| **Lehman Brothers Holdings Inc.** | Sep. 2008 | 613,000,000,000 | 956,957,469 | 0.2 |
| **Lyondell Chemical Company** | Jan. 2009 | 22,000,000,000 | 205,932,292 | 0.9 |
| **American Airlines** | Nov. 2011 | 11,000,000,000 | 391,637,858 | 3.6 |
| **Washington Mutual, Inc.** | Sep. 2008 | 8,000,000,000 | 271,085,213 | 3.4 |
| **Edison Mission Energy** | Dec. 2012 | 5,000,000,000 | 96,244,628 | 1.9 |
| **Energy Future Holdings Corp.** | Apr. 2014 | 40,000,000,000 | 450,110,233 | 1.1 |
| **Puerto Rico[2]** | **2017** | **64,000,000,000[3]** | **1,584,050,751** | **2.5** |

Summary Statistics

| | |
|---|---|
| Avg. | 2.08% |
| Max | 3.56% |
| Min | 0.16% |
| Med | 2.33% |

Puerto Rico involves added complexity as the largest public sector restructuring in the history of the United States

1 Excludes pensions and other retirement liabilities
2 Debt amount for Puerto Rico does not include over $50 billion in unfunded pension liabilities.
3 From "Basic Financial Statements and Supplementary Information" for fiscal year ended June 30, 2016 prepared by the Puerto Rico Department of the Treasury; inclusive of unaccreted interest of capital appreciation bonds; rounded up from $63.9B for consistency with other cities

**Emergency reserve:** The purpose of the Emergency Reserve fund is to expedite response activities and, upon request, provide the Commonwealth agencies, public corporations and affected municipalities ("Emergency Reserve Recipients") with capital to quickly begin response activities that exceed their capacity during declared events in Puerto Rico. Starting in FY2019, the Commonwealth must set aside $130 million annually into an emergency reserve that is to total $1.3 billion, or ~2.0% of FY2018 GNP. The methodology supporting this reserve is informed by

guidance provided to other Caribbean islands by the International Monetary Fund in defining an adequate emergency reserve (2-4% of GNP, accumulated at 0.5% per year).[38]

Restrictions placed on these funds must ensure that it is only used in case of an extraordinary event like natural disasters or as otherwise agree with the Board; the Commonwealth can only make disbursements with approval from the Oversight Board. Historically, the Oversight Board has authorized use of the emergency reserve in response to the 2017 hurricanes (Maria and Irma), the 2020 earthquakes impacting the southwestern part of Puerto Rico, and the COVID-19 pandemic. Moving forward, a fund advance will require the following:

■ The Governor would need to declare a state of emergency

■ AAFAF requests FOMB access to the emergency reserve fund for a finite period

■ Once FOMB authorizes access to the emergency reserve funds; OMB would submit to FOMB requests from the Emergency Reserve Recipients to approve amount and usage of funds

■ Amounts approved by the FOMB and disbursed to the Emergency Reserve Recipients would need to be replenished not later than the following fiscal year

■ Emergency Reserve Recipients that received funds from the emergency reserve fund are required to file with FEMA a Request for Public Assistance (RPA) and Project Worksheet to ensure that any federal reimbursements to Emergency Reserve Recipients are replenished into to the emergency reserve state fund

■ Emergency Reserve Recipients are required to update OMB on a quarterly basis on the process of Public Assistance with FEMA

■ OMB must provide quarterly reporting to FOMB on the use of authorized funds (see *Chapter 21* for more information)

### 5.2.9   Expenditure gross-ups

For each of the gross-up revenue items included in *Section 5.1.5* and *Section 5.1.6*, an equivalent expenditure is included in the baseline expense forecast.

## 5.3    Surplus potentially not available for the Commonwealth

The 2021 Fiscal Plan financial projections show the surplus generated by all entities covered by the Commonwealth Fiscal Plan. However, some of the surplus is generated by Commonwealth public corporations, and the Commonwealth's ability to access such surplus amounts could be problematic without further legislative action. As such, the 2021 Fiscal Plan also represents what the surplus would be if these funds were inaccessible (*Exhibit 25*).

---

[38]   IMF Bahamas Article IV report published March 22, 2018

EXHIBIT 25: SURPLUS POTENTIALLY NOT AVAILABLE FOR COMMONWEALTH



# Chapter 6. Long-term projections and Debt Sustainability Analysis (DSA)

## 6.1    Long-term macroeconomic, revenue, and expenditure projections

The 2021 Fiscal Plan projects a post-pandemic recovery in FY2021 and FY2022, followed by limited real growth between FY2023 and FY2029 (average real growth of 0.2% during this period). As disaster relief funding and the spending of COVID-19 federal and local stimulus funds drop off considerably and structural reform growth rates are muted, GNP growth returns to its historical negative trend starting in FY2030. Population is estimated to steadily decline at an average rate of ~1.2% annually, due to a combination of outmigration and demographic factors. Inflation is estimated to settle at a long-term run-rate of 1.5%-1.9% as it is expected to gradually approach to mainland forecasts.

Most revenues are projected to grow with nominal GNP in the long term.[39] This includes SUT, corporate income tax, personal income tax, non-resident withholding not paid by Act 154 entities and most General Fund revenues. Exceptions include:

---

[39]   This methodology is consistent with general IMF forecasting approaches and is intended to capture the overall change in consumption, investment and production within the economy

59

- **Alcoholic beverages and cigarette-related tax revenues**, which are expected to grow by inflation and population. This assumption is supported both by relatively constant alcohol consumption in growing economies along with the long-term decline in cigarette consumption both in Puerto Rico and the U.S. mainland.

- **Rum excise on offshore shipments,** is expected to grow by U.S. mainland population and is partially driven by the statutory waterfall by which rum excise taxes are paid into the General Fund.

- **Non-resident withholding (NRW) and Act 154 revenues,** which will face declines due to U.S. tax reform, supply chain diversification, and patent expirations. This decline had begun during FY2020, with incremental declines forecasted in each year through FY2024 (~40% cumulative decline versus FY2018 baseline). No further declines are anticipated through FY2027; however, additional loss of Act 154 revenue are expected in FY2028-FY2031, such that FY2031 revenues are projected to be ~60% below baseline. This leads to a steady state of $859 million in annual Act 154 revenues beginning in FY2031. NRW revenues associated with Act 154 taxpayers have also declined. Based on past and current performance, NRW payments are projected at $170 million in FY2022 (~60% below baseline). NRW revenues not related to Act 154 payers continue to grow with nominal GNP.

- **Independently Forecasted Component Units (IFCU) revenues**, which are projected on a line item basis and grow by the same values as in the short-term projections (largely by nominal GNP, with exceptions for those related to healthcare, population, or other factors).

- **Federal fund revenues,** which grow based on historical and statutory appropriations. The standard cap for **Medicaid matching funds** grows by the medical services component of CPI-U and CHIP funding grows proportional to growth of premiums and enrollment. However, several significant sources of federal funding for Medicaid (e.g., the Affordable care act or ACA, the Bipartisan Budget Act of 2018 or BBA, the Further Consolidated Appropriations Act, the Families First Act) are only legislated through the first quarter of FY2022, or through September 30, 2021. **This creates a "fiscal cliff" starting in FY2022 whereby the share of Medicaid funding borne by the Commonwealth increases significantly.** Between FY2023 and FY2051, average annual federal funding for Medicaid is 15.7% of total expenditures (versus 38% in FY2022). While additional federal funding for Medicaid may be provided in the future, the 2021 Fiscal Plan only reflects federal funding provided by currently-enacted legislation.

Just as most revenues grow by GNP, most **expenditures grow by standard inflation** after FY2026. Exceptions include:

- **Medicaid premiums** grow at a faster pace than standard inflation and are instead grown by a PMPM growth rate and population change. The PMPM growth rate is estimated through actuarial analysis of historic utilization trends and projected demographic changes on-Island. Long-term PMPM growth trends (FY2027-FY2051) will be 4.95% on average.

- **Capital expenditures** are anticipated to rise to 1.9% of GNP (in line with the mainland average) by FY2041 to account for an enhanced capital stock needing maintenance after the significant reconstruction efforts in the wake of Hurricanes Maria and Irma. This change in methodology increases the annual Commonwealth average to ~$759 million over FY2041-FY2051, as Puerto Rico must sustain a higher level of maintenance and rely on its own funding for capital investments (rather than disaster relief funding).

- **Cost match for disaster-related federal funding** reaches an average of ~$28 million from FY2027 to FY2035, after full usage of CDBG-DR funds available for local cost matching. The Commonwealth is not responsible for the portion of funds allocated to instrumentalities (e.g., PREPA, PRASA, HTA, UPR).

60

- **Independently Forecasted Component Units (IFCU) expenditures** are forecasted on a line item basis. Most grow with standard Puerto Rico inflation with some exceptions, such as healthcare- or claims-related expenditures. Over the long-term, the expenses of some healthcare-related IFCUs (e.g., Cardio) are projected to grow faster than revenues, creating a deficit. This 2021 Fiscal Plan assumes deficits related to healthcare will be funded by the Commonwealth.

- **Fiscal measures** grow by their relevant macroeconomic indicator (e.g., revenues by nominal Puerto Rican GNP, expenditures by Puerto Rican inflation, healthcare measure by health inflation and population).

The long-term macroeconomic and financial projections are shown below. *Exhibit 26* shows the forecasted Nominal GNP, which maintains a positive growth for almost all years (mainly due to an stable and positive inflation), the estimated rate at which population is expected to decline, the growing Nominal GNP per capita that results from the combination of the first two, and the corresponding trend of own revenues. The estimations of all metrics, as well as corresponding projected revenues, expenditures, and fiscal gap or surplus are shown on *Exhibit 27* for selected years. Finally, *Exhibit 28* shows what these projections are with or without structural reforms.

EXHIBIT 26: FY2022-51 FINANCIAL PROJECTIONS



1 Own revenues includes all Commonwealth-collected revenues and excludes all federal transfers and gross up revenues; includes impact of COFINA settlement

## EXHIBIT 27: LONG-TERM FISCAL PLAN PROJECTIONS POST-MEASURES AND STRUCTURAL REFORMS

Financial projection detail post-measures and structural reforms, units as labeled

| Projection | FY26 | FY31 | FY36 | FY41 | FY46 | FY51 |
|---|---|---|---|---|---|---|
| **Population,** thousands | 2,764 | 2,637 | 2,496 | 2,324 | 2,178 | 2,062 |
| Population growth rate, % | -1.2% | -1.1% | -1.3% | -1.4% | -1.2% | -1.0% |
| **Real growth rate[5],** % | **0.7%** | **-0.2%** | **-1.5%** | **-0.5%** | **-0.4%** | **-0.3%** |
| **Nominal GNP,** $M | **76,759** | **84,555** | **86,769** | **91,303** | **97,809** | **105,594** |
| Nominal GNP per capita, $ | 27,770 | 32,062 | 34,769 | 39,284 | 44,913 | 51,208 |
| Nominal GNP per capita growth, % | 3.4% | 2.4% | 1.3% | 2.8% | 2.7% | 2.7% |
| **Inflation,** % | **1.5%** | **1.5%** | **1.6%** | **1.9%** | **1.9%** | **1.9%** |
| Disaster funding, $M | 5,883 | 4,546 | - | - | - | - |
| **Revenues[1],** $M | **20,914** | **22,135** | **22,743** | **24,016** | **25,878** | **28,069** |
| Commonwealth GF and SRF revenues | 15,757 | 16,545 | 16,689 | 17,406 | 18,627 | 20,081 |
| Federal transfers[2] | 5,158 | 5,591 | 6,053 | 6,610 | 7,251 | 7,988 |
| **Expenditures[1],** $M | **(19,581)** | **(21,126)** | **(22,862)** | **(25,165)** | **(27,505)** | **(30,306)** |
| Commonwealth-funded expenditures | (14,431) | (15,540) | (16,807) | (18,542) | (20,233) | (22,278) |
| Federally-funded expenditures | (5,150) | (5,586) | (6,055) | (6,623) | (7,272) | (8,028) |
| **Gap / surplus,** $M | **1,334** | **1,009** | **(119)** | **(1,149)** | **(1,627)** | **(2,237)** |
| Contractual debt service payments[3] | (1,668) | (1,867) | (1,144) | (990) | (163) | (50) |
| **Net gap / surplus,** $M | **(334)** | **(858)** | **(1,264)** | **(2,138)** | **(1,790)** | **(2,286)** |
| Surplus potentially not available[4], $M | *152* | *238* | *234* | *253* | *294* | *339* |

1 Revenues and expenditures excluding gross up adjustments; revenues do not include Earned Income Tax Credit
2 Does not include the recently approved additional federal funding for the local EITC extension, since it would be received as a reimbursement
3 Debt service based on prepetition contractual debt obligations. Presented for illustrative purposes only and does not represent anticipated future payments on restructured debt. Includes
  GO, PBA, CCDA, PRIFA, PFC, ERS. The 2021 Fiscal Plan does not assume any predetermined outcome of ongoing litigation with respect to GO bonds
4 These surplus amounts are generated by Commonwealth corporations and the Commonwealth's ability to access such surplus could be at risk without further legislative action
5 Adjusted for income effects

## EXHIBIT 28: ANNUAL GAP/SURPLUS BASED ON IMPACT OF STRUCTURAL REFORMS



Annual gap/surplus based on impact of structural reforms, $M (nominal)

Scenario (SR growth uptick)

$B Cumulative surplus

The 2021 Fiscal Plan shows short-term surpluses driven by significant federal relief as well as fiscal measures and structural reforms. Long-term deficits are driven by healthcare costs that outpace GNP growth (even after reforms, in part due to the Medicaid "fiscal cliff"), lack of robust structural reforms, phase out of disaster relief funding, and declining Act 154 revenues.

While the 2021 Fiscal Plan projects deficits from FY2036 onward, the Government will be required to take additional measures that go beyond the FY2022-26 framework of this 2021 Fiscal Plan as the Puerto Rico Constitution requires the Government to operate within a framework of fiscal balance. Accordingly, what follows are a set of options that can be considered to obtain fiscal balance in the out-years. Some of these reforms – which would reduce deficits and therefore make funds available for a variety of potential uses, including investment in the people of Puerto Rico – have been proposed by the Oversight Board, but have not been adopted. The Government must take up these reforms and implement them to realize their benefits.

- **Securing additional permanent federal funding for Medicaid** of ~$1 billion per year (and growing with inflation) is projected to increase the FY2022-51 surplus by ~$20 billion if begun in FY2031 and ~$10 billion if begun in FY2041.

- **Imposing a cap on total healthcare expenditure growth** at 2% above standard inflation is projected to result in savings of ~$14 billion by FY2051 if implemented in FY2031 and ~$2.4 billion if implemented in FY2041.

- **Private sector labor reform,** generating an additional 0.50% GNP growth over two years, by repealing Law 80 of May 30, 1976, which would make Puerto Rico an employment at-will jurisdiction, similar to its principal competitor mainland states, such as Florida. This would reduce the cost of hiring workers on the Island, improving the environment for local businesses and potentially attracting additional investment from the mainland into Puerto Rico. The reform is projected to increase the FY2022-51 surplus by ~$13 billion if implemented in FY2031 and by ~$4 billion if implemented in FY2041.

- **Ease of doing business reform,** generating an additional 0.15% GNP growth, based on instituting trading across borders reform, and repealing restrictive and inefficient regulations, and implementing a comprehensive reform of the Transportation system, similar to the one described in *Chapter 11*, which would contribute to unlock greater impact across all other ease of doing business initiatives, allowing Puerto Rico to better compete for new investments with jurisdictions around the world. The FY2022-51 surplus is projected to increase by ~$4 billion if implemented in FY2031 and by ~$1 billion if implementation takes place in FY2041.

- **Overhaul of the tax system of Puerto Rico** to stimulate growth by lowering the statutory marginal tax rates and broadening the tax base by eliminating many exemptions, deductions, credits, and incentives. This would simplify the tax paying structure and process, improving the business environment and delivering long-term growth benefits up to 0.5% spread over five years. The reform is projected to increase the FY2022-51 surplus by ~$11 billion if implemented in FY2031 and by ~$3 billion if implementation takes place in FY2041.

- **Growing the pharmaceutical and medical devices manufacturing sector** given the unique opportunity for Puerto Rico to be a center of excellence and play a leading role in the national portfolio of locations for expanded domestic manufacturing in this sector. The physical infrastructure, human capital, and regulatory processes are already established and well positioned.  Previous analyses published by the Board had shown the potential value on economic growth and employment that this effort could have.

**Risks to the long-term projections in the 2021 Fiscal Plan.** While the 2021 Fiscal Plan projects that ~$15.2 billion in surplus will be generated through FY2022-FY2035, there are several variables that have a material impact on the long-term financial projections. The extent at which the economic activity will recover from the COVID-19 pandemic impact and the time it will take to return to pre-pandemic levels remain highly uncertain and could prove to be narrower and longer-lasting than anticipated. Moreover, revenues could be compromised through lower growth

generated by delays or failures to implement structural reforms, lower than expected federal funding, and/or less efficient spending on capital than projected. Both revenues and expenditures could be impacted by demographic shifts not yet seen on the Island or other external shocks or natural disasters. Finally, expenditures could be impacted if, once the Oversight Board is terminated, the Government reverses its focus on fiscal discipline and allows Government expenditures to increase.

## 6.2    Debt Sustainability Analysis (DSA)

The DSA is intended to provide a framework for assessing the long-term capacity of the Government to pay debt service on its bonded debt. Debt levels post-restructuring need to be sustainable over the long-term and consistent with both a minimal risk of default on the restructured debt and a recovery of market access for future new money borrowings for ongoing infrastructure investment. The analysis begins with the 2021 Fiscal Plan and is then informed by the debt sustained by the most appropriate peer group against which to benchmark Puerto Rico. The DSA then applies rating agency metrics for that benchmark group to Puerto Rico to arrive at an assessment of what debt levels are sustainable in light of long-term projections and the peer metrics. Net tax-supported debt is defined as debt payable from statewide taxes and other general resources, net of obligations that are self-supporting from pledged sources other than state taxes or operating resources (such as utility or local government revenues). Prior to the enactment of PROMESA, Puerto Rico had approximately $45 billion in tax-supported debt with a declining economy and no guarantee of sustained federal funding. Net tax-supported debt is comprised of GO, PBA, COFINA, PRIFA, HTA, CCFA, ERS, Public Finance Corporation (PFC), and other intergovernmental loans.

**US states as peer comparables:** Like  U.S. states, Puerto Rico does not control its own currency, has no access to IMF restructuring support programs or similar international sovereign relief funding packages, and traditionally has been reliant on access to the same long-term municipal bond market used by mainland U.S. states to finance their capital needs. Puerto Rico's bonds are also rated by the same rating agency analyst groups that assign ratings to mainland U.S. states, not by foreign sovereign bond rating analysts. For these and other reasons, Puerto Rico has more similarities to U.S. states than to sovereign nations. By virtually any measure tracked by the rating agencies, Puerto Rico's existing debt levels are clear outliers relative to these  U.S. state peers (*Exhibit 29*).

EXHIBIT 29: U.S. STATES AS COMPARABLES



1 Own revenues includes all Commonwealth-collected revenues and excludes all federal transfers
NOTE: Puerto Rico benchmark metrics per Moody's debt service as % of revenues based on 2015 own-source government revenues, personal income reflects FY18 preliminary estimates from Commonwealth. In Puerto Rico's case, net tax supported debt totals approximately $45 billion and includes GO, PBA, COFINA, PRIFA, HTA, CCDA, ERS, PFC, and UPR
Source: Moody's investors service, "Medians – Flat debt total signals cautious borrowing, despite infrastructure needs from June 3, 2019, Puerto Rico data from Moody's investors service, "Medians – Total State Debt Remains Essentially Flat in 2017 from May 3, 2017"

While some observers note that Puerto Rico residents do not pay federal income taxes, they do pay Social Security and Medicare taxes, and the low per capita income levels would place most local residents in a tax bracket where they would otherwise pay little or no federal income tax. Meanwhile, federal reimbursement levels provided to Puerto Rico for the largest Government spending programs (including Medicaid and transportation) are capped at levels well below the FMAP and federal highway reimbursement levels provided to comparably sized and wealthier states. Puerto Rico's residents pay graduated income taxes to Puerto Rico at brackets comparable to the federal income tax rates, thereby providing the funds needed to provide services to the Puerto Rico resident population, which is far poorer than the population of any U.S. state. Yet Puerto Rico receives far less federal support.

**Metrics for debt sustainability:** Viewing U.S. states as the most comparable group for benchmarking Puerto Rico, the DSA uses the debt ratio metrics in the May 12, 2020 Moody's Investors Service (Moody's) report "Medians – State debt declined in 2019, but likely to grow in coming years" and the "Fixed Costs" ratio metrics in *Exhibit 30* of the September 18, 2020 Moody's report "Medians – Pension and Other Postemployment Benefits (OPEB) liabilities fell in fiscal 2019 ahead of jump in 2020" to develop a range of levels for sustainable debt capacity, including Maximum Annual Debt Service (MADS) levels for Puerto Rico on its restructured existing debt. The key debt ratios for the ten lowest indebted states, the 25 lowest indebted states, the 25 highest indebted states, the ten highest indebted states, and the mean for all U.S. states are shown below (*Exhibit 30*).

## EXHIBIT 30: KEY DEBT RATIOS FOR U.S. STATES

**Net tax-supported debt, % of GDP[1]**

| | | |
|---|---|---|
| | Low 10 | 0.4 |
| | Low 25 | 0.9 |
| | Mean | 2.3 |
| | Top 25 | 3.8 |
| | Top 10 | 5.4 |
| 1 | Connecticut | 8.3 |
| 2 | Hawaii | 8.1 |
| 3 | Massachusetts | 7.2 |
| 4 | New Jersey | 5.7 |
| 5 | Mississippi | 4.8 |
| 6 | Kentucky | 4.7 |
| 7 | Delaware | 4.3 |
| 8 | West Virginia | 3.9 |
| 9 | Rhode Island | 3.9 |
| 10 | New York | 3.7 |

**Net tax-supported debt to state personal income, %[1]**

| | | |
|---|---|---|
| | Low 10 | 0.4 |
| | Low 25 | 1.0 |
| | Mean | 2.6 |
| | Top 25 | 4.2 |
| | Top 10 | 6.1 |
| 1 | Hawaii | 9.6 |
| 2 | Connecticut | 8.4 |
| 3 | Massachusetts | 8.3 |
| 4 | Delaware | 6.1 |
| 5 | New Jersey | 5.8 |
| 6 | Kentucky | 5.2 |
| 7 | Mississippi | 4.8 |
| 8 | New York | 4.6 |
| 9 | Illinois | 4.5 |
| 10 | Rhode Island | 4.1 |

**Net tax-supported debt per capita, $[1]**

| | | |
|---|---|---|
| | Low 10 | 209 |
| | Low 25 | 500 |
| | Mean | 1,505 |
| | Top 25 | 2,511 |
| | Top 10 | 3,900 |
| 1 | Connecticut | 6,637 |
| 2 | Massachusetts | 6,258 |
| 3 | Hawaii | 5,528 |
| 4 | New Jersey | 4,125 |
| 5 | New York | 3,314 |
| 6 | Delaware | 3,289 |
| 7 | Illinois | 2,635 |
| 8 | Washington | 2,579 |
| 9 | Maryland | 2,323 |
| 10 | Rhode Island | 2,308 |

**Debt Service, % of own-source revenues[2]**

| | | |
|---|---|---|
| | Low 10 | 0.9 |
| | Low 25 | 2.1 |
| | Mean | 4.3 |
| | Top 25 | 6.5 |
| | Top 10 | 9.2 |
| 1 | Connecticut | 14.7 |
| 2 | Massachusetts | 10.5 |
| 3 | Illinois | 9.9 |
| 4 | Hawaii | 9.8 |
| 5 | New Jersey | 9.6 |
| 6 | Kentucky | 9.3 |
| 7 | New York | 7.5 |
| 8 | Washington | 7.3 |
| 9 | Maryland | 6.8 |
| 10 | Mississippi | 6.4 |

**Fixed Costs, % of own-source revenues[2]**

| | | |
|---|---|---|
| | Low 10 | 3.1 |
| | Low 25 | 5.1 |
| | Mean | 9.7 |
| | Top 25 | 14.3 |
| | Top 10 | 20.0 |
| 1 | Colorado | 31.0 |
| 2 | Idaho | 27.3 |
| 3 | Kansas | 23.5 |
| 4 | Georgia | 22.1 |
| 5 | New Hampshire | 21.3 |
| 6 | Maryland | 18.6 |
| 7 | Maine | 15.9 |
| 8 | Oregon | 13.8 |
| 9 | Washington | 13.7 |
| 10 | Pennsylvania | 13.1 |

1 Moody's investors service, "Medians – State debt declined in 2019, but likely to grow in coming years" from May 12, 2020
2 Moody's investors service, "Medians – Pension and OPEB liabilities fell in fiscal 2019 ahead of jump in 2020" from September 8, 2020
"Fixed costs" are the FY2019 sum of each state's (1) net tax-supported debt service expense and their (2) actual budgetary contributions to pension expense and retiree health care
("OPEB"), as reported by Moody's

*Exhibit 31* uses the long-term macroeconomic forecast to determine a range of implied debt capacity based on the debt and fixed cost metrics of the average U.S. state. The debt capacity ranges shown are based off the following five methodologies: (i) debt to own-source revenues, (ii) debt per capita, (iii) debt to state personal income; (iv) debt to GDP; and (v) fixed costs to own-source revenues. Implied debt capacity and expected growth in debt capacity must be sufficient to cover both restructured debt and debt service on any future new money capital borrowings Puerto Rico needs to maintain its public infrastructure. To the extent new and additional revenues are enacted in the future, including revenues designed to support future capital projects or generated by public-private partnership infrastructure investments, those initiatives could generate additional debt capacity for Puerto Rico that is not reflected in the current 2021 Fiscal Plan projections. Consistent with the February 22, 2021 Commonwealth Plan Support Agreement, the debt service on Commonwealth tax-supported debt (excluding COFINA senior bonds) is limited to 25 years for the purposes of this analysis. The 5-year average capacity statistics represent the average par amount between the five methodologies of an implied 5.00% 25-year - level debt service structure. Moody's defines "fixed costs" as the sum of a state's annual debt service and its annual budgetary pension and retiree healthcare (i.e., Other Post-Employment Benefits (OPEB)) expenditures. Given that Puerto Rico's public employee pension system is essentially zero percent funded – and that as a consequence the Central Government will pay pension expenditures on a fully PayGo basis from budgeted revenues each year – the fixed costs ratio helps capture that burden in comparison to the level of fixed costs as a percentage of Own Source Revenues for U.S. States.

EXHIBIT 31: IMPLIED NET TAX-SUPPORTED DEBT CAPACITY RANGE BASED ON AVERAGE U.S. STATE



Implied debt capacity range based on average US state, $M

For illustration purposes. Values in ($000's)

*Exhibit 32* uses the long-term macroeconomic forecast to determine a range of implied debt capacity based on the debt metrics of the *10 highest indebted* U.S. states. The debt capacity ranges shown are based off the following five methodologies: (i) debt service to own source revenues, (ii) debt per capita, (iii) debt to state personal income, (iv) debt to GDP, and (v) fixed costs to own-source revenues. Implied debt capacity and expected growth in debt capacity must be sufficient to cover both restructured debt and future debt issuance. The 5-year average capacity statistics represent the average amount between the five methodologies of an implied 5.00% 25-year level debt service structure.

EXHIBIT 32: IMPLIED NET TAX-SUPPORTED DEBT CAPACITY RANGE BASED ON TOP-10 HIGHEST INDEBTED U.S. STATE DEBT METRICS



Implied debt capacity range based on top-10 highest indebted US state debt metrics, $M

For illustration purposes. Values in ($000's)

The illustrative implied levels of the Government's restructured debt in the previous chart are calculated by applying the Net Tax Supported Debt ratios of the "top ten" U.S. states (in terms of debt load) to Puerto Rico's future projected GDP, population and Own-Source Revenues. Debt Service to Own Source Revenue and Fixed Costs to Own Source Revenues figures are derived assuming debt service of a long-term level debt service structure, 5.00% average coupon and 25-year level debt service structure.

*Exhibit 33* uses the long-term macroeconomic forecast to determine a range of implied debt capacity based on the debt metrics of the *25 highest indebted* U.S. states with the same five methodologies.

EXHIBIT 33: IMPLIED NET TAX-SUPPORTED DEBT CAPACITY RANGE BASED ON TOP-25 HIGHEST INDEBTED U.S. STATE DEBT METRICS



*Exhibit 34* uses the long-term macroeconomic forecast to determine a range of implied debt capacity based on the debt metrics of the *25 lowest indebted* U.S. states with the same five methodologies.

EXHIBIT 34: IMPLIED NET TAX-SUPPORTED DEBT CAPACITY RANGE BASED ON 25 LOWEST INDEBTED U.S. STATE DEBT METRICS



**Maximum annual debt service cap on fixed payment debt:** The implied debt capacity and expected growth in debt capacity is the Oversight Board's determination of the highest debt service levels that would be compatible with economic sustainability, fiscal responsibility, and the regaining of market access. The maximum MADS level is derived from both the 2021 Fiscal Plan cash flow projections and U.S. state rating metrics, and specifically a rating metric that Moody's calls the "Debt Service Ratio." The Debt Service Ratio is the ratio of total payments due in a year on all existing net tax-supported debt over that state government's debt policy revenues in that year. The debt policy revenues for the Commonwealth are forecast to be $16.2B in FY2022 and to increase to $21.1B by FY2051.[40]

The Moody's report indicates that the average Debt Service Ratio for the all U.S. states is 4.3% (see *Exhibit 30*). The Moody's report indicates that the average Debt Service Ratio for the top 10 most indebted states is 9.2%. The Moody's report indicates that the average Debt Service Ratio for the top 25 most indebted states is 6.5%. The Moody's report indicates that the average Debt Service Ratio for the 25 lowest indebted states is 2.1%. To the extent any of these Debt Service Ratios is used to set a MADS cap on the restructured debt and the Primary Surplus is below the MADS level, then the debt service due on fixed payment debt would need to be set at the lower of the amount available for debt service or the MADS limit.

With respect to the Moody's Fixed Costs Ratio, the September 2020 Moody's report indicates that the average Fixed Costs Ratio for all U.S. States is 9.7%. The same report indicates that the average Fixed Costs Ratio for the 10 States with the highest Fixed Costs Ratios is 20.0%, the average Fixed Costs Ratio for the 25 States with the highest Fixed Costs Ratios is 14.3%, and the average Fixed Costs Ratio for the 25 States with the lowest Fixed Costs Ratios is 5.1%.

**Debt sustainability analysis.** *Exhibit 35* below calculates implied debt capacity based on a range of interest rates and 2021 Fiscal Plan risk factors under an assumed illustrative 25-year term and level debt service. The risk factor is calculated by reducing the amount of projected cash flow available per year for debt service by a certain percentage. For example, a 20% risk factor case would use only 80% of the projected cash flow available to pay debt service on fixed payment debt.

EXHIBIT 35: IMPLIED DEBT CAPACITY BASED ON RANGE OF INTEREST RATES AND RISK FACTORS

Implied debt capacity based on range of interest rates and contingency, $M

| Illustrative Cash Flow Available | Sensitivity Analysis: Implied Debt Capacity at 20% contingency | | | |
|---|---|---|---|---|
| | **$200** | **$400** | **$600** | **$800** |
| **Sensitivity Analysis: PV Rates %** | | | | |
| 4.0% | $2,500 | $4,999 | $7,499 | $9,998 |
| 5.0% | 2,255 | 4,510 | 6,765 | 9,020 |
| 6.0% | 2,045 | 4,091 | 6,136 | 8,181 |

| Illustrative Cash Flow Available | Sensitivity Analysis: Implied Debt Capacity at 5% PV Rate | | | |
|---|---|---|---|---|
| | **$200** | **$400** | **$600** | **$800** |
| **Sensitivity Analysis: % Contingency** | | | | |
| 10.0% | $2,537 | $5,074 | $7,611 | $10,148 |
| 20.0% | 2,255 | 4,510 | 6,765 | 9,020 |
| 30.0% | 1,973 | 3,946 | 5,919 | 7,893 |

---

[40] Calculated as adjusted revenue post measures (excluding federal transfer) plus COFINA debt service. COFINA debt service figures based on Per page 15 of June 2020 COFINA Certified Fiscal Plan. See appendix for forecast annual debt service revenue through FY2051 (see *Section 24.2*)

**Restoration of cost-effective market access:** As Puerto Rico seeks to regain cost-effective capital markets access, rating analysts and investors will demand that the Government demonstrate improvement in all four core areas of creditworthiness identified by Moody's: (i) the economy, (ii) Government finances, (iii) governance, and "fixed cost" debt service, and (iv) pension expenditures. The Government must adhere to structurally balanced budgets reflecting ongoing fiscal discipline and return to the timely publication of audited financial statements and related disclosure information. Together, these and other measures outlined in the 2021 Fiscal Plan can chart a path to restoring Puerto Rico's market access.

# PART III: Restoring growth to the Island

**The fiscal and economic turnaround of Puerto Rico cannot be accomplished without the implementation of structural economic reforms that promote the transformation of the Island's economy and its workforce.** Puerto Rico struggles from an uncompetitive labor market, unreliable energy and infrastructure, regulatory and other burdens that hinder business productivity, and low educational outcomes and workforce support – all of which prevent it from competing in a global economy and from attaining positive economic growth. Structural reforms—those that seek to strengthen the fundamental drivers of economic growth to encourage job creation, investment, and increased productivity—could transform Puerto Rico's future. Years of successive natural disasters and health crises further underscore the need for comprehensive Government action as outlined in this 2021 Fiscal Plan to reverse the economic challenges that have plagued the Island and its people for far too long. If implemented quickly and widely, structural reforms are projected to drive real economic growth, reversing decades-long economic challenges and enabling the Island's economy and its people to flourish.

Specifically, the Government must pursue the following structural economic reforms to achieve their forecasted economic impact:

- **Human capital and welfare reforms** that will improve the well-being and self-sufficiency of all local residents, increase the quality and competitiveness of the workforce, enable investment, and facilitate the economic modernization of the Island, resulting in a cumulative GNP impact of 0.15% by FY2025.

- **K-12 education reforms** that will position all students to succeed in school and upon graduation by raising the quality of the Island's public schools, resulting in an additional 0.01% GNP impact per year starting in FY2037 (i.e., reaching 0.15% by FY2051).[41]

- **Ease of doing business reforms** that will improve conditions for economic activity and business vitality, attracting new investment and creating jobs, resulting in a cumulative GNP impact of 0.30% by FY2026.

- **Power sector reforms** that will improve the availability, reliability, and affordability of energy for families and businesses, resulting in 0.30% cumulative GNP impact by FY2026.

- **Infrastructure reform and capital investment** that will improve the flow of goods, services, information, and people across the Island.

Unfortunately, while the Government has faced numerous unexpected disasters and crises that impeded implementation, it has also, at times, rejected the deadlines outlined in the Fiscal Plans. Together, this has resulted in delayed implementation on most of the identified structural reforms. For example, the Government has:

- Implemented the Earned Income Tax Credit (EITC) but without a robust campaign to raise awareness of the new benefit and encourage work in the formal sector;

- Delayed implementation of the complementary Nutrition Assistance Program (NAP) work requirement;

- Made little progress in strengthening the Island's workforce development programs;

- Increased on-Island land freight charges and expanded the regulation across incremental sectors of the economy, rather than deregulating as outlined in this and previous Fiscal Plans;

---

[41] Education reforms are projected to generate GNP impact after the first kindergarten class to benefit from those reforms completes their first year in higher education or the workforce. As such, the 2021 Fiscal Plan assumes that the implementation of K-12 education reforms in FY2024 will generate GNP uptick starting in FY2037

- Implemented very few of the required ease of doing business reforms with sufficient progress to make the Island substantially more competitive and attractive to investors; and

- Undertook almost no discernible efforts to reform the Island's K-12 education system, a situation that is partially explained but also exacerbated by the COVID-19 pandemic.

These delays have already diminished the projected economic uptick and revenues associated with structural reforms. Had the structural reforms above been implemented at the pace and scale forecasted in the 2019 Fiscal Plan, the Government would have generated 0.14% in additional GNP uptick, worth another $12 billion in tax revenues by FY2051. This shortfall is even more pronounced relative to the structural reform impact forecasted in the April 2018 Fiscal Plan, whereby the Government would have generated 1.09% in additional GNP uptick, worth another $75 billion in tax revenues by FY2051 (*Exhibit 36*). Not only have the residents of Puerto Rico lost opportunities to gain new skills, experiences and education, but the Island has lost time in attracting incremental investment that would produce jobs and tax revenues to be reinvested again into the people of Puerto Rico.

EXHIBIT 36: COMPARISON OF GNP UPTICK FROM STRUCTURAL REFORMS ACROSS FISCAL PLANS



Given the disruption and hardship brought about by the COVID-19 pandemic, the economic uplift that could be generated through structural reforms matters now more than ever. Urgent and comprehensive Government action is needed to promote economic recovery and opportunity for all local residents. If implemented as specified in this 2021 Fiscal Plan, structural reforms are projected to collectively generate an invaluable 0.75% GNP uptick by FY2026, as well as 0.90% in total GNP growth and more than $30 billion in additional Commonwealth revenues by FY2051. As discussed in *Chapter 6*, these revenues will play a key role in helping the Government address budget shortfalls in the medium- and long-term.

<u>EXHIBIT 37: ESTIMATED IMPACT OF STRUCTURAL REFORMS IN THE 2021 FISCAL PLAN</u>



# Chapter 7. Human capital and welfare reform

## 7.1    Basis for human capital and welfare reforms

Increasing the productivity of Puerto Rico's labor force is essential to creating growth.  There are several structural reasons why Puerto Rico lags its potential, and that each must be addressed with tailored actions.

In 2020 Puerto Rico's formal labor force participation rate was on average 40.2%, among the lowest in the world and far below U.S. and Caribbean averages.[42] As the Congressional Budget Office states, labor force participation is an important component of economic growth, since it allows firms to expand employment and increase production, and has an important impact on fiscal and budget trends.[43] Puerto Rico has an opportunity to increase this rate and must aspire to reach at least the rate of the lowest U.S. state (West Virginia, with 55%), to provide its economy with the dynamism it requires to foster growth.[44]

Puerto Rico's low labor force participation is a function of a wide range of factors, including suboptimal eligibility criteria for welfare programs and underperforming human capital development systems, among others. This low level predates the 2017 hurricanes, the 2019-20 earthquakes, the COVID-19 pandemic, and even the economic downturn that began in 2006. According to the World Bank, Puerto Rico's labor force participation rate has ranked in the

---

[42]  For comparison, the  U.S. has a 61% labor force participation rate. In the Caribbean, the Dominican Republic's labor force participation rate was 62% in 2020. Jamaica and Haiti's rates were even higher (64% and 65%, respectively). See the World Bank Group via International Labor Organization, "Labor force participation rate, total (% of total population ages 15+)," 2020; and Departamento del Trabajo y Recursos Humanos, "Empleo y Desempleo en Puerto Rico," Diciembre 2020

[43]  Congressional Budget Office, Factors Affecting the Labor Force Participation of People Ages 25 to 54, 2018

[44]  US Bureau of Labor Statistics, "Employment status of the civilian noninstitutional population 16 years of age and over by region, division, and state, 2019-2020 annual averages," 2020

bottom-20 of more than 200 global economies since at least 1990 and in the bottom-15 since 2009.[45]

**Suboptimal eligibility criteria for welfare programs**: The current design of welfare programs may disincentivize some residents from pursuing work within the formal economy in order to ensure sufficient nutritional support, housing and healthcare.[46] For instance, current welfare eligibility guidelines sharply phase-out beneficiaries as their income rises, informally taxing workers for seeking work within the formal economy.[47] This phenomenon is particularly pronounced in the case of recipients of public housing assistance: even securing a *part-time* minimum wage job can render a beneficiary ineligible for public housing, potentially forcing some beneficiaries to choose between formal sector work and keeping their homes.[48] Working with the Federal Government to revise eligibility guidelines and other policies that encourage residents to work could help resolve these issues.

**Underperforming human capital development systems:** In 2012, Puerto Rico participated for the first time in the PISA test (Programme for International Student Assessment) and participated again in 2015. The test, sponsored by the Organization for Economic Cooperation and Development (OECD), was administered by the local Department of Education. It tests the knowledge and skills of students through a uniform metric that was internationally agreed upon. It measures the ability of students aged 15 to use their reading, mathematics, and science knowledge skills to meet real-life challenges. At the international level, Puerto Rico scored, on average, in all three areas below the U.S. and OECD member countries.[49] These relatively low levels of proficiency represent a challenge for Puerto Rican students to graduate from secondary and high-school. Failure to graduate is often correlated with a higher probability of joining the informal labor sector and receiving lower wages.[50]

Worker training programs in Puerto Rico, meanwhile, are managed in a disjointed manner by 15 local workforce boards. Strengthening the Island's education system, as well as the workforce development programs, could mitigate these challenges and help ensure that all local residents are able to participate in the current and future economy. The significant amount of workers displaced due to the pandemic adds another level of urgency to improving workforce development in Puerto Rico.

Unfortunately, the Government has delayed the implementation of many human capital and welfare reforms intended to address these structural challenges, reducing the potential economic uplift to the Island and delaying the opportunity for residents in need of this critical support. Continued Government inaction will further jeopardize the development of Puerto Rico's human capital, the opportunities available to each resident of Puerto Rico for personal development and economic self-sufficiency, and the projected GNP uptick and its associated increases in tax revenues.

---

[45] See the World Bank Group via International Labor Organization, "Labor force participation rate, total (% of total population ages 15+)," 2020

[46] Cordero-Guzmán, "The production and reproduction of poverty in Puerto Rico," in Nazario, ed. *Poverty in Puerto Rico: A Socioeconomic and Demographic Analysis with data from the Puerto Rico Community Survey* (2014), 2016

[47] For example, a single parent with two dependents and an annual income below $4,900 was eligible to receive up to $4,229 dollars in annual Nutritional Assistance Program (NAP) benefits in 2016. But, should this parent work 35 hours per week at minimum wage—generating approximately $12,180 in annual earnings, they would become ineligible for NAP benefits. Net of taxes on their earning, full-time formal sector work would increase household income by only $7,002—the equivalent of a $3.86 effective hourly wage. Effective hourly wage income equals income received from formal sector work minus income lost from loss of benefits

[48] The U.S. Department of Housing and Urban Development (HUD) sets income limits that determine the eligibility of applicants for assisted housing programs. For U.S. states, the limit to be considered an "extremely low-income family" is determined by HUD using the Department of Health and Human Services (HHS) poverty guidelines. However, an alternative formula is used to define an extremely low-income family for Puerto Rico—30% of the median family income for an area or lower—which results in lower income limits. The current HUD income limits are so low that, in many cases, entering the formal labor market in a part time job at the minimum wage would result in losing eligibility for housing assistance. Thus, the existing income limits directly disincentivize formal employment and hinder economic mobility in Puerto Rico

[49] OECD, PISA 2015 Results (Volume I): Excellence and Equity in Education, 2016

[50] International Monetary Fund, "Role of Individual Characteristics and Policies in Driving Labor Informality in Vietnam," 2020

To achieve the associated increases to GNP, the Government must implement the following human capital and welfare reforms.

**Expand the Earned Income Tax Credit (EITC) and broadly publicize it by:**

- Puerto Rico Legislature: Collaborating with Hacienda to design an extended EITC program that complies with what is outlined in the American Rescue Plan (ARP) Act and adjusting regulations accordingly

- Hacienda: Complying with all execution requirements outlined in the ARP Act, including sending timely annual reports to the U.S. Department of the Treasury

- Hacienda: Promoting the EITC in collaboration with the Administration of the Socio-Economic Development of the Family (ADSEF, by its Spanish acronym)

- ADSEF: Designing a multifaceted EITC outreach strategy (including working with community organizations throughout the Island)

**Implement a Nutritional Assistance Program (NAP) work/volunteer requirement in the next two years by:**

- ADSEF: Creating a work/volunteer requirement compliant with the 2021 Fiscal Plan parameters

- ADSEF: Completing all administrative requirements (e.g., obtaining Federal Government approval) necessary to implement a work/volunteer requirement

- ADSEF: Verifying the eligibility of all adult NAP recipients (including adults without dependent children) for the new work/volunteer requirement

**Support high-quality workforce development programs by:**

- Department of Economic Development and Commerce (DDEC, by its Spanish acronym): Creating partnerships with private and social sector organizations to strengthen worker training

- DDEC: Conducting regular analyses to understand private sector labor market needs

- DDEC: Integrate the results of the analyses into a holistic strategic plan that states how different workforce development efforts blend in a cohesive way across programs and the 15 local boards

- DDEC & Vivienda: Allocating resources in a data-driven manner

- DDEC: Removing structural barriers to employment (e.g., difficulty in securing transportation and childcare to go to work)

## 7.2 Expand and broadly publicize the Earned Income Tax Credit (EITC) by leveraging ARP Act federal funding

**The ARP Act included permanent additional funds to incentivize Puerto Rico to expand the local EITC program put in place for tax year 2019.** The ARP Act provides for up to $600 million to be delivered to Puerto Rico in the form of a reimbursable grant, equivalent to three times the local spending, and indexed for U.S. inflation after the first year. The Government must amend the current EITC program to qualify for the additional federal funding provided in the ARP Act.

The ARP Act establishes that, in order to qualify for this additional funding, Puerto Rico must:

- Increase the percentage of earned income which is allowed as a credit for each group of recipients, in a manner designed to substantially increase labor force participation

- Spend an amount of local funds greater than a statutorily specified base amount of $200 million each year, adjusted for U.S. inflation

- Provide an annual report to the U.S. Department of the Treasury that includes an estimate of the EITC cost for that year and a statement of the actual costs in the preceding year

To fulfill these requirements the Government must amend the local EITC legislation to expand the program's reach and benefits. These amendments must ensure the program complies with the design parameters outlined in the ARP Act. Other than expanding local EITC funding to maximize matching federal funding, the amended legislation should otherwise be consistent with the Revenue Neutrality Principle included in this and previous Fiscal Plans.

Under this amended regulation, the Government must make annual payments to EITC recipients of at least $800 million to ensure receipt of the full amount of the federal grant. Thus, and to enable the permanent positive effect of such additional federal funding on Puerto Rico's residents and economy, the Oversight Board has made available the local resources required to reach the full federal funding available. The 2021 Fiscal Plan includes this incremental funding.

On top of the funding for the tax credit expansion, the ARP Act includes an additional payment of $1.0 million per year to pay for EITC outreach and education through 2025. Previous Fiscal Plans established that to effectively enhance labor force participation and reduce poverty through increased EITC benefits, the Government must more comprehensively promote the program for tax year 2020 and beyond.

US policymakers have implemented and promoted the EITC across mainland states and have seen meaningful gains in formal labor force participation as a result, especially among low-to moderate-income workers.[51] The credit is an effective anti-poverty tool, empowering beneficiaries to defray the cost of education, training, and childcare and support their own self-sufficiency.[52] Since its creation in 1996, the EITC has lifted 6.5 million people out of poverty (half of them children)—more than any other US-based anti-poverty initiative. However, the value of the EITC is greatest when the targeted population is sufficiently knowledgeable of its value to a degree that influences daily decision-making around whether they will enter or stay in the formal economy and whether they will seek employment in Puerto Rico or elsewhere.

### 7.2.1    EITC design parameters

The Fiscal Plans required the Government to introduce an EITC, which adhered to the following parameters in tax year 2019:

- Individual benefit is dependent on a filer's marital status, number of dependents, and earned income verifiable through an employer-issued tax withholding statement

- Potential benefit increases as earned income rises to a cap, then plateaus, and then decreases at a phase-out income level until it reaches $0

- EITC is coupled with a robust promotional campaign to raise awareness of the benefit among potential claimants and encourage formal labor force participation

In addition to the 2021 Fiscal Plan and ARP Act parameters listed above, when amending the Puerto Rico's EITC legislation, the "EITC must increase the percentage of earned income which is allowed as a credit for each group of individuals with respect to which such percentage is

---

[51]  National Bureau of Economic Research, "Behavioral Responses to Taxes: Lessons from the EITC and Labor Supply," 2006

[52]  To reward formal sector work, the credit reduces claimants' tax obligations and often generates a cash refund. For example, a $1,000 increase in EITC benefit has been tied to a 7.3% increase in employment; see Hoynes and Patel, "How Does EITC Affect Poor Families," 2015.

separately stated or determined in a manner designed to substantially increase workforce participation."[53]

### 7.2.2   Current state and path forward

Although the Government has implemented an EITC for tax years 2019 and 2020 which is consistent with the design parameters laid out above, the Government has not coupled the credit with a robust promotional campaign as required by the 2020 Fiscal Plan. Hacienda's EITC outreach efforts have centered primarily around sending circular letters detailing the benefit to tax preparers and establishing a handful of outreach centers across the Island to discuss EITC with potential filers in-person. The operation of centers was cut short with the COVID-19 pandemic lockdown. By relying extensively on an in-person outreach campaign after the tax year was over and failing to establish a more robust promotional strategy (e.g., via digital channels, targeted marketing), the uptake of the program and its intended benefits have been limited.

The efforts from FY2022 and beyond must be to take the necessary actions to incorporate the additional federal funding included in the ARP Act and to design and execute an effective and extensive educational and promotional strategy. The outreach strategy should be evidence based and focused on encouraging non-filers to file. Recent research from Virginia showed that sending mailers and automated calls to those that are eligible was a cost-effective way to increase EITC participation. Additionally, researchers suggest that advertising free tax services, such as the mainland's volunteer income tax assistance (VITA) program, can encourage those that do not file taxes to file.

Hacienda should also consider partnering with private sector tax-prepares to help with the outreach for both the EITC and the CTC.

The Government must accomplish the following actions by their respective deadlines, which will maximize the uptake and benefits of EITC:

---

[53]   American Rescue Plan Act of 2021

EXHIBIT 38: REQUIRED IMPLEMENTATION ACTIONS FOR EITC

| | Action item | Owner | Deadline |
|---|---|---|---|
| To be completed in FY2022 | Monitor EITC filing data to prevent and detect fraud | Hacienda | Ongoing |
| | Assume responsibility for managing EITC outreach in tax year 2021 and beyond | ADSEF | July 16, 2021 |
| | Design an EITC outreach strategy for tax year 2021 and share with Oversight Board | ADSEF | September 15, 2021 |
| | As established by the ARP Act, increase the percentage of earned income which is allowed as a credit for each group of recipients, in a manner designed to substantially increase labor force participation. | Hacienda | September 15, 2021 |
| | Provide an annual report to the U.S. Department of the Treasury that includes an estimate of the EITC cost for that year and a statement of the actual cost in the preceding year. | Hacienda | September 15, 2021 |
| | Design a recurring assessment of performance to fulfill federal guidelines and reform the EITC platform so can be aligned with federal requirements. | Hacienda | September 15, 2021 |
| | Prepare EITC performance report and share with Oversight Board | Hacienda | September 15, 2021 |
| | Meet with Oversight Board to discuss EITC performance report and tax year 2021 promotional strategy | Hacienda, ADSEF | September 30, 2021 |
| | Launch new EITC promotional campaign | ADSEF | Annually from January 1 2022 |
| | Monitor EITC uptake data in real-time to inform promotional campaign | Hacienda, ADSEF | Ongoing each tax year |
| | Prepare EITC performance report and share with Oversight Board | Hacienda, ADSEF | Annually from June 1, 2022 |
| | Discuss EITC performance with Oversight Board | Hacienda, ADSEF | Annually from June 15, 2022 |

A key element of the mechanism through which the EITC impacts growth is its ability to bring informal labor into the formal labor sector and, thus, increase labor force participation. For this to happen, the EITC should be supported by a labor regulatory environment that is supportive of hiring labor in the formal sector.

The Labor Transformation and Flexibility Act, or Act 4-2017, did not go nearly as far as needed to eliminate the most egregious elements of Act 80 of 1976, also known as the Unjust Dismissal Act. However, Act 4-2017 did to some extent ease some restrictions on labor hiring. While some stakeholders have called for the repeal of Act 4-2017, its elimination would likely reestablish onerous provisions related to probationary periods, overtime, and bonuses, which would all make the hiring environment more costly in the formal sector. Its repeal would discourage new hiring and reduce the labor market flexibility, thus limiting the effectiveness of the EITC expansion in promoting labor force participation, economic growth, and the revenues associated with that growth. Therefore, the Government must refrain from repealing Act 4-2017 or enacting new legislation that negatively impacts labor market flexibility.

According to the 2020 World Bank's Doing Business study focused on the impact of labor flexibility on labor formality, there is approximately a linear relation whereby informality is inversely related to the degree of employment flexibility. Clearly then, the elimination of Act 4-2017 or other actions taken that are detrimental to a labor regulatory environment supportive of hiring labor in the formal sector would put at risk the incremental GNP growth and revenues related to the implementation of the EITC.

## 7.3 Introduce a Nutritional Assistance Program (NAP) work/volunteer requirement

**To further support labor force participation, the 2021 Fiscal Plan requires the Government to introduce a work/volunteer requirement for select adult NAP beneficiaries, with full implementation by the beginning of FY2024.** NAP is Puerto

Rico's largest Government assistance program and provides nutritional assistance. Unlike mainland Supplemental Nutritional Assistance Program (SNAP) benefits, NAP does not include a work/volunteer requirement. The Federal Government requires that all able-bodied adult beneficiaries without dependent children work, volunteer, or be enrolled in worker training classes for at least 20 hours per week to receive SNAP benefits.[54] When well-designed, including such requirements in similar programs has led to increases in labor force participation.[55] The implementation of a NAP work/volunteer requirement would contribute to increasing labor market participation and to achieve the potential growth anticipated from human capital and welfare reforms.

### 7.3.1    *Specific initiatives and design parameters*

The 2021 Fiscal Plan requires the Government to implement a NAP work/volunteer requirement using the following parameters. Specifically, by FY2024 the Government must:

■  Apply the requirement year-round to all able-bodied NAP beneficiaries aged 18-59 without dependent children in their household[56]

■  Grant all eligible recipients up to a three-month transition period to secure employment, begin volunteering, or enroll in qualified education or training programs ("qualifying activities")

■  Mandate that all eligible recipients complete 80 hours of qualifying activities per month

■  Ensure NAP eligibility guidelines and benefit calculations effectively promote the labor force participation increase by avoiding drastic phase-out structures that could factually penalize eligible recipients  for seeking formal sector work

■  Redistribute savings realized through the work/volunteer requirement to boost working eligible recipients' take-home pay through an expansion of the Earned Income Disregard (EID)[57]

### 7.3.2    *Current state and path forward*

The 2020 Fiscal Plan provided design parameters and specific milestones for the implementation of a NAP work/volunteer requirement. Unfortunately, as of April 2021,  the Government has made no meaningful progress in the implementation of this work/volunteer requirement. The Government has yet to meet any major milestones in the implementation of this reform, including designing the requirement itself.

The Government has recently committed to a 2-year implementation timeline. Reaching full and timely implementation requires urgent and nimble action from the Government.

The Government must accomplish the following action items by their respective deadlines:

---

[54]  NAP also differs from SNAP in that the former is funded as a block grant and is administered separately from the latter; see Center on Budget and Policy Priorities, "How Does Household Food Assistance in Puerto Rico Compare to the Rest of the United States?" published 2020

[55]  For example, when the Federal Government first introduced a work/volunteer requirement for recipients of Temporary Assistance for Needy Families (TANF) benefits in the 1990s, the labor force participation rates of single mothers rose while poverty rates among single mothers and children both fell substantially. See Gitis, "A Menu of Options to Grow the Labor Force," 2017, and Gitis and Arndt, "The 20th Anniversary of Welfare Reform," 2016

[56]  As such, all NAP recipients who are under the age of 18, older than the age of 59, have children dependents in their household, or are medically certified as physically or mentally unfit for employment should be excluded from the work/volunteer requirement

[57]  The EID allows Government assistance beneficiaries to exclude a portion of income earned through formal sector work from welfare benefit calculations. An increase in the EID can boost an aid recipient's take-home pay by allowing them claim Government benefits that they otherwise would not be eligible for due to an increase in earned income

EXHIBIT 39: REQUIRED IMPLEMENTATION ACTIONS FOR NAP WORK REQUIREMENT

| Required implementation action | Owner | Deadline |
|---|---|---|
| ▪ Design a NAP work/volunteer requirement proposal compliant with parameters above and share with the Oversight Board | ▪ ADSEF | ▪ August 1, 2021 |
| ▪ Meet with the Oversight Board to discuss proposal | ▪ ADSEF | ▪ August 15, 2021 |
| ▪ Submit work/volunteer proposal to FNS[2] | ▪ ADSEF | ▪ September 15, 2021 |
| ▪ Assess operational requirements needed to implement the work/volunteer requirement as proposed | ▪ ADSEF | ▪ April 1, 2022 |
| ▪ Discuss operational requirements with the Oversight Board | ▪ ADSEF | ▪ April 15, 2022 |
| ▪ Receive work/volunteer requirement approval from FNS | ▪ ADSEF | ▪ November 1, 2022 |
| ▪ Publish FNS-approved State Plan aligned with Certified Fiscal Plan parameters | ▪ ADSEF | ▪ December 15, 2021 |
| ▪ Retain a qualified third-party analytical firm acceptable to the Oversight Board to oversee implementation | ▪ ADSEF | ▪ January 1, 2022 |
| ▪ Complete review of all NAP recipients to verify work/volunteer requirement eligibility | ▪ ADSEF | ▪ June 31, 2022 |
| ▪ Implement full-year work/volunteer requirement | ▪ ADSEF | ▪ July 1, 2023 |
| ▪ End three-month transition period for eligible recipients | ▪ ADSEF | ▪ September 30, 2023 |
| ▪ Validate work/volunteer requirement implementation with the Oversight Board | ▪ Third party-firm | ▪ November 15, 2023 |
| ▪ Publish annual report on NAP program and work/volunteer requirement performance | ▪ ADSEF | ▪ Annually from August 15, 2024 |

# 7.4 Create high-quality workforce development programs

To facilitate increased labor force participation, the 2021 Fiscal Plan requires that the Government take steps to more effectively trains residents on the knowledge and skills needed to contribute to the economy. Currently, the Island's worker training programs are managed by local workforce development boards and have a local scale that results in a limited scope to support the development needs of Puerto Rican workers at all stages of their working life cycles. Moreover, the Government has not conducted the analyses or outreach necessary to target the Island's most-pressing talent gaps with a forward-looking view aligned with major labor force trends, like digitization and automation. Inadequate preparation and training have left many local residents without a real opportunity to succeed in the formal labor force and that situation will quickly scale in the years to come. The COVID-19 pandemic has exacerbated these issues, meaning that empowering workers to enter or re-enter the workforce will be especially important in the following months and years.

## 7.4.1 Specific initiatives and design parameters

To strengthen workforce development programs and promote participation in the formal economy, the 2021 Fiscal Plan require that the Government complete several initiatives by the end of FY2022:

- Centralize the administration of Workforce Innovation Opportunity Act (WIOA) funds—the primary vehicle for federal investments in workforce development—under the Department of Economic Development and Commerce (DDEC)

- Promote the signing of Memoranda of Understanding (MOUs) between local worker training boards and Government agencies to strengthen training and defray costs

- Conduct the rigorous data analyses outlined throughout this chapter to leverage workforce development funds in a data-driven manner to reduce labor market talent gaps

- Integrate the results of such analysis in a holistic strategic plan that clearly states how different workforce development efforts and funding blend in a cohesive way to improve human capital development for local residents

- Improve the existing resources allocation and spending tracking process, by making it more standard, transparent and data-driven

- Coordinate an interagency initiative to deeply analyze structural barriers to unemployment and support labor force stakeholders in their efforts to overcome them

### 7.4.2    Current state and path forward

Unfortunately, the Government's progress in overhauling the Island's worker training systems has been limited to the centralized oversight of WIOA funds under DDEC and some improvements in systems to track program data. Local boards, which administer WIOA-funded programming in their respective regions, continue to offer workforce programs of disparate and inconsistent quality, and many have delayed signing MOUs with Government agencies. Moreover, while DDEC updated its WIOA State Plan in March 2020 and successfully incorporated labor market analysis, further analyses are still required to better understand barriers to employment and identify and propose solutions to existing talent gaps. As such, current initiatives may not be well-attuned to the current and future needs of the Island's employers and its economy, and need to be adjusted.

To develop high-quality worker training programs that empower all residents to reach their fullest potential and enter the labor force, the Government must first implement strategic and administrative enablers throughout FY2021 and FY2022. As such, DDEC must:[58]

- **Conduct analyses to understand labor market needs** by analyzing the Island's labor market to identify talent gaps and making the required diligence on the global future of work trends[59]

- **Share the results of such analysis with local workforce development boards,** so they could better inform their local strategies and programs

- **Design and implement a workforce development coordination strategy** that works as the stepping stone to further collaboration among local workforce development boards and helps materialize scale benefits and knowledge sharing

- **Leverage** existing metrics to evaluate all uses of workforce development funds and its impact and provide actionable feedback to the 15 local workforce development boards

- **Coordinate an interagency effort to deeply analyze the barriers to employment** and identify potential initiatives to overcome them

In turn, these enablers will empower and potentiate the in-field implementation of human capital development programs and tools.

The 2020 Fiscal Plan included a set of initiatives that aimed to support the training, learning, and human capital accumulation needs of local residents at all stages in their working life cycles ("life

---

[58] U.S Department of Labor Employment and Training Administration, "Best Practices, Partnership Models, and Resources Available for Serving English Language Learners, Immigrants, Refugees, and New Americans," 2017; Center for Law and Social Policy, "WIOA: What Human Service Agencies and Advocates Need to Know," 2015

[59] In McAllen, TX, the Broader Workforce Alliance uses a data-driven approach to align workforce development programs to local employer needs. The program has served more than 7,700 individuals, placed 90% of candidates into job opportunities, and has led to a 230% increase in wages among participants. See Project QUEST's web homepage for more information

cycle initiatives") in FY2022 and beyond. However, the implementation of such initiatives would have required the usage of CDBG-DR funding, as well as the repurposing of recurring WIOA funds. Both are federal funds allocated to Puerto Rico under a specific granting process. The recipient Government agencies have exercised their rights to define the priorities to be pursued with those funds and, as their plans have been approved by the Federal Government, are currently in the process of implementing them. While pursuing the same overarching goals, such plans are different in structure and focus to the initiatives outlined in the 2020 Fiscal Plan. Nonetheless, the Oversight Board believes that the aforementioned life-cycle initiatives would significantly benefit Puerto Rico's labor force development if implemented, so it strongly recommends that the Government considers its importance and potential implementation in the near future. Life-cycle initiatives include:

- **Work with PRDE to reform education to enable everyone to graduate high school (see *Chapter 8* and *Section 15.3*)**

- **Prepare high schoolers for success in college and the workforce** by designing a dual enrollment Pilot program that enables high school students to take college-level classes and earn an associate degree alongside their high school diploma, and creating a strategy to expand and leverage vocational education to address talent gaps. [60,61]

- **Empower college students to obtain job skills and research opportunities** by designing employer guidelines and an outreach strategy to expand the number of high-quality co-ops and internships available to college students, and expanding opportunities for college students to conduct Science, Technology, Engineering and Mathematics (STEM) research. [62,63]

- **Create training programs tailored to employer needs** by designing a strategy to create high-quality apprenticeships to address identified current and future talent gaps, and developing a customizable workforce development Pilot program that leverages partnerships

---

[60] The University of Puerto Rico-Mayaguez (UPR-Mayaguez)'s R2DEEP program, the leading dual enrollment initiative in Puerto Rico, has served high-achieving students with an interest in engineering for several years, but space is limited to just several dozen students and tuition can exceed $240 per credit. Several small universities, such as Columbia Central University, also enable students to complete college courses during the school year or summer breaks. In the aftermath of the 2019-20 earthquakes, PRDE also partnered with a handful of universities to offer online college courses to high schoolers from the most-affected areas. Although this initiative approximates a fully-fleshed dual enrollment initiative, the program was established as a temporary solution to education disruptions, focuses on students from affected areas, and does not offer high-achieving students associate degrees. See University of Puerto Rico-Mayaguez, "R2DEEP Requirements and Costs"; El Vocero, "Oportunidad para adelantar estudios universitarios," 2018; and Alicea, "Educacion lanza cursos en linea en conjunto con siete universidades," published 2020

[61] A study in California, for example, concluded that students who participated in dual enrollment classes were more likely than their peers to graduate from high school, enroll in four-year colleges, and succeed in college. California's efforts to expand access to dual enrollment programs (e.g. offering free textbooks) have widened participation (one in eight California high schoolers are dual enrolled) and boosted student achievement (90% of participants earned college credit). Once in college, the study concluded that previously dual enrolled students accumulated more college credits and were less likely to take remedial classes than their peers; see Hughes, et. al., "Broadening the Benefits of Dual Enrollment," 2012, and EdSource, "High school students benefit from taking college courses, but access uneven in California," published 2020

[62] D'Abate, "Developmental interactions for business students: Do they make a difference?" published 2010

[63] UPR's Cooperative Engineering Education Program (referred to as "COOP") has promoted co-ops for more than 40 years, but access to COOP is limited to UPR students and primarily geared toward engineering students (with some exceptions). Similarly, readily -available internships (as determined through a web search for "internships in Puerto Rico" in April 2020) are primarily offered by large multinational firms (e.g. biopharmaceutical companies and financial services firms) are relatively few in number, limiting opportunities to a small cohort of successful applicants. See University of Puerto Rico, "Celebran 40 aniversario del Programa Coop de Ingeniería," 2017, and University of Puerto Rico-Rio Piedras, "Experiencia de Educacion Cooperativa (COOP)"

with local technical colleges to provide qualified employers no-cost tailored training programs. [64],[65]

- **Subsidize training programs to support lifelong learning** by designing lifelong learning Pilot program to subsidize adult residents' access to high-quality technical education courses that can address pressing talent gaps through technical reskilling or specialization.[66]

DDEC is best positioned to oversee the development and implementation of these life cycle initiatives. Exercising its role as coordinator, DDEC can perform the analyses, consolidate local knowledge and expertise provided by WIOA boards, and establish the partnerships needed to produce high-quality workforce development programming.[67] Vivienda is also managing a $90 million Workforce Training Program with CDBG-DR funds . [68]. DDEC should ensure its initiatives are aligned with the proposed usage of the CDBG-DR funds to avoid duplication of efforts or redundancy.

Revamping workforce development is necessary to ensure the full economic benefits of the Human Capital and Welfare Reform. For example, the EITC and the NAP work requirements would be significantly hampered if workers are unable to be matched with job openings in the formal economy due to lack of training, skills, or other barriers to employment. In other words, lack of progress in improving workforce development would put at risk the incremental GNP growth and revenues attributed to the Human Capital and Welfare Reform by negatively impacting the effectiveness of the EITC and the NAP work requirement in promoting growth.

### 7.4.3   Analyses to understand labor market needs

To create impactful workforce development programs, the Government must first conduct an analysis of the Island's labor market to identify talent gaps.

The 2021 Fiscal Plan requires the Government to conduct such an analysis, including by creating an inter-agency working group. While DDEC is best positioned to be in charge of the implementation of this initiative, results and impact will benefit from the knowledge and expertise of all Puerto Rican labor-related stakeholders. Thus, DDEC must establish and coordinate a working group dedicated to this interagency effort. Given their respective roles and experience, DOF, ADSEF, DOLHR, PRDE, and Vivienda must be incorporated within such a group.

---

[64] A study of apprenticeships in 10 mainland states found that apprentices earned more than $240,000 in total lifetime earnings on average than those who did not complete apprenticeships; see Reed, et. al., "An Effective Assessment and Cost-Benefit analysis of Registered Apprenticeship in 10 States," 2012. For additional findings on the positive benefits of apprentices for employers, see Lerman, et.al., "The Benefits and Challenges of Registered Apprenticeship: The Sponsors' Perspective," 2009; Lerman, "Apprenticeship in the United states: Patterns of Governance and Recent Developments," in Schlogl, ed. Situated Competence Development Through Innovative Apprenticeships, 2008. Regarding returns on investment, a study of more than 1,000 Canadian employers found that companies derived $1.47 in benefits for every dollar invested in apprenticeship training; see Canadian Apprenticeship Forum, "It pays to hire an apprentice: Calculating the return on training and investment for skilled trades employers in Canada," published 2009

[65] In 2018, DDEC and DOLHR launched an initiative to develop construction, tourism, aerospace, agriculture, and advanced manufacturing apprenticeships. Since then, the effort has only successfully engaged a handful employers (primarily aerospace firms) to create programs. Despite their importance, the initiative has not created any construction- or tourism-focused apprenticeships; see Action Plan Amendment Three as certified by the Oversight Board, 2020, and El Vocero, "Arranca Programa de Formacion para el Empleo del DDEC," published 2018

[66] Reskilling and specialization can be achieved through enrollment in structured career transition programs managed by local colleges and universities or through pre-approved technical education courses (including online courses); for more information, see SkillsFuture, "What is it?"

[67] WIOA funds are intended to support initiatives to train youth, adult, and dislocated workers as well as apprenticeships. Given their knowledge of local and regional needs, DDEC should also leverage the expertise of local WIOA boards, which are responsible for the administration of WIOA funds and workforce programming in their respective regions, and non-governmental workforce development organizations where appropriate

[68] Per the Action Plan, the Workforce Training Program has the objective of promoting workforce development in the construction, hospitality and tourism, healthcare, technology, and manufacturing industries

In the first stage, the working group must identify the current and potential talent needs of employers that will shape their demand for workers. In this stage, DDEC must determine current and future talent demands of employers on the Island; current skill and knowledge gaps among existing workers (informed by employers); and the availability, cost, and quality of the Island's talent supply. It should also draw on relevant benchmarks and best practices, as well as major global labor market trends to inform future talent needs.

Some aspects of this first stage are already present in the 2020 WIOA State Plan. However, DDEC must ensure the full analysis is complete and available for all relevant stakeholders in order to appropriately inform workforce development efforts.

In the second stage, the working group must discern the available resources and trends that will shape the supply of talent to meet employers' needs. As such, DDEC must identify the resources currently available to train workers to meet employer needs, new resources that workers will leverage to develop relevant skillsets, the amount of training currently offered through employers, and potential private and social sector partners that can help in training or re-skilling workers.

Enhancing opportunities for local residents depends on the working group's ability to transform its learnings and conclusions into effective workforce development tools. So in a third and final stage, the working group must issue actionable recommendations at the local and Island-wide levels, in the form of an integrated strategic plan that would outline the tactical roadmap to build a more robust offer of training programs, initiatives, and efforts.

Additionally, the creation and publication of such plan will allow the working group to have a holistic view of the current situation and more effectively plan for the usage of all workforce development funding currently available in the Island, namely the recurring WIOA funding, the resources received from CDBG-DR, and the local funds included in the this document (see *Section 12.2*).

To make certain this is accomplished,  the Government must complete the following action items by their respective deadlines:

EXHIBIT 40: REQUIRED IMPLEMENTATION ACTIONS FOR HIGH-QUALITY WORKFORCE DEVELOPMENT PROGRAMS COORDINATION STRATEGY

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2021** | ▪ Share with Oversight Board report on progress of CDBG-DR Workforce Training Program | ▪ Vivienda | ▪ Quarterly starting on May 30, 2021 |
| **To be completed in FY2022** | ▪ Publish a strategic plan that states how different workforce development efforts and funding (i.e., WIOA, CDBG-DR, 21st Century Technical and Business Education fund) blend in a cohesive way to improve human capital development | ▪ DDEC, DOLHR, Vivienda | ▪ December 31, 2021 |
| | ▪ Share strategic plan and coordination strategy with 15 local boards | ▪ DDEC | ▪ March 30, 2022 |
| | ▪ Re-conduct labor market analyses and update strategic plan | ▪ DDEC | ▪ Quadrennially from December 31, 2023 |

### 7.4.4    *Allocate resources in a data-driven manner*

To maximize the number of workers that can benefit from redesigned workforce development programs, the Government must analyze data to confirm that workforce funds are used transparently, efficiently, and effectively. Routine and comprehensive internal data analysis will enable DDEC to provide appropriate feedback and pertinent recommendations on the uses of

workforce development funding when necessary, to boost impact improve outcomes in future years. Potential metrics to analyze include:

- Employment and worker self-sufficiency (e.g., employed participant retention rates, average duration of first employment upon program completion, wages over time)
- Program quality (e.g., participant attendance rates, employer satisfaction rates with participants' training, percentage of corporate partners who hire participants)
- Workforce attraction (e.g., percentage of unemployed workers who inquire about a program, percentage of inquiring workers who participate in a program)

Some progress has been made on this front. As detailed in the 2020 WIOA State Plan, a new Participant Record Information System (PRIS) will now include common registration and case management across WIOA programs. Puerto Rico also signed the State Wage Interchange System (SWIS) Agreement with the Department of Labor Employment and Training Administration, which incorporates all six WIOA core programs to exchange interstate quarterly wage records. Since January 1, 2020, all Queries for Wage Data for all applicable programs are processed through the SWIS Clearinghouse. Going forward, DDEC must ensure these and additional metrics are continuously analyzed and leveraged to guide workforce development strategies. DDEC must also ensure systems provide KPIs and benchmark targets and enable a centralized source of information for case management and program evaluation.

To support the efficient and transparent use of WIOA funds, DDEC must promote a common approach to spending evaluation and reporting. As such, DDEC must:

- Standardize and make transparent all monitoring processes, metrics, and targets, as well as compliance and promotional efforts results, to create more effective programs

- Ensure that regional boards sign MOUs with Government agencies to strengthen training programs while defraying programming costs, facilitating the redeployment of workforce development funds to support other high-performing initiatives

- Leverage data on performance against the aforementioned metrics to set regional boards' annual budgets based on prior-year performance to promote efficient and effective uses of workforce development funds at the local level

The Oversight Board considers that local residents would benefit from a structure of local workforce development boards grouped into larger regional entities, which would enable enhanced results driven by well-performing boards taking over underperforming peers, as well as additional benefits from economies of scale. The Oversight Board strongly recommends that DDEC and WIOA consider the system's reorganization into a less fragmented structure.

To ensure that workforce development funds are used in a data-driven manner, the Government must accomplish the following actions by their respective deadlines:

EXHIBIT 41: REQUIRED IMPLEMENTATION ACTIONS FOR DATA-DRIVEN RESOURCE ALLOCATIONS

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2022** | • Standardize and make transparent all monitoring processes, metrics, and targets, as well as compliance and promotion efforts results, to create more effective programs | • DDEC | • July 30, 2021 |
| | • Begin tracking performance of all workforce development initiatives relative to KPIs and provide actionable feedback to the 15 local workforce development boards in reports available online to the general public | • DDEC | • Biannually from December 1, 2021 |

### 7.4.5   *Understand structural barriers to employment and support efforts to eliminate them*

Another important objective the Government must pursue is to ensure that new entrants into the formal economy can retain employment. Transportation, childcare, and mental health-related issues, for example, can temporarily inhibit an otherwise willing worker from pursuing employment in the formal economy. Mainland jurisdictions have used several solutions, including job counseling, paid transitional employment, and two-generation strategies that educate parents alongside their children, to tackle many of these same barriers.[69] With 57.1% of Puerto Rican children living in poverty and years of traumatic natural disasters and health crises, the Government's efforts should initially prioritize reducing employment barriers for working parents, low-income families, and persons affected by mental illness.[70]

DDEC is well positioned to help local workforce development boards and other relevant stakeholders better understand these barriers, their causes, and the size of their effects, by performing pertinent research and coordinating working groups to further study this topic.

Having a comprehensive view of these issues would allow labor-related public and social sector entities to better inform their programs' design, and could place Puerto Rico in the correct pattern to tackle structural barriers to employment and labor force participation.

To support the system's understanding of structural barriers to employment, the Government must accomplish the following actions by their respective deadlines:

EXHIBIT 42: REQUIRED IMPLEMENTATION ACTIONS FOR EMPLOYMENT BARRIER REDUCTION

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2021** | ▪ Create a working group comprised of DOF, ADSEF, DOLHR, PRDE, Vivienda, and DDEC tasked with identifying the most significant barriers to employment on the island, such as access to transportation or childcare | ▪ DDEC | ▪ June 30, 2021 |
| **To be completed in FY2022** | ▪ Publish a report with actionable items and recommendations to reduce barriers to employment | ▪ Working group | ▪ November 15, 2021 |

### 7.4.6   *Further initiatives on human capital development to be pursued in the mid-term*

Given the challenges involved in restoring long-term growth and development for Puerto Rico, the previous initiatives should be understood as a starting point. Much more needs to be done.

■  In collaboration with Estudios Técnicos, Inc., the Oversight Board published a report *Human Capital Development in Puerto Rico: An Overview (2020)* which includes additional initiatives that the Government may adopt, including the creation of a Human Capital Committee to create a Human Capital Policy for Puerto Rico. The Committee should bring together all relevant stakeholders from the various sectors that are contributors to strengthening Puerto Rico's human capital.

---

69  For example, a New York's Center for Employment Opportunities offers formerly-incarcerated persons job training, paid transitional employment, and career counseling; post-enrollment, participants are 48% likelier than non-participants to gain full-time employment and 19% less like to be re-convicted or -arrested for a felony; see Center for Employment Opportunities, "Research Results," and Bloom, et. al., "Four Strategies to Overcome Barriers to Employment: An Introduction to the Enhanced services for the Hard-to-Employ Demonstration and Evaluation Project," published 2007

70  Rosa-Rodriguez, "State of mental health services for children in Puerto Rico: Mental heal services for Puerto Rico's children are not a luxury but a necessity," published 2019

- Recent research assigns a central role in human capital improvement to additional factors such as health and skills accumulated outside of the schooling system. The population of Puerto Rico must have access to healthcare services in order to boost productivity in the long term. For example, Puerto Rico faces high rates of chronic health conditions. Human capital initiatives going forward incorporate these factors. An effective system of statistics and information is needed to support human capital improvement initiatives.

- Puerto Rico's statistical system needs to be refurbished in order to provide information that is useful for research and policy making. As part of this effort, the 2021 Fiscal Plan recommends reincorporating Puerto Rico in the PISA tests and other international metrics, which would help to know where the Island stands in relation to other countries or states' proficiency in basic educational abilities and track its progress towards meeting goals.

With the objective of boosting formal labor participation, DDEC and the Department of Labor and Human Resources should explore creating a program of incubators for the formalization of existing informal businesses, as has been suggested by a study published by the National Bureau of Economic Research on the case of Puerto Rico. This study also suggested that work activities common to the informal labor market such as construction and reparation work could be organized through cooperatives of community workers or through community organizations.[71]

Puerto Rico's competitive advantage when competing with similar localities will depend, possibly more than on anything else, on the quality of its human capital. The necessary reforms to improve knowledge and skills, and to reduce barriers to employment, will spur more investment from within and abroad, and will help workers find meaningful and well-paid jobs that will in turn contribute to a faster economic growth in the Island.

# Chapter 8. K-12 education reform

**A high-quality education is the cornerstone for creating economic opportunities for the residents of Puerto Rico—especially after years of devastating natural disasters and the unprecedented impacts of the COVID-19 crisis.** The entire system of education has been disrupted, and the Department of Education (PRDE) – along with many education systems across the U.S. – was not prepared to adapt quickly enough. These challenges were exacerbated in Puerto Rico given the destabilizing impact of recent natural disasters as well as high leadership turnover resulting from the election year. Despite these obstacles, PRDE has attempted to implement the 2020 Fiscal Plan initiatives, but many of these initiatives saw limited progress in part due to COVID-19 pandemic.

Comprehensive K-12 education reforms will help address the academic and social-emotional impacts of the last year while simultaneously empowering every Puerto Rican to develop the skillsets needed to achieve economic self-sufficiency and join the formal workforce. Together with *Section 15.3* of the 2021 Fiscal Plan, which outlines the necessary management improvements and operational efficiencies that the Department of Education (PRDE) must pursue, this chapter provides a transformation roadmap that will transform K-12 student outcomes on the Island. Indeed, studies show that mainland workers that attain fluency in both English and Spanish earn $2,800 more per year than their monolingual peers, while Puerto Rican workers (ages 65 or below) with a high school diploma earn three times as much as residents who lack one.[72] Improvements in education will bring prosperity and growth to individuals and the Island as a whole.

---

71 Enchautegui, M., & Freeman, R. B. (2005). Why don't more Puerto Rican men work? The rich uncle (Sam) hypothesis (No. w11751). National Bureau of Economic Research.
72 Ruggles, et. al., IPUMS USA: Version 9.0 [Puerto Rico Community Survey], 2015; $17,348 vs $5,731

Even before the COVID-19 pandemic, PRDE was struggling to provide a high-quality educational experience meeting the developmental needs of all children, preparing them for success in higher education or the workforce. Puerto Rico ranked 67th out of 73 education systems in average scores of 15-year-old students on the Program for International Student Assessment (PISA) mathematics literacy scale in 2015, with an average score of only 378 compared to the overall average of 490 (see *Exhibit 43*).[73] The Island performed slightly better in reading (59th) and science (65th) literacies but was still well below the average in both subjects (83 and 90 points below, respectively). Moreover, school underperformance persists on the Island, with just 45% of students proficient in Spanish, 39% of students proficient in English, and 30% of students proficient in mathematics in 2019. There are particularly sharp drops in English proficiency between the third and fourth grades, and similarly sharp drops in mathematics and Spanish proficiency between the fifth and sixth grades.[74] Thirty-three percent of current third graders are at-risk of not graduating high school, and PRDE has delayed the introduction of evidence-based practices that are important to properly serving Special Education students (who comprise a greater share of the student population—32%— than in any other U.S. jurisdiction).[75,76]

EXHIBIT 43: AVERAGE MATH LITERACY SCORES, ORGANIZATION FOR ECONOMIC COOPERATION AND DEVELOPMENT (OECD)'S PROGRAM FOR INTERNATIONAL STUDENT ASSESSMENT (PISA), 2015



Average math literacy scores, OECD's PISA 2015

1  OECD Program for International Student Assessment (PISA) test scores, 2015

The COVID-19 pandemic is likely to worsen student outcomes given research showing a disproportionately negative impact on low-income (~80% of PRDE student population in 2021)

---

73  OECD Program for International Student Assessment (PISA) test scores, published 2015
74  English: 55.4% in third grade to 39.0% in fourth; Spanish: 62.3% in third to 48.6% in fourth; mathematics: 45.3% in fifth to 11.5% in sixth; see Puerto Rico Department of Education, "Resultados META-PR 2018-2019," published 2019
75  This calculation is based on recent PRDE performance data and accounts for the fact that students who do not read at grade level by third grade are four times likelier to not graduate high school; see Puerto Rico Department of Education, "Reporte de Desercion Escolar 2018-19," 2019 and Hernandez, "Double Jeopardy: How Third-Grade Reading Skills and Poverty Influence High School Graduation," published 2012
76  An average of 13% of students are characterized as special education students on the mainland; see Puerto Rico Department of Education, "Matricula Activa," 2020;  U.S. Department of Education, National Center for Education Statistics, published 2017

and Special Education students.[77,78] Furthermore, surveys of K-12 students in the U.S. found that ~40% of students have been putting less effort into their work compared to before the pandemic, and ~80% of students indicate that feeling depressed, stressed, or anxious makes it hard to do their best in school.[79] Between 2017 and 2020, students in Puerto Rico were estimated to have missed up to ~160 school days.[80] To most effectively serve students and address learning gaps, the Governor of Puerto Rico and PRDE decided to begin reopening schools in line with national recommendations. As of April 2021, the Department had welcomed back students in kindergarten through third grade, and twelfth grade, as well as Special Education students at ~120 schools. To continue to safely re-open schools in fall 2021, PRDE needs clear, robust plans, including contingency plans that would allow for a speedy transition to a remote or hybrid environment as needed.

Although natural disasters and the COVID-19 pandemic have wrought substantial destruction and turmoil, relief funds offer PRDE an unprecedented opportunity to reshape Puerto Rico's public schools for the better. In the 2020 Fiscal Plan, the Oversight Board allocated $124 million in Commonwealth funds to purchase tablets, software, and training services necessary to support distance learning for all PRDE students and teachers as part of the Emergency Measures Support Package in response to the COVID-19 emergency. Additionally, as discussed in *Section 15.3*, PRDE has been allocated a significant amount (~$4.6 billion) of one-time Elementary and Secondary School Emergency Relief (ESSER) funding through the CARES, CRRSA, and ARP Acts, which can be used to support recovery and response efforts related to the COVID-19 pandemic. The Oversight Board is analyzing the formal guidance released by the U.S. Department of Education on how to calculate the Maintenance of Effort (MOE) requirements associated with this fund, and will determine what, if any, implications the MOE requirements have on the Commonwealth, UPR, and PRDE funding provided in the 2021 Fiscal Plan and FY2022 Commonwealth Budget. Furthermore, PRDE has hundreds of millions of federal carryover funds from prior year grant allocations and received an additional $2.3 billion in FEMA funding that can be used to improve school building infrastructure damaged by Hurricane María.

This fiscal situation brings meaningful opportunity for students in Puerto Rico, but also significant management and logistical complexity. As such, PRDE must create a multi-year financial plan – as outlined in detail in *Section 15.3* – to strategically allocate those funds in high impact, evidence-based, and equitable ways aligned to its strategic goals. Devising an effective financial plan starts with assessing student learning deficits in order to pinpoint the most acute needs and invest in impactful interventions through a learning acceleration plan. As the Department works to align financial resources to its strategic priorities, it also needs the right people with the right qualifications to carry out these priorities. To this end, PRDE must address the capacity constraints exacerbated by the increasing demands of the COVID-19 pandemic and PRDE leadership turnover from the election. Magnifying these challenges, outdated systems, inefficient processes, and poor data management often impede the ability of staff at all levels to carry out their normal daily functions, never mind respond to disruptions strategically or with agility.

**The effects of the events of the last year have reverberated across the Island and the whole of the Department of Education – putting PRDE in a constantly reactive position.** To afford all local residents an equal opportunity to develop the knowledge and skillsets needed to contribute to the Puerto Rican economy and to address the urgent needs of students resulting from the COVID-19 pandemic, PRDE must continue implementing education structural reforms in FY2022**.** As described in its State Plan, PRDE aimed to achieve 73% student proficiency in mathematics, 77% proficiency in English, and 80% proficiency in Spanish across all grade levels by the 2021-22 school year, but the Department remains far from these goals.

---

[77]  Puerto Rico Department of Education, "Matricula Activa," 2021

[78]  NWEA, "Learning during COVID-19: Initial findings on students' reading and math achievement and growth", November 2020

[79]  The Evidence Project at CRPE, "The kids are (really) not alright: A synthesis of COVID-19 student surveys", March 2021

[80]  Bellwether Education Partners, *Puerto Rican students during the COVID-19 pandemic: Data update, March 2021*

Nonetheless, the future of Puerto Rico relies on PRDE delivering this level of improvement. To achieve these targets—and ensure that PRDE makes a concerted effort to offer the children of Puerto Rico the high-quality education that they deserve—comprehensive reforms must begin immediately, particularly in areas such as English Language Learning (ELL), K-5 literacy, and STEM instruction.

To maximize the likelihood of success, education reforms should build on the improvement areas PRDE identified in 2017: increased student achievement (as measured by META-PR scores and graduation rates), stronger professional development for directors and teachers, and additional effort to support the developmental needs of the whole child. [81] As such, the Government's overhaul must:

1. **Implement PRDE's 2022-27 strategic plan to guide reforms**
2. **Launch evidence-based curriculum reforms**
3. **Create a post-COVID-19 back-to-school plan and learning acceleration strategy**
4. **Improve professional development opportunities for all staff**
5. **Make targeted investments to boost family engagement**
6. **Systematically collect, manage, and leverage data for better decision-making**

These reforms must collectively aim to strengthen system-wide accountability among educators and administrators; facilitate data-driven leadership at the central, regional, and school level; and increase PRDE's responsiveness to the needs of the whole child and the broader community on the Island. Moreover, the Oversight Board welcomes PRDE, its non-Government partners, and other Government agencies to design and propose further innovative reforms to strengthen PRDE schools and mitigate the ongoing challenges of the COVID-19 pandemic and its residual impacts.

## 8.1    Implement a strategic plan to guide reforms

**Successful education reforms require a strategic and operational foundation to succeed.** Before PRDE can transform the Island's schools, it should understand how student needs (e.g., academics challenges, curricular resources, social-emotional support) vary across schools, especially in light of the impacts of the COVID-19 pandemic, and centralize its strategic efforts to ensure consistent implementation.

### 8.1.1    Specific initiatives and design parameters

The 2021 Fiscal Plan requires that PRDE execute the following actions to establish a foundation for education reforms:

- **Create a Chief Operating Officer function**
- **Implement the 2022-2027 strategic plan** to achieve defined KPIs, improvement targets, and milestones; codify an operational model that clearly delineates central, regional, and local administrators' responsibilities around the implementation of education reforms; and realize strategies for central, regional, and local administrators to implement differentiated interventions based on individual needs of students.[82]

---

[81] The fourth improvement area—right-sizing schools to optimize resources, improve responsiveness, and strengthen regional and local management—is addressed in *Section 15.3.2*

[83] Unlike traditional learning environments (which evaluate learning at a unit's end), PBL emphasizes ongoing learning and evidence-based argumentation. Studies spanning more than 40 years have linked PBL to stronger long-term information retention, skill development, and student and teacher satisfaction than traditional educational approaches; see Strobel, et. al., "When is PBL more effective? A meta-synthesis of meta-analyses comparing PBL to conventional classrooms," published 2009

### 8.1.2    Current state and path forward

In April 2021, PRDE defined improvement goals and strategies while developing its 2022-27 strategic plan. However, PRDE must also still create a Chief Operating Officer (COO) function to lead PRDE operations and oversee the day-to-day implementation of reforms. To complement these efforts, the Department must also strengthen financial management capabilities within the existing CFO's office and create a roadmap to guide spending at all levels, as outlined in *Section 15.3*.

To establish the strong foundation required to implement education reforms, PRDE's Central Office must accomplish the following actions by their respective deadlines. Implementation of the PRDE efficiency measures stipulated in *Section 15.3*, which will promote the more effective management and use of Departmental resources, will further strengthen education reform efforts' likelihood of success.

EXHIBIT 44: REQUIRED IMPLEMENTATION ACTIONS TO ESTABLISH ENABLERS FOR EDUCATION REFORM

| | Action item | Owner | Deadline |
|---|---|---|---|
| To be completed in FY2021 | ·Launch search for a COO | ·PRDE | ·July 1, 2020 |
| | ·Segment all PRDE schools | ·PRDE | ·Start of 2020-2021 school year |
| | ·Define KPIs, targets, and milestones for each achievement tier to evaluate the impact of education reforms and share them with the Oversight Board | ·PRDE | ·September 30, 2020 |
| | ·Discuss KPIs, targets, and milestones with the Oversight Board | ·PRDE | ·October 15, 2020 |
| | ·Discuss progress made in the development of a preliminary 2022-27 strategic plan with the Oversight Board (check-in #1) | ·PRDE | ·November 30, 2020 |
| | ·Identify a COO | ·PRDE | ·December 15, 2020 |
| | ·Discuss progress made in the development of a preliminary 2022-27 strategic plan with the Oversight Board (check-in #2) | ·PRDE | ·January 15, 2021 |
| | ·Share a preliminary 2022-27 strategic plan with (1) professional development, (2) curricular and distance learning, (3) family engagement, (4) data-driven, and (5) other viable reforms for each achievement tier with the Oversight Board (check-in #3) | ·PRDE | ·February 15, 2021 |
| | ·Discuss preliminary strategic plan draft and projected costs with Oversight Board | ·PRDE | ·February 28. 2021 |
| | ·Finalize strategic plan and share with Oversight Board | ·PRDE | ·March 31, 2021 |
| | ·Discuss finalized strategic plan and projected costs with Oversight Board | ·PRDE | ·April 15, 2021 |
| To be completed in FY2022 and beyond | ·Implement 2022-27 strategic plan | ·PRDE | ·July 1, 2021 |
| | ·Publish annual reform implementation progress report | ·PRDE | ·Annually from June 30, 2022 |
| | ·Discuss annual implementation progress report with Oversight Board | ·PRDE | ·Annually from August 15, 2022 |

1 In particular, PRDE should focus on (1) strengthening budget oversight and forecasting capabilities, (2) integrating ERP and HRIS systems to improve financial and personnel management capabilities, (3) professionalizing its procurement office to reduce fraud and waste and improve category purchasing strategies, (4) identifying top-10 contracts to analyze to identify and renegotiate to attain cost savings, and (5) strengthening overall financial controls to maximize operational efficiencies.

## 8.2    Launch evidence-based curriculum reforms

**PRDE must overhaul its curriculum and leverage supplemental learning opportunities, especially digital aids, to achieve significant increases in student proficiency.** PRDE's curriculum is in need of end-to-end standardization around evidence-based best practices while also preserving the flexibility for educators to meet the diverse learning needs of all students and address requirements within Special Education students' IEPs. Additionally, PRDE's curriculum must integrate digital aids that facilitate the high-quality education of Puerto Rico's children and guard against schooling disruptions. Finally, to best meet

the needs of PRDE students, the new curriculum and materials should incorporate leading practices in social-emotional learning.

### 8.2.1   Specific initiatives and design parameters

The 2021 Fiscal Plan requires that PRDE execute the following actions to strengthen its curriculum:

- **Assess the impact of current curricular spend on student performance** to direct resources to evidence-based curriculum and instructional strategies to benefit the greatest number of General and Special Education students, while still providing all additional support required by Special Education students' Individualized Education Plans (IEPs). PRDE should design a new curriculum to address the areas of most-significant academic and developmental (i.e., social-emotional) need across the PRDE system.

- **Implement innovative learning strategies** to empower students through curricular innovations such as project-based learning (PBL). These approaches aim to build foundational problem-solving skills (e.g., synthesis, analysis) through a "real world" application conducive to long-term information retention, and empower all educators—through the use of formative assessments (e.g., checks for understanding, weekly quizzes, student-teacher feedback sessions)—to boost student achievement, quality of work, information retention, and attendance.[83,84] Such strategies should also embed social-emotional skill building within the school day.

- **Bolster learning strategies with proven digital aids** to equip educators with learning resources (e.g., lessons, assessments) and other curricular materials tailored to each student's developmental needs, to boost student performance and instruction.[85,86] Digital resources also allow for more curricular choice, differentiation in learning style, and remediation/extension opportunities at lower cost and larger scale.

### 8.2.2   Current state and path forward

PRDE's current curriculum does not adequately support the needs of all General and Special Education students, and many teachers lack the pedagogical strategies needed to maximize student outcomes with current curricular resources. The Department also lacks a sense for how its curricular spend translates into student impact, preventing PRDE from reallocating resources to maximize performance. Likewise, PRDE has not yet implemented innovative teaching strategies—such as project-based learning—across all schools, further inhibiting student performance.

Federal and Commonwealth funding has eliminated major barriers to digital education within and outside of PRDE schools. Furthermore, all schools have wired internet access and will have

---

[83] Unlike traditional learning environments (which evaluate learning at a unit's end), PBL emphasizes ongoing learning and evidence-based argumentation. Studies spanning more than 40 years have linked PBL to stronger long-term information retention, skill development, and student and teacher satisfaction than traditional educational approaches; see Strobel, et. al., "When is PBL more effective? A meta-synthesis of meta-analyses comparing PBL to conventional classrooms," published 2009

[84] Formative assessments have been linked to gains in student achievement, with especially strong results among previously underperforming learners, as well as higher quality student work, better student attendance, and increased retention. See Bakula, "The Benefits of Formative Assessments for Teaching and Learning," 2010, and Hanover Research, "The Impact of Formative Assessment and Learning Intentions on Student Achievement," published 2014

[85] Miami-Dade County Public Schools (FL) piloted Voxy, an English-learning software with adaptive learning capabilities, to strengthen ESL instruction. Students with one semester of exposure to the program improved an average of 15% on the Language Proficiency Assessment, while their non-Voxy peers only averaged a 3.5% improvement

[86] For example, in Uruguay, a nationwide initiative used laptops that had previously been distributed to elementary schoolers to improve ELL instruction, driving meaningful improvements in participants' reading and writing scores

wireless internet by the end of 2021, but PRDE has not yet identified beneficial digital aids (e.g., supplemental digital resources) to enhance student performance inside schools.[87]

While the Oversight Board encourages the Department to select interventions that align most-closely with its 2022-27 strategic plan, PRDE must accomplish the action items outlined in *Exhibit 45* by their respective deadlines.

EXHIBIT 45: REQUIRED IMPLEMENTATION ACTIONS TO STRENGTHEN CURRICULUM

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2021** | • PRDE to launch a school competition for education innovation and create an application process for school leaders that have ideas to positively impact student achievement through innovative programs or practices | • PRDE | • December 2020 |
| | • Design curricular reform to complement distance learning strategy and leverage (1) student performance assessments, (2) innovative learning strategies, and (3) proven digital aids, and (4) other viable interventions to strengthen PRDE's curriculum at each achievement tier as part of the preliminary strategic plan | • PRDE | • February 15, 2021 |
| | • Finalize updates to curricular reforms as part of the updated strategic plan | • PRDE | • March 15, 2021 |
| **To be completed in FY2022** | • Update curricular reform section within annual reform implementation progress report | • PRDE | • Annually from July 31, 2022 |

## 8.3    Create a post-COVID-19 back-to-school plan and stand up distance learning capabilities

While implementing evidence-based reforms is an important near-term goal, the most immediate priority for PRDE must be to continue to refine plans for students in the 2021-2022 school year in response to the impact of the COVID-19 pandemic. This planning process must include a comprehensive learning acceleration strategy, including ample social-emotional support; a distance/ hybrid learning strategy; and a path to reopen as many schools as safely as possible, which is a requirement for PRDE to receive the ESSER funds allocated to Puerto Rico under the ARP Act. It is critical for PRDE to begin this work immediately so that the strategy can be implemented in advance of the new school year, though such innovations will also support instruction in future years.

### 8.3.1    Specific initiatives and design parameters

■ **Back-to-school planning** must combine public health guidance, PRDE management expertise, stakeholder input, and research on national and international learning acceleration approaches in order to develop the right plan for Puerto Rico. Nearly every school system in the world is currently navigating this exact challenge, and Puerto Rico can learn from the successes and failures of others. In addition to creating the right plan, PRDE will also have to effectively implement it. The impact of the COVID-19 pandemic on top of the 2017 hurricanes and 2020 earthquakes will require new safety measures on top of accelerated learning strategies and greater support for students and educators.

■ **Social-emotional support** will help ensure students have the mental and emotional capacity to focus on their studies. Several months into the COVID-19 pandemic, half of U.S. K-12 students indicated a lack of focus on their learning, and 59% stated an inability to

---

[87] Wireless initiatives have been funded through a combination of federal E-Rate and RESTART funds. The Federal Communications Commission's E-Rate program offers eligible schools and libraries discounted telecommunications products and services, including internet connections, on the basis of local poverty levels; see Federal Communications Commission, "E-Rate: Universal Service Program for Schools and Libraries," published 2020

motivate themselves to do schoolwork in a virtual setting.[88] PRDE must address this gap by investing in high-quality social-emotional support, especially given that 46% of K-12 students cite depression, stress, and/or anxiety as an obstacle to learning due to the crisis.[89] These challenges are unlikely to disappear upon return to in-person classes due to the combined effects of a public health crisis, social isolation, and economic issues for many families. Previous research has shown that in addition to improving core social competencies, high-quality social-emotional learning (SEL) programming can improve students' academic performance by 11%.[90]

- **Innovative, proven educational interventions to accelerate learning** will target students' highest academic needs. These intervention strategies will be most effective if PRDE leverages data to differentiate support. PRDE can learn from the practices of schools such as New York City Department of Education's transfer schools, English Language Learners and International Support (ELLIS) Preparatory Academy (New York), and Rocketship Public Schools (Bay Area, Milwaukee, Nashville, and Washington D.C.), which have effectively supported students who are behind their grade level before and after the COVID-19 pandemic. Several strategies common to these schools include extensive academic and social-emotional diagnostic assessments, cross-content collaboration, flexible scheduling, peer support and collaboration, and deep community partnerships.[91]

- **Actively monitoring student attendance** is a basic, yet critical function of the education system; however, it is an area in which PRDE has struggled. Data from January 2021 indicates that only about one-third of teachers had entered attendance data for 95% or more of their class periods in PRDE's Student Information System by the end of the month.[92] According to PRDE's own student retention policy, teachers are responsible for tracking student attendance habits to identify and flag chronic absenteeism, an end goal, which is nearly impossible without accurate and timely data. During this past school year, PRDE began addressing this recurring issue by providing updated guidance on attendance-taking in a remote environment to teachers and implementing attendance-taking reports for school directors. The Department can further promote accountability of student attendance-taking through system updates that encourage timely data entry. PRDE must actively monitor student attendance to ensure the health and safety of students and provide interventions for students at risk of truancy.

- **Teacher absenteeism** is another historical issue that PRDE has confronted. Students need reliable interaction with a consistent adult resource to support their learning and development. In FY2021, PRDE took steps to improve its ability to track teacher attendance and respond to chronic absenteeism by integrating the Kronos time management system with payroll and HR systems. This change will also have significant financial benefits for the Department, as an Oversight Board analysis found that PRDE made at least $80 million in payments over 13 years to employees who had resigned, retired, died, or were otherwise not working. In March 2021, the Department finalized its Time & Attendance effort (referenced in *Chapter 13* above) and implemented the first round of payroll deductions for teachers based on missed class time, per the updated public policy. While the implementation of the Kronos system and payroll deductions are expected to reduce teacher absenteeism, school directors should actively monitor this metric to address chronically absent staff. School directors should ensure that Kronos systems are installed, online, and functioning and continue to foster a culture of accountability.

- **Distance learning strategies** continue to be a critical element of back-to-school and learning acceleration planning, especially given the amount of out-of-school time children in Puerto Rico have experienced over the past several years. Distance learning should be

---

[88]   Youth Truth, Learning and Well-Being During COVID-19 Survey: *Part I*, July 2020

[89]   Youth Truth, Learning and Well-Being During COVID-19 Survey: *Part II*, December 2020

[90]   Edutopia, Social and Emotional Learning Research Review, November 2012

[91]   NYSED; Bridges SIFE Manual; ELLIS Prep Academy SCEP

[92]   Gobierno de Puerto Rico Departamento de Educación, "Informe de la toma de asistencia", January 2021

accessible on a moment's notice as it could potentially be the default delivery model for some students in the fall of 2021, particularly those students in the southern part of the Island where school buildings have not been rebuilt. PRDE's distance learning plan should include strategies to enable instructional delivery (e.g., adaptive curriculum), support vulnerable populations, professional development mechanisms for teachers, and technology deployment. In FY2021, PRDE started to build out its distance learning capabilities with recurring trainings on new technology tools occurring throughout the school year for staff, parents, and students. Although PRDE has procured thousands of devices for students and teachers and provided programming to offer $40 vouchers for internet service through May 2021, the deployment of these resources alone does not constitute a learning strategy. PRDE must also follow through with commitments to developing a Learning Management System and a more digitally focused curriculum as described in the Curriculum Reform section of this chapter. PRDE should seek to leverage strategies that have proven successful, focusing on delivering high-quality instruction with appropriate professional supports for teachers.

### 8.3.2    Current state and path forward

Even without knowing the full effects of the disruption of the last year, PRDE has started to address the increased support that children so desperately need during this turbulent time, including  launching a tutoring program in partnership with the University of Puerto Rico (UPR) to provide extra support in Math, English, and Spanish. PRDE also hired school nurses in every school and psychologists in ~72% of schools to provide physical, emotional, and mental health resources. While these steps are a start to installing critical support structures and programs, PRDE will need scaled strategies that impact all schools to most effectively accelerate learning and care for the social-emotional well-being of all students.

While PRDE should plan for all possible back-to-school situations, the successful reopening of ~120 schools in March 2021 can help inform a strategy for a fully in-person return in the fall. Reopening schools is contingent upon PRDE taking all necessary measures to protect the health and safety of students and staff by reviewing and updating existing safety protocols to protect the community.

Funding for  initiatives to address the impacts of the COVID-19 pandemic should come from the various funding sources previously mentioned in this chapter; for example, these efforts are an allowable expense under federal funding from the American Rescue Plan (ARP) Act. *Exhibit 46* describes some of the key implementation actions that are critical to this initiative.

## EXHIBIT 46: BACK-TO-SCHOOL AND DISTANCE LEARNING IMPLEMENTATION ACTIONS

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2021** | •Develop plans and protocols to deliver remote instruction, and support parents and teachers June 2020 through remainder of 2019-20 school year | •PRDE | •June 2020 |
| | •Assess which portions of the curriculum will be areas of focus during remote learning period, balancing accessibility and equity | •PRDE | •June 2020 |
| | •Rapidly provide Professional Development and platform for digital community/connection as educators seek to exchange ideas and best practices for remote instruction | •PRDE | •June 2020 |
| | •Assess summer scenarios by exploring options to provide ongoing learning opportunities and/or programming for students during summer months | •PRDE | •June 2020 |
| | •Identify gaps in IT systems and infrastructure to enable seamless online learning and teaching June 2020 experience | •PRDE | •June 2020 |
| | •Define criteria for selection of technology vendors, including long-term viability, scalability of platform, and data security among others | •PRDE | •June 2020 |
| | •Distribute devices and support students' and educators' hardware and connectivity needs as July/August they transition to remote learning 2020 | •PRDE | •July/ August 2020 |
| | •Coordinate with Academics team and educators to reflect on best practices in remote learning environments, and streamline technology to support better integration of education delivery and instructional strategies | •PRDE | •July/ August 2020 |
| | •Evaluate effectiveness of technology tools and platforms, and improve processes underpinning remote operations (e.g., systems to connect administration and learning, devices and training) | •PRDE | •July/ August 2020 |
| | •Develop more comprehensive asset management strategy, including asset inventory reviews, to support remote learning | •PRDE | •July/ August 2020 |
| | •Reflect on what worked this spring, challenges, and emerging best practices to develop a plan August 2020 to strength instructional delivery (regardless of setting) | •PRDE | •August 2020 |
| | •Provide new professional development for educators that reflects the now-different demands of their jobs, and the likely need for flexible instructional tactics going forward | •PRDE | •August 2020 |
| | •Engage in scenario planning for fall instruction (various delivery channels, adjusted curriculum), and plan for altered curriculum and schedules for fall | •PRDE | •August 2020 |
| | •Develop plan to assess impact of COVID-related school closures on student learning and progress | •PRDE | •August 2020 |
| | •Assess impact of remote learning and remediate lost learning time by doubling down on English, Spanish, Science and math | •PRDE | •December 2020 |
| **To be completed in FY2021** | •Offer additional mental health services and social-emotional supports for students, who will have had a wide variety of at-home experiences over the last 6 months | •PRDE | •December 2020 |
| | •Create specific plans, pathways, and supports for students in key transition grades to ensure that they have the supports necessary to be successful without having completed the prior grade in-person | •PRDE | •December 2020 |
| | •Provide educators with ongoing support and professional practice opportunities to improve regardless of delivery channel | •PRDE | •December 2020 |
| | •Assess security, bandwidth and resiliency of current IT infrastructure and invest to shore up gaps identified | •PRDE | •December 2020 |
| | •Review and alter cybersecurity processes and protocols to reflect changes in technology infrastructure and use | •PRDE | •December 2020 |
| | •Invest in online learning infrastructure to ensure resiliency of remote learning environment | •PRDE | •December 2020 |
| | •Identify opportunities improve efficiency and security of technology portfolio, infrastructure, and operating model | •PRDE | •December 2020 |
| **To be completed in FY2022** | •Design and implement a comprehensive SEL strategy that mentally prepares students to engage in learning and strengthens the student/teacher relationship (e.g., student advisory programs, community engagement forums); include feedback loops to assess program impact on student mental health / social-emotional development | •PRDE | •July/ August 2021 |
| | •Quantify learning gaps through diagnostic assessments and identify highest need academic areas and student populations | •PRDE | •August 2021 |
| | •Prepare and implement an action plan to address identified learning gaps through research-backed interventions (e.g. high frequency tutoring, targeted remediation sessions) | •PRDE | •August 2021 |
| | •Reach a student time reporting threshold of at least 95% (as measured by % of all teachers recording student attendance within the SIE system at the end of a school day) with proof of physically marking students present over the course of the semester | •PRDE | •October 31, 2021 |
| | •Reach a teacher time reporting threshold of at least 95% teacher attendance across all schools as measured by punching in via the Kronos system (in-person or remote) | •PRDE | •May 1, 2022 |

## 8.4 Improve professional development opportunities for directors and teachers

PRDE must strengthen longer-term professional development for teachers and directors to improve classroom instruction and school management. Well-trained teachers are better

equipped to develop strong lesson plans, understand their curricula, and support their students.[93] Similarly, well-trained school directors are better equipped to improve school operations, implement reforms, and oversee the development of teachers when they receive robust training on how to do so.

In addition to the importance of developing academic staff, a significant factor driving PRDE's underperformance is a lack of capacity within the system to execute complex strategies in a challenging educational environment. Many senior members within the Department do not have extensive educational backgrounds, and there is high turnover at the leadership level—a problem magnified during gubernatorial transitions. Additionally, PRDE's Human Resources office lacks a clear talent management function to support the recruitment, development, and retention of effective employees across the organization. To best leverage and build upon the talent in the system, PRDE should strive to provide opportunities for continuous learning through professional development programs, particularly by leveraging the training partnership with the University of Puerto Rico (UPR). These programs should be differentiated based on the level and function of the staff member to best support skills most relevant to his or her role. Instituting these changes will result in well-trained staff who understand how to improve the system.

### 8.4.1    Specific initiatives and design parameters

The 2021 Fiscal Plan requires that PRDE adhere to a set of parameters when implementing this reform. Specifically, PRDE must:

- **Invest in school director development** to tap into a key lever for improving student outcomes. A recent study from the Wallace Foundation found that replacing a below-average elementary school principal (the equivalent to PRDE's school director position) with an above-average one would result in nearly 3 months of learning gains in both math and reading, which is a larger impact than two-thirds of other math interventions and about half of reading interventions.[94] On average, PRDE school directors scored lower (2.3 out of 4) than mainland U.S. principals (2.8) on the Development World Management survey, indicating room for improvement.[95] To close this gap and improve principal effectiveness, PRDE has engaged in a research-practice partnership with the University of Toronto to offer Academia de Desarrollo Profesional de la Educación para la Gestión de Liderazgo y la Profesionalización (EDUGESPRO), a professional development & management training program, to all school directors by the end of FY2022. PRDE should continue to monitor the impact of these efforts and engage in other evidence-based programs tied to school director recruitment and ongoing development.

- **Define operational and results-based criteria** that will provide the Central Office with additional input in identifying the top-performing directors and teachers across PRDE, enabling PRDE to broaden mentorship opportunities that introduce underperforming educators to best practices (e.g., by reducing top-performers' workloads to leverage them as formal mentors trained via the University of Puerto Rico-PRDE partnership and hiring job-embedded coaches to serve as full-time mentors), and offering evaluators across PRDE schools (e.g., superintendents, gerentes escolares, facilitators) a clear structure against which to provide directors and teachers performance-based feedback.

- **Formalize communities of practice across PRDE schools** to expose teachers and directors to instructional, administrative, and social-developmental best practices, and

---

[93]  Investigators found that a one standard deviation increase in teacher quality in a single grade raises annual earnings by 1% on average. Moreover, researchers linked the replacement of a low (bottom 5%) value-added teacher with an average value-added teacher to a $267,000 increase in students' average lifetime incomes per classroom taught; see Chetty, et. al, "The Long-Term Impacts of Teachers: Teacher Value-Added and Student Outcomes in Adulthood," published 2011

[94]  Wallace Foundation, *How Principals Affect Students and School,* February 2021

[95]  University of Toronto, *Improving and Sustaining Management Practices in Public Schools: Report Year 1,* December 2020

strengthen ELL, K-5 literacy, and STEM instruction (especially K-5 mathematics) through robust mentorship (e.g., all low-performing teachers could be assigned a high-performing mentor to help them develop their strengths and address their weaknesses).[96],[97]

- **Fully leverage the K-12 teacher training partnership between the University of Puerto Rico (UPR) and PRDE** made possible by a $10 million annual Commonwealth payment to the university-to subsidize teacher certification and training in core subjects (e.g., English, mathematics, and science) and practices (e.g., classroom management, how to design effective assessments) to improve instructional quality, and expand the availability of teacher preparation classes that address specific areas of Departmental underperformance (e.g., coursework on how to identify, support, and find additional assistance for students with academic or behavioral challenges).

- **Capitalize on partnerships with education non-governmental organizations (NGOs)** to establish a high-quality fellowship program to train motivated and high-quality professionals on the Island to transition into careers in education and develop long-term home-grown solutions to instructional or administrative challenges (e.g., how to develop teacher evaluations that measure value-add behaviors).[98]

- **Introduce universal student screenings conducted by PRDE school psychologists[99] alongside a Multi-Tiered System of Support (MTSS)[100] framework** to: a) ensure that every student's developmental needs are routinely identified and met to prevent children from being erroneously categorized as Special Education students; b) understand the academic, behavioral, and social-emotional needs of the whole child to pair every student with appropriate interventions (e.g., small group lessons for certain Special Education students); c) ensure that every Special Education student receives services required by their Individualized Education Plans (IEPs) in the least restrictive setting possible (e.g., reading comprehension support in a General Education classroom); and d) reduce the use of costly professional services firms to execute IEP analyses and other support services required by Special Education students (e.g., by leveraging in-house developmental staff). It is important to note that successful MTSS implementation is contingent upon high-quality data and data systems.

### 8.4.2   *Current state and path forward*

Despite the importance of professional development, PRDE currently lacks a standardized approach to delivering such programs. PRDE has proposed strengthening its STEM offerings, boosting literacy proficiency and bilingualism, and teaching more "real world" or actionable skills. To further these goals, the Oversight Board has allocated funding to several initiatives intended to improve student instruction and outcomes by supporting more robust professional development within PRDE, including the UPR-PRDE teacher training partnership and programming to train ELL instructors across the Island. The UPR-PRDE partnership is intended to offer PRDE educators robust training opportunities to help them develop capabilities and

---

[96] Communities of practice offer teachers and administrators a forum to meet their counterparts to discuss best practices and solve classroom challenge

[97] In California, Long Beach Unified School District has used formal CoPs to improve English language learning (ELL) test scores–a top priority for PRDE–by 9% since 2015

[98] Some partnerships are already yielding benefits; an ongoing PRDE-Puerto Rico Education Foundation (PREF) initiative has provided administrators guidance on how to manage a regional education system. As part of this effort, PREF identified barriers to improved student outcomes in Bayamon ORE and proposed several solutions

[99] To identify students with academic or behavioral learning challenges, screenings should be brief, sensitive to change over time, and grounded in research

[100]     The MTSS framework is a three-tiered approach to identify and meet the needs of General and Special Education students in the least-restrictive setting possible (as required by law). It stresses the use of a pedagogical approach that evaluates the academic, behavioral, and social-emotional needs of the "whole child" to place students into the appropriate tier. The first tier (80-85% of students) includes all General Education and many Special Education students and uses universal screenings to identify learning or behavioral challenges. The second tier (10-15% of students) includes Special Education students with additional academic or behavioral goals that respond to support in a targeted small group setting. The tertiary prevention tier (3-5% of students) offers students that do not respond to second tier interventions individualized support and assistance

skillsets actively sought by the Department. The initiative is made possible through a $10 million annual appropriation from the Commonwealth to UPR. In FY2021, PRDE used $8 million of these available funds to launch credit-bearing courses and leadership academies and allocated a maximum of $10 million to the tutoring program for students (with ~$1.2 million already incurred).

The Oversight Board encourages PRDE to select interventions that align most-closely with its 2022-27 strategic plan, but stresses that the Department must complete the following action items by their respective deadlines:

EXHIBIT 47: REQUIRED IMPLEMENTATION ACTIONS TO STRENGTHEN PROFESSIONAL DEVELOPMENT

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2021** | ·Work with the non-profit organizations to apply for discretionary Federal grant to defray expenses associated with training ELL instructors | ·PRDE | ·June 2020 |
| | ·Launch NGO partnership to hire and train high-quality ELL instructors | ·PRDE | ·September 2020 |
| | ·Design professional development reform that leverages (1) effectiveness criteria, (2) learning walks and communities of progress (3) the PRDE-UPR partnership, (4) partnerships with non-profit organization (5) internal development staff and the MTSS framework, and (6) other viable intervention | ·PRDE | ·February 15, 2021 |
| | ·Finalize updates to PD reforms as part of updated strategic plan | ·PRDE | ·March 15, 2021 |
| | ·Train all developmental support staff in how to leverage the MTSS framework to better support the needs of all students | ·PRDE | ·June 30, 2021 |
| | ·Finalize professional development section of annual reform implementation progress report | ·PRDE | ·Annually from June 30, 2021 |
| **To be completed in FY2022** | ·Establish and implement a strategy to leverage UPR and NGO partnerships to provide professional development for teachers and school directors that intentionally targets skills related to accelerating learning, providing social-emotional support, and improving management (e.g., professional learning communities, coaching) | ·PRDE | ·December 15, 2022 |
| | ·Develop a pipeline program for high-quality school directors that addresses targeted external recruitment and development opportunities for high potential internal candidates | ·PRDE | ·May 1, 2022 |

## 8.5    Make targeted investments to boost family engagement

**Given the relationship between family engagement and student achievement, PRDE must broaden its efforts to promote robust family engagement in its students' academic lives.**[101] Parental involvement is one of five key factors that, when present, makes schools ten times likelier to drive meaningful improvements in student performance.[102] Comprehensive family engagement, meanwhile, can magnify the benefits of parental involvement and has been linked to higher levels of academic performance, stronger student motivation, fewer behavioral problems, and easier social-emotional adjustment.[103] As such, PRDE should leverage non-digital and digital tools, as well proven family engagement strategies, to facilitate robust and impactful family engagement.

---

[101]  A family engagement partnership between District of Columbia Public Schools and local parents, for example, yielded improved student literacy scores and boosted student attendance by 24%

[102]  The other four factors are the (1) use of an instructional guidance system to articulate the "what" and "how" of teaching, (2) professional capacity to improve instruction, (3) the presence of a student-centered learning climate, and (4) strong leadership from principals; see Bryk, et. al., *Organizing Schools for Improvement: Lessons from Chicago,* published 2010

[103]  Examples of comprehensive family engagement include setting clear academic expectations and helping children develop strong reading habits; see Castro, et. al., "Parental Involvement on Student Academic Achievement: A Meta-Analysis," 2015; Niehaus, et. al., "School Support, Parental Involvement, and Academic and Social-Emotional Outcomes for English Language Learners," published 2014

### 8.5.1   Specific initiatives and design parameters

The 2021 Fiscal Plan requires that PRDE adhere to a set of parameters. Specifically, PRDE must:

- **Utilize non-digital and digital engagement tools** to empower families to obtain a robust picture of their child's academic trajectory (e.g., through individualized emails, use of a student information system containing student grades and attendance data), identify opportunities to volunteer in their student's school (e.g., through a weekly newsletter), and enable parents of Special Education students to more effectively advocate for and support the needs of their child (e.g., guide to Special Education services).

- **Leverage proven family engagement strategies** to better equip parents and teachers, using strengths-based approaches and relationship-based practices, to collaborate as equal partners in a child's development and improve student outcomes (especially for Special Education students), and achievement, through two-generation partnerships, which directly intertwine the education of children with parents to improve outcomes for both (e.g., offer parents job training alongside high-quality after school for their children).[104,105]

- **Regularly survey the families of PRDE students** to empower directors and teachers to understand how well they are supporting students' academic development, and identify opportunities to better meet the needs of the whole child (e.g., improve safety, provide additional behavioral support).

### 8.5.2   Current state and path forward

PRDE has taken initial steps to boost family engagement, but the Department must standardize the use of tools and strategies to maximize the impact of its family engagement efforts. In 2018, PRDE created an office of family engagement. While this office is a step in the right direction, the broader Department has yet to institutionalize the use of non-digital and digital tools to give parents a more robust sense of their child's performance. Moreover, the Department has not yet trained administrators or teachers in the use of proven family engagement strategies to foster more effective family engagement.[106]

While the Oversight Board encourages the Department to pursue interventions that align most-closely with its 2022-27 strategic plan, PRDE must accomplish the action items outlined in *Exhibit 48* by their respective deadlines.

EXHIBIT 48: REQUIRED IMPLEMENTATION ACTIONS TO BOOST FAMILY ENGAGEMENT

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2021** | •Design family engagement strategy that leverages (1) non-digital and digital tools, (2) proven engagement strategies, (3) fielding family surveys, and (4) other viable interventions to boost family engagement at each achievement tier as part of the preliminary strategic plan | •PRDE | •February 15, 2021 |
| | •Finalize updates to family engagement as part of the updated strategic plan | •PRDE | •March 15, 2021 |
| **To be completed in FY2022 and beyond** | •Distribute family survey | •PRDE | •Every six months from October 15, 2021 |
| | •Update family engagement reform section within annual reform implementation progress report | •PRDE | •Annually from July 15, 2022 |

---

[104] Under a strengths-based approach, educators engage with parents as partners in a child's education, leverage parents to broaden their understanding of a student's needs, and work with families to identify opportunities to reinforce in-class lessons outside of school. Relationship-based practices promote reflection on families' personal backgrounds to shape interactions and use parents' emotions around their child's education to establish common ground between educators and households

[105] For example, a 2-Gen partnership in St. Clair, AL successfully graduated 100% of adult participants from a pharmacy technician program at a local college while improving student attendance at an educational after-school program

[106] *Noticel*, "Nace nueva oficina en el Departamento de Educación," published 2018

## 8.6    Systematically collect, manage, and leverage data

**Regular data collection, management, and analysis will empower PRDE to make informed decisions to improve student outcomes and assess the effectiveness of its reform efforts.** Evidence from mainland states suggests that data collection and analysis will enable PRDE to better direct resources toward impactful evidence-based curricular resources and instructional strategies, make targeted and timely interventions to support vulnerable student populations, and assess the impact of education reforms.[107] In turn, access to these datasets and analyses will empower educators, families, and third-parties to further improve student outcomes.

### 8.6.1    Specific initiatives and design parameters

The 2021 Fiscal Plan requires that PRDE adheres to a set of parameters to strengthen family engagement:

- **Identify which data is crucial to the optimization of funding, identification of intervention opportunities, and evaluation of reform effectiveness** in order to conduct a diagnostic of readily-trackable data within PRDE, understand which systems to connect, consolidate, or eliminate, and engage internal and external resources as needed to develop currently unavailable data-tracking capabilities.

- **Implement a data management system that allows superintendents, *gerentes escolares,* and facilitators to quickly access relevant regional, school, and student data** to evaluate student achievement (e.g., META-PR scores, grade point averages) and performance trends (e.g., attendance, truancy/ drop-outs; disciplinary referrals) in real-time. This includes digitizing Special Education students' IEP documentation to facilitate compliance with IEP requirements[108] and enable PRDE to effectively staff and budget Special Education and *Remedio Provisional* programming. These systems will improve resource allocation (e.g., regional support teams) to support underperforming, vulnerable, or Special Education student populations and allow PRDE to measure the impact of education reforms on student outcomes and teacher satisfaction.

- **Enable directors and other school administrators to access the data management system** to support the implementation of the evidence-based progress-monitoring required for the operationalization of the MTSS framework to support all General and Special Education students in the least restrictive manner possible, evaluate the performance of teachers and students relative to key metrics or Departmental policies (e.g., revised time and attendance guidelines), tailor teacher professional development opportunities to address the most-pressing areas of student underperformance, and optimize the allocation of school resources.

- **Publish anonymized data using the data management system on a regular basis** to facilitate school-specific performance scorecards that include student and teacher attendance, META-PR results, and graduation rates, among other data points. This data will empower educators to reshape their instructional plans (e.g., content, lesson plans, and pacing) in response to student data (e.g., META-PR scores) and allow parents to understand their child's educational trajectory and make home-based interventions when appropriate. Third parties, such as education non-profits and academic researchers will also be able to better understand and support the educational needs of Puerto Rican students.

---

[107] For example, in Texas, the state education agency uses the Student Data System (TSDS) to collect, manage, and produce individual student dashboards for educators to evaluate important information, such as college readiness trends. Similarly, in Kentucky, the Center for Education and Workforce Statistics collects statewide government data to support informed K-12 policymaking at the state, district, and school levels

[108] More robust initial compliance with IEP requirements could reduce costly expenses currently incurred through the use of *Remedio Provisional* as a result of untimely or inadequate support for Special Education students

### 8.6.2    Current state and path forward

To optimize the decision-making process, PRDE should first identify the most critical decisions it needs to make on a regular basis and develop a vision for how data and technology can provide support. However, PRDE has made very little progress in collecting or managing data to inform decision-making. To-date, the Department has focused on developing a stronger time and attendance system to track student and teacher attendance. Beyond this, PRDE has yet to train all staff on how to make data-driven decisions nor established a culture of high-quality data collection. The absence of a robust data management system populated by accurate and timely relevant data further inhibits data-driven decision-making. Improved data capabilities will allow leadership, staff, and educators to be more agile in their work, dedicating time, energy, and dollars to efforts that will have the most impact on student outcomes.

Although the Oversight Board encourages PRDE to introduce interventions that align most-closely with its 2022-27 strategic plan, the Department must accomplish the action items outlined in *Exhibit 49* by their respective deadlines.

EXHIBIT 49: REQUIRED IMPLEMENTATION ACTIONS TO FACILITATE DATA-DRIVEN DECISION MAKING

| | Action item | Owner | Deadline |
|---|---|---|---|
| To be completed in FY2022 and beyond | ·Central office: Update data reform section within annual implementation progress report | ·PRDE | ·Annually from June 30, 2021 |
| | ·Assemble data reform working group comprised of PRDE technical personnel and educators (e.g., directors, teachers, etc.) | ·PRDE | ·July 1, 2021 |
| | ·Working group: Define KPIs and ideal technical future state for PRDE data systems (e.g., desired data outputs to appear on student-, school-, and system-wide performance dashboards; most important data for decision-making, etc.) | ·PRDE | ·August 1, 2021 |
| | ·Working group: Conduct a review of PRDE's systems architecture to understand gaps between current and ideal technical future state | ·PRDE | ·September 15, 2021 |
| | ·Central office: Update scorecards to reflect the most recent information for school year 2020-2021 and provide reporting to the Oversight Board on agreed upon format | ·PRDE | ·September 15, 2021 |
| | ·Working group: Design implementation roadmap (including training on new systems and tools) and identify all relevant stakeholders needed to achieve ideal technical future state | ·PRDE | ·October 31, 2021 |
| | ·Technical staff: Once implementation roadmap is finalized, begin execution, including monthly progress reports to the Oversight Board | ·PRDE | ·December 2021 to December 2022 |
| | ·Central office: Update data reform section within annual reform implementation progress report | ·PRDE | ·June 30, 2022 (annually) |
| | ·Central office: Train all staff and educators (e.g., directors, teachers) on how to use new data systems and tools | ·PRDE | ·July to December 2022 |
| | ·Central office: Begin sharing anonymized data with the National Center for Education Statistics | ·PRDE | ·Ongoing from January 2023 |
| | ·PRDE schools: Offer educators refresher courses and parents introductory sessions on how to use data systems and tools | ·PRDE | ·Ongoing from January 2023 |

# Chapter 9. Ease of doing business reform

## 9.1    Current state of business regulation, investment promotion, and tourism attraction

The Government of Puerto Rico has been using the World Bank's *Doing Business Report*—an independent assessment and ranking of the ease of doing business in 190 economies— to

benchmark the business regulatory environment. The Doing Business indicators and methodology are designed to help countries reform their bureaucratic processes to improve the overall business climate. The World Bank did not publish its 2021 report due to irregularities found in the data in the Doing Business 2018 and Doing Business 2020 reports. Nevertheless, the data and benchmarking contained in the most recently published study continue to be excellent resources to compare Puerto Rico's doing business regulatory environment to best-in-class economies and top reformers. The report provides policymakers with an extensive knowledge base to learn from top performers and identify the regulatory and operational changes necessary to materially improve Puerto Rico's business environment.

Empirical studies have shown that, as a result of business environment reforms, countries have seen increases in firm creation, business activity, investment, and economic growth, after controlling for other relevant variables, such as overall governance and macroeconomic conditions. One study found that "on average, each business regulatory reform is associated with a 0.15% increase in growth rate of GDP."[109] Another concluded that "the overall ease of doing business has a positive and significant effect on business creation." [110] And a study on the impact of the ease of doing business indicators on foreign direct investment (FDI) flows found that "on average across economies, a difference of 1 percentage point in regulatory quality as measured by Doing Business distance to frontier scores is associated with a difference in annual FDI inflows of $250–500 million."[111] In sum, there exists ample theoretical and empirical evidence that effectively designing and implementing ease of doing business reforms has a positive effect on reducing barriers to new firm entry, new business creation, investment, and economic growth.

In 2020, the World Bank report rated Puerto Rico the 65th most business-friendly economy. The Island's ranking trails the U.S. mainland's (ranked 6th in 2020) and has declined annually since 2006 when Puerto Rico was ranked 18th. Bringing the Island's business environment in line with Mexico—the top-ranked Latin American and Caribbean economy (49th in 2018)—would give Puerto Rico the edge that it needs to succeed in an increasingly competitive environment; macroeconomic projections in the Fiscal Plan rely on achieving this goal. The Island competes regionally and internationally for tourism and hospitality investments; internationally for pharmaceutical, life sciences, and medical devices, as well as knowledge services, investments; and, overall, with mainland U.S. states.  Given heightened levels of competition in the global marketplace, the Island needs to urgently improve its business-friendliness through implementation of ease of doing business reforms to support economic growth.

Instituting comprehensive reforms is particularly important considering the COVID-19 pandemic. Once global economies start to recover from the aftermath of the pandemic, companies may look to shift supply chains back to the  U.S.  Many are evaluating their business models from the experience of having to operate remotely, and many Governments will likely quickly respond to these changing market forces by implementing rapid reforms to capture these opportunities. Therefore, Puerto Rico needs to urgently institute ease of doing business reforms to succeed in attracting new investment. Small businesses continue to face significant uncertainty as economic conditions evolve, underscoring the need to generate economic activity and attract new investments across the Island. Failure to institute reforms may enable U.S. mainland states and rapidly reforming countries to out-compete Puerto Rico for key investments. For example, the Democratic Republic of Georgia has made drastic improvements in its ease of doing business ranking, driven by robust reforms (e.g., streamlining tax compliance, simplifying administrative processes for starting a business, making contract enforcement easier). Georgia has seen its output per capita increase by 66% and its business density triple between 2006 and 2014—the same period in which the country of Georgia improved its ease of doing business ranking from 98th to 8th.

---

109 Haidar, J. I. (2012). The impact of business regulatory reforms on economic growth. Journal of the Japanese and international economies, 26(3), 285-307.
110 Canare, T. 2018. "The Effect of Ease of Doing Business on Firm Creation." Annals of Economics and Finance, 19(2): 555-584
111 Anderson, J., & Gonzalez, A. (2013). Does Doing Business matter for foreign direct investment? Doing Business.

Puerto Rico's relatively low-ranked business-friendliness in the 2020 World Bank Doing Business Survey is correlated with deficiencies in Government regulations and processes (see *Exhibit 50)*, including:

- **Getting electricity:** The Island's energy supply is costly and unreliable. The cost to obtain an electric connection in Puerto Rico is equal to 318% of income per capita[112]

- **Dealing with construction permits:** Firms spend significant time 165 days, effort (22 procedures), and money (6.7% of project's future value) to obtain permits, on average[113]

- **Registering property:** Companies invest significant amounts of time (190 days) and effort (8 procedures), on average, to register property[114]

- **Paying taxes:** Firms report spending significant time (218 hours) completing filings and making payments (16 payments), on average[115]

- **Occupational licensing laws:** Excessive regulations hinder entry into the labor force. Puerto Rico licenses over 185 professions with excessive requirements and significant cost. With a labor participation rate of less than 40%, many unnecessary requirements constrain economic activity, incentivize shadow economy participation, and accelerate outmigration from Puerto Rico.

- **Freight regulations:** Expanding the use of minimum freight tariffs across previously unregulated sectors of the economy, and other burdensome regulations, inflated transportation costs and increased the complexity of doing business across the Island. While that increased minimum tariff has been stricken, the Commonwealth must look for more opportunities to reduce and eliminate excessive regulation.

- **Tourism attraction:** The Destination Marketing Organization's (DMO) efforts to transform Puerto Rico into a leading tourist destination are undermined by insufficient Government funding and the fact that key functions and responsibilities remain at the Puerto Rico Tourism Company.

- **Offshore investment attraction:** Inadequate Government resourcing and lack of progress on ease of doing business reforms have inhibited efforts to attract major investments, resulting in overreliance on tax incentives as a primary business promotion tool.

---

[112] On the mainland, this cost falls to just 22% of income per capita and businesses enjoy much more reliable energy supplies

[113] For comparison, businesses invest 81 days, complete 16 procedures, and pay 0.7% of a project's future value on the mainland according to the World Bank Doing 2020 Doing Business Survey

[114] For comparison, businesses invest 15 days and complete four procedures on the mainland.

[115] For comparison, businesses make 11 payments and invest 175 hours on the mainland; the odds of an audit for a corporate income tax underpayment are also substantially lower on the mainland.

EXHIBIT 50:  DRIVERS OF PUERTO RICO'S UNDERPERFORMANCE IN DOING BUSINESS



Indicator scores, *lower figures are better*

= Doing Business 2019     = Doing Business 2020

Puerto Rico's **ranking continues to worsen** as a result of insufficient ease of doing business reforms

| Overall[1] | Starting a business[2] | Getting electricity | Dealing with construction permits | Registering property | Paying taxes |
|---|---|---|---|---|---|
| 64  65 | 53  59 | 88  92 | 141  143 | 159  161 | 162  163 |

1 Doing Business does not evaluate occupational licensing, on-Island freights, investment attraction, or tourism promotion
2 Ease of doing business reforms target improvements to starting a business as an extension of the effort to digitize and streamline all business permitting

The Government's efforts to date implementing ease of doing business reforms have been at best insufficient to compete with other economies demonstrably and indefatigably committed to swiftly improving their business regulatory environment. In 2020, the Government started to implement ease of doing business reforms in some of its processes, but reforms have been slow and not transformative or thorough enough to warrant improvements in ranking or in investor attitudes.

Compared to the May 2019 Fiscal Plan, delayed implementation of ease of doing business reforms has in turn affected forecasted Gross National Product (GNP) growth. The positive effect of implementation progress on initiatives like permit processing and tax paying automation, equivalent to 0.10%, is still expected to be captured in FY2023, while the 0.2% impact of the rest of initiatives, to be captured over two years, has been delayed by one year, from FY2025 to FY2026. In order to accomplish this GNP growth increase, and avoid further delays, the Government should make every effort to prioritize implementing the reforms included in the 2021 Fiscal Plan and dedicate the necessary resources to achieve the implementation targets and to reach a ranking of at least 49th in the Doing Business report.

**To attain the GNP uptick associated with Ease of doing business (EODB) reforms, the Government needs to focus on achieving the following in FY2022:**

- **Improve the availability, cost, and reliability of electricity (see *Chapter 10*).**

- **Make permits more easily accessible to enable business activity and public safety** by streamlining processes and eliminating procedural inefficiencies (e.g., reallocate underutilized personnel) across permitting agencies ("lean transformations"), digitizing all procedures required to start a business into the Single Business Portal, developing the Permitting Performance Dashboard, and launching the Red Tape Commission to support operational and technical transformations.

- **Overhaul property registration to facilitate financial transactions and promote disaster-preparedness** by identifying and standardizing best practices among registrars to speed up processing, merging the current land registration system with a faster land recordation system, merging the existing land registries into one uniform parcel registry, and launching a campaign to map ownership of all unregistered properties on the Island.

- **Simplify paying taxes to spur economic activity** by designing a tax administration reform that digitizes, consolidates, and eliminates select tax filings, and conducting an operational needs assessment across Hacienda to reallocate personnel.

- **Reduce occupational licensing to facilitate labor force participation** by designing legislative reforms to reduce required licenses and excessive requirements, implementing uniform licensing requirements like those in many U.S. mainland states, and consolidating the processing of occupational licenses under one department.

- **Minimize the negative effect of inefficient on-Island freight regulations by reverting to the interpretation of regulations concerning carriers that was in effect prior to December 23, 2020, ensure that any tariff increases on traditionally regulated segments of the economy are developed in line with best practices and Puerto Rico law with regard to regulatory processes, and minimize the financial barriers to entry in the trucking sector.** The Oversight Board will continue meeting with trucking representatives, the business community, and the Government of Puerto Rico to engage in a constructive dialogue to assess their needs and the best interests of the people of Puerto Rico.

- **Strengthen offshore investment attraction efforts** by implementing a strategy to compete with mainland states and other economies for investments as firms move to shift their supply chains to the U.S. and attracting airline cargo companies through the air cargo and passenger transfer hub waiver granted by the U.S. Department of Transportation.

- **Prime tourism attraction efforts for success** by transferring internal (on-Island), airline, and event marketing responsibilities and funding from the Puerto Rico Tourism Company (PRTC) to Discover Puerto Rico (DPR).

**While all reforms will help foster economic growth and job creation, simplifying and digitizing permits (including business registrations), property registration, and paying taxes will have a particularly significant impact.**

## 9.2 Streamline permits to promote business activity and public safety

**To foster economic development, promote public safety, and enable recovery from the COVID-19 pandemic, the Government must urgently revamp the Island's permitting system.**

As part of the efforts to reform the permitting process, a new Joint Regulation, the Island-wide permitting rules, was implemented in January 2021.[116] The Joint Regulation is intended to allow for an expedited permitting process, one of the biggest hurdles to business operations, through a change of the single permit process. The single permit process, in effect since 2019, attempts to allow applicants to complete all documentation required in one process, as long as the permit filing is in compliance with all requirements, including zoning. The new process, per the 2021 Joint Regulation, allows all required inspections to occur after a business starts operations. With this specific change, single permit approval time has been reduced from an average of 52 days in 2020 to an average of 13 days in 2021. In addition, many construction permits that once required an environmental assessment no longer require it if the project's environmental impact falls within certain minimal guidelines. This modification is expected to reduce permitting process timelines by at least six months and reduce business costs for those types of projects. Another

---

[116] This Joint Regulation was declared null by the Court of Appeals on March 31, 2021 and on April 12, 2021 in two different judgments. The Puerto Rico Planning Board has 30 days to appeal the decisions before the Supreme Court of Puerto Rico, so they are not final. The Puerto Rico Planning Board has said that they will appeal the decision and if necessary will present their case before the Supreme Court of Puerto Rico. Until the decision becomes final, the Joint Regulation is considered as current.

important change in the regulation is that applicants can choose to renew their Single Permit in one or three years, reducing the time spent renewing permits.

**Despite this near-term progress, the permitting process itself still needs to urgently be reformed, with the bulk of the work – process and system reengineering—still to be implemented over the next two to three years.** Without these permanent changes, permitting backlogs will likely persist. Changes are required to create uniformity within the Island-wide permitting rules and estimated time to adjudicate permits, regardless of the office or the Municipality that is processing the permit.

Not only are the delays in construction permit issuance a deterrent to business creation and expansion, they also incentivize informal construction, which in turn potentially increases risks to public safety, as informal construction may not follow applicable building codes.[117] Without thorough implementation of the reforms outlined below, permitting will impede the Island's economic revitalization—discouraging construction and business operations, and undermining recipients who aim to rebuild their homes and businesses in the wake of natural disasters. In the aftermath of the COVID-19 pandemic, creating a streamlined permitting system that allows businesses to quickly start or restart activity will be crucial to support Puerto Rico's recovery—especially in the case of small businesses, which are particularly vulnerable to economic disruptions.[118]

### 9.2.1   *Permitting reform design parameters*

The 2021 Fiscal Plan requires the Government to implement the permitting reforms highlighted in bold, below. The 2021 Fiscal Plan recommends that the Government adhere to the corresponding set of parameters when implementing the required permitting reforms. Specifically, the Government must:

*Implement operational changes to permitting processes*

- **Improve efficiency while maintaining public safety.** The Government can implement this reform by eliminating sources of waste (e.g., under-trained employees asking applicants for excess documentation) through a lean transformation and routine regulatory training and testing for employees at key permitting agencies,119 and issuing all construction (PCOC)[120] and business (PU)[121] permits that comply with basic requirements on a conditional basis, with continued validity dependent on the findings of proactive (mid-construction or -operation) inspections.[122] The Government should also increase utilization (i.e., identifying additional inspection types to delegate) and oversight of third-party inspectors (e.g., more training and auditing),[123],[124] streamline permitting for strategic projects (e.g., major developments,

---

117 In 2007, Interviron Services, Inc. concluded that as much of 55% of the Puerto Rico's residential and commercial construction could have been done informally; see Hinojosa, et. al., "The Housing Crisis in Puerto Rico and the Impact of Hurricane Maria," 2018.

118 For example, the average small business generally holds less than one month of cash on hand. JP Morgan Chase & Co Institute, "Cash is King: Flows, Balances, and Buffer Days: Evidence from 600,000 Small Businesses," 2016.

119 These include the Permits Management Office (OGPe), the chief permitting regulator; the Environmental Quality Board (DRNA-JCA), which exempts permits from environmental impact reviews and conducts the reviews themselves; and the Department of Health (DOH) and Firefighters Bureau (CB), which issue the sanitation licenses and fire prevention certificates required for businesses to operate.

120 The consolidated construction permit (PCOC) is required for all construction on the Island.

121 The single permit (PU) is required of all businesses on the Island to operate. It consolidates the use permit, the environmental quality certificate, the fire prevention certificate (adjudicated by CB), the sanitation license (adjudicated by DOH), and depending on the nature of the business, liquor, and tobacco licenses (adjudicated by Hacienda).

122 All permits are currently adjudicated through a time-intensive analysis to determine whether projects as written in the applications would comply with regulations. In a proactive inspection regime, regulatory compliance is ascertained through live inspections, enabling adjudicators to issue permits more quickly (reducing processing times), inspectors to verify code compliance in practice (boosting safety), and builders spot quality control issues earlier on (averting expensive rework).

123 Profesionales autorizados may complete fire prevention certificate inspections, but both OGPe and local permitting experts have voiced concern about the quality of some third-party inspections.

124 In Washington, D.C., third-party inspectors may conduct building, mechanical, electrical, and plumbing with supervision from the city's Commercial Inspections Division; see District of Columbia, "Third Party Program Procedure Manual 2018," 2018.

projects above a certain value threshold), and guarantee highly-delayed applications a right to obtain agency review.[125]

- **Accelerate construction permitting.**  The Government can implement this reform by expanding the types of businesses and construction projects excluded from environmental impact review.[126] The Department of Natural and Environmental Resources (DRNA, by its Spanish acronym) should amend their Administrative Order on Categorical Exclusions to increase the number of actions and activities exempted to perform an environmental assessment because they do not have significant impact on the environment.

- **Expedite business permitting.**  The Government can implement this reform by eliminating sanitation and fire department inspections for some businesses, such as stores in shopping centers and offices in some commercial buildings that go through annual inspections, and ending sanitation inspections for low-risk businesses (e.g., offices, retail outlets) altogether.[127] In addition, after completing reengineering of the permit's process, the permit's law and the joint regulation will need revisions to incorporate changes, simplify language, and eliminate procedural inefficiencies.

- **Improve municipal permitting offices' compliance with permitting regulations.** The Government can implement this reform by revising, standardizing, and renewing all legal agreements that allow autonomous municipalities to issue permits on their compliance with permitting regulations,[128] redirecting applications and fees away from non-compliant municipalities,[129] and allowing municipal permit applicants to document a municipal permitting office's regulatory non-compliance and petition OGPe to review their cases.

- **Allowing Government agencies to propose regulatory changes in response to economic or technological changes to maximize efficiency and safety.**[130]

### 9.2.2   Reform targets and indicators

Successful property registration reforms will allow Puerto Rico (ranked 143rd in the *Doing Business "dealing with* construction permits" indicator) to compete with the top-ranked Latin American and Caribbean economy in this indicator (ranked 87th) by reducing the time, number of procedures, and cost required to obtain permits by FY2023. It must digitize and integrate all procedures required to start a business into Single Business Portal (SBP) (Act 19-2017).

The Government must continue to redesign the Island's permitting regime by implementing operational changes to ensure systemic and enduring changes.

- **Overhaul the Single Business Portal:** The platform needs solutions to glitches and additional features to meet the Island's permitting needs. It should also be redesigned to be customer-centric, process-driven, and to prevent errors in document submittal[131] An

---

125 The Government could offer significantly delayed permit applications the ability to petition OGPe's Adjudication Board (OGPe-JA) for a final decision. In turn, the Government should bolster the board's technical capabilities by developing a permanent technical staff to review applications and require OGPe-JA to issue final rulings on their status by a certain deadline.

126 Before applying for permits, applicants must solicit an environmental document approval from OGPe. The categorical exclusion (DEC) is the most common and fastest to adjudicate (as no analyses are required). Applicants who do not qualify for a DEC must complete an environmental assessment (EA) or an environmental impact assessment (DIA).

127 An end to low-risk business sanitation inspections would reduce regulatory burdens for those businesses and enable DOH to allocate additional personnel to inspect high-risk facilities (e.g., labs, restaurants).

128 Act 81-1991 created autonomous municipalities. Under existing regulations, autonomous municipalities are legally allowed to open municipal permitting offices once they have submitted municipal zoning maps to and signed convenios de delegacion with JP. Convenios de delegacion are valid for five-year periods.

129 OGPe could redirect permitting applications and fees away from municipalities that display sustained patterns of non-compliance (via SBP) or (in conjunction with JP) digitally revoke their authority to issue permits altogether.

130 Modifications should respond to technological advances (e.g., development of new software that renders certain analyses obsolete). An effective mechanism in the Joint Regulation would require JP to (1) review all proposals and send viable ones to public commentary on a quarterly basis and (2) update the Joint Regulation within 90 days of their approval.

131 SBP was created by Act 19-2017 to serve as the Island's one-stop portal for construction and business permits, individual and corporate incentives, and business registration procedures. To-date, the platform is only used to solicit and adjudicate permits and incentives. SBP has been played by technical issues (e.g., incorrectly computing application fees, sending applications to the wrong permitting office, etc.) and hampered by the absence of important features (e.g., amending applications, allowing permitting agencies to view all tasks awaiting completion, etc.).

operational redesign will enable agencies to comply with processing time limits to adjudicate permits. While modifications to SBP were made to reduce technical glitches (e.g., applications sent to incorrect offices) and a lack of critical features (e.g., amending applications) additional intelligence capabilities have to be added to prevent errors, reduce time by directing applications through the process and permitting proponents to present complaints when process deviations occur. SBP upgrades will provide a foundation for the operational transformation. The Commonwealth should digitize and centralize all procedures to start a business as required by Act 19-2017 and facilitate inter-agency collaboration by offering all permitting agencies and municipal offices more visibility into outstanding tasks (e.g., inspections).

- **Revise all Island zoning to reduce land use consults or use variations:** The Planning Board needs to complete territorial planning for all municipalities, including updating existing plans to reduce location consultations (e.g., revising zones that have organically changed use but have not been recognized in the zoning maps). These problems are reflected in the lengthy and costly permitting process that needs to be followed for use variance and land use consults.

- **Revise the Environmental Document Regulation:** The DRNA should revise their regulation to allow for more flexible delimitation of actions that are determined to be Categorical Exclusions, including for existing facilities, expansions, and any other that are known to not have a significant impact on the environment. This change will expedite the permit evaluation process for many cases, as it reduces time to approximately six months for environmental document approval for many projects.

- **Establish Performance goals for all agencies, municipalities, and offices that participate in the permitting process, and publish a dashboard with the general status and statistics for accountability in the permitting process:** The creation of a public dashboard will provide transparency on the permitting process and will help identify bottlenecks and inefficiencies among the agencies and offices involved.

- **Launch a Permitting Performance Dashboard (DPP)** to evaluate permitting agencies' and Municipal offices' compliance with processing time limits found in the Joint Regulation[132] by calculating the average processing time (submission to adjudication) for all permit classes and types (and agency sub-tasks if adjudicated by two or more agencies),[133,134] tracking the number of applications closed without adjudication or returned to applicants due to incomplete documentation for all permit classes and types,[135] recording the percentage of third-party permit inspections audited by the Planning Board, and enabling applicants to view their permit's approval status in real-time.

- **Launch a Red Tape Commission**[136] comprised of private and public sector experts to identify opportunities to streamline the environmental documents, such as the Determination of Categorical Exclusion (DEC) and the Environmental Assessment (EA), and major construction procedures like the Land Use Consult (CUB), the Consolidated Construction Permit (PCOC), the Infrastructure Agency Recommendation (SRI), and the single business permit (PU). The commission should also map the objectives of all OGPe-issued permits to identify overlaps in scope, outdated use cases, permits that could be processed in parallel or

---

132 The Joint Regulation creates three permit classes: Ministerial permits comply with all land use, zoning, and building regulations and must be adjudicated within 30 days. Discretionary permits that contravene only building rules (e.g., square footage limits) are subject to a Construction Consultation (CC) but not subject to public commentary and must be adjudicated within 120 days. All other discretionary permits are subject to a public hearing and must be adjudicated within 180 days.
133 Class refers to a permit's ministerial or discretionary character, type refers to its use (e.g., PCOC, PU, etc.).
134 The SRI is one example of a permit adjudicated by more than one agency. Although it is issued by OGPe, the determination is based on input from the affected infrastructure agency (e.g., PREPA).
135 The Joint Regulation resets time limits when agencies receive an application lacking required documentation. Local permitting experts have noted prior experiences with agencies marking completed applications "incomplete" to reset application time limits.
136 In New York City, a red tape commission developed more than 60 solutions to address inefficient business processes, including permitting. In New Jersey, the creation of a statewide commission coincided with a slowdown in the issuing of new regulations. When enforceable by law, red tape reduction efforts have drastically reduced excess regulations. Rhode Island eliminated 31% of all statewide regulations when it legally set its entire regulatory code to expire at the end of 2018. See Broughel, "A Dark Day for Red Tape in the Buckeye State," 2019.

leverage the same analyses, as well as recommend which permit inspections could be delegated to third-party inspectors and flag major SBP glitches and common-sense technical upgrades.

The implementation of these reforms is critical to improve the permitting process. The Oversight Board recommends the Government—notably the Planning Board (JP, by its Spanish acronym) and the Permits Management Office (OGPe, by its Spanish acronym)—implement these reforms promptly to improve the permitting system.[137] The implementation of these reforms is necessary to achieve the economic growth assumed in the Fiscal Plan and to increase the tax revenues that come as a result of economic growth.

To successfully implement permits' reform, the Government must accomplish the following action items by their respective deadlines:

EXHIBIT 51: IMPORTANT ACTIONS FOR IMPLEMENTING REQUIRED PERMITTING REFORM

| | Action item | Owner | Deadline |
|---|---|---|---|
| To be completed in FY2022 | • Establish Red Tape Commission Comprised of private sector experts, CB, DOH, DRNA-JCA, JP, OGPe, and the Oversight Board | • DDEC | • July 31, 2021 |
| | • Publish in SBP Permit's Performance Dashboard with metrics by office: OGPe, Municipalities, DoH, FD, and all Agencies that participate in permits process and by employees. | • OGPe | • July 31, 2021 |
| | • Establish and communicate performance goals for all permit office and Planning Board employees and incorporate in performance review process. | • OGPe, PRPB | • July 31, 2021 |
| | • Train all supervisors in supervisory skills, performance and change management. | • OGPe, PRPB, UPR | • July 31, 2021 |
| | • Develop and publish RFP to hire lean consultants to perform process reengineering with Code Enforcement Grant. | • OGPe, PRPB/IBTS | • July 31, 2021 |
| | • Revise all Island zoning to reduce land use consults or use variations. Obtain from SBP list of repetitive location consultations to discuss with PRPB to identify areas to change zoning and include id field in SBP for field variations. | • PRPB | • July 31, 2021 |
| | • Develop new Strategic Project Definition, streamline approval process with metrics and dashboard and activate committee. | • Governor's Advisor on Priority Projects | • August 30, 2021 |
| | • Establish and communicate an oversight procedure for PAs, OGPe and Municipal Offices' personnel that includes: % of cases to be audited, deficiencies reports and sanctions. | • PRPB | • September 30, 2021 |
| | • Create dashboard of PA's and employees (users) performance (audit scores and complaints) and deficiencies. | • PRPB | • September 30, 2021 |
| | • Select and hire Lean Consultant. | • OGPe, PRPB/IBTS | • September 30, 2021 |
| | • Re-train all OGPe and Municipal Permit's Offices employees, technicians, inspectors on new regulation, SBP and code adoption (Grant) . | • OGPe, PRPB/IBTS | • October 31, 2021 |
| | • Revise the environmental document regulation. | • DRNA | • October 31, 2021 |
| | • Under Code Adoption Grant develop RFP for System Architecture Provider with Customer Centric and Service Design Experience for SBP development. | • OGPe, PRPB/IBTS | • October 31, 2021 |
| | • Design implementation plan to digitalize all business registration process (to start a new business) | • Business Registration Agencies | • December 31, 2021 |
| | • Select System engineer and start SBP system design | • OGPe, PRPB/IBTS | • December 31, 2021 |
| | • Amend laws to allow a streamlined process for the development of territorial plans. | • Legislature | • December 31, 2021 |
| | • Complete lean reengineering and communicate recommendations. | • OGPe, PRPB/IBTS, Lean Consultant | • January 31, 2022 |

---

[137] For example, creating a more coherent land use plan and zoning map could streamline the permitting process by eliminating the need for time-intensive pre-construction consultations. Multi-year delays in updating this map have increased the need for such consultations as Island's developmental trajectory has necessitated commercial and industrial development in areas officially zoned for residential or agricultural uses. As such, the Oversight Board urges collaboration between JP and autonomous municipalities to produce an updated land use plan and zoning map that meets the Island's economic and environmental needs.

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2022** | • Amend permit law and regulation  (as necessary) to incorporate lean recommendations. | • Legislature/Executive | • March 31, 2022 |
| | • Complete SBP System Design. | • OGPe, PRPB/IBTS | • March 31, 2022 |
| | • Develop RFP for  SBP System Developer to create SBP modifications. | • OGPe, PRPB/IBTS | • April 30, 2022 |
| | • Select System developer and start SBP system programming | • OGPe, PRPB/IBTS | • June 30, 2022 |
| **To be completed in FY2023** | • Amend Joint Permit Regulation to incorporate changes required by changes in the law and lean process. | • PRPB | • September 31, 2022 |
| | • Complete SBP modifications. | • OGPe, PRPB/IBTS | • December 31, 2022 |
| | • Complete territorial planning for municipalities and update existing plans. | • PRPB | • December 31, 2022 |
| | • Fully digitalize all procedures to start a business within SBP | • Third Parties | • June 30, 2023 |
| | • Reduce average processing times for each permit type and class to 2x Joint Regulation | • OGPe, PRPB | • June 30, 2023 |
| | • Reduce average processing times for each permit type and class to comply | • OGPe, PRPB | • June 30, 2023 |

## 9.3    Overhaul property registration to facilitate financial transactions and promote disaster-preparedness

**To remove barriers to financial activity and promote disaster-preparedness, the Government must continue implementing property registration reforms in FY2021.** The digitization of property registrations has boosted productivity at the Department of Justice-Property Registry (DOJ-PR), enabling the registry to process more documents than it received[138] Since the certification of the 2020 Fiscal Plan, the Register has been able to reduce backlogs from 400,000 to 320,000 documents, and registrations average less than 90 days to process compared to 190 days in the World Bank 2020 report. In some sections of the Register document registration is taking less than ten days. This has been done by creating performance dashboards and establishing performance goals for all employees. However, even with these temporary changes, the backlog has not been eliminated, and without systemic and procedural changes the backlog could further increase, therefore procedural changes are necessary for long-term reform.

Accelerating property registration will ensure that all residents and businesses can quickly and reliably document property rights—crucial to day-to-day business operations and to post-disaster recovery efforts. As it stands, the Island's current set of disjointed registries does not comprehensively map all land ownership, complicating the Government's disaster relief efforts.[139,140,141] To empower residents and businesses to recover from future natural disasters and comply with U.S. Department of Housing and Urban Development (HUD) guidelines for unlocking $8.3 billion in Community Development Block Grant Mitigation (CDBG-MIT) funds, reforms should also demonstrate meaningful progress in the creation of a uniform parcel registry that can be used to verify the ownership of properties across the Island.

### 9.3.1    Reform design parameters

The 2021 Fiscal Plan requires the Government to implement the property registration reforms highlighted in bold, below.  The 2021 Fiscal Plan recommends that the Government adhere to the

---

138 Puerto Rico Department of Justice-Property Registry, performance data shared with Oversight Board, 2019; the World Bank Group, Doing Business 2020, 2019.

139 In the aftermath of the 2017 hurricanes, many individuals and families affected by the disasters struggled to document legal ownership of their properties, requiring FEMA to make an exception and allow claimants to self-certify ownership.

140 Unregistered properties, also known as informal housing stock, are generally self-built by lower-income households, often in flood zones and without rigid building code compliance. In 2007, Interviron Services, Inc. concluded that as much as 55% of the Puerto Rico's residential and commercial construction could have been done informally.

141 Puerto Rico has three property registration systems: (1) DOJ-PR's registry records transactions (e.g. acquisitions) relating to real properties and uses registrars to analyze the validity of property transactions; (2) Centro de Recaudacion de Ingresos Municipales (CRIM) maintains a digital registry of real property in each municipality (the Cadaster of Puerto Rico) for tax, legal, economic, and administrative purposes; (3) JP maintains an interactive database with location, environmental, and land use data across the Island. Neither the DOJ-PR registry nor the Cadaster accurately capture property ownership. Registration in the former is voluntary, time-consuming, expensive, and unnecessary in the absence of financial transactions. While registration in the latter is mandatory, the Cadaster does automatically record informal transactions.

corresponding set of parameters when implementing the required property registration reforms. Specifically, the Government must:

- **Reduce the amount of time required to register a property.** The Government can achieve this reform by completing consolidation of regional offices, train supervisors on supervisory skills including performance management, provide continuous training to employees to increase productivity, conducting performance analyses to reallocate support staff (e.g. technicians) to maximize registrars' processing capabilities, and eliminating the backlog of outstanding property registrations.

- **Eliminate the backlog of outstanding property registrations.** The Government can achieve this reform by promoting legislation such as was done in 2010 with Act 216, known as Act to Accelerate the Property Register. The sequential registration of documents is necessary to maintain updated property records that guarantee ownership. The Oversight Board recommends that legislation be enacted that would consider as registered all documents presented before December 31, 2020, as long as they have a tract record and are in the correct estate.

- **Modify Karibe,** the digital platform used by the Register. The Government can achieve this reform by taking steps to minimize data entry errors, including establishing checklists of documents to be submitted to assure completeness and prevent errors that require notification of cases, adding the features to analyze data entered to validate correctness and completeness, adding help tools to guide users through the submittal process and providing training to Public Notaries and their staff on system usage.

- **Create a taskforce composed of Public Notaries, and DOJ-PR to develop recommendations and set procedures and legal requirements to register non-registered property on the Island.** The current process to register properties that have never been registered requires that all transactions go through the judicial system. It is estimated that there are 90,000 informal properties in Puerto Rico that would have to go through that process, potentially creating a huge backlog in the judicial system. The taskforce should develop recommendations on a process based on the experiences of what other countries have done to tackle informal property registration to register these properties without going through the courts.

- **Create a uniform parcel registry that comprehensively records property ownership and rights across the Island** (funded by a $50 million CDBG-DR grant for this purpose). The Government can achieve this reform by prioritizing the mapping of the entire Island, including only basic information for each property, and limiting participation to stakeholders with registration data, establishing an administrative and technical protocol for continuously updating the parcel registry to reflect legal changes (e.g., new ownership), and creating a legal protocol to incorporate informal housing stock lacking legally-determined boundaries, deeds, or titles into the uniform parcel registry. According to the Department of Housing CBDG-DR Office Action Plan (V), the GeoFrame Program will aggregate, integrate, and actualize all cadastral data (addresses, roads, parcels, structures, ownership, occupancy, land use, etc.) in Puerto Rico using a centralized regulated system. The program guidelines were approved in September 2020 and the program launched in October 2020 with a Request for Proposal (RFP) for a program manager.

- **Launch a Geoportal that provides an interactive geospatial presentation of data populated within the uniform parcel registry** (funded by the same $50 million CDBG-DR grant mentioned above). The Government can achieve this reform by contracting surveyors and GIS service providers to develop a digital portal of the Island, and prioritizing the overlay of parcel and ID, ownership, land use, and valuation data[142] The RFP to select the GIS provider was published on September 30, 2020. The Government Procurement Office is in the process of selecting the service provider.

---

142 After satisfying HUD requirements, the Government could populate additional data (e.g., utility, school population, crime) to meet the Island's legal and economic needs.

### 9.3.2    Reform targets and indicators

Successful property registration reforms will allow Puerto Rico (ranked 161st in the *Doing Business* registering property indicator) to compete with the top-ranked Latin American and Caribbean economy in this indicator (ranked 95th) by reducing the time and number of procedures required to register property by FY2024. It will also allow Puerto Rico to demonstrate to the U.S. Department of Housing and Urban Development (HUD) how ongoing efforts to develop a uniform parcel registry and GIS map will assist HUD in verifying legal and physical addresses associated with the use of CDBG-MIT funds.

The Oversight Board will also track the following indicators to ensure that the Government implements property registration reforms:

- Average number of days to register property

- Number of procedures required to register property

- Number of backlogged property registration applications

To successfully implement property registration reform, the Government must accomplish the following action items by their respective deadlines:

EXHIBIT 52: IMPORTANT ACTIONS FOR IMPLEMENTATION OF REQUIRED PROPERTY REGISTRATION REFORM

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed during FY2022** | Work with Legislature to pass law to register all documents in backlog up to 12/31/20 that have a tract record (missing a partial payment, a small correction or a Gov required document) | DoJ / PR / Legislature | July 31, 2021 |
| | Develop regulation and plan for implementation of law | DoJ / PR | July 31, 2021 |
| | Establish employee performance quotas, include in performance review process and publish weekly, monthly and YTD | DoJ / PR | July 31, 2021 |
| | Create internal and external users' team as advisors (Civil Law Notaries) and government agencies with vested interest in the process: Property Registry, OGPE & CRIM | DoJ / PR / Working Groups | July 31, 2021 |
| | Begin implementing strategy to reduce property registration processing times | DoJ / PR | August 31, 2021 |
| | Publish dashboards with all employees, teams and Registry Sections performance, internally and in KARIBE | DoJ / PR / Working Groups | August 31, 2021 |
| | Develop RFP to Hire System Designer for KARIBE | DoJ / PR / PRITS | August 31, 2021 |
| | Issue request for proposal for third-party surveyors and GSI providers to begin developing digital map of the Island (funded by $50 million CDBG-DR) grant for this purpose. | PRDOH | September 30, 2021 |
| | Hire System Designer (Front End KARIBE) | DoJ / PR / PRITS | October 31, 2021 |
| | Work legislation to implement fee for cases presented physically at Registry Offices. | DoJ / PR / Legislature | November 30, 2021 |
| | Identify all changes to be performed to KARIBE to improve presentation, increase user friendliness and automate certain tasks performed by technicians and prepare RFP for system developer. | DoJ / PR | December 31, 2021 |
| | Hire system developer and start changes to KARIBE. | DoJ / PR / PRITS | February 28, 2022 |
| | Establish compensation plan for technicians that exceed goals with new funds collected. | DoJ / PR | February 28, 2022 |
| | Define administrative protocol to continuously update uniform parcel registry in response to legal changes (e.g. ownership changes). | Working Group | April 31, 2022 |
| | Finalize merger of CRIM, DOJ-PR, and JP property registries into uniform parcel registry | Third Parties | May 30, 2022 |

| | Action item | Owner | Timeline |
|---|---|---|---|
| **Timeframe FY2022** | • Introduce technical mechanisms to continuously update uniform parcel registry and GIS map in response to legal changes (e.g. ownership changes). | • Third Parties | • June 15, 2022 |
| | • Incorporate CRIM geographic area validation. | • DoJ / PR | • June 30, 2022 |
| | • Complete consolidation of 12 Regional Offices into 8 with limited services | • DoJ / PR | • June 30, 2022 |
| **FY2023** | • Complete all document registration as required with the new law. | • DoJ / PR | • July 31, 2022 |
| | • Complete changes in KARIBE. | • DoJ / PR / Working Groups | • September 31, 2022 |
| | • Issue request for proposal for third-party firm to merge CRIM, DOJ-PR, JP property registries into uniform parcel registry. | • PRDOH | • November 15, 2022 |
| | • Design protocol to incorporate informal housing stock when identified into uniform parcel registry. | • PRDOH | • January 31, 2023 |
| | • Design campaign to map unregistered properties or those with outdated ownership and share with oversight Board. | • PRDOH | • February 15, 2023 |
| **FY2024 and Beyond** | • Develop an expedited ownership declaration process. Create preregistration process to comply with Federal Government requirements to assure all properties in Puerto Rico have some type of evidence of ownership. | • CDGB-DR / JP / CRIM / PRDOH | • July 31, 2023 |
| | • Conclude mapping campaign. | • DoJ / PR | • March 31, 2024 |
| | • Finalize upload of data from mapping campaign into uniform parcel registry and GIS map. | • Working Group | • June 30, 2024 |
| | • Finalize uniform parcel registry that maps all ownership and rights across the island. | • CDGB-DR / JP / CRIM / PRDOH | • September 15, 2024 |
| | • Finalize GIS map that include parcels, property IDs, property ownership, land use, and property value data. | • CDGB-DR / JP / CRIM / PRDOH | • December 31, 2024 |

## 9.4    Simplify paying taxes to spur economic activity

**To spur economic activity, the Government must implement reforms to meaningfully simplify the process of paying taxes.** The Oversight Board acknowledges Hacienda's progress in digitizing and increasing the number of tax filings made via the Internal Revenue Unified System (SURI, by its Spanish acronym). During FY2020 and FY2021 Hacienda automated corporate income tax filing and the submittal of documents for audits and error correction. In addition, they established an appointment system on their webpage to eliminate the need for taxpayers to visit the taxpayer's services office and wait in line for post filing error resolution. Hacienda is also in the process of digitizing SUT payments in SURI. These efforts have drastically reduced the burden of tax filings and has helped filers reduce the time required to complete certain filings and payments (e.g., form 480, SUT, corporate income taxes) by digitizing and centralizing those processes in one place. However, municipal and property tax filings and payments remain time-consuming and complex. Post-filing audit procedures are still particularly time-consuming and challenging to resolve, often involving multiple in-person visits to Hacienda[143] or require filers to interface with multiple revenue agencies and mediums to comply with their tax obligation.

The Government should prioritize the reform of the tax administration process and should appoint a tax administration reform working group composed of public and private sector members including CPAs, CRIM, and the Municipalities.

### 9.4.1   Reform design parameters

The 2021 Fiscal Plan requires the Government to adhere to a set of parameters when implementing the required tax administration reforms.  Specifically, the Government must:

- **Reduce the time required to pay taxes.** The Government can implement this reform by digitizing analog tax filings (e.g., municipal and property taxes), consolidating several tax filings (unemployment, workers compensation, disability and driver's insurance), and improve post-filing error-resolution processes (e.g., by communicating to users the new

---

143 Most technicians only have the authority to resolve (and frequently escalate to their superiors) errors worth $25,000 or less, with taxpayers needing multiple follow-up visits to speak to higher-level officials.

capability for secure uploads for digital document) into SURI, as well as by exploring opportunities to reduce the number of required tax payments (e.g., less frequent payments for smaller amounts)

- **Accelerate the processing of tax filings and timeliness of audit completion.** The Government can implement this reform by conducting an operational needs assessment to support the reallocation of underutilized personnel to critical functions (e.g., error-resolution, audits), and identifying and implementing operational efficiencies within the audit process (e.g., by identifying bottlenecks, duplicative work, and workload scheduling)

- **Create a working group to identify and prioritize efficiency-minded regulatory changes that can be incorporated into future SURI releases and to develop a plan to reform the tax administration process**

### 9.4.2   *Reform targets and indicators*

Successful tax administration reforms will allow Puerto Rico (ranked 163rd in the *Doing Business* paying taxes indicator) to compete with the top-ranked Latin American and Caribbean economies in this indicator (ranked 99th) by reducing the time and number of filings that companies must complete to pay taxes by FY2023:

The Oversight Board will also track the following indicators to ensure that the Government implements tax administration reforms:

- Average number of mandatory tax payments for corporations

- Number of days for claims resolution

- *Doing Business* post-filing index score

To successfully implement the required tax administration reform, the Government should accomplish the following action items by their respective deadlines:

EXHIBIT 53: IMPORTANT ACTIONS FOR IMPLEMENTATION OF REQUIRED TAX ADMINISTRATION REFORM

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2022** | • Establish a Tax Administration reform working group with Private Sector tax professionals, CRIM, Hacienda, Governor's Priority Projects Advisor and FOMB | • Hacienda/AFFAF | • July 31, 2021 |
| | • Start implementation of  Municipal Sale Tax Payments in SURI (COFIM) | • Hacienda/AFFAF | • July 31, 2021 |
| | • Discuss tax reform strategy, projected costs, and necessary administrative and legislative changes with Oversight Board. | • Reform Team | • July 31, 2021 |
| | • Assess basic operational needs across all departments to facilitate allocation of personnel to processing filings, error resolution and audits. | • Hacienda | • October 31, 2021 |
| | • Train personnel to be relocated to processing filings, error resolution and audits. | • Hacienda | • December 31, 2021 |
| | • Design an implementation plan to maximize the effectiveness of tax administration reforms | • Reform Team | • December 31, 2021 |
| | • Reallocate trained personnel to ease the processing filing, error resolution and audits. | • Hacienda | • January 31, 2022 |
| | • Start implementation of the Tax Credit Management Module ("Business Credit Manager") | • Hacienda/AFFAF | • January 31, 2022 |
| | • Finalize update to the latest version of SURI platform (Version 12) to improve user experience with a communication program for users | • Hacienda | • February 28, 2022 |
| | • Finalize update to SURI platform to include Municipal Sale Tax Payments (COFIM) | • Hacienda | • June 30, 2022 |
| **To be completed in FY2023 and beyond** | • Finalize the Tax Credit Management Module ("Business Credit Manager") | • Hacienda | • September 31, 2022 |
| | • Finalize necessary administrative and legislative changes required to implement tax administration reforms for tax year 2022 | • Hacienda / Legislature | • December 31, 2022 |
| | • Finalize technical upgrades to Hacienda's digital platforms for reform implementation | • Hacienda | • March 31, 2023 |

## 9.5    Reduce occupational licensing to facilitate labor force participation

**Current occupational licensing requirements complicate certain workers' entry into the formal workforce and expose applicants to lengthy wait times and potential costs.** Occupational licensing is meant to ensure high quality services while protecting public safety.  However, overregulation in this area creates a strong disincentive for certain workers to move into the formal labor force.[144] To promote labor force participation and create incentives for skilled workers to remain on-Island, the Government should, as appropriate, streamline, eliminate, or harmonize occupational licensing requirements with those on the U.S. mainland. By aligning licensing requirements with other jurisdictions, professionals could consider Puerto Rico as an attractive relocation destination. Additionally, the Government should leverage established best practices when creating new licenses to produce less burdensome regulations and reduce the need for future time-intensive legislative overhauls.

The Government has not enacted any professional licensing reforms to date. More than 185 professions[145] are licensed by autonomous boards and supervised by the Department of Health (DOH), the Department of State (DOS), the Puerto Rico Tourism Company (PRTC), and the Sports and Recreation Department (DRD, by its Spanish acronym). Workers must meet application requirements set by licensing boards. Applications are then processed by their respective boards and issued by DOH, DOS, PRTC, and DRD. Processing times vary substantially.[146]

### 9.5.1    Reform design parameters

The 2021 Fiscal Plan recommends that the Government adhere to a set of parameters when implementing occupational licensing reforms. Specifically, the Government should review requirements to identify licenses for simplification, consolidation, or elimination, and assess the basis for legislating a mandated reduction in occupational licensing regulations, as is done in other U.S. jurisdictions.[147] The Government should also join U.S. mainland compacts that recognize licenses obtained in other states, such as the Compact for the Temporary Licensure of Professionals.  The Government should also amend current licensing requirements to align them with those in mainland states that are home to significant Puerto Rican populations that might one day return to the Island (e.g., Florida, New Jersey, New York, Pennsylvania) or employ significant numbers of workers in industries that Puerto Rico aims to attract (e.g., knowledge services, hospitality and tourism) to facilitate relocations.

Additionally, the Government should create less burdensome occupational licenses in the future by employing less-restrictive alternatives for occupations that pose low risks to public safety, closely tailoring license requirements to mitigate specific health and safety risks, conducting regular cost-benefit analyses, and reducing barriers to inter-state mobility through the enactment of legislation.[148]

---

144 The White House, "Occupational Licensing: A Framework for Policymakers," 2015; Carpenter, et. al., "License to Work: A National Study of Burdens from Occupational Licensing," 2017

145 Inventory performed by the Dept of State and AAFAF

146 In 2019, applicants for designer licenses waited approximately 33 business days to receive their license (18 days at the board and 15 at DOS), while barbers waited nearly 160 days (117 days at the board and 40 at DOS). Puerto Rico Department of State, performance data shared with Oversight Board, 2019

147 Virginia, for example, created an inventory of all statewide regulations and mandated a 25% reduction in occupational licensing rules; see Broughel, "A Dark Day for Red Tape in the Buckeye State," 2019

148 These include certification, registration, mandatory bonding, or more direct regulation of companies; with certifications, for example, the Government would limit the use of professional titles to licensed workers but allow workers to practice a trade. See The White House, "Occupational Licensing: A Framework for Policymakers," 2015

### 9.5.2   Reform indicators

The Oversight Board will track the following indicators to ensure that the Government implements occupational licensing reforms:

- Average number of days to obtain an occupational license after application is complete
- Average number of days to renew a license
- Number of occupational licenses eliminated or harmonized with interstate compacts

To successfully implement occupational licensing reform, the Government should accomplish the following action items by their respective deadlines:

EXHIBIT 54: IMPORTANT ACTIONS FOR IMPLEMENTING OCCUPATIONAL LICENSING REFORM

| | Action item | Owner | Deadline |
|---|---|---|---|
| To be completed in FY2022 | Establish working group of DOH, DOS, PRTC, FOMB and any related agency with Occupational Licenses | DOH, DOS, PRTC | Completed |
| | Identify all occupational licenses, requirements and processes using Institute of Justice License to Work methodology and compare to licenses in the U.S. | DOS, DOH, PRTC, DRD and UPR | September 30, 2021 |
| | Establish a plan to reduce excessive licenses requirements and identify which licenses could be converted to less restrictive options like certification, bonding, insurance, inspections and registration | DOS, DOH, PRTC, DRD and UPR | October 31, 2021 |
| | Design reform to reduce licensing by (1) creating protocol to streamline licenses, (2) joining inter-state licensing compacts, and (3) aligning licensing rules with those in states with large Puerto Rican communities (NY, NJ, FL, TX ) | DOS, DOH, PRTC, DRD and UPR | October 31, 2021 |
| | Identify viable strategies to promote local boards compliance with licensing reforms | DOS, DOH, PRTC, DRD and UPR | November 30, 2021 |
| | Publish performance report detailing (1) the average time and costs required to obtain each license type and (2) administrative or legislative changes made to reduce licenses or accelerate their processing | DOS | December 31, 2021 |
| | Design Strategy to accelerate processing of licenses within DOH, DOS, PRTC, DRD (consolidating under one department) | DOS, DOH, PRTC, DRD | February 28, 2022 |
| | Discuss licensing reform, compliance strategy, processing improvements, projected costs, and necessary administrative and legislative changes with Oversight Board | DOS, DOH, PRTC, DRD | February 28, 2022 |
| | Finalize necessary administrative and legislative changes required to implement occupational licensing reforms from FY2022 onward | DOS / Legislature | June 30, 2022 |
| To be completed in FY2023 | Implement revised occupational licensing requirements | DOS | June 30, 2023 |

## 9.6   Deregulate on-Island freight

Puerto Rico is one of only two major U.S. jurisdictions that still regulates land freight prices.  The cargo industry has sufficient providers to be able to compete on prices. Regulated freights in other jurisdictions in the past have reportedly decreased the quality of services rendered by carriers and shippers, and forced companies to hold additional inventory, all of which have helped increase the cost of doing business in Puerto Rico.[149]  Rates in Puerto Rico are also at least double that of market rates in most states. Higher transportation costs negatively impact businesses and lead to more expensive consumer goods relative to the mainland.

Deregulation efforts undertaken in the late 1970s and early 1980s by the Carter Administration created a more competitive market environment for the U.S. motor carrier industry.[150] Building on this momentum, the Motor Carrier Act of 1980 (Act) further liberalized interstate trucking by allowing easier entry of trucking firms, relaxing pricing controls, and eliminating restrictions on

---

[149]    Advantage Business Consulting, "Progress Report on Deregulation of Land Freight Rates," 2016.

[150] Rastatter, Edward H. May – June 2018. "Trucking Deregulation." Transportation News, pp. 33- 39

routes and the products that could be carried over them.[151]  Federal deregulation of interstate trucking culminated in 1995 with the passage of the ICC Termination Act, which abolished the Interstate Commerce Commission. Regulation of motor carriers (trucking companies and interstate bus lines) became from that point onward the responsibility of the Federal Motor Carrier Safety Administration (FMCSA), whose primary mission is to prevent motor vehicle-related fatalities and injuries. All states followed the Federal lead and by mid-1990's also eliminated nearly all price regulations, with continuing regulatory efforts focused predominantly on safety. As a result, since 1995 interstate trucking essentially is no longer subject to price or entry regulations.

Federal and state deregulation of interstate (and intrastate) trucking has produced significant efficiency gains and general gains in economic welfare by lowering trucking rates,[152] improving services especially to small communities and remote areas,[153] less restrictive entry of workers into the industry[154], increasing number of licensed carriers,[155] increasing intermodal carriage,[156] increasing savings due to the substantial drop in the cost of holding inventories,[157] and increasing demand for brokering services due to the influx of small trucking firms into the motor carrier industry.[158]

Similar to the impact of federal deregulation, the deregulation of land freights in Puerto Rico would likely reduce transportation costs for the Puerto Rican business community and ultimately, for consumers. Deregulation of land freight rates in Puerto Rico may potentially lead to trucking prices closer to those of the mainland. Moreover, it will increase flexibility of industry participants to negotiate directly and set prices, often with contract requirements that are more sophisticated and complex (for example, including provisions such as advertising incentives).  It would also lead to a reduction in consumer prices.

In Puerto Rico the Transportation and Public Services Bureau (NTSP, by its Spanish acronym), is the agency that regulates public and private transportation.  On December 23, 2020, the NTSP issued Circular letter 2020-35 temporarily increasing the minimum inland transportation freights by 35%, without identifying the impact on the economy. While the Circular letter has been enjoined by the local Court of Appeals[159], the decision to enforce the increase in rates appears to have coincided with a new interpretation of Act 75-2017 that expanded NTSP's regulations across new segments of the economy, including manufacturing and retail. In effect, this new interpretation of the law expanded regulation rather than deregulating as required by the Fiscal Plan. Retailers and manufacturers have historically established private contracts with carriers to transport merchandise to the point of sale, that were not under the purview of NTSP's rate setting. The pricing in these contracts has been negotiated often based on volume rather than distance, and often include other financial incentives, such as parking reimbursement, payment for advertising the company logo and public responsibility insurance, among others. The expansion of business segments covered by the regulation will directly impact consumer goods prices for all people in Puerto Rico. The tariff rate in Puerto Rico, if widely applied and enforced, would result

---

[151] McMullen, B. Starr. 1987. "The Impact of Regulatory Reform on U.S. Motor Costs. A Preliminary Examination." Journal of Transportation Economics and Policy.

[152] The average interstate truck load rates (TL)fell nearly 25% between 1977 and 1982 and the average less-than-truck load rates (LTL) fell nearly by 12%. See for example Owen, Diane. S. 1988. Deregulation in the Trucking Industry. Bureau of Economics. Federal Trade Commission

[153] Trucking Deregulation in the United States. September 2007. Submission by the United States to the Ibero-American Competition Forum

[154] Moore, Thomas Gale. Trucking Deregulation. The Concise Encyclopedia of Economics. Library of Economics and Liberty. https://www.econlib.org/library/Encl/TruckingDeregulation.html. Accessed July 22, 2020

[155] Ibid.

[156] Ibid.

[157] Ibid.

[158] Crum, M.R. Summer 1985. "The Expanded Role of Motor Freight Brokers in the Wake of Regulatory Reforms." Transportation Journal, pp. 5-15

[159] Cámara de Comercio de Puerto Rico v. Negociado de Transporte y Otros Servicios Públicos, KLRA202100025 (April 12, 2021)

in an estimated per mile trucking rate equal to between $5.55 and $7.51 per mile based on the rate schedule contained in the recently nullified Circular 2020-35. This compares to an average per mile cost of $2.74 for the U.S. mainland.[160] The regulated rates in Puerto Rico are significantly higher (more than double) than in most regions of the U.S. If Puerto Rico were to deregulate pricing within the trucking industry, it is expected that per mile rates would decline to a level more consistent with other U.S. regions. Furthermore, NTSP would be better equipped to focus on compliance with environmental and safety regulations in the absence of tariff regulation.

The 2021 Fiscal Plan recommends the Government retract the extension of the tariff setting function of the NTSP to private contracts. The NTSP should maintain regulatory responsibilities over the previously covered segments of the economy that hauled cargo in spot transactions, without including private contracts. Based on the business model of the consumer goods distributors and their constant use of carriers, the tariff structure is not practical and it will disrupt their distribution models. The actual contracting model is a good example of how a free market operates and has proven to be successful. The NTSP should consider deregulating all of the tariffs to carriers after performing an in-depth analysis of the benefits and the costs associated with enforcing such tariffs. In addition, when increasing rates for covered segments, NTSP should ensure more inclusive procedures are instituted to prevent sudden unannounced changes, and that any proposed changes are supported by empirical data and analysis. This evidence should take into account impacts on industries and the economy as a whole. Finally, any new regulations should ensure they do not create undue barriers to entry for new market participants in the trucking industry. Currently, the Oversight Board is undergoing an analysis, including stakeholder meetings, to determine the nature and timing of next steps that will best serve the economy. It is crucial that any regulations should not create undue financial barriers to entry for new market participants in the trucking industry.

In addition, the NTSP should review the complete regulations to eliminate duplicate permitting processes between OGPe and the NTSP and to eliminate unnecessary documentation and processes required of carriers that add costs and are extremely time consuming.

### 9.6.1   *Reform design parameters*

The NTSP should undergo the regulatory process to update the regulations required under Law 38-2017, the Uniform Administrative Proceedings Act, which includes notifying the public of the regulations to be approved, provide opportunity for citizen participation, including public hearings when necessary or mandatory, submit the regulations to the Department of State for the corresponding approval. The NTSP must also submit the proposed regulation to the Oversight Board per PROMESA Section 204(b)(4). The Oversight Board recommends to the NTSP that it enhance the review process by including with its proposed regulation a study by a credible and independent economist built on a sound empirical foundation of the market for trucking services in Puerto Rico, including such details as shipping rates actually paid, trucking firm sizes, the number of trucking firms, and the number of firms using trucking services. The study should also include a simulation on the economic impact on any tariff increase on consumer prices, economic growth and tax collections. Moreover, the regulations should be reviewed to ensure they do not place oversized burdens on the trucking industry. It is critical that NTSP shares its evaluation methodology with stakeholders to ensure transparency in the process.

The regulations should also address reducing barriers to entry into the trucking sector, ensuring environmental and public safety without onerous requirements for trucking services providers.

To successfully implement deregulation of on-Island freights, the Government should accomplish the following action items by their respective deadlines:

---

[160] This estimate assumes an average trip of 55 miles which is half the distance from the two furthest land transport points in Puerto Rico (San Juan to Mayaguez)

EXHIBIT 55: REQUIRED IMPLEMENTATION ACTIONS FOR ON-ISLAND FREIGHTS REFORM

| | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2022** | ▪ Revert tariff application to companies with negotiated contracts with carriers | ▪ NTSP | ▪ April 30, 2021 |
| | ▪ Revise regulation to eliminate duplicate permitting processes, excessive requirements and documentation to carriers and clarify that contracts between carriers and companies are exempt from tariff requirements. | ▪ NTSP | ▪ December 31, 2021 |

## 9.7     Strengthen offshore investment attraction efforts

**To transform Puerto Rico into a more competitive destination for offshore investment, the Department of Economic Development and Commerce (DDEC, by its Spanish acronym) should work together with Invest Puerto Rico (IPR), the Island's Investment Promotion Agency (IPA), in developing an economic development plan and providing them the tools and the resources to execute the strategies that would bring new investment, jobs and opportunities for local businesses to grow.**

**During FY2021, Invest Puerto Rico (IPR) prepared to execute several strategies for attracting new investment of life sciences and air cargo companies.** IPR developed and published their promotional plan, their annual report and their monthly KPIs as required in the 2020 Fiscal Plan. Their efforts to attract investment generated a pipeline of approximately 1,700 in potential jobs and $308 million in capital investment for the second half of the fiscal year. They attracted two life sciences companies that have agreed to set up operations in Puerto Rico, with $228 million of capital investment and the creation of 400 high paying jobs. Even though they have been able to reach their goals in leads and opportunities closed, the investment attracted has not produced the jobs and the capital investment expected.

Attracting job-creating investments is crucial to Puerto Rico, as the number of business establishments in Puerto Rico was already in decline before the 2017 hurricanes.[161] Jurisdictions across the globe have leveraged IPAs to attract offshore investments, fuel economic growth, and create jobs for their residents.[162] Effective investment promotion efforts are especially important in the aftermath of the COVID-19 pandemic. Off-Island investments (from both U.S. mainland and international companies) and from companies that establish transshipment centers in Puerto Rico to benefit from the air cargo and passenger transfer hub waiver granted by the U.S. Department of Transportation, will play a crucial role in supporting economic growth and creating jobs necessary to help Puerto Rico economically recover from the COVID-19 pandemic. To achieve this, IPR partnered with the Pharmaceutical Industry Association (PIA) on an extensive analysis of the Island's competitiveness with regards to other similar jurisdictions in the U.S. and abroad to be able to target manufacturing companies considering shifting their supply chains to the U.S. **In addition, Invest Puerto Rico is leading a multi-sectoral Air Transshipment Committee** that has developed a comprehensive strategic plan and is actively working towards implementing initiatives to support the global logistics industry with the enactment of the U.S. DOT transshipment waiver, granted to Puerto Rico in April 2020.  This collaboration, in addition to establishing new air carriers on the Island, should increase direct routes, and stimulate new markets through Life Sciences company attraction, and expanding usage of the Foreign-Trade Zone (FTZ) status of the Island.

Stronger investment promotion will also help ensure that the Island can effectively compete with mainland states and other countries for critical investments aligned to the Island's competitive

---

161 Puerto Rico Department of Labor and Human Resources, Bureau of Labor Statistics, "Puerto Rico Economic Analysis Report: 2015-2016," 2016

162 In Ireland, for example, the Industrial Development Authority (IDA) has helped secure investments from many of the world's top pharmaceutical firms and software companies, and more than 210,000 Irish residents—nearly 10% of the country's workforce— are employed by IDA client companies. See IDA Ireland, "Local impact"; the World Bank Group via International Labor Organization, "Labor force, total – Ireland," 2019

advantages (e.g., life sciences research and manufacturing, knowledge services, and hospitality and tourism) – increasingly important as companies look to shift their supply chains in the aftermath of the COVID-19 pandemic.[163]

### 9.7.1    IPR in comparison to other IPAs

Unlike other IPAs, Invest Puerto Rico only has one mandate: attract offshore investment (primarily from the mainland) to the Island. For this purpose, IPR has an annual budget of $5 million, $1.4 million of which is allocated to investment promotion.[164] However, according to an analysis by the OECD of IPAs in its member states, national IPAs commonly have about six mandates, including inward foreign investment promotion, export promotion, innovation promotion, regional development promotion, and granting financial incentives.[165] Sub-national IPAs (such as IPR) often have many of these same responsibilities, as well as domestic investment promotion, issuing relevant business permits, and operation of a business one-stop shop. To support IPR's promotional campaign as part of the broader effort to help the Island recover from recent natural disasters, Vivienda has allocated $7 million in CDBG-DR funding to IPR to be used in FY2021. However, for future years DDEC should consider providing an increased budget to IPR tied to their ability to raise incremental new investment.

### 9.7.2    Reform design parameters

The 2021 Fiscal Plan recommends the Government adhere to a set of parameters to fully empower IPR to effectively attract growth-generating and job-creating investments to the Island. Specifically, the Government should:

- **Require IPR to publicly release performance data** clearly illustrating the effectiveness of its promotional campaign in bringing incremental investments to Puerto Rico.

- **Ensure that IPR implements the strategic plan it developed to compete with U.S. mainland states and other economies for investments** that arise as companies move to shift their supply chains to the U.S. to minimize risk.

- **Partner with DDEC and DPR to implement the integrated strategic plan developed to leverage the U.S. Department of Transportation (DOT) air hub waiver** authorizing international air cargo and passenger transfers in Puerto Rico's international airports to foster economic development and spur tourism (if effectively utilized, the waiver is expected to generate $30 million in additional payroll by 2022).[166] The waiver authorizes international air carriers to transfer cargo and passengers from any of their aircrafts to any of their other aircrafts restricted in many U.S. Airports. The activities allowed by the waiver within Puerto Rico international airports are:  to transfer cargo and passengers from any of their aircrafts to any other aircraft provided that the aircraft are operating to/from a point in the carrier's homeland; make changes in the type of number of aircrafts used to transfer cargo and passengers, provided that in the outbound direction, the transportation beyond Puerto Rico is a continuation of the transportation from the carrier's homeland to Puerto Rico, and in the inbound direction, the transportation to the carrier's homeland is a continuation of the transportation from behind Puerto Rico. It also allows the commingling of cargo and passenger traffic moving in foreign air transportation with cargo and passenger

---

163 Rapoza, "New Data Show U.S. Companies are Definitely Leaving China," 2020
164 For comparison, JobsOhio has an annual budget of $134 million, Invest Atlanta of $40 million, and Enterprise Florida of $37 million. The average national IPA, meanwhile, as a budget of $68 million ($12 million of which is allocated to investment promotion) and the median national IPA a budget of $12 million (with $5 million allocated to investment promotion). See Organization for Economic Cooperation and Development, "Mapping of Investment Promotion Agencies in OECD Countries," 2018
165 These include inward foreign investment promotion (100% of IPAs), export promotion (56%), innovation promotion (56%), promotion of regional development (50%), green investment promotion (44%), domestic investment promotion (41%), granting financial incentives (31%), outward investment promotion (28%), trade facilitation (25%), and screening and approving investors (25%); see Organization for Economic Cooperation and Development, "Mapping of Investment Promotion Agencies in OECD Countries," 2018
166 Issued in February 2020, the waiver is expected to allow at least 10 new flights per day, creating 900 new jobs and increasing payroll by about $30 million (according to a study by Estudios Tecnicos, Inc.)

traffic not moving in foreign air transportation. They should also work together with DDEC to renew the waiver in 2022.[167]

- **Continue its efforts to attract companies in the eight targeted industries:** Energy, Creative Industries, Innovation & Entrepreneurship, Finance & Insurance, Professional Services, Technology, Air Cargo and Lifesciences.

- **DDEC should provide IPR with the tools and capabilities to offer existing idle Government properties** (e.g., abandoned industrial parks, factories, storage facilities) that could be used by potential investors as they explore the possibility of running their businesses on the Island. The Oversight Board encourages close coordination between the DDEC and IPR to allow IPR to present to investors a more compelling offer, as finding the right location to run operations in a new area is time-consuming and challenging. It could also provide IPR with a new source of revenue (e.g., through brokerage fees on each transaction) and help the Government leverage their unused properties.

### 9.7.3   Reform targets

The 10-year collaboration agreement between DDEC and IPR establishes a set of multi-year performance targets. Despite the disruptions caused by the pandemic, the growing number of firms considering shifting their supply chains to the U.S. to minimize risk in the aftermath of the pandemic—if well targeted—will ensure that IPR can meet or exceed its contractual obligations. As such, IPR should generate, according to their collaboration agreement, by the end of FY2023, at least: 4,400 new businesses, 26,000 new jobs, $923 million in capital investments, and $40,000 in average payroll committed by each new business.

To successfully implement investment attraction reform, the Government should accomplish the following action items by their respective deadlines:

EXHIBIT 56: IMPORTANT ACTIONS FOR IMPLEMENTING EFFECTIVE OFFSHORE INVESTMENT ATTRACTION

| | Required implementation actions | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2021** | Identify KPIs that IPR will report to AAFAF on a monthly basis | IPR, AAFAF | Completed |
| | Develop clear list of target sectors and companies that IPR will target as it works to take advantage of efforts to rebalance supply chains toward the U.S. and capitalize on the DOT air hub waiver and discuss with Oversight Board | IPR | Completed |
| | Establish Airhub working group comprised of DDEC, DoT, DPR, Ports Authority, Land Administration, Private Sector and the FOMB  to design and implement economic development strategy that leverage the newly issued Air Transit  Waiver | DDEC | Completed |
| | Send KPI report to AAFAF | IPR | Completed |
| | Update 2019-2020 promotional plan to clearly detail strategy to capture investment from companies rebalancing their global supply change and those that can benefit form the Air Transfer Hub Waiver | IPR | Completed |
| | Publish annual performance report | IPR | Completed |
| | Design economic development strategy and share with Oversight Board | Working group | Completed |
| | Discuss economic development strategy and projected costs with Oversight Board | Working Group | Completed |
| | Publish promotional plan for upcoming calendar year | IPR | Completed |

---

167 With Federal approval, the waiver can be renewed every two years

| Required implementation actions | Owner | Deadline |
|---|---|---|
| • Develop a value proposition on Puerto Rico's supply chain value for Biden Administration | • IPR / DDEC | • July 31, 2021 |
| • Connect the local Innovation & Entrepreneurship ecosystem to global capital | • IPR / Working Groups | • July 31, 2021 |
| • Coordinate with PRIDCO to continuously receive updated list of government properties | • IPR/PRIDCO | • July 31, 2021 |
| • Have 20+ new qualified properties listed on State book | • IPR | • July 31, 2021 |
| • Support 5G Zone Center of Excellence by completing marketing material and webpage | • IPR | • July 31, 2021 |
| • Complete marketing material and webpage, including opportunity for companies to sign up | • IPR | • July 31, 2021 |
| • Conduct business mission in targeted geographies in coordination with strategic partners | • IPR / Working Groups | • October 31, 2021 –ongoing |
| • Implement strategy to attract targeted industries beside manufacturing (technology, professional services, finance and insurance, etc.) | • IPR / Working Groups | • October 31, 2021 –ongoing |
| • Conduct familiarization tour with select group of investors and C-suite executives | • IPR | • December 31, 2021 |
| • Develop and execute an outreach program to identify and target prospective transshipment companies | • IPR | • December 31, 2021 |
| • Develop customized business cases to pitch to companies | • IPR | • December 31, 2021 |
| • Implementation of strategy to attract manufacturing reshoring to the U.S. | • IPR | • December 31, 2021 |
| • Develop and execute an outreach program to target companies, including event activations, campaigns and other business development tactics | • IPR / Working Groups | • December 31, 2021 |
| • Conduct familiarization tour with select group of site selectors and corporate real estate | • IPR / Working Groups | • December 31, 2021 |
| • Support DDEC and work with key industry stakeholders to help strengthen sector | • IPR / DDEC | • December 31, 2021 |
| • Have a comprehensive list of real estate assets that IPR can market on web page that represents opportunities across sectors, sizes, and geographies | • IPR | • December 31, 2021 |

(Left column label: **To be completed in FY2022**)

## 9.8     Prime tourism attraction efforts for success

**To continue Puerto Rico's transformation into a leading Caribbean tourism destination, the Government should expand the mandate and resourcing of Discover Puerto Rico (DPR), the Island's Destination Marketing Organization (DMO).** Despite its natural beauty and rich culture, Puerto Rico underperformed as a tourism destination even before the 2017 hurricanes. For example, the Island was ranked 55th in the 2015 *Travel and Tourism Competitiveness Report*—an independent assessment of the strength of the tourism sector in 141 economies conducted by the World Economic Forum.[168] Destinations across the globe have leveraged DMOs to attract visitors, generate economic activity, and create jobs.[169] In Puerto Rico's case, DPR became fully operational in early 2019, when it launched its first promotional campaign and played an important role in driving record tourism performance in 2019. Effective management of on- and off-Island tourism marketing efforts will remain especially critical in the aftermath of the COVID-19 pandemic, which effectively crippled global tourism and the Island's industry and associated sectors (e.g., cruises). The leisure and hospitality industry was one of the hardest hit sectors in Puerto Rico, with 43% of employment lost in April 2020 (approximately 35,000 jobs)."[170]

COVID-19 has had an enormous impact on global tourism and the Island's tourism sectors. As Puerto Rico looks forward, the Oversight Board is encouraged that, according to third-party travel

---

168 The mainland, for comparison, was ranked 6th that same year. See World Economic Forum, Travel and Tourism Competitiveness Index 2015, 2015. Puerto Rico has not been participating in this Index after 2015, therefore there are no recent numbers
169 For example, the Barbadian Tourism Product Authority (TPA), created in 2014, helped increase the travel and tourism sector's direct contribution to Barbados' GDP (5.4% contribution in 2015, 10.3% contribution in 2016) and employment (4.3% contribution in 2015, 9.8% contribution in 2016). The creation of a DMO in New Orleans, LA was linked to higher business activity in other nearby cities as higher tourism demand for flights to New Orleans facilitated economic development in surrounding areas. And, in Chicago, the creation of a DMO helped raise the city's business exposure, resulting in a partnership between the city's DMO and its World Business Chicago (WBC), the city's economic development agency, to promote the city as both a tourist and business destination. As a result, 70% of WBC marketing is conducted via Chicago's DMO; see Oxford Economics, "Destination Promotion: An Engine of Economic Development," 2014
170 U.S. Bureau of Labor Statistics

data, Puerto Rico had been moving the needle of growth in this sector pre-COVID-19 and that it is starting to recover from the pandemic. The tourism sector's contributions to the economy and Island-wide employment surpassed historic trends in 2019,[171] air arrivals and lodging demand reached record levels in 2019,[172] and DPR's media campaign is credited with spurring higher spend and longer hotel stays among visitors.[173]

With a limited budget on the first six months of FY2021, DPR had to cut expenses by 56% by reducing staff from 60 to 45, reducing salaries to top earners and/or cancelling non-essential contracts. However, this did not stop their promotional efforts since they shifted their marketing and sales activities to digital. These efforts resulted in Puerto Rico achieving the highest number of web searches for people considering traveling in the coming months. In the past months, DPR has taken several initiatives to keep Puerto Rico in the top of mind of travelers, such as doing virtual tours of the Island and integrations in programs such as morning talk shows. In addition, they have been preparing for the recovery of the industry by developing a comprehensive rapid recovery plan. However, implementing their recovery plans will be dependent on availability of funds from PRTC and/or additional funding from the CARES Act and CBDG-DR.

### 9.8.1    DPR in comparison to other U.S. and Caribbean Destination Marketing Offices (DMOs)

DPR has a smaller mandate and lower budget in comparison to other DMOs. In FY2021 DPR has only received 40% or $6 million of the contracted budget from the PRTC. The typical DMO markets to six distinct segments: visiting individuals and families; groups (e.g., family reunions); Meetings, Incentives, Conferences, and Exhibitions (MICE); events (e.g., major sports tournaments); local residents; and airlines (e.g., purchasing airline ads, subsidizing seats). DPR, however, is only responsible for marketing to individuals, groups, and MICE. PRTC continues to manage event, internal, and airline marketing. DPR also has a smaller budget than other Caribbean destinations —$25 million (or $943 per available hotel room) or 60% of the average budget of $42.1 million (or $1,485 per room) for Caribbean DMOs.[174]

### 9.8.2    Reform design parameters

The 2021 Fiscal Plan recommends the Government adhere to a set of parameters to enable DPR to capitalize on its early successes and continue leading the Island's emergence as a leading tourist destination. Specifically, DPR should:

- **Work in conjunction with the PRTC in internal tourism, airline, and event marketing** to ensure a uniform and consistent approach and to leverage DPR's expertise and knowledge on research and digital media.

- **Implement passenger component of Air Transit Hub strategy developed by DPR** that capitalizes on the recently-issued Federal DOT waiver. This would involve recruiting a consultant to work with the airlines to align the air transit hub with their business models. DPR also needs funding for marketing the cargo hub to international markets to generate the demand. There is a possibility that additional CBDG-DR funds be assigned to DPR for marketing and promotions that could be used for this purpose.

- **Maximize promotional dollars from funds obtained from the CARES Act and CBDG-DR.** To support DPR's promotional campaign as part of the broader effort to help the Island recover from recent natural disasters, Vivienda has allocated $7.8 million in CDBG-DR

---

171 World Travel & Tourism Council, "Puerto Rico: 2019 Annual Research: Key Highlights," 2019.

172 Aerostar, AirDNA, Discover Puerto Rico, Smith Travel Research. In 2019, Puerto Rico welcomed 5.2 million visitors (2016, the previous record-holder, had only 4.8 million air arrivals). Similarly, lodging demand reach 4.7 million units (in both hotels and independent lodging units), up from 4.6 million units in 2017.

173 ADARA Impact, Arrivalist. Visitor exposed to DPR media stayed 4.8 days on average (vs. 4.3) and spent an average of $217 on lodging per night (vs. $199).

174 DPR budget is the established amount on 10-year contract with PRTC, in 2020-21 DPR have not received contracted amount due to lower room tax collected by PTRC. Numbers for other Islands comes from Destinations International.

funding to DPR for digital and broadcast advertising. It must be spent before February 8, 2022. In addition, the Government assigned $15.8 million from CARES Act for the same purpose to be spent before December 31, 2021. These funds were intended to increase marketing efforts on Puerto Rico to help the Island recover from the hurricanes and the Covid-19 pandemic, but because the PRTC have not been sending the contracted funds for DPR, these funds will be used for regular promotion.

- **Continue to strengthen the DPR brand through all marketing and promotions by maintaining a consistent message on Puerto Rico strengths as a destination.**

- **Implement destination visitor research program** to pivot marketing campaigns according to visitor's preference and to communicate to Government agencies areas of opportunities on infrastructure and services.

- **Implement a Small and Medium Enterprises (PYMEs, by its Spanish acronym) recovery plan to help the industry prepare for reinvigorated tourism after the pandemic.**

### 9.8.3   Reform targets

DPR's initial performance indicates that the organization can effectively compete with top-ranked Caribbean DMOs and destinations in attracting visitors and growing the Island's tourism sector. Given the COVID-19 pandemic's impact on global tourism, however, no targets were in effect for FY2021.[175] Nevertheless, after massive vaccination in the U.S. and demonstrated interest from travelers to come to Puerto Rico, DMO should work toward achieving the targets below in FY2022:

- -10% vs. pre-COVID in the tourism sector's direct contribution to GNP

- -12% vs. pre-COVID in direct contribution to employment

- -10% vs. pre-COVID average travel receipts per visitor per year

- -14% vs. pre-COVID in tourist visitors per year

- -25% vs. pre-COVID meetings and conventions attracted to the Island[176]

To successfully implement investment attraction reform, the Government should accomplish the following action items by their respective deadlines:

---

[175] Targets are reduced in response to a projected 71% reduction in global air travel in 2020 (relative to 2019) and a 58% reduction in 2021 (also relative to 2019).

[176] Targets are reduced in response to a projected 71% reduction in global air travel in 2020 (relative to 2019) and a 58% reduction in 2021 (also relative to 2019)

EXHIBIT 57: IMPORTANT ACTIONS FOR IMPLEMENTING EFFECTIVE TOURISM ATTRACTION

| | Action item | Owner | Deadline |
|---|---|---|---|
| To be completed in FY2022 | Create and share Puerto Rico's Travel and Tourism Competitiveness scorecard with Fortaleza, the Legislature, PRTC, and the Oversight Board | DPR | Completed |
| | Design air hub strategy and share with Oversight Board | Working Group | Completed |
| | Design air hub strategy with Oversight Board | Working Group | Completed |
| | Publish promotional plan for upcoming calendar year | DPR | Completed |
| | Establish air hub working group comprised of DDEC, DPR, IPR, Land Admin, Ports and private sector to design economic development strategy that leverages new USDOT air hub waiver. | DDEC | July 1, 2021 |
| | Assure funding for implementation of passenger component of Air Transit Hub | DPR/DDEC | July 31, 2021 |
| | Establish and document Strategic marketing plan (to drive demand) for passengers through Air Transit Hub | DPR | July 31, 2021 |
| | Participate with PRTC in the development of internal tourism marketing strategy | DPR/PRTC | July 31, 2021 |
| | Participate with PRTC in development of airline marketing strategy | DPR/PRTC | July 31, 2021 |
| | Implement 1st Phase of Small and Medium Enterprise (PYME) recovery plan | DPR, Governor | August 31, 2021 |
| | Implement destination visitor research program | DPR, PR & Federal Government | October 31, 2021 |
| | Launch Phase II of (PYME) recovery plan | DPR | December 31, 2021 |
| | Secure fully-funded Co-op budget of $5M, per the law (Act 2017-17) | DPR | December 31, 2021 |
| | Implement passenger component of Air Transit Hub project based upon strategy developed by DPR - Launch passenger recruitment | DPR, DDEC/PRTC | January 31, 2022 |
| | Launch Phase 1 of Island wide multimedia content repository collabatoria | DPR | January 31, 2022 |
| | Generate $12:1 ROI for overall investment in PYME recovery plan | DPR | June 30, 2022 |
| | Launch Phase II of Island wide multimedia content repository | DPR | June 30, 2022 |

# Chapter 10. Power sector reform

## 10.1   Introduction and context for energy reform

Affordable, reliable, safe, and resilient electric power service is essential for Puerto Rico's economic growth and development. It is a fundamental enabler of the people of Puerto Rico's livelihoods, and remains a critical service that needs to be safeguarded, particularly in light of the outsized catastrophic events in 2020 (e.g., January 2020 earthquakes, COVID-19 pandemic). As an important element of household and business activity, electricity is also a critical factor for attracting and maintaining investment in Puerto Rico. Since 1941, the Puerto Rico Electric Power Authority (PREPA) has been responsible for providing electricity to Puerto Rico. PREPA is a public corporation, owned and operated by the Government of Puerto Rico.

PREPA has been encumbered by numerous financial and operational issues. Over the years, PREPA has failed to update rates to cover base operating costs, neglected to invest in modernizing the system, avoided adequately funding the utility's pension system, and underinvested in maintenance and resiliency initiatives for its assets. Furthermore, prior to filing for PROMESA Title III protection, PREPA incurred significant legacy debt obligations, failed to implement a long-term capital improvement program, and made decisions based on short-term political gains (e.g., avoiding modest rate increases), all of which have culminated in consistently poor and unreliable service.

This operating model has created an untenable financial and operational situation for PREPA. Politicized management and volatile fuel prices – exacerbated by declining demand and an economic contraction – have resulted in PREPA's inability to service its debt, and ultimately

resulted in PREPA seeking PROMESA Title III protection in July 2017.[177] For several years prior to filing for PROMESA Title III protection, PREPA lacked access to the capital markets to help fund grid and generation maintenance and modernization investments, further contributing to the poor quality of service experienced by the Island's residents and businesses.

Underinvestment and underdevelopment of the grid, poor maintenance practices, and workforce losses all contributed to an unsatisfactorily performing power sector. Puerto Rico has almost twice as many forced outages as the U.S. industry average.[178] PREPA also significantly underperforms against mainland utilities on multiple reliability and customer service dimensions, as well as safety and operational metrics:

- **The reliability of service provided by PREPA to Puerto Rico's residents and businesses remains well behind industry standards when compared to benchmarks from** the Institute of Electrical and Electronics Engineers (IEEE)[179]: For instance, the median performance among the U.S. utilities reporting in the 2020 IEEE Benchmark[180] is a System Average Interruptions Frequency Index (SAIFI) of 1.12 interruptions per year and a System Average Interruptions Duration Index (SAIDI) of 126 minutes per year[181]. Whereas, for 2019, PREPA reported a SAIFI of 4.6, and a SAIDI of 675 minutes. Outside reviews suggest service reliability may be worse than reported by PREPA. For example, an assessment conducted by LUMA – using the industry standard IEEE methodology – as part of its Front-End Transition responsibilities and submitted to the Puerto Rico Energy Bureau (PREB) reports a SAIFI of 9.8, and a SAIDI of 1,097 minutes for PREPA in 2019.

EXHIBIT 58: RELIABILITY METRICS COMPARED TO PEER GROUP MEDIAN

| Metric | PREPA CY 2019 | PREPA CY2019 (calculated by LUMA) | IEEE median, 2019 188 |
|---|---|---|---|
| System Average Interruption Duration Index (SAIDI) Minutes per year | 675 | 1,097 | 126 |
| System Average Interruption Frequency Index (SAIFI) Number of interruptions per year | 4.6 | 9.8 | 1.12 |

- Employee Safety incidents are high by utility standards: PREPA's Recordable Incident Rate for 2019 is 8.76 while the Edison Electric Institute (EEI) average rate is 1.78.[182]

- Vegetation management issues caused 17% to 28% of service interruptions in 2020, representing an improvement when compared to the 35% to 45% of 2016[183]. PREPA lacks a comprehensive vegetation management strategy and has historically been slow to spend allocated budget amounts for tree-trimming initiatives[184] During the 2020 fiscal year, PREPA

---

177 "Puerto Rico's Power Authority Effectively Files for Bankruptcy", New York Times, 2 July 2017

178 PREPA reported 417 forced outages during 2020; U.S. Energy Information Administration (EIA), Independent Statistic & Analysis, Major Disturbances and Unusual Occurrences, Year-to-Date 2020

179 The IEEE is a technical professional organization that develops and publishes standards related to the collection, measurement and calculation of key electrical reliability indices, including System Average Interruption Duration Index (SAIDI) and System Average Interruption Frequency Index (SAIFI). In order to benchmark a utility's performance in SAIDI and SAIFI against that of other utilities, IEEE provides rules on how data can be collected, measured and calculated according to the same standards. Participation is limited to North American electric entities

180 Based on 2019 data

181 IEEE Benchmark Year 2020 Results for 2019 Data, 2020 Distribution Reliability Group Virtual Meeting

182 The Edison Electric Institute (EEI) provides comparable benchmarks specific to transmission and distribution operations in the United States.  EEI was established in 1933, is an association that represents all U.S. investor-owned electric companies. Its members provide electricity for 220 million Americans, operate in all 50 states and the District of Columbia, and directly employ more than 500,000 workers

183 "…[PREPA] describes itself as always playing a catch-up game on maintenance — following outages, instead of improving the fundamental system." Fisher and Horowitz, Expert Report, p 33

184 PREPA, "Professional & Technical Outsourced Services," B2A YTD-Expenses, Budget to Actual Variance Report for the Second Quarter of Fiscal Year 2021, (data set, February 16, 2021)

only spent 10% of its $50 million budget for vegetation management. Mainland U.S. utilities, by contrast, typically have operating budgets where vegetation management is one of the largest spend category. More recently, PREPA has shown improvement in this area. As of February 2021, PREPA has obligated 89% of its $70.5 million budgeted for vegetation management, out of which 20% ($14 million) has been spent. In terms of miles cleared, as of February 2021, 732 miles out of 2,595 had been cleared, representing approximately 28% of total miles contracted.[185]

■  Puerto Rico's emissions from electricity generation remain relatively high as compared to the rest of the U.S. due to a high reliance on fossil fuels and the continued use of older and inefficient facilities. This is due to a severe lack of investment into generation assets, low asset reliability, and maintenance of a very high reserve margin.

  –  **High reliance on fossil fuels:** Puerto Rico's generation fleet is highly dependent on fossil fuels. In FY2020, over 97% of the Island's electricity was generated using fossil fuels[186]. As a comparison, the U.S. national average was approximately 60% for the same period. Fossil fuel generation makes Puerto Rico vulnerable to changes in fuel prices, which can substantially increase generation costs and thus increase electricity prices for its residents.

  –  **Lack of capital investments in new generation assets:** Minimal capital investments into generation assets have resulted in an aged and highly unreliable fleet; the average age of PREPA's generation fleet is 41 years[187] compared to the U.S. average of only 18 years.[188] As a result, asset reliability has been poor, and PREPA is often forced to rely on its diesel generators that would otherwise be inactive or retired.[189]

  –  **Maintenance of a very high reserve margin:** PREPA has historically maintained a very high reserve margin, keeping more than double the capacity needed to serve demand.

Previous Fiscal Plans of the Commonwealth and PREPA have outlined a comprehensive power sector transformation to address PREPA's financial and operational challenges, which have been caused by mismanagement, underinvestment and underdevelopment of the grid, as well as poor operations and maintenance practices. Although the first steps on PREPA's transformation journey, that started over the last 3 years, have already led to increased financial stability, a number of challenges still lie ahead.

## 10.2   Vision for power sector transformation

Over the next years, the power sector in Puerto Rico must continue its transformation and modernization to support the delivery of reliable, clean, and affordable power. The Commonwealth must continue to implement a comprehensive energy sector reform to enable a successful transformation and unlock the resulting growth from the 2021 Fiscal Plan projections. The successful transformation of Puerto Rico's power sector depends on:

1.  **Implementing regulatory reform:** A strong and independent energy sector regulator is essential for injecting certainty and stability into the energy market, promoting much needed investments, and enforcing compliance with the energy sector transformation's objectives. In recent years, the framework of regulatory reform has been approved and an independent

---

[185]      FY2021 Fiscal Plan Initiatives Reporting, January 15, 2021; PREPA's Vegetation Management report, February 2021

[186] "Puerto Rico: Profile Overview." U.S. Energy Information Administration, last modified November 21, 2020

[187]      PREPA, *2019 Fiscal Plan*, p 30

[188]      US Congress, *Exploring Energy Challenges and Opportunities*, p 4

[189]      "A review of PREPA's generation patterns reveals that PREPA, in fact, increased its reliance on the diesel generation fleet in FY2015 and FY2016, doubling its use of distributed generation turbines and tripling its use of the diesel Aguirre CC plant." Fisher and Horowitz, *Expert Report*, 31-32

regulator, the Puerto Rico Energy Bureau (PREB), has been established. The focus in coming years will be continuing to support the independence of the regulator and enabling the regulator to execute on its mandate. This will be accomplished by developing and strengthening the regulatory framework and promoting greater transparency and accountability.

2. **Transitioning the operation and management of PREPA's electricity grid and generation assets to private operators**, **while moving the energy system to 100% renewables:** Attracting a private operator to manage and operate Puerto Rico's Transmission and Distribution (T&D) network will improve affordability, operational performance and customer service, support rigorous capital project execution to modernize the system, strengthen grid resilience, and ensure ongoing fiscal balance and control. As such, on June 22, 2020, the transformation of the Island's energy system took another step forward through the execution of the agreement[190] with LUMA Energy, LLC (LUMA). Under the agreement, LUMA is responsible for, among other activities, the operation and maintenance of the transmission and distribution assets and system. On November 10, 2020, the Puerto Rico Public-Private Partnership Authority (P3A) issued a Request for Proposals (RFP) to select one or more private operators for PREPA's existing generation assets. Two of the major tasks that LUMA, as the entity responsible for the Integrated Resource Plan (IRP) implementation, will have to enable and undertake are the transition of the power sector to 100% renewable energy, as mandated by Act-17, as well as the maximization and efficient delivery of federal funds for the modernization of Puerto Rico's energy grid.

3. **Restructuring legacy debt obligations:** To fund the transformation of Puerto Rico's power sector, PREPA will require access to capital markets. Given the utility's significant legacy debt obligations, a sustainable restructuring plan is necessary for PREPA to exit Title III and regain access to traditional credit markets. Without restructuring, customers will experience higher rates, resulting from repayment of a higher legacy obligation and risk premiums associated with the Title III case. Ultimately, successful restructuring of outstanding bonds and debt obligations will allow PREPA to achieve its transformation goals, thus modernizing Puerto Rico's power grid, and passing on subsequent efficiencies and cost savings to end users.

PREPA's Certified 2021 Fiscal Plan and the energy public policy and legal framework established by the Government of Puerto Rico[191] lays out the transformation roadmap. If successfully implemented, a reformed energy system will lead to a modernized and reliable energy service across the Island: a diversified fuel mix and reduced fuel costs, anchored on low-cost renewable energy generation resources; increased operational efficiencies; and a well-funded, financially sustainably utility. These outcomes will benefit the customers and businesses of Puerto Rico through more affordable, reliable, clean, and safe electricity service.

### 10.2.1  Energy regulatory reform and oversight

As previously stated, the current regulator of the power sector in Puerto Rico is the Puerto Rico Energy Bureau (PREB), which has been operational since its creation by Act 57-2014. PREB has the responsibility to "regulate, monitor, and enforce the energy public policy of the Commonwealth of Puerto Rico."

As Puerto Rico's energy sector is transformed into a vibrant, modern system, PREB will continue to be responsible for the development of a robust regulatory framework that will promote prudent investments by utilities, increase quality of service to customers, and ensure industry trends and technological advancements are appropriately incorporated into Puerto Rico's energy system. To that end, PREB's regulatory oversight will directly impact the utility and have significant influence

---

190    This agreement was deemed to be compliant with the Commonwealth's energy policy by PREB on June 17, 2020 and
       approved by PREPA's Governing Board, the Governor, and the Governor of Puerto Rico on June 22, 2020
191    Puerto Rico Energy System Transformation, Act No. 120-2018; Puerto Rico Energy Policy Act, Act No. 17-2019

on Puerto Rico's energy sector. To fully achieve its purpose, PREB should remain financially independent from the Government and its decisions, and its determinations should be free from any political influence or interference.

To ensure PREB becomes a best-in-class regulator, several structural changes are required, as detailed below. In addition, the following section provides a description of what PREB's roles and responsibilities will be in the long-term as well as the near-term delineation responsibilities between PREB and the Oversight Board.

*Long-term mandate, authorities, and expertise for the energy sector regulator*

To be effective, PREB's regulatory authority and its mandate to promote an efficient, reliable, resilient, and customer-responsive energy system must be clear and well-established. In a transformed energy system state (after emergence from Title III), PREB's responsibilities include (1) rate setting, (2) Integrated Resource Plan (IRP) approval and compliance oversight, (3) protecting customers, and (4) ensuring workforce safety.

*Rate setting for non-legacy debt:* PREB should "review and approve and, if applicable, modify the rates or fees charged by electric power service companies in Puerto Rico."[192] In doing so, PREB should ensure rates and rate structure are rational and predictable, minimize risk and "rate shock", and create incentives to support equitability and economic development. PREB should set a clear, transparent, and efficient process for rate cases. All rate adjustments and revisions, other than those approved under the plan of adjustment, must be approved by PREB before enactment. In this capacity, PREB must ensure that necessary operational frameworks are in place to not only provide a robust review process in line with best-in-class U.S. state regulators, but also ensure that rate reviews are conducted efficiently and in a manner that does not adversely impact service performance or consumer confidence.

Over the next years, PREB should encourage the implementation of several core principles within rate case proceedings,  including the development of dynamic rate structures (e.g., time of use, rate decoupling, unbundling), evaluating prudency of investments and cost of service, and analyzing the distribution of cost and revenue allocations.

*Integrated Resource Plan (IRP) approval and compliance:* PREB is mandated to "review and approve policies and strategic plans [...] in connection with energy resources integrated planning in Puerto Rico, and oversee compliance therewith."[193] During review, PREB should assess related policies and plans on whether they meet the objectives of Puerto Rico's energy public policy and promote energy service reliability, safety, efficiency, and affordability.

*Protecting customers and customer service:* PREB is responsible for ensuring energy prices are just and reasonable, investments are aimed at improving service quality, and reliability, and customers have access to information regarding their rights and responsibilities.  This includes reviewing potential policies, rates, and capital projects for their potential effects on customers and service quality, and ensuring customers understand and have the ability to voice their opinions regarding future decisions. PREB is also responsible for addressing customer complaints and ensuring customers are not subject to unjust or abusive practices by their energy providers.

*Ensuring safety:* PREB is responsible for ensuring the safe operation of Puerto Rico's utilities for workers and the public. This is particularly important given the high number of safety incidents PREPA has experienced by U.S. utility standards. PREPA experiences significantly higher workplace incidents than the average U.S. utility. From 2018 to 2019, PREPA's recordable Incident Rate fell from 10.7 in 2018 to 8.76 in 2019, yet it was nearly five times higher than the U.S. average of 1.78.[194] PREB should develop a comprehensive safety plan addressing overall

---

[192] "About the Puerto Rico Energy Bureau" at Puerto Rico Energy Bureau website. Accessed April 20, 2021.

[193] Ibid.

[194] The Edison Electric Institute (EEI) provides comparable benchmarks specific to transmission and distribution operations in the United States

safety culture at regulated entities and ensure that utilities have sufficient resources to comply with these plans. Finally, PREB should establish, track, and analyze key safety performance metrics, and monitor the effectiveness of utility safety programs.

*Regulator expertise*

To implement its long-term mandate in a robust and effective manner, PREB must build expertise on topics that reflect the core regulatory priorities facing most regulators:

■ Generation planning and dispatch

■ T&D reliable operations and capital planning

■ Workplace safety

■ Customer service

■ Rate-making

In addition, PREB can build expertise in topics that are increasingly addressed by regulators across the mainland so that Puerto Rico's energy sector is able to match pace with best-in-class utilities. By doing so, PREB can provide proper guidance to sector players on how to secure, modernize, and efficiently operate the grid. These topics include:

■ Contribution-in-lieu of taxes (CILT)

■ Renewable energy integration (distributed and commercial)

■ Weather-related risks (e.g., hurricanes, climate change)

*Authorities for the energy sector regulators during transformation*

Until PREPA emerges from Title III and the transformation of the energy system is complete, it is important to clearly delineate the role of the Oversight Board and PREB with respect to energy sector regulation. The table below describes the role of each entity during the transition period:

EXHIBIT 59: ROLES OF THE OVERSIGHT BOARD AND PREB DURING THE TRANSITION PERIOD

| | Oversight Board | PREB |
|---|---|---|
| **IRP** | Approves revenue requirements and expenditures in the Fiscal Plan for PREPA. PREPA's Fiscal Plan should be informed by the results of the IRP and provide a clear framework for executing the modernization of generation resources. | Approves the IRP. The IRP process shall be open and transparent so that third parties can understand inputs and methodologies behind each scenario and be able to participate and attend hearings to understand the decisions driving approval of the final capital plan and revenue requirement. |
| **Budget and rate-making** | Approves a yearly budget for PREPA that aligns with PREPA's Fiscal Plan and thus should align with revenue requirements and expenditures. | Authorize rates, except those approved under a plan of adjustment, (either formulaic or on an expedited manner) which align with the budget as certified by the Oversight Board. |
| **Utility debt** | Approves restructuring of existing debt through the Plan of Adjustment for PREPA. | No authority |
| **Liquidity management** | Oversees liquidity management in the energy system, to ensure that consistent and quality energy service to customers is not disrupted. | No authority |
| **Title III** | As the representative of PREPA in Title III, the Oversight Board has the exclusive right to file a Plan of Adjustment, which will contain any transformation-related agreements. | No authority |
| **Transition to Privately Managed Operations** | Approves any operator that engages with PREPA (e.g., T&D and generational operators). After the operators have been installed, the Oversight Board will continue to ensure compliance with PROMESA and the energy sector transformation objectives. The interaction between PREPA, the operators, and the Oversight Board will be determined at a later date. | Issues Energy Compliance Certificate and approves the following: performance metrics, rate orders (when applicable), System Operation Principles, System Remediation Plan, Integrated Resource Plan ("IRP"), among others. |
| **Other** | Track PREB's actions around distributed generation, net metering, and CILT to ensure the regulator is providing proper oversight over these critical topics. | Continues to exercise duties and responsibilities (e.g., addressing distributed generation, net metering, and CILT) as outlined in its enabling laws, except when doing so is inconsistent with the powers and authorities delegated to the Oversight Board under PROMESA. |

### Structural elements to ensure a best-in-class regulatory agency

Although administratively located within the Puerto Rico Public Service Regulatory Board (PSRB), PREB's decision-making process should not be subject to direct or indirect review by other government entities, except for any review under applicable administrative procedure rules or with respect to issues that are covered by a federal statute such as PROMESA. Staff involved in substantive decision-making should be kept separate and independent from the PSRB and be fully dedicated to matters within PREB's jurisdiction and purview. PREB may, on an annual basis, provide funds to the PSRB to cover administrative and other operational costs, however, PREB's resources should be kept separate and shall not be controlled or placed under the direction of the PSRB.

There are five key structural elements that will ensure PREB is a best-in-class regulatory agency:

- *Governance:* It is imperative that PREB's governance structure enable independent, quick and robust decision-making. In line with best practices for regulatory commissions (e.g., California Public Utilities Commission, Hawaii Public Utilities Commission, New York Public Services Commission), PREB is headed by five commissioners who serve staggered six-year terms. The commissioners are appointed based on their technical, professional and/or academic credentials, with potential candidates identified and appointed through a candidate list developed by an external recruitment firm. The commissioners should be supported in their oversight role by professional civil servant staff that has utility expertise.

- *Independent ratepayer advocate:* All commission decisions in adjudicatory proceedings must comply with applicable requirements of administrative procedure. Separate from the regulator, there shall be an independent ratepayer advocate, a role currently filled by the *Oficina Independiente de Protección al Consumidor* (OIPC). OIPC should be well-funded so that it has the resources to meet its responsibilities. Currently, PREB transfers 10% of its

budget to OIPC; as priorities evolve and the need for a robust consumer advocate increases, the Government may – with the approval of the Oversight Board – provide OIPC with additional funding.

- *Employee structure:* Presently, all 23 of PREB's employees are considered trust employees, meaning PREB's organizational structure fails to comply with Act 17, which requires PREB to achieve an employee structure wherein trust employees comprise no more than 25% of employees.[195] Moreover, the 2020 Fiscal Plan required PREB to further reduce this amount to no more than 15% by June 30, 2021 and 10% by June 30, 2022.[196] On November 23, 2020, the Oversight Board partially approved a budget reprogramming request submitted by PREB to fund the creation of 22 civil servant positions and maintain existing 7 trust positions[197]. While the structure proposed by PREB would have allowed it to achieve the Act 17 target of no more than 25% trust employees, PREB would still fall short of the 15% trust employee target by June 30, 2021 outlined in the 2020 Certified Fiscal Plan. Accordingly, no later than December 31, 2021, PREB must reduce the number of trust employees to no more than 15% of total employees, with a further reduction to no more than 10% trust employees by June 30, 2022.[198]

    During and after the energy sector reform process, PREB must have enough staff to effectively undertake its duties and responsibilities in a timely and professional manner. The selection, hiring, and management of PREB's staff must not be subject to review or approval by any other entity of the Executive or Legislative Branch.

- *Budget:* PREB's substantive independence must be supported by financial independence. Under current law, PREB's yearly budget is set at $20 million and collected through charges assessed on certified energy companies.[199] To provide for a steady and predictable funding source, PREB's enabling act must be amended to provide that PREB's budget shall be funded entirely through rates, as part of the revenue requirement used to determine energy rates. PREB's funds are then collected by the T&D operator through customer bills and periodically remitted to PREB. This funding mechanism is consistent with the mechanisms used to fund peer mainland regulators. Providing for an independent and unencumbered source of income for PREB helps create the conditions to protect ratepayer interests, increase transparency, and reduce system costs. However, the Government has not yet complied with this requirement and has not ensured a steady and predictable source of funding to PREB. Instead, PREB is currently being funded through fees levied on energy companies certified by PREB to provide energy services in Puerto Rico.

    While the Oversight Board is in existence it can ensure PREB's budget through its budgetary powers. However, moving forward, PREB's budget and funding must be kept separate and independent from the Commonwealth budget or the budget of any other Commonwealth agency, entity, or instrumentality, and neither the Executive nor the Legislative branches should have authority to modify PREB's budget or reapportion any of PREB's funds without PREB's prior consent. PREB is subject to periodic reviews from relevant authorities for use of public funds, which is consistent with all other Government agencies in Puerto Rico.

- *Transparency:* To achieve best-in-class status as an energy system, transparency is an indispensable factor. PREB must ensure that proactive transparency permeates relevant energy operations, while being diligent in excluding confidential information such as customer data and operational details that would increase cyber or risk vulnerabilities.

---

[195] "Trust employees" includes any employees that are related to political appointments, non-civil service appointments, etc.

[196] To show that this has been completed, PREB needs to submit an organization chart showing the split of employees (civil servant vs. trust) no later than the end of Q1 of FY2021. However, PREB has not yet complied with this requirement

[197] Approved for remaining 8 months of fiscal year; partially approved medical insurance.

[198] Relevant milestones and deadlines are shown in *Section 10.3*

[199] Amount in line with other jurisdictions; the Hawaii Public Utilities Commission had revenues of $19 million in FY2017 to serve a population of 1.4 million

Transparency practices  may include making information publicly accessible, maintaining quick and efficient decision-making, and holding public events when appropriate in order to consider public opinion. Additionally, PREB must uphold transparency in its own financials and operations, including disclosing how it utilizes its annual budget.

### 10.2.2  Vision and structure for an energy system operator

As described above, private operators for T&D and generation operations will be responsible for executing Puerto Rico's energy system modernization strategy as well as assisting with the allocation of related federal funding. Each private operator's overall objective will be to improve service quality and deliver reliable service at just and reasonable prices. As such, a private operator will be motivated to deliver financial and operational performance improvements across six dimensions:

- **Reduce costs by introducing experienced personnel.** A private operator would be incentivized to reduce PREPA's dependency on outsourced contracts by insourcing activities, empowering the local labor force, and potentially achieving economies of scale.

- **Upgrade technology.** While PREPA has limited access and experience with industry-standard technology, a private operator would be incentivized to deploy modern grid technologies, digital capabilities, and infrastructure to significantly enhance operational efficiency, thus lowering O&M costs and customer rates over time through better asset utilization.

- **Improve processes and procedures.** Drawing on operational expertise, a private operator would be incentivized to streamline and standardize critical management processes and implement operational efficiencies (e.g., processes such as procurement, contract management, maintenance). A private operator can also leverage experience in customer service to improve PREPA's responsiveness to customer needs and expectations.

- **Limit political interference.** A private operator's decisions would be subject to independent regulatory oversight, but free of political interference. This would lead to the adoption of standard industry practice where experienced utility operators make operational decisions with oversight from an independent regulator (e.g., investment decisions made based on overall benefit to the system, instead of short-term political gains).

- **Effective and efficient capital delivery.** A private operator would be incentivized to establish the tools and processes critical to improving PREPA's capital project management. This will be key to unlocking the federal funding required for grid modernization and generation improvements, which in turn will aid PREPA in strengthening grid resilience and making its generation fleet future proof.

- **Renewable energy generation and transmission**. A private operator would assist with and enable the transition to a clean, reliable, and sustainable energy sector. This shall include renewable energy procurement, renewable energy program management, T&D system modernization, and renewable generation scheduling and dispatch. These efforts are required to meet the goals set up by Act 17, which mandates that Puerto Rico should obtain 40% of its electricity from renewable resources by 2025, 60% by 2040, and 100% by 2050.

*Energy Sector Reorganization*

To achieve Puerto Rico's energy system transformation, a change in PREPA's historical roles and responsibilities and their reassignment through multiple entities is imperative. The first step in this restructuring process was taken with the enactment of Act 57-2014, which established the Island's energy regulator, PREB. PREB's establishment eliminated PREPA's prior authority to self-regulation and installed those regulatory and oversight responsibilities within PREB. In

Puerto Rico's transformed energy system, those regulatory roles and responsibilities remain at PREB.

PREPA's Certified 2020 Fiscal Plan required PREPA's vertically integrated operations to be, as mandated by law, disaggregated into Generation and T&D utility functions – GenCo and GridCo, respectively. GridCo (which comprises transmission and distribution, customer service and administrative functions, operated and maintained by LUMA Energy, LLC or "LUMA") and GenCo (which comprises existing PREPA-owned generation resources that are to be operated and maintained by one or more private operators until their retirement, as mandated by PREPA's approved Integrated Resource Plan).[200] Besides the selection of LUMA as the T&D operator, the Island's transformed energy sector also envisions GenCo being responsible for, among other activities, the operation and maintenance of existing PREPA-owned generation resources, environmental compliance, safety and plant retirement and decommissioning. Additionally, GenCo will be responsible for working closely with LUMA to ensure appropriate short-, mid- and long-term system planning and timely and efficient execution of system-wide capital improvements.

Finally, PREPA's existing day-to-day roles and responsibilities over the operation of the energy system, deployment of federally and non-federally funded capital investments, short medium, and long-term system planning and energy sector oversight are expected to be reduced over time as such roles and responsibilities are taken up by the relevant Government agencies and private operators. [201]

---

[200] See Section 1.8 of the Puerto Rico Energy Public Policy Act; Act 17-2019

[201] See Section 1.7 of Act 17-2019, which states that "the Government of Puerto Rico, by itself or through the Authority or another public corporation affiliated to the Authority, shall maintain ownership of the transmission and distribution assets and may maintain ownership of the legacy power generation assets." See Section 1.8(b) of Act 17-2019 which also provides that PREPA shall only "retain personnel as are necessary to fulfill its responsibility as a Partnering Government Entity, as such term is defined in Act No. 29-2009, of assisting the Public-Private Partnership Authority in overseeing the Contractor's performance of the Partnership Contract and compliance with the performance-based metrics set forth therein." Pursuant to the LUMA agreement, PREPA delegated any duties with respect to overseeing LUMA's performance to the P3A

EXHIBIT 60: ENERGY SECTOR TRANSFORMATION – CURRENT AND FUTURE STATE



1. GenCo refers to the wholly-owned subsidiary of PREPA who would obtain ownership of the Legacy Generation Assets after a potential reorganization of PREPA.
2. GridCo refers to PREPA, in its capacity as owner of the T&D assets.

*System modernization*

In September 2017, Puerto Rico's electric system was completely devastated by the landfall of Hurricanes Irma and María, resulting in the longest electrical blackout in modern U.S. history. In efforts to mitigate the economic, fiscal, and social impacts of future storms, FEMA and the Government agreed to a fixed cost estimate of $10.7 billion to repair the electricity system in Puerto Rico (see *Exhibit 61* below). Of those $10.7 billion, $9.7 billion would be provided by FEMA, with the remaining $1 billion to be covered by PREPA through own funds and/or available CDBG funding.

EXHIBIT 61: PREPA ASSET CATEGORIES AND COST ESTIMATES

| Asset category | Eligible cost, $ |
|---|---|
| Building Assets | 125,088,362.54 |
| Transmission Assets | 2,642,131,654.47 |
| Substation Assets | 781,890,093.70 |
| Telecommunications and IT | 685,928,720.98 |
| Generation Assets | 108,927,715.08 |
| Distribution Assets | 5,499,837,404.90 |
| Water Assets | 860,926,275.87 |
| Total Eligible Costs from FEMA | 10,704,730,227.54 |

*Transmission & Distribution Modernization*

Approximately $8.1 billion (76%) in FEMA reconstruction funds are destined for Transmission & Distribution Assets[202], which include thousands of miles of transmission and distribution lines. The remaining 24% is destined to Hydro Assets $860 million (9%)[203] Substation Assets $782 million (7%)[204], Telecommunications Assets $686 million (6%)[205], Building Assets $125 million (1%)[206], and Generation Assets $108 million (1%).[207] After the transition to LUMA has been completed, LUMA will be responsible for implementing the modernization of the T&D system.

*Generation Assets Modernization*

As directed by the PREB, and as required under Act-57, PREPA prepared an IRP intended to consider all reasonable resources to satisfy the demand for electrical services over a twenty-year planning horizon. The IRP as well as Act 82-2010, as amended by Act 17, directs PREPA to procure Renewable Energy Resources in accordance with the following milestones relative to the aggregate percentage of generation supplying its system: 20% by 2022, 40% by 2025, 60% by 2040 and 100% by 2050. On February 22, 2021, PREPA released RFP No. 112648 for the procurement of 1,000 MW of renewable energy resources capacity and 500 MW of energy storage resource capacity. This marks an important first step for Puerto Rico and its journey towards delivering clean, sustainable, and reliable energy and will accelerate the deployment of renewable generation sources. This RFP represents the first of six RFPs to procure a total of 3,750 MW renewable energy resources and 1,500 MW of energy storage resources during the next 3 years. Already, on February 26, 2021, the Oversight Board approved two (2) PPOAs to deliver 150MW out of the 1000 MW, to further accelerate the transition towards renewable resources.

EXHIBIT 62: YEARLY INCREMENTAL RENEWABLE GENERATION CAPACITY PROCURED AND ADDED BASED ON PREB'S GUIDANCE

| | Solar PV or equivalent other energy, MW | | 4-hr. battery storage equivalent, MW | | |
|---|---|---|---|---|---|
| RFP target release date | Minimum | Cumulative | Minimum | Cumulative | Tranche |
| Feb. 2021[1] | 1,000 | 1,000 | 500 | 500 | 1 ✓ |
| Jun. 2021 | 500 | 1,500 | 250 | 750 | 2 |
| Dec. 2021 | 500 | 2,000 | 250 | 1,000 | 3 |
| Jun. 2022 | 500 | 2,500 | 250 | 1,250 | 4 |
| Dec. 2022 | 500 | 3,000 | 125 | 1,375 | 5 |
| Jun. 2023 | 750 | 3,750 | 125 | 1,500 | 6 |

PREB guidance for procurement of renewable generation and battery storage capacity

✓ Completed

1 Original date was Dec. 2020, but has been updated to reflect the current review process (RFP 112648 was released on February 22, 2021)
SOURCE: PREB

---

202 Transmission and Distribution assets include the following: approximately 2,491 circuit miles of overhead transmission lines, 37 miles of underground 115kV cable, 63 miles of underground 38kV cable, 22.59 miles of submarine 38Kv cable to the islands of Vieques y Culebra, 708 access roads, 1,229 distribution feeders including 182,985 transformers and 16,800 miles of overhead and underground line, 342,569 each of Streetlights with an estimate of total population of 489,385 streetlights Island-wide, Poles and power line hardware
203 The Water Assets consist of Hydroelectric Plants, Dams, Irrigation Channels, and Water Conveyance infrastructure
204 Substation Assets include 392 substations and Transmission Centers located in 292 facilities
205 Telecommunication Assets consist of telecom facilities, communication hardware, software, information technology (IT) and other peripheral elements
206 Building Assets consist of 134 buildings throughout seven regional sectors on the Island
207 The Generation Assets consist of 12 power plants that generate electricity through fossil fuel. Nine power plants are included in this claim: Cambalache, Aguirre, Palo Seco, San Juan, Yabucoa, Mayaguez, Vega Baja, Daguao, and Jobos

EXHIBIT 63: PROJECTED INSTALLATION TIMELINE OF THE RENEWABLE GENERATION CAPACITY ORDERED BY PREB

Projected installation timeline of the renewable generation capacity ordered by PREB, in MW



1 Assumes RFP process takes two months, the PPOA finalization process takes one month, construction begins eight months after the PPOA approval, and commercial operations begin 24 months after construction begins

*Role of operators*

PREPA's existing operations will be split into GridCo (comprising T&D and customer service functions) and GenCo (comprising PREPA's existing generation assets). GridCo and GenCo are to be privately operated by professional entities selected through a competitive process under the supervision of the P3A. LUMA has been selected and has entered into an agreement to manage GridCo, while the process for identifying one or more operators for GenCo is currently underway. As mentioned before, the transition to private, professional operators is expected to improve quality of services, bring cutting-edge knowledge and expertise, improved efficiency, ensure compliance with applicable laws, and promote long-term sustainable planning, among others.

In order to achieve a reliable and modern energy system, PREPA must maintain the minimum levels of working capital needed to ensure all necessary and approved operational and capital investment expenditures are made on time. To that end, PREPA must create and fund various operational reserve accounts to be used by PREPA, LUMA and any additional private operators to fund the day-to-day operations of the energy system, ensure capital availability for maintenance and improvement projects, included FEMA-funded projects, and safeguard the financial sustainability of the system.

Specifically, no later than 10 business days prior to June 1, 2021, PREPA shall establish and fund one or more such operational reserve accounts, which accounts shall be consistent with the requirements in the LUMA Energy operations and maintenance agreement (OMA). PREPA and/or the Government must deposit in such accounts a total sum of approximately $1.0 billion, of which a substantial portion of approximately $500 to 750 million shall be funded through an equity contribution from the Commonwealth and the remaining $250 to 500 million shall be funded from PREPA's existing cash reserves. The funding deposited in these accounts shall be used exclusively for the maintenance and operation of the transmission and distribution system and the execution of capital improvement projects, including FEMA-funded projects, as such functions are described and contemplated in the LUMA Energy OMA.

*Transmission & Distribution*

On June 22, 2020, the P3A, PREPA and LUMA signed a 15-year OMA for the T&D system. Under the OMA, LUMA is responsible for, among other activities, the operation and maintenance of the transmission and distribution assets and system, control center operations, generation scheduling and dispatch, power procurement and integration of renewable generation and distributed energy resources, customer metering, billing and collections, regulatory and environmental compliance

139

delivery of grid-related capital expenditures and deployment of federal funding across the system. Full transfer of O&M responsibilities to LUMA is expected to take place by June 1, 2021.

Under the OMA with LUMA, LUMA shall interview and hire qualified PREPA employees, and shall grant priority to PREPA employees over other, equally qualified, candidates. Existing PREPA employees who are not selected by LUMA, may be eligible to continue employment at PREPA's generation operations (to the extent consistent with PREPA's 2021 Fiscal Plan and Budget and until such operations are transferred to one or more private operators), may be eligible to transfer to another Commonwealth entity (to the extent consistent with applicable law, the 2021 Fiscal Plan and Budgets for the Commonwealth or any other covered instrumentality to which such employees may transfer) or may be eligible to participate in an early retirement program (to the extent such program is developed and implemented by PREPA in a manner consistent with the PREPA 2021 Fiscal Plan).

*Generation*

On November 10, 2020, the P3A launched an RFP to select one or more private operators for PREPA's existing generation assets. The selected proponent(s) will be responsible for the operation and maintenance of existing generation assets until those assets are retired and decommissioned in accordance with PREB-approved integrated resource plan (IRP). Additionally, the selected proponent(s) will be responsible for, among others, environmental compliance and safety, and fuel management. Currently, the P3A is expected to select the winning proponent(s) by August 2021 with full transfer of O&M responsibilities by the last quarter of the year.

EXHIBIT 64: CURRENT PREPA STRUCTURE



EXHIBIT 65: FUTURE PREPA STRUCTURE



*Oversight*

During the transformation of Puerto Rico's energy system[208], i.e., while PREPA remains a covered instrumentality under PROMESA and until PREPA emerges from Title III, PREB will share responsibility for the regulation of the energy sector with the Oversight Board. During this time, the Oversight Board will have authority to approve revenue requirements and expenditures in PREPA's 2021 Fiscal Plan, which should be informed by PREPA's IRP. Additionally, the Oversight Board has the authority to approve a yearly budget and restructure PREPA's existing debt through a Plan of Adjustment and oversee liquidity management. PREB, in turn, will have authority to approve PREPA's IRP, authorize rates that align with PREPA's budget, and will continue to exercise its duties and responsibilities as outlined in its enabling laws, i.e., Act 57-2014 (e.g., addressing net metering, distributed generation, and CILT). Related to the transition of the T&D system and generation to private operators, PREB has the authority to approve performance metrics, rate orders (when applicable), System Operations Principles, the System Remediation Plan, as well as the IRP developed by the private operator. At the same time, the Oversight Board approved any private operator that engages with PREPA, and – after the operator has been installed – ensures compliance with PROMESA and the energy sector transformation objectives.

Once the transformation has been completed and PREPA has emerged from Title III, oversight responsibility in Puerto Rico's transformed energy system lies with PREB and the P3A.[209]PREB retains its roles and responsibilities under Act 57-2014, which include approving of energy rates, integrated resource planning (IRP), capital planning, reviewing of proposed power purchase

---

[208] Stated above in this section

[209] The Oversight Board will also retain its power and duties under PROMESA with respect to PREPA as long as PREPA is a covered territorial instrumentality

agreements and oversight of companies in the energy sector, and the implementation of the Commonwealth's energy policy.

On the other hand, the P3A, as Administrator, is responsible for overseeing the development, evaluation, negotiation, selection and future monitoring of private operator contracts. To fully comply with their mandate, the P3A must build up its capabilities in order to assume their role in the transformation process of the energy system. As such, the P3A must develop a plan to develop the organizational structure needed to act as Administrator, build its resources, including the hiring of professional, experienced civil servants, with an aim at reducing trust positions within the Administrator division of the P3A to no more than 10%. Further detail on the timeline for achieving this organizational build-up is provided in *Exhibit 67*.

*Energy sector debt restructuring*

As of May 2017, PREPA had $9.25 billion of outstanding bond and other debt obligations, and an unsustainable repayment schedule; PREPA would have had to repay approximately $4.5 billion of debt service obligations between FY2019 and FY2023. PREPA's unsustainable capital structure reflects persistent operating deficits, resulting from overly low base rates and high operating costs. As long as PREPA remains in bankruptcy, it poses a risk to suppliers and partners, potentially increasing costs and delaying progress in rebuilding after major catastrophic events (e.g., hurricanes, earthquakes, COVID-19).

To restructure PREPA's debt, a debt restructuring agreement among a group of PREPA creditors, the Oversight Board, the Government, and PREPA is in progress. However, as a result of the uncertain and unpredictable effects of COVID-19 on PREPA and its customers, the Oversight Board requested additional time from the court to assess the situation. PREPA's Restructuring Support Agreement remains in effect and has not been terminated by the Oversight Board, the Government, PREPA, or PREPA's creditors.

## 10.3 Implementation and enforcement of power sector reform

To achieve 2021 Fiscal Plan savings projections, several reforms to the power sector must be implemented immediately. Several of those measures recommended in earlier Fiscal Plans already have been completed and are listed in *Exhibit 66*.

## EXHIBIT 66: COMPLETED MILESTONES FOR POWER SECTOR REFORM

| Area of focus | Action item | Responsible party | Completed |
|---|---|---|---|
| **Implement regulatory reform** | Provide interim feedback on PREPA's Integrated Resource Plan (IRP) | PREB | Completed |
| | Remove CW government approval needed for PREB staff appointments | CW government | Completed |
| | Revise charter legislation to provide dedicated funding for power sector regulation that provides regulator with annual budget of $20 million in line with benchmark | CW government | Completed[1] |
| | Appoint the remaining PREB commissioner to serve staggered six-year terms | PREB | Completed |
| | Increase number of PREB staff in line with appropriate benchmarks | PREB | Completed |
| | Approve IRP | PREB | Completed |
| **Transition to private operators** | Perform market sounding to collect feedback on interests and concerns from interested parties for generation asset privatization | P3 Authority / Oversight Board | Completed |
| | Select a winning proponent to manage and operate PREPA's T&D system | P3 Authority | Completed |
| | Prepare for and launch RFQ for the selection of a proponent for PREPA's generation assets | P3 Authority | Completed |
| | Prepare for and launch RFP for the selection of a proponent for PREPA's generation assets | P3 Authority | Completed |

1 Partially completed. Legislation was adopted (Act No. 17), providing $20 million in funding. However, the funding was not from a dedicated source; PREB will need to confirm completion in the near future.

*Exhibit 67* describes the additional reforms required to ensure the transformation of the electricity sector and compliance with the 2021 Fiscal Plan, and to meet the 2021 Fiscal Plan growth and revenue targets. Several of these reforms were outlined in the June 2019 PREPA Fiscal Plan and remain incomplete (demarcated with *).

EXHIBIT 67: PENDING MILESTONES FOR POWER SECTOR REFORM

| Area of focus | Action item | Responsible party | Deadline |
|---|---|---|---|
| Implement regulatory reform | Create an oversight and monitoring division for LUMA operation and management agreement and other P3A deals, with experienced career civil servants and minimal trust employees | P3 Authority | June 1 , 2021 |
| | Provide FOMB with staffing plan and organizational chart outlining the monitoring and compliance division created within P3A and required funding sources. | P3 Authority/ AAFAF/ Legislature | June 1, 2021 |
| | Amend PREB enabling act (Act 57-2014) to stipulate that PREB's budget will be funded through rates | Governor/ Legislature | December 31, 2021 |
| | Submit implementation plan for achieving a workforce with no more than 10% trust employees. | PREB | June 30,2021 |
| | Reduce the percentage of trust employees to 15% of total employees | PREB | June 30, 2021 |
| | Reduce the percentage of trust employees to 10% of total employees | PREB | June 30, 2022 |
| | Conclude and publish a study regarding an optimal CILT structure and submit a recommendation to the Governor and the Legislature.* | PREB | September 1, 2021[1] |
| | Develop a CILT process by which municipalities pay for electricity consumption not covered by CILT, and are able to file complaints related to CILT* | PREB | December 1, 2021 |
| Transition to private operators | Select a winning proponent to manage and operate PREPA's existing generation assets | P3 Authority | First half of FY22 |
| | Implement approved IRP and grid modernization plan to ensure a modernized, resilient, and reliable grid | PREPA | In process |
| Restructure legacy debt obligations | Confirm Title III plan of adjustment | FOMB | To be determined |
| | Implement PREPA plan of adjustment | PREPA | To be determined |

\* Milestones also recommended in June 2019 Fiscal Plan
1   This is revised from the original deadline in Act 17-2019, which stipulates that, "In view of this new model for an Electrical System, on or before December 31, 2019, the Energy Bureau shall conduct a study on the implementation, effectiveness, cost-benefit, reasonableness, and economic impact of the contribution in lieu of taxes (CILT) to determine the need and convenience, if any, of reforming this mechanism and the subsidies."

# Chapter 11. Infrastructure reform

The transportation sector is essential for both economic and social development with transportation systems playing a critical role in facilitating the movement of goods and people. A well-performing system can increase workers' access to jobs and businesses' access to customers, unlocking the productive potential of residents and firms, thereby increasing economic output and inviting further private investment. Meanwhile, a poorly performing system can mire its residents in wasted time, inequitable access to jobs and opportunities, fractured communities, and productivity losses, as can be observed in Puerto Rico.

Puerto Rico's transportation sector underperforms across a range of outcomes. Roads in Puerto Rico are crowded and unsafe, resulting in 80% more traffic-related fatalities than the U.S. average.[210] Among U.S. cities, San Juan has the seventh-longest average commute at 31.2 minutes.[211] Drivers lose 58 hours each year in traffic[212] at a cost of $1,274 per driver and $400 million to the city.[213] Puerto Rico's roads suffer from poor conditions—only 4% of the Island's non-interstate highways are in good condition, compared to the U.S. median of 57%.[214] Furthermore, in 2020 the Highways and Transportation Authority (HTA) reported to FHWA that 12% of Puerto Rico's lane miles are in "poor" condition, thus exceeding the maximum of 5% of

---

[210] "Highway Statistics 2019." Office of Highway Policy Information of the U.S. Department of Transportation Federal Highway Administration. Last updated September 30, 2020

[211] "150 Best Places to Live in the U.S. in 2020-21." U.S. News and World Report. Accessed 21 April 2021

[212] "2019 Urban Mobility Report." The Texas A&M Transportation Institute. August 2019

[213] Costs include lost productivity, increased freight movements costs, higher operating costs and decreased reliability. For more information, see "Revised Departmental Guidance on Valuation of Travel Time in Economic Analysis." Memo from Acting Assistant Secretary of Transportation Policy Vinn White to Secretarial Officers and Modal Administrators, September 27, 2016

[214] Ibid "Highway Statistics 2019"

lane miles in "poor" state for pavement conditions on the Interstate System[215] as required by federal law.[216] As a result, for a second consecutive year, FHWA imposed a penalty and constraints on some portion of its federal allocated funds.[217] Moreover, the road safety and congestion are not the only challenges faced by the transit sector.

EXHIBIT 68: POOR ROAD SURFACE CONDITIONS MAKE IT DIFFICULT FOR LIFE SCIENCES MANUFACTURERS TO MOVE THEIR GOODS TO MARKET



1. Airports with meaningful cargo traffic that are key points for air cargo trans-shipment
2. Assumes 9pm departure, for overnight freight shipments
SOURCE: 2018 HTA CIP Validation Report; PRIDCO; Google Maps; FHWA; Invest Puerto Rico

The financial performance and sustainability of the transit sector also lags mainland peers. Tren Urbano's (TU) transit farebox recovery ratio (share of expenses covered by fare revenues) is only 9%, compared to 26% for peer U.S. systems.[218] The percent of non-fare directly generated public transit revenue (as a percent of total transit revenue) in Puerto Rico is about half of the U.S. median.[219] Construction of TU took 75% longer than expected, delaying its opening by four years, and increasing project costs from $1.5 billion to $2.3 billion. A 2017 assessment after Hurricanes Irma and María found that more than 50% of the turnstiles (barriers) were not operational, 20% of the ticket vending machines were defective and non-compliant with Payment Card Industry Standards and used outdated software. TU has failed to fix these problems, despite federal funding being available to do so since 2012.

The ferry service is yet another example of suboptimal performance. For months, the Maritime Transportation Authority (ATM, by its Spanish acronym) has operated with two (2) or fewer of its fourteen (14) ferry boats to meet its service demand due to frequent breakdowns and, for several

---

215 As defined by 23 USC 103(c)

216 23 USC 119(f)(1) and 23 CFR 490.315

217 In a letter dated September 30, 2020, FHWA informed HTA the determination regarding pavement conditions in the Interstate System.  After analyzing the 2019 Interstate System pavement condition data reported by HTA on the Highway Monitoring System, FHWA determined that (1) HTA did not meet the minimum level requirements for pavement condition on the Interstate System as required in 23 USC 119(f)(1) and 23 CFR 490.315 and (2) penalty under the provisions of the Interstate System Condition (23 USC 119 (f)(1) must be invoked pursuant to 23 CFR 490.317. As a result, HTA will have constraints on some portion of its allocated funds as per 23 CFR 490.31(e)

218 "2019 data tables." United States Department of Transportation Federal Transit Administration. Accessed April 21, 2021

219 "2019 funding sources." United States Department of Transportation Federal Transit Administration. Accessed April 21, 2021

years, has relied on leased ferry boats to supply services, thereby limiting its ability to invest in its ferry assets, worsening their condition and further forcing ATM to continue to rely on leased ferries. The Desirability and Convenience Study for the Puerto Rico Maritime Transportation Services PPP further highlights the issues concerning the ferry service. Chief among the challenges is the current state of facilities and vessels, which are in operation beyond their expected service life. Consequently, ferry services are subject to frequent cancellations and delays and increasing maintenance costs, forcing ATM to defer much needed maintenance for its vessels and facilities. The result is an unpredictable and unreliable ferry service that too often leaves the residents of Vieques and Culebra without access to basic goods and services (including access to medical services, given Vieques lacks on-Island hospital facilities), and prevents the Islands from realizing their full potential as world-class tourism destinations.

Given the complexity of managing an entire island's transportation infrastructure cost-effectively, the Government should implement a cohesive policy for the transportation system.  The task at hand will result in a total reorganization of Puerto Rico's transportation infrastructure. Such effort would mainly revolve around the following key initiatives:

1. **Restructuring transportation capabilities and organizational structures by allocating transportation assets into entities based on type of asset and/or transportation service (e.g., toll roads, non-toll roads, mass transit)** to achieve efficiencies in operational expenses and capital delivery while also paving the way for closer collaboration between different transportation entities

2. **Creating an overreaching Transportation Policy Board** to ensure consistency in long-term planning strategies and priorities across all transportation assets management

3. **Improving performance management** through the integration in public systems, performance-based contracts, better supervision, and leveraging private sector capabilities

4. **Maximizing available funds through a more aggressive federal grants strategy and attracting private capital**

## 11.1   Current structure of Puerto Rico's transportation system

*Individual modes of transportation with overlapping and fragmented ownership*

The transportation system falls under the organizational structure of the Department of Transportation and Public Works (DTOP, by its Spanish acronym), which includes the Highways and Transportation Authority (HTA) and the Integrated Transit Authority (PRITA). PRITA is further divided into ATM and the Metropolitan Bus Authority (AMA, by its Spanish acronym).

Currently, asset ownership is fragmented across Puerto Rico's transportation entities. Non-tolled roads are split between HTA and DTOP. Bus routes are divided between HTA and AMA. The urban transit line sits within the highway authority (HTA), rather than the dedicated transit authority (PRITA).

EXHIBIT 69: CURRENT ALIGNMENT OF TRANSPORTATION ASSETS TYPES TO ENTITIES



Fragmentation across transportation modes inhibits efficient management of the transportation system by complicating budget distribution, priority-setting, and decision making. For instance, even though DTOP is responsible for ~96% of the road system's maintenance (excluding toll roads), HTA often performs such maintenance.  HTA's operational and project delivery capacity is further strained due to also being responsible for over ~95% of the road system's construction projects (including toll roads).  This mix of both tolled and non-tolled roads leaves HTA with limited resources to concentrate on the operation and maintenance of the toll roads and with a mix of private revenue streams (e.g., tolls and fines) and public funds (e.g., transfers from the Commonwealth) that complicates decision making concerning transportation public policy setting and implementation. As an example, HTA has not adjusted toll rates since 2005, despite increases in both congestion and inflation, toll roads have not been the subject of focused capital investments, and non-toll roads suffer from a backlog of maintenance projects such as toll fare adjustments and toll road capital projects.[220] Furthermore, HTA is the federal grantee for PRITA, ATM, TU, and feeder bus routes, while AMA is its own FTA grantee.

The fragmented ownership of transit assets inhibits cross-modal coordination: TU, AMA, and the feeder bus networks do not have harmonized schedules that enable easy and efficient transfers between modes. This creates a negative user experience for riders and encourages commuters to travel via private vehicle rather than public transit, which in turn worsens the financial performance of transit systems and increases road congestion.[221] Puerto Rico, furthermore, receives about 90% of the federal funding for roads that could be expected based on its population size.[222] Despite this, agencies struggle to spend all the money available to them due to difficulties executing the backlog of projects.

---

220 In other states, by contrast, toll roads and non-toll roads are managed by independent, apolitical public entities (e.g., Florida Turnpike Enterprise, New Jersey Turnpike Authority) that can focus on maintaining their own financial sustainability

221 Many U.S. cities, by contrast, have integrated transit authorities so all transit assets across modes coordinate schedules and payment methods, ensuring a seamless experience for customers and efficiency in delivering services. For example, Portland's TriMet system operates bus, light rail, heavy rail, and streetcar services under one network with a single payment system and harmonized schedules

222 "Revenues Used By States For State-Administered Highways – 2018." Office of Highway and Policy Information of the United States Department of Transportation Federal Transit Administration. Last updated January 2020

EXHIBIT 70: TRANSPORTATION ASSET DISTRIBUTION ACROSS PUBLIC ENTITIES

| | Assets | Managed by |
|---|---|---|
| **HTA Toll Roads** | • 4 tollways: PR-53, 52, 66, 20<br>• 704 lane miles | • HTA responsible for construction, maintenance, and operations |
| **Non-Toll Roads & Bridges** | • Primary: 3,005 lane miles<br>— Urban: 954 lane miles<br>— Non-urban: 2,051 lane miles<br>• Secondary: 2,304 lane miles<br>• Tertiary: 6,344 lane miles | • HTA manages a subset of primary, secondary, and tertiary roads, and is responsible for:<br>— Operation & maintenance of 753 lane miles<br>— Construction of 11,299 lane miles<br>• DTOP owns a subset of roads, but is only responsible for:<br>— Operation & maintenance of 10,547 lane miles<br>• Concessionaires are responsible for the construction, operation & maintenance of the remaining roads:<br>— Abertis manages 9 lane miles<br>— Metropistas manages 344 lane miles |
| **Rail** | • Tren Urbano | • HTA, which was supposed to transfer the administration of this asset to PRITA, but the process stalled |
| **Bus** | • 3 HTA feeder bus lines<br>• San Juan bus systems (30 routes) | • HTA manages the 3 Tren Urbano feeder bus lines. HTA was supposed to transfer to PRITA, but the process stalled<br>• AMA used to administer the San Juan bus system. However, it has recently transferred it to PRITA |
| **Ferry** | • AcuaExpreso (San Juan)<br>• Culebra and Vieques (Fajardo) | • In process of transfer from MTA (Maritime Transportation Authority) to ATI/PRITA |
| **Ports and airports** | • 9 ports<br>• 10 airports | • Port Authority manages both airports and ports (SJU is outsourced to Aerostar) |

1 DTOP, Puerto Rico 2040 Island-wide Long Range Transportation Plan, 2013. Estimated ownership of system using HTA provided km-ln by functional road class.

*Historically, Puerto Rico has not maximized its funding potential*

Currently, AMA has federal grantee status. Meanwhile, PRITA is a subgrantee to the Puerto Rico Ports Authority (PRPA) and HTA. This scenario is far from ideal for PRITA to carry out its mission to operate and invest in Puerto Rico's bus, ferry, and rail transportation services. Furthermore, the proportional allocation of federal funds to transportation is a separate challenge itself. Puerto Rico's 3.1 million residents represent 1.0% of the United States population, and yet, Puerto Rico rarely sees a proportional amount of federal funding from large transportation-related grants programs. HTA, for instance, received zero new discretionary grants in FY2020. If Puerto Rico received discretionary grants[223] proportional to its population, agencies would have an additional $1.5 billion available for strategically important, non-State of Good Repair (SOGR) projects over the next 30 years, granted that the Government seek a holistic grantee structure and federal funding strategy.

Moreover, to generate this type of capital spending, the Commonwealth and its corporations will need to maximize investments in Puerto Rico's transportation sector by ensuring access to all available federal and private funding. To achieve this, PRITA should successfully obtain grantee status, which is pivotal for maximizing federal funding opportunities and would pave the way to efficient multi-modal coordination.

Puerto Rico should explore further opportunities to leverage private capital via PPP projects. The Government should build on the success of the PR-22 and PR-5 PPP with Metropistas. Since 2011, Metropistas has contributed $1.6 billion for the right to operate and collect tolls on PR-22 and PR-5. These funds have been used to reduce existing debt, improve road quality, and accelerate safety improvements.[224] As a result, 99% of PR-22's pavement is in "good" or "fair" condition, compared to 86% for Puerto Rico's interstate system as a whole.[225] Puerto Rico's PPP Authority

---

[223] E.g., Capital Investment Grants, Better Utilizing Investments to Leverage Development (BUILD) grants, Infrastructure for Rebuilding America (INFRA) grants, Highways for Life (HfL) grants

[224] "Project Profile: Puerto Rico PR-22 and PR-5 Lease." Center for Innovative Finance Support, United States Department of Transportation Federal Transit Administration. Accessed April 21, 2021

225 2028 Puerto Rico Transportation Asset Management Plan, Final Revised as of October 8, 2019

should pursue a transportation-focused strategy to attract additional private funding to this sector. Puerto Rico should also leverage non-toll sources of revenue through innovative contract financial structures with its PPP concession-holders.

## 11.2    The future of Puerto Rico's transportation system

*Reorganization of Puerto Rico's transportation assets and responsibilities into entities based on type of asset and/or transportation service*

To achieve long-term financial stability and sustainability, Puerto Rico's transportation sector should be reorganized to ensure the best outcomes across different modes of transport. Under this proposed reorganization, HTA would operate as a standard toll road authority and oversee Puerto Rico's toll roads, DTOP would act as a standard department of transportation, with responsibility over non-tolled, non-municipal roads, and PRITA would fulfill its original intention as a unitary transit authority by managing and consolidating all transit assets on the Island (e.g., buses, ferries, Tren Urbano). [226] The Ports Authority would continue to retain control over airports and ports. All relevant agencies should achieve federal grantee status as these new roles and responsibilities require.

Consistent with the reorganization described above, and with the 205(a) letter of January 29, 2021, the 2021 Fiscal Plan increases the HTA operating transfer to cover the full cost of non-toll assets, marking the first step towards the implementation of the Transportation Sector Reform. As a result, over FY2025-FY2051, the 2021 Fiscal Plan includes an average annual operating appropriation of ~$133 million and capital appropriation of $68 million per year on average. The amount of the annual operating transfer may be reduced in a proportionate amount should federal funding for non-toll assets appropriated to HTA increase.

The HTA operating transfer is intended to be used by HTA solely to fund costs associated to non-toll assets and is not available to be used for any other purposes, including funding costs and projects above and beyond those contemplated in HTA's Fiscal Plan.

EXHIBIT 71: PROPOSED ALIGNMENT OF ASSET TYPES TO ENTITIES



The state of public transit infrastructure and management on the Island deserves special focus. Congestion is increasing in many metropolitan areas, implying additional delays for activities such as commuting.  Traffic in congested urban areas is moving at the same speed that it did 100

---

226 There is an existing legislative precedent for this type of effort, as outlined under 23 L.P.R.A. § 11161. The enactment of PRITA was originally intended to integrate mass transit systems under one authority, thus relieving HTA from its responsibilities related to the Tren Urbano transit system

years ago on horse-drawn carriages.[227] The San Juan metro area has 37,000 more households commuting by private vehicle than would be expected if mass-transit usage matched the U.S. average.[228] As a result of these extra vehicle journeys, San Juan experiences two additional weeks of low air-quality days per year, compared to the U.S. average.[229] Worse yet, NOx and PM2.5 emissions from vehicles are statistically associated with excess deaths in the local population.[230] Hence, a reliable public transit option is extremely valuable to day-to-day activities of local residents. The current system suffers from limited availability, efficiency, route coordination, operational cohesiveness, and accessibility. These issues result in higher congestion and reduced mobility particularly for low-income residents who experience long commutes or are forced to invest in owning a vehicle.

Achieving an integration of the public transit systems and cohesive operations and investment strategies across modes will require the Government assume a proactive role. The Government should establish a unified transport system and although these initiatives would ideally be implemented by an integrated PRITA, their implementation can and should start today.

The transformation into  an integrated transit system would mainly rely on the implementation of the following initiatives:

- **Integrate all transit assets under PRITA:** PRITA should be empowered to fulfill its original intention, and act as a unitary transit authority by managing all transit on the Island (e.g., all buses, ferries, Tren Urbano). To accomplish this, the Government should ensure PRITA achieves federal grantee status as necessary to take on these new roles and responsibilities (e.g., FTA grantee status).

- **Integrate all non-toll roads under DTOP:** DTOP should assume responsibility for construction and maintenance of non-toll roads from HTA. Doing so would better align sources of funding with entity mandates (i.e., public funds used for publicly-managed roads). This would require relevant personnel and capabilities also shift from HTA to DTOP to ensure DTOP can manage the full portfolio of non-toll roads.

- **Integration of public transit networks:** Existing public transit agencies of the San Juan metropolitan area should integrate their operations to maximize ridership by increasing both the legibility and usefulness of the system.[231] Example initiatives include:

  - Adoption of a single farecard for all transit networks

  - Harmonization of fares and schedules across TU, buses, and ferries

  - Design of a coordinated network of routes to increase accessibility and attractiveness of mass-transit alternatives

  - Redevelop areas surrounding major transit stations to maximize mobility and accessibility to goods and services

- **Coordination of public transit systems with private transport networks:** Public transit agencies should collaborate closely with private transport networks (e.g. Públicos,

---

227 The Geography of Transport Systems, 5th Edition, 2020 by Jean-Paul Rodrigue, Claude Comtois, and Brian Slack
228 22% of San Juan metro area residents commute via carpool, walking, bicycling, or public transit, compared to 27% for the U.S. as a whole. Data.IO
229 Low air quality defined as AQI > 100; PR has 19 days per year to U.S. median of 4, as per the Department of Natural and Environmental Resources website
230 EPA estimates excess deaths per ton of emissions at 0.002 for NOx and 0.1 for PM2.5
231 Oregon's TriMet system shows how this can work in practice. Like TU, TriMet is a relatively new transit system, having developed its light rail in the 1980s. TriMet consolidates all Portland-area transit assets into a single entity that coordinates route planning, scheduling, and payments. Riders use "Hop Fastpass," a smart fare card, to pay for their travel and can plan multi-modal trips using TriMet's website. This user-friendly system encourages high levels of ridership on the city's light rail and bus systems, saving the city $150 million annually due to reduced traffic congestion. Finally, a major emphasis in TriMet's planning was to use transit to improve land use, leading to $25 billion in new development near light rail stations

Transportation Network Companies).[232] By implementing a series of joint initiatives (e.g., fare integration, station re-design, schedule integration, multi-modal trip planning), public agencies and private network operators would be able to achieve increased service quality and increased ridership.

- **Improvement of curb management practices:** Public transit agencies should work with local municipal authorities to promote the adoption of innovative curb management practices (e.g., dynamic pricing for on-street parking, replacing on-street parking with drop-off zones). These practices would incentivize commuters to use public transit rather than private vehicles. They would also generate funds that could improve service quality in the communities they service (e.g., construct more and better bus shelters).

Overall, these initiatives would contribute to the decrease of average commute times for the residents of the San Juan metropolitan area, thus resulting in substantial labor productivity gains and other benefits to residents such as greater mobility, accessibility, and equity, while also reducing harmful vehicle emission, thus increasing the overall quality of life. At the same time, they would enable public transit networks to increase their ridership and their revenue, thus having a smaller need for subsidies from FTA or the Government. These measures should be led by agencies responsible for various assets (HTA, ATM, PRITA) until the transformation of PRITA into a true transit authority is complete, at which point PRITA should become the responsible party across assets.

Implementing these goals will require a concerted effort and continued engagement of a workforce, all collaborating towards a common goal. As an example, asset transfers between agencies should also consider the transfer of responsibilities and recurrent funding, in addition to the assets themselves. In order to apply lessons learned, the Government should perform an initial assessment of legal, Federal Transit Administration (FTA) and Transportation Asset Management Plan (TAMP) considerations. Once the assessment is completed, the Government should develop a program foundation to align on priorities, success metrics, measures, and a future state organizational structure (as reflected in *Exhibit 72*) to demonstrate progress. Thereafter, workstreams can be implemented and, along the path of implementation, optimization and innovation can take place after results have been assessed and new workstreams are established. Ultimately, the end goal is for rider experience to improve, and transit ridership and accessibility to increase. As part of the reorganization of assets and responsibilities into mode-specific entities, the Commonwealth should ensure that the entities meet all requirements to obtain federal grantee status.

*Create an overarching Transportation Policy Board to guide multi-modal transportation strategy across the Island*

The Commonwealth should create an independent Transportation Policy Board ("TPB") to set and execute an Island-wide transportation strategy. The TPB would be empowered to, at a minimum,

1. Set long-term, cross-modal, strategic plans and investment priorities applicable to all transportation investments on the Island

2. Regularly review and report on execution against strategic plans, providing transparency and guidance on any corrective steps required

3. Coordinate the federal grants strategy for all transportation entities to harmonize the process and maximize opportunity and availability of federal funds

---

232 Públicos and Transportation Network Companies carry ~50 million passengers per year, representing the vast majority (65%) of total transit rides in the San Juan metropolitan area. Puerto Rico Long Range Transportation Plan, December 2013

4.  Develop and oversee the use of objective frameworks for project selection and project prioritization processes

5.  Provide oversight and compliance check to both the pre-construction and capital delivery activities.

The proposed TPB would provide oversight and guidance for the transportation entities within the Government but would not seek to burden them with new regulations, leaving implementation of long-term strategic plans to each relevant entity.

The TPB should be comprised of 3 to 5 members, appointed by the Governor with the advice and consent of the Senate. Candidates should be selected from lists developed by professional recruitment firms and should comply with minimum knowledge and expertise requirements. To insulate TPB members from political pressure and ensure continuity and consistency in long-term planning, initial TPB member terms should be staggered with subsequent appointments being for a term of no less than five years. TPB members should also not be subject to at will removal, and should only be removed for cause.

EXHIBIT 72: PROPOSED RELATIONSHIP BETWEEN TRANSPORTATION POLICY BOARD AND OTHER TRANSPORTATION ENTITIES



*Improve performance management through performance-based contracting and concessions with the private sector*

Puerto Rico should better integrate private operators into public systems. At present, *públicos* and transportation network companies ("TNC") operate broadly across Puerto Rico to satisfy excess demand for transportation beyond that provided by the public sector. There is limited coordination, however, between these private operators and the public networks. Similarly, private contractors execute much of the Island's transportation construction without providing visibility into individual project performance. If managed well, the private sector can be a key partner in both operating transit systems and delivering capital projects efficiently and cost-effectively. As an example, the Maritime Transportation Services  PPP with HMS Ferries LLC ("HMS") is structured such that HMS prioritizes improved service quality and efficiency, thereby aligning the interests of private operators with those of Puerto Rico's businesses and residents, who demand access to reliable and safe transportation services. Moreover, the management of private sector players is critical for transportation agencies to ensure that they can maximize available funds and mitigate risks, as shown through the improvements seen in PR-22 road condition as a result of the Metropistas PPP.[233] Further, Puerto Rico's transportation entities can get more value from their private-sector vendors through innovative contract design and improved vendor supervision. Moreover, PPPs are an additional tool to attract private investment.

---

233 At present, the Acts governing PRITA and HTA provide for the implementation of this measure per P.R. Laws tit. 9, § 2004a

Of the ten projects currently under consideration by the PPP Authority, none impact transportation.[234] Greater coordination between transportation sector entities and the PPP Authority can enhance the potential of private funds being leveraged for transportation, specifically by identifying, developing, and structuring attractive projects, such as the long-term concession of the remaining toll roads. If Puerto Rico achieved the same amount of PPP investment per capita as Virginia, it would receive an influx of $3.7 billion in private investment.[235]

In addition, the Government, and more specifically, relevant transportation entities, should systematically identify ancillary revenue opportunities (e.g., advertising, creating service plazas, renting out real estate to retailers). If Puerto Rico achieved a level of non-toll revenue similar to mainland peers such as Florida's Turnpike Enterprise and the North Texas Tollway Authority, HTA would realize an incremental $12.7 million in annual revenues.[236] As with PPP funding, this best-in-class example should serve not as a specific target, but as an indication of what is possible.

***Maximize funding by ensuring all relevant entities have federal grantee status, adopting a more comprehensive federal grants strategy, and attracting private capital***

The Government needs to maximize investments in Puerto Rico's transportation sector by ensuring access to all available federal and private funding are deployed. To achieve this, PRITA should successfully complete the FTA's process to obtain grantee status, which is pivotal for maximizing federal funding opportunities, reorganization of assets and management responsibilities, and would pave the way to efficient multi-modal coordination.

Puerto Rico would benefit from a holistic strategy to maximize funding flowing into its transportation network. The TPB would be well-situated to coordinate these efforts across transportation entities. By establishing an Island-wide federal funding strategy, attracting more private investment, and increasing ancillary revenue, Puerto Rico can improve the transportation sector's financial health and invest more in-service delivery to public transportation users.[237]

---

234 Puerto Rico Public Private Partnerships Authority website

235 $10.2 B in new build PPP at 8.5 M people in Virginia is about $1200 per person. $1200 per person for 3.2 M people in Puerto Rico represents $3.8 B and Puerto Rico currently has $127 M in new build PPP projects, per the Center for Innovative Finance Support,  United States Department of Transportation Federal Transit Administration

236 The Florida Turnpike Authority and the North Texas Tollway Authority each bring in ancillary revenue equivalent to about 3-5% toll revenues. The NJTA is particularly successful in collecting non-toll revenue, and they regularly renegotiate with private operators (including toll collectors, gas stations, and service plazas) at the end of every contract. The NJTA successfully leverages the lucrative nature of these concession agreements to build performance incentives into contracts and pursue profit-sharing agreements between vendors and the agency. In 2019, non-toll revenues were equal to 15.5% of NJTA's toll revenues and included cellular tower rentals, park-and-ride facilities, rent, towing fees, property sales, billboard commissions, video feed licensing, an Arts Center, and other investments, compared to 5% in Puerto Rico. $121 million in toll fares * 15.5% = $16.2 million; $16.2 million - $6 million in "other income" = ~$10 million. Per the New Jersey Turnpike Authority 2021 Annual Budget in Brief; the New Jersey Turnpike Revenue Bond Resolution Certification 713 (c) dated October 14, 2020; and the HTA FY2020 Fiscal Plan

237 At present, the Center of Federal Opportunities (under the Office of Management and Budget) is tasked with providing technical assistance to the Government of Puerto Rico and its related agencies in order to obtain and maximize federal grants. This recommendation requires that the Center of Federal Opportunities fulfill its mandate by supporting transportation authorities to secure further public funding

## 11.3   Implementation of the transportation system reform

To meet the requirements outlined above, the below milestones should be accomplished:[238]

EXHIBIT 73: IMPLEMENTATION TIMELINE FOR THE TRANSPORTATION SECTOR REORGANIZATION

| Municipality | Action item | Owner | Deadline |
|---|---|---|---|
| Allocate transportation assets into mode-specific entities | Develop a program foundation to align on priorities, success metrics, measures and future state organizational structure to demonstrate progress | PRITA, HTA, DTOP, AAFAF | October 1, 2021 |
| | Organize assets, roles and responsibilities within existing entities into asset-class groupings | PRITA, HTA, DTOP, AAFAF | October 1, 2021 |
| | Identify legal and other obstacles to asset reorganization and present to FOMB | PRITA, HTA, DTOP, AAFAF | October 1, 2021 |
| | Segregate costs/revenues associated to tolled, non-tolled roads and transit assets (i.e. labor, opex, etc.) and assign by asset class | PRITA, HTA, DTOP, AAFAF | October 1, 2021 |
| | Amend/Update entity organizational structures to accommodate restructured roles and responsibilities | PRITA, HTA, DTOP, AAFAF | November 15, 2021 |
| | Transfer personnel and resources (as applicable) to the relevant entities | PRITA, HTA, DTOP, AAFAF | June 30, 2022 |
| | Finalize transfer of roles and responsibilities for non-tolled roads from HTA to DTOP. | PRITA, HTA, DTOP, AAFAF | June 30, 2023 |
| Re-allocate transit assets to PRITA | Perform initial assessment of legal, Federal Transit Administration (FTA) and Transportation Asset Management Plan (TAMP) considerations | PRITA, HTA, AAFAF | September 1, 2021 |
| | Specify, procure, and implement required system to operate transit assets (e.g., IT infrastructure) | PRITA | December 31, 2021 |
| | Achieve minimum financial, legal, and technical capacity to effectively manage FTA funds | PRITA, AAFAF | October 1, 2021 |
| | Submit request to FTA for Grantee Status Designation | PRITA, AAFAF | November 1, 2021 |
| | Achieve FTA grantee[1] | PRITA | June 30, 2022 |
| | Finalize transfer of all transit assets to PRITA | PRITA,HTA | June 30, 2023 |
| Transit Service Integration and Coordination | Enhance governance structure of PRITA by ensuring subject matter expertise is present at all levels of the organization, including top level management and Board of Directors. | PRITA | December 31, 2021 |
| | Adopt a single farecard for all public transit networks | HTA, ATM, PRITA | December 31, 2021 |
| | Harmonize fares and schedules across TU, buses and ferries | HTA, ATM, PRITA | December 31, 2021 |
| | Pool data resources in order to conduct common research on future initiatives | HTA, ATM, PRITA | December 31, 2021 |
| | Design a coordinated network of public transit routes | PRITA | March 31, 2022 |
| | Begin redesigning the physical landscape around transit stations to encourage pedestrian traffic and promote integration with the stations | PRITA | April 30, 2022 |
| Leverage private-sector services for improved efficiency | Design a series of initiatives that could be implemented in collaboration with private transport networks (e.g. Públicos) | PRITA | December 31, 2021 |
| | Develop a strategy for communicating with private network operators | PRITA | December 31, 2021 |
| Identify and implement innovative transportation initiatives | Identify curb management practices and other practices that disincentivize the use of mass transit infrastructure | PRITA | March 1, 2022 |
| | Introduce new legal/regulatory framework proposals to address these practices and promote greater use of transit systems | PRITA | June 30, 2022 |
| Establish Transportation Policy Board or analogous entity[2] | Establish an independent advisory board responsible for setting long term holistic strategic plans and oversight of investment prioritization processes to advance transportation from an island-wide perspective | AAFAF | November 1, 2021 |
| | Establish processes and guidelines for reviewing and reporting on the execution of strategic plans and providing transparency and guidance on corrective action | Transportation Policy Board (TPB) | December 1, 2021 |
| | Establish processes and guidelines for coordinating the federal grants strategy for all transportation entities to harmonize the process and maximize availability of federal funds | TPB | December 1, 2021 |
| | Assess and develop mechanisms to lower traffic congestion and increase accessibility to transit | TPB | December 1, 2021 |

1 This is dependent on FTA review and approval process, which is outside of the Commonwealth's control.
2 The proposed Transportation Policy Board would have to be created by legislation or by modifying the existing legislative mandate that established an Advisory Board on Transportation

---

238 In the interest of ensuring compliance, the Oversight Board reserves the right to tie a portion of DTOP's and PRITA's budgets to the successful implementation of certain milestones (TBD), and, as such, freeze or clawback funds should the Government fail to implement its milestones

# Part IV. Investments to revitalize Puerto Rico

As Puerto Rico aims to navigate through the COVID-19 pandemic and rebuild both economically and fiscally, the 2021 Fiscal Plan builds on what has been multi-year strategic investment program to improve government services, increase competitiveness, and create the conditions for growth that can benefit all residents.

Multiple Fiscal Plans have called for investments in front-line services that residents depend on for health, safety, and economic opportunity. This has included investments to support the Government, as well as individuals and businesses, in combating the COVID-19 pandemic. The 2021 Fiscal Plan preserves investments included in prior Fiscal Plans and supplements them in priority areas such as broadband infrastructure, developing the technology-oriented workforce of Puerto Rico, and ensuring robust civil service reform.

The Government must deploy these funds efficiently and effectively to maximize their benefit for the Island's people and economy.

These investments can be categorized as follows.

## Immediate response to COVID-19

In the wake of the COVID-19 pandemic, the Oversight Board worked closely with the Government to act decisively to mitigate the effects of the sudden economic shock caused by the COVID-19 pandemic. These initial investments totaled **$787 million** and provided hazard pay for front-line workers, direct payments to residents, essential supplies and equipment for public safety, materials for distance learning in the public education system, and funding for COVID-19 related research and development in UPR's Medical Sciences Department.

## Investments in frontline services and agency operations

The 2021 Fiscal Plan also continues or makes additional investments to support frontline services and to enhance agency operations. These include ~**$900 million to bolstering healthcare infrastructure and services** (e.g., capital improvements at public hospitals, public hospital IT, telehealth infrastructure, opioid treatments, education loan forgiveness for rural healthcare professionals, and funds to maintain nurse and health professional staffing levels), ~**$880 million for public safety** (e.g., police salary raises, police equipment and capital, funds to hire Forensics Institute personnel, and funds for a DCR assessment of facility footprint and consolidation potential), ~**$640 million for educational outcomes** (e.g., funds for school psychologists and nurses, better transportation for students, teacher time and attendance analysis, needs based scholarships, incentives for student attendance reporting, digitization, teacher and director salary raises, and innovation), and ~**$550 million for new Government programs and to enhance agency operations** (e.g., funds to support ERP implementation, hire staff to finalize centralized procurement initiatives, accelerate municipal service consolidation, create transparency into economic incentives, hire special prosecutors and agents for the Specialized Domestic Violence, Sexual Crimes and Child Abuse units, and enable the fourth phase of the "Abriendo Caminos" infrastructure improvement program and for regular maintenance programs for the road infrastructure, etc.).

## Strengthening the technology sector

To ensure Puerto Rico can compete in a global economy, the 2021 Fiscal Plan includes critical funds for technology infrastructure and workforce development programs. These include **$400 million to boost universal broadband access** through incentives to expanded broadband roll out and the provision of faster service, and **$50 million to establish a 21st Century Technical and Business Education Fund,** designed to develop technical and business skills that are aligned with the needs of the 21st century economy.

Further information on these investments are detailed in *Chapter 12* below.

### Cultivating a high-performing public workforce in Puerto Rico

To ensure the Commonwealth Government can provide quality services to Puerto Rico's residents for years to come, especially given the set of natural disasters and emergencies the Island continues to face, the 2021 Fiscal Plan includes ~**$790 million for comprehensive civil service reform.** The program will aim to: align the Government's workforce capabilities and organizational structures to better meet mission objectives; enable the Government to better recruit and retain the right talent; augment employee development through standardized training; optimize human resources technology, compensation structures and policies; and redesign performance management and succession planning to promote employee development. The program will start with a pilot for financial management personnel and functions; the Oversight Board will work with the Government to ensure the success of this pilot as well as its scaling across other agencies and functions.

Further information on these investments are detailed in *Chapter 13* below.

# Chapter 12. Strengthening Puerto Rico's technology sector

## 12.1   Broadband infrastructure

The 2012 Puerto Rico Broadband Strategic Plan (written by Connect Puerto Rico, in conjunction with the Puerto Rico Telecommunications Regulatory Board and the Puerto Rico Broadband Taskforce) established a vision of a Puerto Rico with fast, robust, redundant, and ubiquitous broadband access. Broadband provides numerous socio-economic benefits to communities and individuals, including improving labor market outcomes by enabling remote education and increasing business productivity through better connectivity, providing access to better health care through telemedicine for those in rural areas, and enhancing civic participation through better access to information.

During the COVID-19 pandemic, internet access has become even more important to residents' livelihoods. Across the US, telemedicine is becoming more widespread as a way to deliver health services safely. As public and private school systems alike move to distance learning models, students who do not have access to reliable, high speed internet are unable to participate – and therefore fall farther behind. Finally, most employers have shifted to remote or hybrid working models, meaning participation in the formal sector requires stable broadband access.

Unfortunately, within Puerto Rico, while there was some growth in broadband deployment in 2011-2014 (driven by an aggressive capacity upgrade of cable networks, as well as the deployment of fiber by other broadband providers), critical broadband infrastructure gaps still exist, particularly across rural areas of the Island. As of 2014 (the most recent year for which data is available), while ~99% of urban households across Puerto Rico had access to speeds of at least 10 Mbps download and 1.5 Mbps upload, this was true for only ~66% of rural households[239] (see *Exhibit 74* below). Broadband adoption figures across Puerto Rico also reveal a persistent gap among certain demographic groups. Broadband non-adopters in Puerto Rico are generally low-income groups, senior residents, people with disabilities, and/or individuals with less education, which mirrors demographic trends related to broadband adoption on the U.S. mainland. These gaps have possibly widened since Hurricanes Irma and María, particularly in the mountainous region of Puerto Rico, where topography has hindered replacement of damaged infrastructure.

---

[239] Puerto Rico Broadband Strategic Assessment, 2015

EXHIBIT 74: PUERTO RICO BROADBAND STRATEGIC ASSESSMENT (2015) – UNSERVED HOUSEHOLDS



Addressing the digital divide is critical to ensuring that all residents of Puerto Rico can take advantage of the many well-documented socio-economic benefits afforded by Internet connections. These benefits are most evident when people have access to the Internet at speeds fast enough to be considered broadband since these speeds are required to facilitate full interaction with advanced online platforms.

Historically, the Federal Government has created a number of programs to expand and subsidize broadband access throughout the United States, including the Federal Communications Commission (FCC) Uniendo a Puerto Rico Fund, the FCC E-Rate and Rural Health Care programs, and the FCC Connect America Fund (CAF), amongst others. To date, these programs have yet to fully address the particular needs of Puerto Rico with regard to broadband availability, quality of service, and adoption, and significant gaps in service availability and take-up remain. For example, the *Uniendo a Puerto Rico Fund*, an FCC reverse auction program to help rebuild the fixed and mobile broadband infrastructure damaged during the 2017 hurricanes, awarded $385.9 million for a 10-year period totaling ($127.1 million and $258.8 million, for fixed and mobile infrastructure, respectively). Although wide in coverage, this program emphasized availability of service over affordability, adoption and usage and focused on deployment across residential locations, potentially overlooking public institutions. Meanwhile, while significant new national broadband funding is also expected through federal legislative responses to the COVID-19 pandemic (including the CARES Act, the CRRSA Act, and the proposed American Jobs Plan Act), funds for Puerto Rico are still to be determined, and could be minimal.

To truly address broadband affordability and accessibility, more investment is needed. As such, the 2021 Fiscal Plan complements federal programs with $400 million in FY2021 (to be used over three years) to accelerate growth in broadband access and expand resident adoption and use of online resources, develop necessary and reliable data through an assessment of broadband availability, incentivize private sector investments in broadband build-out, and to improve access to faster speed offerings in underserved areas (the "Broadband Infrastructure Fund"). This emulates the approach taken by several states such as Illinois, Minnesota, California and Kentucky. While the overarching goal of all these sources of funding is aligned with that of federal

programs, their focus, scope, granting and eligibility criteria, and disbursement timeline are different and complementary.

Meanwhile, in order to maximize the impact of these resources, an integrative, comprehensive and well-coordinated broadband strategy is required. This coordinated strategy should help overcome barriers to broadband expansion, ensure that all residents, enterprises, and public institutions in Puerto Rico benefit from this capacity, and ensure that critical public institutions – e.g., schools, hospitals, libraries – can stay connected. The goal is that the Broadband Infrastructure Fund will support expansion efforts in unserved and underserved areas through a grant program (the "Broadband Infrastructure Grant Program") that will fund a portion of the cost of deployment in these communities.

The Broadband Infrastructure Fund and its associated grant program, stand to complement the federally funded programs by:

- Developing and implementing a purpose-built broadband program for the needs of Puerto Rico
- Updating the Puerto Rico Broadband Strategic Assessment, and establishing a system for continual updates, data analysis and maintenance
- Providing increased penetration and faster connectivity to users, at levels compatible with the 2015 Puerto Rico Strategic Assessment (100/50) and higher than minimum federal requirements (25/3)
- Driving up adoption and usage (~40% of Puerto Rico households do not have an internet subscription[240])
- Connecting critical public institutions, including schools, hospitals, and libraries
- Enhancing resiliency of infrastructure by favoring buried conduit over aerial infrastructure
- Encouraging the participation of local vendors (~69% of local residents live in areas where there is only one provider[241])
- Providing for roll out over a shorter timeframe (3-years as opposed to 10 years)
- Enabling up-to-date and reliable local data distribution supporting FCC monitoring and assessing the digital divide

A successful Broadband Infrastructure Grant Program will require strong leadership, accountability, continuity, and willingness to work with a broad range of entities, both within the Government and the private sector. There are a variety of ways U.S. mainland states structure their broadband programs (e.g., some states, including Minnesota and Colorado, have broadband offices established by statute or executive order, while others, including Tennessee, have staff within an agency dedicated to supporting broadband programs). In the case of Puerto Rico, the grant program will be managed by a third-party administrator (the "Grant Administrator") who will develop and manage a transparent and user-friendly grant application process, including development of the grant application, and will monitor disbursements from the Broadband Infrastructure Fund, amongst other administrative services.

This 2021 Fiscal Plan requires AAFAF to conduct a transparent, competitive procurement process as reviewed and approved by the Oversight Board to select the Grant Administrator. The selected Grant Administrator shall have a staff of experienced professionals and a dynamic network of collaborators that include a broad range of private and government organizations. The Grant Administrator must also ensure accountability by requiring that all grantees demonstrate they are providing the service they were funded to deliver, while also providing the data needed to evaluate the program and progress toward defined goals.

---

[240] The White House, "American Jobs Plan, Puerto Rico Fact Sheet" 2021
[241] Ibid.

The 2020 Fiscal Plan indicated that AAFAF had to complete the procurement by December 1, 2020, and on October 21st 2020, AAFAF released a Request for Proposals (RFP) for broadband infrastructure grant administrator services (i.e. procure the Grant Administrator). A total of 4 proposals were received by the RFP's deadline. On February 1st, 2021, AAFAF confirmed 5 members for a selection committee, which began to evaluate all proposals. To date, a preferred proponent has not been selected as a Grant Administrator. A schedule for the spending of these funds is shown in *Exhibit 75* below.

EXHIBIT 75: ALLOCATION OF STRATEGIC INVESTMENT FUNDING FOR TELECOM BROADBAND INFRASTRUCTURE ($M)

|  | FY22 | FY23 | FY24 | Total |
|---|---|---|---|---|
| Assessment – Update Plan | 1.0 | - | 0.5 | 1.5 |
| Broadband Grant Program | 50.0 | 168.0 | 173.0 | 391.0 |
| Trust Admin/ Program Evaluation | 2.5 | 2.5 | 2.5 | 7.5 |
| **Total** | **53.5** | **170.5** | **176.0** | **400.0** |

Over the next three years, in partnership with the Federal Government and public and private stakeholders, the Fund Administrator must collaborate to assess, evaluate, and map various opportunities for broadband expansion. Broadband inventory maps and technology assessment research will enable a better understanding of the Puerto Rico broadband market and help define infrastructure needs in underserved regions, as well as ensure that money is sent to the right places. The Fund Administrator, in collaboration with the broadband provider community, information and communication technology providers, K-12 education stakeholders, the higher-education community, healthcare professionals, local government, grassroots community groups working to address the digital divide in their communities, and private sector groups for whom broadband is an essential investment asset, will be responsible for:

■ Monitoring, measuring, and assessing the impact of broadband across the Puerto Rico economy

■ Measuring and publishing aggregate, industry-wide data regarding broadband investment trends

■ Measuring and publishing aggregate broadband use patterns

■ Adjusting Puerto Rico economic indicators to estimate and monitor the impact broadband has on the overall economy

Moreover, the Grant Administrator will set up the Broadband Infrastructure Grant Program and develop a solicited proposal mechanism with the goal of providing funding to telecommunications operators and other Internet Service Providers to support broadband deployment in unserved and underserved areas. The Grant Administrator will be overseen by a 5-member government committee (the "Grant Committee") which will provide guidance as it relates to the grant administration services and ultimately approve any grants awarded by the Grant Administrator. The Grant Committee will also have one (1) ex-officio and non-voting member from the Oversight Board.

Once funding has been approved and disbursed, the Grant Administrator must institute grant reporting, data collection, and other accountability measures to ensure that funded projects

deliver the promised service and provide data necessary for the state to evaluate progress toward its goals. Additionally, and to speed up deployment, The Grant Administrator, in collaboration with relevant telecommunication stakeholders, must also work to streamline construction permitting and planning, and leverage existing public assets, such as poles, ducts, conduits, and rights-of-ways, to incentivize private broadband investments.

The Grant Administrator will also provide timely information and strategic planning support to grantees who can leverage FCC funding opportunities as part of the broadband build-out. Therefore, program grants will need to "plug in" some of the gaps inherent in the federal programs, like focusing on critical institutions (e.g., schools, hospitals, libraries), enhancing resiliency of infrastructure by favoring buried conduit, encouraging higher speed infrastructure (100/1000 fixed, 5G wireless) and making service more affordable by driving adoption and utilization of disadvantaged populations.

By ensuring the Government enhances measuring, monitoring and strategic oversight of telecoms and internet service providers, the 2021 Fiscal Plan expects to improve the overall infrastructure on Island and to provide enhanced opportunities—through better and more equal access to education, healthcare, and information—for the people of Puerto Rico. The goals set forth by the 2021 Fiscal Plan, which require a Fund Administrator to conduct a data assessment and develop a new strategic plan in consultation with local stakeholders, will ensure a holistic vision for the program, one that is distinct and complementary to other broadband funding streams.

In order to achieve all these objectives in a timely manner and ensure access to this funding, the Government must accomplish the following actions by their respective deadlines:

EXHIBIT 76: REQUIRED IMPLEMENTATION ACTIONS FOR THE BROADBAND INFRASTRUCTURE GRANT PROGRAM

|  | Action item | Owner | Deadline |
|---|---|---|---|
| **To be completed in FY2021** | ▪ Select Grant Administrator | ▪ AAFAF | ▪ April 2021 |
| **To be completed in FY2022 and beyond** | ▪ Perform Broadband assessment | ▪ AAFAF | ▪ September 2021 |
|  | ▪ Setup Broadband Infrastructure Grant Program | ▪ AAFAF | ▪ December 2021 |
|  | ▪ Launch Broadband grants application and selection process | ▪ AAFAF | ▪ January 2022 |
|  | ▪ Complete execution of the Broadband infrastructure buildout projects supported by the program | ▪ AAFAF | ▪ June 2024 |

## 12.2   21st Century Technical and Business Education Fund

In addition to funding for telecom and broadband infrastructure, the 2021 Fiscal Plan recognizes the importance of investing to close core skill gaps and ensure the people of Puerto Rico are able to compete in a global economy. Creating an aligned, 21st century workforce that prepares residents of Puerto Rico to thrive is the central challenge to maintaining economic competitiveness over the next decade.

As the pace of technological change has accelerated, one core skill gap in Puerto Rico is around technical capabilities. To close the gap for people who are already in the workforce, Puerto Rico must take a learner-centric approach to make it easier to access targeted technical education.

160

Meanwhile as businesses look for new skillsets, they are often willing to look beyond college graduates to fill open roles – especially for technical skills. According to a recent survey by Future Workforce, 90% of employers would hire candidates who validate their knowledge using a certification, digital badge, or coursework in lieu of a college degree.[242] In addition, 55% of employers often offer jobs to people who have not finished college. Today, the number of both traditional and non-degree credentials is rising. There are now 315,067 unique credential programs from non-academic organizations, with the largest categories being digital badges and online course completion certificates. Coding bootcamps, which have appeared recently, were responsible for over 1,000 unique credentials.

In Puerto Rico, there are initiatives such as Codetrotters Academy, which offers 10-week certification programs in web and mobile development, and the Holberton School, which recently opened a campus on the Island. However, these programs are limited and may not be affordable to many residents. In addition, they mostly focus on web development and programming, thereby leaving an array of important technical areas uncovered, such as cloud infrastructure, server administration, cyber security, business intelligence, artificial intelligence (AI), and machine learning (ML).

Addressing the need for additional short-duration technical and business education opportunities requires forceful and forward-thinking leadership. To spearhead this drive for Puerto Rico, the 2021 Fiscal Plan allocates $50 million for a 21st century Technical and Business Education Fund.

The 2020 Fiscal Plan required AAFAF to conduct a transparent, competitive procurement process as reviewed and approved by the Oversight Board to select an organization to serve as the administrator of these funds (the "Education Fund Administrator"). The selected Education Fund Administrator must have a staff of experienced professionals and a dynamic network of collaborators that include a broad range of private and government organizations. AAFAF must complete the procurement by December 1, 2020. To date, the RFP Request for Proposal has not been completed and a fund administrator has not been selected. The Oversight Board expects this administrator to be selected by September 2021, in order for the Government to keep access to funding for this important program.

The Education Fund Administrator will be tasked with developing a plan for 21st century technical and business skills for the entire workforce pipeline in Puerto Rico. The plan will prioritize the technical and business areas/skills to focus on, and the program will partner with multiple stakeholders in catalyzing and evolving the skills ecosystem. Scholarships would be made available for programs that are certified by the Education Fund Administrator, which would do so in alignment with the skill development plan. To support these efforts, the Education Fund Administrator must establish an engagement mechanism with stakeholders (e.g., a private sector taskforce), publish the results of its skills assessment report, create the supporting infrastructure for the scholarship program, and put in place a regular monitoring and evaluation process.

Furthermore, the plan will allow universities and private providers to develop and open programs in anticipation of fees from the scholars' enrollment. Given the importance of online learning, the plan should also encourage programs to be offered in multiple formats, be it online, on campus, or a hybrid of the two.

---

[242] Future Workplace and Wiley Education Services, "Closing the Skills Gap," 2019

# Chapter 13. Cultivating a high-performing public workforce

## 13.1   The need for Civil Service Reform in Puerto Rico

The civil service is the backbone of good governance and quality public service provision. Having dynamic, competent, motivated, and high-performing civil servants is critically important as they have a direct bearing on the content and implementation of public policies and reforms, translating executive and legislative directives and regulations into tangible daily actions. The ability of the Government of Puerto Rico to provide quality services to its residents has been questioned for some time, especially when considering its recent performance in managing emergencies such as the earthquakes in the south part of the Island and the COVID-19 pandemic.

For this reason, the sustainability and quality of public services requires a comprehensive civil service reform to resolve the underlying problems and challenges of human resources management in the Government. Only by achieving this kind of reform will the Government be able to change practices that prevent Puerto Rico's Government from effectively fulfilling the most fundamental and emerging needs of its residents.

Act 8-2017 (formally known as the "Government of Puerto Rico Human Resources Administration and Transformation Act") and Regulation 8992 (formally known as the "Regulation for Implementation of Act 8-2017") were adopted by the Puerto Rico Government with the intention, among others, of achieving best practices in public administration. However, based on the evidence gathered by Oversight Board, the reforms have fallen short, as they have covered too little ground, and allowed much of the existing civil service challenges to remain intact[243]. One major flaw of Act 8-2017 was the underlying assumption that centralizing certain operational structure of human resource management would lead to a transformation of the civil service. Another aspect where Act 8-2017 fell short is that it covered a small portion of government employees because a significant number of government entities are exempted from its application. Short-term tweaks such as the centralization of compensation and classification systems do not resolve the structural problems in the civil service. True and effective reform must address the inherent problems of civil service, like political patronage, an aging and outdated talent pool, and poor performance, and redesign the processes and systems used to manage human resources in the Government.

In May 2019, the Government of Puerto Rico submitted a Uniform Classification and Compensation Plan to establish a uniform role and pay structure for its employees. The plan included career government employees and positions of trust across 65 agencies subject to the jurisdiction of the Government's central personnel management agency, the Office of the Administration and Transformation of Human Resources (OATRH, by its Spanish acronym). The plan proposed an annual investment of $146 million to provide compensation increases for 13,198 employees in these agencies.

Although a worthy effort to ensure consistency and standardization across government agencies, the Uniform Classification and Compensation Plan falls short in addressing the perennial structural problems in human resource management (HRM) in the Commonwealth's civil service. A recent examination of the existing human resources management structure in the Commonwealth Government conducted by the Oversight Board revealed many deficiencies in areas such as strategic human capital planning, recruitment, selection, talent management, performance management and evaluations, and succession planning.[244] Therefore, the

---

[243] Gonzalez, Simuell et al. "Policy Paper: Civil Service Reform." Puerto Rico Federal Oversight Management Board website. Accessed April 21, 2021

[244] Ibid.

Government should consider a broader and more integrated approach to civil service reform, as shown in *Exhibit 77.*

EXHIBIT 77: CIVIL SERVICE REFORM GOALS FOR THE COMMONWEALTH



**1. Ongoing and fact- based workforce planning**

**Strategic Workforce Planning**

- Conduct ongoing workforce analysis: Evaluate roles and responsibilities, skills and knowledge, supervisory ratios and staffing levels.
- Conduct workload analysis: Analyze activity/workload.
- Conduct human capital planning activities, like attrition forecasting and succession planning.

**2. Having the right workforce**

**Talent Acquisition**

- Recruit, select, develop, and retain top talent.
- Curtail political cronyism and managerial personalism.
- Institute leadership and employee training & development programs to keep pace with emerging needs and innovations.

**3. Promoting a performance culture**

**Performance Management**

- Develop modern, objective, credible and robust employee performance management system.
- Introduce time and attendance system throughout the central government.

## 13.2   Civil Service Reform approach

There is no universal blueprint for successful civil service reform. Changes in public sector personnel management should be tailored to the local context and conditions. Some governments adopt a comprehensive, government-wide approach to civil service reform, fully revamping the civil service system, while others follow a more incrementalistic approach, targeting more narrow areas of human resource management. For example, Title VI Section 601 (i.e., Research programs and demonstration projects) of the Civil Service Reform Act of 1978 allowed "federal agencies to experiment, subject to congressional oversight, with new and different personnel management concepts in controlled situations to achieve more efficient management of the Government's human resources and greater productivity in the delivery of service to the public." Allowing federal agencies this flexibility to innovate on personnel management systems has proven useful with many federal agencies making their demonstration projects permanent. Further, it will be difficult to push civil service reforms forward that have a positive lasting impact in Puerto Rico without strong executive and legislative backing and strategic engagement with key stakeholders.

Given the amount of administrative and political challenges with reform in Puerto Rico, a gradual and more narrowed approach, focused on pressing human capital issues within key functions of government might be more practical. Adopting a pilot-then-scale implementation approach will enable government leadership to see reforms in action and allow for policy changes and new programs to be adapted and tweaked as required prior to a larger-scale implementation and roll out. It also allows leadership to get a more concrete and accurate idea of the operational and financial challenges that might be faced in the implementation of reforms.

## 13.3   Financial management and reporting within the Commonwealth

As mentioned in previous chapters, Puerto Rico has had fiscal management challenges for years that created a growing deficit in the Island. For the Government to adhere to structurally balanced budgets reflecting ongoing fiscal discipline, it must be able to return to the timely publication of audited financial statements and related disclosure information, which is a key issue for regaining access to markets, in accordance with PROMESA. Best practice calls for audited statements to be published no later than 180 days after the end of each fiscal year, while in Puerto Rico, the FY2015 and FY2016 Annual Audited Report (AAR) were issued and published by the Government 1,095 and 1,037 days, respectively. The latest completed (AAR) is that of FY2017, issued 38 months after the fiscal year ended. Currently, the Commonwealth is conducting the FY2018 audit (expected to be issued by June 2021), and proposed to complete the FY2019 AAR by May 2022 – 35 months after that fiscal year closed. The current rate of progress to close this gap and bring these reports and audits current is not effective and the amount of time projected to audit each year in arrears will guarantee that the Commonwealth will continue this unacceptable situation well into the future.

A root cause of Puerto Rico's financial management challenges is that they Government lacks key personnel with the technical knowledge and training to properly implement new and current Governmental Accounting Standard Board (GASB) pronouncements and develop a proper financial management infrastructure. As a result, the Government continues to engage with outside contractors for critical day-to-day functions. Senior officers in charge of the preparation, review, and approval of the AAR's are replaced every time there is a change in administration. Meanwhile, Hacienda's workforce is significantly older than most private sector firms, which increases the seriousness of workforce challenges ahead. For example, almost half of Hacienda employees have been in government for over 20 years. Having long tenure but limited upward movement and training means that some employees may not have the "future skills" that are necessary for continued mobility. Similarly, employees with long tenure are more likely to have an outdated job description, with responsibilities that might be currently obsolete. And given high attrition rates across the Government, Hacienda will need succession planning efforts as well as effective sources and methods for recruiting and retaining candidates to avoid the loss of technical expertise in mission-critical skills.

In order to solve these workforce challenges, a clear and fact-based understanding of the human capital situation at Hacienda and other auditing areas at Component Units is required to align "people policies" to performance goals. Instead of adding additional accountants or establishing a new Uniform Renumeration Plan (URP) in a vacuum, the Government should work on developing a comprehensive human capital plan for financial management and reporting functions, using data and analysis to address specific areas, like strategic alignment, talent management, performance, and evaluation.

## 13.4   A human capital pilot to enable timely and effective financial reporting processes in the Government

The Government must commence a **civil service reform pilot program (Pilot)** to achieve an aligned and sustainable human capital strategy to meet future financial reporting challenges at the Commonwealth. The Pilot would have the following objectives:

- Align the Commonwealth's workforce capabilities and organizational structures to better meet objectives.

- Enable the Commonwealth to recruit and retain the right talent needed to meet financial reporting requirements.

- Augment employee development through standardized training, evaluation, and knowledge transfer.
- Optimize processes, technology, compensation, and policies to effectively support human capital management.
- Redesign performance management and succession planning to promote employee motivation, development, and retention.

The Government shall be responsible for assembling a Pilot Project Team (PPT)—comprised of Hacienda, the Office of Management and Budget (OGP, by its Spanish acronym), OATRH, the Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym) and the Oversight Board—to perform ongoing weekly tracking and reporting of the Pilot. The PPT would also be in charge of reviewing current and future state documentation, such as operational structures, job descriptions, headcount, budgets, human resources policies and procedures, and previous financial reporting reports. Upon reviewing all the information, the PPT would conduct a current state gap analysis in skills, abilities, and knowledge, and then define future state competencies and activities for finance and accounting roles at Hacienda and other relevant agencies. Based on the assessment, the PPT will develop recruitment policies and processes and an actionable roadmap for Pilot implementation, prioritizing key positions for talent interventions.

The Pilot will be developed in phases. *Exhibit 78* includes detailed actions, timelines, and milestones that will require action by the Government to make progress in the Pilot.

EXHIBIT 78: PILOT MILESTONES AND PHASES

| Action item | Phase Duration |
| --- | --- |
| ▪ Establish Pilot Project Team comprised of Hacienda, OMB, AAFAF and FOMB | Week 1-2 |
| ▪ Evaluate current and future state of financial management and reporting at the Commonwealth | Week 3-9 |
| ▪ Conduct workload and workforce assessment of financial management divisions at Hacienda and finance departments at agencies participating in the pilot | Week 10-13 |
| ▪ Develop Human Capital Plan for financial management divisions at Hacienda and finance departments at agencies participating in the Pilot | Week 14-17 |
| ▪ Develop recruitment strategy and actionable roadmap for pilot implementation (including new URP structure at pilot agencies/divisions) | Week 14-18 |
| ▪ Pilot execution- Recruitment of key personnel, deployment of new URP and performance appraisal system at Pilot agencies/division | Week 19-25 |
| ▪ First Pilot Audit | Week 30-32 |

## 13.5   Oversight Board and pilot implementation collaboration

In addition to being a member of the PPT, the Oversight Board will play an active role in overseeing all aspects of the Pilot implementation. The Government must work with the Oversight Board and its staff to effectively implement key deliverables of this Pilot to ensure overall progress against objectives outlined in this chapter. The Government will work with the Oversight Board

staff to evaluate existing processes, analyze the problem areas, and develop a new financial management structure and a human capital plan for the future.

For example, the Government will work with the Oversight Board staff on key deliverables of the Pilot, including a current state assessment, a workforce capability matrix and report, a staffing plan, workload analysis summary, skills inventory, future state operating model / organizational design, short- and long-term recruitment strategies, revised recruitment policies and procedures, and prioritized talent intervention actionable roadmap, exclusive of identifying contractor support for implementation.

## 13.6  From pilot to government-wide Civil Service Reform implementation

Once the audit of the Pilot is completed and it is determined by the Oversight Board that the Pilot objectives were met, the 2021 Fiscal Plan provides an option for larger-scale implementation and roll out of the Civil Service Reform for the rest of the central government. Expanding the Civil Service Reform will be done incrementally, strategically moving from one government agency to the next based on implementation indicators collected by the Oversight Board. The PPT will be tasked with developing a scaling roadmap detailing where, when, and in what order to expand the Civil Service Reform. *Exhibit 79* includes a scaling checklist detailing the essential steps to deploy the Civil Service Reform at a given agency.

EXHIBIT 79: CHECKLIST OF ESSENTIAL STEPS TO EXPAND CIVIL SERVICE REFORM

| Civil Service Reform Components | Central Government Outcomes | Agency Accountabilities |
|---|---|---|
| **Pilot Financial Management** | ▪ Successful implementation of the pilot (per FOMB audit) | |
| **Strategic Workforce Planning** | ▪ Digitalization of HR records through a centralized information system<br>▪ Training of OATRH staff and HR professionals at Commonwealth agencies of the new system<br>▪ Workforce planning forecasting model tool to perform quantitative and scenario-based workforce modeling | ▪ Appropriate policies to enable HR data management compliance in the new centralized information system<br>▪ Facilitation of trainings and workshops for implementation of new system<br>▪ Deployment strategy to enable adoption and utilization of new system (certified by OATRH) |
| **Talent Acquisition** | ▪ New recruitment and outreach policies and procedures<br>▪ New recruitment web platform<br>▪ Talent screening of qualified candidates and outreach activities by 3rd party staffing agency | ▪ Facilitation of trainings and workshops for implementation of new system<br>▪ Deployment strategy to enable adoption and utilization of new system (certified by OATRH) |
| **Performance Management** | ▪ New performance appraisal framework, guidelines and operating manual<br>▪ Identified critical capabilities and key performance metrics for talent evaluation processes<br>▪ Web-based performance appraisal system<br>▪ Time and Attendance (T&A) guidelines for agencies | ▪ Facilitation of trainings and workshops for implementation of new system<br>▪ Deployment strategy to enable adoption and utilization of new system (certified by OATRH)<br>▪ Utilization and compliance with T&A system guidelines and procedures<br>▪ Automate TNR at agency |

## 13.7  Funding the program

The Oversight Board estimates that the financial management Pilot will cost $11.5 million in FY2022, which includes $1.5 million in implementation costs. As the program scales, the Government and Oversight Board estimate that it will cost $83 million per year in General Fund expenditures. The 2021 Fiscal Plan includes almost $800 million in investment FY2022-FY2051

to cover much of the run-rate costs of the program, while it expects the Government to fund a portion through savings generated through its Time & Attendance project.

On March 8, 2021, the Puerto Rico Department of Education (PRDE), in conjunction with AAFAF and Hacienda, officially launched and implemented a Time and Attendance (T&A) project that allowed the Department to determine which employees were being paid while no longer active or employed. Already, $22 million in run-rate General Fund savings have been identified through PRDE's efforts. Implementation of T&A is estimated to save $58 million annually by ensuring that only active employees who show up to work get paid.

EXHIBIT 80: CIVIL SERVICE REFORM COSTS AND SAVINGS[245]

| Cost and Savings, $M | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|
| Civil Service Reform Costs | 12 | 38 | 64 | 83 | 84 |
| T&A Savings | 12 | 38 | 58 | 59 | 60 |
| Civil Service Incremental Costs to the CW | 0 | 0 | 0 | 9 | 25 |

---

[245] PRDE in FY2022 already achieved $22 million of savings as a result of T&A implementation in FY2021 of which $11.5 million will go to pay the Civil Service Reform in FY2022

# PART V: Transforming government to better serve the residents

In addition to structural reforms, the Government must also implement fiscal measures to create a sustainable fiscal future for Puerto Rico. Fiscal measures should reduce costs while maintaining or improving the quality of important services. The wide range of government efficiency initiatives target an increase in revenues through new and more efficient collections activities, while decreasing government expenditures by ensuring reasonable usage of resources.

Although the Government has successfully maintained balanced budgets established by the Fiscal Plans, it has been slow to make meaningful progress in transforming its processes and organizational structures. These measures are necessary to sustainably reduce the Island's cost of operations. This delayed progress has created precarious risk to government service delivery, especially given recent events.

The earthquakes and the COVID-19 crisis have caused local residents to be especially reliant on the Government to effectively and efficiently provide public services. At the same time, the Government has received significant funding from both the Federal Government and the Oversight Board to respond to COVID-19, ensure service provision, and spur economic recovery. For one, the Oversight Board and Government provided a $787 million Emergency Support Package in early 2020 to agencies, individuals, and businesses. Further, COVID-19 related federal relief has totaled over $43 billion for the Island, with ~$4 billion alone going to PRDE and $5.5 billion for the Government's fiscal uses (via the CARES, CRRSA, and ARP Acts). Finally, the Oversight Board paused most fiscal measures for FY2021 to enable the Government to focus on implementation.

Unfortunately, the Government has struggled to drive operational changes and reforms, in part due to COVID-19 and a transition in Commonwealth leadership, but also because agencies have not focused on pursuing such reforms. With billions of dollars in federal support and the nation and Island starting to navigate out of the pandemic, the time is now for the Government to make its final push to drive efficiency and effectiveness.

With a new administration in place, the Government has a new opportunity to re-commit to identifying and driving initiatives that will result in better processes, more efficient spending, and greater quality of service for the Island. The 2021 Fiscal Plan resumes fiscal measures in FY2022 and continues to include milestone budgeting, which provides incentives for achievement of longstanding key fiscal goals and efficiencies. Through these incentives, as well as rapid implementation of effective managerial processes, the Government can make meaningful progress in FY2022.

## Fiscal measures

**Office of the CFO** *(Chapter 14)*. The Office of the CFO ("OCFO"), will be responsible for a variety of reforms that will ensure the most efficient financial stewardship of the Island's resources.

**Agency Efficiencies** *(Chapter 15)*. The new model for government operations involves "rightsizing" the Government through agency consolidation, process re-engineering, standardization of benefits, and reduction and/or elimination of government services. This process includes implementing comprehensive reform initiatives in the Departments of Education, Health, Public Safety, Corrections, OCFO, and Economic Development, as well as consolidations and reductions within the "long tail" of other agencies. FY2022 represents the final "savings ramp" for most of these measures, which are supposed to have been implemented since

FY2019. Agency efficiency measures must result in $1.5 billion in run-rate savings[246] by FY2026 (versus the FY2018 baseline).

**Medicaid Investments and Reform** *(Chapter 16)*. Healthcare measures seek to reduce the rate of healthcare cost inflation through a comprehensive healthcare model. The model prioritizes quality relative to cost and must result in $331 million in run-rate savings by FY2026, projected to grow with healthcare inflation.

**Tax Compliance and Fees Enhancement** *(Chapter 17)*. Tax compliance initiatives involve implementing new taxes as well as employing technology and other innovative practices to capture revenue from under-leveraged sources. These initiatives must increase run-rate revenues by $459 million by FY2026.

**Reduction in Appropriations to UPR** *(Chapter 18)*. The central Government will decrease appropriations granted to UPR, which must result in $288 million in run-rate savings by FY2026.

**Municipal Services Reform** (*Chapter 19*). In FY2017, Municipalities faced a dire financial situation despite massive Commonwealth assistance. The 2021 Fiscal Plan establishes a reduction of $220 million to the Municipalities appropriation through municipal service consolidation and improvement in property tax collections to achieve a 100% reduction by FY2025.

**Pension Reform** *(Chapter 20)*. The current PayGo system must be modified to freeze future pension accruals and reduce current benefit amounts paid (with protection for participants with benefits close to the poverty level). Future retirement benefits must be funded by expanded Social Security and Defined Contribution access to safeguard the financial stability of the public employees' retirement funds. These pension reform measures must result in $46 million of net run-rate savings by FY2026.[247]

Together, these measures are crucial to the structural balance of the Commonwealth's budget, and are projected to have an impact of over $10 billion during FY2022-FY2026 and over $84 billion by FY2051 (See *Exhibit 81*)[248].

EXHIBIT 81: CUMULATIVE IMPACT OF FISCAL MEASURES SAVINGS AND REVENUES[249]



[246] Includes right-sizing, compensation, and utility measures
[247] Excludes savings attributable to the upfront payment to System 2000 participants
[248] Excludes non-Medicaid healthcare investments, union agreement, and other COVID-19 related investments
[249] Excludes Union agreement, Non-Medicaid health investments and other COVID-19 investments

# Chapter 14. Office of the Chief Financial Officer (OCFO)

**One of the key goals of the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA) is for fiscal accountability to be quickly and permanently ensconced in the Government. To fulfill this goal, the Government** must **create a strong Office of the Chief Financial Officer (OCFO).** By centralizing key financial management functions (e.g., financial reporting, procurement, payroll) under a capable and well-resourced OCFO, the Government can address long-standing issues that have arisen under the Island's historically decentralized financial management regime that did not provide a central focus to government-wide financial reform. These include persistent difficulties around: understanding the financial needs and priorities across Government, collecting transparent data, conducting timely and accurate consolidated reporting, preventing the misallocation of funds, preventing agencies from overspending their budgets, controlling management of bank accounts, and consolidating financial statements. The OCFO is the organization that establishes policies, processes and procedures that are repetitive, efficient, and timely to track the financial impact of all transactions and report those to government leadership and external users. The creation of a centralized OCFO has been a linchpin in the restoration of fiscal responsibility of several public entities, including the District of Columbia following its financial crisis in the mid-1990's, the City of Detroit in its Chapter 9 bankruptcy as well as New York City and Philadelphia's municipal restructuring. A strong OCFO helps to provide accurate, timely and analytical financial information to support executive decision making and evaluate the impact of certain actions on efficiency and effectiveness of program outcomes. The Oversight Board strongly stands behind the need for a centralized OCFO to **place the Island on a fiscally responsible economic trajectory and restore its access to the capital markets as required by PROMESA.**

The Government's efforts to create a highly-performing OCFO have been slow and disjointed. However, progress has been made in certain areas, including providing bank account transparency, publishing weekly emergency reserve reports, monthly reporting of budget-to-actuals for select Government agencies, enhancing General Fund collections with technology, and publishing of the 2017 tax expenditure report in September 2019. While the enhanced reporting yields some improvements in management and oversight capabilities, there is a need for more detailed and timely reporting in several areas. For instance, detailed monthly budget to actuals on Special Revenue Funds (SRFs) and component units including revenues, expenditures and encumbrances; and timely issuance of the Government's annual audited financial statements (Annual Audited Report) and the annual Tax Expenditure Report (TER). In essence, each relevant financial agency has improved operational capacity and accountability somewhat, but there has been little centralization, and responsibilities still remain unclear within the group. Operating without a strong legislative mandate, the OCFO has moved from Hacienda to AAFAF throughout FY2020, and back to Hacienda during FY2021. While the OCFO has made recent efforts to produce more granular budgets and create detailed agency-level budget-to-actual spending reports, it has been substantially delayed in the issuance of its annual audits (as of April 2021, the FY2018, FY2019, and FY2020 audits have not been issued). The goal is to have a defined repeatable process where these reports are produced as required without extraordinary intervention being required. Recently, the Governor signed an Executive Order on the position of the Chief Financial Officer, and although the effort is a positive step that is expected to begin to provide some movement toward centralization, it still falls short of the centralized authorities envisioned in the 2021 Fiscal Plan.

The Executive Order ("EO-018") provided the creation of the CFO and for it to be the Secretary of Treasury. The Secretary is tasked with numerous initiatives including issuance of the Annual Audited Report, implementation of an ERP, and establishing corrective actions on control deficiencies identified by external auditors. However, the Executive Order falls short of the OCFO envisioned in the 2021 Fiscal Plan. A statutorily-created OCFO, as envisioned by the 2021 Fiscal Plan, would possess enhanced oversight capabilities through the consolidation of authorities currently spread across multiple agencies, including the Department of Treasury, Office of

Management and Budget ("OMB"), Office of Administration and Transformation of Human Resources, the General Services Administration, and the Fiscal Agency and Financial Advisory Authority ("AAFAF"). EO-018 lacks the appropriate authorities over financial dependencies that would allow CFO authorities over critical fiscal roles, responsibilities, and processes. Further, as drafted, the OCFO is not directly related, rather it must collaborate with other financial agencies and those agencies are to provide staff and professional services as requested.

Key financial management and administrative functions remain distributed across a half-dozen Government agencies, and the Government has yet to legislatively authorize the OCFO's organizational and governance structures or adequately staff the organization to fully execute its oversight responsibilities. Part of the problem is not having the right human resource management structure at the Commonwealth. Ensuring all personnel at Hacienda and other relevant agencies have clear expectations and roles, are highly motivated, and their workloads are optimally distributed will improve overall financial performance in the Government. Additionally, determining the needed competencies, assessing the available workers and recommending training, outsourcing or hiring additional staff will be necessary to enable OCFO implementation. The 2021 Fiscal Plan makes funds available to enhance the effectiveness of the civil service through comprehensive civil service reform (as outlined in *Chapter 13*). Given the importance of the OCFO to enable accurate, timely and analytical financial information at the Commonwealth, the 2021 Fiscal Plan proposes beginning the civil service reform with a pilot within financial management and reporting functions of the Government. In this Pilot, the Government will work with the Oversight Board to develop a comprehensive human capital plan for financial management and reporting functions, using data and analysis to address specific areas, like strategic alignment, talent management, performance, and evaluation. This pilot will strengthen the OCFO office and enable swift implementation.

Without comprehensive action, the Island's financial management capabilities will continue to fall short of best practices, the expectations of the capital markets, and the needs of the Puerto Rican people. Given the amount of disaster relief funds expected to flow into the economy of Puerto Rico within the next fiscal years, over $100 billion, proper structure and implementation of the OCFO will be required to maximize and provide oversight of the use of such federal funds. As such, the OCFO should assume all key financial management functions across the Government—necessary to place the Island on stronger financial footing[250].

The core objectives of the consolidated OCFO must be to:

- **Centralize treasury and liquidity management**
- **Enhance the budget development process** by improving monitoring and performance tracking based on timely and accurate accounting practices and data
- **Drive the standardization and integration of the Government's financial IT systems**
- **Ensure compliance with procurement, contract, and human resource management policies** across Government agencies
- **Ensure full implementation of pension policies** across Government agencies, including Act 106-2017 regarding the Defined Contribution system for government employees, the timely deposit of employee contributions withheld by government employers, the timely implementation of Social Security as required by the 2021 Fiscal Plan for judges and teachers, and the full repayment (with repayment plans as required) of amounts owed by government employers for PayGo obligations
- **Strengthen oversight of SRFs** through enhanced control mechanisms

---

[250] On February 26, 2021 the Oversight Board held a Public Meeting with Governor Pierluisi on the outstanding Annual Audited Report issuance, ERP implementation, and OCFO creation recommendations. The Governor agreed to the recommendations presented, which are included in a PROMESA Section 205 letter addressed to the Executive branch. As of the date of the 2021 Fiscal Plan certification, the Government is still within the 90 days' timeframe awarded to respond

- **Improve the timeliness of the publication of the Government's Annual Audited Reports and financial reporting,** achieving issuance on a best practices basis – within six months of fiscal year end
- **Centralize and validate the management of Government bank accounts, funds, debts, and other financial transactions**
- **Ensure coordination of maximally efficient use and transparent reporting of federal funds,** including both regular annual funds and disaster-related funds

Empowering the OCFO to effectively manage the Government's finances is more important than ever considering the devastating COVID-19 crisis. As part of the Federal Government's response to the pandemic, the OCFO will play a central role in administering and monitoring the use of over $45B federal and Commonwealth funds meant to support the Island's recovery from the pandemic. To that end, the OCFO must be prepared to comply with enhanced reporting and oversight requirements governing the use of Coronavirus Aid, Relief, and Economic Security Act (CARES), the Coronavirus Response and Relief Supplemental Appropriations Act (CRRSAA), the American Rescue Plan (ARP) Act and other federal funds earmarked for Puerto Rico.

A properly structured OCFO will constitute an important organizing entity for the pursuit of timely financial reporting, decision making, monthly budget-to-actual analysis, and for resource management and planning. Ultimately, PROMESA requires the institutionalization of sound financial management and fiscal responsibility within the Government. As such, the Government should take steps to institutionalize the responsibilities, financial requirements, and goals encompassed in the 2021 Fiscal Plan to ensure efficient financial management practices are sustained post-PROMESA. Cooperation between the OCFO and the primary fiscal entities and officers of Puerto Rico is essential in achieving these objectives.

## 14.1   OCFO design parameters

### 14.1.1   Responsibilities of OCFO

The 2021 Fiscal Plan requires the Government to strengthen the OCFO in line with the following parameters during FY2022 by:

- **Centralizing treasury and liquidity management to:**
  - Enforce and manage a consolidated Treasury Single Account (TSA) for the Government that controls and offers visibility into all Government bank accounts (to the extent possible), including those of component units (CU) at private banks
  - Enable all other public entities to maintain zero balance sweep accounts
  - Empower the OCFO to serve as the sole authority for Government bank account creation and closure—facilitating liquidity reporting, monitoring, and analysis
  - Facilitate the rationalization of the Government's account portfolio to support maximization of earnings, cash pooling, daily cash sweeps and treasury operations, and implementation of uniform accounts payable and disbursement prioritization processes and reports
- **Enhancing the budget development process by improving monitoring and performance tracking** to:
  - Comply with the recently-issued Oversight Board budget guidelines to develop an auditable budget that is readily-traceable to the 2021 Certified Fiscal Plan and its priorities
  - Forecast and manage the seasonality of tax receipts

- Forecast and report the fiscal cost of tax credits

- Oversee all tax decrees and tax agreement issues

- Operationalize the financial system budget to ensure consistency between accounts and facilitate their monitoring

- Estimate, protect, and enhance tax collections and revenue streams

- Establish budgetary priorities—namely, effective expenditure controls and Government-wide procurement reforms

- Develop budgets using detailed and granular account level structures for expenditures and revenues accounting through standard guidelines followed by all Commonwealth agencies

- Report revenues and expenditures' budget-to-actuals for the General Fund and Special Revenue Funds on a recurring monthly basis

■ **Driving the standardization and integration of the Government's financial information technology (IT) systems** to:

- Identify disparate systems being used for financial tracking and reporting

- Establish a roadmap to standardize and integrate systems to the fewest possible

- Orchestrate the integration across agencies, including defining new policies and procedures, coordinating data migration and validation, and training system users to effectively utilize new systems

- Improve and standardize processes that support and contribute to the accuracy of financial information provided to the ERP

- The Oversight Board encourages the Government to evaluate current laws which exempt certain government entities from the Puerto Rico Government Accounting Act. Regardless, while some entities are mandated by law to maintain fiscal independence, these entities could still leverage central financial IT systems to reduce costs and automate current processes.

■ **Ensuring compliance with procurement, contract, pension, and human resource management policies across Government agencies** to:

- Certify all contracts, bills, invoices, payroll charges, and other evidences of claim, demand, or charge relating to the Government and entities reliant upon its taxing authority by prescribing receipts, vouchers, and claims for all agencies to leverage

- Manage centralized health insurance procurement and policy management

- Oversee human resources, Government payroll operations, and all Government-related financial transactions

- Implement uniform time, attendance, and overtime processes, payroll controls, and reporting standards

---

Puerto Rico Department of Education (PRDE) Time & Attendance (T&A) Project:

- In September 2020, the Oversight Board uncovered and disclosed to the public that **PRDE paid at least $80 million in salaries** between 2007 and 2020 **to more than 17,500 former employees who should not have been on the agency's payroll.**

- As such, on November 2020, the **Oversight Board began supporting PRDE in the T&A Project, in collaboration with AAFAF and Hacienda.** The project sought to fully implement PRDE's T&A Policy, enforce the use of PRDE's existing time reporting system (Kronos), and ensure that all payroll systems were linked. By doing so, PRDE would **ensure only active employees who showed up to work were paid,** while also **directly impacting the wellbeing of public-school students** – as students are unable to effectively engage in school or receive quality, consistent education without a teacher present.

- The original timeline of the project was that starting with the pay period of December 16 to December 31, 2020 (payable on January 31, 2021) all employees would be required to record their attendance as a condition to get paid, and those who failed to properly record their attendance would receive payroll discounts on a subsequent paycheck. However, the PRDE Secretary requested additional time to implement a communication strategy.

- Nonetheless, **PRDE successfully launched the project for the pay period of February 16 to February 28, 2021** (payable on March 31, 2021). Although the project was launched ~3.5 months after initiation, this process is expected to be continued and enforced at PRDE from now onwards, without exceptions.

  - For the **first implementation cycle** (February 16 to February 28, 2021), the **financial impact to PRDE was ~$1.49 million** in discounts to ~4,370 employees.

- As of late March 2021, the project had already yielded significant savings to the Government. For example, as a direct result of the T&A project, the Oversight Board, along with PRDE, were able to identify **973 employees who were inactive or terminated but still being paid, representing ~$27 million of annual payroll costs.** All findings will be officially validated through a forensic audit currently being conducted and expected to be completed before FY2021 end.

- **Strengthening oversight of Special Revenue Funds (SRF) through enhanced control mechanisms** to:

  - Implement processes and guidelines that improve stewardship and centralization of all SRFs

  - Ensure all revenue streams attributable to SRF are deposited within the TSA

  - Improve centralization of revenues and expenditure budget-to-actual reporting and accounting of transactions in a centralized accounting system

- **Improving the timeliness of the Government's annual audited report (Annual Audited Report) and financial reporting** to:

  - Produce high-quality Annual Audited Reports that follow the modified-accrual basis of accounting required by PROMESA and leverage new forecasting, e-settlement, and analytics capabilities for FY2018 onward within established regulatory timeframes

  - Issue the FY2018, FY2019, FY2020, and FY2021 Annual Audited Reports no later than December 2021.

  - Implement long-lasting standard reporting processes and policies to ensure FY2021 and beyond audit issuances can occur within six months of a fiscal year end

- – Support stronger implementation forecasting of measures required by the 2021 Certified Fiscal Plan and more robust reporting of actuals

- – Supervise property tax assessment reforms, prepare tax maps, and provide notice of taxes and special assessments

- **Centralizing and validating the management of Government funds, debts, and other financial transactions to:**

  - – Maintain custody of all public funds, investments, and cash

  - – Administer cash management programs to invest surplus cash

  - – Facilitate short- and long-term borrowing programs

  - – Establish accountability over all Government funds, property, and assets

  - – Oversee all tax decrees and agreements issued

  - – Publish an annual TER that identifies and quantifies all tax expenditures[251] (initial report published in September 2019 for tax year 2017)

- **Overseeing the Implementation of the 2021 Certified Fiscal Plan to:**

  - – Enable all Government agencies to comply with efficiency measures stipulated within the 2021 Certified Fiscal Plan

  - – Facilitate timely and targeted interventions to address areas of underperformance relative to efficiency measures

- **Ensure robust management of new federal funds and ensure compliance to maximize and optimize their usage**

  - – Assign leaders to spur accountability and improve transparency

  - – Establish mechanisms to coordinate with federal counterparts

  - – Plan for financial inflows

  - – Provide appropriate resources for agencies to handle the influx of demand

### 14.1.2   Authority and composition of OCFO

To execute these responsibilities, OCFO must have the power to:

- **Act as the central authority over finance, budget, human resources, audit, procurement, cash management, and debt issuance** matter for all entities supported by the General Fund or dependent on the Government's taxing authority

- **Exercise a direct reporting line into agency CFOs** (in parallel to reporting lines to agency secretaries)

- **Remove any fiscal officer belonging to entities supported by the General Fund or the Government's taxing authority for violations of or non-compliance with the law**—including failure to provide timely and accurate financial information

- **Reform personnel policies**—even through the renegotiation of existing or negotiation of future Collective Bargaining Agreements (CBAs)—**in a manner consistent with the 2021**

---

[251] These include tax exclusions, exemptions, adjustments, deductions, subtractions, credits, abatements, deferrals, rebates and special rules

**Certified Fiscal Plan's efforts to realize budget savings and efficiencies** and enhance the delivery of Government services

## 14.2   OCFO structure and agency efficiency measures

### 14.2.1   Future state structure

To enable this degree of centralized management, these functions must be concentrated under a single individual: the Chief Financial Officer currently responsible for overseeing the OCFO. Over time, relevant responsibilities presently distributed across various Government agencies should be consolidated within OCFO.[252] After this consolidation, the Government should consolidate or eliminate the following agencies (*Exhibit 82*):

EXHIBIT 82: LIST OF AGENCIES IN FUTURE STATE OCFO GROUPING

| | | | |
|---|---|---|---|
| 1 | Department of Treasury (Hacienda) | 4 | Treasury (internal entity) |
| 2 | Office of Management and Budget | 5 | General Services Administration |
| 3 | Office of Administration and Transformation of HR | 6 | Fiscal Agency and Financial Advisory Authority[1] |

Limited legislative support for OCFO consolidation and various delays around standardizing and upgrading financial systems have placed the broader benefits of a consolidated OCFO at risk. The Government has not complied with original deadlines to consolidate the requisite agencies under the OCFO. Although Executive Orders can facilitate initial reforms, a broader legislative and administrative overhaul conforming to the parameters set forth within the 2021 Fiscal Plan and PROMESA is necessary to establish an effective OCFO capable of executing the responsibilities and wielding the authority outlined above. And, while Act 73-2019 marks a step in the right direction, its primary benefits (improved visibility and budgetary controls) are contingent upon IT system upgrades and the creation of procurement boards that have yet to be realized.

---

[252] These agencies include but are not limited to: The Department of the Treasury, the Office of Management and Budget, the Government Development Bank (scheduled to be liquidated), the Office of Administration and Transformation of Human Resources, and the General Services Administration. AAFAF remains a separate entity per Government plans as of May 2020 but is included in OCFO agency efficiencies section for presentational purposes

---

**Enabling improved financial stewardship**

- **GSA centralized procurement staff and implementation (~$6 million per year)**:
Starting FY2021 onwards, GSA has been funded with the staff needed to rapidly centralize
procurement across the Government, focusing real effort on identifying opportunities to
consolidate contracts, bring increased insight into spending, facilitating coordinated and
rigorous vendor management, among other best practices.

- **Civil Service Reform Pilot**: The 2021 Fiscal Plan includes $10 million in funds during
FY2022 for a civil service reform pilot program (Pilot) to achieve an aligned and sustainable
human capital strategy to meet future financial reporting challenges at the Commonwealth.
The goal of this Pilot would be to design a workforce with the right people, the right skills, and
the right mix to support, optimize, and transform financial management at the
Commonwealth. The Pilot would cover financial and accounting positions at Hacienda and
OMB and finance departments at PRDE, DCR, DOH and DPS. These human capital
investments will enable swift implementation of the OCFO.

- **ERP implementation ($36 million)**: In FY2021, capital expenditure funding was
provided for the implementation of a new Government ERP system -- $14 million for Wave 1
and $22 million for Wave 2 after the completion of Wave 1. However, Hacienda was unable to
complete the required milestones during FY2021 and were not able to access the
aforementioned funding.

---

### 14.2.2   Hacienda process streamlining and personnel rightsizing

By FY2022, Hacienda must attain a 15% net reduction (25% gross) in overall costs (approximately
$33 million or $55 million gross).[253] To do so, Hacienda should:

- Partner with private banks to reduce its real estate and personnel footprint
- Optimize non-personnel and procurement spend (e.g., support service consolidation)
- Digitize and optimize general processes to capture operational efficiencies

40% of Hacienda's gross cost reduction (approximately $22 million) should be reinvested to
bolster compliance activities and capabilities by:

- Hiring additional full-time employees for compliance activities (e.g., collection centers)
- Funding relevant technology investments to improve collection and reporting (e.g., fix
challenges with SURI platform)
- Strengthening its in-house accounting capabilities and reduce its reliance on contracted
accounting services
- Rolling out its internal ERP program

To-date, Hacienda has made progress in streamlining its processes, primarily by finalizing the roll
out of the SURI digital platform and leveraging said platform in rolling out COVID-19 benefits.
The agency has also been rightsizing its personnel with headcount decreasing by ~12% between
FY2018 and FY2020. However, further improvements are needed in order to meet the FY2022
personnel target without compromising on its service quality.

During FY2021, additional resources were made available to Hacienda for hiring accountants;
however, only ~12% of available funding has been used. Additionally, the ERP roll out has been
delayed with Wave 1 (i.e., Hacienda's internal roll out) yet to be completed even though the Prior

---

[253] For instance, a transformation within Her Majesty's Revenue and Customs agency (United Kingdom) reduced costs by 25% over
a five-year period through a series of management initiatives, including IT cost reductions, realized operational efficiencies,
reduced real estate footprint, and overall process improvements; see National Audit Office, "Reducing Costs in HM Revenue &
Customs," 2011

Administration had already spent $57 million on ERP-related consulting contracts over the past four years alone. The implementation of a centralized OCFO presents a valuable strategic opportunity to create a new Project Oversight structure over the implementation of the ERP to help address concerns over management direction and staff availability and commitment to the ERP implementation still need to be addressed, which are necessary for the success of the project.

### 14.2.3   ERP implementation status and actions needed

The successful implementation of a new ERP system can help drive changes in processes and at all levels of organizations. In Puerto Rico, the Government's ERP roll out has been consistently delayed with its initial wave (i.e. Hacienda's internal roll out) yet to be completed, despite prior administrations spending $57 million on ERP-related consulting contracts over the past four years. The implementation of a centralized OCFO presents an opportunity to create a new Project Oversight structure over the implementation of the ERP to help address concerns over management direction, internal capacity, and staff commitment to the project.

The Government must document and standardize all processes that lead up to recording transactions and must replace processes that are redundant or inconsistent with those contained in the new ERP. Prioritization must take place to cleanse data that is inaccurate or inconsistently recorded in various parts of the organization later to be used for financial analyses and management decision-making. As these processes change, so do the roles of the people executing them, providing an opportunity to consolidate functions. During the process of implementing a new ERP system, the OCFO must educate all individuals involved in the transaction flow on the importance of their role to the overall integrity of the new ERP. The Government should not be automating inefficiencies, but rethinking the processes to take maximum advantage of the controls built into the new system and be constantly vigilant at pushing back on modifications allowing for old processes and procedures to continue. In this way, the implementation of ERP can be a key driver of efficiency and accuracy of financial functions.

Puerto Rico's ERP implementation process has suffered many cost overruns and implementation delays. Although there have been some factors outside of the control of Commonwealth's management, such as natural disasters, the project has:

- Lacked the basic day to day management control and involvement at all levels;
- Been driven mainly by contractors; and
- Misaligned with future state considerations of the Commonwealth's financial operations

The execution and future successful implementation of the recently enacted Executive Order 2021-018 issued by the Governor on March 2021, which expresses a commitment to fundamentally change the financial management of the Commonwealth, demonstrates a commitment from the Commonwealth to refocus its attention on the implementation of the ERP system and the improvements its successful implementation could drive.

Before the project's implementation there are several basic underlying and structural project oversight mechanisms that should be established. The OCFO must:

- Create an Executive Project Steering Committee Chaired by the CFO and composed of other executive level officials to oversee implementation;
- Create an ERP Implementation Team headed by the Commonwealth's project manager. Members of this team should be dedicated to this project on a full-time basis;
- Agree on a project plan with milestones and budget for completion of Wave 1 and projections of total project completion of subsequent Waves before restarting Wave 1; and
- Reassess the full project timeline and cost and impact of lessons learned in Wave 1 implementation at the conclusion of Wave 1.

The Commonwealth is expected to limit its reliance on contracted resources to assist with the implementation of the ERP. In fact, the Commonwealth must assure it has access to and can

maintain all of the consultant's work product that are key to the project's successful implementation. In developing the system, the Commonwealth must retain the project decision-making role, and to do so must be in a position to supervise and oversee the work of the contractor. The contractor's role should be clearly understood and documented, and any additional work of an operational nature should be scrutinized as to why it is not able to be performed by Commonwealth staff and the plan to migrate that work away from contractors to internal staff over time.

During FY2021, additional resources were made available to Hacienda for hiring accountants; however, only ~12% of available funding has been used. Additionally, the ERP roll out has been delayed with Wave 1 (i.e., Hacienda's internal roll out) yet to be completed even though the Prior Administration has already spent $57 million on ERP-related consulting contracts over the past four years alone and indicated that Wave 1 completions was only weeks away only to find out that completion was further delayed. The implementation of a centralized OCFO presents a perfect opportunity to create a new Project Oversight structure over the implementation of the ERP to help address concerns over management direction and staff availability and commitment to the ERP implementation still need to be addressed, which are necessary for the success of the project.

EXHIBIT 83: ERP REQUIRED IMPLEMENTATION ACTIONS

| | Required implementation actions | Deadline | Status / FY22 Budget Incentive |
|---|---|---|---|
| **To be completed in FY2021** | • Create an Executive Project Steering Committee, chaired by the CFO and composed by other executive level officials to oversee the implementation | • May 2021 | • Not Started |
| | • Designate project management team (with 3+ FTEs) to monitor and evaluate the progress and completion of the Enterprise Resource Management implementation. This team should be dedicated to this project on a full-time basis | • August 2020 | • Delayed - June 2021 ($4.4M for Wave 1 implementation)[1] |
| | • Provide to the Oversight Board a project plan with milestones and budget for the completion of Wave 1, and project completion of subsequent Waves before initiate Wave 1. | • June 2021 | • Not Started |
| **To be completed in FY2022** | • Complete ERP Wave 1 implementation for the internal ERP system at Hacienda. | • September 2020 | • Delayed - August 2021 |
| | • Reassess the full project timeline and fees based on the results achieved in Wave 1. Furthermore, at the conclusion of Wave 1, present the impact of lessons learned throughout the implementation process of Wave 1 | • August 2021 | • Not Started |

[1] FY2021 budget incentives: Provide additional $4.4M for capex related to ERP Wave 1 implementation

### 14.2.4  Other OCFO personnel and non-personnel efficiencies

The Office of Management and Budget (OMB), the Office of Administration and Transformation of Human Resources (OATRH, by its Spanish acronym), and the General Services Administration (GSA) must also achieve significant savings as part of their consolidation under OCFO.

By FY2021 the OCFO was supposed to implement, but has yet to fully roll out procurement reform, centralizing Government-wide procurement processes and procedures at GSA, ultimately driving expected procurement savings across agencies.

During FY2021 the Government focused efforts on implementing the Procurement Reform Act by appointing required leadership positions such as a Chief Procurement Officer, a Bidding Official

and a centralized Bid Board, and by formalizing the Uniform Regulation for Purchases and Bids of Goods, Works and Nonprofessional services. Additionally, GSA is in the midst of transferring procurement employees from Central Government agencies as provided for in a circular letter published in January 2021. Although these milestones have advanced procurement centralization that should be continued during FY2022, savings have not yet been materialized given delays in reform implementation. For example, critical agencies, such as PRDE, that would drive efficiencies have not fully transitioned to the centralized procurement model.

Notwithstanding these efforts, the realization of OCFO efficiencies is currently delayed. These delays are tied to several factors: the absence of a plan to consolidate shared services, the lack of an HR management system, and the Government's movement of the OCFO within AAFAF and later to Hacienda. To achieve the 2021 Fiscal Plan savings projections, OCFO reforms must be implemented at the pace outlined below in *Exhibit 85*.

## 14.3   Looking ahead – efficiency savings to be achieved and required implementation actions

OCFO must continue driving consolidation and other reforms, as detailed in the previous section, in order to achieve the annual run-rate savings through FY2026 outlined in *Exhibit 117*. During the 2021 Fiscal Plan period, personnel efficiencies must continue to deliver run-rate savings of $26 million and non-personnel efficiencies of $73 million by FY2026.

EXHIBIT 84: OCFO MEASURES SUMMARY OF IMPACT



180

EXHIBIT 85: OCFO REQUIRED IMPLEMENTATION ACTIONS

| | Required implementation actions | Deadline | Status / FY22 Budget Incentive |
|---|---|---|---|
| **To be completed in FY2021** | ▪ Transfer DC plan funds from 2017 onward (located in temporary trust) into newly created segregated accounts, including payroll transfer of the employee contributions to the new DC account[1] | ▪ Quarterly progress | ▪ Completed |
| | ▪ Publish the 2018 Audited Annual Report | ▪ June 2021 | ▪ On track |
| | ▪ Provide an action plan for the audit process and publication of the 2019, 2020, and 2021 Audited Annual Reports | ▪ June 2021 | ▪ On track / Release $1.5M for professional services |
| **To be completed in FY2022** | ▪ Create and recruit associate Chief Financial Officer positions for the following groupings: (a) Economic Development, (b) Education, (c) Health, (d) Housing, (e) Public Safety and (f) Justice, whose authority would fall under the OCFO pursuant to enabling legislation | ▪ December 2020 | ▪ Delayed - September 2021 |
| | ▪ Ensure passage of legislation to enable consolidation and empower OCFO to act as the central authority over finance, budget, human resources, audit, etc.[1] | ▪ December 2020 | ▪ Delayed - December 2021 |
| | ▪ Publish the 2019, 2020, and 2021 Audited Annual Reports | ▪ December 2021 | ▪ On track |
| | ▪ All entities covered under Act 73-2019 must submit Annual Acquisition Plan to GSA, as provided for in Circular Letter 2021-04 | ▪ March 2022 | ▪ On track |

1. For all entities supported by the General Fund or dependent on the Government's taxing authority

# Chapter 15. Agency efficiency measures

In accordance with Section 201(b)(1) of PROMESA, the Fiscal Plans for Puerto Rico "provide a method to achieve fiscal responsibility and access to the capital markets." When the Fiscal Plan process began in 2017, the Government had approximately 16,500 employees across 114 Executive, Legislative, and Judicial branch government agencies, excluding large instrumentalities.[254,255,256] These agencies **were ineffective and inefficient at delivering the services needed by the people of Puerto Rico, while consuming resources that were outsized compared to the population served**.

Even now, compared with U.S. states serving similar populations, Puerto Rico remains an outlier in terms of the sheer number of agencies. For example, as of 2018, Connecticut had only 78 state agencies, while Iowa had just 36. Staffing and managing an organization of this size is highly challenging and complex, even in a stable fiscal and economic environment. With over 100 direct reports to the Governor, it has been a practically impossible management task. **In addition, notwithstanding the amount of spending, there are countless examples of subpar service delivery across the Government.** For instance, despite having six agencies primarily dedicated to the financial stewardship of the Island, the Government has been unable to consistently issue consolidated audited financial statements on a timely basis. Further, Puerto Rico's education system has a record of consistently delivering unsatisfactory student outcomes,

---

[254] These include Puerto Rico Electric Power Authority (PREPA), Puerto Rico Aqueduct and Sewer Authority (PRASA), Highways and Transportation Authority (HTA), University of Puerto Rico (UPR), Public Corporation for the Supervision and Insurance of Cooperatives (COSSEC, by its Spanish acronym), and the Government Development Bank (GDB)

[255] Excludes transitory employees.

[256] Excludes agencies which currently have $0 operating budget and no employees.

including below- U.S. mainland average graduation rates and standardized test scores that are far below basic proficiency levels.

To assure the delivery of essential services while achieving financial sustainability**, the Government** must **focus on operational efficiencies to enable better service delivery in a cost-effective way.** A leaner, more efficient, and transformed future Government of Puerto Rico should wherever possible reflect mainland U.S. benchmarks in terms of both number and size of agencies.

As part of the new Government model, the Government must conclude the process of consolidating the over 110 agencies into **no more than 49 agency groupings and independent agencies** (see *Section 25.2*). In some cases, these consolidations should better focus the competing efforts of multiple agencies, such as the Economic Development grouping, which is consolidating ten agencies into one. In other cases, the consolidations should serve to move services closer to residents, such as the Healthcare grouping, which will consolidate access points to important services like Medicaid. In all cases, consolidations will enable agencies to streamline back-office processes, eliminate duplicative resources and benefit from procurement efficiencies.

In addition to agency consolidations, the 2021 Fiscal Plan outlines operational and process improvements that must be made to more efficiently use resources—including staff, equipment, services, and buildings—across agency groupings such as Education (PRDE), Corrections (DCR), Health (DOH), and Public Safety (DPS). The goal of such efficiency measures is to improve the quality of the underlying services for the population while also directing valuable resources toward priorities and achieving the cost savings needed to balance the Government budget.

These measures were developed through an iterative process with the Government and are designed to ensure compliance with necessary savings targets without compromising the quality of public service delivery on the Island—and actually improving it in many cases. These include various agency-specific efficiency (rightsizing) measures as well as certain government-wide savings measures:

- **Agency-specific personnel measures**: Personnel efficiencies specific to each agency (e.g., back-office consolidation, process re-engineering to enable headcount rightsizing and aligning resources with mainland U.S. state benchmarks) that will enable the reduction of payroll expenditure levels

- **Agency-specific non-personnel measures:** Operational efficiencies specific to each agency (such as procurement centralization and optimization of spend, consolidation of facilities) that will enable the reduction of non-payroll expenditure levels

- **Government-wide compensation measures:** Standardization of personnel policies throughout government (including institution of a standard employer healthcare contribution, a hiring freeze, a payroll freeze, elimination of the Christmas bonus and prevention of carryover of sick/vacation days beyond the statutory caps) to enable the reduction of payroll expenditures across agencies even without reducing employees

- **Government-wide non-personnel measures:** Utilities efficiency improvements and conscious usage of electricity and water (e.g., PREPA and PRASA) to result in savings on utility expenses. Further, reductions of professional services to enable the professionalization of the civil service and reduce reliance on outside consultants. Finally, elimination of 'englobadas,' or less transparent spending to improve fiscal controls and accountability.

- **Budgetary adjustments and other funding:** Adjustments made on an annual basis to reflect new information obtained during the budget process. These include funding to ensure Government agencies meet federal requirements (e.g., consent decrees), provide quality front-line service delivery, and to reflect changes in agency operating needs.

- **Investments:** Agency-specific one-time or recurring funding provided to enhance service and improve the fiscal and financial management of the Government (such as the Pilot phase of the Civil Service Reform), to improve the tourism and economic activity of the Island (such as the hosting of the Central American and the Caribbean Games[257]),  provide quality front-line service delivery (by continuing to fund pay raises to teachers, firefighters, police), enhance growth and labor productivity (such as through scholarships for UPR students, and funds for workforce development programs) and focus on implementation of efficiency measures.

**To date, the Government has unfortunately failed to demonstrate meaningful progress in implementing agency consolidations or otherwise improving operational efficiency, though it has generally met budget targets. The Government has also struggled to properly activate several investments provided by the Oversight Board.**

To achieve personnel savings, the Government has primarily utilized broad-based early or incentivized retirement programs (e.g., the Voluntary Transition Program and Voluntary Pre-Retirement Program),[258] (Law 211-2015, as amended)), instead of driving optimization of back-office roles[259] or alignment of front-office roles with mainland U.S. states' benchmarks (e.g., State Elections Commission personnel). Furthermore, the Government's efforts through these untargeted retirement programs have encouraged critical personnel to retire early  leading to large payouts with high retirement rates, major gaps in skills and capabilities, and a slower, less effective government.

To achieve non-personnel savings (required since FY2018), the Government started to make changes during FY2021 to its procurement processes. FY2021 was the first year that the General Services Administration (GSA) received a General Fund allocation to carry out procurement centralization. The agency has managed to centralize some contracts and has begun to transition procurement employees across Central Government agencies. The GSA has also started assessing Government-wide procurement needs to attain efficiencies and achieve savings. Despite this consolidation of certain contracts across agencies, GSA claims it will take additional time to complete procurement centralization and achieve material savings. Additionally, procurement efforts have not been appropriately aligned with the consolidation of physical locations of operations, causing inefficient spending to continue longer than necessary. For example, utility expenses at closed schools have largely continued even though the schools are unused, and officers continue to be staffed to guard closed correctional facilities.

Finally, some funds have gone unspent or been utilized ineffectively. While there is some progress—DCR, for example, has successfully used funds provided to start its review of habitable spaces to enable prison consolidations, and salary raises have been provided to frontline police officers—there have been struggles in implementing many investments. For example, PRDE misspent funds for raises to teachers and directors in FY2019 and FY2020, leading to a costly lawsuit and delays in providing raises. Similarly, funds for a Firefighter Academy have only been used partially (not to the extent budgeted for) due to the inability of the Firefighters to establish a successful program to date. Funds for healthcare IT and capital expenditures have also gone largely unspent, though the procurement process has been initiated for most initiatives. And funds provided for FEMA Disaster Relief Funding cost share have been redirected to other uses, such as funding to cover state share of projects that are not disaster related. These are just selected examples among many. To truly enhance efficiency and effectiveness, these funds should be deployed – and deployed correctly – as soon as possible.

In addition to the above, the 2020 Fiscal Plan allocated **$73 million of implementation budget incentives in FY2021 for PRDE, DCR, DDEC, DOH, Hacienda, and AAFAF to**

---

[257] Funding subject to a determination on the availability of federal funds i.e., American Rescue Plan (ARP) Act

[258] Law 211-2015, as amended

[259] e.g., Through reduction of duplicate administrative roles in DCR or centralizing back-office operations in the Office of the Chief Financial Officer (OCFO)

**accelerate transformation** of core government services and encourage progress in high priority areas, including but not limited to meeting higher data quality and transparency standards, conducting operating model/capacity analyses, and building up essential infrastructure to facilitate process improvements. Agencies that completed full implementation of certain required actions for specific projects by the stated deadline would be eligible to receive budget incentives upon certification by the Oversight Board. **DDEC and AAFAF completed the required actions** within the determined deadline, making them eligible for the budget incentive. **However, PRDE, DOH, and Hacienda did not meet the requirements to comply with the implementation** of required actions within established deadlines. As such, these agencies lost the budget incentive. Many agencies like DOH and DCR, on the other hand, requested a deadline extension for the budget incentive due to delays in their procurement processes.

**The implementation of 2021 Fiscal Plan initiatives and measures is required to achieve operational efficiency and improve government services. More than ever, given the significant influx of federal funding received as a result of natural disasters and the COVID-19 pandemic, all agencies must develop a long-term financial plan by December 2021 to serve as a concrete working plan to allocate State and federal resources in order to meet short and long-term objectives. A comprehensive long-term financial plan** must **have clear milestones, deadlines and actions that account for agency needs (short and long-term), while also focusing on implementing crucial agency efficiencies detailed in this chapter.**

## 15.1   Agency operational efficiencies and improvements

The 2021 Fiscal Plan continues to outline savings the Government is expected to achieve through both agency-specific and government-wide personnel and non-personnel measures.

### 15.1.1   Agency-specific personnel and non-personnel efficiency measures

There are several actions that have been applied to each agency to achieve these targets:

- **A series of agencies must be merged** when benchmarking and best practices determine that activities across agencies could be better served through a single mission and management to eliminate redundancies, and/or where economies of scale make shared services more economical without reducing quality of service

- **A small subset of agencies will be left independent but must be made more efficient** through a series of streamlining efforts related to both personnel and operations, allowing the agencies to provide improved services at a lower cost to taxpayers

- **Some agencies will be closed completely or privatized** if their function and programs are not required, or can be transferred to private ownership, resulting in a 100% personnel and non-personnel savings for all non-federal funded expenditures after a two to three-year wind-down period (a minimum of 50% savings must be achieved no later than year two). The Government proposed three agencies for closure: Model Forest; Culebra Conservation and Development Authority;[260] and Company for the Integral Development of Cantera's Peninsula;[261];

- Additionally, the 2021 Fiscal Plan requires **the transfer of ownership or change in legal status of the Public Broadcasting Corporation (WIPR)** to a not-for-profit organization.

---

[260] Agency will only be partially closed, so funding will be reduced by 32% overall starting in FY2020. No progress to date
[261] To be closed on July 1, 2033 per current law.

The 2021 Fiscal Plan lays out three major types of areas of operational efficiency across all agencies (whether consolidated or kept independent, but made more efficient):

- **Back-office personnel savings:** Achieve process efficiencies, centralization, and/or digitization of redundant tasks and eliminate role duplications in administrative positions. These levers have demonstrated savings of 15-20% in entities undergoing mergers

- **Front-office personnel savings:** Achieve personnel efficiencies by ensuring staffing levels are consistent with operational drivers with benchmarks from mainland U.S. states

- **Procurement/non-personnel savings:** Achieve operational efficiencies through contract renegotiations, reduction of rent payments, bundling acquisition across agencies, and other initiatives. Similar reforms of this nature have been shown to create savings of 10-15% for public and private sector entities

The Oversight Board and the Government established a working group in 2018 to develop the roadmap for these rightsizing efforts, which became the basis for the Fiscal Plans. For several of the larger agency groupings (i.e., PRDE, DOH, DPS, DCR, DDEC, and OCFO), the 2021 Fiscal Plan lays out specific reforms that are expected to be implemented in each of these areas. For other agencies, the 2021 Fiscal Plan sets savings targets that agencies are expected to achieve through their own operational improvement plans. Finally, while the Government has indicated that some consolidation plans may change, the Government shall still be responsible for achieving the total annual savings projected in the 2021 Fiscal Plan.

Furthermore, Act 73-2019, as amended, requires all Government entities to prepare an Annual Procurement Plan based on the agency's annual estimate of probable needs and purchases, using as reference the purchases made during the previous fiscal year. The plan must include a list of all goods, works and non-professional services that are considered necessary for the next fiscal year. GSA is responsible for publishing annual guidelines for the preparation of such plan, which must be submitted to GSA by March 31st of each year. Going forward, all agencies must comply with this requirement, which in turn will allow them to obtain an understanding of the purchases to be made during the year, identify potential savings, ensure compliance with budget targets, and flag opportunities to improve current processes and procedures. Although Act 73-2019 does not require the agencies to prepare a plan for annual professional services, they must in fact prepare a similar plan that details all professional services to be contracted by them during the fiscal year in order to obtain similar benefits.

### 15.1.2   Cross-cutting personnel measures

In addition to driving operational improvements specific to service delivery, the Government is expected to achieve cross-cutting personnel expenditure reductions through several initiatives which would reduce the requirement to reduce personnel:

**Maintaining a payroll freeze:** The March 2017 Fiscal Plan included a measure (which became law in FY2018) to freeze all payroll expenditures. To extend the savings from freezing payroll increases and minimize further rightsizing of staff, the freeze must be continued through the end of FY2023.

**Standardizing healthcare provided to government employees:** Medical insurance is a core benefit provided to all government employees. However, the degree of coverage varies widely across government agencies, with some employees receiving superior coverage compared to their peers. For instance, PRDE employees receive an average of $120 per month in medical benefits, whereas employees of the Housing Finance Authority receive on average over $730 per month.[262] To ensure fairness and reduce expenditures, the Government must implement its proposal to **standardize employer health insurance contributions so that all Commonwealth**

---

[262] Per latest FY2021 Housing Finance Authority payroll roster.

185

**agencies contribute $125 per employee per month, or $1,500 per year**.[263] This initiative should have been fully implemented by the start of FY2019, but the Government has failed to implement it to date. Compliant with the 2021 Fiscal Plan, the annual budget includes an appropriation to cover the healthcare contribution up to $125 per employee per month.[264]

**Reducing additional outsized non-salary compensation paid to employees:** There are several policies that the Government must continue to enforce through the duration of the 2021 Fiscal Plan that will impact personnel spend. These include:

- Asserting a hiring freeze with stringent requirements for backfilling positions left open by attrition or workforce reduction

- Limiting paid holidays to 15 days annually across all public employees

- Prohibiting carryover of sick and vacation days between fiscal years over the statutory caps (60 days for vacation and 90 days for sick leave, aligned with Act 26-2017)

- Prohibiting any future liquidation of sick and vacation days in excess of the amount of days permitted by law

- Eliminating funding for the Christmas bonus

The hiring freeze measure has been included in the Fiscal Plans since the March 2017 Fiscal Plan. The 2021 Fiscal Plan continues to require the policy, while also requiring the Government to propose stringent requirements for the backfilling of any opened positions, and to gain budgetary approval by the Oversight Board before the requirements are implemented.

The other measures outlined above were enacted in Act 26-2017, except for the elimination of the Christmas bonus. The elimination of the Christmas bonus was to be implemented starting in FY2019, but unfortunately the Government paid the bonus without approval from the Oversight Board. In FY2021, the Oversight Board reached an agreement with the Government of Puerto Rico to pay employees the Christmas bonus as long as it was done within the existing contours of the Commonwealth FY2021 Certified Budget. Certified Budgets do not include funding for the Christmas bonus.

### 15.1.3   Cross-cutting non-personnel measures

In addition to driving operational improvements specific to service delivery, agencies should reduce spend on utilities, as well as on other areas of the budget which have been historically "opaque" in terms of where funds are flowing:

- **Reducing utility spend over time:** The Government should implement energy efficiency initiatives that reduce utility payments in line with mainland energy efficiency efforts such as the U.S. Federal Energy Management Program (FEMP). Energy efficiency initiatives would include facility & fleet optimization (e.g., recycling), improved procurement agreements, and strategic investments, potentially through utility capital expenditure. By FY2023, the Government must achieve savings of 15% on its FY2018 utilities expenses, considering the rate increases projected by PREPA and PRASA. While savings associated with this measure were paused for FY2021, they have been reinstated for FY2022.

- **Reducing spend on historically low-visibility areas:** The Government should continuously monitor and reduce expenses in historically low-visibility areas (e.g., "unclassified professional services" and "englobadas"). The 2019 Fiscal Plan required a one-time and government-wide 10% incremental cut on professional services spend and 10% limit to unclassified professional services. While no incremental cut is explicitly required in

---

[263] The exception is public corporations, which should maintain current employer contribution levels for those employees with chronic pre-existing conditions. There are also exceptions based on the recent Plan Support Agreement.

[264] The exception is public corporations, which should maintain current employer contribution levels for those employees with chronic pre-existing conditions. There are also exceptions based on the recent Plan Support Agreement.

FY2021, the Oversight Board continues to expect more rigorous documentation and justification for such spending before approving its inclusion in future agency budgets. The 2021 Fiscal Plan will maintain the 10% limit on unclassified professional services.

As with prior Fiscal Plans, this 2021 Fiscal Plan includes implementation exhibits that date back to Fiscal Plans certified in 2018 (starting *Chapter 7*). These exhibits continue to show implementation dates that have been passed without Government completion of the action. The Government must act as soon as possible to address these missed milestones and to accelerate the pace of change. This 2021 Fiscal Plan therefore lays out future dates for missed milestones, by which the Government must implement the actions.

## 15.2    Investing to support agency efficiency and recovery

The 2021 Fiscal Plan includes new incremental funding to support the Government in its efforts to operate effectively and sustainably. These include:

- **Investments in frontline service delivery:** The 2021 Fiscal Plan includes several incremental investments in frontline service delivery, including compensation and benefit raises for police officers, support for Special Education therapy, and teacher compensation; funds to attract additional recruits to the Emergency Medical Services Corps and Institute of Forensic Sciences; and investments in healthcare, including funds for opioid treatment, telehealth, electronic health records, hospital capital expenditures, scholarships for medical students who commit to practice outside of major metro areas, and additional school nurses.

- **Support for accelerating operational improvements:** The Government's lack of progress on operational changes to date has created a risk to government services delivery, especially given the effects of the recent earthquakes and COVID-19. The 2021 Fiscal Plan includes implementation budget incentives that would become available when certain milestones are accomplished (e.g., consolidation of back-office functions).

- **Funding to enable consent decree compliance:** Several Puerto Rico Government agencies are subject to federal consent decrees that require them to adhere to certain regulations. These consent decrees often mandate funding requirements (e.g., certain funding levels to Special Education students). The 2021 Fiscal Plan includes funding for all consent decree requirements of which the Oversight Board is currently aware.

- **Funding for agency priorities:** The Government's proposed initiatives include investment such as the fourth phase of "Abriendo Caminos" infrastructure improvement program and additional funding for regular maintenance programs for the road infrastructure (Department of transportation and public works), hire additional personnel for Specialized Domestic Violence, Sexual Crimes and Child Abuse Units (Department of Justice), increasing funding for the Comprehensive Cancer Center and support to host Central American and Caribbean Games[265] as stimulus to post-COVID local and international tourism and general economic activity.

- **Funding for Civil Service Reform:** The 2021 Fiscal Plan includes funds for Government-wide civil service reform, as discussed in *Chapter 13*. This funding is intended to enhance training, performance management, recruitment and retention of Government employees, and thereby professionalize the public workforce.

Specific investments are detailed by agency in the following sections.

---

[265] Funding for the Central American and the Caribbean Games will be made available following the selection of the host and subject to a determination on the availability of federal funds i.e., American Rescue Plan (ARP) Act

## 15.3    Department of Education (PRDE)

The Puerto Rico Department of Education (PRDE) is the largest government agency within the Commonwealth, with approximately 44 thousand employees, charged with providing high quality education for approximately 276 thousand K-12 students across the Island at 858 schools. However, as *Chapter 8* indicates, PRDE has struggled to improve educational outcomes for its students and to operate at a size commensurate to its student enrollment.

As discussed in *Chapter 8*, a significant factor driving PRDE's subpar outcomes is **a set of underlying bureaucratic systems and structures that are ineffective and inefficient.** Simply stated, PRDE has not developed the internal capacity, or led with commitment to a clear plan to manage the complex educational dynamics in Puerto Rico. As the largest agency by both personnel headcount and budget dollars, PRDE is outsized relative to its results and needs. While student enrollment has declined considerably over the past few decades (over 50% decline since its peak in 1980 and approximately 33% in the past decade) in line with a declining population, prior to the 2017 Fiscal Plan, the number of schools and teachers had not decreased proportionally.[266,267] Furthermore, although regional offices are up and running, they currently function more as an additional layer of bureaucracy, rather than as mechanisms to drive change and shared learning closer to the student and parent populations in schools.

The Oversight Board has made a number of suggestions to help PRDE operate in more strategic ways while aiming to fulfill its core function of driving a more efficient and cost-effective educational delivery model. The one year pause on agency efficiency measures during FY2021 presented PRDE with the opportunity to start implementing necessary reforms; however, the Department was unable to move these initiatives forward, in part due to its focus on managing through the operational challenges faced during the COVID-19 pandemic and the significant leadership turnover during the election year.

Upon preliminary review of PRDE personnel and non-personnel expenses for FY2021, it would appear that PRDE achieved some savings (e.g., the number of core teachers is aligned to 2021 Fiscal Plan targets); however, these are known to be the result of low teacher staffing levels in some areas and increased vacancies due to the remote learning environment rather than adherence to the structural changes required by the 2021 Fiscal Plan. The Oversight Board anticipates the level of savings and budget underspending to decrease as PRDE resumes full in-person instruction. In addition, the Department has not achieved progress in increasing the academic support in the regional offices or executing planned workforce reductions in other areas. This effect was deeply felt by the school community during the COVID-19 pandemic since many critical schools supports (e.g., teacher coaches or "facilitadores", family engagement coordinators) were significantly lacking. At the same time, PRDE continues to have a deficit in some academic areas such as English. Currently, PRDE does not have an adequate number of English teachers to support students across the Island, which in turn result in schools that are sub-scale and require targeted resources, on a per student basis.

The Oversight Board recognizes that PRDE has been operating in a complex environment in the wake of Hurricanes Maria and Irma, earthquakes, and the ongoing COVID-19 pandemic. However, beyond these crises, PRDE continues to be challenged by its bureaucratic processes and the significant lack of system capacity that hinders its ability to implement necessary reforms. While *Chapter 8* offers recommendations and benchmarks to improve management capacity of the system and, in turn, student outcomes, this chapter focuses on the operational and financial process improvements required to support increased transparency and better decision-making at PRDE. While agency efficiency measures are applied to the State budget, PRDE needs to unlock

---

[266] Helen F. Ladd and Francisco L. Rivera-Batiz, "Education and Economic Development in Puerto Rico" The Puerto Rican Economy: Restoring Growth, Brookings Institution Press, Washington, D.C., 2006, 189-238

[267] There were 1,619 public schools in 1990 and 1,131 at the time of reporting. Oversight Board Listening Session, Secretary Julia Keleher, "On the Road to Transformation," November 30, 2017

and strategically allocate all sources of funding. This will only be possible if PRDE has clear insight to its existing spend through improved financial reporting processes.

During FY2021, PRDE was able to finalize and sign the Third-Party Fiduciary Agent (TPFA) contract (related to Special Conditions imposed by the U.S. Department of Education (USDE) in June 2019). Failure to finalize the contract in prior years (based on PRDE's inaction) had prevented PRDE from accessing ~$1.12 billion total from FY2021 and FY2020 USDE federal funds. However, the Oversight Board, and the Government of Puerto Rico, now expect these funds to be released during FY2022. In addition to these recurrent federal funds, PRDE received an unprecedented allocation of federal funding in FY2021 as a result of the COVID-19 pandemic and prior natural disasters. Incremental federal funds available to PRDE include:

- ~$2.3 billion of disaster relief funding designated by FEMA to support reconstruction of damages caused by Hurricane Maria.

- ~$4.5 billion of COVID-19 related federal funding meant to address high priority needs associated with planning for a safe return to school and offering robust learning opportunities in the case of extended in-person school closures. This amount includes various stimulus, such as:

  - ~$349 million of Coronavirus Aid, Relief, and Economic Security Act (CARES) funds

  - ~$1.3 billion of the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act

  - ~$2.9 billion of the American Rescue Plan (ARP) Act

- A portion of the ~$173 million allocated to the Governor's Emergency Education Relief Fund, authorized by CARES (~$48 million) and CRRSA (~$125 million).

The above funding will require a clear plan and rigorous controls to provide for the basic needs of students and families, nonetheless, these are not meant to reduce the expectation that the Department accelerate a major transformation of its operations and basic management improvements to better provide services and maintain fiscal balance. Without active management, operational improvements and leadership, PRDE will likely continue to see student outcomes stall.

The initiatives and milestones included in this chapter aim to provide a roadmap for PRDE to improve its operational efficiency and achieve savings targets required by the 2021 Fiscal Plan. **It is important to note all these initiatives were developed in collaboration with the Government and/or are based on PRDE's internal guidelines and regulations.** Given the immeasurable effects of the COVID-19 pandemic and other natural disasters on student learning, there has never been a greater need to drive operational process improvements and strategically reallocate resources to provide better services to the children of Puerto Rico.

*Investments to drive operational improvements*

The 2021 Fiscal Plan continues several investments that have been made in past years to ensure PRDE has what it needs to fulfill federal requirements and to enable better service delivery. These include:

- **Teacher and school director compensation (~$285 million over five years):** The 2018 and 2019 Fiscal Plans provided salary raises for teachers and directors in FY2019 and FY2020. Unfortunately, PRDE mistakenly excluded transitory teachers and directors from these raises, which generated a lawsuit against the Department. As such, the 2020 Fiscal Plan provided the funding to cover the retroactive raises for these groups. As of March 2021, PRDE had taken the necessary steps to transfer the funds from the custody of OMB to PRDE in order to cover the FY2019 and FY2020 raises for transitory teachers and directors.

189

- **Special Education and Remedio Provisional program specific FY2022 budget accounting:** In addition to the funding above, the 2021 Fiscal Plan continues to ensure that PRDE is compliant with legal requirements for the Special Education and Remedio Provisional program. In order to ensure proper resources are allocated to all special education students, the FY2022 Budget for the Special Education Program and the Remedio Provisional Program will be separately presented from PRDE's overall budget. By presenting the budgets separately, the Oversight Board can ensure resources are properly allocated based on Special Education student enrollment and needs, while also ensuring greater transparency in program spending.

*Overview of efficiency measures*

The COVID-19 pandemic caused significant prolonged disruptions to the education system and PRDE was mainly able to focus on providing virtual education, which impacted the advancement of initiatives to proactively capture savings. To help the Government manage the COVID-19 pandemic and to progress implementation across key reforms, the Oversight Board allowed a one-year deferral on agency efficiency measures for FY2021. However, starting in FY2022, PRDE is once again required to generate personnel and non-personnel savings outlined in *Exhibit 86.* The Oversight Board is analyzing the formal guidance released by the U.S. Department of Education on how to calculate the Maintenance of Effort (MOE) requirements associated with the COVID-19 funding, and will determine what, if any, implications the MOE requirements have on the Commonwealth, UPR, and PRDE funding provided in the 2021 Fiscal Plan and FY2022 Commonwealth Budget.

EXHIBIT 86: DEPARTMENT OF EDUCATION MEASURES SUMMARY OF IMPACT



Run-rate savings from agency efficiency measures[1], $M

1 Excluding investments and other funding increases

### 15.3.1   Improving student-teacher ratio

One key indicator of school efficiency is the student-to-teacher ratio (ST ratio) used across the school system. Given the need for PRDE to rightsize its resources in alignment with a steadily declining student enrollment, it should aim to manage its ST ratio to ensure improvements in efficiency. The Oversight Board recognizes that these are challenging times for the Department and that it may need to staff additional resources to address the tremendous student learning loss due to the pandemic. For this, PRDE must take advantage of the recent influx of non-recurring, non-General Fund dollars (e.g., stimulus, federal funds) to support these critical student needs through temporary staff that may not need to be incorporated as permanent positions. As described in *Section 8.3*, PRDE should protect against the possibility of this new headcount

creating a budget overspend by developing a long-term financial plan that efficiently leverages all funding sources available.

The ST ratio calculation is based on data from the Department and includes both general education students as well as Special Education students who spend most of the school day in inclusive classrooms with their general education peers (known as "salón recurso"). The teachers counted in the ST ratio are those that teach core subjects and/or homeroom classrooms.[268] The staffing of all other teachers (previously referred to as 'non-academic' teachers) are expected to be rightsized through attrition.[269]

EXHIBIT 87: TEACHER HEADCOUNT AND STUDENT ENROLLMENT



PRDE historical and target teacher headcount, thousands

PRDE will need to monitor its teacher staffing formulas and more systematically apply its own guidelines, referred to as Organización Escolar, to assign teachers based on classroom size. Although PRDE initially assigns teachers based on these guidelines, it also allows for various exceptions which are not adequately documented. For example, PRDE may choose to retain an extra teacher in a school with declining enrollment if the teacher is not able to fill a vacant position at the current school or move to another school due to extenuating circumstances (e.g., onerous travel distance per Collective Bargaining Agreement (CBA)).

Due to the impact of the COVID-19 pandemic and remote learning, for the 2020-2021 school year, PRDE did not hire the number of teachers it would typically hire in an in-person school year. This has resulted in a ST ratio of ~18.9 for December 2020 (13.9k core teachers and 263.1k students served in general education classrooms) which is slightly better than the 2021 Fiscal Plan target of 18.7. However, as PRDE resumes in-person learning, and hires additional teachers to support it, the ST ratio is expected to decrease below the 2021 Fiscal Plan target.

---

268 Core subjects / homeroom teachers include those that teach General Education, English, Math, Science, Spanish, History, and homeroom
269 All other teachers include, for example, Career and Technology, PE, Arts, and Special Education teachers

EXHIBIT 88: PRDE *ORGANIZACIÓN ESCOLAR* STAFFING POLICIES

| | Formal policy | Implied guidelines | No implied guidelines |
|---|---|---|---|
| **General Education** | • Class size maximums (PK: 16, K-3: 25, 4-12: 30) | • Grades 6-12: 5 classrooms per pod of 5 teachers – consisting of math, science, history, Spanish, and English teachers | • General Education assistants (n=~80) |
| **Specialty** | | • English (K-5): 5 classes taught per day<br>• PE: 1 every 250 students<br>• Arts, Health, Career & Technology: 1 per subject per 6-8 and 9-12 grade | |
| **Special Education** | • Class size maximums<br>  − Regular, reduced enrollment: 16<br>  − Full-time classroom (promotion): 12;<br>  − Full-time classroom (modified): 10<br>• Resource teachers: 25 pull-outs per day<br>• Therapists: based on individual IEP | • Note: Special Education class size maximums in practice are lower than stated formal policy | • Special Education assistants (n=5.8k)<br>Note: Driven in large part by IEPs, but exceptions are made based on need with no firm ratios |
| **Source / Policy** | • Organización Escolar (General Education + Special Education)<br>• Convenio Colectivo | • Escuela Basica<br>• HR Director guidance | • Decisions are made flexibly |

Notes: Special Education issued their first school organization policy in FY18-19; *PRDE communicated 1 nurse per school is required by Law 85, though the language is not apparent
SOURCE: Carta Circular num. 05-2019-2020, PRDE política pública sobre la organización escolar para el programa de educación especial y los requisitos de promoción y graduación para los estudiantes con discapacidades matriculados en las escuelas del departamento de educación de puerto rico, May 2019

By following its own staffing guidelines, PRDE would be pursuing a more efficient staffing structure; however, PRDE could ultimately fall short of 2021 Fiscal Plan targets over time given that many schools operate at inefficient enrollment levels and thus incur in significant "breakage" (i.e., underutilized teachers). For example, if a school has 36 students in third grade, that school will need two third grade teachers with classrooms of 18 students each, even though those teachers could theoretically teach an additional 7 students each, (i.e., up to 25 students per class), per *the Organización Escolar* guidelines. This type of situation is pervasive across the Island: in FY2020 only 40% of PRDE's schools operated at roughly efficient school size (see *Exhibit 89*). These schools are geographically dispersed across the Island with inefficiencies existing in all regions and urban/suburban/rural areas. The issue can be best addressed with active footprint management, taking into consideration geographic and student demographic constraints.

EXHIBIT 89: MAP OF PRDE SCHOOLS BY ABILITY TO ACHIEVE EFFICIENT STAFFING



| | | |
|---|---|---|
| ● | **Inefficient school:** based on current enrollment structure or size, applying *organización escolar* results in a teacher need that equates to a below average ratio | **485 schools** |
| ○ | **Efficient school:** based on current enrollment structure or size, applying *organización escolar* results in a teacher need that equates to an above average ratio | **353 schools** |

As enrollment is projected to decline by 4-5% each year through FY2026 (due to overall Island population decline), this issue of breakage will worsen, with schools increasingly less able to maintain efficient staffing levels. While the 2021 Fiscal Plan does not require additional school closures (which would reduce breakage in the system), it is nonetheless important to acknowledge the personnel (and operating) costs of managing a school system where capacity exceeds enrollment. PRDE has the opportunity to assess its existing school footprint and long-term plan through the Facilities Master Plan which will need to be prepared to assess the ~$2.3 billion of disaster relief funding designated by FEMA to support reconstruction of damages caused by Hurricane Maria.

EXHIBIT 90: REQUIRED IMPLEMENTATION ACTIONS FOR IMPROVING STUDENT-TEACHER RATIO

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| **To be completed in FY2021** | ▪ Review current staffing levels against PRDE staffing guidelines (Organización Escolar) across all schools and identify schools with incorrect mix of teaching staff | ▪ December 2020 | ▪ Delayed – November 2021 |
| | ▪ Define an implementation plan to align teacher count to current Organización Escolar guidelines for identified schools – this change would allow PRDE to meet the Fiscal Plan savings targets for FY2022 to FY2025 | ▪ May 2021 | ▪ Delayed – August 2021 |
| | ▪ Outline a plan to streamline the process for school staffing in a transparent data-based manner that will allow PRDE to continue to manage the student-teacher ratio in a systematic way | ▪ May 2021 | ▪ Delayed – December 2021 |
| **To be completed in FY2022** | ▪ Define an implementation plan to align teacher count to current Organización Escolar guidelines and meet Fiscal Plan targets for FY2022-FY2025 | ▪ August 2021 | ▪ Not Started |
| | ▪ Implement a streamlined process to systematically apply staffing guidelines and document allowable exceptions to teacher assignments to ensure that going forward PRDE is able to maintain an appropriate allocation of teaching staff in all schools | ▪ December 2021 | ▪ Not Started |

### 15.3.2  Capturing savings from past school consolidations

The Government of Puerto Rico recognized that declining student enrollment requires active management of school facilities to enable the system to invest in a smaller number of higher-

performing schools. Therefore, in 2018, the Government proposed to consolidate schools to improve overall efficiency within the system. After an analysis of several factors including capacity, geographic and cultural characteristics, distance to neighboring schools, transportation costs, and facility quality, the joint Government / Oversight Board proposal within the October 2018 Fiscal Plan included a measure for PRDE to close 307 schools by FY2020 which was projected to result in ~$111 million of run-rate savings by FY2023. By FY2020, PRDE had consolidated 255 schools, and the Oversight Board determined that no further closures were required at the time. However, PRDE committed to capture the full savings estimate (representing ~$15-20 million per year[270]) elsewhere. Unfortunately, to date, school consolidations have not led to proportional personnel and non-personnel costs savings because the consolidations have not been accompanied by concurrent reductions in administrative staff or operational savings.

On the personnel side, this initiative requires the number of school administrators (school directors, office staff, etc.), food service staff, facility maintenance staff, and other school-specific staff to be scaled down to account for a smaller number of schools than achieved to date through consolidation efforts.

EXHIBIT 91: RUN RATE SAVINGS TARGET AND ACTUAL RUN RATE SAVINGS ACHIEVED, BY PERSONNEL CATEGORY (FY2021)

| School personnel category | Run rate savings target, $M | Actual run rate savings, $M |
| --- | --- | --- |
| Administration | 29.6 | 11.0 |
| Maintenance | 18.8 | 7.7 |
| Food Services | 28.8 | 5.2 |
| **Total** | **77.2** | **23.9** |

SOURCE: PRDE Personnel roster December 2020

The 2021 Fiscal Plan requires the Department to maintain its 2018 average of 3.39 food services full-time employees (FTEs) and 2.24 school administrative FTEs per school. As of December 2020, PRDE employed 3,588 food services staff and 2,230 school administrators (implying a ratio of 4.45 and 2.77[271] respectively). This is an excess of 1,274 employees from 2020 Fiscal Plan expectations for FY2021 and equivalent to ~$42.2 million in unrealized run-rate savings in that same fiscal year. As such, in FY2022 PRDE must prioritize rightsizing headcount to meet 2021 Fiscal Plan personnel saving targets.

Recently, PRDE provided internal guidelines for staffing food services and school administrative staff. The full implications of the information received in late FY2021 is still being reviewed and analyzed. However, based on the evidence received, PRDE actual ratios are distant even from their internal guidelines. PRDE must achieve the personnel savings committed to when the 307 school closures were proposed, as required in the 2021 Fiscal Plan.

Furthermore, PRDE must also achieve a 2.27 maintenance FTEs per school ratio. Recently, PRDE provided supporting information for staffing maintenance personnel, which specified PRDE staffs 1 FTE per 13 building units (a unit is defined as 1 classroom, 2 bathrooms, 1 office, or 1 library). However, when asked to provide the building data necessary to assess if current staffing levels align with these guidelines, no further information was made available to the Oversight Board. As of December 2020, PRDE had not met 2020 Fiscal Plan targets for maintenance staff, employing 2,200 employees for a ratio of 2.61. As such, in FY2022 PRDE also must prioritize rightsizing maintenance headcount to meet 2021 Fiscal Plan personnel saving targets.

---

[270] Non-personnel saving per school (~$47,000) was the result of analyzing Government-provided school closure data from previous years and represents the average non-personnel savings across a group of 151 closed schools

[271] Based on Agency Efficiency Measure model target of 806 operating schools

EXHIBIT 92: SUMMARY OF CBA / STAFFING GUIDELINES FOR FOOD SERVICES, MAINTENANCE AND SCHOOL ADMINISTRATION

|  | Formal Policy | Source / Policy |
|---|---|---|
| **School Administration** | ▪ No formal CBA<br>▪ Escuela Básica indicates 1 administrative FTE / school | ▪ Escuela Básica<br>▪ HR Director guidance |
| **Maintenance** | ▪ 1 maintenance FTE per 13 units[1] | ▪ Maintenance staff CBA (2012) |
| **Food Services** | ▪ 1 food services FTE per every 9-14 meals served per hour[2]<br>▪ 1 food services supervisor FTE per school | ▪ Food Services staff CBA (2012) |

1 Unit defined as: 1 classroom, 2 bathrooms, 1 office, or 1 library
2 Meals served per hour calculated based on overall meal volume

On the operational side, school consolidations required PRDE to capture non-personnel savings, including reductions in spend on facilities/utilities, professional services, and purchased services, among others.

To date, PRDE has struggled to capture these additional operational savings. The Department has not provided a clear view into how the consolidation of 255 schools has resulted in lower utilities and other operating costs. However, PRDE has been working to avoid unnecessary payments in closed schools by diligently reconciling utility bills from PREPA and PRASA and increasing inter-agency communication. PRDE claims it has been able to recoup a significant amount from identification of excess electricity charges and water charges (although no supporting documentation has been shared), and the Department committed to continue monitoring these bills to avoid overpayment in the future in both closed and active schools.

Despite moderate progress made, many closed school buildings have been left empty or repurposed for administrative uses, inhibiting PRDE's ability to capture full savings from each of the school closures. PRDE has identified 56 school buildings to repurpose for administrative uses, including 41 to be used as inactive archives, regional offices, and for other administrative uses, and 15 to be used by a non-profit alternative education program (Proyecto Centros de Apoyo Sustentable al Alumno (CASA)); however, PRDE has not provided a capacity assessment to justify this decision. As part of its Facilities Master Plan, PRDE must work towards minimizing the spend on retained buildings and therefore achieving the required 2021 Fiscal Plan savings.

Further, notwithstanding that PRDE is not the owner of the schools, the Government (including PRDE, DTOP, PBA, AAFAF and any other relevant Government agency) must make every effort to finalize a plan for sale or lease to ensure the unused buildings are most efficiently utilized in communities and do not create new community challenges due to their abandonment. In FY2022, PRDE is expected to capture all the outlined 2021 Fiscal Plan savings for both personnel and operational savings.

EXHIBIT 93: REQUIRED IMPLEMENTATION ACTION FOR CAPTURING SAVINGS FROM PAST SCHOOL CONSOLIDATIONS

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| **To be completed in FY2022** | • Define an implementation plan to rightsize food services personnel, maintenance, and school administrators according to internal staffing guidelines (e.g., CBA) and Fiscal Plan targets | • August 2021 | • Not Started |
| | • Provide a savings analysis of the 255 schools closed, including rent, utilities, maintenance, security, property materials, telecoms, etc. | • September 2021 | • Not Started |
| | • As part of the Facilities Master Plan, PRDE will work with other Government agencies (e.g., DTOP, AEP, AAFAF) to plan for the sale/lease/other of unused buildings, assess the cost to maintain ~56 closed schools for alternate use and identify a funding source to cover these operational expenses | • November 2021 | • Not Started |

### 15.3.3  Rightsizing regional and central offices

The 2021 Fiscal Plan supports PRDE's own proposed shift from a single central administrative office model to a central/regional administration model. By pursuing a regional model, PRDE had aimed to enable faster, more locally relevant educational services; drive system-wide initiatives and shared services from a central office; and reduce administrative headcount. In this new central/regional model, administration of individual schools would be decentralized and made leaner while also putting decision-making closer to students and families. Developing and relying on regional leadership would also allow PRDE's central administrative structure to rightsize to staffing levels comparable to state educational agencies on the mainland. In keeping with the push toward a central/regional model, Fiscal Plans have required that by FY2020, PRDE achieve approximately a 25% reduction in administrative headcount between regional and central office roles; this target has been maintained in the 2020 and 2021 Fiscal Plans.

As of December 2020, PRDE had ~2.8k staff that held central/regional office roles: 722 in the central office, 607 in the seven regional offices, and the largest portion, ~1.5k, in field-based roles that are directly serving schools or groups of schools but tagged to regions. **A comparison analysis of PRDE's administrative headcount for FY2020 and FY2021, which includes those in central and regional offices not directly serving schools, shows that there has been no progress in rightsizing headcount to meet savings targets.**

In order to meet 2021 Fiscal Plan targets going forward and maximize the impact of its staff, the Department must first clearly define the roles and responsibilities of functions at the regional and central level to identify capacity gaps and better empower the regions. There is currently redundancy in responsibilities to be resolved at the central and regional levels, which contributes to process inefficiencies and lack of ownership over decisions. Furthermore, these issues lead to unclear definitions of success, prevent high performers from being elevated to leadership positions, and limit opportunities for professional development programs differentiated based on the level and function of the staff member. PRDE must enable its staff to succeed through clearly defined roles, formal accountability structures, and professional supports to build relevant skills as outlined in *Chapter 8*. Addressing these concerns will result in a more efficient system and staff who understand how to maximize their contributions to improve the Department.

Additionally, to achieve the vision of a decentralized model, PRDE must realign existing resources to fill critical vacancies at both the central and regional level. In doing so, PRDE should re-evaluate dispersion of responsibilities across the central leadership team to create an organizational structure that best supports the needs of the Department. Furthermore, PRDE must ensure enough support at the regional levels, where there was a 20% reduction in field-based staff from FY2020-FY2021. In particular, there has been a stark understaffing of community engagement

regional coordinators, with four of seven posts remaining vacant, and of academic support staff, including facilitators who support teacher development.

EXHIBIT 94: ACADEMIC FACILITATOR COUNT VERSUS TARGET



SOURCE: PRDE Personnel roster Dec 2020

Moving forward, PRDE must pursue its vision for a better-defined central/regional model by clearly defining the role of the central and regional offices and eliminating duplicative responsibilities between the offices. Subsequently, PRDE must fill key vacancies in all levels of the system, with a particular focus on increasing academic support staff as well as rightsizing administrative headcount in the central and regional offices to ensure resources are more adequately focused on driving student achievement in schools.

EXHIBIT 95: REQUIRED IMPLEMENTATION ACTIONS FOR RIGHTSIZING REGIONAL AND CENTRAL OFFICES

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| To be completed FY2022 | • Delineate roles and responsibilities for each function of the Central vs. Regional offices in a manner that allows PRDE to identify duplicative responsibilities and re-prioritize school support in the regions | • August 2020 | • Delayed – December 2021 |
| | • Define an implementation plan to invest in Region's school support function by re-allocating staff to increase academic facilitator positions in the regions and reduce administrative headcount in the central and regional administrative offices, aligned to Fiscal Plan targets for FY2022 to FY2025 | • December 2020 | • Delayed – August 2021 |
| | • Identify critical vacancies at central, regional, and school level and develop a plan to fill with high potential candidates by reducing and reallocating existing resources, particularly administrative positions | • August 2021 | • Not Started |
| | • Define implementation plan to achieve 25% reduction in administrative headcount between regional and central offices | • December 2021 | • Not Started |

### 15.3.4 Reducing procurement spend

PRDE procurement spend must be reduced by 10-15% by FY2023 through centralized procurement policies, including strategic purchasing, and demand controls. As detailed in *Exhibit 96,* PRDE must meet 2021 Fiscal Plan savings targets across all procurement categories, by creating greater spending transparency, consolidating vendor contracts, and prioritizing savings

in areas that represent variable costs (which generally decline as enrollment does) and those that have less impact on students and schools.

EXHIBIT 96: SUMMARY OF EXPECTED PROCUREMENT SAVINGS PER 2021 FISCAL PLAN



Even if PRDE operated within 2020 Fiscal Plan budget targets for FY2021, PRDE has not made notable progress in implementing structural initiatives to drive sustainable procurement savings, and instead has waited for the procurement centralization within the **General Services Administration (GSA)** to realize procurement savings. Starting on FY2022, GSA will start taking an increased role in procurement on behalf of PRDE, although PRDE is still accountable for achieving these procurement savings in the interim.

PRDE's ability to make informed strategic management decisions on how to effectively allocate resources to procurement expenses is constrained by a lack of transparency in spending. The 2020 Fiscal Plan highlighted the need to increase transparency of spending data (e.g., providing more visibility into the ~40-50% of non-personnel expenses tagged to categories with unclear descriptions or listed as "unclassified"), in order to allow PRDE to identify areas for efficiencies. During FY2021, PRDE took some initial steps to implement new subcategories in the financial system (Financial Information System of the Department of Education or SIFDE by its Spanish acronym) to better classify spend in the Professional and Purchased Services concept codes, and it should now aim to assess this spend and identify areas for vendor consolidation and/or other procurement efficiencies. Also, as part of the long-term financial plan mentioned in *Section 15.1.1*, PRDE must assess and rationalize spending across funding sources to ensure it is efficiently leveraging all funding sources available.

Lastly, as mentioned in *Section 15.1*, PRDE must comply with Act 73-2019, as amended, which requires the agency to prepare an Annual Procurement Plan based on the agency's annual estimate of probable needs and purchases. Although Act 73-2019 does not require agencies to prepare a plan for annual professional services, PRDE must prepare a similar plan that details all professional services to be contracted during the fiscal year to obtain similar benefits, including an understanding of the purchases to be made during the year, identifying potential savings, ensuring compliance with budget targets, and flagging opportunities to improve current processes and procedures.

*Facilities costs*

Currently, there is still very little transparency into what PRDE spends on facilities. PRDE continues to capture facilities related spend in several cost concepts, making it difficult to disaggregate between type of spend, including custodial, maintenance, capital expenditures, etc. The Oficina para el Mejoramiento de Escuelas Públicas (OMEP), which represented ~60% of facilities spending in FY2019, implemented minor changes in its system during this past fiscal year to increase alignment with SIFDE and better capture facilities spend. However, OMEP has yet to implement an expense reconciliation process with SIFDE, which limits the visibility into total facilities costs. Driving to a greater level of transparency in how OMEP spends its budget across the various facilities cost concepts will help PRDE make sure dollars are being allocated with the appropriate level of prioritization. As such, in FY2022 PRDE must implement updates to capture all facilities spend at PRDE (e.g., spend from OMEP) in a more streamlined manner and to be able to differentiate spend between maintenance, capital expenditures and custodians.

The 2020 Fiscal Plan discussed how PRDE must commission the development of a Facilities Master Plan to assess its portfolio of buildings alongside their purpose and plan for the future. During FY2021, PRDE contracted a vendor to complete a Facilities Master Plan as part of the requirements of the FEMA Accelerated Award Strategy (FAASt) funding obligation. An initial master plan is expected to be completed mid-to-late 2021 with the full plan finalized in early 2022. This plan would account for changing needs and demographics of schools on the Island by prioritizing investments in school buildings that have a long-term place in the school footprint and are equipped with 21st century features and resources as well as disaster-resilient infrastructure. The plan must also identify alternative uses of its facilities that may be phased out over time. As such, in FY2022 PRDE must comply with the FEMA requirement to create a facilities master plan that assesses the need of PRDE facilities portfolio and share all versions of such plan with the Oversight Board.

*Transportation costs*

Federal Individuals with Disabilities Education Act (IDEA) dollars and School-wide funds have been used by PRDE in the past to fund student transportation; however, USDE-imposed restrictions on PRDE currently prohibit the use of federal funds for transportation. This is due to the fact that PRDE has had a series of reports on non-compliance with the provisions of the Code of Federal Regulations and the IDEA Law related to improper payments, lack of internal controls, non-compliance with its own policies, and lack of adequate monitoring in relation to the issuance of payments for transportation services to students of the Special Education Program. Thus, at the moment, PRDE must completely fund both General and Special Education student transportation through the General Fund until compliance with USDE-imposed special conditions and other USDE requirements are met. Ultimately, this puts increased pressure on State dollars for student transportation instead of being able to leverage a portion of federal dollars.

**During FY2021, PRDE made progress in implementing the transportation system updates that would address USDE findings, but it has yet to present these updates to USDE to assess completion of the actions. PRDE must prioritize this work in FY2022 to achieve greater flexibility in funding sources for student transportation.**

EXHIBIT 97: REQUIRED IMPLEMENTATION ACTIONS FOR REDUCING PROCUREMENT SPEND

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| **To be completed in FY2022** | • Define a plan to increase expense categorization and reporting transparency, which could include adding descriptors in PRDE's internal financial systems (e.g., SIFDE) | • December 2020 | • Completed |
| | • Evaluate current transportation spend and services in order to ensure that all students that are eligible (per IEP or regular eligibility guidelines) receive transportation services | • December 2020 | • Delayed – July 2021 |
| | • Evaluate facilities spend and create an implementation plan to capture all facilities spend at PRDE (e.g., spend from OMEP) in a more streamlined manner and to be able to differentiate spend between maintenance, capital expenditures and custodians | • December 2020 | • Delayed – December 2021 |
| | • Create a facilities master plan that assesses and the need of PRDE facilities portfolio in order to ensure that spend is prioritized according to need and PRDE's long-term facilities strategy | • May 2021 | • Delayed – July 2021 |
| | • Implement updates to the transportation system and resolve all pending items identified to comply with USDE requirements and thus be able to leverage Federal Funds to cover part of student transportation costs | • July 2021 | • Not Started |
| | • Create a facilities master plan that assesses the need of PRDE facilities portfolio in order to ensure that spend is prioritized according to need and PRDE's long-term facilitates strategy (PRDE must share all versions of such plan with the Oversight Board) | • July 2021 | • Not Started |
| | • Evaluate improved spending transparency given new subclassifications within SIFDE and identify savings achieved as well as potential opportunities to meet Fiscal Plan savings target | • October 2021 | • Not Started |
| | • Prepare and submit the Annual Procurement Plan to GSA, as required by Law 73-2019, and prepare a similar plan for professional services to be contracted during the next fiscal year | • March 2022 | • Not Started |

### 15.3.5   *Optimizing Special Education professional services costs*

PRDE serves Special Education students through two programs. The primary program is the Special Education Program, known as Secretaría Asociada de Educación Especial (SAEE), which provides educational and therapeutic services to students, with the second program being *Remedio Provisional,* which only provides non-education support services to students. *Remedio Provisional* was created as a result of the Rosa Lydia Vélez Case to offer therapeutic services to Special Education students whose only impediment to receiving services is that the Department of Education does not have the resources to offer them. Typically, if PRDE does not provide necessary services within 30 days from the request of services from SAEE and drafting of the Individualized Education Program (IEP), the family of the special education student has the ability to receive services through this alternate channel. While it is good practice for districts to have a formal mechanism for complaints and ensuring students receive adequate services, PRDE's way of addressing this situation is not typical. PRDE uses *Remedio Provisional* as a more permanent solution for students to receive services. Services that were not budgeted for appropriately at the beginning of the year within SAEE are provided through Remedio Provisional; only to then transfer students to receive services via SAEE the following year.  Given this practice, PRDE ends up spending much more on student support costs than is necessary to deliver the same quality of service.

PRDE's ability to provide Special Education services through the pandemic has been impacted with social distancing requirements altering service delivery and creating significant delays in the IEP revision process. Despite these challenges, PRDE has been able to make progress towards improving quality and transparency of Special Education data, primarily through updates to the Mi Portal Especial (MiPE) system (e.g., adding Human Resources modules to create better visibility into allocation of Special Education assistants and integrations between Sistema de Información Estudiantil (SIE) and MiPE systems to better monitor Special Education students' academic progress).

To date, PRDE has been unable to realize reductions in professional services costs associated with the Remedio Provisional program, which are 4-5 times more expensive than services provided through the regular Special Education program. As of March 2021, PRDE was working on completing the required market study on Remedio Provisional pricing and is expected to evaluate the results and incorporate revised rates in FY2022. As such, in FY2022 PRDE must implement these revised rates, as well as analyze and capture savings achieved.

Furthermore, PRDE has made slow progress on the implementation of a process to transition students from *Remedio Provisional* to the regular Special Education program. During FY2021, a committee was formed to identify students that could be transitioned into the Special Education program; however, the committee was ineffective at creating additional capacity needed to serve many of these students within the Special Education program, in part because of the challenges of the on-going pandemic.

For FY2022, PRDE proposed that it could transition students receiving psychological or individual speech therapy through contracted vendors to the Special Education program as there are existing internal resources with capacity to provide these services (e.g., school psychologists). As such, in FY2022 PRDE must define and implement a plan to increase the service offering capacity of PRDE's Special Education program in order to transition students from *Remedio Provisional*.

EXHIBIT 98: REQUIRED IMPLEMENTATION ACTIONS FOR SPECIAL EDUCATION

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| To be completed in FY2021 | Create a small Central Office team (max of 8) to implement the digitization of Special Education IEP records with supporting documentation, assigned resources and related service requirements, and provide a 12-month implementation plan to the Oversight Board.[1] | July 2020 | Completed |
| | Revisit Remedio Provisional's services pricing to ensure these are aligned to market rates as per Law 85-2018 | May 2021 | On track |
| To be completed in FY2022 | Establish transition process for students from Remedio Provisional back to PRDE Special Education program, which will allow PRDE to serve these students within the system at more reasonable rates | December 2020 | Delayed – October 2021 |
| | Implement recommendations of PRDE's transition committee to enable students to receive services through PRDE's Special Education Program instead of Remedio Provisional | October 2021 | Not Started |
| | Implement revised Remedio Provisional rates and analyze savings achieved by submitting a report to the Oversight Board | December 2021 | Not Started |
| | Define and implement a plan to increase the service offering capacity of PRDE's Special Education program in order to transition additional students from Remedio Provisional | October 2021 | Not Started |

1  At a minimum, the plan must include (1) amount of IEPs to be digitalized, (2) amount of time employees will take to carry out the project, (3) accountability measures/checks to validate accuracy of data inputted, (4) monthly milestones, (5) team members with name, employee ID, contact information, and job title, and (6) project supervisor with name, employee ID, contact information, and job title.

### 15.3.6  *Improving financial processes*

As mentioned in *Chapter 9*, to support the effort of developing a long-term financial plan, PRDE must identify and hire a well-qualified chief financial officer (CFO) to lead the process of establishing a long-term financial plan that aligns to the strategic plan of the Department, incorporates all funding sources, and prepares the Department to address the short and long-term education reforms previously outlined in *Chapter 9* and *Section 15.3*. While aligning financial resources to student needs should always be a core ambition of an education system, the drastic challenges that have arisen over the last year, and the complexity of the Department's financial situation, further underscore the importance of this long-term financial planning exercise.

A key component of good financial management at PRDE is understanding, accessing, and fully leveraging all available funding resources. Historically, the Department has not used all its federal funds prior to the end of the corresponding grant periods, which has been exacerbated by the delay in signing the Third-Party Fiduciary Agent (TPFA) contract, as mentioned in *Section 15.3*. Furthermore, the Department has at times been unable to use federal funds for typically allowable purposes due to operational mismanagement, as in the case of funding for student transportation. The current educational situation in Puerto Rico is too dire not to figure out how to unlock all available funds, too urgent not to rethink how these funds are aligned to the Department's strategic priorities, and too complex to address in a single budget cycle.

EXHIBIT 99: REQUIRED IMPLEMENTATION ACTIONS FOR THE DEVELOPMENT OF A LONG-TERM FINANCIAL PLAN

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| To be completed in FY2022 | ▪ Hire a well-qualified Chief Financial Officer (CFO) who will work with PRDE leadership to develop a long-term financial plan, in addition to other budgeting and planning responsibilities | ▪ August 2021 | ▪ Not Started |
| | ▪ Identify all available funding (recurring and non-recurring), including any spending restrictions, expiration dates, or inaccessible funds | ▪ September 2021 | ▪ Not Started |
| | ▪ Develop and execute a plan to release inaccessible funds, including the ability to leverage Federal Funds to student transportation | ▪ September 2021 | ▪ Not Started |
| | ▪ Prepare and share with the Oversight Board a long-term financial plan that models revenue and cost projections by funding source, aligns to the Department's strategies, deploys stimulus funds, and achieves the savings measures specified in this chapter | ▪ December 2021 | ▪ Not Started |
| | ▪ Communicate strategic priorities to regions and school directors to support alignment of financial resources in school budgets and institutionalize recurrent meetings to measure progress | ▪ March 2022 | ▪ Not Started |

**Lastly, in order to implement the 2021 Fiscal Plan and meet overall objectives related to improving support for students, staff, and parents, PRDE must address a series of challenges throughout the Department, particularly related to fiscal procedures and operational practices.** In some cases, fiscal procedures and internal controls are well documented, but the Department does not adhere to them. In other instances, the Department faces issues when it does not have proper policies or documentation to map processes, guarantee internal controls, establish segregation of duties, and designate responsibilities.

For example, based on analysis conducted by the Oversight Board, there is a lack of adherence to the Department of Treasury (Hacienda) policies, particularly as it relates to the submission of weekly and monthly interfaces that contain accounting information and spending transaction details. Based on Hacienda's Carta Circular 1300-04-09, Hacienda requires all Government agencies to submit weekly interfaces by the following Friday, as well as a monthly closing interface due 5 business days after the end of the month. However, PRDE does not submit weekly interfaces, and, while PRDE does submit monthly closings interface, the agency does not meet the established timeline. PRDE claims this is due to the significant number of transaction amendments that must be performed to clean the data to avoid errors in transactions (e.g., incorrect account numbers), particularly as it relates to payroll transactions. In addition, Hacienda's Carta Circular 1300-04-09 requires all Government agencies to include encumbrances and expenses in the interfaces, however, PRDE only includes expenses and fails to share encumbrances until the end of the fiscal year. This non-compliance with the policies and procedures established by Hacienda complicates PRDE's and the Government's ability to actively monitor and manage available resources within the agency, while also limiting spending

transparency. As such, in FY2022 PRDE must define and implement a plan to address financial process concerns related to weekly/monthly soft-closings and year-end closing.

Other examples that highlight PRDE's inability to make informed decisions on a timely basis, meet Government-wide policies and increase transparency include:

- **Heavy reliance on consultants for everyday functions.** PRDE heavily relies on consultants throughout the Department (e.g., data analysis and management, federal funds administration, human resources systems) which then results in a lack of trained personnel within the agency. Although the Oversight Board recognizes PRDE, and any entity for that matter, may require external help in implementing effective technology systems or implementing leading instructional practices, PRDE must use consultants as bridge capacity to build internal capabilities and not as permanent resources. PRDE must ensure its internal resources are trained and capable of performing the work consultants do after a reasonable amount of time. In addition, starting July 2021, PRDE must include a reference to transfer knowledge and train agency employees on all professional service contracts to lower dependency on third-party vendors and consultants over time.

- **Bureaucratic procurement processes.** The time for procuring services can take over 6 months, while at the same time PRDE has ineffective manual processes and paper trails, poor segregation of duties between responsible personnel, and lack of internal controls (e.g., lack of oversight, no adequate training for employees, no proper documentation of required approvals). These issues are also highlighted in the Federal Government's Audit Reports (2019 Puerto Rico Department of Education's Internal Controls over the Immediate Aid to Restart Schools Operations Program; 2013 Review of Final Expenditures Under ARRA). As such, in FY2022 PRDE must define and implement a plan to address all findings identified in state and federal audits, digitize the procuring process, establish clear segregation of duties, and enforce comprehensive internal controls.

- **Lag from the time an encumbrance is recorded, to the time PRDE receives the invoice from the vendor, to the time the invoice is paid.** PRDE's Finance Office monitors the high dollar amount of encumbrances and the low dollar amount of disbursements, however, there is no internal policy or requirement to ensure PRDE programs and offices follow up with the vendors to receive and pay the invoices on time. At the end of the year, encumbrances are not paid on time, fiscal year State dollars are left unused and these unpaid invoices accumulate as debt. As such, in FY2022 PRDE must define and implement an internal process to address lags between the time an encumbrance is recorded, to the time PRDE receives the invoice from the vendor, to the time the invoice is paid, as to avoid incurring unnecessary debt.

- **Inability to liquidate funds on allowable costs before the established deadline.** For example, in FY2019 and FY2020, there was significant General Fund underspend ($49 million and $60 million, respectively). However, the Oversight Board recognizes there are areas and projects within PRDE that have not been properly funded due to mismanagement of funds which highlight the disconnect between resources available and financial planning. Similarly, PRDE has to constantly request extensions and waivers from the Federal Government in order to liquidate federal grants. As such, in FY2022 PRDE must institute a weekly/monthly budget-to-actual analysis to monitor progress on defined workplans among the different PRDE programs.

- **Discrepancies in account codes** used by PRDE, which are not aligned to Hacienda's approved account codes. These discrepancies must be constantly reconciled by both Agencies, further complicating and extending the closing and reconciliation processes. As such, in FY2022 PRDE must identify discrepancies in accounts codes and implement the codes established by Hacienda.

Improvement of these financial processes will not only enable the implementation of key 2021 Fiscal Plan reforms and initiatives but will also allow PRDE to better manage costs and use dollars more effectively for students. The Department must take clear and tactical actions to improve their financial processes as these have a direct impact to the service delivered to students and the financial transparency, controls, and efficiencies that are required to manage their expenditures. PRDE must actively and constantly review and improve all financial and operational process, not just the ones listed above, which are inefficient and prevent the agency from meeting its goals.

EXHIBIT 100: REQUIRED IMPLEMENTATION ACTIONS FOR IMPROVING FINANCIAL PROCESSES

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| To be completed in FY2022 | Include a reference to transfer knowledge and train agency employees on all professional service contracts to lower dependency on third-party vendors and consultants over time | July 2021 | Not Started |
| | Define and implement plan to address financial process concerns related to weekly/monthly soft-closings and year-end closing | September 2021 | Not Started |
| | Institute a weekly/monthly budget-to-actual analysis to monitor progress on defined plan among programs | September 2021 | Not Started |
| | Define an implementation plan to address all findings identified in state and federal audits, digitize the procuring process, establish clear segregation of duties, and enforce comprehensive internal controls. | September 2021 | Not Started |
| | Define an implementation plan to transfer to modified accrual accounting, as established by PROMESA, to allow for timely expense recording in books and in compliance with 203 reporting | December 2021 | Not Started |
| | Finalize the implementation of the plan developed to address all findings identified in state and federal audits, digitize the procuring process, establish clear segregation of duties, and enforce comprehensive internal controls. | January 2022 | Not Started |
| | Analyze consultant contracts in order to evaluate the commencement date of the services rendered and develop a plan to train PRDE employees capable of carrying out these functions, as a way to decrease dependency on external contractors | January 2022 | Not Started |
| | Finalize the implementation of modified accrual accounting, as established by PROMESA, to allow for timely expense recording in books and in compliance with 203 reporting | May 2022 | Not Started |
| | Identify discrepancies in PRDE and Hacienda accounts codes, and implement the account numbers/codes established by Hacienda to avoid future discrepancies | May 2022 | Not Started |

## 15.4   Department of Health (DOH)

As of 2021, the Government has several health-related agencies that are highly fragmented: five public corporations, and two agencies, with nine public hospitals in total. One of the agencies is the Department of Health with seven health regions and sixteen programs—each of them, with their own back office support functions. Such fragmentation has driven up cost and inefficiency, as each agency is required to provide its own human capital management, procurement, and financial support. Patient experience and care delivery have also suffered as residents' cases are frequently transferred among frontline staff.

Additionally, access to care on the Island is significantly lower when compared to national averages. This is especially the case outside of the San Juan metro area, given the shortage of clinics and trauma centers. As of December 31, 2020, there were 110 Health Professional Shortage Areas (HPSA)[272] and 72 Medically Underserved Areas[273] in Puerto Rico. Based on the number of additional physicians required to remove HPSA status, as of September 30, 2020, Puerto Rico

---

[272] "Designated Health Professional Shortage Areas Statistics, First Quarter of Fiscal Year 2021." Health Resources and Services Administration
[273] HRSA Tools, MUA Find. Accessed March 25, 2021

meets 1.91% of demand for primary care (versus the 44.52% national average)[274]., 16.56% of demand for dental care (versus the 29.28% national average)[275], and 14.60% of demand for mental health services (versus the 26.9% national average)[276]. In Puerto Rico, this fragmented and resource-constrained healthcare system has resulted in several issues, including health outcomes that are significantly poorer than national averages.

The 2021 Fiscal Plan requires the Department of Health to consolidate the following six healthcare agencies: Department of Health (DOH); Medical Services Administration (ASEM); Health Insurance Administration (ASES); Mental Health and Anti-Addiction Services Administration (ASSMCA); Cardiovascular Center of Puerto Rico and the Caribbean (CCPRC); and Center for Research, Education, and Medical Services for Diabetes (CDPR) (*Exhibit 101*).[277] Consolidating these six agencies will provide the opportunity for rightsizing support functions, as well as centralizing procurement to provide savings on costly medical materials, equipment and services. This new consolidated agency should enable efficiencies while focusing on providing a high-quality public healthcare system.

EXHIBIT 101: AGENCIES INCLUDED IN FUTURE STATE DEPARTMENT OF HEALTH GROUPING

| | |
|---|---|
| 1  Department of Health | 4  Puerto Rico and the Caribbean Cardiovascular Center Corporation |
| 2  Health Insurance Administration (ASES) | 5  Center for Research, Education and Medical Services for Diabetes |
| 3  Medical Services Administration (ASEM) | 6  Mental Health and Addiction Services Administration |

To date, the Government has achieved no progress towards this requirement. Legislation presented in December 2019 that was needed to execute the first phase of consolidation (consolidation of ASES and DOH) was not recommended by the Senate's Health Commission, and legislation to consolidate the remaining health agencies has not been drafted.

While ASEM has made initial progress on initiatives to improve supply chain management (e.g., procurement centralization), these initiatives remain in the early stages and must be expanded to other health agencies in order to achieve target savings. The revenue cycle management optimization initiative has also been delayed for over a year, though a third-party provider has been selected and the project was launched in March 2021. Moreover, while an Electronic Health Records (EHR) system has been deployed in the ASEM emergency room, the ASEM Trauma Hospital, the DOH University District Hospital for Adults (UDH) and the University Pediatric Hospital (HOPU). EHR capabilities and digital hospital management tools across the health agencies remain limited since systems are fragmented and information is not integrated or shared between systems, creating a barrier to realizing operational efficiencies and lacking a standardized reporting system.

This lack of progress in improving the public healthcare system is particularly problematic given the major crises Puerto Rico has faced in recent years — and may continue to face. Though Puerto Rico has weathered the COVID-19 pandemic well thus far, with one of the lowest per capita death rates of any U.S. state or territory,[278] there have been spikes in recent weeks as tourists and others

---

274 Primary Care Health Professional Shortage Areas (HPSAs) | KFF, Accessed April 8, 2021
275 Dental Care Health Professional Shortage Areas (HPSAs) | KFF, Accessed April 10, 2021
276 Mental Health Care Health Professional Shortage Areas (HPSAs) | KFF, Accessed April 10, 2021
277 University of Puerto Rico Comprehensive Cancer Center will likely remain separate but is maintained in the Health Grouping given no formal legislation passed as of April 2022.
278 Coronavirus in the U.S.: Latest Map and Case Count. NY Times. Accessed March 25, 2021

return to the Island for holidays and vacations.[279] Moreover, provider infrastructure and patient access has not yet fully recovered since Hurricane María, with just 10,580 health professionals serving the entire population of 3.2 million people in 2019.[280] While DOH has moved to counter some of these issues by coordinating patient care with private hospitals, the lingering after effects of the hurricane and COVID-19 may still be a challenge to the health system in the future.

To counter the pressures that the COVID-19 pandemic has placed on the public healthcare system, the Oversight Board and the Government made investments of over $443 million during FY2021, from which $393 million are dedicated to targeted infrastructure expansion and improvements. These funds are being invested to enable the Government's near-term response to COVID-19 and to position the healthcare system to meet the needs of Puerto Rico. Specifically, (1) to address critical infrastructure gaps in Hospital and Health Facilities, (2) to increase capacity by expanding Public Hospitals, (3) invest in specific CDTs and Medical Facilities and (4) to improve technology with Medicaid IT and Public Hospital IT system. The Oversight Board is monitoring the use of these funds to ensure they are spent effectively and in areas of true need. As of March 2021, 80% of the $393 million targeted infrastructure investments have initiated the procurement process but only 3% of the funds have been disbursed (See *Section 15.4.1* and *Exhibit 102* below for more detail).

This additional funding has been complemented by funds from federal legislation related to the COVID-19 response, which are allocated to public and private sector health care providers. Major estimated funding flows for Puerto Rico include more than $2.4 billion in healthcare related programs, under the Preparedness and Response Supplemental Appropriations Act, the Families First Coronavirus Response Act, the CARES Act, the CRRSA Act, and the ARP Act. These include funds for emergency medical supplies, COVID-19 testing, contact tracing, and vaccination, as well as funding for programs like the Provider Relief Fund, the Public Health and Social Services Fund, and the Community Healthcare allocations.

Given the amount of investment in the health system in the wake of COVID-19—and the importance of a well-functioning health sector to help Puerto Rico exit the pandemic, it is a particularly urgent and important for DOH to deploy these funds effectively across various priorities. Without meaningful change—both through efficiency measures as well as targeted investments in the public health provider system—the health agencies will continue to falter in their mission to provide adequate health services for the people of Puerto Rico.

### 15.4.1  Investments to enhance healthcare services

Ensuring access to high quality, affordable healthcare for Puerto Rico continues to be a top priority of the Government and Oversight Board. In accordance with this priority and given the increased public health needs driven by the earthquakes and the COVID-19 pandemic, the 2020 Fiscal Plan recommended and included several strategic investments for the health system. Over the last year, the Oversight Board has worked with DOH to ensure the funds are being spent effectively. Unfortunately, many funds remain unspent. However, there are plans to spend much of what is left. Below is a summary of current progress in spending:

---

[279] "Chaotic Situation': Puerto Ricans indignant at tourists breaking Covid mandates." NBC News, March 20, 2021

[280] "A 13-year-old's death highlights Puerto Rico's post-Maria health care crisis." Vox, Feb 27, 2020. Accessed March 25, 2021

EXHIBIT 102: HEALTHCARE INVESTMENTS

| Investment | Total Budget, $M | Total Disbursed to date, $M | Disbursed to date, % |
|---|---|---|---|
| ▪ Hospital and health facility infrastructure | 162[1] | 3 | 2% |
| ▪ Capital Expansions at public hospitals | 110 | 10 | 9% |
| ▪ Public hospital IT | 90 | 0 | 0% |
| ▪ Medicaid IT (discussed in Chapter 15) | 25 | 0 | 0% |
| ▪ Telehealth infrastructure | 5 | $ | 0% |
| Capex Sub-total | 393 | 13 | 3% |
| ▪ Medical Scholarship – UPR Team | 30 | 0 | 0% |
| ▪ Combatting the Opioid Crisis | 20 | 0 | 0% |
| Other Non-Capex Investments Sub-total | 50 | 0 | 0% |
| Grand Total Healthcare Investments | 443 | 13 | 3% |

1 FY2020 Fiscal Plan included ~$25M additional to the $162M in funding to fully operationalize the Cancer Center. These funds are not capex related.

*Capital expansions at public hospitals for hospital and health facility infrastructure*

Funds were assigned to address critical, near-term infrastructure needs at public hospitals (e.g., renovation of facilities in major disrepair, installation of air conditioning and purification systems, purchase of power generators) and to complete major capital expansions. These investments are meant to ensure that the health system has the capacity and equipment needed to meet the long-term healthcare needs of Puerto Rico.

DOH submitted their Action Plan in September 2020, which included their preliminary implementation plans per project, and since then minimal progress has been made due to the magnitude of hospital capital expenditure $393 million (CAPEX) projects and resource capacity constraints within the Department of Health. At this point, 80% of the projects have initiated the procurement process, but only 3% has been disbursed to date. DOH is undergoing an assessment phase during which every site assigned CAPEX funds will be visited. The assessment phase has been completed for 21% of the projects. The rest of the assessment is expected to be completed before the end of Fiscal Year 2021. Meanwhile, funds assigned for Diagnostic and Treatment Centers (CDTs) have already been transferred to the corresponding municipalities, and projects at DOH hospitals are being closely monitored.

The remaining health agencies, including ASSMCA, ASEM, University of Puerto Rico Comprehensive Cancer Center, Cardiovascular Center Corporation, and the University of Puerto Rico Recinto de Ciencias Médicas have identified the projects to be implemented. However, capacity constraints and bureaucratic processes have meant little to no progress in disbursing funds. Only 1.2% of the assigned funds to these remaining health agencies have been disbursed.

*Public hospital IT*

Funds were budgeted for public hospitals to modernize technology, particularly via implementation of Electronic Health Records (EHR) and digital tools for hospital management. EHR (or digital patient records) can be accessed by all clinicians involved in a patient's treatment in real-time, enabling integrated communication within and across provider facilities, and allowing clinicians to make informed decisions based on comprehensive patient treatment histories. Investing in EHR capabilities is expected to reduce clinical/prescription errors and will reduce administrative burden in public hospitals. Digital hospital management tools allow

hospitals to collect and analyze data on patient flow, equipment use, etc. in real-time. Investing in these tools will enable operational improvement in public hospitals.

The Cancer Center has been assigned ~$8 million out of this funding pool to complete the implementation of the EHR. Specifically, the objective is to continue the development of the necessary infrastructure and implementation of the EHR's project in order to comply with the requirements stipulated by the Centers for Medicare and Medicaid Services (CMS) and the different health insurance providers.

*Telehealth infrastructure*

Funds were budgeted at DOH to implement telehealth infrastructure to address the urgent need to improve access to care outside the San Juan municipal area. Advancements in telehealth infrastructure would allow patients to more seamlessly receive care from physicians regardless of patient location. This is particularly beneficial to people living in rural areas, and to all of Puerto Rico during periods of heightened physical distancing. The goal is for the funding to be invested in a telehealth platform and/or to develop access points in facilities (e.g., FQHCs) located in underserved areas.

During FY2021, DOH established a plan for implementing telehealth portals which included the following activities : 1) carrying out a diagnosis of telehealth needs in communities and facilities in at least three health regions; 2) developing a map of the resources and needs identified; 3) defining the technological infrastructure specifications of telehealth; 4) developing and implementing a plan to acquire and effectively install the telehealth portals; 5) developing a monitoring plan for the use of telehealth equipment; 6) designing and developing a Health Department telehealth portal.

Furthermore, DOH successfully identified sites outside of the Municipality of San Juan for potential installation of telehealth portals. The Department identified seven CDTs as well as sites of four community organizations. As reported by DOH, these entities represent key agents for reducing healthcare access barriers. DOH will work with the entities to formalize the collaboration agreement. However, DOH has not yet disbursed any of the funds.

Further actions to be achieved during FY2022 include procurement, purchase, and installation of the telehealth portals at the sites identified, as outlined in the required implementation actions found in *Exhibit 104.*

*Combating the opioid crisis*

Approximately $20 million dollars was allocated to Fiscal Years 2020 and 2021 to combat the opioid crisis, which remains a pressing concern for Puerto Rico. (The full extent of the tragedy remains unknown, as data quality from Puerto Rico has been contested). Funding can be used to procure and distribute overdose reversal drugs, invest in community health events, and scale existing opioid treatment programs.

In FY2021, DOH identified three important action items that must be achieved in order to combat the crisis: 1) Developing a collaborative action plan to acquire and distribute overdose reversal medications as an opioid treatment initiative; 2) Evaluating existing opioid treatment programs to improve support and investment in community health events; and 3) Developing the technological infrastructure / capacity for the collection and sharing of opioid-related data to support informed decision-making.

 DOH and ASSMCA are jointly undertaking efforts to support the implementation of improvements and expansion of Puerto Rico's Prescription Drug Monitoring System (PDMP). ASSMCA administers the PDMP in Puerto Rico and is responsible for the improvements to be made to the system. To this end, DOH established a collaboration agreement (MOU) with ASSMCA to develop a joint work plan. DOH and ASSMCA agreed to invest in improvements to the PDMP and the contract for such vendor is currently waiting for approval at Puerto Rico

Information Technology Service (PRITS). This approval is expected to be granted by the end of April 2021. As soon as the contract is approved by PRITS, the vendor will proceed to install and configure modules related to this system. This process can take up to a month, nonetheless, the agencies expect to finalize implementation of the PDMP before the end of the Fiscal Year 2021.

These improvements to the PDMP should result in the strengthening of monitoring capacities, use of data, and access to statistics on prescriptions of controlled substances; the provision of timely and reliable information on providers and patients; and the proactive identification of potentially problematic or illegal behaviors related to opioid prescription.

In addition, DOH must develop public awareness campaigns and education on the prevention of, misuse and overdose of opioids across health regions. Moreover, they must continue to evaluate the action plan for the provision of opioid treatment and forensic analysis, in collaboration with relevant government agencies. Action items related to Opioid Prevention are outlined in *Exhibit 104* under the required implementation actions DOH must achieve.

*Loan forgiveness program and endowment fund*

This investment is to fund an independently-managed loan forgiveness program and endowment fund which will support healthcare students and residents (e.g., medical, dental, nursing) who commit to serving in rural and underserved areas.

Actions to retain healthcare professionals in Puerto Rico were deemed necessary to address the escalating healthcare professional shortages of the Island. It is estimated that as of 2018, two-thirds of primary care physicians in Puerto Rico were older than 55 years, as compared with a national rate of 43%.[281] Prior to the COVID-19 pandemic the Island had already faced with shortages of medical due to a myriad of factors including recent natural disasters and economic challenges.

Over the past decade, retention issues of healthcare professionals that have obtained advanced degrees from medical programs and/or completed residency programs have increased substantially.  In a study conducted by the Robert Graham Centre it is reported that only four out of every ten graduates of family medicine residencies from 2011 to 2017 remained on the Island in 2018.  Puerto Rico's new family physician retention rate was placed among the lowest in the nation.  During that time period, 111 family medicine residents graduated among the Island's four residency programs.  Of those 111 graduates, only 45 remained practicing in Puerto Rico in 2018, yielding a retention rate of 40.5%.[282]

Upon successful completion of residency programs, recent medical school graduates are often attracted by potential career opportunities with higher salaries on the mainland.  Through this Medical Student Loan Forgiveness Program, the Oversight Board seeks to decrease the percentage of provider to population gap by both increasing the retention rate of recent medical student graduates through economic incentives for medical students who attend and graduate from medical programs of universities in Puerto Rico as well as attracting medical students from the mainland to healthcare job opportunities on the Island. The economic incentives will be in the form of a medical student loan forgiveness program to be awarded to eligible students or residents upon completion of approved worked experience with program partnered organizations.

The 2020 Fiscal Plan allocated a total of $30 million over two fiscal years to be used to establish an independently managed loan forgiveness program in order to incentivize doctors to practice in underserved areas in Puerto Rico. Funding in the amount of $10 million were budgeted during Fiscal Year 2020 and $20 million were budgeted for Fiscal Year 2021. Under this program, each medical student or resident would be eligible for up to $25,000 of loan forgiveness per year of service – up to four years – in underserved areas and the program would be administered by an

281 Bureau of Health Workforce Health Resources and Services Administration (HRSA) – Designated Health Professional Shortage
    Areas Statistics; Third Quarter of Fiscal Year 2020, Designated HPSA Quarterly Summary, June 30, 2020
282 Robert Graham Center Report: A Shrinking Primary Care Workforce in Puerto Rico, Dec 13, 2019

independent third party. Action items that must be achieved for this initiative are outlined in *Exhibit 104* under required implementation actions.

*Hospital Accreditation*

During FY2020 and FY2021, $6 million each year ($12 million total) was allocated to ASSMCA's Dr. Ramón Fernández Marina Río Piedras Psychiatric Hospital to enable the hospital to receive accreditation by the CMS. The hospital lost its accreditation in 2009, and since then has been unable to bill for services rendered to their Medicaid and Medicare patient population.

The additional funds were intended to be used to increase care standards by making physical repairs to the hospital and improving staffing levels in order to comply with CMS regulations. In addition, ASSMCA was allocated $43.8 million in CAPEX funds during FY2020 (extended to be used during FY2021) to purchase anti-ligature beds, eliminate hanging points and to perform capital improvements to the hospital's structure and other facilities.

To date, the hospital has not yet received certification, though there are plans in place to receive it in Fiscal Year 2023. The certification process can take years to achieve, though the agency argues that recent delays in the process have been mainly due to the COVID-19 pandemic, specifically with the recruitment of personnel. Agency claims recruitment is now limited as workforce has been hesitant to work on site and unwilling to be exposed to COVID-19. Additionally, in order for the hospitals to be compliant with regulatory agencies, ASSMCA must perform capital improvement projects to address infrastructure issues raised by regulatory agencies. These capital improvement projects have been delayed for months due to an existing backlog of requests at GSA. However, GSA has confirmed that these projects have been prioritized and expects to have all RFP's published by the end of FY2021. The 2021 Fiscal Plan allocates ASSMCA $10 million over two years, starting in FY2022 to comply with minimum staffing levels at the hospital so that the regulatory requirement is met.

Achieving this certification is of upmost importance to ensure that the people of Puerto Rico have access to accredited mental and behavioral health inpatient services within the public healthcare system. Additionally, being able to bill for services rendered to the Medicaid and Medicare patient population will increase revenues, which can then be reinvested in hospital infrastructure and programs for further improvements. ASSMCA aims to achieve the CMS Accreditation by September 2022. In order to achieve this the agency must first accomplish several steps including but not limited to: 1) recruitment of the necessary personnel to comply with minimum staffing levels, 2) creation of rules, policies and procedures among the different functional areas, 3) finalizing capital improvement projects directly related to the hospital accreditation, 4) CMS inspector visit, and 5) receive a visit from the Joint Commission auditors. Once the hospital has received the letter of recommendation and accreditation from CMS and the Joint Commission, the hospital can start billing for the Medicaid and Medicare patient populations. Action items that must be achieved by ASSMCA for this initiative are outlined in *Exhibit 104* under required implementation actions.

ASEM has the only Trauma Hospital on the Island providing specialized care to adult and pediatric patients with multiple body trauma. This includes the Virgin Islands as well. Additionally, the Adult University Hospital is the only supra tertiary public hospital of Puerto Rico. Both institutions serve as an Academy Program for different health professionals where 24 Residency Programs are offered. These Residency Programs include Neurosurgery, Anesthesiology, Dermatology, Surgery, Physical Medicine and Rehabilitation, Neurology, Diagnostic Radiology, Nuclear Medicine, Cardiology, Infectious Diseases, Hematology and Oncology, Nephrology, Rheumatology, Gastroenterology, Endocrinology, Allergy and Immunology, Infectology, Obstetrics and Gynecology, Orthopedics, Ophthalmology, Otolaryngology and Head & Neck, Pathology and Laboratory Medicine, Urology, and Combined Internal Medicine & Pediatrics. During April 2021, the Accreditation Council for Graduate Medical Education (ACGME) withdrew the accreditation (effective July 1st, 2022) for the Neurosurgery Residency Program, which had been in probation for the past years. Some of the

ACGME findings were related to deficiencies found in both academic and clinical staff support required - not previously addressed by ASEM and UDH. As such, the 2021 Fiscal Plan allocates a $15.2 million budget to be used to hire additional House Staff and Clinical Staff (General Nurses, Licensed Practical Nurses, Direct Patient Care Clerks, etc.) which will directly support the continuity of the 24 Residency Programs at the institutions. The $15.2 million appropriation will be split among ASEM and UDH according to information presented by the agencies.

*Implementation of Electronic Health Records at the Cancer Center*

The 2021 Fiscal Plan allocates to the Cancer Center a $20 million investment over two years, contingent upon Cancer Center completing certain actions. By May 2021, the Cancer must provide a Business Plan detailing specific actions the Center will take to become sustainable by FY2024. If this is completed, the Cancer Center will have access to a $10 million appropriation for FY2022 which will be held under the custody of OMB. Meanwhile, the Center must also focus on EHR implementation during FY2022. This will allow the Center to properly and timely bill health insurance provides, increase their collections and reduce margins of error in the billing process. If EHR implementation is completed in FY2022, the Center will have access to an additional $10 million during FY2023. The Center must transition to be self-sufficient and rely on their own revenues starting in FY2024. Specific action items that the Cancer Center must achieve are detailed in *Exhibit 104* under required implementation actions.

*Maintaining Direct Patient Care Staffing Levels*

The 2021 Fiscal Plan includes additional funding for Direct patient care employees working at the Department of Health. Additionally, all personnel measures impacting the Intellectual Disability Program within the Department of Health have been reversed, as such, the Program can comply with the minimum budget established by the court.

*Fulfilling federal requirements*

The 2021 Fiscal Plan allocates funding for fulfillment of three federal requirements:

- **Intellectual Disability Program:** The Puerto Rico Division of Services for People with Intellectual Disabilities is required to have certain standards for services, and state appropriations to the program must be fully utilized to meet those standards. A Federal Court found that Puerto Rico failed to use state funds allocated for this purpose from FY2015-FY2019. Accordingly, the 2021 Fiscal Plan allocates $20 million over four years (FY2021-FY2025) in order to reimburse the program. Additionally, as mentioned above, measures related to personnel have been eliminated.

- **Health 330 Centers:** Puerto Rico is required to cover the difference between "reasonable costs" and what is reimbursed by the Medicaid Program for federally qualified health centers (FQHCs). The 2021 Fiscal Plan includes annual funding to cover these "wraparound payments."

- **Psychiatric hospital:** The 2021 Fiscal Plan ensures that the annual budget for the Psychiatric Hospital in Rio Piedras is a minimum of $23 million. To do this, the 2021 Fiscal Plan allocates an incremental $5 million in FY2022 and FY2023 to enable the facility to earn its Medicare certification. Certification will drive increased revenues, which can be reinvested in the hospital to maintain full compliance with the consent decree.

### 15.4.2  Overview of efficiency actions

During FY2021, DOH was not required to achieve additional savings over those required in FY2020 – this pause was to progress on implementation efforts across key operational efficiencies.  All savings associated to such pause are reinstated in FY2022. From FY2022 to FY2025, DOH must achieve the personnel and non-personnel savings outlined in *Exhibit 104.*

EXHIBIT 103: DEPARTMENT OF HEALTH MEASURES SUMMARY OF IMPACT



Run-rate savings from agency efficiency measures[1], $M

*Consolidating administrative and support functions*

Consolidation of health agencies will enable efficiencies in administrative and support areas, including Management, General Administration, Auxiliary Services, IT, and a portion of Hospital Administration. In addition, operational efficiencies are expected to be realized through elimination of duplicative programs across agencies. For example, labor-intensive and/or paper-based processes are expected to be streamlined through digitization and implementation of software solutions.

Thus far, efforts to achieve required savings in this area have focused on consolidation. In FY2019, DOH conducted an analysis to identify support-function savings that could be achieved through consolidation. Legislation to enable consolidation of DOH and ASES was submitted in December 2019, however, approval was not recommended by the Senate's Health Commission of their 18th Legislative Assembly.  As a result, progress towards the future-state organization has stalled, with agencies citing the need for the passage of legislation and leadership alignment as the prerequisite for implementation. Although there exists a need to formalize structural consolidation remains outstanding, it is critical for health agencies to identify efficiency opportunities (e.g., back-office operational improvements, cross-agency coordination, program consolidation) to drive operational changes and achieve savings notwithstanding.  To date, efforts to achieve operational improvements (e.g., implementation of time and attendance reporting, digitalization of finance processes) within health agencies have been stagnant.

Efforts must be undertaken to streamline internal management processes and enable identification of further efficiencies. This must include completing a capacity analysis to identify duplicative roles and programs across health agencies that must be reduced or centralized. By December 2020, DOH was expected to complete such analysis and report that all back-office roles and positions by activity and program were assessed.  As of March 2021, DOH has contracted the services of a third party to complete a capacity analysis and expects to complete it by the end of FY2021. At that time, DOH must take action and implement efficiencies and task centralizations as identified by the capacity analysis. Action items related to the Capacity Analysis are outlined in the required implementation actions found in *Exhibit 104.*

*Rightsizing of non-administrative health personnel*

As the Puerto Rican population declines, spending on non-administrative payroll such as allied health professionals is expected to decline. There are several ways to decrease this spend without impacting health services. For example, wages should be aligned with fair market value to reduce turnover and the associated spend on temporary/overtime workers, and roles and responsibilities

should be optimized to skill level and wage rate (e.g., nurses should practice at the "top of their license"). Expected savings for this category were determined using the Government's analysis of need and attrition for DOH and ASEM. Furthermore, health agencies should also optimize staff placement wherever possible. Best practice hospital management tools, such as shift management software, should be used to maximize efficiency. For example, the planning of nurse staffing needs is currently done manually at UDH, which limits the opportunity of allocating resources timely and efficiently depending on Hospital occupancy.

DOH hospitals reported underspending in payroll during FY2021, however, no real long-term savings have been achieved, as the underspending was not related to achieving efficiencies but instead due to the availability of the Coronavirus Relief Funds (CRF) because DOH and ASEM were able to pay for regular payroll expenses via the Program for Emergency Assistance to Public Hospitals. Meanwhile, hospitals have yet to implement best-practice operational tools to manage personnel. Currently, personnel and/or payroll records remain decentralized and outdated. Accordingly, health agencies have been unable to provide consistent and comprehensive historical or current data on clinical staff roles. Some hospitals report target staff-to-patient ratios, but data on utilization, patient flows, and staffing levels is not consistently collected nor digitalized. Furthermore, human resources processes (e.g., payroll, hiring) are overly complicated and inefficient.

Simplification and streamlining of these processes will reduce administrative burden and improve operational efficiency. Public hospitals must utilize IT investments to implement digital clinical management tools that can enable consistent data collection, reporting, and identification of opportunities for operational optimization.

*Consolidating regional Medicaid offices*

At the end of FY2018, the Medicaid Program within DOH had 85 offices that provided face-to-face service to the public across the 78 municipalities. To date, the Medicaid program has successfully reduced the number of offices to 66. These 66 offices are located across 78 municipalities. Savings from this Medicaid office consolidation (which relate to savings on office space and equipment rental, utility expenses, and cleaning services) reached ~$440,000 in FY2019 (out of a total of $500,000 required), and additional office location consolidations were being considered; however, due to COVID-19 this effort had been deprioritized. During FY2022 DOH must re engage in this initiative and achieve the full amount of savings ($500,000 required) by June of 2022 as outlined in the required implementation actions found in *Exhibit 104.*

Reducing the Medicaid office and regional hospital office footprint eliminates duplication of effort and allows DOH to provide more robust services at strategic locations. In addition, DOH, through the Medicaid Program and in connection with ASES, must redesign the Medicaid eligibility and enrollment process to be more web-based, managed care organization MCO-dependent, and hospital-centric, and to encourage the use of digital services to improve data management. Key priorities going forward relate to operational improvements and digitization of the Medicaid eligibility and enrollment process, which are discussed in *Section 16.3.1.*

*Optimizing supply chain management*

Implementation of procurement best practices and leveraging economies of scale must also be extended to non-healthcare categories (e.g., office and general maintenance supplies, security services). Such initiatives are expected to be enabled by agency consolidation and operational streamlining. While ASEM has made progress in achieving savings on medical supplies (*Exhibit 104*), non-hospital procurement savings have been minimal across health agencies. To help expedite savings initiatives, the Government must leverage its ability to utilize the General

213

Services Administration's (GSA) procurement services and rates for non-hospital related purchases.[283] Full utilization of these services can drive additional procurement savings.

With the upcoming centralization of procurement employees into GSA, as established by the new GSA Regulation 9230, additional efficiencies within the supply chain management process must result in the savings outlined by the 2021 Fiscal Plan. Procurement savings specific to hospitals are discussed in *Chapter 16*.

*Transforming hospital management*

Due to the level of spending and rising costs of medical supplies, services and equipment, there is a significant opportunity to improve procurement efficiency for hospitals and health systems by focusing on commodity standardization and sourcing, indirect spending (analyzing insourcing versus outsourcing opportunities), and physician preference item optimization.

ASEM was created to serve as a central procurement office for the member institutions of the Puerto Rico Medical Center to create economies of scale for medical supplies, devices, and services. Over time, procurement costs have increased at a higher rate than those of the broader healthcare industry, while procurement processes have become decentralized across the institutions that ASEM was created to serve.

Efforts to address this issue have started with the UDH working with ASEM to centralize purchasing and establish competitive bidding. These early efforts have yielded reported savings of ~$11 million as reported by ASEM[284]. However, the opportunity exists for more health agencies and facilities (e.g., HOPU) to participate in procurement centralization, and efforts must be made to expedite this cross-agency cooperation. For FY2022, ASEM must focus on identifying common administrative services (i.e. maintenance, cleaning, security services) and medical supplies across health agencies and public corporations with opportunities for savings through procurement centralizations as outlined in the required implementation actions found in *Exhibit 104*.

Holistic hospital transformation efforts must also reduce payroll spend through clinical labor optimization, which is captured in *Chapter 16*. To date, the health agencies have made successful progress toward a full implementation of Electronic Health Records (EHR), except for the UPR Comprehensive Cancer Center (CCCUPR), where implementation remains in process with completion scheduled for mid FY2022. For those hospitals that have made substantial progress toward EHR implementation, financial savings from deployment and use have not yet materialized, as reported.

The Cancer Center attributes delays in implementing EHR to the contract approval process. The absence of EHR at CCCUPR not only affects the level and quality of patient care, but also leads to delays in the billing cycle. These delays in turn decrease collection rates with insurance providers, affecting the hospital's revenues. By FY2022, the Cancer Center must go live with the EHR. As discussed in *Chapter 16*, hospitals must leverage available IT investments to implement digital clinical management tools in the near-term.

*Restructuring ASEM and Revenue Cycle Management (RCM)*

Optimized revenue cycle management allows hospitals to establish the most advanced, efficient, and effective clinical services registration, improve effective billing of services, timely collection on account receivables, as well as health care utilization and patient discharge management. By working with analytics experts, ASEM will increase the speed and accuracy of claims processing, improve collection rates with external payors, and maximize revenue.

ASEM had already selected a vendor to outsource revenue cycle management through a competitive process and expected to finalize an outsourcing contract by February 2020. However,

---

[283] GSA order OGP 4800.2I (July 19, 2016).
[284] Reported by ASEM: Strategic Plan FY2020-2021 dated January 4, 2021

launch of the project was significantly delayed due to the COVID-19 pandemic and delays in the contracting process. ASEM has now resumed its efforts and expects the contract to be signed during the third quarter of FY2021.

The Revenue Cycle Management contractor began providing service to ASEM and UDH in mid-March 2021. The RCM will be implemented in a three-phase approach. The first phase has already been completed and consisted of on-boarding staff for a period of two weeks by providing training and hands on practice/shadowing of the tasks they must execute. The next step includes a pre-operational phase where the RCM contractor will continue to train staff and hold operational meetings to discuss areas of improvement and opportunities with the clinical and administrative teams. In the final phase, the RCM contractor would be fully operational and in charge by mid-June 2021.

Given the recent implementation of the RCM, no savings or increased revenue and collections have been achieved to date. For FY2022, ASEM must continue with the implementation of the RCM and review and monitor the current providers performance as outlined in the required implementation actions found in *Exhibit 104.*

### 15.4.3   Required implementation actions

To achieve the 2021 Fiscal Plan requirements, the DOH grouping must complete key operational efficiencies as outlined in *Exhibit 104.*

EXHIBIT 104:  REQUIRED  IMPLEMENTATION  ACTIONS  FOR  THE  DEPARTMENT OF HEALTH

| | Required implementation actions | Deadline | Status |
|---|---|---|---|
| | Launch ASEM revenue cycle management (RCM) initiative with engaged vendor | May 2020 | Completed |
| | Develop near-term and long-term plan to improve clinical operation, data consolidation, including identification of hospital management software / solutions | June 2020 | Delayed – December 2021 |
| | Identify common administrative and medical supplies across health agencies and public hospitals with opportunities for savings through procurement centralization | June 2020 | Delayed – December 2021 |
| | Develop plan to hire additional nurses to maintain staffing levels, and optimize deployment across DOH facilities | September 2020 | Delayed – July 2021 |
| **To be completed in FY2021** | Identify 10+ sites (e.g., FQHCs, community centers) outside San Juan for potential installation of telehealth portal | September 2020 | Completed |
| | Identify opioid treatment initiatives / organizations for investment and partnership with DOH | September 2020 | Completed |
| | Finalize design of medical student scholarship and identify potential federal matching funding | September 2020 | Completed |
| | Develop proposal for hospital capital improvement projections, including recommended vendors, detailed cost estimates, and timelines for completion | September 2020 | Completed |
| | Conduct capacity analysis to identify duplicative roles and positions across agencies/programs and opportunities for centralization of duplicative tasks | December 2020 | Delayed – June 2021 |
| | Work with providers to develop action plan to enable telehealth, including required tools/software | December 2020 | Completed |
| | Centralize procurement of identified administrative and medical supplies within ASEM | December 2020 | Delayed – June 2022 |
| | Enact legislation to consolidate DOH and ASES and launch consolidation implementation efforts | March 2021 | Delayed - TBD |

| Required implementation actions | Deadline | Status |
|---|---|---|
| Cancer Center- Develop Business Plan to become sustainable by FY2024. | May 2021 | Completed |
| Publish RFP to identify third party vendor for the Medical Student Loan Forgiveness Program | June 2021 | Delayed – December 2021 |
| DOH- Execute public awareness campaigns on Opioid prevention and provide an update on the Prescription Drug Monitoring System | June 2021 (ongoing) | Delayed – December 2021 |
| ASSMCA- Provide monthly reports on CMS accreditation status | June 2021 (ongoing) | Delayed – July 2021 |
| Select vendor a third party vendor for the Loan Forgiveness Program and sign contract | September 2021 | Completed |
| ASEM -Review the current providers performance on the RCM, report savings and KPI's. | December 2021 | Completed |
| DOH- Complete the procurement, purchase and installation of the Telehealth Portals | December 2021 | Completed |
| Cancer Center- Fully implement Electronic Health Records | June 2022 | Completed |
| DOH- Finalize all Medicaid office closures to achieve the full savings projected in the Fiscal Plan | June 2022 | Delayed – June 2021 |
| ASSMCA- achieve CMS accreditation and start billing for Medicare and Medicaid patients | September  2022 | Completed |
| Cancer Center- Become self-sufficient and rely on SRF's by FY2024 | June 2023 | Delayed – June 2022 |

(Left label spanning rows: **To be completed in FY2022**)

## 15.5   Department of Public Safety (DPS)

The Department of Public Safety (DPS) is an agency grouping which was approved by Puerto Rico's Legislature in 2017 (Act 20) and includes seven bureaus responsible for **ensuring safety and security for all residents of the Island** (*Exhibit 105*). The DPS grouping includes the following agencies[285]:

EXHIBIT 105: LIST OF BUREAUS IN DEPARTMENT OF PUBLIC SAFETY GROUPING[1]

1 Puerto Rico Police Bureau (PRPB)      5 9-1-1 Services Governing Board

2 Firefighters Corps      6 Special Investigation Unit

3 Emergency Medical Services Corps      7 Department of Public Safety

4 Emergency Management and Disaster Administration Bureau

1 Bureau of Forensic Science Institute will remain separate of the Department of Public Safety grouping

Of all Commonwealth agencies, the second largest agency by spend and personnel is the Puerto Rico Police Bureau (PRPB), representing ~85% of total DPS spend. Based on reports as of July 2017, over 2,000 of the 13,000 sworn officers in the Police were fulfilling administrative roles. This situation has persisted since 2013, when a consent decree agreement with the U.S. Department of Justice on reform measures compelled PRPB to conduct a staffing allocation and resources study to assess the proper size of the police force. This study, completed in May 2018, found that PRPB needed to rebalance its workforce and move sworn officers to non-administrative roles to improve personnel resource allocation and maximize public safety. The 2021 Fiscal Plan adopted key recommendations from the study to outline necessary efficiency actions, including transitioning sworn officers to the field, adding civilians to backfill

---

285 Forensics Sciences has been maintained as an independent agency per Act 135-2020. Fiscal Plan savings expectations for agencies do not change if they are determined to remain independent versus consolidating. As such, 2021 Fiscal Plan targets for Forensics will not change

administrative roles, and increasing police salaries to bring to competitive levels as compared to the mainland by FY2021.

For other DPS bureaus, the 2021 Fiscal Plan requires consolidation of back-office functions and optimization of non-personnel spend, while allocating funds for priorities such as consent decree compliance, materials and equipment, and salary increases for the Firefighters Corps. Specific investments and other funding are outlined below.

To date, the Department of Public Safety has made some progress towards consolidating back-office roles through the creation of a shared services structure within DPS, partially implemented a time and attendance system, and digitized all forms (including the CAD system/incident reporting). The formation of a shared services structure within DPS, although implemented in FY2021, has added bureaucracy, and created additional hurdles related to Procurement and Recruitment affecting the performance of the agencies within the umbrella. As a result, the Institute of Forensic Science of Puerto Rico, separated from DPS effective December 1, 2020 and took with it all efficiency measures related to the Institute.

As of March 2020, PRPB reported that ~1,200 of 11,650 sworn officers were still performing administrative roles. A combination of high historic attrition rates, the agency's continued inability to hire additional civilian staff, and a push for headcount reductions through Voluntary Transition Programs (VTP) has led to a shortage of field officers and increased overtime spend. PRPB implemented two academies and recruited 263 cadets in FY2020 to address this shortage, but despite these efforts, PRPB has struggled to hire civilians and to enable more cadets and sworn officers to move into field roles.

Recruitment difficulties – for front and administrative roles - continues to be a major hurdle amongst other DPS bureaus as well.  The Fire Bureau will begin their first academy since 2016 during May 2021, mainly due to delays in candidate selection. The Emergency Medical Services Bureau has yet to recruit staff for 44 vacant positions during FY2021. As such, the 2021 Fiscal Plan highlights the need to drive actual changes in processes and back-office efficiencies, as relying on retirement incentive programs to reduce frontline staff has the potential to negatively impact service levels. The currently unfolding COVID-19 crisis further necessitates DPS bureaus to resolve recruitment issues by utilizing payroll investments provided by the 2021 Fiscal Plan (see below) to maintain service levels.

### 15.5.1   *Investments in safeguarding public safety*

The 2021 Fiscal Plan included continued investment in public safety for Puerto Rico. The below detailed investments were intended to enable the Bureaus to hire and retain frontline employees and work with proper and sufficient equipment. Investments included:

- **Sworn police officer salary increase (~$160 million per year):** The 2021 Fiscal Plan continued the provision of funds to support the 30% increase in salary relative to FY2019 levels (which already included a $1,500 raise per sworn officer instituted at the beginning of FY2019), provided in two installments of 15% each in FY2020 and FY2021. It also maintained increased funds for life and disability insurance ($250 per year per sworn officer), employer Social Security contributions for all police starting in FY2020, and Law 70 contributions.

- **Investments in the Police Bureau for Capital Expenditures ($20 million per year):** The 2021 Fiscal Plan provides additional funds for new vehicles and fleet replacement.

- **Investment in Firefighter salaries (~$2.65 million per year):** The 2021 Fiscal Plan provides the funding required to preserve the $1,500 salary increase for firefighters in FY2022.

- **Investments in personnel for Emergency Medical Corps (EMS):** Since 2017, EMS has registered an improvement in its response time by 14 minutes despite facing attrition of ~100 paramedics. Considering the unfolding COVID-19 emergency, the 2020 Fiscal Plan

217

provided funding to the Bureau to recruit additional paramedics and further improve response time to U.S. mainland standards. Therefore, the 2021 Fiscal Plan continues to provide  an annual investment of $1.1 million towards the recruitment of paramedics and dispatchers.

- **PRPB reform:** $20 million annual investment in 212 areas of police improvement for three consecutive years since FY2020. The 2021 Fiscal Plan includes funding to meet the requirements of the agreement/consent decree.

- **Police overtime:** The 2020 Fiscal Plan included $6.58 million funding for overtime pay and implementation and maintenance of the Kronos electronic timekeeping and overtime management system. An additional $6.6 million will be provided during by the 2021 Fiscal Plan during FY2022.

- **Investments in personnel and materials for Institute of Forensics:** $4.7 million in payroll to enable the hiring of forensics scientists, pathologists, examiners, and DNA specialists. The 2021 Fiscal Plan continues an investment in Forensic Sciences Institute of $2.3 million, for this same purpose. Additionally, the Institute received a $3.017 million appropriation to renovate their Autopsy facilities, including $1.625 million for new equipment.

### 15.5.2  Overview of efficiency measures

DPS was not required to achieve additional savings in FY2021 over those required in FY2020. This delay in incremental measures was intended to provide funding urgently needed to implement efficiency efforts. However, from FY2022 to FY2025, DPS must achieve the personnel and non-personnel savings outlined in *Exhibit 106*.

EXHIBIT 106: DEPARTMENT OF PUBLIC SAFETY MEASURES SUMMARY OF IMPACT



*Transferring sworn officers out of administrative roles and into the field*

As of March 2020, PRPB reported 11,650 sworn officers, of whom ~1,200 are still performing administrative roles. Contrary to what the 2020 Fiscal Plan specified, the amount of sworn officers performing administrative tasks has increased significantly during the past year, to 1,476 as of December 2020.

In accordance with the 2021 Fiscal Plan, PRPB should replace sworn officers currently performing civilian duties—such as mechanics, radio operators, record and report keepers, area command statistics compilers, and maintenance workers—with less expensive civilian personnel, and transfer sworn officers out into communities. In doing so, PRPB will be able to provide better services by enabling more officers to work in the field with the community, while reducing overall expenditures for the Bureau.

Fiscal Plans require PRPB to transfer more than 1,000 sworn officers to non-administrative roles between FY2020 and FY2025 and hire an additional ~900 civilian personnel to perform the administrative functions, while also pursuing efficiency measures to reduce the overall need for administrative personnel. PRPB must accomplish this by pursuing process optimization, digitizing incident reporting, automating time and attendance systems, and consolidating statistical reporting. Furthermore, DPS must streamline vehicle maintenance processes through superior scheduling and procurement protocols, which can reduce the need for vehicle maintenance staff, as detailed in *Exhibit 107*.

To achieve additional efficiencies, PRPB must consolidate police stations, transit units, and specialized units to reduce the amount of administrative personnel required (e.g., station desk officers, station commanders and directors, stations auxiliary commanders and directors, and vehicle managers). Simultaneously, PRPB must eliminate units and divisions which perform duplicative services already provided by other agencies within the Government (e.g., the Divers Unit, the Rescue Squad Division).

PRPB has made good progress on these goals, including successfully deploying and implementing a time and attendance system for more than 50% of the Bureau (with plans to deploy it across all PRPB precincts by June 2021) and updating to the latest software version of its incident reporting system (TIBURON/CAD).

However, PRPB is still behind on overall process improvements, as well as its goal of moving more sworn officers into the field. The Bureau still has ~1,476 sworn officers serving in administrative roles, with overtime expenses still above budgeted amounts. This is due to a lack of real back office operational improvement, struggles to hire civilian personnel, and overall attrition rates, as recruited cadets help maintain a steady level of sworn officers. The 2021 Fiscal Plan specifies that there should be 11,842 active sworn officers and 1,413 active civilians/back-office personnel in FY2022. Currently, there are 11,454 and 457, respectively.

The Bureau has reported no savings from back-office efficiencies. Further, as of February 2021, DPS reported that 49 officers in administrative roles had been replaced by 90 civilian employees. This is not in line with the partial back-fill targets required in the 2021 Fiscal Plan. Efforts to implement two academies and recruit 252 cadets in FY2021, along with an ongoing Academy with 126 cadets, have not solved current staffing shortages.

The Bureau has also struggled to recruit civilians for administrative roles, despite multiple attempts to recruit from civilian staff within government as well as external efforts. In FY2021, PRPB launched external recruitment for 130 of the 228 roles stated by the 2021 Fiscal Plan. Only 90 civilians have been recruited as of February 2021. The Department claims the limited hiring is due to non-competitive salaries for the civilian roles, additional requirements (such as thorough background checks), and academic/professional experience needed to qualify. DPS claims to have implemented multiple recruitment drives, both within the Government as well as externally, to recruit for accounting and IT back-office roles, which they consider extremely difficult to recruit. However, DPS has not provided evidence to substantiate claims of non-competitive salaries or a plan for addressing any of these claimed obstacles.

Without focused action, PRPB will be unable to achieve the actions required to transform its operations and ensure it can move more sworn officers onto the streets to improve public safety on the Island.

219

*Reducing overtime*

PRPB spent approximately ~$50 million on overtime in FY2018, excluding the emergency overtime needs resulting from Hurricane María. This level of overtime is considerably higher than overtime for police forces in comparably sized U.S. mainland states. For instance, Connecticut, which has a similar population to Puerto Rico, spent only ~$28 million on a comparable basis in 2017. This gap persists despite the fact that Connecticut's total police spend per capita is ~$140 less than that of Puerto Rico.[286] Fiscal Plans have therefore required PRPB to reduce paid overtime by 60% by FY2023, in part through the operational efficiencies noted above, as well as by moving more sworn officers into the field and deploying more effective staffing models.

While PRPB reduced overtime spend in FY2019, FY2020 and FY2021 saw sharp increases driven by a shortage of field officers and failure to hire civilian staff. Additional systemic factors, such as paying current pay rates for previously incurred overtime, also contributed to the increase in overtime pay. Based on the latest information from the PRPB, the Police Bureau had already spent $25 million on overtime as of January 2021, almost the same as the annual spend for FY2020.

Tracking and managing overtime in Puerto Rico is further complicated by the manual nature of the process and a lack of centralized reporting. As a result, DPS does not have visibility into the quantity of overtime for a given period. To address this issue, a system to track overtime hours (SITAS) has been successfully implemented in nine Police areas, accounting for more than 50% of the current PRPB workforce. Full implementation of time and attendance tracking is scheduled to be completed by June 2021. After fully implementing the Kronos/SITAS time & attendance tool, the Bureau must properly track overtime and reduced yearly expenses to the $20 million savings required in the 2021 Fiscal Plan by outlining an implementation plan to reduce overtime expenses, as detailed in *Exhibit 107*.

The Bureau should continue to advance efforts to improve tracking and management of overtime to avoid unnecessary costs in future years. Furthermore, the SITAS/Kronos tool must be used to identify specific areas and timeframes with unusually high overtime expenses.

*Driving other DPS agency personnel efficiencies*

The other DPS bureaus[287] were required to consolidate back-office functions into the centralized DPS administrative agency starting in FY2019, with a goal of 50% reduction in transitory workers (excluding PRPB, PRFB, and EMS).

Measurable progress has been made at DPS in this consolidation. To date, approximately 350 employees[288] have transferred to DPS from across the seven Bureaus. After the departure of the Institute of Forensics Sciences from the DPS grouping, the total amount was reduced to 315 employees. DPS has also established direct reporting lines and process integration across the remaining six bureaus for Procurement, Legal, Communications, Human Resources and Finance, and has migrated all Bureaus onto standardized system software for key back-office functions (e.g., accounting, finance, procurement). This should further ease the transition to centralized back-office operations beginning FY2021.

Although DPS now has a budget to fund centralized back-office roles, procedures and key performance indicators still need to be established. This is especially true for Recruitment and Procurement, where multiple duplicative manual processes are performed in both areas. The Oversight Board has yet to receive a proper staffing and capacity analysis of current personnel, including detailed information of year-to-date procurement activity. DPS must provide monthly implementation reports, as per reporting requirements, regarding recruitment and procurement

---

[286] Connecticut Office of the State Comptroller; census data 2014; FBI Crime Justice Information Services
[287] Excluding 9-1-1
[288] Including more than 200 positions that are currently vacant (204 as of December 2020)

activity and progress for all Bureaus, including Capital Expenditure reports and vacant positions filled, as detailed in *Exhibit 107*.

The Firefighter Corps and the Special Investigations Bureau have both adopted the time and attendance system (Kronos) for administrative roles. DPS has confirmed plans for other agencies to adapt this same system, but an implementation timeline has yet to be proposed. A time and attendance tool, including a timeline schedule of full implementation across all Bureaus, needs to be established for all pending front and back-office personnel in order to enable better transparency in personnel time allocation and payroll expenditures. Time and attendance for the remaining personnel in all DPS Bureaus must be established by June 30, 2022, as detailed in *Exhibit 107*.

*Optimizing all DPS agency non-personnel spending*

DPS must achieve procurement savings of 30% in FY2018 spend base. To do so, DPS should centralize and consolidate purchasing for all DPS agencies, leverage the negotiating power of the federal General Services Administration, utilize e-auctions, and launch competitive Requests for Proposal (RFPs) for outsourcing responsibilities. Even though procurement has been centralized within the DPS Shared Services structure, they will have to coordinate directly with GSA as the Government's central procurement agency for all purchases of the Bureaus and re-engineer their processes as the Shared Services structure has become less effective due to multiple manual processes. DPS must use FY2021 appropriations to address these issues, eliminating all current manual procedures by June 30, 2022, as detailed in *Exhibit 107*.

While DPS has identified ~35 contracts for potential consolidation in the future, no estimated savings for those contracts has been communicated. For FY2022 DPS must implement the milestones as detailed in *Exhibit 107* regarding procurement improvements.

### 15.5.3   Required implementation actions

To achieve the 2021 Fiscal Plan expectations, the Department of Public Safety grouping must complete key operational efficiencies as outlined in *Exhibit 107*.

EXHIBIT 107: DEPARTMENT OF PUBLIC SAFETY REQUIRED IMPLEMENTATION ACTIONS

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| **To be completed in FY2022** | Define a plan to increase expense categorization and reporting transparency, which could include adding descriptors in PRDE's internal financial systems (e.g., SIFDE) | December 2020 | Completed |
| | Evaluate current transportation spend and services in order to ensure that all students that are eligible (per IEP or regular eligibility guidelines) receive transportation services | December 2020 | Delayed – July 2021 |
| | Evaluate facilities spend and create an implementation plan to capture all facilities spend at PRDE (e.g., spend from OMEP) in a more streamlined manner and to be able to differentiate spend between maintenance, capital expenditures and custodians | December 2020 | Delayed – December 2021 |
| | Create a facilities master plan that assesses and the need of PRDE facilities portfolio in order to ensure that spend is prioritized according to need and PRDE's long-term facilities strategy | May 2021 | Delayed – July 2021 |
| | Implement updates to the transportation system and resolve all pending items identified to comply with USDE requirements and thus be able to leverage Federal Funds to cover part of student transportation costs | July 2021 | Not Started |
| | Create a facilities master plan that assesses the need of PRDE facilities portfolio in order to ensure that spend is prioritized according to need and PRDE's long-term facilitates strategy (PRDE must share all versions of such plan with the Oversight Board) | July 2021 | Not Started |
| | Evaluate improved spending transparency given new subclassifications within SIFDE and identify savings achieved as well as potential opportunities to meet Fiscal Plan savings target | October 2021 | Not Started |
| | Prepare and submit the Annual Procurement Plan to GSA, as required by Law 73-2019, and prepare a similar plan for professional services to be contracted during the next fiscal year | March 2022 | Not Started |

## 15.6   Department of Corrections and Rehabilitation (DCR)

The Department of Corrections grouping (*Exhibit 108*) consists of two agencies: the Department of Corrections (DCR), which manages the functions and policies of the Puerto Rican correctional system;[289] and the Correctional Health Department (CH), which provides healthcare to the incarcerated people under the jurisdiction of DCR. In FY2018, DCR reported a total employee headcount of 6,695, for an adult incarcerated population of 9,385 and juvenile population of 156. The agencies had a combined FY2018 budget of $419 million.

EXHIBIT 108: LIST OF AGENCIES IN FUTURE STATE DEPARTMENT OF CORRECTIONS AND REHABILITATION GROUPING



1 Department of Corrections and Rehabilitation          2 Correctional Health Department

*Department of Corrections (DCR)*

While operating an aging prison system dependent on outdated technology does necessitate a relatively high staffing level, the actual number of employees at DCR is substantially higher than comparable benchmarks. For example, DCR's FY2018 FTE-to-inmate ratio was 0.71, significantly higher than the 75th percentile for correctional staffing ratios in mainland U.S. states (0.54 FTEs per inmate).[290] Currently, as of March 2021, the FTE-to-inmate ratio is even higher – at 0.82 – largely due to reductions in the prisoner population not accompanied by reductions in staff.

In addition to its inmate population, DCR also served 7,122 community program participants in FY2018 (a population three-fourths the size of the total carceral population). In contrast,

---

289 This includes all penal institutions and rehabilitation facilities for men, women, and juveniles
290 NASBO, FBI, BJS databases

mainland U.S. states with FTE-to-inmate ratios near 0.54 serve nearly 3.6 times as many community program participants as the number of incarcerated adults in state prisons[291]. Additionally, while most U.S. state prison systems are near 100% utilization, as of March 2021 Puerto Rico facility utilization is 73%, which only considers habitable spaces.[292]

*Correctional Health (CH)*

To deliver healthcare services to incarcerated people, CH employs a hybrid management model comprising of in-house direct care providers and contracted healthcare delivery through third-party healthcare providers (e.g., Physicians, Mental health professionals). While most states in the U.S. have a direct-care model or use staff for administration and outsource healthcare, CH's model is relatively complex and unique, with the contracted vendor directly managing CH's roster staff. In FY2018, CH spent $8,499 per incarcerated person to provide healthcare services, while median spend across U.S. mainland states was $5,763.[293]

*Juvenile Programs*

In 1994, the United States filed a complaint against the Commonwealth of Puerto Rico and some named officials for subjecting juveniles confined in residential facilities to conditions that deprived them of their federal rights. The Commonwealth and the named Commonwealth officials agreed to settle the matter with the United States, culminating in the comprehensive 1997 Settlement Agreement. On December 12, 1997, the U.S. District Court for the District of Puerto Rico ("USDC") entered the Settlement Agreement as an Order. The USDC appointed a Monitor to ensure compliance with the provisions in the Settlement Agreement. In a report made for 2019, the Monitor concluded that the Department of Correction and Rehabilitation was non-compliant on three (3) provisions and partially compliant on twenty-one (21) of the remaining thirty (30) provisions in the court approved Settlement Agreement. The non and partial compliance provisions were related to inadequate staffing levels, which hinder the security of the juveniles, and to facility conditions. To address these issues, the Federal Monitor concluded in a report that an adequate staffing analysis and a separate budget for the Juvenile Program would be conducive towards good management.

In April 2020, the USDC ordered the establishment of a separate budget for the Juvenile Program in the amount of $22 million to ensure the Juvenile Program would have the necessary resources to operate and condition the juvenile facilities. Going forward, the Certified Budget will continue to segregate the Juvenile Program budget at a granular concept code level.

The Oversight Board has not seen any progress towards achieving operational efficiencies by DCR or CH. DCR's system-wide utilization of space for adult prisons continues to decline, coming in at 56% utilization as of February 2021. This decline has primarily been driven by government restrictions relating to COVID-19, as courts were closed for the first months of the pandemic and no pre-trial cases could be seen. This forced DCR to release some pre-trial incarcerated people, as the agency is not allowed to house them for more than 6 months if not convicted of a crime. As a result, the adult incarcerated population in DCR declined by 19% from June 2020 to February 2021, up from an average decline of 6% per year from 2014 and early 2020. However, total DCR employees have declined by just 4% per year since 2014.

Following the earthquakes, DCR closed a severely damaged facility in Ponce, and two other facilities were partially evacuated. This required two formerly-consolidated facilities to be reopened in order to temporarily house transferred inmates. As of 2021, DCR has stabilized its distribution of inmates to the proper facilities. However, a new challenge arose this year with the advent of COVID-19. Positive test results among incarcerated people and DCR employees has complicated operations, as agency safety protocols have necessitated the use of some facilities for quarantine. In light of these operational challenges, it is imperative for DCR to identify

---

291 Bureau of Justice Statistics, 2014
292 Bureau of Justice Statistics, 2014
293 Pew Trust "Prison Health Care: Costs and Quality" Report, 2017

inefficiencies currently embedded in the system and enhance Puerto Rico's correctional facilities, thereby making existing spaces more operationally useful and optimizing delivery of healthcare service to its inmates.

While in FY2021, DCR and CH were not held to any incremental measures, DCR and CH are expected to continue agency efficiencies in FY2022 to continue moving toward a more efficient staffing model and facility footprint. To enable progress, the Oversight Board made a one-time investment of $500,000 for a feasibility study to identify major areas in disrepair and in need of capital investment. Unfortunately, the completion date of this study was delayed due to COVID-19 from December 2020 to May 2021. As a result, the agency has paused any further consolidations. This will continue to impact potential savings, as DCR has yet to show procurement savings resulting from the large incarcerated population decline in FY2021.The Oversight Board strongly believes that DCR must focus more carefully on how it spends its resources so that it can more successfully deliver on its mission to protect inmate and staff safety.

The 2021 Fiscal Plan also includes explicit funding to enable DCR to measure and monitor federal consent decree requirements, including:

- **Corrections reform:** The 2021 Fiscal Plan ensures funding to achieve minimum confinement standards and inmate support at Puerto Rico Corrections facilities.

- **Juvenile corrections:** The U.S. District Court required a $22 million budget for the FY2021 Juvenile program following a joint recommendation from the Juvenile Program and the Federal Monitor. The 2021 Fiscal Plan includes funding to meet the requirements of the Court.

- **Correctional Health reform:** The Fiscal Plan provides funding to meet correctional health requirements based on the Carlos Morales Feliciano case.

### 15.6.1  *Overview of efficiency measures*

For FY2021, the 2020 Fiscal Plan did not require additional savings for DCR and CH. This pause was meant to allow the agencies to implement urgent efficiency efforts. However, from FY2022 to FY2026, DCR must achieve the personnel and non-personnel savings outlined in *Exhibit 109*.

EXHIBIT 109: DEPARTMENT OF CORRECTIONS AND REHABILITATION MEASURES SUMMARY OF IMPACT



Run-rate savings from agency efficiency measures[1], $M

*Optimizing the FTEs-to-inmate ratio*

**Personnel savings must be captured by reducing DCR FTEs per inmate.** The agency is required to meet target FTE-to-Inmate ratio of 0.63 by FY2023. This is a slight increase from the bottom-quartile U.S. states' benchmark of 0.54, which was the target ratio in past Fiscal Plans.[294] Considering the minimum staffing needs established by law for juvenile facilities and DCR's obligations towards community program participants (through socio-penal technicians), DCR must achieve headcount reduction targets by rightsizing administrative staff roles and redirecting correctional officers currently working in administrative or civilian roles. Despite the requirements of the 2020 Certified Fiscal Plan on this issue, the FTE ratio has increased from 0.67 in June 2020 to 0.82 as of February 2021 reporting; as the inmate population continues to decline due to COVID-19 implications.

DCR must achieve these personnel reductions by employing back-office process efficiencies (see *Exhibit 110* below). These include building internal capacity, increasing access to information technology, establishing clear measurement tools for identifying progress in implementation and quality of services rendered, identifying and training staff to assume leadership positions in Finance and Operations, having increased control over its budget, and strengthening quality assurance systems. The Oversight Board believes these changes are necessary to establish better administration of services provided to both DCR employees and to the adult and juvenile incarcerated populations.

*Consolidating adult facilities*

To bring the system in line with the requirements of the population and to increase utilization across all prison facilities, DCR is required to consolidate its footprint to reach an overall system utilization of 93% (see *Exhibit 110*). This must be achieved while maintaining appropriate separation of different inmate risk profiles and populations, including men, women, and juveniles, as required.

DCR's facilities are technologically outdated with rapidly deteriorating infrastructure. Repairs are needed for plumbing, electric, roof sealings and gate repairs, among other concerns. In FY2021 DCR was required to conduct a facility footprint and consolidation assessment study with the objectives of: (1) diagnosing the current state of infrastructure across its facilities; (2) identifying capex investment needs; and (3) identifying opportunities for additional facility consolidation. This assessment was meant to serve as a guiding tool for DCR to implement the consolidation of facilities following an overarching and comprehensive approach. Unfortunately, due to the pandemic, the study was delayed from December 2020 with results being provided at the end of FY2021. The delays were attributed to a long hiring process and the vendor not being able to travel to the Island due to COVID-19 concerns.

DCR reported consolidating five prisons before FY2018 in addition to closing four prison facilities, including two juvenile facilities – a departure from 2020 Fiscal Plan expectations. However, DCR has continued to operate those facilities, at least in part, using them as storage, administrative offices, or program offices (e.g., community program, special arrests). As a result, no savings from the closure of these facilities have been achieved.

Meanwhile, despite the reported consolidation of facilities, system-wide utilization rates for facilities that house inmates continue to be low. DCR is now operating a total of 33 facilities with a total capacity of 12,643. With an incarcerated population of 7,125, this implies a utilization rate of just 56%. This indicates potential for DCR to further consolidate additional facilities.

Almost 23% of DCR's total capacity is reportedly 'uninhabitable'. To enable improvement in habitability of this excess space, the Oversight Board provided DCR a one-time capex allocation of $19.2 million in FY2020. However, the agency did not utilize these funds to improve habitability of spaces, instead spending the funds on regular roof repairs, perimeter gates repairs,

---

294 Census data, 2014; Bureau of Justice Statistics, 2014

infrastructure repairs and purchase/installation of power generators. Given the lower inmate population, DCR has consistently pointed to the uninhabitable spaces in large prisons. Making these spaces habitable is key to the further consolidation of DCR facilities.[295]

Completion of the feasibility study will provide additional clarity and further direction as to which facilities are ideal for additional consolidation, either by investing in repairs to uninhabitable spaces and or by making the general repairs needed to existing facilities.

Once the vendor provides the final recommendation at the end of FY2021, agency must analyze and establish their plan to implement the results of the study. Agency must prioritize implementing the consolidation of its footprint and operational consolidation must still be realized for the agency to achieve savings. DCR must cease operations in facilities not currently used to house inmates and, accordingly, wind down maintenance and operating costs. At a minimum, DCR should shut off utilities (electricity, water) at these facilities, and identify opportunities to enable transfer of ownership wherever possible. Agency continues to use closed facilities for other needs, such as storage, as well as reopening previously closed facilities to temporarily move inmates due to the January 2020 earthquakes and to accommodate special needs created by the COVID-19 pandemic. Capital improvements for facility modernization (e.g., electronic monitoring through installation of security cameras, automated gates, etc.) should also be expected to reduce dependence on front-line personnel and enable personnel efficiencies.

Overall, the 2021 Fiscal Plan expects 40% of non-personnel operating expenditures to be captured by FY2025 for each closed facility by consolidating the physical footprint, winding down contracts, and other levers. The remaining operating expenditures should be transferred to support population increases in the remaining facilities.

*Reducing procurement spend*

DCR FY2018 total addressable spent totaled $52.5 million on procurement. It was determined that these costs could be reduced through leveraging the negotiating power of the Federal General Services Administration, utilizing e-auctions, launching competitive Requests for Proposal (RFPs), centralizing purchasing to the greatest extent possible, and outsourcing/contracting responsibilities.

Procurement efficiency measures included a $5.6 million HMO contract savings, and $5.1 million in procurement efficiencies. In FY2019 and FY2020, DCR reported ~$4 million in procurement savings through renegotiating its HMO contract for the delivery of correctional health services, and closing administrative offices and the juvenile facility at Humacao. However, in that same period, DCR has not met the additional annual saving goal of $5.1 million in procurement efficiencies.

In FY2021, which saw a decline in the incarcerated population of 9%, DCR reported savings only on food costs, while other contracted services either maintained or increased spend. Furthermore, this savings in food costs is expected to be reduced or eliminated when the agency changes its food provider before FY2022. This change will result in paying more per plate, with added services such as management of commissary stores, laundry and equipment replacement for the managed areas without proportional changes in those in-house costs.

For FY2022, DCR is required to continue procurement savings as the inmate population declines. Possible correctional facility consolidations in FY2022 will drive savings opportunities for the agency as long as they implement feasibility study recommendations to continue to eliminate its facility footprint.

---

[295] As of January 2021 data, 11 facilities with the lowest utilization rates had 925 inmates who could be transferred to the remaining facilities to increase system wide utilization rates to 91%

*Improving management of prisoner healthcare*

In FY2018, the Government spent $8,499 per inmate for correctional healthcare. The 2021 Fiscal Plan required the Government to bring per-inmate spend in line with the 50th percentile of U.S. states and unlock savings by renegotiating existing contracts, launching competitive RFPs for key contracts with terms more in-line with mainland spending practices, reconsidering level of service due to the currently declining prison population, and strategically evaluating insourcing options. As of FY2021 CH has implemented a generic medicine program across all facilities, with the goal of reducing medicine expenditure.

Furthermore, CH is expected to achieve personnel efficiencies of $8.2 million as per FY2018 baseline. In order to achieve savings, agency needs to reevaluate its staffing policies for administrative and support roles (such as paraprofessionals, pharmacists, etc.), and implement back-office process efficiencies and/or centralization/digitization of common tasks across facilities (see *Exhibit 110* below).

CH reported achieving procurement savings in FY2019 through efficient inventory management, renegotiating procurement contracts with rebates, implementing generic drug buying policy, and enacting new medication formulary and clinical management.[296] The Oversight Board provided one-time additional funding of $8 million to cover projected overspend. However, the agency continues to struggle to implement the efficiency savings required by the 2020 Fiscal Plan. Even as DCR has achieved procurement savings through renegotiating the correctional health HMO contract and food services contract, there are still opportunities to evaluate potential savings on other contracts in Correctional Health, including those for sub-contractors. CH is required to achieve savings of $4.6 million in FY2022 (see *Exhibit 110* below).[297]

### 15.6.2   *Required implementation actions.*

To achieve the 2021 Fiscal Plan requirements, the Department of Corrections and Rehabilitation grouping must complete key operational efficiencies as outlined in *Exhibit 110.*

EXHIBIT 110: DEPARTMENT OF CORRECTIONS REQUIRED IMPLEMENTATION ACTIONS

| Areas of focus | Required implementation action | Deadline | Status | New Deadline |
|---|---|---|---|---|
| Consolidate agencies | Provide outline for facility footprint and consolidations assessment study | July 2020 | Completed | N/A |
| | Publish facility footprint and consolidation assessment study listing facilities to be considered for consolidation or investment required to improve habitability of spaces | December 2020 | Delayed | May 2021 |
| | Implement plan to consolidate additional facilities and improve habitability of spaces to improve system level utilization of existing spaces and provide supporting documentation (e.g., RFP documents submitted to proceed with consolidation) | March 2021 | Delayed | March 2022 |
| Rightsizing personnel | Implement back-office process redesign (e.g., digitization of record keeping) to achieve personnel efficiencies and reach FY2022 headcount targets | July 2020 | Delayed | December 2021 |
| | Outline initiatives to reduce headcount in order to achieve target headcount in FY2022 and onward | March 2021 | Delayed | September 2021 |
| Optimize procurement spend | Provide facility-level data on opex spend, list of procurement contracts and outline initiatives to achieve procurement efficiencies in FY2022 | September 2020 | Completed | N/A |
| Redesign correctional health program | Provide updated roster of Correctional Health employees (direct, contracted) outlining key roles and responsibilities to validate current staffing levels | July 2020 | Completed | N/A |
| | Provide assessment of healthcare spend per inmate and identify initiatives to generate personnel or opex savings | December 2020 | Completed | N/A |

---

296 As reported by Physicians HMO – correctional health administration and management vendor.
297 Contract with Carolina Catering was established prior to FY2020. However, ongoing legal proceedings with Trinity catering (prior vendor) has delayed implementation of the new contract.

## 15.7 Department of Economic Development and Commerce (DDEC)

The Department of Economic Development and Commerce (DDEC) includes a consortium of agencies critical to incentivize and support the revitalization and transformation of Puerto Rico's economy. To promote growth, DDEC must enable high-impact projects, energize existing industries, and facilitate the attraction of off-Island investments to strengthen and modernize the Island's economy. Additionally, the Department manages a variety of youth and workforce development programs meant to foster qualities (e.g. entrepreneurship, job-preparedness) crucial to a growing economy. Finally, DDEC and its component agencies are charged with the implementation of structural reforms (e.g. overhauling permitting) to transform Puerto Rico into a more competitive business, tourist, and investment destination.

To ensure streamlined economic development and realize efficiencies, seven agencies have been slated for full front- and back-office consolidation into DDEC, with three more agencies to be assigned to the Department. Assigned agencies will consolidate their back offices into DDEC, but retain separate front offices. The agencies to be consolidated are as shown below (*Exhibit 111*).

EXHIBIT 111: LIST OF AGENCIES IN FUTURE STATE DEPARTMENT OF ECONOMIC DEVELOPMENT GROUPING

| | | | |
|---|---|---|---|
| 1 | Department of Economic Development and Commerce (DDEC) | 6 | Commonwealth of Puerto Rico Regional Center Corporation |
| 2 | Puerto Rico Industrial Development Company | 7 | Local Redevelopment Authority for Roosevelt Roads |
| 3 | Puerto Rico Trade and Export Company | 8 | Permits Management Office |
| 4 | Office of Industrial Tax Exemption | 9 | Puerto Rico Tourism Company |
| 5 | State Office of Energy Policy | 10 | Planning Board |

### 15.7.1 Overview of efficiency measures

From FY2022 to FY2026, DDEC must achieve the savings outlined in *Exhibit 112*.

EXHIBIT 112: DEPARTMENT OF ECONOMIC DEVELOPMENT MEASURES SUMMARY OF IMPACT



*Consolidating operations and rightsizing personnel*

The 2021 Fiscal Plan requires DDEC to consolidate 10 entities, which is expected to yield significant personnel and non-personnel savings. This consolidation requires DDEC to clearly define each agency's responsibilities, which will limit costs and prevent overlapping duties. Each agency's responsibilities must also be distinguished from those of Discover Puerto Rico (DPR), currently responsible for attracting off-Island tourists, groups, and conventions, and Invest Puerto Rico (IPR), which is charged with attracting offshore investments from businesses.

The 2021 Fiscal Plan requires DDEC to realize front and back-office personnel efficiencies as the Department consolidates other agencies. Specifically, DDEC should reduce front-line personnel by 20% by FY2022 to produce a streamlined and efficient organization. In line with the findings of a Government analysis that identified a redundancy in service of back-office personnel across the Department, DDEC should also consolidate back-office operations to reduce back-office headcount by 41% by FY2022.[298]Further, DDEC should establish a set of key performance indicators, targets, and milestones for each of its subsidiaries to measure the performance of its subsidiaries and partners and act to address issues.

To date, DDEC has made substantial progress by operationally consolidating 70% of agencies. The seven agencies have moved to a centralized accounting and payroll systems. Pending entities includes the Puerto Rico Tourism Company (PRTC), Roosevelt Roads (RR) and Planning Board (PB).

Although DDEC has integrated seven of ten agencies and merged agencies' back-offices into one, targets are at-risk due to PB, PRTC and RR. DDEC has struggled to integrate PB's back-office due to the lack of cooperation from the agency. However, in October 2020, Planning Board identified 36 employees that can be transferred to DDEC without affecting the agency's operations. This list was given to DDEC, but DDEC did not proceed with the transfer of these employees. As a result, PB's management sent an updated list in March 2021, with only 17 identified employees. Planning Board's consolidation into DDEC must be finalized in FY2022 (see *Exhibit 113*).

At the beginning of FY2021, PRTC transferred approximately 157 employees to the Gaming Commission. Currently, the agency has 209 employees, of which 46 are front-office (22%), 136

298 DDEC analysis, 2018

are back-office (65%), and 27 are working in another agency (13%). In addition to the consolidation of PRTC as a program under DDEC, efforts to reduce back-office personnel in the agency are pivotal for the operational efficiency of PRTC.

The required capacity analysis for the future state of DDEC explaining the various offices and the required personnel remains incomplete. The 2021 Fiscal Plan requires the agency to commence the project as soon as possible and have it finalized by September 2021 (see *Exhibit 113*).

Further, DDEC has so far reduced headcount only through Voluntary Transition Programs (VTP) or natural attrition. To achieve personnel reductions in a manner that does not compromise short-term or long-term operational capabilities, DDEC will need to analyze its personnel base and develop a targeted plan for what roles could be rationalized (see *Exhibit 113*).

*Achieving non-personnel efficiencies*

DDEC must reduce non-personnel spend by 30% by FY2022. DDEC has yet to initiate its procurement reform, which should aim to generate savings through contract renegotiations. Going forward, DDEC must focus on reviewing all its procurement contracts and identifying top contenders for contract consolidation or renegotiation.

In addition to reducing procurement spend, DDEC was required to consolidate its physical footprint to accommodate all programmatic areas and back-office personnel, and manage all tax exemptions, grants and credits under one centralized Department. Previously it was intended that employees should be consolidated in two main buildings, but current management decided to consolidate all personnel in PRIDCO's Hato Rey building located in Roosevelt Avenue. To date, DDEC consolidated all of its employees, with the exception of Planning Board and Tourism, into the Hato Rey building.

### 15.7.2   *Required implementation actions*

DDEC has a set of required implementation actions which will dictate the operational efficiency of the grouping moving forward. In FY2022, DDEC must achieve the following:

- Finalize the physical and operational consolidation of the agencies (including PRTC and Planning Board);
- Conduct an operational needs assessment to identify excess resources and reduce superfluous front- and back-office personnel;
- Start and finalize the procurement contract renegotiations;
- Publish the quarterly reports.

During FY2021, DDEC was given an implementation milestone, to publish quarterly reports on the agency's website detailing all economic incentive donation/subsidy amounts given to private corporations. If they achieved the milestone, up to $1.8 million would be provided per quarter for their operational budget. DDEC has published the quarterly reports, thus receiving the incentives for the first two quarters of FY2021. For FY2022, the implementation milestone will be applied as in FY2021 and it is expected the agency will improve the quarterly reporting to expand on the description of the economic activity, include return on investment (ROI), NAICS industry code and number of employees (see *Exhibit 113*).

To achieve the 2021 Fiscal Plan requirements, the Department of Economic Development and Commerce must complete key operational efficiencies as outlined in *Exhibit 113*.

EXHIBIT 113: DEPARTMENT OF ECONOMIC DEVELOPMENT AND COMMERCE REQUIRED IMPLEMENTATION ACTIONS

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| To be completed in FY2022 | Publish quarterly reports in the agency's website detailing all economic incentive donation/subsidy amounts given to private corporations | Quarterly<br>• Q1 – October 2021<br>• Q2 – January 2022<br>• Q3 – April 2022<br>• Q4 – July 2022 | • On track |
| | Identify which procurement contracts have been renegotiated or are pending renegotiation or elimination (across all consolidated and ascribed DDEC entities) to the Oversight Board | • June 2020 | • Delayed – September 2021 |
| | Conduct operational needs assessment across all consolidated and ascribed entities (including PRTC and JP) to identify where to reduce front- and back-office personnel without inhibiting the performance of DDEC agencies | • September 2020 | • Delayed – September 2021 |
| | Finalize the consolidation of the physical footprint of all consolidated DDEC agencies | • September 2020 | • Completed |
| | Reduce excess front- and back-office headcount across all DDEC agencies (excluding PRTC and JP) | • March 2021 | • Delayed – March 2022 |
| | Execute the administrative actions (e.g. systems integration) required to consolidate PRTC and ascribe JP | • March 2021 | • Delayed – March 2022 |
| | Finalize procurement contract renegotiations | • June 2021 | • Delayed – March 2022 |
| | Consolidate PB's key back-office personnel into DDEC's back office | • June 2021 | • Delayed – March 2022 |
| | Reduce excess front- and back-office headcount from PRTC and back-office personnel from JP in line with September 2021 operational needs assessment | • June 2021 | • Delayed – June 2022 |

## 15.8   Puerto Rico Innovation and Technology Services (PRITS)

### 15.8.1   *Context and current technology landscape in the Government of Puerto Rico*

The Puerto Rico Innovation and Technology Services (PRITS) was created to establish an administrative structure responsible for technology strategy across the Government of Puerto Rico.

The 2017 Executive Order that established PRITS gave it the following responsibilities, among others:

- Integration of technology into government management
- Promotion of public, private and academic projects in the technological field
- Creation of a digital platform to integrate the different components and government entities
- Generation of a system of tax payment and bank transfers under Hacienda
- Development of a public accountability system

In March 2019, an additional Executive Order reinforced the additional leadership roles and responsibilities of PRITS, including transferring the responsibilities of the Office of the Chief Information Officer (CIO) to PRITS  and establishing the role of the Chief Information and Innovation Officer (CIIO). The CIIO is in charge of integrating and streamlining the Government's information and communication technology processes.

In July 2019, the Government enacted Act 75-2019, making PRITS the office of the Executive Branch responsible for implementing, developing, and coordinating the Government's public policy on innovation, and information technology ("IT"). However, PRITS's first few years were marked by delays in the development and adoption of key technological reforms, as well as insufficient oversight of the use of technological resources.

To better enable PRITS to carry out its responsibilities, the Oversight Board approved its FY2021 budget of $70 million. These funds included a $2.5 million payroll increase for new skilled personnel and over $3o million in additional operational expenses for investments in cybersecurity, centralized data centers, strategy and operations, cloud services, and the implementation of centralized telecommunication services.

During FY2021, PRITS made some progress in improving transparency and accountability of IT spend across government. For example, the Proposal Evaluation Guidelines ("PEG") were implemented to standardize criteria used by PRITS to evaluate innovation and technology proposals submitted by the Government Agencies. Additionally, PRITS has improved oversight by establishing better communication with agency information officers and developing an inventory of available technology infrastructure and applications used by the government agencies.

In addition to these accomplishments, however, PRITS has room to make more effective use of its technology resources and available funding. First, PRITS still has room for improvement in integrating its IT infrastructure (e.g., on-premises data centers and cloud storage) and services (e.g., applications) across the Government. During FY2021, PRITS was granted $10 million for centralized data center strategy and operations, cloud services and new equipment. Such funding should have been utilized by PRITS for investments in centralized IT infrastructure and the migration of existing government services into such centralized IT infrastructure. These efforts would significantly reduce the need for infrastructure and cloud services at the agency level, which, in many instances, are being underutilized. The agency has not yet been able to provide a detailed plan for the integration of services and applications identified in its inventory. PRITS also still needs to make meaningful progress in the implementation of centralized telecommunication services and cybersecurity strategy and operations.

Second, although PRITS was granted $3.3 million in FY2021 for full staffing (including specialized resources), the agency suffered significant delays in formalizing a Government-approved organizational structure. In fairness, these delays coincided with other bureaucratic obstacles in the recruitment process, such as the electoral ban and outdated job classifications not reflective of agency staffing needs. Nonetheless, delays in the recruitment of key positions such as Chief Information Security Officer (CISO), and Chief technology Officer (CTO), as well as personnel with expertise in solution development, operations and technology architecture, resulted in a ~$1 million Payroll underspend and ultimately hindered the agency's ability to meet implementation deadlines.

The Government and PRITS need to prioritize the creation of centralized teams with the specialized skills needed to accelerate infrastructure consolidation and improve the Government's ability to deliver new technology solutions. Agencies continue to rely too heavily on external vendors rather than building the capabilities of PRITS to lead and manage these initiatives. Similarly, there continues to be unclear accountability for technologies developed at the agency level. As a result, pieces of infrastructure are developed and managed separately, with dispersed accountability, creating a complex web of oversight, incremental cost, and ineffective systems. Additionally, while it is apparent that certain agencies are taking advantage of the centralized cloud infrastructure by moving additional services into the cloud, the savings and existing budgets associated with the operational costs of on-premises data centers and other related expenses are not being transferred to PRITS.

As provided by the Act 75 of 2019, the Governor has the authority to transfer to PRITS personnel, funds, budgets, documents, records, equipment, materials, and files of any other IT operational area of any agency, for use in the purposes and purposes of the Act. The Government and PRITS should work together to ensure that PRITS has the necessary resources to fulfill its mandate of centralizing and standardizing the management of the information technologies and innovation areas of government.

### 15.8.2  Importance of digital modernization

It is critical that the Government make effective use of its technology resources. The Government, via PRITS, must continue to improve its capabilities in digital delivery to achieve critical benefits, including:

- **Reducing expenses and improving reliability through data-center consolidation.** Since 2016, the Federal Government has closed 210 tiered data centers, and over 3,000 non-tiered data centers.  To realize the full benefit of this action, PRITS must implement best practices at the state and federal level. These should include increasing use of virtualization, freezing new data centers unless compelling justification exists, and exploring the use of cross-agency shared services.

- **Rationalizing the application portfolio to ensure that Government-wide resources are directed to the highest priority initiatives.**     Modern governments face substantially higher demand for technology services than can be fulfilled. In a resource-constrained environment, disciplined application portfolio management can ensure alignment between IT spend and government priorities. Accordingly, PRITS must implement a Government-wide application rationalization effort which prioritizes proven solutions. These are likely to include creating a portfolio management governance approach; establishing a baseline inventory of applications; assessing the business value and total cost of ownership of the applications; scoring/ranking applications; and creating a forward-looking plan to migrate the portfolio to higher-value uses.

- **Enhancing cybersecurity to prevent costly data breaches.** As cyber threats continue to proliferate, government agencies globally have adopted cybersecurity-specific risk management practices. PRITS must improve the Government's cyber defenses by developing a government-wide view of "crown jewels" in the technology ecosystem that must be protected, providing policy guidance to agencies setting forth evolving standards and requirements, and coordinating delivery of specialized expertise across government where the need arises.

- **Improving transparency and accountability of IT spend across government, and focusing on value for IT dollar spending**. PRITS will realize its greatest impact when stakeholders are given a clear line of sight into where IT spending is going, and what value is being delivered. Encouraging agencies spending government resources to provide this transparency should therefore be a core focus for PRITS, rather than pursuing a centralized effort that treats transparency as incremental to existing IT spending.

### 15.8.3  Required implementation actions

In line with the four key initiatives stated above, PRITS must achieve the following objectives and milestones *(Exhibit 114)*.

EXHIBIT 114: PUERTO RICO INNOVATION AND TECHNOLOGY SERVICES REQUIRED IMPLEMENTATION ACTIONS

| | Required implementation actions | Deadline | Status / New deadline |
|---|---|---|---|
| **To be completed in FY2021** | • Establish process and protocols for IT contract review[1] of government agencies to create greater transparency on IT spend and needs of infrastructure or cloud services | • September 2020 | • Completed |
| **To be completed in FY2022** | • Develop strategy to consolidate Cloud services and on premise data-centers with a detailed migration plan to drive consolidation of infrastructure during FY2021 | • December 2020 | • Delayed – October 2021 |
| | • Provide a structured and exhaustive portfolio of digital initiatives, prioritizing by impact, feasibility and relevance for Central Government Agencies | • December 2020 | • Delayed – October 2021 |
| | • Ensure critical cybersecurity infrastructure, processes and control systems are set in place by PRITS and adopted by government agencies to minimize risks through clearly defined governance structures | • December 2020 | • Delayed – October 2021 |
| | • Create a protocol for PRITS to review all technology-related budget requests as part of the FY2022 Budget cycle | • December 2020 | • Delayed – December 2021 |
| | • Develop plan to consolidate current personnel spending and establish cross-functional teams by identifying personnel in government agencies with specialized technology skills to be centralized | • June 2021 | • Delayed – December 2021 |

1 Does not apply for contracts that require a formal RFP process

## 15.9   Legislative Assembly

As of FY2017, the size of the Puerto Rican Legislative Assembly was significantly larger than comparable legislatures in U.S. mainland states, even when accounting for the demands of full-time legislatures and excluding the money that the Legislature spends on supporting non-profit organizations. Puerto Rico spent $34.16 per resident on addressable legislature expenditure, while the weighted average expenditure per capita for comparable "full-time" U.S. mainland legislatures (e.g., in Michigan, California, New York, and Pennsylvania) was $13.11. The variance persists even when legislative expenditure is considered as a percentage of GDP. As such, reductions to the size and funding of the Legislature are necessary to bring it in line with benchmarks and optimize government funds.

As remarked earlier in this chapter, the Legislative Assembly is required to achieve additional savings in FY2022 over that required in FY2021 of ~$12 million. Refer to *Exhibit 115* for annual savings that must be achieved through FY2026.

234

EXHIBIT 115: LEGISLATIVE ASSEMBLY MEASURES SUMMARY OF IMPACT



1  Excluding investments and other funding increases

## 15.10  General Court of Justice

The General Court of Justice, although to a lesser extent, was similarly over U.S. mainland cost benchmarks in FY2018 (by ~35% when compared to the median cost of mainland full-time Judiciaries). As such, the 2021 Fiscal Plan continues to require that the Court maintains agency efficiency measures equivalent to a 10% reduction in their annual budget, amount that the Court cut in his FY2018 budget. Therefore, it will not be required to achieve additional savings in FY2021 or in future years.

EXHIBIT 116: GENERAL COURT OF JUSTICE MEASURES SUMMARY OF IMPACT



1  Excluding investments and other funding increases

## 15.11  State Elections Commission

The State Elections Commission (SEC or "CEE" by its Spanish acronym) is charged with administering elections for the Commonwealth. Given this important role, every effort must be made to ensure that SEC can thoroughly execute its mandate to promote and enable voter rights for the people of Puerto Rico in the most efficient, simplest, and least costly ways. The Oversight

Board is deeply committed to supporting elections that are conducted in a fair, free, and open manner. Consistent with this objective, the Oversight Board also requires the SEC to adapt its processes to bring down the Island's cost of election administration closer to that of mainland states.

On June 20th 2020, after the certification of the 2020 Fiscal Plan, the Government of Puerto Rico enacted Act 58-2020, restructuring SEC's operations in alignment with the Oversight Board's January 2019 recommendation. Act 58 modernizes SEC's operations by providing for the implementation of an Electronic Poll Book, the elimination of separate voter ID cards, the expansion of mail-in Early and Absentee voting, and the eventual elimination of "Juntas de Inscripción Permanentes" (JIPS), which should be replaced by more consolidated State Centers for Integrated Voter Services.

In compliance with Act 58-2020, the SEC has eliminated 160 positions and created 15 new ones. However, the agency has expressed that it does not intend to reduce personnel, which maintains payroll spend at a level not supported by the 2021 Fiscal Plan as SEC's current 656 headcount includes 338 positions not stipulated in Act 58-2020, ultimately accounting for an excess of $8.5 million in Payroll. Additionally, the SEC is still evaluating how the agency will implement the other changes stipulated by Act 58. This delay hinders the savings and efficiencies that are expected after restructuring. The Oversight Board's 2021 Fiscal Plan continues to expect the SEC to reduce its steady state (non-election year) expenditures by 32% by FY2022 (based on FY2018 spend).

To enable the SEC to seamlessly administer expected FY2021 electoral activities, the Oversight Board approved extending one-time funding of $7 million in FY2020 for the presidential and local primaries, both of which were rescheduled to FY2021 due to the COVID19 pandemic. The 2020 Fiscal Plan also provided $9 million for the FY2021 general elections and the same amount every four years thereafter. Following both the 2020 Fiscal Plan and budget certifications, the Oversight Board addressed SEC's late requests for further resources by allocating an additional $2.3 million for primaries, $11.2 million for the general elections, $3.5 million for a referendum and $0.8 million in federal fund matching for the agency to execute its mission of ensuring the democratic process. Unfortunately, SEC experienced significant confusion and delays in the vote counting process, later claiming that it was unprepared to manage the significant increase in mail-in votes. Finally, SEC ended up returning ~$3 million of its allocated funds after the election, highlighting administrative failures within the agency.

Given the escalation of funding over the past two years and the continued struggles of the SEC to meet its mandate, the agency needs to rethink its operations to conduct a fairer, more transparent and efficient electoral process that assures the rights of all constituents of the Commonwealth of Puerto Rico. Moreover, SEC should fully capitalize on the decreased workload of this upcoming non-election year to enact real progress on agency efficiencies.

EXHIBIT 117: STATE ELECTIONS COMMISSION MEASURES SUMMARY OF IMPACT



Run-rate savings from agency efficiency measures[1], $M

1 Excluding investments and other funding increases

## 15.12  Agencies that promote public integrity and transparency

There is wide agreement that driving a successful fiscal transformation within the Government of Puerto Rico will require public integrity and transparency at every turn. Within the Government, several agencies are dedicated to maintaining this oversight and fiscal responsibility; namely, the Office of the Comptroller, and the Office of Government Ethics. In line with the priorities of the Governor, the functioning of these agencies is critical to achieving the goals and ensuring the long-term sustainability of the 2020 Fiscal Plan. Accordingly, the budgets for the Office of the Comptroller and the Office of Government Ethics will not be affected by agency-specific rightsizing measures, but must still achieve Christmas bonus reduction, uniform healthcare, and utilities savings.

## 15.13  All other agencies

To date, implementation progress and engagement has varied across the smaller Government agencies. Some agencies are developing meaningful tools and creative solutions to achieve savings. For example, the Department of Agriculture is planning digital solutions to reduce personnel, while the Department of Environment's green tourism initiative envisions creating job opportunities and tax revenues. Still, many agencies have not planned to implement their respective changes effectively, resulting in slow progress to reach their savings targets. The Government of Puerto Rico must continue looking for ways to reduce back-office expenditures, align staffing levels to the volume of services required, and upgrade those services needed to accommodate for current conditions.

Some success has been achieved to date in these areas. For instance, the Prosecutor Panel was able to reduce staffing levels during several months of the year to reflect the lower volume of work. The Utility Commission was able to consolidate all back-office functions and move into one office/building. The Puerto Rico Education Council was able to consolidate State Departments in under 90 days, and saved over $400 thousand by reducing office footprint. Finally, the Office of Women's Advocacy successfully provided its employees with the necessary equipment to process increased call volume after the COVID-19 emergency declaration.

### 15.13.1 *Required implementation actions*

To achieve the 2021 Fiscal Plan requirements, all agency groupings must complete key operational efficiencies as outlined in *Exhibit 118*, with particular requirements associated with the Department of Natural Resources.

EXHIBIT 118: REQUIRED IMPLEMENTATION ACTIONS FOR OTHER AGENCY GROUPINGS

| Action item | Deadline |
| --- | --- |
| ▪ Enact legislation for agencies consolidation | ▪ September 2020 |
| ▪ Conduct an analysis of non-personnel spend and prioritize major savings opportunities to be pursued | ▪ September 2020 |
| ▪ Develop detailed plan and timeline for achieving required utilities savings | ▪ September 2020 |
| ▪ Develop target organizational structure and plans for achieving personnel rightsizing; Share with FOMB | ▪ December 2020 |
| ▪ Fully transition to target organizational state and implement personnel rightsizing | ▪ June 2022 |

### 15.13.2 *Required implementation actions related to the Volkswagen Diesel Emissions Environmental Mitigation Trust*

The 2021 Fiscal Plan also notes the existence of funding from the Volkswagen Diesel Emissions Environmental Mitigation Trust. This funding has been available since January 29, 2018, but has gone unused due to Government delays in meeting the necessary requirements for accessing funds from the trust, as well as in the recruitment of necessary personnel for the development and implementation of the mitigation projects.

On March 27, 2020, the Department of Natural and Environmental Resources was designated as Puerto Rico's lead agency for this project, and a high-level action plan has since been developed. Moreover, on September 30, 2020, an Administrative Order with guidelines to evaluate and select proposals was issued, and public notice was published on October 2020 through major newspapers to notify interested parties of the availability of funds under the Mitigation Action Project. Several proposals were submitted thereafter for evaluation. On March 30, 2021, a committee was established to evaluate proposals and the members appointed are being notified. The Department of Natural and Environmental Resources (DNER) expects the committee will evaluate and select approved proposals to then begin the disbursement of funds in the near term.

EXHIBIT 119: REQUIRED IMPLEMENTATION ACTIONS RELATED TO THE VOLKSWAGEN DIESEL EMISSIONS ENVIRONMENTAL MITIGATION TRUST

| | Required implementation actions | Deadline | Status / New deadline |
| --- | --- | --- | --- |
| To be completed in FY2022 | ▪ Begin disbursement of funds from the Volkswagen Diesel Emission Environmental Trust pursuant to the Second Mitigation Action Plan (DNER) | ▪ October 2020 | ▪ Delayed – September 2021 |

In summary, the implementation of agency efficiency measures is necessary to achieve a sustainable and effective Government for Puerto Rico. Fiscal measures should aim to reduce costs while improving the quality of important services. Unfortunately, the Government has too often opted to maintain balanced budgets through quick wins such as incentivized retirement programs that have impaired direct service functions,  instead of driving initiatives and reengineering processes that will result in efficient services and spending.

The 2021 Fiscal Plan requires continuation of rightsizing measures to further reduce operating budgets, while focusing valuable resources on improved government service delivery and prioritization of investments into rekey areas requested by the Governor.  Notwithstanding the pause in fiscal measures included in the 2020 Fiscal Plan to achieve full implementation of previous measures, few agencies took full advantage and made significant implementation progress.  Although the Oversight Board is cognizant that natural disasters and the COVID-19 pandemic have challenged government implementation, efforts must restart with urgency.  Time is of the essence to implement the changes needed to bring Puerto Rico closer to fiscal sustainability paired with government efficiency.

# Chapter 16. Medicaid investments and reform

## 16.1   Current State of Puerto Rico's Medicaid program

In 2019, ~37% of local residents received their health coverage through the Commonwealth's state-run Medicaid program ("Plan Vital", formerly known as "Mi Salud"). The percent of local residents receiving benefits via Plan Vital increases to 46% when considering the addition of dual-eligible who are also in one of the Island's Medicare Advantage programs (Platinos). This share of the population enrolled in Medicaid/CHIP-funded health insurance exceeds that of any U.S. state.[299]

In addition to its large covered population, Puerto Rico has lagged mainland U.S. states in both health outcomes and access. The Urban Institute's 2017 assessment of Puerto Rico's health care infrastructure and system performance cited the Island's aging population and high rates of poverty as partial contributors to the high rates of some chronic conditions such as hypertension and diabetes compared to mainland U.S. states[300]. Puerto Rico also has higher premature birth and infant mortality rates, and higher rates of adults reporting fair or poor health.[301,302] Puerto Rico also contains 72 "medically underserved areas," as defined by the U.S. Department of Health and Human Services. These medically underserved areas have shortages of primary medical care, dental or mental health providers.[303]

Two separate agencies are responsible for the administration and provision of the Plan Vital. The Department of Health is the single state agency for the administration of Medicaid, via the Puerto Rico Medicaid Program (PRMP). PRMP oversees enrollment and eligibility processes, and also operates the Medicaid Management Information System (MMIS). Meanwhile, the Puerto Rico Health Insurance Administration (ASES, by its Spanish acronym) is responsible for negotiating, managing, and implementing the provision of Medicaid benefits, primarily through contracts with private managed care organizations (MCOs), pharmacy benefit managers (PBMs) and other health services organizations.

Plan Vital consists of four primary eligibility groups: federally-qualified Medicaid recipients; expanded federally-qualified Medicaid recipients; Children's Health Insurance Program (CHIP); and the Commonwealth's self-funded health insurance program, which covers low-income adults who do not qualify for federal programs but qualify under the eligibility criteria established by the local government. The first three programs are eligible for federally matching at varying rates, known as the Federal Medical Assistance Percentage (FMAP). The Vital program also covers dual-

---

299 Kaiser Family Foundation, "Medicaid State Fact Sheets: Percent of People Covered by Medicaid/CHIP, 2019"
300 Perreira, Krista et al. "Puerto Rico Health Care Infrastructure Assessment." Urban Institute, January 2017
301 Puerto Rico infant mortality rate is 6.16 per 1000 vs. U.S. mainland 5.2 per 1000. "Puerto Rico," World Factbook (Washington, DC: CIA)
302 Health Disparities Research Framework Adaptation to Reflect Puerto Rico's Socio-Cultural Context, Internal Journal of Environmental Research and Public Health; Published November 18, 2020
303 As reported on HHS HRSA website (data accessed March 30 2021)

eligible, those who meet the eligibility standards for both federal Medicaid and Medicare. For dual-eligible who are enrolled in Medicare Advantage plans, the Commonwealth provides an additional "wrap-around" payment of roughly $10 per-member, per-month.

Because federal-matching funds for Medicaid in U.S. territories is subject to an annual cap, the federal portion of the Vital program revenues functions more like a block grant than a traditional Medicaid reimbursement system. Medicaid expenditures eligible for federal matching are projected to exceed available funding every year. As a result, the Commonwealth's projected fiscal outlays are very sensitive to rising healthcare costs, as the Commonwealth absorbs 100% of all incremental costs beyond the capped federal reimbursement.

Since 2011, Puerto Rico has received temporary relief from rising healthcare costs through increased levels of federal reimbursement that temporarily raised or eliminated the cap. The two most substantial inflows of federal funds came from the 2010 Affordable Care Act and the 2018 Bipartisan Budget Act. More recently, the 2019 Further Consolidated Appropriations Act provided supplemental federal funding (up to $5.7B total) to Puerto Rico's Medicaid program through September 30, 2021 (first quarter in FY2022). In addition, the law temporarily raised Puerto Rico's FMAP—the portion of Medicaid expenditures that federal funds can cover—from the standard level of 55% to 76% for most populations. Finally, in response to the COVID-19 pandemic, the Families First Coronavirus Response Act was passed in March 2020. This act further increased both the available federal funds, adding an additional $183 million, and the FMAP, which rose an additional 6.2% for most eligibility groups (slightly less for CHIP population). The additional 6.2% FMAP has been extended with the Public Health Emergency until at least December 31, 2021.

Without new federal legislation, the available federal funds will return to statutory levels, the standard cap, on October 1, 2021 (see *Chapter 5* for more information on Medicaid federal funds). This "Medicaid fiscal cliff" means that in the absence of federal action, the Commonwealth will be responsible for more than 80% of its annual healthcare expenditures, placing a significantly higher burden on the General Fund expenditures compared to any past program year over the last decade.

Given the uncertainty regarding future federal reimbursement levels, the 2021 Fiscal Plan assumes funding based only on current enacted legislation. In light of the lack of a permanent or long term federal funding policy, and the significant portion of the population reliant on Medicaid for healthcare, it is important that the Commonwealth always be prepared to fund these services. It is therefore crucial for ASES to take advantage of the additional runway provided by recent federal legislation and put in place required reforms to reduce the long-term growth rate of healthcare expenditures.

## 16.2  Medicaid investments

Puerto Rico's healthcare system has experienced significant strain stemming from the hurricanes, earthquakes, and the COVID-19 pandemic. These events are expected to have amplified provider shortages and create increases in demand for health services, particularly behavioral health care. In a survey conducted by the Office of Inspector General at the U.S. Department of Health and Human Services (HHS-OIG) across 45 states, the District of Columbia, and Puerto Rico, hospitals reported that the COVID-19 pandemic has significantly strained the health care delivery system[304]. Given these turbulent circumstances and the uncertain outlook with respect to the COVID-19 pandemic in the long term, the FY2020 Fiscal Plan included incremental investments in the health system. Such investments were made possible through federal funding made available by the 2020 Further Consolidated Appropriations Act. As a result, the following section outlines certain priority investments that will apply through September 30, 2021 (the expiration

---

304 Hospitals Reported That the COVID-19 Pandemic Has Significantly Strained Health Care Delivery, OEI-09-21-00140 (hhs.gov)

of supplemental federal funding). These investments include providing Hepatitis C drug coverage and increasing reimbursement rates to specialty and primary care providers and hospitals.

Moreover, during FY2021, the Oversight Board entered into an agreement with the Government of Puerto Rico to temporarily expand the coverage of the Medicaid Program to more than 200,000 local residents during the COVID-19 pandemic. The Government of Puerto Rico achieved this by submitting a State Plan Amendment (SPA) to the CMS with a sunset date of September 30, 2021, the same date that the increased Medicaid funding provided by the Federal Government is set to expire. Enrollment of these new beneficiaries started as early as December 2020.

---

**Increase provider reimbursement rates ($155 million):** Reimbursement rates for Government Health Plan (GHP) providers lag those of Medicaid programs in other states and territories. For example, from July 2016 to July 2017 primary care services were reimbursed at 19% of the Puerto Rico Medicare fee-for-service rate, while these services are reimbursed at 66% of the Medicare rate nationally. Also, maternity services were reimbursed at 50% of the Puerto Rico Medicare fee-for-service rate while these services are reimbursed at 81% of Medicare rate nationally. Low reimbursement rates place pressure on providers and may lead to shortages, lack of access to certain specialty services, and lengthy wait times. These investments will last until September 30, 2021 and ASES will increase provider reimbursement rates as follows:

- **Establish a 70% of Medicare reimbursement floor for outpatient physician services ($100 million)**: Pursuant to a provision in the 2020 Further Consolidated Appropriations Act, ASES will establish a reimbursement floor for physician services set at 70% of the Medicare fee-for-service rate. The costs associated with the investment will be included in the Managed Care Organization PMPM capitation rate. In turn, the MCOs will be contractually obligated to reimburse all contracted providers at the rate of at least 70% of the Puerto Rico Medicare fee schedule.

- **Increase sub-capitation payment for primary care physician (PCP) services ($10 million)**: Almost all primary care services are paid through sub-capitation arrangements, wherein MCOs pay Primary Medical Groups (PMGs) a fixed, monthly rate per member treated. To improve access to primary and preventive services, ASES will include a 10% increase in the PMPM sub-capitation rate paid to PMGs for contract year 2020.

- **Increase reimbursement rates for hospitals ($45 million)**: According to the latest available CMS Hospital Cost Reports, over 50% of Puerto Rico hospitals reported net losses. Given the high portion of the population covered by Medicaid, Puerto Rico hospitals are disproportionately affected by reimbursement rates of the Medicaid program, which are lower than those of most other payers. These conditions jeopardize the ability for hospitals to operate and re-invest in their infrastructure. To support the ability of hospitals to meet the needs of Puerto Rico, ASES will increase reimbursement rates. Specifically, ASES will mandate that MCOs increase reimbursements for inpatient services through an episode-based payment schedule.

**Hepatitis C drug coverage ($50 million):** Puerto Rico's Medicaid plan did not previously provide coverage for drugs that cure the Hepatitis C virus. There are approximately 14,000 local residents that are eligible for treatment and could be cured by making these drugs available to them. Granting coverage for these drugs will significantly increase the quality of lives for affected individuals. Furthermore, in the long term, it is estimated that savings can be achieved due to the avoidance of costs related to the treatment of Hepatitis C virus such as decompensated cirrhosis and liver transplants. This coverage will be available to affected Medicaid recipients from March 2020 – September 30, 2021.

**Medicaid IT ($25 million):** Funding for capital expenditures and operational support to enable the Puerto Rico Medicaid Program to improve and modernize technology for eligibility processing and enrollment verification, and invest in analytics to identify fraud, waste, and abuse, claims cost optimization opportunities and inform value-based program design.

---

## 16.3   Medicaid reform measures

The goal of the Puerto Rican public health insurance system is to fund high-quality healthcare services to all residents in need and, in doing so, cultivate a healthier population, especially as it relates to lowering the Island's disproportionally high rates of chronic conditions. To ensure the system can continue to support the vulnerable populations who rely on its services, Puerto Rico will need to improve the efficiency and effectiveness of its health insurance plan by "bending the healthcare cost curve" on premium inflation, which is reflective of escalating expenditures of healthcare delivery on the Island.

Puerto Rico's healthcare system has faced significant challenges from recent events. Unfavorable trends instigated by the hurricanes (e.g., provider shortages, outstanding infrastructure needs) persist and have been amplified by the earthquakes and the COVID-19 pandemic. These circumstances make progress against healthcare measures challenging, although the availability of additional federal funding has enabled a more tempered path to achieving the target end-state for the healthcare system.

This section outlines several categories of actions the Government is required to execute to both curb the growth rate in per capita health care expenditure as well as shift the overall public health system toward higher-value care. In each of the below measures, the plan seeks to avoid reduction in service quality for beneficiaries. Such reforms include improving program integrity and quality relative to cost. Program integrity initiatives help to ensure that eligibility decisions are made correctly; prospective and enrolled providers meet federal and state participation requirements; services provided to enrollees are medically necessary and appropriate; and provider payments are made in the correct amount and for appropriate services[305]. Moreover, under value-based care, providers are reimbursed based on their ability to improve quality of care in a cost-effective manner or lower costs while maintaining standards of care, rather than the volume of care they provide[306].

These efforts are needed to keep Medicaid cost growth at sustainable levels to ensure that the Commonwealth Medicaid program can effectively deliver quality care to the approximately 37% of local residents who rely on Plan Vital for medical insurance. The measure savings in the 2021 Fiscal Plan are designed to lower premium expenditures across Medicaid and CHIP. After federal funds are capped in October 2021, the Commonwealth budget will realize nearly all (97%) the savings from health reform measures, thereby curbing inflationary growth in the program.[307] These reforms will keep Medicaid cost growth at sustainable levels and ensure that the Commonwealth Medicaid program can effectively deliver quality care to the ~37% of local residents who rely on Plan Vital for medical insurance. While the Government must achieve all savings to curb long-term costs, the 2021 Fiscal Plan surplus will only consider savings that accrue to the Commonwealth.

Total run-rate savings must reach ~$328 million by FY2025 (off the FY2025 baseline of approximately $3.4 billion). After FY2025, the expected savings from health reforms continue to increase as baseline expenditures increase (*Exhibit 120*). Since the baseline healthcare expenditures of the Commonwealth are projected to grow at inflation rates much higher than general Island inflation, unchecked growth would contribute to a significant deficit. Therefore, the Government must act urgently to implement these value-based reforms to sustain its public health system. This action includes building the infrastructure and data systems required to execute more advanced payment reform models and quality monitoring across the Island.

---

305 Program integrity : MACPAC, Accessed March 30, 2021
306 CMS Issues New Roadmap for States to Accelerate Adoption of Value-Based Care to Improve Quality of Care for Medicaid Beneficiaries | CMS
307 Approximately three percent of the measures savings will continue to flow back to the Federal Government in the form of reduced matching support for the CHIP program, where federal funding remains uncapped. The 2021 Fiscal Plan surplus will only consider savings that accrue to the Commonwealth

To-date, the Government has realized some savings through the implementation of initiatives aimed at controlling healthcare cost inflation. These initiatives include more effective management of the Prescription Drug List and the launch of a single-region managed care model in 2018. This new model is expected to continue to yield cost savings relative to quality of care delivered through greater competition among managed care providers, increased patient choice, and reduced administrative costs. However, these reforms are just two of many shifts towards value-based care Puerto Rico must make if it is going to sustain its public health insurance program.

EXHIBIT 120: MEDICAID REFORM SUMMARY OF IMPACT



### 16.3.1 Medicaid reforms to improve program integrity

The 2021 Fiscal Plan includes savings between FY2022 and FY2025 that will be achieved through initiatives that improve program integrity. Program integrity activities are meant to ensure that federal and state taxpayer dollars are spent appropriately on delivering quality, necessary care and preventing fraud, waste, and abuse from taking place[308]. Program integrity initiatives will help to ensure that the Government is performing accurate enrollment verifications and minimizing fraud, waste, and abuse.

In 2016, the U.S. Government Accountability Office (GAO) reported that Managed Care Organizations (MCOs) in U.S. territories have not consistently reported improper payments to providers billing to the system, and that many MCOs face conflicts of interest in finding and eliminating fraud.[309] In a report released in February 2021, GAO found that seven of the eight selected Puerto Rico procurements[310] did not include important steps to promote competition and mitigate the risk for fraud, waste, and abuse, underscoring the need for federal oversight.[311]

Typical fraud, waste, and abuse reduction programs in other state Medicaid programs and health insurers have been able to achieve 1-3% cost savings. These savings have been reached through pre-payment review (e.g., reviewing claims before payment to identify outliers/issues); auditing and enforcement units to investigate suspicious behavior; advanced analytics capabilities to identify inefficient or fraudulent activities in post-payment review, such as identification of

---

308 "Program integrity : MACPAC", Accessed March 30, 2021
309 "Medicaid and CHIP Increased Funding in U.S. Territories Merits Improved Program Integrity Efforts." GAO.gov, April 2016
310 According to the report, these eight procurements represent a non-generalizable sample of Puerto Rico Medicaid procurements that were in effect as of April 1, 2020. They represented approximately 97% of the total costs of Puerto Rico's Medicaid procurements in effect at that time
311 "Medicaid: CMS Needs to Implement Risk-Based Oversight of Puerto Rico's Procurement Process." GAO.gov, February 5, 2021. Accessed March 20, 2021

"impossible" utilization (e.g., billing for over 24 hours of service in one day) or frequently repeated, high value procedures; and long-term policy or organizational transformation. Pursuant to federal requirements, ASES has established a contracting reform plan to improve procurement and contracting prices as well as combat fraudulent, wasteful, and abusive contracts.

In addition, it is imperative for Medicaid programs to deploy robust enrollment verification, in order to ensure that coverage is offered only to eligible individuals. In December 2020, the Office of Inspector General at the U.S. Department of Health and Human Services performed a Risk Assessment of Puerto Rico's Medicaid Program and identified the beneficiary eligibility process as a high-risk area. Specifically, the HHS-OIG noted weaknesses related to Puerto Rico's post-eligibility determination process for validating beneficiary eligibility. Outdated, missing, or inaccurate beneficiary eligibility information may limit the effectiveness of the eligibility validation process and increase the risk that ineligible applicants will be enrolled in the Puerto Rico Medicaid program[312]. Full compliance with Medicaid Eligibility Quality Control (MEQC) requirements and establishment of an asset verification system that utilizes 3rd party data sources can strengthen enrollment verification.[313]

Puerto Rico has taken meaningful steps towards improving program integrity. These include the integration of ASES data with the MMIS. During FY2021, CMS approved the certification of Phase 2 of Puerto Rico's MMIS, clearing the way for the PRMP to begin planning Phase 3 implementation. MMIS Phase 3 includes the Design, Development and Implementation (DDI) phase, expected to kick off by January 2022; improving the Payment Error Rate Measurement (PERM) and MEQC. Other steps taken towards promoting program integrity in prior years include the establishment of a Medicaid Fraud Control Unit (MFCU) and Program Integrity Unit (PIU), and the improvement in enrollment verification through employer certification and Public Assistance Reporting Information System (PARIS) checks.

While Puerto Rico has taken steps towards improving its Medicaid Program integrity, opportunities for further improvement remain. Limited recoupments from MCO investigations suggest that more can be done to mitigate fraud, waste and abuse. Furthermore, practices in other states support the development of additional program integrity tools in parallel to building MMIS capabilities, such as leveraging analytics vendors on a contingent bases to identify savings related to improper payments. Finally, in their report to Congress, ASES has stated they face challenges with reporting data since the same is limited to the provider level and, therefore, the eligibility systems and data sets cannot track fraudulent activity performed by beneficiaries. Issues with enrollment verification can be improved by instituting an Asset Verification System and partnering with key out-migration states to conduct enrollment checks. Pursuant to the 2020 Further Consolidated Appropriations Act, Puerto Rico must continue to make progress to meet CMS's PERM and MEQC requirements.

### 16.3.2 *Medicaid reforms to improve quality relative to cost*

Pursuing value-based improvement initiatives with demonstrated success are required to help the Commonwealth "bend the curve" on healthcare inflation without jeopardizing outcomes. There are several potential sources of value in Puerto Rico's healthcare system. These sources of value are opportunities to reduce wasteful healthcare spending and increase efficiency while improving quality of care and health outcomes.

Examples of best practice for value-based payment models include implementing a Diagnosis Related Group (DRG) based payment model where providers are reimbursed a fixed amount to fully treat a patient with a given medical condition. These models help control medical costs by incentivizing providers to deliver cost-effective care without sacrificing quality, while also improving the effectiveness of Medicaid service delivery by standardizing the measurement of

---

[312] Risk Assessment of Puerto Rico Medicaid Program, A-02-20-01011 (hhs.gov). December 11, 2020

[313] GAO "Medicaid Eligibility: Accuracy of Determinations and Efforts to Recoup Federal Funds Due to Errors," January 2020

patient acuity across providers and reducing the administrative burden associated with reimbursement. Another potential source of value lies in reducing emergency room (ER) visits. Prior to Hurricane María and the reforms, local residents utilized the ER three times as often as peers on the U.S. mainland, with estimates as high as 90% of ER visits occurring for non-emergency care that could be treated in lower cost settings.[314] Successfully shifting unnecessary ER visits to lower-cost settings, such as primary care offices or urgent care, could save tens of millions of dollars annually.

Moreover, there are several other additional value-based reforms that should be implemented to achieve cost savings. New approaches that emphasize care coordination and align incentives between patients, providers, and payors can produce improvements in health outcomes while lowering costs. Direct pay-for-performance quality bonuses provide special incentives to care for members with high-cost needs like behavioral health. Care coordination models like patient centered medical homes have been quite effective at improving outcomes for members with chronic conditions, empowering primary care providers to work closely with patients and manage treatment plans across multiple care providers.[315] Given the preponderance of chronic conditions and potential rising behavioral and mental health needs in the wake of Hurricane María, better access and coordination of multiple comorbidities across populations will become increasingly important.[316]

Additional opportunity exists through reduction of both inpatient length of stay and hospital readmissions. Puerto Rico's inpatient length of stay was 1.5 times the U.S. average in 2014,[317] and 35 out of 41 Puerto Rico hospitals show readmission rates above the U.S. average of 15.3%[318]. Hospital readmissions occur when patients are discharged from hospitals but must return for additional treatment for the same condition. This can occur when patients are not adequately prepared to return home due to lack of education, lack of access to follow-up care, challenges with prescription drugs, among other factors. MCOs can incentivize both reduced hospital readmissions and shorter length of stay through improved discharge planning, as well as by increasing weekend staffing to manage discharges. Similar value-based programs piloted in mainland states have typically saved 2-10% of costs. In Puerto Rico, value-based reforms may result in lower-than-average savings due to the breadth of other simultaneous savings measures being implemented for Vital, as well as the challenges associated with recent natural disasters and the COVID-19 pandemic. Nevertheless, these structural changes to reimbursement and care delivery present the most viable path to long-term sustainability for the program.

Pursuant to the opportunities described above, ASES has developed a plan for implementing a modern DRG-based prospective payment system for inpatient services provided by short-term acute care hospitals. ASES has begun using a case mix adjustment that adjusts the payment to each hospital from the inpatient hospital funding pool based on the severity of conditions that each hospital treats, relative to each other. According to ASES the DRG-based prospective payment system will create financial incentives for hospitals to improve coding and documenting practices, reduce lengths of stay, reduce utilization of unnecessary ancillary services and reduce rates of avoidable complications and hospital-acquired conditions. ASES originally planned to launch this payment model in July 2021. However, due to the delicate position hospitals were in during the pandemic, this go-live date has been postponed to October 2021. Even though the Government has stated that the implementation of DRG will not achieve immediate savings, this effort is necessary for the Government to fund the long-term health needs of Puerto Rico.

---

314 JEL Consulting analysis (Dec 30, 2106) of ASES data and Puerto Rico Community Survey, Public Use Microdata, 2014. Estimates exclude Platino beneficiaries

315 Patient-Centered Primary Care Collaborative, "Benefits of Implementing the Primary Care Medical Home: A Review of Cost & Quality Results, 2012" (Sept 2012)

316 Thomas Huelskoetter, Center for American Progress, "Hurricane Katrina's Health Care Legacy" (August 15, 2015)

317 As of 2014. JEL Consulting analysis (Dec 30, 2106) of ASES data and Puerto Rico Community Survey, Public Use Microdata, 2014. Estimates exclude Platino beneficiaries

318 The disparity in hospital quality metrics between Puerto Rico and the U.S. - V2A (v2aconsulting.com), December 2, 2019

EXHIBIT 121: REQUIRED IMPLEMENTATION ACTIONS FOR MEDICAID REFORM

| | Required implementation actions | Deadline | Status |
|---|---|---|---|
| **To be completed in FY2021** | Incorporate language requiring participation in DRG-based payment model in MCO contract | May 2020 | Completed |
| | Define key performance indicators and savings target measures for Medicaid program integrity initiatives (e.g., fraud, waste, and abuse reduction, enrollment verification) | June 2020 | Delayed – June 2021 |
| | Complete assessment for the need for additional third party vendors to develop an Asset Verification System and analytics for fraud, waste, and abuse reduction and enrollment verification | June 2020 | Delayed – June 2021 |
| | Identify and design additional value-based incentives (e.g., direct pay-for-performance quality bonuses) for inclusion in future MCO agreements, including timeline and plan for implementation | December 2020 | Delayed – September 2021 |
| | Develop plan to incorporate Medicaid program integrity key performance indicators and savings targets into future MCO contracts, including design for associated incentives and penalties | December 2020 | Delayed – September 2021 |
| | Complete Phase II of PRMMIS development and migrate financial and enrollment processes to the platform | June 2021 | Completed |
| | Draft plans to meet PERM and MEQC requirements and receive CMS approval | June 2021 | On track |
| **To be completed in FY2022** | Change the current CMS-64 Claiming Methodology to properly account for Rebates | September 2021 | On track |
| | Start Phase III of PRMMIS development | September 2021 | On track |
| | Launch DRG-based payment model | July 2021 | Delayed – October 2021 |

## 16.4   Joining the Medicaid Drug Rebate Program: Opportunities and drawbacks

Under CMS Rule 84 FR 64783, U.S. Territories will be required to join the federal Medicaid Rebate Program (MDRP) on April 1, 2022,[319] unless they apply for and receive a waiver. Currently, Puerto Rico operates its own drug rebate program whereby the Commonwealth negotiates or utilizes pre-negotiated agreements with drug manufacturers to return a portion of cost for prescription drugs (expected to be $264 million in FY2022). These funds enter the Commonwealth budget as Special Revenue Funds and are applied directly against the costs of Medicaid premiums. However, Puerto Rico has expressed its intention to join the MDRP program in the next fiscal year.

Puerto Rico's potential entry into the MDRP is expected to yield higher rebate rates from drug manufacturers compared to those the Commonwealth currently has in place. Partly to enable entry into the federal program, the Government has also indicated its intention to update its accounting systems and the methodology by which it reports prescription drug utilization to the Centers for Medicare and Medicaid Services (CMS). In doing so, Puerto Rico will also begin sharing a portion of the rebate revenue with the Federal Government to the extent it reduces the costs eligible for federal matching. The Board is working with the Government to estimate the net financial impact and timing of the shift to the MDRP, including by seeking guidance from CMS on what revenues, if any, must be shared with the Federal Government.

---

[319] "Medicaid Program; Covered Outpatient Drug; Further Delay of Inclusion of Territories in Definitions of States and United States." Federal Register, 11 November 2019. Accessed 16 April 2021

# Chapter 17. Tax compliance and fees enhancement

## 17.1    Current state and future vision for tax environment

Puerto Rico's current tax system suffers from structural complexity, instability, internal inconsistency, inefficient administration, and inadequate enforcement. There have been at least 11 major revisions to Puerto Rico's tax code since 1994, including at least six adjustments since 2013.[320] This has allowed for persistent problems with non-compliance, worsened by a lack of an integrated approach to addressing non-compliance. Much of the Government's revenue is highly concentrated in collections from a handful of multi-national corporations. The Government has also issued an assortment of credits, deductions, and incentives that add to the system's complexity and further erode the tax base. Furthermore, audit and enforcement activity in recent years has been limited, which creates risks of increased levels of non-compliance.

In response to these challenges, the Government has taken actions to improve tax compliance. It has taken steps to improve information reporting to better detect under-reporting of income and over-usage of deductions and credits, notably through recent changes to information reporting requirements included in Act 257-2018. These changes create greater interdependencies among taxpayers and the information they are obligated to report, which is expected to enable greater oversight and verification of the information being reported to the Government. Enhanced usage of data can help Hacienda better isolate risk and focus its compliance and enforcement resources. Hacienda has also expanded its SUT internet sales collections through regulations enabled with the passage of Act 40-2020. Hacienda is driving improvements in its culture and organization to boost enforcement capabilities, and digitizing the process of filing taxes, to lighten the burden of compliance on taxpayers.

With the publication of the first Tax Expenditure Report in September 2019 (see *Section 17.3.1*), policymakers now have the data necessary to review, assess, and adjust the use of individual tax expenditures to ensure that these foregone revenues are leading to positive economic development on the Island.

## 17.2    Administrative tax initiatives to increase revenue collections

Through implementation of administrative tax reform and realization of measures included in prior fiscal plans, the Government has captured incremental revenues through, among others, the implementation of SURI, which are now included in the baseline FY2021 General Fund revenue forecast.

---

[320] Reforms include: Act 40-2013, the "Tax Burden Redistribution and Adjustment Act;" Act 120-2014, the "Small and Medium Business Job Generation and Retention Act;" Act 72-2015, the "Adjustments to the Internal Revenue Code of 2011;" Administrative Orders 2017-01 and 2017-05; and Act 257-2018, the "2018 Puerto Rico Tax Reform Act."

EXHIBIT 122: REVENUE MEASURES SUMMARY OF IMPACT



### 17.2.1   Improve compliance rate

**The Government has made significant progress in its compliance efforts.** The 2020 Fiscal Plan included a ramp-up of 3 years, meeting 100% of targets by FY2023, to achieve a target 5% net uplift in annual revenues due to enhanced compliance across the major tax lines (personal income tax, corporate income tax, and SUT) – inclusive of implementation costs. Given the collections seen for the previous year and because all the necessary activities to achieve this have been implemented (e.g., the implementation of SURI, the collection of SUT on internet sales, among others), the 2o21 Fiscal Plan accelerates the full value of the measures from FY2023 to FY2021.

Nevertheless, Hacienda should continue to undertake the initiatives set forth immediately below. These initiatives can boost voluntary compliance and will allow Hacienda to continue collecting the total taxes as expected in the 2021 Fiscal Plan. The goal should be to reduce the cost of compliance and simultaneously raise the cost of non-compliance, through a combination of an increased likelihood of identifying non-compliant taxpayers and evaders, and more effective and enforceable penalties.[321] Therefore, the 2021 Fiscal Plan requires the Government to:

- **Continue to use new systems and processes to identify and remediate non-compliance.** Hacienda has taken steps to make it harder to abuse deductions and credits to avoid tax liability, for example by only allowing taxpayers to claim certain deductions and exemptions if their return is prepared by a certified public accountant following agreed upon procedures.

- **Reduce the complexity of the tax system and process of filing taxes** to make it easier for individuals and businesses to pay their taxes correctly. As detailed further in *Section 9.4*, improving the process of for filing and paying taxes is critical for improving ease of doing business, and helps boost voluntary compliance.

- **Improve use of data and analytics to address non-compliance.** Small and medium taxpayers account for a significant share of the unpaid and underpaid taxes, but only a tiny fraction of these taxpayers receive full-scale audits due to the significant time and cost investment needed. While a traditional IRS audit costs an average of $2,278 per case,

automated notices or letters can be executed for $52 to $274 per case.[322] Hacienda is receiving increasing filings of information returns that can be used to better identify risk and focus compliance resources. Hacienda should implement data-driven, tiered compliance approaches which, over time will enable Puerto Rico to reach a significantly larger share of nonpayers.

- **Improve collection of taxes on online purchases.** This has been implemented as part of Act 40-2020; which allowed the Government to reach agreements with remote sellers and marketplace facilitators. The results from this implementation have been also included as part of the forecasted SUT compliance gains in the 2021 Fiscal Plan and are expected to continue to be administered going forward. The Government should continue to expand agreements with remote sellers on a regular basis.

### 17.2.2 Right-rate other taxes and fees

On the other hand, the 2021 Fiscal Plan incorporates the value of collections from Medical Marijuana Tax and Airbnb (Room tax) tax which have been updated to reflect the value of actuals for FY2020 and FY2021 as of January 2021.

**Medical marijuana tax.** Legislation has been enacted and enforced to tax medical marijuana. Based on information provided by the Government, total collections for FY2019 and FY2020 were approximately ~$13 million and ~$18 million per year respectively. The revenue collected from this initiative continues to be part of the revenue incorporated in the 2021 Fiscal Plan.[323]

**Online Rental Platforms Tax.** Legislation has been enacted to apply a 7% hotel room tax to all rental platforms, resulting in a projected annual revenue increase of ~$8 million. Going forward, the Government should analyze collections under this provision using the estimated number and value of online rentals and, where there are differences between expected and collected revenues, should identify corrective actions to work with the rental platform providers to ensure all taxes owed are collected.

### 17.2.3 Improve tax yield from Other General Fund revenue sources

The 2021 Fiscal Plan also incorporates additional revenue collections as a measure to reflect improved collections of Partnerships and Other Excise taxes.

**Partnerships.** As discussed in *Chapter 5*, Partnership income taxes have significantly increased since FY2020 due to the enactment and enforcement of Act 60-2019. While most of this increase is attributed to a shift in the tax baseline (as taxes previously paid at the individual/corporate level are now paid at the partnership level), the 2021 Fiscal Plan incorporates ~$25 million of recurring income from Partnerships as a tax administration measure, resulting from improved tax compliance achieved by Hacienda.

**Other Excise Taxes.** As discussed in *Chapter 5*, there has been an increased yield in Other Excise Taxes collections, which began at the launch of Hacienda's new integrated tax platform in FY2019. The 2021 Fiscal Plan attributes ~$75 million of the increase in recurring income from other excise taxes tax administration measure, achieved as a result of improved tax compliance. This measure is inclusive of Hacienda's efforts to increase collections of Tobacco taxes (included as a measure in prior fiscal plans). Analysis provided by Hacienda suggests that part of the increase in collections coming from Other Excise Taxes is from tobacco taxes. Hacienda is working to refine the allocations of these other excise taxes to more specific categories.

---

[322] IRS Enforcement Results, TIGTA Filing Season Audit, IRS Taxpayer Advocate, GAO

[323] Projected receipts include $1.5 million of dedicated revenues for the medical marijuana council established in 2017-Act 42 and controlled substances monitoring in 2017-Act 70

Hacienda must take all necessary steps to ascertain proper classification of all excise tax revenues collected through SURI on a timely basis, but not later than December 2021.

## 17.3    Implementation and enforcement of revenue measures

The following implementation plan details the continuation of the Commonwealth's efforts to improve tax administration.

### 17.3.1   Creation of a tax expenditure report and regular reporting

In order to provide a critical element of fiscal responsibility and transparency, the Government must regularly produce a tax expenditure report, which includes a comprehensive list of revenue losses attributable to provisions of the Puerto Rican tax code that deviate from the tax structures benchmark law. It is essential to know how much revenue is foregone because of tax incentives and to periodically review such expenditures to ensure they continue to meet their strategic objective. Having a clear and accurate understanding of what the Government spends through tax expenditures is critical to ensuring the expenditures are continuing to contribute to economic growth and opportunity.[324]

In response to the 2019 Fiscal Plan requirements, the Government published its inaugural Tax Expenditure Report in September 2019 for tax expenditures associated with tax year 2017. For the first time in Puerto Rico's history, taxpayers and the Government have better visibility into the full scope of tax expenditures being offered, together with a description and approximate cost of each expenditure. As shown in *Exhibit 123*, the 2017 Tax Expenditures Report provided many key insights into Puerto Rico's use of tax expenditures as an economic development tool, including the fact Puerto Rico issues more than 300 tax incentives with total foregone revenue in excess of $21 billion.  This analysis also revealed, for the first time, as illustrated in *Exhibit 124* and *Exhibit 125*, that Puerto Rico offers a far more generous tax incentive program far more generous than virtually every other jurisdiction in the U.S. as a share of the economy or total tax collections.

---

[324] Tax Policy Center, Urban Institute & Brookings Institution, "State Income Tax Expenditures"

## EXHIBIT 123: TAX EXPENDITURES IN PUERTO RICO RELATIVE TO OTHER JURISDICTIONS

**Total tax expenditures by count[1]**

|  | Credits | Deductions | Exclusions | Exemptions | Preferential Tax rate | Deferrals | Total |
|---|---|---|---|---|---|---|---|
| Individual | 28 | 10 | 8 | 47 | 11 | - | 104 |
| Corporations | 62 | 9 | 3 | 35 | 27 | 6 | 142 |
| SUT | - | - | 4 | 23 | - | - | 27 |
| Excise tax | 1 | - | 16 | 12 | - | - | 29 |
| Total | 91 | 19 | 31 | 117 | 38 | 6 | 302 |

**Total tax expenditures by dollar amount[1], $ in million**

|  | Credits | Deductions | Exclusions | Exemptions | Preferential Tax rate | Deferrals | Total |
|---|---|---|---|---|---|---|---|
| Individual | $76 | $348 | $187 | $446 | $203 | - | $1,260 |
| Corporations | 144 | 13 | 5 | 72 | 15,864 | - | 16,098 |
| SUT | - | - | 580 | 2,765 | - | - | 3,345 |
| Excise tax | 8 | - | 471 | 13 | - | - | 491 |
| Total | $152 | $13 | $1,056 | $2,850 | $15,846 | | $21,194 |

1 Puerto Rico's Tax expenditure report identifies $26.4 bn of tax expenditure. However, some of the components of this total are estimates of the SUT base, rather than the revenue forgone from a tax on that base (i.e., SUT rate * base). These estimates were adjusted accordingly for SUT tax expenditures related to vehicles, electricity, gasoline, and water.
SOURCE: 2017 Tax Expenditures Report

## EXHIBIT 124: TOTAL ESTIMATED TAX EXPENDITURE AS SHARE OF GROSS STATE PRODUCT



Note: Gross States Product (GSP) data is gathered from the Bureau of Economic Analysis (BEA). Alabama, Connecticut and Ohio do not include tax expenditures that arise from federal income tax, further no state produces an entirely comprehensive set of tax expenditure estimates. As a result, some of the variance between states is due to differences in levels of this comprehensiveness. *Tax expenditure estimates for the US are for 2020 and reflect Tax Cuts and Jobs Act of 2017 changes in tax policy. US tax total is not reduced for the cost of the refundable portion of tax credits, including the Earned Income Tax Credit

SOURCE: Bureau of Economic Analysis (BEA)

EXHIBIT 125: TOTAL TAX EXPENDITURE AS A SHARE OF TOTAL TAXES



Note: Total tax expenditure includes tax expenditures associated with total individual income tax, corporate income tax, SUT, and excise tax as well as other taxes included in state tax expenditure reports (excluding property tax). Similarly, total taxes include all taxes other than property tax. Alabama, Connecticut and Ohio do not include tax expenditures which arise from federal income tax, further no state produces an entirely comprehensive set of tax expenditure estimates. As a result, some of the variance between states is due to differences in levels of this comprehensiveness.

For tax expenditures reporting to maintain its relevance and maximize its impact on the policy making process, regular reviews of each tax incentive must be completed to assess whether each incentive is meeting its policy objective (including an assessment of benefits along with costs).

All tax expenditures should undergo periodic technical reviews with a presumption each credit will be prohibited unless sufficient justification exists to maintain the incentive. The default position for all tax expenditures should be that the burden of proof of effectiveness lies with the tax expenditure. Absent a compelling justification, the tax expenditure should be eliminated. Simply because an incentive was offered in the past does not mean it meets the policy objectives in Puerto Rico's future.

Going forward, the estimates in the tax expenditures report must also be systematically incorporated into the annual fiscal plan and budget review process. This means the estimates need to be considered in conjunction with direct spending proposals at the executive review and legislative levels and as a component of the budget envelope for agencies responsible for related direct spending programs. As an example, to force a legislative discussion, other states automatically sunset certain tax expenditures, which expire unless the incentives are proactively renewed, or states will explicitly cap the level of incentives offered.

For that milestone to be achieved, the tax expenditure report must be produced annually on a timely and efficient basis. In fact, the publication of the first tax expenditures report, in September 2019, stated the second annual report would be published in March 2020. The Government, moreover, should already have published the 2018 and 2019 calendar years tax expenditure reports, in accordance with the timing stipulated in the 2020 Fiscal Plan. As of the certification of this 2021 Fiscal Plan, however, that milestone has not yet been met. The 2018 Tax Expenditures Report must now be published no later than May 31, 2021[325]. Additionally, going forward the Government must publish the annual report by December 31st of each calendar year.

Additional revisions must also be incorporated into future tax expenditure reporting. This includes a multi-year expenditure forecast, a policy rationale for each incentive, a year-end assessment of tax incentives granted to each intended target, and a trend analysis of tax revenue

---

325 On March 30, 2021 the Oversight Board issued a letter to the Secretary of Treasury providing detailed comments on the Commonwealth's tax expenditures.

collections.  More specifically, future Tax Expenditure Reports must include the cost of each tax expenditure for the current year and at least the prior two years. The Tax Expenditure Reports must also forecast the expected revenue collections and losses for at least the next five years from the date the report is produced.  As future Tax Expenditure Reports become more normalized, the forecast can also start accounting for behavioral effects of each incentive and the macroeconomic or other dynamic effects in the cost estimates.

Future Tax Expenditure Reports must also broaden the universe of tax expenditures included in the reports.  The inaugural report included deviations from major revenue sources, including individual income taxes, personal income taxes, sale and gross receipts taxes and excise taxes. However, non-corporate business income tax analysis, property taxes, and certain other taxes were not included; going forward, they should be included in this report. In addition, the exclusion of Act 154 taxes from the report may need to be reconsidered and or its legitimacy confirmed. Including an inventory of all tax credits, cash grants, deductions, exemptions, preferential tax rate, tax liability deferral and any other tax incentives where amounts allocated can materially impact the Commonwealth's financials will make the report more comprehensive.

Rationalizing the amount of tax expenditures offered by the Government is smart and prudent fiscal management.  This can only be done in a comprehensive way through the production of the annual tax expenditure report on a timely basis.[326]

### 17.3.2   Tax incentives code reform

The current tax incentives code structure has high fiscal costs – in excess of $400 million – but does not provide enough visibility to allow for clear tracking of these tax concessions and the returns they generate for Puerto Rico's economic growth. Past studies, based on limited available economic data, have indicated that while some tax incentives led to positive returns on investment, many others do not yield similar results.

That is what led the Commonwealth to enact Act 60-2019 (the "Puerto Rico Tax Incentives Code" or "Incentives Code"), which amended the tax incentives code and adopted a new legal and administrative framework to normalize the way in which new incentives are created, approved, processed, and monitored.  Not all laws established in Act 60-2019 were repealed and replaced, creating confusion as to whether the Treasury Department should follow guidelines imposed by these still-active statues or those imposed by the Incentives Code. To fully effectuate the goal of the Incentives Code, and to limit confusion, the Government should take action and repeal the remaining statutes, still in effect that were merged into the Incentives Code. To evaluate the fiscal benefit from each incentive, the Incentives Code uses a Return on Investment ("ROI") approach combined with an assessment of fiscal multipliers to prioritize high value-added incentives relative to those that do not generate sufficient economic return. The Incentives Code, however, does not include explicit caps on, reductions to, or the elimination of any specific incentives. Rather, the purpose of the Incentives Code is to measure the ROI of tax and economic incentives by grouping them under a transparent and uniform code.

Through the Incentives Code, the term, rate, and characteristics of incentives offered are harmonized across industries and credits. The Incentives Code also creates a centralized Incentives Office for Businesses in Puerto Rico at DDEC and establishes an Incentives Concession Portal to centralize, standardize, and streamline the processes related to the application and approval of decrees, cash grants, tax credits, subsidies, and other incentives.

Act 60-2019 also required the public disclosure of beneficiaries of certain tax expenditures. In accordance with that requirement, DDEC disclosed (on January 30, 2020) that 8,364 companies and individuals received certain tax incentives. The online database offers the name of the grantee, the type of benefit, and the decree's issue date. DDEC released the relevant information for recipients that receive benefits from the following Acts: Act 14-2017 (Physician Retention); Act

---

[326] Ibid.

20-2012 (Exportation of Services); Act 22-2012 (Investor Relocation); Act 273-2012 (International Financial Center Regulatory Act); and Act 27-2011 (Film Production). DDEC subsequently released additional data on February 11, 2020, disclosing recipients of the following tax expenditures: Act 73-2008 (Economic Incentives for the Development of Puerto Rico Act); and Act 83-2010 (Puerto Rico Green Energy Incentives Act). During FY2021, DDEC had a milestone budgeting incentive to publish quarterly reports on the agency's website detailing all economic incentive donations and subsidies to private corporations from FY2017 to the present date. DDEC has accordingly published the quarterly reports on their website.

Many provisions of Act 60-2019, before they can be implemented, require the drafting and approval of regulations, including prior Oversight Board review and approval.[327] The promulgation of such regulations was included as part of the process during FY2021 and such regulations must continue to be drafted and approved during FY2022.

The lack of transparency and high cost of these tax concessions warrants further revisions to the Incentives Code such that tax incentives are structured in a way that is more likely to be beneficial to the Commonwealth. A multipronged approach is needed. This approach must include limiting the DDEC Secretary's discretion in awarding incentives, specifying in more detail the meaningful information to be submitted in the annual public reporting required by the statute, establishing a more robust audit process with meaningful penalties for firms that are found to be out of compliance or failing to provide the anticipated benefits, and establishing an ROI based standard of program evaluation that will meaningfully discriminate among projects so that incentives are concentrated on those projects most likely to provide net economic benefits to the commonwealth.

This can most easily be accomplished through the drafting and approval of Act 60-2019's regulations, including prior Oversight Board review and approval. Specifically, these regulations must, at minimum, include the following provisions:

- **Deconcentrated authority and distributed oversight.** At the moment, excess discretionary authority for determination of eligibility, terms and award of tax incentives and grants is concentrated with a single official of the Commonwealth Government, the DDEC Secretary. Act 60-2019 regulations combined with an Executive Order by the Governor should establish an Economic Incentives Review Board, with the DDEC Secretary as Chair, to advise and confirm incentive awards, the terms of these awards, the process and methods involved in the evaluation of award proposals, annual award limits, oversight and reporting requirements, and consultation with affected agencies and municipalities. In addition to the DDEC Secretary, this body should be composed of senior fiscal office holders within the Commonwealth Government who do not report to the DDEC Secretary, such as, for example, (i) Treasury Secretary, (ii) Puerto Rico Fiscal Agency and Financial Advisory Authority Executive Director, (iii) Director of Office of Management and Budget, and (iv) Chief Investment Officer.

- **Evaluation standards for tax incentive and grant award should be balanced.** Act 60-2019 established a positive ROI as the primary standard for determining incentive awards. The standard as currently operationalized, however, lacks balance. Benefits are defined more comprehensively and extensively than are costs, resulting in an ROI standard that does not assure net benefit actually accrues to the Commonwealth. The ROI standard operationalized by the implementing regulations should consider opportunity costs to the Commonwealth and any consideration of direct, indirect and induced benefits, and should also require consideration of direct, indirect and induced cost for the ROI standard to meaningfully reflect net outcomes for the Commonwealth.

- **Limited time duration and sunset and review.** Any decree or incentive granted under Act 60-2019 should be for a specifically identified and limited amount of time. Typically, this should be no more than 5 years based on facts and circumstances, and extraordinary processes

---

[327] Pursuant to PROMESA section 204(b)(4) and the Oversight Board's policy with respect thereto, proposed rules, regulations, administrative orders and executive orders covered by said policy, including all regulations under Act 60-2019, must be submitted to the Oversight Board before being issued to ensure compliance with the certified 2021 Commonwealth Fiscal Plan

of review and approval should be required of any decree granted for a period in excess of 5 years. All decrees should specify and expiration date. No decrees should be extended without reapplication. Annual reports to the Legislature should include an evaluation of the efficacy of incentive programs and each program should undergo extensive review every 3 years which includes a recommendation on its continuation or termination and the detailed basis for that recommendation.

- **Budgeting incentives.** Cash grants require annual appropriation. All incentives, however, should be limited. Annual limits should be placed on the aggregate scale of incentives that can be offered each year. The estimated revenue loss calculated in the ROI should form the basis of determining annual revenue costs and the aggregate of these costs should be limited annually. Additional awards should be deferred to the following year once annual limits are reached. The accuracy of estimated revenue losses should be confirmed in subsequent program reports.

- **Revenue neutrality.** Firm limits should be established to limit the set of potentially eligible projects to ensure, with confidence, these projects satisfy development objectives and remain revenue neutral and consistent with the certified 2021 Fiscal Plan. Within the ROI methodology, the fiscal analysis of projects should assure at minimum they are revenue neutral.

- **Consultation with affected agencies and municipalities.** All affected agencies and jurisdictions should be consulted regarding the offering of tax incentives and the Commonwealth Government should not be permitted to commit the tax resources of a municipality toward a tax incentive without that municipality's active concurrence. Procedures should be established to minimize the risk that municipalities' tax resources are committed toward a tax incentive without a mutual agreement in place ensuring that the incentive is in both governments' best interests.

- **Public reporting of incentive recipient performance and audit.** Regular reporting of incentive effectiveness is required through publication of an Annual Incentive Effectiveness Report. The Act 60-2019 regulations should also provide meaningful guidance on how required project performance measures will be obtained or calculated. The annual report should include detail sufficient to maintain transparency and accountability. Similar to the DDEC transparency portal, it should publicly disclose recipients, type and level of performance on incentives and expected public benefits. To assure that recipients comply with the terms of incentive decrees, audits should be periodically performed in the form of detailed desk reviews of compliance reports and on-site audits of books and facilities. Audit selection and review should be based on the decision of an audit committee, rather than at the discretion of a single official. An important feature to consider including are random audits incorporating a full onsite review of performance targets related to, for example, facilities, employment documentation, charitable contributions, investment, local purchases, and exports.

### 17.3.3  Principle of revenue neutrality

Puerto Rico needs to drive toward more formality and increased compliance within the tax base, but it cannot lose revenues in the process. Therefore, any tax reform or tax law initiative that the Government undertakes or pursues during a year within the 2021 Fiscal Plan period must be revenue neutral, that is, all tax reductions must be accompanied by specific, offsetting revenue measures of the same amount that are identified in the enabling legislation. Each tax measure must also include confidence building elements, such as behavioral adjustments and reasonable capture rates. To ensure revenue neutrality, the implementation of any tax law initiative must occur sequentially, with the Government ensuring that initiatives are paid for before rates are reduced. Enforcement mechanisms that yield additional revenues must be part of any tax initiative package that results in a tax revenue decrease to prevent a scenario where tax reductions

255

are not accompanied by sufficient offsetting revenue measures identified in the enabling legislation.

### 17.3.4   Required implementation actions

To achieve the 2021 Fiscal Plan revenue measures, certain action items must be implemented according to the schedule described in *Exhibit 126*:

EXHIBIT 126: REVENUE MEASURES REQUIRED IMPLEMENTATION ACTIONS

| Required implementation action | Deadline |
| --- | --- |
| ▪ Implement process to estimate the impact of compliance efforts on revenue collections to inform future program priorities | ▪ June 2021 |
| ▪ Publish an annual Tax Expenditures Report that identifies and quantifies all tax expenditures (including tax exclusions, exemptions, adjustments, deductions, subtractions, credits, abatements, deferrals, rebates, and special rules). | ▪ December 2021 |
| ▪ Implement process to ascertain proper classification of all excise tax revenues collected through SURI | ▪ December 2021 |
| ▪ Conduct an analysis on the estimated number and value of online rentals to compare with the total collections from Online Rental Platforms Tax. | ▪ December 2021 |

# Chapter 18. Reduction in appropriations to UPR

## 18.1   Current state and vision

The central Government provides a range of appropriations, including to the University of Puerto Rico (UPR), Puerto Rico's 78 municipalities, the Highways and Transportation Authority (HTA), and "other" recipients (typically private industry or non-profit institutions).

The UPR, founded in 1903, is Puerto Rico's largest and main university system. Its mission is to serve the people of Puerto Rico, contribute to the development and enjoyment of the fundamental values of Puerto Rican culture, and uphold the ideals of a democratic society. To advance its mission, UPR strives to provide high-quality education and create new knowledge in the Arts, Sciences, and Technology. UPR has a history of academic excellence, with 694 degree-granting academic and professional certification programs, including six first-level professional degree programs and 34 PhD programs. The university system is also an important center of research; for example, the Río Piedras campus is classified as a high research activity university by the Carnegie Foundation (one of only 335 U.S. universities to receive such a designation) and there are 79 separate research centers across the university system. UPR plays a critical role in providing avenues for social and economic advancement, with 68% of students receiving Pell grants.[328]

In FY2018, UPR was 67% subsidized (~$678 million in annual appropriations) by state and local funds, compared to an average 25% state and local subsidization for U.S. public universities.[329] In FY2018, UPR's undergraduate tuition was less than one-third of the U.S. average for public universities, even after adjusting for per-capita income, and more than 40% below the average

---

328 UPR 2012-2017 Strategic Plan
329 UPR, IPEDs 2016, College Board

tuition of private universities on the Island.[330] Yet, during the past decade, UPR has seen a 24% enrollment decline (17% since FY2018) with an additional drop of 5.2% expected through FY2023 across both graduate and undergraduate populations. Moreover, UPR consists of 11 independent campuses with minimal shared services or administrative consolidation. UPR has reduced its exposures to subsidies from the Commonwealth, and has made some progress in various measures, such as increasing undergraduate tuition, increasing the contribution to pension plans, and slightly increasing graduate tuition. Some other areas require additional progress, including diversification of revenues, implementation of tuition and scholarship systems, renewal and maintenance of infrastructure, addressing operational inefficiencies, and consolidation of the back-office.

## 18.2   Key initiatives to reduce appropriations

Reducing the Commonwealth appropriation to UPR must lead to run-rate savings of ~$283 million by FY2025 (*Exhibit 127*).

EXHIBIT 127: REDUCTION IN UPR APPROPRIATIONS MEASURES SUMMARY OF IMPACT STUDENTS



Summary of UPR appropriation (net of measures)[1], $M

● Measures impact

| | FY20 | FY21 | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|---|---|
| Measures impact | -157 | -157 | -251 | -275 | -279 | -283 | -288 |
| | 560 | 560 | 466 | 442 | 448 | 455 | 462 |

1 This exhibit does not represent the total budgeted appropriation; It reflects the baseline appropriation post-measures

A reduction in the appropriation for UPR was determined in 2017 through a collaborative process with the Government to identify reasonable, sustainable measures to bring UPR closer to U.S. mainland public university tuition and administrative cost benchmarks, while maintaining (and in many cases improving) the performance of the system, which serves as a primary economic growth engine of the Island. It reflects both the declining enrollment of the university as well as the sizeable opportunity to diversify revenue sources, transform operations through greater utilization of shared services and other administrative streamlining across its 11 campuses.

In light of the COVID-19 pandemic, last year, the Oversight Board provided a one-year pause (for FY2021) in the further reduction of UPR's annual appropriation to enable UPR to focus all its efforts on implementing the efficiencies previously required and not yet completed. For FY2022, the 2021 Fiscal Plan expects the appropriation to be reduced to $466 million. Thereafter, a gradual decrease in the UPR appropriation will continue as previously envisioned to ~$455 million by FY2025.

---

330 Represents the average across the Ana G. Mendez University system, Inter-American University, Sacred Heart University, and Polytechnic University for SY18-19

The Oversight Board is analyzing the formal guidance released by the U.S. Department of Education on how to calculate the Maintenance of Effort (MOE) requirements associated with the federal funding provided by the COVID-19 stimulus packages (i.e., CARES, CRRSA and ARP Acts), and will determine what, if any, implications the MOE requirements have on the Commonwealth, UPR, and PRDE funding provided in the 2021 Fiscal Plan and FY2022 Commonwealth Budget.

## 18.3   Establish an independent needs-based scholarship fund for UPR

The UPR 2021 Fiscal Plan includes a measure to increase tuition, thereby bringing UPR more in line with other public U.S. universities in terms of own-source revenues, and ensuring that those who can afford university pay for attending. At the same time, the Commonwealth has created a needs-based UPR scholarship fund, whose intent is to ensure the tuition-related measures do not impact the ability of students with demonstrated financial need to afford a UPR education.

The 2021 Fiscal Plan allocates funds to establish an independently-managed needs-based scholarship fund to benefit the students of the university system. The Commonwealth will contribute $35 to $51 million per year for  scholarships to be managed  by an external third party. In April 2020, an RFP process was started in order to provide Fund Administration Services and Trust Services to AAFAF with respect to the scholarship endowment trust fund. The RFP was awarded in May 2020 to Fundación Comunitaria. The fund is expected to award the first scholarships in August 2021, as the application process will be conducted by June of the same year. During FY2021, $43 million was added to the fund and an additional $47 million is expected to be added for FY2022.  The Oversight Board urges the Government of Puerto Rico to continue this implementation so students who cannot otherwise afford tuition in Puerto Rico are able to through this program. The need-based scholarship will guarantee that those who need the resources get them.

# Chapter 19. Municipal services reform

## 19.1   Current state

All of Puerto Rico's 78 municipalities are recipients of the Commonwealth municipal appropriation. To incentivize a new operating model between the central and municipal governments, as well as municipal operational changes, prior Fiscal Plans reduced this appropriation. In FY2018, the total municipal appropriation was $220 million (a reduction of $110 million relative to the prior year). In FY2019, it was reduced to $176 million, and in FY2020, as stipulated in the 2019 Fiscal Plan, it was further reduced to $132 million. This amount remained the same for FY2021 as a planned reduction was paused to provide support to municipalities during the COVID-19 pandemic, but the appropriation will be phased-out and eliminated by FY2025. The transfer in FY2022 will decrease to $88 million. Given this decrease and the eventual phase out of transfers to municipalities, the imperative to execute strategic efforts to increase revenues, maximize investment of federal recovery funds and decrease operational costs to maintain fiscal sustainability is critical.

Municipalities are often on the front lines of providing individual and community services and were demonstrably engaged in COVID-19 response and recovery. This recovery is in addition to ongoing efforts to recover from the natural disasters of hurricanes and earthquakes.  Through stimulus measures, including the ARP Act and CARES Act, as well as significant disaster relief funds, municipalities will receive substantial, time limited, financial aid to support economic

redevelopment. Their siloed operations and limited local capacity to manage relief funding creates obstacles to leveraging funding effectively to promote necessary economic development and fiscal recovery.

Prior to, and in recovery from the pandemic, there has been little meaningful progress on redefining the relationship between the territorial Government and municipalities, almost no decentralization of responsibilities, and no fiscal decentralization. Moreover, municipalities have made little (if any) progress towards implementing the fiscal discipline required to reduce reliance on Commonwealth appropriations and better reflect a declining population in many areas. This lack of fiscal management was further stressed by the COVID-19 pandemic, threatening the ability of municipalities to provide necessary services, such as health, sanitation, public safety, and emergency services to their residents, and forcing them to prioritize expenditures. Based on the lack of progress to date and entrenchment of the municipal governance including municipal legislatures, comprehensive changes including consolidation of services are required as individual municipalities cannot accomplish significant impacts to the municipal cost structure.

### 19.1.1   *Municipal reliance on Commonwealth funding*

The level of municipal dependency on intergovernmental income is highlighted in *Exhibit 128* below. Transfers of intergovernmental income includes both an equalization fund and lottery transfers. The lottery transfers will be maintained as the equalization fund portion phases out by FY2025. In FY2019, the General Fund of 37 of the 78 municipalities were 40% or more dependent upon funding from the Central Government. As the equalization fund portion of these transfers phases out, municipal revenues will become increasingly stressed.

EXHIBIT 128: MUNICIPAL DEPENDENCY ON INTERGOVERNMENTAL TRANSFERS AS A PERCENTAGE OF FY19 REVENUE[1]



1 Only 57 of the 78 municipalities reported yearly results to ABRE for each year between 2010 and 2018. To avoid any misleading comparisons, only these municipalities are analyzed throughout this section

A further review of historical trends of municipalities' fiscal condition validates the challenge of operating with declining resources. Data analysis produced by ABRE Puerto Rico, a non-profit that evaluates municipality finances, from "fully-reporting" municipalities with declining revenues from the period of FY2010 through FY2019 (*Exhibit 129*), which demonstrates a pattern of inability to operate within budget targets[331]

---

[331] "Fully-reporting" municipalities are defined as the 55 municipalities (out of the 78 total) that reported yearly results to ABRE Puerto Rico for each year between 2010 and 2019. To avoid any misleading comparisons due to inconsistent data availability, only these municipalities are analyzed throughout this section

EXHIBIT 129: GENERAL FUND REVENUES AND EXPENDITURES[1]



From FY2010 to FY2019, these municipalities' aggregate General Fund balances fluctuated between positive and negative values from negative $55 million to positive $39 million (*Exhibit 130)*. Shortfalls have put further financial strain on the following years budget, driving negative fund balances that have required persistent Commonwealth support and/or increased borrowing.

EXHIBIT 130: FULLY-REPORTING MUNICIPALITIES' END-OF-YEAR GENERAL FUND BALANCES



In total, municipalities have been able to reduce long-term debt (excluding pensions), but this is primarily due to limited access to credit, particularly after the liquidation of the Government Development Bank (GDB) (*Exhibit 131)*.

EXHIBIT 131: FULLY-REPORTING MUNICIPALITIES' DEBT AND DEBT PAYMENTS

Debt and debt payments by fully-reporting municipalities , $M



On the revenue side, improving collections has the potential to increase annual revenues for municipalities. The Municipal Revenue Collection Center (CRIM, by its Spanish acronym), which operates property tax collection on behalf of municipalities, must establish a program to improve collections on existing properties, reclassify properties that are currently erroneously categorized (residential vs. commercial), and pursue strategies to enhance collections. Current year collections have averaged approximately 68% in recent years, which is well below comparable U.S. jurisdictions. Low compliance rates and thousands of properties in Puerto Rico that do not appear on the property tax rolls affect the revenue productivity and fairness of the property tax system. CRIM has the responsibility for virtually every aspect of property tax administration, including developing a cadastral survey, identifying taxable parcels, developing and maintaining an appraisal manual, developing tax records, calculating the valuation for all real property, notifying taxpayers of their respective obligations, and collecting the real and personal property tax. Although CRIM currently delegates services to select municipalities via collaboration agreements for functions such as appraisals, collections, verifications, and investigations, municipal governments still have limited roles in the administration of the property tax. Thus, enhancing the effectiveness of CRIM is critical for municipal revenues and services.

*Act 29-2019*

On April 15, 2020, the Title III court issued a decision granting summary judgment to the Oversight Board on several of its claims against the Governor and the Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym). The court issued a mandatory permanent injunction precluding the enforcement of Act 29-2019 and declared Act 29-2019 a nullity because it violated various provisions of PROMESA.  The Title III court's order became effective on May 7, 2020. The effect of this nullification required municipalities to cover their own employees' PayGo and healthcare costs going forward and to reimburse the Commonwealth for its costs resulting from the impact of Act 29-2019 during its effective period. For FY2020, the PayGo and healthcare obligations were approximately $166 million and $32 million, respectively. The Oversight Board, the Government, and CRIM agreed that the combined amount due, $198 million, would be partially offset by the FY2020 Commonwealth transfer of $132 million (that was transferred to CRIM in accordance with the 2019 Fiscal Plan and Certified Budget). Under Act 29-2019, CRIM retained these funds and did not remit them to the municipalities as part of the Equalization Fund. Therefore, CRIM transferred the $132 million to the Health Insurance Administration (ASES, by its Spanish acronym) and the Retirement System for Employees of the Government of Puerto Rico (ERS) to partially repay the FY2020 PayGo and ASES debt. The $132 million was allocated proportionally to the municipalities based on their projected FY2020 PayGo and ASES debt.

After accounting for this transfer, the nullification of Act 29-2019 resulted in the municipalities together owing $66 million to the Commonwealth for their employees' FY2020 PayGo and healthcare contributions. This amount equated to approximately 3% of the total municipality General Fund budgets in FY2020 (~$2 billion), although the impact varied on a municipality-by-municipality basis. The remaining $66 million had to be repaid according to the repayment waterfall in *Exhibit 132*. This repayment waterfall focuses on incremental revenues that municipalities had not considered in their FY2020 or FY2021 budgets. Therefore, the financial impact on municipalities was minimized.

Since the beginning of FY2021, CRIM, AAFAF, and the municipalities have been working closely with the Oversight Board to implement the repayment waterfall and pay the outstanding FY2020 PayGo and healthcare debt. Funds have been prioritized to pay PayGo debt first before paying healthcare debt. The first three (3) steps of the repayment waterfall have been completed. As of March 2021, the outstanding FY2020 PayGo debt is $2 million. Similarly, the outstanding FY2020 healthcare debt is $18 million. The combined debt outstanding of $20 million, which is approximately 10% of the original debt outstanding, will be repaid through steps 4 and 5 of the repayment waterfall. CRIM and AAFAF have been working since July 2020 to retain expert services to support valuation of the property tax debt and associated tax liens, which is projected to be worth approximately $400 million, based on a third party's previous proposal to purchase the portfolio. On August 17, 2020, CRIM and AAFAF issued a request for proposals (RFP), responses to which were due on August 28, 2020. Three proposals were received. After reviewing the proposals, CRIM and AAFAF requested additional information on the methodology and approach that the candidates would use to ensure an acceptable confidence level in the data, assuming data validation and cleanup were required in the initial phase of the work. Therefore, an addendum to the RFP was issued on November 5, 2020. By November 13, 2020, the three proposing firms submitted their responses to the addendum, explaining their proposed methodologies and adjusting their proposed fee structures to reflect the incremental work. To date, CRIM and AAFAF have yet to finalize the selection of the third-party experts to support the data clean-up and portfolio valuation. Therefore, given this delay, CRIM will not be able to sell the portfolio by the end of FY2021, which is step 4 of the repayment waterfall. As a result, in order to repay any outstanding FY2020 PayGo and healthcare debt, CRIM must offset an amount equal to 1/12th of the outstanding debt monthly, beginning on December 31, 2021. This will ensure that the debt is fully repaid by the end of FY2022, as required by this 2021 Fiscal Plan and in accordance with Step 5 of the repayment waterfall. Nevertheless, CRIM and AAFAF must sell the portfolio by FY2022 to provide municipalities with additional revenue.

EXHIBIT 132: REPAYMENT WATERFALL

| Repayment waterfall | Description |
|---|---|
| Step 1 – Offset outstanding obligation against electronic lottery funds true up | • CRIM identified $17.6 million of Electronic Lottery proceeds from FY2016 & FY2017 previously not remitted to CRIM as required by Law<br>• Use these funds to offset a portion of the remaining obligation of $66 million |
| Step 2 – Offset outstanding obligation against excess CAE rebate | • If tax collections exceed the amount needed to cover annual debt service on CAE loans, municipalities receive this excess at the end of the year<br>• Use these funds to further offset remaining obligations after Step 1 |
| Step 3 – Offset outstanding obligation against the final FY2020 liquidation | • CRIM projects annual municipal advances at the beginning of each fiscal year and remits funds based on projections monthly<br>• After the fiscal year ends, CRIM reconciles actual collections to remittances and liquidates any excess to the corresponding municipality<br>• Use these funds to further offset remaining obligations after Steps 1 and 2 |
| Step 4 – Offset outstanding obligation against the collection of aged Accounts Receivable | • CRIM will value and plan to monetize its portfolio of accounts receivable by the end of FY2021. This action is projected to result in up to $400 million in proceeds<br>• Proceeds from the sale of this portfolio shall be paid to the Commonwealth to further offset remaining obligations after Steps 1, 2 and 3 |
| Step 5 – Offset outstanding obligation against municipal advances | • If FY2020 PayGo and health care obligations are not fully repaid after Steps 1, 2, 3 and 4, CRIM should offset the municipality's monthly advances until the remaining obligation is repaid in full<br>• To minimize the impact of offsets, CRIM must undertake revenue enhancing measures to secure additional revenues that could then offset the remaining liability due<br>• If CRIM does not achieve its revenue-enhancing measures by the end of FY2022, a series of collection measures will be enacted. These measures  include the establishment of a lockbox mechanism to control all cash receipts and disbursements and an immediate offset of 25% of the outstanding obligation from property tax advances<br>• These offsets will continue in varying amounts until the obligation is fully repaid<br>• If the balance of the FY2020 health care and PayGo obligations is not paid down by the end of FY2022, the budgeted monthly Commonwealth transfer will be placed on hold until such time as the requirement is met |

# 19.2   Disaster relief and the COVID-19 pandemic

## 19.2.1   Accelerating post-disaster relief at municipalities

Puerto Rico has experienced historic and unprecedented disasters since 2017. The impact of Hurricanes Irma and María, as well as a magnitude 6.4 earthquake on January 7, 2020 (and the subsequent aftershocks), resulted in significant damage to the infrastructure and economy, and prompted material out-migration. The Federal Government has supported post-hurricane reconstruction in the municipalities primarily through FEMA's Public Assistance (PA) Program, Community Disaster Loans (CDLs), and 406 Hazard Mitigation Grant Program (HMGP). FEMA processes PA Program grant funding according to the type of work the applicant undertakes. Eligible work must be required as a result of the declared incident, be located in the designated area, and be the legal responsibility of the applicant. Eligible work is classified into different categories: Emergency work and Permanent work. Permanent work projects are considered either large or small. Projects above a certain amount are considered "large." The threshold corresponds to the annually adjusted project maximum, which is adjusted annually for inflation. For FY2018, when hurricanes Irma and María made landfall, that threshold was $123,100. For small projects, final funding is based on the estimate at the time of project approval and certification of project completion is required when the project is done. Unlike large projects where the applicant completes the project and is later reimbursed for the project costs, small projects are paid out upon obligation. Given the liquidity issues facing many of the municipalities, the Government made the obligation of small projects a priority in the Island's recovery.

In addition to the aid provided through the FEMA PA Program, CDLs are provided to municipalities that have suffered a substantial loss of revenues as a result of a disaster and that can demonstrate a need for federal financial assistance to perform critical functions such as payroll, supplies, and maintenance materials related to disaster operations. 78 of the 78 municipalities have received over $306 million from the Federal Government to make up for lost

revenues due to the hurricanes in the form of CDLs. 15 municipalities affected by the 2020 earthquakes also received approximately $55 million in assistance in the form of CDL loans (see *Exhibit 133*).

EXHIBIT 133: POST-HURRICANE RECONSTRUCTION FEDERAL FUNDS FOR MUNICIPALITIES

| Source of funding | Allocated funds, $M | Disbursements, $M |
|---|---|---|
| FEMA Public Assistance | 1,600 | 177 |
| CDLs for hurricane relief | 306 | 285 |
| CDLs for earthquake relief | 55 | 32 |
| **Total** | **1,961** | **494** |

SOURCE: PRDE Personnel roster December 2020

Municipalities and Puerto Rican residents have also received disaster funding through Individual Assistance programs, Small Business Administration (SBA) Loans, Department of Housing Community Development Block Grant Disaster Recovery (CDBG-DR) programs, and Department of Transportation funding.

On December 7, 2019, the Oversight Board approved the Government's request to establish a "State Recovery Fund" that would fund advances to eligible Small Projects under the FEMA PA Program, which many municipalities required due to a lack of liquidity.[332] The State Recovery Fund was financed solely from a reprogramming of the $100 million FY2020 Certified Budget appropriation under the custody of the Office of Management and Budget (OGPe, by its Spanish acronym) designated as "Cost share of public assistance" and is to be used only for Small Projects (as defined above). The Oversight Board also included several requirements from the Government as a precondition of approval of this State Recovery Fund. Since the establishment of this State Recovery Fund, COR3 has informed the Oversight Board that $92.5 million would be returned to OGP, given other mechanisms have been put in place to expedite Small Projects and the funds are no longer required by the municipalities.[333] The fund was made available to municipalities from early 2020 to late spring of 2020. During the term of availability few municipalities completed the process to access these funds as the rate of obligation of small projects increased dramatically and Municipalities began to receive the funds to carry out the projects. Thus, the fund was no longer necessary and  funds could be re-programmed and used to address other needs.

The 2020 Fiscal Plan included the use of $51.4 million requested for the first required steps of demolition and debris removal as a result of the earthquakes in the southwestern region of the Island. These funds were appropriated to the Puerto Rico Department of Housing to administer for municipalities to carry out the FEMA Private Property Debris Removal and Demolition program (PPDR). Debris removal from private property is generally the responsibility of individual private property owners leveraging private funding, such as insurance, to cover the cost. However, if private property owners are not available because they have evacuated, the state or local government may need to enter the private property to remove debris considered to be an immediate threat to the lives, health, and safety of its residents.[334] The municipalities of Guayanilla, Guánica, Ponce, Yauco, and Peñuelas received approval from FEMA and COR3 to administer their own PPDR programs. In order for municipalities to have access to these funds, they had to enter into a Memorandum of Understanding (MOU) with Vivienda. To date, four out of these five municipalities have completed the MOU stage and a total of $12.4 million has been advanced to begin demolition work. As part of the agreement with Vivienda, municipalities must work with COR3 to request the reimbursement for eligible expenses under this program. The

---

[332] Oversight Board letters dated December 7 and December 14, 2019
[333] COR3 letter to the Oversight Board dated April 14, 2020
[334] Public Assistance Debris Removal Guide FEMA 325/July2007

reimbursement will then be used in the second stage of the redevelopment of the southwest region.

After the demolition and debris removal, the next step or second stage should be the development of an integrated and comprehensive plan for the long-term economic reconstruction of the southwest region, focusing on rebuilding with resiliency and taking into account the changes in the economy in a post-COVID world, the patterns of migration from the area, and the potentially-permanent risks to populations from the earthquakes and erosion after the hurricanes, among other factors. This plan should be developed in coordination with Vivienda and other relevant state and federal agencies.

On March 16, 2021, Governor Pierluisi announced the reallocation of CDBG-DR City Revitalization funds overseen by Vivienda. This reallocation will increase the funds to the municipalities from an initial $600 million obligation to $1 billion, with an addition of $400 million. These funds were initially obligated on February 20, 2020 and the funds must be used by September 18, 2024. Additionally, the Governor allocated $10 million to municipalities for administrative expenses. *Exhibit 134* below details the total disaster relief funds allocated to each municipality. The Board also approved $14.9 million of support from the General fund Emergency Reserve to 18 municipalities directly impacted by the earthquakes.

EXHIBIT 134: DISASTER RELIEF FUNDING ALLOCATIONS TO MUNICIPALITIES, $K

| Municipality | FEMA PA | CDBG-DR | TOTAL | Municipality | FEMA PA | CDBG-DR | TOTAL | Municipality | FEMA PA | CDBG-DR | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Municipality | 2,044 | 8,543 | 4,735 | Fajardo | 2,478 | 11,862 | 14,340 | Fajardo | 2,478 | 11,862 | 14,340 |
| Adjuntas | 8,966 | 10,827 | 8,130 | Florida | 2,245 | 8,180 | 10,424 | Florida | 2,245 | 8,180 | 10,424 |
| Aguada | 2,608 | 11,997 | 28,182 | Guánica | 2,484 | 9,638 | 12,122 | Guánica | 2,484 | 9,638 | 12,122 |
| Aguadilla | 4,660 | 9,313 | 5,908 | Guayama | 6,371 | 15,048 | 21,418 | Guayama | 6,371 | 15,048 | 21,418 |
| Aguas Buenas | 6,608 | 9,754 | 5,482 | Guayanilla | 6,185 | 9,687 | 15,873 | Guayanilla | 6,185 | 9,687 | 15,873 |
| Aibonito | 8,281 | 10,158 | 6,471 | Guaynabo | 7,107 | 13,193 | 20,300 | Guaynabo | 7,107 | 13,193 | 20,300 |
| Añasco | 3,667 | 15,881 | 41,800 | Gurabo | 6,838 | 10,158 | 16,996 | Gurabo | 6,838 | 10,158 | 16,996 |
| Arecibo | 5,175 | 9,982 | 4,715 | Hatillo | 2,792 | 10,185 | 12,977 | Hatillo | 2,792 | 10,185 | 12,977 |
| Arroyo | 3,812 | 9,593 | 5,737 | Hormigueros | 1,644 | 8,510 | 10,155 | Hormigueros | 1,644 | 8,510 | 10,155 |
| Barceloneta | 4,318 | 9,661 | 6,717 | Humacao | 5,613 | 13,995 | 19,609 | Humacao | 5,613 | 13,995 | 19,609 |
| Barranquitas | 17,263 | 20,140 | 68,655 | Isabela | 5,474 | 10,886 | 16,361 | Isabela | 5,474 | 10,886 | 16,361 |
| Bayamón | 8,260 | 15,406 | 27,166 | Jayuya | 10,338 | 8,010 | 18,348 | Jayuya | 10,338 | 8,010 | 18,348 |
| Cabo Rojo | 10,230 | 22,997 | 54,357 | Juana Díaz | 6,129 | 12,289 | 18,419 | Juana Díaz | 6,129 | 12,289 | 18,419 |
| Caguas | 3,386 | 9,441 | 7,155 | Juncos | 6,335 | 10,015 | 16,350 | Juncos | 6,335 | 10,015 | 16,350 |
| Camuy | 7,610 | 12,864 | 23,547 | Lajas | 2,708 | 11,264 | 13,972 | Lajas | 2,708 | 11,264 | 13,972 |
| Canóvanas | 21,606 | 21,321 | 55,470 | Lares | 2,721 | 9,108 | 11,829 | Lares | 2,721 | 9,108 | 11,829 |
| Carolina | 6,296 | 9,630 | 5,642 | Las Marías | 3,534 | 8,964 | 12,498 | Las Marías | 3,534 | 8,964 | 12,498 |
| Cataño | 2,824 | 18,296 | 21,319 | Las Piedras | 4,827 | 10,074 | 14,901 | Las Piedras | 4,827 | 10,074 | 14,901 |
| Cayey | 2,808 | 11,650 | 4,048 | Loíza | 8,053 | 14,550 | 22,603 | Loíza | 8,053 | 14,550 | 22,603 |
| Ceiba | 2,453 | 9,677 | 4,520 | Luquillo | 3,431 | 8,593 | 12,024 | Luquillo | 3,431 | 8,593 | 12,024 |
| Ciales | 9,111 | 10,194 | 19,612 | Manatí | 5,012 | 11,256 | 16,268 | Manatí | 5,012 | 11,256 | 16,268 |
| Cidra | 7,916 | 10,559 | 8,388 | Maricao | 7,613 | 8,559 | 16,172 | Maricao | 7,613 | 8,559 | 16,172 |
| Coamo | 3,417 | 9,518 | 4,937 | Maunabo | 11,061 | 8,769 | 19,830 | Maunabo | 11,061 | 8,769 | 19,830 |
| Comerío | 7,511 | 10,467 | 7,436 | Mayagüez | 11,148 | 14,977 | 26,126 | Mayagüez | 11,148 | 14,977 | 26,126 |
| Corozal | 376 | 9,257 | 3,165 | Moca | 3,225 | 10,010 | 13,235 | Moca | 3,225 | 10,010 | 13,235 |
| Culebra | 7,073 | 10,793 | 8,042 | Morovis | 5,059 | 10,342 | 15,402 | Morovis | 5,059 | 10,342 | 15,402 |

SOURCE: COR3, AAFAF, Congressional reports on ARP allocations

## 19.2.2   COVID-19 pandemic and municipal support

Municipalities have received continuous Government and federal aid to address increased expenses associated with COVID-19 response and recovery actions. The most significant of this recovery funding are the allocations associated with the ARP Act.

On March 28, 2020, the Oversight Board approved the Commonwealth's plan to provide $100 million as part of the COVID-19 Emergency Measures Support Package. Municipalities received

$50 million per month for two months with the funds distributed to each municipality using a 3-tier approach based on municipal population levels of $1 million, $1.35 million and $1.75 million.

Further, the 2020 Fiscal Plan provided a one-year pause in the further reduction of Commonwealth appropriations to municipalities; accordingly, the FY2021 appropriation remained at $132 million. This additional financial support for municipalities was intended to be used to effectively implement strategies to improve municipalities' financial sustainability by instituting critical changes in operating structure, sharing costs through consolidated services, and improving revenue collection.

In addition, the Governor signed an executive order that adopts the "Strategic Plan for Disbursement" of the $2.2 billion allocated to Puerto Rico by the Coronavirus Relief Fund (CRF) created by the Federal Government through the CARES Act, which assigned $100 million to be transferred to the municipalities for eligible expenses related to COVID-19. Another $100 million in funding was available under the CARES Act to reimburse allowable COVID-related expenses incurred by the municipalities.  In July 2020, the Governor expanded the available funds by another $100 million for a total of $200 million overseen by AAFAF. Municipalities are responsible for documenting and tracking all expenses for reimbursement.

In February 2021, the Governor announced the disbursement of an additional $100 million from the CARES Act to assist the municipalities with the mitigation of the effects of the pandemic. Each municipality will receive $1 million and the remaining $22 million will be distributed among the municipalities with the greatest economic difficulties.

EXHIBIT 135: COVID-19 FUNDING ALLOCATIONS TO MUNICIPALITIES, $K

| Municipality | CW Support | CARES Act | ARP | TOTAL | Municipality | CW Support | CARES Act | ARP | TOTAL | Municipality | CW Support | CARES Act | ARP | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adjuntas | 1,000 | 2,066 | 1,669 | 4,735 | Fajardo | 1,350 | 2,808 | 13,242 | 17,400 | Naguabo | 1,350 | 2,581 | 2,477 | 6,408 |
| Aguada | 1,350 | 3,252 | 3,528 | 8,130 | Florida | 1,000 | 2,000 | 1,088 | 4,088 | Naranjito | 1,350 | 2,678 | 2,629 | 6,658 |
| Aguadilla | 1,750 | 4,085 | 22,347 | 28,182 | Guánica | 1,000 | 2,000 | 1,479 | 4,479 | Orocovis | 1,000 | 2,241 | 1,944 | 5,185 |
| Aguas Buenas | 1,000 | 2,523 | 2,386 | 5,908 | Guayama | 1,350 | 3,422 | 17,584 | 22,356 | Patillas | 1,000 | 2,000 | 1,559 | 4,559 |
| Aibonito | 1,000 | 2,357 | 2,125 | 5,482 | Guayanilla | 1,000 | 2,081 | 1,694 | 4,776 | Peñuelas | 1,000 | 2,181 | 1,851 | 5,032 |
| Añasco | 1,350 | 2,605 | 2,515 | 6,471 | Guaynabo | 1,750 | 6,138 | 22,395 | 30,283 | Ponce | 1,750 | 9,093 | 61,904 | 72,747 |
| Arecibo | 1,750 | 6,030 | 34,020 | 41,800 | Gurabo | 1,350 | 3,890 | 4,528 | 9,767 | Quebradillas | 1,000 | 2,406 | 2,203 | 5,610 |
| Arroyo | 1,000 | 2,058 | 1,657 | 4,715 | Hatillo | 1,350 | 3,407 | 3,770 | 8,527 | Rincón | 1,000 | 2,000 | 1,313 | 4,313 |
| Barceloneta | 1,000 | 2,456 | 2,281 | 5,737 | Hormigueros | 1,000 | 2,000 | 1,492 | 4,492 | Río Grande | 1,350 | 3,947 | 17,595 | 22,892 |
| Barranquitas | 1,350 | 2,701 | 2,665 | 6,717 | Humacao | 1,350 | 4,108 | 21,695 | 27,554 | Sabana Grande | 1,000 | 2,332 | 2,087 | 5,420 |
| Bayamón | 1,750 | 11,388 | 55,517 | 68,655 | Isabela | 1,350 | 3,481 | 18,387 | 23,217 | Salinas | 1,350 | 2,665 | 2,608 | 6,623 |
| Cabo Rojo | 1,350 | 3,916 | 21,900 | 27,166 | Jayuya | 1,000 | 2,000 | 1,335 | 4,335 | San Germán | 1,350 | 2,855 | 16,988 | 21,193 |
| Caguas | 1,750 | 8,647 | 43,960 | 54,357 | Juana Díaz | 1,350 | 3,742 | 18,321 | 23,413 | San Juan | 1,750 | 20,542 | 183,849 | 206,141 |
| Camuy | 1,350 | 2,872 | 2,933 | 7,155 | Juncos | 1,350 | 3,341 | 3,668 | 8,360 | San Lorenzo | 1,350 | 3,209 | 3,460 | 8,019 |
| Canóvanas | 1,350 | 3,742 | 18,455 | 23,547 | Lajas | 1,000 | 2,351 | 2,116 | 5,467 | San Sebastián | 1,350 | 3,180 | 16,563 | 21,093 |
| Carolina | 1,750 | 10,020 | 43,700 | 55,470 | Lares | 1,000 | 2,490 | 2,334 | 5,824 | Santa Isabel | 1,000 | 2,302 | 2,039 | 5,341 |
| Cataño | 1,000 | 2,419 | 2,223 | 5,642 | Las Marías | 1,000 | 2,000 | 762 | 3,762 | Toa Alta | 1,750 | 5,420 | 20,700 | 27,870 |
| Cayey | 1,350 | 3,603 | 16,366 | 21,319 | Las Piedras | 1,350 | 3,271 | 3,558 | 8,179 | Toa Baja | 1,750 | 5,558 | 26,454 | 33,762 |
| Ceiba | 1,000 | 2,000 | 1,048 | 4,048 | Loíza | 1,000 | 2,507 | 2,361 | 5,867 | Trujillo Alto | 1,750 | 4,907 | 20,800 | 27,458 |
| Ciales | 1,000 | 2,000 | 1,520 | 4,520 | Luquillo | 1,000 | 2,084 | 1,698 | 4,782 | Utuado | 1,350 | 2,681 | 2,634 | 6,665 |
| Cidra | 1,350 | 3,351 | 14,911 | 19,612 | Manatí | 1,350 | 3,288 | 18,150 | 22,788 | Vega Alta | 1,350 | 3,213 | 3,467 | 8,030 |
| Coamo | 1,350 | 3,353 | 3,686 | 8,388 | Maricao | 1,000 | 2,000 | 522 | 3,522 | Vega Baja | 1,750 | 4,070 | 19,331 | 25,151 |
| Comerío | 1,000 | 2,144 | 1,793 | 4,937 | Maunabo | 1,000 | 2,000 | 992 | 3,992 | Vieques | 1,000 | 2,000 | 806 | 3,806 |
| Corozal | 1,350 | 2,982 | 3,105 | 7,436 | Mayagüez | 1,750 | 5,390 | 35,463 | 42,602 | Villalba | 1,000 | 2,312 | 2,055 | 5,366 |
| Culebra | 1,000 | 2,000 | 165 | 3,165 | Moca | 1,350 | 3,141 | 3,354 | 7,846 | Yabucoa | 1,350 | 2,981 | 3,104 | 7,435 |
| Dorado | 1,350 | 3,218 | 3,475 | 8,042 | Morovis | 1,350 | 2,862 | 2,916 | 7,128 | Yauco | 1,350 | 3,060 | 14,554 | 18,964 |
| | | | | | | | | | | Total | 100,050 | 278,000 | 949,826 | 1,327,876 |

SOURCE: COR3, AAFAF, Congressional reports on ARP allocations

On March 11, 2021, President Biden signed the American Rescue Plan (ARP) Act into law, which contains $1.9 trillion in overall U.S. national spending to support relief and economic recovery efforts. The ARP Act provides a total of $350 billion in assistance to states, counties, municipalities, territories and tribal governments to cover expenses, make up for lost revenue,

266

and ease the overall economic impact from the COVID-19 pandemic. Specific to municipalities is the $130.2 billion to local governments from the Coronavirus Local Fiscal Recovery Fund:

- $65.1 billion to counties, allocated based on each county's share of the U.S. national population.

- $45.6 billion to metropolitan cities (cities with 50,000 or more people), allocated by an average of one of two sets of economic ratios, to be determined by the U.S. Secretary of the Treasury.

- $19.5 billion to municipalities with fewer than 50,000 people (to be distributed by the applicable state), allocated based on each municipality's share of the overall population of municipalities

Puerto Rico's municipalities are estimated to receive approximately $950 million under ARP. Local government funds will be distributed in two equal tranches, the first by May 10, 2021, and the second by March 11, 2022. Funds for all other municipalities (and any counties that are not political subdivisions of a state) will be distributed to the states for redistribution by May 10, 2021, and the states must distribute allocated amounts to such municipalities within 30 days of receipt, although a state may request a 30-day extension—and in certain cases additional extensions—due to administrative burden.

Funds allocated from each of the State Fiscal Recovery Fund and Local Fiscal Recovery Fund may be used to:

- Respond to the COVID-19 emergency and address its economic effects, including through aid to households, small businesses, nonprofits, and impacted industries such as tourism and hospitality.

- Provide premium pay to essential employees of state or local governments or make grants to the employers of essential employees. Premium pay may not exceed $13 per hour or $25,000 per worker.

- Provide government services to the extent of any revenue reduction resulting from COVID-19.

- Make investments in water, sewer and broadband infrastructure.

- All funds must be spent on costs incurred on or before December 31, 2024.

- State and local governments cannot use the funds to make pension payments.

- State and local governments may transfer funds to private nonprofit groups, public benefit corporations involved in passenger or cargo transportation, and special-purpose units of state or local governments.

- State and local governments must provide periodic reports to the Secretary of the Treasury giving a detailed accounting of the uses of funds and, in the cases of states, all modifications to the states' tax revenue sources.

## 19.3   Vision and reform needed to transform municipal services

The significant opportunity associated with ARP and other recovery funds provide municipalities an opportunity to make meaningful investments towards their fiscal sustainability. Municipalities must engage in evidence-based investments in driving efficiencies in operations to lower expenses while increasing revenues through economic development, improved tax collections and business growth.  Yet, for many of the 78 municipalities, reducing their individual cost structures will be insufficient in the face of rising operational costs and without the ongoing benefit of governmental transfers.  Current levels of fiscal stability, level of population decline, and economic opportunities vary across the 78 municipalities.  Furthermore, many municipalities

which have greater dependency upon Commonwealth transfers as a source of revenue are at increased risk of fiscal distress as transfers continue to decline.

Thus, the Government will need to develop a solution to streamline and consolidate municipal services throughout Puerto Rico. Otherwise, the Government faces the prospect of expanding municipal operating deficits, further deteriorating infrastructure, and worsening service delivery.

To enhance stakeholder discussion on this issue, in June 2020 the Oversight Board published a policy paper examining a new government structure between the Commonwealth and municipal governments.[335] The report included design parameters around decentralization and municipal service consolidation. While the Oversight Board did not advocate for eliminating municipal governments, it did call for a comprehensive statutory overhaul to lay a solid foundation for reform. In March 2021, an Executive Order was signed by Governor Pierluisi, the Mayor's Association, and the Mayor's Federation to create the 'Committee for the Decentralization of Municipal Affairs.' The Committee, composed of one representative from each political party and led by the Secretary for Municipal Affairs would be responsible for identifying potential services and competencies that could be gradually transferred from the Central Government to the municipalities, along with the respective required funding.  The Committee is expected to submit a report by May 18, 2021 listing their ideas.  Top-down changes to the delivery of government services is critical to achieving impact on cost structures given the entrenched local governance structure with 78 municipal governments and their legislatures. The Committee's recommended implementation plan must prioritize changing the cost structure of service delivery as well as shifting responsibilities.

A new decentralized model could improve the delivery of services by centralized Commonwealth agencies which are historically untimely and lack responsiveness. Such a model has the potential to dramatically increase capacity to respond to a crisis and improve service delivery at a local level. Unfortunately, most municipalities do not (individually) have the administrative or financial capacity to operate programs currently provided by the Commonwealth. Many also lack the economies of scale necessary to be efficient with programs such as the Administration for Child Support Enforcement (ASUME, by its Spanish acronym), Administration for Families and Children (ADFAN, by its Spanish acronym), or Vivienda. However, a consolidated municipal service structure could enable the delegation of certain Commonwealth responsibilities to local governments. Such a model could yield municipal and Commonwealth savings, and a portion of those savings could be reinvested back into the municipalities where savings are realized.

In addition, a more integrated government structure could help implement locally based economic development strategies, which are more viable at a regional level than on an individual municipality basis. On the revenue side, service consolidation could further enhance the coordination of property tax collection by standardizing and automating processes and integrating data and information systems. The Oversight Board is committed to helping the Government and all the municipal governments throughout a reform process, with ideas, insight, and design support, if , and only if, the proposed solution reduces the costs of services provided by municipalities through service consolidation.

### 19.3.1  *Oversight Board's municipal pilot*

The Oversight Board initiated the Pilot program in May 2019 when it designated all 78 Puerto Rican municipalities as covered entities under PROMESA.  The 10 municipalities in the Pilot were Aibonito, Barranquitas, Camuy, Cidra, Comerío, Isabela, Quebradillas, San Sebastián, Orocovis and Villalba, reflecting diverse political representation, size, and financial strength. The Pilot provided important insights into the scope of financial problems municipalities face and the deep-rooted systemic challenges that must be overcome to enable fiscal sustainability.  Although the Pilot ends on June 30, 2021, the Oversight Board will continue its work with municipal

---

[335] Cruz, Arnaldo. "Essay: Rethinking Government, A New Commonwealth-Muni Partnership." Puerto Rico Financial Oversight and Management Board. Accessed April 21, 2021

governments with the launch of three municipal incentive funds available to all 78 municipalities. The Oversight Board will work with any and all that are eager to benefit from this program and will continue to provide support to help improve municipalities' fiscal stability by working with mayors on identifying and adopting leading local government practices on efficient spending, economic development, and maximization of federal funds.

EXHIBIT 136: MAP OF MUNICIPALITIES PARTICIPATING IN THE OVERSIGHT BOARD'S PILOT PROGRAM



### 19.3.2   Incentivizing consolidation of services

To further incentivize service consolidation, the 2020 Fiscal Plan established funds to assist the municipalities to achieve fiscal sustainability. By consolidating services, municipalities will be able to significantly reduce costs and generate additional revenues through economic development and other potential initiatives. Municipalities that voluntarily  consolidate services will be eligible to receive a one-time financial incentive upon certification of such action by the Oversight Board. To fund this initiative, the 2020 Fiscal Plan set aside $22 million in each fiscal year through FY2025 for distribution among municipalities that complete service consolidations. The amount distributed to each participating municipality will be determined in coordination between AAFAF and the Oversight Board and is dependent on the savings or revenue generation achieved. The fund is expected to commence under AAFAF in the fourth quarter of 2021.  FY2021 funding not disbursed is authorized to rollover to FY2022.  The annual funding commitment will be reviewed each year through FY2025 based on municipal participation in the fund.

*School and Road Maintenance Funds*

As provided for in the 2020 Commonwealth Fiscal Plan, the Oversight Board committed to support all 78 municipalities through the creation of school and road maintenance funds.  These funds will help municipalities through:

- Defraying maintenance costs often covered by municipalities instead of responsible Commonwealth agencies

- Detailing requirements between Commonwealth agencies and municipalities for roads and school maintenance

- Establishing processes to fund such requirements

For school maintenance, the  2020 Fiscal Plan made available  $2.5 million for FY2021, which has been extended to FY2022 if not disbursed.  Within this incentive fund, municipalities are reimbursed for maintenance costs associated with their Public Building Authority (AEP for its Spanish acronym) managed schools.  377 schools managed by AEP in 76 municipalities are eligible to participate. This represents $6,631 available funding per school. Municipalities are

269

required to establish a memorandum of understanding with AEP on specific maintenance costs which can be covered.

For road maintenance, the 2020 Fiscal Plan made available $10 million for FY2021, which has been extended  to FY2022.  Within this incentive fund, municipalities can be reimbursed for maintenance costs associated with their secondary and tertiary roads through coordination with the Department of Transportation and Public Works (DTOP for its Spanish acronym).  78 municipalities with 6,553 kilometers of roads are eligible to participate. This represents $1,526 available funds per kilometer. Municipalities are required to establish a memorandum of understanding with DTOP on specific maintenance costs which can be covered and may include primary roads.

### 19.3.3   Property tax reform

CRIM plays an important role in supporting Puerto Rico's municipalities in their economic and social development by ensuring an efficient process for collecting and distributing real and personal property taxes, which are important revenue sources for municipalities. For FY2021, property taxes represent approximately 30% of the aggregate general fund budget for municipalities.

Historically, the taxable value of real and personal property has been significantly reduced by tax exemptions and exonerations, which have a negative impact on the municipalities that rely on property taxes to fund essential services. Puerto Rico offers considerably more tax breaks both in terms of number and notional value compared to other U.S. jurisdictions. For example, in FY2020, more than 50% of the real and personal property tax base was eliminated through these exemptions and exonerations. In addition, CRIM's tax roll does not include all the properties in Puerto Rico, nor does it accurately reflect the taxable value of some properties as significant home improvements have not been properly appraised. Similarly, due to outdated systems, there are high levels of delinquencies with collection rates for current year real property tax billings well below comparable jurisdictions, standing at approximately 68%. This has resulted in a large accounts receivable balance. Therefore, it is essential that CRIM seize all opportunities to maximize property tax collections by improving compliance to help municipalities reduce the reliance on the Commonwealth transfer and achieve long-term fiscal sustainability.

CRIM is continually undergoing an operational transformation centered around replacing outdated and inefficient applications and hardware, implementing best practices for business continuity, re-engineering processes to improve services to municipalities and taxpayers, and establishing a more data-driven culture. These initiatives should serve as the foundation for CRIM to implement strategies for successfully enhancing tax revenue collections. In addition, CRIM is undertaking various measures to improve collaboration with other government agencies and update the tax rolls to accurately reflect property taxable value and ownership. These measures will allow CRIM to better capture unrealized property tax revenues by increasing tax compliance and improving overall collection rates. Based on implementation planning discussions with CRIM management, CRIM estimates these initiatives could produce:

- $69 million of additional annual revenue from raising real property tax compliance from 68% to 76%

- $166 million of additional annual revenue from registering properties and home improvements not on the tax roll

- $89 million of additional annual revenue from fixing incorrect mailing addresses in the billing system

- $400 million of one-time revenue from selling the accounts receivable portfolio

- Additional revenue-enhancing measures are identified in CRIM's 2021 Fiscal Plan

EXHIBIT 137: REDUCTION IN MUNICIPAL APPROPRIATIONS UNDER STATUS QUO SCENARIO



Summary of appropriation (net of measures), $M

# Chapter 20. Pension reform

## 20.1  Current state of and required changes to pension reform

The Government operates three public employee retirement systems in Puerto Rico: The Employees' Retirement System (ERS), the Teachers' Retirement System (TRS), and the Judiciary Retirement System (JRS). The systems have different tiers of benefit formulas, some of which are traditional defined benefit pensions based upon years of service and final salary, while others are hybrid cash balance plans. Under the hybrid cash balance plans, employees have notional accounts credited with contributions and interest, and upon retirement, benefits are payable as an annuity. Different benefit tiers apply to employees based upon the year in which they were hired. Per the latest data available, each of the systems included the following liabilities: [336]

- **ERS:** 233,000 total participants covered (113,000 active employees, 120,000 retirees and other beneficiaries); with $1.5 billion in annual benefits and $31 billion in total actuarial liability[337]

- **TRS:** 77,000 total participants covered (32,000 active employees, 45,000 retirees and other beneficiaries); with $0.8 billion in annual benefits and $17 billion in total actuarial liability

- **JRS:** 840 total participants covered (381 active employees, 459 retirees and other beneficiaries); with $25 million in annual benefits and $0.7 billion in total actuarial liability

**All employees have historically made contributions toward their benefits, albeit at different rates.** Most regular government employees (including police officers as of January 1, 2020) also participate in Social Security, which includes both employer and employee contributions; most teachers and judges do not participate.

---

336 All liability estimates are as of July 1, 2017. Benefit estimates and headcounts are based on census data as of July 1, 2017
337 Coverage counts do not include participants who are terminated and owed a deferred vested benefit as this participant data is unavailable. The liability for these participants is estimated via a load in the actuarial liability

EXHIBIT 138: PUBLIC EMPLOYEE RETIREMENT SYSTEMS OVERVIEW (PRIOR TO PLAN OF ADJUSTMENT)

| Group | Defined Benefit Component | Hybrid Cash Balance Component | Defined Contribution Component | Social Security Coverage |
|---|---|---|---|---|
| ERS - Hired Jan 1, 2000 or later | None | Based on employee contributions and a share of investment earnings prior to July 1, 2017 | Based on employee contributions beginning July 1, 2017 | Police – Yes[1] Others – Yes |
| ERS - Hired before 2000 | Based on years of service and salary, frozen as of June 30, 2013 | Based on employee contributions and a share of investment earnings from June 30, 2013 to July 1, 2017 | Based on employee contributions beginning July 1, 2017 | Police – Yes[1] Others – Yes |
| TRS - Hired Aug 1, 2014 or later | None | None | Based on employee contributions | No |
| TRS – Hired before Aug 1, 2014 | Based on salary and years of service | None | None | No |
| JRS - Hired Jul 1, 2014 or later | Reduced formula based on salary and years of service | Based on employee contributions and a share of investment earnings | None | No |
| JRS — Hired before Jul 1, 2014 | Based on salary and years of service | None | None | No |

1 Police officers were enrolled in Social Security effective as of January 1, 2020.

**Over many decades, successive Governments have failed to adequately fund these retirement plans, and today the ERS, TRS, and JRS are insolvent**. In fact, Commonwealth PayGo expenditures to provide pension benefits are expected to continue constituting over 20% of General Fund expenditures without further action, as detailed below (*Exhibit 139*).

EXHIBIT 139: PAYGO EXPENDITURES COMPARED TO OVERALL GENERAL FUND EXPENDITURES, PRE-MEASURES



PayGo expenditures compared to overall General Fund expenditures, $M

◻ General Fund expenditures, including social programs (e.g., Medicaid)[1]     ⬭ X%   PayGo as % of General Fund expenditures
■ Total PayGo

| | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|
| | 21% | 20% | 19% | 19% | 19% |

1 Includes only General Fund portion of Medicaid and social programs; excludes intergovernmental transfers and General Fund Capex

In accordance with Section 211 of PROMESA, the Oversight Board published a detailed report in September 2019 on the Commonwealth's retirement systems.[338] This report provides a

---

338 EY, PROMESA Section 211 Report on the Puerto Rico Retirement Systems, September 2019

comprehensive analysis of the retirement systems' legal structure, operations, and benefit provisions, as well as additional detail related to the history of management of these funds and actions by the Commonwealth that led to the insolvency of these plans. The report outlines that several factors contributed to the historical underfunding, including inadequate employer contribution levels; the enactment of special laws granting new benefits without adequate funding for said benefits; early retirement programs; debt issuance the ERS system could not support; and mortgage, personal and cultural loans made to participants. Moreover, it clearly illustrates the systems' critical underfunding (see *Exhibit 140*) and urgent need for reform.

EXHIBIT 140: FUNDING LEVELS OF ERS, TRS, AND JRS AS OF JUNE 30, 2016



As previously stated, these retirement plans have depleted the assets that were set aside to pay benefits. Further, the employer contributions were not transferred as anticipated.[339] Satisfying pension commitments to current retirees and future retirees and their families is not only important to these individuals but also important to Puerto Rico's economy as retirees spend virtually all their income on the Island. **Action must be taken to identify a level of benefits that Puerto Rico can afford and devise a plan for the Government to fund these revised benefits**.

The Commonwealth has already taken critical steps toward a more stable pension system. Benefits for System 2000 ERS employees hired after January 1, 2000 were transitioned to a hybrid cash balance design with a benefit level based solely on the level of employee contributions. Subsequently, various legislation passed from 2013 through 2017 ceased accruals under the unsustainable ERS and TRS defined benefit (DB) plans (though TRS reform was subsequently partially overturned). As part of this reform, benefits for all ERS employees and for TRS employees hired after August 1, 2014 were transitioned to a hybrid cash balance plan design. With Act 106-2017, the Commonwealth transitioned to a new PayGo pension system, was required to liquidate assets of the three systems to help fund benefits owed, and has moved the assets of recently hired TRS members (and future contributions of ERS and TRS members) into segregated accounts. Hybrid accounts of System 2000 members were not similarly moved into segregated accounts. Now, almost four years after the provisions of Act 106-2017 went into effect, Puerto Rico's retirement systems must be further reformed to reduce costs and maintain adequate funding for current and future retirees. The measures included herein will have an average annual

---

[339] Legislative attempts to increase employer contributions to the pension trust were passed, including the Additional Uniform Contribution payments for ERS (Act 32-2013) and the Annual Additional Contribution for TRS and JRS (Act 160-2013 and Act 162-2013), however, large portions went unpaid and/or were not fully implemented prior to elimination by Act 106-2017

impact of approximately $59 million through FY2026, once fully implemented by the start of FY2023. Reductions to benefits have also been structured to **protect lower-income retirees**, who otherwise could become impoverished and therefore be forced to rely upon government "safety net" benefits.

**Only with pension reform can the Government help restore both fiscal balance and the promise for current and future retirees to safeguard their assets and their future pensions.**

## 20.2   Proposed pension reform initiatives

Based on the measures herein, restructuring the pension systems will lead to $198 million in savings from FY2022 to FY2026, as shown below (*Exhibit 141*).

EXHIBIT 141: PENSION REFORM SUMMARY OF IMPACT



Summary of pensions reform impact, $M

1 Post-measures
2 System 2000 removal savings are in exchange for a one-time payment of ~$1.5 billion per Section 20.2.4

### 20.2.1   Freeze Defined Benefit accumulation for JRS/TRS and enroll employees in a Defined Contribution plan with segregated accounts

TRS members hired prior to August 1, 2014 and all JRS members are currently accruing benefits under the defined benefit components of their retirement plans. ERS members and TRS members hired after August 1, 2014 transitioned to hybrid cash balance plans. TRS members hired after August 1, 2014 have subsequently had their hybrid accounts segregated from the DB plan by Act 106-2017. These segregated balances, along with ERS and TRS contributions made after June 30, 2017, have been transitioned to DC accounts effective June 2020. **To avoid creating future pension liabilities and to adequately fund the pensions future retirees, the JRS and remaining TRS benefit accruals must be frozen by January 1, 2022.** Members will retain the benefits they have accrued to date, subject to the benefit reduction discussed below. Future benefits must be based on contributions and earnings in new defined contribution retirement accounts. This will result in consistent and equitable treatment across ERS, TRS, and

JRS, where all employees will contribute to segregated DC accounts. Going forward, employees should have certainty that their contributions and investment returns will be safeguarded for the future through managing their own segregated accounts.

The DB freeze savings over time produce significant savings (growing to over $300 million per year by FY2044) which will play a significant role in restoring long-term adequate funding. The freeze will be implemented through the Plan of Adjustment and is slated to take effect in January 2022.

The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects:

- Participants eligible to retire at the freeze date retain eligibility to retire at any time based on the benefit that has accrued through the freeze date. Otherwise:
  - Individuals that have yet to vest in a benefit amount will be allowed the opportunity to earn additional service towards vesting after the freeze; the benefit upon vesting will be calculated based on service as of the freeze date, with prorations of the full 10-year benefit based on years of service less than 10 years for judges with shorter tenures;
  - Certain judges within six months of service as of the freeze of reaching 30-year enhanced service benefits will be granted six months to grow into a modified enhanced 30-year benefit;
  - Normal retirement eligibility will be delayed up to three years for those not yet eligible for retirement as of the freeze date;
- Future Cost of Living Adjustments (COLAs) will be eliminated;
- Minimum benefits and bonuses will be eliminated for future retirements;
- The ability to purchase additional years of service will be eliminated; and
- Future terminations due to disability will be entitled to the same benefits as regular terminations.

### 20.2.2  8.5% pension benefit reduction

Notwithstanding the reduction in expenditures throughout the Commonwealth's budget, contractual debt service remains unaffordable. Retirement plan participants, like other unsecured claimholders, therefore face a reduction of up to 8.5% in the amounts paid to them by the Commonwealth.[340] **A reduction in pensions (with protections for participants close to the poverty level) is necessary for the Commonwealth to achieve long-term fiscal stability.** The goal is a balanced approach to restore fiscal health to Puerto Rico while ensuring that cuts to retirement benefits occur in a manner that protects any retirees from falling into poverty. The proposed reduction, while significantly smaller as a percentage reduction than those faced by other unsecured claims, including general obligation (GO) bondholder claims and General Unsecured Claims, will still represent a significant reduction in retirement income for many retirees. This treatment is similar to the level of reduction in pension benefits relative to reductions faced by other creditors that has been seen with other government systems facing pension funding crises.[341]

---

[340] As per the terms of the Plan Support Agreement reached between the Oversight Board and Retiree Committee on June 7, 2019 and first reflected in the 2020 Fiscal Plan. In comparison, the 2019 Fiscal Plan included a reduction that was expressed as a marginal reduction to benefits above a threshold that varied by position and was indexed, resulting in a 10% average reduction in monthly pension benefits (including medical insurance bonuses). The revised formulation is a simplified 8.5% flat reduction to the monthly pension benefits (excluding medical insurance bonuses) that is limited by a single $1,500 per month threshold ($1,200 per month in the 2020 Fiscal Plan), below which benefits are not reduced

[341] For example, in Detroit and Rhode Island, pension cuts ranged from 0-30% across beneficiary categories

Although the benefit reduction will be 8.5%, this reduction will not apply to those with monthly pension benefits of less than $1,500 per month and will not reduce anyone's monthly benefits below such level.[342] This represents an enhancement to the original threshold of $1,200 agreed under the Plan Support Agreement reached with the Committee of Retirees, which was already a smaller reduction than the original terms proposed by the Oversight Board. As a result of this change, the threshold is now above the average benefits for teachers of $1,450[343] and average benefit of $1,322 for police (neither of which have access to Social Security). *Exhibit 142* illustrates the current distribution of participants by monthly benefit amount across the Commonwealth's retirement systems.

EXHIBIT 142: DISTRIBUTION OF BENEFIT AMOUNTS BY RETIREMENT SYSTEM

| Monthly benefit amount | ERS | | TRS | | JRS | |
| | Number of pensioners | % of total pensioners | Number of pensioners | % of total pensioners | Number of pensioners | % of total pensioners |
| --- | --- | --- | --- | --- | --- | --- |
| Up to $1,000 | 71,065 | 59.6% | 12,634 | 27.6% | 37 | 6.9% |
| $1,000 - $1,200 | 9,539 | 8.0% | 3,932 | 8.6% | 8 | 1.5% |
| $1,200 - $1,500 | 12,545 | 10.5% | 8,728 | 19.1% | 23 | 4.3% |
| $1,500 - $2,000 | 12,815 | 10.7% | 7,648 | 16.7% | 34 | 6.4% |
| $2,000 - $3,000 | 9,509 | 8.0% | 12,436 | 27.2% | 51 | 9.6% |
| Over $3,000 | 3,778 | 3.2% | 322 | 0.7% | 380 | 71.3% |

Under this approach, **about 72% of current retirees would receive no reduction in their benefits and no retiree will experience a benefit reduction of more than 8.5%** (*Exhibit 143*).

This formula will also apply to benefits earned through the petition date by current employees who have yet to retire. Overall, about 82% of retirees and future retirees would receive no reduction to their benefits.

---

342 The reduction formula is determined as follows: (1) Calculate the average monthly pension by adding the regular monthly, pension amount, the special law pension, and 1/12 of the Christmas, Summer, and Medicine Bonus payments; (2) Reduce these monthly benefits by 8.5%; (3) Reductions are limited such that the total benefit level (as defined above) is not reduced below $1,500 per month
343 Based on information from ERS as of July 1, 2019

EXHIBIT 143: DISTRIBUTION OF BENEFIT REDUCTION



Distribution of benefit reduction for 2021 Fiscal Plan entities, % of retirees

8.5% reduction — 25%

Reduction of less than 8.5% — 3%

No reduction — 72%

The 2021 Fiscal Plan assumes that this 8.5% reduction shall take effect on July 1, 2022.

### 20.2.3  Covering more government workers in Social Security

Currently, teachers and judges do not participate in Social Security. They do not pay into the program, nor does the Government make a Social Security contribution on their behalf. Unlike ERS members, teachers and judges are entirely reliant on their government pensions for income in retirement. This places them at risk given that government retirement plans are poorly funded. Effective January 1, 2020, police officers, who were similarly situated previously, began actively participating in Social Security.

These groups are exempt from Social Security because of the "Section 218" agreement between the Commonwealth and the Social Security Administration, which stipulates that certain government employees have wages that are includable for Social Security and subject to Federal Insurance Contributions Act (FICA) taxes while others may be exempt from Social Security if they participate in a "qualified replacement plan." Section 218 of the Social Security law provides guidance as to what constitutes a "qualified retirement plan," such as a defined benefit plan with a minimum benefit level or a defined contribution plan in which total employee and employer contributions equal to at least 7.5% of employee wages. Teachers and judges are both in job classifications that, under the Section 218 agreement, are exempted if such a "qualified replacement plan" exists. Under the current TRS and JRS retirement plans, this requirement is met and, therefore, such employees are exempted from Social Security.

Covering these workers under Social Security will provide them with diversified sources of income in retirement, and Social Security's progressive benefit formula will provide a stronger safety net for lower-paid employees. Workers will typically earn greater retirement benefits under Social Security, based on a 6.2% employee contribution and a 6.2% employer (government) match, than they would in a DC plan funded only with a 6.2% employee contribution. For example, a typical full-career government employee retiring with a salary of $35,000 will be entitled to a Social Security benefit of approximately $16,000, in addition to the benefit the employee builds in their defined contribution retirement account.

Social Security retirement benefits are only provided for those who have ten years of covered earnings. Therefore, it would not be worthwhile for older workers, who may not meet the ten-year threshold and do not have other employment in which they were covered by Social Security, to be covered under Social Security. For this reason, only teachers and judges *under the age of 45* shall be covered under Social Security. This can be accomplished without either an employee referendum or new federal legislation by freezing the TRS and JRS plans and reducing the defined contributions for current teachers and judges under the age of 45 and all teachers and judges hired in the future to an amount lower than the 7.5% required by Section 218. This step will trigger mandatory enrollment in Social Security. Concurrently, lowering the employee defined contribution for younger workers will address the loss of take-home pay they would suffer by having to contribute the 6.2% Social Security payroll tax. This approach is consistent with the approach used to implement Social Security participation for police officers in FY2020.

### 20.2.4 System 2000 settlement

Following the agreement with AFSCME documented in the AFSCME Plan Support Agreement, the Plan of Adjustment includes specific treatment for certain ERS plan participants known as System 2000 members. These are generally ERS members hired on or after January 1, 2000.

Employees who joined ERS on or after January 1, 2000 were enrolled in a hybrid cash balance plan. The hybrid account balances were credited with the employee contributions made to the plan and interest that was connected to the overall ERS trust return. As a result of Act 106-2017, these accounts were frozen as of June 30, 2017 and no longer were credited with either employee contributions or interest.

For participants who have not yet retired, providing access to a market interest return can help the participant in achieving greater retirement benefits than the System 2000 contributions. In lieu of receiving a future benefit from ERS, System 2000 participants will receive the value of their contributions and any interest accrued under the terms of the plan through the Commonwealth (approximately $1.5 billion) petition date as a deposit into their Act 106-2017 accounts.

For ERS participants hired prior to January 1, 2000, defined benefits accrued and payable under Act 1 and Act 447 were frozen as of June 30, 2013 by Act 3-2013. As a result, from July 1, 2013 through June 30, 2017, these employees also accrued benefits under a hybrid plan from employee contributions and interest associated with ERS trust returns similar to System 2000. These benefits are annuitized and paid out along with the defined benefits calculated under Act 1 / Act 447. As this portion of the benefit is largely based on employee contributions, the 8.50% benefit reduction described above will not be applied to the annuitized value of these hybrid accounts.

### 20.2.5 Other Plan of Adjustment provisions

The Plan of Adjustment provides that a  pension reserve trust will be established and funded to ensure that future PayGo benefits can be supported regardless of the future economic or political situation in the Commonwealth. The trust will be independently managed by a committee whose members shall meet the independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics and conflicts of interest laws and regulations[344]. Funding for the pension reserve trust is to be provided according to a formula based on the Commonwealth's annual surpluses.[345]

In order to ensure that retirees may benefit from the Commonwealth's outperformance of 2020 Fiscal Plan financial projections, the Plan of Adjustment also contemplates a mechanism whereby

---

[344] Article LXXX, Governance and Provisions regarding Pension Reserve, Section 80.2, page 118 of the Amended Plan of Adjustment published during March 8, 2021

[345] Please refer to Article LXXX – Governance and Provisions Regarding Pension Reserve in the March 8, 2021 Amended Plan of Adjustment for additional detail

retirees subject to the aforementioned reduction in monthly pension benefits may see that reduction partially, or even fully, restored in cases where the Commonwealth materially exceeds the financial projections in the Fiscal Plan that is certified by the Oversight Board and is in effect as of the Effective Date of the Plan of Adjustment.[346]

Due to the contingent nature of these provisions, neither the contributions to the pension reserve trust nor the restoration of pension benefits are included in the 2021 Fiscal Plan projections. For additional detail on these and all other Plan of Adjustment provisions, please refer to the published Plan of Adjustment, available on the Oversight Board website, as the authoritative source for information.[347]

The Oversight Board recognizes that there will be costs associated with implementing the various pension related provisions of the Plan of Adjustment.  Therefore, the Oversight Board intends to allocate funds that can be accessed for the execution of these provisions based on services that need to be rendered.

## 20.3   Implementation and enforcement of pensions measures

Advance work will be necessary to prepare the systems for the JRS / TRS freeze and pensions reductions, as well as to ensure proper communications with all Puerto Rican pension recipients. The May 2020 Certified Fiscal Plan assumed the full implementation of pension reform measures by January 1, 2022. Given implementation delays, the 2021 Fiscal Plan assumes that full implementation of pension reform measures will not occur until July 1, 2022.

### 20.3.1   Defined Contribution plan implementation

After almost three years since Act 106-2017 introduced the Defined Contribution accounts for most of the Commonwealth employees, and multiple letters and statements issued by the Oversight Board regarding the importance of implementing these accounts, individual accounts for participants were funded and employees received access to view and manage their account balances in June 2020. In addition to government employees being able to view their account balances, they now have the ability to select their investments, designate their beneficiaries, transfer balances to other investment funds and increase their contributions. Prior to this, employee contributions to their Defined Contribution accounts were held in a temporary trust with nominal interest accruals. By fully funding the individual accounts, the participants are being provided access to their market returns implicitly as promised by the Government. Current and future public sector workers can now have confidence that the funds being invested toward their retirement are being treated with the appropriate level of care and afforded the opportunity to grow over time. It is precisely because the Government has no financial obligation for these retirement benefits, that the Government must continue honoring its fiduciary obligation for implementing the Act 106 plan and transferring employee contribution in a timely manner (i.e. by 15th day of the following month).

During this implementation delay, the Oversight Board repeatedly identified instances where the Government has failed to ensure employee withholdings are transferred immediately to the temporary trust where account balances are being held. On April 30, 2019 and subsequently on February 21, 2020, the Oversight Board notified the Commonwealth that it had identified agencies that had withheld employee contributions intended for participants DC accounts but had failed to transfer these dollars to the Retirement System.  As a result of this follow-up and ongoing monitoring by the Oversight Board, the Oversight Board made pertinent referrals to the Department of Justice, and individual contributions has decreased  97%. The Oversight Board

---

[346] Please refer to the definition of "*Benefit Restoration*" and *Article XLII - Provisions For Treatment Of Active And Retired Employee Retirement Benefit Claims (Class 39A Through 39E)* in the March 8, 2021 Amended Plan of Adjustment for additional detail

[347] The Plan of Adjustment is available from the Oversight Board as amended during March 8, 2021

continues to urge the Government of Puerto Rico to instruct agencies, municipalities, public corporations, and those entities that manage government payroll to deduct and immediately address the transfer of these individual contributions. A failure to honor this fiduciary obligation increases the risk of insufficiency in retirement income, the potential futility of the benefit offering, and the diminishing viability of employment in the public sector.

Additionally, during 2020 the Oversight Board made a recommendation to the Government pursuant Section 205 of PROMESA for legislative intervention to amend Act 106 in order to define the default investment option as a target data life-cycle fund, rather than a principal preservation fund once the transition to the Defined Contribution plan became complete. The Oversight Board believes that the default investment option offered by the Defined Contribution Plan should encourage participants to adequately invest their accounts to generate retirement stability. The current default option of the principal preservation fund is inadequate for this task, and as such the Oversight Board feels it is important to change the default investment option to the target date life-cycle fund. This vehicle produces significantly higher long term returns by providing access to higher returning investments during the period of participants' lives when they are better able to handle the risk. While the Government has declined to take the Board's suggestion on this matter, the Oversight Board remains committed to promoting this change since the default option of a principal preservation fund, as currently provided under Act 106, is inadequate for retirement readiness.

In addition, the Oversight Board believes that the use of a principal protection fund as the default investment option is not compliant with fiduciary responsibilities under the Employee Retirement Income Security Act of 1974 (ERISA). The use of target date funds as an investment option, however, is largely supported by similar plans in both the private sector and is consistent with the investment vehicles used by many other governments.

As part of meeting its fiduciary responsibility, in selecting which target date funds to offer, the Commonwealth should select funds that have a demonstrated track record of appropriate management and achieving returns that are justified by their fees. This will provide Commonwealth employees with the tools they need to be adequately prepared for retirement.

After the Oversight Board's recommendation, the Government declined to implement. The Oversight Board urges the Government to reevaluate or continue to provide constant education to DC participants so that each individual can manage their investment options and make decisions that best benefit individually.

### 20.3.2  Monitoring of pension related legislative activity

The Oversight Board has been actively monitoring a series of Acts and proposed legislation that has sought to expand the retirement system for the Commonwealth. The Oversight Board has, on numerous occasions, expressed concern over the compliance of these pieces of legislation with the provisions of PROMESA.

In August 2020, the Commonwealth enacted Act 80-2020 granting an incentivized retirement program for certain ERS participants, Act 81-2020 granting enhanced benefits to members of the Puerto Rico Police Ranking System, Fire Fighters Corps Bureau, Puerto Rico Custody Officers Corps, and medical emergency technicians of the Medical Emergency Corps Bureau and the Municipal Medical Emergency System, and Act 82-2020 granting credit to retirement benefits arising from unused sick leave balances for participants under the Teachers Retirement System. Contrary to the requirements of PROMESA, the Commonwealth did not provide sufficient financial analysis to demonstrate that any additional costs generated by these Acts would be offset with savings identified by the Commonwealth.  In connection with multiple meetings with the legislature and other stakeholders regarding this and other pending Acts, the Oversight Board has asked the Government to delay implementation of each of these laws until a full and accurate study has been performed to ensure that the Commonwealth has identified a significant source of savings to pay for the costs of the benefits provided under the laws.  On November 20, 2020, the

280

Commonwealth notified the Oversight Board that these laws would not be implemented until an agreement was reached with the Oversight Board concerning the financial viability of each Act. In the meantime, the Government has proposed House Bill 164 which would further expand the number of participants eligible for enhanced benefits under Act 80, and House Bill 265 which would do the same to Act 81.  On April 6, 2021 the Government provided an initial analysis summarizing the data for participants who had applied for benefits under Act 80 (prior to any amendments proposed under House Bill 164). The Government identified that of 10,553 participants applying for the law, 6,564 were in positions identified as essential, potentially requiring replacement, and concluded that of the 67 municipalities and 82 agencies and public corporations with applicants, only 16 municipalities and 11 agencies and public corporations would see savings in year 1.  This analysis and the associated data are in the process of being reviewed by the Oversight Board.

House Bill 120 ("HB120") was introduced by the Legislature in January 2021 and purports to dictate the only terms of a plan of adjustment for the Commonwealth with which the Commonwealth government will be permitted to cooperate to restructure the Commonwealth's enormous debt.  The Bill would eliminate all pension reforms contemplated by the 2021 Fiscal Plan (including the freeze of benefit accruals under TRS and JRS and 8.5% cut to benefits over $1,500), along with all essential reforms implemented under Act 106-2017 ("Act 106"), and would reinstate all public pension systems as they existed prior to Act 106, and consolidate the source of funding of these unsustainable benefit obligations into one new retirement trust.  The Oversight Board has communicated through letters on January 29, 2021 and February 20, 2021 that it believes the provisions of this law are in violation of PROMESA, rest on false economic assumptions, create an insufficient level of pension funding, reinstates a defined benefit plan in conflict with the 2021 Fiscal Plan, mortgages the future by establishing a vastly underfunded defined benefit plan, and makes false promises to participants.

In addition, the Government has proposed House Bill  533 ("HB 533") which intends to permit those retirees who left the Government through an Early Retirement Program, such as the proposed Act 80, to be eligible for reemployment and House Bill 523 ("HB 523") which grants a vested contractual right to individual pensions in order to prevent impairment under the legal proceedings held in accordance with Title III of PROMESA. These pieces of legislation are under review by the Oversight Board, which actively communicates with the Government to ensure consistency with the requirements of PROMESA. It is important to mention that several historical factors contributed to the underfunded status of the Retirement Systems, such as inadequate employer contribution levels, the enactment of special laws granting new benefits without adequate funding for said benefits, early retirement program or voluntary transition programs, debt issuance that ERS system ultimately could not support, mortgage, personal and cultural loans made to participants. The Oversight Board continues to monitor to ensure that past mistakes are not repeated through new pension legislation such as the laws and bills described above.

## 20.4  PayGo Compliance

In addition to establishing the Defined Contribution Plan, the passage of Act 106-2017 established the Pay-as-you-Go ("PayGo") system. The PayGo system, under which pension benefits are paid out of the annual Commonwealth budget rather than via amounts previously set aside into pension trust funds, was implemented to ensure the continued payment of benefits to retirees given that the ERS, TRS, and JRS trust funds were effectively insolvent. Currently, PayGo obligations represent approximately 20% of General Fund expenditures.

Section 2.1(b) of Act 106-2017 establishes a PayGo Fee that is "equal to the amount paid to Retirees and Beneficiaries of each covered entity." The responsibility for entities to pay this Fee and the authority of the Office of Management and Budget to collect the fee is further outlined in the legislation. Section 2.1(f) authorizes the Office of Management and Budget to "withhold from

the appropriations made to the agencies of the Government of Puerto Rico, the necessary amounts for the payment of the Pay-Go Fee, if it determines that such withholding is necessary to ensure that covered entities fulfill their obligation." Section 3.5(2) further subjects any entity who fails to remit the Fee to a series of corrective actions, including the following:

- A demand by the Retirement Board for the immediate transfer of the Pay-Go fee or delinquent contribution

- The Secretary of Treasury may make adjustments to the "accounts, obligations, and advances that the Department of Treasury must remit to the delinquent employer"

- The Municipal Revenue Collection Center, "CRIM", may remit the Pay-Go fee or delinquent contribution from the "unencumbered balance of the property tax and other revenues that the Municipalities are entitled to receive."

- The Office of Management and Budget may withhold any form of appropriations to agencies necessary to meet the Pay-Go Fee obligation

The Oversight Board continuously monitors the status of entity compliance with paying the Pay-Go Fee. *Exhibit 144* demonstrates the significant level of PayGo debt owed by Commonwealth Government Entities and Municipalities as of May 15, 2020.

EXHIBIT 144: CURRENT PAYGO DEBT FOR MUNICIPALITIES AND PUBLIC CORPORATIONS

| Entity type | FY2018 debt, $M | FY2019 debt, $M | FY2020 debt, $M | FY2021 debt, $M | Total[1], $M |
|---|---|---|---|---|---|
| Municipality | 19 | 75 | 5 | 47 | 154 |
| Commonwealth Government entities | 43 | 19 | 11 | 54 | 120 |
| **Total** | **62** | **95** | **16** | **101** | **274** |

1 Total PayGo Debt as of February 2021 per AFAAF Monthly Report 6(A) February PayGo Report provided during April 15, 2021

There has been an effort to have delinquent agencies and municipalities to enter into payment plans to resolve historic PayGo debt. As of February 15, 2021, municipalities and public corporations have executed repayment plans, with two other active negotiations ongoing for the municipalities of San Juan and Guaynabo. Signed payment plans account for ~$48 million of the $274 million in outstanding debt. The Oversight Board will continue to closely monitor the municipalities budget and compliance with current year PayGo debt and the execution of Payment Plans.

It is important to mention that after the Act 29-2019 per Title III Court ruling on April 15, 2020, the Oversight Board engaged with the Retirement Board, CRIM and Municipalities concerning the implementation of a repayment waterfall that Municipalities received from Excess CAE (refer to CRIM 2021 Fiscal Plan, Section 7.4 for further information). The Oversight Board reached out as well after becoming aware that FY2020 Payment Plans were being executed regardless of the repayment waterfall and notified Retirement Board the inconsistency with the implementation agreed. However, the Oversight Board made clear for prior periods municipalities with FY2018 and/or FY2019 debts must enter into payment plans for such periods in accordance with certified Commonwealth and CRIM Fiscal Plans and Article 2.1 of Law 106-2017, as amended.

EXHIBIT 145: MUNICIPALITIES REQUIRING PAY-GO PAYMENT PLAN EXECUTION

| Municipality | PayGo Debt not in Payment Plan | Amount of Debt, $ |
|---|---|---|
| Arecibo | FY2018 Debt | 1,846,779 |
| Maricao | FY2018 Debt | 284,596 |
| | FY2019 Debt | 494,941 |
| Cataño | FY2019 Debt | 134,584 |
| San Juan | FY2018 Debt | 9,415,391 |
| | FY2019 Debt | 56,025,885 |

The Oversight Board has further discussed with AAFAF possible remedies to further reduce the outstanding debt. AAFAF has the authority under Section 8(e) of Act 2 – 2017 to appoint a representative to oversee compliance with the execution of the 2021 Fiscal Plan, including compliance with the requirement that future and past due PayGo Fees be remitted in a timely fashion. Further, Section 8(b)(iv) of Act 2 – 2017 permits that when reports indicate an entity's cash flows are not consistent with the Certified Budget, AAFAF may "direct and perform banking transactions on behalf of the appropriate entities of the Government of Puerto Rico to make debt service payments, among others." The Oversight Board and AAFAF have discussed actions including, but not limited to, withholding general fund revenues and/or debiting existing cash accounts to satisfy PayGo Fee debt.

Proper long-term health of the PayGo system requires constant compliance with and monitoring of the PayGo Fees as set forth in Act 106-2017. Failure to ensure these payments continue to be made would threaten the ability of the General Fund to sustain pension payments in the long-term and ultimately harm the welfare of Commonwealth retirees.

### Pension Working Groups

**Social Security:** The Oversight Board reached out to the Government on February 27, 2020 to convene an interagency working group (the "Social Security Working Group") to ensure the effective and timely implementation of Social Security for teachers and judges. The expansion of access to Social Security for public workers has been a goal since the 2017 Fiscal Plan, and the Social Security Working Group has been created to prevent additional delays in ensuring that public employees are eligible for this benefit, particularly in light of past delays and challenges experienced as part of the implementation process. On July 19, 2019, the Governor enacted legislation (Act 71-2019) to allow for the participation of police officers in Social Security. Multiple Fiscal Plans, including the 2019 Fiscal Plan, called for police officers to have access to Social Security no later than July 1, 2019. To provide adequate funding, the certified Commonwealth budgets also provided the appropriations needed for the Police Bureau to fund their Social Security contributions. Nevertheless, the implementation of Social Security for police was delayed by six months to January 1, 2020.

The Social Security Working Group will be addressing the lessons learned from the implementation of Social Security for police officers, payroll implementation, and optional participation election with the participation of members selected by the Government from AAFAF, the Department of Education, the Retirement Board, the Department of the Treasury, and the Office of Court Administration, as well as representation from the teachers' union.

Additional Working Groups are being formed to facilitate the establishment of the Pension Reserve Trust, including establishment of an independent board to oversee the Trust, and

coordinate with ERS regarding administrative functions post Act 106-2017. These Working Groups are being formed based on needs identified as a result of on-going discussions between the Oversight Board and various agencies in connection with the Oversight Board's focus on the timely payment of pensions to the Commonwealth's retirees.

The Working Groups have been regularly meeting, developing timelines, and assigning the tasks necessary to meet this goal, including educational materials for all teachers and judges. In connection with this, and at the Oversight Board's recommendation, the Social Security Working Group is also participating in implementation discussions related to the Defined Contribution plan so that all retirement related withholdings are coordinated. This is important in particular for police whose minimum Defined Contribution requirements have been reduced to 2.3%, with an additional 6.2% being withheld for Social Security FICA purposes. Based on the terms of their Section 218 agreement, police that want to maintain their eligibility for Social Security coverage cannot be allowed to contribute to their Defined Contribution accounts more than the 7.5% bar for a qualified replacement plan under Social Security law. Similar protocols will also need to be in place for teachers and judges that eventually are enrolled in Social Security.[348]

The 2021 Fiscal Plan expects the Working Groups to accomplish the milestones outlined in *Exhibit 146* below.

### 20.4.1  Required implementation actions

To achieve the 2021 Fiscal Plan pension reform measures, certain action items must be implemented according to the schedule described in *Exhibit 146*. Multiple steps are needed to implement each of these action items.

EXHIBIT 146: REQUIRED IMPLEMENTATION ACTIONS FOR PENSION REFORM

| | Action item | Target date | Sample intermediate steps |
|---|---|---|---|
| **To be completed by FY2022** | **Enroll teachers and judges** under age 45, as well as new hires, **in Social Security** | ▪ June 2021<br>▪ August 2021<br>▪ October 2021<br>▪ October 2021<br>▪ December 2021<br>▪ January 2022 | ▪ Establish controls to prevent DC contributions from exceeding 7.5% if enrolled in Social Security<br>▪ Draft legislation to reduce DC contributions to 2.3% to teachers/judges under 45 and new hires<br>▪ Communicate changes to members<br>▪ Design reporting and reconciliation steps required for Social Security Administration compliance<br>▪ Update PRDE and Office of Court Administration payroll systems to reflect revised withholdings<br>▪ Confirm law modified to reflect TRS/JRS freeze prior to enrollment in Social Security |
| | **Implement JRS / TRS freeze** and transition to segregated DC accounts | ▪ September 2021<br>▪ October 2021<br>▪ December 2021<br>▪ January 2022 | ▪ Update processes to allow for DC deposits on 15th of following month<br>▪ Communicate changes to members<br>▪ Establish and provide access DC accounts for judges and pre-2014 teachers<br>▪ Update pension calculation systems to reflect frozen benefit provisions |
| | **Implement 8.5% pension reduction** | ▪ November 2021<br>▪ April 2022<br>▪ April 2022<br>▪ May 2022<br>▪ July 2022 | ▪ Collect census data for determination of benefit subject to cut<br>▪ Update ERS pension calculation systems for cut formula, including $1,500 threshold<br>▪ Communicate changes to members<br>▪ Update ERS/Hacienda records for benefit amount post cut<br>▪ Establish pension reserve trust and define governance protocols, including: independent board, investment policy and mechanisms for transferring surplus |

The implementation of these milestones is the combined responsibilities of AAFAF, Treasury Department, Department of Education, Retirement Board, and the Office of Court Administration. These agencies are actively participating in Working Groups towards

---

[348] Internal Revenue Service, "Federal State Reference Guide", 2020

achievement of these key milestones. The Oversight Board continues to urge the Working Groups outlined above to take responsibility for identifying all intermediate milestones, as well as establishing the necessary detailed timelines and responsibilities so that these steps will be complete when the Plan of Adjustment is approved.

# Chapter 21. Ensuring successful implementation and fiscal controls

As discussed in *Chapter 14*, the Office of the Chief Financial Officer (OCFO) has broad responsibility for improving fiscal management as outlined in the 2021 Fiscal Plan. Below are specific details regarding the necessary implementation steps and reporting required by the 2021 Fiscal Plan.

## 21.1   Implementation architecture

Developing a centrally run Project Management Office (PMO) is an important step toward ensuring the implementation and tracking of the core operational transformation and agency efficiency measures that will achieve savings targets under the 2021 Fiscal Plan. The Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym) should serve as the central PMO with defined reporting to the Governor of all economic and transformation measures. The PMO should be run by AAFAF's senior leadership, regularly coordinate across the Office of Management and Budget (OMB) and the Office of the Administration and Transformation of Human Resources (OATRH, by its Spanish acronym), work directly and frequently with Agency PMOs, and report directly to the Governor's office.

Individual Agency PMOs should be established with direct reporting to the PMO. Each agency head shall be responsible for developing and implementing a PMO structure that best fits their respective agency groupings. They are expected to coordinate across all agencies in their grouping, lead reforms for the grouping and be responsible for achieving their agency grouping savings targets. Through this PMO structure, the Government will be positioned to effectively manage and implement the 2021 Fiscal Plan. As such:

- Designated agency heads should lead the Agency PMOs and report directly to AAFAF.

- Agency PMOs should undertake the required work to implement initiatives.

- The daily activities of PMOs should be managed and undertaken by staff knowledgeable in the relevant subject matter areas, and assigned members should meet regularly with PMO leadership to report on progress and facilitate necessary decision-making.

- Agency PMOs shall be responsible for assembling a taskforce to: complete validation and definition of full scope of projects and priorities, finalize reporting tools and tracking responsibilities, and perform ongoing weekly tracking and reporting.

The PMOs should ensure continued implementation progress through robust tracking and reporting tools that foster growth in transparency and ownership, including:

- **Project charters** that establish the goals and structures of measures, identify risks and obstacles, and establish metrics and KPIs.

- **Implementation plans** with detailed layouts of each activity required for accomplishing sub-measures, risks / mitigants for each activity, clear leaders and owners for each activity,

and metrics and KPIs. These should include a "live" calendar of updates and status of each measure.

- **Implementation dashboard / tracker** that provides a single snapshot of the entire transformation plan; and allows management to know the status of each initiative in a distinct status: Complete; In Progress; Delays; Major Issues. This tracker will allow the Oversight Board to monitor progress and ensure enforcement of measures and reforms.

- **Sub-measure dashboards** that provide "zoomed in" views of a specific sub-measure, display progress with details / commentary on project status, include agreed upon milestones / dates to track progress, and provide mitigation plans.

- **Implementation monthly reports** that provide a more detailed perspective on progress, including several key reporting elements: a) headcount by regular and transitory with more details in specific agency cases, b) budget to actuals by cost category and concept, c) milestones progress, d) KPIs/leading indicators, e) achieved savings to date. These reports provide important codification of progress as well as context for monthly meetings where agencies, OCFO and Oversight Board representatives can hold meaningful discussions on progress, items at risk and ongoing mitigating activities.

## 21.2   Oversight Board and OCFO implementation collaboration

The Oversight Board has played, and will continue to play, an active role in overseeing all aspects of Fiscal Plan implementation. The OCFO must provide the Oversight Board and its staff the information needed to effectively track the status of key initiatives included in the 2021 Fiscal Plan, which is necessary to measure overall progress against the fiscal and budget objectives outlined therein.

For example, the OCFO will provide Oversight Board staff with key management information on a timely basis, including:

- Implementation plans submitted by individual PMOs

- Progress reviews (including milestones and metrics) against key structural and fiscal measures

- Reviews of key implementation risks, including assessments of the likelihood of realization, potential impact, and potential mitigations

- Monthly progress reports submitted by individual PMOs

## 21.3   Reporting on Fiscal Plan reforms

**The fiscal and structural reforms described in the 2021 Fiscal Plan represent a significant and transformative effort across the Government.** As such, there are strict reporting requirements needed to ensure savings and growth targets are being achieved on time, and to identify any major risks to reform to course correct at an early stage.

**To date, however, the Government has struggled with implementing reforms and reporting on this implementation in a timely manner.** Progress has, as a result, been inconsistent and incomplete, and many agencies appear unprepared to meet savings targets. While some progress on measures has been made, many reforms are delayed or not occurring. In cases where certain reforms will not occur, the Government must achieve these savings through other means.

286

**The Government shall produce monthly performance reports**, which shall be submitted to the Oversight Board on the 15th of each month, demonstrating the progress made on all key reform areas. Agency efficiency savings that have been realized should be broken down by grouping and agency across payroll and non-payroll savings (as well as on an object level where needed) and display the performance of the realized agency efficiency savings for each agency against the projections as set forth herein. Implementation reports should explicitly explain how budget-to-actuals reports tie to agency actions and reforms, and what is driving major discrepancies. Reporting shall also include detail on use of funds for professional services, as well as within the Other (or "englobadas") cost concept, such that these expenses can be appropriately managed. Currently, less than 30% of agency groupings have consistently provided implementation reporting. The Government must improve reporting such that it and the Oversight Board can hold agencies accountable for achieving savings through the implementation of fiscal measures.

If, after any fiscal quarter, the projected agency efficiency savings for any grouping is not realized, the shortfall from that fiscal quarter will be added to the agency efficiency savings target for the corresponding grouping for the following quarter. As needed, the Oversight Board will also hold public hearings to review implementation progress. Should there be underperformance in agency efficiency savings for any grouping, the Oversight Board may rely on its powers and rights pursuant to PROMESA to take measures to enforce reductions in the amount of unrealized savings.

## 21.4   Ensuring fiscal controls and transparency

Consistent with *Chapter 15*, the OCFO must improve fiscal governance, accountability, and internal controls over the Government's finances and budget. To ensure that there is transparency into the Government's progress toward meeting its savings targets, the Government must meet the following milestones (*Exhibit 147*).

## EXHIBIT 147: FISCAL CONTROLS & REPORTING KEY IMPLEMENTATION MILESTONES

| | Reporting Requirement | Closing of the 1st Reporting Period | Cadence for FOMB Reporting [A] | Cadence for Public Reporting [B] | Reporting Requirement Source |
|---|---|---|---|---|---|
| **I. Cash Reporting** | A. Treasury Single Account (TSA) Liquidity (Actuals vs. Liquidity Plan) | 10/06/2018 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | B. Consolidated TSA including Agency Detail (Actuals vs. Liquidity Plan) | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | C. Independently Forecasted Component Units (IFCUs) (Actuals vs. Liquidity Plan) | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | D. Liquidity - Office of the Comptroller, Senate, House of Representatives, Judiciary Branch, Civil Rights Commission, OMBUDSMAN (Actuals vs. Liquidity Plan) | 10/31/2018 | Monthly | Monthly (beginning 11/30/18) | Fiscal Plan |
| | E. Summary of Bank Account for the Government of Puerto Rico and its Instrumentalities | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| **II. Additional Actuals Reporting** | A. Budget to Actual Report - Including Revenues (including gross revenues, tax credits collected, and net revenues)[1] | | | | |
| | 1. General Fund | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | 2. Non-General Fund Funds (including Special Revenue Funds) [2,3] | 10/31/2018 | Monthly | Monthly (beginning 1/31/19) | Fiscal Plan |
| | 3. Federal Funds | 10/31/2018 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | 4. IFCUs | 10/31/2018 | Monthly | Monthly (beginning 1/31/19) | Fiscal Plan |
| | 5. Comptroller, Senate, House of Representatives, Judiciary, Civil Rights Commission, OMBUDSMAN | 10/31/2018 | Monthly | Monthly (beginning 11/30/18) | Fiscal Plan |
| | B. Central Government Payroll and Headcount | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | C. IFCU Payroll and Headcount [4] | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| | D. Central Government 3rd Party Accounts Payable | 10/06/2018 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | E. Central Government Invoice Processing KPIs | 10/31/2018 | Monthly | Monthly (beginning 11/30/18) | Fiscal Plan |
| | F. Tax Credits | | - | - | Fiscal Plan |
| | 1. Liability | 12/31/2018 | Quarterly | Quarterly (beginning 1/31/19) | Fiscal Plan |
| | 2. New credits granted | 10/31/2018 | Monthly | Monthly (beginning 1/31/19) | Fiscal Plan |
| | 3. Credits used (direct impact on collections) | 12/31/2018 | Monthly | Monthly | Fiscal Plan |
| | 4. Tax Expenditure Report | 12/31/2018 | Yearly | Yearly | Fiscal Plan |
| | G. CATRM Attendance for the Preceding 4-Week Period | 12/31/2018 | Monthly | Monthly | Fiscal Plan |
| | H. Emergency Reserve Fund Quarterly Reporting | 5/15/2020 | Weekly, Monthly | Weekly, Monthly | Fiscal Plan |
| | I. Budget to Actual CAPEX Report | 11/15/2020 | Monthly | Quarterly | Fiscal Plan |
| | J. Prior Year Fund Extensions and Releases | 8/15/2021 | Monthly | Monthly | Fiscal Plan |
| | K. Quarterly budget to actual revenues, expenditures, and cash flows, together with a variance analysis, of the territorial government during the preceding quarter | 10/31/2018 | Quarterly | Quarterly | Fiscal Plan |
| | L. Revised Year End Quarterly budget to actual revenues, expenditures, and cash flows, together with a variance analysis, of the territorial govt. during the preceding quarter (60 days after year end) | 8/31/2019 | Annual | Annual | Fiscal Plan |
| **III. Measures and Reforms Reporting (Progress Reports)[C,5]** | A. Structural Reforms (4) | | | | |
| | 1. Labor Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 2. Ease of Doing Business Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 3. Energy Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 4. Infrastructure Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | B. Fiscal Measures (4) | | | | |
| | 1. Office of the Chief Financial Officer | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 2. Revenue Measures | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 3. Pension Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 4. Healthcare Reform | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | C. Agency Efficiencies | | | | |
| | 1. Agriculture | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 2. Corrections | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 3. Culture | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 4. Economic Development | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 5. Environmental | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 6. Executive Offices | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 7. Finance Commission | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 8. Office of the CFO | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 9. Healthcare | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 10. Justice | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 11. Labor | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 12. Land | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 13. Ombudsman | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 14. Public Safety | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 15. Public Works | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 16. Social Welfare | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 17. State | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 18. Universities | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 19. Utilities Commission | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 20. Education | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| | 21. Independent Agencies | 10/31/2018 | Monthly | Quarterly | Fiscal Plan |
| **IV. Macro-economic Indicators** | Macroeconomic Indicators | 12/31/2018 | Quarterly | Quarterly | Fiscal Plan |
| **V. Recovery Funding Reporting** | A. Uses/Disbursement Related to Hurricane Assistance (PWs) | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| | B. Department of Housing | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| | C. Highways and Transportation Authority | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| | D. TSA Vendor Disbursements | 10/31/2018 | Monthly | n/a | Fiscal Plan |
| **VI. PayGo Receivables and Contributions Reporting** | PayGo Receivables and Contributions Reporting | 10/31/2018 | Monthly | Monthly | Fiscal Plan |
| **VII. Certifications and Others** | A. Quarterly revenue forecast update | 10/31/2018 | 45 days after end of every quarter | n/a | Budget |
| | B. Certify that no appropriation of any previous fiscal year (except for appropriations covered by the exceptions authorized in the budget) has been used to cover any expense during the prior fiscal quarter | 12/31/2018 | 15 days after end of every quarter | n/a | Budget |
| | C. Certify that no amount of the (i) Social Security Reserve or (ii) Emergency Reserve has been used to cover any expenses during the prior fiscal quarter | 12/31/2018 | 15 days after end of every quarter | n/a | Budget |
| | D. Payroll transfers per Law 8-2017 | 12/31/2018 | Monthly | n/a | Fiscal Plan |
| | E. Signed legislation Compliance Certificates | n/a | 7 days after a bill is signed by the Governor | n/a | PROMESA |
| | F. Sabana file submission | n/a | n/a | n/a | Budget |
| | G. Quarterly budget submission | n/a | n/a | n/a | Budget |

1 Revenues must include gross revenues received, less tax refunds; SRF revenues must be included.
2 The following fund types are included in non-GF reporting: (1) FEIE (Fondos Especiales Estatales or Special State Funds) – This fund type should only include revenue designated by specific laws; (2) OI (Otros Ingresos or Other Income) - This fund type should only include non-recurring revenue with specific expenses tied to it. No recurring income should be included or recognized under this fund type OI; and (3) IP (Ingresos Propios or Own Income) – This fund type should only include revenue generated by the agencies or public corporation through their services.
3 The monthly deliverable must include: (1) All revenues and expenses for the current FY; (2) The cash balance for each fund type as of the beginning of the Fiscal Year; (3) The new cash earned during the current fiscal year; and (4) the net cash balance.
4 The report must include (1) the fund type; (2) overtime amounts; and (3) the breakdown of benefits.
5 Implementation plans must be provided for each agency under each grouping; the full list of the agencies is included in the Appendix of the Fiscal Plan.
6 Reporting must include: (a) Monthly monitoring by each government agency of key performance indicators for each of the fiscal reform measures. (b) Monthly self-reported realized savings achieved year to date by agency and agency groupings. (c) Implementation dashboard / tracker that provides status of each initiative in a distinct status. (d) Sub-measures dashboard

A Unless otherwise specified, monthly reporting to the Oversight Board must be received 15 days after the end of a reporting period.
B Unless otherwise specified, public reporting must be published 30 days after the end of a reporting period.
C Report shall be structured in a way that allows for the confidentiality of the agreements to be maintained, but the overall (summarized) numbers and trends to be available to the public.

In addition to meeting the above milestones, the Government must proceed according to the following budgetary requirements:

■ The Department of the Treasury will remit to: the Legislative Branch and its components, the Judicial Branch, the University of Puerto Rico (UPR), and the non-profit entities that receive funds from the General Fund, monthly and in advance, the budgetary allotments corresponding to one-twelfth (1/12) of the budget allocation provided herein for such entities. The one-twelfth monthly allocation to each entity (except with respect to the Judicial Branch) shall be subject to the 2.5% withholding set forth in the section below during the first three quarters of FY2022.

■ The Director of the OMB may authorize the encumbrance and disbursement of up to 97.5% of each appropriation intended for encumbrance and disbursement during the first three quarters of FY2022. The Director of OMB shall withhold the remaining 2.5% of each appropriation until after the end of the third quarter of FY2022. Such withheld percentage of each appropriation shall only be encumbered and disbursed during the fourth quarter of FY2022 if (1) the first eight months of actual General Fund revenues reported to the Oversight Board reach the revenue forecast in the 2021 Fiscal Plan for that period and (2) the encumbrance and disbursement is approved first by the Oversight Board and then authorized by the Director of OMB. If actual General Fund revenues for the first eight months of the FY2022 fail to reach the revenue forecast for that period, the amount of the withheld percentage of each appropriation that may be encumbered and disbursed shall be reduced proportionally according to the negative budget variance between projected and actual General Fund revenues. Notwithstanding the foregoing, PayGo appropriations, Consent Decree amounts, Housing and Transportation Authority (HTA) appropriations, economic incentive funds and distributions, cigarette and rum distributions, allocations of SUT to FAM and agencies in the Department of Public Safety and in the Health groupings, as defined in the 2021 Fiscal Plan, shall not be subject to the 2.5% withholding requirement.

■ Notwithstanding any statement here to the contrary, the appropriations listed in the General Fund in Budget FY2022 under (1) Allocation of the Sales and Use Tax (SUT) to the Municipal Administration Fund (FAM, by its Spanish acronym) (excluding Debt Portion); (2) Outflow of the Special Fund for Economic Development (FEDE, by its Spanish acronym) Portion of Corp. Income Taxes and Non-Resident Withholding; and, (3) cigarette and rum distributions, are entirely dependent on the level of revenues collected therefrom and, as such, the disbursements of those appropriations will be gradual and subject to the actual collections thereunder. No expenditure, pledge, or obligation of any such funds may be made until such time as the revenues are actually collected and received.

■ No later than 45 days after the closing of each quarter of FY2022, the Secretary of Treasury shall revise the projected net revenues of the General Fund for FY2022 (the "Quarterly Revision") and notify the revision to the Director of the OMB, the Governor and the Oversight Board. The Quarterly Revision shall project future revenues based on actual General Fund revenues and include revisions to the assumptions used to generate the General Fund's net revenue projections.

■ All appropriations authorized in any prior fiscal year, including appropriations without a specific fiscal year, are eliminated and no disbursement of public funds may be covered by such appropriations, except the following which the 2021 Fiscal Plan redeploys as current appropriations, subject to Oversight Board adjustment at any time: (1) appropriations authorized in the fiscal year to carry out permanent improvements that have been encumbered, accounted for and kept on the books but not exceeding two fiscal years on the books; (2) appropriations in the Certified Budget for equipment with procurement cycles that extend beyond the end of the fiscal year, which are encumbered on or before June 30, 2022; (3) the portion of the appropriations authorized for fiscal year that have been encumbered on or before June 30 of such fiscal year, which shall be kept in the books for 60 days after the termination of that fiscal year and after those 60 days no amount shall be drawn against such

portion for any reason; (4) the appropriation in the amount $130 million for the emergency reserve included in the FY2021 Certified Budget and required by *Section 5.2.8* in the 2021 Fiscal Plan (the "Emergency Reserve"); (5) the unobligated portion of the Public Assistance Federal Fund Matching appropriation included in the FY2021 Certified Budget; (6) the unused appropriations for the UPR Scholarships Fund included in the FY2019, FY2020, and FY2021 Certified Budgets, which is held under the custody of the Department of Treasury; (7) unused appropriations for use in audit services held at the Department of Treasury; (8) FY2021 unused General Funds intended for Medicaid related expenditures; (9) unused Title III funds; (10) reported unused funds from Department of Health's Mental Disability program until the end of the following fiscal year; (11) unused Special Revenue Funds collected during prior fiscal years for Ports Authority, Puerto Rico Convention Center District Authority and Puerto Rico Tourism Company, but limited to the amount of the FY2022 Special Revenue Funds appropriation; (12) reported unused funds from Department of Correction and Rehabilitation's Juvenile program; (13) unused appropriations for State unemployment insurance, disability insurance, and chauffeur's insurance, which are held under the custody of the Department of Labor and Human Resources; and (14) unused appropriations for milestones and incentives held under the custody of OMB as approved; (15) unused appropriations for municipal voluntary cost sharing milestone; (16) unused appropriations for the school and road maintenance funds; and (17) FY2021 unused General Funds intended for Catastrophic Illness Fund related expenditures. In addition, this restriction on the use of appropriations of prior fiscal years shall not apply to: (i) programs financed in whole or in part with federal funds; or (ii) orders by the United States district court with jurisdiction over all matters under Title III of PROMESA; or (iii) matters pertaining to any consent decree or injunction, or an administrative order or settlement entered into with a federal agency, with respect to federal programs.

■ On or before July 31, 2021, the Treasury Secretary, Executive Director of the Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym), and the Director of the OMB shall provide to the Oversight Board a certification indicating the amounts of unused FY2021 appropriations for all items of the previous section. If the Government fails to submit said certification, the amount of unused funds in items 1 and 2 will not carry over to the following fiscal year.

■ Each power of OMB, AAFAF or the Department of the Treasury, including the authorities granted under Act 230-1974, as amended, known as the "Puerto Rico Government Accounting Act" ("Act 230"), to authorize the reprogramming or extension of appropriations of prior fiscal years is hereby suspended.

■ The Oversight Board must approve in writing, in advance, any reprogramming requests for any appropriations approved in this budget. For the avoidance of doubt, this prohibition includes any reprogramming of any amount, line item, or expenditure provided in this budget, regardless of whether it is an intra-agency reprogramming.

■ The Governor shall submit to the Oversight Board all reporting requirements set forth on *Exhibit 147* of the 2021 Fiscal Plan according to the reporting cadence described therein. In addition, if the Oversight Board approves a reprogramming pursuant to the section above, the immediately subsequent report by the Governor must illustrate the specific implementation of such reprogramming, including the amount, the source of the reprogrammed amount identified by government entity and expenditure concept, the Government entity that received such amount, and the expenditure concept to which it was applied.

■ In addition, the Governor shall submit to the Oversight Board a comprehensive reporting package in a similar format to that required and provided in accordance with Section 203 of PROMESA for the following specified programs within different agencies: (1) Department of Education's (PRDE) Special Education Program; (2) PRDE's Remedio Provisional Program (3) Department of Health's (DOH) Adult Hospital Program; (4) DOH's Pediatric Hospital Program; (5) DOH's Hospital Universitario Dr. Ramón Ruiz Arnau (HURRA) Bayamón

Hospital Program; (6) DOH's 330 Centers Payments; (7) DOH's Intellectual Disability Program, (8) Mental Health and Anti-Addiction Services Administration's (ASSMCA, by its Spanish acronym) Río Piedras Hospital Program, and (9) the Department of Correction and Rehabilitation's (DCR) Juvenile Program. Program reporting must include and clearly detail budget to actuals on a concept level basis, any reprogramming of funds within the program, and any reprogramming of funds to/from other programs or agencies.

- In addition, in order to ensure maximum and proper use of federal funds, such as, but not limited to, (1) DRF, (2) CARES, (3) FFCRA, (4) CRRSAA, (5) and ARP, the Governor shall submit a work plan before any disbursement of funds. Improved reporting will help prevent and combat actual, and claims of, misuse, fraud, waste, and abuse. Therefore, the Governor shall also submit weekly reports that detail any disbursements and use of federal funds received. Weekly reporting shall include a list of all awards broken down by agency, program, category, recipient, and sub-recipient detailing (1) date award was granted; (2) date award expires/renews; (3) total award amount (split into payroll/non-personnel); (4) total award encumbrances and disbursements from prior fiscal years (split into payroll/non-personnel); (5) total award encumbrances and disbursements for the current fiscal year (split into payroll/non-personnel); and (6) total remaining award amount (split into payroll/non-personnel). The Governor shall also provide, as requested, performance metrics with regards, but not limited to, time required to submit claims, time required to submit compliance reporting, and time required to collect reimbursement claims.

- In addition, the Governor shall submit to the Oversight Board a monthly reporting package detailing capital expenditure spending by agency and by project including details for expenditures which have RFPs issued, which contracts have been awarded, and which are in process.

- Furthermore, the Governor shall submit to the Oversight Board a monthly reporting package detailing all of PRDE's salary and other payroll expenses within four categories: (1) Central Administrative Personnel; (2) Regional Administrative Personnel; (3) Regional School Support Personnel; and (4) School Personnel as established in this FY2022 Certified Budget resolution. In order to assess compliance and guarantee accountability, PRDE must submit such monthly reporting detailing salary and payroll expenses by the categories established herein along with a salaries and payroll reconciliation of funds disbursed and actual expenses recorded.

- The reports required pursuant to this section are in addition to the reports that the Governor must submit to the Oversight Board in accordance with Section 203 of PROMESA.

- In conjunction with the reports that the Governor must submit to the Oversight Board no later than 15 days after the last day of each quarter of FY2022, pursuant to Section 203 of PROMESA, the Treasury Secretary, Executive Director of AAFAF and the Director of the OMB shall each certify to the Oversight Board: (1) that no appropriation of any previous fiscal year (except for the appropriations covered by the exceptions in the sections above) have been used to cover any expense; and (2) the Director of the OMB shall certify to the Oversight Board that no amount of (i) the Emergency Reserve and (ii) the unallocated capital expenditures under the custody of OMB has been obligated unless authorized in accordance with the section below.

- The Emergency Reserve, the unallocated capital expenditures, healthcare investments reserve, technology reserve, milestones reserve, and the economic incentive fund under the custody accounts of OMB and the Department of Treasury, respectively, as detailed in the Certified Budget for FY2020, FY2021, and FY2022 may not be used to cover any allocation or expense whatsoever without the approval of the Oversight Board. The economic incentive funds held under the custody of the Department of Treasury will be released on a quarterly basis after a formal reapportionment is submitted by the Department of Economic Development and Commerce (DDEC, by its Spanish acronym), reviewed and approved by

OMB, and submitted to the Oversight Board for review, and the Oversight Board provides its authorization to release such funding. Exceptions to the economic incentive fund release may apply upon meeting all of the specified criteria listed on the Milestones and Incentives Appendix.

- The Emergency Reserve is intended to expedite response activities and, upon request, provide the Commonwealth Agencies and affected local governments with capital in the event of an emergency of such severity and magnitude that effective response exceeds the capacity of current budget resources and federal disaster assistance is not available or not yet available to respond to the emergency.  Moreover, the Emergency Reserve is intended for extraordinary events like natural disasters or as otherwise agree with the Board and that are generally outside of human control and unpreventable. The Emergency Fund is not intended to mitigate emergencies related to operational inefficiencies.

  - Accessing Emergency Reserve funds shall require: (1) a State of Emergency declaration, by the Governor of the Commonwealth, in accordance with Article 6.10 of Act 20-2017, as amended, known as the Puerto Rico Public Safety Department Act; (2) OMB shall request of the Oversight Board access to the emergency reserve fund for a finite period, indicating the agency or local government that will receive the advance, the amount of the advance, usage of funds requested and the PR Emergency Disaster Management (PREMA) request number from WEBEOC platform, as well as the projected re-payment date of the funds; (3) amounts approved by the Oversight Board and disbursed to the Government shall be replenished not later than the following fiscal year; (4) agencies and municipalities, recipients of state emergency reserve funds, shall update OMB on a quarterly basis about the Public Assistance process with FEMA.

  - OMB shall request Emergency Reserve funds exclusively for the use of Government agencies and affected local governments.  The agencies and affected local governments must be in an emergency declared area and the Emergency Reserve funds must be used for response activities related to the declared event.  Non-profits, public corporations outside of the commonwealth, and individuals are not eligible applicants for advances through the Emergency Reserve fund.

  - OMB shall submit quarterly reports to Oversight Board detailing the status of Emergency Reserve funds, amounts provided to agencies and affected local governments, amount of funds expended, amount of funds remaining, and updated projected re-payment dates. Agencies and local governments that received funds from the Emergency Reserve are required to file with FEMA a Request for Public Assistance (RPA) and Project Worksheet to ensure maximum federal fund reimbursements are replenished into the Emergency Reserve.  As a rule, OMB shall offset late repayment by agencies and local governments with other Commonwealth funding to repay the Emergency Reserve on time.

- Cost share matching funds are restricted for use on approved projects/requirements under FEMA's Individual Assistance, Public Assistance, and Hazard Mitigation programs.  Any unused cost share matching funds in a given fiscal year may be rolled over to the following fiscal year and are subject to the same restrictions. The use of these funds must be coordinated with CDBG-DR and CDBG-MIT in meeting cost share requirements.

- Funds to cover parametric insurance will be made available upon reaching the following milestones and after the approval and authorization from the Oversight Board.

  (1) Develop a sophisticated insurance plan to develop a comprehensive program that considers the available markets, costs, meeting O&M requirements, and levels of coverage.
    - Conduct a risk analysis including hazards/perils covered
    - Analysis of expected O&M requirements on a building by building basis
    - Identify the types and extent of insurance needed to protect against risk and meet O&M requirements

292

- Identifying insurance gaps between O&M requirements and insurance that is reasonably available
- Identify the authority for developing, implementing, and enforcing the plan
- The financial arrangement structure for funding the plan and pay for losses, which includes a system for fixed contributions, a formalized plan to pay losses as they occur, and how funds will be distributed

(2) Prioritizing insurance and strategically consider options to supplement the existing insurance coverage:
- Identify how the Commonwealth will meet Flood Insurance requirements
- Consider broader / expanded limits on existing policies
- Consider a separate excess insurance policy that provides coverage above the current limits
- Consider a Parametric policy and CAT Bond or a hybrid combination of the two to provide supplemental or excess coverage

(3) Engage the Insurance Commissioner
- Establishing the criteria for the Insurance Commissioner's certification of the insurance coverage that is reasonably available

- Funding for the Central American and the Caribbean Games will be held under the custody of OMB and made available following the selection of the host and subject to a determination on whether any or all of the funding is eligible for American Rescue Plan (ARP) Act funds.

- As a rule, necessary for the responsible disbursement of budgetary allocations for operating and other expenses, OMB shall withhold from any of the allocations to the agencies of the Executive Branch the amounts necessary to pay for the PayGo contribution, unemployment insurance, or taxes withheld from their employees, when OMB determines that such a withholding is necessary to ensure compliance with these obligations by the agencies concerned. Any such amounts withheld by OMB shall solely be reprogrammed to pay the corresponding outstanding obligations related to PayGo contributions, unemployment insurance, or taxes withheld from employees.

- Additional General Funds may be made available to agencies upon reaching certain, specified milestones and after the approval and authorization from the Oversight Board. Once the respective milestones are achieved, agencies must provide a formal notice and submit supporting data corroborating such achievement for the Oversight Board's review.

- OMB and the Department of the Treasury are authorized to establish the necessary mechanisms to ensure that when implementing the concept of mobility, pursuant to the provisions of Act 8-2017, as amended, known as the "Puerto Rico Human Resources Management and Transformation in the Government Act," the corresponding transfer of funds allocated to payroll and related costs of said employee are to be carried out simultaneously.

- The Secretary of Treasury, the Director of the OMB, and the Treasurer and Executive Director of each agency or public corporation covered by the 2021 Fiscal Plan shall be responsible for not spending or encumbering during FY2022 any amount that exceeds the appropriations authorized for FY2022. This prohibition applies to every appropriation set forth in a budget certified by the Oversight Board, including appropriations for payroll and related costs. The Executive Director of AAFAF and the Director of the OMB shall also certify to the Oversight Board by September 30, 2021 that no amount was spent or encumbered that exceeded the appropriations in the Certified Budget for FY2021.

- For the avoidance of doubt, any reference within the budget to AAFAF, the Department of Treasury, or OMB, or any of their respective officers, shall apply to any successor thereof.

- On or before July 31, 2021, the Governor shall provide to the Oversight Board budget projections of General Fund revenues and expenditures for each quarter of FY2022, which must be consistent with the corresponding budget certified by the Oversight Board (the

"Quarterly Budget"). The Quarterly Budget shall be provided to the Oversight Board in Excel format and include detailed allocations by agency, public corporation, fund type and concept of spend. Together with the report that the Governor must provide under Section 203 of PROMESA not later than 15 days after the last day of each quarter, the Governor shall provide a quarterly variance analysis that is consistent with modified accrual accounting.

- If during the fiscal year the Government fails to comply with the liquidity and budgetary savings measures required by this 2021 Fiscal Plan, the Oversight Board may take all necessary corrective action, including the measures provided in PROMESA Sections 203 and 204.

- Pursuant to Section 204 (b)(2) of PROMESA, the Oversight Board has maintained since November 6, 2017 a Contract Review Policy to require prior Oversight Board approval of contracts with a value of $10 million or more to assure that they "promote market competition" and "are not inconsistent with the approved fiscal plan." The Policy applies to any contract or series of related contracts, inclusive of any amendments, modifications or extensions, with an aggregate expected value of $10 million or more, that is proposed to be entered into by the Commonwealth (which includes the Executive, Legislative, and Judicial branches of government) or any covered instrumentality. In addition, the Oversight Board may select to review contracts below the $10 million threshold for these purposes, on a random basis or at its own discretion. Specifically, in the case of the Puerto Rico Electric Power Authority ("PREPA") the contract review threshold has been reduced to $250,000 exclusively for contracts which are payable from PREPA's "Professional & Technical Outsourced Services" and "PREPA Restructuring and Title III" budget lines. Consequently, all proposed contracts (or series of related contracts) that meet such threshold and are classified as Consulting Services Contracts by the Office of the Comptroller of Puerto Rico (and any applicable sub-categories) must be submitted to the Oversight Board for review and approval prior to execution. For all other PREPA contracts, the Oversight Board maintains the current $10 million threshold. Similarly, in the case of the University of Puerto Rico, the Oversight Board lowered the UPR's contract review threshold to $2 million for all contracts. Finally, in order to further ensure certain contracts promote market competition, the Oversight Board may require, at its own discretion, the Commonwealth or any covered instrumentality, to give it access to ongoing procurement processes for the execution of new contracts.

Moreover, pursuant to Section 204(b)(4) of PROMESA, the Oversight Board has maintained since August 6, 2018 a Policy for the Review of Rules, Regulations, and Orders to be issued by the Executive Branch of the Commonwealth of Puerto Rico. This Policy is aimed at ensuring that certain rules, regulations, administrative orders, and executive orders proposed to be issued by the Governor (or the head of any department or agency) "are not inconsistent with the approved fiscal plan." The Policy requires prior Oversight Board approval of any rule, regulation, administrative order, or executive order that is proposed to be issued in connection with or that concerns financial aspects, or which has the potential to impact fiscal governance, accountability, or internal controls of the Commonwealth or any covered instrumentality under the most recent Certified Fiscal Plan. The above implementation and fiscal controls requirements are important tools to ensure the Government can make meaningful progress towards achieving the goals of the 2021 Fiscal Plan.

### 21.4.1  Skills and knowhow transfer from consultants to public sector personnel

The lack of adequate human capital planning in the Government has led to the excessive delegation of critical responsibilities to government contractors and consultants. Contractors and consultants are often performing day-to-day planning and management functions within agencies, instead of being limited to temporary, short-term projects which do not require full time employment or other similar items. Additionally, agencies' pervasive reliance upon contractors for increasingly critical tasks can result in a lack of transparency of true government expenses. Professional services costs can exceed the cost of comparable full-time employees as contractors

and consultants often have additional contractual remuneration and benefits (i.e., travel expenses) creating needless tension and budgetary shortfalls at the Commonwealth agencies.

Consequently, the Commonwealth should work on reducing its professional services spending to enable the professionalization of the civil service and reduce the reliance on outside consultants. Starting in FY2022, professional consulting contracts should include provisions requiring adequate transfer of skills and technical knowledge, from consultants to pertinent public sector personnel to the extent that the contract reflects recurring work that could be done by appropriately trained government staff.

Specifically, contracts must detail the functions carried out by consultants, as per their applicable Scopes of Work and establish clear plans to ensure that agencies create internal teams of appropriately trained and experienced employees to carry out such functions upon the expiration of consulting contracts. Additionally, agencies will need to establish clear expectations with consultants that internal knowledge transfer and technical training is a key priority. Therefore, shared responsibility and progress should be measured and monitored for the purposes of contract compliance and performance.

Accordingly, agencies should strive to ensure that both the creation of internal teams and the transfer of knowledge to such teams are completed within the applicable timeframes of proposed contracts.

# PART VI. Conclusion

**The 2021 Fiscal Plan is the result of five years of intensive work sessions, dialogue, stakeholder engagement, and experience working to establish the conditions for economic recovery and growth for the benefit of residents of Puerto Rico.** Across these activities, the Oversight Board and the Government have collaborated to create a deep and rich fact base to underpin their work and have remained focused on creating an integrated approach to restoring fiscal sustainability and economic opportunity for future generations of local residents. The starting point for this 2021 Fiscal Plan involved numerous structural inhibitors to growth, over $120 billion in outstanding debt and unfunded pension obligations, and the devastating impact from a historically destructive set of natural disasters.

**Yet in the aftermath of hurricanes, earthquakes, and the COVID-19 pandemic—with a new gubernatorial administration and over $120 billion in federal support mechanisms being made available to enable the Island to rebuild—Puerto Rico now has a unique opportunity to take control of its future destiny through implementation of broad-based economic reforms and fiscal measures.**

**First priority must be the implementation of transformational structural reforms that will change the nature of Puerto Rico's economic development trajectory and provide the residents of the Island with a better and more prosperous future.** COVID-19 federal relief and disaster relief-related spending will provide economic buoyancy in the coming years. However, to achieve meaningful economic growth in the long term, Puerto Rico must use this time to achieve timely and robust implementation of structural reforms, to enhance workforce development and labor productivity and to create a better environment for businesses and investors to create jobs. Without sustained dedication to implementing the 2021 Fiscal Plan structural reforms, and the ambition to pursue additional structural reforms in the future, the challenges that have held back the economy will not be addressed, and the Government will have lost its window to restore long-term opportunity to the people of Puerto Rico. The 2021 Fiscal Plan lays out a series of practical and proven growth-oriented structural reforms and investments, which, when coupled with the federal reconstruction funds, can ensure that the Island can rebuild better in the wake of the pandemic and other natural disasters.

**Second, reorganizing the way government services are delivered, as well as improving their delivery and efficacy on the Island, is critical.** The 2021 Fiscal Plan includes, in order to achieve sustainable and quality delivery of public services, investments aimed at enabling agency implementation of fiscal measures, enhancing frontline services, strengthening the technology sector, and cultivating a high-performing public workforce. Amongst the different investments the 2021 Fiscal Plan includes resources to provide broadband access for all residents as well as to begin a comprehensive civil service reform aimed at empowering civil servants by strengthening their skills and performance management and hence provide better quality public services. However, the Government must take the actions necessary to ensure a healthy fiscal future for the Island. As Puerto Rico embarks on a new era of fiscal responsibility, maintaining balanced budgets becomes a critical part of a path towards growth.

**The Puerto Rico Government has a unique opportunity to seize the current moment—with substantial federal support—to transform the Island's trajectory. The Oversight Board stands ready to work in partnership with the Government to achieve this vital outcome.**

# Appendix

# Chapter 22. Model presentation

The 2021 Fiscal Plan addresses the finances of central government agencies, component units, and other agencies. Agencies for which an independent 2021 Fiscal Plan is being developed have not been consolidated into the 2021 Fiscal Plan and are only represented to the extent they impact the Commonwealth (*Exhibit 148, Exhibit 149, Exhibit 150*).

EXHIBIT 148: MAJOR ENTITIES INCLUDED IN AND EXCLUDED FROM THE 2021 FISCAL PLAN

| | **Major Entities Included in the 2020 Fiscal Plan** | **1. TSA** | **2. Major CUs** | **3. Other** |
|---|---|---|---|---|
| **Included** | 1. Central Government Entities<br>2. Major Component Units<br>3. Other Component Units and agencies | Central Government<br><br>Agencies: Department of Education, Department of Health, Police, etc. | ASEM GDB[1]<br>CCPRC PRTC<br>ASES PRITA<br>Ports PBA ADEA<br>HTA[1] DDEC<br>AAFAF UPR[1] HFA<br>SIFC PRCCDA | Roughly 45 additional agencies and component units, such as: Solid Waste Authority and Public Broadcasting Authority |
| | | Individually Reported – Comprises approx. 90% of Fiscal Plan Cash Flow | | Not Individually Reported – approx. 10% of Fiscal Plan Cash Flow |

| | **Major Entities Excluded from the 2020 Fiscal Plan** | | | |
|---|---|---|---|---|
| **Excluded** | | Puerto Rico Electric Power Authority (PREPA) | | PR Aqueduct and Sewer Authority (PRASA) |
| | | The Children's Trust Fund | PRIDCO | COSSEC | Municipalities |

1 GDB , HTA, and UPR have separate and apart fiscal plans from the Central Government; HTA and UPR receive General Fund appropriations
2. Major CUs include the following IFCUs: ASEM, ASES, PRITA, Ports, PBA, ADEA, AAFAF, HFA, SIFC, PRCCDA
Note: Housing Finance Authority, resources from the Cap Funds (money transferred by HUD for financing projects and repayment of bonds) are not contemplated in the 2020 Fiscal Plan.

## EXHIBIT 149: LIST OF ENTITIES COVERED BY THE 2021 FISCAL PLAN

| Agency Code | Agency | Agency Code | Agency |
|---|---|---|---|
| 8 | Office of the Comptroller | 139 | Parole Board |
| 10 | General Court of Justice | 152 | Elderly and Retired People Advocate Office |
| 11 | Traffic Safety Commission | 153 | Advocacy for Persons with Disabilities of the CW of Puerto Rico |
| 15 | Office of the Governor | 155 | State Historic Preservation Office |
| 16 | Office of Management and Budget | 161 | Infrastructure Financing Authority |
| 18 | Planning Board | 162 | Public Building Authority (PBA) |
| 21 | Emergency and Disaster Management Admin Agency | 165 | Land Authority |
| 22 | Office of The Commissioner of Insurance | 167 | Company for the Integral Development of Cantera's Peninsula |
| 23 | Department of State | 168 | Ports Authority |
| 24 | Department of the Treasury | 177 | Land Administration |
| 28 | Commonwealth Election Commission | 180 | Tourism Company |
| 29 | Federal Affairs Administration | 186 | Culebra Conservation and Development Authority |
| 30 | Office of Admin and Transformation of Human Resources | 187 | Health Insurance Administration (ASES) |
| 31 | General Services Administration | 188 | Puerto Rico and the Caribbean Cardiovascular Center Corporation |
| 34 | Investigarion, Prosecution and Appeals Commission | 189 | Institute of Forensics Sciences |
| 37 | Civil Rights Commission | 191 | Musical Arts and Stagecraft Corporation |
| 38 | Department of Justice | 192 | Fine Arts Center Corporation |
| 40 | Puerto Rico Police Department | 193 | Office of Government Ethics |
| 41 | Special Investigations Office | 195 | Economic Development Bank |
| 42 | Puerto Rico Firefighter Corps | 196 | Public Broadcasting Corporation |
| 43 | Puerto Rico National Guard | 198 | Farm Insurance Corporation |
| 45 | Department of Public Safety | 200 | Special Independent Prosecutor's Panel |
| 49 | Department of Transportation and Public Works | 211 | AFICA |
| 50 | Department of Natural and Environmental Resources | 215 | Conservatory of Music Corporation |
| 55 | Department of Agriculture | 220 | Correctional Health |
| 60 | Citizen's Advocate Office (Ombudsman) | 221 | Emergency Medical Services Corps |
| 62 | Cooperative Development Commission | 231 | Health Advocate Office |
| 67 | Department of Labor and Human Resources | 235 | Housing Financing Authority (HFA) |
| 68 | Labor Relations Board | 236 | Fondo de Innovación para el Desarrollo Agrícola de Puerto Rico (FIDA) |
| 69 | Department of Consumer Affairs | 238 | Port of the Americas Authority |
| 70 | State Insurance Fund Corporation (SIFC) | 241 | Administration for Integral Development of Childhood |
| 71 | Department of Health | 264 | Martin Peña Canal ENLACE Project Corporation |
| 75 | Office of the Financial Institutions Commissioner | 265 | Roosevelt Roads Naval Station Redevelopment |
| 78 | Department of Housing | 268 | Institute of Statistics |
| 79 | Automobile Accidents Compensation Administration (ACAA) | 271 | Puerto Rico Innovation and Technology Services |
| 81 | Department of Education | 272 | Office of the Inspector General |
| 82 | Institute of Puerto Rican Culture | 276 | Public-Private Partnership Authority |
| 87 | Department of Sports and Recreation | 277 | Agricultural Enterprises Development Administration (ADEA) |
| 90 | Medical Services Administration (ASEM) | 279 | Public Service Appeals Commission |
| 95 | Mental Health and Addiction Services Administration | 281 | Office of the Election Comptroller |
| 96 | Women's Advocate Office | 285 | Puerto Rico Integrated Transport Authority (PRITA) |
| 100 | Legislative Assembly | 286 | Ponce Port Authority |
| 105 | Industrial Commission | 288 | UPR Comprehensive Cancer Center |
| 106 | Public Housing Administration | 293 | Center for Research, Education and Medical Services for Diabetes |
| 109 | School of Plastic Arts | 295 | Fiscal Agency and Financial Advisory Authority (AAFAF) |
| 119 | Department of Economic Development and Commerce | 297 | Financial Oversight and Management Board for Puerto Rico |
| 120 | Veterans Advocate Office | 298 | Public Service Regulatory  Board |
| 121 | 911 Service Governing Board | 303 | Convention Center of District Authority (PRCCDA) |
| 122 | Secretariat of the Department of the Family | 310 | Municipal Finance Corporation |
| 123 | Department of the Family | 311 | Gaming Commission |
| 124 | Families and Children Administration | 312 | Retirement Board of the Government of Puerto Rico |
| 126 | Vocational Rehabilitation Administration | 329 | Socio-Economic Development Office |
| 127 | Administration for Socioeconomic Development of the Family | | Additional (Electronic) Lottery |
| 137 | Department of Correction and Rehabilitation | | Traditional Lottery |
| 138 | Institutional Trust of the National Guard of Puerto Rico | | Unemployment Insurance Fund |

## EXHIBIT 150: LIST OF ENTITIES EXCLUDED FROM THE 2021 FISCAL PLAN

| Entities issuing standalone Fiscal Plan | Entities excluded from Fiscal Plan |
|---|---|
| Development Bank for PR | Agency Fund (Special Deposit Fund) |
| Aqueduct and Sewer Authority | Commonwealth of Puerto Rico Regional Center Corporation |
| Municipal Revenues Collection Center (CRIM) | Public Finance Corporation (PFC) |
| PR Electric Power Authority | Puerto Rico Government Investment Trust Fund |
| PR Highways and Transportation Authority[1] | Puerto Rico Municipal Finance Agency |
| Puerto Rico Industrial Development Company | Puerto Rico Water Pollution Control Revolving Fund |
| University of Puerto Rico[2] | Puerto Rico Industrial Development Company |
| Public Corporation for the Supervision and Deposit Insurance of Puerto Rico Cooperatives | Safe Drinking Water Treatment Revolving Loan Fund |
| | The Children's Trust Fund |
| | Tourism Development Fund |

1 Commonwealth Fiscal Plan includes HTA general fund appropriations
2 Commonwealth Fiscal Plan includes UPR general fund appropriations

# Chapter 23. Macroeconomic projections

## 23.1   Economic and demographic trends

### EXHIBIT 151: MACROECONOMIC TRENDS



Macroeconomic trajectory: Total GNP, $B Fiscal Years ending June 30th

EXHIBIT 152: POPULATION TREND



Historical and projected population, millions of people

EXHIBIT 153: PER CAPITA GNP TREND



Historical and projected GNP per capita, $ USD

# Chapter 24. Financial projections

## 24.1   Detailed financial projections

EXHIBIT 154: FINANCIAL PROJECTIONS POST-MEASURES AND STRUCTURAL REFORMS

Financial projections post-measures and structural reforms, units as labeled

| Line item | FY22 | FY23 | FY24 | FY25 | FY26 |
|---|---|---|---|---|---|
| **Population, #** | 2,928 | 2,883 | 2,839 | 2,798 | 2,764 |
| Population growth rate, % | -1.6% | -1.6% | -1.5% | -1.5% | -1.2% |
| **Real growth rate[4], %** | **1.5%** | **-1.5%** | **-0.7%** | **0.4%** | **0.7%** |
| **Nominal GNP, $M** | **73,333** | **73,156** | **73,679** | **75,106** | **76,759** |
| Nominal GNP per capita, $ | 25,042 | 25,376 | 25,952 | 26,846 | 27,770 |
| Nominal GNP per capita growth, % | 4.3% | 1.3% | 2.3% | 3.4% | 3.4% |
| **Inflation, %** | **1.1%** | **1.3%** | **1.4%** | **1.5%** | **1.5%** |
| Disaster funding, $M | 3,950 | 5,318 | 4,681 | 5,879 | 5,883 |
| **Revenues[1], $M** | **21,487** | **20,447** | **20,238** | **20,586** | **20,914** |
| Commonwealth revenues | 15,773 | 15,504 | 15,229 | 15,506 | 15,757 |
| Federal transfers | 5,714 | 4,943 | 5,009 | 5,080 | 5,158 |
| **Expenditures[1], $M** | **(19,771)** | **(19,127)** | **(19,167)** | **(19,321)** | **(19,581)** |
| Commonwealth-funded expenditures | (14,065) | (14,193) | (14,167) | (14,250) | (14,431) |
| Federally funded expenditures | (5,706) | (4,935) | (5,000) | (5,072) | (5,150) |
| **Gap/surplus, $M** | **1,716** | **1,320** | **1,071** | **1,265** | **1,334** |
| Contractual debt service payments[2], $M | (1,749) | (1,764) | (1,674) | (1,679) | (1,668) |
| **Net gap / surplus, $M** | **(33)** | **(444)** | **(603)** | **(414)** | **(334)** |
| *Surplus potentially not available[3], $M* | *141* | *142* | *138* | *143* | *152* |

1 Revenues and expenditures excluding gross up adjustments; revenues do not include Earned Income Tax Credit
2 Debt service based on prepetition contractual debt obligations. Presented for illustrative purposes only & does not represent anticipated future payments on restructured debt. Includes GO, PBA, CCDA, PRIFA, PFC, ERS. The 2021 Fiscal Plan does not assume any predetermined outcome of ongoing litigation with respect to GO bonds
3 These surplus amounts are generated by Commonwealth corporations and the Commonwealth's ability to access such surplus amounts could be at risk without further legislative action
4 Adjusted for income effects

## EXHIBIT 155: REVENUE BREAKDOWN POST-MEASURES (INCLUDING EITC)

Revenue detail post-measures, Earned Income Tax Credit and structural reforms

| Fiscal Year Ending June 30, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY22-26 |
|---|---|---|---|---|---|---|
| **General Fund Revenues:** | | | | | | |
| Individual Income Tax[1] | 2,105 | 2,115 | 2,116 | 2,173 | 2,219 | 10,728 |
| Corporate Income Tax | 2,054 | 2,017 | 1,997 | 2,069 | 2,110 | 10,247 |
| Sales and Use Tax | 2,239 | 2,219 | 2,214 | 2,253 | 2,292 | 11,218 |
| Act 154 | 1,631 | 1,447 | 1,199 | 1,199 | 1,199 | 6,676 |
| Non-Resident Withholdings | 349 | 349 | 350 | 354 | 358 | 1,759 |
| Alcoholic Beverages | 264 | 263 | 263 | 263 | 263 | 1,315 |
| Cigarettes | 95 | 94 | 94 | 94 | 95 | 472 |
| Motor Vehicles | 538 | 450 | 391 | 399 | 407 | 2,185 |
| Excises on Off-Shore Shipment Rum | 209 | 200 | 201 | 202 | 202 | 1,014 |
| Partnerships | 103 | 103 | 103 | 105 | 108 | 521 |
| Other excise taxes | 235 | 234 | 236 | 240 | 246 | 1,191 |
| Other General Fund Revenue | 387 | 386 | 389 | 396 | 405 | 1,962 |
| **Sub-total before other Tax Revenues** | **10,207** | **9,877** | **9,554** | **9,747** | **9,904** | **49,289** |
| Total GF portion of misc. tax streams | 552 | 569 | 571 | 578 | 584 | 2,854 |
| Total Conditionally Allocable Revenues (including CRIM) | 822 | 832 | 832 | 836 | 841 | 4,163 |
| **Total General Fund Revenues** | **11,582** | **11,278** | **10,957** | **11,160** | **11,330** | **56,306** |
| **Special Revenue Fund** | | | | | | |
| SRF revenues - CW Agencies | 1,154 | 1,156 | 1,162 | 1,180 | 1,202 | 5,853 |
| SRF revenues - IFCUs | 1,633 | 1,646 | 1,663 | 1,695 | 1,731 | 8,367 |
| Enterprise Fund Revenues | 1,204 | 1,220 | 1,238 | 1,256 | 1,275 | 6,194 |
| **Total SRF Revenues** | **3,991** | **4,022** | **4,063** | **4,131** | **4,208** | **20,415** |
| **Federal Fund Revenues:** | | | | | | |
| Central Government | 1,124 | 1,138 | 1,153 | 1,170 | 1,188 | 5,773 |
| IFCUs | 161 | 163 | 165 | 167 | 170 | 826 |
| Social Programs | 3,148 | 3,175 | 3,207 | 3,242 | 3,281 | 16,052 |
| **Federal Fund Revenues (excluding Medicaid receipts)** | **4,432** | **4,476** | **4,525** | **4,579** | **4,639** | **22,651** |
| Federal Transfers - Medicaid | 1,282 | 468 | 484 | 501 | 519 | 3,254 |
| **Total Federal Fund Revenues** | **5,714** | **4,943** | **5,009** | **5,080** | **5,158** | **25,904** |
| | | | | | | |
| **Revenue post measures** | **21,287** | **20,243** | **20,029** | **20,372** | **20,695** | **102,625** |
| | | | | | | |
| Adjustments for revenue gross up | 718 | 702 | 703 | 704 | 708 | 3,534 |
| **Revenue post measures and gross ups** | **22,004** | **20,944** | **20,732** | **21,076** | **21,403** | **106,159** |

1 Includes Earned Income Tax Credit

## EXHIBIT 156: SUMMARY OF BASELINE EXPENDITURES AND MEASURES

Expense detail post-measures and structural reforms

| Fiscal Year Ending June 30, $M | FY22 | FY23 | FY24 | FY25 | FY26 | FY22-26 |
|---|---|---|---|---|---|---|
| **Expenses** | | | | | | |
| **General Fund Expenditures:** | | | | | | |
| Direct Payroll | (3,134) | (3,179) | (3,228) | (3,279) | (3,330) | (16,152) |
| Non-Personnel Operating Expense (excl. Capex) | (1,964) | (1,893) | (1,933) | (1,965) | (1,990) | (9,745) |
| Municipal, HTA and UPR appropriations | (1,193) | (1,179) | (1,125) | (1,142) | (1,128) | (5,766) |
| Pension Expenses | (2,307) | (2,285) | (2,281) | (2,272) | (2,263) | (11,409) |
| Disaster Recovery Cost Match | - | - | - | (40) | (61) | (101) |
| Restructuring / Title III Costs | (275) | (168) | (130) | (49) | - | (622) |
| Other GF Expenses | (535) | (498) | (500) | (507) | (491) | (2,530) |
| **Total GF Expenses (excl. inter gov transfers)** | **(9,408)** | **(9,203)** | **(9,197)** | **(9,254)** | **(9,263)** | **(46,325)** |
| Medicaid - commonwealth funded | (1,554) | (2,226) | (2,317) | (2,409) | (2,517) | (11,022) |
| Social Programs - commonwealth funded | (15) | (15) | (15) | (15) | (15) | (76) |
| **Total GF Expenses (excl. inter gov transfers and incl. Medicaid and social programs)** | **(10,977)** | **(11,444)** | **(11,529)** | **(11,678)** | **(11,795)** | **(57,423)** |
| **Special Revenue Fund Expenditures:** | | | | | | |
| CW Agencies Direct Payroll | (696) | (707) | (716) | (728) | (740) | (3,588) |
| CW agencies Non-Personnel Operating Expenses (excl. Capex) | (1,534) | (1,542) | (1,556) | (1,582) | (1,612) | (7,825) |
| Medicaid - Special Revenue Fund | (414) | (427) | (437) | (447) | (458) | (2,183) |
| **Federal Fund Expenditures:** | | | | | | |
| CW Agencies Direct Payroll | (739) | (743) | (748) | (753) | (761) | (3,744) |
| CW agencies Non-Personnel Operating Expenses (excl. Capex) | (938) | (950) | (962) | (976) | (991) | (4,817) |
| Medicaid - federally funded | (1,282) | (468) | (484) | (501) | (519) | (3,254) |
| Social Programs - federally funded | (2,747) | (2,775) | (2,806) | (2,841) | (2,879) | (14,047) |
| **Total CW Funded Op. Exp.[1]** | **(18,949)** | **(18,712)** | **(18,894)** | **(19,154)** | **(19,397)** | **(95,106)** |
| Expense Measures | 1,051 | 1,443 | 1,608 | 1,745 | 1,758 | 7,605 |
| Adjustments for expenditure gross up | (718) | (702) | (703) | (704) | (708) | (3,534) |
| **Total CW Funded Op. Exp. Post Measures excl. Loss of Medicaid Funding** | **(18,616)** | **(17,971)** | **(17,988)** | **(18,113)** | **(18,347)** | **(91,035)** |
| **Net Operating Surplus/(Deficit)** | **3,589** | **3,178** | **2,952** | **3,177** | **3,276** | **16,171** |
| **Capex and Other Expenses:** | | | | | | |
| Maintenance Capex | (291) | (295) | (300) | (304) | (309) | (1,500) |
| Enterprise funds | (1,204) | (1,219) | (1,237) | (1,256) | (1,275) | (6,191) |
| Others[2] | (378) | (343) | (345) | (351) | (357) | (1,775) |
| Other Non-Recurring | - | - | - | - | - | - |
| **Total Capex and Other Expenses** | **(1,873)** | **(1,858)** | **(1,882)** | **(1,912)** | **(1,942)** | **(9,466)** |
| **Surplus Post Measures (excl. Debt Payments)[3]** | **1,716** | **1,320** | **1,071** | **1,265** | **1,334** | **6,706** |
| Pre Petition Contractual Debt Service (excl. COFINA)[4] | (1,749) | (1,764) | (1,674) | (1,679) | (1,668) | (8,533) |
| **Surplus after Measures and Debt Payments** | **(33)** | **(444)** | **(603)** | **(414)** | **(334)** | **(1,827)** |
| Surplus potentially not available, $M[5] | 141 | 142 | 138 | 143 | 152 | 716 |

Excludes Enterprise Funds, Capex, Other non-recurring, Cigarettes, Disbursements to public corporations, Payment of State Revolving Funds / Other Federal Funds Deposits at GDB
[1] Cigarettes, Disbursements to public corporations, Payment of State Revolving Funds / Other Federal Funds Deposits at GDB
[2] Includes capex and other expenses
[3] Debt service based on prepetition contractual debt obligations. Presented for illustrative purposes only and does not represent anticipated future payments on restructured debt.
[4] These surplus amounts are generated by Commonwealth corporations and the Commonwealth's ability to access such surplus amounts could be at risk without further legislative action.

## 24.2  Debt policy revenues

EXHIBIT 157: DEBT POLICY REVENUES

| Year | Adj. Revenue Post Measures (excl. federal transfers), $M | Cofina debt service, $M[1] | Debt policy revenues, $M | Year | Adj. Revenue Post Measures (excl. federal transfers), $M | Cofina debt service, $M[1] | Debt policy revenues, $M |
|------|------|------|------|------|------|------|------|
| FY21 | 15,768 | 448 | 16,216 | FY37 | 16,761 | 846 | 17,607 |
| FY22 | 15,773 | 466 | 16,238 | FY38 | 16,891 | 880 | 17,771 |
| FY23 | 15,504 | 485 | 15,988 | FY39 | 17,046 | 917 | 17,963 |
| FY24 | 15,229 | 504 | 15,734 | FY40 | 17,217 | 955 | 18,172 |
| FY25 | 15,506 | 525 | 16,030 | FY41 | 17,406 | 991 | 18,397 |
| FY26 | 15,757 | 546 | 16,303 | FY42 | 17,634 | 991 | 18,625 |
| FY27 | 16,132 | 568 | 16,700 | FY43 | 17,872 | 991 | 18,863 |
| FY28 | 16,315 | 591 | 16,906 | FY44 | 18,115 | 991 | 19,105 |
| FY29 | 16,391 | 615 | 17,006 | FY45 | 18,367 | 991 | 19,358 |
| FY30 | 16,456 | 640 | 17,096 | FY46 | 18,627 | 991 | 19,617 |
| FY31 | 16,545 | 666 | 17,210 | FY47 | 18,900 | 991 | 19,890 |
| FY32 | 16,569 | 693 | 17,262 | FY48 | 19,178 | 991 | 20,169 |
| FY33 | 16,643 | 721 | 17,363 | FY49 | 19,467 | 991 | 20,458 |
| FY34 | 16,703 | 750 | 17,453 | FY50 | 19,770 | 991 | 20,760 |
| FY35 | 16,766 | 780 | 17,546 | FY51 | 20,081 | 991 | 21,072 |
| FY36 | 16,689 | 812 | 17,502 | | | | |

1 Cofina debt service figures based on Per page 15 of June 2020 COFINA Certified Fiscal Plan.
SOURCE: June 2020 COFINA Certified Fiscal Plan.

# Chapter 25. Fiscal measures

## 25.1   Agency efficiencies

*Exhibit 158* details the payroll and non-payroll savings for each of the agency groupings. Agency groupings are as shown below in *Exhibit 159*.

### EXHIBIT 158: MEASURES SUMMARY IMPACT FOR ALL AGENCY GROUPINGS

Run-rate savings from agency efficiency measures[1], $K

| | FY2020 | FY2021 | FY2022 | FY2023 | FY2024 | FY2025 | FY2026 |
|---|---|---|---|---|---|---|---|
| Agriculture | 26,662 | 19,316 | 29,866 | 30,465 | 30,904 | 31,365 | 31,841 |
| Automobile Accident Compensation Administration | 16,051 | 13,185 | 19,244 | 19,978 | 20,267 | 20,569 | 20,881 |
| Closures | 3,377 | 16,104 | 21,913 | 22,289 | 22,610 | 22,947 | 23,296 |
| Corrections | 96,348 | 67,482 | 101,621 | 110,933 | 112,534 | 114,212 | 115,945 |
| Courts and Legislature | 84,540 | 75,609 | 94,712 | 97,195 | 98,597 | 100,068 | 101,587 |
| Culture | 5,407 | 3,166 | 4,467 | 5,818 | 5,699 | 5,784 | 5,872 |
| Custody Acct. | 110,841 | 89,562 | 50,325 | 50,987 | 61,458 | 62,375 | 63,322 |
| Economic Development | 26,770 | 74,742 | 58,183 | 59,432 | 60,289 | 61,188 | 62,117 |
| Education | 336,854 | 309,238 | 445,026 | 510,705 | 517,759 | 525,480 | 533,456 |
| Environmental | 15,034 | 17,624 | 23,139 | 24,179 | 24,566 | 24,973 | 25,393 |
| Executive Office | 16,973 | 10,750 | 20,476 | 22,239 | 22,560 | 22,896 | 23,243 |
| Families & Children | 21,108 | 22,575 | 49,349 | 55,263 | 56,060 | 56,896 | 57,760 |
| Finance Commission | 3,513 | 2,962 | 4,196 | 4,349 | 4,412 | 4,478 | 4,546 |
| FOMB | 10,971 | 22,721 | 15,418 | 15,473 | 15,534 | 15,599 | 15,677 |
| Health | 104,341 | 94,625 | 116,912 | 110,352 | 111,946 | 113,618 | 115,345 |
| Housing | 26,798 | 18,255 | 33,393 | 35,526 | 36,039 | 36,577 | 37,132 |
| Independent Agencies | 22,490 | 20,030 | 36,428 | 38,551 | 39,108 | 39,691 | 40,293 |
| Institute of Statistics | 483 | 375 | 537 | 551 | 558 | 567 | 575 |
| Justice | 14,619 | 13,965 | 15,798 | 19,252 | 19,529 | 19,821 | 20,121 |
| Labor | 13,473 | 12,073 | 18,218 | 19,310 | 19,589 | 19,881 | 20,183 |
| Land | 2,894 | 1,740 | 4,021 | 4,158 | 4,218 | 4,281 | 4,346 |
| OCFO - Treasury | 26,966 | 38,964 | 91,341 | 94,145 | 95,503 | 96,928 | 98,399 |
| Ombudsman | 1,692 | 1,565 | 2,338 | 2,462 | 2,498 | 2,535 | 2,574 |
| Public Safety | 143,966 | 172,023 | 173,846 | 193,847 | 201,955 | 199,719 | 197,577 |
| Public Works | 37,260 | 38,890 | 37,138 | 52,292 | 53,047 | 53,838 | 54,655 |
| Retirement Services | 26,656 | 1,578 | 1,578 | 1,615 | 1,638 | 1,662 | 1,688 |
| State | 11,203 | 2,024 | 3,059 | 3,155 | 3,200 | 3,248 | 3,298 |
| State Insurance Fund Corporation | 61,700 | 59,427 | 78,506 | 81,293 | 82,466 | 83,696 | 84,966 |
| Transparency & Control Entities | 995 | 564 | 1,009 | 1,025 | 1,039 | 1,055 | 1,071 |
| Universities | 1,651 | 1,353 | 1,954 | 2,122 | 2,153 | 2,185 | 2,218 |
| Utilities Commission | 3,239 | 1,531 | 3,115 | 3,304 | 3,352 | 3,402 | 3,454 |
| **Total run-rate savings from agency efficiency measures** | 1,274,875 | 1,224,020 | 1,557,128 | 1,692,063 | 1,731,089 | 1,751,534 | 1,772,829 |

1 Excluding investments and other funding increases

## 25.2 Agency groupings and consolidation progress

### EXHIBIT 159: AGENCY GROUPINGS

| Group | Agencies | |
|---|---|---|
| **Agriculture** | 1 Agricultural Enterprises Development Administration | 3 Farm Insurance Corporation |
| | 2 Department of Agriculture | |
| **Courts and Legislature** | 1 General Court of Justice (GCJ) | 2 Legislative Assembly (LA) |
| **Culture** | 1 Fine Arts Center Corporation | 3 Musical Arts and Stagecraft Corporation |
| | 2 Institute of Puerto Rican Culture | |
| **Economic Development** | 1 Authority for the Redevelopment of Roosevelt Roads Naval Station | 6 Permit Management Office |
| | 2 Department of Economic Development and Commerce | 7 Planning Board |
| | 3 Energy Affairs Office | 8 Puerto Rico Trade and Export Company |
| | 4 Industrial Development Company | 9 Regional Center Corporation of Commonwealth of PR |
| | 5 Industrial Tax Exemption Office | 10 Tourism Company |
| **Environmental** | 1 Department of Natural and Environmental Resources | 3 Natural Resources Administration |
| | 2 Environmental Quality Board | 4 Solid Waste Authority |
| **Executive Office** | 1 Federal Affairs Administration | 5 Office of Socioeconomic Development |
| | 2 Infrastructure Financing Authority | 6 Public Buildings Authority |
| | 3 Office of the Commissioner of Municipal Affairs | 7 Public-Private Partnership Authority |
| | 4 Office of the Governor | 8 State Historical Preservation Office |
| **Finance Comm.** | 1 Office of the Commissioner of Insurance | 2 Office of the Financial Institutions Commissioner |
| **Health** | 1 Center for Research, Education and Medical Services for Diabetes | 4 Medical Services Administration |
| | 2 Department of Health | 5 Medical health and Addiction Services Administration |
| | 3 Health Insurance Administration | 6 Puerto Rico and Caribbean Cardiovascular Center Corporation |
| | 7 University of Puerto Rico Comprehensive Cancer Center[1] | |
| **Justice** | 1 Department of Justice | 2 Parole Board |
| **Labor** | 1 Department of Labor and Human Resources | 4 Public Service Appeals Commission |
| | 2 Investigation, Prosecution and Appeals Commission | 5 Vocational Rehabilitation Administration[1] |
| | 3 Labor Relations Board | |
| **Land** | 1 Land Administration | 2 Land Authority |
| | 3 Agricultural Development Innovation Fund | |
| **Ombudsman** | 1 Advocacy for Persons with Disabilities of the Commonwealth of Puerto Rico | 4 Veterans Advocate Office |
| | 2 Elderly and Retired People Advocate Office | 5 Women's Advocate Office |
| | 3 Health Advocate Office | |
| **Public Works** | 1 Department of Transportation and Public Works | 3 Ports Authority[1] |
| | 2 Integrated Transport Authority | 4 Traffic Safety Commission |
| **Families** | 1 Administration for Integral Development of Childhood | 4 Department of the Family |
| | 2 Administration for Socioeconomic Development of the Family | 5 Families and Children Administration |
| | 3 Child Support Administration | |
| **Housing[2]** | 1 Department of Housing | 3 Public Housing Administration |
| | 2 Housing Financing Authority | |
| **State** | 1 Department of State | 2 Puerto Rico Education Council |
| **Transparency & Control Entities** | 1 Office of Government Ethics | 2 Office of the Comptroller |
| **Department of Public Safety** | 1 Puerto Rico Police Department (PRPD) | 5 9-1-1 Services Governing Board |
| | 2 Firefighters Corps | 6 Special Investigation Unit |
| | 3 Emergency Medical Services Corps | 7 Department of Public Safety |
| | 4 Emergency Management and Disaster Administration Agency | |
| **Treasury / OCFO** | 1 Department of the Treasury | 4 General Services Administration |
| | 2 Puerto Rico Office of Human Resources Management and Transformation | 5 Fiscal Agency and Financial Advisory Authority[1] |
| | 3 Office of Management and Budget | |
| **Universities** | 1 Conservatory of Music[1] | 2 School of Plastic Arts[1] |
| **Utilities Commission** | 1 Puerto Rico Energy Board | 4 Independent Bureau of Consumer Protection |
| | 2 Public Services Commission | 5 Telecommunications Regulatory Board |
| | 3 Public Service Regulatory Board | |
| **Corrections** | 1 Department of Correction and Rehabilitation | 2 Correctional Health |
| **Closures** | 1 Model Forest of Puerto Rico | 2 Culebra Conservation and Development Authority |
| **Independent Agencies** | 1 Civilian's Advocate Office (Ombudsman) | 15 Office of the Inspector General |
| | 2 Civil Rights Commission | 16 Port of Ponce Authority |
| | 3 State Elections Commission | 17 Port of the Americas |
| | 4 Company for the Integral Development of Cantera's Peninsula | 18 Public Broadcasting Corporation |
| | 5 Convention Center District Authority | 19 Puerto Rico Innovation and Technology Services |
| | 6 Cooperative Development Commission | 20 Puerto Rico National Guard |
| | 7 Department of Consumer Affairs | 21 Special Independent Prosecutor Panel |
| | 8 Department of Sports and Recreation | 22 Teacher's Retirement System |
| | 9 Gaming Commission | 23 Institute of Statistics |
| | 10 Industrial Commission | 24 Economic Development Bank |
| | 11 Martín Peña Canal ENLACE Project Corporation | 25 Retirement Board of the Government of Puerto Rico |
| | 12 Institutional Trust of the National Guard of Puerto Rico | 26 Department of Education |
| | 13 Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority | 27 Agricultural Innovation Development Fund |
| | | 28 Institute of Forensic Sciences |
| | 14 Office of the Electoral Comptroller | |
| **Other** | 1 Automobile Accident Compensation Authority | 3 State Insurance Fund Corporation |
| | 2 Financial Oversight and Management Board | |

1 Current draft of agency consolidation plan may leave this agency as a standalone entity     2 Federal funding requirements may limit consolidation of Housing agencies

# EXHIBIT 160: AGENCY CONSOLIDATION PROGRESS DETAILS

| Grouping | Agencies | Consolidation status | Legal provision (if applicable) | Remarks and key FY2021 priorities (indicated by agency) |
|---|---|---|---|---|
| State | Department of State, Puerto Rico Education Council | 🟢 Completed | Law 212-2018 | • Consolidation of shared services completed within 90 days; savings higher than USD 400 thousand realized in rental contract cancellation<br>• One single Finance reporting and HR system<br>• Staffing remains constrained |
| Utilities Commission | PR Energy Board (PREB), Public Service Commission (PSC), Independent Bureau of Consumer Protection, Telecommunications Regulatory Board | 🟢 Completed | Law 211-2018 | • Consolidation of shared services completed under Public Services Commission (JRSP)<br>• All administrative (e.g., HR, Legal, Finance) supervision consolidated under one director; IT yet to consolidate under central office location and implement platform integration |
| Environ-mental | Department of Natural and Environmental Resources, Environmental Quality Board, Natural Resources Administration, Solid Waste Authority | 🟢 Completed | Law 171-2018 | • Office locations consolidated in the same building<br>• Shared services and back-office systems consolidated across agencies |
| Agriculture | Agricultural Enterprises Development Administration (ADEA), Department of Agriculture (DA), Farm Insurance Corporation (CSA) | 🟢 Completed | MOU signed (expiration December 31, 2020) | • Consolidation of administrative areas (HR, Legal, Finance, IT) for ADEA and DA is complete with shared back-office (with back-office personnel efficiencies)<br>• CSA continues to maintain operational independence (legal limitations on being an insurance company) but is in the process to merge IT systems with ADEA |
| Department of Public Safety | Puerto Rico Police Bureau (PRPB), Firefighters Corps, Emergency Medical Services Corps, Emergency Management and Disaster Administration Agency, 9-1-1 services Governing Board, Special Investigations Unit | 🟢 Completed | Law 20-2017 | • Processes unified for all functions across bureaus; all back-office functions consolidated in shared services structure.<br>• Direct reporting and central office established across functional departments; currently staffing vacancies in DPS and other Bureaus.<br>• FY22 priority to recruit civilian staff for administrative roles in and reduce overtime expenses in PRPB and implement KRONOS across all bureaus.<br>• Forensic left grouping as of 12/23/2020 |
| Economic Development | Authority of the Redevelopment of the Roosevelt Roads Naval Station (RR), Department of Economic Development and Commerce, Energy Affairs Office, Industrial Development Company (PRIDCO), Industrial Tax Exemption Office, Permit Management Office, Planning Board, PR Trade and Export Company, Regional Center Corporation of Commonwealth of PR (CRELA), PR Tourism Company (PRTC) | 🟡 Delayed | Law 141-2018 establishes all agencies to be reorganized into DDEC except ascribed agencies (RR, PRIDCO and Planning Board) | • Consolidation of accounting books (except PRTC, PRIDCO, CRELA and RR)<br>• Cross-training of employees across agencies<br>• PRIDCO building being remodeled to transfer all front-office personnel |
| Finance Commission | Office of the Commissioner of Insurance (OIC), Office of the Financial Institutions | 🔴 No progress | Legislation repealed; MOU certified | • Third-party analysis of shared services consolidation is yet incomplete<br>• OCI to identify Commissioner to re-initiate consolidation effort. |
| Health | Center for Research Education and Medical Services for Diabetes, Comprehensive Cancer Center, Department of Health, Health Insurance Administration, Medical Services Administration, Mental Health and Addiction Services Administration, Puerto Rico and Caribbean Cardiovascular Center Corporation | 🔴 No progress | Legislation for ASES/DOH Consolidation was not recommended in the Legislature | • Plans for consolidation of all health agencies have not been drafted nor presented to the Oversight Board<br>• No back-office consolidations achieved between agencies in the grouping |
| Labor | Department of Labor and Human Resources, Investigation, Prosecution and Appeals Commission, Labor Relations Board, Public Service Appeals Commission, Vocational Rehabilitation Administration | 🔴 No progress | MOU not signed | • No progress reported on consolidation of shared services |
| Family | Administration for Integral Development of Childhood, Administration for Socioeconomic Development of the Family, Child Support Administration, Department of Family, Families and Children Administration | 🔴 Delayed | Legislation proposed but not presented | • MOU pending for physical space consolidation<br>• Backoffice consolidation has been achieved partially between some sub-groups of agencies but inconsistently across different functions (e.g., HR, Procurement) |
| Treasury/ OCFO | Department of the Treasury, Puerto Rico Office of Human Resources Management and Transformation (OATRH), Office of Management and Budget (OMB), General Services Administration (GSA), Fiscal Agency and Financial Advisory Authority (AAFAF) | 🔴 No progress | EO 2021-018, legislation not presented | • The Government has issued an Executive Order creating the CFO position in collaboration with other financial agencies<br>• There has not been concrete traction to enact legislation |

| Grouping | Agencies | Consolidation status | Legal provision (if applicable) | Remarks and key FY2021 priorities (indicated by agency) |
|---|---|---|---|---|
| **Executive Office** | Federal Affairs Administration, Infrastructure Financing Authority, Office of the Commissioner of Municipal Affairs, Office of the Governor, Office of Socioeconomic Development, Public Buildings Authority, Public-Private Partnership Authority, State Historical Preservation Office | ● No progress | **No legal provision** | • Government has indicated no willingness to merge agencies |
| **Culture** | Fine Arts Center Corporation, Institute of Puerto Rican Culture, Musical Arts and Stagecraft Corporation | ● No progress | **MOU signed (expiration June 30, 2023)** | • Only consulting services shared as of now<br>• No progress (or future plans) reported on unification of functions or offices |
| **Public Works** | Department of Transportation and Public Works (DTPW), Integrated Transport Authority (ITA), Ports Authority, Traffic Safety Commission (TSC) | ● No progress | **Legislation repealed** | • No progress or future implementation plans reported |
| **Housing** | Department of Housing, Housing Financing Authority, Public Housing Administration | ● No progress | **No law or MOU signed** | • All agencies currently operating independently; no progress or future implementation plans reported |
| **Universities** | Conservatory of Music, School of Plastic Arts | ● No progress | **Legislation proposed but not presented** | • Government letter to Oversight Board claimed lack of inter-agency cooperation |
| **Justice** | Department of Justice, Parole Board | ● No progress | **No detail provided on legal provision or MOU** | • No progress or future implementation plans reported; Parole board still under DCR |
| **Land** | Land Administration, Land Authority | ● No progress | **No law or MOU signed** | • Both agencies currently operating independently; no progress or future implementation plans reported |
| **Ombudsman** | Advocacy for Persons with Disability, Elderly and Retired People Advocate Office, Health Advocate Office, Veterans Advocate Office, Women Advocate Office | ● No progress | **Legislation repealed; MOU not signed** | • No progress or future implementation plans reported |

**<u>Exhibit 20</u>**

*Privileged & Confidential*
*Attorney Work Product*
*Draft*



**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
FOR PUERTO RICO**

**November 19, 2021**

**RESOLUTION RELATING TO ACT 80-2020, ACT 81-2020, ACT 82-2020, AND SENATE
JOINT RESOLUTION 171-2021**

WHEREAS, on June 30, 2016, the federal Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") was enacted;

WHEREAS, section 101 of PROMESA created the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board");

WHEREAS, on August 3, 2020, then-Governor Vazquez Garced signed into law three statutes designated Act 80-2020 ("Act 80"), Act 81-2020 ("Act 81"), and Act 82-2020 ("Act 82");

WHEREAS, Act 80 creates the Incentivized Retirement Program, which offers early retirement to specific classes of eligible public employees covered under the Employees' Retirement System ("ERS") defined-benefit pension plan, and would increase the pension benefits of those employees from 29–40% of their highest salary to 50% of the highest annual compensation received over their final three years of employment;

WHEREAS, Act 81 amends the ERS defined-benefit pension plan to allow certain public emergency employees hired prior to January 1, 2000 to retire earlier than currently provided by statute and would increase the pension benefits of those employees from 29–40% of their final salaries to 45–55% of their final salaries;

WHEREAS, Act 82 modifies Act 26-2017 to allow Teachers' Retirement System ("TRS") participants to apply pre-existing or excess unused sick leave towards their retirement eligibility and pension-benefit levels, allowing some teachers to retire years earlier than was possible prior to the enactment of Act 82;

WHEREAS, Act 80, Act 81, and Act 82 would each increase the pension obligations of the Commonwealth, while potential savings from headcount reductions are uncertain and unlikely to cover this increased cost, and—according to the Oversight Board's assessment—could increase the Commonwealth's expenses by billions of dollars over the next 30 years;

WHEREAS, as noted in the Oversight Board's extensive correspondence with the government, the Oversight Board determined Act 80, Act 81, and Act 82 are inconsistent with the certified Commonwealth Fiscal Plan (the "Fiscal Plan"), would violate PROMESA by increasing Commonwealth expenditures not contemplated in the Fiscal Plan or requiring an unauthorized reprogramming to fund the new pension benefits, and by implementing new laws with wide-ranging effects on the Commonwealth's pension system without a full understanding of the financial implications of such measures or a mechanism to ensure they have no negative fiscal impact;

WHEREAS, on November 20, 2020, the Governor and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF," and together with the Governor, the "Government") confirmed that Act 80, Act 81, and Act 82 would not be implemented until an agreement is reached with the Oversight Board regarding whether or how these acts can be implemented in a fiscally responsible manner;

WHEREAS, since the passage of Act 80, Act 81, and Act 82, the Oversight Board has engaged in good faith efforts to work with the Government to analyze the impact of Act 80, Act 81, and Act 82 on the Commonwealth's expenditures and revenues and to explore options for implementing such programs in a fiscally responsible manner;

WHEREAS, on April 1, 2021, AAFAF provided the Oversight Board with data showing the eligible public employees seeking to retire under Act 80 and the costs the Commonwealth would bear as a result;

WHEREAS, on June 22, 2021, the Oversight Board proposed an option for partial implementation of Act 80, provided that certain conditions and restrictions are met, including amending Act 80 (i) to apply only where "implementation will generate savings incremental to the applicable Fiscal Plans" and (ii) to provide that "all benefits payable under Act 80 will be sourced through PayGo rather than payroll";

WHEREAS, the Government has not yet responded to the Oversight Board's proposal;

WHEREAS, on November 11, 2021, the Puerto Rico Legislature approved Senate Joint Resolution 171-2021 ("SJR 171"), which compels the Government to implement Act 80 and does not address the concerns raised in the Oversight Board's June 22, 2021 letter;

WHEREAS, the Oversight Board informed the Government on November 16, 2021 that SJR 171 would violate PROMESA by compelling the Government to implement a law—

in violation of the Government's agreement with the Oversight Board—that is significantly inconsistent with the Fiscal Plan and would impair and defeat PROMESA's purposes;

WHEREAS, SJR 171 is now awaiting action by the Governor;

WHEREAS, the Oversight Board has not changed its determination that Act 80, if implemented, will impair and defeat PROMESA's purposes, and the Oversight Board reaffirms its prior determination;

WHEREAS, the Oversight Board has determined that Act 80, if implemented, will impair and defeat PROMESA's purpose of achieving fiscal responsibility by (1) increasing the Commonwealth's pension obligations without ensuring corresponding savings, and (2) reversing the freeze of the ERS pension system that occurred prior to the Commonwealth's Title III case;

WHEREAS, the Oversight Board also reaffirms its prior determination that Act 81, if implemented, will impair and defeat PROMESA's purposes of achieving fiscal responsibility by (1) increasing the Commonwealth's pension obligations without ensuring corresponding savings, and (2) reversing the freeze of the ERS pension system that occurred prior to the Commonwealth's Title III case;

WHEREAS, the Oversight Board also reaffirms its prior determination that Act 82, if implemented, will impair and defeat PROMESA's purposes of achieving fiscal responsibility by (1) increasing the Commonwealth's pension obligations without ensuring corresponding savings, and (2) reversing certain aspects of the freeze of the TRS pension system required by the proposed plan of adjustment;

WHEREAS, the Oversight Board has determined that SJR 171, if implemented, will impair and defeat PROMESA's purposes of achieving fiscal responsibility by forcing partial implementation of a law that (1) will increase the Commonwealth's pension obligations without ensuring corresponding savings, and (2) the Oversight Board has determined will impair and defeat PROMESA's purposes;

WHEREAS, following discussions with the Government, and after consultation with the Oversight Board's legal and financial advisors, and following extensive deliberation, the Oversight Board has determined it is necessary and appropriate under PROMESA to take such actions as it considers necessary, consistent with its powers under PROMESA, to prevent further harm to Puerto Rico's financial future; and

NOW, THEREFORE, IT IS HEREBY RESOLVED that the Oversight Board:

1. Directs the Government not to implement Act 80, SJR 171, or any law based on or requiring implementation of Act 80;

2.  Directs the Government not to implement Act 81, or any law based on or requiring implementation of Act 81;

3.  Directs the Government not to implement Act 82, or any law based on or requiring implementation of Act 82;

4.  Advises the Government that the Governor and Legislature are barred by PROMESA section 108(a)(2) from enacting, implementing, and enforcing any and all of Act 80, Act 81, Act 82, and SJR 171;

5.  Approves taking legal action against the Government and other appropriate parties, pursuant to its authority under PROMESA sections 104(k), 108, and 204, to enforce the bar against enacting, implementing, and enforcing Act 80, Act 81, Act 82, and SJR 171 and have them declared nullities, to prevent further harm to the Commonwealth and its citizens and to carry out PROMESA.

Agreed and authorized as of the date first set forth above.