UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------x

| | |
|---|---|
| In re: | PROMESA |
| | Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO et al., | (Jointly Administered) |
| Debtors.[1] | |

------------------------------------------------------------x

ORDER REGARDING CERTAIN ASPECTS OF MOTION FOR
CONFIRMATION OF MODIFIED EIGHTH AMENDED TITLE III JOINT
PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

The Court, having presided over the November 2021 hearing on the Debtors'

motion for confirmation of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the

Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19365 in Case No. 17-3283, as modified

pursuant to any revisions made at or subsequent to the Confirmation Hearing as set forth in the

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Proposed Confirmation Order, including the Plan Supplement, and as may be modified pursuant to section 313 of PROMESA, the "Proposed Plan"),[2] and having reviewed carefully the parties' submissions and all of the evidence submitted in connection therewith, including the *Notice of Filing of Revised Proposed Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19368, the "Proposed Confirmation Order") and the *Notice of Filing Revised Proposed Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19427, the "Proposed FFCL" and, together with the Proposed Plan and the Proposed Confirmation Order, the "Proposed Plan Materials"), has identified certain materially problematic aspects of the Debtors' Proposed Plan Materials. This Memorandum Order identifies the relevant issues, sets forth the Court's views, and invites the Debtors' proposal of modifications consistent with this Memorandum Order or a showing of cause as to why the motion for confirmation should not be denied in the absence of such modifications.

I. SCOPE OF PROPOSED PREEMPTION PROVISIONS

Paragraphs 145 and 146 of the Proposed FFCL include certain proposed findings and conclusions concerning preemption of Commonwealth law, including provisions that quote, mirror, or repeat provisions of the Proposed Plan and the Proposed Confirmation Order.[3] The Court views the formulation of these preemption issues as problematic for several reasons.

---

[2] All docket references are to entries in Case No. 17-3283 unless otherwise indicated.

[3] For efficiency, in this section the Court will cite and quote the provisions of the Proposed FFCL, with the understanding that equivalent language in the other Proposed Plan Materials raises the same concerns and should be addressed accordingly.

In general, the preemption provisions in the Proposed Plan Materials are overly vague and/or broad and thus appear to be inconsistent with section 314(b)(3) of PROMESA. To the extent that the preemption language in the Proposed Plan Materials simply reiterates the effect of section 4 of PROMESA (see, e.g., Proposed FFCL ¶ 145 ("all laws (or such portions thereof) of the Commonwealth of Puerto Rico . . . inconsistent with PROMESA, are held preempted"), it is too vague because it is not clear what, if any, independent effect or purpose it serves. It also appears too broad to the extent it purports to declare preempted the entirety of statutes that may not be focused solely on financial obligations, the application of funds, or other economic structures or measures.

Accordingly, to the extent that the Proposed Plan Materials need to include one or more provisions recognizing the preemption Commonwealth statutes, it appears to the Court that a preemption provision should be directed to specified legislation and should include language specifically addressing the scope of such preemption. For example, based upon the *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19054-4, the "Jaresko Declaration"), it appears that the intention of the Oversight Board is that laws must be preempted if they (i) require the Commonwealth to spend its money to repay its current general obligation and guaranteed debt in full without regard to the fiscal plans and budgets certified by the Oversight Board, (ii) authorize the Commonwealth to issue debt without obtaining Oversight Board approval, (iii) require the Governor to approve any debt the Commonwealth issues, regardless of whether that debt issuance is authorized under PROMESA or the Plan, (iv) require the Commonwealth to transfer money to numerous other entities to spend on various purposes, outside the Oversight Board's certified budget, fiscal plan and Plan, and/or (v) require the

Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment. (Jaresko Decl. ¶¶ 230-35.) Express language clarifying the intended scope of preemption, together with record supported findings as to projected costs and inconsistency with the certified budget, fiscal plan and/or assumptions underlying the Proposed Plan, would appear to serve the, would appear to serve the goals of the Oversight Board (i.e., ensuring that Commonwealth legislation does not impede the implementation and effectuation of the Plan) while providing adequate information to the Court and parties and ensuring that the Proposed Plan is consistent with section 314(b)(3) of PROMESA.

Second, to the extent that any preemption provision of the Proposed Plan Materials would effectively nullify a law or portion of a law due to inconsistency with a certified budget or fiscal plan, it is not clear whether or how any rights that may have accrued during the postpetition period would be affected or can be affected. While non-inclusion of a particular obligation in a certified budget or fiscal plan may preempt the Commonwealth's appropriation of governmental resources to pay that obligation, the Debtors have not shown that there is any clear basis in law or fact to conclude that such preemption invalidates the law creating such obligation in the first place, or that it invalidates the obligation to pay where a creditor provides beneficial postpetition consideration to a debtor pursuant to a postpetition transaction with a debtor. See Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.), 954 F.2d 1, 5 (1st Cir. 1992) ("As a general rule, a request for priority payment of an administrative expense pursuant to Bankruptcy Code § 503(a) may qualify if (1) the right to payment arose from a postpetition transaction with

the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor.").

Third, the Oversight Board's addition of Act 80-2020, Act 81-2020, and Act 82-2020 to the amended list of preempted statutes in the Proposed Plan Materials occurred after the close of evidence at the Confirmation Hearing, and thus the Court finds little factual basis in the record[4] for inclusion of those statutes in any list of preempted statutes.

Fourth, the Proposed FFCL contemplates the preemption of all "laws enacted prior to June 30, 2016, that provide for . . . transfers from . . . one of [the Commonwealth's] instrumentalities to any agency or instrumentality," but the Debtors have not apparently provided a basis in law or fact for the preemption of laws that impose obligations on non-debtor entities. The Proposed Plan Materials should clarify the temporal scope of preemption as to laws that predate the enactment PROMESA. The Proposed Plan Materials should clarify that the Proposed Plan only contemplates preemption as to the obligations of the Debtors, and only to the extent that such laws provided for obligations existing on or after June 30, 2016.

Fifth, the Proposed FFCL provides that "each of the preempted laws is preempted permanently" (Proposed FFCL ¶ 145), but the scope of the proscription must be clarified substantially. It is not clear to the Court whether this language simply means that preempted statutory provisions, as codified, will not come back into effect, or whether this provision is intended to prohibit the enactment of new laws (that have not yet been formulated by the Legislative Assembly) that re-create old laws. If the latter meaning is intended, the Oversight

---

[4] The *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057) does briefly discuss the cost of "several pension-related laws," including Act 81-2020, but it does not specifically reference Act 80 or Act 82. (Malhotra Supp. Decl. ¶ 20.)

Board must address how the government or a court would be able to determine whether enactment of a post-confirmation statute would (impermissibly) re-create a preempted law as opposed to (permissibly) creating a new law, and why the Title I and Title II mechanisms for challenging future legislation would not suffice as means of addressing such action by the Commonwealth.

## II. TREATMENT OF "UNSECURED" PORTIONS OF ALLOWED EMINENT DOMAIN CLAIMS AND TREATMENT OF INVERSE CONDEMNATION CLAIMS

The Court also finds that the Proposed Plan's treatment of "unsecured" portions of allowed eminent domain claims (some of which form a part of Class 54), and the absence of any appropriate treatment for allowed inverse condemnation claims (which do not currently form a part of Class 54) (together, the "Per Se Creditors"), is materially defective because the Proposed Plan does not provide for full payment of the "unsecured" portion of those claims and the Takings Clause of the Constitution of the United States prohibits the Debtors from impairing and discharging any obligation to provide "just compensation" for the physical taking of private property for public use. U.S. Const. am. V. As such, the Proposed Plan is in contravention of section 314(b)(3) of PROMESA. 48 U.S.C. § 2174. Although these claims differ in their procedural postures, each seeks just compensation for an alleged physical taking of property by the Commonwealth prior to the filing of the Commonwealth's bankruptcy petition.

Allowed eminent domain Claims are separately classified in Class 54 of the Proposed Plan. The holders of such Claims assert they hold prepetition constitutional Claims based on seizures of property pursuant to the Commonwealth's eminent domain power. Under applicable Puerto Rico law, upon commencement of a condemnation proceeding, title to a subject property is transferred to the Commonwealth and funds are deposited "for the benefit and use of the natural or artificial person or persons entitled thereto, of the amount estimated as

compensation and specified" for the value of the property interest or right of the former title holder. 32 L.P.R.A. § 2907. The Debtors assert that eminent domain claims are properly classified in Class 54 on the theory that they are partially secured by funds deposited by the Commonwealth with the Clerk of the Court of First Instance in connection with condemnation proceedings underlying such Claims. (Proposed Plan § 58.1.) Claims within Class 54 are currently treated as secured Claims to the extent the Claims are allowable and there is cash on deposit for them with the Clerk of the Court of First Instance. (Proposed Plan § 58.1.) To the extent an allowed Class 54 Claim exceeds the cash on deposit with the Clerk of the Court of First Instance, the Proposed Plan currently treats the Claims as Class 58 CW General Unsecured Claims entitled to the same treatment as other holders of CW General Unsecured Claims. (Id.; Jaresko Decl. ¶ 54.) Allowed inverse condemnation Claims are not separately classified in the Proposed Plan. Such claims are treated as Class 58 CW General Unsecured Claims subject to the same treatment as CW General Unsecured Claims. (See Nov. 22, 2021, Hr'g Tr. 11:12-20.)

The Per Se Creditors contend that their interests in just compensation are fully secured and, even if they are not secured, that they are nevertheless entitled to payment in full of their allowable unsecured Claims because the Claims are based on the Fifth Amendment of the U.S. Constitution. The issue presented by the claimants is whether they are entitled to have the unsecured portions of their Claims designated as nondischargeable or otherwise required to be paid in full. It is undisputed that the Proposed Plan does not currently except the eminent domain and inverse condemnation Claims from discharge. The Debtors and Per Se Creditors disagree as to whether the Court can and should except them from discharge. Because the Fifth Amendment of the U.S. Constitution provides "private property [shall not] be taken for public use, without just compensation," the claimants assert Congress lacks power to legislate the

discharge of eminent domain or inverse condemnation claims for less than payment in full of just compensation. Conversely, the Debtors contend that article I, section 8, clause 4 of the Constitution of the United States grants Congress the power to pass uniform laws on the subject of bankruptcies, and empowers Congress to provide for the discharge of eminent domain claims for less than payment in full as the Debtors purport to do in the Proposed Plan.

For the following reasons, the Court concludes, as to such "unsecured" eminent domain and inverse condemnation claims that are ultimately allowed, that the Proposed Plan as currently written is materially defective because the treatment of such claims would violate the Takings Clause of the Constitution of the United States.

The Per Se Creditors rely on Supreme Court decisions for the propositions that a physical invasion of property constitutes a per se taking (Cedar Point Nursery v. Hassid, 141 S. Ct. 2063, 2071 (2021)), for which an irreducible entitlement to just compensation immediately ripens under the Takings Clause (Knick v. Twp. of Scott, 139 S. Ct. 2162, 2171 (2019); Blanchette v. Conn. Gen. Ins. Corp., 419 U.S. 102, 155 (1974) ("[A]ny deficiency of constitutional magnitude in the compensation [of seized property] . . . will indeed be a taking of private property for public use.")), and that the bankruptcy code is subject to the Takings Clause (see Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589, 601-02 (1935); United States v. Sec. Indus. Bank, 459 U.S. 70, 75, 78, 80, 82 (1982)). See also In re City of Detroit, 524 B.R. 147, 304-07 (Bankr. E.D. Mich. 2014).

The Debtors respond that, to the extent portions of these Takings Clause claims are not secured by deposits of funds with courts, they are simply unsecured claims that are subject to impairment and discharge under the bankruptcy code and that, while Supreme Court decisions have recognized that the Fifth Amendment restricts the bankruptcy code, it does

so only to the extent that property interests are secured. See Sec. Indus. Bank, 459 U.S. at 75-76, 78; Wright v. Union Cent. Life Ins. Co., 311 U.S. 273, 278 (1940) (the constitution protects "the rights of secured creditors, throughout the proceedings, to the extent of the value" of the creditors' collateral). See also Cobb v. City of Stockton (In re City of Stockton), 909 F.3d 1256 (2018); Poinsett Lumber Mfg. v. Drainage Dist. No. 7, 119 F.2d 270 (8th Cir. 1941). The Debtors also argue that claims for just compensation under the Takings Clause are not meaningfully distinguishable from other constitutional claims resulting in relief, which are commonly dischargeable in bankruptcy. (See, e.g., Docket Entry No. 18874 ¶¶ 86, 88 (quoting In re City of Stockton, 909 F.3d at 1268 ("[C]onstitutionally based lawsuits seeking money damages, such as § 1983 claims, are routinely adjusted in bankruptcy.")).)

Federal statutes, such as the bankruptcy code and PROMESA, are subject to the strictures of the Constitution, including the Fifth Amendment prohibition of government takings of property without just compensation. Indeed, the bankruptcy power conferred by article I, section 8 of the Constitution of the United States is itself subject to the Fifth Amendment. See Radford, 295 U.S. at 589 ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."). This principle was reaffirmed and extended by the Supreme Court in Security Industrial Bank, where the Court cautioned that, "however 'rational' the exercise of the bankruptcy power may be, that inquiry is quite separate from the question whether the enactment takes property within the prohibition of the Fifth Amendment." 459 U.S. at 75. In keeping with traditional takings jurisprudence, the predicate inquiry must concern the nature of the property at issue and whether a taking occurred. See also id. at 76-77 (classifying secured interests in contract rights as properly analyzed under the factors set forth in Penn Cent. Transp. Co. v. City of New York, 438 U.S.

104, 124 (1978), as distinguished from jurisprudence governing fee simple interest in real property).

The Debtors' application of the distinction between secured and unsecured interests under the bankruptcy code to determine whether a Takings Clause-related obligation can be impaired is inconsistent with the Fifth Amendment, which requires first assessing the origin of the payment obligation: whether it arises from a government taking of private property for public use. While a security interest is a type of property that can be protected by both the Fifth Amendment and the bankruptcy code, a physical invasion (in this case, of real property) falls squarely within the ambit of Fifth Amendment protection, whether or not the government entity has provided any security for its obligation to pay just compensation.

The Supreme Court's takings jurisprudence requires evaluating whether the real property was subject to a physical invasion (implicating per se takings analysis) or whether, for example, it was subjected to a use restriction (in which case the Penn Central factors are applied to determine whether a regulatory taking occurred). Cedar Point Nursery, 141 S. Ct. at 2071-72. The Per Se Creditors assert, and the Debtors do not dispute, that their claims concern the physical invasion by the Commonwealth of privately owned real property (giving rise to either eminent domain or inverse condemnation claims); the Court therefore confines its examination to a per se takings analysis. "These sorts of physical appropriations constitute the 'clearest sort of taking,' and we assess them using a simple, *per se* rule: The government must pay for what it takes." Id. at 2071 (emphasis in original) (internal citation omitted).

The Court now turns to the question of just compensation and whether valid claims for just compensation can be impaired in bankruptcy. Unlike other constitutional prohibitions of government conduct, for violations of which Congress has created causes of

action, the Takings Clause of the constitution itself mandates a remedy of "just compensation" in the event that "private property [is] taken for public use." U.S. Const. am. V. In Knick, the Supreme Court stated that "[t]he Fifth Amendment right to full compensation arises at the time of the taking, regardless of post-taking remedies that may be available to the property owner," a principle derived from Jacobs v. United States, 290 U.S. 13, 17 (1933), in which the Court stressed that the owner of a "valid takings claim is entitled to compensation as if it had been 'paid contemporaneously with the taking'—that is, the compensation must generally consist of the total value of the property when taken, plus interest from that time." Knick, 139 S. Ct. at 2170. Thus, unlike judgment creditors whose statutory remedies for violations of other constitutional provisions are dischargeable, holders of takings claims have a constitutional right (rather than a statutory remedy) to just compensation that is not subject to impairment or discharge under a plan of adjustment. See Blanchette, 419 U.S. at 155 ("[A]ny deficiency of constitutional magnitude in the compensation [of seized property] . . . will indeed be a taking of private property for public use."); see also In re City of Detroit, 524 B.R. at 268-70. Put differently, "just compensation" is not a statutory remedy for a constitutionally identified wrong but is instead a necessary condition to the exercise of government power to take private property for public use.

The federal appellate cases cited by the Debtors are inapposite, both because they are materially distinguishable and because they do not support an alternative interpretation of the Supreme Court's jurisprudence. The case of Poinsett Lumber is inapposite because, unlike the instant matter where claimants have timely filed proofs of claim and objected to the treatment of their claims under the Plan, the claimant in that case had failed to timely preserve its right to object to the readjustment until after the plan had been confirmed. Poinsett Lumber Mfg., 119

F.2d at 274 ("Appellant could not remain silent until the proceedings had advanced to the stage of a final decree and then, in a collateral attack, make the claim successfully that its cause of action is not included in the plan of composition, nor affected by it, nor dealt with therein."). Moreover, although the Eighth Circuit did reject the creditor's argument that the Takings Clause protected its claim from discharge, the debtor had previously been found to not be a public entity. Id. at 272-73; Luehrmann v. Drainage Dist. No. 7 of Poinsett Cnty., 104 F.2d 696, 698 (8th Cir. 1939) ("[Elsewhere,] this court held that an Arkansas Drainage District is not a governmental agency as respects the question of whether the district is subject to equity jurisdiction. This ruling is based upon the decisions of the Supreme Court of Arkansas holding that drainage districts are quasi-public corporations which are not political or civil divisions of the state like counties and municipal corporations created to aid in the general administration of the government."). Accordingly, Poinsett Lumber does not support the Debtors' theory that a government debtor may impair and discharge a valid Takings Clause claim for just compensation, let alone for the reason that the claim for just compensation is unsecured rather than secured.

The Debtors' reliance on In re City of Stockton is likewise unavailing. First, the creditor in that Ninth Circuit case had slept on his rights to oppose the discharge of his claim under the plan of adjustment. The majority determined that Mr. Cobb had not sought any stay relief, that the plan had already been substantially consummated, that reversal of the confirmation order would have threatened the settlements underlying the plan to the prejudice of settlement participants, and that the relief sought required dismantling the plan, and so his claim was deemed equitably moot. In re City of Stockton, 909 F.3d at 1263-65. Such questions of equitable mootness are simply not present at this pre-confirmation stage in the instant

proceeding. Second, and more importantly, the Debtors' reliance on the Ninth Circuit's alternate finding that Mr. Cobb's claim was dischargeable because his interest was unsecured rather than secured, not only lacks any clear basis in Supreme Court jurisprudence, but it appears to derive from a conflation of the constitutional guarantee of just compensation under the Takings Clause with statutory remedies for other constitutional violations. See id. at 1268 ("[O]ther constitutionally based lawsuits seeking money damages, such as § 1983 claims, are routinely adjusted in bankruptcy[.]"). See also id. at 1278 (Friedland, J. dissenting) ("[T]he Constitution's mandate that takings claims be excepted from discharge does not depend on whether those claims were initially classified in any bankruptcy proceeding as secured or unsecured; the whole point of nondischargeability is that nondischargeable claims pass through bankruptcy unaffected[.]"). The Court declines any invitation to overlook the unique nature of the Takings Clause here by conditioning the Fifth Amendment requirement of just compensation on the existence of security for the obligation. To hold otherwise would be to make the Takings Clause subject to federal bankruptcy law, which is precisely the opposite of what the Supreme Court has required.[5]

---

[5] The Oversight Board also contended, for the first time, at oral argument that the Court should allow the impairment and discharge of per se takings claims because (i) Congress can otherwise bar Takings Clause claims through the operation of statutes of limitations, just like any other claim (see, e.g., Nov. 22, 2021, Hr'g Tr. 60:10-25 (discussing Block v. North Dakota, 461 U.S. 273, 292 (1983))), and (ii) "the bankruptcy power is not always subject to the Fifth Amendment when it comes to discharge and avoidance of property interests," such that "if you can avoid a property interest under bankruptcy code section 544, surely you can discharge an unsecured claim to just compensation under section 944." (Nov. 23, 2021, Hr'g Tr. 26:20-27:5.) The first argument fails because (a) the cases cited by the Oversight Board are distinguishable (including Block), because none of them concerned any limitation periods for raising Takings Clause claims, nor do any of them provide an analytical basis for determining that Congress can statutorily limit a constitutional claim to which sovereign immunity is not a barrier; (b) statutes of limitations concern litigation decisions over which claimants have control, such as the timing of filing a claim, and therefore they do not support by

Accordingly, the Court has concluded that the per se claims asserted by the Per Se Creditors, to the extent they are ultimately allowed as such, are not subject to impairment or discharge, and that the Per Se Creditors' objections to confirmation should be sustained. The Proposed Plan's treatment of eminent domain and inverse condemnation claims is therefore in violation of the Takings Clause of the Constitution of the United States.[6] Thus, the Court will not confirm the Proposed Plan as written because Class 54 relegates to partial payment the

---

analogy the Oversight Board's argument that PROMESA or the bankruptcy code can affect Takings Clause claims in a manner beyond the control of the claimants; and (c) whereas statutes of limitations serve as a procedural bar to claims, the Oversight Board's theory would affect the substance of Takings Clause claims, regardless of when they are brought. The Oversight Board's second argument fares no better: 11 U.S.C. § 544(b)(1) only allows for the avoidance of transfers that would be voidable under applicable law. Section 544(b)(1) is thus already restricted to transfers that are "voidable under applicable law," which accommodates restrictions imposed by non-bankruptcy law, including the Takings Clause. 11 U.S.C. § 544(b)(1). Further, the Takings Clause serves only as a narrow boundary to the Debtors' avoidance powers. In situations where regulatory takings are at issue, the authority under section 544(b)(1) to avoid transfers may still be exercised in cases where the Penn Central analysis permits. See also 11 U.S.C. §§ 547(b), 548(a). It is only in the limited situations, like those discussed above, in which it appears that the Supreme Court's jurisprudence on Takings Clause claims would impose a limit a debtor's avoidance powers. The Court need not, and does not, express any opinion here as to the application of statutes of limitation to Takings Clause claims.

[6] The Court's analysis should not be construed to prejudge whether all Per Se Creditors must receive "full" compensation for their Takings Clause claims. The Fifth Amendment mandates that a meritorious takings claimant receive just compensation, as determined by the court. See In re City of Stockton, 909 F.3d at 1279 (Friedland, J. dissenting). The Court does not decide or prejudge today the meaning or quantum of just compensation for any particular claimant. For some claimants, that amount has already been adjudicated. For others, that determination has not yet been made. Rather, the Court's limited determination here is that any treatment in the Proposed Plan that provides less than just compensation for allowed eminent domain and inverse condemnation claims by way of impairment and discharge in bankruptcy does not comply with the Fifth Amendment.

portion of Allowed Eminent Domain Claims that is not on deposit with the Court of First Instance, and makes no provision for full payment of allowed inverse condemnation claims.

### III. MISCELLANEOUS OTHER PROVISIONS

The Court has also identified other provisions of the Proposed Confirmation Order, the Proposed FFCL, and the Proposed Plan that warrant revision in any subsequent filing.

First, the Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases provision (paragraph 29) of the Proposed Confirmation Order provides that "all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by the Debtors as of the Effective Date . . .", except in very limited instances delineated in that provision. However, the Rejection Damages Claim provision (paragraph 31) provides *inter alia* that claims arising from rejected contracts are barred if they are not asserted by the later of thirty days after "(i) the Confirmation Date or (ii) entry of an order authorizing rejection." As a practical matter, the rejection of a contract needs to precede the period of time for a counterparty to file a claim arising from the rejected contract. As currently written, the Rejection Damages Claim provision could limit a counterparties' ability to object to the rejection of a contract that is "added" to the Debtors' rejection list beyond (i) 30 days after the Confirmation Date, or (ii) after an order authorizing rejection of a contract has been entered. Thus, the timeline for the Debtors' authority to reject contracts, the Effective Date, could extend beyond the period of time for counterparties to file claims arising from rejected contracts. Accordingly, these provisions warrant revision.

Second, the Appointments Related Litigation/Uniformity Litigation provision (paragraph 63) of the Proposed Confirmation Order includes "the compromise and settlement of

the Commonwealth-COFINA Dispute and the releases, exculpations and injunctions provided pursuant to Article XCII of the Plan and herein." However, section 92.8 of the Proposed Plan does not include a reference to the Commonwealth-COFINA Dispute. Thus, this provision warrants revision.

Third, section 76.4 of the Proposed Plan provides "[t]he parties to such Executory Contracts and Unexpired Leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtors. If there are any objections filed, the Title III Court shall hold a hearing on a date to be set by the Title III Court." On November 23, 2021, the Debtors filed a *Notice of Executory Contracts and Unexpired Leases to be Assumed Pursuant to Title III Plan of Adjustment* (Docket Entry No. 19353 in Case No. 17-3283). To the extent this filing is intended to satisfy in part or in whole section 76.4 of the Plan, this provision warrants revision.

Fourth, paragraph 39 of the Proposed FFCL provides "[o]n July 12, 2021, the Oversight Board certified the modification of the Fourth Amended Plan and the submission of the Fifth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (Docket Entry No. 17306) (the "Fifth Amended Plan"). (Debtors Exhibit 127)." While the Debtors reference Exhibit 127 as the resolution certifying the modification to the Fourth Amended Plan of Adjustment, Debtors Exhibit 127 is in fact a resolution titled "Approving Execution of Amended and Restated Plan Support Agreement for the Commonwealth, PBA, and ERS." Thus, this paragraph warrants revision.

Fifth, paragraph 40 of the Proposed FFCL provides "[o]n July 26, 2021, the Oversight Board certified the modification of the Fifth Amended Plan and the submission of the Sixth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.

(Docket Entry No. 17516) (the "Sixth Amended Plan"). (Debtors Exhibit 128)." While the Debtors reference Exhibit 128 as the resolution certifying the modification to the Fifth Amended Plan of Adjustment, Debtors Exhibit 128 is in fact a resolution titled "Approving Execution of PRIFA Related Plan Support Agreement." Thus, this paragraph warrants revision.

Sixth, paragraph 46 of the Proposed FFCL provides "[o]n November 28, 2021, the Oversight Board certified the modification of the Third Modified Eighth Amended Plan and the submission of the Plan upon a determination, in the Oversight Board's sole discretion, that the Plan was consistent with the Fiscal Plan. (Debtors Exhibit [ ])." Thus, this paragraph warrants revision insofar as the sentence is incomplete as it does not include a Docket Entry No.

Seventh, paragraph 86 of the Proposed Confirmation Order provides that any secured claim of a surety will be paid in full "to the extent that the Claim of a surety against any of the Debtors is determined to be a secured claim and allowed in whole or in part, by Final Order . . . ." The requirement of a final order appears inconsistent with section 502(a) of the Bankruptcy Code. The Court suggests inserting ". . . or by operation of section 502(a) following the expiration of the Debtors' time to object to such claim." Accordingly, this paragraph warrants revision.

Finally, the term "bankruptcy court" is widely used throughout the Proposed Plan Materials to refer to the Court. Thus, revisions to make uniform reference to the Title III Court are warranted.

IV. CONCLUSION

For the reasons set forth above, the Debtors are hereby ordered to submit either (i) a proposal of modifications consistent with this Memorandum Order or (ii) a showing of cause as to why the motion for confirmation should not be denied in the absence of such modifications.

Prior to such submission, the Oversight Board is directed to meet and confer with relevant parties in interest, including AAFAF, concerning these issues, and the Oversight Board's submission should include a statement as to whether and what extent changes to the Proposed Plan Materials are being made with those parties' consent. The Oversight Board is directed to file its submission by December 20, 2021. Parties in interest, including AAFAF, may submit responses by December 23, 2021.

SO ORDERED.

Dated: December 14, 2021

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge