# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.,*<br><br>Debtors.[1] | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>Plaintiff,<br>v.<br><br>HON. PEDRO PIERLUISI URRUTIA, in his official capacity as Governor of Puerto Rico; THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY; LUIS M. COLLAZO RODRÍGUEZ, in his official capacities as Administrator of the Retirement System for Employees of the Government of Puerto Rico and Executive Director of the Government of Puerto Rico Retirement Board; and JUAN C. BLANCO URRUTIA, in his official capacity as Director of the Office of Management and Budget,<br><br>Defendants. | Adv. Proc. No. _____ in 17 BK 3283-LTS |

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523 (LTS)) (Last Four Digits of Federal Tax ID: 3801). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO'S
COMPLAINT IN RESPECT OF ACTS 80, 81, 82, AND JOINT RESOLUTION 33
AGAINST THE GOVERNOR OF PUERTO RICO, THE PUERTO RICO FISCAL
AGENCY AND FINANCIAL ADVISORY AUTHORITY, THE ADMINISTRATOR OF
THE RETIREMENT SYSTEM FOR EMPLOYEES OF THE GOVERNMENT OF
PUERTO RICO, THE EXECUTIVE DIRECTOR OF THE GOVERNMENT OF
PUERTO RICO RETIREMENT BOARD, AND
<u>THE DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET</u>**

**To the Honorable United States District Judge Laura Taylor Swain:**

Plaintiff the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), for itself and as Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), brings this complaint against defendants Pedro Pierluisi Urrutia (the "Governor"), in his official capacity, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), Luis M. Collazo Rodríguez (the "ERS Administrator"), in his official capacities as Administrator of the Retirement System for Employees of the Government of Puerto Rico ("ERS") and Executive Director of the Government of Puerto Rico Retirement Board (the "Retirement Board"), Juan C. Blanco Urrutia (the "OMB Director"), in his official capacity as Director of the Office of Management and Budget ("OMB") (together, the "Government" or "Defendants").

## NATURE OF THE ACTION

1.      The Oversight Board has brought this action because the Government enacted laws, and demanded their implementation, which illegally create new pension debt obligations without Oversight Board approval and illegally modify treatment of claims in the currently proposed Title III plan of adjustment.  As a result, various categories of active employees will receive more than payment in full of their pension claims, while other creditors will suffer losses.

2.      This action requests declaratory and injunctive relief pursuant to the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. §§ 2101-2241 ("PROMESA"). In contravention of PROMESA's requirements, the Puerto Rico Legislature enacted and former Governor Wanda Vázquez Garced signed into law Act 80-2020 (formerly Senate Bill 1616, hereinafter "Act 80"), Act 81-2020 (formerly Senate Bill 1623, hereinafter "Act 81"), and Act 82-2020 (formerly Senate Bill 1432, hereinafter "Act 82") (together, the "Acts").  The Acts would

reinstate the fiscal mismanagement that existed before PROMESA and caused Puerto Rico to incur over $120 billion in unaffordable debt, including $55 billion of unfunded pension obligations. Repeating history, the Acts would create billions of dollars in new unfunded defined-benefit pension obligations for the Commonwealth with no viable plan or method to cover the increased costs.   In the determination of the Oversight Board, the Acts thereby impair and defeat PROMESA's purposes, including the restructuring of debt in accordance with PROMESA Title III and achievement of fiscal responsibility and access to capital markets.

3.      In addition to imposing the treatment of certain prepetition pension claims in violation of and independent of PROMESA Title III, each Act violates PROMESA §§ 204(a), 204(c), 207, and 108(a)(2) because it imposes billions of dollars in new liabilities outside the Oversight Board-certified fiscal plans and budgets for the Commonwealth and other affected instrumentalities by modifying existing pension obligations (*i.e.*, debt) without identifying an adequate method of paying for them or obtaining prior Oversight Board approval.

4.      The Oversight Board engaged in extensive efforts with the Government to explore ways to implement potential modifications of the Acts in a fiscally responsible manner.   Those efforts were premised on the Government's express agreement not to implement the Acts without Oversight Board approval.   The Government has broken that agreement, however, with the recent passage and signing into law of Joint Resolution 33-2021 ("JR 33," formerly Senate Joint Resolution 171-2021), a measure requiring the Government to implement, at least partially, Act 80.   The Government violated PROMESA § 108(a)(2) by enacting and signing into law JR 33, and by moving forward with its implementation.

5.      The Oversight Board brings this action to enjoin implementation and enforcement of the Acts, as well as JR 33, and have each of them declared a nullity.

2

**PARTIES**

6.      Plaintiff the Oversight Board is an entity within the Commonwealth Government established pursuant to PROMESA § 101.

7.      Defendant Pedro Pierluisi Urrutia is the Governor of Puerto Rico, vested with the executive power and the obligation to execute the laws.  P.R. Const. art. IV §§ 1, 4.

8.      Defendant AAFAF is the fiscal agent, financial advisor, and reporting agent of all entities of the Puerto Rico Government with responsibility for the Government's collaboration, communication, and cooperation with the Oversight Board.  Act 2-2017 § 5(a).

9.      Defendant Luis M. Collazo Rodríguez is the ERS Administrator and the Executive Director of the Retirement Board.  Under Commonwealth law, the ERS Administrator has the power to implement Act 80 and is required to do so under JR 33.  *See* JR 33 § 1; Act 80 § 12; *see also* Act 106-2017, arts. 4.1, 4.2, & 5.1; 3 L.P.R.A. §§ 9561, 9562 & 9571.

10.      Defendant Juan C. Blanco Urrutia is the OMB Director.  Under Commonwealth law, together with the ERS Administrator, the OMB Director has the power to implement Act 80 and is required to do so under JR 33.  *See* JR 33, § 1; Act 80 § 12.

**JURISDICTION AND VENUE**

11.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 because the action arises under PROMESA, a federal statute, and pursuant to PROMESA §§ 106(a) and 306(a)(2) because the action arises out of PROMESA and relates to the Commonwealth's Title III case by increasing and modifying the Commonwealth's liabilities.

12.      This Court has personal jurisdiction over all Defendants pursuant to PROMESA § 306(c) and because they are either officers or an agency of the Government of Puerto Rico, are

3

located in Puerto Rico, or have performed acts in Puerto Rico giving rise to the claims in this action.

13.     Venue is proper in this District pursuant to PROMESA §§ 106(a) and 307.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because all Defendants reside in the District and because a substantial part of the events or omissions giving rise to the action occurred in the District.

## FACTUAL BACKGROUND

### A.     THE COMMONWEALTH FISCAL PLANS

14.     The Oversight Board certified a number of fiscal plans for the Commonwealth, the most recent on May 27, 2020 (the "2020 Fiscal Plan") and April 23, 2021 (the "2021 Fiscal Plan") (together, the "Fiscal Plans").  True and correct copies of which are attached hereto as Exhibit 1 and Exhibit 2, respectively.  The Fiscal Plans acknowledge the many challenges Puerto Rico continues to face, including recovering from the natural disasters of the past four years and the ongoing COVID-19 global pandemic.  *Id.*  To overcome those challenges, the Fiscal Plans provide a blueprint for the Commonwealth to achieve PROMESA's goals of financial stability and capital-market access by, among other things, undertaking fiscal measures and structural governmental reforms, including reforms to Puerto Rico's unfunded pension systems.  Ex. 1 at 8–19; Ex. 2 at 10–15.

15.     The Puerto Rico Government operates three public-employee retirement systems: ERS; the Teachers' Retirement System ("TRS"); and the Judiciary Retirement System ("JRS").  As noted in the Fiscal Plans, "[o]ver many decades, successive [g]overnments have failed to adequately fund these retirement plans, and today the ERS, TRS, and JRS are insolvent."  Ex. 1 at 232; Ex. 2 at 272.  To help rein in these unfunded liabilities, the Government passed Act 3-2013

4

which froze the Act 447-1951 ("Act 447") and Act 1-1990 ("Act 1") components of the ERS defined-benefit plan as of June 30, 2013 for employees hired before 2000, converting all employees to hybrid accounts ("Act 3 Accounts") similar to those created under System 2000 by Act 305-1999.  Ex. 1 at 238; Ex. 2 at 278.

16.    The Fiscal Plans include several pension-reform initiatives expected by the Oversight Board to result in significant savings.  According to the 2021 Fiscal Plan, restructuring the pension systems will create $198 million in total savings between FY 2022 and FY 2026.  "To avoid creating future pension liabilities and to adequately fund the pensions [of] future retirees," the Fiscal Plans provide that "the JRS and remaining TRS benefit accruals must be frozen,"[1] and the 2021 Fiscal Plan requires that this freeze occur by January 1, 2022.  Ex. 2 at 274.  The pension costs anticipated in the Fiscal Plan "rely on demographic and actuarial estimations for Employees' Retirement System (ERS), Teachers' Retirement System (TRS), and Judiciary Retirement System (JRS) populations and benefit obligations."  *Id.* at 54.  Key provisions of the TRS and JRS defined-benefits freezes "are comparable to the ERS freeze that was implemented in 2013," which remains in effect.  *See id.* at 275.

17.    In light of the Commonwealth's distress as set forth in PROMESA § 405(m) and its shrinking population, the Fiscal Plans provide a new model for government operations by "rightsizing" the Government through agency consolidation as well as implementing certain government-wide cost-savings measures such as the reduction or elimination of government services.  Ex. 1 at 147–198; Ex. 2 at 180–239.  This process will be directed at larger Commonwealth agencies "as well as consolidations and reductions within the 'long tail' of other

---

[1] TRS members hired after August 1, 2014 do not receive defined benefits.

agencies." Ex. 1 at 145.  The Fiscal Plans mandate that rightsizing, along with related reforms in compensation and utility measures, must result in significant savings; the 2021 Fiscal Plan mandates $1.5 billion "in run-rate savings by FY2026" as compared to the FY 2018 baseline estimates. Ex. 2 at 169.

     **B.**    **THE ACTS**

        <u>**ACT 80**</u>

     18.    Act 80, enacted on August 3, 2020, creates an Incentivized Retirement Program (the "<u>IRP</u>") offering early retirement to specific classes of eligible public employees covered under the ERS defined-benefit formulas implemented by Act 447 and Act 1.  A certified translation of Act 80 is attached hereto as Exhibit 3.  Positions vacated by retirees will remain unfilled unless the agency, in its sole discretion, determines the position provides "essential services for the operation of the agency. . . ." *Id.* art. 9(b).  Regardless of the agency's determination, any position may be refilled if either OMB or the Judiciary so instructs.  *Id.* art. 9(a).

     19.    Act 80 does not limit the number of eligible employees who may participate in the early retirement program or otherwise place a limit on its costs.  *Id.*

     20.    Initially, Act 447 and Act 1 provided eligible public employees up to 75% of their final salaries in annual pension compensation, based on an employee's number of years of service at retirement.  For budgetary reasons, the value of these benefits was frozen at salary and service levels as of June 30, 2013. On and after that date, those eligible public employees earned additional benefits through Act 3 Accounts, which resulted in lower benefit levels than those previously provided for under Act 447 and Act 1.  Ultimately, even the accruals under these Act 3 Accounts were frozen by Act 106-2017.  As recognized by Act 80, these amendments resulted in average

6

benefit levels of 40% of an Act 447 employee's final salary and 29% of an Act 1 employee's final salary.

21.     Act 80, however, increases benefits by providing participating public employees "[a] lifetime retirement pension equivalent to fifty percent (50%) of the compensation equivalent to the highest annual gross compensation accrued in any of the last three (3) years prior to the moment they availed themselves of this Program," and "[a]n employer contribution of one hundred dollars ($100) per month to the health insurance plan chosen by the participant" until the participant reaches sixty-two years old.  *See id*. art. 7(a)(2)–(b)(2).  Act 80 thereby effectuates an expansion of ERS pension benefits, negating savings created by the ERS pension-benefit freeze and adding billions of dollars in liabilities to a pension system that has already run out of funds and transitioned to a "pay-as-you-go" system.  Such an increase pays putative retirees more than their allowable pension claims while other creditors suffer losses, and contradicts the Government's position in 2013 that a pension freeze was necessary to rein in unaffordable pension costs.  The Acts would result in an increase in recoveries to affected pension claimants under the Plan of Adjustment, in many cases above full recovery, while other unsecured creditors will incur material losses, and simultaneously create new defined benefits in the same manner that helped cause the Commonwealth's financial distress in the first place.

22.     The Government's most recent estimates rely on analyses prepared by Integrum LLC ("Integrum"), which purport to show Act 80 will save $2.6 billion over the next 30 to 50 years.  True and correct copies of the Government's supplemental Act 80 certification and the September 24, 2020 Integrum analysis are attached hereto as Exhibit 4 and Exhibit 5, respectively.  Those analyses assume all positions—regardless of essential status—will be frozen and remain unfilled, despite Act 80's express language to the contrary.  *See* Ex. 5 at 2.  In addition, Integrum's

assumption of a uniform elimination of positions ignores the practical reality that essential positions *must* be filled for the Government to provide effective services and that the Government has failed to commit to freezing non-essential positions.  The Government itself has admitted that there is no practical mechanism for it to eliminate permanently all of the positions that Integrum assumes will be eliminated.  As a result, the Government's estimates do not qualify as "formal estimates" because they fail to accurately and completely account for the law's express terms and for the law's practical implications.

23.     The Oversight Board determined Act 80 will impose additional costs on the Commonwealth not contemplated in the Fiscal Plans.  Specifically, the Oversight Board estimated that after meeting the Fiscal Plans' payroll reduction obligations, entities covered by the Fiscal Plans will still incur at least an additional $80.4 million in costs, and likely closer to $100 million, in the first year alone.  Over ten years, the Oversight Board estimated that Act 80 will cost the Commonwealth approximately $430 million, and likely closer to $900 million.

24.     Ultimately, the Government has not shown to the Oversight Board the savings achieved under Act 80 through early retirement would be more than the additional pension costs imposed by Act 80 and the savings required in the Fiscal Plans.  Moreover, because the purported savings depend largely on permanently eliminating positions, and the Government has admitted there is no way to ensure that positions will be eliminated permanently, the Government cannot produce the savings necessary to cover the costs of Act 80.

25.     Even a "partial implementation" of Act 80, as mandated by JR 33, will increase costs in year one, which by itself makes the Act inconsistent with the certified Fiscal Plan and Budget, and would require a reprogramming to cover the increased costs in that year.  But any purported savings in later years is illusory because the Government has admitted it cannot ensure

8

the positions will be permanently eliminated.  As a result, even a partial implementation of Act 80 is significantly inconsistent with the certified Fiscal Plan and certified budget, and the Commonwealth will have to resort to reprogramming funds allocated for other purposes to cover the costs.  The Oversight Board has neither received a reprogramming request regarding Act 80, nor has it ever consented to such a reprogramming.

26.     Further, despite Act 80's modification of the Commonwealth's existing pension obligations, the Oversight Board has not received a request to approve such modification, as required by PROMESA § 207.

27.     Act 80 increases costs beyond the Fiscal Plans' allocations by tens of millions of dollars a year, and the Government has not provided necessary assurances for how it proposes to offset those costs.  Act 80 is significantly inconsistent with the Fiscal Plans and impairs and defeats the purposes of PROMESA as determined by the Oversight Board.

### **ACT 81**

28.     Act 81 amends Act 447 and Act 1 to allow the following categories of active public employees that are part of the ERS retirement system hired before January 1, 2000 to retire at 55 years of age, provided they serve at least 30 years:  (*i*) members of the Puerto Rico Police Bureau; (*ii*) members of the Firefighters Corps Bureau; (*iii*) members of the Custodial Officers Corps; and (*iv*) Emergency Medical Technicians ("EMTs") that are members of either the Medical Emergency Corps Bureau or the Municipal Medical Emergencies System (collectively, "Public Emergency Employees").  A certified translation of Act 81 is attached hereto as Exhibit 6.

29.     Public Emergency Employees were included in the freeze of pension benefits that applied to ERS participants.  Under Act 81, however, eligible Public Emergency Employees are entitled to receive 45%–55% of their final salaries, depending on when they entered ERS and their

9

age at retirement.  They also receive a lifetime employer contribution of $100 per month to use toward their chosen health-insurance plan.

30.     The Government's most recent estimates provided to the Oversight Board rely on analyses prepared by Integrum, which purport to show Act 81 will be revenue-neutral.  True and correct copies of the Government's supplemental Act 81 certification and the October 27, 2020 Integrum analysis are attached hereto as Exhibit 7 and Exhibit 8, respectively.  The analyses assume the necessary savings can be achieved by "limiting the hiring of new recruits to fill the vacant posts, or by hiring at lower rates."  *See* Ex. 8 at 4.  Paying for increased retirement benefits by limiting the hiring of new recruits and by hiring Public Emergency Employees at lower rates is contrary to (*i*) the Fiscal Plans' mandate to ensure the funding of essential public services and (*ii*) recent governmental efforts to reverse the high levels of Public Emergency Employee attrition.

31.     Moreover, the Oversight Board has received no request to approve Act 81 pursuant to PROMESA § 207, even though the law modifies the Commonwealth's existing pension obligations.  The Oversight Board has not approved the debt modifications imposed by Act 81.

32.     As a result, Act 81 increases costs beyond what is provided in the Fiscal Plans without a viable method of paying for those increased costs.  Act 81 is significantly inconsistent with the Fiscal Plans and in the determination of the Oversight Board impairs and defeats the purposes of PROMESA.

## ACT 82

33.     Act 82 modifies Act 26-2017 ("Act 26") to allow TRS participants to apply up to 108 days of pre-existing or excess unused sick leave toward their retirement eligibility and pension-benefit levels.  A certified translation of Act 82 is attached hereto as Exhibit 9.  As such, it allows certain teachers to retire sooner than permitted by Act 26.  According to the Oversight

Board's estimates, Act 82 could add hundreds of millions of dollars (perhaps as much as $1.6 billion) in pension costs.  That additional cost would substantially negate savings the Oversight Board expects to achieve by the freeze of the TRS pension plan.

34.     The Government's submission under PROMESA § 204(a) claims Act 82 will be revenue-neutral but offers no meaningful financial analysis supporting its conclusions.  A true and correct copy of the Act 82 submission is attached hereto as Exhibit 10.  For example, the Government represented "Act 82 has no impact on expenditures since no liquidations [of unused sick time] are required."  *Id.*  That representation ignores the fact that, although sick time could not be liquidated for immediate payment, unused sick time still enables teachers to retire earlier, which increases costs because eligible teachers receive a defined benefit—meaning that, by retiring earlier, they would receive benefits for a longer period of time.  Thus, the Government's statement that the law is revenue-neutral is not factually supported.

35.     In addition, Act 82 modifies and enlarges existing pension obligations of the Commonwealth, yet the Oversight Board has not received a request as required under PROMESA § 207 to do so.

36.     Act 82 increases costs beyond what the Fiscal Plans project without a viable method of paying for the increased costs.  Act 82 is significantly inconsistent with the Fiscal Plans and in the determination of the Oversight Board impairs and defeats the purposes of PROMESA.

C.     **OVERSIGHT BOARD WARNINGS PRIOR TO PASSAGE OF THE ACTS**

37.     Before its enactment, the Oversight Board warned the Puerto Rico Government against passage of the Senate bill that would become Act 80.  By letter dated June 23, 2020, the Oversight Board advised then-Governor Vázquez Garced, then-President of the Puerto Rico Senate Thomas Rivera Schatz ("then-Senate President Schatz"), and then-Speaker of the Puerto

Rico House of Representatives Carlos Méndez Núñez ("then-House Speaker Núñez") that the

bill's assumed payroll savings for offsetting its vast expansion of retiree benefits might not actually

materialize.  A true and correct copy of the June 23, 2020 letter is attached hereto as Exhibit 11.

Accordingly, the bill "could potentially cause significant increases in long-term costs to the

Government." *Id.* at 1.

38.     Given the significant financial risks—specifically the unfunded, increased pension

costs—the Oversight Board advised the Legislature and the Governor that the Senate bill, if

enacted, would be "significantly inconsistent" with the 2020 Fiscal Plan and "would . . . impair[]

or defeat[]" PROMESA's purposes, including the Oversight Board's "exclusive right" to

determine the treatment of pension claims in a plan of adjustment, and "would be contrary to the

currently proposed plan of adjustment." *Id*. at 2.  To ensure the bill would "meet [the Oversight

Board's] rightsizing requirements without reducing the ability of the agencies to provide essential

services and also pay for the cost of any additional benefits," the Oversight Board asked then-

Governor Vázquez Garced, pursuant to PROMESA § 104(c), for further information addressing

the bill's likely effects, such as any actuarial reports.  *Id*.

39.     In a letter dated June 30, 2020, then-Governor Vázquez Garced (through AAFAF)

objected that it was "inappropriate and at odds with PROMESA" to provide the Oversight Board

with any analysis of the Senate bill's likely effects.  June 30 ltr. at 5, a true and correct copy of

which is attached hereto as Exhibit 12.  Only if the Senate bill were "ultimately enacted" would

such an analysis be provided.  *Id*.

40.     The Oversight Board also warned the Government about the deficiencies in the

Senate bill that would become Act 81.  On June 24, 2020, the Oversight Board advised then-

Governor Vázquez Garced, then-Senate President Schatz, and then-House Speaker Núñez that,

while the Senate bill "ha[d] the effect of significantly increasing the retirement costs associated with police officer retirement," it provided no means of paying for the increases other than through payroll savings from new cadets replacing retired officers, which the 2020 Fiscal Plan already relied on to fund other expenses.  June 24 ltr. at 1, a true and correct copy of which is attached hereto as Exhibit 13.  The Oversight Board warned the Governor and the Legislature that the Senate bill's "reinstatement of a defined benefit pension accrual could undo the work of Act 71-2019," which made police officers eligible for social security, and thus "potentially disqualify the police officers from Social Security participation" in contravention of the 2020 Fiscal Plan.  *Id*. at 2.

41.    The Oversight Board advised the Legislature and Governor that the Senate bill, if enacted, would be "significantly inconsistent" with the 2020 Fiscal Plan and would "impair[] or defeat[]" the purposes of PROMESA.  *Id*. at 2.  The Oversight Board therefore requested additional information pursuant to PROMESA § 104(c) to analyze properly whether, for example, "the cost of the enhanced benefits payable over the lifetime of the pensioners would be fully paid for by any savings generated by hiring new cadets sooner than anticipated" in the 2020 Fiscal Plan.  *Id.*

42.    Then-Governor Vázquez Garced never responded to the Oversight Board or provided the information the Oversight Board had requested.  Instead, ignoring the Oversight Board's warnings, the Legislature enacted Acts 80, 81, and 82, which then-Governor Vázquez Garced signed into law on August 3, 2020.  *See* Exs. 3, 6, 9.

### D.   THE FORMER GOVERNOR'S UNTIMELY AND DEFICIENT § 204(a) SUBMISSIONS

43.   Having signed the Acts into law on August 3, 2020, then-Governor Vázquez Garced was required under PROMESA § 204(a)(1) and (a)(2) to submit to the Oversight Board by August 12 a "formal estimate" of each Act's impact on expenditures and revenues and a "certification" of whether each Act was or was not "significantly inconsistent with the Certified Fiscal Plan for the fiscal year." No such estimate or certification was timely submitted by or on behalf of the Governor for any of the Acts.

44.   On August 18, 2020, the Oversight Board sent a letter to AAFAF inquiring about the missing formal estimates and certifications for the Acts. Aug. 18 letter at 1, a true and correct copy of which is attached hereto as Exhibit 14. The Oversight Board noted that it had expressed "grave concerns" about Acts 80 and 81 months earlier and requested further information, but the Government had ignored its requests. *Id.* Given the Government's failure to comply with PROMESA §§ 204(a) and 104(c), the Oversight Board advised AAFAF of its determination under PROMESA § 108(a)(2) that the Acts impaired or defeated the purposes of PROMESA and directed the Governor not to enforce the Acts "unless the Oversight Board has determined the Acts do not violate PROMESA sections 108(a), 204, and 207." *Id.* at 2.

45.   On August 19, 2020, then-Governor Vázquez Garced and AAFAF submitted to the Oversight Board certifications for the Acts. True and correct copies of the Act 80 certification, the Act 81 certification, and the Act 82 certification are attached hereto as Exhibit 15, Exhibit 16, and Exhibit 17, respectively. They also submitted actuarial reports from Integrum, upon which the certifications for Acts 80 and 81 were based and which purported to "assess the impact" of those Acts based on provisions of the Senate bills that preceded their enactment. *See* Exs. 15, 16.

14

No actuarial report was provided by or on behalf of the Governor to the Oversight Board for Act 82.

46.     The Governor's certification for each Act stated that the law was "not significantly inconsistent with the 2020 Fiscal Plan."  *See* Exs. 15, 16, 17.  As to Act 80, the certification estimated an "aggregate savings on payroll expenditures of approximately $1.4 billion dollars during a period of 30–40 years."  *See* Ex. 15 at 2.  For Act 81, the certification estimated a "budgetary neutral" implementation "by limiting the hiring of new recruits" but stated that, if necessary, a request for reprogramming would be made to the Oversight Board.  *See* Ex. 16 at 2. And the Act 82 certification estimated "no impact on expenditures" because the law did not require liquidation of sick days upon retirement.  Ex. 17 at 1.  All three certifications estimated "no impact on revenues."  Exs. 15 at 2, 16 at 2, 17 at 1.

47.     Notwithstanding the certifications, in a separate letter sent on the same day, AAFAF informed the Oversight Board "that, for the moment, the Government will not accept applications from public employees under the . . . Acts."  Aug. 19 ltr. at 1, a true and correct copy of which is attached hereto as Exhibit 18.

### E.     THE   GOVERNOR'S   CONTINUED   FAILURE   TO   SUPPLY INFORMATION REQUIRED BY PROMESA REGARDING THE ACTS

48.     On August 28, 2020, the Oversight Board notified then-Governor Vázquez Garced, then-Senate President Schatz, and then-House Speaker Núñez that the certifications and estimates for the Acts were untimely under PROMESA § 204(a)(1) and deficient under PROMESA § 204(a)(2)(A).  Aug. 28 ltr. at 2, a true and correct copy of which is attached hereto as Exhibit 19.

49.     The Oversight Board explained the formal estimates for Acts 80 and 81 were impermissibly based on the Senate bills that were subsequently "amended during the legislative process prior to the enactment of the Acts," rather than "the laws themselves."  *Id.* at 1-2.  And the

Act 82 "formal estimate" was based solely on the observation that the law does not require liquidation of sick days, ignoring the impact on expenditures of increased pension benefits resulting from the early retirement of teachers. *Id.* at 2. The Oversight Board advised that the required "formal estimates" were missing for each of the Acts pursuant to PROMESA § 204(a)(3)(A) and directed the Governor, pursuant to PROMESA § 204(a)(4)(A), to provide the missing formal estimates by September 1, 2020. *Id.* at 2.

50.     Based on the Oversight Board's own analysis that the Acts would likely cost more than $3 billion over a 30-year period, and because the Government's estimates were patently deficient, the Oversight Board concluded the Acts were significantly inconsistent with the 2020 Fiscal Plan. *Id.* at 2. The Oversight Board further determined implementation of the Acts would impair or defeat PROMESA's purposes because "the implementation of laws with wide-ranging effects on the Commonwealth's pension system without a full understanding of the financial implications of such measures is the antithesis of financial responsibility." *Id.* at 4.

51.     Despite those determinations, the Oversight Board advised it was prepared to work with the Government to examine the fiscal impact of the Acts. *Id.* at 2. The Oversight Board thus requested, pursuant to PROMESA § 104(c), 17 specific categories of information (such as the "[h]eadcount of eligible participants for each applicable agency" and a list of individuals eligible for specific benefits) upon which the Government had based its conclusions. *Id.* at 2–3. The Oversight Board provided a September 1, 2020 deadline to provide the information. *Id.* at 2.

52.     AAFAF responded on the Governor's behalf on September 1, 2020, providing answers to just 9 of the Oversight Board's 17 requests for information. Sept. 1 ltr. at 1,2; a true and correct copy of which is attached hereto as Exhibit 20. AAFAF explained that it needed to collect "extensive data . . . across multiple agencies" and requested a seven-day extension to

provide the information.  *Id*. at 1.  As for the actuarial reports on which the Act 80 and Act 81 certifications were based, AAFAF admitted the reports were "not directly responsive to a specific version of a bill, but on a proposal of the most viable design, terms and conditions." *Id.* at 2.

53.     On September 4, 2020, the Oversight Board granted AAFAF an extension until September 11 to submit the requested information, but stated that AAFAF's letter was "facially inadequate" with regard to addressing the Oversight Board's outstanding questions.  Sept. 4 ltr. at 1,3; a true and correct copy of which is attached hereto as Exhibit 21.  The Oversight Board found it "deeply troubling" that AAFAF could not produce an analysis which should have been performed before the Acts were enacted.  *Id*. at 1.

54.     AAFAF did not submit any further information to the Oversight Board in connection with the Acts by the September 11, 2020 deadline.  The next day, on September 12, AAFAF emailed some of the outstanding data requested by the Oversight Board, explaining the balance of the requested information was not within its possession and reserving the right to provide supplemental information.

55.     By letter dated September 21, 2020, the Oversight Board expressed concern that, given AAFAF's difficulty in compiling the necessary information, such information was "never readily available to Commonwealth decision-makers when evaluating the merits of pending legislation."  Sept. 21 ltr. at 1, a true and correct copy of which is attached hereto as Exhibit 22. The Oversight Board provided AAFAF until September 25 to supply the requested information. *Id.* at 5.

56.      On September 25, 2020, AAFAF provided the Oversight Board with another incomplete data set.

17

57.     On September 29, 2020—more than six weeks after a valid and complete formal estimate and certification was due—AAFAF provided the Oversight Board with a "Supplemental Certificate" for Act 80.  Ex. 4.  Based on updated actuarial data, the certification concluded Act 80 saves $1.2 billion more than originally estimated, for a total savings of $2.6 billion during a period of 30-50 years.  *Id.*

58.     Several days later, on October 2, 2020, AAFAF provided the Oversight Board with current sick-leave balances for all teachers who would be potentially eligible for benefits contemplated by Act 82.

### F.     THE GOVERNMENT'S COMMITMENT NOT TO IMPLEMENT THE ACTS

59.     On October 14, 2020, ERS and OMB issued Circular Letter No. 2021-01 setting forth the procedure for implementing Act 80.  A certified translation of Circular Letter No. 2021-01 is attached hereto as Exhibit 23.  The letter provided that applicable agencies may, in their discretion, establish a plan for the phased retirement of eligible participants under Act 80.  *Id.*

60.     The next day, on October 15, 2020, AAFAF informed the Oversight Board that ERS and OMB would begin implementing Acts 80 and 82, reversing its statement on August 19, 2020 that it was not accepting applications from public employees under the Acts.  Oct. 15 ltr. at 1, a true and correct copy of which is attached hereto as Exhibit 24.  The letter also stated the Government would be sending a "Supplemental Certification" under PROMESA § 204(a) for Act 81.  *Id.*

61.     On October 21, 2020, the Oversight Board advised AAFAF that implementing Acts 80 and 82 without any plan to pay for their significant costs would violate PROMESA and directed AAFAF to confirm by the following day that such implementation had ceased.  Oct. 21 ltr. at 5, a true and correct copy of which is attached hereto as Exhibit 25.  The Oversight Board

stressed that the Acts "in the aggregate will increase the Government's costs by as much as $8.3 billion over the next 30 years," which is "significantly inconsistent" with the 2020 Fiscal Plan. *Id.* at 1.

62.    With respect to Acts 80 and 81, the Oversight Board advised that cost savings could be achieved only through significant and permanent reductions in headcount above and beyond those required by the 2020 Fiscal Plan. *Id.* at 2.  The Oversight Board noted such reductions seemed "highly improbable and impossible to achieve without negatively impacting the Government's ability to provide essential services." *Id*. at 3.  The Oversight Board, however, offered to discuss with the Government ways of implementing those Acts in a manner consistent with the 2020 Fiscal Plan and compliant with PROMESA. *Id.* at 5.  To do so, the Oversight Board invited AAFAF to "present a substantive program" by which the Acts (*i*) "would not impose net costs incremental to the Fiscal Plan" and (*ii*) "would be implemented in a fiscally responsible manner that ensures adequate essential services." *Id.* at 3, 4.  As to Act 82, the Oversight Board noted that the costs incurred by the law will always be unaccounted for in the Commonwealth's budget, and thus in excess of expenditures contemplated by the 2020 Fiscal Plan, "as teachers do not currently have the ability to use accumulated sick days to increase pension benefits." *Id*. at 4. The Oversight Board advised that, "if the Government remains committed to implementing Act 82, it must first explain specifically how it intends to achieve the savings necessary to make Act 82 revenue neutral." *Id.* at 5.

63.    The Oversight Board concluded that, for AAFAF to implement the Acts, it must provide "a certification of implementation of a plausible plan, including headcount reduction and a process for tracking incurred costs vs. positions eliminated[] on an agency-by-agency basis, that the Oversight Board determines will reduce costs as needed without sacrificing the level of public

19

services required by" the 2020 Fiscal Plan. *Id.* The Oversight Board stated it did not consent to implementation absent such a plan, which it requested by October 28, 2020. *Id.* The Oversight Board also requested confirmation by October 22 that implementation of Acts 80 and 82 had ceased. *Id.*

64.     The October 22, 2020 deadline passed, with no confirmation from AAFAF that it would cease implementation of Acts 80 and 82.

65.     On October 27, 2020—nearly three months after a valid certification was due—AAFAF provided the Oversight Board with a "Supplemental Certificate" for Act 81, including an updated actuarial report. Ex. 7. As before, however, the certification assumed a "budgetary neutral" implementation by "limiting the hiring of new recruits," and it again stated that a reprogramming request would be made if necessary. *Id.* at 2.

66.     The next day, on October 28, 2020, AAFAF sent a letter objecting to supposed "erroneous statements" in the Oversight Board's October 21 letter and defending AAFAF's "good faith" certifications that the "Acts are not significantly inconsistent with the 2020 Fiscal Plan." Oct. 28 ltr. at 1, a true and correct copy of which is attached hereto as Exhibit 26. Despite disagreeing about the necessity of headcount reductions, AAFAF committed to "only move forward with the implementation of Act 80-2020 in a phased approach." *Id.* at 2. Phase one would entail "commencing and completing the process for applications of the public employee participants that qualify" under Act 80. *Id.* In phase two, the Government would "evaluate the applications, quantify the number of participants that took advantage of the retirement benefits as established by Act 80-2020, and confirm the expected amount of aggregate savings, taking into account the actual employees that elected the window." *Id.* And in phase three, the Government would "establish the date of separation from service of each eligible participant in order to start

20

receiving the program's benefits and implement the mobility plans and/or other measures required under [current Commonwealth law]." *Id.* AAFAF committed to use a similar phased approach for Acts 81 and 82. *Id.* at 2–3.

67. By letter dated November 9, 2020, the Oversight Board admonished AAFAF for not responding to its "direction to cease implementation of the Acts" or its "request for specific information and a program for achieving the savings necessary to make the Acts revenue neutral." Nov. 9 ltr. at 1, a true and correct copy of which is attached hereto as Exhibit 27. The Oversight Board also included detailed analyses of each of the Acts and support for its findings that retirements under the Acts create costs not anticipated in the 2020 Fiscal Plan. *Id.* at 2–4.

68. For Act 80, the Oversight Board explained that if—as AAFAF's analysis assumed—all eligible participants elected to retire and receive benefits, total pension costs for Act 80 Commonwealth retirees would be up to $2.2 billion over 30 years. *Id.* at 2. Eliminating those retirees' positions could not be assured because the agencies had discretion to designate and refill essential positions, and that plan would not fully offset Act 80's costs because the "Fiscal Plan already *requires* the Government to eliminate 3,200 positions," a point AAFAF apparently ignored in its analysis. *See id.* (emphasis in original).

69. With respect to Act 81, the Oversight Board explained the Government could achieve revenue neutrality through payroll only if at least 1,835 positions were eliminated after their occupants retired. *Id.* at 3.

70. With respect to Act 82, the Oversight Board explained the Act would likely "create additional costs in all events" because it enables teachers to retire earlier with the same level of defined-pension benefits, which necessarily increases costs because teachers would receive the

same level of benefits for a longer period of time and the Government had not provided even a theoretical plan for offsetting such costs.  *Id.* at 3.

71.     The Oversight Board expressed doubt that a "phased approach" would ensure the Acts were not significantly inconsistent with the 2020 Fiscal Plan.  *Id.* at 4.

72.     The Oversight Board reiterated "the Acts must not be implemented until their true costs and means of paying for them are known and approved," and requested specific information and commitments regarding each of the Acts.  *Id*. at 4–5.  The Oversight Board also directed the Government to notify all employees through a public statement that "[t]he benefits provided under the Acts are conditional and may never accrue."  *Id.* at 5.

73.     That same day, November 9, 2020, ERS and OMB issued an amendment to Circular Letter No. 2021-01 concerning implementation of Act 80.  A true and correct copy of Circular Letter No. 2021-01 is attached hereto as Exhibit 28.  According to the letter, employees who elected to retire under Act 80 may not be separated from service until after the election period concluded, at which point a phased plan must be prepared for their separation.  *Id*. at 2.

74.     Having received no reply to its November 9, 2020 letter, the Oversight Board sent another letter on November 16, 2020 reminding AAFAF of its determination that the Acts could cost $8.3 billion collectively over the next 30 years. Nov. 16, 2020 ltr. at 1, a true and correct copy of which is attached hereto as Exhibit 29.  The Oversight Board recognized the "positive" changes in Circular Letter No. 2021-02 for the implementation of Act 80, but made clear those changes did not satisfy the requests in its November 9 letter, to which it again demanded responses by November 18.  *Id.*

75.     On November 19, 2020, the Oversight Board met to review the effects of Acts 80, 81, and 82, including their costs.

22

76.     On November 19, 2020, the Oversight Board concluded as follows:

a.      the Government had not provided sufficient support for its certification that each of the Acts was not significantly inconsistent with the 2020 Fiscal Plan;

b.      the Oversight Board had engaged in comprehensive and robust discussions with the Government to understand the fiscal impact of each of the Acts and to rectify the deficiencies in the Government's data, analysis, and conclusions;

c.      each of the Acts would result in significant additional costs—potentially totaling hundreds of millions of dollars per year beyond the costs set forth in the 2020 Fiscal Plan;

d.      the Government had failed not only to account for these incremental costs but to provide a method for funding; and

e.      the Government was repeating past mistakes of promising increased defined-pension benefits with no plan or funds to pay for them.

77.     Based on these conclusions and following its extensive engagement with the Government, on November 19, 2020, the Oversight Board confirmed its determination under PROMESA § 108(a)(2) that each of the Acts impairs or defeats the purposes of PROMESA.  The Oversight Board also determined the Government failed to comply with § 204(a) of PROMESA by, among other things, failing to provide timely, complete, and accurate formal estimates of the impact of each law on expenditures and revenues.  The Oversight Board further determined the Government violated § 204(c) of PROMESA because Act 80 creates a revenue deficiency in the budget the Government would likely need to remedy through reprogramming that had been neither requested nor authorized.  Finally, the Oversight Board determined the Government violated § 207 of PROMESA because each of the Acts modified existing Commonwealth debt by un-freezing pension plans to provide billions of dollars in new pension benefits and significantly increasing the Commonwealth's pension obligations, all without the Oversight Board's approval.

78.     The Oversight Board decided that, at its public meeting the following day, it would vote on whether to commence litigation against the Government to prevent implementation of and nullify each of the Acts.

23

79.     Later that same day, November 19, 2020, the Oversight Board provided AAFAF an advance copy of the presentation materials it intended to use at its public meeting.  A true and correct copy of the presentation material is attached hereto as Exhibit 30.  The presentation materials included more than ten slides summarizing the Oversight Board's analysis and concerns regarding the Acts.

80.     AAFAF sent a letter[2] to the Oversight Board early the following morning, November 20, 2020, purporting to respond to the Oversight Board's November 9 and 16 letters.  A true and correct copy of AAFAF's letter dated November 18, 2020 letter is attached hereto as Exhibit 31.  AAFAF (*i*) complained about the Oversight Board's information requests concerning the Acts; (*ii*) contended it needed more time to collect information and to respond to the requests; and (*iii*) stated that, by November 25, 2020, it would "provide an update and an appropriate timeframe to respond."  *Id.* at 2.  AAFAF indicated it intended to proceed with implementing the Acts and it would provide at a later to-be-determined date the information and answers the Oversight Board had requested.  *Id*.

81.     Later that same morning, however, AAFAF reversed its position.  After reviewing the Oversight Board's presentation for the public meeting (scheduled for later that morning), AAFAF's Executive Director called the Oversight Board's Executive Director and offered not to implement the Acts—thereby avoiding potential litigation—until the Oversight Board agreed they could be implemented in a fiscally sound manner consistent with PROMESA.  AAFAF followed up with a letter stating the Acts would not be implemented "until an agreement is reached with the Oversight Board."  A true and correct copy of AAFAF's November 20, 2020 letter is attached

---

[2] Despite being dated November 18, 2020, the Oversight Board did not receive the letter until November 20.

hereto as Exhibit 32.  The Oversight Board received the letter just before the November 20, 2020
public meeting was scheduled to begin.

82.     Thereafter, during the public meeting, the Oversight Board's Executive Director
reviewed the impact of each of the Acts on the Commonwealth's expenditures and revenues.
AAFAF's Executive Director, in turn, publicly agreed the Government would not implement the
Acts unless or until an agreement was reached with the Oversight Board.[3]  Based on AAFAF's
express agreement—in writing and at the public meeting—not to implement the Acts absent an
agreement with the Oversight Board, the Oversight Board deferred a decision on commencing
litigation to prevent implementation of and to nullify each of the Acts.

83.     Thereafter, on November 23, 2020, the Oversight Board sent a follow-up letter to
AAFAF to confirm "the agreement we reached during the Oversight Board's public meeting on
November 20, 2020."  Nov. 23, 2020 ltr. at 1, a true and correct copy of which is attached hereto
as Exhibit 33.  The Oversight Board also assented to AAFAF providing updated information about
each of the three Acts by November 25, as it had promised in its November 18 letter.  *Id.*

84.     Despite its assurances, AAFAF did not provide any additional information about
the Acts by November 25, 2020.

85.     On December 15, 2020, AAFAF notified the Oversight Board that ERS and OMB
had issued a second amendment to Circular Letter 2020-01 regarding implementation of Act 80.
Dec. 15, 2020 ltr. at 1, a true and correct copy of which is attached hereto as Exhibit 34.  The
amended circular letter:  (*i*) "inform[ed] Government entities of the phased implementation of Act

---

[3] *See* Financial Oversight & Management Board for Puerto Rico, Nov. 20, 2020 Twenty-Second Public
Meeting, available at  https://www.youtube.com/watch?v=xzhPbRObLzY&t=17s  (relevant discussion
begins at 1:41:55) (last visited Dec. 14, 2021).

80-2020 by which the Government will first complete the Election Period, quantify the amount of
employees that wish to make use of Act 80's benefits; and validate the projected savings";
(*ii*) "extend[ed] the Election Period (as defined by Act 80-2020) until January 22, 2021"; and
(*iii*) "advise[d] the program will not go into effect until ERS and OMB so allows via circular letter
to those effects." *Id.* According to AAFAF, these changes "in no way represent[] a modification
to the Government's agreement to not implement phase three until an agreement is reached with
the Oversight Board." *Id.*

86.     By letter dated December 22, 2020, the Oversight Board expressed concern that
AAFAF had expressly agreed not to implement Act 80 but "fail[ed] to state that Act 81 and 82
will not be implemented until an agreement is reached with the Oversight Board." Dec. 22 ltr. at 1,
a true and correct copy of which is attached hereto as Exhibit 35. Seeing "no path to avoid
incremental pension costs," the Oversight Board thus requested Acts 81 and 82 "be repealed or
amended to provide for revenue-neutrality." *Id.* The Oversight Board also demanded that, by
December 28, 2020, the Government "clearly communicate to the public that, like Act 80, Acts 81
and 82 will not be implemented until an agreement is reached with the Oversight Board." *Id.* at 2.

87.     AAFAF did not communicate to the public by December 28, 2020 that Acts 81 and
82 would not be implemented absent an agreement with the Oversight Board.

88.     Nevertheless, on January 15, 2021, AAFAF advised the Oversight Board that, in
addition to requiring Oversight Board approval before implementing Act 80, "the Government will
not implement Acts 81-2020 and Acts 82-2020 until it reaches an agreement with the Oversight
Board." Jan. 15 ltr. at 1, a true and correct copy of which is attached hereto as Exhibit 36.

### G.   THE GOVERNMENT'S REVISED ANALYSES FOR ACT 80

89.    In April 2021, AAFAF submitted anonymized data identifying the employees who had indicated a desire to participate in the Act 80 program.  A true and correct copy of AAFAF's email is attached hereto as Exhibit 37.  The data also identified which retiring employees held "non-essential" positions, *i.e.*, positions that need not be refilled upon the employee's retirement.

90.    In a summary sheet accompanying the data set, AAFAF concluded Act 80 would generate annual savings.  A true and correct copy of AAFAF's summary sheet is attached hereto as Exhibit 38.  The resulting savings, AAFAF contended, would offset the increased pension costs the Commonwealth would incur.  *Id.*  It appeared AAFAF assumed all non-essential positions would not be refilled following the employees' retirement and AAFAF failed to account for the headcount reductions already required by the Fiscal Plan.  *Id.*

91.    AAFAF also submitted a revised analysis regarding 11 agencies it contended would generate savings if Act 80 were implemented.  AAFAF sought the Oversight Board's approval to implement Act 80 with respect to those agencies.  AAFAF took the unusual step of attempting to shield this analysis from disclosure by declaring it "confidential" and "subject to [Rule] 408" of the Federal Rules of Civil Procedure.

92.    Thereafter, on June 7 and 8, 2021, the Oversight Board held discussions with the Retirement Board, AAFAF, and their respective advisors at Integrum and Ankura Consulting Group, LLC.  *See* June 22, 2021 ltr., a true and correct copy of which is attached hereto as Exhibit 39.  During those discussions, the Oversight Board described several adjustments the Government would need to make for the Oversight Board to consider agreeing to implementation of Act 80.  Those adjustments included: (*i*) removing certain unnecessary costs associated with filling positions of essential employees; (*ii*) removing the $100 medical cost erroneously included

27

for certain members who were not eligible for the subsidy; and (*iii*) "[a]djusting the savings analysis to consider the baseline requirements of the May 2021 Fiscal Plan and subsequently including only such savings as are incremental to the Fiscal Plan." *Id.*

93.     Meanwhile, the Oversight Board performed its own analysis of the data AAFAF had provided.  Assuming—like AAFAF—that all non-essential positions would be frozen (*i.e.*, eliminated), the Oversight Board concluded Act 80 would nevertheless generate additional costs ranging from approximately $80 million to $110 million in the first year alone for Commonwealth entities covered by the Fiscal Plans.  But the Oversight Board found the assumption that non-essential positions would be eliminated was untenable because Act 80 does not *require* the elimination of non-essential positions and because AAFAF had provided no binding assurances it would not refill those positions.  *Id.* at 2.

94.     Act 80 affords agencies authority to designate "essential" and "non-essential" positions and the Commonwealth authority to make exceptions to the freeze at any time and for any reason.  *See* Ex. 3 art. 9.  The Oversight Board concluded AAFAF had failed to provide a verifiable method for achieving the savings it claimed—which still was insufficient to cover the costs of Act 80.  Ex. 39 at 3.

95.     After considering the data, the Oversight Board sent a letter to AAFAF on June 22, 2021 advising that, based on the presentation dated April 1 and the Oversight Board's review of the data AAFAF provided, "eight government agencies and public corporations would achieve savings by implementing Act 80, compared to the eleven entities noted in [AAFAF's April 1 presentation]."  *Id.* at 2.  The Oversight Board identified certain textual amendments and administrative guarantees necessary to ensure implementation of Act 80 for those agencies and corporations would be consistent with the Fiscal Plans.  *Id.* at 3–4.  It also expressed willingness

28

"to explore . . . the possibility of pursuing limited implementation of Act 80 subject to certain conditions and restrictions" necessary to achieve the projected savings and it requested a meeting with AAFAF to discuss the issues.  *Id*.  In the meantime, the Oversight Board reiterated that "it does not consent to" Act 80's implementation and directed AAFAF not to implement Act 80 without its consent.  *Id*. at 3.

96.     The Oversight Board received no response to its letter, nor did the Government engage further regarding partial implementation of Act 80.

### H.     JOINT RESOLUTION 33

97.     Two months later, on August 23, 2021, the bill that would become JR 33 was introduced in the Puerto Rico Senate.  A certified translation of JR 33 is attached hereto as Exhibit 40.  JR 33 orders the Executive Directors of OMB and the Retirement Systems Administration "to take the necessary measures and require the eligible municipalities, public corporations, and agencies take the appropriate actions to implement [Act 80] with regard to non-essential employees who have already been identified at each entity." *Id.* § 1.  JR 33 requires such actions within 30 business days of its enactment.  *Id.* § 2.  JR 33 states the partial implementation of Act 80 "is without prejudice to the rights of essential employees also take advantage of [Act 80]" following the completion of "the corresponding analysis and the budgetary impact of the retirement based on the reengineering of positions at the different entities." *Id.* § 1.  That analysis must be completed within 60 days of JR 33's enactment. *Id.* § 1.

98.     JR 33 was passed by the Puerto Rico Senate on August 30, 2021 and by the Puerto House of Representatives on November 11, 2021.

99.     JR 33 mischaracterizes the Oversight Board's letter dated June 22, 2021.  JR 33 states that, in the Legislature's view, it is "urgent and legitimate" to implement Act 80 and that "[t]his is all the more so since, as we have indicated, the [Oversight Board's] June 22, 2021 letter

to [AAFAF] acknowledges that the Early Retirement Incentive Program could lead to savings at agencies and municipalities and that partial implementation is feasible, which we so order in this Joint Resolution." Ex. 40, Statement of Motives at 5.

100.    In fact, the Oversight Board's letter informed AAFAF that, among other things, "the Oversight Board has reviewed the Government Analysis and agrees Act 80 would result in savings at a limited number of agencies and municipalities under certain conditions." Ex. 39 at 2. The Oversight Board then detailed the conditions and potential framework for a partial implementation of Act 80—but only at the limited number of agencies. *Id.* at 3–4. JR 33 is not limited to those agencies where savings would be achieved, and provides none of the conditions or framework the Oversight Board identified in its June 22, 2021 letter. Instead, JR 33 applies to all non-essential employees at all agencies, regardless of whether savings are achieved at those agencies, and provides for implementation within thirty business days as to those employees. JR 33 also provides a path for implementation as to essential employees.

101.    On November 16, 2021, the Oversight Board sent a letter to the Governor, the President of the Puerto Rico Senate, and the Speaker of the Puerto Rico House of Representatives notifying them that, consistent with its determinations regarding Act 80, the Oversight Board had determined that JR 33 would impair and defeat PROMESA's purposes. A true and correct copy of the Oversight Board's November 16, 2021 letter is attached hereto as Exhibit 41. The Oversight Board warned that PROMESA § 108(a)(2) therefore bars enactment, implementation, and enforcement of JR 33. *Id.*

102.    On November 19, 2021, the Oversight Board issued a resolution concerning the Acts and JR 33 (*i*) reaffirming its determination that the Acts will impair and defeat PROMESA's purposes; (*ii*) announcing its determination that JR 33 will similarly impair and defeat

PROMESA's purposes by mandating partial implementation of Act 80; (*iii*) directing the Government not to enact, implement, or enforce the Acts or JR 33; and (*iv*) approving legal action against the Government and other appropriate parties, if necessary, to enforce the bar against enacting, implementing, and enforcing the Acts or JR 33 and to have them declared nullities. A true and correct copy of the Oversight Board's November 19, 2021 Resolution is attached hereto as Exhibit 42.

103.    On December 15, 2021, the Governor signed into law JR 33.

104.    Based on AAFAF's April 1, 2021 data, Act 80 will increase costs beyond the Fiscal Plans' allocations for pension expenses even if partially implemented as contemplated by JR 33. That is because the Commonwealth must meet the Fiscal Plans' benchmarks for payroll reductions before generating *any* savings from Act 80. The Oversight Board estimates that implementing Act 80 only for those employees already designated as non-essential—and assuming that each of those positions will be eliminated permanently—would cause the Commonwealth to incur in the first year alone additional costs of at least $5.6 million, and more likely closer to $61 million.

105.    The Governor and the Legislature enacted JR 33 after receiving written notice of (*i*) the Oversight Board's determinations that such implementation would impair and defeat PROMESA's purposes and its clear directives not to implement the law; (*ii*) AAFAF's own data demonstrating Act 80 would impose significant additional costs on the Commonwealth; and (*iii*) AAFAF's express agreement not to implement Act 80 (as well as Acts 81 and 82) unless and until the Oversight Board agrees to the implementation.

106.    On December 17, 2021, the Oversight Board sent a letter to the Governor and AAFAF reiterating its concerns with JR 33. A true and correct copy of the Oversight Board's December 17, 2021 letter is attached hereto as Exhibit 43. The Oversight Board requested that the

Governor and AAFAF inform the Oversight Board whether they "will agree to: (1) Suspend any implementation of Joint Resolution 33 and Acts 80-82 until the validity of these laws is adjudicated in the Title III Court; and (2) Publicly announce such suspension to avoid any confusion on the part of the currently affected public employees." *Id.* at 1. The Oversight Board requested a response by 1:00 PM AST on Sunday, December 19, 2021. *Id.*

107. In response, the Government sent a letter to the Oversight Board on December 19, 2021 at 1:12 PM AST. A true and correct copy of the Government's December 19, 2021 letter is attached hereto as Exhibit 44. The Governor did not provide the assurances requested in the Oversight Board's December 17 letter. Instead, the Government indicated that it would pursue implementation of JR 33. In addition, recognizing that JR 33 requires implementation within thirty business days, the Government informed the Oversight Board that "the Government will be presenting legislation in the near future that will extend the implementation date of Joint Resolution 33 beyond 30 days." *Id.* at 2

108. On December 20, 2021, the Oversight Board replied to AAFAF's letter dated December 19, 2021 observing, among other things, that AAFAF did not agree to suspend implementation of JR 33 and Act 80 until the Title III court adjudicates the validity of the laws. A true and correct copy of the December 20, 2021 letter is attached hereto as Exhibit 45.

109. The Government has taken many steps consistent with an intent to implement all the Acts. The Legislature enacted JR 33 and the Government reversed its express commitment not to implement Act 80 without the Oversight Board's consent. In addition, the Legislature and Governor recently enacted Act 7-2021, which purported to create an entirely new defined-benefit pension system. The Oversight Board sought a court order to enjoin and nullify the law. Dkt. No. 78 in Case No. 21-00072 (D.P.R. Oct. 13, 2021).

32

110.     Moreover, the Governor has repeatedly affirmed his preference for defined-benefit pension plans for public employees.  *See, e.g.*, House Bills 886-2021 and 887-2021, certified translations of which are attached hereto as Exhibit 46 and Exhibit 47, respectively.  On December 7, 2021, the Governor submitted to the Oversight Board a proposal regarding changes to police pensions and other retirement benefits.[4]  The Governor's proposal includes an expanded defined-benefit pension program and medical premium subsidies for retired officers.[5]  The Oversight Board is also considering its own proposal for a revision to the pension program for police officers within the parameters of the Plan of Adjustment and Fiscal Plan.

111.     Further, during this past legislative session, the Legislature introduced several bills relevant to the Acts.  Senate Bill 265-2021 proposed to expand eligibility for participation in Act 81.[6]  House Bill 1111-2021 would change the categories of active public employees eligible for Act 81's benefits.  House Bill 1074-2021 would amend Act 81 to provide funding through additional lottery draws.  House Bill 1119-2021 would amend Act 11-1933, also known as the Games of Chance Act, to increase the percentage of revenues directed to the Police Retirement Fund from 50% to 95%.  House Bill 533-2021 would permit certain retired pensioners to be reemployed by the Government on a part-time basis while continuing to receive pension benefits.[7]

112.     Further, public employees ostensibly covered by the Acts have sought to force the Government to implement the Acts either through judicial proceedings or coercive political

---

[4] The Governor's press release is publicly available on the Governor's website: https://www.fortaleza.pr.gov/.

[5] *Id.*

[6] Senate Bill 265-2021 has been withdrawn by its author.

[7] Proposed legislation is publicly available on the website of the Office of Legislative Services: https://sutra.oslpr.org/osl/esutra/indext.aspx.

actions. *See* Dkt. No. 19448 in Case No. 17-bk-3283 (D.P.R. Bankr. Nov. 20, 2021). Finally, the

Government objected to the Oversight Board's request for a ruling that PROMESA preempts the

Acts. *See* Dkt. No. 19319 in Case No. 17-bk-3283 (D.P.R. Bankr. Nov. 20, 2021).

## I.    THE PLAN OF ADJUSTMENT AND PREEMPTION

113.    The currently proposed *Modified Eighth Amended Title III Joint Plan of Adjustment*

*of the Commonwealth of Puerto Rico, et al.*, Dkt. No. 19365, Case No. 17-BK-3283-LTS (D.P.R.

Bankr. Nov. 28, 2021) (the "Plan of Adjustment") provides for the treatment of all pension claims

against the Commonwealth and ERS.

114.    The Plan of Adjustment provides all pension benefits earned by retired and active

employees through the Commonwealth's Petition Date shall be paid in full when due, without any

reductions in such accrued benefits. Plan of Adjustment art. LV.

115.    The Plan of Adjustment further provides that active TRS participants shall not

accrue additional benefits under the TRS defined benefit plan after the Plan of Adjustment's

effective date. Plan of Adjustment § 55.9(a)(i), Ex. F-1.

116.    The Plan of Adjustment further provides any right of active TRS participants to

purchase service credits toward retirement eligibility is eliminated. Plan of Adjustment, Ex. F-1.

117.    Finally, the Plan of Adjustment provides "the Government . . . shall not (a)

implement existing legislation or enact new legislation to create or increase any defined benefit

pension payment or obligation to current or future retirees from or related to any defined benefit

plans over the benefits provided by the [Plan of Adjustment], regardless of funding source." Plan

of Adjustment § 83.4.

118.    Acts 80 and 81 directly modify and contradict the Plan of Adjustment's treatment

of eligible active ERS participants, by increasing the treatment of their earned pension benefits to

more than payment in full on account of accrued pension rights under prepetition law.

34

119.     Act 82 conflicts with the Plan of Adjustment's treatment of active TRS participants' claims by allowing for purchases of service credit with unused sick days after the effective date, which would provide for an increase in benefits and reduction in retirement eligibility age after the Plan of Adjustment effective date, in conflict with the Plan of Adjustment's treatment of active TRS participants (*i.e.*, the freeze of the TRS defined-benefit plan).

120.     Each of the Acts is inconsistent with and therefore preempted by PROMESA, and the Oversight Board included the Acts in the list of preempted Commonwealth laws in the Plan of Adjustment. *Id.* § 89.3, *id.* at Ex. K at K-4.  The counts in this complaint set forth causes of action to nullify and otherwise prevent implementation of the Acts on multiple grounds including preemption.

## COUNT I

**NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF
ACTS 80, 81, AND 82 AND JR 33
(PROMESA §§ 312, 313, AND 104(k), BANKRUPTCY CODE § 1123(a)(4))**
(The Governor and AAFAF)

121.     The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 120 above as if set forth in full herein.

122.     Under PROMESA §§ 312 and 313, the Oversight Board is the only party with the authority to file and to modify a plan of adjustment.

123.     The Oversight Board filed the Plan of Adjustment for the Court's consideration on November 28, 2021.  The Plan of Adjustment provides for (i) payment in full of all pension obligations to retirees and active employees accrued through the effective date of the Plan of Adjustment and (ii) a freeze of TRS pension benefit accruals as of the effective date of the Plan of Adjustment.

35

124.   The Acts and JR 33, however, would modify the Plan of Adjustment by increasing the treatment of pension claims of certain classes of pension claims in violation of PROMESA § 313.  By changing the treatment of some pension claims, but not others, the Plan of Adjustment would violate Bankruptcy Code § 1123(a)(4), made applicable by PROMESA § 301(a), requiring the same treatment of each claim in the class.  Some claimholders would receive the option of retiring early and collecting the same or a higher pension for a longer time, while others would not.

125.   Act 80 would increase pension benefits of certain (but not all) active ERS participants holding claims in Class 51G of the Plan of Adjustment above the treatment of such claims provided in the Plan of Adjustment.  JR 33 would mandate the Government implement Act 80.

126.   Act 81 would increase pension benefits of certain (but not all) other active ERS participants holding claims in Class 51G of the Plan of Adjustment above the amounts provided for in the Plan of Adjustment.

127.   Act 82 would increase pension benefits of certain teachers who are active TRS participants in Class 51I of the Plan of Adjustment by allowing them to use unused sick days as a credit toward retirement eligibility, thus accelerating their eligibility in direct contradiction of the Plan of Adjustment's treatment of active TRS participants, which includes delays in retirement eligibility and elimination of teachers' ability to purchase credits toward eligibility.

128.   Each of the Acts and JR 33 substantively modifies the Plan of Adjustment by increasing the treatment of claims in these classes and, with respect to certain claimants in Class 51G, providing them in excess of 100% of their allowed claim amounts, while other creditors

suffer losses.  Only the Oversight Board has the authority to modify the Plan of Adjustment under

PROMESA § 313.

129.    The Oversight Board is entitled to an order pursuant to PROMESA §§ 104(k), 312,

and 313 and Bankruptcy Code § 1123(a)(4) nullifying and enjoining implementation and

enforcement of the Acts and JR 33.

**COUNT II**

**NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF
ACTS 80, 81, AND 82 AND JR 33
(BANKRUPTCY CODE § 1129 AND PROMESA § 104(k))**
(The Governor and AAFAF)

130.    The Oversight Board repeats and realleges every allegation set forth in paragraphs 1

to 129 above as if set forth in full herein.

131.    PROMESA § 301 makes applicable certain sections of the Bankruptcy Code in

Title III cases, including Bankruptcy Code § 1129(b).

132.    Bankruptcy Code § 1129(b) requires that a plan of adjustment must be fair and

equitable with respect to a class of unsecured claimholders that has rejected the plan.

133.    For a plan of adjustment to meet the fair and equitable requirement with respect to

rejecting classes not being paid in full, no creditor in another class may be paid more than 100%

on account of its allowed claim.

134.    The Acts and JR 33 would permit certain claimants in Class 51G under the Plan of

Adjustment as described herein to recover in excess of 100% of their claims when other unsecured

claimholders in classes that rejected the Plan of Adjustment are not being paid in full.

135.    The Acts and JR 33 violate PROMESA § 301(a) and Bankruptcy Code § 1129(b)

by increasing the treatment of certain claimants in Class 51G of the Plan of Adjustment to recover

in excess of the full amount of their claims instead of distributing such excess recoveries to other unsecured claimholders in rejecting classes not receiving full recoveries.

136.    The Oversight Board is entitled to an order pursuant to PROMESA §§ 104(k) and 301(a) and Bankruptcy Code § 1129(b) nullifying and enjoining implementation and enforcement of the Acts and JR 33.

## COUNT III

### NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF ACTS 80, 81, AND 82 AND JR 33
### (PROMESA §§ 207 and 104(k))
(The Governor, AAFAF, OMB, OMB Director, and the Retirement Board)

137.    The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 136 above as if set forth in full herein.

138.    PROMESA § 207 bars the Commonwealth and all its instrumentalities from issuing, guaranteeing, exchanging, modifying, repurchasing, and redeeming debt (or entering into any similar transaction) without prior Oversight Board approval.

139.    Without prior Oversight Board approval, the enactment and implementation of each of Acts 80, 81, and 82, and JR 33 modifies the Commonwealth's pension obligations to the covered employees.  In doing so, without prior Oversight Board approval, the Government modified Commonwealth, various public corporation, and municipalities' debt by increasing the benefits owed to participating retirees or permitting retirees to access such pension benefits sooner than permitted prior to passage of the Acts.

140.    The Oversight Board is entitled to an order pursuant to PROMESA § 104(k) nullifying the Acts and JR 33 and an injunction barring implementation and enforcement of the Acts and JR 33 on the grounds that the laws seek to modify Commonwealth, public corporation, and municipal debt in violation of PROMESA § 207.

## COUNT IV

### NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF
### ACTS 80, 81, AND 82 AND JR 33
### (PROMESA §§ 108(a)(2) AND 104(k))
(The Governor and AAFAF)

141.    The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 140 above as if set forth in full herein.

142.    PROMESA § 108(a)(2) bars the Governor and Legislature from enacting, implementing, or enforcing any law that would impair or defeat the purposes of PROMESA, as determined by the Oversight Board.

143.    PROMESA's purposes include providing a method for the Commonwealth to achieve fiscal responsibility and access to capital markets.  *See* PROMESA §§ 101(a), 201.

144.    The Oversight Board has determined the Acts and JR 33 impair or defeat PROMESA's purpose of achieving fiscal responsibility by adding billions of dollars in pension expenditures not contemplated by the Fiscal Plans without ensuring corresponding savings and by reversing the freeze of pension benefits required by the proposed plan of adjustment.

145.    Specifically, Act 80 incentivizes early retirement among certain classes of employees covered under the ERS defined-benefit plan and increases those employees' pension benefits from 29%-40% of their final salary as of June 30, 2013, as stated by the Government in its preamble to Act 80, to 50% of their highest salary in their last three years of employment.  Such a substantial increase in pension benefits partially reverses the 2013 freeze of the ERS system and would violate the Plan of Adjustment's restrictions on future expansions of pension benefits. The Government fails to identify savings necessary to offset the expansion of benefits.  It identifies only savings from headcount reductions already required by the Fiscal Plans, which were meant to be used for other purposes.  Acts 80-82 attempt to use those savings to pay higher pensions to

39

employees than they were entitled to at the commencement of the Commonwealth and ERS Title
III cases.  But even if AAFAF identifies sufficient savings from additional headcount reductions
above and beyond the Fiscal Plans' requirements, Act 80 provides no mechanism to ensure such
savings by preventing eliminated positions from being refilled.  Absent such a mechanism, the
additional costs will undermine the Commonwealth's ability to achieve fiscal responsibility.  The
recently enacted JR 33 mandates the Government begin implementation of Act 80.

146.    Act 81 amends the ERS defined-benefit pension plan to allow certain public
emergency employees to retire earlier and increases those employees' annual benefits from their
frozen levels of their final salaries as of June 30, 2013 to 45-55% of their highest salary in their
last three years of employment.  That expansion partially reverses the prior ERS system freeze and
conflicts with the restriction of future expansions of benefits set forth in the proposed plan of
adjustment.  The Government fails to identify any means of funding this increase outside of
headcount reductions or some undetermined savings from lower salaries for new hires.  These
funding mechanisms are nothing more than fictions because Act 81 does not require them, nor
does the Government otherwise identify a mechanism to ensure Act 81 will not impose additional
costs.  Moreover, paying for increased retirement benefits by limiting the hiring of new recruits
and by hiring Public Emergency Employees at lower rates is contrary to (*i*) the Fiscal Plans'
mandate to ensure the funding of essential public services and (*ii*) recent governmental efforts to
reverse high levels of attrition among Public Emergency Employees.  Along with these significant
costs, the Act also threatens to make police ineligible for Social Security benefits, in direct
contravention to the Fiscal Plans.

147.    Act 82 permits eligible TRS participants to apply preexisting or excess unused sick
leave towards their retirement eligibility and pension-benefit levels, allowing some teachers to

retire years earlier and collect higher pensions for a longer term.  The increase in pension benefits substantially negates savings expected from pension-benefit reductions in the Fiscal Plans and partially reverses the freeze of the TRS pension system required by the pending proposed plan of adjustment.  The Government has not provided a method to offset such increased costs.

148.    The Oversight Board advised the Government on several occasions of its determinations that the Acts would impair or defeat PROMESA's purposes and directed it not to enact or implement the laws.

149.    The Government agreed in November 2020 not to implement any of the Acts unless and until the Oversight Board consented.

150.    Notwithstanding the Oversight Board's determinations and directives with respect to each Act, and the agreement between the Government and the Oversight Board not to implement the Acts until the Oversight Board consents, the Puerto Rico Legislature has passed and the Governor has signed JR 33, which mandates the commencement of Act 80's implementation.

151.    JR 33 requires the Government to begin implementing Act 80 as to non-essential employees while leaving open the early-retirement option for other eligible employees.  But the Oversight Board estimates that even such a purported partial implementation would impose at least $5.6 million and as much as $61 million in costs in the first year if AAFAF's underlying assumptions regarding savings distribution across agencies prove impossible (as the Oversight Board believes likely).  JR 33 provides no additional mechanism for ensuring the purported savings materialize and the Government itself has admitted that it cannot ensure that positions will be eliminated permanently—rendering the purported savings illusory.

152.    Following over a year of correspondence and cooperation with the Government in an effort to determine the true fiscal impact of the Acts and to seek a fiscally responsible path, in

November 2021, the Oversight Board reaffirmed its prior determination that the Acts impair and defeat PROMESA's purpose of achieving fiscal responsibility by (*i*) increasing the Commonwealth's pension obligations without ensuring corresponding savings, and (*ii*) reversing the freeze of the ERS pension system that occurred prior to the Commonwealth's Title III case. The Oversight Board also determined JR 33 impairs and defeats PROMESA's purposes for the same reasons.

153.     PROMESA § 108(a)(2) statutorily barred the Government from enacting or implementing the Acts once the Oversight Board advised the Government it determined they impaired or defeated the purposes of PROMESA.

154.     The Oversight Board is thus entitled to equitable relief in the form of a mandatory permanent injunction prohibiting the Government from implementing and enforcing the Acts.

155.     The Oversight Board is entitled to an order pursuant to PROMESA §§ 104(k) and 108(a)(2) nullifying the Acts and JR 33.

## COUNT V

**NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF ACT 80
AND SJR-171
(PROMESA §§ 204(a) AND 104(k))**
(The Governor, AAFAF, OMB, OMB Director, and the Retirement Board)

156.     The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 155 above as if set forth in full herein.

157.     PROMESA § 204(a)(1) requires the Governor to submit to the Oversight Board new legislation within seven business days of its enactment, and § 204(a)(2) requires the Governor to include with the submission a "formal estimate" of the law's impact on the Commonwealth's expenditures and revenues and a "certification" of whether the law is or is not "significantly inconsistent" with the certified fiscal plan.

158.    Former Governor Vázquez Garced initially failed to provide the formal estimate of Act 80's impact on expenditures and revenues required by PROMESA § 204(a)(2).  The estimate she provided did not assess Act 80 as enacted but rather an earlier Senate bill, which had undergone significant amendments during the legislative process.  Because then-Governor Vázquez Garced relied on that data in certifying Act 80 as not significantly inconsistent with the 2020 Fiscal Plan, the certification was deficient under PROMESA § 204(a)(2).

159.    Pursuant to PROMESA § 204(a)(3)(A), the Oversight Board notified then-Governor Vázquez Garced of these deficiencies and, pursuant to PROMESA § 204(a)(4)(A), directed her to provide the missing formal estimate.  Because of these deficiencies and because the Oversight Board determined Act 80 did not provide for sufficient, permanent savings above and beyond those required by the 2020 Fiscal Plan to offset its billions in dollars of added defined-benefit pension costs over the next 30 years, the Oversight Board advised that Act 80 was significantly inconsistent with the 2020 Fiscal Plan.

160.    Over six weeks after the submission deadline, AAFAF provided a "supplemental certification" estimating—based on updated actuarial analysis from Integrum that assumed all eligible participants would elect to retire and receive benefits and all their positions would be eliminated and not filled—that Act 80 would save $2.6 billion over a period of 30-50 years.  Based on that estimate, the supplemental certification again certified Act 80 as not "significantly inconsistent" with the 2020 Fiscal Plan.

161.    The supplemental certification and updated Integrum analysis demonstrate Act 80 would impose substantial costs on the Commonwealth not contemplated by the Fiscal Plans.  The Fiscal Plans already require the Commonwealth to achieve and maintain $85.2 million in annual payroll savings through reductions in headcount, meaning headcount reductions above and beyond

43

those requirements are necessary to offset Act 80's costs.  AAFAF neglects those requirements and improperly assumes a baseline of zero headcount reductions in estimating savings under Act 80 (*i.e.*, all headcount reductions in Act 80 count toward estimated savings in the Act).

162.    With zero headcount reductions, AAFAF has not identified payroll savings to meet both the Fiscal Plans' requirements and the full cost of Act 80—which means the Act could saddle the Commonwealth with billions of dollars of pension costs over 30 years.  Act 80 contains no mechanism to ensure that eliminating non-essential positions, as AAFAF proposes, will generate the promised savings.  While Act 80 instructs the Government to refrain from filling non-essential positions following an employee's retirement, it grants agencies sole discretion to designate "essential" and "non-essential" positions and empowers the Commonwealth to make exceptions to the prohibition on rehiring non-essential positions.  In addition, the Government recently admitted it cannot ensure that positions will be permanently eliminated.

163.    By relying on inaccurate and incomplete data that fails to account for Act 80's express language permitting eliminated positions to be refilled and the practical reality that such positions must be refilled to ensure the provision of essential services, AAFAF failed to provide the "formal estimate" the Oversight Board requested pursuant to PROMESA § 204(a)(4)(A).

164.    Because it could impose billions of dollars in incremental costs over the next 30 years, Act 80 is significantly inconsistent with the Fiscal Plans.  To address the significant inconsistency, the Oversight Board directed AAFAF to present a plausible plan for implementing the law without imposing such incremental costs.  The Oversight Board advised the Government it did not consent to implementation absent such a plan.

165.    AAFAF failed to present a plausible plan and it agreed not to implement Act 80 until it had reached an agreement with the Oversight Board as to such implementation.

44

166.    By signing JR 33 into law, the Government disavowed its agreement not to implement Act 80.  JR 33 increases costs in year one by at least $5 million and likely by more than $60 million, and any purported savings in later years is illusory because the Government has admitted that it cannot ensure the positions will be permanently eliminated.  As a result, JR 33 and Act 80 are significantly inconsistent with the Fiscal Plan and Budget.

167.    The Oversight Board is entitled to an order pursuant to PROMESA §§ 104(k) and 204(a)(5) nullifying, and enjoining implementation and enforcement of, Act 80 and JR 33 on the grounds the Governor and AAFAF failed to comply with PROMESA § 204(a).

## COUNT VI

### NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF ACT 81 (PROMESA §§ 204(a) AND 104(k))
(The Governor and AAFAF)

168.    The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 167 above as if set forth in full herein.

169.    PROMESA § 204(a)(1) requires the Governor to submit to the Oversight Board new legislation within seven business days of its enactment, and § 204(a)(2) requires the Governor to include with the submission a "formal estimate" of the law's impact on the Commonwealth's expenditures and revenues and a "certification" of whether the law is or is not "significantly inconsistent" with the certified fiscal plan.

170.    Former Governor Vázquez Garced initially failed to provide the requisite formal estimate of Act 81's impact on expenditures and revenues required by PROMESA § 204(a)(2). When the Governor did submit an estimate, the submitted estimate was based on a prior draft of the Senate bill and focused on only police personnel rather than the complete range of safety professionals covered by the law.  Because then-Governor Vázquez Garced relied on that data in

certifying Act 81 as not significantly inconsistent with the 2020 Fiscal Plan, the certification also was deficient under PROMESA § 204(a)(2).

171.    Pursuant to PROMESA § 204(a)(3)(A), the Oversight Board notified then-Governor Vázquez Garced of these deficiencies and, pursuant to PROMESA § 204(a)(4)(A), directed her to provide the missing formal estimate. Because the estimate was patently deficient and because the law would increase costs to the Commonwealth, the Oversight Board advised that Act 81 was significantly inconsistent with the 2020 Fiscal Plan.

172.    Over ten weeks after the submission deadline, AAFAF provided a "supplemental certification" estimating—based on an updated actuarial analysis from Integrum—Act 81 would incur $852 million in pension costs unaccounted for by the Fiscal Plans over a thirty-to-forty-year period. Ex. 7 at 1. Despite this finding, the supplemental certification again certified Act 81 as being not "significantly inconsistent" with the 2020 Fiscal Plan because the Government indicated it would "limit[] the hiring of new recruits or . . . hir[e] at lower rates and, therefore, limit[] new payroll expenditures for about $852 million during a period of 30-40 years." Ex. 7 at 2. Nothing in Act 81 so limits hiring new recruits, and the supplemental certification contained no concrete commitment or plan to change hiring practices over the next 30 or 40 years.

173.    The supplemental certification and updated Integrum analysis demonstrate Act 81 would likely impose substantial costs on the Commonwealth not contemplated by the Fiscal Plans. The cost savings necessary to pay for Act 81 could be achieved only by limiting hiring and rehiring employees at lower rates over the course of a generation. The Commonwealth's proposal to pay for Act 81 by reducing hiring is directly contrary to the Fiscal Plans. The 2021 Fiscal Plan makes plain that the Commonwealth must hire more officers, and transition officers from administrative roles into field positions to "ensure [the Commonwealth] can move more sworn officers onto the

streets to improve public safety on the Island." Ex. 2 at 219.  The 2021 Fiscal Plan observes the Puerto Rico Police Bureau is suffering from "[a] combination of high historic attrition rates . . . and a push for headcount reductions through Voluntary Transition Programs (VTP) has led to a shortage of field officers."  *Id.* at 217.  Despite recruiting more than 250 cadets to fill these shortages, the Police Bureau continues to struggle "to enable more cadets and sworn officers to move into field roles."  *Id.*

174.    By relying on inaccurate and incomplete data and by providing a plan for implementation (reduced hiring and lower starting salaries) that is directly contrary to the Fiscal Plans, AAFAF failed to provide the "formal estimate" that the Oversight Board requested pursuant to PROMESA § 204(a)(4)(A).  In addition, AAFAF's certification was defective not only because Act 81 could impose billions of dollars in additional costs beyond what the Fiscal Plans provided, but also because AAFAF's plan to pay for those costs, as noted above, was itself directly contrary to the Fiscal Plans' mandate to increase the number of officers on the ground.  *Id.*

175.    Act 81, as described in paragraph 28 above, may impose up to $2.4 billion in incremental costs over the next 30 years.  By creating billions of dollars of liabilities and by requiring extensive additional headcount reductions at the expense of public safety, Act 81 is significantly inconsistent with the Fiscal Plans.  To address the significant inconsistency, the Oversight Board directed AAFAF to present an implementation plan showing how (*i*) such savings were achievable over time and (*ii*) positions could be eliminated "without jeopardizing essential police, firefighter, and other emergency services."  Ex. 27 at 4.  The Oversight Board unambiguously warned it did not consent to implementation absent such a plan.

176.    Despite stating the "Government is currently working on the circular letters to be issued to implement Act 81-2020 in a phased approach" in late 2020, Ex. 26 at 2, AAFAF did not issue circular letters or implement such a plan during the past 13 months.

177.    The Oversight Board is entitled to an order pursuant to PROMESA §§ 104(k) and 204(a)(5) nullifying and enjoining implementation and enforcement of Act 81 on the grounds that the Governor and AAFAF failed to comply with PROMESA § 204(a).

### COUNT VII

**NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF ACT 82
(PROMESA §§ 204(a) AND 104(k))**
(The Governor and AAFAF)

178.    The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 177 above as if set forth in full herein.

179.    PROMESA § 204(a)(1) requires the Governor to submit to the Oversight Board new legislation within seven business days of its enactment, and § 204(a)(2) requires the Governor to include with the submission a "formal estimate" of the law's impact on the Commonwealth's expenditures and revenues and a "certification" of whether the law is or is not "significantly inconsistent" with the certified fiscal plan.

180.    Former Governor Vázquez Garced failed to provide the formal estimate of Act 82's impact on expenditures and revenues required by PROMESA § 204(a)(2).  By letter dated August 21, 2020, AAFAF stated "there are no actuarial reports concerning Act 82-2020."  A true and correct copy of the August 21, 2020 letter is attached hereto as Exhibit 48.  Instead, the purported estimate consisted of a conclusory statement that Act 82 had no impact on expenditures or revenues, and on that flawed ground the Governor certified Act 82 as "not significantly inconsistent" with the 2020 Fiscal Plan.

48

181. The purported estimate incorrectly focused only on Act 82's impact to the Retirement System Administration's certified budget. PROMESA § 204(a)(2) does not limit the impact of a law to any particular agency, however; it requires an estimate of the "impact, if any, the new law will have on expenditures or revenues" for any and all parties. The purported estimate also incorrectly asserts "Act 82 has no impact on expenditures since no liquidations [of unused sick days] are required." That assertion ignores that Act 82 will necessarily increase costs by allowing teachers to retire earlier and receive their defined benefits for a longer period of time.

182. Pursuant to PROMESA § 204(a)(3)(A), the Oversight Board notified then-Governor Vázquez Garced of these deficiencies and, pursuant to PROMESA § 204(a)(4)(A), directed her to provide the missing formal estimate. In addition, because the estimate was patently deficient and because, as noted in paragraph 33 above, the law would cost up to $1.6 billion over the next 30 years, the Oversight Board advised that Act 82 was significantly inconsistent with the 2020 Fiscal Plan.

183. By refusing to provide any substantiation for its purported submission, AAFAF failed to provide the "formal estimate" the Oversight Board requested pursuant to PROMESA § 204(a)(4)(A).

184. The Oversight Board requested these revised submissions and analyses on multiple occasions, but did not receive them. Based on the Oversight Board's analysis, Act 82 could impose billions of dollars in incremental costs over the next 30 years and is significantly inconsistent with the Fiscal Plans. As AAFAF failed to present any actuarial analysis regarding the financial impact of a law seeking to allow teachers to retire earlier with greater pension benefits and no additional revenue creation, the certification is facially invalid.

49

185. The Oversight Board is entitled to an order pursuant to PROMESA §§ 104(k) and 204(a)(5) nullifying and enjoining implementation and enforcement of Act 82 on the grounds the Governor and AAFAF failed to comply with PROMESA § 204(a).

## COUNT VIII

### NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF ACT 80 AND JR 33
### (PROMESA §§ 204(c) AND 104(k))
(The Governor, AAFAF, OMB, OMB Director, and the Retirement Board)

186. The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 185 above as if set forth herein.

187. Act 80 grants employees defined benefit pensions greater than their entitlements when the Commonwealth and ERS Title III petitions were filed. Act 80 also directly conflicts with the restriction of future expansions of ERS pension benefits included in the proposed and pending Title III Plan of Adjustment.

188. The Government's supplemental certification and estimate asserting Act 80 will save $2.6 billion over the next 30 to 50 years is based on several erroneous assumptions, including that all positions current employees vacate when they retire under Act 80, regardless of essential status, will be frozen and remain unfilled.

189. The Government's own data from April 2021, shows the Government's savings are less than the additional pension costs imposed by Act 80. As a result, the Commonwealth will have to resort to reprogramming funds allocated for other purposes to cover the costs of Act 80. PROMESA § 204(c)(2) bars the Legislature from adopting, and any officer or employee of Puerto Rico from carrying out, any reprogramming prior to receiving from the Oversight Board an analysis certifying the reprogramming will not be inconsistent with the certified fiscal plan or budget.

190.    The partial implementation of Act 80 through JR 33 will also require a reprogramming of funds.  JR 33 increases costs in year one by at least $5 million and likely more than $60 million, requiring a reprogramming.

191.    The Oversight Board has not provided any certification required by PROMESA § 204(c)(2) for Act 80 or JR 33 and Defendants have not requested such a certification.

192.    Act 80 and JR 33 were each enacted and will be implemented in violation of PROMESA § 204(c), which charges the Oversight Board with the responsibility to ensure that any reprogramming is not inconsistent with the certified fiscal plan or budget.

193.    The Oversight Board is entitled to an order pursuant to PROMESA § 104(k) nullifying Act 80 and JR 33 and an injunction barring implementation and enforcement of Act 80 and JR 33 on the ground the Governor failed to comply with PROMESA § 204(c).

## COUNT IX

**NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF ACT 81
(PROMESA §§ 204(c) AND 104(k))**
(The Governor, AAFAF, OMB, OMB Director, and the Retirement Board)

194.    The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 193 above as if set forth herein.

195.    Act 81 effectuates a substantial expansion of ERS pension benefits for certain public employees, potentially adding billions of dollars in liabilities to a pension system that has already run out of funds and transitioned to "pay-as-you-go" system.  It directly conflicts with the restriction of such increases in ERS pension benefits included in the pending proposed Title III Plan of Adjustment.

196.     Although the Government's most recent certification and estimate purport to show Act 81 is revenue neutral, it is based on several erroneous assumptions, including that limiting new hires and decreasing other payroll costs will compensate for the additional costs.

197.     Based on the Government's data and the Oversight Board's analysis, Act 81 will cost more than it purports to save, and the Commonwealth will have to resort to reprogramming funds allocated for other purposes to cover the costs.  PROMESA § 204(c)(2) bars the Legislature from adopting, and any officer or employee of Puerto Rico from carrying out, any reprogramming prior to receiving from the Oversight Board an analysis certifying the reprogramming will not be inconsistent with the certified fiscal plan or budget.

198.     The Oversight Board has not provided any certification required by PROMESA § 204(c)(2) for Act 81 and Defendants have not requested such a certification.

199.     The Oversight Board is entitled to an order pursuant to PROMESA § 104(k) nullifying Act 81 and an injunction barring implementation and enforcement of Act 81 on the grounds the Governor failed to comply with PROMESA § 204(c).

## COUNT X

### NULLIFICATION AND INJUNCTION BARRING IMPLEMENTATION OF ACT 82 (PROMESA §§ 204(c) AND 104(k))
(The Governor, AAFAF, OMB, OMB Director, and the Retirement Board)

200.     The Oversight Board repeats and realleges every allegation set forth in paragraphs 1 to 199 above as if set forth herein.

201.     Act 82 provides for use of unused sick days to accelerate retirement, thereby extending the period for which teachers will receive pension benefits, and increasing the Commonwealth's estimated pension liabilities.

202.     Although the Government's certification states Act 82 will have no impact on revenue or expenditures, this ignores the additional costs the Commonwealth will incur when public employees become eligible for retirement earlier.   PROMESA § 204(c)(2) bars the Legislature from adopting, and any officer or employee of Puerto Rico from carrying out any reprogramming prior to receiving from the Oversight Board an analysis certifying the reprogramming will not be inconsistent with the certified fiscal plan or budget.

203.     The Oversight Board has not provided any certification required by PROMESA § 204(c)(2) for Act 82 and Defendants have not requested such a certification.

204.     Act 82 was enacted in violation of PROMESA § 204(c) and its implementation would be in violation of PROMESA § 204(c), which charges the Oversight Board with the responsibility to ensure that any reprogramming is not inconsistent with the certified fiscal plan or budget.

205.     The Oversight Board is entitled to an order pursuant to PROMESA § 104(k) nullifying Act 82 and an injunction barring implementation and enforcement of Act 82 on the grounds the Governor failed to comply with PROMESA § 204(c).

## PRAYER FOR RELIEF

WHEREFORE the Oversight Board prays that judgment be entered for it and against Defendants, and for the following relief:

A.     That each claim be sustained;

B.     That the Acts and JR 33 be nullified;

C.     That Defendants be preliminarily and permanently enjoined from implementing the Acts and JR 33;

D.     Granting Plaintiff such other and further relief as the Court finds just and proper.

Dated: December 20, 2021
San Juan, Puerto Rico

*s/Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944
Email:
hermann.bauer@oneillborges.com


*s/Martin J. Bienenstock*
Martin J. Bienenstock (*pro hac vice*)
Mark Harris (*pro hac vice*)
Timothy W. Mungovan (*pro hac vice*)
Hadassa R. Waxman (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900
Email:  mbienenstock@proskauer.com
        mharris@proskauer.com
        tmungovan@proskauer.com
        hwaxman@proskauer.com

*s/Guy Brenner*
Guy Brenner (*pro hac vice*)
**PROSKAUER ROSE LLP**
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Tel:     (202) 416-6800
Fax:     (202) 416-6899
Email: gbrenner@proskauer.com

*Attorneys for the Financial Oversight
and Management Board in its own
right and as representative of the
Commonwealth of Puerto Rico*