# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>    Debtors.[1] | PROMESA<br><br>Title III<br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

**NOTICE OF FILING REVISED PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH
CONFIRMATION OF THE MODIFIED EIGHTH AMENDED TITLE III JOINT
PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.**

**PLEASE TAKE NOTICE** that, on December 6, 2021, the Financial Oversight and

Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the

Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the

Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings

Authority ("PBA"), pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and*

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

*Economic Stability Act* ("PROMESA"), filed the *[Proposed] Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "First Revised Proposed Findings and Conclusions") [ECF No. 19427, Ex. A].

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as **Exhibit A** is the *[Proposed] Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Second Revised Proposed Findings and Conclusions").

**PLEASE TAKE FURTHER NOTICE** that, attached hereto as **Exhibit B** is a redline comparison of the Second Revised Proposed Findings and Conclusions against the First Revised Proposed Findings and Conclusions.[2]

**PLEASE TAKE FURTHER NOTICE** that all documents filed in these Title III Cases are available (a) free of charge by visiting https://cases.primeclerk.com/puertorico or by calling +1 (844) 822-9231, and (b) on the Court's website at http://www.prd.uscourts.gov, subject to the procedures and fees set forth therein.

Dated: December 21, 2021
      San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
Brian S. Rosen
(Admission *pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

---

[2]   The redline does not reflect the addition of Exhibit A to the Second Revised Proposed Findings and Conclusions, which is included in **Exhibit A** hereto.

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

/s/  Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

<u>**Exhibit A**</u>

**Revised Proposed Findings and Conclusions**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Title III No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY, | |
| Debtors.[1] | |

## [PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH CONFIRMATION OF THE MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

LAURA TAYLOR SWAIN, United States District Judge:

Before the Court is the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated December 20, 2021 (Docket Entry No. 19568 in Case No. 17-3283)[2] (as modified pursuant to any revisions made at or subsequent to the Confirmation Hearing as set forth in the Confirmation Order, including the Plan Supplement, and as may be modified pursuant to section 313 of PROMESA, the "Plan")[3] filed by the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), and together with the Commonwealth and ERS, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Debtors pursuant to PROMESA Section 315(b).[4]  The following documents have been filed by the Debtors in connection with confirmation of the Plan:

(a) *Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18470) (as the same may be amended, supplemented, or modified, the "Plan Supplement");

(b) *Certificate of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9) (Debtors Exhibits 138–140) (the "Mailing Affidavits");

---

[2]  All docket references are to entries in Case No. 17-3283 unless otherwise indicated.

[3]  Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

[4]  The Court previously entered, pursuant to, inter alia, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, submission, and tabulation of votes and elections with respect to the Plan, approving the forms of ballots, master ballots, and election notices in connection therewith, and approving the form of notice of the Confirmation Hearing.  Moreover, the Court previously entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640).

(c) *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4) (Debtors Exhibit 141) (the "Publication Affidavit" and, together with the Mailing Affidavits, the "Service Affidavits");

(d) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18874);

(e) *Memorandum of Law in Support of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18869);

(f) *Certificate of Service* (Docket Entry No. 19182);

(g) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Requested Rulings Regarding Act 53-2021 Relating to the Modified Eighth Amended Joint Plan of Adjustment* (Docket Entry No. 19249);

(h) *Response of the Financial Oversight and Management Board in Accordance with the Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19567)

(i) *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18729 and 19054-4) ("Jaresko Decl.");

(j) *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18731 and 19054-9) ("Skeel Decl.");

(k) *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18726 and 19054-1) ("Brownstein Decl.");

(l) *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18734 and 19054-10) ("Zelin Decl.");

(m) *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18730 and 19054-8) ("Shah Decl.");

3

(n) *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18738 and 19054-6) ("Malhotra Decl.");

(o) *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18736 and 19054-7) ("Santambrogio Decl.");

(p) *Declaration of Adam Chepenik in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18735 and 19054-2) ("Chepenik Decl.");

(q) *Declaration of Sheva Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18737 and 19054-5) ("Levy Decl.");

(r) *Declaration of Jay Herriman in Respect of Confirmation of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18732 and 19054-3) ("Herriman Decl.");

(s) *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19056) ("Pullo Decl.");

(t) *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725) ("Wolfe Decl.");

(u) *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724) (Murray Decl.");

(v) *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057) ("Malhotra Sup. Decl.");

(w) *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058) ("Jaresko Sup. Decl.");

(x) *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19059) ("Levy Sup. Decl.");

4

(y) *Supplemental Declaration of Juan Santambrogio in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19060) ("Santambrogio Sup. Decl.");

(z) *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115) ("Pullo Sup. Decl."); and

(aa) *Supplemental Declaration of Jay Herriman in Respect of Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al*. (Docket Entry No. 19329) ("Herriman Sup. Decl.").

Oppositions to confirmation of the Plan were filed by the following parties: (i) PFZ Properties, Inc. (Docket Entry Nos. 9223 and 18418); (ii) Sucesión Pastor Mandry Mercado (Docket Entry Nos. 12701, 16481, 17062, and 17998); (iii) Vicente Pérez Acevedo and Corporación Marcaribe Investment (Docket Entry No. 16668); (iv) Antonio Martin Cervera (Docket Entry No. 16871); (v) Maria Teresita Martin (Docket Entry No. 16872); (vi) Wanda Ortiz Santiago (Docket Entry Nos. 16939 and 17175); (vii) Nancy I. Negron-Lopez (Docket Entry No. 16955); (viii) Demetrio Amador Inc. (Docket Entry Nos. 17005 and 18582); (ix) Suiza Dairy Corp. (Docket Entry Nos. 17013, 17526, and 18593); (x) Maruz Real Estate Corp. (Docket Entry No. 17016); (xi) Group Wage Creditors (Docket Entry No. 17021); (xii) Yashei Rosario (Docket Entry Nos. 17047 and 17116); (xiii) Ana A. Núñez Velázquez (Docket Entry Nos. 17436, 17438, and 18529); (xiv) Edgardo Marquez Lizardi (Docket Entry Nos. 18111 and 18249); (xv) Maria M. Ortiz Morales (Docket Entry No. 18396); (xvi) Arthur Samodovitz (Docket Entry No. 18433); (xvii) Miguel Luna de Jesus (Docket Entry No. 18485); (xviii) Ismael L. Purcell Soler and Alys Collazo Bougeois (Docket Entry No. 18504); (xix) Mildred Batista De León (Docket Entry Nos. 18505 and 19010); (xx) Javier Alejandrino Osorio (Docket Entry Nos. 18506 and 19008); (xxi) Service Employees International Union (Docket Entry No. 18511); (xxii) Mapfre PRAICO Insurance Company (Docket Entry Nos. 18512 and 18513); (xxiii) certain creditors who filed

5

actions in the United States District Court for the District of Puerto Rico (Docket Entry No. 18535);
(xxiv) Med Centro, Inc. (Docket Entry No. 18538); (xxv) Asociación De Jubilados De La
Judicatura De Puerto Rico (Docket Entry Nos. 18548 and 18549); (xxvi) Cooperativa de Ahorro
y Crédito Vegabajeña (Docket Entry No. 18551); (xxvii) International Union, UAW (Docket Entry
No. 18558); (xxviii) Maruz Real Estate Corp. (Docket Entry No. 18563); (xxix) LORTU-TA Ltd,
Inc., La Cuarterola, Inc., Juaza, Inc., and the Conjugal Partnership Composed of Juan Zalduondo
Viera and Magdalena Machicote Ramery (Docket Entry No. 18564); (xxx) Sucn. De Frank Torres
Ortiz & Aurea Rodriguez (Docket Entry No. 18565); (xxxi) Finca Matilde, Inc. (Docket Entry No.
18566); (xxxii) the University of Puerto Rico Retirement System Trust (Docket Entry No. 18573);
(xxxiii) Peter C. Hein (Docket Entry No. 18575); (xxxiv) Miriam E. Lima Colón, Betzaida
Feliciano Concepción, and Angel L. Méndez González (Docket Entry No. 18583); (xxxv)
Asociatión de Maestros Puerto Rico and Asociación de Maestros de Puerto Rico-Local Sindical
(Docket Entry No. 18585); (xxxvi) the Underwriter Defendants (Docket Entry No. 18587);
(xxxvii) certain credit unions (Docket Entry No. 18594); (xxxviii) Community Health Foundation
of P.R. Inc. (Docket Entry No. 18604); (xxxix) Quest Diagnostics of Puerto Rico, Inc. (Docket
Entry No. 18560); (xl) U.S. Bank Trust Association and U.S. Bank National Association (Docket
Entry Nos. 18631 and 18634); and (xli) Nilsa Candelario (Docket Entry No. 18663); and (xlii)
Jorge Rafael Eduardo Collazo Quinones (Docket Entry No. 19311).  In addition, the Debtors have
received letters in opposition to confirmation of the Plan, which were not filed with the Court,
from: (a) Luiz Roldan Ruiz; (b) Antonia Medina Rodriquez; and (c) Aida Iris Santiago Torres.

Reservations of rights or limited objections raising discreet issues but generally supporting
the Plan were filed by the following parties: (i) the Ad Hoc Group of FGIC Noteholders (Docket

6

Entry No. 17001); (ii) AAFAF (Docket Entry Nos. 17202 and 18592);[5] (iii) Vaquería Tres
Monjitas, Inc. (Docket Entry No. 18637); (iv) the Constitutional Debt Group, GO Group, LCDC,
and QTCB Group (Docket Entry No. 18453); (v) Ambac (Docket Entry No. 18479); (vi) the
Internal Revenue Service (Docket Entry No. 18567); (vii) certain ERS bondholders (Docket Entry
No. 18569); (viii) Bank of New York Mellon (Docket Entry No. 18588); (ix) the Creditors'
Committee (Docket Entry No. 18589); and (x) the University of Puerto Rico Retirement System
Trust (Docket Entry No. 19048).

Further, oppositions to the initial proposed confirmation order (Docket Entry No. 18447)
were filed by the following parties: (i) Peter C. Hein (Docket Entry No. 18647); (ii) Suiza Dairy
Corp. (Docket Entry No. 18651); (iii) Finca Matilde, Inc. (Docket Enrty No. 18670); and (iv)
AAFAF (Docket Entry No. 18742).[6]  Oppositions to the revised proposed confirmation orders
(Docket Entry Nos. 19118, Ex. A and 19188, Ex. A) were filed by the following parties: (a)
International Union, United Automobile, Aerospace and Agricultural Implement Workers of
America and Service Employees International Union (Docket Entry No. 19162 and 19204);[7] (b)
PFZ Properties, Inc. (Docket Entry No. 19212); (c) Finca Matilde, Inc. (Docket Entry No. 19214);
(d) Peter C. Hein (Docket Entry No. 19218); (e) certain credit unions (Docket Entry No. 19221);

---

[5]   AAFAF's additional limited objection to confirmation of the Plan, Docket Entry No. 18742, was withdrawn prior
      to the Confirmation Hearing.  (Docket Entry No. 19109).

[6]   "DRA Parties" means AmeriNational Community Services, LLC, as servicer for the GDB Debt Recovery
      Authority, and Cantor-Katz Collateral Monitor LLC, which serves as the collateral monitor for Wilmington Trust,
      N.A.  The DRA Parties' objections to confirmation of the Plan, Docket Entry Nos. 18590 and 18636, and objection
      to the initial proposed confirmation order, Docket Entry No. 18685, were withdrawn prior to the Confirmation
      Hearing.  (Docket Entry No. 19121).

[7]   International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Service
      Employees International Union's objections to the proposed Confirmation Order were partially withdrawn after
      the Confirmation Hearing.  (Docket Entry No. 19349).

(f) Demetrio Amador, Inc. (Docket Entry No. 19228); (g) Suiza Dairy Corp. (Docket Entry No. 19279); and (h) AAFAF (Docket Entry No. 19319).

Reservations of rights with respect to the proposed confirmation orders were filed by the following parties: (i) Assured (Docket Entry Nos. 18645 and 19217); (ii) the Creditors' Committee (Docket Entry Nos. 18658 and 19225); (iii) Bank of New York Mellon (Docket Entry No. 18662); (iv) the Retiree Committee (Docket Entry Nos. 18679 and 19248) (v) Ambac (Docket Entry No. 18694); and (vi) the Ad Hoc Group of Constitutional Debtholders, the Ad Hoc Group of General Obligation Bondholders, the LCDC, and the QTCB Noteholder Group (Docket Entry No. 19281).

Statements in support of confirmation of the Plan were filed by the following parties: (i) the Retiree Committee (Docket Entry No. 18562); (ii) National (Docket Entry No. 18574); (iii) Assured (Docket Entry No. 18584); (iv) FGIC (Docket Entry No. 18595); (v) Ambac (Docket Entry No. 18601); and (vi) the Puerto Rico Funds (Docket Entry No. 18848).[8]

---

[8] The Puerto Rico Funds are: GNMA & US Government Target Maturity Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.), Mortgage-Backed & US Government Securities Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.), Puerto Rico Residents Bond Fund I (f/k/a Puerto Rico Investors Bond Fund I), Puerto Rico Residents Tax-Free Fund, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund, Inc.), Puerto Rico Residents Tax-Free Fund II, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund II), Inc., Puerto Rico Residents Tax-Free Fund III, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund III, Inc.), Puerto Rico Residents Tax-Free Fund IV, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund IV, Inc.), Puerto Rico Residents Tax-Free Fund V, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund V, Inc.), Puerto Rico Residents Tax-Free Fund VI, Inc. (f/k/a Puerto Rico Investors Tax- Free Fund VI, Inc.), Tax-Free Fixed Income Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund, Inc.), Tax-Free Fixed Income Fund II for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund II, Inc.), Tax-Free Fixed Income Fund III for Puerto Rico Residents, Inc. (Puerto Rico Fixed Income Fund III, Inc.), Tax-Free Fixed Income Fund IV for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund IV, Inc.), Tax-Free Fixed Income Fund V for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund V, Inc.), Tax-Free Fixed Income Fund VI for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund VI, Inc.), Tax Free Fund for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Fund, Inc.), Tax Free Fund II for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Fund II, Inc.), Tax-Free High Grade Portfolio Bond Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Bond Fund, Inc.), Tax-Free High Grade Portfolio Bond Fund II for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Bond Fund II, Inc.), Tax-Free High Grade Portfolio Target Maturity Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Target Maturity Fund, Inc.), Tax Free Target Maturity Fund for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Target Maturity Fund, Inc.), and UBS IRA Select Growth & Income Puerto Rico Fund.

Further, pursuant to the *Urgent Motion of the Financial Oversight and Management Board of Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021* (Docket Entry No. 19002), the Oversight Board requested Court approval of certain rulings related to Act 53-2021 in connection with confirmation of the Plan.  Oppositions to such rulings were filed by the following parties: (i) Asociación Puertorriqueña de la Judicatura, Inc (Docket Entry No. 19161); (ii) Asociación de Jubilados de la Judicatura de Puerto Rico and Hon. Hector Urgell Cuebas, Former Judge of the Puerto Rico Court of Appeals (Docket Entry No. 19175); (iii) Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc. (Docket Entry No. 19180); (iv) Asociación de Maestros de Puerto Rico and Asociacón de Maestros de Puerto Rico-Local Sindical (Docket Entry No. 19181); and (v) Maria A. Clemente Rosa (Docket Entry No. 19254).  A joinder in support of the Oversight Board's requested rulings was filed by the LCDC (Docket Entry No. 19252).

The Court heard argument and received evidence in connection with confirmation of the Plan at a hearing held on November 8, 9, 10, 12, 15, 17, 22, and 23, 2021 (the "Confirmation Hearing").[9]  The Court has carefully considered the Plan, as well as the supporting and opposing submissions, and the witness testimony and voluminous briefing and written evidence submitted by the parties.  The Court has also reviewed and considered carefully hundreds of letters and email messages submitted by members of the public and has listened carefully to the oral remarks made

---

[9]   At the Confirmation Hearing, the Court also considered approval of the *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Infrastructure Financing Authority* (Case No. 21-1492, Docket Entry No. 1, Ex. A) and *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Convention Center District Authority* (Case No. 21-1493, Docket Entry No. 1, Ex. A).

on the record at the Confirmation Hearing by members of the public.  For the following reasons, the Plan is hereby confirmed and any remaining objections are overruled to the extent provided herein.

## Introduction

In 2017, the Oversight Board initiated unprecedented proceedings to restructure the debts of the Commonwealth and certain of its instrumentalities pursuant to Title III of PROMESA.  At the outset of these historic proceedings, the Court emphasized the goal of Title III and the Court's goal in overseeing these cases would be to find a path forward for Puerto Rico, its citizens, and others holding a stake in its future, including financial investors who hold obligations or are otherwise dependent on Puerto Rico for their financial well-being.  (See May 22, 2017 Hrg. Tr. 6:9–8:12).

On November 7, 2018, this Court approved a qualifying modification for GDB (Case No. 18-1561, Docket Entry No. 270), which restructured approximately $4.5 billion of claims against GDB.  On February 4, 2019, this Court confirmed the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated January 9, 2019 (Docket Entry Nos. 5047 and 5048, as amended by Docket Entry Nos. 5053 and 5055 on February 5, 2019), for the Puerto Rico Sales Tax Financing Corporation ("COFINA") and approved the settlement between the Commonwealth and COFINA (Docket Entry No. 5045) that divides rights to a significant flow of tax revenues between the two debtors that were involved in complex litigation regarding the ownership of such tax revenues.  The settlement of such dispute paved the way for the design of a plan of adjustment for the Commonwealth that meets PROMESA's goals of achieving fiscal responsibility and access to capital markets for the benefit of the Commonwealth, its people, and its many other stakeholders.

10

The Plan represents a significant next step on the path toward Puerto Rico's financial recovery, economic stability, and prosperity, and a consensual resolution of complex litigation involving many of the Debtors' key stakeholders.  The litigation resolutions embodied in the Plan resulted from good faith, arm's length negotiations, many of which were facilitated by the Mediation Team appointed by the Court.  After considering the applicable legal standards and the evidence, the Court finds the Plan is necessary and compliant with the relevant legal standards and is essential to ensure that Puerto Rico is on a path that will restore its access to capital markets as it builds a stronger economy.  Importantly, with the exception of certain payments to be made by HTA, the Plan addresses only the Commonwealth, ERS, and PBA's assets and liabilities, and not those of other instrumentalities, including HTA and PREPA.

## **Findings of Fact and Conclusions of Law**

1.     <u>Findings and Conclusions</u>.  This memorandum (the "<u>Memorandum</u>") constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and PROMESA Section 310.  To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such.  Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Memorandum, the Confirmation Order, or the Plan.

2.     <u>Jurisdiction</u>.  This Court has exclusive jurisdiction over the Title III Cases pursuant to PROMESA Section 306(a).  Venue is proper before this Court pursuant to PROMESA Section 307(a).  Pursuant to Section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercised, and continues to exercise, exclusive jurisdiction over all property of the

Debtors, wherever located.  To the extent necessary, pursuant to PROMESA Section 305, the
Oversight Board has granted consent to, and the Plan provides for, this Court's exercise of
jurisdiction over the property and revenues of the Debtors as necessary to approve and authorize
the implementation of this Memorandum, the Confirmation Order, and the Plan.

　　　3.　　Judicial Notice.  The Court takes judicial notice of the dockets of the Title III Cases,
the appellate court dockets of any and all appeals taken from any order entered or opinion issued
by the Court in the Title III Cases, and the following litigations and adversary proceedings, each
as defined in the Plan, including all pleadings and other documents filed, all orders entered, and
all evidence and arguments made, proffered, or adduced at hearings related thereto: (a) the Ambac
Action, (b) the Appointments Related Litigation, (c) the Clawback Actions, (d) the ERS Litigation,
(e) the ERS Recovery Actions, (f) the ERS Takings Action, (g) the FGIC Action, (h) the Gracia
Gracia CW Action, (i) the Gracia Gracia Federal Action, (j) the Lift Stay Motions, (k) the Med
Center Litigation, (l) the Med DC Action, (m) the National Action, (n) the PBA Litigation, (o) the
PRIFA BANs Litigation, (p) the SCC Action, (q) the Uniformity Litigation, (r) the Invalidity
Actions, (s) the Lien Challenge Actions, (t) the Debt Related Objections, and (u) the Avoidance
Actions set forth on Exhibits A and B to the Plan.

　　　4.　　Burden of Proof.  The Debtors have the burden of proving the elements of
PROMESA Section 314 and, to the extent applicable to consideration of confirmation of the Plan,
Rule 9019 of the Bankruptcy Rules, by a preponderance of the evidence.  The Debtors have met
their burden with respect to each element of PROMESA Section 314 and, to the extent applicable
to consideration of confirmation of the Plan, Bankruptcy Rule 9019.

## General Background

### I.    The Oversight Board and Title III Cases

5.    For more than a decade, Puerto Rico has faced an unprecedented fiscal and economic crisis.  The actions taken in the past caused Puerto Rico to lose access to capital markets and precipitated the collapse of Puerto Rico's public finance system.  (See PROMESA § 405(m)).  These actions accelerated the contraction of Puerto Rico's economy and increased the out-migration of its residents.  (See Murray Decl. Ex. A, ¶ 20–22).  The situation has been further exacerbated by the devastation caused to Puerto Rico by Hurricanes Irma and Maria in 2017, the earthquakes that occurred in early 2020, and the COVID-19 pandemic.  (Jaresko Decl. ¶¶ 20, 22–23).

6.    On June 30, 2016, the United States enacted PROMESA, and the Oversight Board was established pursuant to PROMESA Section 101(b).  (Jaresko Decl. ¶ 7).  Pursuant to Section 4 of PROMESA and Article VI of the United States Constitution, the provisions thereof prevail over any inconsistent general or specific provisions of territory law, State law, or regulation.  (See PROMESA § 4).

7.    On August 31, 2016, President Obama appointed the Oversight Board's original seven voting members.  (Jaresko Decl. ¶ 8).  The Oversight Board currently has its full complement of seven members.  (Id.).

8.    The Oversight Board designated ERS and PBA as "covered instrumentalities" pursuant to PROMESA Section 101(d).  (Jaresko Decl. ¶ 15).  The Commonwealth is a "covered territory" pursuant to PROMESA Sections 5(8) and 101(b)(1).

9.    On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for the

Commonwealth pursuant to PROMESA Section 304(a), thereby commencing the Commonwealth

Title III Case.  (See Docket Entry No. 1).

10.      On May 21, 2017, the Oversight Board issued a restructuring certification pursuant

to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for ERS pursuant

to PROMESA Section 304(a), thereby commencing the ERS Title III Case.  (Case No. 17-3566,

Docket Entry No. 1).

11.      On June 15, 2017, the U.S. Trustee appointed the Creditors' Committee in the

Commonwealth Title III Case (Docket Entry No. 338) and, on August 25, 2017, the U.S. Trustee

amended that appointment to provide that the Creditors' Committee would also serve in the ERS

Title III Case (Docket Entry No. 1171).  On June 15, 2017, the U.S. Trustee appointed the Retiree

Committee in the Commonwealth Title III Case.  (Docket Entry No. 340).

12.      On June 23, 2017, the Court entered an order appointing the Mediation Team, led

by Chief Bankruptcy Judge Barbara Houser.  (Docket Entry No. 430).

13.      On June 29, 2017, the Court entered an order granting the joint administration of

the Commonwealth Title III Case and the ERS Title III Case, for procedural purposes only.  (Case

No. 17-3655, Docket Entry No. 156).

14.      On September 27, 2019, the Oversight Board issued a restructuring certification,

pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for PBA

pursuant to PROMESA Section 304(a), thereby commencing the PBA Title III Case.  (Case No.

19-5523, Docket Entry No. 1).

15.      On October 9, 2019, the Court entered an order granting the joint administration of

the PBA Title III Case with the existing Title III Cases (Case No. 19-5523, Docket Entry No. 13).

## II.     The Plan Support Agreements, Plan, and Disclosure Statement

16.     The Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team, and negotiated directly with various constituencies, in an effort to build support for the restructuring of, among other indebtedness, the Commonwealth, ERS, and PBA's debt.  Those negotiations culminated in certain agreements with various stakeholders in furtherance of the successful implementation of the Plan.  (Jaresko Decl. ¶ 29; Skeel Decl. ¶ 17; Zelin Decl. ¶ 13; Debtors Exhibits 16–19, 23).

17.     On May 31, 2019, the Oversight Board entered into a plan support agreement (the "2019 PSA") with certain holders of approximately $3 billion of GO Bond Claims and PBA Bond Claims regarding the framework of a plan of adjustment to resolve (i) disputes regarding the validity and related rights of the GO Bonds and PBA Bonds, and (ii) disputes between the Commonwealth and PBA regarding the characterization of certain purported leases, the amount of any administrative rent that may be owed by the Commonwealth for the use of PBA facilities following the commencement of the Commonwealth Title III Case, and the ownership of certain PBA facilities.  Following entry into the 2019 PSA, the Oversight Board, under the guidance of the Mediation Team, continued to negotiate with its creditors to generate further consensus among the parties, including, but not limited to, other holders and insurers of GO Bonds and PBA Bonds. (Jaresko Decl. ¶ 30; Skeel Decl. ¶ 18; Zelin Decl. ¶¶ 14–15).

18.     On June 7, 2019, the Oversight Board (i) reached an agreement with the Retiree Committee regarding, among other things, the treatment of accrued ERS, JRS, and TRS benefits pursuant to the Plan, and (ii) entered into the AFSCME Plan Support Agreement regarding, among other things, return of contributions of all public employees to ERS under the System 2000 plan, and modifications to a collective bargaining agreement and AFSCME's consent to the treatment

of ERS benefits pursuant to the Plan. (Jaresko Decl. ¶ 31; Santambrogio Decl. ¶ 12; Skeel Decl.

¶ 19; Debtors Exhibit 21). The AFSCME Plan Support Agreement provides for AFSCME's

support for modified terms of collective bargaining agreements, along with its consent to the

restructuring of the Commonwealth's pension obligations, pursuant to the Plan. (Jaresko Decl. ¶

31; Santambrogio Decl. ¶ 12; Debtors Exhibit 21).

19.     On September 27, 2019, the Debtors filed the Original Plan (as defined below),

containing the material terms outlined in the 2019 PSA. The Oversight Board thereafter continued

to negotiate with various stakeholders to generate further support for a plan of adjustment. On

February 9, 2020, the Oversight Board and certain holders of GO Bonds and PBA Bonds holding

over $8 billion in Claims (and, inclusive of Claims held by parties who executed joinders thereto,

over $10 billion), terminated the 2019 PSA, and disclosed they had reached a global settlement in

principle outlined in a plan support agreement (the "2020 PSA"). (Jaresko Decl. ¶¶ 18, 33; Skeel

Decl. ¶ 21; Zelin Decl. ¶ 16). On February 28, 2020, in furtherance of the 2020 PSA, the Oversight

Board filed the First Amended Plan (as defined below), a disclosure statement in connection with

the First Amended Plan (Docket Entry No. 11947) (the "2020 Disclosure Statement"), and a

motion seeking approval of the 2020 Disclosure Statement (Docket Entry No. 11950). (Jaresko

Decl. ¶ 34).

20.     On March 10, 2020, the Court entered an order scheduling a hearing to consider the

adequacy of information contained in the 2020 Disclosure Statement and setting related deadlines.

(Docket Entry No. 12187). Shortly thereafter, in response to the COVID-19 pandemic and its

effects on the people and economy of Puerto Rico, the Oversight Board filed a motion (Docket

Entry No. 12485) seeking to adjourn the hearing to consider approval of the 2020 Disclosure

16

Statement and related deadlines, which the Court granted on March 27, 2020 (Docket Entry No. 12549).  (Skeel Decl. ¶ 23).

21.     Following the adjournment, the Oversight Board re-engaged with the parties to the 2020 PSA and entered into further mediation sessions with the assistance and guidance of the Mediation Team.  (Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24; Zelin Decl. ¶ 17).  However, the parties were unable to reach a consensus and, on October 6, 2020, the PSA Creditors filed a motion (Docket Entry No. 14478) seeking to impose deadlines for confirmation of a plan of adjustment. On October 29, 2020, the Court entered the *Order on Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* (Docket Entry No. 14987) (the "Plan Scheduling Order") directing the Oversight Board to file, on or before February 10, 2021, the proposed terms of a plan of adjustment and a motion for approval of a proposed timetable for filing an amended plan and proposed disclosure statement, among other things.  (Id.).

22.     The Oversight Board continued to engage in discussions with the guidance of the Mediation Team and, on February 9, 2021, reached an agreement in principle with the parties to the 2020 PSA regarding the terms of an amended plan of adjustment, subject to execution of a plan support agreement. (Zelin Decl. ¶¶ 20, 22).  Accordingly, the Oversight Board requested an extension of the February 10, 2021 deadline set forth in the Plan Scheduling Order.  (Docket Entry No. 15821).  On February 16, 2021, the Court entered the *Order Granting Urgent Motion of the Financial Oversight and Management Board for Puerto Rico Requesting Extension of Deadlines for Submission of Plan of Adjustment or Term Sheet with Respect Thereto* (Docket Entry No. 15849), extending the February 10, 2021 deadline to March 8, 2021.

17

23.     On February 23, 2021, the Oversight Board announced the termination of the 2020 PSA and the execution of the Initial PSA, dated as of February 22, 2021, among the Oversight Board, as representative of the Debtors, and the Initial GO/PBA PSA Creditors.  (Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24; Zelin Decl. ¶ 22; Debtors Exhibit 16).  On March 8, 2021, in furtherance of the Initial PSA, the Oversight Board filed the Second Amended Plan (as defined below) and a disclosure statement in connection with the Second Amended Plan.

24.     Following entry into the Initial PSA, the Oversight Board continued to work to develop additional consensual resolutions, and engaged with objecting parties under the guidance of the Mediation Team.  (Jaresko Decl. ¶ 38; Zelin Decl. ¶ 26).  On March 9, 2021, the Oversight Board entered into the ERS Stipulation (amended on April 2, 2021) which, among other things, (i) provides a global resolution of disputes regarding the validity and related rights of ERS Bonds and the extent of the alleged liens supporting the obligations thereunder, (ii) resolves the administrative expense claims filed by certain ERS Bondholders, (iii) provides a resolution of disputes regarding certain legal challenges to the Commonwealth's post-petition enactment of a "pay as you go" system for payment of pension benefits to retirees, (iv) provides for the payment of $373 million in cash to the holders of ERS Bonds, as well as the proceeds from the sale of certain ERS assets to the Commonwealth, and (v) provides for the disposition of the ERS Private Equity Portfolio. (Jaresko Decl. ¶ 38–39; Skeel Decl. ¶ 26–27; Zelin Decl. ¶ 27; Debtors Exhibit 19).

25.     On May 5, 2021, the Oversight Board entered into the HTA/CCDA Plan Support Agreement with certain holders and insurers of bonds issued by HTA and CCDA which, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in

18

cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the HTA/CCDA Plan Support Agreement, (iv) provides for the bondholders and insurers party thereto to support the Plan, and (v) provides an agreement regarding the structure of a potential plan of adjustment for HTA. (Jaresko Decl. ¶ 40; Skeel Decl. ¶ 28; Zelin Decl. ¶ 34; Debtors Exhibit 17).

26.     On May 11, 2021, in furtherance of the HTA/CCDA Plan Support Agreement, the Debtors filed the Third Amended Plan (as defined below) and a disclosure statement in connection with the Third Amended Plan (Docket Entry No. 16741).  On May 13, 2021, the Debtors filed a motion seeking approval of such disclosure statement (Docket Entry No. 16756).  On June 29, 2021, the Debtors filed the Fourth Amended Plan (as defined below), reflecting additional terms negotiated with certain creditors, and a disclosure statement in connection with the Fourth Amended Plan (Docket Entry No. 17192).

27.     On July 12, 2021, the Oversight Board (i) entered into the GO/PBA Plan Support Agreement, which amended and restated the Initial PSA (Jaresko Decl. ¶ 122; Debtors Exhibit 16) and (ii) reached an agreement in principle with the Creditors' Committee, which proposed recoveries for Classes of unsecured claimholders and resolved the Creditors' Committee's objections to the Plan, subject to the terms of the Committee Agreement.  (Jaresko Decl. ¶ 41; Zelin Decl. ¶ 38; Debtors Exhibit 23).  The GO/PBA Plan Support Agreement, together with the restructuring of COFINA's debt, contemplates the reduction of the Commonwealth's debt (including principal and interest from restructured COFINA bonds) by approximately 62%, from $90.4 billion to $34.1 billion.  (Jaresko Decl. ¶ 37; Zelin Decl. ¶ 25).  The GO/PBA Plan Support Agreement also (i) provides for a proposed global resolution of disputes regarding the validity and related rights of GO Bonds that may have been issued in violation of the Puerto Rico Constitutional

debt limit, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and PBA, and (iv) provides for the resolution of disputes regarding the PRIFA BANs pursuant to a stipulation dated February 22, 2021 (the "PRIFA BANs Stipulation") (Debtors Exhibit 22).  (Id.).  Also on July 12, 2021, in furtherance of the GO/PBA Plan Support Agreement, the Debtors filed the Fifth Amended Plan (as defined below) and a disclosure statement in connection with the Fifth Amended Plan (Docket Entry No. 17308).

28.      On July 27, 2021, the Oversight Board entered into the PRIFA Plan Support Agreement, which, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the PRIFA PSA, (iv) provides for the bondholders and insurers party thereto to support the Plan, and (v) presents the foundation for a restructuring of the PRIFA Bonds pursuant to Title VI of PROMESA. (Jaresko Decl. ¶ 42; Skeel Decl. ¶ 30; Zelin Decl. ¶ 41; Debtors Exhibit 18).  Also on July 27, 2021, in furtherance of the PRIFA Plan Support Agreement, the Debtors filed the Sixth Amended Plan (as defined below) and a disclosure statement in connection with the Sixth Amended Plan. (Docket Entry No. 17516).

29.      On July 30, 2021, the Debtors filed the Seventh Amended Plan and an updated disclosure statement in connection with the Seventh Amended Plan (Docket Entry No. 17628) (the "Disclosure Statement").  (Debtors Exhibit 2).

30.     On August 2, 2021, the Court entered the Disclosure Statement Order, among other things (a) approving the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, (b) establishing (1) October 19, 2021 at 5:00 p.m. (Atlantic Standard Time) as the Confirmation Objection Deadline, (2) October 4, 2021 at 5:00 p.m. (Atlantic Standard Time) as the deadline by which (i) ballots to accept or reject the Plan were required to be received by the Solicitation Agent (the "Voting Deadline") and (ii) elections regarding the form of distributions were required to be effectuated through ATOP (the "Election Deadline"), and (c) scheduling a hearing on certain dates from November 8–23, 2021 to consider confirmation of the Plan.  On September 27, 2021, the Court entered an order (Docket Entry No. 18258) extending the Voting Deadline to October 18, 2021 at 5:00 p.m. (Atlantic Standard Time) and, on October 1, 2021, the Court entered an order (Docket Entry No. 18360) extending the Election Deadline to October 18, 2021 at 5:00 p.m. (Atlantic Standard Time).

31.     Consistent with the Disclosure Statement Order, the Debtors caused the Solicitation Agent to distribute Solicitation Packages to all holders of Claims entitled to vote.  The Solicitation Packages contained, among other things: (a) the Confirmation Hearing Notice setting forth the time, date, and place of the Confirmation Hearing, (b) the Disclosure Statement Order (without the exhibits thereto) and the Disclosure Statement (together with all exhibits thereto, including the Plan), (c) the appropriate form of Ballot or Notice, if any, with instructions for voting and/or making any applicable election and, as applicable, a pre-addressed, pre-paid return envelope, (d) with respect to Class 51, the Retiree Committee Letter and Information Guide, and (e) with respect to Classes 54, 58, and 66, the Creditors' Committee Letter.  (Mailing Affidavits; Pullo Decl. ¶ 4). The Debtors also caused the Solicitation Agent to publish the Confirmation Hearing Notice and place radio advertisements providing, among other things, information regarding the solicitation

21

of votes to accept or reject the Plan and deadlines associated therewith.  (Publication Affidavit;

Pullo Decl. ¶ 7).

## Compliance with PROMESA Sections 104(j) and 313

32.     The Oversight Board must certify the submission or modification of a plan of

adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or

modifying such plan of adjustment.  See PROMESA § 104(j)(1)–(2).  The Oversight Board may

certify a plan of adjustment only if it determines, in its sole discretion, that it is consistent with the

applicable certified fiscal plan.  See id. § 104(j)(3).  The Oversight Board, after the issuance of a

certification pursuant to PROMESA Section 104(j), may modify the plan at any time before

confirmation, but may not modify the plan so that the plan as modified fails to meet the

requirements of PROMESA Title III.   See id. § 313.   After the Oversight Board files a

modification, "the plan as modified becomes the plan."  Id.

33.     The Oversight Board has complied with its obligations pursuant to PROMESA

Sections 104(j) and 313.  On April 23, 2021, the Oversight Board certified the Commonwealth's

current fiscal plan, which includes ERS and PBA (the "Fiscal Plan").  (Jaresko Decl. ¶ 28; Debtors

Exhibit 10).

34.     On September 26, 2019, the Oversight Board certified the submission of the *Title

III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 8765)

(the "Original Plan").  (Debtors Exhibit 122).

35.     On February 28, 2020, the Oversight Board certified the modification of the

Original Plan and the submission of the *Amended Title III Joint Plan of Adjustment of the

Commonwealth of Puerto Rico, et al.* (Docket Entry No. 11946) (the "First Amended Plan").

(Debtors Exhibit 123).

36.     On March 8, 2021, the Oversight Board certified the modification of the First Amended Plan and the submission of the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 15976) (the "Second Amended Plan"). (Debtors Exhibit 124).

37.     On May 11, 2021, the Oversight Board certified the modification of the Second Amended Plan and the submission of the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 16740) (the "Third Amended Plan"). (Debtors Exhibit 125).

38.     On June 29, 2021, the Oversight Board certified the modification of the Third Amended Plan and the submission of the *Fourth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17194) (the "Fourth Amended Plan"). (Debtors Exhibit 126).

39.     On July 12, 2021, the Oversight Board certified the modification of the Fourth Amended Plan and the submission of the *Fifth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17306) (the "Fifth Amended Plan"). (Debtors Exhibit 127).

40.     On July 26, 2021, the Oversight Board certified the modification of the Fifth Amended Plan and the submission of the *Sixth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17516) (the "Sixth Amended Plan"). (Debtors Exhibit 128).

41.     On July 30, 2021, the Oversight Board certified the modification of the Sixth Amended Plan and the submission of the *Seventh Amended Title III Joint Plan of Adjustment of*

*the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17627) (Debtors Exhibit 1) (the "Seventh Amended Plan").  (Debtors Exhibit 129).

42.     On November 3, 2021, the Oversight Board certified the modification of the Seventh Amended Plan and the submission of the *Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19053) (Debtors Exhibit 136) (the "Eighth Amended Plan").  (Debtors Exhibit 137).

43.     On November 7, 2021, the Oversight Board certified the modification of the Eighth Amended Plan and the submission of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19114) (Debtors Exhibit 143) (the "First Modified Eighth Amended Plan").  (Debtors Exhibit 144).

44.     On November 12, 2021, the Oversight Board certified the modification of the First Modified Eighth Amended Plan and the submission of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19184) (the "Second Modified Eighth Amended Plan").  (Debtors Exhibit 147).

45.     On November 21, 2021, the Oversight Board certified the modification of the Second Modified Eighth Amended Plan and the submission of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19323) (Debtors Exhibit 149) (the "Third Modified Eighth Amended Plan"). (Debtors Exhibit 148).

46.     On November 24, 2021, the Oversight Board certified the modification of the Third Modified Eighth Amended Plan and the submission of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19365) (the "Fourth Modified Eighth Amended Plan").  (Docket Entry No. 19569, Ex. C).

47.     On December 20, 2021, the Oversight Board certified the modification of the Fourth Modified Eighth Amended Plan and the submission of the Plan upon a determination, in the Oversight Board's sole discretion, that the Plan was consistent with the Fiscal Plan.  (Docket Entry No. 19569, Ex. D).  Accordingly, the Oversight Board submitted the modification of the Third Modified Eighth Amended Plan and the Plan in compliance with PROMESA Section 104(j).

48.     The Oversight Board submitted the Plan in accordance with PROMESA Section 313.  For the reasons explained herein, the Plan meets the requirements of PROMESA and the Oversight Board has complied with all provisions of PROMESA applicable to confirmation of the Plan.

### Compliance with PROMESA Section 314(b)

**A. PROMESA § 314(b)(1):** *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301.*

49.     As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the proponents.  Plan at 1.  In addition, as detailed below, the Plan satisfies the requirements of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), and 1123(d) of the Bankruptcy Code.

#### i.    Bankruptcy Code Section 1122(a)

50.     With the exception of Administrative Expense Claims and Professional Claims, which need not be classified, Article IV of the Plan designates the classification of Claims.  The Plan's classification of Claims complies with section 1122(a) of the Bankruptcy Code because each Class contains only claims that are either all unsecured Claims or are all secured Claims secured by the same collateral.  (Jaresko Decl. ¶ 47).  The Plan designates the following sixty-nine (69) Classes of Claims:

25

| Claim | Class | Debtor(s) |
|---|---|---|
| Vintage PBA Bond Claims | Class 1 | PBA |
| Vintage PBA Bond Claims (Assured) | Class 2 | PBA |
| Vintage PBA Bond Claims (National) | Class 3 | PBA |
| Vintage PBA Bond Claims (Ambac) | Class 4 | PBA |
| Vintage PBA Bond Claims (FGIC) | Class 5 | PBA |
| Vintage PBA Bond Claims (Syncora) | Class 6 | PBA |
| Retail Vintage PBA Bond Claims | Class 7 | PBA |
| 2011 PBA Bond Claims | Class 8 | PBA |
| Retail 2011 PBA Bond Claims | Class 9 | PBA |
| 2012 PBA Bond Claims | Class 10 | PBA |
| Retail 2012 PBA Bond Claims | Class 11 | PBA |
| PBA/DRA Secured Claim | Class 12 | PBA |
| PBA General Unsecured Claims | Class 13 | PBA |
| PBA/DRA Unsecured Claim | Class 14 | PBA |
| Vintage CW Bond Claims | Class 15 | Commonwealth |
| Retail Vintage CW Bond Claims | Class 16 | Commonwealth |
| Vintage CW Bond Claims (Assured) | Class 17 | Commonwealth |
| Vintage CW Bond Claims (National) | Class 18 | Commonwealth |
| Vintage CW Bond Claims (Ambac) | Class 19 | Commonwealth |
| Vintage CW Bond Claims (FGIC) | Class 20 | Commonwealth |
| Vintage CW Bond Claims (Syncora) | Class 21 | Commonwealth |
| Vintage CW Bond Claims (Taxable Election) | Class 22 | Commonwealth |
| Vintage CW Guarantee Bond Claims | Class 23 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Assured) | Class 24 | Commonwealth |
| Vintage CW Guarantee Bond Claims (National) | Class 25 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Ambac) | Class 26 | Commonwealth |
| Vintage CW Guarantee Bond Claims (FGIC) | Class 27 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Syncora) | Class 28 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 29 | Commonwealth |
| 2011 CW Bond Claims | Class 30 | Commonwealth |
| Retail 2011 CW Bond Claims | Class 31 | Commonwealth |
| 2011 CW Bond Claims (Assured) | Class 32 | Commonwealth |

| Claim | Class | Debtor(s) |
|---|---|---|
| 2011 CW Bond Claims (Taxable Election) | Class 33 | Commonwealth |
| 2011 CW Guarantee Bond Claims | Class 34 | Commonwealth |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 35 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims | Class 36 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Assured) | Class 37 | Commonwealth |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 38 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 39 | Commonwealth |
| 2012 CW Bond Claims | Class 40 | Commonwealth |
| Retail 2012 CW Bond Claims | Class 41 | Commonwealth |
| 2012 CW Bond Claims (Assured) | Class 42 | Commonwealth |
| 2012 CW Bond Claims (Taxable Election) | Class 43 | Commonwealth |
| 2012 CW Guarantee Bond Claims | Class 44 | Commonwealth |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 45 | Commonwealth |
| 2014 CW Bond Claims | Class 46 | Commonwealth |
| Retail 2014 CW Bond Claims | Class 47 | Commonwealth |
| 2014 CW Bond Claims (Taxable Election) | Class 48 | Commonwealth |
| 2014 CW Guarantee Bond Claims | Class 49 | Commonwealth |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 50 | Commonwealth |
| Retired ERS Participant Below-Threshold Claims | Class 51A | Commonwealth |
| Retired JRS Participant Below-Threshold Claims | Class 51B | Commonwealth |
| Retired TRS Participant Below-Threshold Claims | Class 51C | Commonwealth |
| Retired ERS Participant Above-Threshold Claims | Class 51D | Commonwealth |
| Retired JRS Participant Above-Threshold Claims | Class 51E | Commonwealth |
| Retired TRS Participant Above-Threshold Claims | Class 51F | Commonwealth |
| Active ERS Participant Claims | Class 51G | Commonwealth |

| Claim | Class | Debtor(s) |
|---|---|---|
| Active JRS Participant Claims | Class 51H | Commonwealth |
| Active TRS Participant Claims | Class 51I | Commonwealth |
| System 2000 Participant Claims | Class 51J | Commonwealth |
| VTP Payroll Participant Below-Threshold Claims | Class 51K | Commonwealth |
| VTP Payroll Participant Above-Threshold Claims | Class 51L | Commonwealth |
| AFSCME Claims | Class 52 | Commonwealth |
| Dairy Producer Claims | Class 53 | Commonwealth |
| Eminent Domain/Inverse Condemnation Claims | Class 54 | Commonwealth |
| Energy Incentive Claims | Class 55 | Commonwealth |
| Med Center Claims | Class 56 | Commonwealth |
| Tax Credit Claims | Class 57 | Commonwealth |
| CW General Unsecured Claims | Class 58 | Commonwealth |
| GDB/PET Claim | Class 58A | Commonwealth |
| CW/HTA Claims | Class 59 | Commonwealth |
| CW/Convention Center Claims | Class 60 | Commonwealth |
| CW/PRIFA Rum Tax Claims | Class 61 | Commonwealth |
| CW/MBA Claims | Class 62 | Commonwealth |
| CW Appropriations Claims | Class 63 | Commonwealth |
| Section 510(b) Subordinated Claims | Class 64 | Commonwealth, ERS, and PBA |
| ERS Bond Claims | Class 65 | ERS |
| ERS General Unsecured Claims | Class 66 | ERS |
| Gracia-Gracia Claims | Class 67 | Commonwealth |
| Convenience Claims | Class 68 | Commonwealth and ERS |
| Federal Claims | Class 69 | Commonwealth |

(Jaresko Decl. ¶ 47).

51.     The classification of Claims set forth in the Plan is reasonable and was not done to
control the outcome of voting to accept or reject the Plan, as the classification is based upon
differences in the legal nature and/or priority of such Claims in accordance with applicable law.

28

To the extent unsecured Claims are separately classified from the Commonwealth's general unsecured claims (Class 58),[10] it is not to gerrymander an accepting Class, as proven by there being several impaired accepting Classes for each Debtor.  Rather, separate classification is used for governmental or business reasons usually requiring different treatment of separate Classes' Claims.  (Jaresko Decl. ¶ 48).

52.   All holders of Claims in Classes 1–11 hold PBA Bonds and allege the same guarantee against the Commonwealth, but are separately classified based on three factors: the year in which the bonds were issued; whether the bonds are insured and, if so, the insurer; and whether the bondholder is a retail investor.  Classification depending on year of issuance is based on differences in the risk profile associated with each issuance potentially having violated the debt service limit set forth in Article VI, section 2 of the Commonwealth Constitution, with the treatment of Classes varying based on how much risk of disallowance of the Claims existed for each Class.  Holders of insured bonds issued the same year are separately classified because the insurance agreements provide bondholders different rights.  Claims of Retail Investors are separately classified because such Claims are smaller in dollar amount and the holders' rights differ from those of holders of GO Bonds and PBA Bonds pursuant to the GO/PBA Plan Support Agreement, and holders of bonds insured by the Monolines.  Thus, the holders of Claims in Classes 1–11 are classified by whether the PBA Bonds they hold: (a) were issued prior to 2011 and are (i) uninsured (Class 1), (ii) uninsured and held by a Retail Investor (Class 7), (iii) insured by Assured (Class 2), National (Class 3), Ambac (Class 4), FGIC (Class 5), or Syncora (Class 6); (b)

---

[10]   Class 58A consists of the GDB/PET Claim, which will receive payments from the Commonwealth equal to, and on the same timeframe as, the pro rata payments to be made to holders of Allowed CW General Unsecured Claims (Class 58) pursuant to the Plan.  Plan § 62.4.

29

were issued in 2011 and are (i) uninsured (Class 8), or (ii) uninsured and held by a Retail Investor (Class 9); or (c) were issued in 2012 and are (i) uninsured (Class 10), or (ii) uninsured and held by a Retail Investor (Class 11).  (Jaresko Decl. ¶ 48).

53.    Bond Claims against the Commonwealth in Classes 15–50 are classified separately based on the date of bond issuance, whether the bonds are insured and, if so, the insurer, and whether the bondholder is a retail investor as follows: (a) whether the bonds were issued prior to March 2011 (Classes 15–29), March or later in 2011 (Classes 30–39), in 2012 (Classes 40–45), or 2014 (Classes 46–50), and (b) whether the bonds are (i) uninsured (Classes 15, 23, 30, 34, 36, 40, 44, 46, and 49) and held by Retail Investors (Classes 16, 31, 38, 41, and 47), or (ii) insured by Assured (Classes 17, 24, 32, and 42), National (Classes 18 and 25), Ambac (Classes 19 and 26), FGIC (Classes 20 and 27), or Syncora (Classes 21 and 28).  (Jaresko Decl. ¶ 49).

54.    Based on the elections offered pursuant to the Plan, certain Vintage CW Bond Claims, Vintage CW Guarantee Bond Claims, 2011 CW Bond Claims, 2011 CW Guarantee Bond Claims, 2011 CW Series D/E/PIB Bond Claims, 2012 CW Bond Claims, 2014 CW Bond Claims, and 2014 CW Guarantee Bond Claims, to the extent elections were made, were shifted to other Classes (Classes 22, 29, 33, 35 39, 43, 48, and 50, respectively) to denote the election made by holders of such Claims to receive taxable distributions on account of their bonds, and the alternative form of distribution elected.  (Jaresko Decl. ¶ 49).  Only Puerto Rico Investors could elect to receive taxable bonds because, unlike mainland U.S. investors, Puerto Rico Investors are generally not subject to U.S. federal income taxation.  (Brownstein Decl. ¶ 16).  When Puerto Rico Investors elect taxable treatment, it increases the likelihood that a greater amount of tax-exempt bonds will be available for mainland U.S. bondholders.  (Brownstein Decl. ¶ 16).  The taxable election for on-island bondholders benefits mainland U.S. bondholders because, as a result of on-

island bondholders taking the taxable election, mainland investors receive a higher amount of tax-exempt bonds affording a greater after-tax gain.[11]  Nov. 12, 2021 Hrg. Tr. 112:5–15.

55.     Active and retired employees holding pension Claims comprise Classes 51A–51L. These current and retired employees are integral to the basic provision of governmental services to the Commonwealth's residents and the Government could not function without them. Moreover, the best interests of the Commonwealth and all of its stakeholders are served by ensuring pensioners receive monthly benefits to maintain the ability to support themselves without requiring additional future support from the Commonwealth.  These pension Claims are further classified separately based on whether the pensioners (a) are retired (Classes 51A–F, K, and L) or active (Classes 51G–J), (b) are participants in ERS (Classes 51A, 51D, and 51G), JRS (Classes 51B, 51E, and 51H), TRS (Classes 51C, 51F, and 51I), System 2000 (51J), or participated in a voluntary termination program (Classes 51K and 51L), because each program had different funding sources as of the Commonwealth Petition Date, with different levels of underfunding, and (c) receive total monthly pension benefits above (Classes 51D-F and 51L) or below (Classes 51A-C and 51K) $1,500.[12]  (Jaresko Decl. ¶ 50–51).

56.     The separate classification of Claims for retirement benefits is justified for at least two reasons. *First*, unlike the Claims of commercial creditors, who contracted to be paid a fixed

---

[11]  On cross-examination, Mr. Brownstein testified that an individual mainland bondholder in a 35 percent tax bracket would benefit by a 14 percent after-tax gain: "Clearly, if you're a taxpayer who pays state and local taxes, you're higher than that, but in a 35 percent tax bracket, you, as an U.S. holder, mainland holder of these bonds, for the 49 million in bonds that the local on-island holders took taxable instead of you, you have a 14 percent after-tax gain. That is what was provided to you by giving the on-island investors the right to elect taxable bonds, which meant that your portfolio would have a higher amount of tax exempt bonds."  Nov. 12, 2021 Hrg. Tr. 112:5–15.

[12]  Whether claimants' monthly benefits are above or below the $1,500 threshold does not impact the treatment of their Claims following the post-solicitation passage of Act 53 and removal of the Monthly Benefit Modification from the Plan, as described below in paragraph 193.

sum at a fixed time, retirees agreed to defer their compensation with the expectation that the deferred compensation, *i.e.*, their pension, would be paid in periodic payments over the balance of their life (and that of any surviving spouse), based on formulas established when they worked for the Commonwealth or other governmental entities.  Accordingly, the Plan proposes to make payments to retirees over the life of the retiree and any eligible spouse through the PayGo system and specified statutory rules established before the Commonwealth's Title III case began, as modified pursuant to the Plan, including through the "freeze" of TRS and JRS and elimination of cost of living adjustments ("COLAs").

57.     *Second*, retiree Claims are claims for "essential public services" under Article II, section 18 of the Puerto Rico Constitution, which constitutes a reasonable justification for treating them differently from other Claims.  Pensions are deferred compensation for the essential services that retirees, who served as police officers, firemen, teachers, judges, and government employees of all categories, provided to the Commonwealth.

58.     Claims held by AFSCME, related to certain collective bargaining agreements between AFSCME affiliates and the Commonwealth that will occur pursuant to the Plan, are classified in Class 52, separately from general unsecured claims.  The separate classification is compelled because the treatment of these claims is the adoption of a new collective bargaining agreement.  This treatment is inapplicable to other Classes of unsecured Claims and it is beneficial to the Commonwealth and all its stakeholders to provide such treatment as opposed to the potential litigation and treatment of any rejection damages Claims relating to these collective bargaining agreements.  AFSCME and its local affiliates collectively constitute one of Puerto Rico's primary public employee unions, and is an important bargaining unit whose members provide the Commonwealth's public services.  (Jaresko Decl. ¶ 52).  Separate classification of these Claims is

reasonable, justified, and supported by a governmental purpose.  All other collective bargaining agreements are not being rejected or assumed pursuant to the Plan.

59.    The Claims held by Suiza Dairy, Inc. and Vaqueria Tres Monjitas, Inc.—the Commonwealth's primary producers and sources of dairy for the population—are classified separately in Class 53, which rejected the Plan.  The Plan may be confirmed pursuant to Bankruptcy Code section 1129(b)(2)(B) because no Claims junior to the Claims in Class 53 receive or retain any property and there is no contention the Plan unfairly discriminates against Class 53. Moreover, if there were such a contention it would be overruled because the Allowed Claims in Class 53 receive more than CW General Unsecured Claims in Class 58.  It is very costly and difficult for Puerto Rico to consistently import dairy, which has a short shelf life—a fact underscoring the importance of the domestic dairy industry to the Commonwealth and its residents. Dairy production is one of the key issues of food security on the Island.  The dairy industry also is one of the Commonwealth's largest agricultural industries and employs a significant number of Puerto Rico's residents.  It is reasonable and justified to separately classify such Claims and provide such Class with a fifty percent (50%) recovery, ensuring that such integral Claimants do not suffer further financial hardship and impair an industry vital to the health of the Commonwealth's citizens.  (Jaresko Decl. ¶ 53).  Further, the dairy producers' claims arose from the prepetition Dairy Producer Settlement Agreement (see Jaresko Decl. ¶ 53; Plan § 1.190, 1.191; Debtors Exhibit 26), and the Commonwealth obligation to pay certain fees to protect consumers (see Debtors Exhibit 26, ¶ 14).  Accordingly, it is reasonable, justified, and supported by a governmental purpose to classify separately claims held by large dairy producers.  In addition, Claims in Class 53 are different from the Claims in Class 58 because the dairy producers assert their settlement agreement provides them 'takings' claims pursuant to the Fifth Amendment of the

33

U.S. Constitution.  The Court is not ruling on whether the Claims are takings Claims pursuant to the Fifth Amendment.  But if they are takings Claims, for the same reasons provided in the next paragraph with respect to Eminent Domain/Inverse Condemnation Claims, the Court overrules the claimholders' contentions they are entitled to have their takings Claims rendered nondischargeable or paid in full.

60.     Eminent Domain/Inverse Condemnation Claims are separately classified in Class 54.  The holders of such Claims assert they are prepetition constitutional Claims based on seizures of property pursuant to the Commonwealth's eminent domain power, and are partially secured by funds deposited by the Commonwealth with the Clerk of the Court of First Instance in connection with condemnation proceedings underlying such Claims in accordance with Puerto Rico law, 32 L.P.R.A. § 2907.  In accordance with applicable Puerto Rico law, upon commencement of the condemnation proceeding, title to a subject property was transferred to the Commonwealth and funds on deposit became property of the former title holder.  32 L.P.R.A. § 2907.  The Plan treats the Claims as secured Claims to the extent the Claims are allowable and there is cash on deposit for them.  The Plan treats the Eminent Domain/Inverse Condemnation Claims as Class 58 CW General Unsecured Claims entitled to the same treatment as other holders of CW General Unsecured Claims to the extent each allowable Claim exceeds the cash on deposit for it (Jaresko Decl. ¶ 54), unless the Confirmation Order, to the extent a Final Order, provides that such Claims must be paid in full to the extent they are Allowed Claims for just compensation.  *See* Plan § 1.178. The claimants contend they are fully secured and entitled to payment in full of their allowable unsecured Claims because the Claims are based on the Fifth Amendment of the U.S. Constitution. These Claims are classified separately because they are each alleged Eminent Domain/Inverse Condemnation Claims and are at least partially secured.  The issue presented by the claimants is

34

whether they are entitled to have the unsecured portions of their Claims designated as nondischargeable or otherwise required to be paid in full.  They would be statutorily entitled to full payment if PROMESA Title III granted them priority status.  But, PROMESA Title III only provides for one type of priority claim which is not a grant of priority to eminent domain claims. PROMESA Section 301(a) incorporates Bankruptcy Code section 507(a)(2), which provides a priority for administrative expenses allowed by Bankruptcy Code section 503(b).  None of the Eminent Domain/Inverse Condemnation Claims is an administrative expense because they are prepetition Claims and therefore are not for actual, necessary costs and expenses of preserving the Debtors' property.  The Eminent Domain/Inverse Condemnation Claims are prepetition unsecured Claims for the Commonwealth's having taken title to the claimants' properties prior to commencement of the Commonwealth Title III case.  PROMESA Section 301(a) also incorporates Bankruptcy Code section 944(c), which does not provide eminent domain claims or takings claims are nondischargeable.  Rather, sections 944(b) and (c) provide the debtor is discharged from all debts except debts (i) excepted from discharge by a plan or confirmation order or (ii) owed to an entity that, before confirmation of a plan, had neither notice nor actual knowledge of the case.  It is undisputed the Plan does not except the Eminent Domain/Inverse Condemnation Claims from discharge.  The Debtors and claimants disagree as to whether the Court can and should except them from discharge.  Because the Fifth Amendment of the U.S. Constitution provides "private property [shall not] be taken for public use, without just compensation," the claimants assert Congress lacks power to legislate the discharge of eminent domain claims for less than payment in full of just compensation.  Conversely, the Debtors contend Article I, Section 8, clause 4 of the U.S. Constitution grants Congress the power to pass uniform laws on the subject of bankruptcies, and empowers Congress to provide for the discharge of eminent domain claims for less than

35

payment in full as it has done.  To date, two United States Courts of Appeals have indicated or ruled prepetition eminent domain claims are dischargeable as general claims, see Pointsett Lumber Manufacturing v. Drainage District No. 7, 119 F.2d 270, 272–73 (8th Cir. 1941); Cobb v. City of Stockton (In re City of Stockton), 909 F.3d 1256, 1268 (9th Cir. 2018), and one bankruptcy court has ruled they are not dischargeable.  In re City of Detroit, 524 B.R. 147, 268–271 (Bankr. E.D. Mich. 2014).[13]  The claimants in Class 54 assert, and those in City of Detroit asserted, Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555 (1935), and United States v. Security Industrial Bank, 459 U.S. 70 (1982), rule the bankruptcy power is subject to the Fifth Amendment.  Radford and Security Industrial Bank each ruled in the context of a creditor having a perfected security interest in the debtor's assets, which is not the case here.  See Radford, 295 U.S. at 589; Security Industrial Bank, 459 U.S. at 74.  No claimant has proffered evidence of having a secured claim in anything other than the cash escrowed by the Commonwealth for them.  Radford, however, clarified: "Under the bankruptcy power Congress may discharge the debtor's personal obligation, because, unlike the States, it is not prohibited from impairing the obligation of contracts," but cannot take substantive property rights without invoking the Fifth Amendment.  Radford, 295 U.S. at 589–590.  Here, claimants' property rights were taken before the Title III cases commenced, and all that remain are Debtor's personal obligations to pay which Radford ruled are dischargeable. Because the Fifth Amendment requires payment of just compensation, claimants in Class 54 are requesting the Court to rule nondischargeable the unsecured portions of their Claims Radford ruled

---

[13]   Additionally, the Supreme Court and lower courts have ruled Congress can enact statutes of limitation terminating the ability to recover on eminent domain claims.  Soriano v. United States, 352 U.S. 270, 273-77 (1957); Block v. North Dakota, 461 U.S. 273, 292 (1983) ("A constitutional claim can become time-barred just as any other claim can . . . Nothing in the Constitution requires otherwise."); Stone Container Corp. v. U.S., 229 F.3d 1345, 1350 (Fed. Cir. 2000) ("Both the Supreme Court and this court have repeatedly held that the federal government may apply statutes of limitations to just compensation claims.").

were dischargeable.  That, however, contradicts Radford's express approval of the bankruptcy power's discharge of unsecured obligations and its interpretation of the Fifth Amendment solely to protect property interests in the debtor's property.  See id.  If the Fifth Amendment's just compensation requirement is interpreted to make nondischargeable the unsecured obligations it creates, then there is no principled reason why any other unsecured obligation created by the Constitution is dischargeable, such as discrimination claims.  One would have to interpret the Constitution's passive statement that just compensation should be paid as creating a priority claim, while interpreting the Constitution's bar against discrimination as not creating a priority claim. Even City of Detroit held the other liabilities of Detroit created by the Constitution are dischargeable.  City of Detroit, 524 B.R. at 265–267.  The claimants holding Claims in Class 54 have provided no authority showing the Fifth Amendment constricts the bankruptcy discharge power in situations other than when a creditor has a property interest in the debtor's assets.  To the contrary, the federal bankruptcy laws have routinely taken creditors' property rights during bankruptcy cases to carry out the bankruptcy power's purposes without being restricted by the Fifth Amendment.  Pursuant to Bankruptcy Code section 547, perfected security interests and all other property interests lawfully transferred under nonbankruptcy law can be avoided as preferences if transferred to repay antecedent debt by the debtor within ninety days before bankruptcy while the debtor is insolvent.  See 11 U.S.C. § 547.  Pursuant to other sections of chapter 5 of the Bankruptcy Code, lawful prepetition transfers of money, perfected security interests, and other property are routinely avoided to carry out the bankruptcy power.  See, e.g., 11 U.S.C. § 548.  The Supreme Court expressly acknowledges the equality of distribution policy is carried out by avoiding property transfers under Bankruptcy Code section 547.  Union Bank v. Wolas, 502 U.S. 151, 161 (1991); Begier v. IRS, 496 U.S. 53, 58 (1990).   Rendering

37

nondischargeable the Eminent Domain/Inverse Condemnation Claims here would create a new interpretation and application of the Fifth Amendment having consequences throughout bankruptcies as multiple constitutionally rooted claims are rendered nondischargeable., thereby creating a judicial priority for Constitutional claims.  Accordingly, the Class 54 claimants' and inverse condemnation claimants' assertions that their Claims should be paid in full or deemed nondischargeable are overruled, unless the Confirmation Order, to the extent a Final Order, provides that such Claims must be paid in full to the extent they are Allowed Claims for just compensation.

61.    Claims in Class 55 arise from, or relate to, the Energy Incentive Act, which provides tax incentives for citizens who undertake certain clean-energy projects to reduce their household's energy use.  Pursuant to the Plan, such Claims are not paid in cash or other monies in the Debtors' Title III Cases, but rather, are satisfied through reductions in tax revenue.  (Jaresko Decl. ¶ 55).  It is in the Commonwealth's best interests to promote the reasonable governmental purpose of supporting residents who are taking steps to address climate change and who took those steps in reliance upon the availability of such tax deductions under the Energy Incentive Act.

62.    Class 56 consists of all Claims of certain federally qualified health centers arising from or relating to the Medicaid Act, 42 U.S.C. § 1396a(bb).  Separate classification of such Claims is reasonable and justified because such Claims are held by entities which provide critical medical treatment to Commonwealth residents, particularly in a global pandemic, and are payable through Medicare/Medicaid funds from the federal government earmarked for the payment of such claims and not available to other general unsecured claimholders.  Separate classification of such Class and enhanced treatment on account of its Claims through the receipt of a fifty percent (50%)

recovery is reasonable and justified to support such critical services and ensure that medical

providers on the Island are not underfunded.  (Jaresko Decl. ¶ 56).

63.     Class 57 consists of Claims (other than Energy Incentive Claims) relating to refunds

or credits for the payment of personal income taxes, arising under the Puerto Rico Internal Revenue

Code of 2011, or an economic incentive law, in each case resulting in income tax credits,

deductions, or carryforwards.  Such Tax Credit Claims were designed and implemented by the

Government of the Commonwealth to incentivize certain behavior and to benefit the

Commonwealth and support the economy as a whole.  Pursuant to the Plan, such Claims are not

paid in cash or other monies in the Debtors' Title III Cases, but rather, are satisfied through

reductions in tax revenue.  (Jaresko Decl. ¶ 57).  Accordingly, it is reasonable and in the best

interests of the Commonwealth and its economy to continue to honor such tax incentives upon

which residents and local businesses have relied, and to separately classify such Claims.

64.     Class 63 consists of Claims arising from or related to indebtedness only payable

from appropriations of the Commonwealth Legislature.  Such claimants have significantly lesser

rights than holders of CW General Unsecured Claims, as they have no ability to compel payment

of their Claims and hold only contingent rights to payment to the extent appropriated by the

Government of the Commonwealth.  (Jaresko Decl. ¶ 58).

65.     Class 64 consists of Claims determined pursuant to a Final Order to be subject to

section 510(b) of the Bankruptcy Code.  (Jaresko Decl. ¶ 59).  Section 510(b) of the Bankruptcy

Code subordinates such Claims to other general unsecured claims, and provides that such Claims

are only eligible to receive a recovery pursuant to the Plan once all other unsecured creditors have

been paid in full.  Because these Claims have a lower priority than general unsecured claims, they

are sufficiently dissimilar to general unsecured claims to warrant separate classification and treatment.

66.     As each Class contains Claims substantially similar to each other, the Plan satisfies the requirements of section 1122(a) of the Bankruptcy Code.

67.     Further, the Plan separately classifies Claims not similarly situated to other Claims based upon differences in the legal nature and/or priority of such Claims or because they are asserted against a different Debtor than other Claims with the same priority, including secured and unsecured Claims against PBA (Classes 12–14), CW/HTA Claims (Class 59), CW/Convention Center Claims (Class 60), CW/PRIFA Rum Tax Claims (Class 61), CW/MBA Claims (Class 62), ERS Bond Claims and ERS General Unsecured Claims (Classes 65 and 66), Gracia Gracia Claims (Class 67), and Federal Claims (Class 69).

### ii.     Bankruptcy Code Section 1122(b)

68.     Class 68 consists of Convenience Claims, consisting of Claims equal to or less than $20,000, or Claims which the holder elects to reduce to $20,000 pursuant to the Plan.  Any holder of multiple Claims in an aggregate amount of $40,000 or more may elect to reduce all such Claims to an aggregate amount of $40,000 and be treated within Class 68.  (Plan §§ 1.162–1.163, Art. LXXII).  The separate classification of Convenience Claims is reasonable and necessary to ease the administrative burden on the Debtors.

69.     The Plan satisfies the requirements of section 1122(b) of the Bankruptcy Code.

### iii.    Bankruptcy Code Section 1123(a)(1)

70.     Section 4.1 of the Plan designates sixty-nine (69) separate Classes of Claims for the Debtors, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code.

71.     The Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### iv. Bankruptcy Code Section 1123(a)(2)

72. Section 84.1 of the Plan specifies that Claims in Classes 1 through 50, 51B, 51E, 51G through 51I, 52 through 54, 56, 58 through 66, and 69 are impaired. Section 84.2 of the Plan specifies that Claims in Classes 51A, 51C, 51D, 51F, 51J through 51L, 55, 57, 67, and 68 are unimpaired.

73. The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### v. Bankruptcy Code Section 1123(a)(3)

74. Articles V through LIV, Sections 55.2, 55.5, 55.7 through 55.9, Articles LVI through LVIII, LX, LXII through LXX, and LXXIII of the Plan identify the treatment of each Class of Claims impaired by the Plan.

75. The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### vi. Bankruptcy Code Section 1123(a)(4)

76. Articles V through LXXIII of the Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim.

77. Certain parties receive Consummation Costs, Restriction Fees, or Retail Support Fees pursuant to the Plan and in accordance with the plan support agreements negotiated by the Oversight Board. These costs are critical components of the plan support agreements that made development of the Plan possible. In consideration for their efforts in assisting in the formulation of the Plan, and to compensate the PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the GO/PBA PSA and HTA/CCDA PSA, it is fair and

41

reasonable for the PSA Creditors to be paid the Consummation Costs.  (Jaresko Decl. ¶ 216; Zelin

Decl. ¶¶ 80, 84, 88, 91–93; Debtors Exhibits 16, 17).  The Consummation Costs are not paid on

account of creditors' Claims.  Instead, Consummation Costs are paid to reimburse expenses

incurred in negotiating plan support agreements that enabled the Plan to move forward.  See Nov.

10, 2021 Hrg. Tr. 63:24–64:5; Zelin Decl. ¶¶ 80, 84, 88.  The 1.5% Consummation Cost expense

reimbursement is reasonable.  Nov. 10 Hrg. Tr. 91:17–25.  Additionally, in exchange for agreeing

to support the Plan and tender or "lock up," as applicable, the parties' bonds in accordance with

each of the GO/PBA PSA and HTA/CCDA PSA, it is fair and reasonable to make PSA Restriction

Fees available to such parties.  (Zelin Decl. ¶¶ 80, 84, 85, 89, 91–93; Jaresko Decl. ¶¶ 127).

Similarly, in exchange for executing the ERS Stipulation and agreeing to all of its terms and

conditions, including agreeing to support the Plan and "lock up" their ERS Bonds in connection

with the ERS Stipulation, it is fair and reasonable to make an ERS Restriction Fee available to

each ERS bondholder party to the ERS Stipulation.  (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 83, 91–

93; Debtors Exhibit 19).

78.    In addition, as part of the negotiations culminating in the GO/PBA PSA, a similar

Retail Support Fee (i.e. a form of "restriction fee") will be available to Retail Investors who did

not tender and exchange their bonds to join the GO/PBA PSA.  (Zelin Decl. ¶¶ 81, 82; Debtors

Exhibit 16).  Providing Retail Investors an opportunity to receive similar payments is fair and

reasonable, balances the interests of various creditor constituencies, and is beneficial to reduce the

risk of potentially costly cramdown litigation in connection with Plan confirmation.  (Jaresko Decl.

¶¶ 128, 216).  Moreover, the Oversight Board has agreed to provide bondholders with an additional

opportunity to certify that they are Retail Investors and receive their Pro Rata Share of the GO/PBA

Restriction Fee Percentage, as set forth in the Confirmation Order.

79. The Consummation Costs, Restriction Fees, and Retail Support Fees are not awarded on account of the creditors' Claims, but rather, as consideration for their actions in facilitating the settlements embodied in the Plan. See Nov. 10, 2021 Hrg. Tr. 63:24–64:5, 72:23–73:6; Zelin Decl. ¶ 78; Jaresko Decl. ¶ 66. Such fees were essential to incentivize parties to engage in continued negotiations over an extended period of time, and incentivize creditor parties to the plan support agreements to support confirmation of the Plan. Without such fees, building consensus and encouraging parties to engage in negotiations and ultimately document their agreements would have been significantly more difficult, and Plan confirmation would have been less likely or substantially prolonged. (Zelin Decl. ¶¶ 91–92). Such fees are the result of arm's length negotiations engaged in by the parties and are an integral part of the settlements reached between the parties. (Zelin Decl. ¶ 93). The Consummation Costs, Restriction Fees, and Retail Support Fees are fair and reasonable. (Zelin Decl. ¶¶ 91–93; Nov. 10, 2021 Hrg. Tr. 91:17–25). Accordingly, payment of these fees is consistent with section 1123(a)(4) of the Bankruptcy Code.

**vii.    Bankruptcy Code Section 1123(a)(5)**

80. Various provisions of the Plan provide adequate and proper means for its implementation:

- Article III provides for the payment of Administrative Expense Claims required to be paid on the Effective Date;

- Section 74.1 provides for the issuance and distribution of the New GO Bonds;

- Section 74.2 provides for the issuance and distribution of the CVIs;

- Section 74.5 ensures the feasibility of the Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated";

- Section 76.1 provides, subject to Sections 76.5 and 76.7 of the Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtors and any

43

Entity, and which have not expired by their own terms on or prior to the Effective Date, shall be rejected by the Debtors as of the Effective Date, except for any Executory Contract or Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party) . . . .";

- Article LXXVII provides for distributions to be made to holders of all Allowed Claims under the Plan;

- Article LXXVIII provides for the Avoidance Actions Trust Assets to vest in the Avoidance Actions Trust, to be administered by the Avoidance Actions Trustee, and provides for the semi-annual distribution of liquidated Avoidance Actions Trust Assets to the beneficiaries thereof;

- Section 81.2 vests in the Disbursing Agent, among other things, the power and authority to make distributions contemplated by the Plan;

- Article LXXXII provides for the Debtors to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

- Article LXXXIII provides for the funding and administration of the Pension Reserve Trust under the Plan;

- Article LXXXVIII provides that, "[o]n the Effective Date all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance

44

documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule";

- Section 92.1 provides for the re-vesting of assets: "Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order);

- Article LXIX provides for the sale of all ERS assets to the Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private Equity Portfolio; and

- Articles VI through XV provide for approximately $1.1 billion to be paid by the Commonwealth to holders of PBA Bond Claims in satisfaction of their claims.

(see Jaresko Decl. ¶ 67; see generally Plan).

81.     The Plan Supplement contains, among other things, the forms of (a) the New GO Bond Trust Agreement, (b) the CVI Trust Agreement, (c) the Avoidance Actions Trust Agreement, (d) the ERS Trust Agreement, (e) the Schedule of Executory Contracts and Unexpired Leases to be Assumed, (f) the Supplemental Ambac Election Notice, (g) the Assured Custodial Trust Documents, (h) the FGIC Custodial Trust Agreement, (i) Act 53-2021, and (j) the Pension Reserve Trust Guidelines (each as defined in the Plan Supplement).  The Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.

82.     The Confirmation Order further provides adequate means for the Plan's implementation including, but not limited to, paragraph 62 thereof which provides: "Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined

45

benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accurals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans that ended up creating nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan." Confirmation Order ¶ 62. This provision is appropriate and necessary for the implementation and feasibility of the Plan. See Nov. 15, 2021 Hrg. Tr. 181:16–182:14.

83.    The Court's conclusion under Bankruptcy Code section 1123(a)(5), made applicable by PROMESA Section 301(a), that there are adequate means to implement the Plan rests on, among other things, Act 53 (Debtors Exhibit 134) authorizing the new debt to be issued pursuant to the Plan with the full faith and credit of the Commonwealth, as long as the Plan does not include Monthly Benefit Modifications to pension payments. Authorization of the new debt pursuant to Act 53 is unaffected by the freezes in the accruals of pension benefits and eliminations of cost of living adjustments. The debt authorization in Act 53 is conditioned only on the Plan's

46

removal of the Monthly Benefit Modification that was provided for in the proposed Seventh

Amended Plan, and does not require satisfaction of any other conditions including cancellation of

(a) the elimination of cost of living adjustments and/or (b) freeze or terminations of accrual of

defined benefits under TRS or JRS from and after the Effective Date.  The Plan cancels and

eliminates the Monthly Benefit Modification previously included in the proposed Seventh

Amended Plan, thereby satisfying the condition in Act 53 for its debt authorization.  Accordingly,

Act 53 provides adequate means for implementation of the Plan.  Moreover, enabling legislation

is not required to establish the freeze of defined benefits or elimination of COLAs because a

legislature's efforts to elevate contractual pension obligations above other forms of unsecured

prepetition debt would run contrary to the federal bankruptcy power to impair contracts.  See In re

City of Detroit, Michigan, Case No. 13-53846 (TJT) (Bankr. E.D. Mich.), Docket Entry No. 1945

at 79–80, 92 (explaining that no applicable law protected pension benefits from impairment and

"if a state consents to a municipal bankruptcy, no state law can protect contractual pension rights

from impairment in bankruptcy, just as no state law could protect any other types of contractual

rights").  PROMESA Section 314(b)(5) only requires legislation when necessary under applicable

law, but there is no applicable law requiring enabling legislation to implement the freeze or

elimination of cost of living adjustments.  Other provisions of PROMESA also establish enabling

legislation is not necessary to implement the freeze and COLA elimination.  See, e.g., PROMESA

§ 104(k) (empowering the Oversight Board to seek judicial enforcement of its authority to carry

out its responsibilities pursuant to PROMESA, which responsibilities include the restructuring of

the Commonwealth's pension obligations); PROMESA § 108 (preventing the Governor and

Legislature from enacting, implementing, or enforcing any statute that would impair or defeat the

purposes of PROMESA).

84. The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

**viii.    Bankruptcy Code Section 1123(b)(1)**

85. Article LXXXIV of the Plan identifies which Classes of Claims are impaired and which Classes of Claims are left unimpaired.

86. The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

**ix.    Bankruptcy Code Section 1123(b)(2)**

87. Section 76.1 of the Plan provides that, as of the Effective Date, all Executory Contracts and Unexpired Leases to which any Debtor is a party are rejected, "except for any Executory Contract or Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtors reserve the right to amend, on or prior to the Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall

48

be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the

Effective Date." Plan § 76.1; see also Plan Supplement at Exhibit E.

88.     The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

   **x.     Bankruptcy Code Section 1123(b)(3)(A)**

89.     The Plan incorporates, among other things, the settlements and compromises set

forth in the AFSCME Plan Support Agreement (Debtors Exhibit 21), the GO/PBA Plan Support

Agreement (Debtors Exhibit 16), the HTA/CCDA Plan Support Agreement (Debtors Exhibit 17),

the PRIFA Plan Support Agreement (Debtors Exhibit 18), the Retiree Committee Plan Support

Agreement (Debtors Exhibit 20), the Committee Agreement (Debtors Exhibit 23), the ERS

Stipulation (Debtors Exhibit 19), the PRIFA BANs Stipulation (Debtors Exhibit 22), and the

*Stipulation in Connection with DRA Related Disputes* (Docket Entry No. 19100, Ex. A) (Debtors

Exhibit 146).  Further, the Plan sets forth the terms and conditions for a global compromise and

integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights

of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond

Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum

Tax Claims, and PRIFA BANs, including the disputes: (a) set forth in the Debt Related Objections

challenging, among other things, the validity, priority, secured status and related rights of the 2011

CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the

2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the

2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions, (c) set forth

in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee

Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally

appropriated to CCDA, HTA, MBA, and PRIFA, as applicable, and "clawed back" by the

49

Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation. (Jaresko Decl. ¶¶ 71, 114–187). The Plan also incorporates the terms of a global settlement and compromise of all pending disputes involving the DRA Parties. (See Docket Entry No. 19100, ¶¶ 9–12). Such settlements and compromises are in the best interests of the Debtors and their creditors, and within the range of reasonableness. (Murray Decl. Ex. A, ¶¶ 119–136; Zelin Decl. ¶¶ 13, 24, 29, 36, 43; Jaresko Decl. ¶¶ 201–216; Skeel Decl. ¶¶ 32–46).

90.     Each of the plan support agreements was reached following months of negotiations directed by the Mediation Team and/or other informal discussions that included party representatives, legal and financial advisors, and involved vigorous debate and discussion on both sides. (Zelin Decl. ¶¶ 18–20, 21–22, 26–28, 32–33, 38, 40–41; Jaresko Decl. ¶¶ 202–216). Those negotiations were conducted at arms' length and in good faith. (Id.; Skeel Decl. ¶ 33; Jaresko Decl. ¶ 202). The litigation resolved by the plan support agreements involves extraordinarily complex, high-stake disputes and, because these are the first Title III cases litigated under PROMESA, novel legal issues. Collectively, billions of dollars were at stake. (Jaresko Decl.

50

¶ 203).  The consequence of the GO Bondholders prevailing on their priority argument, or the

HTA, PRIFA, or CCDA bondholders prevailing on their property interest contentions, would have

inflicted grave harm on the Commonwealth and its residents because the Commonwealth, in either

situation, would have lost control of billions of dollars of revenues needed to sustain the

Commonwealth.  This would have prevented the Oversight Board from developing fiscal plans

and budgets necessary to carry out its statutory mission.  A small risk of a negative and grave

outcome was imprudent to undertake once settlement was possible on the terms in the Plan.  (Skeel

Decl. ¶ 34; Jaresko Decl. ¶¶ 203–213).  The settlements embodied in the Plan also avoid the

uncertainty, delay, and significant expense that would result from continued litigation.  (Skeel

Decl. ¶ 44; Jaresko Decl. ¶ 214).

91.     The Plan is the result of extensive arms' length negotiations among the Government

Parties and significant creditor constituencies, including the PSA Creditors, each of which was

represented by sophisticated counsel, and the compromises and settlements among the

Government Parties and various PSA Creditors form the very foundation of the Plan.  In the

absence of such compromises and settlements, the Debtors' emergence from Title III would likely

be significantly delayed by further litigation and burdened by additional expense, which could

impair the Debtors' ability to successfully adjust their debts, thereby prejudicing recovery for all

creditors and raising further uncertainties regarding the Debtors' financial condition.  (See Jaresko

Decl. ¶¶ 81–82, 201–204, 214–215; Skeel Decl. ¶ 43–46).

92.     Each of the compromises and settlements incorporated into the Plan (a) is made in

good faith, furthers the policies and purposes of PROMESA, and is fair, equitable, and reasonable;

(b) is in the best interests of the Debtors, their creditors, and all other affected Persons with respect

to the Claims, Causes of Action, and other matters resolved by such compromises and settlements;

(c) is within the range of reasonable results if the issues were litigated; (d) falls above the lowest point in the range of reasonableness; and (e) meets the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a), and other applicable law.  Further, the Plan will fairly and consensually resolve numerous pending adversary proceedings and appeals, each of which raises difficult and complex issues.  The Plan thus incorporates a complex series of compromises and settlements that resolve the most significant potential obstacles to confirmation of a plan of adjustment.  (See Skeel Decl. ¶¶ 33–34; Jaresko Decl. ¶¶ 201–205).  The settlements resolve billions of dollars of claims against the Debtors.  (Skeel Decl. ¶ 46).  Each of the settlements is consistent with what would be expected as a result of negotiations in a complex debt restructuring and is reasonable.  In addition, the ability to achieve consensus from at least 15 major parties is evidence the settlements are reasonable.  (Murray Decl. Ex. A ¶¶ 115–137; Zelin Decl. ¶¶ 24, 29, 36, 43).

93.     Accordingly, the Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

### xi.     Bankruptcy Code Section 1123(b)(3)(B)

94.     Article LXXVIII of the Plan provides for, among other things, the transfer of the Avoidance Actions to the Avoidance Actions Trust.  Section 79.1 of the Plan provides: "Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court."  Plan § 79.1.

95.     Further, Section 82.1(a) of the Plan states: "[e]xcept with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall

52

object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses, and counterclaims shall be litigated to Final Order; provided, however, that Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise, or withdraw any objections to Claims, without approval of the Title III Court." For the avoidance of doubt, the foregoing is subject to the rights of the two (2) Creditors' Committee appointees to the Avoidance Action Trust Board pursuant to Section 82.1(b) of the Plan.  Plan § 82.1(a).

96.     The Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

**xii.     Bankruptcy Code Section 1123(b)(4)**

97.     Article LXIX of the Plan provides for the sale of all ERS assets to the Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private Equity Portfolio, subject to certain conditions.  (Jaresko Decl. ¶ 76).  Specifically, Section 69.2 of the Plan states that the Commonwealth, up to and including April 10, 2023, "shall have the option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . .  In the event that the Commonwealth declines to exercise the option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond Claims shall have the option to exercise the Bondholder Election and purchase all of the interests in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant

53

to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by providing written notice thereof to the Commonwealth on or prior to April 15, 2023."  However, "[i]n the event that neither the Commonwealth Election nor the Bondholder Election shall have been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . ."  Pursuant to Section 69.1 of the Plan, in either scenario, the proceeds of the purchase of the ERS Private Equity Portfolio, along with the $373 million in cash, shall be distributed to holders of Allowed ERS Bond Claims.  Plan § 69.1.

98.    The Plan is consistent with section 1123(b)(4) of the Bankruptcy Code.

**xiii.    Bankruptcy Code Section 1123(b)(5)**

99.    Articles V through LIV, Sections 55.2, 55.5, 55.7 through 55.9, Articles LVI through LVIII, LX, LXII through LXX, and LXXIII of the Plan modify the rights of holders of Claims in the impaired Classes.  Sections 55.1, 55.3, 55.4, 55.6, 55.10 through 55.12, Articles LIX, LXI, LXXI, and LXXII of the Plan leave the holders of unimpaired Claims rights unaffected pursuant to the Plan.

100.    The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

**xiv.    Bankruptcy Code Section 1123(b)(6)**

101.    Article XCII of the Plan provides for, among other things, (a) certain releases, injunctions, and exculpations described below in paragraphs 199–208 and (b) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of New GO Bonds and CVIs.  (Jaresko Decl. ¶ 78; Zelin Decl. ¶¶ 94, 96, 97, 99, 107–110).

102.    The Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

**xv.    Bankruptcy Code Section 1123(d)**

54

103.     Section 76.4 of the Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts and Unexpired Leases assumed, or assumed and assigned, pursuant to the Plan.  All cure amounts will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established by the Plan. (Jaresko Decl. ¶ 79).  On November 23, 2021, the Oversight Board filed and caused to be served the *Notice of Executory Contracts and Unexpired Leases to be Assumed Pursuant to Title III Plan of Adjustment* (Docket Entry No. 19353), (i) setting forth the cure amounts for each assumed Executory Contract and Unexpired Lease based on a review of the Debtors' books and records, and (ii) establishing a deadline for parties to object to the proposed cure amounts for an Executory Contract or Unexpired Lease to which they are a party or to the assumption of such Executory Contract or Unexpired Lease.  Within ten (10) Business Days of entry of a Final Order setting for the cure amount as to each Executory Contract or Unexpired Lease to be assumed or assumed and assigned, the Debtors or the Reorganized Debtors, as the case may be, shall pay or otherwise satisfy such cure amount.

104.     The Plan is consistent with section 1123(d) of the Bankruptcy Code.

**xvi.     Bankruptcy Code Section 1129(a)(2)**

105.     The Debtors have (i) complied with applicable provisions of the Bankruptcy Code and PROMESA applicable to confirmation of the Plan, except as otherwise provided or permitted by orders of this Court, and (ii) complied with the applicable provisions of the Bankruptcy Code, PROMESA, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the Election Notices, and related documents, and in soliciting and tabulating votes on the Plan.

106. The Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the Disclosure Statement (Debtors Exhibit 2), and sought and received input and comment thereon from other parties in interest. This Court approved the Disclosure Statement as containing adequate information and meeting the requirements of sections 1125 and 1126 of the Bankruptcy Code. (Jaresko Decl. ¶ 80). The Debtors have properly solicited and tabulated votes on the Plan. (Jaresko Decl ¶ 80; see generally Pullo Decl.; see generally Pullo Sup. Decl.).

107. The Oversight Board, as proponent of the Plan, is the duly-appointed representative of the Debtors in their Title III Cases as provided pursuant to PROMESA and has acted in accordance with applicable law in proposing the Plan.

108. The Debtors have complied with section 1129(a)(2) of the Bankruptcy Code.

**xvii.    Bankruptcy Code Section 1129(a)(3)**

109. The Plan was proposed in good faith with the legitimate purpose to provide a means for the Debtors to achieve fiscal responsibility and access to capital markets, consistent with the purposes of PROMESA. (Jaresko Decl. ¶ 81). In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Title III Cases, the Plan itself, the lengthy process leading to the Plan's formulation (including the compromises, settlements, and releases incorporated therein), and the process associated with the Plan's prosecution. The Debtors' good faith is evident from the facts and records of the Title III Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Title III Cases, including related adversary proceedings. The Plan (including the settlements and compromises contained therein) is the result of extensive

arm's length negotiations among the parties, including through mediation led by Chief Bankruptcy Judge Barbara Houser.

110.    The Oversight Board has worked to develop consensus with creditors and to evaluate the Commonwealth's and its instrumentalities' current and future financial circumstances.  These circumstances have been subject to constant change as the Oversight Board, the Commonwealth, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic. (Jaresko Decl. ¶ 82).  The Plan and Disclosure Statement represent the culmination of those efforts and the substantial input of each key stakeholder.

111.    The Plan (including all other agreements, documents, and instruments necessary to effectuate the Plan) achieves a rational adjustment of the Debtors' debts, and properly distributes value to creditors, including through the implementation of (a) parties' elections with respect to distributions and/or (b) the settlements pursuant to the Plan.  The Plan was proposed with the legitimate and honest purpose of implementing the settlements and compromises of numerous risky and costly disputes, while avoiding protracted litigation that could delay distributions to creditors.  (Jaresko Decl. ¶ 83).

112.    The Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**xviii.    Bankruptcy Code Section 1129(a)(6)**

113.    The Plan does not provide for any rate changes by the Debtors and, accordingly, section 1129(a)(6) of the Bankruptcy Code does not apply.

**xix.    Bankruptcy Code Section 1129(a)(8)**

114.    Pursuant to the Disclosure Statement Order, the Title III Court approved the Disclosure Statement (Debtors Exhibit 2) and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and directed the Debtors to solicit acceptances and rejections of the Plan, as well as certain elections with respect thereto.  (Disclosure Statement Order ¶¶ B, 7–19).  Prior to the transmission of the Disclosure Statement, the Debtors did not solicit acceptances of the Plan from any holders of Claims.

115.    The Solicitation Packages were served in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the Disclosure Statement Order.  (See generally Mailing Affidavits).

116.    The (a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and (c) airing of radio advertisements regarding the approval of the Disclosure Statement, Confirmation Hearing dates, Confirmation Objection Deadline, Voting Deadline, and Election Deadline: (i) were adequate and sufficient under the circumstances of the Title III Cases; (ii) provided adequate and sufficient notice of such deadlines, the method of voting or making an election of distribution pursuant to the Plan; and the date, time, and location of the Confirmation Hearing; (iii) provided holders of Claims with a reasonable period of time to make an informed decision to accept or reject the Plan and to make any election provided thereunder; (iv) were in compliance with PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due process to all parties in interest in the Title III Cases.  (See Service Affidavits; see also generally Pullo Decl.).

117.    No other or further notice with respect to the Plan or the Confirmation Hearing is required.  Based upon the foregoing, the Debtors and their successors, predecessors, control persons, representatives, officers, directors, employees, agents, attorneys, financial advisors, investment bankers, accountants, and other retained professionals, and any and all affiliates, managers, employees, attorneys, and advisors of the foregoing (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their activities relating to the solicitation of acceptances of the Plan or elections thereunder and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer and issuance of securities pursuant to the Plan and, therefore, are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or elections thereunder or the offer and issuance of securities pursuant to the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in Section 92.7 of the Plan.

118.    Votes to accept or reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the Disclosure Statement Order, PROMESA, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  (See Pullo Decl. ¶ 8).

119.    Certain Classes either voted to reject, or were deemed to reject, the Plan (the
"Rejecting Classes") (See Pullo Decl. Ex. A; Pullo Sup. Decl. Ex. A).[14]   Notwithstanding such
rejection and deemed rejection, the Plan is confirmable because, as is explained below, it satisfies
sections 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code with respect to the Rejecting
Classes.

### xx.    Bankruptcy Code Section 1129(a)(10)

120.    At least one Class of each of the Commonwealth creditors' impaired Claims, PBA
creditors' impaired Claims, and ERS creditors' impaired Claims has accepted the Plan.  (See Pullo
Decl. Ex. A).  Accordingly, the Plan complies with section 1129(a)(10) of the Bankruptcy Code.

### xxi.    Bankruptcy Code Section 1129(b)(1)

121.    The Plan's treatment of Claims in the Rejecting Classes is proper because, as is
described further below, the Plan does not discriminate unfairly and is fair and equitable with
respect to such Claims.  (Jaresko Decl. ¶ 87).  Unfair discrimination applies only to rejecting
classes of creditors, not individual creditors within a class.  See Bankruptcy Code §§ 1129(b)(1),
1123(a)(4).  "Thus, a disapproving creditor within a class that approves a plan cannot claim unfair
discrimination." In re Nuverra Envtl. Sols., Inc., 834 F. App'x 729, 734–35 (3d Cir. 2021).  As a
preliminary matter, the Court notes that no Rejecting Class has objected to confirmation of the
Plan on the basis that the Plan discriminates unfairly.

---

[14]   Classes 51D, 51F, and 51L voted to reject the Plan, but subsequently were rendered unimpaired and deemed to
have accepted the Plan by the modifications made in the Eighth Amended Plan.  Accordingly, such classes are not
Rejecting Classes.  See Pullo Sup. Decl. Ex. A.

122.     The treatment afforded to retirees classified in Classes 51A through 51F, 51K, and 51L, and active employees classified in Classes 51G through 51J pursuant to the Plan is fair and equitable and does not discriminate unfairly against other creditors in the Title III cases.  Any cut to pensions of retired government employees would have a negative impact on Puerto Rico's economy because retirees comprise a significant component of local demand in Puerto Rico.  (*Amended Declaration of Simon Johnson* (Docket Entry No. 19014) ("Johnson Decl.") at ¶ 1; Retiree Committee Exhibit 1 at § 2.17).  Cutting pensions actually could destabilize Puerto Rico's economic prospects, lead to greater out-migration, and make it harder for Puerto Rico to obtain credit in the future, and the savings from pension cuts do not justify the damage those cuts would cause to the economy.   (Johnson Decl. ¶1; Retiree Committee Exhibit 1 §§ 2.6; 2.13; 2.22).  Roughly half of the retirees have pensions that place them below the federal poverty level of $11,800 per year for a single person household. (Retiree Committee Exhibit 1 § 4.5).  Further, retirees had also already experienced substantial reductions in pensions, and, except for judges, government retirees have not received cost of living increases since 2008.  (Retiree Committee Exhibit 1 §§ 4.7; 4.8).  Many retirees, such as retired police, teachers, and judges, do not receive federal social security payments. (Retiree Committee Exhibit 1 §§ 4.3; 4.16).  The gross income of the approximately 167,000 government retirees represents 6.4% of the total household expenditures on the Island and 5.8% of Puerto Rico's gross national income. (Retiree Committee Exhibit 1 § 4.4).

123.     The macroeconomic impact of reducing the pensions of retirees on the overall Puerto Rican economy is significant.  (Retiree Committee Exhibit 1 § 5).  Because each dollar that is not spent by a retiree has a ripple effect throughout the economy, the loss of a $1.00 of retiree income impacts overall spending at a higher rate, known as the fiscal multiplier.  (Retiree

Committee Exhibit 1 § 5.2).  Applying the Oversight Board's fiscal multiplier would result in the loss of 1,600 jobs on the island and a 0.2% reduction in GNP in the near term.  (Retiree Committee Exhibit 1 § 2.9).  A higher fiscal multiplier would have a greater negative impact on the economy of a loss of 6,300 jobs on the island and a reduction in GNP of 0.6%.  (Retiree Committee Exhibit 1 §§ 2.9, 5).  Given Puerto Rico's high level of out-migration, including the increase in out migration since 2016 by those individuals that are retired, pension cuts may force many more retirees to move to the states to be with family members if they can no longer support themselves living in Puerto Rico. Increased out-migration will have a further negative impact on the economy as pension dollars are then spent outside of Puerto Rico.  (Retiree Committee Exhibit 1 §§ 5.21– 5.28).

124.    The Plan, which eliminates any reductions in accrued pensions and certain other retiree benefits for retired and active employees and provides for the creation of the Pension Reserve Trust, is better for Puerto Rico's economy and for other creditors and justifies the treatment that Claimants for retirement benefits are receiving pursuant to the Plan.  See, e.g., In re Creekstone Apartments Assocs., L.P., 168 B.R. 639, 644 (Bankr. M.D. Tenn. 1994) (disparate treatment between classes is not unfair if it "protect[s] a relationship with specific creditors that the debtor need[s] to reorganize successfully").  The treatment of Classes 51A through 51L does not unfairly discriminate in favor of holders of Claims for retirement benefits and is fair and equitable.

125.    The Plan does not unfairly discriminate against holders of Claims in Class 58 (CW General Unsecured Claims), Class 66 (ERS General Unsecured Claims), or Class 13 (PBA General Unsecured Claims).  For the reasons set forth above in paragraphs 55–64, certain Classes of unsecured Claims have been separately classified to ensure the Commonwealth is best able to

provide critical government services to its residents, and that certain claimants are able to continue

providing such services in an efficient, reliable, and sustainable manner.  For these reasons, it is

important that certain Classes of unsecured Claims receive superior treatment to Claims in Classes

58, 66, and 13.  Further, for the reasons set forth above in paragraphs 59–60, separate classification

and treatment of Claims in Class 53 (Dairy Producer Claims) and Class 54 (Eminent

Domain/Inverse Condemnation Claims) is necessary because such claimants assert Fifth

Amendment rights, and the Plan does not discriminate unfairly with respect to such Classes.

Separate classification and treatment of such Claims is reasonable and justified by a governmental

purpose, and does not constitute unfair discrimination.

126.    Accordingly, the Plan complies with section 1129(b)(1) of the Bankruptcy Code.

**xxii.    Bankruptcy Code Section 1129(b)(2)**

127.    The Plan's treatment of Claims in the Rejecting Classes is proper because the Plan

provides all holders of Claims in the Rejecting Classes with what they can reasonably expect to

receive under the circumstances of the Title III Cases.  Because there are no equity holders in

chapter 9 cases, the requirement under Bankruptcy Code section 1129(b)(2)(B) (incorporated by

PROMESA section 301(a)) that a plan be "fair and equitable" requires that, where a debtor seeks

nonconsensual confirmation of a plan over one or more rejecting classes, no claim junior to any of

the claims in the rejecting classes of the relevant debtor may receive any property.  Under the Plan,

the Class holding junior Claims to the unsecured Rejecting Classes (Section 510(b) Subordinated

Claims) receives no property. The commencement of the Title III Cases was precipitated by the

Debtors' untenable debt burden, a severe cash shortage, and the economic decline and out-

migration eroding the Debtors' revenues.  The creditor recoveries in the Plan were calculated or

negotiated to reasonably compensate holders of Claims while enabling the Debtors to avoid a

recurrence of these financial difficulties and to institute necessary reforms to ensure the Debtors'

fiscal responsibility and access to capital markets.  (See Jaresko Decl ¶ 81; Murray Decl. Ex. A,

¶ 20, 139).

128.    Class 54 is the only Rejecting Class of secured Claims in the Plan, and section

1129(b)(2)(A) is satisfied with respect to such Class.  Holders of Claims in Class 54 will receive

the cash deposits securing their Claims as payment in full on account of the secured portion of

such Claims.  (Jaresko Decl. ¶ 88).

129.    Accordingly, the Plan complies with section 1129(b)(2) of the Bankruptcy Code

with respect to Claims in the Rejecting Classes.

**B.  PROMESA § 314(b)(2):** *The Plan Fully Complies with the Provisions in Title III of PROMESA.*

130.    Except as otherwise provided for or permitted by orders of the Court, the Oversight

Board has complied with the applicable provisions of PROMESA, the Bankruptcy Code, the

Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order since it commenced the

Title III Cases, including in transmitting the Solicitation and in tabulating the votes and elections

with respect to the Plan.  (See generally Jaresko Decl. and Pullo Decl.).

131.    The Disclosure Statement Order established the procedures for the solicitation of

votes on the Plan.  The Solicitation Agent complied with the procedures established in the

Disclosure Statement Order.  Specifically, the Solicitation Agent determined which creditors were

entitled to vote on the Plan by following the instructions in the Disclosure Statement Order, by

Class, and by applying the Voting Record Dates set forth in the Disclosure Statement Order.  The

Solicitation Agent then coordinated the distribution of solicitation materials to holders of Claims

entitled to vote.  (Pullo Decl. ¶¶ 5–6).  The Solicitation Agent coordinated publication of the

confirmation hearing notices as set forth in the Disclosure Statement Order.  (Pullo Decl. ¶ 7; see

64

also Publication Affidavit).  The solicitation materials were properly distributed to the appropriate

parties, including brokers and nominees.  (See Mailing Affidavits).

132.    The Solicitation Agent received, reviewed, determined the validity of, and

tabulated the Ballots submitted.  (Pullo Decl. ¶ 8).  The Solicitation Agent also worked with the

Depository Trust Company ("DTC") to count votes from the Bond Classes tendered through

DTC's Automated Tender Offer Program ("ATOP").  (Pullo Decl. ¶ 9).

133.    The July 2021 tender and exchange offer was not an improper solicitation of votes

on the Plan, but instead, created alternative CUSIP identifiers to track joinders to the GO/PBA

Plan Support Agreement.  (Zelin Decl. ¶ 82).  The new CUSIP provided an administrative

mechanism for tracking the beneficial interests of uninsured bonds that became subject to the

GO/PBA Plan Support Agreement.  (See Docket Entry No. 18761-8).  Solicitation packages with

respect to votes to accept or reject the Plan were delivered to these new CUSIPs in accordance

with the Disclosure Statement Order.  (See Mailing Affidavits).  To vote to accept or reject the

Plan, GO/PBA PSA Creditors were required to instruct their nominee or broker to tender their

bonds to the appropriate folder on ATOP before the voting deadline pursuant to the Disclosure

Statement Order.  (Disclosure Statement Order ¶ 32).

134.    The Court approved the procedures for voting to accept or reject the Plan, including

the use of DTC's ATOP process for bondholder votes, in the Disclosure Statement Order.  (See

Disclosure Statement Order ¶¶ 9, 14, 32).  The tabulation of votes, showing approximately eighty

percent (80%) of Bond Claims in dollar amount participated in the vote, shows that creditors were

able to successfully vote on the Plan.  (See Pullo Decl. Ex. A).

135.    The Plan complies with PROMESA Section 314(b)(2).

**C. PROMESA § 314(b)(3):** *The Debtors Are Not Prohibited by Law from Taking any Action
Necessary to Carry Out the Plan.*

65

136.    The Plan contains no provisions which would require the Debtors to violate the law, including Commonwealth law that is not preempted.

137.    Act 53, enacted on October 26, 2021, authorizes the issuance of the CVIs and the New GO Bonds, consistent with the terms set forth in the Plan and the plan support agreements. (Jaresko Decl. ¶ 92; Debtors Exhibit 134).  Act 53's effectiveness is conditioned only on the elimination of the Monthly Benefit Modification (as defined in the Seventh Amended Plan) from the Plan.  The Monthly Benefit Modification is not contained in the Plan, and accordingly Act 53 is effective and the Commonwealth's issuance of the CVIs and New GO Bonds is consistent with applicable Commonwealth law.  Further, PROMESA preempts Acts 91-2004 (establishing TRS) and 12-1954 (establishing JRS), each as amended, providing for the future accrual of defined benefits and future cost of living adjustments, to the extent set forth in **Exhibit A** hereto.  Absent preemption, the amount of Commonwealth revenues that would need to be spent on TRS and JRS pension benefits in fiscal year 2022 is $984 million.  (Malhotra Decl. ¶ 65).  Absent preemption, these inconsistent statutes would undermine the restructuring contemplated by the Plan.  (Jaresko Decl. ¶ 235).

138.    In addition, obligations arising from Commonwealth statutes, including statutes providing employees the right to accrue pension or other retirement benefits, give rise to obligations treated as contractual under Puerto Rico law, which can be impaired and discharged pursuant to the Plan.  See Order and Opinion Denying the DRA Parties' Motion for Allowance of an Administrative Expense Claim (Docket Entry No. 18892 at 19–20).  The discharge of prepetition contractual obligations does not need to be approved by or consistent with Commonwealth law.  See, e.g., Order Confirming Debtor's Sixth Amended Plan of Adjustment of Debts Pursuant to Chapter 9 of the Bankruptcy Code [Case No. 09-15000, D.I. 442], at 7 ("The

66

Court . . . finds and concludes that the City's actions under the Plan are not prohibited by law, and the treatment of the Classes who formerly had an interest in the City's pension plan is lawful under the Bankruptcy Code."); In re Sanitary & Improvement Dist. No. 7, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("If a municipality were required to pay prepetition bondholders the full amount of their claim with interest as contained on the face of the bonds and the [municipality] had no ability to impair the bondholder claims over objection, the whole purpose and structure of chapter 9 would be of little value . . . To create a federal statute [chapter 9 of the Bankruptcy Code] based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debts is not, in the point of view of this Court, a logical or necessary result.").

139.    Pursuant to Puerto Rico law, legislation of the Commonwealth is presumed to be valid if enacted by the Legislative Assembly of Puerto Rico and signed into law by the Governor. See, e.g., Brau v. ELA, 2014 TSPR 26, 190 D.P.R. 315, 337, 2014 WL 997526 (P.R. Feb. 21, 2014); Partido Socialista Puertorriqueño v. ELA, 107 D.P.R. 590, 7 P.R. Offic. Trans. 653, 727, 1978 WL 48833 (P.R. Oct. 5, 1978), holding modified by Partido Independentista Puertorriqueño v. CEE, 120 D.P.R. 580, 1988 JTS 23, 20 P.R. Offic. Trans. 607, 1988 WL 580845 (P.R. Mar. 7, 1988) ("To begin with, laws are presumed to be constitutional and the movant [objector] should place the courts in a position to decide by introducing evidence to sustain the facts alleged, and then stating the legal arguments on which its assignment of unconstitutionality is based, specifically mentioning the constitutional provisions involved and the legal precedents supporting its assignment.").

140.    The Plan does not contain any provision that would require violation of the Contracts Clause of the Constitution of the United States. The Contracts Clause provides that no

67

state shall pass any law impairing the obligation of contracts.  U.S. Const. art. I, § 10, cl. 1.  While

a state or territory cannot make a law unconstitutionally impairing contractual obligations,

Congress is empowered to so impair contractual obligations pursuant to Article I, Section 8 of the

Constitution, which provides that Congress shall have the power to establish uniform laws on the

subject of bankruptcies throughout the United States.  U.S. Const. art. I, § 8, cl. 4.  It has long been

recognized that one of the fundamental goals of bankruptcy law is to adjust the debtor-creditor

relationship, that is, to alter contract rights.  See In re City of Stockton, Cal., 478 B.R. 8, 14–15

(Bankr. E.D. Cal. 2012).  "While bankruptcy law endeavors to provide a system of orderly,

predictable rules for treatment of parties whose contracts are impaired, that does not change the

starring role of contract impairment in bankruptcy."  Id. at 16.  Congress is, therefore, "expressly

vested with the power of passing [bankruptcy] laws, and is not prohibited from passing laws

impairing the obligation of contracts."  Id. at 15 (citing Sturges v. Crowninshield, 17 U.S. 122,

191 (1819)).  Further, confirmation of the Plan does not implicate the Contracts Clause because it

is not a legislative action.  A federal court's confirmation of a reorganization plan under federal

law cannot violate the Contracts Clause.  See Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467

U.S. 717, 732 n.9 (1984) (holding that the Contracts Clause does not apply to non-legislative

actions).  It follows that this Court may approve the Plan pursuant to PROMESA, a federal law

enacted by Congress with the express purpose of allowing Puerto Rico to achieve fiscal

responsibility and access to the capital markets through, inter alia, adjustment of its debts and those

of its instrumentalities, without offending the Constitution.  Moreover, in considering claims

brought under the Contracts Clause, courts must "reconcile the strictures of the Contract[s] Clause

with the essential attributes of sovereign power necessarily reserved by the States to safeguard the

welfare of their citizens."   United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v.

68

Fortuño, 633 F.3d 37, 41 (1st Cir. 2011).  In doing so, courts apply a two-pronged test: they examine first "whether the state law has . . . operated as a substantial impairment of a contractual relationship," and then, if the law has, "whether the impairment was reasonable and necessary to serve an important government purpose."  Id.  No party objecting to confirmation of the Plan has established that any impairment of their contractual rights would be "substantial" and, regardless, confirmation serves an important government purpose in light of the ongoing fiscal crisis in Puerto Rico.

141.    The Plan does not contain any provision violating the Takings Clause of the Constitution of the United States.  The proper analytical framework for addressing the Takings Clause is set forth in Penn Central Transportation v. City of New York, 438 U.S. 104, 124 (1978). See Patriot Portfolio v. Weinstein (In re Weinstein), 164 F.3d 677, 685 (1st Cir. 1999) (applying Penn Central analysis to constitutional challenge to lien avoidance pursuant to section 522(f) of the Bankruptcy Code).  Pursuant to that test, courts consider three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; and (3) the character of the governmental action."  Id.

142.    Considering the first factor, the Court notes the Plan will not result in the total destruction of the value of property interests.  Pursuant to the terms of the Plan, bondholders will receive substantial value in New GO Bonds, CVIs, and, in some cases, cash.  Furthermore, based upon the record before it, the Court finds that the resolution of substantial legal challenges to the structure underlying the existing bonds provides significant value to the bondholders.

143.    Second, although the proposed treatment of bondholders' claims may interfere with certain bondholders' subjective investment expectations, bondholders' reasonable expectations

must take account of the claims and potential claims that have been the subject of the substantial litigation that the Plan, which was negotiated with the assistance of the Mediation Team, proposes to resolve.  Cf. New Haven Inclusion Cases, 399 U.S. 392, 492 (1970) (noting that security holders "invested their capital in a public utility that does owe an obligation to the public [and thereby] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs") (quotation marks omitted).

144.    Third, the character of the governmental action strongly supports the Court's conclusion that the Plan does not result in an unconstitutional taking.  The proposals are not physical invasions of property by the government.  Rather, the restructuring of the relationships between the Debtors and their bondholders, using the powers established by Congress in PROMESA, is a quintessential example of a "public program adjusting the benefits and burdens of economic life to promote the common good."  Penn Cent. Transp. Co., 438 U.S. at 124.

145.    Furthermore, even if the restructuring proposed by the Plan results in a Fifth Amendment "taking" of bondholder property, the Court is satisfied that the value to be received by bondholders pursuant to the Plan constitutes just compensation.  Here, creditors will receive consideration that is discounted by settlements that recognize significant litigation risks, the allocation of distributions was determined via a long mediation and settlement process among sophisticated parties, and creditors have ratified the result by voting in favor of the Plan.  These characteristics of the settlements and the Plan and the circumstances under which they were developed provide sufficient proof that the consideration to be received by bondholders pursuant to the Plan constitutes just compensation within the meaning of the Takings Clause.  The objections to the Plan and Settlement Agreement based upon the Takings Clause of the United States Constitution are therefore overruled.

70

146.     Section 89.3 of the Plan provides: "As of the Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, all laws (or such portions thereof) of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, inconsistent with PROMESA, are held preempted.  Such preempted laws include, without limitation, laws enacted prior to June 30, 2016, that transfer, appropriate or require appropriations from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, and such laws shall not be enforceable to facilitate payment of such indebtedness, directly or indirectly, and shall not be enforceable if enforcement thereof would be inconsistent with any provision of PROMESA having continuing applicability and effectiveness. Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, those listed on Exhibit "K" hereto and (b) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on Exhibit "K" hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal."  Plan § 89.3.  Accordingly, laws that are inconsistent with PROMESA are preempted for the reasons, and to the extent, set forth in **Exhibit A** hereto.  Such preemption generally consists of: (i) pursuant to Section 4 of PROMESA, all laws, rules, and regulations, to the extent they give rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA are preempted by PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations; (ii) pursuant to Section 4 of PROMESA, to the extent not previously ruled preempted pursuant to an order of the Title III Court, all laws (or such portions thereof) of the Commonwealth, other than budgets certified by the Oversight Board, to the extent they are

71

inconsistent with PROMESA, are preempted; and (iii) laws enacted prior to June 30, 2016, to the extent they provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted and such laws shall not be enforceable for any purpose. Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, (i) those listed on <u>Exhibit K</u> to the Plan and <u>Exhibit C</u> to the Confirmation Order, and (ii) Sections 6 and 8 of Article VI of the Puerto Rico Constitution insofar as they could be applied to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant to the Plan, but not for any future purpose, and (b) all litigation in which any Government Party is a defendant over whether Commonwealth law listed on <u>Exhibit K</u> to the Plan or <u>Exhibit C</u> to the Confirmation Order is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.  For the avoidance of doubt, Act 80-2020, Act 81-2020, and Act 82-2020, each of which are listed on <u>Exhibit K</u> to the Plan and <u>Exhibit C</u> to the Confirmation Order, are preempted by PROMESA.

147.    Many of the preempted statutes generally would require the Commonwealth to use its revenues to repay its general obligation and guaranteed debt in full, and the amount of debt service necessary for fiscal year 2022 would be $1.7 billion.  (Malhotra Decl. ¶ 63).  These statutes are inconsistent with PROMESA, and would undermine the restructuring contemplated by the Plan and Puerto Rico's return to fiscal responsibility and access to capital markets.  (Jaresko Decl. ¶¶ 230–233).  Further, certain preempted statutes require the appropriation of Commonwealth revenues and would require more than $3 billion in Commonwealth revenues to be transferred in

fiscal year 2022. (Malhotra Decl. ¶ 64). In addition, certain preempted statutes require the Commonwealth to provide pension and other benefits or payments to retirees who participated in the ERS, TRS, or JRS retirement systems at statutorily specified rates; the amount of Commonwealth revenues that would need to be spent on TRS and JRS benefits or payments in fiscal year 2022 pursuant to these statutes would be $984 million. (Malhotra Decl. ¶ 65). Such statutes are inconsistent with PROMESA and would undermine the restructuring contemplated by the Plan and the Plan's contemplated repayment of claims from such revenues. (Jaresko Decl. ¶ 234). PROMESA's preemption of inconsistent Commonwealth Laws is settled. See, e.g., Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 916 F.3d 98, 116 (1st Cir. 2019) ("Under PROMESA's preemption provision, the grants of authority to the Board at §§ 201 and 202 to approve Fiscal Plans and Budgets 'prevail over *any* general or specific provisions of territory law' . . . .") (emphasis added) (citation omitted); Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 330 F. Supp. 3d 685, 701 (D.P.R. 2018) ("[A] budget approved and adopted by the Oversight Board as compliant with a certified fiscal plan becomes law . . . and inconsistent Commonwealth laws are preempted."), aff'd, 945 F.3d 3 (1st Cir. 2019).

148.   The Plan complies with PROMESA Section 314(b)(3).

**D. PROMESA § 314(b)(4):** *The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date.*

149.   Section 3.1 of the Plan states: "On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to

the claimant than as may be agreed upon by and between the holder thereof and the Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan."

150.    Consummation Costs, Restriction Fees, and Retail Support Fees will be paid in Cash on the Effective Date.  All other Allowed Administrative Expense Claims, if any, will likewise be paid pursuant to Section 3.1 of the Plan.

151.    The Plan complies with PROMESA Section 314(b)(4).

**E.  PROMESA § 314(b)(5):** *The Plan Has Obtained all Necessary Legislative, Regulatory, and Electoral Approvals.*

152.    The Plan has obtained all necessary legislative, regulatory, and electoral approvals. Further, by approving and certifying the Fiscal Plan, the Oversight Board provided approval for the issuance of securities contemplated by the Plan as required by PROMESA Section 207.  The debt authorization in Act 53 is conditioned only on the Plan's removal of the Monthly Benefit Modification that was provided for in the Seventh Amended Plan and does not require removal of the pension freezes or the elimination of COLAs from the Plan.  Act 53 (Debtors Exhibit 134), Arts. 104, 605.

**F.  PROMESA § 314(b)(6):** *The Plan Is Feasible and in the Best Interests of Creditors.*

74

153.    The Plan complies with PROMESA Section 314(b)(6) because it is feasible and in the best interests of creditors.

### i.    Feasibility

#### a.    The Plan is Feasible as to ERS

154.    The Plan is feasible with respect to ERS, as ERS no longer has pensions and other obligations to beneficiaries, which obligations were assumed by the Commonwealth upon the enactment of Act 106.  Pursuant to the Plan, ERS's assets are being sold and transferred to the Commonwealth in exchange for $373 million and the agreement to purchase the ERS Private Equity Portfolio for $70,750,000, subject to certain conditions.  ERS's obligations pursuant to the Plan include distributing the $373 million in cash received from the Commonwealth to the holders of Allowed ERS Bond Claims, as well as payments to holders of Allowed ERS General Unsecured Claims in a *de minimis* amount.  (Jaresko Decl. ¶ 98; Plan §§ 2.4, 69.2, 77.1(c)).

155.    Pursuant to the Plan, ERS will place the ERS Private Equity Portfolio in the ERS Trust, which will then be purchased by either the Commonwealth or holder(s) of Allowed ERS Bond Claims on or before April 25, 2023 for no less than $70,750,000, which funds will be distributed to holders of Allowed ERS Bond Claims.  (Jaresko Decl. ¶ 99; Plan §§ 2.4, 69.2, 77.1(c)).  Further, on the Effective Date, each holder of an ERS General Unsecured Claim will receive such holder's Pro Rata Share of the ERS GUC Pool, which is comprised of $500,000 plus the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests, capped at $5 million.  Plan §§ 70.1, 1.223.  ERS will dissolve after the Effective Date of the Plan and all remaining assets of ERS will be deemed sold and transferred to the Commonwealth.  (Jaresko Decl. ¶ 99; Plan § 88.2).  Any excess amount in the ERS GUC Pool will be reallocated, on a pro rata basis, to holders of Allowed CW General Unsecured Claims.  Plan

75

§ 1.223.  ERS will therefore have no material obligations after the Effective Date.  (Jaresko Decl. ¶ 99).  Accordingly, the Plan is feasible with respect to ERS and is not likely to result in the need for a further restructuring of ERS.

### b.  The Plan is Feasible as to PBA

156.    The Plan is feasible with respect to PBA, as PBA holds sufficient cash to pay its obligations to all of its creditors pursuant to the Plan, including any Allowed Claims on account of loans made by GDB to PBA.  Holders of PBA Bond Claims will receive their Pro Rata Share of the Vintage PBA Bond Recovery, 2011 PBA Bond Recovery, or 2012 PBA Bond Recovery, as applicable, in the aggregate amount of approximately $1.1 billion to be paid by the Commonwealth.  Plan Arts. VI–XV.  Holders of Claims in Classes 12 (PBA/DRA Secured Claims), 13 (PBA General Unsecured Claims), and 14 (PBA/DRA Unsecured Claims) will each receive Cash in an amount equal to ten percent (10%) of such Claims.  Plan Arts. XVI–XVIII.

157.    Further, each of the Unexpired Leases to which PBA is a party (collectively, the "PBA Leases") will be deemed rejected upon the earliest to occur of (a) June 30, 2022, (b) the date upon which such PBA Lease expires in accordance with its terms, (c) the date upon which PBA enters into a new or amended lease with respect to the leased property subject to such PBA Lease, (d) such other date as PBA, as lessor, provides written notice to the counterparty to a PBA Lease, and (e) the date upon which AAFAF provides written notice to PBA that such PBA Lease is rejected; provided, however, during the period from the Effective Date up to the date of such rejection, with respect to any PBA Lease between PBA as lessor and the Commonwealth or any Commonwealth agency, public corporation, or instrumentality, as lessee, monthly lease payments shall be limited to the lower of (y) the amount budgeted and approved pursuant to a certified fiscal plan and (z) the monthly costs and expenses associated with the applicable leased property; and

provided, further, any accruals on the books of PBA or any of the Commonwealth or an agency, public corporation, or instrumentality of the Commonwealth as counterparty to a PBA Lease for the unpaid debt service component of rent under any PBA Lease shall be deemed released, settled, and discharged as of the rejection date.  The treatment of PBA Leases has been consented to by the Oversight Board, on behalf of the Debtors, and AAFAF, on behalf of the agencies, instrumentalities, and public corporations.

158.    Accordingly, the Plan is feasible with respect to PBA and is not likely to result in the need for a further restructuring of PBA.

### c.   The Plan is Feasible as to the Commonwealth

159.    The Plan is feasible with respect to the Commonwealth.  The Plan provides for the following types of payments: (1) cash on the Effective Date, (2) new debt issued by the Commonwealth in the form of New GO Bonds, and (3) CVIs.  (Zelin Decl. ¶ 47; Malhotra Decl. ¶ 9).  In addition, the Plan contemplates payments to retirees of pensions and other benefits in reduced amounts, without adjustment for any Monthly Benefit Modification, as well as additional payments to Commonwealth employees.  (Malhotra Decl. ¶ 9).

160.    The Plan provides for the payment of Cash on the Effective Date and over time, in the aggregate amount of approximately $8 billion, plus up to $801 million in consummation costs, restriction fees, and retail support fees.  (See Malhotra Decl. ¶ 10; Zelin Decl. ¶¶ 48, 86).

161.    The Plan provides the Reorganized Commonwealth will issue New GO Bonds on the Effective Date with different maturity dates, having an aggregate original principal amount of $7,414,063,543.25.  (Malhotra Decl. ¶ 11; Zelin Decl. ¶ 49; Plan Art. LXXIV).  All holders of general obligation debt and general obligation guaranteed debt will receive New GO Bonds having thirteen (13) CUSIP numbers, which distribution was calculated to provide each holder with

incremental value of 2.25% of their par claims, which increment exceeds any liquidity charge by approximately 1.75% of their par claims.  See Nov. 12, 2021 Hrg. Tr. 108:15–111:1.  Minimizing the number of CUSIPs would not be in the interest of bondholders; rather, the issuance pursuant to the Plan of thirteen (13) CUSIPs to each bondholder provides each holder with as significant a recovery as possible within the boundaries of the municipal bond market and the need to keep annual debt service sustainable, and a significantly greater total amount of value.  See Nov. 12, 2021 Hrg. Tr. 105:11–106:4; 108:18–111:4.  The aggregate amount owed, including all principal and interest over the life of the New GO Bonds from the Deemed Issuance Date of July 1, 2021 to the maturity of the final New GO Bond on July 1, 2046, is $10,914,969,303.20.  (Malhotra Decl. ¶ 12; Zelin Decl. ¶ 49).  The Plan provides for a Debt Service Fund to be established.  The Plan provides that, on the Effective Date, the Reorganized Commonwealth shall deposit into the Debt Service Fund the amounts necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.  Plan § 74.1(f).  On the first business day of each month after the Effective Date until the obligations of the applicable New GO Bonds are satisfied, the Commonwealth will deposit the portion of principal and accrued interest for that month into the Debt Service Fund. (Malhotra Decl. ¶ 16; Plan § 74.1(f)).

162.    The Plan provides for the issuance of (i) GO CVIs in the aggregate original notional amount of $3.5 billion, having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and (ii) Clawback CVIs in the aggregate original notional amount of $5.239 billion, having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051.  (Malhotra Decl. ¶ 19; Zelin Decl. ¶ 54; Plan § 74.2).  The Commonwealth's obligation to pay under the CVIs arises only if certain outperformance conditions specified in the Plan and the CVI indentures occur.  Specifically, the Plan provides for the establishment of threshold

metrics based on tax revenue projections contained in certified fiscal plans.  Only if actual revenues exceed the established threshold at the end of a given fiscal year will an obligation to pay come into being, subject to certain caps.  (Malhotra Decl. ¶ 20; Zelin Decl. ¶ 55; Plan Ex. J).  Further, payments on the CVIs are triggered only when both cumulative and annual outperformance occurs, which protects the Commonwealth from making substantial CVI payouts when it experiences one year of outperformance after experiencing several years of underperformance.  (Malhotra Decl. ¶¶ 35–37; Zelin Decl. ¶¶ 60–65).

163.    In addition, the Plan provides for (i) payments of pension and other post-employment benefits to retired Commonwealth employees, without adjustment for any Monthly Benefit Modification, (ii) the restoration of contributions made by Commonwealth employees to the System 2000 program, and (iii) payments to the Pension Reserve Trust.  (Malhotra Decl. ¶ 21; Plan Art. LV).  Participants in System 2000 will not be subject to benefit reductions, but instead will receive the amount of their contributions to System 2000 from its enactment until June 30, 2017.  (Plan § 55.1).  The aggregate sum of such contributions plus interest accrued thereon is approximately $1.2 billion.  (Malhotra Decl. ¶ 23).  The Pension Reserve Trust will receive an initial contribution of $5 million on the Effective Date and, for the next ten (10) fiscal years, the Commonwealth will make a contribution in an amount equal to (1) the Base Contribution, $175 million or, for any fiscal year in which the projected Fiscal Plan Surplus set forth in the Fiscal Plan is equal to or greater than $1.75 billion, an amount equal to fifty percent (50%) of that amount, plus (2) an additional amount calculated as (i) the lower of the actual primary surplus for such fiscal year and the projected Fiscal Plan surplus for such fiscal year, minus (ii) the sum of the Base Contribution, plus the Commonwealth's debt service obligations pursuant to the Plan for such fiscal year, plus $200 million.  (Plan Art. LXXXIII; Malhotra Decl. ¶ 24; Malhotra Sup. Decl.

79

¶¶ 12–13; Jaresko Sup. Decl. ¶¶ 10–11; Santambrogio Sup. Decl. ¶¶ 8–9).  The Commonwealth's contributions to the Pension Reserve Trust are estimated to total approximately $2.4 billion during the ten years of funding based on the Fiscal Plan, all of which will be paid during the time period in which the Fiscal Plan projects surpluses.  The Pension Reserve Trust is projected to have a balance of $3.1 billion through the end of fiscal year 2031 based on the Fiscal Plan.  (Malhotra Sup. Decl. ¶ 14; Santambrogio Sup. Decl. ¶ 10).  Further, the Pension Reserve Trust will be professionally and independently managed to insulate the funding available to pay pensions from political or economic influences.  (Malhotra Decl. ¶ 34).

164.    The Seventh Amended Plan contained a Monthly Benefit Modification pursuant to which reductions to monthly pension payments would be made.  The New GO Bond Legislation and CVI Legislation, Act 53, is conditioned on the removal of the Monthly Benefit Modification from the Plan, and so the Plan no longer contains a Monthly Benefit Modification consistent with Act 53.  (See Plan Art. LV).  The Plan nevertheless remains feasible, provided there are no other modifications to the Plan involving pensions.   The elimination of the Monthly Benefit Modification is estimated to add an average of approximately $87 million annually to the cost of the Commonwealth's PayGo obligations for the first ten years, which represents less than five percent (5%) of the Commonwealth's estimated PayGo expenses for this period, and less than one percent (1%) of the Commonwealth's overall budget for this period.  The additional cost will be payable from the surpluses projected in the Fiscal Plan during this period.  Over the thirty-year period of Fiscal Plan projections, the aggregate cost of eliminating the Monthly Benefit Modification is approximately $1.9 billion.  (Malhotra Sup. Decl. ¶ 9, Ex. 1; Levy Sup. Decl. ¶ 10; Jaresko Sup. Decl. ¶ 8).  The elimination of the Monthly Benefit Modification does not materially impact feasibility of the Plan.  (Malhotra Sup. Decl. ¶ 10; Jaresko Sup. Decl. ¶ 8–12).

165.     If the Plan were modified to (i) eliminate the freeze of JRS and TRS pension benefit accruals and (ii) retain any future pension benefit cost of living adjustments, the Plan would be at risk of not being feasible.  (Malhotra Sup. Decl. ¶ 8; Jaresko Sup. Decl. ¶ 13).  Specifically, the PayGo impact of eliminating the pension freeze and reinstating COLAs relative to the Fiscal Plan is estimated to be approximately $5.6 billion over thirty (30) years, or approximately $4.7 billion after taking into account social security costs.  (Levy Sup. Decl. ¶ 14).  By 2047, the incremental PayGo cost associated with eliminating the pension freeze and maintaining COLAs is estimated to increase the annual PayGo obligation by twenty-five percent (25%).  Unlike the elimination of the Monthly Benefit Modification, the incremental cost of which decreases as the Commonwealth approaches the deficits projected by the Fiscal Plan, the incremental costs associated with eliminating the pension freeze and reinstating any COLAs are projected to grow larger as the Commonwealth approaches the deficits projected by the Fiscal Plan, thus running the risk that the Plan may not be feasible.  (Malhotra Sup. Decl. ¶¶ 17–18; Levy Sup. Decl. ¶¶ 9–17).  Absent the Pension Freeze, TRS and JRS pension liabilities will continue to increase relative to the Fiscal Plan.  Eliminating the pension freeze creates an open-ended incremental defined benefit liability because TRS and JRS participants would continue to accrue new benefits for as long as they continue to work for the Commonwealth.  (Malhotra Sup. Decl. ¶ 18).  Moreover, not implementing the pension freeze and the reinstatement of COLAs would increase the likelihood of needing to rely on the Pension Reserve Trust for payment of the Commonwealth's PayGo obligations, and increase the risk of completely exhausting the Pension Reserve Trust during the Fiscal Plan projection period.  (Malhotra Sup. Decl. ¶ 18; Levy Sup. Decl. ¶ 16).

166.     Section 83.4 of the Plan ensures pension-related provisions contained in the Plan will not be undone such that pension payments become unaffordable, and provides: "Before the

81

tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature of the Commonwealth of Puerto Rico, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans that ended up creating nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan." Plan § 83.4. This prohibition on new defined benefits for a ten (10) year period is enforceable and essential to the Plan's continued feasibility. See Nov. 15, 2021 Hrg. Tr. 181:16–182:14; see also Malhotra Sup. Decl. ¶ 20 (explaining the costs of pension-related laws proposed by the Government would increase the risk the Plan will not be feasible).

82

167.     The Plan also provides for additional payments to be made to current employees who are members of certain public employee unions affiliated with AFSCME and non-union rank and file employees.   Pursuant to the Plan, the Commonwealth's monthly contribution for healthcare benefits to Commonwealth employees who are members of AFSCME-affiliated unions will increase from $125 per employee per month to $170 per employee per month.  (Santambrogio Decl. ¶ 31).   In addition, the Plan provides for $500 signing bonuses to each member of an AFSCME-affiliated union and, if the Commonwealth has an excess cash surplus after CVI payments that is greater than $100 million, 25% of that surplus will be allocated to a bonus pool for the benefit of members of the AFSCME-affiliated unions and other non-union rank and file employees.  (Plan Art. LVI; Malhotra Decl. ¶ 25–26, 29; Santambrogio Decl. ¶¶ 22–23).   Subject to a minimum cash bonus of $2,000 per year per AFSCME-represented employee for the five-year term of the amended collective bargaining agreement, such employees only receive the cash surplus bonuses if the government outperforms the Fiscal Plan, so employees are incentivized to ensure the government is operating efficiently.  (Nov. 10, 2021 Hrg. Tr. 62:25–63:4; Santambrogio Sup. Decl. ¶ 11).

168.     The Plan also provides the Debtors shall transfer ACR-eligible claims pursuant to the ACR Order, which claims shall be reconciled and paid in the ordinary course of business.  The Commonwealth has reserved $229 million for payment of such claims.  (Plan § 82.7; Malhotra Decl. ¶ 27, 29).

169.     Further, the Plan provides ERS Bondholders a right to receive a future payment of $70.75 million from the purchase of the ERS Private Equity Portfolio.  (Plan § 69.2; Malhotra Decl. ¶ 27, 29).

170.    The Plan, including each of these provisions, is feasible with respect to the Commonwealth.  (Malhotra Decl. ¶ 29).  Confirmation of the Plan is not likely to be followed by the need for further financial reorganization not contemplated in the Plan, and will enable the Commonwealth to provide future public services and remain a viable public entity.  That is true notwithstanding the fact that, based on the 2021 Fiscal Plan (Debtors Exhibit 10) projections, deficits after debt service are projected to reemerge in approximately FY 2035.  (Id.).  By the time deficits are projected to emerge, the amount of Commonwealth general obligation debt outstanding will only be $2.1 billion, as compared to pre-petition debt liabilities of $30.5 billion.   The Commonwealth will not likely need further reorganization notwithstanding projected deficits due to a number of factors, including the following: (i) the Plan reduces the Commonwealth's overall debt; (ii) the Plan includes multiple provisions designed to insulate the Commonwealth from downside risks; (iii) the Commonwealth can implement certain reforms the Oversight Board identified that could result in additional liquidity, which could eliminate the projected deficit; and (iv) the Plan does not take into account potential upside factors which, if they materialize, would result in additional liquidity.  (See Malhotra Decl. ¶ 29).

171.    Further, the Plan significantly reduces the Debtors' debt.  After confirmation, the Commonwealth's general obligation and guaranteed debt will be approximately $7.4 billion, considerably lower than $30.5 billion pre-restructuring, and all ERS and PBA debt will be eliminated.  (Malhotra Decl. ¶ 31; Jaresko Decl. ¶¶ 98–100).  Prior to the commencement of the Title III Cases, annual Commonwealth debt service was approximately $2.1 billion, and post-Effective Date, the Commonwealth's average annual debt service during the first ten years will be approximately $666 million.  (Malhotra Decl. ¶ 30–31).  Over 50% of the newly issued debt under the Plan will have amortized within 10 years of its issuance date.  Debt levels will continuously

decline and remain low until full repayment of the Commonwealth's general obligation and guaranteed debt, which is projected to occur in fiscal year 2046. Thereafter, the only commitments that will remain outstanding will be the CVIs and COFINA debt. The CVIs are paid only if specific revenues outperform projections, and COFINA debt is serviced via a pledged portion of sales and use tax. (Malhotra Decl. ¶ 32). The Commonwealth will have the ability to pay debt service pursuant to the Plan through at least 2034. (Wolfe Decl. Ex. A, ¶ 12).

172. In addition, several Plan provisions—the Pension Reserve Trust, the CVI structures, the Debt Management Policy, and the Comprehensive Cap—mitigate the impact of potential financial underperformance and the effects of projected deficits. (See Malhotra Decl. ¶ 33–40). The Commonwealth will also establish an emergency reserve and a certain level of unrestricted cash, and the Oversight Board has agreed to fund a temporary disaster aid revolving line of credit, which mitigate against potential downside risks. (Malhotra Decl. ¶¶ 49–51; Chepenik Decl. ¶¶ 9, 28, 30, 36, 38). The Commonwealth will retain an unrestricted cash balance of $1 billion to help maintain uninterrupted government operations when unforeseen fiscal challenges emerge. (Malhotra Decl. ¶ 49; Chepenik Decl. ¶ 28; Nov. 12, 2021 Hrg. Tr. 50:21–51:5). The emergency fund will be funded with $130 million annually for a period of ten years, until the reserve balance reaches $1.3 billion, or 2% of Gross National Product, in line with International Monetary Fund guidance. (Malhotra Decl. ¶ 51; Chepenik Decl. ¶ 38).

173. The Plan also is not dependent on new borrowings that would impede the Debtors' ability to achieve compliance with the Fiscal Plan. The Fiscal Plan (Debtors Exhibit 10) does not show a need for incremental borrowing, and therefore the Plan's borrowing restrictions will not impede the Commonwealth's ability to implement the Fiscal Plan. (Murray Decl. Ex. A ¶¶ 99–102). The Plan will leave the Debtors with a level of cash consistent with the cash necessary to

implement the undertakings referenced in the Fiscal Plan.  (Murray Decl. Ex. A ¶ 65).  In addition, the Plan requires a comprehensive cap on net tax-supported debt equal to 7.94% of debt policy revenues, and the expected level of net tax supported debt service is projected to be 7.6% of debt policy revenues.  (Murray Decl. Ex. A ¶¶ 100–101; Plan § 74.4).

174.    The Commonwealth has sufficient resources to pay debt service pursuant to the Plan until 2034, through annual surpluses.  (Wolfe Decl. Ex. A, ¶ 12).  Additional options for payment of debt service will become available in later years because the Commonwealth can implement structural reforms to increase the Commonwealth's resources and create surpluses. (Wolfe Decl. ¶¶ 13, 15–27).  Proactively implementing structural reforms would create a stream of fiscal surpluses sufficient to cover the Commonwealth's debt service obligations pursuant to the Plan and could build cumulative surpluses not incorporated into the Fiscal Plan totaling $32.4 billion for fiscal years 2022 through 2046, well above the cumulative debt service over that same period of $10.9 billion.  (Wolfe Decl. Ex. A ¶¶ 13, 27).  There are additional potential upside factors not incorporated into the Plan which, if they occur, will produce additional revenues.  These factors include a potential increase in Medicaid, and potential provision of Social Security Income to Puerto Rico residents that could increase economic activity.  (See Malhotra Decl. ¶¶ 44–48).

175.    Accordingly, the Plan is feasible with respect to the Commonwealth and is not likely to result in the need for a further restructuring of the Commonwealth.

### ii.    Best Interests Test

176.    As in chapter 9 of the Bankruptcy Code, PROMESA's "best interests" test differs substantially from the chapter 11 "best interests" requirement.  In chapter 11, the test requires a court to determine whether an individual creditor would receive more if the chapter 11 debtor were to liquidate its assets.  In contrast, the chapter 9 test is not a liquidation test (since municipalities

cannot be liquidated) and is focused on the *collective* recovery of creditors in the aggregate.  Cf. In re City of Detroit, Mich., 524 B.R. 147, 212–13 (Bankr. E.D. Mich. 2014) (comparing the "best interests" tests in chapter 9 and chapter 11 of the Bankruptcy Code); see also Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, Case No. 17-3284-LTS, Docket Entry No. 560 at ¶ 147.  The PROMESA best interests test additionally modifies the chapter 9 best interests test, requiring only the Court "to *consider*" "whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by [the] plan."[15]  PROMESA § 314(b)(6) (emphasis added).  Thus, the PROMESA best interests test does not impose a litmus test or establish a floor for creditor recoveries.  See id.

177.    Accordingly, PROMESA's best interests test requires the Court only to *consider* whether creditors of each Debtor *in the aggregate* receive an equal or greater recovery on their Claims pursuant to the Plan than they would outside of Title III if the Debtor's Title III case was dismissed and creditors exercised their remedies.  An analysis of creditor recoveries in such hypothetical circumstances requires application of a number of assumptions, including (i) estimates of the resources that would be available for debt service, which requires an assessment of available cash, revenues, and operating expenses in the absence of a confirmed plan of adjustment; (ii) the outstanding creditor obligations due and payable that would exist outside of Title III; and (iii) the priority in which creditor claims would be paid outside of Title III, which in

---

[15]  Notably, Section 314(b)(6) speaks in terms of a single "recovery" for "creditors" (plural).  PROMESA § 314(b)(6).

certain circumstances requires consideration of assumptions regarding the potential outcome of litigation matters. (Shah Decl. ¶ 8).

178.    The recoveries for claimholders of each Debtor pursuant to the Plan, in the aggregate, are within the range or greater than the range of the projected recoveries for such claimholders in the aggregate if the Title III Cases were dismissed for each of the Debtors, as demonstrated by the best interest test reports attached to the Shah Declaration as Exhibits A, B, and C. (Shah Decl. ¶ 35, Exs. A, B, and C; Debtors Exhibits 130, 131). Additionally, the recovery pursuant to the Plan for holders of GO Bonds is within the range of the projected recoveries for such claimholders pursuant to the Oversight Board's best interest test analysis if the Commonwealth's Title III case was dismissed, assuming all GO Bonds were validly issued. (Compare Shah Decl. ¶ 45; Shah Decl. Ex. 7 to Ex. A).

179.    In the aggregate, excluding the payment of Restriction Fees or Consummation Costs (which are not being paid on account of Claims), and excluding Federal Claims, there is an estimated $22.8 billion in Claims asserted against the Commonwealth, which are projected to receive $15.7 billion pursuant to the Plan, for an aggregate recovery for all claimholders of 69%, exclusive of any payments to be made with respect to CVIs or payments from the Avoidance Actions Trust. (Shah Decl. ¶ 48). This compares favorably to the projected range of recoveries pursuant to the Oversight Board's best interest test analysis if the Commonwealth's Title III case is dismissed: $9.3–15.3 billion (34%–62%). (Shah Decl. ¶ 35). Realized Commonwealth creditor recoveries could be even higher pursuant to the Plan, as the 69% estimated recovery excludes any additional recoveries available on account of payments from the Avoidance Action Trust or CVIs. (Shah Decl. ¶ 48).

180.     Pursuant to the Plan, exclusive of the payment of the ERS Restriction Fee (which is not being paid on account of Claims), ERS Bondholders are projected to receive a recovery of approximately $444 million on $3.169 billion of Claims, and ERS General Unsecured Claims are projected to receive a recovery of 100% on approximately $300,000 of Claims, for an implied aggregate recovery of 14%.  (Shah Decl. ¶ 54).  This is within the range of projected recoveries pursuant to the Oversight Board's best interest test analysis if ERS's Title III case is dismissed: $0.2–3.7 billion (5%–100%).  (Shah Decl. ¶ 35).[16]

181.     Pursuant to the Plan, PBA Bondholders are projected to receive a recovery of $1.1 billion against PBA.  The Plan provides that the PBA/DRA Secured Claim, PBA General Unsecured Claims, and PBA/DRA Unsecured Claims, will receive recoveries of approximately $6.6 million, $41.0 million, and $13.4 million, respectively.  Accordingly, holders of Claims against PBA are projected to receive an implied aggregate recovery of $1.1 billion, or 21%.  (Shah Decl. ¶ 59).  This compares favorably to the projected recoveries pursuant to the Oversight Board's best interest test analysis if PBA's Title III case is dismissed: $0.3 billion (5%).  (Shah Decl. ¶ 35).

182.     Accordingly, for each Debtor, creditors in the aggregate will receive a percentage recovery on their Claims pursuant to the Plan that is within the range or greater than projected recoveries outside of Title III.  (Shah Decl. ¶ 13).

---

[16]   While it is theoretically possible there would be a 100% recovery on ERS Claims outside of Title III, that result is very unlikely because it would require a court to rule ERS Bondholders hold liens on PayGo payments.  Notably, the First Circuit has already determined the ERS Bondholders' collateral, which consists of statutory employer contributions to ERS, was subject to material impairment by legislative action, stating: "Importantly, the Bond Resolution explicitly states that the legislature of the Commonwealth might reduce (or, by implication, eliminate) Employers' Contributions, and so 'adversely affect' the Bondholders."  In re Financial Oversight and Management Board for Puerto Rico, 948 F.3d 457, 468–69 (1st Cir. 2020).

183.   These results are unsurprising.   Absent a mechanism to restructure the Debtors' outstanding debt and pension liabilities, the Commonwealth would face great uncertainty, financial and political instability, and significant lawsuits.   In such environment the Government will face significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms.   Without the benefit of the uptick in growth from these reforms, overall economic growth and tax revenue will be lower, reducing the amounts available to pay all creditors.   (Shah Decl. ¶ 12).   Outside of Title III and without a confirmed plan of adjustment, creditors would race to the courthouse to recover on their claims.   "Clearly, such a result is chaos . . . ."  6 Collier on Bankruptcy § 943.03 (16th ed. 2021).

184.   Accordingly, the Court finds that the Plan is in the best interests of creditors within the meaning of Section 314(b)(6) of PROMESA.

**G. PROMESA § 314(b)(7):** *Fiscal Plan Consistency.*

185.   Section 314(b)(7) of PROMESA requires that the Plan merely be consistent with the applicable certified fiscal plan, not identical.   (Jaresko Decl. ¶ 103; Murray Decl. Ex. A ¶ 62). The Plan is consistent in all respects with the Fiscal Plan.—nothing contained in the Plan would violate or otherwise interfere with the Fiscal Plan.   (Jaresko Decl. ¶ 103; Debtors Exhibit 10).

186.   The Fiscal Plan provides a blueprint for the Commonwealth to achieve, among other things, fiscal responsibility and access to capital markets, and contains a debt sustainability analysis ("DSA"), which creates a range established by the Oversight Board as the amount of debt and long-term capacity of the Government to pay debt service on its debt.   (Zelin Decl. ¶ 57; Malhotra Decl. ¶¶ 55–56; Debtors Exhibit 10).   The aggregate principal and total debt service of the New GO Bonds falls within the bounds of the debt range implied by the DSA.   (Zelin Decl. ¶ 57; Malohtra Decl. ¶¶ 58–59, 61).   The cash payments due on the Effective Date do not count as

90

debt for purposes of the DSA because the cash payments do not create a debt obligation after the Effective Date.  (Malhotra Decl. ¶ 60).  Any cash payments under the CVIs do not count as debt for purposes of the DSA because the CVIs are only payable out of outperformance.  (Id.)  The CVI payments are contingent in nature and are, by definition, paid from excess cash available relative to baseline Fiscal Plan projections.  (Zelin Decl. ¶ 58; Malhotra Decl. ¶ 60).  The debt levels under the Plan are consistent with the debt levels set forth in the Fiscal Plan, and the debt proposed to be issued pursuant to the Plan is consistent with the DSA.  (Skeel Decl. ¶ 52; Murray Decl. Ex. A ¶¶ 72, 78; Malhotra Decl. ¶ 61).

187.    The Plan is also consistent with the Fiscal Plan because it includes the freeze of accruing pension benefits and elimination of all COLAs under Act 91-2004, amended by 160-2013 for TRS, and under Act 12-1954, amended by 162-2013, for JRS.  Unlike the elimination of the Monthly Benefit Modification, if the Plan were modified to remove the (i) pension freeze and (ii) the elimination of COLAs, the Plan would not be consistent with the Fiscal Plan which requires the pension freeze and the elimination of COLAs.  (Jaresko Sup. Decl. ¶ 13; Debtors Exhibit 10).  Failure to include the pension freeze and elimination of future COLAs in any plan would cause it to be materially inconsistent with the Fiscal Plan, and even if confirmed would result in significant additional, and unpredictable, costs to the Commonwealth and will require spending inconsistent with the Fiscal Plan in amounts that will increase during the period that deficits projected in the Fiscal Plan will also increase.  (Jaresko Sup. Decl. ¶ 13; Debtors Exhibit 10).  Moreover, costs of removing the pension freeze and elimination of COLAs would increase over time and grow larger during periods in which deficits are projected by the Fiscal Plan.  (Jaresko Sup. Decl. ¶¶ 8, 13; Malhotra Sup. Decl. ¶ 17).

188.    If Act 53 were interpreted to require the removal of the freeze and COLA elimination, and the Plan were modified to implement such changes, such Plan would not be consistent with the Fiscal Plan.  (Jaresko Sup. Decl. ¶ 13).  The Court's conclusion that the Plan is consistent with the Fiscal Plan is dependent on, among other things, the pension freeze and elimination of COLAs being in the Plan.

189.    The Plan remains consistent with the Fiscal Plan notwithstanding the elimination of the Monthly Benefit Modification.  The Fiscal Plan contemplates the possibility that pensioners would be restored to the full amount of their accrued pension benefits under certain circumstances.  (Fiscal Plan, Debtors Exhibit 10 at 279).  Unlike the costs of removing the pension freeze and elimination of COLAs, the majority of the costs associated with removal of the Monthly Benefit Modification will be incurred during periods of budget surplus.  (Jaresko Sup. Decl. ¶ 12; Santambrogio Sup. Decl. ¶ 10; Malhotra Sup. Decl. ¶ 9; Fiscal Plan, Debtors Exhibit 10 at 59).

190.    The Fiscal Plan explicitly provides for the establishment of the Pension Reserve Trust to ensure future pension benefits will be supported regardless of the future economic or political circumstances of the Commonwealth.  (Jaresko Decl. ¶ 103).  To ensure adequate funding to cover the increased costs resulting from the elimination of the Monthly Benefit Modification, additional funds will be set aside in the Pension Reserve Trust during years in which the Fiscal Plan projects a surplus.  (Jaresko Sup. Decl. ¶¶ 9).  An increase to the funding amounts for the Pension Reserve Trust using a surplus-based funding mechanism does not render the Plan inconsistent with the Fiscal Plan because such increased funding levels come out of projected surpluses and do not impose additional obligations on the Commonwealth that would interfere with carrying out the Fiscal Plan.  (See Jaresko Decl. ¶ 103; Jaresko Sup. Decl. ¶¶ 9–12).

191.     In addition, the Plan modifies the Seventh Amended Plan to provide that the Upside Participation Bonus pursuant to the AFSCME Plan Support Agreement (Debtors Exhibit 21) will be a minimum of $2,000 for each AFSCME-represented employee during the five-year term of the new AFSCME collective bargaining agreement.  The additional cost of this modification is only an incremental cost of approximately $18.35 million per year for the five years beginning in fiscal year 2022 as compared to the Upside Participation Bonus contemplated in the Seventh Amended Plan.  (Santambrogio Sup. Decl. ¶ 11).

192.     Accordingly, the Plan complies with PROMESA Section 314(b)(7).

**H. Bankruptcy Rule 3019:**  *The Plan Does Not Adversely Change the Treatment of Claims of Creditors.*

193.     Subsequent to the Voting Deadline passed, the Oversight Board filed the Eighth Amended Plan.  The Eighth Amended Plan eliminated the Monthly Benefit Modification that was contained in the Seventh Amended Plan and otherwise contains minor revisions to address concerns raised by certain parties.  None of the modifications adversely changes the treatment of the Claims of any Creditor that accepted the Seventh Amended Plan.  To the contrary, the Plan was amended to enhance treatment of the pension Claims in Classes 51A through 51I, 51K, and 51L through the removal of the Monthly Benefit Modification.  (See Malhotra Sup. Decl. ¶ 9). Treatment of Claims in other Classes is not impacted in any way by this change.

194.     In addition, following the Voting Deadline passed, the Oversight Board filed the First Modified Eighth Amended Plan, which separately classified the GDB/PET Claim in Class 58A.  (See First Modified Eighth Amended Plan, Art. LXII). The GDB/PET Claim was previously classified as a CW General Unsecured Claim in Class 58.  Pursuant to Section 62.4 of the Plan, the holder of the GDB/PET Claim will receive "payments from the Commonwealth equal to, and on the same timeframe, as the pro rata payments to be made to holders of Allowed CW General

93

Unsecured Claims pursuant to the terms and provisions [governing treatment of CW General Unsecured Claims]," see Plan § 62.4, but is not intended, nor shall it be construed, as a CW General Unsecured Claim pursuant to the Plan.  The GDB/PET Claim is treated in the same manner as it would have been treated pursuant to the Seventh Amended Plan.  See id.  Accordingly, this modification does not adversely change the treatment of the Claims of any Creditor that accepted the Seventh Amended Plan.

195.    The Oversight Board subsequently filed the Plan, which contains additional technical changes not impacting the treatment of any Claims.

196.    The modifications do not materially or adversely modify the treatment to be afforded to creditors pursuant to the Plan and do not require the resolicitation of acceptance or rejections thereto.  Accordingly, the Plan can be confirmed without the filing of a new disclosure statement and resolicitation with respect to the Plan.  See Bankruptcy Rule 3019.

## I.  Nullification of Laws Conditioning Debt Authorization on Elimination of Freeze of Accruing Pension Benefits and Cost of Living Adjustments.

197.    All parties in interest, including, without limitation, the Governor and the Legislature, know the Plan's consistency with the Fiscal Plan, feasibility, and implementation are each dependent on the freezes in the accruals of future pension benefits under TRS and JRS and elimination of cost of living adjustments.  All objections that suggest Act 53 or any other law causes the new debt issued under the Plan to be unauthorized by Act 53 due to the freezes in the accruals of future pension benefits under TRS and JRS and elimination of cost of living adjustments have been overruled as set forth in the Confirmation Order.  To the extent any law is interpreted to mean such freezes and eliminations cause the new debt issuable under the Plan to be unauthorized, Act 53 and such other laws, if any, may not be enforced pursuant to PROMESA Section 108 to the limited extent of eliminating such impact on the debt's authorization.  Act 53

94

does not provide such freezes and eliminations cause the new debt issuable under the Plan to be unauthorized and notice of the request for such determination was adequately provided to all former and present governmental employees.

### The Releases, Exculpations, and Injunctions Pursuant to the Plan

198.   The Plan includes certain discharge, release, exculpation, and injunction provisions, which provisions are essential to the Debtors' restructuring, and without which a consensual restructuring could not be successfully accomplished.  (Jaresko Decl. ¶ 217; Zelin Decl. ¶ 95).

199.   A critical element of the Plan is the complete resolution of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case.  To achieve this, the Debtors and claimholders agreed to a mutual release of all Claims and Causes of Action arising, in whole or in part, prior to the Effective Date.  (Jaresko Decl. ¶ 218).  The Debtors' releases incentivized claimholders to support, and undertake actions to support, the Plan and its confirmation, without fear of lawsuits in the future.  Certain creditors would not have supported the Plan absent its release provisions. (Jaresko Decl. ¶ 219; Zelin Decl. ¶ 100).  Further, the releases of claims by the Debtors impact only those parties that made a significant contribution to the negotiation and development of the Plan and incurred cost and expense during their essential participation in negotiations. (Jaresko Decl. ¶ 221; Zelin Decl. ¶¶ 102, 106).  The Plan's discharges and releases likewise provide the Debtors and Reorganized Debtors with assurance that the restructuring balance struck by the Plan will not be upset by further claims against the Reorganized Debtors after the Effective Date.  (Jaresko Decl. ¶ 220; Zelin Decl. ¶ 106).

**A. Releases**

200.    The Plan's release provisions include, among other provisions, subject to certain exclusions as set forth in the Plan: (i) a release by the GO/PBA PSA Creditors (solely in their capacity as Creditors of the Debtors), which includes the Monolines, against certain government parties, including the Oversight Board, AAFAF, and the Debtors, of certain Claims and Causes of Action arising prior to the Plan Effective Date, including the Revenue Bond Claims litigation and the Lift Stay Motions, and (ii) a release by the Debtors and Reorganized Debtors of Claims and Causes of Action related to the Debtors and their assets in the Title III Cases.  (Zelin Decl. ¶ 96).

201.    The Plan's release of Claims or Causes of Action by the GO/PBA PSA Creditors against the Oversight Board, its committees and subcommittees, AAFAF, and the Debtors, of certain Claims and Causes of Action, including those related to the Revenue Bond Claims Litigation and Lift Stay Motions, is a key component of the Plan.  Litigation over such Claims and Causes of Action was hard-fought and remained active as between the Commonwealth, on the one hand, and the Monolines (who would ultimately become GO/PBA PSA Creditors) on the other. By agreeing to settle these disputes, the GO/PBA PSA Creditors provided a clear benefit to the Debtors by eliminating the need to incur additional costs, and mitigating the substantial risk associated with, further litigation.   (Zelin Decl. ¶ 97).   To create global peace upon the effectiveness of the Plan, the Debtors and Reorganized Debtors agreed to release Claims and Causes of Action against, among other entities, the Government Parties, official committees, and PSA Creditors.  (Zelin Decl. ¶ 99).  The Plan's release provisions were essential to get the key stakeholders to engage in negotiations over a potential consensual release of claims against the Commonwealth.  (Zelin Decl. ¶ 100).

202.    The parties receiving releases all made significant contributions to the negotiation and development of the Plan and incurred costs and expenses during the course of their essential

participation in the negotiations. (Zelin Decl. ¶ 103). The releases were a product of robust, mediator-supervised negotiations and the stakeholders had an opportunity to be heard as to the scope and content of the releases. (Zelin Decl. ¶¶ 105–106). The releases granted by the Debtors constitute a sound exercise of the Debtors' judgment. They are fair, reasonable, and in the best interests of the Debtors. (Zelin Decl. ¶ 103).

203.   The Plan does not provide for non-consensual third-party releases; the Plan's releases are limited to those necessary to effect the Debtors' successful restructuring. Except as explicitly agreed to by the creditors in their respective plan support agreements, the Plan does not release any claims of a creditor of the Debtors, in its capacity as such, against a party that is not a Debtor. (Jaresko Decl. ¶ 223; Zelin Decl. ¶ 107). Specifically, Section 92.2(a) provides that "without prejudice to the exculpation rights set forth in Section 92.7 [of the Plan], nothing contained in the Plan or Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors." Plan § 92.2(a). Further, Sections 92.2(d), (e), and (f) of the Plan carve out from the Released Claims certain claims, causes of action, or other rights or powers that are held by the Securities and Exchange Commission, the United States, and parties to certain Underwriter Actions. Likewise, as confirmed by the definitions of Related Persons (see Plan, Section 1.420) and Released Claims (see Plan, Section 1.421), claims against AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA, which are or may be subject to their own restructuring proceedings, are not released pursuant to the Plan and such entities are not "Related Persons" of the Released Parties or Releasing Parties. Further, Avoidance Actions generally are not released under the Plan. (See

97

Plan, Section 1.421).   These carve-outs ensure that only those releases that are reasonable and necessary to Plan confirmation are being provided.  (Jaresko Decl. ¶ 224; Zelin Decl. ¶¶ 108–109).

204.   The releases contemplated by the Plan are appropriate and essential to the Debtors' successful reorganization.

### B.  Exculpation

205.   Section 92.7 of the Plan provides for exculpation of the Government Parties, PSA Creditors, Retiree Committee, Creditors' Committee, AFSCME, and the Monolines for, among other things, any acts taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan and the settlements contained therein (including, but not limited to, the Plan Support Agreements). (Jaresko Decl. ¶ 225; Zelin Decl. ¶ 110).   The expectation that parties would be exculpated incentivized them to participate in the negotiations and support confirmation of the Plan without fear of future lawsuits.  Without the Plan's exculpation provisions, parties would likely be exposed to litigation after extensive good-faith negotiations.  (Zelin Decl. ¶ 111).  The Plan's exculpation provisions are narrowly tailored to the exculpated parties' efforts related to the Plan.  All of the parties being exculpated in the Plan played a key role in the negotiation of the Plan and the settlements that enabled the Plan, including through their participation in mediation.  The Plan's exculpation provisions do not alter the liability of any entity that is determined to have acted or failed to act in a manner that constitutes intentional fraud or willful misconduct.  (Jaresko Decl. ¶ 226; Zelin Decl. ¶ 110, 112).  In addition, decretal paragraph 61(g) of the Confirmation Order provides for exculpation of the DRA Parties, which is substantially the same as the exculpation provided pursuant to the Plan and is appropriate in light of the Stipulation in Connection with DRA Related Disputes, dated as of November 5, 2021, by and among the Oversight Board, as

98

representative of the Debtors and HTA, and the DRA Parties.  (See Confirmation Order ¶ 61(g);

Debtors Exhibit 146).  Exculpation provisions are appropriate for parties' acts or omissions in

connection with or related to the pursuit of confirmation of a plan.  See In re Montreal Me. & Atl.

Ry., 2015 Bankr. LEXIS 3737 at *24, 26 (Bankr. D. Me. Oct. 9, 2015).

### C.  Injunction

206.    The Plan's injunction provisions (Sections 92.3, 92.9, and 92.11) are necessary to

the reorganization and are fair to those parties involved.  The injunction ensures that the releases

and exculpations discussed above are preserved and enforced by prohibiting legal action

concerning the Released Claims, avoiding the time, burden and expense that could be incurred if

parties were permitted to pursue Released Claims.  The Plan's injunction provisions are narrowly-

tailored to serve that purpose.  (Zelin Decl. ¶ 113; Jaresko Decl. ¶ 227).

207.    The releases, exculpation provisions, and injunctions pursuant to the Plan are

integral and critical parts of the Plan and the compromises and settlements implemented pursuant

to the Plan.  Plan Art. II; § 92.4.  The approval of such releases is a condition to the occurrence of

the Effective Date, and all Released Parties have relied on the efficacy and conclusive effects of

such releases and injunctions and on the Title III Court's retention of jurisdiction to enforce such

releases and injunctions when making concessions pursuant to the Plan and by agreeing to,

accepting, and supporting the settlement and treatment of their respective Claims, Causes of

Action, and other rights pursuant to the Plan.  (Zelin Decl. ¶¶ 96, 98, 100–04, 106, 110–12).

Accordingly, such provisions are justified and warranted based upon the circumstances of the Title

III Cases and the consideration being provided by all Released Parties in connection with the Plan.

208.    To maintain and protect the integrity and feasibility of the Plan, while the Oversight

Board is in existence, any and all governmental units and any officer or employee thereof shall

neither recreate by statute, regulation, rule, policy, or executive order nor repay by any means, any debt discharged by the Plan without the Oversight Board's express prior written consent or except as may otherwise be provided by a certified fiscal plan or budget.  Without limitation, the debt referred to herein includes any and all pension obligations frozen and cost of living adjustments in amount such that they shall not increase from their levels in existence on the Effective Date of the Plan.

**Validity of Bonds and CVIs**

209.    Pursuant to Section 4 of PROMESA, as well as sections 944[17] and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Court

---

[17] Section 944(b)(3) of the requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations. 11 U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws" (citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D. Cal. 2010) (additional citations omitted)).  As set forth in the leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future."  6 Alan N. Resnick & Henry J. Sommer, Collier On Bankruptcy § 944.03[1][b] (16th ed. 2013); See also, Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernadino, California, as Modified by the Court, dated February 7, 2017, ¶ 22 ("In accordance with Section 944(a) and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon . . . ."); Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit, dated November 12, 2014, ¶ 86 ("[I]n accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of . . . ."); Findings of Fact, Conclusions of Law, Order Confirming the Chapter 9 Plan of Adjustment for Jefferson County, Alabama, dated November 6, 2013, ¶ 37 ("Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a), as well as general principles of federal supremacy, the provisions of this Confirmation Order, the Plan, and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law."); Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated February 5, 2019, ¶ ("Pursuant to PROMESA, including section 4 thereof, as well as sections 944 and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order, the Settlement, the Plan, and Act 241, the Court determines that the COFINA Bonds are legal, valid, binding, and enforceable . . .")

determines that the New GO Bonds and CVIs, and the covenants by the Commonwealth for the

benefit of the holders of the New GO Bonds and CIVs, are legal, valid, binding, and enforceable

obligations of the Reorganized Debtors benefitting from the following protections, each of which

is legal, valid, binding, and enforceable against the Reorganized Debtors, the Commonwealth, and

other persons and entities, as applicable, under Puerto Rico, New York, and federal law:

a.  The Confirmation Order is full, final, complete, conclusive, and binding and shall
    not be subject to collateral attack or other challenge in any court or other forum,
    except as permitted under applicable law.

b.  The New GO Bond Legislation and the CVI Legislation are incorporated into Act
    53-2021, which has been validly enacted by the Commonwealth and is valid and
    effective in accordance with its terms.

c.  The New GO Bonds and the CVIs are bonds or notes within the meaning of Section
    2 of Article VI of the Commonwealth Constitution to which the Commonwealth
    may legally pledge its full faith, credit and taxing power under the Commonwealth
    Constitution and applicable Puerto Rico law for the payment of principal and
    interest.

d.  Pursuant to the New GO Bond Legislation and the CVI Legislation, the
    Commonwealth has validly pledged its full faith, credit and taxing power under the
    Commonwealth Constitution and applicable Puerto Rico law for the payment of
    principal and interest with respect to the New GO Bonds and payment with respect
    to the CVIs.

e.  Subject to the occurrence of the Effective Date and as of the date of issuance of the
    New GO Bonds and CVIs, the Commonwealth is in compliance with any applicable

101

debt limits, including the Comprehensive Cap and any applicable debt limit (if any) contained in the Commonwealth Constitution.

f.   Pursuant to the New GO Bonds Legislation and other applicable law, upon the issuance of the New GO Bonds, the New GO Bonds shall be secured by a first priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53)) over the funds deposited in the Debt Service Fund, including any revenues generated therefrom, which statutory first lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person, and shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms.

g.   The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights in the Plan and in the Confirmation Order).

h.   The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, creates the valid pledge and the valid lien upon the right, title and interest of the Commonwealth in such funds in favor of the Trustee (for the benefit of the holders of the New GO Bonds) which it purports to create, subject only to the provisions of the New GO Bonds Indenture permitting

102

the withdrawal, payment, setting apart or appropriation thereof for the purposes and on the terms and conditions set forth in the New GO Bonds Indenture and each applicable supplemental indenture.

i.  The Commonwealth has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) with respect to monies on deposit in the Debt Service Fund as of the commencement thereof.

j.  The Plan meets all conditions set forth in the New GO Bond Legislation and the CVI Legislation for issuance of the New GO Bonds and CVIs.

k.  In light of the enactment of the New GO Bond Legislation and the CVI Legislation, and upon execution by all parties thereto, the New GO Bonds Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

l.  At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to be stamped or written on each of the New GO Bonds, the GO CVIs, and the Clawback CVIs, a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE

103

JUDGMENT AND CONFIRMATION ORDER, ENTERED ON
THE [___] DAY OF [_____], 2021.

### **GDB Loan Priority Determination**

210.    The Plan provides for the issuance of the HTA Clawback CVI as consideration for

the settlement of CW/HTA Claims under the HTA/CCDA Plan Support Agreement.  The CVI

Indenture provides for four separate Sub-Subseries of such HTA Clawback CVI to be issued, and

for payments on such Sub-Subseries of the HTA Clawback CVI to be made first, on account of

CW/HTA Claims related to the HTA 68 Bonds; second, on account of CW/HTA Claims related

to the HTA 98 Senior Bonds; third, on account of CW/HTA Claims related to the HTA 98 Sub

Bonds; and fourth, subject to the GDB Loan Priority Determination, on account of either CW/HTA

Claims related to the GDB HTA Loans or CW/HTA Claims related to the HTA Bonds.  (CVI

Indenture §§ 2.01(c)(i), 5.07(c); see also Plan at J-12, §§ 1.172, 63.2, Ex. J at Annex 6.).

211.    Certain disbursements under the "CVI Payment Reserve" are dependent on the

"GDB Loan Priority Determination," (Plan § 1.172), which is defined as "[t]he determination, in

either the Commonwealth Title III Case or the HTA Title III Case, (a) with respect to the relative

rights of recovery and priority of payment of the [19]68 Bonds and the [19]98 Bonds to the rights

of GDB with respect to the GDB HTA Loans, and/or (b) that the [DRA] does not possess an

allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such

GDB HTA Loans."  Plan § 1.259.

212.    On June 26, 2021, the DRA Parties filed a complaint initiating an adversary

proceeding against the Defendants,[18] with the stated purpose of "provid[ing] a means to resolve

---

[18]  "Defendants" means Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp.,
Financial Guaranty Insurance Company, National Public Finance Guarantee Corporation, Peaje Investments LLC,
and The Bank of New York Mellon.

the priority question with respect to the payments made by the Commonwealth on account of the clawback claims, and any payments that may be made on account of the Loan Claims and the HTA Bonds under a future plan for HTA."  (Adv. Proc. No. 21-00068-LTS, Docket Entry No. 1 ¶ 101).

213.    The complaint sought declaratory relief on four counts: (i) Count 1, "that the DRA is the only party with (i) a valid, perfected, first-priority lien on the Act 30-31 Revenues and (ii) a right to collect from the Act 30-31 Revenues"; (ii) Count 2, "that the HTA Bondholders have limited collateral to secure the bonds, that the HTA Bonds are limited recourse obligations, and neither the collateral pledged to secure the bonds, nor the bond revenues to which the bondholders have recourse, includes the Act 30-31 Revenues"; (iii) Count 3, "that the DRA's Loans are not subordinate to the bonds"; and (iv) Count 4, "that the DRA's Loans are entitled to collect on the loan claims from the bond revenues not deposited in the bond revenue accounts."  (Adv. Proc. No. 21-00068-LTS, Docket Entry No. 1).

214.    On August 26, 2021, the Defendants moved to dismiss all four counts.  (Adv. Proc. No. 21-00068-LTS, Docket Entry No. 44 ¶¶ 5–6) (the "Motion to Dismiss").  On September 23, 2021, the DRA Parties filed an opposition to the Motion to Dismiss and on October 8, 2021, Defendants filed their reply in support of the Motion to Dismiss, which concluded briefing on the motion.[19]

215.    On October 29, 2021, the Court entered an opinion and order dismissing all four counts of the DRA Parties' complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure

---

[19]  The Oversight Board and AAFAF were granted full intervention rights in Counts 1, 2, and 4 of this adversary proceeding and moved to dismiss those counts, but their motion was denied as moot in light of the order granting the Defendants' Motion to Dismiss.

for failure to state a claim upon which relief could be granted. (Adv. Proc. No. 21-00068-LTS, Docket Entry No. 83 at 27) (the "GDB Loan Priority Determination Opinion").

216.    As to Count 1, the Court held that the plain language of Acts 30 and 31[20] and the Assignment and Security Agreement[21] make clear that the HTA Bonds are payable from Act 30-31 Revenues.[22]  (GDB Loan Priority Determination Opinion at 18–20).

217.    As to Count 3, the Court held that HTA Bondholders had standing to enforce the subordination provisions of the Assignment and Security Agreement and Loan Agreements[23] under 3 L.P.R.A. § 2013(a)(3).   The Court further held that the Assignment and Security Agreement unambiguously subordinates the GDB HTA Loans to the HTA Bonds (including, for the avoidance of doubt, the HTA 68 Bonds and the HTA 98 Bonds), a conclusion that was reinforced by the GDB HTA Loan Agreement attached to the Complaint.  (GDB Loan Priority Determination Opinion at 21).

218.    The Court dismissed Counts 2 and 4 because they "logically depend[ed]" on the Court granting Counts 1 and 3, because the Assignment and Security Agreement "unambiguously compels the conclusion that, before any funds are paid toward the Loans, Bond payment obligations must first be satisfied."  (GDB Loan Priority Determination Opinion at 25).

---

[20]  "Acts 30 and 31" means Commonwealth Act 30-2013 and Act 31-2013, both approved on June 25, 2013.

[21]  "Assignment and Security Agreement" means the agreement between HTA and GDB executed on August 28, 2013.

[22]  "Act 30-31 Revenues" means certain crude oil taxes, motor vehicle license fees, and other excise taxes levied pursuant to Acts 30 and 31.

[23]  "GDB HTA Loan Agreements" means the loan agreements between GDB and HTA that were executed between 2008 and 2014.

219.    In the GDB Loan Priority Determination Opinion, the Court directed the Clerk of Court to enter judgment consistent therewith, and a final judgment dismissing Counts 1, 2, 3, and 4 was entered contemporaneously with the GDB Loan Priority Determination Opinion.  (GDB Loan Priority Determination Opinion).

220.    The Court's rulings in the GDB Loan Priority Determination Opinion are incorporated by reference herein.

221.    The Court's ruling that the GDB HTA Loans and any liens securing such GDB HTA Loans are subordinated to the HTA Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.[24]

### **Miscellaneous Provisions**

222.    <u>Plan Supplement</u>.  All materials contained in the Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is or shall be required.  <u>See</u> Service Affidavits; Plan Supplement.

223.    <u>Satisfaction of Confirmation Requirements</u>.  Based on the foregoing, the Plan satisfies the requirements for confirmation set forth in PROMESA Section 314.

224.    <u>Oversight Board Certification</u>.  For purposes of Section 209 of PROMESA, the discharge of debt to occur as of the Effective Date pursuant to the Plan and the Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth, as determined in accordance with modified accrual accounting standards.

---

[24] Pursuant to Section 1.172 of the Plan, Cash payable from the HTA Clawback CVI in the CVI Payment Reserve will be distributed upon entry of a Final Order with respect to the GDB Loan Priority Determination.

225.   <u>Implementation</u>.  All documents necessary to implement the Plan, including those contained in the Plan Supplement and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.  Without limiting the generality of the foregoing, the Debtors, prior to the Effective Date, and Reorganized Debtors, from and after the Effective Date, are authorized to consummate the transactions contemplated in the Plan and Plan Supplement.   The execution, delivery, or performance by the Debtors or Reorganized Debtors, as the case may be, of any documents in connection with the Plan Supplement, and compliance by the Debtors or Reorganized Debtors, as the case may be, with the terms thereof, is hereby authorized by, and will not conflict with, the terms of the Plan or the Confirmation Order.

226.   <u>Good Faith</u>.  The Debtors will be acting in good faith if they proceed to (i) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby and (ii) take the actions authorized and directed by the Confirmation Order.

227.   <u>Retention of Jurisdiction</u>.  This Court may properly and, upon the Effective Date shall, subject to the terms and provisions of Article XCI of the Plan, and except as otherwise provided in the Plan or Confirmation Order, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the Plan, retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the matters set forth in Article XCI of the Plan.

228.   Without limiting the generality of any of the foregoing, the Court shall retain jurisdiction to (i) enter appropriate orders with respect to the payment, enforcement, and remedies of the bonds and any other instruments issued pursuant to the plan, (ii) enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, (iii) adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any action taken by any entity pursuant to or in furtherance of the Plan or the Confirmation Order including, without limitation, issuance of bonds, and (iv) to enforce prohibitions against any subsequent collateral attack on provisions contained in the Plan and the Confirmation Order.

229.   <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document entered into in connection with the Plan or Plan Supplement provides otherwise, the rights, duties, and obligations arising pursuant to the Plan shall be governed by, and construed in accordance with, PROMESA (including the provisions of the Bankruptcy Code make applicable pursuant to Section 301 of PROMESA), and to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

230.   <u>Enforceability</u>.  Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a) as well as general principles of federal supremacy, the provisions of this Memorandum, the Confirmation Order, and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.  The documents contained in the Plan Supplement (as such documents may be further modified and filed with the Court prior to the Effective Date) provide adequate means for implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall constitute valid legal obligations of the

Debtors and valid provisions to pay or secure payment of the bonds pursuant to section 944(b)(3)

of the Bankruptcy Code, and shall be enforceable in accordance with their terms.

231.    <u>No Precedential Effect</u>.   The findings of fact and conclusions of law herein

concerning the separate classification of certain Claims from Class 58 CW General Unsecured

Claims, including the governmental or business reasons for such classifications, are made with

respect to the Title III cases of the Commonwealth, ERS, and PBA, and shall not have any

precedential effect for other Title III cases.

## <u>Conclusion</u>

For the foregoing reasons, the Court is concurrently entering its *Order and Judgment*

*Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of*

*Puerto Rico, et al.*

Dated: [            ], 2021

_____
LAURA TAYLOR SWAIN
United States District Judge

## Exhibit A

**Preempted Statutes**

## I.     Commonwealth good faith and credit pledge statutes

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 2 approved October 10, 1985 13 L.P.R.A. § 141–141m** | Authorizes the issue of refinancing bonds to refinance all or any part of any public improvement bonds, provides for payment of principal and interest on such refinancing bonds, provides for the use of proceeds of such bonds, and exempts such bonds from the payment of taxes | **Section 1** – Authorizes issuance of refinancing bonds and payment of costs related to the sale and issuance of such refinancing bonds<br><br>**Section 3(f)** – Provides refinancing bonds may be issued subject to certain conditions<br><br>**Section 5** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the refinancing bonds; authorizes and directs the Secretary of the Treasury to make such payments<br><br>**Sections 6(a) and (c)** – Provides that proceeds of bond issuances shall be held in trust solely for the payment of principal and interest on bonds being refinanced | **Sections 1, 3(f)** – The Act does not authorize the issuance of specific bonds, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Section 5** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Sections 6(a) and (c)** – The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds will be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.<br><br>Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by | During the term of the Oversight Board |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 1 approved June 26, 1987, as amended 13 L.P.R.A. § 63–63h** | Authorizes the issuance of notes, in a principal amount that shall not exceed $800 million, in advance of taxes and revenues of the Commonwealth to be collected in cash during such fiscal year, and creates a Special Fund for the Redemption of Notes in Advance of Taxes and Revenues | **Section 1** – Authorizes the issuance of notes and payment of expenses related to the sale and issuance of such notes<br><br>**Section 4** – Provides that all specified taxes and revenues received after the notes are issued and before the close of the fiscal year in which the notes are issued be deposited in a special fund, and that the money in such fund shall be used to pay the principal, redemption premium, and interest on the notes and shall not be used for any other purpose | **Section 1** – The Act does not authorize the issuance of specific bonds, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>To the extent the statute is interpreted not to require approval pursuant to PROMESA section 207, the Act would be inconsistent with PROMESA and is therefore preempted.<br><br>**Section 4** – The Act requires certain taxes and revenues to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds will be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | PROMESA section 207 requires that, for so long as the Oversight Board remains in operation, "no territorial government may, without the prior approval of the Oversight Board, issue debt or guarantee exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt." Additionally, the Plan provides, at paragraph 74.5, limitations on future debt which supports feasibility.  *See* Plan § 74.5.<br><br>To the extent the Act is interpreted or applied to permit the Commonwealth to "issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt" without the prior approval of the Oversight Board as required by | During the term of the Oversight Board |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | PROMESA section 207, and/or without compliance with paragraph 74.5 of the Plan, the Act is preempted.<br><br>Such an interpretation or application of the Act would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | |
| **Act 34 approved March 4, 2014** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $3.5 billion to pay or refinance debt and other obligations of the Commonwealth or public corporations, pay rent to PBA, other uses authorized pursuant to previous legislation, establish reserves associated with the bond issuance, and provide for | **Sections 1, 1(i)–(iv), and 1(vii)** – Authorizes the issuance of bonds, the proceeds of which shall be used for the payment of bonds and other debt of the Commonwealth and its instrumentalities and to establish related reserves in connection with the issuance of the bonds, and authorizes the payment of costs incurred in connection with the issuance of the bonds. | **Sections 1, 1(i)–(iv), 1(vii), 5** – The Act authorizes the issuance of bonds in an amount not to exceed $3.5 billion, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | payment of principal and interest on the bonds, among other purposes | **Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of bond anticipation notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 7** – Authorizes the use of money appropriated under the Act for payment of other Commonwealth debt or obligations, or any other use approved by the Legislative Assembly, to the extent not needed for | Plan, and may give certain bonds and notes priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>Section 7 – The Act authorizes the use of funds for the payment of any debt of the Commonwealth or any unspecified "other use," which may not be provided for in the Fiscal Plan or the Plan, and may be restructured pursuant to the Plan. (PROMESA § 202, 314). | Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | the purposes stated in the Act. | | | |
| **Act 79 approved June 1, 2011** | Authorizes the issuance of Commonwealth bonds in a principal amount that shall not exceed $304 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds, and provides that $34 million of proceeds be reserved for payment of interest on bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments. | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $304 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 13** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Section 1** – The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.<br><br>Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|----------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | **Section 13** – Appropriates $8.5 million of bond proceeds for payment of expenses incurred in connection with the bond issuance. | | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 243 approved August 9, 2008** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $250 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $250 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt.  (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 13** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan.  (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone.  *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | Secretary of the Treasury to make such payments.<br><br>**Section 13** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | | with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 43 approved August 1, 2005, as amended** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $575 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $575 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 13** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone.  *See* Amended Malhotra | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 13** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | | Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 216 approved August 19, 2004** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $550 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds. | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $550 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | restructured pursuant to the Plan. (PROMESA §§ 202, 314). | by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 100 approved July 12, 2002, as amended** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $500 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $500 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 161 approved July 5, 2003** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $540 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $540 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | **Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 149 approved August 9, 2002, as amended** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $110 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Establishes a special fund to which an amount equal to or greater than $110 million must be deposited by the Secretary | **Section 1** – The Act authorizes the issuance of bonds in an amount not to exceed $110 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | of Treasury for the payment of principal, redemption premium, and interest on the bonds.<br><br>**Section 5** - Authorizes and directs the Secretary of the Treasury to make bond payments. | provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Joint Resolution No. 57** | Authorizes the Secretary of the Treasury to issue, from time to time, refinancing bonds of the | **Section 1** – Authorizes the issuance of bonds. | **Section 1** – The Act does not authorize the issuance of specific bonds, and could be used to issue additional debt in the future which is | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and | For so long as the Oversight Board |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| approved July 12, 1993 | Commonwealth with the purpose or refinancing, completely or partially, any expenses related to the sale and issue of said Refinancing Bonds | | not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). | the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | remains in place |
| Act 54 approved July 6, 2001 | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $475 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $475 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan because payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | | the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 118 approved July 13, 2000** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $425 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $425 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates $3.25 million of bond proceeds for payment of expenses incurred in connection with the bond issuance. | | $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 153 approved July 19, 1999** | Act 153-1999, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes in an amount not to exceed $475,000,000; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Section 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Section 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes.<br><br>**Section 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Section 4** – Directs payment of principal and | **Sections 1 (para. 1), 3, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $475 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 1 (para. 3), 4, 6** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Section 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Section 6** – Pledges good faith, credit, and taxing power and directs payment of interest on notes as it comes due. Directs issuance of bonds to pay said notes.<br><br>**Section 7** – Proceeds shall be covered into "Public Improvements Fund of 2000" and disbursed according to unspecified statutory provisions<br><br>**Section 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the Public Improvements Fund of 2000.<br><br>**Section 12** – Appropriates $3.25 million to expenses of issuing bonds. | Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Sections 7, 8, 12, 13** – The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 12** – The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Proposed Plan. (PROMESA §§ 202, 314). | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

45

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | **Section 13** – Appropriates $23.75 million to the Aqueduct and Sewer Authority. | | | |
| **Act 219 approved August 9, 1998** | Act 219-1998, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Article 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.\n\n**Article 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes.\n\n**Article 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.\n\n**Article 4** – Directs payment of principal and interest on bonds as they fall due and to commit good faith, credit, and taxing power.\n\n**Article 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.\n\n**Article 6** – Provides for pledge of good faith, credit, and taxing power and directs payment of interest on notes as it | **Article 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $475 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).\n\n**Articles 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).\n\n**Articles 7, 8, 12, 13** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).\n\n**Article 12** - The Act requires certain proceeds to be used solely for bond | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.\n\nStatutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | Permanent |

46

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | comes due. Directs issuance of bonds to pay said notes.<br><br>**Article 7** – Proceeds shall be covered into "1999 Public Improvement Fund" and disbursed pursuant to unspecified statutes.<br><br>**Article 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the 1999 Public Improvement Fund.<br><br>**Article 12** – Appropriates $3.25 million to expenses of issuing bonds.<br><br>**Article 13** – Appropriates $23.75 million to the Infrastructure Financing Authority (AFI). | payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 81 approved August 14, 1997** | Act 81-1997, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; | **Section 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Section 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes. | **Sections 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $500 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Section 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Section 4** – Directs payment of principal and interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Section 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Section 6** – Provides for pledge of good faith, credit, and taxing power and directs payment of interest on notes as it comes due. Directs issuance of bonds to pay said notes.<br><br>**Section 7** – Proceeds shall be covered into "1998 Public Improvements Fund" and disbursed pursuant to unspecified statutes.<br><br>**Section 8** – Secretary of the Treasury shall reimburse any provisional | limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Sections 7, 8, 12, 13** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 12** - The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | advance made, out of the first moneys available in the 1998 Public Improvements Fund.<br><br>**Section 12** – Appropriates $3.25 million to expenses of issuing bonds.<br><br>**Section 13** – Appropriates $25 million to the Office of the Management and Budget until the Special Maintenance Proposals Inter Agency Evaluating and Approval Committee claims the deposit thereof in the Special Maintenance Fund. | | | |
| **Act 119 approved August 9, 1995** | Act 119-1995, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Article 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Article 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes.<br><br>**Article 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Article 4** – Directs payment of principal and | **Articles 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $355 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Articles 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Article 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Article 6** – Provides for pledge of good faith, credit, and taxing power and directs payment of interest on notes as it comes due. Directs issuance of bonds to pay said notes.<br><br>**Article 7** – Proceeds shall be covered into "1996 Public Improvements Fund" and disbursed pursuant to unspecified statutes.<br><br>**Article 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the 1996 Public Improvements Fund.<br><br>**Article 12** – Appropriates $3.5 million to expenses of issuing bonds. | Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Articles 7, 8, 12** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Article 12** - The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | | |
| **Act 46 approved July 28, 1994** | Act 46-1994, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Article 1 (para. 1)** – Authorizes issuance of Commonwealth bonds. <br><br>**Article 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes. <br><br>**Article 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance. <br><br>**Article 4** – Directs payment of principal and interest on bonds as they fall due and to commit good faith, credit, and taxing power. <br><br>**Article 5** – Authorizes borrowing money and issuing notes in advance of bond issuance. <br><br>**Article 6** – Pledge of good faith, credit, and taxing power and directs payment of interest on notes as it comes due. | **Articles 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $325 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). <br><br>**Articles 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). <br><br>**Articles 7, 8, 12, 13** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202). <br><br>**Articles 12** - The Act requires certain proceeds to be used solely for bond | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. <br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone.  *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | Directs issuance of bonds to pay said notes.<br><br>**Article 7** – Proceeds shall be covered into "1995 Public Improvements Fund" and disbursed pursuant to unspecified statutes.<br><br>**Article 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the 1995 Public Improvements Fund.<br><br>**Article 12** – Appropriates $3.5 million to expenses of issuing bonds.<br><br>**Article 13** – Appropriates $16.25 million to the Budget and Management Office, until the Interagency Committee for Evaluation and Approval of Extraordinary Maintenance Proposals orders its allocation to the Extraordinary Maintenance Fund. | payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 39 approved May 13, 1976, as** | Act 39-1976, among other things, provides for the continuing monthly transfer of certain funds | **Section 1** – Requires transfer of funds to a sinking fund for the payment of bonds on a | **Section 1** - The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the | If these statutes have to be complied with, they would undermine the restructuring of Commonwealth debt | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| amended | for the payment of certain bonds and promissory notes issued by the Commonwealth of Puerto Rico. The Act provides the funds so transferred are to be kept in trust for the purpose of paying bonds and notes. | specified schedule; requires transfer of interest on proceeds to the sinking fund.<br><br>**Section 2** – requires use of funds in sinking fund only for payment of bonds. | Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 2** - The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds must be restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Section 2** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | contemplated in the Plan. Amended Jaresko Decl. ¶ 233.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 83 approved August 30, 1991** | Act 83-1991, among other things, provides for certain tax proceeds and appropriations for payment of the Commonwealth's general obligation bonds or notes. | **Article 2.02** – Imposes special tax of 1.03% on the appraised value of all non-exempt personal and real property in Puerto Rico for the amortization and redemption of the general obligations of the Commonwealth. | **Articles 2.02, 2.04 and 2.05** – The act is preempted to the extent Articles 2.02 and 2.04 would impose payment obligations outside of any Oversight Board-certified budget or fiscal plan, or would require payment in full of prepetition obligations. (PROMESA §§ 202, 314). | If these statutes have to be complied with, they would undermine the restructuring of Commonwealth debt contemplated in the Plan. Amended Jaresko Decl. ¶ 233.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Article 2.04** – Provides that proceeds from taxes imposed by Article 2.02 shall be applied for payment of the principal and interest on the general obligations of the Commonwealth of Puerto Rico, or the early redemption of such obligations.<br><br>**Article 2.05** – Provides that Articles 2.02 and 2.08 shall be considered a preferential obligation and authorization for distributions to be made pursuant to the Act. | For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted. | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Joint Resolution No. 99-2013 approved December 12, 2013** | Joint Resolution No. 99-2013, among other things, (i) authorizes the General Services Administration to take money on loan; (ii) establishes the method of repayment for the loan; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the loan. | **Section 1** – Provides for a line of credit.<br><br>**Section 3** – Pledge of good faith, credit and taxing power and directs payment of principal and interest. | **Section 1 -** The Act authorizes the borrowing of money in an amount not to exceed $34 million, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt.  (PROMESA §§ 202, 314).<br><br>**Section 3 -** The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | |
| **Joint Resolution No. 104 approved December 13, 2013** | Joint Resolution No. 104-2013, among other things, authorizes the Office of the Superintendent of the Capitol to take money on loan and establishes the method of repayment for the loan to be through annual budgetary allocations from the General Fund. | **Section 1** – Authorizes line of credit.<br><br>**Section 2** – Requires honoring of payment and allocation of funds from the general fund for payment of line of credit. | **Section 1** - The Act authorizes the borrowing of money in an amount not to exceed $15 million, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Section 2** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | restructured pursuant to the Plan. (PROMESA §§ 202, 314). | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | |
| **Joint Resolution No. 96 approved November 27, 2013** | Joint Resolution No. 96-2013, among other things, (i) allocates funds from the Public Improvements Fund; (ii) authorizes remaining funds to be distributed according to a Joint Resolution; and (iii) authorizes the Government Development Bank for Puerto Rico to advance the Secretary of the Treasury a loan to address work determined by the Governor. | **Section 1** – Allocates specific funds to agencies and municipalities for specified purposes.<br><br>**Section 2** – Allocates funds in a way to be determined.<br><br>**Section 3** – Arranges for a line of credit | **Sections 1, 2** - The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 3** - The Act authorizes the borrowing of money in an amount not to exceed $30 million, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt.  (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets.  Amended Jaresko Decl. ¶ 232.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 17 approved April 11, 1968** | Act 17-1968, among other things, (i) authorizes the Public Buildings Authority to issue certain bonds; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds through a continuing appropriation; and (iii) pledges the good faith and credit of the Commonwealth of Puerto Rico for payment of the bonds. | <u>Section 1</u> – Provides for guarantee of Public Buildings Authority Bonds; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | <u>Section 1</u> - The Act provides for a guarantee of indebtedness in an amount not to exceed $27 million, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). <br><br>The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). <br><br>The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds will be restructured pursuant to the Plan. (PROMESA §§ 202, 314). <br><br>The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission to empowering the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. <br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202). | | |
| **Act 409 approved September 22, 2004** | Act 409-2004, among other things, provides that the Commonwealth of Puerto Rico guarantees the payment of principal and interest on outstanding bonds that are issued by the Port of Americas Authority, and directs the Secretary of the Treasury to make payments of principal and interest on bonds issued by the Port of Americas Authority whenever the Port of Americas Authority lacks the funds to make such payments. | **Section 1** – Provides for guarantee of debt of Port of Americas Authority; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | **Section 1** - The Act provides for a guarantee of indebtedness in an amount not to exceed $250 million, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).

The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan.  (PROMESA §§ 202, 314).

The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan.  (PROMESA §§ 202, 314).

The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget.  (PROMESA § 202). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.

The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 1 approved January 15, 2015** | Act 1-2015, among other things, (i) allows PRIFA to assume or repay certain debts of HTA; (ii) creates the Infrastructure Financing Authority Special Economic Assistance Fund; (iii) authorizes PRIFA to issue bonds to finance the assumed debts of HTA; (iv) provides guarantees for the payment of the bonds issued under the act; (v) authorizes the Secretary of the Treasury to pay outstanding obligations from the bonds as necessary; and (vi) pledges the full faith and credit and the taxing power of the Commonwealth of Puerto Rico to guarantee the repayment of the bonds or notes to be paid from the Infrastructure Financing Authority Special Economic Assistance Fund. | **Section 2.02 (Amended Section 34(h))** – Provides for Commonwealth guarantee of agency bonds; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | **Section 2.02 (Amended Section 34(h))** - The Act provides for a guarantee of indebtedness of an unspecified amount, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).

The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).

The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan. (PROMESA §§ 202, 314).

The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232

The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 45 approved July 28, 1994** | Act 45-1994, among other things, (i) guarantees the payment of principal and interest on outstanding and future bonds issued by the Aqueducts and Sewers Authority of Puerto Rico; (ii) directs the Secretary of the Treasury to cosign or advance funds to cover payments on bonds guaranteed under the Act; and (iii) pledges the good faith and credit of the Commonwealth of Puerto Rico for payment of the bonds. | <u>Section 1</u> – Provides for Commonwealth guarantee of Water and Sewage Authority of unspecified amount; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | <u>Section 1</u> - The Act provides for a guarantee of indebtedness of an unspecified amount, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt.  (PROMESA §§ 202, 314).<br><br>The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan.  (PROMESA §§ 202, 314).<br><br>The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan.  (PROMESA §§ 202, 314).<br><br>The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget.  (PROMESA § 202). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

## II.   Statutes appropriating Commonwealth revenues

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021** | Appropriates automobile license fees to HTA, which HTA may pledge to the repayment of principal and interest on bonds and other obligations of HTA. | <u>Section 2021</u> – Appropriates increase in automobile license fees to HTA for its corporate purposes and for the repayment of HTA's bonds or other obligations | <u>Section 2021</u> – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations.  (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA § 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion[19] at 16, 19, PROMESA § 314.<br><br>The obligations under the Act were made so that HTA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating.  Upon the effectiveness of HTA's plan of adjustment such debt obligations will no longer be in effect.  Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Title III of | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified | Permanent |

---

[19]      "DRA Opinion" refers to the *Opinion and Order Denying the DRA Parties' Motion for Allowance of an Administrative Expense Claim*, ECF No. 18892, dated October 29, 2021.

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314). | budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| 13 L.P.R.A. § 31751(a)(1) | Appropriates certain revenues to HTA, which HTA may pledge to the repayment of principal and interest on bonds and other obligations of HTA. | <u>Section 31751(a)(1)</u> – Appropriates gasoline and oil taxes to HTA<br><br><u>Section 31751(a)(1) (A, B)</u> – Such appropriated funds shall be covered into a special deposit in favor of HTA and paid on a monthly basis<br><br><u>Section 31751(a)(1) (C, E)</u> – Such appropriated funds shall be pledged to the repayment of HTA's | <u>Section 31751(a)(1)</u> – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|-----------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
|  |  | bonds and other obligations, subject to Section 8 Article VI of the Puerto Rico Constitution and the Commonwealth committed not to reduce the amount of funds appropriated | Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMEA § 314.<br><br>The obligations under the Act were made so that HTA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of HTA's plan of adjustment such debt obligations will no longer be in effect.  Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Title III of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA.  (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. |  |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| 13 L.P.R.A. § 31751(a)(3) | Appropriates revenues derived from cigarette excise taxes to HTA, which HTA may pledge to the repayment of principal and interest on bonds and other obligations of HTA. | <u>Section 31751(a)(3)</u> – Appropriates up to $20 million in cigarette excise taxes to HTA for its corporate powers and purposes<br><br><u>Section 31751(a)(3)(A)</u> – Provides that appropriated funds shall be covered into a special deposit account for HTA<br><br><u>Section 31751(a)(3)(C)</u> – Provides that appropriated funds shall be used for repayment of HTA's bonds and other obligations, subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution | <u>Section 31751(a)(3)</u> – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.<br><br>The obligations under the Act were made so that HTA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of HTA's plan of adjustment such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Title III of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | its current form, which is expected to take place on the effective date of the Plan. | amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914** | Appropriates revenues derived from rum taxes to PRIFA, which PRIFA may pledge to the repayment of principal and interest on bonds and other obligations of PRIFA. | <u>Section 1914</u> – Appropriates $117 million annually of rum taxes to PRIFA for its corporate purposes, which PRIFA may pledge to the repayment of its bonds or other obligations subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution | <u>Section 1914</u> – The appropriation provisions to PRIFA are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.<br><br>The obligations under the Act were made so that PRIFA will have sufficient moneys to | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of PRIFA's qualifying modification such debt obligations will no longer be in effect.  Continuing to send the moneys and appropriate despite the debts being discharged pursuant to the Plan and the qualifying modification under Title VI of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan.  *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a)** | Appropriates certain excise tax revenue to PRIFA and HTA for the purpose of repaying debts and obligations of HTA. | **Section 31751a(a)** – Appropriates funds to Infrastructure Financing Authority Special Economic Assistance Fund and such funds are to be used by PRIFA for | **Section 31751a(a)** – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations.  (PROMESA §§ 202, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
|  |  | repayment of HTA debts and obligations | These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.<br><br>The obligations under the Act were made so that HTA or PRIFA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of the relevant plan of adjustment or qualifying modification such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to the Plan and the qualifying modification pursuant to Title VI of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA.  (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | debt restructurings. Amended Jaresko Decl. ¶ 230.<br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan.  *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth |  |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| 13 L.P.R.A. § 31751(a)(4) | Appropriates revenues derived from cigarette excise taxes to the MBA, which the MBA may pledge to the repayment of principal and interest on bonds and other obligations of the MBA. | **Section 31751(a)(4)** – Appropriates up to $10 million in cigarette excise taxes to the MBA for its corporate powers and purposes<br><br>**Section 31751(a)(4)(A)** – Provides that appropriated funds shall be covered into a special deposit account for the MBA<br><br>**Section 31751(a)(4)(C)** – Provides that appropriated funds shall be used for repayment of the MBA's bonds and other obligations, subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution | **Section 31751(a)(4)** – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations.  (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.<br><br>The obligations under the Act were made so that MBA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Plan conflicts with the discharge provisions of PROMESA. The Plan provides for a clawback claim for MBA, once the debt is | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | discharged pursuant to PROMESA the appropriation is preempted.  (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| 13 L.P.R.A. § 31751(a)(5) | Appropriates revenues derived from cigarette excise taxes to PRITA, which PRITA may transfer to the Infrastructure Financing Authority for the debt or other obligation of the Infrastructure Financing Authority. | **Section 31751(a)(5)** – Appropriates up to $36 million in cigarette excise taxes to PRITA for its corporate powers and purposes<br><br>**Section 31751(a)(5)(A, B)** – Provides that appropriated funds shall be covered into a special deposit account for PRITA and specifies amount appropriated | **Section 31751(a)(5)** – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan.  (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable.  (PROMESA §§ 108, 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims | **Section 31751(a)(5) (A, B)** – During the term of the Oversight Board.<br><br>**Section 31751(a)(5) (C, D)** – Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 31751(a)(5)(C)** – Provides that appropriated funds are subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution<br><br>**Section 31751(a)(5)(D)** – Provides that PRITA shall transfer funds to PRIFA for repayment of PRIFA's debts or obligations when its funds are insufficient to cover such debts or obligations | its current form, which is expected to take place on the effective date of the Plan. | contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|------------------------|
| 13 L.P.R.A. § 2271v(a) | Appropriates certain excise tax revenue to CCDA, which CCDA may pledge to the repayment of principal and interest on its bonds and other obligations. | Section 2271v(a) – Appropriates room occupancy taxes to CCDA, which CCDA may pledge to the repayment of bonds and other obligations of CCDA, subject to Section 8 Article VI of the Puerto Rico Constitution. | Section 2271v(a) –The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations.  (PROMESA §§ 202, 314).

These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).

Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.

The obligations under the Act were made so that CCDA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of CCDA's Title VI qualifying modification such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to the Qualified Modification pursuant to Title IV of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA.  (PROMESA § 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.

If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.

The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*

These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 | During the term of the Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | Fiscal Plan to identify the amount of revenues to be transferred in and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| **Act 147 enacted June 18, 1980, 23 L.P.R.A. § 104** | Appropriates 4.0% of the annual General Fund revenue to the Judicial Branch. In addition, establishes the priorities of payment for "when the available funds for a specific fiscal year are not sufficient to cover the appropriations approved for that year." | <u>Section 104(a)(7)</u> – Appropriates funds from the General Fund of the Treasury to the Judicial Branch for operating expenses.<br><br><u>Section 104(c)</u> – Sets priority guidelines for the disbursement of public funds. | <u>Section 104(a)(7)</u> – The act imposes payment obligations and appropriations outside of any Oversight Board-certified budget or fiscal plan. (PROMESA § 202).<br><br><u>Section 104(c)</u> – The act requires payment of prepetition debt of the Commonwealth claims discharged upon effectiveness of the Plan of Adjustment and creates payment priorities that conflict with Section 314(b)(4) of PROMESA.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes | <u>Section 104(a)(7)</u>: During the term of the Oversight Board. Section.<br><br><u>Section 104(c)</u>: Permanent. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **18 L.P.R.A. § 621-1** | Appropriates certain funds to the University of Puerto Rico. | **Section 621-1(a)** – Appropriates 9.60% of the annual General Fund budget to the University of Puerto Rico. | **Section 621-1(a)** – The act imposes payment obligations and appropriations outside of any Oversight Board-certified budget or fiscal plan.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and | Until the debt issued pursuant to the Plan is paid in full. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 83 approved August 30, 1991, as amended, 21 L.P.R.A. §§ 5002, 5004, 5006, 5815.12** | Appropriates special tax revenue for the amortization and redemption of Commonwealth obligations, compensate municipalities for certain uncollected property taxes, and appropriates certain Commonwealth funds to municipalities. | <u>**Section 5002 (para. 1)**</u> – Authorizes revenues of a special tax of 1.03% per annum on the appraised value of all personal and real property not exempted from taxes for the amortization and redemption of the Commonwealth general obligations.

<u>**Section 5004(a), (c)**</u> – Directs the product and proceeds from the taxes levied under § 5002 to the payment of principal on existing and future general obligation bonds and notes.

<u>**Section 5006 (para. 1–2)**</u> – Authorizes the transfer of funds for compensation of municipalities for uncollected property taxes resulting from tax exemptions. | <u>**Section 5002 (para. 1)**</u> – This act is preempted to the extent it requires transfers of money independent of their inclusion in an Oversight Board-certified fiscal plan or budget. (The provisions authorizing municipalities to levy an additional surtax and empowering the Municipal Revenues Collection Center to collect such taxes are not preempted.)  (PROMESA § 202).

<u>**Section 5004(a), (c)**</u> – This act requires payment of prepetition debt of the Commonwealth  claims discharged upon effectiveness of the Plan of Adjustment, creates payment priorities that conflict with Section 314(b)(4) of PROMESA, and requires transfers of money independent of their inclusion in an Oversight Board–certified fiscal plan or budget. (PROMESA §§ 202, 314).

<u>**Section 5006 (para. 1–2)**</u> – This act requires transfers of monies independent of their inclusion in an Oversight Board-certified fiscal plan or budget. (PROMESA § 202).

<u>**Section 5815(a)–(d)**</u> – This act requires transfers of money independent of their | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.

If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.

The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified | <u>**Section 5002 (para. 1)**</u> – Permanent

<u>**Section 5004**</u> – Permanent.

<u>**Section 5006 (para. 1–2)**</u> – Until the debt issued pursuant to the Plan has been paid in full.

<u>**Section 5815(a)–(d)**</u> – During the term of the Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 5815(a)–(d)** – Authorizes the transfer of funds from taxes, the Additional Lottery System, the net internal revenues of the General Fund, and fines to municipalities. | inclusion in an Oversight Board-certified fiscal plan or budget.  (PROMESA § 202). For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted. | budget, fiscal plan, and the Plan. *Id.* These statutes contain formulas explaining the amount of revenues to be transferred.  I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan.  The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 221 approved May 15, 1948, as amended, 15 L.P.R.A. § 74** | The statute provides for the calculation of the annual net income from slot machines and distributes those incomes to slot machine operators, the Gaming Commission, and government funds including the General Fund. | **Section 74** – Calculates slot machine license fees and taxes and authorizes the distribution of the annual net income from slot machines. The collection of the taxes are not preempted. | **Section 74** – This act is preempted to the extent it requires transfers of net slot machine income independent of their inclusion in an Oversight Board-certified fiscal plan or budget.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's | During term of Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | | | billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 18 approved January 24, 2014, as amended, 21 L.P.R.A. § 6742** | The statute provides for varying percentages of the Sales and Use Tax ("IVU" by Spanish acronym) to be distributed to the Municipal Administration Fund which has a waterfall distribution to the Municipal Development Fund, the Municipal Redemption Fund, and the Municipal Improvement Fund. | <u>Section 6742(a)(1)–(3)</u> – Provides for the distribution of funds from the Municipal Administration Fund to municipalities. | <u>Section 6742(a)(1)–(3)</u> – This act requires transfers of money independent of their inclusion in an Oversight Board-certified fiscal plan or budget.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the | During term of Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|-----------------------------|-------------------------------|----------------------|---------------------------------------|------------------------|
| | | | | amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 41 approved July 22, 2011, as amended, 12 L.P.R.A. §8105** | The statute establishes a fund to collect fees on all new tires (imported or manufactured locally) to facilitate the disposal of unusable tires from the island and provides that resources of the fund shall be allocated through regulations. | <u>Section 8105(g) and (h)</u> – Appropriates funds gathered from the Scrap Tire Management and Disposal Fee as provided for in regulations. | <u>Section 8105(g) and (h)</u> – This act authorizes transfers of money independent of their inclusion in an Oversight Board-certified fiscal plan or budget.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234. | During the term of the Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|-----------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | | | The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.* | |
| | | | | These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |

## III. TRS and JRS Statutes

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| **Act 106 approved August 23, 2017** | Act 106-2017 ("Act 106") provides for the liquidation of the then-remaining assets of the three public retirement systems (ERS, TRS, and JRS), the transfer of their assets (with specified exceptions) to the Commonwealth, and the Commonwealth's assumption of payment of all pensions to retired participants in the three systems, subject to reimbursement by other employers who participated in these systems of pensions paid to their respective retirees.<br><br>Act 106 also provides for the establishment of a new defined contribution plan, pursuant to which employees will contribute 8.5% of | **Section 2.3** – Provides for the continued accrual of defined benefit pension obligations under TRS and JRS<br><br>**Section 2.4(a)** – Provides for the continued accrual of defined benefit pension obligations under TRS and JRS<br><br>**Section 2.4(b)** – Provides for the continued accrual of defined benefit pension obligations<br><br>**Section 2.6** – Provides for the continued accrual of defined benefit pension obligations under TRS and JRS<br><br>**Section 3.1(b)(1)** – Excepts judges and certain teachers from participation in the defined contribution accounts and provides for continued participation for | **Section 2.3** – The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 2.4(a)** - The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 2.4(b)** - The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 2.6** - The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 3.1(b)(1)** – The Act requires minimum mandatory individual contributions to the defined contribution accounts in | The Oversight Board has determined the freeze of the TRS and JRS pension plans is essential to achieving the goals of PROMESA, as it will result in net savings of $4.7 billion over the next 30 years. Supplemental Levy Decl. [ECF No. 19059], ¶ 14.<br><br>Each of the cited sections, other than Section 3.6(a)(2), is inconsistent either with the freeze of JRS and TRS, or with the treatment the Plan proposes to provide affected participants on account of the freeze.<br><br>With respect to Section 3.6(a)(2), AFSCME has requested, and the Oversight Board has agreed, a default investment for Commonwealth contributions under Sections 55.7 and 55.10 of the Plan that will provide an opportunity for investment return is better for participants than an investment that merely preserves the principal contributions. This will further the Oversight Board's goal, consistent with PROMESA, of enhancing retirement funding for current government employees. | The preemption of Section 3.6(a)(2) only applies to the one-time contributions to be made to active ERS and System 2000 participants under Sections 55.7 and 55.10.<br><br>Because the Oversight Board requires the permanent freeze of TRS and JRS and conversion of the retirement plans of participants to the Act 106 defined contribution plan, the preemption of the remaining implicated sections of Act 106 must be permanent. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | their salaries to individual retirement accounts.  All ERS participants, and all TRS participants hired after July 31, 2014 are required to participate in this new defined contribution plan, and teachers hired before August 1, 2014, plus all JRS participants, may participate but are not required.<br><br>Act 106 further provides that the default investment option for deposits into the defined contribution plan shall include a guarantee of the principal amount of contributions, which implicitly means there will be little or no return on investment.<br><br>Act 106 further provides that TRS and JRS shall remain unfrozen, and participants in these systems shall | these participants in the defined benefit plans<br><br>**Section 3.4** – Requires participants to contribute a minimum of 8.5% of such participants' monthly salary to their defined contribution accounts each month.<br><br>**Section 3.6(a)(2)** – Establishes as a default investment for Act 106 contributions an instrument that guarantees the return of principal. | the amount of 8.5% of the subject participant's monthly salary in violation of the Plan.  This minimum contribution shall continue to apply to all Act 106 plan participants except for TRS and JRS pension plan participants who will be enrolled in social security under the Plan, whose minimum contribution is reduced to 2.3% under the Plan, as they will be making payments to social security of 6.2% (for a total of the 8.5% Act 106 requires to be paid to the defined contribution plan). Plan § 55.9.  (PROMESA § 314).<br><br>**Section 3.4** – The Act requires minimum mandatory individual contributions to the defined contribution accounts in the amount of 8.5% of the subject participant's monthly salary in violation of the Plan which provides for certain participants to be able to reduce their contribution to 2.3% as they will be making payments to social security of 6.2% (for a total of the 8.5% Act 106 requires to be paid to the defined contribution plan).  Plan § 55.9.  (PROMESA § 314).<br><br>**Section 3.6(a)(2)** – Establishes s a default investment for Act 106 contributions an instrument that guarantees the return of principal. This section is inconsistent with | | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | continue to make contributions to and accrue benefits under these systems in accordance with their enabling acts. | | the Plan, and is therefore preempted, only with respect to the contributions to be made by the Commonwealth to the Act 106 accounts for active ERS participants in Classes 51G and 51J under the Plan (sections 55.7 and 55.10 of the Plan), which will be subject to a default investment in target retirement date funds unless the participants chooses otherwise. (PROMESA § 314). All other contributions by employees to the Act 106 accounts shall be subject to the default investment set forth in Section 3.6(a)(2).<br><br>The Plan provides for the freeze of the defined benefit plans of TRS and JRS.  In consideration for the freeze of these plans, affected participants will be required to enroll in the Act 106 defined contribution plan, such that enrollment in this plan will no longer be voluntary for any participants in the TRS and JRS systems.  In addition, any TRS or JRS participant to be enrolled in social security under the Plan will be subject to a reduced contribution requirement of 2.3% of salary, as they will be making payments to social security of 6.2% (for a total of the 8.5% Act 106 requires to be paid to the defined contribution plan). | | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|----------|
| | | | Finally, the treatment of active ERS participants in Classes G and J of the Plan require certain contributions into the Act 106 accounts by the Commonwealth, with a default investment of these funds in target retirement date funds closest to the year in which each participant will reach age 65 applicable to each participant. (PROMESA § 314). | | |
| **Act 160 approved December 24, 2013**<br><br>**18 L.P.R.A. § 393-399d** | Act 160-2013 creates a new teachers' retirement system ("TRS"), and repeals Act 91-2004. Among other things, the act provides a framework to determine payments into and from the retirement system. The act indicates that the retirement system will receive additional Commonwealth funds to make up a deficit in the system. | **Section 3.11** – Provides for a minimum pension benefit for certain participants<br><br>**Section 4.1** - Establishes the Commonwealth's responsibility to appropriate funds to finance pensions<br><br>**Section 4.3(b)** – Establishes employer contributions of up to 20.25% of monthly salary obligations to participants<br><br>**Section 4.4** – Establishes defined benefit pension obligations | **Section 3.11** – The Act requires the payment of minimum pension benefits for certain participants in violation of the Fiscal Plan (Fiscal Plan at 275) and the treatment of pensions under the Plan (Plan Art. LV).  (PROMESA §§ 202, 314).<br><br>**Section 4.1** – The Act provides for the appropriation of funds to TRS that are not provided for in the budget or Fiscal Plan, and which conflict with the Plan's provisions freezing TRS pension benefit accruals and transferring all participants to the defined contribution plans established under Act 106.  Plan § 55.9. (PROMESA §§ 202, 314).<br><br>**Section 4.3(b)** – The Act requires employers, including covered instrumentalities, to make payments not accounted for in the Fiscal Plan and budget. (PROMESA § 202). | Absent the freeze of the TRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | **Section 4.5(b)** – Establishes disability pension benefits for certain participants, calculated using a defined benefit formula<br><br>**Section 4.6** – Sets forth the method of calculating the disability pensions provided in § 4.5 using a defined benefit formula<br><br>**Section 4.9(b)** – Requires the Commonwealth to make an annual contribution to TRS in the amount of $1,675 per participant<br><br>**Section 5.6** – Requires employer contributions to be paid in accordance with § 4.3(b).<br><br>**Section 7.1** – Establishes appropriations from the Commonwealth to TRS to fund pension obligations | **Section 4.4** – The Act creates defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 4.5(b)** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 4.6** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284).<br><br>**Section 4.9(b)** – The Act requires the Commonwealth to make contributions to TRS without Oversight Board approval and which contributions are not provided in the budget, and conflict with the Fiscal Plan, and the freeze of TRS under the Plan. Post-Effective Date, all teachers' pensions will be administered on a "PayGo" basis as established under Act 106. Plan § 55.9. (PROMESA §§ 202, 314).<br><br>**Section 5.6** – The Act requires employers, including covered | "[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment.  If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether."  Jaresko Decl. [ECF No. 18729], ¶ 235.<br><br>"Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination of COLAs, is approximately $5.6 billion."  Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | instrumentalities, to make payments not accounted for in the Fiscal Plan and budget. (PROMESA § 202).<br><br>**Section 7.1** – The Act requires hundreds of millions of dollars to be appropriated to TRS annually without Oversight Board approval and in violation of the budget, Fiscal Plan, and the Plan's freeze of TRS.  Plan § 55.9.  (PROMESA §§ 202, 314). | Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%".  Supplemental Levy Decl. [ECF No. 19059], ¶ 15.<br><br>"The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations."  Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |
| **Act 91 of March 29, 2004**<br><br>**18 L.P.R.A. § 391-392w**<br><br>**Repealed by Act 160** | Act 91-2004, the prior act governing the TRS, required (among other things) the Commonwealth to contribute funds to the retirement system for each teacher employed by the Commonwealth. | **Section 14** – Establishes the Commonwealth's responsibility to appropriate funds to finance pensions<br><br>**Section 20** – Authorizes certain government employees to | **Section 14** – The Act provides for the appropriation of funds to TRS that are not provided for in the budget or Fiscal Plan, and which conflict with the Plan's provisions freezing TRS pension benefit accruals and transferring all participants to the defined contribution plans established under Act 106.  Plan § 55.9. (PROMESA §§ 202, 314). | Absent the freeze of the TRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | participate in TRS, subject to withholding 9% of their salary<br><br>**Section 25** – Establishes a minimum pension benefit<br><br>**Section 29** – Establishes disability pension benefits for certain participants, calculated using a defined benefit formula<br><br>**Section 35** – Establishes certain death benefits for pensioners' beneficiaries and heirs, including benefits for school-age children<br><br>**Section 40** – Establishes defined benefit pension obligations<br><br>**Section 47** – Establishes appropriations from the Commonwealth | **Section 20** – The Act provides certain education-related government employees to participate in the TRS defined benefit pension plans in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 25** – The Act requires the payment of minimum pension benefits for certain participants in violation of the Fiscal Plan (Fiscal Plan at 275) and the treatment of pensions under the Plan (Plan Art. LV). (PROMESA §§ 202, 314).<br><br>**Section 29** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 35** – The Act creates death benefits for pensioners' beneficiaries, including providing children enrolled in school with shares of their deceased parent's defined benefit pensions in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314). | "According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment. If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether." Jaresko Decl. [ECF No. 18729], ¶ 235. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | to TRS to fund pension obligations<br><br>**Section 48** – Establishes appropriations from the Commonwealth to TRS to fund pension obligations<br><br>**Section 49** – Requires the Secretary of Treasury to apply Commonwealth revenues to fund pension obligations | **Section 40** – The Act creates defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 47** – The Act requires hundreds of millions of dollars to be appropriated to TRS annually without Oversight Board approval and in violation of the budget, Fiscal Plan, and the Plan's freeze of TRS.  Plan § 55.9.  (PROMESA §§ 202, 314).<br><br>**Section 48** – The Act requires hundreds of millions of dollars to be appropriated to TRS annually without Oversight Board approval and in violation of the budget, Fiscal Plan, and the Plan's freeze of TRS.  Plan § 55.9.  (PROMESA §§ 202, 314).<br><br>**Section 49** – The Act requires the Secretary of Treasury to transfer certain surplus funds to TRS in violation of the budget, Fiscal Plan, and Plan provisions which allocate surplus funds to, among other things, the Pension Reserve Trust.  (PROMESA §§ 202, 314). | "Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination of COLAs, is approximately $5.6 billion."  Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%".  Supplemental Levy Decl. [ECF No. 19059], ¶ 15.<br><br>"The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations."  Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | | transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |
| **Act 12 approved October 19, 1954**<br><br>**4 L.P.R.A. § 233-246** | Act 12-1954 creates JRS. The act, in relevant part, provides the structure of the retirement system and the amount of funds the Commonwealth is required to contribute as well as the purpose for those Commonwealth contributions. | **Article 4** – Establishes defined benefit pension for judges<br><br>**Article 6** – Establishes disability pension benefits for certain participants, calculated using a defined benefit formula<br><br>**Article 8** – Establishes certain death benefits for pensioners' beneficiaries and heirs | **Article 4** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Article 6** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Article 8** – The Act creates additional death benefits in violation of the JRS freeze in the Plan (Plan § 55.8, Exhibit E) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314). | Absent the freeze of the JRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|----------|
| | | | | other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment.  If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether."  Jaresko Decl. [ECF No. 18729], ¶ 235.<br><br>"Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination of COLAs, is approximately $5.6 billion."  Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%".  Supplemental Levy Decl. [ECF No. 19059], ¶ 15. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | | "The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations." Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |
| **Act 162 approved on December 24, 2013** | Act 162-2013 amends the retirement system for the Commonwealth's judiciary ("JRS") and creates a new defined benefit and defined contribution Hybrid Program applicable to future Commonwealth judges. The act, among other things, amends pension calculations, amends the contribution amount of system | **Section 2** – Establishes defined benefit pension for judges<br><br>**Section 3** – Establishes certain increased defined benefit pensions for certain judges<br><br>**Section 5** – Establishes the defined benefit portion of the hybrid system pension obligations for | **Section 2** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 3** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 5** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal | Absent the freeze of the JRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | participants, establishes contribution accounts for the Hybrid Program of the Commonwealth's new JRS, and amends summer and Christmas bonus provisions. | judges hired after July 1, 2014<br><br>**Section 6** – Establishes certain disability pension benefits for participants hired after July 1, 2014, calculated using a defined benefit formula<br><br>**Section 11** – Establishes the defined contribution portion of the hybrid pension system for judges hired after July 1, 2014, including a guaranteed return on investment and employer contributions<br><br>**Section 12** – Provides for defined benefit pension obligations for certain participants<br><br>**Section 13** – Establishes a Christmas bonus for participants | Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 6** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 11** – The Act creates a hybrid system, whereby certain judges are entitled to defined benefits in the form of lifetime annuities and defined contributions. The rights created under the Act, including the guaranteed return on investment, conflict with the treatment of pension obligations under the Plan whereby participants will be enrolled in the Act 106 defined contribution accounts that do not include such rights. (PROMESA § 314).<br><br>**Section 12** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 13** – The Act entitles participants to receive a Christmas bonus in the annual amount of up to $600 per participant in violation | (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment.  If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether."  Jaresko Decl. [ECF No. 18729], ¶ 235.<br><br>"Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|----------|
| | | **Section 14** – Establishes a Summer bonus for participants | of the Plan, which eliminates such benefit (Plan, Exhibit E). (PROMESA § 314).<br><br>**Section 14** – The Act entitles participants to receive a Summer bonus in the annual amount of up to $100 per participant in violation of the Plan, which eliminates such benefit (Plan, Exhibit E). (PROMESA § 314). | of COLAs, is approximately $5.6 billion." Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%". Supplemental Levy Decl. [ECF No. 19059], ¶ 15.<br><br>"The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations." Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |

| Act 80 approved August 3, 2020 | Creates incentivized retirement program certain for ERS participants and offers them increased lifetime pensions. | Act 80 is preempted in its entirety. | Plan of Adjustment Art. LV: Act 80 is preempted because it modifies the treatment of certain pension claims from the treatment provided for in the Plan of Adjustment. (PROMESA § 314).

Plan of Adjustment § 83.4: Act 80 is preempted because it increases pension benefits for certain future retirees, which conflicts with the Plan of Adjustment's provision that the Government shall not implement existing legislation to increase any defined benefit pension payment or obligation to current or future retirees.  (PROMESA § 314).

Bankruptcy Code § 1123(a)(4) (made applicable by PROMESA § 301(a)):  Act 80 is preempted because some claimholders would receive the option of retiring early and collecting the same or a higher pension for a longer time, while others would not, which conflicts with § 1123(a)(4)'s requirement that each claim in the class receive the same treatment. (PROMESA §§ 301, 314).

Bankruptcy Code §1129(b) (made applicable by PROMESA § 301(a)): Act 80 is preempted because it allows certain claimants in certain classes of the Plan to recover in excess of | 2021 Commonwealth Fiscal Plan at Chap. 24; *id.* at 54.

Response to AAFAF's Informative Motion re Pension Reserve Trust Funding Mechanism [ECF No. 19306] – "The increase in the funding levels provided for in the Plan are warranted by the Commonwealth's history of disregarding the magnitude of its pension obligations. Indeed, the Oversight Board, and this Court, have witnessed numerous attempts by the Government—including the current administration—to add billions of dollars of future spending without regard to how it would be funded. For example…Act 80-2020, Act 81-2020, and Act 82-2020, which would create billions of dollars in new pension obligations for the Commonwealth with (1) no viable plan or method to cover the increased costs and (2) no Oversight Board approval for this additional spending. Then-Governor Vázquez Garced agreed with the Oversight Board the Government would not implement these pension laws unless and until it could demonstrate to the Oversight | Act 80 should be permanently preempted because it modifies the treatment of certain (but not all) active ERS participants holding claims in Class 51G of the Plan of Adjustment above the treatment of such claims provided in the Plan of Adjustment. |

| | | | | |
|---|---|---|---|---|
| | | | 100% of their claims when other unsecured claimholders in classes that rejected the Plan are not being paid in full, which conflicts with § 1129(b)'s requirement that a plan of adjustment must be fair and equitable with respect to a class of unsecured claimholders that has rejected the plan. (PROMESA §§ 301, 314).<br><br>Fiscal Plan: Act 80 is preempted because it increases pension costs beyond the current ERS freeze, which conflicts with the Fiscal Plan's allocation of pension spending. *See* 2021 Commonwealth Fiscal Plan at Chap. 24; *id.* at 54.  (PROMESA § 202).<br><br>PROMESA: Act 80 is preempted because it conflicts with PROMESA's purpose of returning the Commonwealth to fiscal responsibility by implementing pension cost increases without ensuring corresponding savings. (PROMESA § 101(a).)<br><br>Act 80 also conflicts with PROMESA § 204(c), which prohibits reprogramming without Oversight Board approval, by increasing pension costs beyond what is provided for in the FY22 budget, thereby requiring a | Board an economically responsible path toward implementation of the law and payment of the new pension obligations it creates."<br><br>Closing Argument Deck [ECF No. 19328-2 at 143-184] – "Acts 80, 81 and 82 reestablish defined benefit plans by compelling enhanced benefits over and above pension payments payable pursuant to the Plan."<br><br>"AAFAF admits that Act 80 substantially increases pension benefits, over and above the pension benefits to which employees and retirees would be entitled under the Plan."  *Id.* at 144. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | reprogramming.  (PROMESA § 204(c).)  Act 80 would increase pension obligations without Oversight Board approval, in violation of PROMESA § 207, which prohibits modifying debt without Oversight Board approval.  (PROMESA §§ 202, 207).  Budget:  Act 80 would require additional pension spending not provided for in the FY22 Budget. (PROMESA § 202). | | |

| Act 81 approved August 3, 2020 | Creates an incentivized retirement program for certain emergency agency employees and offers participants increased lifetime pensions. | Act 81 is preempted in its entirety. | Plan of Adjustment Art. LV: Act 81 is preempted because it modifies the treatment of certain pension claims from the treatment provided for in the Plan of Adjustment. (PROMESA § 314). Plan of Adjustment § 83.4: Act 81 is preempted because increasing pension benefits for certain future retirees conflicts with the Plan of Adjustment's provision that the Government shall not implement existing legislation to increase any defined-benefit pension payment or obligation to current or future retirees. (PROMESA § 314). Bankruptcy Code § 1123(a)(4) (made applicable by PROMESA § 301(a)): Act 81 is preempted because some claimholders would receive the option of retiring early and collecting the same or a higher pension for a longer time, while others would not, which conflicts with § 1123(a)(4)'s requirement that each claim in the class receive the same treatment. (PROMESA §§ 301, 314). Bankruptcy Code §1129(b) (made applicable by PROMESA § 301(a)): Act 81 is preempted because it allows certain claimants in certain classes of the Plan to recover in excess of 100% of their claims when other | 2021 Commonwealth Fiscal Plan at Chap. 24; id. at 54. Response to AAFAF's Informative Motion regarding Pension Reserve Trust Funding Mechanism [ECF No. 19306] – "The increase in the funding levels provided for in the Plan are warranted by the Commonwealth's history of disregarding the magnitude of its pension obligations. Indeed, the Oversight Board, and this Court, have witnessed numerous attempts by the Government—including the current administration—to add billions of dollars of future spending without regard to how it would be funded. For example…Act 80-2020, Act 81-2020, and Act 82-2020, which would create billions of dollars in new pension obligations for the Commonwealth with (1) no viable plan or method to cover the increased costs and (2) no Oversight Board approval for this additional spending. Then-Governor Vázquez Garced agreed with the Oversight Board the Government would not implement these pension laws unless and until it could demonstrate to the Oversight | Act 81 should be permanently preempted because it modifies the treatment of certain (but not all) active ERS participants holding claims in Class 51G of the Plan of Adjustment above the amounts provided for in the Plan of Adjustment. |

| | | | unsecured claimholders in classes that rejected the Plan are not being paid in full, which conflicts with § 1129(b)'s requirement that a plan of adjustment must be fair and equitable with respect to a class of unsecured claimholders that has rejected the plan. (PROMESA §§ 301, 314).

Fiscal Plan: Act 81 is preempted because it increases pension costs beyond the current ERS freeze, which conflicts with the Fiscal Plan's allocation of pension spending. *See* 2021 Commonwealth Fiscal Plan at Chap. 24; *Id.* at 54.  (PROMESA § 202).

PROMESA: Act 81 is preempted because it conflicts with PROMESA's purpose of returning the Commonwealth to fiscal responsibility by implementing pension cost increases without providing for any corresponding savings. (PROMESA § 101(a).)

Act 81 also conflicts with PROMESA § 204(c), prohibits reprogramming without Oversight Board approval, by increasing pension costs beyond what is provided for in the FY22 budget, thereby requiring a reprogramming.  (PROMESA §§ 202, 204(c)). | Board an economically responsible path toward implementation of the law and payment of the new pension obligations it creates."

Closing Argument Deck [ECF No. 19328-2 at 143, 149-152] – "Acts 80, 81 and 82 reestablish defined benefit plans by compelling enhanced benefits over and above pension payments payable pursuant to the Plan."  *Id.* at 143.

"AAFAF admits that Act 81 also increases retirement benefits." *Id.* at 149.

"It is not established that the payroll savings will be enough to cover the increased benefits and the law has no contingency for that scenario."  *Id.* at 152. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | Act 81 would increase pension obligations without Oversight Board approval, in violation of PROMESA § 207, which prohibits modifying debt without Oversight Board approval. (PROMESA §§ 202, 207)<br><br>FY22 Budget: Act 81 would require additional pension spending not provided for in the FY22 Budget. (PROMESA § 202). | | |

| Act 82 approved August 3, 2020 | Allows TRS participants to apply up to 108 days of pre-existing or excess unused sick leave toward their retirement eligibility and pension-benefit levels. | Act 82 is preempted in its entirety. | Plan of Adjustment Art. LV: Act 82 is preempted because it modifies the treatment of certain TRS pension claims from the treatment provided for in the Plan of Adjustment. (PROMESA § 314).

Plan of Adjustment § 55.9(a)(i): Act 82 is preempted because it allows certain TRS participants to accrue additional benefits under the TRS defined benefit plan after the Plan of Adjustment's effective date. (PROMESA § 314).

Plan of Adjustment Ex. F-1: Act 82 is preempted because it allows certain TRS participants to purchase service credits in conflict with the Plan of Adjustment's provision which eliminates that right. (PROMESA § 314).

Fiscal Plan: Act 81 is preempted because it reverses the freeze of the TRS plan required in the Fiscal Plan. *See* 2021 Commonwealth Fiscal Plan at 274.  (PROMESA § 202).

PROMESA: Act 82 is preempted because it conflicts with PROMESA's purpose of returning the Commonwealth to fiscal responsibility by implementing pension cost increases without providing for | 2021 Fiscal Plan at Chap. 24; *Id.* at 54.

Response to AAFAF's Informative Motion regarding Pension Reserve Trust Funding Mechanism [ECF No. 19306] – "The increase in the funding levels provided for in the Plan are warranted by the Commonwealth's history of disregarding the magnitude of its pension obligations. Indeed, the Oversight Board, and this Court, have witnessed numerous attempts by the Government—including the current administration—to add billions of dollars of future spending without regard to how it would be funded. For example…Act 80-2020, Act 81-2020, and Act 82-2020, which would create billions of dollars in new pension obligations for the Commonwealth with (1) no viable plan or method to cover the increased costs and (2) no Oversight Board approval for this additional spending. Then-Governor Vázquez Garced agreed with the Oversight Board the Government would not implement these pension laws unless and until it could demonstrate to the Oversight | Act 82 should be permanently preempted because it modifies the treatment of claims by certain TRS participants covered by the Plan of Adjustment above the amounts provided for in the Plan of Adjustment and allows those participants to purchase service credits in conflict with the provisions of the Plan of Adjustment. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | any corresponding savings. (PROMESA § 101(a).) Act 82 would increase pension obligations without Oversight Board approval, in violation of PROMESA § 207, which prohibits modifying debt without Oversight Board approval. (PROMESA §§ 202, 207). | Board an economically responsible path toward implementation of the law and payment of the new pension obligations it creates." Closing Argument Deck [ECF No. 19328-2 at 143, 153-154] – "Acts 80, 81 and 82 reestablish defined benefit plans by compelling enhanced benefits over and above pension payments payable pursuant to the Plan." *Id.* at 143 "AAFAF admits that Act 81 also increases retirement benefits AAFAF also admits that Act 82 increases teachers' retirement benefits." *Id.* at 153. | |

## IV.    Article VI of the Puerto Rico Constitution

| Article | Brief Description of Article | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| Article VI, Sections 6 and 8 | These provisions of the Puerto Rico Constitution require the Commonwealth to appropriate any pay certain operating expenses and payments on "public debt," and | **Article VI, Section 6** – States that, if at the end of any fiscal year, the appropriations necessary for the ordinary operating expenses of the Government and for the payment of debt | Whether the rights provided by Article VI, Sections 6 and 8 of the Puerto Rico Constitution to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant to the Plan are preempted by PROMESA is settled by the treatment of such bonds and indebtedness pursuant to the provisions of | Statutes or other laws authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year | To the extent it authorizes payment in full of pre-petition obligations, permanent. |

| Article | Brief Description of Article | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|----------|
|  | provide the order in which disbursements are to be made if available revenues for any fiscal year are insufficient to meet the appropriations for that year. | service on public debt for the ensuing fiscal year shall not have been made, the amounts appropriated in the last appropriation acts for such operating expenses and debt service shall continue in effect, and the Governor shall authorize payments necessary for such purpose until further appropriations are made.<br><br>**Article VI, Section 8** – Provides that, if available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, debt service on the public debt shall be paid first, and other disbursements shall thereafter be made in accordance with the order of priorities established by law. | the Plan.  Nothing in the Plan affects or determines whether Article VI, Sections 6 and 8 of the Puerto Rico Constitutions is preempted for any future purpose.<br><br>These sections provide for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | 2022 alone. *See* Amended Malhotra Decl. ¶ 63.<br><br>Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan.  Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes and laws require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. |  |

**<u>Exhibit B</u>**

**Redline**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re: | PROMESA |
| | Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY, | |
| Debtors.[1] | |

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION
WITH CONFIRMATION OF THE MODIFIED EIGHTH AMENDED TITLE III JOINT**

**PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.**

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Ca se numbers due to software limitations).

LAURA TAYLOR SWAIN, United States District Judge:

Before the Court is the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated ~~November 28,~~ December 20, 2021 (Docket Entry No. ~~19365~~ 19568 in Case No. 17-3283)[2] (as modified pursuant to any revisions made at or subsequent to the Confirmation Hearing as set forth in the Confirmation Order, including the Plan Supplement, and as may be modified pursuant to section 313 of PROMESA, the "Plan")[3] filed by the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), and together with the Commonwealth and ERS, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as representative of the Debtors pursuant to PROMESA Section 315(b).[4]  The following documents have been filed by the Debtors in connection with confirmation of the Plan:

(a) *Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18470) (as the same may be amended, supplemented, or modified, the "Plan Supplement");

(b) *Certificate of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9) (Debtors Exhibits 138–140) (the "Mailing Affidavits");

---

[2]   All docket references are to entries in Case No. 17-3283 unless otherwise indicated.
[3]   Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.
[4]   The Court previously entered, pursuant to, inter alia, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, submission, and tabulation of votes and elections with respect to the Plan, approving the forms of ballots, master ballots, and election notices in connection therewith, and approving the form of notice of the Confirmation Hearing. Moreover, the Court previously entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640).

(c) *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4) (Debtors Exhibit 141) (the "Publication Affidavit" and, together with the Mailing Affidavits, the "Service Affidavits");

(d) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18874);

(e) *Memorandum of Law in Support of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18869);

(f) *Certificate of Service* (Docket Entry No. 19182);

(g) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Requested Rulings Regarding Act 53-2021 Relating to the Modified Eighth Amended Joint Plan of Adjustment* (Docket Entry No. 19249);

(h) *Response of the Financial Oversight and Management Board in Accordance with the Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19567)

(i) (h) *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18729 and 19054-4) ("Jaresko Decl.");

(j) (i) *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18731 and 19054-9) ("Skeel Decl.");

(k) (j) *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18726 and 19054-1) ("Brownstein Decl.");

(l) (k) *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18734 and 19054-10) ("Zelin Decl.");

(m) (l) *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18730 and 19054-8) ("Shah Decl.");

3

(n) (m) *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18738 and 19054-6) ("Malhotra Decl.");

(o) (n) *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18736 and 19054-7) ("Santambrogio Decl.");

(p) (o) *Declaration of Adam Chepenik in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18735 and 19054-2) ("Chepenik Decl.");

(q) (p) *Declaration of Sheva Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18737 and 19054-5) ("Levy Decl.");

(r) (q) *Declaration of Jay Herriman in Respect of Confirmation of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18732 and 19054-3) ("Herriman Decl.");

(s) (r) *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19056) ("Pullo Decl.");

(t) (s) *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725) ("Wolfe Decl.");

(u) (t) *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724) ("Murray Decl.");

(v) (u) *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057) ("Malhotra Sup. Decl.");

(w) (v) *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058) ("Jaresko Sup. Decl.");

(x) (w) *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19059) ("Levy Sup. Decl.");

4

(y) ~~(x)~~ *Supplemental Declaration of Juan Santambrogio in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19060) ("<u>Santambrogio Sup. Decl.</u>");

(z) ~~(y)~~ *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115) ("<u>Pullo Sup. Decl.</u>"); and

(aa) ~~(z)~~ *Supplemental Declaration of Jay Herriman in Respect of Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19329) ("<u>Herriman Sup. Decl.</u>").

Oppositions to confirmation of the Plan ~~having been~~were filed by the following parties: (i) PFZ Properties, Inc. (Docket Entry Nos. 9223 and 18418); (ii) Sucesión Pastor Mandry Mercado (Docket Entry Nos. 12701, 16481, 17062, and 17998); (iii) Vicente Pérez Acevedo and Corporación Marcaribe Investment (Docket Entry No. 16668); (iv) Antonio Martin Cervera (Docket Entry No. 16871); (v) Maria Teresita Martin (Docket Entry No. 16872); (vi) Wanda Ortiz Santiago (Docket Entry Nos. 16939 and 17175); (vii) Nancy I. Negron-Lopez (Docket Entry No. 16955); (viii) Demetrio Amador Inc. (Docket Entry Nos. 17005 and 18582); (ix) Suiza Dairy Corp. (Docket Entry Nos. 17013, 17526, and 18593); (x) Maruz Real Estate Corp. (Docket Entry No. 17016); (xi) Group Wage Creditors (Docket Entry No. 17021); (xii) Yashei Rosario (Docket Entry Nos. 17047 and 17116); (xiii) Ana A. Núñez Velázquez (Docket Entry Nos. 17436, 17438, and 18529); (xiv) Edgardo Marquez Lizardi (Docket Entry Nos. 18111 and 18249); (xv) Maria M. Ortiz Morales (Docket Entry No. 18396); (xvi) Arthur Samodovitz (Docket Entry No. 18433); (xvii) Miguel Luna de Jesus (Docket Entry No. 18485); (xviii) Ismael L. Purcell Soler and Alys Collazo Bougeois (Docket Entry No. 18504); (xix) Mildred Batista De León (Docket Entry Nos. 18505 and 19010); (xx) Javier Alejandrino Osorio (Docket Entry Nos. 18506 and 19008); (xxi) Service Employees International Union (Docket Entry No. 18511); (xxii) Mapfre

PRAICO Insurance Company (Docket Entry Nos. 18512 and 18513); (xxiii) certain creditors who filed actions in the United States District Court for the District of Puerto Rico (Docket Entry No. 18535); (xxiv) Med Centro, Inc. (Docket Entry No. 18538); (xxv) Asociación De Jubilados De La Judicatura De Puerto Rico (Docket Entry Nos. 18548 and 18549); (xxvi) Cooperativa de Ahorro y Crédito Vegabajeña (Docket Entry No. 18551); (xxvii) International Union, UAW (Docket Entry No. 18558); (xxviii) Maruz Real Estate Corp. (Docket Entry No. 18563); (xxix) LORTU-TA Ltd, Inc., La Cuarterola, Inc., Juaza, Inc., and the Conjugal Partnership Composed of Juan Zalduondo Viera and Magdalena Machicote Ramery (Docket Entry No. 18564); (xxx) Sucn. De Frank Torres Ortiz & Aurea Rodriguez (Docket Entry No. 18565); (xxxi) Finca Matilde, Inc. (Docket Entry No. 18566); (xxxii) the University of Puerto Rico Retirement System Trust (Docket Entry No. 18573); (xxxiii) Peter C. Hein (Docket Entry No. 18575); (xxxiv) Miriam E. Lima Colón, Betzaida Feliciano Concepción, and Angel L. Méndez González (Docket Entry No. 18583); (xxxv) Asociación de Maestros Puerto Rico and Asociación de Maestros de Puerto Rico-Local Sindical (Docket Entry No. 18585); (xxxvi) the Underwriter Defendants (Docket Entry No. 18587); (xxxvii) certain credit unions (Docket Entry No. 18594); (xxxviii) Community Health Foundation of P.R. Inc. (Docket Entry No. 18604); (xxxix) Quest Diagnostics of Puerto Rico, Inc. (Docket Entry No. 18560); (xl) U.S. Bank Trust Association and U.S. Bank National Association (Docket Entry Nos. 18631 and 18634); and (xli) Nilsa Candelario (Docket Entry No. 18663); and (xlii) Jorge Rafael Eduardo Collazo Quinones (Docket Entry No. 19311).   In addition, the Debtors have received letters in opposition to confirmation of the Plan, which were not filed with the Court, from: (a) Luiz Roldan Ruiz; (b) Antonia Medina Rodriquez; and (c) Aida Iris Santiago Torres.

6

Reservations of rights or limited objections raising discreet issues but generally supporting the Plan were filed by the following parties: (i) the Ad Hoc Group of FGIC Noteholders (Docket Entry No. 17001); (ii) AAFAF (Docket Entry Nos. 17202 and 18592);[5] (iii) Vaquería Tres Monjitas, Inc. (Docket Entry No. 18637); (iv) the Constitutional Debt Group, GO Group, LCDC, and QTCB Group (Docket Entry No. 18453); (v) Ambac (Docket Entry No. 18479); (vi) the Internal Revenue Service (Docket Entry No. 18567); (vii) certain ERS bondholders (Docket Entry No. 18569); (viii) Bank of New York Mellon (Docket Entry No. 18588); (ix) the Creditors' Committee (Docket Entry No. 18589); and (x) the University of Puerto Rico Retirement System Trust (Docket Entry No. 19048).

Further, oppositions to the initial proposed confirmation order (Docket Entry No. 18447) were filed by the following parties: (i) Peter C. Hein (Docket Entry No. 18647); (ii) Suiza Dairy Corp. (Docket Entry No. 18651); (iii) Finca Matilde, Inc. (Docket Enrty No. 18670); and (iv) AAFAF (Docket Entry No. 18742).[6]  Oppositions to the revised proposed confirmation orders (Docket Entry Nos. 19118, Ex. A and 19188, Ex. A) were filed by the following parties: (a) International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Service Employees International Union (Docket Entry No. 19162 and 19204);[7] (b) PFZ Properties, Inc. (Docket Entry No. 19212); (c) Finca Matilde, Inc. (Docket Entry No. 19214); (d) Peter C. Hein (Docket Entry No. 19218); (e) certain credit unions (Docket Entry No.

---

[5]  AAFAF's additional limited objection to confirmation of the Plan, Docket Entry No. 18742, was withdrawn prior to the Confirmation Hearing.  (Docket Entry No. 19109).

[6]  "DRA Parties" means AmeriNational Community Services, LLC, as servicer for the GDB Debt Recovery Authority, and Cantor-Katz Collateral Monitor LLC, which serves as the collateral monitor for Wilmington Trust, N.A.  The DRA Parties' objections to confirmation of the Plan, Docket Entry Nos. 18590 and 18636, and objection to the initial proposed confirmation order, Docket Entry No. 18685, were withdrawn prior to the Confirmation Hearing.  (Docket Entry No. 19121).

[7]  International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Service Employees International Union's objections to the proposed Confirmation Order were partially withdrawn after the Confirmation Hearing.  (Docket Entry No. 19349).

19221); (f) Demetrio Amador, Inc. (Docket Entry No. 19228); (g) Suiza Dairy Corp. (Docket Entry No. 19279); and (h) AAFAF (Docket Entry No. 19319).

Reservations of rights with respect to the proposed confirmation orders were filed by the following parties: (i) Assured (Docket Entry Nos. 18645 and 19217); (ii) the Creditors' Committee (Docket Entry Nos. 18658 and 19225); (iii) Bank of New York Mellon (Docket Entry No. 18662); (iv) the Retiree Committee (Docket Entry Nos. 18679 and 19248) (v) Ambac (Docket Entry No. 18694); and (vi) the Ad Hoc Group of Constitutional Debtholders, the Ad Hoc Group of General Obligation Bondholders, the LCDC, and the QTCB Noteholder Group (Docket Entry No. 19281).

Statements in support of confirmation of the Plan were filed by the following parties: (i) the Retiree Committee (Docket Entry No. 18562); (ii) National (Docket Entry No. 18574); (iii) Assured (Docket Entry No. 18584); (iv) FGIC (Docket Entry No. 18595); (v) Ambac (Docket Entry No. 18601); and (vi) the Puerto Rico Funds (Docket Entry No. 18848).[8]

---

[8]   The Puerto Rico Funds are: GNMA & US Government Target Maturity Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.), Mortgage-Backed & US Government Securities Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.), Puerto Rico Residents Bond Fund I (f/k/a Puerto Rico Investors Bond Fund I), Puerto Rico Residents Tax-Free Fund, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund, Inc.), Puerto Rico Residents Tax-Free Fund II, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund II), Inc., Puerto Rico Residents Tax-Free Fund III, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund III, Inc.), Puerto Rico Residents Tax-Free Fund IV, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund IV, Inc.), Puerto Rico Residents Tax-Free Fund V, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund V, Inc.), Puerto Rico Residents Tax-Free Fund VI, Inc. (f/k/a Puerto Rico Investors Tax- Free Fund VI, Inc.), Tax-Free Fixed Income Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund, Inc.), Tax-Free Fixed Income Fund II for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund II, Inc.), Tax-Free Fixed Income Fund III for Puerto Rico Residents, Inc. (Puerto Rico Fixed Income Fund III, Inc.), Tax-Free Fixed Income Fund IV for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund IV, Inc.), Tax-Free Fixed Income Fund V for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund V, Inc.), Tax-Free Fixed Income Fund VI for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund VI, Inc.), Tax Free Fund for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Fund, Inc.), Tax Free Fund II for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Fund II, Inc.), Tax-Free High Grade Portfolio Bond Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Bond Fund, Inc.), Tax-Free High Grade Portfolio Bond Fund II for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Bond Fund II, Inc.), Tax-Free High Grade Portfolio Target Maturity Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Target Maturity Fund, Inc.), Tax Free Target Maturity Fund for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Target Maturity Fund, Inc.), and UBS IRA Select Growth & Income Puerto Rico Fund.

Further, pursuant to the *Urgent Motion of the Financial Oversight and Management Board of Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021* (Docket Entry No. 19002), the Oversight Board requested Court approval of certain rulings related to Act 53-2021 in connection with confirmation of the Plan.  Oppositions to such rulings were filed by the following parties: (i) Asociación Puertorriqueña de la Judicatura, Inc (Docket Entry No. 19161); (ii) Asociación de Jubilados de la Judicatura de Puerto Rico and Hon. Hector Urgell Cuebas, Former Judge of the Puerto Rico Court of Appeals (Docket Entry No. 19175); (iii) Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc. (Docket Entry No. 19180); (iv) Asociación de Maestros de Puerto Rico and Asociacón de Maestros de Puerto Rico-Local Sindical (Docket Entry No. 19181); and (v) Maria A. Clemente Rosa (Docket Entry No. 19254).  A joinder in support of the Oversight Board's requested rulings was filed by the LCDC (Docket Entry No. 19252).

The Court heard argument and received evidence in connection with confirmation of the Plan at a hearing held on November 8, 9, 10, 12, 15, 17, 22, and 23, 2021 (the "Confirmation Hearing").[9]  The Court has carefully considered the Plan, as well as the supporting and opposing submissions, and the witness testimony and voluminous briefing and written evidence submitted by the parties.  The Court has also reviewed and considered carefully hundreds of letters and email messages submitted by members of the public and has listened carefully to the oral remarks made on the record at the Confirmation Hearing by members of the public.  For the

---

[9]   At the Confirmation Hearing, the Court also considered approval of the *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Infrastructure Financing Authority* (Case No. 21-1492, Docket Entry No. 1 , Ex. A) and *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Convention Center District Authority* (Case No. 21-1493, Docket Entry No. 1, Ex. A).

following reasons, the Plan is hereby confirmed and any remaining objections are overruled to the extent provided herein.

### Introduction

In 2017, the Oversight Board initiated unprecedented proceedings to restructure the debts of the Commonwealth and certain of its instrumentalities pursuant to Title III of PROMESA. At the outset of these historic proceedings, the Court emphasized the goal of Title III and the Court's goal in overseeing these cases would be to find a path forward for Puerto Rico, its citizens, and others holding a stake in its future, including financial investors who hold obligations or are otherwise dependent on Puerto Rico for their financial well-being. (See May 22, 2017 Hrg. Tr. 6:9–8:12).

On November 7, 2018, this Court approved a qualifying modification for GDB (Case No. 18-1561, Docket Entry No. 270), which restructured approximately $4.5 billion of claims against GDB. On February 4, 2019, this Court confirmed the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated January 9, 2019 (Docket Entry Nos. 5047 and 5048, as amended by Docket Entry Nos. 5053 and 5055 on February 5, 2019), for the Puerto Rico Sales Tax Financing Corporation ("COFINA") and approved the settlement between the Commonwealth and COFINA (Docket Entry No. 5045) that divides rights to a significant flow of tax revenues between the two debtors that were involved in complex litigation regarding the ownership of such tax revenues. The settlement of such dispute paved the way for the design of a plan of adjustment for the Commonwealth that meets PROMESA's goals of achieving fiscal responsibility and access to capital markets for the benefit of the Commonwealth, its people, and its many other stakeholders.

10

The Plan represents a significant next step on the path toward Puerto Rico's financial recovery, economic stability, and prosperity, and a consensual resolution of complex litigation involving many of the Debtors' key stakeholders. The litigation resolutions embodied in the Plan resulted from good faith, arm's length negotiations, many of which were facilitated by the Mediation Team appointed by the Court. After considering the applicable legal standards and the evidence, the Court finds the Plan is necessary and compliant with the relevant legal standards and is essential to ensure that Puerto Rico is on a path that will restore its access to capital markets as it builds a stronger economy. Importantly, with the exception of certain payments to be made by HTA, the Plan addresses only the Commonwealth, ERS, and PBA's assets and liabilities, and not those of other instrumentalities, including HTA and PREPA.

### Findings of Fact and Conclusions of Law

1. <u>Findings and Conclusions</u>. This memorandum (the "<u>Memorandum</u>") constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and PROMESA Section 310. To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such. Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Memorandum, the Confirmation Order, or the Plan.

2. <u>Jurisdiction</u>. This Court has exclusive jurisdiction over the Title III Cases pursuant to PROMESA Section 306(a). Venue is proper before this Court pursuant to PROMESA Section 307(a). Pursuant to Section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercised, and continues to exercise, exclusive jurisdiction

11

over all property of the Debtors, wherever located.   To the extent necessary, pursuant to PROMESA Section 305, the Oversight Board has granted consent to, and the Plan provides for, this Court's exercise of jurisdiction over the property and revenues of the Debtors as necessary to approve and authorize the implementation of this Memorandum, the Confirmation Order, and the Plan.

3.   <u>Judicial Notice</u>.   The Court takes judicial notice of the dockets of the Title III Cases, the appellate court dockets of any and all appeals taken from any order entered or opinion issued by the Court in the Title III Cases, and the following litigations and adversary proceedings, each as defined in the Plan, including all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered, or adduced at hearings related thereto: (a) the Ambac Action, (b) the Appointments Related Litigation, (c) the Clawback Actions, (d) the ERS Litigation, (e) the ERS Recovery Actions, (f) the ERS Takings Action, (g) the FGIC Action, (h) the Gracia Gracia CW Action, (i) the Gracia Gracia Federal Action, (j) the Lift Stay Motions, (k) the Med Center Litigation, (l) the Med DC Action, (m) the National Action, (n) the PBA Litigation, (o) the PRIFA BANs Litigation, (p) the SCC Action, (q) the Uniformity Litigation, (r) the Invalidity Actions, (s) the Lien Challenge Actions, (t) the Debt Related Objections, and (u) the Avoidance Actions set forth on <u>Exhibits</u> <u>A</u> and <u>B</u> to the Plan.

4.   <u>Burden of Proof</u>.   The Debtors have the burden of proving the elements of PROMESA Section 314 and, to the extent applicable to consideration of confirmation of the Plan, Rule 9019 of the Bankruptcy Rules, by a preponderance of the evidence.   The Debtors have met their burden with respect to each element of PROMESA Section 314 and, to the extent applicable to consideration of confirmation of the Plan, Bankruptcy Rule 9019.

**General Background**

### I.   The Oversight Board and Title III Cases

5.      For more than a decade, Puerto Rico has faced an unprecedented fiscal and economic crisis.  The actions taken in the past caused Puerto Rico to lose access to capital markets and precipitated the collapse of Puerto Rico's public finance system.  (See PROMESA § 405(m)).  These actions accelerated the contraction of Puerto Rico's economy and increased the out-migration of its residents.  (See Murray Decl. Ex. A, ¶ 20–22).  The situation has been further exacerbated by the devastation caused to Puerto Rico by Hurricanes Irma and Maria in 2017, the earthquakes that occurred in early 2020, and the COVID-19 pandemic.  (Jaresko Decl. ¶¶ 20, 22–23).

6.      On June 30, 2016, the United States enacted PROMESA, and the Oversight Board was established pursuant to PROMESA Section 101(b).  (Jaresko Decl. ¶ 7).  Pursuant to Section 4 of PROMESA and Article VI of the United States Constitution, the provisions thereof prevail over any inconsistent general or specific provisions of territory law, State law, or regulation.  (See PROMESA § 4).

7.      On August 31, 2016, President Obama appointed the Oversight Board's original seven voting members.  (Jaresko Decl. ¶ 8).  The Oversight Board currently has its full complement of seven members.  (Id.).

8.      The Oversight Board designated ERS and PBA as "covered instrumentalities" pursuant to PROMESA Section 101(d).  (Jaresko Decl. ¶ 15).  The Commonwealth is a "covered territory" pursuant to PROMESA Sections 5(8) and 101(b)(1).

9.      On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA Section 304(a), thereby commencing the Commonwealth Title III Case.  (See Docket Entry No. 1).

10.     On May 21, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for ERS pursuant to PROMESA Section 304(a), thereby commencing the ERS Title III Case.  (Case No. 17-3566, Docket Entry No. 1).

11.     On June 15, 2017, the U.S. Trustee appointed the Creditors' Committee in the Commonwealth Title III Case (Docket Entry No. 338) and, on August 25, 2017, the U.S. Trustee amended that appointment to provide that the Creditors' Committee would also serve in the ERS Title III Case (Docket Entry No. 1171).  On June 15, 2017, the U.S. Trustee appointed the Retiree Committee in the Commonwealth Title III Case.  (Docket Entry No. 340).

12.     On June 23, 2017, the Court entered an order appointing the Mediation Team, led by Chief Bankruptcy Judge Barbara Houser.  (Docket Entry No. 430).

13.     On June 29, 2017, the Court entered an order granting the joint administration of the Commonwealth Title III Case and the ERS Title III Case, for procedural purposes only. (Case No. 17-3655, Docket Entry No. 156).

14.     On September 27, 2019, the Oversight Board issued a restructuring certification, pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for PBA pursuant to PROMESA Section 304(a), thereby commencing the PBA Title III Case.  (Case No. 19-5523, Docket Entry No. 1).

15. On October 9, 2019, the Court entered an order granting the joint administration of the PBA Title III Case with the existing Title III Cases (Case No. 19-5523, Docket Entry No. 13).

## II. The Plan Support Agreements, Plan, and Disclosure Statement

16. The Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team, and negotiated directly with various constituencies, in an effort to build support for the restructuring of, among other indebtedness, the Commonwealth, ERS, and PBA's debt. Those negotiations culminated in certain agreements with various stakeholders in furtherance of the successful implementation of the Plan. (Jaresko Decl. ¶ 29; Skeel Decl. ¶ 17; Zelin Decl. ¶ 13; Debtors Exhibits 16–19, 23).

17. On May 31, 2019, the Oversight Board entered into a plan support agreement (the "2019 PSA") with certain holders of approximately $3 billion of GO Bond Claims and PBA Bond Claims regarding the framework of a plan of adjustment to resolve (i) disputes regarding the validity and related rights of the GO Bonds and PBA Bonds, and (ii) disputes between the Commonwealth and PBA regarding the characterization of certain purported leases, the amount of any administrative rent that may be owed by the Commonwealth for the use of PBA facilities following the commencement of the Commonwealth Title III Case, and the ownership of certain PBA facilities. Following entry into the 2019 PSA, the Oversight Board, under the guidance of the Mediation Team, continued to negotiate with its creditors to generate further consensus among the parties, including, but not limited to, other holders and insurers of GO Bonds and PBA Bonds. (Jaresko Decl. ¶ 30; Skeel Decl. ¶ 18; Zelin Decl. ¶¶ 14–15).

15

18.     On June 7, 2019, the Oversight Board (i) reached an agreement with the Retiree Committee regarding, among other things, the treatment of accrued ERS, JRS, and TRS benefits pursuant to the Plan, and (ii) entered into the AFSCME Plan Support Agreement regarding, among other things, return of contributions of all public employees to ERS under the System 2000 plan, and modifications to a collective bargaining agreement and AFSCME's consent to the treatment of ERS benefits pursuant to the Plan.  (Jaresko Decl. ¶ 31; Santambrogio Decl. ¶ 12; Skeel Decl. ¶ 19; Debtors Exhibit 21).  The AFSCME Plan Support Agreement provides for AFSCME's support for modified terms of collective bargaining agreements, along with its consent to the restructuring of the Commonwealth's pension obligations, pursuant to the Plan. (Jaresko Decl. ¶ 31; Santambrogio Decl. ¶ 12; Debtors Exhibit 21).

19.     On September 27, 2019, the Debtors filed the Original Plan (as defined below), containing the material terms outlined in the 2019 PSA.  The Oversight Board thereafter continued to negotiate with various stakeholders to generate further support for a plan of adjustment.  On February 9, 2020, the Oversight Board and certain holders of GO Bonds and PBA Bonds holding over $8 billion in Claims (and, inclusive of Claims held by parties who executed joinders thereto, over $10 billion), terminated the 2019 PSA, and disclosed they had reached a global settlement in principle outlined in a plan support agreement (the "2020 PSA"). (Jaresko Decl. ¶¶ 18, 33; Skeel Decl. ¶ 21; Zelin Decl. ¶ 16).  On February 28, 2020, in furtherance of the 2020 PSA, the Oversight Board filed the First Amended Plan (as defined below), a disclosure statement in connection with the First Amended Plan (Docket Entry No. 11947) (the "2020 Disclosure Statement"), and a motion seeking approval of the 2020 Disclosure Statement (Docket Entry No. 11950).  (Jaresko Decl. ¶ 34).

16

20.    On March 10, 2020, the Court entered an order scheduling a hearing to consider the adequacy of information contained in the 2020 Disclosure Statement and setting related deadlines.   (Docket Entry No. 12187).   Shortly thereafter, in response to the COVID-19 pandemic and its effects on the people and economy of Puerto Rico, the Oversight Board filed a motion (Docket Entry No. 12485) seeking to adjourn the hearing to consider approval of the 2020 Disclosure Statement and related deadlines, which the Court granted on March 27, 2020 (Docket Entry No. 12549).  (Skeel Decl. ¶ 23).

21.    Following the adjournment, the Oversight Board re-engaged with the parties to the 2020 PSA and entered into further mediation sessions with the assistance and guidance of the Mediation Team.  (Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24; Zelin Decl. ¶ 17).   However, the parties were unable to reach a consensus and, on October 6, 2020, the PSA Creditors filed a motion (Docket Entry No. 14478) seeking to impose deadlines for confirmation of a plan of adjustment. On October 29, 2020, the Court entered the *Order on Joint Motion of PSA Creditors Pursuant to Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* (Docket Entry No. 14987) (the "Plan Scheduling Order") directing the Oversight Board to file, on or before February 10, 2021, the proposed terms of a plan of adjustment and a motion for approval of a proposed timetable for filing an amended plan and proposed disclosure statement, among other things.  (Id.).

22.    The Oversight Board continued to engage in discussions with the guidance of the Mediation Team and, on February 9, 2021, reached an agreement in principle with the parties to the 2020 PSA regarding the terms of an amended plan of adjustment, subject to execution of a plan support agreement. (Zelin Decl. ¶¶ 20, 22).  Accordingly, the Oversight Board requested an extension of the February 10, 2021 deadline set forth in the Plan Scheduling Order.  (Docket

Entry No. 15821).  On February 16, 2021, the Court entered the *Order Granting Urgent Motion of the Financial Oversight and Management Board for Puerto Rico Requesting Extension of Deadlines for Submission of Plan of Adjustment or Term Sheet with Respect Thereto* (Docket Entry No. 15849), extending the February 10, 2021 deadline to March 8, 2021.

23.   On February 23, 2021, the Oversight Board announced the termination of the 2020 PSA and the execution of the Initial PSA, dated as of February 22, 2021, among the Oversight Board, as representative of the Debtors, and the Initial GO/PBA PSA Creditors. (Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24; Zelin Decl. ¶ 22; Debtors Exhibit 16).  On March 8, 2021, in furtherance of the Initial PSA, the Oversight Board filed the Second Amended Plan (as defined below) and a disclosure statement in connection with the Second Amended Plan.

24.   Following entry into the Initial PSA, the Oversight Board continued to work to develop additional consensual resolutions, and engaged with objecting parties under the guidance of the Mediation Team.  (Jaresko Decl. ¶ 38; Zelin Decl. ¶ 26).  On March 9, 2021, the Oversight Board entered into the ERS Stipulation (amended on April 2, 2021) which, among other things, (i) provides a global resolution of disputes regarding the validity and related rights of ERS Bonds and the extent of the alleged liens supporting the obligations thereunder, (ii) resolves the administrative expense claims filed by certain ERS Bondholders, (iii) provides a resolution of disputes regarding certain legal challenges to the Commonwealth's post-petition enactment of a "pay as you go" system for payment of pension benefits to retirees, (iv) provides for the payment of $373 million in cash to the holders of ERS Bonds, as well as the proceeds from the sale of certain ERS assets to the Commonwealth, and (v) provides for the disposition of the ERS Private Equity Portfolio. (Jaresko Decl. ¶ 38–39; Skeel Decl. ¶ 26–27; Zelin Decl. ¶ 27; Debtors Exhibit 19).

25.     On May 5, 2021, the Oversight Board entered into the HTA/CCDA Plan Support Agreement with certain holders and insurers of bonds issued by HTA and CCDA which, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the HTA/CCDA Plan Support Agreement, (iv) provides for the bondholders and insurers party thereto to support the Plan, and (v) provides an agreement regarding the structure of a potential plan of adjustment for HTA. (Jaresko Decl. ¶ 40; Skeel Decl. ¶ 28; Zelin Decl. ¶ 34; Debtors Exhibit 17).

26.     On May 11, 2021, in furtherance of the HTA/CCDA Plan Support Agreement, the Debtors filed the Third Amended Plan (as defined below) and a disclosure statement in connection with the Third Amended Plan (Docket Entry No. 16741).  On May 13, 2021, the Debtors filed a motion seeking approval of such disclosure statement (Docket Entry No. 16756). On June 29, 2021, the Debtors filed the Fourth Amended Plan (as defined below), reflecting additional terms negotiated with certain creditors, and a disclosure statement in connection with the Fourth Amended Plan (Docket Entry No. 17192).

27.     On July 12, 2021, the Oversight Board (i) entered into the GO/PBA Plan Support Agreement, which amended and restated the Initial PSA (Jaresko Decl. ¶ 122; Debtors Exhibit 16) and (ii) reached an agreement in principle with the Creditors' Committee, which proposed recoveries for Classes of unsecured claimholders and resolved the Creditors' Committee's objections to the Plan, subject to the terms of the Committee Agreement.  (Jaresko Decl. ¶ 41; Zelin Decl. ¶ 38; Debtors Exhibit 23).  The GO/PBA Plan Support Agreement, together with the

restructuring of COFINA's debt, contemplates the reduction of the Commonwealth's debt (including principal and interest from restructured COFINA bonds) by approximately 62%, from $90.4 billion to $34.1 billion. (Jaresko Decl. ¶ 37; Zelin Decl. ¶ 25). The GO/PBA Plan Support Agreement also (i) provides for a proposed global resolution of disputes regarding the validity and related rights of GO Bonds that may have been issued in violation of the Puerto Rico Constitutional debt limit, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and PBA, and (iv) provides for the resolution of disputes regarding the PRIFA BANs pursuant to a stipulation dated February 22, 2021 (the "PRIFA BANs Stipulation") (Debtors Exhibit 22). (Id.). Also on July 12, 2021, in furtherance of the GO/PBA Plan Support Agreement, the Debtors filed the Fifth Amended Plan (as defined below) and a disclosure statement in connection with the Fifth Amended Plan (Docket Entry No. 17308).

28.     On July 27, 2021, the Oversight Board entered into the PRIFA Plan Support Agreement, which, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the PRIFA PSA, (iv) provides for the bondholders and insurers party thereto to support the Plan, and (v) presents the foundation for a restructuring of the PRIFA Bonds pursuant to Title VI of PROMESA. (Jaresko Decl. ¶ 42; Skeel Decl. ¶ 30; Zelin Decl. ¶ 41; Debtors Exhibit 18). Also on July 27, 2021, in furtherance of the PRIFA Plan Support Agreement, the Debtors filed the

20

Sixth Amended Plan (as defined below) and a disclosure statement in connection with the Sixth

Amended Plan.  (Docket Entry No. 17516).

29.     On July 30, 2021, the Debtors filed the Seventh Amended Plan and an updated

disclosure statement in connection with the Seventh Amended Plan (Docket Entry No. 17628)

(the "Disclosure Statement").  (Debtors Exhibit 2).

30.     On August 2, 2021, the Court entered the Disclosure Statement Order, among

other things (a) approving the Disclosure Statement as containing adequate information within

the meaning of section 1125 of the Bankruptcy Code, (b) establishing (1) October 19, 2021 at

5:00 p.m. (Atlantic Standard Time) as the Confirmation Objection Deadline, (2) October 4, 2021

at 5:00 p.m. (Atlantic Standard Time) as the deadline by which (i) ballots to accept or reject the

Plan were required to be received by the Solicitation Agent (the "Voting Deadline") and (ii)

elections regarding the form of distributions were required to be effectuated through ATOP (the

"Election Deadline"), and (c) scheduling a hearing on certain dates from November 8–23, 2021

to consider confirmation of the Plan.   On September 27, 2021, the Court entered an order

(Docket Entry No. 18258) extending the Voting Deadline to October 18, 2021 at 5:00 p.m.

(Atlantic Standard Time) and, on October 1, 2021, the Court entered an order (Docket Entry No.

18360) extending the Election Deadline to October 18, 2021 at 5:00 p.m. (Atlantic Standard

Time).

31.     Consistent  with  the  Disclosure  Statement  Order,  the  Debtors  caused  the

Solicitation Agent to distribute Solicitation Packages to all holders of Claims entitled to vote.

The Solicitation Packages contained, among other things: (a) the Confirmation Hearing Notice

setting forth the time, date, and place of the Confirmation Hearing, (b) the Disclosure Statement

Order (without the exhibits thereto) and the Disclosure Statement (together with all exhibits

thereto, including the Plan), (c) the appropriate form of Ballot or Notice, if any, with instructions for voting and/or making any applicable election and, as applicable, a pre-addressed, pre-paid return envelope, (d) with respect to Class 51, the Retiree Committee Letter and Information Guide, and (e) with respect to Classes 54, 58, and 66, the Creditors' Committee Letter.  (Mailing Affidavits; Pullo Decl. ¶ 4).  The Debtors also caused the Solicitation Agent to publish the Confirmation Hearing Notice and place radio advertisements providing, among other things, information regarding the solicitation of votes to accept or reject the Plan and deadlines associated therewith.  (Publication Affidavit; Pullo Decl. ¶ 7).

### Compliance with PROMESA Sections 104(j) and 313

32.     The Oversight Board must certify the submission or modification of a plan of adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or modifying such plan of adjustment.  See PROMESA § 104(j)(1)–(2).  The Oversight Board may certify a plan of adjustment only if it determines, in its sole discretion, that it is consistent with the applicable certified fiscal plan.  See id. § 104(j)(3).  The Oversight Board, after the issuance of a certification pursuant to PROMESA Section 104(j), may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of PROMESA Title III.  See id. § 313.  After the Oversight Board files a modification, "the plan as modified becomes the plan."  Id.

33.     The Oversight Board has complied with its obligations pursuant to PROMESA Sections 104(j) and 313.  On April 23, 2021, the Oversight Board certified the Commonwealth's current fiscal plan, which includes ERS and PBA (the "Fiscal Plan").  (Jaresko Decl. ¶ 28; Debtors Exhibit 10).

22

34.     On September 26, 2019, the Oversight Board certified the submission of the *Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 8765) (the "Original Plan").  (Debtors Exhibit 122).

35.     On February 28, 2020, the Oversight Board certified the modification of the Original Plan and the submission of the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 11946) (the "First Amended Plan"). (Debtors Exhibit 123).

36.     On March 8, 2021, the Oversight Board certified the modification of the First Amended Plan and the submission of the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 15976) (the "Second Amended Plan").  (Debtors Exhibit 124).

37.     On May 11, 2021, the Oversight Board certified the modification of the Second Amended Plan and the submission of the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 16740) (the "Third Amended Plan"). (Debtors Exhibit 125).

38.     On June 29, 2021, the Oversight Board certified the modification of the Third Amended Plan and the submission of the *Fourth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17194) (the "Fourth Amended Plan").  (Debtors Exhibit 126).

39.     On July 12, 2021, the Oversight Board certified the modification of the Fourth Amended Plan and the submission of the *Fifth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17306) (the "Fifth Amended Plan"). (Debtors Exhibit 127).

40.      On July 26, 2021, the Oversight Board certified the modification of the Fifth Amended Plan and the submission of the *Sixth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17516) (the "Sixth Amended Plan"). (Debtors Exhibit 128).

41.      On July 30, 2021, the Oversight Board certified the modification of the Sixth Amended Plan and the submission of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17627) (Debtors Exhibit 1) (the "Seventh Amended Plan").  (Debtors Exhibit 129).

42.      On November 3, 2021, the Oversight Board certified the modification of the Seventh Amended Plan and the submission of the *Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19053) (Debtors Exhibit 136) (the "Eighth Amended Plan").  (Debtors Exhibit 137).

43.      On November 7, 2021, the Oversight Board certified the modification of the Eighth Amended Plan and the submission of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19114) (Debtors Exhibit 143) (the "First Modified Eighth Amended Plan").  (Debtors Exhibit 144).

44.      On November 12, 2021, the Oversight Board certified the modification of the First Modified Eighth Amended Plan and the submission of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19184) (the "Second Modified Eighth Amended Plan").  (Debtors Exhibit 147).

45.      On November 21, 2021, the Oversight Board certified the modification of the Second Modified Eighth Amended Plan and the submission of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No.

24

19323) (Debtors Exhibit 149) (the "Third Modified Eighth Amended Plan"). (Debtors Exhibit 148).

46. On November 28,24, 2021, the Oversight Board certified the modification of the Third Modified Eighth Amended Plan and the submission of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19365) (the "Fourth Modified Eighth Amended Plan").  (Docket Entry No. 19569, Ex. C).

47. On December 20, 2021, the Oversight Board certified the modification of the ThirdFourth Modified Eighth Amended Plan and the submission of the Plan upon a determination, in the Oversight Board's sole discretion, that the Plan was consistent with the Fiscal Plan. (Debtors Exhibit [   ]Docket Entry No. 19569, Ex. D).  Accordingly, the Oversight Board submitted the modification of the Third Modified Eighth Amended Plan and the Plan in compliance with PROMESA Section 104(j).

48. 47. The Oversight Board submitted the Plan in accordance with PROMESA Section 313.  For the reasons explained herein, the Plan meets the requirements of PROMESA and the Oversight Board has complied with all provisions of PROMESA applicable to confirmation of the Plan.

### Compliance with PROMESA Section 314(b)

**A. PROMESA § 314(b)(1):** *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301.*

49. 48. As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the proponents.  Plan at 1.  In addition, as detailed below, the Plan satisfies the requirements of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), and 1123(d) of the Bankruptcy Code.

### i. Bankruptcy Code Section 1122(a)

25

50.   49.  With the exception of Administrative Expense Claims and Professional Claims, which need not be classified, Article IV of the Plan designates the classification of Claims.   The Plan's classification of Claims complies with section 1122(a) of the Bankruptcy Code because each Class contains only claims that are either all unsecured Claims or are all secured Claims secured by the same collateral.   (Jaresko Decl. ¶ 47).   The Plan designates the following sixty-nine (69) Classes of Claims:

| Claim | Class | Debtor(s) |
|---|---|---|
| Vintage PBA Bond Claims | Class 1 | PBA |
| Vintage PBA Bond Claims (Assured) | Class 2 | PBA |
| Vintage PBA Bond Claims (National) | Class 3 | PBA |
| Vintage PBA Bond Claims (Ambac) | Class 4 | PBA |
| Vintage PBA Bond Claims (FGIC) | Class 5 | PBA |
| Vintage PBA Bond Claims (Syncora) | Class 6 | PBA |
| Retail Vintage PBA Bond Claims | Class 7 | PBA |
| 2011 PBA Bond Claims | Class 8 | PBA |
| Retail 2011 PBA Bond Claims | Class 9 | PBA |
| 2012 PBA Bond Claims | Class 10 | PBA |
| Retail 2012 PBA Bond Claims | Class 11 | PBA |
| PBA/DRA Secured Claim | Class 12 | PBA |
| PBA General Unsecured Claims | Class 13 | PBA |
| PBA/DRA Unsecured Claim | Class 14 | PBA |
| Vintage CW Bond Claims | Class 15 | Commonwealth |
| Retail Vintage CW Bond Claims | Class 16 | Commonwealth |
| Vintage CW Bond Claims (Assured) | Class 17 | Commonwealth |
| Vintage CW Bond Claims (National) | Class 18 | Commonwealth |
| Vintage CW Bond Claims (Ambac) | Class 19 | Commonwealth |
| Vintage CW Bond Claims (FGIC) | Class 20 | Commonwealth |
| Vintage CW Bond Claims (Syncora) | Class 21 | Commonwealth |
| Vintage CW Bond Claims (Taxable Election) | Class 22 | Commonwealth |
| Vintage CW Guarantee Bond Claims | Class 23 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Assured) | Class 24 | Commonwealth |

| Vintage CW Guarantee Bond Claims (National) | Class 25 | Commonwealth |
|---|---|---|
| Vintage CW Guarantee Bond Claims (Ambac) | Class 26 | Commonwealth |
| Vintage CW Guarantee Bond Claims (FGIC) | Class 27 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Syncora) | Class 28 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 29 | Commonwealth |
| 2011 CW Bond Claims | Class 30 | Commonwealth |
| Retail 2011 CW Bond Claims | Class 31 | Commonwealth |
| 2011 CW Bond Claims (Assured) | Class 32 | Commonwealth |
| 2011 CW Bond Claims (Taxable Election) | Class 33 | Commonwealth |
| 2011 CW Guarantee Bond Claims | Class 34 | Commonwealth |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 35 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims | Class 36 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Assured) | Class 37 | Commonwealth |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 38 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 39 | Commonwealth |
| 2012 CW Bond Claims | Class 40 | Commonwealth |
| Retail 2012 CW Bond Claims | Class 41 | Commonwealth |
| 2012 CW Bond Claims (Assured) | Class 42 | Commonwealth |
| 2012 CW Bond Claims (Taxable Election) | Class 43 | Commonwealth |
| 2012 CW Guarantee Bond Claims | Class 44 | Commonwealth |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 45 | Commonwealth |
| 2014 CW Bond Claims | Class 46 | Commonwealth |
| Retail 2014 CW Bond Claims | Class 47 | Commonwealth |
| 2014 CW Bond Claims (Taxable Election) | Class 48 | Commonwealth |
| 2014 CW Guarantee Bond Claims | Class 49 | Commonwealth |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 50 | Commonwealth |
| Retired ERS Participant Below-Threshold Claims | Class 51A | Commonwealth |
| Retired JRS Participant Below-Threshold Claims | Class 51B | Commonwealth |
| Retired TRS Participant Below-Threshold | Class 51C | Commonwealth |

| Claims | | |
|---|---|---|
| Retired ERS Participant Above-Threshold Claims | Class 51D | Commonwealth |
| Retired JRS Participant Above-Threshold Claims | Class 51E | Commonwealth |
| Retired TRS Participant Above-Threshold Claims | Class 51F | Commonwealth |
| Active ERS Participant Claims | Class 51G | Commonwealth |
| Active JRS Participant Claims | Class 51H | Commonwealth |
| Active TRS Participant Claims | Class 51I | Commonwealth |
| System 2000 Participant Claims | Class 51J | Commonwealth |
| VTP Payroll Participant Below-Threshold Claims | Class 51K | Commonwealth |
| VTP Payroll Participant Above-Threshold Claims | Class 51L | Commonwealth |
| AFSCME Claims | Class 52 | Commonwealth |
| Dairy Producer Claims | Class 53 | Commonwealth |
| Eminent Domain/Inverse Condemnation Claims | Class 54 | Commonwealth |
| Energy Incentive Claims | Class 55 | Commonwealth |
| Med Center Claims | Class 56 | Commonwealth |
| Tax Credit Claims | Class 57 | Commonwealth |
| CW General Unsecured Claims | Class 58 | Commonwealth |
| GDB/PET Claim | Class 58A | Commonwealth |
| CW/HTA Claims | Class 59 | Commonwealth |
| CW/Convention Center Claims | Class 60 | Commonwealth |
| CW/PRIFA Rum Tax Claims | Class 61 | Commonwealth |
| CW/MBA Claims | Class 62 | Commonwealth |
| CW Appropriations Claims | Class 63 | Commonwealth |
| Section 510(b) Subordinated Claims | Class 64 | Commonwealth, ERS, and PBA |
| ERS Bond Claims | Class 65 | ERS |
| ERS General Unsecured Claims | Class 66 | ERS |
| Gracia-Gracia Claims | Class 67 | Commonwealth |
| Convenience Claims | Class 68 | Commonwealth and ERS |
| Federal Claims | Class 69 | Commonwealth |

(Jaresko Decl. ¶ 47).

51. ~~50.~~ The classification of Claims set forth in the Plan is reasonable and was not done to control the outcome of voting to accept or reject the Plan, as the classification is based upon differences in the legal nature and/or priority of such Claims in accordance with applicable law.  To the extent unsecured Claims are separately classified from the Commonwealth's general unsecured claims (Class 58),[10] it is not to gerrymander an accepting Class, as proven by there being several impaired accepting Classes for each Debtor.  Rather, separate classification is used for governmental or business reasons usually requiring different treatment of separate Classes' Claims.  (Jaresko Decl. ¶ 48).

52. ~~51.~~ All holders of Claims in Classes 1–11 hold PBA Bonds and allege the same guarantee against the Commonwealth, but are separately classified based on three factors: the year in which the bonds were issued; whether the bonds are insured and, if so, the insurer; and whether the bondholder is a retail investor.  Classification depending on year of issuance is based on differences in the risk profile associated with each issuance potentially having violated the debt service limit set forth in Article VI, section 2 of the Commonwealth Constitution, with the treatment of Classes varying based on how much risk of disallowance of the Claims existed for each Class.  Holders of insured bonds issued the same year are separately classified because the insurance agreements provide bondholders different rights.  Claims of Retail Investors are separately classified because such Claims are smaller in dollar amount and the holders' rights differ from those of holders of GO Bonds and PBA Bonds pursuant to the GO/PBA Plan Support Agreement, and holders of bonds insured by the Monolines.  Thus, the holders of Claims in

---

[10]   Class 58A consists of the GDB/PET Claim, which will receive payments from the Commonwealth equal to, and on the same timeframe as, the pro rata payments to be made to holders of Allowed CW General Unsecured Claims (Class 58) pursuant to the Plan.  Plan § 62.4.

Classes 1–11 are classified by whether the PBA Bonds they hold: (a) were issued prior to 2011 and are (i) uninsured (Class 1), (ii) uninsured and held by a Retail Investor (Class 7), (iii) insured by Assured (Class 2), National (Class 3), Ambac (Class 4), FGIC (Class 5), or Syncora (Class 6); (b) were issued in 2011 and are (i) uninsured (Class 8), or (ii) uninsured and held by a Retail Investor (Class 9); or (c) were issued in 2012 and are (i) uninsured (Class 10), or (ii) uninsured and held by a Retail Investor (Class 11).  (Jaresko Decl. ¶ 48).

53.    52.  Bond Claims against the Commonwealth in Classes 15–50 are classified separately based on the date of bond issuance, whether the bonds are insured and, if so, the insurer, and whether the bondholder is a retail investor as follows: (a) whether the bonds were issued prior to March 2011 (Classes 15–29), March or later in 2011 (Classes 30–39), in 2012 (Classes 40–45), or 2014 (Classes 46–50), and (b) whether the bonds are (i) uninsured (Classes 15, 23, 30, 34, 36, 40, 44, 46, and 49) and held by Retail Investors (Classes 16, 31, 38, 41, and 47), or (ii) insured by Assured (Classes 17, 24, 32, and 42), National (Classes 18 and 25), Ambac (Classes 19 and 26), FGIC (Classes 20 and 27), or Syncora (Classes 21 and 28).  (Jaresko Decl. ¶ 49).

54.    53.  Based on the elections offered pursuant to the Plan, certain Vintage CW Bond Claims, Vintage CW Guarantee Bond Claims, 2011 CW Bond Claims, 2011 CW Guarantee Bond Claims, 2011 CW Series D/E/PIB Bond Claims, 2012 CW Bond Claims, 2014 CW Bond Claims, and 2014 CW Guarantee Bond Claims, to the extent elections were made, were shifted to other Classes (Classes 22, 29, 33, 35 39, 43, 48, and 50, respectively) to denote the election made by holders of such Claims to receive taxable distributions on account of their bonds, and the alternative form of distribution elected.  (Jaresko Decl. ¶ 49).  Only Puerto Rico Investors could elect to receive taxable bonds because, unlike mainland U.S. investors, Puerto Rico Investors are

30

generally not subject to U.S. federal income taxation.  (Brownstein Decl. ¶ 16).  When Puerto Rico Investors elect taxable treatment, it increases the likelihood that a greater amount of tax-exempt bonds will be available for mainland U.S. bondholders.  (Brownstein Decl. ¶ 16). The taxable election for on-island bondholders benefits mainland U.S. bondholders because, as a result of on-island bondholders taking the taxable election, mainland investors receive a higher amount of tax-exempt bonds affording a greater after-tax gain.[11]  Nov. 12, 2021 Hrg. Tr. 112:5–15.

55. 54. Active and retired employees holding pension Claims comprise Classes 51A–51L.  These current and retired employees are integral to the basic provision of governmental services to the Commonwealth's residents and the Government could not function without them.  Moreover, the best interests of the Commonwealth and all of its stakeholders are served by ensuring pensioners receive monthly benefits to maintain the ability to support themselves without requiring additional future support from the Commonwealth.  These pension Claims are further classified separately based on whether the pensioners (a) are retired (Classes 51A–F, K, and L) or active (Classes 51G–J), (b) are participants in ERS (Classes 51A, 51D, and 51G), JRS (Classes 51B, 51E, and 51H), TRS (Classes 51C, 51F, and 51I), System 2000 (51J), or participated in a voluntary termination program (Classes 51K and 51L), because each program had different funding sources as of the Commonwealth Petition Date, with different levels of

---

[11]    On cross-examination, Mr. Brownstein testified that an individual mainland bondholder in a 35 percent tax bracket would benefit by a 14 percent after-tax gain: "Clearly, if you're a taxpayer who pays state and local taxes, you're higher than that, but in a 35 percent tax bracket, you, as an U.S. holder, mainland holder of these bonds, for the 49 million in bonds that the local on-island holders took taxable instead of you, you have a 14 percent after-tax gain. That is what was provided to you by giving the on-island investors the right to elect taxable bonds, which meant that your portfolio would have a higher amount of tax exempt bonds."  Nov. 12, 2021 Hrg. Tr. 112:5–15.

31

underfunding, and (c) receive total monthly pension benefits above (Classes 51D-F and 51L) or below (Classes 51A-C and 51K) $1,500.[12]  (Jaresko Decl. ¶ 50–51).

56.  55. The separate classification of Claims for retirement benefits is justified for at least two reasons. *First*, unlike the Claims of commercial creditors, who contracted to be paid a fixed sum at a fixed time, retirees agreed to defer their compensation with the expectation that the deferred compensation, *i.e.*, their pension, would be paid in periodic payments over the balance of their life (and that of any surviving spouse), based on formulas established when they worked for the Commonwealth or other governmental entities.  Accordingly, the Plan proposes to make payments to retirees over the life of the retiree and any eligible spouse through the PayGo system and specified statutory rules established before the Commonwealth's Title III case began, as modified pursuant to the Plan, including through the "freeze" of TRS and JRS and elimination of cost of living adjustments ("COLAs").

57.  56. *Second*, retiree Claims are claims for "essential public services" under Article II, section 18 of the Puerto Rico Constitution, which constitutes a reasonable justification for treating them differently from other Claims.  Pensions are deferred compensation for the essential services that retirees, who served as police officers, firemen, teachers, judges, and government employees of all categories, provided to the Commonwealth.

58.  57. Claims held by AFSCME, related to certain collective bargaining agreements between AFSCME affiliates and the Commonwealth that will occur pursuant to the Plan, are classified in Class 52, separately from general unsecured claims.  The separate classification is compelled because the treatment of these claims is the adoption of a new collective bargaining agreement.   This treatment  is  inapplicable  to  other Classes of unsecured Claims and it is

---

[12]   Whether claimants' monthly benefits are above or below the $1,500 threshold does not impact the treatment of their Claims following the post-solicitation passage of Act 53 and removal of the Monthly Benefit Modification from the Plan, as described below in paragraph 192.193.

beneficial to the Commonwealth and all its stakeholders to provide such treatment as opposed to the potential litigation and treatment of any rejection damages Claims relating to these collective bargaining agreements.  AFSCME and its local affiliates collectively constitute one of Puerto Rico's primary public employee unions, and is an important bargaining unit whose members provide the Commonwealth's public services.  (Jaresko Decl. ¶ 52).  Separate classification of these Claims is reasonable, justified, and supported by a governmental purpose.  All other collective bargaining agreements are not being rejected or assumed pursuant to the Plan.

59.   58. The Claims held by Suiza Dairy, Inc. and Vaqueria Tres Monjitas, Inc.—the Commonwealth's primary producers and sources of dairy for the population—are classified separately in Class 53, which rejected the Plan.  The Plan may be confirmed pursuant to Bankruptcy Code section 1129(b)(2)(B) because no Claims junior to the Claims in Class 53 receive or retain any property and there is no contention the Plan unfairly discriminates against Class 53.  Moreover, if there were such a contention it would be overruled because the Allowed Claims in Class 53 receive more than CW General Unsecured Claims in Class 58.  It is very costly and difficult for Puerto Rico to consistently import dairy, which has a short shelf life—a fact underscoring the importance of the domestic dairy industry to the Commonwealth and its residents.  Dairy production is one of the key issues of food security on the Island.  The dairy industry also is one of the Commonwealth's largest agricultural industries and employs a significant number of Puerto Rico's residents.  It is reasonable and justified to separately classify such Claims and provide such Class with a fifty percent (50%) recovery, ensuring that such integral Claimants do not suffer further financial hardship and impair an industry vital to the health of the Commonwealth's citizens.  (Jaresko Decl. ¶ 53).  Further, the dairy producers' claims arose from the prepetition Dairy Producer Settlement Agreement (see Jaresko Decl. ¶ 53;

33

Plan § 1.190, 1.191; Debtors Exhibit 26), and the Commonwealth obligation to pay certain fees to protect consumers (see Debtors Exhibit 26, ¶ 14).  Accordingly, it is reasonable, justified, and supported by a governmental purpose to classify separately claims held by large dairy producers. In addition, Claims in Class 53 are different from the Claims in Class 58 because the dairy producers assert their settlement agreement provides them 'takings' claims pursuant to the Fifth Amendment of the U.S. Constitution.  The Court is not ruling on whether the Claims are takings Claims pursuant to the Fifth Amendment.  But if they are takings Claims, for the same reasons provided in the next paragraph with respect to ~~eminent domain claims~~Eminent Domain/Inverse Condemnation Claims, the Court overrules the claimholders' contentions they are entitled to have their takings Claims rendered nondischargeable or paid in full.

60. ~~59.~~  Eminent ~~domain~~Domain/Inverse Condemnation Claims are separately classified in Class 54.  The holders of such Claims assert they are prepetition constitutional Claims based on seizures of property pursuant to the Commonwealth's eminent domain power, and are partially secured by funds deposited by the Commonwealth with the Clerk of the Court of First Instance in connection with condemnation proceedings underlying such Claims in accordance with Puerto Rico law, 32 L.P.R.A. § 2907.  In accordance with applicable Puerto Rico law, upon commencement of the condemnation proceeding, title to a subject property was transferred to the Commonwealth and funds on deposit became property of the former title holder.  32 L.P.R.A. § 2907.  The Plan treats the Claims as secured Claims to the extent the Claims are allowable and there is cash on deposit for them.  The Plan treats the Eminent Domain/Inverse Condemnation Claims as Class 58 CW General Unsecured Claims entitled to the same treatment as other holders of CW General Unsecured Claims to the extent each allowable Claim exceeds the cash on deposit for it~~—~~  (Jaresko Decl. ¶ 54)~~.~~, unless the

34

Confirmation Order, to the extent a Final Order, provides that such Claims must be paid in full to the extent they are Allowed Claims for just compensation.  *See* Plan § 1.178.  The claimants contend they are fully secured and entitled to payment in full of their allowable unsecured Claims because the Claims are based on the Fifth Amendment of the U.S. Constitution.  These Claims are classified separately because they are each alleged ~~eminent domain~~Eminent Domain/Inverse Condemnation Claims and are at least partially secured.  The issue presented by the claimants is whether they are entitled to have the unsecured portions of their Claims designated as nondischargeable or otherwise required to be paid in full.  They would be statutorily entitled to full payment if PROMESA Title III granted them priority status.  But, PROMESA Title III only provides for one type of priority claim which is not a grant of priority to eminent domain claims. PROMESA Section 301(a) incorporates Bankruptcy Code section 507(a)(2), which provides a priority for administrative expenses allowed by Bankruptcy Code section 503(b).  None of the ~~eminent domain~~Eminent Domain/Inverse Condemnation Claims is an administrative expense because they are prepetition Claims and therefore are not for actual, necessary costs and expenses of preserving the Debtors' property.  The ~~eminent domain~~Eminent Domain/Inverse Condemnation Claims are prepetition unsecured Claims for the Commonwealth's having taken title to the claimants' properties prior to commencement of the Commonwealth Title III case. PROMESA Section 301(a) also incorporates Bankruptcy Code section 944(c), which does not provide eminent domain claims or takings claims are nondischargeable.  Rather, sections 944(b) and (c) provide the debtor is discharged from all debts except debts (i) excepted from discharge by a plan or confirmation order or (ii) owed to an entity that, before confirmation of a plan, had neither notice nor actual knowledge of the case.  It is undisputed the Plan does not except the ~~eminent domain~~Eminent Domain/Inverse Condemnation Claims from discharge.  The Debtors

and claimants disagree as to whether the Court can and should except them from discharge. Because the Fifth Amendment of the U.S. Constitution provides "private property [shall not] be taken for public use, without just compensation," the claimants assert Congress lacks power to legislate the discharge of eminent domain claims for less than payment in full of just compensation.    Conversely, the Debtors contend Article I, Section 8, clause 4 of the U.S. Constitution grants Congress the power to pass uniform laws on the subject of bankruptcies, and empowers Congress to provide for the discharge of eminent domain claims for less than payment in full as it has done.   To date, two United States Courts of Appeals have indicated or ruled prepetition eminent domain claims are dischargeable as general claims, see Pointsett Lumber Manufacturing v. Drainage District No. 7, 119 F.2d 270, 272–73 (8th Cir. 1941); Cobb v. City of Stockton (In re City of Stockton), 909 F.3d 1256, 1268 (9th Cir. 2018), and one bankruptcy court has ruled they are not dischargeable.   In re City of Detroit, 524 B.R. 147, 268–271 (Bankr. E.D. Mich. 2014).[13]   The claimants in Class 54 assert, and those in City of Detroit asserted, Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555 (1935), and United States v. Security Industrial Bank, 459 U.S. 70 (1982), rule the bankruptcy power is subject to the Fifth Amendment. Radford and Security Industrial Bank each ruled in the context of a creditor having a perfected security interest in the debtor's assets, which is not the case here.   See Radford, 295 U.S. at 589; Security Industrial Bank, 459 U.S. at 74.   No claimant has proffered evidence of having a secured claim in anything other than the cash escrowed by the Commonwealth for them.   Radford, however, clarified: "Under the bankruptcy power Congress may discharge the debtor's personal

---

[13]    Additionally, the Supreme Court and lower courts have ruled Congress can enact statutes of limitation terminating the ability to recover on eminent domain claims.  Soriano v. United States, 352 U.S. 270, 273-77 (1957); Block v. North Dakota, 461 U.S. 273, 292 (1983) ("A constitutional claim can become time-barred just as any other claim can . . . Nothing in the Constitution requires otherwise."); Stone Container Corp. v. U.S., 229 F.3d 1345, 1350 (Fed. Cir. 2000) ("Both the Supreme Court and this court have repeatedly held that the federal government may apply statutes of limitations to just compensation claims.").

obligation, because, unlike the States, it is not prohibited from impairing the obligation of contracts," but cannot take substantive property rights without invoking the Fifth Amendment. Radford, 295 U.S. at 589–590. Here, claimants' property rights were taken before the Title III cases commenced, and all that remain are Debtor's personal obligations to pay which Radford ruled are dischargeable. Because the Fifth Amendment requires payment of just compensation, claimants in Class 54 are requesting the Court to rule nondischargeable the unsecured portions of their Claims Radford ruled were dischargeable. That, however, contradicts Radford's express approval of the bankruptcy power's discharge of unsecured obligations and its interpretation of the Fifth Amendment solely to protect property interests in the debtor's property. See id. If the Fifth Amendment's just compensation requirement is interpreted to make nondischargeable the unsecured obligations it creates, then there is no principled reason why any other unsecured obligation created by the Constitution is dischargeable, such as discrimination claims. One would have to interpret the Constitution's passive statement that just compensation should be paid as creating a priority claim, while interpreting the Constitution's bar against discrimination as not creating a priority claim. Even City of Detroit held the other liabilities of Detroit created by the Constitution are dischargeable. City of Detroit, 524 B.R. at 265–267. The claimants holding Claims in Class 54 have provided no authority showing the Fifth Amendment constricts the bankruptcy discharge power in situations other than when a creditor has a property interest in the debtor's assets. To the contrary, the federal bankruptcy laws have routinely taken creditors' property rights during bankruptcy cases to carry out the bankruptcy power's purposes without being restricted by the Fifth Amendment. Pursuant to Bankruptcy Code section 547, perfected security interests and all other property interests lawfully transferred under nonbankruptcy law can be avoided as preferences if transferred to repay antecedent debt by the debtor within ninety

37

days before bankruptcy while the debtor is insolvent.  See 11 U.S.C. § 547.  Pursuant to other sections of chapter 5 of the Bankruptcy Code, lawful prepetition transfers of money, perfected security interests, and other property are routinely avoided to carry out the bankruptcy power. See, e.g., 11 U.S.C. § 548.  The Supreme Court expressly acknowledges the equality of distribution policy is carried out by avoiding property transfers under Bankruptcy Code section 547.  Union Bank v. Wolas, 502 U.S. 151, 161 (1991); Begier v. IRS, 496 U.S. 53, 58 (1990). Rendering nondischargeable the eminent domainEminent Domain/Inverse Condemnation Claims here would create a new interpretation and application of the Fifth Amendment having consequences throughout bankruptcies as multiple constitutionally rooted claims are rendered nondischargeable., thereby creating a judicial priority for Constitutional claims.  Accordingly, the Class 54 claimants' and inverse condemnation claimants' assertions that their Claims should be paid in full or deemed nondischargeable are overruled, unless the Confirmation Order, to the extent a Final Order, provides that such Claims must be paid in full to the extent they are Allowed Claims for just compensation.

61.     60. Claims in Class 55 arise from, or relate to, the Energy Incentive Act, which provides tax incentives for citizens who undertake certain clean-energy projects to reduce their household's energy use.  Pursuant to the Plan, such Claims are not paid in cash or other monies in the Debtors' Title III Cases, but rather, are satisfied through reductions in tax revenue. (Jaresko Decl. ¶ 55).  It is in the Commonwealth's best interests to promote the reasonable governmental purpose of supporting residents who are taking steps to address climate change and who took those steps in reliance upon the availability of such tax deductions under the Energy Incentive Act.

62.   61. Class 56 consists of all Claims of certain federally qualified health centers arising from or relating to the Medicaid Act, 42 U.S.C. § 1396a(bb).  Separate classification of such Claims is reasonable and justified because such Claims are held by entities which provide critical medical treatment to Commonwealth residents, particularly in a global pandemic, and are payable through Medicare/Medicaid funds from the federal government earmarked for the payment of such claims and not available to other general unsecured claimholders.  Separate classification of such Class and enhanced treatment on account of its Claims through the receipt of a fifty percent (50%) recovery is reasonable and justified to support such critical services and ensure that medical providers on the Island are not underfunded.  (Jaresko Decl. ¶ 56).

63.   62. Class 57 consists of Claims (other than Energy Incentive Claims) relating to refunds or credits for the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, or an economic incentive law, in each case resulting in income tax credits, deductions, or carryforwards.  Such Tax Credit Claims were designed and implemented by the Government of the Commonwealth to incentivize certain behavior and to benefit the Commonwealth and support the economy as a whole.  Pursuant to the Plan, such Claims are not paid in cash or other monies in the Debtors' Title III Cases, but rather, are satisfied through reductions in tax revenue.  (Jaresko Decl. ¶ 57).  Accordingly, it is reasonable and in the best interests of the Commonwealth and its economy to continue to honor such tax incentives upon which residents and local businesses have relied, and to separately classify such Claims.

64.   63. Class 63 consists of Claims arising from or related to indebtedness only payable from appropriations of the Commonwealth Legislature.  Such claimants have significantly lesser rights than holders of CW General Unsecured Claims, as they have no ability

39

to compel payment of their Claims and hold only contingent rights to payment to the extent appropriated by the Government of the Commonwealth. (Jaresko Decl. ¶ 58).

65.   64.-Class 64 consists of Claims determined pursuant to a Final Order to be subject to section 510(b) of the Bankruptcy Code. (Jaresko Decl. ¶ 59). Section 510(b) of the Bankruptcy Code subordinates such Claims to other general unsecured claims, and provides that such Claims are only eligible to receive a recovery pursuant to the Plan once all other unsecured creditors have been paid in full. Because these Claims have a lower priority than general unsecured claims, they are sufficiently dissimilar to general unsecured claims to warrant separate classification and treatment.

66.   65.-As each Class contains Claims substantially similar to each other, the Plan satisfies the requirements of section 1122(a) of the Bankruptcy Code.

67.   66.-Further, the Plan separately classifies Claims not similarly situated to other Claims based upon differences in the legal nature and/or priority of such Claims or because they are asserted against a different Debtor than other Claims with the same priority, including secured and unsecured Claims against PBA (Classes 12–14), CW/HTA Claims (Class 59), CW/Convention Center Claims (Class 60), CW/PRIFA Rum Tax Claims (Class 61), CW/MBA Claims (Class 62), ERS Bond Claims and ERS General Unsecured Claims (Classes 65 and 66), Gracia Gracia Claims (Class 67), and Federal Claims (Class 69).

### ii.   Bankruptcy Code Section 1122(b)

68.   67.-Class 68 consists of Convenience Claims, consisting of Claims equal to or less than $20,000, or Claims which the holder elects to reduce to $20,000 pursuant to the Plan. Any holder of multiple Claims in an aggregate amount of $40,000 or more may elect to reduce all such Claims to an aggregate amount of $40,000 and be treated within Class 68. (Plan §§

40

1.162–1.163, Art. LXXII). The separate classification of Convenience Claims is reasonable and necessary to ease the administrative burden on the Debtors.

69. ~~68.~~ The Plan satisfies the requirements of section 1122(b) of the Bankruptcy Code.

### iii. Bankruptcy Code Section 1123(a)(1)

70. ~~69.~~ Section 4.1 of the Plan designates sixty-nine (69) separate Classes of Claims for the Debtors, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code.

71. ~~70.~~ The Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### iv. Bankruptcy Code Section 1123(a)(2)

72. ~~71.~~ Section 84.1 of the Plan specifies that Claims in Classes 1 through 50, 51B, 51E, 51G through 51I, 52 through 54, 56, 58 through 66, and 69 are impaired. Section 84.2 of the Plan specifies that Claims in Classes 51A, 51C, 51D, 51F, 51J through 51L, 55, 57, 67, and 68 are unimpaired.

73. ~~72.~~ The Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### v. Bankruptcy Code Section 1123(a)(3)

41

74. ~~73.~~ Articles V through LIV, Sections 55.2, 55.5, 55.7 through 55.9, Articles LVI through LVIII, LX, LXII through LXX, and LXXIII of the Plan identify the treatment of each Class of Claims impaired by the Plan.

75. ~~74.~~ The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### vi.    Bankruptcy Code Section 1123(a)(4)

76. ~~75.~~ Articles V through LXXIII of the Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim.

77. ~~76.~~ Certain parties receive Consummation Costs, Restriction Fees, or Retail Support Fees pursuant to the Plan and in accordance with the plan support agreements negotiated by the Oversight Board. These costs are critical components of the plan support agreements that made development of the Plan possible. In consideration for their efforts in assisting in the formulation of the Plan, and to compensate the PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the GO/PBA PSA and HTA/CCDA PSA, it is fair and reasonable for the PSA Creditors to be paid the Consummation Costs. (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 80, 84, 88, 91–93; Debtors Exhibits 16, 17). The Consummation Costs are not paid on account of creditors' Claims. Instead, Consummation Costs are paid to reimburse expenses incurred in negotiating plan support agreements that enabled the Plan to move forward. See Nov. 10, 2021 Hrg. Tr. 63:24–64:5; Zelin Decl. ¶¶ 80, 84, 88. The 1.5% Consummation Cost expense reimbursement is reasonable. Nov. 10 Hrg. Tr. 91:17–25. Additionally, in exchange for agreeing to support the Plan and tender or "lock up," as applicable, the parties'

42

bonds in accordance with each of the GO/PBA PSA and HTA/CCDA PSA, it is fair and reasonable to make PSA Restriction Fees available to such parties. (Zelin Decl. ¶¶ 80, 84, 85, 89, 91–93; Jaresko Decl. ¶¶ 127). Similarly, in exchange for executing the ERS Stipulation and agreeing to all of its terms and conditions, including agreeing to support the Plan and "lock up" their ERS Bonds in connection with the ERS Stipulation, it is fair and reasonable to make an ERS Restriction Fee available to each ERS bondholder party to the ERS Stipulation. (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 83, 91–93; Debtors Exhibit 19).

78. ~~77.~~ In addition, as part of the negotiations culminating in the GO/PBA PSA, a similar Retail Support Fee (i.e. a form of "restriction fee") will be available to Retail Investors who did not tender and exchange their bonds to join the GO/PBA PSA. (Zelin Decl. ¶¶ 81, 82; Debtors Exhibit 16). Providing Retail Investors an opportunity to receive similar payments is fair and reasonable, balances the interests of various creditor constituencies, and is beneficial to reduce the risk of potentially costly cramdown litigation in connection with Plan confirmation. (Jaresko Decl. ¶¶ 128, 216). Moreover, the Oversight Board has agreed to provide bondholders with an additional opportunity to certify that they are Retail Investors and receive their Pro Rata Share of the GO/PBA Restriction Fee Percentage, as set forth in the Confirmation Order.

79. ~~78.~~ The Consummation Costs, Restriction Fees, and Retail Support Fees are not awarded on account of the creditors' Claims, but rather, as consideration for their actions in facilitating the settlements embodied in the Plan. See Nov. 10, 2021 Hrg. Tr. 63:24–64:5, 72:23–73:6; Zelin Decl. ¶ 78; Jaresko Decl. ¶ 66. Such fees were essential to incentivize parties to engage in continued negotiations over an extended period of time, and incentivize creditor parties to the plan support agreements to support confirmation of the Plan. Without such fees, building consensus and encouraging parties to engage in negotiations and ultimately document

43

their agreements would have been significantly more difficult, and Plan confirmation would have been less likely or substantially prolonged. (Zelin Decl. ¶¶ 91–92). Such fees are the result of arm's length negotiations engaged in by the parties and are an integral part of the settlements reached between the parties. (Zelin Decl. ¶ 93). The Consummation Costs, Restriction Fees, and Retail Support Fees are fair and reasonable. (Zelin Decl. ¶¶ 91–93; Nov. 10, 2021 Hrg. Tr. 91:17–25). Accordingly, payment of these fees is consistent with section 1123(a)(4) of the Bankruptcy Code.

### vii.   Bankruptcy Code Section 1123(a)(5)

80. ~~79.~~ Various provisions of the Plan provide adequate and proper means for its implementation:

- Article III provides for the payment of Administrative Expense Claims required to be paid on the Effective Date;

- Section 74.1 provides for the issuance and distribution of the New GO Bonds;

- Section 74.2 provides for the issuance and distribution of the CVIs;

- Section 74.5 ensures the feasibility of the Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated";

- Section 76.1 provides, subject to Sections 76.5 and 76.7 of the Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Effective Date, shall be rejected by the Debtors as of the Effective Date, except for any Executory Contract or Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Commonwealth of Puerto Rico and rum

44

producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party) . . . .";

- Article LXXVII provides for distributions to be made to holders of all Allowed Claims under the Plan;

- Article LXXVIII provides for the Avoidance Actions Trust Assets to vest in the Avoidance Actions Trust, to be administered by the Avoidance Actions Trustee, and provides for the semi-annual distribution of liquidated Avoidance Actions Trust Assets to the beneficiaries thereof;

- Section 81.2 vests in the Disbursing Agent, among other things, the power and authority to make distributions contemplated by the Plan;

- Article LXXXII provides for the Debtors to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

- Article LXXXIII provides for the funding and administration of the Pension Reserve Trust under the Plan;

- Article LXXXVIII provides that, "[o]n the Effective Date all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule";

- Section 92.1 provides for the re-vesting of assets: "Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order);

- Article LXIX provides for the sale of all ERS assets to the Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private Equity Portfolio; and

- Articles VI through XV provide for approximately $1.1 billion to be paid by the Commonwealth to holders of PBA Bond Claims in satisfaction of their claims.

45

(see Jaresko Decl. ¶ 67; see generally Plan).

81. ~~80.~~ The Plan Supplement contains, among other things, the forms of (a) the New GO Bond Trust Agreement, (b) the CVI Trust Agreement, (c) the Avoidance Actions Trust Agreement, (d) the ERS Trust Agreement, (e) the Schedule of Executory Contracts and Unexpired Leases to be Assumed, (f) the Supplemental Ambac Election Notice, (g) the Assured Custodial Trust Documents, (h) the FGIC Custodial Trust Agreement, (i) Act 53-2021, and (j) the Pension Reserve Trust Guidelines (each as defined in the Plan Supplement). The Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.

82. ~~81.~~ The Confirmation Order further provides adequate means for the Plan's implementation including, but not limited to, paragraph 62 thereof which provides: "Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans that ended up creating nearly $55 billion of

46

unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan."   Confirmation Order ¶ 62.   This provision is appropriate and necessary for the implementation and feasibility of the Plan.  See Nov. 15, 2021 Hrg. Tr. 181:16–182:14.

83.   82.  The Court's conclusion under Bankruptcy Code section 1123(a)(5), made applicable by PROMESA Section 301(a), that there are adequate means to implement the Plan rests on, among other things, Act 53 (Debtors Exhibit 134) authorizing the new debt to be issued pursuant to the Plan with the full faith and credit of the Commonwealth, as long as the Plan does not include Monthly Benefit Modifications to pension payments.  Authorization of the new debt pursuant to Act 53 is unaffected by the freezes in the accruals of pension benefits and eliminations of cost of living adjustments.  The debt authorization in Act 53 is conditioned only on the Plan's removal of the Monthly Benefit Modification that was provided for in the proposed Seventh Amended Plan, and does not require satisfaction of any other conditions including cancellation of (a) the elimination of cost of living adjustments and/or (b) freeze or terminations of accrual of defined benefits under TRS or JRS from and after the Effective Date.  The Plan cancels and eliminates the Monthly Benefit Modification previously included in the proposed Seventh Amended Plan, thereby satisfying the condition in Act 53 for its debt authorization.  Accordingly, Act 53 provides adequate means for implementation of the Plan.  Moreover,

47

enabling legislation is not required to establish the freeze of defined benefits or elimination of COLAs because a legislature's efforts to elevate contractual pension obligations above other forms of unsecured prepetition debt would run contrary to the federal bankruptcy power to impair contracts.  See In re City of Detroit, Michigan, Case No. 13-53846 (TJT) (Bankr. E.D. Mich.), Docket Entry No. 1945 at 79–80, 92 (explaining that no applicable law protected pension benefits from impairment and "if a state consents to a municipal bankruptcy, no state law can protect contractual pension rights from impairment in bankruptcy, just as no state law could protect any other types of contractual rights").  PROMESA Section 314(b)(5) only requires legislation when necessary under applicable law, but there is no applicable law requiring enabling legislation to implement the freeze or elimination of cost of living adjustments.  Other provisions of PROMESA also establish enabling legislation is not necessary to implement the freeze and COLA elimination.  See, e.g., PROMESA § 104(k) (empowering the Oversight Board to seek judicial enforcement of its authority to carry out its responsibilities pursuant to PROMESA, which responsibilities include the restructuring of the Commonwealth's pension obligations); PROMESA § 108 (preventing the Governor and Legislature from enacting, implementing, or enforcing any statute that would impair or defeat the purposes of PROMESA).

84.   83. The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### viii.   Bankruptcy Code Section 1123(b)(1)

85.   84. Article LXXXIV of the Plan identifies which Classes of Claims are impaired and which Classes of Claims are left unimpaired.

86.   85. The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### ix.   Bankruptcy Code Section 1123(b)(2)

48

87.    86. Section 76.1 of the Plan provides that, as of the Effective Date, all Executory Contracts and Unexpired Leases to which any Debtor is a party are rejected, "except for any Executory Contract or Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtors reserve the right to amend, on or prior to the Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date."  Plan § 76.1; see also Plan Supplement at Exhibit E.

88.    87. The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

    **x.**    **Bankruptcy Code Section 1123(b)(3)(A)**

89. 88. The Plan incorporates, among other things, the settlements and compromises set forth in the AFSCME Plan Support Agreement (Debtors Exhibit 21), the GO/PBA Plan Support Agreement (Debtors Exhibit 16), the HTA/CCDA Plan Support Agreement (Debtors Exhibit 17), the PRIFA Plan Support Agreement (Debtors Exhibit 18), the Retiree Committee Plan Support Agreement (Debtors Exhibit 20), the Committee Agreement (Debtors Exhibit 23), the ERS Stipulation (Debtors Exhibit 19), the PRIFA BANs Stipulation (Debtors Exhibit 22), and the *Stipulation in Connection with DRA Related Disputes* (Docket Entry No. 19100, Ex. A) (Debtors Exhibit 146).   Further, the Plan sets forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, including the disputes: (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, MBA, and PRIFA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without

50

limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation.  (Jaresko Decl. ¶¶ 71, 114–187).  The Plan also incorporates the terms of a global settlement and compromise of all pending disputes involving the DRA Parties.  (See Docket Entry No. 19100, ¶¶ 9–12).  Such settlements and compromises are in the best interests of the Debtors and their creditors, and within the range of reasonableness.  (Murray Decl. Ex. A, ¶¶ 119–136; Zelin Decl. ¶¶ 13, 24, 29, 36, 43; Jaresko Decl. ¶¶ 201–216; Skeel Decl. ¶¶ 32–46).

90.  89. Each of the plan support agreements was reached following months of negotiations directed by the Mediation Team and/or other informal discussions that included party representatives, legal and financial advisors, and involved vigorous debate and discussion on both sides.  (Zelin Decl. ¶¶ 18–20, 21–22, 26–28, 32–33, 38, 40–41; Jaresko Decl. ¶¶ 202–216).  Those negotiations were conducted at arms' length and in good faith.  (Id.; Skeel Decl. ¶ 33; Jaresko Decl. ¶ 202).  The litigation resolved by the plan support agreements involves extraordinarily complex, high-stake disputes and, because these are the first Title III cases litigated under PROMESA, novel legal issues.  Collectively, billions of dollars were at stake.  (Jaresko Decl. ¶ 203).  The consequence of the GO Bondholders prevailing on their priority argument, or the HTA, PRIFA, or CCDA bondholders prevailing on their property interest contentions, would have inflicted grave harm on the Commonwealth and its residents because the Commonwealth, in either situation, would have lost control of billions of dollars of revenues

51

needed to sustain the Commonwealth. This would have prevented the Oversight Board from developing fiscal plans and budgets necessary to carry out its statutory mission. A small risk of a negative and grave outcome was imprudent to undertake once settlement was possible on the terms in the Plan. (Skeel Decl. ¶ 34; Jaresko Decl. ¶¶ 203–213). The settlements embodied in the Plan also avoid the uncertainty, delay, and significant expense that would result from continued litigation. (Skeel Decl. ¶ 44; Jaresko Decl. ¶ 214).

91. 90. The Plan is the result of extensive arms' length negotiations among the Government Parties and significant creditor constituencies, including the PSA Creditors, each of which was represented by sophisticated counsel, and the compromises and settlements among the Government Parties and various PSA Creditors form the very foundation of the Plan. In the absence of such compromises and settlements, the Debtors' emergence from Title III would likely be significantly delayed by further litigation and burdened by additional expense, which could impair the Debtors' ability to successfully adjust their debts, thereby prejudicing recovery for all creditors and raising further uncertainties regarding the Debtors' financial condition. (See Jaresko Decl. ¶¶ 81–82, 201–204, 214–215; Skeel Decl. ¶ 43–46).

92. 91. Each of the compromises and settlements incorporated into the Plan (a) is made in good faith, furthers the policies and purposes of PROMESA, and is fair, equitable, and reasonable; (b) is in the best interests of the Debtors, their creditors, and all other affected Persons with respect to the Claims, Causes of Action, and other matters resolved by such compromises and settlements; (c) is within the range of reasonable results if the issues were litigated; (d) falls above the lowest point in the range of reasonableness; and (e) meets the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a), and other applicable law. Further, the Plan will fairly and consensually resolve

52

numerous pending adversary proceedings and appeals, each of which raises difficult and complex issues. The Plan thus incorporates a complex series of compromises and settlements that resolve the most significant potential obstacles to confirmation of a plan of adjustment. (See Skeel Decl. ¶¶ 33–34; Jaresko Decl. ¶¶ 201–205). The settlements resolve billions of dollars of claims against the Debtors. (Skeel Decl. ¶ 46). Each of the settlements is consistent with what would be expected as a result of negotiations in a complex debt restructuring and is reasonable. In addition, the ability to achieve consensus from at least 15 major parties is evidence the settlements are reasonable. (Murray Decl. Ex. A ¶¶ 115–137; Zelin Decl. ¶¶ 24, 29, 36, 43).

93.    92.  Accordingly, the Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

### xi.    Bankruptcy Code Section 1123(b)(3)(B)

94.    93.  Article LXXVIII of the Plan provides for, among other things, the transfer of the Avoidance Actions to the Avoidance Actions Trust. Section 79.1 of the Plan provides: "Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the BankruptcyTitle III Court." Plan § 79.1.

95.    94.  Further, Section 82.1(a) of the Plan states: "[e]xcept with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of

53

the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses, and counterclaims shall be litigated to Final Order; provided, however, that Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise, or withdraw any objections to Claims, without approval of the Title III Court."  For the avoidance of doubt, the foregoing is subject to the rights of the two (2) Creditors' Committee appointees to the Avoidance Action Trust Board pursuant to Section 82.1(b) of the Plan.  Plan § 82.1(a).

96.    95.  The Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

**xii.    Bankruptcy Code Section 1123(b)(4)**

97.    96.  Article LXIX of the Plan provides for the sale of all ERS assets to the Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private Equity Portfolio, subject to certain conditions.  (Jaresko Decl. ¶ 76).  Specifically, Section 69.2 of the Plan states that the Commonwealth, up to and including April 10, 2023, "shall have the option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . .  In the event that the Commonwealth declines to exercise the option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond Claims shall have the option to exercise the Bondholder Election and purchase all of the interests in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by providing written notice thereof to the Commonwealth on or prior to April 15, 2023."  However, "[i]n the event that neither the Commonwealth Election nor the Bondholder Election shall have

54

been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . ."  Pursuant to Section 69.1 of the Plan, in either scenario, the proceeds of the purchase of the ERS Private Equity Portfolio, along with the $373 million in cash, shall be distributed to holders of Allowed ERS Bond Claims.  Plan § 69.1.

98.    97. The Plan is consistent with section 1123(b)(4) of the Bankruptcy Code.

### xiii.    Bankruptcy Code Section 1123(b)(5)

99.    98. Articles V through LIV, Sections 55.2, 55.5, 55.7 through 55.9, Articles LVI through LVIII, LX, LXII through LXX, and LXXIII of the Plan modify the rights of holders of Claims in the impaired Classes.  Sections 55.1, 55.3, 55.4, 55.6, 55.10 through 55.12, Articles LIX, LXI, LXXI, and LXXII of the Plan leave the holders of unimpaired Claims rights unaffected pursuant to the Plan.

100.    99. The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

### xiv.    Bankruptcy Code Section 1123(b)(6)

101.    100. Article XCII of the Plan provides for, among other things, (a) certain releases, injunctions, and exculpations described below in paragraphs 198–207199–208 and (b) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of New GO Bonds and CVIs.  (Jaresko Decl. ¶ 78; Zelin Decl. ¶¶ 94, 96, 97, 99, 107–110).

102.    101. The Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

### xv.    Bankruptcy Code Section 1123(d)

103.    102. Section 76.4 of the Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts and Unexpired Leases assumed, or assumed and assigned, pursuant to the Plan.  All cure amounts will be determined in accordance

55

with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established by the Plan. (Jaresko Decl. ¶ 79). On November 23, 2021, the Oversight Board filed and caused to be served the *Notice of Executory Contracts and Unexpired Leases to be Assumed Pursuant to Title III Plan of Adjustment* (Docket Entry No. 19353), (i) setting forth the cure amounts for each assumed Executory Contract and Unexpired Lease based on a review of the Debtors' books and records, and (ii) establishing a deadline for parties to object to the proposed cure amounts for an Executory Contract or Unexpired Lease to which they are a party or to the assumption of such Executory Contract or Unexpired Lease. Within ten (10) Business Days of entry of a Final Order setting for the cure amount as to each Executory Contract or Unexpired Lease to be assumed or assumed and assigned, the Debtors or the Reorganized Debtors, as the case may be, shall pay or otherwise satisfy such cure amount.

104. ~~103.~~ The Plan is consistent with section 1123(d) of the Bankruptcy Code.

**xvi.    Bankruptcy Code Section 1129(a)(2)**

105. ~~104.~~ The Debtors have (i) complied with applicable provisions of the Bankruptcy Code and PROMESA applicable to confirmation of the Plan, except as otherwise provided or permitted by orders of this Court, and (ii) complied with the applicable provisions of the Bankruptcy Code, PROMESA, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the Election Notices, and related documents, and in soliciting and tabulating votes on the Plan.

106. ~~105.~~ The Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the Disclosure Statement (Debtors Exhibit 2), and sought and received input and comment thereon from other parties in interest. This Court approved the Disclosure Statement as containing adequate

information and meeting the requirements of sections 1125 and 1126 of the Bankruptcy Code. (Jaresko Decl. ¶ 80). The Debtors have properly solicited and tabulated votes on the Plan. (Jaresko Decl ¶ 80; see generally Pullo Decl.; see generally Pullo Sup. Decl.).

107. 106. The Oversight Board, as proponent of the Plan, is the duly-appointed representative of the Debtors in their Title III Cases as provided pursuant to PROMESA and has acted in accordance with applicable law in proposing the Plan.

108. 107. The Debtors have complied with section 1129(a)(2) of the Bankruptcy Code.

**xvii.    Bankruptcy Code Section 1129(a)(3)**

109. 108. The Plan was proposed in good faith with the legitimate purpose to provide a means for the Debtors to achieve fiscal responsibility and access to capital markets, consistent with the purposes of PROMESA. (Jaresko Decl. ¶ 81). In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Title III Cases, the Plan itself, the lengthy process leading to the Plan's formulation (including the compromises, settlements, and releases incorporated therein), and the process associated with the Plan's prosecution. The Debtors' good faith is evident from the facts and records of the Title III Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Title III Cases, including related adversary proceedings. The Plan (including the settlements and compromises contained therein) is the result of extensive arm's length negotiations among the parties, including through mediation led by Chief Bankruptcy Judge Barbara Houser.

110. 109. The Oversight Board has worked to develop consensus with creditors and to evaluate the Commonwealth's and its instrumentalities' current and future financial circumstances. These circumstances have been subject to constant change as the Oversight

Board, the Commonwealth, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic. (Jaresko Decl. ¶ 82). The Plan and Disclosure Statement represent the culmination of those efforts and the substantial input of each key stakeholder.

111. ~~110.~~ The Plan (including all other agreements, documents, and instruments necessary to effectuate the Plan) achieves a rational adjustment of the Debtors' debts, and properly distributes value to creditors, including through the implementation of (a) parties' elections with respect to distributions and/or (b) the settlements pursuant to the Plan. The Plan was proposed with the legitimate and honest purpose of implementing the settlements and compromises of numerous risky and costly disputes, while avoiding protracted litigation that could delay distributions to creditors. (Jaresko Decl. ¶ 83).

112. ~~111.~~ The Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**xviii.    Bankruptcy Code Section 1129(a)(6)**

113. ~~112.~~ The Plan does not provide for any rate changes by the Debtors and, accordingly, section 1129(a)(6) of the Bankruptcy Code does not apply.

**xix.    Bankruptcy Code Section 1129(a)(8)**

114. ~~113.~~ Pursuant to the Disclosure Statement Order, the Title III Court approved the Disclosure Statement (Debtors Exhibit 2) and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and directed the Debtors to solicit acceptances and rejections of the Plan, as well as certain elections with respect thereto. (Disclosure Statement Order ¶¶ B, 7–19). Prior to

58

the transmission of the Disclosure Statement, the Debtors did not solicit acceptances of the Plan from any holders of Claims.

115. ~~114.~~ The Solicitation Packages were served in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the Disclosure Statement Order.  (<u>See generally</u> Mailing Affidavits).

116. ~~115.~~ The (a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and (c) airing of radio advertisements regarding the approval of the Disclosure Statement, Confirmation Hearing dates, Confirmation Objection Deadline, Voting Deadline, and Election Deadline: (i) were adequate and sufficient under the circumstances of the Title III Cases; (ii) provided adequate and sufficient notice of such deadlines, the method of voting or making an election of distribution pursuant to the Plan; and the date, time, and location of the Confirmation Hearing; (iii) provided holders of Claims with a reasonable period of time to make an informed decision to accept or reject the Plan and to make any election provided thereunder; (iv) were in compliance with PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due process to all parties in interest in the Title III Cases. (<u>See</u> Service Affidavits; <u>see also generally</u> Pullo Decl.).

117. ~~116.~~ No other or further notice with respect to the Plan or the Confirmation Hearing is required.  Based upon the foregoing, the Debtors and their successors, predecessors, control persons, representatives, officers, directors, employees, agents, attorneys, financial advisors, investment bankers, accountants, and other retained professionals, and any and all affiliates, managers, employees, attorneys, and advisors of the foregoing (i) have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the

applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their activities relating to the solicitation of acceptances of the Plan or elections thereunder and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer and issuance of securities pursuant to the Plan and, therefore, are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or elections thereunder or the offer and issuance of securities pursuant to the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in Section 92.7 of the Plan.

118.   ~~117.~~ Votes to accept or reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the Disclosure Statement Order, PROMESA, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  (See Pullo Decl. ¶ 8).

119.   ~~118.~~ Certain Classes either voted to reject, or were deemed to reject, the Plan (the "Rejecting Classes") (See Pullo Decl. Ex. A; Pullo Sup. Decl. Ex. A).[14]  Notwithstanding such rejection and deemed rejection, the Plan is confirmable because, as is explained below, it satisfies sections 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code with respect to the Rejecting Classes.

### xx.   Bankruptcy Code Section 1129(a)(10)

---

[14]   Classes 51D, 51F, and 51L voted to reject the Plan, but subsequently were rendered unimpaired and deemed to have accepted the Plan by the modifications made in the Eighth Amended Plan.  Accordingly, such classes are not Rejecting Classes.  See Pullo Sup. Decl. Ex. A.

120. ~~119.~~ At least one Class of each of the Commonwealth creditors' impaired Claims,

PBA creditors' impaired Claims, and ERS creditors' impaired Claims has accepted the Plan.

(*See* Pullo Decl. Ex. A).  Accordingly, the Plan complies with section 1129(a)(10) of the

Bankruptcy Code.

### xxi.   Bankruptcy Code Section 1129(b)(1)

121. ~~120.~~ The Plan's treatment of Claims in the Rejecting Classes is proper because, as

is described further below, the Plan does not discriminate unfairly and is fair and equitable with

respect to such Claims.  (Jaresko Decl. ¶ 87).  Unfair discrimination applies only to rejecting

classes of creditors, not individual creditors within a class.  See Bankruptcy Code §§ 1129(b)(1),

1123(a)(4).  "Thus, a disapproving creditor within a class that approves a plan cannot claim

unfair discrimination."  In re Nuverra Envtl. Sols., Inc., 834 F. App'x 729, 734–35 (3d Cir.

2021).  As a preliminary matter, the Court notes that no Rejecting Class has objected to

confirmation of the Plan on the basis that the Plan discriminates unfairly.

122. ~~121.~~ The treatment afforded to retirees classified in Classes 51A through 51F,

51K, and 51L, and active employees classified in Classes 51G through 51J pursuant to the Plan is

fair and equitable and does not discriminate unfairly against other creditors in the Title III cases.

Any cut to pensions of retired government employees would have a negative impact on Puerto

Rico's economy because retirees comprise a significant component of local demand in Puerto

Rico.  (*Amended Declaration of Simon Johnson* (Docket Entry No. 19014) ("Johnson Decl.") at ¶

1; Retiree Committee Exhibit 1 at § 2.17).  Cutting pensions actually could destabilize Puerto

Rico's economic prospects, lead to greater out-migration, and make it harder for Puerto Rico to

obtain credit in the future, and the savings from pension cuts do not justify the damage those cuts

61

would cause to the economy.   (Johnson Decl. ¶1; Retiree Committee Exhibit 1 §§ 2.6; 2.13; 2.22).   Roughly half of the retirees have pensions that place them below the federal poverty level of $11,800 per year for a single person household. (Retiree Committee Exhibit 1 § 4.5).   Further, retirees had also already experienced substantial reductions in pensions, and, except for judges, government retirees have not received cost of living increases since 2008.   (Retiree Committee Exhibit 1 §§ 4.7; 4.8).   Many retirees, such as retired police, teachers, and judges, do not receive federal social security payments. (Retiree Committee Exhibit 1 §§ 4.3; 4.16).   The gross income of the approximately 167,000 government retirees represents 6.4% of the total household expenditures on the Island and 5.8% of Puerto Rico's gross national income. (Retiree Committee Exhibit 1 § 4.4).

123.   ~~122.~~ The macroeconomic impact of reducing the pensions of retirees on the overall Puerto Rican economy is significant.  (Retiree Committee Exhibit 1 § 5).   Because each dollar that is not spent by a retiree has a ripple effect throughout the economy, the loss of a $1.00 of retiree income impacts overall spending at a higher rate, known as the fiscal multiplier. (Retiree Committee Exhibit 1 § 5.2).   Applying the Oversight Board's fiscal multiplier would result in the loss of 1,600 jobs on the island and a 0.2% reduction in GNP in the near term. (Retiree Committee Exhibit 1 § 2.9).   A higher fiscal multiplier would have a greater negative impact on the economy of a loss of 6,300 jobs on the island and a reduction in GNP of 0.6%. (Retiree Committee Exhibit 1 §§ 2.9, 5).   Given Puerto Rico's high level of out-migration, including the increase in out migration since 2016 by those individuals that are retired, pension cuts may force many more retirees to move to the states to be with family members if they can no longer support themselves living in Puerto Rico. Increased out-migration will have a further

62

negative impact on the economy as pension dollars are then spent outside of Puerto Rico. (Retiree Committee Exhibit 1 §§ 5.21–5.28).

124. ~~123.~~ The Plan, which eliminates any reductions in accrued pensions and certain other retiree benefits for retired and active employees and provides for the creation of the Pension Reserve Trust, is better for Puerto Rico's economy and for other creditors and justifies the treatment that Claimants for retirement benefits are receiving pursuant to the Plan. See, e.g., In re Creekstone Apartments Assocs., L.P., 168 B.R. 639, 644 (Bankr. M.D. Tenn. 1994) (disparate treatment between classes is not unfair if it "protect[s] a relationship with specific creditors that the debtor need[s] to reorganize successfully"). The treatment of Classes 51A through 51L does not unfairly discriminate in favor of holders of Claims for retirement benefits and is fair and equitable.

125. ~~124.~~ The Plan does not unfairly discriminate against holders of Claims in Class 58 (CW General Unsecured Claims), Class 66 (ERS General Unsecured Claims), or Class 13 (PBA General Unsecured Claims). For the reasons set forth above in paragraphs ~~54–63,~~55–64, certain Classes of unsecured Claims have been separately classified to ensure the Commonwealth is best able to provide critical government services to its residents, and that certain claimants are able to continue providing such services in an efficient, reliable, and sustainable manner. For these reasons, it is important that certain Classes of unsecured Claims receive superior treatment to Claims in Classes 58, 66, and 13. Further, for the reasons set forth above in paragraphs ~~58–59,~~59–60, separate classification and treatment of Claims in Class 53 (Dairy Producer Claims) and Class 54 (Eminent Domain/Inverse Condemnation Claims) is necessary because such claimants assert Fifth Amendment rights, and the Plan does not discriminate unfairly with

respect to such Classes. Separate classification and treatment of such Claims is reasonable and justified by a governmental purpose, and does not constitute unfair discrimination.

126. ~~125.~~ Accordingly, the Plan complies with section 1129(b)(1) of the Bankruptcy Code.

### xxii.    Bankruptcy Code Section 1129(b)(2)

127. ~~126.~~ The Plan's treatment of Claims in the Rejecting Classes is proper because the Plan provides all holders of Claims in the Rejecting Classes with what they can reasonably expect to receive under the circumstances of the Title III Cases. Because there are no equity holders in chapter 9 cases, the requirement under Bankruptcy Code section 1129(b)(2)(B) (incorporated by PROMESA section 301(a)) that a plan be "fair and equitable" requires that, where a debtor seeks nonconsensual confirmation of a plan over one or more rejecting classes, no claim junior to any of the claims in the rejecting classes of the relevant debtor may receive any property. Under the Plan, the Class holding junior Claims to the unsecured Rejecting Classes (Section 510(b) Subordinated Claims) receives no property. The commencement of the Title III Cases was precipitated by the Debtors' untenable debt burden, a severe cash shortage, and the economic decline and out-migration eroding the Debtors' revenues. The creditor recoveries in the Plan were calculated or negotiated to reasonably compensate holders of Claims while enabling the Debtors to avoid a recurrence of these financial difficulties and to institute necessary reforms to ensure the Debtors' fiscal responsibility and access to capital markets. (See Jaresko Decl ¶ 81; Murray Decl. Ex. A, ¶ 20, 139).

128. ~~127.~~ Class 54 is the only Rejecting Class of secured Claims in the Plan, and section 1129(b)(2)(A) is satisfied with respect to such Class. Holders of Claims in Class 54 will

receive the cash deposits securing their Claims as payment in full on account of the secured portion of such Claims.  (Jaresko Decl. ¶ 88).

129. ~~128.~~ Accordingly, the Plan complies with section 1129(b)(2) of the Bankruptcy Code with respect to Claims in the Rejecting Classes.

**B. PROMESA § 314(b)(2):** *The Plan Fully Complies with the Provisions in Title III of PROMESA.*

130. ~~129.~~ Except as otherwise provided for or permitted by orders of the Court, the Oversight Board has complied with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order since it commenced the Title III Cases, including in transmitting the Solicitation and in tabulating the votes and elections with respect to the Plan.  (<u>See generally</u> Jaresko Decl. and Pullo Decl.).

131. ~~130.~~ The Disclosure Statement Order established the procedures for the solicitation of votes on the Plan.  The Solicitation Agent complied with the procedures established in the Disclosure Statement Order.  Specifically, the Solicitation Agent determined which creditors were entitled to vote on the Plan by following the instructions in the Disclosure Statement Order, by Class, and by applying the Voting Record Dates set forth in the Disclosure Statement Order.  The Solicitation Agent then coordinated the distribution of solicitation materials to holders of Claims entitled to vote.  (Pullo Decl. ¶¶ 5–6).  The Solicitation Agent coordinated publication of the confirmation hearing notices as set forth in the Disclosure Statement Order.  (Pullo Decl. ¶ 7; <u>see also</u> Publication Affidavit).  The solicitation materials were properly distributed to the appropriate parties, including brokers and nominees.  (<u>See</u> Mailing Affidavits).

132. ~~131.~~ The Solicitation Agent received, reviewed, determined the validity of, and tabulated the Ballots submitted.  (Pullo Decl. ¶ 8).  The Solicitation Agent also worked with the

Depository Trust Company ("DTC") to count votes from the Bond Classes tendered through DTC's Automated Tender Offer Program ("ATOP"). (Pullo Decl. ¶ 9).

133. ~~132.~~ The July 2021 tender and exchange offer was not an improper solicitation of votes on the Plan, but instead, created alternative CUSIP identifiers to track joinders to the GO/PBA Plan Support Agreement. (Zelin Decl. ¶ 82). The new CUSIP provided an administrative mechanism for tracking the beneficial interests of uninsured bonds that became subject to the GO/PBA Plan Support Agreement. (See Docket Entry No. 18761-8). Solicitation packages with respect to votes to accept or reject the Plan were delivered to these new CUSIPs in accordance with the Disclosure Statement Order. (See Mailing Affidavits). To vote to accept or reject the Plan, GO/PBA PSA Creditors were required to instruct their nominee or broker to tender their bonds to the appropriate folder on ATOP before the voting deadline pursuant to the Disclosure Statement Order. (Disclosure Statement Order ¶ 32).

134. ~~133.~~ The Court approved the procedures for voting to accept or reject the Plan, including the use of DTC's ATOP process for bondholder votes, in the Disclosure Statement Order. (See Disclosure Statement Order ¶¶ 9, 14, 32). The tabulation of votes, showing approximately eighty percent (80%) of Bond Claims in dollar amount participated in the vote, shows that creditors were able to successfully vote on the Plan. (See Pullo Decl. Ex. A).

135. ~~134.~~ The Plan complies with PROMESA Section 314(b)(2).

**C. PROMESA § 314(b)(3):** *The Debtors Are Not Prohibited by Law from Taking any Action Necessary to Carry Out the Plan.*

136. ~~135.~~ The Plan contains no provisions which would require the Debtors to violate the law, including Commonwealth law that is not preempted.

137. ~~136.~~ Act 53, enacted on October 26, 2021, authorizes the issuance of the CVIs and the New GO Bonds, consistent with the terms set forth in the Plan and the plan support

66

agreements. (Jaresko Decl. ¶ 92; Debtors Exhibit 134). Act 53's effectiveness is conditioned only on the elimination of the Monthly Benefit Modification (as defined in the Seventh Amended Plan) from the Plan. The Monthly Benefit Modification is not contained in the Plan, and accordingly Act 53 is effective and the Commonwealth's issuance of the CVIs and New GO Bonds is consistent with applicable Commonwealth law. Further, PROMESA preempts ~~any Commonwealth law~~Acts 91-2004 (establishing TRS) and 12-1954 (establishing JRS), each as amended, providing for the future accrual of defined benefits and future cost of living adjustments, ~~including, without limitation, Acts 91-2004 (establishing TRS) and 12-1954 (establishing JRS)~~to the extent set forth in **Exhibit A** hereto. Absent preemption, the amount of Commonwealth revenues that would need to be spent on TRS and JRS pension benefits in fiscal year 2022 is $984 million. (Malhotra Decl. ¶ 65). Absent preemption, these inconsistent statutes would undermine the restructuring contemplated by the Plan. (Jaresko Decl. ¶ 235).

138. ~~137.~~ In addition, obligations arising from Commonwealth statutes, including statutes providing employees the right to accrue pension or other retirement benefits, give rise to obligations treated as contractual under Puerto Rico law, which can be impaired and discharged pursuant to the Plan. See Order and Opinion Denying the DRA Parties' Motion for Allowance of an Administrative Expense Claim (Docket Entry No. 18892 at 19–20). The discharge of prepetition contractual obligations does not need to be approved by or consistent with Commonwealth law. See, e.g., Order Confirming Debtor's Sixth Amended Plan of Adjustment of Debts Pursuant to Chapter 9 of the Bankruptcy Code [Case No. 09-15000, D.I. 442], at 7 ("The Court . . . finds and concludes that the City's actions under the Plan are not prohibited by law, and the treatment of the Classes who formerly had an interest in the City's pension plan is lawful under the Bankruptcy Code."); In re Sanitary & Improvement Dist. No. 7, 98 B.R. 970,

974 (Bankr. D. Neb. 1989) ("If a municipality were required to pay prepetition bondholders the full amount of their claim with interest as contained on the face of the bonds and the [municipality] had no ability to impair the bondholder claims over objection, the whole purpose and structure of chapter 9 would be of little value . . . To create a federal statute [chapter 9 of the Bankruptcy Code] based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debts is not, in the point of view of this Court, a logical or necessary result.").

139. ~~138.~~ Pursuant to Puerto Rico law, legislation of the Commonwealth is presumed to be valid if enacted by the Legislative Assembly of Puerto Rico and signed into law by the Governor.  See, e.g., Brau v. ELA, 2014 TSPR 26, 190 D.P.R. 315, 337, 2014 WL 997526 (P.R. Feb. 21, 2014); Partido Socialista Puertorriqueño v. ELA, 107 D.P.R. 590, 7 P.R. Offic. Trans. 653, 727, 1978 WL 48833 (P.R. Oct. 5, 1978), holding modified by Partido Independentista Puertorriqueño v. CEE, 120 D.P.R. 580, 1988 JTS 23, 20 P.R. Offic. Trans. 607, 1988 WL 580845 (P.R. Mar. 7, 1988) ("To begin with, laws are presumed to be constitutional and the movant [objector] should place the courts in a position to decide by introducing evidence to sustain the facts alleged, and then stating the legal arguments on which its assignment of unconstitutionality is based, specifically mentioning the constitutional provisions involved and the legal precedents supporting its assignment.").

140. ~~139.~~ The Plan does not contain any provision that would require violation of the Contracts Clause of the Constitution of the United States.  The Contracts Clause provides that no state shall pass any law impairing the obligation of contracts.  U.S. Const. art. I, § 10, cl. 1. While a state or territory cannot make a law unconstitutionally impairing contractual obligations, Congress is empowered to so impair contractual obligations pursuant to Article I, Section 8 of the

Constitution, which provides that Congress shall have the power to establish uniform laws on the subject of bankruptcies throughout the United States.  U.S. Const. art. I, § 8, cl. 4.  It has long been recognized that one of the fundamental goals of bankruptcy law is to adjust the debtor-creditor relationship, that is, to alter contract rights.  See In re City of Stockton, Cal., 478 B.R. 8, 14–15 (Bankr. E.D. Cal. 2012).  "While bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of parties whose contracts are impaired, that does not change the starring role of contract impairment in bankruptcy."  Id. at 16.  Congress is, therefore, "expressly vested with the power of passing [bankruptcy] laws, and is not prohibited from passing laws impairing the obligation of contracts."  Id. at 15 (citing Sturges v. Crowninshield, 17 U.S. 122, 191 (1819)).  Further, confirmation of the Plan does not implicate the Contracts Clause because it is not a legislative action.  A federal court's confirmation of a reorganization plan under federal law cannot violate the Contracts Clause.  See Pension Ben. Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 732 n.9 (1984) (holding that the Contracts Clause does not apply to non-legislative actions).  It follows that this Court may approve the Plan pursuant to PROMESA, a federal law enacted by Congress with the express purpose of allowing Puerto Rico to achieve fiscal responsibility and access to the capital markets through, inter alia, adjustment of its debts and those of its instrumentalities, without offending the Constitution.  Moreover, in considering claims brought under the Contracts Clause, courts must "reconcile the strictures of the Contract[s] Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens."   United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 41 (1st Cir. 2011).  In doing so, courts apply a two-pronged test: they examine first "whether the state law has . . . operated as a substantial impairment of a contractual relationship," and then, if the law has, "whether the impairment was

reasonable and necessary to serve an important government purpose." Id.  No party objecting to confirmation of the Plan has established that any impairment of their contractual rights would be "substantial" and, regardless, confirmation serves an important government purpose in light of the ongoing fiscal crisis in Puerto Rico.

141.  140. The Plan does not contain any provision violating the Takings Clause of the Constitution of the United States.  The proper analytical framework for addressing the Takings Clause is set forth in Penn Central Transportation v. City of New York, 438 U.S. 104, 124 (1978).  See Patriot Portfolio v. Weinstein (In re Weinstein), 164 F.3d 677, 685 (1st Cir. 1999) (applying Penn Central analysis to constitutional challenge to lien avoidance pursuant to section 522(f) of the Bankruptcy Code).  Pursuant to that test, courts consider three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; and (3) the character of the governmental action." Id.

142.  141. Considering the first factor, the Court notes the Plan will not result in the total destruction of the value of property interests.  Pursuant to the terms of the Plan, bondholders will receive substantial value in New GO Bonds, CVIs, and, in some cases, cash.  Furthermore, based upon the record before it, the Court finds that the resolution of substantial legal challenges to the structure underlying the existing bonds provides significant value to the bondholders.

143.  142. Second, although the proposed treatment of bondholders' claims may interfere with certain bondholders' subjective investment expectations, bondholders' reasonable expectations must take account of the claims and potential claims that have been the subject of the substantial litigation that the Plan, which was negotiated with the assistance of the Mediation Team, proposes to resolve.  Cf. New Haven Inclusion Cases, 399 U.S. 392, 492 (1970) (noting

70

that security holders "invested their capital in a public utility that does owe an obligation to the public [and thereby] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs") (quotation marks omitted).

144.    143. Third, the character of the governmental action strongly supports the Court's conclusion that the Plan does not result in an unconstitutional taking. The proposals are not physical invasions of property by the government. Rather, the restructuring of the relationships between the Debtors and their bondholders, using the powers established by Congress in PROMESA, is a quintessential example of a "public program adjusting the benefits and burdens of economic life to promote the common good." Penn Cent. Transp. Co., 438 U.S. at 124.

145.    144. Furthermore, even if the restructuring proposed by the Plan results in a Fifth Amendment "taking" of bondholder property, the Court is satisfied that the value to be received by bondholders pursuant to the Plan constitutes just compensation. Here, creditors will receive consideration that is discounted by settlements that recognize significant litigation risks, the allocation of distributions was determined via a long mediation and settlement process among sophisticated parties, and creditors have ratified the result by voting in favor of the Plan. These characteristics of the settlements and the Plan and the circumstances under which they were developed provide sufficient proof that the consideration to be received by bondholders pursuant to the Plan constitutes just compensation within the meaning of the Takings Clause. The objections to the Plan and Settlement Agreement based upon the Takings Clause of the United States Constitution are therefore overruled.

146.    145. Section 89.3 of the Plan provides: "As of the Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, all laws (or such portions thereof) of the Commonwealth of Puerto Rico, other than budgets certified by the

71

Oversight Board, inconsistent with PROMESA, are held preempted.  Such preempted laws include, without limitation, laws enacted prior to June 30, 2016, that transfer, appropriate or require appropriations from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, and such laws shall not be enforceable to facilitate payment of such indebtedness, directly or indirectly, and shall not be enforceable if enforcement thereof would be inconsistent with any provision of PROMESA having continuing applicability and effectiveness. Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, those listed on Exhibit "K" hereto and (b) all litigation in which any Government Party is a defendant, over whether Commonwealth law listed on Exhibit "K" hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal." Plan § 89.3.   Accordingly, laws that are inconsistent with PROMESA are preempted for the reasons, and to the extent, set forth in **Exhibit A** hereto.  Such preemption generally consists of: (i) pursuant to Section 4 of PROMESA, all laws, rules, and regulations giving, to the extent they give rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA are preempted by PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations. Pursuant; (ii) pursuant to Section 4 of PROMESA, to the extent not previously ruled preempted pursuant to an order of the Title III Court, all laws (or such portions thereof) of the Commonwealth, other than budgets certified by the Oversight Board, to the extent they are inconsistent with PROMESA, are preempted. Such preempted laws include, without limitation,; and (iii) laws enacted prior to June 30, 2016, thatto the extent they provide for transfers or other appropriations after the

enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted and such laws shall not be enforceable for any purpose. Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, (i) those listed on Exhibit K to the Plan and Exhibit C to the Confirmation Order, and (ii) Sections 6 and 8 of Article VI of the Puerto Rico Constitution insofar as they could be applied to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant to the Plan, but not for any future purpose, and (b) all litigation in which any Government Party is a defendant over whether Commonwealth law listed on Exhibit K to the Plan or Exhibit C to the Confirmation Order is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal. For the avoidance of doubt, Act 80-2020, Act 81-2020, and Act 82-2020, each of which are listed on Exhibit K to the Plan and Exhibit C to the Confirmation Order, are preempted by PROMESA. To avoid the future re-creation of the debts and claims discharged herein, and except as otherwise provided herein (including, but not limited to, this paragraph 145), each of the preempted laws is preempted permanently.

147. 146. Many of the preempted statutes generally would require the Commonwealth to use its revenues to repay its general obligation and guaranteed debt in full, and the amount of debt service necessary for fiscal year 2022 would be $1.7 billion. (Malhotra Decl. ¶ 63). These statutes are inconsistent with PROMESA, and would undermine the restructuring contemplated by the Plan and Puerto Rico's return to fiscal responsibility and access to capital markets. (Jaresko Decl. ¶¶ 230–233). Further, certain preempted statutes require the appropriation of

73

Commonwealth revenues and would require more than $3 billion in Commonwealth revenues to be transferred in fiscal year 2022. (Malhotra Decl. ¶ 64). In addition, certain preempted statutes require the Commonwealth to provide pension and other benefits or payments to retirees who participated in the ERS, TRS, or JRS retirement systems at statutorily specified rates; the amount of Commonwealth revenues that would need to be spent on TRS and JRS benefits or payments in fiscal year 2022 pursuant to these statutes would be $984 million. (Malhotra Decl. ¶ 65). Such statutes are inconsistent with PROMESA and would undermine the restructuring contemplated by the Plan and the Plan's contemplated repayment of claims from such revenues. (Jaresko Decl. ¶ 234). PROMESA's preemption of inconsistent Commonwealth Laws is settled. See, e.g., Méndez-Núñez v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 916 F.3d 98, 116 (1st Cir. 2019) ("Under PROMESA's preemption provision, the grants of authority to the Board at §§ 201 and 202 to approve Fiscal Plans and Budgets 'prevail over *any* general or specific provisions of territory law' . . . .") (emphasis added) (citation omitted); Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 330 F. Supp. 3d 685, 701 (D.P.R. 2018) ("[A] budget approved and adopted by the Oversight Board as compliant with a certified fiscal plan becomes law . . . and inconsistent Commonwealth laws are preempted."), aff'd, 945 F.3d 3 (1st Cir. 2019).

148. ~~147.~~ The Plan complies with PROMESA Section 314(b)(3).

**D. PROMESA § 314(b)(4):** *The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date.*

149. ~~148.~~ Section 3.1 of the Plan states: "On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such

Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan."

150.   149. Consummation Costs, Restriction Fees, and Retail Support Fees will be paid in Cash on the Effective Date.  All other Allowed Administrative Expense Claims, if any, will likewise be paid pursuant to Section 3.1 of the Plan.

151.   150. The Plan complies with PROMESA Section 314(b)(4).

**E.  PROMESA § 314(b)(5):** *The Plan Has Obtained all Necessary Legislative, Regulatory, and Electoral Approvals*.

152.   151. The Plan has obtained all necessary legislative, regulatory, and electoral approvals.  Further, by approving and certifying the Fiscal Plan, the Oversight Board provided approval for the issuance of securities contemplated by the Plan as required by PROMESA Section 207.  The debt authorization in Act 53 is conditioned only on the Plan's removal of the Monthly Benefit Modification that was provided for in the Seventh Amended Plan and does not require removal of the pension freezes or the elimination of COLAs from the Plan.  Act 53 (Debtors Exhibit 134), Arts. 104, 605.

**F.  PROMESA § 314(b)(6):** *The Plan Is Feasible and in the Best Interests of Creditors*.

75

153.   ~~152.~~ The Plan complies with PROMESA Section 314(b)(6) because it is feasible and in the best interests of creditors.

### i.   Feasibility

#### a.   The Plan is Feasible as to ERS

154.   ~~153.~~ The Plan is feasible with respect to ERS, as ERS no longer has pensions and other obligations to beneficiaries, which obligations were assumed by the Commonwealth upon the enactment of Act 106.  Pursuant to the Plan, ERS's assets are being sold and transferred to the Commonwealth in exchange for $373 million and the agreement to purchase the ERS Private Equity Portfolio for $70,750,000, subject to certain conditions.  ERS's obligations pursuant to the Plan include distributing the $373 million in cash received from the Commonwealth to the holders of Allowed ERS Bond Claims, as well as payments to holders of Allowed ERS General Unsecured Claims in a *de minimis* amount.  (Jaresko Decl. ¶ 98; Plan §§ 2.4, 69.2, 77.1(c)).

155.   ~~154.~~ Pursuant to the Plan, ERS will place the ERS Private Equity Portfolio in the ERS Trust, which will then be purchased by either the Commonwealth or holder(s) of Allowed ERS Bond Claims on or before April 25, 2023 for no less than $70,750,000, which funds will be distributed to holders of Allowed ERS Bond Claims.  (Jaresko Decl. ¶ 99; Plan §§ 2.4, 69.2, 77.1(c)).  Further, on the Effective Date, each holder of an ERS General Unsecured Claim will receive such holder's Pro Rata Share of the ERS GUC Pool, which is comprised of $500,000 plus the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests, capped at $5 million.  Plan §§ 70.1, 1.223.  ERS will dissolve after the Effective Date of the Plan and all remaining assets of ERS will be deemed sold and transferred to the Commonwealth.  (Jaresko Decl. ¶ 99; Plan § 88.2).  Any excess amount in the ERS GUC Pool will be reallocated, on a pro rata basis, to holders of Allowed CW General Unsecured Claims.

Plan § 1.223.  ERS will therefore have no material obligations after the Effective Date.  (Jaresko Decl. ¶ 99).  Accordingly, the Plan is feasible with respect to ERS and is not likely to result in the need for a further restructuring of ERS.

### b.  The Plan is Feasible as to PBA

156.  ~~155.~~ The Plan is feasible with respect to PBA, as PBA holds sufficient cash to pay its obligations to all of its creditors pursuant to the Plan, including any Allowed Claims on account of loans made by GDB to PBA.  Holders of PBA Bond Claims will receive their Pro Rata Share of the Vintage PBA Bond Recovery, 2011 PBA Bond Recovery, or 2012 PBA Bond Recovery, as applicable, in the aggregate amount of approximately $1.1 billion to be paid by the Commonwealth.  Plan Arts. VI–XV.  Holders of Claims in Classes 12 (PBA/DRA Secured Claims), 13 (PBA General Unsecured Claims), and 14 (PBA/DRA Unsecured Claims) will each receive Cash in an amount equal to ten percent (10%) of such Claims.  Plan Arts. XVI–XVIII.

157.  ~~156.~~ Further, each of the Unexpired Leases to which PBA is a party (collectively, the "PBA Leases") will be deemed rejected upon the earliest to occur of (a) June 30, 2022, (b) the date upon which such PBA Lease expires in accordance with its terms, (c) the date upon which PBA enters into a new or amended lease with respect to the leased property subject to such PBA Lease, (d) such other date as PBA, as lessor, provides written notice to the counterparty to a PBA Lease, and (e) the date upon which AAFAF provides written notice to PBA that such PBA Lease is rejected; provided, however, during the period from the Effective Date up to the date of such rejection, with respect to any PBA Lease between PBA as lessor and the Commonwealth or any Commonwealth agency, public corporation, or instrumentality, as lessee, monthly lease payments shall be limited to the lower of (y) the amount budgeted and approved pursuant to a certified fiscal plan and (z) the monthly costs and expenses associated with the applicable leased

77

property; and provided, further, any accruals on the books of PBA or any of the Commonwealth or an agency, public corporation, or instrumentality of the Commonwealth as counterparty to a PBA Lease for the unpaid debt service component of rent under any PBA Lease shall be deemed released, settled, and discharged as of the rejection date. The treatment of PBA Leases has been consented to by the Oversight Board, on behalf of the Debtors, and AAFAF, on behalf of the agencies, instrumentalities, and public corporations.

158. ~~157.~~ Accordingly, the Plan is feasible with respect to PBA and is not likely to result in the need for a further restructuring of PBA.

### c. The Plan is Feasible as to the Commonwealth

159. ~~158.~~ The Plan is feasible with respect to the Commonwealth. The Plan provides for the following types of payments: (1) cash on the Effective Date, (2) new debt issued by the Commonwealth in the form of New GO Bonds, and (3) CVIs. (Zelin Decl. ¶ 47; Malhotra Decl. ¶ 9). In addition, the Plan contemplates payments to retirees of pensions and other benefits in reduced amounts, without adjustment for any Monthly Benefit Modification, as well as additional payments to Commonwealth employees. (Malhotra Decl. ¶ 9).

160. ~~159.~~ The Plan provides for the payment of Cash on the Effective Date and over time, in the aggregate amount of approximately $8 billion, plus up to $801 million in consummation costs, restriction fees, and retail support fees. (See Malhotra Decl. ¶ 10; Zelin Decl. ¶¶ 48, 86).

161. ~~160.~~ The Plan provides the Reorganized Commonwealth will issue New GO Bonds on the Effective Date with different maturity dates, having an aggregate original principal amount of $7,414,063,543.25. (Malhotra Decl. ¶ 11; Zelin Decl. ¶ 49; Plan Art. LXXIV). All holders of general obligation debt and general obligation guaranteed debt will receive New GO

Bonds having thirteen (13) CUSIP numbers, which distribution was calculated to provide each holder with incremental value of 2.25% of their par claims, which increment exceeds any liquidity charge by approximately 1.75% of their par claims.  See Nov. 12, 2021 Hrg. Tr. 108:15–111:1.  Minimizing the number of CUSIPs would not be in the interest of bondholders; rather, the issuance pursuant to the Plan of thirteen (13) CUSIPs to each bondholder provides each holder with as significant a recovery as possible within the boundaries of the municipal bond market and the need to keep annual debt service sustainable, and a significantly greater total amount of value.  See Nov. 12, 2021 Hrg. Tr. 105:11–106:4; 108:18–111:4.  The aggregate amount owed, including all principal and interest over the life of the New GO Bonds from the Deemed Issuance Date of July 1, 2021 to the maturity of the final New GO Bond on July 1, 2046, is $10,914,969,303.20.  (Malhotra Decl. ¶ 12; Zelin Decl. ¶ 49).  The Plan provides for a Debt Service Fund to be established.  The Plan provides that, on the Effective Date, the Reorganized Commonwealth shall deposit into the Debt Service Fund the amounts necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.  Plan § 74.1(f).  On the first business day of each month after the Effective Date until the obligations of the applicable New GO Bonds are satisfied, the Commonwealth will deposit the portion of principal and accrued interest for that month into the Debt Service Fund.  (Malhotra Decl. ¶ 16; Plan § 74.1(f)).

162.  ~~161.~~ The Plan provides for the issuance of (i) GO CVIs in the aggregate original notional amount of $3.5 billion, having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and (ii) Clawback CVIs in the aggregate original notional amount of $5.239 billion, having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051.  (Malhotra Decl. ¶ 19; Zelin Decl. ¶ 54; Plan § 74.2).  The Commonwealth's obligation to pay under the CVIs arises only if certain outperformance

conditions specified in the Plan and the CVI indentures occur.  Specifically, the Plan provides for the establishment of threshold metrics based on tax revenue projections contained in certified fiscal plans.  Only if actual revenues exceed the established threshold at the end of a given fiscal year will an obligation to pay come into being, subject to certain caps.  (Malhotra Decl. ¶ 20; Zelin Decl. ¶ 55; Plan Ex. J).  Further, payments on the CVIs are triggered only when both cumulative and annual outperformance occurs, which protects the Commonwealth from making substantial CVI payouts when it experiences one year of outperformance after experiencing several years of underperformance.  (Malhotra Decl. ¶¶ 35–37; Zelin Decl. ¶¶ 60–65).

163.  162.  In addition, the Plan provides for (i) payments of pension and other post-employment benefits to retired Commonwealth employees, without adjustment for any Monthly Benefit Modification, (ii) the restoration of contributions made by Commonwealth employees to the System 2000 program, and (iii) payments to the Pension Reserve Trust.  (Malhotra Decl. ¶ 21; Plan Art. LV).  Participants in System 2000 will not be subject to benefit reductions, but instead will receive the amount of their contributions to System 2000 from its enactment until June 30, 2017.  (Plan § 55.1).  The aggregate sum of such contributions plus interest accrued thereon is approximately $1.2 billion.  (Malhotra Decl. ¶ 23).  The Pension Reserve Trust will receive an initial contribution of $5 million on the Effective Date and, for the next ten (10) fiscal years, the Commonwealth will make a contribution in an amount equal to (1) the Base Contribution, $175 million or, for any fiscal year in which the projected Fiscal Plan Surplus set forth in the Fiscal Plan is equal to or greater than $1.75 billion, an amount equal to fifty percent (50%) of that amount, plus (2) an additional amount calculated as (i) the lower of the actual primary surplus for such fiscal year and the projected Fiscal Plan surplus for such fiscal year, minus (ii) the sum of the Base Contribution, plus the Commonwealth's debt service

80

obligations pursuant to the Plan for such fiscal year, plus $200 million. (Plan Art. LXXXIII; Malhotra Decl. ¶ 24; Malhotra Sup. Decl. ¶¶ 12–13; Jaresko Sup. Decl. ¶¶ 10–11; Santambrogio Sup. Decl. ¶¶ 8–9). The Commonwealth's contributions to the Pension Reserve Trust are estimated to total approximately $2.4 billion during the ten years of funding based on the Fiscal Plan, all of which will be paid during the time period in which the Fiscal Plan projects surpluses. The Pension Reserve Trust is projected to have a balance of $3.1 billion through the end of fiscal year 2031 based on the Fiscal Plan. (Malhotra Sup. Decl. ¶ 14; Santambrogio Sup. Decl. ¶ 10). Further, the Pension Reserve Trust will be professionally and independently managed to insulate the funding available to pay pensions from political or economic influences. (Malhotra Decl. ¶ 34).

164. ~~163.~~ The Seventh Amended Plan contained a Monthly Benefit Modification pursuant to which reductions to monthly pension payments would be made. The New GO Bond Legislation and CVI Legislation, Act 53, is conditioned on the removal of the Monthly Benefit Modification from the Plan, and so the Plan no longer contains a Monthly Benefit Modification consistent with Act 53. (See Plan Art. LV). The Plan nevertheless remains feasible, provided there are no other modifications to the Plan involving pensions. The elimination of the Monthly Benefit Modification is estimated to add an average of approximately $87 million annually to the cost of the Commonwealth's PayGo obligations for the first ten years, which represents less than five percent (5%) of the Commonwealth's estimated PayGo expenses for this period, and less than one percent (1%) of the Commonwealth's overall budget for this period. The additional cost will be payable from the surpluses projected in the Fiscal Plan during this period. Over the thirty-year period of Fiscal Plan projections, the aggregate cost of eliminating the Monthly Benefit Modification is approximately $1.9 billion. (Malhotra Sup. Decl. ¶ 9, Ex. 1; Levy Sup.

81

Decl. ¶ 10; Jaresko Sup. Decl. ¶ 8).  The elimination of the Monthly Benefit Modification does not materially impact feasibility of the Plan.  (Malhotra Sup. Decl. ¶ 10; Jaresko Sup. Decl. ¶ 8–12).

165.  ~~164.~~If the Plan were modified to (i) eliminate the freeze of JRS and TRS pension benefit accruals and (ii) retain any future pension benefit cost of living adjustments, the Plan would be at risk of not being feasible.  (Malhotra Sup. Decl. ¶ 8; Jaresko Sup. Decl. ¶ 13). Specifically, the PayGo impact of eliminating the pension freeze and reinstating COLAs relative to the Fiscal Plan is estimated to be approximately $5.6 billion over thirty (30) years, or approximately $4.7 billion after taking into account social security costs.  (Levy Sup. Decl. ¶ 14). By 2047, the incremental PayGo cost associated with eliminating the pension freeze and maintaining COLAs is estimated to increase the annual PayGo obligation by twenty-five percent (25%).  Unlike the elimination of the Monthly Benefit Modification, the incremental cost of which decreases as the Commonwealth approaches the deficits projected by the Fiscal Plan, the incremental costs associated with eliminating the pension freeze and reinstating any COLAs are projected to grow larger as the Commonwealth approaches the deficits projected by the Fiscal Plan, thus running the risk that the Plan may not be feasible.  (Malhotra Sup. Decl. ¶¶ 17–18; Levy Sup. Decl. ¶¶ 9–17).  Absent the Pension Freeze, TRS and JRS pension liabilities will continue to increase relative to the Fiscal Plan.  Eliminating the pension freeze creates an open-ended incremental defined benefit liability because TRS and JRS participants would continue to accrue new benefits for as long as they continue to work for the Commonwealth. (Malhotra Sup. Decl. ¶ 18).  Moreover, not implementing the pension freeze and the reinstatement of COLAs would increase the likelihood of needing to rely on the Pension Reserve Trust for payment of the Commonwealth's PayGo obligations, and increase the risk of

completely exhausting the Pension Reserve Trust during the Fiscal Plan projection period. (Malhotra Sup. Decl. ¶ 18; Levy Sup. Decl. ¶ 16).

166.   165. Section 83.4 of the Plan ensures pension-related provisions contained in the Plan will not be undone such that pension payments become unaffordable, and provides: "Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature of the Commonwealth of Puerto Rico, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans that ended up creating nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan." Plan § 83.4. This prohibition

83

on new defined benefits for a ten (10) year period is enforceable and essential to the Plan's continued feasibility. See Nov. 15, 2021 Hrg. Tr. 181:16–182:14; see also Malhotra Sup. Decl. ¶ 20 (explaining the costs of pension-related laws proposed by the Government would increase the risk the Plan will not be feasible).

167. 166. The Plan also provides for additional payments to be made to current employees who are members of certain public employee unions affiliated with AFSCME and non-union rank and file employees. Pursuant to the Plan, the Commonwealth's monthly contribution for healthcare benefits to Commonwealth employees who are members of AFSCME-affiliated unions will increase from $125 per employee per month to $170 per employee per month. (Santambrogio Decl. ¶ 31). In addition, the Plan provides for $500 signing bonuses to each member of an AFSCME-affiliated union and, if the Commonwealth has an excess cash surplus after CVI payments that is greater than $100 million, 25% of that surplus will be allocated to a bonus pool for the benefit of members of the AFSCME-affiliated unions and other non-union rank and file employees. (Plan Art. LVI; Malhotra Decl. ¶ 25–26, 29; Santambrogio Decl. ¶¶ 22–23). Subject to a minimum cash bonus of $2,000 per year per AFSCME-represented employee for the five-year term of the amended collective bargaining agreement, such employees only receive the cash surplus bonuses if the government outperforms the Fiscal Plan, so employees are incentivized to ensure the government is operating efficiently. (Nov. 10, 2021 Hrg. Tr. 62:25–63:4; Santambrogio Sup. Decl. ¶ 11).

168. 167. The Plan also provides the Debtors shall transfer ACR-eligible claims pursuant to the ACR Order, which claims shall be reconciled and paid in the ordinary course of business. The Commonwealth has reserved $229 million for payment of such claims. (Plan § 82.7; Malhotra Decl. ¶ 27, 29).

169. ~~168.~~ Further, the Plan provides ERS Bondholders a right to receive a future payment of $70.75 million from the purchase of the ERS Private Equity Portfolio.  (Plan § 69.2; Malhotra Decl. ¶ 27, 29).

170. ~~169.~~ The Plan, including each of these provisions, is feasible with respect to the Commonwealth.  (Malhotra Decl. ¶ 29).  Confirmation of the Plan is not likely to be followed by the need for further financial reorganization not contemplated in the Plan, and will enable the Commonwealth to provide future public services and remain a viable public entity.  That is true notwithstanding the fact that, based on the 2021 Fiscal Plan (Debtors Exhibit 10) projections, deficits after debt service are projected to reemerge in approximately FY 2035.  (Id.).  By the time deficits are projected to emerge, the amount of Commonwealth general obligation debt outstanding will only be $2.1 billion, as compared to pre-petition debt liabilities of $30.5 billion. The Commonwealth will not likely need further reorganization notwithstanding projected deficits due to a number of factors, including the following: (i) the Plan reduces the Commonwealth's overall debt; (ii) the Plan includes multiple provisions designed to insulate the Commonwealth from downside risks; (iii) the Commonwealth can implement certain reforms the Oversight Board identified that could result in additional liquidity, which could eliminate the projected deficit; and (iv) the Plan does not take into account potential upside factors which, if they materialize, would result in additional liquidity.  (See Malhotra Decl. ¶ 29).

171. ~~170.~~ Further, the Plan significantly reduces the Debtors' debt.  After confirmation, the Commonwealth's general obligation and guaranteed debt will be approximately $7.4 billion, considerably lower than $30.5 billion pre-restructuring, and all ERS and PBA debt will be eliminated.  (Malhotra Decl. ¶ 31; Jaresko Decl. ¶¶ 98–100).  Prior to the commencement of the Title III Cases, annual Commonwealth debt service was approximately $2.1 billion, and

post-Effective Date, the Commonwealth's average annual debt service during the first ten years will be approximately $666 million. (Malhotra Decl. ¶ 30–31). Over 50% of the newly issued debt under the Plan will have amortized within 10 years of its issuance date. Debt levels will continuously decline and remain low until full repayment of the Commonwealth's general obligation and guaranteed debt, which is projected to occur in fiscal year 2046. Thereafter, the only commitments that will remain outstanding will be the CVIs and COFINA debt. The CVIs are paid only if specific revenues outperform projections, and COFINA debt is serviced via a pledged portion of sales and use tax. (Malhotra Decl. ¶ 32). The Commonwealth will have the ability to pay debt service pursuant to the Plan through at least 2034. (Wolfe Decl. Ex. A, ¶ 12).

172.   171. In addition, several Plan provisions—the Pension Reserve Trust, the CVI structures, the Debt Management Policy, and the Comprehensive Cap—mitigate the impact of potential financial underperformance and the effects of projected deficits. (See Malhotra Decl. ¶ 33–40). The Commonwealth will also establish an emergency reserve and a certain level of unrestricted cash, and the Oversight Board has agreed to fund a temporary disaster aid revolving line of credit, which mitigate against potential downside risks. (Malhotra Decl. ¶¶ 49–51; Chepenik Decl. ¶¶ 9, 28, 30, 36, 38). The Commonwealth will retain an unrestricted cash balance of $1 billion to help maintain uninterrupted government operations when unforeseen fiscal challenges emerge. (Malhotra Decl. ¶ 49; Chepenik Decl. ¶ 28; Nov. 12, 2021 Hrg. Tr. 50:21–51:5). The emergency fund will be funded with $130 million annually for a period of ten years, until the reserve balance reaches $1.3 billion, or 2% of Gross National Product, in line with International Monetary Fund guidance. (Malhotra Decl. ¶ 51; Chepenik Decl. ¶ 38).

173.   172. The Plan also is not dependent on new borrowings that would impede the Debtors' ability to achieve compliance with the Fiscal Plan. The Fiscal Plan (Debtors Exhibit

86

10) does not show a need for incremental borrowing, and therefore the Plan's borrowing restrictions will not impede the Commonwealth's ability to implement the Fiscal Plan. (Murray Decl. Ex. A ¶¶ 99–102). The Plan will leave the Debtors with a level of cash consistent with the cash necessary to implement the undertakings referenced in the Fiscal Plan. (Murray Decl. Ex. A ¶ 65). In addition, the Plan requires a comprehensive cap on net tax-supported debt equal to 7.94% of debt policy revenues, and the expected level of net tax supported debt service is projected to be 7.6% of debt policy revenues. (Murray Decl. Ex. A ¶¶ 100–101; Plan § 74.4).

174. 173. The Commonwealth has sufficient resources to pay debt service pursuant to the Plan until 2034, through annual surpluses. (Wolfe Decl. Ex. A, ¶ 12). Additional options for payment of debt service will become available in later years because the Commonwealth can implement structural reforms to increase the Commonwealth's resources and create surpluses. (Wolfe Decl. ¶¶ 13, 15–27). Proactively implementing structural reforms would create a stream of fiscal surpluses sufficient to cover the Commonwealth's debt service obligations pursuant to the Plan and could build cumulative surpluses not incorporated into the Fiscal Plan totaling $32.4 billion for fiscal years 2022 through 2046, well above the cumulative debt service over that same period of $10.9 billion. (Wolfe Decl. Ex. A ¶¶ 13, 27). There are additional potential upside factors not incorporated into the Plan which, if they occur, will produce additional revenues. These factors include a potential increase in Medicaid, and potential provision of Social Security Income to Puerto Rico residents that could increase economic activity. (See Malhotra Decl. ¶¶ 44–48).

175. 174. Accordingly, the Plan is feasible with respect to the Commonwealth and is not likely to result in the need for a further restructuring of the Commonwealth.

**ii.    Best Interests Test**

176.  175. As in chapter 9 of the Bankruptcy Code, PROMESA's "best interests" test differs substantially from the chapter 11 "best interests" requirement.  In chapter 11, the test requires a court to determine whether an individual creditor would receive more if the chapter 11 debtor were to liquidate its assets.  In contrast, the chapter 9 test is not a liquidation test (since municipalities cannot be liquidated) and is focused on the ***collective*** recovery of creditors in the aggregate.  Cf. In re City of Detroit, Mich., 524 B.R. 147, 212–13 (Bankr. E.D. Mich. 2014) (comparing the "best interests" tests in chapter 9 and chapter 11 of the Bankruptcy Code); see also Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, Case No. 17-3284-LTS, Docket Entry No. 560 at ¶ 147.  The PROMESA best interests test additionally modifies the chapter 9 best interests test, requiring only the Court "to ***consider***" "whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by [the] plan."[15] PROMESA § 314(b)(6) (emphasis added).  Thus, the PROMESA best interests test does not impose a litmus test or establish a floor for creditor recoveries.  See id.

177.  176. Accordingly, PROMESA's best interests test requires the Court only to ***consider*** whether creditors of each Debtor ***in the aggregate*** receive an equal or greater recovery on their Claims pursuant to the Plan than they would outside of Title III if the Debtor's Title III case was dismissed and creditors exercised their remedies.  An analysis of creditor recoveries in such hypothetical circumstances requires application of a number of assumptions, including (i) estimates of the resources that would be available for debt service, which requires an assessment of available cash, revenues, and operating expenses in the absence of a confirmed plan of

---

[15]  Notably, Section 314(b)(6) speaks in terms of a single "recovery" for "creditors" (plural).  PROMESA § 314(b)(6).

adjustment; (ii) the outstanding creditor obligations due and payable that would exist outside of Title III; and (iii) the priority in which creditor claims would be paid outside of Title III, which in certain circumstances requires consideration of assumptions regarding the potential outcome of litigation matters. (Shah Decl. ¶ 8).

178. ~~177.~~ The recoveries for claimholders of each Debtor pursuant to the Plan, in the aggregate, are within the range or greater than the range of the projected recoveries for such claimholders in the aggregate if the Title III Cases were dismissed for each of the Debtors, as demonstrated by the best interest test reports attached to the Shah Declaration as Exhibits A, B, and C. (Shah Decl. ¶ 35, Exs. A, B, and C; Debtors Exhibits 130, 131). Additionally, the recovery pursuant to the Plan for holders of GO Bonds is within the range of the projected recoveries for such claimholders pursuant to the Oversight Board's best interest test analysis if the Commonwealth's Title III case was dismissed, assuming all GO Bonds were validly issued. (Compare Shah Decl. ¶ 45; Shah Decl. Ex. 7 to Ex. A).

179. ~~178.~~ In the aggregate, excluding the payment of Restriction Fees or Consummation Costs (which are not being paid on account of Claims), and excluding Federal Claims, there is an estimated $22.8 billion in Claims asserted against the Commonwealth, which are projected to receive $15.7 billion pursuant to the Plan, for an aggregate recovery for all claimholders of 69%, exclusive of any payments to be made with respect to CVIs or payments from the Avoidance Actions Trust. (Shah Decl. ¶ 48). This compares favorably to the projected range of recoveries pursuant to the Oversight Board's best interest test analysis if the Commonwealth's Title III case is dismissed: $9.3–15.3 billion (34%–62%). (Shah Decl. ¶ 35). Realized Commonwealth creditor recoveries could be even higher pursuant to the Plan, as the

69% estimated recovery excludes any additional recoveries available on account of payments from the Avoidance Action Trust or CVIs.  (Shah Decl. ¶ 48).

180.   ~~179.~~ Pursuant to the Plan, exclusive of the payment of the ERS Restriction Fee (which is not being paid on account of Claims), ERS Bondholders are projected to receive a recovery of approximately $444 million on $3.169 billion of Claims, and ERS General Unsecured Claims are projected to receive a recovery of 100% on approximately $300,000 of Claims, for an implied aggregate recovery of 14%.  (Shah Decl. ¶ 54).  This is within the range of projected recoveries pursuant to the Oversight Board's best interest test analysis if ERS's Title III case is dismissed: $0.2–3.7 billion (5%–100%).  (Shah Decl. ¶ 35).[16]

181.   ~~180.~~ Pursuant to the Plan, PBA Bondholders are projected to receive a recovery of $1.1 billion against PBA.  The Plan provides that the PBA/DRA Secured Claim, PBA General Unsecured Claims, and PBA/DRA Unsecured Claims, will receive recoveries of approximately $6.6 million, $41.0 million, and $13.4 million, respectively.  Accordingly, holders of Claims against PBA are projected to receive an implied aggregate recovery of $1.1 billion, or 21%.  (Shah Decl. ¶ 59).  This compares favorably to the projected recoveries pursuant to the Oversight Board's best interest test analysis if PBA's Title III case is dismissed: $0.3 billion (5%).  (Shah Decl. ¶ 35).

182.   ~~181.~~ Accordingly, for each Debtor, creditors in the aggregate will receive a percentage recovery on their Claims pursuant to the Plan that is within the range or greater than projected recoveries outside of Title III.  (Shah Decl. ¶ 13).

---

[16]   While it is theoretically possible there would be a 100% recovery on ERS Claims outside of Title III, that result is very unlikely because it would require a court to rule ERS Bondholders hold liens on PayGo payments. Notably, the First Circuit has already determined the ERS Bondholders' collateral, which consists of statutory employer contributions to ERS, was subject to material impairment by legislative action, stating: "Importantly, the Bond Resolution explicitly states that the legislature of the Commonwealth might reduce (or, by implication, eliminate) Employers' Contributions, and so 'adversely affect' the Bondholders."  In re Financial Oversight and Management Board for Puerto Rico, 948 F.3d 457, 468–69 (1st Cir. 2020).

183. ~~182.~~ These results are unsurprising.   Absent a mechanism to restructure the Debtors' outstanding debt and pension liabilities, the Commonwealth would face great uncertainty, financial and political instability, and significant lawsuits.   In such environment the Government will face significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms.   Without the benefit of the uptick in growth from these reforms, overall economic growth and tax revenue will be lower, reducing the amounts available to pay all creditors.   (Shah Decl. ¶ 12).   Outside of Title III and without a confirmed plan of adjustment, creditors would race to the courthouse to recover on their claims.   "Clearly, such a result is chaos . . . ."  6 Collier on Bankruptcy § 943.03 (16th ed. 2021).

184. ~~183.~~ Accordingly, the Court finds that the Plan is in the best interests of creditors within the meaning of Section 314(b)(6) of PROMESA.

**G.  PROMESA § 314(b)(7):** *Fiscal Plan Consistency*.

185. ~~184.~~ Section 314(b)(7) of PROMESA requires that the Plan merely be consistent with the applicable certified fiscal plan, not identical.  (Jaresko Decl. ¶ 103; Murray Decl. Ex. A ¶ 62).  The Plan is consistent in all respects with the Fiscal Plan.—nothing contained in the Plan would violate or otherwise interfere with the Fiscal Plan.  (Jaresko Decl. ¶ 103; Debtors Exhibit 10).

186. ~~185.~~ The Fiscal Plan provides a blueprint for the Commonwealth to achieve, among other things, fiscal responsibility and access to capital markets, and contains a debt sustainability analysis ("DSA"), which creates a range established by the Oversight Board as the amount of debt and long-term capacity of the Government to pay debt service on its debt.  (Zelin Decl. ¶ 57; Malhotra Decl. ¶¶ 55–56; Debtors Exhibit 10).  The aggregate principal and total debt service of the New GO Bonds falls within the bounds of the debt range implied by the DSA.

(Zelin Decl. ¶ 57; Malohtra Decl. ¶¶ 58–59, 61).  The cash payments due on the Effective Date do not count as debt for purposes of the DSA because the cash payments do not create a debt obligation after the Effective Date.  (Malhotra Decl. ¶ 60).  Any cash payments under the CVIs do not count as debt for purposes of the DSA because the CVIs are only payable out of outperformance.  (Id.)  The CVI payments are contingent in nature and are, by definition, paid from excess cash available relative to baseline Fiscal Plan projections.  (Zelin Decl. ¶ 58; Malhotra Decl. ¶ 60).  The debt levels under the Plan are consistent with the debt levels set forth in the Fiscal Plan, and the debt proposed to be issued pursuant to the Plan is consistent with the DSA.  (Skeel Decl. ¶ 52; Murray Decl. Ex. A ¶¶ 72, 78; Malhotra Decl. ¶ 61).

187.  186. The Plan is also consistent with the Fiscal Plan because it includes the freeze of accruing pension benefits and elimination of all COLAs under Act 91-2004, amended by 160-2013 for TRS, and under Act 12-1954, amended by 162-2013, for JRS.  Unlike the elimination of the Monthly Benefit Modification, if the Plan were modified to remove the (i) pension freeze and (ii) the elimination of COLAs, the Plan would not be consistent with the Fiscal Plan which requires the pension freeze and the elimination of COLAs.  (Jaresko Sup. Decl. ¶ 13; Debtors Exhibit 10).  Failure to include the pension freeze and elimination of future COLAs in any plan would cause it to be materially inconsistent with the Fiscal Plan, and even if confirmed would result in significant additional, and unpredictable, costs to the Commonwealth and will require spending inconsistent with the Fiscal Plan in amounts that will increase during the period that deficits projected in the Fiscal Plan will also increase.  (Jaresko Sup. Decl. ¶ 13; Debtors Exhibit 10).  Moreover, costs of removing the pension freeze and elimination of COLAs would increase over time and grow larger during periods in which deficits are projected by the Fiscal Plan.  (Jaresko Sup. Decl. ¶¶ 8, 13; Malhotra Sup. Decl. ¶ 17).

188.  ~~187.~~ If Act 53 were interpreted to require the removal of the freeze and COLA elimination, and the Plan were modified to implement such changes, such Plan would not be consistent with the Fiscal Plan.  (Jaresko Sup. Decl. ¶ 13).  The Court's conclusion that the Plan is consistent with the Fiscal Plan is dependent on, among other things, the pension freeze and elimination of COLAs being in the Plan.

189.  ~~188.~~ The Plan remains consistent with the Fiscal Plan notwithstanding the elimination of the Monthly Benefit Modification.  The Fiscal Plan contemplates the possibility that pensioners would be restored to the full amount of their accrued pension benefits under certain circumstances.  (Fiscal Plan, Debtors Exhibit 10 at 279).  Unlike the costs of removing the pension freeze and elimination of COLAs, the majority of the costs associated with removal of the Monthly Benefit Modification will be incurred during periods of budget surplus.  (Jaresko Sup. Decl. ¶ 12; Santambrogio Sup. Decl. ¶ 10; Malhotra Sup. Decl. ¶ 9; Fiscal Plan, Debtors Exhibit 10 at 59).

190.  ~~189.~~ The Fiscal Plan explicitly provides for the establishment of the Pension Reserve Trust to ensure future pension benefits will be supported regardless of the future economic or political circumstances of the Commonwealth.  (Jaresko Decl. ¶ 103).  To ensure adequate funding to cover the increased costs resulting from the elimination of the Monthly Benefit Modification, additional funds will be set aside in the Pension Reserve Trust during years in which the Fiscal Plan projects a surplus.  (Jaresko Sup. Decl. ¶¶ 9).  An increase to the funding amounts for the Pension Reserve Trust using a surplus-based funding mechanism does not render the Plan inconsistent with the Fiscal Plan because such increased funding levels come out of projected surpluses and do not impose additional obligations on the Commonwealth that would

93

interfere with carrying out the Fiscal Plan.  (<u>See</u> Jaresko Decl. ¶ 103; Jaresko Sup. Decl. ¶¶ 9–12).

191. ~~190.~~ In addition, the Plan modifies the Seventh Amended Plan to provide that the Upside Participation Bonus pursuant to the AFSCME Plan Support Agreement (Debtors Exhibit 21) will be a minimum of $2,000 for each AFSCME-represented employee during the five-year term of the new AFSCME collective bargaining agreement.  The additional cost of this modification is only an incremental cost of approximately $18.35 million per year for the five years beginning in fiscal year 2022 as compared to the Upside Participation Bonus contemplated in the Seventh Amended Plan.  (Santambrogio Sup. Decl. ¶ 11).

192. ~~191.~~ Accordingly, the Plan complies with PROMESA Section 314(b)(7).

**H. Bankruptcy Rule 3019:**  *The Plan Does Not Adversely Change the Treatment of Claims of Creditors*.

193. ~~192.~~ Subsequent to the Voting Deadline passed, the Oversight Board filed the Eighth Amended Plan.  The Eighth Amended Plan eliminated the Monthly Benefit Modification that was contained in the Seventh Amended Plan and otherwise contains minor revisions to address concerns raised by certain parties.  None of the modifications adversely changes the treatment of the Claims of any Creditor that accepted the Seventh Amended Plan.  To the contrary, the Plan was amended to enhance treatment of the pension Claims in Classes 51A through 51I, 51K, and 51L through the removal of the Monthly Benefit Modification.  (<u>See</u> Malhotra Sup. Decl. ¶ 9).  Treatment of Claims in other Classes is not impacted in any way by this change.

194. ~~193.~~ In addition, following the Voting Deadline passed, the Oversight Board filed the First Modified Eighth Amended Plan, which separately classified the GDB/PET Claim in Class 58A.  (<u>See</u> First Modified Eighth Amended Plan, Art. LXII). The GDB/PET Claim was

previously classified as a CW General Unsecured Claim in Class 58.  Pursuant to Section 62.4 of

the Plan, the holder of the GDB/PET Claim will receive "payments from the Commonwealth

equal to, and on the same timeframe, as the pro rata payments to be made to holders of Allowed

CW General Unsecured Claims pursuant to the terms and provisions [governing treatment of CW

General Unsecured Claims]," see Plan § 62.4, but is not intended, nor shall it be construed, as a

CW General Unsecured Claim pursuant to the Plan.  The GDB/PET Claim is treated in the same

manner as it would have been treated pursuant to the Seventh Amended Plan.  See id.

Accordingly, this modification does not adversely change the treatment of the Claims of any

Creditor that accepted the Seventh Amended Plan.

195.    194. The Oversight Board subsequently filed the Plan, which contains additional

technical changes not impacting the treatment of any Claims.

196.    195. The modifications do not materially or adversely modify the treatment to be

afforded to creditors pursuant to the Plan and do not require the resolicitation of acceptance or

rejections thereto.  Accordingly, the Plan can be confirmed without the filing of a new disclosure

statement and resolicitation with respect to the Plan.  See Bankruptcy Rule 3019.

I.    **Nullification of Laws Conditioning Debt Authorization on Elimination of Freeze of Accruing Pension Benefits and Cost of Living Adjustments.**

197.    196. All parties in interest, including, without limitation, the Governor and the

Legislature, know the Plan's consistency with the Fiscal Plan, feasibility, and implementation are

each dependent on the freezes in the accruals of future pension benefits under TRS and JRS and

elimination of cost of living adjustments.  All objections that suggest Act 53 or any other law

causes the new debt issued under the Plan to be unauthorized by Act 53 due to the freezes in the

accruals of future pension benefits under TRS and JRS and elimination of cost of living

adjustments have been overruled as set forth in the Confirmation Order.  To the extent any law is

interpreted to mean such freezes and eliminations cause the new debt issuable under the Plan to be unauthorized, Act 53 and such other laws, if any, may not be enforced pursuant to PROMESA Section 108 to the limited extent of eliminating such impact on the debt's authorization. Act 53 does not provide such freezes and eliminations cause the new debt issuable under the Plan to be unauthorized and notice of the request for such determination was adequately provided to all former and present governmental employees.

### The Releases, Exculpations, and Injunctions Pursuant to the Plan

198. ~~197.~~ The Plan includes certain discharge, release, exculpation, and injunction provisions, which provisions are essential to the Debtors' restructuring, and without which a consensual restructuring could not be successfully accomplished. (Jaresko Decl. ¶ 217; Zelin Decl. ¶ 95).

199. ~~198.~~ A critical element of the Plan is the complete resolution of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case. To achieve this, the Debtors and claimholders agreed to a mutual release of all Claims and Causes of Action arising, in whole or in part, prior to the Effective Date. (Jaresko Decl. ¶ 218). The Debtors' releases incentivized claimholders to support, and undertake actions to support, the Plan and its confirmation, without fear of lawsuits in the future. Certain creditors would not have supported the Plan absent its release provisions. (Jaresko Decl. ¶ 219; Zelin Decl. ¶ 100). Further, the releases of claims by the Debtors impact only those parties that made a significant contribution to the negotiation and development of the Plan and incurred cost and expense during their essential participation in negotiations. (Jaresko Decl. ¶ 221; Zelin Decl. ¶¶ 102, 106). The Plan's discharges and releases likewise provide the Debtors and Reorganized Debtors with assurance

that the restructuring balance struck by the Plan will not be upset by further claims against the
Reorganized Debtors after the Effective Date.  (Jaresko Decl. ¶ 220; Zelin Decl. ¶ 106).

### A.  Releases

200.  ~~199.~~ The Plan's release provisions include, among other provisions, subject to
certain exclusions as set forth in the Plan: (i) a release by the GO/PBA PSA Creditors (solely in
their capacity as Creditors of the Debtors), which includes the Monolines, against certain
government parties, including the Oversight Board, AAFAF, and the Debtors, of certain Claims
and Causes of Action arising prior to the Plan Effective Date, including the Revenue Bond
Claims litigation and the Lift Stay Motions, and (ii) a release by the Debtors and Reorganized
Debtors of Claims and Causes of Action related to the Debtors and their assets in the Title III
Cases.  (Zelin Decl. ¶ 96).

201.  ~~200.~~ The Plan's release of Claims or Causes of Action by the GO/PBA PSA
Creditors against the Oversight Board, its committees and subcommittees, AAFAF, and the
Debtors, of certain Claims and Causes of Action, including those related to the Revenue Bond
Claims Litigation and Lift Stay Motions, is a key component of the Plan.  Litigation over such
Claims and Causes of Action was hard-fought and remained active as between the
Commonwealth, on the one hand, and the Monolines (who would ultimately become GO/PBA
PSA Creditors) on the other.  By agreeing to settle these disputes, the GO/PBA PSA Creditors
provided a clear benefit to the Debtors by eliminating the need to incur additional costs, and
mitigating the substantial risk associated with, further litigation.  (Zelin Decl. ¶ 97).  To create
global peace upon the effectiveness of the Plan, the Debtors and Reorganized Debtors agreed to
release Claims and Causes of Action against, among other entities, the Government Parties,
official committees, and PSA Creditors.  (Zelin Decl. ¶ 99).  The Plan's release provisions were

essential to get the key stakeholders to engage in negotiations over a potential consensual release of claims against the Commonwealth.  (Zelin Decl. ¶ 100).

202.   ~~201.~~ The parties receiving releases all made significant contributions to the negotiation and development of the Plan and incurred costs and expenses during the course of their essential participation in the negotiations.  (Zelin Decl. ¶ 103).  The releases were a product of robust, mediator-supervised negotiations and the stakeholders had an opportunity to be heard as to the scope and content of the releases.  (Zelin Decl. ¶¶ 105–106).  The releases granted by the Debtors constitute a sound exercise of the Debtors' judgment.  They are fair, reasonable, and in the best interests of the Debtors.  (Zelin Decl. ¶ 103).

203.   ~~202.~~ The Plan does not provide for non-consensual third-party releases; the Plan's releases are limited to those necessary to effect the Debtors' successful restructuring.  Except as explicitly agreed to by the creditors in their respective plan support agreements, the Plan does not release any claims of a creditor of the Debtors, in its capacity as such, against a party that is not a Debtor.  (Jaresko Decl. ¶ 223; Zelin Decl. ¶ 107).  Specifically, Section 92.2(a) provides that "without prejudice to the exculpation rights set forth in Section 92.7 [of the Plan], nothing contained in the Plan or Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors."  Plan § 92.2(a).  Further, Sections 92.2(d), (e), and (f) of the Plan carve out from the Released Claims certain claims, causes of action, or other rights or powers that are held by the Securities and Exchange Commission, the United States, and parties to certain Underwriter Actions.  Likewise, as confirmed by the definitions of Related Persons (see Plan, Section 1.420) and Released Claims (see Plan, Section 1.421), claims against AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR,

and PREPA, which are or may be subject to their own restructuring proceedings, are not released pursuant to the Plan and such entities are not "Related Persons" of the Released Parties or Releasing Parties.  Further, Avoidance Actions generally are not released under the Plan.  (See Plan, Section 1.421).  These carve-outs ensure that only those releases that are reasonable and necessary to Plan confirmation are being provided.  (Jaresko Decl. ¶ 224; Zelin Decl. ¶¶ 108–109).

204.  203. The releases contemplated by the Plan are appropriate and essential to the Debtors' successful reorganization.

**B. Exculpation**

205.  204. Section 92.7 of the Plan provides for exculpation of the Government Parties, PSA Creditors, Retiree Committee, Creditors' Committee, AFSCME, and the Monolines for, among other things, any acts taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan and the settlements contained therein (including, but not limited to, the Plan Support Agreements).  (Jaresko Decl. ¶ 225; Zelin Decl. ¶ 110).  The expectation that parties would be exculpated incentivized them to participate in the negotiations and support confirmation of the Plan without fear of future lawsuits.  Without the Plan's exculpation provisions, parties would likely be exposed to litigation after extensive good-faith negotiations.  (Zelin Decl. ¶ 111).  The Plan's exculpation provisions are narrowly tailored to the exculpated parties' efforts related to the Plan.  All of the parties being exculpated in the Plan played a key role in the negotiation of the Plan and the settlements that enabled the Plan, including through their participation in mediation.  The Plan's exculpation provisions do not alter the liability of any entity that is determined to have acted or failed to act in a manner that constitutes intentional fraud or willful

99

misconduct.  (Jaresko Decl. ¶ 226; Zelin Decl. ¶ 110, 112).  In addition, decretal paragraph 61(g)

of the Confirmation Order provides for exculpation of the DRA Parties, which is substantially the

same as the exculpation provided pursuant to the Plan and is appropriate in light of the

Stipulation in Connection with DRA Related Disputes, dated as of November 5, 2021, by and

among the Oversight Board, as representative of the Debtors and HTA, and the DRA Parties.

(See Confirmation Order ¶ 61(g); Debtors Exhibit 146).  Exculpation provisions are appropriate

for parties' acts or omissions in connection with or related to the pursuit of confirmation of a

plan.  See In re Montreal Me. & Atl. Ry., 2015 Bankr. LEXIS 3737 at *24, 26 (Bankr. D. Me.

Oct. 9, 2015).

### C. Injunction

206.  205.  The Plan's injunction provisions (Sections 92.3, 92.9, and 92.11) are

necessary to the reorganization and are fair to those parties involved.  The injunction ensures that

the releases and exculpations discussed above are preserved and enforced by prohibiting legal

action concerning the Released Claims, avoiding the time, burden and expense that could be

incurred if parties were permitted to pursue Released Claims.  The Plan's injunction provisions

are narrowly-tailored to serve that purpose.  (Zelin Decl. ¶ 113; Jaresko Decl. ¶ 227).

207.  206.  The releases, exculpation provisions, and injunctions pursuant to the Plan are

integral and critical parts of the Plan and the compromises and settlements implemented pursuant

to the Plan.  Plan Art. II; § 92.4.  The approval of such releases is a condition to the occurrence of

the Effective Date, and all Released Parties have relied on the efficacy and conclusive effects of

such releases and injunctions and on the Title III Court's retention of jurisdiction to enforce such

releases and injunctions when making concessions pursuant to the Plan and by agreeing to,

accepting, and supporting the settlement and treatment of their respective Claims, Causes of

Action, and other rights pursuant to the Plan.  (Zelin Decl. ¶¶ 96, 98, 100–04, 106, 110–12).

Accordingly, such provisions are justified and warranted based upon the circumstances of the

Title III Cases and the consideration being provided by all Released Parties in connection with

the Plan.

208.   207.   To maintain and protect the integrity and feasibility of the Plan, while the

Oversight Board is in existence, any and all governmental units and any officer or employee

thereof shall neither recreate by statute, regulation, rule, policy, or executive order nor repay by

any means, any debt discharged by the Plan without the Oversight Board's express prior written

consent or except as may otherwise be provided by a certified fiscal plan or budget.  Without

limitation, the debt referred to herein includes any and all pension obligations frozen and cost of

living adjustments in amount such that they shall not increase from their levels in existence on

the Effective Date of the Plan.

## Validity of Bonds and CVIs

101

209. 208. Pursuant to Section 4 of PROMESA, as well as sections 944[17] and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Court determines that the New GO Bonds and CVIs, and the covenants by the Commonwealth for the benefit of the holders of the New GO Bonds and CIVs, are legal, valid, binding, and enforceable obligations of the Reorganized Debtors benefitting from the following protections, each of which is legal, valid, binding, and enforceable against the Reorganized Debtors, the Commonwealth, and other persons and entities, as applicable, under Puerto Rico, New York, and federal law:

---

[17] Section 944(b)(3) of the requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations. 11 U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws" (citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D. Cal. 2010) (additional citations omitted)). As set forth in the leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future." 6 Alan N. Resnick & Henry J. Sommer, Collier On Bankruptcy § 944.03[1][b] (16th ed. 2013); See also, Order Confirming Third Amended Plan for the Adjustment of Debts of the City of San Bernadino, California, as Modified by the Court, dated February 7, 2017, ¶ 22 ("In accordance with Section 944(a) and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Confirmation Order shall be binding upon . . . ."); Order Confirming Eighth Amended Plan for the Adjustment of Debts of the City of Detroit, dated November 12, 2014, ¶ 86 ("[I]n accordance with section 944(a) of the Bankruptcy Code and notwithstanding any otherwise applicable law, upon the occurrence of the Effective Date, the terms of the Plan and this Order shall be binding upon, and inure to the benefit of . . . ."); Findings of Fact, Conclusions of Law, Order Confirming the Chapter 9 Plan of Adjustment for Jefferson County, Alabama, dated November 6, 2013, ¶ 37 ("Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a), as well as general principles of federal supremacy, the provisions of this Confirmation Order, the Plan, and related documents or any amendments or modifications thereto shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law."); Amended Memorandum of Findings of Fact and Conclusions of Law in Connection with Confirmation of the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated February 5, 2019, ¶ ("Pursuant to PROMESA, including section 4 thereof, as well as sections 944 and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order, the Settlement, the Plan, and Act 241, the Court determines that the COFINA Bonds are legal, valid, binding, and enforceable . . .")

a.  The Confirmation Order is full, final, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

b.  The New GO Bond Legislation and the CVI Legislation are incorporated into Act 53-2021, which has been validly enacted by the Commonwealth and is valid and effective in accordance with its terms.

c.  The New GO Bonds and the CVIs are bonds or notes within the meaning of Section 2 of Article VI of the Commonwealth Constitution to which the Commonwealth may legally pledge its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest.

d.  Pursuant to the New GO Bond Legislation and the CVI Legislation, the Commonwealth has validly pledged its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest with respect to the New GO Bonds and payment with respect to the CVIs.

e.  Subject to the occurrence of the Effective Date and as of the date of issuance of the New GO Bonds and CVIs, the Commonwealth is in compliance with any applicable debt limits, including the Comprehensive Cap and any applicable debt limit (if any) contained in the Commonwealth Constitution.

f.  Pursuant to the New GO Bonds Legislation and other applicable law, upon the issuance of the New GO Bonds, the New GO Bonds shall be secured by a first priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53)) over

103

the funds deposited in the Debt Service Fund, including any revenues generated therefrom, which statutory first lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person, and shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms.

g.   The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights in the Plan and in the Confirmation Order).

h.   The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, creates the valid pledge and the valid lien upon the right, title and interest of the Commonwealth in such funds in favor of the Trustee (for the benefit of the holders of the New GO Bonds) which it purports to create, subject only to the provisions of the New GO Bonds Indenture permitting the withdrawal, payment, setting apart or appropriation thereof for the purposes and on the terms and conditions set forth in the New GO Bonds Indenture and each applicable supplemental indenture.

i.   The Commonwealth has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of the

104

Commonwealth (whether under Title III of PROMESA or otherwise) with respect to monies on deposit in the Debt Service Fund as of the commencement thereof.

j.   The Plan meets all conditions set forth in the New GO Bond Legislation and the CVI Legislation for issuance of the New GO Bonds and CVIs.

k.   In light of the enactment of the New GO Bond Legislation and the CVI Legislation, and upon execution by all parties thereto, the New GO Bonds Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

l.   At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to be stamped or written on each of the New GO Bonds, the GO CVIs, and the Clawback CVIs, a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE [___] DAY OF [_____], 2021.

### GDB Loan Priority Determination

210.  209.  The Plan provides for the issuance of the HTA Clawback CVI as consideration for the settlement of CW/HTA Claims under the HTA/CCDA Plan Support Agreement.  The CVI Indenture provides for four separate Sub-Subseries of such HTA Clawback

CVI to be issued, and for payments on such Sub-Subseries of the HTA Clawback CVI to be made

first, on account of CW/HTA Claims related to the HTA 68 Bonds; second, on account of

CW/HTA Claims related to the HTA 98 Senior Bonds; third, on account of CW/HTA Claims

related to the HTA 98 Sub Bonds; and fourth, subject to the GDB Loan Priority Determination,

on account of either CW/HTA Claims related to the GDB HTA Loans or CW/HTA Claims related

to the HTA Bonds.  (CVI Indenture §§ 2.01(c)(i), 5.07(c); see also Plan at J-12, §§ 1.172, 63.2,

Ex. J at Annex 6.).

211. 210. Certain disbursements under the "CVI Payment Reserve" are dependent on

the "GDB Loan Priority Determination," (Plan § 1.172), which is defined as "[t]he

determination, in either the Commonwealth Title III Case or the HTA Title III Case, (a) with

respect to the relative rights of recovery and priority of payment of the [19]68 Bonds and the

[19]98 Bonds to the rights of GDB with respect to the GDB HTA Loans, and/or (b) that the

[DRA] does not possess an allowable claim or entitlement to recover with respect to the HTA

Clawback CVI based upon such GDB HTA Loans."  Plan § 1.259.

212. 211. On June 26, 2021, the DRA Parties filed a complaint initiating an adversary

proceeding against the Defendants,[18] with the stated purpose of "provid[ing] a means to resolve

the priority question with respect to the payments made by the Commonwealth on account of the

clawback claims, and any payments that may be made on account of the Loan Claims and the

HTA Bonds under a future plan for HTA."  (Adv. Proc. No. 21-00068-LTS, Docket Entry No. 1 ¶

101).

213. 212. The complaint sought declaratory relief on four counts: (i) Count 1, "that the

DRA is the only party with (i) a valid, perfected, first-priority lien on the Act 30-31 Revenues

---

[18]    "Defendants" means Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal
    Corp., Financial Guaranty Insurance Company, National Public Finance Guarantee Corporation, Peaje
    Investments LLC, and The Bank of New York Mellon.

and (ii) a right to collect from the Act 30-31 Revenues"; (ii) Count 2, "that the HTA Bondholders have limited collateral to secure the bonds, that the HTA Bonds are limited recourse obligations, and neither the collateral pledged to secure the bonds, nor the bond revenues to which the bondholders have recourse, includes the Act 30-31 Revenues"; (iii) Count 3, "that the DRA's Loans are not subordinate to the bonds"; and (iv) Count 4, "that the DRA's Loans are entitled to collect on the loan claims from the bond revenues not deposited in the bond revenue accounts." (Adv. Proc. No. 21-00068-LTS, Docket Entry No. 1).

214.   213. On August 26, 2021, the Defendants moved to dismiss all four counts.  (Adv. Proc. No. 21-00068-LTS, Docket Entry No. 44 ¶¶ 5–6) (the "Motion to Dismiss").   On September 23, 2021, the DRA Parties filed an opposition to the Motion to Dismiss and on October 8, 2021, Defendants filed their reply in support of the Motion to Dismiss, which concluded briefing on the motion.[19]

215.   214. On October 29, 2021, the Court entered an opinion and order dismissing all four counts of the DRA Parties' complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief could be granted. (Adv. Proc. No. 21-00068-LTS, Docket Entry No. 83 at 27) (the "GDB Loan Priority Determination Opinion").

216.   215. As to Count 1, the Court held that the plain language of Acts 30 and 31[20] and the Assignment and Security Agreement[21] make clear that the HTA Bonds are payable from Act 30-31 Revenues.[22]  (GDB Loan Priority Determination Opinion at 18–20).

---

[19]   The Oversight Board and AAFAF were granted full intervention rights in Counts 1, 2, and 4 of this adversary proceeding and moved to dismiss those counts, but their motion was denied as moot in light of the order granting the Defendants' Motion to Dismiss.

[20]   "Acts 30 and 31" means Commonwealth Act 30-2013 and Act 31-2013, both approved on June 25, 2013.

[21]   "Assignment and Security Agreement" means the agreement between HTA and GDB executed on August 28, 2013.

[22]   "Act 30-31 Revenues" means certain crude oil taxes, motor vehicle license fees, and other excise taxes levied pursuant to Acts 30 and 31.

217. 216. As to Count 3, the Court held that HTA Bondholders had standing to enforce the subordination provisions of the Assignment and Security Agreement and Loan Agreements[23] under 3 L.P.R.A. § 2013(a)(3).   The Court further held that the Assignment and Security Agreement unambiguously subordinates the GDB HTA Loans to the HTA Bonds (including, for the avoidance of doubt, the HTA 68 Bonds and the HTA 98 Bonds), a conclusion that was reinforced by the GDB HTA Loan Agreement attached to the Complaint.  (GDB Loan Priority Determination Opinion at 21).

218. 217. The Court dismissed Counts 2 and 4 because they "logically depend[ed]" on the Court granting Counts 1 and 3, because the Assignment and Security Agreement "unambiguously compels the conclusion that, before any funds are paid toward the Loans, Bond payment obligations must first be satisfied."  (GDB Loan Priority Determination Opinion at 25).

219. 218. In the GDB Loan Priority Determination Opinion, the Court directed the Clerk of Court to enter judgment consistent therewith, and a final judgment dismissing Counts 1, 2, 3, and 4 was entered contemporaneously with the GDB Loan Priority Determination Opinion. (GDB Loan Priority Determination Opinion).

220. 219. The Court's rulings in the GDB Loan Priority Determination Opinion are incorporated by reference herein.

221. 220. The Court's ruling that the GDB HTA Loans and any liens securing such GDB HTA Loans are subordinated to the HTA Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.[24]

**Miscellaneous Provisions**

---

[23]   "GDB HTA Loan Agreements" means the loan agreements between GDB and HTA that were executed between 2008 and 2014.

[24]   Pursuant to Section 1.172 of the Plan, Cash payable from the HTA Clawback CVI in the CVI Payment Reserve will be distributed upon entry of a Final Order with respect to the GDB Loan Priority Determination.

222. 221. Plan Supplement.  All materials contained in the Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is or shall be required.  See Service Affidavits; Plan Supplement.

223. 222. Satisfaction of Confirmation Requirements.  Based on the foregoing, the Plan satisfies the requirements for confirmation set forth in PROMESA Section 314.

224. 223. Oversight Board Certification.  For purposes of Section 209 of PROMESA, the discharge of debt to occur as of the Effective Date pursuant to the Plan and the Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth, as determined in accordance with modified accrual accounting standards.

225. 224. Implementation.  All documents necessary to implement the Plan, including those contained in the Plan Supplement and all other relevant and necessary documents have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.  Without limiting the generality of the foregoing, the Debtors, prior to the Effective Date, and Reorganized Debtors, from and after the Effective Date, are authorized to consummate the transactions contemplated in the Plan and Plan Supplement.  The execution, delivery, or performance by the Debtors or Reorganized Debtors, as the case may be, of any documents in connection with the Plan Supplement, and compliance by the Debtors or Reorganized Debtors, as the case may be, with the terms thereof, is hereby authorized by, and will not conflict with, the terms of the Plan or the Confirmation Order.

226. 225. Good Faith.  The Debtors will be acting in good faith if they proceed to (i) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby and (ii) take the actions authorized and directed by the Confirmation Order.

227. 226. Retention of Jurisdiction.  This Court may properly and, upon the Effective Date shall, subject to the terms and provisions of Article XCI of the Plan, and except as otherwise provided in the Plan or Confirmation Order, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the Plan, retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the matters set forth in Article XCI of the Plan.

228. 227. Without limiting the generality of any of the foregoing, the Court shall retain jurisdiction to (i) enter appropriate orders with respect to the payment, enforcement, and remedies of the bonds and any other instruments issued pursuant to the plan, (ii) enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, (iii) adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any action taken by any entity pursuant to or in furtherance of the Plan or the Confirmation Order including, without limitation, issuance of bonds, and (iv) to enforce prohibitions against any subsequent collateral attack on provisions contained in the Plan and the Confirmation Order.

229. 228. Governing Law.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document entered into in connection with the Plan

or Plan Supplement provides otherwise, the rights, duties, and obligations arising pursuant to the Plan shall be governed by, and construed in accordance with, PROMESA (including the provisions of the Bankruptcy Code make applicable pursuant to Section 301 of PROMESA), and to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

230.   229. Enforceability.  Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a) as well as general principles of federal supremacy, the provisions of this Memorandum, the Confirmation Order, and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.  The documents contained in the Plan Supplement (as such documents may be further modified and filed with the Court prior to the Effective Date) provide adequate means for implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall constitute valid legal obligations of the Debtors and valid provisions to pay or secure payment of the bonds pursuant to section 944(b)(3) of the Bankruptcy Code, and shall be enforceable in accordance with their terms.

231.   230. No Precedential Effect.  The findings of fact and conclusions of law herein concerning the separate classification of certain Claims from Class 58 CW General Unsecured Claims, including the governmental or business reasons for such classifications, are made with respect to the Title III cases of the Commonwealth, ERS, and PBA, and shall not have any precedential effect for other Title III cases.

## Conclusion

For the foregoing reasons, the Court is concurrently entering its *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*

Dated: [          ], 2021

_____
LAURA TAYLOR SWAIN
United States District Judge