**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,
        Debtors.[1]

-------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

**MOTION SUBMITTING CORRECTED RESPONSE OF THE**
**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD**
**IN ACCORDANCE WITH ORDER REGARDING CERTAIN ASPECTS OF MOTION**
**FOR CONFIRMATION OF MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN**
**OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.**

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA," and together with the Commonwealth and ERS, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the Debtors pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), respectfully submit this motion (the "Motion") submitting a corrected version of the *Response of the Financial Oversight and Management Board in Accordance with Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 19567] (the "Response"), and states as follows:

1.      Pursuant to the Court's *Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 19517], on December 20, 2021, the Debtors filed the Response.

2.      Paragraph 24 of the Response inadvertently omitted its final sentence, which should have read as follows: "The Supreme Court itself has restricted *Radford* to secured claims and confirmed that consistent with the Fifth Amendment Congress can enact bankruptcy laws allocating assets to unsecured claims as long as the distribution scheme is fair, reasonable, and equitable. *Kuehner v. Irving Trust Co.*, 299 U.S. 445, 450-453 (1937)."

3.      The Debtors submit as **Exhibit A** hereto a corrected version of the Response (the "Corrected Response") which incorporates this sentence into paragraph 24.

WHEREFORE, the Debtors respectfully request the Court take notice of this Motion and the Corrected Response.

Dated: December 21, 2021                    Respectfully submitted,
        San Juan, Puerto Rico

                                            */s/ Martin J. Bienenstock*
                                            Martin J. Bienenstock (*pro hac vice*)
                                            Brian S. Rosen (*pro hac vice*)
                                            Paul V. Possinger (*pro hac vice*)
                                            Ehud Barak (*pro hac vice*)
                                            **PROSKAUER ROSE LLP**
                                            Eleven Times Square
                                            New York, NY 10036
                                            Tel: (212) 969-3000
                                            Fax: (212) 969-2900
                                            Email: mbienenstock@proskauer.com
                                                    brosen@proskauer.com
                                                    ppossinger@proskauer.com
                                                    ebarak@proskauer.com

                                            -and-

                                            */s/ Hermann D. Bauer*
                                            Hermann D. Bauer
                                            USDC No. 215205
                                            **O'NEILL & BORGES LLC**
                                            250 Muñoz Rivera Ave., Suite 800
                                            San Juan, PR 00918-1813
                                            Tel: (787) 764-8181
                                            Fax: (787) 753-8944

                                            *Attorneys for the Financial Oversight and
                                            Management Board as Representative of the
                                            Debtors*

2

**EXHIBIT A**

## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,
           Debtors.[2]

-------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

## CORRECTED RESPONSE OF THE
## FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
## IN ACCORDANCE WITH ORDER REGARDING CERTAIN ASPECTS OF MOTION
## FOR CONFIRMATION OF MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN
## OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

---

[2]      The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico ("Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

I.     PROPOSED PREEMPTION PROVISIONS ........................................................................ 2

    A.     The Plan Does Not Leave Any Valid Post-Petition Administrative Expense
Claims Unpaid. ...................................................................................................... 3

    B.     Preemption of Laws that Impose Obligations on Non-Debtor Entities ............... 10

    C.     Further Detail on Scope of Preemption ................................................................ 11

II.    TREATMENT OF ALLOWED EMINENT DOMAIN CLAIMS AND INVERSE
CONDEMNATION CLAIMS ...................................................................................... 12

III.   MISCELLANEOUS OTHER PROVISIONS ................................................................ 25

APPENDIX A .............................................................................................................................. 30

I.     COMMONWEALTH GOOD FAITH AND CREDIT PLEDGE STATUTES .............. 30

II.    STATUTES APPROPRIATING COMMONWEALTH REVENUES............................ 61

III.   TRS AND JRS STATUTES .......................................................................................... 81

IV.    ARTICLE VI OF THE PUERTO RICO CONSTITUTION .......................................... 101

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Altair Credit Opportunities Fund LLC v. P.R. AAA Portfolio Bond Fund, Inc. (In re Fin. Oversight & Mgmt. Bd.),*
914 F.3d 694 (1st Cir. 2019)........................................................................................19

*Ambac Assur. Corp. v. Comm. of P.R. (In re Fin. Oversight & Mgmt. Bd.),*
297 F. Supp. 3d 269 (D.P.R. 2018)..............................................................................25

*Americredit Fin. Servs. v. Nichols (In re Nichols),*
440 F.3d 850 (6th Cir. 2006) ......................................................................................19

*Ashton v. Cameron County Water Improvement District No. 1,*
298 U.S. 513 (1936)......................................................................................................22

*Begier v. IRS,*
496 U.S. 53 (1990)........................................................................................................18

*Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,*
403 U.S. 388 (1971)......................................................................................................23

*Blanchette v. Connecticut General Insurance Corp. (Regional Rail Reorganization Act Cases),*
419 U.S. 102 (1974)......................................................................................................16

*Block v. North Dakota,*
461 U.S. 273 (1983)......................................................................................................24

*Board of Improv. v. Moreland,*
127 S.W. 469 (Ark. 1910).............................................................................................21

*Chapman v. Houston Welfare Rights Organization,*
441 U.S. 600 (1979)......................................................................................................23

*Cobb v. City of Stockton (In re City of Stockton),*
909 F.3d 1256 (9th Cir. 2018) ..........................................................................13, 15, 22

*Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),*
536 F.2d 950 (1st Cir. 1976)..........................................................................................9

*Davis v. United States,*
481 F. App'x. 145 (5th Cir. 2012) ...............................................................................24

*Dickerson v. Tri-County Drainage Dist.*,
212 S.W. 334 (Ark. 1919).......................................................................................22

*Drainage Dist. No. 2 v. Mercantile-Commerce Bank & Trust Co.*,
69 F.2d 138 (8thCir. 1934) ............................................................................ 21-22

*Drainage Dist. v. Stacey*,
192 S.W. 904 (Ark. 1917).......................................................................................21

*Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño*,
604 F.3d 7 (1st Cir. 2010)......................................................................................14

*In re City of Detroit*,
524 B.R. 147 (Bankr. E.D. Mich. 2014) ............................................................16

*In re Craig Cnty. Hosp. Auth.*,
572 B.R. 340 (Bankr. N.D. Okla. 2017) ..............................................................9

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
618 B.R. 349 (D.P.R. 2020)......................................................................................6

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
621 B.R. 289 (D.P.R. 2020)......................................................................................9

*In re Sanborn, Inc.*,
216 B.R. 697 (Bankr. D. Mass. 1998) ...................................................................5

*Knick v. Twp. of Scott*,
139 S. Ct. 2162 (2019)............................................................................................14

*Kuehner v. Irving Trust Co.*,
299 U.S. 445, 450-453 (1937) ...............................................................................17

*Logan v. Zimmerman Brush Co.*,
455 U.S. 422 (1982)................................................................................................19

*Louisville Joint Stock Land Bank v. Radford*,
295 U.S. 555 (1935).........................................................................................16, 17

*Luehrmann v. Drainage District No. 7 of Poinsett County*,
104 F.2d 696 (8th Cir. 1939),
*cert. denied*, 308 U.S. 604, *reh'g denied*, 308 U.S. 608 (1939) ...................20, 21, 22

*Lynch v. Household Finance Corp.*,
405 US. 538 (1972)................................................................................................16

*Lynch v. United States*,
292 U.S. 571 (1934)................................................................................................19

*New Haven Inclusion Cases,*
    399 U.S. 392 (1970)..................................................................................15

*Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.),*
    430 B.R. 65 (S.D.N.Y. 2010)......................................................................15

*Pearl-Phil GMT LTD. v. Caldor Corp.,*
    266 B.R. 575 (S.D.N.Y. 2001)......................................................................8

*Poinsett Lumber & Mfg. Co. v. Drainage Dist.,*
    119 F.2d 270 (8thCir. 1941) ..................................................................20, 21

*Ropico, Inc. v. New York,*
    425 F. Supp. 970 (S.D.N.Y. 1976)..............................................................15

*Sain v. Cypress Creek Drainage Dist.,*
    257 S.W. 49 (Ark. 1923)............................................................................21

*Soriano v. United States,*
    352 U.S. 270 (1957)..................................................................................24

*St. Francis Drainage Dist. v. Austin,*
    296 S.W.2d 668 (Ark. 1956)......................................................................22

*Stone Container Corp. v. United States,*
    229 F.3d 1345 (Fed. Cir. 2000)..................................................................24

*Tulsa Prof'l Collection Servs., Inc. v. Pope,*
    485 U.S. 478 (1988)..................................................................................19

*United States v. Caltex, Inc.,*
    344 U.S. 149 (1952)..................................................................................15

*United States v. Commodities Trading Corp.,*
    339 U.S. 121 (1950)..................................................................................15

*United States v. Martin (In re Martin),*
    542 B.R. 479 (B.A.P. 9th Cir. 2015)............................................................22

*United States v. Norwood,*
    602 F.3d 830 (7th Cir. 2010) ....................................................................15

*United States v. Security Industrial Bank,*
    459 U.S. 70 (1982)................................................................................17, 19

*Woburn Assocs. V. Kahn (In re Hemingway Transp., Inc.),*
    954 F.2d 1 (1st Cir. 1992)............................................................................5

*Wos v. E.M.A. ex rel. Johnson*,
  568 U.S. 627 (2013)................................................................................................5

**STATUTES**

PROMESA § 5...............................................................................................................11

PROMESA § 108...........................................................................................................4

PROMESA § 202...........................................................................................................10

PROMESA § 204...........................................................................................................4

PROMESA § 207...........................................................................................................4

PROMESA § 301...........................................................................................................17

PROMESA § 503...........................................................................................................6

PROMESA § 507...........................................................................................................6

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA," and together with the Commonwealth and ERS, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the Debtors pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), respectfully submit this response (the "Response") in accordance with the Court's *Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 19517] (the "Memorandum Order"), entered on December 14, 2021.[3]

### Response

1.     In the Memorandum Order, the Court stated it was identifying certain issues and setting forth its views in respect of certain materially problematic aspects of the Debtors' Proposed Plan Materials, and the Court invited the Debtors to propose modifications consistent with the Memorandum Order or show cause why the motion for confirmation should not be denied in the absence of such modifications.  Specifically, the issues identified related to (a) the scope of proposed preemption provisions in the Proposed Plan Materials, (b) the treatment of "unsecured" portions of allowed eminent domain claims and inverse condemnation claims, and (c) various comments to the Proposed Confirmation Order, Proposed FFCL, and the Plan.[4]  This Response

---

[3]     Capitalized terms used herein but not otherwise defined shall have the meanings given to them in the Memorandum Order.

[4]     "Plan" refers to the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, filed contemporaneously herewith.

addresses each issue the Court identified.[5]  Contemporaneously with the filing of this Response, the Oversight Board has filed a modified Plan and revised forms of the Proposed Confirmation Order and the Proposed FFCL.  The modifications to the Plan address the Court's concerns and, based upon recent circumstances, add a condition to the Plan's effectiveness that the Court shall have entered an order or finding determining that (i) Acts 80, 81 and 82 and (ii) Joint Resolution 33-2021, enacted into law on December 16, 2021, are either preempted by PROMESA or nullified or unenforceable.

## I.     Proposed Preemption Provisions

2.     Pursuant to the Plan, the Debtors seek preemption of certain laws listed on Exhibit K, which contains statutes that "require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings." *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.*, [ECF No. 19054-4] ("Jaresko Decl."), ¶ 230.  The Memorandum Order requests that the Debtors supplement this request with further details regarding the impact of such preemption on obligations that are alleged to have accrued in advance of any order invalidating such law.

3.     The Debtors address these questions as follows, but in particular note the following with respect to Acts 80-2020, 81-2020, and 82-2020, and the new Joint Resolution 33-2021[6] (the "2020 Pension Acts").  The Oversight Board has determined the 2020 Pension Acts will result in

---

[5]     Prior to the filing of this Response, the Oversight Board met and conferred with AAFAF, and had informal discussions with other relevant parties in interest, concerning the issues identified in the Memorandum Order.

[6]     Joint Resolution 33-2021, signed into law by Governor Pierluisi on December 16, 2021, requires the executive branch to commence the immediate implementation of Act 80-2020.

significant additional costs to the Commonwealth that are neither included in the current certified fiscal plan nor affordable under its projections, such that the Plan is likely not feasible, and thus cannot become effective, if the 2020 Pension Acts are not nullified and are implemented. Therefore, concurrently with the filing of this Response, the Oversight Board has commenced an adversary proceeding by filing a complaint (the "Pension Act Complaint") seeking the Court's determination regarding the preemption of the 2020 Pension Acts or the nullification or unenforceability thereof, including the enjoinment of their implementation.[7] The Oversight Board is also concurrently filing a modified Plan that adds as a condition to the Plan's effectiveness that the Court shall have entered an order determining the 2020 Pension Acts are either preempted by PROMESA or nullified or unenforceable, and has requested necessary amendments to the plan support agreements to provide the Effective Date is to occur on or before March 15, 2022, to allow time for this litigation to conclude.

### A.   The Plan Does Not Leave Any Valid Post-Petition Administrative Expense Claims Unpaid.

4.     The Court expressed concerns over whether rights accrued under any Puerto Rico law being preempted under the Plan are nonetheless entitled to treatment as administrative expense priority claims.  This concern appears to focus on pension obligations that may have accrued during the Title III cases, and in particular new benefits that would be provided under the 2020 Pension Acts.[8] *See* Memorandum Order at 4-5.  As an initial point, Commonwealth employees and retirees are receiving payment in full on account of all lawfully accrued pension obligations, including

---

[7]     The Oversight Board intends to seek preliminary injunctive relief and summary judgment on the Pension Act Complaint as expeditiously as the Court's schedule will allow.

[8]     Notably, to date, the 2020 Pension Acts have not been implemented and no increased benefits have been or are being paid thereunder.

3

those obligations on account of services provided during the course of the Title III cases.  *See* Plan Art. LV (providing for payment of accrued pension claims in Classes 51A-I, K, and L of "his or her benefits without adjustment for any Monthly Benefit Modification," and also paying Classes 51H and I "such additional benefits for service on or after May 4, 2017, frozen as of the [Effective Date of the Plan].").

5.     The Commonwealth government, however, attempted to increase benefits to certain employees under the 2020 Pension Acts, which would have the effect of giving these employees more than full payment of their benefits under prepetition law as provided in the Plan. These laws are invalid because they (i) would increase the treatment of certain unsecured pension claims in Classes 51G and I above the treatment of these claims in the Plan, resulting in some, but not all, members of these classes receiving more than full payment of such claims accrued through the Effective Date (while leaving the other claims in these classes with the "lesser" treatment of payment in full), (ii) violate PROMESA §§ 204(a), 204(c), 207, and 108(a)(2) because, as stated in the Pension Act Complaint and its supporting materials, they impose billions of dollars in new liabilities outside the Oversight Board-certified fiscal plans and budgets for the Commonwealth and other affected instrumentalities by modifying existing pension obligations (*i.e.*, debt) without identifying an adequate method of paying for them or obtaining prior Oversight Board approval, and, for these reasons, (iii) impair and defeat PROMESA's purposes, including the achievement of fiscal responsibility and access to capital markets.  The 2020 Pension Acts are invalid and preempted by PROMESA—preemption under PROMESA is automatic by operation of law, and nothing further is required to invalidate preempted laws.  Accordingly, no legal transaction between the Commonwealth and the subject retirement system participants ever existed, and these employees are not entitled to any alleged benefits under such invalid laws.  *See, e.g.*, *In re Sanborn*,

*Inc.*, 216 B.R. 697 (Bankr. D. Mass. 1998) (invalidating proofs of claim asserted on account of invalid contract); *see also Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627 (2013) (prohibiting North Carolina from recovering certain amounts from tort recoveries because the subject law was preempted).

6.      Obligations allegedly accrued under the 2020 Pension Acts are also not entitled to administrative expense priority under the Bankruptcy Code.  As the Court recognizes, "a request for priority payment of an administrative expense pursuant to Bankruptcy Code § 503(a) may qualify if (1) the right to payment arose from a postpetition transaction with the debtor estate, rather than from a prepetition transaction with the debtor, and (2) the consideration supporting the right to payment was beneficial to the estate of the debtor."  Memorandum Order at 4-5 (citing *Woburn Assocs. v. Kahn (In re Hemingway Transp., Inc.)*, 954 F.2d 1, 5 (1st Cir. 1992)).  Here, even putting aside the preemption and invalidity of the 2020 Pension Acts, the 2020 Pension Acts would not give rise to administrative expense priority claims because (1) the 2020 Pension Acts would modify the Commonwealth's *prepetition* pension obligations to certain employees under the ERS defined benefit plan, which was frozen in 2013, and the TRS defined benefit plan, which was closed to new participants in 2014, rather than create separate postpetition obligations in a postpetition transaction, and (2) the 2020 Pension Acts provide no benefit to the Debtors.

7.      The 2020 Pension Acts generally purport to provide certain favored classes of employees with expanded pension benefits above those that they had been entitled to as of the Petition Date, partially reversing the freeze of ERS that was enacted in 2013 and the freeze of TRS under the Plan.  The Plan already provides for payment in full of all amounts that had accrued up to the Petition Date, as well as all amounts accrued by employees throughout the course of these Title III cases; the expanded pension benefits under the 2020 Pension Acts would unilaterally

increase the amounts owed to such employees under prepetition pension plans, on account of work

the impacted employees had done and were still doing without any promise of additional benefits

before these laws were enacted.  Because the 2020 Pension Acts served only to amend the Debtors'

pre-existing prepetition pension obligations, without the consent or approval of the Oversight

Board, these contractual obligations are not akin to postpetition contracts and are not entitled to

administrative expense priority.  *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 618 B.R. 349,

357–58 (D.P.R. 2020) (finding prepetition agreements amended postpetition may be assumed and

rejected under section 365 of the Bankruptcy Code because they remain prepetition contracts).

8.      Moreover, even if the Court were to find the 2020 Pension Acts created new

postpetition obligations, this issue is not dispositive of whether such obligations give rise to

administrative expense claims.

9.      To start, the alleged accrual of liability under the 2020 Pension Acts does not serve

to benefit the debtor.  In Title III, because PROMESA incorporates sections 503 and 507(a)(2) of

the Bankruptcy Code, administrative expenses may be allowed under subsection 503(b)(1)(A) of

the Bankruptcy Code, so long as the transaction arose postpetition and the expense benefits the

debtor.  Here, as detailed in the Pension Act Complaint, the 2020 Pension Acts add substantial

costs and increase the possibility of future deficits, and are thus detrimental to the Commonwealth.

In fact, the Oversight Board has estimated the 2020 Pension Acts would cost a cumulative $3

billion in additional expenditures over a 30-year period.  While the early retirement of eligible

participants under the 2020 Pension Acts will eliminate the cost of these retirees' salaries, the

elimination of these costs will be far more than offset by the costs imposed by each of the 2020

Pension Acts.  With respect to Act 80—which would offer certain employees the option to retire

immediately and receive a lifetime defined benefit obligation of 50% of current salary—if the

eligible employees elect to retire and receive their heightened benefits, the Oversight Board estimates that the total added pension costs to the Commonwealth alone for such retirees would be up to $2.2 billion over 30 years.  [ECF No. 19448, Ex. 12 at 32].  There is nothing in the law that requires such retiring employees' positions to remain unfilled, so there is no guarantee that any long-term payroll savings will be realized in exchange for this additional cost.  Moreover, to the extent any positions are eliminated following the employee's early retirement, the Commonwealth will still likely not be able to achieve payroll savings incremental to the Fiscal Plan, because the Fiscal Plan already requires the Government to eliminate 3,200 positions in the first year of the Fiscal Plan (*i.e.*, Fiscal Year 2022).  To offset the added pension costs to the Commonwealth under Act 80, the Commonwealth would need to further reduce its workforce by 1,500 positions, an unrealistic proposition that, even if achieved, will materially impair the Commonwealth's ability to function. *Id*.

10.     As to Act 81—which would unilaterally increase the pensions payable to certain public safety employees up to 55% of salary at retirement—the Oversight Board estimates the increased pensions would cost the Commonwealth an additional $2.5 billion over 30 years, which would require a permanent reduction of at least 1,835 emergency personnel beyond those already provided for under the Fiscal Plan to be cost-neutral.  Such a drastic reduction in the ranks of police officers and other emergency service providers is, in the view of the Oversight Board, highly improbable and impossible to achieve without negatively impacting the Government's ability to provide essential services and maintain public safety.  Finally, with respect to Act 82—which would permit teachers to use sick leave to buy up to 5 additional years of service credit, accelerating retirement eligibility and increasing pension entitlements—the Oversight Board estimates that this act would incur up to $1.6 billion in additional costs over 30 years. *Id*.  The

7

Commonwealth government does not even propose to offset such additional cost with any reductions in teacher headcount.

11.     The 2020 Pension Acts therefore do not provide any benefit to the Debtors that would support administrative priority for the liabilities they would add.  The billions of dollars in proposed additional spending for the Commonwealth overwhelms any potential savings from reduction in payroll costs, particularly considering the lack of any mechanisms under the 2020 Pension Acts to guarantee the Commonwealth government undertakes permanent headcount reductions that would be required to render these acts revenue-neutral, let alone beneficial to the Debtors.  Moreover, postpetition administrative expense claims are entitled to greater priority because it would be unreasonable to expect persons and entities to do business with a debtor during the reorganization period without assurance of payment priority over prepetition claims.  *See Pearl-Phil GMT LTD. v. Caldor Corp.*, 266 B.R. 575, 582 (S.D.N.Y. 2001).  Here, the subject employees were already "doing business" with the Commonwealth by performing services to it. The government's unilateral decision to try to enhance retirement benefits for some of them, increasing costs without adequately offsetting such costs or otherwise addressing the significant issues caused thereby, does not necessitate making such benefits a priority obligation, even if the 2020 Pension Acts were a valid and lawful postpetition "transaction," which as explained above they are not.

12.     The Plan freezes TRS and JRS to stop the accrual of new pension benefits, which the Oversight Board has concluded is critical to fulfilling its mission in light of the complete failure of defined benefit plans in existence when it was appointed; absent the freeze, and the continued freeze of ERS, billions of dollars of newly accruing pension liabilities would remain with the Commonwealth indefinitely, causing a drag on economic performance and growth and potentially

returning the Commonwealth to structural deficits.   Because the 2020 Pension Acts are
detrimental, rather than beneficial to the Commonwealth, they cannot give rise to administrative
expense claims.  *See Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.)*, 536 F.2d 950,
954 (1st Cir. 1976) (claimant entitled to administrative expense priority "only to the extent that the
consideration supporting the claimant's right to payment was both supplied to and beneficial to
the debtor-in-possession in the operation of the business.").

13.     Additionally, the Oversight Board, as Title III representative of the
Commonwealth, has not consented to treatment of these obligations as administrative expense
claims.  Rather, the Oversight Board has spent over a year securing the Government's agreement
not to implement the 2020 Pension Acts specifically because of the billions of dollars in additional
unsupported liabilities the Oversight Board anticipates they would create without offset.  In a
municipal bankruptcy such as this Title III Case, an administrative expense claim is appropriate
only where (1) the services are necessary to preserve the operations of the debtor, and (2) the
debtor consents to payment of the claim as an administrative expense.  *See In re Craig Cnty. Hosp.
Auth*., 572 B.R. 340 (Bankr. N.D. Okla. 2017); *see also In re Fin. Oversight & Mgmt. Bd. for P.R.*,
621 B.R. 289, 301 (D.P.R. 2020) ("In light of the restrictions on judicial authority and the scope
of PROMESA that are imposed by sections 303 and 305 of the statute, Oversight Board and debtor
consent are also relevant considerations.").  Simply put, (1) the services that the 2020 Pension Acts
purport to compensate were already provided to the Commonwealth and cannot be said to be
necessary to preserve its operations, and (2) the Oversight Board does not consent to the treatment
of any alleged claims for increased pension benefits under the 2020 Pension Acts as administrative
expenses.  Government employees and pensioners are receiving payment in full on account of their

9

accrued pensions—they are not entitled to payment more than in full on account of invalid, preempted laws, and no administrative expense obligations are created thereby.

**B.     Preemption of Laws that Impose Obligations on Non-Debtor Entities**

14.     The proposed FFCL requests preemption of "laws enacted prior to June 30, 2016, that provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality . . . for any . . . purpose . . . ." Proposed FFCL ¶ 145. Pursuant to PROMESA section 202, the Oversight Board has sole discretion to certify all spending pertaining to a "Budget" as defined in accordance with PROMESA. *See id.* § 202 for any covered territorial instrumentality (as defined in PROMESA), whether or not a Title III or Title VI debtor.   The Memorandum Order provides Debtors have apparently not provided a basis in law or fact for the preemption of laws that impose obligations on non-debtor entities.  Memorandum Order at 5.  Prepetition Commonwealth laws which purport to authorize spending outside an Oversight Board-certified Budget (as defined in PROMESA) contradict this budgeting power, and thus are expressly preempted as inconsistent with PROMESA.  *See* Confirmation Brief[9] ¶¶ 281-284 and accompanying citations.  Budgets, in turn, may include the Commonwealth and all covered territorial instrumentalities. *See* PROMESA §§ 5(4), 5(13), 5(21).  Accordingly, spending in connection with Commonwealth and all "covered territorial instrumentalities", **including non-Debtors**, is within the Oversight Board's budgeting power.   Commonwealth laws, including with respect to non-Debtor covered territorial instrumentalities, are preempted to the extent they would impose payment obligations and appropriations outside of any Oversight Board-certified Budget or fiscal plan.  Moreover, laws

---

[9]     "Confirmation Brief" means the *Memorandum of Law in Support of Confirmation of Amended Title III Joint Plan of adjustment for the Commonwealth of Puerto Rico, et al.*, ECF No. 18869, dated October 27, 2021.

that purport to authorize or require any "covered territorial instrumentalities", including a non-Debtor, to pay obligations under a prepetition statute that are being discharged under the Plan (pursuant to the Bankruptcy Code and PROMESA), effectively nullify the effectiveness and feasibility of the Plan and are inconsistent with PROMESA and the Bankruptcy Code.

### C. Further Detail on Scope of Preemption

15. The Memorandum Order requested the Debtors clarify (*i*) "the intended scope of preemption, together with record-supported findings as to projected costs and inconsistency with the certified budget, fiscal plan, and/or assumptions underlying the Proposed Plan, [which] would appear to . . . serve the goals of the Oversight Board (i.e., ensuring that Commonwealth legislation does not impede the implementation and effectuation of the Plan) while providing adequate information to the Court and parties and ensuring that the Proposed Plan is consistent with section 314(b)(3) of PROMESA," Memorandum Order at 4, and (*ii*) "whether [Proposed FFCL ¶ 145] is intended to prohibit the enactment of new laws (that have not yet been formulated by the Legislative Assembly) that re-create old laws." *Id.* at 5. The chart attached as **Appendix A** to this Response provides the statutory provisions the Debtors contend are preempted, the basis for and duration of the preemption, and record citations supporting the projected costs and inconsistencies between the statutes and the certified budgets, fiscal plan, and Plan. The chart also identifies the section(s) of PROMESA inconsistent with each of the statutes listed as preempted because many of the statutes, on their faces, are preempted because, for instance, they either mandate appropriations without Oversight Board certification, transfer funds to repay discharged debt, create or modify debt, including pension debt, without Oversight Board approval, re-create discharged debt, or violate other aspects of PROMESA.

16. With respect to the Court's question regarding any potential "prohibition" on the enactment of new laws, the Debtors clarify that they do not request an order broadly prohibiting

enactment of new laws that re-create old preempted laws.  But, the Oversight Board does want to retain the protections in the proposed Plan and confirmation order against acts (whether executive orders, policies, rules, or laws) designed to undermine the Plan such as by modifying the Plan's treatment of claims without Oversight Board consent and Court approval.  As a matter of law, any law enacted by the Legislative Assembly will be preempted to the extent it conflicts with PROMESA or any other federal law.

## II.   Treatment of Allowed Eminent Domain Claims and Inverse Condemnation Claims

17.   The Oversight Board is revising the Plan to provide full payment to allowed claims for eminent domain takings and inverse condemnation takings if the Court adheres to the views in its Memorandum Order and the confirmation order issued by the Court becomes final and no longer subject to review or *certiorari* proceedings.  If the Court does not adhere to those views or if a party in interest appeals and obtains relief in respect of the treatment of eminent domain and/or inverse condemnation claims, the revised Plan provides such claims shall be treated as general unsecured claims in Class 58.

18.   Pursuant to the Memorandum Order's invitation (at 2) to show cause why the motion for confirmation should not be denied absent modifications to the treatment of eminent domain and inverse condemnation claims, we submit the following reasons establish cause.

19.   The main pillars of the views in the Memorandum Order are contained in the following three sentences taken from pages 11 and 13 of the Memorandum Order:

> Put differently, 'just compensation' is not a statutory remedy for a constitutionally identified wrong but is instead a necessary condition to the exercise of government power to take private property for public use. . . .

> The Court declines any invitation to overlook the unique nature of the Takings Clause here by conditioning the Fifth Amendment requirement of just compensation on the existence of security for the obligation. To hold otherwise would be to make the Takings Clause subject to federal bankruptcy law, which is precisely the opposite of what the Supreme Court has required.  (Footnote omitted).

20.     Section 3.1 of the Plan provides for full payment of allowed administrative expense claims.  Therefore, to the extent any allowed takings claim is a postpetition claim, it will be paid in full without any revision to the Plan.  To the extent, however, the first sentence quoted above from the Memorandum Order means a taking does not exist until just compensation is paid, that meaning would contradict undisputed facts.  All laws, regulations and other actions resulting in allowable inverse condemnation claims occurred prepetition.  All takings of title to property resulting in allowable eminent domain claims occurred prepetition.  (To the extent, if any, title did not transfer prepetition, the claimant would have an administrative expense claim.)  As shown below, the Memorandum Order partially relies on the dissent in *City of Stockton*, *infra*, which contends in that case that title had not transferred before bankruptcy.  Although the Memorandum Order relies on *City of Stockton*'s dissent, the Memorandum Order overlooks the dissent's contention about title not transferring pre-bankruptcy and that contention renders the dissent supportive of the Oversight Board's position.

21.     Therefore, the undisputed facts underlying the eminent domain and inverse condemnation claims are (i) the government taking occurred prepetition, and (ii) the former property owners have (except to the extent of escrowed cash) prepetition unsecured claims for just compensation under the Fifth Amendment[10]  whose required treatment is the issue to be determined.  *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2171 (2019), confirms the taking claims arose at the time of taking, rendering them prepetition claims here.  Consistently with this Supreme Court jurisprudence, every circuit court to decide the issue has held that unsecured claims can be

---

[10]     The Fifth Amendment applies to Puerto Rico through the Fourteenth Amendment. *Fideicomiso De La Tierra Del Caño Martin Peña v. Fortuño*, 604 F.3d 7, 12 (1st Cir. 2010).  The Fourteenth Amendment makes no reference to payment.

impaired and discharged in bankruptcy without violating the U.S. Takings Clause. *See Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Joint Plan of Adjustment*, ECF No. 18874 (the "Confirmation Reply Brief"), at 44–45.

22.     In the next paragraph we address the interaction of the Fifth Amendment and the bankruptcy power, but as a preliminary matter we address the Memorandum Order's attribution of special significance to the just compensation payment requirement in the Fifth Amendment as compared to other constitutional amendments protecting personal liberty interests, but not containing a just compensation payment requirement.[11]   Simply put, the constitutional amendments protecting personal liberty interests and freedoms accomplish their goals by prohibiting conduct.   They prohibit passage of laws restricting freedoms such as speech and religion (First Amendment), they bar slavery (Thirteenth Amendment), and they bar denial of the right to vote based on race, color, or sex (Fifteenth and Nineteenth Amendments).   Unsurprisingly, these amendments do not add damages must be paid if the protections are breached.   That is too obvious.   Conversely, the Constitution does not bar governmental takings.   It allows them.   To protect rights in property the Fifth Amendment adds, as it must, an obligation to pay just compensation for a taking.   Therefore, it is both counterintuitive and unsubstantiated to infer from the mechanical need to insert a payment requirement into the Fifth Amendment that its framers

---

[11]     At pages 10-11 the Memorandum Order provides:   "Unlike other constitutional prohibitions of government conduct, for violations of which Congress has created causes of action, the Takings Clause of the constitution itself mandates a remedy of 'just compensation' in the event that 'private property [is] taken for public use.'"

and framers of subsequent amendments intended just compensation claims for property to be paid in full in bankruptcy while damage claims for restricting freedoms or imposing slavery or discrimination can be discharged and paid in bankruptcy dollars. The inference is particularly unjustified when one considers the quantification of just compensation claims has been adjudged to be potentially less than actual damage claims (the property's fair value). *See, e.g.*, *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950); *United States v. Norwood*, 602 F.3d 830, 834 (7th Cir. 2010) (just compensation does not necessarily mean full compensation).[12] Additionally, for jurisdictional purposes, the Supreme Court explained one cannot differentiate based on personal liberty and property.[13]

---

[12]    *See also, e.g.*, *New Haven Inclusion Cases*, 399 U.S. 392, 491–92 (1970) (holding that elimination of $60 million worth of collateral for public interest during railroad bankruptcy without compensation was not impermissible taking under the constitution, given the public interest in having railroad continue to operate despite its financial difficulties); *Cobb v. City of Stockton (In re City of Stockton)*, 909 F.3d 1256, 1268 (9th Cir. 2018) (upholding treatment of taking clause claim as general unsecured claim, in part because, "'just compensation' under the Takings Clause is not equivalent to 'full compensation.'"); *Ropico, Inc. v. New York*, 425 F. Supp. 970, 977 (S.D.N.Y. 1976) (citing *United States v. Caltex, Inc.*, 344 U.S. 149, 155 (1952)) ("[i]n order to fulfill its primary obligation to protect the well-being of its citizens in times of emergency, a sovereign may take action which constitutes some taking of property without being required to pay compensation."); *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 96 (S.D.N.Y. 2010) (court held that a claimant's unsecured claim was not protected by the Takings Clause, but that, even if it was, Takings Clause would not be violated by a free and clear sale of the Debtors' assets, as the claimant, "as an unsecured creditor, [the claimant] will share in a pro rata distribution of the consideration paid for the Debtors' assets in the Sale under an eventual chapter 11 plan, consistent with the statutory priority provisions. [The claimant] can hardly complain about that result because, as the Bankruptcy Court found, [i]n the event of a liquidation, creditors now trying to increase their incremental recoveries would get nothing.").

[13]    *Lynch v. Household Finance Corp.*, 405 US. 538, 552 (1972) (jurisdictional dispute concerning pre-judgment garnishment) (emphasis added), provides:

> The right to enjoy property without unlawful deprivation, no less than the right to speak or the right to travel, is in truth a 'personal' right, whether the 'property' in question be a welfare check, a home, or a savings account. In fact, a <u>fundamental</u> interdependence exists between the personal right to liberty and the personal right in property. Neither could have meaning without the other.

23.     The Memorandum Order rejects the Oversight Board's assertions the Fifth Amendment does not apply to prepetition unsecured Fifth Amendment claims and they can be impaired in bankruptcy, on the ground Supreme Court opinions such as *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 589 (1935), opine "[t]he bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment."  We respectfully submit the Memorandum Order's view that such statements can be extended to prepetition unsecured claims is incorrect as shown by all the takings imposed by the Bankruptcy Code to carry out the bankruptcy power and routinely approved by the Supreme Court notwithstanding the absence of full payment or any payment of just compensation.  Notably, neither the Memorandum Order nor any claimant has cited any decision other than *In re City of Detroit*, 524 B.R. 147 (Bankr. E.D. Mich. 2014), for the proposition the Fifth Amendment applies to prepetition, unsecured Fifth Amendment claims to just compensation.  For instance, *Blanchette v. Connecticut General Insurance Corp.* (*Regional Rail Reorganization Act Cases)*, 419 U.S. 102, 107, 136, 156 (1974), involved the postpetition taking of eight railroad companies' assets and their coerced operation at a loss.  While the Supreme Court acknowledged the Fifth Amendment taking, it concluded the parties suffering the takings had adequate remedies under the Tucker Act.  *Id*.  Notably, recourse to the Tucker Act is not barred by PROMESA.  As a result, the Court should discharge the unsecured prepetition claims against the Commonwealth as provided by PROMESA and, if that results in a Fifth Amendment violation, the just compensation claimants will be able to bring suit against the U.S. under the Tucker Act.

24.     *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 572 (1935), involved the restructuring of a secured farm mortgage.  *United States v. Security Industrial Bank*, 459 U.S. 70, 71, 73 (1982), involved the potential avoidance of a security interest, where the Supreme Court

carefully distinguished between a property right and a contractual right.  The Supreme Court itself

has restricted *Radford* to secured claims and confirmed that consistent with the Fifth Amendment

Congress can enact bankruptcy laws allocating assets to unsecured claims as long as the

distribution scheme is fair, reasonable, and equitable.  *Kuehner v. Irving Trust Co.*, 299 U.S. 445,

450-453 (1937).

      25.     The proof that *Radford*'s language cannot be extended to prepetition unsecured

Fifth Amendment claims is in Chapter 5 of the Bankruptcy Code.  It contains numerous avoidance

powers where to carry out the equity of distribution policy, debtors, including governmental

debtors, can take property from third parties without incurring postpetition liability to pay just

compensation in full or at all.  The Memorandum Order (at 13-14 n.5) dismisses this argument

because Bankruptcy Code section 544(b), made applicable by PROMESA section 301(a), only

avoids transfers already voidable by applicable law.  The proof, however, lies in Bankruptcy Code

sections 544(a), 547, and 552, among other sections made applicable by PROMESA section

301(a).

      26.     To prove the point, we take three examples.  First, we consider a creditor holding a

prepetition unperfected security interest or a transferee of real property who does not record the

deed.  Unperfected security interests are completely enforceable outside bankruptcy.  So are

unrecorded deeds.  They are vulnerable to perfected security interests or later recorded deeds, but

if the debtor does not grant another creditor a perfected security interest or transfer a recorded

deed, the unperfected security interest and unrecorded deed can be enforced and are not avoidable

by applicable law.  In bankruptcy, Bankruptcy Code section 544(a) grants the debtor or trustee the

hypothetical status of a judicial lien creditor and perfected bona fide purchaser of real property.

Thus, the Bankruptcy Code grants rights to the debtor that take away the creditor's unperfected

17

security interest and the transferee's unrecorded deed. Those are clear takings. But, there is no liability for just compensation. If the Fifth Amendment overrides the Bankruptcy Code, those takings would not be possible.

27.    Second, we consider a creditor having an unsecured claim against the debtor, which the debtor pays in cash fifty days before bankruptcy. Paying a valid debt is legal in all respects. It is not avoidable by applicable law. But, in bankruptcy, the debtor can deploy Bankruptcy Code section 547 to take back the money it paid the creditor as a voidable preference. As the Supreme Court has ruled, this furthers the equality of distribution policy.[14] Taking back money paid to satisfy a valid debt is the clearest taking one can imagine. But, it is necessary to carry out the bankruptcy power and has never been adjudged subject to the Fifth Amendment just compensation requirement. By contrast, requiring full payment to prepetition unsecured eminent domain and inverse condemnation claims violates the equality of distribution policy in the extreme.

28.    Third, we consider a creditor having a security agreement granting it a security interest in accounts receivable the debtor creates and collects in the normal course. That is a completely valid and enforceable security agreement outside bankruptcy. It is not avoidable by applicable law. But, in bankruptcy, Bankruptcy Code section 552(a) takes away the creditor's security interests against postpetition collections on the theory that on the petition date the collections did not yet exist leaving the creditor with an unsecured claim. This is exactly what

---

[14]    *Begier v. IRS*, 496 U.S. 53, 58 (1990) (emphasis added), provides:

Equality of distribution among creditors is a central ***policy*** of the ***Bankruptcy*** Code. According to that ***policy***, creditors of equal priority should receive pro rata shares of the debtor's property. *See, e.g.*, 11 U.S.C. § 726(b) (1982 Ed.); H. R. Rep. No. 95-595, *supra*, at 177-178. Section 547(b) furthers this ***policy*** by permitting a trustee in bankruptcy to avoid certain preferential payments made before the debtor files for bankruptcy. This mechanism prevents the debtor from favoring one creditor over others by transferring property shortly before filing for ***bankruptcy***.

18

happened in ERS,[15] as we mentioned at oral argument.[16]   If Radford's statement that the bankruptcy power is subject to the Fifth Amendment were applicable to prepetition unsecured claims, section 552 and the ERS outcome it created would be unconstitutional.   Application of the bankruptcy power to prepetition unsecured Fifth Amendment takings claims is similarly constitutional.   The Fifth Amendment deals with takings.   It does not distinguish between eminent domain takings, inverse condemnation takings, and takings of security interests and repayments of debt within ninety days of bankruptcy.   Thus, the Memorandum Order cannot and does not provide any rationale explaining how the Fifth Amendment prevents discharge of prepetition unsecured eminent domain claims, but does not prevent discharge of just compensation claims for the takings effectuated by Bankruptcy Code sections 544, 547, and 552.

29.   That the takings embodied in Bankruptcy Code sections 544(a), 547, and 552 were known by creditors does not render them any different than the impairment and discharge

---

[15]   *Altair Credit Opportunities Fund LLC v. P.R. AAA Portfolio Bond Fund, Inc. (In re Fin. Oversight & Mgmt. Bd.)*, 914 F.3d 694 (1st Cir. 2019).

[16]   Nov. 23, 2021 Hearing Transcript at 26:20-22. Moreover, outside of the bankruptcy context, the jurisprudence is clear that contractual and other unsecured rights are, in fact, "property" that is protected by the U.S. Takings Clause.   *See, e.g.*, *Lynch v. United States*, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a State, or the United States."); *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 485 (1988) (unsecured claims arising from unpaid bill is "property" protected from taking); *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("[A] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause.").   Yet it has long been held constitutional for the Bankruptcy Code to impair and discharge such claims without the provision of just compensation. *See, e.g.*, *United States v. Sec. Indus. Bank*, 459 U.S. 70, 75–77 (1982) (recognizing difference for U.S. Takings Clause purposes in bankruptcy between "the contractual right of a secured creditor to obtain repayment of his debt" and "the property right of the same creditor in the collateral" and holding that while bankruptcy laws likely could not retroactively "destroy" the latter, they could retroactively discharge the former); *Americredit Fin. Servs. v. Nichols (In re Nichols)*, 440 F.3d 850, 854 (6th Cir. 2006) (distinguishing between a contractual right to payment and a secured creditor's property rights in collateral for Takings Clause purposes and noting that "[b]ankruptcy laws have long been construed to authorize the impairment of contractual obligations").

provisions of Bankruptcy Code section 944 that discharge takings claims and all claims other than claims of creditors without notice and actual knowledge of the case. That bankruptcy discharges claims is better known than its avoidance provisions.

30.     The bottom line is the restructuring and discharge of prepetition unsecured Fifth Amendment claims carry out the bankruptcy policies of fresh start and equality of distribution, as much as the avoidance actions do. None of the Supreme Court authorities suggest or even hint the Fifth Amendment overrides bankruptcy policies when it comes to prepetition unsecured claims, and all the takings built into the Bankruptcy Code and its predecessors for over a hundred years show the language from *Radford* has not been extended to prepetition unsecured claims.

31.     The Memorandum Order provides the view that the contrary authorities cited by the Oversight Board are inapposite. We submit they are not. The Memorandum Order (at p. 12) expresses the view *Poinsett Lumber & Manufacturing Co. v. Drainage District*, 119 F.2d 270 (8th Cir. 1941), is inapposite because the Fifth Amendment claimant did not timely file a proof of claim and object to its treatment under the plan. We submit that does not render the opinion inapposite because the court stated the issue was whether the trial court abused its discretion by denying the claimant leave to prosecute its Fifth Amendment claim. *Id*. at 272. To determine whether the court abused its discretion, the appellate court had to and did determine whether the claim for just compensation was invested with "constitutional sanctity." *Id.* That is exactly the issue the Memorandum Order analyzes. Based on its prior decision in *Luehrmann v. Drainage District No. 7 of Poinsett County*, 104 F.2d 696, 703 (8th Cir. 1939), *cert. denied*, 308 U.S. 604, *reh'g denied*, 308 U.S. 608 (1939), the Eighth Circuit Court of Appeals ruled against the constitutional sanctity of the Fifth Amendment claim. There is no question the appellate court considered and ruled on the merits of the same claim at issue here. It had to do so to determine whether the denial of leave

20

to pursue the Fifth Amendment claim was an abuse of discretion.  Moreover, the reliance on *Luehrmann*'s holding shows the *Poinsett* court did not consider the Fifth Amendment claim based on an inverse condemnation taking (flooding of its property), *Poinsett*, 119 F.2d at 271, any different than the dissenting bondholders' taking claim for being forced into a settlement of their bond claims.  *Luehrmann*, 104 F.2d at 702-703.

32.     The Memorandum Order (at 12) also discounts *Poinsett* on the ground it was not a governmental agency for purposes of equity jurisdiction.  That issue was only relevant for purposes of whether a receiver could be appointed.  *Drainage Dist. No. 2 v. Mercantile-Commerce Bank & Trust Co.*, 69 F.2d 138, 140-141 (8th Cir. 1934).  Not being a governmental agency for purposes of equity jurisdiction does not render *Poinsett* inapposite.  First, *Poinsett* was a debtor under the Bankruptcy Act's chapter for municipal debtors.  Second, *Poinsett* was created by the legislature, formulated plans for drainage improvements, and levied a tax or special assessment to meet the principal and interest on the district's bonds.  *Id*. at 139.  The Eighth Circuit assumed the debtor could be the subject of a meritorious claim for just compensation for the taking of property under Arkansas law—an assumption which is borne out by the applicable Arkansas jurisprudence, which makes clear drainage districts are "quasi-public corporations" with the power of eminent domain.[17]

---

[17]     *See, e.g.*, *Board of Improv. v. Moreland*, 127 S.W. 469, 469 (Ark. 1910) (citations omitted) (drainage districts in Arkansas are "governmental agencies, or public quasi corporations, which are 'purely auxiliaries to the state, and have no powers, duties or liabilities except as conferred expressly by statute."); *Sain v. Cypress Creek Drainage Dist.*, 257 S.W. 49 (Ark. 1923) (drainage district liable to pay just compensation for taking private property for public use); *Drainage Dist. v. Stacey*, 192 S.W. 904 (Ark. 1917) (same); *Dickerson v. Tri-County Drainage Dist.*, 212 S.W. 334, 336 (Ark. 1919) (drainage district can exercise state eminent domain power); *St. Francis Drainage Dist. v. Austin*, 296 S.W.2d 668, 668-69, 671 (Ark. 1956) (indicating that drainage district was liable to pay just compensation for property which it took, and collecting cases). *Luehrmann v. Drainage Dist. No. 7 of Poinsett Cnty.*, 104 F.2d 696, 698 (8th Cir. 1939), cited by the Court, *see* Memorandum Order at 12, is not to the contrary.  Quite the opposite: that case affirmed the above rulings that Arkansas drainage districts are "quasi-public corporations."  *Id*. *Luehrmann* made only a limited ruling that such drainage districts should not be treated the same

21

33.    The Memorandum Order (at 12-13) also views *In re City of Stockton*, 909 F.3d
1256 (9th Cir. 2018), as unavailing because the court determined the appeal was equitably moot.
The Memorandum Order (at 13) acknowledges *City of Stockton* also determined the Fifth
Amendment claim was dischargeable (indeed *City of Stockton* announces in its first paragraph the
claim fails on the merits, 909 F.3d at 1259).  *See United States v. Martin (In re Martin)*, 542 B.R.
479, 490 (B.A.P. 9th Cir. 2015) ("When alternate grounds are given for a holding, neither ground
constitutes non-binding dicta."); Confirmation Reply Brief at 47 n.25.  Then, the Memorandum
Order (at 13) views *City of Stockton* as conflating the Fifth Amendment's "constitutional guarantee
of just compensation" with "statutory remedies for other constitutional violations."    The
conflation, however, is actually the difference of opinion between *City of Stockton* and the
Memorandum Order.  Put differently, *City of Stockton* is simply contrary to the Memorandum
Order.  Indeed, the Memorandum Order (at 13) cites to the dissent in *City of Stockton* to make its
argument.  But, the dissent pins its views on a fact that makes its views support the Oversight
Board.    The dissent contends title to the condemned property had not transferred before
bankruptcy.  *City of Stockton*, 909 F.3d at 1276 ("Cobb's takings claim was never finally
adjudicated, and title to his property never passed to the City . . . . Cobb's title is meaningful
because it demonstrates that he has an outstanding constitutional claim for just compensation . . .
. To this day, Cobb remains the legal owner of the property with an outstanding claim for just
compensation.").  As we state above, we agree postpetition condemnations yield administrative

---

as central elements of the state government for the purposes of determining whether *Ashton v.
Cameron County Water Improvement District No. 1*, 298 U.S. 513 (1936), precluded the drainage
district from filing for bankruptcy.  *Id*.  Nothing in *Luehrmann* suggests that drainage districts
cannot be liable to pay just compensation under the U.S. Constitution—as noted, all the Arkansas
jurisprudence suggests they can.

claims entitled to payment in full.  The dissent in *City of Stockton* on which the Memorandum Order relies is in accord.

34.    Although the Memorandum Order views *City of Stockton* as conflating statutory remedies with the Fifth Amendment payment guaranty, binding Supreme Court jurisprudence makes clear that § 1983 (which does not itself mention damages or compensation) is a purely *procedural* statute and that actions for damages are not based on § 1983, but rather on the violation of a constitutional right.  *See Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617-18 (1979) (emphasis added) ("[§ 1983] served only to ensure that an individual had a cause of action for violations of the Constitution . . . *the breadth of its coverage does not alter its procedural character* . . . one cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything . . . . *All civil suits, as every lawyer understands, which this act authorizes, are not based upon it; they are based upon the right of the citizen.*"). And, indeed, the Supreme Court has previously held that rights to damages can be implied from the Fourth Amendment and other constitutional rights which do not expressly mention damages. *See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 397 (1971) ("Having concluded that petitioner's complaint states a cause of action under the Fourth Amendment . . . we hold that petitioner is entitled to recover money damages for any injuries he has suffered as a result of the agents' violation of the Amendment.").

35.    The Memorandum Order also opined that jurisprudence relating to the applicability of statutes of limitation to just compensation claims[18] does not apply here, because (1) "none of

---

[18]    *See, e.g.*, *Soriano v. United States*, 352 U.S. 270, 273-77 (1957) (upholding statute of limitations for suits seeking just compensation against U.S. for actions taken during World War II); *Block v. North Dakota*, 461 U.S. 273, 292 (1983) ("A constitutional claim can become time-barred just as any other claim can . . . . Nothing in the Constitution requires otherwise."); *Davis v. United States*, 481 F. App'x. 145, 149 (5th Cir. 2012) (statutes of limitations barring constitutional

the[] [cases] concerned any limitation periods for raising Takings Clause claims," (2) none of the

jurisprudence applies if sovereign immunity is not a barrier to the claim, (3) statutes of limitation

concern litigation decisions over which claimants have control, unlike bankruptcy, and (4) statutes

of limitation are procedural, not substantive.  Memorandum Order at 13–14 n.5.  As to the first

point, the Oversight Board respectfully submits the Court is incorrect.  Decisions cited by the

Oversight Board at oral argument expressly held that claims for just compensation for the alleged

taking of their property could be barred by a statute of limitations.  For example, in *Soriano v.*

*United States*, 352 U.S. 270, 273-77 (1957), the Supreme Court held the claimant's action for just

compensation for the destruction of his property in World War II by U.S. affiliated combatants

was time barred, and thus the claimant could not receive "just compensation" for the taking.  It has

long been understood that Supreme Court and Circuit-level jurisprudence allows for claims for

just compensation under the Fifth Amendment to become time barred.  *See, e.g.*, *Stone Container*

*Corp. v. United States*, 229 F.3d 1345, 1350 (Fed. Cir. 2000) ("Both the Supreme Court and this

court have repeatedly held that the federal government may apply statutes of limitations to just

compensation claims" and collecting cases).

36.     With respect to the Court's second and third points, the Court adds conditions to

the applicability of statutes of limitations that are not found in the applicable jurisprudence.  No

government or other entity has immunity from enforcement of constitutional rights.  This Court's

ruling was consistent.  "Section 106(e) does not, however, deprive the Court of jurisdiction to

entertain Plaintiff's claims that the Fiscal Plan is invalid or unenforceable as violative of the

Contracts, Takings and Due Process Clauses of the federal Constitution."  *Ambac Assur. Corp. v.*

---

claims "have long been upheld as constitutional."); *Stone Container Corp. v. United States*, 229
F.3d 1345, 1350 (Fed. Cir. 2000) ("Both the Supreme Court and this court have repeatedly held
that the federal government may apply statutes of limitations to just compensation claims.").

*Comm. of P.R. (In re Fin. Oversight & Mgmt. Bd.),* 297 F. Supp. 3d 269, 284 (D.P.R. 2018). The decisions do not hinge their reasoning on sovereign immunity or whether the claimant had control over the timing of litigation. Indeed, in *Soriano v. United States*, 352 U.S. 270, 273-77 (1957), for example, the Supreme Court recognized its ruling would likely cause hardship and conflict with the expectations of many claimants whose property had been destroyed during the war and who had spent years seeking adjudication of their rights through administrative tribunals, but nonetheless applied the statute of limitations to bar the claimant's claim for just compensation. *Id.* at 277. Finally, with respect to the Court's fourth point, nothing in the relevant jurisprudence limits its applicability to statutes of a "procedural" character, rather than a "substantive" character, nor is any such distinction workable. In either case, the result of the bar is the same: the claimant is deprived of its right to just compensation by a Congressional statute. Either a statute can create such a result or it cannot—and Supreme Court jurisprudence is clear that it can.

## III.     Miscellaneous Other Provisions

37.     The Oversight Board has made revisions to the Proposed Confirmation Order, the Proposed FFCL, and the Plan in accordance with the Court's comments in Part III (Miscellaneous Other Provisions) of the Memorandum Order, as summarized below. Contemporaneously with the filing of this Response, the Oversight Board has filed a revised Proposed Confirmation Order, Proposed FFCL, and Plan.

| Court's Comment | Revision |
|---|---|
| **Proposed Confirmation Order** | |
| Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases (Paragraphs 29 and 31): The rejection of a contract needs to precede the period of time for a counterparty to file a claim | Paragraph 31 of the Proposed Confirmation Order previously provided that parties must file a rejection damages claim on or before thirty (30) days after the later to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing |

25

| Court's Comment | Revision |
|---|---|
| arising from the rejected contract. *Memorandum Order* at 15. | rejection of a particular Executory Contract and Unexpired Lease, while paragraph 29 provided for rejection of Executory Contracts and Unexpired Leases as of the Effective Date. Clause (i) of paragraph 31 has been revised to reflect the Effective Date, and accordingly the rejection of Executory Contracts and Unexpired Leases precedes the period of time for parties to file claims. |
| Appointments Related Litigation/Uniformity Litigation (Paragraph 63): Paragraph 63 of the Proposed Confirmation Order includes a reference to the Commonwealth-COFINA Dispute, but the Proposed Plan does not include such reference. *Memorandum Order* at 15-16. | The reference to the Commonwealth-COFINA Dispute has been removed from paragraph 63 of the revised Proposed Confirmation Order. |
| Paragraph 86 of Proposed Confirmation Order: The requirement of a final order appears inconsistent with section 502(a) of the Bankruptcy Code. The Court suggests inserting ". . . or by operation of section 502(a) following the expiration of the Debtors' time to object to such claim." *Memorandum Order* at 17. | Paragraph 86 of the Proposed Confirmation Order has been revised to provide that a Claim of a surety that is determined to be secured and allowed in whole or in part by Final Order, "or by operation of section 502(a) of the Bankruptcy Code following the expiration of the period to object to any such Claim in accordance with the provisions of Section 82.1 of the Plan," shall be paid in full.[19] |
| **Proposed Plan** | |
| Section 76.4 of the Proposed Plan – Executory Contracts and Unexpired Leases: To the extent the Debtors' November 23, 2021 *Notice of Executory Contracts and Unexpired Leases to be Assumed Pursuant to Title III Plan of Adjustment* [ECF No. 19353] is intended to satisfy in part or in whole section 76.4 of the Plan, such provision warrants revision. *Memorandum Order* at 16. | Section 76.4 of the Proposed Plan has been revised to provide that, within ten (10) business days of entry of a Final Order setting forth the cure amount as to each Executory Contract or Unexpired Lease to be assumed or assumed and assigned, the Debtors or Reorganized Debtors shall pay or otherwise satisfy such cure amount. |
| **Proposed Findings of Fact and Conclusions of Law** | |

---

[19]    Section 82.1 of the Plan provides for objections to Claims.

| Court's Comment | Revision |
|---|---|
| Paragraph 39 of Proposed FFCL:<br><br>While Exhibit 127 is referenced as the resolution certifying the modification to the Fourth Amended Plan of Adjustment, Debtors Exhibit 127 is in fact a resolution titled "Approving Execution of Amended and Restated Plan Support Agreement for the Commonwealth, PBA, and ERS." *Memorandum Order* at 16-17. | The Debtors' Exhibit List [ECF No. 19327] correctly lists Debtors' Exhibit 127 as the resolution certifying the modification of the Fourth Amended Plan and submission of the Fifth Amended Plan. However, the *Continued Exhibits of Debtors* [ECF No. 18807] inadvertently attached as Exhibit 127 a different Oversight Board resolution. Contemporaneously herewith, the Oversight Board filed the *Notice of Filing of (I) Corrected Debtors' Exhibits 127 and 128 and (II) Oversight Board Certifications of Modified Plans of Adjustment, in Connection with Response of the Financial Oversight and Management Board in Accordance with the Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Exhibit Notice"), which attaches as Exhibit A the correct Debtors' Exhibit 127 to substitute for the document inadvertently filed as Exhibit 127 to the *Continued Exhibits of Debtors*. |
| Paragraph 40 of Proposed FFCL:<br><br>While Exhibit 128 is referenced as the resolution certifying the modification to the Fifth Amended Plan of Adjustment, Debtors Exhibit 128 is in fact a resolution titled "Approving Execution of PRIFA Related Plan Support Agreement." *Memorandum Order* at 16-17. | The Debtors' Exhibit List [ECF No. 19327] correctly lists Debtors' Exhibit 128 as the resolution certifying the modification of the Fifth Amended Plan and submission of the Sixth Amended Plan. However, the *Continued Exhibits of Debtors* [ECF No. 18807] inadvertently attached as Exhibit 128 a different Oversight Board resolution. The Exhibit Notice attaches as Exhibit B the correct Debtors' Exhibit 128 to substitute for the document inadvertently filed as Exhibit 128 to the *Continued Exhibits of Debtors*. |
| Paragraph 46 of Proposed FFCL:<br><br>This paragraph warrants revision insofar as the sentence is incomplete as it does not include a Docket Entry No. for the Oversight Board's certification of the modification of the Third Modified Eighth Amended Plan. *Memorandum Order* at 17. | The Proposed FFCL was filed prior to the filing of the relevant Oversight Board certification, and accordingly the Docket Entry No. in the Proposed FFCL was left blank. The Exhibit Notice attaches the applicable Oversight Board certification as Exhibit C, and the revised Proposed FFCL, filed contemporaneously herewith, includes the Docket Entry No. associated with that filing. Further, the Exhibit Notice attaches as Exhibit |

| Court's Comment | Revision |
|---|---|
|  | <u>D</u> the Oversight Board certification for the revised Plan filed contemporaneously herewith, and the revised Proposed FFCL includes the Docket Entry No. for such certification. |
| **Miscellaneous** | |
| The term "bankruptcy court" is widely used throughout the Proposed Plan Materials to refer to the Court.  Thus, revisions to make uniform reference to the Title III Court are warranted. *Memorandum Order* at 17. | Where necessary, the Proposed Plan Materials have been modified to make that uniform change. |

[*Remainder of page intentionally left blank*]

Dated: December 20, 2021
        San Juan, Puerto Rico

Respectfully submitted,

/s/ Martin J. Bienenstock
Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Paul V. Possinger (*pro hac vice*)
Ehud Barak (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
Email: mbienenstock@proskauer.com
        brosen@proskauer.com
        ppossinger@proskauer.com
        ebarak@proskauer.com

-and-

/s/ Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Attorneys for the Financial Oversight and
Management Board as Representative of the
Debtor*

### Appendix A

## I.    Commonwealth good faith and credit pledge statutes

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 2 approved October 10, 1985 13 L.P.R.A. § 141–141m** | Authorizes the issue of refinancing bonds to refinance all or any part of any public improvement bonds, provides for payment of principal and interest on such refinancing bonds, provides for the use of proceeds of such bonds, and exempts such bonds from the payment of taxes | **Section 1** – Authorizes issuance of refinancing bonds and payment of costs related to the sale and issuance of such refinancing bonds<br><br>**Section 3(f)** – Provides refinancing bonds may be issued subject to certain conditions<br><br>**Section 5** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the refinancing bonds; authorizes and directs the Secretary of the Treasury to make such payments<br><br>**Sections 6(a) and (c)** – Provides that proceeds of bond issuances shall be held in trust solely for the payment of principal and interest on bonds being refinanced | **Sections 1, 3(f)** – The Act does not authorize the issuance of specific bonds, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Section 5** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Sections 6(a) and (c)** – The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds will be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.<br><br>Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by | During the term of the Oversight Board |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 1 approved June 26, 1987, as amended 13 L.P.R.A. § 63–63h** | Authorizes the issuance of notes, in a principal amount that shall not exceed $800 million, in advance of taxes and revenues of the Commonwealth to be collected in cash during such fiscal year, and creates a Special Fund for the Redemption of Notes in Advance of Taxes and Revenues | <u>**Section 1**</u> – Authorizes the issuance of notes and payment of expenses related to the sale and issuance of such notes<br><br><u>**Section 4**</u> – Provides that all specified taxes and revenues received after the notes are issued and before the close of the fiscal year in which the notes are issued be deposited in a special fund, and that the money in such fund shall be used to pay the principal, redemption premium, and interest on the notes and shall not be used for any other purpose | <u>**Section 1**</u> – The Act does not authorize the issuance of specific bonds, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>To the extent the statute is interpreted not to require approval pursuant to PROMESA section 207, the Act would be inconsistent with PROMESA and is therefore preempted.<br><br><u>**Section 4**</u> – The Act requires certain taxes and revenues to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds will be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | PROMESA section 207 requires that, for so long as the Oversight Board remains in operation, "no territorial government may, without the prior approval of the Oversight Board, issue debt or guarantee exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt." Additionally, the Plan provides, at paragraph 74.5, limitations on future debt which supports feasibility.  *See* Plan § 74.5.<br><br>To the extent the Act is interpreted or applied to permit the Commonwealth to "issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt" without the prior approval of the Oversight Board as required by | During the term of the Oversight Board |

31

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | PROMESA section 207, and/or without compliance with paragraph 74.5 of the Plan, the Act is preempted.<br><br>Such an interpretation or application of the Act would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | |
| **Act 34 approved March 4, 2014** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $3.5 billion to pay or refinance debt and other obligations of the Commonwealth or public corporations, pay rent to PBA, other uses authorized pursuant to previous legislation, establish reserves associated with the bond issuance, and provide for | **Sections 1, 1(i)–(iv), and 1(vii)** – Authorizes the issuance of bonds, the proceeds of which shall be used for the payment of bonds and other debt of the Commonwealth and its instrumentalities and to establish related reserves in connection with the issuance of the bonds, and authorizes the payment of costs incurred in connection with the issuance of the bonds. | **Sections 1, 1(i)–(iv), 1(vii), 5** – The Act authorizes the issuance of bonds in an amount not to exceed $3.5 billion, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | payment of principal and interest on the bonds, among other purposes | **Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of bond anticipation notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 7** – Authorizes the use of money appropriated under the Act for payment of other Commonwealth debt or obligations, or any other use approved by the Legislative Assembly, to the extent not needed for | Plan, and may give certain bonds and notes priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Section 7** – The Act authorizes the use of funds for the payment of any debt of the Commonwealth or any unspecified "other use," which may not be provided for in the Fiscal Plan or the Plan, and may be restructured pursuant to the Plan.  (PROMESA § 202, 314). | Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | the purposes stated in the Act. | | | |
| **Act 79 approved June 1, 2011** | Authorizes the issuance of Commonwealth bonds in a principal amount that shall not exceed $304 million to cover the costs of public improvements | <u>Section 1</u> – Authorizes the issuance of bonds, and provides that $34 million of proceeds be reserved for payment of interest on bonds.<br><br><u>Section 4</u> – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br><u>Section 5</u> – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br><u>Section 6</u> – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments. | <u>Sections 1, 5</u> – The Act authorizes the issuance of bonds in an amount not to exceed $304 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br><u>Sections 4, 5, 6, 13</u> – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br><u>Section 1</u> – The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.<br><br>Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | Permanent |

34

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 13** – Appropriates $8.5 million of bond proceeds for payment of expenses incurred in connection with the bond issuance. | | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 243 approved August 9, 2008** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $250 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $250 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 13** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | Secretary of the Treasury to make such payments.<br><br>**Section 13** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | | with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 43 approved August 1, 2005, as amended** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $575 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $575 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 13** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone.  *See* Amended Malhotra | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 13** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | | Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 216 approved August 19, 2004** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $550 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds. | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $550 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | <u>Section 6</u> – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br><u>Section 12</u> – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | restructured pursuant to the Plan. (PROMESA §§ 202, 314). | by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 100 approved July 12, 2002, as amended** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $500 million to cover the costs of public improvements | <u>Section 1</u> – Authorizes the issuance of bonds.<br><br><u>Section 4</u> – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br><u>Section 5</u> – Authorizes the borrowing of money and | <u>Sections 1, 5</u> – The Act authorizes the issuance of bonds in an amount not to exceed $500 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br><u>Sections 4, 5, 6, 12</u> – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 161 approved July 5, 2003** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $540 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $540 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | <u>**Sections 4, 5, 6, 12**</u> – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 149 approved August 9, 2002, as amended** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $110 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Establishes a special fund to which an amount equal to or greater than $110 million must be deposited by the Secretary | **Section 1** – The Act authorizes the issuance of bonds in an amount not to exceed $110 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | of Treasury for the payment of principal, redemption premium, and interest on the bonds.<br><br>**Section 5** - Authorizes and directs the Secretary of the Treasury to make bond payments. | provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Joint Resolution No. 57** | Authorizes the Secretary of the Treasury to issue, from time to time, refinancing bonds of the | **Section 1** – Authorizes the issuance of bonds. | **Section 1** – The Act does not authorize the issuance of specific bonds, and could be used to issue additional debt in the future which is | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and | For so long as the Oversight Board |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| approved July 12, 1993 | Commonwealth with the purpose or refinancing, completely or partially, any expenses related to the sale and issue of said Refinancing Bonds | | not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). | the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | remains in place |
| Act 54 approved July 6, 2001 | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $475 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $475 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan because it may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | | the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 118 approved July 13, 2000** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $425 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $425 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates $3.25 million of bond proceeds for payment of expenses incurred in connection with the bond issuance. | | $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 153 approved July 19, 1999** | Act 153-1999, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes in an amount not to exceed $475,000,000; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Section 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Section 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes.<br><br>**Section 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Section 4** – Directs payment of principal and | **Sections 1 (para. 1), 3, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $475 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 1 (para. 3), 4, 6** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Section 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Section 6** – Pledges good faith, credit, and taxing power and directs payment of interest on notes as it comes due. Directs issuance of bonds to pay said notes.<br><br>**Section 7** – Proceeds shall be covered into "Public Improvements Fund of 2000" and disbursed according to unspecified statutory provisions<br><br>**Section 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the Public Improvements Fund of 2000.<br><br>**Section 12** – Appropriates $3.25 million to expenses of issuing bonds. | Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Sections 7, 8, 12, 13** – The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 12** – The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Proposed Plan. (PROMESA §§ 202, 314). | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 13** – Appropriates $23.75 million to the Aqueduct and Sewer Authority. | | | |
| **Act 219 approved August 9, 1998** | Act 219-1998, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Article 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Article 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes.<br><br>**Article 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Article 4** – Directs payment of principal and interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Article 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Article 6** – Provides for pledge of good faith, credit, and taxing power and directs payment of interest on notes as it | **Article 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $475 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Articles 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Articles 7, 8, 12, 13** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Article 12** - The Act requires certain proceeds to be used solely for bond | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone.  *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | comes due. Directs issuance of bonds to pay said notes.<br><br>**Article 7** – Proceeds shall be covered into "1999 Public Improvement Fund" and disbursed pursuant to unspecified statutes.<br><br>**Article 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the 1999 Public Improvement Fund.<br><br>**Article 12** – Appropriates $3.25 million to expenses of issuing bonds.<br><br>**Article 13** – Appropriates $23.75 million to the Infrastructure Financing Authority (AFI). | payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 81 approved August 14, 1997** | Act 81-1997, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; | **Section 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Section 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes. | **Sections 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $500 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Section 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Section 4** – Directs payment of principal and interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Section 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Section 6** – Provides for pledge of good faith, credit, and taxing power and directs payment of interest on notes as it comes due. Directs issuance of bonds to pay said notes.<br><br>**Section 7** – Proceeds shall be covered into "1998 Public Improvements Fund" and disbursed pursuant to unspecified statutes.<br><br>**Section 8** – Secretary of the Treasury shall reimburse any provisional | limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Sections 7, 8, 12, 13** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 12** - The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|------------------------|
| | | advance made, out of the first moneys available in the 1998 Public Improvements Fund.<br><br>**Section 12** – Appropriates $3.25 million to expenses of issuing bonds.<br><br>**Section 13** – Appropriates $25 million to the Office of the Management and Budget until the Special Maintenance Proposals Inter Agency Evaluating and Approval Committee claims the deposit thereof in the Special Maintenance Fund. | | | |
| **Act 119 approved August 9, 1995** | Act 119-1995, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Article 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Article 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes.<br><br>**Article 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Article 4** – Directs payment of principal and | **Articles 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $355 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Articles 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Article 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Article 6** – Provides for pledge of good faith, credit, and taxing power and directs payment of interest on notes as it comes due. Directs issuance of bonds to pay said notes.<br><br>**Article 7** – Proceeds shall be covered into "1996 Public Improvements Fund" and disbursed pursuant to unspecified statutes.<br><br>**Article 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the 1996 Public Improvements Fund.<br><br>**Article 12** – Appropriates $3.5 million to expenses of issuing bonds. | Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Articles 7, 8, 12** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget.  (PROMESA § 202).<br><br>**Article 12** - The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone.  *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | | | | |
| **Act 46 approved July 28, 1994** | Act 46-1994, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Article 1 (para. 1)** – Authorizes issuance of Commonwealth bonds. <br><br> **Article 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes. <br><br> **Article 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance. <br><br> **Article 4** – Directs payment of principal and interest on bonds as they fall due and to commit good faith, credit, and taxing power. <br><br> **Article 5** – Authorizes borrowing money and issuing notes in advance of bond issuance. <br><br> **Article 6** – Pledge of good faith, credit, and taxing power and directs payment of interest on notes as it comes due. | **Articles 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $325 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). <br><br> **Articles 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). <br><br> **Articles 7, 8, 12, 13** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202). <br><br> **Articles 12** - The Act requires certain proceeds to be used solely for bond | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. <br><br> Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | Directs issuance of bonds to pay said notes.<br><br>**Article 7** – Proceeds shall be covered into "1995 Public Improvements Fund" and disbursed pursuant to unspecified statutes.<br><br>**Article 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the 1995 Public Improvements Fund.<br><br>**Article 12** – Appropriates $3.5 million to expenses of issuing bonds.<br><br>**Article 13** – Appropriates $16.25 million to the Budget and Management Office, until the Interagency Committee for Evaluation and Approval of Extraordinary Maintenance Proposals orders its allocation to the Extraordinary Maintenance Fund. | payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 39 approved May 13, 1976, as** | Act 39-1976, among other things, provides for the continuing monthly transfer of certain funds | **Section 1** – Requires transfer of funds to a sinking fund for the payment of bonds on a | **Section 1** - The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the | If these statutes have to be complied with, they would undermine the restructuring of Commonwealth debt | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| amended | for the payment of certain bonds and promissory notes issued by the Commonwealth of Puerto Rico. The Act provides the funds so transferred are to be kept in trust for the purpose of paying bonds and notes. | specified schedule; requires transfer of interest on proceeds to the sinking fund.<br><br>**Section 2** – requires use of funds in sinking fund only for payment of bonds. | Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 2** - The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds will be restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Section 2** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | contemplated in the Plan. Amended Jaresko Decl. ¶ 233.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 83 approved August 30, 1991** | Act 83-1991, among other things, provides for certain tax proceeds and appropriations for payment of the Commonwealth's general obligation bonds or notes. | **Article 2.02** – Imposes special tax of 1.03% on the appraised value of all non-exempt personal and real property in Puerto Rico for the amortization and redemption of the general obligations of the Commonwealth. | **Articles 2.02, 2.04 and 2.05** – The act is preempted to the extent Articles 2.02 and 2.04 would impose payment obligations outside of any Oversight Board-certified budget or fiscal plan, or would require payment in full of prepetition obligations. (PROMESA §§ 202, 314). | If these statutes have to be complied with, they would undermine the restructuring of Commonwealth debt contemplated in the Plan. Amended Jaresko Decl. ¶ 233.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | **Article 2.04** – Provides that proceeds from taxes imposed by Article 2.02 shall be applied for payment of the principal and interest on the general obligations of the Commonwealth of Puerto Rico, or the early redemption of such obligations.<br><br>**Article 2.05** – Provides that Articles 2.02 and 2.08 shall be considered a preferential obligation and authorization for distributions to be made pursuant to the Act. | For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted. | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Joint Resolution No. 99-2013 approved December 12, 2013** | Joint Resolution No. 99-2013, among other things, (i) authorizes the General Services Administration to take money on loan; (ii) establishes the method of repayment for the loan; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the loan. | **Section 1** – Provides for a line of credit.<br><br>**Section 3** – Pledge of good faith, credit and taxing power and directs payment of principal and interest. | **Section 1 -** The Act authorizes the borrowing of money in an amount not to exceed $34 million, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt.  (PROMESA §§ 202, 314).<br><br>**Section 3 -** The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | | Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | |
| Joint Resolution No. 104 approved December 13, 2013 | Joint Resolution No. 104-2013, among other things, authorizes the Office of the Superintendent of the Capitol to take money on loan and establishes the method of repayment for the loan to be through annual budgetary allocations from the General Fund. | **Section 1** – Authorizes line of credit.<br><br>**Section 2** – Requires honoring of payment and allocation of funds from the general fund for payment of line of credit. | **Section 1** - The Act authorizes the borrowing of money in an amount not to exceed $15 million, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Section 2** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | restructured pursuant to the Plan. (PROMESA §§ 202, 314). | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | |
| **Joint Resolution No. 96 approved November 27, 2013** | Joint Resolution No. 96-2013, among other things, (i) allocates funds from the Public Improvements Fund; (ii) authorizes remaining funds to be distributed according to a Joint Resolution; and (iii) authorizes the Government Development Bank for Puerto Rico to advance the Secretary of the Treasury a loan to address work determined by the Governor. | **Section 1** – Allocates specific funds to agencies and municipalities for specified purposes.<br><br>**Section 2** – Allocates funds in a way to be determined.<br><br>**Section 3** – Arranges for a line of credit | **Sections 1, 2** - The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 3** - The Act authorizes the borrowing of money in an amount not to exceed $30 million, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|------------------------|
| | | | | restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 17 approved April 11, 1968** | Act 17-1968, among other things, (i) authorizes the Public Buildings Authority to issue certain bonds; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds through a continuing appropriation; and (iii) pledges the good faith and credit of the Commonwealth of Puerto Rico for payment of the bonds. | <u>Section 1</u> – Provides for guarantee of Public Buildings Authority Bonds; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | <u>Section 1</u> - The Act provides for a guarantee of indebtedness in an amount not to exceed $27 million, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan.  (PROMESA §§ 202, 314).<br><br>The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds will be restructured pursuant to the Plan.  (PROMESA §§ 202, 314).<br><br>The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission to allow the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202). | | |
| **Act 409 approved September 22, 2004** | Act 409-2004, among other things, provides that the Commonwealth of Puerto Rico guarantees the payment of principal and interest on outstanding bonds that are issued by the Port of Americas Authority, and directs the Secretary of the Treasury to make payments of principal and interest on bonds issued by the Port of Americas Authority whenever the Port of Americas Authority lacks the funds to make such payments. | **Section 1** – Provides for guarantee of debt of Port of Americas Authority; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | **Section 1** - The Act provides for a guarantee of indebtedness in an amount not to exceed $250 million, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).

The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan.  (PROMESA §§ 202, 314).

The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan.  (PROMESA §§ 202, 314).

The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget.  (PROMESA § 202). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.

The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 1 approved January 15, 2015** | Act 1-2015, among other things, (i) allows PRIFA to assume or repay certain debts of HTA; (ii) creates the Infrastructure Financing Authority Special Economic Assistance Fund; (iii) authorizes PRIFA to issue bonds to finance the assumed debts of HTA; (iv) provides guarantees for the payment of the bonds issued under the act; (v) authorizes the Secretary of the Treasury to pay outstanding obligations from the bonds as necessary; and (vi) pledges the full faith and credit and the taxing power of the Commonwealth of Puerto Rico to guarantee the repayment of the bonds or notes to be paid from the Infrastructure Financing Authority Special Economic Assistance Fund. | **Section 2.02 (Amended Section 34(h))** – Provides for Commonwealth guarantee of agency bonds; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | **Section 2.02 (Amended Section 34(h))** - The Act provides for a guarantee of indebtedness of an unspecified amount, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).

The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).

The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan. (PROMESA §§ 202, 314).

The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232

The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 45 approved July 28, 1994** | Act 45-1994, among other things, (i) guarantees the payment of principal and interest on outstanding and future bonds issued by the Aqueducts and Sewers Authority of Puerto Rico; (ii) directs the Secretary of the Treasury to cosign or advance funds to cover payments on bonds guaranteed under the Act; and (iii) pledges the good faith and credit of the Commonwealth of Puerto Rico for payment of the bonds. | <u>Section 1</u> – Provides for Commonwealth guarantee of Water and Sewage Authority of unspecified amount; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | <u>Section 1</u> - The Act provides for a guarantee of indebtedness of an unspecified amount, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt.  (PROMESA §§ 202, 314).<br><br>The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan.  (PROMESA §§ 202, 314).<br><br>The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan.  (PROMESA §§ 202, 314).<br><br>The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget.  (PROMESA § 202). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

60

## II.    Statutes appropriating Commonwealth revenues

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021** | Appropriates automobile license fees to HTA, which HTA may pledge to the repayment of principal and interest on bonds and other obligations of HTA. | <u>Section 2021</u> – Appropriates increase in automobile license fees to HTA for its corporate purposes and for the repayment of HTA's bonds or other obligations | <u>Section 2021</u> – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations.  (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA § 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion[20] at 16, 19, PROMESA § 314.<br><br>The obligations under the Act were made so that HTA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating.  Upon the effectiveness of HTA's plan of adjustment such debt obligations will no longer be in effect.  Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Title III of | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified | Permanent |

---

[20]    "DRA Opinion" refers to the *Opinion and Order Denying the DRA Parties' Motion for Allowance of an Administrative Expense Claim*, ECF No. 18892, dated October 29, 2021.

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA.  (PROMESA § 314). | budget, fiscal plan, and the Plan.  *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| 13 L.P.R.A. § 31751(a)(1) | Appropriates certain revenues to HTA, which HTA may pledge to the repayment of principal and interest on bonds and other obligations of HTA. | **Section 31751(a)(1)** – Appropriates gasoline and oil taxes to HTA<br><br>**Section 31751(a)(1) (A, B)** – Such appropriated funds shall be covered into a special deposit in favor of HTA and paid on a monthly basis<br><br>**Section 31751(a)(1) (C, E)** – Such appropriated funds shall be pledged to the repayment of HTA's | **Section 31751(a)(1)** – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations.  (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | bonds and other obligations, subject to Section 8 Article VI of the Puerto Rico Constitution and the Commonwealth committed not to reduce the amount of funds appropriated | Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMEA § 314.<br><br>The obligations under the Act were made so that HTA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of HTA's plan of adjustment such debt obligations will no longer be in effect.  Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Title III of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA.  (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan.  *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| 13 L.P.R.A. § 31751(a)(3) | Appropriates revenues derived from cigarette excise taxes to HTA, which HTA may pledge to the repayment of principal and interest on bonds and other obligations of HTA. | <u>Section 31751(a)(3)</u> – Appropriates up to $20 million in cigarette excise taxes to HTA for its corporate powers and purposes<br><br><u>Section 31751(a)(3)(A)</u> – Provides that appropriated funds shall be covered into a special deposit account for HTA<br><br><u>Section 31751(a)(3)(C)</u> – Provides that appropriated funds shall be used for repayment of HTA's bonds and other obligations, subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution | <u>Section 31751(a)(3)</u> – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.<br><br>The obligations under the Act were made so that HTA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of HTA's plan of adjustment such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Title III of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | its current form, which is expected to take place on the effective date of the Plan. | amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| **Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914** | Appropriates revenues derived from rum taxes to PRIFA, which PRIFA may pledge to the repayment of principal and interest on bonds and other obligations of PRIFA. | <u>Section 1914</u> – Appropriates $117 million annually of rum taxes to PRIFA for its corporate purposes, which PRIFA may pledge to the repayment of its bonds or other obligations subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution | <u>Section 1914</u> – The appropriation provisions to PRIFA are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.<br><br>The obligations under the Act were made so that PRIFA will have sufficient moneys to | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of PRIFA's qualifying modification such debt obligations will no longer be in effect.  Continuing to send the moneys and appropriate despite the debts being discharged pursuant to the Plan and the qualifying modification under Title VI of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a)** | Appropriates certain excise tax revenue to PRIFA and HTA for the purpose of repaying debts and obligations of HTA. | **Section 31751a(a)** – Appropriates funds to Infrastructure Financing Authority Special Economic Assistance Fund and such funds are to be used by PRIFA for | **Section 31751a(a)** – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations.  (PROMESA §§ 202, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | repayment of HTA debts and obligations | These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314). Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314. The obligations under the Act were made so that HTA or PRIFA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of the relevant plan of adjustment or qualifying modification such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to the Plan and the qualifying modification pursuant to Title VI of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA.  (PROMESA § 314). Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234. The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan.  *Id.* These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | | | revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| 13 L.P.R.A. § 31751(a)(4) | Appropriates revenues derived from cigarette excise taxes to the MBA, which the MBA may pledge to the repayment of principal and interest on bonds and other obligations of the MBA. | <u>Section 31751(a)(4)</u> – Appropriates up to $10 million in cigarette excise taxes to the MBA for its corporate powers and purposes <br><br> <u>Section 31751(a)(4)(A)</u> – Provides that appropriated funds shall be covered into a special deposit account for the MBA <br><br> <u>Section 31751(a)(4)(C)</u> – Provides that appropriated funds shall be used for repayment of the MBA's bonds and other obligations, subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution | <u>Section 31751(a)(4)</u> – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314). <br><br> These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314). <br><br> Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314. <br><br> The obligations under the Act were made so that MBA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Plan conflicts with the discharge provisions of PROMESA. The Plan provides for a clawback claim for MBA, once the debt is | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. <br><br> If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234. <br><br> The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | discharged pursuant to PROMESA the appropriation is preempted.  (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | budget, fiscal plan, and the Plan.  *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| 13 L.P.R.A. § 31751(a)(5) | Appropriates revenues derived from cigarette excise taxes to PRITA, which PRITA may transfer to the Infrastructure Financing Authority for the debt or other obligation of the Infrastructure Financing Authority. | **Section 31751(a)(5)** – Appropriates up to $36 million in cigarette excise taxes to PRITA for its corporate powers and purposes<br><br>**Section 31751(a)(5)(A, B)** – Provides that appropriated funds shall be covered into a special deposit account for PRITA and specifies amount appropriated | **Section 31751(a)(5)** – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan.  (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims | **Section 31751(a)(5)(A, B)** – During the term of the Oversight Board.<br><br>**Section 31751(a)(5)(C, D)** – Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 31751(a)(5)(C)** – Provides that appropriated funds are subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution

**Section 31751(a)(5)(D)** – Provides that PRITA shall transfer funds to PRIFA for repayment of PRIFA's debts or obligations when its funds are insufficient to cover such debts or obligations | its current form, which is expected to take place on the effective date of the Plan. | contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.

The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*

These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| 13 L.P.R.A. § 2271v(a) | Appropriates certain excise tax revenue to CCDA, which CCDA may pledge to the repayment of principal and interest on its bonds and other obligations. | Section 2271v(a) – Appropriates room occupancy taxes to CCDA, which CCDA may pledge to the repayment of bonds and other obligations of CCDA, subject to Section 8 Article VI of the Puerto Rico Constitution. | Section 2271v(a) –The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations.  (PROMESA §§ 202, 314). <br><br> These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314). <br><br> Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314. <br><br> The obligations under the Act were made so that CCDA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of CCDA's Title VI qualifying modification such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to the Qualified Modification pursuant to Title IV of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA.  (PROMESA § 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. <br><br> If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234. <br><br> The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.* <br><br> These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 | During the term of the Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | Fiscal Plan to identify the amount of revenues to be transferred in and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 147 enacted June 18, 1980, 23 L.P.R.A. § 104** | Appropriates 4.0% of the annual General Fund revenue to the Judicial Branch. In addition, establishes the priorities of payment for "when the available funds for a specific fiscal year are not sufficient to cover the appropriations approved for that year." | <u>Section 104(a)(7)</u> – Appropriates funds from the General Fund of the Treasury to the Judicial Branch for operating expenses.<br><br><u>Section 104(c)</u> – Sets priority guidelines for the disbursement of public funds. | <u>Section 104(a)(7)</u> – The act imposes payment obligations and appropriations outside of any Oversight Board-certified budget or fiscal plan. (PROMESA § 202).<br><br><u>Section 104(c)</u> – The act requires payment of prepetition debt of the Commonwealth claims discharged upon effectiveness of the Plan of Adjustment and creates payment priorities that conflict with Section 314(b)(4) of PROMESA.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes | <u>Section 104(a)(7)</u>: During the term of the Oversight Board. Section.<br><br><u>Section 104(c)</u>: Permanent. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.* <br><br> These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **18 L.P.R.A. § 621-1** | Appropriates certain funds to the University of Puerto Rico. | **Section 621-1(a)** – Appropriates 9.60% of the annual General Fund budget to the University of Puerto Rico. | **Section 621-1(a)** – The act imposes payment obligations and appropriations outside of any Oversight Board-certified budget or fiscal plan.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and | Until the debt issued pursuant to the Plan is paid in full. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|------------------------|
|         |                              |                               |                      | debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth |                        |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 83 approved August 30, 1991, as amended, 21 L.P.R.A. §§ 5002, 5004, 5006, 5815.12** | Appropriates special tax revenue for the amortization and redemption of Commonwealth obligations, compensate municipalities for certain uncollected property taxes, and appropriates certain Commonwealth funds to municipalities. | <u>**Section 5002 (para. 1)**</u> – Authorizes revenues of a special tax of 1.03% per annum on the appraised value of all personal and real property not exempted from taxes for the amortization and redemption of the Commonwealth general obligations.<br><br><u>**Section 5004(a), (c)**</u> – Directs the product and proceeds from the taxes levied under § 5002 to the payment of principal on existing and future general obligation bonds and notes.<br><br><u>**Section 5006 (para. 1–2)**</u> – Authorizes the transfer of funds for compensation of municipalities for uncollected property taxes resulting from tax exemptions. | <u>**Section 5002 (para. 1)**</u> – This act is preempted to the extent it requires transfers of money independent of their inclusion in an Oversight Board-certified fiscal plan or budget. (The provisions authorizing municipalities to levy an additional surtax and empowering the Municipal Revenues Collection Center to collect such taxes are not preempted.)  (PROMESA § 202).<br><br><u>**Section 5004(a), (c)**</u> – This act requires payment of prepetition debt of the Commonwealth  claims discharged upon effectiveness of the Plan of Adjustment, creates payment priorities that conflict with Section 314(b)(4) of PROMESA, and requires transfers of money independent of their inclusion in an Oversight Board–certified fiscal plan or budget. (PROMESA §§ 202, 314).<br><br><u>**Section 5006 (para. 1–2)**</u> – This act requires transfers of monies independent of their inclusion in an Oversight Board-certified fiscal plan or budget. (PROMESA § 202).<br><br><u>**Section 5815(a)–(d)**</u> – This act requires transfers of money independent of their | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified | <u>**Section 5002 (para. 1)**</u> – Permanent<br><br><u>**Section 5004**</u> – Permanent.<br><br><u>**Section 5006 (para. 1–2)**</u> – Until the debt pursuant to the Plan has been paid in full.<br><br><u>**Section 5815(a)–(d)**</u> – During the term of the Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | <u>**Section 5815(a)–(d)**</u> – Authorizes the transfer of funds from taxes, the Additional Lottery System, the net internal revenues of the General Fund, and fines to municipalities. | inclusion in an Oversight Board-certified fiscal plan or budget.  (PROMESA § 202).<br><br>For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted. | budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 221 approved May 15, 1948, as amended, 15 L.P.R.A. § 74** | The statute provides for the calculation of the annual net income from slot machines and distributes those incomes to slot machine operators, the Gaming Commission, and government funds including the General Fund. | <u>**Section 74**</u> – Calculates slot machine license fees and taxes and authorizes the distribution of the annual net income from slot machines. The collection of the taxes are not preempted. | <u>**Section 74**</u> – This act is preempted to the extent it requires transfers of net slot machine income independent of their inclusion in an Oversight Board-certified fiscal plan or budget.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's | During term of Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|------------------------|
| | | | | restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 18 approved January 24, 2014, as amended, 21 L.P.R.A. § 6742** | The statute provides for varying percentages of the Sales and Use Tax ("IVU" by Spanish acronym) to be distributed to the Municipal Administration Fund which has a waterfall distribution to the Municipal Development Fund, the Municipal Redemption Fund, and the Municipal Improvement Fund. | <u>Section 6742(a)(1)–(3)</u> – Provides for the distribution of funds from the Municipal Administration Fund to municipalities. | <u>Section 6742(a)(1)–(3)</u> – This act requires transfers of money independent of their inclusion in an Oversight Board-certified fiscal plan or budget.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.  If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.  The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*  These statutes contain formulas explaining the | During term of Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 41 approved July 22, 2011, as amended, 12 L.P.R.A. §8105** | The statute establishes a fund to collect fees on all new tires (imported or manufactured locally) to facilitate the disposal of unusable tires from the island and provides that resources of the fund shall be allocated through regulations. | <u>Section 8105(g) and (h)</u> – Appropriates funds gathered from the Scrap Tire Management and Disposal Fee as provided for in regulations. | <u>Section 8105(g) and (h)</u> – This act authorizes transfers of money independent of their inclusion in an Oversight Board-certified fiscal plan or budget.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234. | During the term of the Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | | | The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion.  Amended Malhotra Decl. ¶ 64. | |

## III.    TRS and JRS Statutes

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| **Act 106 approved August 23, 2017** | Act 106-2017 ("Act 106") provides for the liquidation of the then-remaining assets of the three public retirement systems (ERS, TRS, and JRS), the transfer of their assets (with specified exceptions) to the Commonwealth, and the Commonwealth's assumption of payment of all pensions to retired participants in the three systems, subject to reimbursement by other employers who participated in these systems of pensions paid to their respective retirees.\n\nAct 106 also provides for the establishment of a new defined contribution plan, pursuant to which employees will contribute 8.5% of | **Section 2.3** – Provides for the continued accrual and payment of defined benefit pension obligations under TRS and JRS\n\n**Section 2.4(a)** – Provides for the continued accrual of defined benefit pension obligations under TRS and JRS\n\n**Section 2.4(b)** – Provides for the continued accrual of defined benefit pension obligations\n\n**Section 2.6** – Provides for the continued accrual of defined benefit pension obligations under TRS and JRS\n\n**Section 3.1(b)(1)** – Excepts judges and certain teachers from participation in the defined contribution accounts and provides for continued participation for | **Section 2.3** – The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284).  (PROMESA §§ 202, 314).\n\n**Section 2.4(a)** - The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284).  (PROMESA §§ 202, 314).\n\n**Section 2.4(b)** - The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).\n\n**Section 2.6** - The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284).  (PROMESA §§ 202, 314).\n\n**Section 3.1(b)(1)** – The Act requires minimum mandatory individual contributions to the defined contribution accounts in | The Oversight Board has determined the freeze of the TRS and JRS pension plans is essential to achieving the goals of PROMESA, as it will result in net savings of $4.7 billion over the next 30 years. Supplemental Levy Decl. [ECF No. 19059], ¶ 14.\n\nEach of the cited sections, other than Section 3.6(a)(2), is inconsistent either with the freeze of JRS and TRS, or with the treatment the Plan proposes to provide affected participants on account of the freeze.\n\nWith respect to Section 3.6(a)(2), AFSCME has requested, and the Oversight Board has agreed, a default investment for Commonwealth contributions under Sections 55.7 and 55.10 of the Plan that will provide an opportunity for investment return is better for participants than an investment that merely preserves the principal contributions.  This will further the Oversight Board's goal, consistent with PROMESA, of enhancing retirement funding for current government employees. | The preemption of Section 3.6(a)(2) only applies to the one-time contributions to be made to active ERS and System 2000 participants under Sections 55.7 and 55.10.\n\nBecause the Oversight Board requires the permanent freeze of TRS and JRS and conversion of the retirement plans of participants to the Act 106 defined contribution plan, the preemption of the remaining implicated sections of Act 106 must be permanent. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | their salaries to individual retirement accounts. All ERS participants, and all TRS participants hired after July 31, 2014 are required to participate in this new defined contribution plan, and teachers hired before August 1, 2014, plus all JRS participants, may participate but are not required.<br><br>Act 106 further provides that the default investment option for deposits into the defined contribution plan shall include a guarantee of the principal amount of contributions, which implicitly means there will be little or no return on investment.<br><br>Act 106 further provides that TRS and JRS shall remain unfrozen, and participants in these systems shall | these participants in the defined benefit plans<br><br>**Section 3.4** – Requires participants to contribute a minimum of 8.5% of such participants' monthly salary to their defined contribution accounts each month.<br><br>**Section 3.6(a)(2)** – Establishes as a default investment for Act 106 contributions an instrument that guarantees the return of principal. | the amount of 8.5% of the subject participant's monthly salary in violation of the Plan. This minimum contribution shall continue to apply to all Act 106 plan participants except for TRS and JRS pension plan participants who will be enrolled in social security under the Plan, whose minimum contribution is reduced to 2.3% under the Plan, as they will be making payments to social security of 6.2% (for a total of the 8.5% Act 106 requires to be paid to the defined contribution plan). Plan § 55.9. (PROMESA § 314).<br><br>**Section 3.4** – The Act requires minimum mandatory individual contributions to the defined contribution accounts in the amount of 8.5% of the subject participant's monthly salary in violation of the Plan which provides for certain participants to be able to reduce their contribution to 2.3% as they will be making payments to social security of 6.2% (for a total of the 8.5% Act 106 requires to be paid to the defined contribution plan). Plan § 55.9. (PROMESA § 314).<br><br>**Section 3.6(a)(2)** – Establishes s a default investment for Act 106 contributions an instrument that guarantees the return of principal. This section is inconsistent with | | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | continue to make contributions to and accrue benefits under these systems in accordance with their enabling acts. | | the Plan, and is therefore preempted, only with respect to the contributions to be made by the Commonwealth to the Act 106 accounts for active ERS participants in Classes 51G and 51J under the Plan (sections 55.7 and 55.10 of the Plan), which will be subject to a default investment in target retirement date funds unless the participants chooses otherwise. (PROMESA § 314). All other contributions by employees to the Act 106 accounts shall be subject to the default investment set forth in Section 3.6(a)(2). The Plan provides for the freeze of the defined benefit plans of TRS and JRS.  In consideration for the freeze of these plans, affected participants will be required to enroll in the Act 106 defined contribution plan, such that enrollment in this plan will no longer be voluntary for any participants in the TRS and JRS systems.  In addition, any TRS or JRS participant to be enrolled in social security under the Plan will be subject to a reduced contribution requirement of 2.3% of salary, as they will be making payments to social security of 6.2% (for a total of the 8.5% Act 106 requires to be paid to the defined contribution plan). | | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | Finally, the treatment of active ERS participants in Classes G and J of the Plan require certain contributions into the Act 106 accounts by the Commonwealth, with a default investment of these funds in target retirement date funds closest to the year in which each participant will reach age 65 applicable to each participant. (PROMESA § 314). | | |
| **Act 160 approved December 24, 2013**<br><br>**18 L.P.R.A. § 393-399d** | Act 160-2013 creates a new teachers' retirement system ("TRS"), and repeals Act 91-2004. Among other things, the act provides a framework to determine payments into and from the retirement system. The act indicates that the retirement system will receive additional Commonwealth funds to make up a deficit in the system. | **Section 3.11** – Provides for a minimum pension benefit for certain participants<br><br>**Section 4.1** - Establishes the Commonwealth's responsibility to appropriate funds to finance pensions<br><br>**Section 4.3(b)** – Establishes employer contributions of up to 20.25% of monthly salary obligations to participants<br><br>**Section 4.4** – Establishes defined benefit pension obligations | **Section 3.11** – The Act requires the payment of minimum pension benefits for certain participants in violation of the Fiscal Plan (Fiscal Plan at 275) and the treatment of pensions under the Plan (Plan Art. LV).  (PROMESA §§ 202, 314).<br><br>**Section 4.1** – The Act provides for the appropriation of funds to TRS that are not provided for in the budget or Fiscal Plan, and which conflict with the Plan's provisions freezing TRS pension benefit accruals and transferring all participants to the defined contribution plans established under Act 106.  Plan § 55.9. (PROMESA §§ 202, 314).<br><br>**Section 4.3(b)** – The Act requires employers, including covered instrumentalities, to make payments not accounted for in the Fiscal Plan and budget. (PROMESA § 202). | Absent the freeze of the TRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | **Section 4.5(b)** – Establishes disability pension benefits for certain participants, calculated using a defined benefit formula<br><br>**Section 4.6** – Sets forth the method of calculating the disability pensions provided in § 4.5 using a defined benefit formula<br><br>**Section 4.9(b)** – Requires the Commonwealth to make an annual contribution to TRS in the amount of $1,675 per participant<br><br>**Section 5.6** – Requires employer contributions to be paid in accordance with § 4.3(b).<br><br>**Section 7.1** – Establishes appropriations from the Commonwealth to TRS to fund pension obligations | **Section 4.4** – The Act creates defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 4.5(b)** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284).  (PROMESA §§ 202, 314).<br><br>**Section 4.6** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284).<br><br>**Section 4.9(b)** – The Act requires the Commonwealth to make contributions to TRS without Oversight Board approval and which contributions are not provided in the budget, and conflict with the Fiscal Plan, and the freeze of TRS under the Plan. Post-Effective Date, all teachers' pensions will be administered on a "PayGo" basis as established under Act 106.  Plan § 55.9. (PROMESA §§ 202, 314).<br><br>**Section 5.6** – The Act requires employers, including covered | "[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment.  If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether."  Jaresko Decl. [ECF No. 18729], ¶ 235.<br><br>"Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination of COLAs, is approximately $5.6 billion."  Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension | |

85

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | instrumentalities, to make payments not accounted for in the Fiscal Plan and budget. (PROMESA § 202).<br><br>**Section 7.1** – The Act requires hundreds of millions of dollars to be appropriated to TRS annually without Oversight Board approval and in violation of the budget, Fiscal Plan, and the Plan's freeze of TRS.  Plan § 55.9.  (PROMESA §§ 202, 314). | Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%".  Supplemental Levy Decl. [ECF No. 19059], ¶ 15.<br><br>"The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations."  Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |
| **Act 91 of March 29, 2004**<br><br>**18 L.P.R.A. § 391-392w**<br><br>**Repealed by Act 160** | Act 91-2004, the prior act governing the TRS, required (among other things) the Commonwealth to contribute funds to the retirement system for each teacher employed by the Commonwealth. | **Section 14** – Establishes the Commonwealth's responsibility to appropriate funds to finance pensions<br><br>**Section 20** – Authorizes certain government employees to | **Section 14** – The Act provides for the appropriation of funds to TRS that are not provided for in the budget or Fiscal Plan, and which conflict with the Plan's provisions freezing TRS pension benefit accruals and transferring all participants to the defined contribution plans established under Act 106.  Plan § 55.9. (PROMESA §§ 202, 314). | Absent the freeze of the TRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | participate in TRS, subject to withholding 9% of their salary<br><br>**Section 25** – Establishes a minimum pension benefit<br><br>**Section 29** – Establishes disability pension benefits for certain participants, calculated using a defined benefit formula<br><br>**Section 35** – Establishes certain death benefits for pensioners' beneficiaries and heirs, including benefits for school-age children<br><br>**Section 40** – Establishes defined benefit pension obligations<br><br>**Section 47** – Establishes appropriations from the Commonwealth | **Section 20** – The Act provides certain education-related government employees to participate in the TRS defined benefit pension plans in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 25** – The Act requires the payment of minimum pension benefits for certain participants in violation of the Fiscal Plan (Fiscal Plan at 275) and the treatment of pensions under the Plan (Plan Art. LV). (PROMESA §§ 202, 314).<br><br>**Section 29** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 35** – The Act creates death benefits for pensioners' beneficiaries, including providing children enrolled in school with shares of their deceased parent's defined benefit pensions in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314). | "According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment. If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether." Jaresko Decl. [ECF No. 18729], ¶ 235. | |

87

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|----------|
| | | to TRS to fund pension obligations<br><br>**Section 48** – Establishes appropriations from the Commonwealth to TRS to fund pension obligations<br><br>**Section 49** – Requires the Secretary of Treasury to apply Commonwealth revenues to fund pension obligations | **Section 40** – The Act creates defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 47** – The Act requires hundreds of millions of dollars to be appropriated to TRS annually without Oversight Board approval and in violation of the budget, Fiscal Plan, and the Plan's freeze of TRS.  Plan § 55.9.  (PROMESA §§ 202, 314).<br><br>**Section 48** – The Act requires hundreds of millions of dollars to be appropriated to TRS annually without Oversight Board approval and in violation of the budget, Fiscal Plan, and the Plan's freeze of TRS.  Plan § 55.9.  (PROMESA §§ 202, 314).<br><br>**Section 49** – The Act requires the Secretary of Treasury to transfer certain surplus funds to TRS in violation of the budget, Fiscal Plan, and Plan provisions which allocate surplus funds to, among other things, the Pension Reserve Trust.  (PROMESA §§ 202, 314). | "Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination of COLAs, is approximately $5.6 billion."  Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%".  Supplemental Levy Decl. [ECF No. 19059], ¶ 15.<br><br>"The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations."  Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the | |

88

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | | transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |
| **Act 12 approved October 19, 1954** <br><br> **4 L.P.R.A. § 233-246** | Act 12-1954 creates JRS. The act, in relevant part, provides the structure of the retirement system and the amount of funds the Commonwealth is required to contribute as well as the purpose for those Commonwealth contributions. | **Article 4** – Establishes defined benefit pension for judges <br><br> **Article 6** – Establishes disability pension benefits for certain participants, calculated using a defined benefit formula <br><br> **Article 8** – Establishes certain death benefits for pensioners' beneficiaries and heirs | **Article 4** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314). <br><br> **Article 6** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314). <br><br> **Article 8** – The Act creates additional death benefits in violation of the JRS freeze in the Plan (Plan § 55.8, Exhibit E) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314). | Absent the freeze of the JRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13. <br><br> "According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13. <br><br> "[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|----------|
| | | | | other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment.  If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether."  Jaresko Decl. [ECF No. 18729], ¶ 235.<br><br>"Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination of COLAs, is approximately $5.6 billion."  Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%".  Supplemental Levy Decl. [ECF No. 19059], ¶ 15. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | | "The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations."  Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |
| **Act 162 approved on December 24, 2013** | Act 162-2013 amends the retirement system for the Commonwealth's judiciary ("JRS") and creates a new defined benefit and defined contribution Hybrid Program applicable to future Commonwealth judges.  The act, among other things, amends pension calculations, amends the contribution amount of system | **Section 2** – Establishes defined benefit pension for judges<br><br>**Section 3** – Establishes certain increased defined benefit pensions for certain judges<br><br>**Section 5** – Establishes the defined benefit portion of the hybrid system pension obligations for | **Section 2** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 3** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 5** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal | Absent the freeze of the JRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | participants, establishes contribution accounts for the Hybrid Program of the Commonwealth's new JRS, and amends summer and Christmas bonus provisions. | judges hired after July 1, 2014

**Section 6** – Establishes certain disability pension benefits for participants hired after July 1, 2014, calculated using a defined benefit formula

**Section 11** – Establishes the defined contribution portion of the hybrid pension system for judges hired after July 1, 2014, including a guaranteed return on investment and employer contributions

**Section 12** – Provides for defined benefit pension obligations for certain participants

**Section 13** – Establishes a Christmas bonus for participants | Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).

**Section 6** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).

**Section 11** – The Act creates a hybrid system, whereby certain judges are entitled to defined benefits in the form of lifetime annuities and defined contributions. The rights created under the Act, including the guaranteed return on investment, conflict with the treatment of pension obligations under the Plan whereby participants will be enrolled in the Act 106 defined contribution accounts that do not include such rights. (PROMESA § 314).

**Section 12** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).

**Section 13** – The Act entitles participants to receive a Christmas bonus in the annual amount of up to $600 per participant in violation | (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.

"[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment. If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether." Jaresko Decl. [ECF No. 18729], ¶ 235.

"Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|----------|
| | | **Section 14** – Establishes a Summer bonus for participants | of the Plan, which eliminates such benefit (Plan, Exhibit E). (PROMESA § 314).<br><br>**Section 14** – The Act entitles participants to receive a Summer bonus in the annual amount of up to $100 per participant in violation of the Plan, which eliminates such benefit (Plan, Exhibit E). (PROMESA § 314). | of COLAs, is approximately $5.6 billion." Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%". Supplemental Levy Decl. [ECF No. 19059], ¶ 15.<br><br>"The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations." Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |

| Act 80 approved August 3, 2020 | Creates incentivized retirement program certain for ERS participants and offers them increased lifetime pensions. | Act 80 is preempted in its entirety. | Plan of Adjustment Art. LV: Act 80 is preempted because it modifies the treatment of certain pension claims from the treatment provided for in the Plan of Adjustment. (PROMESA § 314).

Plan of Adjustment § 83.4: Act 80 is preempted because it increases pension benefits for certain future retirees, which conflicts with the Plan of Adjustment's provision that the Government shall not implement existing legislation to increase any defined benefit pension payment or obligation to current or future retirees. (PROMESA § 314).

Bankruptcy Code § 1123(a)(4) (made applicable by PROMESA § 301(a)): Act 80 is preempted because some claimholders would receive the option of retiring early and collecting the same or a higher pension for a longer time, while others would not, which conflicts with § 1123(a)(4)'s requirement that each claim in the class receive the same treatment. (PROMESA §§ 301, 314).

Bankruptcy Code §1129(b) (made applicable by PROMESA § 301(a)): Act 80 is preempted because it allows certain claimants in certain classes of the Plan to recover in excess of | 2021 Commonwealth Fiscal Plan at Chap. 24; *id.* at 54.

Response to AAFAF's Informative Motion re Pension Reserve Trust Funding Mechanism [ECF No. 19306] – "The increase in the funding levels provided for in the Plan are warranted by the Commonwealth's history of disregarding the magnitude of its pension obligations. Indeed, the Oversight Board, and this Court, have witnessed numerous attempts by the Government—including the current administration—to add billions of dollars of future spending without regard to how it would be funded. For example…Act 80-2020, Act 81-2020, and Act 82-2020, which would create billions of dollars in new pension obligations for the Commonwealth with (1) no viable plan or method to cover the increased costs and (2) no Oversight Board approval for this additional spending. Then-Governor Vázquez Garced agreed with the Oversight Board the Government would not implement these pension laws unless and until it could demonstrate to the Oversight | Act 80 should be permanently preempted because it modifies the treatment of certain (but not all) active ERS participants holding claims in Class 51G of the Plan of Adjustment above the treatment of such claims provided in the Plan of Adjustment. |

<table>
<tr>
<td></td>
<td></td>
<td></td>
<td>

100% of their claims when other unsecured claimholders in classes that rejected the Plan are not being paid in full, which conflicts with § 1129(b)'s requirement that a plan of adjustment must be fair and equitable with respect to a class of unsecured claimholders that has rejected the plan. (PROMESA §§ 301, 314).

Fiscal Plan: Act 80 is preempted because it increases pension costs beyond the current ERS freeze, which conflicts with the Fiscal Plan's allocation of pension spending. *See* 2021 Commonwealth Fiscal Plan at Chap. 24; *id.* at 54.  (PROMESA § 202).

PROMESA: Act 80 is preempted because it conflicts with PROMESA's purpose of returning the Commonwealth to fiscal responsibility by implementing pension cost increases without ensuring corresponding savings. (PROMESA § 101(a).)

Act 80 also conflicts with PROMESA § 204(c), which prohibits reprogramming without Oversight Board approval, by increasing pension costs beyond what is provided for in the FY22 budget, thereby requiring a

</td>
<td>

Board an economically responsible path toward implementation of the law and payment of the new pension obligations it creates."

Closing Argument Deck [ECF No. 19328-2 at 143-184] – "Acts 80, 81 and 82 reestablish defined benefit plans by compelling enhanced benefits over and above pension payments payable pursuant to the Plan."

"AAFAF admits that Act 80 substantially increases pension benefits, over and above the pension benefits to which employees and retirees would be entitled under the Plan."  *Id.* at 144.

</td>
<td></td>
</tr>
</table>

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|----------|
| | | | reprogramming.  (PROMESA § 204(c).)  Act 80 would increase pension obligations without Oversight Board approval, in violation of PROMESA § 207, which prohibits modifying debt without Oversight Board approval.  (PROMESA §§ 202, 207).  Budget:  Act 80 would require additional pension spending not provided for in the FY22 Budget. (PROMESA § 202). | | |

| Act 81 approved August 3, 2020 | Creates an incentivized retirement program for certain emergency agency employees and offers participants increased lifetime pensions. | Act 81 is preempted in its entirety. | Plan of Adjustment Art. LV: Act 81 is preempted because it modifies the treatment of certain pension claims from the treatment provided for in the Plan of Adjustment. (PROMESA § 314). <br><br> Plan of Adjustment § 83.4: Act 81 is preempted because increasing pension benefits for certain future retirees conflicts with the Plan of Adjustment's provision that the Government shall not implement existing legislation to increase any defined-benefit pension payment or obligation to current or future retirees.  (PROMESA § 314). <br><br> Bankruptcy Code § 1123(a)(4) (made applicable by PROMESA § 301(a)):  Act 81 is preempted because some claimholders would receive the option of retiring early and collecting the same or a higher pension for a longer time, while others would not, which conflicts with § 1123(a)(4)'s requirement that each claim in the class receive the same treatment. (PROMESA §§ 301, 314). <br><br> Bankruptcy Code §1129(b) (made applicable by PROMESA § 301(a)): Act 81 is preempted because it allows certain claimants in certain classes of the Plan to recover in excess of 100% of their claims when other | 2021 Commonwealth Fiscal Plan at Chap. 24; *id.* at 54. <br><br> Response to AAFAF's Informative Motion regarding Pension Reserve Trust Funding Mechanism [ECF No. 19306] – "The increase in the funding levels provided for in the Plan are warranted by the Commonwealth's history of disregarding the magnitude of its pension obligations. Indeed, the Oversight Board, and this Court, have witnessed numerous attempts by the Government—including the current administration—to add billions of dollars of future spending without regard to how it would be funded. For example…Act 80-2020, Act 81-2020, and Act 82-2020, which would create billions of dollars in new pension obligations for the Commonwealth with (1) no viable plan or method to cover the increased costs and (2) no Oversight Board approval for this additional spending. Then-Governor Vázquez Garced agreed with the Oversight Board the Government would not implement these pension laws unless and until it could demonstrate to the Oversight | Act 81 should be permanently preempted because it modifies the treatment of certain (but not all) active ERS participants holding claims in Class 51G of the Plan of Adjustment above the amounts provided for in the Plan of Adjustment. |

| | | | unsecured claimholders in classes that rejected the Plan are not being paid in full, which conflicts with § 1129(b)'s requirement that a plan of adjustment must be fair and equitable with respect to a class of unsecured claimholders that has rejected the plan. (PROMESA §§ 301, 314).<br><br>Fiscal Plan: Act 81 is preempted because it increases pension costs beyond the current ERS freeze, which conflicts with the Fiscal Plan's allocation of pension spending. *See* 2021 Commonwealth Fiscal Plan at Chap. 24; *Id.* at 54. (PROMESA § 202).<br><br>PROMESA: Act 81 is preempted because it conflicts with PROMESA's purpose of returning the Commonwealth to fiscal responsibility by implementing pension cost increases without providing for any corresponding savings. (PROMESA § 101(a).)<br><br>Act 81 also conflicts with PROMESA § 204(c), prohibits reprogramming without Oversight Board approval, by increasing pension costs beyond what is provided for in the FY22 budget, thereby requiring a reprogramming. (PROMESA §§ 202, 204(c)). | Board an economically responsible path toward implementation of the law and payment of the new pension obligations it creates."<br><br>Closing Argument Deck [ECF No. 19328-2 at 143, 149-152] – "Acts 80, 81 and 82 reestablish defined benefit plans by compelling enhanced benefits over and above pension payments payable pursuant to the Plan." *Id.* at 143.<br><br>"AAFAF admits that Act 81 also increases retirement benefits." *Id.* at 149.<br><br>"It is not established that the payroll savings will be enough to cover the increased benefits and the law has no contingency for that scenario." *Id.* at 152. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|----------|
| | | | Act 81 would increase pension obligations without Oversight Board approval, in violation of PROMESA § 207, which prohibits modifying debt without Oversight Board approval.  (PROMESA §§ 202, 207)  FY22 Budget:  Act 81 would require additional pension spending not provided for in the FY22 Budget.  (PROMESA § 202). | | |

| Act 82 approved August 3, 2020 | Allows TRS participants to apply up to 108 days of pre-existing or excess unused sick leave toward their retirement eligibility and pension-benefit levels. | Act 82 is preempted in its entirety. | Plan of Adjustment Art. LV: Act 82 is preempted because it modifies the treatment of certain TRS pension claims from the treatment provided for in the Plan of Adjustment. (PROMESA § 314).<br><br>Plan of Adjustment § 55.9(a)(i): Act 82 is preempted because it allows certain TRS participants to accrue additional benefits under the TRS defined benefit plan after the Plan of Adjustment's effective date. (PROMESA § 314).<br><br>Plan of Adjustment Ex. F-1: Act 82 is preempted because it allows certain TRS participants to purchase service credits in conflict with the Plan of Adjustment's provision which eliminates that right. (PROMESA § 314).<br><br>Fiscal Plan: Act 81 is preempted because it reverses the freeze of the TRS plan required in the Fiscal Plan. *See* 2021 Commonwealth Fiscal Plan at 274.  (PROMESA § 202).<br><br>PROMESA: Act 82 is preempted because it conflicts with PROMESA's purpose of returning the Commonwealth to fiscal responsibility by implementing pension cost increases without providing for | 2021 Fiscal Plan at Chap. 24; *Id.* at 54.<br><br>Response to AAFAF's Informative Motion regarding Pension Reserve Trust Funding Mechanism [ECF No. 19306] – "The increase in the funding levels provided for in the Plan are warranted by the Commonwealth's history of disregarding the magnitude of its pension obligations. Indeed, the Oversight Board, and this Court, have witnessed numerous attempts by the Government—including the current administration—to add billions of dollars of future spending without regard to how it would be funded. For example…Act 80-2020, Act 81-2020, and Act 82-2020, which would create billions of dollars in new pension obligations for the Commonwealth with (1) no viable plan or method to cover the increased costs and (2) no Oversight Board approval for this additional spending. Then-Governor Vázquez Garced agreed with the Oversight Board the Government would not implement these pension laws unless and until it could demonstrate to the Oversight | Act 82 should be permanently preempted because it modifies the treatment of claims by certain TRS participants covered by the Plan of Adjustment above the amounts provided for in the Plan of Adjustment and allows those participants to purchase service credits in conflict with the provisions of the Plan of Adjustment. |
| --- | --- | --- | --- | --- | --- |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | any corresponding savings. (PROMESA § 101(a).)<br><br>Act 82 would increase pension obligations without Oversight Board approval, in violation of PROMESA § 207, which prohibits modifying debt without Oversight Board approval. (PROMESA §§ 202, 207). | Board an economically responsible path toward implementation of the law and payment of the new pension obligations it creates."<br><br>Closing Argument Deck [ECF No. 19328-2 at 143, 153-154] – "Acts 80, 81 and 82 reestablish defined benefit plans by compelling enhanced benefits over and above pension payments payable pursuant to the Plan." *Id.* at 143<br><br>"AAFAF admits that Act 81 also increases retirement benefits AAFAF also admits that Act 82 increases teachers' retirement benefits." *Id.* at 153. | |

## IV.    Article VI of the Puerto Rico Constitution

| Article | Brief Description of Article | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| Article VI, Sections 6 and 8 | These provisions of the Puerto Rico Constitution require the Commonwealth to appropriate any pay certain operating expenses and payments on "public debt," and | **Article VI, Section 6** – States that, if at the end of any fiscal year, the appropriations necessary for the ordinary operating expenses of the Government and for the payment of debt | Whether the rights provided by Article VI, Sections 6 and 8 of the Puerto Rico Constitution to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant to the Plan are preempted by PROMESA is settled by the treatment of such bonds and indebtedness pursuant to the provisions of | Statutes or other laws authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year | To the extent it authorizes payment in full of pre-petition obligations, permanent. |

| Article | Brief Description of Article | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | provide the order in which disbursements are to be made if available revenues for any fiscal year are insufficient to meet the appropriations for that year. | service on public debt for the ensuing fiscal year shall not have been made, the amounts appropriated in the last appropriation acts for such operating expenses and debt service shall continue in effect, and the Governor shall authorize payments necessary for such purpose until further appropriations are made.<br><br>**Article VI, Section 8** – Provides that, if available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, debt service on the public debt shall be paid first, and other disbursements shall thereafter be made in accordance with the order of priorities established by law. | the Plan.  Nothing in the Plan affects or determines whether Article VI, Sections 6 and 8 of the Puerto Rico Constitutions is preempted for any future purpose.<br><br>These sections provide for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | 2022 alone. *See* Amended Malhotra Decl. ¶ 63.<br><br>Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan.  Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes and laws require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |