# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## OBJECTION TO RESPONSE OF THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD IN ACCORDANCE WITH ORDER REGARDING CERTAIN ASPECTS OF MOTION FOR CONFIRMATION OF MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL, AT DOCKET NO. 19567 (CORRECTED AT DOCKET NO. 19574)

*[Space left blank intentionally.]*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

I.    BACKGROUND ........................................................................................................... 5

II.   ARGUMENT ................................................................................................................ 10

a.    To be confirmed, the Modified Eighth Amended Plan of Adjustment must comply with

PROMESA 314 (b)(3), (b)(5) and (b)(6). ..................................................................... 10

b.    The Plan of Adjustment nor the Confirmation Order are the enabling legislation according to

Section 314 of PROMESA. ........................................................................................... 28

c.    The FOMB must comply with the PROMESA Section 204(a) process before it can

invalidate Act 106-2017 ................................................................................................. 31

RELIEF REQUESTED ........................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Armstrong v. United States*,
  182 U.S. 243, 244 (1901) ........................................................................................... 2

*Asociación de Maestros de PR v. Sistema de Retiro para Maestros de PR*,
  190 DPR 854 (2014)................................................................... 10, 18, 19, 20, 21, 22

*Centro de Periodismo Investigativo v. Fin. & Mgmt. Bd. for P.R.*,
  2018 U.S. Dist. LEXIS 77262, at 21. ................................................................... 26, 33

*Dooley v. United States*,
  182 U.S. 222, 236 (1901) ........................................................................................... 2

*Downes v. Bidwell*,
  182 U.S. 244 (1901) ................................................................................................... 2

*English v. Gen. Elec. Co.*,
  496 U.S. 72, 79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990) ..................................... 26

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
  140 S. Ct. 1649 (2020)............................................................................................... 3

*Goetze v. United States*,
  182 U.S. 221, 221-22 (1901) ..................................................................................... 2

*Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*,
  232 F.3d 8, 14 (1st Cir. 2000)............................................................................... 26, 33

*Huus v. New York & Porto Rico S.S. Co.*,
  182 U.S. 392, 397 (1901) ........................................................................................... 2

*Rice v. Santa Fe, Corp.*,
  331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947) ................................. 26, 33

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &
  Mgmt. Bd. for P.R.)*,
  330 F. Supp. 3d 685, 701 (D.P.R. 2018) ............................................................. 5, 27

*The Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Vázquez Garced
  (In re the Fin. Oversight & Mgmt. Bd. for Puerto Rico)*,
  403 F.Supp.3d 1, 13 (D.P.R. 2019) .......................................................................... 32

*Tobin v. Fed. Exp. Corp.*,
  775 F.3d 448, 452 (1st Cir. 2014)............................................................................. 26

## Constitutional Provisions

P.R. Const. Art. I, § 1 ............................................................................................ 2

P.R. Const. Art. II, § 7 ...................................................................................... 18, 21

P.R. Const. Art. III, § 1 .......................................................................................... 2

P.R. Const. Art. IV, § 1 ......................................................................................... 2

U.S. Const. Art. IV ................................................................................................ 1

U.S. Const. Art. VI, cl. 2 ...................................................................................... 26

## Statutes

11 U.S.C. § 1109 ................................................................................................. 10

Act 53-2021, known as the *Ending Puerto Rico's Bankruptcy Act* .................. 6, 27, 28

Act 91 of March 29, 2004 .......................................................................... 11, 14, 21

Act 106-2017 .............................................................................................. *passim*

Act 160-2013 .............................................................................................. *passim*

Pub. L. 81-600, 64 Stat. 319, *An Act to provide for the organization of a constitutional government by the people of Puerto Rico* ........................................................... 1

Puerto Rico, Oversight, Management and Economic Stability Act ("PROMESA"),

    48 U.S.C. § 2101, *et seq.* .............................................................................. 1

    §2103 ......................................................................................................... 25

    § 2141(c)(3), (d)(2), (e)(2) .......................................................................... 3

    § 2142 ........................................................................................................ 2

    § 2144 ..................................................................................................... 3, 4

    § 2144(a)(1) .............................................................................................. 31

    § 2144(a)(1), (5) ......................................................................................... 2

    § 2144(a)(2)(A) ......................................................................................... 31

    § 2144(a)(2)(B)–(C) .................................................................................. 31

    § 2144(a)(4)(A) ......................................................................................... 32

    § 2144(a)(5) .............................................................................................. 32

    § 2144(c)(3)(A) ........................................................................................... 2

    § 2144(c)(3)(B) ........................................................................................... 2

§ 2147 ............................................................................................................................ 2

§ 2174(b)(5) ............................................................................................................ *passim*

§2194(m)(4) .................................................................................................................. 1

## Other Authorities

Pierluisi:  *"There is no ambiance to reform the pension systems"* Noticel. November 9, 2021.
Available at: https://www.noticel.com/gobierno/ahora/legislatura/top-
stories/20211109/pierluisi-no-hay-ambiente-para-reformar-sistemas-de-pensiones/. .............. 28

Rivera Clemente, Yaritza. *In Debate the Position of the Fiscal Control Board on Law 53*.
El Vocero. November 3, 2021. ................................................................................................ 28

U.S. Supreme Court's Oral Argument on *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius
Inv., LLC*, 140 S. Ct. 1649 (2020), Oct. 15th, 2019, at pgs. 22-23. Available at:
https://www.supremecourt.gov/oral_arguments/argument_transcripts/2019/18-
1334_ljgm.pdf. ..................................................................................................................... 3

COME NOW, Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc., (collectively as "Teachers' Associations"), as a creditors and parties in interest, by and through the undersigned counsel, and hereby submit this *Opposition to Response of the Financial Oversight and Management Board in Accordance with Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al,* ECF No. 19567 (corrected at ECF No. 19574), and in support thereof, respectfully state as follows:

## PRELIMINARY STATEMENT

1.  The Commonwealth of Puerto Rico was established in 1952 through Pub. L. 81-600, ("Act 600"), based upon the principles of self-government.[2] However, in 2016 Puerto Rico's self-government was destroyed after Congress' enactment of the Puerto Rico, Oversight, Management and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2101, *et seq.,* with the purpose of restructuring the island's outstanding debt. *See* 48 U.S.C. §2194(m)(4). PROMESA was enacted by Congress pursuant to its plenary powers under Article IV of the U.S. Constitution, which states that "Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." U.S. Const. Art. IV, §2, cl. 1. This constitutional provision was further interpreted by the Supreme Court in the racist and infamous *Insular Cases*, which established a distinction between incorporated and unincorporated territories

---

[2] Pub. L. 81-600, 64 Stat. 319, *An Act to provide for the organization of a constitutional government by the people of Puerto Rico.* Act 600 established that "[w]hereas Congress of the United States by a series of enactments has progressively recognized the right of self-government of the people of Puerto Rico; and [w]hereas under the terms of these congressional enactments an increasingly large measure of self-government has been achieved." Federal Relations Act, Pub. L. 81-600.

based on race. *See Downes v. Bidwell*, 182 U.S. 244, 287 (1901).[3] Through PROMESA, Congress imposed upon Puerto Rico and its residents a Financial Oversight and Management Board for Puerto Rico ("FOMB" or "Oversight Board"), composed of seven non voted members, and it is in charge of handling all matters relating to Puerto Rico's fiscal policy and the debt restructuring process. However, the FOMB is not accountable to the People of Puerto Rico; Puerto Ricans did not have a say on who were going to compose the members of the FOMB and neither the policies nor determinations taken by such entity.

2.   The Constitution of the Commonwealth of Puerto Rico establishes that the political power emanates from the People, P.R. Const. Art. I, § 1, and that the Governor and the members of the legislative assembly –which are the two branches in charge of managing Puerto Rico's financial affairs– shall be selected by direct vote at each election. P.R. Const. Art. III, § 1; Art. IV, § 1. However, the powers vested upon the FOMB by Congress' enactment of PROMESA, override these constitutional powers of the Governor and the members of the legislature of Puerto Rico.

3.   For instance, the FOMB has veto power over the Governor's and Legislature's adoption of budgets, 48 U.S.C. § 2142, authorization of bonds, *Id*. §2147, and legislation. *Id*. §2144(a)(1), (5). Moreover, it has the power to rescind legislative and executive actions, *Id*. §2144(c)(3)(A), and may review, and in its sole discretion, rescind laws that alters priorities of creditors. *Id*. §2144(c)(3)(B). Furthermore, the FOMB has the power to approve fiscal plans proposed by the Commonwealth, and disapprove them, in its sole discretion, if it determines that such Fiscal Plan does not comply with the requirements provided by Section 201(b) of PROMESA, and thus, issue its own fiscal plan –to which the Governor and legislature may not object. *Id*. §2141(c)(3), (d)(2),

---

[3] *See also, De Lima v. Bidwell*, 182 U.S. 1, 200 (1901); *Goetze v. United States*, 182 U.S. 221, 221-22 (1901); *Dooley v. United States*, 182 U.S. 222, 236 (1901); *Armstrong v. United States*, 182 U.S. 243, 244 (1901); *Downes v. Bidwell*, 182 U.S. 244, 287 (1901); *Huus v. New York & Porto Rico S.S. Co.,* 182 U.S. 392, 397 (1901).

(e)(2). Moreover, the FOMB, through its legal counsel, expressed in the Supreme Court's oral arguments in *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020), that "what the Board is actually charged with doing is acting in the shoes of the government of Puerto Rico [...]."[4]

4. However, the only power that is reserved for the People of Puerto Rico through the Legislative Assembly is found in Section 314(b)(5) of PROMESA. Section 314(b)(5) establishes that the Court shall confirm the plan of adjustment if "any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval." 48 U.S.C. § 2174(b)(5). In other words, a plan of adjustment is not confirmable without the enabling legislation as enacted by the Government of Puerto Rico.

5. The Plan of Adjustment[5] states several Commonwealth statutes that are supposedly preempted by PROMESA. Most of the statutes predate the enactment of PROMESA but Act 106-2017 was passed a year *after* the enactment of PROMESA. The Government and the FOMB strictly followed the interactive process of Section 204(a) of PROMESA when Act 106-2017 was enacted to determine the compliance of this legislation with the Fiscal Plan. *See* 48 U.S.C. § 2144. The FOMB *never* exercised its power to invalidate Act 106-2017. This Act was enacted on August 23, 2017, and has been fully implemented since. The Oversight Board has had more than 4 years to decide whether to commence an adversary proceeding to invalidate it, but it did nothing. Now

---

[4] Expressions of Donald B. Verilli (Counsel for the Oversight Board), U.S. Supreme Court's Oral Argument on *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020), Oct. 15th, 2019, at pgs. 22-23. Available at: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2019/18-1334_ljgm.pdf. (Last visit: November 9, 2021).
[5] On December 20, 2021, the FOMB filed a *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al*., ECF No. 19568, any reference to such document and its subsequent amendments will be made as "Plan of Adjustment".

the FOMB argues that preemption is automatic. Not so, when the federal statute contains a specific procedure to exercise the particular federal power, preemption is not warranted. Since preemption is exceptional, courts "start with the assumption that the historic police powers of the States [are] not to be superseded by" a federal statute "unless that [is] the clear and manifest purpose of Congress."[6] Courts have cautioned that "[p]reemption is [a] strong medicine, not casually to be dispensed."[7] Preemption of Act 106-2017 is unavailing, since Congress intended otherwise when enacting PROMESA Section 204(a).

6.   The preemption argument cannot be invoked to override a prerogative that PROMESA grants exclusively to the Legislature.  Furthermore, a law violating a plan of adjustment, or making it unconfirmable, does not make that law preempted. Preemption only occurs when the law is "inconsistent" with the PROMESA statute itself. *See* Section 4 of PROMESA, 48 U.S.C. §2103. The Plan of Adjustment must comply with existing law and should be implemented by the enabling legislation to comply with Sections 314(b)(5) and (6) of PROMESA. 48 U.S.C. § 2174(b)(5), (6). On the contrary, if the Plan of Adjustment could preempt local laws, Sections 314 (b)(5) and (6) would become futile.

7.   Preemption only displaces local legislation, but there is still a need to enact new legislation that establishes the provisions necessary to implement and carry out the provisions of the Plan of Adjustment, including those that attempt to modify in any way the TRS. The Plan of Adjustment and/or the Fiscal Plan in and of themselves cannot serve as the *legislation* required to confirm the Plan and Section 314(b)(5) only grants the power to enact the enabling legislation to the Government of Puerto Rico. This contravenes what this Court has already called the "awkward

---

[6] *Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res.*, 232 F.3d 8, 14 (1st Cir. 2000) at 14-15 (quoting *Rice v. Santa Fe, Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947) (alterations in original).
[7] *Id*. at 18 (citation omitted). See *Centro de Periodismo Investigativo v. Fin. & Mgmt. Bd. for P.R.*, 2018 U.S. Dist. LEXIS 77262, at 21.

power-sharing agreement" that PROMESA created, "in which the Oversight Board has significant tools to shape Puerto Rico's financial operations, but it has "not been given power to affirmatively legislate." *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018).

8. The FOMB cannot seek the legislative approval required in Section 314 of PROMESA through a confirmation order or the preemption doctrine. When a state law is preempted, it is no longer valid or enforceable. But this only means that the federal statute rules upon the regulated circumstances. PROMESA does not provide for how any modification to the pension systems will be executed. The Plan of Adjustment only contains sparce general points on this issue that in no way serve as the *legislation* necessary to implement the Plan. Therefore, and for the sake of the argument, even if it is conceded that the provisions of PROMESA cause several laws to be preempted by PROMESA, the Plan itself is not the enabling legislation necessary for the Plan to be confirmed. Even if the Plan of Adjustment is amended to include a more detailed text for the amendments, cuts, and reforms to the TRS it would still be insufficient and would clearly violate the "awkward power sharing agreement" created by Section 314 of PROMESA.

## I.   BACKGROUND

9. During the month of November 2021, this Court presided the hearings on the motion for confirmation of the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al,* ECF No. 19365, as modified in subsequent revisions made. Hereinafter the reference will be made to the "Plan of Adjustment".

10. On November 1st, 2021, the FOMB filed the *Urgent Motion of The Financial Oversight and Management Board for Puerto Rico for Order (I) Approving Form of Notice of Rulings the*

*Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 and (II) Scheduling Objection Deadline* (ECF No. 19002) ("Urgent Motion").

11. On November 2nd, 2021, the Court entered the *Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 And (II) Scheduling Objection Deadline*. (ECF No. 19017).

12. On November 12th, 2021, Federación de Maestros de Puerto Rico, Inc. ("FMPR"), Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc. ("ECUAMOS"), and Unión Nacional de Educadores y Trabajadores de la Educación, Inc. "UNETE"), (collectively as "Teachers' Associations"), filed an *Objection to Urgent Motion of the Financial Oversight and Management Board for Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 at Docket No. 19002 and Request to be Heard,* (ECF No. 19180), ("Objection to Urgent Motion").

13. In the Objection to Urgent Motion, the Teachers' Associations argued, in essence, that the correct interpretation of Act 53-2021[8] is that Puerto Rico's Legislative Assembly intended zero cuts to pensions, thus, the bond issuance permitted by the Act was conditioned to no cuts in the Teachers Retirement System ("TRS") and the Judiciary Retirement System ("JRS") and that any interpretation to the contrary would contravene PROMESA Section 314 (b)(5) that requires that the necessary legislative approval has been obtained for confirmation and to carry out any provision of Plan. The Teachers' Associations also argued that Section 314(b)(5) of PROMESA requires the Legislature to pass the enabling legislation of the plan of adjustment and, more importantly, that the FOMB cannot legislate through the Plan nor the confirmation order.

---

[8] Act 53-2021, known as the *Ending Puerto Rico's Bankruptcy Act,* signed into law on October 26, 2021.

Accordingly, if the Plan of Adjustment requires modifying the retirement systems of government employees, the legislature must affirmatively legislate to impose those reforms.

14. Regarding the Preemption issue, the Teachers' Associations also stated in the Objection to Urgent Motion that the preemption argument cannot be invoked to override a prerogative that PROMESA grants exclusively to the Legislature and while preemption displaces local legislation, there is still a need to enact new legislation that establishes the provisions necessary to implement and carry out the provisions of the Plan of Adjustment, including those that attempt to modify in any way the TRS. The Plan of Adjustment and/or the Fiscal Plan in and of themselves cannot serve as the *legislation* required to confirm the Plan and Section 314(b)(5) only grants the power to enact the enabling legislation to the Government of Puerto Rico. PROMESA does not provide for how any modification to the pension systems will be executed and the Plan of Adjustment only contains sparce general points on this issue that in no way serve as the *legislation* necessary to implement the Plan. Even if it is conceded that the provisions of the Plan of Adjustment cause several laws to be preempted by PROMESA, the Plan itself is not the enabling legislation necessary for the Plan to be confirmed.

15. On December 14, 2021, this Honorable Court issued an *Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.,* ECF No. 19517, ("Memorandum Order").

16. The Court stated it carefully reviewed the parties' submissions and all of the evidence submitted in connection therewith, including the *Notice of Filing of Revised Proposed Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19368, the "Proposed Confirmation Order") and the *Notice of Filing Revised Proposed Findings of Fact and Conclusions of Law in*

*Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19427, the "Proposed FFCL" and, together with the Proposed Plan and the Proposed Confirmation Order, the "Proposed Plan Materials"), and it identified certain materially problematic aspects of the Debtor's Proposed Plan Materials. Memorandum Order, at 2. Thus, the Court required the Debtors[9], represented by the FOMB,[10] to propose modifications consistent with the Memorandum Order or show cause why the motion for confirmation should not be denied in the absence of such modifications. Specifically, the issues identified related to (a) the scope of proposed preemption provisions in the Proposed Plan Materials, (b) the treatment of "unsecured" portions of allowed eminent domain claims and inverse condemnation claims, and (c) various comments to the Proposed Confirmation Order, Proposed FFCL, and the Plan.[11]

17. On December 21, 2021, the FOMB filed a *Response of the Financial Oversight and Management Board in Accordance with Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al,* ECF No. 19567 (corrected at ECF No. 19574) ("FOMB's Response").

18. Concurrently with the filing of its Response, the FOMB commenced an Adversary Proceeding by filing a complaint (the "Pension Act Complaint"), Adv. Proc. 21-00119, *see also,* ECF No. 19566, seeking the Court's determination regarding the preemption of the 2020 Pension

---

[9] The Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA," and together with the Commonwealth and ERS, the "Debtors").
[10] The sole Title III representative of the Debtors pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").
[11] "Plan" refers to the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*

Acts [12] or the nullification or unenforceability thereof, including the enjoinment of their implementation.[13] The Teachers' Associations hereby reserve the right to request leave to intervene in this adversary proceeding as they may deem it necessary, pursuant to Fed. R. Civ. Proc. 24.

19. The FOMB also filed a *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al*., dated December 20, 2021, ECF No. 19568, that adds as a condition to the Plan's effectiveness that the Court shall have entered an order determining the 2020 Pension Acts are either preempted by PROMESA or nullified or unenforceable, and requested necessary amendments to the plan support agreements to provide the Effective Date is to occur on or before March 15, 2022, to allow time for this litigation to conclude.

20. Also, on December 20, 2021, the FOMB filed the *[Proposed] Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Finst Revised Proposed Findings and Conclusions"), ECF No. 19570, and the *[Proposed] Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Fifth Revised Proposed Order") ECF No. 19571.

21. The members of the Teachers' Associations are employees of the Commonwealth of Puerto Rico or its instrumentalities. The Teachers' Associations also represent retirees. Their members will be directly affected by the Commonwealth's and the FOMB's determinations in these Title III proceedings. Moreover, the members of the Teachers' Associations are participants of the Teachers' Retirement System ("TRS") of the Commonwealth, thus the appearing labor

---

[12] Acts 80-2020, 81-2020, and 82-2020, and the new Joint Resolution 33-2021 that was signed into law by Governor Pierluisi on December 16, 2021 and requires the executive branch to commence the immediate implementation of Act 80-2020.

[13] The FOMB informed that it intends to seek preliminary injunctive relief and summary judgment on the Pension Act Complaint.

associations and retirees are parties in interest and creditors of the Commonwealth that by the
confirmation of the Plan of Adjustment, and any other related ruling, will be severely affected for
decades to come.[14]

22. Moreover, the protection of pensions of more than 20,000 teachers was addressed seven
(7) years ago by the Supreme Court of Puerto Rico that held that teachers had a constitutional right
to their retirement benefits and that the Government had "severely impaired the contractual rights
of thousands of teachers without even making certain that this would advance the interest of
ensuring the solvency of the TRS." *See, Asociación de Maestros de PR v. Sistema de Retiro para
Maestros de PR*, 190 DPR 854 (2014) (the "TRS Pension Decision"), ECF No. 19285 for Official
Translation of the TRS Pension Decision.[15] Later, with the enactment of Act 106-2017, the Puerto
Rico Supreme Court's decision was reiterated.

23. Pursuant to this Court's Memorandum Order, the Teachers' Associations, as Parties in
interest in these proceedings, submit this Objection to the FOMB's Response.

## II.    ARGUMENT

### a. To be confirmed, the Modified Eighth Amended Plan of Adjustment must comply with PROMESA 314 (b)(3), (b)(5) and (b)(6).

24. Section 314 of PROMESA states that "[t]he Court shall confirm the plan if – […] (3)
the debtor is not prohibited by law from taking any action necessary to carry out the plan; […] (5)
any legislative, regulatory, or electoral approval necessary under applicable law in order to carry
out any provision of the plan has been obtained, or such provision is expressly conditioned on such

---

[14] *See,* 11 U.S.C. § 1109 – Right to be heard.
(a) […]
(b) A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee,
a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in
a case under this chapter.
[15] *See also,* the *Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (ECF
No. 19569) filed by the Oversight Board states that "[n]othing in this term sheet or the Plan of Adjustment shall impact
the precedential effect of this decision." *See* Eighth Amended Plan, Appendix II at. F-16, ECF No. 19568 at 233.

approval; [and] (6) the plan is feasible…".[16] Thus, compliance with Commonwealth law, the requirement of enabling legislation and feasibility are mandatory requirements for the Plan to be confirmed and further implemented.

25. The FOMB intends to preempt some provisions of Act 106 approved on August 23, 2017, Act 160 approved December 24, 2013, and Act 91 of March 29, 2004. *See* the FOMB's Response, Appendix A p. 81-88. These provisions establish a coherent legal framework for the purposes of regulating in detail the TRS. However, neither the FOMB's Response nor any of the other documents submitted to date explain how it will be possible to continue managing the TRS in the absence of these provisions. The TRS is in operation, but it needs the current regulatory framework for it to fulfill its functions according to law. The preemption of specific sections of these laws also affects the TRS rules and regulations that operationalize said areas of the Acts and would be rendered ineffective in the absence of the authority of the law.[17] The FOMB does not seem to be interested nor mentions the impact of eliminating these sections on the current operations of the TRS. On the other hand, none of the provisions that will remain in force that are not affected by the preemption establish the necessary transition for the TRS to become one of defined contributions. Therefore, there is no enabling legislation to implement and carry out the provisions of the Plan of Adjustment.

26. On August 23, 2017, the Government enacted Act 106-2017, known as the *Act to Guarantee the Payment of Our Pensioners and Establish a New Plan of Defined Contributions for Public Servants* ("Act 106"), which transformed the Systems into a single pay-as-you-go system as contemplated in various iterations of the Fiscal Plan. Act 106 included a declaration that the

---

[16] 48 USC § 2174(b)(3), (b)(5) and (b)(6).
[17] *See Regulation on Pension and Benefits of the Teachers' Retirement System*, available at: http://app.estado.gobierno.pr/ReglamentosOnLine/Reglamentos/8029.pdf. Last visited December 22nd, 2021. (Our translation).

Systems were in a state of "financial emergency" and cited sections of the Constitution of Puerto

Rico vesting the Legislature with authority to pass laws "for the protection of the life, health and

wellbeing of the People... when the health, public safety or essential government services are

clearly in jeopardy." This is a post-petition Act in compliance with the Fiscal Plan, that the FOMB

accepted and never filed an adversary proceeding to enjoin its enforcement. As it will be further

discussed, this prevents the applicability of the preemption doctrine. It's also important to note,

that Act 106 is applicable to all participants and pensioners of the government of Puerto Rico.

Thus, the effects of preemption will have widespread consequences beyond teachers.

27. The FOMB requests for this Court to determine that Sections 2.3, 2.4(a), 2.4(b), 2.6,

3.1(b)(1), 3.4 and 3.6(a)(2) of Act 106 are preempted. Yet, the FOMB's description of the content

of these particular sections, as stated in Appendix A at 81-88, is not an accurate description of the

scope of these Sections.[18] Therefore, the FOMB's Response falls short in exposing the full scope

of the preemption and its consequences as requested by this Court in its Memorandum Order.

28. Section 2.3 states:

Section 2.3.- Terms to pay accumulated pension benefits.
The terms to pay the accumulated pension benefits of each participant, beneficiary, or
retiree **shall be computed as provided in the statutes of their respective Retirement
Systems as of the effective date of this act.** The terms to pay disability benefits, death
benefits, payments to beneficiaries, or refunds of contributions, and any amount owed or
similar benefit shall also be computed as provided in the statutes of the respective
Retirement Systems on the effective date of this act. **Those employees who, as of the
approval of this act, have filed an application for disability or any other benefits, may
complete such transaction as provided in the applicable law at the time of the filing
of the application.** (Emphasis added).

29. If Section 2.3 of Act 106 is preempted as the FOMB requests, it will eliminate the legal

foundation for the computation of the accumulated pension benefits of each participant,

---

[18] The FOMB has not submitted to this Court the complete text of the Commonwealth laws that it purports are
preempted. Thus, the complete translated version of Act 106-2017 is hereto attached as **Exhibit A.**

beneficiary, or retiree from **all** the governmental retirements systems. Additionally, the preemption will eliminate any foundation as to what will happen to those employees who, as of the Effective Date of the Plan, have filed an application for pension, disability or any other benefits that is pending.

30. Section 2.4 (a) and (b) of Act 106 state:

Section 2.4.- Accumulated pension benefits.

(a) As of the effective date of this act, the accumulated pension benefits of the Retirement Systems' participants who began to work prior to the effective date of this act **shall be preserved and guaranteed by the Government.**

(b) Those participants who, as of the effective date of this act, are eligible to retire and receive pension benefits and/or annuity under the applicable provisions of their respective Retirement Systems, **may retire on any later date and be entitled to receive their corresponding accumulated pension benefit,** computed under the applicable provisions of their respective Retirement Systems as of the effective date of this act and the terms contained therein. (Emphasis added).

31. Under Section 2.4 (a) and (b) of Act 106, the Government guaranteed the payment of "Accumulated Pension" benefits under all of the previously described plans.[19] If Sections 2.4 (a) and (b) are preempted, it will eliminate the legal foundation for the computation of the accumulated pension benefits of each participant, beneficiary, or retiree from all the governmental retirements systems. Additionally, the preemption will eliminate any foundation as to what will happen to those employees who, as of the Effective Date of the Plan, accrued pension or any other benefits.

32. Section 2.6 of Act 106 states:

Section 2.6.- Special provisions.

Notwithstanding the provisions of this chapter, it is hereby provided as an exception, that the teachers and members of the Teachers' Retirement System who are making contributions to the Teachers' Retirement System under Act No. 91- 2004, as amended, known as the "Commonwealth of Puerto Rico Teachers' Retirement System Act", **shall continue to make such contributions in accordance with the provisions of said statute.**

---

[19] *See*, Act 160-2013 enacted on December 24, 2013, that creates a new teachers' retirement system ("TRS"), and repeals Act 91-2004. The complete translated version of Act 160-2013 is attached hereto as **Exhibit B.**

**The accumulated pension benefits of said teachers and members of the Teachers'
Retirement System shall be those computed based on the terms and conditions of said
Act.** Likewise, it is hereby provided that the accumulated pension benefits of judges who
are making contributions and those newly enrolled in the Judiciary Retirement System who
are appointed after the approval of this act shall continue to be computed as provided in §§
233 et seq. of Title 4, known as the "Judiciary Retirement Act", applicable to every judge.
It is hereby expressly provided that such accumulated pension benefits as well as the terms
to pay them shall not be affected or modified in any manner whatsoever by the provisions
of this chapter. **However, the individual contributions of said teachers, members of the
Teachers' Retirement System, and judges shall remain just as they were prior to the
approval of this act and be deposited in the Accumulated Pension Benefits Payment
Account, as established by the Retirement Board.**

**Teachers, members of the Teachers' Retirement System, and judges who wish to
enroll in the New Defined Contribution Plan may do so voluntarily, as determined by
the Retirement Board. To do so, they must make the contribution provided in § 9554
of this title in addition to their current individual contribution.** (Emphasis added).

33. Under Section 2.6 of Act 106, the Government guaranteed that teachers, shall continue

to make contributions to fund the retirement plan in accordance with the provisions of the

Teachers' Retirement System Act". The accumulated pension benefits of said teachers and

members of the Teachers' Retirement System shall be those computed based on the terms and

conditions of said Act.[20] If Section 2.6 of Act 106 is preempted, it will eliminate the legal

foundation for the contribution of each participant to the TRS. Also, teachers, members of the TRS

and judges who wish to enroll in the New Defined Contribution Plan would not be able to do so.

Additionally, the preemption will eliminate any foundation as to what will happen to those

employees who, as of the effective date of the Plan, accrued pension or any other benefits.

34. Section 3.1(b)(1) of Act 106 states:

Section 3.1.- New Defined Contribution Plan.

[…]

(b) The following individuals **may participate in the New Defined Contribution Plan**:

---

[20] *See*, Act 160-2013 enacted on December 24, 2013, that creates a new teachers' retirement system ("TRS"), and
repeals Act 91-2004. The complete translated version of Act 160-2013 is attached hereto as **Exhibit B.**

(1) Every active Retirement System Participant, on the effective date of this act; **except for teachers, members of the Teachers' Retirement System making contributions to the Teachers' Retirement System under Act No. 91-2004**, and judges making contributions under the Judiciary Retirement System, who did not enroll in the New Defined Contribution Plan and continue contributing to their Retirement Systems as they have done thus far, except as provided in § 9546 of this title. (Emphasis added).

35. Under Section 3.1(b)(1) of Act 106, every Active Retirement System Participant **may** participate in the New Defined Contribution Plan, except teachers, members of the Teachers' Retirement System making contributions to the Teachers' Retirement System under Act No. 91-2004. Act 106 specifically states that these teachers will not participate in the New Defined Contribution Plan unless they choose to do so. However, if Section 3.1(b)(1) of Act 106 is preempted, all of the Active Retirement System Participant, including Teachers, will not have the legal foundation necessary to participate in the New Defined Contribution Plan, leaving all participants in an undefined position as to its right to participate in the New Defined Contribution Plan.

36. Section 3.4 of Act 106 states:

Section 3.4.- Contributions by participants of the New Defined Contribution Plan.

After the effective date of this act, **every Retirement Systems participant shall mandatorily make contributions to his Defined Contribution Account at a minimum rate of eight point five percent (8.5%) of his monthly compensation**, up to the limit established in the Code. In addition, participants may voluntarily contribute additional amounts as allowed under the Code. Upon the approval of this act, the participants of the New Defined Contribution Plan shall be entitled to adjust their current contribution to the Retirement Systems to the minimum rate authorized in this section. **The participants of the New Defined Contribution Plan may adjust the percentage they wish to contribute to such Plan from time to time,** but it shall never be less than the minimum rate required by this chapter. (Emphasis added).

37. Under Section 3.4 of Act 106, every Active Retirement System that decided to participate in the New Defined Contribution Plan, shall mandatorily make contributions to his or her Defined Contribution Account at a minimum rate of eight point five percent (8.5%) of his or

15

her monthly compensation. However, is Section 3.4 of Act 106 is preempted, there will be no legal
foundation or requirement for the minimum amount of contribution to the Defined Contribution
Account, neither the option to change the percent of the contribution.

38. Section 3.6(a)(2) of Act 106 states:

Section 3.6.- Credits to the Defined Contribution Account, return on investment, and rights
over the Defined Contribution Account.

Credits.-The following items shall be credited to the Defined Contribution Account of each
Participant of the New Defined Contribution Plan:

[…]

(2) Return on investment.-**The return on investment shall be subject to the participant's
investment option, according to his preference and risk profile.** Participants shall be
provided with several diversified investment options, as determined by the Retirement
Board. **Among said alternatives, at least one of the options shall guarantee the total
amount of the individual contributions made by the participant, thus preserving the
principal thereof.** Said option shall be automatically selected if the employee does not
select a preferred option. Participants may choose another option from those offered from
time to time. Basic and reasonable management fees shall be covered by the Government
of Puerto Rico. However, the return on investment shall be credited to the account of each
participant and net from add-on or special management fees, as determined by the
Retirement Board, ensuring that such fees are reasonable. Participants shall be provided,
periodically and at least annually, with reports on the activity of their Defined Contribution
Accounts, whether on a printed or electronic format readily accessible through a
Government website. (Emphasis added).

39. Section 3.6(a)(2) of Act 106 allows each Participant of the New Defined Contribution
Plan the option that the return on investment shall be subject to the participant's investment,
according to his or her preference and risk profile. At least one of the options shall guarantee the
total amount of the individual contributions made by the participant, thus preserving the principal
thereof. The chart submitted by the FOMB in Appendix A, at 82-83, states that the only matter
preempted is the option that guarantee the total amount of the individual contribution. However,
the FOMB further comments the following regarding this Section:

The Plan provides for the freeze of the defined benefit plans of TRS and JRS. In consideration for the freeze of these plans, **affected participants will be required to enroll in the Act 106 defined contribution plan, such that enrollment in this plan will no longer be voluntary for any participants in the TRS and JRS systems. In addition, any TRS or JRS participant to be enrolled in social security under the Plan** will be subject to a reduced contribution requirement of 2.3% of salary, **as they will be making payments to social security of 6.2%** (for a total of the 8.5% Act 106 requires to be paid to the defined contribution plan).

Finally, the treatment of active ERS participants in Classes G and J of the Plan require certain contributions into the Act 106 accounts by the Commonwealth, with a default investment of these funds in target retirement date funds closest to the year in which each participant will reach age 65 applicable to each participant. (PROMESA § 314). (Emphasis added).

40. This final comment of Section 3.6(a)(2) of Act 106 clearly confirms that the FOMB intends to "enact" new legislation with the Plan of Adjustment. But as it will be further discussed, this is impossible without amending PROMESA. How can affected participants be required to enroll in the defined contribution plan pursuant to Act 106, and how can the Plan of Adjustment make such enrollment compulsory for the TRS participants if there are no amendments to Act 106 duly approved by the legislature? The FOMB's Response does not provide an answer to that fundamental legal question. Yet, the necessary legislation to carry out any provision of the Plan of Adjustment is a specific requirement of Section 314(b)(5) of PROMESA that conditions the Plan's confirmation.

41. As with Act 106, the FOMB also asserts that some sections of Act 160-2013 ("Act 160)" are also preempted. Act 160, enacted on December 24, 2013, known as the *Commonwealth of Puerto Rico Teachers' Retirement Act*, was enacted in response to the crisis that the TRS was going through and reformed the teachers' retirement system to convert it into a defined contribution plan and repeals, among others, Act 91-2004. Act 160 provides a framework to determine payments into and from the retirement system, among other things. However, it is important to note that in *Asociación de Maestros de P.R. v. Sistema de Retiro para Maestros de*

*PR,* 190 DPR 854 (2014) (the "TRS Pension Decision") the Supreme Court of Puerto Rico declared unconstitutional some sections of Act 160 pursuant to Art. II, Sec. 7 of the Constitution of the Commonwealth of Puerto Rico for impairment of contractual rights accrued under the terms of Act 91-2004. *See* ECF No. 19285 for Official Translation of the TRS Pension Decision. Moreover, the Plan of Adjustment states that "nothing in this term sheet or the Plan of Adjustment shall impact the precedential effect of this decision."[21]

42. The chart in Appendix A of the FOMB's Response does not show the complete text of the sections that the FOMB purports to deem preempted from each Commonwealth law, nor shows the impact that such preemption would have for the TRS participants and the basic operations of the TRS. For this Court's full understanding of the provisions the FOMB purports to preempt in contrast with the entire text of the Act, attached hereto as **Exhibit B** is the full text of Act 160.

43. Section 3.11 of Act 160 states as follows:

> Section 3.11.— Minimum pension.—
> (a) **Any participant who is active as of July 31, 2014**, and was not eligible for retirement on such date with a pension benefit equal to or over sixty-five percent (65%) of the average salary and who, subsequently, applies for retirement when completing thirty (30) years of service and reaching the age of fifty-five (55) shall be entitled to a minimum pension of one thousand six hundred twenty-five dollars ($1,625) per month. The minimum pension of one thousand six hundred twenty-five dollars ($1,625) shall be guaranteed to teachers who enroll in the system as of August 1, 2014, and meet the years of service and age requirements provided in subsection (d) of § 395h of this title.
>
> (b) A minimum pension of five hundred dollars ($500) per month is hereby fixed for those participants who retired on or before July 31, 2014. Every pensioner receiving a pension of less than five hundred dollars ($500) per month shall receive, as of August 1, 2014, the corresponding raise so that his/her pension amounts to five hundred dollars ($500) per month.
>
> (c) **Every four (4) years, the System shall request an actuarial study to evaluate the impact of increasing the minimum pension herein**

---

[21] *See* Eighth Amended Plan, Appendix II at. F-16, ECF No. 19568 at 233.

**established.** In the event that the actuarial study recommends an increase to the minimum pension, the System's Board of Trustees shall be required to adopt such increase at the beginning of the following fiscal year. (Emphasis added).

44. First, the cited Section 3.11 of Act 160 is one of the sections that the Supreme Court of Puerto Rico deemed unconstitutional in the TRS Pension Decision for which the FOMB already stated in the Plan of Adjustment that the precedential effect of such decision would not be affected. Yet, the FOMB now specifically requests for this section to be deemed preempted. This section provides for specific amounts and other requirements as to years of service and age pursuant to a defined benefit formula that are not provided for in the reforms that the FOMB wants to implement because it purports to impose freezes to the TRS through the Eighth Modified Plan and the Fiscal Plan.[22]   Moreover, this section requires for an actuarial study every four (4) years that the FOMB certainly does not contemplate under the reforms it seeks to implement through the Eighth Modified Plan.

45. Section 4.1 of Act 160 establishes the Commonwealth's responsibility to appropriate funds to finance pensions. The FOMB purports to preempt such section stating that those appropriations are not provided for in the budget or Fiscal Plan and conflict with the Plan's provisions freezing the TRS pension benefit accruals and transferring all participants to the defined contributions plans established under Act 106. But, if this provision of Act 160 is preempted, then it eliminates any contribution or mechanism to raise funds for a retirement system that is currently operating and for which the Plan does not provide the appropriate provisions of how to execute a reform. The FOMB does not have the power to legislate those operational aspects through the Plan

---

[22] The Teachers' Associations argued that the FOMB cannot impose the proposed freezes to the TRS as stated in the Eighth Modified Plan because the Legislative Assembly intended zero cuts to pensions when it enacted Act 53-2021, thus, the FOMB does not have the legislative approval required by Section 314(b)(5) of PROMESA for the confirmation of the plan and to carry out the provisions of the Plan. *See* Objection Urgent Motion, ECF No. 19180.

of Adjustment since it is not at law and, on the contrary, it is the Plan the one that has to comply

with the law. The Plan cannot be the basis for preemption.

46. Section 4.3(b) establishes employer contributions of up to 20.25% of monthly salary

obligations to participants under the defined benefit system. It also states that the employer

contribution with respect to participants of the Defined Contribution Program shall continue to be

deposited in the Fund. Section 5.6 also requires employer contributions to be paid in accordance

with Section 4.3(b) beginning on August 1, 2014. The FOMB alleges that such sections are

preempted as they require employers to make payments not accounted for in the Fiscal Plan or

budget. However, consistent with the TRS Pension Decision, Act 106 did not impose the defined

benefit system on those participants hired before August 1, 2014. As already stated, there is no

legislation that provides for the transition of such participants into a defined contribution system.

The Plan of Adjustment and the Fiscal Plan imposes the defined contribution system on all retirees,

but, as already stated, the FOMB cannot legislate through the Plan of Adjustment or the Fiscal

Plan as such power is only vested on the Legislative Assembly and it is expressly recognized in

Section 314(b)(5) of PROMESA.

47. Section 4.4 of Act 160 states the following:

> Article 4.4 (a).—Grandfather provision.—
> **Should this act had not been passed, any participant who would have been
> entitled to retire with a pension under Articles 40(b)(1) and (b)(2) of Act No.
> 91-2004, as amended,** for having completed thirty (30) years of credited service
> between August 1, 2014 and June 30, 2016, may do so under the following
> conditions:
> (a) Any participant who would have completed thirty (30) years of credited service
> or more during such period, but has not reached the age of fifty-five (55) or more
> on or before the effective date of this Act, shall be granted seventy percent (70%)
> of the average salary of such participant as of the effective date of this act. To
> benefit from this provision, participants shall be required to retire effective on July
> 31, 2014, and continue making individual contributions to the System as provided
> in subsection (d) of § 396c of this title, until they reach the age of fifty-five (55).
> Likewise, employers shall continue to make contributions to the System as

established in subsection (d) of § 396c of this title, until the participant reaches the age of fifty-five (55).

(b) Any participant who has completed thirty (30) years of credited service or more during such period and reached the age of fifty-five (55) or more on or before the effective date of this act, shall be granted seventy percent (70%) of the average salary of such participant on the effective date of this act. To benefit from this provision, the participant shall be required to retire effective on July 31, 2014. Participants in active service who meet the requirements to receive a pension under this section and wish to avail themselves of the provisions of this section, shall be required to notify their resignation, final and binding, to the Department of Education and send a copy thereof to the Teacher's Retirement System on or before March 31, 2014. (Emphasis added).

48. Again, Section 4.4 is also one of the sections that the Supreme Court of Puerto Rico deemed unconstitutional in the TRS Pension Decision. As such, the TRS Pension Decision required that the rights under Act 91-2004 could not be altered pursuant to Article II, Sec. 7 of the Commonwealth Constitution that bars the impairment of contractual obligations. The FOMB stated in the Plan of Adjustment that the precedential effect of such decision would not be affected. Thus, the preemption the Oversight Board now seeks, contravenes such rights and the statement in the Plan itself that states that it will not impact the precedential effect of this decision.

49. Section 4.5(b) of Act 160 states:

> Article 4.5. — Disability retirement.—
> (a) Until July 31, 2014, any participant in active service who applies for a disability pension shall be entitled to a lifetime annual income in the amount established in § 396f of this title.

50. The FOMB only argues that this provision of Act 160 is in violation of the TRS freeze in the Plan and the Fiscal Plan. The FOMB also purports to preempt Section 4.6 of Act 160 that sets forth the method of calculating the disability pensions provided in the previous Section 4.5 using a defined benefit formula. However, as already stated, this the FOMB does not have the legislative authorization specifically required by Section 314(b)(5) of PROMESA that is necessary to carry out that provision of the Plan (Plan § 55.9) given that the Legislative Assembly expressly

21

stated in Act 53-2021 a public policy of zero cuts to pensions. If this section is preempted, then there would be no provision for the calculation of the disability pension for the participants that have the right to that pension and are protected by the TRS Pension Decision.

51. Section 4.9(b) of Act 160 states the following:

> Article 4.9. — Additional benefits.—
> […]
> (b) As of fiscal year 2014-2015 and on each subsequent fiscal year, the System shall receive from the general Fund a contribution equal to one thousand six hundred seventy-five dollars ($1,675) per pensioner, **notwithstanding the pensioner retired on or after August 1, 2014, in order to pay these additional benefits and nourish the System.** (Emphasis added).

52. The FOMB states as a basis for preemption that this section requires the Commonwealth to make contributions to the TRS without the FOMB's approval and that such contributions are not provided for in the budget and contravene the Fiscal Plan and the TRS Freeze of the Plan. The FOMB also states that Post-Effective Date, all teachers' pensions will be administered on a "PayGo" basis as established under Act 106. However, those hired before August 1, 2014, are protected by the TRS Pension Decision which was reiterated by Act 106. If this section is preempted, there is no provision in law that ensures nourishing the system in compliance with the TRS Pension Decision regarding the vested rights of these participants.

53. The above discussion of the effects of the purported preemption of Acts 106 and 160 shows the detrimental effects on, not only the participants and the pensioners, but also the entire operation of the TRS. Legislation is needed to cover all the necessary aspects of the operation of the TRS as well as the details on the requirements and processes established to provide for the participants and pensioners; and that cannot be done through a Plan of Adjustment that is not the *legislation* required by Section 314 of PROMESA.

54. The Government's exercise of its police powers in passing Act 106 represented a post-petition guaranty of retiree statutory obligations. As a result, the Oversight Board's contemplated plan of adjustment impermissibly seeks to modify these rights without the necessary legislative approval and required just compensation.

55. The lack of enabling legislation -for the FOMB to implement the TRS transformation and pension freezes and cuts through the Plan of Adjustment- lead to the necessary conclusion that the Plan is contrary to current law, the FOMB is not authorized to implement those changes; it is not feasible, thus unconfirmable by the mandate of Section 314(b)(3), (5) and (6) of PROMESA. The FOMB alleges that if the Plan has to be modified to eliminate the changes to the TRS, then the Plan would not be confirmable, as it would not be consistent with the Fiscal Plan. The FOMB's Response states that:

> The Plan freezes TRS and JRS to stop the accrual of new pension benefits, which the Oversight Board has concluded is critical to fulfilling its mission in light of the complete failure of defined benefit plans in existence when it was appointed; absent the freeze, and the continued freeze of ERS, billions of dollars of newly accruing pension liabilities would remain with the Commonwealth indefinitely, causing a drag on economic performance and growth and potentially returning the Commonwealth to structural deficits. FOMB's Response ¶12.

56. The freeze will cause a considerable pension cut and reduction to active participants of approximately 40% to 50% of their salaries once they retire, in contrast with the 75% accrued of their current salary pension. Not only will teachers be poor when retiring, but they will be dependent on the government to cover their expenses. They will need to request government housing, healthcare, food vouchers, and others benefits to survive. This will generate more investment from the government, not savings, as the FOMB has ambiguously stated. Those additional cost are not considered in the Fiscal Plan, therefore its projections and assumptions regarding savings are not reliable. If the FOMB is not authorized through enabling legislation to

implement those modifications, reforms and cuts, the Plan is not feasible. Thus, the Plan is unconfirmable for lack of enabling legislation and feasibility.

57. The FOMB relies on the preemption doctrine with the clear intention of transferring all TRS participants from a defined benefit pension obligation system to a defined contributions account. But that is not possible without enabling legislation because the FOMB cannot legislate and the Fiscal Plan nor the Plan of Adjustment constitute the necessary legislation.

58. Preempting the different sections of the Acts as already discussed will cause TRS participants to stay in a limbo since there would be no coherent legislation and Regulations, nor amendments to Act 106-2017, that establish the process to calculate or administer pensions in the new hybrid system that the FOMB wants to implement. As a result, the TRS's current tools to calculate pension benefits will no longer be legal or enforceable. Thus, the TRS would become completely inoperant for the 20,000 current participants covered by the defined pension system.

59. Today, over 500 participants have submitted the necessary documents to retire now in December 2021, and over 1,500 have submitted their intention to retire by June 3rd, 2021. Unfortunately, employees of the TRS will not know how to process their petitions if the Plan of Adjustment is confirmed, with the FOMB's proposal to preempt all the aforementioned sections of the Acts, because the legal framework will be inoperative by the preemption that the FOMB seeks. Without new legislation that replaces or amends Act 106-2017, this transformation cannot become effective since the TRS will not have a comprehensive legal framework that enables pension administration or calculation.

60. Section 314 of PROMESA recognizes to the Government of Puerto Rico the exclusive power to enact the enabling legislation in order for the Plan of Adjustment to be confirmed. The

Oversight Board does not have the power to legislate, nor trough the Plan of Adjustment or the Fiscal Plans. Neither can the confirmation order be a substitute to the enabling legislation.[23]

61. Enabling legislation means "any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan". *See* 48 U.S.C. § 2174(b)(5). The concept of "enabling legislation" necessarily includes all new legislation and/or amendments to the statutes that are required to implement the provisions of the Plan of Adjustment. Accordingly, if the Plan of Adjustment requires modifying the retirement systems of government employees, the legislature must affirmatively legislate to impose those reforms. Therefore, the preemption that the FOMB is seeking is futile and does not resolve the issue that the Plan lacks enabling legislation and that it is unfeasible.

62. The preemption argument cannot be invoked to override the exclusive prerogative that PROMESA grants to the Legislature. Furthermore, a law violating a plan of adjustment, or making it unconfirmable, does not make that law preempted. Preemption only occurs when the law is "inconsistent" with the PROMESA statute itself. *See* Section 4 of PROMESA, 48 U.S.C. §2103. The Plan of Adjustment must comply with existing law and should be implemented by the enabling legislation to comply with Section 314 (b)(5) and (6) of PROMESA. On the contrary, if the Plan of Adjustment could preempt local laws, Section 314 (b)(5) and (6) would become futile.

63. Preemption only displaces local legislation, but there is still a need to enact new legislation that establishes the provisions necessary to implement the Plan of Adjustment,

---

[23] Indeed, the Oversight Board is aware that nor the Fiscal Plans or the Plan of Adjustment are legislative acts. *See* Oversight Board's arguments in the *Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(1) and (b)(6)* at Docket No. 31 in Adv. Proc. 17-00229-LTS, p. 33, in the context of a Contract Clause claim. *See also, the Opinion and Order Granting in Part and Denying in Part the Motions to Dismiss Plaintiff's Amended Adversary Complaint Pursuant to Fed. R. Civ. P. 12 (b)(1) and (b)(6)*. Docket No. 62. Adv. Proc. 17-00229-LTS. (Stating that Plaintiffs assertions are "insufficient to state plausibly a claim that the fiscal plans are state legislation and therefore subject to the Contracts Clause.").

including those that attempt to modify in any way the TRS.[24] The Plan of Adjustment and/or the

Fiscal Plan in and of themselves cannot serve as the *legislation* required to confirm the Plan and

Section 314(b)(5) only grants the power to enact the enabling legislation to the Government of

Puerto Rico.

64. Despite the vast powers that PROMESA vested on the FOMB to act upon Puerto Rico's

affairs, Congress did not grant the Oversight Board the power to legislate. Thus, although the

FOMB determines in the Fiscal Plan distinctive measures that it considers necessary, legislative

action is required to implement such measures. This is true for new legislation that is necessary

under these proceedings, but also when repealing existing laws. This Court has already stated

clearly the boundaries of this "awkward power-sharing agreement" that prevents the FOMB from

usurping the powers delegated exclusively to the Legislature:

> While PROMESA grants the Oversight Board significant powers to achieve
> its purpose, the statute does not, subject to the provisions of Titles I and II,
> "impair the power" of Puerto Rico "to control, by legislation or otherwise .
> . .the exercise of the political or governmental powers." PROMESA § 303,
> 48 U.S.C. § 2163. Thus, PROMESA has created "an awkward power-
> sharing arrangement," in which the **Oversight Board has significant tools
> to shape Puerto Rico's financial operations, but it has "not been given**

---

[24] Federal preemption is rooted in the Supremacy Clause, which states that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2; *see also Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008). Pursuant to the Supremacy Clause, Congress has the power to preempt state law. *See Tobin v. Fed. Exp. Corp*., 775 F.3d 448, 452 (1st Cir. 2014). When determining if federal law preempts state law, courts look to the intent of Congress. *Grant's Dairy—Me., LLC v. Comm'r of Me. Dep't of Agric., Food & Rural Res*., 232 F.3d 8, 14 (1st Cir. 2000) ("Congressional intent is the touchstone of preemption analysis."). Federal law can preempt a state law in one of two ways: express preemption or implied preemption. *Grant's Dairy*, 232 F.3d at 15. "Express preemption occurs only when a federal statute explicitly confirms Congress's intention to preempt state law and defines the extent of that preclusion." *Id*. Implied preemption can occur through field preemption or conflict preemption. Field preemption occurs when Congress creates "a federal regulatory scheme [] so pervasive as to warrant an inference that Congress did not intend the states to supplement it." *Id*. Conflict preemption has been found where "it is impossible for a private party to comply with both state and federal requirements or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990) (internal quotation marks and citations omitted). Courts "start with the assumption that the historic police powers of the States [are] not to be superseded by" a federal statute "unless that [is] the clear and manifest purpose of Congress." *Grant's Dairy*, 232 F.3d at 14-15 (quoting *Rice v. Santa Fe, Corp*., 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947) (alterations in original). Courts have cautioned that "[p]reemption is strong medicine, not casually to be dispensed." *Id*. at 18 (citation omitted). *See Centro de Periodismo Investigativo v. Fin. & Mgmt. Bd. for P.R.,* 2018 U.S. Dist. LEXIS 77262, at 21.

**power to affirmatively legislate."** *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)* ("Rosselló Nevares"), 330 F. Supp. 3d 685, 701 (D.P.R. 2018). The provisions governing the formulation and confirmation of plans of adjustment under PROMESA further reflect this **division of responsibilities between the Oversight Board and the Commonwealth government**. "Only the Oversight Board" may file a plan of adjustment. PROMESA § 312(a), 48 U.S.C. § 2172(a). **Yet, the statute also provides that a plan of adjustment cannot be confirmed unless the Oversight Board obtains "legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan" or confirmation is "expressly conditioned on such approval." PROMESA § 314(b)(5), 48 U.S.C. § 2174(b)(5). This provision gives the Commonwealth government the ability to "obstruct implementation" or "complicate" the Oversight Board's efforts to produce a confirmable plan of adjustment.** *Rosselló Nevares*, 330 F. Supp. 3d at 701. The Oversight Board, on the other hand, has at its disposal its "budgetary tools," other statutory powers, and negotiations in seeking "to elicit any necessary buy-in from the elected officials and legislators." *Id.* Opinion and Order, at 6. Adv. Proc. 21-00072-LTS. Docket No. 78. (Emphasis added). *Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018). (Emphasis added).

65. On the other hand, when Act 53-2021 was enacted, there was a conscious legislative determination not to authorize legislation on these issues of freezes and further cuts to pensions that were considered throughout the legislative process and that ended up being excluded from the final wording of the statute. In other words, the Legislature determined not to legislate on the subject. Act 53-2021 did not -and never intended to- repeal the existing legislation that creates and implements the TRS. Thus, that legislation is still valid and enforceable. This a clear indication that the enabling legislation for the Plan of Adjustment in regard to any modification or reform to the TRS has not been enacted, pursuant to Section 314(b)(5) of PROMESA.

66. Moreover, to the Legislative Assembly it is clear that Act 53-2021 does not allow any cuts to the TRS as part of the public policy of "zero cuts" and that the reforms to the retirement

system have to be addressed with separate legislation. As to this, the President of the House of

Representatives, Hon. Rafael Hernández, has stated to the press that:

> With great respect and deference, I support the determination of both the judiciary and the teachers to continue their lawsuit in court. We reaffirm our commitment to resolve the situation of teachers and judges **through legislation when they are willing to sit with us in a responsible manner**. They requested, first - by direct voting in a consultation - not to modify their retirement system and then in the public hearings they requested that the (language included in the) project that included the solution to the teachers' retirement system be withdrawn for them to continue their litigation.[25]

67. Likewise, Governor Pierluisi's position on what Act 53-2021 really intended with "zero

cuts" has been consistent after the Act's enactment. Recently the Governor stated that there is no

ambiance in the legislature to reform the pension systems in Puerto Rico. Particularly, with respect

to the TRS, Governor Pierluisi stated the following to the press:

> First of all, the so-called freeze, which [has been] a requirement of the [Oversight] Board for more than five years to reform the retirement systems for **teachers and judges**, the [Oversight] Board has included it in all fiscal plans certified to this day. So, it should come as no surprise that it is included in the Plan of Adjustment. **That has not been legislated**. **Despite the [Oversight] Board's request, the legislature has not given way. And it has never given way**, if something like this were to be done and it reaches the hands of the Legislative Assembly, I am sure that we will enter into a negotiation process, of conversations to be fair with the teachers and the judges. [Emphasis added, our translation].[26]

> **b. The Plan of Adjustment nor the Confirmation Order are the enabling legislation according to Section 314 of PROMESA.**

---

[25] Rivera Clemente, Yaritza. *In Debate the Position of the Fiscal Control Board on Law 53.* El Vocero. November 3, 2021. Available at: https://www.elvocero.com/gobierno/legislatura/en-debate-la-postura-de-la-junta-de-control-fiscal-sobre-la-ley-53/article_78119e14-3c53-11ec-bf0b-a3835ec86b0d.html. (Last visited November 9, 2021) (Our translation).

[26] Pierluisi: *"There is no ambiance to reform the pension systems"* Noticel. November 9, 2021. Available at: https://www.noticel.com/gobierno/ahora/legislatura/top-stories/20211109/pierluisi-no-hay-ambiente-para-reformar-sistemas-de-pensiones/. (Last visited November 9, 2021) (Our translation).
Governor Pierluisi added that "[w]hat Law 53 demanded is that there be zero cuts to pensions and that has materialized. The Board has already eliminated the pension cuts. There is not a pensioner in Puerto Rico who is receiving a cut. So, the Board insists that these systems must be reformed. The Teachers Association objected. The Court Administration Office objected. Now the matter is in the hands of the court, in the hands of Judge Taylor Swain. **She is the one who is going to decide whether to proceed with this reform of the retirement systems without legislation.**" (Emphasis added). *Id.*

68. EXHIBIT F-1 of the Eighth Plan of Adjustment regarding "Modifications to TRS Pension Benefits (Without AMPR PSA)" is comprised of a simple table with general statements about a future teacher's retirement plan that in no way should be considered as the enabling legislation required for the TRS Benefit Modification that the FOMB seeks. The table states:

**MODIFICATIONS FOR FREEZE OF TRS BENEFIT OBLIGATIONS**

The following is a summary of modifications with respect to a freeze of pension benefits accrued under the TRS. The modifications listed herein modify the benefits provided by TRS as established in Act 218-1951 and all subsequent amendments through the Plan Effective Date (including but not limited to Act 91-2004, Act 160-2013, and Act 106-2017) and are to be adhered to in the administration of TRS benefits by the Retirement Board. Administrative procedures not addressed below (such as rounding procedures in determining ages and service of participants) should be consistent with past practices.

TRS members hired prior to August 1, 2014, are currently accruing benefits under a defined benefit ("DB") formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the TRS plan benefit accrual shall be frozen as of the Effective Date of the Plan (the "Freeze Date") Such freeze shall apply to all members of TRS, regardless of title or job classification. TRS members will retain the benefits they have accrued to date, provided that any future cost of living adjustments, which are not accrued benefits and will not be accrued benefits as of the Effective Date. Future benefits shall be based on contributions and earnings in new segregated defined contribution ("DC") retirement accounts funded by employee contributions. As a result, employees will have the certainty that their contributions and investment returns will be safeguarded for the future, ensuring retirement security.[27]

69. A summary of modifications contained in the Plan of Adjustments cannot be considered as the enabling legislation required to confirm and further implement the Plan. This would violate the basics of "an awkward power-sharing agreement" between the FOMB and Puerto Rico's government. How is the Oversight Board going to implement those provisions of the Plan without the participation of the legislature? If Section 314(b)(5) recognizes the legislative

---

[27] Modified Eighth Amended Title III Joint Plan of Adjustment of The Commonwealth of Puerto Rico, Et Al Doc#:19114 p.221-225. [Citations omitted].

power to enact the enabling legislation, how can the FOMB be able to circumvent it through the Plan of Adjustment or even with the Confirmation Order?

70. Furthermore, EXHIBIT F-1 of the Modified Eighth Plan of Adjustment regarding Modifications to TRS Pension Benefits (Without AMPR PSA) establishes a wish list of purported amendments to the current legislation that can only be properly addressed by the Legislature in order to be fully enforceable. A simple table with a wish list of changes to legislation is not the enabling legislation *per se* that Section 314(b)(5) of PROMESA requires for the Plan of Adjustment to be confirmed.

71. When the Commonwealth Plan of Adjustment is compared with the Plan for the City of Detroit, the need for enabling legislation is evident. In the City of Detroit, the Plan included the full text of the law.[28] In other words, the City determined all the particulars of its retirement system in accordance with its legislative power. That is not the case in Puerto Rico, since the FOMB is the only entity authorized to prosecute the Title III cases and represents the debtors in Puerto Rico. But the FOMB cannot legislate.

72. The FOMB cannot seek the legislative approval stipulated in Section 314 of PROMESA through a confirmation order or the preemption doctrine. When a state law is preempted, it is no longer valid or enforceable. But this only means that the federal statute rules upon the regulated circumstances. PROMESA does not provide for how any modification to the pension systems will be executed. The Plan of Adjustment only contains sparce general points on this issue that in no way serve as the *legislation* necessary to implement the Plan. Therefore, and for the sake of the argument, even if it is conceded that the provisions of PROMESA cause several

---

[28] *See COMBINED PLAN FOR THE GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN, Amendment and Restatement, Effective July 1, 2014.* p. 378. Available at https://www.michigan.gov/documents/treasury/Detroit_-_Eighth_Amended_Plan_of_Adjustment_476086_7.pdf. Last visited December 22nd, 2021.

laws to be preempted by PROMESA, the Plan itself is not the enabling legislation necessary for the Plan to be confirmed. Even if the Plan of Adjustment is amended to include a more detailed text for the amendments, cuts, and reforms to the TRS it would still be insufficient and would clearly violate the "awkward power sharing agreement" created by Section 314 of PROMESA.

### c. The FOMB must comply with the PROMESA Section 204(a) process before it can invalidate Act 106-2017

73. If the FOMB needs to invalidate a Commonwealth statute enacted after the passage of PROMESA, it must abide by the expressed intention of Congress on how it should do it. Since Congress stablished a mechanism in PROMESA to allow the FOMB to enforce its powers, the preemption doctrine is not available to invalidate laws legislated after the enactment of PROMESA.

74. Section 204(a) of PROMESA "establishes a sequential process for the submission of legislative acts to the Oversight Board" for review. *The Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Vázquez Garced (In re the Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 616 B.R. 238, 246 (D.P.R. 2020). That procedure applies to all laws enacted "during any fiscal year in which the Oversight Board is in operation." PROMESA § 204(a)(1); 48 U.S.C. § 2144(a)(1). It requires at the outset that the Governor provide, within seven business days of a new law's enactment, (i) a formal estimate of the law's impact on expenditures and revenues, *see* PROMESA § 204(a)(2)(A); 48 U.S.C. § 2144(a)(2)(A); and (ii) a certification that the law either "is not significantly inconsistent" or "is significantly inconsistent" with the applicable FOMB-certified fiscal plan. PROMESA § 204(a)(2)(B)–(C); 48 U.S.C. § 2144(a)(2)(B)–(C).

75. When the Government certifies that a law is "not significantly inconsistent" with the fiscal plan, the next step in the Section 204(a) process allows the FOMB to make a "challenge to the completeness or accuracy of a certification." *The Fin. Oversight & Mgmt. Bd. for Puerto Rico*

31

*v. Vázquez Garced (In re the Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 403 F.Supp.3d 1, 13 (D.P.R. 2019). If the FOMB determines that either the Government's cost estimate or "not significantly inconsistent" determination are insufficient, then the FOMB is required to send a notification to the Government directing it to "provide the missing estimate or certification (as the case may be), in accordance with such procedures as the Oversight Board may establish." PROMESA § 204(a)(4)(A); 48 U.S.C. § 2144(a)(4)(A); *see also*, 403 F.Supp.3d at 14 (finding that "[i]n the absence of information concerning the fiscal effect of that aspect of [a challenged law]," the Oversight Board may "properly invoke[] Section 204(a)(3)(A) and (B) and Section 204(a)(4)(A) of PROMESA to direct the Governor to supplement the formal estimate and submit an amended certificate consistent with that estimate").

76. But the process of Section 204(a) does not end with the FOMB's notification regarding the sufficiency of the certification required by Section 204(a). It also provides a process for when the Governor has certified that a law is "not significantly inconsistent" with the fiscal plan and the Oversight Board is not satisfied with the Government's efforts to explain its conclusions. In that case, the FOMB may take additional actions to ensure that the new law will not adversely affect compliance with the fiscal plan, "including preventing the enforcement or application of the law." PROMESA § 204(a)(5); 48 U.S.C. § 2144(a)(5). And since only a court of competent jurisdiction can nullify a law, the FOMB must seek a court order doing so. *See* 403 F.Supp.3d at 13 ("Congress did not deprive the Court of jurisdiction to consider challenges to a certification by the Governor or a territorial agency."). The FOMB is well aware of its power to seek such an order, as it has used it to file multiple lawsuits seeking to nullify legislation with which it disagreed.[29]

---

[29] *See e.g., Act 29 II*, 616 B.R. 238, 245 (D.P.R. 2020) (initiating a lawsuit to invalidate Act 29-2019); *Vázquez Garced v. The Fin. Oversight & Mgmt. Bd. for Puerto Rico (In re the Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 511 F.Supp.3d 90, 128 (D.P.R. 2020) (asserting counterclaims to invalidate Act 82-2019, Act 138-2019, Act 176-2019, Act 181-2019, and Act 47-2020); *The Fin. Oversight & Mgmt. Bd. for Puerto Rico v. Pierluisi Urrutia (In re the Fin.*

77. In compliance with the Memorandum Order, the FOMB recently filed an adversary proceeding seeking the annulment of Act 80, 81, 82 of 2020, because the Court pointed to the lack of foundation on the record to apply the Preemption Doctrine. (Adv. Proc. No. 21-00119, *Financial Oversight & Mgmt. Bd. v. Pierluisi Urrutia, et al*).

78. The Government and the FOMB strictly followed the process of Section 204(a) of PROMESA when Act 106-2017 was enacted. Yet, the FOMB has *never* exercised its power to invalidate Act 106-2017. This Act was enacted on August 23, 2017, and has been fully implemented since. The Oversight Board has had more than 4 years to decide whether to commence an adversary proceeding to invalidate it, but it did nothing. The FOMB argues that preemption is automatic. But when the federal statute contains a specific procedure to exercise the particular federal power preemption is not warranted. Since preemption is exceptional, courts "start with the assumption that the historic police powers of the States [are] not to be superseded by" a federal statute "unless that [is] the clear and manifest purpose of Congress." *Grant's Dairy*, 232 F.3d at 14-15 (quoting *Rice v. Santa Fe, Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947) (alterations in original). Courts have cautioned that "[p]reemption is strong medicine, not casually to be dispensed." *Id.* at 18 (citation omitted). *See Centro de Periodismo Investigativo v. Fin. & Mgmt. Bd. for P.R.*, 2018 U.S. Dist. LEXIS 77262, at 21. Preemption of Act 106-2017 is unavailing, since Congress intended otherwise when enacting PROMESA Section 204(a).

## **RELIEF REQUESTED**

WHEREFORE, pursuant to the arguments previously stated, it is respectfully requested from this Honorable Court to deny the confirmation of the Eight Amended Plan of Adjustment

---

*Oversight & Mgmt. Bd. for Puerto Rico)*, Adv. Proc. No. 21-00072-LTS, 2021 WL 4768715, at *1 (D.P.R. Oct. 13, 2021) (initiating a lawsuit *to* invalidate Act 7-2021).

pursuant to Sections 314(b)(3), (5), (6) of PROMESA.

RESPECTFULLY SUBMITTED.

In Ponce, Puerto Rico, this 23rd day of December 2021.

**WE HEREBY CERTIFY** that on this same date we electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

to all participants and attorneys of record.

*/s/Rolando Emmanuelli-Jiménez*
Rolando Emmanuelli-Jiménez, Esq.
USDC: 214105

*/s/Jessica E. Méndez-Colberg*
Jessica E. Méndez-Colberg, Esq.
USDC: 302108

BUFETE EMMANUELLI, C.S.P.
P.O. Box 10779
Ponce, Puerto Rico 00732
Tel.: 787-848-0666
Fax: 1-787-841-1435
E-mail: rolando@emmanuelli.law
        jessica@emmanuelli.law

*Counsel to Federación de Maestros de Puerto Rico,
Inc.; Grupo Magisterial Educadores(as) por la
Democracia, Unidad, Cambio, Militancia y
Organización Sindical, Inc.; Unión Nacional de
Educadores y Trabajadores de la Educación, Inc.*