# EXHIBIT II

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 03283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, et al., | |
| Debtors. [1] | |
| In re: | PROMESA Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 03566-LTS |
| as representative of | |
| THE EMPLOYMENT RETIREMENT SYSTEM OF THE COMMONWEALTH OF PUERTO RICO ("ERS"), | |
| Debtor. | |

**OBJECTION OF THE INDIVIDUAL PLAINTIFFS RETIREES AND BENEFICIARIES OF THE ERS TRUST TO THE MOTION OF UBS FINANCIAL SERVICES INCORPORATED OF PUERTO RICO FOR RELIEF FROM AUTOMATIC STAY**

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481); (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808); (iv) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); and (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17-BK-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as bankruptcy case numbers due to software limitations).

## TABLE OF CONTENTS                                                PAGE

**I.**   PRELIMINARY STATEMENT …...……………………………………………3

**II.**  PROCEDURAL BACKGROUND ………………………………………………4

**III.** THE RETIREES CLAIM AGAINST UBS ..……………………………………7

    A.   NATURE OF CLAIM ……………………………………………….....7

    B.   STANDING OF THE INDIVIDUAL CLAIMANTS…………………….…12

    C.   UNTIMELINESS OF THE PROPOSED COUNTER CLAIM IN
        THE COMMONWEALTH COURT ACTION………………………….13

    D.   STATUS OF LITIGATION
        (Plaintiffs' Motion for Partial Summary Judgment)…………………………...15

**IV.** THE CLAIMS OF THE RETIREES AND THE ERS IN THE
    COMMONWEALTH COURT ACTION SHOULD NOT BE STAYED
    OR DISMISSED BY THIS COURT, NOR REMOVED BY THIS COURT
    FROM THE COMMONWEALTH COURT………………………………….....35

**TO THE HONORABLE COURT:**

Individual plaintiffs Pedro José Nazario Serrano, Joel Rivera Morales, María de Lourdes Gómez Pérez, Héctor Cruz Villanueva, Lourdes Rodríguez y Luis M. Jordán Rivera, all of them retirees/beneficiaries and plaintiffs in the claim for damages described below, that is currently pending in the Commonwealth of Puerto Rico Court of First Instance, San Juan Part (the "Commonwealth Court"), without submitting to the jurisdiction of this Court, very respectfully tender this objection to the *Motion of UBS Financial Services of Puerto Rico for Relief from the Automatic Stay,* ECF No. 8823. The aforesaid individual plaintiffs state and allege as follows:

## I.    PRELIMINARY STATEMENT

1.1.    On October 8, 2019, UBS Financial Services Incorporated of Puerto Rico (UBS Financial) filed a motion ECF No. 8823, (i) requesting relief from the Automatic Stay in order to allow UBS Financial to prosecute a counterclaim against the ERS in the case filed by the ERS and the appearing plaintiffs before the Commonwealth Court, (ii) stating that the case in the Commonwealth Court should be stayed pending this Court's resolution of alleged common legal issues; and (iii) reserving the right to seek such a stay or dismissal of the Commonwealth Court case in favor of the allegedly "overlapping proceedings here". In support of its motion, UBS states that, in the aforesaid Commonwealth Court action, the ERS contends that the bonds issued by it in 2008 were illegal because the Legislative Assembly of Puerto Rico did not approve them[2]. That

---

[2] According to their prospectuses or offering memoranda, the Bonds are limited, non-recourse obligations of the ERS, payable solely and secured solely by a pledge of Employer Contributions made after the date of issuance of the Bonds. **The Bonds are not payable from the investments made by the ERS with proceeds of the Bonds or from any other assets of the ERS, or from employee contributions to the ERS. The Bonds are not obligations of the Commonwealth of Puerto Rico or any of its other instrumentalities or political subdivisions, and are not**

statement by UBS Financial is wrong, because it intimates that the plaintiffs in the Commonwealth Court case are asking the Commonwealth Court to declare the bonds issued by the ERS in 2008 null and void. The truth is that the claims made by both the Retirees/Beneficiaries and the ERS before the Commonwealth Court, with respect to the bonds underwritten by UBS Financial in 2008, are not based on the alleged illegality of the ERS Bonds, but on the wrongful advice provided by UBS Financial to the trustees of the ERS <u>prior to the issuance of the ERS Bonds</u>, in order to induce them to enter into a transaction that was subject to significant risks which were not fully vetted by UBS Financial, and that UBS Financial, as an advisor to the ERS, incurred in a gross breach of its obligations and fiduciary duties, inflicting substantial damages upon the ERS as well as upon the Retirees/Beneficiaries appearing herein. It is specifically alleged in the Commonwealth Court action that, prior to the underwriting and issuance of the Bonds, UBS held itself out to be a world renowned investment banking firm, providing an impressive combination of expertise and execution, and an impressive access to the world's capital markets. The plaintiffs' complaint in the Commonwealth Court action is a claim resulting from the tortious conduct of UBS. In other words, in its most basic analysis, the complaint in the Commonwealth Court case is essentially a claim for malpractice. Indeed, as discussed below, the retirees/beneficiaries filed that claim under the assumption that the UBS misconduct described therein caused damages to the plaintiffs, **irrespective of whether the ERS bonds are valid and binding obligations of the ERS.**

## II.    PROCEDURAL BACKGROUND

---

**payable out of any moneys of the Commonwealth other than future Employer Contributions. The Legislature of the Commonwealth could reduce Employer Contribution rate or make other changes in existing law that adversely affect the amount of Employer Contributions to the ERS. If any such change is made, the ability of the ERS to pay debt service in Bonds where due could be adversely affected. The maturity of the Bonds is not subject to acceleration for any reason, including non payment of debt service of the Bonds or any other Event of Default.**

2.1.    On September 29, 2011, plaintiff Pedro José Nazario, his wife Juanita Sosa Pérez, and the conjugal partnership constituted between them, in their capacity as retirees beneficiaries of the ERS, filed a claim for damages against UBS Financial Services Incorporated of Puerto Rico ("UBS Financial") and UBS Consulting Services of Puerto Rico ("UBS Consulting"), among others, entitled *Pedro José Nazario Serrano, Juanita Sosa Pérez and their Conjugal Partnership v. UBS Financial Services and others*, Civil No. KAC 2011-1067 (803), in the Commonwealth of Puerto Rico Court of First Instance, San Juan Part (the "Commonwealth Court Action"). Since the filing of the claim by the two retirees, the complaint has been amended three times for different reasons.

2.2.    The First Amended Complaint was filed shortly thereafter, on October 28, 2011, before any of the defendants had filed any responsive allegation. The main purpose of the amendment was to include Samuel Ramírez & Co., Inc. and Santander Securities, both as co-defendants.

2.3.    The Second Amended Complaint was filed on April 16, 2013. The main purpose of this amendment was to include an additional group of individual plaintiffs, namely Joel Rivera Morales, María De Lourdes Gómez Pérez, Héctor Cruz Villanueva, Lourdes Rodríguez and Luis M. Jordán Rivera, all of them beneficiaries and or retirees of the ERS.

2.4.    The Third Amended Complaint was filed on January 20, 2017, as per the Order of the Court of First Instance. The purpose of this amendment was to change the character of the ERS participation in this case, from involuntary plaintiff to voluntary plaintiff.  That is, by virtue of the Third Amended Complaint, the ERS became a voluntary plaintiff.

2.5.    UBS Financial and UBS Consulting filed three Motions to Dismiss on March 13, 2012, June 4, 2015, and February 14, 2017, respectively. On March 30, 2017, the Court of First Instance denied all pending motions to dismiss.

2.6.    On May 3rd 2017, UBS Financial and UBS Consulting filed their Answer to the Third Amended Complaint. In other words, after **six years** of procedural maneuvers and interlocutory appeals, the UBS defendant finally filed an answer to the Complaint. **Notably the UBS defendants did not file a Counterclaim**.

2.7.    By that time, this case had been considered by the Puerto Rico Court of Appeals on three separate occasions: *Pedro José Nazario et al v. UBS Financial et al*, **KLCE201501056**; *Pedro José Nazario et al v. UBS Financial et al*, **KLAN201700991**; and, *Pedro José Nazario et al v. UBS Financial et al*, **KLCE201701359**.  Among other things, the Puerto Rico Court of Appeals resolved that the individual retirees/beneficiaries had standing to file the Commonwealth Court Action.

2.8.    On March 6, 2019, plaintiffs sought leave to file a Fourth Amended Complaint (see Ex. B to the UBS Lift of Stay Motion). The reason for this fourth amendment, as explained to the Court, was to simplify and refine the allegations, in light of the fact that the plaintiffs had recently voluntarily dismissed claims against certain codefendants, namely Santander Securities, LLC, Samuel Ramírez, Inc. and Héctor Mayol Kaufmann. As a result, the only remaining defendants in the Commonwealth Court Action were UBS Financial, UBS Consulting and their unknown insurance carriers.

2.9.    On April 1, 2019, the UBS defendants filed a "Motion to Comply with Order Regarding Authorization for the Filing of Fourth Amended Complaint", whereby **they acknowledged that the amendments proposed by the plaintiffs did not introduce new causes of action against them, <u>in light of which they decided not to oppose the filing of the Fourth Amended Complaint</u>** *(our translation)*.

2.10.    By means of an Order entered on April 15, 2019, the Court of First Instance allowed the filing of the Fourth Amended Complaint.

2.11.    The Fourth Amended Complaint was answered by UBS Financial and UBS Consulting on April 29, 2019. For the first time, after almost **eight years** of litigation, the UBS defendants indicated that they would seek a lift of stay from this Court in order to file a counterclaim, even though they had failed to file their compulsory counterclaim when they answered the Third Amended Complaint.

2.12.    On June 27, 2019, the Plaintiffs filed an objection to the UBS defendants' attempt to continue to delay the proceedings before the Court of First Instance, on the grounds that any compulsory counterclaim had been waived by the UBS defendants **two (2) years previously**, when they filed their Answer to the Third Amended Complaint, on May 3, 2017. See Rule 11.1 of Civil Procedure Rules of Puerto Rico, 32 LPRA Ap. V, R. 11.1.

2.13.    On July 1, 2019, the Court of First Instance entered an Order declaring that plaintiffs' objection to the compulsory counterclaim was not ripe, since the compulsory counterclaim had not been actually filed.

### III.    THE RETIREES CLAIM AGAINST UBS

### A.  NATURE OF CLAIM

3.1.    In the Commonwealth Court Action, the individual plaintiffs and the ERS seek the recovery of damages caused by the tortious misconduct of UBS, in connection with the underwriting and issuance of the ERS Bonds in 2008, **irrespective of whether the ERS Bonds are legal and binding obligations of the ERS and irrespective of the validity of such bonds.**

**3.2.**     The Fourth Amended Complaint in the Commonwealth Court Action includes only the following five causes of action, which, in turn, **do not include any request whatsoever to declare the ERS Bonds null and void:**

3.2.1   First Cause of Action / Breach of Contractual Duties by UBS Financial and UBS Consulting.

3.2.2   Second Cause of Action / Article 1802 of the Puerto Rico Civil Code, which provides in its pertinent part that "a person who by act or omission causes damages to another through fault or negligence shall be obliged to repair the damage so done".

3.2.3   Third Cause of Action / Liability of Insurer ABC Insurance Company, Inc.

3. 2.4   Fourth Cause of Action / Liability of X Y Z Insurance Company, Inc.

3. 2.5   Fifth Cause of Action / Costs and Expenses and Attorneys' Fees.

**3.3.**     The validity of the ERS Bonds is not a material fact, nor a legal controversy, in the Commonwealth Court Action, which is essentially a malpractice claim against UBS, based on its misrepresentations and in its breach of fiduciary duties to ERS, which resulted in the ERS Bond issues and the damages claimed by plaintiffs.  In other words, the Commonwealth Court Action is grounded on misconduct by UBS that occurred prior the issuance of the ERS Bonds which UBS underwrote, **irrespective of the validity of said bonds.**

**3.4.**     The only reference quoted by UBS for this Honorable Court to infer, and/or to conclude, that common issues exist in this case and in the Commonwealth Court Action is paragraph 1.6 of the Fourth Amended Complaint (*Motion of UBS for Relief from Automatic Stay, Exhibit B, Fourth Amended Complaint, page 2*), which characterizes the issuance and sale of the ERS Bonds as "illicit".  That allegation was merely part of the introductory section of the Complaint and is not a legal issue, nor a material fact, of the five causes of action in the Commonwealth Court Action.

8

3.5.   The UBS misrepresentations and other negligent acts or omissions that form the basis for

plaintiffs' causes of action in the Commonwealth Court Action are particularly alleged in Sections

IV and VI of the Fourth Amended Complaint (see, Exhibit B of *Motion of UBS for Relief from*

*Automatic Stay, Exhibit B*).   From the face of those allegations, it is evident that the validity of the

ERS Bond issuance is not a material fact, nor a legal controversy, that the Commonwealth Court

needs to address to adjudicate the Commonwealth Court Action, that is essentially a tort or a

malpractice claim against UBS.   For example:

> 6.3   Among the representations made by UBS and UBS Consulting, to convince the System that the issuance of the Bonds would be beneficial and would help with the solvency of the System's coffers, was <u>that the investment of the proceeds from of the issuance would generate a positive arbitrage, which would result in net income for the System</u>.   These representations were not only false, but were made so that UBS and UBS Consulting could profit and collect their commissions and fees, such as those they actually charged, which surpassed $35 million.

> 6.13   UBS and UBS Consulting also knew or should have known that proceeds of the illicit and grossly negligent sale of the Bonds <u>could not be prudently invested in safe investment vehicles that would produce sufficient yield to amortize the issuance costs and interest on the Bonds and produce the positive arbitrage that the System needed and that, on the contrary, the investment of the proceeds from the sale of the Bonds would result in a recurring loss to the System, as the interest payable on the Bonds exceeded the yield that the System could reasonably obtain from the net funds investment attained from the sale thereof</u>.

> 6.14   UBS and UBS Consulting also knew or should have known that the Bonds would not improve, but would worsen, the "funding or funded ratio" of the System, <u>since upon their issuance, the net worth of the System would decrease due to the Bond issuance and sale costs and the System's liability would increase by an amount greater that the increase in its assets, due to said Bond issuance and sale costs.</u>   Despite knowing or [despite the fact] that they should have known all of the above, these co-defendants not only recommended the issuance and sale of the Bonds, but, for further profit, UBS acted as its lead underwriter and placed much of the Bonds in closed-end mutual funds created and administered by UBS and/or UBS affiliates and/or UBS Consulting.   This produced large profits for UBS and/or UBS Consulting in the sale of the Bonds and continues to produce annual profits for UBS and/or its affiliates from the management of the closed-end mutual funds invested in the Bonds,

whose assets still include much of the Bonds and which are managed by UBS and/or UBS Consulting and/or its affiliates."

6.15 UBS and UBS Consulting knew or should have known that the projections and estimates used to support the issuance and sale of the Bonds were clearly erroneous and misleading, but they did not warn the System and proceeded with the issuance and sale of the Bonds, for profit and without giving consideration or importance to the predictable negative consequences for the System of such issue an sale of the Bonds.

............

6.17 Neither UBS nor UBS Consulting conducted an adequate study on the viability of the issuance and sale of the Bonds, their possible harmful consequences for the System and the risks that such a transaction would entail for the System and for the System's and the Government's credit.

6.20 UBS and UBS Consulting made recommendations to the System that were obviously negligent and reckless because, as stated above, they failed to perform an adequate analysis of the risk in which the System was placed as a result of the issuance and sale of the Bonds and the possible consequences of such transactions.

..............

6.23 The conduct of UBS and UBS Consulting, as referred to above to this Forth Amended Complaint, was illicit, reckless, grossly negligent, violated its obligation to the System and therefore has caused, causes and will cause damage to the System in multi-million-dollar amounts, as well as damages to the Plaintiff's herein. *(Emphasis supplied and cited omitted) (Fourth Amended Complaint, pages. 28-33)*.

3.6. Furthermore, as will be discussed below, the fact that the validity of the ERS Bonds is <u>not</u> an issue in the Commonwealth Court Action is also evident from the *Motion for Summary Judgment* filed by the Plaintiffs and pending resolution before the Commonwealth Court. In that *Motion for Summary Judgment,* there is not one single allegation that puts the validity of the ERS Bonds at issue to attach liability upon UBS. In other words, in order to adjudicate the Commonwealth Court Action and find UBS liable for damages to the plaintiffs, the Commonwealth Court need not determine that the ERS Bond issuance is invalid. **UBS' liability for the damages caused by its negligent acts or omissions is independent and not subject to the Court adjudicating the validity of the ERS Bonds**.

3.7.    Contrary to UBS' contention, there are no "identical" nor "overlapping issues" between the malpractice or Puerto Rico Civil Code tort action to be considered in the Commonwealth Court Action (including, breach of its fiduciary duty, misrepresentations and the predictable negative consequences for the issuance and sale of the ERS Bonds, among others) versus the validity of the issuance and sale of those bonds.  In other words, the resolution of the controversy in the Commonwealth Court Action is essentially about a tort committed by UBS and there is no "wasteful duplication" created by ERS in both cases, as UBS erroneously avers.

**3.8.**    Whether leave to file a compulsory counterclaim to the Fourth Amended Complaint in the Commonwealth Court Action is going to be granted or not by the Commonwealth Court is uncertain. The fact is that, at this time, there is no counterclaim filed by UBS, nor is there a pending motion for leave to file a counterclaim at the Commonwealth Court, and, in any event, plaintiffs would oppose any such procedural maneuvers by UBS.  **The motion of UBS for relief from the automatic stay in the caption case is grounded on matters that are not material for the Commonwealth Court Action resolution.**

3.9.    UBS did not include any affirmative defense with regards to the validity of the ERS bonds issuance in its Answer to the Fourth Amended Complaint on April 29, 2019.  Even more relevant is the fact that UBS omitted to include an English translation of its Answer to the Fourth Amended Complaint and of its affirmative defenses (relevant documents to determine the material issues to address by the Commonwealth Court in the Commonwealth Court Action), as required, which would show that UBS did not raise any affirmative defense relative to the validity of the ERS Bonds.  This should be sufficient for this Honorable Court to deny UBS' request for relief from automatic stay.

3.10.    Finally, if the validity of the ERS bonds were a controversy to be addressed by the Commonwealth Court to decide the malpractice claim in the Commonwealth Court Action, which we deny, then UBS will have every opportunity to defend itself and conduct discovery regardless of a counterclaim.    Therefore, a relief from the automatic stay would be academic in the Commonwealth Court Action.

3.11.    To allege that the automatic stay "impacts UBS" because it cannot "fully defend itself through the assertion of related counterclaims" is frivolous. (*Motion of UBS for Relief from Automatic Stay, paragraph 31, page 11*).    UBS did not exercise its right to request permission to file a counterclaim at the time it filed an Answer to the Third Amended Complaint in the ERS Action (2017).    Also, UBS has vigorously litigated and opposed plaintiffs' motions and has sought remedies in the Commonwealth Court Action, without any limitation by the Commonwealth Court.    In fact, UBS filed an Answer to the Fourth Amended Complaint, including its affirmative defenses, and has conducted discovery in the Commonwealth Court Action.

3.12.    The mere statement of UBS, that its counterclaim is grounded on the validity of the issuance of the ERS Bonds in the Commonwealth Court Action, shows that it refers to an issue that is not part of the matters that are to be considered to adjudicate the tort/malpractice claim against UBS in the Commonwealth Court Action.    The motion for lift of stay is just another attempt by UBS to delay the proceedings and resolution in the Commonwealth Court Action, to the prejudice of the individual plaintiffs appearing herein.

### B.    STANDING OF THE INDIVIDUAL PLAINTIFFS

3.13.    As stated in the Fourth Amended Complaint in the Commonwealth Court Action, at paragraph 3.1, the ERS is a trust created by law and the members of the ERS Board are trustees. The active and the retired employees of the Government of Puerto Rico are fidecommisaries or

beneficiaries of the Trust. The individual plaintiffs in the Commonwealth Court Action are therefore beneficiaries or fidecommisaries of the Trust.[3]

3.14.    It is unquestionable that the individual plaintiffs, **as beneficiaries of the ERS (trust),** have standing to bring the Commonwealth Court Action against the UBS defendants, as has been resolved by the Puerto Rico Court Appeals. Moreover, Law No. 3 of April 4, 2013, at Section 40, unequivocally recognizes plaintiffs standing to file the Commonwealth Court Action **on their own behalf:**

> "A cause of action is hereby recognized to the participants and <u>pensioners</u> of the Employees Retirement System of the Government of Puerto Rico and the Judiciary <u>to sue, on their own behalf,</u> non-government <u>investment advisors and underwriters</u> in any transaction in which pension obligation bonds have been issued by the Employees Retirement System of the Government of Puerto Rico and the Judiciary, for damages <u>caused to the System or its beneficiaries.</u>" (Emphasis added)

### C.    UNTIMELINESS OF THE PROPOSED COUNTERCLAIM IN THE COMMONWEALTH COURT ACTION

3.15.    Through a motion dated April 29, 2019, UBS informed the Commonwealth Court that it would seek from the instant Court relief from the automatic stay of claims against ERS (as debtor herein), in order to file a counterclaim against ERS in the Commonwealth Court Action (the "Proposed Counterclaim").

3.16.    According to UBS, the Proposed Counterclaim would include claims solely against ERS arising from the acts, omissions or events which originated the claims included by plaintiffs in their Third Amended Complaint in the Commonwealth Court Action and

---

[3] The individual plaintiffs are only seven retirees, but the Commonwealth Court Action could very well be converted into a class action on behalf of more than 200,000 beneficiaries of the ERS, with the seven current individual plaintiffs as lead Plaintiffs, and they expressly reserve the right to do so. Contrary to what UBS avers, it is respectfully submitted that **this Court lacks jurisdiction over the claims of the individual plaintiffs against UBS, which can neither be stayed by this Court nor removed from the Commonwealth Court to this Court.**

repeated in the Fourth Amended Complaint, which, as UBS admits, is no different from the Third one, except only because several defendants were excluded from the Fourth one.

3.17.    The proposed Counterclaim is a "compulsory counterclaim" under Rule 11.1 of the Puerto Rico Rules of Civil Procedure, 32 P.R. Law Ann. Ap. V. R. 11.1[4], and as such, it had to be included in UBS's Answer to the Third Amended Complaint, filed by UBS more than two years ago, on April 29, 2019.  As stated by the Puerto Rico Supreme Court in Silvia Font de Badón, et. al. v. Mini-Warehouse Corporation, et. al., 2010 TSPR 96, DPR 322, compulsory counterclaims have to be filed when the moving party notifies its responsive pleading.  If they are not filed on time, the cause of actions is waived, and the facts and claims are totally adjudicated with defendant being unable to later file a claim arising from the same events.  See Neca Mortg. Corp. v. A & W  Dev., S.E., 137 D.P.R. 860, 867 (1955), and Sastre v. Cabrera, 75 D.P.R. 1, 3 (1953).

3.18.    To grant the relief from stay requested by UBS would be futile, because, as explained above, UBS waived its right to file the Proposed Counterclaim, since it failed to do so on a timely basis, when it answered the Third Amended Complaint in the

---

[4] The text of Rule 11.1, in its original Spanish version, is as follows:

**"Regla 11.1.  Reconvenciones compulsorias**

Una alegación contendrá por vía de reconvención cualquier reclamación que la parte que la formula tenga contra cualquier parte adversa al momento de certificar dicha alegación, siempre que surja del acto, de la omisión o del evento que motivó la reclamación de la parte adversa y no requiera para ser adjudicación la presencia de terceros sobre quienes el tribunal no pueda adquirir jurisdicción.  Sin embargo, no será necesario incluir dicha reclamación mediante reconvención si al momento de comenzarse el pleito tal reclamación era ya objeto de otro pleito pendiente.

 Our translation of the aforesaid text into English is as follows:

An allegation will contain, through a counterclaim, any claim which the party has against any advisory party at the moment of the notification of said allegation, as long as it arises from the act, the omission or the event which motivated the claim of the adversary party, and that it does not require, for its adjudication, the presence of third parties over whom the Court cannot acquire jurisdiction.  However, it will not be necessary to include said claim though a counterclaims if, at the beginning of the litigation, said claim was already the subject of another pending lawsuit.

Commonwealth Court Action, more than two years ago. Moreover, this Court does not have jurisdiction to stay or remove the claims of the individual plaintiffs pursuant to the Fourth Amended Complaint filed in the Commonwealth Court Action.

### D.    STATUS OF THE LITIGATION

**3.19    Plaintiffs' Motion for Partial Summary Judgment**

On March 22, 2019, Plaintiffs filed before the Commonwealth Court a "Motion for Partial Summary Judgment". Our translation of the 76 proposed Statement of Uncontested Material Facts, without exhibits, **as it appears in the Motion for Partial Summary Judgment,** is as follows[5]:

#### Facts Admitted By Co-Defendants In Their Answer To The Fourth Amended Complaint

1.    The System is a trust and its trustees are the members of its Board and the settlers/beneficiaries are the active and retired employees of the Government. (Paragraph No. 2.1 of Defendant's Answer to Fourth Amended Complaint).

2.    UBS PR is a corporation organized and existing under the laws of Puerto Rico and engaged in the business of investment banking, financial consulting and securities brokerage. Its address is: Penthouse, 250 Ave. Muñoz Rivera, San Juan, PR 00918. (Paragraph No. 2.8 of Defendant's Answer to Fourth Amended Complaint).

3.    UBS Consulting is not a corporation, rather, it is a subdivision of UBS Trust. Its address is Penthouse 250 Ave. Muñoz Rivera, San Juan, PR 00918. (Paragraph No. 2.9 of Defendant's Answer to Fourth Amended Complaint).

4.    UBS Trust signed consulting services agreements with the System, according to which UBS Consulting (division of UBS Trust) would render related services, among other things, to provide assistance in the development of an asset allocation study and to formulate a investment policy statement. (Paragraph No. 2.9 of Defendant's Answer to Fourth Amended Complaint).

---

[5] No exhibits to the Motion for Partial Summary Judgment are attached to this Motion in an effort to make this Motion as brief as possible, but Plaintiffs offer to make them available to the instant Court upon request. In their Opposition to Motion to Partial Summary Judgment ("Oposición a Moción de Sentencia Sumaria Parcial") dated August 2, 2019, the UBS defendants admit the facts alleged in paragraphs 1 through 17 and paragraphs 19 and 20, and claim that all the other facts are in <u>controversy</u>, but Plaintiffs allege that the UBS defendants do not comply with the requirements of Rule 36.3(b)(2) of the Puerto Rico Rules of Civil Procedure, 32 Laws of Puerto Rico Ann., Ap.V, when alleging that said facts are in controversy.

5. In 2007, Merrill Lynch, the System and the GDB developed a plan for the issuance of bonds, the sum of which amounted to approximately seven (7) billion dollars. (Paragraph No. 4.1 of Defendant's Answer to Fourth Amended Complaint).

6. UBS Trust Company of Puerto Rico ("UBS Trust") had an Agreement for Consulting Services with the System during 2007, according to which the UBS Consulting Services of Puerto Rico division would provide, among other things, assistance in the development of an asset allocation study and an investment policy statement. (Paragraph No. 4.4 of Defendant's Answer to Fourth Amended Complaint). (Contract, **Attachment 15**, page 1).

7. UBS PR agreed to serve as lead underwriter for the issuance of bonds to the System and to sell those bonds in the local Puerto Rico market. (Paragraph No. 4.5 of Defendant's Answer to Fourth Amended Complaint).

8. In 2008, UBS PR acted as the lead underwriter for the three bond issues of the System. (Paragraph No. 4.7 and 4.13 of Defendant's Answer to Fourth Amended Complaint).

9. On January 29, 2008, the Bonds denominated as "Series A" were issued for a total of $1,588,810,799.60. (Paragraph No. 4.7 and 4.13.1 of Defendant's Answer to Fourth Amended Complaint).

10. On May 28, 2008, the Bonds denominated "Series B" were issued for a total of $1,058,634,613.05. (Paragraph no. 4.7 and 4.13.2 of Defendant's Answer to Fourth Amended Complaint).

11. On June 26, 2008, the Bonds denominated "Series C" were issued for a total of $300,202,930.00. (Paragraph No. 4.7 and 4.13.3 of Defendant's Answer to Fourth Amended Complaint).

12. The contract between UBS PR and the System gave a discount to UBS PR when purchasing the bonds issued by the System. (Paragraph No. 4.8 of Defendant's Answer to Fourth Amended Complaint). (Contract, **Attachment 15**, page 1).

13. UBS PR sold those bonds in the local Puerto Rican market, in an aggregate principal sum which was less than seven (7) billion dollars. (Paragraph No. 4.13 of Defendant's Answer to Fourth Amended Complaint).

14. The maturity of the Bonds fluctuates between July 1, 2023 and July 1, 2058, and their interest rates fluctuate between 5.85% and 6.55% annually. Such interests are exempt from income tax for residents of Puerto Rico. (Paragraph No. 4.14 of Defendant's Answer to Fourth Amended Complaint).

15. The System has not issued any Bonds whatsoever since June 26, 2008. (Paragraph No. 4.15 of Defendant's Answer to Fourth Amended Complaint).

### *Sworn Statement By Mr. Héctor Mayol Kauffman*

16. On February 20, 2019, Mr. Héctor Mayol Kauffman signed an affidavit in regard to this case. (**Attachment 2**, page 1).

17. Mr. Héctor Mayol Kauffman served as System Administrator from January 2009 through October 2013. (**Attachment 2**, page 1).

18. Mr. Héctor Mayol Kauffman is a graduate of the School of Law of the University of Puerto Rico and the Rensselaer Polytechnic Institute, where he obtained the degrees of Juris Doctor, Bachelors' and Masters, respectively. During the course of his professional career, he has held several positions within the financial industry, including brokerage houses, investment banking and asset management. (**Attachment 2**, page 1).[6]

19. Mr. Héctor Mayol Kauffman, served as Commissioner of Financial Institutions of the Government of Puerto Rico, from January 1993 through September 1995. (**Attachment 2**, page X).[7]

20. The Retirement System has a total of beneficiaries that exceeds two hundred sixty-five thousand (265,000) persons, including active employees, retirees and beneficiaries. (**Attachment 2**, page 1).

### *Retaining Of UBS*

21. On February 14, 2007, the UBS Financial Services firm (hereinafter "UBS"[8]) made a *"Power Point"* presentation to the Board of Directors of the Retirement System (hereinafter, the "Retirement Board of Directors"). (See **Attachment 1**, page 1).

---

[6] Due to his academic studies and professional experience, Mr. Héctor Mayol Kauffman is an expert in the area of financial advice and stock market. However, due to his intervention with the subject matter of this litigation, Mr. Héctor Mayol Kauffman is also a factual witness. That is, he must be qualified as what the doctrine calls an "occurrence expert", which is the category that "[g]roups those who have previously obtained extrajudicial knowledge of the facts through of direct observations or participation in events subsequently relevant to litigation. [...] They are people who have had immediate perception of the facts and, as such, have irreplaceable information. He distinguishes himself from the ordinary witness in that he uses his special training in perceiving events. "*San Lorenzo Trad., Inc. v. Hernández*. 114 DPR 704, (1983). As such, his testimony deserves high probative value.

[7] See, footnote number 2 of this motion.

[8] The term "UBS" in this document refers to UBS Financial Services, Inc. and/or UBS Financial Services Incorporated of Puerto Rico and/or UBS Trust Company of Puerto Rico and/or their respective affiliated or related companies.

22. The defendant accepted the existence of such presentation. (Last sentence of the response to paragraph No. 4.5 of Defendant's Answer to Fourth Amended Complaint).

23. In that presentation, UBS represented to the Directors of the Retirement System that the UBS firm was among the first ten (10) investment banks globally (**Attachment 1**, page 3).

24. UBS told the Retirement System that it would provide an impressive combination of expertise and global strength, as well as a partnership, which guaranteed superior execution, novel solutions and maximum knowledge in terms of investment advice (**Attachment 1**, pages 5,7 and 10).

25. UBS also agreed to recognize and accept fiduciary responsibility and that this is what the Retirement System could expect from its "*Consultant*". (**Attachment 1**, page 26).

26. Regarding the particular problems and challenges of the Puerto Rico Pensions System, UBS stressed that it had extensive experience in reconciling market conditions and expectations of results. (**Attachment 1**, pages 29, 40, 47 and 48; **Attachment 2**, paragraph 1).

27. Eventually, the Retirement Board of Directors hired UBS as the firm that was in charge of underwriting Retirement System Bonds in the amount of approximately three billion dollars, which were issued on January 29, 2008 (Series A); May 28, 2008 (Series B); and, June 26, 2008 (Series C) (hereinafter, collectively, the "Retirement Bonds"). See, **Attachment 2**, paragraph 2.

### *Minutes Of The Board Of Directors*

28. According to page 6 of the Minutes of the Retirement Board of Directors corresponding to the Special Meeting of February 27, 2007, officials of the Government Development Bank for Puerto Rico ("GDBPR") represented to the members of the Board of Directors the following, referring to the said issue of Retirement Bonds:

   "... this solution **would extend the life of the resources of the System through 2027 and would significantly improve the "funding ratio" of 19% which is currently up to 72%**. *If the increase in contributions proposed in the bill is also approved at 12.5%, using this scheme, the System's obligation could be covered through 2042" (Emphasis added).*

(**Attachment 3**, page 6; **Attachment** 2, paragraph 3).

18

29.     At that same meeting, the then Administrator of the Retirement System represented to the Board of Directors the following, as appears from page 7 of the minutes of said meeting:

        *"... the financial consultants are already working on the different scenarios for the distribution of investments that will be presented for the Board's consideration soon. Mr. Cancel Alegría added that the talks on this transaction are aimed at executing it by June 2007, that is, before the end of this fiscal year. "(Emphasis added).*

(**Attachment 3**, page 7; **Attachment 2**, paragraph 4).

30.     At a joint meeting of the Retirement Board of Directors and the Board of Directors of GDBPR, of January 24, 2008, in which the issuance of the Retirement Bonds by both Boards was approved, both Boards were also represented that *"The expectations of the issue is that the markets are favorable and there is a positive return on the portfolio, which would alleviate the debt."* (**Attachment 4**, page 10; **Attachment 2**, paragraph 5).

31.     On this matter and at the same joint meeting, the then Chairman of the Board of Directors of the Government Development Bank, Mr. Rafael Martínez Margarida, asked whether the Administration of the Retirement System had the mechanisms to ensure that when the money came in from the underwriting, the expected average yield could be produced. Mr. Jorge Irizarry Herrans, (then President of GDBPR), said that, **together with the consultants**, a strategy has been designed for the distribution of these funds, which includes the hiring of eighteen (18) managers in addition to the eight (8) that already exist and that are ready to receive the money. (**Attachment 4**, page 11; **Attachment 2**, paragraph 6). (Emphasis added).

32.     The following was also expressed at said joint meeting, as appears on page 9 of the minutes of the meeting:

        "Mr. Luis Alfaro Martínez, Vice President of Financing of the Government Development Bank for Puerto Rico, points out that the debt at the general fund is not being increased **because the obligation is in the Retirement System**, what is being done is changing the source of repayment of obligations ". (Emphasis added).

(**Attachment 4**, page 9; **Attachment 2**, paragraph 7).

33.     Finally, on page 13 of the Minutes of that meeting, the following is stated:

        *"... Mr. Luis Alfaro Martínez stated that the public policy of the Government Development Bank is to maximize the resources and conditions of the local market, it is for this reason that the issuance is made first in the local market*

*and to then go to the market He added that the local market has advantages over the global market, such as that local bonds are redeemable before maturity ("callable") within ten (10) years, which allows that if after ten (10) years, rates have dropped, these bonds can be called and refinanced, this cannot be done with global bonds because they are "non-callable." Mr. Alfaro states that they originally went to the market with an offer of $750 million, as the days went by the interest increased and ended with a demand of $1.4 billion ($1,456,247,368.95) and orders continue coming in, so a commitment was made with UBS to provide space and amend the transaction, for which the Board of Trustees and the Board of Directors of the Bank would have to meet again to approve the new amount. The members of the Board of Directors recommended to establish the clause that would allow the increase of the amount up to 15% without having to go to the meetings for new approval. The Chairman of the Board of Trustees found the recommendation for the future favorable ..." (Our underline).*

(**Attachment 4**, page 13; **Attachment 2**, paragraph 8).

34.     In accordance with the Minutes of the Board of Directors of February 27, 2007, on page 6, the following was said:

*"... The cost of the debt is estimated at 6%, which allows a <u>positive arbitration</u> in light of the fact that the investments of the System must yield 8.5%...".* (Our underline).

(**Attachment 3**, page 6; **Attachment 2**, paragraph 9).

35.     In the Minutes of the Special Meeting of the Board of January 10, 2008, to page 2, the following arises:

*"... With great enthusiasm and satisfaction, the Chairman informed the Board of Trustees that today the first phase of the issuance of Retirement Systems bonds is launched, in the local part corresponding to Puerto Rico. He indicated that in the next hour, the financing team of the transaction would be meeting with the 'brokers', to make the presentation of the structure to them...".*

(**Attachment 5**, page 2; **Attachment 2**, paragraph 10).

36.     In the Minutes corresponding to May 13, 2008, on page 20, the following is stated:

**"... C. Investment Committee of the Board of Trustees**

*Mr. Jorge Irizarry Herrans, Chairman of the Board of Trustees' Investment Committee informed the Board Members that the Committee has been*

*meeting to work with the investment strategy known as 'liability driven investment' in order to ensure the cash flow of investments for the next six (6) or seven (7) years. Mr. Irizarry Herrans explains that the Committee has examined a large number of proposals on this strategy and continues to develop strategies, and then submit a recommendation to the Board of Trustees...".*

(**Attachment 6**, page 20; **Attachment 2**, paragraph 11).

37.     According to the Minutes of June 13, 2008, Messrs. Juan G. Herrans Barrera and John Thomas Engfer, both UBS officials, appeared as guests to the Board of Directors of the Retirement System. (**Attachment 7**, page 2; **Attachment 2**, paragraph 12).

38.     At that meeting on June 13, 2008, the Chairman of the Board of Trustees of the Retirement System says the following to page 3:

*"... The Chairman of the Board of Trustees, Mr. Jorge Irizarry Herrans presented to the Board Members for discussion and approval the recommendations of the Investment Committee of the Board of Trustees and the <u>Financial Consultant of the Agency: UBS. on the investment strategy called "Liability Driven Investment." For the presentation of this matter, the members of the Board had the representatives of UBS: Luán G. Herrans Barrera and Lohn Thomas Engfer</u>, as well as the Acting Treasurer of the Government Development Bankfor Puerto Rico, Mr. Rene Van Noort...". (Our underline).*

(**Attachment 7**, page 3; **Attachment 2**, paragraph 13).

39. Later, in that same Minutes of June 13, 2008, to page 3, the following is said:

*"... Mr. Irizarry Herrans indicates that the Board's Investment Committee and the Government Bank work group have been working hard during the past months with the <u>analysis and evaluation of investment strategies that will allow the Retirement System to fulfill its obligations with the pensioners.</u> The Chairman of the Board notes that both groups together with the <u>Financial Consultant have been carefully studying the strategy</u> known as 'LDI' or 'liability driven investment ... "'. (Our underline).*

(**Attachment 7**, page 3; **Attachment 2**, paragraph 14).

40.     Later, in the same Minutes of June 13, 2008, on pages 3 and 4, the following is said:

*"... Mr. <u>Irizarry Herrans</u> explains that the 'LDI' investment strategy is a relatively new one and therefore many of the alternatives presented by the*

*managers are <u>new in the world</u> of investments; therefore, it <u>required a lot of study and analysis of the persons who were working on this exercise</u>. He adds that the group's approach was aimed at selecting a combination of investments <u>that offered a high return with the lowest possible risk</u>...". (Our underline).*

(**Attachment 7**, pages 3 and 4; **Attachment 2**, paragraph 15).

41.     In the same Minutes of June 13, 2008, on page 4, the following is stated:

*"... Mr. Juan G. Herrans Barrera [of UBS] began his presentation explaining to the Members of the Board the aspects to be presented for consideration: the recommendations for the distribution of assets on which the Board shall deliberate; <u>the explanation of the strategy of the 'LDI'; and the recommendation of selection of managers to implement the investment strategy</u> and the amounts to be allocated...". (Our underline).*

(**Attachment 7**, page 4; **Attachment 2**, paragraph 16).

42.     In addition, on page 5, the following is said:

*"... The guests [from UBS] began by presenting to the Board the current distribution of the System's assets assuming that an additional $400 million is raised from the $1 billion that was raised on June 2, 2008 as a result of the issuance of Retirement System bonds, for a grand total of assets of $5,015,200,557, of which 27.28% would be cash. The Consultant's assignment is to recommend the way in which that cash is to be distributed...".*

(**Attachment 7**, page 5; **Attachment 2**, paragraph 17).

43.     Also in the Minutes of June 13, 2008, on page 5, the following is said, without mentioning the increase in liabilities of the Retirement System, resulting from the issuance of

*"... Mr. Jorge Irizarry Herrans intervened at this point to indicate that the $1,000 million approved at the Board of Trustees to issue on June 2, 2008 were institutional bonds and that there is a demand for individual accounts that are to be offered for sale soon. the $1,000 million were already received and an additional $400 million is estimated. He highlighted as an important achievement for the System that a total of $5 billion in assets has been reached, when only one year ago, the System had $2.5 billion, which means that they have doubled the assets thanks to the strategy that has been being executed. "He added that the 'funding ratio' of the System which, by 2005 was 19%, as of June 2008, is 40% with a plan drawn up to reach 70 or 80% if the strategy is completed ..."*

(**Attachment 7**, page 5; **Attachment 2**, paragraph 18).

44.     Later, in that same Minutes of June 13, 2008, on pages 5 and 6, the
following is said:

> "... *Mr. Juan C. Herrans Barrera continued the presentation showing the
> proposed distribution of assets according to the <u>recommended strategy</u>, on
> which the Board of Trustees must make a determination. It proposes to
> allocate $1.7 billion <u>to the strategy of the 'LDI'</u>, which is equivalent to
> 34.10% of total assets considering the $5 billion mentioned above, this is
> equal to one third of the System's portfolio in 'LDI'. The proposal
> contemplates allocating $1.4 million of cash (27.28%) to the 'LDI' strategy
> and add to it, through redistribution, $3 million currently allocated in
> shares...'"*. (Our underline).

(**Attachment 7**, pages 5 and 6; **Attachment 2**, paragraph 19).

45.     According to that Minutes of June 13, 2008, there is a "*power point*"
presentation with the UBS logo.



[**Attachment** 7, page 6; **Attachment** 2, paragraph 20].

46.     At the same meeting and, according to the Minutes of June 13, 2008, on
pages 6 and 7, the following is said:

> "... *In order for the Board of Trustees to consider this recommendation, <u>the
> Consultant presented</u> the two (2) faces of the investments: risk versus
> return. The diagram <u>presented by the Consultant identifies the current
> strategy of the System</u>, without considering cash. This strategy maintains a
> distribution of 40% of its portfolio in bonds or loans that behave as bonds
> and 60% of it in shares. Mr. Herrans Barrera explains that this distribution
> is on par with the average of all pension plans in the United States. When*

*asked by CPA Roberto E. Aquino García, <u>Mr. Herrans Barrera [of UBS]
stated that this strategy is in line with the investment policies approved by
the Board of Trustees. As a result, the System obtains an approximate return
of 9.52% versus a risk deviation equivalent to 5.5%...</u>"* (Our underline).

(**Attachment 7**, pages 6 and 7; **Attachment 2**, paragraph 21).

47.   In that Minutes of June 13, 2008, pages 7 and 8, the following is said and t
he following table is attached:

> *"... For this reason, <u>the Consultant proposes an</u> intermediate <u>strategy</u> that
> offers a yield of 10.44% and a risk deviation of 3.74%. Mr. Herrans Barrera
> [of UBS] states that he is aware that there are many pension plans and
> pension foundations that use this strategy with great success, however,
> taking into account the criterion of prudence, his <u>recommendation</u> is
> directed to an intermediate strategy that allows, during the process in which
> it is used, to evaluate its results with caution, considering a movement
> towards such strategy based on the results that are obtained...".* (Our
> underline).



(**Attachment 7**, pages 7 and 8; **Attachment 2**, paragraph 22).

48.   In that Minutes of June 13, 2008, on pages 8 and 9, the following is said:

> *"... Mr. Herrans Barrera [of UBS] continued his presentation presenting
> averages of <u>probability of earnings and returns of the Retirement System</u>
> portfolio taking into account the portfolio distribution alternatives according
> to the <u>strategies presented</u> for the $1.7 billion of assets to one, three, five and
> ten years. From the analysis thereof, it appears that the diversification of the
> portfolio reduces risk and improves performance, <u>which is why the 'LDI'</u>*

*strategy and the combination of strategies that support it is recommended for a complete economic cycle of seven (7) years...".* (Our underline).

(**Attachment 7**, pages 8 and 9; **Attachment 2**, paragraph 23).

49.     In the same Minutes of June 13, 2008, at page 12, it reads as follows:

> *"... Therefore, <u>the Consultant</u> notes that this <u>strategy</u> cannot work like a conventional <u>strategy</u>, nor can historical data about it be used because it is 'sui generis'. <u>It is then necessary to structure the strategy</u>...".* (Our underline).

(**Attachment 7**, page 12; **Attachment 2**, paragraph 24).

50.     In the same Minutes of June 13, 2008, page 12, the following is stated and the following table is included:

> *"... To this end, <u>the Financial Consultant presented a proposal</u> for rebalancing and redistribution of the new assets of the System, which does not include the Wellington Firm because its alternatives were not very different from the strategies with the System accounts, it does not add diversity, presented no cohesion, etc. the distribution of assets by UBS is the following:* (Our underline).



Proposed Rebalancing and Distribution of New Assets

(**Attachment 7**, page 12; **Attachment 2**, paragraph 24).

51.     In the same Minutes of June 13, 2008, at page 13, the following is stated and the following table is included:

*"... The Members of the Board discussed the proposals presented, in it, they discussed the expectations that the Retirement System could have when approving the <u>proposed strategies</u>. The Chairman of the Board was very hopeful, understanding that such strategies may extend the life of the Retirement System, referring to the following projections included in the presentation of the consultants ... ".* (Our underline).



(**Attachment 7**, page 13). (See also **Attachment 2**, paragraph 26).

52.    In the same Minutes of June 13, 2008, on page 15, the following is stated:

"... Having discussed these aspects, the CPA Roberto E. Aquino García presented a motion to approve the <u>proposals and recommendations of the Financial Consultant: UBS. As to the investment strategy</u> considering the 'LDI', the rebalancing and distribution of assets of the Retirement System, as well as the selection of the managers proposed in the presentation. Mr. Juan José Zamora Santos seconded the motion. There being no objections, it is approved. For such purposes, the Chairman of the Board of Trustees, Mr. Jorge Irizarry Herrans instructed the Retirement Systems Administrator, Ms. Minia González Álvarez to carry out the corresponding procedures to execute this determination of the Board of Trustees ..." (Our underline).

(**Attachment 7**, page 15). (See also, **Attachment 2**, paragraph 27).

### *The Conway Mackenzie Report:*

53.    On June 30, 2010, the independent firm of Conway Mackenzie (hereinafter "CM"), was hired by GDBPR to study the causes and origin of the crisis through which the Retirement System was going through. Specifically, CM focused on several areas, including the analysis carried out to support the

decision to issue three billion dollars in Pension obligation Bonds during 2008. CM is a prestigious firm of Financial Consultants, specialized in evaluations and forensic analysis, with an extensive research career. They are "*Certified Fraud Examiners*" and "*Certified Financial Forensic Specialists*". **The study concluded that the issuance of 2008 Retirement Bonds was detrimental and contributed to the current crisis of the Retirement System, as well as that it was a risky, poorly conceived and speculative strategy. (Attachment 2**, paragraph 28; in addition, **Attachment 8**, page 3).

54.     UBS co-defendants acknowledge and accept that the CM website states that it is "Certified Fraud Expert" and "Certified Financial Forensic Specialist". (Paragraph No. 4.53 of Defendant's Answer to Fourth Amended Complaint).

55.     From the Report rendered by CM, it appears that they found that the Board of Directors was induced to execute this risky transaction, which was miscalculated. Originally, the Retirement System, with the endorsement of the GDBPR, considered issuing $7.0 billion in Obligation Bonds, which would be paid by contributions received from members and employers. Due to the magnitude of the transaction, it could not be specified according to the original parameters, and only approximately $2.9 billion could be issued; all in the local market, through UBS. That smaller amount was not enough to carry out the strategy originally drawn up and the Bonds product was not reinvested with sufficient yield to cover the interests of the Bonds and, in addition, produce a positive margin for the Retirement System, so that the expected results were never generated to help improve the financial condition of the Retirement System. It was clear that market conditions revealed that this transaction was very risky and there was no appetite for investors to participate in it. In fact, at the Special Meeting of the Board of Directors on May 27, 2008, the following point was raised: "*Mr. Alfaro Martínez stated that since January [2008] when the first series of bonds was issued until now, the market has deteriorated around 35 basis points, which represents a substantial difference in the interest rates of the bonds, making it more expensive to obtain financing today than in January 2008 ... Mr. Alfonso Martínez stated that these bonds were only sold to UBS, Santander and a small order of $5 million to Triple S funds.*" **The strategy of creating an opportunity of arbitrage for the Retirement System, through the underwriting of Bonds, was misconceived from the beginning**. Really, the pension obligations Bonds issue is and will be an additional burden for the Retirement System, which did not provide a solution to the problem and worsened (instead of improving) its "funded ratio". (**Attachment 2**, paragraph 29; **Attachment 8**, page 16; Minutes Corresponding to the Special Meeting of the Board of Trustees of the Retirement Systems of the Employees of the Government of the Commonwealth and the Judiciary together with the Board of Directors of

the Government Development Bank for Puerto Rico - **Attachment 9**, page 5, first paragraph).

56.     According to the documents and reports reviewed by CM, it was concluded that the Retirement System Administration was never totally and fully aware of the possible repercussions of this Bond issue, evidently risky and totally speculative. On page 4 of his report, CM notes the following:

> "... Lastly, we believe that the _POB transactions_ may have negatively impacted the ERS and the Government, in general. In analyzing management's decision to enter into the POB transaction, _we found no basis for the initial assumption made that such a strategy would immediately improve the funded status of the ERS_. In fact, the strategy _has not improved the funded position of the System and, due to the negative arbitrage realized and fees paid as part of the POB transaction, actually worsened the funded position of the System._ The short term _liquidity fix is costly and these costs may be realized for decades to come._ In our opinion, the POB transaction accomplished little more than passing on, and increasing the complexity of, the burden of fixing the System's fundamental structural problems to future administrations of the ERS. _In addition several warning signs, which suggested that the full implementation of the POB strategy would be difficult, if not impossible,_ were identified but ultimately downplayed or ignored by those responsible for making the decisions to enter into the POB transactions (ERS management, the ERS Board of Trustees, and the GDB Board of Directors in 2008). For these reasons, we believe the decision-makers may have failed to meet the standard of due care and other important fiduciary duties in approving such a transaction ... "(Our underline).

(**Attachment 2**, paragraph 30; **Attachment 8**, page 4).

57.     On page 10 of the CM report, the following is stated:

> "... The POBs were issued by the ERS with the intent of providing the System with increased assets to pay benefit obligations, reduce the unfunded accrued actuarial liability and generate additional revenue to the System through speculative arbitrage..."

(**Attachment 2**, paragraph 31; **Attachment 8**, page 10).

58.     On page 11 of the CM Report, the following is stated:

> "... As discussed in greater detail below, _the POB transaction was speculative and subject to significant risks_ which do not appear to have been fully understood or vetted by the Board of Trustees prior to undertaking the bond issuance strategy in 2008. In addition, several early

*warning signs which existed prior to the issuance of the POBs appear to have been ignored by the ERS's Board of Trustees, therefore it is our opinion that <u>given the risks inherent in the transactions</u> several of which appear to have increased significantly in probability prior to the issuance of these bonds, <u>the decisions to pursue and enter into Series A. Series B and Series C transactions were not prudent and may not comply with the general standards of fiduciary responsibilities of a Board of Trustees.</u> Furthermore, our analyses indicate that a significant portion of the POB proceeds were not invested as originally anticipated ..."* (Our underline).

(**Attachment 2**, paragraph 32; **Attachment 8**, page 11).

59.     The following is added to page 11 of the CM Report:

*"...Based on analysis and advice from its lead underwriter, Merrill Lynch, it appears that the GDB and ERS had reason to believe that the proposed $7.0 billion POB transaction would be sufficient to resolve the System's short term liquidity crisis and meet the System's long-term cash flow requirements but the ERS and GDB should have known the $3.0 billion of proceeds issued would not salve the long-term cash flow requirements...".*

(**Attachment 2**, paragraph 33; **Attachment 8**, page 11).

60.     The following is indicated on page 12 of the CM Report:

*"...Given the treatment by the System's actuarial consultants, we do not believe it was reasonable to conclude that the POB transactions would positively impact the funded ratio immediately, as was originally communicated. We further question how those responsible for making the decision to enter into the POB transaction could have overlooked this <u>fundamental flaw</u> in the forecasted funding ratio's computation methodology...".* (Our underline).

(**Attachment 2**, paragraph 34; **Attachment 8**, page 12).

61.     In addition at page 12 of the CM Report ads the following:

*"...It appears that <u>numerous warning signs existed. foretelling difficulties with placing the bonds and realizing the returns required, yet action</u> plans were not altered..." (Our underline).*

(**Attachment 2**, paragraph 35; **Attachment 8**, page 12).

62.     On page 12 of the CM Report, this firm reaches the following conclusion:

" ...*Conclusion Based upon Merrill Lynch's analyses, the ERS had the
capacity to issue $7.0 billion of pension obligation bonds. While it was a
reasonable strategy to help address near term liquidity requirements, it was
not likely to significantly improve the System's funding status when
calculated consistently with prior methodologies. In addition, the
transaction was subject to significant risks among others, the risk of a failed
or undersubscribed offering and the System's potential inability to generate
arbitrage on the POB proceeds. Based upon our review of supporting
documents, it appears that these risks were not fully understood or vetted
by the decision-makers prior to undertaking the bond issuance strategy and
several of these risks actually materialized. Given the importance,
magnitude and potential risks associated with a failed strategy, by not
understanding or vetting the risks associated with the POB transaction, it
appears the ERS management, the Board of Trustees and GDB Board of
Directors did not exercise due care...". (Our underline).*

(**Attachment 2**, paragraph 36; **Attachment 8**, page 12).

63.    The then administrator of the System, Mr. Héctor Mayol Kauffman,
believes that UBS was obliged to identify, for the benefit of the members
of the Retirement Board of Directors, the significant risks involved in the
issuance of Bonds. That is, UBS, as Financial Advisor, had the obligation
to ensure that the members of the Retirement System Board fully
understood and validated the strategy before approving the issuance.
(**Attachment 2**, paragraph 37).

64.    On whether it was prudent to carry out this issue, the CM Report, at page
12, concludes the following:

*" ...2. Was it prudent to issue the Pension Obligation Bonds?*

*The ERS and then lead underwriter, Merrill Lynch, pursued a $7.0 billion POB
issuance during 2007 but Merrill Lynch was unable to consummate the
transaction due to a lackluster demand in the global market. UBS then replaced
Merrill Lynch as underwriter and placed approximately $3.0 billion of the bonds
in the local Puerto Rico market Given the System's significant current and
projected annual net cash flow shortfalls, the transaction was not large
enough to create arbitrage opportunities since a significant portion of the
proceeds have been (and will continue to be) utilized to address annual cash
flow shortfalls, as opposed to being invested for the long term. This means
that the transaction has also resulted in costly annual interest expense for
the ERS..."*

(**Attachment 2**, paragraph 37; **Attachment 8**, page 12).

65.    The CM Report concludes the following about market conditions:

*"...c. In an ERS Board meeting held in May of 2008, an issue was raised that the "market has deteriorated around 35 basis points since January 2008" (when the first series of bonds were placed) and that "this represented a substantial difference in interest rates of the bonds, making it more expensive to obtain financing."[12]...*

---

*[12] Based on the ERS Board of Trustees meeting minutes dated May 27, 2008."*

*"...d. By June 2008 there were also signs that <u>the stock market was deteriorating. which should have signaled to the ERS that its arbitrage goals were jeopardized...".</u>* (Our underline).

(**Attachment 2**, paragraph 38; **Attachment 8**, page 13).

66.     The then administrator of the System, Mr. Héctor Mayol Kauffman, believes that UBS, as Financial Advisor, should have noticed this deterioration of the market and alert members of the Board of Directors and recommend to them accordingly. (**Attachment 2**, paragraph 39).

67.     The UBS co-defendants were required to act "in accordance with the highest standards of fiduciary duties towards their clients and investors", as required by Article 25.1 of Regulation Number 6078 of the Office of the Commissioner of Financial Institutions, better known as the Regulation of the Uniform Securities Act of Puerto Rico. In what is pertinent here, that Article sets forth the following:

**Article 25. Dishonest And Unethical Practices In The Securities Business.**

Section 25.1. Standard of business and fiduciary duties towards clients. Every broker-dealer, issuer, investment advisor, representative of investment advisor, advisor under federal cover, representative of the advisor under federal cover, agent or any other person subject to the provisions of the Law, **shall observe the highest standards of fiduciary duties towards its clients and investors. (Emphasis added)**.

(**Attachment 2**, paragraph 40; Article 25.1 of Regulation No. 6078, **Attachment 10**).

68.     The then administrator of the System, Mr. Héctor Mayol Kauffman, believes that UBS, in its capacity as Financial Consultant and investment advisor, had the obligation and fiduciary duty to alert members of the Retirement Board of Directors about the risks inherent to the issue. Further, he concurs with the CM Report in that this issuance was reckless. UBS should have alerted the members of the Retirement Board of Directors. (**Attachment 2**, paragraph **41**).

69. The following conclusions of the CM Report, on pages 14 and 16, are consistent with the opinion of Mr. Héctor Mayol Kauffman.

> "...<u>Conclusion</u>
>
> <u>The notion that the POB transaction would generate arbitrage opportunities for the System was inherently flawed</u> based on the current liquidity needs of the System. In fact, <u>the POB transaction has and will continue to cost the System</u> money. as short-term cash flow problems continue to require the use of the POB proceeds to fund current expenses of the System. Simply put, the ERS cannot generate investment returns on POB proceeds that are used to fund System expenses, as opposed to being invested. For this reason, the POB issuance is currently costing the ERS more than what it is actually earning on invested proceeds. Our findings indicate this occurred because ERS management and Board of Trustees ignored market conditions and were subsequently constrained and blinded by the necessity to utilize cash proceeds to fund cash requirements of the System. This lack of understanding is not reasonable any may not fall within the general standards of fiduciary responsibilities expected by a Board of Trustees...". (Our underline).
>
> [...]
>
> "...Perhaps even more concerning in our analysis of the decision to enter into the POB transaction is the decision to move forward with the transaction in light of the <u>many warning signs that existed suggesting</u> full implementation of the strategy would be difficult if not impossible. The successful execution of the POB transaction was dependent on the assumption that the market would be able to absorb the full $7.0 billion issuance, since consummating a transaction of significantly less than $7.0 billion would merely serve as an expensive, temporary solution to the System's liquidity issues, further postponing the date of the ERS's eventual insolvency...".
> (Our underline).

(**Attachment 8**, pages 14 and 16).

### <u>Official Statements</u>:

70. In the *"Official Statement"* dated January 29, 2008, for the Series A Bonds, drafted with the advice of UBS, the following representations were made, among others, regarding the use of the proceeds of the sale of the Series A Bonds:

   a.   The proceeds from the sale of the Bonds would be invested and such

investments and the profits they produce would be used to pay pension benefits to the beneficiaries of the System ("invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries") (**Attachment 11** - First page or cover of the *"Official Statement"* of January 29, 2008).

b.      The proceeds of the sale of the Bonds, after deducting issuance expenses, commissions and reserves, will be added to the System's invested assets ("will be added to the System's pool of invested assets") (**Attachment 11** - Page 17 del *"Official Statement"* of January 29, 2008).

71.     In the "*Official Statement*" dated January 29, 2008, for Series A Bonds, drafted with the advice of UBS, the following representations were made, among others, about the projected future issuance of Series B Bonds, which amounted $1,058,634,613.05 and, like the Series A and Series C Bonds, were sold exclusively in Puerto Rico:

*"The System currently contemplates offering additional parity Bonds (the "Series B Bonds") in other jurisdictions. The Series B Bonds would be Offered by means of one or more separate Official Statements and may not under any circumstances be purchased by residents of Puerto Rico."* (Emphasis added).

(**Attachment** 11, page 1, paragraph 2).

72.     However, in the *"Official Statement"* of May 28, 2008, for the Series B Bonds, drafted with the advice of UBS, the following representations were made, among others, regarding the use of the proceeds of the sale of the Series B Bonds, which, like the Series C Bonds, were offered and sold only to investors in Puerto Rico, in violation to what is mentioned in Section 6.6. supra:

a.      The proceeds from the sale of the Bonds would be invested and such investments and the profits they produce would be used to pay pension benefits to the beneficiaries of the System *("invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries"*) (**Attachment 12**- First page or cover of the *"Official Statement"* of May 28, 2008).

b.      The proceeds of the sale of the Bonds, after deducting issuance expenses, commissions and reserves, will be added to the System's invested assets *("will be added to the System's pool of invested assets"*) (**Attachment 12**- Page 17 of the *"Official Statement"* of May 28, 2008).

73.     In the "*Official Statement*" of June 26, 2008, for the Series C Bonds, drafted with the advice of UBS, the following representations were made, among

others, regarding the use of the proceeds of the sale of the Series C Bonds, which were offered and sold only to investors in Puerto Rico, in violation to what is mentioned in Section 6.6, *supra*:

a.  The proceeds from the sale of the Bonds would be invested and such investments and the profits they produce would be used to pay pension benefits to the System beneficiaries ("*invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries*") (**Attachment 13**-First page or cover of the "*Official Statement*" of June 26, 2008).

b.  The proceeds of the sale of the Bonds, after deducting issuance expenses, commissions and reserves, will be added to the System's invested assets *("will be added to the System's pool of invested assets"*) (**Attachment 13**- Page 17 of the "*Official Statement*" of June 26, 2008).

### *Communication With The Press:*

74.  In a letter entitled "Government Development Bank Pension Issue", dated April 11, 2007, Mr. Miguel A. Ferrer, on behalf of UBS Financial Services, as Chief Executive Officer of said firm, told Mr. José Alvarado Vega, of The San Juan Star Newspaper, that "What I told you and repeated several times was that the issuance of bonds (or part of it) would have less cost if it was placed in Puerto Rico, being "tax-free" here and **would allow positive arbitrage** from the beginning, as the reinvestment would be in the taxable markets." (**Attachment 14**, second paragraph).

75.  In that same letter, Mr. Miguel A. Ferrer, on behalf of UBS Financial Services, clarified that his firm was not an "asset manager", rather "**financial consultants**; something very different." (**Attachment 14**, fourth paragraph).

### *Duty Of Contractual Trust:*

76.  In addition to the "highest fiduciary duty" imposed by Regulation No. 6078, the UBS co-defendants voluntarily contracted that obligation in the Service Contract. (**Attachment 15**, page 1).

3.20.  On August 2, 2019, the UBS defendants filed an opposition to plaintiffs' Motion for Summary Judgment.  On September 23, 2019, the Court of First Instance entered an order stating that the issue was joined and took the matter under advisement, indicating that the court would render a resolution in due course.

3.21.   In their Motion for Summary Judgment, the plaintiffs contend that the Commonwealth Court should enter partial judgment in their favor with respect to the liability of the UBS defendants, which would leave only the determination of damages for a later stage.

3.22.   A review of the uncontested material facts, as stated in the Motion for Partial Summary Judgment, confirms what is the true nature of the plaintiffs' claim against the UBS defendants. **Contrary to the statement made by UBS to this Court in the Lift of Stay Motion, the claims against the UBS defendants in the Commonwealth Court Action have absolutely nothing to do with whether the bonds issued by the ERS are valid or null and void,  nor do the plaintiffs seek to make UBS "responsible for that alleged defect in the ERS bonds**".

## IV.    THE CLAIMS OF THE RETIREES AND OF THE ERS IN THE COMMONWEALTH COURT ACTION SHOULD NOT BE STAYED OR DISMISSED BY THIS COURT, NOR REMOVED BY THIS COURT FROM THE COMMONWEALTH COURT.

4.1.   The claims of the individual retirees who appear or co-plaintiffs in the Commonwealth Court Action are **not** claims or assets of the ERS, and this Court has no jurisdiction over them. Therefore, this Court should not stay or dismiss said claims and should not remove them from the Commonwealth Court.

4.2.   Under the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), and given that the ERS is one of the Debtors in the instant case, this Court may have the right, but not the obligation, to elect to assume jurisdiction over the ERS claims in the Commonwealth Court Action, but this Court also has the authority to abstain from assuming said jurisdiction, as resolved by this Court in IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD OF PUERTO RICO, et. al. v. the Commonwealth of Puerto Rico, Debtors.  Asociación de Salud Primaria de Puerto Rico, et. al., 330 F. Supp. 3d. 667, in the US District Court of Puerto Rico (the "Asociación de Salud Primaria Case").

4.3.    This Court should abstain from intervening in the Commonwealth Court Action, as it

pertains to the ERS, because in the Commonwealth Court Action, as in Asociación de Salud

Primaria, *supra*, abstention is warranted for the reasons explained below:

4.3.1.   The Commonwealth Court Action does not invoke issues of federal law.  See In

Re: Middlesex, 292 F. 3rd. at 69.

4.3.2.   The Commonwealth Court Action is not about the validity of the ERS Bonds and

is not related to the main PROMESA Title III case which includes the ERS as one of the debtors.

4.3.3.   Abstention promotes the efficient administration of the ERS estate.  See In Re:

Loewen Group Int'l., Inc. 344 BR. 727,730 (D. Del. 2006).

4.3.4.   The issues in the Commonwealth Court Action are far removed or peripheral, and

do not invoke issues central to the restructuring of the ERS liabilities, and there are no "overlapping

proceedings here", as UBS falsely claims.

4.3.5.   The removal of the Commonwealth Court Action from the Commonwealth Court

to the instant Court would merely delay and complicate its resolution, which is what UBS really

seeks.  Allowing the Commonwealth Court to continue presiding over the Commonwealth Court

Action is not only possible, but the most efficient way forward.

4.3.6.   **There is a likelihood that the removal sought by UBS is an attempt at forum**

**shopping.**   The parties have been litigating the Commonwealth Court Action in the

Commonwealth Court for more than eight (8) years.  UBS now proposes to ask this Court to again

analyse the same arguments and sets of facts before the Commonwealth Court.  To the extent that

UBS wants to have the ERS claims against it removed to this Court simply in order to progress in

another forum, this weighs heavily in favor of abstention.  See In Re: Encompass Servs. Corp.,

337 B.R. 864, 879  (Bankr. S.D. Tex. 2006).

4.3.7. Exercising jurisdiction over the Commonwealth Court Action would create an unnecessary additional burden on the already busy Title III docket of this Court. The Commonwealth Court Action has been litigated, in Spanish, in the Commonwealth Court, for more than eight (8) years. For this Court to "pick up the pen now would be no small task". Assumption by this Court in the eleventh hour would not be in the interest of justice. Courts have decided accordingly in litigations that have made for less progress. See Estate of Scott v. Cervantes, 2008 WL11337657 at *4 (C.D. Cal. July 29, 2008). The avoidance of unnecessary burden weighs in favor of abstention.

4.3.8. The Commonwealth Court Action does not invoke issues or claims requiring interpretating PROMESA, nor are they directly related to the ERS restructuring process. Having those issues or claims adjudicated in the Commonwealth Court does not hinder the Title III restructuring process. In fact, the efficiency gained by maintaining the Commonwealth Court Action in the Commonwealth Court weighs heavily in favor of nor removing said action from the Commonwealth Court.

4.3.9. UBS would not be prejudiced by this Court's decision of not interviewing in the Commonwealth Court Action. The Commonwealth Court is capable of presiding over the Commonwealth Court Action, and it has the authority to provide complete relief to all the plaintiffs therein, including the ERS and the individual retirees, as well as to protect the rights of the defendants.

**THEREFORE**, the individual plaintiffs respectfully request this Honorable Court to deny the Motion of UBS for relief of the automatic stay, as well as any request by UBS to remove, stay or dismiss the Commonwealth Court Action.

Respectfully Submitted.

In San Juan, Puerto Rico, this _____ day of November, 2019.

**I HEREBY CERTIFY:** That a true and exact copy of this motion was served on counsels for UBS, Mc. Connell Valdes LLC, 270 Muñoz Rivera Avenue, Hato Rey, Puerto Rico 00918 (Attn: **Roberto C. Quiñones-Rivera, Esq**.) and Skadden, Arps, State, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware, 19899 (Attn: **Paul J. Lockwood, Esq.**).

**VICENTE & CUEBAS**
P.O. Box 11609
San Juan, PR 00910-1609
Phone No. (787) 751-8000
Fax No. (787) 756-5250

/s/ Harold D. Vicente
**Harold D. Vicente, Esq.**
USDC-PR Bar No. 117711
hvicente@vclawpr.com

/s/ Harold D. Vicente-Colón
**Harold D. Vicente-Colón, Esq.**
USDC-PR Bar No. 211805
hdvc@vclawpr.com

**PUJOL LAW OFFICES, PSC**
P.O. Box 363042
San Juan, PR 00936-3042
Phone No. (787) 724-0900
Fax No. (787) 724-1196

/s/ Francisco Pujol Meneses
**Francisco Pujol Meneses, Esq**.
USDC-PR Bar No. 212706
fpujol@pujollawpr.com

**BUFETE ANDREU & SAGARDÍA**
261 Avenida Domenech
San Juan, Puerto Rico 00918
Phone No. (787) 754-1777/763-8044
Fax No. (787) 763-8045

/s/José A. Andreu Fuentes
USDC-PR Bar No. 204409
jaf@andreu-sagardia.com

*Counsel for individual plaintiffs, beneficiaries of the Retirement System
of the Commonwealth of Puerto Rico*