## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                  Debtors.[1] | PROMESA<br><br>Title III<br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## INFORMATIVE MOTION OF FINANCIAL OVERSIGHT AND MANAGEMENT BOARD REGARDING NONSUBSTANTIVE MODIFICATIONS TO DRAFT FINDINGS OF FACT AND CONCLUSIONS OF LAW AND CONFIRMATION ORDER

To the Honorable United States District Judge Laura Taylor Swain:

Pursuant to the Court's *Order Regarding Proposed Nonsubstantive Modifications to Confirmation Order Materials* [Case No. 17-3283, ECF No. 19734] (the "Order"), the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Puerto Rico

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

Public Buildings Authority ("PBA"), and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS," and together with the Commonwealth and PBA, the "Debtors") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] respectfully states as follows:

1.       On January 10, 2022, the Court entered the *Order Regarding Plan Modifications Necessary to the Entry of an Order Confirming Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [Case No. 17-3283, ECF No. 19721] (the "Modifications Order").    Attached to the Modifications Order as Attachments 1 and 2, respectively, are the Court's drafts of the *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (the " (the "Draft FFCL") and the *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (the "Draft Confirmation Order" and, together with the Draft FFCL, the "Draft Orders").

2.       On January 11, 2022, the Court entered the Order, authorizing the Oversight Board to file an informative motion (this "Informative Motion") identifying any non-substantive proposed changes or corrections to the Draft Orders, together with redlined versions of the Draft Orders illustrating the proposed changes or corrections.    Accordingly, the Oversight Board

---

[2]    PROMESA has been codified at 48 U.S.C. §§ 2101–2241.

respectfully requests that the Court implement the proposed changes to the Draft Orders identified

below.  Redlines of the Draft FFCL and Draft Confirmation Order reflecting such changes are

attached hereto as **Exhibits A** and **B**, respectively.

| Draft FFCL | |
|---|---|
| **Text of Court's Draft FFCL with Oversight Board's Redlined Changes** | **Basis for Changes** |
| 52.³   On November 24, 2021, the Oversight Board certified the modification of the Third Modified Eighth Amended Plan (Docket Entry No. 19569 Ex. C) (the "Certification of the Submission of the **Fourth** Modified Eighth Amended Plan"). The Oversight Board subsequently filed, on November 28, 2021, the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19367) (the "Fourth Modified Eighth Amended Plan"). **53.   On December 20, 2021, the Oversight Board certified the modification of the Fourth Modified Eighth Amended Plan (Docket Entry No. 19569, Ex. D) (the "Certification of the Submission of the Fifth Modified Eighth Amended Plan").** The Oversight Board **subsequently** ~~then~~ filed, on December 2**1**~~0~~, 2021, the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, (Docket Entry No. 19568 in Case No. 17-3283) (the "Fifth Modified Eighth Amended Plan"). **53**~~54~~.   On ~~December 20~~**January 14**, 2022**1**, the Oversight Board certified the modification of the ~~Fourth~~**Fifth** Modified Eighth Amended Plan and the submission of the Plan upon a determination, in the Oversight Board's sole discretion, that the Plan was consistent with the Fiscal Plan. (Docket Entry No. ~~19569 Ex. D~~**19786 Ex. A**) (the "Certification of Consistency with the Fiscal Plan"). Accordingly, the | Pursuant to the Modifications Order, the Oversight Board filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [ECF No. 19784] (the "Plan") on January 14, 2022. Accordingly, the Draft FFCL should be revised to reflect such filing and the Oversight Board's related certification. In addition, the Draft FFCL should be revised to reflect the prior certification and filing of the Fifth Modified Eighth Amended Plan, consistent with the Draft FFCL's descriptions of the certification of other versions of the proposed plan of adjustment. |

---

³   Unless otherwise indicated, the paragraph numbering in this chart corresponds to the redline Draft FFCL attached hereto as **Exhibit A**, and not the Draft FFCL attached to the Modification Order.

| | |
|---|---|
| Oversight Board submitted the modification of the ~~Fourth~~ Fifth Modified Eighth Amended Plan and the Plan in compliance with section 104(j) of PROMESA. | |
| 78.     Section 84.1 of the Plan specifies that Claims in Classes 1 through 50, 51B, 51E, 51G through 51I, 52 through 5~~3~~4, 56, 58 through ~~62, 65,~~ 66 and 69 are impaired. Section 84.2 of the Plan specifies that Claims in Classes 51A, 51C, 51D, 51F, 51J through 51L, ~~54,~~ 55, 57, 67, and 68 are unimpaired. <br><br> . . . | The Draft FFCL does not list Classes 63 and 64 as impaired Classes pursuant to the Plan.  However, the Plan provides that such Classes are impaired and will receive no distribution (*see* Plan §§ 67.1, 68.1, 84.1), and the Modifications Order does not provide for any change to the treatment of Claims in such Classes. |
| 80.     Articles V through LIV, sections 55.2, 55.5, 55.7 through 55.9, articles LVI through LVII, LX, LXII through ~~LXVI, LXIX,~~ LXX and LXXIII of the Plan identify the treatment of each Class of Claims impaired by the Plan. Sections 62.2 and 62.3 have been revised to remove any reference to Eminent Domain Claims from the category of CW General Unsecured Claims and treatment thereunder. | Further, pursuant to the modifications made to the Plan in connection with the Modifications Order, Class 54 has been rendered unimpaired. <br><br> Accordingly, the Draft FFCL should be revised to provide that Classes 63 and 64 are impaired, and Class 54 is unimpaired. |
| 108.     Article XCII of the Plan provides for, among other things, (a) certain releases, injunctions, and exculpations described below in paragraphs ~~199–208~~ 233–242 and (b) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of New GO Bonds and CVIs. (Jaresko Decl. ¶ 78; Zelin Decl. ¶¶ 94, 96, 97, 99, 107-10.) <br><br> . . . <br><br> 132.     The Plan does not unfairly discriminate against holders of Claims in Class 58 (CW General Unsecured Claims), Class 66 (ERS General Unsecured Claims), or Class 13 (PBA General Unsecured Claims). For the reasons set forth above in paragraphs ~~55–64~~ 62–70, certain Classes of unsecured Claims have been separately classified . . . Further, for the reasons set forth above in paragraph ~~65~~ 66, separate classification and treatment of Claims in Class 54 (Eminent Domain/Inverse Condemnation Claims) is necessary . . . | New paragraphs were added to the Draft FFCL.  Accordingly, paragraph cross-references in paragraphs 108 and 132 should be updated to reference the correct paragraphs. <br><br> The changes to the paragraph cross-references in the previous column assume that the Court will adopt the Oversight Board's proposed changes to paragraphs 52–54 described above (including the addition of new paragraph 53).  Should the Court decline to adopt such changes to paragraphs 52–54, the paragraph cross-references identified in the preceding column should be changed to "232–241," "61–69," and "65," respectively, as there will be one less preceding paragraph. |

| | |
|---|---|
| 201.  . . . (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans **under which the Commonwealth and other governmental employers accrued**~~(the poor management of which led to~~ nearly $55 billion of unfunded pension obligations~~)~~ . . . | Pursuant to the Modifications Order, changes were made to Section 83.4 of the Plan.  Accordingly, conforming changes should be made to paragraph 201 of the Draft FFCL, which quotes Section 83.4 of the Plan. |

| **Draft Confirmation Order** | |
|---|---|
| **Text of Court's Draft Confirmation Order with Oversight Board's Redlined Changes** | **Basis for Changes** |
| 39.    (a)  The two (2) Creditors Committee appointees to the Avoidance Actions Trust Board (collectively, the "Creditor Appointees") shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, ~~Eminent Domain Claims,~~ an ERS General Unsecured Claims, ~~and~~ Convenience Claims, **and, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, Eminent Domain/Inverse Condemnation Claims** regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or ~~an Eminent Domain Claim~~**in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, an Eminent Domain/Inverse Condemnation Claim** (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00) . . . | Pursuant to the Modifications Order, the Court's ruling on the treatment of Eminent Domain/Inverse Condemnation Claims is preserved for appeal.  Section 82.1(b) of the Plan has been revised to reflect that such ruling may be appealed and the Oversight Board's understanding reached with the Creditors' Committee.  Accordingly, conforming changes should be made to paragraph 39 of the Draft Confirmation Order, which quotes section 82.1(b) of the Plan. |
| 48.    . . . including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-Insured GO Bond or PBA Bond insured | Pursuant to an agreement between the Oversight Board and FGIC, "FGIC" should be removed from this text. |

| | |
|---|---|
| by Amac, Assured, ~~FGIC,~~ Syncora, or National, as the case may be . . . | |
| 76. Eminent Domain/Inverse Condemnation Claims. Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, (a) nothing contained in the Plan or this Confirmation Order shall impair or otherwise affect the treatment provided in Class 54 to holders of Allowed Eminent Domain/Inverse Condemnation Claims, (b) as of the Effective Date, and upon the effective date of a Final Order of a court of competent jurisdiction determining the validity of and amount of just compensation attributable to an Allowed Eminent Domain Claim or Allowed Inverse Condemnation Claim, the holder of such a Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one hundred percent (100%) of such Allowed Eminent Domain/Inverse Condemnation Claim, and (c) Allowed Eminent Domain/Inverse Condemnation Claims shall not be treated in any way as CW General Unsecured Claims for purposes of distribution. Nothing in the Plan or this Confirmation Order shall be construed to prevent any determination of just compensation from including, if and to the extent the tribunal deems appropriate, interest on an Allowed Eminent Domain/Inverse Condemnation Claim. **Notwithstanding the foregoing, in the event that (x) the Oversight Board appeals from the Confirmation Order and the Findings of Fact and Conclusions of Law regarding the Title III Court's ruling that Allowed Eminent Domain/Inverse Condemnation Claims must be paid in full or otherwise be rendered unimpaired pursuant to the Plan, (y) such appeal is successful, and (z) a Final Order is entered holding that Allowed Eminent Domain/Inverse Condemnation Claims may be impaired, subject to the terms and provisions of Articles LXXVII and LXXXII of the Plan, each holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its** | Pursuant to the Modifications Order, the Court's ruling on the treatment of Eminent Domain/Inverse Condemnation Claims is preserved for appeal. Section 58.1 of the Plan has been revised to reflect that such ruling may be appealed and the Oversight Board's understanding reached with the Creditors' Committee. Accordingly, conforming changes should be made to paragraph 76 of the Draft Confirmation Order. |

| | |
|---|---|
| **Allowed Eminent Domain/Inverse Condemnation Claim, and the Reorganized Commonwealth shall make, payments, in Cash, in an amount equal to the pro rata payments to be made to holders of Allowed CW General Unsecured Claims up to the GUC Recovery Cap.** | |

**WHEREFORE** the Oversight Board respectfully requests that the Court take notice of the foregoing and adopt the proposed changes to the Draft Orders identified in this Informative Motion.

Dated: January 14, 2022
     San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*
Martin J. Bienenstock
Brian S. Rosen
(Admission *pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

*/s/  Hermann D. Bauer*
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

## Exhibit A

**Redline Draft FFCL**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Title III No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO et al., | |
| Debtors.[1] | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH
CONFIRMATION OF THE MODIFIED EIGHTH AMENDED TITLE III JOINT
PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO,
THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

LAURA TAYLOR SWAIN, United States District Judge

The motion of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") for confirmation of a proposed Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System and the Public Buildings Authority is now before the Court pursuant to Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").[2]  The Court has jurisdiction of this matter pursuant to section 306(a) of PROMESA.  This Court hereby makes its findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and section 310 of PROMESA, with respect to the confirmation motion.

## Introduction

In 2017, the Commonwealth of Puerto Rico (the "Commonwealth"), through the Oversight Board, initiated unprecedented proceedings pursuant to PROMESA to restructure the debts of the Commonwealth and certain of its instrumentalities and to find a path forward for Puerto Rico, its citizens, and other stakeholders.  (See May 22, 2017, Hr'g Tr. 6:9-8:12.)  During the pendency of the Title III cases, Puerto Rico has endured the disastrous effects of hurricanes, earthquakes, and the COVID-19 pandemic.  These events have not only made day to day life far more challenging for the residents of Puerto Rico, but they have exacerbated the financial difficulties of the Commonwealth and made the already complex circumstances more challenging for those involved in the resolution of these Title III cases.  Nonetheless, the Oversight Board, representatives of many creditor constituencies, including retirees, the

---

[2]     PROMESA is codified at 48 U.S.C. § 2101 et seq.  References to "PROMESA" section numbers in the remainder of this FFCL (defined below) are to the uncodified version of the legislation, unless otherwise indicated.

government of Puerto Rico and other parties-in-interest have persevered, with the help and

guidance of an extraordinary team of skilled judicial mediators (the "Mediation Team"), in

working toward a resolution intended to allow the Commonwealth and two of its

instrumentalities to exit these PROMESA Title III cases.

### Prior Restructurings under PROMESA

On November 7, 2018, this Court approved a qualifying modification for the

Government Development Bank for Puerto Rico ("GDB"), which restructured approximately

$4.5 billion of claims against GDB (Docket Entry No. 270 in Case No. 18-1561.)  On February

4, 2019, this Court confirmed the *Third Amended Title III Plan of Adjustment of Puerto Rico

Sales Tax Financing Corporation*, dated January 9, 2019 (Docket Entry Nos. 5047 and 5048, as

amended by Docket Entry Nos. 5053 and 5055 on February 5, 2019), for the Puerto Rico Sales

Tax Financing Corporation ("COFINA") and approved the settlement between the

Commonwealth and COFINA (Docket Entry No. 5045.)   The settlement divides rights to a

significant flow of tax revenues between the two debtors that were involved in complex litigation

regarding the ownership of such tax revenues.  The resolution of the GDB and COFINA disputes

marked important first steps towards Puerto Rico's financial recovery, economic stability, and

prosperity.

### Proposed Plan of Adjustment for the Commonwealth of Puerto Rico,
### the Employees Retirement System and the Public Buildings Authority

The Debtors have now brought before the Court for confirmation the [xx] *III Joint

Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January, 2022 (Docket

Entry No. [xx] in Case No. 17-3283)[3] (as modified pursuant to any revisions made at or

---

[3]      All docket references are to entries in Case No. 17-3283 unless otherwise indicated.

220110 ATTACH 1 - REV'D PROPOSED FFCL         VERSION JANUARY 10, 2022

subsequent to the Confirmation Hearing, including the Plan Supplement, and as may be modified

pursuant to section 313 of PROMESA, the "Plan")[4] The Plan[5] required extraordinary work over

the course of several years to negotiate the terms of various plan support agreements and resolve

disputes arising throughout the pendency of these Title III Cases.  The Mediation Team has

served a critical role in facilitating navigation of complicated negotiations between parties-in-

interest that have spanned several years and involved complex issues.  In response to requests of

this Court, the Mediation Team has filed certifications of the good faith participation of parties in

confidential negotiations at key points during these cases.  (See, e.g., Docket Entry Nos. 17314

and 18885.)  The motion to confirm the Plan before this Court constitutes a crucial step in the

effort to achieve the economic recovery of the Commonwealth of Puerto Rico and its

instrumentalities.

The Plan of adjustment has broad but not universal support.  Objections by

creditors, and the case put forward by the Debtors, are discussed in detail in the findings of fact

and conclusion of law that follow (the "Findings of Fact and Conclusions of Law" or "FFCL").

In addition to formal filings by parties, the Court has received thousands of letters and email

communications from citizens and others who live in Puerto Rico and are concerned about

Puerto Rico's future and their own.  Within the past few months in particular, government

workers and retirees have written with passion and sadness about their anxieties concerning their

---

[4]    Capitalized terms used but not defined herein shall have the meanings given to them in
the Plan.

[5]    The use of the term "Plan" herein, unless otherwise indicated by context, refers to the
confirmable final version as described herein (or the "Sixth Modified Eighth Amended
Plan").  The penultimate version of the plan, which required final modifications to be
confirmable, was filed as the *Modified Eighth Amended Title III Joint Plan of Adjustment
of the Commonwealth of Puerto Rico, et al.*, dated December 20, 2021 (Docket Entry No.
19568 in Case No. 17-3283) (the "Fifth Modified Eighth Amended Plan").

ability to support their families and live in a dignified way in retirement.  Many have also

protested that the past government borrowings and the disposition of borrowed funds were

improper and that ordinary citizens should not have to bear the economic consequences of

alleged past wrongs; many such communications demanded that the Court order a full audit of

the past borrowings and dispositions before considering any proposed plan of adjustment.  Many

of the writers express frustration with the economic measures developed by the Oversight Board

and also, sadly, express lack of confidence in elected leaders' willingness and ability to manage

responsibly the resources that will be available to the government following the confirmation of

a plan of adjustment.  They are understandably concerned about the provision of services that

residents consider essential.  Pride in and concern for the University of Puerto Rico were

prominent features of many of the communications.

        In evaluating whether the proposed plan of adjustment should be confirmed, the

Court considered the legal and evidentiary submissions of the parties in interest, and the larger

context of pain and hope in which Puerto Rico moves forward.  The Court's authority is

significant but is exercised within boundaries set by the Constitution and laws of the United

States.  In this connection, Congress has conferred powers on the Oversight Board to develop

fiscal plans and budgets in collaboration with the elected government, and has given the

Oversight Board the sole power to formulate and propose plans of adjustment.  The Court must

determine whether the proposed plan of adjustment meets the requirements of the laws passed by

Congress and, where objections based on the Constitution of the United States have been raised,

the requirements of the Constitution.  It is not for the Court to determine whether particular

policies, asset allocations, or settlements of disputed issues are optimal; the Court determines

whether the proposed Plan meets the legal requirements for confirmation of a plan of adjustment.

This process is largely forward-looking.  The applicable legal standards do not require an audit of the creation and disposition of past borrowings.

For the reasons explained in the following Findings of Fact and Conclusions of Law, the Court finds that, with the incorporation of certain specified revisions, the Plan proposed by the Oversight Board meets the confirmation requirements of PROMESA and does not violate the Constitution.  The Court has also determined that PROMESA itself does not violate the Constitution.  In moving forward following confirmation, the Court urges the people of Puerto Rico to use their resources and voices well, and urges those who govern and those who oversee Puerto Rico to listen to those voices, to make wise choices and explain them well, and to lead Puerto Rico to a better, brighter, and more vibrant future of growth and economic stability.[6]

## The Motion and Submissions Considered

Before the Court is the Plan filed by the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), and together with the Commonwealth and ERS, the "Debtors"), by and through the Oversight Board, as representative of the Debtors pursuant to section 315(b) of PROMESA.[7]  The following documents have been filed by the Debtors in connection with confirmation of the Plan:

---

[6]     While the legal standards governing the confirmation determination did not require the Court to consider an audit of the creation and disposition of past borrowings, confirmation of the Plan does not foreclose further investigation, whether through regulatory, law enforcement, or civil litigation channels, into the origins of Puerto Rico's debt crisis and the application of the proceeds of the pre-PROMESA borrowings.

[7]     The Court previously entered, pursuant to, inter alia, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, submission, and tabulation of votes and elections with respect to the Plan, approving the forms of ballots, master ballots, and election notices in connection therewith, and approving the form of

(a) *Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18470) (as the same may be amended, supplemented, or modified, the "Plan Supplement");

(b) *Certificate of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9) (Debtors Exs. 138-140) (the "Mailing Affidavits");

(c) *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4) (Debtors Ex. 141) (the "Publication Affidavit" and, together with the Mailing Affidavits, the "Service Affidavits");

(d) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18874);

(e) *Memorandum of Law in Support of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18869);

(f) *Certificate of Service* (Docket Entry No. 19182);

(g) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Requested Rulings Regarding Act 53-2021 Relating to the Modified Eighth Amended Joint Plan of Adjustment* (Docket Entry No. 19249);

(h) *Response of the Financial Oversight and Management Board in Accordance with the Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19567)

(i) *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18729 and 19054-4) (the "Jaresko Decl.");

(j) *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18731 and 19054-9) (the "Skeel Decl.");

---

notice of the Confirmation Hearing.  The Court also entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640.)

(k) *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18726 and 19054-1) (the "Brownstein Decl.");

(l) *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18734 and 19054-10) (the "Zelin Decl.");

(m) *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18730 and 19054-8) (the "Shah Decl.");

(n) *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18738 and 19054-6) (the "Malhotra Decl.");

(o) *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18736 and 19054-7) (the "Santambrogio Decl.");

(p) *Declaration of Adam Chepenik in Respect of the Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18735 and 19054-2) (the "Chepenik Decl.");

(q) *Declaration of Sheva R. Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18737 and 19054-5) (the "Levy Decl.");

(r) *Declaration of Jay Herriman in Respect of Confirmation of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18732 and 19054-3) (the "Herriman Decl.");

(s) *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19056) (the "Pullo Decl.");

(t) *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725) (the "Wolfe Decl.");

(u) *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724) (the "Murray Decl.");

(v) *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057) (the "Malhotra Sup. Decl.");

(w) *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058) (the "Jaresko Sup. Decl.");

(x) *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19059) (the "Levy Sup. Decl.");

(y) *Supplemental Declaration of Juan Santambrogio in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19060) (the "Santambrogio Sup. Decl.");

(z) *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115) (the "Pullo Sup. Decl."); and

(aa) *Supplemental Declaration of Jay Herriman in Respect of Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19329) (the "Herriman Sup. Decl.").

Submissions in opposition to confirmation of the Plan were filed by the following

parties: (i) PFZ Properties, Inc. (Docket Entry Nos. 9223 and 18418); (ii) Sucesión Pastor

Mandry Mercado (Docket Entry Nos. 12701, 16481, 17062, 17998, and 19605); (iii) Vicente

Pérez Acevedo and Corporación Marcaribe Investment (Docket Entry No. 16668); (iv) Antonio

Martin Cervera (Docket Entry No. 16871); (v) Maria Teresita Martin (Docket Entry No. 16872);

(vi) Wanda Ortiz Santiago (Docket Entry Nos. 16939 and 17175); (vii) Nancy I. Negron-Lopez

(Docket Entry No. 16955); (viii) Demetrio Amador Inc. (Docket Entry Nos. 17005 and 18582);

(ix) Suiza Dairy Corp. (Docket Entry Nos. 17013, 17526, 18593, and 19601); (x) Maruz Real

Estate Corp. (Docket Entry No. 17016); (xi) Group Wage Creditors (Docket Entry No. 17021);

(xii) Yashei Rosario (Docket Entry Nos. 17047 and 17116); (xiii) Ana A. Núñez Velázquez

(Docket Entry Nos. 17436, 17438, and 18529); (xiv) Edgardo Marquez Lizardi (Docket Entry

Nos. 18111 and 18249); (xv) Maria M. Ortiz Morales (Docket Entry No. 18396); (xvi) Arthur

Samodovitz (Docket Entry No. 18433); (xvii) Miguel Luna de Jesus (Docket Entry No. 18485);

(xviii) Ismael L. Purcell Soler and Alys Collazo Bougeois (Docket Entry No. 18504); (xix)

Mildred Batista De León (Docket Entry Nos. 18505 and 19010); (xx) Javier Alejandrino Osorio

(Docket Entry Nos. 18506 and 19008); (xxi) Service Employees International Union (Docket

Entry No. 18511 and 19349); (xxii) Mapfre PRAICO Insurance Company (Docket Entry Nos.

18512 and 18513); (xxiii) certain creditors who filed actions in the United States District Court

for the District of Puerto Rico (Docket Entry No. 18535); (xxiv) Med Centro, Inc. (Docket Entry

No. 18538); (xxv) Asociación de Jubilados de la Judicatura de Puerto Rico (Docket Entry Nos.

18548 and 18549); (xxvi) Cooperativa de Ahorro y Crédito Vegabajeña (Docket Entry No.

18551); (xxvii) International Union, UAW (Docket Entry No. 18558); (xxviii) Maruz Real Estate

Corp. (Docket Entry No. 18563); (xxix) LORTU-TA Ltd, Inc., La Cuarterola, Inc., Juaza, Inc.,

and the Conjugal Partnership Composed of Juan Zalduondo Viera and Magdalena Machicote

Ramery (Docket Entry No. 18564); (xxx) Sucn. De Frank Torres Ortiz & Aurea Rodriguez

(Docket Entry No. 18565); (xxxi) Finca Matilde, Inc. (Docket Entry No. 18566 and 19608);

(xxxii) the University of Puerto Rico Retirement System Trust (Docket Entry No. 18573);

(xxxiii) Peter C. Hein (Docket Entry No. 18575); (xxxiv) Miriam E. Lima Colón, Betzaida

Feliciano Concepción, and Angel L. Méndez González (Docket Entry No. 18583); (xxxv)

Asociatión de Maestros Puerto Rico and Asociación de Maestros de Puerto Rico-Local Sindical

(Docket Entry No. 18585) (the "AMPR Objection"); (xxxvi) the Underwriter Defendants

(Docket Entry No. 18587); (xxxvii) certain credit unions (Docket Entry No. 18594); (xxxviii)

Community Health Foundation of P.R. Inc. (Docket Entry No. 18604); (xxxix) Quest

Diagnostics of Puerto Rico, Inc. (Docket Entry No. 18560); (xl) U.S. Bank Trust Association and U.S. Bank National Association (Docket Entry Nos. 18631 and 18634); and (xli) Nilsa Candelario (Docket Entry No. 18663); (xlii) Jorge Rafael Eduardo Collazo Quinones (Docket Entry No. 19311), (xliii) El Ojo de Agua Development, Inc. (Docket Entry No. 19610); (xliv) Demetrio Amador Inc. (Docket Entry No. 19611); and (xlv) Maruz Real Estate Corp. (Docket Entry No. 19612).  In addition, the Debtors have received letters in opposition to confirmation of the Plan, which were not filed with the Court, from: (a) Luiz Roldan Ruiz; (b) Antonia Medina Rodriquez; and (c) Aida Iris Santiago Torres.  The Court received numerous letters regarding the confirmation motion and the Plan, which were filed on the docket with Notices of Correspondence.

Reservations of rights or limited objections raising discrete issues but generally supporting the Plan were filed by the following parties: (i) the Ad Hoc Group of FGIC Noteholders (Docket Entry No. 17001); (ii) AAFAF (Docket Entry Nos. 17202 and 18592);[8] (iii) Vaquería Tres Monjitas, Inc. (Docket Entry No. 18637); (iv) the Constitutional Debt Group, GO Group, LCDC, and QTCB Group (Docket Entry No. 18453); (v) Ambac (Docket Entry No. 18479); (vi) the Internal Revenue Service (Docket Entry No. 18567); (vii) certain ERS bondholders (Docket Entry No. 18569); (viii) Bank of New York Mellon (Docket Entry No. 18588); (ix) the Creditors' Committee (Docket Entry No. 18589 and 19609); and (x) the University of Puerto Rico Retirement System Trust (Docket Entry No. 19048.)

Further, submissions in opposition to the proposed confirmation order (Docket Entry No. 18447) were filed by the following parties: (i) Peter C. Hein (Docket Entry No.

---

[8]     AAFAF's additional limited objection to confirmation of the Plan, Docket Entry No. 18742, was withdrawn prior to the Confirmation Hearing.  (Docket Entry No. 19109.)

18647); (ii) Suiza Dairy Corp. (Docket Entry No. 18651 and 19602); (iii) Finca Matilde, Inc.

(Docket Entry No. 18670); and (iv) AAFAF (Docket Entry No. 18742 and 19495).[9]  Oppositions

to the revised proposed confirmation orders (Docket Entry Nos. 19061, 19118, 19188, 19325,

19368, and 19571) were filed by the following parties: (a) International Union, United

Automobile, Aerospace and Agricultural Implement Workers of America and Service

Employees International Union (Docket Entry Nos. 19162, 19204 and 19349);[10] (b) PFZ

Properties, Inc. (Docket Entry Nos. 19212 and 19597); (c) Finca Matilde, Inc. (Docket Entry

Nos. 19214 and 19608); (d) Peter C. Hein (Docket Entry Nos. 19218, 19446, and 19599); (e)

certain credit unions (Docket Entry No. 19221); (f) Demetrio Amador, Inc. (Docket Entry No.

19228); (g) Suiza Dairy Corp. (Docket Entry Nos. 19279 and 19398); and (h) AAFAF (Docket

Entry No. 19319.)

        Reservations of rights with respect to the proposed confirmation orders were filed

by the following parties: (i) Assured (Docket Entry Nos. 18645 and 19217); (ii) the Creditors'

Committee (Docket Entry Nos. 18658 and 19225); (iii) Bank of New York Mellon (Docket

Entry No. 18662); (iv) the Retiree Committee (Docket Entry Nos. 18679 and 19248) (v) Ambac

(Docket Entry No. 18694); and (vi) the Ad Hoc Group of Constitutional Debtholders, the Ad

Hoc Group of General Obligation Bondholders, the LCDC, and the QTCB Noteholder Group

---

[9]     "DRA Parties" means AmeriNational Community Services, LLC, as servicer for the
GDB Debt Recovery Authority, and Cantor-Katz Collateral Monitor LLC, which serves
as the collateral monitor for Wilmington Trust, N.A.  The DRA Parties' objections to
confirmation of the Plan, Docket Entry Nos. 18590 and 18636, and objection to the initial
proposed confirmation order, Docket Entry No. 18685, were withdrawn prior to the
Confirmation Hearing.  (Docket Entry No. 19121.)

[10]    International Union, United Automobile, Aerospace and Agricultural Implement Workers
of America and Service Employees International Union's objections to the proposed
confirmation order were partially withdrawn after the Confirmation Hearing.  (Docket
Entry No. 19349.)

(Docket Entry No. 19281).  A statement in response to the proposed confirmation order was filed

by the International Union, UAW and Service Employees International Union (Docket Entry No.

19388).  The Court has also received and reviewed carefully submissions in connection with

each version of the Oversight Boards' submissions in connection with its Proposed Findings of

Facts and Conclusion of Law (Docket Entry Nos. 18739, 19366, 19427, and 19570.)

Statements in support of confirmation of the Plan were filed by the following

parties: (i) the Retiree Committee (Docket Entry No. 18562); (ii) National (Docket Entry No.

18574); (iii) Assured (Docket Entry No. 18584); (iv) FGIC (Docket Entry No. 18595); (v)

Ambac (Docket Entry No. 18601); and (vi) the Puerto Rico Funds (Docket Entry No. 18848.)[11]

---

[11]   The Puerto Rico Funds are: GNMA & US Government Target Maturity Fund for Puerto
Rico Residents, Inc. (f/k/a Puerto Rico GNMA & U.S. Government Target Maturity
Fund, Inc.), Mortgage-Backed & US Government Securities Fund for Puerto Rico
Residents, Inc. (f/k/a Puerto Rico Mortgage-Backed & U.S. Government Securities Fund,
Inc.), Puerto Rico Residents Bond Fund I (f/k/a Puerto Rico Investors Bond Fund I),
Puerto Rico Residents Tax-Free Fund, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund,
Inc.), Puerto Rico Residents Tax-Free Fund II, Inc. (f/k/a Puerto Rico Investors Tax-Free
Fund II), Inc., Puerto Rico Residents Tax-Free Fund III, Inc. (f/k/a Puerto Rico Investors
Tax-Free Fund III, Inc.), Puerto Rico Residents Tax-Free Fund IV, Inc. (f/k/a Puerto Rico
Investors Tax-Free Fund IV, Inc.), Puerto Rico Residents Tax-Free Fund V, Inc. (f/k/a
Puerto Rico Investors Tax-Free Fund V, Inc.), Puerto Rico Residents Tax-Free Fund VI,
Inc. (f/k/a Puerto Rico Investors Tax-Free Fund VI, Inc.), Tax-Free Fixed Income Fund
for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund, Inc.), Tax-Free
Fixed Income Fund II for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income
Fund II, Inc.), Tax-Free Fixed Income Fund III for Puerto Rico Residents, Inc. (Puerto
Rico Fixed Income Fund III, Inc.), Tax-Free Fixed Income Fund IV for Puerto Rico
Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund IV, Inc.), Tax-Free Fixed Income
Fund V for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund V, Inc.),
Tax-Free Fixed Income Fund VI for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed
Income Fund VI, Inc.), Tax Free Fund for Puerto Rico Residents, Inc. (f/k/a Tax-Free
Puerto Rico Fund, Inc.), Tax Free Fund II for Puerto Rico Residents, Inc. (f/k/a Tax-Free
Puerto Rico Fund II, Inc.), Tax-Free High Grade Portfolio Bond Fund for Puerto Rico
Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Bond Fund, Inc.), Tax-Free High Grade
Portfolio Bond Fund II for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio
Bond Fund II, Inc.), Tax-Free High Grade Portfolio Target Maturity Fund for Puerto Rico
Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Target Maturity Fund, Inc.), Tax Free

Further, pursuant to the *Urgent Motion of the Financial Oversight and Management Board of Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021* (Docket Entry No. 19002), the Oversight Board requested Court approval of certain rulings related to Act 53-2021 ("Act 53") in connection with confirmation of the Plan.  Oppositions to such rulings were filed by the following parties: (i) Asociación Puertorriqueña de la Judicatura, Inc. (Docket Entry No. 19161); (ii) Asociación de Jubilados de la Judicatura de Puerto Rico and Hon. Hector Urgell Cuebas, Former Judge of the Puerto Rico Court of Appeals (Docket Entry No. 19175); (iii) Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc. (Docket Entry No. 19180); (iv) Asociación de Maestros de Puerto Rico and Asociacón de Maestros de Puerto Rico-Local Sindical (Docket Entry No. 19181); and (v) Maria A. Clemente Rosa (Docket Entry No. 19254).  A joinder in support of the Oversight Board's requested rulings was filed by the LCDC (Docket Entry No. 19252.)

Further, pursuant to the *Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et. al.* (Docket Entry No. 19517), the Oversight Board filed a *Response of the Financial Oversight and Management Board in Accordance with Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et. al.* (Docket Entry No. 19567.)

---

Target Maturity Fund for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Target Maturity Fund, Inc.), and UBS IRA Select Growth & Income Puerto Rico Fund.

Responses were filed by the following parties: (i) International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Service Employees International Union (Docket Entry No. 19586); (ii) PFZ Properties, Inc. (Docket Entry No. 19597); (iii) Peter Hein (Docket Entry Nos. 19599 and 19616), (iv) Cooperativa de Ahorro y Crédito Vegabajeña (Docket Entry No. 19600); (v) Suiza Dairy Corp. (Docket Entry No. 19603); (vi) Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc. (Docket Entry No. 19606) (the "Teachers' Associations Sup. Obj."); (vii) AAFAF (Docket Entry No. 19607); (viii) Finca Matilde, Inc. (Docket Entry No. 19608); (ix) El Ojo de Agua Development, Inc. (Docket Entry No. 19610); (x) Demetrio Amador Inc. (Docket Entry No. 19611); and (xi) Maruz Real Estate Corp. (Docket Entry No. 19612.)

The Court heard argument and statements by members of the public, and received evidence, in connection with confirmation of the Plan at a hearing held on November 8, 9, 10, 12, 15, 17, 22, and 23, 2021 (the "Confirmation Hearing").[12]  The Court has carefully considered the Plan, as well as the supporting and opposing submissions, and the witness testimony and voluminous briefing and written evidence submitted by the parties.  The Court has also reviewed and carefully considered hundreds of letters and email messages submitted by members of the public and listened carefully to the oral remarks made on the record at the Confirmation Hearing by members of the public.

---

[12]    Following the Confirmation Hearing, the Court also considered and reserved decision on approval of the *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Infrastructure Financing Authority* (Docket Entry No. 1 Ex. A in Case No. 21-1492) and *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Convention Center District Authority* (Docket Entry No. 1 Ex A in Case No. 21-1493.)

On January [xx], 2022, the Court entered its *Order Regarding Plan Modifications Necessary to the Entry of an Order Confirming Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (the "January Order").  In response, the Oversight Board filed the Plan.

For the following reasons, the Plan is hereby confirmed and any remaining objections are overruled except to the extent expressly stated herein.  For the avoidance of doubt, to the extent that a particular objection or issue is not specifically addressed in these Findings of Fact and Conclusions of Law, it has been considered thoroughly and is overruled.  The overruled objections, and the Oversight Board's positions as to the proper scope of preemption and the proper treatment of Eminent Domain/Inverse Condemnation Claims are preserved for appeal.

The Court turns now to its analysis and decision on the motion for confirmation of the plan of adjustment that the Oversight Board has proposed for the Commonwealth of Puerto Rico, the Employees Retirement System and the Public Buildings Authority, and the reasons for that decision.

## Findings of Fact and Conclusions of Law

1.      <u>Findings and Conclusions</u>.  What follows constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and section 310 of PROMESA.  To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such.  Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of the Findings of Fact and Conclusions of Law set forth herein or the Plan.

2.      <u>Jurisdiction</u>.  This Court has exclusive jurisdiction over the Title III Cases

pursuant to PROMESA section 306(a).  Venue is proper before this Court pursuant to

PROMESA section 307(a).  Pursuant to section 306(b) of PROMESA, upon commencement of

the Title III Cases, the Title III Court exercised, and continues to exercise, exclusive jurisdiction

over all property of the Debtors, wherever located.  To the extent necessary, pursuant to

PROMESA section 305, the Oversight Board has granted consent to, and the Plan provides for,

this Court's exercise of jurisdiction over the property and revenues of the Debtors as necessary to

approve and authorize the implementation of the Findings of Fact and Conclusions of Law and

the Plan.

3.      <u>Judicial Notice</u>.  The Court takes judicial notice of the dockets of the Title III

Cases, the appellate court dockets of any and all appeals taken from any order entered or opinion

issued by the Court in the Title III Cases, and the following litigation and adversary proceedings,

each as defined in the Plan, including all pleadings and other documents filed, all orders entered,

and all evidence and arguments made, proffered, or adduced at hearings related thereto: (a) the

Ambac Action, (b) the Appointments Related Litigation, (c) the Clawback Actions, (d) the ERS

Litigation, (e) the ERS Recovery Actions, (f) the ERS Takings Action, (g) the FGIC Action, (h)

the Gracia Gracia CW Action, (i) the Gracia Gracia Federal Action, (j) the Lift Stay Motions, (k)

the Med Center Litigation, (l) the Med DC Action, (m) the National Action, (n) the PBA

Litigation, (o) the PRIFA BANs Litigation, (p) the SCC Action, (q) the Uniformity Litigation, (r)

the Invalidity Actions, (s) the Lien Challenge Actions, (t) the Debt Related Objections, and (u)

the Avoidance Actions listed in Exhibits A and B to the Plan.

4.      <u>Burden of Proof</u>.  The Debtors have the burden of proving satisfaction of the

requirements of section 314 of PROMESA and, to the extent applicable to consideration of

confirmation of the Plan, Rule 9019 of the Bankruptcy Rules, by a preponderance of the

evidence.  As explained below, the Plan, which has been amended to incorporate the Debtors'

Alternative Full-Payment Proposal (defined below) for Eminent Domain/Inverse Condemnation

Claims to the extent they are Allowed Claims for just compensation, meets the applicable

requirements of section 314 of PROMESA and, to the extent applicable to consideration of

confirmation of the Plan, Bankruptcy Rule 9019.

## General Background

### I.  The Oversight Board and Title III Cases

5.      For more than a decade, Puerto Rico has faced an unprecedented fiscal and

economic crisis.  Actions taken in the past caused Puerto Rico to lose access to capital markets

and precipitated the collapse of Puerto Rico's public finance system.  (See PROMESA §

405(m).)  These actions accelerated the contraction of Puerto Rico's economy and increased the

out-migration of its residents.  (See Murray Decl. Ex. A ¶¶ 20-22.)[13]  The situation has been

further exacerbated by the devastation caused to Puerto Rico by Hurricanes Irma and Maria in

---

[13]     Consistent with the investigative authority granted to the Oversight Board by section 104
of PROMESA, the Oversight Board commissioned a report on the origins of the
Commonwealth's financial crisis.  The report was prepared by Kobre & Kim LLP, and it
was published on the Oversight Board's website on August 20, 2018.  (See Docket Entry
No. 3774.)  Many residents of Puerto Rico, political leaders, and investors have called for
specific auditing of the bond issues and the application of the proceeds of certain bond
issues and/or prosecution of individuals or entities that may have misapplied bond
proceeds.  Such inquiries could be helpful to Puerto Rico as it grapples with its past and
moves toward the future.  The Court understands, however, that in the context of these
Title III restructuring proceedings the Oversight Board, in its capacity as the Debtors'
representative, has focused on the identification of resources that can be marshaled for
application to outstanding debts, and on reaching agreements to reduce outstanding debts
without extensive further litigation.  Those are reasonable and prudent decisions, and
remedial measures that are not inconsistent with the Plan can be pursued by appropriate
authorities.  As noted above (see supra n.5), confirmation of the Plan does not preclude
further investigations or law enforcement activity with respect to conduct in connection
with the past issuance of debt and application of debt proceeds.

2017, the earthquakes that occurred in early 2020, and the COVID-19 pandemic.  (Jaresko Decl. ¶¶ 20, 22-23.)

6.      On June 30, 2016, the United States enacted PROMESA, and the Oversight Board was established pursuant to section 101(b) of PROMESA.  (Jaresko Decl. ¶ 7.)  Pursuant to section 4 of PROMESA and Article VI of the Constitution of the United States, the provisions of PROMESA prevail over any inconsistent general or specific provisions of territory law, State law, or regulation.  See PROMESA § 4.

7.      On August 31, 2016, President Obama appointed the Oversight Board's original seven voting members.  (Jaresko Decl. ¶ 8.)  The Oversight Board currently has its full complement of seven members.  (Id.)

8.      The Oversight Board designated ERS and PBA as "covered instrumentalities" pursuant to PROMESA Section 101(d).  (Jaresko Decl. ¶ 15.)  The Commonwealth is a "covered territory" pursuant to PROMESA Sections 5(8) and 101(b)(1).

9.      On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA Section 304(a), thereby commencing the Commonwealth Title III Case.  (See Docket Entry No. 1.)

10.     On May 21, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for ERS pursuant to PROMESA Section 304(a), thereby commencing the ERS Title III Case.  (Docket Entry No. 1 in Case No. 17-3566.)

11.     On June 15, 2017, the U.S. Trustee appointed the Creditors' Committee in the Commonwealth Title III Case (Docket Entry No. 338) and, on August 25, 2017, the U.S. Trustee

amended that appointment to provide that the Creditors' Committee would also serve in the ERS

Title III Case (Docket Entry No. 1171).  On June 15, 2017, the U.S. Trustee appointed the

Retiree Committee in the Commonwealth Title III Case.  (Docket Entry No. 340.)

12.     On June 23, 2017, the Court entered an order appointing the Mediation Team, led

by Chief Bankruptcy Judge Barbara Houser.  (Docket Entry No. 430.)

13.     On June 29, 2017, the Court entered an order providing for the joint

administration of the Commonwealth Title III Case and the ERS Title III Case, for procedural

purposes only.  (Docket Entry No. 156 in Case No. 17-3566.)

14.     On September 27, 2019, the Oversight Board issued a restructuring certification,

pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for PBA

pursuant to PROMESA Section 304(a), thereby commencing the PBA Title III Case.  (Docket

Entry No. 1 in Case No. 19-5523.)

15.     On October 9, 2019, the Court entered an order providing for the joint

administration of the PBA Title III Case with the existing Title III Cases.  (Docket Entry No. 13

in Case No. 19-5523.)

**II.  The Plan Support Agreements, Plan, and Disclosure Statement**

16.     The Oversight Board, either directly or through its advisors, engaged in extensive

mediation sessions under the guidance and direction of the Mediation Team, and negotiated

directly with various constituencies, in an effort to build support for the restructuring of, among

other indebtedness, the Commonwealth, ERS, and PBA's debt.  Those negotiations culminated

in certain agreements with various stakeholders in furtherance of the successful implementation

of the Plan.  (Jaresko Decl. ¶ 29; Skeel Decl. ¶ 17; Zelin Decl. ¶ 13; Debtors Exs. 16-19, 23.)

17.     On May 31, 2019, the Oversight Board entered into a plan support agreement (the
"2019 PSA") with certain holders of approximately $3 billion of GO Bond Claims and PBA
Bond Claims regarding the framework of a plan of adjustment to resolve (i) disputes regarding
the validity and related rights of the GO Bonds and PBA Bonds, and (ii) disputes between the
Commonwealth and PBA regarding the characterization of certain purported leases, the amount
of any administrative rent that may be owed by the Commonwealth for the use of PBA facilities
following the commencement of the Commonwealth Title III Case, and the ownership of certain
PBA facilities.  Following entry into the 2019 PSA, the Oversight Board, under the guidance of
the Mediation Team, continued to negotiate with its creditors to generate further consensus
among the parties, including, but not limited to, other holders and insurers of GO Bonds and
PBA Bonds.  (Jaresko Decl. ¶ 30; Skeel Decl. ¶ 18; Zelin Decl. ¶¶ 14-15.)

18.     On June 7, 2019, the Oversight Board (i) reached an agreement with the Retiree
Committee regarding, among other things, the treatment of accrued ERS, JRS, and TRS benefits
pursuant to the Plan, and (ii) entered into the AFSCME Plan Support Agreement regarding,
among other things, return of contributions of all public employees to ERS under the System
2000 plan, and modifications to a collective bargaining agreement and AFSCME's consent to the
treatment of ERS benefits pursuant to the Plan.  (Jaresko Decl. ¶ 31; Santambrogio Decl. ¶ 12;
Skeel Decl. ¶ 19; Debtors Ex. 21.)  The AFSCME Plan Support Agreement provides for
AFSCME's support for modified terms of collective bargaining agreements, along with its
consent to the restructuring of the Commonwealth's pension obligations, pursuant to the Plan.
(Jaresko Decl. ¶ 31; Santambrogio Decl. ¶ 12; Debtors Ex. 21.)

19.     On September 27, 2019, the Debtors filed the Original Plan (as defined below),
containing the material terms outlined in the 2019 PSA.  The Oversight Board thereafter

continued to negotiate with various stakeholders to generate further support for a plan of

adjustment.  On February 9, 2020, the Oversight Board and certain holders of GO Bonds and

PBA Bonds holding over $8 billion in Claims (and, inclusive of Claims held by parties who

executed joinders thereto, over $10 billion), terminated the 2019 PSA, and disclosed they had

reached a global settlement in principle outlined in a plan support agreement (the "2020 PSA").

(Jaresko Decl. ¶¶ 18, 33; Skeel Decl. ¶ 21; Zelin Decl. ¶ 16.)  On February 28, 2020, in

furtherance of the 2020 PSA, the Oversight Board filed the First Amended Plan (as defined

below), a disclosure statement in connection with the First Amended Plan (Docket Entry No.

11947) (the "2020 Disclosure Statement"), and a motion seeking approval of the 2020 Disclosure

Statement (Docket Entry No. 11950).  (Jaresko Decl. ¶ 34.)

20.     On March 10, 2020, the Court entered an order scheduling a hearing to consider

the adequacy of information contained in the 2020 Disclosure Statement and setting related

deadlines.  (Docket Entry No. 12187.)  Shortly thereafter, in response to the COVID-19

pandemic and its effects on the people and economy of Puerto Rico, the Oversight Board filed a

motion (Docket Entry No. 12485) seeking to adjourn the hearing to consider approval of the

2020 Disclosure Statement and related deadlines, which the Court granted on March 27, 2020

(Docket Entry No. 12549).  (Skeel Decl. ¶ 23.)

21.     Following the adjournment, the Oversight Board re-engaged with the parties to

the 2020 PSA and entered into further mediation sessions with the assistance and guidance of the

Mediation Team.  (Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24; Zelin Decl. ¶ 17.)  However, the parties

were unable to reach a consensus and, on October 6, 2020, the PSA Creditors filed a motion

(Docket Entry No. 14478) seeking to impose deadlines for confirmation of a plan of adjustment.

On October 29, 2020, the Court entered the *Order on Joint Motion of PSA Creditors Pursuant to*

*Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan of Adjustment* (Docket Entry No. 14987) (the "Plan Scheduling Order") directing the Oversight Board to file, on or before February 10, 2021, the proposed terms of a plan of adjustment and a motion for approval of a proposed timetable for filing an amended plan and proposed disclosure statement, among other things.  (Id.)

22.     The Oversight Board continued to engage in discussions with the guidance of the Mediation Team and, on February 9, 2021, reached an agreement in principle with the parties to the 2020 PSA regarding the terms of an amended plan of adjustment, subject to execution of a plan support agreement. (Zelin Decl. ¶¶ 20, 22.)  Accordingly, the Oversight Board requested an extension of the February 10, 2021 deadline set forth in the Plan Scheduling Order.  (Docket Entry No. 15821.)  On February 16, 2021, the Court entered the *Order Granting Urgent Motion of the Financial Oversight and Management Board for Puerto Rico Requesting Extension of Deadlines for Submission of Plan of Adjustment or Term Sheet with Respect Thereto* (Docket Entry No. 15849), extending the February 10, 2021 deadline to March 8, 2021.

23.     On February 23, 2021, the Oversight Board announced the termination of the 2020 PSA and the execution of the Initial PSA, dated as of February 22, 2021, among the Oversight Board, as representative of the Debtors, and the Initial GO/PBA PSA Creditors. (Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24; Zelin Decl. ¶ 22; Debtors Ex. 16.)  On March 8, 2021, in furtherance of the Initial PSA, the Oversight Board filed the Second Amended Plan (as defined below) and a disclosure statement in connection with the Second Amended Plan.

24.     Following entry into the Initial PSA, the Oversight Board continued to work to develop additional consensual resolutions and engaged with objecting parties under the guidance of the Mediation Team.  (Jaresko Decl. ¶ 38; Zelin Decl. ¶ 26.)  On March 9, 2021, the Oversight

Board entered into the ERS Stipulation (amended on April 2, 2021) which, among other things, (i) provides a global resolution of disputes regarding the validity and related rights of ERS Bonds and the extent of the alleged liens supporting the obligations thereunder, (ii) resolves the administrative expense claims filed by certain ERS Bondholders, (iii) provides a resolution of disputes regarding certain legal challenges to the Commonwealth's post-petition enactment of a "pay as you go" system for payment of pension benefits to retirees, (iv) provides for the payment of $373 million in cash to the holders of ERS Bonds, as well as the proceeds from the sale of certain ERS assets to the Commonwealth, and (v) provides for the disposition of the ERS Private Equity Portfolio.  (Jaresko Decl. ¶¶ 38-39; Skeel Decl. ¶¶ 26-27; Zelin Decl. ¶ 27; Debtors Ex. 19.)

25.     On May 5, 2021, the Oversight Board entered into the HTA/CCDA Plan Support Agreement with certain holders and insurers of bonds issued by HTA and CCDA which, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the HTA/CCDA Plan Support Agreement, (iv) provides for the bondholders and insurers party thereto to support the Plan, and (v) provides an agreement regarding the structure of a potential plan of adjustment for HTA. (Jaresko Decl. ¶ 40; Skeel Decl. ¶ 28; Zelin Decl. ¶ 34; Debtors Ex. 17.)

26.     On May 11, 2021, in furtherance of the HTA/CCDA Plan Support Agreement, the Debtors filed the Third Amended Plan (as defined below) and a disclosure statement in connection with the Third Amended Plan (Docket Entry No. 16741).  On May 13, 2021, the

Debtors filed a motion seeking approval of such disclosure statement (Docket Entry No. 16756).

On June 29, 2021, the Debtors filed the Fourth Amended Plan (as defined below), reflecting

additional terms negotiated with certain creditors, and a disclosure statement in connection with

the Fourth Amended Plan (Docket Entry No. 17192.)

27.     On July 12, 2021, the Oversight Board (i) entered into the GO/PBA Plan Support

Agreement, which amended and restated the Initial PSA (Jaresko Decl. ¶ 122; Debtors Ex. 16)

and (ii) reached an agreement in principle with the Creditors' Committee, which proposed

recoveries for Classes of unsecured claimholders and resolved the Creditors' Committee's

objections to the Plan, subject to the terms of the Committee Agreement.  (Jaresko Decl. ¶ 41;

Zelin Decl. ¶ 38; Debtors Ex. 23.)  The GO/PBA Plan Support Agreement, together with the

restructuring of COFINA's debt, contemplates the reduction of the Commonwealth's debt

(including principal and interest from restructured COFINA bonds) by approximately 62%, from

$90.4 billion to $34.1 billion.  (Jaresko Decl. ¶ 37; Zelin Decl. ¶ 38.)  The GO/PBA Plan Support

Agreement also (i) provides for a proposed global resolution of disputes regarding the validity

and related rights of GO Bonds that may have been issued in violation of the Puerto Rico

Constitutional debt limit, (ii) provides for the issuance of new bonds and CVIs, along with the

payment of certain amounts in cash, resolving the bondholders' claims against the

Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and PBA,

and (iv) provides for the resolution of disputes regarding the PRIFA BANs pursuant to a

stipulation dated February 22, 2021 (the "PRIFA BANs Stipulation") (Debtors Ex. 22.)  (Jaresko

Decl. ¶ 37.)  Also on July 12, 2021, in furtherance of the GO/PBA Plan Support Agreement, the

Debtors filed the Fifth Amended Plan (as defined below) and a disclosure statement in

connection with the Fifth Amended Plan (Docket Entry No. 17308.)

28.     On July 27, 2021, the Oversight Board entered into the PRIFA Plan Support

Agreement, which, among other things, (i) provides for a global resolution of disputes regarding

the bondholders' rights and alleged property interests in certain allocable "clawed back"

revenues of the Commonwealth, (ii) provides for the issuance of new CVIs, along with the

payment of certain amounts in cash, resolving the bondholders' claims against the

Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other

parties to the PRIFA PSA, (iv) provides for the bondholders and insurers party thereto to support

the Plan, and (v) presents the foundation for a restructuring of the PRIFA Bonds pursuant to Title

VI of PROMESA.  (Jaresko Decl. ¶ 42; Skeel Decl. ¶ 30; Zelin Decl. ¶ 41; Debtors Ex. 18.)

Also on July 27, 2021, in furtherance of the PRIFA Plan Support Agreement, the Debtors filed

the Sixth Amended Plan (as defined below) and a disclosure statement in connection with the

Sixth Amended Plan.  (Docket Entry No. 17516.)

29.     On July 30, 2021, the Debtors filed the Seventh Amended Plan and an updated

disclosure statement in connection with the Seventh Amended Plan (Docket Entry No. 17628)

(the "Disclosure Statement").  (Debtors Ex. 2.)

30.     On August 2, 2021, the Court entered the Disclosure Statement Order which,

among other things (a) approved the Disclosure Statement as containing adequate information

within the meaning of section 1125 of the Bankruptcy Code, (b) established (1) October 19, 2021

at 5:00 p.m. (Atlantic Standard Time) as the Confirmation Objection Deadline, (2) October 4,

2021 at 5:00 p.m. (Atlantic Standard Time) as the deadline by which (i) ballots to accept or reject

the Plan were required to be received by the Solicitation Agent (the "Voting Deadline") and (ii)

elections regarding the form of distributions were required to be effectuated through the

Automated Tender Offer Program ("ATOP") (the "Election Deadline"), and (c) scheduled a

hearing on November 8-10, 12, 15-18, and 22-23, 2021, to consider confirmation of the Plan. (Docket Entry No. 17639.)  On September 27, 2021, the Court entered an order (Docket Entry No. 18258) extending the Voting Deadline to October 18, 2021, at 5:00 p.m. (Atlantic Standard Time) and, on October 1, 2021, the Court entered an order (Docket Entry No. 18360) extending the Election Deadline to October 18, 2021, at 5:00 p.m. (Atlantic Standard Time).

31.     Consistent with the Disclosure Statement Order, the Debtors caused the Solicitation Agent to distribute Solicitation Packages to all holders of Claims entitled to vote. (Mailing Affidavits; Pullo Decl. ¶ 4.)  The Solicitation Packages contained, among other things: (a) the Confirmation Hearing Notice setting forth the time, date, and place of the Confirmation Hearing, (b) the Disclosure Statement Order (without the exhibits thereto) and the Disclosure Statement (together with all exhibits thereto, including the Plan), (c) the appropriate form of Ballot or Notice, if any, with instructions for voting and/or making any applicable election and, as applicable, a pre-addressed, pre-paid return envelope, (d) with respect to Class 51, the Retiree Committee Letter and Information Guide, and (e) with respect to Classes 54, 58, and 66, the Creditors' Committee Letter.  (Id. ¶ 4.)  The Debtors also caused the Solicitation Agent to publish the Confirmation Hearing Notice and place radio advertisements providing, among other things, information regarding the solicitation of votes to accept or reject the Plan and deadlines associated therewith.  (Publication Affidavit; Pullo Decl. ¶ 7.)

32.     The Court now turns to a review of the legal and factual issues raised in connection with the motion to confirm the Plan, beginning with an objection to the constitutionality of PROMESA itself.

## PROMESA's Consistency with the Constitution of the United States[14]

33.     Challenges to PROMESA itself, primarily by bondholder Peter Hein, assert, but fail as a matter of law to show, that PROMESA is unconstitutional.

34.     **The Bankruptcy Clause**:  Objections by pro se claimants Peter Hein (Docket Entry No. 18575) (the "Hein Objection") and Arthur Samodovitz (Docket Entry No. 18433) (the "Samodovitz Objection") assert that PROMESA violates the Bankruptcy Clause of the Constitution of the United States because it is not uniform with Chapter 9, which requires, as a predicate to filing a petition, a showing of insolvency.  (Samodovitz Obj. at 11-12; Hein Obj. at 33-34 (discussing 11 U.S.C. § 109(c)(3)).  See also Nov. 22, 2021, Hr'g Tr. 140:5-21 ("Chapter 9 . . . applies throughout the country, except for Puerto Rico, [and] Chapter 9 requires proof of insolvency. . . .  But in this PROMESA proceeding, proof of insolvency is not being imposed as a requirement for a discharge.").)

35.     PROMESA does not violate the uniformity requirement of the Bankruptcy Clause of the Constitution of the United States, which empowers Congress to "establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. art. I, § 8, cl. 4 (the "Bankruptcy Clause").  U.S. Const., Art. IV, § 3, cl. 2.  The reason for this broad grant of

---

[14]     The Court has received and reviewed the *Notice of Appearance and Request for Service of Papers* (Docket Entry No. 19647), as well as the *Notice of Participation by the United States of America* (Docket Entry No. 19710), filed by the United States Department of Justice, Civil Division, notifying the Court that the United States intends to "participate in the above-captioned proceeding for the purpose of defending the constitutionality of PROMESA as it applies to the proposed approval of the Plan of Adjustment."  (Docket Entry No. 19710 at 2.)  The Court nevertheless proceeds to enter its Findings of Fact and Conclusions of Law because Rule 5.1(c) of the Federal Rules of Civil Procedure provides that "[b]efore the time to intervene expires, the court may reject the constitutional challenge, but may not enter a final judgment holding the statute unconstitutional."  Fed. R. Civ. P. 5.1(c).  That is to say, "[t]he court may reject a constitutional challenge at any time[.]"  Fed. R. Civ. P. 5.1 advisory committee's note.  Because the Court herein rejects constitutional challenges to PROMESA, the Court proceeds accordingly.

authority to Congress is that our Constitution "envisions a federalist structure, with the National

Government exercising limited federal power and other, local governments—usually state

governments—exercising more expansive power." <u>Fin. Oversight & Mgmt. Bd. for P.R. v.

Aurelius Inv., LLC</u>, 140 S. Ct. 1649, 1658 (2020) (hereinafter, "<u>Aurelius</u>").  In legislating with

respect to territories, however, Congress has authority to act like a state legislature, with

sovereign authority unconstrained by certain of the restrictions that limit Congress's authority to

enact laws for the United States "as a political body of states in union." <u>Cincinnati Soap Co. v.

United States</u>, 301 U.S. 308, 323 (1937) ("In dealing with the territories, possessions and

dependencies of the United States, this nation has all the powers of other sovereign nations, and

Congress in legislating is not subject to the same restrictions which are imposed in respect of

laws for the United States considered as a political body of states in union."); <u>Palmore v. United

States</u>, 411 U.S. 389, 397 (1973) ("Not only may statutes of Congress of otherwise nationwide

application be applied to the District of Columbia, but Congress may also exercise all the police

and regulatory powers which a state legislature or municipal government would have in

legislating for state or local purposes.").  Congress's authority to govern territories is "general

and plenary, arising from and incidental to the right to acquire the territory itself, and from the

power given by the constitution to make all needful rules and regulations respecting the territory

or other property belonging to the United States." <u>Late Corp. of the Church of Jesus Christ of

Latter-Day Saints v. United States</u>, 136 U.S. 1, 42 (1890); <u>see Palmore</u>, 411 U.S. at 398 (noting

that Congress's authority to legislate with respect to the District of Columbia "permits it to

legislate for the District in a manner with respect to subjects that would exceed its powers, or at

least would be very unusual, in the context of national legislation enacted under other powers

delegated to it").[15]

36.    Congress unambiguously invoked its Article IV authority when it enacted

PROMESA.  See Aurelius, 140 S. Ct. 1649, 1664-65 ("Congress expressly invoked a

constitutional provision allowing it to make local debt-related law (Article IV).").  The

uniformity requirement is, by the Bankruptcy Clause's plain text, a limitation on a specific

enumerated power within Article I, not a generally applicable limitation that restricts the exercise

of legislative power where it would otherwise be proper under Article IV.  Accordingly, the

Bankruptcy Clause-related objections of Mr. Samodovitz and Mr. Hein are overruled.

37.    **Substantive Due Process and the Ex Post Facto Clause**: Mr. Hein argues that

the retroactive application of PROMESA to pre-enactment debts violates substantive due process

and that the Ex Post Facto Clause prohibits the retroactive application of a statute (such as

PROMESA) to impair his prepetition bonds (Hein Obj. at 17).  The Supreme Court opinion on

which Mr. Hein relies, Eastern Enterprises v. Apfel, 524 U.S. 498, 537-38 (1998), is inapposite

because it does not support the theories Mr. Hein purports to derive from it.  In deciding that the

Coal Industry Retiree Health Benefit Act of 1992 imposed severe retroactive liability on a

limited class of parties that could not have anticipated the liability (and that the liability was

substantially disproportionate to the parties' past experience), thereby violating the Takings

Clause of the Constitution of the United States, 524 U.S. at 528-29, the Supreme Court expressed

---

[15]    Nor would a contrary holding necessarily prove fatal to PROMESA or to this Plan.
Congress expressly provided in the legislation's severability clause (section 3(b) of
PROMESA) that the solution to any uniformity problem would not be to strike down
PROMESA, but rather to extend it to any similarly situated territory, "provided that the
legislature of that territory adopts a resolution signed by the territory's governor
requesting the establishment and organization of a Financial Oversight and Management
Board pursuant to section 101."  48 U.S.C.A. § 2102(b) (Westlaw through P.L. 117-80).

reservations about applying the doctrine of substantive due process to economic legislation and, in light of its determination that a taking had occurred, did not base its decision on the doctrine of substantive due process, 524 U.S. at 537-38, and it likewise declined to extend the Ex Post Facto Clause, which is "directed at the retroactivity of penal legislation," to legislation affecting property and for which the jurisprudence of the Takings Clause is more appropriate, 524 U.S. 533-34. Accordingly, Mr. Hein fails to demonstrate that substantive due process analysis is appropriate, that the Ex Post Facto Clause of the Constitution is applicable to PROMESA, or that PROMESA violates such constitutional principles. See U.S. Const. art. I, § 9, cl. 3. The Court now turns to PROMESA's plan confirmation requirements.

## Compliance with PROMESA Sections 104(j) and 313

38.     The Oversight Board must certify the submission or modification of a plan of adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or modifying such plan of adjustment. See PROMESA § 104(j)(1)-(2). The Oversight Board may certify a plan of adjustment only if it determines, in its sole discretion, that the Plan is consistent with the applicable certified fiscal plan. See id. § 104(j)(3). The Oversight Board, after the issuance of a certification pursuant to PROMESA Section 104(j), may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of PROMESA Title III. See id. § 313. After the Oversight Board files a modification, "the plan as modified becomes the plan." Id.

39.     The Oversight Board has complied with its obligations pursuant to PROMESA Sections 104(j) and 313. On April 23, 2021, the Oversight Board certified the Commonwealth's current fiscal plan, which also covers ERS and PBA (the "Fiscal Plan"). (Jaresko Decl. ¶ 28; Debtors Ex. 10.)

40.     On September 26, 2019, the Oversight Board certified the submission of the *Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18806-5) (the "Certification of the Original Plan").  (Debtors Ex. 122.)  The Oversight Board subsequently filed the *Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al*. (Docket Entry No. 8765) (the "Original Plan").

41.     On February 28, 2020, the Oversight Board certified the modification of the Original Plan (Docket Entry No. 18807-1) (the "Certification of the Amended Plan").  (Debtors Ex. 123.)  The Oversight Board subsequently filed the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 11946) (the "First Amended Plan").

42.     On March 8, 2021, the Oversight Board certified the modification of the First Amended Plan (Docket Entry No. 18807-2) (the "Certification of the Submission of the Second Amended Plan").  (Debtors Ex. 124.)  The Oversight Board subsequently filed the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 15976) (the "Second Amended Plan").

43.     On May 11, 2021, the Oversight Board certified the modification of the Second Amended Plan (Docket Entry No. 18807-3) (the "Certification of the Submission of the Third Amended Plan").  (Debtors Ex. 125.)  The Oversight Board subsequently filed the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 16740) (the "Third Amended Plan").

44.     On June 29, 2021, the Oversight Board certified the modification of the Third Amended Plan (Docket Entry No. 18807-4) (the "Certification of the Submission of the Fourth Amended Plan").  (Debtors Ex. 126.)  The Oversight Board subsequently filed the *Fourth*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket

Entry No. 17194) (the "Fourth Amended Plan").

45.    On July 12, 2021, the Oversight Board certified the modification of the Fourth

Amended Plan and the submission of the *Fifth Amended Title III Joint Plan of Adjustment of the*

*Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17306) (the "Fifth Amended Plan").

(Debtors Ex. 127.)

46.    On July 26, 2021, the Oversight Board certified the modification of the Fifth

Amended Plan and the submission of the *Sixth Amended Title III Joint Plan of Adjustment of the*

*Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17516) (the "Sixth Amended Plan").

(Debtors Ex. 128.)

47.    On July 30, 2021, the Oversight Board certified the modification of the Sixth

Amended Plan (Docket Entry No. 18807-7) (the "Certification of the Submission of the Seventh

Amended Plan").  (Debtors Ex. 129.)  The Oversight Board subsequently filed the *Seventh*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket

Entry No. 17627) (the "Seventh Amended Plan").  (Debtors Ex. 1.)

48.    On November 3, 2021, the Oversight Board certified the modification of the

Seventh Amended Plan (Docket Entry No. 19106-4) (the "Certification of the Submission of

Eighth Amended Plan").  (Debtors Ex. 137.)  The Oversight Board subsequently filed the *Eighth*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket

Entry No. 19053) (the "Eighth Amended Plan").  (Debtors Ex. 136.)

49.    On November 7, 2021, the Oversight Board certified the modification of the

Eighth Amended Plan (Docket Entry No. 19119-2) (the "Certification of the Submission of

Modified Eighth Amended Plan").  (Debtors Ex. 144.)  The Oversight Board subsequently filed

the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19114) (the "First Modified Eighth Amended Plan").  (Debtors Ex. 143.)

50.    On November 12, 2021, the Oversight Board certified the modification of the First Modified Eighth Amended Plan (Docket Entry No. 19327-1) (the "Certification of the Submission of Modifications to the Modified Eighth Amended Plan").  (Debtors Ex. 147.)  The Oversight Board subsequently filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19184) (the "Second Modified Eighth Amended Plan").

51.    On November 21, 2021, the Oversight Board certified the modification of the Second Modified Eighth Amended Plan (Docket Entry No. 19327-2) (the "Certification of the Submission of Additional Modifications to the Modified Eighth Amended Plan").  (Debtors Ex. 148.)  The Oversight Board subsequently filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19323) (the "Third Modified Eighth Amended Plan").  (Debtors Ex. 149.)

52.    On November 24, 2021, the Oversight Board certified the modification of the Third Modified Eighth Amended Plan (Docket Entry No. 19569 Ex. C) (the "Certification of the Submission of the Fourth Modified Eighth Amended Plan").  The Oversight Board subsequently filed, on November 28, 2021, the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19367) (the "Fourth Modified Eighth Amended Plan").  ~~The Oversight Board then filed, on December 20,~~

53.    On December 20, 2021, the Oversight Board certified the modification of the Fourth Modified Eighth Amended Plan (Docket Entry No. 19569 Ex D) (the "Certification of the

Submission of the Fifth Modified Eighth Amended Plan").  The Oversight Board subsequently filed, on December 21, 2021, the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, (Docket Entry No. 19568 in Case No. 17-3283) (the "Fifth Modified Eighth Amended Plan").

53.54.  On ~~December 20, 2021,~~January 14, 2022, the Oversight Board certified the modification of the ~~Fourth~~Fifth Modified Eighth Amended Plan and the submission of the Plan upon a determination, in the Oversight Board's sole discretion, that the Plan was consistent with the Fiscal Plan.  (Docket Entry No. ~~19569 Ex. D) (the~~ 19786 Ex. A) (the "Certification of Consistency with the Fiscal Plan").  Accordingly, the Oversight Board submitted the modification of the ~~Fourth~~Fifth Modified Eighth Amended Plan and the Plan in compliance with section 104(j) of PROMESA.

54.55.  The Oversight Board submitted the Plan in accordance with section 313 of PROMESA.  For the reasons explained herein, the Court confirms the Sixth Modified Eighth Amended Plan and holds that it meets the requirements of PROMESA and that the Oversight Board has complied with all provisions of PROMESA applicable to confirmation of the Plan.

## Compliance with PROMESA Section 314(b)

**A.  PROMESA § 314(b)(1):** *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301.*

55.56.  As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the Debtors as the proponents.  (Plan at 1.)  In addition, as detailed below, the Plan satisfies the requirements of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5), 1123(b), and 1123(d) of the Bankruptcy Code.

### i.  Bankruptcy Code Section 1122(a)

56.57.  With the exception of Administrative Expense Claims and Professional Claims,

which need not be classified, Article IV of the Plan designates the classification of Claims.  The

Plan's classification of Claims complies with section 1122(a) of the Bankruptcy Code because

each Class contains only claims that are either all unsecured Claims or are all secured Claims

secured by the same collateral, or are otherwise substantially similar to the other claims in the

class.  (Jaresko Decl. ¶ 47.)  The Plan designates the following sixty-nine (69) Classes of Claims:

| Claim | Class | Debtor(s) |
|---|---|---|
| Vintage PBA Bond Claims | Class 1 | PBA |
| Vintage PBA Bond Claims (Assured) | Class 2 | PBA |
| Vintage PBA Bond Claims (National) | Class 3 | PBA |
| Vintage PBA Bond Claims (Ambac) | Class 4 | PBA |
| Vintage PBA Bond Claims (FGIC) | Class 5 | PBA |
| Vintage PBA Bond Claims (Syncora) | Class 6 | PBA |
| Retail Vintage PBA Bond Claims | Class 7 | PBA |
| 2011 PBA Bond Claims | Class 8 | PBA |
| Retail 2011 PBA Bond Claims | Class 9 | PBA |
| 2012 PBA Bond Claims | Class 10 | PBA |
| Retail 2012 PBA Bond Claims | Class 11 | PBA |
| PBA/DRA Secured Claim | Class 12 | PBA |
| PBA General Unsecured Claims | Class 13 | PBA |
| PBA/DRA Unsecured Claim | Class 14 | PBA |
| Vintage CW Bond Claims | Class 15 | Commonwealth |
| Retail Vintage CW Bond Claims | Class 16 | Commonwealth |
| Vintage CW Bond Claims (Assured) | Class 17 | Commonwealth |
| Vintage CW Bond Claims (National) | Class 18 | Commonwealth |
| Vintage CW Bond Claims (Ambac) | Class 19 | Commonwealth |
| Vintage CW Bond Claims (FGIC) | Class 20 | Commonwealth |
| Vintage CW Bond Claims (Syncora) | Class 21 | Commonwealth |
| Vintage CW Bond Claims (Taxable Election) | Class 22 | Commonwealth |
| Vintage CW Guarantee Bond Claims | Class 23 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Assured) | Class 24 | Commonwealth |

| Claim | Class | Debtor(s) |
|-------|-------|-----------|
| Vintage CW Guarantee Bond Claims (National) | Class 25 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Ambac) | Class 26 | Commonwealth |
| Vintage CW Guarantee Bond Claims (FGIC) | Class 27 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Syncora) | Class 28 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 29 | Commonwealth |
| 2011 CW Bond Claims | Class 30 | Commonwealth |
| Retail 2011 CW Bond Claims | Class 31 | Commonwealth |
| 2011 CW Bond Claims (Assured) | Class 32 | Commonwealth |
| 2011 CW Bond Claims (Taxable Election) | Class 33 | Commonwealth |
| 2011 CW Guarantee Bond Claims | Class 34 | Commonwealth |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 35 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims | Class 36 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Assured) | Class 37 | Commonwealth |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 38 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 39 | Commonwealth |
| 2012 CW Bond Claims | Class 40 | Commonwealth |
| Retail 2012 CW Bond Claims | Class 41 | Commonwealth |
| 2012 CW Bond Claims (Assured) | Class 42 | Commonwealth |
| 2012 CW Bond Claims (Taxable Election) | Class 43 | Commonwealth |
| 2012 CW Guarantee Bond Claims | Class 44 | Commonwealth |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 45 | Commonwealth |
| 2014 CW Bond Claims | Class 46 | Commonwealth |
| Retail 2014 CW Bond Claims | Class 47 | Commonwealth |
| 2014 CW Bond Claims (Taxable Election) | Class 48 | Commonwealth |
| 2014 CW Guarantee Bond Claims | Class 49 | Commonwealth |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 50 | Commonwealth |
| Retired ERS Participant Below-Threshold Claims | Class 51A | Commonwealth |

| Claim | Class | Debtor(s) |
|---|---|---|
| Retired JRS Participant Below-Threshold Claims | Class 51B | Commonwealth |
| Retired TRS Participant Below-Threshold Claims | Class 51C | Commonwealth |
| Retired ERS Participant Above-Threshold Claims | Class 51D | Commonwealth |
| Retired JRS Participant Above-Threshold Claims | Class 51E | Commonwealth |
| Retired TRS Participant Above-Threshold Claims | Class 51F | Commonwealth |
| Active ERS Participant Claims | Class 51G | Commonwealth |
| Active JRS Participant Claims | Class 51H | Commonwealth |
| Active TRS Participant Claims | Class 51I | Commonwealth |
| System 2000 Participant Claims | Class 51J | Commonwealth |
| VTP Payroll Participant Below-Threshold Claims | Class 51K | Commonwealth |
| VTP Payroll Participant Above-Threshold Claims | Class 51L | Commonwealth |
| AFSCME Claims | Class 52 | Commonwealth |
| Dairy Producer Claims | Class 53 | Commonwealth |
| Eminent Domain/Inverse Condemnation Claims | Class 54 | Commonwealth |
| Energy Incentive Claims | Class 55 | Commonwealth |
| Med Center Claims | Class 56 | Commonwealth |
| Tax Credit Claims | Class 57 | Commonwealth |
| CW General Unsecured Claims | Class 58 | Commonwealth |
| GDB/PET Claim | Class 58A | Commonwealth |
| CW/HTA Claims | Class 59 | Commonwealth |
| CW/Convention Center Claims | Class 60 | Commonwealth |
| CW/PRIFA Rum Tax Claims | Class 61 | Commonwealth |
| CW/MBA Claims | Class 62 | Commonwealth |
| CW Appropriations Claims | Class 63 | Commonwealth |
| Section 510(b) Subordinated Claims | Class 64 | Commonwealth, ERS, and PBA |
| ERS Bond Claims | Class 65 | ERS |
| ERS General Unsecured Claims | Class 66 | ERS |

| Claim | Class | Debtor(s) |
|---|---|---|
| Gracia-Gracia Claims | Class 67 | Commonwealth |
| Convenience Claims | Class 68 | Commonwealth and ERS |
| Federal Claims | Class 69 | Commonwealth |

(Jaresko Decl. ¶ 47.)

57.58.  The classification of Claims set forth in the Plan is reasonable and was not done

to control the outcome of voting to accept or reject the Plan, as the classification is based upon

differences in the legal nature and/or priority of such Claims in accordance with applicable law.

To the extent unsecured Claims are separately classified from the Commonwealth's general

unsecured claims (Class 58),[16] it is not to gerrymander an accepting Class, as proven by there

being several impaired accepting Classes for each Debtor.  Rather, separate classification is used

for governmental or business reasons usually requiring different treatment of separate Classes'

Claims.  (Jaresko Decl. ¶ 48.)

58.59.  All holders of Claims in Classes 1-11 hold PBA Bonds and allege the same

guarantee against the Commonwealth, but are separately classified based on three factors: the

year in which the bonds were issued; whether the bonds are insured and, if so, the insurer; and

whether the bondholder is a retail investor.  Classification depending on year of issuance is based

on differences in the risk profile associated with each issuance potentially having violated the

debt service limit set forth in Article VI, section 2 of the Commonwealth Constitution, with the

treatment of Classes varying based on how much risk of disallowance of the Claims existed for

---

[16]     Class 58A consists of the GDB/PET Claim, which will receive payments from the
Commonwealth equal to, and on the same timeframe as, the pro rata payments to be
made to holders of Allowed CW General Unsecured Claims (Class 58) pursuant to the
Plan.  (Plan § 62.4.)

each Class.  Holders of insured bonds issued the same year are separately classified because the

insurance agreements provide bondholders different rights.  Claims of Retail Investors are

separately classified because such Claims are smaller in dollar amount and the holders' rights

differ from those of holders of GO Bonds and PBA Bonds who are parties to the GO/PBA Plan

Support Agreement, and holders of bonds insured by the Monolines.  Thus, the holders of Claims

in Classes 1-11 are classified by whether the PBA Bonds they hold: (a) were issued prior to 2011

and are (i) uninsured (Class 1), (ii) uninsured and held by a Retail Investor (Class 7), (iii) insured

by Assured (Class 2), National (Class 3), Ambac (Class 4), FGIC (Class 5), or Syncora (Class 6);

(b) were issued in 2011 and are (i) uninsured (Class 8), or (ii) uninsured and held by a Retail

Investor (Class 9); or (c) were issued in 2012 and are (i) uninsured (Class 10), or (ii) uninsured

and held by a Retail Investor (Class 11).  (Jaresko Decl. ¶ 48.)

59.60.   Bond Claims against the Commonwealth in Classes 15-50 are classified

separately based on the date of bond issuance, whether the bonds are insured and, if so, the

insurer, and whether the bondholder is a retail investor as follows: (a) whether the bonds were

issued prior to March 2011 (Classes 15-29), March or later in 2011 (Classes 30-39), in 2012

(Classes 40-45), or 2014 (Classes 46-50), and (b) whether the bonds are (i) uninsured (Classes

15, 23, 30, 34, 36, 40, 44, 46, and 49) and held by Retail Investors (Classes 16, 31, 38, 41, and

47), or (ii) insured by Assured (Classes 17, 24, 32, and 42), National (Classes 18 and 25), Ambac

(Classes 19 and 26), FGIC (Classes 20 and 27), or Syncora (Classes 21 and 28).  (Jaresko Decl. ¶

49.)

60.61.   Based on the elections offered pursuant to the Plan, certain Vintage CW Bond

Claims, Vintage CW Guarantee Bond Claims, 2011 CW Bond Claims, 2011 CW Guarantee

Bond Claims, 2011 CW Series D/E/PIB Bond Claims, 2012 CW Bond Claims, 2014 CW Bond

Claims, and 2014 CW Guarantee Bond Claims, to the extent elections were made, were shifted

to other Classes (Classes 22, 29, 33, 35 39, 43, 48, and 50, respectively) to denote the election

made by holders of such Claims to receive taxable distributions on account of their bonds, and

the alternative form of distribution elected.  (Jaresko Decl. ¶ 49.)  Only Puerto Rico Investors

could elect to receive taxable bonds because, unlike mainland U.S. investors, Puerto Rico

Investors are generally not subject to U.S. federal income taxation.  (Brownstein Decl. ¶ 16.)

When Puerto Rico Investors elect taxable treatment, it increases the likelihood that a greater

amount of tax-exempt bonds will be available for mainland U.S. bondholders.  (Id.)  The taxable

election for on-island bondholders benefits mainland U.S. bondholders because, as a result of on-

island bondholders taking the taxable election, mainland investors receive a higher amount of

tax-exempt bonds affording a greater after-tax gain.[17]  (See Nov. 12, 2021, Hr'g Tr. 112:5-15.)

61. 62.  Active and retired employees holding pension Claims comprise Classes 51A-51L.

The services that are and have been performed by these current and retired employees are

integral to the basic provision of governmental services to the Commonwealth's residents and

the Government could not function without them.  Moreover, the best interests of the

Commonwealth and all of its stakeholders are served by ensuring that pensioners receive

monthly benefits to maintain the ability to support themselves without requiring additional future

support from the Commonwealth.  These pension Claims are further classified separately based

---

[17]     On cross-examination, the Debtors' witness, David M. Brownstein, Managing Director in
the Municipal Finance Department at Citigroup Global Markets Inc., testified that an
individual mainland bondholder in a 35 percent tax bracket would benefit by a 14 percent
after-tax gain: "Clearly, if you're a taxpayer who pays state and local taxes, you're higher
than that, but in a 35 percent tax bracket, you, as an U.S. holder, mainland holder of these
bonds, for the 49 million in bonds that the local on-island holders took taxable instead of
you, you have a 14 percent after-tax gain.  That is what was provided to you by giving the
on-island investors the right to elect taxable bonds, which meant that your portfolio
would have a higher amount of tax exempt bonds."  (Nov. 12, 2021, Hr'g Tr. 112:8-15.)

on whether the pensioners (a) are retired (Classes 51A-F, K, and L) or active (Classes 51G-J), (b) are participants in ERS (Classes 51A, 51D, and 51G), JRS (Classes 51B, 51E, and 51H), TRS (Classes 51C, 51F, and 51I), System 2000 (51J), or participated in a voluntary termination program (Classes 51K and 51L), because each program had different funding sources as of the Commonwealth Petition Date, with different levels of underfunding, and (c) receive total monthly pension benefits above (Classes 51D-F and 51L) or below (Classes 51A-C and 51K) $1,500.[18]  (Jaresko Decl. ¶¶ 50-51.)

62.63.  The separate classification of Claims for retirement benefits from the claims of other creditors is justified.  Unlike the Claims of commercial creditors, who contracted to be paid a fixed sum at a fixed time, retirees agreed to defer their compensation with the expectation that the deferred compensation, i.e., their pension, would be paid in periodic payments over the balance of their life (and that of any surviving spouse), based on formulas established when they worked for the Commonwealth or other governmental entities.  Accordingly, the Plan proposes to make payments to retirees over the life of the retiree and any eligible spouse through the PayGo system and specified statutory rules established before the Commonwealth's Title III case began, as modified pursuant to the Plan, including through the "freeze" of TRS and JRS and elimination of cost of living adjustments ("COLAs").

63.64.  Claims held by AFSCME, related to certain collective bargaining agreements between AFSCME affiliates and the Commonwealth that will occur pursuant to the Plan, are classified in Class 52, separately from general unsecured claims.  The separate classification is

---

[18]    As set forth below, in light of the passage of Act 53 and modifications to the proposed plan after the classes were established and votes were solicited, the Plan was modified to remove the Monthly Benefit Modification feature of the Seventh Amended Plan, and the $1,500 threshold no longer affects the treatment of pensioners' claims.

necessary because the treatment of these claims is the result of the adoption of a new collective bargaining agreement.  This treatment is inapplicable to other Classes of unsecured Claims and it is beneficial to the Commonwealth and all its stakeholders to provide such treatment as opposed to the potential litigation and treatment of any rejection damages Claims relating to these collective bargaining agreements.  AFSCME and its local affiliates collectively constitute one of Puerto Rico's primary public employee unions and an important bargaining unit whose members provide the Commonwealth's public services.  (Jaresko Decl. ¶ 52.)  Separate classification of these Claims is reasonable, justified, and supported by a governmental purpose.  The Plan provides that all other collective bargaining agreements are neither being rejected nor assumed.

64.65.  The Claims held by Suiza Dairy, Inc. and Vaqueria Tres Monjitas, Inc.—the Commonwealth's primary producers and sources of dairy for the population—are classified separately in Class 53, which rejected the Plan.  The Plan may nonetheless be confirmed pursuant to Bankruptcy Code section 1129(b)(2)(B) because no Claims junior to the Claims in Class 53 receive or retain any property and there is no contention the Plan unfairly discriminates against Class 53.  Moreover, if there were such a contention it would be overruled because the Allowed Claims in Class 53 receive more than CW General Unsecured Claims in Class 58.  The separate classification of these unsecured claims is justified by the particular importance of the milk industry in Puerto Rico.  It is very costly and difficult for Puerto Rico to consistently import dairy, which has a short shelf life—a fact underscoring the importance of the domestic dairy industry to the Commonwealth and its residents.  Dairy production is one of the key issues of food security on the Island.  The dairy industry also is one of the Commonwealth's largest agricultural industries and employs a significant number of Puerto Rico's residents.  It is reasonable and justified to classify such dairy producers' Claims separately and provide such

Class with a fifty percent (50%) recovery,[19] ensuring that such integral Claimants do not suffer further financial hardship and impair an industry that is vital to the health of the Commonwealth's citizens. (Jaresko Decl. ¶ 53.) Further, the dairy producers' claims arose from the prepetition Dairy Producer Settlement (see Jaresko Decl. ¶ 53; Plan §§ 1.190, 1.191; Debtors Ex. 26 (the "Dairy Producer Settlement")), and the Commonwealth obligation to pay certain fees to protect consumers (see Debtors Ex. 26 ¶ 14). Accordingly, the separate classification of claims held by large dairy producers is reasonable, justified, and supported by a governmental purpose.

65.66. Eminent Domain/Inverse Condemnation Claims (as that term is defined in section 1.212 of the Plan) are separately classified in Class 54 of the Plan. The holders of such Claims assert that they hold prepetition constitutional Claims based on seizures or the inverse condemnation of real property pursuant to the Commonwealth's eminent domain power. The Debtors allege that the Eminent Domain Claims are partially secured by funds deposited by the Commonwealth with the Clerk of the Court of First Instance in connection with condemnation proceedings underlying such Claims in accordance with Puerto Rico law, 32 L.P.R.A. § 2907. In accordance with applicable Puerto Rico law, upon commencement of a condemnation proceeding, title to a subject property is transferred to the Commonwealth and funds on deposit become available to the former title holder.[20] 32 L.P.R.A. § 2907. The Fifth Modified Eighth Amended Plan filed with the Court on December 21, 2021 (Docket Entry No. 19568) treats the

---

[19]     The objection of Suiza Dairy is discussed and resolved infra, at paragraphs 175-77.

[20]     If the Commonwealth does not initiate a condemnation proceeding following applicable eminent domain procedures, or if the taking is the result of the diminution of the property's use or value resulting from government conduct, the former owner of property may initiate a claim for inverse condemnation for the taking of property for public use without just compensation. See, e.g., Filler v. United States, 116 Fed. Cl. 123, 127 n.2 (Fed. Cl. 2014).

Eminent Domain/Inverse Condemnation Claims as secured Claims to the extent the Claims are

allowable and there is cash on deposit for them.  It further provides that the Eminent

Domain/Inverse Condemnation Claims will be treated as Class 58 CW General Unsecured

Claims entitled to the same treatment as other holders of CW General Unsecured Claims to the

extent each allowable Claim exceeds the cash on deposit for it (Jaresko Decl. ¶ 54.)  That

proposed Plan further provides, however, that if the Court determines that such Claims must be

paid in full to the extent they are Allowed Claims for just compensation, they will be so paid.

(See Fifth Modified Eighth Amended Plan §§ 58.1, 77.1(e) (the "Alternative Full-Payment

Proposal").)  The claimants, opposing the proposed treatment of their claims as partially secured

and partially unsecured (or, in the case of Inverse Condemnation claimants, entirely unsecured),

dispute the classification of any portion of their claims as general unsecured claims and argue

that, even to the extent their claims are unsecured, they are nonetheless entitled to payment in

full of their allowable unsecured Claims because the Claims are based on the Fifth Amendment

of the U.S. Constitution.  The issue presented by the Fifth Modified Eighth Amended Plan and

the pertinent objections is whether the Eminent Domain/Inverse Condemnation claimants are

entitled to have the unsecured portions of their Claims (i.e., those portions that the Debtors do

not already propose to pay in full) designated as nondischargeable or otherwise required to be

paid in full.  The Eminent Domain/Inverse Condemnation Claims are prepetition Claims arising

from the Commonwealth's alleged taking of title to the claimants' real properties, or deprivation

of the claimants of use of such properties, prior to commencement of the Commonwealth Title

III case.  It is undisputed that the Fifth Modified Eighth Amended Plan does not currently except

the Eminent Domain/Inverse Condemnation Claims from discharge.  The Debtors and claimants

disagree as to whether the Court can and should except them from discharge.  Because the Fifth

Amendment of the U.S. Constitution provides "private property [shall not] be taken for public

use, without just compensation," the claimants assert Congress lacks power to legislate the

discharge of the Eminent Domain/Inverse Condemnation Claims for less than payment in full of

just compensation.  Conversely, the Debtors contend that article I, section 8, clause 4 of the U.S.

Constitution, which grants Congress the power to pass uniform laws on the subject of

bankruptcies, empowers Congress to provide for the discharge of such claims for less than

payment in full as Debtors have done in the Fifth Modified Eighth Amended Plan.  As set forth

more fully below, the Court concludes that the Eminent Domain/Inverse Condemnation Claims

identified in Class 54 are not subject to impairment and discharge.  Accordingly, the Class 54

claimants' and inverse condemnation claimants' assertions that their Claims should be paid in

full or deemed nondischargeable are sustained and such Allowed Claims must be paid in

accordance with Debtors' Alternative Full-Payment Proposal in connection with Eminent

Domain/Inverse Condemnation Claims (as set forth in Docket Entry No. 19568 §§ 58.1, 77.1(e)).

The Court's January Order conditioned entry of this FFCL on the Debtors' revision of the Plan to

incorporate the treatment of Allowed Eminent Domain/Inverse Condemnation Claims as set

forth in the Alternative Full-Payment Proposal.

66.67.  Claims in Class 55 arise from, or relate to, the Energy Incentive Act, which

provides tax incentives for citizens who undertake certain clean-energy projects to reduce their

household's energy use.  Pursuant to the Plan, such Claims are not paid in cash or other monies

in the Debtors' Title III Cases, but rather, are satisfied through reductions in tax revenue.

(Jaresko Decl. ¶ 55.)  It is in the Commonwealth's best interests to promote the reasonable

governmental purpose of supporting residents who are taking steps to address climate change

and who took those steps in reliance upon the availability of such tax deductions under the

Energy Incentive Act.  Accordingly, separate classification of such Claims is reasonable and justified.

67.68.  Class 56 consists of all Claims of certain federally qualified health centers arising from or relating to the Medicaid Act.  Separate classification of such Claims is reasonable and justified because such Claims are held by entities that provide critical medical treatment to Commonwealth residents, particularly in a global pandemic, and are payable through Medicare/Medicaid funds from the federal government that are earmarked for the payment of such claims and not available to other general unsecured claimholders.  Separate classification of such Class and enhanced treatment on account of its Claims through the receipt of a fifty percent (50%) recovery is reasonable and justified to support such critical services and ensure that medical providers on the Island are not underfunded.  (Jaresko Decl. ¶ 56.)  42 U.S.C. § 1396a(bb).  Class 56 also exempts the litigation styled Rio Grande Cmty. Health Ctr. Inc., et al. v. Commonwealth of Puerto Rico, et al., Case No. 03-1640 (GAG), currently pending in the United States District Court for the District of Puerto Rico, from dismissal under section 60.2 of the Plan, and provides separate treatment for the manner in which that litigation shall be pursued and resolved by the parties thereto.  (Plan § 60.2.)

68.69.  Class 57 consists of Claims (other than Energy Incentive Claims) relating to refunds or credits for the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, or an economic incentive law, in each case resulting in income tax credits, deductions, or carryforwards.  Such Tax Credit Claims were designed and implemented by the Government of the Commonwealth to incentivize certain behavior and to benefit the Commonwealth and support the economy as a whole.  Pursuant to the Plan, such Claims are not paid in cash or other monies in the Debtors' Title III Cases, but rather, are

satisfied through reductions in tax revenue.  (Jaresko Decl. ¶ 57.)  Accordingly, it is reasonable

and in the best interests of the Commonwealth and its economy to continue to honor such tax

incentives upon which residents and local businesses have relied, and to separately classify such

Claims.

69.70.   Class 63 consists of Claims arising from or related to indebtedness only payable

from appropriations of the Commonwealth Legislature.  Such claimants, significantly, have

fewer rights than holders of CW General Unsecured Claims, as they have no ability to compel

payment of their Claims and hold only contingent rights to payment to the extent appropriated by

the Government of the Commonwealth.  (Jaresko Decl. ¶ 58.)  It is therefore reasonable and

appropriate to separately classify such claims.

70.71.   Class 64 consists of Claims determined pursuant to a Final Order to be subject to

section 510(b) of the Bankruptcy Code.  (Jaresko Decl. ¶ 59.)  Section 510(b) of the Bankruptcy

Code subordinates such Claims to other general unsecured claims, and provides that such Claims

are only eligible to receive a recovery pursuant to the Plan once all other unsecured creditors

have been paid in full.  Because these Claims have a lower priority than general unsecured

claims, they are sufficiently dissimilar to general unsecured claims to warrant separate

classification and treatment.

71.72.   As each Class contains Claims substantially similar to each other, the Plan

satisfies the requirements of section 1122(a) of the Bankruptcy Code.[21]

---

[21]     Mapfre PRAICO Insurance Company ("Mapfre PRAICO") contends that the Plan
violates section 1122(a) because it places Mapfre PRAICO's claims against the
Commonwealth and against PBA into Class 58 and Class 13, respectively,
notwithstanding Mapfre PRAICO's assertion that those claims are secured.  The
Confirmation Order, however, provides that, to the extent Mapfre PRAICO's claims are
determined to be secured claims, they will be unimpaired and not subject to treatment as
general unsecured claims.  See Confirmation Order ¶ 86 ("Notwithstanding anything

72.73.  The Plan separately classifies Claims not similarly situated to other Claims based upon differences in the legal nature and/or priority of such Claims or because they are asserted against a different Debtor than other Claims with the same priority, including secured and unsecured Claims against PBA (Classes 12-14), CW/HTA Claims (Class 59), CW/Convention Center Claims (Class 60), CW/PRIFA Rum Tax Claims (Class 61), CW/MBA Claims (Class 62), ERS Bond Claims and ERS General Unsecured Claims (Classes 65 and 66), Gracia Gracia Claims (Class 67), and Federal Claims (Class 69).

### ii.  Bankruptcy Code Section 1122(b)

73.74.  Class 68 consists of Convenience Claims, comprising Claims equal to or less than $20,000, or Claims which the holder elects to reduce to $20,000 pursuant to the Plan.  (Plan § 1.162.)  Any holder of multiple Claims in an aggregate amount of $40,000 or more may elect to reduce all such Claims to an aggregate amount of $40,000 and be treated within Class 68.  (Plan §-1.163, art. LXXII.)  The separate classification of Convenience Claims is reasonable and necessary to ease the administrative burden on the Debtors.  (See Jaresko Decl. ¶ 60.)

74.75.  The Plan satisfies the requirements of section 1122(b) of the Bankruptcy Code.

---

contained in the Plan to the contrary, to the extent that the Claim of a surety against any of the Debtors is determined to be a secured claim and allowed in whole or in part, by Final Order, or by operation of section 502(a) of the Bankruptcy Code following the expiration of the period to object to any such Claim in accordance with the provisions of Section 82.1 of the Plan, such Claim shall be paid in full, in Cash; provided, however, that, in the event some or all of any such Claim is determined to be an unsecured claim and allowed in whole or in part, by Final Order, such Claim shall be treated in accordance with the provisions of Section 17.1, 62.1 or 70.1 of the Plan, as the case may be.").)  Accordingly, as modified by the Confirmation Order, to the extent that Mapfre PRAICO's claims are determined to be secured claims, such claims will not be treated as general unsecured claims.  Mapfre PRAICO has not objected to the treatment that would be provided by paragraph 86 of the Confirmation Order.  Moreover, the classification did not affect voting because any separate, unimpaired class of secured claims would have been deemed to accept the Plan, see 11 U.S.C. § 1126(f), and Class 13 and Class 58 did not vote to accept the Plan.

### iii. Bankruptcy Code Section 1123(a)(1)

75.76. Section 4.1 of the Plan designates sixty-nine (69) separate Classes of Claims for the Debtors, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code.

76.77. The Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### iv. Bankruptcy Code Section 1123(a)(2)

77.78. Section 84.1 of the Plan specifies that Claims in Classes 1 through 50, 51B, 51E, 51G through 51I, 52 through 54,53, 56, 58 through 62, 65, 66 and 69 are impaired. Section 84.2 of the Plan specifies that Claims in Classes 51A, 51C, 51D, 51F, 51J through 51L, 54, 55, 57, 67, and 68 are unimpaired.

78.79. Insofar as the Plan has been modified to exclude Class 54 from the list of impaired Classes and add it to the list of unimpaired Classes the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### v. Bankruptcy Code Section 1123(a)(3)

79.80. Articles V through LIV, sections 55.2, 55.5, 55.7 through 55.9, articles LVI through LVII, LX, LXII through LXVI, LXIX, LXX and LXXIII of the Plan identify the treatment of each Class of Claims impaired by the Plan. Sections 62.2 and 62.3 have been revised to remove any reference to Eminent Domain Claims from the category of CW General Unsecured Claims and treatment thereunder.

80.81. The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### vi. Bankruptcy Code Section 1123(a)(4)

81.82. Articles V through LXXIII of the Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the

extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim. (Jaresko Decl. ¶ 65.)

82.83.   Mr. Hein objects to the payment of certain costs and fees to some, but not all bondholders, arguing that such payments render the treatment of the bondholders' respective claims different, violating section 1123(a)(4) of the Bankruptcy Code.  Consummation Costs, Restriction Fees, or Retail Support Fees are being paid to certain parties pursuant to the Plan and in accordance with the plan support agreements negotiated by the Oversight Board.  (See Zelin Decl. ¶¶ 80, 84, 85; Debtors Exs. 16, 17.)  Hein's objection is unfounded because these costs are not awarded on account of the creditors' Claims but, rather, as consideration for the creditors' actions in facilitating the settlements embodied in the Plan.  (See Nov. 10, 2021, Hr'g Tr. 63:24-64:5, 72:23-73:6; Zelin Decl. ¶ 78; Jaresko Decl. ¶ 66.)  Commitments to pay Consummation Costs and Restriction Fees were essential to incentivize parties to engage in continued negotiations over an extended period of time, and incentivize parties to the plan support agreements to support confirmation of the Plan.  (Zelin Decl. ¶ 91.)  Without such fees, building consensus and encouraging parties to engage in negotiations and ultimately document their agreements would have been significantly more difficult, and Plan confirmation would have been less likely or substantially prolonged.  (Id. ¶¶ 91-92.)  The Oversight Board has determined that it is fair and reasonable for the PSA Creditors to be paid Consummation Costs as consideration for their efforts in assisting in the formulation of the Plan that has garnered significant creditor support, and to compensate the PSA Creditors for fees and expenses incurred in connection with the negotiation and execution of the GO/PBA PSA and HTA/CCDA PSA. (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 80, 84, 88, 91-93; Debtors Exs. 16, 17.)  During the lengthy and complex negotiation process led by the Mediation Team, PSA Creditors agreed to various

conditions and covenants set forth in plan support agreements, including, among other things, a

pledge to support the Plan, the imposition of restrictions on the transfer of their bonds, and a

waiver of their right to seek reimbursement of expenses through other means.  (Zelin Decl. ¶ 93,

Debtors Exs. 16, 17.)  The Consummation Costs are not paid on account of creditors' Claims.

(See Jaresko Decl. ¶ 66.)  Rather, the Consummation Costs are paid to reimburse expenses

incurred in negotiating plan support agreements that enabled the Plan to move forward.  (See

Nov. 10, 2021, Hr'g Tr. 63:24-64:5; Zelin Decl. ¶¶ 80, 84, 88, 92.)  Thus, the Oversight Board

has determined, and this Court finds that, the 1.5% Consummation Cost expense is reasonable.

(Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 91-93; Nov. 10, 2021, Hr'g Tr. 91:17-25.)

83.84.  Additionally, in exchange for agreeing to support the Plan and tender or "lock

up," as applicable, the parties' bonds in accordance with each of the GO/PBA PSA and

HTA/CCDA PSA, it is fair and reasonable to make PSA Restriction Fees available to holders of

bonds issued by such entities.  (Zelin Decl. ¶¶ 80, 84, 85, 89, 91-93; Jaresko Decl. ¶¶ 127, 178.)

Similarly, in exchange for executing the ERS Stipulation and agreeing to all of its terms and

conditions, including agreeing to support the Plan and "lock up" their ERS Bonds in connection

with the ERS Stipulation, it is fair and reasonable to make an ERS Restriction Fee available to

each ERS bondholder party to the ERS Stipulation.  (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 83, 91-

93; Debtors Ex. 19.)

84.85.  As a product of the negotiations culminating in the GO/PBA PSA, a similar Retail

Support Fee (i.e., a form of "restriction fee") will be available to Retail Investors who did not

tender and exchange their bonds to join the GO/PBA PSA.  (Zelin Decl. ¶¶ 81, 82; Debtors Ex.

16.)  The Oversight Board determined that providing Retail Investors an opportunity to receive

similar payments is fair and reasonable, and balances the interests of various creditor

constituencies.  (Jaresko Decl. ¶¶ 128, 216.)  Moreover, the Oversight Board has agreed to

provide bondholders with an additional opportunity to certify that they are Retail Investors and

receive their Pro Rata Share of the GO/PBA Restriction Fee Percentage.  (See Nov. 22, 2021,

Hr'g Tr. 44:1-45:4.)  The Retail Support Fee payments are reasonable and appropriate, and will

not be paid on account of Claims.

~~85.~~86.   The provisions for payment of Consummation Costs, Restriction Fees, and Retail

Support Fees are critical components of the plan support agreements that made development of

the Plan possible.  (See Jaresko Decl. ¶ 66.)  The payment of Consummation Costs, Restriction

Fees, and Retail Support Fees to certain parties does not violate section 1123(a)(4) of the

Bankruptcy Code, which mandates that "a plan shall . . . provide the same treatment for each

claim or interest of a particular class . . . ." 11 U.S.C.A. § 1123(a)(4) (Westlaw through P.L. 117-

80).  While it is true that all claims must be treated equally, the same is not true for all claimants.

See 7 Collier on Bankruptcy ¶ 1123.01 (16th ed. 2021) ("The equality addressed by section

1123(a)(4) extends only to the treatment of members of the same class of claims and interests,

and not to the plan's overall treatment of the creditors holding such claims or interests . . . .

Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'");

see also Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody

Energy Corp.), 582 B.R. 771, 781 (E.D. Mo. 2017) (same); In re Adelphia Commc'ns Corp., 368

B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) ("[C]ourts have held that the statute does not require

identical treatment for all class members in all respects under a plan, and that the requirements of

section 1123(a)(4) apply only to a plan's treatment on account of particular claims or interests in

a specific class—not the treatment that members of the class may separately receive under a plan

on account of the class members' other rights or contributions.") (emphasis in original).

Accordingly, the payment of these fees is consistent with section 1123(a)(4) of the Bankruptcy

Code and the Hein and Samodovitz objections on this ground are overruled.[22]

### vii. Bankruptcy Code Section 1123(a)(5)

~~86.~~87.   Various provisions of the Plan provide adequate and proper means for its

implementation:

- Article III provides for the payment of Administrative Expense Claims required to be paid on the Effective Date;

- Section 74.1 provides for the issuance and distribution of the New GO Bonds;

- Section 74.2 provides for the issuance and distribution of the CVIs;

- Section 74.5 ensures the feasibility of the Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated";

- Section 76.1 provides, subject to Sections 76.5, 76.7, and 76.10 of the Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Effective Date, shall be rejected by the Debtors as of the Effective Date, except for any Executory Contract or Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2

---

[22]   Mr. Hein and Mr. Samodovitz further contend that Retail Investor bondholders should also be entitled to the 1.5% Consummation Cost in addition to a Retail Support Fee. While Mr. Hein and Mr. Samodovitz assert that they should be accorded a larger payment under the plan support agreements, they do not argue that their Claims have been treated differently (or impaired) as a result of the payment of a Consummation Cost to certain PSA creditors, and the Court finds that there is no such prohibited differential treatment by reason of the payment of Consummation Costs.  Rather, as explained above, Consummation Costs are not awarded on account of the individual creditors' Claims. (Zelin Decl. ¶ 78; Jaresko Decl. ¶ 66.)   As noted above, section 1123(a)(4) of the Bankruptcy Code does not require identical treatment of all claimants.

L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Government of the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party) . . . .";

- Article LXXVII provides for distributions to be made to holders of all Allowed Claims under the Plan;

- Article LXXVIII provides for the Avoidance Actions Trust Assets to vest in the Avoidance Actions Trust, to be administered by the Avoidance Actions Trustee, and provides for the semi-annual distribution of liquidated Avoidance Actions Trust Assets to the beneficiaries thereof;

- Section 81.2 vests in the Disbursing Agent, among other things, the power and authority to make distributions contemplated by the Plan;

- Article LXXXII provides for the Debtors to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

- Article LXXXIII provides for the funding and administration of the Pension Reserve Trust under the Plan;

- Article LXXXVIII provides that, "[o]n the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule";

- Section 92.1 provides for the re-vesting of assets: "Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order)";

- Articles II and LXIX provide for the sale of all ERS assets to the Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private Equity Portfolio; and

- Articles VI through XV provide for approximately $1.1 billion to be paid by the Commonwealth to holders of PBA Bond Claims in satisfaction of their claims.

(See Jaresko Decl. ¶ 67; Shah Decl. ¶ 59; see generally Plan.)

87.88.   The Plan Supplement contains, among other things, the forms of (a) the New GO Bond Trust Agreement, (b) the CVI Trust Agreement, (c) the Avoidance Actions Trust Agreement, (d) the ERS Trust Agreement, (e) the Schedule of Executory Contracts and Unexpired Leases to be Assumed, (f) the Supplemental Ambac Election Notice, (g) the Assured Custodial Trust Documents, (h) the FGIC Custodial Trust Agreement, (i) Act 53-2021, and (j) the Pension Reserve Trust Guidelines (each as defined in the Plan Supplement).  (See generally Plan Sup.)  The Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.

88.89.   The Confirmation Order further provides adequate means for the Plan's implementation including, but not limited to, paragraph 62 thereof which provides: "Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in

whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living

adjustments for government employees; provided, however, that the Governor and Legislature,

subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from

this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes,

(iii) the reasons why the requested changes will not create a risk of the financial distress caused

by the Commonwealth's prior defined benefit plans, under which the Commonwealth and other

governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the

means of funding the requested changes and reasons why there is little risk of such funding not

being carried out, (v) the reasons why the requested changes will not create a material risk of

defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why

the defined contribution plans are insufficient and defined benefit plans are both prudent and

required; and, provided, however, that, prior to the termination of the Oversight Board, the

Oversight Board shall not reduce any defined benefit pension payment or obligation to current or

future retirees from the benefits provided by the Plan."  (Confirmation Ord. ¶ 62.)  This

provision is appropriate and necessary for the implementation and feasibility of the Plan.[23]

---

[23]  Section 1142(b) of the Bankruptcy Code provides that the "court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan."  11 U.S.C. § 1142(b); see In re Riverside Nursing Home, 137 B.R. 134, 138 (Bankr. S.D.N.Y. 1992) ("Subsection (b) of § 1142 expressly authorizes the court to direct a recalcitrant debtor or other party to perform acts necessary to consummate the plan. . . . [A] court may direct a confirmed debtor to retain professional management, order payments to creditors from specific accounts and direct that funds be held so as to implement the plan."); In re Coral Air, Inc., 21 V.I. 7, 12 (D.V.I. 1984) (noting that section 1142(b) permits a court "to enter appropriate orders to enforce the intent and specific provisions of the plan").  The Debtors have proffered evidence that the Commonwealth's pension obligations have been and, absent modification, would continue to be a significant source of debt for Puerto Rico (Jaresko Decl. ¶ 15), and that provisions that conflict with the treatment of retirees put forth in the

89.90.  The Court's conclusion under Bankruptcy Code section 1123(a)(5), made

applicable by PROMESA section 301(a), that there are adequate means to implement the Plan

rests on, among other things, Act 53 (Debtors Ex. 134), which authorizes the new debt to be

issued pursuant to the Plan with the support of the full faith and credit of the Commonwealth, as

long as the Plan does not include Monthly Benefit Modifications to pension payments.  (See

generally id.)  The freezes in the accruals of pension benefits and the elimination of cost of living

adjustments do not affect the authorization of the new debt.  The plain and unambiguous terms of

the statute provide that the debt authorization in Act 53 is conditioned only on the Plan's removal

of the Monthly Benefit Modification provision that was included in the proposed Seventh

Amended Plan, and Act 53 does not require satisfaction of any other conditions to the

authorization of new debt, such as removal of Plan provisions concerning (a) the elimination of

---

Plan may undermine the goals of PROMESA and the feasibility of the Plan. (See Jaresko
Decl. ¶ 235; see also Jaresko Sup. Decl. ¶ 13 (discussing similar need to ensure
consistency between treatment of retirees in Plan with respect to the Freeze and COLAs
to protect Plan's feasibility).)  The record adequately demonstrates that the "freeze" of
certain defined benefit obligations is essential to the Plan's feasibility, and the prohibition
of the re-creation or enhancement of existing defined benefit plans is therefore a
necessary and appropriate means to ensure the viability of the Plan and implement the
discharge of the Commonwealth's prepetition pension obligations.  (See Malhotra Sup.
Decl. ¶¶ 16-21.)

Although early versions of the Plan and proposed confirmation order did not include the
provision restricting the re-creation or enhancement of existing defined benefit plans (the
"DB Increase Restriction"), parties in interest have been given adequate notice of the
relief sought with respect to pension programs, including Plan provisions affecting future
rights under existing pension plans (in particular, the defined benefit "freeze" and the
restriction on cost of living adjustments), and of this request for a restriction on the
government's power to restore defined benefit arrangements.  The DB Increase
Restriction is a restriction on the exercise of governmental powers, not an impairment of
existing vested rights held by any person.  Accordingly, the notice provided is sufficient
under the circumstances.  The inclusion of the provision in the proposed confirmation
order thus will not violate the due process rights of retirement plan participants who did
not receive individualized notice of the Debtors' intention to request that the provision be
included in the Plan and the Confirmation Order.

cost of living adjustments and/or (b) the freeze or termination of accrual of defined benefits

under TRS or JRS from and after the Effective Date.[24]  The Plan cancels and eliminates the

Monthly Benefit Modification previously included in the proposed Seventh Amended Plan,

thereby satisfying the condition in Act 53 for authorization of the new debt to be issued pursuant

to the Plan.  (See, e.g., Plan § 55.7(a).)  Accordingly, Act 53 provides adequate means for

implementation of the Plan.  In this connection, the Court also concludes that PROMESA's

preemption provisions and Title III's debt adjustment and plan confirmation provisions are

---

[24]      Courts "interpret a Puerto Rico statute according to its plain meaning." Santiago-Ramos
v. Centennial P.R. Wireless Corp., 217 F.3d 46, 59 (1st Cir. 2000).  "We first determine
whether the statutory language is unambiguous.  In the absence of ambiguity, we
generally do not look beyond the plain meaning of the statutory language." Herman v.
Hector I. Nieves Transp., Inc., 244 F.3d 32, 34 (1st Cir. 2001) (citations omitted).  Here,
article 104 of Act 53 declares that it is the public policy of Puerto Rico "to protect the
accrued pensions of its public servants."   Article 104 provides that, "[t]herefore, with
regard to the accrued pensions of government employees, it is hereby provided as
follows: The Legislative Assembly authorizes the issuance of the General Obligation
Bonds and CVIs subject to the FOMB filing an amended Plan for confirmation by the
Title III Court that eliminates the Monthly Benefit Modification."  Article 605 of Act 53
further provides that "[t]he effectiveness of [Act 53] is conditioned to the FOMB filing an
amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit
Modification as defined in the Plan."  These operative provisions establish that the
conditions put in place by Act 53 concern the protection of accrued pension rights and, in
particular, the elimination of the Monthly Benefit Modification from the Plan.  No
language in Act 53 indicates a legislative intent to preclude the defined benefit accrual
"freeze" or the elimination of COLAs, each of which operates prospectively and does not
affect accrued pension rights.  Notwithstanding arguments to the contrary that were
raised in certain objections, Article 104's references to protecting "accrued pensions of . .
. public servants" and "the pensions of all of our retirees" confirm that Act 53's
conditions are met by a Plan that affects only the accrual of future pension benefits rather
than those already earned.  Article 605's references to "reductions to . . . pensions" and
"[z]ero cuts to pensions" arise in the context of a provision that expressly provides
"clarity" to prior provisions and does not establish additional conditions.  Like the
reference to "avoid[ing] any cut of pensions" in Article 603, those phrases are merely
restatements of the policy of protecting accrued pension rights announced in Article 104
of Act 53, and they are consistent with the sufficiency of a plan that eliminates a cut to
accrued current monthly pension payments and precludes further defined benefit accruals
and cost of living increases to those monthly benefits.

sufficient to enable the Commonwealth to implement the defined benefit and COLA freeze

provisions of the Plan without further legislative action.  The Court's Confirmation Order, which

provides detailed terms for the implementation of the defined benefit and COLA freeze aspects

of the Plan, approves the freezes, which are economic measures consistent with the fiscal plan

and within the scope of the Oversight Board's powers under PROMESA.  The Plan and

Confirmation Order are enforceable against the Commonwealth, its officials and other interested

parties, and any Commonwealth law provisions contrary to their terms are preempted.

90.91.  The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy

Code.[25]

### viii.    Bankruptcy Code Section 1123(b)(1)

91.92.  Article LXXXIV of the Plan identifies which Classes of Claims are impaired and

which Classes of Claims are left unimpaired.  Article LXXXIV has been modified to reflect that

Class 54 is unimpaired rather than impaired.

92.93.  The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### ix.  Bankruptcy Code Section 1123(b)(2)

93.94.  Subject to section 76.10 of the Plan, section 76.1 of the Plan provides that, as of

the Effective Date, all Executory Contracts and Unexpired Leases to which any Debtor is a party

are rejected, "except for any Executory Contract or Unexpired Lease (a) that has been assumed

---

[25]    The Asociación de Maestros Puerto Rico and the Asociación de Maestros de Puerto Rico-
Local Sindical (together, "AMPR") contend that the accrual of post-Effective Date
benefits and cost of living adjustments cannot be preempted by the Plan or rejected by the
Debtors.  AMPR does not, however, dispute that the Supreme Court of Puerto Rico has
characterized such obligations as contractual in nature.  (See, e.g., AMPR Obj. ¶¶ 2, 21
(citing Asociación de Maestros de P.R. v. Sistema de Retiro para Maestros de P.R., 190
DPR 854 (P.R. 2014)).)   Such rights are therefore ultimately subject to impairment and
discharge like other general unsecured obligations.

and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective

Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to

the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto

Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto

Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been

approved by the Oversight Board or authorized by the Title III Court unless specifically

designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of

its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive

agreement between the Commonwealth of Puerto Rico and rum producers with respect to rum

excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico

agencies, departments, municipalities, public corporations, or instrumentalities (other than leases

to which PBA is a party); provided, however, that the Debtors reserve the right to amend, on or

prior to the Effective Date, such schedules to delete any Executory Contract and Unexpired

Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event

such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be,

either rejected, assumed, or assumed and assigned as of the Effective Date."  (Plan § 76.1; see

also Plan Sup. Ex. E.)

94.95.   The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

### x.   Bankruptcy Code Section 1123(b)(3)(A)

95.96.   The Plan incorporates, among other things, the settlements and compromises set

forth in the AFSCME Plan Support Agreement (Debtors Ex. 21), the GO/PBA Plan Support

Agreement (Debtors Ex. 16), the HTA/CCDA Plan Support Agreement (Debtors Ex. 17), the

PRIFA Plan Support Agreement (Debtors Ex. 18), the Retiree Committee Plan Support

Agreement (Debtors Ex. 20), the Committee Agreement (Debtors Ex. 23), the ERS Stipulation
(Debtors Ex. 19), the PRIFA BANs Stipulation (Debtors Ex. 22), and the *Stipulation in
Connection with DRA Related Disputes* (Docket Entry No. 19100 Ex. A) (Debtors Ex. 146).
Further, the Plan sets forth the terms and conditions for a global compromise and integrated
settlement of, among other issues, asserted and unasserted disputes concerning the rights of
holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond
Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum
Tax Claims, and PRIFA BANs, including the disputes: (a) set forth in the Debt Related
Objections challenging, among other things, the validity, priority, secured status and related
rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW
Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA
Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity
Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond
Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues
historically conditionally appropriated to CCDA, HTA, MBA, and PRIFA, as applicable, and
"clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth
Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the
GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS
Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the
resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation
(ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the
PBA Property, between the Commonwealth and PBA and the claims that PBA may assert
against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift

Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the

CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs

Litigation.  (Jaresko Decl. ¶¶ 71, 114-87.)  The Plan also incorporates the terms of a global

settlement and compromise of all pending disputes involving the DRA Parties.  (See Docket

Entry No. 19100, ¶¶ 9-12.)  As explained in the paragraphs that follow, such settlements and

compromises are in the best interests of the Debtors and their creditors, and within the range of

reasonableness.  (Murray Decl. Ex. A ¶¶ 119-136; Zelin Decl. ¶¶ 13, 24, 29, 36, 43; Jaresko

Decl. ¶¶ 201-16; Skeel Decl. ¶¶ 32-46.)

96.97.  Each of the plan support agreements was reached following months of

negotiations directed by the Mediation Team and/or other informal discussions that included

party representatives, legal and financial advisors, and involved vigorous debate and discussion

on both sides.  (Zelin Decl. ¶¶ 18-20, 21-22, 26-28, 32-33, 38, 40-41; Jaresko Decl. ¶¶ 202-16.)

Those negotiations were conducted at arms' length and in good faith.  (Id.; Skeel Decl. ¶ 33;

Jaresko Decl. ¶ 202.)  The litigation resolved by the plan support agreements involves

extraordinarily complex, high-stake disputes and, because these are the first Title III cases

litigated under PROMESA, novel legal issues.  Collectively, billions of dollars were at stake.

(Jaresko Decl. ¶ 203.)  The consequence of the GO Bondholders prevailing on their priority

argument, or the HTA, PRIFA, or CCDA bondholders prevailing on their property interest

contentions, would have inflicted grave harm on the Commonwealth and its residents because

the Commonwealth, in either situation, would have lost control of billions of dollars of revenues

needed to sustain the Commonwealth.  This would have prevented the Oversight Board from

developing fiscal plans and budgets necessary to carry out its statutory mission.  A small risk of a

negative and grave outcome was imprudent to undertake once settlement was possible on the

terms in the Plan.  (Skeel Decl. ¶ 34; Jaresko Decl. ¶¶ 203-13.)  The settlements embodied in the

Plan also avoid the uncertainty, delay, and significant expense that would result from continued

litigation.  (Skeel Decl. ¶ 44; Jaresko Decl. ¶ 214.)

97.98.   The Plan is the result of extensive arms' length negotiations among the

Government Parties and significant creditor constituencies, including the PSA Creditors, each of

which was represented by sophisticated counsel, and the compromises and settlements among

the Government Parties and various PSA Creditors form the very foundation of the Plan.  In the

absence of such compromises and settlements, the Debtors' emergence from Title III would

likely be significantly delayed by further litigation and burdened by additional expense, which

could impair the Debtors' ability to successfully adjust their debts, thereby prejudicing recovery

for all creditors and raising further uncertainties regarding the Debtors' financial condition.  (See

Jaresko Decl. ¶¶ 81-82, 201-04, 214-215; Skeel Decl. ¶¶ 43-46.)

98.99.   Each of the compromises and settlements incorporated into the Plan (a) is made in

good faith, furthers the policies and purposes of PROMESA, and is fair, equitable, and

reasonable; (b) is in the best interests of the Debtors, their creditors, and all other affected

Persons with respect to the Claims, Causes of Action, and other matters resolved by such

compromises and settlements; (c) is within the range of reasonable results if the issues were

litigated; (d) falls above the lowest point in the range of reasonableness; and (e) meets the

standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy

Rule 9019(a), and other applicable law.  Further, the Plan will fairly and consensually resolve

numerous pending adversary proceedings and appeals, each of which raises difficult and

complex issues.  The Plan thus incorporates a complex series of compromises and settlements

that resolve the most significant potential obstacles to confirmation of a plan of adjustment.  (See

Skeel Decl. ¶¶ 33-34; Jaresko Decl. ¶¶ 201-05.)  The settlements resolve billions of dollars of
claims against the Debtors.  (Skeel Decl. ¶ 46.)  Each of the settlements is consistent with what
would be expected as a result of negotiations in a complex debt restructuring and is reasonable.
In addition, the ability to achieve consensus from at least 15 major parties is evidence the
settlements are reasonable.  (Murray Decl. Ex. A ¶¶ 115-37; Zelin Decl. ¶¶ 24, 29, 36, 43.)  For
these reasons, the negotiated settlements provide an appropriate and reasonable basis for the
adjustment of all affected Claims, including those of dissenting Creditors in the accepting
Classes, as well as claims and interests belonging to the Debtors.

99.100.      Accordingly, the Plan is consistent with section 1123(b)(3)(A) of the
Bankruptcy Code.

### xi.  Bankruptcy Code Section 1123(b)(3)(B)

100.101.      Article LXXVIII of the Plan provides for, among other things, the transfer
of the Avoidance Actions to the Avoidance Actions Trust.  Section 79.1 of the Plan provides:
"Except as settled and released herein, from and after the Effective Date, the Avoidance Actions
Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance
Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III
Court."  (Plan § 79.1.)

101.102.      Further, Section 82.1(a) of the Plan states: "[e]xcept with respect to
Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR
Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with
AAFAF, shall object to, and shall assume any pending objection filed by the Debtors to, the
allowance of Claims filed with the Title III Court with respect to which it disputes liability,
priority or amount, including, without limitation, objections to Claims that have been assigned

and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses, and counterclaims shall be litigated to Final Order; provided, however, that Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise, or withdraw any objections to Claims, without approval of the Title III Court."  For the avoidance of doubt, the foregoing is subject to the rights of the two (2) Creditors' Committee appointees to the Avoidance Action Trust Board pursuant to section 82.1(b) of the Plan.  (Plan § 82.1(a).)

102.103.    The Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

### xii. Bankruptcy Code Section 1123(b)(4)

103.104.    Article LXIX of the Plan provides for the sale of all ERS assets to the Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private Equity Portfolio, subject to certain conditions.  (Jaresko Decl. ¶ 76.)  Specifically, section 69.2 of the Plan provides that the Commonwealth, up to and including April 10, 2023, "shall have the option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . .  In the event that the Commonwealth declines to exercise the option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond Claims shall have the option to exercise the Bondholder Election and purchase all of the interests in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by providing written notice thereof to the Commonwealth on or prior to April 15, 2023."  However, "[i]n the event that neither the Commonwealth Election nor the Bondholder Election shall have

been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . ."  Pursuant to section 69.1 of the Plan, in either scenario, the proceeds of the purchase of the ERS Private Equity Portfolio, along with the $373 million in cash, shall be distributed to holders of Allowed ERS Bond Claims.  (Plan § 69.1.)

104.105.      The Plan is consistent with section 1123(b)(4) of the Bankruptcy Code.

### xiii.      Bankruptcy Code Section 1123(b)(5)

105.106.      Articles V through LIV, sections 55.2, 55.5, 55.7 through 55.9, articles LVI through LVII, LX, LXII through LXX, and LXXIII of the Plan modify the rights of holders of Claims in the impaired Classes.  Sections 55.1, 55.3, 55.4, 55.6, 55.10 through 55.12, articles LVIII through LIX, LXI, LXXI, and LXXII of the Plan leave the rights of holders of unimpaired Claims unaffected.  Sections 62.2 and 62.3 have been revised to remove any reference to Eminent Domain Claims from the category of CW General Unsecured Claims and treatment thereunder.

106.107.      The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

### xiv.      Bankruptcy Code Section 1123(b)(6)

107.108.      Article XCII of the Plan provides for, among other things, (a) certain releases, injunctions, and exculpations described below in paragraphs 199–208233–242 and (b) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of New GO Bonds and CVIs.  (Jaresko Decl. ¶ 78; Zelin Decl. ¶¶ 94, 96, 97, 99, 107-10.)

108.109.      The Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

### xv. Bankruptcy Code Section 1123(d)

109.110.      Section 76.4 of the Plan provides for the payment of cure amounts

required to be paid to the counterparties of Executory Contracts and Unexpired Leases assumed,

or assumed and assigned, pursuant to the Plan.  All cure amounts will be determined in

accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to

the procedures established by the Plan. (Jaresko Decl. ¶ 79.)  On November 23, 2021, the

Oversight Board filed and caused to be served the *Notice of Executory Contracts and Unexpired*

*Leases to be Assumed Pursuant to Title III Plan of Adjustment* (Docket Entry No. 19353), (i)

setting forth the cure amounts for each assumed Executory Contract and Unexpired Lease based

on a review of the Debtors' books and records, and (ii) establishing a deadline for parties to

object to the proposed cure amounts for an Executory Contract or Unexpired Lease to which they

are a party or to the assumption of such Executory Contract or Unexpired Lease.  Within ten (10)

Business Days of entry of a Final Order setting forth the cure amount as to each Executory

Contract or Unexpired Lease to be assumed or assumed and assigned, the Debtors or the

Reorganized Debtors, as the case may be, shall pay or otherwise satisfy such cure amount.

110.111.      The Plan is consistent with section 1123(d) of the Bankruptcy Code.

**xvi.      Bankruptcy Code Section 1129(a)(2)**

111.112.      The Debtors have (i) complied with provisions of the Bankruptcy Code

and PROMESA applicable to confirmation of the Plan, except as otherwise provided or

permitted by orders of this Court, and (ii) complied with the applicable provisions of the

Bankruptcy Code, PROMESA, the Bankruptcy Rules, the Local Rules, and the Disclosure

Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the Election

Notices, and related documents, and in soliciting and tabulating votes on the Plan.

112.113.      The Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the Disclosure Statement (Debtors Ex. 2), and sought and received input and comment thereon from other parties in interest.  This Court approved the Disclosure Statement as containing adequate information and meeting the requirements of sections 1125 and 1126 of the Bankruptcy Code. (Jaresko Decl. ¶ 80.)  The Debtors have properly solicited and tabulated votes on the Plan. (Jaresko Decl ¶ 80; see generally Pullo Decl.; see generally Pullo Sup. Decl.)

113.114.      The Oversight Board, as proponent of the Plan, is the duly-appointed representative of the Debtors in their Title III Cases as provided pursuant to PROMESA and has acted in accordance with applicable law in proposing the Plan.

114.115.      The Debtors have complied with section 1129(a)(2) of the Bankruptcy Code.

> **xvii.      Bankruptcy Code Section 1129(a)(3)**

115.116.      The Plan was proposed in good faith with the legitimate purpose to provide a means for the Debtors to achieve fiscal responsibility and access to capital markets, consistent with the purposes of PROMESA.  (Jaresko Decl. ¶ 81.)  In determining that the Plan has been proposed in good faith, the Court has examined the totality of the circumstances surrounding the filing of the Title III Cases, the Plan itself, the lengthy process leading to the Plan's formulation (including the compromises, settlements, and releases incorporated therein), and the process associated with the Plan's prosecution.  The Debtors' good faith is evident from the facts and records of the Title III Cases, the Disclosure Statement and the hearing thereon, and the record of the Confirmation Hearing and other proceedings held in the Title III Cases, including related adversary proceedings.  The Plan (including the settlements and compromises

contained therein) is the result of extensive arm's length negotiations among the parties, including through mediation led by former Chief Bankruptcy Judge Barbara Houser.

116.117.     The Oversight Board has worked to develop consensus with creditors and to evaluate the Commonwealth's and its instrumentalities' current and future financial circumstances.  These circumstances have been subject to constant change as the Oversight Board, the Commonwealth, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic.  (Jaresko Decl. ¶ 82.)  The Plan and Disclosure Statement represent the culmination of those efforts and the substantial input of each key stakeholder.

117.118.     The Plan (including all other agreements, documents, and instruments necessary to effectuate the Plan) achieves a rational adjustment of the Debtors' debts, and properly distributes value to creditors, including through the implementation of (a) parties' elections with respect to distributions and/or (b) the settlements pursuant to the Plan.  The Plan was proposed with the legitimate and honest purpose of implementing the settlements and compromises of numerous risky and costly disputes, while avoiding protracted litigation that could delay distributions to creditors.  (Jaresko Decl. ¶ 83.)

118.119.     The Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**xviii.     Bankruptcy Code Section 1129(a)(6)**

119.120.     The Plan does not provide for any rate changes by the Debtors and, accordingly, section 1129(a)(6) of the Bankruptcy Code does not apply.

**xix.     Bankruptcy Code Section 1129(a)(8)**

120.121.      Pursuant to the Disclosure Statement Order, the Title III Court approved the Disclosure Statement (Debtors Ex. 2) and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and directed the Debtors to solicit acceptances and rejections of the Plan, as well as certain elections with respect thereto.  (Disclosure Statement Ord. ¶¶ B, 7-19.)  Prior to the transmission of the Disclosure Statement, the Debtors did not solicit acceptances of the Plan from any holders of Claims.[26]

121.122.      The Solicitation Packages were served in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the Disclosure Statement Order.  (See generally Mailing Affidavits.)

122.123.      The (a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and (c) airing of radio advertisements regarding the approval of the Disclosure Statement, Confirmation Hearing dates, Confirmation Objection Deadline, Voting Deadline, and Election Deadline: (i) were adequate and sufficient under the circumstances of the Title III Cases; (ii) provided adequate and sufficient notice of such deadlines, the method of voting or making an election of distribution pursuant to the Plan; and the date, time, and location of the Confirmation Hearing; (iii) provided holders of Claims with a reasonable period of time to make an informed decision to accept or reject the Plan and to make any election provided thereunder; (iv) were in compliance with PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due process to all parties in interest in the Title III Cases. (See Service Affidavits; see also generally Pullo Decl.)

---

[26]      See infra ¶¶ 136-160, 147-149.

123.124.       No other or further notice with respect to the Plan or the Confirmation

Hearing is required.  Based upon the foregoing, the Debtors and their successors, predecessors,

control persons, representatives, officers, directors, employees, agents, attorneys, financial

advisors, investment bankers, accountants, and other retained professionals, and any and all

affiliates, managers, employees, attorneys, and advisors of the foregoing (i) have acted in "good

faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the

applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local

Rules, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of

disclosure in connection with all their activities relating to the solicitation of acceptances of the

Plan or elections thereunder and their participation in the activities described in section 1125 of

the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in

compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer

and issuance of securities pursuant to the Plan and, therefore, are not, and on account of such

offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable

law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or

elections thereunder or the offer and issuance of securities pursuant to the Plan, and are entitled

to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such

parties are listed therein, the exculpation provisions set forth in section 92.7 of the Plan.

124.125.       Votes to accept or reject the Plan were solicited and tabulated fairly, in

good faith, and in a manner consistent with the Disclosure Statement Order, PROMESA, the

Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  (See Pullo Decl. ¶ 8.)

125.126.     Certain Classes either voted to reject, or were deemed to reject, the Plan
(the "Rejecting Classes").  (See Pullo Decl. Ex. A; Pullo Sup. Decl. Ex. A.)[27]  Notwithstanding
such rejection and deemed rejection, the Sixth Modified Eighth Amended Plan (as revised in
compliance with the Court's order rejecting the unsecured claim treatment of Eminent
Domain/Inverse Condemnation Claims and directing the Debtors to incorporate their Alternative
Full-Payment Proposal for the payment of Allowed Eminent Domain/Inverse Condemnation
Claims (see Docket Entry No. 19517 at 6-15, 17-18)) satisfies sections 1129(b)(2)(A) and
1129(b)(2)(B) of the Bankruptcy Code with respect to the Rejecting Classes.

### xx. Bankruptcy Code Section 1129(a)(10)

126.127.     At least one Class of each of the Commonwealth creditors' impaired
Claims, PBA creditors' impaired Claims, and ERS creditors' impaired Claims has accepted the
Plan.  (See Pullo Decl. Ex. A.)  Accordingly, the Plan complies with section 1129(a)(10) of the
Bankruptcy Code.

### xxi.     Bankruptcy Code Section 1129(b)(1)

127.128.     The Plan's treatment of Claims in the Rejecting Classes is proper because,
as is described further below, the Plan does not discriminate unfairly and is fair and equitable
with respect to such Claims.  (Jaresko Decl. ¶ 87.)  Unfair discrimination applies only to
rejecting classes of creditors, not individual creditors within a class.  See Bankruptcy Code §§
1129(b)(1), 1123(a)(4).  "Thus, a disapproving creditor within a class that approves a plan cannot

---

[27]     Classes 51D, 51F, and 51L voted to reject the Plan, but subsequently were rendered
unimpaired and deemed to have accepted the Plan by the modifications made in the
Eighth Amended Plan.  Accordingly, such classes are not Rejecting Classes.  See Pullo
Sup. Decl. Ex. A.  Moreover, because holders of Allowed Claims under Class 54 are
entitled to payment in full under the Alternative Full-Payment Proposal, Allowed
Eminent Domain/Inverse Condemnation Claims are unimpaired.

claim unfair discrimination."  In re Nuverra Envtl. Sols., Inc., 834 F. App'x 729, 734-35 (3d Cir.
2021).  As a preliminary matter, the Court notes that no Rejecting Class has objected to
confirmation of the Plan on the basis that the Plan discriminates unfairly.

128.129.    The treatment afforded to retirees classified in Classes 51A through 51F,
51K, and 51L, and active employees classified in Classes 51G through 51J pursuant to the Plan
is fair and equitable and does not discriminate unfairly against other creditors in the Title III
cases.  Any cut to pensions of retired government employees would have a negative impact on
Puerto Rico's economy because retirees comprise a significant component of local demand in
Puerto Rico.  (Amended Declaration of Simon Johnson (Docket Entry No. 19014-1) (the
"Johnson Decl.") ¶ 6; Retiree Committee Ex. A § 2.17.)  Cutting pensions actually could
destabilize Puerto Rico's economic prospects, lead to greater out-migration, and make it harder
for Puerto Rico to obtain credit in the future, and the savings from pension cuts do not justify the
damage those cuts would cause to the economy.  (Johnson Decl. ¶ 6; Retiree Committee Ex. A
§§ 2.6; 2.13; 2.22.)  Roughly half of the retirees have pensions that place them below the federal
poverty level of $11,880 per year for a single person household.  (Retiree Committee Ex. A §
4.5.)  Further, retirees have also already experienced substantial reductions in pensions, and,
except for judges, government retirees have not received cost of living increases since 2008.
(Retiree Committee Ex. A §§ 4.11; 4.12.)  Many retirees, such as retired police, teachers, and
judges, do not receive federal social security payments. (Retiree Committee Ex. A §§ 4.3; 4.16.)
The gross income of the approximately 167,000 government retirees represents 6.4% of the total
household expenditures on the Island and 5.8% of Puerto Rico's gross national income. (Retiree
Committee Ex. A §§ 4.1, 4.4.)

129.130.    The macroeconomic impact of reducing the pensions of retirees on the overall Puerto Rican economy is significant.  (Retiree Committee Ex. A § 5.)  Because each dollar that is not spent by a retiree has a ripple effect throughout the economy, the loss of $1.00 of retiree income impacts overall spending at a higher rate, known as the fiscal multiplier. (Retiree Committee Ex. A § 5.2.)  Applying the Oversight Board's fiscal multiplier, reducing the monthly benefits would result in the loss of 1,600 jobs on the island and a 0.2% reduction in GNP in the near term.  (Retiree Committee Ex. A § 2.9.)  A higher fiscal multiplier would indicate a greater negative impact on the economy of a loss of 6,300 jobs on the island and a reduction in GNP of 0.6%.  (Retiree Committee Ex. A §§ 2.9, 5.)  Given Puerto Rico's high level of out-migration, including the increase in out-migration of retirees since 2016, pension cuts may force many more retirees to move to the states to be with family members if they can no longer support themselves living in Puerto Rico.  Increased out-migration will have a further negative impact on the economy as pension dollars are then spent outside of Puerto Rico.  (Retiree Committee Ex. A §§ 5.21-5.28.)

130.131.    The Plan, which eliminates any reductions in accrued pensions and certain other retiree benefits for retired and active employees and provides for the creation of the Pension Reserve Trust, is better than further pension and benefit cuts for Puerto Rico's economy and for other creditors and justifies the treatment that Claimants for retirement benefits are receiving pursuant to the Plan.  See, e.g., In re Creekstone Apartments Assocs., L.P., 168 B.R. 639, 644 (Bankr. M.D. Tenn. 1994) (disparate treatment between classes is not unfair if it "protect[s] a relationship with specific creditors that the debtor need[s] to reorganize successfully.").  The treatment of Classes 51A through 51L does not unfairly discriminate in favor of holders of Claims for retirement benefits and is fair and equitable.

131.132.      The Plan does not unfairly discriminate against holders of Claims in Class

58 (CW General Unsecured Claims), Class 66 (ERS General Unsecured Claims), or Class 13

(PBA General Unsecured Claims).  For the reasons set forth above in paragraphs 55-64,62–70,

certain Classes of unsecured Claims have been separately classified to ensure that the

Commonwealth is best able to provide critical government services to its residents, and that

certain claimants are able to continue providing such services in an efficient, reliable, and

sustainable manner.  For these reasons, it is important that certain Classes of unsecured Claims

receive superior treatment to Claims in Classes 58, 66, and 13.  Further, for the reasons set forth

above in paragraph 65,66, separate classification and treatment of Claims in Class 54 (Eminent

Domain/Inverse Condemnation Claims) is necessary because such claimants assert Fifth

Amendment rights, and the Plan does not discriminate unfairly with respect to that Class.

Separate classification and treatment of such Claims is reasonable and justified by a

governmental purpose, and does not constitute unfair discrimination.

132.133.      Accordingly, the Plan complies with section 1129(b)(1) of the Bankruptcy

Code.

### xxii.      Bankruptcy Code Section 1129(b)(2)

133.134.      The Plan's treatment of Claims in the Rejecting Classes is proper because

the Plan provides all holders of Claims in the Rejecting Classes with what they can reasonably

expect to receive under the circumstances of the Title III Cases.  Because there are no equity

holders in chapter 9 cases, the requirement under Bankruptcy Code section 1129(b)(2)(B)

(incorporated by PROMESA section 301(a)) that a plan be "fair and equitable" requires that,

where a debtor seeks nonconsensual confirmation of a plan over one or more rejecting classes,

no claim junior to any of the claims in the rejecting classes of the relevant debtor may receive

any property.  Under the Plan, the Class holding Claims junior to the unsecured Rejecting

Classes (Section 510(b) Subordinated Claims) receives no property.  The commencement of the

Title III Cases was precipitated by the Debtors' untenable debt burden, a severe cash shortage,

and the economic decline and out-migration eroding the Debtors' revenues.  The creditor

recoveries in the Plan were calculated or negotiated to reasonably compensate holders of Claims

while enabling the Debtors to avoid a recurrence of these financial difficulties and to institute

necessary reforms to ensure the Debtors' fiscal responsibility and access to capital markets.  (See

Jaresko Decl. ¶ 81; Murray Decl. Ex. A ¶¶ 20, 139.)

134.135.    Class 54 is the only Rejecting Class of Claims characterized as secured in

the Plan, and section 1129(b)(2)(A) is satisfied with respect to such Class.  Consistent with these

Findings of Fact and Conclusions of Law, holders of Claims in Class 54 will receive payment in

full to the extent they are Allowed Claims.  (Jaresko Decl. ¶ 88.)

135.136.    Accordingly, the Plan complies with section 1129(b)(2) of the Bankruptcy

Code with respect to Claims in the Rejecting Classes.

**B.  PROMESA § 314(b)(2):** *The Plan Fully Complies with the Applicable Provisions of Title III of PROMESA.*

136.137.    Except as otherwise provided for or permitted by orders of the Title III

Court, the Oversight Board has complied with Section 1125(b) of the Bankruptcy Code and

Section 314(b)(2) of PROMESA, including the solicitation and tabulation of votes consistent

with the Disclosure Statement Order.  (See generally Jaresko Decl. and Pullo Decl.)

137.138.    The Disclosure Statement Order established the procedures for the

solicitation of votes on the Plan.  The Solicitation Agent complied with the procedures

established in the Disclosure Statement Order.  (Mailing Affidavits; Pullo Decl. ¶ 4.)

Specifically, the Solicitation Agent determined which creditors were entitled to vote on the Plan

by following the instructions in the Disclosure Statement Order, by Class, and by applying the

Voting Record Dates set forth in the Disclosure Statement Order.  The Solicitation Agent then

coordinated the distribution of solicitation materials to holders of Claims entitled to vote.  (Pullo

Decl. ¶¶ 5-6.)  The Solicitation Agent coordinated publication of the confirmation hearing

notices as set forth in the Disclosure Statement Order.  (Id. ¶ 7; see also Publication Affidavit.)

The solicitation materials were properly distributed to the appropriate parties, including brokers

and nominees.  (See Mailing Affidavits.)

138.139.     The Solicitation Agent received, reviewed, determined the validity of, and

tabulated the Ballots submitted.  (Pullo Decl. ¶ 8.)  The Solicitation Agent also worked with the

Depository Trust Company ("DTC") to count votes from the Bond Classes tendered through

DTC's ATOP.  (Id. ¶ 9.)

**Plan Support Agreements**

139.140.     Section 1125(b) of the Bankruptcy Code requires that "[a]n acceptance or

rejection of a plan may not be solicited after the commencement of the case under this title from

a holder of a claim or interest with respect to such claim or interest, unless, at the time of or

before such solicitation, there is transmitted to such holder the plan or a summary of the plan,

and a written disclosure statement approved, after notice and a hearing, by the court as

containing adequate information."  11 U.S.C.  § 1125(b).  Congress intended debtors and

creditors be afforded flexibility to resolve disputes, and where possible, reach a consensual

resolution of issues in contemplation of the development of a plan of adjustment.  See In re

Indianapolis Downs, LLC., 486 B.R. 286, 295 (Bankr. D. Del. 2013) ("[A] narrow construction

of 'solicitation' affords [] parties the opportunity to memorialize their agreements in a way that
allows a […] case to move forward.")

140.141.     Here, the Plan was made possible by the Debtors' extensive negotiations
with numerous claimholder constituencies and the Plan Support Agreements that resulted from
the negotiations.  (Jaresko Decl. ¶ 14.)  These agreements include the GO/PBA Plan Support
Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support
Agreement, and agreement with the UCC.  (Zelin Decl. ¶ 13.)  The process of negotiation and
solicitation of assent to the plan support agreements prior to the approval and distribution of the
disclosure statement did not constitute improper solicitation of votes with respect to the Plan.
"An agreement to accept the Debtor's plan, made post-petition but before approval of the
disclosure statement, remained executory until [the creditor] actually filed its accepting ballot . . .
Neither the recitation in the disclosure statement, nor the parties' execution of the written
memorandum, constituted an acceptance of the plan as such."  In re Heritage Org., L.L.C., 376
B.R. 783, 793 (Bankr. N.D. Tex. 2007).

### Debtors' "Notice to Holders of Uninsured Bonds" dated July 27, 2021

141.142.     On or about July 27, 2021, the Debtors published a Notice to Holders of
Uninsured Bonds[28] that provided an exchange opportunity to all beneficial owners of Uninsured
Bonds to become party to the amended plan support agreement.  Acceptance of the opportunity
would render the bondholder a party to the GO/PBA PSA, entitle the bondholder to a Restriction
Fee pursuant to the PSA, and constitute consent to the change of the CUSIP number assigned to
the existing bondholding.  (See Docket Entry No. 18761-8) (the "Exchange Offer") (Hein Ex.

---

[28]     The term "Uninsured Bonds" is designated the meaning provided in the Exchange Offer.

FFF at 2.)[29]  The Exchange Offer was open to "all beneficial owners of Uninsured Bonds,

including retail beneficial holders."  (Id. at 4.)  Importantly, the bondholders' right to the PSA

Restriction Fee Claim "travels" with the Uninsured Bond.  (Id.)  Thus, "in order to separately

identify the Uninsured Bonds that fall into this category, the PSA provides for the assignment of

alternative identifying CUSIPs to track beneficial interests in Uninsured Bonds that become

subject to the PSA […]." (Id.; See also GO/PBA Plan Support Agreement § 2.2.) (Debtors Ex.

16.)

      142.143.     Mr. Hein and Mr. Samodovitz argue that the Exchange Offer was an

improper solicitation designed to procure votes in favor of the Plan.  (Hein Obj. at 23).  In

response, the Debtors explain that the Exchange Offer provided a procedural mechanism for all

uninsured bondholders to "deal with the tender and exchange [of bonds]" through the creation of

alternative CUSIPS.  (Nov. 15, 2021, Hr'g. Tr. 140:1-2.)  Mr. Hein further argues that the

August 13, 2021 participation deadline (the "Participation Deadline") for retail bondholders to

join to the PSA was unreasonable because the participation deadline only permitted 17 days to

consider the offer (and review the accompanying material) before electing to participate. (Hein

Obj. at 23.)  However, the Exchange Offer did not require retail bondholders to take immediate

action before the Participation Deadline to become entitled to a support fee.  All beneficial

owners who tendered their Uninsured Bonds by the Participation Deadline were entitled to

receive a PSA Restriction Fee.  (Hein Ex. FFF at 3.)  The Exchange Offer also disclosed that,

after August 13, 2021, retail bondholders who did not tender their bonds by the Participation

Deadline remain entitled to a Retail Support Fee (in the same amount as the PSA Restriction

---

[29]     An "Amended Notice to Holders of Uninsured Bonds" was published on or about July
30, 2021 (Docket Entry No. 18761-9) (the "Amended Exchange Offer").  (Hein Ex.
GGG.)

Fee), so long as their Class of retail bondholders approves the Plan and the retail bondholder certifies their retail investor status. (Id. at 5.) The ballots were not distributed by the Solicitation Agent until August 30, 2021, after the Participation Deadline had passed. (Debtors Ex. 138.) The Court finds that the Exchange Offer was not a solicitation of votes and that the Participation Deadline was reasonable. The Debtors have proffered a good faith basis for the development of a procedural mechanism to track all retail bondholders' entitlement to the PSA Restriction Fee and Retail Support Fee. Thus, the objections are overruled.

### **Entitlement to the Retail Support Fee**

143.144.        The Plan provides "in the event that a Class of Retail Investors […] votes to accept the Plan, the members of such Class shall be entitled to receive their Pro Rata Share of such Class's allocable share of the aggregate Retail Support Fee […]." (Plan § 3.6.) The Retail Support Fee will thus be available to each member of a class of Retail Investors that votes, as a class, to accept the Plan. (Jaresko Decl. ¶ 128.) Additionally, the Debtors represent that a retail bondholder who voted and certified his status as a retail investor would be entitled to receive the Retail Support Fee, so long as the class voted to accept the Plan, whether or not the bondholder voted in favor of the Plan. (Nov. 15, 2021, Hr'g Tr. 139:9-15, 166:16-20.)

144.145.        The Retail Support Fee was designed to deliver the same amount of fee consideration, as a percentage of claim amount held, to Retail Investors as to recipients of the GO/PBA Restriction Fee. (Zelin Decl. ¶ 81.) Thus, the Retail Support Fee was designed to achieve economic parity for Retail Investors vis-à-vis the recipients of the GO/PBA Restriction Fee without requiring Retail Investors to sign the GO/PBA PSA and agree to its terms and conditions, including the obligation to support the Plan and the "lock up" provisions. (Id.)

145.146.         Retail bondholders were provided the option to either (i) participate in the Exchange Offer with all other bondholders, thereby receiving the same PSA fee as other Restriction Fee parties, or (ii) as originally contemplated, receive the Retail Support Fee if the creditor identifies as a retail investor and the retail class votes to accept the Plan.  (Id. ¶ 82.)

146.147.         The Debtors have represented that "all retail investor classes voted to accept the Plan […], and all members of the retail classes shall receive the restriction fee." (Nov. 15, 2021, Hr'g. Tr. 142: 20-21; 23-24.)  The tabulation summary shows that the retail classes voted to accept the Plan.  (See Pullo Decl., Ex. A; See also Pullo Sup. Decl. Ex. A.)

**Voting on the Plan of Adjustment**

147.148.         Pursuant to the Disclosure Statement Order, the Debtors, or their Solicitation Agent, distributed materials needed for voting on the Plan or making elections on distributions thereunder (the "Solicitation Package") to bondholders in various voting classes. (See Disclosure Statement Ord. ¶¶ 9, 14, 32.)  The Court approved the procedures for voting to accept or reject the Plan, including the use of DTC's ATOP process for bondholder votes, in the Disclosure Statement Order.  (See Id. at ¶¶ 9, 14, 32.)  The Solicitation Agent distributed the Solicitation Package to appropriate parties, including brokers and nominees.  (See Mailing Affidavits.) (See also Debtors Ex. 138.)

148.149.         Mr. Hein and Mr. Samodovitz argue  that the complexity of the voting process may have impaired retail bondholders' ability to cast timely ballots and/or certify themselves as retail investors for purposes of establishing entitlement to a Retail Support Fee if a class majority voted to accept the Plan.  (Nov. 15, 2021, Hr'g Tr. 149:1-14; Id. at 159: 19-25.) To vote to accept or reject the Plan, GO/PBA PSA Creditors were required to instruct their nominee or broker to tender their bonds utilizing ATOP before the voting deadline pursuant to

the Disclosure Statement Order.  (Disclosure Statement Ord. ¶ 32, Sched. 2.)  Mr. Hein and Mr.

Samodovitz have not proffered credible evidence that retail bondholders, as a whole, were

unable to vote on the Plan.  Rather, the voting summary includes a tabulation of all votes cast in

support and opposition of the Plan and indicates that retail bondholders from each retail class

successfully voted.  (See Pullo Decl., Ex. A; See also Pullo Sup. Decl. Ex. A.)  To the extent the

objections are challenges to the Disclosure Statement Order and the voting process outlined

therein, the objections are overruled.

149.150.      The Plan complies with PROMESA Section 314(b)(2).

**C.   PROMESA § 314(b)(3):** *The Debtors Are Not Prohibited by Law from Taking any Action Necessary to Carry Out the Plan*.

150.151.      The Plan contains no provisions which would require the Debtors to

violate the law, including Commonwealth law that is not preempted.

151.152.      Act 53, enacted on October 26, 2021, authorizes the issuance of CVIs and

New GO Bonds, consistent with the terms set forth in the Plan and the plan support agreements.

(Jaresko Decl. ¶ 92; Debtors Ex. 134.)  Act 53's effectiveness is conditioned only on the

elimination of the Monthly Benefit Modification (as defined in the Seventh Amended Plan) from

the Plan.  The Monthly Benefit Modification is not included in the Plan, and accordingly Act 53

is effective and the Commonwealth's issuance of the CVIs and New GO Bonds is consistent

with applicable Commonwealth law.  Furthermore, by reason of the Plan's provisions freezing

defined benefit accruals and future costs of living adjustments, upon the Plan's Effective Date,

PROMESA preempts Acts 91-2004 (establishing TRS) and 12-1954 (establishing JRS), each as

amended, providing for the future accrual of defined benefits and future cost of living

adjustments, to the extent set forth in **Exhibit A** hereto.  Absent preemption, the amount of

Commonwealth revenues that would need to be spent on TRS and JRS pension benefits in fiscal

year 2022 is $984 million.  (Malhotra Decl. ¶ 65.)  Absent preemption, these inconsistent statutes

would undermine the restructuring contemplated by the Plan.  (Jaresko Decl. ¶ 235.)

~~152.~~153.       Enabling legislation is not required to establish the freeze of defined

benefits or the elimination of COLAs.  Obligations arising from Commonwealth statutes,

including statutes providing employees the right to accrue pension or other retirement benefits,

give rise to claims which can be impaired and discharged pursuant to the Plan.  See 11 U.S.C. §

101(5)(A) (defining claim as "right to payment, whether or not such right is . . . contingent,

matured, [or] unmatured"); Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35-36 (1st Cir. 2009)

("The definition of claim . . . defines what is discharged by the proceeding.  In enacting this

language, Congress gave the term 'claim' the 'broadest available definition.'") (quoting Johnson

v. Home State Bank, 501 U.S. 78, 83 (1991)); In re Fin. Oversight & Mgmt. Bd. for P.R., Case

No. 17 BK-3283-LTS, 2021 WL 5024287, at *8-9 (D.P.R. Oct. 29, 2021).  The discharge of

prepetition obligations does not need to be approved pursuant to, or consistent with,

Commonwealth law.  See, e.g., Order Confirming Debtor's Sixth Amended Plan of Adjustment of

Debts Pursuant to Chapter 9 of the Bankruptcy Code, In re City of Prichard, No. 09-15000, at 7

(Bankr. S.D. Ala. July 8, 2014) ("The Court . . . finds and concludes that the City's actions under

the Plan are not prohibited by law, and the treatment of the Classes who formerly had an interest

in the City's pension plan is lawful under the Bankruptcy Code."); In re Sanitary & Improvement

Dist. No. 7, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("If a municipality were required to pay

prepetition bondholders the full amount of their claim with interest as contained on the face of

the bonds and the [municipality] had no ability to impair the bondholder claims over objection,

the whole purpose and structure of chapter 9 would be of little value. . . . To create a federal

statute [chapter 9 of the Bankruptcy Code] based upon the theory that federal intervention was

necessary to permit adjustment of a municipality's debts and then to prohibit the municipality

from adjusting such debts is not, in the point of view of this Court, a logical or necessary

result.").

153.154.    The Debtors have sufficiently demonstrated that express recognition of the

preemptive effect of section 4 of PROMESA is crucial to accomplishing the Plan's goals and

ensuring its feasibility.  However, as set forth in the Court's *Order Regarding Certain Aspects of*

*Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the*

*Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19517) (the "Clarification Order"), the

broad language of the preemption provisions of the Plan as previously proposed by the Debtors

are overly broad and vague.  Accordingly, the Court memorializes its conclusions concerning

preemption here, and will enter an order confirming the Sixth Modified Eighth Amended Plan.

154.155.    Provisions of Commonwealth laws that are inconsistent with PROMESA

are preempted for the reasons, and to the extent, set forth in **Exhibit A** hereto.[30]  Such preempted

provisions include, without limitation: (i) pursuant to section 4 of PROMESA, all laws, rules,

and regulations, to the extent they give rise to obligations of the Debtors discharged by the Plan

and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any

---

[30]    The Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por
la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión
Nacional de Educadores y Trabajadores de la Educación, Inc., (collectively, the
"Teachers' Associations") contend that the scope of preemption set forth in [Appendix A]
is overly broad because certain sections and subsections of Act 106-2017 and Act 160-
2013 govern all Commonwealth public retirement systems, not just TRS and JRS, and
include provisions essential to the functioning of the government's retirement systems.
(See Teachers' Associations Sup. Obj. ¶¶ 5-72.)  Exhibit A, however, does not
contemplate the preemption of the entirety of every statutory section or subsection set
forth in the "Specific Provisions Preempted" column; rather, any such section or
subsection is preempted only to the extent its operative provisions are both described in
the "Specific Provisions Preempted" column and a basis for the preemption thereof is
listed in the "Basis for Preemption" column.

general or specific provisions of territory laws, rules, and regulations and (ii) laws enacted prior

to June 30, 2016, to the extent they provide for transfers or other appropriations after the

enactment of PROMESA, including transfers from the Commonwealth or one of its

instrumentalities to any agency or instrumentality, whether to enable such agency or

instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted to the

extent inconsistent with the Plan's discharge of the Debtors' obligations.  Through modifications

to the proposed Plan and related documents, the Oversight Board previously requested judicial

acknowledgement that Act 80-2020, Act 81-2020, and Act 82-2020 are preempted by

PROMESA.  That request has been mooted by the Court's approval of the *Stipulation and Order*

*Resolving Oversight Board Complaint Dated December 20, 2021 Concerning Acts 80-2020, 81-*

*2020, and 82-2020 and Joint Resolution 33-2021* (Docket Entry No. 6 in Adv. Proc. No. 21-

00119), pursuant to which the Puerto Rico Fiscal Agency and Financial Advisory Authority, the

Office of Management and Budget, and the Honorable Pedro Pierluisi Urrutia, the Governor of

the Commonwealth of Puerto Rico, resolved litigation concerning the validity of Acts 80-2020,

81-2020, and 82-2020 and Joint Resolution 33-2021 and agreed that they are significantly

inconsistent with the relevant certified fiscal plan.[31]

---

[31]   Asociación Puertorriqueña de la Judicatura, Inc. and Asociación de Jubilados de la
Judicatura de Puerto Rico object to the impairment of any obligations to the Judicial
Retirement System and contend that any such impairment would be inconsistent with
rights under the Puerto Rico Constitution and principles of separation of powers and
judicial independence that are embedded in that document.  However, PROMESA
permits the impairment and discharge of prepetition debts where, as here, the
requirements for confirmation of a plan of adjustment are satisfied.  See 11 U.S.C. §
944(b).  To the extent that Commonwealth law is inconsistent with such impairment and
discharge, it is preempted by PROMESA.  See Commonwealth of Mass. Div. of
Employment and Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l Med. Ctr., Inc.),
291 F.3d 111, 126 (1st Cir. 2002) ("[T]o the extent that we were to read the Employment
and Training Law to require that the Division receive administrative expense priority for
a claim that the Bankruptcy Code would assign general unsecured status, the state law

155.156.       Many of the preempted statutes would require the Commonwealth to use

its revenues to repay its general obligation and guaranteed debt in full.  The amount of debt

service necessary for fiscal year 2022 would be $1.7 billion.  (Malhotra Decl. ¶ 63.)  These

statutes are inconsistent with PROMESA to the extent they are inconsistent with the discharge of

outstanding claims and the treatment provided for such claims by the Plan under Title III of

PROMESA and would undermine the restructuring contemplated by the Plan and Puerto Rico's

return to fiscal responsibility and access to capital markets.  (Jaresko Decl. ¶¶ 230-33.)  Further,

certain preempted statutes require the appropriation of Commonwealth revenues and would

require more than $3 billion in Commonwealth revenues to be transferred in fiscal year 2022.

(Malhotra Decl. ¶ 64.)  In addition, certain preempted statutes require the Commonwealth to

provide pension and other benefits or payments to retirees who participated in the ERS, TRS, or

JRS retirement systems at statutorily specified rates; the amount of Commonwealth revenues that

would need to be spent on TRS and JRS benefits or payments in fiscal year 2022 pursuant to

these statutes would be $984 million.  (Malhotra Decl. ¶ 65.)  Such statutes are inconsistent with

PROMESA to the extent they are inconsistent with the discharge of claims and treatment

provided for pension benefits and payments by the Plan under Title III of PROMESA and would

undermine the restructuring contemplated by the Plan and the Plan's contemplated repayment of

claims from such revenues.  (Jaresko Decl. ¶ 234.)  For the avoidance of doubt, the non-inclusion

of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis

for disallowance and discharge of such obligation to the extent the claim arising therefrom

---

would then be inconsistent with federal law and so preempted.  The application of the
doctrine of preemption is often complex, but in such a case would be clear-cut." (citations
omitted)); In re Sanitary & Imp. Dist., No. 7, 98 B.R. at 974.

otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the

Bankruptcy Code.[32]

## CONSTITUTIONAL CHALLENGES TO THE PLAN

156.157.        Several creditors, including Mr. Hein, object to the Plan on the grounds

that it allegedly violates the Contracts Clause or the Takings Clause of the Constitution of the

United States.  Having considered carefully the parties' submissions and arguments on these

issues, the objections are overruled, with the exception of the objections concerning Eminent

---

[32]        Mr. Hein objects to the scope of the preemption provisions of the Plan and this analysis
and contends that the statutes authorizing the bonds that he holds, which commit the full
faith and credit of the Commonwealth to repayment of the bonds, cannot be preempted.
His argument is contrary to the provisions of PROMESA, which permit the impairment
and discharge of prepetition debts such as Mr. Hein's.  To the extent that Commonwealth
law requires the payment of such debts in full, it is inconsistent with the discharge of
such debts and therefore subject to preemption.  To the extent that Mr. Hein's objection is
that other creditors are being treated favorably notwithstanding Commonwealth law that
provides his claims with an entitlement to certain streams of revenues or priority
treatment over other debts, such arguments are precluded by the acceptance of the Plan
by each class of bonds, including the bondholder classes of which Mr. Hein is a member.
The Bankruptcy Code's requirements that a plan "not discriminate unfairly, and [be] fair
and equitable" are applicable only as "to each class of claims or interests that is impaired
under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1); see 7 Collier on
Bankruptcy ¶ 1129.03 (16th 2021) ("[S]ection 1129(b)(1) requires that the plan
proponent prove, *as to the dissenting class*, that the plan is both fair and equitable and not
unfairly discriminatory.") (emphasis added).  Those requirements of section 1129(b) are
applied on a class-wide basis, not on a creditor-by-creditor basis, and "a disapproving
creditor within a class that approves a plan [therefore] cannot claim unfair
discrimination" or a lack of fair and equitable treatment.  In re Nuverra Envtl. Sols., Inc.,
834 F. App'x 729, 735 (3d Cir. 2021), as amended (Feb. 2, 2021), cert. denied, No. 21-
17, 2021 WL 4733333 (U.S. Oct. 12, 2021); In re W.R. Grace & Co., 475 B.R. 34, 175
(D. Del. 2012) ("It is a well-known legal rule in Chapter 11 reorganization litigation that
'[u]nder § 1129(b), a finding that a plan is 'fair and equitable' is required only in the
context of a cramdown.'") (quoting In re Dow Corning Corp., 244 B.R. 678, 693 (Bankr.
E.D. Mich. 1999)), aff'd, 729 F.3d 332 (3d Cir. 2013).  Finally, to the extent that Mr.
Hein contends that the Plan fails to meet the "best interests" test due to such treatment,
the Court will address his argument in connection with its discussion below of section
314(b)(6) of PROMESA.

Domain/Inverse Condemnation Claims.  The objections concerning Eminent Domain/Inverse

Condemnation Claims are sustained, and such Allowed Claims must be paid in accordance with

Debtors' Alternative Full-Payment Proposal (as set forth in Docket Entry No. 19568 §§ 58.1,

77.1(e)).

### Contracts Clause

157.158.       The Plan contains no provision that would constitute or create a violation

of the Contracts Clause of the Constitution of the United States.  The Contracts Clause provides

that no state shall pass any law impairing the obligation of contracts.  U.S. Const. art. I, § 10, cl.

1.  Although the Constitution prohibits a state or territory from impairing contractual obligations

through legislative action, it imposes no such prohibition on Congress and, indeed, empowers

Congress to impair contractual obligations through article I, section 8 of the Constitution, which

provides that Congress shall have the power to establish uniform laws on the subject of

bankruptcies throughout the United States.  U.S. Const. art. I, § 8, cl. 4.  It has long been

recognized that one of the fundamental goals of bankruptcy law is to adjust the debtor-creditor

relationship, that is, to alter contract rights.  See Ass'n of Retired Emps. of Stockton v. City of

Stockton (In re City of Stockton), 478 B.R. 8, 14-15 (Bankr. E.D. Cal. 2012).  "While

bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of

parties whose contracts are impaired, that does not change the starring role of contract

impairment in bankruptcy."  Id. at 16.  Congress is, therefore, "'expressly vested with the power

of passing [bankruptcy] laws, and is not prohibited from passing laws impairing the obligation of

contracts. . . .'"  Id. at 15 (citing Sturges v. Crowninshield, 17 U.S. 122, 191 (1819)).  Further,

the Plan does not implicate the Contracts Clause because it is not a legislative action.  A federal

court's confirmation of a reorganization plan under federal law cannot violate the Contracts

Clause.  See Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 732 n.9 (1984)

(holding that the Contracts Clause does not apply to federal government actions).  It follows that

this Court may approve the Plan under PROMESA, a federal law enacted by Congress pursuant

to the Territories Clause of the Constitution that incorporates key bankruptcy concepts and

provisions,[33] with the express purpose of allowing Puerto Rico to achieve fiscal responsibility

and access to the capital markets through, inter alia, adjustment of its debts and those of its

instrumentalities, without violating the Contracts Clause.[34]

158.159.        Mr. Hein has also failed to demonstrate that the fiscal plans constitute

territorial laws subject to the restrictions of the Contracts Clause, and his Contracts Clause

objection with respect to the fiscal plans is therefore overruled.  To the extent that Mr. Hein

argues that the Commonwealth's Act 53 (the "New Bond Legislation") authorizing the issuance

of New Bonds and contemplating the cancellation of currently outstanding bonds is within the

scope of the Contracts Clause, the Court concludes, as explained below, that such legislation

does not violate the Contracts Clause because the record establishes that it is reasonable and

necessary in light of the surrounding circumstances.  Although the language of the Contracts

Clause is "unequivocal," it "'does not make unlawful every state law that conflicts with any

contract.'"  United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuño, 633 F.3d

37, 41 (1st Cir. 2011) (quoting Loc. Div. 589, Amalgamated Transit Union v. Massachusetts,

666 F.2d 618, 638 (1st Cir. 1981)).  In considering claims brought under the Contracts Clause,

---

[33]        See ¶¶ 6, 35-36 supra.

[34]        To the extent the objection of the Asociación de Jubilados de la Judicatura de Puerto Rico
(the "AJJPR") may construed as objecting to the Plan on the basis of the Contracts
Clause, that aspect of the AJJPR's objection is overruled for the same reasons.  (See
Docket Entry No. 18549 ¶ 10.)

courts must "'reconcile the strictures of the Contract[s] Clause with the essential attributes of

sovereign power necessarily reserved by the States to safeguard the welfare of their citizens.'"

Id. (quoting Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente, 125

F.3d 9, 14 (1st Cir. 1997)).  In doing so, courts apply a two-pronged test: they examine first

"'whether the state law has . . . operated as a substantial impairment of a contractual

relationship,'" id. (quoting Energy Rsrv. Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400,

411 (1983)), and then, if the law has, "whether the impairment was 'reasonable and necessary to

serve an important government purpose.'"  Id. (quoting U.S. Tr. Co. of N.Y. v. New Jersey, 431

U.S. 1, 20 (1977).)  Assuming arguendo that New Bond Legislation will substantially impair

contractual obligations, the Court examines its reasonableness and necessity.  The First Circuit

considers "the reasonableness inquiry" to "ask[ ] whether the law is 'reasonable in light of the

surrounding circumstances,'" while "the necessity inquiry focuses on 'whether [Puerto Rico]

'imposed a drastic impairment when an evident and more moderate course would serve its

purposes equally well.''"  Id. at 45-46 (quoting Mercado Boneta, 125 F. 3d at 15.)  In analyzing

these questions, courts may consider "whether the act (1) was an emergency measure; (2) was

one to protect a basic societal interest, rather than particular individuals; (3) was tailored

appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the

duration of the emergency."  Id. at 46 (quoting Energy Rsrv. Grp., 459 U.S. at 410 n.11.)

159.160.    The circumstances surrounding the enactment of the New Bond

Legislation are clear: the Commonwealth Legislature enacted the New Bond Legislation in

response to the Commonwealth's unprecedented fiscal and economic crisis, the need to resolve

litigation concerning the Commonwealth's bond obligations, and the need to enable the

Commonwealth to effectuate the Plan so that it can regain access to capital markets.  The

Legislature's decision is a reasonable one under the surrounding circumstances.  The legislation, which provides for the cancellation of instruments representing restructured debts and eliminates potential disputes regarding the validity of the issuance of New Bonds that could affect the marketability of those bonds, is also necessary in light of the ongoing fiscal emergency in Puerto Rico.  The Court concludes that the Contracts Clause does not prohibit confirmation of the Plan, and Mr. Hein's objections invoking the Contracts Clause are therefore overruled.

### Takings Clause

~~160.~~161.　　　For the reasons that follow, confirmation objections invoking the Takings Clause of the Constitution of the United States are overruled, with the exception of certain objections to the Debtors' proposed treatment of Eminent Domain/Inverse Condemnation Claims.  With respect to those Claims, the Debtors' Alternative Full-Payment Proposal would provide sufficient treatment and payment in the event the Court finds their original proposal to pay only a portion of Allowed Eminent Domain Claims violative of the Takings Clause.  As explained below, the Court finds that the original proposal for such Claims does not comport with the requirements of the Takings Clause and the Court has directed the Debtors to revise the Fifth Modified Eighth Amended Plan, to ensure consistency and compliance with the treatment contemplated by the Debtors' Alternative Full-Payment Proposal.  The Debtors have done so, and the Court finds that the further revised Sixth Modified Eighth Amended Plan (Docket Entry No. [xx]) meets the requirements of section 314(b)(3) of PROMESA.  For the avoidance of doubt, the provisions of this FFCL are incorporated by reference in the Confirmation Order, and so the Debtors' position that their original proposal does not violate the Takings Clause is preserved for purposes of appeal.

161. 162.          Various claimants have objected to the Plan, arguing that the treatment of

their claims violates the Fifth Amendment's Takings Clause.  Generally, these objectors fall into

three categories: (1) those asserting that they hold Eminent Domain or Inverse Condemnation

Claims that may not be impaired by the Plan; (2) bondholders who argue that the Plan takes their

property interest in bonds—specifically, the alleged lien on revenues that they claim secures

repayment of the bonds issued by the Commonwealth—without just compensation; and (3) Suiza

Dairy, which argues that the Plan authorizes a regulatory taking without just compensation.[35]

---

[35]     The Court here does not address the objection filed by Ismael L. Purcell Soler and Alys
Collazo Bougeois concerning their inverse condemnation claim.  (See Docket Entry No.
18504.)  The substance of the objection makes clear that Mr. Purcell Soler's and Ms.
Collazo Bougeois' inverse condemnation claim concerns actions by PREPA.  (See, e.g.,
id. at 4.)  Mr. Purcell Soler and Ms. Collazo Bougeois are therefore creditors of PREPA,
not of the Title III debtors currently before this Court.  The Plan does not adjust PREPA's
debts or provide for any releases or exculpations of PREPA.  Accordingly, Mr. Purcell
Soler and Ms. Collazo Bougeois have no standing to challenge the Plan and their
objection is overruled.  See Bank of N.Y. Mellon v. P.R. Sales Tax Fin. Corp. (In re Fin.
Oversight & Mgmt. Bd. for P.R.), 301 F. Supp. 3d 306, 312 (D.P.R. 2017) (finding that
creditors of Commonwealth lacked standing in adversary proceeding concerning
COFINA bonds).

Additionally, for the reasons set forth in this Court's *Memorandum Opinion Granting
Defendants' Motions to Dismiss Second Amended Complaint* (Docket Entry No. 192 in
Adv. Proc. No. 18-00028), the Court overrules the objection of Cooperativa de Ahorro y
Crédito Abraham Rosa, Cooperativa de Ahorro y Crédito de Ciales, Cooperative de
Ahorro y Crédito de Rincón, Cooperative de Ahorro y Crédito Vega Alta, Cooperativa de
Ahorro y Credito Dr. Manuel Zeno Gandía, and Cooperativa de Ahorro y Crédito de
Juana Díaz (the "Credit Unions") to the extent it incorporates the allegations set forth in
their adversary complaint, which has now been dismissed without leave to amend,
alleging that their claims are protected by the Takings Clause.  Because the Court has
concluded that the Credit Unions have not stated a claim upon which relief could be
granted under the Takings Clause, the Court finds that their claims for payment
concerning that alleged taking are not protected by the Fifth Amendment and may be
impaired and discharged by the Plan.  Moreover, to the extent the Credit Unions have
asserted a claim that approval of the Plan itself would constitute a taking, the Credit
Unions' objection is also overruled for the reasons discussed in connection with the
objections of other bondholders (see infra ¶¶ 170-73).

162.163.        Federal statutes, such as the Bankruptcy Code and PROMESA, are subject

to the strictures of the Constitution, including the Fifth Amendment's requirement that

government takings of property for public use be justly compensated.  Indeed, the bankruptcy

power conferred by article I, section 8 of the Constitution of the United States is itself subject to

the Fifth Amendment.  See Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589

(1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to

the Fifth Amendment.").  This principle was reaffirmed and extended by the Supreme Court in

Security Industrial Bank, where the Court cautioned that, "however 'rational' the exercise of the

bankruptcy power may be, that inquiry is quite separate from the question whether the enactment

takes property within the prohibition of the Fifth Amendment."  United States v. Sec. Indus.

Bank, 459 U.S. 70, 75 (1982).  In keeping with traditional takings jurisprudence, the predicate

inquiry must concern the nature of the property at issue and whether a taking occurred.  See also

id. at 76-77 (classifying secured interests in contract rights as properly analyzed under the factors

set forth in Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978), as

distinguished from jurisprudence governing fee simple interests in real property).

163.164.        Throughout the confirmation process, the Debtors have argued that, while

Supreme Court decisions have recognized that the Fifth Amendment restricts the Bankruptcy

Code, it does so only to the extent that property interests are secured.  See Sec. Indus. Bank, 459

U.S. at 75-76, 78; Wright v. Union Cent. Life Ins. Co., 311 U.S. 273, 278 (1940) (the

constitution protects "the rights of secured creditors, throughout the proceedings, to the extent of

the value" of the creditors' collateral).  See also Cobb v. City of Stockton (In re City of

Stockton), 909 F.3d 1256 (2018); Poinsett Lumber Mfg. v. Drainage Dist. No. 7, 119 F.2d 270

(8th Cir. 1941).  This conclusion is inconsistent with the Fifth Amendment, which is implicated

by a governmental act—the taking of private property for public use—and whose just

compensation requirement is not conditioned on whether the government gives security for a

compensation obligation that is not satisfied immediately.  While a security interest is a type of

property that can be protected by both the Fifth Amendment and the Bankruptcy Code, its

absence is not determinative of Fifth Amendment protection.

164.165.      The Supreme Court's takings jurisprudence requires evaluation of whether

the real property was subject to a physical invasion (implicating per se takings analysis) or

whether, for example, it was subjected to a use restriction (in which case the Penn Central factors

are applied to determine whether a regulatory taking occurred).  Cedar Point Nursery v. Hassid,

141 S. Ct. 2063, 2071-72 (2021).

165.166.      **Eminent Domain/Inverse Condemnation Objections**: With respect to

the objections raised by holders of alleged Eminent Domain or Inverse Condemnation Claims,

the creditors assert, and the Debtors do not dispute, that their Claims arise from the physical

invasion by the Commonwealth of privately owned real property.  The objectors aptly rely on

Supreme Court decisions for the propositions that a physical invasion of property constitutes a

per se taking (Cedar Point Nursery, 141 S. Ct. at 2071), for which an irreducible entitlement to

just compensation immediately ripens under the Takings Clause (Knick v. Twp. of Scott, 139 S.

Ct. 2162, 2171 (2019); Blanchette v. Conn. Gen. Ins. Corp., 419 U.S. 102, 155 (1974) ("[A]ny

deficiency of constitutional magnitude in the compensation [of seized property] . . . will indeed

be a taking of private property for public use.")), and that the Bankruptcy Code is subject to the

Takings Clause (see Radford, 295 U.S. at 589, 601-02; Sec. Indus. Bank, 459 U.S. at 75, 78, 80,

82).  See also In re City of Detroit, 524 B.R. 147, 304-07 (Bankr. E.D. Mich. 2014).[36]  The Court

therefore confines its examination of these Claims to a per se takings analysis.  "These sorts of

physical appropriations constitute the 'clearest sort of taking,' and we assess them using a

simple, per se rule: The government must pay for what it takes."  Cedar Point Nursery, at 2071

(emphasis in original) (internal citation omitted).  The Court now turns to the question of just

compensation and whether valid claims for just compensation can be impaired in bankruptcy.

For the reasons set forth below, and for materially the same reasons set forth in this Court's order

of December 14, 2021 (Docket Entry No. 19517 at 6-15), the Court finds that such claims may

not be impaired.

166.167.      Unlike other constitutional prohibitions of government conduct, in

connection with which the Framers did not specify remedies, the Takings Clause of the

Constitution of the United States itself mandates the provision of "just compensation" in the

event that "private property [is] taken for public use."  U.S. Const. am. V.  The Supreme Court

---

[36]      The Debtors respond that, to the extent portions of these Eminent Domain/Inverse
Condemnation Claims are not "secured" by deposits of funds with a Clerk of Court, they
are simply unsecured claims that are subject to impairment and discharge under the
Bankruptcy Code and that, while Supreme Court decisions have recognized that the Fifth
Amendment restricts the Bankruptcy Code, it does so only to the extent that property
interests are secured.  See Sec. Indus. Bank, 459 U.S. at 75-76, 78; Wright v. Union Cent.
Life Ins. Co., 311 U.S. 273, 278 (1940) (the constitution protects "the rights of secured
creditors, throughout the proceedings, to the extent of the value" of the creditors'
collateral).  See also Cobb v. City of Stockton (In re City of Stockton), 909 F.3d 1256
(2018); Poinsett Lumber Mfg. v. Drainage Dist. No. 7, 119 F.2d 270 (8th Cir. 1941).  The
Debtors' application of the distinction, however, between secured and unsecured interests
under the Bankruptcy Code to determine whether a Takings Clause-related obligation can
be impaired is inconsistent with the Fifth Amendment, which requires first assessing the
origin of the payment obligation: whether it arises from a government taking of private
property for public use.  As explained further below, while a security interest is a type of
property that can be protected by both the Fifth Amendment and the Bankruptcy Code, a
physical invasion (in this case, of real property) falls squarely within the ambit of Fifth
Amendment protection, whether or not the government entity has provided any security
for its obligation to pay just compensation.

has recently and expressly recognized the unique status of cases involving the governmental

takings of real property.  In Knick, the Supreme Court stated that "[t]he Fifth Amendment right

to full compensation arises at the time of the taking, regardless of post-taking remedies that may

be available to the property owner," a principle derived from Jacobs v. United States, 290 U.S.

13, 17 (1933), in which the Court stressed that the owner of a "valid takings claim is entitled to

compensation as if it had been 'paid contemporaneously with the taking'—that is, the

compensation must generally consist of the total value of the property when taken, plus interest

from that time."  Knick, 139 S. Ct. at 2170.  See also Cedar Point Nursery, 141 S. Ct. at 2071-72

("When the government physically acquires private property for a public use, the Takings Clause

imposes a clear and categorical obligation to provide the owner with just compensation.").  Thus,

unlike judgment creditors whose statutory remedies for violations of other constitutional

provisions are dischargeable, holders of takings claims have a constitutional right to just

compensation that is not subject to impairment or discharge under a plan of adjustment.  See

Blanchette, 419 U.S. at 155 ("[A]ny deficiency of constitutional magnitude in the compensation

[of seized property] . . . will indeed be a taking of private property for public use."); see also In

re City of Detroit, 524 B.R. at 268-70.  Put differently, "just compensation" is not a statutory

damages remedy for a constitutional violation but is instead a necessary condition to the exercise

of government power to take private property for public use.[37]

---

[37]     The Oversight Board argues, without citation, that the only reason the Takings Clause
specifies the need for "just compensation" is that, unlike in other constitutional
provisions, the government action is permitted rather than prohibited, and that Eminent
Domain/Inverse Condemnation Claims are therefore not otherwise entitled to preferential
treatment when damages for other constitutional violations are subject to impairment and
discharge.  (See Docket Entry No. 19574 ¶ 22.)  Such an argument itself acknowledges,
however, that the Takings Clause is, in fact, unique in requiring just compensation as the
condition for taking private property for public use.  The conclusion is textually
inescapable, and accordingly inflexible.

167.168.     The federal appellate cases cited by the Debtors are inapposite, both

because they are materially distinguishable and because they do not support an alternative

interpretation of the Supreme Court's clear jurisprudence distinguishing the Takings Clause from

other constitutional provisions.  First, the case of Poinsett Lumber does not purport to directly

address the issue before this Court, and the Oversight Board places more weight on it than it will

support.  Unlike the instant matter, in which claimants have timely filed proofs of Claim and

objected to the treatment of their Claims under the Plan, the claimant in Poinsett Lumber had

failed to timely preserve its right to object to the readjustment until after the plan had been

confirmed.  Poinsett Lumber Mfg., 119 F.2d at 274 ("Appellant could not remain silent until the

proceedings had advanced to the stage of a final decree and then, in a collateral attack, make the

claim successfully that its cause of action is not included in the plan of composition, nor affected

by it, nor dealt with therein.").  Moreover, although the Eighth Circuit did reject the creditor's

argument that the Takings Clause protected its claim from discharge, Poinsett Lumber concerned

a challenge to the constitutionality of a federal bankruptcy statute, the validity of which

apparently hinged on the determination that the drainage district was "not a governmental

agency," making that case dissimilar from the instant dispute, which concerns whether a plan of

adjustment is unconstitutional because it authorizes a government actor to withhold just

compensation owed for the taking of private property for public use.  119 F.2d at 272 (citing

Luehrmann v. Drainage Dist. No. 7 of Poinsett Cnty., 104 F.2d 696, 703 (8th Cir. 1939) ("the

Act of August 16, 1937, is valid as applied to this drainage district, which is not a governmental

agency.")).  Indeed, Poinsett Lumber's narrow reliance on Luehrmann appears to be for the

limited purpose of determining that the federal bankruptcy statute was valid.  Poinsett Lumber,

119 F.2d at 272-73.[38]  Here, by contrast, the question is whether government action under the

Plan (rather than the proper interpretation of a federal statute) permits a taking in violation of the

Fifth Amendment by impairing the constitutional right of just compensation.  Id. at 272-73.

Poinsett Lumber does not clearly support the Debtors' theory that a government debtor may

impair and discharge a valid Takings Clause Claim for just compensation, let alone for the

reason that the claim for just compensation is unsecured rather than secured.

168.169.      The Debtors' reliance on In re City of Stockton is likewise unavailing.

First, the creditor in that Ninth Circuit case had slept on his rights to oppose the discharge of his

claim under the plan of adjustment.  The majority determined that the creditor, a Mr. Cobb, had

not sought any stay relief, that the plan had already been substantially consummated, that

reversal of the confirmation order would have threatened the settlements underlying the plan to

the prejudice of settlement participants, and that the relief sought required dismantling the plan,

and so his claim was deemed equitably moot.  In re City of Stockton, 909 F.3d at 1263-65.  Such

---

[38]      It apparently mattered to the Poinsett Lumber court that the federal bankruptcy statute
was previously deemed valid in light of the fact that drainage districts were not
government agencies.  See id. at 272-73 (citing Luehrmann, 104 F.2d at 703)).
Nevertheless, even if the 1941 decision of Poinsett Lumber does not refute the Oversight
Board's position that Arkansas law recognized drainage districts as potentially liable for
Takings Clause claims (see Docket Entry No. 19574 ¶¶ 31-32 (citing St. Francis
Drainage Dist. v. Austin, 296 S.W.2d 668, 668-69 (Ark. 1956))), and that therefore
Poinsett Lumber assumes the dischargeability of Takings Clause claims, it is at best
unclear whether the Poinsett Lumber court squarely considered that precise question and
whether it factored into the decision it reached.  See Poinsett Lumber, 119 F.2d at 272-
73.  It is therefore inappropriate to infer from silence that the Poinsett Lumber court
maintained or even acknowledged the Oversight Board's theory.  Moreover, the general
dicta of Luehrmann at pages 702 and 703 (on which Poinsett Lumber imprecisely relies)
largely did not concern any prepetition per se taking, and to the extent it briefly upheld
the lower court's disallowance of an unliquidated claim for alleged overflow damage, it
did so for the limited purpose of acknowledging that the lower courts rightly overruled
the objection that the debtor was not insolvent.  As such, Luehrmann does not even
establish a thin reed of support for the Oversight Board's theory.  104 F.2d at 702-03.

questions of equitable mootness are simply not present at this pre-confirmation stage in the

instant proceeding.  Second, and more importantly, the Debtors' reliance on the Ninth Circuit's

alternate finding that Mr. Cobb's claim was dischargeable because his interest was unsecured

rather than secured, not only lacks any clear basis in Supreme Court jurisprudence, but it appears

to derive from a conflation of the constitutional guarantee of just compensation under the

Takings Clause with statutory remedies for other constitutional violations.  See id. at 1268

("[O]ther constitutionally based lawsuits seeking money damages, such as § 1983 claims, are

routinely adjusted in bankruptcy[.]").  See also id. at 1278 (Friedland, J. dissenting) ("[T]he

Constitution's mandate that takings claims be excepted from discharge does not depend on

whether those claims were initially classified in any bankruptcy proceeding as secured or

unsecured; the whole point of nondischargeability is that nondischargeable claims pass through

bankruptcy unaffected[.]").[39]  The Court declines any invitation to overlook the unique nature of

the Takings Clause here by conditioning the Fifth Amendment requirement of just compensation

on the existence of security for the obligation.  To hold otherwise would be to make the Takings

Clause subject to federal bankruptcy law, which is precisely the opposite of what the Supreme

Court has done.[40]

---

[39]    Despite the Oversight Board's argument that Judge Friedland's dissent distinguished
between pre-petition and post-petition transfers of title (Docket Entry No. 19574 ¶ 33
(discussing In re City of Stockton, 909 F.3d at 1276)), it does not support the Oversight
Board's theory.  The dissent made that distinction for the purpose of disputing the
procedural posture of Mr. Cobb's claim under California law and is a far cry from
constituting support for the Oversight Board's generalized theory that only post-petition
condemnations are not subject to impairment, let alone that they (and they alone) should
be treated as administrative expenses.  The Oversight Board obscures the relevance of
Judge Friedland's dissent, which reached the conclusion that this Court announces today.
Id. at 1278.

[40]    The Oversight Board also contended, for the first time, at oral argument that the
Court should allow the impairment and discharge of per se takings Claims because (i)
Congress can otherwise bar Takings Clause claims through the operation of statutes of

limitations, just like any other claim  (see, e.g., Nov. 22, 2021, Hr'g Tr. 60:10-25
(discussing Block v. North Dakota, 461 U.S. 273, 292 (1983))), and (ii) "the
bankruptcy power is not always subject to the Fifth Amendment when it comes to
discharge and avoidance of property interests," such that "if you can avoid a property
interest under Bankruptcy Code section 544, surely you can discharge an unsecured
claim to just compensation under section 944."  (Nov. 23, 2021, Hr'g Tr. 26:20-27:5.
See also Docket Entry No. 19574 ¶¶ 35-36.)  The first argument fails because (a) the
cases cited by the Oversight Board (including Block) are distinguishable, because none
of them directly involved any limitation periods for raising Takings Clause claims in
federal district courts, nor does any of them provide an analytical basis for determining
that Congress can statutorily limit a constitutional claim to which sovereign immunity
is not a barrier (cf. Soriano v. United States, 352 U.S. 270, 273-77 (1957) (statute of
limitations pertaining to claim for just compensation before Court of Federal Claims));
(b) statutes of limitations concern the procedural bounds of litigation decisions over
which claimants have control, such as the timing of filing a claim, and therefore they
do not support by analogy the Oversight Board's argument that PROMESA or the
Bankruptcy Code can substantively affect Takings Clause claims in a manner beyond
the control of the claimants; and, relatedly, (c) whereas statutes of limitations serve as
a procedural bar to claims and may therefore be harmonized with the Takings Clause
without impairing the substance of a litigant's right to just compensation, the Oversight
Board's theory would affect the substance of Takings Clause claims in a manner that
appears to abridge litigants' rights to just compensation itself, regardless of when their
claims are brought.  Ultimately, the Court need not, and does not, express any opinion
here as to the application of statutes of limitation to Takings Clause claims.

The Oversight Board's second argument fares no better: 11 U.S.C. § 544(b)(1) only
allows for the avoidance of transfers that would be voidable under applicable law.
Section 544(b)(1) is thus already restricted to transfers that are "voidable under
applicable law," which accommodates restrictions imposed by non-bankruptcy law,
including the Takings Clause.  11 U.S.C. § 544(b)(1).  Further, the Takings Clause
serves only as a narrow boundary to the Debtors' avoidance powers, particularly with
respect to per se takings.  In situations where regulatory takings are potentially at issue,
the authority under section 544(b)(1) to avoid transfers may still be exercised in cases
where the Penn Central analysis permits.  See also 11 U.S.C. §§ 544(a), 547(b), 548(a).
The Oversight Board essentially posits that, because it can conceive of a highly fact-
specific hypothetical in which an attempt to avoid an unrecorded transfer of real
property under section 544(a) might constitute a taking under this Court's analysis, the
avoidance provisions of the Bankruptcy Code would be broadly endangered if the
Takings Clause could preclude such avoidances.  (See Docket Entry No. 19574 ¶ 26.)
Not only does the Court decline to decide hypothetical cases not before it, but the
Oversight Board's argument is self-defeating.  It does not follow that, because the
Takings Clause could conceivably preclude a debtor's exercise of avoidance powers in
a highly specific set of circumstances, the Bankruptcy Code is endangered root and
branch.

169.170.        Accordingly, the Court concludes that the per se claims asserted by the

holders of alleged Eminent Domain and Inverse Condemnation Claims, to the extent they are

ultimately allowed, are not subject to impairment or discharge, and that such creditors'

objections to confirmation are hereby sustained to the extent the provisions of the Fifth Modified

Eighth Amended Plan (dated December 21, 2021) would treat such allowed claims as general

unsecured claims.  The Debtors have proffered the Alternative Full-Payment Proposal for the

treatment of the Claims in the event the Court, as it has done here, rejects the proposal to treat

unfunded portions of Eminent Domain and Inverse Condemnation Claims on parity with general

unsecured claims.  That Alternative Full-Payment Proposal provides for full satisfaction of

Allowed Eminent Domain and Inverse Condemnation Claims when this decision and

determinations allowing such Claims become final.  The Court directed the Debtors to revise the

Fifth Modified Eighth Amended Plan to provide solely for such treatment of the Claims

(although the Debtors' original position that the Claims are dischargeable and may be treated as

general unsecured claims to the extent they are unfunded is preserved for appeal) and the

Debtors have done so.[41]  The Court, accordingly, finds that the Sixth Modified Eighth Amended

Plan's treatment of Eminent Domain and Inverse Condemnation Claims is not a barrier to

confirmation.

---

[41]     The Court's analysis should not be construed to prejudge whether particular Eminent
Domain and Inverse Condemnation creditors must receive "full" compensation for their
Takings Clause Claims. The Fifth Amendment mandates that a meritorious takings
claimant receive just compensation, as determined by the court.  See In re City of
Stockton, 909 F.3d at 1279 (Friedland, J. dissenting). The Court does not decide or
prejudge today the meaning or quantum of just compensation for any particular
claimant.  For some claimants, that amount has already been adjudicated. For others,
that determination has not yet been made. Rather, the Court's limited determination here
is that the Fifth Amendment prohibits the Plan from providing less than just
compensation for allowed Eminent Domain and Inverse Condemnation Claims by way
of impairment and discharge through bankruptcy.

~~170.~~171.       **Bondholders' Objections**: With respect to the objectors who have raised

Takings Clause arguments with respect to their status as bondholders (see Docket Entry Nos.

18418 (the "Samodovitz Objection"), 18575 (the "Hein Objection")), the proper analytical

framework for addressing these claims is set forth in Penn Central.  438 U.S. at 124; see Patriot

Portfolio, LLC v. Weinstein (In re Weinstein), 164 F.3d 677, 685 (1st Cir. 1999) (applying Penn

Central analysis to constitutional challenge to lien avoidance pursuant to section 522(f) of the

Bankruptcy Code).  Pursuant to that test, courts consider three factors: "(1) the economic impact

of the regulation on the claimant; (2) the extent to which the regulation interferes with the

claimant's reasonable investment-backed expectations; and (3) the character of the governmental

action."  Patriot Portfolio, 164 F.3d at 685.

~~171.~~172.       Considering the first factor, the Court notes that the actions challenged by

the Bondholders will not result in the total destruction of the value of the liens allegedly securing

the existing bonds.  Pursuant to the terms of the Plan (see Plan §§ 1.199, 1.359, 74.1),

bondholders will receive substantial value in new secured bonds and, in some cases, cash.  (See

also Disclosure Statement, Docket Entry No. 17628 at 61 ("The New GO Bonds will be secured

by a statutory first lien and pledge of the amounts on deposit in the Debt Service Fund and a

pledge of the Commonwealth's full faith, credit and taxing power[.]").)

~~172.~~173.       Second, although the proposed treatment of bondholders' claims may

interfere with certain bondholders' subjective investment expectations, a proper assessment of

bondholders' reasonable expectations must take account of the general risk that a government

issuer may have higher payment priorities in the event of a reorganization or economic crisis,

and the more specific risks of potential economic instability resulting from the indebtedness of

the Commonwealth, at the time they made their bond investments.  Cf. New Haven Inclusion

Cases, 399 U.S. 392, 491-92 (1970) (noting that security holders "invested their capital in a
public utility that does owe an obligation to the public . . . [and thereby] assumed the risk that in
any depression or any reorganization the interests of the public would be considered as well as
theirs") (citation and quotation marks omitted)).

173.174.          Third, the character of the governmental action strongly indicates that the
Plan does not result in an unconstitutional taking.  The challenged proposals are not physical
invasions of property by the government.  Rather, the restructuring of the relationships between
the Commonwealth and its bondholders, using the powers established by Congress in
PROMESA, is a quintessential example of a "public program adjusting the benefits and burdens
of economic life to promote the common good."  Penn Cent. Transp. Co., 438 U.S. at 124.  The
Takings Claim aspect of the Bondholders' objections is therefore overruled.

174.175.          **Suiza Dairy Objection**:  Unlike the objecting holders of Eminent
Domain/Inverse Condemnation Claims, Suiza Dairy ("Suiza") has not demonstrated that it has a
factual or legal basis for its assertion that it holds a valid Takings Clause Claim that is protected
by the Fifth Amendment.  Suiza objects to the Plan, asserting, on the basis of a preliminary
injunction it had obtained prepetition in the District of Puerto Rico against the Milk Industry
Regulatory Office of Puerto Rico, that it has an adjudicated regulatory taking claim against the
Commonwealth (Docket Entry No. 18594) (the "Suiza Objection").  See Vaqueria Tres
Monjitas, Inc. v. Laboy, Civil No. 04-1840 (DRD), 2007 WL 7733665 (D.P.R. July 13, 2007).
The Plan's impairment of Suiza's claim does not violate the Takings Clause of the Constitution
of the United States for the simple reason that, prior to receiving a final judgment on its Takings
Clause claim, see Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 484 (1st Cir. 2009),
Suiza (and other plaintiffs) entered into a stipulation (Docket Entry No. 2322 in Civil Case No.

04-1840 and Docket Entry No. 19361-6 in Case No. 17-3283) (the "Dairy Producer Settlement"),

under which the parties agreed to abide by certain regulatory accrual formulae set forth therein

(Dairy Producer Settlement ¶ 14.)  The Dairy Producer Settlement made no concession of the

plaintiffs' claims, made no concession of the validity of any of the prior district and circuit court

determinations, and provided that entry of court approval would operate as a final and

unappealable judgment dismissing the action with prejudice (Dairy Producer Settlement ¶¶ 1-2.)

In assessing the nature of the regulatory accrual which the preliminary injunction required (and

the Dairy Producer Settlement would thereafter incorporate), the First Circuit determined that it

was not just compensation for a taking, but instead resembled an equitable remedy.  See Irizarry,

587 F.3d at 479-80.  The court's judgment was thereafter entered on November 6, 2013,

incorporating the terms of the Dairy Producer Settlement.  (Docket Entry No. 2347 in Civil Case

No. 04-1840 and Docket Entry No. 19361-7 in Case No. 17-3283.)  Thus, there was no favorable

adjudication of Suiza's Takings Clause claim, which was dismissed with prejudice by the

ordered entered in 2013.  See Irizarry, 587 F.3d at 479-80 ("[H]ere there has been no award of

damages that the state must pay.  That an equitable remedy results in the payment of monies to

plaintiff does not, in itself, render the relief monetary compensation for a taking."), rh'g denied,

600 F.3d 1 (1st Cir. 2010).  Accordingly, it follows that Suiza merely has a contract-based claim

for payment pursuant to the Dairy Producer Settlement.

175.176.     The Court looks to the three factors of Penn Central to determine whether

the impairment of Suiza's property interest in its settlement agreement rises to the level of a

taking.  Concerning the first factor, the Plan's treatment of Suiza's claim will not result in the

total destruction of the value of Suiza's interest in the Dairy Producer Settlement.  Rather, to the

extent the Plan's treatment of Class 53 affects Suiza's claim, the plan provides for the payment

of 50% of the Allowed Dairy Producer Claim and preserves other rights under the Dairy

Producer Settlement.  (Plan § 57.1.)

~~176.~~177.        Second, notwithstanding Suiza's subjective economic expectations at the

time the Dairy Producer Settlement was executed, any assessment of its reasonable expectations

must account for an awareness of the Commonwealth's indebtedness, as well as the general risk

that the Commonwealth might have higher payment priorities in the event of a reorganization or

economic crisis.  See New Haven Inclusion Cases, 399 U.S. at 492.

~~177.~~178.        Third, the character of the governmental action strongly supports the

Court's determination that the Plan's treatment of Suiza's claim does not result in an

unconstitutional taking.  Rather, the restructuring of the relationships between the

Commonwealth and its creditors under the powers established by PROMESA is a prime example

of a "public program adjusting the benefits and burdens of economic life to promote the common

good." Penn Cent. Transp. Co., 438 U.S. at 124.  Accordingly, the Plan's treatment of Suiza's

claim does not constitute a taking without just compensation in violation of the Takings Clause

of the Constitution of the United States.  Suiza's objection is therefore overruled.


**Discrimination Provisions: Due Process, Equal Protection, and Privileges and Immunities
Clauses**

~~178.~~179.        Objector Peter Hein contends that the Plan's different treatment of

mainland investors from Puerto Rico-resident investors violates the various discrimination

provisions of the Constitution of the United States, to the extent the Plan makes distinctions

based on investors' geographic location.  (Hein Obj. at 26.)[42]  Such discrimination, he argues,

---

[42]        Specifically, Mr. Hein argues that all bondholders of a particular bond series, and not just
Puerto Rico investors, should be given the option to elect to receive a single maturity of

violates the Due Process, Equal Protection, and Privileges and Immunities Clauses of the

Constitution of the United States.  U.S. Const. art. IV, § 2, cl.1; am. V; am. XIV § 1.  The Plan

does not, however, violate any of these provisions of the Constitution.

179.180.     Regarding the Privileges and Immunities Clause, not only are the Court's

decisions concerning the confirmability of the Plan not limited by the Clause, Hawes v. Club

Ecuestre El Comandante, 535 F.2d 140, 145 (1st Cir. 1976) ("Article IV, s 2 is a limitation on

powers of states and in no way affects the powers of a federal district court."), the Plan's taxable

bond election provision does not fall within the purview of the Privileges and Immunities Clause

because it does not burden an activity that is sufficiently basic to the "vitality of the nation as a

single entity," Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. 371, 383 (1978); see also

id. at 388, and it is closely related to the advancement of a substantial state interest, namely, the

reorganization of the Commonwealth's debts.  Supreme Court of Va. v. Friedman, 487 U.S. 59,

65 (1988).

180.181.     As for the Due Process and Equal Protection Clauses of the Fifth and

Fourteenth Amendments, Mr. Hein has exercised his right to challenge the differential treatment

before this tribunal, he has cited no fundamental right as being impaired, and has not identified

any discrimination based on any constitutionally protected class or status.  His objections citing

these constitutional amendments thus have no factual basis. Mr. Hein's argument that due

process prevents the Court from merely deferring to the Oversight Board's determinations and

certifications (see Hein Obj. at 18), is beside the point because the Court has indeed undertaken

an independent review of the Plan, in accordance with the legal standards applicable under

---

potentially taxable higher coupon bonds, and that failure to do so causes discrimination
based on place of residence.  (Hein Obj. at 26.)

PROMESA, which do not authorize the Oversight Board to act as a judge in its own case, nor to discharge or impair claims unilaterally.  See In re Fin. Oversight & Mgmt. Bd. for P.R. 583 B.R. 626, 632-33 (D.P.R. 2017).  Moreover, the Plan's taxable election provision is supported by a rational basis because it seeks, by providing an opportunity to maximize the availability of non-taxable bonds for mainland investors who pay federal taxes, to enhance recoveries for mainland investors without harming local investors.  See United States v. Kras, 409 U.S. 434, 446 (1973).

181.182.       His objections are therefore overruled.

182.183.       The Plan complies with PROMESA section 314(b)(3).

**D.  PROMESA § 314(b)(4):** *The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date.*

183.184.       Section 3.1 of the Plan states: "On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan."

~~184.~~185.     Consummation Costs, Restriction Fees, and Retail Support Fees will be

paid in Cash on the Effective Date.  All other Allowed Administrative Expense Claims, if any,

will likewise be paid pursuant to section 3.1 of the Plan.

~~185.~~186.     The Plan complies with section 314(b)(4) of PROMESA.

**E. PROMESA § 314(b)(5):** *The Plan Has Obtained all Necessary Legislative, Regulatory, and Electoral Approvals*.

~~186.~~187.     The Plan has obtained all necessary legislative, regulatory, and electoral

approvals.  Further, by approving and certifying the Fiscal Plan, the Oversight Board provided

approval for the issuance of securities contemplated by the Plan as required by section 207 of

PROMESA.  The debt authorization in Act 53 is conditioned only on the Plan's removal of the

Monthly Benefit Modification that was provided for in the Seventh Amended Plan and does not

require removal of the pension freezes or the elimination of COLAs from the Plan.  Act 53

(Debtors Ex. 134), arts. 104, 605.  Pursuant to Puerto Rico law, legislation of the Commonwealth

is presumed to be valid if enacted by the Legislative Assembly of Puerto Rico and signed into

law by the Governor.  See, e.g., Brau v. ELA, 190 D.P.R. 315, 337 (P.R. 2014); Partido

Socialista Puertorriqueño v. Puerto Rico, 107 D.P.R. 590, 609 n.11 (P.R. 1978), holding

modified by Partido Independentista Puertorriqueño v. Comisión Estatal de Elecciones y Ostros,

120 D.P.R. 580 (P.R. 1988) ("To begin with, laws are presumed to be constitutional and the

movant [objector] should place the courts in a position to decide by introducing evidence to

sustain the facts alleged, and then stating the legal arguments on which its assignment of

unconstitutionality is based, specifically mentioning the constitutional provisions involved and

the legal precedents supporting its assignment.

**F. PROMESA § 314(b)(6):** *The Plan Is Feasible and in the Best Interests of Creditors*.

~~187.~~188.     The Plan complies with section 314(b)(6) of PROMESA because it is feasible and in the best interests of creditors.

### i. Feasibility

"[T]he Court has an independent duty to determine [feasibility] and to make specific findings of fact."  In re City of Detroit, 524 B.R. 147, 220 (Bankr. E.D. Mich. 2014).  Under PROMESA, a plan of adjustment must be supported by financial projections that are "reasonable and demonstrate a probability that [the Debtor] will be able to satisfy its obligations under the Plan."  In re Fin. Oversight & Mgmt. Bd. for P.R., 361 F. Supp. 3d 203, 246 (D.P.R. 2019).  Additionally, as in chapter 9, a PROMESA debtor, as a government entity, must show that it is "probable that [the] debtor can both pay post-petition debt and provide future public services at the level necessary to its viability as a [territory]."  In re Mount Carbon Metro. Dist., 242 B.R. 18, 35 (Bank. D. Colo. 1999).  The core inquiry has been articulated as follows: "Is it likely that the [Debtor], after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of [the Debtor] and to meet the obligations contemplated in the Plan without the significant probability of a default?"  In re City of Detroit, 524 B.R. at 222.

### a. The Plan is Feasible as to ERS

~~188.~~189.     The Plan is feasible with respect to ERS.  ERS no longer has pension and other obligations to beneficiaries, those obligations having been assumed by the Commonwealth upon the enactment of Act 106.  Pursuant to the Plan, ERS's assets are being sold and transferred to the Commonwealth in exchange for $373 million and the agreement to purchase the ERS Private Equity Portfolio for $70,750,000, subject to certain conditions.  ERS's obligations pursuant to the Plan include distributing the $373 million in cash received from the

Commonwealth to the holders of Allowed ERS Bond Claims, as well as payments to holders of Allowed ERS General Unsecured Claims in a *de minimis* amount.  (Jaresko Decl. ¶ 98; Plan §§ 2.4, 69.2, 77.1(c).)

189.190.      Pursuant to the Plan, ERS will place the ERS Private Equity Portfolio in the ERS Trust, which will then be purchased by either the Commonwealth or holder(s) of Allowed ERS Bond Claims on or before April 25, 2023 for no less than $70,750,000, which funds will be distributed to holders of Allowed ERS Bond Claims.  (Jaresko Decl. ¶ 99; Plan §§ 2.4, 69.2, 77.1(c).)  Further, on the Effective Date, each holder of an ERS General Unsecured Claim will receive such holder's Pro Rata Share of the ERS GUC Pool, which is comprised of $500,000 plus the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests, capped at $5 million.  (Plan §§ 70.1, 1.223.)  ERS will dissolve after the Effective Date of the Plan and all remaining assets of ERS will be deemed sold and transferred to the Commonwealth.  (Jaresko Decl. ¶ 99; Plan § 88.2.)  Any excess amount in the ERS GUC Pool will be reallocated, on a pro rata basis, to holders of Allowed CW General Unsecured Claims.  (Plan § 1.223.)  ERS will therefore have no material obligations after the Effective Date. (Jaresko Decl. ¶ 99.)  Accordingly, the Plan is feasible with respect to ERS and is not likely to result in the need for a further restructuring of ERS.

**b.  The Plan is Feasible as to PBA**

190.191.      The Plan is feasible with respect to PBA, as PBA holds sufficient cash to pay its obligations to all of its creditors pursuant to the Plan, including any Allowed Claims on account of loans made by GDB to PBA.  (Jaresko Decl. ¶ 100.)  Holders of PBA Bond Claims will receive their Pro Rata Share of the Vintage PBA Bond Recovery, 2011 PBA Bond Recovery, or 2012 PBA Bond Recovery, as applicable, in the aggregate amount of

approximately $1.1 billion to be paid by the Commonwealth.  (Shah Decl. ¶ 59; Plan arts. V-XV.)  Holders of Claims in Classes 12 (PBA/DRA Secured Claims), 13 (PBA General Unsecured Claims), and 14 (PBA/DRA Unsecured Claims) will each receive Cash in an amount equal to ten percent (10%) of such Claims.  (Plan arts. XVI-XVIII.)

191.192.    The Debtors seek an order providing that each of the Unexpired Leases to which PBA is a party (collectively, the "PBA Leases") will be deemed rejected upon the earliest to occur of (a) June 30, 2022, (b) the date upon which such PBA Lease expires in accordance with its terms, (c) the date upon which PBA enters into a new or amended lease with respect to the leased property subject to such PBA Lease, (d) such other date of which PBA, as lessor, provides written notice to the counterparty to a PBA Lease, and (e) the date upon which AAFAF provides written notice to PBA that such PBA Lease is rejected; provided, however, that during the period from the Effective Date up to the date of such rejection, with respect to any PBA Lease between PBA as lessor and the Commonwealth or any Commonwealth agency, public corporation, or instrumentality, as lessee, monthly lease payments shall be limited to the lower of (y) the amount budgeted and approved pursuant to a certified fiscal plan and (z) the monthly costs and expenses associated with the applicable leased property; and provided, further, that any accruals on the books of PBA or any of the Commonwealth or an agency, public corporation, or instrumentality of the Commonwealth as counterparty to a PBA Lease for the unpaid debt service component of rent under any PBA Lease shall be deemed released, settled, and discharged as of the rejection date.  (See Confirmation Ord. ¶ 84.) The treatment of PBA Leases has been consented to by the Oversight Board, on behalf of the Debtors.  The Oversight Board represents, and AAFAF has not denied, that AAFAF, on behalf of the agencies, instrumentalities,

and public corporations, has also consented to the treatment of the PBA Leases set forth in the Plan.

192.193.        Accordingly, the Plan is feasible with respect to PBA and is not likely to result in the need for a further restructuring of PBA.

### c.  The Plan is Feasible as to the Commonwealth

193.194.        The Plan is feasible with respect to the Commonwealth.  The Plan provides for the following types of payments to financial creditors: (1) cash on the Effective Date, (2) new debt issued by the Commonwealth in the form of New GO Bonds, and (3) CVIs. (Zelin Decl. ¶ 47; Malhotra Decl. ¶ 9.)  In addition, the Plan contemplates payments to retirees of pensions and other benefits, without adjustment for any Monthly Benefit Modification, as well as additional payments to Commonwealth employees.  (Malhotra Decl. ¶ 9.)

194.195.        The Plan provides for the payment of Cash on the Effective Date and over time, in the aggregate amount of approximately $8 billion, plus up to $801 million in consummation costs, restriction fees, and retail support fees.  (See Malhotra Decl. ¶ 10; Zelin Decl. ¶¶ 48, 86.)

195.196.        The Plan provides that the Reorganized Commonwealth will issue New GO Bonds on the Effective Date with different maturity dates, having an aggregate original principal amount of $7,414,063,543.25.  (Malhotra Decl. ¶ 11; Zelin Decl. ¶ 49; Plan art. LXXIV.)  All holders of general obligation debt and general obligation guaranteed debt will receive New GO Bonds having thirteen (13) CUSIP numbers, which distribution was calculated to provide each holder with incremental value of 2.25% of their par claims, which increment exceeds any liquidity charge by approximately 1.75% of their par claims.  (See Nov. 12, 2021, Hr'g Tr. 108:15-111:1.)  Minimizing the number of CUSIPs would not be in the interest of

bondholders as a whole; rather, the issuance pursuant to the Plan of thirteen (13) CUSIPs to each

bondholder provides each holder with as significant a recovery as possible within the boundaries

of the municipal bond market and the need to keep annual debt service sustainable, and a

significantly greater total amount of value.  (See Nov. 12, 2021, Hr'g Tr. 105:11-106:4; 108:18-

111:4.)  The aggregate amount owed, including all principal and interest over the life of the New

GO Bonds from the Deemed Issuance Date of July 1, 2021 to the maturity of the final New GO

Bond on July 1, 2046, is $10,914,969,303.20.  (Malhotra Decl. ¶ 12; Zelin Decl. ¶ 49.)  The Plan

provides for a Debt Service Fund to be established.  On the first business day of each month after

the Effective Date until the obligations of the applicable New GO Bonds are satisfied, the

Commonwealth will deposit the portion of principal and accrued interest for that month into the

Debt Service Fund.  (Malhotra Decl. ¶ 16; Plan § 74.1(f).)  The Plan also provides that, on the

Effective Date, the Reorganized Commonwealth shall deposit into the Debt Service Fund such

additional amounts necessary to account for the New GO Bonds being issued as of the Deemed

Issuance Date.  (Plan § 74.1(f).)

196.197.       The Plan provides for the issuance of (i) GO CVIs in the aggregate

original notional amount of $3.5 billion, having a maturity date of July 1, 2043 and a final

redemption payment date of November 1, 2043, and (ii) Clawback CVIs in the aggregate original

notional amount of $5.239 billion, having a maturity date of July 1, 2051 and a final redemption

payment date of November 1, 2051.  (Malhotra Decl. ¶ 19; Zelin Decl. ¶ 54; Plan § 74.2.)  The

Commonwealth's obligation to pay under the CVIs arises only if certain outperformance

conditions specified in the Plan and the CVI indentures occur.  Specifically, the Plan provides for

the establishment of threshold metrics based on tax revenue projections contained in certified

fiscal plans.  Only if actual revenues exceed the established threshold at the end of a given fiscal

year will an obligation to pay come into being, subject to certain caps.  (Malhotra Decl. ¶ 20;
Zelin Decl. ¶ 55; Plan Ex. J.)  Further, payments on the CVIs are triggered only when both
cumulative and annual outperformance occurs, which protects the Commonwealth from making
substantial CVI payouts when it experiences one year of outperformance after experiencing
several years of underperformance.  (Malhotra Decl. ¶¶ 35-37; Zelin Decl. ¶¶ 60-65.)

197.198.       In addition, the Plan provides for (i) payments of pension and other post-
employment benefits to retired Commonwealth employees, without adjustment for any Monthly
Benefit Modification, (ii) the restoration of contributions made by Commonwealth employees to
the System 2000 program, and (iii) payments to the Pension Reserve Trust.  (Malhotra Decl. ¶
21; Plan art. LV.)  Participants in System 2000 will not be subject to benefit reductions, but
instead will receive the amount of their contributions to System 2000 from its enactment until
June 30, 2017.  (Plan § 55.1.)  The aggregate sum of such contributions plus interest accrued
thereon is approximately $1.2 billion.  (Malhotra Decl. ¶ 23.)  The Pension Reserve Trust will
receive an initial contribution of $5 million on the Effective Date and, for the next ten (10) fiscal
years, the Commonwealth will make a contribution in an amount equal to (1) the Base
Contribution, $175 million or, for any fiscal year in which the projected Fiscal Plan Surplus set
forth in the Fiscal Plan is equal to or greater than $1.75 billion, an amount equal to fifty percent
(50%) of that amount, plus (2) an additional amount calculated as (i) the lower of the actual
primary surplus for such fiscal year and the projected Fiscal Plan surplus for such fiscal year,
minus (ii) the sum of the Base Contribution, plus the Commonwealth's debt service obligations
pursuant to the Plan for such fiscal year, plus $200 million.  (Plan art. LXXXIII; Malhotra Decl.
¶ 24; Malhotra Sup. Decl. ¶¶ 12-13; Jaresko Sup. Decl. ¶¶ 10-11; Santambrogio Sup. Decl. ¶¶ 8-
9.)  The Commonwealth's contributions to the Pension Reserve Trust are estimated to total

approximately $2.4 billion during the ten years of funding based on the Fiscal Plan, all of which

will be paid during the time period in which the Fiscal Plan projects surpluses.  The Pension

Reserve Trust is projected to have a balance of $3.1 billion through the end of fiscal year 2031

based on the Fiscal Plan.  (Malhotra Sup. Decl. ¶ 14; Santambrogio Sup. Decl. ¶ 10.)  Further,

the Pension Reserve Trust will be professionally and independently managed to insulate the

funding available to pay pensions from political or economic influences.  (Malhotra Decl. ¶

34.)[43]

198.199.    The Seventh Amended Plan contained a Monthly Benefit Modification

pursuant to which reductions to monthly pension payments would be made.  The New GO Bond

Legislation and CVI Legislation, Act 53, is conditioned on the removal of the Monthly Benefit

Modification from the Plan and so, consistent with Act 53, the Plan no longer contains a Monthly

Benefit Modification provision.  (See Plan art. LV.)  The Plan nevertheless remains feasible,

provided there are no other modifications to the Plan involving pensions.  The elimination of the

Monthly Benefit Modification is estimated to add an average of approximately $87 million

annually to the cost of the Commonwealth's PayGo obligations for the first ten years, which

represents less than five percent (5%) of the Commonwealth's estimated PayGo expenses for this

period, and less than one percent (1%) of the Commonwealth's overall budget for this period.

The additional cost will be payable from the surpluses projected in the Fiscal Plan during this

---

[43]    AAFAF objects to portions of this finding, and to similar conclusions in ¶ 224 concerning
the Pension Reserve Trust, arguing the factual evidence supporting the funding details is
based on declarations that were submitted prior to changes made to the funding
provisions during the Confirmation Hearing.  (See Docket Entry No. 19402 at 12; see
also Docket Entry No. 19173; Docket Entry No. 19320).  The Debtors have, however,
provided an explanation of the need for such changes and the factual support for the
feasibility of the new provisions in the supplemental declarations of Ms. Jaresko, Mr.
Malhotra, and Mr. Santambrogio.  (See Jaresko Sup. Decl. ¶¶ 9-11; Malhotra Sup. Decl.
¶¶ 12-13; Santambrogio Sup. Decl. ¶¶ 8-9.)  AAFAF's objection is therefore overruled.

period.  Over the thirty-year period of Fiscal Plan projections, the aggregate cost of eliminating

the Monthly Benefit Modification is approximately $1.9 billion.  (Malhotra Sup. Decl. ¶ 9, Ex. 1;

Levy Sup. Decl. ¶ 10; Jaresko Sup. Decl. ¶ 8.)  The elimination of the Monthly Benefit

Modification does not materially affect the feasibility of the Plan.  (Malhotra Sup. Decl. ¶ 10;

Jaresko Sup. Decl. ¶¶ 8-12.)

~~199.~~200.        If the Plan were modified to (i) eliminate the freeze of JRS and TRS

pension benefit accruals and (ii) retain any future pension benefit cost of living adjustments, the

Plan would be at risk of not being feasible.  (Malhotra Sup. Decl. ¶ 8; Jaresko Sup. Decl. ¶ 13.)

Specifically, the PayGo impact of eliminating the pension freeze and reinstating COLAs relative

to the Fiscal Plan is estimated to be approximately $5.6 billion over thirty (30) years, or

approximately $4.7 billion after taking into account social security costs.  (Levy Sup. Decl. ¶ 14.)

By 2047, the incremental PayGo cost associated with eliminating the pension freeze and

maintaining COLAs is estimated to increase the annual PayGo obligation by twenty-five percent

(25%).  Unlike the elimination of the Monthly Benefit Modification, the incremental cost of

which decreases as the Commonwealth approaches the deficits projected by the Fiscal Plan, the

incremental costs associated with eliminating the pension freeze and reinstating any COLAs are

projected to grow larger as the Commonwealth approaches the deficits projected by the Fiscal

Plan, thus presenting the risk that the Plan may not be feasible.[44]  (Malhotra Sup. Decl. ¶¶ 17-18;

---

[44]        AMPR objects that, even with the inclusion of the JRS and TRS benefit freeze, the Plan
       may not be feasible because the employees whose benefits are frozen will have a
       damages claim based on the loss of their future accruals that is not provided for in the
       Plan. (See Docket Entry No. 18585 at 16 n.12).  AMPR does not proffer any evidence
       concerning the potential cost of such claims to the Commonwealth.  The Debtors proffer
       that the Plan already provides for the treatment of these claims by ensuring the payment
       of any defined benefits accrued up to the Effective Date, providing a tax deferred defined
       contribution account, and providing matching contributions to Social Security for those
       who opt in. (Nov. 15, 2021, Hr'g Tr. 51:2 - 51:7.)  To the extent AMPR would be able to

Levy Sup. Decl. ¶¶ 9-17.)  Absent the Pension Freeze, TRS and JRS pension liabilities will continue to increase relative to the Fiscal Plan.  Eliminating the pension freeze would create an open-ended incremental defined benefit liability because TRS and JRS participants would continue to accrue new benefits for as long as they continue to work for the Commonwealth.  (Malhotra Sup. Decl. ¶ 18.)  Moreover, not implementing the pension freeze and the reinstatement of COLAs would increase the likelihood of needing to rely on the Pension Reserve Trust for payment of the Commonwealth's PayGo obligations, and increase the risk of completely exhausting the Pension Reserve Trust during the Fiscal Plan projection period.  (Malhotra Sup. Decl. ¶ 18; Levy Sup. Decl. ¶ 16.)

200.201.      Section 83.4 of the Plan ensures that pension-related provisions contained in the Plan will not be undone in the short term such that pension payments become unaffordable, providing that: "Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature of the Commonwealth of Puerto Rico,

---

assert a rejection damages claim, the Court finds that the Plan anticipates any such claim from the employees subject to the freeze of their benefits, (see Plan § 1.487 (defining "TRS Participant Claim" to include "any right to accrue additional retiree benefits in TRS from and after the Effective Date")) and provides a treatment for such claims (see Plan §§ 55.3, 55.9) that is accounted for in the Debtors' feasibility demonstration.  AMPR has not provided any evidence showing that prospective claims from its members would render the Plan infeasible.  AMPR's feasibility objection is therefore overruled.

subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from

this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes,

(iii) the reasons why the requested changes will not create a risk of the financial distress caused

by the Commonwealth's prior defined benefit plans (the poor management of which led to under

which the Commonwealth and other governmental employers accrued nearly $55 billion of

unfunded pension obligations), (iv) the means of funding the requested changes and reasons why

there is little risk of such funding not being carried out, (v) the reasons why the requested

changes will not create a material risk of defaults on any of the then outstanding obligations

pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and

defined benefit plans are both prudent and required; and, provided, however, that, prior to the

termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit

pension payment or obligation to current or future retirees from the benefits provided by the

Plan."  (Plan § 83.4.)  This prohibition on new defined benefits for a ten (10) year period is

enforceable and is essential to the Plan's continued feasibility.[45]  (See Nov. 15, 2021, Hr'g Tr.

181:16-182:14; see also Malhotra Sup. Decl. ¶ 20 (explaining the costs of pension-related laws

proposed by the government would increase the risk the Plan will not be feasible).)

201. 202.     The Plan also provides for additional payments to be made to current

employees who are members of certain public employee unions affiliated with AFSCME and

non-union rank and file employees.  Pursuant to the Plan, the Commonwealth's monthly

contribution for healthcare benefits to Commonwealth employees who are members of

AFSCME-affiliated unions will increase from $125 per employee per month to $170 per

employee per month.  (See Santambrogio Decl. ¶ 31; Malhotra Decl. ¶ 26.)  In addition, the Plan

---

[45]     See supra n.23.

provides for $500 signing bonuses to each member of an AFSCME-affiliated union and, if the

Commonwealth has an excess cash surplus after CVI payments that is greater than $100 million,

25% of that surplus will be allocated to a bonus pool for the benefit of members of the

AFSCME-affiliated unions and other non-union rank and file employees.  (Plan art. LVI; Plan

Ex. G; Malhotra Decl. ¶¶ 25-26, 29 & n.6; Santambrogio Decl. ¶¶ 22-23.)  Subject to a minimum

cash bonus of $2,000 per year per AFSCME-represented employee for the five-year term of the

amended collective bargaining agreement, such employees only receive the cash surplus bonuses

if the government outperforms the Fiscal Plan, so employees are incentivized to ensure that the

government is operating efficiently.  (Nov. 10, 2021, Hr'g Tr. 62:25-63:4; Santambrogio Sup.

Decl. ¶ 11.)

202.203.      The Plan also provides that the Debtors shall transfer ACR-eligible claims

pursuant to the ACR Order, which claims shall be reconciled and paid in the ordinary course of

business.  The Commonwealth has reserved $229 million for payment of such claims.  (Plan §

82.7; Malhotra Decl. ¶¶ 27, 29.)

203.204.      Further, the Plan provides ERS Bondholders a right to receive a future

payment of $70.75 million from the purchase of the ERS Private Equity Portfolio.  (Plan § 69.2;

Malhotra Decl. ¶¶ 27, 29.)

204.205.      The Plan, including each of these provisions, is feasible with respect to the

Commonwealth.[46]  (Malhotra Decl. ¶ 29.)  Confirmation of the Plan is not likely to be followed

---

[46]      The Plan remains feasible even accounting for the payment in full of the total of Eminent
Domain and Inverse Condemnation Claims asserted to arise out of the Takings Clause.
See supra ¶¶ 65, 160, 169.  Based on a review and reconciliation of claims to date, the
cost of such Claims is currently estimated to be approximately $390 million. (See
Herriman Sup. Decl. ¶ 11.)  The Debtors have proffered credible evidence to support the
conclusion that the Plan would still be feasible because the Commonwealth will have
sufficient cash remaining after fulfilling its Effective Date obligations under the Plan to

by the need for further financial reorganization not contemplated in the Plan, and will enable the

Commonwealth to provide future public services and remain a viable public entity.  That is true

notwithstanding the fact that, based on the 2021 Fiscal Plan (Debtors Ex. 10) projections, deficits

after debt service are projected to reemerge in approximately FY 2035.  (Malhotra Decl. ¶ 29.)

By the time deficits are projected to emerge, the amount of Commonwealth general obligation

debt outstanding will only be $2.1 billion, as compared to pre-petition debt liabilities of $30.5

billion.  (Id.)  The Commonwealth will not likely need further reorganization notwithstanding

projected deficits due to a number of factors, including the following: (i) the Plan reduces the

Commonwealth's overall debt; (ii) the Plan includes multiple provisions designed to insulate the

Commonwealth from downside risks; (iii) the Commonwealth can implement certain reforms the

Oversight Board identified that could result in additional liquidity, which could eliminate the

projected deficit;[47] and (iv) the Plan does not take into account potential upside factors which, if

they materialize, would result in additional liquidity.  (See id.)

---

pay such Eminent Domain/Inverse Condemnation Claims, to the extent they are Allowed,
in full.  Additionally, not all Allowed Eminent Domain/Inverse Condemnation Claims
will need to be paid out immediately on the Effective Date, as some have not yet been
adjudicated.  (See Debtors Ex. 30 at 3; Malhotra Sup. Decl. Ex. 1; Herriman Sup. Decl.;
Nov. 22, 2021, Hr'g Tr. 15:11-17:20.)

[47]   Mr. Hein argues that the Commonwealth has previously failed to implement structural
reforms put forth by the Oversight Board and that there is no evidence that the
Commonwealth government would now adopt such proposals, such that the Debtors'
representation that the Plan is feasible is unpersuasive.  (See, e.g., Docket Entry No.
19400 at 41-42.)  The Commonwealth government's commitment to implementing
proposed structural changes cannot be guaranteed, but the Plan provides incentives for
the Commonwealth and interested parties to ensure that the government pursues policies
to achieve strong fiscal performance.  (See, e.g., Malhotra Decl. ¶ 26 (describing Upside
Bonus Participation pool for certain public employees if the Commonwealth has an
Excess Cash Surplus); Zelin Decl. ¶¶ 60-66 (explaining alignment of incentives between
the Commonwealth and CVI holders to achieve outperformance).)  Furthermore, as set
forth supra, the proposed structural reforms are not the only protections the Plan offers to
combat projected deficits starting in FY 2035.  The Plan also provides mechanisms such
as the Pension Reserve Trust, the CVI structure, and the Debt Management Policy to

205.206.       The Plan also reduces the Debtors' debt significantly.  After confirmation,

the Commonwealth's general obligation and guaranteed debt will be approximately $7.4 billion,

considerably lower than the $30.5 billion pre-restructuring total, and all ERS and PBA debt will

be eliminated.  (Malhotra Decl. ¶ 31; Jaresko Decl. ¶¶ 98-100.)  Prior to the commencement of

the Title III Cases, annual Commonwealth debt service was approximately $2.1 billion, and post-

Effective Date, the Commonwealth's average annual debt service during the first ten years will

be approximately $666 million.[48]  (Malhotra Decl. ¶¶ 30-31.)  Over 50% of the newly issued

debt under the Plan will have amortized within 10 years of its issuance date.  (Id. ¶ 32.)  Debt

levels will continuously decline and remain low until full repayment of the Commonwealth's

general obligation and guaranteed debt, which is projected to occur in fiscal year 2046.  (Id.)

Thereafter, the only commitments that will remain outstanding will be the CVIs and COFINA

debt.  The CVIs are paid only if specific revenues outperform projections, and COFINA debt is

---

ensure obligations are met even if the Commonwealth begins to run deficits.  (See
Malhotra Decl. ¶ 33.)  The projections underlying the Fiscal Plan and the Plan also do not
account for potential upsides that could increase the Commonwealth's liquidity in the
future.  (Id. ¶¶ 41-51.)  Thus, the uncertainty of the Commonwealth's support for
proposed structural changes does not render the Plan infeasible.

[48]     The SEIU argues in its objection that the Plan leaves the Commonwealth with an
unaffordable debt burden that renders the Plan infeasible.  (See Docket Entry No. 18511
¶¶ 23-25; Docket Entry No. 19386 ¶ 13.)  The SEIU relies on a study by economist
Joseph Stiglitz, which was not proffered into evidence, in arguing that the economic and
social needs of Puerto Rico are far greater than those of mainland U.S. states and
therefore that Puerto Rico should not have a larger debt load than the average U.S. state.
(See Docket Entry No. 18511 ¶ 23.)  Based on the metric of net tax-supported debt per
capita, the SEIU argues that, under the Plan, Puerto Rico would rank ninth from the top
in the rankings of most indebted states in the United States. (See id. ¶ 25.)  The Court is
not persuaded that this sole metric, net tax-supported debt per capita, is the proper
standard by which to judge whether the Plan is feasible.  The Debtors have put forth
persuasive evidence that the Plan will allow the Debtors to meet their obligations and is
not likely to be followed by the need for further reorganization (Malhotra Decl. ¶ 29), and
the SEIU has not proffered any evidence to the contrary.  Thus, the SEIU's objection
with respect to the Plan's feasibility is overruled.

serviced via a pledged portion of sales and use tax.  (Id.)  The Commonwealth will have the

ability to pay debt service pursuant to the Plan through at least 2034, and the Plan proposes

additional reforms and potential factors that could increase the Commonwealth's resources and

create surpluses that could extend this projection.  (Wolfe Decl. Ex. 1 ¶¶ 12, 13, 15-27.)

        206.207.        In addition, several Plan provisions—the Pension Reserve Trust, the CVI

structures, the Debt Management Policy, and the Comprehensive Cap—mitigate the impact of

potential financial underperformance and the effects of projected deficits.  (See Malhotra Decl.

¶¶ 33-40.)  The Commonwealth will also establish an emergency reserve and a certain level of

unrestricted cash, and the Oversight Board has agreed to fund a temporary disaster aid revolving

line of credit, which mitigate against potential downside risks.  (Id. ¶¶ 49-51; Chepenik Decl. ¶¶

9, 28, 30, 36, 38.)  The Commonwealth will retain an unrestricted cash balance of $1 billion to

help maintain uninterrupted government operations when unforeseen fiscal challenges emerge.

(Malhotra Decl. ¶ 49; Chepenik Decl. ¶ 28; Nov. 12, 2021, Hr'g Tr. 50:21-51:5.)  The

emergency fund will be funded with $130 million annually for a period of ten years, until the

reserve balance reaches $1.3 billion, or 2% of Puerto Rico's Fiscal Year 2018 Gross National

Product, in line with International Monetary Fund guidance.  (Malhotra Decl. ¶ 51; Chepenik

Decl. ¶ 38.)

        207.208.        The Plan is not dependent on new borrowings that would impede the

Debtors' ability to achieve compliance with the Fiscal Plan.  The Fiscal Plan (Debtors Ex. 10)

does not show a need for incremental borrowing, and therefore the Plan's borrowing restrictions

will not impede the Commonwealth's ability to implement the Fiscal Plan.  (Murray Decl. Ex. 1

¶¶ 99-102.)  The Plan will leave the Debtors with a level of cash consistent with the cash

necessary to implement the undertakings referenced in the Fiscal Plan.  (Murray Decl. Ex. A ¶

65.)  In addition, the Plan imposes a comprehensive cap on net tax-supported debt equal to

7.94% of debt policy revenues, and the expected level of net tax supported debt service is

projected to be 7.6% of debt policy revenues.  (Murray Decl. Ex. A ¶¶ 100-01; Plan § 74.4.)

208.209.     The Commonwealth has sufficient resources to pay debt service pursuant

to the Plan until 2034, through annual surpluses.  (Wolfe Decl. Ex. 1 ¶ 12.)  Additional options

for payment of debt service will become available in later years because the Commonwealth can

implement structural reforms to increase the Commonwealth's resources and create surpluses.

(Wolfe Decl. ¶¶ 13, 15-27.)  Proactively implementing structural reforms would create a stream

of fiscal surpluses sufficient to cover the Commonwealth's debt service obligations pursuant to

the Plan and could build cumulative surpluses not incorporated into the Fiscal Plan totaling $32.4

billion for fiscal years 2022 through 2046, well above the cumulative debt service over that same

period of $10.9 billion.  (Wolfe Decl. Ex. 1 ¶¶ 13, 27.)  There are additional potential upside

factors not incorporated into the Plan which, if they occur, will produce additional revenues.

These factors include a potential increase in federal Medicaid funding, and potential provision of

Social Security Income to Puerto Rico residents that could increase economic activity.  (See

Malhotra Decl. ¶¶ 44-48.)

209.210.     Accordingly, the Plan is feasible with respect to the Commonwealth and is

not likely to result in the need for a further restructuring of the Commonwealth.

### ii.  Best Interests Test

210.211.     As in chapter 9 of the Bankruptcy Code, PROMESA's "best interests" test

differs substantially from the chapter 11 "best interests" requirement.  In chapter 11, the test

requires a court to determine whether an individual creditor would receive more if the chapter 11

debtor were to liquidate its assets.  In contrast, the chapter 9 test is not a liquidation test (because

municipalities cannot be liquidated) and is focused on the *collective* recovery of creditors in the

aggregate.  Cf. In re City of Detroit, 524 B.R. at 212-13 (comparing the "best interests" tests in

chapter 9 and chapter 11 of the Bankruptcy Code); see also In re Fin. Oversight & Mgmt. Bd. for

P.R., 361 F. Supp. 3d 203, 250-51 (D.P.R. 2019).  The PROMESA best interests test additionally

modifies the chapter 9 best interests test, only requiring the Court "to *consider* whether available

remedies under the non-bankruptcy laws and constitution of the territory would result in a greater

recovery for the creditors than is provided by [the] plan."[49]  48 U.S.C.A. § 2174(b)(6) (Westlaw

through P.L. 117-80) (emphasis added).  Thus, the PROMESA best interests test does not impose

a litmus test or establish a floor for creditor recoveries.  See id.

211.212.         Accordingly, PROMESA's best interests test requires the Court only to

*consider* whether creditors of each Debtor *in the aggregate* receive an equal or greater recovery

on their Claims pursuant to the Plan than they would outside of Title III if the Debtor's Title III

case were dismissed and creditors exercised their remedies.  An analysis of creditor recoveries in

such hypothetical circumstances requires the application of a number of assumptions, including

(i) estimates of the resources that would be available for debt service, which requires an

assessment of available cash, revenues, and operating expenses in the absence of a confirmed

plan of adjustment; (ii) the outstanding creditor obligations due and payable that would exist

outside of Title III; and (iii) the priority in which creditor claims would be paid outside of Title

III, which in certain circumstances requires consideration of assumptions regarding the potential

outcome of litigation matters.  (Shah Decl. ¶ 8.)

---

[49]      Notably, Section 314(b)(6) speaks in terms of a single "recovery" for "creditors" (plural).
48 U.S.C.A. § 2174(b)(6) (Westlaw through P.L. 117-80)

212.213.     The Debtors have met their burden of showing that recoveries for claimholders of each Debtor pursuant to the Plan, in the aggregate, are within the range or greater than the range of the projected recoveries for such claimholders in the aggregate if the Title III Cases were dismissed for each of the Debtors, as demonstrated by the best interest test reports attached to the Shah Declaration as Exhibits A, B, and C.  (Shah Decl. ¶ 35, Exs. A, B, and C; Debtors Exs. 130, 131.)  Additionally, the recovery pursuant to the Plan for holders of GO Bonds is within the range of the projected recoveries for such claimholders pursuant to the Oversight Board's best interest test analysis if the Commonwealth's Title III case were dismissed, assuming all GO Bonds were validly issued.  (See Shah Decl. ¶ 45; Shah Decl. Ex. 7 to Ex. A.)

213.214.     In the aggregate, excluding the payment of Restriction Fees or Consummation Costs (which are not being paid on account of Claims), and excluding Federal Claims,[50] there are an estimated $22.8 billion in Claims asserted against the Commonwealth, which are projected to receive $15.7 billion pursuant to the Plan, for an aggregate recovery for all claimholders of 69%, exclusive of any payments to be made with respect to CVIs or payments from the Avoidance Actions Trust.  (Id. ¶ 48.)  This compares favorably to the projected range of recoveries pursuant to the Oversight Board's best interest test analysis if the Commonwealth's Title III case is dismissed: $9.3-15.3 billion (34%-62%).  (Id. ¶ 35.)  Realized Commonwealth creditor recoveries could be even higher pursuant to the Plan, as the 69% estimated recovery excludes any additional recoveries available on account of payments from the Avoidance Action Trust or CVIs.  (Id. ¶ 48.)

---

[50]     Federal Claims are excluded from the aggregate recovery computation because they are being paid at 100% and would artificially inflate the demonstration as to other claims. (See Plan § 73.1; Shah Decl. ¶ 35 n.3.)

214.215.   Pursuant to the Plan, exclusive of the payment of the ERS Restriction Fee
(which is not being paid on account of Claims), ERS Bondholders are projected to receive a
recovery of approximately $444 million on $3.169 billion of Claims, and ERS General
Unsecured Claims are projected to receive a recovery of 100% on approximately $300,000 of
Claims, for an implied aggregate recovery of 14%.  (Shah Decl. ¶ 54.)  This is within the range
of projected recoveries pursuant to the Oversight Board's best interest test analysis if ERS's Title
III case is dismissed: $0.2-3.7 billion (5%-100%).  (Id. ¶ 35.)[51]

215.216.   Pursuant to the Plan, PBA Bondholders are projected to receive a recovery
of $1.1 billion against PBA.  (Id. ¶ 59.)  The Plan provides that the PBA/DRA Secured Claim,
PBA General Unsecured Claims, and PBA/DRA Unsecured Claims, will receive recoveries of
approximately $6.6 million, $41.0 million, and $13.4 million, respectively.  (Id.)  Accordingly,
holders of Claims against PBA are projected to receive an implied aggregate recovery of $1.1
billion, or 21%.  (Id.)  This compares favorably to the projected recoveries pursuant to the
Oversight Board's best interest test analysis if PBA's Title III case is dismissed: $0.3 billion
(5%).  (Id. ¶ 35.)

---

[51]   While it is theoretically possible there would be a 100% recovery on ERS Claims outside
of Title III, that result is very unlikely because it would require a court to rule that ERS
Bondholders hold liens on PayGo payments.  Notably, the First Circuit has already
determined that the ERS Bondholders' collateral, which consists of statutory employer
contributions to ERS, was subject to material impairment by legislative action, stating:
"Importantly, the Bond Resolution explicitly states that the legislature of the
Commonwealth might reduce (or, by implication, eliminate) Employers' Contributions,
and so 'adversely affect[]' the Bondholders."  Fin. Oversight & Mgmt. Bd. for P.R. v.
Andalusian Global Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.),
948 F.3d 457, 468-69 (1st Cir. 2020).

216.217.        Accordingly, for each Debtor, creditors in the aggregate will receive a

percentage recovery on their Claims pursuant to the Plan that is within the range of or greater

than projected recoveries outside of Title III.[52]  (Id. ¶ 13.)

217.218.        These results are unsurprising.  Absent a mechanism to restructure the

Debtors' outstanding debt and pension liabilities, the Commonwealth would face great

uncertainty, financial and political instability, and significant lawsuits.  In such an environment,

the Government would face significant challenges to enact legislation and enforce cooperation

among agencies to institute structural reforms.  Without the benefit of the uptick in growth from

such reforms, overall economic growth and tax revenue would be lower, reducing the amounts

available to pay all creditors.  (Id. ¶ 12.)  Outside of Title III and without a confirmed plan of

adjustment, creditors would race to the courthouse to recover on their claims.  "Clearly, such a

result is chaos . . . ."  6 Collier on Bankruptcy § 943.03 (16th ed. 2021).

218.219.        Accordingly, the Court finds that the Plan is in the best interests of

creditors within the meaning of Section 314(b)(6) of PROMESA.

---

[52]        Several creditors have argued that the Plan is not in their best interests because they
would, individually, receive better recoveries under non-bankruptcy laws. (See Docket
Entry No. 18433 (Samodovitz Objection); Docket Entry No. 18551 (Ahorro Objection);
Docket Entry No. 18585 (AMPR Objection); Docket Entry No. 18566 (Finca Matilde
Objection); Docket Entry No. 18575 (Hein Objection)). These creditors do not
appropriately apply the "best interest" standard under PROMESA.  Under the
PROMESA standard, as explained above, the Court does not assess each individual
creditor's recovery.  Furthermore, these objectors have provided no alternative best
interest analysis or evidence to suggest that the Plan as a whole is not in the best interests
of creditors in the aggregate.  Many of these objectors also assume in their analysis of
their recovery under non-bankruptcy laws that they would prevail in litigation of hotly
contested issues that will be settled by the Plan.  Thus, such objections are overruled.

**G. PROMESA § 314(b)(7):** *Fiscal Plan Consistency.*

~~219.~~220.        Section 314(b)(7) of PROMESA requires that the Plan merely be consistent with, not identical to, the applicable certified fiscal plan.  (Jaresko Decl. ¶ 103; Murray Decl. Ex. A ¶ 62.)  The Plan is consistent in all respects with the Fiscal Plan—nothing contained in the Plan would violate or otherwise interfere with the Fiscal Plan.  (Jaresko Decl. ¶ 103; see Debtors Ex. 10.)

~~220.~~221.        The Fiscal Plan provides a blueprint for the Commonwealth to achieve, among other things, fiscal responsibility and access to capital markets, and contains a debt sustainability analysis ("DSA"), which creates a range established by the Oversight Board as the amount of debt and long-term capacity of the Government to pay debt service on its debt.  (Zelin Decl. ¶ 57; Malhotra Decl. ¶¶ 55-56; Debtors Ex. 10.)  The aggregate principal and total debt service of the New GO Bonds falls within the bounds of the debt range implied by the DSA. (Zelin Decl. ¶ 57; Malhotra Decl. ¶¶ 58-59, 61.)  The cash payments due on the Effective Date do not count as debt for purposes of the DSA because the cash payments do not create a debt obligation after the Effective Date.  (Malhotra Decl. ¶ 60.)  Any cash payments under the CVIs do not count as debt for purposes of the DSA because the CVIs are only payable out of outperformance.  (Id.)  The CVI payments are contingent in nature and are, by definition, paid from excess cash available relative to baseline Fiscal Plan projections.  (Zelin Decl. ¶ 58; Malhotra Decl. ¶ 60.)  The debt levels under the Plan are consistent with the debt levels set forth in the Fiscal Plan, and the debt proposed to be issued pursuant to the Plan is consistent with the DSA.  (Skeel Decl. ¶ 52; Murray Decl. Ex. A ¶¶ 72, 78; Malhotra Decl. ¶ 61.)

~~221.~~222.        The Plan is also consistent with the Fiscal Plan because it includes the freeze of accruing pension benefits and elimination of all COLAs under Act 91-2004, amended

by 160-2013 for TRS, and under Act 12-1954, amended by 162-2013, for JRS.  (See Plan §§ 55.8, 55.9, Exs. E, F.)  The Fiscal Plan requires the pension freeze and the elimination of COLAs, and the failure to include the pension freeze and elimination of future COLAs in the Plan would cause it to be materially inconsistent with the Fiscal Plan due to the significant additional spending and unpredictable costs that would result from the exclusion of the pension freeze and COLA elimination provisions.  (Jaresko Sup. Decl. ¶ 13; see Debtors Ex. 10.)  Moreover, the costs of removing the pension freeze and elimination of COLAs would increase over time and grow larger during periods in which deficits are projected by the Fiscal Plan.  (Jaresko Sup. Decl. ¶¶ 8, 13; Malhotra Sup. Decl. ¶ 17.)

222.223.      If Act 53 were interpreted to require the removal of the freeze and COLA elimination, and the Plan were modified to implement such changes, the Plan would not be consistent with the Fiscal Plan.  (Jaresko Sup. Decl. ¶ 13.)  The Court's conclusion that the Plan is consistent with the Fiscal Plan is dependent on, among other things, the Plan's inclusion of the pension freeze and elimination of COLAs.

223.224.      The Plan remains consistent with the Fiscal Plan notwithstanding the elimination of the Monthly Benefit Modification.  The Fiscal Plan contemplates the possibility that pensioners would be restored to the full amount of their accrued pension benefits under certain circumstances.  (Debtors Ex. 10 at 279.)  Unlike the costs of removing the pension freeze and elimination of COLAs, the majority of the costs associated with removal of the Monthly Benefit Modification will be incurred during periods of budget surplus.  (Jaresko Sup. Decl. ¶ 12; Santambrogio Sup. Decl. ¶ 10; Malhotra Sup. Decl. ¶ 9; Debtors Ex. 10 at 59.)

224.225.      The Fiscal Plan explicitly provides for the establishment of the Pension Reserve Trust to ensure that the future pension benefits contemplated by the Plan will be

supported regardless of the future economic or political circumstances of the Commonwealth. (Jaresko Decl. ¶ 103.)  To ensure adequate funding to cover the increased costs resulting from the elimination of the Monthly Benefit Modification, additional funds will be set aside in the Pension Reserve Trust during years in which the Fiscal Plan projects a surplus.  (Jaresko Sup. Decl. ¶ 9.)  An increase to the funding amounts for the Pension Reserve Trust using a surplus-based funding mechanism does not render the Plan inconsistent with the Fiscal Plan because such increased funding levels come out of projected surpluses and do not impose additional obligations on the Commonwealth that would interfere with carrying out the Fiscal Plan.  (See Jaresko Decl. ¶ 103; Jaresko Sup. Decl. ¶¶ 9-12.)

225.226.       In addition, the Plan modifies the Seventh Amended Plan to provide that the Upside Participation Bonus pursuant to the AFSCME Plan Support Agreement (Debtors Ex. 21) will be a minimum of $2,000 for each AFSCME-represented employee during the five-year term of the new AFSCME collective bargaining agreement.  (See Plan App'x II.)  The additional cost of this modification is only an incremental cost of approximately $18.3 million per year for the five years beginning in fiscal year 2022 as compared to the lower Upside Participation Bonus contemplated in the Seventh Amended Plan.  (Santambrogio Sup. Decl. ¶ 11.)

226.227.       Accordingly, the Plan complies with PROMESA section 314(b)(7).  The Court's determination sustaining objections that allowed Eminent Domain and Inverse Condemnation Claims are protected by the Fifth Amendment's Takings Clause and, accordingly, may not be impaired by the Plan, does not vitiate the Plan's compliance with PROMESA section 314(b)(7) because there are sufficient uncommitted funds to satisfy Takings Clause Claim obligations without requiring modification of the certified fiscal plan.  (See supra ¶ 204 n.47.)

H. **Bankruptcy Rule 3019:** *The Plan Does Not Adversely Change the Treatment of Claims of Creditors.*

227228.        The Oversight Board filed the Eighth Amended Plan after the Voting Deadline has passed.  The Eighth Amended Plan eliminated the Monthly Benefit Modification that was contained in the Seventh Amended Plan and makes minor revisions to address concerns raised by certain parties.  None of the modifications adversely changes the treatment of the Claims of any Creditor that accepted the Seventh Amended Plan.  To the contrary, the Plan was amended to enhance the treatment of the pension Claims in Classes 51A through 51I, 51K, and 51L through the removal of the Monthly Benefit Modification (see Malhotra Sup. Decl. ¶¶ 8-9).  Treatment of Claims in other Classes is not affected in any way by this change.

228229.        In addition, following the passage of the Voting Deadline, the Oversight Board filed the First Modified Eighth Amended Plan, which separately classified the GDB/PET Claim in Class 58A.  (See First Modified Eighth Amended Plan art. LXII.)  The GDB/PET Claim was previously classified as a CW General Unsecured Claim in Class 58.  Pursuant to section 62.4 of the Plan, the holder of the GDB/PET Claim will receive "payments from the Commonwealth equal to, and on the same timeframe, as the pro rata payments to be made to holders of Allowed CW General Unsecured Claims pursuant to the terms and provisions [governing treatment of CW General Unsecured Claims]," (Plan § 62.4), but Debtors represent that the GDB/PET Claim is not intended, nor shall it be construed, as a CW General Unsecured Claim pursuant to the Plan.  The GDB/PET Claim is treated in the same manner as it would have been treated pursuant to the Seventh Amended Plan.  (See id.)  Accordingly, this modification does not adversely change the treatment of the Claims of any Creditor that accepted the Seventh Amended Plan.

229.230.    The Oversight Board subsequently filed the Plan, which contains
additional technical changes not affecting the treatment of any Claims, and has further modified
it and to comply with this Court's determination regarding the proper treatment of Allowed
Eminent Domain and Inverse Condemnation Claims.

230.231.    The modifications do not materially or adversely modify the treatment to
be afforded to creditors pursuant to the Plan and do not require the resolicitation of acceptances
or rejections thereof.  Accordingly, the Plan can be confirmed without the filing of a new
disclosure statement and resolicitation with respect to the Plan.  See Bankr. R. 3019.

**I.    Nullification of Laws Conditioning Debt Authorization on Elimination of Freeze of
Accruing Pension Benefits and Cost of Living Adjustments.**

231.232.    The Debtors represent that all parties in interest, including, without
limitation, the Governor and the Legislature, know that the Plan's consistency with the Fiscal
Plan, feasibility, and implementation are each dependent on the freezes in the accruals of future
pension benefits under TRS and JRS and elimination of cost of living adjustments.  (See supra
n.23.)  All objections that suggest Act 53 or any other law causes the new debt issued under the
Plan to be unauthorized by Act 53 due to the freezes in the accruals of future pension benefits
under TRS and JRS and elimination of cost of living adjustments have been overruled as set
forth in the Confirmation Order.  To the extent any law is interpreted to mean such freezes and
eliminations cause the new debt issuable under the Plan to be unauthorized, Act 53 and such
other laws, if any, may not be enforced pursuant to section 108 of PROMESA to the limited
extent of eliminating such impact on the debt's authorization.  Debtors have proven to the
Court's satisfaction that the unambiguous language of Act 53 does not provide that such freezes
and eliminations cause the new debt issuable under the Plan to be unauthorized. Notice of the

request for such determination was adequately provided to all former and present governmental

employees.  (See Docket Entry No. 19182.)

**The Releases, Exculpations, and Injunctions Pursuant to the Plan**

232.233.        The Plan includes certain discharge, release, exculpation, and injunction

provisions, which are essential to the Debtors' restructuring, and without which a consensual

restructuring could not be successfully accomplished.  (Jaresko Decl. ¶ 217; Zelin Decl. ¶ 95.)

233.234.        A critical element of the Plan is the complete resolution of the

Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case.  To achieve

this, the Debtors and certain claimholders agreed to a mutual release of all Claims and Causes of

Action arising, in whole or in part, prior to the Effective Date.  (Jaresko Decl. ¶ 218.)  The

Debtors' releases incentivized claimholders to support, and undertake actions to support, the Plan

and its confirmation, without fear of lawsuits in the future.  Certain creditors would not have

supported the Plan absent its release provisions.  (Jaresko Decl. ¶ 219; Zelin Decl. ¶ 100.)

Further, the releases of claims by the Debtors affect only those parties that made a significant

contribution to the negotiation and development of the Plan and incurred cost and expense during

their essential participation in negotiations.  (Jaresko Decl. ¶ 221; Zelin Decl. ¶¶ 102, 106.)  The

Plan's discharges and releases likewise provide the Debtors and Reorganized Debtors with

assurance that the restructuring balance struck by the Plan will not be upset by further claims

against the Reorganized Debtors after the Effective Date.  (Jaresko Decl. ¶ 220; Zelin Decl. ¶

106.)

A.  **Releases**

234.235.        The Plan's release provisions include, among other provisions, subject to

certain exclusions as set forth in the Plan: (i) a release by the GO/PBA PSA Creditors (solely in

their capacity as Creditors of the Debtors), which includes the Monolines, against certain government parties, including the Oversight Board, AAFAF, and the Debtors, of certain Claims and Causes of Action arising prior to the Plan Effective Date, including the Revenue Bond Claims litigation and the Lift Stay Motions, and (ii) a release by the Debtors and Reorganized Debtors of Claims and Causes of Action related to the Debtors and their assets in the Title III Cases.  (Zelin Decl. ¶ 96.)

235.236.      The Plan's release of Claims or Causes of Action by the GO/PBA PSA Creditors against the Oversight Board, its committees and subcommittees, AAFAF, and the Debtors, of certain Claims and Causes of Action, including those related to the Revenue Bond Claims Litigation and Lift Stay Motions, is a key component of the Plan.  (Id. ¶ 97.)  Litigation over such Claims and Causes of Action was hard-fought and remained active as between the Commonwealth, on the one hand, and the Monolines (who would ultimately become GO/PBA PSA Creditors) on the other.  (Id.)  By agreeing to settle these disputes, the GO/PBA PSA Creditors provided a clear benefit to the Debtors by eliminating the need to incur additional costs for, and mitigating the substantial risk associated with, further litigation.  (Id.)  To create global peace upon the effectiveness of the Plan, the Debtors and Reorganized Debtors agreed to release Claims and Causes of Action against, among other entities, the Government Parties, official committees, and PSA Creditors.  (Id. ¶ 99.)  The Plan's release provisions were essential to get the key stakeholders to engage in negotiations over a potential consensual release of claims against the Commonwealth.  (Id. ¶ 100.)

236.237.      The parties receiving releases all made significant contributions to the negotiation and development of the Plan and incurred costs and expenses during the course of their essential participation in the negotiations.  (Id. ¶ 102.)  The releases were a product of

robust, mediator-supervised negotiations and the stakeholders had an opportunity to be heard as

to the scope and content of the releases.  (Id. ¶ 105.)  To incentivize the PSA Creditors to grant

the concessions outlined above, and in consideration of the substantial benefits provided by the

Released Parties, the Debtor and Reorganized Debtors agreed to prosecute and pursue the

releases, exculpation, and injunction provisions set forth in the Plan. The Oversight Board has

determined that the releases are fair, reasonable, and in the best interests of the Debtors.  (Id. ¶

103.)

237.238.      The Plan does not provide for non-consensual third-party releases; the

Plan's releases are limited to those necessary to effectuate the Debtors' successful restructuring.

Except as explicitly agreed to by the creditors in their respective plan support agreements, the

Plan does not release any claims of a creditor of the Debtors, in its capacity as such, against a

party that is not a Debtor.  (Jaresko Decl. ¶ 223; Zelin Decl. ¶ 107.)  Specifically, section 92.2(a)

of the Plan provides that "without prejudice to the exculpation rights set forth in Section 92.7 [of

the Plan], nothing contained in the Plan or the Confirmation Order is intended, nor shall it be

construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME,

and of their respective Related Persons by Creditors of the Debtors."  (Plan § 92.2(a).)  Further,

sections 92.2(d), (e), and (f) of the Plan carve out from the Released Claims certain claims,

causes of action, or other rights or powers that are held by the Securities and Exchange

Commission, the United States, and parties to certain Underwriter Actions.  Likewise, as

confirmed by the definitions of Related Persons (see id. § 1.420) and Released Claims (see id. §

1.421), claims against AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA,

PRIDCO, PRIFA, UPR, and PREPA, which are or may be subject to their own restructuring

proceedings, are not released pursuant to the Plan and such entities are not "Related Persons" of

the Released Parties or Releasing Parties.  Further, Avoidance Actions generally are not released

under the Plan.  (See id. § 1.421.)  These carve-outs ensure that only those releases that are

reasonable and necessary to Plan confirmation are being provided.  (Jaresko Decl. ¶ 224; Zelin

Decl. ¶¶ 108-09.)

238.239.      For these reasons, the Court finds that the releases contemplated by the

Plan are reasonable, necessary, and appropriate to implementation of the Plan and, therefore, the

consensual releases are hereby approved.

## B.  Exculpation

239.240.      Section 92.7 of the Plan provides for exculpation of the Government

Parties, PSA Creditors, Retiree Committee, Creditors' Committee, AFSCME, and the Monolines

for, among other things, any acts taken consistent with the Plan or in connection with the

formulation, preparation, dissemination, implementation, acceptance, confirmation or approval

of the Plan and the settlements contained therein (including, but not limited to, the Plan Support

Agreements).  (Jaresko Decl. ¶ 225; Zelin Decl. ¶ 110.)  The expectation that parties would be

exculpated incentivized them to participate in the negotiations and support confirmation of the

Plan without fear of future lawsuits.  Without the Plan's exculpation provisions, parties would

likely be exposed to litigation after extensive good-faith negotiations.  (Zelin Decl. ¶ 111.)  The

Plan's exculpation provisions are narrowly tailored to the exculpated parties' efforts related to

the formulation of the Plan.  All of the parties being exculpated in the Plan played key roles in

the negotiation of the Plan and the settlements that enabled the Plan, including through their

participation in mediation.  The Plan's exculpation provisions do not alter the liability of any

entity that is determined to have acted or failed to act in a manner that constitutes intentional

fraud or willful misconduct.  (Jaresko Decl. ¶ 226; Zelin Decl. ¶¶ 110, 112.)  In addition, decretal

paragraph 61(g) of the Confirmation Order provides for exculpation of the DRA Parties, which is

substantially the same as the exculpation provided pursuant to the Plan and is appropriate in light

of the Stipulation in Connection with DRA Related Disputes, dated as of November 5, 2021, by

and among the Oversight Board, as representative of the Debtors and HTA, and the DRA Parties.

(See Confirmation Ord. ¶ 61(g); Debtors Ex. 146.)  Exculpation provisions are appropriate for

parties' acts or omissions in connection with or related to the "pursuit of confirmation of a plan."

See In re Montreal Me. & Atl. Ry., Ltd., Bk. No. 13-10670, 2015 WL 7431192, at *9 (Bankr. D.

Me. Oct. 9, 2015) (approving exculpation provisions "as appropriate under applicable law

because it is part of a Plan proposed in good faith, was vital to the Plan formulation process and

is appropriately limited in scope . . ., including its carve-out for gross negligence and willful

misconduct").[53]

## C. Injunction

240.241.        The Plan's injunction provisions (sections 92.3, 92.6, and 92.11) are

necessary to the reorganization and are fair to those parties involved.  The injunctions ensure that

the releases and exculpations discussed above are preserved and enforced by prohibiting legal

action concerning the Released Claims, avoiding the time, burden and expense that could be

incurred if parties were permitted to pursue Released Claims.  The Plan's injunction provisions

are narrowly tailored to serve that purpose.  (Zelin Decl. ¶ 113; Jaresko Decl. ¶ 227.)

---

[53]        Mr. Hein contends that the exculpation provision should not extend to acts or omissions
by the PSA Creditors in connection with their role in negotiating plan support
agreements.  Exculpation provisions are, however, appropriate when narrowly tailored to
the acts or omissions of a party in the pursuit of confirmation of a Plan.  See In re
Montreal Me. & Atl. Ry., Ltd., 2015 WL 7431192, at *9.  Mr. Hein does not allege any
facts suggesting willful misconduct or gross negligence of a PSA Creditor.  Thus, the
exculpation provision as crafted is appropriate and Mr. Hein's objection thereto is
overruled.

241.242.    The releases, exculpation provisions, and injunctions pursuant to the Plan

are integral and critical parts of the Plan and the compromises and settlements implemented

pursuant to the Plan.  (Plan §§ 2.3, 92.4.)  The approval of such releases is a condition to the

occurrence of the Effective Date, and all Released Parties have relied on the efficacy and

conclusive effects of such releases and injunctions and on the Title III Court's retention of

jurisdiction to enforce such releases and injunctions when making concessions pursuant to the

Plan and by agreeing to, accepting, and supporting the settlement and treatment of their

respective Claims, Causes of Action, and other rights pursuant to the Plan.  (Zelin Decl. ¶¶ 96,

98, 100-04, 106, 110-12; Plan § 86.1.)  Accordingly, such provisions are justified and warranted

based upon the circumstances of the Title III Cases and the consideration being provided by all

Released Parties in connection with the Plan.

242.243.    To maintain and protect the integrity and feasibility of the Plan, while the

Oversight Board is in existence, any and all governmental units and any officer or employee

thereof shall neither recreate by statute, regulation, rule, policy, or executive order nor repay by

any means, any debt discharged by the Plan without the Oversight Board's express prior written

consent or except as may otherwise be provided by a certified fiscal plan or budget.  Without

limitation, the debt referred to herein includes any and all pension obligations frozen and cost of

living adjustments in amount such that they shall not increase from their levels in existence on

the Effective Date of the Plan.

## Validity of Bonds and CVIs

243.244.        Pursuant to section 4 of PROMESA, as well as sections 944[54] and 1123 of
the Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Court
determines that the New GO Bonds and CVIs, and the covenants by the Commonwealth for the
benefit of the holders of the New GO Bonds and CIVs, are legal, valid, binding, and enforceable
obligations of the Reorganized Debtors benefitting from the following protections, each of which
is legal, valid, binding, and enforceable against the Reorganized Debtors, the Commonwealth,
and other persons and entities, as applicable, under Puerto Rico, New York, and federal law:

  a.   The Confirmation Order is full, final, complete, conclusive, and binding and shall
       not be subject to collateral attack or other challenge in any court or other forum,
       except as permitted under applicable law.

---

[54]    Section 944(b)(3) of the Bankruptcy Code the requires the Court, as a condition to
providing a discharge, to determine the validity of obligations imposed under a plan of
the debtor and of any provision made to pay or secure payment of such obligations. 11
U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr.
E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding
restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy
Clause operates to cause federal bankruptcy law to trump state laws, including state
constitutional provisions, that are inconsistent with the exercise by Congress of its
exclusive power to enact uniform bankruptcy laws" (citing Ass'n of Retired Emps. of the
City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-
16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local
2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D.
Cal. 2010) (additional citations omitted)).  As set forth in the leading bankruptcy treatise,
"[t]he requirement of a court determination of validity is extra assurance for those who
might be skittish about the nature of the bonds being issued . . . . It has the added feature
of removing any doubt concerning the matter, because the determination of the court on
that issue should be binding in the future."  6 Alan N. Resnick & Henry J. Sommer,
Collier on Bankruptcy § 944.03[1][b] (16th ed. 2013).

b.   The New GO Bond Legislation and the CVI Legislation are incorporated into Act
53-2021, which has been validly enacted by the Commonwealth and is valid and
effective in accordance with its terms.

c.   The New GO Bonds and the CVIs are bonds or notes within the meaning of
Section 2 of Article VI of the Commonwealth Constitution to which the
Commonwealth may legally pledge its full faith, credit and taxing power under
the Commonwealth Constitution and applicable Puerto Rico law for the payment
of principal and interest.

d.   Pursuant to the New GO Bond Legislation and the CVI Legislation, the
Commonwealth has validly pledged its full faith, credit and taxing power under
the Commonwealth Constitution and applicable Puerto Rico law for the payment
of principal and interest with respect to the New GO Bonds and payment with
respect to the CVIs.

e.   Subject to the occurrence of the Effective Date and as of the date of issuance of
the New GO Bonds and CVIs, the Commonwealth is in compliance with any
applicable debt limits, including the Comprehensive Cap and any applicable debt
limit (if any) contained in the Commonwealth Constitution.

f.   Pursuant to the New GO Bonds Legislation and other applicable law, upon the
issuance of the New GO Bonds, the New GO Bonds shall be secured by a first
priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53)) over
the funds deposited in the Debt Service Fund, including any revenues generated
therefrom, which statutory first lien shall occur automatically and shall
automatically attach and be perfected, valid and binding from and after the

Effective Date, without any further act or agreement by any Person, and shall

remain in full force and effect until the New GO Bonds have been paid or

satisfied in full in accordance with their terms.

g.  The statutory first lien on funds deposited into the Debt Service Fund, as provided

for in the New GO Bonds Legislation, and all other provisions to pay the New GO

Bonds are valid, binding, legal and enforceable, including, without limitation,

covenants not to impair such property, maintain available tax exemption and

provide for the conditions regarding substitution of collateral (including, without

limitation, the statutory lien thereon as adequate protection for the property rights

in the Plan and in the Confirmation Order).

h.  The statutory first lien on funds deposited into the Debt Service Fund, as provided

for in the New GO Bonds Legislation, creates the valid pledge and the valid lien

upon the right, title and interest of the Commonwealth in such funds in favor of

the Trustee (for the benefit of the holders of the New GO Bonds) which it

purports to create, subject only to the provisions of the New GO Bonds Indenture

permitting the withdrawal, payment, setting apart or appropriation thereof for the

purposes and on the terms and conditions set forth in the New GO Bonds

Indenture and each applicable supplemental indenture.

i.  The Commonwealth has waived, and shall be deemed to have waived, the

automatic stay in any future insolvency proceeding commenced on behalf of the

Commonwealth (whether under Title III of PROMESA or otherwise) with respect

to monies on deposit in the Debt Service Fund as of the commencement thereof.

j.  The Plan meets all conditions set forth in the New GO Bond Legislation and the

CVI Legislation for issuance of the New GO Bonds and CVIs.

k.  In light of the enactment of the New GO Bond Legislation and the CVI

Legislation, and upon execution by all parties thereto, the New GO Bonds

Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized

by the Commonwealth, and (ii) be in full force and effect and valid and binding

upon the Commonwealth and enforceable in accordance with their terms, except

that enforceability of rights and remedies may be limited by bankruptcy,

insolvency, reorganization, moratorium or other laws affecting creditors' rights

generally or as to the availability of any particular remedy.

l.  At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the

Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to

be stamped or written on each of the New GO Bonds, the GO CVIs, and the

Clawback CVIs, a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT
> FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11
> U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY
> BINDING, AND ENFORCEABLE PURSUANT TO THE
> JUDGMENT AND CONFIRMATION ORDER, ENTERED ON
> THE [___] DAY OF [_____], 2022.

### GDB Loan Priority Determination

244.245.    The Plan provides for the issuance of the HTA Clawback CVI as

consideration for the settlement of CW/HTA Claims under the HTA/CCDA Plan Support

Agreement.  The CVI Indenture provides for four separate Sub-Subseries of such HTA

Clawback CVI to be issued, and for payments on such Sub-Subseries of the HTA Clawback CVI

to be made first, on account of CW/HTA Claims related to the HTA 68 Bonds; second, on

account of CW/HTA Claims related to the HTA 98 Senior Bonds; third, on account of CW/HTA

Claims related to the HTA 98 Sub Bonds; and fourth, subject to the GDB Loan Priority

Determination, on account of either CW/HTA Claims related to the GDB HTA Loans or

CW/HTA Claims related to the HTA Bonds.  (CVI Indenture §§ 2.01(c)(i), 5.07(c); see also Plan

at J-12, §§ 1.172, 63.2, Ex. J at Annex 6.)

245.246.      Certain disbursements under the "CVI Payment Reserve" are dependent

on the "GDB Loan Priority Determination," (Plan § 1.172), which is defined as "[t]he

determination, in either the Commonwealth Title III Case or the HTA Title III Case, (a) with

respect to the relative rights of recovery and priority of payment of the [19]68 Bonds and the

[19]98 Bonds to the rights of GDB with respect to the GDB HTA Loans, and/or (b) that the

[DRA] does not possess an allowable claim or entitlement to recover with respect to the HTA

Clawback CVI based upon such GDB HTA Loans."  (Plan § 1.259.)

246.247.      On June 26, 2021, the DRA Parties filed a complaint initiating an

adversary proceeding against the Defendants,[55] with the stated purpose of "provid[ing] a means

to resolve the priority question with respect to the payments made by the Commonwealth on

account of the clawback claims, and any payments that may be made on account of the Loan

Claims and the HTA Bonds under a future plan for HTA."  (Docket Entry No. 1 in Adv. Proc.

No. 21-00068-LTS ¶ 101.)

247.248.      The complaint sought declaratory relief on four counts: (i) Count 1, "that

the DRA is the only party with (i) a valid, perfected, first-priority lien on the Act 30-31

---

[55]      "Defendants" means Ambac Assurance Corporation, Assured Guaranty Corp., Assured
Guaranty Municipal Corp., Financial Guaranty Insurance Company, National Public
Finance Guarantee Corporation, Peaje Investments LLC, and The Bank of New York
Mellon.

Revenues and (ii) a right to collect from the Act 30-31 Revenues;" (ii) Count 2, "that the HTA

Bondholders have limited collateral to secure the bonds, that the HTA Bonds are limited

recourse obligations, and neither the collateral pledged to secure the bonds, nor the bond

revenues to which the bondholders have recourse, includes the Act 30-31 Revenues;" (iii) Count

3, "that the DRA's Loans are not subordinate to the bonds;" and (iv) Count 4, "that the DRA's

Loans are entitled to collect on the loan claims from the bond revenues not deposited in the bond

revenue accounts."  (Docket Entry No. 1 in Adv. Proc. No. 21-00068-LTS.)

248.249.        On August 26, 2021, the Defendants moved to dismiss all four counts

(Docket Entry No. 44 in Adv. Proc. No. 21-00068-LTS ¶¶ 2-6) (the "Motion to Dismiss").  On

September 23, 2021, the DRA Parties filed an opposition to the Motion to Dismiss and on

October 8, 2021, Defendants filed their reply in support of the Motion to Dismiss, which

concluded briefing on the motion.[56]

249.250.        On October 29, 2021, the Court entered an opinion and order dismissing

all four counts of the DRA Parties' complaint under Rule 12(b)(6) of the Federal Rules of Civil

Procedure for failure to state a claim upon which relief could be granted (Docket Entry No. 83 in

Adv. Proc. No. 21-00068-LTS at 27) (the "GDB Loan Priority Determination Opinion").

---

[56]     The Oversight Board and AAFAF were granted full intervention rights in Counts 1, 2,
         and 4 of Adversary Proceeding No. 21-00068-LTS and moved to dismiss those counts,
         but their motion was denied as moot in light of the order granting the Defendants' Motion
         to Dismiss.

250.251.       As to Count 1, the Court held that the plain language of Acts 30 and 31[57]

and the Assignment and Security Agreement[58] make clear that the HTA Bonds are payable from

Act 30-31 Revenues.[59]  (GDB Loan Priority Determination Op. at 18-20.)

251.252.       As to Count 3, the Court held that HTA Bondholders had standing to

enforce the subordination provisions of the Assignment and Security Agreement and Loan

Agreements[60] under 3 L.P.R.A. § 2013(a)(3).  The Court further held that the Assignment and

Security Agreement unambiguously subordinates the GDB HTA Loans to the HTA Bonds

(including, for the avoidance of doubt, the HTA 68 Bonds and the HTA 98 Bonds), a conclusion

that was reinforced by the GDB HTA Loan Agreement attached to the Complaint.  (GDB Loan

Priority Determination Op. at 21-23.)

252.253.       The Court dismissed Counts 2 and 4 because they "logically depend[ed]"

on the Court granting Counts 1 and 3, because the Assignment and Security Agreement

"unambiguously compels the conclusion that, before any funds are paid toward the Loans, Bond

payment obligations must first be satisfied."  (GDB Loan Priority Determination Op. at 25.)

253.254.       In the GDB Loan Priority Determination Opinion, the Court directed the

Clerk of Court to enter judgment consistent therewith, and a final judgment dismissing Counts 1,

---

[57]    "Acts 30 and 31" means Commonwealth Act 30-2013 and Act 31-2013, both approved
on June 25, 2013.

[58]    "Assignment and Security Agreement" means the agreement between HTA and GDB
executed on August 28, 2013.

[59]    "Act 30-31 Revenues" means certain crude oil taxes, motor vehicle license fees, and
other excise taxes levied pursuant to Acts 30 and 31.

[60]    "GDB HTA Loan Agreements" means the loan agreements between GDB and HTA that
were executed between 2008 and 2014.

2, 3, and 4 was entered thereafter.  (GDB Loan Priority Determination Op. at 27; Docket Entry

No. 86 in Adv. Proc. No. 21-00068-LTS.)

254.255.          The Court's rulings in the GDB Loan Priority Determination Opinion are

incorporated by reference herein.

255.256.          The Court's ruling that the GDB HTA Loans and any liens securing such

GDB HTA Loans are subordinated to the HTA Bonds qualifies as the "GDB Loan Priority

Determination" for purposes of the Plan.[61]

## Miscellaneous Provisions

256.257.          Plan Supplement.  All materials contained in the Plan Supplement comply

with the terms of the Plan, and the filing, notice, and service of such documents were done in

accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other

or further notice is or shall be required.  (See Service Affidavits; Plan Sup.)

257.258.          Satisfaction of Confirmation Requirements.  Based on the foregoing, the

Plan satisfies the requirements for confirmation set forth in section 314 of PROMESA.

258.259.          Oversight Board Certification.  For purposes of section 209 of

PROMESA, the discharge of debt to occur as of the Effective Date pursuant to the Plan and the

Confirmation Order is necessary for the Oversight Board to certify that expenditures do not

exceed revenues for the Commonwealth, as determined in accordance with modified accrual

accounting standards.

259.260.          Implementation.  All documents necessary to implement the Plan,

including those contained in the Plan Supplement and all other relevant and necessary

---

[61]          Pursuant to section 1.172 of the Plan, Cash payable from the HTA Clawback CVI in the
CVI Payment Reserve will be distributed upon entry of a Final Order with respect to the
GDB Loan Priority Determination.

documents, have been negotiated in good faith and at arm's length and shall, upon completion of

documentation and execution, be valid, binding, and enforceable agreements and not be in

conflict with any federal or state law.  Without limiting the generality of the foregoing, the

Debtors, prior to the Effective Date, and Reorganized Debtors, from and after the Effective Date,

are authorized to consummate the transactions contemplated in the Plan and Plan Supplement.

The execution, delivery, or performance by the Debtors or Reorganized Debtors, as the case may

be, of any documents in connection with the Plan Supplement, and compliance by the Debtors or

Reorganized Debtors, as the case may be, with the terms thereof, is hereby authorized by, and

will not conflict with, the terms of the Plan or the Confirmation Order.

~~260.~~261.         <u>Good Faith</u>.  The Debtors will be acting in good faith if they proceed to (i)

consummate the Plan and the agreements, settlements, transactions, and transfers contemplated

thereby and (ii) take the actions authorized and directed by the Confirmation Order.

~~261.~~262.         <u>Retention of Jurisdiction</u>.  This Court may properly and, upon the

Effective Date shall, subject to the terms and provisions of article XCI of the Plan, and except as

otherwise provided in the Plan or Confirmation Order, pursuant to sections 105, 945(a), and

1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the

Plan, retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and

concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters

arising under PROMESA, arising out of, and related to, the Title III Cases to the fullest extent

legally permissible, including, but not limited to, subject matter jurisdiction over the matters set

forth in article XCI of the Plan.

~~262.~~263.         Without limiting the generality of any of the foregoing, the Court shall

retain jurisdiction to (i) enter appropriate orders with respect to the payment, enforcement, and

remedies of the bonds and any other instruments issued pursuant to the plan, (ii) enter and

implement such orders as may be necessary or appropriate to execute, implement, or

consummate the provisions of the Plan, (iii) adjudicate any and all controversies, suits, or issues

that may arise regarding the validity of any action taken by any entity pursuant to or in

furtherance of the Plan or the Confirmation Order including, without limitation, issuance of

bonds, and (iv) to enforce prohibitions against any subsequent collateral attack on provisions

contained in the Plan and the Confirmation Order.

263.264.     Governing Law.  Except to the extent that other federal law is applicable,

or to the extent that an exhibit to the Plan or any document entered into in connection with the

Plan or Plan Supplement provides otherwise, the rights, duties, and obligations arising pursuant

to the Plan shall be governed by, and construed in accordance with, PROMESA (including the

provisions of the Bankruptcy Code make applicable pursuant to section 301 of PROMESA), and

to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving

effect to principles of conflicts of laws.

264.265.     Enforceability.  Pursuant to Bankruptcy Code sections 1123(a), 1123(b),

and 944(a) as well as general principles of federal supremacy, the provisions of this

Memorandum, the Confirmation Order, and the Plan shall apply and be enforceable

notwithstanding any otherwise applicable nonbankruptcy law.  The documents contained in the

Plan Supplement (as such documents may be further modified and filed with the Court prior to

the Effective Date) provide adequate means for implementation of the Plan pursuant to section

1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall

constitute valid legal obligations of the Debtors and valid provisions to pay or secure payment of

the bonds pursuant to section 944(b)(3) of the Bankruptcy Code, and shall be enforceable in

accordance with their terms.

265.266.      No Precedential Effect.  The findings of fact and conclusions of law herein

concerning the separate classification of certain Claims from Class 58 CW General Unsecured

Claims, including the governmental or business reasons for such classifications, are made with

respect to the Title III cases of the Commonwealth, ERS, and PBA, and shall not have any

precedential effect for other Title III cases.

## Conclusion

For the foregoing reasons, the Debtors' motion to confirm the Plan is granted and

a Confirmation Order will be entered contemporaneously herewith.


SO ORDERED.

Dated: January [xx], 2022

_[DRAFT – Sample Only]____
LAURA TAYLOR SWAIN
United States District Judge

**Exhibit B**

**Redline Draft Confirmation Order**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO et al.,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

ORDER AND JUDGMENT CONFIRMING MODIFIED EIGHTH AMENDED TITLE III
JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO,

THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE

COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1. | Confirmation of the Plan | 5 |
| 2. | Objections | 5 |
| 3. | Findings/Conclusions | 5 |
| 4. | Litigation Resolution | 9 |
| 5. | Plan Settlements Approved | 11 |
| 6. | Dismissal of Med Center Litigation | 11 |
| 7. | Dismissal of ERS Litigation | 12 |
| 8. | Dismissal of GO/Clawback Litigation | 13 |
| 9. | Dismissal of PRIFA BANs Litigation | 13 |
| 10. | Dismissal of the PBA Litigation | 14 |
| 11. | Implementation of the Plan | 14 |
| 12. | Enforceability of New Debt Instruments | 15 |
| 13. | Authorization of New GO Bonds and CVIs and Injunction | 15 |
| 14. | Purchase and Sale of Certain ERS Assets | 16 |
| 15. | Monthly Deposits of Interest and Principal | 16 |
| 16. | Comprehensive Cap on All Net Tax-Supported Debt | 17 |
| 17. | Adoption and Maintenance of a Debt Management Policy | 18 |
| 18. | Creation of Avoidance Actions Trust | 18 |
| 19. | Avoidance Actions Trust Assets | 19 |
| 20. | Funding, Costs, and Expenses of the Avoidance Actions Trust | 19 |
| 21. | Indemnification of Avoidance Actions Trustee and Board | 20 |
| 22. | Creation of Pension Reserve Trust | 21 |
| 23. | Funding of the Pension Reserve Trust | 21 |
| 24. | No Action | 22 |
| 25. | Government Action | 22 |
| 26. | Oversight Board Consent Pursuant to PROMESA Section 305 | 23 |
| 27. | Binding Effect | 23 |
| 28. | Cancellation of Notes, Instruments, Certificates, and Other Documents | 24 |
| 29. | Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases | 26 |

| 30. | Insurance Policies | 27 |
| 31. | Rejection Damages Claims | 28 |
| 32. | Payment of Cure Amounts | 28 |
| 33. | Setoff | 28 |
| 34. | Delivery of Distributions | 29 |
| 35. | Disbursing Agent | 37 |
| 36. | Payment of Trustee Fees and Expenses | 38 |
| 37. | Securities Laws Exemption | 38 |
| 38. | Acceleration of Insured Bonds | 39 |
| 39. | Disputed Claims Reconciliation | 40 |
| 40. | Disputed Claims Holdback | 42 |
| 41. | National Action Claims | 43 |
| 42. | No Amendments to Proofs of Claim | 44 |
| 43. | Conditions to Effective Date | 45 |
| 44. | Administrative Claim Bar Date | 45 |
| 45. | Professional Compensation and Reimbursement Claims | 46 |
| 46. | GO/PBA Consummation Costs | 47 |
| 47. | AFSCME Professional Fees | 47 |
| 48. | GO/PBA PSA Restriction Fee | 48 |
| 49. | ERS Restriction Fee | 50 |
| 50. | CCDA Consummation Costs | 50 |
| 51. | CCDA Restriction Fee | 51 |
| 52. | HTA Bond Claims | 53 |
| 53. | System 2000 Obligations | 53 |
| 54. | HTA/CCDA Clawback Structuring Fees | 53 |
| 55. | Active JRS Participants and Active TRS Participants | 54 |
| 56. | Discharge and Release of Claims and Causes of Action | 56 |
| 57. | Releases by the Debtors and Reorganized Debtors | 62 |
| 58. | Release and Exculpation Provisions | 63 |
| 59. | **Injunction on Claims** | 63 |
| 60. | **Injunction Related to Releases** | 64 |
| 61. | Exculpation | 65 |

| | | |
|---|---|---|
| 62. | Maintenance of Pension System | 71 |
| 63. | Appointments Related Litigation | 72 |
| 64. | **Bar Order** | 72 |
| 65. | **Supplemental Injunction** | 73 |
| 66. | Term of Existing Injunctions or Stays | 75 |
| 67. | Prosecution of Claims | 75 |
| 68. | Indemnification and Reimbursement Obligations | 75 |
| 69. | Compliance with Tax Requirements | 76 |
| 70. | Documents and Instruments | 77 |
| 71. | Fiscal Plan | 77 |
| 72. | Claims | 77 |
| 73. | GUC Reserve | 78 |
| 74. | PROMESA 407 Claims | 78 |
| 75. | Dairy Producer Claims | 78 |
| 76. | Eminent Domain/Inverse Condemnation Claims. | 79 |
| 77. | Oversight Board Termination and Post-Confirmation Powers | 79 |
| 78. | Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's Sole Discretion | 80 |
| 79. | Government Post-Confirmation Powers and Duties | 80 |
| 80. | Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated | 81 |
| 81. | Non-Impairment of CVIs, SUT | 81 |
| 82. | Reversal/Stay/Modification/Vacatur of Order | 81 |
| 83. | Retention of Jurisdiction | 82 |
| 84. | Conflicts Among Documents | 82 |
| 85. | PBA Leases | 83 |
| 86. | Modifications | 84 |
| 87. | Asserted Surety Claims | 84 |
| 88. | Identification of Additional Retail Investors / Retail Support Fee | 85 |
| 89. | Provisions of Plan and Order Nonseverable and Mutually Dependent | 86 |
| 90. | Governing Law | 86 |
| 91. | PFC Reservation | 87 |
| 92. | Applicable Nonbankruptcy Law | 87 |
| 93. | Waiver of Filings | 87 |

94.   Notice of Order ......................................................................................... 88

95.   No Waiver ................................................................................................... 88

through the date hereof);[4] and the Court having entered, pursuant to, inter alia, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), (i) approving the adequacy of the information set forth in the Disclosure Statement, (ii) establishing procedures for the solicitation, voting, and tabulation of votes on and elections with respect to the Plan, (iii) approving the forms of ballots, master ballots, and election notices used in connection therewith, and (iv) approving the form of notice of the Confirmation Hearing; and the Court having entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640); and the following documents having been filed by the Debtors or the PSA Creditors in support of or in connection with confirmation of the Plan:

(a)     Plan Supplement (Docket Entry No. 18470);

(b)     *Certificate of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9);

(c)     *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4);

(d)     *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18874);

(e)     *Memorandum of Law in Support of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 18869);

---

[4]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement Order, the Confirmation Brief (each as defined herein), or the *Findings of Fact and Conclusions of Law Regarding Confirmation of Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Findings of Fact and Conclusions of Law"), entered contemporaneously herewith, as applicable.  A composite copy of the Plan is annexed hereto as **Exhibit A**.

(f)     *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18729 and 19054-4);

(g)     *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico et al.* (Docket Entry Nos. 18726 and 19054-1);

(h)     *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18731 and 19054-9);

(i)     *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18734 and 19054-10);

(j)     *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18730 and 19054-8);

(k)     *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18738 and 19054-6);

(l)     *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18736 and 19054-7);

(m)     *Declaration of Adam Chepenik in Respect of the Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18735 and 19054-2);

(n)    *Declaration of Sheva R. Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18737 and 19054-5);

(o)    *Declaration of Jay Herriman in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18732 and 19054-3);

(p)    *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19056. See also Docket Entry No. 19144);

(q)    *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725);

(r)    *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724);

(s)    *Supplemental Declaration of Gaurav Malhotra of Ernst &Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057);

(t)    *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058);

(u)    *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19059);

(v)      *Supplemental Declaration of Juan Santambrogio in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19060);

(w)      *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115); and

(x)      *Supplemental Declaration of Jay Herriman in Respect of Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19329);

and objections to confirmation of the Plan having been interposed by certain parties, as reflected on the docket of the Title III Cases and on the record of the Confirmation Hearing; and, except to the extent otherwise provided herein, each of the objections having been resolved, overruled, sustained, or withdrawn at, prior to, or subsequent to the Confirmation Hearing;[5] and the Court having held the Confirmation Hearing commencing on November 8, 2021; and the appearances of all interested parties, including members of the public selected by the Court, having been noted in the record of the Confirmation Hearing; and after full consideration of the record of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case, including, without limitation, motions, applications and orders in each of such cases, the foregoing

---

[5]   All opposition submissions are also listed as part of the Court's Findings of Fact and Conclusions of Law.

documents, and the evidence admitted and arguments of counsel presented at the Confirmation

Hearing; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT**:

1.      Confirmation of the Plan.  The Plan and each of its provisions shall be, and hereby

are, CONFIRMED pursuant to section 314(b) of PROMESA.  The documents contained in the

Plan Supplement are authorized and approved.  The terms of the Plan, as amended,

supplemented, or modified by the revisions made prior, at, or subsequent to the Confirmation

Hearing, as set forth in this Confirmation Order as well as in the revised composite copy attached

hereto as **Exhibit A**, include the Plan Supplement, as amended, supplemented, or modified on or

prior to the date hereof, and are incorporated by reference into and are an integral part of this

Confirmation Order.

2.      Objections.  With the narrow exception of the objections of holders of alleged

Eminent Domain/Inverse Condemnation Claims, which are hereby SUSTAINED to the extent

that such Claims are ultimately Allowed Claims, all objections, responses to, and statements and

comments, if any, in opposition to or inconsistent with the Plan shall be and hereby are,

OVERRULED and DENIED in their entirety.  All withdrawn objections are deemed withdrawn

with prejudice.

3.    <u>Findings/Conclusions</u>.  The findings of fact and conclusions of law set forth in the

Court's Findings of Fact and Conclusions of Law are incorporated herein as though set forth in

full.  Notwithstanding such incorporation, the following summarizes certain of the Court's

determinations:

(A)    Pursuant to PROMESA, on May 3, 2017, May 21, 2017, and September 27,
2019, respectively, the Commonwealth, ERS, and PBA, respectively, each commenced a
case before the Court in accordance with the requirements of Title III of
PROMESA.  The commencement of these cases vested the Court with
exclusive jurisdiction over the cases and all respective property of the
Commonwealth, ERS, and PBA, wherever located.  As a result of the
consensual agreement among the Debtors and their respective creditor
representatives, the Debtors formulated, duly solicited, and now seek
confirmation of a plan of adjustment in accordance with federal law.

(B)    This Confirmation Order is a final order intended to be binding on all parties
in interest, and shall not be subject to collateral attack or other challenge in
any other court or other forum, except as permitted under applicable law.
Confirmation of the Plan constitutes a judicial determination, pursuant to
section 4 of PROMESA, that all laws, rules, and regulations giving rise to
obligations of the Debtors discharged by the Plan and this Confirmation Order
pursuant to PROMESA are preempted by PROMESA and such discharge
shall prevail over any general or specific provisions of territory laws, rules,
and regulations.  Pursuant to section 4 of PROMESA, to the extent
previously ruled preempted pursuant to an order of the Title III Court, all laws
(or such portions thereof) of the Commonwealth of Puerto Rico, other than
budgets certified by the Oversight Board, inconsistent with PROMESA, have
been preempted to the extent set forth in Exhibit A to the Findings of Fact and
Conclusions of Law.  Such preempted laws include, without limitation, laws
enacted prior to June 30, 2016, that provide for transfers or other
appropriations after the enactment of PROMESA, including transfers from the

Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, to the extent inconsistent with the Plan's discharge of the Debtors' obligations.  Such laws shall not be enforceable to the extent they are inconsistent with the Plan's discharge of the Debtors' obligations.  All laws enacted from and after the commencement of the Title III Cases to the extent they are inconsistent with the transactions contemplated by the Plan are also unenforceable.  Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, those listed on **Exhibit C** hereto for the reasons, and to the extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law, and (b) all litigation in which any Government Party is a defendant, over whether any Commonwealth law listed on **Exhibit C** hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.   For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

(C)     The Court shall retain jurisdiction to enforce the terms hereof and of the Plan, the New GO Bonds, the GO CVIs, and the Clawback CVIs in accordance with their terms to ensure compliance with the Plan and to adjudicate claims arising therefrom, including rights to specific performance.

(D)     At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to be stamped or written on each of the New GO Bonds, the GO CVIs, the Clawback CVIs, and the Rum Tax CVI a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE

PURSUANT TO THE JUDGMENT AND
CONFIRMATION ORDER, ENTERED ON THE [xx]
DAY OF [xx], 2022.

(E)     The New GO Bonds Legislation and the CVI Legislation are incorporated into
Act No. 53-2021, which has been validly enacted by the Commonwealth and
is valid and effective in accordance with its terms.

(F)     Pursuant to PROMESA, including section 4 thereof, as well as sections 944[6]
and 1123 of the Bankruptcy Code, and in accordance with the Confirmation
Order and the Plan, the Court determines that the New GO Bonds and the
CVIs, and the covenants by the Commonwealth, for the benefit of the holders
of the New GO Bonds, and the CVIs as provided in the New GO Bonds
Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI
Indenture or the Confirmation Order, as applicable, constitute valid, binding,
legal and enforceable obligations of the Commonwealth, under Puerto Rico,
New York, and federal law.

---

[6]   Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine
the validity of obligations imposed under a plan of the debtor and of any provision made to pay
or secure payment of such obligations.  11 U.S.C. § 944(b)(3).  See generally In re City of
Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state
relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. .
. . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws,
including state constitutional provisions, that are inconsistent with the exercise by Congress of
its exclusive power to enact uniform bankruptcy laws.") (citing Ass'n of Retired Emps. of the
City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-16
(Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v.
City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D. Cal. 2010))
(additional citations omitted).  As set forth in the leading bankruptcy treatise, "[t]he
requirement of a court determination of validity is extra assurance for those who might be
skittish about the nature of the bonds being issued . . . . It has the added feature of removing
any doubt concerning the matter, because the determination of the court on that issue should be
binding in the future."  6 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy §
944.03[1][b] (16th ed. 2013).

(G)    The New GO Bonds and the CVIs are bonds or notes within the meaning of Section 2 of Article VI of the Commonwealth Constitution to which the Commonwealth may legally pledge its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest.

(H)    Pursuant to the New GO Bonds Legislation and the CVI Legislation, the Commonwealth has validly pledged its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest with respect to the New GO Bonds and payment with respect to the CVIs.

(I)    Subject to the occurrence of the Effective Date and as of the date of issuance of the New GO Bonds and CVIs, the Commonwealth is in compliance with any applicable debt limits, including the Comprehensive Cap and any applicable debt limit (if any) contained in the Commonwealth Constitution.

(J)    Pursuant to the New GO Bonds Legislation and other applicable law, upon the issuance of the New GO Bonds, the New GO Bonds shall be secured by a first priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53)) over the funds deposited in the Debt Service Fund, including any revenues generated therefrom, which statutory first lien shall occur automatically and shall automatically attach and be perfected, valid, and binding from and after the Effective Date, without any further act or agreement by any Person, and shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms.

(K)    The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal, and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights in the Plan and in the Confirmation Order).

(L)     The statutory first lien on funds deposited into the Debt Service Fund, as
provided for in the New GO Bonds Legislation, creates the valid pledge and
the valid lien upon the right, title and interest of the Commonwealth in such
funds in favor of the Trustee (for the benefit of the holders of the New GO
Bonds) which it purports to create, subject only to the provisions of the New
GO Bonds Indenture permitting the withdrawal, payment, setting apart or
appropriation thereof for the purposes and on the terms and conditions set
forth in the New GO Bonds Indenture and each applicable supplemental
indenture.

(M)     The Commonwealth has waived, and shall be deemed to have waived, the
automatic stay in any future insolvency proceeding commenced on behalf of
the Commonwealth (whether under Title III of PROMESA or otherwise) with
respect to monies on deposit in the Debt Service Fund as of the
commencement thereof.

(N)     In light of the enactment of the New GO Bonds Legislation and the CVI
Legislation, upon execution by all parties thereto, the New GO Bonds
Indenture and the CVI Indenture shall (i) have been duly and lawfully
authorized by the Commonwealth, and (ii) be in full force and effect and valid
and binding upon the Commonwealth and enforceable in accordance with
their terms, except that enforceability of rights and remedies may be limited by
bankruptcy, insolvency, reorganization, moratorium, or other laws affecting
creditors' rights generally or as to the availability of any particular remedy.

(O)     For purposes of section 209 of PROMESA, the discharge of debt to occur as
of the Effective Date pursuant to the Plan and the Confirmation Order is
necessary for the Oversight Board to certify that expenditures do not exceed
revenues for the Commonwealth, as determined in accordance with modified
accrual accounting standards.

(P)     The Court's *Opinion and Order Granting Defendants' Motion to Dismiss the
Complaint* (Docket Entry No. 83 in Adv. Proc. No. 21-00068), including,
without limitation, that the GDB HTA Loans are subject to subordination to

the HTA 68 Bonds and the HTA 98 Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.

4.   <u>Litigation Resolution</u>.  For the reasons stated herein and in the Findings of Fact and Conclusions of Law, the provisions of the Plan constitute a good faith, reasonable, fair, and equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the compromise and settlement of asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, and disputes (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status, and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, the Puerto Rico Metropolitan Bus Authority (the "MBA") and PRIFA, as applicable, and subject to "clawback" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the

validity, priority, secured status, and related rights attendant to the GDB HTA Loans, (f) set forth

in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the

Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and

Causes of Action currently being litigated in the PBA Litigation, (ii) the amount, if any, of the

PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the

Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under

leases, agreements, and applicable law, (h) set forth in the Lift Stay Motions and the Clawback

Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the

CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation, each as

incorporated into the Plan, and the entry of this Confirmation Order constitutes, if required,

approval of all such compromises and settlements pursuant to Bankruptcy Rule 9019 and

sections 105(a) and 1123(b)(5) of the Bankruptcy Code.  Pursuant to this Confirmation Order,

and to the extent provided in the Plan, on the Effective Date, such compromises and settlements

shall be binding upon the Debtors, all Creditors of the Debtors, and all other Entities and, to the

fullest extent permitted by applicable law, shall not be subject to collateral attack or other

challenge (other than appeals) in any other court or forum.

5.      <u>Plan Settlements Approved</u>.  The Court hereby approves the compromises and
settlements embodied in the Plan as fair and reasonable and, as of the Effective Date of the Plan,
authorizes and directs the consummation thereof.

6.      <u>Dismissal of Med Center Litigation</u>.  On the Effective Date, the Med Center
Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice, and each of
the Commonwealth and the respective Med Centers shall take such action as is necessary to
notify the applicable court of such dismissal, including, without limitation, within ten (10)
Business Days of the Effective Date, filing notices with the clerk of such court setting forth the
resolution of the Med Center Litigation and the dismissal thereof (except the Med DC Action),
with prejudice; <u>provided</u>, <u>however</u>, that all appeals taken from the Med DC Action shall be
dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such
appeals shall take such action as is necessary to notify such appellate courts of appeal of such
dismissal, with prejudice; and, <u>provided</u>, <u>further</u>, that the Commonwealth and the Med Centers
shall file a notice with the clerk of the court in connection with the Med DC Action that (a) all
actions in connection with the Med DC Action shall be stayed, and (b) in the event that, from and
after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the
Medicaid Act, 42 U.S.C. § 1396a(bb), such stay shall be lifted and the Med Centers may pursue

relief and the Commonwealth may present any and all defenses with respect to such alleged future defaults, with all existing defaults as of the date hereof having been waived by the Med Centers.  Without in any way limiting the foregoing, from and after the earlier to occur of (y) July 1, 2022 and (z) the Effective Date (the "Med Center Outside Date"), and until otherwise ordered or agreed upon, the parties shall continue to adhere to and comply with the terms and provisions of that certain *Stipulation Modifying the Automatic Stay Between the Commonwealth and Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. De Serv. Médicos Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castañer, Inc.*, dated July 12, 2019 (the "Med Center Stipulation") (see Docket Entry Nos. 8499, 12918-14), including, without limitation, the making of quarterly payments to certain Med Centers in accordance therewith.  Payments made by the Commonwealth, either directly or indirectly through contractors or subcontractors, to any Med Center prior to modification of the Med Center Stipulation or such other agreement between the applicable Med Centers and the Commonwealth shall not be subject to setoff or recoupment on account of any claims or causes of action arising during the period up to and including the Effective Date; provided, however, that, in the event

that the Commonwealth or any Med Center determines that any payments made pursuant to the

Med Center Stipulation from and after the Med Center Outside Date constitute an overpayment

or an underpayment, as the case may be, based upon services provided by the Med Centers from

and after the Med Center Outside Date, the Commonwealth or such Med Center shall submit

such issue for a determination in connection with the Med DC Action, with all parties reserving

all rights, defenses, and counterclaims with respect to such overpayments or underpayments, as

the case may be, notwithstanding the imposition of any stay.

     7.    <u>Dismissal of ERS Litigation</u>.  On the Effective Date, (a) the ERS Litigation and

the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the

Oversight Board, by itself or through its committees, the Creditors' Committee, and the ERS

Bondholders (on their own account or on behalf of affiliates or related funds or accounts

managed by affiliates) shall take any and all action reasonably necessary, including, without

limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to

effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions,

with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate

the dismissal and/or denial of the ERS Takings Action, with prejudice.

8.      <u>Dismissal of GO/Clawback Litigation</u>.  On the Effective Date, (a) to the extent, the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the Lift Stay Motions, the Clawback Actions, and the Section 926 Motion shall be dismissed and/or denied, with prejudice, (b) the Oversight Board, by itself or through its committees, the Creditors' Committee, the Monolines and the PSA Creditors (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action reasonably necessary, including, without limitation, filing such notices, stipulations or other pleadings in the Title III Court, the United States Court of Appeals for the First Circuit and the courts of the Commonwealth of Puerto Rico, as applicable, to effectuate the dismissal of the aforementioned litigations and motions, with prejudice.

9.      <u>Dismissal of PRIFA BANs Litigation</u>.  On the Effective Date, (a) the PRIFA BANs Litigation and the PRIFA BANs Takings Litigation shall be dismissed and/or denied, with prejudice, and (b) the Oversight Board, by itself or through its committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action necessary, including, without limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal and/or denial of the PRIFA BANs Litigation, with prejudice, and (ii) in the United States Court of

Federal Claims to effectuate the dismissal and/or denial of the PRIFA BANs Takings Litigation, with prejudice.

10.   <u>Dismissal of the PBA Litigation</u>.  On the Effective Date, (a) the PBA Litigation shall be dismissed, with prejudice, and (b) the Oversight Board, by itself or through its committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action necessary, including, without limitation, filing such notices, stipulations or other pleadings in the Title III Court to effectuate such dismissal and/or denial of the PBA Litigation, with prejudice.

11.   <u>Implementation of the Plan</u>.  On and after the Effective Date, the Debtors, the Reorganized Debtors, and each of their respective authorized agents and representatives are authorized and directed to (a) execute, deliver, file, or record such documents, contracts, instruments, releases, and other agreements including, without limitation, those contained in the Plan Supplement, (b) make any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the Plan Supplement, (c) take such other actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan, including, among other things, all such actions delineated in article LXXXIX of the Plan,[7] and

---

[7]   Article LXXXIV has been amended to reflect that Class 54 is among the Unimpaired Classes (§ 84.2), rather than among the Impaired Classes (§ 84.1.)

(d) direct or instruct The Depository Trust Company, or such other person or entity necessary to implement or effectuate the terms of (i) any custodial trust, escrow arrangement, or similar structure established pursuant to section 75.5(b) of the Plan and facilitated by Ambac (an "Ambac Trust"), (ii) the FGIC Trust, (iii) the Syncora Trust, (iv) any custodial trust, escrow arrangement, or similar structure established pursuant to section 75.1(b)(ii) of the Plan (an "Assured Trust"), and (v) the Avoidance Actions Trust (collectively, the "Trusts"), and (vi) the related Trust documentation.  Without in any way limiting the foregoing, on the Effective Date, the appropriate officers or representatives of the Debtors and Reorganized Debtors, as the case may be, and members of the boards of directors of the same, as applicable, are authorized, empowered, and directed to issue, execute, file, and deliver or record such documents, contracts, instruments, releases, and other agreements, including those contained in the Plan Supplement, contemplated by the Plan, and make, or cause to be made, any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the Plan Supplement, in the name of and on behalf of the Debtors and Reorganized Debtors, as applicable.

12.  <u>Enforceability of New Debt Instruments</u>.  Pursuant to each of Bankruptcy Code section 944(b)(3), the New GO Bonds Legislation, the CVI Legislation, and all debt instruments to be issued pursuant to the Plan will constitute, upon distribution thereof, valid legal obligations

of the Debtor or the Reorganized Debtor, as the case may be, that issues them, and any provision made to pay or secure payment of such obligation is valid.

13.    <u>Authorization of New GO Bonds and CVIs and Injunction</u>.  The debt authorization in Act 53-2021 is conditioned only on the Plan's cancellation of the Monthly Benefit Modification provided for in the proposed *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17627) (the "Seventh Amended Plan"), and does not require satisfaction of any other conditions including cancellation of (a) the elimination of cost of living adjustments and/or (b) freeze or terminations of accrual of defined benefits under the Teachers Retirement System or the Judiciary Retirement System from and after the Effective Date.  The Plan cancels and eliminates the Monthly Benefit Modification previously included in the proposed Seventh Amended Plan, thereby satisfying the condition in Act 53-2021 for its debt authorization.  The Commonwealth government shall not repeal such debt authorization prior to all such indebtedness issued pursuant to the Plan being satisfied in accordance with the terms thereof.  For avoidance of doubt, the Plan does not modify benefits comprised of the "Monthly Base Pension," "Christmas Bonus," "Summer Bonus," "Medicine Bonus," and "Medical Insurance Benefit," each as defined in the Seventh Amended Plan.

14.    <u>Purchase and Sale of Certain ERS Assets</u>.  On the Effective Date, (a) the

Commonwealth shall purchase, and ERS shall sell, assign, transfer, and convey to the

Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without

limitation, such Assets subject to a valid and perfected lien or security interest (other than liens or

claims discharged pursuant to the Plan and this Confirmation Order) for an aggregate purchase

price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and

(b) in accordance with the terms and provisions of section 69.2 of the Plan, (i) the

Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the

interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option,

pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS

Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million

Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be necessary

to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS

Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not exercised, the

Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy Million Seven

Hundred Fifty Thousand Dollars ($70,750,000.00).

15.     <u>Monthly Deposits of Interest and Principal</u>.  Pursuant to the New GO Bonds

Legislation and the New GO Bonds Indenture, from and after the Effective Date, until the New

GO Bonds have been paid or satisfied in full in accordance with their terms, on the first (1st)

Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the

Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i)

one-sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the

payment of interest to accrue on the New GO Bonds through the next interest payment date, and

(ii) one twelfth (1/12) of the Reorganized Commonwealth's then annual obligation with respect

to the payment of principal (or accreted value) on the New GO Bonds.  On the Effective Date,

the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional

amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed

Issuance Date.

16.     <u>Comprehensive Cap on All Net Tax-Supported Debt</u>.  During the Debt Policy

Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds

Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as

applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive

Cap on all Net Tax-Supported Debt of article IV of the Debt Responsibility Act, which cap shall

be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and

when measured in accordance with the Debt Responsibility Act, including a secured and/or

securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy Revenues

above and beyond the percentage of Debt Policy Revenues required to pay the maximum annual

debt service on the COFINA Bonds outstanding as of the Effective Date.  Debt service payments

on New GO CABs issued pursuant to the Plan to holders or insurers of GO Bonds and PBA

Bonds, and payments on CVIs to be issued pursuant to the Plan or other contingent value

instruments that may be issued pursuant to or in connection with a Commonwealth

Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA, CCDA, or

PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such

instrumentality or (b) other creditors of such instrumentality, will not apply towards the

Comprehensive Cap.  For the avoidance of doubt, any capital appreciation general obligation

bonds or similar tax supported debt obligations issued to anyone other than the holders or

insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value

instruments or similar tax supported debt obligations issued other than pursuant to or in

connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the

Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date.  The

Secretary of Treasury's certification of compliance with the Debt limit pursuant to section 74.4

of the Plan shall be conclusive and binding absent manifest error; provided, however, that, in

issuing such certification, with respect to the calculation of the revenues of public corporations

included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from

officers of such public corporations.

17.     Adoption and Maintenance of a Debt Management Policy

.  During the Debt Policy Period, the Reorganized Commonwealth shall maintain and comply

with a Debt Management Policy designed to ensure that certain past Debt issuance practices of

the Commonwealth are not repeated.  The Debt Management Policy shall, unless otherwise

approved, in writing, by the Oversight Board (to the extent exercising authority in accordance

with the provisions of PROMESA), at all times include the principles and limitations provided in

section 74.5 of the Plan.

18.     Creation of Avoidance Actions Trust.  Upon the execution of the Avoidance

Actions Trust Agreement pursuant to section 78.1 of the Plan, the Avoidance Actions Trust shall

be established and validly created pursuant to the terms of the Avoidance Actions Trust

Agreement, with no further authorization or legislative action being required, and the Avoidance

Actions Trustee shall be selected in accordance with the terms and provisions of the Avoidance

Actions Trust Agreement.  This Court shall retain jurisdiction to enforce the terms and provisions of the Avoidance Actions Trust Agreement.

19.    <u>Avoidance Actions Trust Assets</u>.  The Avoidance Actions Trust shall consist of the Avoidance Actions Trust Assets.  On the Effective Date, the Debtors shall transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust and, in accordance with section 1123(b)(3)(B) of the Bankruptcy Code, the Avoidance Actions Trust shall have the sole right, authority, and standing to prosecute, settle or otherwise dispose of all Avoidance Actions, including, without limitation, those set forth on Exhibits A and B to the Plan, as of the Effective Date.  The Avoidance Actions Trust Assets may be transferred subject to certain liabilities, including, without limitation, all counterclaims and defenses to any such Avoidance Actions Trust Assets, as provided in the Plan or the Avoidance Actions Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors, the Reorganized Debtors, and their predecessors, successors and assigns, and each other Entity released pursuant to section 88.2 of the Plan shall be discharged and released from all liability with respect to the delivery of such distributions.

20.   <u>Funding, Costs, and Expenses of the Avoidance Actions Trust</u>.  On the Effective

Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to

Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior

to the Confirmation Hearing.  The reasonable costs and expenses of the Avoidance Actions

Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained

professionals, shall be paid out of the Avoidance Actions Trust Assets.  Fees and expenses

incurred in connection with the prosecution and settlement of any Claims shall be considered

costs and expenses of the Avoidance Actions Trust.

21.   <u>Indemnification of Avoidance Actions Trustee and Board</u>.  The Avoidance

Actions Trustee, the Trust Advisory Board (as defined in the Avoidance Actions Trust

Agreement), and their respective firms, companies, affiliates, partners, officers, directors,

members, employees, professionals, advisors, attorneys, financial advisors, investment bankers,

disbursing agents and agents, and any of such Person's successors and assigns (each, an

"Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries (as defined

in the Avoidance Actions Trust Agreement) for actions taken or omitted in their capacity as, or

on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except

those acts arising from their own fraud, willful misconduct or gross negligence, and each shall be

entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except for any actions or inactions involving fraud, willful misconduct or gross negligence.  Any indemnification claim of an Indemnified Party pursuant to section 7.5 of the Avoidance Actions Trust Agreement shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom.  The Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals.  The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

22. <u>Creation of Pension Reserve Trust</u>.  Upon the execution of the Pension Reserve Deed of Trust pursuant to section 83.1 of the Plan, the Pension Reserve Trust shall be established and validly created pursuant to the terms of the Pension Reserve Deed of Trust, with no further authorization or legislative action being required, and shall not be subject to taxation by the Commonwealth.  This Court's retention of jurisdiction includes jurisdiction over actions to enforce the terms and provisions of the Pension Reserve Deed of Trust.

23.    <u>Funding of the Pension Reserve Trust</u>.  On the Effective Date, the Commonwealth

shall contribute, or cause to be contributed, to the Pension Reserve Five Million Dollars

($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension Reserve

Trust, of which One Million Dollars ($1,000,000.00) shall be deposited into the Pension Reserve

Board's general account, Two Million Five Hundred Thousand Dollars ($2,500,000.00) shall be

deposited into the Pension Benefits Council's administrative and operating account, and One

Million Five Hundred Thousand Dollars ($1,500,000.00) shall be deposited into the Pension

Reserve Board's administrative and operating account.  From and after the FY in which the

Effective Date occurs up to and including the conclusion of the ninth (9th) FY following the FY

in which the Effective Date occurs, the Reorganized Commonwealth shall make, or cause to be

made, annual (but in no event later than October 1st following the conclusion of each FY)

contributions to the Pension Reserve Trust in an amount equal to (a) the Base Contribution, (b)

such additional amount calculated as the lower of the actual primary surplus for such FY and the

projected Fiscal Plan primary surplus for such FY, minus the sum of (i) the Base Contribution for

such FY, plus (ii) the  Commonwealth debt service obligation pursuant to the Fiscal Plan for

such FY, plus (iii) Two Hundred Million Dollars ($200,000,000.00); <u>provided</u>, <u>however</u>, that, in

all instances, such additional amount cannot be lower than zero dollars ($0.00), and (c) subject to

applicable laws, including, without limitation, Titles I and II of PROMESA, such additional

amounts as the Reorganized Commonwealth may deposit into the Pension Reserve Trust.  The

Pension Reserve Trust shall be managed by an independent entity whose members shall meet the

independence, professionalism, experience and qualification standards set forth in the Pension

Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics, and

conflicts of interest laws and regulations.

24.     No Action.  Pursuant to section 1142(b) of the Bankruptcy Code, the Debtors are

directed to, and no further action of the directors or officers of the Debtors shall be required to

authorize the Debtors to, enter into, execute, deliver, file, adopt, amend, restate, consummate, or

effectuate, as the case may be, the Plan, and any contract, instrument, or other document to be

executed, delivered, adopted, or amended in connection with the implementation of the Plan,

including, without limitation, the Plan Supplement.

25.     Government Action.  From the Effective Date up to and including the satisfaction

of the New GO Bonds and the CVIs in accordance with their respective terms, (a) pursuant to

Bankruptcy Code section 1142(b), the Government of Puerto Rico, including, without limitation,

any Entity or Person acting for or on behalf thereof, shall take any and all actions necessary to

consummate the transactions contemplated by the Plan, (b) the Puerto Rico Department of

Treasury and AAFAF, as applicable, are authorized and directed, notwithstanding any

requirements of Puerto Rico law, to execute any and all agreements necessary for the

implementation of the Plan and to make any payments required thereunder,  and (c) pursuant to

section 108(a)(2) of PROMESA, no party, individual, official, or officer (elected or appointed),

agency, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that (i)

impedes, financially or otherwise, consummation and implementation of the transactions

contemplated by the Plan, including, but not limited to, those contemplated pursuant to the New

GO Bonds Indenture and the CVI Indenture, or (ii) creates any inconsistency in any manner,

amount, or event between the terms and provisions of the Plan or a Fiscal Plan certified by the

Oversight Board, each of which actions has been determined by the Oversight Board to impair or

defeat the purposes of PROMESA.  To the maximum extent permitted by law, the Government

of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof,

is directed to take any and all actions necessary to consummate the transactions contemplated by

the Plan.  Without in any way limiting the foregoing, on the earlier to occur of (y) the Effective

Date and (z) within forty-five (45) days from and after the date hereof, the agencies and

instrumentalities set forth on **Exhibit D** hereto are directed to transfer the funds and the proceeds

of liquid securities held on account and set forth on **Exhibit D** hereto to the Puerto Rico Treasury

Single Account; provided, however, that **Exhibit D** hereto may be amended during the period up to and including thirty (30) days from the date hereof upon the agreement of the Oversight Board and AAFAF and, to the extent amended, the Oversight Board shall file an informative motion with the Title III Court with respect thereto.

26.   Oversight Board Consent Pursuant to PROMESA Section 305.  Pursuant to section 305 of PROMESA, with the consent of the Oversight Board and consistent with the Plan, using all their political and governmental powers, the Governor and Legislature are directed to take all acts necessary to carry out and satisfy all obligations and distributions set forth in the Plan.

27.   Binding Effect.  This is a full and complete Final Order intended to be conclusive and binding on all parties in interest, is not intended to be subject to collateral attack in any other forum, and may only be challenged in accordance with applicable rules in this Court and appealed as provided in PROMESA and other applicable federal laws, rules, and jurisprudence, by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or

otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with

respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank

that receives or holds funds related to such bonds, whether or not such claim or other rights of

such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity

accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs,

successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives,

attorneys, beneficiaries or guardians; provided, however, that the compromises and settlements

set forth in the Plan and this Confirmation Order with respect to the priority of the New GO

Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other applicable law

shall not be binding on any party in interest (including any successor to the Oversight Board) in a

subsequent Title III (or other insolvency) proceeding.

28.    Cancellation of Notes, Instruments, Certificates, and Other Documents.  Pursuant

to section 77.6 of the Plan, and except (a) as provided in any contract, instrument or other

agreement or document entered into or delivered in connection with the Plan, (b) for purposes of

evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the

Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to section

76.1 of the Plan), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all

instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against the Debtors without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee, paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained in the Plan or herein to the contrary, the PBA Bonds, ERS Bonds and GO Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed Bond Claims and Allowed Insured Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) to allow any trustee, fiscal agent, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan, and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and

instruments other than the Debtors, (v) to allow a Monoline to exercise the redemption or call

rights assigned to such Monoline pursuant to the provisions of article LXXV of the Plan, (vi) to

allow the applicable trustee or fiscal agent, as the case may be, to appear in any proceeding in

which such trustee or fiscal agent is or becomes a party with respect to clauses (i) through (iv)

above, or (vii) as may be necessary to preserve any claims under the respective insurance policies

and related documents issued by a Monoline and the Oversight Board shall request that the

Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP

numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such

other reasonable steps as may be necessary to preserve and effectuate such Claims.

Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such

bonds or bond documents that remain outstanding shall not form the basis for the assertion of any

Claim against the Debtors or Reorganized Debtors, as the case may be.

29.    Rejection or Assumption of Remaining Executory Contracts and Unexpired

Leases.  Pursuant to section 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case

pursuant to section 301 of PROMESA, and subject to the provisions of sections 76.5 and 76.7 of

the Plan, all Executory Contracts and Unexpired Leases that exist between the Debtors and any

Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall

be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract

and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of

the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a

contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been

registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from

registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and

regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or

authorized by the Title III Court, unless specifically designated a contract to be rejected in the

Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or

pursuant to any federal program, (g) that is an incentive agreement between the Government of

the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover

Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments,

municipalities, public corporations, or instrumentalities (other than leases to which PBA is a

party); provided, however, that the Debtors reserve the right to amend, on or prior to the

Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom

or add any Executory Contract and Unexpired Lease thereto, in which event such Executory

Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected,

assumed, or assumed and assigned as of the Effective Date. The Debtors shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of section 76.1 of the Plan, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of section 76.1 of the Plan, by serving a separate notice to the relevant counterparties to such agreements. To the extent there are any amendments to such schedules, the Debtors shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby. The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtors that such document is an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder. Except as provided in articles LV and LVI of the Plan, none of the Debtors' collective bargaining agreements shall be treated as Executory Contracts and none shall be assumed or rejected or otherwise treated pursuant to the Plan, but shall remain in effect subject, in all instances, to Puerto Rico law and articles LV and LVI of the Plan regarding the payment and ongoing treatment of pension and related claims obligations.

30.   <u>Insurance Policies</u>. Subject to the terms and provisions of section 76.7 of the Plan, each of the Debtors' insurance policies and any agreements, documents, or instruments

relating thereto, are treated as Executory Contracts under the Plan; provided, however, that, such

treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect

to its respective obligations to holders of Claims under policies of insurance and applicable law

and governing documents with respect thereto.

31.     <u>Rejection Damages Claims</u>.  If the rejection of an Executory Contract and

Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to such

contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of

Claim, shall be forever barred and shall not be enforceable against the Debtors, or its properties

or agents, successors, or assigns, including, without limitation, Reorganized Debtors, unless a

proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board

and Reorganized Debtors, as the case may be, on or before thirty (30) days after the later to occur

of (i) the Effective Date, and (ii) the date of entry of an order by the Title III Court authorizing

rejection of a particular Executory Contract and Unexpired Lease.

32.     <u>Payment of Cure Amounts</u>.  Any monetary amount required as a cure payment

with respect to each prepetition executory contract and unexpired lease to be assumed pursuant to

the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of

the cure amount in Cash on the later to occur of (a) the Effective Date and (b) within ten (10)

Business Days of the occurrence of a Final Order setting forth the cure amount as to each

executory contract or unexpired ease to be assumed or assumed and assigned, or upon such other

terms and dates as the parties to such executory contracts or unexpired leases and the Debtor

otherwise agree.

33.     Setoffs.  Except as otherwise provided in the Plan or in this Confirmation Order,

the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off

against any Allowed Claim and the distributions to be made pursuant to the Plan on account

thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the

claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may

hold against the holder of such Allowed Claim; provided, however, that neither the failure to

effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release

by the Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the

Debtors or the Reorganized Debtors possess against such holder; and, provided, further, that

nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of

setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560

of the Bankruptcy Code or pursuant to the common law right of recoupment; and, provided,

further, that nothing in this decretal paragraph or section 77.11 of the Plan shall affect the releases and injunctions provided in article XCII of the Plan or this Confirmation Order.

34.     Delivery of Distributions.

(a)     Delivery of Distributions Generally.   Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the Plan or herein, distributions and deliveries to holders of Allowed Claims shall be made through The Depository Trust Company or at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; provided, however, that, except as otherwise provided herein, distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the respective governing documents for such obligations; and, provided, further, that, except as otherwise provided herein, the Disbursing Agent may make distributions of PSA Restriction Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto in a manner mutually agreed upon between such party and the Disbursing Agent.  The trustee or fiscal agent for each such obligation (or such trustee's or fiscal agent's designee) shall, in turn,

deliver the distribution to holders in the manner provided for in the applicable governing documents.  Each trustee or fiscal agent may conclusively rely upon the distribution instructions received from the Debtors or their agents with respect to the delivery of distributions in accordance with the terms and provisions of the Plan, including the contra-CUSIP positions and escrow positions established by the Debtors or their agents with The Depository Trust Company, and each trustee or fiscal agent shall close and terminate the original CUSIPs after making distributions in accordance with the terms and provisions of the Plan and shall have no further distribution obligations thereunder.  No trustee or fiscal agent shall be required to post any bond or surety or other security for the performance of its duties, unless otherwise ordered or directed by the Title III Court.  Subject to any agreements to the contrary, each trustee or fiscal agent shall only be required to make the distributions and deliveries described in this decretal paragraph and the Plan and in accordance with the terms of this Confirmation Order, the Plan and such other governing document, and shall have no liability for actions reasonably taken in accordance with the terms of this Confirmation Order, the Plan and such other governing document, or in reasonable reliance upon information provided to such trustee or fiscal agent by the Debtors or their agents in accordance with the terms of this Confirmation Order, the Plan or in connection with distributions to be made hereunder or thereunder, except for liabilities resulting from the

gross negligence or willful misconduct of such trustee or fiscal agent.  The New GO Bonds and the CVIs shall be transferable and recognized if made in accordance with the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

(b)    Delivery of Distributions with Respect to Assured Insured Bonds.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) to the extent an Assured Insured Bondholder holding the Assured Insured Bond with CUSIP number 74514LD46  validly elects (or is deemed to elect) Assured Bondholder Election 2, the Disbursing Agent will deposit the Assured New Securities and Cash allocable to such Assured Insured Bondholder in the applicable Assured Trust in accordance with the applicable trust agreement; (ii) to the extent an Assured Insured Bondholder holding the custody receipt with CUSIP number 74514LGL5 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745145XZ0, the custody receipt with CUSIP number 745235UX7 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP number 745235YJ4 or 745235UX7 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP number 745235YZ8 evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP

number 745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond

with CUSIP number 745235SC6, or the custody receipt with CUSIP number 745235YV7 or

745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond with

CUSIP number 745235SC6 validly elects (or is deemed to elect) Assured Bondholder Election

2, such Assured Insured Bondholder will be deemed to have deposited such custody receipts

into the applicable Assured Trust; the trustee (the "Assured Trustee") of the Assured Trusts (as

the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the

existing custodial arrangement, such that the Assured Trustee will be deemed to hold the

Assured Insured Bonds underlying the applicable custody receipts and the related Assured

Insurance Policies as provided in the applicable trust agreement, without any further action on

the part of the existing custodian, provided, however, that the existing custodian is also hereby

authorized and ordered to take any further actions that may be necessary to confirm the collapse

of the existing custodial arrangement as provided herein; and the Disbursing Agent will transfer

the Assured New Securities and Cash allocable to such Assured Insured Bondholder to the

Assured Trustee for deposit in the applicable Assured Trust on account of such custody receipts

and Assured Insured Bonds in accordance with the applicable trust agreement; (iii) to the extent

an Assured Insured Bondholder holding the custody receipt with CUSIP number 74514LWE3

evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number

745145R53 or holding the custody receipt with CUSIP number 74514LUW5 evidencing a

beneficial ownership interest in the Assured Insured Bond with CUSIP number 74514LNG8

validly elects (or is deemed to elect) Assured Bondholder Election 2, such Assured Insured

Bondholder will be deemed to have deposited such custody receipts into the applicable Assured

Trust; the Assured Trustee (as the holder of the applicable custody receipts) and Assured will be

deemed to have collapsed the existing custodial arrangement, such that the Assured Trustee will

be deemed to hold the Assured Insured Bonds underlying the applicable custody receipts and

the related Assured Insurance Policies as provided in the applicable trust agreement, without

any further action on the part of the existing custodian, provided, however, that the existing

custodian is also hereby authorized and ordered to take any further actions that may be

necessary to confirm the collapse of the existing custodial arrangement as provided herein, and,

without prejudice to the ability of the Assured Trustee to draw on the applicable Assured

Insurance Policy, the Assured Trustee shall be deemed to have deposited such Assured Insured

Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and

the related FGIC Plan Consideration into the applicable FGIC Trust pursuant to section 75.4(a)

of the Plan; and the trustee for the Assured Trust related to such Assured Insured Bonds shall be

deemed to have received its Pro Rata Share of the FGIC Plan Consideration, and shall receive

the FGIC Certificates allocable to such Assured Insured Bondholder on account of the custody

receipts referred to in this subsection (iii) above and Assured Insured Bonds (which also qualify

as FGIC Insured Bonds) referred to in this subsection (iii) above for deposit in the relevant

Assured Trust in accordance with the applicable trust agreement; (iv) pursuant to section

75.1(a) of the Plan, Assured is hereby deemed to have exercised the Assured Acceleration Price

Payment Option with respect to all Assured Insured Bonds with respect to which Assured has

exercised the Assured Election, and the Disbursing Agent shall disburse the Assured New

Securities and Cash on account of any Assured Insured Bonds with respect to which Assured

has exercised the Assured Election or with respect to which an Assured Insured Bondholder has

validly elected Assured Bondholder Election 1 to Assured in a manner mutually agreed upon

between the Disbursing Agent and Assured; and (v) on or prior to the Effective Date, the

Disbursing Agent and the Debtors shall disclose to Assured the Acceleration Price to be paid

with respect to any Assured Insured Bonds with respect to which Assured has exercised the

Assured Election or with respect to which an Assured Insured Bondholder has validly elected

Assured Bondholder Election 1, and on the Effective Date (1) with respect to such Assured

Insured Bonds insured in the primary market, the paying agent for the GO Bonds or the fiscal

agent for the PBA Bonds, as applicable, shall draw down on the applicable Assured Insurance

Policies to pay the applicable Assured Acceleration Price to the beneficial holders of such

Assured Insured Bonds insured in the primary market in accordance with sections 75.1(a) and

75.1(b)(i) of the Plan, as applicable, and (2) with respect to such Assured Insured Bonds insured

in the secondary market, Assured shall, or shall cause the applicable custodian of custody

receipts evidencing the beneficial ownership interest of the holders thereof in such Assured

Insured Bonds and the related Assured Insurance Policies to draw on the applicable Assured

Insurance Policies in order to pay the applicable Assured Acceleration Price to the beneficial

holders of such Assured Insured Bonds insured in the secondary market in accordance with

sections 75.1(a) and 75.1(b)(i) of the Plan, as applicable; provided, however, that, for the

avoidance of doubt, Assured shall not in any circumstance be required to pay itself an

Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by

subrogation or otherwise.

(c)     Delivery of Distributions with Respect to National Insured Bonds.

Notwithstanding any other provision of the Plan or of this Confirmation Order, on the Effective

Date, National shall receive, and the Disbursing Agent shall disburse to National in a manner

mutually agreed upon by the Disbursing Agent and National, the National Plan Consideration

that would otherwise be allocable to holders of Allowed National Insured Bond Claims that

elected to receive the National Non-Commutation Treatment by electing such treatment in

accordance with the Election Notice for National Bond Holders with Claims in Classes 3 and 25

(Docket Entry No. 17639-30) or the Election Notice for National Bond Holders with Claims in

Class 18 (Docket Entry No. 17639-31); provided, however, that, for the avoidance of doubt,

National shall not in any circumstance be required to pay itself the National Acceleration Price

with respect to any National Insured Bonds owned by National, by subrogation or otherwise.

(d)      Delivery of Distributions to FGIC.  Notwithstanding any other provision

of the Plan or of this Confirmation Order, on the Effective Date, the Disbursing Agent shall

distribute to FGIC FGIC's share of the Vintage CW Bond Recovery, the Vintage CW Guarantee

Bond Recovery, and the Vintage PBA Bond Recovery in accordance with the terms and

provisions of section 75.4(b) of the Plan in a manner mutually agreed upon between the

Disbursing Agent and FGIC.

(e)      Delivery of Distributions with Respect to Ambac Insured Bonds.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) to the extent

a holder of any Ambac Insured Bonds with CUSIP numbers 745235D32,745235D40, or

745235B75 validly elects to receive the Ambac Non-Commutation Treatment, the Disbursing

Agent shall, on the Effective Date or as soon as reasonably practicable thereafter, distribute to Ambac the Ambac Plan Consideration payable to such holder on account of its Allowed Claims in Classes 4 and 26; (ii) to the extent a holder of any Ambac Insured Bonds with CUSIP numbers 745235D32, 745235D40, or 745235B75 validly elects to receive the Ambac Commutation Treatment or otherwise fails to validly elect to receive the Ambac Non-Commutation Treatment (including submitting an election for less than all of its Claims in Classes 4 or 26), on the Effective Date or as soon as reasonably practicable thereafter, the Disbursing Agent shall distribute the Ambac Commutation Consideration payable on account of its Allowed Claims in Class 4 and/or 26 under the Plan to the applicable indenture trustee, which shall in turn distribute such consideration to the applicable bondholders, except that Ambac may direct the applicable indenture trustee to reduce the distribution to any holder to account for any payments that Ambac has made, or for any other consideration that Ambac has made available or will make available, to such holder (collectively, the "Prior Payments"), and the applicable indenture trustee shall then pay the portion of the Ambac Commutation Consideration equal to the applicable Prior Payment to Ambac; (iii) to the extent a holder of any Ambac Insured Bonds with CUSIP number 745145AX0 validly elects to receive the Ambac Non-Commutation Treatment, on the Effective Date or as soon as reasonably practicable

thereafter, the Disbursing Agent shall distribute to Ambac the Ambac Plan Consideration

payable to such holder on account of its Allowed Claims in Class 19; (iv) to the extent a holder

of any Ambac Insured Bonds with CUSIP number 745145AX0 fails to validly elect to receive

the Ambac Non-Commutation Treatment (including by submitting an election for less than all

of its Claims), on the Effective Date or as soon as reasonably practicable thereafter, the

Disbursing Agent shall distribute the Ambac Commutation Consideration payable on account of

its Allowed Claims in Class 19 under the Plan to the applicable indenture trustee, which shall in

turn distribute such consideration to the applicable bondholders, except that Ambac may direct

the applicable indenture trustee to reduce the distribution to any holder to account for any Prior

Payments that Ambac has made, or for any other consideration that Ambac has made available

or will make available, to such holder and the applicable indenture trustee shall then pay the

portion of the Ambac Commutation Consideration equal to the applicable Prior Payment to

Ambac; and (v) with respect to Ambac Insured Bonds with CUSIP numbers 745145GB2,

745145A3, 745145YY2, 745235KT7, 745235TH4, 745235TJ0, 745235TK7, 745235TL5,

which are fully matured, on the Effective Date or as soon as reasonably practicable thereafter,

the Disbursing Agent shall distribute the Ambac Plan Consideration distributable on account of

Allowed Claims in Classes 4, 19, or 26 to Ambac.

(f)    <u>Delivery of Distributions with Respect to Clawback Recoveries</u>.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) on the

Effective Date, or, in the event the HTA Distribution Conditions have not been satisfied as of

the Effective Date, upon satisfaction of the HTA Distribution Conditions, the Disbursing Agent

shall distribute to each applicable Monoline its share of the CW/HTA Clawback Recovery in

accordance with the terms and provisions of section 63.1 of the Plan in a manner mutually

agreed upon between the Disbursing Agent and such Monoline; (ii) on the Effective Date, the

Disbursing Agent shall distribute to each applicable Monoline its share of the CW/Convention

Center Clawback Recovery in accordance with the terms and provisions of section 64.1 of the

Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline; and

(iii) on the Effective Date, or, in the event the PRIFA Distribution Conditions have not been

satisfied as of the Effective Date, upon satisfaction of the PRIFA Distribution Conditions, the

Disbursing Agent shall distribute to each applicable Monoline its share of the CW/PRIFA Rum

Tax Recovery in accordance with the terms and provision of section 65.1 of the Plan in a

manner mutually agreed upon between the Disbursing Agent and such Monoline and (iv) on the

later to occur of (A) the Effective Date and (B) satisfaction of the HTA Distribution Conditions,

the Disbursing Agent shall distribute to National National's share of the CW/HTA Clawback

Recovery in accordance with the terms and provisions of section 63.2 of the Plan in a manner

mutually agreed upon by the Disbursing Agent and National.  Upon satisfaction of the HTA

Distribution Conditions, DRA shall be entitled to receive its share of the CW/HTA Clawback

Recovery, as delineated in the Priority Distribution Waterfall from Clawback CVI Allocation to

Allowed CWHTA Claims set forth in Exhibit J to the Plan.

35.   <u>Disbursing Agent</u>.  Pursuant to section 1.204 of the Plan, the Disbursing Agent

shall be, as applicable, such Entity or Entities designated by the Oversight Board, upon

consultation with AAFAF, on or prior to the Effective Date to make or to facilitate distributions

in accordance with the provisions of the Plan and this Confirmation Order.  Upon designation

thereof, the Oversight Board shall file an informative motion with the Title III Court setting forth

the name of the Disbursing Agent designated.

36.   <u>Payment of Trustee Fees and Expenses</u>.  The distributions to be made pursuant to

the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses

allegedly due and owing by the Commonwealth, ERS, and PBA with respect to amounts

discharged pursuant to the Plan.  The Plan does not, nor shall it be construed to, limit the rights

of each Trustee/Fiscal Agent to payment of such amounts (a) from the distributions to be made

hereunder, including, without limitation, the imposition of any valid Charging Lien, or (b)

pursuant to a contractual fee agreement entered into by the Debtors, or on their behalf, during the

period from and after the Commonwealth Petition Date, including, without limitation, that

certain Settlement Agreement and Invoice Instructions (the "Settlement Agreement"), dated as of

December 21, 2018, by and between, among others, AAFAF, U.S. Bank Trust National

Association, and U.S. Bank National Association (collectively, the "USB Entities"); provided,

however, that (a) with respect to PBA, the Effective Date, and (b) with respect to PRIFA, the

later of (i) the Effective Date and (ii) effectiveness of the PRIFA Qualified Modification pursuant

to Title VI of PROMESA, (the "PRIFA Effective Date") in the event that, following application

of fees and expenses in accordance with the terms and provisions of the Settlement Agreement,

the USB Entities retain any monies deposited by PBA or PRIFA, as the case may be, pursuant to

the terms thereof, the USB Entities shall remit such excess funds to PBA or PRIFA, as the case

may be, or such other Entity as may be designated by PBA or PRIFA, as the case may be, within

fifteen (15) Business Days following the Effective Date or the PRIFA Effective Date, as

applicable, by wire transfer of immediately available funds.

      37.    Securities Laws Exemption.  Pursuant to section 1145 of the Bankruptcy Code

and/or section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New

GO Bonds, the CVIs, and interests in the ERS Trust pursuant to the terms of the Plan and this

Confirmation Order (and any subsequent offering of such securities, including, without

limitation, pursuant to a case under Title VI of PROMESA), or the custodial trusts created in

accordance with articles LXIII, LXIV, LXV, and LXXV of the Plan shall be exempt from

registration under the Securities Act and any state or local law requiring registration for the offer,

issuance or distribution of securities, including, but not limited to, the registration requirements

of section 5 of the Securities Act and any other applicable state or federal law requiring

registration and/or prospectus delivery or qualification prior to the offering, issuance,

distribution, or sale of securities, and, pursuant to section 2(b) of the Investment Company Act of

1940, as amended (the "Investment Company Act"), such custodial trusts, securities and interests

shall be exempt from the provisions of the Investment Company Act.

38.    <u>Acceleration of Insured Bonds</u>.  Notwithstanding any other provision of the Plan

or this Confirmation Order:

(a)    <u>Assured Insured Bonds</u>: To the extent there are no outstanding payment defaults
by Assured with respect to Assured Insured Bonds up to and including the
Effective Date, the payment of the principal of the Assured Insured Bonds shall be
accelerated from and after the Effective Date, and such Assured Insured Bonds
shall be due and payable from and after the Effective Date at the Assured
Acceleration Price of one hundred percent (100%) of the principal amount thereof
plus accrued interest thereon (or, in the case of any capital appreciation bonds, the
compounded amount thereof) to the date of payment.

(b)   <u>National Insured Bonds</u>:  To the extent there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

(c)   <u>Syncora Insured Bonds</u>:  To the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

(d)   <u>FGIC Insured Bonds</u>:  Notwithstanding the terms and conditions of the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; <u>provided</u>, <u>however</u>, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(e)   <u>Ambac Insured Bonds</u>:  To the extent that there are no outstanding payment defaults by Ambac with respect to Ambac Insured Bonds up to and including the Effective Date, the principal amount (or compounded amount in the case of

capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the Effective Date.  Ambac shall have the right to pay such accelerated amounts and unpaid interest accrued to the date of payment at any time, regardless of which Ambac Non-Commutation Treatment (sections 75.5(b)(i)-(iv) of the Plan) applies to a particular holder of Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the Ambac Insurance Policy or other documents related to the Ambac Insured Bonds.  For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

39.     <u>Disputed Claims Reconciliation</u>.  In accordance with the terms and provisions of section 82.1(b) of the Plan and the Committee Agreement:

(a)     The two (2) Creditors Committee appointees to the Avoidance Actions Trust Board (collectively, the "Creditor Appointees") shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, ~~Eminent Domain Claims, an~~ ERS General Unsecured Claims, ~~and~~ Convenience Claims, and, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, Eminent Domain/Inverse Condemnation Claims regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or ~~an Eminent Domain~~, in the event

that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, an Eminent Domain/Inverse Condemnation Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019.  To facilitate the exercise of the settlement review process, the Oversight Board or AAFAF, as the case may be, shall inform the Creditor Appointees, in writing, five (5) days prior to making or accepting a settlement proposal for the resolution of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim where the proposed allowed amount exceeds Five Hundred Thousand Dollars ($500,000.00).[8]

(b)   With respect to the obligations and responsibilities set forth in this decretal paragraph 39, the Creditor Appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), inclusive of reimbursement of their reasonable out-of-pocket expenses incurred in furtherance of discharging such obligations and responsibilities, which amounts shall be funded from the GUC Reserve.  All such compensation and reimbursements shall be paid by the Entity selected pursuant to section 1.285 of the Plan to hold the GUC Reserve within thirty (30) days of such Entity's receipt of a request for such payment.  To the extent the Oversight Board or, in the event the Oversight Board terminates, AAFAF, disputes the validity or amount of any reimbursement request, it shall inform such Entity and, in the event the parties are unable to resolve such dispute, the Title III Court shall retain jurisdiction to resolve any such dispute.

---

[8]   Notwithstanding any reference to Eminent Domain Claims in this subparagraph or any report rendered pursuant thereto, the treatment of such Claims is governed by sections 58.1 and 77.2(e) of the Plan.

(c)     Without limiting the foregoing, (i) within sixty (60) days after the Effective Date, the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide the Creditor Appointees with a report (the "Initial Claims Report") containing (1) a register setting forth all CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims that have not been reconciled and which are being evaluated for possible objection, (2) the status of any pending objections to CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims, and (3) information illustrating which Claims are subject to the ACR Procedures and are to be excluded from CW General Unsecured Claims pursuant to section 82.7 of the Plan, and (ii) within ten (10) days of the end of each month (the "Monthly Claims Report"), the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide a report containing material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports.  In addition, the Oversight Board or AAFAF, as the case may be, through its advisors, shall, upon reasonable request, periodically supply the Creditor Appointees with any other information the Creditor Appointees may reasonably request related to the claims reconciliation process.[9]

(d)     In connection with the foregoing, the Creditor Appointees, together with their counsel and advisors in such capacity, shall not be liable to any Person for actions taken or omitted in connection with the exercise of their rights hereunder except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement from the GUC Reserve for fees and expenses in defending any and all actions or inaction in their capacity as Creditor Appointees, except for any actions or inactions involving willful misconduct or gross negligence.  The foregoing indemnity in respect of any Creditor Appointee shall survive and termination of such Creditor Appointee from the capacity for which they are indemnified.

---

[9]   Notwithstanding any reference to Eminent Domain Claims in this subparagraph or any report rendered pursuant thereto, the treatment of such Claims is governed by sections 58.1 and 77.2(e) of the Plan.

40.     <u>Disputed Claims Holdback</u>.  From and after the Effective Date, and until such

time as each Disputed Claim has been compromised and settled, estimated by the Title III Court

in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the

Title III Court, Reorganized Debtors or the Disbursing Agent, as applicable, shall retain, for the

benefit of each holder of a Disputed Claim, the distributions that would have been made to such

holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount

set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the

Disputed Claims have been estimated by the Title III Court pursuant to section 502 of the

Bankruptcy Code constitutes and represents the maximum amount in which such Claim may

ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the

holder of such Disputed Claim and Reorganized Debtors; <u>provided</u>, <u>however</u>, that the recovery

by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii), and (iii) above.  To the

extent the Disbursing Agent or any of the Reorganized Debtors, as the case may be, retains any

New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or

CVIs are distributed, the Disbursing Agent or such Reorganized Debtors, as the case may be,

shall exercise voting or consent rights with respect to such obligations.

41.  <u>National Action Claims</u>.  Notwithstanding anything contained herein, in the

GO/PBA Plan Support Agreement, or the HTA/CCDA Plan Support Agreement to the contrary,

National may continue to litigate to final judgment or settlement all claims and causes of action

asserted in the National Action;  <u>provided</u>, <u>however</u>, that, in the event that notwithstanding the

application and effectiveness of the Bar Date Orders, the Plan, and the Confirmation Order, the

defendants and, to the extent named, third-party  defendants in the National Action assert against

the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of

the Commonwealth (collectively, the "CW Entities") claims or counterclaims for

indemnification, contribution, reimbursement, setoff or similar theories of recovery based on,

arising from or related to the National Action (collectively, the "CW Entities' Claims"), (i) the

CW Entities agree (A) to vigorously defend against any such CW Entities' Claims, including,

without limitation, invoking the Bar Date Orders and discharge provisions set forth in article

XCII of the Plan and this Confirmation Order, objecting to any proof of claim, and prosecuting

available appeals, based upon, arising from, or related to the National Action, (B) to allow

National, at its option, to participate in or undertake such defense to such action in its sole

discretion, and (C) not to settle any CW Entities' Claims without National's written consent,

which consent shall not be unreasonably withheld, and (ii) National agrees to (A) indemnify and

hold the CW Entities harmless to the extent of the CW Entities' liability for the payment of

monies or the delivery of property, pursuant to a Final Order or settlement as a result of the

National Action, and (B) reimburse the relevant CW Entities for all documented fees and

expenses incurred in connection with the defense against such CW Entities' Claims, including,

without limitation, attorneys' fees and expenses incurred (amounts pursuant to clauses (ii)(A) and

(B) collectively, the "Total Reimbursement"), but in no event may the Total Reimbursement

exceed any recovery realized by National in connection with the National Action; provided,

however, that National shall have no obligation pursuant to this Confirmation Order, the Plan or

otherwise to indemnify and hold the CW Entities harmless for any claims based upon, arising

from or related to the Underwriter Actions that are not based upon, arising from, or related to the

National Action or in which National is not involved.  For the avoidance of doubt, CW Entities'

Claims shall not constitute CW General Unsecured Claims.

      42.     No Amendments to Proofs of Claim/Objections to Claims.  As of the

commencement of the Confirmation Hearing, a proof of Claim may not be amended without the

approval of the Title III Court.  With the exception of proofs of Claim timely filed hereafter in

respect of executory contracts and unexpired leases rejected pursuant to this Confirmation Order,

any proof of Claim filed on or after the commencement of the Confirmation Hearing is hereby

barred, and the Clerk of the Court and the Debtors' Claims Agent are authorized to remove such proofs of Claims from the claims registry in the Title III Cases.  Notwithstanding the provisions of section 82.1 of the Plan, in the event that (a) a Claim that has been transferred pursuant to the terms and provisions of either the ACR Order or the ADR Order is subsequently transferred back to the claims registry for determination by the Title III Court, the period in which the Reorganized Debtors shall file and serve any objections to the Claim, by and through the Oversight Board, or AAFAF, as the case may be, shall be extended up to and including one hundred eighty (180) days from and after the date of such notice transferring any such Claim back to the claims registry, and (b) within thirty (30) days of the date hereof, in accordance with section 204 of PROMESA, the Government of the Commonwealth of Puerto Rico shall deliver, or cause applicable agencies, instrumentalities, or Commonwealth of Puerto Rico public corporations to deliver, to the Oversight Board a copy of all files, documents, instruments and, to the extent applicable, pleadings requested by the Oversight Board in connection with the reconciliation of Claims, including, without limitation, Disputed Claims.  Without in any way limiting the foregoing or the terms and provisions of the Plan or the ACR Order, to the extent a Claim subject to the terms and provisions of the ACR Order, including, without limitation, "grievance claims" subject to the provisions of collective bargaining agreements, remain subject

to the ACR Order, upon resolution thereof, such Claims shall be satisfied by the Debtors in the ordinary course.

43.     <u>Conditions to Effective Date</u>.  The Plan shall not become effective unless and until the conditions set forth in section 86.1 of the Plan have been satisfied or waived in accordance with the provisions set forth in section 86.2 of the Plan.

44.     <u>Administrative Claim Bar Date</u>.  The last day to file proof of Administrative Expense Claims shall be ninety (90) days after the Effective Date, after which date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto; <u>provided</u>, <u>however</u>, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by any of the Debtors during the period from and after the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, (e) relates to actions occurring in the ordinary course during the period from and after the respective Debtor's

petition date up to and including the Effective Date, (f) relates to a Claim that is subject to the

provisions of the ACR Order, including, without limitation, "grievance claims" relating to any of

the Debtor's collective bargaining agreements, or (g) is the subject of a pending motion seeking

allowance of an administrative expense pursuant to section 503(b) of the Bankruptcy Code as of

the entry of this Confirmation Order; and, provided, further, that any such proof of

Administrative Expense Claim by a governmental unit shall remain subject to the rights and

interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in

interest to interpose an objection or other defense to the allowance or payment thereof.

     45.    Professional Compensation and Reimbursement Claims.  All Entities awarded

compensation, including, without limitation, to the fullest extent provided in respective letters of

engagement or similar instruments or agreements, or reimbursement of expenses by the Title III

Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court, including,

without limitation, all amounts previously awarded subject to holdbacks pursuant to orders of the

Title III Court, (a) no later than the tenth (10th) calendar day (or the first Business Day to occur

thereafter) after the later to occur of (i) the Effective Date and (ii) the date upon which the Title

III Court order allowing such Claims is deemed to be a Final Order, or (b) upon such other terms

no more favorable to the claimant as may be mutually agreed upon between such claimant and

the Government Parties; provided, however, that, except as provided herein or in the Plan, each

Professional must file its application for final allowance of compensation for professional

services rendered and reimbursement of expenses on or prior to the date that is one hundred

twenty (120) days following the Effective Date.  The Reorganized Debtors shall pay

compensation for professional services extended and reimbursement of expenses incurred by

their respective Professionals from and after the Effective Date in the ordinary course and

without the need for Title III Court approval.

46.   GO/PBA Consummation Costs.  Notwithstanding anything contained in the Plan

or this Confirmation Order to the contrary, to compensate certain parties for the cost of

negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the

Plan, and in consideration of (a) the negotiation, execution and delivery of the GO/PBA Plan

Support Agreement by each Initial GO/PBA PSA Creditor and (b) the obligations and covenants

contained in the GO/PBA Plan Support Agreement, each Initial GO/PBA PSA Creditor shall be

entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event

later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the

form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths

percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims,

CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to

each of Assured, Syncora, and National, including positions that it holds or has insured), without

duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (Eastern

Standard Time) on February 22, 2021.

47.     AFSCME Professional Fees.  Notwithstanding anything contained in the Plan or

this Confirmation Order to the contrary, on the Effective Date, AFSCME shall be reimbursed its

reasonable professional fees and expenses incurred to compensate AFSCME for the cost of

negotiation, confirmation, and consummation of the AFSCME Term Sheet and the Plan, and the

resolution of issues pertaining to pensions.

48.     GO/PBA PSA Restriction Fee.  Notwithstanding anything contained in the Plan or

this Confirmation Order to the contrary, in exchange for (a) executing and delivering the

GO/PBA Plan Support Agreement or (b) if applicable, tendering and exchanging GO Bonds or

PBA Bonds in accordance with the terms and conditions of the GO/PBA Plan Support

Agreement and notices posted on EMMA, and agreeing to all of its terms and conditions,

including support of the Plan and  the "lock-up" of GO Bonds and PBA Bonds in accordance

with the terms of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors

(including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a

Monoline-insured GO Bond or PBA Bond insured by Ambac, Assured, FGIC, Syncora, or

National, as the case may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is

authorized to vote the Claim with respect to such Monoline-insured GO Bond or PBA Bond in

accordance with section 301(c)(3) of PROMESA, definitive insurance documents and applicable

law, and (ii) Ambac, Assured, FGIC, Syncora, and National, to the extent Ambac, Assured,

FGIC, Syncora, or National, as the case may be, is authorized to vote such Claims in accordance

with section 301(c)(3) of PROMESA definitive insurance documents and applicable law) shall

be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event

later than ten (10) Business Days following the Effective Date, the GO/PBA PSA Restriction

Fee, in the form of an Allowed Administrative Expense Claim, payable in Cash, at the time of

consummation of the Plan equal to the GO/PBA Restriction Fee Percentage multiplied by the

aggregate amount of PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims

(without duplication and, to the extent such Claims are Monoline-insured, solely to the extent a

GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with section

301(c)(3) of PROMESA, definitive insurance documents and applicable law) held or, in the case

of Ambac, Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor

as of the Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond

Claims, CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims

are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any

such Claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance

documents and applicable law) for which it would have been entitled to receive the GO/PBA

PSA Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive

on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10)

Business Days following the Effective Date, the GO/PBA PSA Restriction Fee on account

thereof; and, provided, further, that, in the event the GO/PBA Plan Support Agreement has been

terminated pursuant to the terms of sections 7.1(b)(iii) (subject to the extension provided for in

section 7.1(b) thereof), (c)(i), or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA

Plan Support Agreement for any reason other than a breach of the GO/PBA Plan Support

Agreement by a non-Government Party, the aggregate GO/PBA PSA Restriction Fee and

Consummation Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be

paid, ratably, in Cash, as an allowed administrative expense claim under a plan of adjustment for

the Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and,

provided, further, that, in all other circumstances, upon termination of the GO/PBA Plan Support

Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and

payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the GO/PBA Plan Support Agreement is terminated.

49.   ERS Restriction Fee.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, (a) in exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee), shall be entitled to receive, and, on the Effective Date, ERS shall pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars ($75,000,000.00), and (b) in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, the Commonwealth shall pay to First Ballantyne, LLC, Monarch Alternative Capital LP, Moore Global Investments, LLC, Two Seas Capital LP, and Verition Multi-Strategy Master Fund, Ltd. their Pro Rata Share of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00), as agreed to among such parties.

50.   CCDA Consummation Costs.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, in order to compensate certain parties for the cost of

negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than Fifteen Million Dollars ($15,000,000.00).

51.     CCDA Restriction Fee.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, in exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, or FGIC, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, and FGIC, to the extent

Ambac, Assured, or FGIC, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in Cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period; provided, however, that each CCDA Restriction Fee Creditor who acquires any CCDA Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC, or National, as the case may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC, and National, to the extent Ambac, Assured or National, as applicable, is authorized to

vote such Insured CCDA Bond Claims in accordance with section 301(c)(3) of PROMESA,
definitive insurance documents and applicable law) shall be entitled to receive such CCDA
Restriction Fee equal to the CCDA Restriction Fee Percentage multiplied by the aggregate
amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are
Monoline-insured, solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any
such claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance
documents and applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to
occur of the HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and,
provided, further, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it
would have been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be
entitled to receive the CCDA Restriction Fee on account thereof and such entitlement shall
remain with the selling party; and, provided, further, that, in all circumstances, the sum of the
aggregate CCDA Restriction Fees plus the CCDA Consummation Costs attributable to a holder's
CCDA Bond Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided,
further, that, in the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the
terms of section 7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be

due and payable to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond
Claims.

52.   <u>HTA Bond Claims</u>.  In consideration for the agreements set forth in the
HTA/CCDA Plan Support Agreement, and within ten (10) Business Days following satisfaction
of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA
68 Bond Claims and HTA 98 Senior Bond Claims in the amounts of One Hundred Eighty-Four
Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two
Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall
reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and
the corresponding HTA Bond Claims; <u>provided</u>, <u>however</u>, that, for purposes of this decretal
paragraph 52, the applicable Monolines shall constitute the holders of the HTA 68 Bond Claims
and the HTA 98 Senior Bond Claims arising from the HTA Bonds insured by any such
Monoline, if any, in accordance with section 301(c)(3) of PROMESA, applicable law and
governing insurance and other documents applicable to such HTA Bonds; and, <u>provided</u>, <u>further</u>,
that, notwithstanding the foregoing, (a) with respect to any HTA 98 Senior Bonds owned by
FGIC, HTA shall make such interim distribution to FGIC, and (b) with respect to any HTA 98

Senior Bonds insured by FGIC, but not owned by FGIC, HTA shall make such interim distribution to the owners of such HTA 98 Senior Bonds.

53.  <u>System 2000 Obligations</u>.  Pursuant to the terms and provisions of section 55.10 of the Plan, the Commonwealth shall satisfy all obligations associated with Allowed System 2000 Participant Claims in the timeframes set forth therein.

54.  <u>HTA/CCDA Clawback Structuring Fees</u>.  In consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution Conditions, and in accordance with the terms and provisions of section 6.1(d) of the HTA/CCDA Plan Support Agreement, on the HTA Effective Date, or as soon as practicable thereafter in accordance with the terms of the HTA Plan, but in no event later than ten (10) Business Days following such date, the Commonwealth shall make payments to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively.

55.  <u>Active JRS Participants and Active TRS Participants</u>.  In connection with the treatment of Active JRS Participant Claims and Active TRS Participant Claims pursuant to sections 55.8 and 55.9 of the Plan:

(a)     <u>Act 106 Defined Contribution Accounts</u>.  Notwithstanding any provision of Act

106 to the contrary (including, without limitation, sections 1.4, 1.6, 2.1, 2.6, and 3.1 thereof), on

or prior to the Effective Date, the Commonwealth shall establish defined contribution accounts

(the "Defined Contribution Accounts") pursuant to chapter 3 of Act 106 for all holders of such

Active JRS Participant Claims and Active TRS Participant Claims who do not have such

accounts as the Effective Date and who, prior to the Effective Date, were making contributions to

JRS  in accordance with the provisions of Act No. 12 of October 19, 1954, as amended, known

as the "Judiciary Retirement Act," or to TRS in accordance with the provisions of Act No.

91-2004, as amended, known as the "Commonwealth of Puerto Rico Teachers' Retirement

System Act," as applicable.  Without in any way limiting the foregoing, in connection with the

modification of the Commonwealth's obligations under any laws establishing or enabling TRS or

JRS, the Commonwealth shall enroll teachers, judges, and all other employees that would have

otherwise been enrolled in TRS, hired from and after the Effective Date in the Act 106 Defined

Contribution Plan and establish Defined Contribution Accounts for such individuals.

(b)     <u>Eligibility for and Enrollment in Federal Social Security</u>.  From and after the

Effective Date, and notwithstanding any provision of Act 106 to the contrary (including, without

limitation, section 3.4 thereof), every (i) Active JRS Participant, (ii) teacher who is an Active

TRS Participant, and (iii) teacher and judge hired from and after the Effective Date shall

mandatorily make contributions to his or her Defined Contribution Account at a minimum rate of

two and three-tenths percent (2.3%) of his or her monthly compensation, up to the limit

established in section 1081.01(d)(7) of Act 1-2011; provided, however, that each teacher and

judge who is forty-five (45) years of age or older as of the Effective Date shall contribute to his

or her Defined Contribution Account at a minimum rate of eight and one-half percent (8.5%)

of his or her monthly compensation, up to the limited established in section 1081.01(d)(7) of Act

No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," or any

successor law thereof, and, therefore, fail to be eligible to contribute to the Federal Social

Security system, unless any such teacher or judge shall have irrevocably elected within sixty (60)

days of the Effective Date to reduce their contributions to a minimum of two and three-tenths

percent (2.3%) and be enrolled in the Federal Social Security system.  For teachers who are

Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the

Effective Date who contribute two and three-tenths percent (2.3%) of their monthly

compensation as set forth above, including those aged 45 and older who have elected to do so,

the Employer, in coordination with the Retirement Board and/or Secretary of Treasury, shall

withhold the minimum amount of six and two-tenths percent (6.2%) of their applicable monthly

compensation and remit such amount to the appropriate authority as required by the applicable

provisions of the Federal Social Security Act and other applicable Federal law to enable the

inclusion of the Participant in the Federal Social Security system.  Teachers who are Active TRS

Participants, Active JRS Participants, and teachers and judges first hired after the Effective Date

may voluntarily contribute to their Defined Contribution Accounts additional amounts to those

established as allowed under section 1081.01 of Act No. 1-2011, provided, however, that in no

case may those increased contribution rates and additional amounts exceed the applicable limits

to be eligible, and affect the eligibility of these Participants, for coverage under the Federal

Social Security system, unless such Participants are aged 45 and older and do not participate in

the Federal Social Security system.  In accordance with the foregoing, the Government of the

Commonwealth of Puerto Rico, including, without limitation, any Entity or Person acting for or

on behalf thereof, shall implement all reasonably necessary or advisable policies, procedures, or

mechanisms to provide for all payroll deduction or transmittal required by federal law to ensure

eligibility for and enrollment of Participants in the Federal Social Security system and

effectuating the Federal Insurance Contributions Act remittances.

56.    <u>Discharge and Release of Claims and Causes of Action</u>.

(a)    Except as expressly provided in the Plan or herein, all distributions and rights

afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete

satisfaction, settlement, discharge, and release of, all Claims or Causes of Action against the

Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date,

relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective

Assets, property, or interests of any nature whatsoever, including any interest accrued on such

Claims from and after the Petition Date, and regardless of whether any property will have been

distributed or retained pursuant to the Plan on account of each of the Claims or Causes of Action;

<u>provided,</u> <u>however</u>, that, without prejudice to the exculpation rights set forth in section 92.7 of

the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this Confirmation

Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release

of the PSA Creditors, AFSCME, and each of their respective Related Persons by any Creditors of

the Debtors.  Upon the Effective Date and independent of the distributions provided for under the

Plan, the Debtors and Reorganized Debtors shall be discharged and released from any and all

Claims, Causes of Action, and any other debts that arose, in whole or in part, prior to the

Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections

502(g), 502(h), or 502(i) of the Bankruptcy Code and section 407 of PROMESA, whether or not

(a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the

Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and

section 407 of PROMESA (or is otherwise resolved), or (c) the holder of a Claim based upon

such debt voted to accept the Plan.  For the avoidance of doubt, nothing contained in the Plan or

herein shall release, discharge, or enjoin any claims or causes of action against PREPA arising

from or related to PREPA-issued bonds, including, without limitation, Monoline-issued

insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against

any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to

PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's

Title III case, including, without limitation, any plan of adjustment therein.

(b)      Except as expressly provided in the Plan or herein, all Entities shall be precluded

from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of their

respective employees, officials, Assets, property, rights, remedies, Claims, or Causes of Action

of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized Debtors or

any of their respective Assets and property, including any and all interest accrued on such

Claims, and regardless of whether any property will have been distributed or retained pursuant to

the Plan on account of each of the Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action, or liabilities.  In accordance with the foregoing, except as expressly provided in the Plan or herein, this Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtors or Reorganized Debtors and their respective Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt, or liability.  As of the Effective Date, and in consideration for the distributions or other value provided pursuant to the Plan, each holder of a Claim in any Class under the Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtors and Reorganized Debtors, and their respective Assets and property, all such Claims.

(c)     Notwithstanding any other provisions of decretal paragraph 56 of this Confirmation Order or section 92.2 of the Plan, in accordance with the provisions of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have

released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any

other type of relief against any of the Government Releasees based upon, arising from or relating

to the Government Released Claims or any of the Claims or Causes of Action asserted or which

could have been asserted, including, without limitation, in the Clawback Actions and the Lift

Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with respect to

the Government Released Claims that is prohibited by decretal paragraph 56 of this Confirmation

Order and section 92.2 of the Plan.

(d)     SEC Limitation.  Notwithstanding anything contained herein or in the Plan to the

contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers,

or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes

of action, proceedings or investigations against any non-debtor person or non-debtor entity in any

forum.

(e)     United States Limitation.  Notwithstanding anything contained herein or in the

Plan to the contrary, no provision shall (i) impair the United States, its agencies, departments, or

agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be,

from compliance with federal laws or territorial laws and requirements implementing a federally

authorized or federally delegated program protecting the health, safety, and environment of

persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which

the Debtors or the Reorganized Debtors are entitled under Title III, and (iii) discharge, release,

enjoin, or otherwise bar (A) any liability of the Debtors or the Reorganized Debtors to the United

States arising from and after the Effective Date, (B) any liability to the United States that is not a

Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the

Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and

recoupment of such parties are expressly preserved, (D) the continued validity of the obligations

of the United States, the Debtors, or the Reorganized Debtors, as the case may be, under any

United States grant or cooperative assistance agreement, (E) the Debtors' or the Reorganized

Debtors' obligations arising under federal police or regulatory laws, including, but not limited to,

laws relating to the environment, public health or safety, or territorial laws implementing such

federal legal provisions, including, but not limited to, compliance obligations, requirements

under consent decrees or judicial orders, and obligations to pay associated administrative, civil,

or other penalties, and (F) any liability to the United States on the part of any non-debtor.

Without limiting the foregoing, nothing contained herein or in the Plan shall be deemed (i) to

determine the tax liability of any Entity, including, but not limited to, the Debtors and the

Reorganized Debtors and any obligation of the Debtors to pay post-petition interest on any such

tax liability, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or

tax filing and withholding obligations of any Entity, including, but not limited to, the Debtors and

the Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any claim

of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv) to

grant any relief to any Entity that the Court is prohibited from granting by the Declaratory

Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

(f)      _Underwriter Actions_.  Notwithstanding anything contained herein or in the Plan to

the contrary, including, without limitation, sections 92.2, 92.3, and 92.11 of the Plan, except as

may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the

Confirmation Order, or any Plan-related document set forth in the Plan Supplement is intended,

nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release,

reduce, eliminate, or limit the rights of the plaintiffs and defendants, including, without

limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims,

causes of action and defenses in the Underwriter Actions, including, but not limited to, any

Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available),

or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit

against) any judgment in connection with the Underwriter Actions (collectively, the "Defensive

Rights"); provided, however, that, for the avoidance of doubt, in no event shall any Defensive Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property to any plaintiff, defendant and, to the extent named, third-party defendant by any of the CW Entities in connection with an Underwriter Action; and, provided, further, that, no party in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the extent named, third-party defendants, shall be permitted to assert: (i) against the Debtors or the Reorganized Debtors any Claim or Cause of Action for purposes of obtaining an affirmative monetary recovery that otherwise is barred or discharged pursuant to the Bar Date Orders, the Plan, and/or this Confirmation Order; and/or (ii) against any of the CW Entities any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, for indemnification, contribution, reimbursement, setoff, or similar theories to the extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or counterclaims shall be deemed disallowed, barred, released, and discharged in accordance with the terms and provisions of the Plan and the Confirmation Order; and provided, further, that, for the avoidance of doubt, nothing in this decretal paragraph 56(f) is intended, nor shall it be construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or

limiting the amount of any liability or judgment in any Underwriter Action.  The parties in the

Underwriter Actions shall be permanently barred, enjoined, and restrained from commencing,

prosecuting, or asserting against any of the CW Entities any Claims or counterclaims for

purposes of obtaining an affirmative monetary recovery, including, without limitation,

indemnification, contribution, reimbursement, setoff or similar theories, to the extent asserted for

purposes of obtaining an affirmative monetary recovery, based upon, arising from, or related to

the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a

court, an arbitration, an administrative agency or forum, or in any other manner.

   (g) <u>Quest Litigation</u>.  Notwithstanding anything contained herein or in the Plan to the

contrary, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in

the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish,

prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the right of the Quest Diagnostics

of Puerto Rico, Inc. ("Quest") (1) from asserting its respective rights, claims, causes of action

and defenses in the avoidance action brought against it, including, but not limited to, any Claims,

defenses, Causes of Action, and rights of setoff or recoupment, or any rights to allocate

responsibility or liability or any other basis for the reduction of (or credit against) any judgment

(the "Quest Rights"); <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, in no event shall any

Quest Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property by any of the Debtors to Quest in connection with the merits of its avoidance action, and (2) to file and receive payment on any Claim it has pursuant to section 502(h) of the Bankruptcy Code and Bankruptcy Rule 3002(c)(3); provided, however, that any such Claims would constitute a CW General Unsecured Claim and be treated in accordance with the terms and provisions of article LXII of the Plan.

57.   Releases by the Debtors and Reorganized Debtors.  Except as otherwise expressly provided in the Plan or this Confirmation Order, on the Effective Date, and for good and valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally, and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors, Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims.

58.   Release and Exculpation Provisions.  Except as otherwise provided in this Confirmation Order, all release and exculpation provisions, including, but not limited to, those

contained in article XCII of the Plan, are approved and shall be effective and binding on all

Entities, to the extent provided therein.

59.    **Injunction on Claims**.  **Except as otherwise expressly provided in section**

**92.11 of the Plan, this Confirmation Order, or such other Final Order of the Title III Court**

**that is applicable, all Entities who have held, hold, or in the future hold Claims or any**

**other debt or liability that is discharged or released pursuant to section 92.2 of the Plan or**

**who have held, hold, or in the future hold Claims or any other debt or liability discharged**

**or released pursuant to section 92.2 of the Plan are permanently enjoined, from and after**

**the Effective Date, from (a) commencing or continuing, directly or indirectly, in any**

**manner, any action or other proceeding (including, without limitation, any judicial,**

**arbitral, administrative, or other proceeding) of any kind on any such Claim or other debt**

**or liability discharged pursuant to the Plan against any of the Released Parties or any of**

**their respective assets or property, (b) the enforcement, attachment, collection or recovery**

**by any manner or means of any judgment, award, decree, or order against any of the**

**Released Parties or any of their respective assets or property on account of any Claim or**

**other debt or liability discharged pursuant to the Plan, (c) creating, perfecting, or enforcing**

**any encumbrance of any kind against any of the Released Parties or any of their respective**

assets or property on account of any Claim or other debt or liability discharged pursuant

to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553,

555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of

recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against

any obligation due from any of the Released Parties or any of their respective assets or

property, with respect to any such Claim or other debt or liability discharged pursuant to

the Plan.  Such injunction shall extend to all successors and assigns of the Released Parties

and their respective assets and property.  Notwithstanding the foregoing, without prejudice

to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61

hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it

be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME,

and of their respective Related Persons by Creditors of the Debtors.

60. **Injunction Related to Releases**.  As of the Effective Date, all Entities that

hold, have held, or in the future hold a Released Claim released pursuant to section 92.5 of

the Plan, are, and shall be, permanently, forever and completely stayed, restrained,

prohibited, barred, and enjoined from taking any of the following actions, whether directly

or indirectly, derivatively or otherwise, on account of or based on the subject matter of

such discharged Released Claims: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action, or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under decretal paragraph 57 of this Confirmation Order and section 92.5 of the Plan; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration, or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or this Confirmation Order.  For the avoidance of doubt, the following stipulations will terminate upon the entry of this Confirmation Order: the *Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order* (Docket Entry No. 15854), as amended; and the *Fourth Amended Stipulation and Consent Order Between Title III*

*Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Exhibit "B" Regarding the Tolling of Statute of Limitations* **(Docket Entry No. 17394), as amended.**

61.   <u>Exculpation</u>.

(a)   <u>Government Parties</u>:  The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this subparagraph (a) or section 92.7 of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.  Nothing in this subparagraph (a) or section 92.7(a) of the Plan shall prejudice the right of any of the Government Parties, and the Government Parties' officers and

directors serving at any time up to and including the Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

(b)      <u>PSA Creditors</u>:  Each of the PSA Creditors solely in its capacity as a party to the GO/PBA Plan Support Agreement, the PRIFA Plan Support Agreement, and/or the HTA/CCDA Plan Support Agreement and a Creditor and/or insurer, as applicable, from the relevant Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, or the mediation, negotiation, formation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the GO/PBA Plan Support Agreement, the PRIFA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the Definitive Documents, or any other contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this subparagraph (b) and section 92.7(b) of the Plan shall not affect the liability of any Entity that otherwise would result from any

such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(c)   <u>Retiree Committee</u>:  Each of the members of the Retiree Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date and each of the Retiree Committee's Related Persons shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation, or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Retiree Committee Plan Support Agreement; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Retiree Committee with respect to the aforementioned actions, such member shall be reimbursed for reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, <u>provided</u>, <u>however</u>, that, the foregoing provisions of this subparagraph (c) and section 92.7(c) of the Plan

shall not affect the liability of any Entity that otherwise would result from any such act or

omission to the extent that such act or omission is determined in a Final Order to have

constituted intentional fraud or willful misconduct.

(d)     Creditors' Committee:  Each of the members of the Creditors' Committee, solely

in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the

relevant Petition Date up to and including the Effective Date and each of the Creditors'

Committee's Related Persons shall not have or incur any liability to any Entity for any act taken

or omitted to be taken in connection with the Title III Cases, the formation, preparation,

dissemination, implementation, confirmation, or approval of the Plan or any compromises or

settlements contained therein, the Disclosure Statement, or any contract, instrument, release, or

other agreement or document provided for or contemplated in connection with the consummation

of the transactions set forth in the Plan; provided, however, that, notwithstanding the foregoing

exculpation, in the event that litigation is commenced against a member of the Creditors

Committee with respect to the aforementioned actions, such member shall be reimbursed for

reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any

damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, provided,

however, that, the foregoing provisions of this subparagraph (d) and section 92.7(d) of the Plan

shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(e)    AFSCME:  AFSCME, solely in its capacity as a party to the AFSCME Plan Support Agreement and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date, and each of its respective Related Persons shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation, or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the AFSCME Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan and the AFSCME Plan Support Agreement; provided, however, that, the foregoing provisions of this subparagraph (e) and section 92.7(e) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(f)    <u>Monoline Insurers</u>:  Ambac, Assured, FGIC, National, Syncora, and their Related

Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken

consistent with the Plan or in connection with the formulation, preparation, dissemination,

implementation, acceptance, confirmation, or approval of the Plan, including, without limitation,

in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims,

FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims, the

voting procedures, the election procedures, and any release of obligations under the applicable

Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, National

Insurance Policies, or Syncora Insurance Policies: <u>provided</u>, <u>however</u>, that, notwithstanding

anything contained in this Confirmation Order or the Plan to the contrary, the terms and

provisions of the Plan and this Confirmation Order shall not, and shall not be construed to,

release or exculpate, with respect to any beneficial holder of Ambac Insured Bonds, Assured

Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured Bonds any

payment obligation under the applicable Ambac Insurance Policy, Assured Insurance Policy,

FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in accordance

with its terms solely to the extent of any failure of such holder to receive the Ambac

Commutation Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora

Treatment, as applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may

have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's,

FGIC's, National's or Syncora's applicable obligations under the Ambac Insurance Policies,

Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as

applicable); provided, however, that the foregoing provisions of this subparagraph (f) and section

92.7(f) of the Plan shall not affect the liability of any Entity that otherwise would result from any

such act or omission to the extent that such act or omission is determined, pursuant to a Final

Order, to have constituted intentional fraud or willful misconduct.

(g)     The DRA Parties:  Each of the GDB Debt Recovery Authority ("DRA"),

AmeriNational Community Services LLC (the "Servicer"), as servicer for the DRA, and

Cantor-Katz Collateral Monitor LLC (the "Collateral Monitor"), as collateral monitor for

Wilmington Trust N.A. (collectively, the "DRA Parties"), from the Petition Date up to and

including the Effective Date and each of the DRA Parties, respective predecessors, successors

and assigns (whether by operation of law or otherwise), and their respective financial advisors,

attorneys, accountants, consultants, agents, and professionals, or other representatives, each

acting in such capacity, and any Entity acting for or on behalf of any of them, in each case, solely

to the extent acting in such capacity, shall not have or incur any liability to any Entity for any act

taken or omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Stipulation in Connection with DRA Related Disputes, dated as of November 5, 2021, by and among the Oversight Board, as representative of the Debtors and HTA, the Servicer, and the Collateral Monitor (Docket Entry No. 19100 Ex. A), or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, the foregoing provisions of this subparagraph (g) shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

62.    Maintenance of Pension System.  Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or

part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan.

63.    Appointments Related Litigation/Uniformity Litigation.  Notwithstanding anything contained herein or the Plan to the contrary, in the event that a Final Order is entered in connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to

entry of this Confirmation Order, in consideration of the distributions made, to be made, or

deemed to be made in accordance with the terms and provisions of the Plan and documents and

instruments related hereto, and all Creditors or such other Entities receiving, or deemed to have

received, distributions pursuant to or as a result of the Plan or this Confirmation Order having

consented and agreed, such Final Order shall not in any way or manner reverse, affect or

otherwise modify the transactions contemplated in the Plan and this Confirmation Order,

including, without limitation, the releases, exculpations and injunctions provided pursuant to

article XCII of the Plan and herein; provided, however, that, to the extent that a plaintiff in the

Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA

Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support

Agreement, or the ERS Stipulation, within five (5) Business Days of the Effective Date, such

plaintiff shall take any and all actions to dismiss, with prejudice or, in the event other plaintiffs

are party to such litigations, withdraw from, with prejudice, such Appointments Related

Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing

notices with the clerk of the court having jurisdiction thereof.

64.    **Bar Order**.  **To the limited extent provided in the Plan, each and every Entity**

**is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing, or**

litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action

of any and every kind, character or nature whatsoever, in law or in equity, known or

unknown, direct or derivative, whether asserted or unasserted, against any of the Released

Parties, based upon, related to, or arising out of or in connection with any of the Released

Claims, confirmation and consummation of the Plan, the negotiation and consummation of

the GO/PBA Plan Support Agreement, HTA/CCDA Plan Support Agreement, PRIFA Plan

Support Agreement, AFSCME Plan Support Agreement, the Retiree Committee Plan

Support Agreement, or any claim, act, fact, transaction, occurrence, statement, or omission

in connection with or alleged or that could have been alleged in the Title III Cases,

including, without limitation, any such claim, demand, right, liability, or cause of action for

indemnification, contribution, or any other basis in law or equity for damages, costs, or

fees incurred arising directly or indirectly from or otherwise relating to the Title III Cases,

either directly or indirectly by any Person for the direct or indirect benefit of any Released

Party arising from or related to the claims, acts, facts, transactions, occurrences,

statements, or omissions that are, could have been or may be alleged in the related actions

or any other action brought or that might be brought by, through, on behalf of, or for the

benefit of any of the Released Parties (whether arising under federal, state, or foreign law,

and regardless of where asserted); **provided**, **however**, that, without prejudice to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.

65.    **Supplemental Injunction**.  Notwithstanding anything contained herein or in the Plan to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, or may control by enacting legislation, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Cases or any Claim against the Debtors, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity, or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained, and enjoined from taking any action including enacting legislation against any of the Released Parties for the purpose of directly or indirectly collecting, recovering, or receiving any payment or recovery with

respect to any Released Claims for themselves or other entities, arising prior to the

Effective Date (including prior to the Petition Date), including, but not limited to:

(a)    Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b)    Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)    Creating, perfecting, or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)    Except as otherwise expressly provided in the Plan or this Confirmation Order, asserting, implementing, or effectuating any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim;

(e)    Enacting or adopting any statute, law, rule, resolution, or policy to cause, directly or indirectly, any Released Party to have liability for any Released Claims; and

(f)    Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or this Confirmation Order; provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code;

provided, however, that, without prejudice to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it be construed, to be a non-consensual

**third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.**

66.  <u>Term of Existing Injunctions or Stays</u>.  Unless otherwise provided in the Plan or this Confirmation Order, all injunctions or stays in effect in the Title III Cases (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order) shall remain in full force and effect through the Effective Date, except that each injunction imposed by a Court order shall remain in effect permanently unless the order specifies a termination date or event, in which case, the specification set forth in such order shall govern.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

67.  <u>Prosecution of Claims</u>.  Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court.  The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the Avoidance Actions Trust Agreement.

68. <u>Indemnification and Reimbursement Obligations</u>.  For purposes of the Plan, (i) to the extent executory in nature, the obligations of the Debtors, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, shall be deemed assumed as of the Effective Date and (ii) indemnification obligations of the Debtors arising from conduct of officers and directors during the period from and after the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, shall be Administrative Expense Claims.

69. <u>Compliance with Tax Requirements</u>.  Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state, or local tax law or Tax Authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements; <u>provided</u>, <u>however</u>, that payments or redemptions made with respect to the CVIs shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may

otherwise be applicable to such payments or redemptions.  Except as provided above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party.  The Disbursing Agent or the trustee of the applicable trust may require, as a condition to the receipt of a distribution (including the applicable trust certificates), that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

70.    Documents and Instruments.  Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and

instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Confirmation Order.

71.     <u>Fiscal Plan</u>.  For so long as the Oversight Board is in existence, the Oversight Board shall cause the Fiscal Plan in effect on the Effective Date, and any post-Effective Date Fiscal Plan certified by the Oversight Board to include provisions requiring the certified budget to provide for the payment in each FY of (a) principal and interest payable on the New GO Bonds, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

72.     <u>Claims Against the Commonwealth Based on Debt Issued by HTA, CCDA, PRIFA, and MBA</u>.  The Claims asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall, to the extent allowed, be allowed as a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and are hereby discharged and the Debtors and the Reorganized Debtors have no further liability on account of such Claims.

73.    <u>GUC Reserve</u>.  On and after the Effective Date, the Debtors' and Reorganized

Debtors' liability to holders of Allowed CW General Unsecured Claims shall be limited to

funding the GUC Reserve in accordance with section 62.3 of the Plan as follows: subject to the

reductions provided therein, (a) Two Hundred Million Dollars ($200,000,000.00) on the

Effective Date; (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31,

2022; (c) One Hundred Million Dollars ($100,000,000,00) on or prior to December 31, 2023; (d)

One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2024; and (e)

Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025.  Upon the

GUC Reserve being funded by the Commonwealth in accordance with section 62.3 of the Plan,

the Debtors and Reorganized Debtors shall have no further liability on account of such Allowed

CW General Unsecured Claims.

74.    <u>PROMESA 407 Claims</u>.  All Claims reserved by holders of bonds issued by HTA,

CCDA, PRIFA, or MBA under that certain *Findings of Fact, Conclusions of Law, and Order*

*Approving the Qualifying Modification for the Government Development Bank for Puerto Rico*

*Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and Economic*

*Stability Act*, including, without limitation, any claim under section 407 of PROMESA, shall be

automatically released on the Effective Date with no further notice or action.

75.   <u>Dairy Producer Claims</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, (a) nothing contained herein shall adjust, enlarge, compromise discharge or otherwise affect the respective parties' rights or obligations pursuant to the Dairy Producer Settlement except with respect to the Commonwealth's payment obligation under the Dairy Producer Settlement, (b) the Commonwealth's obligation for the regulatory approval accrual set forth decretal paragraph 14 of the Dairy Producer Settlement shall be treated and discharged in accordance with the Plan and shall not be recouped by a holder of a Dairy Producer Claim from any other source, and (c) the Plan shall not affect the regulatory accrual charge being assessed on and paid from the cost of milk pursuant to the Dairy Producer Settlement.

76.   <u>Eminent Domain/Inverse Condemnation Claims</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, (a) nothing contained in the Plan or this Confirmation Order shall impair or otherwise affect the treatment provided in Class 54 to holders of Allowed Eminent Domain/Inverse Condemnation Claims, (b) as of the Effective Date, and upon the effective date of a Final Order of a court of competent jurisdiction determining the validity of and amount of just compensation attributable to an Allowed Eminent Domain Claim or Allowed Inverse Condemnation Claim, the holder of such a Claim shall be entitled to receive,

in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one hundred percent (100%) of such Allowed Eminent Domain/Inverse Condemnation Claim, and (c) Allowed Eminent Domain/Inverse Condemnation Claims shall not be treated in any way as CW General Unsecured Claims for purposes of distribution.  Nothing in the Plan or this Confirmation Order shall be construed to prevent any determination of just compensation from including, if and to the extent the tribunal deems appropriate, interest on an Allowed Eminent Domain/Inverse Condemnation Claim.  Notwithstanding the foregoing, in the event that (x) the Oversight Board appeals from the Confirmation Order and the Findings of Fact and Conclusions of Law regarding the Title III Court's ruling that Allowed Eminent Domain/Inverse Condemnation Claims must be paid in full or otherwise be rendered unimpaired pursuant to the Plan, (y) such appeal is successful, and (z) a Final Order is entered holding that Allowed Eminent Domain/Inverse Condemnation Claims may be impaired, subject to the terms and provisions of Articles LXXVII and LXXXII of the Plan, each holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, and the Reorganized

Commonwealth shall make, payments, in Cash, in an amount equal to the pro rata payments to be made to holders of Allowed CW General Unsecured Claims up to the GUC Recovery Cap.

77.     <u>Oversight Board Termination and Post-Confirmation Powers</u>.  Neither the Plan nor this Confirmation Order shall change the duration of the Oversight Board's existence set forth in section 209 of PROMESA, and neither the Plan nor this Confirmation Order shall alter any of the Oversight Board's powers and duties under each title of PROMESA.  Until termination of the Oversight Board pursuant to section 209 of PROMESA, the Oversight Board may enforce the Plan.  At all times, each party in interest may enforce Plan provisions directly affecting the party in interest.

78.     <u>Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's Sole Discretion</u>.  Nothing in the Plan and nothing in this Confirmation Order (a) alters the powers of the Oversight Board granted by Titles I and II of PROMESA, including its rights in its sole discretion, to amend the certified Fiscal Plan and budget in effect on the Effective Date and to develop and certify new fiscal plans and budgets at any times, (b) grants the government of Puerto Rico any entitlement to any provisions in certified fiscal plans and budgets, and (c) grants the government of Puerto Rico any rights and powers barred by section 108(a) of PROMESA.

79.   <u>Government Post-Confirmation Powers and Duties</u>.  Upon termination of the Oversight Board pursuant to section 209 of PROMESA, the Governor shall enforce the Plan.  If the Governor fails to enforce a Plan provision directly or indirectly impacting a party in interest after being requested to do so by a party in interest, each party in interest that would reasonably be prejudiced or injured by lack of enforcement may enforce the Plan provision.  At no time prior or subsequent to the termination of the Oversight Board shall the Governor or Legislature enact, implement, or enforce any statute, resolution, policy, or rule reasonably likely, directly or indirectly, to impair the carrying out of the Plan's payment provisions, covenants, and other obligations.  Pursuant to section 1142(b) of the Bankruptcy Code, the Governor shall cause the executive branch of the Commonwealth government to take all acts necessary for the consummation of the Plan.

80.   <u>Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated</u>. The Government of Puerto Rico, including without limitation, any Entity or Person acting for or on behalf thereof, shall not enact any statute, resolution, policy, or rule that would repeal, change, or negate any law currently existing that authorizes debt issued pursuant to the Plan or any law pledging the full faith, credit, and taxing power of the Commonwealth to secure debt issued pursuant to the Plan.

81.     <u>Non-Impairment of CVIs, SUT</u>.  Until all obligations with respect to the CVIs have been paid or otherwise satisfied in accordance with their terms, the Commonwealth, or any Entity or Person acting for or on behalf thereof, shall take no action that would: (a) limit or alter the rights vested in the Commonwealth in accordance with the Plan and this Confirmation Order to fulfill the terms of any agreements with the holders of CVIs; (b) impair the rights and remedies of the holders of the CVIs; or (c) impair the ability of the holders of the CVIs to track performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the payment of the CVIs in accordance with the terms and provisions of the Plan and as set forth in the CVI Indenture; <u>provided</u>, <u>however</u>, that the foregoing shall not preclude the Commonwealth from exercising its power, through a valid change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture.

82.     <u>Reversal/Stay/Modification/Vacatur of Order</u>.  Except as otherwise provided in this Confirmation Order or a subsequent order issued by this Court or a higher court having jurisdiction over an appeal of this Confirmation Order or over a <u>certiorari</u> proceeding in respect of this Confirmation Order, if any or all of the provisions of this Confirmation Order are hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other

court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors or the Reorganized Debtors, as applicable, prior to the effective date of such reversal, stay, modification, or vacatur.  Notwithstanding any such reversal, stay, modification, or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in reliance on, this Confirmation Order prior to the effective date of such reversal, stay, modification, or vacatur shall be governed in all respect by the provisions of this Confirmation Order and the Plan.  To the extent not specifically reversed, modified, vacated, or stayed by an order of this Court or an appellate court, all existing orders entered in the Title III Cases remain in full force and effect.

83.     Retention of Jurisdiction.  Notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, subject to the terms and provisions of article XCI of the Plan, and except as otherwise provided in the Plan or herein, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the Plan, this Court shall retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the

fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the matters set forth in article XCI of the Plan.

84.   <u>Conflicts Among Documents</u>.  The provisions of the Plan and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purpose of each; <u>provided</u>, <u>however</u>, that, in the event of any inconsistency between (a) the Plan or this Confirmation Order and (b) the New GO Bond Legislation, the CVI Legislation, or any other legislation implementing the Plan or otherwise in any manner, the terms and provisions of the Plan or this Confirmation Order, as applicable, shall prevail; and, <u>provided</u>, <u>further</u>, that, in the event of any irreconcilable inconsistency between the Plan and this Confirmation Order, the documents shall control in the following order of priority: (i) this Confirmation Order, and (ii) the Plan; and, <u>provided</u>, <u>further</u>, that, in the event of any inconsistency between this Confirmation Order and any other order in the Commonwealth Title III Case, the ERS Title III Case, the PBA Title III Case, the terms and provisions of this Confirmation Order shall control; and, <u>provided</u>, <u>further</u>, that nothing contained herein is intended, nor shall be construed, to modify the economic terms of the Plan.

85.   <u>PBA Leases</u>.  Notwithstanding anything contained herein or in the Plan to the contrary, each of the Unexpired Leases to which PBA is a party (collectively, the "PBA Leases")

shall be deemed rejected effective upon the earliest to occur of (a) June 30, 2022, (b) the date upon which such PBA Lease expires in accordance with its terms, (c) the date upon which PBA enters into a new or amended lease with respect to the leased property subject to such PBA Lease, (d) such other date of which PBA, as lessor, provides written notice to the counterparty to a PBA Lease, and (e) the date upon which AAFAF, on behalf of the Commonwealth or any Commonwealth agency, public corporation or instrumentality, that is a counterparty, as lessee, with respect to a PBA Lease, provides written notice to PBA that such PBA Lease is rejected (in each case, the earliest of (a) through (e), the "PBA Rejection Date"); provided, however, that, during the period from the Effective Date up to, but not including, the applicable PBA Rejection Date, with respect to any PBA Lease between PBA, as lessor, and the Commonwealth or any Commonwealth agency, public corporation or instrumentality, as lessee, monthly lease payments shall be limited to the lower of (y) the amount budgeted and approved pursuant to a certified Fiscal Plan and (z) the monthly costs and expenses associated with the applicable leased property; and, provided, further, that any accruals on the books of PBA or any of the Commonwealth or an agency, public corporation, or instrumentality of the Commonwealth as counterparty to a PBA Lease for the unpaid debt service component of rent under any PBA Lease shall be deemed released, settled, and discharged as of the PBA Rejection Date.

86.    <u>Modifications</u>.  The modifications to the Seventh Amended Plan, as set forth in the Plan, do not adversely change the treatment of the Claim of any Creditor that accepted the Seventh Amended Plan and all such Creditors shall be deemed to have accepted the Plan.  Before substantial consummation of the Plan, the Oversight Board may modify the Plan at any time after entry of this Confirmation Order, subject to any limitations set forth in the Plan (including consent rights) and any stipulation approved by this Court in connection with the Plan; <u>provided</u>, <u>however</u>, that the circumstances warrant such modification and the Court, after notice and a hearing, confirms such modified plan under the applicable legal requirements.  For the avoidance of doubt, the Plan shall not be modified except in accordance with Bankruptcy Code section 942 and the terms of this Confirmation Order.

87.    <u>Asserted Surety Claims</u>.  Notwithstanding anything contained in the Plan to the contrary, to the extent that the Claim of a surety against any of the Debtors is determined to be a secured claim and allowed in whole or in part, by Final Order, or by operation of section 502(a) of the Bankruptcy Code following the expiration of the period to object to any such Claim in accordance with the provisions of section 82.1 of the Plan, such Claim shall be paid in full, in Cash; <u>provided</u>, <u>however</u>, that, in the event some or all of any such Claim is determined to be an

unsecured claim and allowed in whole or in part, by Final Order, such Claim shall be treated in accordance with the provisions of section 17.1, 62.1 or 70.1 of the Plan, as the case may be.

88.   <u>Identification of Additional Retail Investors / Retail Support Fee</u>.  Within five (5) Business Days of the date hereof, the Oversight Board shall cause the Balloting Agent to distribute, by mail, electronic mail, or such other means customary, the form of Certification Notice annexed hereto as **<u>Exhibit E</u>** (the "Certification Notice") to all known holders, by and through their respective Nominee(s), of (a) Vintage PBA Bond Claims, (b) 2011 PBA Bond Claims, (c) 2012 PBA Bond Claims, (d) Vintage CW Bond Claims, (e) 2011 CW Bond Claims, (f) 2011 CW Series D/E/PIB Bond Claims, (g) 2012 CW Bond Claims, and (h) 2014 CW Bond Claims (collectively, the "Bonds") who did <u>not</u> submit a vote that was not otherwise revoked by such holder pursuant to the procedures set forth in the Disclosure Statement Order on or before 6:00 p.m. (Atlantic Standard Time) on October 18, 2021.

     a.   The record date to determine which beneficial owners of the Bonds (collectively, the "Beneficial Owners") are entitled to receive the Certification Notice and make the Certification (as defined below) shall be 6:00 p.m. (Atlantic Standard Time) on October 18, 2021 (the "Certification Record Date").

     b.   Promptly upon receipt of a Certification Notice, each Nominee (or such Nominee's agent) shall distribute such Certification Notice to the Beneficial Owners eligible as of the Certification Record Date pursuant to such Nominee's (or such Nominee's agent's) customary practices for conveying such information.

c.   If it is a Nominee's (or such Nominee's agent's) customary and accepted business practice to forward the Certification Notice to (and collect Certifications from) Beneficial Owners by information form, email, telephone, or other customary means of communications, as applicable, the Nominee (or such Nominee's agent) shall employ such method of communication in lieu of sending a paper copy of the Certification Notice to Beneficial Owners; provided, however, that if the Nominee's (or such Nominee's agent's) customary internal practice is to provide to Beneficial Owners an electronic link to the Certification Notice, the Nominee (or such Nominee's agent) may follow such customary practice in lieu of forwarding paper copies of the Certification Notice to Beneficial Owners.

d.   The Oversight Board shall cause the Balloting Agent to provide Beneficial Owners of the Bonds as of the Certification Record Date a frozen "user CUSIP" (or similarly appropriate non-tradeable identifier) for the purpose of making the Certification.

e.   Each Beneficial Owner of the Bonds who certifies that it is an individual who held the Bonds as of the Certification Record Date in the aggregate outstanding principal amount of One Million Dollars ($1,000,000.00) or less in one or more brokerage account(s), trust account(s), custodial account(s), or separately managed account(s) (the "Certification") pursuant to the procedures set forth in this decretal paragraph 88 hereof shall be deemed a Retail Investor for purposes of distributions to be made pursuant to the Plan, and shall receive a distribution of the Retail Support Fee through the "user CUSIP" in accordance with the terms and provisions of the Plan.

f.   Beneficial Owners of the Bonds must deliver their certification instructions to (or otherwise coordinate with) their Nominee according to the instructions in the Certification Notice in sufficient time for the Nominee to effectuate the Beneficial Owner's Certification through The Depository Trust Company's ("DTC") Automated Tender Offer Program ("ATOP") in accordance with the procedures of DTC and be received on ATOP by 6:00 p.m. (Atlantic Standard Time) on the first Business Day thirty (30) days from and after the date hereof (the "Certification

Deadline");[10] provided, however, that any holder who has executed, completed, and delivered through ATOP in accordance with the procedures of DTC its Certification may revoke such Certification and withdraw any securities that have been tendered with respect to a Certification through ATOP in accordance with the procedures of DTC on or before the Certification Deadline.

g.  All securities that are tendered with respect to a Certification shall be restricted from further trading or transfer through the Effective Date of the Plan.

89.  <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>.  The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth in the Findings of Fact and Conclusions of Law, are nonseverable and mutually dependent.

90.  <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

---

[10]  6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

91.    <u>PFC Reservation</u>.  Neither the Plan nor this Confirmation Order determine, affect, or limit any claims or rights U.S. Bank Trust National Association and U.S. Bank National Association, as Trustee for bonds issued by PFC, may have against GDB, DRA, or the GDB/PET, including, without limitation, claims and rights in respect of letters of credit.

92.    <u>Applicable Nonbankruptcy Law</u>.  Pursuant to section 1123(a) of the Bankruptcy Code, as applicable to the Title III Cases pursuant to section 301(a) of PROMESA, the provisions of this Confirmation Order and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.  The documents contained in the Plan Supplement and such other documents necessary or convenient to implement the provisions of this Confirmation Order and the Plan (as such documents may be further, amended, supplemented, or modified and filed with the Court on or prior to the Effective Date), including, without limitation, the New GO Bonds, the New GO Bonds Indenture, the GO CVIs, the GO CVI Indenture, the Clawback CVIs, the Clawback CVI Indenture, and the Avoidance Actions Trust Agreement, provide adequate means for implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall constitute legal, valid, and binding obligations of the Debtors, as applicable, and valid provisions to pay and to secure payment of the New GO Bonds, the GO CVIs, and the Clawback CVIs, as

applicable, pursuant to section 944(b)(3) of the Bankruptcy Code, and be enforceable in accordance with their terms.

93.    <u>Waiver of Filings</u>.  Any requirement pursuant to Bankruptcy Rule 1007 obligating the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S. Trustee is hereby waived as to any such list, schedule, or statement not filed as of the Effective Date.

94.    <u>Notice of Order</u>.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of this Confirmation Order and the occurrence of the Effective Date, substantially in the form attached as **<u>Exhibit B</u>** hereto, to all parties who hold a Claim in the Commonwealth Title III Case, the ERS Title III Case, the HTA Title III Case, and the PBA Title III Case, as well as the Creditors' Committee, the Retiree Committee, the U.S. Trustee, any party filing a notice pursuant to Bankruptcy Rule 2002, the Securities and Exchange Commission, the Internal Revenue Service, and the United States Attorney for the District of Puerto Rico.  Such notice is hereby approved in all respects and shall be deemed good and sufficient notice of entry of this Confirmation Order.

95.   <u>No Waiver</u>.  The failure to specifically include any particular provision of the Plan in this Confirmation Order shall not diminish the effectiveness of such provision nor constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its entirety and incorporated herein by this reference.


SO ORDERED.

Dated:  January [xx], 2022

 [DRAFT – Sample Only]
LAURA TAYLOR SWAIN
United States District Judge