UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO et al.,<br><br>                    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

ORDER AND JUDGMENT CONFIRMING MODIFIED EIGHTH AMENDED TITLE III
JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO,
THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY

---

[1]     The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

1.	Confirmation of the Plan ................................................................................ 5

2.	Objections ..................................................................................................... 5

3.	Findings/Conclusions..................................................................................... 5

4.	Litigation Resolution ..................................................................................... 9

5.	Plan Settlements Approved ........................................................................... 10

6.	Dismissal of Med Center Litigation................................................................ 11

7.	Dismissal of ERS Litigation .......................................................................... 12

8.	Dismissal of GO/Clawback Litigation ............................................................ 13

9.	Dismissal of PRIFA BANs Litigation .............................................................. 13

10.	Dismissal of the PBA Litigation ..................................................................... 13

11.	Implementation of the Plan ........................................................................... 14

12.	Enforceability of New Debt Instruments ........................................................ 15

13.	Authorization of New GO Bonds and CVIs and Injunction .............................. 15

14.	Purchase and Sale of Certain ERS Assets.................................................... 16

15.	Monthly Deposits of Interest and Principal .................................................... 16

16.	Comprehensive Cap on All Net Tax-Supported Debt ..................................... 17

17.	Adoption and Maintenance of a Debt Management Policy .............................. 18

18.	Creation of Avoidance Actions Trust ............................................................. 18

19.	Avoidance Actions Trust Assets.................................................................... 19

20.	Funding, Costs, and Expenses of the Avoidance Actions Trust ...................... 19

21.	Indemnification of Avoidance Actions Trustee and Board .............................. 20

22.	Creation of Pension Reserve Trust ............................................................... 20

23.	Funding of the Pension Reserve Trust .......................................................... 21

24.	No Action ..................................................................................................... 22

25.	Government Action........................................................................................ 22

26.	Oversight Board Consent Pursuant to PROMESA Section 305....................... 23

27.	Binding Effect ............................................................................................... 23

28.	Cancellation of Notes, Instruments, Certificates, and Other Documents ......... 24

29.	Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases.......................................................................................................... 26

30.	Insurance Policies ........................................................................................ 27

31. Rejection Damages Claims ............................................................................... 28

32. Payment of Cure Amounts .............................................................................. 28

33. Setoff .............................................................................................................. 28

34. Delivery of Distributions ................................................................................ 29

35. Disbursing Agent ............................................................................................ 37

36. Payment of Trustee Fees and Expenses .......................................................... 37

37. Securities Laws Exemption ............................................................................. 38

38. Acceleration of Insured Bonds ....................................................................... 39

39. Disputed Claims Reconciliation ..................................................................... 40

40. Disputed Claims Holdback ............................................................................. 42

41. National Action Claims ................................................................................... 43

42. No Amendments to Proofs of Claim ............................................................... 44

43. Conditions to Effective Date .......................................................................... 45

44. Administrative Claim Bar Date ....................................................................... 45

45. Professional Compensation and Reimbursement Claims ................................ 46

46. GO/PBA Consummation Costs ....................................................................... 47

47. AFSCME Professional Fees ............................................................................ 47

48. GO/PBA PSA Restriction Fee ........................................................................ 48

49. ERS Restriction Fee ........................................................................................ 50

50. CCDA Consummation Costs ........................................................................... 50

51. CCDA Restriction Fee .................................................................................... 51

52. HTA Bond Claims ........................................................................................... 53

53. System 2000 Obligations ................................................................................ 53

54. HTA/CCDA Clawback Structuring Fees ........................................................ 53

55. Active JRS Participants and Active TRS Participants .................................... 54

56. Discharge and Release of Claims and Causes of Action ................................ 56

57. Releases by the Debtors and Reorganized Debtors ........................................ 62

58. Release and Exculpation Provisions ............................................................... 63

59. **Injunction on Claims** .................................................................................. 63

60. **Injunction Related to Releases** ................................................................. 64

61. Exculpation .................................................................................................... 65

62. Maintenance of Pension System .................................................................... 71

63. Appointments Related Litigation ................................................................... 72

64.   **Bar Order** ................................................................................................................. 72

65.   **Supplemental Injunction** ....................................................................................... 73

66.   Term of Existing Injunctions or Stays ....................................................................... 75

67.   Prosecution of Claims ................................................................................................ 75

68.   Indemnification and Reimbursement Obligations ...................................................... 75

69.   Compliance with Tax Requirements ........................................................................... 76

70.   Documents and Instruments ....................................................................................... 77

71.   Fiscal Plan .................................................................................................................. 77

72.   Claims ......................................................................................................................... 77

73.   GUC Reserve .............................................................................................................. 78

74.   PROMESA 407 Claims .............................................................................................. 78

75.   Dairy Producer Claims ............................................................................................... 78

76.   Eminent Domain/Inverse Condemnation Claims. ...................................................... 79

77.   Oversight Board Termination and Post-Confirmation Powers ................................... 80

78.   Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's
      Sole Discretion ........................................................................................................... 80

79.   Government Post-Confirmation Powers and Duties .................................................... 81

80.   Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated ........ 81

81.   Non-Impairment of CVIs, SUT .................................................................................. 81

82.   Reversal/Stay/Modification/Vacatur of Order ............................................................ 82

83.   Retention of Jurisdiction ............................................................................................ 82

84.   Conflicts Among Documents ...................................................................................... 83

85.   PBA Leases ................................................................................................................. 83

86.   Modifications .............................................................................................................. 84

87.   Asserted Surety Claims ............................................................................................... 85

88.   Identification of Additional Retail Investors / Retail Support Fee ............................. 85

89.   Provisions of Plan and Order Nonseverable and Mutually Dependent ...................... 87

90.   Governing Law ........................................................................................................... 87

91.   PFC Reservation ......................................................................................................... 87

92.   Applicable Nonbankruptcy Law ................................................................................. 87

93.   Waiver of Filings ........................................................................................................ 88

94.   Notice of Order ........................................................................................................... 88

95.   No Waiver ................................................................................................................... 89

The Commonwealth of Puerto Rico (the "Commonwealth"), the Employees

Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the

Puerto Rico Public Buildings Authority ("PBA" and, collectively with the Commonwealth and

ERS, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto

Rico (the "Oversight Board"), as Title III representative of the Debtors under section 315(b) of

the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[1] having

proposed and filed with the United States District Court for the District of Puerto Rico (the

"Court") the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth*

*of Puerto Rico, et al.*, dated January 14, 2022 (Docket Entry No. 19784 in Case No. 17-3283)[2]

(as amended, supplemented, or modified prior, at, or subsequent to the Confirmation Hearing as

set forth in this Confirmation Order through the date hereof, including the Plan Supplement, and

as may be amended, supplemented, or modified pursuant to section 313 of PROMESA, the

"Plan"[3] through the date hereof);[4] and the Court having entered, pursuant to, inter alia, section

---

[1]    PROMESA is codified at 48 U.S.C. § 2101 et seq.  References to "PROMESA" section
numbers in the remainder of this Confirmation Order are to the uncodified version of the
legislation.

[2]    All docket entry references are to entries in Case No. 17-3283 unless otherwise indicated.

[3]    The use of the term "Plan" herein, unless otherwise indicated by context, refers to the
confirmable final version filed at Docket Entry No. 19784, as described herein.  The
penultimate version of the plan, which required final modifications to be confirmable,
was filed as the *Modified Eighth Amended Title III Joint Plan of Adjustment of the
Commonwealth of Puerto Rico, et al.*, dated December 20, 2021 (Docket Entry No.
19568 in Case No. 17-3283) (the "Fifth Modified Eighth Amended Plan").

[4]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in
the Plan, the Disclosure Statement Order, the Confirmation Brief (each as defined
herein), or the *Findings of Fact and Conclusions of Law Regarding Confirmation of
Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto
Rico, et al.* (the "Findings of Fact and Conclusions of Law"), entered contemporaneously
herewith, as applicable.  A composite copy of the Plan is annexed hereto as **Exhibit A**.

1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an

order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), (i)

approving the adequacy of the information set forth in the Disclosure Statement, (ii) establishing

procedures for the solicitation, voting, and tabulation of votes on and elections with respect to

the Plan, (iii) approving the forms of ballots, master ballots, and election notices used in

connection therewith, and (iv) approving the form of notice of the Confirmation Hearing; and the

Court having entered the *Order Establishing Procedures and Deadlines Concerning Objections*

*to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640); and the

following documents having been filed by the Debtors or the PSA Creditors in support of or in

connection with confirmation of the Plan:

(a)  Plan Supplement (Docket Entry No. 18470);

(b)  *Certificate of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9);

(c)  *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4);

(d)  *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18874);

(e)  *Memorandum of Law in Support of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 18869) (the "Confirmation Brief");

(f)  *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18729 and 19054-4);

(g)  *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico et al.* (Docket Entry Nos. 18726 and 19054-1);

(h)     *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18731 and 19054-9);

(i)     *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18734 and 19054-10);

(j)     *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18730 and 19054-8);

(k)     *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18738 and 19054-6);

(l)     *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18736 and 19054-7);

(m)     *Declaration of Adam Chepenik in Respect of the Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18735 and 19054-2);

(n)     *Declaration of Sheva R. Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18737 and 19054-5);

(o)     *Declaration of Jay Herriman in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18732 and 19054-3);

(p)     *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19056. See also Docket Entry No. 19144);

(q)     *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725);

(r)     *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724);

(s)     *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057);

(t)     *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058);

(u)     *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19059);

(v)      *Supplemental Declaration of Juan Santambrogio in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19060);

(w)     *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115); and

(x)     *Supplemental Declaration of Jay Herriman in Respect of Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19329);

and objections to confirmation of the Plan having been interposed by certain parties, as reflected on the docket of the Title III Cases and on the record of the Confirmation Hearing; and, except to the extent otherwise provided herein, each of the objections having been resolved, overruled, sustained, or withdrawn at, prior to, or subsequent to the Confirmation Hearing;[5] and the Court having held the Confirmation Hearing commencing on November 8, 2021; and the appearances of all interested parties, including members of the public selected by the Court, having been noted in the record of the Confirmation Hearing; and after full consideration of the record of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case, including, without limitation, motions, applications and orders in each of such cases, the foregoing

---

[5]     All opposition submissions are also listed as part of the Court's Findings of Fact and Conclusions of Law.

documents, and the evidence admitted and arguments of counsel presented at the Confirmation

Hearing; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT**:

1.      Confirmation of the Plan.  The Plan and each of its provisions shall be, and

hereby are, CONFIRMED pursuant to section 314(b) of PROMESA.  The documents contained

in the Plan Supplement are authorized and approved.  The terms of the Plan, as amended,

supplemented, or modified by the revisions made prior, at, or subsequent to the Confirmation

Hearing, as set forth in this Confirmation Order as well as in the revised composite copy attached

hereto as **Exhibit A**, include the Plan Supplement, as amended, supplemented, or modified on or

prior to the date hereof, and are incorporated by reference into and are an integral part of this

Confirmation Order.

2.      Objections.  With the narrow exception of the objections of holders of alleged

Eminent Domain/Inverse Condemnation Claims, which are hereby SUSTAINED to the extent

that such Claims are ultimately Allowed Claims, all objections, responses to, and statements and

comments, if any, in opposition to or inconsistent with the Plan shall be and hereby are,

OVERRULED and DENIED in their entirety.  All withdrawn objections are deemed withdrawn

with prejudice.

3.      Findings/Conclusions.  The findings of fact and conclusions of law set forth in the

Court's Findings of Fact and Conclusions of Law are incorporated herein as though set forth in

full.  Notwithstanding such incorporation, the following summarizes certain of the Court's

determinations:

(A)      Pursuant to PROMESA, on May 3, 2017, May 21, 2017, and September 27,
2019, the Commonwealth, ERS, and PBA, respectively, each commenced a
case before the Court in accordance with the requirements of Title III of
PROMESA.  The commencement of these cases vested the Court with

exclusive jurisdiction over the cases and all respective property of the Commonwealth, ERS, and PBA, wherever located.  As a result of the consensual agreement among the Debtors and their respective creditor representatives, the Debtors formulated, duly solicited, and now seek confirmation of a plan of adjustment in accordance with federal law.

(B)     This Confirmation Order is a final order intended to be binding on all parties in interest, and shall not be subject to collateral attack or other challenge in any other court or other forum, except as permitted under applicable law.  Confirmation of the Plan constitutes a judicial determination, pursuant to section 4 of PROMESA, that all laws, rules, and regulations giving rise to obligations of the Debtors discharged by the Plan and this Confirmation Order pursuant to PROMESA are preempted by PROMESA and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations.  Pursuant to section 4 of PROMESA, to the extent not previously ruled preempted pursuant to an order of the Title III Court, all laws (or such portions thereof) of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, inconsistent with PROMESA, have been preempted to the extent set forth in Exhibit A to the Findings of Fact and Conclusions of Law.  Such preempted laws include, without limitation, laws enacted prior to June 30, 2016, that provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, to the extent inconsistent with the Plan's discharge of the Debtors' obligations.  Such laws shall not be enforceable to the extent they are inconsistent with the Plan's discharge of the Debtors' obligations.  All laws enacted from and after the commencement of the Title III Cases to the extent they are inconsistent with the transactions contemplated by the Plan are also unenforceable.  Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, those listed on **Exhibit C** hereto for the reasons, and to the extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law, and (b) all litigation in which any Government Party is a defendant, over whether any Commonwealth law listed on **Exhibit C** hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.   For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

(C)     The Court shall retain jurisdiction to enforce the terms hereof and of the Plan, the New GO Bonds, the GO CVIs, and the Clawback CVIs in accordance with their terms to ensure compliance with the Plan and to adjudicate claims arising therefrom, including rights to specific performance.

(D)    At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to be stamped or written on each of the New GO Bonds, the GO CVIs, the Clawback CVIs, and the Rum Tax CVI a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022.

(E)    The New GO Bonds Legislation and the CVI Legislation are incorporated into Act No. 53-2021, which has been validly enacted by the Commonwealth and is valid and effective in accordance with its terms.

(F)    Pursuant to PROMESA, including section 4 thereof, as well as sections 944[6] and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Court determines that the New GO Bonds and the CVIs, and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds, and the CVIs as provided in the New GO Bonds Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York, and federal law.

---

[6]    Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations.  11 U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws.") (citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D. Cal. 2010)) (additional citations omitted).  As set forth in the leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future."  6 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 944.03[1][b] (16th ed. 2013).

(G)     The New GO Bonds and the CVIs are bonds or notes within the meaning of
Section 2 of Article VI of the Commonwealth Constitution to which the
Commonwealth may legally pledge its full faith, credit and taxing power
under the Commonwealth Constitution and applicable Puerto Rico law for the
payment of principal and interest.

(H)     Pursuant to the New GO Bonds Legislation and the CVI Legislation, the
Commonwealth has validly pledged its full faith, credit and taxing power
under the Commonwealth Constitution and applicable Puerto Rico law for the
payment of principal and interest with respect to the New GO Bonds and
payment with respect to the CVIs.

(I)     Subject to the occurrence of the Effective Date and as of the date of issuance
of the New GO Bonds and CVIs, the Commonwealth is in compliance with
any applicable debt limits, including the Comprehensive Cap and any
applicable debt limit (if any) contained in the Commonwealth Constitution.

(J)     Pursuant to the New GO Bonds Legislation and other applicable law, upon the
issuance of the New GO Bonds, the New GO Bonds shall be secured by a first
priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53))
over the funds deposited in the Debt Service Fund, including any revenues
generated therefrom, which statutory first lien shall occur automatically and
shall automatically attach and be perfected, valid, and binding from and after
the Effective Date, without any further act or agreement by any Person, and
shall remain in full force and effect until the New GO Bonds have been paid
or satisfied in full in accordance with their terms.

(K)     The statutory first lien on funds deposited into the Debt Service Fund, as
provided for in the New GO Bonds Legislation, and all other provisions to pay
the New GO Bonds are valid, binding, legal, and enforceable, including,
without limitation, covenants not to impair such property, maintain available
tax exemption and provide for the conditions regarding substitution of
collateral (including, without limitation, the statutory lien thereon as adequate
protection for the property rights in the Plan and in the Confirmation Order).

(L)     The statutory first lien on funds deposited into the Debt Service Fund, as
provided for in the New GO Bonds Legislation, creates the valid pledge and
the valid lien upon the right, title and interest of the Commonwealth in such
funds in favor of the Trustee (for the benefit of the holders of the New GO
Bonds) which it purports to create, subject only to the provisions of the New
GO Bonds Indenture permitting the withdrawal, payment, setting apart or
appropriation thereof for the purposes and on the terms and conditions set
forth in the New GO Bonds Indenture and each applicable supplemental
indenture.

(M)     The Commonwealth has waived, and shall be deemed to have waived, the
automatic stay in any future insolvency proceeding commenced on behalf of

the Commonwealth (whether under Title III of PROMESA or otherwise) with respect to monies on deposit in the Debt Service Fund as of the commencement thereof.

(N)   In light of the enactment of the New GO Bonds Legislation and the CVI Legislation, upon execution by all parties thereto, the New GO Bonds Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium, or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

(O)   For purposes of section 209 of PROMESA, the discharge of debt to occur as of the Effective Date pursuant to the Plan and the Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth, as determined in accordance with modified accrual accounting standards.

(P)   The Court's *Opinion and Order Granting Defendants' Motion to Dismiss the Complaint* (Docket Entry No. 83 in Adv. Proc. No. 21-00068), including, without limitation, that the GDB HTA Loans are subject to subordination to the HTA 68 Bonds and the HTA 98 Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.

4.   <u>Litigation Resolution</u>.  For the reasons stated herein and in the Findings of Fact and Conclusions of Law, the provisions of the Plan constitute a good faith, reasonable, fair, and equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the compromise and settlement of asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, and disputes (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status, and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the

Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of

CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive

revenues historically conditionally appropriated to CCDA, HTA, the MBA, and PRIFA, as

applicable, and subject to "clawback" by the Commonwealth pursuant to the provisions of the

Commonwealth Constitution, (e) relating to the validity, priority, secured status, and related

rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery

Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including,

without limitation, the resolution of (i) the claims and Causes of Action currently being litigated

in the PBA Litigation, (ii) the amount, if any, of the PBA Administrative Expense Claim, and

(iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims

that PBA may assert against the Commonwealth under leases, agreements, and applicable law,

(h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention

Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in

the PRIFA BANs Litigation, each as incorporated into the Plan, and the entry of this

Confirmation Order constitutes, if required, approval of all such compromises and settlements

pursuant to Bankruptcy Rule 9019 and sections 105(a) and 1123(b)(5) of the Bankruptcy Code.

Pursuant to this Confirmation Order, and to the extent provided in the Plan, on the Effective

Date, such compromises and settlements shall be binding upon the Debtors, all Creditors of the

Debtors, and all other Entities and, to the fullest extent permitted by applicable law, shall not be

subject to collateral attack or other challenge (other than appeals) in any other court or forum.

    5.    Plan Settlements Approved.  The Court hereby approves the compromises and

settlements embodied in the Plan as fair and reasonable and, as of the Effective Date of the Plan,

authorizes and directs the consummation thereof.

6.      Dismissal of Med Center Litigation.  On the Effective Date, the Med Center

Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice, and each of

the Commonwealth and the respective Med Centers shall take such action as is necessary to

notify the applicable court of such dismissal, including, without limitation, within ten (10)

Business Days of the Effective Date, filing notices with the clerk of such court setting forth the

resolution of the Med Center Litigation and the dismissal thereof (except the Med DC Action),

with prejudice; provided, however, that all appeals taken from the Med DC Action shall be

dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such

appeals shall take such action as is necessary to notify such appellate courts of appeal of such

dismissal, with prejudice; and, provided, further, that the Commonwealth and the Med Centers

shall file a notice with the clerk of the court in connection with the Med DC Action that (a) all

actions in connection with the Med DC Action shall be stayed, and (b) in the event that, from and

after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the

Medicaid Act, 42 U.S.C. § 1396a(bb), such stay shall be lifted and the Med Centers may pursue

relief and the Commonwealth may present any and all defenses with respect to such alleged

future defaults, with all existing defaults as of the date hereof having been waived by the Med

Centers.  Without in any way limiting the foregoing, from and after the earlier to occur of (y)

July 1, 2022 and (z) the Effective Date (the "Med Center Outside Date"), and until otherwise

ordered or agreed upon, the parties shall continue to adhere to and comply with the terms and

provisions of that certain *Stipulation Modifying the Automatic Stay Between the Commonwealth
and Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr.
Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. De Serv. Médicos
Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc.,*

*Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castañer, Inc.*,
dated July 12, 2019 (the "Med Center Stipulation") (see Docket Entry Nos. 8499 and 12918-14),
including, without limitation, the making of quarterly payments to certain Med Centers in
accordance therewith.  Payments made by the Commonwealth, either directly or indirectly
through contractors or subcontractors, to any Med Center prior to modification of the Med
Center Stipulation or such other agreement between the applicable Med Centers and the
Commonwealth shall not be subject to setoff or recoupment on account of any claims or causes
of action arising during the period up to and including the Effective Date; provided, however,
that, in the event that the Commonwealth or any Med Center determines that any payments made
pursuant to the Med Center Stipulation from and after the Med Center Outside Date constitute an
overpayment or an underpayment, as the case may be, based upon services provided by the Med
Centers from and after the Med Center Outside Date, the Commonwealth or such Med Center
shall submit such issue for a determination in connection with the Med DC Action, with all
parties reserving all rights, defenses, and counterclaims with respect to such overpayments or
underpayments, as the case may be, notwithstanding the imposition of any stay.

       7.    Dismissal of ERS Litigation.  On the Effective Date, (a) the ERS Litigation and
the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the
Oversight Board, by itself or through its committees, the Creditors' Committee, and the ERS
Bondholders (on their own account or on behalf of affiliates or related funds or accounts
managed by affiliates) shall take any and all action reasonably necessary, including, without
limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to
effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions,

with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate

the dismissal and/or denial of the ERS Takings Action, with prejudice.

8.     Dismissal of GO/Clawback Litigation.  On the Effective Date, (a) to the extent

extant, the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the Lift

Stay Motions, the Clawback Actions, and the Section 926 Motion shall be dismissed and/or

denied, with prejudice, (b) the Oversight Board, by itself or through its committees, the

Creditors' Committee, the Monolines and the PSA Creditors (on their own account or on behalf

of affiliates or related funds or accounts managed by affiliates) shall take any and all action

reasonably necessary, including, without limitation, filing such notices, stipulations or other

pleadings in the Title III Court, the United States Court of Appeals for the First Circuit and the

courts of the Commonwealth of Puerto Rico, as applicable, to effectuate the dismissal of the

aforementioned litigations and motions, with prejudice.

9.     Dismissal of PRIFA BANs Litigation.  On the Effective Date, (a) the PRIFA

BANs Litigation and the PRIFA BANs Takings Litigation shall be dismissed and/or denied, with

prejudice, and (b) the Oversight Board, by itself or through its committees, and the plaintiffs

therein (on their own account or on behalf of affiliates or related funds or accounts managed by

affiliates) shall take any and all action necessary, including, without limitation, filing such

notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal

and/or denial of the PRIFA BANs Litigation, with prejudice, and (ii) in the United States Court

of Federal Claims to effectuate the dismissal and/or denial of the PRIFA BANs Takings

Litigation, with prejudice.

10.    Dismissal of the PBA Litigation.  On the Effective Date, (a) the PBA Litigation

shall be dismissed, with prejudice, and (b) the Oversight Board, by itself or through its

committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related

funds or accounts managed by affiliates) shall take any and all action necessary, including,

without limitation, filing such notices, stipulations or other pleadings in the Title III Court to

effectuate such dismissal and/or denial of the PBA Litigation, with prejudice.

     11.   <u>Implementation of the Plan</u>.  On and after the Effective Date, the Debtors, the

Reorganized Debtors, and each of their respective authorized agents and representatives are

authorized and directed to (a) execute, deliver, file, or record such documents, contracts,

instruments, releases, and other agreements including, without limitation, those contained in the

Plan Supplement, (b) make any and all distributions and transfers contemplated pursuant to, and

as provided for in, the Plan and the Plan Supplement, (c) take such other actions as may be

necessary to effectuate, implement, and further evidence the terms and conditions of the Plan,

including, among other things, all such actions delineated in article LXXXIX of the Plan,[7] and

(d) direct or instruct The Depository Trust Company, or such other person or entity necessary to

implement or effectuate the terms of (i) any custodial trust, escrow arrangement, or similar

structure established pursuant to section 75.5(b) of the Plan and facilitated by Ambac (an

"Ambac Trust"), (ii) the FGIC Trust, (iii) the Syncora Trust, (iv) any custodial trust, escrow

arrangement, or similar structure established pursuant to section 75.1(b)(ii) of the Plan (an

"Assured Trust"), and (v) the Avoidance Actions Trust (collectively, the "Trusts"), and (vi) the

related Trust documentation.  Without in any way limiting the foregoing, on the Effective Date,

the appropriate officers or representatives of the Debtors and Reorganized Debtors, as the case

may be, and members of the boards of directors of the same, as applicable, are authorized,

---

[7]     Article LXXXIV has been amended to reflect that Class 54 is among the Unimpaired
Classes (§ 84.2), rather than among the Impaired Classes (§ 84.1.)

empowered, and directed to issue, execute, file, and deliver or record such documents, contracts, instruments, releases, and other agreements, including those contained in the Plan Supplement, contemplated by the Plan, and make, or cause to be made, any and all distributions and transfers contemplated pursuant to, and as provided for in, the Plan and the Plan Supplement, in the name of and on behalf of the Debtors and Reorganized Debtors, as applicable.

12.    <u>Enforceability of New Debt Instruments</u>.  Pursuant to each of Bankruptcy Code section 944(b)(3), the New GO Bonds Legislation, the CVI Legislation, and all debt instruments to be issued pursuant to the Plan will constitute, upon distribution thereof, valid legal obligations of the Debtor or the Reorganized Debtor, as the case may be, that issues them, and any provision made to pay or secure payment of such obligation is valid.

13.    <u>Authorization of New GO Bonds and CVIs and Injunction</u>.  The debt authorization in Act 53-2021 is conditioned only on the Plan's cancellation of the Monthly Benefit Modification provided for in the proposed *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17627) (the "Seventh Amended Plan"), and does not require satisfaction of any other conditions including cancellation of (a) the elimination of cost of living adjustments and/or (b) freeze or terminations of accrual of defined benefits under the Teachers Retirement System or the Judiciary Retirement System from and after the Effective Date.  The Plan cancels and eliminates the Monthly Benefit Modification previously included in the proposed Seventh Amended Plan, thereby satisfying the condition in Act 53-2021 for its debt authorization.  The Commonwealth government shall not repeal such debt authorization prior to all such indebtedness issued pursuant to the Plan being satisfied in accordance with the terms thereof.  For avoidance of doubt, the Plan does not modify benefits

comprised of the "Monthly Base Pension," "Christmas Bonus," "Summer Bonus," "Medicine

Bonus," and "Medical Insurance Benefit," each as defined in the Seventh Amended Plan.

14. <u>Purchase and Sale of Certain ERS Assets</u>.  On the Effective Date, (a) the

Commonwealth shall purchase, and ERS shall sell, assign, transfer, and convey to the

Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without

limitation, such Assets subject to a valid and perfected lien or security interest (other than liens

or claims discharged pursuant to the Plan and this Confirmation Order) for an aggregate purchase

price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and

(b) in accordance with the terms and provisions of section 69.2 of the Plan, (i) the

Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the

interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option,

pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS

Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy

Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be

necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with

the ERS Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not

exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy

Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

15. <u>Monthly Deposits of Interest and Principal</u>.  Pursuant to the New GO Bonds

Legislation and the New GO Bonds Indenture, from and after the Effective Date, until the New

GO Bonds have been paid or satisfied in full in accordance with their terms, on the first (1st)

Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the

Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i) one-

sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the

payment of interest to accrue on the New GO Bonds through the next interest payment date, and

(ii) one twelfth (1/12) of the Reorganized Commonwealth's then annual obligation with respect

to the payment of principal (or accreted value) on the New GO Bonds.  On the Effective Date,

the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional

amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed

Issuance Date.

16.     <u>Comprehensive Cap on All Net Tax-Supported Debt</u>.  During the Debt Policy

Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds

Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as

applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive

Cap on all Net Tax-Supported Debt of article IV of the Debt Responsibility Act, which cap shall

be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and

when measured in accordance with the Debt Responsibility Act, including a secured and/or

securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy

Revenues above and beyond the percentage of Debt Policy Revenues required to pay the

maximum annual debt service on the COFINA Bonds outstanding as of the Effective Date.  Debt

service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO

Bonds and PBA Bonds, and payments on CVIs to be issued pursuant to the Plan or other

contingent value instruments that may be issued pursuant to or in connection with a

Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA,

CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by

such instrumentality or (b) other creditors of such instrumentality, will not apply towards the

Comprehensive Cap.  For the avoidance of doubt, any capital appreciation general obligation

bonds or similar tax supported debt obligations issued to anyone other than the holders or

insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value

instruments or similar tax supported debt obligations issued other than pursuant to or in

connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the

Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date.  The

Secretary of Treasury's certification of compliance with the Debt limit pursuant to section 74.4

of the Plan shall be conclusive and binding absent manifest error; provided, however, that, in

issuing such certification, with respect to the calculation of the revenues of public corporations

included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from

officers of such public corporations.

17.     Adoption and Maintenance of a Debt Management Policy.  During the Debt

Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt

Management Policy designed to ensure that certain past Debt issuance practices of the

Commonwealth are not repeated.  The Debt Management Policy shall, unless otherwise

approved, in writing, by the Oversight Board (to the extent exercising authority in accordance

with the provisions of PROMESA), at all times include the principles and limitations provided in

section 74.5 of the Plan.

18.     Creation of Avoidance Actions Trust.  Upon the execution of the Avoidance

Actions Trust Agreement pursuant to section 78.1 of the Plan, the Avoidance Actions Trust shall

be established and validly created pursuant to the terms of the Avoidance Actions Trust

Agreement, with no further authorization or legislative action being required, and the Avoidance

Actions Trustee shall be selected in accordance with the terms and provisions of the Avoidance

Actions Trust Agreement.  This Court shall retain jurisdiction to enforce the terms and

provisions of the Avoidance Actions Trust Agreement.

19.     <u>Avoidance Actions Trust Assets</u>.  The Avoidance Actions Trust shall consist of

the Avoidance Actions Trust Assets.  On the Effective Date, the Debtors shall transfer all of the

Avoidance Actions Trust Assets to the Avoidance Actions Trust and, in accordance with section

1123(b)(3)(B) of the Bankruptcy Code, the Avoidance Actions Trust shall have the sole right,

authority, and standing to prosecute, settle or otherwise dispose of all Avoidance Actions,

including, without limitation, those set forth on Exhibits A and B to the Plan, as of the Effective

Date.  The Avoidance Actions Trust Assets may be transferred subject to certain liabilities,

including, without limitation, all counterclaims and defenses to any such Avoidance Actions

Trust Assets, as provided in the Plan or the Avoidance Actions Trust Agreement.  Such transfer

shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other

similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the

Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors, the Reorganized

Debtors, and their predecessors, successors and assigns, and each other Entity released pursuant

to section 88.2 of the Plan shall be discharged and released from all liability with respect to the

delivery of such distributions.

20.     <u>Funding, Costs, and Expenses of the Avoidance Actions Trust</u>.  On the Effective

Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to

Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior

to the Confirmation Hearing.  The reasonable costs and expenses of the Avoidance Actions

Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained

professionals, shall be paid out of the Avoidance Actions Trust Assets.  Fees and expenses

incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Avoidance Actions Trust.

21.     <u>Indemnification of Avoidance Actions Trustee and Board</u>.  The Avoidance Actions Trustee, the Trust Advisory Board (as defined in the Avoidance Actions Trust Agreement), and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns (each, an "Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries (as defined in the Avoidance Actions Trust Agreement) for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except those acts arising from their own fraud, willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except for any actions or inactions involving fraud, willful misconduct or gross negligence.  Any indemnification claim of an Indemnified Party pursuant to section 7.5 of the Avoidance Actions Trust Agreement shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom.  The Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals.  The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

22.     <u>Creation of Pension Reserve Trust</u>.  Upon the execution of the Pension Reserve Deed of Trust pursuant to section 83.1 of the Plan, the Pension Reserve Trust shall be established

and validly created pursuant to the terms of the Pension Reserve Deed of Trust, with no further

authorization or legislative action being required, and shall not be subject to taxation by the

Commonwealth.  This Court's retention of jurisdiction includes jurisdiction over actions to

enforce the terms and provisions of the Pension Reserve Deed of Trust.

      23.    <u>Funding of the Pension Reserve Trust</u>.  On the Effective Date, the Commonwealth

shall contribute, or cause to be contributed, to the Pension Reserve Five Million Dollars

($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension Reserve

Trust, of which One Million Dollars ($1,000,000.00) shall be deposited into the Pension Reserve

Board's general account, Two Million Five Hundred Thousand Dollars ($2,500,000.00) shall be

deposited into the Pension Benefits Council's administrative and operating account, and One

Million Five Hundred Thousand Dollars ($1,500,000.00) shall be deposited into the Pension

Reserve Board's administrative and operating account.  From and after the FY in which the

Effective Date occurs up to and including the conclusion of the ninth (9th) FY following the FY

in which the Effective Date occurs, the Reorganized Commonwealth shall make, or cause to be

made, annual (but in no event later than October 1st following the conclusion of each FY)

contributions to the Pension Reserve Trust in an amount equal to (a) the Base Contribution, (b)

such additional amount calculated as the lower of the actual primary surplus for such FY and the

projected Fiscal Plan primary surplus for such FY, minus the sum of (i) the Base Contribution

for such FY, plus (ii) the  Commonwealth debt service obligation pursuant to the Fiscal Plan for

such FY, plus (iii) Two Hundred Million Dollars ($200,000,000.00); <u>provided</u>, <u>however</u>, that, in

all instances, such additional amount cannot be lower than zero dollars ($0.00), and (c) subject to

applicable laws, including, without limitation, Titles I and II of PROMESA, such additional

amounts as the Reorganized Commonwealth may deposit into the Pension Reserve Trust.  The

Pension Reserve Trust shall be managed by an independent entity whose members shall meet the independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics, and conflicts of interest laws and regulations.

24.    No Action.  Pursuant to section 1142(b) of the Bankruptcy Code, the Debtors are directed to, and no further action of the directors or officers of the Debtors shall be required to authorize the Debtors to, enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including, without limitation, the Plan Supplement.

25.    Government Action.  From the Effective Date up to and including the satisfaction of the New GO Bonds and the CVIs in accordance with their respective terms, (a) pursuant to Bankruptcy Code section 1142(b), the Government of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof, shall take any and all actions necessary to consummate the transactions contemplated by the Plan, (b) the Puerto Rico Department of Treasury and AAFAF, as applicable, are authorized and directed, notwithstanding any requirements of Puerto Rico law, to execute any and all agreements necessary for the implementation of the Plan and to make any payments required thereunder,  and (c) pursuant to section 108(a)(2) of PROMESA, no party, individual, official, or officer (elected or appointed), agency, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that (i) impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan, including, but not limited to, those contemplated pursuant to the New GO Bonds Indenture and the CVI Indenture, or (ii) creates any inconsistency in any manner,

amount, or event between the terms and provisions of the Plan or a Fiscal Plan certified by the

Oversight Board, each of which actions has been determined by the Oversight Board to impair or

defeat the purposes of PROMESA.  To the maximum extent permitted by law, the Government

of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf

thereof, is directed to take any and all actions necessary to consummate the transactions

contemplated by the Plan.  Without in any way limiting the foregoing, on the earlier to occur of

(y) the Effective Date and (z) within forty-five (45) days from and after the date hereof, the

agencies and instrumentalities set forth on **Exhibit D** hereto are directed to transfer the funds and

the proceeds of liquid securities held on account and set forth on **Exhibit D** hereto to the Puerto

Rico Treasury Single Account; provided, however, that **Exhibit D** hereto may be amended

during the period up to and including thirty (30) days from the date hereof upon the agreement of

the Oversight Board and AAFAF and, to the extent amended, the Oversight Board shall file an

informative motion with the Title III Court with respect thereto.

      26.    <u>Oversight Board Consent Pursuant to PROMESA Section 305</u>.  Pursuant to

section 305 of PROMESA, with the consent of the Oversight Board and consistent with the Plan,

using all their political and governmental powers, the Governor and Legislature are directed to

take all acts necessary to carry out and satisfy all obligations and distributions set forth in the

Plan.

      27.    <u>Binding Effect</u>.  This is a full and complete Final Order intended to be conclusive

and binding on all parties in interest, is not intended to be subject to collateral attack in any other

forum, and may only be challenged in accordance with applicable rules in this Court and

appealed as provided in PROMESA and other applicable federal laws, rules, and jurisprudence,

by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its

instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or

any other Commonwealth instrumentality, including each holder of a bond claim and each holder

of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer

or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with

respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank

that receives or holds funds related to such bonds, whether or not such claim or other rights of

such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity

accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs,

successors, assigns, trustees, executors, administrators, officers, directors, agents,

representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises

and settlements set forth in the Plan and this Confirmation Order with respect to the priority of

the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other

applicable law shall not be binding on any party in interest (including any successor to the

Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

       28.     <u>Cancellation of Notes, Instruments, Certificates, and Other Documents</u>.  Pursuant

to section 77.6 of the Plan, and except (a) as provided in any contract, instrument or other

agreement or document entered into or delivered in connection with the Plan, (b) for purposes of

evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the

Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to section

76.1 of the Plan), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all

instruments and documents related thereto will be deemed automatically cancelled, terminated

and of no further force or effect against the Debtors without any further act or action under any

applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee,

paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained in the Plan or herein to the contrary, the PBA Bonds, ERS Bonds and GO Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed Bond Claims and Allowed Insured Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) to allow any trustee, fiscal agent, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan, and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtors, (v) to allow a Monoline to exercise the redemption or call rights assigned to such Monoline pursuant to the provisions of article LXXV of the Plan, (vi) to allow the applicable trustee or fiscal agent, as the case may be, to appear in any proceeding in which such trustee or fiscal agent is or becomes a party with respect to clauses (i) through (iv) above, or (vii) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline and the Oversight Board shall request that the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims.

Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such

bonds or bond documents that remain outstanding shall not form the basis for the assertion of

any Claim against the Debtors or Reorganized Debtors, as the case may be.

29.     Rejection or Assumption of Remaining Executory Contracts and Unexpired

Leases.  Pursuant to section 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case

pursuant to section 301 of PROMESA, and subject to the provisions of sections 76.5 and 76.7 of

the Plan, all Executory Contracts and Unexpired Leases that exist between the Debtors and any

Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall

be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract

and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of

the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a

contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been

registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from

registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and

regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or

authorized by the Title III Court, unless specifically designated a contract to be rejected in the

Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or

pursuant to any federal program, (g) that is an incentive agreement between the Government of

the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover

Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments,

municipalities, public corporations, or instrumentalities (other than leases to which PBA is a

party); provided, however, that the Debtors reserve the right to amend, on or prior to the

Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom

or add any Executory Contract and Unexpired Lease thereto, in which event such Executory

Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected,

assumed, or assumed and assigned as of the Effective Date.  The Debtors shall serve (y) notice of

any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through

the operation of section 76.1 of the Plan, by including a schedule of such contracts and leases in

the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be

rejected through the operation of section 76.1 of the Plan, by serving a separate notice to the

relevant counterparties to such agreements.  To the extent there are any amendments to such

schedules, the Debtors shall provide notice of any such amendments to the parties to the

Executory Contract and Unexpired Lease affected thereby.  The listing of a document on the

schedules to the Plan Supplement or in any separate notice shall not constitute an admission by

the Debtors that such document is an Executory Contract and Unexpired Lease or that the

Debtors have any liability thereunder.  Except as provided in articles LV and LVI of the Plan,

none of the Debtors' collective bargaining agreements shall be treated as Executory Contracts

and none shall be assumed or rejected or otherwise treated pursuant to the Plan, but shall remain

in effect subject, in all instances, to Puerto Rico law and articles LV and LVI of the Plan

regarding the payment and ongoing treatment of pension and related claims obligations.

     30.   <u>Insurance Policies</u>.  Subject to the terms and provisions of section 76.7 of the

Plan, each of the Debtors' insurance policies and any agreements, documents, or instruments

relating thereto, are treated as Executory Contracts under the Plan; <u>provided</u>, <u>however</u>, that, such

treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect

to its respective obligations to holders of Claims under policies of insurance and applicable law

and governing documents with respect thereto.

31.    <u>Rejection Damages Claims</u>.  If the rejection of an Executory Contract and

Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to

such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof

of Claim, shall be forever barred and shall not be enforceable against the Debtors, or its

properties or agents, successors, or assigns, including, without limitation, Reorganized Debtors,

unless a proof of Claim is filed with the Title III Court and served upon attorneys for the

Oversight Board and Reorganized Debtors, as the case may be, on or before thirty (30) days after

the later to occur of (i) the Effective Date, and (ii) the date of entry of an order by the Title III

Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

32.    <u>Payment of Cure Amounts</u>.  Any monetary amount required as a cure payment

with respect to each prepetition executory contract and unexpired lease to be assumed pursuant

to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment

of the cure amount in Cash on the later to occur of (a) the Effective Date and (b) within ten (10)

Business Days of the occurrence of a Final Order setting forth the cure amount as to each

executory contract or unexpired ease to be assumed or assumed and assigned, or upon such other

terms and dates as the parties to such executory contracts or unexpired leases and the Debtor

otherwise agree.

33.    <u>Setoffs</u>.  Except as otherwise provided in the Plan or in this Confirmation Order,

the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off

against any Allowed Claim and the distributions to be made pursuant to the Plan on account

thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the

claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may

hold against the holder of such Allowed Claim; <u>provided</u>, <u>however</u>, that neither the failure to

effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release

by the Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the

Debtors or the Reorganized Debtors possess against such holder; and, <u>provided</u>, <u>further</u>, that

nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of

setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560

of the Bankruptcy Code or pursuant to the common law right of recoupment; and, <u>provided</u>,

<u>further</u>, that nothing in this decretal paragraph or section 77.11 of the Plan shall affect the

releases and injunctions provided in article XCII of the Plan or this Confirmation Order.

    34.    <u>Delivery of Distributions</u>.

    (a)    <u>Delivery of Distributions Generally</u>.  Subject to the provisions of Rule

9010 of the Bankruptcy Rules, and except as provided in the Plan or herein, distributions and

deliveries to holders of Allowed Claims shall be made through The Depository Trust Company

or at the address of each such holder as set forth on the Schedules filed with the Court, unless

superseded by the address set forth on proofs of Claim filed by such holders, or at the last known

address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing

of a change of address; <u>provided</u>, <u>however</u>, that, except as otherwise provided herein,

distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be

made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the

respective governing documents for such obligations; and, <u>provided</u>, <u>further</u>, that, except as

otherwise provided herein, the Disbursing Agent may make distributions of PSA Restriction

Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto

in a manner mutually agreed upon between such party and the Disbursing Agent.  The trustee or

fiscal agent for each such obligation (or such trustee's or fiscal agent's designee) shall, in turn,

deliver the distribution to holders in the manner provided for in the applicable governing

documents.  Each trustee or fiscal agent may conclusively rely upon the distribution instructions

received from the Debtors or their agents with respect to the delivery of distributions in

accordance with the terms and provisions of the Plan, including the contra-CUSIP positions and

escrow positions established by the Debtors or their agents with The Depository Trust Company,

and each trustee or fiscal agent shall close and terminate the original CUSIPs after making

distributions in accordance with the terms and provisions of the Plan and shall have no further

distribution obligations thereunder.  No trustee or fiscal agent shall be required to post any bond

or surety or other security for the performance of its duties, unless otherwise ordered or directed

by the Title III Court.  Subject to any agreements to the contrary, each trustee or fiscal agent

shall only be required to make the distributions and deliveries described in this decretal

paragraph and the Plan and in accordance with the terms of this Confirmation Order, the Plan

and such other governing document, and shall have no liability for actions reasonably taken in

accordance with the terms of this Confirmation Order, the Plan and such other governing

document, or in reasonable reliance upon information provided to such trustee or fiscal agent by

the Debtors or their agents in accordance with the terms of this Confirmation Order, the Plan or

in connection with distributions to be made hereunder or thereunder, except for liabilities

resulting from the gross negligence or willful misconduct of such trustee or fiscal agent.  The

New GO Bonds and the CVIs shall be transferable and recognized if made in accordance with

the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

    (b)    Delivery of Distributions with Respect to Assured Insured Bonds.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) to the extent

an Assured Insured Bondholder holding the Assured Insured Bond with CUSIP number

74514LD46  validly elects (or is deemed to elect) Assured Bondholder Election 2, the

Disbursing Agent will deposit the Assured New Securities and Cash allocable to such Assured

Insured Bondholder in the applicable Assured Trust in accordance with the applicable trust

agreement; (ii) to the extent an Assured Insured Bondholder holding the custody receipt with

CUSIP number 74514LGL5 evidencing a beneficial ownership interest in the Assured Insured

Bond with CUSIP number 745145XZ0, the custody receipt with CUSIP number 745235UX7

evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number

745235SA0, the custody receipt with CUSIP number 745235YJ4 or 745235UX7 evidencing a

beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the

custody receipt with CUSIP number 745235YZ8 evidencing a beneficial ownership interest in

the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP

number 745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond

with CUSIP number 745235SC6, or the custody receipt with CUSIP number 745235YV7 or

745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond with

CUSIP number 745235SC6 validly elects (or is deemed to elect) Assured Bondholder Election

2, such Assured Insured Bondholder will be deemed to have deposited such custody receipts

into the applicable Assured Trust; the trustee (the "Assured Trustee") of the Assured Trusts (as

the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the

existing custodial arrangement, such that the Assured Trustee will be deemed to hold the

Assured Insured Bonds underlying the applicable custody receipts and the related Assured

Insurance Policies as provided in the applicable trust agreement, without any further action on

the part of the existing custodian, provided, however, that the existing custodian is also hereby

authorized and ordered to take any further actions that may be necessary to confirm the collapse

of the existing custodial arrangement as provided herein; and the Disbursing Agent will transfer
the Assured New Securities and Cash allocable to such Assured Insured Bondholder to the
Assured Trustee for deposit in the applicable Assured Trust on account of such custody receipts
and Assured Insured Bonds in accordance with the applicable trust agreement; (iii) to the extent
an Assured Insured Bondholder holding the custody receipt with CUSIP number 74514LWE3
evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number
745145R53 or holding the custody receipt with CUSIP number 74514LUW5 evidencing a
beneficial ownership interest in the Assured Insured Bond with CUSIP number 74514LNG8
validly elects (or is deemed to elect) Assured Bondholder Election 2, such Assured Insured
Bondholder will be deemed to have deposited such custody receipts into the applicable Assured
Trust; the Assured Trustee (as the holder of the applicable custody receipts) and Assured will be
deemed to have collapsed the existing custodial arrangement, such that the Assured Trustee will
be deemed to hold the Assured Insured Bonds underlying the applicable custody receipts and
the related Assured Insurance Policies as provided in the applicable trust agreement, without
any further action on the part of the existing custodian, provided, however, that the existing
custodian is also hereby authorized and ordered to take any further actions that may be
necessary to confirm the collapse of the existing custodial arrangement as provided herein, and,
without prejudice to the ability of the Assured Trustee to draw on the applicable Assured
Insurance Policy, the Assured Trustee shall be deemed to have deposited such Assured Insured
Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and
the related FGIC Plan Consideration into the applicable FGIC Trust pursuant to section 75.4(a)
of the Plan; and the trustee for the Assured Trust related to such Assured Insured Bonds shall be
deemed to have received its Pro Rata Share of the FGIC Plan Consideration, and shall receive

the FGIC Certificates allocable to such Assured Insured Bondholder on account of the custody receipts referred to in this subsection (iii) above and Assured Insured Bonds (which also qualify as FGIC Insured Bonds) referred to in this subsection (iii) above for deposit in the relevant Assured Trust in accordance with the applicable trust agreement; (iv) pursuant to section 75.1(a) of the Plan, Assured is hereby deemed to have exercised the Assured Acceleration Price Payment Option with respect to all Assured Insured Bonds with respect to which Assured has exercised the Assured Election, and the Disbursing Agent shall disburse the Assured New Securities and Cash on account of any Assured Insured Bonds with respect to which Assured has exercised the Assured Election or with respect to which an Assured Insured Bondholder has validly elected Assured Bondholder Election 1 to Assured in a manner mutually agreed upon between the Disbursing Agent and Assured; and (v) on or prior to the Effective Date, the Disbursing Agent and the Debtors shall disclose to Assured the Acceleration Price to be paid with respect to any Assured Insured Bonds with respect to which Assured has exercised the Assured Election or with respect to which an Assured Insured Bondholder has validly elected Assured Bondholder Election 1, and on the Effective Date (1) with respect to such Assured Insured Bonds insured in the primary market, the paying agent for the GO Bonds or the fiscal agent for the PBA Bonds, as applicable, shall draw down on the applicable Assured Insurance Policies to pay the applicable Assured Acceleration Price to the beneficial holders of such Assured Insured Bonds insured in the primary market in accordance with sections 75.1(a) and 75.1(b)(i) of the Plan, as applicable, and (2) with respect to such Assured Insured Bonds insured in the secondary market, Assured shall, or shall cause the applicable custodian of custody receipts evidencing the beneficial ownership interest of the holders thereof in such Assured Insured Bonds and the related Assured Insurance Policies to draw on the applicable Assured

Insurance Policies in order to pay the applicable Assured Acceleration Price to the beneficial holders of such Assured Insured Bonds insured in the secondary market in accordance with sections 75.1(a) and 75.1(b)(i) of the Plan, as applicable; provided, however, that, for the avoidance of doubt, Assured shall not in any circumstance be required to pay itself an Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise.

(c)     Delivery of Distributions with Respect to National Insured Bonds. Notwithstanding any other provision of the Plan or of this Confirmation Order, on the Effective Date, National shall receive, and the Disbursing Agent shall disburse to National in a manner mutually agreed upon by the Disbursing Agent and National, the National Plan Consideration that would otherwise be allocable to holders of Allowed National Insured Bond Claims that elected to receive the National Non-Commutation Treatment by electing such treatment in accordance with the Election Notice for National Bond Holders with Claims in Classes 3 and 25 (Docket Entry No. 17639-30) or the Election Notice for National Bond Holders with Claims in Class 18 (Docket Entry No. 17639-31); provided, however, that, for the avoidance of doubt, National shall not in any circumstance be required to pay itself the National Acceleration Price with respect to any National Insured Bonds owned by National, by subrogation or otherwise.

(d)     Delivery of Distributions to FGIC.  Notwithstanding any other provision of the Plan or of this Confirmation Order, on the Effective Date, the Disbursing Agent shall distribute to FGIC FGIC's share of the Vintage CW Bond Recovery, the Vintage CW Guarantee Bond Recovery, and the Vintage PBA Bond Recovery in accordance with the terms and provisions of section 75.4(b) of the Plan in a manner mutually agreed upon between the Disbursing Agent and FGIC.

(e)     <u>Delivery of Distributions with Respect to Ambac Insured Bonds</u>.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) to the extent

a holder of any Ambac Insured Bonds with CUSIP numbers 745235D32,745235D40, or

745235B75 validly elects to receive the Ambac Non-Commutation Treatment, the Disbursing

Agent shall, on the Effective Date or as soon as reasonably practicable thereafter, distribute to

Ambac the Ambac Plan Consideration payable to such holder on account of its Allowed Claims

in Classes 4 and 26; (ii) to the extent a holder of any Ambac Insured Bonds with CUSIP

numbers 745235D32, 745235D40, or 745235B75 validly elects to receive the Ambac

Commutation Treatment or otherwise fails to validly elect to receive the Ambac Non-

Commutation Treatment (including submitting an election for less than all of its Claims in

Classes 4 or 26), on the Effective Date or as soon as reasonably practicable thereafter, the

Disbursing Agent shall distribute the Ambac Commutation Consideration payable on account of

its Allowed Claims in Class 4 and/or 26 under the Plan to the applicable indenture trustee,

which shall in turn distribute such consideration to the applicable bondholders, except that

Ambac may direct the applicable indenture trustee to reduce the distribution to any holder to

account for any payments that Ambac has made, or for any other consideration that Ambac has

made available or will make available, to such holder (collectively, the "Prior Payments"), and

the applicable indenture trustee shall then pay the portion of the Ambac Commutation

Consideration equal to the applicable Prior Payment to Ambac; (iii) to the extent a holder of

any Ambac Insured Bonds with CUSIP number 745145AX0 validly elects to receive the

Ambac Non-Commutation Treatment, on the Effective Date or as soon as reasonably

practicable thereafter, the Disbursing Agent shall distribute to Ambac the Ambac Plan

Consideration payable to such holder on account of its Allowed Claims in Class 19; (iv) to the

extent a holder of any Ambac Insured Bonds with CUSIP number 745145AX0 fails to validly

elect to receive the Ambac Non-Commutation Treatment (including by submitting an election

for less than all of its Claims), on the Effective Date or as soon as reasonably practicable

thereafter, the Disbursing Agent shall distribute the Ambac Commutation Consideration

payable on account of its Allowed Claims in Class 19 under the Plan to the applicable indenture

trustee, which shall in turn distribute such consideration to the applicable bondholders, except

that Ambac may direct the applicable indenture trustee to reduce the distribution to any holder

to account for any Prior Payments that Ambac has made, or for any other consideration that

Ambac has made available or will make available, to such holder and the applicable indenture

trustee shall then pay the portion of the Ambac Commutation Consideration equal to the

applicable Prior Payment to Ambac; and (v) with respect to Ambac Insured Bonds with CUSIP

numbers 745145GB2, 745145A3, 745145YY2, 745235KT7, 745235TH4, 745235TJ0,

745235TK7, 745235TL5, which are fully matured, on the Effective Date or as soon as

reasonably practicable thereafter, the Disbursing Agent shall distribute the Ambac Plan

Consideration distributable on account of Allowed Claims in Classes 4, 19, or 26 to Ambac.

(f)      Delivery of Distributions with Respect to Clawback Recoveries.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) on the

Effective Date, or, in the event the HTA Distribution Conditions have not been satisfied as of

the Effective Date, upon satisfaction of the HTA Distribution Conditions, the Disbursing Agent

shall distribute to each applicable Monoline its share of the CW/HTA Clawback Recovery in

accordance with the terms and provisions of section 63.1 of the Plan in a manner mutually

agreed upon between the Disbursing Agent and such Monoline; (ii) on the Effective Date, the

Disbursing Agent shall distribute to each applicable Monoline its share of the CW/Convention

Center Clawback Recovery in accordance with the terms and provisions of section 64.1 of the

Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline; and

(iii) on the Effective Date, or, in the event the PRIFA Distribution Conditions have not been

satisfied as of the Effective Date, upon satisfaction of the PRIFA Distribution Conditions, the

Disbursing Agent shall distribute to each applicable Monoline its share of the CW/PRIFA Rum

Tax Recovery in accordance with the terms and provision of section 65.1 of the Plan in a

manner mutually agreed upon between the Disbursing Agent and such Monoline and (iv) on the

later to occur of (A) the Effective Date and (B) satisfaction of the HTA Distribution Conditions,

the Disbursing Agent shall distribute to National National's share of the CW/HTA Clawback

Recovery in accordance with the terms and provisions of section 63.2 of the Plan in a manner

mutually agreed upon by the Disbursing Agent and National.  Upon satisfaction of the HTA

Distribution Conditions, DRA shall be entitled to receive its share of the CW/HTA Clawback

Recovery, as delineated in the Priority Distribution Waterfall from Clawback CVI Allocation to

Allowed CWHTA Claims set forth in Exhibit J to the Plan.

35.    _Disbursing Agent_.  Pursuant to section 1.204 of the Plan, the Disbursing Agent

shall be, as applicable, such Entity or Entities designated by the Oversight Board, upon

consultation with AAFAF, on or prior to the Effective Date to make or to facilitate distributions

in accordance with the provisions of the Plan and this Confirmation Order.  Upon designation

thereof, the Oversight Board shall file an informative motion with the Title III Court setting forth

the name of the Disbursing Agent designated.

36.    _Payment of Trustee Fees and Expenses_.  The distributions to be made pursuant to

the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses

allegedly due and owing by the Commonwealth, ERS, and PBA with respect to amounts

discharged pursuant to the Plan.  The Plan does not, nor shall it be construed to, limit the rights
of each Trustee/Fiscal Agent to payment of such amounts (a) from the distributions to be made
hereunder, including, without limitation, the imposition of any valid Charging Lien, or (b)
pursuant to a contractual fee agreement entered into by the Debtors, or on their behalf, during the
period from and after the Commonwealth Petition Date, including, without limitation, that
certain Settlement Agreement and Invoice Instructions (the "Settlement Agreement"), dated as of
December 21, 2018, by and between, among others, AAFAF, U.S. Bank Trust National
Association, and U.S. Bank National Association (collectively, the "USB Entities"); provided,
however, that (a) with respect to PBA, the Effective Date, and (b) with respect to PRIFA, the
later of (i) the Effective Date and (ii) effectiveness of the PRIFA Qualified Modification
pursuant to Title VI of PROMESA, (the "PRIFA Effective Date") in the event that, following
application of fees and expenses in accordance with the terms and provisions of the Settlement
Agreement, the USB Entities retain any monies deposited by PBA or PRIFA, as the case may be,
pursuant to the terms thereof, the USB Entities shall remit such excess funds to PBA or PRIFA,
as the case may be, or such other Entity as may be designated by PBA or PRIFA, as the case may
be, within fifteen (15) Business Days following the Effective Date or the PRIFA Effective Date,
as applicable, by wire transfer of immediately available funds.

     37.   Securities Laws Exemption.  Pursuant to section 1145 of the Bankruptcy Code
and/or section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New
GO Bonds, the CVIs, and interests in the ERS Trust pursuant to the terms of the Plan and this
Confirmation Order (and any subsequent offering of such securities, including, without
limitation, pursuant to a case under Title VI of PROMESA), or the custodial trusts created in
accordance with articles LXIII, LXIV, LXV, and LXXV of the Plan shall be exempt from

registration under the Securities Act and any state or local law requiring registration for the offer,

issuance or distribution of securities, including, but not limited to, the registration requirements

of section 5 of the Securities Act and any other applicable state or federal law requiring

registration and/or prospectus delivery or qualification prior to the offering, issuance,

distribution, or sale of securities, and, pursuant to section 2(b) of the Investment Company Act of

1940, as amended (the "Investment Company Act"), such custodial trusts, securities and interests

shall be exempt from the provisions of the Investment Company Act.

       38.   <u>Acceleration of Insured Bonds</u>.  Notwithstanding any other provision of the Plan

or this Confirmation Order:

     (a)   <u>Assured Insured Bonds</u>: To the extent there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

     (b)   <u>National Insured Bonds</u>:  To the extent there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

     (c)   <u>Syncora Insured Bonds</u>:  To the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

     (d)   <u>FGIC Insured Bonds</u>:  Notwithstanding the terms and conditions of the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be

accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and
payable from and after the Effective Date at an "acceleration price" of one
hundred percent (100%) of the principal amount thereof, plus interest accrued
thereon (or, in the case of capital appreciation bonds, the compounded amount
thereof) to the date of payment; provided, however, that for the avoidance of
doubt, notwithstanding such acceleration, there shall be no acceleration of any
payment required to be made by FGIC under a FGIC Insurance Policy, unless
FGIC elects, in its sole and absolute discretion, to make such payment(s) on an
accelerated basis and FGIC has the express right to accelerate any such payment
under the applicable FGIC Insurance Policy or the related agreements relating to
the applicable FGIC Insured Bonds.

(e)   Ambac Insured Bonds:  To the extent that there are no outstanding payment
defaults by Ambac with respect to Ambac Insured Bonds up to and including the
Effective Date, the principal amount (or compounded amount in the case of
capital appreciation bonds) of the Ambac Insured Bonds shall be deemed
accelerated and immediately due and payable as of the Effective Date.  Ambac
shall have the right to pay such accelerated amounts and unpaid interest accrued
to the date of payment at any time, regardless of which Ambac Non-Commutation
Treatment (sections 75.5(b)(i)-(iv) of the Plan) applies to a particular holder of
Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee
or fiscal agent (as applicable) shall be required to accept the same in satisfaction
of Ambac's obligations under the applicable Ambac Insurance Policy with respect
to such bonds, and, upon such payment, Ambac's obligations under the applicable
Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding
any provision of the Ambac Insurance Policy or other documents related to the
Ambac Insured Bonds.  For the avoidance of doubt, notwithstanding such
acceleration, there shall be no acceleration of any payment required to be made
under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute
discretion to make such payment(s) on an accelerated basis.

39.   Disputed Claims Reconciliation.  In accordance with the terms and provisions of

section 82.1(b) of the Plan and the Committee Agreement:

(a)   The two (2) Creditors Committee appointees to the Avoidance Actions Trust
Board (collectively, the "Creditor Appointees") shall (i) receive monthly updates
to the claims reconciliation process, which process shall continue to be
administered by the Oversight Board, with the assistance of AAFAF, (ii) have the
right to (A) review the claims objections and reconciliation process, including the
ADR Procedures, as it relates to CW General Unsecured Claims, ERS General
Unsecured Claims, Convenience Claims, and, in the event that the Oversight
Board appeals the Title III Court's ruling that Eminent Domain/Inverse
Condemnation Claims are non-dischargeable and must be paid in full, Eminent
Domain/Inverse Condemnation Claims regardless of the size of the asserted
Claim amount, (B) ensure compliance with the exclusions from CW General
Unsecured Claims as provided in the Plan, and (C) in the event that such

appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, an Eminent Domain/Inverse Condemnation Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019.  To facilitate the exercise of the settlement review process, the Oversight Board or AAFAF, as the case may be, shall inform the Creditor Appointees, in writing, five (5) days prior to making or accepting a settlement proposal for the resolution of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim where the proposed allowed amount exceeds Five Hundred Thousand Dollars ($500,000.00).[8]

(b)   With respect to the obligations and responsibilities set forth in this decretal paragraph 39, the Creditor Appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), inclusive of reimbursement of their reasonable out-of-pocket expenses incurred in furtherance of discharging such obligations and responsibilities, which amounts shall be funded from the GUC Reserve.  All such compensation and reimbursements shall be paid by the Entity selected pursuant to section 1.285 of the Plan to hold the GUC Reserve within thirty (30) days of such Entity's receipt of a request for such payment.  To the extent the Oversight Board or, in the event the Oversight Board terminates, AAFAF, disputes the validity or amount of any reimbursement request, it shall inform such Entity and, in the event the parties are unable to resolve such dispute, the Title III Court shall retain jurisdiction to resolve any such dispute.

(c)   Without limiting the foregoing, (i) within sixty (60) days after the Effective Date, the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide the Creditor Appointees with a report (the "Initial Claims Report") containing (1) a register setting forth all CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims that have not been reconciled and which are being evaluated for possible objection, (2) the status of any pending objections to CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims, and (3) information illustrating which Claims are subject to the ACR Procedures and are to be excluded from CW General Unsecured Claims pursuant to section 82.7

---

[8]   Notwithstanding any reference to Eminent Domain Claims in this subparagraph or any report rendered pursuant thereto, the treatment of such Claims is governed by sections 58.1 and 77.1(e) of the Plan.

of the Plan, and (ii) within ten (10) days of the end of each month (the "Monthly Claims Report"), the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide a report containing material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports. In addition, the Oversight Board or AAFAF, as the case may be, through its advisors, shall, upon reasonable request, periodically supply the Creditor Appointees with any other information the Creditor Appointees may reasonably request related to the claims reconciliation process.[9]

(d)     In connection with the foregoing, the Creditor Appointees, together with their counsel and advisors in such capacity, shall not be liable to any Person for actions taken or omitted in connection with the exercise of their rights hereunder except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement from the GUC Reserve for fees and expenses in defending any and all actions or inaction in their capacity as Creditor Appointees, except for any actions or inactions involving willful misconduct or gross negligence.  The foregoing indemnity in respect of any Creditor Appointee shall survive and termination of such Creditor Appointee from the capacity for which they are indemnified.

40.     <u>Disputed Claims Holdback</u>.  From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the Title III Court, Reorganized Debtors or the Disbursing Agent, as applicable, shall retain, for the benefit of each holder of a Disputed Claim, the distributions that would have been made to such holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims have been estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the

---

[9]     Notwithstanding any reference to Eminent Domain Claims in this subparagraph or any report rendered pursuant thereto, the treatment of such Claims is governed by sections 58.1 and 77.1(e) of the Plan.

holder of such Disputed Claim and Reorganized Debtors; provided, however, that the recovery

by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii), and (iii) above.  To the

extent the Disbursing Agent or any of the Reorganized Debtors, as the case may be, retains any

New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or

CVIs are distributed, the Disbursing Agent or such Reorganized Debtors, as the case may be,

shall exercise voting or consent rights with respect to such obligations.

41.     National Action Claims.  Notwithstanding anything contained herein, in the

GO/PBA Plan Support Agreement, or the HTA/CCDA Plan Support Agreement to the contrary,

National may continue to litigate to final judgment or settlement all claims and causes of action

asserted in the National Action;  provided, however, that, in the event that notwithstanding the

application and effectiveness of the Bar Date Orders, the Plan, and the Confirmation Order, the

defendants and, to the extent named, third-party  defendants in the National Action assert against

the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of

the Commonwealth (collectively, the "CW Entities") claims or counterclaims for

indemnification, contribution, reimbursement, setoff or similar theories of recovery based on,

arising from or related to the National Action (collectively, the "CW Entities' Claims"), (i) the

CW Entities agree (A) to vigorously defend against any such CW Entities' Claims, including,

without limitation, invoking the Bar Date Orders and discharge provisions set forth in article

XCII of the Plan and this Confirmation Order, objecting to any proof of claim, and prosecuting

available appeals, based upon, arising from, or related to the National Action, (B) to allow

National, at its option, to participate in or undertake such defense to such action in its sole

discretion, and (C) not to settle any CW Entities' Claims without National's written consent,

which consent shall not be unreasonably withheld, and (ii) National agrees to (A) indemnify and

hold the CW Entities harmless to the extent of the CW Entities' liability for the payment of

monies or the delivery of property, pursuant to a Final Order or settlement as a result of the

National Action, and (B) reimburse the relevant CW Entities for all documented fees and

expenses incurred in connection with the defense against such CW Entities' Claims, including,

without limitation, attorneys' fees and expenses incurred (amounts pursuant to clauses (ii)(A)

and (B) collectively, the "Total Reimbursement"), but in no event may the Total Reimbursement

exceed any recovery realized by National in connection with the National Action; provided,

however, that National shall have no obligation pursuant to this Confirmation Order, the Plan or

otherwise to indemnify and hold the CW Entities harmless for any claims based upon, arising

from or related to the Underwriter Actions that are not based upon, arising from, or related to the

National Action or in which National is not involved.  For the avoidance of doubt, CW Entities'

Claims shall not constitute CW General Unsecured Claims.

      42.    No Amendments to Proofs of Claim/Objections to Claims.  As of the

commencement of the Confirmation Hearing, a proof of Claim may not be amended without the

approval of the Title III Court.  With the exception of proofs of Claim timely filed hereafter in

respect of executory contracts and unexpired leases rejected pursuant to this Confirmation Order,

any proof of Claim filed on or after the commencement of the Confirmation Hearing is hereby

barred, and the Clerk of the Court and the Debtors' Claims Agent are authorized to remove such

proofs of Claims from the claims registry in the Title III Cases.  Notwithstanding the provisions

of section 82.1 of the Plan, in the event that (a) a Claim that has been transferred pursuant to the

terms and provisions of either the ACR Order or the ADR Order is subsequently transferred back

to the claims registry for determination by the Title III Court, the period in which the

Reorganized Debtors shall file and serve any objections to the Claim, by and through the

Oversight Board, or AAFAF, as the case may be, shall be extended up to and including one hundred eighty (180) days from and after the date of such notice transferring any such Claim back to the claims registry, and (b) within thirty (30) days of the date hereof, in accordance with section 204 of PROMESA, the Government of the Commonwealth of Puerto Rico shall deliver, or cause applicable agencies, instrumentalities, or Commonwealth of Puerto Rico public corporations to deliver, to the Oversight Board a copy of all files, documents, instruments and, to the extent applicable, pleadings requested by the Oversight Board in connection with the reconciliation of Claims, including, without limitation, Disputed Claims.  Without in any way limiting the foregoing or the terms and provisions of the Plan or the ACR Order, to the extent a Claim subject to the terms and provisions of the ACR Order, including, without limitation, "grievance claims" subject to the provisions of collective bargaining agreements, remain subject to the ACR Order, upon resolution thereof, such Claims shall be satisfied by the Debtors in the ordinary course.

43.   Conditions to Effective Date.  The Plan shall not become effective unless and until the conditions set forth in section 86.1 of the Plan have been satisfied or waived in accordance with the provisions set forth in section 86.2 of the Plan.

44.   Administrative Claim Bar Date.  The last day to file proof of Administrative Expense Claims shall be ninety (90) days after the Effective Date, after which date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Court or (ii) with the written consent of the applicable Government Parties expressly

granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an

intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of

taxes incurred by any of the Debtors during the period from and after the Commonwealth

Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, (e) relates to

actions occurring in the ordinary course during the period from and after the respective Debtor's

petition date up to and including the Effective Date, (f) relates to a Claim that is subject to the

provisions of the ACR Order, including, without limitation, "grievance claims" relating to any of

the Debtor's collective bargaining agreements, or (g) is the subject of a pending motion seeking

allowance of an administrative expense pursuant to section 503(b) of the Bankruptcy Code as of

the entry of this Confirmation Order; and, provided, further, that any such proof of

Administrative Expense Claim by a governmental unit shall remain subject to the rights and

interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in

interest to interpose an objection or other defense to the allowance or payment thereof.

45.    <u>Professional Compensation and Reimbursement Claims</u>.  All Entities awarded

compensation, including, without limitation, to the fullest extent provided in respective letters of

engagement or similar instruments or agreements, or reimbursement of expenses by the Title III

Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court, including,

without limitation, all amounts previously awarded subject to holdbacks pursuant to orders of the

Title III Court, (a) no later than the tenth (10th) calendar day (or the first Business Day to occur

thereafter) after the later to occur of (i) the Effective Date and (ii) the date upon which the Title

III Court order allowing such Claims is deemed to be a Final Order, or (b) upon such other terms

no more favorable to the claimant as may be mutually agreed upon between such claimant and

the Government Parties; provided, however, that, except as provided herein or in the Plan, each

Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date.  The Reorganized Debtors shall pay compensation for professional services extended and reimbursement of expenses incurred by their respective Professionals from and after the Effective Date in the ordinary course and without the need for Title III Court approval.

46.    <u>GO/PBA Consummation Costs</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, to compensate certain parties for the cost of negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the Plan, and in consideration of (a) the negotiation, execution and delivery of the GO/PBA Plan Support Agreement by each Initial GO/PBA PSA Creditor and (b) the obligations and covenants contained in the GO/PBA Plan Support Agreement, each Initial GO/PBA PSA Creditor shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to each of Assured, Syncora, and National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (Eastern Standard Time) on February 22, 2021.

47.    <u>AFSCME Professional Fees</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, on the Effective Date, AFSCME shall be reimbursed its reasonable professional fees and expenses incurred to compensate AFSCME for the cost of

negotiation, confirmation, and consummation of the AFSCME Term Sheet and the Plan, and the
resolution of issues pertaining to pensions.

       48.    <u>GO/PBA PSA Restriction Fee</u>.  Notwithstanding anything contained in the Plan or
this Confirmation Order to the contrary, in exchange for (a) executing and delivering the
GO/PBA Plan Support Agreement or (b) if applicable, tendering and exchanging GO Bonds or
PBA Bonds in accordance with the terms and conditions of the GO/PBA Plan Support
Agreement and notices posted on EMMA, and agreeing to all of its terms and conditions,
including support of the Plan and  the "lock-up" of GO Bonds and PBA Bonds in accordance
with the terms of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors
(including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-
insured GO Bond or PBA Bond insured by Ambac, Assured, Syncora, or National, as the case
may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the
Claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with section
301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac,
Assured, FGIC, Syncora, and National, to the extent Ambac, Assured, FGIC, Syncora, or
National, as the case may be, is authorized to vote such Claims in accordance with section
301(c)(3) of PROMESA definitive insurance documents and applicable law) shall be entitled to
receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten
(10) Business Days following the Effective Date, the GO/PBA PSA Restriction Fee, in the form
of an Allowed Administrative Expense Claim, payable in Cash, at the time of consummation of
the Plan equal to the GO/PBA Restriction Fee Percentage multiplied by the aggregate amount of
PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims (without duplication
and, to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA

Creditor is authorized to vote any such Claim in accordance with section 301(c)(3) of

PROMESA, definitive insurance documents and applicable law) held or, in the case of Ambac,

Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor as of the

Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond Claims,

CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims are

Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such

Claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance documents

and applicable law) for which it would have been entitled to receive the GO/PBA PSA

Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive on the

Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business

Days following the Effective Date, the GO/PBA PSA Restriction Fee on account thereof; and,

provided, further, that, in the event the GO/PBA Plan Support Agreement has been terminated

pursuant to the terms of sections 7.1(b)(iii) (subject to the extension provided for in section

7.1(b) thereof), (c)(i), or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA Plan

Support Agreement for any reason other than a breach of the GO/PBA Plan Support Agreement

by a non-Government Party, the aggregate GO/PBA PSA Restriction Fee and Consummation

Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be paid, ratably, in

Cash, as an allowed administrative expense claim under a plan of adjustment for the

Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and,

provided, further, that, in all other circumstances, upon termination of the GO/PBA Plan Support

Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and

payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan

Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the GO/PBA Plan Support Agreement is terminated.

49.    <u>ERS Restriction Fee</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, (a) in exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee), shall be entitled to receive, and, on the Effective Date, ERS shall pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars ($75,000,000.00), and (b) in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, the Commonwealth shall pay to First Ballantyne, LLC, Monarch Alternative Capital LP, Moore Global Investments, LLC, Two Seas Capital LP, and Verition Multi-Strategy Master Fund, Ltd. their Pro Rata Share of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00), as agreed to among such parties.

50.    <u>CCDA Consummation Costs</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA

Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than Fifteen Million Dollars ($15,000,000.00).

51.    <u>CCDA Restriction Fee</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, in exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, or FGIC, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, and FGIC, to the extent Ambac, Assured, or FGIC, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in Cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period; <u>provided</u>, <u>however</u>, that each CCDA Restriction Fee Creditor who acquires any CCDA Bonds

after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than
a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC, or National, as the case
may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with
respect to such Monoline-insured CCDA Bond in accordance with section 301(c)(3) of
PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC,
and National, to the extent Ambac, Assured or National, as applicable, is authorized to vote such
Insured CCDA Bond Claims in accordance with section 301(c)(3) of PROMESA, definitive
insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee
equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA
Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured,
solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in
accordance with section 301(c)(3) of PROMESA, the definitive insurance documents and
applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the
HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and, provided,
further, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have
been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to
receive the CCDA Restriction Fee on account thereof and such entitlement shall remain with the
selling party; and, provided, further, that, in all circumstances, the sum of the aggregate CCDA
Restriction Fees plus the CCDA Consummation Costs attributable to a holder's CCDA Bond
Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided, further, that, in
the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of section

7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be due and payable to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond Claims.

52.    <u>HTA Bond Claims</u>.  In consideration for the agreements set forth in the HTA/CCDA Plan Support Agreement, and within ten (10) Business Days following satisfaction of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bond Claims and HTA 98 Senior Bond Claims in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims; <u>provided</u>, <u>however</u>, that, for purposes of this decretal paragraph 52, the applicable Monolines shall constitute the holders of the HTA 68 Bond Claims and the HTA 98 Senior Bond Claims arising from the HTA Bonds insured by any such Monoline, if any, in accordance with section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to such HTA Bonds; and, <u>provided</u>, <u>further</u>, that, notwithstanding the foregoing, (a) with respect to any HTA 98 Senior Bonds owned by FGIC, HTA shall make such interim distribution to FGIC, and (b) with respect to any HTA 98 Senior Bonds insured by FGIC, but not owned by FGIC, HTA shall make such interim distribution to the owners of such HTA 98 Senior Bonds.

53.    <u>System 2000 Obligations</u>.  Pursuant to the terms and provisions of section 55.10 of the Plan, the Commonwealth shall satisfy all obligations associated with Allowed System 2000 Participant Claims in the timeframes set forth therein.

54.    <u>HTA/CCDA Clawback Structuring Fees</u>.  In consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims,

CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution

Conditions, and in accordance with the terms and provisions of section 6.1(d) of the HTA/CCDA

Plan Support Agreement, on the HTA Effective Date, or as soon as practicable thereafter in

accordance with the terms of the HTA Plan, but in no event later than ten (10) Business Days

following such date, the Commonwealth shall make payments to Assured and National in the

amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and

Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively.

55.    <u>Active JRS Participants and Active TRS Participants</u>.  In connection with the

treatment of Active JRS Participant Claims and Active TRS Participant Claims pursuant to

sections 55.8 and 55.9 of the Plan:

(a)    <u>Act 106 Defined Contribution Accounts</u>.  Notwithstanding any provision of Act

106 to the contrary (including, without limitation, sections 1.4, 1.6, 2.1, 2.6, and 3.1 thereof), on

or prior to the Effective Date, the Commonwealth shall establish defined contribution accounts

(the "Defined Contribution Accounts") pursuant to chapter 3 of Act 106 for all holders of such

Active JRS Participant Claims and Active TRS Participant Claims who do not have such

accounts as the Effective Date and who, prior to the Effective Date, were making contributions

to JRS  in accordance with the provisions of Act No. 12 of October 19, 1954, as amended,

known as the "Judiciary Retirement Act," or to TRS in accordance with the provisions of Act

No. 91-2004, as amended, known as the "Commonwealth of Puerto Rico Teachers' Retirement

System Act," as applicable.  Without in any way limiting the foregoing, in connection with the

modification of the Commonwealth's obligations under any laws establishing or enabling TRS or

JRS, the Commonwealth shall enroll teachers, judges, and all other employees that would have

otherwise been enrolled in TRS, hired from and after the Effective Date in the Act 106 Defined

Contribution Plan and establish Defined Contribution Accounts for such individuals.

(b)     <u>Eligibility for and Enrollment in Federal Social Security</u>.  From and after the

Effective Date, and notwithstanding any provision of Act 106 to the contrary (including, without

limitation, section 3.4 thereof), every (i) Active JRS Participant, (ii) teacher who is an Active

TRS Participant, and (iii) teacher and judge hired from and after the Effective Date shall

mandatorily make contributions to his or her Defined Contribution Account at a minimum rate of

two and three-tenths percent (2.3%) of his or her monthly compensation, up to the limit

established in section 1081.01(d)(7) of Act 1-2011; <u>provided</u>, <u>however</u>, that each teacher and

judge who is forty-five (45) years of age or older as of the Effective Date shall contribute to his

or her Defined Contribution Account at a minimum rate of eight and one-half percent (8.5%) of

his or her monthly compensation, up to the limited established in section 1081.01(d)(7) of Act

No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," or any

successor law thereof, and, therefore, fail to be eligible to contribute to the Federal Social

Security system, unless any such teacher or judge shall have irrevocably elected within sixty (60)

days of the Effective Date to reduce their contributions to a minimum of two and three-tenths

percent (2.3%) and be enrolled in the Federal Social Security system.  For teachers who are

Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the

Effective Date who contribute two and three-tenths percent (2.3%) of their monthly

compensation as set forth above, including those aged 45 and older who have elected to do so,

the Employer, in coordination with the Retirement Board and/or Secretary of Treasury, shall

withhold the minimum amount of six and two-tenths percent (6.2%) of their applicable monthly

compensation and remit such amount to the appropriate authority as required by the applicable

provisions of the Federal Social Security Act and other applicable Federal law to enable the inclusion of the Participant in the Federal Social Security system.  Teachers who are Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the Effective Date may voluntarily contribute to their Defined Contribution Accounts additional amounts to those established as allowed under section 1081.01 of Act No. 1-2011, provided, however, that in no case may those increased contribution rates and additional amounts exceed the applicable limits to be eligible, and affect the eligibility of these Participants, for coverage under the Federal Social Security system, unless such Participants are aged 45 and older and do not participate in the Federal Social Security system.  In accordance with the foregoing, the Government of the Commonwealth of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof, shall implement all reasonably necessary or advisable policies, procedures, or mechanisms to provide for all payroll deduction or transmittal required by federal law to ensure eligibility for and enrollment of Participants in the Federal Social Security system and effectuating the Federal Insurance Contributions Act remittances.

56.     Discharge and Release of Claims and Causes of Action.

(a)     Except as expressly provided in the Plan or herein, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims or Causes of Action against the Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of each of the Claims or Causes of Action;

provided, however, that, without prejudice to the exculpation rights set forth in section 92.7 of

the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this Confirmation

Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release

of the PSA Creditors, AFSCME, and each of their respective Related Persons by any Creditors

of the Debtors.  Upon the Effective Date and independent of the distributions provided for under

the Plan, the Debtors and Reorganized Debtors shall be discharged and released from any and all

Claims, Causes of Action, and any other debts that arose, in whole or in part, prior to the

Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections

502(g), 502(h), or 502(i) of the Bankruptcy Code and section 407 of PROMESA, whether or not

(a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the

Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and

section 407 of PROMESA (or is otherwise resolved), or (c) the holder of a Claim based upon

such debt voted to accept the Plan.  For the avoidance of doubt, nothing contained in the Plan or

herein shall release, discharge, or enjoin any claims or causes of action against PREPA arising

from or related to PREPA-issued bonds, including, without limitation, Monoline-issued

insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against

any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to

PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's

Title III case, including, without limitation, any plan of adjustment therein.

       (b)      Except as expressly provided in the Plan or herein, all Entities shall be precluded

from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of

their respective employees, officials, Assets, property, rights, remedies, Claims, or Causes of

Action of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized

Debtors or any of their respective Assets and property, including any and all interest accrued on

such Claims, and regardless of whether any property will have been distributed or retained

pursuant to the Plan on account of each of the Claims or other obligations, suits, judgments,

damages, debts, rights, remedies, causes of action, or liabilities.  In accordance with the

foregoing, except as expressly provided in the Plan or herein, this Confirmation Order shall

constitute a judicial determination, as of the Effective Date, of the discharge and release of all

such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors

pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case

pursuant to section 301 of PROMESA, and such discharge shall void and extinguish any

judgment obtained against the Debtors or Reorganized Debtors and their respective Assets, and

property at any time, to the extent such judgment is related to a discharged Claim, debt, or

liability.  As of the Effective Date, and in consideration for the distributions or other value

provided pursuant to the Plan, each holder of a Claim in any Class under the Plan shall be and

hereby is deemed to release and forever waive and discharge as against the Debtors and

Reorganized Debtors, and their respective Assets and property, all such Claims.

   (c)  Notwithstanding any other provisions of decretal paragraph 56 of this

Confirmation Order or section 92.2 of the Plan, in accordance with the provisions of the

GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective

Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have

released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek

any other type of relief against any of the Government Releasees based upon, arising from or

relating to the Government Released Claims or any of the Claims or Causes of Action asserted or

which could have been asserted, including, without limitation, in the Clawback Actions and the

Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with
respect to the Government Released Claims that is prohibited by decretal paragraph 56 of this
Confirmation Order and section 92.2 of the Plan.

(d)     SEC Limitation.  Notwithstanding anything contained herein or in the Plan to the
contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers,
or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes
of action, proceedings or investigations against any non-debtor person or non-debtor entity in
any forum.

(e)     United States Limitation.  Notwithstanding anything contained herein or in the
Plan to the contrary, no provision shall (i) impair the United States, its agencies, departments, or
agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be,
from compliance with federal laws or territorial laws and requirements implementing a federally
authorized or federally delegated program protecting the health, safety, and environment of
persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which
the Debtors or the Reorganized Debtors are entitled under Title III, and (iii) discharge, release,
enjoin, or otherwise bar (A) any liability of the Debtors or the Reorganized Debtors to the United
States arising from and after the Effective Date, (B) any liability to the United States that is not a
Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the
Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and
recoupment of such parties are expressly preserved, (D) the continued validity of the obligations
of the United States, the Debtors, or the Reorganized Debtors, as the case may be, under any
United States grant or cooperative assistance agreement, (E) the Debtors' or the Reorganized
Debtors' obligations arising under federal police or regulatory laws, including, but not limited to,

laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, and (F) any liability to the United States on the part of any non-debtor. Without limiting the foregoing, nothing contained herein or in the Plan shall be deemed (i) to determine the tax liability of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors and any obligation of the Debtors to pay post-petition interest on any such tax liability, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv) to grant any relief to any Entity that the Court is prohibited from granting by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

(f)    <u>Underwriter Actions</u>.  Notwithstanding anything contained herein or in the Plan to the contrary, including, without limitation, sections 92.2, 92.3, and 92.11 of the Plan, except as may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the Confirmation Order, or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate, or limit the rights of the plaintiffs and defendants, including, without limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit

against) any judgment in connection with the Underwriter Actions (collectively, the "Defensive

Rights"); provided, however, that, for the avoidance of doubt, in no event shall any Defensive

Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery

of property to any plaintiff, defendant and, to the extent named, third-party defendant by any of

the CW Entities in connection with an Underwriter Action; and, provided, further, that, no party

in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the

extent named, third-party defendants, shall be permitted to assert: (i) against the Debtors or the

Reorganized Debtors any Claim or Cause of Action for purposes of obtaining an affirmative

monetary recovery that otherwise is barred or discharged pursuant to the Bar Date Orders, the

Plan, and/or this Confirmation Order; and/or (ii) against any of the CW Entities any Claims or

counterclaims for purposes of obtaining an affirmative monetary recovery, including, without

limitation, for indemnification, contribution, reimbursement, setoff, or similar theories to the

extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or

counterclaims shall be deemed disallowed, barred, released, and discharged in accordance with

the terms and provisions of the Plan and the Confirmation Order; and provided, further, that, for

the avoidance of doubt, nothing in this decretal paragraph 56(f) is intended, nor shall it be

construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in

any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or

limiting the amount of any liability or judgment in any Underwriter Action.  The parties in the

Underwriter Actions shall be permanently barred, enjoined, and restrained from commencing,

prosecuting, or asserting against any of the CW Entities any Claims or counterclaims for

purposes of obtaining an affirmative monetary recovery, including, without limitation,

indemnification, contribution, reimbursement, setoff or similar theories, to the extent asserted for

purposes of obtaining an affirmative monetary recovery, based upon, arising from, or related to
the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a
court, an arbitration, an administrative agency or forum, or in any other manner.

(g) <u>Quest Litigation</u>. Notwithstanding anything contained herein or in the Plan to the
contrary, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in
the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish,
prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the right of the Quest
Diagnostics of Puerto Rico, Inc. ("Quest") (1) from asserting its respective rights, claims, causes
of action and defenses in the avoidance action brought against it, including, but not limited to,
any Claims, defenses, Causes of Action, and rights of setoff or recoupment, or any rights to
allocate responsibility or liability or any other basis for the reduction of (or credit against) any
judgment (the "Quest Rights"); <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, in no event
shall any Quest Rights be used to obtain or result in the affirmative payment of money or the
affirmative delivery of property by any of the Debtors to Quest in connection with the merits of
its avoidance action, and (2) to file and receive payment on any Claim it has pursuant to section
502(h) of the Bankruptcy Code and Bankruptcy Rule 3002(c)(3); <u>provided</u>, <u>however</u>, that any
such Claims would constitute a CW General Unsecured Claim and be treated in accordance with
the terms and provisions of article LXII of the Plan.

57. <u>Releases by the Debtors and Reorganized Debtors</u>. Except as otherwise expressly
provided in the Plan or this Confirmation Order, on the Effective Date, and for good and
valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and
each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and
hereby does irrevocably and unconditionally, fully, finally, and forever waive, release, acquit,

and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors, Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims.

58.      Release and Exculpation Provisions.  Except as otherwise provided in this Confirmation Order, all release and exculpation provisions, including, but not limited to, those contained in article XCII of the Plan, are approved and shall be effective and binding on all Entities, to the extent provided therein.

59.      **Injunction on Claims**.  **Except as otherwise expressly provided in section 92.11 of the Plan, this Confirmation Order, or such other Final Order of the Title III Court that is applicable, all Entities who have held, hold, or in the future hold Claims or any other debt or liability that is discharged or released pursuant to section 92.2 of the Plan or who have held, hold, or in the future hold Claims or any other debt or liability discharged or released pursuant to section 92.2 of the Plan are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative, or other proceeding) of any kind on any such Claim or other debt or liability discharged pursuant to the Plan against any of the Released Parties or any of their respective assets or property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree, or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability discharged pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective**

assets or property on account of any Claim or other debt or liability discharged pursuant

to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553,

555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of

recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against

any obligation due from any of the Released Parties or any of their respective assets or

property, with respect to any such Claim or other debt or liability discharged pursuant to

the Plan.  Such injunction shall extend to all successors and assigns of the Released Parties

and their respective assets and property.  Notwithstanding the foregoing, without prejudice

to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61

hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it

be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME,

and of their respective Related Persons by Creditors of the Debtors.

   60. **Injunction Related to Releases**.  As of the Effective Date, all Entities that

hold, have held, or in the future hold a Released Claim released pursuant to section 92.5 of

the Plan, are, and shall be, permanently, forever and completely stayed, restrained,

prohibited, barred, and enjoined from taking any of the following actions, whether directly

or indirectly, derivatively or otherwise, on account of or based on the subject matter of

such discharged Released Claims: (i) commencing, conducting or continuing in any

manner, directly or indirectly, any suit, action, or other proceeding (including, without

limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii)

enforcing, attaching (including, without limitation any prejudgment attachment),

collecting, or in any way seeking to recover any judgment, award, decree, or other order;

(iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any

Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under decretal paragraph 57 of this Confirmation Order and section 92.5 of the Plan; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration, or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or this Confirmation Order.  For the avoidance of doubt, the following stipulations will terminate upon the entry of this Confirmation Order: the *Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order* (Docket Entry No. 15854), as amended; and the *Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Exhibit "B" Regarding the Tolling of Statute of Limitations* (Docket Entry No. 17394), as amended.

61.   Exculpation.

(a)   Government Parties:  The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the

foregoing provisions of this subparagraph (a) or section 92.7 of the Plan shall not affect the

liability of any Entity that otherwise would result from any such act or omission to the extent that

such act or omission is determined in a Final Order to have constituted intentional fraud or

willful misconduct.  Nothing in this subparagraph (a) or section 92.7(a) of the Plan shall

prejudice the right of any of the Government Parties, and the Government Parties' officers and

directors serving at any time up to and including the Effective Date, and each of their respective

professionals to assert reliance upon advice of counsel as a defense with respect to their duties

and responsibilities under the Plan.

        (b)    <u>PSA Creditors</u>:  Each of the PSA Creditors solely in its capacity as a party to the

GO/PBA Plan Support Agreement, the PRIFA Plan Support Agreement, and/or the HTA/CCDA

Plan Support Agreement and a Creditor and/or insurer, as applicable, from the relevant Petition

Date up to and including the Effective Date and each of their respective Related Persons shall not

have or incur any liability to any Entity for any act taken or omitted to be taken in connection

with the Title III Cases, or the mediation, negotiation, formation, preparation, dissemination,

implementation, acceptance, confirmation or approval of the Plan or any compromises or

settlements contained therein, the Disclosure Statement, the GO/PBA Plan Support Agreement,

the PRIFA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the Definitive

Documents, or any other contract, instrument, release or other agreement or document provided

for or contemplated in connection with the consummation of the transactions set forth in the

Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this subparagraph (b) and section

92.7(b) of the Plan shall not affect the liability of any Entity that otherwise would result from any

such act or omission to the extent that such act or omission is determined in a Final Order to

have constituted intentional fraud or willful misconduct.

(c)     <u>Retiree Committee</u>:  Each of the members of the Retiree Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date and each of the Retiree Committee's Related Persons shall not have or incur through the Effective Date any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation, or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Retiree Committee Plan Support Agreement; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Retiree Committee with respect to the aforementioned actions, such member shall be reimbursed for reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, <u>provided</u>, <u>however</u>, that, the foregoing provisions of this subparagraph (c) and section 92.7(c) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(d)     <u>Creditors' Committee</u>:  Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the relevant Petition Date up to and including the Effective Date and each of the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation,

dissemination, implementation, confirmation, or approval of the Plan or any compromises or

settlements contained therein, the Disclosure Statement, or any contract, instrument, release, or

other agreement or document provided for or contemplated in connection with the consummation

of the transactions set forth in the Plan; provided, however, that, notwithstanding the foregoing

exculpation, in the event that litigation is commenced against a member of the Creditors

Committee with respect to the aforementioned actions, such member shall be reimbursed for

reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any

damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, provided,

however, that, the foregoing provisions of this subparagraph (d) and section 92.7(d) of the Plan

shall not affect the liability of any Entity that would otherwise result from any such act or

omission to the extent such act or omission is determined in a Final Order to have constituted

intentional fraud or willful misconduct.

      (e)      AFSCME:  AFSCME, solely in its capacity as a party to the AFSCME Plan

Support Agreement and a Creditor, as applicable, from the relevant Petition Date up to and

including the Effective Date, and each of its respective Related Persons shall not have or incur

through the Effective Date any liability to any Entity for any act taken or omitted to be taken in

connection with the Title III Cases, the formation, preparation, dissemination, implementation,

confirmation, or approval of the Plan or any compromises or settlements contained therein, the

Disclosure Statement, the AFSCME Plan Support Agreement, or any contract, instrument,

release or other agreement or document provided for or contemplated in connection with the

consummation of the transaction set forth in the Plan and the AFSCME Plan Support Agreement;

provided, however, that, the foregoing provisions of this subparagraph (e) and section 92.7(e) of

the Plan shall not affect the liability of any Entity that otherwise would result from any such act

or omission to the extent that such act or omission is determined in a Final Order to have

constituted intentional fraud or willful misconduct.

(f)      <u>Monoline Insurers</u>:  Ambac, Assured, FGIC, National, Syncora, and their Related

Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken

consistent with the Plan or in connection with the formulation, preparation, dissemination,

implementation, acceptance, confirmation, or approval of the Plan, including, without limitation,

in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims,

FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims,

the voting procedures, the election procedures, and any release of obligations under the

applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies,

National Insurance Policies, or Syncora Insurance Policies: <u>provided</u>, <u>however</u>, that,

notwithstanding anything contained in this Confirmation Order or the Plan to the contrary, the

terms and provisions of the Plan and this Confirmation Order shall not, and shall not be

construed to, release or exculpate, with respect to any beneficial holder of Ambac Insured Bonds,

Assured Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured

Bonds any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance

Policy, FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in

accordance with its terms solely to the extent of any failure of such holder to receive the Ambac

Commutation Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora

Treatment, as applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may

have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's,

FGIC's, National's or Syncora's applicable obligations under the Ambac Insurance Policies,

Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as

applicable); provided, however, that the foregoing provisions of this subparagraph (f) and section 92.7(f) of the Plan shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined, pursuant to a Final Order, to have constituted intentional fraud or willful misconduct.

(g)     The DRA Parties:  Each of the GDB Debt Recovery Authority ("DRA"), AmeriNational Community Services LLC (the "Servicer"), as servicer for the DRA, and Cantor-Katz Collateral Monitor LLC (the "Collateral Monitor"), as collateral monitor for Wilmington Trust N.A. (collectively, the "DRA Parties"), from the Petition Date up to and including the Effective Date and each of the DRA Parties, respective predecessors, successors and assigns (whether by operation of law or otherwise), and their respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent acting in such capacity, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Stipulation in Connection with DRA Related Disputes, dated as of November 5, 2021, by and among the Oversight Board, as representative of the Debtors and HTA, the Servicer, and the Collateral Monitor (Docket Entry No. 19100 Ex. A), or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, the foregoing provisions of this subparagraph (g) shall not affect the liability of any Entity that would otherwise result from any

such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

62.  <u>Maintenance of Pension System</u>.  Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; <u>provided</u>, <u>however</u>, that the Governor and Legislature, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, <u>provided</u>, <u>however</u>, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan.

63.    <u>Appointments Related Litigation/Uniformity Litigation</u>.  Notwithstanding
anything contained herein or the Plan to the contrary, in the event that a Final Order is entered in
connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to
entry of this Confirmation Order, in consideration of the distributions made, to be made, or
deemed to be made in accordance with the terms and provisions of the Plan and documents and
instruments related hereto, and all Creditors or such other Entities receiving, or deemed to have
received, distributions pursuant to or as a result of the Plan or this Confirmation Order having
consented and agreed, such Final Order shall not in any way or manner reverse, affect or
otherwise modify the transactions contemplated in the Plan and this Confirmation Order,
including, without limitation, the releases, exculpations and injunctions provided pursuant to
article XCII of the Plan and herein; <u>provided</u>, <u>however</u>, that, to the extent that a plaintiff in the
Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA
Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support
Agreement, or the ERS Stipulation, within five (5) Business Days of the Effective Date, such
plaintiff shall take any and all actions to dismiss, with prejudice or, in the event other plaintiffs
are party to such litigations, withdraw from, with prejudice, such Appointments Related
Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing
notices with the clerk of the court having jurisdiction thereof.

64.    **<u>Bar Order</u>.  To the limited extent provided in the Plan, each and every Entity
is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing, or
litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action
of any and every kind, character or nature whatsoever, in law or in equity, known or
unknown, direct or derivative, whether asserted or unasserted, against any of the Released**

Parties, based upon, related to, or arising out of or in connection with any of the Released

Claims, confirmation and consummation of the Plan, the negotiation and consummation of

the GO/PBA Plan Support Agreement, HTA/CCDA Plan Support Agreement, PRIFA Plan

Support Agreement, AFSCME Plan Support Agreement, the Retiree Committee Plan

Support Agreement, or any claim, act, fact, transaction, occurrence, statement, or omission

in connection with or alleged or that could have been alleged in the Title III Cases,

including, without limitation, any such claim, demand, right, liability, or cause of action for

indemnification, contribution, or any other basis in law or equity for damages, costs, or fees

incurred arising directly or indirectly from or otherwise relating to the Title III Cases,

either directly or indirectly by any Person for the direct or indirect benefit of any Released

Party arising from or related to the claims, acts, facts, transactions, occurrences,

statements, or omissions that are, could have been or may be alleged in the related actions

or any other action brought or that might be brought by, through, on behalf of, or for the

benefit of any of the Released Parties (whether arising under federal, state, or foreign law,

and regardless of where asserted); _provided_, _however_, that, without prejudice to the

exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61 hereof,

nothing contained in the Plan or this Confirmation Order is intended, nor shall it be

construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and

of their respective Related Persons by Creditors of the Debtors.

     65.    **Supplemental Injunction**.  Notwithstanding anything contained herein or in

the Plan to the contrary, except to the limited extent provided in the Plan, all Entities,

including Entities acting on their behalf, who currently hold or assert, have held or

asserted, or may hold or assert, or may control by enacting legislation, any Released

**Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Cases or any Claim against the Debtors, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity, or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained, and enjoined from taking any action including enacting legislation against any of the Released Parties for the purpose of directly or indirectly collecting, recovering, or receiving any payment or recovery with respect to any Released Claims for themselves or other entities, arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:**

**(a)      Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;**

**(b)      Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;**

**(c)      Creating, perfecting, or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;**

**(d)      Except as otherwise expressly provided in the Plan or this Confirmation Order, asserting, implementing, or effectuating any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim;**

**(e)      Enacting or adopting any statute, law, rule, resolution, or policy to cause, directly or indirectly, any Released Party to have liability for any Released Claims; and**

**(f)      Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or this Confirmation Order; provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code;**

**provided, however, that, without prejudice to the exculpation rights set forth in section 92.7
of the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this
Confirmation Order is intended, nor shall it be construed, to be a non-consensual third-
party release of the PSA Creditors, AFSCME, and of their respective Related Persons by
Creditors of the Debtors.**

66.     Term of Existing Injunctions or Stays.  Unless otherwise provided in the Plan or

this Confirmation Order, all injunctions or stays in effect in the Title III Cases (pursuant to

sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing

on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this

Confirmation Order) shall remain in full force and effect through the Effective Date, except that

each injunction imposed by a Court order shall remain in effect permanently unless the order

specifies a termination date or event, in which case, the specification set forth in such order shall

govern.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in

full force and effect in accordance with their terms.

67.     Prosecution of Claims.  Except as settled and released herein, from and after the

Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a)

litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance

Actions, upon approval of the Title III Court.  The net proceeds of any such litigation or

settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be

transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the

Avoidance Actions Trust Agreement.

68.     Indemnification and Reimbursement Obligations.  For purposes of the Plan, (i) to

the extent executory in nature, the obligations of the Debtors, including, without limitation,

directors and officers insurance policies, to indemnify and reimburse its directors or officers that

were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS

Petition Date, or the PBA Petition Date, as applicable, shall be deemed assumed as of the

Effective Date and (ii) indemnification obligations of the Debtors arising from conduct of

officers and directors during the period from and after the Commonwealth Petition Date, the

ERS Petition Date, or the PBA Petition Date, as applicable, shall be Administrative Expense

Claims.

      69.    <u>Compliance with Tax Requirements</u>.  Any party issuing any instrument or making

any distribution under the Plan shall comply with all applicable withholding and reporting

requirements imposed by any United States federal, state, or local tax law or Tax Authority, and

all distributions under the Plan shall be subject to any such withholding or reporting

requirements; <u>provided</u>, <u>however</u>, that payments or redemptions made with respect to the CVIs

shall not be subject to any Commonwealth tax or withholding obligation imposed by the

Commonwealth now or in the future regardless of whether such payments or redemptions with

respect to the CVIs may be exempt from the payment of federal or state taxes, including, without

limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may

otherwise be applicable to such payments or redemptions.  Except as provided above, each

holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and

exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by

any governmental unit, including income, withholding and other tax obligations, on account of

such distribution.  Any party issuing any instrument or making any distribution under the Plan

has the right, but not the obligation, to not make a distribution until such holder has made

arrangements satisfactory to such issuing or disbursing party for payment of any such

withholding tax obligations and, if any party issuing any instrument or making any distribution

under the Plan fails to withhold with respect to any such holder's distribution, and is later held

liable for the amount of such withholding, the holder shall reimburse such party.  The Disbursing

Agent or the trustee of the applicable trust may require, as a condition to the receipt of a distribution (including the applicable trust certificates), that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

70.     <u>Documents and Instruments</u>.  Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Confirmation Order.

71.     <u>Fiscal Plan</u>.  For so long as the Oversight Board is in existence, the Oversight Board shall cause the Fiscal Plan in effect on the Effective Date, and any post-Effective Date Fiscal Plan certified by the Oversight Board to include provisions requiring the certified budget to provide for the payment in each FY of (a) principal and interest payable on the New GO Bonds, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

72.     <u>Claims Against the Commonwealth Based on Debt Issued by HTA, CCDA, PRIFA, and MBA</u>.  The Claims asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall, to the extent allowed, be allowed as a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and are hereby discharged and the Debtors and the Reorganized Debtors have no further liability on account of such Claims.

73.   <u>GUC Reserve</u>.  On and after the Effective Date, the Debtors' and Reorganized

Debtors' liability to holders of Allowed CW General Unsecured Claims shall be limited to

funding the GUC Reserve in accordance with section 62.3 of the Plan as follows: subject to the

reductions provided therein, (a) Two Hundred Million Dollars ($200,000,000.00) on the

Effective Date; (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31,

2022; (c) One Hundred Million Dollars ($100,000,000,00) on or prior to December 31, 2023; (d)

One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2024; and (e)

Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025.  Upon the

GUC Reserve being funded by the Commonwealth in accordance with section 62.3 of the Plan,

the Debtors and Reorganized Debtors shall have no further liability on account of such Allowed

CW General Unsecured Claims.

74.   <u>PROMESA 407 Claims</u>.  All Claims reserved by holders of bonds issued by

HTA, CCDA, PRIFA, or MBA under that certain *Findings of Fact, Conclusions of Law, and*

*Order Approving the Qualifying Modification for the Government Development Bank for Puerto*

*Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and*

*Economic Stability Act*, including, without limitation, any claim under section 407 of

PROMESA, shall be automatically released on the Effective Date with no further notice or

action.

75.   <u>Dairy Producer Claims</u>.  Notwithstanding anything contained in the Plan or this

Confirmation Order to the contrary, (a) nothing contained herein shall adjust, enlarge,

compromise discharge or otherwise affect the respective parties' rights or obligations pursuant to

the Dairy Producer Settlement except with respect to the Commonwealth's payment obligation

under the Dairy Producer Settlement, (b) the Commonwealth's obligation for the regulatory

approval accrual set forth decretal paragraph 14 of the Dairy Producer Settlement shall be treated

and discharged in accordance with the Plan and shall not be recouped by a holder of a Dairy

Producer Claim from any other source, and (c) the Plan shall not affect the regulatory accrual

charge being assessed on and paid from the cost of milk pursuant to the Dairy Producer

Settlement.

76.   Eminent Domain/Inverse Condemnation Claims.  Notwithstanding anything

contained in the Plan or this Confirmation Order to the contrary, (a) nothing contained in the

Plan or this Confirmation Order shall impair or otherwise affect the treatment provided in Class

54 to holders of Allowed Eminent Domain/Inverse Condemnation Claims, (b) as of the Effective

Date, and upon the effective date of a Final Order of a court of competent jurisdiction

determining the validity of and amount of just compensation attributable to an Allowed Eminent

Domain Claim or Allowed Inverse Condemnation Claim, the holder of such a Claim shall be

entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's

unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one

hundred percent (100%) of such Allowed Eminent Domain/Inverse Condemnation Claim, and

(c) Allowed Eminent Domain/Inverse Condemnation Claims shall not be treated in any way as

CW General Unsecured Claims for purposes of distribution.  Nothing in the Plan or this

Confirmation Order shall be construed to prevent any determination of just compensation from

including, if and to the extent the tribunal deems appropriate, interest on an Allowed Eminent

Domain/Inverse Condemnation Claim.  Notwithstanding the foregoing, in the event that (x) the

Oversight Board appeals from the Confirmation Order and the Findings of Fact and Conclusions

of Law regarding the Title III Court's ruling that Allowed Eminent Domain/Inverse

Condemnation Claims must be paid in full or otherwise be rendered unimpaired pursuant to the

Plan, (y) such appeal is successful, and (z) a Final Order is entered holding that Allowed

Eminent Domain/Inverse Condemnation Claims may be impaired, subject to the terms and

provisions of Articles LXXVII and LXXXII of the Plan, each holder of an Allowed Eminent

Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration,

satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent

Domain/Inverse Condemnation Claim, and the Reorganized Commonwealth shall make,

payments, in Cash, in an amount equal to the pro rata payments to be made to holders of

Allowed CW General Unsecured Claims up to the GUC Recovery Cap.

      77.    <u>Oversight Board Termination and Post-Confirmation Powers</u>.  Neither the Plan

nor this Confirmation Order shall change the duration of the Oversight Board's existence set

forth in section 209 of PROMESA, and neither the Plan nor this Confirmation Order shall alter

any of the Oversight Board's powers and duties under each title of PROMESA.  Until

termination of the Oversight Board pursuant to section 209 of PROMESA, the Oversight Board

may enforce the Plan.  At all times, each party in interest may enforce Plan provisions directly

affecting the party in interest.

      78.    <u>Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's
Sole Discretion</u>.  Nothing in the Plan and nothing in this Confirmation Order (a) alters the

powers of the Oversight Board granted by Titles I and II of PROMESA, including its rights in its

sole discretion, to amend the certified Fiscal Plan and budget in effect on the Effective Date and

to develop and certify new fiscal plans and budgets at any times, (b) grants the government of

Puerto Rico any entitlement to any provisions in certified fiscal plans and budgets, and (c) grants

the government of Puerto Rico any rights and powers barred by section 108(a) of PROMESA.

79.     <u>Government Post-Confirmation Powers and Duties</u>.  Upon termination of the
Oversight Board pursuant to section 209 of PROMESA, the Governor shall enforce the Plan.  If
the Governor fails to enforce a Plan provision directly or indirectly impacting a party in interest
after being requested to do so by a party in interest, each party in interest that would reasonably
be prejudiced or injured by lack of enforcement may enforce the Plan provision.  At no time
prior or subsequent to the termination of the Oversight Board shall the Governor or Legislature
enact, implement, or enforce any statute, resolution, policy, or rule reasonably likely, directly or
indirectly, to impair the carrying out of the Plan's payment provisions, covenants, and other
obligations.  Pursuant to section 1142(b) of the Bankruptcy Code, the Governor shall cause the
executive branch of the Commonwealth government to take all acts necessary for the
consummation of the Plan.

80.     <u>Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated</u>.
The Government of Puerto Rico, including without limitation, any Entity or Person acting for or
on behalf thereof, shall not enact any statute, resolution, policy, or rule that would repeal,
change, or negate any law currently existing that authorizes debt issued pursuant to the Plan or
any law pledging the full faith, credit, and taxing power of the Commonwealth to secure debt
issued pursuant to the Plan.

81.     <u>Non-Impairment of CVIs, SUT</u>.  Until all obligations with respect to the CVIs
have been paid or otherwise satisfied in accordance with their terms, the Commonwealth, or any
Entity or Person acting for or on behalf thereof, shall take no action that would: (a) limit or alter
the rights vested in the Commonwealth in accordance with the Plan and this Confirmation Order
to fulfill the terms of any agreements with the holders of CVIs; (b) impair the rights and
remedies of the holders of the CVIs; or (c) impair the ability of the holders of the CVIs to track

performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the

payment of the CVIs in accordance with the terms and provisions of the Plan and as set forth in

the CVI Indenture; provided, however, that the foregoing shall not preclude the Commonwealth

from exercising its power, through a valid change in law, to eliminate the Measured SUT, or

replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI

Indenture.

   82. Reversal/Stay/Modification/Vacatur of Order.  Except as otherwise provided in

this Confirmation Order or a subsequent order issued by this Court or a higher court having

jurisdiction over an appeal of this Confirmation Order or over a certiorari proceeding in respect

of this Confirmation Order, if any or all of the provisions of this Confirmation Order are

hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other

court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of

any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors

or the Reorganized Debtors, as applicable, prior to the effective date of such reversal, stay,

modification, or vacatur.  Notwithstanding any such reversal, stay, modification, or vacatur of

this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in

reliance on, this Confirmation Order prior to the effective date of such reversal, stay,

modification, or vacatur shall be governed in all respect by the provisions of this Confirmation

Order and the Plan.  To the extent not specifically reversed, modified, vacated, or stayed by an

order of this Court or an appellate court, all existing orders entered in the Title III Cases remain

in full force and effect.

   83. Retention of Jurisdiction.  Notwithstanding the entry of this Confirmation Order

or the occurrence of the Effective Date, subject to the terms and provisions of article XCI of the

Plan, and except as otherwise provided in the Plan or herein, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the Plan, this Court shall retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the matters set forth in article XCI of the Plan.

84.     <u>Conflicts Among Documents</u>.  The provisions of the Plan and this Confirmation Order shall be construed in a manner consistent with each other so as to effect the purpose of each; <u>provided</u>, <u>however</u>, that, in the event of any inconsistency between (a) the Plan or this Confirmation Order and (b) the New GO Bond Legislation, the CVI Legislation, or any other legislation implementing the Plan or otherwise in any manner, the terms and provisions of the Plan or this Confirmation Order, as applicable, shall prevail; and, <u>provided</u>, <u>further</u>, that, in the event of any irreconcilable inconsistency between the Plan and this Confirmation Order, the documents shall control in the following order of priority: (i) this Confirmation Order, and (ii) the Plan; and, <u>provided</u>, <u>further</u>, that, in the event of any inconsistency between this Confirmation Order and any other order in the Commonwealth Title III Case, the ERS Title III Case, the PBA Title III Case, the terms and provisions of this Confirmation Order shall control; and, <u>provided</u>, <u>further</u>, that nothing contained herein is intended, nor shall be construed, to modify the economic terms of the Plan.

85.     <u>PBA Leases</u>.  Notwithstanding anything contained herein or in the Plan to the contrary, each of the Unexpired Leases to which PBA is a party (collectively, the "PBA Leases") shall be deemed rejected effective upon the earliest to occur of (a) June 30, 2022, (b) the date

upon which such PBA Lease expires in accordance with its terms, (c) the date upon which PBA

enters into a new or amended lease with respect to the leased property subject to such PBA

Lease, (d) such other date of which PBA, as lessor, provides written notice to the counterparty to

a PBA Lease, and (e) the date upon which AAFAF, on behalf of the Commonwealth or any

Commonwealth agency, public corporation or instrumentality, that is a counterparty, as lessee,

with respect to a PBA Lease, provides written notice to PBA that such PBA Lease is rejected (in

each case, the earliest of (a) through (e), the "PBA Rejection Date"); provided, however, that,

during the period from the Effective Date up to, but not including, the applicable PBA Rejection

Date, with respect to any PBA Lease between PBA, as lessor, and the Commonwealth or any

Commonwealth agency, public corporation or instrumentality, as lessee, monthly lease payments

shall be limited to the lower of (y) the amount budgeted and approved pursuant to a certified

Fiscal Plan and (z) the monthly costs and expenses associated with the applicable leased

property; and, provided, further, that any accruals on the books of PBA or any of the

Commonwealth or an agency, public corporation, or instrumentality of the Commonwealth as

counterparty to a PBA Lease for the unpaid debt service component of rent under any PBA

Lease shall be deemed released, settled, and discharged as of the PBA Rejection Date.

      86.   Modifications.  The modifications to the Seventh Amended Plan, as set forth in

the Plan, do not adversely change the treatment of the Claim of any Creditor that accepted the

Seventh Amended Plan and all such Creditors shall be deemed to have accepted the Plan.  Before

substantial consummation of the Plan, the Oversight Board may modify the Plan at any time after

entry of this Confirmation Order, subject to any limitations set forth in the Plan (including

consent rights) and any stipulation approved by this Court in connection with the Plan; provided,

however, that the circumstances warrant such modification and the Court, after notice and a

hearing, confirms such modified plan under the applicable legal requirements.  For the avoidance

of doubt, the Plan shall not be modified except in accordance with Bankruptcy Code section 942

and the terms of this Confirmation Order.

87.  <u>Asserted Surety Claims</u>.  Notwithstanding anything contained in the Plan to the

contrary, to the extent that the Claim of a surety against any of the Debtors is determined to be a

secured claim and allowed in whole or in part, by Final Order, or by operation of section 502(a)

of the Bankruptcy Code following the expiration of the period to object to any such Claim in

accordance with the provisions of section 82.1 of the Plan, such Claim shall be paid in full, in

Cash; <u>provided</u>, <u>however</u>, that, in the event some or all of any such Claim is determined to be an

unsecured claim and allowed in whole or in part, by Final Order, such Claim shall be treated in

accordance with the provisions of section 17.1, 62.1 or 70.1 of the Plan, as the case may be.

88.  <u>Identification of Additional Retail Investors / Retail Support Fee</u>.  Within five (5)

Business Days of the date hereof, the Oversight Board shall cause the Balloting Agent to

distribute, by mail, electronic mail, or such other means customary, the form of Certification

Notice annexed hereto as **<u>Exhibit E</u>** (the "Certification Notice") to all known holders, by and

through their respective Nominee(s), of (a) Vintage PBA Bond Claims, (b) 2011 PBA Bond

Claims, (c) 2012 PBA Bond Claims, (d) Vintage CW Bond Claims, (e) 2011 CW Bond Claims,

(f) 2011 CW Series D/E/PIB Bond Claims, (g) 2012 CW Bond Claims, and (h) 2014 CW Bond

Claims (collectively, the "Bonds") who did <u>not</u> submit a vote that was not otherwise revoked by

such holder pursuant to the procedures set forth in the Disclosure Statement Order on or before

6:00 p.m. (Atlantic Standard Time) on October 18, 2021.

    a.  The record date to determine which beneficial owners of the Bonds (collectively,
the "Beneficial Owners") are entitled to receive the Certification Notice and make
the Certification (as defined below) shall be 6:00 p.m. (Atlantic Standard Time)
on October 18, 2021 (the "Certification Record Date").

b. Promptly upon receipt of a Certification Notice, each Nominee (or such Nominee's agent) shall distribute such Certification Notice to the Beneficial Owners eligible as of the Certification Record Date pursuant to such Nominee's (or such Nominee's agent's) customary practices for conveying such information.

c. If it is a Nominee's (or such Nominee's agent's) customary and accepted business practice to forward the Certification Notice to (and collect Certifications from) Beneficial Owners by information form, email, telephone, or other customary means of communications, as applicable, the Nominee (or such Nominee's agent) shall employ such method of communication in lieu of sending a paper copy of the Certification Notice to Beneficial Owners; provided, however, that if the Nominee's (or such Nominee's agent's) customary internal practice is to provide to Beneficial Owners an electronic link to the Certification Notice, the Nominee (or such Nominee's agent) may follow such customary practice in lieu of forwarding paper copies of the Certification Notice to Beneficial Owners.

d. The Oversight Board shall cause the Balloting Agent to provide Beneficial Owners of the Bonds as of the Certification Record Date a frozen "user CUSIP" (or similarly appropriate non-tradeable identifier) for the purpose of making the Certification.

e. Each Beneficial Owner of the Bonds who certifies that it is an individual who held the Bonds as of the Certification Record Date in the aggregate outstanding principal amount of One Million Dollars ($1,000,000.00) or less in one or more brokerage account(s), trust account(s), custodial account(s), or separately managed account(s) (the "Certification") pursuant to the procedures set forth in this decretal paragraph 88 hereof shall be deemed a Retail Investor for purposes of distributions to be made pursuant to the Plan, and shall receive a distribution of the Retail Support Fee through the "user CUSIP" in accordance with the terms and provisions of the Plan.

f. Beneficial Owners of the Bonds must deliver their certification instructions to (or otherwise coordinate with) their Nominee according to the instructions in the Certification Notice in sufficient time for the Nominee to effectuate the Beneficial Owner's Certification through The Depository Trust Company's ("DTC") Automated Tender Offer Program ("ATOP") in accordance with the procedures of DTC and be received on ATOP by 6:00 p.m. (Atlantic Standard Time) on the first Business Day thirty (30) days from and after the date hereof (the "Certification Deadline");[10] provided, however, that any holder who has executed, completed, and delivered through ATOP in accordance with the procedures of DTC its Certification may revoke such Certification and withdraw any securities that have been tendered with respect to a Certification through ATOP in accordance with the procedures of DTC on or before the Certification Deadline.

---

[10]    6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

g.  All securities that are tendered with respect to a Certification shall be restricted from further trading or transfer through the Effective Date of the Plan.

89.  <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>.  The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth in the Findings of Fact and Conclusions of Law, are nonseverable and mutually dependent.

90.  <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

91.  <u>PFC Reservation</u>.  Neither the Plan nor this Confirmation Order determine, affect, or limit any claims or rights U.S. Bank Trust National Association and U.S. Bank National Association, as Trustee for bonds issued by PFC, may have against GDB, DRA, or the GDB/PET, including, without limitation, claims and rights in respect of letters of credit.

92.  <u>Applicable Nonbankruptcy Law</u>.  Pursuant to section 1123(a) of the Bankruptcy Code, as applicable to the Title III Cases pursuant to section 301(a) of PROMESA, the provisions of this Confirmation Order and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.  The documents contained in the Plan Supplement and such other documents necessary or convenient to implement the provisions of this Confirmation Order and the Plan (as such documents may be further, amended, supplemented, or modified and filed with the Court on or prior to the Effective Date), including,

without limitation, the New GO Bonds, the New GO Bonds Indenture, the GO CVIs, the GO

CVI Indenture, the Clawback CVIs, the Clawback CVI Indenture, and the Avoidance Actions

Trust Agreement, provide adequate means for implementation of the Plan pursuant to section

1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall

constitute legal, valid, and binding obligations of the Debtors, as applicable, and valid provisions

to pay and to secure payment of the New GO Bonds, the GO CVIs, and the Clawback CVIs, as

applicable, pursuant to section 944(b)(3) of the Bankruptcy Code, and be enforceable in

accordance with their terms.

93.    <u>Waiver of Filings</u>.  Any requirement pursuant to Bankruptcy Rule 1007 obligating

the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S.

Trustee is hereby waived as to any such list, schedule, or statement not filed as of the Effective

Date.

94.    <u>Notice of Order</u>.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon

as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of

this Confirmation Order and the occurrence of the Effective Date, substantially in the form

attached as **<u>Exhibit B</u>** hereto, to all parties who hold a Claim in the Commonwealth Title III

Case, the ERS Title III Case, the HTA Title III Case, and the PBA Title III Case, as well as the

Creditors' Committee, the Retiree Committee, the U.S. Trustee, any party filing a notice

pursuant to Bankruptcy Rule 2002, the Securities and Exchange Commission, the Internal

Revenue Service, and the United States Attorney for the District of Puerto Rico.  Such notice is

hereby approved in all respects and shall be deemed good and sufficient notice of entry of this

Confirmation Order.

95.    <u>No Waiver</u>.  The failure to specifically include any particular provision of the

Plan in this Confirmation Order shall not diminish the effectiveness of such provision nor

constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its

entirety and incorporated herein by this reference.


SO ORDERED.

Dated: January 18, 2022

                                    <u>/s/ Laura Taylor Swain</u>
                                    LAURA TAYLOR SWAIN
                                    United States District Judge