# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## TEACHERS' ASSOCIATIONS' MOTION FOR STAY PENDING APPEAL REGARDING:
## ORDER AND JUDGMENT CONFIRMING MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEE RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY [DOCKET NO. 19813]

*[Space left blank intentionally.]*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ............................................................... **1**

**I.     SUMMARY OF PROCEDURAL BACKGROUND** ................................... **5**

**II.    STANDARD OF REVIEW** ............................................................ **11**

**III.   ARGUMENT** ........................................................................ **12**

   A.   THE PROPOSED APPEAL OF THE CONFIRMATION ORDER IS LIKELY TO
       SUCCEED ON THE MERITS. ...................................................... 12

   B.   THE DENIAL OF THE STAY WILL RESULT IN IRREPARABLE HARM TO THE
       TEACHERS' ASSOCIATIONS........................................................ 26

   C.   THE ISSUANCE OF THE STAY WILL NOT RESULT IN INJURY TO ANY OTHER
       PARTIES. ............................................................................ 30

   D.   THE PUBLIC INTEREST IS NOT AFFECTED BY THE PROPOSED STAY.......... 31

**RELIEF REQUESTED** ............................................................... **32**

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Allied Fin., Inc. v. WM Capital Partners 53, LLC (In re Allied Fin., Inc.)*,
    572 B.R. 45, 52-53 (Bankr. D.P.R. 2017) .................................................................... 14

*Arizona v. United States*,
    567 U.S. 387, 398-400 (2012);. ......................................................................................... 14

*Armstrong v. United States*,
    182 U.S. 243, 244 (1901) ................................................................................................... 1

*Assured Guar. Corp. v. Garcia-Padilla*,
    214 F. Supp. 3d 117, 125 (D.P.R. 2016) ......................................................................... 14

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.* ,
    996 F.3d 37, 44 (1st Cir. 2021)......................................................................................... 12

*Capron v. Office of the AG of Mass.*,
    944 F.3d 9, 20-21 (1st Cir. 2019)..................................................................................... 14

*Charlesbank Equity Fund II, Ltd. P'ship v. Blinds to Go, Inc.*,
    370 F.3d 151, 162 (1st Cir. 2004).............................................................................. 12, 26

*Cooperativa de Ahorro y Credito v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight
    & Mgmt. Bd.)*,
    989 F.3d 123 (1st Cir. 2021)...................................................................................... 11, 26

*Dooley v. United States*,
    182 U.S. 222, 236 (1901) ................................................................................................... 1

*Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*,
    140 S. Ct. 1649 (2020)........................................................................................................ 2

*Fin. Oversight & Mgmt. Bd. For P.R. v. Pierluisi Urrutia (In re Fin. Oversight & Mgmt.
    Bd. For P.R.)*,
    2021 U.S. Dist. LEXIS 197292, at *11-12 (D.P.R. Oct. 13, 2021).......................... 16

*Fin. Oversight & Mgmt. Bd. v. Garced (In re Fin. Oversight & Mgmt. Bd.)*,
    616 B.R. 238 (D.P.R. 2020) .............................................................................................. 2

*Goetze v. United States*,
    182 U.S. 221, 221-22 (1901) ............................................................................................. 1

*Goya de P.R., Inc. v. Santiago*,
    59 F. Supp. 2d 274, 279 (D.P.R. 1999) ........................................................................... 13

*Huus v. New York & Porto Rico S.S. Co.,*
  182 U.S. 392, 397 (1901) ................................................................................. 1

*In re Betteroads Asphalt, LLC,*
  610 B.R. 28, 48 (Bankr. D.P.R. 2019) ......................................................... 12, 26

*In re Fin. Oversight & Mgmt. Bd.,*
  390 F. Supp. 3d 311, 321 (D.P.R. 2019) .......................................................... 3

*In re Fin. Oversight & Mgmt. Bd. for P.R. ,*
  987 F.3d 173 (1st Cir. 2021) ......................................................................... 11, 26

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
  579 U.S. 115, 136 S. Ct. 1938 (2016) ............................................................ 15

*Rosselló Nevares v. Fin. Oversight & Mgmt. (In re Fin. Oversight & Mgmt. Bd.),*
  330 F. Supp. 3d 685, 701 (D.P.R. 2018) ..................................................... 3, 16, 19

*Siembra Finca Carmen, LLC v. Sec'y of the Dep't of Agric. of P.R.,*
  437 F. Supp. 3d 119, 127 (D.P.R. 2020) ........................................................ 13

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.*
  *Bd. for P.R.),*
  945 F.3d 3 (1st Cir. 2019) ............................................................................. 2

**Constitutional Provisions**

P.R. Const. Art. II, § 6. ...................................................................................... 5

U.S. Const. Art. IV ............................................................................................. 1

**Statutes**

Puerto Rico, Oversight, Management and Economic Stability Act ("PROMESA"),
  48 U.S.C. § 2101, *et seq.* ........................................................................... 1, 2, 3
  § 2103 ....................................................................................................... 14, 15
  § 2141(b)(1)(C) ......................................................................................... 15, 23
  § 2142 ....................................................................................................... 18
  § 2144(a)(1). ............................................................................................. 18
  § 2144(a)(1), (5) ....................................................................................... 18
  § 2147 ....................................................................................................... 18
  § 2174(b) ................................................................................................... 20
  § 2174(b)(5) ......................................................................................... 2, 7, 23, 25
  § 2194(m)(4) ............................................................................................. 1

Act 134-1960, *Act to Authorize the Discount of Fees of Associations, Federations, or Puerto Rico Government Employees Unions*. 3 LPRA § 702, *et seq.* ..................................................... 5

Act 53-2021, known as the *Ending Puerto Rico's Bankruptcy Act* ................................. 4, 6, 7, 20
   Statement of Motives Statement of Motives, Act 53-2021 ....................................... 21
   Art. 104 ......................................................................................................... 20, 21
   Art. 603 ................................................................................................................ 21
   Art. 605 ................................................................................................................ 21

Merchant Marine Act of 1920, Pub. L. 66-261, 41 Stat. 988 ("Jones Act"). ................................ 3

Organic Act of 1900, Pub. L. 56–191, 31 Stat. 77 ("Foraker Act") ................................ 3

Pub. L. 81-600, 64 Stat. 319, *An Act to provide for the organization of a constitutional government by the people of Puerto Rico* ..................................................................... 1

## Rules

Fed. R. App. P. Rule 8(a)(1)(A) ............................................................................... 11

Fed. R. Bankr. P. 8007(a)(1)(A) .............................................................................. 11

## Other Authorities

COMBINED PLAN FOR THE GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN, Amendment and Restatement, ........................................................................... 17, 25

CyberNews, *Pierluisi: "No hay ambiente para reformar sistemas de pensiones"* NOTICEL, November 9, 2021.. .................................................................................................. 22

REGULATION ON PENSION AND BENEFITS OF THE TEACHERS' RETIREMENT SYSTEM. .................. 24

U.S. Supreme Court's Oral Argument on *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020), Oct. 15th, 2019, at pgs. 22-23 .............................................. 2

COME NOW, Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc., (collectively "Teachers' Associations"), as a creditors and parties in interest, by and through the undersigned counsel, and hereby submit this *Teachers' Associations Motion for Stay Pending Appeal regarding Order and Judgment Confirming Modified Eighth amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority [Docket No. 19813]* and, in support thereof, respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Commonwealth of Puerto Rico was established in 1952 through Pub. L. 81-600, ("Act 600"), based upon the principles of self-government.[2] However, in 2016, Congress enacted the *Puerto Rico Oversight, Management and Economic Stability Act* ("PROMESA"), 48 U.S.C. § 2101, *et seq.,* with the purpose of restructuring the island's outstanding debt. *See* 48 U.S.C. §2194(m)(4). With the enactment of PROMESA, pursuant to Congress' plenary powers under Article IV of the U.S. Constitution,[3] as interpreted by the Supreme Court in the infamous and racially motivated *Insular Cases,*[4] Congress imposed upon Puerto Rico and its residents a Financial Oversight and Management Board for Puerto Rico ("Oversight Board"), composed

---

[2] Pub. L. 81-600, 64 Stat. 319, *An Act to provide for the organization of a constitutional government by the people of Puerto Rico.* Act 600 established that "[w]hereas Congress of the United States by a series of enactments has progressively recognized the right of self-government of the people of Puerto Rico; and [w]hereas under the terms of these congressional enactments an increasingly large measure of self-government has been achieved." Federal Relations Act, Pub. L. 81-600.

[3] "Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." U.S. Const. Art. IV, §2, cl. 1.

[4] *See Downes v. Bidwell*, 182 U.S. 244, 287 (1901)(establishing the distinction between incorporated and unincorporated territories based on race.) *See also, De Lima v. Bidwell*, 182 U.S. 1, 200 (1901); *Goetze v. United States*, 182 U.S. 221, 221-22 (1901); *Dooley v. United States*, 182 U.S. 222, 236 (1901); *Armstrong v. United States*, 182 U.S. 243, 244 (1901); *Downes v. Bidwell*, 182 U.S. 244, 287 (1901); *Huus v. New York & Porto Rico S.S. Co.,* 182 U.S. 392, 397 (1901).

of seven non-elected members. The Oversight Board was tasked with handling all matters relating to Puerto Rico's fiscal recovery and the debt restructuring. However, the Oversight Board is not accountable to the People of Puerto Rico nor do Puerto Ricans have any say in its operations.

2. Under PROMESA, the exorbitant powers vested upon the Oversight Board override most, if not all, constitutional powers of the Governor and the members of the Legislative Assembly of Puerto Rico.[5] Even the Oversight Board's legal counsel expressed in the Supreme Court's oral arguments in *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020), that "what the Board is actually charged with doing is acting in the shoes of the government of Puerto Rico . . . ."[6] The only power that was reserved for the People of Puerto Rico through the Legislative Assembly was precisely the power to legislate affirmatively. *See* 48 U.S.C. § 2174(b)(5). Yet, in these proceedings, it has become clear that the Oversight Board expects to usurp those powers as well.

3. With a superficial argument of preemption, the Oversight Board has somehow convinced this Court that through a debt adjustment plan, confirmed in the bankruptcy process, it has the ability to revoke laws and enact new ones. The Commonwealth of Puerto Rico's Plan of Adjustment, as confirmed by this Court on January 18, 2022, displaces the statutory provisions of the Teachers' Retirement System ("TRS"), among other laws including sections of Puerto Rico's own Constitution. It does so by invoking the doctrine of preemption, which has no place

---

[5] *See, for example, Fin. Oversight & Mgmt. Bd. v. Garced (In re Fin. Oversight & Mgmt. Bd.)*, 616 B.R. 238 (D.P.R. 2020)(declaring that Act 29-2019 does not have effect without the Oversight Board's approval); *Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 945 F.3d 3 (1st Cir. 2019)(ruling that the Oversight Board's recommendations become binding if included in the fiscal plan).
[6] Expressions of Donald B. Verilli (Counsel for the Oversight Board), U.S. Supreme Court's Oral Argument on *Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC*, 140 S. Ct. 1649 (2020), Oct. 15th, 2019, at pgs. 22-23. (*available at*: https://www.supremecourt.gov/oral_arguments/argument_transcripts/2019/18-1334_ljgm.pdf) (last visit November 9, 2021).

or applicability in these proceedings. Throughout the years since PROMESA's enactment it has been clearly and consistently declared that the Oversight Board cannot legislate.[7] For that reason, PROMESA mandates that the Oversight Board confer and negotiate with the Legislative Assembly to carry out its plans. Now, on the brink of the Oversight Board's sixth year of existence, it hopes that this Court will overlook that undeniable fact and look the other way as it attempts to create a new retirement system out of thin air, with no enabling legislation and only a wish list of specific provisions to speak of. To allow this course of action would result in the very abusive dictatorial worst case scenarios that many have cautioned could be perpetrated under the interpretative rule of the *Insular Cases* and the enactment of PROMESA, a return to the colonial rule of the organic acts,[8] where self-governance was inexistant rather than ineffectual.

4. As it will be argued below, the preemption doctrine has not taken place in these proceedings. The Retirement Laws that have been "preempted" do not conflict with PROMESA and the Plan of Adjustment confirmed by this Court is not a federal law that can possibly cause preemption. Moreover, the Oversight Board is incapable of legislating, therefore, it's proposals cannot preempt state laws, outside of the proper channels set forth in PROMESA.

5. That said, the Court erred in confirming the Plan of Adjustment because, without the farcical preemption, the Plan is not confirmable. It does not meet the requirements under PROMESA for confirmation as it lacks enabling legislation and feasibility. It also forces the

---

[7] *See, for example, Rosselló Nevares v. Fin. Oversight & Mgmt. (In re Fin. Oversight & Mgmt. Bd.),* 330 F. Supp. 3d 685, 701 (D.P.R. 2018)("[T]he Oversight Board has not been given power to affirmatively legislate. Thus, with respect to policy measures that would require the adoption of new legislation or the repeal or modification of existing Commonwealth law, the Oversight Board has only budgetary tools and negotiations to use to elicit any necessary buy-in from the elected officials and legislators."); *In re Fin. Oversight & Mgmt. Bd.,* 390 F. Supp. 3d 311, 321 (D.P.R. 2019)("This Court has previously recognized that PROMESA neither abrogated the Commonwealth government's power to legislate nor vested the Oversight Board with such legislative authority.")

[8] *I.e.* Organic Act of 1900, Pub. L. 56–191, 31 Stat. 77 ("Foraker Act"); Merchant Marine Act of 1920, Pub. L. 66-261, 41 Stat. 988 ("Jones Act").

Commonwealth to act in violation of its own laws. Specifically, regarding Act 53-2021, the Court adopts an interpretation that is contrary to the plain language of the text, the stated intent of the legislators and the representations made by the Commonwealth's Government as a whole. By virtue of that interpretation, the Court forces the Commonwealth to violate Act 53-2021, which by its own terms should cease to exist as a result of the pension cuts incorporated in the confirmed Plan of Adjustment.

6. While the Teachers' Associations intend to take these arguments to the First Circuit for review, it is imperative that this Court stay the judgment confirming the Plan, if any party hopes to have their day in court and exercise the appellate rights they have preserved through their objections. Without the requested stay, the case will likely become equitably moot by the effective date of the Plan, leaving the Teachers' Associations and any other potential appellants with no remedy at law. Neither the judicial nor the political processes will be able to amend the damage caused by the confirmation of the Plan.

7. Not only is the determination to confirm the Plan of Adjustment incorrect, but also the financial and emotional toll that it's confirmation causes the teachers of Puerto Rico merits the careful consideration of the courts.[9] While the Teachers' Associations understand the importance and the gravity of the situation that this Court and the Oversight Board hope to address with the prompt confirmation of a plan, this desire for expedite resolution should not come at the cost of such suffering for the teachers who will be forced to work longer for less pay and reduced to poverty in their old age. Surely, a balance can be struck that does not depend on trampling the livelihood of these individuals.

---

[9] *See, for example,* Exhibit 3: *Declaration of Liza Fournier Córdova* ¶ 21 ("This situation has affected my emotional and mental health. I have problems to sleep at night.  Due to all the stress, I suffered during the past months related to the uncertainty of my retirement and the loss of income, I had a heart attack on Dec 7, 2021, now I am taking 6 pills daily to control my blood pressure and anxiety."). *See, also,* Exhibit 7: *Declaration of Nancy Meléndez Soberal* ¶ 7.

# I.    SUMMARY OF PROCEDURAL BACKGROUND

8.   There are three associations involved in this case. Federación de Maestros de Puerto Rico, Inc.
("FMPR") is a teachers organization comprised by over 2,500 active and retired teachers of
the Department of Education of the Commonwealth of Puerto Rico. It is recognized by the
Department of Labor as a *bona fide* organization under Act 134 of 1960, as amended,[10] and
the constitutional right to free association and organization.[11] It was registered before the
Department of State of Puerto Rico as a not-for-profit organization on November 9, 1966, with
registration number 4280.[12]

9.   Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y
Organización Sindical, Inc. ("EDUCAMOS"), is a *bona fide* organization, created under Act
134 of 1960 and the constitutional right to free association and organization, with the purpose
of promoting the social, economic, and union welfare within its members and all the workers
of education system as well. As educators, they promote the pedagogical and union training of
teachers, as well as the strengthening of the Puerto Rican public education system as an
essential foundation towards the achievement of a more just, equitable and truly democratic
society. The organization was registered with the Department of State of the Government of
Puerto Rico on September 30, 2010, with registration number 61472. EDUCAMOS represents
approximately 750 affiliates, including teachers and retirees.[13]

10.  Unión Nacional de Educadores y Trabajadores de la Educación, Inc. ("UNETE"), is a *bona
fide* union organization that represents teachers and other active teaching workers (counselors,
social workers, librarians, etc.) that are permanent or temporary workers of the Commonwealth

---

[10] Act 134-1960, *Act to Authorize the Discount of Fees of Associations, Federations, or Puerto Rico Government
Employees Unions.* 3 LPRA § 702, *et seq.*
[11] P.R. Const. Art. II, § 6.
[12] *See* Exhibit 1: *Declaration of Mercedes Martinez Padilla ¶ 2.*
[13] *See* Exhibit 2: *Declaration of Migdalia Santiago Negrón ¶ 2.*

of Puerto Rico. The organization was founded on March 9, 2008, with registration number 54628. It represents approximately 900 members within its General Chapter and the Retirees Chapter. [14]

11. The members of the Teachers' Associations are employees of the Commonwealth of Puerto Rico or its instrumentalities. The Teachers' Associations also represent retirees. Their members will be directly affected by the Commonwealth's and the Oversight Board's determinations in these Title III proceedings. Moreover, the members of the Teachers' Associations are participants of the Teacher's Retirement System ("TRS") of the Commonwealth, thus the appearing labor associations and retirees are parties in interest and creditors of the Commonwealth that by the confirmation of the Plan of Adjustment, and any other related ruling, will be severely affected for decades to come.

12. On October 26, 2021, the Governor of the Commonwealth of Puerto Rico ("Commonwealth") signed into law Act No. 53-2021, known as the *Ending Puerto Rico's Bankruptcy Act,* ("Act 53"), the only enabling legislation that the Legislative Assembly has enacted in relation to the Commonwealth's Title III Plan of Adjustment.

13. Nevertheless, on November 1st, 2021, the Oversight Board filed the *Urgent Motion of The Financial Oversight and Management Board for Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 and (II) Scheduling Objection Deadline* **[Docket No. 19002]** ("Urgent Motion"). In this Urgent Motion, the Oversight Board's ultimate goal was to obtain a ruling from this Court that Act 53 only conditioned debt authorization on the elimination of the Monthly Benefit Modification, as it was defined previously in the Plan of Adjustment and, therefore, did not

---

[14] *See* Exhibit 3: *Declaration of Liza Fournier Córdova* ¶ 2.

require the elimination of any cost of living adjustments or freezes to pensions.

14. On November 3, 2021, the Oversight Board filed the *Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* **[Docket No. 19053]** ("Eighth Plan of Adjustment"). The Eighth Plan of Adjustment reiterated the proposed reform measures that would impact the TRS, such as freezes in pension benefits and the elimination of the cost of living adjustments and other benefits.[15]

15. On November 12, 2021, Teachers' Associations filed an *Objection to Urgent Motion of the Financial Oversight and Management Board for Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 at Docket No. 19002 and Request to be Heard.* **[Docket No. 19180]** ("Objection to Urgent Motion").

16. In the Objection to the Urgent Motion, the Teachers' Associations argued, in essence, that the correct interpretation of Act 53 is that Puerto Rico's Legislative Assembly intended zero cuts to pensions, thus, the bond issuance permitted by the Act was conditioned to no cuts in the TRS and that any interpretation to the contrary would contravene PROMESA Section 314 (b)(5), which requires the Oversight Board to obtain the approval of the necessary legislation to carry out any provision of the Plan before it can be approved. The Teachers' Associations also argued that Section 314(b)(5) of PROMESA requires the Legislative Assembly to pass the enabling legislation and, more importantly, that the Oversight Board cannot legislate through the Plan nor the confirmation order. Accordingly, the Plan required affirmative legislation to reform the TRS.

17. Regarding the preemption issue, the Teachers' Associations also stated in the Objection to

---

[15] This Plan was modified six times without altering the plan number, making the final Plan the Sixth Modified Version of the Eighth Amended Plan of Adjustment.

Urgent Motion that the preemption argument cannot be invoked to override a prerogative that PROMESA grants exclusively to the Legislative Assembly. While in certain circumstances preemption displaces local legislation, it does not eliminate the need for new enabling legislation to implement and carry out the provisions of the Plan, including those that attempt to modify in any way the TRS. The Plan in and of itself cannot serve as the legislation required to confirm the Plan. Even if it was conceded that the provisions of the Plan cause several laws to be preempted by PROMESA, which it was not, the Plan itself is not the enabling legislation necessary for the Plan to be confirmed.

18. On December 14, 2021, the Court issued an *Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, where it identified certain materially problematic aspects of the Eighth Plan of Adjustment and ordered the Oversight Board to propose modifications to remedy those problems or show cause why the motion for confirmation should not be denied in the absence of such modifications. **[Docket No. 19517].** Among the main issues identified was the scope of proposed preemption provisions.

19. On December 21, 2021, the Oversight Board filed a *Response of the Financial Oversight and Management Board in Accordance with Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al* **[Docket No. 19567 (corrected at Docket No. 19574)]** ("Oversight Board's Response"). The Oversight Board also filed a Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., dated December 20, 2021**. [Docket No. 19568]**

20. On December 23, 2021, the Teachers' Associations filed their *Opposition to Response of the*

8

*Financial Oversight and Management Board in Accordance with Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al, ECF No. 19567 (corrected at ECF No. 19574)* **[Docket No. 19606]** ("Opposition to Response"). In summary, in this filing, the Teachers' Associations argued that the proposed Plan of Adjustment remained unconfirmable, due to lack of compliance with PROMESA's Section 314(b), specifically because of lacking enabling legislation. That is, they posited that the proposed preemption of the Retirement Laws did not solve the issues for confirmation of the Plan of Adjustment, because without enabling legislation, that preemption leaves only a gap and an inoperative pension system. Additionally, they argued that the preemption of Act 106-2017 was entirely unwarranted, as it was an act enacted after PROMESA's effective date and would have been subject to the Oversight Board's powers under Section 204(a).

21. On January 10, 2022, the Court issued an *Order Regarding Plan Modifications Necessary to the Entry of an Order Confirming Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority*, where it set out additional modifications to be made. **[Docket No. 19721]** The Court also stated: "Overruled objections and the Oversight Board's positions as to the proper scope of preemption and the proper treatment of Eminent Domain/Inverse Condemnation Claims are preserved for appeal." **[Docket No. 19721 at 4]**

22. Finally, on January 14, 2022, the Oversight Board filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al* **[Docket No. 19784]** (hereafter the "Plan"). Shortly after, on January 18, 2022, the Court issued *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth*

9

*of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* **[Docket No. 19813]** ("Confirmation Order") and its *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* **[Docket No. 19812]** ("Findings of Fact and Conclusions of Law").

23. In its *Findings of Fact and Conclusions of Law*, the Court determined that "[p]rovisions of the Commonwealth laws that are inconsistent with PROMESA are preempted for the reasons, and to the extent set forth in **Exhibit A** hereto." **[Docket No. 19812 at 96]**

> Such preempted provisions include, without limitation: (i) pursuant to section 4 of PROMESA, all laws, rules, and regulations, to the extent they give rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules and regulations and (ii) laws enacted prior to June 30, 2016, to the extent they provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or on of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted to the extent inconsistent with the Plan's discharge of the Debtor's obligations. **[Docket No. 19812 at 96]**

24. Moreover, the Court addressed the Teachers' Associations concerns in a footnote as follows:

> The [Teachers' Associations] contend that the scope of preemption set forth in the Plan is overly broad because certain sections and subsections of Act 106-2017 and Act 160-2013 govern all Commonwealth public retirement systems, not just TRS and JRS, and include provisions essential to the functioning of the government's retirement systems. Exhibit A, however, does not contemplate the preemption of the entirety of every statutory section or subsection set forth in the "Specific Provisions Preempted" column; rather, any such section or subsection is preempted only to the extent its operative provisions are both described in the "Specific Provisions Preempted" column and a basis for the preemption thereof is listed in the "Basis for Preemption" column. **[Docket No. 19812 at 96 f.n. 31]** (parenthesis omitted).

25. The Court did not, however, address the depth of the arguments presented in the filings regarding the Oversight Board's inability to preempt the Retirement Laws through the Plan or Confirmation Order. Nor did the Court address the lack of enabling legislation featured prominently in the filings.

26. Finally, the Court determined that the Plan met PROMESA's requirements and, therefore, was confirmed.

27. In response, on January 28, 2022, the Teachers' Associations filed a *Notice of Appeal*. **[Docket No. 19941]** For the reasons stated herein, it is respectfully requested that this Court stay the Confirmation Order and Findings of Fact and Conclusions of Law, while the appeal is pending.

## II.   STANDARD OF REVIEW

28. Pursuant to the Bankruptcy Rules of Procedure, "a party must move first in the bankruptcy court for . . . a stay of a judgment, order, or decree of the bankruptcy court pending appeal . . . ." Fed. R. Bankr. P. 8007(a)(1)(A). Likewise, under the Federal Rules of Appellate Procedure, "[a] party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal . . . ." Fed. R. App. P. Rule 8(a)(1)(A). The First Circuit has already cautioned the need for a stay pending appeal of a confirmed plan of adjustment, due to the risk of equitable mootness. *See In re Fin. Oversight & Mgmt. Bd. for P.R.*, 987 F.3d 173 (1st Cir. 2021); *Cooperativa de Ahorro y Credito v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd.)*, 989 F.3d 123 (1st Cir. 2021).

29. In the evaluation of a request for a stay pending appeal, the following factors should be considered:

> (1) Whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. The first two factors are the most critical. *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch.*

*Comm. of Bos.* , 996 F.3d 37, 44 (1st Cir. 2021) (brackets, citations and quotation marks omitted).

30. Thus, the first factor to consider is the likelihood of success on the merits. Nonetheless, likelihood of success is not determinative; it must be balanced with the strong probability of injury in absence of the stay. *See Rivera v. Lake Berkley Resort Master Ass'n (In re Rivera),* 532 B.R. 425, 427 (Bankr. D.P.R. 2015). On the other hand, "[i]rreparable harm most often exists where a party has no adequate remedy at law." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds to Go, Inc.,* 370 F.3d 151, 162 (1st Cir. 2004). *See, also, In re Betteroads Asphalt, LLC,* 610 B.R. 28, 48 (Bankr. D.P.R. 2019). Thus, though all four factors must be present and considered, the first two factors carry the most weight in this decision.

## III.    ARGUMENT

### A.  THE PROPOSED APPEAL OF THE CONFIRMATION ORDER IS LIKELY TO SUCCEED ON THE MERITS.

31. The crux of the impending appeal is based, in part, in misinterpretations regarding the concept of preemption in our legal system. However, from that stem the inconsistencies between the requirements PROMESA places on a plan of adjustment and the Plan confirmed by the District Court. Thus, the Teachers' Associations are confident in the likelihood of success on the merits of the appeal based on two principal aspects: (1) the misapplication of law regarding preemption, and (2) the lack of compliance with Section 314(b) of PROMESA in the Plan.

#### i.    The Retirement Laws cannot be preempted in the Confirmation Order.

##### 1.  Preemption cannot exist in absence of a displacing statute or regulation.

32. In the captioned case, the Court determined "[t]he Debtors have sufficiently demonstrated that express recognition of the preemptive effect of section 4 of PROMESA is crucial to accomplishing the Plan's goals and ensuring its feasibility." **[Docket No. 19812 at 95]** Therefore, it concluded that "[p]rovisions of Commonwealth laws that are inconsistent with

PROMESA are preempted for the reasons, and to the extent, set forth in **Exhibit A** hereto."

**[Docket No. 19812 at 96]** (footnote omitted).

> Such preempted provisions include, without limitation: (i) **pursuant to section 4 of PROMESA**, all laws, rules, and regulations, to the extent they give rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations and (ii) laws enacted prior to June 30, 2016, to the extent they provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or on of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, **are preempted to the extent inconsistent with the Plan's discharge of the Debtors' obligations. [Docket No. 19812 at 96]**(emphasis added).

33. On this point, the Court's interpretation of the concept of preemption is overly broad and exceeds the scope of the doctrine.

34. Preemption is the name given to "certain circumstances, [where] federal law will take precedence over state regulation." *Goya de P.R., Inc. v. Santiago*, 59 F. Supp. 2d 274, 279 (D.P.R. 1999)(citations omitted).[16] This phenomenon is rooted in the "Supremacy Clause of Article VI of the United States Constitution that vests upon Congress the power to pre-empt state regulation." *Id.*

35. Therefore, in such cases, "the purpose of Congress is the ultimate touchstone." *Siembra Finca Carmen, LLC v. Sec'y of the Dep't of Agric. of P.R.,* 437 F. Supp. 3d 119, 127 (D.P.R. 2020)(brackets and citations omitted).

> **A federal statute can preempt a state law in three ways: through express preemption, field preemption, or conflict preemption.** Express preemption occurs when congressional intent to preempt state law is made explicit in the language of a federal statute. If Congress does not explicitly preempt state law, preemption may still occur when federal regulation in a legislative field is so

---

[16] Tellingly, Black's Law Dictionary defines preemptive as the principle "that a federal law can **supersede or supplant** any **inconsistent** state law or regulation." *Preemption*, BLACK'S LAW DICTIONARY (11th ed. 2019)(emphasis added).

pervasive that congressional intent allows no inference that it left room for the states to supplement it. This is known as "field preemption" or "occupying the field."

Even if Congress has neither expressly preempted state law or occupied the field, state law is preempted to the extent it conflicts with federal law. "Conflict preemption," as it is commonly known, may arise in two circumstances: 1) when it is impossible to comply with both federal and state law or 2) when state law stands as an obstacle to achieving the objectives of the federal law. *Allied Fin., Inc. v. WM Capital Partners 53, LLC (In re Allied Fin., Inc.)*, 572 B.R. 45, 52-53 (Bankr. D.P.R. 2017)(citations omitted)(emphasis added). *See, also, Arizona v. United States*, 567 U.S. 387, 398-400 (2012); *Capron v. Office of the AG of Mass.,* 944 F.3d 9, 20-21 (1st Cir. 2019).

36. Nonetheless, "[p]reemption is a 'strong medicine,' that is not casually to be dispensed". *Assured Guar. Corp. v. Garcia-Padilla*, 214 F. Supp. 3d 117, 125 (D.P.R. 2016)(citations and quotation marks omitted). Thus, the Courts should start with the assumption that preemption does not occur, unless the clear and manifest purpose of Congress is shown. *See Id.* "When a challenge to a state law is raised on the basis of preemption, **a presumption exists that the state statute is valid**." *Allied Fin., Inc.,* 572 B.R. at 53 (citations omitted)(emphasis added).

37. In view of the foregoing, it is evident that preemption cannot exist in absence of a federal legislation that supersedes, supplants, or conflicts with the local law. That said, it must be noted that PROMESA does not preempt the Retirement Laws that this Court has turned inoperable.

## 2. PROMESA does not preempt the Retirement Laws

38. As the Court notes, PROMESA contains a supremacy clause which states "[t]he **provisions of this chapter** shall prevail over any general or specific provisions of territory law, State law, or regulation that is **inconsistent with this chapter**". 48 U.S.C. § 2103 (emphasis added). Nonetheless, to say that PROMESA preempts state law as a matter of fact is a misapplication of the concept. There must be an analysis regarding whether and how the state laws are **inconsistent** with PROMESA and its provisions. Yet, the Court's analysis went as far as determining that the Retirement Laws are inconsistent with the Plan, not with PROMESA's

14

own provisions, and concluding preemption therein. This is a misapplication of the doctrine.

39. To reiterate, a law violating a Plan, or making it unconfirmable, does not make that law preempted. Preemption only occurs when the law is "inconsistent" with the PROMESA statute itself. *See* Section 4 of PROMESA, 48 U.S.C. § 2103.

40. With regards to the Retirement Laws, there can be no preemption. In the entirety of the text of PROMESA, there is no legislative pronouncement regarding the nature or structure of the public retirement systems nor any provisions that could possibly displace or supplant the Retirement Laws. On the contrary, PROMESA mandates adequate funding for the pension systems. *See* 48 U.S.C. § 2141(b)(1)(C). Therefore, neither does PROMESA's preemption provision expressly preempt the Retirement Laws, nor do the Retirement Laws in any way conflict with PROMESA or enter the field occupied by PROMESA,[17].

41. Moreover, the Plan is not a federal law or regulation, but rather an instrument of the bankruptcy process in which the adjustment of current debts and obligations of the Commonwealth are established. While the Plan is binding regarding the treatment of creditors including pension recipients, it cannot legislate future pension obligations. Such actions are beyond the scope of bankruptcy proceedings. Therefore, the Plan, of its own accord, cannot cause preemption or displace existing laws. Such a consequence is only possible through enabling legislation.

### 3.  The Oversight Board does not have the power to legislate nor preempt laws.

42. As argued above, preemption occurs when federal law displaces local legislation, be it through express preemption, field preemption or conflict preemption. However, as this Court has previously stated, the Oversight Board **cannot legislate.**

---

[17] A different scenario would be if, as in *Franklin*, PROMESA expressly stated that there could be no local retirement laws or that the power to legislate retirement systems were uniformly an exclusive power of Congress. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 136 S. Ct. 1938 (2016).

This Court has previously addressed the unique dynamic PROMESA created between the Oversight Board and the Commonwealth government. **While PROMESA grants the Oversight Board significant powers to achieve its purpose, the statute does not**, subject to the provisions of Titles I and II**, impair the power of Puerto Rico to control, by legislation or otherwise the exercise of the political or governmental powers. Thus, PROMESA has created an awkward power-sharing arrangement, in which the Oversight Board has significant tools to shape Puerto Rico's financial operations, but it has not been given power to affirmatively legislate. The provisions governing the formulation and confirmation of plans of adjustment under PROMESA further reflect this division of responsibilities between the Oversight Board and the Commonwealth government. Only the Oversight Board may file a plan of adjustment**. **Yet, the statute also provides that a plan of adjustment cannot be confirmed unless the Oversight Board obtains legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan or confirmation is expressly conditioned on such approval.** This provision gives the Commonwealth government the ability to obstruct implementation or complicate the Oversight Board's efforts to produce a confirmable plan of adjustment. *Fin. Oversight & Mgmt. Bd. For P.R. v. Pierluisi Urrutia (In re Fin. Oversight & Mgmt. Bd. For P.R.),* Nos. 17-BK-3283-LTS, 21-00072-LTS, 2021 U.S. Dist. LEXIS 197292, at *11-12 (D.P.R. Oct. 13, 2021)(emphasis added)(quotation marks, ellipsis and citations omitted). *See, also, Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. For P.R. (In re Fin. Oversight & Mgmt. Bd. For P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018).

43. The Court itself recognizes that the Oversight Board lacks the power to legislate on behalf of the Commonwealth. Thus, this rationale has to apply equally to the process of preparing and confirming the Plan. Yet, in total contradiction, the Court erroneously allows the Oversight Board to exercise the power of preemption, which requires legislative power to repeal existing statutes and enact legislation through the Plan, thereby obliterating the only remaining power the Legislative Assembly has in this "awkward power-sharing arrangement" and shifting the balance of power entirely over to the Oversight Board. Thus, preemption cannot be invoked to override the exclusive prerogative that PROMESA grants to the Legislative Assembly.

44. In view of the foregoing, declaring that the Plan preempts the Retirement Laws would mean that the Court is allowing the Oversight Board to subvert the reality of its inability to legislate

by placing mandates in the Plan that are equivalent to legislation, though incomplete legislation for sure. Here the Oversight Board is annulling legislation that both predates and postdates PROMESA by replacing it with an exhibit on a filing in a bankruptcy procedure. It is attempting to implement through the Plan what it was unable to obtain in the Legislative Assembly, the enabling legislation to make this Plan feasible and confirmable. Such a result cannot be allowed.

45. In a Chapter 9 case, where the debtor has control over the proceedings, such actions may be permissible because the filer of the plan has the power to legislate. For example, in the case of the City of Detroit, Michigan, the plan of adjustment contemplated the change in nature of the retirement systems with an entire statutory structure to replace the existing one.[18] But, that is not the case here, mainly because **the Oversight Board is not the debtor,** and it does not have legislative power.

46. The Oversight Board has already been given an extraordinary, if not abominable, amount of power over the Commonwealth's affairs. To allow it this on top of those powers, would be to admit that the Oversight Board is the *de facto* government of the Commonwealth and render our public servants inoperative, ineffectual, and impotent.

47. Under PROMESA, Congress expressly allowed the Oversight Board the power to review legislation for compliance with PROMESA and any certified budgets or fiscal plans, 48 U.S.C. § 2144; approve and control fiscal plans and budgets for the Commonwealth, *Id.* § 2141-2143; and place the Commonwealth into a Title III bankruptcy, where the Oversight Board alone is able to file a plan of adjustment. *Id.* § 2175. The Oversight Board has veto power over the

---

[18] See COMBINED PLAN FOR THE GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN, Amendment and Restatement, Effective July 1, 2014. p. 378 (available at https://www.michigan.gov/documents/treasury/Detroit_-_Eighth_Amended_Plan_of_Adjustment_476086_7.pdf )(Last visited January 25, 2022).

adoption of budgets, *Id.* § 2142, authorization of bonds, *Id.* §2147, and legislation. *Id.* §2144(a)(1), (5).

48. But, if the Oversight Board needs to invalidate a Commonwealth statute enacted after the passage of PROMESA, it must abide by the expressed intention of Congress on how it should do it. *See* 48 U.S.C. § 2144(a)(1). While most of the Retirement Laws predate the enactment of PROMESA, Act 106 was passed a year **after** the enactment of PROMESA, yet the Oversight Board never exercised its power to invalidate it, though it has had more than four years to do so. For the Oversight Board to argue now that preemption is automatic, to cover for its inaction when Act 106 was enacted, is more than a little convenient.

49. Nonetheless, as already stated by this Court, Congress left the Legislative Assembly with the limited power to legislate and create obstacles or force negotiation when legislation was needed to implement the Oversight Board's wish list.

50. Yet, in the Plan, the Oversight Board claims the power to legislate pension systems through its budgeting power. While it may not call EXHIBIT F-1 legislation, there is no doubt that it is not an adjustment of existing debts, but a prospective guide to reform the nature of the TRS. Therefore, it is analogous to a legislative action. However, the Oversight Board's wide budgeting power does not entitle it to preempt legislation. Budgeting powers allow the Oversight Board to decide matters of funding and distribution, but not to establish the equivalent of a law.[19]

51. While current pensions are debts claimed in the Title III proceeding that are subject to the Plan,

---

[19] It should be noted that while the Oversight Board does not have the power to legislate, even if it did, EXHIBIT F-1 cannot be considered substitute legislation for the entirety of the Retirement Laws it attempts to displace. As we discuss below, the document is wholly insufficient, which is more obvious when it is compared to the legislation it intends to replace as well as the legislation proposed in the case of Detroit. If anything, EXHIBIT F-1 reads as an attempt to amend existing laws which is a far cry from preemption and, likewise, outside the scope of the Oversight Board's powers.

the TRS is not a debt, but piece of legislation that defines and structures not just the basic formula for the accrual of pension benefits, but every aspect of a complex system and its procedures. As such, a plan of adjustment that is not even a law and whose only purpose is the restructuring of debt cannot simply displace and replace existing legislation.

52. If it had been Congress' intent to preempt any and all legislation that inconvenienced the Oversight Board's desired plan of adjustment, pursuant to its plenary powers as interpreted by the infamous *Insular Cases,* it would have granted the Oversight Board the power to legislate as it has granted it so many other powers. Such is the nature of preemption and Congressional power.

53. For the sake of argument, even if  the Retirement Laws are inconsistent with the Plan, as the Court states, it is not the Court's role to fix these inconsistencies by declaring the laws preempted. It is the role of the Oversight Board to lobby and negotiate with the Legislative Assembly to reach agreements that make these laws consistent with the Plan or adapt the Plan to the laws. *See Rosselló Nevares v. Fin. Oversight & Mgmt,* 330 F. Supp. 3d at 701("[W]ith respect to policy measures that would require the adoption of new legislation or the repeal or modification of existing Commonwealth law, **the Oversight Board has only budgetary tools and negotiations to use to elicit any necessary buy-in from the elected officials and legislators**."(emphasis added)).

54. In view of the foregoing, the Confirmation Order incorrectly declared the Retirement Laws to be preempted by EXHIBIT F-1 of the Plan.

### ii.   The Plan does not meet the requirements for confirmation under Section 314(b) of PROMESA.

55. Pursuant to Section 314(b) of PROMESA, in order to confirm a plan of adjustment, there are certain requirements. For example, it must be shown that "the debtor is not prohibited by law

from taking any action necessary to carry out the plan . . .”; “any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval . . .”; and “the plan is feasible….” 48 U.S.C. § 2174(b)(3), (5)-(6). Nonetheless, in this case, the Plan was confirmed in defiance of this Section, where it does not meet these three requirements.

### 1. The Plan does not meet Section 314(b)(3) because it requires the Commonwealth to violate PROMESA and Act 53-2021

56. As previously stated, for the confirmation of a plan, the debtor cannot be prohibited by law to take any of the necessary actions to carry it out. In this case, the Plan requires the Commonwealth to violate more than one law.

57. On October 26, 2021, the Governor of the Commonwealth of Puerto Rico signed into law Act No. 53-2021, known as the *Ending Puerto Rico's Bankruptcy Act,* after it had been adopted by both houses of the Puerto Rico legislature (“Act 53”). [20] Act 53 provides conditional authorization for the issuance of the New GO Bonds and CVIs pursuant to the Plan of Adjustment. Act 53 authorizes the issuance of the New GO Bonds and CVIs “subject to the Oversight Board filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification.” Art. 104, P.R. Laws ann. tit. 13 § 73c. Furthermore, according to the article of effectiveness of the Act:

> For the sake of clarity, this act shall immediately cease to be in effect and any transactions undertaken pursuant to it **if reductions to the pensions of government employees are decreed or implemented under the Debt Adjustment Plan** or the restructuring of the debt. The continued effect of this act is **contingent upon cero [sic] cuts to pensions**. Art. 605 (emphasis added).

---

[20] For a more detailed analysis of Act 53 and its legislative history, refer to the Teachers' Associations' *Objection to Urgent Motion of The Financial Oversight and Management Board for Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 at Docket No. 19002 and Request to Be Heard* at Docket No. 19180.

58. This means that Act 53 established the Commonwealth's public policy of "zero cuts" to pensions and conditioned its own effectiveness cognizant of that "zero cuts" policy by stating that it would cease to be in effect along with any transactions undertaken pursuant to it if any reductions to public pensions were decreed or implemented. As such, Act 53 authorizes the issuance of the New GO Bonds and CVIs conditioned to compliance with that "zero cuts" policy in relation to public pensions.[21]

59. The legislative history of Act 53 speaks to that intention of protecting the integrity of public pensions and its own the text is evidence of that unquestionable public policy "of the highest priority" to "avoid cuts to the pensions of 100% of the retirees", who have already suffered cuts in their pensions due to previous statutes in recent years. *See* Statement of Motives of Act 53. Therefore, the only logical interpretation of the statute is that the Legislative Assembly expressly intended for no cuts whatsoever to public pensions, including, but not limited to, the Monthly Benefit Modification, as it is stated specifically in Art. 104 of the Act. Thereby, any public pension cuts would be barred and doom the statute to inefficacy as stated in Art. 603 and 605.

60. With regards to Act 53, the Court interpreted that its effectiveness was conditioned solely to the elimination of the Monthly Benefit Modification. Nonetheless, such an interpretation directly contradicts the text of the Act which emphasizes for clarity that no pension cuts will be tolerated, and that Act 53 will cease to exist upon the issuance or implementation of such cuts.

61. While the Oversight Board persuaded the Court to reach that interpretation, it is only by calling Act 53 inconsistent with the proposed Plan that such a conclusion was reached. Essentially,

---

[21] Docket No. 19002 contains the English version of the Act, starting at page 57.

21

the Oversight Board's main argument is that the Court should interpret Act 53 pursuant to its belief because the alternative interpretation does not favor its desired result.[22] This is not a proper method for the interpretation of a statute. The plain language of the statute does not yield this result and to interpret the statute based on the Oversight Board's wishes is inconsistent with the proceedings before this Court, particularly when PROMESA expressly places the burden on the Oversight Board to obtain the necessary legislative cooperation or adjust the Plan accordingly.

62. Both the Legislative Assembly and the Governor of Puerto Rico have adopted a rigid "zero cuts" policy with respect to these pensions.[23] This plain language and the legislative intent that led up to it are clear: pensions, as they are, must be protected for Act 53 to continue in effect. In view of the incorrect interpretation of Act 53, the Plan clearly violates the "zero cuts" policy with regard to pensions that is established in the law. Therefore, the Plan would force the Commonwealth to violate its own law, which makes the Plan unconfirmable under Section 314(b)(3).

---

[22] See Oversight Board's *Urgent Motion of The Financial Oversight and Management Board for Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 and (II) Scheduling Objection Deadline* [Docket No. 19002] filed on November 1st, 2021, where it states its belief that Act 53 only conditions authorization of the Plan to the elimination of the Monthly Benefit Modification. [Docket No. 19002 at ¶ 6]. The Oversight Board further stated its belief that "zero cuts to pensions" means no Monthly Benefit Modification. [Docket No. 19002 at ¶ 7]. The Oversight Board set out three main reasons to issue a ruling regarding the interpretation of Act 53: (1) that in absence of this interpretation, the Plan would no longer be confirmable, because it would be inconsistent with the Fiscal Plan; (2) that if the freeze and elimination of COLAs were eliminated the Plan could not be implemented; and (3) that this would make the plan unfeasible. [Docket No. 19002 at ¶ 8].

[23] *See* CyberNews, *Pierluisi: "No hay ambiente para reformar sistemas de pensiones"* NOTICEL, November 9, 2021. (*available at*: https://www.noticel.com/gobierno/ahora/legislatura/top-stories/20211109/pierluisi-no-hay-ambiente-para-reformar-sistemas-de-pensiones/). Governor Pierluisi added that:

> What Law 53 demanded is that there be **zero cuts** to pensions and that has materialized. The Board has already eliminated the pension cuts. There is not a pensioner in Puerto Rico who is receiving a cut. So, the Board insists that these systems must be reformed. The Teachers Association objected. The Court Administration Office objected. Now the matter is in the hands of the court, in the hands of Judge Taylor Swain. **She is the one who is going to decide whether to proceed with this reform of the retirement systems without legislation.** *Id.* (emphasis added)(our translation).

63. Furthermore, PROMESA clearly states that the Oversight Board has a duty to provide adequate funding for the public pension systems. 48 U.S.C. § 2141(b)(1)(C). Therefore, by cutting pension benefits the Plan forces the Commonwealth to violate PROMESA's mandate.

### 2. The Plan does not meet Section 314(b)(5) because the Oversight Board did not acquire the necessary enabling legislation

64. As discussed above, the Court's determination that the Retirement Laws were preempted was misguided. Nonetheless, even if these laws were preempted, there is no substituting legislation, and this presents yet another obstacle for confirmation.

65. Enabling legislation is defined as "any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan." 48 U.S.C. § 2174(b)(5). The concept of "enabling legislation" necessarily includes all new legislation and/or amendments to the statutes that are required to implement the provisions of the Plan. Accordingly, if the Plan requires modifying the retirement systems of government employees, the Legislative Assembly must affirmatively legislate those reforms.

66. However, it is a widely known fact that the Oversight Board has been consistently unable to obtain the necessary legislation to change the nature of the retirement systems from the Legislative Assembly. [24] In fact, as discussed above, Act 53 reflects this inability. Consequently, the Oversight Board has attempted to impose a legislative measure in the Plan

---

[24] *Id.* Governor Pierluisi's official remarks state:

> First of all, the so-called freeze, which [has been] a requirement of the [Oversight] Board for more than five years to reform the retirement systems for **teachers and judges**, the [Oversight] Board has included it in all fiscal plans certified to this day. So, it should come as no surprise that it is included in the Plan of Adjustment. **That has not been legislated. Despite the [Oversight] Board's request, the legislature has not given way. And it has never given way,** if something like this were to be done and it reaches the hands of the Legislative Assembly, I am sure that we will enter into a negotiation process, of conversations to be fair with the teachers and the judges. (emphasis added)(our translation).

through EXHIBIT F-1. Nonetheless, this is impermissible. As previously argued, the Oversight Board does not have the power to legislate and the workings of the pension systems going forward after the confirmation of the Plan are beyond the scope of these proceedings. That is why Section 314(b)(5) conditions the approval and implementation of the Plan to the obtainment of enabling legislation. If the Oversight Board were able to subvert that requirement by placing certain rules within the Plan, Section 314(b)(5) would be useless, and the awkward power sharing arrangement explained by this Court would be a farse.

67. In this case, what the Oversight Board intends is to preempt provisions of the Retirement Laws which establish a coherent legal framework for the purposes of regulating in detail the TRS. However, the Oversight Board has not submitted any document to date that explains how it will be possible to continue managing the TRS in the absence of these provisions. While the TRS is currently in operation, it requires the current regulatory framework to fulfill its functions. Moreover, the preemption of specific sections of these Retirement Laws also affects the legal authority of the TRS rules and regulations that operationalize the system and these would be rendered ineffective according to administrative law. [25]

68. Simply put, the preemption this Court has confirmed displaces the necessary legislation without an existing substitute. Therefore, there is no enabling legislation to implement and carry out the provisions of the Plan with respect to the Retirement Laws.

69. That said, we must reiterate and emphasize that EXHIBIT F-1 of the Plan is not a substitute for the Retirement Laws. EXHIBIT F-1 of the Plan regarding "Modifications to TRS Pension Benefits (Without AMPR PSA)" consists of a simple table with general statements about a

---

[25] *See* REGULATION ON PENSION AND BENEFITS OF THE TEACHERS' RETIREMENT SYSTEM (*available at:* http://app.estado.gobierno.pr/ReglamentosOnLine/Reglamentos/8029.pdf). (last visited December 22nd, 2021)(our translation).

future teacher's retirement plan that in no way should be considered as the enabling legislation required for the TRS Benefit Modification that the Oversight Board seeks.

70.  Furthermore, EXHIBIT F-1 establishes a wish list of purported amendments to the current Retirement Laws that can only be properly addressed by the Legislative Assembly in order to be fully enforceable. A simple table with a wish list of changes to legislation is not enabling legislation and cannot meet the requirements of Section 314(b)(5) for confirmation.

71. To reinforce this point, the contrast with the case of the City of Detroit's Chapter 9 case is highly illustrative. In the City of Detroit, the Plan included the full text of the law.[26] In other words, the City determined all the particulars of its retirement system in accordance with its legislative power. That is not the case in the Commonwealth's bankruptcy, since the Oversight Board is the only entity authorized to prosecute the Title III cases but cannot legislate.

72. It should be noted that Act 53, even under the Oversight Board's and the Court's interpretation, does not authorize the freeze nor the elimination of COLAs. Therefore, even to that extent there is no enabling legislation for those changes.

73. In conclusion, without this enabling legislation, the Plan cannot be confirmed under Section 314(b)(5).

### 3.  The Plan does not meet Section 314(b)(6) because, in absence of the impermissible preemption, it is unfeasible.

74. In view of the foregoing, the Plan is unfeasible and, therefore, does not meet the requirements pursuant to Section 314(b)(6). As previously mentioned, the Oversight Board itself admits that, without the impermissible preemption that we have already discussed, the Plan is simply not feasible. **[Docket No. 19002 at ¶ 8].** The Court acknowledges it as well. **[Docket No. 19812**

---

[26] See COMBINED PLAN FOR THE GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN, supra note 18.

**at 127**]

75. Given the fact that the Plan is unfeasible without the forced and circular interpretation of Act

    53 and the improper preemption of other retirement laws, this Court should not have confirmed

    it in absence of the enabling legislation required.

**B. THE DENIAL OF THE STAY WILL RESULT IN IRREPARABLE HARM TO THE TEACHERS' ASSOCIATIONS.**

76. In the present case, the Teachers' Associations stand to sustain irreparable injury in the absence

    of a stay pending appeal.

77. First and foremost, the lack of a stay will likely render the Teachers' Associations' appeal

    equitably moot, pursuant to the First Circuit's recent decisions. *See In re Fin. Oversight &*

    *Mgmt. Bd. for P.R.* , 987 F.3d 173 (1st Cir. 2021); *Cooperativa de Ahorro y Credito v. Fin.*

    *Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd.)* , 989 F.3d 123 (1st Cir. 2021).

    Were that to occur, the Teachers' Associations would literally be left with no alternative

    remedy, given the language of the Court's Confirmation Order which prevents any judicial,

    legislative, or executive alteration to the Plan and shields its provisions from any attack. Thus,

    to deny the stay is to deny any possibility of review for the Teachers' Associations and a final

    permanent blow to their rights. The First Circuit has already recognized that "[i]rreparable

    harm most often exists where a party has no adequate remedy at law." *Charlesbank Equity*

    *Fund II, Ltd. P'ship,* 370 F.3d at 162. *See, also, In re Betteroads Asphalt, LLC,* 610 B.R. at 48.

78. The Confirmation Order expressly states that "[a]t no time prior or subsequent to the

    termination of the Oversight Board shall the Governor or Legislature enact, implement, or

    enforce any statute, resolution, policy, or rule reasonably likely, directly or indirectly, to impair

    the carrying out of the Plan's payment provisions, covenants, and other obligations." **[Docket**

    **No. 19813 at 85]** Moreover, the Confirmation Order binds future public officials from ever

remedying the wrongs to the pension systems, by declaring:

> The Government of Puerto Rico, including without limitation, any Entity or Person acting for or on behalf thereof, shall not enact any statute, resolution, policy, or rule that would repeal, change, or negate any law currently existing that authorizes debt issued pursuant to the Plan or any law pledging the full faith, credit, and taxing power of the Commonwealth to secure debt issued pursuant to the Plan. **[Docket No. 19813 at 85]**

79. The Plan itself includes a provision to bind the Government of the Commonwealth for ten (10) years before it can make changes to the pension system, unless, after the Oversight Board is terminated, it makes the corresponding request to the Title III Court and meets a host of requirements:

> 83.4 Maintenance of Pension: **Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico**, including, without limitation, by any Entity or Person acting for or on behalf thereof, **shall not** (a) **implement existing legislation or enact new legislation** to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) **undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees**; provided, however, that **the Governor and Legislature of the Commonwealth of Puerto Rico, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing** (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan. **[Docket No. 19813-1 at 181]** (emphasis added)

80. In this way, it is clear that there is no further course of action for the Teachers' Associations but to appeal and, without a stay, that right is infringed.

81. The Plan changes the nature of TRS from defined benefits to one of defined contributions, so the amount of the pension accrued by a teacher at the moment of retirement is uncertain. Additionally, it substantially reduces the pensions of teachers who will retire in the future. Furthermore, the Plan dismantled the TRS by eliminating several articles of the enabling law without any legislative text to replace it, which will create problems and controversies in implementing these changes and in the operation of the TRS. This legal void, in turn, will delay or disrupt the operations of the TRS.[27]

82. The Teachers' Associations have exhausted every available method, tactic, and forum within their reach to avoid these damages. They have appeared before the Legislative Assembly, the Governor, and the Courts to preserve their pension rights. And in most respects, they were successful. And yet, the Plan undoes their hard work, replacing the will of the Commonwealth's governing bodies and leaving teachers with no other choice.[28]

83. The only remedy in law remaining for the Teachers' Associations is to appeal the Confirmation Order before the First Circuit and, without the requested stay, even that remedy may be closed off to them.

84. The impending implementation of the Plan has already begun to provoke an exodus of teachers from the public school system, whom the Teachers' Associations have the honor to represent. The Court itself attests to the panic caused by the Plan in its Findings of Fact and Conclusions of Law.[29] **[Docket No. 19812 at 18]** Additionally, going forward with the Plan implies the

---

[27] *See* Exhibit 1: *Declaration of Mercedes Martinez Padilla* ¶ 6; Exhibit 2: *Declaration of Migdalia Santiago Negrón* ¶ 6; Exhibit 3: *Declaration of Liza Fournier Córdova* ¶ 6.

[28] *See* Exhibit 1: *Declaration of Mercedes Martinez Padilla* ¶ 10; Exhibit 2: *Declaration of Migdalia Santiago Negrón* ¶ 10; Exhibit 3: *Declaration of Liza Fournier Córdova* ¶ 10.

[29] "In addition to formal filings by parties, the Court has received thousands of letters and email communications from citizens and others who live in Puerto Rico and are concerned about Puerto Rico's future and their own. Within the past few months in particular, government workers and retirees have written with passion and sadness about their anxieties concerning their ability to support their families and live in a dignified way in retirement."

immediate and permanent displacement of the Retirement Laws which would bring chaos and disarray to public employee pensions.

85. Moreover, if the pension freeze goes into effect on March 15, 2022, in less than two months, over a thousand teachers who have already applied would be excluded from opting to purchase the remaining months of their service and advance their retirement.[30] Additionally, the change in the nature of the retirement system cuts these teachers' monthly pensions in some cases by hundreds and in other thousands of dollars, reducing their retirement income to poverty levels.[31] Some individuals will see their monthly pension income reduced by over a thousand dollars due to the change to receiving 95% of 1.8% of their salary for their years of service. To avoid this, an exorbitant number of teachers will opt to resign as public school teachers halfway through the semester, leaving the Department of Education with a mass exodus, tons of vacancies and no resources to teach their students, who have already suffered through many interruptions to their education in the past years. We are already seeing signs of these movements.

86. Freezing teachers' pensions, establishing the concept of defined contributions, and increasing the retirement age to 63 years, as the Plan states, has the effect of applying a cut between 35% to 40% to future teachers' pensions.[32] That is, if a teacher retires today, their pension could be $1,875 per month (without social security, [33] without health insurance, without Christmas bonus, without medication bonus). If the confirmed Plan is implemented, that same teacher

---

[30] *See* Exhibit 7: *Declaration of Nancy Meléndez Soberal* ¶ 6; Exhibit 8: *Declaration of Mildred Fraticelli Torres* ¶ 4.
[31] *See, for example,* Exhibit 4: *Declaration of Jocelyn Villanueva Rodríguez* ¶¶ 3-5 (monthly pension will be reduced from **$1,456.25** to **$355.26**); Exhibit 5: *Declaration of Noelanie Fuentes Cardona* ¶¶ 2-4(monthly pension will be reduced from **$1,437** to **$455.55**). Although all the declarations contain similar reductions, these individuals best represent the gravity of the situation.
[32] *See* Exhibit 6: *Declaration of Miguel Rivera Gonzalez* ¶ 6.
[33] *See* Exhibit 1: *Declaration of Mercedes Martinez Padilla* ¶ 21; Exhibit 4: *Declaration of Jocelyn Villanueva Rodríguez* ¶ 8.

tomorrow would have a pension of $1,000 per month (a monthly cut of $875), with the added

aggravation that upon retiring at age 63 the cost of living will be much higher than it is now.

Simply put, the Plan will reduce teachers to poverty and unable to provide for themselves and

their families, should they choose to remain committed to our public school system. While we

cite to individual cases, these are not isolated incidents of injury. The Plan will affect all the

teachers in the public school system, and while their stories may differ in color, the end result

is the same. Either they leave the public school system, or they condemn themselves to poverty

in their retirement.

87. On that note, these pension reforms will destabilize Puerto Rico's education system, because

not many will so choose to stay. [34]   The news of the Plan's confirmation already threatens to

cause a stampede of thousands of teachers looking to retire earlier than planned or resign

immediately and search for better opportunities outside the territorial limits of the

Commonwealth, leaving our Department of Education without experienced teachers and

completely unprepared to offer classes, in these already troubled times for our students.

## C. THE ISSUANCE OF THE STAY WILL NOT RESULT IN INJURY TO ANY OTHER PARTIES.

88. While, as we have established, the denial of the stay would cause irreparable harm to the

Teachers' Associations and their rights, the issuance of the stay does not have an adverse effect

on the other parties.

89. To begin with, the issuance of the stay would merely preserve the status quo, which would not

affect any interests involved here because the Confirmation Order is not final and the rights in

the Plan are not vested. The mere delay of the Effective Date, when the debt has gone unpaid

---

[34] *See* Exhibit 4: *Declaration of Jocelyn Villanueva Rodríguez* ¶ 9; Exhibit 4: *Declaration of Jocelyn Villanueva Rodríguez* ¶ 7.

for five years now, cannot be considered an injury where it does not put the other parties in a position different from the one they currently hold nor place them at any disadvantage. Moreover, the appellate procedure may be expedited upon request of the parties. These parties are also aware that appeals are part of the procedures before this Court, and the First Circuit has cautioned that a stay pending appeal is indispensable for that to progress. Therefore, there is not even injury to the parties' expectations.

90. Additionally, the Plan itself establishes a set of Conditions Precedent without which the Effective Date cannot accrue. Among these Conditions Precedent is the obtainment of all the necessary enabling legislation for the implementation of the Plan. Article LXXXVI, Section 86.1(d). **[Docket No. 19813-1 at 186]** As mentioned above, the Plan currently lacks enabling legislation for the changes to the retirement systems, therefore, its Effective Date should be equally stalled on that basis.[35]

### D.  THE PUBLIC INTEREST IS NOT AFFECTED BY THE PROPOSED STAY.

91. Lastly, the public interest is not affected by the issuance of a stay in this case. At any rate, staying the proceedings can only serve to provide more certainty of the terms to be implemented and allow public officials to prepare for the impending changes, if any. Again, the stay, of its own accord, would simply preserve the status quo for a limited time pending the review of the First Circuit. Meanwhile, the rights of retirees are a matter of public interest that would not be addressed in absence of the stay and would be prejudiced. The balance of the equities favors the rights of the retirees over the desire to expedite the Effective Date of the Plan.

---

[35] Moreover, given that PROMESA itself requires the enabling legislation, a waiver cannot be applied to this Condition Precedent.

## RELIEF REQUESTED

WHEREFORE, pursuant to the arguments previously stated, it is respectfully requested from this Honorable Court to stay the implementation of the confirmed Eighth Amended Plan of Adjustment pursuant to Rule 8007 of Bankruptcy Procedure while the Teachers' Associations' appeal to the First Circuit Court of Appeals is pending. In the alternative, we request that the preemption of the Retirement Laws be stayed pending the result of the appellate proceeding.

**RESPECTFULLY SUBMITTED.**

In Ponce, Puerto Rico, this 1st day of February 2022.

**WE HEREBY CERTIFY** that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and attorneys of record.

*/s/Jessica E. Méndez-Colberg*
Jessica E. Méndez-Colberg, Esq.
USDC: 302108

*/s/Rolando Emmanuelli-Jiménez*
Rolando Emmanuelli-Jiménez, Esq.
USDC: 214105

BUFETE EMMANUELLI, C.S.P.
P.O. Box 10779
Ponce, Puerto Rico 00732
Tel.: 787-848-0666
Fax: 1-787-841-1435
E-mail: jessica@emmanuelli.law
        rolando@emmanuelli.law

*Counsel for the Federación de Maestros de Puerto Rico, Inc.; Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc.; Unión Nacional de Educadores y Trabajadores de la Educación, Inc.*