## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

### NOTICE OF SUBMISSION OF THIRD AMENDED PLAN SUPPLEMENT AND PLAN RELATED DOCUMENTS BY THE COMMONWEALTH OF PUERTO RICO, ET AL.

**PLEASE TAKE NOTICE** that on October 11, 2021, that the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA") pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[2] filed the *Plan Supplement and Plan Related Documents*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] PROMESA is codified at 48 U.S.C. §§ 2101–2241.

of the Commonwealth of Puerto Rico, et al. (the "Original Plan Supplement") [Case No. 17-BK-3283-LTS, ECF No. 18470], containing documents listed on Schedule 1 thereto, pursuant to Section 1.395 of the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 17627].[3]

**PLEASE TAKE FURTHER NOTICE** that on November 4, 2021, the Oversight Board filed the *Amended Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 19062] (the "Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE** that on November 21, 2021, the Oversight Board filed the *Second Amended Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* [Case No. 17-BK-3283-LTS, ECF No. 19326] (the "Second Amended Plan Supplement").

**PLEASE TAKE FURTHER NOTICE** that the Oversight Board has filed the *Third Amended Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* (the "Third Amended Plan Supplement"), which includes additional documents, and revisions to certain documents contained in the Second Amended Plan Supplement. The Third Amended Plan Supplement is attached hereto as **Exhibit A**, containing documents listed on **Schedule 1** hereto (collectively, the "Plan Related Documents"), and redlines of the exhibits compared against the versions filed as part of the Second Amended Plan Supplement, where appropriate.

**PLEASE TAKE FURTHER NOTICE** that the Plan Related Documents remain subject to negotiations with parties in interest, and the Oversight Board, the Commonwealth, ERS, and

---

[3] Capitalized terms used herein that are not otherwise defined shall have the meanings given to them in the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2021 [ECF No. 19784].

PBA reserve the right to amend, modify, or supplement any of the Plan Related Documents up to and including the occurrence of the Effective Date.

**PLEASE TAKE FURTHER NOTICE** that the rights of all parties in interest, including, but not limited to, the Oversight Board, the Commonwealth, ERS, and PBA, and the other parties to the GO/PBA Plan Support Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement, Creditors' Committee Agreement, Retiree Committee Plan Support Agreement, and AFSCME Plan Support Agreement, with respect to the form of the Plan Related Documents, are expressly preserved and the exercise or waiver of any consent rights are expressly preserved.

**PLEASE TAKE FURTHER NOTICE** that all documents filed in these Title III cases are available (a) free of charge by visiting https://cases.primeclerk.com/puertorico or by calling +1 (844) 822-9231, and (b) on the Court's website at http://www.prd.uscourts.gov, subject to the procedures and fees set forth therein.

Dated: February 3, 2022
     San Juan, Puerto Rico

Respectfully submitted,

*/s/ Brian S. Rosen*

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

*/s/ Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

## Schedule 1

### List of Exhibits in the Third Amended Plan Supplement[4]

| | |
|---|---|
| Exhibit A: | New GO Bond Trust Agreement |
| Exhibit B: | CVI Trust Agreement |
| Exhibit C: | Avoidance Actions Trust Agreement |
| Exhibit D: | ERS Trust Agreement |
| Exhibit E: | Schedule of Executory Contracts and Unexpired Leases to be Assumed |
| Exhibit F: | Assured Custodial Trust Documents |
| Exhibit G: | FGIC Custodial Trust Agreement |
| Exhibit H: | Act 53-2021 approved on October 26, 2021[5] |
| Exhibit I: | Pension Reserve Trust Guidelines |
| Exhibit J: | CVI Calculation Agent Agreement |
| Exhibit K: | New GO Bonds Reporting Agreement |
| Exhibit L: | CVI Reporting Agreement |

---

[4] The Plan Related Documents remain subject to negotiation with parties in interest and the rights of all parties in interest, including, but not limited to, the Oversight Board, the Commonwealth, ERS, and PBA, and the other parties to the GO/PBA Plan Support Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement, Creditors' Committee Agreement, Retiree Committee Plan Support Agreement, and AFSCME Plan Support Agreement, with respect to the form of documents contained in the Plan Supplement, are expressly reserved and the exercise or waiver of any consent rights are expressly preserved.

Syncora has elected to pay the Syncora Acceleration Price in lieu of establishing the Syncora Trust (each as defined in the Plan). [ECF No. 18983]. Accordingly, the Syncora Custodial Trust Documents are not included in the Plan Supplement.

[5] The English version of Act 53-2021 begins on page 36 of Exhibit H.

**Exhibit A**

**Third Amended Plan Supplement**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>  as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>  Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## THIRD AMENDED PLAN SUPPLEMENT AND PLAN RELATED DOCUMENTS OF THE COMMONWEALTH OF PUERTO RICO, ET AL.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**Table of Contents[2]**

| | |
|---|---|
| Exhibit A: | New GO Bond Trust Agreement |
| Exhibit B: | CVI Trust Agreement |
| Exhibit C: | Avoidance Actions Trust Agreement |
| Exhibit D: | ERS Trust Agreement |
| Exhibit E: | Schedule of Executory Contracts and Unexpired Leases to be Assumed |
| Exhibit F: | Assured Custodial Trust Documents |
| Exhibit G: | FGIC Custodial Trust Agreement |
| Exhibit H: | Act 53-2021 approved on October 26, 2021[3] |
| Exhibit I: | Pension Reserve Trust Guidelines |
| Exhibit J: | CVI Calculation Agent Agreement |
| Exhibit K: | New GO Bonds Reporting Agreement |
| Exhibit L: | CVI Reporting Agreement |

---

[2] The Plan Related Documents remain subject to negotiation with parties in interest and the rights of all parties in interest, including, but not limited to, the Oversight Board, the Commonwealth, ERS, and PBA, and the other parties to the GO/PBA Plan Support Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement, Creditors' Committee Agreement, Retiree Committee Plan Support Agreement, and AFSCME Plan Support Agreement, with respect to the form of documents contained in the Plan Supplement, are expressly reserved and the exercise or waiver of any consent rights are expressly preserved.

Syncora has elected to pay the Syncora Acceleration Price in lieu of establishing the Syncora Trust (each as defined in the Plan). [ECF No. 18983]. Accordingly, the Syncora Custodial Trust Documents are not included in the Plan Supplement.

[3] The English version of Act 53-2021 begins on page 36 of Exhibit H.

# **<u>EXHIBIT A</u>**

New GO Bond Trust Agreement

DRAFT 02/03/2022

**TRUST AGREEMENT**

**by and between**

**COMMONWEALTH OF PUERTO RICO**

**and**

**UMB BANK, N.A., as Trustee**

_____

**Dated as of March 15, 2022**

_____

Relating to the
Commonwealth of Puerto Rico
General Obligation Restructured Bonds

# TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINITIONS AND INTERPRETATION ........................................................ 3

| | | |
|---|---|---|
| Section 1.01 | Definitions ................................................................................ | 3 |
| Section 1.02 | Rules of Construction ................................................................ | 13 |

ARTICLE II. AUTHORIZATION, ISSUANCE OF BONDS AND SERIES 2022A BONDS ...14

| | | |
|---|---|---|
| Section 2.01 | Authorization of Bonds ............................................................. | 14 |
| Section 2.02 | Provisions for Issuance of Bonds ............................................. | 14 |
| Section 2.03 | Supplemental Trust Agreements ............................................... | 16 |
| Section 2.04 | Maturity Dates, Principal Amounts and Interest Rates for Series 2022A-1 Current Interest Bonds ................................................ | 17 |
| Section 2.05 | Maturity Dates, Principal Amounts and Interest Rates for Series 2022A-1 Capital Appreciation Bonds .......................................... | 18 |
| Section 2.06 | Maturity Dates, Principal Amounts and Interest Rates for Series 2022A-2 Bonds .................................................................... | 18 |
| Section 2.07 | Interest Payments and Interest Accretion ................................. | 18 |

ARTICLE III. GENERAL TERMS AND PROVISIONS OF BONDS ................................. 19

| | | |
|---|---|---|
| Section 3.01 | Place and Medium of Payment .................................................. | 19 |
| Section 3.02 | Legends ...................................................................................... | 20 |
| Section 3.03 | CUSIP Numbers ........................................................................ | 20 |
| Section 3.04 | Execution and Authentication .................................................. | 20 |
| Section 3.05 | Interchangeability of Bonds ...................................................... | 21 |
| Section 3.06 | Transfer and Registry ............................................................... | 21 |
| Section 3.07 | Transfer of Bonds ..................................................................... | 21 |
| Section 3.08 | Regulations with Respect to Exchanges and Transfers ............ | 22 |
| Section 3.09 | Bonds Mutilated, Destroyed, Lost or Stolen ........................... | 22 |
| Section 3.10 | Book Entry Bonds ..................................................................... | 23 |
| Section 3.11 | Preparation of Definitive Bonds; Temporary Bonds ............... | 24 |

ARTICLE IV. REDEMPTION OF BONDS ...................................................................... 24

| | | |
|---|---|---|
| Section 4.01 | Authorization of Redemption .................................................... | 24 |
| Section 4.02 | Redemption at the Election of the Commonwealth ................... | 24 |
| Section 4.03 | Redemption Other Than at Commonwealth's Election .............. | 25 |
| Section 4.04 | Redemption Prices and Terms of Series 2022A Bonds ............ | 25 |
| Section 4.05 | Selection of Bonds to be Redeemed ......................................... | 31 |
| Section 4.06 | Notice of Redemption ............................................................... | 31 |
| Section 4.07 | Payment of Redeemed Bonds ................................................... | 32 |

ARTICLE V. STATUTORY LIEN ON MONEYS IN DEBT SERVICE FUND; FUNDS AND ACCOUNTS; COMMONWEALTH REVENUES AND APPLICATION THEREOF ....33

| | | |
|---|---|---|
| Section 5.01 | Statutory Lien in Debt Service Fund ........................................ | 33 |
| Section 5.02 | Establishment of Funds and Accounts ...................................... | 33 |

# TABLE OF CONTENTS
## (continued)

**Page**

Section 5.03    Application of Bond Proceeds............................................................34
Section 5.04    Application of Money in the Costs of Issuance Fund ......................34
Section 5.05    Application of Moneys .....................................................................35
Section 5.06    Debt Service Fund............................................................................35
Section 5.07    Arbitrage Rebate Fund.....................................................................36
Section 5.08    Transfer of Investments ...................................................................36

ARTICLE VI. SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS.....................37

Section 6.01    Security for Deposits .......................................................................37
Section 6.02    Investment of Funds and Accounts Held by the Trustee .................37
Section 6.03    Liability for Investments..................................................................38

ARTICLE VII. PARTICULAR COVENANTS...........................................................................38

Section 7.01    Payment of Principal and Interest....................................................38
Section 7.02    Pledge of Good Faith and Credit; Bonds Constitute Public Debt ....38
Section 7.03    Deemed Annual Allocation..............................................................38
Section 7.04    Powers as to Bonds ..........................................................................39
Section 7.05    Further Assurance .............................................................................39
Section 7.06    Offices for Payment and Registration of Bonds ..............................39
Section 7.07    General..............................................................................................39
Section 7.08    Non-Impairment Covenant ...............................................................40
Section 7.09    Tax Exemption Covenant .................................................................40
Section 7.10    Comprehensive Cap on Net Tax-Supported Debt............................40
Section 7.11    Fiscal Plan........................................................................................41
Section 7.12    Reporting Requirements ...................................................................41
Section 7.13    IRS Favorable Tax Determination....................................................41

ARTICLE VIII. CONCERNING THE TRUSTEE AND THE PAYING AGENT ....................41

Section 8.01    Appointment and Acceptance of Trustee .........................................41
Section 8.02    Appointment and Acceptance of Paying Agents .............................41
Section 8.03    Responsibilities of Trustee and Paying Agents ...............................42
Section 8.04    Property Held in Trust ......................................................................42
Section 8.05    Rights of the Trustee and the Paying Agent ....................................42
Section 8.06    Compensation and Indemnification..................................................44
Section 8.07    Permitted Acts..................................................................................45
Section 8.08    Resignation of Trustee .....................................................................45
Section 8.09    Removal of Trustee ..........................................................................45
Section 8.10    Successor Trustee and/or Paying Agent...........................................45
Section 8.11    Transfer of Rights and Property to Successor Trustee .....................46
Section 8.12    Merger or Consolidation of the Trustee ...........................................47
Section 8.13    Ancillary Agreements.......................................................................47

# TABLE OF CONTENTS
## (continued)

**Page**

ARTICLE IX. SUPPLEMENTAL TRUST AGREEMENTS ....................................................47

Section 9.01    Modification and Amendment without Consent ................................47
Section 9.02    Supplemental Trust Agreements Effective with Consent of Bondholders ........48
Section 9.03    General Provisions Relating to Supplemental Trust Agreements ...................48

ARTICLE X. AMENDMENTS OF TRUST AGREEMENT .....................................................49

Section 10.01   Powers of Amendment .................................................................49
Section 10.02   Consent of Bondholders ..............................................................50
Section 10.03   Modifications by Unanimous Consent ...........................................51
Section 10.04   Mailing ......................................................................................51
Section 10.05   Exclusion of Bonds .....................................................................51
Section 10.06   Notation on Bonds .......................................................................51

ARTICLE XI. DEFAULTS AND REMEDIES ....................................................................51

Section 11.01   Events of Default .........................................................................51
Section 11.02   No Acceleration with Respect to the Bonds ....................................52
Section 11.03   Enforcement of Remedies .............................................................52
Section 11.04   Priority of Payments after Default .................................................53
Section 11.05   Termination of Proceedings ..........................................................54
Section 11.06   Bondholders' Direction of Proceedings ..........................................54
Section 11.07   Control by Holders of Bonds; Limitations .....................................54
Section 11.08   Actions by Trustee; Possession of Bonds by Trustee Not Required ................55
Section 11.09   Waiver and Non–Waiver of Default ..............................................55
Section 11.10   Notice of Event of Default ............................................................55
Section 11.11   Remedies Not Exclusive ...............................................................56

ARTICLE XII. DEFEASANCE .........................................................................................56

Section 12.01   Defeasance...................................................................................56

ARTICLE XIII. EXECUTION OF INSTRUMENTS BY BONDHOLDERS AND PROOF
OF OWNERSHIP OF BONDS............................................................................................58

Section 13.01   Evidence of Signatures of Bondholders and Ownership of Bonds ..................58

ARTICLE XIV. MISCELLANEOUS ................................................................................59

Section 14.01   Preservation and Inspection of Documents ....................................59
Section 14.02   Money and Funds Held for Particular Bonds ..................................59
Section 14.03   Cancellation of Bonds ..................................................................59
Section 14.04   No Recourse under Trust Agreement or on the Bonds......................59
Section 14.05   Severability of Invalid Provision ...................................................59
Section 14.06   Parties of Interest ........................................................................59
Section 14.07   Certain Provisions Relating to Capital Appreciation Bonds ..............60

# TABLE OF CONTENTS
## (continued)

**Page**

Section  14.08  Notices ........................................................................................................60
Section  14.09  Headings ......................................................................................................60
Section  14.10  Governing Laws ..........................................................................................61
Section  14.11  Retention of Jurisdiction of Title III Court ................................................61
Section  14.12  Signatures and Counterparts ........................................................................61
Section  14.13  Successors and Assigns ................................................................................61
Section  14.14  Conflicts ......................................................................................................61

EXHIBIT A – FORM OF SERIES 2022A CURRENT INTEREST BONDS ......................... A-1
EXHIBIT B – FORM OF SERIES 2022A-1 CAPITAL APPRECIATION BONDS ..............B-1
EXHIBIT C – ACCRETED VALUE TABLE ......................................................................C-1
EXHIBIT D – CONFIRMATION ORDER .......................................................................... D-1
EXHIBIT E – REPORTING AGREEMENT .......................................................................E-1

4842-1351-5245.23

# TRUST AGREEMENT

**THIS TRUST AGREEMENT,** dated as of March 15, 2022, by and between the **COMMONWEALTH OF PUERTO RICO** (together with any successors thereto, the **"Commonwealth"**), and **UMB BANK, N.A.,** as trustee (the **"Trustee"**).

The Commonwealth recites and represents to the Trustee for the benefit of the Bondholders that it has authorized this Trust Agreement.

## R E C I T A L S

[to be updated as proceedings progress]

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. (**"PROMESA"**); pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017, the Financial Oversight and Management Board (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to section 101(b) of PROMESA, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing a case under Title III of PROMESA (the "**Title III Case**").

Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth, wherever located.

By entry of the Confirmation Order (as defined below), the Title III Court confirmed the Commonwealth's Plan (as defined below), the material components of which were [the resolution of certain claims relating to the Commonwealth's direct and guaranteed general obligation debt and certain other liabilities of the Commonwealth] and the restructuring of all claims against the Commonwealth relating to pre-existing indebtedness of the Commonwealth through, among other things, the issuance of Bonds (as defined below) pursuant to this Trust Agreement.

On October 26, 2021, in furtherance of the implementation of the Commonwealth Plan, the Commonwealth enacted the Act (as defined below) which, among other things authorized the issuance of the Series 2022A Bonds.

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan, and the Act, the Title III Court made a binding determination that the Bonds are legal, valid, binding and enforceable obligations of the Commonwealth benefiting from the following protections, each of which is legal, valid, binding and enforceable against the Commonwealth and other Persons and entities, as applicable, under Commonwealth law and federal law:

a.   The Confirmation Order is full, final, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

b.   The Title III Court shall retain jurisdiction to enforce the terms of the Confirmation Order and the Plan.

c.   All provisions herein made to pay or secure payment of the Bonds, including the Commonwealth's good faith[1], credit and taxing power pledge herein, are legal, valid, binding, and enforceable, including, without limitation, covenants not to impair such property, as adequate protection for the property rights conferred under the Plan, the Act and the Confirmation Order.

d.   At the time of issuance and delivery of the Bonds, the Commonwealth is hereby authorized and directed to have stamped or written on each of the Bonds a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2022

All things have been done which are necessary to make the Bonds, when executed by the Commonwealth and authenticated and delivered by the Trustee hereunder, the valid obligations of the Commonwealth, and to constitute this Trust Agreement a valid trust agreement for the security of the Bonds, in accordance with the terms of this Trust Agreement.

**NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:**

It is hereby covenanted and declared that all the Bonds are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Commonwealth does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit of all Bonds as follows:

This Trust Agreement provides for the following transactions:

(a)   issuance by the Commonwealth of its general obligations to settle certain claims made by the Commonwealth's creditors, including claims relating to indebtedness previously issued or guaranteed by the Commonwealth, and to refund, refinance or defease any obligations issued hereunder and authorized under the Act:

(b)   the statutory lien on moneys deposited into the Debt Service Fund (as defined herein) established herein; and

---

[1]   "Good faith" ("*buena fe*") is the standard provision in the Commonwealth's Constitution. "Good faith" is the literal translation of the term "buena fe". See Article VI, Section 2 of the Commonwealth's Constitution.

(c)     the rights and remedies of the holders from time to time of the Commonwealth's Bonds.

**IN TRUST NEVERTHELESS**, upon the terms and trusts herein set forth, the moneys on deposit in the Debt Service Fund shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Bonds issued and to be issued hereunder, without preference, priority or distinction as to participation in the moneys on deposit in the Debt Service Fund, and the benefit and protection thereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Bonds shall have the same right, lien and privilege hereunder to the extent herein provided and shall be equally secured thereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST NEVERTHELESS,** that these presents are upon the express condition that if (a)(i) the Commonwealth or its successors or assigns shall well and truly pay or cause to be paid the Principal (as defined below) of Bonds with interest, according to the provisions set forth in the Bonds, respectively, and each of them or (ii) shall provide for the payment of Bonds by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 12.01 of this Trust Agreement, when and as authorized by the provisions of Section 12.01 of this Trust Agreement, and (b) shall also pay or cause to be paid all other sums payable hereunder by the Commonwealth, then, provided no Bonds remain Outstanding (as defined below) hereunder, these presents and the estate and rights granted hereby and by the Act shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Commonwealth and upon the payment of the costs and expenses thereof, shall duly execute, acknowledge and deliver to the Commonwealth such instruments of satisfaction or release as may be specified by the Commonwealth as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Act, the Plan and the Confirmation Order, if necessary, shall grant, reassign and deliver to the Commonwealth, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned hereunder, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Bonds are to be issued, authenticated and delivered, and that the property or amounts available for the payment of the Bonds are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Commonwealth, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions**.  All capitalized terms used in this Trust Agreement and not otherwise defined herein shall have the meanings set forth in the Plan.  As used in this Trust

- 3 -

Agreement, the following terms have the following meanings, unless a different meaning clearly appears from the context:

"**AAFAF**" means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

"**Accreted Value**" means, with respect to the Capital Appreciation Bonds, as of the date of calculation, the principal amount at initial issuance thereof, plus interest thereon to such date of calculation, capitalized semiannually on each Valuation Date at the accretion rate stated in Section 2.05 herein or within the applicable Supplemental Trust Agreement until paid at stated maturity, or prior redemption permitted by the terms of the applicable Supplemental Trust Agreement or after stated maturity following payment default by the Commonwealth, assuming that between Valuation Dates such Accreted Value increases in equal daily amounts on the basis of a 360-day year of twelve 30-day months; *provided, however*, that Accreted Value shall be, as of the time of the Commonwealth actually makes a Sinking Fund Installment payment or other payment required or permitted to be made on such Capital Appreciation Bond, reduced by the amount, if any, that such payment exceeds accrued interest on such Capital Appreciation Bond from the prior Valuation Date.

"**Act**" means Act No. 53-2021.

"**Ancillary Agreements**" means the Trust Agreement, the Confirmation Order, the Plan, the Reporting Agreement and any other agreement or instrument entered into by the Commonwealth or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan.

"**Arbitrage Rebate Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Authorized Denominations**" means, with respect to the Series 2022A-1 Capital Appreciation Bonds, $1.00 principal amount in Maturity Value, or any integral multiple thereof, and with respect to Series 2022A Current Interest Bonds, $1.00 in Principal amount or any integral multiple thereof.

"**Authorized Officer**" means (a) in the case of the Commonwealth, the Governor of the Commonwealth, the Secretary of Treasury or such other officer of a Government Entity as may be designated by the Governor through executive order, and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other Person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by-laws of the Trustee.

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases in accordance with Section 301 of PROMESA.

- 4 -

**"Bond"** means any bond, including the Series 2022A Bonds, of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 hereof and, with respect to the Refunding Bonds the applicable Supplemental Trust Agreement.

**"Bondholder", "Holder of Bonds"** or **"Holder"** or any similar term, when used with reference to a Bond or Bonds, means the registered owner thereof; *provided, however*, that for purposes of this Trust Agreement, in the case of any Insured Bonds, the applicable Bond Insurer shall be treated as (i) the sole Holder of the Insured Bonds insured by such Bond Insurer for the purpose of consenting to any modification or amendment, exercising any voting right or privilege, giving any consent or direction, or taking any action that the Holders of such Insured Bonds are entitled to take pursuant to the provisions of this Trust Agreement pertaining to defaults and remedies and the duties and obligations of the Trustee, and (ii) an additional Holder of the Insured Bonds insured by such Bond Insurer for purposes of receiving any notices or exercising any rights to inspect documents provided for under this Trust Agreement.

**"Bond Insurance Policy"** means a municipal bond insurance policy, if any, issued by a Bond Insurer that guarantees payment of Principal of and interest on Insured Bonds.

**"Bond Insurer"** means the provider of a Bond Insurance Policy, if any, specified in a Supplemental Trust Agreement.

**"Book Entry Bond"** means a Bond issued to and registered in the name of a Depository for the participants in such Depository.

**"Business Day"** means any day other than a Saturday, a Sunday or any other day on which commercial banks in San Juan, Puerto Rico or New York, New York, are required or authorized to close by law, regulation or executive order.

**"Capital Appreciation Bond"** means any Bond as to which interest is capitalized on each Valuation Date therefor and is stated to be payable only at the maturity or prior redemption thereof.

**"Code"** means the Internal Revenue Code of 1986, as amended, and the applicable regulations thereunder.

**"Comprehensive Cap"** has the meaning ascribed to such term in the Debt Responsibility Act.

**"Confirmation Order"** means the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code.

"**Constitution**" means the Constitution of the Commonwealth.

[**"Costs of Issuance"** means the items of expense to be paid by the Commonwealth which are incurred prior to, upon and during a reasonable period of time after issuance of the Bonds of a Series, in each case in connection with the authorization, sale and issuance of the Bonds, which items of expense may include, but not be limited to, underwriting discount or fees, structuring fees, placement fees, document printing and reproduction costs, filing and recording fees, costs of credit ratings, initial fees and charges of a Depository or the Trustee and its counsel, other legal fees and charges, professional consultants' fees, fees and charges for execution, transportation and

- 5 -

safekeeping of the Bonds, premiums, fees and charges for insurance on the Bonds, and other costs, charges and fees in connection with the foregoing.]

[**"Costs of Issuance Fund"** means the fund so designated, created and established pursuant to Section 5.02 hereof.]

**"Debt Management Policy"** means the policy developed by AAFAF, relating to the issuance of indebtedness by the Commonwealth and its instrumentalities, as more fully described in the Plan and the Debt Responsibility Act.

**"Debt Policy Revenues"** means, collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Legislative Assembly of the Commonwealth, including, without limitation, any such revenue assigned to, or owned by, the Puerto Rico Sales Tax Financing Corporation or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan (as defined in the Plan), (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement (as defined in the Plan); and, provided, further, that, for purposes of illustration, with respect to Fiscal Year 2020, and as reflected in the CW Fiscal Plan (as defined in the Plan), "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six Hundred Thousand Dollars ($15,146,600,000.00).

**"Debt Responsibility Act"** shall mean Act No. 101-2020, as the same may be amended, modified or supplemented.

**"Debt Service Fund"** means the fund so designated, created and established pursuant to Section 5.02 hereof.

**"Defeasance Security"** means:

(a)     a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America; and

(b)     any other U.S. Government Obligation (including the interest component of Resolution Funding Corporation Bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; **provided** that at the time an investment therein is made such U.S.

- 6 -

Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services.

**"Depository"** means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other Person, firm, association or corporation designated in the Supplemental Trust Agreement authorizing a Series of Bonds to serve as securities depository for Bonds of such Series, or any successor of any of the foregoing, as applicable.

**"Effective Date"** means the date that the Plan becomes effective in accordance with its terms and the Confirmation Order.

**"Electronic Means"** means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

**"Eligible Investments"** means any of the following obligations or securities that the Commonwealth is permitted to hold as an investment under the laws of the Commonwealth:

(a)    Defeasance Securities;

(b)    interest-bearing general obligations of the United States of America;

(c)    United States of America treasury bills and other non-interest-bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Commonwealth a return on such investment in lieu of interest;

(d)    short-term discount U.S. Government Obligations;

(e)    certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable U.S. Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)    banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)    commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)    tax-exempt securities exempt from federal arbitrage provisions applicable to investments of proceeds of the Commonwealth's tax-exempt debt obligations, provided that such securities must be rated by at least two Rating Services (with one such Rating Service being S&P or Moody's) no less than AA (or equivalent) and no less than the rating on the Bonds, and provided, further, that any such

- 7 -

securities must be in book-entry form through The Depository Trust Company or a comparable depository;

(i)    domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(j)    Investment Agreements that are fully collateralized by Eligible Investments; and

(k)    domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

"**EMMA**" means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

"**Event of Default**" has the meaning given to such term in Section 11.01 hereof.

"**Fiscal Plan**" means a Fiscal Plan (as defined by Section 5(10) of PROMESA) of the Commonwealth, certified by the Oversight Board.

"**Fiscal Year**" means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

"**Fitch**" means Fitch Ratings and its successors.

"**General Fund**" means the Commonwealth's primary operating fund.

"**Government Entity**" means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

"**Instructions**" has the meaning given to such term in Section 8.05.

"**Insured Bond**" means a Bond issued hereunder and designated as an Insured Bond in the Supplemental Trust Agreement authorizing the issuance thereof.

"**Interest Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.02 hereof.

"**Interest Payment Date**" means each January 1 and July 1; provided, however, that with respect to the Series 2022A Bonds that are not issued as Capital Appreciation Bonds, such term also includes the Effective Date.

"**Investment Agreement**" means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

"**KBRA**" means Kroll Bond Rating Agency Inc. and its successors.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such Bonds as of such date.

"**Maturity Value**" means, with respect to a Series 2022A-1 Capital Appreciation Bond, the Accreted Value due at stated maturity if no Sinking Fund Installment on such Bond is paid prior to stated maturity.

[**"Monthly Disbursement Date**" means the first Business Day of each calendar month.]

"**Moody's**" means Moody's Investor Service, Inc. and its successors.

"**Outstanding**", when used in reference to Bonds, means, as of a particular date, all such Bonds authenticated and delivered hereunder and under any applicable Supplemental Trust Agreement except:

(a)      any Bonds canceled by the Trustee at or before such date;

(b)      any Bonds deemed to have been paid in accordance with Section 12.01 hereof;

(c)      any Bond canceled or paid pursuant to Section 3.09 and Section 4.07 hereof or any Bond in lieu of or in substitution for which another Bond, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.07 or Section 10.06 hereof; and

(d)      for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Bonds hereunder, any Bond deemed to not be Outstanding in accordance with Section 10.05 hereof.

"**Oversight Board**" has the meaning given to such term in the Recitals.

"**Paying Agent**" means, with respect to the Bonds of any Series, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

"**Plan**" means the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code, and the terms thereof.

4842-1351-5245.23

"**Principal**" means collectively, the principal payment required to be made on a Bond on its final maturity date and each Sinking Fund Installment of a Bond due on a Principal Payment Date.

"**Principal Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.02 hereof.

"**Principal Payment Date**" means each July 1.

"**PROMESA**" means The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a)     a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b)     a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(c)     a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

- 10 -

(d)     the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Commonwealth; or

(e)     a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that meets the applicable rating requirements set forth above.

"**Quarter in Interest**" means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such Bonds as of such date. In the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Bonds (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

"**Rating Confirmation**" means the written confirmation of a relevant Rating Service to the effect that the rating assigned, without regard to any insurance or other credit enhancement, to each of the Bonds rated by such Rating Service will remain unchanged and will not be withdrawn, suspended or reduced as a consequence of some act or occurrence.

"**Rating Service**" means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

"**Record Date**" means, when used in relation to the Bonds of a Series, the date specified as the record date for such Bonds in the Supplemental Trust Agreement authorizing such Bonds.

"**Redemption Date**" means each date of redemption specified in Section 4.04 hereof for the redemption of Series 2022A-1 Capital Appreciation Bonds.

"**Redemption Price**" when used with respect to a Bond, means the Principal amount of such Bond plus the applicable premium, if any, payable upon redemption prior to maturity thereof pursuant hereto or to the applicable Supplemental Trust Agreement.

"**Refunding Bonds**" means any of the Bonds issued to refund, refinance or defease other Bonds in compliance with the provisions of Section 2.02 hereof.

"**Reporting Agreement**" means the Reporting Agreement (Commonwealth of Puerto Rico General Obligation Restructured Bonds), dated as of _____, 2022, as executed and delivered by the Commonwealth and as amended or supplemented from time to time.

"**Restructuring Transaction**" means the transactions contemplated by, or in furtherance of, the Plan.

"**S&P**" means S&P Global Ratings and its successors.

- 11 -

"**Secretary of Treasury**" means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

"**Serial Bonds**" means the Bonds so designated in a Supplemental Trust Agreement.

"**Series**" means with respect to Bonds, all of the Bonds authenticated and delivered on original issuance and pursuant hereto and to the Supplemental Trust Agreement authorizing such Bonds as a separate Series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to Article III, Section 4.07 or Section 10.06 hereof, regardless of variations in maturity, interest rate, Sinking Fund Installments or other provisions.

"**Series 2022A Bonds**" means the Commonwealth's Restructured General Obligation Bonds, Series 2022A authorized and issued pursuant to Article II of this Trust Agreement, which consist of, collectively, the Series 2022A-1 Bonds and the Series 2022A-2 Bonds.

"**Series 2022A Current Interest Bonds**" means collectively, the Series 2022A-1 Current Interest Bonds and the Series 2022A-2 Bonds.

"**Series 2022A-1 Bonds**" means the Series 2022A Bonds that are issued as Tax Exempt Bonds, which consist of, collectively, the Series 2022A-1 Capital Appreciation Bonds and the Series 2022A-1 Current Interest Bonds.

"**Series 2022A-1 Capital Appreciation Bonds**" means the Series 2022A-1 Bonds issued as Capital Appreciation Bonds, which have stated maturity dates of July 1, 2024 and July 1, 2033.

"**Series 2022A-1 Current Interest Bonds**" means the Series 2022A-1 Bonds issued as current interest bonds, which have stated maturity dates of July 1, 2023, July 1, 2025, July 1, 2027, July 1, 2029, July 1, 2031, July 1, 2033, July 1, 2035, July 1, 2037, July 1, 2041 and July 1, 2046.

"**Series 2022A-2 Bonds**" means the Series 2022A Bonds other than the Series 2022A-1 Bonds, which Series 2022A-2 Bonds have a stated maturity date of July 1, 2041 and are current interest bonds. Subject to Section 7.13 of this Trust Agreement, the Series 2022A-2 Bonds are Taxable Bonds.

"**Sinking Fund Installment**" means, as of any date of computation, the amount of money required to be paid on a single future July 1 for the retirement of any Bonds which mature after said future July 1, but does not include any amount payable by the Commonwealth by reason only of the maturity of a Bond.

"**Statutory Lien**" means the statutory first lien on the amounts deposited into the Debt Service Fund established with the Trustee for the purpose of securing the payment of the Bonds, including any income and revenues generated therefrom, which statutory first lien is created under and imposed by Article 203 of the Act.

"**Supplemental Trust Agreement**" means any trust agreement of the Commonwealth amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

- 12 -

"**Taxable Bond**" means all Bonds issued pursuant to this Trust Agreement other than Tax Exempt Bonds.

"**Tax Exempt Bond**" means any Bond as to which Transaction Counsel has rendered an opinion to the effect that interest on it is excluded from gross income for purposes of federal income taxation.

"**Term Bond**" means a Bond so designated and payable from Sinking Fund Installments.

"**Title III Cases**" has the meaning given to such term in the Recitals.

"**Title III Court**" has the meaning given to such term in the Recitals.

"**Transaction Counsel**" means a nationally recognized firm of attorneys as may be selected by the Commonwealth for a specific purpose hereunder.

"**Trust Agreement**" means this Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

"**Trustee**" means the bank or trust company appointed as Trustee for the Bonds pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant hereto.

"**U.S. Government Obligation**" means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

"**Valuation Date**" means with respect to any Capital Appreciation Bond, each January 1 and July 1; provided, however, that with respect to the Series 2022A Bonds that are issued as Capital Appreciation Bonds, such term also includes the Effective Date.

**Section 1.02   Rules of Construction.** Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing Persons shall include firms, associations and corporations, including public bodies as well as natural Persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Trust Agreement, refer to the Trust Agreement. All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless otherwise expressly stated. All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

- 13 -

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## AUTHORIZATION, ISSUANCE OF BONDS AND SERIES 2022A BONDS

**Section 2.01   Authorization of Bonds**. (a) There are hereby authorized to be issued Bonds of the Commonwealth to be designated as "Commonwealth of Puerto Rico General Obligation Restructured Bonds," which, in accordance with, and as provided by, Article 203 of the Act are secured by the Statutory Lien. The aggregate principal amount of Bonds which may be executed, authenticated and delivered is not limited except as provided hereby and in the Act, the Plan, the Confirmation Order, and the terms and conditions authorized by the Commonwealth and set forth in the Ancillary Agreements.

(b)   On the Effective Date, the Commonwealth is hereby authorized to issue, with a deemed issuance date of July 1, 2021, and deliver the Series 2022A Bonds in two subseries (i) the Series 2022A-1 Bonds, consisting of (A) $5,861,055,000 aggregate principal amount of the Series 2022A-1 Current Interest Bonds and (B) $1,170,550,000 aggregate principal amount in Maturity Value of Series 2022-A Capital Appreciation Bonds and (ii) $822,260,000 aggregate principal amount of Series 2022A-2 Bonds. Each maturity of the Series 2022A Bonds is hereby designated as a Term Bond. The Series 2022A-1 Bonds are Tax Exempt Bonds and are hereby designated "Commonwealth of Puerto Rico General Obligation Restructured Bonds, Series 2022A-1" and the Series 2022A-2 Bonds are hereby designated "Commonwealth of Puerto Rico General Obligation Restructured Bonds, Series 2022A-2 (Taxable)".[2] Subject to Section 7.13 of this Trust Agreement, the Series 2022A-2 Bonds are Taxable Bonds.

(c)   The form of the Series 2022A Current Interest Bonds is attached hereto as Exhibit A. The form of the Series 2022A-1 Capital Appreciation Bonds is attached hereto as Exhibit B.

**Section 2.02   Provisions for Issuance of Bonds**. The Commonwealth shall issue Bonds under this Trust Agreement in accordance with, and upon receipt of, the written direction of the Authorized Officer of the Commonwealth, or his or her designee; provided, however, that such direction may not conflict with the terms of this Trust Agreement, the Act, the Plan or the Confirmation Order. The Series 2022A Bonds are permitted to be issued as provided herein. The issuance of any Series of Refunding Bonds permitted to be issued hereunder shall be authorized by a Supplemental Trust Agreement or Supplemental Trust Agreements. The Bonds of a Series authorized to be issued shall be executed by the Commonwealth and delivered to the Trustee. Such Bonds shall from time to time and in such amounts as directed by the Commonwealth be authenticated by the Trustee and by it delivered to or upon the order of the Commonwealth upon receipt of the consideration therefor and upon delivery to the Trustee of:

---

[2]   NTD: Amounts are preliminary.

(a)      a copy of this Trust Agreement and, with respect to any Series of Bonds other than the Series 2022A Bonds, the Supplemental Trust Agreement authorizing such Bonds, certified by an Authorized Officer of the Commonwealth;

(b)      a written order as to the delivery of such Bonds, signed by an Authorized Officer of the Commonwealth, describing the Bonds to be delivered, designating the Person(s) to whom such Bonds are to be delivered and stating the consideration for such Bonds;

(c)      a certificate signed by the Secretary of the Treasury relating to (i) authorization and due execution of the Bond documents; (ii) signature of the Bonds; (iii) order to authenticate and deliver the Bonds; (vi) application of proceeds of the Bonds and (vii) as of the date of issuance of the Bonds, the Commonwealth is in compliance with any applicable debt limits, including the Comprehensive Cap and any applicable debt limit (if any) contained in the Constitution, and such certificate shall describe any assumptions with respect to the calculation of such debt limit;

(d)      a certificate of AAFAF regarding the resolution approving the issuance of the Bonds and confirming its recommendations to the Governor of the Commonwealth and the Secretary of Treasury as to the details of the Bonds;

(e)      [an opinion of Transaction Counsel to the effect that (i) the Trust Agreement and any applicable Supplemental Trust Agreement authorizing the Series of Bonds have been duly and lawfully authorized, executed and delivered by the Commonwealth; (ii) the Trust Agreement and the applicable Supplemental Trust Agreement are in full force and effect and are valid and binding upon the Commonwealth and enforceable in accordance with their terms; (iii) the Commonwealth is duly authorized and entitled to issue such Series of Bonds and, upon the execution and delivery thereof and upon authentication by the Trustee, such Series of Bonds will be duly and validly issued and will constitute valid and binding general obligations of the Commonwealth for which the good faith, credit and taxing power of the Commonwealth are irrevocably pledged and entitled to the benefits of the Trust Agreement; and (iv) all legal authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by this Trust Agreement and, with respect to any Series of Bonds other than the Series 2022A Bonds, the Supplemental Trust Agreement authorizing such Bonds, are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes; *provided, however,* that such opinion of Transaction Counsel may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determination by the Title III Court addresses and provides for such matters; *provided, further,* that such opinion of Transaction Counsel may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy; and]

(f)      for any issuance of Bonds issued after the Effective Date, [an opinion of the Secretary of Justice of the Commonwealth to the effect that (i) the Trust Agreement and, if any, the applicable Supplemental Trust Agreement authorizing the Series of Bonds have been duly and lawfully authorized, executed and delivered by the Commonwealth; (ii) the Trust Agreement and the applicable Supplemental Trust Agreement are in full force and effect and are valid and binding upon the Commonwealth and enforceable in accordance with their terms; (iii) the Commonwealth is duly authorized and entitled to issue such Series of Bonds and, upon the execution and delivery

- 15 -

thereof and upon authentication by the Trustee, such Series of Bonds will be duly and validly issued and will constitute valid and binding general obligations of the Commonwealth for which the good faith, credit and taxing power of the Commonwealth are irrevocably pledged and entitled to the benefits of the Trust Agreement; (iv) all legal authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by this Trust Agreement and, with respect to any Series of Bonds other than the Series 2021A Bonds, the Supplemental Trust Agreement authorizing such Bonds, are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes; (v) no litigation is pending, or, to the best of his or her knowledge, threatened (a) to restrain or enjoin the issuance or delivery of any of the Bonds, (b) in any way contesting or affecting any authority for or the validity of this Trust Agreement, the applicable Supplemental Trust Agreement, the Bonds, the issuance of the Bonds, or the repayment of other indebtedness of the Commonwealth as set forth in this Trust Agreement, (c) in any way contesting the power of the Authorized Officer of the Commonwealth to issue the Bonds or the power of the Commonwealth to sell the Bonds, or (d) in any way contesting the pledge of the good faith, credit and taxing power of the Commonwealth to the prompt payment of the Principal of and interest on the Bonds; *provided, however,* that such opinion of the Secretary of Justice of the Commonwealth may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determinations address and provide for such matters; *provided, further*, that such opinion of Secretary of Justice of the Commonwealth may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy, and (vi) the Bonds constitute "public debt" within the meaning of Sections 2 and 8 of Article VI of the Puerto Rico Constitution;] and

(g)     for each issuance of Refunding Bonds, a certificate of an Authorized Officer of the Commonwealth demonstrating that upon the issuance of such Series of Refunding Bonds:

(A)     the final maturity date of the Refunding Bonds is not later than thirty (30) years from the original scheduled maturity date of the Outstanding Bonds to be refunded; and

(B)     upon the issuance of any Refunding Bonds, (1) there is no increase in the amount of Principal and interest due on Outstanding Bonds in any Fiscal Year and (2) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by the Commonwealth in its Debt Management Policy; provided, however, that, refinancings without cash flow savings in any Fiscal Year are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and debt service due in any Fiscal Year does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

**Section 2.03   Supplemental Trust Agreements**. Each Supplemental Trust Agreement authorizing the issuance of Refunding Bonds shall specify the following:

(a)     The authorized principal amount of such Series of Bonds;

- 16 -

(b)      The date or dates of the Bonds, the maturity date or dates and Principal amounts of each maturity of the Bonds of such Series, the amount and date of each Sinking Fund Installment, as applicable, and which Bonds of such Series are Serial Bonds or Term Bonds, if any, and the Record Date or Record Dates of the Bonds of such Series;

(c)      The interest rate or rates, if any, on the Bonds of such Series and the first date on which interest on the Bonds of such Series shall be payable; *provided, however,* in no event shall a Holder of Bonds be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon) other than overdue interest that accrues at the regular non-penalty rate of the applicable Bond or interest accruing on such overdue interest at the regular non-penalty rate of the applicable Bond;

(d)      If all or a portion of the Bonds of such Series are Capital Appreciation Bonds, the Valuation Dates for such Bonds and the Accreted Value on each such Valuation Date;

(e)      The denomination or denominations of and the manner of numbering and lettering of the Bonds of such Series;

(f)      The Redemption Price or Redemption Prices, if any, and, subject to Article IV hereof, the redemption terms, if any, for the Bonds of such Series;

(g)      Provisions for the sale or exchange of the Bonds of such Series and for the delivery thereof;

(h)      The form of the Bonds of such Series and the form of the Trustee's certificate of authentication thereon, and whether any Bonds of such Series are to be issued as Book Entry Bonds and the Depository therefor;

(i)      Directions for the application of the proceeds of the Bonds of such Series;

(j)      If all or a portion of such Bonds will be issued as Insured Bonds, the terms and conditions for payment of such Insured Bonds under the applicable Bond Insurance Policy; *provided, however,* in no event shall the Holder of Insured Bonds or the Bond Insurer be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon); and

(k)      Any other provisions deemed advisable by an Authorized Officer of the Commonwealth not in conflict with the provisions hereof or of any Ancillary Agreement.

**Section 2.04   Maturity Dates, Principal Amounts and Interest Rates for Series 2022A-1 Current Interest Bonds**. The Series 2022A-1 Current Interest Bonds shall bear interest at such rates and shall mature on July 1 of each year set forth below and in the amounts set forth below:

| Year | Principal Amount | Interest Rate | CUSIP |
|------|------------------|---------------|-------|
| 2023 | $745,050,000 | 5.000% | |
| 2025 | 740,820,000 | 5.000 | |
| 2027 | 729,565,000 | 5.000 | |
| 2029 | 710,040,000 | 5.000 | |
| 2031 | 680,835,000 | 5.000 | |
| 2033 | 637,040,000 | 4.000 | |
| 2035 | 448,580,000 | 4.000 | |
| 2037 | 255,660,000 | 4.000 | |
| 2041 | 204,600,000 | 4.000 | |
| 2046 | 708,865,000 | 4.000 | |

**Section 2.05   Maturity Dates, Principal Amounts and Interest Rates for Series 2022A-1 Capital Appreciation Bonds**[3]. The Series 2022A-1 Capital Appreciation Bonds shall accrue and accrete at such rates and shall mature on July 1 of each year set forth below and in the Maturity Value set forth below:

| Year | Initial Accreted Amount | Maturity Value[†] | Interest Rate | CUSIP |
|------|-------------------------|-------------------|---------------|-------|
| 2024 | $288,241,989.75 | $334,275,000.00 | 5.000% | |
| 2033 | 442,506,553.50 | $836,275,000.00 | 5.375 | |

[†]  "Maturity Value" reflects Accreted Value at maturity if no Sinking Fund Installment are made prior to stated maturity.

**Section 2.06   Maturity Dates, Principal Amounts and Interest Rates for Series 2022A-2 Bonds**. The Series 2022A-2 Bonds shall bear interest at such rates and shall mature on July 1 of each year set forth below and in the amounts set forth below:

| Year | Principal Amount | Interest Rate | CUSIP |
|------|------------------|---------------|-------|
| 2041 | $822,260,000 | 5.000% | |

**Section 2.07   Interest Payments and Interest Accretion**. (a) The Series 2022A Current Interest Bonds shall bear interest from July 1, 2021 until paid (whether at maturity, prior redemption or after maturity following payment default by the Commonwealth), payable on the Effective Date and semiannually thereafter on each Interest Payment Date, at the rates provided above. Interest on the Series 2022A Current Interest Bonds shall be computed on the basis of a 360-day year consisting of twelve 30-day months. Interest shall accrue on overdue interest and Principal at the rates provided above, and shall compound on each Interest Payment Date. All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2022A Current Interest Bonds shall be issued as fully registered bonds in Authorized Denominations. If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

---

[3]NTD: Amounts are preliminary.

4842-1351-5245.23

(b)      Interest on the Series 2022A-1 Capital Appreciation Bonds shall accrue and accrete from July 1, 2021 until paid (whether at maturity, prior redemption or after maturity following payment default by the Commonwealth).   Interest on the Series 2022A-1 Capital Appreciation Bonds will not be paid on a current basis, but will be added to the Principal thereof in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Commonwealth).   See "Exhibit C - Table of Accreted Value for the Series 2022A-1 Capital Appreciation Bonds" for the Accreted Values for Series 2022A-1 Capital Appreciation Bonds on each Valuation Date, assuming that no Sinking Fund Installment will be made prior to stated maturity. All overdue amounts (and any interest thereon) shall remain due and payable until paid.

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF BONDS

**Section 3.01   Place and Medium of Payment**.  The Bonds shall be payable, with respect to interest, Principal and Redemption Price, in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except in the case of Book Entry Bonds (as provided in Section 3.10 hereof) as otherwise provided in Section 4.07 hereof, upon presentation and surrender of Bonds, the Principal or Redemption Price of such Bonds shall be payable at the designated corporate trust office of the Trustee.  Interest on the Bonds shall be paid by check mailed to the registered owner thereof at the address thereof as it appears on the registry books of the Commonwealth or if authorized by the Supplemental Trust Agreement authorizing a Series of Bonds by wire transfer to such registered owner of the Bonds of such Series. For purposes of this Section, interest is payable on an Interest Payment Date to the registered owner of a Bond at the close of business on the Record Date for such Bond.  All payments of Principal or Redemption Price of or interest on Bonds shall specify the CUSIP number or numbers of the Bonds in connection with which such payment is made.  All payments of Principal and interest shall be rounded to the nearest $1.00.

The Bonds of each Series shall be issued in the form of fully registered Bonds without coupons.

Bonds of each Series issued prior to the first Interest Payment Date thereof shall be dated as of the date specified in the Supplemental Trust Agreement authorizing the issuance thereof. Bonds of each Series issued on or subsequent to the first Interest Payment Date thereof shall be dated as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be an Interest Payment Date, in which case they shall be dated as of such date of authentication; ***provided, however,*** that if, as shown by the records of the Trustee, interest on the Bonds of any Series has not been paid as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, the Bonds of such Series issued in lieu of Bonds surrendered for transfer or exchange shall be dated as of the date through which interest has been paid in full on the Bonds surrendered or, if no interest has been paid on the Bonds surrendered since their authentication, as of the date of authentication of the surrendered Bonds.  Bonds of each Series shall bear interest from (and including) their date and shall bear interest on overdue interest at the interest rate of such Bonds, which shall capitalize

- 19 -

on each Interest Payment Date. For the avoidance of doubt, if any Principal of, or accrued interest on, a Bond is not paid when due, such Principal and interest shall remain due and payable until paid.

All Bonds of each Series shall mature and/or have Sinking Fund Installments on July 1 of the year or years fixed herein with respect to the Series 2022A Bonds or by the Supplemental Trust Agreement authorizing the issuance of Refunding Bonds. Interest on all Bonds (other than Capital Appreciation Bonds) shall be payable on each Interest Payment Date of each year. The first installment of interest due on the Bonds of a Series may be for such period as the Commonwealth shall fix herein with respect to the Series 2022A Bonds or in the Supplemental Trust Agreement authorizing the issuance thereof of the Refunding Bonds.

**Section 3.02   Legends**.  The Bonds may contain, or have endorsed thereon, such provisions, specifications and descriptive words not inconsistent herewith or with any Supplemental Trust Agreement authorizing the same, as may be necessary or desirable and as may be determined by the Commonwealth prior to their delivery.  The Series 2022A Bonds shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE [   ] DAY OF [       ], 2022."

**Section 3.03   CUSIP Numbers**.  The Commonwealth shall provide for the assignment of CUSIP numbers for all Bonds ((including a separate CUSIP for each Series (and, where applicable, the subseries of such Series evidenced by such subseries' stated maturity date) of the Series 2022A-1 Current Interest Bonds, the Series 2022A-1 Capital Appreciation Bonds, the Series 2022A-2 Bonds and any future Series (and, where applicable, subseries of such Series evidenced by such subseries' stated maturity date) of Bonds issued pursuant to a Supplemental Trust Agreement) and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Bondholders as a convenience to Bondholders; *provided, however,* that any such notice may state that no representation is made as to the correctness of such number either as printed on such Bonds or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Bond or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption.  The Commonwealth shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Bond of which the Commonwealth has knowledge.  The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04   Execution and Authentication**.  The Bonds shall be executed in the name of the Commonwealth by the manual or facsimile signature of an Authorized Officer of the Commonwealth, or in such other manner as may be permitted by law.  In case any one or more of the officers or employees who shall have signed any of the Bonds shall cease to be such officer or employee before the Bonds so signed shall have been actually authenticated and delivered by the Trustee, such Bonds may, nevertheless, be delivered as provided herein, and may be issued as if the Persons who signed such Bonds had not ceased to hold such offices or be so employed.  Any Bond may be signed on behalf of the Commonwealth by such Persons as at the actual time of the execution of such Bond shall be duly authorized or hold the proper office in or be employed by, the Commonwealth, although at the date of the Bonds such Persons may not have been so authorized or have held such office or employment.

- 20 -

The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth herein with respect to the Series 2022A Bonds or in the Supplemental Trust Agreement authorizing the issuance of the Bonds, executed manually by the Trustee. Only such Bonds as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Bond executed on behalf of the Commonwealth shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05   Interchangeability of Bonds**. Bonds, upon surrender thereof at the designated corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate principal amount of Bonds of the same Series, maturity and tenor of any other authorized denominations.

**Section 3.06   Transfer and Registry**. So long as any of the Bonds remain Outstanding, the Commonwealth shall maintain and keep, or cause to be maintained and kept, at the designated corporate trust office of the Trustee, books for the registration and transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Commonwealth shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or transfer. So long as any of the Bonds remain Outstanding, the Commonwealth shall make all necessary provisions to permit the exchange of Bonds at the designated corporate trust office of the Trustee.

**Section 3.07   Transfer of Bonds**. Each Bond shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in Person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer. Upon the transfer of any such Bond, the Commonwealth shall cause to be issued in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity and tenor as the surrendered Bond.

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

The Commonwealth and the Trustee may deem and treat the Person in whose name any Outstanding Bond shall be registered upon the books of the Commonwealth as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the Principal or Redemption Price of and, subject to the provisions of Section 3.01 hereof with respect to Record Dates, interest on such Bond and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall

be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums paid, and neither the Commonwealth nor the Trustee shall be affected by any notice to the contrary. The Commonwealth agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without negligence hereunder, in so treating such registered owner.

Section 3.08   **Regulations with Respect to Exchanges and Transfers**. In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the Commonwealth shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions hereof. All Bonds surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee. For every such exchange or transfer of Bonds, whether temporary or definitive, the Commonwealth or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer. Notwithstanding any other provisions hereof, the cost of preparing each new Bond upon each exchange or transfer, and any other expenses of the Commonwealth or the Trustee incurred in connection therewith, shall be paid by the Person requesting such exchange or transfer. The Commonwealth shall not be obliged to make, or cause to be made, any exchange or transfer of Bonds of any Series during the period beginning on the Record Date for such Bonds immediately preceding an Interest Payment Date on such Bonds and ending on such Interest Payment Date, or, in the case of any proposed redemption of Bonds of such Series, after the date immediately preceding the date notice of redemption has been mailed.

Section 3.09   **Bonds Mutilated, Destroyed, Lost or Stolen**. In case any Bond shall become mutilated or be destroyed, lost or stolen, the Commonwealth in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, tenor and Principal amount as the Bond so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for such Bond so destroyed, lost or stolen, upon filing with the Commonwealth evidence satisfactory to the Commonwealth and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith. All Bonds so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Commonwealth. In case any Bond which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Commonwealth may, instead of issuing a Bond in exchange or substitution therefor, pay or authorize the payment of such mutilated Bond upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Bond, upon the Holder thereof filing evidence satisfactory to the Commonwealth and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith.

- 22 -

**Section 3.10   Book Entry Bonds**. Anything herein to the contrary notwithstanding, the Series 2022A Bonds shall be authorized and issued as Book Entry Bonds and any other Bonds may be authorized and issued as Book Entry Bonds in accordance with the Supplemental Trust Agreement authorizing such Bonds.

For all purposes of the Trust Agreement the Holder of a Book Entry Bond shall be the Depository therefor and neither the Commonwealth nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Bond or to any direct or indirect participant in such Depository. Without limiting the generality of the foregoing, neither the Commonwealth nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Bond with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Bond, (b) the delivery to any participant of the Depository, the beneficial owner of such Bond or any other Person, other than the Depository, of any notice with respect to such Bond, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Bond or any other Person, other than the Depository, of any amount with respect to the Principal or Redemption Price of, or interest on, such Bond. The Commonwealth and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Bond for the purpose of (x) payment of the Principal or Redemption Price of and interest on such Bond, (y) giving notices of redemption and of other matters with respect to such Bond, (z) registering transfers with respect to such Bond, and for all other purposes whatsoever. The Trustee shall pay all Principal or Redemption Price of and interest on such Bond only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Commonwealth's obligations with respect to such Principal or Redemption Price and interest to the extent of the sum or sums so paid. No Person other than the Depository shall receive a Bond or other instrument evidencing the Commonwealth's obligation to make payments of the Principal or Redemption Price thereof and interest thereon.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Bond which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Bond to the Trustee; ***provided, however,*** that the Trustee shall maintain records as to each such payment and of the Principal amount of such Bond Outstanding, which shall be binding on the Commonwealth and the Holders from time to time of such Bond.

The Commonwealth, without the consent of the Trustee, the beneficial owner of a Book Entry Bond or any other Person, may terminate the services of the Depository with respect to a Book Entry Bond if the Commonwealth reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Bonds or (b) a continuation of the requirement that all of the Outstanding Bonds of like Series issued in book entry form be registered in the registration books of the Commonwealth in the name of the Depository, is not in the best interest of the beneficial owners of such Bonds, and the Commonwealth shall terminate the services of the Depository upon receipt by the Commonwealth and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Bonds for which the Depository is serving as Depository.

- 23 -

Upon the termination of the services of a Depository with respect to a Book Entry Bond, or upon the resignation of a Depository with respect to a Book Entry Bond, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Commonwealth following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Bonds shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names designated by Bondholders transferring or exchanging such Bonds, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Commonwealth or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

**Section 3.11  Preparation of Definitive Bonds; Temporary Bonds**.  The definitive Bonds of each Series shall be lithographed or printed on steel engraved borders, except that Book Entry Bonds may be typewritten.  Until the definitive Bonds of any Series are prepared, the Commonwealth may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Bonds, but subject to the same provisions, limitations and conditions as the definitive Bonds, except as to the denominations thereof and as to exchangeability for registered Bonds, one or more temporary Bonds, substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in authorized denominations or any whole multiples thereof authorized by the Commonwealth, and with such omissions, insertions and variations as may be appropriate to such temporary Bonds. The Commonwealth at its own expense shall prepare and execute and, upon the surrender at the designated corporate trust office of the Trustee of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated corporate trust office of the Trustee, definitive Bonds of the same aggregate Principal amount, Series and maturity as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds issued pursuant hereto.

All temporary Bonds surrendered in exchange for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

## ARTICLE IV.

## REDEMPTION OF BONDS

**Section 4.01  Authorization of Redemption**.  Bonds subject to redemption prior to maturity pursuant hereto or to a Supplemental Trust Agreement shall be redeemable, in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein or in the Supplemental Trust Agreement authorizing such Series.

**Section 4.02  Redemption at the Election of the Commonwealth**.  In the case of any redemption of Bonds other than as provided in Section 4.03 hereof, the Commonwealth shall give

- 24 -

written notice to the Trustee of its election to redeem, of the Series and of the Principal amounts and Redemption Prices of the Bonds of each maturity of such Series to be redeemed. Such notice shall be given not less than thirty (30) days prior to the redemption date. The Series, maturities and Principal amounts thereof to be so redeemed shall be determined by the Commonwealth in its sole discretion, subject to any limitations with respect thereto contained herein (including, without limitation, Section 4.05 below) or in the Supplemental Trust Agreement authorizing such Series. The Commonwealth shall pay to the Trustee on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee in the Debt Service Fund, is sufficient to redeem on the redemption date at the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, all of the Bonds to be so redeemed.

**Section 4.03   Redemption Other Than at Commonwealth's Election**. Whenever by the terms hereof (with respect to the Series 2022A Bonds) or of a Supplemental Trust Agreement the Trustee is required to redeem Bonds through the application of mandatory Sinking Fund Installments, the Trustee shall select the Bonds of the Series and maturities to be redeemed in the manner provided in Section 4.05 hereof, give the notice of redemption and pay out of money available therefor the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, to the appropriate Paying Agents in accordance with the terms of this Article IV.

**Section 4.04   Redemption Prices and Terms of Series 2022A Bonds**. The Series 2022A Current Interest Bonds shall be subject to redemption prior to maturity as provided in this Section 4.04.

(a)   *Optional Redemption*. The Series 2022A Current Interest Bonds maturing on or before July 1, 2031 are not subject to optional redemption prior to stated maturity. The Series 2022A-1 Capital Appreciation Bonds maturing on July 1, 2024 are not subject to optional redemption prior to stated maturity.

The Series 2022A-1 Current Interest Bonds maturing on July 1, 2033, July 1, 2035, July 1, 2037, July 1, 2041, and July 1, 2046 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
| --- | --- |
| July 1, 2031 through June 30, 2032 | 103% |
| July 1, 2032 through June 30, 2033 | 102% |
| July 1, 2033 through June 30, 2034 | 101% |
| On and after July 1, 2034 | 100% |

The Series 2022A-1 Capital Appreciation Bonds maturing on July 1, 2033 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
| --- | --- |
| On or after July 1, 2031 | 100% of Accreted Value |

- 25 -

The Series 2022A-2 Bonds maturing on July 1, 2041 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
| --- | --- |
| July 1, 2031 through June 30, 2032 | 103% |
| July 1, 2032 through June 30, 2033 | 102% |
| July 1, 2033 through June 30, 2034 | 101% |
| On and after July 1, 2034 | 100% |

(b)      *Mandatory Redemption for the Series 2022A-1 Current Interest Bonds*.  The Series 2022A-1 Current Interest Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed herein, at the Redemption Price of one hundred per centum (100%) of the Principal amount of each Series 2022A-1 Current Interest Bond or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption.  Unless none of the Series 2022A-1 Current Interest Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) of this Trust Agreement permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series 2022A-1 Current Interest Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2022A-1 Current Interest Bonds:

$745,050,000
Series 2022A-1
Current Interest Bonds
maturing July 1, 2023

| Year | Amount[*] |
| --- | --- |
| 2022 | $ 372,660,000 |
| 2023[†] | 372,390,000 |

[†] Stated maturity.

$740,820,000
Series 2022A-1
Current Interest Bonds
maturing July 1, 2025

| Year | Amount[*] |
| --- | --- |
| 2024 | $ 371,350,000 |
| 2025[†] | 369,470,000 |

[†] Stated maturity.

- 26 -

$729,565,000
Series 2022A-1
Current Interest Bonds
maturing July 1, 2027

| Year | Amount[*] |
|---|---|
| 2026 | $ 366,675,000 |
| 2027[†] | 362,890,000 |

[†] Stated maturity.

$710,040,000
Series 2022A-1
Current Interest Bonds
maturing July 1, 2029

| Year | Amount[*] |
|---|---|
| 2028 | $ 358,030,000 |
| 2029[†] | 352,010,000 |

[†] Stated maturity.

$680,835,000
Series 2022A-1
Current Interest Bonds
maturing July 1, 2031

| Year | Amount[*] |
|---|---|
| 2030 | $ 344,740,000 |
| 2031[†] | 336,095,000 |

[†] Stated maturity.

$637,040,000
Series 2022A-1
Current Interest Bonds
maturing July 1, 2033

| Year | Amount[*] |
|---|---|
| 2032 | $ 325,990,000 |
| 2033[†] | 311,050,000 |

[†] Stated maturity.

$448,580,000
Series 2022A-1
Current Interest Bonds
maturing July 1, 2035

| Year | Amount* |
|------|---------|
| 2034 | $ 294,385,000 |
| 2035† | 154,195,000 |

† Stated maturity.

$255,660,000
Series 2022A-1
Current Interest Bonds
maturing July 1, 2037

| Year | Amount* |
|------|---------|
| 2036 | $ 137,290,000 |
| 2037† | 118,370,000 |

† Stated maturity.

$204,600,000
Series 2022A-1
Current Interest Bonds
maturing July 1, 2041

| Year | Amount* |
|------|---------|
| 2038 | $ 97,300,000 |
| 2039 | 64,880,000 |
| 2040 | 29,640,000 |
| 2041† | 12,780,000 |

† Stated maturity.

$708,865,000
Series 2022A-1
Current Interest Bonds
maturing July 1, 2046

| Year | Amount* |
|------|---------|
| 2042 | $ 130,875,000 |
| 2043 | 136,110,000 |
| 2044 | 141,555,000 |
| 2045 | 147,220,000 |
| 2046† | 153,105,000 |

† Stated maturity.

(c)     _Mandatory Redemption for the Series 2022A-1 Capital Appreciation Bonds_.
The Series 2022A-1 Capital Appreciation Bonds shall be subject to redemption, in part, through

- 28 -

application of Sinking Fund Installments as herein provided, upon notice given as prescribed herein, at the Redemption Price of one hundred per centum (100%) of the Accreted Value calculated to the Redemption Date of each Series 2022A-1 Capital Appreciation Bond or portion thereof to be redeemed. Unless none of the Series 2022A-1 Capital Appreciation Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) of this Trust Agreement permitting amounts to be credited to part or all of any one or more Sinking Fund Installments, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series 2022A-1 Capital Appreciation Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2022A-1 Capital Appreciation Bonds:

$288,241,989.75 Initial Accreted Value
Series 2022A-1
Capital Appreciation Bonds
maturing July 1, 2024

| Year | Initial Accreted Value | Accreted Value at Redemption Date* | Maturity Value** |
|------|------------------------|------------------------------------|------------------|
| 2022 | $100,862,061.30 | $105,968,971.50 | $116,970,000.00 |
| 2023 | 96,003,057.15 | 105,969,766.35 | 111,335,000.00 |
| 2024†† | 91,376,871.30 | 105,970,000.00 | 105,970,000.00 |

\* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
\*\* Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

$442,506,553.50 Initial Accreted Value
Series 2022A-1
Capital Appreciation Bonds
maturing July 1, 2033

| Year | Initial Accreted Value | Accreted Value at Redemption Date* | Maturity Value** |
|------|------------------------|------------------------------------|------------------|
| 2029 | $98,129,013.00 | $149,997,523.50 | $185,450,000.00 |
| 2030 | 93,059,851.80 | 149,997,764.30 | 175,870,000.00 |
| 2031 | 88,252,614.90 | 149,998,089.75 | 166,785,000.00 |
| 2032 | 83,694,073.80 | 149,998,937.80 | 158,170,000.00 |
| 2033†† | 79,371,000.00 | 150,000,000.00 | 150,000,000.00 |

\* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
\*\* Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

(d) *Mandatory Redemption of the Series 2022A-2 Bonds*. The Series 2022A-2 Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed herein, at the Redemption Price

- 29 -

of one hundred per centum (100%) of the Principal amount of each Series 2022A-2 Bond or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption. Unless none of the Series 2022A-2 Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series 2022A-2 Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2022A-2 Bonds:

$822,260,000
Series 2022A-2
Current Interest Bonds
maturing July 1, 2041

| Year | Amount |
|------|--------|
| 2035 | $121,695,000 |
| 2036 | 118,735,000 |
| 2037 | 115,625,000 |
| 2038 | 112,360,000 |
| 2039 | 117,980,000 |
| 2040 | 123,880,000 |
| 2041[†] | 111,985,000 |

[†] Stated maturity.

(e)     *Credit Against Sinking Fund Installments*. There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable on a Series 2022A Current Interest Bond entitled, as applicable, to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of such Series 2022A Current Interest Bond (A) purchased by the Commonwealth with moneys in the Debt Service Fund pursuant to Section 5.06(b) of this Trust Agreement, (B) redeemed at the option of the Commonwealth pursuant to paragraph (a) of this Section, (C) purchased by the Commonwealth and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 12.01 of this Trust Agreement. Series 2022A Current Interest Bonds purchased pursuant to Section 5.06(b) of this Trust Agreement shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section. Series 2022A Current Interest Bonds redeemed at the option of the Commonwealth, purchased by the Commonwealth (other than pursuant to Section 5.06(b) of this Trust Agreement), or deemed to have been paid in accordance with Section 12.01 of this Trust Agreement shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Commonwealth shall specify in a written direction of an Authorized Officer of the Commonwealth delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 2022A Current Interest Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 2022A Current Interest Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 12.01 of this

Trust Agreement to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

**Section 4.05   Selection of Bonds to be Redeemed**.  Unless otherwise provided in the Supplemental Trust Agreement authorizing the issuance of Bonds of a Series, in the event of redemption of less than all of the Outstanding Bonds of like Series, maturity and tenor, the Trustee shall assign to each Outstanding Bond of the Series, maturity and tenor to be redeemed a distinctive number for each unit of the Principal amount of such Bond equal to the lowest denomination in which the Bonds of such Series are authorized to be issued and shall select by lot, using such method of selection as it shall deem proper in its discretion, from the numbers assigned to such Bonds as many numbers as, at such unit amount equal to the lowest denomination in which the Bonds of such Series are authorized to be issued for each number, shall equal the Principal amount of such Bonds to be redeemed.  In making such selections the Trustee may draw the Bonds by lot (i) individually or (ii) by one or more groups, the grouping for the purpose of such drawing to be by serial numbers (or, in the case of Bonds of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued, by the numbers assigned thereto as in this Section 4.05 provided) which end in the same digit or in the same two digits.  In case, upon any drawing by groups, the total Principal amount of Bonds drawn shall exceed the amount to be redeemed, the excess may be deducted from any group or groups so drawn in such manner as the Trustee may reasonably determine.  The Trustee may in its discretion assign numbers to aliquot portions of Bonds and select part of any Bond for redemption.  The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; ***provided, however,*** that only so much of the Principal amount of each such Bond of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued shall be redeemed as shall equal the lowest denomination in which the Bonds of such Series are authorized to be issued for each number assigned to it and so selected.

For purposes of this Section 4.05, the lowest denomination in which a Capital Appreciation Bond is authorized to be issued shall be the lowest Accreted Value authorized to be due at maturity on such Bonds.

Notwithstanding the foregoing, in the event that a Depository shall be the registered owner of all of such Bonds of the Series being redeemed, if less than all of the Bonds of a particular Series are called for redemption, the Commonwealth shall select the maturity or maturities of such Series to be redeemed and the Depository, on behalf of the Trustee, shall select the Bonds within the same maturity of such Series to be redeemed by means of a random lottery and in any event in accordance with the applicable practices of the Depository.

**Section 4.06   Notice of Redemption**.  Whenever Bonds are to be redeemed, the Trustee shall give notice of the redemption of the Bonds in the name of the Commonwealth which notice shall specify:  (a) the Bonds to be redeemed which shall be identified by the designation of the Bonds given in accordance with Article II hereof; (b) the maturity dates and interest rates or accretion rates of the Bonds to be redeemed and the date of such Bonds; (c) the numbers and other distinguishing marks of the Bonds to be redeemed, including CUSIP numbers; (d) the redemption date; (e) the Redemption Price, if then known; (f) with respect to each such Bond, the Principal amount thereof to be redeemed; (g) that, except in the case of Book Entry Bonds, such Bonds will be redeemed at the designated corporate trust office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (h) that no representation

- 31 -

is made as to the correctness of the CUSIP number either as printed on the Bonds or as contained in such notice and that an error in a CUSIP number as printed on a Bond or as contained in such notice shall not affect the validity of the proceedings for redemption; and (i) if the Commonwealth's obligation to redeem the Bonds is subject to conditions, a statement to that effect and of the conditions to such redemption. Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Bond to be redeemed the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, and that, from and after such date, payment having been made or provided for, interest thereon shall cease to accrue. Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date. Such notice shall be sent by first class mail, postage prepaid (i) to the registered owners of the Bonds which are to be redeemed, at their last known addresses, if any, appearing on the registration books, and (ii) to the Bond Insurer (if any) insuring the Bonds to be redeemed, at the Bond Insurer's last known address, not more than ten (10) Business Days prior to the date such notice is given. Upon giving such notice, the Trustee shall promptly certify to the Commonwealth that it has mailed or caused to be mailed such notice to the Holders of the Bonds to be redeemed in the manner provided herein. Such certificate shall be conclusive evidence that such notice was given in the manner required hereby. The failure of any Holder of a Bond to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Bonds.

The Trustee shall, if any of the Bonds to be redeemed are Book Entry Bonds, transmit a copy of the notice of redemption to the Depository for such Book Entry Bonds not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Bonds are held by the Depository, such notice shall be given in accordance with the procedures of the Depository). Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Bond and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Bonds. This paragraph shall not alter the Trustee's obligation to transmit a notice of redemption to the Bond Insurer as provided in the preceding paragraph.

Any notice of redemption given pursuant to this Section 4.06 which states that it is conditional upon receipt by the Trustee of money sufficient to pay the Redemption Price of such Bonds or upon the satisfaction of any other condition, may be rescinded at any time before payment of such Redemption Price if any such condition so specified is not satisfied. Notice of such rescission shall be given by the Trustee to affected Bondholders as promptly as practicable upon the failure of such condition or the occurrence of such other event.

**Section 4.07   Payment of Redeemed Bonds**. Notice having been given in the manner provided in Section 4.06 hereof, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, except as otherwise provided in Section 3.10 hereof upon presentation and surrender of such Bonds, at the office or offices specified in such notice, and, in the case of Bonds presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest

- 32 -

accrued and unpaid to the redemption date; *provided, however,* that payment of the Redemption Price may be paid by wire transfer to such registered owner if so authorized in the Supplemental Trust Agreement that authorized the Bonds of the Series to be redeemed. If there shall be called for redemption less than all of the Principal amount of a registered Bond, the Commonwealth shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the Principal amount of the registered Bond so surrendered, Bonds of like Series, maturity and tenor in any of the authorized denominations. If, on the redemption date, money for the redemption of all Bonds or portions thereof of any like Series, maturity and tenor to be redeemed, together with interest accrued and unpaid thereon to the redemption date, shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, interest on the Bonds or portions thereof so called for redemption shall cease to accrue and such Bonds shall no longer be considered to be Outstanding hereunder. If such money shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

## ARTICLE V.

## STATUTORY LIEN ON MONEYS IN DEBT SERVICE FUND; FUNDS AND ACCOUNTS; COMMONWEALTH REVENUES AND APPLICATION THEREOF

**Section 5.01  Statutory Lien in Debt Service Fund**. To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants, automatically, upon the issuance of the Bonds, the Statutory Lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys deposited in the Debt Service Fund established herein, which Statutory Lien shall remain in full force and effect until the Bonds have been paid or satisfied in full in accordance with their terms. The Statutory Lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of the Statutory Lien. Furthermore, pursuant to this Trust Agreement, the funds established hereunder (with the exception of the Arbitrage Rebate Fund [and the Costs of Issuance Fund]), are hereby pledged to secure the repayment of the Bonds. The Commonwealth agrees that, as of the commencement date of any future insolvency proceeding commenced by or on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise), the automatic stay pursuant to 11 U.S.C. Section 362 shall be deemed waived with respect to monies on deposit in the Debt Service Fund, and the Commonwealth shall consent to any motion for relief from the automatic stay filed by the Trustee or any beneficial owner of the Bonds filed pursuant to this Section 5.01.

**Section 5.02  Establishment of Funds and Accounts**. (a) The following funds and separate accounts within funds are hereby established and shall be held, in trust for the benefit of the Holders of the Bonds and maintained by the Trustee:

> Costs of Issuance Fund; and
> Debt Service Fund, comprised of:
>> Interest Account; and
>> Principal Account

(b)        The Arbitrage Rebate Fund is hereby established and created and shall be held by the Trustee for the benefit of the Commonwealth.  The Arbitrage Rebate Fund is not subject to the Statutory Lien or contractual lien.

(c)        Each such fund may contain one or more accounts or subaccounts, for purposes of internal accounting, as necessary for arbitrage calculations or as the Commonwealth may otherwise deem proper.  All money at any time deposited in any fund, account or subaccount created hereby or by any Supplemental Trust Agreement or required hereby or thereby (other than the Arbitrage Rebate Fund) to be created shall be held in trust for the benefit of the Holders of Bonds, but shall nevertheless be disbursed, allocated and applied solely for the uses and purposes provided herein.

**Section 5.03    Application of Bond Proceeds**.  Upon the receipt of proceeds from the sale of a Series of Bonds, the Commonwealth shall apply such proceeds as specified in the Supplemental Trust Agreement authorizing such Series.  No deposit of proceeds shall be made in connection with the issuance of the Series 2022A Bonds; provided that, on the Effective Date, the Secretary of Treasury shall transfer into the Debt Service Fund such additional amounts as may be necessary to account for the Bonds being issued as of July 1, 2021.

Accrued interest, if any, received upon the delivery of a Series of Bonds shall be deposited in the Debt Service Fund unless all or any portion of such amount is to be otherwise applied as specified in the Supplemental Trust Agreement authorizing such Series.

**Section 5.04    Application of Money in the Costs of Issuance Fund**.  [(a) As soon as practicable after the delivery of each Series of Bonds, there shall be deposited into each account within the Costs of Issuance Fund the amount, if any, required to be deposited therein pursuant to the Supplemental Trust Agreement authorizing such Series.

(b)        Except as otherwise provided in this Article V and in any applicable Supplemental Trust Agreement, money in the Costs of Issuance Fund shall be used only to pay the Costs of Issuance of the Bonds payable by the Commonwealth.  Such payments shall be made by the Trustee upon the direction of an Authorized Officer of the Commonwealth that sets forth in reasonable detail the purpose of the payment, the amount of such payment and the name of the payee.  If such payment is to be made by bank wire, such direction shall include the routing and account numbers of the payee.  If such payment is to be made by check, such direction shall include the address of the payee. The Trustee shall rely fully on any such written direction delivered pursuant to this Section and shall not be required to make any investigation in connection therewith.

(c)        The money remaining in the Costs of Issuance Fund after paying or making provision in accordance with the direction of an Authorized Officer of the Commonwealth for the payments required to be made pursuant to paragraph (b) of this Section, including any Costs of Issuance then unpaid, shall be applied by the Trustee in the following order of priority:

- 34 -

*First*, to the Arbitrage Rebate Fund, the amount determined by the Commonwealth to be required to be deposited therein; and

*Second*, to the Debt Service Fund, any balance remaining therein.]

**Section 5.05   Application of Moneys**. On each [Monthly Disbursement Date,] the Secretary of Treasury shall transfer to the Trustee and the Trustee shall apply such amounts as follows and in the following order of priority; ***provided, however***, that on the Effective Date the Secretary of the Treasury shall deposit such additional amounts as may be necessary to account for the issuance of the Bonds from July 1, 2021:[4]

*First*: To the following accounts:

(i)        the Interest Account of the Debt Service Fund, one-sixth (1/6) of the amount of the interest payable on the Bonds on the next Interest Payment Date; and

(ii)       the Principal Account of the Debt Service Fund, one-twelfth (1/12) of the amount of Principal and Sinking Fund Installment due on the next Principal Payment Date;

*Second*: Upon the written direction of an Authorized Officer of the Commonwealth, to the Arbitrage Rebate Fund moneys on deposit in the amount set forth in such direction.

**Section 5.06   Debt Service Fund**. (a)  The Trustee shall pay out of the Debt Service Fund the Principal of and interest on all Outstanding Bonds as the same is due and payable. Amounts paid to a Paying Agent for payments pursuant to this Section shall be irrevocably pledged to and applied to such payments.

(b)       Notwithstanding the provisions of this Section, the Commonwealth may, at any time but in no event less than thirty-five (35) days prior to the succeeding date on which a Sinking Fund Installment is scheduled to be due, direct the Trustee to purchase, with money on deposit in the Debt Service Fund, at a price equal to the Principal amount (with respect to Bonds that are not Capital Appreciation Bonds) or the Accreted Value (with respect to Capital Appreciation Bonds) thereof plus interest accrued and unpaid to the date of such purchase, Term Bonds to be redeemed from such Sinking Fund Installment; provided that the portion of such purchase price funded from the Principal Account shall not exceed the amount of the upcoming Sinking Fund Installment due on such purchased bond and the portion of such purchase price funded from the Interest Account shall not exceed the amount of interest accrued and unpaid on such purchased bond to the date of such purchase; provided further that in the case of Capital Appreciation Bonds, no portion of the purchase price may be funded from the Interest Account.  Any Term Bond so purchased or otherwise purchased and delivered to the Trustee shall be canceled upon receipt thereof by the Trustee and evidence of such cancellation shall be given to the Commonwealth.  The Principal amount or Accreted Value, as applicable, of each Term Bond so canceled shall be credited against the Sinking Fund Installment due on such date.

(c)       Money in the Debt Service Fund in excess of the amount required to be deposited therein in accordance with Section 5.05 herein, shall at the written direction of an Authorized

---

[4]     NTD: Manner of payment of trustee fees under discussion.

Officer of the Commonwealth, upon payment or satisfaction in full of the Bonds, be withdrawn and transferred to the Commonwealth.

     **Section 5.07   Arbitrage Rebate Fund**. The Trustee shall deposit to the Arbitrage Rebate Fund any money delivered to it by the Commonwealth for deposit therein and, notwithstanding any other provisions of this Article V, shall transfer to the Arbitrage Rebate Fund, in accordance with written directions of an Authorized Officer of the Commonwealth, money on deposit in any other funds or accounts held by the Trustee hereunder at such times and in such amounts as shall be set forth in such written directions of the Commonwealth.

     Money on deposit in the Arbitrage Rebate Fund shall be applied by the Trustee in accordance with the direction of an Authorized Officer of the Commonwealth only for the purpose of making payments to the Department of the Treasury of the United States of America at such times and in such amounts as the Commonwealth shall determine, based on an opinion of Transaction Counsel, to be required by the Code to be rebated to the Department of the Treasury of the United States of America. As of any date, money on deposit in the Arbitrage Rebate Fund which an Authorized Officer of the Commonwealth determines to be in excess of the amount required to be so rebated as of such date, shall be transferred (a) to the Debt Service Fund, if the amount then on deposit in the Debt Service Fund is less than the sum of the amounts required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and (b) to the extent not required to be deposited in the Debt Service Fund, may at the direction of an Authorized Officer of the Commonwealth, either be retained therein or transferred to the Commonwealth.

     If and to the extent required by the Code, the Commonwealth shall periodically, at such times as may be required to comply with the Code, determine or cause to be determined the amount required by the Code to be rebated to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (a) transfer or direct the Trustee to transfer from any other of the funds and accounts held hereunder and deposit to the Arbitrage Rebate Fund, such amount as the Commonwealth shall have determined to be necessary in order to enable it to comply with its obligation to rebate money to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (b) pay out of the Arbitrage Rebate Fund to the Department of the Treasury of the United States of America the amount, if any, required by the Code to be rebated thereto.

     **Section 5.08   Transfer of Investments**. Whenever money in any fund or account established hereunder is to be paid in accordance herewith to another such fund or account, such payment may be made, in whole or in part, by transferring to such other fund or account investments held as part of the fund or account from which such payment is to be made, whose value, together with the money, if any, to be transferred, is equal to the amount of the payment then to be made; *provided, however,* that no such transfer of investments would result in a violation of any investment standard or guideline applicable to such fund.

# ARTICLE VI.

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

**Section 6.01   Security for Deposits.** All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Holders of the Bonds, and solely to the extent of any residual moneys to be returned to the Commonwealth pursuant to the terms of this Agreement, for the benefit of the Commonwealth, in such manner as may then be required by applicable federal or Commonwealth laws and regulations regarding security, by Eligible Investments of a market value at least equal at all times to the amount of the deposit so held by the Trustee. The Trustee shall have no obligation for the payment of interest on moneys properly held by it that are uninvested hereunder.

**Section 6.02   Investment of Funds and Accounts Held by the Trustee.** (a)  Subject to the limitations set forth in this paragraph, money held hereunder, if permitted by law, shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the direction of an Authorized Officer of the Commonwealth given in writing.

(b)      The Trustee may conclusively rely upon the Commonwealth's written instructions as to both the suitability and legality of the directed investments. Ratings of permitted investments shall be determined at the time of purchase of such permitted investments. The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)      Obligations purchased or other investments made as an investment of money in any fund or account held under the provisions hereof shall be deemed at all times to be a part of such fund or account and the income or interest earned, profits realized or losses suffered by a fund or account due to the investment thereof shall be credited or charged, as the case may be, to such fund or account.

(d)      In computing the amount in any fund or account held by the Trustee under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)      Subject to the provisions hereof, the Commonwealth, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Commonwealth, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section. Except as otherwise provided herein, such investments shall be sold by the Commonwealth or by the Trustee at the direction of the Authorized Officer of the Commonwealth at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the fund or account in which such investment is held. The Trustee shall advise the Commonwealth in writing, on or before the fifteenth (15th) day of each calendar month, of the amounts required to be on deposit in each fund and account hereunder and of the details of all investments held for the credit of each fund and account in its custody under the provisions hereof as of the end of the preceding month and as to whether such investments comply with the provisions of paragraphs (a) and (b) of this Section. The details of such investments shall include

- 37 -

the par value, if any, the cost and the current market value of such investments as of the end of the preceding month. The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in each such fund and account in the previous month.

(f)     Although the Commonwealth recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Commonwealth hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.03   Liability for Investments**. Neither the Commonwealth nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

## ARTICLE VII.

## PARTICULAR COVENANTS

The Commonwealth covenants and agrees with the Holders of the Bonds as follows:

**Section 7.01   Payment of Principal and Interest**. The Commonwealth shall pay or cause to be paid every Bond, including interest thereon, on the dates and at the places and in the manner provided in this Trust Agreement and in the Bonds.

**Section 7.02   Pledge of Good Faith and Credit; Bonds Constitute Public Debt**. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Principal of and the interest on the Bonds authorized by this Trust Agreement. The Bonds constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution. The Secretary of Treasury is authorized and directed to pay the Principal of and the interest of the Bonds as the same shall become due from any funds in the Treasury of the Commonwealth available for such purpose in the Fiscal Year for which said payment is required. Such funds in the Treasury of the Commonwealth available for such purpose shall be deposited by the Secretary of Treasury in trust with the Trustee for the benefit of the Holders of the Bonds in the amounts and at the times required by Section 5.05 hereof. For the avoidance of doubt, the Commonwealth acknowledges that all references in this Trust Agreement to the pledge of its "good faith, credit and taxing power" (consistent with the Spanish version of the Constitution) should also be interpreted as references to the pledge of its "full faith, credit and taxing power" (consistent with the English version of the Constitution).

**Section 7.03   Deemed Annual Allocation**. Pursuant to the Act, the Commonwealth shall, to the extent necessary to satisfy its obligations to pay the Bonds, apply (i) the proceeds of the 1.03% property tax levied pursuant to Act No. 107-2020, as amended, and collected by the Municipal Revenues Collection Center of the Commonwealth, (ii) any monies arising from the operation of Section 8 of Article VI of the Constitution, and (iii) any other available resources (*recursos disponibles*) of the Commonwealth to the payment of the Principal of and the interest (and accreted value) on the Bonds; provided that (A) this covenant is not intended to grant to the Holders of the Bonds any lien on such proceeds, monies and resources until deposited pursuant to

- 38 -

the provisions hereof, and (B) for purposes of compliance with this covenant, to the extent that such proceeds, monies and resources are transferred to the Commonwealth's General Fund, payments of principal and interest (and accreted value) made to the Holders of the Bonds from the Commonwealth's General Fund shall be deemed to have been made from such proceeds, monies and resources in the order set forth herein.

**Section 7.04   Powers as to Bonds**.  Pursuant to the Act, the Plan, and the Confirmation Order, the Commonwealth is duly authorized to create and issue the Bonds and to execute the Trust Agreement and each Supplemental Trust Agreement. The Commonwealth further represents that all corporate action on the part of the Commonwealth to that end has been duly and validly taken.  Pursuant to the Plan and the Confirmation Order, the Commonwealth further represents that the Bonds and the provisions hereof and of each Supplemental Trust Agreement are and shall be the valid and legally enforceable obligations of the Commonwealth in accordance with their terms and the terms hereof and of each Supplemental Trust Agreement.  The Commonwealth further covenants that its good faith, credit and taxing power pledge in support of the Bonds is a valid, binding and legally enforceable pledge of the Commonwealth.  The Commonwealth further covenants that it shall not fail to at all times to defend, preserve and protect, or cause to be defended, preserved and protected, the Statutory Lien and all of the rights of the Trustee for the benefit of the Holders of Bonds under the Trust Agreement and each Supplemental Trust Agreement against all claims and demands of all Persons whomsoever.

**Section 7.05   Further Assurance**.  The Commonwealth, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the Statutory Lien and the pledge of its good faith, credit and taxing power set forth herein, or which the Commonwealth may hereafter become bound to pledge or assign.

**Section 7.06   Offices for Payment and Registration of Bonds**.  Unless all of the Bonds are Book Entry Bonds, the Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Bonds may be presented for payment, which office or agency may be at or through the designated corporate trust office of the Trustee. The Commonwealth may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Bonds of the Series authorized thereby or referred to therein may be presented for payment.  The Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Bonds may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Bonds.  The provisions of this Section shall be subject to the provisions of Section 3.01 hereof.

**Section 7.07   General**.  The Commonwealth shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Commonwealth under the provisions hereof in accordance with the terms of such provisions.

Upon the date of issuance of Bonds, all conditions, acts and things required by the Plan and the statutes of the Commonwealth, including the Act, and hereby to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds, shall exist, have happened and have been performed.

**Section 7.08   Non-Impairment Covenant**. The Commonwealth, for the benefit of all initial and subsequent Holders of Bonds, covenants and agrees that, until all obligations with respect to this Trust Agreement and the Bonds have been paid or otherwise satisfied in full in accordance with their terms, the Commonwealth will not take any action that would:

(a)     Impair the monthly deposits of interest and Principal required by Article 203 of the Act and Section 5.05 hereof,

(b)     limit or alter the rights vested in Holders of Bonds in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the Holders of the Bonds,

(c)     impair the rights and remedies of the Holders of the Bonds.

**Section 7.09   Tax Exemption Covenant.** The Commonwealth covenants that it shall not take any action that would, or fail to take any action, if such failure would cause interest on the Tax Exempt Bonds to become includable in gross income for federal income tax purposes and that it will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the Holders of any Tax Exempt Bonds shall be and remain excludable from gross income for federal income tax purposes.

**Section 7.10   Comprehensive Cap on Net Tax-Supported Debt**.  For so long as any portion of the Series 2022A Bonds shall remain outstanding, the Commonwealth shall maintain a Comprehensive Cap on all Net Tax-Supported Debt (as defined in the Plan) for purposes of the limitation on the issuance of additional Net Tax-Supported Debt set forth in Article VI of the Debt Responsibility Act, which Comprehensive Cap shall not exceed at any time 7.94% of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of 0.25% of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds (as defined in the Plan) outstanding as of the Effective Date. Subject in all respects to the terms of the Plan, debt service payments on Series 2022A-1 Capital Appreciation Bonds, and payments on CVIs (as defined in the Plan) that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with another plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan or Title VI Qualifying Modification for HTA (as defined in the Plan), CCDA (as defined in the Plan), or PRIFA (as defined in the Plan), in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap. In connection with the issuance of Net Tax-Supported Debt, the Secretary of Treasury shall certify that such Net Tax-Supported Debt is being issued in compliance with the Comprehensive Cap. Absent manifest error, the certification of the Secretary of Treasury shall be conclusive and binding on all parties, including the Holders of Bonds issued under this Trust Agreement, and the validity of such Net Tax-Supported Debt shall not be subject to legal challenge. In calculating Debt Policy Revenues for purposes of this Section 7.10 and the Debt Responsibility Act, the Secretary of Treasury may rely on certifications from officers of public corporations as to the revenues of such public corporations.

**Section 7.11   Fiscal Plan.**   Any post-Effective Date Fiscal Plan proposed by the Commonwealth will include provisions for the payment in each Fiscal Year of Principal and interest (and Accreted Value) on the Bonds.

**Section 7.12   Reporting Requirements**.   The Commonwealth covenants that, in connection with the delivery of the Series 2022A Bonds hereunder, it will enter into a reporting agreement substantially the form attached hereto as Exhibit E.  An event of default under such Reporting Agreement, including the failure to timely provide the notices or information described therein shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the Reporting Agreement.

**Section 7.13   IRS Favorable Tax Determination**.   The Commonwealth shall use reasonable best efforts to obtain from the Internal Revenue Service (the "IRS") a determination with respect to the tax-exemption of Taxable Bonds, if any, issued on the Effective Date (the "Effective Date Taxable Bonds") or an opinion of Transaction Counsel with respect to the tax-exemption of the Effective Date Taxable Bonds (such determination or opinion, a "Favorable Determination") that the ratio of the aggregate principal amount of Effective Date Taxable Bonds to the total aggregate principal amount of Bonds issued on the Effective Date is less than thirteen percent (13%).  In the event that the Favorable Determination is obtained subsequent to the Effective Date and the new ratio is less than thirteen percent (13%), then the Holders of the Effective Date Taxable Bonds affected by the Favorable Determination shall be invited to exchange (the "Exchange Offer") the Effective Date Taxable Bonds for tax-exempt bonds (the "Converted Bonds") and, subject to the application of all reasonable expenses incurred by the Commonwealth in connection with the Exchange Offer, the interest rate on the Converted Bonds shall be the same as the Effective Date Taxable Bonds of the same type, interest rate, series and maturity; provided, however, that, such Converted Bonds shall be accompanied by the favorable opinion of Transaction Counsel that the interest, other than pre-issuance accrued interest on such Converted Bonds, and on the Effective Date Taxable Bonds exchanged for such Converted Bonds from the original date of delivery of such Effective Date Taxable Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for federal income tax purposes and from United States of America, state, Commonwealth and local income taxation.  In the event that an Favorable Determination is not obtained, this covenant shall terminate upon the earlier to occur: (1) December 15, 2021, (2) notification by the IRS to the Commonwealth that the IRS is unable to issue a favorable private letter ruling, closing agreement or other type of determination with respect to the tax-exemption of the Effective Date Taxable Bonds, and (3) an amendment of this Trust Agreement following a receipt of a Favorable Determination and consummation of the Exchange Offer.

# ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

**Section 8.01   Appointment and Acceptance of Trustee**.   The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02   Appointment and Acceptance of Paying Agents**.   In addition to the Trustee, the Commonwealth may appoint one or more Paying Agents for the Bonds of any Series

- 41 -

in the Supplemental Trust Agreement authorizing such Bonds or in the manner provided herein or in such Supplemental Trust Agreement or shall appoint such Paying Agent or Paying Agents prior to the authentication and delivery of the Bonds so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent. Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Commonwealth and the Trustee.

**Section 8.03   Responsibilities of Trustee and Paying Agents**. The recitals of fact contained herein and in each Supplemental Trust Agreement and in the Bonds shall be taken as the statements of the Commonwealth and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same. Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof, of any Supplemental Trust Agreement or of any Bonds, or in respect of the security afforded hereby or by each Supplemental Trust Agreement, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof. Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to: (i) the issuance of the Bonds for value; (ii) the application of the proceeds thereof except to the extent that such proceeds are received by it in its capacity as Trustee or Paying Agent; or (iii) the application of any money paid to the Commonwealth or others in accordance herewith and with each Supplemental Trust Agreement except as to the application of any money paid to it in its capacity as Trustee or Paying Agent. Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder and under each Supplemental Trust Agreement except for its own negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and of each Supplemental Trust Agreement and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein and in each Supplemental Trust Agreement, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee. If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

**Section 8.04   Property Held in Trust**. All money and securities conveyed to or held by the Trustee at any time pursuant to the terms hereof and of each Supplemental Trust Agreement shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof and of each Supplemental Trust Agreement.

**Section 8.05   Rights of the Trustee and the Paying Agent**. The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties. The Trustee and any Paying Agent may consult with counsel of its selection, who may or may not be of counsel to the Commonwealth, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

- 42 -

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder and under any Supplemental Trust Agreement, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth. Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof and of the Supplemental Trust Agreement upon the faith thereof, but in its reasonable discretion the Trustee or any Paying Agent, in lieu thereof, may either accept other evidence of such fact or matter or require such further or additional evidence. Except as otherwise expressly provided herein and in each Supplemental Trust Agreement, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof and of any Supplemental Trust Agreement by the Commonwealth to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

The Trustee shall not be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated corporate trust office of the Trustee and such notice references the Bonds relative to which an Event of Default has occurred.

The Trustee may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon.

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Bonds.

The Trustee shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Bonds or Majority in Interest of Outstanding Bonds, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its negligence or willful misconduct in connection therewith.

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("**Instructions**"); provided, however, that the Commonwealth shall provide to

- 43 -

the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a Person is to be added or deleted from the listing. If the Commonwealth elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling. The Commonwealth understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer. The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth. Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to negligence or willful misconduct of the Trustee. The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and any Paying Agent immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06  Compensation and Indemnification.**  Unless otherwise provided, the Commonwealth shall pay to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder and under the applicable Supplemental Trust Agreement, and also all reasonable, necessary and documented expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder and under the applicable Supplemental Trust Agreement. None of the provisions contained herein or in any Supplemental Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

- 44 -

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07   Permitted Acts**.  The Trustee may become the owner of or may deal in Bonds as fully and with the same rights as if it were not such Trustee or a Paying Agent. The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Commonwealth or any committee formed to protect the rights of Holders of Bonds or to effect or aid in any reorganization growing out of the enforcement hereof or of the Bonds or any Supplemental Trust Agreement whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Bonds in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

**Section 8.08   Resignation of Trustee**.  The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder and under each Supplemental Trust Agreement by giving not less than sixty (60) days' written notice to: (a) the Commonwealth, and (b) the Holders of the Bonds by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books or, in the case of a Bond Insurer, at such Bond Insurer's last known address, Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; ***provided, however,*** that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09   Removal of Trustee**.  The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon thirty (30) days' written notice by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondholders or by their attorneys-in-fact duly authorized and delivered to the Commonwealth.  The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof or of any Supplemental Trust Agreement with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Bonds.  No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.  A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof, shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Commonwealth.

**Section 8.10   Successor Trustee and/or Paying Agent**.  In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer

- 45 -

shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Commonwealth and the predecessor Trustee and/or Paying Agent; **provided, nevertheless,** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Commonwealth by a duly executed written instrument signed by an Authorized Officer of the Commonwealth shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Bonds, at their last addresses appearing on the registry books or, in the case of a Bond Insurer, at such Bond Insurer's last known address. Any successor Trustee and/or Paying Agent appointed by the Commonwealth shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Commonwealth, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor. Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby and by each Supplemental Trust Agreement.

Neither the Commonwealth nor any public corporation, agency or instrumentality of the Commonwealth nor any entity or Person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11   Transfer of Rights and Property to Successor Trustee.** Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Commonwealth, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder and under each Supplemental Trust Agreement, with like effect as if originally appointed as Trustee. However, the Trustee then ceasing to act shall nevertheless, on request by the Commonwealth or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein. Should any deed, conveyance or instrument in writing from the Commonwealth be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties

- 46 -

or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Commonwealth.

**Section 8.12 Merger or Consolidation of the Trustee**. Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger or consolidation to which it shall be a party or any company to which such Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank having trust powers or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance. In the event that such entity is not so qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

**Section 8.13 Ancillary Agreements.** The Trustee is authorized to enter into and perform its obligations under the Ancillary Agreements.

## ARTICLE IX.

## SUPPLEMENTAL TRUST AGREEMENTS

**Section 9.01 Modification and Amendment without Consent**. Notwithstanding any other provisions of this Article IX or Article X hereof, the Commonwealth and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a)     To provide for the issuance of a Series of Bonds under and in accordance with (and, for the avoidance of doubt, not in any way contrary to or inconsistent with) the provisions hereof and to prescribe the terms and conditions pursuant to which such Bonds may be issued, paid or redeemed;

(b)     To add additional covenants and agreements of the Commonwealth for the purpose of further securing the payment of the Bonds, provided such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Commonwealth or the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that such additional covenants and agreements shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(c)     To prescribe further limitations and restrictions upon the issuance of Refunding Bonds by the Commonwealth which are not contrary to or inconsistent with the limitations and restrictions thereon theretofore in effect including the limitations and restrictions set forth in the Act and the Plan;

(d)     To surrender any right, power or privilege reserved to or conferred upon the Commonwealth by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that same shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(e)     To confirm, as further assurance, the Statutory Lien, and the subjection to the Statutory Lien, of the Commonwealth's right title and interest in the monies deposited hereunder, or any other money, investments thereof or funds, provided that such further assurance shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(f)     To modify any of the provisions hereof or of any previously adopted Supplemental Trust Agreement in any other respects, provided that such modifications shall not be effective until after all Bonds of any Series of Bonds Outstanding as of the effective date of such Supplemental Trust Agreement shall cease to be Outstanding, and all Bonds issued under such Supplemental Trust Agreements shall contain a specific reference to the modifications contained in such subsequent Supplemental Trust Agreement;

(g)     With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the last paragraph of this Section 9.01, adversely affect the interests of the Bondholders in any respect.

(h)     [To modify any of the provisions hereof or of any previously adopted Supplemental Trust Agreement in any other respects, provided that such modifications shall not be effective unless there has been delivered to the Trustee (i) a Rating Confirmation on the Outstanding Bonds and (ii) an opinion of Transaction Counsel to the effect that the same is not inconsistent with this Trust Agreement and will not adversely affect the exclusion of interest on any Tax Exempt Bond from gross income for purposes of federal income taxation, *provided, however,* this clause (i) shall be inapplicable unless the Outstanding Bonds are rated at least Baa3/BBB- (or equivalent) by at least two Rating Services (with one such Rating Service being S&P or Moody's).]

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Commonwealth and the Commonwealth has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement will not materially adversely affect: (i) the excludability of interest on the Tax Exempt Bonds from gross income of the Holders for federal income tax purposes, and (ii) with respect to a modification or amendment made pursuant to paragraphs (b) – (h) above, the rights of the Holders of the Bonds.

For the avoidance of doubt, no Supplemental Trust Agreement shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 with the consent of each affected Holder.

**Section 9.02 Supplemental Trust Agreements Effective with Consent of Bondholders**. The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to the written consent of the Bondholders in accordance with Article X hereof, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Commonwealth.

**Section 9.03 General Provisions Relating to Supplemental Trust Agreements**. The Trust Agreement shall not be modified or amended in any respect except in accordance with

- 48 -

and subject to the provisions of this Article IX, Article X or Section 7.05 hereof. Nothing contained in this Article IX or Article X hereof shall affect or limit the rights or obligations of the Commonwealth to make, do, execute or deliver any Supplemental Trust Agreement, act or other instrument pursuant to the provisions of Section 7.04 hereof or the right or obligation of the Commonwealth to execute and deliver to the Trustee or any Paying Agent any instrument elsewhere herein provided or permitted to be delivered to the Trustee or any Paying Agent.

A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, the Rating Confirmation, if any is required by Section 9.01(i), and an opinion of Transaction Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Commonwealth and enforceable in accordance with its terms. The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

The Commonwealth, as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective, shall give written notice thereof to each Rating Service then providing a rating on the Outstanding Bonds at the request of the Commonwealth and shall post a copy of such Supplemental Trust Agreement on the Commonwealth's website and EMMA under the CUSIPs for the Outstanding Bonds.

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT

**Section 10.01 Powers of Amendment**. (a) Except as provided in Section 9.01 hereof, any modification or amendment hereof and of the rights and obligations of the Commonwealth and of the Holders of the Bonds hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Bonds Outstanding at the time such consent is given, or (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Bonds of each Series so affected and Outstanding at the time such consent is given; ***provided, however,*** that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series, maturity and tenor remain Outstanding, the consent of the Holders of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.

(b) No such modification or amendment shall, without the prior written consent of the Holder of such Bond, permit a change in the provisions related to the timing or amount of any payment on the Bonds, including, without limitation, any change in the currency to be used to pay Principal of and interest on the Bonds, any change in the amount or date of any Sinking Fund Installment, payment of Principal or any other payment, the terms of redemption or maturity of the Principal of any Outstanding Bond or of any installment of interest thereon or a reduction in

- 49 -

the Principal amount or the Redemption Price thereof or in the rate of interest thereon. Further, no such modification or amendment shall, without the prior written consent of the Holder of such Bond, reduce the percentages or otherwise affect the classes of Bonds the consent of the Holders of which is required to effect any such modification or amendment. Further, no waiver of any default or compliance with any provisions of this Section 10.01(b) shall be granted without the prior written consent of the Holder of such Bond.

(c) For the purposes of this Section 10.01, a Series shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Bonds of such Series in any respect. The Trustee may in its discretion reasonably determine whether or not, in accordance with the foregoing provisions, the Bonds of any particular Series or maturity would be affected by any modification or amendment hereof and any such determination shall be binding and conclusive on the Commonwealth and all Holders of Bonds. If the Trustee does not make such a determination, the Trustee shall obtain an opinion of Transaction Counsel as to whether the Bonds of any particular Series or maturity would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Commonwealth and all Holders of Bonds.

**Section 10.02 Consent of Bondholders**. The Commonwealth may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section. Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized Officer of the Commonwealth shall be filed with the Trustee for the inspection of the Holders of Bonds. A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Bonds for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Commonwealth to each affected Holder of Bonds. Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Bonds specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided. Any such consent shall be binding upon the Holder of the Bonds giving such consent and on any subsequent Holder of such Bonds (whether or not such subsequent Holder has notice thereof). At any time after the Holders of the required percentages of Bonds shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Bonds and will be effective as provided in this Section, shall be given to the Bondholders by mailing such notice to Bondholders or by Electronic Means. The Commonwealth shall file with the Trustee proof of giving such notice. Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Commonwealth and the Holders of all Bonds at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty day period; **provided, however**, that the Commonwealth during such sixty day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem expedient so long as consistent with the Supplemental Trust Agreement.

- 50 -

**Section 10.03 Modifications by Unanimous Consent**. The terms and provisions hereof and the rights and obligations of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth and of the Holders of the Bonds may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Commonwealth of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Commonwealth and the consent of the Holders of all of the Bonds then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04 Mailing**. Any provision in this Article X for the mailing of a notice or other document to Bondholders shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Bonds then Outstanding at such Person's address, if any, appearing upon the registry books of the Commonwealth, (b) to the Trustee, and (c) to the Bond Insurer at its last known address.

**Section 10.05 Exclusion of Bonds**. Bonds owned or held by or for the account of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be entitled with respect to such Bonds to give any consent or take any other action provided for herein. At the time of any consent or other action taken hereunder, the Commonwealth shall furnish the Trustee a certificate of an Authorized Officer of the Commonwealth, upon which the Trustee may rely, describing all Bonds so to be excluded.

**Section 10.06 Notation on Bonds**. Bonds delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Commonwealth and the Trustee as to such action, and in that case upon demand of the Holder of any Bond Outstanding at such effective date and upon presentation of his Bond for such purpose at the designated corporate trust office of the Trustee suitable notation shall be made on such Bond by the Trustee as to any such action. If the Commonwealth or the Trustee shall so determine, new Bonds so modified as, in the opinion of the Trustee and the Commonwealth, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Bond then Outstanding shall be exchanged, without cost to such Bondholder, for Bonds of the same Series and maturity then Outstanding, upon surrender of such Bonds.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 Events of Default**. An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a)     Payment of the Principal or Redemption Price of any Bond shall not be made by the Commonwealth when the same shall become due and payable, either at maturity or by proceedings for redemption or otherwise; or

(b)     Payment of an installment of interest on any Bond shall not be made by the Commonwealth when the same shall become due and payable; or

- 51 -

(c)     The Statutory Lien shall at any time and for any reason cease to be in full force and effect or a final judgment shall be rendered which shall declare the Statutory Lien to be null and void or shall declare that the Statutory Lien does not establish in any material respect the lien it purports to establish; or

(d)     The Commonwealth shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Bonds or in any Supplemental Trust Agreement on the part of the Commonwealth to be performed, other than the provisions of Section 7.12 hereof, and such default shall continue for forty-five (45) days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, unless, if such default is capable of being cured but is not capable of being cured within forty-five (45) days, the Commonwealth has commenced to cure such default within forty-five (45) days and does cure such default within ninety (90) days of the date the default initially occurred; or

(e)     the Commonwealth permits the validity or effectiveness of this Trust Agreement or the Bonds to be impaired, and such impairment affects the enforceability of or payments on the Bonds, or any Person to be released from any covenants or obligations with respect to the Bonds.

**Section 11.02 No Acceleration with Respect to the Bonds.** There shall be no right of acceleration with respect to the Bonds.

**Section 11.03 Enforcement of Remedies.** (a) If an Event of Default occurs and is continuing, the Trustee shall make payments in accordance with Section 11.04 below.

(b)     If an Event of Default under Section 11.01(a) or (b) occurs and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall, bring an action against the Secretary of Treasury, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of Treasury to apply available resources (*recursos disponibles*) of the Commonwealth to the payment of the Bonds, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution.

(c)     If an Event of Default under Section 11.01 occurs and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall, seek specific performance of any relevant provisions of this Trust Agreement or any relevant Supplemental Trust Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(d)     Subject to Article VIII hereof, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

In the enforcement of any remedy hereunder and under each Supplemental Trust Agreement the Trustee shall be entitled to sue for, enforce payment of, and receive any and all amounts then, or during any default becoming, and at any time remaining, due from the Commonwealth for Principal or interest or otherwise under any of the provisions of the Trust Agreement or of any Supplemental Trust Agreement or of the Bonds, with interest on overdue payments of the Principal of or interest on the Bonds at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under any Supplemental Trust Agreement and under such Bonds, including the fees and expenses of the Trustee and its attorneys and other agents, without prejudice to any other right or remedy of the Trustee or of the Holders of such Bonds, and to recover and enforce judgment or decree against the Commonwealth but solely as provided herein, in any Supplemental Trust Agreement and in such Bonds, for any portion of such amounts remaining unpaid, with interest, costs and expenses, and to collect in any manner provided by law, the money adjudged or decreed to be payable.

**Section 11.04 Priority of Payments after Default.**  If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee hereunder and under each Supplemental Trust Agreement shall not be sufficient to pay the Principal of and interest on the Bonds as the same become due and payable, the money held by the Trustee hereunder and under each Supplemental Trust Agreement together with any money then available or thereafter becoming available to pay the Principal of and interest on the Bonds, whether through exercise of the remedies provided for in this Article XI or otherwise, shall be applied as follows, *pro rata*:

    (A)    [To the payment of amounts due to the Trustee and its agents and counsel under Section 8.06 hereof]; and

    then, pro-rata, as follows:

    (B)    To the payment to the persons entitled thereto of all installments of interest then due in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference; and

    (C)    To the payment to the persons entitled thereto of the unpaid Principal or Redemption Price of any Bonds which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any date, then to the payment thereof ratably, according to the amount of Principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future. The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Commonwealth, to any Holder of Bonds or to any other person for any

- 53 -

delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee. Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date (which shall be on an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made, and upon such date interest on the amounts of Principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Bonds are Outstanding and unpaid shall be paid and applied in accordance with Section 5.05 hereof.

**Section 11.05 Termination of Proceedings**. In case any proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Commonwealth, the Trustee and the Bondholders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been commenced.

**Section 11.06 Bondholders' Direction of Proceedings**. Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Bonds shall have the right by an instrument in writing executed and delivered to the Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder, under each Supplemental Trust Agreement or otherwise, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy available pursuant to Section 11.03, provided, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof and of each Supplemental Trust Agreement, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of counsel to the Trustee would be unjustly prejudicial to Bondholders not parties to such direction.

**Section 11.07 Control by Holders of Bonds; Limitations**. No Holder of any of the Bonds shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted hereby or to institute such action, suit or proceeding in its or their name, and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time (and in no event shall a delay of more than thirty (30) days be deemed reasonable for such purposes) after receipt thereof. Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for

- 54 -

any other remedy hereunder and in equity or at law. Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that no one or more Holders of the Bonds secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all proceedings at law or in equity shall be instituted and maintained for the benefit of all Holders of the Outstanding Bonds. Notwithstanding any other provision hereof, the Holder of any Bond shall have the right which is absolute and unconditional to receive payment of the Principal of (and premium, if any) and interest on such Bond on the stated maturity expressed in such Bond (or, in the case of redemption, on the redemption date or, in the case of interest, on the Interest Payment Date on which such interest is due) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder, and the Holders shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Commonwealth Constitution and in the Plan, the Confirmation Order and the Act.

**Section 11.08 Actions by Trustee; Possession of Bonds by Trustee Not Required**. All rights of action hereunder or under any of the Bonds secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Bonds or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Bonds to which such action relates, subject to the provisions hereof.

**Section 11.09 Waiver and Non–Waiver of Default**. No delay or omission of the Trustee or any Bondholder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein. Every power and remedy given by this Article XI to the Trustee and the Bondholders, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall waive any default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; ***provided, however,*** the Trustee may not waive any default if it has received a direction from not less than a Quarter in Interest of the Outstanding Bonds that such default may not be waived by the Trustee; ***provided, further,*** that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10 Notice of Event of Default**. The Trustee shall give notice of each Event of Default hereunder known to the Trustee to AAFAF, the Commonwealth and Holders of the Bonds, within ten (10) Business Days after knowledge of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice; ***provided, however***, that failure to provide notice to AAFAF or the Commonwealth of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Bondholders. In the case of the Holders of the Bonds, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders of Bonds, as the names and addresses of such Holders appear on the books for registration and transfer of Bonds as kept by the Trustee and to the Bond Insurer at its last known address.

**Section 11.11 Remedies Not Exclusive**. No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

# ARTICLE XII.

# DEFEASANCE

**Section 12.01 Defeasance**. (a)   If the Commonwealth shall pay or cause to be paid to the Holder of a Bond the Principal or Redemption Price of and interest thereon, at the times and in the manner stipulated therein, herein, and in the applicable Supplemental Trust Agreement, then all rights granted hereby and by the Act to such Bond (including without limitation, the Statutory Lien) shall be discharged and satisfied. In such event, the Trustee shall, upon the request of the Commonwealth, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Commonwealth, and all money or investments thereof held by it pursuant hereto and to the applicable Supplemental Trust Agreement which are being held for the sole benefit of such Bonds and which are not required for the payment or redemption of Bonds of the same Series as such Bond shall be applied by the Trustee as follows: first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Commonwealth, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than the sum of the amount required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of an Authorized Officer of the Commonwealth, shall be transferred to the Commonwealth.

(b)      Bonds for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee for the benefit of the Holders of the Bonds (through deposit of money for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section. All Outstanding Bonds of any Series or any maturity within a Series or a portion of a maturity within a Series shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

(i)      in case any of said Bonds are to be redeemed on any date prior to their maturity, the Commonwealth shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of such Bonds; and

(ii)      there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay when due the Principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the Redemption Date or maturity date thereof, as the case may be; and

- 56 -

(iii)    in the event said Bonds are not by their terms subject to redemption within the next succeeding sixty (60) days, the Commonwealth shall have given the Trustee, in form satisfactory to it, irrevocable instructions to give, as soon as practicable, by first class mail, postage prepaid, to the Holders of said Bonds at their last known addresses appearing on the registration books, a notice to the Holders of such Bonds that the deposit required by (ii) above has been made with the Trustee and that said Bonds are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which money is to be available for the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; and

(iv)    the Commonwealth shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Bond having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, (B) such defeasance is in accordance with the terms hereof and (C) with respect to a Tax Exempt Bond, such defeasance will not adversely affect the exclusion of interest on such Tax Exempt Bond from gross income for purposes of federal income taxation.

The Commonwealth shall give written notice to the Trustee of its selection of the Series and maturity payment of which shall be made in accordance with this Section. The Trustee shall select the Bonds of like Series and maturity payment of which shall be made in accordance with this Section in the manner provided in Section 4.05 hereof. Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; ***provided, however,*** that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due the Principal or Redemption Price, if applicable, of and interest to become due on said Bonds on and prior to such redemption date or maturity date hereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such money so deposited, shall, to the extent certified by the Trustee to be in excess of the amounts required hereinabove to pay the Principal or Redemption Price, if applicable, of and interest on such Bonds, as realized, shall be applied by the Trustee as follows:  first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Commonwealth, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than the sum of the amount required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of an Authorized Officer of the Commonwealth, shall be retained therein or, upon confirmation of the nationally recognized verification agent that sufficient monies remain to effectuate the defeasance pursuant to this Article XII, transferred to the Commonwealth.

(c)    Anything herein to the contrary notwithstanding, any money held by the Trustee or a Paying Agent in trust for the payment and discharge of any of the Bonds of a Series or the interest thereon which remain unclaimed for three (3) years after the date when all of the Bonds of such Series have become due and payable, either at their stated maturity dates or by call

for earlier redemption, if such money was held by the Trustee or Paying Agent at such date, or for three (3) years after the date of deposit of such money if deposited with the Trustee or Paying Agent after said date when all of the Bonds of such Series become due and payable, or three (3) years after the date when the Principal or Redemption Price of or interest on the Bonds for which said money is held was due and payable, shall, at the written request of the Commonwealth, be repaid by the Trustee or Paying Agent to the Commonwealth as its absolute property and free from trust, and the Trustee or Paying Agent shall thereupon be released and discharged with respect thereto and the Holders of Bonds shall look only to the Commonwealth for the payment of such Bonds.

## ARTICLE XIII.

## EXECUTION OF INSTRUMENTS BY BONDHOLDERS
## AND PROOF OF OWNERSHIP OF BONDS

**Section 13.01 Evidence of Signatures of Bondholders and Ownership of Bonds**. Any request, consent or other instrument which the Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Bonds may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Bonds in Person or by his or their attorneys duly appointed in writing. Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any Person of such Bonds, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Bondholder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the Person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. The corporation of the Person or Persons executing any such instrument on behalf of a corporate Bondholder may be established without further proof if such instrument is signed by a Person purporting to be the president or a vice–president of such corporation with a corporate seal affixed and attested by a Person purporting to be its secretary or an assistant secretary.

The ownership of Bonds and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books. Any request, consent or vote of the owner of any Bond shall bind all future owners of such Bond in respect of anything done or suffered to be done or omitted to be done by the Commonwealth or the Trustee in accordance therewith. The Commonwealth or the Trustee may fix a record date in connection with any such request, consent or vote.

- 58 -

## ARTICLE XIV.

## MISCELLANEOUS

**Section 14.01 Preservation and Inspection of Documents**.  All documents received by the Trustee from the Commonwealth or from Bondholders under the provisions hereof or of any Supplemental Trust Agreement shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Commonwealth, any Bondholder, and their agents and their representatives, any of whom may make copies thereof; *provided, however,* that with respect to inspection by a Bondholder a written request of such Bondholder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection. The Trustee shall provide to the Commonwealth account balances and other information reasonably requested by the Commonwealth.

**Section 14.02 Money and Funds Held for Particular Bonds**. The amounts held by the Trustee or any Paying Agent for the payment of the Principal or Redemption Price of and interest on the Bonds due on any date with respect to particular Bonds shall, pending such payment, be set aside and held in trust by it for the benefit of the Holders of such Bonds entitled thereto, and for the purposes hereof such Principal or Redemption Price of and interest on such Bonds, due after such date thereof, shall no longer be considered to be unpaid upon such payment.

**Section 14.03 Cancellation of Bonds**.  The Trustee or any Paying Agent shall forthwith cancel all Bonds which have been redeemed or paid and shall dispose of such Bonds in accordance with its customary procedures.  No such Bonds shall be deemed Outstanding Bonds hereunder and no Bonds shall be issued in lieu thereof.

**Section 14.04 No Recourse under Trust Agreement or on the Bonds**.  All covenants, stipulations, promises, agreements and obligations of the Commonwealth contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Commonwealth and not of any member, officer or employee of the Commonwealth, and no recourse shall be had for the payment of the Principal or Redemption Price of or interest on the Bonds or for any claims based thereon, hereon or on the Supplemental Trust Agreement against any member, officer or employee of the Commonwealth or any Person executing the Bonds, all such liability, if any, being expressly waived and released by every Holder of Bonds by the acceptance of the Bonds.

**Section 14.05 Severability of Invalid Provision**. If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein or in any Supplemental Trust Agreement on the part of the Commonwealth or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of such Supplemental Trust Agreement or of the Bonds.

**Section 14.06 Parties of Interest**.  Nothing herein or in any Supplemental Trust Agreement adopted pursuant to the provisions hereof, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the

- 59 -

Trustee, the Paying Agents and the Holders and, to the extent provided in this Trust Agreement and any Supplemental Trust Agreement, any Bond Insurer any rights, remedies or claims hereunder or by reason hereof or of any Supplemental Trust Agreement or any covenant, condition or stipulation thereof. All covenants, stipulations, promises and agreements herein or in any Supplemental Trust Agreement contained by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Paying Agents, the Holders and the Bond Insurer. Any Bond Insurer of any Insured Bonds issued under this Trust Agreement is an express third party beneficiary of this Trust Agreement and of any applicable Supplemental Trust Agreement.

**Section 14.07 Certain Provisions Relating to Capital Appreciation Bonds**. For the purposes of receiving payment of the Redemption Price if a Capital Appreciation Bond is redeemed prior to maturity, the then current Accreted Value of such Bond shall be deemed to be its Principal amount. In computing the Principal amount of Bonds held by the registered owner of a Capital Appreciation Bond in giving to the Commonwealth or the Trustee any notice, consent, request, or demand pursuant hereto for any purpose whatsoever, the Accreted Value of such Bond as at the immediately preceding Valuation Date shall be deemed to be its principal amount. Notwithstanding any other provision hereof, the amount payable at any time with respect to the Principal of and interest on any Capital Appreciation Bond be equal to its Accreted Value thereof at such time plus redemption premium, if any.

**Section 14.08 Notices**. Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto or to any Supplemental Trust Agreement shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed: in the case of the Commonwealth, _____, _____, San Juan, PR _____; in the case of the Trustee, addressed to it at the designated corporate trust office of the Trustee at _____, _____, _____ _____, attention: Corporate Trust; in the case of the Commonwealth or the Secretary of Treasury, to the attention of the Secretary of Treasury at 10 Paseo Covadonga, San Juan, Puerto Rico, 00901; and in the case of AAFAF, addressed to [          ], or, in each case, to such other individual and at such other address as the Person to be notified shall have specified by notice to the other Persons. Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any series of Bonds, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Bonds of the Series to the Commonwealth's dissemination agent for distribution through the EMMA system. The Commonwealth shall cooperate with the Trustee to the extent necessary to facilitate the foregoing. The Trustee shall not be liable under any circumstances for monetary damages to any Person for any breach of the provisions of this paragraph. The sole remedy for failure of the Trustee to perform is specific performance.

Any notice provided to the Commonwealth shall also be provided to AAFAF.

**Section 14.09 Headings**. Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

4842-1351-5245.23

**Section 14.10 Governing Laws**.  This Trust Agreement and the Bonds shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Bonds; *provided, however*, that the authorization of this Trust Agreement and the issuance of the Bonds by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided, further*, that the holders of the Bonds shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Constitution.

**Section 14.11 Retention of Jurisdiction of Title III Court**.  The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan, the Confirmation Order and this Trust Agreement, including, without limitation, with respect to the payment of the Bonds and the enforcement of the remedies set forth herein to the fullest extent permitted by law. Any disputes, legal action, suit, or proceeding arising from or related to this Trust Agreement or the Bonds (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 14.12 Signatures and Counterparts**.  This Trust Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Trust Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Trust Agreement.

**Section 14.13 Successors and Assigns**.   Whenever in the Trust Agreement the Commonwealth is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Trust Agreement contained by or on behalf of the Commonwealth shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

**Section 14.14 Conflicts.**  All resolutions or other proceedings of the Commonwealth or parts thereof in conflict herewith are repealed insofar as such conflict exists.

[Remainder of page intentionally left blank; signature page follows]

- 61 -

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement as of the date first written above.

**COMMONWEALTH OF PUERTO RICO**

By: _____

Name:

Title:

**UMB BANK, N.A.,** as Trustee

By: _____

Name:

Title:

Signature page to Trust Agreement]

EXHIBIT A

FORM OF SERIES 2022A CURRENT INTEREST BOND

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2022**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number: ___                                                             $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
GENERAL OBLIGATION RESTRUCTURED BONDS
[SERIES 2022A-1][SERIES  2022A-2]

| INTEREST RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| % | | | |

Registered Owner:     CEDE & CO.

Principal  Amount:     _____ DOLLARS

A-1

The **COMMONWEALTH OF PUERTO RICO** (the "Commonwealth") is justly indebted and for value received hereby promises to pay to the **REGISTERED OWNER** named above or registered assigns or legal representatives, on the **MATURITY DATE** specified above (or earlier as hereinafter referred to), upon the presentation and surrender hereof, the **PRINCIPAL AMOUNT** specified above and to pay interest thereon from the date hereof or from the January 1 or July 1 next preceding the date of authentication to which interest shall have been paid, unless such date of authentication is a January 1 or July 1, in which case from such date, at the Interest Rate per annum specified above, until payment of such Principal Amount, such interest to the payment hereof being payable semi-annually on the first (1st) day of each January and July (each, an "Interest Payment Date"). The Principal Amount of this bond is payable upon presentation and surrender hereof at the corporate trust office of the Trustee hereinafter mentioned. Interest shall accrue on overdue interest and Principal at the rate provided above, and shall compound on each Interest Payment Date. Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of **UMB BANK, N.A.,** as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Payment of the interest hereon shall be payable by the Trustee as provided in Section 3.01 of the Trust Agreement, or at the option of any owner of $1,000,000 or more in aggregate Principal amount of the Series 2022A Current Interest Bonds, by wire transfer to such registered owner at the wire transfer address in the continental United States to which such registered owner has not later than the Record Date immediately preceding such Interest Payment Date directed the Trustee to wire such interest payment. The Record Date is the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date. All overdue interest and Principal (and any interest accruing on such overdue amounts) shall remain due and payable until paid.

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on this bond. To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants a statutory lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys on deposit in the Debt Service Fund established under the Trust Agreement.

This bond is one of a duly authorized issue of bonds of the Commonwealth designated as "General Obligation Restructured Bonds, [Series 2022A-1] [Series 2022A-2]" (herein called the "Series 2022A Bonds"). The Series 2022A Bonds are issued pursuant to a Trust Agreement, by and between the Commonwealth and UMB Bank, N.A., as trustee (the "Trustee"), dated as of _____, 2022 (the "Trust Agreement") and [ACT]. The bonds constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth. Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth and the bondholders, as applicable. The Trust Agreement may be amended to the extent and in the manner provided therein.

Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

A-2

This Series 2022A Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Trust Agreement for the purposes set forth in the Trust Agreement.

The Series 2022A Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Trust Agreement. Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Commonwealth, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Trust Agreement, the Plan and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2022A Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This bond is transferable, as provided in the Trust Agreement, only upon the books of the Commonwealth maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2022A Bond or Bonds in the same aggregate Principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Commonwealth and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

A-3

**IN WITNESS WHEREOF, THE COMMONWEALTH OF PUERTO RICO** has caused this bond to be signed in its name and on its behalf Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and attested by its Secretary of the State (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022A Bonds, all as of the Dated Date specified above.

_____
Governor of the Commonwealth of Puerto Rico

_____
Secretary of the Treasury of Puerto Rico

**ATTEST:**

_____
Secretary of State

A-4

4842-1351-5245.23

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the General Obligation Restructured Bonds, Series 2022A, of the Commonwealth of Puerto Rico.

**UMB BANK, N.A.**, as Trustee

By: _____

Authorized Signatory

Date of authentication: _____, 2022

A-5

ASSIGNMENT

FOR VALUE RECEIVED:  _____

_____
(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____
(Please insert Social Security or other tax identifying number of Transferee)

| |
|---|

_____

Please print or typewrite name and address, including zip code, of transferee

_____

the within-mentioned Bond and hereby irrevocably constitutes and appoints _____, attorney-in-fact, to transfer the same on the books of registry in the office of the Trustee, as registrar, with full power of substitution in the premises.

Dated: _____        _____

NOTE: The signature to this assignment must correspond with the name as written on the within Bond in every particular, without alteration or enlargement or any change whatsoever.

| |
|---|
| Signature Guaranteed: |

A-6

EXHIBIT B

FORM OF SERIES 2022A-1 CAPITAL APPRECIATION BONDS

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2022**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number: ___                                                                              $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
GENERAL OBLIGATION RESTRUCTURED BONDS,
SERIES 2022A-1

| ACCRETION RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|

Registered Owner:     CEDE & CO.

Principal Amount at Issuance:          _____ DOLLARS

B-1

Maturity Value[5]:       _____ DOLLARS

The **COMMONWEALTH OF PUERTO RICO** (the "Commonwealth") is justly indebted and for value received hereby promises to pay to the **REGISTERED OWNER** named above or registered assigns or legal representatives, on the **MATURITY DATE** specified above (or earlier as hereinafter referred to), upon the presentation and surrender hereof, the **MATURITY VALUE** specified above on the Maturity Date stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement) upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned. Interest on this bond shall accrete at the **ACCRETION RATE** set forth above and shall not be payable on a current basis but shall be compounded, and added to Principal, on the Effective Date and on each January 1 and July 1 (each, a "Valuation Date") such that the **PRINCIPAL AMOUNT AT ISSUANCE** specified above shall accrete to equal the **MATURITY VALUE** specified above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement). Interest shall accrete on overdue interest and Principal at the rate provided above, and shall compound on each Valuation Date. Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of **UMB BANK, N.A.,** as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. All overdue Principal (and any interest accruing thereon) shall remain due and payable until paid.

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on this bond. To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants a statutory lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys on deposit in the Debt Service Fund established under the Trust Agreement.

This bond is one of a duly authorized issue of bonds of the Commonwealth designated as "General Obligation Restructured Bonds, Series 2022A-1" (herein called the "Series 2022A Bonds"). The Series 2022A Bonds are issued pursuant to a Trust Agreement, by and between the Commonwealth and UMB Bank, N.A., as trustee (the "Trustee), dated as of _____, 2022 (the "Trust Agreement") and [ACT]. The bonds constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth. Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth and the bondholders, as applicable. The Trust Agreement may be amended to the extent and in the manner provided therein.

Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

---

[5]   Reflects Accreted Value at maturity if no Sinking Fund Installment are made prior to stated maturity.

This Series 2022A Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Trust Agreement for the purposes set forth in the Trust Agreement.

The Series 2022A Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Trust Agreement. Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Commonwealth, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Trust Agreement, the Plan and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2022A Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This bond is transferable, as provided in the Trust Agreement, only upon the books of the Commonwealth maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2022A Bond or Bonds in the same aggregate Accreted Value, and of the same series, maturity and accretion rate, shall be issued to the transferee in exchange therefor as provided in the Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Commonwealth and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

B-3

**IN WITNESS WHEREOF, THE COMMONWEALTH OF PUERTO RICO** has caused this bond to be signed in its name and on its behalf Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and attested by its Secretary of the State (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series 2022A Bonds, all as of the Dated Date specified above.

_____
Governor of the Commonwealth of Puerto Rico


_____
Secretary of the Treasury of Puerto Rico


**ATTEST:**


_____
Secretary of State


B-4

4842-1351-5245.23

## TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the General Obligation Restructured Bonds, Series 2022A, of the Commonwealth of Puerto Rico.

**UMB BANK, N.A.**, as Trustee

By: _____
                        Authorized Signatory

Date of authentication:  _____, 2022

B-5

ASSIGNMENT

FOR VALUE RECEIVED: _____

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____

Please print or typewrite name and address,
including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated: _____   _____

NOTE: The signature to this assignment must
correspond with the name as written on the within
Bond in every particular, without alteration or
enlargement or any change whatsoever.

Signature Guaranteed:

B-6

EXHIBIT C

ACCRETED VALUE TABLE

EXHIBIT D

CONFIRMATION ORDER

D-1

EXHIBIT E

REPORTING AGREEMENT

4842-1351-5245.23

**Redline of Exhibit A**

DRAFT ~~11/21/2021~~02/03/2022

# TRUST AGREEMENT

**by and between**

# COMMONWEALTH OF PUERTO RICO

**and**

_____**UMB BANK, N.A.**, as Trustee

_____

**Dated as of** ~~xx, 2021~~**March 15, 2022**

_____

Relating to the
Commonwealth of Puerto Rico
General Obligation Restructured Bonds

# TABLE OF CONTENTS

|  | | **Page** |
|---|---|---|
| **ARTICLE I. DEFINITIONS AND INTERPRETATION** | | ~~3~~4 |
| Section 1.01 | Definitions | ~~3~~4 |
| Section 1.02 | Rules of Construction | 13 |
| **ARTICLE II. AUTHORIZATION, ISSUANCE OF BONDS AND SERIES ~~2021~~2022A BONDS** | | 14 |
| Section 2.01 | Authorization of Bonds | 14 |
| Section 2.02 | Provisions for Issuance of Bonds | 14 |
| Section 2.03 | Supplemental Trust Agreements | ~~16~~17 |
| Section 2.04 | Maturity Dates, Principal Amounts and Interest Rates for Series ~~2021~~2022A-1 Current Interest Bonds | 17 |
| Section 2.05 | Maturity Dates, Principal Amounts and Interest Rates for Series ~~2021~~2022A-1 Capital Appreciation Bonds | ~~17~~18 |
| Section 2.06 | Maturity Dates, Principal Amounts and Interest Rates for Series ~~2021~~2022A-2 Bonds | ~~17~~18 |
| Section 2.07 | Interest Payments and Interest Accretion | ~~17~~18 |
| **ARTICLE III. GENERAL TERMS AND PROVISIONS OF BONDS** | | ~~18~~19 |
| Section 3.01 | Place and Medium of Payment | ~~18~~19 |
| Section 3.02 | Legends | ~~19~~20 |
| Section 3.03 | CUSIP Numbers | ~~19~~20 |
| Section 3.04 | Execution and Authentication | 20 |
| Section 3.05 | Interchangeability of Bonds | ~~20~~21 |
| Section 3.06 | Transfer and Registry | ~~20~~21 |
| Section 3.07 | Transfer of Bonds | ~~20~~21 |
| Section 3.08 | Regulations with Respect to Exchanges and Transfers | ~~21~~22 |
| Section 3.09 | Bonds Mutilated, Destroyed, Lost or Stolen | ~~21~~22 |
| Section 3.10 | Book Entry Bonds | ~~22~~23 |
| Section 3.11 | Preparation of Definitive Bonds; Temporary Bonds | ~~23~~24 |
| **ARTICLE IV. REDEMPTION OF BONDS** | | 24 |
| Section 4.01 | Authorization of Redemption | 24 |
| Section 4.02 | Redemption at the Election of the Commonwealth | ~~24~~25 |
| Section 4.03 | Redemption Other Than at Commonwealth's Election | ~~24~~25 |
| Section 4.04 | Redemption Prices and Terms of Series ~~2021~~2022A Bonds | ~~24~~25 |
| Section 4.05 | Selection of Bonds to be Redeemed | ~~30~~31 |
| Section 4.06 | Notice of Redemption | ~~31~~32 |
| Section 4.07 | Payment of Redeemed Bonds | ~~32~~33 |

**TABLE OF CONTENTS**
**(continued)**

Page

ARTICLE V. STATUTORY LIEN ON MONEYS IN DEBT SERVICE FUND; FUNDS
AND ACCOUNTS; COMMONWEALTH REVENUES AND APPLICATION THEREOF ~~32~~33

| | | |
|---|---|---|
| Section 5.01 | Statutory Lien in Debt Service Fund | ~~32~~33 |
| Section 5.02 | Establishment of Funds and Accounts | ~~33~~34 |
| Section 5.03 | Application of Bond Proceeds | ~~33~~34 |
| Section 5.04 | Application of Money in the Costs of Issuance Fund | ~~33~~34 |
| Section 5.05 | Application of Moneys | ~~34~~35 |
| Section 5.06 | Debt Service Fund | ~~34~~35 |
| Section 5.07 | Arbitrage Rebate Fund | ~~35~~36 |
| Section 5.08 | Transfer of Investments | ~~35~~37 |

ARTICLE VI. SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS     ~~36~~37

| | | |
|---|---|---|
| Section 6.01 | Security for Deposits | ~~36~~37 |
| Section 6.02 | Investment of Funds and Accounts Held by the Trustee | ~~36~~37 |
| Section 6.03 | Liability for Investments | ~~37~~38 |

ARTICLE VII. PARTICULAR COVENANTS     ~~37~~38

| | | |
|---|---|---|
| Section 7.01 | Payment of Principal and Interest | ~~37~~38 |
| Section 7.02 | Pledge of Good Faith and Credit; Bonds Constitute Public Debt | ~~37~~38 |
| Section 7.03 | Deemed Annual Allocation | ~~37~~39 |
| Section 7.04 | Powers as to Bonds | ~~38~~39 |
| Section 7.05 | Further Assurance | ~~38~~39 |
| Section 7.06 | Offices for Payment and Registration of Bonds | ~~38~~39 |
| Section 7.07 | General | ~~38~~40 |
| Section 7.08 | Non-Impairment Covenant | ~~39~~40 |
| Section 7.09 | Tax Exemption Covenant | ~~39~~40 |
| Section 7.10 | Comprehensive Cap on Net Tax-Supported ~~Indebtedness~~ | ~~39~~Debt 40 |
| Section 7.11 | Fiscal Plan. | ~~40~~41 |
| Section 7.12 | ~~Continuing Disclosure~~ | ~~40~~Reporting Requirements 41 |
| Section 7.13 | IRS Favorable Tax Determination | ~~40~~41 |

ARTICLE VIII. CONCERNING THE TRUSTEE AND THE PAYING AGENT     ~~40~~42

| | | |
|---|---|---|
| Section 8.01 | Appointment and Acceptance of Trustee | ~~40~~42 |
| Section 8.02 | Appointment and Acceptance of Paying Agents | ~~40~~42 |
| Section 8.03 | Responsibilities of Trustee and Paying Agents | ~~41~~42 |
| Section 8.04 | Property Held in Trust | ~~41~~42 |
| Section 8.05 | Rights of the Trustee and the Paying Agent | ~~41~~43 |
| Section 8.06 | Compensation and Indemnification | ~~43~~44 |
| Section 8.07 | Permitted Acts | ~~44~~45 |
| Section 8.08 | Resignation of Trustee | ~~44~~45 |
| Section 8.09 | Removal of Trustee | ~~44~~45 |
| Section 8.10 | Successor Trustee and/or Paying Agent | ~~44~~46 |

## TABLE OF CONTENTS
### (continued)

Page

Section 8.11   Transfer of Rights and Property to Successor Trustee   4546
Section 8.12   Merger or Consolidation of the Trustee   4647
Section 8.13   Ancillary Agreements   4647

ARTICLE IX. SUPPLEMENTAL TRUST AGREEMENTS   4647

Section 9.01   Modification and Amendment without Consent   4647
Section 9.02   Supplemental Trust Agreements Effective with Consent of Bondholders   4749
Section 9.03   General Provisions Relating to Supplemental Trust Agreements   4849

ARTICLE X. AMENDMENTS OF TRUST AGREEMENT   4849

Section 10.01   Powers of Amendment   4849
Section 10.02   Consent of Bondholders   4950
Section 10.03   Modifications by Unanimous Consent   5051
Section 10.04   Mailing   5051
Section 10.05   Exclusion of Bonds   5051
Section 10.06   Notation on Bonds   5051

ARTICLE XI. DEFAULTS AND REMEDIES   5052

Section 11.01   Events of Default   5052
Section 11.02   No Acceleration with Respect to the Bonds   5152
Section 11.03   Enforcement of Remedies   5152
Section 11.04   Priority of Payments after Default   5253
Section 11.05   Termination of Proceedings   5354
Section 11.06   Bondholders' Direction of Proceedings   5354
Section 11.07   Control by Holders of Bonds; Limitations   5354
Section 11.08   Actions by Trustee; Possession of Bonds by Trustee Not Required   5455
Section 11.09   Waiver and Non–Waiver of Default   5455
Section 11.10   Notice of Event of Default   5455
Section 11.11   Remedies Not Exclusive   5456

ARTICLE XII. DEFEASANCE   5556

Section 12.01   Defeasance   5556

ARTICLE XIII. EXECUTION OF INSTRUMENTS BY BONDHOLDERS  AND PROOF
OF OWNERSHIP OF BONDS   5758

Section 13.01   Evidence of Signatures of Bondholders and Ownership of Bonds   5758

ARTICLE XIV. MISCELLANEOUS   5759

Section 14.01   Preservation and Inspection of Documents   5759
Section 14.02   Money and Funds Held for Particular Bonds   5859
Section 14.03   Cancellation of Bonds   5859

# TABLE OF CONTENTS
## (continued)

**Page**

Section 14.04    No Recourse under Trust Agreement or on the Bonds    ~~58~~59
Section 14.05    Severability of Invalid Provision    ~~58~~59
Section 14.06    Parties of Interest    ~~58~~60
Section 14.07    Certain Provisions Relating to Capital Appreciation Bonds    ~~59~~60
Section 14.08    Notices    ~~59~~60
Section 14.09    Headings    ~~59~~61
Section 14.10    Governing Laws    ~~59~~61
Section 14.11    Retention of Jurisdiction of Title III Court    ~~60~~61
Section 14.12    Signatures and Counterparts    ~~60~~61
Section 14.13    Successors and Assigns    ~~60~~61
Section 14.14    Conflicts    ~~60~~61

EXHIBIT A – FORM OF SERIES ~~2021~~2022A CURRENT INTEREST BONDS    A-1
EXHIBIT B – FORM OF SERIES ~~2021~~2022A-1 CAPITAL APPRECIATION BONDS    B-1
EXHIBIT C – ACCRETED VALUE TABLE    C-1
EXHIBIT D – CONFIRMATION ORDER    D-1
[EXHIBIT E – ~~CONTINUING DISCLOSURE~~REPORTING AGREEMENT    E-1]

4842-1351-~~5245.17~~5245.23

## TRUST AGREEMENT

**THIS TRUST AGREEMENT,** dated as of ~~xx, 2021,~~ March 15, 2022, by and between the **COMMONWEALTH OF PUERTO RICO** (together with any successors thereto, the **"Commonwealth"**), and ~~_____~~ **UMB BANK, N.A.,** as trustee (the **"Trustee"**).

The Commonwealth recites and represents to the Trustee for the benefit of the Bondholders that it has authorized this Trust Agreement.

### R E C I T A L S

[to be updated as proceedings progress]

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. ("**PROMESA**"); pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017, the Financial Oversight and Management Board (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to section 101(b) of PROMESA, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing a case under Title III of PROMESA (the "**Title III Case**").

Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth, wherever located.

By entry of the Confirmation Order (as defined below), the Title III Court confirmed the Commonwealth's Plan (as defined below), the material components of which were [the resolution of certain claims relating to the Commonwealth's direct and guaranteed general obligation debt and certain other liabilities of the Commonwealth] and the restructuring of all claims against the Commonwealth relating to pre-existing indebtedness of the Commonwealth through, among other things, the issuance of Bonds (as defined below) pursuant to this Trust Agreement.

On October 26, 2021, in furtherance of the implementation of the Commonwealth Plan, the Commonwealth enacted the Act (as defined below) which, among other things authorized the issuance of the Series ~~2021~~2022A Bonds.

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan, and the Act, the Title III Court made a binding determination that the Bonds are legal, valid, binding and enforceable obligations of the Commonwealth benefiting from the following protections, each of which is legal, valid, binding and enforceable against the Commonwealth and other Persons and entities, as applicable, under Commonwealth law and federal law:

4842-1351-~~5245.17~~5245.23

a.      The Confirmation Order is full, final, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

b.      The Title III Court shall retain jurisdiction to enforce the terms of the Confirmation Order and the Plan.

c.      All provisions herein made to pay or secure payment of the Bonds, including the Commonwealth's good faith[1], credit and taxing power pledge herein, are legal, valid, binding, and enforceable, including, without limitation, covenants not to impair such property, as adequate protection for the property rights conferred under the Plan, the Act and the Confirmation Order.

d.      At the time of issuance and delivery of the Bonds, the Commonwealth is hereby authorized and directed to have stamped or written on each of the Bonds a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, ~~2021~~2022

All things have been done which are necessary to make the Bonds, when executed by the Commonwealth and authenticated and delivered by the Trustee hereunder, the valid obligations of the Commonwealth, and to constitute this Trust Agreement a valid trust agreement for the security of the Bonds, in accordance with the terms of this Trust Agreement.

**NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:**

It is hereby covenanted and declared that all the Bonds are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Commonwealth does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit of all Bonds as follows:

This Trust Agreement provides for the following transactions:

(a)      issuance by the Commonwealth of its general obligations to settle certain claims made by the Commonwealth's creditors, including claims relating to indebtedness previously issued or guaranteed by the Commonwealth, and to refund, refinance or defease any obligations issued hereunder and authorized under the Act:

(b)      the statutory lien on moneys deposited into the Debt Service Fund (as defined herein) established herein; and

---

[1] "Good faith" ("*buena fe*") is the standard provision in the Commonwealth's Constitution. "Good faith" is the literal translation of the term "buena fe". See Article VI, Section 2 of the Commonwealth's Constitution.

(c)      the rights and remedies of the holders from time to time of the Commonwealth's Bonds.

**IN TRUST NEVERTHELESS**, upon the terms and trusts herein set forth, the moneys on deposit in the Debt Service Fund shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Bonds issued and to be issued hereunder, without preference, priority or distinction as to participation in the moneys on deposit in the Debt Service Fund, and the benefit and protection thereof of one Bond over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Bonds shall have the same right, lien and privilege hereunder to the extent herein provided and shall be equally secured thereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST NEVERTHELESS,** that these presents are upon the express condition that if (a)(i) the Commonwealth or its successors or assigns shall well and truly pay or cause to be paid the Principal (as defined below) of Bonds with interest, according to the provisions set forth in the Bonds, respectively, and each of them or (ii) shall provide for the payment of Bonds by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 12.01 of this Trust Agreement, when and as authorized by the provisions of Section 12.01 of this Trust Agreement, and (b) shall also pay or cause to be paid all other sums payable hereunder by the Commonwealth, then, provided no Bonds remain Outstanding (as defined below) hereunder, these presents and the estate and rights granted hereby and by the Act shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Commonwealth and upon the payment of the costs and expenses thereof, shall duly execute, acknowledge and deliver to the Commonwealth such instruments of satisfaction or release as may be specified by the Commonwealth as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Act, the Plan and the Confirmation Order, if necessary, shall grant, reassign and deliver to the Commonwealth, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned hereunder, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Bonds are to be issued, authenticated and delivered, and that the property or amounts available for the payment of the Bonds are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Commonwealth, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

## ARTICLE I.

### DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions**.  All capitalized terms used in this Trust Agreement and not otherwise defined herein shall have the meanings set forth in the Plan.  As used in this Trust

Agreement, the following terms have the following meanings, unless a different meaning clearly appears from the context:

**"AAFAF"** means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

**"Accreted Value"** means, with respect to the Capital Appreciation Bonds, as of the date of calculation, the principal amount at initial issuance thereof, plus interest thereon to such date of calculation, capitalized semiannually on each Valuation Date at the accretion rate stated in Section 2.05 herein or within the applicable Supplemental Trust Agreement until paid at stated maturity, or prior redemption permitted by the terms of the applicable Supplemental Trust Agreement or after stated maturity following payment default by the Commonwealth, assuming that between Valuation Dates such Accreted Value increases in equal daily amounts on the basis of a 360-day year of twelve 30-day months; *provided, however*, that Accreted Value shall be, as of the time of the Commonwealth actually makes a Sinking Fund Installment payment or other payment required or permitted to be made on such Capital Appreciation Bond, reduced by the amount, if any, that such payment exceeds accrued interest on such Capital Appreciation Bond from the prior Valuation Date.

**"Act"** means Act No. 53-2021.

{**"Ancillary Agreements"** means the Trust Agreement, the Confirmation Order, the Plan, the Reporting Agreement and any other agreement or instrument entered into by the Commonwealth or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan.}

**"Arbitrage Rebate Fund"** means the fund so designated, created and established pursuant to Section 5.02 hereof.

**"Authorized Denominations"** means, with respect to the Series 2021 2022 A-1 Capital Appreciation Bonds, $1.00 principal amount in Maturity Value, or any integral multiple thereof, and with respect to Series 2021 2022 A Current Interest Bonds, $1.00 in Principal amount or any integral multiple thereof.

**"Authorized Officer"** means (a) in the case of the Commonwealth, the Governor of the Commonwealth, the Secretary of Treasury or such other officer of a Government Entity as may be designated by the Governor through executive order, and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other Person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by-laws of the Trustee.

**"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases in accordance with Section 301 of PROMESA.

- 4 -

4842-1351-5245.17 5245.23

"**Bond**" means any bond, including the Series ~~2021~~2022A Bonds, of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 hereof and, with respect to the Refunding Bonds the applicable Supplemental Trust Agreement.

"**Bondholder**", "**Holder of Bonds**" or "**Holder**" or any similar term, when used with reference to a Bond or Bonds, means the registered owner thereof; *provided, however*, that for purposes of this Trust Agreement, in the case of any Insured Bonds, the applicable Bond Insurer shall be treated as (i) the sole Holder of the Insured Bonds insured by such Bond Insurer for the purpose of consenting to any modification or amendment, exercising any voting right or privilege, giving any consent or direction, or taking any action that the Holders of such Insured Bonds are entitled to take pursuant to the provisions of this Trust Agreement pertaining to defaults and remedies and the duties and obligations of the Trustee, and (ii) an additional Holder of the Insured Bonds insured by such Bond Insurer for purposes of receiving any notices or exercising any rights to inspect documents provided for under this Trust Agreement.

"**Bond Insurance Policy**" means a municipal bond insurance policy, if any, issued by a Bond Insurer that guarantees payment of Principal of and interest on Insured Bonds.

"**Bond Insurer**" means the provider of a Bond Insurance Policy, if any, specified in a Supplemental Trust Agreement.

"**Book Entry Bond**" means a Bond issued to and registered in the name of a Depository for the participants in such Depository.

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks in San Juan, Puerto Rico or New York, New York, are required or authorized to close by law, regulation or executive order.

"**Capital Appreciation Bond**" means any Bond as to which interest is capitalized on each Valuation Date therefor and is stated to be payable only at the maturity or prior redemption thereof.

"**Code**" means the Internal Revenue Code of 1986, as amended, and the applicable regulations thereunder.

"**Comprehensive Cap**" has the meaning ascribed to such term in the Debt Responsibility Act.

"**Confirmation Order**" means the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code.

"**Constitution**" means the Constitution of the Commonwealth.

[**"Costs of Issuance**" means the items of expense to be paid by the Commonwealth which are incurred prior to, upon and during a reasonable period of time after issuance of the Bonds of a Series, in each case in connection with the authorization, sale and issuance of the Bonds, which items of expense may include, but not be limited to, underwriting discount or fees, structuring fees, placement fees, document printing and reproduction costs, filing and recording fees, costs of credit ratings, initial fees and charges of a Depository or the Trustee and its counsel,

- 5 -

other legal fees and charges, professional consultants' fees, fees and charges for execution, transportation and safekeeping of the Bonds, premiums, fees and charges for insurance on the Bonds, and other costs, charges and fees in connection with the foregoing.]

["**Costs of Issuance Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.]

"**Debt Management Policy**" means the policy developed by AAFAF, relating to the issuance of indebtedness by the Commonwealth and its instrumentalities, as more fully described in the Plan and the Debt Responsibility Act.

"**Debt Policy Revenues**" means, collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Legislative Assembly of the Commonwealth, including, without limitation, any such revenue assigned to, or owned by, the Puerto Rico Sales Tax Financing Corporation or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan (as defined in the Plan), (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement (as defined in the Plan); and, provided, further, that, for purposes of illustration, with respect to Fiscal Year 2020, and as reflected in the CW Fiscal Plan (as defined in the Plan), "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six Hundred Thousand Dollars ($15,146,600,000.00).

"**Debt Responsibility Act**" shall mean Act No. 101-2020, as the same may be amended, modified or supplemented.

"**Debt Service Fund**" means the fund so designated, created and established pursuant to Section 5.02 hereof.

"**Defeasance Security**" means:

(a)     a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America; and

(b)     any other U.S. Government Obligation (including the interest component of Resolution Funding Corporation Bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption

- 6 -

on a stated future date; **provided** that at the time an investment therein is made such U.S. Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services.

**"Depository"** means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other Person, firm, association or corporation designated in the Supplemental Trust Agreement authorizing a Series of Bonds to serve as securities depository for Bonds of such Series, or any successor of any of the foregoing, as applicable.

**"Effective Date"** means the date that the Plan becomes effective in accordance with its terms and the Confirmation Order.

**"Electronic Means"** means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

**"Eligible Investments"** means any of the following obligations or securities that the Commonwealth is permitted to hold as an investment under the laws of the Commonwealth:

(a)     Defeasance Securities;

(b)     interest-bearing general obligations of the United States of America;

(c)     United States of America treasury bills and other non-interest-bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Commonwealth a return on such investment in lieu of interest;

(d)     short-term discount U.S. Government Obligations;

(e)     certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable U.S. Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)     banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)     commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)     tax-exempt securities exempt from federal arbitrage provisions applicable to investments of proceeds of the Commonwealth's tax-exempt debt obligations, provided that such securities must be rated by at least two Rating Services (with one such Rating Service being S&P or Moody's) no less than AA (or equivalent)

- 7 -

and no less than the rating on the Bonds, and provided, further, that any such securities must be in book-entry form through The Depository Trust Company or a comparable depository;

(i)    domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(j)    Investment Agreements that are fully collateralized by Eligible Investments; and

(k)    domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

"**EMMA**" means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

"**Event of Default**" has the meaning given to such term in Section 11.01 hereof.

"**Fiscal Plan**" means a Fiscal Plan (as defined by Section 5(10) of PROMESA) of the Commonwealth, certified by the Oversight Board.

"**Fiscal Year**" means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

"**Fitch**" means Fitch Ratings and its successors.

"**General Fund**" means the Commonwealth's primary operating fund.

"**Government Entity**" means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

"**Instructions**" has the meaning given to such term in Section 8.05.

"**Insured Bond**" means a Bond issued hereunder and designated as an Insured Bond in the Supplemental Trust Agreement authorizing the issuance thereof.

"**Interest Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.02 hereof.

"**Interest Payment Date**" means each January 1 and July 1; provided, however, that with respect to the Series 2021 2022A Bonds that are not issued as Capital Appreciation Bonds, such term also includes the Effective Date.

- 8 -

"**Investment Agreement**" means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

"**KBRA**" means Kroll Bond Rating Agency Inc. and its successors.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such Bonds as of such date.

"**Maturity Value**" means, with respect to a Series ~~2021~~2022A-1 Capital Appreciation Bond, the Accreted Value due at stated maturity if no Sinking Fund Installment on such Bond is paid prior to stated maturity.

["**Monthly Disbursement Date**" means the first Business Day of each calendar month.]

"**Moody's**" means Moody's Investor Service, Inc. and its successors.

"**Outstanding**", when used in reference to Bonds, means, as of a particular date, all such Bonds authenticated and delivered hereunder and under any applicable Supplemental Trust Agreement except:

(a)     any Bonds canceled by the Trustee at or before such date;

(b)     any Bonds deemed to have been paid in accordance with Section 12.01 hereof;

(c)     any Bond canceled or paid pursuant to Section 3.09 and Section 4.07 hereof or any Bond in lieu of or in substitution for which another Bond, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.07 or Section 10.06 hereof; and

(d)     for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Bonds hereunder, any Bond deemed to not be Outstanding in accordance with Section 10.05 hereof.

"**Oversight Board**" has the meaning given to such term in the Recitals.

"**Paying Agent**" means, with respect to the Bonds of any Series, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

"**Plan**" means the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code, and the terms thereof.

- 9 -

"**Principal**" means collectively, the principal payment required to be made on a Bond on its final maturity date and each Sinking Fund Installment of a Bond due on a Principal Payment Date.

"**Principal Account**" means the account within the Debt Service Fund so designated, created and established pursuant to Section 5.02 hereof.

"**Principal Payment Date**" means each July 1.

"**PROMESA**" means The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a)     a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b)     a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(c)     a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

- 10 -

(d)     the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Commonwealth; or

(e)     a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that ~~meet~~meets the applicable rating requirements set forth above.

"**Quarter in Interest**" means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Bonds eligible to act on a matter, measured by (a) with respect to Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such Bonds as of such date.  In the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Bonds (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

"**Rating Confirmation**" means the written confirmation of a relevant Rating Service to the effect that the rating assigned, without regard to any insurance or other credit enhancement, to each of the Bonds rated by such Rating Service will remain unchanged and will not be withdrawn, suspended or reduced as a consequence of some act or occurrence.

"**Rating Service**" means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

"**Record Date**" means, when used in relation to the Bonds of a Series, the date specified as the record date for such Bonds in the Supplemental Trust Agreement authorizing such Bonds.

"**Redemption Date**" means each date of redemption specified in Section 4.04 hereof for the redemption of Series ~~2021~~2022A-1 Capital Appreciation Bonds.

"**Redemption Price**" when used with respect to a Bond, means the Principal amount of such Bond plus the applicable premium, if any, payable upon redemption prior to maturity thereof pursuant hereto or to the applicable Supplemental Trust Agreement.

"**Refunding Bonds**" means any of the Bonds issued to refund, refinance or defease other Bonds in compliance with the provisions of Section 2.02 hereof.

"**Reporting Agreement**" means the Reporting Agreement (Commonwealth of Puerto Rico General Obligation Restructured Bonds), dated as of _____, 2022, as executed and delivered by the Commonwealth and as amended or supplemented from time to time.

"**Restructuring Transaction**" means the transactions contemplated by, or in furtherance of, the Plan.

"**S&P**" means S&P Global Ratings and its successors.

**"Secretary of Treasury"** means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

**"Serial Bonds"** means the Bonds so designated in a Supplemental Trust Agreement.

**"Series"** means with respect to Bonds, all of the Bonds authenticated and delivered on original issuance and pursuant hereto and to the Supplemental Trust Agreement authorizing such Bonds as a separate Series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution for such Bonds pursuant to Article III, Section 4.07 or Section 10.06 hereof, regardless of variations in maturity, interest rate, Sinking Fund Installments or other provisions.

**"Series ~~2021~~2022A Bonds"** means the Commonwealth's Restructured General Obligation Bonds, Series ~~2021~~2022A authorized and issued pursuant to Article II of this Trust Agreement, which consist of, collectively, the Series ~~2021~~2022A-1 Bonds and the Series ~~2021~~2022A-2 Bonds.

**"Series ~~2021~~2022A Current Interest Bonds"** means collectively, the Series ~~2021~~2022A-1 Current Interest Bonds and the Series ~~2021~~2022A-2 Bonds.

**"Series ~~2021~~2022A-1 Bonds"** means the Series ~~2021~~2022A Bonds that are issued as Tax Exempt Bonds, which consist of, collectively, the Series ~~2021~~2022A-1 Capital Appreciation Bonds and the Series ~~2021~~2022A-1 Current Interest Bonds.

**"Series ~~2021~~2022A-1 Capital Appreciation Bonds"** means the Series ~~2021~~2022A-1 Bonds issued as Capital Appreciation Bonds, which have stated maturity dates of July 1, 2024 and July 1, 2033.

**"Series ~~2021~~2022A-1 Current Interest Bonds"** means the Series ~~2021~~2022A-1 Bonds issued as current interest bonds, which have stated maturity dates of July 1, 2023, July 1, 2025, July 1, 2027, July 1, 2029, July 1, 2031, July 1, 2033, July 1, 2035, July 1, 2037, July 1, 2041 and July 1, 2046.

**"Series ~~2021~~2022A-2 Bonds"** means the Series ~~2021~~2022A Bonds other than the Series ~~2021~~2022A-1 Bonds, which Series ~~2021~~2022A-2 Bonds have a stated maturity date of July 1, 2041 and are current interest bonds.  Subject to Section 7.13 of this Trust Agreement, the Series ~~2021~~2022A-2 Bonds are Taxable Bonds.

**"Sinking Fund Installment"** means, as of any date of computation, the amount of money required to be paid on a single future July 1 for the retirement of any Bonds which mature after said future July 1, but does not include any amount payable by the Commonwealth by reason only of the maturity of a Bond.

**"Statutory Lien"** means the statutory first lien on the amounts deposited into the Debt Service Fund established with the Trustee for the purpose of securing the payment of the Bonds, including any income and revenues generated therefrom, which statutory first lien is created under and imposed by Article 203 of the Act.

**"Supplemental Trust Agreement"** means any trust agreement of the Commonwealth amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement

- 12 -

executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

"**Taxable Bond**" means all Bonds issued pursuant to this Trust Agreement other than Tax Exempt Bonds.

"**Tax Exempt Bond**" means any Bond as to which Transaction Counsel has rendered an opinion to the effect that interest on it is excluded from gross income for purposes of federal income taxation.

"**Term Bond**" means a Bond so designated and payable from Sinking Fund Installments.

"**Title III Cases**" has the meaning given to such term in the Recitals.

"**Title III Court**" has the meaning given to such term in the Recitals.

"**Transaction Counsel**" means a nationally recognized firm of attorneys as may be selected by the Commonwealth for a specific purpose hereunder.

"**Trust Agreement**" means this Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

"**Trustee**" means the bank or trust company appointed as Trustee for the Bonds pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant hereto.

"**U.S. Government Obligation**" means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

"**Valuation Date**" means with respect to any Capital Appreciation Bond, each January 1 and July 1; provided, however, that with respect to the Series ~~2021~~2022A Bonds that are issued as Capital Appreciation Bonds, such term also includes the Effective Date.

**Section 1.02   Rules of Construction.**  Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing Persons shall include firms, associations and corporations, including public bodies as well as natural Persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Trust Agreement, refer to the Trust Agreement. All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless

- 13 -

4842-1351-~~5245.17~~5245.23

otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## AUTHORIZATION, ISSUANCE OF BONDS AND SERIES ~~2021~~2022A BONDS

**Section 2.01   Authorization of Bonds**.  (a)   There are hereby authorized to be issued Bonds of the Commonwealth to be designated as "Commonwealth of Puerto Rico General Obligation Restructured Bonds," which, in accordance with, and as provided by, Article 203 of the Act are secured by the Statutory Lien.  The aggregate principal amount of Bonds which may be executed, authenticated and delivered is not limited except as provided hereby and in the Act, the Plan, the Confirmation Order, and the terms and conditions authorized by the Commonwealth and set forth in the Ancillary Agreements.

(b)   On the Effective Date, the Commonwealth is hereby authorized to issue, with a deemed issuance date of July 1, 2021, and deliver the Series ~~2021~~2022A Bonds in two subseries (i) the Series ~~2021~~2022A-1 Bonds, consisting of (A) $5,861,055,000 aggregate principal amount of the Series ~~2021~~2022A-1 Current Interest Bonds and (B) $1,170,550,000 aggregate principal amount in Maturity Value of Series ~~2021~~2022-A Capital Appreciation Bonds and (ii) $822,260,000 aggregate principal amount of Series ~~2021~~2022A-2 Bonds.  Each maturity of the Series ~~2021~~2022A Bonds is hereby designated as a Term Bond.  The Series ~~2021~~2022A-1 Bonds are Tax Exempt Bonds and are hereby designated "Commonwealth of Puerto Rico General Obligation Restructured Bonds, Series ~~2021~~2022A-1" and the Series ~~2021~~2022A-2 Bonds are hereby designated "Commonwealth of Puerto Rico General Obligation Restructured Bonds, Series ~~2021~~2022A-2 (Taxable)".[2]  Subject to Section 7.13 of this Trust Agreement, the Series ~~2021~~2022A-2 Bonds are Taxable Bonds.

(c)   The form of the Series ~~2021~~2022A Current Interest Bonds is attached hereto as Exhibit A.  The form of the Series ~~2021~~2022A-1 Capital Appreciation Bonds is attached hereto as Exhibit B.

**Section 2.02   Provisions for Issuance of Bonds**[3].   The Commonwealth shall issue Bonds under this Trust Agreement in accordance with, and upon receipt of, the written direction of the Authorized Officer of the Commonwealth, or his or her designee; provided, however, that such direction may not conflict with the terms of this Trust Agreement, the Act, the Plan or the Confirmation Order.   The Series ~~2021~~2022A Bonds are permitted to be issued as provided herein.  The issuance of any Series of Refunding Bonds permitted to be issued hereunder shall be authorized by a Supplemental Trust Agreement or Supplemental Trust Agreements.  The Bonds of a Series authorized to be issued shall be executed by the Commonwealth and delivered to the Trustee.   Such Bonds shall from time to time and in such amounts as directed by the

---

[2]   NTD: Amounts are preliminary.
~~[3]   NTD: The Secretary of Justice opinion and Secretary of Justice certificate are under review.~~

4842-1351-~~5245.17~~5245.23

Commonwealth be authenticated by the Trustee and by it delivered to or upon the order of the Commonwealth upon receipt of the consideration therefor and upon delivery to the Trustee of:

(a)     a copy of this Trust Agreement and, with respect to any Series of Bonds other than the Series 20212022A Bonds, the Supplemental Trust Agreement authorizing such Bonds, certified by an Authorized Officer of the Commonwealth;

(b)     a written order as to the delivery of such Bonds, signed by an Authorized Officer of the Commonwealth, describing the Bonds to be delivered, designating the Person(s) to whom such Bonds are to be delivered and stating the consideration for such Bonds;

(c)     Reserved;

(c)     (d) [a certificate signed by the Secretary of the Treasury relating to (i) authorization and due execution of the Bond documents; (ii) signature of the Bonds; (iii) order to authenticate and deliver the Bonds; (vi) application of proceeds of the Bonds and (vii) as of the date of issuance of the Bonds, the Commonwealth is in compliance with any applicable debt limits, including the Comprehensive Cap and any applicable debt limit (if any) contained in the Constitution, and such certificate shall describe any assumptions with respect to the calculation of such debt limit;]

(d)     (e) [a certificate of AAFAF regarding the resolution approving the issuance of the Bonds and confirming its recommendations to the Governor of the Commonwealth and the Secretary of Treasury as to the details of the Bonds;]

(e)     (f) [an opinion of Transaction Counsel to the effect that (i) the Trust Agreement and any applicable Supplemental Trust Agreement authorizing the Series of Bonds have been duly and lawfully authorized, executed and delivered by the Commonwealth; (ii) the Trust Agreement and the applicable Supplemental Trust Agreement are in full force and effect and are valid and binding upon the Commonwealth and enforceable in accordance with their terms; (iii) the Commonwealth is duly authorized and entitled to issue such Series of Bonds and, upon the execution and delivery thereof and upon authentication by the Trustee, such Series of Bonds will be duly and validly issued and will constitute valid and binding general obligations of the Commonwealth for which the good faith, credit and taxing power of the Commonwealth are irrevocably pledged and entitled to the benefits of the Trust Agreement; and (iv) all legal authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by this Trust Agreement and, with respect to any Series of Bonds other than the Series 20212022A Bonds, the Supplemental Trust Agreement authorizing such Bonds, are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes; ***provided, however,*** that such opinion of Transaction Counsel may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determination by the Title III Court addresses and provides for such matters; ***provided, further***, that such opinion of Transaction Counsel may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy; and]

- 15 -

(f)    for any issuance of Bonds issued after the Effective Date, [an opinion of the Secretary of Justice of the Commonwealth to the effect that (i) the Trust Agreement and, if any, the applicable Supplemental Trust Agreement authorizing the Series of Bonds have been duly and lawfully authorized, executed and delivered by the Commonwealth; (ii) the Trust Agreement and the applicable Supplemental Trust Agreement are in full force and effect and are valid and binding upon the Commonwealth and enforceable in accordance with their terms; (iii) the Commonwealth is duly authorized and entitled to issue such Series of Bonds and, upon the execution and delivery thereof and upon authentication by the Trustee, such Series of Bonds will be duly and validly issued and will constitute valid and binding general obligations of the Commonwealth for which the good faith, credit and taxing power of the Commonwealth are irrevocably pledged and entitled to the benefits of the Trust Agreement; (iv) all legal authorizations, consents and approvals necessary to fulfill in all material respects the terms and conditions of the Bonds and to carry out the transactions contemplated by this Trust Agreement and, with respect to any Series of Bonds other than the Series 2021A Bonds, the Supplemental Trust Agreement authorizing such Bonds, are in full force and effect or have been obtained, as applicable, and no further legislation, authorization, consent or approval is required for such purposes; (v) no litigation is pending, or, to the best of his or her knowledge, threatened (a) to restrain or enjoin the issuance or delivery of any of the Bonds, (b) in any way contesting or affecting any authority for or the validity of this Trust Agreement, the applicable Supplemental Trust Agreement, the Bonds, the issuance of the Bonds, or the repayment of other indebtedness of the Commonwealth as set forth in this Trust Agreement, (c) in any way contesting the power of the Authorized Officer of the Commonwealth to issue the Bonds or the power of the Commonwealth to sell the Bonds, or (d) in any way contesting the pledge of the good faith, credit and taxing power of the Commonwealth to the prompt payment of the Principal of and interest on the Bonds; *provided, however,* that such opinion of the Secretary of Justice of the Commonwealth may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determinations address and provide for such matters; *provided, further*, that such opinion of Secretary of Justice of the Commonwealth may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy, and (vi) the Bonds constitute "public debt" within the meaning of Sections 2 and 8 of Article VI of the Puerto Rico Constitution;] and

(g)    for each issuance of Refunding Bonds, a certificate of an Authorized Officer of the Commonwealth demonstrating that upon the issuance of such Series of Refunding Bonds:

(A)    the final maturity date of the Refunding Bonds is not later than thirty (30) years from the original scheduled maturity date of the Outstanding Bonds to be refunded; and

(B)    upon the issuance of any Refunding Bonds, (1) there is no increase in the amount of Principal and interest due on Outstanding Bonds in any Fiscal Year and (2) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by the Commonwealth in its Debt Management Policy; provided, however, that, refinancings without cash flow savings in any Fiscal Year are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar

- 16 -

emergencies and debt service due in any Fiscal Year does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

**Section 2.03   Supplemental Trust Agreements**.  Each Supplemental Trust Agreement authorizing the issuance of Refunding Bonds shall specify the following:

(a)     The authorized principal amount of such Series of Bonds;

(b)     The date or dates of the Bonds, the maturity date or dates and Principal amounts of each maturity of the Bonds of such Series, the amount and date of each Sinking Fund Installment, as applicable, and which Bonds of such Series are Serial Bonds or Term Bonds, if any, and the Record Date or Record Dates of the Bonds of such Series;

(c)     The interest rate or rates, if any, on the Bonds of such Series and the first date on which interest on the Bonds of such Series shall be payable; ***provided, however,*** in no event shall a Holder of Bonds be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon) other than overdue interest that accrues at the regular non-penalty rate of the applicable Bond or interest accruing on such overdue interest at the regular non-penalty rate of the applicable Bond;

(d)     If all or a portion of the Bonds of such Series are Capital Appreciation Bonds, the Valuation Dates for such Bonds and the Accreted Value on each such Valuation Date;

(e)     The denomination or denominations of and the manner of numbering and lettering of the Bonds of such Series;

(f)     The Redemption Price or Redemption Prices, if any, and, subject to Article IV hereof, the redemption terms, if any, for the Bonds of such Series;

(g)     Provisions for the sale or exchange of the Bonds of such Series and for the delivery thereof;

(h)     The form of the Bonds of such Series and the form of the Trustee's certificate of authentication thereon, and whether any Bonds of such Series are to be issued as Book Entry Bonds and the Depository therefor;

(i)     Directions for the application of the proceeds of the Bonds of such Series;

(j)     If all or a portion of such Bonds will be issued as Insured Bonds, the terms and conditions for payment of such Insured Bonds under the applicable Bond Insurance Policy; ***provided, however,*** in no event shall the Holder of Insured Bonds or the Bond Insurer be entitled to the payment of a penalty for a payment default (including, without limitation, penalty interest and any interest or other amounts due thereon); and

(k)     Any other provisions deemed advisable by an Authorized Officer of the Commonwealth not in conflict with the provisions hereof or of any Ancillary Agreement.

4842-1351-5245.17 5245.23

**Section 2.04   Maturity Dates, Principal Amounts and Interest Rates for Series 2021 2022A-1 Current Interest Bonds**.  The Series 2021 2022A-1 Current Interest Bonds shall bear interest at such rates and shall mature on July 1 of each year set forth below and in the amounts set forth below:

| Year | Principal Amount | Interest Rate | CUSIP |
|------|-----------------|---------------|-------|
| 2023 | $745,050,000 | 5.000% | |
| 2025 | 740,820,000 | 5.000 | |
| 2027 | 729,565,000 | 5.000 | |
| 2029 | 710,040,000 | 5.000 | |
| 2031 | 680,835,000 | 5.000 | |
| 2033 | 637,040,000 | 4.000 | |
| 2035 | 448,580,000 | 4.000 | |
| 2037 | 255,660,000 | 4.000 | |
| 2041 | 204,600,000 | 4.000 | |
| 2046 | 708,865,000 | 4.000 | |

**Section 2.05   Maturity Dates, Principal Amounts and Interest Rates for Series 2021 2022A-1 Capital Appreciation Bonds**[43].  The Series 2021 2022A-1 Capital Appreciation Bonds shall accrue and accrete at such rates and shall mature on July 1 of each year set forth below and in the Maturity Value set forth below:

| Year | Initial Accreted Amount | Maturity Value[†] | Interest Rate | CUSIP |
|------|------------------------|-------------------|---------------|-------|
| 2024 | $288,241,989.75 | $334,275,000.00 | 5.000% | |
| 2033 | 442,506,553.50 | $836,275,000.00 | 5.375 | |

[†]   "Maturity Value" reflects Accreted Value at maturity if no Sinking Fund Installment are made prior to stated maturity.

**Section 2.06   Maturity Dates, Principal Amounts and Interest Rates for Series 2021 2022A-2 Bonds**.  The Series 2021 2022A-2 Bonds shall bear interest at such rates and shall mature on July 1 of each year set forth below and in the amounts set forth below:

| Year | Principal Amount | Interest Rate | CUSIP |
|------|-----------------|---------------|-------|
| 2041 | $822,260,000 | 5.000% | |

**Section 2.07   Interest Payments and Interest Accretion**.  (a)   The Series 2021 2022A Current Interest Bonds shall bear interest from July 1, 2021 until paid (whether at maturity, prior redemption or after maturity following payment default by the Commonwealth), payable on the Effective Date and semiannually thereafter on each Interest Payment Date, at the rates provided above.  Interest on the Series 2021 2022A Current Interest Bonds shall be computed on the basis of a 360-day year consisting of twelve 30-day months.  Interest shall accrue on overdue interest and Principal at the rates provided above, and shall compound on each Interest Payment Date. All overdue interest and Principal (and any interest accruing thereon) shall remain due and payable until paid. The Series 2021 2022A Current Interest Bonds shall be issued as fully registered bonds in Authorized Denominations.  If any such Interest Payment Date or Principal Payment Date is not a Business Day, any action to be taken on such date need not be taken on

[43]  NTD: Amounts are preliminary.

- 18 -

4842-1351-5245.17 5245.23

such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of such delay.

(b) Interest on the Series 2021/2022A-1 Capital Appreciation Bonds shall accrue and accrete from July 1, 2021 until paid (whether at maturity, prior redemption or after maturity following payment default by the Commonwealth). Interest on the Series 2021/2022A-1 Capital Appreciation Bonds will not be paid on a current basis, but will be added to the Principal thereof in the form of accretion on the Effective Date and semiannually thereafter on each Valuation Date, and will be treated as if accruing on the basis of a 360-day year consisting of twelve 30-day months between Valuation Dates, until paid (whether at stated maturity, prior redemption or after maturity following payment default by the Commonwealth). See "Exhibit C - Table of Accreted Value for the Series 2021/2022A-1 Capital Appreciation Bonds" for the Accreted Values for Series 2021/2022A-1 Capital Appreciation Bonds on each Valuation Date, assuming that no Sinking Fund Installment will be made prior to stated maturity. All overdue amounts (and any interest thereon) shall remain due and payable until paid.

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF BONDS

**Section 3.01 Place and Medium of Payment**. The Bonds shall be payable, with respect to interest, Principal and Redemption Price, in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except in the case of Book Entry Bonds (as provided in Section 3.10 hereof) as otherwise provided in Section 4.07 hereof, upon presentation and surrender of Bonds, the Principal or Redemption Price of such Bonds shall be payable at the designated corporate trust office of the Trustee. Interest on the Bonds shall be paid by check mailed to the registered owner thereof at the address thereof as it appears on the registry books of the Commonwealth or if authorized by the Supplemental Trust Agreement authorizing a Series of Bonds by wire transfer to such registered owner of the Bonds of such Series. For purposes of this Section, interest is payable on an Interest Payment Date to the registered owner of a Bond at the close of business on the Record Date for such Bond. All payments of Principal or Redemption Price of or interest on Bonds shall specify the CUSIP number or numbers of the Bonds in connection with which such payment is made. All payments of Principal and interest shall be rounded to the nearest $1.00.

The Bonds of each Series shall be issued in the form of fully registered Bonds without coupons.

Bonds of each Series issued prior to the first Interest Payment Date thereof shall be dated as of the date specified in the Supplemental Trust Agreement authorizing the issuance thereof. Bonds of each Series issued on or subsequent to the first Interest Payment Date thereof shall be dated as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be an Interest Payment Date, in which case they shall be dated as of such date of authentication; **_provided, however,_** that if, as shown by the records of the Trustee, interest on the Bonds of any Series has not been paid as of the Interest Payment Date immediately preceding the date of authentication thereof by the Trustee, the Bonds of such Series issued in lieu of Bonds surrendered for transfer or exchange shall be dated as of the date through which interest has been paid in full on the Bonds surrendered or, if no interest

- 19 -

has been paid on the Bonds surrendered since their authentication, as of the date of authentication of the surrendered Bonds.  Bonds of each Series shall bear interest from (and including) their date and shall bear interest on overdue interest at the interest rate of such Bonds, which shall capitalize on each Interest Payment Date. For the avoidance of doubt, if any Principal of, or accrued interest on, a Bond is not paid when due, such Principal and interest shall remain due and payable until paid.

All Bonds of each Series shall mature and/or have Sinking Fund Installments on July 1 of the year or years fixed herein with respect to the Series 20212022A Bonds or by the Supplemental Trust Agreement authorizing the issuance of Refunding Bonds.  Interest on all Bonds (other than Capital Appreciation Bonds) shall be payable on each Interest Payment Date of each year.  The first installment of interest due on the Bonds of a Series may be for such period as the Commonwealth shall fix herein with respect to the Series 20212022A Bonds or in the Supplemental Trust Agreement authorizing the issuance thereof of the Refunding Bonds.

**Section 3.02   Legends**.   The Bonds may contain, or have endorsed thereon, such provisions, specifications and descriptive words not inconsistent herewith or with any Supplemental Trust Agreement authorizing the same, as may be necessary or desirable and as may be determined by the Commonwealth prior to their delivery.  The Series 20212022A Bonds shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE [   ] DAY OF [        ], 2021.2022."

**Section 3.03   CUSIP Numbers**.  The Commonwealth shall provide for the assignment of CUSIP numbers for all Bonds ((including a separate CUSIP for each Series (and, where applicable, the subseries of such Series evidenced by such subseries' stated maturity date) of the Series 20212022A-1 Current Interest Bonds, the Series 20212022A-1 Capital Appreciation Bonds, the Series 20212022A-2 Bonds and any future Series (and, where applicable, subseries of such Series evidenced by such subseries' stated maturity date) of Bonds issued pursuant to a Supplemental Trust Agreement) and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Bondholders as a convenience to Bondholders; ***provided, however,*** that any such notice may state that no representation is made as to the correctness of such number either as printed on such Bonds or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Bond or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption.  The Commonwealth shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Bond of which the Commonwealth has knowledge.  The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04   Execution and Authentication**.  The Bonds shall be executed in the name of the Commonwealth by the manual or facsimile signature of an Authorized Officer of the Commonwealth, or in such other manner as may be permitted by law.  In case any one or more of the officers or employees who shall have signed any of the Bonds shall cease to be such officer or employee before the Bonds so signed shall have been actually authenticated and delivered by the Trustee, such Bonds may, nevertheless, be delivered as provided herein, and may be issued as if the Persons who signed such Bonds had not ceased to hold such offices or be so employed.  Any

4842-1351-5245.175245.23

Bond may be signed on behalf of the Commonwealth by such Persons as at the actual time of the execution of such Bond shall be duly authorized or hold the proper office in or be employed by, the Commonwealth, although at the date of the Bonds such Persons may not have been so authorized or have held such office or employment.

The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth herein with respect to the Series ~~2021~~2022A Bonds or in the Supplemental Trust Agreement authorizing the issuance of the Bonds, executed manually by the Trustee. Only such Bonds as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Bond executed on behalf of the Commonwealth shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05   Interchangeability of Bonds**.  Bonds, upon surrender thereof at the designated corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate principal amount of Bonds of the same Series, maturity and tenor of any other authorized denominations.

**Section 3.06   Transfer and Registry**.  So long as any of the Bonds remain Outstanding, the Commonwealth shall maintain and keep, or cause to be maintained and kept, at the designated corporate trust office of the Trustee, books for the registration and transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Commonwealth shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or transfer. So long as any of the Bonds remain Outstanding, the Commonwealth shall make all necessary provisions to permit the exchange of Bonds at the designated corporate trust office of the Trustee.

**Section 3.07   Transfer of Bonds**.  Each Bond shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in Person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer. Upon the transfer of any such Bond, the Commonwealth shall cause to be issued in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity and tenor as the surrendered Bond.

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

- 21 -

The Commonwealth and the Trustee may deem and treat the Person in whose name any Outstanding Bond shall be registered upon the books of the Commonwealth as the absolute owner of such Bond, whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the Principal or Redemption Price of and, subject to the provisions of Section 3.01 hereof with respect to Record Dates, interest on such Bond and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums paid, and neither the Commonwealth nor the Trustee shall be affected by any notice to the contrary.  The Commonwealth agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without negligence hereunder, in so treating such registered owner.

**Section 3.08   Regulations with Respect to Exchanges and Transfers**.  In all cases in which the privilege of exchanging Bonds or transferring Bonds is exercised, the Commonwealth shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions hereof.  All Bonds surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee.  For every such exchange or transfer of Bonds, whether temporary or definitive, the Commonwealth or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.  Notwithstanding any other provisions hereof, the cost of preparing each new Bond upon each exchange or transfer, and any other expenses of the Commonwealth or the Trustee incurred in connection therewith, shall be paid by the Person requesting such exchange or transfer.  The Commonwealth shall not be obliged to make, or cause to be made, any exchange or transfer of Bonds of any Series during the period beginning on the Record Date for such Bonds immediately preceding an Interest Payment Date on such Bonds and ending on such Interest Payment Date, or, in the case of any proposed redemption of Bonds of such Series, after the date immediately preceding the date notice of redemption has been mailed.

**Section 3.09   Bonds Mutilated, Destroyed, Lost or Stolen**.  In case any Bond shall become mutilated or be destroyed, lost or stolen, the Commonwealth in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, tenor and Principal amount as the Bond so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for such Bond so destroyed, lost or stolen, upon filing with the Commonwealth evidence satisfactory to the Commonwealth and the Trustee that such Bond has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith.  All Bonds so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Commonwealth.  In case any Bond which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Commonwealth may, instead of issuing a Bond in exchange or substitution therefor, pay or authorize the payment of such mutilated Bond upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Bond, upon the Holder thereof filing evidence satisfactory to the Commonwealth and the Trustee that such Bond has been

- 22 -

destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith.

**Section 3.10   Book Entry Bonds**.  Anything herein to the contrary notwithstanding, the Series 20212022A Bonds shall be authorized and issued as Book Entry Bonds and any other Bonds may be authorized and issued as Book Entry Bonds in accordance with the Supplemental Trust Agreement authorizing such Bonds.

For all purposes of the Trust Agreement the Holder of a Book Entry Bond shall be the Depository therefor and neither the Commonwealth nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Bond or to any direct or indirect participant in such Depository.  Without limiting the generality of the foregoing, neither the Commonwealth nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Bond with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Bond, (b) the delivery to any participant of the Depository, the beneficial owner of such Bond or any other Person, other than the Depository, of any notice with respect to such Bond, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Bond or any other Person, other than the Depository, of any amount with respect to the Principal or Redemption Price of, or interest on, such Bond.  The Commonwealth and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Bond for the purpose of (x) payment of the Principal or Redemption Price of and interest on such Bond, (y) giving notices of redemption and of other matters with respect to such Bond, (z) registering transfers with respect to such Bond, and for all other purposes whatsoever.  The Trustee shall pay all Principal or Redemption Price of and interest on such Bond only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Commonwealth's obligations with respect to such Principal or Redemption Price and interest to the extent of the sum or sums so paid.  No Person other than the Depository shall receive a Bond or other instrument evidencing the Commonwealth's obligation to make payments of the Principal or Redemption Price thereof and interest thereon.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Bond which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Bond to the Trustee; ***provided, however,*** that the Trustee shall maintain records as to each such payment and of the Principal amount of such Bond Outstanding, which shall be binding on the Commonwealth and the Holders from time to time of such Bond.

The Commonwealth, without the consent of the Trustee, the beneficial owner of a Book Entry Bond or any other Person, may terminate the services of the Depository with respect to a Book Entry Bond if the Commonwealth reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Bonds or (b) a continuation of the requirement that all of the Outstanding Bonds of like Series issued in book entry form be registered in the registration books of the Commonwealth in the name of the Depository, is not in the best interest of the beneficial owners of such Bonds, and the Commonwealth shall terminate the services of the Depository upon

- 23 -

receipt by the Commonwealth and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Bonds for which the Depository is serving as Depository.

Upon the termination of the services of a Depository with respect to a Book Entry Bond, or upon the resignation of a Depository with respect to a Book Entry Bond, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Commonwealth following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Bonds shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names designated by Bondholders transferring or exchanging such Bonds, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Commonwealth or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code.  The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

**Section 3.11  Preparation of Definitive Bonds; Temporary Bonds**.  The definitive Bonds of each Series shall be lithographed or printed on steel engraved borders, except that Book Entry Bonds may be typewritten.  Until the definitive Bonds of any Series are prepared, the Commonwealth may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Bonds, but subject to the same provisions, limitations and conditions as the definitive Bonds, except as to the denominations thereof and as to exchangeability for registered Bonds, one or more temporary Bonds, substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in authorized denominations or any whole multiples thereof authorized by the Commonwealth, and with such omissions, insertions and variations as may be appropriate to such temporary Bonds.  The Commonwealth at its own expense shall prepare and execute and, upon the surrender at the designated corporate trust office of the Trustee of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated corporate trust office of the Trustee, definitive Bonds of the same aggregate Principal amount, Series and maturity as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds issued pursuant hereto.

All temporary Bonds surrendered in exchange for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

# ARTICLE IV.

## REDEMPTION OF BONDS

**Section 4.01  Authorization of Redemption**.  Bonds subject to redemption prior to maturity pursuant hereto or to a Supplemental Trust Agreement shall be redeemable, in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein or in the Supplemental Trust Agreement authorizing such Series.

**Section 4.02  Redemption at the Election of the Commonwealth**.  In the case of any redemption of Bonds other than as provided in Section 4.03 hereof, the Commonwealth shall give written notice to the Trustee of its election to redeem, of the Series and of the Principal amounts and Redemption Prices of the Bonds of each maturity of such Series to be redeemed. Such notice shall be given not less than thirty (30) days prior to the redemption date.  The Series, maturities and Principal amounts thereof to be so redeemed shall be determined by the Commonwealth in its sole discretion, subject to any limitations with respect thereto contained herein (including, without limitation, Section 4.05 below) or in the Supplemental Trust Agreement authorizing such Series.  The Commonwealth shall pay to the Trustee on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee in the Debt Service Fund, is sufficient to redeem on the redemption date at the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, all of the Bonds to be so redeemed.

**Section 4.03  Redemption Other Than at Commonwealth's Election**.  Whenever by the terms hereof (with respect to the Series ~~2021~~2022A Bonds) or of a Supplemental Trust Agreement the Trustee is required to redeem Bonds through the application of mandatory Sinking Fund Installments, the Trustee shall select the Bonds of the Series and maturities to be redeemed in the manner provided in Section 4.05 hereof, give the notice of redemption and pay out of money available therefor the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, to the appropriate Paying Agents in accordance with the terms of this Article IV.

**Section 4.04  Redemption Prices and Terms of Series ~~2021~~2022A Bonds**.  The Series ~~2021~~2022A Current Interest Bonds shall be subject to redemption prior to maturity as provided in this Section 4.04.

(a)  *Optional Redemption*.  The Series ~~2021~~2022A Current Interest Bonds maturing on or before July 1, 2031 are not subject to optional redemption prior to stated maturity. The Series ~~2021~~2022A-1 Capital Appreciation Bonds maturing on July 1, 2024 are not subject to optional redemption prior to stated maturity.

The Series ~~2021~~2022A-1 Current Interest Bonds maturing on July 1, 2033, July 1, 2035, July 1, 2037, July 1, 2041, and July 1, 2046 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

- 25 -

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2031 through June 30, 2032 | 103% |
| July 1, 2032 through June 30, 2033 | 102% |
| July 1, 2033 through June 30, 2034 | 101% |
| On and after July 1, 2034 | 100% |

The Series ~~2021~~2022A-1 Capital Appreciation Bonds maturing on July 1, 2033 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| On or after July 1, 2031 | 100% of Accreted Value |

The Series ~~2021~~2022A-2 Bonds maturing on July 1, 2041 are subject to redemption prior to stated maturity, at the election of the Commonwealth, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day on or after July 1, 2031 during the periods and at the Redemption Prices set forth below:

| Redemption Period | Redemption Price |
|---|---|
| July 1, 2031 through June 30, 2032 | 103% |
| July 1, 2032 through June 30, 2033 | 102% |
| July 1, 2033 through June 30, 2034 | 101% |
| On and after July 1, 2034 | 100% |

(b)  *Mandatory Redemption for the Series ~~2021~~2022A-1 Current Interest Bonds*.  The Series ~~2021~~2022A-1 Current Interest Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed herein, at the Redemption Price of one hundred per centum (100%) of the Principal amount of each Series ~~2021~~2022A-1 Current Interest Bond or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption.  Unless none of the Series ~~2021~~2022A-1 Current Interest Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) of this Trust Agreement permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series ~~2021~~2022A-1 Current Interest Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series ~~2021~~2022A-1 Current Interest Bonds:

- 26 -

$745,050,000
Series ~~2021~~2022A-1
Current Interest Bonds
maturing July 1, 2023

| Year | Amount[*] |
|------|-----------|
| 2022 | $ 372,660,000 |
| 2023[†] | 372,390,000 |

[†] Stated maturity.

$740,820,000
Series ~~2021~~2022A-1
Current Interest Bonds
maturing July 1, 2025

| Year | Amount[*] |
|------|-----------|
| 2024 | $ 371,350,000 |
| 2025[†] | 369,470,000 |

[†] Stated maturity.

$729,565,000
Series ~~2021~~2022A-1
Current Interest Bonds
maturing July 1, 2027

| Year | Amount[*] |
|------|-----------|
| 2026 | $ 366,675,000 |
| 2027[†] | 362,890,000 |

[†] Stated maturity.

$710,040,000
Series ~~2021~~2022A-1
Current Interest Bonds
maturing July 1, 2029

| Year | Amount[*] |
|------|-----------|
| 2028 | $ 358,030,000 |
| 2029[†] | 352,010,000 |

[†] Stated maturity.

$680,835,000
Series ~~2021~~2022A-1
Current Interest Bonds
maturing July 1, 2031

| Year | Amount[*] |
|------|-----------|
| 2030 | $ 344,740,000 |
| 2031[†] | 336,095,000 |

- 27 -

† Stated maturity.

$637,040,000
Series ~~2021~~2022A-1
Current Interest Bonds
maturing July 1, 2033

| Year | Amount[*] |
|------|-----------|
| 2032 | $  325,990,000 |
| 2033† | 311,050,000 |

_____
† Stated maturity.

$448,580,000
Series ~~2021~~2022A-1
Current Interest Bonds
maturing July 1, 2035

| Year | Amount[*] |
|------|-----------|
| 2034 | $  294,385,000 |
| 2035† | 154,195,000 |

_____
† Stated maturity.

$255,660,000
Series ~~2021~~2022A-1
Current Interest Bonds
maturing July 1, 2037

| Year | Amount[*] |
|------|-----------|
| 2036 | $  137,290,000 |
| 2037† | 118,370,000 |

_____
† Stated maturity.

$204,600,000
Series ~~2021~~2022A-1
Current Interest Bonds
maturing July 1, 2041

| Year | Amount[*] |
|------|-----------|
| 2038 | $  97,300,000 |
| 2039 | 64,880,000 |
| 2040 | 29,640,000 |
| 2041† | 12,780,000 |

_____
† Stated maturity.

- 28 -

$708,865,000
Series ~~2021~~2022A-1
Current Interest Bonds
maturing July 1, 2046

| Year | Amount* |
|------|---------|
| 2042 | $ 130,875,000 |
| 2043 | 136,110,000 |
| 2044 | 141,555,000 |
| 2045 | 147,220,000 |
| 2046† | 153,105,000 |

_____
† Stated maturity.

(c)     *Mandatory Redemption for the Series ~~2021~~2022A-1 Capital Appreciation Bonds*.  The Series ~~2021~~2022A-1 Capital Appreciation Bonds shall be subject to redemption, in part, through application of Sinking Fund Installments as herein provided, upon notice given as prescribed herein, at the Redemption Price of one hundred per centum (100%) of the Accreted Value calculated to the Redemption Date of each Series ~~2021~~2022A-1 Capital Appreciation Bond or portion thereof to be redeemed.   Unless none of the Series ~~2021~~2022A-1 Capital Appreciation Bonds of a maturity to be so redeemed shall be then Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) of this Trust Agreement permitting amounts to be credited to part or all of any one or more Sinking Fund Installments, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series ~~2021~~2022A-1 Capital Appreciation Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series ~~2021~~2022A-1 Capital Appreciation Bonds:

$288,241,989.75 Initial Accreted Value
Series ~~2021~~2022A-1
Capital Appreciation Bonds
maturing July 1, 2024

| Year | Initial Accreted Value | Accreted Value at Redemption Date* | Maturity Value** |
|------|------------------------|-----------------------------------|------------------|
| 2022 | $100,862,061.30 | $105,968,971.50 | $116,970,000.00 |
| 2023 | 96,003,057.15 | 105,969,766.35 | 111,335,000.00 |
| 2024†† | 91,376,871.30 | 105,970,000.00 | 105,970,000.00 |

_____
*   Equals the original principal amount, plus interest accreted to the stated Redemption Date.
**  Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
††  Stated Maturity.

- 29 -

4842-1351-~~5245.17~~5245.23

$442,506,553.50 Initial Accreted Value
Series 2021 2022A-1
Capital Appreciation Bonds
maturing July 1, 2033

| Year | Initial Accreted Value | Accreted Value at Redemption Date* | Maturity Value** |
|------|------------------------|-------------------------------------|-------------------|
| 2029 | $98,129,013.00 | $149,997,523.50 | $185,450,000.00 |
| 2030 | 93,059,851.80 | 149,997,764.30 | 175,870,000.00 |
| 2031 | 88,252,614.90 | 149,998,089.75 | 166,785,000.00 |
| 2032 | 83,694,073.80 | 149,998,937.80 | 158,170,000.00 |
| 2033†† | 79,371,000.00 | 150,000,000.00 | 150,000,000.00 |

_____
\* Equals the original principal amount, plus interest accreted to the stated Redemption Date.
\*\* Equals the total Accreted Value that would be represented by the portion of the capital appreciation term bond being redeemed if it were held to maturity.
†† Stated Maturity.

(d)     *Mandatory Redemption of the Series 2021 2022A-2 Bonds*.  The Series 2021 2022A-2 Bonds shall be subject to mandatory redemption, in part, through application of Sinking Fund Installments, as herein provided, upon notice given as prescribed herein, at the Redemption Price of one hundred per centum (100%) of the Principal amount of each Series 2021 2022A-2 Bond or portion thereof to be redeemed, plus accrued interest, if any, to the date of redemption.  Unless none of the Series 2021 2022A-2 Bonds of a maturity to be so redeemed shall then be Outstanding and, subject to the provisions of Sections 5.06(b) and 4.04(e) permitting amounts to be credited to part or all of any one or more Sinking Fund Installments or the payment due at stated maturity, there shall be due and the Commonwealth shall be required to pay for the retirement of the Series 2021 2022A-2 Bonds maturing on July 1 of the years set forth below on July 1 of each of the years set forth in the following table, the amount set forth opposite such year in said table, and the said amount to be paid on each such date is hereby established as and each payment prior to stated maturity shall constitute a Sinking Fund Installment for retirement of such Series 2021 2022A-2 Bonds:

$822,260,000
Series 2021 2022A-2
Current Interest Bonds
maturing July 1, 2041

| Year | Amount |
|------|--------|
| 2035 | $121,695,000 |
| 2036 | 118,735,000 |
| 2037 | 115,625,000 |
| 2038 | 112,360,000 |
| 2039 | 117,980,000 |
| 2040 | 123,880,000 |
| 2041† | 111,985,000 |

_____
† Stated maturity.

(e)     *Credit Against Sinking Fund Installments*.  There shall be credited against and in satisfaction of the Sinking Fund Installments or the payment due at stated maturity payable

- 30 -

on a Series 20212022A Current Interest Bond entitled, as applicable, to the payment of such Sinking Fund Installments and the payment due at stated maturity an amount equal to the Principal amount of such Series 20212022A Current Interest Bond (A) purchased by the Commonwealth with moneys in the Debt Service Fund pursuant to Section 5.06(b) of this Trust Agreement, (B) redeemed at the option of the Commonwealth pursuant to paragraph (a) of this Section, (C) purchased by the Commonwealth and delivered to the Trustee for cancellation, and (D) deemed to have been paid in accordance with Section 12.01 of this Trust Agreement. Series 20212022A Current Interest Bonds purchased pursuant to Section 5.06(b) of this Trust Agreement shall be applied in satisfaction of a Sinking Fund Installment in accordance with such Section. Series 20212022A Current Interest Bonds redeemed at the option of the Commonwealth, purchased by the Commonwealth (other than pursuant to Section 5.06(b) of this Trust Agreement), or deemed to have been paid in accordance with Section 12.01 of this Trust Agreement shall be applied in satisfaction, in whole or in part, of one or more Sinking Fund Installments payable on such dates as the Commonwealth shall specify in a written direction of an Authorized Officer of the Commonwealth delivered to the Trustee at least thirty-five (35) days prior to the earliest date on which notice of redemption of the Series 20212022A Current Interest Bonds entitled to such Sinking Fund Installment may be given by the Trustee and the Sinking Fund Installment payable on each date specified in such direction shall be reduced by the Principal amount of the Series 20212022A Current Interest Bonds (or portions thereof) so purchased, redeemed or deemed to have been paid in accordance with Section 12.01 of this Trust Agreement to be applied in satisfaction of such Sinking Fund Installment as set forth in such direction.

**Section 4.05 Selection of Bonds to be Redeemed**. [Unless otherwise provided in the Supplemental Trust Agreement authorizing the issuance of Bonds of a Series, in the event of redemption of less than all of the Outstanding Bonds of like Series, maturity and tenor, the Trustee shall redeem such bonds on a *pro rata* basis.assign to each Outstanding Bond of the Series, maturity and tenor to be redeemed a distinctive number for each unit of the Principal amount of such Bond equal to the lowest denomination in which the Bonds of such Series are authorized to be issued and shall select by lot, using such method of selection as it shall deem proper in its discretion, from the numbers assigned to such Bonds as many numbers as, at such unit amount equal to the lowest denomination in which the Bonds of such Series are authorized to be issued for each number, shall equal the Principal amount of such Bonds to be redeemed. In making such selections the Trustee may draw the Bonds by lot (i) individually or (ii) by one or more groups, the grouping for the purpose of such drawing to be by serial numbers (or, in the case of Bonds of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued, by the numbers assigned thereto as in this Section 4.05 provided) which end in the same digit or in the same two digits. In case, upon any drawing by groups, the total Principal amount of Bonds drawn shall exceed the amount to be redeemed, the excess may be deducted from any group or groups so drawn in such manner as the Trustee may reasonably determine. The Trustee may in its discretion assign numbers to aliquot portions of Bonds and select part of any Bond for redemption. The Bonds to be redeemed shall be the Bonds to which were assigned numbers so selected; ***provided, however,*** that only so much of the Principal amount of each such Bond of a denomination of more than the lowest denomination in which the Bonds of such Series are authorized to be issued shall be redeemed as shall equal the lowest denomination in which the Bonds of such Series are authorized to be issued for each number assigned to it and so selected.

- 31 -

For purposes of this Section 4.05, the lowest denomination in which a Capital Appreciation Bond is authorized to be issued shall be the lowest Accreted Value authorized to be due at maturity on such Bonds.

Notwithstanding the foregoing, in the event that a Depository shall be the registered owner of all of such Bonds of the Series being redeemed, if less than all of the Bonds of a particular Series are called for redemption, the Commonwealth shall select the maturity or maturities of such Series to be redeemed and the Depository, on behalf of the Trustee, shall select the Bonds within the same maturity of such Series to be redeemed by means of a random lottery and in any event in accordance with the applicable practices of the Depository.]

**Section 4.06   Notice of Redemption**.   Whenever Bonds are to be redeemed, the Trustee shall give notice of the redemption of the Bonds in the name of the Commonwealth which notice shall specify:  (a) the Bonds to be redeemed which shall be identified by the designation of the Bonds given in accordance with Article II hereof; (b) the maturity dates and interest rates or accretion rates of the Bonds to be redeemed and the date of such Bonds; (c) the numbers and other distinguishing marks of the Bonds to be redeemed, including CUSIP numbers; (d) the redemption date; (e) the Redemption Price, if then known; (f) with respect to each such Bond, the Principal amount thereof to be redeemed; (g) that, except in the case of Book Entry Bonds, such Bonds will be redeemed at the designated corporate trust office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (h) that no representation is made as to the correctness of the CUSIP number either as printed on the Bonds or as contained in such notice and that an error in a CUSIP number as printed on a Bond or as contained in such notice shall not affect the validity of the proceedings for redemption; and (i) if the Commonwealth's obligation to redeem the Bonds is subject to conditions, a statement to that effect and of the conditions to such redemption.  Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Bond to be redeemed the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, and that, from and after such date, payment having been made or provided for, interest thereon shall cease to accrue.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid (i) to the registered owners of the Bonds which are to be redeemed, at their last known addresses, if any, appearing on the registration books, and (ii) to the Bond Insurer (if any) insuring the Bonds to be redeemed, at the Bond Insurer's last known address, not more than ten (10) Business Days prior to the date such notice is given.  Upon giving such notice, the Trustee shall promptly certify to the Commonwealth that it has mailed or caused to be mailed such notice to the Holders of the Bonds to be redeemed in the manner provided herein.  Such certificate shall be conclusive evidence that such notice was given in the manner required hereby.  The failure of any Holder of a Bond to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Bonds.

The Trustee shall, if any of the Bonds to be redeemed are Book Entry Bonds, transmit a copy of the notice of redemption to the Depository for such Book Entry Bonds not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Bonds are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of

- 32 -

delivery thereof to the holders of beneficial interests in a Book Entry Bond and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Bonds.  This paragraph shall not alter the Trustee's obligation to transmit a notice of redemption to the Bond Insurer as provided in the preceding paragraph.

Any notice of redemption given pursuant to this Section 4.06 which states that it is conditional upon receipt by the Trustee of money sufficient to pay the Redemption Price of such Bonds or upon the satisfaction of any other condition, may be rescinded at any time before payment of such Redemption Price if any such condition so specified is not satisfied. Notice of such rescission shall be given by the Trustee to affected Bondholders as promptly as practicable upon the failure of such condition or the occurrence of such other event.

**Section 4.07   Payment of Redeemed Bonds**.  Notice having been given in the manner provided in Section 4.06 hereof, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, except as otherwise provided in Section 3.10 hereof upon presentation and surrender of such Bonds, at the office or offices specified in such notice, and, in the case of Bonds presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date; ***provided, however,*** that payment of the Redemption Price may be paid by wire transfer to such registered owner if so authorized in the Supplemental Trust Agreement that authorized the Bonds of the Series to be redeemed.  If there shall be called for redemption less than all of the Principal amount of a registered Bond, the Commonwealth shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the owner thereof, for the unredeemed balance of the Principal amount of the registered Bond so surrendered, Bonds of like Series, maturity and tenor in any of the authorized denominations.  If, on the redemption date, money for the redemption of all Bonds or portions thereof of any like Series, maturity and tenor to be redeemed, together with interest accrued and unpaid thereon to the redemption date, shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, interest on the Bonds or portions thereof so called for redemption shall cease to accrue and such Bonds shall no longer be considered to be Outstanding hereunder.  If such money shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

## ARTICLE V.

## STATUTORY LIEN ON MONEYS IN DEBT SERVICE FUND; FUNDS AND ACCOUNTS;
## COMMONWEALTH REVENUES AND APPLICATION THEREOF

**Section 5.01   Statutory Lien in Debt Service Fund**. To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants, automatically, upon the issuance of the Bonds, the Statutory Lien in favor of the Trustee for the benefit of the Holders

4842-1351-~~5245.17~~5245.23

of the Bonds on the moneys deposited in the Debt Service Fund established herein, which Statutory Lien shall remain in full force and effect until the Bonds have been paid or satisfied in full in accordance with their terms.  The Statutory Lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of the Statutory Lien.  Furthermore, pursuant to this Trust Agreement, the funds established hereunder (with the exception of the Arbitrage Rebate Fund [and the Costs of Issuance Fund]), are hereby pledged to secure the repayment of the Bonds.  The Commonwealth agrees that, as of the commencement date of any future insolvency proceeding commenced by or on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise), the automatic stay pursuant to 11 U.S.C. Section 362 shall be deemed waived with respect to monies on deposit in the Debt Service Fund, and the Commonwealth shall consent to any motion for relief from the automatic stay filed by the Trustee or any beneficial owner of the Bonds filed pursuant to this Section 5.01.

**Section 5.02   Establishment of Funds and Accounts**.  (a)   The following funds and separate accounts within funds are hereby established and shall be held, in trust for the benefit of the Holders of the Bonds and maintained by the Trustee:

> Costs of Issuance Fund; and
> Debt Service Fund, comprised of:
> > Interest Account; and
> > Principal Account

(b)      The Arbitrage Rebate Fund is hereby established and created and shall be held by the Trustee for the benefit of the Commonwealth. The Arbitrage Rebate Fund is not subject to the Statutory Lien or contractual lien.

(c)      Each such fund may contain one or more accounts or subaccounts, for purposes of internal accounting, as necessary for arbitrage calculations or as the Commonwealth may otherwise deem proper.  All money at any time deposited in any fund, account or subaccount created hereby or by any Supplemental Trust Agreement or required hereby or thereby (other than the Arbitrage Rebate Fund) to be created shall be held in trust for the benefit of the Holders of Bonds, but shall nevertheless be disbursed, allocated and applied solely for the uses and purposes provided herein.

**Section 5.03   Application of Bond Proceeds**.  Upon the receipt of proceeds from the sale of a Series of Bonds, the Commonwealth shall apply such proceeds as specified in the Supplemental Trust Agreement authorizing such Series.  No deposit of proceeds shall be made in connection with the issuance of the Series 2021 2022A Bonds; provided that, on the Effective Date, the Secretary of Treasury shall transfer into the Debt Service Fund such additional amounts as may be necessary to account for the Bonds being issued as of July 1, 2021.

Accrued interest, if any, received upon the delivery of a Series of Bonds shall be deposited in the Debt Service Fund unless all or any portion of such amount is to be otherwise applied as specified in the Supplemental Trust Agreement authorizing such Series.

**Section 5.04   Application of Money in the Costs of Issuance Fund**.  [(a)  As soon as practicable after the delivery of each Series of Bonds, there shall be deposited into each account

- 34 -

within the Costs of Issuance Fund the amount, if any, required to be deposited therein pursuant to the Supplemental Trust Agreement authorizing such Series.

(b)     Except as otherwise provided in this Article V and in any applicable Supplemental Trust Agreement, money in the Costs of Issuance Fund shall be used only to pay the Costs of Issuance of the Bonds payable by the Commonwealth.  Such payments shall be made by the Trustee upon the direction of an Authorized Officer of the Commonwealth that sets forth in reasonable detail the purpose of the payment, the amount of such payment and the name of the payee.  If such payment is to be made by bank wire, such direction shall include the routing and account numbers of the payee.  If such payment is to be made by check, such direction shall include the address of the payee. The Trustee shall rely fully on any such written direction delivered pursuant to this Section and shall not be required to make any investigation in connection therewith.

(c)     The money remaining in the Costs of Issuance Fund after paying or making provision in accordance with the direction of an Authorized Officer of the Commonwealth for the payments required to be made pursuant to paragraph (b) of this Section, including any Costs of Issuance then unpaid, shall be applied by the Trustee in the following order of priority:

*First*, to the Arbitrage Rebate Fund, the amount determined by the Commonwealth to be required to be deposited therein; and

*Second*, to the Debt Service Fund, any balance remaining therein.]

**Section 5.05   Application of Moneys**.   [On each [Monthly Disbursement Date,] the Secretary of Treasury shall transfer to the Trustee and the Trustee shall apply such amounts as follows and in the following order of priority; ***provided, however***, that on the Effective Date the Secretary of the Treasury shall deposit such additional amounts as may be necessary to account for the issuance of the Bonds from July 1, 2021:[4]

*First*:  To the following accounts:

(i)     the Interest Account of the Debt Service Fund, one-sixth (1/6) of the amount of the interest payable on the Bonds on the next Interest Payment Date; and

(ii)    the Principal Account of the Debt Service Fund, one-twelfth (1/12) of the amount of Principal and Sinking Fund Installment due on the next Principal Payment Date;

*Second*:  Upon the written direction of an Authorized Officer of the Commonwealth, to the Arbitrage Rebate Fund moneys on deposit in the amount set forth in such direction.]

**Section 5.06   Debt Service Fund**.  (a)   The Trustee shall pay out of the Debt Service Fund the Principal of and interest on all Outstanding Bonds as the same is due and payable. Amounts paid to a Paying Agent for payments pursuant to this Section shall be irrevocably pledged to and applied to such payments.

---

[4]   NTD: Manner of payment of trustee fees under discussion.

4842-1351-5245.17 5245.23

(b)      Notwithstanding the provisions of this Section, the Commonwealth may, at any time but in no event less than thirty-five (35) days prior to the succeeding date on which a Sinking Fund Installment is scheduled to be due, direct the Trustee to purchase, with money on deposit in the Debt Service Fund, at a price equal to the Principal amount (with respect to Bonds that are not Capital Appreciation Bonds) or the Accreted Value (with respect to Capital Appreciation Bonds) thereof plus interest accrued and unpaid to the date of such purchase, Term Bonds to be redeemed from such Sinking Fund Installment; provided that the portion of such purchase price funded from the Principal Account shall not exceed the amount of the upcoming Sinking Fund Installment due on such purchased bond and the portion of such purchase price funded from the Interest Account shall not exceed the amount of interest accrued and unpaid on such purchased bond to the date of such purchase; provided further that in the case of Capital Appreciation Bonds, no portion of the purchase price may be funded from the Interest Account. Any Term Bond so purchased or otherwise purchased and delivered to the Trustee shall be canceled upon receipt thereof by the Trustee and evidence of such cancellation shall be given to the Commonwealth.  The Principal amount or Accreted Value, as applicable, of each Term Bond so canceled shall be credited against the Sinking Fund Installment due on such date.

(c)      Money in the Debt Service Fund in excess of the amount required to be deposited therein in accordance with Section 5.05 herein, shall at the written direction of an Authorized Officer of the Commonwealth, upon payment or satisfaction in full of the Bonds, be withdrawn and transferred to the Commonwealth.

**Section 5.07   Arbitrage Rebate Fund**.  The Trustee shall deposit to the Arbitrage Rebate Fund any money delivered to it by the Commonwealth for deposit therein and, notwithstanding any other provisions of this Article V, shall transfer to the Arbitrage Rebate Fund, in accordance with written directions of an Authorized Officer of the Commonwealth, money on deposit in any other funds or accounts held by the Trustee hereunder at such times and in such amounts as shall be set forth in such written directions of the Commonwealth.

Money on deposit in the Arbitrage Rebate Fund shall be applied by the Trustee in accordance with the direction of an Authorized Officer of the Commonwealth only for the purpose of making payments to the Department of the Treasury of the United States of America at such times and in such amounts as the Commonwealth shall determine, based on an opinion of Transaction Counsel, to be required by the Code to be rebated to the Department of the Treasury of the United States of America.  As of any date, money on deposit in the Arbitrage Rebate Fund which an Authorized Officer of the Commonwealth determines to be in excess of the amount required to be so rebated as of such date, shall be transferred (a) to the Debt Service Fund, if the amount then on deposit in the Debt Service Fund is less than the sum of the amounts required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and (b) to the extent not required to be deposited in the Debt Service Fund, may at the direction of an Authorized Officer of the Commonwealth, either be retained therein or transferred to the Commonwealth.

If and to the extent required by the Code, the Commonwealth shall periodically, at such times as may be required to comply with the Code, determine or cause to be determined the amount required by the Code to be rebated to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (a) transfer or direct the Trustee to transfer from any other of the funds and accounts held hereunder and deposit to the Arbitrage Rebate

- 36 -

Fund, such amount as the Commonwealth shall have determined to be necessary in order to enable it to comply with its obligation to rebate money to the Department of the Treasury of the United States of America with respect to Tax Exempt Bonds and (b) pay out of the Arbitrage Rebate Fund to the Department of the Treasury of the United States of America the amount, if any, required by the Code to be rebated thereto.

**Section 5.08   Transfer of Investments**.   Whenever money in any fund or account established hereunder is to be paid in accordance herewith to another such fund or account, such payment may be made, in whole or in part, by transferring to such other fund or account investments held as part of the fund or account from which such payment is to be made, whose value, together with the money, if any, to be transferred, is equal to the amount of the payment then to be made; *provided, however,* that no such transfer of investments would result in a violation of any investment standard or guideline applicable to such fund.

## ARTICLE VI.

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

**Section 6.01   Security for Deposits.**  All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of ~~the Commonwealth and~~ the Holders of the Bonds, and solely to the extent of any residual moneys to be returned to the Commonwealth pursuant to the terms of this Agreement, for the benefit of the Commonwealth, in such manner as may then be required by applicable federal or Commonwealth laws and regulations regarding security, by Eligible Investments of a market value at least equal at all times to the amount of the deposit so held by the Trustee.  The Trustee shall have no obligation for the payment of interest on moneys properly held by it that are uninvested hereunder.

**Section 6.02   Investment of Funds and Accounts Held by the Trustee**.   (a)   Subject to the limitations set forth in this paragraph, money held hereunder, if permitted by law, shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the direction of an Authorized Officer of the Commonwealth given in writing.

(b)      The Trustee may conclusively rely upon the Commonwealth's written instructions as to both the suitability and legality of the directed investments.   Ratings of permitted investments shall be determined at the time of purchase of such permitted investments.   The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)      Obligations purchased or other investments made as an investment of money in any fund or account held under the provisions hereof shall be deemed at all times to be a part of such fund or account and the income or interest earned, profits realized or losses suffered by a fund or account due to the investment thereof shall be credited or charged, as the case may be, to such fund or account.

(d)      In computing the amount in any fund or account held by the Trustee under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

- 37 -

4842-1351-~~5245.17~~5245.23

(e)      Subject to the provisions hereof, the Commonwealth, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Commonwealth, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section.  Except as otherwise provided herein, such investments shall be sold by the Commonwealth or by the Trustee at the direction of the Authorized Officer of the Commonwealth at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the fund or account in which such investment is held.  The Trustee shall advise the Commonwealth in writing, on or before the fifteenth (15th) day of each calendar month, of the amounts required to be on deposit in each fund and account hereunder and of the details of all investments held for the credit of each fund and account in its custody under the provisions hereof as of the end of the preceding month and as to whether such investments comply with the provisions of paragraphs (a) and (b) of this Section.  The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the preceding month.  The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in each such fund and account in the previous month.

(f)      Although the Commonwealth recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Commonwealth hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.03   Liability for Investments**.  Neither the Commonwealth nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

## ARTICLE VII.

## PARTICULAR COVENANTS

The Commonwealth covenants and agrees with the Holders of the Bonds as follows:

**Section 7.01   Payment of Principal and Interest**.  The Commonwealth shall pay or cause to be paid every Bond, including interest thereon, on the dates and at the places and in the manner provided in this Trust Agreement and in the Bonds.

**Section 7.02   Pledge of Good Faith and Credit; Bonds Constitute Public Debt**.  The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Principal of and the interest on the Bonds authorized by this Trust Agreement.  The Bonds constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution.  The Secretary of Treasury is authorized and directed to pay the Principal of and the interest of the Bonds as the same shall become due from any funds in the Treasury of the Commonwealth available for such purpose in the Fiscal Year for which said payment is required.  Such funds in the Treasury of the Commonwealth available for such purpose shall be deposited by the Secretary of Treasury in trust with the Trustee for the benefit of the Holders of the Bonds in the amounts and at the times required by Section 5.05 hereof.  For

- 38 -

the avoidance of doubt, the Commonwealth acknowledges that all references in this Trust Agreement to the pledge of its "good faith, credit and taxing power" (consistent with the Spanish version of the Constitution) should also be interpreted as references to the pledge of its "full faith, credit and taxing power" (consistent with the English version of the Constitution).

**Section 7.03   Deemed Annual Allocation**.   Pursuant to the Act, the Commonwealth shall, to the extent necessary to satisfy its obligations to pay the Bonds, apply (i) the proceeds of the 1.03% property tax levied pursuant to Act No. 107-2020, as amended, and collected by the Municipal Revenues Collection Center of the Commonwealth, (ii) any monies arising from the operation of Section 8 of Article VI of the Constitution, and (iii) any other available resources (*recursos disponibles*) of the Commonwealth to the payment of the Principal of and the interest (and accreted value) on the Bonds; provided that (A) this covenant is not intended to grant to the Holders of the Bonds any lien on such proceeds, monies and resources until deposited pursuant to the provisions hereof, and (B) for purposes of compliance with this covenant, to the extent that such proceeds, monies and resources are transferred to the Commonwealth's General Fund, payments of principal and interest (and accreted value) made to the Holders of the Bonds from the Commonwealth's General Fund shall be deemed to have been made from such proceeds, monies and resources in the order set forth herein.

**Section 7.04   Powers as to Bonds**.   Pursuant to the Act, the Plan, and the Confirmation Order, the Commonwealth is duly authorized to create and issue the Bonds and to execute the Trust Agreement and each Supplemental Trust Agreement.   The Commonwealth further represents that all corporate action on the part of the Commonwealth to that end has been duly and validly taken.   Pursuant to the Plan and the Confirmation Order, the Commonwealth further represents that the Bonds and the provisions hereof and of each Supplemental Trust Agreement are and shall be the valid and legally enforceable obligations of the Commonwealth in accordance with their terms and the terms hereof and of each Supplemental Trust Agreement. The Commonwealth further covenants that its good faith, credit and taxing power pledge in support of the Bonds is a valid, binding and legally enforceable pledge of the Commonwealth. The Commonwealth further covenants that it shall not fail to at all times to defend, preserve and protect, or cause to be defended, preserved and protected, the Statutory Lien and all of the rights of the Trustee for the benefit of the Holders of Bonds under the Trust Agreement and each Supplemental Trust Agreement against all claims and demands of all Persons whomsoever.

**Section 7.05   Further Assurance**.   The Commonwealth, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the Statutory Lien and the pledge of its good faith, credit and taxing power set forth herein, or which the Commonwealth may hereafter become bound to pledge or assign.

**Section 7.06   Offices for Payment and Registration of Bonds**.   Unless all of the Bonds are Book Entry Bonds, the Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Bonds may be presented for payment, which office or agency may be at or through the designated corporate trust office of the Trustee.   The Commonwealth may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Bonds of the Series authorized thereby or

- 39 -

referred to therein may be presented for payment.  The Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Bonds may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Bonds.   The provisions of this Section shall be subject to the provisions of Section 3.01 hereof.

**Section 7.07   General**.  The Commonwealth shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Commonwealth under the provisions hereof in accordance with the terms of such provisions.

Upon the date of issuance of Bonds, all conditions, acts and things required by the Plan and the statutes of the Commonwealth, including the Act, and hereby to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds, shall exist, have happened and have been performed.

**Section 7.08   Non-Impairment Covenant**.  The Commonwealth, for the benefit of all initial and subsequent Holders of Bonds, covenants and agrees that, until all obligations with respect to this Trust Agreement and the Bonds have been paid or otherwise satisfied in full in accordance with their terms, the Commonwealth will not take any action that would:

(a)    Impair the monthly deposits of interest and Principal required by Article 203 of the Act and Section 5.05 hereof,

(b)    limit or alter the rights vested in Holders of Bonds in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the Holders of the Bonds,

(c)    impair the rights and remedies of the Holders of the Bonds.

**Section 7.09   Tax Exemption Covenant.**  The Commonwealth covenants that it shall not take any action that would, or fail to take any action, if such failure would cause interest on the Tax Exempt Bonds to become includable in gross income for federal income tax purposes and that it will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the Holders of any Tax Exempt Bonds shall be and remain excludable from gross income for federal income tax purposes.

**Section 7.10   Comprehensive Cap on Net Tax-Supported Debt**.  For so long as any portion of the Series 20212022A Bonds shall remain outstanding, the Commonwealth shall maintain a Comprehensive Cap on all Net Tax-Supported Debt (as defined in the Plan) for purposes of the limitation on the issuance of additional Net Tax-Supported Debt set forth in Article VI of the Debt Responsibility Act, which Comprehensive Cap shall not exceed at any time 7.94% of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of 0.25% of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds (as defined in the Plan) outstanding as of the Effective Date.  Subject in all respects to the terms of the Plan, debt service payments on Series 20212022A-1 Capital Appreciation Bonds, and payments on CVIs (as defined in the Plan) that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with another plan of adjustment or Title VI

- 40 -

Qualifying Modification for an instrumentality of the Commonwealth, including any plan or Title VI Qualifying Modification for HTA (as defined in the Plan), CCDA (as defined in the Plan), or PRIFA (as defined in the Plan), in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap. In connection with the issuance of Net Tax-Supported Debt, the Secretary of Treasury shall certify that such Net Tax-Supported Debt is being issued in compliance with the Comprehensive Cap. Absent manifest error, the certification of the Secretary of Treasury shall be conclusive and binding on all parties, including the Holders of Bonds issued under this Trust Agreement, and the validity of such Net Tax~~-Support~~Supported Debt shall not be subject to legal challenge. In calculating Debt Policy Revenues for purposes of this Section 7.10 and the Debt Responsibility Act, the Secretary of Treasury may rely on certifications from officers of public corporations as to the revenues of such public corporations.

**Section 7.11  Fiscal Plan.**  Any post-Effective Date Fiscal Plan proposed by the Commonwealth will include provisions for the payment in each Fiscal Year of Principal and interest (and Accreted Value) on the Bonds.

**Section 7.12  ~~Continuing Disclosure~~Reporting Requirements**.  The Commonwealth covenants that, in connection with the delivery of the Series 2022A Bonds hereunder, it will enter into a ~~continuing disclosure~~reporting agreement ~~in~~ substantially the form attached hereto as Exhibit E. ~~[scope of continuing disclosure and cure periods under consideration]~~.  An event of default under such ~~continuing disclosure agreement~~Reporting Agreement, including the failure to timely provide the notices or information described therein shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the ~~continuing disclosure agreement~~Reporting Agreement.

**Section 7.13  IRS Favorable Tax Determination**.  The Commonwealth shall use reasonable best efforts to obtain from the Internal Revenue Service (the "IRS") a determination with respect to the tax-exemption of Taxable Bonds, if any, issued on the Effective Date (the "Effective Date Taxable Bonds") or an opinion of Transaction Counsel with respect to the tax-exemption of the Effective Date Taxable Bonds (such determination or opinion, a "Favorable Determination") that the ratio of the aggregate principal amount of Effective Date Taxable Bonds to the total aggregate principal amount of Bonds issued on the Effective Date is less than thirteen percent (13%). In the event that the Favorable Determination is obtained subsequent to the Effective Date and the new ratio is less than thirteen percent (13%), then the Holders of the Effective Date Taxable Bonds affected by the Favorable Determination shall be invited to exchange (the "Exchange Offer") the Effective Date Taxable Bonds for tax-exempt bonds (the "Converted Bonds") and, subject to the application of all reasonable expenses incurred by the Commonwealth in connection with the Exchange Offer, the interest rate on the Converted Bonds shall be the same as the Effective Date Taxable Bonds of the same type, interest rate, series and maturity; provided, however, that, such Converted Bonds shall be accompanied by the favorable opinion of Transaction Counsel that the interest, other than pre-issuance accrued interest on such Converted Bonds, and on the Effective Date Taxable Bonds exchanged for such Converted Bonds from the original date of delivery of such Effective Date Taxable Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for federal income tax purposes and from United States of America, state, Commonwealth and local income taxation. In the event that an Favorable Determination is not obtained, this covenant shall terminate upon the earlier to occur: (1) December 15, 2021, (2) notification by the IRS to the Commonwealth that the IRS is unable

- 41 -

to issue a favorable private letter ruling, closing agreement or other type of determination with respect to the tax-exemption of the Effective Date Taxable Bonds, and (3) an amendment of this Trust Agreement following a receipt of a Favorable Determination and consummation of the Exchange Offer.

## ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

**Section 8.01   Appointment and Acceptance of Trustee**.  The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02   Appointment and Acceptance of Paying Agents**.  In addition to the Trustee, the Commonwealth may appoint one or more Paying Agents for the Bonds of any Series in the Supplemental Trust Agreement authorizing such Bonds or in the manner provided herein or in such Supplemental Trust Agreement or shall appoint such Paying Agent or Paying Agents prior to the authentication and delivery of the Bonds so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent.  Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Commonwealth and the Trustee.

**Section 8.03   Responsibilities of Trustee and Paying Agents**.  The recitals of fact contained herein and in each Supplemental Trust Agreement and in the Bonds shall be taken as the statements of the Commonwealth and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof, of any Supplemental Trust Agreement or of any Bonds, or in respect of the security afforded hereby or by each Supplemental Trust Agreement, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to:  (i) the issuance of the Bonds for value; (ii) the application of the proceeds thereof except to the extent that such proceeds are received by it in its capacity as Trustee or Paying Agent; or (iii) the application of any money paid to the Commonwealth or others in accordance herewith and with each Supplemental Trust Agreement except as to the application of any money paid to it in its capacity as Trustee or Paying Agent.  Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder and under each Supplemental Trust Agreement except for its own negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and of each Supplemental Trust Agreement and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein and in each Supplemental Trust Agreement, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee.  If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust

- 42 -

Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

**Section 8.04   Property Held in Trust**.  All money and securities conveyed to or held by the Trustee at any time pursuant to the terms hereof and of each Supplemental Trust Agreement shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof and of each Supplemental Trust Agreement.

**Section 8.05   Rights of the Trustee and the Paying Agent**.  The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties.  The Trustee and any Paying Agent may consult with counsel of its selection, who may or may not be of counsel to the Commonwealth, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder and under any Supplemental Trust Agreement, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth.  Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof and of the Supplemental Trust Agreement upon the faith thereof, but in its reasonable discretion the Trustee or any Paying Agent, in lieu thereof, may either accept other evidence of such fact or matter or require such further or additional evidence.  Except as otherwise expressly provided herein and in each Supplemental Trust Agreement, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof and of any Supplemental Trust Agreement by the Commonwealth to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

The Trustee shall not be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated corporate trust office of the Trustee and such notice references the Bonds relative to which an Event of Default has occurred.

The Trustee may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon.

- 43 -

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Bonds, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Bonds.

The Trustee shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Bonds or Majority in Interest of Outstanding Bonds, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its negligence or willful misconduct in connection therewith.

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("**Instructions**"); provided, however, that the Commonwealth shall provide to the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a Person is to be added or deleted from the listing. If the Commonwealth elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling. The Commonwealth understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer. The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth. Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to negligence or willful misconduct of the Trustee. The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances;

- 44 -

and (iv) to notify the Trustee and any Paying Agent immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06   Compensation and Indemnification.**   Unless otherwise provided, the Commonwealth shall pay to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder and under the applicable Supplemental Trust Agreement, and also all reasonable, necessary and documented expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder and under the applicable Supplemental Trust Agreement.   None of the provisions contained herein or in any Supplemental Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07   Permitted Acts**.   The Trustee may become the owner of or may deal in Bonds as fully and with the same rights as if it were not such Trustee or a Paying Agent.   The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Commonwealth or any committee formed to protect the rights of Holders of Bonds or to effect or aid in any reorganization growing out of the enforcement hereof or of the Bonds or any Supplemental Trust Agreement whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Bonds in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

**Section 8.08   Resignation of Trustee**.   The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder and under each Supplemental Trust Agreement by giving not less than sixty (60) days' written notice to: (a) the Commonwealth, and (b) the Holders of the Bonds by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books or, in the case of a Bond Insurer, at such Bond Insurer's last known address,   Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; ***provided, however,*** that such resignation shall not take effect

- 45 -

until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09 Removal of Trustee**. The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon thirty (30) days' written notice by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondholders or by their attorneys-in-fact duly authorized and delivered to the Commonwealth. The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof or of any Supplemental Trust Agreement with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Bonds. No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment. A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof, shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Commonwealth.

**Section 8.10 Successor Trustee and/or Paying Agent**. In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Bonds, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Commonwealth and the predecessor Trustee and/or Paying Agent; **provided, nevertheless,** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Commonwealth by a duly executed written instrument signed by an Authorized Officer of the Commonwealth shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Bonds, at their last addresses appearing on the registry books or, in the case of a Bond Insurer, at such Bond Insurer's last known address. Any successor Trustee and/or Paying Agent appointed by the Commonwealth shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Commonwealth, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor. Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust

- 46 -

powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby and by each Supplemental Trust Agreement.

Neither the Commonwealth nor any public corporation, agency or instrumentality of the Commonwealth nor any entity or Person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11   Transfer of Rights and Property to Successor Trustee**.  Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Commonwealth, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder and under each Supplemental Trust Agreement, with like effect as if originally appointed as Trustee.  However, the Trustee then ceasing to act shall nevertheless, on request by the Commonwealth or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein.  Should any deed, conveyance or instrument in writing from the Commonwealth be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Commonwealth.

**Section 8.12   Merger or Consolidation of the Trustee**.  Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger or consolidation to which it shall be a party or any company to which such Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank having trust powers or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance.  In the event that such entity is not so qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Bonds.

**Section 8.13   Ancillary Agreements.**   The Trustee is authorized to enter into and perform its obligations under the Ancillary Agreements**.**

## ARTICLE IX.

## SUPPLEMENTAL TRUST AGREEMENTS

**Section 9.01   Modification and Amendment without Consent**.  Notwithstanding any other provisions of this Article IX or Article X hereof, the Commonwealth and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one

- 47 -

4842-1351-~~5245.17~~5245.23

or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a)     To provide for the issuance of a Series of Bonds under and in accordance with (and, for the avoidance of doubt, not in any way contrary to or inconsistent with) the provisions hereof and to prescribe the terms and conditions pursuant to which such Bonds may be issued, paid or redeemed;

(b)     To add additional covenants and agreements of the Commonwealth for the purpose of further securing the payment of the Bonds, provided such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Commonwealth or the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that such additional covenants and agreements shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(c)     To prescribe further limitations and restrictions upon the issuance of Refunding Bonds by the Commonwealth which are not contrary to or inconsistent with the limitations and restrictions thereon theretofore in effect including the limitations and restrictions set forth in the Act and the Plan;

(d)     To surrender any right, power or privilege reserved to or conferred upon the Commonwealth by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements or in the Act; provided that same shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(e)     To confirm, as further assurance, the Statutory Lien, and the subjection to the Statutory Lien, of the Commonwealth's right title and interest in the monies deposited hereunder, or any other money, investments thereof or funds, provided that such further assurance shall be for the equal benefit and security of all Bonds, without discrimination or preference;

(f)     To modify any of the provisions hereof or of any previously adopted Supplemental Trust Agreement in any other respects, provided that such modifications shall not be effective until after all Bonds of any Series of Bonds Outstanding as of the effective date of such Supplemental Trust Agreement shall cease to be Outstanding, and all Bonds issued under such Supplemental Trust Agreements shall contain a specific reference to the modifications contained in such subsequent Supplemental Trust Agreement;

(g)     With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the last paragraph of this Section 9.01, adversely affect the interests of the Bondholders in any respect.

(h)     [To modify any of the provisions hereof or of any previously adopted Supplemental Trust Agreement in any other respects, provided that such modifications shall not be effective unless there has been delivered to the Trustee (i) a Rating Confirmation on the Outstanding Bonds and (ii) an opinion of Transaction Counsel to the effect that the same is not

- 48 -

inconsistent with this Trust Agreement and will not adversely affect the exclusion of interest on any Tax Exempt Bond from gross income for purposes of federal income taxation, ***provided, however,*** this clause (i) shall be inapplicable unless the Outstanding Bonds are rated at least Baa3/BBB- (or equivalent) by at least two Rating Services (with one such Rating Service being S&P or Moody's).]

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Commonwealth and the Commonwealth has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement [is required in connection with amendments or supplements to the Confirmation Order or the Plan or] will not materially adversely affect: (i) the excludability of interest on the Tax Exempt Bonds from gross income of the Holders for federal income tax purposes, and (ii) with respect to a modification or amendment made pursuant to paragraphs (b) – (ih) above, the rights of the Holders of the Bonds in any other materially adverse respect.

For the avoidance of doubt, no Supplemental Trust Agreement shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 with the consent of each affected Holder.

**Section 9.02   Supplemental Trust Agreements Effective with Consent of Bondholders**.  The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to the written consent of the Bondholders in accordance with Article X hereof, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Commonwealth.

**Section 9.03   General Provisions Relating to Supplemental Trust Agreements**.  The Trust Agreement shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX, Article X or Section 7.05 hereof.  Nothing contained in this Article IX or Article X hereof shall affect or limit the rights or obligations of the Commonwealth to make, do, execute or deliver any Supplemental Trust Agreement, act or other instrument pursuant to the provisions of Section 7.04 hereof or the right or obligation of the Commonwealth to execute and deliver to the Trustee or any Paying Agent any instrument elsewhere herein provided or permitted to be delivered to the Trustee or any Paying Agent.

A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, the Rating Confirmation, if any is required by Section 9.01(i), and an opinion of Transaction Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Commonwealth and enforceable in accordance with its terms.  The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

- 49 -

4842-1351-5245.175245.23

The Commonwealth, as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective, shall give written notice thereof to each Rating Service then providing a rating on the Outstanding Bonds at the request of the Commonwealth and shall post a copy of such Supplemental Trust Agreement on the Commonwealth's website and EMMA under the CUSIPs for the Outstanding Bonds.

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT

**Section 10.01 Powers of Amendment**.  (a) Except as provided in Section 9.01 hereof, any modification or amendment hereof and of the rights and obligations of the Commonwealth and of the Holders of the Bonds hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Bonds Outstanding at the time such consent is given, or (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Bonds of each Series so affected and Outstanding at the time such consent is given; ***provided, however,*** that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series, maturity and tenor remain Outstanding, the consent of the Holders of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.

(b)      No such modification or amendment shall, without the prior written consent of the Holder of such Bond, permit a change in the provisions related to the timing or amount of any payment on the Bonds, including, without limitation, any change in the currency to be used to pay Principal of and interest on the Bonds, any change in the amount or date of any Sinking Fund Installment, payment of Principal or any other payment, the terms of redemption or maturity of the Principal of any Outstanding Bond or of any installment of interest thereon or a reduction in the Principal amount or the Redemption Price thereof or in the rate of interest thereon.  Further, no such modification or amendment shall, without the prior written consent of the Holder of such Bond, reduce the percentages or otherwise affect the classes of Bonds the consent of the Holders of which is required to effect any such modification or amendment. Further, no waiver of any default or compliance with any provisions of this Section 10.01(b) shall be granted without the prior written consent of the Holder of such Bond.

(c)      For the purposes of this Section 10.01, a Series shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Bonds of such Series in any respect.  The Trustee may in its discretion reasonably determine whether or not, in accordance with the foregoing provisions, the Bonds of any particular Series or maturity would be affected by any modification or amendment hereof and any such determination shall be binding and conclusive on the Commonwealth and all Holders of Bonds.  If the Trustee does not make such a determination, the Trustee shall obtain an opinion of Transaction Counsel as to whether the Bonds of any particular Series or maturity would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Commonwealth and all Holders of Bonds.

- 50 -

**Section 10.02  Consent of Bondholders**.  The Commonwealth may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section.  Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized Officer of the Commonwealth shall be filed with the Trustee for the inspection of the Holders of Bonds.  A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Bonds for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Commonwealth to each affected Holder of Bonds.  Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Bonds specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided.  Any such consent shall be binding upon the Holder of the Bonds giving such consent and on any subsequent Holder of such Bonds (whether or not such subsequent Holder has notice thereof).  At any time after the Holders of the required percentages of Bonds shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Bonds and will be effective as provided in this Section, shall be given to the Bondholders by mailing such notice to Bondholders or by Electronic Means.  The Commonwealth shall file with the Trustee proof of giving such notice.  Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Commonwealth and the Holders of all Bonds at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty day period; **provided, however**, that the Commonwealth during such sixty day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem expedient so long as consistent with the Supplemental Trust Agreement.

**Section 10.03  Modifications by Unanimous Consent**.  The terms and provisions hereof and the rights and obligations of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth and of the Holders of the Bonds may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Commonwealth of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Commonwealth and the consent of the Holders of all of the Bonds then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04  Mailing**.  Any provision in this Article X for the mailing of a notice or other document to Bondholders shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Bonds then Outstanding at such Person's address, if any, appearing upon the registry books of the Commonwealth, (b) to the Trustee, and (c) to the Bond Insurer at its last known address.

**Section 10.05  Exclusion of Bonds**.  Bonds owned or held by or for the account of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and

- 51 -

the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be entitled with respect to such Bonds to give any consent or take any other action provided for herein. At the time of any consent or other action taken hereunder, the Commonwealth shall furnish the Trustee a certificate of an Authorized Officer of the Commonwealth, upon which the Trustee may rely, describing all Bonds so to be excluded.

**Section 10.06 Notation on Bonds**. Bonds delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Commonwealth and the Trustee as to such action, and in that case upon demand of the Holder of any Bond Outstanding at such effective date and upon presentation of his Bond for such purpose at the designated corporate trust office of the Trustee suitable notation shall be made on such Bond by the Trustee as to any such action. If the Commonwealth or the Trustee shall so determine, new Bonds so modified as, in the opinion of the Trustee and the Commonwealth, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Bond then Outstanding shall be exchanged, without cost to such Bondholder, for Bonds of the same Series and maturity then Outstanding, upon surrender of such Bonds.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 Events of Default**. An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a)   Payment of the Principal or Redemption Price of any Bond shall not be made by the Commonwealth when the same shall become due and payable, either at maturity or by proceedings for redemption or otherwise; or

(b)   Payment of an installment of interest on any Bond shall not be made by the Commonwealth when the same shall become due and payable; or

(c)   The Statutory Lien shall at any time and for any reason cease to be in full force and effect or a final judgment shall be rendered which shall declare the Statutory Lien to be null and void or shall declare that the Statutory Lien does not establish in any material respect the lien it purports to establish; or

(d)   (c) The Commonwealth shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Bonds or in any Supplemental Trust Agreement on the part of the Commonwealth to be performed, other than the provisions of Section 7.12 hereof, and such default shall continue for forty-five (45) days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, unless, if such default is capable of being cured but is not capable of being cured within forty-five (45) days, the Commonwealth has commenced to cure such default within forty-five (45) days and does cure such default within ninety (90) days of the date the default initially occurred; or

- 52 -

(e)   ~~(d)~~ the Commonwealth permits the validity or effectiveness of this Trust Agreement or the Bonds to be impaired, and such impairment affects the enforceability of or payments on the Bonds, or any Person to be released from any covenants or obligations with respect to the Bonds.

**Section 11.02 No Acceleration with Respect to the Bonds.**  There shall be no right of acceleration with respect to the Bonds.

**Section 11.03 Enforcement of Remedies**.  (a)   If an Event of Default occurs and is continuing, the Trustee shall make payments in accordance with Section 11.04 below.

(b)   If an Event of Default under Section 11.01(a) ~~and~~or (b) occurs and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall, bring an action against the Secretary of Treasury, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of Treasury to apply available resources (*recursos disponibles*) of the Commonwealth to the payment of the ~~Bond~~Bonds, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution.

(c)   If an Event of Default ~~occurs~~ under Section 11.01 occurs and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Bonds shall, seek specific performance of any relevant provisions of this Trust Agreement or any relevant Supplemental Trust Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(d)   Subject to Article VIII hereof, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

In the enforcement of any remedy hereunder and under each Supplemental Trust Agreement the Trustee shall be entitled to sue for, enforce payment of, and receive any and all amounts then, or during any default becoming, and at any time remaining, due from the Commonwealth for Principal or interest or otherwise under any of the provisions of the Trust Agreement or of any Supplemental Trust Agreement or of the Bonds, with interest on overdue payments of the Principal of or interest on the Bonds at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under any Supplemental Trust Agreement and under such Bonds, including the fees and expenses of the Trustee and its attorneys and other agents, without prejudice to any other right or remedy of the Trustee or of the Holders of such Bonds, and to recover and enforce judgment or decree against the Commonwealth but solely as provided herein, in any Supplemental Trust Agreement and in such Bonds, for any portion of such amounts remaining unpaid, with interest, costs and expenses, and to collect in any manner provided by law, the money adjudged or decreed to be payable.

**Section 11.04  Priority of Payments after Default**.  If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee hereunder and under each Supplemental Trust Agreement shall not be sufficient to pay the Principal of and interest on the Bonds as the same become due and payable, the money held by the Trustee hereunder and under each Supplemental Trust Agreement together with any money then available or thereafter becoming available to pay the Principal of and interest on the Bonds, whether through exercise of the remedies provided for in this Article XI or otherwise, shall be applied as follows, *pro rata*:

(A)    (A) [To the payment of amounts due to the Trustee and its agents and counsel under Section 8.06 hereof]; and

then, pro-rata, as follows:

(B)    To the payment to the persons entitled thereto of all installments of interest then due in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference; and

(BC)   To the payment to the persons entitled thereto of the unpaid Principal or Redemption Price of any Bonds which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any date, then to the payment thereof ratably, according to the amount of Principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future.  The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Commonwealth, to any Holder of Bonds or to any other person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee.  Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date (which shall be on an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made, and upon such date interest on the amounts of Principal to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Bonds are Outstanding and unpaid shall be paid and applied in accordance with Section 5.05 hereof.

**Section 11.05  Termination of Proceedings**.  In case any proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or

- 54 -

4842-1351-5245.175245.23

shall have been determined adversely to the Trustee, then and in every such case the Commonwealth, the Trustee and the Bondholders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been commenced.

**Section 11.06 Bondholders' Direction of Proceedings**.  Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Bonds shall have the right by an instrument in writing executed and delivered to the Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder, under each Supplemental Trust Agreement or otherwise, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy available pursuant to Section 11.03, provided, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof and of each Supplemental Trust Agreement, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of counsel to the Trustee would be unjustly prejudicial to Bondholders not parties to such direction.

**Section 11.07 Control by Holders of Bonds; Limitations**.  No Holder of any of the Bonds shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted hereby or to institute such action, suit or proceeding in its or their name, and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time (and in no event shall a delay of more than thirty (30) days be deemed reasonable for such purposes) after receipt thereof.  Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law.  Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that no one or more Holders of the Bonds secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all proceedings at law or in equity shall be instituted and maintained for the benefit of all Holders of the Outstanding Bonds.  Notwithstanding any other provision hereof, the Holder of any Bond shall have the right which is absolute and unconditional to receive payment of the Principal of (and premium, if any) and interest on such Bond on the stated maturity expressed in such Bond (or, in the case of redemption, on the redemption date or, in the case of interest, on the Interest Payment Date on which such interest is due) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder, and the Holders shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Commonwealth Constitution and in the Plan, the Confirmation Order and the Act.

4842-1351-~~5245.17~~5245.23

**Section 11.08  Actions by Trustee; Possession of Bonds by Trustee Not Required**.  All rights of action hereunder or under any of the Bonds secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Bonds or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Bonds to which such action relates, subject to the provisions hereof.

**Section 11.09  Waiver and Non–Waiver of Default**.  No delay or omission of the Trustee or any Bondholder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein.  Every power and remedy given by this Article XI to the Trustee and the Bondholders, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the Holders of not less than a Quarter in Interest of the Outstanding Bonds, shall waive any default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; ***provided, however,*** the Trustee may not waive any default if it has received a direction from not less than a Quarter in Interest of the Outstanding Bonds that such default may not be waived by the Trustee; ***provided, further,*** that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10  Notice of Event of Default**.  The Trustee shall give notice of each Event of Default hereunder known to the Trustee to AAFAF, the Commonwealth and Holders of the Bonds, within ten (10) Business Days after knowledge of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice; ***provided, however***, that failure to provide notice to AAFAF or the Commonwealth of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Bondholders.  In the case of the Holders of the Bonds, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders of Bonds, as the names and addresses of such Holders appear on the books for registration and transfer of Bonds as kept by the Trustee and to the Bond Insurer at its last known address.

**Section 11.11  Remedies Not Exclusive**.  No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

**ARTICLE XII.**

**DEFEASANCE**

**Section 12.01  Defeasance**.  (a)   If the Commonwealth shall pay or cause to be paid to the Holder of a Bond the Principal or Redemption Price of and interest thereon, at the times and in the manner stipulated therein, herein, and in the applicable Supplemental Trust Agreement, then all rights granted hereby and by the Act to such Bond (including without limitation, the

- 56 -

4842-1351-~~5245.17~~5245.23

Statutory Lien) shall be discharged and satisfied.  In such event, the Trustee shall, upon the request of the Commonwealth, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Commonwealth, and all money or investments thereof held by it pursuant hereto and to the applicable Supplemental Trust Agreement which are being held for the sole benefit of such Bonds and which are not required for the payment or redemption of Bonds of the same Series as such Bond shall be applied by the Trustee as follows: first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Commonwealth, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than the sum of the amount required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of an Authorized Officer of the Commonwealth, shall be transferred to the Commonwealth.

(b)     Bonds for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee for the benefit of the Holders of the Bonds (through deposit of money for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section.  All Outstanding Bonds of any Series or any maturity within a Series or a portion of a maturity within a Series shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

(i)     in case any of said Bonds are to be redeemed on any date prior to their maturity, the Commonwealth shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of such Bonds; and

(ii)     there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay when due the Principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the Redemption Date or maturity date thereof, as the case may be; and

(iii)     in the event said Bonds are not by their terms subject to redemption within the next succeeding sixty (60) days, the Commonwealth shall have given the Trustee, in form satisfactory to it, irrevocable instructions to give, as soon as practicable, by first class mail, postage prepaid, to the Holders of said Bonds at their last known addresses appearing on the registration books, a notice to the Holders of such Bonds that the deposit required by (ii) above has been made with the Trustee and that said Bonds are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which money is to be available for the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; and

(iv)     the Commonwealth shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Bond having been deemed to have been

- 57 -

paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, (B) such defeasance is in accordance with the terms hereof and (C) with respect to a Tax Exempt Bond, such defeasance will not adversely affect the exclusion of interest on such Tax Exempt Bond from gross income for purposes of federal income taxation.

The Commonwealth shall give written notice to the Trustee of its selection of the Series and maturity payment of which shall be made in accordance with this Section. The Trustee shall select the Bonds of like Series and maturity payment of which shall be made in accordance with this Section in the manner provided in Section 4.05 hereof. Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the Principal or Redemption Price, if applicable, of and interest on said Bonds; *provided, however,* that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due the Principal or Redemption Price, if applicable, of and interest to become due on said Bonds on and prior to such redemption date or maturity date hereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such money so deposited, shall, to the extent certified by the Trustee to be in excess of the amounts required hereinabove to pay the Principal or Redemption Price, if applicable, of and interest on such Bonds, as realized, shall be applied by the Trustee as follows: first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of the Commonwealth, second, to the Debt Service Fund, to the extent the amount then on deposit therein is less than the sum of the amount required to be deposited therein in accordance with Section 5.05 of this Trust Agreement for the then current Fiscal Year, and third, to the extent not required to be deposited in the Arbitrage Rebate Fund or the Debt Service Fund, at the direction of an Authorized Officer of the Commonwealth, shall be retained therein or, upon confirmation of the nationally recognized verification agent that sufficient monies remain to effectuate the defeasance pursuant to this Article XII, transferred to the Commonwealth.

(c) Anything herein to the contrary notwithstanding, any money held by the Trustee or a Paying Agent in trust for the payment and discharge of any of the Bonds of a Series or the interest thereon which remain unclaimed for three (3) years after the date when all of the Bonds of such Series have become due and payable, either at their stated maturity dates or by call for earlier redemption, if such money was held by the Trustee or Paying Agent at such date, or for three (3) years after the date of deposit of such money if deposited with the Trustee or Paying Agent after said date when all of the Bonds of such Series become due and payable, or three (3) years after the date when the Principal or Redemption Price of or interest on the Bonds for which said money is held was due and payable, shall, at the written request of the Commonwealth, be repaid by the Trustee or Paying Agent to the Commonwealth as its absolute property and free from trust, and the Trustee or Paying Agent shall thereupon be released and discharged with respect thereto and the Holders of Bonds shall look only to the Commonwealth for the payment of such Bonds.

4842-1351-5245.17~5245.23

# ARTICLE XIII.

## EXECUTION OF INSTRUMENTS BY BONDHOLDERS
## AND PROOF OF OWNERSHIP OF BONDS

**Section 13.01  Evidence of Signatures of Bondholders and Ownership of Bonds**.  Any request, consent or other instrument which the Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Bonds may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Bonds in Person or by his or their attorneys duly appointed in writing.  Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any Person of such Bonds, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Bondholder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the Person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer.  The corporation of the Person or Persons executing any such instrument on behalf of a corporate Bondholder may be established without further proof if such instrument is signed by a Person purporting to be the president or a vice–president of such corporation with a corporate seal affixed and attested by a Person purporting to be its secretary or an assistant secretary.

The ownership of Bonds and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books.  Any request, consent or vote of the owner of any Bond shall bind all future owners of such Bond in respect of anything done or suffered to be done or omitted to be done by the Commonwealth or the Trustee in accordance therewith.  The Commonwealth or the Trustee may fix a record date in connection with any such request, consent or vote.

# ARTICLE XIV.

## MISCELLANEOUS

**Section 14.01  Preservation and Inspection of Documents**.  All documents received by the Trustee from the Commonwealth or from Bondholders under the provisions hereof or of any Supplemental Trust Agreement shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Commonwealth, any Bondholder, and their agents and their representatives, any of whom may make copies thereof; ***provided, however,*** that with respect to inspection by a Bondholder a written request of such Bondholder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection. The Trustee shall provide to the Commonwealth account balances and other information reasonably requested by the Commonwealth.

- 59 -

**Section 14.02  Money and Funds Held for Particular Bonds**.  The amounts held by the Trustee or any Paying Agent for the payment of the Principal or Redemption Price of and interest on the Bonds due on any date with respect to particular Bonds shall, pending such payment, be set aside and held in trust by it for the benefit of the Holders of such Bonds entitled thereto, and for the purposes hereof such Principal or Redemption Price of and interest on such Bonds, due after such date thereof, shall no longer be considered to be unpaid upon such payment.

**Section 14.03  Cancellation of Bonds**.  The Trustee or any Paying Agent shall forthwith cancel all Bonds which have been redeemed or paid and shall dispose of such Bonds in accordance with its customary procedures.  No such Bonds shall be deemed Outstanding Bonds hereunder and no Bonds shall be issued in lieu thereof.

**Section 14.04  No Recourse under Trust Agreement or on the Bonds**.  All covenants, stipulations, promises, agreements and obligations of the Commonwealth contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Commonwealth and not of any member, officer or employee of the Commonwealth, and no recourse shall be had for the payment of the Principal or Redemption Price of or interest on the Bonds or for any claims based thereon, hereon or on the Supplemental Trust Agreement against any member, officer or employee of the Commonwealth or any Person executing the Bonds, all such liability, if any, being expressly waived and released by every Holder of Bonds by the acceptance of the Bonds.

**Section 14.05  Severability of Invalid Provision**.  If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein or in any Supplemental Trust Agreement on the part of the Commonwealth or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of such Supplemental Trust Agreement or of the Bonds.

**Section 14.06  Parties  of  Interest**.   Nothing herein or in any Supplemental Trust Agreement adopted pursuant to the provisions hereof, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the Trustee, the Paying Agents and the Holders and, to the extent provided in this Trust Agreement and any Supplemental Trust Agreement, any Bond Insurer any rights, remedies or claims hereunder or by reason hereof or of any Supplemental Trust Agreement or any covenant, condition or stipulation thereof.  All covenants, stipulations, promises and agreements herein or in any Supplemental Trust Agreement contained by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Paying Agents, the Holders and the Bond Insurer.  Any Bond Insurer of any Insured Bonds issued under this Trust Agreement is an express third party beneficiary of this Trust Agreement and of any applicable Supplemental Trust Agreement.

**Section 14.07  Certain Provisions Relating to Capital Appreciation Bonds**.  For the purposes of receiving payment of the Redemption Price if a Capital Appreciation Bond is redeemed prior to maturity, the then current Accreted Value of such Bond shall be deemed to be its Principal amount.  In computing the Principal amount of Bonds held by the registered owner

- 60 -

of a Capital Appreciation Bond in giving to the Commonwealth or the Trustee any notice, consent, request, or demand pursuant hereto for any purpose whatsoever, the Accreted Value of such Bond as at the immediately preceding Valuation Date shall be deemed to be its principal amount.   Notwithstanding any other provision hereof, the amount payable at any time with respect to the Principal of and interest on any Capital Appreciation Bond be equal to its Accreted Value thereof at such time plus redemption premium, if any.

**Section 14.08 Notices**.  Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto or to any Supplemental Trust Agreement shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed: in the case of the Commonwealth, _____, _____, San Juan, PR _____; in the case of the Trustee, addressed to it at the designated corporate trust office of the Trustee at _____, _____, _____ _____, attention: Corporate Trust; in the case of the Commonwealth or the Secretary of Treasury, to the attention of the Secretary of Treasury at 10 Paseo Covadonga, San Juan, Puerto Rico, 00901; and in the case of AAFAF, addressed to [          ], or, in each case, to such other individual and at such other address as the Person to be notified shall have specified by notice to the other Persons. Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any series of Bonds, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Bonds of the Series to the Commonwealth's dissemination agent for distribution through the EMMA system.  The Commonwealth shall cooperate with the Trustee to the extent necessary to facilitate the foregoing.  The Trustee shall not be liable under any circumstances for monetary damages to any Person for any breach of the provisions of this paragraph.  The sole remedy for failure of the Trustee to perform is specific performance.

Any notice provided to the Commonwealth shall also be provided to AAFAF.

**Section 14.09 Headings**.  Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

**Section 14.10 Governing Laws**.  This Trust Agreement and the Bonds shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Bonds; *provided, however*, that the authorization of this Trust Agreement and the issuance of the Bonds by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided, further*, that the holders of the Bonds shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Constitution.

**Section 14.11 Retention of Jurisdiction of Title III Court**.  The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan and, the Confirmation Order and this Trust Agreement, including, without limitation, with

respect to the payment of the Bonds and the enforcement of the remedies set forth herein to the fullest extent permitted by law.  Any disputes, legal action, suit, or proceeding arising from or related to this Trust Agreement or the Bonds (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

Section 14.12 **Signatures and Counterparts**.  This Trust Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Trust Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Trust Agreement.

Section 14.13 **Successors and Assigns**.   Whenever in the Trust Agreement the Commonwealth is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Trust Agreement contained by or on behalf of the Commonwealth shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

Section 14.14 **Conflicts.**  All resolutions or other proceedings of the Commonwealth or parts thereof in conflict herewith are repealed insofar as such conflict exists.

[Remainder of page intentionally left blank; signature page follows]

4842-1351-~~5245.17~~5245.23

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement as of the date first written above.

**COMMONWEALTH OF PUERTO RICO**

By: _____
Name:
Title:


[TRUSTEE   NAME]UMB   BANK,   N.A.,   as Trustee


By: _____
Name:
Title:

Signature page to Trust Agreement]

EXHIBIT A

FORM OF SERIES ~~2021~~2022A CURRENT INTEREST BOND

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, ~~2021~~2022**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number: ___                                                                                    $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
GENERAL OBLIGATION RESTRUCTURED BONDS
[SERIES ~~2021~~2022A-1][SERIES ~~2021~~2022A-2]

| INTEREST RATE | MATURITY DATE | DATED DATE | CUSIP NO. |
|---|---|---|---|
| % | | | |

Registered Owner:     CEDE & CO.

Principal Amount:     _____ DOLLARS

A- 1

The **COMMONWEALTH OF PUERTO RICO** (the "Commonwealth") is justly indebted and for value received hereby promises to pay to the **REGISTERED OWNER** named above or registered assigns or legal representatives, on the **MATURITY DATE** specified above (or earlier as hereinafter referred to), upon the presentation and surrender hereof, the **PRINCIPAL AMOUNT** specified above and to pay interest thereon from the date hereof or from the January 1 or July 1 next preceding the date of authentication to which interest shall have been paid, unless such date of authentication is a January 1 or July 1, in which case from such date, at the Interest Rate per annum specified above, until payment of such Principal Amount, such interest to the payment hereof being payable semi-annually on the first (1st) day of each January and July (each, an "Interest Payment Date"). The Principal Amount of this bond is payable upon presentation and surrender hereof at the corporate trust office of the Trustee hereinafter mentioned. Interest shall accrue on overdue interest and Principal at the rate provided above, and shall compound on each Interest Payment Date. Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of [NAME OF TRUSTEE]UMB BANK, N.A., as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Payment of the interest hereon shall be payable by the Trustee as provided in Section 3.01 of the Trust Agreement, or at the option of any owner of $1,000,000 or more in aggregate Principal amount of the Series 20212022A Current Interest Bonds, by wire transfer to such registered owner at the wire transfer address in the continental United States to which such registered owner has not later than the Record Date immediately preceding such Interest Payment Date directed the Trustee to wire such interest payment. The Record Date is the fifteenth (15th) day (whether or not a Business Day) of the calendar month next preceding the applicable Interest Payment Date. All overdue interest and Principal (and any interest accruing on such overdue amounts) shall remain due and payable until paid.

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on this bond. To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants a statutory lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys on deposit in the Debt Service Fund established under the Trust Agreement.

This bond is one of a duly authorized issue of bonds of the Commonwealth designated as "General Obligation Restructured Bonds, [Series 20212022A-1] [Series 20212022A-2]" (herein called the "Series 20212022A Bonds"). The Series 20212022A Bonds are issued pursuant to a Trust Agreement, by and between the Commonwealth and [NAME OF TRUSTEE]UMB Bank, N.A., as trustee (the "Trustee"), dated as of _____, 20212022 (the "Trust Agreement") and [ACT]. The bonds constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth. Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth and the bondholders, as applicable. The Trust Agreement may be amended to the extent and in the manner provided therein.

Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

A- 2

This Series 2021 2022A Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Trust Agreement for the purposes set forth in the Trust Agreement.

The Series 2021 2022A Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Trust Agreement.  Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Commonwealth, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Trust Agreement, the Plan and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series 2021 2022A Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This bond is transferable, as provided in the Trust Agreement, only upon the books of the Commonwealth maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2021 2022A Bond or Bonds in the same aggregate Principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Commonwealth and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

A- 3

**IN WITNESS WHEREOF, THE COMMONWEALTH OF PUERTO RICO** has caused this bond to be signed in its name and on its behalf Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and attested by its Secretary of the State (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series ~~2021~~2022A Bonds, all as of the Dated Date specified above.

_____
Governor of the Commonwealth of Puerto Rico


_____
Secretary of the Treasury of Puerto Rico


**ATTEST:**


_____
Secretary of State

A- 4

4842-1351-~~5245.17~~5245.23

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the General Obligation Restructured Bonds, Series ~~2021~~2022A, of the Commonwealth of Puerto Rico.

~~[NAME OF TRUSTEE]~~UMB BANK, N.A., as Trustee

By: _____

Authorized Signatory

Date of authentication: _____, ~~2021~~2022

A- 5

ASSIGNMENT

FOR VALUE RECEIVED:     _____

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

_____

Please print or typewrite name and address,
including zip code, of transferee

the within-mentioned Bond and hereby irrevocably constitutes and appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated:     _____     _____

NOTE: The signature to this assignment must
correspond with the name as written on the within
Bond in every particular, without alteration or
enlargement or any change whatsoever.

Signature Guaranteed:

4842-1351-~~5245.17~~5245.23

EXHIBIT B

FORM OF SERIES ~~2021~~2022A-1 CAPITAL APPRECIATION BONDS

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, ~~2021~~2022**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE BONDS THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE PRINCIPAL AMOUNT OUTSTANDING UNDER THIS BOND MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE.  DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS BOND MAY NOT RELY UPON THE PRINCIPAL AMOUNT INDICATED HEREON AS THE PRINCIPAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID.  THE PRINCIPAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS BOND SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO.  OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

Number:  ___                                                                         $_____

UNITED STATES OF AMERICA
COMMONWEALTH OF PUERTO RICO
GENERAL OBLIGATION RESTRUCTURED BONDS,
SERIES ~~2021~~2022A-1

<u>ACCRETION RATE</u>          <u>MATURITY DATE</u>          <u>DATED DATE</u>          <u>CUSIP NO.</u>

Registered Owner:     CEDE & CO.

Principal Amount at Issuance:          _____  DOLLARS

B- 1

4842-1351-~~5245.17~~5245.23

Maturity Value[5]: _____ DOLLARS

The **COMMONWEALTH OF PUERTO RICO** (the "Commonwealth") is justly indebted and for value received hereby promises to pay to the **REGISTERED OWNER** named above or registered assigns or legal representatives, on the **MATURITY DATE** specified above (or earlier as hereinafter referred to), upon the presentation and surrender hereof, the **MATURITY VALUE** specified above on the Maturity Date stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement) upon the presentation and surrender hereof at the principal corporate trust office of the Trustee hereinafter mentioned.   Interest on this bond shall accrete at the **ACCRETION RATE** set forth above and shall not be payable on a current basis but shall be compounded, and added to Principal, on the Effective Date and on each January 1 and July 1 (each, a "Valuation Date") such that the **PRINCIPAL AMOUNT AT ISSUANCE** specified above shall accrete to equal the **MATURITY VALUE** specified above on the **MATURITY DATE** stated above (except to the extent that such Maturity Value due on the Maturity Date is reduced by prior redemption as provided in the Trust Agreement).   Interest shall accrete on overdue interest and Principal at the rate provided above, and shall compound on each Valuation Date.   Principal and Redemption Price of this bond shall be payable at the principal corporate trust office of ~~[NAME OF TRUSTEE]~~UMB BANK, N.A., as trustee (together with any successor in such capacity, the "Trustee"), in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. All overdue Principal (and any interest accruing thereon) shall remain due and payable until paid.

The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on this bond.   To secure the payment of the Principal and Redemption Price of and interest on the Bonds, the Act grants a statutory lien in favor of the Trustee for the benefit of the Holders of the Bonds on the moneys on deposit in the Debt Service Fund established under the Trust Agreement.

This bond is one of a duly authorized issue of bonds of the Commonwealth designated as "General Obligation Restructured Bonds, Series ~~2021~~2022A-1" (herein called the "Series ~~2021~~2022A Bonds").   The Series ~~2021~~2022A Bonds are issued pursuant to a Trust Agreement, by and between the Commonwealth and ~~[NAME OF TRUSTEE]~~UMB Bank, N.A., as trustee (the "Trustee), dated as of _____, ~~2021~~2022 (the "Trust Agreement") and [ACT].   The bonds constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.   Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth and the bondholders, as applicable.   The Trust Agreement may be amended to the extent and in the manner provided therein.

Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Trust Agreement.

This Series ~~2021~~2022A Bond is part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Trust Agreement for the purposes set forth in the Trust Agreement.

---

[5]   Reflects Accreted Value at maturity if no Sinking Fund Installment are made prior to stated maturity.

The Series ~~2021~~2022A Bonds are subject to mandatory and optional redemption prior to maturity as provided in the Trust Agreement.  Notice of redemption shall be given as provided in the Trust Agreement.

Copies of the Trust Agreement are on file at the office of the Commonwealth, and at the corporate trust office of the Trustee, and reference to the Trust Agreement and any and all supplements thereto and amendments thereof and to the Act is made for a description of the Statutory Lien securing the Bonds, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the Trust Agreement and subject to the conditions therein, the provisions of the Trust Agreement or any Supplemental Trust Agreement amendatory thereof or supplemental thereto may be modified or amended.

It is hereby certified, recited, and declared that all conditions, acts and things required by the statutes of the Commonwealth, the Trust Agreement, the Plan and the Confirmation Order to exist, to have happened or to have been performed prior to or in connection with the issuance of this bond exist, have happened and have been performed in due time, form and manner as required by law and the issue of the Series ~~2021~~2022A Bonds is within every debt and other limit prescribed by law.

The registered owner of this bond shall have no right to enforce the provisions of the Trust Agreement, to institute action to enforce the provisions of the Trust Agreement or to institute, appear in or defend any suit or other proceeding with respect thereto, except as provided in the Trust Agreement.

This bond is transferable, as provided in the Trust Agreement, only upon the books of the Commonwealth maintained for that purpose at the corporate trust office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series ~~2021~~2022A Bond or Bonds in the same aggregate Accreted Value, and of the same series, maturity and accretion rate, shall be issued to the transferee in exchange therefor as provided in the Trust Agreement and upon the payment of the charges, if any, therein prescribed. The Commonwealth and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payments due on this bond and for all other purposes whatsoever.

This bond shall not be valid until the certificate of authentication hereon shall have been manually signed by the Trustee.

**IN WITNESS WHEREOF, THE COMMONWEALTH OF PUERTO RICO** has caused this bond to be signed in its name and on its behalf Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and attested by its Secretary of the State (the signatures of said officers may be by facsimile), and said officials by the execution hereof do adopt as and for their own proper signatures the signatures appearing on each of the Series ~~2021~~2022A Bonds, all as of the Dated Date specified above.

_____
Governor of the Commonwealth of Puerto Rico

_____
Secretary of the Treasury of Puerto Rico

**ATTEST:**

_____
Secretary of State

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This bond is one of the Bonds described in the within mentioned Trust Agreement and is one of the General Obligation Restructured Bonds, Series 20212022A, of the Commonwealth of Puerto Rico.

[NAME OF TRUSTEE]UMB BANK, N.A., as Trustee

By: _____
Authorized Signatory

Date of authentication: _____, 20212022

B- 5

4842-1351-5245.175245.23

ASSIGNMENT

FOR VALUE RECEIVED:   _____

_____

(Please print or typewrite name of undersigned transferor)

hereby sells, assigns and transfers unto _____

_____

(Please insert Social Security or other tax identifying number of Transferee)

[                    ]        _____

Please print or typewrite name and address,
including zip code, of transferee

the   within-mentioned   Bond   and   hereby   irrevocably   constitutes   and   appoints
_____, attorney-in-fact, to transfer the same on the
books of registry in the office of the Trustee, as registrar, with full power of substitution in the
premises.

Dated:   _____         _____

NOTE: The signature to this assignment must
correspond with the name as written on the within
Bond in every particular, without alteration or
enlargement or any change whatsoever.

Signature Guaranteed:

4842-1351-5245.17~5245.23

B- 6

EXHIBIT C

ACCRETED VALUE TABLE

4842-1351-~~5245.17~~5245.23

EXHIBIT D

CONFIRMATION ORDER

4842-1351-5245.175245.23

EXHIBIT E

REPORTING AGREEMENT

# **EXHIBIT B**

CVI Trust Agreement

Draft: 02/03/2022

**TRUST AGREEMENT**

**(relating to CVIs)**

**by and between**

**COMMONWEALTH OF PUERTO RICO**

**and**

**THE BANK OF NEW YORK MELLON, as Trustee**

—————————————————

**Dated as of March 15, 2022**

—————————————————

# TABLE OF CONTENTS

**Page**

## ARTICLE I.

### DEFINITIONS AND INTERPRETATION

Section 1.01   Definitions .................................................................................. 4
Section 1.02   Rules of Construction ...................................................................22

## ARTICLE II.

### AUTHORIZATION AND ISSUANCE OF NOTES

Section 2.01   Authorization of Notes ...................................................................23
Section 2.02   Provisions for Issuance of Notes ....................................................25

## ARTICLE III.

### GENERAL TERMS AND PROVISIONS OF NOTES

Section 3.01   Place and Medium of Payment ........................................................25
Section 3.02   Legends .........................................................................................26
Section 3.03   CUSIP Numbers ............................................................................26
Section 3.04   Execution and Authentication .......................................................26
Section 3.05   Interchangeability of Notes ...........................................................27
Section 3.06   Transfer and Registry ....................................................................27
Section 3.07   Transfer of Notes ..........................................................................27
Section 3.08   Regulations with Respect to Exchanges and Transfers .................28
Section 3.09   Notes Mutilated, Destroyed, Lost or Stolen ..................................28
Section 3.10   Book Entry Notes ..........................................................................28
Section 3.11   Preparation of Definitive Notes; Temporary Notes .......................30

## ARTICLE IV.

### REDEMPTION OF NOTES

Section 4.01   Authorization of Redemption .........................................................30
Section 4.02   Extraordinary Redemption of GO CVIs at Election of
Commonwealth ............................................................................30
Section 4.03   Extraordinary Redemption of Clawback CVIs at Election of
Commonwealth ............................................................................31
Section 4.04   Extraordinary Redemption at the Election of the Commonwealth.........31
Section 4.05   Selection of Notes to be Redeemed ...............................................31
Section 4.06   Notice of Redemption ...................................................................31
Section 4.07   Payment of Redeemed Notes .........................................................32

## ARTICLE V.

### LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS;
### PLEDGED DEPOSITS AND APPLICATION THEREOF

Section 5.01   Lien on Trust Estate ......................................................................33
Section 5.02   Establishment of Funds and Accounts ...........................................33

- i -

# TABLE OF CONTENTS
## (continued)

**Page**

Section 5.03   Determination of Occurrence of an SUT Outperformance
Condition and Rum Tax Outperformance Condition ............................35
Section 5.04   Subject to Waterfall Outperformance Amount and Annual
Waterfall Payment.................................................................37
Section 5.05   Not Subject to Waterfall Outperformance Amount ..............................40
Section 5.06   Rum Tax CVI Annual Payment Amount ...........................................41
Section 5.07   HTA Clawback CVI Priority Distribution Waterfall ...........................42
Section 5.08   CVIs Payment Fund .................................................................43
Section 5.09   Trustee and Independent Consultant Expenses Fund ...........................44

## ARTICLE VI.

## INVESTMENT OF FUNDS

Section 6.01   Investment of Funds ...............................................................45
Section 6.02   Liability for Investments..........................................................46

## ARTICLE VII.

## PARTICULAR COVENANTS

Section 7.01   Payment of Notes ..................................................................46
Section 7.02   Pledge of Good Faith, Credit and Taxing Power of
Commonwealth......................................................................46
Section 7.03   Powers as to Notes .................................................................47
Section 7.04   Further Assurance ..................................................................47
Section 7.05   Offices for Payment and Registration of Notes ....................................47
Section 7.06   General ..............................................................................47
Section 7.07   Non-Impairment Covenant .......................................................47
Section 7.08   Baseline SUT Reduction and SUT True-Up ......................................48
Section 7.09   Substitute Measured Tax ..........................................................49
Section 7.10   Tax Covenant........................................................................49
Section 7.11   Comprehensive Cap on Net Tax Supported Indebtedness....................49
Section 7.12   Rum Tax Reporting .................................................................50
Section 7.13   Creation of Liens. The Commonwealth shall not create or cause
to be created any lien or charge on the Trust Estate, other than as
provided in Section 5.01 hereof ...............................................50
Section 7.14   Fiscal Plan ..........................................................................50
Section 7.15   Reporting Requirements ...........................................................50
Section 7.16   Cap on Notional Amount ..........................................................50
Section 7.17   Subsequent Bankruptcy Case ....................................................50

## ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

Section 8.01   Appointment and Acceptance of Trustee............................................51
Section 8.02   Appointment and Acceptance of Paying Agents ...................................51
Section 8.03   Responsibilities of Trustee and Paying Agents ...................................51

4820-1003-9275.22

# TABLE OF CONTENTS
## (continued)

**Page**

Section 8.04    Property Held in Trust ....................................................52
Section 8.05    Rights of the Trustee and the Paying Agent ...........................52
Section 8.06    Compensation and Indemnification ....................................53
Section 8.07    Permitted Acts ..............................................................54
Section 8.08    Resignation of Trustee ...................................................54
Section 8.09    Removal of Trustee .......................................................54
Section 8.10    Successor Trustee and/or Paying Agent...............................55
Section 8.11    Transfer of Rights and Property to Successor Trustee ..........56
Section 8.12    Merger or Consolidation of the Trustee ..............................56
Section 8.13    Ancillary Agreements .....................................................56

## ARTICLE IX.

## AMENDMENTS TO TRUST AGREEMENT

Section 9.01    Modification and Amendment without Consent ....................56
Section 9.02    Supplemental Trust Agreements Effective with Consent of Holders ........................................................................57
Section 9.03    General Provisions Relating to Supplemental Trust Agreements ..........57

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT WITH CONSENT OF HOLDERS

Section 10.01    Powers of Amendment ...................................................58
Section 10.02    Consent of Holders.......................................................59
Section 10.03    Modifications by Unanimous Consent................................59
Section 10.04    Mailing ....................................................................59
Section 10.05    Exclusion of Notes ......................................................60
Section 10.06    Notation on Notes .......................................................60

## ARTICLE XI.

## DEFAULTS AND REMEDIES

Section 11.01    Events of Default .........................................................60
Section 11.02    No Acceleration with Respect to the Notes..........................61
Section 11.03    Enforcement of Remedies...............................................61
Section 11.04    Priority of Payments after Default ....................................61
Section 11.05    Termination of Proceedings ...........................................62
Section 11.06    Holders' Direction of Proceedings ...................................62
Section 11.07    Control by Holders of Notes; Limitations ...........................63
Section 11.08    Actions by Trustee; Possession of Notes by Trustee Not Required .......63
Section 11.09    Waiver and Non–Waiver of Default ..................................64
Section 11.10    Notice of Event of Default ..............................................64
Section 11.11    Remedies Not Exclusive.................................................64

# TABLE OF CONTENTS
## (continued)

Page

ARTICLE XII.

DEFEASANCE

Section 12.01    Discharge and Defeasance ....................................................................64

ARTICLE XIII.

EXECUTION OF INSTRUMENTS BY NOTE HOLDERS
AND PROOF OF OWNERSHIP OF NOTES

Section 13.01    Evidence of Signatures of Holders and Ownership of Notes ................65

ARTICLE XIV.

MISCELLANEOUS

Section 14.01    Preservation and Inspection of Documents ..........................................66
Section 14.02    Money and Funds Held for Particular Notes ........................................66
Section 14.03    Cancellation of Notes ..........................................................................66
Section 14.04    No Recourse under Trust Agreement or on the Notes ...........................66
Section 14.05    Severability of Invalid Provision .........................................................67
Section 14.06    Parties of Interest ................................................................................67
Section 14.07    Notices ................................................................................................67
Section 14.08    Headings ..............................................................................................67
Section 14.09    Governing Laws ...................................................................................67
Section 14.10    Retention of Jurisdiction of Title III Court ...........................................68
Section 14.11    Signatures and Counterparts ................................................................68
Section 14.12    Successors and Assigns ........................................................................68
Section 14.13    Conflicts ..............................................................................................68

Attachment 1     5.5% SUT Baseline
Attachment 2     PRIFA Rum Tax CVI Outperformance Metric
Attachment 3     GO CVI Allocation Summary
Attachment 4     Clawback CVI Allocation Summary
Attachment 5     Form of GO CVI (includes variations for different GO CVI Subseries)
Attachment 6     Form of Clawback CVI (includes variations for different Clawback CVI Subseries and Sub-Subseries)
Attachment 7     Calculations relating to GO CVIs and Clawback CVIs Payments
Attachment 8     Illustrative scenarios of the calculation of the Subject to Waterfall Outperformance Amount
Attachment 9     Illustrative scenarios of the calculation of the Not Subject to Waterfall Outperformance Amount
Attachment 10    Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount
Attachment 11    Reporting Agreement
Attachment 12    Form of Initial Calculation Agent Agreement

EXHIBIT A - CONFIRMATION ORDER

# TRUST AGREEMENT

**THIS TRUST AGREEMENT,** dated as of March 15, 2022, by and between the **COMMONWEALTH OF PUERTO RICO** (together with any successors thereto, the **"Commonwealth"**), and **THE BANK OF NEW YORK MELLON**, as trustee (the **"Trustee"**).

The Commonwealth recites and represents to the Trustee for the benefit of the Holders that it has authorized this Trust Agreement.

## R E C I T A L S

[to be updated as proceedings progress]

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. ("**PROMESA**"); pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017, the Financial Oversight and Management Board for Puerto Rico (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to section 101(b) of PROMESA, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing a case under Title III of PROMESA (the "**Title III Case**").

Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Case, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth, wherever located.

By entry of the Confirmation Order (as defined below) attached hereto as Exhibit A, the Title III Court confirmed the Commonwealth's Plan (as defined below), the material components of which were the resolution of certain claims relating to the Commonwealth's general obligation bonds and certain other liabilities of the Commonwealth and the restructuring of all claims against the Commonwealth relating to pre-existing indebtedness of the Commonwealth through, among other things, the issuance of Notes (as defined below) pursuant to this Trust Agreement.

On October 26, 2021, in furtherance of the implementation of the Commonwealth Plan, the Commonwealth enacted the CVI Legislation (as defined below) which, among other things, authorized the issuance of the Notes and the irrevocable pledge of the good faith[1], credit and taxing power of the Commonwealth for the prompt payment of the Notes when due.

---

[1] "Good faith" ("*buena fe*") is the standard provision in the Commonwealth's Constitution. "Good faith" is the literal translation of the term "buena fe". See Article VI, Section 2 of the Commonwealth's Constitution.

4820-1003-9275.22

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan, and the CVI Legislation, the Title III Court made a binding determination that the Notes are legal, valid, binding and enforceable obligations of the Commonwealth benefiting from the following protections, each of which is legal, valid, binding and enforceable against the Commonwealth and other Persons and entities, as applicable, under Puerto Rico law and federal law: [to be updated consistent with final Plan]

a.   The Confirmation Order is a judicial determination pursuant to Section 4 of PROMESA, and is full, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

b.   The Title III Court shall retain jurisdiction to enforce the terms of the Confirmation Order and the Plan.

c.   All provisions herein made to pay or secure payment of the Notes are legal, valid, binding, and enforceable, including, without limitation, the covenants provided for herein.

d.   At the time of issuance and delivery of the Notes, the Commonwealth is hereby authorized and directed to have stamped or written on each of the Notes a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2022

All things have been done which are necessary to make the Notes, when executed by the Commonwealth and authenticated and delivered by the Trustee hereunder, the valid obligations of the Commonwealth, and to constitute this Trust Agreement a valid trust indenture for the security of the Holders (as defined below), in accordance with the terms of this Trust Agreement.

**NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:**

It is hereby covenanted and declared that all the Notes are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Commonwealth does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit of all Notes as follows:

This Trust Agreement provides for the issuance by the Commonwealth of the Notes to settle certain claims made by the Commonwealth's creditors, including claims relating to indebtedness previously issued or guaranteed by the Commonwealth, and to refund, refinance or defease any obligations issued hereunder and authorized under the CVI Legislation, and the rights and remedies of the Holders.

**IN TRUST NEVERTHELESS**, upon the terms and trusts herein set forth, amounts available for the payment of the Notes shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Notes issued and to be issued hereunder, without preference, priority or distinction as to participation in the Trust Estate (as defined below), and the benefit and protection thereof of one Note over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Notes shall have the same right, lien and privilege hereunder to the extent herein provided and shall be equally secured thereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST NEVERTHELESS,** that these presents are upon the express condition that if (a) (i) the Commonwealth or its successors or assigns shall (A) well and truly pay or cause to be paid the Notes, according to the provisions set forth in the Notes, respectively and each of them or (B) provide for the payment of Notes by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 12.01 of this Trust Agreement, when and as authorized by the provisions of Section 12.01 of this Trust Agreement, or (ii) the GO CVIs Final Maturity Date and the Clawback CVIs Final Maturity Date (each as defined below) shall have occurred and there shall be no obligation of the Commonwealth hereunder to make any additional payments on the GO CVIs or the Clawback CVIs (each as defined below), respectively, and (b) the Commonwealth or its successors or assigns shall also pay or cause to be paid all other sums payable hereunder by the Commonwealth or its successors or assigns, then, provided no Notes remain Outstanding (as defined below) hereunder, these presents and the estate and rights granted hereby shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Commonwealth and upon the payment of the costs and expenses thereof, shall duly execute, acknowledge and deliver to the Commonwealth such instruments of satisfaction or release as may be specified by the Commonwealth as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Plan and the Confirmation Order, if necessary, shall grant, reassign and deliver to the Commonwealth, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned hereunder, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Notes are to be issued, authenticated and delivered, and that the property or amounts available for the payment of the Notes are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Commonwealth, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

# ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions.**  All capitalized terms used in this Trust Agreement and not otherwise defined herein shall have the meanings set forth in the Plan.  As used in this Trust Agreement, the following terms have the following meanings, unless a different meaning clearly appears from the context:

**"5.5% SUT"** means the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).  In the event a Substitute Measured Tax is substituted for the 5.5% SUT as provided in Section 7.09 hereof, all references herein to 5.5% SUT shall instead refer to the Substitute Measured Tax.

**"5.5% SUT Baseline"** reflects the baseline projections of the 5.5% SUT set forth in Attachment 1 hereto.  Upon the occurrence of a Baseline SUT Reduction, an SUT True-Up or the substitution of a Substitute Measured Tax for the 5.5% SUT, the Commonwealth shall substitute a revised Attachment 1 prepared by the Calculation Agent for the then applicable Attachment 1 as provided in Sections 7.08 and 7.09 hereof and in the Calculation Agent Agreement and all references herein to the 5.5% SUT Baseline shall thereafter refer to the amounts set forth in the revised Attachment 1.

**"AAFAF"** means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

**"Ancillary Agreements"** means the Trust Agreement, the Confirmation Order, the Plan, the Calculation Agent Agreement, the Reporting Agreement and any other agreement or instrument entered into by the Commonwealth or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan.

**"Annual Clawback CVI Carryforward Amount"** as described in Section 5.04(c)(ii)(B) or (C) hereof, as applicable.

**"Annual GO CVI Carryforward Amount"** as described in Section 5.04(c)(i)(B) hereof.

**"Annual Waterfall Payment"** as described in Section 5.04(e) and (f) hereof, as applicable.

**"Authorized Officer"** means (a) in the case of the Commonwealth, the Secretary of Treasury and his or her designees, and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other Person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by–laws of the Trustee.

- 4 -

"**Bankruptcy Code**" means the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases in accordance with Section 301 of PROMESA.

"**Base Cover Over**" means the lesser of (i) $10.50 per proof gallon of the Rum Tax and (ii) the amount per proof gallon of the Rum Tax required to be covered over to the Commonwealth by the U.S. Department of Treasury pursuant to the U.S. Internal Revenue Code of 1986.

"**Base Cover Over Revenues**" means the product of (a) Commonwealth Rum Tax Revenues, and (b) the ratio of the Base Cover Over divided by the sum of (1) the Supplemental Cover Over and (2) the Base Cover Over.

"**Baseline SUT Reduction**" has the meaning set forth in Section 7.08(b) hereof.

"**Book Entry Note**" means a Note issued to and registered in the name of a Depository for the participants in such Depository.

"**Business Day**" means any day other than a Saturday, a Sunday or any other day on which commercial banks in San Juan, Puerto Rico or New York, New York, are required or authorized to close by law, regulation or executive order.

"**Calculation Agent**" means the Person serving in such capacity under the Calculation Agent Agreement from time to time. The Calculation Agent must be an Independent Consultant for all purposes of this Trust Agreement.

"**Calculation Agent Agreement**" means the Calculation Agent Agreement, dated as of March 15, 2022, by and among the Commonwealth, the Calculation Agent and the Trustee, as amended or supplemented from time to time, including any successor agreements thereto serving substantially the same purposes. The form of the initial Calculation Agent Agreement is attached hereto as Attachment 12.

"**Causes of Action**" has the meaning set forth in the Plan.

"**CCDA**" means the Puerto Rico Convention Center District Authority.

"**Challenge Payment Date**" means the date of distribution of moneys on deposit in the Disputed Payments Account following the final settlement of a challenge or Proceeding under the Calculation Agent Agreement, which distribution shall be not later than [15] Business Days following the finalization of such challenge or Proceeding.

"**Claim**" means any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

"**Clawback CVI Annual Not Subject to Waterfall Payment Amount**" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.05 hereof.

"**Clawback CVI Annual Payment Amount**" means, for each Fiscal Year, the sum of the Clawback CVI Annual Not Subject to Waterfall Payment Amount plus the Clawback CVI Annual Subject to Waterfall Payment Amount.

"**Clawback CVI Annual Subject to Waterfall Payment Amount**" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.04 hereof.

"**Clawback CVI Carryforward Amount**" has the meaning attributed under Section 5.04(c)(ii)(B).

"**Clawback CVI Carryforward Balance**" has the meaning attributed under Section 5.04(c)(ii).

"**Clawback CVI Lifetime Cap**" means a total of $5,239,002,764 paid from both Clawback CVI Annual Not Subject to Waterfall Payment Amounts and Clawback CVI Subject to Waterfall Payment Amounts, and, with respect to the PRIFA Rum Tax Clawback CVIs only, additionally from the Rum Tax CVI Annual Payment Amount, of which (a) $3,697,668,995 is allocable for Allowed CW/HTA Claims; (b) $217,228,391 is allocable for Allowed CW/Convention Center Claims; (c) $22,580,090 is allocable for Allowed CW/MBA Claims (as of the Effective Date, $4,000,000 of which has been settled by the Commonwealth and is treated for all purposes hereunder as Deemed Paid CVIs Payments), and (d) $1,301,525,288 is allocable for Allowed CW/PRIFA Rum Tax Claims.

"**Clawback CVI Maximum Annual Payment**" means the maximum annual payment amount applicable to the Clawback CVIs, calculated as provided in Section 5.04(b)(v) or (vi) hereof, as applicable.

"**Clawback CVIs**" means, collectively, the general obligation securities, other than the GO CVIs, issued as Notes pursuant to this Trust Agreement, for the payment of which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and this Trust Agreement. For the avoidance of doubt, unless otherwise provided in this Trust Agreement, the term "Clawback CVI" as used in this Trust Agreement refers to the security representing the interests of the Holders thereof to payments from (a) the Subject to Waterfall Outperformance Amounts, (b) the Not Subject to Waterfall Payment Amounts, and (c) solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amounts.

"**Clawback CVIs Final Maturity Date**" means the earlier to occur of (a) the date when the Holders of the Clawback CVIs have been paid cumulatively an amount equal to the Clawback CVI Lifetime Cap, and (b) the earlier to occur of (1) the CVIs Annual Payment Amount Calculation Date in 2051, in the event an SUT Outperformance Condition has not occurred in the

- 6 -

Fiscal Year ending on June 30, 2051, and (2) the CVIs Annual Payment Date in 2051, in the event an SUT Outperformance Condition has occurred in the Fiscal Year ending on June 30, 2051.

"**Commonwealth**" has the meaning given to such term in the Recitals.

"**Commonwealth Rum Tax Revenues**" means the total Rum Tax collections received by the Commonwealth as documented within the U.S. Department of the Treasury monthly detailed activity report of net excise tax due to the Commonwealth and certified by the Puerto Rico Department of Treasury or any equivalent documentation of such collections that the U.S. Department of the Treasury and/or Puerto Rico Department of Treasury may choose to adopt.

"**Comprehensive Cap**" has the meaning ascribed to such term in the Debt Responsibility Act.

"**Confirmation Order**" means the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 the Bankruptcy Code.

"**Constitution**" means the Constitution of the Commonwealth.

"**CVI Legislation**" means Act No. 53-2021.

"**CVIs Annual Payment Amount**" means, for each Fiscal Year, an amount equal to the sum of the Clawback CVI Annual Payment Amount plus the GO CVI Annual Payment Amount plus, solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amount.

"**CVIs Annual Payment Amount Calculation Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [September 15] of the next Fiscal Year.

"**CVIs Annual Payment Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [November 1] of the next Fiscal Year.

"**CVIs Maximum Payment Amounts**" means the Clawback CVI Lifetime Cap, the Clawback CVI Maximum Annual Payment, the GO CVI Lifetime Cap, the GO CVI Maximum Annual Payment, and the PRIFA Rum Tax Clawback CVIs Lifetime Cap, as applicable.

"**CVIs Outperformance Condition Determination Date**" means, for each Fiscal Year, [September 1] of the next Fiscal Year.

"**CVIs Payment Fund**" means the fund established in accordance with Section 5.08.

"**CW/Convention Center Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-

- 7 -

2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee, and being settled through implementation of the Plan by, among other things, payment of the CW/Convention Center Clawback Recovery.

"**CW/Convention Center Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/Convention Center Claims, consisting of four percent (4.0%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/HTA Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including, without limitation, claims asserted on account of the GDB HTA Loans and claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751(a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998, and being settled through implementation of the Plan by, among other things, payment of the CW/HTA Clawback Recovery.

"**CW/HTA Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths' percent (68.6%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/MBA Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, and being settled through implementation of the Plan by, among other things, payment of the CW/MBA Clawback Recovery. The Commonwealth has settled $4,000,000 of these Claims prior to the Effective Date, and such amount is treated as Deemed Paid CVIs Payments herein.

"**CW/MBA Clawback Recovery**" means the aggregate recovery by holders of Allowed CW/MBA Claims, consisting of four-tenths of one percent (0.4%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/PRIFA Rum Tax Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the PRIFA Bonds, and being settled through implementation of the Plan by, among other things, payment of the CW/PRIFA Rum Tax Clawback Recovery.

- 8 -

"**CW/PRIFA Rum Tax Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/PRIFA Rum Tax Claims, consisting of twenty-seven percent (27.0%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**Debt Management Policy**" means the policy developed by AAFAF, relating to the issuance of indebtedness by the Commonwealth and its instrumentalities, as more fully described in the Plan and the Debt Responsibility Act.

"**Debt Policy Revenues**" means, collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Legislative Assembly of the Commonwealth, including, without limitation, any such revenue assigned to, or owned by, the Puerto Rico Sales Tax Financing Corporation or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan (as defined in the Plan), (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement; and, provided, further, that, for purposes of illustration, with respect to Fiscal Year 2020, and as reflected in the CW Fiscal Plan (as defined in the Plan), "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six hundred Thousand Dollars ($15,146,600,000.00).

"**Debt Responsibility Act**" means Act No. 101-2020, as the same may be amended, modified or supplemented.

"**Deemed Paid CVIs Payments**" means amounts that would otherwise have been payable to the holders of either (a) Claims settled prior to the Effective Date, which consists as of the Effective Date of a $4,000,000 CW/MBA Claim, or (b) notional amounts of Notes redeemed from time to time pursuant to Sections 4.02 and 4.03 hereof. As of the Effective Date, Attachments 2, 3 and 7 reflect the settlement of Claims prior to the Effective Date and, contemporaneously with the extraordinary redemption of Notes pursuant to Section 4.02 and 4.03 hereof, the Commonwealth shall provide substitute Attachments 2, 3 and 7 to the Trustee and the Calculation Agent reflecting such redemptions. Deemed Paid CVIs Payments shall be deducted from the Subject to Waterfall Payment Amount available to be paid to the Holders of the Clawback CVIs and the Not Subject to Waterfall Payment Amount prior to the transfer to the Trustee in accordance with Section 5.08 hereof.

"**Defeasance Security**" means:

(a)    a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America; and

(b)    any other U.S. Government Obligation (including the interest component of Resolution Funding Corporation Bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; *provided* that at the time an investment therein is made such U.S. Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services.

"**Depository**" means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other Person, firm, association or corporation designated in the Supplemental Trust Agreement to serve as securities depository for the Notes, or any successor of any of the foregoing, as applicable.

"**Disputed Payment Amount**" has the meaning ascribed to such term in the Calculation Agent Agreement.

"**Disputed Payment Deposit**" means, with respect to any Disputed Payment Amount, an amount equal to one-half (½) of such Disputed Payment Amount.

"**Disputed Payments Account**" means the account established by Section 5.02(b) hereof.

"**Effective Date**" means the date that the Plan becomes effective in accordance with its terms and the Confirmation Order.

"**Electronic Means**" means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

"**Eligible Investments**" means any of the following obligations or securities that the Commonwealth is permitted to hold as an investment under the laws of the Commonwealth:

(a)    Defeasance Securities;

(b)    interest-bearing general obligations of the United States of America;

(c)    United States treasury bills and other non-interest bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Commonwealth a return on such investment in lieu of interest;

(d)    short-term discount U.S. Government Obligations;

(e)    certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable U.S. Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

- 10 -

(f)      banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)      commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)      domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(i)      Investment Agreements that are fully collateralized by Eligible Investments; and

(j)      domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

**"EMMA"** means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

**"Event of Default"** has the meaning given to such term in Section 11.01 hereof.

**"Extraordinary Redemption Payment Account"** means the account established by Section 5.02(b) hereof.

"**Final Order**" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

**"Fiscal Plan"** means the Fiscal Plan of the Commonwealth adopted in a Fiscal Year.

- 11 -

"**Fiscal Year**" means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

"**Fitch**" means Fitch Ratings and its successors.

"**GDB**" means Government Development Bank for Puerto Rico.

"**GDB HTA Loans**" means, collectively, the loans, if any, made to HTA by GDB and now held by the GDB Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

"**General Fund**" means the Commonwealth's primary operating fund.

"**GO CVI Annual Payment Amount**" means the amount due and payable to the Holders of the GO CVIs in any Fiscal Year in accordance with Section 5.04 hereof.

"**GO CVI Carryforward Amount**" has the meaning attributed under Section 5.04(c)(i)(B).

"**GO CVI Carryforward Balance**" has the meaning attributed under Section 5.04(c)(i).

"**GO CVI Lifetime Cap**" means $3,500,000,000.

"**GO CVI Maximum Annual Payment**" means the maximum annual payment amount applicable to the GO CVIs, calculated as provided in Section 5.04(b)(iv) hereof.

"**GO CVI Notional Amount**" means Three Billion Five Hundred Million Dollars ($3,500,000,000.00) in aggregate initial notional amount as of the Effective Date.

"**GO CVIs**" means, collectively, the general obligation securities, other than the Clawback CVIs, issued as Notes pursuant to this Trust Agreement, for the payment of which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and this Trust Agreement.

"**GO CVIs Final Maturity Date**" means the earlier to occur of (a) the date when the Holders of the GO CVIs have been paid cumulatively an amount equal to the GO CVI Lifetime Cap, and (b) the earlier to occur of (1) the CVIs Annual Payment Amount Calculation Date in 2043, in the event an SUT Outperformance Condition has not occurred in the Fiscal Year ending on June 30, 2043, and (2) the CVIs Annual Payment Date in 2043, in the event an SUT Outperformance Condition has occurred in the Fiscal Year ending on June 30, 2043.

"**Holder**" or any similar term, when used with reference to a Note or Notes, means the registered owner thereof.

"**HTA**" means the Puerto Rico Highways and Transportation Authority.

**"HTA Bonds"** has the meaning set forth in the Plan.

**"HTA/CCDA Related Plan Support Agreement"** means that certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among the Oversight Board and the HTA/CCDA PSA Creditors, as it may be amended, modified or supplemented in accordance with the terms thereof.

**"Independent"** when used with respect to any specified person or entity means such a person or entity who (1) is not the Commonwealth, any instrumentality thereof, or any employee of the Commonwealth or any of its instrumentalities, (2) does not have any direct financial interest or material indirect financial interest in this Trust Agreement, the Notes or the Commonwealth or any of its instrumentalities (other than in connection with the services to be provided as Independent Consultant), and (3) is not connected with the Commonwealth, any of its instrumentalities, any party to this Trust Agreement, or any officer, employee, promoter, underwriter, trustee, partner, director, member or person of the foregoing performing similar functions (other than under this Agreement and any agreement pursuant to which it provides the Independent Consultant services).

**"Independent Consultant"** means an Independent third party performing certain designated functions hereunder chosen by the Commonwealth.  An Independent Consultant may be chosen for any or all of the functions requiring an Independent Consultant hereunder.  Such Independent Consultant shall be nationally recognized and professionally qualified to provide the services of the type required to be performed by such Independent Consultant hereunder.

**"Instructions"** has the meaning given to such term in Section 8.05.

**"Investment Agreement"** means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

**"KBRA"** means Kroll Bond Rating Agency Inc. and its successors.

**"Majority in Interest"** means as of any particular date of calculation, the Holders of a majority of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.

**"MBA"** means the Metropolitan Bus Authority.

**"Measured SUT"** means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the PR Code (or used for any other purpose established by law) up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

**"Moody's"** means Moody's Investor Service, Inc. and its successors.

- 13 -

"**Note**" means any security of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 hereof to evidence the interests of (a) the Holders of the Clawback CVIs to receive their proportionate shares of the Clawback CVI Annual Payment Amounts and, in the case of the Holders of the PRIFA Rum Tax Clawback CVIs only, to also receive the Rum Tax CVI Annual Payment Amounts, and (b) the Holders of the GO CVIs to receive their proportionate shares of the GO CVI Annual Payment Amounts.

"**Not Subject to Waterfall Clawback CVI**" represents the portion of payments to the Holders of the Clawback CVIs made from the Not Subject to Waterfall Outperformance Amounts.

"**Not Subject to Waterfall CVIs Payment Account**" means the account established by Section 5.02(b) hereof.

"**Not Subject to Waterfall CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Date, the amount to be deposited into the Not Subject to Waterfall CVIs Payment Account equal to the payments due to the Holders of the Clawback CVIs from the Not Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.05(a) hereof, other than such amounts payable to the Holders of the PRIFA Rum Tax Clawback CVIs, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Date, taking into account any applicable Deemed Paid CVIs Payments.

"**Not Subject to Waterfall Outperformance Amount**" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.05(a) hereof.

"**Outperformance Amount**" means, for each Fiscal Year in which an SUT Outperformance Condition has occurred, the amount by which the Measured SUT exceeds the 5.5% SUT Baseline reflected in Attachment 1 hereto, as such Attachment 1 may be revised from time to time in accordance with the terms hereof.

"**Outstanding**", when used in reference to the Notes, means, as of a particular date, all such Notes authenticated and delivered hereunder except:

(a)     any Notes canceled by the Trustee at or before such date;

(b)     any Notes deemed to have been paid in accordance with Section 12.01 hereof;

(c)     any Note canceled or paid pursuant to Section 3.09 or Section 4.07 hereof or any Note in lieu of or in substitution for which another Note, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.07 or Section 10.06 hereof;

(d)     for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Notes hereunder, any Note deemed to not be Outstanding in accordance with Section 10.05 hereof;

(e)     GO CVIs on and after the GO CVIs Final Maturity Date, solely to the extent all GO CVI Annual Payment Amounts due on any CVIs Annual Payment Date have been paid; and

(f)     Clawback CVIs on and after the Clawback CVIs Final Maturity Date, solely to the extent all Clawback CVI Annual Payment Amounts due on any CVIs Annual Payment Date have

- 14 -

been paid; provided, however, the Sub-Subseries of Clawback CVIs relating to the CW/HTA Claims, namely the HTA 68 Bond Claims, the HTA 98 Senior Bond Claims, the HTA 98 Sub Bond Claims and the GDB HTA Loans, which are payable in that order of priority, shall be deemed no longer Outstanding when such Holders have been paid their respective notional amounts set forth in Attachment 4 hereto in full prior to the Clawback CVIs Final Maturity Date.

"**Oversight Board**" has the meaning given to such term in the Recitals.

"**Paying Agent**" means, with respect to the Notes, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

"**Permitted Rum Tax Waterfall Deductions**" means the sum of the following:

(a) Science and Technology Trust – $5,000,000 transferred to the Puerto Rico Science, Research and Technology Trust Fund Account;

(b) Rum Producer Incentive Payments – as described in the definition of "**Rum Producer Incentive Payments**";

(c) Conservation Trust – the amount transferred to the Puerto Rico Conservation Trust Account – calculated as the product of (1) Supplemental Cover Over Revenues and (2) 1/6th; and

(d) PRIDCO – the amount transferred to the Puerto Rico Industrial Development Company Account – calculated as the lesser of (1) $5,000,000 and (2) 2.5% multiplied by the Commonwealth Rum Tax Revenues.

"**Person**" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

"**Plan**" means the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms thereof.

"**PRIFA**" means the Puerto Rico Infrastructure Financing Authority.

"**PRIFA Bonds**" means, collectively, the following bonds issued by PRIFA: (a) Special Tax Revenue Bonds, Section 2005A, issued in the original principal amount of Three Hundred Nine Million One Hundred Two Thousand Five Hundred Seventy-Seven Dollars and Thirty-Five Cents ($309,102,577.35), (b) Special Tax Revenue Bonds, Series 2005B, issued in the original principal amount of Three Hundred Twenty-Four Million Six Hundred Twenty-Five Thousand Dollars ($324,625,000.00), (c) Special Tax Revenue Refunding Bonds, Series 2005C, issued in the original principal amount of Six Hundred Ninety-Nine Million Two Hundred Thirty-Five Thousand Three Hundred Thirty-Eight Dollars and Eighty Cents ($699,235,338.80), and (d) Special Tax Revenue Bonds, Series 2006, issued in the original principal amount of Four Hundred Sixty-Nine Million Seven Hundred Seventy Thousand Dollars ($469,770,000.00).

"**PRIFA Related Plan Support Agreement**" means the PRIFA Related Plan Support Agreement, dated as of [July 27, 2021], by and among the Oversight Board, the Commonwealth, certain holders of PRIFA Bond Claims, and certain other signatories, as amended or supplemented from time to time.

"**PRIFA Rum Tax Clawback CVIs**" means the Subseries of Clawback CVIs that are the only Subseries of Clawback CVIs that are the beneficiaries of the Rum Tax CVI Annual Payment Amounts.

"**PRIFA Rum Tax Clawback CVIs Lifetime Cap**" means $1,301,525,288 of the Clawback CVI Lifetime Cap, allocable to the PRIFA Rum Tax Clawback CVIs.

"**PRIFA Rum Tax Clawback CVIs Payment Account**" means the account established by Section 5.02(b) hereof.

"**PRIFA Rum Tax Clawback CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Date, the amount to be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account equal to the payments due to the Holders of the PRIFA Rum Tax Clawback CVIs from (a) the Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.04 hereof, (b) the Not Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.05(a) hereof, and (c) the Rum Tax CVI Annual Payment Amounts as calculated in accordance with Section 5.06 hereof, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Date, taking into account any applicable Deemed Paid CVIs Payments.

"**PRIFA Rum Tax CVI Annual Payment Amount**" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.06 hereof.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**PROMESA**" means The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

"**Puerto Rico Conservation Trust Account**" means [ ].

"**Puerto Rico Industrial Development Company Account**" means [ ].

"**Puerto Rico Science, Research and Technology Trust Fund Account**" means [ ].

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

> (a) a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it

made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b) a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(c) a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(d) the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Commonwealth; or

(e) a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that meets the applicable rating requirements set forth above.

"**Quarter in Interest**" means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs. Subject to the foregoing, in the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Notes (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

"**Rating Service**" means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

"**Record Date**" means, when used in relation to Notes of a Series, the date which is fifteen (15) days before the date of payment or action to be taken, whether or not such fifteenth day is a Business Day.

"**Redemption Price**" when used with respect to a Note, means the price established for such redemption in accordance with Article IV hereof and as set forth in the notice of redemption relating thereto.

"**Remaining Clawback CVI Lifetime Cap**" means, as the context requires, (a) the initial Clawback CVI Lifetime Cap as it relates to the Clawback CVIs collectively, or as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, Allowed CW/MBA Claims, and Allowed CW/PRIFA Rum Tax Claims, (b) less the aggregate amounts of the Clawback CVIs settled, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Date or each extraordinary redemption date in accordance with Section 4.03 hereof.

"**Remaining GO CVI Lifetime Cap**" means (a) the initial GO CVI Lifetime Cap, (b) less the aggregate amounts of the GO CVIs settled, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Date or each extraordinary redemption date in accordance with Section 4.02 hereof.

"**Reporting Agreement**" means the Reporting Agreement (Commonwealth of Puerto Rico Contingent Value Instruments), dated as of March 15, 2022, executed and delivered by the Commonwealth, as amended or supplemented from time to time.

"**Restructuring Transaction**" means the transactions contemplated by, or in furtherance of, the Plan.

"**Rum Producer Incentive Payments**" means the total amount of incentive payments actually shared with and paid to the rum tax producers as stipulated in their respective contracts with the Commonwealth, which percentage is, as of the date of this Trust Agreement, 46%. Solely for purposes of calculating the Rum Tax Outperformance Condition, such percentage is not permitted to exceed the following amounts in the following Fiscal Years: (a) for Fiscal Years ending June 30, 2022 through June 30, 2031, 46%; (b) for Fiscal Years ending June 30, 2032 through June 30, 2036, 48%; and (c) for Fiscal Years ending June 30, 2037 through June 30, 2051, 50%. Any increase in the total amount of incentive payments actually shared with and paid to the rum tax producers in accordance with their respective contracts in excess of the maximum percentages set forth in the preceding sentence will not affect the Rum Tax Outperformance Metric. For the avoidance of doubt, the Rum Producer Incentive Payments may be increased beyond the limits set forth in this definition at the Commonwealth's discretion, however any payments made in excess of such limits will not affect the Rum Tax Outperformance Condition calculation and payment of the Rum Tax CVI Annual Payment Amount.

"**Rum Tax**" means the federal excise taxes on rum and distilled spirits that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the U.S. Internal Revenue Code of 1986.

- 18 -

"**Rum Tax CVI Annual Payment Amount**" means, for each Fiscal Year in which a Rum Tax Outperformance Condition has occurred, the amount calculated as provided in Section 5.06 hereof.

"**Rum Tax Outperformance Condition**" means that Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric in any given Fiscal Year. A Rum Tax Outperformance Condition may occur in any Fiscal Year even if an SUT Outperformance Condition has not occurred in such Fiscal Year.

"**Rum Tax Outperformance Metric**" reflects the baseline projections of 100% of the Waterfall General Fund Rum Tax Collections within the Commonwealth's 2021 Fiscal Plan projections set forth in Attachment 1 hereto.

"**S&P**" means S&P Global Ratings and its successors.

"**Sales Tax**" means the sales and use tax, including any replacement or similar sales and use tax, imposed by the Commonwealth pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

"**Secretary of Treasury**" means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

"**Series**" means either Clawback CVIs or GO CVIs.

"**Series 2022A-1 Capital Appreciation Bonds**" means the Commonwealth's General Obligation Bonds, Series 2022A-1 Bonds.

"**Subject to Waterfall Clawback CVI**" means the portion of payments to the Holders of the Clawback CVIs made from the Subject to Waterfall Outperformance Amounts.

"**Subject to Waterfall CVIs Payment Account**" means the account established by Section 5.02(b) hereof.

"**Subject to Waterfall CVIs Payment Account Deposit**" means, for each CVIs Annual Payment Date, the amount to be deposited into the Subject to Waterfall CVIs Payment Account equal to the payments due to the Holders of the GO CVIs and due to the Holders of the Clawback CVIs from the Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.04 hereof, other than such amounts payable to the Holders of the PRIFA Rum Tax Clawback CVIs, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment Date, taking into account any applicable Deemed Paid CVIs Payments.

"**Subject to Waterfall Outperformance Amount**" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.04(a) hereof.

"**Subseries**" means the four categories of Claims against the Commonwealth underlying the Clawback CVIs – the CW/Convention Center Claims Subseries, the CW/HTA Claims Subseries, the CW/MBA Claims Subseries and the CW/PRIFA Rum Tax Claims Subseries.

- 19 -

"**Subsequent Bankruptcy Case**" has the meaning set forth in Section 7.16 hereof.

"**Substitute Measured Tax**" means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth.

"**Sub-Subseries**" means, as the context requires, the following four Sub-Subseries of Clawback CVIs within the Subseries relating to CW/HTA Claims: (i) HTA 68 Bond Claims; (ii) HTA 98 Senior Bond Claims; (iii) HTA 98 Sub Bond Claims; and (iv) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

"**Supplemental Cover Over**" means the amount per proof-gallon of the Rum Tax that the U.S. Department of Treasury covers over to the Commonwealth, less the Base Cover Over, for the applicable Fiscal Year, it being understood the Supplemental Cover Over cannot be less than $0.

"**Supplemental Cover Over Revenues**" means the product of (a) the Commonwealth Rum Tax Revenues, and (b) the ratio of the Supplemental Cover Over divided by the sum of (1) the Supplemental Cover Over and (2) the Base Cover Over. For purposes of calculating the Rum Tax CVI Annual Payment Amount in Section 5.06 hereof, the maximum amount of Supplemental Cover Over Revenues in each applicable Fiscal Year is the Supplemental Cover Over Revenues Cap.

"**Supplemental Cover Over Revenues Cap**" means $88,000,000.

"**Supplemental Trust Agreement**" means any trust agreement amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

"**SUT Outperformance Condition**" means that the 5.5% SUT collected exceeds the 5.5% SUT Baseline (as adjusted or revised in Attachment 1 as herein provided) in any given Fiscal Year. An SUT Outperformance Condition may occur in any Fiscal Year even if a Rum Tax Outperformance Condition has not occurred in such Fiscal Year.

"**SUT True-Up**" has the meaning set forth in Section 7.08(c) and (d) hereof.

"**Title III Case**" has the meaning given to such term in the Recitals.

"**Title III Court**" has the meaning given to such term in the Recitals.

"**Transaction Counsel**" means a nationally recognized firm of attorneys as may be selected by the Commonwealth for a specific purpose hereunder.

"**Treasury Rate**" means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVI or the Clawback CVI, as the case may be, being redeemed.

4820-1003-9275.22

"**Trust Agreement**" means this Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

"**Trust Estate**" means, other than the Trustee and Independent Consultant Expenses Fund, (a) for the benefit of the Holders, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the CVIs Payment Fund, (b) for the benefit of the Holders of the GO CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the GO CVIs Subaccount of the Disputed Payments Account and the GO CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the GO CVIs; (c) for the benefit of the Holders of the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account, the Clawback CVIs Subaccount of the Disputed Payments Account and the Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs; (d) with respect to the PRIFA Rum Tax Clawback CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the PRIFA Rum Tax Clawback CVIs Payment Account, the PRIFA Rum Tax Clawback CVIs Subaccount of the Disputed Payments Account and the PRIFA Rum Tax Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the PRIFA Rum Tax Clawback CVIs; and (e) in each case, the Trustee's right to receive any such money, securities and other assets relating to each of the foregoing, as applicable, wheresoever located.

"**Trustee**" means the bank or trust company appointed as Trustee for the Notes pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant hereto.

"*Trustee and Independent Consultant Expenses*" means the reasonable and verified permitted costs, fees and expenses of the Trustee and the Independent Consultants arising out of or incurred in connection with carrying out and administering their respective duties hereunder, but excludes certain expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, related to actions, suits, and other Proceedings brought by or at the direction or request of any Holders, including, without limitation, the enforcement of remedies under Article XI hereof, and further excluding the Trustee's rights to indemnification as a result thereof, including the fees and expenses incurred in connection with any indemnified claim, as more fully described in Section 8.06 hereof.

"**Trustee and Independent Consultant Expenses Deposits**" means (a) the amount initially deposited into the Trustee and Independent Consultant Expenses Fund in accordance with Section 2.02(b) hereof, and (b) the additional deposits by the Commonwealth as may be required by Section 5.09(b) hereof.

- 21 -

"**Trustee and Independent Consultant Expenses Cap**" means an annual amount not to exceed $_____.

"**Trustee and Independent Consultant Expenses Fund**" means the Trustee and Independent Consultant Expenses Fund so designated, created and established pursuant to Section 5.02(a) hereof.

"**Trustee and Independent Consultant Expenses Funding Amount**" means, as of each CVIs Annual Payment Amount Calculation Date, the amount by which the Trustee and Independent Consultant Expenses Cap for such Fiscal Year exceeds the amount on deposit in the Trustee and Independent Consultant Expenses Fund.

"**U.S. Government Obligation**" means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

"**U.S. Presidential Declaration of Disaster**" means the declaration of a disaster by the President of the United States under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, P.L. 100-707, as amended or supplemented from time to time, and any comparable successor legislation.

"**Waterfall Cover Over Revenues**" means the sum of (a) Waterfall Supplemental Cover Over Revenues plus (b) Base Cover Over Revenues.

"**Waterfall General Fund Rum Tax Collections**" means (a) Waterfall Cover Over Revenues less (b) Permitted Rum Tax Waterfall Deductions.

"**Waterfall Supplemental Cover Over Revenues**" means the lesser of (a) Supplemental Cover Over Revenues and (b) the Supplemental Cover Over Revenues Cap.

**Section 1.02  Rules of Construction.** Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing Persons shall include firms, associations and corporations, including public bodies as well as natural Persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Trust Agreement, refer to the Trust Agreement. All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless otherwise expressly stated. All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

- 22 -

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

# ARTICLE II.

## AUTHORIZATION AND ISSUANCE OF NOTES

### Section 2.01   Authorization of Notes.

(a)     There are hereby authorized to be issued Notes of the Commonwealth in two series – the "GO CVIs" and the "Clawback CVIs." The Notes shall be issued in authorized denominations of one dollar ($1.00) and integral multiples thereof.

(b)     On the Effective Date, the Commonwealth shall deliver the GO CVIs in the original GO CVI Notional Amount to those beneficiaries entitled to receive the same as provided in the Plan. The GO CVIs shall be issued in eight Subseries designated as "Vintage CW Bond Claims" in the original Notional Amount of "1,128,540,000," "2011 CW Series D/E/PIB Bond Claims" in the original Notional Amount of "122,990,000," "2011 CW Bond Claims" in the original Notional Amount of "86,765,000," "2012 CW Bond Claims" in the original Notional Amount of "530,495,000," "2014 CW Bond Claims" in the original Notional Amount of "709,310,000," "Vintage CW Guarantee Bond Claims" in the original Notional Amount of "531,790,000," "2011 CW Guarantee Bond Claims" in the original Notional Amount of "264,320,000" and "2012 CW Guarantee Bond Claims" in the original Notional Amount of "125,790,000." The GO CVIs shall be deemed issued on July 1, 2021. The GO CVIs shall mature on the earlier of (a) the date when the Holders of the GO CVIs have been paid an amount equal to the GO CVI Lifetime Cap and (b) July 1, 2043, subject to the final GO CVI Annual Payment Amount being paid no later than the GO CVIs Final Maturity Date (with the GO CVIs remaining Outstanding until such time as all GO CVI Annual Payment Amounts due on any CVIs Annual Payment Date have been paid). The sum of the payments to the Holders of the GO CVIs and Deemed Paid CVIs Payments relating to GO CVIs, if any, shall not exceed in the aggregate the GO CVI Lifetime Cap.

(c)     The Clawback CVIs shall be issued in the original aggregate notional amount of $5,239,002,764 in four Subseries designated as "Allowed CW/HTA Claims," "Allowed CW/Convention Center Claims," "Allowed CW/PRIFA Rum Tax Claims" and "Allowed CW/MBA Claims."

(i)     Within the Subseries relating to "Allowed CW/HTA Claims," there shall be issued four Sub-Subseries: (A) HTA 68 Bond Claims; (B) HTA 98 Senior Bond Claims; (C) HTA 98 Sub Bond Claims; and (D) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

(ii)     On the Effective Date, the Commonwealth shall deliver (A) $3,697,668,995 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/HTA Claims, of which (w) $179,462,539 shall be allocated to the Sub-Subseries relating to HTA 68 Bond Claims; (x) $1,833,405,578

shall be allocated to the Sub-Subseries relating to HTA 98 Senior Bond Claims; (y) $207,294,178 shall be allocated to the Sub-Subseries relating to HTA 98 Sub Bond Claims; and (z) the remaining $1,477,506,700 shall be allocated to the Sub-Subseries relating to GDB HTA Loans; (B) $217,228,391 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/Convention Center Claims; (C) $1,301,525,288 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/PRIFA Rum Tax Claims; and (D) $22,580,000 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/MBA Claims, all as provided in the Plan. Of the $22,580,000 aggregate notional amount of Clawback CVIs attributable to the beneficiaries of the Allowed CW/MBA Claims, the Trustee shall distribute $18,580,090 aggregate principal amount of the Clawback CVIs to the beneficiaries thereof and $4,000,000 aggregate principal amount shall be cancelled by the Trustee and reflected on its books as Deemed Paid CVIs Payments hereunder.

(iii) The Clawback CVIs shall be deemed issued on July 1, 2021. The Clawback CVIs shall mature on the earlier to occur of (a) the date when the Holders of the Clawback CVIs have been paid an amount equal to the Clawback CVI Lifetime Cap, and (b) on July 1, 2051, subject to the final Clawback CVI Annual Payment Amount being paid no later than the Clawback CVIs Final Maturity Date (with the Clawback CVIs remaining Outstanding until such time as all Clawback CVI Annual Payment Amounts due on any CVIs Annual Payment Date have been paid). The sum of the payments to the Holders of the Clawback CVIs and Deemed Paid CVIs Payments relating to Clawback CVIs shall not exceed in the aggregate the Clawback CVI Lifetime Cap. From the Clawback CVI Lifetime Cap, payments to the Holders of the Clawback CVIs for the Allowed CW/HTA Claims shall not exceed in the aggregate $3,697,668,995, which are further limited within each Sub-Subseries to the amounts allocated thereto; payments to the Holders of the Clawback CVIs for the Allowed CW/Convention Center Claims shall not exceed in the aggregate $217,228,391; payments to the Holders of the Clawback CVIs for the Allowed CW/PRIFA Rum Tax Claims shall not exceed in the aggregate $1,301,525,288; and payments to the Holders of the Clawback CVIs for the Allowed CW/MBA Claims shall not exceed in the aggregate $22,580,090 (and shall be allocable to Allowed CW/MBA Claims and Deemed Paid CVIs Payments as provided in the last sentence of clause (ii) above), all as provided in the Plan.

(d) The Notes are general obligations of the Commonwealth payable in the manner more particularly provided herein, subject to the occurrence of an SUT Outperformance Condition or a Rum Tax Outperformance Condition, as applicable. The Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Puerto Rico Constitution and applicable Puerto Rico law to the payment of the Notes in accordance with the terms of Section 7.02 hereof.

(e) The form of the GO CVI is attached hereto as Attachment 5. The form of the Clawback CVI is attached hereto as Attachment 6.

**Section 2.02   Provisions for Issuance of Notes.**  The Commonwealth shall issue Notes under this Trust Agreement in accordance with, and upon receipt of, the written direction of the Secretary of Treasury of the Commonwealth, or his or her designee; ***provided***, ***however***, that such direction may not conflict with the terms of this Trust Agreement, the CVI Legislation, the Plan or the Confirmation Order. The Notes authorized to be issued in accordance with the terms of this Section 2.02 shall be executed by the Commonwealth and delivered to the Trustee. Such Notes shall, as directed by the Commonwealth, be authenticated by the Trustee upon delivery to the Trustee of:

   (a) a copy of this Trust Agreement authorizing such Notes, certified by an Authorized Officer of the Commonwealth;

   (b) delivery by the Commonwealth to the Trustee of an amount equal to the Trustee and Independent Consultant Expenses Cap for deposit into the Trustee and Independent Consultant Expenses Fund;

   (c) a written order as to the delivery of such Notes, signed by an Authorized Officer of the Commonwealth, describing the Notes to be delivered and designating the Person(s) to whom such Notes are to be delivered; and

   (d) [an opinion of Transaction Counsel with respect to validity, legality and enforceability of the Notes and the good faith, credit and taxing power pledge of the Commonwealth and the exemption of the Notes under the Securities Act of 1933 and this Indenture under the Trust Indenture Act of 1939 and with respect to such other matters as are customary in connection with the issuance of the Notes; provided, however, that such opinion of Transaction Counsel may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determination by the Title III Court addresses and provides for such matters; provided, further, that such opinion of Transaction Counsel may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy].

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF NOTES

**Section 3.01   Place and Medium of Payment.**  Amounts payable to the Holders of the Notes hereunder, including the CVIs Annual Payment Amount, shall be payable in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except in the case of Book Entry Notes, upon presentation and surrender of Notes, such Notes shall be payable at the designated corporate trust office of the Trustee, and amounts payable to the Holders of the Notes hereunder, including the CVIs Annual Payment Amount, shall be paid by check mailed to the registered owner thereof as of the Record Date at the address thereof as it appears on the registry books of the Commonwealth or by wire transfer to such registered owner of the Notes if such registered Owner owns at least one million dollars ($1,000,000) initial notional amount of Notes of the GO CVIs or any of the Subseries of the Clawback CVIs.

Notes shall be initially dated as of July 1, 2021. Notes of each Series, Subseries and Sub-Subseries issued on or subsequent to the first CVIs Annual Payment Date shall be dated as of the CVIs Annual Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be a CVIs Annual Payment Date, in which case they shall be dated as of such date of authentication; *provided, however,* that if, as shown by the records of the Trustee, no CVIs Annual Payment Amount has been paid as of the CVIs Annual Payment Date immediately preceding the date of authentication thereof by the Trustee, the Notes of such Series Subseries or Sub-Subseries issued in lieu of Notes surrendered for transfer or exchange shall be dated as of the date through which the last CVIs Annual Payment Amount has been paid in full on the Notes surrendered or, if no CVIs Annual Payment Amount has been paid on the Notes surrendered since their authentication, as of the date of authentication of the surrendered Notes.

**Section 3.02   Legends.**   The Notes shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2022."

**Section 3.03   CUSIP Numbers.**   The Commonwealth shall provide for the assignment of CUSIP numbers for all Notes of all Series and Subseries (including a separate CUSIP number for each Subseries, or, in the case of a Subseries that has Sub-Subseries, a separate CUSIP number for each Sub-Subseries) and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Holders as a convenience to Holders; *provided, however,* that any such notice may state that no representation is made as to the correctness of such number either as printed on such Notes or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Note or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption. The Commonwealth shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Note of which the Commonwealth has knowledge. The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04   Execution and Authentication.**   The Notes shall be executed in the name of the Commonwealth by the manual or facsimile signature of an Authorized Officer thereof, or in such other manner as may be permitted by law. In case any one or more of the officers or employees who shall have signed any of the Notes shall cease to be such officer or employee before the Notes so signed shall have been actually authenticated and delivered by the Trustee, such Notes may, nevertheless, be delivered as provided herein, and may be issued as if the Persons who signed such Notes had not ceased to hold such offices or be so employed. Any Note may be signed on behalf of the Commonwealth by such Persons as at the actual time of the execution of such Note shall be duly authorized or hold the proper office in or be employed by, the Commonwealth, although at the date of the Notes such Persons may not have been so authorized or have held such office or employment.

The Notes of each Series, Subseries and Sub-Subseries shall bear thereon a certificate of authentication, in the form set forth in the forms of Notes annexed hereto, executed manually by the Trustee. Only such Notes as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Note shall be valid or obligatory for any purpose

- 26 -

until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Note executed on behalf of the Commonwealth shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05  Interchangeability of Notes.**  Notes, upon surrender thereof at the designated corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate notional amount of Notes of the same Series, Subseries and Sub-Subseries and tenor of any other authorized denominations.

**Section 3.06   Transfer and Registry.**  So long as any of the Notes remain Outstanding, the Commonwealth shall maintain and keep, or cause to be maintained and kept, at the designated corporate trust office of the Trustee, books for the registration and transfer of Notes; and, upon presentation thereof for such purpose at said office, the Commonwealth shall register or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Note entitled to registration or transfer. So long as any of the Notes remain Outstanding, the Commonwealth shall make all necessary provisions to permit the exchange of Notes at the designated corporate trust office of the Trustee.

**Section 3.07   Transfer of Notes.**  Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer. Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series, Subseries and Sub-Subseries and tenor as the surrendered Note.

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

The Commonwealth and the Trustee may deem and treat the Person in whose name any Outstanding Note shall be registered upon the books of the Commonwealth as the absolute owner of such Note, whether such Note shall be overdue or not, for the purpose of receiving payment of, or on account of, the Notes, subject to the provisions of Section 3.01 hereof with respect to Record Dates, and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Note to the extent of the sum or sums paid, and neither the Commonwealth nor the Trustee shall be affected by any notice to the contrary. The Commonwealth agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability

- 27 -

incurred by it, acting in good faith and without negligence hereunder, in so treating such registered owner.

**Section 3.08   Regulations with Respect to Exchanges and Transfers.**  In all cases in which the privilege of exchanging Notes or transferring Notes is exercised, the Commonwealth shall execute and the Trustee shall authenticate and deliver Notes in accordance with the provisions hereof.  All Notes surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee.  For every such exchange or transfer of Notes, whether temporary or definitive, the Commonwealth or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.  Notwithstanding any other provisions hereof, the cost of preparing each new Note upon each exchange or transfer, and any other expenses of the Commonwealth or the Trustee incurred in connection therewith, shall be paid by the Person requesting such exchange or transfer.  The Commonwealth shall not be obliged to make, or cause to be made, any exchange or transfer of Notes of any Series, Subseries or Sub-Subseries during the period beginning on the Record Date for such Notes immediately preceding a CVIs Annual Payment Date relating to such Notes and ending on such CVIs Annual Payment Date, or, in the case of any proposed other redemption of Notes of such Series, Subseries or Sub-Subseries, after the date immediately preceding the date notice of redemption has been mailed.

**Section 3.09   Notes Mutilated, Destroyed, Lost or Stolen.**  In case any Note shall become mutilated or be destroyed, lost or stolen, the Commonwealth in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Note of like Series, Subseries and Sub-Subseries, tenor and notional amount as the Note so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Note, upon surrender and cancellation of such mutilated Note or in lieu of and substitution for such Note so destroyed, lost or stolen, upon filing with the Commonwealth evidence satisfactory to the Commonwealth and the Trustee that such Note has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith. All Notes so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Commonwealth.  In case any Note which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Commonwealth may, instead of issuing a Note in exchange or substitution therefor, pay or authorize the payment of such mutilated Note upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Note, upon the Holder thereof filing evidence satisfactory to the Commonwealth and the Trustee that such Note has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith.

**Section 3.10   Book Entry Notes.** Anything herein to the contrary notwithstanding, Notes shall be authorized and issued as Book Entry Notes.

For all purposes of the Trust Agreement, the Holder of a Book Entry Note shall be the Depository therefor and neither the Commonwealth nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Note or to any direct or indirect participant in such Depository. Without limiting the generality of the foregoing, neither the Commonwealth nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Note with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Note, (b) the delivery to any participant of the Depository, the beneficial owner of such Note or any other Person, other than the Depository, of any notice with respect to such Note, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Note or any other Person, other than the Depository, of any amount with respect to the CVIs Annual Payment Amount and Redemption Prices relating to such Note. The Commonwealth and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Note for the purpose of (x) payment of the CVIs Annual Payment Amount and Redemption Prices relating to such Note, (y) giving notices of redemption and of other matters with respect to such Note, (z) registering transfers with respect to such Note, and for all other purposes whatsoever. The Trustee shall pay the CVIs Annual Payment Amount and Redemption Prices relating to such Note only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Commonwealth's obligations with respect to such CVIs Annual Payment Amount and Redemption Prices to the extent of the sum or sums so paid. No Person other than the Depository shall receive a Note or other instrument evidencing the Commonwealth's obligation to make payments of the CVIs Annual Payment Amount.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Note which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Note to the Trustee; *provided, however,* that the Trustee shall maintain records as to each such payment and of the notional amount of such Note Outstanding, which shall be binding on the Commonwealth and the Holders from time to time of such Note.

The Commonwealth, without the consent of the Trustee, the beneficial owner of a Book Entry Note or any other Person, may terminate the services of the Depository with respect to a Book Entry Note if the Commonwealth reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Notes or (b) a continuation of the requirement that all of the Outstanding Notes of like Series, Subseries and/or Sub-Subseries issued in book entry form be registered in the registration books of the Commonwealth in the name of the Depository, is not in the best interest of the beneficial owners of such Notes, and the Commonwealth shall terminate the services of the Depository upon receipt by the Commonwealth and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Notes for which the Depository is serving as Depository.

Upon the termination of the services of a Depository with respect to a Book Entry Note, or upon the resignation of a Depository with respect to a Book Entry Note, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Commonwealth following consultation with the Trustee, is able to

- 29 -

undertake such functions upon reasonable and customary terms, such Notes shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names designated by the Holders transferring or exchanging such Notes, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Commonwealth or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code. The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

**Section 3.11   Preparation of Definitive Notes; Temporary Notes.** The definitive Notes of each Series, Subseries and Sub-Subseries shall be lithographed or printed on steel engraved borders, except that Book Entry Notes may be typewritten. Until the definitive Notes of any Series, Subseries or Sub-Subseries are prepared, the Commonwealth may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Notes, but subject to the same provisions, limitations and conditions as the definitive Notes, except as to the denominations thereof and as to exchangeability for registered Notes, one or more temporary Notes, substantially of the tenor of the definitive Notes in lieu of which such temporary Note or Notes are issued, in authorized denominations or any whole multiples thereof authorized by the Commonwealth, and with such omissions, insertions and variations as may be appropriate to such temporary Notes. The Commonwealth at its own expense shall prepare and execute and, upon the surrender at the designated corporate trust office of the Trustee of such temporary Notes for exchange and the cancellation of such surrendered temporary Notes the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated corporate trust office of the Trustee, definitive Notes of the same aggregate notional amount and Series, Subseries and Sub-Subseries as the temporary Notes surrendered. Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and security as definitive Notes issued pursuant hereto.

All temporary Notes surrendered in exchange for a definitive Note or Notes shall be forthwith canceled by the Trustee.

## ARTICLE IV.

## REDEMPTION OF NOTES

**Section 4.01   Authorization of Redemption.** Notes are subject to mandatory redemption in accordance with their respective rights to payment from CVIs Annual Payment Amounts. Notes shall be additionally redeemable from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein.

**Section 4.02   Extraordinary Redemption of GO CVIs at Election of Commonwealth.** The GO CVIs are subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future

- 30 -

payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. The amount of the Redemption Price applicable to each such extraordinary redemption under this Section 4.02 shall be calculated by, or the amount calculated by the Commonwealth shall be verified by, an Independent Consultant.

Section 4.03  Extraordinary Redemption of Clawback CVIs at Election of Commonwealth.  The Clawback CVIs are subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points.  The amount of the Redemption Price applicable to each such extraordinary redemption under this Section 4.03 shall be calculated by, or the amount calculated by the Commonwealth shall be verified by, an Independent Consultant.

Section 4.04  Extraordinary Redemption at the Election of the Commonwealth. In the case of any extraordinary redemption of Notes in accordance with the provisions of Section 4.02 or 4.03 hereof from moneys other than CVIs Annual Payment Amounts, the Commonwealth shall give written notice to the Trustee and the Calculation Agent of its election to redeem, whether such Notes are GO CVIs or Clawback CVIs, the notional amount to be redeemed, and the Redemption Prices of the Notes to be redeemed.  Such notice shall be given to the Trustee and the Calculation Agent not less than forty-five (45) days prior to the redemption date.  The Series, Subseries and Sub-Subseries of Notes and notional amounts thereof to be so redeemed shall be determined by the Commonwealth in its sole discretion, subject to any limitations with respect thereto contained herein, including any priority of payment with respect to such Series, Subseries and/or Sub-Subseries as provided herein.  The Commonwealth shall pay to the Trustee on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee hereunder, is sufficient to redeem on the redemption date at the Redemption Price thereof, all of the Notes or portions thereof to be so redeemed, and any such payment shall be deposited by the Trustee in the applicable Subaccount of the Extraordinary Redemption Payment Account.

Section 4.05  Selection of Notes to be Redeemed.  In the event of redemption of less than all of the Outstanding Notes of like Series, Subseries or Sub-Subseries, the Trustee shall select the Notes to be redeemed (i) on a pro rata basis to the extent practicable, or, (ii) in the case of Book Entry Notes, where pro rata redemption is not possible, in accordance with the applicable procedures of the Depository.  Notes selected shall be in amounts of $1.00 or whole multiples of $1.00 in excess thereof, except that if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1.00, shall be redeemed.

Section 4.06  Notice of Redemption.  Whenever Notes or portions thereof are to be redeemed in accordance with Sections 4.02 and 4.03, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth which notice shall specify: (a) the Notes to be redeemed which shall be identified by the designation of the Notes given in accordance with Article II hereof; (b) the numbers and other distinguishing marks of the Notes to be redeemed, including CUSIP numbers; (c) the redemption date; (d) the Redemption Price (including the calculation thereof); (e) with respect to each such Note, the notional amount thereof to be redeemed; (f) that, except in the case of Book Entry Notes, such Notes will be redeemed at the

- 31 -

designated corporate trust office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (g) that no representation is made as to the correctness of the CUSIP number either as printed on the Notes or as contained in such notice and that an error in a CUSIP number as printed on a Note or as contained in such notice shall not affect the validity of the proceedings for redemption; and (h) if the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption. Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Note to be redeemed the Redemption Price thereof. Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date. Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books. Upon giving such notice, the Trustee shall promptly certify to the Commonwealth that it has mailed or caused to be mailed such notice to the Holders of the Notes to be redeemed in the manner provided herein. Such certification shall be conclusive evidence that such notice was given in the manner required hereby. The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

The Trustee shall, if any of the Notes to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository). Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes. The Trustee shall make available to the Holders of Notes subject to redemption a copy of the notice of redemption under procedures established by the Trustee.

**Section 4.07   Payment of Redeemed Notes.** Notice having been given in the manner provided in Section 4.06 hereof, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, except as otherwise provided in Section 3.10 hereof upon presentation and surrender of such Notes, at the office or offices specified in such notice, and, in the case of Notes presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Notes, or portions thereof, shall be paid at the Redemption Price; *provided, however,* that payment of the Redemption Price may be paid by wire transfer as provided in the first paragraph of Section 3.01 hereof. If there shall be called for redemption less than all of the notional amount of a registered Note, the Commonwealth shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Note, without charge to the owner thereof, for the unredeemed balance of the notional amount of the registered Note so surrendered, Notes of like Series, Subseries and Sub-Subseries and tenor in any of the authorized denominations. If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series, Subseries and Sub-Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such

- 32 -

Notes or portions thereof to be redeemed shall no longer be considered to be Outstanding hereunder. If such money shall not be so available on the redemption date, such Notes or portions thereof shall continue to be payable as herein provided as if such redemption had not been noticed.

# ARTICLE V.

## LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS;
## PLEDGED DEPOSITS AND APPLICATION THEREOF

**Section 5.01  Lien on Trust Estate.** The Commonwealth hereby grants, upon the issuance of the Notes, a lien on the Trust Estate in favor of the Trustee for the benefit of the Holders of the Notes, all as reflected in the definition of "Trust Estate". The lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of the lien. [Such lien shall be perfected automatically, without further need for notice, recording or control, if and to the extent so provided in the Confirmation Order.]

**Section 5.02  Establishment of Funds and Accounts.**

(a)    The Trustee shall establish a Trustee and Independent Consultant Expenses Fund, which fund shall not constitute a portion of the Trust Estate and shall be held for the benefit of the Trustee and the Independent Consultants as provided herein and maintained by the Trustee. Moneys shall be deposited into the Trustee and Independent Consultant Expenses Fund as provided in Sections 2.02(b) and 5.09 hereof, and withdrawn by the Trustee for the purposes of paying, and reimbursing the Trustee and the Independent Consultants for the payment of, Trustee and Independent Consultant Expenses.

(b)    The Trustee shall establish a CVIs Payments Fund and, within such CVIs Payments Fund, (i) a Subject to Waterfall CVIs Payment Account, and, within such Subject to Waterfall CVIs Payment Account, a (A) GO CVIs Subaccount and (B) a Clawback CVIs Subaccount, (ii) a Not Subject to Waterfall CVIs Payment Account, (iii) a PRIFA Rum Tax Clawback CVIs Payment Account, (iv) a Disputed Payments Account, and, within such Disputed Payments Account, a (A) GO CVIs Subaccount, (B) Clawback CVIs Subaccount and (C) PRIFA Rum Tax Clawback CVIs Subaccount, and (v) an Extraordinary Redemption Payment Account, and, within such Extraordinary Redemption Payment Account, a (A) GO CVIs Subaccount, (B) Clawback CVIs Subaccount and (C) PRIFA Rum Tax Clawback CVIs Subaccount, which fund, accounts and subaccounts shall constitute a portion of the Trust Estate and shall be held in trust for the benefit of the Holders as provided herein and maintained by the Trustee.

(c)    The GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the GO CVIs Subaccount of the Disputed Payments Account and the GO CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs as provided herein, including Section 5.04 hereof.

(d)    The Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account, the Clawback CVIs Subaccount of the Disputed Payments Account and the Clawback CVIs Subaccount of the Extraordinary

- 33 -

Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs, other than the Holders of the PRIFA Rum Tax Clawback CVIs, as provided herein, including Section 5.05 hereof.

(e)     The PRIFA Rum Tax Clawback CVIs Payment Account, the PRIFA Rum Tax Clawback CVIs Subaccount of the Disputed Payment Account and the PRIFA Rum Tax Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs as provided herein, including Sections 5.04, 5.05 and 5.06 hereof.

(f)     The Disputed Payments Account shall be held by the Trustee in trust for the benefit of the Holders of the Notes pending the resolution of challenges and Proceedings relating to determinations and calculations as more fully described in the Calculation Agent Agreement. In the event that under the Calculation Agent Agreement the parties thereto have determined that they have been unable to resolve any challenges or Proceedings prior to the CVIs Annual Payment Date and have determined any appropriate Disputed Payment Amounts, the Calculation Agent shall give written instructions to the Trustee, with a copy to the Commonwealth, detailing the respective Disputed Payment Amounts and the appropriate Subaccounts within the Disputed Payments Account into which the Trustee should deposit the Disputed Payment Amounts pending final resolution of the challenge or Proceeding. Disputed Payment Deposits relating to GO CVI Annual Payment Amounts shall be deposited into the GO CVIs Subaccount of the Disputed Payments Account and shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs pending the resolution of such challenge or Proceeding. Upon resolution of such challenge or Proceeding, amounts in the GO CVIs Subaccount of the Disputed Payments Account shall be transferred promptly, as appropriate to reflect the recovery from the related challenge or Proceeding, to the Commonwealth and/or the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account. Any amounts transferred to the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account shall promptly (and in no event later than the Challenge Payment Date) be distributed to the Holders of the GO CVIs by Subseries as appropriate. Disputed Payment Deposits relating to Clawback CVI Annual Payment Amounts for the Holders of Clawback CVIs other than the Holders of PRIFA Rum Tax Clawback CVIs shall be deposited into the Clawback CVIs Subaccount of the Disputed Payments Account and shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs other than the Holders of PRIFA Rum Tax Clawback CVIs pending the resolution of such challenge or Proceeding. Upon resolution of such challenge or Proceeding, amounts in the Clawback CVIs Subaccount of the Disputed Payments Account shall be transferred promptly, as appropriate to reflect the recovery from the related challenge or Proceeding, to the Commonwealth and/or to the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account or the Not Subject to Waterfall CVIs Payment Account, as appropriate. Any amounts transferred to the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account or the Not Subject to Waterfall CVIs Payment Account shall promptly (and in no event later than the Challenge Payment Date) be distributed to the Holders of the Clawback CVIs by Subseries and Sub-Subseries as appropriate. Disputed Payment Deposits relating to Clawback CVI Annual Payment Amounts for the Holders of PRIFA Rum Tax Clawback CVIs shall be deposited into the PRIFA Rum Tax Clawback CVIs Subaccount of the Disputed Payments Account and shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs pending the resolution of such challenge or Proceeding. Upon resolution of such challenge or Proceeding, amounts in the PRIFA Rum Tax Clawback CVIs Subaccount of the Disputed Payments Account shall be transferred promptly, as

- 34 -

appropriate to reflect the recovery from the related challenge or Proceeding, to the Commonwealth and/or to the PRIFA Rum Tax Clawback CVIs Payment Account. Any amounts transferred to the PRIFA Rum Tax Clawback CVIs Payment Account shall promptly (and in no event later than the Challenge Payment Date) be distributed to the Holders of the PRIFA Rum Tax CVIs.

(g)     The Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the Notes subject to redemption in accordance with Sections 4.02 and 4.03 hereof. The GO CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs. The Clawback CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs. The PRIFA Rum Tax Clawback CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs.

(h)     The moneys in each such fund, account and subaccount shall be disbursed, allocated and applied solely for the uses and purposes provided herein.

**Section 5.03   Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition.**

(a)     By no later than each CVIs Outperformance Condition Determination Date, commencing after the end of the Fiscal Year ending on June 30, 2022, the Calculation Agent, as provided in the Calculation Agent Agreement, shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year. Upon such determination, the Calculation Agent shall provide the Trustee and the Commonwealth with its determinations, promptly confirmed in writing, together with the calculations used to make such determinations. Within one (1) Business Day of receipt thereof, the Trustee shall post such determinations with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of its receipt of the written confirmation of such determinations. The Trustee shall promptly notify the Holders in writing that such determinations have been so posted. In the event the Calculation Agent has determined that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall thereafter undertake to calculate the amounts required to be calculated in accordance with Section 5.03(b) hereof by no later than the CVIs Annual Payment Amount Calculation Date.

(b)     In the event the Calculation Agent has determined that an SUT Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the Subject to Waterfall Outperformance Amount as provided in Section 5.04 hereof, and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 hereof by no later than the CVIs Annual Payment Amount Calculation Date. In the event the Calculation Agent has determined that a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the Rum Tax CVI Annual Payment Amount as provided in Section 5.06 hereof by no later than the CVIs Annual Payment Amount Calculation Date. In each case, the Calculation Agent shall calculate the amount by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be

- 35 -

applied to the redemption of the Notes of each Series, Subseries and Sub-Subseries on the CVIs Annual Payment Date on a schedule in substantially the form of Attachment 7 hereto. The Commonwealth shall also complete by no later than the CVIs Annual Payment Amount Calculation Date the calculations required to finalize Attachment 7, including the revised amounts of the applicable Remaining Clawback CVI Lifetime Cap and the Remaining GO CVI Lifetime Cap, by Series, Subseries and Sub-Subseries, taking into consideration the amounts to be applied on the CVIs Annual Payment Date. Promptly upon completion, the Calculation Agent shall provide the Commonwealth and the Trustee with written copies of its calculations, including a final Attachment 7. Within one (1) Business Day of receipt thereof, the Trustee shall post such calculations and final Attachment 7, together with supporting narrative, if any, with EMMA under all of the CUSIP numbers applicable to the Notes. The Trustee shall promptly notify the Holders in writing that such calculations and other written materials have been so posted.

(c)      To the extent that an SUT Outperformance Condition and/or Rum Tax Outperformance Condition has occurred, the Commonwealth shall transfer to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date, subject to the CVIs Maximum Payment Amounts, an amount equal to the sum of the Subject to Waterfall Outperformance Amount, the Not Subject to Waterfall Outperformance Amount, if any, and the Rum Tax CVI Annual Payment Amount, if any, together with written directions on the amounts, if any, that are to be deposited into each Subaccount of the Subject to Waterfall CVIs Payment Account (in an amount equal to the Subject to Waterfall CVIs Payment Account Deposit), the Not Subject to Waterfall CVIs Payment Account (in an amount equal to the Not Subject to Waterfall CVIs Payment Account Deposit) and the PRIFA Rum Tax Clawback CVIs Payment Account (in an amount equal to the PRIFA Rum Tax Clawback CVIs Payment Account Deposit). Upon receipt by the Trustee from the Commonwealth of the amounts described in the preceding sentence, (i) an amount equal to the Subject to Waterfall CVIs Payment Account Deposit shall be deposited into the Subject to Waterfall CVIs Payment Account and portions thereof shall be deposited into the Subaccounts therein as hereinafter provided, (ii) an amount equal to the Not Subject to Waterfall CVIs Payment Account Deposit shall be deposited into the Not Subject to Waterfall CVIs Payment Account, and (iii) an amount equal to the PRIFA Rum Tax Clawback CVIs Payment Account Deposit shall be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account. The moneys deposited into the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Payment Account shall be held by the Trustee uninvested until the payment to the respective Holders.

(d)      No payments (other than from the PRIFA Rum Tax Clawback CVIs Payment Account if a Rum Tax Outperformance Condition has occurred) shall be made to the Holders of the Notes in Fiscal Years following Fiscal Years in which an SUT Outperformance Condition has not occurred.

(e)      No payments shall be made to the Holders of the GO CVIs in excess of the GO CVI Annual Payment Amount or the GO CVI Lifetime Cap, as applicable.

(f)      No payments shall be made to the Holders of the Clawback CVIs in excess of the Clawback CVI Annual Payment Amount or the Clawback CVI Lifetime Cap, as applicable.

(g)      No payments shall be made to the Holders of the PRIFA Rum Tax Clawback CVIs from the Rum Tax CVI Annual Payment Amount in excess of the amount

- 36 -

calculated in accordance with Section 5.06(a) hereof or the PRIFA Rum Tax Clawback CVIs Lifetime Cap.

(h)     In the event that, due to any challenge or Proceeding under the Calculation Agent Agreement, (i) the Calculation Agent is not able to finally determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year by no later than the originally scheduled CVIs Outperformance Condition Determination Date, (ii) the Calculation Agent is not able to finally complete the calculations required with respect to all or a portion of the calculations required to be calculated by no later than the originally scheduled CVIs Annual Payment Amount Calculation Date, or (iii) the payment of all or a portion of the amounts due to the Holders as a result of such final calculations cannot be made on the originally scheduled CVIs Annual Payment Date, the Commonwealth, the Trustee and the Calculation Agent shall agree on a revised schedule of compliance with the terms and provisions of this Trust Agreement on a rescheduled CVIs Outperformance Condition Determination Date, CVIs Annual Payment Amount Calculation Date and/or CVIs Annual Payment Date consistent with the resolution of such challenge or Proceeding.

**Section 5.04   Subject to Waterfall Outperformance Amount and Annual Waterfall Payment.**

(a)     The Subject to Waterfall Outperformance Amount shall be calculated and agreed to by the Calculation Agent by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022 (with such calculation identifying any Subject to Waterfall Outperformance Amount associated with the Fiscal Year ending June 30, 2022), following the occurrence of an SUT Outperformance Condition and shall be equal to the lesser of the following; provided, however, for the avoidance of doubt, the Subject to Waterfall Outperformance Amount is subject to the aggregate GO CVI Maximum Annual Payment and the Clawback CVI Maximum Annual Payment and may not be less than $0 in a given year:

(i)     fifty percent (50%) of cumulative Outperformance relative to the 5.5% SUT Baseline (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to (A) the Holders of the GO CVIs and (B) the Holders of Clawback CVIs from Subject to Waterfall Outperformance Amounts; and

(ii)     seventy-five percent (75%) of annual Outperformance for the Fiscal Year in which the SUT Outperformance Condition occurred.

(b)     For purposes of calculating the Subject to Waterfall Outperformance Amount in accordance with subsection (a) above,

(i)     the Commonwealth shall first calculate the amount by which the actual Measured SUT collections in the prior Fiscal Year exceeded the 5.5% SUT Baseline for such Fiscal Year as set forth in the then applicable Attachment 1, which amount is the "annual Outperformance" referred to in Section 5.04(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative

Outperformance" amount referred to in Section 5.04(a)(i) above as described in Section 5.04(b)(ii) below, as well as the 75% of "annual Outperformance" amount for purposes of Section 5.04(a)(ii) above;

(ii)     the "annual Outperformance" amount calculated in accordance with Section 5.04(b)(i) above is added to (if a positive number during a Fiscal Year in which an SUT Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which an SUT Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance" referred to in Section 5.04(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations;

(iii)     the Commonwealth will then calculate the lesser of 50% of the "cumulative Outperformance" amount and 75% of the "annual Outperformance" amount;

(iv)     the GO CVI Maximum Annual Payment shall be calculated as the lesser of (A) the sum of the GO CVI Carryforward Balance and $200,000,000 and (B) $400,000,000;

(v)     until the GO CVIs Final Maturity Date, the Clawback CVI Maximum Annual Payment shall be calculated as the lesser of (A) the sum of the Clawback CVI Carryforward Balance and $175,000,000 and (B) $350,000,000; and

(vi)     beginning in the Fiscal Year after the GO CVIs Final Maturity Date, the Clawback CVI Maximum Annual Payment shall be calculated as the lesser of (i) the sum of the Clawback CVI Carryforward Balance and $375,000,000 and (ii) $750,000,000.

(c)     For purposes of subsection (b) above,

(i)     the "GO CVI Carryforward Balance" shall be calculated as follows:

(A)     for the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2022, $0;

(B)     for each Fiscal Year thereafter, the Annual GO CVI Carryforward Amount shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (A) $200,000,000 and (B) CVI payments (if any) made to the Holders of the GO CVIs in such Fiscal Year. The Annual GO CVI Carryforward Amount from such Fiscal Year shall be added to (if positive) or subtracted from (if negative) the GO CVI Carryforward Balance from the prior Fiscal Year; and

(C)     to the extent there is a positive GO CVI Carryforward Balance remaining at the end of the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2043, the

- 38 -

Commonwealth will not owe any further amount to the Holders of the GO CVIs.

(ii)     the "Clawback CVI Carryforward Balance" shall be calculated as follows:

(A)     for the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2022, $0;

(B)     for each year thereafter during the period described in Section 5.04(b)(v), the Annual Clawback CVI Carryforward Balance shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (A) $175,000,000 and (B) aggregate CVI payments made to the Holders of Clawback CVIs (if any) in such Fiscal Year. The Annual Clawback CVI Carryforward Amount from the such Fiscal Year shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance from the prior Fiscal Year;

(C)     for each year during the period described in Section 5.04(b)(vi), the Annual Clawback CVI Carryforward Amount shall be calculated as the difference between (which for the avoidance of doubt, may be a positive or negative number) (y) $375,000,000 and (z) aggregate CVI payments made (if any) to the Holders of Clawback CVIs in such Fiscal Year. The Annual Clawback CVI Carryforward Amount from the such Fiscal Year shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance from the prior Fiscal Year; and

(D)     to the extent there is a positive Clawback CVI Carryforward Balance remaining at the end of the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2051, the Commonwealth will not owe any further amount to the Holders of the Clawback CVIs.

Illustrative scenarios of the calculation of the Subject to Waterfall Outperformance Amount are set forth in Attachment 8.

(d)     For purposes of Section 5.04(a)(i), for the avoidance of doubt, amounts paid to the Holders of the Clawback CVIs will first be allocated to Subject to Waterfall Clawback CVIs (from Subject to Waterfall Payments) for purposes of calculation of payments previously made.

(e)     Until the GO CVIs Final Maturity Date, the Subject to Waterfall Outperformance Amount shall be distributed as follows as the Annual Waterfall Payment:

(i)     the first $100,000,000 shall be paid to the Holders of the GO CVIs in the percentages allocated consistent with Attachment 3 hereto;

(ii)     the next $11,111,111 shall be paid to the holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto; and

- 39 -

(iii)    thereafter, any remaining available moneys in the Annual Waterfall Payment shall be shared with ninety percent (90%) being paid to the Holders of the GO CVIs in the percentages allocated consistent with Attachment 3 hereto, and the remaining ten percent (10%) being paid to the Holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto.

(f)    Beginning in the Fiscal Year following the GO CVIs Final Maturity Date, subject to both the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap, the Subject to Waterfall Outperformance Amount shall be distributed as follows as the Annual Waterfall Payment: one hundred percent (100%) to the Holders of the Clawback CVIs until the Clawback CVIs Final Maturity Date.

### Section 5.05   Not Subject to Waterfall Outperformance Amount.

(a)    The Not Subject to Waterfall Outperformance Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022, following the occurrence of an SUT Outperformance Condition and shall be equal to the lesser of the following; *provided*, *however*, for the avoidance of doubt, the Not Subject to Waterfall Outperformance Amount is subject to the Clawback CVI Maximum Annual Payment and may not be less than $0 in a given year:

(i)    forty percent (40%) of cumulative Outperformance relative to the 5.5% SUT Baseline (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to the Holders of Clawback CVIs from the Not Subject to Waterfall Outperformance Amounts; and

(ii)    ninety-five percent (95%) of annual Outperformance for the Fiscal Year in which the SUT Outperformance Condition occurred, less payments previously made to (A) the Holders of GO CVIs and (B) the Holders of Clawback CVIs from the Subject to Waterfall Outperformance Amounts for the corresponding Fiscal Year.

(b)    For purposes of calculating the Not Subject to Waterfall Outperformance Amount in accordance with subsection (a) above,

(i)    the Commonwealth shall first calculate the amount by which the actual Measured SUT collections in the prior Fiscal Year exceeded the 5.5% SUT Baseline for such Fiscal Year as set forth in the then applicable Attachment 1, which amount is the "annual Outperformance" referred to in Section 5.05(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.05(a)(i) above as described in Section 5.05(b)(ii) below, as well as the 95% of "annual Outperformance" amount for purposes of Section 5.05(a)(ii) above;

(ii)    the "annual Outperformance" amount calculated in accordance with Section 5.05(b)(i) above is added to (if a positive number during a Fiscal Year in which an SUT Outperformance Condition has occurred), or subtracted from (if a negative number

- 40 -

during a Fiscal Year in which an SUT Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance" referred to in Section 5.05(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations;

(iii)    the Commonwealth will then calculate the lesser of 40% of the "cumulative Outperformance" amount and 95% of the "annual Outperformance" amount; and

(iv)    the Clawback CVI Maximum Annual Payment shall be calculated in the same manner as in Section 5.04(b)(v) and (vi) hereof.

(c)    For purposes of subsection (b) above, the Clawback CVI Carryforward Balance shall be calculated in the same manner as Section 5.04(c)(ii).

(d)    For the avoidance of doubt, when calculating whether aggregate payments to Clawback CVI are limited by the Clawback CVI Maximum Annual Payment, payments to Subject to Waterfall Clawback CVI are counted first against the Clawback CVI Maximum Annual Payment before payments to Not Subject to Waterfall Clawback CVI are counted.

(e)    Subject to both the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap, one hundred percent (100%) of the Not Subject to Waterfall Outperformance Amount shall be paid to the Holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto.

Illustrative scenarios of the calculation of the Not Subject to Waterfall Outperformance Amount are set forth in Attachment 9.

**Section 5.06    Rum Tax CVI Annual Payment Amount.**

(a)    The Rum Tax CVI Annual Payment Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022, following the occurrence of a Rum Tax Outperformance Condition and shall be equal to the lesser of the following:

(i)    forty percent (40%) of cumulative Outperformance of the Waterfall General Fund Rum Tax Collections relative to the Rum Tax Outperformance Metric (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to the Holders of the PRIFA Rum Tax Clawback CVIs on account of previous Rum Tax CVI Annual Payment Amounts;

(ii)    fifty percent (50%) of annual Outperformance of the Waterfall General Fund Rum Tax Collections above the Rum Tax Outperformance Metric, measured at the conclusion of each Fiscal Year; and

(iii)    $30 million.

- 41 -

(b)    For purposes of calculating the Rum Tax CVI Annual Payment Amount in accordance with subsection (a) above,

(i)    the Commonwealth shall first calculate the amount by which the actual Waterfall General Fund Rum Collections in the prior Fiscal Year exceeded the Rum Tax Outperformance Metric for such Fiscal Year as set forth in the then applicable Attachment 2, which amount is the "annual Outperformance" referred to in Section 5.06(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.06(a)(i) above as described in Section 5.06(b)(ii) below, as well as the 50% of "annual Outperformance" amount for purposes of Section 5.06(a)(ii) above;

(ii)    the "annual Outperformance" amount calculated in accordance with Section 5.06(b)(i) above is added to (if a positive number during a Fiscal Year in which a Rum Tax Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which a Rum Tax Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance" referred to in Section 5.06(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations; and

(iii)    the Commonwealth will then calculate the lesser of 40% of the "cumulative Outperformance" amount, 50% of the "annual Outperformance" amount, and $30,000,000.

Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount are set forth in Attachment 10.

**Section 5.07    HTA Clawback CVI Priority Distribution Waterfall.**

Notwithstanding any other provision of this Trust Agreement:

(a)    All moneys to be applied by the Trustee under this Trust Agreement on account of the HTA Clawback CVI shall be applied as follows:

(i)    First, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 68 Bond Claims, up to $179,462,539, until such amount has been paid in full;

(ii)    Second, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 98 Senior Bond Claims, up to $1,833,405,578, until such amount has been paid in full;

(iii)    Third, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 98 Sub Bond Claims, up to $207,294,178, until such amount has been paid in full;

(iv)    Fourth, following payment of the amounts above in full, to the Sub-Subseries related to the GDB HTA Loans up to $1,477,506,700.

- 42 -

(b)     No payment shall be made on account of any Sub-Subseries of HTA Clawback CVI in any Fiscal Year until all Sub-Subseries of a higher priority than such Sub-Subseries in the above waterfall have been paid in full.

**Section 5.08   CVIs Payment Fund.**

(a)     In connection with the preparation of Attachment 7 on any CVIs Annual Payment Date, to the extent an SUT Outperformance Condition has occurred in any Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the amount to be deposited into each Subaccount in the Subject to Waterfall CVIs Payment Account that are payable to (i) the Holders of the GO CVIs, taking into account Deemed Paid CVIs Payments applicable to any GO CVIs, (ii) the Holders of the Clawback CVIs other than the PRIFA Rum Tax Clawback CVIs, taking into account Deemed Paid CVIs Payments applicable to any Clawback CVIs, and (iii) the Holders of the PRIFA Rum Tax Clawback CVIs. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (i) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, and (ii) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account. Moneys deposited into the Subject to Waterfall CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of the Notes entitled to payment therefrom on the CVIs Annual Payment Date as provided in Section 5.04(e) and (f) hereof and Attachments 2 and 3 hereof as directed in writing by an Authorized Officer of the Commonwealth as mandatory redemption of such Notes. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (iii) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.

(b)     In connection with the preparation of Attachment 7 on any CVIs Annual Payment Date, to the extent an SUT Outperformance Condition has occurred in any Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the Not Subject to Waterfall Outperformance Amount to be distributed pursuant to the provisions of Section 5.05 hereof. The Calculation Agent, as provided in the Calculation Agent Agreement, shall then calculate the amounts from the Not Subject to Waterfall Outperformance Amount that are payable to (i) the Holders of the Clawback CVIs other than the PRIFA Rum Tax Clawback CVIs, and (ii) the Holders of the PRIFA Rum Tax Clawback CVIs. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (i) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the Not Subject to Waterfall CVIs Payment Account. Moneys deposited into the Not Subject to Waterfall CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of the Clawback CVIs (other than the Holders of the PRIFA Rum Tax Clawback CVIs) on the CVIs Annual Payment Date as provided in Section 5.05 and Attachment 4 hereof as directed in writing by an Authorized Officer of the Commonwealth as mandatory redemption of such Notes. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (ii) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.

4820-1003-9275.22

(c)    Amounts paid by the Commonwealth in accordance with Section 5.08(a)(iii) and Section 5.08(b)(ii) shall be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account when received by the Trustee. To the extent a Rum Tax Outperformance Condition has occurred in any Fiscal Year, the Commonwealth shall transfer, subject to the PRIFA Rum Tax Clawback CVIs Lifetime Cap, an amount equal to the Rum Tax CVI Annual Payment Amount, if any, to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account. Moneys deposited into the PRIFA Rum Tax Clawback CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of PRIFA Rum Tax Clawback CVIs on the CVIs Annual Payment Date.

(d)    No later than one (1) Business Day before any extraordinary redemption date noticed by the Commonwealth in accordance with Sections 4.02 or 4.03 hereof, the Commonwealth shall transfer to the Trustee an amount necessary to provide for the payment of the Redemption Price of the Notes being redeemed for deposit into the Extraordinary Redemption Payment Account. Moneys transferred by the Commonwealth in connection with the extraordinary redemption of GO CVIs shall be deposited by the Trustee into the GO CVIs Subaccount. Moneys transferred by the Commonwealth in connection with the extraordinary redemption of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs shall be deposited by the Trustee into the Clawback CVIs Subaccount. Moneys transferred by the Commonwealth in connection with the extraordinary redemption of PRIFA Rum Tax Clawback CVIs shall be deposited by the Trustee into the PRIFA Rum Tax Clawback CVIs Subaccount. Moneys deposited into the Extraordinary Redemption Payment Account shall be held uninvested by the Trustee and distributed from the appropriate Subaccount to the Holders of the Notes being redeemed as directed in writing by an Authorized Officer of the Commonwealth.

### Section 5.09   Trustee and Independent Consultant Expenses Fund.

(a)    The Trustee and Independent Consultant Expenses Fund shall not constitute a portion of the Trust Estate and shall be held for the benefit of the Trustee and the Independent Consultants as provided herein and maintained by the Trustee. Moneys shall be deposited into the Trustee and Independent Consultant Expenses Fund as provided in Sections 2.02(b) and 5.09(b) hereof, and withdrawn by the Trustee for the purposes of paying, and reimbursing the Trustee and the Independent Consultants for the payment of, Trustee and Independent Consultant Expenses, in each case upon written requisition signed by an Authorized Officer of the Commonwealth.

(b)    By no later than each CVIs Annual Payment Amount Calculation Date, whether or not an SUT Outperformance Condition and/or Rum Tax Outperformance Condition has occurred with respect to a prior Fiscal Year, the Commonwealth shall calculate the Trustee and Independent Consultant Funding Amount and provide the Trustee with written notice of such amount. On or prior to each CVIs Annual Payment Amount Date, whether or not an SUT Outperformance Condition and/or Rum Tax Outperformance Condition has occurred with respect to a prior Fiscal Year, the Commonwealth shall transfer to the Trustee an amount equal to the Trustee and Independent Consultant Expenses Funding Amount for deposit into the Trustee and Independent Consultant Expenses Fund. The money deposited into the Trustee and Independent Consultant Expenses Fund may be invested as provided in Article VI hereof.

- 44 -

# ARTICLE VI.

## INVESTMENT OF FUNDS

**Section 6.01   Investment of Funds**.

(a)   Moneys in the CVIs Payment Fund and the accounts therein, other than the Disputed Payments Account and the subaccounts therein, shall be held uninvested by the Trustee. The Trustee shall have no obligation for the payment of interest on moneys held by it in the CVIs Payment Fund and the accounts therein, other than the Disputed Payments Account and the subaccounts therein as provided herein.

(b)   Subject to the limitations set forth in this paragraph, moneys held in the Trustee and Independent Consultant Expenses Fund shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the written direction of an Authorized Officer of the Commonwealth.   Subject to the limitations set forth in this paragraph, moneys held in the Disputed Payments Account shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments described in paragraphs ___, ___ and ___ thereof, in accordance with the written direction of an Authorized Officer of the Commonwealth.  The Trustee may conclusively rely upon the Commonwealth's written instructions as to both the suitability and legality of the directed investments.   Ratings of Eligible Investments shall be determined at the time of purchase of such Eligible Investments.  If the event that the ratings of such Eligible Investments fall below the ratings set forth in the definition thereof, the Commonwealth shall substitute such Eligible Investments with other Eligible Investments meeting the ratings requirements of the definition.   The Trustee may make any and all such investments through its own investment department or that of its affiliates or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)   Obligations purchased or other investments made as an investment of money in the Trustee and Independent Consultant Expenses Fund held under the provisions hereof shall be deemed at all times to be a part of such fund and the income or interest earned, profits realized or losses suffered by the Trustee and Independent Consultant Expenses Fund due to the investment thereof shall be credited or charged, as the case may be, to the Trustee and Independent Consultant Expenses Fund. Obligations purchased or other investments made as an investment of money in the Disputed Payments Account held under the provisions hereof shall be deemed at all times to be a part of such fund and the income or interest earned, profits realized or losses suffered by the Disputed Payments Account due to the investment thereof shall be credited or charged, as the case may be, to the Disputed Payments Account.

(d)   In computing the amount in the Trustee and Independent Consultant Expenses Fund and the Disputed Payments Account under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)   Subject to the provisions hereof, the Commonwealth, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Commonwealth, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section.  Except as otherwise provided herein, such investments

- 45 -

shall be sold by the Commonwealth or by the Trustee at the written direction of the Commonwealth at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the Trustee and Independent Consultant Expenses Fund or the Disputed Payments Account, as applicable. The Trustee shall advise the Commonwealth in writing, on or before the fifteenth (15th) day of each calendar month, of the details of all investments held for the credit of the Trustee and Independent Consultant Expenses Fund and the Disputed Payments Account as of the end of the preceding month. The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the preceding month. The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in the Trustee and Independent Consultant Expenses Fund and the Disputed Payments Account in the previous month.

(f)      Although the Commonwealth recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Commonwealth hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.02  Liability for Investments.**  Neither the Commonwealth nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

# ARTICLE VII.

# PARTICULAR COVENANTS

The Commonwealth covenants and agrees with the Holders of the Notes as follows:

**Section 7.01  Payment of Notes.**  Subject to the limitations herein, including the occurrence of an SUT Outperformance Condition or a Rum Tax Outperformance Condition, as applicable, and the CVIs Maximum Payment Amounts, the Commonwealth shall pay or cause to be paid every Note, on the dates and at the places and in the manner provided herein and in the Notes according to the true intent and meaning thereof.

**Section 7.02  Pledge of Good Faith, Credit and Taxing Power of Commonwealth**. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notes as and when due in accordance with this Trust Agreement. The Notes constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution.  The Secretary of Treasury is authorized and directed to pay the Notes as the same shall become due from any funds in the Treasury of the Commonwealth available for such purpose in the Fiscal Year for which said payment is required.  Such funds in the Treasury of the Commonwealth available for such purpose shall be deposited by the Secretary of Treasury in trust with the Trustee for the benefit of the Holders of the Notes in the amounts and at the times required by Section 5.03(b) hereof.  For the avoidance of doubt, the Commonwealth acknowledges that all references in this Trust Agreement to the pledge of its "good faith, credit and taxing power" (consistent with the Spanish version of the Constitution) should also be

interpreted as references to the pledge of its "full faith, credit and taxing power" (consistent with the English version of the Constitution).

**Section 7.03   Powers as to Notes.**   Pursuant to the CVI Legislation, the Plan and the Confirmation Order, the Commonwealth is duly authorized to execute and deliver the Notes and to execute the Trust Agreement.  The Commonwealth further represents that all corporate action on the part of the Commonwealth to that end has been duly and validly taken.  Pursuant to the Plan and the Confirmation Order, the Commonwealth further represents that the Notes and the provisions hereof are and shall be the valid and legally enforceable obligations of the Commonwealth in accordance with their terms and the terms hereof.  The Commonwealth further represents that its good faith, credit and taxing power pledge in support of the Notes is a valid, binding and legally enforceable pledge of the Commonwealth.   The Commonwealth further covenants that it shall not fail at all times to defend, preserve and protect, or cause to be defended, preserved and protected, the lien created by Section 5.01 and all of the rights of the Trustee for the benefit of the Holders of Notes under the Trust Agreement against all claims and demands of all Persons whomsoever.

**Section 7.04   Further Assurance.**   The Commonwealth, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the pledge and lien provided for herein, or which the Commonwealth may hereafter become bound to pledge or assign.

**Section 7.05   Offices for Payment and Registration of Notes.**   Unless all of the Notes are Book Entry Notes, the Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Notes may be presented for payment, which office or agency may be at or through the designated corporate trust office of the Trustee. The Commonwealth may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Notes authorized thereby or referred to herein may be presented for payment.  The Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Notes may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Notes.  The provisions of this Section shall be subject to the provisions of Section 3.10 hereof.

**Section 7.06   General.**   The Commonwealth shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Commonwealth under the provisions hereof in accordance with the terms of such provisions.

Upon the Effective Date, all conditions, acts and things required by the Plan, the Confirmation Order and the statutes of the Commonwealth, including the CVI Legislation, and hereby to exist, to have happened and to have been performed precedent to and in the issuance of such Notes, shall exist, have happened and have been performed.

**Section 7.07   Non-Impairment Covenant.**   The Commonwealth, for the benefit of all initial and subsequent Holders of the Notes, covenants and agrees that, until all obligations with

4820-1003-9275.22

respect to this Trust Agreement and the Notes have been paid or otherwise satisfied in accordance with their respective terms, the Commonwealth will not:

    (a)    take any action that would impair the rights and remedies of the Holders of the Notes;

    (b)    limit or restrict the rights or powers of the appropriate officers of the Commonwealth to fulfill the terms of any agreements made with respect to the Notes; or

    (c)    impair the ability of the Holders of the Notes to track performance of the Measured SUT and the Waterfall General Fund Rum Tax Collections;

*provided*, *however*, the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with this Trust Agreement, which shall protect Holders of the Notes from such elimination or replacement reducing the likelihood that an SUT Outperformance Condition will occur; and, *provided*, *further*, that the Commonwealth shall provide for the timely posting with EMMA by the Trustee of (x) the amounts of Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction, all in accordance with the Calculation Agent Agreement.

### Section 7.08   Baseline SUT Reduction and SUT True-Up.

    (a)    The 5.5% SUT Baseline set forth in Attachment 1 hereto reflects the statutory and administrative provisions of the law governing the imposition and collection of the 5.5% SUT as of the Effective Date. No adjustments to the 5.5% SUT Baseline shall be made for exemptions or holidays that are included in the Puerto Rico Internal Revenue Code (Sections 4030.01 through 4030.27 thereof) as of the Effective Date.

    (b)    In the event that subsequent to the Effective Date, exemptions or holidays are created during a U.S. Presidential Declaration of Disaster for a period not to exceed thirty (30) days and only for emergency-related categories of spend, the 5.5% SUT Baseline shall be reduced by an amount equal to the estimated impact on collections of the 5.5% SUT resulting from any such exemptions or holidays (the "Baseline SUT Reduction").

    (c)    In the event that subsequent to the Effective Date, any other exemptions or holidays of any kind are implemented with respect to the 5.5% SUT (including any exemptions or holidays created during a U.S. Presidential Declaration of Disaster for a period exceeding thirty (30) days or for categories of spend other than emergency-related categories of spend, the Measured SUT shall be increased by an amounts equal to the estimated impact on collections of the 5.5% SUT resulting from such exemptions or holidays ("SUT True-Up").

    (d)    To the extent the Commonwealth reduces the 5.5% SUT to a lower rate, the Commonwealth shall adjust the Measured SUT for each Fiscal Year to maintain the same amount of outperformance had the Measured SUT remained at 5.5% by multiplying (i) the projected Measured SUT generated at the lower rate by (ii) the fraction equal to 5.5% divided by the lower rate. Such an adjustment shall be considered an SUT True-Up for purposes of this Section 7.08.

- 48 -

(e)     For the calculation of either the Baseline SUT Reduction or SUT True-Up, as provided in the Calculation Agreement, the calculation shall be determined by the Secretary of Treasury and verified by an Independent Consultant. Verification by an Independent Consultant shall be binding on both the Commonwealth and the Holders of the Notes.

(f)     As provided in the Calculation Agreement, the Trustee shall post the calculations relating to each Baseline SUT Reduction, SUT True-Up and reduction in the 5.5% SUT and the revised Attachment 1, together with supporting narrative, if any, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

### Section 7.09   Substitute Measured Tax.

(a)     The Commonwealth may substitute a 5.5% SUT with a Substitute Measured Tax, subject to the satisfaction of the requirements set forth in the Calculation Agreement.

(b)     The Substitute Measured Tax shall be all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth.

(c)     As provided in the Calculation Agreement, the Trustee shall post a summary of the material provisions of the Substitute Measured Tax and the revised Attachment 1, reflecting that the Substitute Measured Tax has become effective, together with projections and supporting summary narrative, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

### Section 7.10   Tax Covenant.

(a)     The Commonwealth will take all reasonable best efforts to provide that payments or redemptions made with respect to the Notes shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the Notes may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding, that may otherwise be applicable to such payments or redemptions.

(b)     The Commonwealth will take all reasonable best efforts to cause the Notes to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities, to effectuate such tax-exemption.

### Section 7.11   Comprehensive Cap on Net Tax Supported Indebtedness. For so long as any portion of the Notes shall remain Outstanding, the Commonwealth shall maintain a Comprehensive Cap on all Net Tax-Supported Debt (as defined in the Plan) for purposes of the limitation on the issuance of additional Net Tax-Supported Debt set forth in Article VI of the Debt Responsibility Act, which Comprehensive Cap shall not exceed at any time 7.94% of Debt Policy Revenues (as defined in the Plan) as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of 0.25% of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds (as defined in

the Plan) outstanding as of the Effective Date. Subject in all respects to the terms of the Plan, debt service payments on Series 2022A-1 Capital Appreciation Bonds, and payments on CVIs (as defined in the Plan) that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with another plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan or Title VI Qualifying Modification for HTA (as defined in the Plan), CCDA (as defined in the Plan), or PRIFA (as defined in the Plan), in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap. In connection with the issuance of Net Tax-Supported Debt, the Secretary of Treasury shall certify that such Net Tax-Supported Debt is being issued in compliance with the Comprehensive Cap. Absent manifest error, the certification of the Secretary of Treasury shall be conclusive and binding on all parties, including the Holders of Notes issued under this Trust Agreement, and the validity of such Net Tax-Supported Debt shall not be subject to legal challenge. In calculating Debt Policy Revenues for purposes of this Section 7.11 and the Debt Responsibility Act, the Secretary of Treasury may rely on certifications from officers of public corporations as to the revenues of such public corporations.

**Section 7.12   Rum Tax Reporting**. The Commonwealth shall provide information relating to the collection of the Commonwealth Rum Tax Revenues as set forth in the Calculation Agent Agreement.

**Section 7.13   Creation of Liens.** The Commonwealth shall not create or cause to be created any lien or charge on the Trust Estate, other than as provided in Section 5.01 hereof**.**

**Section 7.14   Fiscal Plan**. Any Fiscal Plan certified after the Effective Date will include provisions for the payment in each Fiscal Year of, to the extent that an SUT Outperformance Condition or a Rum Tax Outperformance Condition is satisfied in the prior Fiscal Year, any amounts due and owing on the Notes in accordance with the terms hereof; provided, however, that nothing in the Fiscal Plan shall be deemed to be a determination that an SUT Outperformance Condition or a Rum Tax Outperformance Condition has occurred with respect to any such Fiscal Year or shall create an obligation of the Commonwealth to make any payments with respect thereto, it being the intention of this Trust Agreement that such determinations and related obligations shall be governed by the provisions of Article V hereof.

**Section 7.15   Reporting Requirements**. The Commonwealth covenants that, in connection with the delivery of the Notes hereunder, it will enter into a reporting agreement in substantially the form attached hereto as Attachment 11 hereto. An event of default under such Reporting Agreement, including the failure to timely provide the notices or information described therein, shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the Reporting Agreement.

**Section 7.16   Cap on Notional Amount**. The GO CVI Notional Amount and the Clawback CVI Notional Amount set out the maximum aggregate amount of Notes that are permitted to be issued pursuant to this Trust Agreement and the Commonwealth shall not issue a greater aggregate notional amount of Notes.

**Section 7.17   Subsequent Bankruptcy Case**. In the event that, during the period that the CVIs remain Outstanding, the Commonwealth commences a proceeding under Title III of

- 50 -

PROMESA or under any other then applicable bankruptcy or insolvency law (the "Subsequent Bankruptcy Case"), the Commonwealth acknowledges and agrees that (a) the Trustee shall be authorized to file a proof of claim in the Subsequent Bankruptcy Case on behalf of the Holders of the CVIs seeking payment on account of a contingent, unliquidated claim with respect to the CVIs that remain Outstanding as of the date of such Subsequent Bankruptcy Case, together with all fees and expenses payable hereunder, and (b) unless the CVIs are rendered or determined to be unimpaired in such Subsequent Bankruptcy Case, the court presiding over such Subsequent Bankruptcy Case shall determine the allowance, amount, and priority of such claim, if any, in accordance with applicable law; provided, however, that nothing contained herein or in any other document, instrument or applicable law shall prevent the Commonwealth or any other party in interest from objecting to the allowance, amount, and priority of such claim on any grounds whatsoever.

## ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

**Section 8.01   Appointment and Acceptance of Trustee.**  The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02   Appointment and Acceptance of Paying Agents.**  In addition to the Trustee, the Commonwealth may appoint one or more Paying Agents for the Notes of any Series, Subseries or Sub-Subseries so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent. Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Commonwealth and the Trustee.

**Section 8.03   Responsibilities of Trustee and Paying Agents.**  The recitals of fact contained herein and in the Notes shall be taken as the statements of the Commonwealth and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same. Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof or of any Notes, or in respect of the security afforded hereby, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof. Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to the application of any money paid to or by the Commonwealth or others in accordance herewith except as to the application of any money paid to it in its capacity as Trustee or Paying Agent. Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder except for its own negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee. If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust

- 51 -

Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

**Section 8.04   Property Held in Trust.** All money and securities conveyed to or held by the Trustee at any time pursuant to the terms hereof shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof.

**Section 8.05   Rights of the Trustee and the Paying Agent.** The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties. The Trustee and any Paying Agent may consult with qualified counsel of its selection, who may or may not be of counsel to the Commonwealth, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth.  Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof upon the faith thereof, but in its reasonable discretion the Trustee or any Paying Agent, in lieu thereof, may either accept other evidence of such fact or matter or require such further or additional evidence.  Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Commonwealth to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

The Trustee shall not be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated corporate trust office of the Trustee and such notice references the Notes relative to which an Event of Default has occurred.

The Trustee may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon.

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

- 52 -

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared or distributed with respect to the Notes, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Notes.

The Trustee shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Notes or Majority in Interest of Outstanding Notes, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its negligence or willful misconduct in connection therewith.

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("Instructions"); *provided*, *however*, that the Commonwealth shall provide to the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a person is to be added or deleted from the listing. If the Commonwealth elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling. The Commonwealth understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer. The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth. Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to negligence or willful misconduct of the Trustee. The Commonwealth agrees to: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and any Paying Agent immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06  Compensation and Indemnification.** Unless otherwise provided, there shall be paid from the Trustee and Independent Consultant Expenses Fund to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder, and also all reasonable, necessary and documented expenses,

- 53 -

charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder. The Commonwealth agrees to pay the foregoing, other than expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, related to actions, suits, and other Proceedings brought by or at the direction or request of any Holders, including, without limitation, the enforcement of remedies under Article XI hereof, and further excluding the Trustee's rights to indemnification as a result thereof, including the fees and expenses incurred in connection with any indemnified claim. None of the provisions contained herein shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07   Permitted Acts.**  The Trustee may become the owner of or may deal in Notes as fully and with the same rights as if it were not such Trustee or a Paying Agent. The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Commonwealth or any committee formed to protect the rights of Holders of Notes or to effect or aid in any reorganization growing out of the enforcement hereof or of the Notes whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Notes in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

**Section 8.08   Resignation of Trustee.**  The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder by giving not less than sixty (60) days' written notice to: (a) the Commonwealth, and (b) the Holders of the Notes by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books. Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; ***provided, however,*** that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09   Removal of Trustee.**  The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon 30 day's written notice by the Holders of a Quarter in

- 54 -

Interest of the Outstanding Notes, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to the Commonwealth.  The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Notes.  No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.  A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof, shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Commonwealth.

**Section 8.10   Successor Trustee and/or Paying Agent.**  In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Notes, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Commonwealth and the predecessor Trustee and/or Paying Agent; ***provided, nevertheless,*** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Commonwealth by a duly executed written instrument signed by an Authorized Officer of the Commonwealth shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Notes, at their last addresses appearing on the registry books. Any successor Trustee and/or Paying Agent appointed by the Commonwealth shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Notes.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Commonwealth, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor. Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby.

Neither the Commonwealth nor any public corporation, agency or instrumentality of the Commonwealth nor any Person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11   Transfer of Rights and Property to Successor Trustee.** Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Commonwealth, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally appointed as Trustee. However, the Trustee then ceasing to act shall nevertheless, on request by the Commonwealth or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein. Should any deed, conveyance or instrument in writing from the Commonwealth be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Commonwealth. In all instances, the Trustee then ceasing to act as trustee shall remain liable for actions or omissions prior to such transfer

**Section 8.12   Merger or Consolidation of the Trustee.** Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger or consolidation to which it shall be a party or any company to which such Trustee may sell or transfer all or substantially all of its corporate trust business, ***provided*** such company shall be a bank having trust powers or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance. In the event that such entity is not so qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Notes.

**Section 8.13   Ancillary Agreements**. To the extent it is a party thereto, the Trustee is authorized to enter into and perform its obligations under the Ancillary Agreements.

## ARTICLE IX.

## AMENDMENTS TO TRUST AGREEMENT

**Section 9.01   Modification and Amendment without Consent.** Notwithstanding any other provisions of this Article IX or Article X hereof, the Commonwealth and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a) To add additional covenants and agreements of the Commonwealth for the purpose of further securing the payment of the Notes, ***provided*** such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements or in the CVI Legislation, and ***provided further*** that such additional covenants and agreements shall be for the equal benefit and security of all Notes, without discrimination or preference;

- 56 -

(b)    To surrender any right, power or privilege reserved to or conferred upon the Commonwealth by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements, the Plan, the Confirmation Order or in the CVI Legislation; provided that same shall be for the equal benefit and security of all Notes, without discrimination or preference;

(c)    To confirm, as further assurance, the lien, and the subjection to the lien, of the Commonwealth's right, title and interest in the Trust Estate, or any other money, investments thereof or funds, provided that such further assurance shall be for the equal benefit and security of all Notes (or, as contemplated hereunder, the applicable Series, Subseries or Sub-Subseries of Notes), without discrimination or preference; and

(d)    With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the next paragraph of this Section 9.01, materially adversely affect the rights of the Holders of the Notes.

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Commonwealth and the Commonwealth has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement is authorized pursuant to this Section 9.01 and will not materially adversely affect the rights of the Holders of the Notes.

For the avoidance of doubt, no Supplemental Indenture shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 hereof with the consent of each affected Holder.

**Section 9.02  Supplemental Trust Agreements Effective with Consent of Holders.** The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to the written consent of the Holders and the rights of the Secretary of Treasury in accordance with and subject to the provisions of Article X hereof, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Commonwealth.

**Section 9.03  General Provisions Relating to Supplemental Trust Agreements.** The Trust Agreement shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX or Article X hereof. A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, and an opinion of Transaction Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Commonwealth and enforceable in accordance with its terms. The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

- 57 -

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

The Commonwealth, as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective, shall post a copy of such Supplemental Trust Agreement on the Commonwealth's website and the Trustee shall post a copy of such Supplemental Trust Agreement on EMMA under the CUSIPs for the Outstanding Notes.

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT WITH CONSENT OF HOLDERS

### Section 10.01 Powers of Amendment.

(a)    Except as provided in Section 9.01 hereof, any modification or amendment hereof or of the rights and obligations of the Commonwealth and of the Holders of the Notes hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Notes Outstanding at the time such consent is given, or (ii) in case less than all of the several Series, Subseries or Sub-Subseries of Notes then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Notes of each Series, Subseries or Sub-Subseries so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Notes of any specified like Series, Subseries or Sub-Subseries and tenor remain Outstanding, the consent of the Holders of such Notes shall not be required and such Notes shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Notes under this Section.

(b)    No such modification or amendment shall, without the prior written consent of the Holder of such Note, permit a change in the provisions related to the timing or amount of any payment on the Notes, including, without limitation, any change in the currency to be used to pay the Notes, any change in the amount or date of any payment, the terms of redemption of any Outstanding Note or a reduction in the notional amount thereof. Further, no such modification or amendment shall, without the prior written consent of the Holder of such Note, reduce the percentages or otherwise affect the classes of Notes the consent of the Holders of which is required to effect any such modification or amendment. Further, no waiver of any default or compliance with any provision of this Section 10.01 shall be granted without the prior written consent of the Holder of such Note.

(c)    For the purposes of this Section 10.01, a Series, Subseries or Sub-Subseries shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Notes of such Series, Subseries or Sub-Subseries in any respect or diminishes (or is likely to diminish) the recovery of or the amount likely to be paid on account of such Series, Subseries or Sub-Subseries in any respect. [The Trustee shall obtain an opinion of Transaction Counsel as to whether the Notes of any particular Series, Subseries or Sub-Subseries would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Commonwealth, the Trustee and all Holders of Notes.]

- 58 -

**Section 10.02 Consent of Holders.** The Commonwealth may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section. Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized Officer of the Commonwealth shall be filed with the Trustee for the inspection of the Holders of Notes. A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Notes of any Series, Subseries or Sub-Subseries affected by such modification or amendment for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Commonwealth to each affected Holder of Notes. Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Notes specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided. For purposes of calculating the required percentage of Notes consenting to a modification or amendment, any such consent shall be binding upon the Holder of the Notes of such Series, Subseries or Sub-Subseries affected giving such consent and on any subsequent Holder of such Notes (whether or not such subsequent Holder has notice thereof). At any time after the Holders of the required percentages of Notes of such Series, Subseries or Sub-Subseries affected shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Notes of such Series, Subseries or Sub-Subseries and will be effective as provided in this Section, shall be given to the Holders by mailing such notice to Holders or by Electronic Means. The Commonwealth shall file with the Trustee proof of giving such notice. Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Commonwealth and the Holders of all Notes of such Series, Subseries or Sub-Subseries affected at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty day period; *provided, however*, that the Commonwealth during such sixty day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem expedient.

**Section 10.03 Modifications by Unanimous Consent.** The terms and provisions hereof and the rights and obligations of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth and of the Holders of the Notes may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Commonwealth of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Commonwealth and the consent of the Holders of all of the Notes then Outstanding, such consent to be given as provided in Section 10.02.

**Section 10.04 Mailing.** Any provision in this Article X for the mailing of a notice or other document to Holders shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Notes then Outstanding at such Person's address, if any, appearing upon the registry books of the Commonwealth, and (b) to the Trustee.

- 59 -

**Section 10.05 Exclusion of Notes.**  Notes owned or held by or for the account of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be entitled with respect to such Notes to give any consent or take any other action provided for herein.  At the time of any consent or other action taken hereunder, the Commonwealth shall furnish the Trustee a certificate of an Authorized Officer of the Commonwealth, upon which the Trustee may rely, describing all Notes so to be excluded.

**Section 10.06 Notation on Notes.**  Notes delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Commonwealth and the Trustee as to such action, and in that case upon demand of the Holder of any Note Outstanding at such effective date and upon presentation of his Note for such purpose at the designated corporate trust office of the Trustee suitable notation shall be made on such Note by the Trustee as to any such action.  If the Commonwealth or the Trustee shall so determine, new Notes so modified as, in the opinion of the Trustee and the Commonwealth, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Note then Outstanding shall be exchanged, without cost to such Holder, for Notes of the same Series, Subseries or Sub-Subseries then Outstanding, upon surrender of such Notes.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 Events of Default.**  An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a)  Following the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition, the Commonwealth shall fail to pay to the Holders of the Notes the amounts due and payable hereunder by (i) the CVIs Annual Payment Date, (ii) in the event of any challenge or Proceeding as to which moneys have been deposited into the Disputed Amounts Account, the related Challenge Payment Date or (iii) extraordinary redemption date, as applicable;  or

(b)  The Commonwealth shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Notes on the part of the Commonwealth to be performed, other than the provisions of Section 7.15 hereof, and such default shall continue for forty-five (45) days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which the Event of Default relates, unless, if such default is capable of being cured but is not capable of being cured within forty-five (45) days, the Commonwealth has commenced to cure such default within forty-five (45) days and does cure such default within ninety (90) days of the date the default initially occurred; or

- 60 -

(c)   the Commonwealth permits the validity or effectiveness of this Trust Agreement or the Notes or the security provided for in this Trust Agreement to be impaired, and such impairment affects the enforceability of or payments on the Notes, or any Person to be released from any covenants or obligations with respect to the Notes.

**Section 11.02 No Acceleration with Respect to the Notes.**  There shall be no right of acceleration with respect to the Notes.

**Section 11.03 Enforcement of Remedies.**

(a)   If an Event of Default occurs under Section 11.01(a) and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall, bring an action against the Secretary of Treasury, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of Treasury to apply available resources (recursos disponibles) of the Commonwealth resources to the payment of the Notes, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution.

(b)   If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which such Event of Default relates shall, seek any other remedies that are available under applicable law or in equity to any other holder of a Commonwealth bond to which its good faith, credit and taxing power are pledged. If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which such Event of Default relates shall, seek specific performance of any relevant provisions of this Trust Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(c)   Subject to Article VIII hereof, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

**Section 11.04 Priority of Payments after Default.**  If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee hereunder shall not be sufficient to pay the amounts on the Notes as the same become due and payable, the money held by the Trustee hereunder together with any money then available or thereafter becoming available to pay the Notes, whether through exercise of the remedies provided for in this Article XI or otherwise, shall be applied as follows:

First: To the payment of amounts due to the Trustee and Paying Agents under Section 8.06;

Second:

(i)   from amounts collected from the exercise of remedies relating to an Event of Default relating to Subject to Waterfall Outperformance Amounts, to the payment to the Holders of the GO CVIs and the Subject to Waterfall Clawback CVIs entitled

- 61 -

thereto to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Subject to Waterfall Outperformance Amount occurred;

(ii)    from amounts collected from the exercise of remedies relating to an Event of Default relating to Not Subject to Waterfall Outperformance Amounts, to the payment to the Holders of Not Subject to Waterfall Clawback CVIs entitled thereto to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Not Subject to Waterfall Outperformance Amount occurred; and

(iii)   from amounts collected from the exercise of remedies relating to an Event of Default relating to the Rum Tax CVI Annual Payment Amount, to the payment to the Holders of the PRIFA Rum Tax Clawback CVIs to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Rum Tax CVI Annual Payment Amount occurred.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future. The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Commonwealth, to any Holder of Notes or to any other Person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee. Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date upon which such application is to be made. The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Notes are Outstanding and unpaid shall be paid to the Commonwealth.

**Section 11.05 Termination of Proceedings.** In case any Proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Commonwealth, the Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such Proceeding had been commenced in the case of discontinuance of abandonment or the provisions of this Trust Agreement shall be modified in accordance with any determination by the entity making such determination if the Proceedings were determined adversely to the Trustee.

**Section 11.06 Holders' Direction of Proceedings.** Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall have the right by an instrument in writing executed and delivered to the

- 62 -

Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder with respect to such Event of Default, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy related to such Event of Default available pursuant to Section 11.03, *provided*, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Holders not parties to such direction. Notwithstanding the foregoing, (a) with respect to any Event of Default, or Proceeding initiated to remedy any Event of Default, relating to the Not Subject to Waterfall Outperformance Amount, including the calculation or application thereof, only the Holders of the Clawback CVIs shall be counted in determining if a Quarter in Interest of the Outstanding Notes has approved or directed any such Proceeding, and (b) with respect to any Event of Default, or Proceeding initiated to remedy any Event of Default, relating to the Rum Tax CVI Annual Payment Amount, including the calculation or application thereof, only the Holders of the PRIFA Rum Tax Clawback CVIs shall be counted in determining if a Quarter in Interest of the Outstanding Notes has approved or directed any such Proceeding.

**Section 11.07  Control by Holders of Notes; Limitations**. No Holder of any of the Notes shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted hereby or to institute such action, suit or proceeding in its or their name, and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time (and in no event shall a delay of more than thirty (30) days be deemed reasonable for such purposes) after receipt thereof. Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law. Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that no one or more Holders of the Notes secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all Proceedings shall be instituted and maintained for the benefit of all Holders of the Outstanding Notes. Notwithstanding any other provision hereof, the Holder of any Note shall have the right which is absolute and unconditional to receive payment of the amounts due on such Note expressed in such Note (or, in the case of redemption, on the redemption date) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder, and the Holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Commonwealth Constitution and in the Plan, the Confirmation Order and the CVI Legislation.

**Section 11.08  Actions by Trustee; Possession of Notes by Trustee Not Required.**
All rights of action hereunder or under any of the Notes secured hereby and thereby, enforceable

by the Trustee, may be enforced by it without the possession of any of such Notes or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Notes to which such action relates, subject to the provisions hereof.

**Section 11.09 Waiver and Non–Waiver of Default**.  No delay or omission of the Trustee or any Holder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein.  Every power and remedy given by this Article XI to the Trustee and the Holders, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates, shall waive such default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; *provided, however,* the Trustee may not waive any default if it has received a direction from not less than a Quarter in Interest of the Outstanding Notes to which such default relates that such default may not be waived by the Trustee; *provided, further,* that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10 Notice of Event of Default**.  The Trustee shall promptly give notice of each Event of Default hereunder known to the Trustee to AAFAF and the Commonwealth and to the Holders of Notes, unless such Event of Default shall have been remedied or cured before the giving of such notice; *provided, however,* that failure to provide notice to AAFAF and the Commonwealth of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Holders.  In the case of the Holders of the Notes, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders of Notes, as the names and addresses of such Holders appear on the books for registration and transfer of Notes as kept by the Trustee.

**Section 11.11 Remedies Not Exclusive**.  No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## ARTICLE XII.

## DEFEASANCE

**Section 12.01 Discharge and Defeasance.**

(a)     If the Commonwealth shall pay or cause to be paid to the Holder of a Note the Remaining Clawback CVI Lifetime Cap or the Remaining GO CVI Lifetime Cap, as applicable, then all rights granted hereby to such Note (including without limitation, the lien) shall be discharged and satisfied.   In such event, the Trustee shall, upon the request of the Commonwealth, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Commonwealth.

- 64 -

(b)      Notes for the redemption of which money shall have been set aside and shall be held in trust by the Trustee (through deposit of money for such redemption) at the redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section.  All Outstanding Notes of any Series or Subseries shall prior to the redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

(i)      the Commonwealth shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of such Notes; and

(ii)      there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay the Remaining Clawback CVI Lifetime Cap or Remaining GO CVI Lifetime Cap, as applicable, on the redemption date; and

(iii)      the Commonwealth shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Note having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, and (B) such defeasance is in accordance with the terms hereof.

Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of said Notes; ***provided, however,*** that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due said Notes on such redemption date.

## ARTICLE XIII.

## EXECUTION OF INSTRUMENTS BY NOTE HOLDERS
## AND PROOF OF OWNERSHIP OF NOTES

**Section 13.01 Evidence of Signatures of Holders and Ownership of Notes.**
Any request, consent or other instrument which the Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Notes may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Notes in person or by his or their attorneys duly appointed in writing.  Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any Person of such Notes, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

- 65 -

The fact and date of the execution by any Holder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the Person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. The corporation of the Person or Persons executing any such instrument on behalf of a corporate Holder may be established without further proof if such instrument is signed by a Person purporting to be the president or another Authorized Officer of such corporation with a corporate seal affixed and attested by a Person purporting to be its secretary or an assistant secretary.

The ownership of Notes and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books. Any request, consent or vote of the owner of any Note shall bind all future owners of such Note in respect of anything done or suffered to be done or omitted to be done by the Commonwealth or the Trustee in accordance therewith. The Commonwealth or the Trustee may fix a record date in connection with any such request, consent or vote.

## ARTICLE XIV.

## MISCELLANEOUS

**Section 14.01 Preservation and Inspection of Documents.** All documents received by the Trustee from the Commonwealth or from Holders under the provisions hereof shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Commonwealth, any Holder and their agents and their representatives, any of whom may make copies thereof; *provided, however,* that with respect to inspection by a Holder a written request of such Holder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection. The Trustee shall provide to the Commonwealth account balances and other information reasonably requested by the Commonwealth.

**Section 14.02 Money and Funds Held for Particular Notes.** The amounts held by the Trustee or any Paying Agent for the payment of particular Notes due on any particular date shall, pending such payment, be irrevocably set aside and held in trust by it for the Holders of such Notes entitled thereto, and for the payments on such Notes, with the amounts so set aside and validly and irrevocably held in trust for the Holders of such Notes, shall no longer be considered to be unpaid upon such payment.

**Section 14.03 Cancellation of Notes.** The Trustee or any Paying Agent shall forthwith cancel all Notes which have been redeemed or paid, or upon the Clawback CVIs Final Maturity Date in the case of the Clawback CVIs and the GO CVIs Final Maturity Date in the case of the GO CVIs, and shall dispose of such Notes in accordance with its customary procedures. No such Notes shall be deemed Outstanding Notes hereunder and no Notes shall be issued in lieu thereof.

**Section 14.04 No Recourse under Trust Agreement or on the Notes.** All covenants, stipulations, promises, agreements and obligations of the Commonwealth contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Commonwealth and not of any member, officer or employee of the Commonwealth, and no

recourse shall be had for the payment of the Notes or for any claims based thereon, hereon against any member, officer or employee of the Commonwealth or any Person executing the Notes, all such liability, if any, being expressly waived and released by every Holder of Notes by the acceptance of the Notes.

**Section 14.05 Severability of Invalid Provision.** If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Commonwealth or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of the Notes.

**Section 14.06 Parties of Interest.** Nothing herein, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the Trustee, the Paying Agents and the Holders any rights, remedies or claims hereunder or by reason hereof or any covenant, condition or stipulation thereof. All covenants, stipulations, promises and agreements herein by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Paying Agents and the Holders.

**Section 14.07 Notices.** Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed: in the case of the Commonwealth, _____, _____, San Juan, PR _____; and in the case of the Trustee, addressed to it at the designated corporate trust office of the Trustee at The Bank of New York Mellon, _____, _____ _____, attention: Corporate Trust; in the case of the Commonwealth or the Secretary of Treasury, to the attention of the Secretary of Treasury at 10 Paseo Covadonga, San Juan, Puerto Rico, 00901, or, in each case, to such other individual and at such other address as the Person to be notified shall have specified by notice to the other Persons. Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any Series or Subseries of Notes, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Notes of the Series or Subseries to the Commonwealth's dissemination agent for distribution through the EMMA system. The Commonwealth shall cooperate with the Trustee to the extent necessary to facilitate the foregoing. The Trustee shall not be liable under any circumstances for monetary damages to any Person for any breach of the provisions of this paragraph. The sole remedy for failure of the Trustee to perform is specific performance.

**Section 14.08 Headings.** Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

**Section 14.09 Governing Laws.** This Trust Agreement and the Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly

- 67 -

within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Notes; ***provided***, ***however***, that the authorization of this Trust Agreement and the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, ***provided***, ***further***, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

**Section 14.10 Retention of Jurisdiction of Title III Court.** The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan, the Confirmation Order and this Trust Agreement, including, without limitation, with respect to the payment of the Notes and the enforcement of the remedies set forth herein to the fullest extent permitted by law. Any disputes, legal action, suit, or proceeding arising from or related to this Trust Agreement or the Notes (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 14.11 Signatures and Counterparts.** This Trust Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Trust Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Trust Agreement.

**Section 14.12 Successors and Assigns.** Whenever in the Trust Agreement the Commonwealth is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Trust Agreement contained by or on behalf of the Commonwealth shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

**Section 14.13 Conflicts**. All resolutions or other proceedings of the Commonwealth or parts thereof in conflict herewith are repealed insofar as such conflict exists.

**[Remainder of page intentionally left blank; signature page follows]**

**IN WITNESS WHEREOF**, the Commonwealth has caused these presents to be signed in its name and on its behalf and attested by its duly authorized officer, and, to evidence its acceptance of the trusts hereby created, the Trustee has caused these presents to be signed in its name and on its behalf by its duly authorized officer, all as of the day and year first above written.

**COMMONWEALTH OF PUERTO RICO**

By: _____
                    Authorized Officer

**THE BANK OF NEW YORK MELLON**,
  as Trustee

By: _____
                    Authorized Officer

[Signature page to Trust Agreement]

## Attachment 1

### 5.5% SUT BASELINE

| Fiscal Year ending June 30, | Amount |
|---|---|
| 2022 | $1,282,901,069.30 |
| 2023 | 1,279,617,661.88 |
| 2024 | 1,301,220,703.34 |
| 2025 | 1,315,295,083.41 |
| 2026 | 1,345,037,783.09 |
| 2027 | 1,377,398,882.61 |
| 2028 | 1,403,141,426.98 |
| 2029 | 1,414,785,980.78 |
| 2030 | 1,427,393,695.32 |
| 2031 | 1,437,998,166.98 |
| 2032 | 1,447,406,781.79 |
| 2033 | 1,428,210,572.57 |
| 2034 | 1,426,102,595.91 |
| 2035 | 1,429,798,842.15 |
| 2036 | 1,438,540,327.00 |
| 2037 | 1,452,657.050.02 |
| 2038 | 1,477,755,111.63 |
| 2039 | 1,495,355,971.13 |
| 2040 | 1,518,089,898.19 |
| 2041 | 1,541,405,892.18 |
| 2042 | 1,565,457,864.38 |
| 2043 | 1,590,148,747.39 |
| 2044 | 1,616,252,365.93 |
| 2045 | 1,642,150,220.79 |
| 2046 | 1,668,748,988.64 |
| 2047 | 1,696,060,240.60 |
| 2048 | 1,724,082,302.73 |
| 2049 | 1,752,859,808.94 |
| 2050§ | 1,781,536,796.27 |
| 2051§ | 1,810,682,942.40 |

_____
§   May 2020 Fiscal Plan contains projections through FY2049.   FY2050  and FY2051  baseline calculated using FY 2049 projections and the average growth rate from FY2045-FY2049.

4820-1003-9275.22

**Attachment 2**

**PRIFA RUM TAX CVI OUTPERFORMANCE METRIC**

| Fiscal Year ending June 30, | Amount |
|---|---|
| 2022 | $208,569,215.76 |
| 2023 | 200,354,469.05 |
| 2024 | 201,031,406.80 |
| 2025 | 201,692,902.40 |
| 2026 | 202,348,675.07 |
| 2027 | 202,998,555.87 |
| 2028 | 203,632,157.16 |
| 2029 | 204,259,404.03 |
| 2030 | 204,869,786.20 |
| 2031 | 205,473,363.12 |
| 2032 | 206,059,507.07 |
| 2033 | 206,627,882.49 |
| 2034 | 207,188,744.83 |
| 2035 | 207,731,302.94 |
| 2036 | 208,265,935.46 |
| 2037 | 208,781,748.91 |
| 2038 | 209,289,240.57 |
| 2039 | 209,788,269.00 |
| 2040 | 210,278,694.61 |
| 2041 | 210,749,432.35 |
| 2042 | 211,211,199.81 |
| 2043 | 211,674,906.69 |
| 2044 | 212,129,474.13 |
| 2045 | 212,574,772.82 |
| 2046 | 213,021,852.71 |
| 2047 | 213,459,499.22 |
| 2048 | 213,898,852.55 |
| 2049 | 214,339,919.35 |
| 2050 | 214,782,706.32 |
| 2051 | 215,227,220.15 |

4820-1003-9275.22

**Attachment 3**

**GO CVI Allocation Summary**

| Claim | GO CVI Allocation  % |
|-------|----------------------|
| Vintage CW Bond Claim | 32.244 |
| 2011 CW Series D/E/PIB Bond Claim | 3.514 |
| 2011 CW Bond Claim | 2.479 |
| 2012 CW Bond Claim[1] | 15.157 |
| 2014 CW Bond Claim[2] | 20.266 |
| Vintage CW Guarantee Claim | 15.194 |
| 2011 CW Guarantee Bond Claim | 7.552 |
| 2012 CW Guarantee Bond Claim | 3.594 |

---

[1]   2012 CW Bond Claim amount includes $198 million of the Hacienda loans and $25 million of the GSA  Helicopter loan.

[2]   2014 CW Bond Claim amount includes $84 million of the PRIFA BANs and $263 million of the Ports Bonds.

Attachment 3-1

4820-1003-9275.22

**Attachment 4**

**Clawback CVI Allocation Summary**

| Claim | Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims[1] | 68.6 |
| payable in the following order of priority: | |
| First, HTA 68 Bond Claims up to $179,462,539; | |
| Second, HTA 98 Senior Bond Claims up to $1,833,405,578; | |
| Third, HTA 98 Sub Bond Claims up to $207,294,178; and | |
| Fourth, GDB HTA Loans up to $1,477,506,700. | |
| Allowed CW/Convention Center Claims | 4.0 |
| Allowed CW/PRIFA Rum Tax Claims | 27.0 |
| Allowed CW/MBA Claims, consisting of | 0.4 |
| Clawback CVIs for Allowed CW/MBA Claims | [0.33] |
| Deemed Paid CVIs Payments relating to CW/MBA Claims | [0.07] |

---

[1] Capitalized terms have the meanings ascribed to them in the HTA/CCDA Related Plan Support Agreement; the waterfall is implemented to the maximum extent allowable against the Commonwealth and subject to judicial determination.

Attachment 4-1

**Attachment 5**

**FORM OF GO CVI**
**(includes variations for different GO CVI Subseries)**

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, 2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE NOTES THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE NOTIONAL AMOUNT OUTSTANDING UNDER THIS NOTE MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS NOTE MAY NOT RELY UPON THE NOTIONAL AMOUNT INDICATED HEREON AS THE NOTIONAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE NOTIONAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS NOTE SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

No. R-____                                                    $[3,500,000,000][1]

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION NOTE REPRESENTING
PROPORTIONATE INTERESTS OF THE HOLDER HEREOF IN AND TO
CERTAIN CONTINGENT VALUE PAYMENT AMOUNTS,
SUBJECT TO THE OCCURRENCE OF CERTAIN CONDITIONS

---

[1]   Insert Lifetime Cap applicable to the Subseries of the applicable GO CVIs.

4820-1003-9275.22

| Subseries[2] | GO CVI Allocation Percentage | Deemed Issuance Date | CUSIP No. |
|---|---|---|---|
| Vintage CW Note Claims | 32.244% | July 1, 2021 | |
| 2011 CW Series D/E/PIB Note Claim | 3.514 | July 1, 2021 | |
| 2011 CW Note Claim | 2.479 | July 1, 2021 | |
| 2012 CW Note Claim | 15.157 | July 1, 2021 | |
| 2014 CW Note Claim | 20.266 | July 1, 2021 | |
| Vintage CW Guarantee Claim | 15.194 | July 1, 2021 | |
| 2011 CW Guarantee Note Claim | 7.552 | July 1, 2021 | |
| 2012 CW Guarantee Note Claim | 3.594 | July 1, 2021 | |

Registered Owner:      Cede & Co.

Initial Notional Amount and GO CVI Lifetime Cap Allocable to Subseries:  [Three Billion Five Hundred][1] Million  Dollars

1.      All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Trust Agreement, dated as of March 15, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), between the Commonwealth and The Bank of New York Mellon, as Trustee and Paying Agent.  Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth of Puerto Rico (the "Commonwealth") and the Holders, as applicable.  The Trust Agreement may be amended to the extent and in the manner provided therein.

2.      The Commonwealth is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the CVIs Annual Payment Dates (as defined below), or earlier upon redemption as hereinafter referred to, up to the GO CVI Lifetime Cap specified above.

3.      The Notional Amount of this Note is payable to the Registered Owner named above as of the fifteenth day before the date of payment thereof, whether or not such fifteenth day is a Business Day (the "Record Date"), subject to (a) the occurrence from time to time prior to the GO CVIs Final Maturity Date of an SUT Outperformance Condition,  (b) the annual limitations hereinafter referred to, and (c) the GO CVI Lifetime Cap, upon, unless the Holder of this Note is DTC, presentation and surrender hereof at the designated corporate trust office of the Trustee and Paying Agent (the "Corporate Trust Office").  This Note is subject to redemption from amounts available therefor each year following  the occurrence of an SUT Outperformance Condition  on [November 1] of the Fiscal Year following  the Fiscal Year in which the SUT Outperformance Condition  occurred (the "CVIs Annual Payment Date").  The Notional Amount of this Note is payable in such coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

4.      The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notional Amount of this Note, subject to the limitations set

---

[2]      Note: the Holders of each Subseries shall receive a Note identifying only their respective Subseries and related GO CVI Allocation percentage and GO CVI Lifetime Cap.

Attachment 5-2

forth in the Trust Agreement, including the limitations set forth in paragraph 3 hereof. The Notes constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.

5.    This Note is one of a duly authorized issue of Notes of the Commonwealth issued in the Initial Notional Amount of $[3,500,000,000][6], known as "Commonwealth of Puerto Rico GO CVIs - _____ Subseries", issued under the authority of and in full compliance with the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "Plan"), and the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA (the "Confirmation Order"), and the CVI Legislation.

6.    In accordance with the Plan and the Confirmation Order, the Commonwealth has executed and delivered two Series of notes collectively referred to as "GO CVIs" and "Clawback CVIs". This Note is a GO CVI. The GO CVIs and the Clawback CVIs are, subject to the occurrence of an SUT Outperformance Condition and certain limitations referred to herein, payable as a general obligation of the Commonwealth in amounts calculated generally by how much the actual collection of a tax rate of five and one-half percent (the "5.5% SUT") is in excess of the baseline projections set forth in Attachment 1 to the Trust Agreement (the "5.5% SUT Baseline"), which Attachment 1 may be revised from time to time under the circumstances more fully described in the Trust Agreement. The amount of excess that is available to be paid to the Holders of the GO CVIs and the Clawback CVIs is determined in accordance with different formula described in the Trust Agreement.

7.    The Commonwealth will determine if an SUT Outperformance Condition has occurred on each CVIs Outperformance Condition Determination Date, which is [September 1] of each Fiscal Year, beginning [September 1], 2022. An SUT Outperformance Condition in any Fiscal Year will occur if the actual collection of the 5.5% SUT in that Fiscal Year is in excess of the 5.5% SUT Baseline for that Fiscal Year set forth in the Trust Agreement. Once the amount of the excess is determined and calculated by an Independent Consultant, such excess amount is then distributed to the Holders of the GO CVIs and the Clawback CVIs in the amounts and priorities set forth in the Trust Agreement.

8.    These Notes are subject to mandatory redemption on each CVIs Annual Payment Date, subject to the limitations described in the Trust Agreement, in amounts equal to the GO CVI Allocation Percentage referred to above of the amounts available to pay to the Holders of all GO CVIs on such CVIs Annual Payment Date, but in no event in an amount that in the aggregate exceeds the GO CVI Lifetime Cap prior to the GO CVIs Final Maturity Date.

9.    The GO CVIs Final Maturity Date will occur on the earlier of (a) the date when the Holders of the GO CVIs have been paid in an amount equal to the GO CVI Lifetime Cap, and (b) (1) [September 15], 2043, in the event an SUT Outperformance Condition did not occur in the Fiscal Year ending on June 30, 2043, and (2) [November 1], 2043, in the event an SUT Outperformance Condition did occur in the Fiscal Year ending on June 30, 2043, whether or not the Holders of all GO CVIs have been paid in the aggregate an amount equal to the GO CVI Lifetime Cap, and no further payments shall thereafter be payable to the Holders of the Notes.

Attachment 5-3

10.    The GO CVIs are also subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. Treasury Rate means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVIs.

11.    Whenever Notes or portions thereof are to be redeemed in accordance with paragraph 10 hereof, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth to the Holders of the Notes to be redeemed. If the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption shall be included in the notice. Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date. Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books. The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

12.    The Trustee shall, if any of the Notes or portions thereof to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository). Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.

13.    Notice having been given in the manner provided above, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price. If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series and Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date, if all conditions to redemption shall be satisfied and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes shall no longer be considered to be Outstanding hereunder.

14.    If less than all of the Notes shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Trust Agreement.

15.    The Notes are issuable as registered Notes in authorized denominations of one dollar ($1.00) and whole multiples thereof. At the Corporate Trust Office of the Trustee, in the manner and subject to the limitations and conditions provided in the Trust Agreement and without cost except for any tax or other governmental charge, Notes may be exchanged for an equal aggregate principal amount of Notes of authorized denominations.

16.     Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the Corporate Trust Office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series and Subseries and tenor as the surrendered Note.

17.     The Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under the Notes; *provided*, *however*, that the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

18.     This Note shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Trust Agreement until this Note shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

19.     It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this Note have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth, and the total indebtedness of the Commonwealth, including this Note, does not exceed any debt or other limitation prescribed by law.

*[Remainder of this page intentionally left blank]*

4820-1003-9275.22

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico has caused this Note to be executed with the facsimile signature of the Secretary of the Treasury of Puerto Rico and a facsimile of the official seal of the Commonwealth of Puerto Rico to be imprinted hereon and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the Deemed Issuance Date specified above.

[Facsimile signature]
Secretary of the Treasury of Puerto Rico

(SEAL)

Attest:

[Facsimile signature]
Secretary of State of Puerto Rico

4820-1003-9275.22

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes issued under the provisions of the Trust Agreement mentioned herein.

**THE BANK OF NEW YORK MELLON**,
as Trustee

By: _____
Authorized Officer

Date of authentication: March 15, 2022

Attachment 5-7

## FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto _____

_____

[please print or type name and address of Transferee]

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to register the transfer of the within Note on the books kept for registration thereof, with full power of substitution in the premises.

Signature: _____

Dated: _____     Guaranteed by: _____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Note in every particular, without alteration or enlargement or any change whatever and must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Trustee which requirements will include membership or participation in the Securities Transfer Agents Medallion Program or such other "signature guarantee program" as may be determined by the Trustee in addition to, or in substitution for the Securities Transfer Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as amended.

4820-1003-9275.22

## Attachment 6

### FORM OF CLAWBACK CVI
**(includes variations for different Clawback CVI Subseries and Sub-Subseries)**

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, 2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE NOTES THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE NOTIONAL AMOUNT OUTSTANDING UNDER THIS NOTE MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS NOTE MAY NOT RELY UPON THE NOTIONAL AMOUNT INDICATED HEREON AS THE NOTIONAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE NOTIONAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS NOTE SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

No. R-___                                                                    $[_____][1]

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION NOTE REPRESENTING
PROPORTIONATE INTERESTS OF THE HOLDER HEREOF IN AND TO
CERTAIN CONTINGENT VALUE PAYMENT AMOUNTS,
SUBJECT TO THE OCCURRENCE OF CERTAIN CONDITIONS

---

[1]      To reflect Notional Amount for each Subseries and Sub-Subseries of the Clawback CVIs.

4820-1003-9275.22

| Subseries[2] | Clawback CVI Allocation Percentage | Deemed Issuance Date | CUSIP No. |
|---|---|---|---|
| Allowed CW/HTA Claims[3] | 68.60% | --- | --- |
| payable in the following order of priority: | | --- | --- |
| First, HTA 68 Bond Claims up to $179,462,539; | | July 1, 2021 | |
| Second, HTA 98 Senior Bond Claims up to $1,833,405,578; | | July 1, 2021 | |
| Third, HTA 98 Sub Bond Claims up to $207,294,178; and | | July 1, 2021 | |
| Fourth, GDB HTA Loans up to $1,477,506,700 | | July 1, 2021 | |
| Allowed CW/Convention Center Claims | 4.00 | July 1, 2021 | |
| Allowed CW/PRIFA Rum Tax Claims | 27.00 | July 1, 2021 | |
| Allowed CW/MBA Claims | [0.33][4] | July 1, 2021 | |

Registered Owner: Cede & Co.

Initial Notional Amount and Clawback CVI Lifetime Cap Allocable to Subseries/Sub-Subseries[1]:
_____ Dollars

1.    All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Trust Agreement, dated as of March 15, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), between the Commonwealth and The Bank of New York Mellon, as Trustee and Paying Agent.   Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth of Puerto Rico (the "Commonwealth") and the Holders, as applicable.   The Trust Agreement may be amended to the extent and in the manner provided therein.

2.    The Commonwealth is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the CVIs Annual Payment Dates (as defined below), or earlier upon redemption as hereinafter referred to, up to the Clawback CVI Lifetime Cap specified above.

3.    The Notional Amount of this Note is payable to the Registered Owner named above as of the fifteenth day before the date of payment thereof, whether or not such fifteenth day is a Business Day (the "Record Date"), subject to (a) the occurrence from time to time prior to the Clawback CVIs Final Maturity Date of an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][12], (b) the annual limitations hereinafter referred to, and (c) the Clawback CVI Lifetime Cap applicable to this Note, upon, unless the Holder of this Note is DTC, presentation and surrender hereof at the designated corporate trust office of the Trustee and Paying Agent (the "Corporate Trust Office"). This Note is subject to redemption from amounts available therefor each year following the occurrence of an SUT Outperformance Condition or a Rum Tax Outperformance Condition on [November 1] of the Fiscal Year following the Fiscal Year in which the SUT Outperformance Condition [or a Rum Tax Outperformance Condition][12] occurred (the

---

[2]    Note: the Holders of each Subseries and Sub-Subseries shall receive a Note identifying only their respective Subseries/Sub-Subseries and related Clawback CVI Allocation percentage and priority and Clawback CVI Lifetime Cap.

[3]    Clawback CVIs issued to the holders of the Allowed CW/HTA Claims will be issued in Sub-Subseries to the Holders of the HTA 68 Bond Claims, HTA 98 Senior Bond Claims, HTA 98 Sub Bond Claims and GDB HTA Loans to recognize their respective priorities of payment for the notional amounts listed above.

[4]    [0.7]% allocable to Deemed Paid CVIs Payments due to $4 million settlement with Oriental Bank.

4820-1003-9275.22

"CVIs Annual Payment Date"). The Notional Amount of this Note is payable in such coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

4.     The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notional Amount of this Note, subject to the limitations set forth in the Trust Agreement, including the limitations set forth in paragraph 3 hereof. The Notes constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.

5.     This Note is one of a duly authorized issue of Notes of the Commonwealth issued in the Initial Notional Amount of $[_____][8], known as "Commonwealth of Puerto Rico Clawback CVIs – [_____ Subseries or Sub-Subseries]", issued under the authority of and in full compliance with the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "Plan"), and the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA (the "Confirmation Order").

6.     In accordance with the Plan and the Confirmation Order, the Commonwealth has executed and delivered two Series of notes collectively referred to as "GO CVIs" and "Clawback CVIs". This Note is a Clawback CVI. The GO CVIs and the Clawback CVIs are, subject to the occurrence of an SUT Outperformance Condition and certain limitations referred to herein, payable as a general obligation of the Commonwealth in amounts calculated generally by how much the actual collection of a tax rate of five and one-half percent (the "5.5% SUT") is in excess of the baseline projections set forth in Attachment 1 to the Trust Agreement (the "5.5% SUT Baseline"), which Attachment 1 may be revised from time to time under the circumstances more fully described in the Trust Agreement. The amount of excess that is available to be paid to the Holders of the GO CVIs and the Clawback CVIs is determined in accordance with different formula described in the Trust Agreement. [If this Note is a PRIFA Rum Tax Clawback CVI, this Note is additionally payable from the Rum Tax CVI Annual Payment Amount.][12]

7.     The Commonwealth will determine if an SUT Outperformance Condition [and/or a Rum Tax Outperformance Condition][12] has occurred on each CVIs Outperformance Condition Determination Date, which is [September 1] of each Fiscal Year, beginning [September 1], 2022. An SUT Outperformance Condition in any Fiscal Year will occur if the actual collection of the 5.5% SUT in that Fiscal Year is in excess of the 5.5% SUT Baseline for that Fiscal Year set forth in the Trust Agreement. [A Rum Tax Outperformance Condition in any Fiscal Year will occur if the Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric for that Fiscal Year set forth in the Trust Agreement][12]. Once the amount of the excess is determined and calculated by an Independent Consultant, such excess amount is then distributed to the Holders of the GO CVIs and the Clawback CVIs in the amounts and priorities set forth in the Trust Agreement.

8.     These Notes are subject to mandatory redemption on each CVIs Annual Payment Date in an amount equal to the Clawback CVI Allocation Percentage referred to above of the amounts available to pay to the Holders of all Clawback CVIs on such CVIs Annual Payment Date, but in no event in an amount that in the aggregate exceeds the Clawback CVI Lifetime Cap prior to the Clawback CVIs Final Maturity Date.

Attachment 6-3

9.      [This Note is an Allowed CW/HTA Claims Subseries, so amounts distributed on the CVIs Annual Payment Date from the Clawback CVI Allocation Percentage allocated to the Allowed CW/HTA Claims Subseries shall be distributed in the following order of priority: first to the Holders of the Sub-Subseries relating to HTA 68 Bond Claims until such Holders receive $179,462,539; second to the Holders of the Sub-Subseries relating to HTA 98 Senior Bond Claims until such Holders receive $1,833,405,578; third to the Holders of the Sub-Subseries relating to HTA 98 Sub Bond Claims until such Holders receive $207,294,178; and fourth to the Holders of the Sub-Subseries relating to GDB HTA Loans until such Holders receive $1,477,506,700. No payment shall be made on account of any Sub-Subseries of HTA Clawback CVI in any Fiscal Year until all Sub-Subseries of a higher priority than such Sub-Subseries have been paid in full.][5]

10.     [This Note is a PRIFA Rum Tax Clawback CVI and is additionally payable from PRIFA Rum Tax CVI Annual Payment Amounts.][12]

11.     The Clawback CVIs Final Maturity Date will occur on the earlier of (a) the date when the Holders of the Clawback CVIs have been paid in an amount equal to the Clawback CVI Lifetime Cap, and (b) (1) [September 15], 2051, in the event an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][12] did not occur in the Fiscal Year ending on June 30, 2051, and (2) [November 1], 2051, in the event an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][12] did occur in the Fiscal Year ending on June 30, 2051, whether or not the Holders of all Clawback CVIs have been paid in the aggregate an amount equal to the Clawback CVI Lifetime Cap, and no further payments shall thereafter be payable to the Holders of the Notes.

12.     The Clawback CVIs are subject to redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. Treasury Rate means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVIs.

13.     Whenever Notes are to be redeemed in accordance with paragraph [12] hereof, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth to the Holders of the Notes to be redeemed. If the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption shall be included in the notice. Such notice shall be given by mailing a copy of such notice not less than twenty (20) days nor more than sixty (60) days prior to the redemption date. Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books. The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

14.     The Trustee shall, if any of the Notes to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than twenty (20) days nor more than sixty (60) days prior to the redemption at the most recent

---

[5]     To be included in Clawback CVIs relating to Allowed CW/HTA Claims.

address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository). Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.

15.    Notice having been given in the manner provided above, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price. If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series, Subseries and Sub-Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date, if all conditions to redemption shall be satisfied and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes shall no longer be considered to be Outstanding hereunder.

16.    If less than all of the Notes shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Trust Agreement.

17.    The Notes are issuable as registered Notes in authorized denominations of one dollar ($1.00) and whole multiples thereof. At the Corporate Trust Office of the Trustee, in the manner and subject to the limitations and conditions provided in the Trust Agreement and without cost except for any tax or other governmental charge, Notes may be exchanged for an equal aggregate principal amount of Notes of authorized denominations.

18.    Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the Corporate Trust Office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer. Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series, Subseries and Sub-Subseries and tenor as the surrendered Note.

19.    The Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under the Notes; *provided*, *however*, that the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

20.    This Note shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Trust Agreement until this Note shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

Attachment 6-5

21.     It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this Note have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth, and the total indebtedness of the Commonwealth, including this Note, does not exceed any debt or other limitation prescribed by law.

*[Remainder of this page intentionally left blank]*

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico has caused this Note to be executed with the facsimile signature of the Secretary of the Treasury of Puerto Rico and a facsimile of the official seal of the Commonwealth of Puerto Rico to be imprinted hereon and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the Deemed Issuance Date specified above.


[Facsimile signature]
_____
Secretary of the Treasury of Puerto Rico

(SEAL)


Attest:


[Facsimile signature]
_____
Secretary of State of Puerto Rico


Attachment 6-7

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes issued under the provisions of the Trust Agreement mentioned herein.

**THE BANK OF NEW YORK MELLON**,
as Trustee

By: _____
Authorized Officer

Date of authentication:   March 15, 2022

Attachment 6-8

## FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto \_\_\_\_\_

_____

[please print or type name and address of Transferee]

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to register the transfer of the within Note on the books kept for registration thereof, with full power of substitution in the premises.

Signature: _____

Dated: _____        Guaranteed by: _____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Note in every particular, without alteration or enlargement or any change whatever and must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Trustee which requirements will include membership or participation in the Securities Transfer Agents Medallion Program or such other "signature guarantee program" as may be determined by the Trustee in addition to, or in substitution for the Securities Transfer Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as amended.

**Attachment 7**

Commonwealth of Puerto Rico

Calculations relating to GO CVIs and Clawback CVIs Payments

(calculations attached)

For Fiscal Year Ending: June 30, 20__

CVIs Outperformance Condition Determination Date: September 1, 20__

        SUT Outperformance Condition has/has not occurred.

        Rum Tax Outperformance Condition has/has not occurred.

CVIs Annual Payment Amount Calculation Date: September 15, 20__

CVIs Annual Payment Date: [November] 1, 20__

4820-1003-9275.22

<u>Calculations  Relating  to GO CVIs Upon Occurrence of SUT Outperformance Condition</u>

(calculations  attached)

Subject to Waterfall Outperformance Amount:                             $_____

   Less Deemed Paid CVIs Payments Allocable  to GO CVIs:          $_____

Amount to be Transferred to Trustee:                                        $_____

     Payment to Holders of GO CVIs: $_____ (deposit to GO CVIs Subaccount of the
Subject to Waterfall CVIs Payment Account)

     Payment to Holders of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs:
$_____ (deposit to Clawback CVIs Subaccount of the Subject to Waterfall
CVIs Payment  Account)

     Payment to Holders of PRIFA Rum Tax Clawback CVIs: $_____ (deposit to
PRIFA Rum Tax Clawback CVIs Payment Account)

Remaining  GO CVI Lifetime Cap as of June 30, 20__: $_____

Remaining  GO CVI Lifetime Cap after CVIs Annual Payment Date: $_____

Application  of Subject to Waterfall Outperformance Amount to GO CVIs (from GO CVIs
Subaccount): $_____

     Amount per $1 Authorized  Denomination  of GO CVI: $0._____

| <u>Claim</u> | <u>GO CVI %</u> | Current Unit <u>Distribution</u> | Prior Unit <u>Distribution</u> | Total <u>Distribution</u> |
|---|---|---|---|---|
| Vintage CW Bond | 32.244 | | | |
| 2011 CW Series D/E/PIB Bond | 3.514 | | | |
| 2011 CW Bond | 2.479 | | | |
| 2012 CW Bond | 15.157 | | | |
| 2014 CW Bond | 20.266 | | | |
| Vintage CW Guarantee | 15.194 | | | |
| 2011 CW Guarantee Bond | 7.552 | | | |
| 2012 CW Guarantee Bond | 3.594 | | | |

Attachment 7-2

Calculations  Relating to Clawback CVIs Upon Occurrence of
SUT Outperformance Condition  and/or Rum Tax Outperformance Condition

(calculations  attached)

Not Subject to Waterfall Outperformance Amount:                                    $_____

   Less Deemed Paid CVIs Payments Allocable to GO CVIs[1]:                    $_____

   Amount  to be Transferred to Trustee:                                             $_____

     Payment to Holders  of Clawback CVIs other than  PRIFA Rum Tax Clawback CVIs:
       $_____ (deposit to Not Subject to Waterfall CVIs Payment Account)

     Payment to Holders of PRIFA Rum Tax Clawback CVIs: $_____ (deposit to PRIFA
       Rum Tax Clawback CVIs Payment Account)

Amount Payable to Holders of Clawback CVIs other than Holders of PRIFA Rum Tax Clawback
CVIs:

     From  Clawback CVIs Subaccount of the  Subject to Waterfall Payment Amount:
     $_____

     From Not Subject to Waterfall Payment Amount:  $_____

       Total:  $_____

     Amount per $1 Authorized Denomination:  $0._____

Amount Payable to Holders of PRIFA Rum Tax Clawback CVIs:

     From  Clawback CVIs Subaccount of the  Subject to Waterfall Payment Amount:
     $_____

     From Not Subject to Waterfall Payment Amount:  $_____

     From Rum Tax CVI Annual Payment Amount:  $_____

       Total:  $_____

     Amount per $1 Authorized  Denomination:  $0._____

Remaining  Clawback CVI Lifetime Cap as of June 30, 20__:  $_____

Remaining  Clawback CVI Lifetime Cap after CVIs Annual Payment Date: $_____

---

[1]     Currently consists of $4 million settlement of Allowed CW/MBA Claim  prior to Effective Date.

4820-1003-9275.22

| Claim | Remaining Lifetime Cap Before Distribution | Current Distribution | Remaining Lifetime Cap After Distribution |
|---|---|---|---|
| Allowed CW/HTA | | | |
| HTA 68 Bond (first priority) | | | |
| HTA 98 Senior Bond (second priority) | | | |
| HTA 98 Sub Bond (third priority) | | | |
| GDB HTA Loans (fourth priority) | | | |
| CW/Convention Center | | | |
| CW/PRIFA Rum Tax Claims | | | |
| CW/MBA | | | |

| Claim | Current Unit Distribution | Prior Unit Distribution | Total Distribution |
|---|---|---|---|
| Allowed CW/HTA | | | |
| HTA 68 Bond (first priority) | | | |
| HTA 98 Senior Bond (second priority) | | | |
| HTA 98 Sub Bond (third priority) | | | |
| GDB HTA Loans (fourth priority) | | | |
| CW/Convention Center | | | |
| CW/PRIFA Rum Tax Claims | | | |
| CW/MBA | | | |

Attachment 7-4

4820-1003-9275.22

**Attachment 8**

**Illustrative scenarios of the calculation of the
Subject to Waterfall Outperformance Amount**

4820-1003-9275.22

**Attachment 9**

**Illustrative scenarios of the calculation of the
Not Subject to Waterfall  Outperformance Amount**

Attachment 9-1

**Attachment 10**

**Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount**

4820-1003-9275.22

**Attachment 11**

**Form of Reporting Agreement**

Attachment 11-1

**Attachment 12**

**Form of Initial Calculation Agent Agreement**

4820-1003-9275.22

**Redline of Exhibit B**

Draft: 11/21/2021 02/03/2022

**TRUST AGREEMENT**

**(relating to CVIs)**

**by and between**

**COMMONWEALTH OF PUERTO RICO**

**and**

**THE BANK OF NEW YORK MELLON, as Trustee**

**Dated as of xx, 2021 March 15, 2022**

4820-1003-9275.18 9275.22

# TABLE OF CONTENTS

Page

ARTICLE I.

DEFINITIONS AND INTERPRETATION ................................................................ 3

    Section 1.01    Definitions ....................................................................... 34
    Section 1.02    Rules of Construction ....................................................... 2122

ARTICLE II.

AUTHORIZATION AND ISSUANCE OF NOTES ...................................................... 21

    Section 2.01    Authorization of Notes ...................................................... 2123
    Section 2.02    Provisions for Issuance of Notes ......................................... 2325

ARTICLE III.

GENERAL TERMS AND PROVISIONS OF NOTES ................................................. 23

    Section 3.01    Place and Medium of Payment ........................................... 2325
    Section 3.02    Legends ........................................................................... 2426
    Section 3.03    CUSIP Numbers ............................................................... 2426
    Section 3.04    Execution and Authentication ............................................ 2426
    Section 3.05    Interchangeability of Notes ............................................... 2527
    Section 3.06    Transfer and Registry ....................................................... 2527
    Section 3.07    Transfer of Notes ............................................................. 2527
    Section 3.08    Regulations with Respect to Exchanges and Transfers ......... 2628
    Section 3.09    Notes Mutilated, Destroyed, Lost or Stolen ....................... 2628
    Section 3.10    Book Entry Notes ............................................................. 2728
    Section 3.11    Preparation of Definitive Notes; Temporary Notes .............. 2830

ARTICLE IV.

REDEMPTION OF NOTES .................................................................................. 28

    Section 4.01    Authorization of Redemption ............................................ 2830
    Section 4.02    Extraordinary Redemption of GO CVIs at Election of
               Commonwealth ............................................................... 2930
    Section 4.03    Extraordinary Redemption of Clawback CVIs at Election of
               Commonwealth ............................................................... 2931
    Section 4.04    Extraordinary Redemption at the Election of the Commonwealth 2931
    Section 4.05    Selection of Notes to be Redeemed .................................... 2931
    Section 4.06    Notice of Redemption ...................................................... 3031
    Section 4.07    Payment of Redeemed Notes ............................................ 3132

ARTICLE V.

LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS;
PLEDGED DEPOSITS AND APPLICATION THEREOF ............................................ 32

    Section 5.01    Lien on Trust Estate ......................................................... 3233
    Section 5.02    Establishment of Funds and Accounts ................................ 3233

**Page**

Section 5.03    Determination of Occurrence of an SUT Outperformance
                Condition and Rum Tax Outperformance Condition    3335
Section 5.04    Subject to Waterfall Outperformance Amount and Annual
                Waterfall Payment 35.    37
Section 5.05    Not Subject to Waterfall Outperformance Amount    3839
Section 5.06    Rum Tax CVI Annual Payment Amount    3941
Section 5.07    HTA Clawback CVI Priority Distribution Waterfall    4042
Section 5.08    CVIs Payment Fund    4142
Section 5.09    Trustee and Independent Consultant Expenses Fund    4344

ARTICLE VI.

INVESTMENT OF FUNDS    43

Section 6.01    Investment of Funds    4344
Section 6.02    Liability for Investments    4446

ARTICLE VII.

PARTICULAR COVENANTS    45

Section 7.01    Payment of Notes    4546
Section 7.02    Pledge of Good Faith, Credit and Taxing Power of
                Commonwealth    4546
Section 7.03    Powers as to Notes    4546
Section 7.04    Further Assurance    4547
Section 7.05    Offices for Payment and Registration of Notes    4547
Section 7.06    General    4647
Section 7.07    Non-Impairment Covenant    4647
Section 7.08    Baseline SUT Reduction and SUT True-Up    4648
Section 7.09    Substitute Measured Tax    4748
Section 7.10    Tax Covenant    4849
Section 7.11    Comprehensive Cap on Net Tax Supported Indebtedness    49
Section 7.12    Rum Tax Reporting    4850
Section 7.13    Fiscal Plan.  The48Creation of Liens. The Commonwealth shall not create or cause to be
Section 7.14    Fiscal Plan    50
Section 7.15    Reporting Requirements    50
Section 7.16    Cap on Notional Amount    50
Section 7.17    Subsequent Bankruptcy Case    50

ARTICLE VIII.

CONCERNING THE TRUSTEE AND THE PAYING AGENT    48

Section 8.01    Appointment and Acceptance of Trustee    4851
Section 8.02    Appointment and Acceptance of Paying Agents    4851
Section 8.03    Responsibilities of Trustee and Paying Agents    4951
Section 8.04    Property Held in Trust    4951
Section 8.05    Rights of the Trustee and the Paying Agent    4952

# TABLE OF CONTENTS
## (continued)

|  |  | Page |
|---|---|---|
| Section 8.06 | Compensation and Indemnification | ~~51~~53 |
| Section 8.07 | Permitted Acts | ~~51~~54 |
| Section 8.08 | Resignation of Trustee | ~~52~~54 |
| Section 8.09 | Removal of Trustee | ~~52~~54 |
| Section 8.10 | Successor Trustee and/or Paying Agent | ~~52~~55 |
| Section 8.11 | Transfer of Rights and Property to Successor Trustee | ~~53~~55 |
| Section 8.12 | Merger or Consolidation of the Trustee | ~~53~~56 |
| Section 8.13 | Ancillary Agreements | ~~54~~56 |

ARTICLE IX.

AMENDMENTS TO TRUST AGREEMENT ......... ~~54~~

| Section 9.01 | Modification and Amendment without Consent | ~~54~~56 |
| Section 9.02 | Supplemental Trust Agreements Effective with Consent of Holders | ~~55~~57 |
| Section 9.03 | General Provisions Relating to Supplemental Trust Agreements | ~~55~~57 |

ARTICLE X.

AMENDMENTS OF TRUST AGREEMENT WITH CONSENT OF HOLDERS ......... ~~55~~

| Section 10.01 | Powers of Amendment | ~~55~~58 |
| Section 10.02 | Consent of Holders | ~~56~~58 |
| Section 10.03 | Modifications by Unanimous Consent | ~~57~~59 |
| Section 10.04 | Mailing | ~~57~~59 |
| Section 10.05 | Exclusion of Notes | ~~57~~59 |
| Section 10.06 | Notation on Notes | ~~57~~60 |

ARTICLE XI.

DEFAULTS AND REMEDIES ......... ~~57~~

| Section 11.01 | Events of Default | ~~57~~60 |
| Section 11.02 | No Acceleration with Respect to the Notes | ~~58~~61 |
| Section 11.03 | Enforcement of Remedies | ~~58~~61 |
| Section 11.04 | Priority of Payments after Default | ~~58~~61 |
| Section 11.05 | Termination of Proceedings | ~~59~~62 |
| Section 11.06 | Holders' Direction of Proceedings | ~~60~~62 |
| Section 11.07 | Control by Holders of Notes; Limitations | ~~60~~63 |
| Section 11.08 | Actions by Trustee; Possession of Notes by Trustee Not Required | ~~61~~63 |
| Section 11.09 | Waiver and Non–Waiver of Default | ~~61~~64 |
| Section 11.10 | Notice of Event of Default | ~~61~~64 |
| Section 11.11 | Remedies Not Exclusive | ~~61~~64 |

ARTICLE XII.

DEFEASANCE ......... ~~62~~

| Section 12.01 | Discharge and Defeasance | ~~62~~64 |

4820-1003-~~9275.18~~9275.22

**TABLE OF CONTENTS**

**(continued)**

Page

ARTICLE XIII.

EXECUTION OF INSTRUMENTS BY NOTE HOLDERS

AND PROOF OF OWNERSHIP OF NOTES ............................................................. ~~63~~

Section 13.01    Evidence of Signatures of Holders and Ownership of Notes .......... ~~63~~65

ARTICLE XIV.

MISCELLANEOUS ............................................................................................... ~~63~~

Section 14.01    Preservation and Inspection of Documents ..................... ~~63~~66
Section 14.02    Money and Funds Held for Particular Notes ..................... ~~64~~66
Section 14.03    Cancellation of Notes ............................................... ~~64~~66
Section 14.04    No Recourse under Trust Agreement or on the Notes .......... ~~64~~66
Section 14.05    Severability of Invalid Provision ................................ ~~64~~67
Section 14.06    Parties of Interest ..................................................... ~~64~~67
Section 14.07    Notices ................................................................... ~~64~~67
Section 14.08    Headings .................................................................. ~~65~~67
Section 14.09    Governing Laws ........................................................ ~~65~~67
Section 14.10    Retention of Jurisdiction of Title III Court .................. ~~65~~68
Section 14.11    Signatures and Counterparts ...................................... ~~65~~68
Section 14.12    Successors and Assigns ............................................. ~~66~~68
Section 14.13    Conflicts ................................................................. ~~66~~68

Attachment 1     5.5% SUT Baseline
Attachment 2         PRIFA Rum Tax CVI Outperformance Metric
Attachment 3         GO CVI Allocation Summary
Attachment 4         Clawback CVI Allocation Summary
Attachment 5         Form of GO CVI (includes variations for different GO CVI Subseries)
Attachment 6     Form of Clawback CVI (includes variations for different Clawback CVI Subseries
                 and Sub-Subseries)
Attachment 7     Calculations relating to GO CVIs and Clawback CVIs Payments
Attachment 8     Illustrative   scenarios   of   the   calculation   of   the   Subject   to   Waterfall
                 Outperformance Amount
Attachment 9     Illustrative   scenarios   of   the   calculation   of   the   Not   Subject   to   Waterfall
                 Outperformance Amount
Attachment 10    Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment
                 Amount
Attachment 11    ~~Continuing Disclosure~~Reporting Agreement
Attachment 12    Form of Initial Calculation Agent Agreement

EXHIBIT A - CONFIRMATION ORDER

4820-1003-~~9275.18~~9275.22

**TRUST AGREEMENT**

**THIS TRUST AGREEMENT,** dated as of ~~xx, 2021,~~ March 15, 2022, by and between the **COMMONWEALTH OF PUERTO RICO** (together with any successors thereto, the **"Commonwealth"**), and ~~————————~~ **THE BANK OF NEW YORK MELLON**, as trustee (the **"Trustee"**).

The Commonwealth recites and represents to the Trustee for the benefit of the Holders that it has authorized this Trust Agreement.

**R E C I T A L S**

[to be updated as proceedings progress]

On June 30, 2016, the United States of America enacted the Puerto Rico Oversight, Management and Economic Stability Act, Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq. ("**PROMESA**"); pursuant to section 4 of PROMESA, the provisions thereof prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent therewith.

On May 3, 2017, the Financial Oversight and Management Board for Puerto Rico (together with any successors thereto, the "**Oversight Board**"), established by the United States of America pursuant to section 101(b) of PROMESA, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA in the United States District Court for the District of Puerto Rico (the "**Title III Court**"), commencing a case under Title III of PROMESA (the "**Title III Case**").

Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Case, the Title III Court exercises exclusive jurisdiction over all property of the Commonwealth, wherever located.

By entry of the Confirmation Order (as defined below) attached hereto as Exhibit A, the Title III Court confirmed the Commonwealth's Plan (as defined below), the material components of which were ~~[~~the resolution of certain claims relating to the Commonwealth's general obligation bonds and certain other liabilities of the Commonwealth~~]~~ and the restructuring of all claims against the Commonwealth relating to pre-existing indebtedness of the Commonwealth through, among other things, the issuance of Notes (as defined below) pursuant to this Trust Agreement.

On October ~~——~~,26, 2021, in furtherance of the implementation of the Commonwealth Plan, the Commonwealth enacted the CVI Legislation (as defined below) which, among other things, authorized the issuance of the Notes and the irrevocable pledge of the good faith[1], credit and taxing power of the Commonwealth for the prompt payment of the Notes when due.

---

[1] "Good faith" ("*buena fe*") is the standard provision in the Commonwealth's Constitution. "Good faith" is the literal translation of the term "buena fe". See Article VI, Section 2 of the Commonwealth's Constitution.

Pursuant to PROMESA, and in accordance with the Confirmation Order, the Plan, and the CVI Legislation, the Title III Court made a binding determination that the Notes are legal, valid, binding and enforceable obligations of the Commonwealth benefiting from the following protections, each of which is legal, valid, binding and enforceable against the Commonwealth and other Persons and entities, as applicable, under Puerto Rico law and federal law: [to be updated consistent with final Plan]

    a.    The Confirmation Order is a judicial determination pursuant to Section 4 of PROMESA, and is full, complete, conclusive, and binding and shall not be subject to collateral attack or other challenge in any court or other forum, except as permitted under applicable law.

    b.    The Title III Court shall retain jurisdiction to enforce the terms of the Confirmation Order and the Plan.

    c.    All provisions herein made to pay or secure payment of the Notes are legal, valid, binding, and enforceable, including, without limitation, the covenants provided for herein.

    d.    At the time of issuance and delivery of the Notes, the Commonwealth is hereby authorized and directed to have stamped or written on each of the Notes a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE _____ DAY OF _____, ~~2021~~2022

All things have been done which are necessary to make the Notes, when executed by the Commonwealth and authenticated and delivered by the Trustee hereunder, the valid obligations of the Commonwealth, and to constitute this Trust Agreement a valid trust indenture for the security of the ~~Notes~~Holders (as defined below), in accordance with the terms of this Trust Agreement.

**NOW, THEREFORE, THIS TRUST AGREEMENT WITNESSETH:**

It is hereby covenanted and declared that all the Notes are to be authenticated and delivered and the property subject to this Trust Agreement is to be held and applied by the Trustee, subject to the covenants, conditions and trusts hereinafter set forth, and the Commonwealth does hereby covenant and agree to and with the Trustee, for the equal and proportionate benefit of all Notes as follows:

This Trust Agreement provides for the issuance by the Commonwealth of the Notes to settle certain claims made by the Commonwealth's creditors, including claims relating to indebtedness previously issued or guaranteed by the Commonwealth, and to refund, refinance or defease any obligations issued hereunder and authorized under the CVI Legislation, and the rights and remedies of the ~~holders from time to time of the Notes~~Holders.

4820-1003-~~9275.18~~9275.22

**IN TRUST NEVERTHELESS**, upon the terms and trusts herein set forth, amounts available for the payment of the Notes shall be held and applied for the equal and *pro rata* benefit and security of each and every owner of the Notes issued and to be issued hereunder, without preference, priority or distinction as to participation in the Trust Estate (as defined below), and the benefit and protection thereof of one Note over or from the others, by reason of priority in the issue or negotiation or maturity thereof, or for any other reason whatsoever, except as herein otherwise expressly provided, so that each of such Notes shall have the same right, lien and privilege hereunder to the extent herein provided and shall be equally secured thereby with the same effect as if the same shall have been made, issued and negotiated simultaneously with the delivery hereof and were expressed to mature on one and the same date;

**IN TRUST NEVERTHELESS,** that these presents are upon the express condition that if (a) (i) the Commonwealth or its successors or assigns shall (A) well and truly pay or cause to be paid the Notes, according to the provisions set forth in the Notes, respectively and each of them or ~~shall~~(B) provide for the payment of Notes by depositing or causing to be deposited with the Trustee the funds and/or securities required by Section 12.01 of this Trust Agreement, when and as authorized by the provisions of Section 12.01 of this Trust Agreement ~~and~~, or (ii) the GO CVIs Final Maturity Date and the Clawback CVIs Final Maturity Date (each as defined below) shall have occurred and there shall be no obligation of the Commonwealth hereunder to make any additional payments on the GO CVIs or the Clawback CVIs (each as defined below), respectively, and (b) the Commonwealth or its successors or assigns shall also pay or cause to be paid all other sums payable hereunder by the Commonwealth or its successors or assigns, then, provided no Notes remain Outstanding (as defined below) hereunder, these presents and the estate and rights granted hereby shall cease and be terminated, and thereupon the Trustee, on payment of its lawful charges and disbursements then unpaid, on demand of the Commonwealth and upon the payment of the costs and expenses thereof, shall duly execute, acknowledge and deliver to the Commonwealth such instruments of satisfaction or release as may be specified by the Commonwealth as necessary or proper to discharge this Trust Agreement, including, if appropriate, any required discharge of record, and, subject to the provisions of the Plan and the Confirmation Order, if necessary, shall grant, reassign and deliver to the Commonwealth, its successors or assigns, all and singular the property, rights, privileges and interest by it granted, conveyed and assigned hereunder, and all substitutes therefor, or any part thereof, not previously disposed of or released as herein provided; otherwise this Trust Agreement shall be and remain in full force.

**IT IS HEREBY COVENANTED, DECLARED AND AGREED** by and between the parties hereto that all Notes are to be issued, authenticated and delivered, and that the property or amounts available for the payment of the Notes are to be held and applied, subject to the further covenants, conditions, releases, uses and trusts hereinafter set forth, and the Commonwealth, for itself and its successors, does hereby covenant and agree to and with the Trustee and its respective successors in said trust as follows:

4820-1003-~~9275.18~~9275.22

# ARTICLE I.

## DEFINITIONS AND INTERPRETATION

**Section 1.01   Definitions.**  All capitalized terms used in this Trust Agreement and not otherwise defined herein shall have the meanings set forth in the Plan.  As used in this Trust Agreement, the following terms have the following meanings, unless a different meaning clearly appears from the context:

**"5.5% SUT"** means the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).  In the event a Substitute Measured Tax is substituted for the 5.5% SUT as provided in Section 7.09 hereof, all references herein to 5.5% SUT shall instead refer to the Substitute Measured Tax.

**"5.5% SUT Baseline"** reflects the baseline projections of the 5.5% SUT set forth in Attachment 1 hereto.  Upon the occurrence of a Baseline SUT Reduction, an SUT True-Up or the substitution of a Substitute Measured Tax for the 5.5% SUT, the Commonwealth shall prepare and substitute a revised Attachment 1 prepared by the Calculation Agent for the then applicable Attachment 1 as provided in Sections 7.08 and 7.09 hereof. and in the Calculation Agent Agreement and all references herein to the 5.5% SUT Baseline shall thereafter refer to the amounts set forth in the revised Attachment 1.

**"AAFAF"** means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

**"Ancillary Agreements"** means the Trust Agreement, the Confirmation Order, the Plan, the Calculation Agent Agreement, the Continuing DisclosureReporting Agreement and any other agreement or instrument entered into by the Commonwealth or the Trustee in connection with, or in furtherance of, the Restructuring Transaction and in accordance with, or in furtherance of, the Plan.

**"Annual Clawback CVI Carryforward Amount"** as described in Section 5.04(c)(ii)(B) or (C) hereof, as applicable.

**"Annual GO CVI Carryforward Amount"** as described in Section 5.04(c)(i)(B) hereof.

**"Annual Waterfall Payment"** as described in Section 5.04(e) and (f) hereof, as applicable.

**"Authorized Officer"** means (a) in the case of the Commonwealth, the Secretary of Treasury and his or her designees, and (b) in the case of the Trustee, any vice president, assistant vice president, senior associate, associate or other officer of the Trustee customarily performing functions similar to those performed by the Persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred because of such Person's knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Trust Agreement, and when used with reference to any act or document also means any other Person authorized to perform any act or sign any document by or pursuant to a resolution of the Board of Directors of the Trustee or the by–laws of the Trustee.

**"Bankruptcy Code"** means the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases in accordance with Section 301 of PROMESA.

**"Base Cover Over"** means the lesser of (i) $10.50 per proof gallon of the Rum Tax and (ii) the amount per proof gallon of the Rum Tax required to be covered over to the Commonwealth by the U.S. Department of Treasury pursuant to the U.S. Internal Revenue Code of 1986.

**"Base Cover Over Revenues"** means the product of (a) Commonwealth Rum Tax Revenues, and (b) the ratio of the Base Cover Over divided by the sum of (1) the Supplemental Cover Over and (2) the Base Cover Over.

**"Baseline SUT Reduction"** has the meaning set forth in Section 7.08(b) hereof.

**"Book Entry Note"** means a Note issued to and registered in the name of a Depository for the participants in such Depository.

**"Business Day"** means any day other than a Saturday, a Sunday or any other day on which commercial banks in San Juan, Puerto Rico or New York, New York, are required or authorized to close by law, regulation or executive order.

**"Calculation Agent"** means the Person serving in such capacity under the Calculation Agent Agreement from time to time.  The Calculation Agent ~~shall~~must be an Independent Consultant for all purposes of this Trust Agreement.

**"Calculation Agent Agreement"** means the Calculation Agent Agreement, dated as of ~~_____, 2021,~~March 15, 2022, by and among the Commonwealth, the Calculation Agent and the Trustee, as amended or supplemented from time to time~~.~~, including any successor agreements thereto serving substantially the same purposes.  The form of the initial Calculation Agent Agreement is attached hereto as Attachment 12.

**"Causes of Action"** has the meaning set forth in the Plan.

**"CCDA"** means the Puerto Rico Convention Center District Authority.

**"Challenge Payment Date"** means the date of distribution of moneys on deposit in the Disputed Payments Account following the final settlement of a challenge or Proceeding under the Calculation Agent Agreement, which distribution shall be not later than [15] Business Days following the finalization of such challenge or Proceeding.

**"Claim"** means any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

"**Clawback CVI Annual Not Subject to Waterfall Payment Amount**" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.05 hereof.

"**Clawback CVI Annual Payment Amount**" means, for each Fiscal Year, the sum of the Clawback CVI Annual Not Subject to Waterfall Payment Amount plus the Clawback CVI Annual Subject to Waterfall Payment Amount.

"**Clawback CVI Annual Subject to Waterfall Payment Amount**" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.04 hereof.

"**Clawback CVI Carryforward Amount**" has the meaning attributed under Section 5.04(c)(ii)(B).

"**Clawback CVI Carryforward Balance**" has the meaning attributed under Section 5.04(c)(ii).

"**Clawback CVI Lifetime Cap**" means a total of $5,239,002,764 paid from both Clawback CVI Annual Not Subject to Waterfall Payment Amounts and Clawback CVI Subject to Waterfall Payment Amounts, and, with respect to the PRIFA Rum Tax Clawback CVIs only, additionally from the Rum Tax CVI Annual Payment Amount, of which (a) $3,697,668,995 is allocable for Allowed CW/HTA Claims; (b) $217,228,391 is allocable for Allowed CW/Convention Center Claims; (c) $22,580,090 is allocable for Allowed CW/MBA Claims (as of the Effective Date, $4,000,000 of which has been settled by the Commonwealth and is treated for all purposes hereunder as Deemed Paid CVIs Payments), and (d) $1,301,525,288 is allocable for Allowed CW/PRIFA Rum Tax Claims.

"**Clawback CVI Maximum Annual Payment**" means the maximum annual payment amount applicable to the Clawback CVIs, calculated as provided in Section 5.04(b)(v) or (vi) hereof, as applicable.

"**Clawback CVIs**" means, collectively, the general obligation securities, other than the GO CVIs, issued as Notes pursuant to this Trust Agreement, for the payment ~~for~~of which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and this Trust Agreement.  For the avoidance of doubt, unless otherwise provided in this Trust Agreement, the term "Clawback CVI" as used in this Trust Agreement refers to the security representing the interests of the Holders thereof to payments from (a) the Subject to Waterfall Outperformance Amounts, (b) the Not Subject to Waterfall Payment Amounts, and (c) solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amounts.

"**Clawback CVIs Final Maturity Date**" means the earlier to occur of (a) the date when the Holders of the Clawback CVIs have been paid cumulatively an amount equal to the Clawback CVI Lifetime Cap, and (b) the earlier to occur of (1) the CVIs Annual Payment Amount Calculation Date in 2051, in the event an SUT Outperformance Condition has not

occurred in the Fiscal Year ending on June 30, 2051, and (2) the CVIs Annual ~~Payment Amount~~ Payment Date in 2051, in the event an SUT Outperformance Condition has occurred in the Fiscal Year ending on June 30, 2051.

"**Commonwealth**" has the meaning given to such term in the Recitals.

"**Commonwealth Rum Tax Revenues**" means the total Rum Tax collections received by the Commonwealth as documented within the U.S. Department of the Treasury monthly detailed activity report of net excise tax due to the Commonwealth and certified by the Puerto Rico Department of Treasury or any equivalent documentation of such collections that the U.S. Department of the Treasury and/or Puerto Rico Department of Treasury may choose to adopt.

"**Comprehensive Cap**" has the meaning ascribed to such term in the Debt Responsibility Act.

"**Confirmation Order**" means the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 the Bankruptcy Code.

"**Constitution**" means the Constitution of the Commonwealth.

~~"**Continuing Disclosure Agreement**" means the Continuing Disclosure Agreement entered into pursuant to Section 7.15 of this Trust Agreement.~~

"**CVI Legislation**" means Act No. 53-2021.

"**CVIs Annual Payment Amount**" means, for each Fiscal Year, an amount equal to the sum of the Clawback CVI Annual Payment Amount plus the GO CVI Annual Payment Amount plus, solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amount.

"**CVIs Annual Payment Amount Calculation Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [~~October 1~~September 15] of the next Fiscal Year.

"**CVIs Annual Payment ~~Amount Payment~~ Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [November 1] of the next Fiscal Year.

~~"**CVIs Annual Payment Amount Verification Date**" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, [October 15] of the next Fiscal Year.~~

"**CVIs Maximum Payment Amounts**" means the Clawback CVI Lifetime Cap, the Clawback CVI Maximum Annual Payment, the GO CVI Lifetime Cap, the GO CVI Maximum Annual Payment, and the PRIFA Rum Tax Clawback CVIs Lifetime Cap, as applicable.

"**CVIs Outperformance Condition Determination Date**" means, for each Fiscal Year, [September 1] of the next Fiscal Year.

"**CVIs Payment Fund**" means the fund established in accordance with Section 5.08.

"**CW/Convention Center Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to CCDA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order including claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee, and being settled through implementation of the Plan by, among other things, payment of the CW/Convention Center Clawback Recovery.

"**CW/Convention Center Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/Convention Center Claims, consisting of four percent (4.0%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/HTA Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including, without limitation, claims asserted on account of the GDB HTA Loans and claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751a(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998, and being settled through implementation of the Plan by, among other things, payment of the CW/HTA Clawback Recovery.

"**CW/HTA Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths' percent (68.6%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/MBA Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, and being settled through implementation of the Plan by, among other things, payment of the CW/MBA Clawback Recovery. The Commonwealth has settled $4,000,000 of these Claims prior to the Effective Date, and such amount is treated as Deemed Paid CVIs Payments herein.

"**CW/MBA Clawback Recovery**" means the aggregate recovery by holders of Allowed CW/MBA Claims, consisting of four-tenths of one percent (0.4%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**CW/PRIFA Rum Tax Claim**" means the Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the PRIFA Bonds, and being settled through implementation of the Plan by, among other things, payment of the CW/PRIFA Rum Tax Clawback Recovery.

"**CW/PRIFA Rum Tax Clawback Recovery**" means the aggregate recovery by holders or insurers of Allowed CW/PRIFA Rum Tax Claims, consisting of twenty-seven percent (27.0%) of the Clawback CVIs, distributed to such holders as provided herein consistent with Attachment 4 hereto.

"**Debt Management Policy**" means the policy developed by AAFAF, relating to the issuance of indebtedness by the Commonwealth and its instrumentalities, as more fully described in the Plan and the Debt Responsibility Act.

"**Debt Policy Revenues**" means, collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Legislative Assembly of the Commonwealth, including, without limitation, any such revenue assigned to, or owned by, the Puerto Rico Sales Tax Financing Corporation or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan (as defined in the Plan), (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement; and, provided, further, that, for purposes of illustration, with respect to Fiscal Year 2020, and as reflected in the CW Fiscal Plan (as defined in the Plan), "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six hundred Thousand Dollars ($15,146,600,000.00).

"**Debt Responsibility Act**" ~~shall mean~~means Act No. 101-2020, as the same may be amended, modified or supplemented.

"**Deemed Paid CVIs Payments**" means amounts that would otherwise have been payable to the holders of either (a) Claims settled prior to the Effective Date, which consists as of the Effective Date of a $4,000,000 CW/MBA Claim, or (b) notional amounts of Notes redeemed from time to time pursuant to Sections 4.02 and 4.03 hereof.  As of the Effective Date, Attachments 2, 3 and 7 reflect the settlement of Claims prior to the Effective Date and, contemporaneously with the extraordinary redemption of Notes pursuant to Section 4.02 and

4.03 hereof, the Commonwealth shall provide substitute Attachments 2, 3 and 7 to the Trustee and the Calculation Agent reflecting such redemptions.  Deemed Paid CVIs Payments shall be deducted from the Subject to Waterfall Payment Amount available to be paid to the Holders of the Clawback CVIs and the Not Subject to Waterfall Payment Amount prior to the transfer to the Trustee in accordance with Section 5.08 hereof.

"**Defeasance Security**" means:

(a)      a direct obligation of, or any obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America; and

(b)      any other U.S. Government Obligation (including the interest component of Resolution Funding Corporation Bonds for which the separation of principal and interest is made by request of the Federal Reserve Bank of New York in book-entry form), that is not subject to redemption prior to maturity other than at the option of the holder thereof or that has been irrevocably called for redemption on a stated future date; *provided* that at the time an investment therein is made such U.S. Government Obligation is rated in the highest senior unsecured rating category by at least two Rating Services.

"**Depository**" means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York (or its nominee), any other Person, firm, association or corporation designated in the Supplemental Trust Agreement to serve as securities depository for the Notes, or any successor of any of the foregoing, as applicable.

"**Disputed Payment Amount**" has the meaning ascribed to such term in the Calculation Agent Agreement.

"**Disputed Payment Deposit**" means, with respect to any Disputed Payment Amount, an amount equal to one-half (½) of such Disputed Payment Amount.

"**Disputed Payments Account**" means the account established by Section 5.02(b) hereof.

"**Effective Date**" means the date that the Plan becomes effective in accordance with its terms and the Confirmation Order.

"**Electronic Means**" means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee, or another electronic method or system specified by the Trustee as available for use in connection with its services hereunder.

"**Eligible Investments**" means any of the following obligations or securities that the Commonwealth is permitted to hold as an investment under the laws of the Commonwealth:

(a)      Defeasance Securities;

(b)      interest-bearing general obligations of the United States of America;

(c)     United States treasury bills and other non-interest bearing general obligations of the United States of America when offered for sale in the open market at a price below the face value of same, so as to afford the Commonwealth a return on such investment in lieu of interest;

(d)     short-term discount U.S. Government Obligations;

(e)     certificates of deposit of a Qualified Financial Institution which are (i) fully collateralized at least one hundred and ten percent (110%) by marketable U.S. Government Obligations marked to market at least monthly, or (ii) insured by the Federal Deposit Insurance Corporation;

(f)     banker's acceptances of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(g)     commercial paper of banks whose senior obligations are rated in one of the top two short-term rating categories by at least two Rating Services and maintaining such rating during the term of such investment;

(h)     domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission and rated in one of the highest two short-term rating categories by at least two Rating Services, including any such fund for which the Trustee or any of its affiliates provides any service including any service for which a fee may be paid;

(i)     Investment Agreements that are fully collateralized by Eligible Investments; and

(j)     domestic money market mutual funds regulated by and in good standing with the Securities and Exchange Commission that invest solely in investments of the types described in clauses (a), (b), (c) and/or (d) of this definition.

"**EMMA**" means the Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board or any successor nationally recognized municipal securities information repositories recognized by the Securities and Exchange Commission for the purposes referred to in Rule 15c2-12, as promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended.

"**Event of Default**" has the meaning given to such term in Section 11.01 hereof.

"**Extraordinary Redemption Payment Account**" means the account established by Section 5.02(f)(b) hereof.

"**Final Order**" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was

appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

"**Fiscal Plan**" means the Fiscal Plan of the Commonwealth adopted in a Fiscal Year.

"**Fiscal Year**" means a period of twelve (12) consecutive months beginning July 1 of a calendar year and ending on June 30 of the next subsequent calendar year.

"**Fitch**" means Fitch Ratings and its successors.

"**GDB**" means Government Development Bank for Puerto Rico.

"**GDB HTA Loans**" means, collectively, the loans, if any, made to HTA by GDB and now held by the GDB Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

"**General Fund**" means the Commonwealth's primary operating fund.

"**GO CVI Annual Payment Amount**" means the amount due and payable to the Holders of the GO CVIs in any Fiscal Year in accordance with Section 5.04 hereof.

"**GO CVI Carryforward Amount**" has the meaning attributed under Section 5.04(c)(i)(B).

"**GO CVI Carryforward Balance**" has the meaning attributed under Section 5.04(c)(i).

"**GO CVI Lifetime Cap**" means $3,500,000,000.

"**GO CVI Maximum Annual Payment**" means the maximum annual payment amount applicable to the GO CVIs, calculated as provided in Section 5.04(b)(iv) hereof.

"**GO CVI Notional Amount**" means Three Billion Five Hundred Million Dollars ($3,500,000,000.00) in aggregate initial notional amount as of the Effective Date.

"**GO CVIs**" means, collectively, the general obligation securities, other than the Clawback CVIs, issued as Notes pursuant to this Trust Agreement, for the payment ~~for~~of which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and this Trust Agreement.

"**GO CVIs Final Maturity Date**" means the earlier to occur of (a) the date when the Holders of the GO CVIs have been paid cumulatively an amount equal to the GO CVI Lifetime Cap, and (b) the earlier to occur of (1) the CVIs Annual Payment Amount Calculation Date in 2043, in the event an SUT Outperformance Condition has not occurred in the Fiscal Year ending on June 30, 2043, and (2) the CVIs Annual Payment ~~Amount Payment~~ Date in 2043, in the event an SUT Outperformance Condition has occurred in the Fiscal Year ending on June 30, 2043.

"**Holder**" or any similar term, when used with reference to a Note or Notes, means the registered owner thereof.

"**HTA**" means the Puerto Rico Highways and Transportation Authority.

"**HTA Bonds**" has the meaning set forth in the Plan.

~~"**HTA Clawback CVI Payment Reserve**" means _____.~~

"**HTA/CCDA Related Plan Support Agreement**" means that certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among the Oversight Board and the HTA/CCDA PSA Creditors, as it may be amended, modified or supplemented in accordance with the terms thereof.

"**Independent**" when used with respect to any specified person or entity means such a person or entity who (1) is not the Commonwealth, any instrumentality thereof, or any employee of the Commonwealth or any of its instrumentalities, (2) does not have any direct financial interest or material indirect financial interest in this Trust Agreement, the Notes or the Commonwealth or any of its instrumentalities (other than in connection with the services to be provided as Independent Consultant), and (3) is not connected with the Commonwealth, any of its instrumentalities, any party to this Trust Agreement, or any officer, employee, promoter, underwriter, trustee, partner, director, member or person of the foregoing performing similar functions (other than under this Agreement and any agreement pursuant to which it provides the Independent Consultant services).

"**Independent Consultant**" means an Independent third party performing certain designated functions hereunder chosen by the Commonwealth.  An Independent Consultant may be chosen for any or all of the functions requiring an Independent Consultant hereunder.  Such Independent Consultant shall be nationally recognized and professionally qualified to provide the services of the type required to be performed by such Independent Consultant hereunder.

"**Instructions**" has the meaning given to such term in Section 8.05.

"**Investment Agreement**" means a repurchase agreement or other agreement for the investment of money with a Qualified Financial Institution.

"**KBRA**" means Kroll Bond Rating Agency Inc. and its successors.

"**Majority in Interest**" means as of any particular date of calculation, the Holders of a majority of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the

PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.

"**MBA**" means the Metropolitan Bus Authority.

"**Measured SUT**" means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the PR Code (or used for any other purpose established by law) up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

"**Moody's**" means Moody's Investor Service, Inc. and its successors.

"**Note**" means any security of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 hereof to evidence the interests of (a) the Holders of the Clawback CVIs to receive their proportionate shares of the Clawback CVI Annual Payment Amounts and, in the case of the Holders of the PRIFA Rum Tax Clawback CVIs only, to also receive the Rum Tax CVI Annual Payment Amounts, and (b) the Holders of the GO CVIs to receive their proportionate shares of the GO CVI Annual Payment Amounts.

"**Not Subject to Waterfall Clawback CVI**" represents the portion of payments to the Holders of the Clawback CVIs made from the Not Subject to Waterfall Outperformance Amounts.

"**Not Subject to Waterfall CVIs Payment Account**" means the account established by Section 5.02(b) hereof.

"**Not Subject to Waterfall CVIs Payment Account Deposit**" means, for each CVIs Annual Payment ~~Amount Payment~~ Date, the amount to be deposited into the Not Subject to Waterfall CVIs Payment Account equal to the payments due to the Holders of the Clawback CVIs from the Not Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.05(a) hereof, other than such amounts payable to the Holders of the PRIFA Rum Tax Clawback CVIs, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment ~~Amount Payment~~ Date, taking into account any applicable Deemed Paid CVIs Payments.

"**Not Subject to Waterfall Outperformance Amount**" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.05(a) hereof.

"**Outperformance Amount**" means, for each Fiscal Year in which an SUT Outperformance Condition has occurred, the amount by which the Measured SUT exceeds the 5.5% SUT Baseline reflected in Attachment 1 hereto, as such Attachment 1 may be revised from time to time in accordance with the terms hereof.

"**Outstanding**", when used in reference to the Notes, means, as of a particular date, all such Notes authenticated and delivered hereunder except:

(a)     any Notes canceled by the Trustee at or before such date;

(b)      any Notes deemed to have been paid in accordance with Section 12.01 hereof;

(c)      any Note canceled or paid pursuant to Section 3.09 ~~and~~or Section 4.07 hereof or any Note in lieu of or in substitution for which another Note, as applicable, shall have been authenticated and delivered pursuant to Article III, Section 4.07 or Section 10.06 hereof;

(d)      for the purpose of calculating a Majority in Interest or a Quarter in Interest of Outstanding Notes hereunder, any Note deemed to not be Outstanding in accordance with Section 10.05 hereof;

(e)      GO CVIs on and after the GO CVIs Final Maturity Date, solely to the extent all GO CVI Annual Payment Amounts due on any CVIs Annual Payment ~~Amount Payment~~ Date have been paid; and

(f)      Clawback CVIs on and after the Clawback CVIs Final Maturity Date, solely to the extent all Clawback CVI Annual Payment Amounts due on any CVIs Annual Payment ~~Amount Payment~~ Date have been paid; provided, however, the Sub-Subseries of Clawback CVIs relating to the CW/HTA Claims, namely the HTA 68 Bond Claims, the HTA 98 Senior Bond Claims, the HTA 98 Sub Bond Claims and the GDB HTA Loans, which are payable in that order of priority, shall be deemed no longer Outstanding when such Holders have been paid their respective notional amounts set forth in Attachment 4 hereto in full prior to the Clawback CVIs Final Maturity Date.

**"Oversight Board"** has the meaning given to such term in the Recitals.

**"Paying Agent"** means, with respect to the Notes, the Trustee and any other bank or trust company and its successor or successors, appointed pursuant to the provisions hereof or of a Supplemental Trust Agreement.

**"Permitted Rum Tax Waterfall Deductions"** means the sum of the following:

(a)      <u>Science and Technology Trust</u> – $5,000,000 transferred to the Puerto Rico Science, Research and Technology Trust Fund Account;

(b)      <u>Rum Producer Incentive Payments</u> – as described in the definition of **"Rum Producer Incentive Payments"**;

(c)      <u>Conservation Trust</u> – the amount transferred to the Puerto Rico Conservation Trust Account – calculated as the product of (1) Supplemental Cover Over Revenues and (2) $1/6^{th}$; and

(d)      PRIDCO – the amount transferred to the Puerto Rico Industrial Development Company Account – calculated as the lesser of (1) $5,000,000 and (2) 2.5% multiplied by the Commonwealth Rum Tax Revenues.

**"Person"** means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

"**Plan**" means the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules thereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms thereof.

"**PRIFA**" means the Puerto Rico Infrastructure Financing Authority.

"**PRIFA Bonds**" means, collectively, the following bonds issued by PRIFA: (a) Special Tax Revenue Bonds, Section 2005A, issued in the original principal amount of Three Hundred Nine Million One Hundred Two Thousand Five Hundred Seventy-Seven Dollars and Thirty-Five Cents ($309,102,577.35), (b) Special Tax Revenue Bonds, Series 2005B, issued in the original principal amount of Three Hundred Twenty-Four Million Six Hundred Twenty-Five Thousand Dollars ($324,625,000.00), (c) Special Tax Revenue Refunding Bonds, Series 2005C, issued in the original principal amount of Six Hundred Ninety-Nine Million Two Hundred Thirty-Five Thousand Three Hundred Thirty-Eight Dollars and Eighty Cents ($699,235,338.80), and (d) Special Tax Revenue Bonds, Series 2006, issued in the original principal amount of Four Hundred Sixty-Nine Million Seven Hundred Seventy Thousand Dollars ($469,770,000.00).

"**PRIFA Related Plan Support Agreement**" means the PRIFA Related Plan Support Agreement, dated as of [July 27, 2021], by and among the Oversight Board, the Commonwealth, certain holders of PRIFA Bond Claims, and certain other signatories, as amended or supplemented from time to time.

"**PRIFA Rum Tax Clawback CVIs**" means the Subseries of Clawback CVIs that are the only Subseries of Clawback CVIs that are the beneficiaries of the Rum Tax CVI Annual Payment Amounts.

"**PRIFA Rum Tax Clawback CVIs Lifetime Cap**" means $1,301,525,288 of the Clawback CVI Lifetime Cap, allocable to the PRIFA Rum Tax Clawback CVIs.

"**PRIFA Rum Tax Clawback CVIs Payment Account**" means the account established by Section 5.02(~~e~~b) hereof.

"**PRIFA Rum Tax Clawback CVIs Payment Account Deposit**" means, for each CVIs Annual Payment ~~Amount Payment~~ Date, the amount to be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account equal to the payments due to the Holders of the PRIFA Rum Tax Clawback CVIs from (a) the Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.04 hereof, (b) the Not Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.05(a) hereof, and (c) the Rum Tax CVI Annual Payment Amounts as calculated in accordance with Section 5.06 hereof, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment ~~Amount Payment~~ Date, taking into account any applicable Deemed Paid CVIs Payments.

"**PRIFA Rum Tax CVI Annual Payment Amount**" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.06 hereof.

"**Proceeding**" means any suit in equity, action at law or other judicial or administrative proceeding.

"**PROMESA**" means The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

"**Puerto Rico Conservation Trust Account**" means [  ].

"**Puerto Rico Industrial Development Company Account**" means [  ].

"**Puerto Rico Science, Research and Technology Trust Fund Account**" means [  ].

"**Qualified Financial Institution**" means any of the following entities that has an equity capital of at least $125,000,000 or whose obligations are unconditionally guaranteed by an affiliate or parent having an equity capital of at least $125,000,000:

(a)  a securities dealer, the liquidation of which is subject to the Securities Investors Protection Corporation or other similar corporation, and (i) that is on the Federal Reserve Bank of New York list of primary government securities dealers and (ii) whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(b)  a bank, a trust company, a national banking association, a corporation subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a domestic branch or agency of a foreign bank which branch or agency is duly licensed or authorized to do business under the laws of any state or territory of the United States of America, a savings bank, a savings and loan association, an insurance company or association chartered or organized under the laws of any state of the United States of America, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(c)  a corporation affiliated with or which is a subsidiary of any entity described in (a) or (b) above or which is affiliated with or a subsidiary of a corporation which controls or wholly owns any such entity, whose senior unsecured long term debt is at the time an investment with it made rated by at least one Rating Service no lower than in the second highest rating category, or, in the absence of a rating on long term debt, whose short term debt is rated by at least one Rating Service no lower than in the highest rating category for such short term debt;

(d)   the Government National Mortgage Association or any successor thereto, the Federal National Mortgage Association or any successor thereto, or any other federal agency or instrumentality approved by the Commonwealth; or

(e)   a corporation whose obligations, including any investments of any money held hereunder purchased from such corporation, are insured by an insurer that ~~meet~~meets the applicable rating requirements set forth above.

"**Quarter in Interest**" means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs.  Subject to the foregoing, in the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Notes (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

"**Rating Service**" means as of any particular date of determination each of Fitch, KBRA, Moody's and S&P, or their respective successors, or any other nationally recognized statistical rating organization identified as such by the Securities and Exchange Commission.

"**Record Date**" means, when used in relation to Notes of a Series, the date which is fifteen (15) days before the date of payment or action to be taken, whether or not such fifteenth day is a Business Day.

"**Redemption Price**" when used with respect to a Note, means the price established for such redemption in accordance with Article IV hereof and as set forth in the notice of redemption relating thereto.

"**Remaining Clawback CVI Lifetime Cap**" means, as the context requires, (a) the initial Clawback CVI Lifetime Cap as it relates to the Clawback CVIs collectively, or as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, Allowed CW/MBA Claims, and Allowed CW/PRIFA Rum Tax Claims, (b) less the aggregate amounts of the Clawback CVIs settled, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment ~~Amount Payment~~ Date or each extraordinary redemption date in accordance with Section 4.03 hereof.

"**Remaining GO CVI Lifetime Cap**" means (a) the initial GO CVI Lifetime Cap, (b) less the aggregate amounts of the GO CVIs settled, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment ~~Amount Payment~~ Date or each extraordinary redemption date in accordance with Section 4.02 hereof.

**"Reporting Agreement"** means the Reporting Agreement (Commonwealth of Puerto Rico Contingent Value Instruments), dated as of March 15, 2022, executed and delivered by the Commonwealth, as amended or supplemented from time to time.

**"Restructuring Transaction"** means the transactions contemplated by, or in furtherance of, the Plan.

**"Rum Producer Incentive Payments"** means the total amount of incentive payments actually shared with and paid to the rum tax producers as stipulated in their respective contracts with the Commonwealth, which percentage is, as of the date of this Trust Agreement, 46%. Solely for purposes of calculating the Rum Tax Outperformance Condition, such percentage is not permitted to exceed the following amounts in the following Fiscal Years: (a) for Fiscal Years ending June 30, 2022 through June 30, 2031, 46%; (b) for Fiscal Years ending June 30, 2032 through June 30, 2036, 48%; and (c) for Fiscal Years ending June 30, 2037 through June 30, 2051, 50%. Any increase in the total amount of incentive payments actually shared with and paid to the rum tax producers in accordance with their respective contracts in excess of the maximum percentages set forth in the preceding sentence will not affect the Rum Tax Outperformance Metric. For the avoidance of doubt, the Rum Producer Incentive Payments may be increased beyond the limits set forth in this definition at the Commonwealth's discretion, however any payments made in excess of such limits will not affect the Rum Tax Outperformance Condition calculation and payment of the Rum Tax CVI Annual Payment Amount.

**"Rum Tax"** means the federal excise taxes on rum and distilled spirits that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the U.S. Internal Revenue Code of 1986.

**"Rum Tax CVI Annual Payment Amount"** means, for each Fiscal Year in which a Rum Tax Outperformance Condition has occurred, the amount calculated as provided in Section 5.06 hereof.

**"Rum Tax Outperformance Condition"** means that Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric in any given Fiscal Year. A Rum Tax Outperformance Condition may occur in any Fiscal Year even if an SUT Outperformance Condition has not occurred in such Fiscal Year.

**"Rum Tax Outperformance Metric"** reflects the baseline projections of 100% of the Waterfall General Fund Rum Tax Collections within the Commonwealth's 2021 Fiscal Plan projections set forth in Attachment 1 hereto.

**"S&P"** means S&P Global Ratings and its successors.

**"Sales Tax"** means the sales and use tax, including any replacement or similar sales and use tax, imposed by the Commonwealth pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

**"Secretary of Treasury"** means the Secretary of the Treasury of the Puerto Rico Department of Treasury.

**"Series"** means either Clawback CVIs or GO CVIs.

**"Series ~~2021~~2022A-1 Capital Appreciation Bonds"** means the Commonwealth's General Obligation Bonds, Series ~~2021~~2022A-1 Bonds.

**"Subject to Waterfall Clawback CVI"** ~~represents~~means the portion of payments to the Holders of the Clawback CVIs made from the Subject to Waterfall Outperformance Amounts.

**"Subject to Waterfall CVIs Payment Account"** means the account established by Section 5.02(b) hereof.

**"Subject to Waterfall CVIs Payment Account Deposit"** means, for each CVIs Annual Payment ~~Amount Payment~~ Date, the amount to be deposited into the Subject to Waterfall CVIs Payment Account equal to the payments due to the Holders of the GO CVIs and due to the Holders of the Clawback CVIs from the Subject to Waterfall Outperformance Amount as calculated in accordance with Section 5.04 hereof, other than such amounts payable to the Holders of the PRIFA Rum Tax Clawback CVIs, as reflected in the verified Attachment 7 delivered in connection with such CVIs Annual Payment ~~Amount Payment~~ Date, taking into account any applicable Deemed Paid CVIs Payments.

**"Subject to Waterfall Outperformance Amount"** means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.04(a) hereof.

**"Subseries"** means the four categories of Claims ~~of~~against the Commonwealth underlying the Clawback CVIs – the CW/Convention Center Claims Subseries, the CW/HTA Claims Subseries, the CW/MBA Claims Subseries and the CW/PRIFA Rum Tax Claims Subseries.

**"Subsequent Bankruptcy Case"** has the meaning set forth in Section 7.16 hereof.

**"Substitute Measured Tax"** means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth.

**"Sub-Subseries"** means, as the context requires, the following four Sub-Subseries of Clawback CVIs within the Subseries relating to CW/HTA Claims: (i) HTA 68 Bond Claims; (ii) HTA 98 Senior Bond Claims; (iii) HTA 98 Sub Bond Claims; and (iv) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

**"Supplemental Cover Over"** means the amount per proof-gallon of the Rum Tax that the U.S. Department of Treasury covers over to the Commonwealth, less the Base Cover Over, for the applicable Fiscal Year, it being understood the Supplemental Cover Over cannot be less than $0.

**"Supplemental Cover Over Revenues"** means the product of (a) the Commonwealth Rum Tax Revenues, and (b) the ratio of the Supplemental Cover Over divided by the sum of (1)

the Supplemental Cover Over and (2) the Base Cover Over. For purposes of calculating the Rum Tax CVI Annual Payment Amount in Section 5.06 hereof, the maximum amount of Supplemental Cover Over Revenues in each applicable Fiscal Year is the Supplemental Cover Over Revenues Cap.

"**Supplemental Cover Over Revenues Cap**" means $88,000,000.

"**Supplemental Trust Agreement**" means any trust agreement ~~of the Commonwealth~~ amending or supplementing this Trust Agreement or any prior Supplemental Trust Agreement executed and becoming effective in accordance with the terms and provisions of Article IX hereof.

"**SUT Outperformance Condition**" means that the 5.5% SUT ~~(or the Substitute Measured Tax if substituted as permitted herein)~~ collected exceeds the 5.5% SUT Baseline (as adjusted or revised in Attachment 1 as herein provided) in any given Fiscal Year. An SUT Outperformance Condition may occur in any Fiscal Year even if a Rum Tax Outperformance Condition has not occurred in such Fiscal Year.

"**SUT True-Up**" has the meaning set forth in Section 7.08(c) and (d) hereof.

"**Title III Case**" has the meaning given to such term in the Recitals.

"**Title III Court**" has the meaning given to such term in the Recitals.

"**Transaction Counsel**" means a nationally recognized firm of attorneys as may be selected by the Commonwealth for a specific purpose hereunder.

"**Treasury Rate**" means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVI or the Clawback CVI, as the case may be, being redeemed.

"**Trust Agreement**" means this Trust Agreement as amended or supplemented from time to time by Supplemental Trust Agreements in accordance with the terms and provisions hereof.

"**Trust Estate**" means, other than the Trustee and Independent Consultant Expenses Fund, (a) for the benefit of the Holders, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the CVIs Payment Fund, (b) for the benefit of the Holders of the GO CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the GO CVIs Subaccount of the Disputed Payments Account and the GO CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the GO CVIs; (c) for the benefit of the Holders of the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account, the Clawback CVIs Subaccount of the Disputed Payments Account and the Clawback CVIs Subaccount of the Extraordinary

Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs; (d) with respect to the PRIFA Rum Tax Clawback CVIs, all of the Commonwealth's right, title and interest in money, securities and other assets on deposit with the Trustee in the PRIFA Rum Tax Clawback CVIs Payment Account, the PRIFA Rum Tax Clawback CVIs Subaccount of the Disputed Payments Account and the PRIFA Rum Tax Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account created pursuant to this Trust Agreement and any Supplemental Trust Agreement that establishes additional funds, accounts and subaccounts intended to further secure the PRIFA Rum Tax Clawback CVIs; and (e) in each case, the Trustee's right to receive any such money, securities and other assets relating to each of the foregoing, as applicable, wheresoever located.

"**Trustee**" means the bank or trust company appointed as Trustee for the Notes pursuant to Section 8.01 hereof and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant hereto.

"**Trustee and Independent Consultant Expenses**" means the reasonable and verified permitted costs, fees and expenses of the Trustee and the Independent Consultants arising out of or incurred in connection with carrying out and administering their respective duties hereunder, but excludes certain expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, related to actions, suits, and other Proceedings brought by or at the direction or request of any Holders, including, without limitation, the enforcement of remedies under Article XI hereof, and further excluding the Trustee's rights to indemnification as a result thereof, including the fees and expenses incurred in connection with any indemnified claim, as more fully described in Section 8.06 hereof.

"**Trustee and Independent Consultant Expenses Deposits**" means (a) the amount initially deposited into the Trustee and Independent Consultant Expenses Fund in accordance with Section 2.02(b) hereof, and (b) the additional deposits by the Commonwealth as may be required by Section 5.09(b) hereof.

"**Trustee and Independent Consultant Expenses Cap**" means an annual amount not to exceed $_____.

"**Trustee and Independent Consultant Expenses Fund**" means the Trustee and Independent Consultant Expenses Fund so designated, created and established pursuant to Section 5.02(a) hereof.

"**Trustee and Independent Consultant Expenses Funding Amount**" means, as of each CVIs Annual Payment Amount Calculation Date, the amount by which the Trustee and Independent Consultant Expenses Cap for such Fiscal Year exceeds the amount on deposit in the Trustee and Independent Consultant Expenses Fund.

"**U.S. Government Obligation**" means (a) a direct obligation of, or an obligation the timely payment of the principal of and interest on which is guaranteed by, the United States of America, the Federal Home Loan Mortgage Corporation, the Federal National Mortgage

Association, Federal Home Loan Banks, the Government National Mortgage Association, or the Federal Farm Credit System and (b) an obligation of the United States of America which has been stripped by the United States Department of the Treasury itself or by any Federal Reserve Bank (not including "CATS," "TIGRS" and "TRS").

**"U.S. Presidential Declaration of Disaster"** means the declaration of a disaster by the President of the United States under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, P.L. 100-707, as amended or supplemented from time to time, and any comparable successor legislation.

**"Waterfall Cover Over Revenues"** means the sum of (a) Waterfall Supplemental Cover Over Revenues plus (b) Base Cover Over Revenues.

**"Waterfall General Fund Rum Tax Collections"** means (a) Waterfall Cover Over Revenues less (b) Permitted Rum Tax Waterfall Deductions.

**"Waterfall Supplemental Cover Over Revenues"** means the lesser of (a) Supplemental Cover Over Revenues and (b) the Supplemental Cover Over Revenues Cap.

**Section 1.02   Rules of Construction.**   Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.   Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa, and words importing Persons shall include firms, associations and corporations, including public bodies as well as natural Persons.

The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in the Trust Agreement, refer to the Trust Agreement.  All references to Articles and Sections in this Trust Agreement refer to the Articles and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

"**$**" and "**dollars**" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## ARTICLE II.

## AUTHORIZATION AND ISSUANCE OF NOTES

**Section 2.01   Authorization of Notes.**

(a)    There are hereby authorized to be issued Notes of the Commonwealth in two series – the "GO CVIs" and the "Clawback CVIs."  The Notes shall be issued in authorized denominations of one dollar ($1.00) and integral multiples thereof.

(b)    On the Effective Date, the Commonwealth shall deliver the GO CVIs in the original GO CVI Notional Amount to those beneficiaries entitled to receive the same as provided in the Plan.  The GO CVIs shall be issued in eight Subseries designated as "Vintage

CW Bond Claims" in the original Notional Amount of "1,128,540,000," "2011 CW Series D/E/PIB Bond Claims" in the original Notional Amount of "122,990,000," "2011 CW Bond Claims" in the original Notional Amount of "86,765,000," "2012 CW Bond Claims" in the original Notional Amount of "530,495,000," "2014 CW Bond Claims" in the original Notional Amount of "709,310,000," "Vintage CW Guarantee Bond Claims" in the original Notional Amount of "531,790,000," "2011 CW Guarantee Bond Claims" in the original Notional Amount of "264,320,000" and "2012 CW Guarantee Bond Claims" in the original Notional Amount of "125,790,000."  The GO CVIs shall be deemed issued on July 1, 2021.  The GO CVIs shall mature on the earlier of (a) the date when the Holders of the GO CVIs have been paid an amount equal to the GO CVI Lifetime Cap and (b) [July 1],1, 2043, subject to the final GO CVI Annual Payment Amount being paid no later than the GO CVIs Final Maturity Date (with the GO CVIs remaining Outstanding until such time as all GO CVI Annual Payment Amounts due on any CVIs Annual Payment Amount Date have been paid).  Payments The sum of the payments to the Holders of the GO CVIs and Deemed Paid CVIs Payments relating to GO CVIs, if any, shall not exceed in the aggregate the GO CVI Lifetime Cap.

(c)    The Clawback CVIs shall be issued in the original aggregate notional amount of $5,239,002,764 in four Subseries designated as "Allowed CW/HTA Claims," "Allowed CW/Convention Center Claims," "Allowed CW/PRIFA Rum Tax Claims" and "Allowed CW/MBA Claims."

(i)    Within the Subseries relating to "Allowed CW/HTA Claims," there shall be issued four Sub-Subseries: (A) HTA 68 Bond Claims; (B) HTA 98 Senior Bond Claims; (C) HTA 98 Sub Bond Claims; and (D) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

(ii)    On the Effective Date, the Commonwealth shall deliver (A) $3,697,668,995 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/HTA Claims, of which (w) $179,462,539 shall be allocated to the Sub-Subseries relating to HTA 68 Bond Claims; (x) $1,833,405,578 shall be allocated to the Sub-Subseries relating to HTA 98 Senior Bond Claims; (y) $207,294,178 shall be allocated to the Sub-Subseries relating to HTA 98 Sub Bond Claims; and (z) the remaining $1,477,506,700 shall be allocated to the Sub-Subseries relating to GDB HTA Loans; (B) $217,228,391 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/Convention Center Claims; (C) $1,301,525,288 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/PRIFA Rum Tax Claims; and (D) $22,580,090 aggregate notional amount of Clawback CVIs to the beneficiaries of the Allowed CW/MBA Claims, all as provided in the Plan.  Of the $22,580,000 aggregate notional amount of Clawback CVIs attributable to the beneficiaries of the Allowed CW/MBA Claims, the Trustee shall distribute $18,580,090 aggregate principal amount of the Clawback CVIs to the beneficiaries thereof and $4,000,000 aggregate principal amount shall be cancelled by the Trustee and reflected on its books as Deemed Paid CVIs Payments hereunder.

(iii)    The Clawback CVIs shall be deemed issued on July 1, 2021.  The Clawback CVIs shall mature on the earlier to occur of (a) the date when the

Holders of the Clawback CVIs have been paid an amount equal to the Clawback CVI Lifetime Cap, and (b) on [July 1,] 2051, subject to the final Clawback CVI Annual Payment Amount being paid no later than the Clawback CVIs Final Maturity Date (with the Clawback CVIs remaining Outstanding until such time as all Clawback CVI Annual Payment Amounts due on any CVIs Annual Payment Amount Payment Date have been paid). Payments The sum of the payments to the Holders of the Clawback CVIs and Deemed Paid CVIs Payments relating to Clawback CVIs shall not exceed in the aggregate the Clawback CVI Lifetime Cap. From the Clawback CVI Lifetime Cap, payments to the Holders of the Clawback CVIs for the Allowed CW/HTA Claims shall not exceed in the aggregate $3,697,668,995, which are further limited within each Sub-Subseries to the amounts allocated thereto; payments to the Holders of the Clawback CVIs for the Allowed CW/Convention Center Claims shall not exceed in the aggregate $217,228,391; payments to the Holders of the Clawback CVIs for the Allowed CW/PRIFA Rum Tax Claims shall not exceed in the aggregate $1,301,525,288; and payments to the Holders of the Clawback CVIs for the Allowed CW/MBA Claims shall not exceed in the aggregate the $22,580,090. $22,580,090 (and shall be allocable to Allowed CW/MBA Claims and Deemed Paid CVIs Payments as provided in the last sentence of clause (ii) above), all as provided in the Plan.

(d)      The Notes are general obligations of the Commonwealth payable in the manner more particularly provided herein, subject to the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition, as applicable. The Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Puerto Rico Constitution and applicable Puerto Rico law to the payment of the Notes in accordance with the terms of Section 7.02 hereof.

(e)      The form of the GO CVI is attached hereto as Attachment 5. The form of the Clawback CVI is attached hereto as Attachment 6.

**Section 2.02   Provisions for Issuance of Notes.** The Commonwealth shall issue Notes under this Trust Agreement in accordance with, and upon receipt of, the written direction of the Secretary of Treasury of the Commonwealth, or his or her designee; **_provided, however,_** that such direction may not conflict with the terms of this Trust Agreement, the CVI Legislation, the Plan or the Confirmation Order. The Notes authorized to be issued in accordance with the terms of this Section 2.02 shall be executed by the Commonwealth and delivered to the Trustee. Such Notes shall, as directed by the Commonwealth, be authenticated by the Trustee upon delivery to the Trustee of:

(a)      a copy of this Trust Agreement authorizing such Notes, certified by an Authorized Officer of the Commonwealth;

(b)      delivery by the Commonwealth to the Trustee of an amount equal to the Trustee and Independent Consultant Expenses Cap for deposit into the Trustee and Independent Consultant Expenses Fund;

(c)      a written order as to the delivery of such Notes, signed by an Authorized Officer of the Commonwealth, describing the Notes to be delivered and designating the Person(s) to whom such Notes are to be delivered; and

(d)      [an opinion of Transaction Counsel with respect to validity, legality and enforceability of the Notes and the good faith, credit and taxing power pledge of the Commonwealth and the exemption of the Notes under the Securities Act of 1933 and this Indenture under the Trust Indenture Act of 1939 and with respect to such other matters as are customary in connection with the issuance of the Notes; provided, however, that such opinion of Transaction Counsel may rely on the determinations of the Title III Court as set forth in the Confirmation Order, but only to the extent such determination by the Title III Court addresses and provides for such matters; provided, further, that such opinion of Transaction Counsel may be qualified to specify that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy].

## ARTICLE III.

## GENERAL TERMS AND PROVISIONS OF NOTES

**Section 3.01   Place and Medium of Payment.**  Amounts payable to the Holders of the Notes hereunder, including the CVIs Annual Payment Amount, shall be payable in any coin or currency of the United States of America which at the time of payment is legal tender for the payment of public and private debts. Except in the case of Book Entry Notes, upon presentation and surrender of Notes, such Notes shall be payable at the designated corporate trust office of the Trustee, and amounts payable to the Holders of the Notes hereunder, including the CVIs Annual Payment Amount, shall be paid by check mailed to the registered owner thereof as of the Record Date at the address thereof as it appears on the registry books of the Commonwealth or by wire transfer to such registered owner of the Notes if such registered Owner owns at least one million dollars ($1,000,000) initial notional amount of Notes of the GO CVIs or any of the Subseries of the Clawback CVIs.

Notes shall be initially dated as of July 1, 2021.  Notes of each Series and, Subseries and Sub-Subseries issued on or subsequent to the first CVIs Annual Payment Amount Payment Date shall be dated as of the CVIs Annual Payment Amount Payment Date immediately preceding the date of authentication thereof by the Trustee, unless such date of authentication shall be a CVIs Annual Payment Amount Payment Date, in which case they shall be dated as of such date of authentication; ***provided, however,*** that if, as shown by the records of the Trustee, no CVIs Annual Payment Amount has been paid as of the CVIs Annual Payment Amount Payment Date immediately preceding the date of authentication thereof by the Trustee, the Notes of such Series, Subseries or Sub-Subseries issued in lieu of Notes surrendered for transfer or exchange shall be dated as of the date through which the last CVIs Annual Payment Amount has been paid in full on the Notes surrendered or, if no CVIs Annual Payment Amount has been paid on the Notes surrendered since their authentication, as of the date of authentication of the surrendered Notes.

**Section 3.02   Legends.**   The Notes shall distinctively bear the following legend: "DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT

TO THE ~~JUDGEMENT~~JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, ~~2021~~ 2022."

**Section 3.03   CUSIP Numbers.**  The Commonwealth shall provide for the assignment of CUSIP numbers for all Notes of all Series and Subseries (including a separate CUSIP number for each Subseries, or, in the case of a Subseries that has Sub-Subseries, a separate CUSIP number for each Sub-Subseries) and cause such CUSIP numbers to be printed thereon, and the Trustee shall use such CUSIP numbers in notices of redemption and on all checks payable to Holders as a convenience to Holders; ***provided, however,*** that any such notice may state that no representation is made as to the correctness of such number either as printed on such Notes or as contained in any notice of redemption, and that an error in a CUSIP number as printed on such Note or as contained in any notice of redemption shall not affect the validity of the proceedings for redemption.  The Commonwealth shall promptly notify the Trustee of any change in the CUSIP numbers assigned to any Note of which the Commonwealth has knowledge.  The Trustee shall deliver a copy of the foregoing notice to the Holders promptly following its receipt thereof.

**Section 3.04   Execution and Authentication.**  The Notes shall be executed in the name of the Commonwealth by the manual or facsimile signature of an Authorized Officer thereof, or in such other manner as may be permitted by law.  In case any one or more of the officers or employees who shall have signed any of the Notes shall cease to be such officer or employee before the Notes so signed shall have been actually authenticated and delivered by the Trustee, such Notes may, nevertheless, be delivered as provided herein, and may be issued as if the Persons who signed such Notes had not ceased to hold such offices or be so employed.  Any Note may be signed on behalf of the Commonwealth by such Persons as at the actual time of the execution of such Note shall be duly authorized or hold the proper office in or be employed by, the Commonwealth, although at the date of the Notes such Persons may not have been so authorized or have held such office or employment.

The Notes of each Series ~~and,~~ Subseries and Sub-Subseries shall bear thereon a certificate of authentication, in the form set forth in the forms of Notes annexed hereto, executed manually by the Trustee.  Only such Notes as shall bear thereon such executed certificate of authentication shall be entitled to any right or benefit hereunder and no Note shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee.  Such certificate of the Trustee upon any Note executed on behalf of the Commonwealth shall be conclusive evidence that the Note so authenticated has been duly authenticated and delivered hereunder and that the Holder thereof is entitled to the benefits hereof.

**Section 3.05   Interchangeability of Notes.**   Notes, upon surrender thereof at the designated corporate trust office of the Trustee with a written instrument of transfer satisfactory to the Trustee, duly executed by the registered owner or his attorney duly authorized in writing, may, at the option of the registered owner thereof, be exchanged for an equal aggregate notional amount of Notes of the same Series, Subseries and Sub-Subseries and tenor of any other authorized denominations.

**Section 3.06   Transfer and Registry.**  So long as any of the Notes remain Outstanding, the Commonwealth shall maintain and keep, or cause to be maintained and kept, at the designated corporate trust office of the Trustee, books for the registration and transfer of Notes; and, upon presentation thereof for such purpose at said office, the Commonwealth shall register

4820-1003-~~9275.18~~9275.22

or cause to be registered therein, and permit to be transferred thereon, under such reasonable regulations as it or the Trustee may prescribe, any Note entitled to registration or transfer.  So long as any of the Notes remain Outstanding, the Commonwealth shall make all necessary provisions to permit the exchange of Notes at the designated corporate trust office of the Trustee.

**Section 3.07   Transfer of Notes.**  Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series, Subseries and Sub-Subseries and tenor as the surrendered Note.

The transferor shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code.  The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

The Commonwealth and the Trustee may deem and treat the Person in whose name any Outstanding Note shall be registered upon the books of the Commonwealth as the absolute owner of such Note, whether such Note shall be overdue or not, for the purpose of receiving payment of, or on account of, the Notes, subject to the provisions of Section 3.01 hereof with respect to Record Dates, and for all other purposes whatsoever, and all such payments so made to any such registered owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Note to the extent of the sum or sums paid, and neither the Commonwealth nor the Trustee shall be affected by any notice to the contrary.  The Commonwealth agrees to indemnify and save the Trustee harmless from and against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without negligence hereunder, in so treating such registered owner.

**Section 3.08   Regulations with Respect to Exchanges and Transfers.**  In all cases in which the privilege of exchanging Notes or transferring Notes is exercised, the Commonwealth shall execute and the Trustee shall authenticate and deliver Notes in accordance with the provisions hereof.  All Notes surrendered in any such exchanges or transfers shall forthwith be canceled by the Trustee.  For every such exchange or transfer of Notes, whether temporary or definitive, the Commonwealth or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer, which sum or sums shall be paid by the Person requesting such exchange or transfer as a condition precedent to the exercise of the privilege of making such exchange or transfer.  Notwithstanding any other provisions hereof, the cost of preparing each new Note upon each exchange or transfer, and any other expenses of the Commonwealth or the Trustee incurred in connection therewith, shall be paid by the Person requesting such exchange or transfer.  The Commonwealth shall not be obliged to make, or cause to be made, any exchange or transfer of Notes of any Series or, Subseries or Sub-Subseries during the period beginning on the Record

Date for such Notes immediately preceding a CVIs Annual Payment ~~Amount Payment~~ Date relating to such Notes and ending on such CVIs Annual Payment ~~Amount Payment~~ Date, or, in the case of any proposed other redemption of Notes of such Series ~~or~~, Subseries or Sub-Subseries, after the date immediately preceding the date notice of redemption has been mailed.

Section 3.09   **Notes Mutilated, Destroyed, Lost or Stolen.**  In case any Note shall become mutilated or be destroyed, lost or stolen, the Commonwealth in its discretion may execute, and upon its request the Trustee shall authenticate and deliver, a new Note of like Series, Subseries and Sub-Subseries, tenor and notional amount as the Note so mutilated, destroyed, lost or stolen, in exchange and substitution for the mutilated, destroyed, lost or stolen Note, upon surrender and cancellation of such mutilated Note or in lieu of substitution for such Note so destroyed, lost or stolen, upon filing with the Commonwealth evidence satisfactory to the Commonwealth and the Trustee that such Note has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith.  All Notes so surrendered to the Trustee shall be canceled by it and evidence of such cancellation shall be given to the Commonwealth.  In case any Note which has matured or is about to mature shall have become mutilated or have been destroyed, lost or stolen, the Commonwealth may, instead of issuing a Note in exchange or substitution therefor, pay or authorize the payment of such mutilated Note upon the surrender on or after the maturity date thereof, or authorize the payment of such destroyed, lost or stolen Note, upon the Holder thereof filing evidence satisfactory to the Commonwealth and the Trustee that such Note has been destroyed, lost or stolen and proof of ownership thereof, and upon furnishing the Commonwealth and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Commonwealth and the Trustee may prescribe and paying such expenses as the Commonwealth and the Trustee may incur in connection therewith.

Section 3.10   **Book Entry Notes.**  Anything herein to the contrary notwithstanding, Notes shall be authorized and issued as Book Entry Notes.

For all purposes of the Trust Agreement, the Holder of a Book Entry Note shall be the Depository therefor and neither the Commonwealth nor the Trustee shall have responsibility or any obligation to the beneficial owner of such Note or to any direct or indirect participant in such Depository.  Without limiting the generality of the foregoing, neither the Commonwealth nor the Trustee shall have any responsibility or obligation to any such participant or to the beneficial owner of a Book Entry Note with respect to (a) the accuracy of the records of the Depository or any participant with respect to any beneficial ownership interest in such Note, (b) the delivery to any participant of the Depository, the beneficial owner of such Note or any other Person, other than the Depository, of any notice with respect to such Note, including any notice of the redemption thereof, or (c) the payment to any participant of the Depository, the beneficial owner of such Note or any other Person, other than the Depository, of any amount with respect to the CVIs Annual Payment Amount and Redemption Prices relating to such Note.   The Commonwealth and the Trustee may treat the Depository therefor as the absolute owner of a Book Entry Note for the purpose of (x) payment of the CVIs Annual Payment Amount and Redemption Prices relating to such Note, (y) giving notices of redemption and of other matters with respect to such Note, (z) registering transfers with respect to such Note, and for all other

purposes whatsoever.  The Trustee shall pay the CVIs Annual Payment Amount and Redemption Prices relating to such Note only to or upon the order of the Depository, and all such payments shall be valid and effective to fully satisfy and discharge the Commonwealth's obligations with respect to such CVIs Annual Payment Amount and Redemption Prices to the extent of the sum or sums so paid.  No Person other than the Depository shall receive a Note or other instrument evidencing the Commonwealth's obligation to make payments of the CVIs Annual Payment Amount.

Anything herein to the contrary notwithstanding, payment of the Redemption Price of a Book Entry Note which is redeemed in part prior to maturity may be paid to the Depository by wire transfer without surrender of such Note to the Trustee; ***provided, however,*** that the Trustee shall maintain records as to each such payment and of the notional amount of such Note Outstanding, which shall be binding on the Commonwealth and the Holders from time to time of such Note.

The Commonwealth, without the consent of the Trustee, the beneficial owner of a Book Entry Note or any other Person, may terminate the services of the Depository with respect to a Book Entry Note if the Commonwealth reasonably determines in good faith following consultation with the Trustee that (a) the Depository is unable to discharge its responsibilities with respect to such Notes or (b) a continuation of the requirement that all of the Outstanding Notes of like Series, Subseries and/or Sub-Subseries issued in book entry form be registered in the registration books of the Commonwealth in the name of the Depository, is not in the best interest of the beneficial owners of such Notes, and the Commonwealth shall terminate the services of the Depository upon receipt by the Commonwealth and the Trustee of written notice from the Depository that it has received written requests that such Depository be removed from its participants having beneficial interests, as shown in the records of the Depository, in an aggregate amount of not less than a Majority in Interest of the then Outstanding Notes for which the Depository is serving as Depository.

Upon the termination of the services of a Depository with respect to a Book Entry Note, or upon the resignation of a Depository with respect to a Book Entry Note, after which no substitute securities depository willing to undertake the functions of such Depository can be found which, in the reasonable opinion of the Commonwealth following consultation with the Trustee, is able to undertake such functions upon reasonable and customary terms, such Notes shall no longer be registered in the registration books kept by the Trustee in the name of a Depository, but shall be registered in the name or names designated by the Holders transferring or exchanging such Notes, in accordance with the provisions of Article III hereof.

In connection with any proposed transfer outside the book-entry system, the Commonwealth or the Depository shall provide or cause to be provided to the Trustee all information necessary to allow the Trustee to comply with any applicable tax reporting obligations, including without limitation any cost basis reporting obligations under Section 6045 of the Code.  The Trustee may rely on the information provided to it and shall have no responsibility to verify or ensure the accuracy of such information.

**Section 3.11  Preparation of Definitive Notes; Temporary Notes.**  The definitive Notes of each Series ~~and~~, Subseries and Sub-Subseries shall be lithographed or printed on steel engraved borders, except that Book Entry Notes may be typewritten.  Until the definitive Notes

of any Series ~~or~~, Subseries or Sub-Subseries are prepared, the Commonwealth may execute, in the same manner as is provided in Section 3.04 hereof, and deliver, in lieu of definitive Notes, but subject to the same provisions, limitations and conditions as the definitive Notes, except as to the denominations thereof and as to exchangeability for registered Notes, one or more temporary Notes, substantially of the tenor of the definitive Notes in lieu of which such temporary Note or Notes are issued, in authorized denominations or any whole multiples thereof authorized by the Commonwealth, and with such omissions, insertions and variations as may be appropriate to such temporary Notes.  The Commonwealth at its own expense shall prepare and execute and, upon the surrender at the designated corporate trust office of the Trustee of such temporary Notes for exchange and the cancellation of such surrendered temporary Notes the Trustee shall authenticate and, without charge to the Holder thereof, deliver in exchange therefor, at the designated corporate trust office of the Trustee, definitive Notes of the same aggregate notional amount and Series, Subseries and Sub-Subseries as the temporary Notes surrendered.  Until so exchanged, the temporary Notes shall in all respects be entitled to the same benefits and security as definitive Notes issued pursuant hereto.

All temporary Notes surrendered in exchange for a definitive Note or Notes shall be forthwith canceled by the Trustee.

## ARTICLE IV.

## REDEMPTION OF NOTES

**Section 4.01  Authorization of Redemption.**    Notes are subject to mandatory redemption in accordance with their respective rights to payment from CVIs Annual Payment Amounts.  Notes shall be additionally redeemable from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts in accordance with this Article IV, at such times, at such Redemption Prices and upon such terms as may otherwise be specified herein.

**Section 4.02  Extraordinary Redemption of GO CVIs at Election of Commonwealth.**  The GO CVIs are subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points.  The amount of the Redemption Price applicable to each such extraordinary redemption under this Section 4.02 shall be calculated by, or the amount calculated by the Commonwealth shall be verified by, an Independent Consultant.

**Section 4.03  Extraordinary Redemption of Clawback CVIs at Election of Commonwealth.**  The Clawback CVIs are subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points.  The amount of the Redemption Price applicable to each such extraordinary redemption under this Section 4.03 shall be calculated by, or the amount calculated by the Commonwealth shall be verified by, an Independent Consultant.

**Section 4.04   Extraordinary Redemption at the Election of the Commonwealth.**  In the case of any extraordinary redemption of Notes in accordance with the provisions of Section 4.02 or 4.03 hereof from moneys other than CVIs Annual Payment Amounts, the Commonwealth shall give written notice to the Trustee and the Calculation Agent of its election to redeem, whether such Notes are GO CVIs or Clawback CVIs, the notional amount to be redeemed, and the Redemption Prices of the Notes to be redeemed.  Such notice shall be given to the Trustee and the Calculation Agent not less than forty-five (45) days prior to the redemption date.  The Series, Subseries and Sub-Subseries of Notes and notional amounts thereof to be so redeemed shall be determined by the Commonwealth in its sole discretion, subject to any limitations with respect thereto contained herein, including any priority of payment with respect to such Series, Subseries and/or Sub-Subseries as provided herein.  The Commonwealth shall pay to the Trustee on or prior to the redemption date an amount which, in addition to other amounts available therefor held by the Trustee hereunder, is sufficient to redeem on the redemption date at the Redemption Price thereof, all of the Notes or portions thereof to be so redeemed, and any such payment shall be deposited by the Trustee in the applicable Subaccount of the Extraordinary Redemption Payment Account.

**Section 4.05   Selection of Notes to be Redeemed.**  In the event of redemption of less than all of the Outstanding Notes of like Series, Subseries or Sub-Subseries, the Trustee shall select the Notes to be redeemed (i) on a pro rata basis to the extent practicable, or, (ii) in the case of Book Entry Notes, where pro rata redemption is not possible, in accordance with the applicable procedures of the Depository.  Notes selected shall be in amounts of $1.00 or whole multiples of $1.00 in excess thereof, except that if all of the Notes of a Holder are to be redeemed, the entire outstanding amount of Notes held by such Holder, even if not a multiple of $1.00, shall be redeemed.

**Section 4.06   Notice of Redemption.**  Whenever Notes or portions thereof are to be redeemed in accordance with Sections 4.02 and 4.03, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth which notice shall specify: (a) the Notes to be redeemed which shall be identified by the designation of the Notes given in accordance with Article II hereof; (b) the numbers and other distinguishing marks of the Notes to be redeemed, including CUSIP numbers; (c) the redemption date; (d) the Redemption Price (including the calculation thereof); (e) with respect to each such Note, the notional amount thereof to be redeemed; (f) that, except in the case of Book Entry Notes, such Notes will be redeemed at the designated corporate trust office of the Trustee giving the address thereof and the telephone number of the Trustee to which inquiries may be directed; (g) that no representation is made as to the correctness of the CUSIP number either as printed on the Notes or as contained in such notice and that an error in a CUSIP number as printed on a Note or as contained in such notice shall not affect the validity of the proceedings for redemption; and (h) if the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption.  Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each Note to be redeemed the Redemption Price thereof.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books.  Upon giving such notice, the Trustee shall promptly certify to the Commonwealth that it has mailed or caused to be mailed such notice to the Holders

of the Notes to be redeemed in the manner provided herein.   Such certification shall be conclusive evidence that such notice was given in the manner required hereby.  The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

The Trustee shall, if any of the Notes to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.  The Trustee shall make available to the Holders of Notes subject to redemption a copy of the notice of redemption under procedures established by the Trustee.

**Section 4.07**   **Payment of Redeemed Notes.**   Notice having been given in the manner provided in Section 4.06 hereof, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, except as otherwise provided in Section 3.10 hereof upon presentation and surrender of such Notes, at the office or offices specified in such notice, and, in the case of Notes presented by other than the registered owner, together with a written instrument of transfer duly executed by the registered owner or his duly authorized attorney, such Notes, or portions thereof, shall be paid at the Redemption Price; ***provided, however,*** that payment of the Redemption Price may be paid by wire transfer as provided in the first paragraph of Section 3.01 hereof.  If there shall be called for redemption less than all of the notional amount of a registered Note, the Commonwealth shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Note, without charge to the owner thereof, for the unredeemed balance of the notional amount of the registered Note so surrendered, Notes of like Series, Subseries and Sub-Subseries and tenor in any of the authorized denominations.  If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series, Subseries and Sub-Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes or portions thereof to be redeemed shall no longer be considered to be Outstanding hereunder.  If such money shall not be so available on the redemption date, such Notes or portions thereof shall continue to be payable as herein provided as if such redemption had not been noticed.

**ARTICLE V.**

**LIEN ON TRUST ESTATE; FUNDS AND ACCOUNTS;**
**PLEDGED DEPOSITS AND APPLICATION THEREOF**

**Section 5.01   Lien on Trust Estate.**   The Commonwealth hereby grants, upon the issuance of the Notes, a lien on the Trust Estate in favor of the Trustee for the benefit of the Holders of the Notes, all as reflected in the definition of "Trust Estate".   The lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of the lien.   [Such lien shall be perfected automatically, without further need for notice, recording or control, if and to the extent so provided in the Confirmation Order.]

**Section 5.02   Establishment of Funds and Accounts.**

(a)   The Trustee shall establish a Trustee and Independent Consultant Expenses Fund, which fund shall not constitute a portion of the Trust Estate and shall be held for the benefit of the Trustee and the Independent Consultants as provided herein and maintained by the Trustee.   Moneys shall be deposited into the Trustee and Independent Consultant Expenses Fund as provided in Sections 2.02(b) and 5.03(d)5.09 hereof, and withdrawn by the Trustee for the purposes of paying, and reimbursing the Trustee and the Independent Consultants for the payment of, Trustee and Independent Consultant Expenses.

(b)   The Trustee shall establish a CVIs Payments Fund and, within such CVIs Payments Fund, (i) a Subject to Waterfall CVIs Payment Account, and, within such Subject to Waterfall CVIs Payment Account, a (A) GO CVIs Subaccount and (B) a Clawback CVIs Subaccount, (ii) a Not Subject to Waterfall CVIs Payment Account, (iii) a PRIFA Rum Tax Clawback CVIs Payment Account, and (iv) a Disputed Payments Account, and, within such Disputed Payments Account, a (A) GO CVIs Subaccount, (B) Clawback CVIs Subaccount and (C) PRIFA Rum Tax Clawback CVIs Subaccount, and (v) an Extraordinary Redemption Payment Account, and, within such Extraordinary Redemption Payment Account, a (A) GO CVIs Subaccount, (B) Clawback CVIs Subaccount and (C) PRIFA Rum Tax Clawback CVIs Subaccount, which fund, accounts and subaccounts shall constitute a portion of the Trust Estate and shall be held in trust for the benefit of the Holders as provided herein and maintained by the Trustee.

(c)   The GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the GO CVIs Subaccount of the Disputed Payments Account and the GO CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs as provided herein, including Section 5.04 hereof.

(d)   The Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account, the Clawback CVIs Subaccount of the Disputed Payments Account and the Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders

- 34 -

of the Clawback CVIs, other than the Holders of the PRIFA Rum Tax Clawback CVIs, as provided herein, including Section 5.05 hereof.

(e)     The PRIFA Rum Tax Clawback CVIs Payment Account, the PRIFA Rum Tax Clawback CVIs Subaccount of the Disputed Payment Account and the PRIFA Rum Tax Clawback CVIs Subaccount of the Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs as provided herein, including Sections 5.04, 5.05 and 5.06 hereof.

(f)     The Disputed Payments Account shall be held by the Trustee in trust for the benefit of the Holders of the Notes pending the resolution of challenges and Proceedings relating to determinations and calculations as more fully described in the Calculation Agent Agreement. In the event that under the Calculation Agent Agreement the parties thereto have determined that they have been unable to resolve any challenges or Proceedings prior to the CVIs Annual Payment Date and have determined any appropriate Disputed Payment Amounts, the Calculation Agent shall give written instructions to the Trustee, with a copy to the Commonwealth, detailing the respective Disputed Payment Amounts and the appropriate Subaccounts within the Disputed Payments Account into which the Trustee should deposit the Disputed Payment Amounts pending final resolution of the challenge or Proceeding. Disputed Payment Deposits relating to GO CVI Annual Payment Amounts shall be deposited into the GO CVIs Subaccount of the Disputed Payments Account and shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs pending the resolution of such challenge or Proceeding. Upon resolution of such challenge or Proceeding, amounts in the GO CVIs Subaccount of the Disputed Payments Account shall be transferred promptly, as appropriate to reflect the recovery from the related challenge or Proceeding, to the Commonwealth and/or the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account. Any amounts transferred to the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account shall promptly (and in no event later than the Challenge Payment Date) be distributed to the Holders of the GO CVIs by Subseries as appropriate. Disputed Payment Deposits relating to Clawback CVI Annual Payment Amounts for the Holders of Clawback CVIs other than the Holders of PRIFA Rum Tax Clawback CVIs shall be deposited into the Clawback CVIs Subaccount of the Disputed Payments Account and shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs other than the Holders of PRIFA Rum Tax Clawback CVIs pending the resolution of such challenge or Proceeding. Upon resolution of such challenge or Proceeding, amounts in the Clawback CVIs Subaccount of the Disputed Payments Account shall be transferred promptly, as appropriate to reflect the recovery from the related challenge or Proceeding, to the Commonwealth and/or to the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account or the Not Subject to Waterfall CVIs Payment Account, as appropriate. Any amounts transferred to the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account or the Not Subject to Waterfall CVIs Payment Account shall promptly (and in no event later than the Challenge Payment Date) be distributed to the Holders of the Clawback CVIs by Subseries and Sub-Subseries as appropriate. Disputed Payment Deposits relating to Clawback CVI Annual Payment Amounts for the Holders of PRIFA Rum Tax Clawback CVIs shall be deposited into the PRIFA Rum Tax Clawback CVIs Subaccount of the Disputed Payments Account and shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs pending the resolution of such challenge or Proceeding. Upon resolution of such challenge or Proceeding, amounts in the PRIFA Rum Tax Clawback CVIs Subaccount of the Disputed Payments Account shall be transferred promptly, as

appropriate to reflect the recovery from the related challenge or Proceeding, to the Commonwealth and/or to the PRIFA Rum Tax Clawback CVIs Payment Account.  Any amounts transferred to the PRIFA Rum Tax Clawback CVIs Payment Account shall promptly (and in no event later than the Challenge Payment Date) be distributed to the Holders of the PRIFA Rum Tax CVIs.

(g)   (f) The Extraordinary Redemption Payment Account shall be held by the Trustee in trust for the benefit of the Holders of the Notes subject to redemption in accordance with Sections 4.02 and 4.03 hereof.  The GO CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the GO CVIs.  The Clawback CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the Clawback CVIs, other than the PRIFA Rum Tax Clawback CVIs.  The PRIFA Rum Tax Clawback CVIs Subaccount therein shall be held by the Trustee in trust for the benefit of the Holders of the PRIFA Rum Tax Clawback CVIs.

(h)   (g) The moneys in each such fund, account and subaccount shall be disbursed, allocated and applied solely for the uses and purposes provided herein.

**Section 5.03   Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition.**

(a)   By no later than each CVIs Outperformance Condition Determination Date, commencing after the end of the Fiscal Year ending on June 30, 2022, the CommonwealthCalculation Agent, as provided in the Calculation Agent Agreement, shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year.  The CommonwealthUpon such determination, the Calculation Agent shall provide written notice to the Trustee as to whetherthe Trustee and the Commonwealth with its determinations, promptly confirmed in writing, together with the calculations used to make such determinations.  Within one (1) Business Day of receipt thereof, the Trustee shall post such determinations with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of its receipt of the written confirmation of such determinations.   The Trustee shall promptly notify the Holders in writing that such determinations have been so posted. In the event the Calculation Agent has determined that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has or has not occurred within five Business Days of such CVIs Outperformance Condition Determination Date.  The Trustee shall provide written notice to the Holders of the Notes as to whether an SUT Outperformance Condition has or has not occurred within three Business Days of its receipt from the Commonwealth of the notice set forth above.  The Trustee shall provide written notice to the Holders of the PRIFA Rum Tax Clawback CVIs as to whether a Rum Tax Outperformance Condition has or has not occurred within three Business Days of its receipt from the Commonwealthoccurred with respect to the prior Fiscal Year, the Calculation Agent, as provided in the Calculation Agent Agreement, shall thereafter undertake to calculate the amounts required to be calculated in accordance with Section 5.03(b) hereof by on or prior tono later than the CVIs Annual Payment Amount Calculation Date.  The Commonwealth shall within [two] Business Days of the CVIs Outperformance Condition Determination Date also provide to the Calculation Agent retained to verify the calculations in accordance with this Section 5.03 such other information as shall be reasonably requested by the Calculation Agent and then available to allow the Calculation Agent

~~to begin its work to verify such calculations on or prior to the CVIs Annual Payment Amount Verification Date.   [Calculation Agent Agreement to provide mechanism for determining and verifying calculations relating to the occurrence or non-occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition, the sharing of information relating to the foregoing and the challenge process, together with remedies.]~~

(b)   ~~By no later than each CVIs Annual Payment Amount~~In the event the Calculation ~~Date, (i) if~~Agent has determined that an SUT Outperformance Condition has occurred with respect to the prior Fiscal Year, the ~~Commonwealth~~Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the Subject to Waterfall Outperformance Amount as provided in Section 5.04 hereof, and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 hereof~~, and (ii) if~~ by no later than the CVIs Annual Payment Amount Calculation Date.  In the event the Calculation Agent has determined that a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the ~~Commonwealth~~Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the Rum Tax CVI Annual Payment Amount~~, if any,~~ as provided in Section 5.06 hereof by no later than the CVIs Annual Payment Amount Calculation Date.  In each case, the ~~Commonwealth~~Calculation Agent shall calculate the amount by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be applied to the redemption of the Notes of each Series, Subseries and Sub-Subseries on the CVIs Annual Payment ~~Amount Payment~~ Date on a schedule in substantially the form of Attachment 7 hereto.  The Commonwealth shall also ~~provide on such schedule calculations as to~~complete by no later than the CVIs Annual Payment Amount Calculation Date the calculations required to finalize Attachment 7, including the revised amounts of the applicable Remaining Clawback CVI Lifetime Cap and the Remaining GO CVI Lifetime Cap, by Series, Subseries and Sub-Subseries, taking into consideration the amounts to be applied on the CVIs Annual Payment ~~Amount Payment Date.   The Commonwealth shall provide notice of the amounts so calculated to the Calculation Agent retained to verify such calculations within [two] Business Days of the CVIs Annual Payment Amount Calculation Date.   The Commonwealth shall also provide to such Calculation Agent such other information as shall be reasonably requested by the Calculation Agent to allow the Calculation Agent to verify such calculations on or prior to the CVIs Annual Payment Amount Verification Date~~Date.  Promptly upon completion, the Calculation Agent shall provide the Commonwealth and the Trustee with written copies of its calculations, including a final Attachment 7.  Within one (1) Business Day of receipt thereof, the Trustee shall post such calculations and final Attachment 7, together with supporting narrative, if any, with EMMA under all of the CUSIP numbers applicable to the Notes.  The Trustee shall promptly notify the Holders in writing that such calculations and other written materials have been so posted.

~~(c)   By no later than each CVIs Annual Payment Amount Verification Date following a determination that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent shall review the calculations made by the Commonwealth.  The Calculation Agent shall either verify the calculations made by the Commonwealth, work with the Commonwealth to agree upon the calculations to be verified, or provide the Calculation Agent's own calculations in the event that the Calculation Agent is in disagreement with the Commonwealth's calculations.   In each case, the Commonwealth shall calculate, and shall have verified by the Calculation Agent, the amount by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be applied to the redemption of the Notes of each Series, Subseries and~~

Sub-Subseries on the CVIs Annual Payment Amount Payment Date, and such other information described in Section 5.03(b), as set forth on a schedule in substantially the form of Attachment 7 hereto.   [Calculation Agent Agreement to provide mechanism for determining calculations relating to the foregoing and the challenge process, together with remedies, prior to final verification.]  Upon such verification, the Commonwealth shall provide notice to the Trustee of the amounts described in the preceding sentence, within five Business Days of such verification.  The Trustee shall provide written notice to the Holders of the Notes of the amounts calculated by the Commonwealth and verified by the Independent Consultant within three Business Days of its receipt from the Commonwealth of the notice set forth in the preceding sentence.  [Scope of information and availability to Holders to be addressed in Calculation Agent Agreement.]

(c)      (d) To the extent that an SUT Outperformance Condition and/or Rum Tax Outperformance Condition has occurred, the Commonwealth shall transfer to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Amount Payment Date, subject to the CVIs Maximum Payment Amounts, an amount equal to the sum of the Subject to Waterfall Outperformance Amount, the Not Subject to Waterfall Outperformance Amount, if any, and the Rum Tax CVI Annual Payment Amount, if any, together with written directions on the amounts, if any, that are to be deposited into each Subaccount of the Subject to Waterfall CVIs Payment Account (in an amount equal to the Subject to Waterfall CVIs Payment Account Deposit), the Not Subject to Waterfall CVIs Payment Account (in an amount equal to the Not Subject to Waterfall CVIs Payment Account Deposit) and the PRIFA Rum Tax Clawback CVIs Payment Account (in an amount equal to the PRIFA Rum Tax Clawback CVIs Payment Account Deposit.  Upon receipt by the Trustee from the Commonwealth of the amounts described in the preceding sentence, (i) an amount equal to the Subject to Waterfall CVIs Payment Account Deposit shall be deposited into the Subject to Waterfall CVIs Payment Account and portions thereof shall be deposited into the Subaccounts therein as hereinafter provided, (ii) an amount equal to the Not Subject to Waterfall CVIs Payment Account Deposit shall be deposited into the Not Subject to Waterfall CVIs Payment Account, and (iii) an amount equal to the PRIFA Rum Tax Clawback CVIs Payment Account Deposit shall be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account.  The moneys deposited into the Subject to Waterfall CVIs Payment Account, the Not Subject to Waterfall CVIs Payment Account and the PRIFA Rum Tax Clawback CVIs Payment Account shall be held by the Trustee uninvested until the payment to the respective Holders.

(d)      (e) No payments (other than from the PRIFA Rum Tax Clawback CVIs Payment Account if a Rum Tax Outperformance Condition has occurred) shall be made to the Holders of the Notes in Fiscal Years following Fiscal Years in which an SUT Outperformance Condition has not occurred.

(e)      (f) No payments shall be made to the Holders of the GO CVIs in excess of the GO CVI Annual Payment Amount or the GO CVI Lifetime Cap, as applicable.

(f)      (g) No payments shall be made to the Holders of the Clawback CVIs in excess of the Clawback CVI Annual Payment Amount or the Clawback CVI Lifetime Cap, as applicable.

(g)      (h) No payments shall be made to the Holders of the PRIFA Rum Tax Clawback CVIs from the Rum Tax CVI Annual Payment Amount in excess of the amount

calculated in accordance with Section 5.06(a) hereof or the PRIFA Rum Tax Clawback CVIs Lifetime Cap.

(i)    [The Trustee shall provide for the timely posting of the following final notices and verified information on EMMA:

(A)    notices of the occurrence of

(h)    In the event that, due to any challenge or Proceeding under the Calculation Agent Agreement, (i) the Calculation Agent is not able to finally determine if an SUT Outperformance Condition and a Rum Tax Outperformance Condition as provided in Section 5.03(a) hereof; and

(B)    the verified information as provided in Section 5.03(c) hereof, including a copy of the final Attachment 7 relating thereto.]/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year by no later than the originally scheduled CVIs Outperformance Condition Determination Date, (ii) the Calculation Agent is not able to finally complete the calculations required with respect to all or a portion of the calculations required to be calculated by no later than the originally scheduled CVIs Annual Payment Amount Calculation Date, or (iii) the payment of all or a portion of the amounts due to the Holders as a result of such final calculations cannot be made on the originally scheduled CVIs Annual Payment Date, the Commonwealth, the Trustee and the Calculation Agent shall agree on a revised schedule of compliance with the terms and provisions of this Trust Agreement on a rescheduled CVIs Outperformance Condition Determination Date, CVIs Annual Payment Amount Calculation Date and/or CVIs Annual Payment Date consistent with the resolution of such challenge or Proceeding.

**Section 5.04**    [**Subject to Waterfall Outperformance Amount and Annual Waterfall Payment.**

(a)    The Subject to Waterfall Outperformance Amount shall be calculated and agreed to by the Calculation Agent by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022 (with such calculation identifying any Subject to Waterfall Outperformance Amount associated with the Fiscal Year ending June 30, 2022), following the occurrence of an SUT Outperformance Condition and shall be equal to the lesser of the following; provided, however, for the avoidance of doubt, the Subject to Waterfall Outperformance Amount is subject to the aggregate GO CVI Maximum Annual Payment and the Clawback CVI Maximum Annual Payment and may not be less than $0 in a given year:

(i)    fifty percent (50%) of cumulative Outperformance relative to the 5.5% SUT Baseline (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to (A) the Holders of the GO CVIs and (B) the Holders of Clawback CVIs from Subject to Waterfall Outperformance Amounts; and

(ii)     seventy-five percent (75%) of annual Outperformance for the Fiscal Year in which the SUT Outperformance Condition occurred.

(b)     For purposes of calculating the Subject to Waterfall Outperformance Amount in accordance with subsection (a) above,

(i)     the Commonwealth shall first calculate the amount by which the actual Measured SUT collections in the prior Fiscal Year exceeded the 5.5% SUT Baseline for such Fiscal Year as set forth in the then applicable Attachment 1, which amount, less the Trustee and Independent Consultant Expenses Funding Amount, is the "annual Outperformance" referred to in Section 5.04(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.04(a)(i) above as described in Section 5.04(b)(ii) below, as well as the 75% of "annual Outperformance" amount for purposes of Section 5.04(a)(ii) above;

(ii)     the "annual Outperformance" amount calculated in accordance with Section 5.04(b)(i) above is added to (if a positive number during a Fiscal Year in which an SUT Outperformance Condition has occurred), or subtracted from (if a negative number during a Fiscal Year in which an SUT Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance"  referred to in Section 5.04(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations;

(iii)     the Commonwealth will then calculate the lesser of 50% of the "cumulative Outperformance" amount and 75% of the "annual Outperformance" amount;

(iv)     the GO CVI Maximum Annual Payment shall be calculated as the lesser of (A) the sum of the GO CVI Carryforward Balance and $200,000,000 and (B) $400,000,000;

(v)     until the GO CVIs Final Maturity Date, the Clawback CVI Maximum Annual Payment shall be calculated as the lesser of (A) the sum of the Clawback CVI Carryforward Balance and $175,000,000 and (B) $350,000,000; and

(vi)     beginning in the Fiscal Year after the GO CVIs Final Maturity Date, the Clawback CVI Maximum Annual Payment shall be calculated as the lesser of (i) the sum of the Clawback CVI Carryforward Balance and $375,000,000 and (ii) $750,000,000.

(c)     For purposes of subsection (b) above,

(i)     the "GO CVI Carryforward Balance" shall be calculated as follows:

(A)     for the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2022, $0;

(B)     for each Fiscal Year thereafter, the Annual GO CVI Carryforward Amount shall be calculated as the difference between

(which, for the avoidance of doubt, may be a positive or negative number) (A) $200,000,000 and (B) CVI payments (if any) made to the Holders of the GO CVIs in such Fiscal Year.  The Annual GO CVI Carryforward Amount from such Fiscal Year shall be added to (if positive) or subtracted from (if negative) the GO CVI Carryforward Balance from the prior Fiscal Year; and

(C)    to the extent there is a positive GO CVI Carryforward Balance remaining at the end of the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2043, the Commonwealth will not owe any further amount to the Holders of the GO CVIs.

(ii)    the "Clawback CVI Carryforward Balance" shall be calculated as follows:

(A)    for the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2022, $0;

(B)    for each year thereafter during the period described in Section 5.04(b)(v), the Annual Clawback CVI Carryforward Balance shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (A) $175,000,000 and (B) aggregate CVI payments made to the Holders of Clawback CVIs (if any) in ~~the prior~~such Fiscal Year.  The Annual Clawback CVI Carryforward Amount from the ~~current~~such Fiscal Year shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance from the prior Fiscal Year;

(C)    for each year during the period described in Section 5.04(b)(~~v~~vi), the Annual Clawback CVI Carryforward Amount shall be calculated as the difference between (which for the avoidance of doubt, may be a positive or negative number) (y) $375,000,000 and (z) aggregate CVI payments made (if any) to the Holders of Clawback CVIs in ~~the prior~~such Fiscal Year.  The Annual Clawback CVI Carryforward Amount from the ~~current~~such Fiscal Year shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance from the prior Fiscal Year; and

(D)    to the extent there is a positive Clawback CVI Carryforward Balance remaining at the end of the calculation of the Annual Waterfall Payment relating to the Fiscal Year ending June 30, 2051, the Commonwealth will not owe any further amount to the Holders of the Clawback CVIs.

Illustrative scenarios of the calculation of the Subject to Waterfall Outperformance Amount are set forth in Attachment 8.

4820-1003-~~9275.18~~9275.22

(d)      For purposes of Section 5.04(a)(i), for the avoidance of doubt, amounts paid to the Holders of the Clawback CVIs will first be allocated to Subject to Waterfall Clawback CVIs (from Subject to Waterfall Payments) for purposes of calculation of payments previously made.

(e)      Until the GO CVIs Final Maturity Date, the Subject to Waterfall Outperformance Amount shall be distributed as follows as the Annual Waterfall Payment:

(i)      the first $100,000,000 shall be paid to the Holders of the GO CVIs in the percentages allocated consistent with Attachment 3 hereto;

(ii)      the next $11,111,111 shall be paid to the holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto; and

(iii)      thereafter, any remaining available moneys in the Annual Waterfall Payment shall be shared with ninety percent (90%) being paid to the Holders of the GO CVIs in the percentages allocated consistent with Attachment 3 hereto, and the remaining ten percent (10%) being paid to the Holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto.

(f)      Beginning in the Fiscal Year following the GO CVIs Final Maturity Date, subject to both the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap, the Subject to Waterfall Outperformance Amount shall be distributed as follows as the Annual Waterfall Payment:  one hundred percent (100%) to the Holders of the Clawback CVIs until the Clawback CVIs Final Maturity Date.]

**Section 5.05   Not Subject to Waterfall Outperformance Amount.**

(a)      The Not Subject to Waterfall Outperformance Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal Year, commencing with the Fiscal Year beginning July 1, 2022, following the occurrence of an SUT Outperformance Condition and shall be equal to the lesser of the following; ***provided***, ***however***, for the avoidance of doubt, the Not Subject to Waterfall Outperformance Amount is subject to the Clawback CVI Maximum Annual Payment and may not be less than $0 in a given year:

(i)      forty percent (40%) of cumulative Outperformance relative to the 5.5% SUT Baseline (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to the Holders of Clawback CVIs from the Not Subject to Waterfall Outperformance Amounts; and

(ii)      ninety-five percent (95%) of annual Outperformance for the Fiscal Year in which the SUT Outperformance Condition occurred, less payments previously made to (A) the Holders of GO CVIs and (B) the Holders of Clawback CVIs from the Subject to Waterfall Outperformance Amounts for the corresponding Fiscal Year.

(b)     For purposes of calculating the Not Subject to Waterfall Outperformance Amount in accordance with subsection (a) above,

(i)     the Commonwealth shall first calculate the amount by which the actual Measured SUT collections in the prior Fiscal Year exceeded the 5.5% SUT Baseline for such Fiscal Year as set forth in the then applicable Attachment 1, which amount, less the Trustee and Independent Consultant Expenses Funding Amount, is the "annual Outperformance" referred to in Section 5.05(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.05(a)(i) above as described in Section 5.05(b)(ii) below, as well as the 95% of "annual Outperformance" amount for purposes of Section 5.05(a)(ii) above;

(ii)     the "annual Outperformance" amount calculated in accordance with Section 5.05(b)(i) above is added to (if a positive number during a Fiscal Year in which an SUT Outperformance Condition has occurred), or subtracted from (if a negative number during a  Fiscal Year in which an SUT Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance"  referred to in Section 5.05(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations;

(iii)     the Commonwealth will then calculate the lesser of 40% of the "cumulative Outperformance" amount and 95% of the "annual Outperformance" amount; and

(iv)     the Clawback CVI Maximum Annual Payment shall be calculated in the same manner as in Section 5.04(b)(v) and (vi) hereof.

(c)     For purposes of subsection (b) above, the Clawback CVI Carryforward Balance shall be calculated in the same manner as Section 5.04(c)(ii).

(d)     For the avoidance of doubt, when calculating whether aggregate payments to Clawback CVI are limited by the Clawback CVI Maximum Annual Payment, payments to Subject to Waterfall Clawback CVI are counted first against the Clawback CVI Maximum Annual Payment before payments to Not Subject to Waterfall Clawback CVI are counted.

(e)     Subject to both the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap, one hundred percent (100%) of the Not Subject to Waterfall Outperformance Amount shall be paid to the Holders of the Clawback CVIs in the percentages allocated consistent with Attachment 4 hereto.

Illustrative scenarios of the calculation of the Not Subject to Waterfall Outperformance Amount are set forth in Attachment 9.

**Section 5.06   Rum Tax CVI Annual Payment Amount.**

(a)     The Rum Tax CVI Annual Payment Amount shall be calculated by no later than the CVIs Annual Payment Amount Calculation Date on an annual basis each Fiscal

4820-1003-9275.189275.22

Year, commencing with the Fiscal Year beginning July 1, 2022, following the occurrence of a Rum Tax Outperformance Condition and shall be equal to the lesser of the following:

(i)        forty percent (40%) of cumulative Outperformance of the Waterfall General Fund Rum Tax Collections relative to the Rum Tax Outperformance Metric (which, for the avoidance of doubt for purposes of the calculation of the cumulative Outperformance amount, includes both overperformance and underperformance from prior Fiscal Years), starting July 1, 2021, less payments previously made to the Holders of the PRIFA Rum Tax Clawback CVIs on account of previous Rum Tax CVI Annual Payment Amounts;

(ii)        fifty percent (50%) of annual Outperformance of the Waterfall General Fund Rum Tax Collections above the Rum Tax Outperformance Metric, measured at the conclusion of each Fiscal Year; and

(iii)        $30 million.

(b)        For purposes of calculating the Rum Tax CVI Annual Payment Amount in accordance with subsection (a) above,

(i)        the Commonwealth shall first calculate the amount by which the actual Waterfall General Fund Rum Collections in the prior Fiscal Year exceeded the Rum Tax Outperformance Metric for such Fiscal Year as set forth in the then applicable Attachment 2, which amount is the "annual Outperformance" referred to in Section 5.06(a)(ii) above; the "annual Outperformance" amount is used both to calculate the continuing "cumulative Outperformance" amount referred to in Section 5.06(a)(i) above as described in Section 5.06(b)(ii) below, as well as the 50% of "annual Outperformance" amount for purposes of Section 5.06(a)(ii) above;

(ii)        the "annual Outperformance" amount calculated in accordance with Section 5.06(b)(i) above is added to (if a positive number during a Fiscal Year in which a Rum Tax Outperformance Condition has occurred), or subtracted from (if a negative number during a  Fiscal Year in which a Rum Tax Outperformance Condition has not occurred), the prior year's cumulative Outperformance amount in calculating the continuing "cumulative Outperformance"  referred to in Section 5.06(a)(i) above; for the first calculation made during the Fiscal Year beginning July 1, 2022, the "annual Outperformance" amount for the Fiscal Year ending June 30, 2022 is also the initial "cumulative Outperformance" amount for future calculations; and

(iii)        the Commonwealth will then calculate the lesser of 40% of the "cumulative Outperformance" amount, 50% of the "annual Outperformance" amount, and $30,000,000.

Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount are set forth in Attachment 10.

**Section 5.07   HTA Clawback CVI Priority Distribution Waterfall.**

Notwithstanding any other provision of this Trust Agreement:

4820-1003-9275.189275.22

(a)    All moneys to be applied by the Trustee under this Trust Agreement on account of the HTA Clawback CVI shall be applied as follows:

(i)    First, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 68 Bond Claims, up to $179,462,539, until such amount has been paid in full;

(ii)    Second, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 98 Senior Bond Claims, up to $1,833,405,578, until such amount has been paid in full;

(iii)    Third, in payment or satisfaction of all amounts due and unpaid to the Sub-Subseries related to the HTA 98 Sub Bond Claims, up to $207,294,178, until such amount has been paid in full;

(iv)    Fourth, following payment of the amounts above in full, to the Sub-Subseries related to the GDB HTA Loans up to $1,477,506,700.

(b)    No payment shall be made on account of any Sub-Subseries of HTA Clawback CVI in any Fiscal Year until all Sub-Subseries of a higher priority than such Sub-Subseries in the above waterfall have been paid in full.

**Section 5.08   CVIs Payment Fund.**

(a)    In connection with the preparation of Attachment 7 on any CVIs Annual Payment Amount Payment Date, to the extent an SUT Outperformance Condition has occurred in any Fiscal Year, the Commonwealth Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the amount to be deposited into each Subaccount in the Subject to Waterfall CVIs Payment Account that are payable to (i) the Holders of the GO CVIs, taking into account Deemed Paid CVIs Payments applicable to any GO CVIs, (ii) the Holders of the Clawback CVIs other than the PRIFA Rum Tax Clawback CVIs, taking into account Deemed Paid CVIs Payments applicable to any Clawback CVIs, and (iii) the Holders of the PRIFA Rum Tax Clawback CVIs. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (i) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the GO CVIs Subaccount of the Subject to Waterfall CVIs Payment Account, and (ii) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the Clawback CVIs Subaccount of the Subject to Waterfall CVIs Payment Account. Moneys deposited into the Subject to Waterfall CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of the Notes entitled to payment therefrom on the CVIs Annual Payment Amount Payment Date as provided in Section 5.04(e) and (f) hereof and Attachments 2 and 3 hereof as directed in writing by an Authorized Officer of the Commonwealth as mandatory redemption of such Notes. Subject to the CVIs Maximum Payment Amounts, the amount calculated in (iii) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment Amount Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.

(b)     In connection with the preparation of Attachment 7 on any CVIs Annual ~~Payment Amount~~ Payment Date, to the extent an SUT Outperformance Condition has occurred in any Fiscal Year, the ~~Commonwealth~~Calculation Agent, as provided in the Calculation Agent Agreement, shall calculate the Not Subject to Waterfall Outperformance Amount to be distributed pursuant to the provisions of Section 5.05 hereof.  The ~~Commonwealth~~Calculation Agent, as provided in the Calculation Agent Agreement, shall then calculate the amounts from the Not Subject to Waterfall Outperformance Amount that are payable to (i) the Holders of the Clawback CVIs other than the PRIFA Rum Tax Clawback CVIs, and (ii) the Holders of the PRIFA Rum Tax Clawback CVIs.  Subject to the CVIs Maximum Payment Amounts, the amount calculated in (i) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment ~~Amount Payment~~ Date for deposit into the Not Subject to Waterfall CVIs Payment Account.  Moneys deposited into the Not Subject to Waterfall CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of the Clawback CVIs (other than the Holders of the PRIFA Rum Tax Clawback CVIs) on the CVIs Annual Payment ~~Amount Payment~~ Date as provided in Section 5.05 and Attachment 4 hereof as directed in writing by an Authorized Officer of the Commonwealth as mandatory redemption of such Notes.  Subject to the CVIs Maximum Payment Amounts, the amount calculated in (ii) shall be paid by the Commonwealth to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual ~~Payment Amount~~ Payment Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.

(c)     Amounts ~~calculated~~paid by the Commonwealth in accordance with Section 5.08(a)(iii) and Section 5.08(b)(ii) shall be deposited into the PRIFA Rum Tax Clawback CVIs Payment Account when received by the Trustee.  To the extent a Rum Tax Outperformance Condition has occurred in any Fiscal Year, the Commonwealth shall transfer, subject to the PRIFA Rum Tax Clawback CVIs Lifetime Cap, an amount equal to the Rum Tax CVI Annual Payment Amount, if any, to the Trustee no later than one (1) Business Day prior to the applicable CVIs Annual Payment ~~Amount Payment~~ Date for deposit into the PRIFA Rum Tax Clawback CVIs Payment Account.  Moneys deposited into the PRIFA Rum Tax Clawback CVIs Payment Account shall be held uninvested by the Trustee and distributed to the Holders of PRIFA Rum Tax Clawback CVIs on the CVIs Annual Payment ~~Amount Payment~~ Date.

(d)     No later than one (1) Business Day before any extraordinary redemption date noticed by the Commonwealth in accordance with Sections 4.02 or 4.03 hereof, the Commonwealth shall transfer to the Trustee an amount necessary to provide for the payment of the Redemption Price of the Notes being redeemed for deposit into the Extraordinary Redemption Payment Account.   Moneys ~~deposited~~transferred by the Commonwealth in connection with the extraordinary redemption of GO CVIs shall be deposited by the Trustee into the GO CVIs Subaccount.  Moneys ~~deposited~~transferred by the Commonwealth in connection with the extraordinary redemption of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs shall be deposited by the Trustee into the Clawback CVIs Subaccount.  Moneys ~~deposited~~transferred by the Commonwealth in connection with the extraordinary redemption of PRIFA Rum Tax Clawback CVIs shall be deposited by the Trustee into the ~~of~~ PRIFA Rum Tax Clawback CVIs Subaccount.  Moneys deposited into the Extraordinary Redemption Payment Account shall be held uninvested by the Trustee and distributed from the appropriate Subaccount to the Holders of the Notes being redeemed as directed in writing by an Authorized Officer of the Commonwealth.

**Section 5.09   Trustee and Independent Consultant Expenses Fund.**

(a)      The Trustee and Independent Consultant Expenses Fund shall not constitute a portion of the Trust Estate and shall be held for the benefit of the Trustee and the Independent Consultants as provided herein and maintained by the Trustee.  Moneys shall be deposited into the Trustee and Independent Consultant Expenses Fund as provided in Sections 2.02(b) and 5.09(b) hereof, and withdrawn by the Trustee for the purposes of paying, and reimbursing the Trustee and the Independent Consultants for the payment of, Trustee and Independent Consultant Expenses, in each case upon written requisition signed by an Authorized Officer of the Commonwealth.

(b)      By no later than each CVIs Annual Payment Amount Calculation Date, whether or not an SUT Outperformance Condition and/or Rum Tax Outperformance Condition has occurred with respect to a prior Fiscal Year, the Commonwealth shall calculate the Trustee and Independent Consultant Funding Amount and provide the Trustee with written notice of such amount. On or prior to each CVIs Annual Payment Amount Date, whether or not an SUT Outperformance Condition and/or Rum Tax Outperformance Condition has occurred with respect to a prior Fiscal Year, the Commonwealth shall transfer to the Trustee an amount equal to the Trustee and Independent Consultant Expenses Funding Amount for deposit into the Trustee and Independent Consultant Expenses Fund.   The money deposited into the Trustee and Independent Consultant Expenses Fund may be invested as provided in Article VI hereof.

## ARTICLE VI.

## INVESTMENT OF FUNDS

**Section 6.01   Investment of Funds**.

(a)      Moneys in the CVIs Payment Fund and the accounts therein, other than the Disputed Payments Account and the subaccounts therein, shall be held uninvested by the Trustee. The Trustee shall have no obligation for the payment of interest on moneys held by it in the CVIs Payment Fund and the accounts therein, other than the Disputed Payments Account and the subaccounts therein as provided herein.

(b)      Subject to the limitations set forth in this paragraph, moneys held in the Trustee and Independent Consultant Expenses Fund shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments in accordance with the written direction of an Authorized Officer of the Commonwealth.  Subject to the limitations set forth in this paragraph, moneys held in the Disputed Payments Account shall, as nearly as may be practicable, be invested by the Trustee in any Eligible Investments described in paragraphs ___, ___ and ___ thereof, in accordance with the written direction of an Authorized Officer of the Commonwealth.  The Trustee may conclusively rely upon the Commonwealth's written instructions as to both the suitability and legality of the directed investments.  Ratings of permitted investmentsEligible Investments shall be determined at the time of purchase of such permitted investmentsEligible Investments.  In the event that the ratings of such Eligible Investments fall below the ratings set forth in the definition thereof, the Commonwealth shall substitute such Eligible Investments with other Eligible Investments meeting the ratings requirements of the definition.  The Trustee may make any and all such investments through its own investment department or that of its affiliates

or subsidiaries, and may charge its ordinary and customary fees for such trades, including investment maintenance fees.

(c)     Obligations purchased or other investments made as an investment of money in the Trustee and Independent Consultant Expenses Fund held under the provisions hereof shall be deemed at all times to be a part of such fund and the income or interest earned, profits realized or losses suffered by the Trustee and Independent Consultant Expenses Fund due to the investment thereof shall be credited or charged, as the case may be, to the Trustee and Independent Consultant Expenses Fund. Obligations purchased or other investments made as an investment of money in the Disputed Payments Account held under the provisions hereof shall be deemed at all times to be a part of such fund and the income or interest earned, profits realized or losses suffered by the Disputed Payments Account due to the investment thereof shall be credited or charged, as the case may be, to the Disputed Payments Account.

(d)     In computing the amount in the Trustee and Independent Consultant Expenses Fund and the Disputed Payments Account under the provisions hereof, obligations purchased as an investment of money therein or held therein shall be valued at the market value thereof, inclusive of accrued interest to the date of valuation.

(e)     Subject to the provisions hereof, the Commonwealth, in its discretion, may, and the Trustee at the direction of an Authorized Officer of the Commonwealth, shall sell, present for redemption or exchange any investment held pursuant hereto and the proceeds thereof may be reinvested as provided in this Section.  Except as otherwise provided herein, such investments shall be sold by the Commonwealth or by the Trustee at the written direction of the Commonwealth at the best price reasonably obtainable by it, or presented for redemption or exchange, whenever it shall be necessary in order to provide money to meet any payment or transfer from the Trustee and Independent Consultant Expenses Fund or the Disputed Payments Account, as applicable.  The Trustee shall advise the Commonwealth in writing, on or before the fifteenth (15th) day of each calendar month, of the details of all investments held for the credit of the Trustee and Independent Consultant Expenses Fund and the Disputed Payments Account as of the end of the preceding month.  The details of such investments shall include the par value, if any, the cost and the current market value of such investments as of the end of the preceding month.  The Trustee shall also describe all withdrawals, substitutions and other transactions occurring in the Trustee and Independent Consultant Expenses Fund and the Disputed Payments Account in the previous month.

(f)     Although the Commonwealth recognizes that it may obtain a broker confirmation or written statement containing comparable information at no additional cost, the Commonwealth hereby agrees that confirmations of Eligible Investments are not required to be issued by the Trustee for each month in which a monthly statement is rendered.

**Section 6.02  Liability for Investments.**  Neither the Commonwealth nor the Trustee shall have any liability arising out of or in connection with the making of any investment authorized by the provisions of this Article VI, in the manner provided in this Article VI, for any depreciation in value of any such investment, or for any loss, fee, tax or other charge, direct or indirect, resulting from any such investment, reinvestment or liquidation of an investment.

4820-1003-9275.18 9275.22

## ARTICLE VII.

## PARTICULAR COVENANTS

The Commonwealth covenants and agrees with the Holders of the Notes as follows:

**Section 7.01   Payment of Notes.**   Subject to the limitations herein, including the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition, as applicable, and the CVIs Maximum Payment Amounts, the Commonwealth shall pay or cause to be paid every Note, on the dates and at the places and in the manner provided herein and in the Notes according to the true intent and meaning thereof.

**Section 7.02   Pledge of Good Faith, Credit and Taxing Power of Commonwealth**. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notes as and when due in accordance with this Trust Agreement.  The Notes constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution.  The Secretary of Treasury is authorized and directed to pay the Notes as the same shall become due from any funds in the Treasury of the Commonwealth available for such purpose in the Fiscal Year for which said payment is required.  Such funds in the Treasury of the Commonwealth available for such purpose shall be deposited by the Secretary of Treasury in trust with the Trustee for the benefit of the Holders of the Notes in the amounts and at the times required by Section 5.03(b) hereof.   For the avoidance of doubt, the Commonwealth acknowledges that all references in this Trust Agreement to the pledge of its "good faith, credit and taxing power" (consistent with the Spanish version of the Constitution) should also be interpreted as references to the pledge of its "full faith, credit and taxing power" (consistent with the English version of the Constitution).

**Section 7.03   Powers as to Notes.**  Pursuant to the CVI Legislation, the Plan and the Confirmation Order, the Commonwealth is duly authorized to execute and deliver the Notes and to execute the Trust Agreement.  The Commonwealth further represents that all corporate action on the part of the Commonwealth to that end has been duly and validly taken.  Pursuant to the Plan and the Confirmation Order, the Commonwealth further represents that the Notes and the provisions hereof are and shall be the valid and legally enforceable obligations of the Commonwealth in accordance with their terms and the terms hereof.  The Commonwealth further represents that its good faith, credit and taxing power pledge in support of the Notes is a valid, binding and legally enforceable pledge of the Commonwealth.   The Commonwealth further covenants that it shall not fail at all times to defend, preserve and protect, or cause to be defended, preserved and protected, the lien created by Section 5.01 and all of the rights of the Trustee for the benefit of the Holders of Notes under the Trust Agreement against all claims and demands of all Persons whomsoever.

**Section 7.04   Further Assurance.**  The Commonwealth, at any and all times, shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the pledge and lien provided for herein, or which the Commonwealth may hereafter become bound to pledge or assign.

**Section 7.05   Offices for Payment and Registration of Notes.**  Unless all of the Notes are Book Entry Notes, the Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan, in The City of New York where Notes may be presented for payment, which office or agency may be at or through the designated corporate trust office of the Trustee. The Commonwealth may, pursuant to a Supplemental Trust Agreement, designate an additional Paying Agent or Paying Agents where Notes authorized thereby or referred to herein may be presented for payment.  The Commonwealth shall at all times maintain an office or agency in the Borough of Manhattan in The City of New York where Notes may be presented for registration, transfer or exchange and the Trustee is hereby appointed as its agent to maintain such office or agency for the registration, transfer or exchange of Notes.  The provisions of this Section shall be subject to the provisions of Section 3.10 hereof.

**Section 7.06   General**.  The Commonwealth shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Commonwealth under the provisions hereof in accordance with the terms of such provisions.

Upon the Effective Date, all conditions, acts and things required by the Plan, the Confirmation Order and the statutes of the Commonwealth, including the CVI Legislation, and hereby to exist, to have happened and to have been performed precedent to and in the issuance of such Notes, shall exist, have happened and have been performed.

**Section 7.07   Non-Impairment Covenant**.  The Commonwealth, for the benefit of all initial and subsequent Holders of the Notes, covenants and agrees that, until all obligations with respect to this Trust Agreement and the Notes have been paid or otherwise satisfied in accordance with their respective terms, the Commonwealth will not:

(a)   take any action that would impair the rights and remedies of the Holders of the Notes;

(b)   limit or restrict the rights or powers of the appropriate officers of the Commonwealth to fulfill the terms of any agreements made with respect to the Notes; or

(c)   impair the ability of the Holders of the Notes to track performance of the Measured SUT and the Waterfall General Fund Rum Tax Collections;

*provided*, *however*, the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with this Trust Agreement, which shall protect Holders of the Notes from such elimination or replacement reducing the likelihood that an SUT Outperformance Condition will occur; and, *provided*, *further*, that the Commonwealth shall provide for the timely posting with EMMA by the ~~Commonwealth~~Trustee of (x) the amounts of Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction, all in accordance with the Calculation Agent Agreement.

**Section 7.08   [Baseline SUT Reduction and SUT True-Up.]**

(a)   The 5.5% SUT Baseline set forth in Attachment 1 hereto reflects the statutory and administrative provisions of the law governing the imposition and collection of the 5.5% SUT as of the Effective Date.  No adjustments to the 5.5% SUT Baseline shall be made for

exemptions or holidays that are included in the Puerto Rico Internal Revenue Code (Sections 4030.01 through 4030.27 thereof) as of the Effective Date.

(b)    In the event that subsequent to the Effective Date, exemptions or holidays are created during a U.S. Presidential Declaration of Disaster for a period not to exceed thirty (30) days and only for emergency-related categories of spend, the 5.5% SUT Baseline shall be reduced by an amount equal to the estimated impact on collections of the 5.5% SUT resulting from any such exemptions or holidays (the "Baseline SUT Reduction"). The Commonwealth agrees, subject to verification by an Independent Consultant, to provide a substitute Attachment 1 within three Business Days of verification by the Independent Consultant reflecting the Baseline SUT Reduction.

(c)    In the event that subsequent to the Effective Date, any other exemptions or holidays of any kind are implemented with respect to the 5.5% SUT (including any exemptions or holidays created during a U.S. Presidential Declaration of Disaster for a period exceeding thirty (30) days or for categories of spend other than emergency-related categories of spend, the Measured SUT shall be increased by an amounts equal to the estimated impact on collections of the 5.5% SUT resulting from such exemptions or holidays ("SUT True-Up"). The Commonwealth agrees, subject to verification by an Independent Consultant, to provide a substitute Attachment 1 within three Business Days of verification by the Independent Consultant reflecting the SUT True-Up.

(d)    To the extent the Commonwealth reduces the 5.5% SUT to a lower rate, the Commonwealth shall adjust the Measured SUT for each Fiscal Year to maintain the same amount of outperformance had the Measured SUT remained at 5.5% by multiplying (i) the projected Measured SUT generated at the lower rate by (ii) the fraction equal to 5.5% divided by the lower rate.  Such an adjustment shall be considered an SUT True-Up for purposes of this Section 7.08. The Commonwealth agrees, subject to verification by an Independent Consultant, to provide a substitute Attachment 1 within three Business Days of verification by the Independent Consultant reflecting the SUT True-Up due to such an adjustment.

(e)    [For the calculation of either the Baseline SUT Reduction or SUT True-Up, as provided in the Calculation Agent Agreement, the calculation shall be determined by the Secretary of Treasury and verified by an Independent Consultant.  Verification by an Independent Consultant shall be binding on both the Commonwealth and the Holders of the Notes.] Notes.

(f)    Within ten Business Days of the verification by an Independent Consultant of the final calculation of any As provided in the Calculation Agent Agreement, the Trustee shall post the calculations relating to each Baseline SUT Reduction or SUT True-Up, the Commonwealth shall post such calculations and, SUT True-Up and reduction in the 5.5% SUT and the revised Attachment 1, together with supporting narrative, if any, with EMMA under all of the CUSIP numbers applicable to the Notes. Notes within one (1) Business Day of receipt thereof.

- 51 -

4820-1003-9275.18 9275.22

**Section 7.09   [Substitute Measured Tax**.

(a)     The Commonwealth may substitute a 5.5% SUT with a Substitute Measured Tax, subject to the satisfaction of the requirements set forth in ~~this Section 7.09.~~the Calculation Agent Agreement.

(b)     The Substitute Measured Tax shall be all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth.

(c)     ~~[_____]~~As provided in the Calculation Agent Agreement, the Trustee shall post a summary of the material provisions of the Substitute Measured Tax and the revised Attachment 1, reflecting that the Substitute Measured Tax has become effective, together with projections and supporting summary narrative, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

**Section 7.10   Tax Covenant**.

(a)     The Commonwealth will take all reasonable best efforts to provide that payments or redemptions made with respect to the Notes shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the Notes may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding, that may otherwise be applicable to such payments or redemptions.

(b)     The Commonwealth will take all reasonable best efforts to cause the Notes to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities, to effectuate such tax-exemption.

**Section 7.11   Comprehensive Cap on Net Tax Supported Indebtedness**.  For so long as any portion of the Notes shall remain ~~outstanding~~Outstanding, the Commonwealth shall maintain a Comprehensive Cap on all ~~net tax supported debt~~Net Tax-Supported Debt (as defined in the Plan) for purposes of the limitation on the issuance of additional ~~net tax supported debt~~Net Tax-Supported Debt set forth in Article VI of the Debt Responsibility Act, which Comprehensive Cap shall not exceed at any time 7.94% of Debt Policy Revenues (as defined in the Plan) as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of 0.25% of Debt Policy Revenues ~~(as defined in the Plan)~~ required to pay the maximum annual debt service on the COFINA Bonds (as defined in the Plan) outstanding as of the Effective Date.  Subject in all respects to the terms of the Plan, debt service payments on Series ~~2021~~2022A-1 Capital Appreciation Bonds, and payments on CVIs (as defined in the Plan) that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with another plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan or Title VI Qualifying Modification for HTA (as defined in the Plan), CCDA (as defined in the Plan), or

PRIFA (as defined in the Plan), in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap.  In connection with the issuance of Net Tax -Supported Indebtedness Debt, the Secretary of Treasury shall certify that such Net Tax -Supported Indebtedness Debt is being issued in compliance with the Comprehensive Cap.  Absent manifest error, the certification of the Secretary of Treasury shall be conclusive and binding on all parties, including the Holders of Notes issued under this Trust Agreement, and the validity of such Net Tax Support Indebtedness Supported Debt shall not be subject to legal challenge.  In calculating Debt Policy Revenues for purposes of this Section 7.11 and the Debt Responsibility Act, the Secretary of Treasury may rely on certifications from officers of public corporations as to the revenues of such public corporations.

**Section 7.12   Rum Tax Reporting**.    [       ]The Commonwealth shall provide information relating to the collection of the Commonwealth Rum Tax Revenues as set forth in the Calculation Agent Agreement.

**Section 7.13   Creation of Liens.** The Commonwealth shall not create or cause to be created any lien or charge on the Trust Estate, other than as provided in Section 5.01 hereof.

**Section 7.14   Fiscal Plan**.  Any Fiscal Plan certified after the Effective Date will include provisions for the payment in each Fiscal Year of, to the extent that an SUT Outperformance Condition or a Rum Tax Outperformance Condition is satisfied in the prior Fiscal Year, any amounts due and owing on the CVIs Notes in accordance with the terms hereof; provided, however, that nothing in the Fiscal Plan shall be deemed to be a determination that an SUT Outperformance Condition or a Rum Tax Outperformance Condition has occurred with respect to any such Fiscal Year or shall create an obligation of the Commonwealth to make any payments with respect thereto, it being the intention of this Trust Agreement that such determinations and related obligations shall be governed by the provisions of Article V hereof.

**Section 7.15   Continuing DisclosureReporting Requirements**.  [The Commonwealth covenants that, in connection with the sale, delivery or marketing of the Notes hereunder, it will enter into a continuing disclosurereporting agreement in substantially the form attached hereto as Attachment 11 hereto.  An event of default under such Continuing DisclosureReporting Agreement, including the failure to timely provide the notices or information described therein, shall not be an Event of Default hereunder and the exclusive remedies available to any Person shall be as described in the continuing disclosure agreement.]Reporting Agreement.

**Section 7.16   Cap on Notional Amount**.  The GO CVI Notional Amount and the Clawback CVI Notional Amount set out the maximum aggregate amount of Notes that are permitted to be issued pursuant to this Trust Agreement and the Commonwealth shall not issue a greater aggregate notional amount of Notes.

**Section 7.17   Subsequent Bankruptcy Case**.  In the event that, during the period that the CVIs remain Outstanding, the Commonwealth commences a proceeding under Title III of PROMESA or under any other then applicable bankruptcy or insolvency law (the "Subsequent Bankruptcy Case"), the Commonwealth acknowledges and agrees that (a) the Trustee shall be authorized to file a proof of claim in the Subsequent Bankruptcy Case on behalf of the Holders of the CVIs seeking payment on account of a contingent, unliquidated claim with respect to the

CVIs that remain Outstanding as of the date of such Subsequent Bankruptcy Case, together with all fees and expenses payable hereunder, and (b) unless the CVIs are rendered or determined to be unimpaired in such Subsequent Bankruptcy Case, the court presiding over such Subsequent Bankruptcy Case shall determine the allowance, amount, and priority of such claim, if any, in accordance with applicable law; provided, however, that nothing contained herein or in any other document, instrument or applicable law shall prevent the Commonwealth or any other party in interest from objecting to the allowance, amount, and priority of such claim on any grounds whatsoever.

## ARTICLE VIII.

## CONCERNING THE TRUSTEE AND THE PAYING AGENT

**Section 8.01   Appointment and Acceptance of Trustee.**  The Trustee, by its execution and delivery of this Trust Agreement, does signify its acceptance of its appointment as and of the duties and obligations of Trustee and Paying Agent imposed upon it hereby.

**Section 8.02   Appointment and Acceptance of Paying Agents.**  In addition to the Trustee, the Commonwealth may appoint one or more Paying Agents for the Notes of any Series, Subseries or Sub-Subseries so long as any such Paying Agents satisfy the requirements set forth in Section 8.10 hereof, and may at any time or from time to time appoint one or more other Paying Agents in the manner and subject to the conditions set forth in Section 8.10 hereof for the appointment of a successor Paying Agent.  Each Paying Agent shall signify its acceptance of the duties and obligations imposed upon it hereby by written instrument of acceptance deposited with the Commonwealth and the Trustee.

**Section 8.03   Responsibilities of Trustee and Paying Agents.**  The recitals of fact contained herein and in the Notes shall be taken as the statements of the Commonwealth and neither the Trustee nor any Paying Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor any Paying Agent makes any representations as to the validity or sufficiency hereof or of any Notes, or in respect of the security afforded hereby, and neither the Trustee nor any Paying Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to the application of any money paid to or by the Commonwealth or others in accordance herewith except as to the application of any money paid to it in its capacity as Trustee or Paying Agent. Neither the Trustee nor any Paying Agent shall be liable in connection with the performance of or failure to perform its duties hereunder except for its own negligence or willful misconduct.

The duties and obligations of the Trustee and any Paying Agent shall be determined by the express provisions hereof and neither the Trustee nor any Paying Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein, and no implied covenants or obligations should be read into this Trust Agreement against the Trustee.  If any Event of Default under this Trust Agreement shall have occurred and be continuing, the Trustee shall exercise such of the rights and powers vested in it by this Trust Agreement and shall use the same degree of care as a prudent person, as a trustee under a trust agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

4820-1003-9275.189275.22

**Section 8.04   Property Held in Trust.**  All money and securities conveyed to or held by the Trustee at any time pursuant to the terms hereof shall be and hereby are assigned, transferred and set over unto the Trustee in trust for the purposes and under the terms and conditions hereof.

**Section 8.05   Rights of the Trustee and the Paying Agent.**  The Trustee and any Paying Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties.  The Trustee and any Paying Agent may consult with qualified counsel of its selection, who may or may not be of counsel to the Commonwealth, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

Whenever the Trustee or any Paying Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth.  Such certificate shall be full warrant for any action taken or suffered in good faith under the provisions hereof upon the faith thereof, but in its reasonable discretion the Trustee or any Paying Agent, in lieu thereof, may either accept other evidence of such fact or matter or require such further or additional evidence.  Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Commonwealth to the Trustee or any Paying Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

The Trustee shall not be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee at the designated corporate trust office of the Trustee and such notice references the Notes relative to which an Event of Default has occurred.

The Trustee may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

Neither the Trustee nor any Paying Agent shall be under any liability for interest on any moneys received hereunder except as may be otherwise agreed upon.

Notwithstanding the effective date of this Trust Agreement or anything to the contrary in this Trust Agreement, the Trustee shall have no liability or responsibility for any act or event relating to this Trust Agreement which occurs prior to the date the Trustee formally executes this Trust Agreement and commences acting as Trustee hereunder.

The Trustee shall have no responsibility with respect to any information, statement or recital in any official statement, offering memorandum or any other disclosure material prepared

- 55 -

or distributed with respect to the Notes, except for any information provided by the Trustee, and shall have no responsibility for compliance with any state or federal securities laws in connection with the Notes.

The Trustee shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Notes or Majority in Interest of Outstanding Notes, as applicable, pursuant to the terms hereof in respect of such action or failure to act, except to the extent of its negligence or willful misconduct in connection therewith.

The Trustee and any Paying Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Trust Agreement and delivered using Electronic Means ("Instructions"); ***provided***, ***however***, that the Commonwealth shall provide to the Trustee and each Paying Agent an incumbency certificate listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a person is to be added or deleted from the listing.  If the Commonwealth elects to give the Trustee or a Paying Agent Instructions using Electronic Means and the Trustee or such Paying Agent in its discretion elects to act upon such Instructions, the Trustee's or such Paying Agent's understanding of such Instructions shall be deemed controlling.  The Commonwealth understands and agrees that the Trustee or a Paying Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and such Paying Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or such Paying Agent have been sent by such Authorized Officer.  The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or any Paying Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth.  Neither the Trustee nor any Paying Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or such Paying Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to negligence or willful misconduct of the Trustee.  The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or any Paying Agent, including without limitation the risk of the Trustee or such Paying Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or any Paying Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and any Paying Agent immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

**Section 8.06   Compensation and Indemnification.**  Unless otherwise provided, there shall be paid from the Trustee and Independent Consultant Expenses Fund to the Trustee and to each Paying Agent, from time to time, such compensation as shall be agreed in writing for all services rendered by it hereunder, and also all reasonable, necessary and documented expenses,

4820-1003-9275.189275.22

charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, required to be incurred in the performance of their powers and duties hereunder.  The Commonwealth agrees to pay the foregoing, other than expenses, charges, counsel fees and expenses and other disbursements, including those of their attorneys, agents and employees, related to actions, suits, and other Proceedings brought by or at the direction or request of any Holders, including, without limitation, the enforcement of remedies under Article XI hereof, and further excluding the Trustee's rights to indemnification as a result thereof, including the fees and expenses incurred in connection with any indemnified claim.  None of the provisions contained herein shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties or in the exercise of any of its rights or powers, if there is reasonable ground for believing that the repayment of such funds or liability is not reasonably assured to it.

The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each agent, custodian and other Person employed to act hereunder.

The provisions of this Section shall survive termination of this Trust Agreement and the resignation and removal of the Trustee.

**Section 8.07   Permitted Acts.**  The Trustee may become the owner of or may deal in Notes as fully and with the same rights as if it were not such Trustee or a Paying Agent.  The Trustee may act as depository for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, the Commonwealth or any committee formed to protect the rights of Holders of Notes or to effect or aid in any reorganization growing out of the enforcement hereof or of the Notes whether or not such committee shall represent the Holders of a Majority in Interest of the then Outstanding Notes in respect of which any such action is taken.

The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys appointed with due care.

The permissive rights of the Trustee to do things enumerated in this Trust Agreement shall not be constructed as a duty unless so specified herein.

**Section 8.08   Resignation of Trustee.**  The Trustee, or any successor thereof, may at any time resign and be discharged of its duties and obligations hereunder by giving not less than sixty (60) days' written notice to: (a) the Commonwealth, and (b) the Holders of the Notes by first class mail, postage prepaid, at their last known addresses, if any, appearing on the registration books.  Such resignation shall take effect upon the date specified in such notice (which shall be no sooner than the date specified in the immediately preceding sentence) unless previously a successor shall have been appointed as provided in Section 8.10 hereof, in which event such resignation shall take effect immediately on the appointment of such successor; **_provided, however,_** that such resignation shall not take effect until a successor Trustee has been appointed and has accepted such appointment pursuant to Section 8.10 hereof.

**Section 8.09   Removal of Trustee.**  The Trustee and/or Paying Agent, or any successor thereof, may be removed at any time upon 30 day's written notice by the Holders of a Quarter in

Interest of the Outstanding Notes, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to the Commonwealth.  The Trustee and/or Paying Agent, or any successor thereof, may also be removed at any time for cause or any breach of trust or for acting or proceeding in violation of, or failing to act or proceed in accordance with, any provisions hereof with respect to the duties and obligations of the Trustee, as applicable, by any court of competent jurisdiction upon application by the Holders of a Quarter in Interest of the Outstanding Notes.  No removal hereunder shall take effect until a successor Trustee has been appointed and has accepted such appointment.  A copy of each instrument or order providing for the removal of the Trustee, or any successor thereof, shall be delivered by the applicable Holders to the Trustee or such successor thereof and to the Commonwealth.

**Section 8.10   Successor Trustee and/or Paying Agent.**  In case the Trustee and/or Paying Agent, or any successor thereof, shall resign or shall be removed or shall become incapable of acting, or shall be adjudged a bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee and/or Paying Agent or of its property shall be appointed, or if any public officer shall take charge or control of the Trustee and/or Paying Agent or of its property or affairs, a successor may be appointed by the Holders of a Quarter in Interest of the Outstanding Notes, by an instrument or concurrent instruments in writing signed and acknowledged by such Holders or by their attorneys-in-fact duly authorized and delivered to such successor Trustee and/or Paying Agent, notification thereof being given to the Commonwealth and the predecessor Trustee and/or Paying Agent; ***provided, nevertheless,*** that unless a successor Trustee and/or Paying Agent shall have been appointed by the Holders as aforesaid, the Commonwealth by a duly executed written instrument signed by an Authorized Officer of the Commonwealth shall forthwith appoint a Trustee and/or Paying Agent to fill such vacancy until a successor Trustee and/or Paying Agent shall be appointed by the Holders as authorized in this Section. The Trustee and/or Paying Agent shall mail a copy of the notice of any such appointment, postage prepaid, to the Holders of any Notes, at their last addresses appearing on the registry books. Any successor Trustee and/or Paying Agent appointed by the Commonwealth shall, immediately and without further act, be superseded by a Trustee and/or Paying Agent appointed by the Holders of a Quarter in Interest of the Outstanding Notes.

If in a proper case no appointment of a successor shall be made within forty–five (45) days after the giving of written notice in accordance with Section 8.08 hereof or after the occurrence of any other event requiring or authorizing such appointment, the Trustee and/or Paying Agent or any Holder may apply, at the expense of the Commonwealth, to any court of competent jurisdiction for the appointment of such a successor, and such court may thereupon, after such notice, if any, as such court may deem proper, appoint such successor.  Any successor appointed under the provisions of this Section shall be a bank having trust powers, a trust company or national banking association, in each case located in the State of New York and having a capital and surplus aggregating at least $50,000,000, if there be such a bank having trust powers or trust company or national banking association willing and able to accept the appointment on reasonable and customary terms and authorized by law to perform all the duties required hereby.

Neither the Commonwealth nor any public corporation, agency or instrumentality of the Commonwealth nor any Person affiliated with the foregoing may be appointed as Trustee or Paying Agent hereunder.

**Section 8.11   Transfer of Rights and Property to Successor Trustee.**  Any successor appointed under the provisions of Section 8.10 hereof shall execute, acknowledge and deliver to its predecessor, and also to the Commonwealth, an instrument accepting such appointment, and thereupon such successor, without any further act, deed or conveyance shall become fully vested with all money, estates, properties, rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally appointed as Trustee.  However, the Trustee then ceasing to act shall nevertheless, on request by the Commonwealth or of such successor, and upon payment of all amounts owed to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor all the right, title and interest of such Trustee in and to any property held by it hereunder, and shall pay over, assign and deliver to such successor any money or other properties subject to the trusts and conditions set forth herein.  Should any deed, conveyance or instrument in writing from the Commonwealth be required by such successor for more fully and certainly vesting in and confirming to it any such money, estates, properties, rights, powers, duties or obligations, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Commonwealth.  In all instances, the Trustee then ceasing to act as trustee shall remain liable for actions or omissions prior to such transfer

**Section 8.12   Merger or Consolidation of the Trustee.**  Any company into which the Trustee may be merged or with which it may be consolidated or any company resulting from any merger or consolidation to which it shall be a party or any company to which such Trustee may sell or transfer all or substantially all of its corporate trust business, ***provided*** such company shall be a bank having trust powers or trust company or national banking association qualified to be a successor to such Trustee under the provisions of Section 8.10 hereof, shall be the successor to such Trustee, without any further act, deed or conveyance.  In the event that such entity is not so qualified, such entity shall nevertheless continue to serve as Trustee until a successor Trustee is appointed by the Holders of a Quarter in Interest of the Outstanding Notes.

**Section 8.13   Ancillary Agreements**.  To the extent it is a party thereto, the Trustee is authorized to enter into and perform its obligations under the Ancillary Agreements.

**ARTICLE IX.**

**AMENDMENTS TO TRUST AGREEMENT**

**Section 9.01   Modification and Amendment without Consent.**  Notwithstanding any other provisions of this Article IX or Article X hereof, the Commonwealth and the Trustee may execute and deliver at any time or from time to time Supplemental Trust Agreements for any one or more of the following purposes, and each such Supplemental Trust Agreement shall become effective in accordance with its terms:

(a)     To add additional covenants and agreements of the Commonwealth for the purpose of further securing the payment of the Notes, ***provided*** such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements or in the CVI Legislation; and

4820-1003-9275.189275.22

*provided **further*** that such additional covenants and agreements shall be for the equal benefit and security of all Notes, without discrimination or preference;

        (b)   ~~[To provide for revisions based upon a Baseline SUT Reduction, SUT True-Up or Substitute Measured Tax as permitted by Sections 7.08 and 7.09 hereof];~~

        (b)  ~~(c)~~ To surrender any right, power or privilege reserved to or conferred upon the Commonwealth by the terms hereof, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Commonwealth contained herein, in the Ancillary Agreements, the Plan, the Confirmation Order or in the CVI Legislation; provided that same shall be for the equal benefit and security of all Notes, without discrimination or preference;

        (c)  ~~(d)~~ To confirm, as further assurance, the lien, and the subjection to the lien, of the Commonwealth's right, title and interest in the Trust Estate, or any other money, investments thereof or funds, provided that such further assurance shall be for the equal benefit and security of all Notes (or, as contemplated hereunder, the applicable Series, Subseries or Sub-Subseries of Notes), without discrimination or preference; and

        (d)  ~~(e)~~ With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision herein or to insert such provisions clarifying matters or questions arising hereunder as are necessary or desirable, provided that such modification shall not, in the opinion of Transaction Counsel to be provided in accordance with the ~~last~~next paragraph of this Section 9.01, materially adversely affect the ~~interests~~rights of the Holders ~~in any respect~~of the Notes.

Notwithstanding the above, no Supplemental Trust Agreement authorized by this Section 9.01 shall be effective unless and until it is executed by both the Trustee and the Commonwealth and the Commonwealth has delivered to the Trustee an opinion of Transaction Counsel to the effect that the execution of the Supplemental Trust Agreement is authorized pursuant to this Section 9.01 and will not materially adversely affect the rights of the Holders of the Notes ~~in any materially adverse respect~~.

For the avoidance of doubt, no Supplemental Indenture shall be permitted pursuant to this Section 9.01 to the extent it would effectuate a modification or amendment that is only permitted under Section 10.01 hereof with the consent of each affected Holder.

**Section 9.02   Supplemental Trust Agreements Effective with Consent of Holders.** The provisions hereof may also be modified or amended at any time or from time to time by a Supplemental Trust Agreement, subject to the written consent of the Holders and the rights of the Secretary of Treasury in accordance with and subject to the provisions of Article X hereof, such Supplemental Trust Agreement to become effective upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Commonwealth.

**Section 9.03   General Provisions Relating to Supplemental Trust Agreements.**  The Trust Agreement shall not be modified or amended in any respect except in accordance with and subject to the provisions of this Article IX or Article X hereof.  A copy of every Supplemental Trust Agreement, when filed with the Trustee for the Trustee's execution, shall be accompanied by the opinion of Transaction Counsel required by Section 9.01, and an opinion of Transaction

Counsel stating that such Supplemental Trust Agreement has been duly and lawfully adopted in accordance with the provisions hereof, is authorized or permitted hereby and is valid and binding upon the Commonwealth and enforceable in accordance with its terms.  The Trustee shall be fully protected in relying on such an opinion of Transaction Counsel.

Notwithstanding anything to the contrary herein, no Supplemental Trust Agreement shall become effective without the written consent of the Trustee.

The Commonwealth, as soon as practicable after a Supplemental Trust Agreement changing, amending or modifying any provisions of this Trust Agreement has become effective, shall post a copy of such Supplemental Trust Agreement on the Commonwealth's website and the Trustee shall post a copy of such Supplemental Trust Agreement on EMMA under the CUSIPs for the Outstanding Notes.

## ARTICLE X.

## AMENDMENTS OF TRUST AGREEMENT WITH CONSENT OF HOLDERS

### Section 10.01 Powers of Amendment.

(a)     Except as provided in Section 9.01 hereof, any modification or amendment hereof or of the rights and obligations of the Commonwealth and of the Holders of the Notes hereunder may only be made by a Supplemental Trust Agreement, with the written consent given as hereinafter provided in Section 10.02 hereof, (i) of the Holders of at least a Majority in Interest of the Notes Outstanding at the time such consent is given, or (ii) in case less than all of the several Series, Subseries or Sub-Subseries of Notes then Outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the Notes of each Series, Subseries or Sub-Subseries so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Notes of any specified like Series or, Subseries or Sub-Subseries and tenor remain Outstanding, the consent of the Holders of such Notes shall not be required and such Notes shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Notes under this Section.

(b)     No such modification or amendment shall, without the prior written consent of the Holder of such Note, permit a change in the provisions related to the timing or amount of any payment on the Notes, including, without limitation, any change in the currency to be used to pay the Notes, any change in the amount or date of any payment, the terms of redemption of any Outstanding Note or a reduction in the notional amount thereof.  Further, no such modification or amendment shall, without the prior written consent of the Holder of such Note, reduce the percentages or otherwise affect the classes of Notes the consent of the Holders of which is required to effect any such modification or amendment.  Further, no waiver of any default or compliance with any provision of this Section 10.01 shall be granted without the prior written consent of the Holder of such Note.

(c)     For the purposes of this Section 10.01, a Series, Subseries or Sub-Subseries shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of Notes of such Series, Subseries or

4820-1003-9275.189275.22

Sub-Subseries in any respect or diminishes (or is likely to diminish) the recovery of or the amount likely to be paid on account of such Series, Subseries or Sub-Subseries in any respect. [The Trustee shall obtain an opinion of Transaction Counsel as to whether the Notes of any particular Series, Subseries or Sub-Subseries would be so affected by any such modification or amendment hereof, which such opinion shall be binding and conclusive on the Commonwealth, the Trustee and all Holders of Notes.]

**Section 10.02 Consent of Holders.**  The Commonwealth may at any time execute and deliver a Supplemental Trust Agreement making a modification or amendment permitted by the provisions of Section 10.01 hereof to take effect when and as provided in this Section.  Upon the adoption of such Supplemental Trust Agreement, a copy thereof, certified by an Authorized Officer of the Commonwealth shall be filed with the Trustee for the inspection of the Holders of Notes.  A copy of such Supplemental Trust Agreement (or summary thereof or reference thereto in form approved in writing by the Trustee) together with a request to Holders of Notes of any Series, Subseries or Sub-Subseries affected by such modification or amendment for their consent thereto in form satisfactory to the Trustee, shall be mailed or distributed by Electronic Means by the Commonwealth to each affected Holder of Notes.  Such Supplemental Trust Agreement shall not become effective until (a) there shall have been filed with the Trustee (i) the written consent of the Holders of the percentages of Outstanding Notes specified in Section 10.01 hereof and (ii) the opinions of Transaction Counsel required by Section 9.03 and (b) a notice shall have been mailed or distributed by Electronic Means as hereinafter in this Section provided.  For purposes of calculating the required percentage of Notes consenting to a modification or amendment, any such consent shall be binding upon the Holder of the Notes of such Series, Subseries or Sub-Subseries affected giving such consent and on any subsequent Holder of such Notes (whether or not such subsequent Holder has notice thereof).  At any time after the Holders of the required percentages of Notes of such Series, Subseries or Sub-Subseries affected shall have filed their consent to the Supplemental Trust Agreement, notice, stating in substance that the Supplemental Trust Agreement has been consented to by the Holders of the required percentages of Notes of such Series, Subseries or Sub-Subseries and will be effective as provided in this Section, shall be given to the Holders by mailing such notice to Holders or by Electronic Means. The Commonwealth shall file with the Trustee proof of giving such notice.  Such Supplemental Trust Agreement shall be deemed conclusively binding upon the Commonwealth and the Holders of all Notes of such Series, Subseries or Sub-Subseries affected at the expiration of sixty (60) days after the filing with the Trustee of the proof of the giving of such notice, except in the event of a final decree of a court of competent jurisdiction setting aside such consent in legal action or equitable proceeding commenced for such purpose within such sixty day period; ***provided, however***, that the Commonwealth during such sixty day period and any such further period during which any such action or proceeding may be pending shall be entitled in its absolute discretion to take such action, or to refrain from taking such action, with respect to such Supplemental Trust Agreement as it may deem expedient.

**Section 10.03 Modifications by Unanimous Consent.**  The terms and provisions hereof and the rights and obligations of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth and of the Holders of the Notes may be modified or amended in any respect upon the execution, delivery and filing with the Trustee by the Commonwealth of a copy of a Supplemental Trust Agreement certified by an Authorized Officer of the Commonwealth and the consent of the Holders of all of the Notes then Outstanding, such consent to be given as provided in Section 10.02.

4820-1003-9275.189275.22

**Section 10.04 Mailing**.  Any provision in this Article X for the mailing of a notice or other document to Holders shall be fully complied with if it is mailed postage prepaid or distributed by Electronic Means only (a) to each registered owner of Notes then Outstanding at such Person's address, if any, appearing upon the registry books of the Commonwealth, and (b) to the Trustee.

**Section 10.05 Exclusion of Notes.**  Notes owned or held by or for the account of the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be deemed Outstanding for the purpose of consent or other action provided for herein, and the Commonwealth or any public corporation, agency or instrumentality of the Commonwealth shall not be entitled with respect to such Notes to give any consent or take any other action provided for herein.   At the time of any consent or other action taken hereunder, the Commonwealth shall furnish the Trustee a certificate of an Authorized Officer of Commonwealth, upon which the Trustee may rely, describing all Notes so to be excluded.

**Section 10.06 Notation on Notes.**  Notes delivered after the effective date of any action taken as provided in Article IX hereof or this Article X may, and if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Commonwealth and the Trustee as to such action, and in that case upon demand of the Holder of any Note Outstanding at such effective date and upon presentation of his Note for such purpose at the designated corporate trust office of the Trustee suitable notation shall be made on such Note by the Trustee as to any such action.  If the Commonwealth or the Trustee shall so determine, new Notes so modified as, in the opinion of the Trustee and the Commonwealth, conform to such action shall be prepared and delivered, and upon demand of the Holder of any Note then Outstanding shall be exchanged, without cost to such Holder, for Notes of the same Series, Subseries or Sub-Subseries then Outstanding, upon surrender of such Notes.

## ARTICLE XI.

## DEFAULTS AND REMEDIES

**Section 11.01 Events of Default.**  An Event of Default shall exist hereunder and under each Supplemental Trust Agreement (herein called "**Event of Default**") if:

(a)     Following the occurrence of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition, the Commonwealth shall fail to pay to the Holders of the Notes the amounts due and payable hereunder by (i) the CVIs Annual Payment Amount Payment Date or any applicable Date, (ii) in the event of any challenge or Proceeding as to which moneys have been deposited into the Disputed Amounts Account, the related Challenge Payment Date or (iii) extraordinary redemption date, as applicable; or

(b)     The Commonwealth shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein or in the Notes on the part of the Commonwealth to be performed, other than the provisions of Section 7.15 hereof, and such default shall continue for forty-five (45) days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth by the Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which the

Event of Default relates, unless, if such default is capable of being cured but is not capable of being cured within forty-five (45) days, the Commonwealth has commenced to cure such default within forty-five (45)  days and does cure such default within ninety (90) days of the date the default initially occurred; or

(c)     the Commonwealth permits the validity or effectiveness of this Trust Agreement or the Notes or the security provided for in this Trust Agreement to be impaired, and such impairment affects the enforceability of or payments on the Notes, or any Person to be released from any covenants or obligations with respect to the Notes.

**Section 11.02 No Acceleration with Respect to the Notes.**  There shall be no right of acceleration with respect to the Notes.

**Section 11.03 Enforcement of Remedies.**

(a)     If an Event of Default occurs under Section 11.01(a) and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall, bring an action against the Secretary of Treasury, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of Treasury to apply available resources (recursos disponibles) of the Commonwealth resources to the payment of the Notes, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution.

(b)     If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which such Event of Default relates shall, seek any other remedies that are available under applicable law or in equity to any other holder of a Commonwealth bond to which its good faith, credit and taxing power are pledged.  If an Event of Default occurs under Section 11.01 and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes  to which such Event of Default relates shall, seek specific performance of any relevant provisions of this Trust Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(c)     Subject to Article VIII hereof, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Trust Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

**Section 11.04 Priority of Payments after Default.**  If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee hereunder shall not be sufficient to pay the amounts on the Notes as the same become due and payable, the money held by the Trustee hereunder together with any money then available or thereafter becoming available to pay the Notes, whether through exercise of the remedies provided for in this Article XI or otherwise, shall be applied as follows:

4820-1003-~~9275.18~~9275.22

First:  To the payment of amounts due to the Trustee and Paying Agents under Section 8.06;

Second:

   (i)     from amounts collected from the exercise of remedies relating to an Event of Default relating to Subject to Waterfall Outperformance Amounts, to the payment to the Holders of the GO CVIs and the Subject to Waterfall Clawback CVIs entitled thereto to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Subject to Waterfall Outperformance Amount occurred;

   (ii)   from amounts collected from the exercise of remedies relating to an Event of Default relating to Not Subject to Waterfall Outperformance Amounts, to the payment to the Holders of Not Subject to Waterfall Clawback CVIs entitled thereto to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Not Subject to Waterfall Outperformance Amount occurred; and

   (iii)  from amounts collected from the exercise of remedies relating to an Event of Default relating to the Rum Tax CVI Annual Payment Amount, to the payment to the Holders of the PRIFA Rum Tax Clawback CVIs to be distributed in the same manner as such amounts would have been distributed if collected in the Fiscal Year applicable to when the Event of Default relating to such Rum Tax CVI Annual Payment Amount occurred.

Whenever money is to be applied by the Trustee pursuant to the provisions of this Section, such money shall be applied by the Trustee at such times, and from time to time, as the Trustee in its sole discretion shall determine, having due regard to the amount of such money available for application and the likelihood of additional money becoming available for such application in the future.  The setting aside of such money in trust for application in accordance with the provisions of this Section shall constitute proper application by the Trustee, and the Trustee shall incur no liability whatsoever to the Commonwealth, to any Holder of Notes or to any other Person for any delay in applying any such money so long as the Trustee acts with reasonable diligence, having due regard to the circumstances, and ultimately applies the same in accordance with such provisions hereof as may be applicable at the time of application by the Trustee.  Whenever the Trustee shall exercise such discretion in applying such money, it shall fix the date upon which such application is to be made.  The Trustee shall give such notice as it may deem appropriate of the fixing of any such date.

Amounts held by the Trustee after payments to be made pursuant to this Section 11.04 have been made and no Notes are Outstanding and unpaid shall be paid to the Commonwealth.

**Section 11.05 Termination of Proceedings.**  In case any Proceedings commenced by the Trustee on account of any default shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Trustee, then and in every such case the Commonwealth, the Trustee and the Holders shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue

4820-1003-9275.189275.22

as though no such Proceeding had been commenced in the case of discontinuance of abandonment or the provisions of this Trust Agreement shall be modified in accordance with any determination by the entity making such determination if the Proceedings were determined adversely to the Trustee.

Section 11.06 **Holders' Direction of Proceedings.**   Anything herein to the contrary notwithstanding, the Holders of a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall have the right by an instrument in writing executed and delivered to the Trustee, to direct the choice of remedies and the time, method and place of conducting any proceeding for any remedy available to the Trustee hereunder with respect to such Event of Default, or exercising any trust or power conferred upon the Trustee, including the power to direct or withhold directions with respect to any remedy related to such Event of Default available pursuant to Section 11.03, ***provided***, (i) such direction shall not be otherwise than in accordance with law and the provisions hereof, (ii) that the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction, and (iii) that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Holders not parties to such direction.  Notwithstanding the foregoing, (a) with respect to any Event of Default, or Proceeding initiated to remedy any Event of Default, relating to the Not Subject to Waterfall Outperformance Amount, including the calculation or application thereof, only the Holders of the Clawback CVIs shall be counted in determining if a Quarter in Interest of the Outstanding Notes has approved or directed any such Proceeding, and (b) with respect to any Event of Default, or Proceeding initiated to remedy any Event of Default, relating to the Rum Tax CVI Annual Payment Amount, including the calculation or application thereof, only the Holders of the PRIFA Rum Tax Clawback CVIs shall be counted in determining if a Quarter in Interest of the Outstanding Notes has approved or directed any such Proceeding.

Section 11.07 **Control by Holders of Notes; Limitations**.  No Holder of any of the Notes shall have any right to institute any suit, action or proceeding in equity or at law for the execution of any trust hereunder, or for any other remedy hereunder unless such Holder previously shall have given to the Trustee written notice of the Event of Default on account of which such suit, action or proceeding is to be instituted, and unless also the Holders of not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates, shall have made written request to the Trustee after the right to exercise such powers or right of action, as the case may be, shall have accrued, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted hereby or to institute such action, suit or proceeding in its or their name, and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses, and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time (and in no event shall a delay of more than thirty (30) days be deemed reasonable for such purposes) after receipt thereof.  Such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers and trusts hereof or for any other remedy hereunder and in equity or at law.  Notwithstanding the right of the Holders to direct proceedings in accordance with Section 11.06 above, it is understood and intended that no one or more Holders of the Notes secured hereby shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security hereof, and that all Proceedings shall be instituted and maintained for the benefit of all Holders of the Outstanding Notes.  Notwithstanding any other

4820-1003-~~9275.18~~9275.22

provision hereof, the Holder of any Note shall have the right which is absolute and unconditional to receive payment of the amounts due on such Note expressed in such Note (or, in the case of redemption, on the redemption date) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder, and the Holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI of the Commonwealth Constitution and in the Plan, the Confirmation Order and the CVI Legislation.

**Section 11.08 Actions by Trustee; Possession of Notes by Trustee Not Required.** All rights of action hereunder or under any of the Notes secured hereby and thereby, enforceable by the Trustee, may be enforced by it without the possession of any of such Notes or the production thereof at the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of the Notes to which such action relates, subject to the provisions hereof.

**Section 11.09 Waiver and Non–Waiver of Default**. No delay or omission of the Trustee or any Holder to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein. Every power and remedy given by this Article XI to the Trustee and the Holders, respectively, may be exercised from time to time and as often as may be deemed expedient.

The Trustee may, and upon written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates, shall waive such default which in its opinion shall have been remedied before the entry of final judgment or decree in any suit, action or proceeding instituted by it under the provisions hereof or before the completion of the enforcement of any other remedy hereunder; *provided, however,* the Trustee may not waive any default if it has received a direction from not less than a Quarter in Interest of the Outstanding Notes to which such default relates that such default may not be waived by the Trustee; *provided, further,* that no such waiver shall extend to or affect any other existing or any subsequent default or defaults or impair any rights or remedies consequent thereon.

**Section 11.10 Notice of Event of Default**. The Trustee shall promptly give notice of each Event of Default hereunder known to the Trustee to AAFAF and the Commonwealth and to the Holders of Notes, unless such Event of Default shall have been remedied or cured before the giving of such notice; *provided, however*, that failure to provide notice to AAFAF and the Commonwealth of any Event of Default shall in no way limit the exercise of remedies by the Trustee or Holders. In the case of the Holders of the Notes, each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof to all registered Holders of Notes, as the names and addresses of such Holders appear on the books for registration and transfer of Notes as kept by the Trustee.

**Section 11.11 Remedies Not Exclusive**. No remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

4820-1003-~~9275.18~~9275.22

## ARTICLE XII.

## DEFEASANCE

**Section 12.01  Discharge and Defeasance.**

(a)     If the Commonwealth shall pay or cause to be paid to the Holder of a Note the Remaining Clawback CVI Lifetime Cap or the Remaining GO CVI Lifetime Cap, as applicable, then all rights granted hereby to such Note (including without limitation, the lien) shall be discharged and satisfied.  In such event, the Trustee shall, upon the request of the Commonwealth, execute and deliver such documents to evidence such discharge and satisfaction as may be reasonably required by the Commonwealth.

(b)     Notes for the redemption of which money shall have been set aside and shall be held in trust by the Trustee (through deposit of money for such redemption) at the redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section.  All Outstanding Notes of any Series or Subseries shall prior to the redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in paragraph (a) of this Section if:

(i)     the Commonwealth shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in Article IV hereof notice of redemption on said date of such Notes; and

(ii)     there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay the Remaining Clawback CVI Lifetime Cap or Remaining                                                                        GO CVI Lifetime Cap, as applicable, on the redemption date; and

(iii)     the Commonwealth shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that (A) any Note having been deemed to have been paid as provided in this Section is no longer Outstanding hereunder and is no longer secured by or entitled to the benefits of this Trust Agreement, and (B) such defeasance is in accordance with the terms hereof.

Neither the Defeasance Securities nor money deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Defeasance Securities shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of said Notes; ***provided, however,*** that any money received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose in the judgment of a nationally recognized verification agent, shall, to the extent practicable, be reinvested in Defeasance Securities maturing at times and in amounts sufficient to pay when due said Notes on such redemption date.

# ARTICLE XIII.

## EXECUTION OF INSTRUMENTS BY NOTE HOLDERS
## AND PROOF OF OWNERSHIP OF NOTES

**Section 13.01 Evidence of Signatures of Holders and Ownership of Notes.**  Any request, consent or other instrument which the Trust Agreement may require or permit to be signed and executed by a Holder or Holders of Notes may be in one or more instruments of similar tenor, and shall be signed or executed by such Holder or Holders of Notes in person or by his or their attorneys duly appointed in writing.  Proof of the execution of any such instrument, or of an instrument appointing any such attorney, or the holding or owning by any Person of such Notes, shall be sufficient for any purpose hereof (except as otherwise herein expressly provided) if made in the manner set forth below, but the Trustee may nevertheless in its discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Holder or his attorney of such instrument may be proved by the certificate, which need not be acknowledged or verified, of any officer of a bank or trust company satisfactory to the Trustee or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the Person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer.  The corporation of the Person or Persons executing any such instrument on behalf of a corporate Holder may be established without further proof if such instrument is signed by a Person purporting to be the president or another Authorized Officer of such corporation with a corporate seal affixed and attested by a Person purporting to be its secretary or an assistant secretary.

The ownership of Notes and the amount, numbers and other identification, and date of holding or owning the same shall be proved by the registry books.  Any request, consent or vote of the owner of any Note shall bind all future owners of such Note in respect of anything done or suffered to be done or omitted to be done by the Commonwealth or the Trustee in accordance therewith.  The Commonwealth or the Trustee may fix a record date in connection with any such request, consent or vote.

# ARTICLE XIV.

## MISCELLANEOUS

**Section 14.01 Preservation and Inspection of Documents.**  All documents received by the Trustee from the Commonwealth or from Holders under the provisions hereof shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Commonwealth, any Holder and their agents and their representatives, any of whom may make copies thereof; ***provided, however,*** that with respect to inspection by a Holder a written request of such Holder must have been received by the Trustee at least five (5) Business Days prior to the date of inspection. The Trustee shall provide to the Commonwealth account balances and other information reasonably requested by the Commonwealth.

4820-1003-~~9275.18~~9275.22

**Section 14.02  Money and Funds Held for Particular Notes.**  The amounts held by the Trustee or any Paying Agent for the payment of particular Notes due on any particular date shall, pending such payment, be irrevocably set aside and held in trust by it for the Holders of such Notes entitled thereto, and for the payments on such Notes, with the amounts so set aside and validly and irrevocably held in trust for the Holders of such Notes, shall no longer be considered to be unpaid upon such payment.

**Section 14.03  Cancellation of Notes.**  The Trustee or any Paying Agent shall forthwith cancel all Notes which have been redeemed or paid, or upon the Clawback CVIs Final Maturity Date in the case of the Clawback CVIs and the GO CVIs Final Maturity Date in the case of the GO CVIs, and shall dispose of such Notes in accordance with its customary procedures.  No such Notes shall be deemed Outstanding Notes hereunder and no Notes shall be issued in lieu thereof.

**Section 14.04  No Recourse under Trust Agreement or on the Notes.**  All covenants, stipulations, promises, agreements and obligations of the Commonwealth contained herein shall be deemed to be the covenants, stipulations, promises, agreements and obligations of the Commonwealth and not of any member, officer or employee of the Commonwealth, and no recourse shall be had for the payment of the Notes or for any claims based thereon, hereon against any member, officer or employee of the Commonwealth or any Person executing the Notes, all such liability, if any, being expressly waived and released by every Holder of Notes by the acceptance of the Notes.

**Section 14.05  Severability of Invalid Provision.**  If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Commonwealth or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of the Notes.

**Section 14.06  Parties of Interest.**  Nothing herein, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the Trustee, the Paying Agents and the Holders any rights, remedies or claims hereunder or by reason hereof or any covenant, condition or stipulation thereof.  All covenants, stipulations, promises and agreements herein by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Paying Agents and the Holders.

**Section 14.07  Notices.**  Except as otherwise provided herein, any notices, directions or other instruments required to be given or delivered pursuant hereto shall be in writing and shall be delivered by hand against the written receipt therefor or sent by registered or certified mail addressed:  in the case of the Commonwealth, _____, _____, San Juan, PR _____; and in the case of the Trustee, addressed to it at the designated corporate trust office of the Trustee at ~~_____~~ The Bank of New York Mellon, _____, _____ _____, attention: Corporate Trust; in the case of the Commonwealth or the Secretary of Treasury, to the attention of the Secretary of Treasury at 10 Paseo Covadonga, San Juan, Puerto Rico, 00901, or, in each case, to such other individual and at such other address as the Person to be notified shall

4820-1003-~~9275.18~~9275.22

have specified by notice to the other Persons.  Any such communication may also be sent by Electronic Means, receipt of which shall be confirmed.

In the event the Trustee sends a notice to the Holders of any Series or Subseries of Notes, the Trustee shall also provide such notice in electronic format, accompanied by such identifying information as is prescribed by the Municipal Securities Rulemaking Board, including the CUSIP numbers for the Notes of the Series or Subseries to the Commonwealth's dissemination agent for distribution through the EMMA system.  The Commonwealth shall cooperate with the Trustee to the extent necessary to facilitate the foregoing.  The Trustee shall not be liable under any circumstances for monetary damages to any Person for any breach of the provisions of this paragraph.  The sole remedy for failure of the Trustee to perform is specific performance.

**Section 14.08 Headings.**  Any headings preceding the text of the several Articles and Sections hereof, and any table of contents or marginal notes appended to copies hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

**Section 14.09 Governing Laws.**  This Trust Agreement and the Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Trust Agreement and the Notes; ***provided***, ***however***, that the authorization of this Trust Agreement and the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, ***provided***, ***further***, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

**Section 14.10 Retention of Jurisdiction of Title III Court.**  The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan and, the Confirmation Order and this Trust Agreement, including, without limitation, with respect to the payment of the Notes and the enforcement of the remedies set forth herein to the fullest extent permitted by law.  Any disputes, legal action, suit, or proceeding arising from or related to this Trust Agreement or the Notes (a) shall be brought in accordance with the terms of this Trust Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**Section 14.11 Signatures and Counterparts.**  This Trust Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Trust Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance

of doubt, the foregoing also applies to any amendments, extensions or renewals of this Trust Agreement.

      **Section 14.12 Successors and Assigns.**   Whenever in the Trust Agreement the Commonwealth is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Trust Agreement contained by or on behalf of the Commonwealth shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

      **Section 14.13 Conflicts**.  All resolutions or other proceedings of the Commonwealth or parts thereof in conflict herewith are repealed insofar as such conflict exists.

**[Remainder of page intentionally left blank; signature page follows]**

4820-1003-~~9275.18~~9275.22

**IN WITNESS WHEREOF**, the Commonwealth has caused these presents to be signed in its name and on its behalf and attested by its duly authorized officer, and, to evidence its acceptance of the trusts hereby created, the Trustee has caused these presents to be signed in its name and on its behalf by its duly authorized officer, all as of the day and year first above written.

**COMMONWEALTH OF PUERTO RICO**

By: _____

    Authorized Officer

**THE BANK OF NEW YORK MELLON,**
    as Trustee

By: _____

    Authorized Officer

**Attachment 1**

**5.5% SUT BASELINE**

| Fiscal Year ending June 30, | Amount |
|---|---|
| 2022 | $1,282,901,069.30 |
| 2023 | 1,279,617,661.88 |
| 2024 | 1,301,220,703.34 |
| 2025 | 1,315,295,083.41 |
| 2026 | 1,345,037,783.09 |
| 2027 | 1,377,398,882.61 |
| 2028 | 1,403,141,426.98 |
| 2029 | 1,414,785,980.78 |
| 2030 | 1,427,393,695.32 |
| 2031 | 1,437,998,166.98 |
| 2032 | 1,447,406,781.79 |
| 2033 | 1,428,210,572.57 |
| 2034 | 1,426,102,595.91 |
| 2035 | 1,429,798,842.15 |
| 2036 | 1,438,540,327.00 |
| 2037 | 1,452,657.050.02 |
| 2038 | 1,477,755,111.63 |
| 2039 | 1,495,355,971.13 |
| 2040 | 1,518,089,898.19 |
| 2041 | 1,541,405,892.18 |
| 2042 | 1,565,457,864.38 |
| 2043 | 1,590,148,747.39 |
| 2044 | 1,616,252,365.93 |
| 2045 | 1,642,150,220.79 |
| 2046 | 1,668,748,988.64 |
| 2047 | 1,696,060,240.60 |
| 2048 | 1,724,082,302.73 |
| 2049 | 1,752,859,808.94 |
| 2050§ | 1,781,536,796.27 |
| 2051§ | 1,810,682,942.40 |

§   May 2020 Fiscal Plan contains projections through FY2049.  FY2050 and FY2051 baseline calculated using FY 2049 projections and the average growth rate from FY2045-FY2049.

4820-1003-9275.22

**Attachment 2**

**PRIFA RUM TAX CVI OUTPERFORMANCE METRIC**

| Fiscal Year ending June 30, | Amount |
|---|---|
| 2022 | $208,569,215.76 |
| 2023 | 200,354,469.05 |
| 2024 | 201,031,406.80 |
| 2025 | 201,692,902.40 |
| 2026 | 202,348,675.07 |
| 2027 | 202,998,555.87 |
| 2028 | 203,632,157.16 |
| 2029 | 204,259,404.03 |
| 2030 | 204,869,786.20 |
| 2031 | 205,473,363.12 |
| 2032 | 206,059,507.07 |
| 2033 | 206,627,882.49 |
| 2034 | 207,188,744.83 |
| 2035 | 207,731,302.94 |
| 2036 | 208,265,935.46 |
| 2037 | 208,781,748.91 |
| 2038 | 209,289,240.57 |
| 2039 | 209,788,269.00 |
| 2040 | 210,278,694.61 |
| 2041 | 210,749,432.35 |
| 2042 | 211,211,199.81 |
| 2043 | 211,674,906.69 |
| 2044 | 212,129,474.13 |
| 2045 | 212,574,772.82 |
| 2046 | 213,021,852.71 |
| 2047 | 213,459,499.22 |
| 2048 | 213,898,852.55 |
| 2049 | 214,339,919.35 |
| 2050 | 214,782,706.32 |
| 2051 | 215,227,220.15 |

4820-1003-~~9275.18~~9275.22

**Attachment 3**

**GO CVI Allocation Summary**

| Claim | GO CVI Allocation % |
|---|---|
| Vintage CW Bond Claim | 32.244 |
| 2011 CW Series D/E/PIB Bond Claim | 3.514 |
| 2011 CW Bond Claim | 2.479 |
| 2012 CW Bond Claim[2] | 15.157 |
| 2014 CW Bond Claim[3] | 20.266 |
| Vintage CW Guarantee Claim | 15.194 |
| 2011 CW Guarantee Bond Claim | 7.552 |
| 2012 CW Guarantee Bond Claim | 3.594 |

---

[2]  2012 CW Bond Claim amount includes $198 million of the Hacienda loans and $25 million of the GSA Helicopter loan.

[3]  2014 CW Bond Claim amount includes $84 million of the PRIFA BANs and $263 million of the Ports Bonds.

Attachment 3-  1

4820-1003-9275.189275.22

**Attachment 4**

**Clawback CVI Allocation Summary**

| Claim | Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims[4] | 68.6 |
| payable in the following order of priority: | |
| First, HTA 68 Bond Claims up to $179,462,539; | |
| Second, HTA 98 Senior Bond Claims up to $~~1,833,405,578~~[5] 1,833,405,578; | |
| Third, HTA 98 Sub Bond Claims up to $~~207,294,178~~[7]207,294,178; and | |
| Fourth, GDB HTA Loans up to $1,477,506,700. | |
| Allowed CW/Convention Center Claims | 4.0 |
| Allowed CW/PRIFA Rum Tax Claims | 27.0 |
| Allowed CW/MBA Claims, consisting of | 0.4 |
| Clawback CVIs for Allowed CW/MBA Claims | [0.33] |
| Deemed Paid CVIs Payments relating to CW/MBA Claims | [0.07] |

---

[4]  Capitalized terms have the meanings ascribed to them in the HTA/CCDA Related Plan Support Agreement; the waterfall is implemented to the maximum extent allowable against the Commonwealth and subject to judicial determination.

[5]  ~~To the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims, pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI to be held in reserve in an amount equal to the difference of (a) the amount of cash that would be due to holders and insurers of the HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds minus (b) the amount of cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is *pari passu* with respect to payment on account of the HTA 98 Bonds.~~

4820-1003-~~9275.18~~9275.22

**Attachment 5**

**FORM OF GO CVI**
**(includes variations for different GO CVI Subseries)**

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, ~~2021.~~2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE NOTES THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE NOTIONAL AMOUNT OUTSTANDING UNDER THIS NOTE MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS NOTE MAY NOT RELY UPON THE NOTIONAL AMOUNT INDICATED HEREON AS THE NOTIONAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE NOTIONAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS NOTE SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

No. R-___                                                           $[3,500,000,000][1]

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION NOTE REPRESENTING
PROPORTIONATE INTERESTS OF THE HOLDER HEREOF IN AND TO
CERTAIN CONTINGENT VALUE PAYMENT AMOUNTS,
SUBJECT TO THE OCCURRENCE OF CERTAIN CONDITIONS

| Subseries[6][2] | GO CVI | Deemed | CUSIP No. |
|---|---|---|---|

[1]   Insert Lifetime Cap applicable to the Subseries of the applicable GO CVIs.

~~[6] Note: the Holders of each Subseries shall receive a Note identifying only their respective Subseries and related GO CVI Allocation percentage.~~

[2]   Note: the Holders of each Subseries shall receive a Note identifying only their respective Subseries and related GO CVI Allocation percentage and GO CVI Lifetime Cap.

Attachment 5- 1

| | **Allocation Percentage** | **Issuance Date** | |
|---|---|---|---|
| Vintage CW Note Claims | 32.244% | July 1, 2021 | |
| 2011 CW Series D/E/PIB Note Claim | 3.514 | July 1, 2021 | |
| 2011 CW Note Claim | 2.479 | July 1, 2021 | |
| 2012 CW Note Claim | 15.157 | July 1, 2021 | |
| 2014 CW Note Claim | 20.266 | July 1, 2021 | |
| Vintage CW Guarantee Claim | 15.194 | July 1, 2021 | |
| 2011 CW Guarantee Note Claim | 7.552 | July 1, 2021 | |
| 2012 CW Guarantee Note Claim | 3.594 | July 1, 2021 | |

Registered Owner:      Cede & Co.

Initial Notional Amount and GO CVI Lifetime Cap Allocable to Subseries:  [Three Billion Five Hundred][1] Million Dollars

1.      All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Trust Agreement, dated as of ————, 2021March 15, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), between the Commonwealth and —————The Bank of New York Mellon, as Trustee and Paying Agent.  Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth of Puerto Rico (the "Commonwealth") and the Holders, as applicable.  The Trust Agreement may be amended to the extent and in the manner provided therein.

2.      The Commonwealth is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the CVIs Annual Payment Amount Payment Dates (the [November 1] following a Fiscal Year in which an SUT Outperformance Condition has occurred Dates (as defined below), or earlier upon redemption as hereinafter referred to, up to the GO CVI Lifetime Cap specified above.

3.      The Notional Amount of this Note is payable to the Registered Owner named above as of the fifteenth day before the date of payment thereof, whether or not such fifteenth day is a Business Day (the "Record Date"), subject to (a) the occurrence from time to time prior to the GO CVIs Final Maturity Date of an SUT Outperformance Condition, (b) the annual limitations hereinafter referred to, and (c) the GO CVI Lifetime Cap, upon, unless the Holder of this Note is DTC, presentation and surrender hereof at the designated corporate trust office of the Trustee and Paying Agent, in ——, —— (the "Corporate Trust Office").  This Note is subject to redemption from amounts available therefor each year following the occurrence of an SUT Outperformance Condition on [November 1] of the Fiscal Year following the Fiscal Year in which the SUT Outperformance Condition occurred (the "CVIs Annual Payment Amount Payment Date").  The Notional Amount of this Note is payable in such coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

4.      The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notional Amount of this Note, subject to the limitations set forth in the Trust Agreement, including the limitations set forth in paragraph 3 hereof.  The

Attachment 5- 2

4820-1003-9275.189275.22

Notes constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.

5.      This Note is one of a duly authorized issue of Notes of the Commonwealth issued in the Initial Notional Amount of $3,500,000,000.[3,500,000,000][6], known as "Commonwealth of Puerto Rico GO CVIs - _____ Subseries", issued under the authority of and in full compliance with the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "Plan"), and the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA (the "Confirmation Order"), and the CVI Legislation.

6.      In accordance with the Plan and the Confirmation Order, the Commonwealth has executed and delivered two Series of notes collectively referred to as "GO CVIs" and "Clawback CVIs".  This Note is a GO CVI.  The GO CVIs and the Clawback CVIs are, subject to the occurrence of an SUT Outperformance Condition and certain limitations referred to herein, payable as a general obligation of the Commonwealth in amounts calculated generally by how much the actual collection of a tax rate of five and one-half percent (the "5.5% SUT") is in excess of the baseline projections set forth in Attachment 1 to the Trust Agreement (the "5.5% SUT Baseline"), which Attachment 1 may be revised from time to time under the circumstances more fully described in the Trust Agreement.  The amount of excess that is available to be paid to the Holders of the GO CVIs and the Clawback CVIs is determined in accordance with different formula described in the Trust Agreement.

7.      The Commonwealth will determine if an SUT Outperformance Condition has occurred on each CVIs Outperformance Condition Determination Date, which is [September 1] of each Fiscal Year, beginning [September 1], 2022.  An SUT Outperformance Condition in any Fiscal Year will occur if the actual collection of the 5.5% SUT in that Fiscal Year is in excess of the 5.5% SUT Baseline for that Fiscal Year set forth in the Trust Agreement.  Once the amount of the excess is determined and verifiedcalculated by an Independent Consultant, such excess amount is then distributed to the Holders of the GO CVIs and the Clawback CVIs in the amounts and priorities set forth in the Trust Agreement.

8.      These Notes are subject to mandatory redemption on each CVIs Annual Payment Amount Payment Date, subject to the limitations described in the Trust Agreement, in amounts equal to the GO CVI Allocation Percentage referred to above of the amounts available to pay to the Holders of all GO CVIs on such CVIs Annual Payment Amount Payment Date, but in no event in an amount that in the aggregate exceeds the GO CVI Lifetime Cap prior to the GO CVIs Final Maturity Date.

9.      The GO CVIs Final Maturity Date will occur on the earlier of (a) the date when the Holders of the GO CVIs have been paid in an amount equal to the GO CVI Lifetime Cap, and (b) (1) [September 115], 2043, ifin the event an SUT Outperformance Condition did not occur duringin the prior Fiscal Year, ending on June 30, 2043, and (2) [November 1], 2043, ifin the event an SUT Outperformance Condition did occur duringin the prior Fiscal Year, ending on June 30, 2043, whether or not the Holders of all GO CVIs have been paid in the aggregate an amount equal to the GO CVI Lifetime Cap, and no further payments shall thereafter be payable to the Holders of the Notes.

Attachment 5- 3

10.     The GO CVIs are also subject to extraordinary redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points.  Treasury Rate means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVIs.

11.     Whenever Notes or portions thereof are to be redeemed in accordance with paragraph 10 hereof, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth to the Holders of the Notes to be redeemed.  If the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption shall be included in the notice.  Such notice shall be given by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date.  Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books.  The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

12.     The Trustee shall, if any of the Notes or portions thereof to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than thirty (30) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository).  Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.

13.     Notice having been given in the manner provided above, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price.  If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series and Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date, if all conditions to redemption shall be satisfied and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes shall no longer be considered to be Outstanding hereunder.

14.     If less than all of the Notes shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Trust Agreement.

15.     The Notes are issuable as registered Notes in authorized denominations of one dollar ($1.00) and whole multiples thereof.  At the ~~corporate trust office~~Corporate Trust Office of the Trustee~~, in _____, _____~~, in the manner and subject to the limitations and conditions provided in the Trust Agreement and without cost except for any tax or other governmental

charge, Notes may be exchanged for an equal aggregate principal amount of Notes of authorized denominations.

16.     Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the ~~designated corporate trust office~~Corporate Trust Office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series and Subseries and tenor as the surrendered Note.

17.     The Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under the Notes; *provided*, *however*, that the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

18.     This Note shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Trust Agreement until this Note shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

19.     It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this Note have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth, and the total indebtedness of the Commonwealth, including this Note, does not exceed any debt or other limitation prescribed by law.

*[Remainder of this page intentionally left blank]*

Attachment 5- 6

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico has caused this Note to be executed with the facsimile signature of the Secretary of the Treasury of Puerto Rico and a facsimile of the official seal of the Commonwealth of Puerto Rico to be imprinted hereon and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the ~~day of _____, 2021.~~Deemed Issuance Date specified above.

_____ [Facsimile signature] _____
Secretary of the Treasury of Puerto Rico

(SEAL)

Attest:

_____ [Facsimile signature] _____
Secretary of State of Puerto Rico

Attachment 5- 8

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes issued under the provisions of the Trust Agreement mentioned herein.

**THE BANK OF NEW YORK MELLON,** as Trustee

By: _____

Authorized Officer

Date of authentication: March 15, 2022

4820-1003-9275.22

Attachment 5- 10

## FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

_____

[please print or type name and address of Transferee]

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ attorney to register the transfer of the within Note
on the books kept for registration thereof, with full power of substitution in the premises.

Signature: _____

Dated: _____     Guaranteed by: _____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Note in every particular, without alteration or enlargement or any change whatever and must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Trustee which requirements will include membership or participation in the Securities Transfer Agents Medallion Program or such other "signature guarantee program" as may be determined by the Trustee in addition to, or in substitution for the Securities Transfer Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as amended.

4820-1003-9275.22

Attachment 5- 12

**Attachment 6**

**FORM OF CLAWBACK CVI**
**(includes variations for different Clawback CVI Subseries and Sub-Subseries)**

**DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE ____ DAY OF _____, ~~2021~~2022.**

AS PROVIDED IN THE TRUST AGREEMENT REFERRED TO HEREIN, UNTIL THE TERMINATION OF REGISTERED OWNERSHIP OF ALL OF THE NOTES THROUGH THE DEPOSITORY TRUST COMPANY (TOGETHER WITH ANY SUCCESSOR SECURITIES DEPOSITORY APPOINTED PURSUANT TO THE TRUST AGREEMENT, "DTC"), AND NOTWITHSTANDING ANY OTHER PROVISION OF THE TRUST AGREEMENT TO THE CONTRARY, THE NOTIONAL AMOUNT OUTSTANDING UNDER THIS NOTE MAY BE PAID OR REDEEMED WITHOUT SURRENDER HEREOF TO THE TRUSTEE. DTC OR A TRANSFEREE OR ASSIGNEE OF DTC AS OWNER OF THIS NOTE MAY NOT RELY UPON THE NOTIONAL AMOUNT INDICATED HEREON AS THE NOTIONAL AMOUNT HEREOF OUTSTANDING AND TO BE PAID. THE NOTIONAL AMOUNT OUTSTANDING AND TO BE PAID ON THIS NOTE SHALL FOR ALL PURPOSES BE THE AMOUNT INDICATED ON THE BOOKS OF THE TRUSTEE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC AND ANY PAYMENT IS MADE TO CEDE & CO., ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL (OTHER THAN THE DEPOSIT AND RELATED PLEDGE PURSUANT TO ANY CUSTODIAL TRUST AGREEMENT CONTEMPLATED UNDER THE PLAN) SINCE THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

No. R-____                                                                 $[_____][71]

UNITED STATES OF AMERICA

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION NOTE REPRESENTING
PROPORTIONATE INTERESTS OF THE HOLDER HEREOF IN AND TO
CERTAIN CONTINGENT VALUE PAYMENT AMOUNTS,
SUBJECT TO THE OCCURRENCE OF CERTAIN CONDITIONS

| Subseries[82] | Clawback CVI | Deemed | CUSIP No. |
|---|---|---|---|

---

[7][1] To reflect Notional Amount for each Subseries and Sub-Subseries of the Clawback CVIs.

~~[8] Note: the Holders of each Subseries and Sub-Subseries shall receive a Note identifying only their respective Subseries/Sub-Subseries and related Clawback CVI Allocation percentage and priority.~~

[2] Note: the Holders of each Subseries and Sub-Subseries shall receive a Note identifying only their respective Subseries/Sub-Subseries and related Clawback CVI Allocation percentage and priority and Clawback CVI Lifetime Cap.

| | Allocation **Percentage** | **Issuance Date** | |
|---|---|---|---|
| Allowed CW/HTA Claims[93] | ~~68.6~~68.60% | ~~---~~ | ~~---~~ |
| payable in the following order of priority: | | ~~---~~ | ~~---~~ |
| First, HTA 68 Bond Claims up to $179,462,539; | | July 1, 2021 | |
| Second, HTA 98 Senior Bond Claims up to $~~1,833,405,578~~[10]1,833,405,578; | | July 1, 2021 | |
| Third, HTA 98 Sub Bond Claims up to $~~207,294,178~~[10]207,294,178; and | | July 1, 2021 | |
| Fourth, GDB HTA Loans up to $1,477,506,700 | | July 1, 2021 | |
| Allowed CW/Convention Center Claims | ~~4.0~~4.00 | July 1, 2021 | |
| Allowed CW/PRIFA Rum Tax Claims | ~~27.0~~27.00 | July 1, 2021 | |
| Allowed CW/MBA Claims | ~~0.4~~[0.33][4] | July 1, 2021 | |

Registered Owner: Cede & Co.

Initial Notional Amount and ~~Series/Subseries/Sub-Subseries~~ Clawback CVI Lifetime Cap Allocable to Subseries/Sub-Subseries[1]: _____ Dollars

1.      All capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Trust Agreement, dated as of ~~_____, 2021~~March 15, 2022 (as amended and supplemented from time to time, the "Trust Agreement"), between the Commonwealth and ~~_____~~The Bank of New York Mellon, as Trustee and Paying Agent.  Reference is made to the Trust Agreement for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth of Puerto Rico (the "Commonwealth") and the Holders, as applicable.  The Trust Agreement may be amended to the extent and in the manner provided therein.

2.      The Commonwealth is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the CVIs Annual Payment ~~Amount Payment Dates (the [November 1] following a Fiscal Year in which an SUT Outperformance Condition [or a Rum Tax Outperformance Condition][11] has occurred~~ Dates (as defined below), or earlier upon redemption as hereinafter referred to, up to the Clawback CVI Lifetime Cap specified above.

3.      The Notional Amount of this Note is payable to the Registered Owner named above as of the fifteenth day before the date of payment thereof, whether or not such fifteenth day is a Business Day (the "Record Date"), subject to (a) the occurrence from time to time prior to the Clawback CVIs Final Maturity Date of an SUT Outperformance Condition [or a Rum Tax

---

~~9  Clawback CVIs issued to the holders of the Allowed CW/HTA Claims will be issued in Sub-Subseries to the Holders of the HTA 68 Bond Claims, HTA 98 Senior Bond Claims, HTA 98 Sub Bond Claims and GDB HTA Loans to recognize their respective priorities of payment for the notional amounts listed above.~~

3    Clawback CVIs issued to the holders of the Allowed CW/HTA Claims will be issued in Sub-Subseries to the Holders of the HTA 68 Bond Claims, HTA 98 Senior Bond Claims, HTA 98 Sub Bond Claims and GDB HTA Loans to recognize their respective priorities of payment for the notional amounts listed above.

~~10  To the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub-Bond Claims, pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI will be held in reserve as described in paragraph [9] hereof.~~

4    [0.7]% allocable to Deemed Paid CVIs Payments due to $4 million settlement with Oriental Bank.

~~11  To be included in PRIFA Rum Tax Clawback CVI.~~

4820-1003-~~9275.18~~9275.22

Outperformance Condition][11,12] (b) the annual limitations hereinafter referred to, and (c) the Clawback CVI Lifetime Cap applicable to this Note, upon, unless the Holder of this Note is DTC, presentation and surrender hereof at the designated corporate trust office of the Trustee and Paying Agent, in _____, _____ (the "Corporate Trust Office"). This Note is subject to redemption from amounts available therefor each year following the occurrence of an SUT Outperformance Condition or a Rum Tax Outperformance Condition on [November 1] of the Fiscal Year following the Fiscal Year in which the SUT Outperformance Condition [or a Rum Tax Outperformance Condition][11,12] occurred (the "CVIs Annual Payment Amount Payment Date"). The Notional Amount of this Note is payable in such coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.

4.     The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the Notional Amount of this Note, subject to the limitations set forth in the Trust Agreement, including the limitations set forth in paragraph 3 hereof. The Notes constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.

5.     This Note is one of a duly authorized issue of Notes of the Commonwealth issued in the Initial Notional Amount of $[_____].[8] known as "Commonwealth of Puerto Rico Clawback CVIs – [_____ Subseries or Sub-Subseries]", issued under the authority of and in full compliance with the [_____] Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "Plan"), and the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and Section 1129 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA (the "Confirmation Order").

6.     In accordance with the Plan and the Confirmation Order, the Commonwealth has executed and delivered two Series of notes collectively referred to as "GO CVIs" and "Clawback CVIs". This Note is a Clawback CVI. The GO CVIs and the Clawback CVIs are, subject to the occurrence of an SUT Outperformance Condition and certain limitations referred to herein, payable as a general obligation of the Commonwealth in amounts calculated generally by how much the actual collection of a tax rate of five and one-half percent (the "5.5% SUT") is in excess of the baseline projections set forth in Attachment 1 to the Trust Agreement (the "5.5% SUT Baseline"), which Attachment 1 may be revised from time to time under the circumstances more fully described in the Trust Agreement. The amount of excess that is available to be paid to the Holders of the GO CVIs and the Clawback CVIs is determined in accordance with different formula described in the Trust Agreement. [If this Note is a PRIFA Rum Tax Clawback CVI, this Note is additionally payable from the Rum Tax CVI Annual Payment Amount.][11,12]

7.     The Commonwealth will determine if an SUT Outperformance Condition [and/or a Rum Tax Outperformance Condition][11,12] has occurred on each CVIs Outperformance Condition Determination Date, which is [September 1] of each Fiscal Year, beginning [September 1], 2022. An SUT Outperformance Condition in any Fiscal Year will occur if the actual collection of the 5.5% SUT in that Fiscal Year is in excess of the 5.5% SUT Baseline for that Fiscal Year set forth in the Trust Agreement. [A Rum Tax Outperformance Condition in any Fiscal Year will occur if the Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric for that Fiscal Year set forth in the Trust Agreement][11,12]. Once the

Attachment 6-  3

amount of the excess is determined and ~~verified~~calculated by an Independent Consultant, such excess amount is ~~used first to fund an account used to pay certain Trustee costs and expenses or reimburse the Commonwealth for advancing such Trustee costs and expenses, and~~ then distributed to the Holders of the GO CVIs and the Clawback CVIs in the amounts and priorities set forth in the Trust Agreement.

8.      These Notes are subject to mandatory redemption on each CVIs Annual Payment ~~Amount Payment~~ Date in an amount equal to the Clawback CVI Allocation Percentage referred to above of the amounts available to pay to the Holders of all Clawback CVIs on such CVIs Annual Payment ~~Amount Payment~~ Date, but in no event in an amount that in the aggregate exceeds the Clawback CVI Lifetime Cap prior to the Clawback CVIs Final Maturity Date.

9.      [This Note is an Allowed CW/HTA Claims Subseries, so amounts distributed on the CVIs Annual ~~Payment Amount~~ Payment Date from the Clawback CVI Allocation Percentage allocated to the Allowed CW/HTA Claims Subseries shall be distributed in the following order of priority: first to the Holders of the Sub-Subseries relating to HTA 68 Bond Claims until such Holders receive $179,462,539; second to the Holders of the Sub-Subseries relating to HTA 98 Senior Bond Claims until such Holders receive $1,833,405,578; third to the Holders of the Sub-Subseries relating to HTA 98 Sub Bond Claims until such Holders receive $207,294,178; and fourth to the Holders of the Sub-Subseries relating to GDB HTA Loans until such Holders receive $1,477,506,700.  No payment shall be made on account of any Sub-Subseries of HTA Clawback CVI in any Fiscal Year until all Sub-Subseries of a higher priority than such Sub-Subseries have been paid in full.]~~12~~5

~~10.      [This Note is part of the Sub-Subseries that relates to HTA 98 Senior Bond Claims or HTA 98 Sub Bond Claims, so, to the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims, pending entry of a Final Order with respect to the GDB Loan Priority Determination, cash payable from the HTA Clawback CVI are to be held in reserve in an amount equal to the difference of (a) the amount of cash that would be due to holders and insurers of the HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds minus (b) the amount of cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is pari passu with respect to payment on account of the HTA 98 Bonds.]13~~

10.      ~~11.~~ [This Note is a PRIFA Rum Tax Clawback CVI and is additionally payable from PRIFA Rum Tax CVI Annual Payment Amounts.]~~11~~12

11.      ~~12.~~ The Clawback CVIs Final Maturity Date will occur on the earlier of (a) the date when the Holders of the Clawback CVIs have been paid in an amount equal to the Clawback CVI Lifetime Cap, and (b) (1) [September ~~1~~15], 2051, ~~if~~in the event an SUT Outperformance Condition [or a Rum Tax Outperformance Condition]~~11~~12 did not occur ~~during~~in the ~~prior~~ Fiscal Year, ending on June 30, 2051, and (2) [November 1], 2051, ~~if~~in the event an SUT Outperformance Condition [or a Rum Tax Outperformance Condition]~~11~~12 did occur ~~during~~in the ~~prior~~ Fiscal Year, ending on June 30, 2051, whether or not the Holders of all Clawback CVIs

---

~~12~~5  To be included in Clawback CVIs relating to Allowed CW/HTA Claims.

~~13 To be included in Clawback CVIs relating to HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims.~~

Attachment 6-  4

have been paid in the aggregate an amount equal to the Clawback CVI Lifetime Cap, and no further payments shall thereafter be payable to the Holders of the Notes.

12.    13. The Clawback CVIs are subject to redemption from amounts provided by the Commonwealth that are not CVIs Annual Payment Amounts, at the option of the Commonwealth, on any date in whole or in part at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate plus 100 basis points. Treasury Rate means the yield (or the interpolated yield) of the comparable U.S. Treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVIs.

13.    14. Whenever Notes are to be redeemed in accordance with paragraph [13 12] hereof, the Trustee shall give notice of the redemption of the Notes in the name of the Commonwealth to the Holders of the Notes to be redeemed. If the Commonwealth's obligation to redeem the Notes is subject to conditions, a statement to that effect and of the conditions to such redemption shall be included in the notice. Such notice shall be given by mailing a copy of such notice not less than twenty (20) days nor more than sixty (60) days prior to the redemption date. Such notice shall be sent by first class mail, postage prepaid to the registered owners of the Notes which are to be redeemed, at their last known addresses, if any, appearing on the registration books. The failure of any Holder of a Note to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the Notes.

14.    15. The Trustee shall, if any of the Notes to be redeemed are Book Entry Notes, transmit a copy of the notice of redemption to the Depository for such Book Entry Notes not less than twenty (20) days nor more than sixty (60) days prior to the redemption at the most recent address therefor, or to any successor thereof (or, if the Notes are held by the Depository, such notice shall be given in accordance with the procedures of the Depository). Transmittal of such copy to the Depository in accordance with the foregoing sentence shall be conclusive evidence of delivery thereof to the holders of beneficial interests in a Book Entry Note and no such notice shall be required to be transmitted by the Commonwealth directly to any such beneficial holder nor shall transmittal to a beneficial holder by the Commonwealth be a condition precedent to such redemption or affect the validity of the proceedings for redemption of the Notes.

15.    16. Notice having been given in the manner provided above, the Notes or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price. If, on the redemption date, money for the redemption of all Notes or portions thereof of any like Series, Subseries and Sub-Subseries and tenor to be redeemed shall be held by the Trustee and Paying Agents so as to be available therefor on such date, if all conditions to redemption shall be satisfied and if notice of redemption shall have been mailed as aforesaid, then, from and after the redemption date, such Notes shall no longer be considered to be Outstanding hereunder.

16.    17. If less than all of the Notes shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Trust Agreement.

17.    18. The Notes are issuable as registered Notes in authorized denominations of one dollar ($1.00) and whole multiples thereof. At the corporate trust office Corporate Trust Office of

Attachment 6-  5

4820-1003-9275.18 9275.22

the Trustee, in _____, _____, in the manner and subject to the limitations and conditions provided in the Trust Agreement and without cost except for any tax or other governmental charge, Notes may be exchanged for an equal aggregate principal amount of Notes of authorized denominations.

18. 19. Each Note shall be transferable only upon the books of the Commonwealth, which shall be kept for that purpose at the designated corporate trust office Corporate Trust Office of the Trustee, by the registered owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer satisfactory to the Trustee duly executed by the registered owner or his duly authorized attorney and the payment of a charge sufficient to reimburse the Commonwealth or the Trustee for any tax, fee or other governmental charge required to be paid with respect to such transfer.  Upon the transfer of any such Note, the Commonwealth shall cause to be issued in the name of the transferee a new Note or Notes of the same aggregate notional amount, Series, Subseries and Sub-Subseries and tenor as the surrendered Note.

19. 20. The Notes shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under the Notes; *provided*, *however*, that the issuance of the Notes by the Commonwealth shall be governed by the laws of the Commonwealth; and, *provided*, *further*, that the holders of the Notes shall be entitled to such rights and remedies established in Sections 2 and 8 of Article VI, of the Commonwealth Constitution.

20. 21. This Note shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Trust Agreement until this Note shall have been authenticated by the execution by the Trustee of the certificate of authentication endorsed hereon.

21. 22. It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this Note have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth, and the total indebtedness of the Commonwealth, including this Note, does not exceed any debt or other limitation prescribed by law.

*[Remainder of this page intentionally left blank]*

4820-1003-9275.189275.22

IN WITNESS WHEREOF, the Commonwealth of Puerto Rico has caused this Note to be executed with the facsimile signature of the Secretary of the Treasury of Puerto Rico and a facsimile of the official seal of the Commonwealth of Puerto Rico to be imprinted hereon and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the ~~day of _____, 2021.~~ Deemed Issuance Date specified above.

_____[Facsimile signature]_____
Secretary of the Treasury of Puerto Rico

(SEAL)

Attest:

_____[Facsimile signature]_____
Secretary of State of Puerto Rico

4820-1003-9275.22

Attachment 6-  9

## CERTIFICATE OF AUTHENTICATION

This is one of the Notes issued under the provisions of the Trust Agreement mentioned herein.

_____,THE BANK OF NEW YORK MELLON,
as Trustee

By: _____
                    Authorized Officer

Date of authentication: March 15, 2022

Attachment 6- 11

## FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

_____

_____
[please print or type name and address of Transferee]

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ attorney to register the transfer of the within Note
on the books kept for registration thereof, with full power of substitution in the premises.

Signature:   _____

Dated:   _____     Guaranteed by:   _____

NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Note in every particular, without alteration or enlargement or any change whatever and must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Trustee which requirements will include membership or participation in the Securities Transfer Agents Medallion Program or such other "signature guarantee program" as may be determined by the Trustee in addition to, or in substitution for the Securities Transfer Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as amended.

4820-1003-9275.22

Attachment 6- 13

**Attachment 7**

Commonwealth of Puerto Rico

Calculations relating to GO CVIs and Clawback CVIs Payments

(calculations attached)

For Fiscal Year Ending:  June 30, 20__

CVIs Outperformance Condition Determination Date:  September 1, 20__

      SUT Outperformance Condition has/has not occurred.

      Rum Tax Outperformance Condition has/has not occurred.

CVIs Annual Payment Amount Calculation Date:  ~~October 1,~~September 15, 20__

CVIs Annual Payment ~~Amount Verification~~ Date:  ~~October 15, 20__  CVIs Annual Payment Amount Payment Date:  ~~[November] 1, 20__

Attachment 7- 2

4820-1003-~~9275.189~~9275.22

Calculations Relating to GO CVIs Upon Occurrence of SUT Outperformance Condition

(calculations attached)

Subject to Waterfall Outperformance Amount:   $_____

  Less Deemed Paid CVIs Payments Allocable to GO CVIs:   $_____

Amount to be Transferred to Trustee:   $_____

  Payment to Holders of GO CVIs:  $_____ (deposit to GO CVIs Subaccount of the
  Subject to Waterfall CVIs Payment Account)

  Payment to Holders of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs:
  $_____ (deposit to Clawback CVIs Subaccount of the Subject to Waterfall
  CVIs Payment Account)

  Payment to Holders of PRIFA Rum Tax Clawback CVIs:  $_____ (deposit to
  PRIFA Rum Tax Clawback CVIs Payment Account)

Remaining GO CVI Lifetime Cap as of June 30, 20__:  $_____

Remaining GO CVI Lifetime Cap after CVIs Annual Payment ~~Amount Payment~~ Date:  $_____

Application of Subject to Waterfall Outperformance Amount to GO CVIs (from GO CVIs
Subaccount): $_____

  Amount per $1 Authorized Denomination of GO CVI:  $0._____

| Claim | GO CVI % | Current Unit Distribution | Prior Unit Distribution | Total Distribution |
|---|---|---|---|---|
| Vintage CW Bond | 32.244 | | | |
| 2011 CW Series D/E/PIB Bond | 3.514 | | | |
| 2011 CW Bond | 2.479 | | | |
| 2012 CW Bond | 15.157 | | | |
| 2014 CW Bond | 20.266 | | | |
| Vintage CW Guarantee | 15.194 | | | |
| 2011 CW Guarantee Bond | 7.552 | | | |
| 2012 CW Guarantee Bond | 3.594 | | | |

4820-1003-9275.22

Calculations Relating to Clawback CVIs Upon Occurrence of
SUT Outperformance Condition and/or Rum Tax Outperformance Condition

(calculations attached)

Not Subject to Waterfall Outperformance Amount: $ $_____

Less Deemed Paid CVIs Payments Allocable to GO CVIs[1]:                        $_____

Amount to be Transferred to Trustee:                        $_____

Payment to Holders of Clawback CVIs other than PRIFA Rum Tax Clawback CVIs: $_____ (deposit to Not Subject to Waterfall CVIs Payment Account)

Payment to Holders of PRIFA Rum Tax Clawback CVIs: $_____ (deposit to PRIFA Rum Tax Clawback CVIs Payment Account)

Amount Payable to Holders of Clawback CVIs other than Holders of PRIFA Rum Tax Clawback CVIs:

From Clawback CVIs Subaccount of the Subject to Waterfall Payment Amount: $_____

From Not Subject to Waterfall Payment Amount: $_____

Total: $_____

Amount per $1 Authorized Denomination: $0._____

Amount Payable to Holders of PRIFA Rum Tax Clawback CVIs:

From Clawback CVIs Subaccount of the Subject to Waterfall Payment Amount: $_____

From Not Subject to Waterfall Payment Amount: $_____

From Rum Tax CVI Annual Payment Amount: $_____

Total: $_____

Amount per $1 Authorized Denomination: $0._____

Remaining Clawback CVI Lifetime Cap as of June 30, 20__: $_____

Remaining Clawback CVI Lifetime Cap after CVIs Annual Payment Amount Payment Date: $_____

---

[1] Currently consists of $4 million settlement of Allowed CW/MBA Claim prior to Effective Date.

Attachment 7- 5

4820-1003-9275.22

| Claim | Remaining Lifetime Cap Before Distribution | Current Distribution | Remaining Lifetime Cap After Distribution |
|---|---|---|---|
| Allowed CW/HTA | | | |
| HTA 68 Bond (first priority) | | | |
| HTA 98 Senior Bond (second priority) | | | |
| HTA 98 Sub Bond (third priority) | | | |
| GDB HTA Loans (fourth priority) | | | |
| CW/Convention Center | | | |
| CW/PRIFA Rum Tax Claims | | | |
| CW/MBA | | | |

| Claim | Current Unit Distribution | Prior Unit Distribution | Total Distribution |
|---|---|---|---|
| Allowed CW/HTA | | | |
| HTA 68 Bond (first priority) | | | |
| HTA 98 Senior Bond (second priority) | | | |
| HTA 98 Sub Bond (third priority) | | | |
| GDB HTA Loans (fourth priority) | | | |
| CW/Convention Center | | | |
| CW/PRIFA Rum Tax Claims | | | |
| CW/MBA | | | |

4820-1003-9275.22

Attachment 7- 7

**Attachment 8**

**Illustrative scenarios of the calculation of the
Subject to Waterfall Outperformance Amount**

4820-1003-9275.189275.22

**Attachment 9**

**Illustrative scenarios of the calculation of the
Not Subject to Waterfall Outperformance Amount**

4820-1003-9275.189275.22

**Attachment 10**

**Illustrative scenarios of the calculation of the Rum Tax CVI Annual Payment Amount**

4820-1003-9275.189275.22

**Attachment 11**

**Form of Reporting Agreement**

4820-1003-9275.22

**Attachment 12**

**Form of Initial Calculation Agent Agreement**

## **EXHIBIT C**

Avoidance Actions Trust Agreement

<u>AVOIDANCE ACTION TRUST AGREEMENT</u>

**AVOIDANCE ACTIONS TRUST AGREEMENT** dated as of [●], 2021 (this "<u>Trust Agreement</u>"), by and among the Financial Oversight and Management Board for Puerto Rico, in its capacity as Title III representative on behalf of the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), the Employees Retirement System of the Government of the Commonwealth ("<u>ERS</u>") and the Puerto Rico Public Buildings Authority ("<u>PBA</u>" and, together with the Commonwealth and ERS, the "<u>Debtors</u>"); [●], as trustee (together with any successor or additional Trustee appointed under the terms hereof, the "<u>Trustee</u>") of the Commonwealth Avoidance Actions Trust (the "<u>Avoidance Actions Trust</u>"); and, solely with respect to <u>Sections 1.3</u> and <u>9.11</u>, the Financial Oversight and Management Board for Puerto Rico on behalf of itself and its committees (the "<u>FOMB</u>").

<u>Section 9.14</u> hereof contains a list of capitalized terms used herein. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Modified Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., dated November [●], 2021, (including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time, the "<u>Plan</u>").

## <u>RECITALS</u>

A.     On June 30, 2016, the President of the United States signed into law legislation passed by Congress, the Puerto Rico Oversight, Management, and Economic Stability Act ("<u>PROMESA</u>"), 48 U.S.C. § 2101 *et seq.*. Titles III and VI of PROMESA provide for debt restructurings for Puerto Rico and its instrumentalities.

B.     The FOMB commenced Title III cases for the Commonwealth, ERS, and PBA on May 3, 2017, May 5, 2017, and September 27, 2019, respectively (the "<u>Title III Cases</u>").

C.     On July 30, 2021, the Commonwealth filed the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al. (the "<u>Seventh Amended Plan</u>"), and the disclosure statement relating to the Plan (as amended, the "<u>Disclosure Statement</u>") with the Title III Court.

D.     On November [●], 2021, the Debtors filed the Plan, which contained certain other modifications to the Seventh Amended Plan.

E.     On [●], 2021, the Title III Court entered an order confirming the Plan (the "<u>Confirmation Order</u>"), which became effective on the Effective Date.

F.     The Plan provides for the creation of the Avoidance Actions Trust on or before the Effective Date to hold, manage and administer the Avoidance Actions Trust Assets and distribute the proceeds thereof, if any, to the Avoidance Actions Trust Beneficiaries, in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order.

G.     The Avoidance Actions Trust is being created on behalf of, and for the benefit of, the Avoidance Actions Trust Beneficiaries.

H.    The Trustee shall have all powers necessary to implement the provisions of this Trust Agreement and administer the Avoidance Actions Trust, including the power to: (i) prosecute for the benefit of the Avoidance Actions Trust Beneficiaries through Trust Professionals any Avoidance Action or other causes of action that may from time to time be held by the Avoidance Actions Trust; (ii) preserve, maintain and liquidate the Avoidance Actions Trust Assets; (iii) distribute the Avoidance Actions Trust proceeds to the Avoidance Actions Trust Beneficiaries; and (iv) otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan and/or the Confirmation Order or in any other agreement executed pursuant to the Plan, in each case subject to the provisions of Sections 6.3, 6.4, and 6.5 hereof regarding limitation on the Trustee and the oversight and consent rights of the Trust Advisory Board and the Title III Court as provided for herein.

I.    The Avoidance Actions Trust is organized for the sole purpose of liquidating and distributing the Avoidance Actions Trust Assets, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

J.    The Avoidance Actions Trust is intended to qualify as a "Liquidating Trust" under the Internal Revenue Code of 1986, as amended (the "IRC") and the regulations promulgated thereunder (the "Treasury Regulations"), specifically Treasury Regulations section 301.7701-4(d) and, as such, as a "grantor trust" for United States federal income tax purposes with the Avoidance Actions Trust Beneficiaries treated as the grantors and owners of the Avoidance Actions Trust.

K.    Pursuant to the Plan, the Trust is intended to be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.

L.    In accordance with the Plan, the Trust is further intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, the Debtors and the Trustee agree as follows:

**AGREEMENT**

## ARTICLE I

## DECLARATION OF TRUST

1.1    Creation of Trust.    The Debtors and the Trustee, pursuant to the Plan and the Confirmation Order, hereby constitute and create the Avoidance Actions Trust, which shall bear the name "Commonwealth Avoidance Actions Trust." In connection with the exercise of the

Trustee's power hereunder, the Trustee may use this name or such variation thereof as the Trustee sees fit.

1.2   Purpose of Avoidance Actions Trust.  The sole purpose of the Avoidance Actions Trust is to implement the Plan on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries, and to serve as a mechanism for liquidating, converting to Cash and distributing the Avoidance Actions Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

1.3   Transfer of Avoidance Actions Trust Assets.  On the Effective Date, the Debtors shall transfer, for the sole benefit of the Avoidance Actions Trust Beneficiaries, and in accordance with the Plan and the Confirmation Order, all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible pursuant to the Plan and Confirmation Order.  On the Effective Date, the Commonwealth shall fund the Avoidance Actions Trust, on a one time basis, in the amount of Fifteen Million U.S. Dollars ($15,000,000) (the "Administrative Funding").  Any portion of the Administrative Funding that is not used to fund the activities of the Avoidance Actions Trust shall be distributed in accordance with Section 4.2.  The FOMB shall reasonably cooperate with the reasonable requests of the Trustee in connection with the transfer by the Debtors of the Avoidance Actions Trust Assets pursuant to this Section 1.3.

1.4   No Rights of Debtors.  Following the Effective Date and the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors shall have no authority or control over the Avoidance Actions Trust Assets, including no rights to appear in, prosecute, compromise, or otherwise direct the litigation or settlement of the Avoidance Actions, except as may be necessary to ensure, and for the sole purpose of ensuring, the full transfer of control and authority over the Avoidance Actions Trust Assets to the Avoidance Actions Trust. The Debtors agree to take whatever actions may be reasonably necessary, including seeking the amendment of complaints or the restatement of tolling agreements, to ensure that all such authority and control over the Avoidance Actions and other Trust Assets is so transferred to the Trust.  The limitations on the Debtors' rights in this subsections shall not prejudice the ability of any of the Debtors to appear in or provide testimony in Avoidance Actions or other litigation in order to fulfil the Debtors' cooperation obligations set forth in Section 9.11 hereof.

1.5   Appointment and Acceptance of Trustee.  As set forth in the Confirmation Order, the members of the Trust Advisory Board hereby designate [●] to serve as the initial Trustee under the Plan.  The Trustee accepts the Avoidance Actions Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery to the Trustee, on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries, by the Debtors of all of their respective right, title and interest in the Avoidance Actions Trust Assets, upon the terms and subject to the conditions set forth herein, in the Plan and in the Confirmation Order. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Avoidance Actions Trust and not otherwise.  The Trustee shall have the authority to bind the

Avoidance Actions Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as Trustee, and not individually.

1.6 <u>Liquidation of Avoidance Actions Trust Assets</u>. The Trustee shall, in an expeditious but commercially reasonable manner and subject to the provisions of the Plan (including Article LXXVIII of the Plan), the Confirmation Order and the other provisions of this Trust Agreement, liquidate and convert to Cash the Avoidance Actions Trust Assets, make timely distributions in accordance with the terms hereof and the Plan and not unduly prolong the existence of the Avoidance Actions Trust. The Trustee shall exercise reasonable business judgment and liquidate the Avoidance Actions Trust Assets to maximize net recoveries; <u>provided</u>, <u>however</u>, that the Trustee shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the maximization of recoveries and the determinations and actions of the Trustee shall in all cases be subject to the limitations provided elsewhere herein. Subject to the terms of this Trust Agreement, such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action of the Avoidance Actions Trust or through the sale or other disposition of the Avoidance Actions Trust Assets (in whole or in combination, and including the sale of any claims, rights or causes of action of the Avoidance Actions Trust). The Trustee may incur any reasonable and necessary expenses in connection with the liquidation or conversion into Cash of the Avoidance Actions Trust Assets or in connection with the administration of the Avoidance Actions Trust and, to the extent that any Administrative Funding is available, such expenses shall first be deducted from the Administrative Funding. Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

1.7 <u>No Reversion to Debtors</u>. In no event shall any part of the Avoidance Actions Trust Assets revert to or be distributed to any Debtor or Reorganized Debtor.

1.8 <u>Incidents of Ownership</u>. The Avoidance Actions Trust Beneficiaries shall be the sole beneficiaries of the Avoidance Actions Trust and the Avoidance Actions Trust Assets, and the Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including those powers set forth in <u>Section 6.2</u> hereof.

1.9 <u>Privileges and Obligation to Respond to Ongoing Investigations</u>.

(a) All attorney-client privileges, work product protections and other immunities or protections from disclosure held by the Debtors ("<u>Privileges</u>") shall be transferred, assigned and delivered to the Avoidance Actions Trust, without waiver and in recognition of the joint and/or successorship interest in prosecuting claims on behalf of the Debtors, and shall vest in the Trustee solely in its capacity as such (and any other Person whom the Trustee, with the consent of the Trust Advisory Board, may designate; it being understood that, as of the date of this Trust Agreement, the Trustee shall designate the Trust Advisory Board, solely in its capacity as such, as well as any other Person designated in this Trust Agreement). The FOMB, the Debtors, as the case may be, and the Trustee are authorized to take all necessary actions to effectuate the sharing and vesting of such Privileges.

(b)      Pursuant to Federal Rule of Evidence 502(d) (to the extent Rule 502(d) is relevant, notwithstanding the fact that the FOMB, the Debtors and the Trustee are joint holders of certain attorney-client privileges, work product protections or other immunities or protections from disclosure), no Privileges shall be waived by disclosure to the Trustee, the Avoidance Actions Trust's professionals, or the Trust Advisory Board of the FOMB's or the Debtors' information subject to attorney-client privileges, work product protections or other immunities or protections from disclosure, or by disclosure among the FOMB, the Debtors, the Trustee and/or the Trust Advisory Board of information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure jointly held by the FOMB, the Debtors, the Trustee and/or the Trust Advisory Board. The Trustee shall be obligated to respond, on behalf of the Debtors, and with their reasonable cooperation, to all information demands with respect to the Avoidance Actions. The Trustee may waive, and/or disclose documents subject to, Privileges that are held by the FOMB and/or the Debtors (including the deliberative process privilege) only with the prior written consent of (i) the applicable holder(s) of such Privilege (*i.e.*, the FOMB and/or the Debtors, as the case may be), and (ii) the Trust Advisory Board, and only to the extent the Trustee determines in good faith that doing so is in the best interests of the Avoidance Actions Trust and its beneficiaries.

(c)      Notwithstanding anything in <u>Section 1.9(b)</u> to the contrary, the Trustee may disclose information that is subject to attorney-client privileges, work product protections or other immunities held by the FOMB or the Debtors (i) pursuant to an order of a court of competent jurisdiction, subject to the procedure described in the next sentence insofar as it applies, or (ii) as otherwise required by law. If the Trustee or the Trust Advisory Board receives a request from a third party to disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the Trustee and/or the Trust Advisory Board, the party or parties who receives such request will (A) pursue all reasonable steps to maintain the applicable privileges, protections or immunities from disclosure, including, if necessary, to maintain the privileges, protections or immunities from disclosure by seeking a protective order against and/or otherwise objecting to the production of such material, (B) notify the Trustee or the Trust Advisory Board, as the case may be, (C) notify AAFAF, (D) allow the Trustee or the Trust Advisory Board, as the case may be, reasonable time under the circumstances to seek a protective order against and/or otherwise object to the production of such material, and (E) unless required by law, not disclose the materials in question unless and until any objection raised by the Trustee or the Trust Advisory Board is resolved in favor of disclosure. For the avoidance of doubt, this <u>Section 1.9(c)</u> does not limit the Trustee's obligations under <u>Section 1.9(b)</u> to seek, and be granted, AAFAF and Trust Advisory Board consent prior to waiving Privileges held by the Debtors or Avoidance Action Trust.

## ARTICLE II

## AVOIDANCE ACTIONS TRUST BENEFICIARIES

2.1      <u>Conflicting Claims</u>. If any conflicting claims or demands are made or asserted with respect to an Avoidance Actions Trust Interest, the Trustee shall be entitled, in its sole and absolute discretion, to refuse to comply with any such conflicting claims or demands. In so refusing, the Trustee, at its sole election, may elect to make no payment or distribution with respect to the Avoidance Actions Trust Interest subject to the claims or demands involved, or any part thereof,

and the Trustee shall refer such conflicting claims or demands to the Title III Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands. In so doing, the Trustee shall not be or become liable to any party for its refusal to comply with any of such conflicting claims or demands. The Trustee shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Title III Court (or such other court of proper jurisdiction) or (b) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall include a complete release of the Avoidance Actions Trust and the Trustee (the occurrence of either (a) or (b) in this Section 2.1 being referred to as a "Dispute Resolution"). Promptly after a Dispute Resolution is reached, the Trustee shall transfer the payments and distributions, if any, in accordance with the terms of such Dispute Resolution. Any payment of any interest or income should be net of any taxes attributable thereto in accordance with Section 5.3.

2.2    Rights of Avoidance Actions Trust Beneficiaries. Each Avoidance Actions Trust Beneficiary shall be entitled to participate in the rights and benefits due to an Avoidance Actions Trust Beneficiary hereunder according to the terms of its Avoidance Actions Trust Interest. The interest of an Avoidance Actions Trust Beneficiary is hereby declared and shall be in all respects personal property. Except as expressly provided hereunder, an Avoidance Actions Trust Beneficiary shall have no title to, right to, possession of, management of or control of the Avoidance Actions Trust or the Avoidance Actions Trust Assets or to any right to call for a partition or division of such assets or to require an accounting. No surviving spouse, heir or devisee of any deceased Avoidance Actions Trust Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Avoidance Actions Trust Assets, but the whole title to the Avoidance Actions Trust Assets shall be vested in the Trustee and the sole interest of each Avoidance Actions Trust Beneficiary shall be the rights and benefits given to such Person under this Trust Agreement and the Plan.

2.3    Evidence of Avoidance Actions Trust Interest. Ownership of an Avoidance Actions Trust Interest in the Avoidance Actions Trust will be evidenced by the recording of such ownership in an electronic book-entry system (the "Book Entry System") maintained either by the Avoidance Actions Trust or an agent of the Avoidance Actions Trust and containing information provided by the Debtors or an agent of the Debtors. An Avoidance Actions Trust Beneficiary shall be deemed the "holder of record" (hereinafter "holder") of such Avoidance Actions Trust Beneficiary's Avoidance Actions Trust Interest(s) for purposes of all applicable United States federal and state laws, rules and regulations, including all applicable Commonwealth laws, rules and regulations. The Trustee shall, upon the written request of a holder of an Avoidance Actions Trust Interest, provide reasonably adequate documentary evidence of such holder's Avoidance Actions Trust Interest, as indicated in the Book Entry System. The expense of providing such documentation shall be borne by the requesting holder.

2.4    Claims Reports. Within sixty (60) days after the Effective Date, the Debtors shall arrange for the Trustee to receive a report (the "Initial Claims Report") regarding Avoidance Actions Trust Interests containing (a) an updated claims register for General Unsecured Claims, and (b) a written report of the status of any previously filed objections to General Unsecured Claims and the status of any reconciliations of General Unsecured Claims, showing which General Unsecured Claims are Allowed Claims, which are Disputed Claims (as defined below), and which are still being evaluated for possible objection. Further, the Debtors shall arrange for the Trustee

6

to receive a monthly report within ten (10) days of the end of each month (the "Monthly Claims Report"), which report shall include all material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports. In addition, the Debtors shall, upon reasonable request, periodically supply the Trustee with any other reports or information the Avoidance Actions Trust may reasonably request related to the reconciliation of General Unsecured Claims and the payment of distributions to Avoidance Actions Trust Beneficiaries.

2.5    Reliance on Debtors for Information.    It is the responsibility of the Debtors, pursuant to, among other things, their cooperation obligations established herein, to provide to the Avoidance Actions Trust reasonably complete and accurate information regarding Avoidance Actions Trust Interests and to provide periodic updates regarding such information as set forth in Section 2.4 hereof. The (a) Trustee, (b) individual(s) comprising the Trustee, as the case may be, (c) Trust Advisory Board, and (d) members of the Trust Advisory Board (each, a "Trust Party" and, collectively, the "Trust Parties") shall be entitled to rely on information supplied by the Debtors and their agents (including the Disbursing Agent) concerning the Avoidance Actions Trust Interests, and shall not be held liable to any party for any incompleteness or inaccuracy of such information.

2.6    Transfers of Avoidance Actions Trust Interests.

(a)    General.    Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law.

(b)    Book Entry System. The Book Entry System shall include a register (which may be electronic) setting forth the names and addresses of the Avoidance Actions Trust Beneficiaries, and the amount and class of their Avoidance Actions Trust Interests from time to time. Any transfer or assignment of an Avoidance Actions Trust Interest by will, intestate succession or operation of law shall not be effective unless and until such transfer or assignment is recorded in the Book Entry System, which shall be completed as soon as practicable. Subject to Section 2.4(d) hereof, the entries in the Book Entry System shall be conclusive absent manifest error, and the Avoidance Actions Trust and the Trustee shall treat each Person whose name is recorded in the Book Entry System pursuant to the terms hereof as the owner of Avoidance Actions Trust Interests indicated therein for all purposes of this Trust Agreement, notwithstanding notice to the contrary.

(c)    Registration.    In accordance with the Plan, the Trust is intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to sections 7(a) and 7(b) of that Act and section 1145 of the Bankruptcy Code. If the Trustee, with the consent of the Trust Advisory Board and upon advice of counsel, determines that any class of Avoidance Actions Trust Interests may be subject to registration pursuant to Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Trustee shall pursue relief from such registration by obtaining either an exemptive order, a no-action letter or an interpretive letter from the Securities and Exchange Commission (the "SEC") or its staff or, absent its ability to achieve that objective or in lieu thereof, shall register such class pursuant to Section 12 of such

statute (it being understood and agreed that the Trustee with the consent of the Trust Advisory Board shall be authorized, among other things, to register such class and to seek relief from one or more of the requirements then applicable subsequent to such registration and to de-register such class). To the extent that any Administrative Funding is available, any expenses that are associated with such application for relief and/or registration shall first be deducted from the Administrative Funding. Incurrence of expenses requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

(d)     <u>Further Limitations on Transfer</u>. Notwithstanding any other provision to the contrary, the Trustee may disregard any purported transfer or assignment of Avoidance Actions Trust Interests by will, intestate succession or operation of law if sufficient necessary information (as reasonably determined by the Trustee), including applicable tax-related information, is not provided by such purported transferee or assignee to the Trustee.

2.7     <u>Limited Liability</u>.   No provision of this Trust Agreement, the Plan or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any Avoidance Actions Trust Beneficiary, shall give rise to any liability of such Avoidance Actions Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors, employees, or equity interest holders of any Debtor, or by any other Person (except to the extent of the Avoidance Actions Trust Beneficiary's fraud, gross negligence or willful misconduct). Avoidance Actions Trust Beneficiaries are deemed to receive the Avoidance Actions Trust Assets in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order in exchange for their Allowed Claims, without further obligation or liability of any kind (except to the extent of the Avoidance Actions Trust Beneficiary's fraud, gross negligence or willful misconduct), but subject to the provisions of this Trust Agreement.

# ARTICLE III

## DURATION AND TERMINATION OF AVOIDANCE ACTIONS TRUST

3.1     <u>Duration</u>. The Avoidance Actions Trust shall become effective upon the Effective Date of the Plan and shall remain and continue in full force and effect until dissolved as provided for in Section 78.14(d) of the Plan.

3.2     <u>Dissolution of the Avoidance Actions Trust</u>.

(a)     The Trustee and the Avoidance Actions Trust shall be discharged or dissolved, as the case may be, on the earlier to occur of (i) all of the Avoidance Actions Trust Assets having been distributed pursuant to the Plan and this Trust Agreement and (ii) following the reconciliation of all General Unsecured Claims, the Trustee having determined, with the consent of the Trust Advisory Board, that the administration of any remaining Avoidance Actions Trust Assets is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit; <u>provided</u>, <u>however</u>, that in no event shall the Avoidance Actions Trust be dissolved later than five (5) years from the Effective Date unless the Title III Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or

8

an opinion of counsel satisfactory to the Trustee and the Trust Advisory Board that any further extension would not adversely affect the status of the trust as a "Liquidating Trust" for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Actions Trust Assets.

(b)      If at any time the Trustee determines, in reliance upon such Trust Professionals as the Trustee may retain, that the expense of administering the Avoidance Actions Trust so as to make a final distribution to the Avoidance Actions Trust Beneficiaries is likely to exceed the value of the assets remaining in the Avoidance Actions Trust, the Trustee may apply to the Title III Court for authority to (i) reserve any amount necessary to dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A) of the type described in Section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under Section 501(a) of the IRC, and (C) that is unrelated to the Debtors, the Reorganized Debtors, the Avoidance Actions Trust, and any insider of the Trustee, and (iii) dissolve the Avoidance Actions Trust. Upon receipt of such authority from the Title III Court, the Trustee shall notify each Avoidance Actions Trust Beneficiary.

3.3      Continuance of Avoidance Actions Trust for Winding Up. After the dissolution of the Avoidance Actions Trust and solely for the purpose of liquidating and winding up the affairs of the Avoidance Actions Trust, the Trustee shall continue to act as such until its duties have been fully performed. Upon distribution of all the Avoidance Actions Trust Assets, the Trustee shall retain the books, records and files that shall have been delivered to or created by the Trustee. At the Trustee's discretion, all of such records and documents may be destroyed at any time following the date that is six (6) years after the final distribution of the Avoidance Actions Trust Assets, subject to any joint prosecution and common interests agreement(s) to which the Trustee may be party. Provisions with respect to the destruction of documents in this Section 3.3 shall not limit the Trustee's right, prior to the dissolution of the Avoidance Actions Trust, to destroy documents that the Trustee considers no longer necessary to retain, subject to applicable law, the Plan, the Disclosure Statement and this Trust Agreement.

**ARTICLE IV**

**ADMINISTRATION OF AVOIDANCE ACTIONS TRUST**

4.1      Payment of Claims, Expenses and Liabilities.  Subject to the Budget from time to time approved by the Trust Advisory Board in accordance with Section 4.13(b), and in accordance with Sections 6.7(j), 6.9(b), and 7.6 hereof, and except as otherwise provided herein, the Trustee shall use the Avoidance Actions Trust Assets: (a) to pay reasonable costs and expenses of the Avoidance Actions Trust (including any taxes imposed on the Avoidance Actions Trust, the actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Avoidance Actions Trust Assets, as provided in Section 6.7 hereof, and the preservation of books and records of the Avoidance Actions Trust); (b) to satisfy other obligations or other liabilities incurred or assumed by the Avoidance Actions Trust (or to which the Avoidance Actions Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order or this Trust Agreement, including reasonable fees and costs incurred in connection with the protection, preservation, liquidation and distribution of the Avoidance Actions Trust Assets and the reasonable costs of investigating, prosecuting, resolving and/or settling any

Claims; (c) as reasonably necessary to meet contingent liabilities and to maintain the value of the Avoidance Actions Trust Assets during liquidation; and (d) to satisfy any other obligations of the Avoidance Actions Trust expressly set forth in the Plan, this Trust Agreement, and the Confirmation Order. The costs, expenses and other obligations or other liabilities set forth in this Section 4.1 shall first be deducted from the Administrative Funding. Incurrence of any such costs, expenses and other obligations or other liabilities requiring funding from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

4.2     Distributions.

(a)     Generally. All distributions to the Avoidance Actions Trust Beneficiaries on account of their Avoidance Actions Trust Interests shall be made, at the election and direction of the Trustee with notice to the Debtors and AAFAF, by either (i) the Disbursing Agent selected by the Debtors under the Plan or (ii) such other disbursing agent as may be selected by the Trustee (the disbursing agent selected by the Trustee under either (i) or (ii) being the "Trust Disbursing Agent"), in either case in accordance with the terms and provisions of Article LXXVII of the Plan, except as otherwise provided herein. The Trust Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same. The Trust Disbursing Agent shall not hold an economic or beneficial interest in such property. The Debtors will direct the Disbursing Agent to share information with and otherwise reasonably cooperate with the Trustee to generate administrative efficiencies and reduce duplication of effort in the distribution processes contemplated hereunder and under the Plan, including by sharing claimant tax information with the Trustee and providing access to the Debtors' Claims register.

(b)     Distributions by the Trust Disbursing Agent. The Trust Disbursing Agent is required to distribute to the Avoidance Actions Trust Beneficiaries on account of their Avoidance Actions Trust Interests, on a semi-annual basis (each such date, a "Distribution Date"), in accordance with the terms of the Plan, all unrestricted Cash then on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section 4.2), except (i) Cash reserved pursuant to this Trust Agreement to fund the activities of the Avoidance Actions Trust, and (ii) such amounts as are allocable to or retained on account of Disputed Claims in accordance with Section 82.3 of the Plan to pay reasonable incurred or anticipated expenses (including any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets); provided, however, that the Trust Disbursing Agent shall not be required to make a distribution pursuant to this Section 4.3 if the aggregate net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such as would make the distribution impracticable as reasonably determined by the Trustee, with the consent of the Trust Advisory Board, in accordance with applicable law, and so long as such aggregate net amount is less than Twenty-Five Million Dollars ($25,000,000.00); provided further, however, that the Trustee, with consent of the Trust Advisory Board, may decide to direct the Trust Disbursing Agent to forego the first distribution to those Avoidance Actions Trust Beneficiaries with respect to which the Trustee, in its reasonable judgment, is not administratively prepared to direct such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Trustee is administratively prepared to do so, not to exceed three (3) months from the date of the first semi-annual distribution.

(c)   Payment of Distributions.   Each Avoidance Actions Trust Beneficiary's share of the Avoidance Actions Trust Interests as determined pursuant to the Plan (including any Cash to be received on account of any Avoidance Actions Trust Interests) shall be allocated and distributed, and the Avoidance Actions Trust Assets shall be allocated and distributed, in accordance with Article LXXVII of the Plan.

4.3   De Minimis Distributions.   No Cash payment shall be made to any holder of an Avoidance Actions Trust Interest until such time, if ever, as the amount payable thereto, in any distribution from the Avoidance Actions Trust, is equal to or greater than Ten Dollars ($10.00). Any holder of an Avoidance Actions Trust Interest on account of which the amount of Cash to be distributed pursuant to any distribution from the Avoidance Actions Trust is less than Ten Dollars ($10.00) shall be deemed to have no claim for such distribution against the Debtors, the Reorganized Debtors, the Avoidance Actions Trust or the Avoidance Actions Trust Assets. Subject to Section 4.6, any Cash not distributed pursuant to this Section 4.3 hereof shall be the property of the Avoidance Actions Trust free of any restrictions thereon, and shall be available for distribution to the other Avoidance Actions Trust Beneficiaries, in accordance with the Plan and this Trust Agreement.

4.4   Undeliverable Distributions.   For purposes of this Trust Agreement, an "undeliverable" distribution shall include a check that is sent to a holder in respect of a distribution to such holder, which check has not been negotiated within six (6) months following the date on which such check was issued. If any distribution to the holder of a Avoidance Actions Trust Interest is undeliverable, no further distribution shall be made to such holder unless and until the Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Trustee (or its duly authorized agent) until such time as a distribution becomes deliverable. All Persons ultimately receiving an undeliverable distribution shall not be entitled to any interest or other accruals of any kind on account of the delay in payment resulting from the undeliverable status of such distribution. Except as required by law, the Trustee (or its duly authorized agent) shall not be required to attempt to locate any holder of a Avoidance Actions Trust Interest.

4.5   Interest on Avoidance Actions Trust Interests.   As set forth in the Plan, interest shall not accrue and be paid on the Avoidance Actions Trust Interests.

4.6   Distributions After the Effective Date.   Distributions made after the Effective Date to holders of Avoidance Actions Trust Interests on account of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article LXXVII of the Plan.

4.7   Compliance with Laws.   Any and all distributions of Avoidance Actions Trust Assets shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

4.8   Fiscal Year.   Except for the first and last years of the Avoidance Actions Trust, the fiscal year of the Avoidance Actions Trust shall be the calendar year. For the first and last years of the Avoidance Actions Trust, the fiscal year of the Avoidance Actions Trust shall be such portion of the calendar year that the Avoidance Actions Trust is in existence.

4.9     Books and Records.  The Trustee shall retain and preserve the Debtors' books, records and files that shall have been delivered to or created by the Trustee. Subject to Section 3.3, the Trustee shall maintain, in respect of the Avoidance Actions Trust and the Avoidance Actions Trust Beneficiaries and all others to receive distributions under this Trust Agreement, books and records relating to the assets and the income of the Avoidance Actions Trust and the payment of expenses of, liabilities of, and claims against or assumed by, the Avoidance Actions Trust and the Trustee, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and applicable provisions of law, including applicable tax, securities and other federal and state laws. Except as otherwise provided herein or in the Plan, nothing in this Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Avoidance Actions Trust, or as a condition for making any payment or distribution out of the Avoidance Actions Trust Assets. The Trustee shall provide AAFAF and any member of the Trust Advisory Board with access to such books and records during normal business hours as may be reasonably requested with three (3) Business Days' advance notice. Avoidance Actions Trust Beneficiaries holding Allowed Claims shall have the right upon thirty (30) days' prior written notice delivered to the Trustee to inspect such books and records; provided, however, that if so requested, all costs associated with such inspection shall be paid in advance by such requesting Avoidance Actions Trust Beneficiary and such Avoidance Actions Trust Beneficiary shall have entered into a confidentiality agreement reasonably satisfactory in form and substance to the Trustee.

4.10    Cash Payments.  All distributions required to be made to the Avoidance Actions Trust Beneficiaries shall be made in Cash denominated in United States dollars by checks drawn on a domestic bank selected by the Trustee or, at the option of the Trustee, by wire transfer from a domestic bank selected by the Trustee or as otherwise required or provided in applicable agreements; provided, however, that Cash payments to foreign holders of Avoidance Actions Trust Interests may be made, at the option of the Trustee, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

4.11    Insurance.  The Avoidance Actions Trust shall maintain customary insurance coverage for the protection of the Trustee, the members of the Trust Advisory Board, employees and any such other persons serving as administrators and overseers of the Avoidance Actions Trust on and after the Effective Date. The Trustee also may obtain insurance coverage it deems necessary and appropriate with respect to real and personal property which may become Avoidance Actions Trust Assets, if any.

4.12    Disputes.  To the extent a dispute arises between the Trustee and the Trust Advisory Board concerning the performance of any of the powers, duties, and/or obligations herein, the Trustee or the Trust Advisory Board may file a motion and/or other pleadings with the Title III Court and obtain advice and guidance or such other relief as may be appropriate concerning a resolution of the matter(s) in dispute between the parties. In the event of a dispute, the Trustee and the Trust Advisory Board, as applicable, shall have the right to engage legal counsel to advise it with respect to the matter(s) in dispute and the reasonable fees and expenses of such legal counsel shall be reimbursed by the Trustee from the Administrative Funding or, if the Administrative Funding has been spent, any other unrestricted Cash in the Avoidance Actions Trust, subject to the approval of a majority of the Trust Advisory Board and subject to Section 7.5. A motion and/or

other pleading described in this Section 4.12 filed by the Trust Advisory Board may only be filed upon the consent of a majority of its members.

4.13    Reports from the Trustee

(a)    The Trustee shall deliver reports to members of the Trust Advisory Board and AAFAF not later than thirty (30) days following the end of each fiscal quarter, or less frequently as may be agreed upon between the Trustee and the Trust Advisory Board. Such reports shall specify in reasonable detail (i) the status of any Causes of Action, Claims and litigation involving the Avoidance Actions Trust or the Avoidance Actions Trust Assets, including Avoidance Actions, including any settlements entered into by the Avoidance Actions Trust, (ii) the costs and expenses of the Avoidance Actions Trust that are incurred (including any taxes imposed on the Avoidance Actions Trust or actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Avoidance Actions Trust Assets and preservation of books and records as provided in Section 4.8) during the preceding fiscal quarter and the remaining amount (if any) of the Administrative Funding, (iii) the amounts listed in clause (ii) incurred since the Effective Date, (iv) the amount of Cash and other assets received by the Avoidance Actions Trust during the prior fiscal quarter, (v) the aggregate amount of Cash and other assets received by the Avoidance Actions Trust since the Effective Date, (vi) the calculation of the estimated amount of the Cash and other assets to be distributed on the next Distribution Date, including any Cash on hand that is not to be distributed pursuant to Section 4.2(a) above, (vii) the aggregate amount of distributions from the Avoidance Actions Trust to the Avoidance Actions Trust Beneficiaries since the Effective Date, and (viii) such other information as the Trust Advisory Board may reasonably request from time to time. The Trustee also shall timely prepare, file and distribute such additional statements, reports and submissions (A) as may be necessary to cause the Avoidance Actions Trust and the Trustee to be in compliance with applicable law or (B) as may be otherwise reasonably requested from time to time by the Trust Advisory Board.

(b)    The Trustee shall prepare and submit to the Trust Advisory Board for approval an annual plan and budget at least thirty (30) days prior to the commencement of each fiscal year of the Avoidance Actions Trust; provided, however, that the first such annual plan and budget shall be submitted no later than forty-five (45) days after the Effective Date of the Plan. Such annual plan and budget shall set forth in reasonable detail: (i) the Trustee's anticipated actions to administer and liquidate the Avoidance Actions Trust Assets; and (ii) the anticipated expenses, including the expenses of Trust Professionals, associated with conducting the affairs of the Avoidance Actions Trust. Such annual plan and budget shall be updated and submitted to the Trust Advisory Board for review and approval on a quarterly basis, and each such quarterly update shall reflect the differences between the anticipated actions described in the annual report and actual operations of the Avoidance Actions Trust to date. Any such annual plan and budget as approved by the Trust Advisory Board is referred to herein as the "Budget". All actions by the Trustee must be substantially consistent with the then current Budget, provided that the Trustee may take action outside the Budget with the prior approval of the Trust Advisory Board.

(c)    In accordance with the Plan, the Avoidance Actions Trust is intended to be exempt from the requirements of (i) the Securities Exchange Act of 1934, as amended, and any applicable state and local laws requiring registration of securities, pursuant to section 1145 of the

Bankruptcy Code, and (ii) the Investment Company Act of 1940, as amended, pursuant to Sections 7(a) and 7(b) of that Investment Company Act of 1940, as amended, and section 1145 of the Bankruptcy Code. Notwithstanding the forgoing, if required to do so, and until such time as the Avoidance Actions Trust is dissolved in accordance with Section 78.14(d) of the Plan (or otherwise in accordance with this Trust Agreement), the Avoidance Actions Trust shall file with (or furnish to, as the case may be) the SEC such periodic reports as the Avoidance Actions Trust is required to file pursuant to the Exchange Act.

## ARTICLE V

## TAX MATTERS

5.1     Avoidance Actions Trust Assets Treated as Owned by Avoidance Actions Trust Beneficiaries.  For all United States federal income tax purposes, all parties (including the Debtors, the Trustee, and the Avoidance Actions Trust Beneficiaries) shall treat the transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as (a) a transfer of the Avoidance Actions Trust Assets (subject to any obligations relating to those assets) directly to the Avoidance Actions Trust Beneficiaries and, to the extent Avoidance Actions Trust Assets are allocable to Disputed Claims, to the reserve for such claims, *followed by* (b) the transfer by such beneficiaries to the Avoidance Actions Trust of the Avoidance Actions Trust Assets (other than the Avoidance Actions Trust Assets allocable to a reserve for disputed claims) in exchange for Avoidance Actions Trust Interests. Accordingly, the Avoidance Actions Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Avoidance Actions Trust Assets (other than such Avoidance Actions Trust Assets as are allocable to a reserve for disputed claims). The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes. The establishment of the Avoidance Actions Trust under United States law shall not, by itself, be deemed to subject the Avoidance Actions Trust Beneficiaries to United States federal income taxes.

5.2     Tax Reporting.

(a)     The Trustee shall prepare and file (or cause to be prepared and filed) tax returns for the Avoidance Actions Trust treating the Avoidance Actions Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this Article V. To the extent and in the manner required by applicable law, the Trustee also will annually send to each holder of an Avoidance Actions Trust Interest a separate statement regarding the receipts and expenditures of the Avoidance Actions Trust as relevant for United States federal income tax purposes and will instruct all such holders to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their United States federal income tax returns. The Trustee also shall file (or cause to be filed) any other statement, return or disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

(b)     To the extent and in the manner required by applicable law, allocations of Avoidance Actions Trust taxable income among the Avoidance Actions Trust Beneficiaries (other than taxable income allocable to a reserve for disputed claims) shall be determined by reference to

the manner in which an amount of Cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to a reserve for disputed claims) to the holders of the Avoidance Actions Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Avoidance Actions Trust. Similarly, to the extent an in the manner required by applicable law, taxable loss of the Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Avoidance Actions Trust Assets. To the extent and in the manner required by applicable law, the tax book value of the Avoidance Actions Trust Assets for purposes of this <u>Section 5.2(b)</u> shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Trustee of a private letter ruling if the Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Trustee), the Trustee shall (i) timely elect to treat any reserve for disputed claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Trustee and the Avoidance Actions Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(d)     The Trustee shall be responsible for payment, out of the Avoidance Actions Trust Assets, of any taxes imposed on the Avoidance Actions Trust or its assets, including any reserve for disputed claims. If, and to the extent, any Cash retained on account of Disputed Claims in the reserve for such claims is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets from such reserve), such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Trustee as a result of the resolution of such Disputed Claims.

5.3     <u>Tax Withholdings by Trustee</u>. The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests. All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions Trust Interests for all purposes of the Trust Agreement, it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution. The Trustee shall be authorized to collect such tax information from the holders of Avoidance Actions Trust Interests (including social security numbers or other tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Trust Agreement. In order

to receive distributions under the Plan, all holders of Avoidance Actions Trust Interests shall be required to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. To the extent the Disbursing Agent collects such tax information in performance of its duties under the Plan, the Debtors agree to direct the Disbursing Agent to provide such tax information concerning Avoidance Action Trust Beneficiaries to the Trust Disbursing Agent for use in accordance with this Trust Agreement. This identification requirement generally applies to all holders of Avoidance Actions Trust Interests, including those who hold their Claims in "street name." The Trustee may refuse to make a distribution to any holder of a Avoidance Actions Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered may treat such holder's Avoidance Actions Trust Interests as disputed; provided, however, that if such information is not furnished to the Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Avoidance Actions Trust Interest; and, provided further, however, that, upon the delivery of such information by a holder of a Avoidance Actions Trust Interest, the Trustee shall make such distribution to which the holder of the Avoidance Actions Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; provided further, however, that if the Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Trustee for such liability (to the extent such amounts were actually distributed to such holder).

Notwithstanding the above, and without limiting any of the other obligations of the Debtors or rights of the Trustee described herein, (a) the Debtors shall be required to supply to the Trustee such tax information of the holders of Avoidance Actions Trust Interests that is in the possession or control of the Debtors or any of their agents, representatives or professionals, including the Disbursing Agent and that the Trustee may reasonably request be provided to it by the Debtors, and (b) the Trust Parties shall be entitled to rely on, and shall not be held liable for any omission or inaccuracy with respect to, such tax information so supplied to the Trustee.

## ARTICLE VI

## POWERS OF AND LIMITATIONS ON THE TRUSTEE

6.1     Trustee.

(a)     "Trustee" means [●] so long as it continues in office, and all other Person(s) who have been duly elected and qualify as Trustee of the Avoidance Actions Trust hereunder pursuant to Section 1.4 or Article VIII. Subject to Article VIII, the Trustee shall hold office until disability, death, resignation, or the termination of the Avoidance Actions Trust in accordance with the terms set forth herein. References herein to the Trustee shall refer to the Person or Persons serving as the Trustee solely in its capacity as Trustee hereunder. The Trustee shall be subject to Puerto Rico laws governing ethics, anti-corruption and conflicts of interest.

(b)     Subject to the express limitations set forth herein, any actions of the Trustee contemplated by this Trust Agreement shall be decided and conducted by the Trustee only.

6.2     Powers of the Trustee.

(a)     Pursuant to the terms of the Plan, the Confirmation Order and this Trust Agreement, the Trustee shall have various powers, duties and responsibilities concerning the prosecution of certain litigation claims, the disposition of assets, the resolution of claims, and numerous other obligations relating to maximizing the proceeds of the Avoidance Actions Trust Assets and the administration of the Avoidance Actions Trust.

(b)     Nothing in this Trust Agreement shall be deemed to limit the Trust Parties' protections and benefits under the Plan or to prevent a Trust Party from taking or refraining to take any action on behalf of the Trust that, based upon the advice of counsel or other professionals, the Trust Party determines it is obligated to take or to refrain from taking in the performance of any duty that the Trust Party may owe the Avoidance Actions Trust Beneficiaries or any other Person under the Plan, Confirmation Order or this Agreement.

(c)     The Trustee shall have only such rights, powers and privileges expressly set forth in the Confirmation Order, the Plan and this Trust Agreement and as otherwise provided by applicable law. Subject to the Confirmation Order, the Plan and the provisions of this Trust Agreement, including the oversight and approvals by and of the Trust Advisory Board and the Title III Court provided herein, the Trustee shall be expressly authorized to undertake the following actions:

(i)     to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust;

(ii)    to hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims or Interests are Allowed on or after the Effective Date;

(iii)   in the Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action or litigation of the Avoidance Actions Trust;

(iv)    to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Trustee otherwise deems appropriate with respect to the Avoidance Actions Trust;

(v)     in the Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Trustee will be responsible;

(vi)    to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority;

(vii)   to enter into any agreements binding the Avoidance Actions Trust, and to execute, acknowledge and deliver any and all instruments that are necessary or

17

deemed by the Trustee to be consistent with and advisable in furthering the purpose of the Avoidance Actions Trust;

(viii)   to open and maintain bank accounts on behalf of or in the name of the Avoidance Actions Trust;

(ix)   to cause the Avoidance Actions Trust to employ and pay professionals, claims agents, disbursing agents, and other agents and third parties, in accordance with the terms and limitations set forth herein;

(x)   to cause the Avoidance Actions Trust to pay all of its lawful expenses, debts, charges, taxes and other liabilities, and make all other payments;

(xi)   to cause the Avoidance Actions Trust to withhold from the amount distributable to any Person the maximum amount needed to pay any tax or other charge that the Trustee has determined, based upon the advice of its agents and/or professionals, may be required to be withheld from such distribution under the income tax or other laws of the United States or of any state or political subdivision thereof;

(xii)   to cause the Avoidance Actions Trust seek a determination of tax liability or refund under section 505 of the Bankruptcy Code;

(xiii)   to cause the Avoidance Actions Trust to establish out of all Avoidance Actions Trust Assets such reserves for taxes, assessments and other expenses of administration of the Trust as may be necessary and appropriate for the proper operation of the Avoidance Actions Trust;

(xiv)   to establish and maintain a website, to the extent the Trustee deems necessary, to provide notice of the Avoidance Actions Trust's activities to Avoidance Actions Trust Beneficiaries, provided that the Trustee determines, on the advice of counsel, that establishing such website does not implicate any securities or other applicable law;

(xv)   to undertake all administrative functions of the Avoidance Actions Trust, including overseeing the winding down and termination of the Avoidance Actions Trust;

(xvi)   to exercise, implement, enforce, and discharge all of the terms, conditions, powers, duties, and other provisions of the Plan, the Confirmation Order, and this Agreement; and

(xvii)   to take all other actions consistent with the provisions of the Plan that the Trustee deems reasonably necessary or desirable to administer the Trust.

(d)   In all circumstances, the Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

6.3   Except as otherwise provided in this Trust Agreement, the Trustee will not be required to obtain the order or approval of the Title III Court, or any other court of competent

jurisdiction in, or account to the Title III Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder. Notwithstanding the foregoing, where the Trustee determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the Trustee will have the right to submit to the Title III Court any question or questions regarding any specific action proposed to be taken by the Trustee with respect to this Trust Agreement, the Avoidance Actions Trust, or the Avoidance Actions Trust Assets, including the administration and distribution of the Avoidance Actions Trust Assets and the termination of the Avoidance Actions Trust. Pursuant to the Plan, the Title III Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Trustee.

6.4     <u>Exclusive Authority to Pursue Avoidance Actions</u>.  The Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court.  The Trustee shall be the sole representative of the Debtors under section 1123(b)(3) of the Bankruptcy Code with respect to the Avoidance Actions.  The Trustee shall be vested with and entitled to assert all setoffs and defenses of the Debtors or the Trust to any counterclaims that may be asserted by any defendant in an Avoidance Action.  The Trustee also shall be vested with and entitled to assert all of the Debtors' rights with respect to any such counterclaims under section 558 of the Bankruptcy Code.

6.5     <u>Limitations on Trustee</u>.  The Trustee shall, on behalf of the Avoidance Actions Trust, hold the Avoidance Actions Trust out as a trust in the process of liquidation and not as an investment company.  The Trustee shall be restricted to the liquidation of the Avoidance Actions Trust Assets on behalf, and for the benefit, of the Avoidance Actions Trust Beneficiaries and the distribution and application of Avoidance Actions Trust Assets for the purposes set forth in, and the conservation and protection of the Avoidance Actions Trust Assets and the administration thereof in accordance with, the provisions of this Trust Agreement, the Plan and the Confirmation Order.

6.6     <u>Conflicts of Interest</u>.  The Trustee will appoint a disinterested Person to handle any matter where the Trustee has identified it has a conflict of interest or the Title III Court, on motion of the any party in interest, determines one exists.  If the Trustee is unwilling or unable to appoint a disinterested Person to handle any such matter, the Title III Court, on notice and hearing, may do so.

6.7     <u>Establishment of Trust Advisory Board</u>.

(a)     The "<u>Trust Advisory Board</u>" means the board to be appointed in accordance with, and to exercise the duties set forth in, this Trust Agreement, which duties shall be (i) to oversee the liquidation and distribution of the Avoidance Actions Trust Assets by the Trustee in accordance with this Trust Agreement, the Plan and the Confirmation Order, (ii) to approve (or withhold approval) of those matters submitted to it for approval in accordance with the terms of this Trust Agreement, and (iii) to remove and appoint any successor to the Trustee as provided for in this Trust Agreement.

(b)     The Trust Advisory Board initially shall be comprised of (i) two (2) directors selected by the Creditors' Committee (the "<u>Creditor Directors</u>"), and (ii) one (1) director

19

selected by the FOMB (the "OB Director").  The initial members of the Trust Advisory Board are set forth on Annex A hereto.  Each member of the Trust Advisory Board shall have a fiduciary duty to act in the best interests of the Avoidance Actions Trust Beneficiaries as a whole.  The Trust Advisory Board shall be subject to provisions consistent with Puerto Rico laws governing ethics, anti-corruption and conflicts of interest, and such laws shall be, and shall be deemed to be, incorporated into the Trust Advisory Board's bylaws.

(c)  The authority of the members of the Trust Advisory Board shall be effective as of the Effective Date and shall remain and continue in full force and effect until the Avoidance Actions Trust is dissolved in accordance with Section 3.2.  The service of the members of the Trust Advisory Board shall be subject to the following:

(i)  the members of the Trust Advisory Board shall serve until disability, death, or resignation pursuant to clause (ii) below, or removal pursuant to clause (iii) below;

(ii)  a member of the Trust Advisory Board may resign at any time by providing a written notice of resignation to the remaining members of the Trust Advisory Board.  Such resignation shall be effective when a successor is appointed as provided herein;

(iii)  a member of the Trust Advisory Board may be removed by the unanimous vote of the other members for (a) fraud, gross negligence or willful misconduct in connection with the affairs of the Avoidance Actions Trust, or (b) cause, which shall include a breach of fiduciary duty other than as specified in the foregoing clause (a).  Such removal shall be effective immediately upon such vote;

(iv)  in the event of a vacancy in a member's position (whether by removal, death or resignation), a new member may be appointed, (A) in the case of a Creditor Director, (i) by the Creditors' Committee, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days, or (ii) if the Creditors' Committee has been dissolved, the remaining Creditor Director, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days, or (B) in the case of the OB Director (i) by the FOMB, as notified in writing to the Trust Advisory Board within ten (10) Business Days, or (ii) if the FOMB has been dissolved, by AAFAF, as notified in writing to the Trust Advisory Board and the Trustee within ten (10) Business Days.  In each case, the appointment of a successor member of the Trust Advisory Board shall be evidenced by the filing with the Title III Court by the Trustee of a notice of appointment, which notice shall include the name, address, and telephone number of the successor member of the Trust Advisory Board; and

(v)  immediately upon appointment of any successor member of the Trust Advisory Board, all rights, powers, duties, authority, and privileges of the predecessor member of the Trust Advisory Board hereunder shall be vested in and undertaken by the successor member of the Trust Advisory Board without any further act; and the successor member of the Trust Advisory Board shall not be liable personally for any act or omission of the predecessor member of the Trust Advisory Board.

(d)      Each member of the Trust Advisory Board shall designate (i) one or more representatives who shall attend meetings of and participate in other activities of the Trust Advisory Board, and (ii) an alternate representative to attend meetings and participate in other activities of the Trust Advisory Board when the representatives designated pursuant to clause (i) above are unavailable.

(e)      Notwithstanding anything in this Trust Agreement to the contrary, the Trust Advisory Board shall not take any action which will cause the Avoidance Actions Trust to fail to qualify as a "Liquidating Trust" for United States federal income tax purposes.

(f)      A quorum for meetings of the Trust Advisory Board shall consist of a majority of the non-recused, voting members of the Trust Advisory Board then serving; provided, however, that, for purposes of determining whether a quorum is present at such a meeting, a voting member of the Trust Advisory Board shall be deemed present if a representative of the member is attending in Person, by telephone or by proxy.

(g)      Except as expressly provided herein, the affirmative vote of a majority of the non-recused, voting members of the Trust Advisory Board shall be the act of the Trust Advisory Board with respect to any matter that requires the determination, consent, approval or agreement of such board.  If an equal number of the non-recused voting members of the Trust Advisory Board vote for and against a particular matter, the Trustee shall only in such circumstances have the authority to cast a vote with respect to such matter.  Any of or all the members of the Trust Advisory Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any member of the Trust Advisory Board participating in a meeting by this means is deemed to be present in Person at the meeting.  In all matters submitted to a vote of the Trust Advisory Board, each Trust Advisory Board member shall be entitled to cast one vote, which vote shall be cast personally by such Trust Advisory Board member or by proxy.  In a matter in which the Trustee cannot obtain direction or authority from the Trust Advisory Board, the Trustee may file a motion requesting such direction or authority from the Title III Court; provided, however, that any member of the Trust Advisory Board may oppose such motion.

(h)      A Trust Advisory Board member and its representative shall be recused from the Trust Advisory Board's deliberations and votes on any and all matters as to which such member has a conflicting interest.  If a Trust Advisory Board member or its representative does not recuse itself from any such matter, that Trust Advisory Board member and its representative may be recused from such matter by the unanimous vote of the remaining, voting members of the Trust Advisory Board that are not recused from the matter.

(i)      Any action required or permitted to be taken by the Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Trust Advisory Board as evidenced by one or more written consents describing the action taken, signed by the Trust Advisory Board and filed with the minutes or proceedings of the Trust Advisory Board.

(j)     The members of the Trust Advisory Board shall be compensated as the Trust Advisory Board shall determine in an amount not to exceed $75,000 per board member per year.  Any member of the Trust Advisory Board shall also be reimbursed by the Trustee for its actual, reasonable out-of-pocket expenses, not to include outside counsel fees, incurred for serving on such board in the same manner and priority as the compensation and expenses of the Trustee under this Trust Agreement, in accordance with the Budget, after submission of reasonably detailed receipts or invoices evidencing such expenses and the approval of such expenses by the Title III Court.  Except as provided for in this Section 6.7, the members of the Trust Advisory Board shall not be entitled to receive any other form of compensation for their services provided as such members.  The Budget shall include a reserve for the fees and expenses of the Trust Advisory Board.  Payment of the compensation and expenses set forth in this Section 6.7(j) shall first be deducted from the Administrative Funding.  Payment of amounts from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

6.8     Cooperation with Respect to Claim Allowance:  The Trustee and the Debtors shall cooperate and consult each other with respect to the disallowance or allowance of claims in connection with the litigation and/or resolution of Avoidance Actions, including with respect to any issues arising under sections 502(d) or 502(h) of the Bankruptcy Code.

6.9     Agents, Employees and Professionals.

(a)     The Avoidance Actions Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain members, managers, agents, representatives, employees, officers and independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the Trustee to have qualifications necessary or desirable to assist in the proper administration of the Avoidance Actions Trust (collectively, the "Trust Professionals"), on such terms as the Trustee deems appropriate, including counsel retained on a contingency-fee basis, subject to the approval of the Trust Advisory Board.  The Debtors agree that the Avoidance Actions Trust may (but shall not be obligated to) retain as disbursing agent the same disbursing agent as retained by one or more of the Debtors, on terms and conditions to facilitate timely and efficient distributions of the Cash proceeds of Avoidance Actions.  None of the professionals that represented parties-in-interest in the Title III Cases shall be precluded from being engaged by the Trustee solely on account of their service as a professional for such parties-in-interest prior to the Effective Date.

(b)     After the Effective Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Trustee and the Trust Advisory Board, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of such Person, plus an itemized statement of expenses.  The Trustee shall pay such invoices thirty (30) days after such invoices are approved by the Trustee.  In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the Trustee or the affected party may ask the Title III Court to resolve the dispute.

(c)     All payments to Trust Professionals shall be paid out of the Administrative Funding or, if all of the Administrative Funding has been spent, any remaining Avoidance Actions Trust Assets, subject to the approval of the Trust Advisory Board.

(d) Nothing in this Agreement shall prevent the Trustee, subject to the approval of the Trust Advisory Board, from seeking and obtaining outside credit or other funding for the prosecution of the Avoidance Actions.

6.10    Investment of Avoidance Actions Trust Monies.  All monies and other assets received by the Trustee as Avoidance Actions Trust Assets (including the proceeds thereof as a result of investment in accordance with this Section 6.10) shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Avoidance Actions Trust Beneficiaries, and shall not be segregated from other Avoidance Actions Trust Assets, unless and to the extent required by the Plan.  The Trustee may invest any Cash (including any earnings thereon or proceeds thereof) as permitted by section 345 of the Bankruptcy Code, in the manner set forth in this Section 6.10, but shall otherwise be under no liability for interest or income on any monies received by the Avoidance Actions Trust hereunder and held for distribution or payment to the Avoidance Actions Trust Beneficiaries, except as such interest shall actually be received. Investment of any monies held by the Avoidance Actions Trust shall be administered in accordance with the general duties and obligations hereunder.  The right and power of the Trustee to invest the Avoidance Actions Trust Assets, the proceeds thereof, or any income earned by the Avoidance Actions Trust, shall be limited to the right and power to: (a) invest such Avoidance Actions Trust Assets (pending distributions in accordance with the Plan or this Trust Agreement) in either (i) short-term direct obligations of, or obligations guaranteed by, the United States of America or (ii) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof; or (b) deposit such assets in demand deposits at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "Permissible Investments"); provided, however, that the scope of any Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulations section 301.7701-4(d), may be permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

6.11    Termination.  The duties, responsibilities and powers of the Trustee shall terminate on the date the Avoidance Actions Trust is wound up and dissolved in accordance with New York law pursuant to Section 3.2 hereof, under applicable law in accordance with the Plan, by an order of the Title III Court or by entry of a final decree closing the Debtors' Title III Cases; provided, that Sections 7.1, 7.2, 7.3, 7.4 and 7.5 hereof shall survive such termination, dissolution and entry.

## ARTICLE VII

## LIABILITY AND INDEMNITY

7.1    Liability to Third Persons.  No Avoidance Actions Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the Avoidance Actions Trust Assets or the affairs of the Trustee (except to the extent of the Avoidance Actions Trust Beneficiary's fraud, gross negligence or willful misconduct).  Notwithstanding anything herein to the contrary and without limitation of section 78.15 of the Plan, neither the Trust Parties nor the Trust Parties' firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial

23

advisors, investment bankers, disbursing agents or agents, or any of such Person's successors and assigns shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person (including, in the case of the Trustee and members of the Trust Advisory Board, to any Trust Professionals retained by the Trustee in accordance with this Trust Agreement) in connection with the Avoidance Actions Trust Assets or the affairs of the Avoidance Actions Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a final order of the Title III Court to be due to their respective gross negligence, fraud, criminal conduct or willful misconduct, and all such persons shall look solely to the Avoidance Actions Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the Avoidance Actions Trust. Other than as set forth in the Plan or in the Confirmation Order, nothing in this Section 7.1 shall be deemed to release any Avoidance Actions Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

7.2     Nonliability for Acts of Others. Except as provided herein, nothing contained in this Trust Agreement, the Plan or the Confirmation Order shall be deemed to be an assumption by Trustee, the Trust Advisory Board (or its members) or the Trust Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the such persons to assume or accept any such liability, obligation or duty. Any successor Trustee or Trust Advisory Board member may accept and rely upon any accounting made by or on behalf of any predecessor Trustee or Trust Advisory Board hereunder, and any statement or representation made as to the assets comprising the Avoidance Actions Trust Assets or as to any other fact bearing upon the prior administration of the Avoidance Actions Trust, so long as it has a good faith basis to do so. The Trustee and the Trust Advisory Board members shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue (except to the extent of the Trustee's, or the Trust Advisory Board members', fraud, gross negligence or willful misconduct). The Trustee or any successor Trustee and the Trust Advisory Board members or any successor Trust Advisory Board member shall not be liable for any act or omission of any predecessor Trustee or Trust Advisory Board member. No provision of this Trust Agreement shall require the Trustee or any Trust Advisory Board member to expend or risk his personal funds or otherwise incur any financial liability in the performance of his rights or powers hereunder if the Trustee or Trust Advisory Board member has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him.

7.3     Exculpation. As of the Effective Date, the Trust Parties, the Trust Parties' firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns shall be and hereby are exculpated by all Persons, including Avoidance Actions Trust Beneficiaries, holders of Claims, holders of Equity interests, and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, this Trust Agreement or any order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by final order of the Title III Court to have arisen out of their own respective fraud, criminal conduct, gross negligence or willful misconduct. No Avoidance Actions Trust Beneficiary, holder of a Claim, or other party-in-interest shall have or be permitted to pursue any claim or cause of action

24

against the Trust Parties, their employees, professionals, or representatives, for making payments in accordance with, or for implementing, the provisions of the Plan, the Confirmation Order and this Trust Agreement. Any action taken or omitted to be taken with the express approval of the Title III Court or the Trust Advisory Board shall conclusively be deemed not to constitute gross negligence or willful misconduct; provided, however, that, notwithstanding any provision herein to the contrary, the Trustee shall not be obligated to comply with a direction of the Trust Advisory Board, whether or not express, that would result in a change to the distribution provisions of this Trust Agreement and the Plan. In such instance, the Trustee shall request, within fourteen (14) days, the Title III Court's ratification of its determination not to comply with a direction of the Trust Advisory Board.

7.4     Limitation of Liability.     The Trustee, the members of the Trust Advisory Board, and the Trust Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances, except for those resulting from acts arising out of their own fraud, willful misconduct, or gross negligence.

7.5     Indemnity.     The Trust Parties and their respective firms, companies, affiliates, partners, officers, directors, members, employees, professionals, advisors, attorneys, financial advisors, investment bankers, disbursing agents and agents, and any of such Person's successors and assigns (each, an "Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Trustee or the Trust Advisory Board, as applicable, except those acts arising out of their own fraud, willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Trustee or the Trust Advisory Board, as applicable, except for any actions or inactions involving fraud, willful misconduct or gross negligence. Any indemnification claim of an Indemnified Party under this Section 7.5 shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and any other claim to or interest in such assets. The Indemnified Parties shall be entitled to rely, in good faith, on the advice of their retained professionals.     The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

7.6     Compensation and Expenses.     The Trustee (including the Person(s) serving as or comprising the Trustee) shall receive compensation for its services, to be paid out of the Avoidance Actions Trust Assets, in the manner and amount determined by the Trust Advisory Board, subject to the approval of the Title III Court. In addition, the Trustee shall be entitled, with the consent of the Trust Advisory Board, and subject to the approval of the Title III Court, to reimburse itself from the Avoidance Actions Trust Assets on a monthly basis for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Plan so long as it falls within the amounts provided for in the Budget; otherwise, approval of the Trust Advisory Board is required. Payment of the compensation and expenses set forth in this Section 7.6 shall first be deducted from the Administrative Funding. Payment of amounts from sources other than the Administrative Funding shall require the approval of the Trust Advisory Board.

# ARTICLE VIII

## SUCCESSOR TRUSTEE

8.1    Resignation.  The Trustee may resign from the Avoidance Actions Trust by giving at least sixty (60) days' prior written notice thereof to each member of the Trust Advisory Board. Such resignation shall become effective on the later to occur of (a) the date specified in such written notice and (b) the effective date of the appointment of a successor Trustee in accordance with Section 8.4 hereof and such successor's acceptance of such appointment in accordance with Section 8.5 hereof.

8.2    Removal.  The Trustee may be removed by a majority vote of the members of the Trust Advisory Board. Such removal shall become effective on the date specified in such action by the Trust Advisory Board.

8.3    Effect of Resignation or Removal.  The resignation, removal, incompetency, bankruptcy or insolvency of the Trustee shall not operate to terminate the Avoidance Actions Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order or invalidate any action theretofore taken by the Trustee. All fees and expenses properly incurred by the Trustee prior to the resignation, incompetency or removal of the Trustee shall be paid from the Avoidance Actions Trust Assets, unless such fees and expenses are disputed by (a) the Trust Advisory Board, or (b) the successor Trustee, in which case the Title III Court shall resolve the dispute and any disputed fees and expenses of the predecessor Trustee that are subsequently allowed by the Title III Court shall be paid from the Avoidance Actions Trust Assets. In the event of the resignation or removal of the Trustee, such Trustee shall:  (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Trustee or directed by the Title III Court to effect the termination of such Trustee's capacity under this Trust Agreement; (ii) promptly deliver to the successor Trustee all documents, instruments, records and other writings related to the Avoidance Actions Trust as may be in the possession of such Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

8.4    Appointment of Successor.  In the event of the death, resignation, removal, incompetency, bankruptcy or insolvency of the Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by a majority of the Trust Advisory Board; provided, however, that under no circumstance shall the successor Trustee be a director or officer of any Affiliate of the Avoidance Actions Trust.

8.5    Acceptance of Appointment by Successor Trustee.  Any successor Trustee appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Title III Court for filing and to the Trust Advisory Board and, in case of the Trustee's resignation, to the resigning Trustee. Thereupon, such successor Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Avoidance Actions Trust with like effect as if originally named Trustee. The resigning or removed Trustee shall duly assign, transfer and deliver to such successor Trustee all property and money held by such resigning or removed Trustee hereunder and shall, as directed by the Title III Court or reasonably requested by such successor Trustee,

execute and deliver an instrument or instruments conveying and transferring to such successor Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Trustee.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

9.1     <u>Binding on the Debtors</u>. This Trust Agreement shall be binding on the Debtors and shall remain binding on the Debtors notwithstanding any dissolution of the FOMB or any other event that may cause the FOMB to cease to exist or to cease serving as a representative of the Debtors.

9.2     <u>Governing Law</u>. This Trust Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to principles of conflicts of laws; <u>provided</u>, <u>however</u>, that the authorization of this Trust Agreement by the Debtors shall be governed by the laws of the Commonwealth, and the Trust Advisory Board shall be subject to Puerto Rico laws governing ethics, anti-corruption and conflicts of interest, and such laws shall be, and shall be deemed to be, incorporated into the Trust Advisory Board's bylaws.

9.3     <u>Jurisdiction</u>.  Subject to the proviso below, the parties agree that the Title III Court shall have exclusive jurisdiction over the Avoidance Actions Trust and the Trustee, including the administration and activities of the Avoidance Actions Trust and the Trustee, and, pursuant to the Plan, the Title III Court has retained such jurisdiction; <u>provided</u>, <u>however</u>, that notwithstanding the foregoing, the Trustee shall have power and authority to bring any action in any court of competent jurisdiction (including the Title III Court) to prosecute any Claims or Causes of Action assigned to the Avoidance Actions Trust.

9.4     <u>Severability</u>. If any provision of this Trust Agreement or the application thereof to any Person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

9.5     <u>Notices</u>. Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, sent by facsimile transmission or e-mail, sent by nationally recognized overnight delivery service or mailed by first-class mail:

      (i)      if to the Trustee, to:

          [●]

          with a copy to:

          [●]

(ii)      if to members of the Trust Advisory Board, then to each of;

[●]

[●]

[●]

(iii)      if to any Avoidance Actions Trust Beneficiary, to the last known address of such Avoidance Actions Trust Beneficiary according to the Debtors' Schedules, such Avoidance Actions Trust Beneficiary's proof of claim or the lists of record holders provided to the Trustee; and

(iv)      if to the FOMB

Financial Oversight and Management Board for Puerto Rico
268 Muñoz Rivera Ave,
Suite 1107 San Juan, PR 00918-1813
Attn: Natalie A. Jaresko, Executive Director

With a copy to:

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn: Martin J. Bienenstock, Esq. Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

AND

O'Neill & Borges LLC
250 Muñoz Rivera Ave,
Suite 800
San Juan, PR 00918-1813
Attn: Hermann Bauer, Esq.
Tel: (787) 764-8181
Fax: (212) 753-8944

(v)      if to each of the Debtors or the Post-Effective Date Debtors:

The Commonwealth of Puerto Rico
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Executive Director

AND

The Employees Retirement System of the Government of the
Commonwealth of Puerto Rico
PO Box 42003
San Juan, PR 00940-2203
Attn: Executive Director

AND

The Puerto Rico Public Buildings Authority
PO Box 41029
San Juan, PR 00940-1029
Attn: Executive Director

With a copy to:

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

AND

Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Executive Director

With a copy to:

O'Melveny & Myers LLP
Seven Times Square
New York, NY 10036
Attn:   John Rapisardi, Esq.
        Peter Friedman, Esq.
        Maria J. DiConza, Esq.
Tel: (212) 326-2000
Fax: (212) 326-2061


        9.6     Deemed Delivery.  All notices shall be effective and shall be deemed delivered : (a)
if by personal delivery, delivery service or courier, on the date of delivery; (b) if by electronic mail

29

or facsimile communication, on the date of receipt or confirmed transmission of the communication; and (c) if by mail, on the date of receipt. Any party from time to time may change its address, facsimile number or other information for the purpose of notices to that party by giving notice specifying such change to the other parties hereto.

9.7    Headings.   The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

9.8    Actions Taken on a Date Other Than A Business Day. If any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

9.9    Relationship to the Plan.   The terms of this Trust Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order, and therefore this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan). Additionally, the Trustee and the Trust Advisory Board may seek any orders from the Title III Court, upon notice and a hearing in furtherance of implementation of the Plan, the Confirmation Order and this Trust Agreement. However, to the extent that there is conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order: (a) *first*, this Trust Agreement; (b) *second*, the Confirmation Order; and (c) *third*, the Plan.

9.10    Entire Trust Agreement.   This Trust Agreement (including the recitals and annexes hereto), the Plan and the Confirmation Order constitute the entire agreement and understanding by and among the parties and supersede all prior and contemporaneous agreements or understandings, statements, or exchanges by and among the parties or any other person with respect to the subject matter hereof.

9.11    Cooperation.   Each of the Debtors and the FOMB shall turn over or otherwise make available to the Trustee at no cost to the Avoidance Actions Trust or the Trustee, all books and records (or copies thereof) and other information, in each as may be reasonably requested by the Trustee, including (a) all communications by and between the FOMB and its professionals and the Avoidance Action defendants, and (b) all data and documents the FOMB and its professionals have received from the Avoidance Action defendants through the "information exchange" process contemplated by the *Order Granting Omnibus Motion by the Financial Oversight and Management Board for Puerto Rico, Acting by and through the Members of the Special Claims Committee and the Official Committee of Unsecured Creditors to (i) Establish Litigation Case Management Procedures and (ii) Establish Procedures for Approval of Settlements* [Docket No. 7941]. The Debtors and the FOMB further agree to reasonably cooperate with the Trustee in carrying out its duties hereunder, including by, among other things: (i) delivering to the Trustee work product developed by their respective professionals in connection with the prosecution of the Avoidance Actions, subject to the confidentiality provisions herein to preserve the confidential nature of the Debtors' and the FOMB's books and records; (ii) following the Effective Date, participating in meetings with the Trustee, at the Trustee's reasonable request and at such times

and upon such notice as does not unreasonably interfere with the operations of such party, for purposes of coordinating the transition of the Avoidance Actions Trust Assets; (iii) providing assistance in discovery responses and witness testimony as is reasonably necessary for the resolution of the Avoidance Actions; and (iv) maintaining all data rooms, hard drives and other media containing information and/or documents related to the Avoidance Actions, as reasonably requested by the Trustee, to facilitate access to such information and/or documents. Notwithstanding the foregoing or anything else that may be to the contrary herein, the FOMB shall not be required to disclose any information or work product if the same constitutes or relates to communications between a committee of the FOMB and another part or a member of the FOMB; provided, however, that the FOMB shall provide to the Trustee the relevant portion of any memoranda or other documents containing research or analysis concerning legal or factual issues arising in the Avoidance Actions, regardless of whether such memoranda or other documents were shared between a committee of the FOMB and another part or a member of the FOMB. The Trustee agrees to give the Debtors and/or their designated counsel reasonable access to attend (A) witness preparations related to the Avoidance Actions for any witness who will be providing testimony in his or her capacity as a current or former employee of any of the Debtors, and (B) the depositions of any witness who provides testimony related to the Avoidance Actions in his or her capacity as a current or former employee of any of the Debtors; provided, however, that such attendance (1) will be solely as an observer, and (2) shall not constitute a waiver of any privileges.

9.12    Amendment and Waiver.  Any provision of this Trust Agreement may be amended or waived by the Trustee with the unanimous consent of all voting members of the Trust Advisory Board.  Notwithstanding this Section 9.12, any amendment to this Trust Agreement shall not be inconsistent with the purpose and intention of the Avoidance Actions Trust to liquidate in an expeditious but orderly manner the Avoidance Actions Trust Assets in accordance with Treasury Regulations section 301.7701-4(d) and Section 1.2.

9.13    Confidentiality.   The Trust Parties and their advisors, including the Trust Professionals (each a "Confidential Party" and, collectively, the "Confidential Parties") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor or the FOMB to which any of the Avoidance Actions Trust Assets relates; provided, however, that such information may be disclosed if: (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or (b) such disclosure is required of the Confidential Parties pursuant to legal process. including subpoena or other court order or other applicable laws or regulations.  If any Confidential Party is requested to divulge confidential information pursuant to clause (b) above, such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Trustee (or the Trust Advisory Board in case the Trustee is the disclosing party) to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trustee (or the Trust Advisory Board, as applicable) in making any such objection, including appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

9.14    Rules of Construction.  Except where the context otherwise may require, (a) words of any gender include the other gender, and (b) words importing the singular number shall include the plural number and *vice versa*.  All references herein to Articles, Sections and other

subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement. The terms "hereof", "hereto", "herein" and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement. The terms "include", "includes" and "including" shall be construed as if followed by the words "without limitation".

9.15    Counterparts. This Trust Agreement may be executed with counterpart signature pages or in any number of counterparts, each of which counterparts shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument. A facsimile, portable document file (PDF) or other electronic transmission signature of any party shall be considered to have the same binding legal effect as an original signature.

9.16    Intention of Parties to Establish Avoidance Actions Trust. This Trust Agreement is intended to create a Avoidance Actions Trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such United States federal income tax laws, which amendments may apply retroactively.

9.17    Definitions.

"AAFAF" shall have the meaning ascribed to such term in the Plan.

"Administrative Funding" shall have the meaning ascribed to such term in Section 1.3 hereof.

"Affiliate" shall have the meaning ascribed to such term in the Plan.

"Allowed" shall have the meaning ascribed to such term in the Plan.

"Allowed Claim" shall have the meaning ascribed to such term in the Plan.

"Avoidance Actions" shall have the meaning ascribed to such term in the Plan.

"Avoidance Actions Trust" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"Avoidance Actions Trust Assets" shall have the meaning ascribed to such term in the Plan and, for the avoidance of doubt, shall include the account at Banco Popular with account number [INSERT NUMBER].

"Avoidance Actions Trust Beneficiaries" shall have the meaning ascribed to such term in the Plan.

"Avoidance Actions Trust Interests" shall have the meaning ascribed to such term in the Plan.

**"Bankruptcy Code"** shall have the meaning ascribed to such term in the Plan.

**"Bankruptcy Rules"** shall have the meaning ascribed to such term in the Plan.

**"Book Entry System"** shall have the meaning ascribed to such term in <u>Section 2.3</u> hereof.

**"Budget"** shall have the meaning ascribed to such term in <u>Section 4.13</u> hereof.

**"Business Day"** shall have the meaning ascribed to such term in the Plan.

**"Cash"** shall have the meaning ascribed to such term in the Plan.

**"Causes of Action"** shall have the meaning ascribed to such term in the Plan.

**"Claims"** shall have the meaning ascribed to such term in the Plan.

**"Commonwealth"** shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**Commonwealth Avoidance Actions Trust**" shall have the meaning ascribed to such term in <u>Section 1.1</u> hereof.

**"Confidential Party"** shall have the meaning ascribed to such term in <u>Section 9.13</u> hereof.

**"Confirmation Order"** shall have the meaning ascribed to such term in the Recitals.

**"Creditors' Committee"** shall have the meaning ascribed to such term in the Plan.

**"Creditor Directors"** shall have the meaning ascribed to such term in <u>Section 6.7(b)</u> hereof.

**"Debtors"** shall have the meaning ascribed to such term in the head of this Trust Agreement.

**"Disbursing Agent"** shall have the meaning ascribed to such term in the Plan.

**"Disclosure Statement"** shall have the meaning ascribed to such term in the Recitals.

**"Dispute Resolution"** shall have the meaning ascribed to such term in <u>Section 2.1</u> hereof.

**"Disputed Claim"** shall have the meaning ascribed to such term in the Plan but shall include, in the period prior to the Debtors' deadline to object to claims, all Claims that have not been Allowed.

33

"**Distribution Date**" shall have the meaning ascribed to such term in Section 4.2(b) hereof.

"**Effective Date**" shall have the meaning ascribed to such term in the Plan.

"**Eminent Domain Claim**" shall have the meaning ascribed to such term in the Plan.

"**Entities**" shall have the meaning ascribed to such term in the Plan.

"**Equity**" shall have the meaning ascribed to such term in the Plan.

"**ERS**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**ERS General Unsecured Claim**" shall have the meaning ascribed to such term in the Plan.

"**Exchange Act**" shall have the meaning ascribed to such term in Section 2.6(c) hereof.

"**Final Order**" shall have the meaning ascribed to such term in the Plan.

"**FOMB**" shall have the meaning ascribed to such term in the head of this Trust Agreement.

"**General Unsecured Claims**" shall have the meaning ascribed to such term in the Plan.

"**Indemnified Party**" shall have the meaning ascribed to such term in Section 7.5 hereof.

"**Initial Claims Report**" shall have the meaning ascribed to such term in Section 2.4 hereof.

"**IRC**" shall have the meaning ascribed to such term in the Recitals.

"**IRS**" shall have the meaning ascribed to such term in the Plan.

"**Liquidating Trust**" shall have the meaning ascribed to such term in Recitals.

"**Monthly Claims Report**" shall have the meaning ascribed to such term in Section 2.4 hereof.

"**OB Director**" shall have the meaning ascribed to such term in Section 6.7(b) hereof.

"**PBA**" shall have the meaning ascribed to such term in the Recitals.

"**Permissible Investments**" shall have the meaning ascribed to such term in Section 6.10 hereof.

"**Person**" shall have the meaning ascribed to such term in the Plan.

**"Plan"** shall have the meaning ascribed to such term in the head of this Trust Agreement.

**"Privileges"** shall have the meaning ascribed to such term in Section 1.9 hereof.

**"PROMESA"** shall have the meaning ascribed to such term in the Recitals.

**"Reorganized Debtors"** shall have the meaning ascribed to such term in the Plan.

**"SEC"** shall have the meaning ascribed to such term in Section 2.6(c) hereof.

"**Seventh Amended Plan**" shall have the meaning ascribed to such term in the Recitals.

 **"Title III Cases"** shall have the meaning ascribed to such term in the Recitals.

**"Title III Court"** shall have the meaning ascribed to such term in the Plan.

**"Treasury Regulations"** shall have the meaning ascribed to such term in the Recitals.

**"Trust Advisory Board"** shall have the meaning ascribed to such term in Section 6.7(a) hereof.

**"Trust Agreement"** shall have the meaning ascribed to such term in the head of this Trust Agreement.

**"Trust Disbursing Agent"** shall have the meaning ascribed to such term in Section 4.2 hereof.

**"Trust Parties"** shall have the meaning ascribed to such term in Section 2.5 hereof.

 **"Trust Professionals"** shall have the meaning ascribed to such term in Section 6.9 hereof.

**"Trustee"** shall have the meaning ascribed to such term in the head of this Trust Agreement.

[Remainder of Page Blank — Signature Page Follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

**THE COMMONWEALTH OF PUERTO RICO**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: _____
      Name:  Natalie Jaresko
      Title:    Executive Director

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: _____
      Name:  Natalie Jaresko
      Title:    Executive Director

**PUERTO RICO PUBLIC BUILDINGS AUTHORITY**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: _____
      Name:  Natalie Jaresko
      Title:    Executive Director

[TRUSTEE]

By: _____
      Name:
      Title:    [Trustee [Title within Institution]]

*And, solely with respect to Sections 1.3 and 9.11 hereof:*

**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO**

By: _____

      Name:  Natalie Jaresko

      Title:   Executive Director

**Annex A**

<u>Initial Trust Advisory Board Members</u>

*Creditor Directors*:

1.      Carol Flaton
2.      Ramon Ortiz Carro

*OB Director*:

3.      [●]

# **EXHIBIT D**

ERS Trust Agreement

## ERS TRUST AGREEMENT

**ERS TRUST AGREEMENT**, dated as of [●], 2021 (this "Trust Agreement"), between the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as sole representative of the Commonwealth of Puerto Rico (the "Commonwealth"), and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico in the Title III Cases ("ERS" and together with the Commonwealth, the "Debtors"), and [●], as trustee (together with any successor or additional trustee appointed under the terms hereof, including qualifying as such pursuant to Section 2.4 or Article X hereof, the "Trustee") of the ERS Trust (the "ERS Trust"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., dated July 30, 2021, including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time (the "Plan") and the ERS Stipulation.

## RECITALS

A.     On June 30, 2016, the President of the United States signed into law legislation passed by Congress, the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. § 2101 *et seq.*

B.     The Oversight Board commenced cases pursuant to Title III of PROMESA for the Commonwealth and ERS on May 3, 2017 and May 21, 2017, respectively, (the "Title III Cases") by filing petitions with the United States District Court for the District of Puerto Rico (the "Title III Court").

C.     On April 2, 2021, the Debtors and certain ERS bondholders filed with the Title III Court an Amended and Restated Stipulation (A) Allowing Claims of such ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of such ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment (the "ERS Stipulation").

D.     On July 30, 2021, the Commonwealth filed the Plan and the disclosure statement relating to the Plan with the Title III Court.

E.     On [●], 2021, the Title III Court entered an order confirming the Plan (the "Confirmation Order").

F.     Since April 2, 2021, monies totaling [●] have been distributed to ERS in connection with ERS's investment in the ERS private equity portfolio, and deposited into a segregated account established by the ERS that shall be used solely for the purposes set forth in the Plan, the ERS Stipulation and this Trust Agreement (the "Segregated Account").

G.     The Plan and the ERS Stipulation provide for the creation of an ERS Trust to hold the ERS's interests in the ERS private equity portfolio and pursuant to which ERS shall continue to manage such assets up to and including the purchase thereof in accordance with the terms and provisions of the Plan.

H.     The ERS Trust will be organized for the sole purpose of holding the ERS's interests

in the ERS Private Equity Portfolio up to and including the purchase thereof, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the purpose of the ERS Trust.

I.      The Trustee shall have all powers necessary to implement the provisions of this Trust Agreement and administer the ERS Trust, including the power to: (i) prosecute for the benefit of the ERS Trust Beneficiaries through Trust Professionals any causes of action that may from time to time be held by the ERS Trust; (ii) preserve, maintain and liquidate the ERS Private Equity Portfolio; (iii) distribute the ERS Trust proceeds to the ERS Trust Beneficiaries; and (iv) otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan and/or the Confirmation Order or in any other agreement executed pursuant to the Plan, in each case subject to the provisions of Article VIII hereof regarding limitation on the Trustee and the Title III Court as provided for herein.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements contained herein, the Debtors and the Trustee agree as follows:

## AGREEMENT

## ARTICLE I

## DEFINITIONS

1.1    Recitals.  The recitals set forth above are unincorporated by reference and are explicitly made a part of this Trust Agreement.

1.2    Definitions.  The following definitions shall apply to and constitute part of this Trust Agreement and all schedules, exhibits and annexes hereto.

"**Administrative Funding**" shall mean funds set aside from the Segregated Account reasonably determined by the Debtors prior to the Effective Date to be necessary to fund the activities of the ERS Trust, which amount shall be Fifty Thousand Dollars ($50,000).

"**Affiliate**" shall mean, with respect to any specified Entity, any other Entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity.

"**Allowed**" shall mean, with respect to any Claim, such Claim or portion thereof (a) proof of which was filed on or before the applicable Bar Date or (b) if no proof of Claim has been timely filed, which has been or hereafter is listed by the Debtors in the List of Creditors and is not listed thereon as "disputed", "contingent", or "unliquidated" or (c) allowed pursuant to (i) section 502(h) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, (ii) the terms of the Plan or (iii) a Final Order; provided, however, that, with respect to any Claim described in clause (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an

2

objection has been interposed and such Claim has been allowed in whole or in part by a Final Order. For purposes of determining the amount of an "Allowed Claim" with respect to distributions within a Class, there shall be deducted therefrom an amount equal to the amount of any, original issue discount not accrued as of the date immediately prior to the Commonwealth Petition Date and any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be set off pursuant to applicable bankruptcy and non-bankruptcy law. Notwithstanding anything to the contrary herein (x) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Title III Court shall not be considered "Allowed" hereunder unless otherwise specified herein or by order of the Title III Court, (y) for any purpose under the Plan, "Allowed" shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date, and (z) "Allowed" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

"**Allowed ERS Bond Claims**" shall mean Claims arising from or related to the ERS Bonds that are or have become allowed by the Title III Court.

"**Allowed Claims**" shall mean a Claim, to the extent it is or has become Allowed.

"**Bankruptcy Code**" shall mean the Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, as applicable to the Title III Cases.

"**Bar Date**" shall mean the respective dates established by the Title III Court by which proofs of Claim must have been filed with respect to such Claims against a Debtor, pursuant to (a) the Bar Date Orders, (b) a Final Order of the Title III Court, or (c) the Plan.

"**Beneficiary Closing Date**" shall mean April 20, 2023.

"**Beneficiary Election**" shall mean the option of each ERS Trust Beneficiary to purchase the ERS Private Equity Portfolio in accordance with the terms of the Plan.

"**Beneficiary Election Purchase Price**" shall mean (a) Seventy Million Seven Hundred Fifty Dollars ($70,750,000.00) plus (b) such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period from April 2, 2021 up to and including the purchases thereof pursuant to the Beneficiary Election that have not been previously reimbursed to the Commonwealth.

"**Book Entry System**" shall mean an electronic book-entry system maintained either by the ERS Trust or an agent of the ERS Trust for the purpose of recording the ownership of ERS Trust Interests.

"**Business Day**" shall mean a day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York and San Juan, Puerto Rico are required

to close by law or executive order.

"**Cash**" shall mean lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and legal equivalents thereof.

"**Causes of Action**" shall mean all claims, actions, causes of action, rights to payment, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) that are pending or may be asserted against any Entity whether arising on or before the Effective Date, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether asserted or unasserted as of the Effective Date.

"**Claim**" shall mean any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

"**Commonwealth**" shall mean the Commonwealth of Puerto Rico.

"**Commonwealth Election**" shall mean the right of the Commonwealth to purchase the ERS Private Equity Portfolio in accordance with the terms and provisions of the Plan and Section 4.1 hereof.

"**Commonwealth Mandatory Closing Date**" shall mean a date no later than April 25, 2023.

"**Commonwealth Mandatory Election**" shall mean the obligation of the Commonwealth to purchase the ERS Private Equity Portfolio in accordance with the terms and provisions of the Plan and Section 4.3 hereof.

"**Commonwealth Option Closing Date**" shall mean April 25, 2023.

"**Confidential Party**" shall mean each of the Trustee and its employees, members, agents, professionals and advisors, including the Trust Professionals.

"**Confirmation Order**" shall mean the order of the Title III Court confirming the Plan in

4

accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable in the Title III cases in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to the Initial PSA Creditors.

"**Debtors**" shall mean, collectively, the Commonwealth of Puerto Rico in the Title III cases, and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

"**Disclosure Statement**" shall mean that certain disclosure statement relating to the Plan filed by the Commonwealth, dated July 30, 2021.

"**Dispute Resolution**" shall mean, in connection with any conflicting claims or demands made or asserted with respect to an ERS Trust Interest, either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Title III Court (or such other court of proper jurisdiction) or (b) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall include a complete release of the ERS Trust and the Trustee.

"**Effective Date**" shall mean the first (1st) Business Day on which (i) all the conditions precedent to confirmation of the Plan specified in Section 85.1 of the Plan shall have been satisfied or waived, as provided in Section 85.2 of the Plan, and (ii) all the conditions precedent to the substantial consummation of the Plan and occurrence of the Effective Date specified in Section 86.1 of the Plan shall have been satisfied or waived as provided in Section 86.2 of the Plan.

"**Encumbrances**" shall mean interests that (i) are not free and clear of any and all mortgages or (ii) have pledges, security interests, options, rights of first offer, unmet capital calls, encumbrances or other restrictions or limitations of any nature whatsoever.

"**Entity**" shall mean A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity.

"**ERS**" shall mean Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

"**ERS Bondholders**" shall mean, collectively, holders of ERS Bonds as of the Effective Date.

"**ERS Bonds**" shall mean, collectively, (a) the non-recourse Senior Pension Funding Bonds, Series A, issued by ERS in the original principal amount of One Billion Five Hundred Eighty-Eight Million Eight Hundred Ten Thousand Seven Hundred Ninety-Nine Dollars and Sixty Cents ($1,588,810,799.60), (b) the non-recourse Senior Pension Funding Bonds, Series B, issued by ERS in the original principal amount of One Billion Fifty-Eight Million Six Hundred Thirty-Four Thousand Six Hundred Thirteen Dollars and Five Cents ($1,058,634,613.05) and (c) the non-recourse Senior Pension Funding Bonds, Series C, issued by ERS in the original principal amount of Three Hundred Million Two Hundred Two Thousand Nine Hundred Thirty Dollars ($300,202,930.00), which, as of the ERS Petition Date, inclusive of compounded amounts, were in the aggregate outstanding principal amount of Three Billion One Hundred Sixty-Eight Million

Six Hundred Ninety-Eight Thousand Seven Hundred Seventy-Six Dollars and Fifty-Five Cents ($3,168,698,776.55).

"**ERS Stipulation**" shall mean that certain Amended and Restated Stipulation (A) Allowing Claims of ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment, dated April 2, 2021.

"**ERS Petition Date**" shall mean May 21, 2017, the date on which the ERS Title III Cases was commenced.

"**ERS Portfolio Price**" shall mean Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

"**ERS Private Equity Portfolio**" shall mean, collectively, the portfolio of private equity interests held by ERS as of the Effective Date, or any interests therein.

"**ERS Trust**" shall mean the trust created in accordance with the terms and provisions of the ERS Stipulation to hold ERS's interest in the ERS Private Equity Portfolio and pursuant to which ERS shall continue to manage such assets up to and including the purchase thereof in accordance with the terms and provisions of Section 69.2 of the Plan.

"**ERS Trust Assets**" shall mean the ERS Private Equity Portfolio, the Segregated Account, and such other property held from time to time by the ERS Trust pursuant to this Trust Agreement and any earnings, including interest, on any of the foregoing.

"**ERS Trust Beneficiaries**" shall mean, collectively, the holders of Allowed ERS Bond Claims.

"**ERS Trust Interest**" shall mean an interest in the ERS Trust allocated to each ERS Trust Beneficiary in an amount equal to such beneficiary's pro rata share of the Allowed ERS Bond Claims as of the Effective Date.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Final Order**" shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous

6

rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

"**holder**" shall mean an ERS Trust Beneficiary that is "holder of record" of such ERS Trust Beneficiary's ERS Trust Interest.

"**Indemnified Party**" shall mean the Trustee or the Person(s) comprising the Trustee, as the case may be, and their respective employees, agents and professionals.

"**IRC**" shall means The United States Internal Revenue Code of 1986, as amended from time to time.

"**Net Allowed ERS Bond Claims**" shall mean collectively, (a) Allowed ERS Bond Claims minus (b) the amount of adequate protection payments received by a holder of such Allowed ERS Bond Claims from and after the ERS Petition Date, calculated on a CUSIP-by-CUSIP basis.

"**Oversight Board**" shall mean the Financial Oversight and Management Board for Puerto Rico established pursuant to Section 101 of PROMESA, as the Debtors' representative in their respective Title III Cases pursuant to Section 315(b) of PROMESA.

"**Permissible Investments**" shall mean, collectively, (i) short-term direct obligations of, or obligations guaranteed by, the United States of America or (ii) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof.

"**Person**" shall mean an individual, general partnership, limited partnership, corporation, limited liability company, limited liability partnership, cooperative, trust, unincorporated organization, association, joint stock company, joint venture, estate, government, or agency or political subdivision thereof, or any other form of legal entity.

"**Plan**" shall mean the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules to the Plan, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms in the Plan.

"**Privileges**" shall mean all attorney-client privileges, work product protections, and other immunities or protections from disclosure held by the Debtors.

"**PROMESA**" shall mean the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. Seq., as it may be amended or modified.

"**Reorganized Debtor**" shall mean the Debtors, from and after the Effective Date.

"**SEC**" shall mean the Securities and Exchange Commission.

"**Segregated Account**" shall have the meaning ascribed to such term in the Recitals.

"**Title III**" shall mean Title III of PROMESA.

"**Title III Cases**" shall mean collectively, the Commonwealth Title III Case and the ERS Title III Case.

"**Title III Court**" shall mean the United States District Court of the District of Puerto Rico or such other court having jurisdiction over the Title III Cases.

"**Trust Agreement**" shall have the meaning ascribed to such term at the head of this Trust Agreement.

"**Trust Professionals**" shall mean employees, officers and independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the Trustee to have qualifications necessary or desirable to assist in the proper administration of the ERS Trust.

"**Trustee**" shall have the meaning ascribed to such term at the head of this Trust Agreement.

## ARTICLE II

## DECLARATION OF TRUST

2.1     Creation of Trust.  The Debtors and the Trustee, pursuant to the Plan and the Confirmation Order, hereby constitute and create the ERS Trust, which shall bear the name "ERS Trust."  In connection with the exercise of the Trustee's power hereunder, the Trustee may use this name or such variation thereof as the Trustee sees fit.

2.2     Purpose of ERS Trust.  The sole purpose of the ERS Trust is to implement the Plan and the ERS Stipulation on behalf, and for the benefit, of the ERS Trust Beneficiaries, and to serve as a mechanism for ERS converting to cash and distributing the ERS Private Equity Portfolio, or interest therein, in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the ERS purpose of the ERS Trust.

2.3     Transfer of ERS Private Equity Portfolio.

(a)     On the Effective Date, and in accordance with the Plan, the ERS Stipulation, and the Confirmation Order, ERS shall transfer to the ERS Trust, for the sole benefit of the ERS Trust Beneficiaries, the ERS Private Equity Portfolio, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or otherwise) of all other Persons to the maximum extent contemplated by and permissible pursuant to the Plan, the ERS Stipulation, the Confirmation Order and this Trust Agreement.

(b)     Prior to the Effective Date, ERS shall not transfer or liquidate the ERS Private Equity Portfolio; provided, however, that assets within the ERS Private Equity Portfolio may be liquidated in the ordinary course pursuant to applicable terms and conditions of the respective underlying agreements, with the proceeds thereof being deposited into the Segregated Account.

(c)     On the Effective Date, the Administrative Funding shall be set aside from the Segregated Account. If there is insufficient cash in the Segregated Account necessary to satisfy the Administrative Funding on the Effective Date, the Commonwealth shall fund any cash shortfalls; provided, however, that, upon sufficient cash existing in the Segregated Account, including, without limitation, up to and including the Commonwealth Option Closing Date, the Beneficiary Closing Date or the Commonwealth Mandatory Closing Date, as applicable, the Trustee shall cause monies to be paid from the Segregated Account to reimburse the Commonwealth for such funded shortfall amounts. Under no circumstances shall the Trustee use any amounts of the Administrative Funding to settle capital calls associated with the ERS Private Equity Portfolio. Under no circumstances shall the Trustee use any proceeds from the sale of the ERS Private Equity Portfolio arising from the Commonwealth Election or the Commonwealth Mandatory Election to reimburse the Commonwealth for such funded shortfall amounts.

(d)     The transfer of the ERS Private Equity Portfolio shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax, pursuant to section 1146(a) of the Bankruptcy Code.

(e)     Any quarterly cash distributions or other proceeds from the ERS Private Equity Portfolio shall be deposited into the Segregated Account. If there is insufficient cash in the Segregated Account from distributions made from the ERS Private Equity Portfolio necessary to satisfy any capital commitments with respect thereto, from and after the Effective Date, the Commonwealth shall fund any cash shortfalls; provided, however, that, upon sufficient cash existing in the Segregated Account, including, without limitation, up to and including the Commonwealth Option Closing Date, the Beneficiary Closing Date or the Commonwealth Mandatory Closing Date, as applicable, the Trustee shall cause monies to be paid from the Segregated Account to reimburse the Commonwealth for such funded shortfall amounts. Under no circumstances shall the Trustee use any proceeds from the sale of the ERS Private Equity Portfolio arising from the Commonwealth Election or the Commonwealth Mandatory Election to reimburse the Commonwealth for such funded shortfall amounts.

(f)     Upon delivery of the ERS Private Equity Portfolio to the ERS Trust, the Debtors shall be discharged and deemed released from all liability with respect to the delivery of such distributions, and exculpated for any and all claims and causes of action asserted with the ERS Private Equity Portfolio during the period up to and including delivery thereof into the ERS Trust.

(g)     The ERS Private Equity Portfolio and all other property held from time to time by the ERS Trust pursuant to this Trust Agreement and any earnings, including interest, on any of the foregoing shall be applied by the Trustee in accordance with the terms hereof, the Plan, the ERS Stipulation, and the Confirmation Order for the benefit of the ERS Trust Beneficiaries, and for no other party, subject to the further covenants, conditions and terms hereinafter set forth.

9

2.4    <u>Appointment and Acceptance of Trustee</u>. As set forth in the Confirmation Order, the Debtors hereby designate [●] to serve as the initial Trustee of the ERS Trust. The Trustee hereby accepts the ERS Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery to the Trustee, on behalf, and for the benefit, of the ERS Trust Beneficiaries, by the Debtors of all of their respective right, title and interest in the ERS Trust Assets, upon the terms and subject to conditions set forth herein, in the Plan, the ERS Stipulation, and in the Confirmation Order. The Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the ERS Trust and not otherwise. The Trustee shall have the authority to bind the ERS Trust within the limitations set forth herein, but shall for all purposes hereunder be acting solely in the capacity as Trustee, and not individually.

2.5    <u>No Reversion to Debtors</u>. In no event shall any part of the ERS Trust Assets revert to or be distributed to any Debtor or Reorganized Debtor, except pursuant to the sale of the ERS Private Equity Portfolio as provided in <u>Article IV</u> hereof.

2.6    <u>Incidents of Ownership</u>. Except as provided in the Plan, the Confirmation Order, and/or the ERS Stipulation, the ERS Trust Beneficiaries shall be the sole beneficiaries of the ERS Trust and the ERS Trust Assets, and the Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including those powers set forth in <u>Section 8.2</u> hereof.

2.7    <u>Privileges and Obligation to Respond to Ongoing Investigations</u>.

(a)    All attorney-client privileges, work product protections, and other immunities or protections from disclosure held by the Debtors shall be transferred, assigned, and delivered to the ERS Trust, without waiver, and shall vest in the Trustee solely in its capacity as such (and any other Person whom the Trustee may designate, as well as any other Person designated in this Trust Agreement).

(b)    Pursuant to Federal Rule of Evidence 502(d) (to the extent Rule 502(d) is relevant, notwithstanding the fact that the Debtors and the Trustee are joint holders of certain attorney-client privileges, work product protections or other immunities or protections from disclosure), no Privileges shall be waived by disclosure between or to the Trustee of the Debtors' information subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure, or by disclosure among the Debtors and the Trustee that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure jointly held by the Debtors and the Trustee. The Trustee shall be obligated to respond, on behalf of the Debtors, to all information demands with respect to the ERS Private Equity Portfolio and the ownership thereof from and after the Effective Date. The Trustee may waive Privileges that are held solely by the Debtors and/or the ERS Trust in the event and to the extent the Trustee determines in good faith that doing so is in the best interests of the ERS Trust and its beneficiaries.

(c)    The Trustee may disclose information that is subject to attorney-client privileges, work product protections, or other immunities only (i) pursuant to an order of a court of competent jurisdiction, subject to the procedure described in the next sentence insofar as it applies, or (ii) as otherwise required by law, subject to the procedure described in the next sentence

insofar as it applies.  If the Trustee receives a request from a third party to disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the Trustee, the Trustee will (A) pursue all reasonable steps to maintain the applicable privileges, protections or immunities from disclosure, including, if necessary, to maintain the privileges, protections or immunities from disclosure by seeking a protective order against and/or otherwise objecting to the production of such material, and (B) unless required by law, not disclose the materials in question unless and until any objection raised by the Trustee is resolved in favor of disclosure.

## ARTICLE III

## ERS TRUST BENEFICIARIES

3.1    Conflicting Claims.  If any conflicting claims or demands are made or asserted with respect to an ERS Trust Interest, the Trustee shall be entitled, in its sole and absolute discretion, to refuse to comply with any such conflicting claims or demands.  In so refusing, the Trustee, at its sole election, may elect to make no payment or distribution with respect to the ERS Trust Interest subject to the claims or demands involved, or any part thereof, and the Trustee shall refer such conflicting claims or demands to the Title III Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands or such other court of competent jurisdiction. In so doing, the Trustee shall not be or become liable to any party for its refusal to comply with any of such conflicting claims or demands.  The Trustee shall be entitled to refuse to act until either (a) the rights of the adverse claimants have been adjudicated by a Final Order of the Title III Court (or such other court of proper jurisdiction) or (b) all differences have been resolved by a written agreement among all of such parties and the Trustee, which agreement shall include a complete release of the ERS Trust and the Trustee.  Promptly after a Dispute Resolution is reached, the Trustee shall transfer the payments and distributions, if any, together with any interest thereon to be paid in accordance with Section 6.2 hereof, in accordance with the terms of such Dispute Resolution.

3.2    Rights of ERS Trust Beneficiaries.  Each ERS Trust Beneficiary shall be entitled to participate in the rights and benefits due to an ERS Trust Beneficiary hereunder according to the terms of its ERS Trust Interest.  The interest of an ERS Trust Beneficiary is hereby declared and shall be in all respects personal property.  Except as expressly provided hereunder, an ERS Trust Beneficiary shall have no title to, right to, possession of, management of or control of the ERS Trust or the ERS Private Equity Portfolio or to any right to call for a partition or division of such assets or to require an accounting.

3.3    Evidence of ERS Trust Interest.  Ownership of an ERS Trust Interest will be evidenced by the recording of such ownership in the Book Entry System.  An ERS Trust Beneficiary shall be deemed the "holder of record" of such ERS Trust Beneficiary's ERS Trust Interest for purposes of all applicable United States federal and state laws, rules and regulations, including all applicable Commonwealth laws, rules and regulations.  The Trustee shall, upon the written request of a holder of an ERS Trust Interest, provide reasonably adequate documentary evidence of such holder's ERS Trust Interest, as indicated in the Book Entry System. The expense of providing such documentation shall be borne by the requesting holder.

3.4     Transfers of ERS Trust Interests.

(a)     General.   ERS Trust Interests shall be freely transferable or assignable, subject to applicable securities laws, if any.

(b)     Book Entry System.   Pursuant to the Book Entry System, the ERS Trust shall maintain, or cause the agent of the ERS Trust to maintain, a register (which may be electronic) setting forth the names and addresses of the ERS Trust Beneficiaries, and the amount and class of their ERS Trust Interests from time to time. Any transfer or assignment of an ERS Trust Interest by operation of law shall not be effective unless and until such transfer or assignment is recorded in the Book Entry System, which shall be completed as soon as practicable. Subject to Section 3.4(d) hereof, the entries in the Book Entry System shall be conclusive absent manifest error, and the ERS Trust and the Trustee shall treat each person whose name is recorded in the Book Entry System pursuant to the terms hereof as the owner of ERS Trust Interests indicated therein for all purposes of this Trust Agreement, notwithstanding notice to the contrary.

(c)     Registration.   If the Trustee, upon advice of counsel, determines that any ERS Trust Interests may be subject to registration pursuant to Section 12 of the Securities Exchange Act of 1934, as amended, the Trustee shall pursue relief from such registration by obtaining either an exemptive order, a no-action letter or an interpretive letter from the Securities and Exchange Commission or its staff or, absent its ability to achieve that objective or in lieu thereof, shall register such class pursuant to Section 12 of such statute (it being understood and agreed that the Trustee shall be authorized, among other things, to register such class and to seek relief from one or more of the requirements then applicable subsequent to such registration and to de-register such class). To the extent that any Administrative Funding is available, any expenses that are associated with such application for relief and/or registration shall first be deducted from the Administrative Funding.

(d)     Limitations on Transfer.   Notwithstanding any other provision to the contrary, the Trustee may disregard any purported transfer or assignment of ERS Trust Interests by operation of law if sufficient necessary information (as reasonably determined by the Trustee), including applicable tax-related information, is not provided by such purported transferee or assignee to the Trustee.

3.5     Limited Liability.   No provision of this Trust Agreement, the Plan or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any ERS Trust Beneficiary, shall give rise to any liability of such ERS Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors, employees, or equity interest holders of any Debtor, or by any other Person, except to the extent of the ERS Trust Beneficiary's fraud, gross negligence, or willful misconduct. ERS Trust Beneficiaries are deemed to receive their ERS Trust Interests in accordance with the provisions of this Trust Agreement, the ERS Stipulation, the Plan and the Confirmation Order in exchange for their Allowed Claims without further obligation or liability of any kind (except to the extent of the ERS Trust Beneficiary's fraud, gross negligence, or willful misconduct), but subject to the provisions of this Trust Agreement.

# ARTICLE IV

## PURCHASE OF ERS PRIVATE EQUITY PORTFOLIO

4.1     <u>Commonwealth Option to Purchase ERS Private Equity Portfolio</u>.   From the Effective Date up to and including April 10, 2023, the Commonwealth shall have the right, but not the obligation, to purchase the ERS Private Equity Portfolio in accordance with the following provisions:

(a)     <u>Purchase Price</u>.  If the Commonwealth elects to purchase the ERS Private Equity Portfolio, the Commonwealth shall pay the ERS Portfolio Price.

(b)     <u>Notice</u>.  If the Commonwealth elects to purchase the ERS Private Equity Portfolio pursuant to <u>Section 4.1</u> hereof, the Commonwealth shall provide written, unconditional, and irrevocable notice thereof to holders of Allowed ERS Bond Claims on or prior April 10, 2023.

(c)     <u>Closing</u>.   Purchase of the ERS Private Equity Portfolio pursuant to the Commonwealth Election shall close on or prior to the Commonwealth Option Closing Date and the Commonwealth shall pay the ERS Portfolio Price by wire transfer of immediately available funds to the Trustee on the Commonwealth Option Closing Date. At the closing of any purchase consummated pursuant to the Commonwealth Election, the Trustee shall deliver to the Commonwealth a certificate or certificates (or other appropriate instruments of transfer) representing the ERS Private Equity Portfolio, accompanied by all necessary stock transfer taxes paid and stamps affixed, if necessary, against receipt of the ERS Portfolio Price. The Trustee also shall cause monies to be paid from the Segregated Account to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Trust that have not been previously reimbursed pursuant to Sections 2.3(c) and (e) herein; <u>provided, however,</u> that no proceeds from the sale of the ERS Private Equity Portfolio shall be used to reimburse the Commonwealth for any funded shortfall amounts.

(d)     <u>Closing Representations and Warranties</u>.  At the closing of any purchase consummated pursuant to the Commonwealth Election, the ERS Trust shall represent and warrant to the Commonwealth that:

(i)     the ERS Trust has good and valid title to the ERS Private Equity Portfolio;

(ii)     the ERS Trust has all the necessary power and authority and has taken all necessary action to sell the ERS Private Equity Portfolio as contemplated by this <u>Section 4.1</u>; and

(iii)     the ERS Private Equity Portfolio interests are free and clear of any and all mortgages, pledges, security interests, options, rights of first offer, unmet capital calls, encumbrances or other restrictions or limitations of any nature whatsoever, other than (A) Encumbrances arising under the securities laws, (B) Encumbrances arising under the constitutional documents of the Persons to which the ERS Private Equity Portfolio interests relate, including partnership agreements, limited liability corporation agreements, shareholder agreements, charters and

13

bylaws, and other similar documents, agreements and instruments, and (C) Encumbrances created by, through, or under the Commonwealth.

(e)　Cooperation. The Trustee shall take all actions as may be reasonably necessary to consummate the Commonwealth Election contemplated by this Section 4.1, including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(f)　Distribution. Upon consummation, the Trustee shall distribute the proceeds from the Commonwealth Election, without setoff or deduction for taxes, to the ERS Trust Beneficiaries pro rata in accordance with their respective beneficial interests in the ERS Trust; provided, however, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims.

4.2　ERS Trust Beneficiary Option to Purchase ERS Private Equity Portfolio. If the Commonwealth declines to exercise the Commonwealth Election option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, each ERS Trust Beneficiary shall have the option, but not the obligation, to exercise the Beneficiary Election in accordance with the following provisions:

(a)　Purchase Price. The ERS Trust Beneficiaries that exercise the Beneficiary Election shall pay the Beneficiary Election Purchase Price. The Trustee shall notify each ERS Trust Beneficiary that determines to exercise the Beneficiary Election of the full Beneficiary Election Purchase Price promptly following such ERS Trust Beneficiary's notice of Beneficiary Election, as provided in this Section 4.2.

(b)　Notice. If one or more ERS Trust Beneficiaries determines to exercise the Beneficiary Election, the Trustee shall provide written, unconditional, and irrevocable notice thereof to the other ERS Trust Beneficiaries on or prior April 15, 2023.

(c)　Closing. If more than one ERS Trust Beneficiary determines to exercise the Beneficiary Election, the purchasing ERS Trust Beneficiaries shall pay Beneficiary Election Purchase Price on a pro rata basis based upon the amount of such ERS Trust Beneficiaries' respective Allowed ERS Bond Claims, no later than the Beneficiary Closing Date. The purchasing ERS Trust Beneficiaries shall pay the Beneficiary Election Purchase Price by wire transfer of immediately available funds to the Trustee on the Beneficiary Closing Date. At the closing of any purchase consummated pursuant to the Beneficiary Election, the Trustee shall deliver to the purchasing ERS Trust Beneficiaries a certificate or certificates (or other appropriate instruments of transfer) representing the ERS Private Equity Portfolio, accompanied by all necessary stock transfer taxes paid and stamps affixed, if necessary, against receipt of the Beneficiary Election Purchase Price.

(d)　Closing Representations and Warranties. At the closing of any purchase consummated pursuant to the Beneficiary Election, the ERS Trust shall represent and warrant to each purchasing ERS Trust Beneficiary that:

(i)　the ERS Trust has good and valid title to the ERS Private Equity Portfolio;

14

(ii)      the ERS Trust has all the necessary power and authority and has taken all necessary action to sell interests in the ERS Trust as contemplated by this <u>Section 4.2</u>; and

(iii)      the ERS Private Equity Portfolio is free and clear of any and all Encumbrances, other than (A) Encumbrances arising under the arising under securities laws, (B) Encumbrances arising under the constitutional documents of the Persons to which the ERS Private Equity Portfolio relates, including partnership agreements, limited liability corporation agreements, shareholder agreements, charters and bylaws, and other similar documents, agreements and instruments, and (C) Encumbrances created by, through, or under the Commonwealth.

(e)    <u>Cooperation</u>. The Trustee shall take all actions as may be reasonably necessary to consummate the Beneficiary Election contemplated by this <u>Section 4.2</u>, including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(f)    <u>Distribution</u>. The Trustee shall distribute proceeds from the Beneficiary Election, net of the amounts necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Trust that have not been previously reimbursed to the Commonwealth, and without setoff or deduction for taxes, to the ERS Trust Beneficiaries pro rata in accordance with their respective beneficial interests in the ERS Trust; <u>provided</u>, <u>however</u>, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims. The Trustee also shall distribute to the Commonwealth amounts necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Trust that have not been previously reimbursed pursuant to Sections 2.3(c) and (e) herein.

4.3    <u>Commonwealth Obligation to Purchase.</u> If neither the Commonwealth Election nor the Beneficiary Election is exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price, in accordance with the following provisions:

(a)    <u>Notice</u>. The Trustee will deliver notice to the Commonwealth of its obligation to purchase the ERS Private Equity Portfolio no later than [April 24,] 2023. When providing such notice, the Trustee, on behalf of the ERS Trust, shall represent and warrant that:

(i)      the ERS Trust has good and valid title to the ERS Private Equity Portfolio;

(ii)      the ERS Trust has all the necessary power and authority and has taken all necessary action to sell the ERS Private Equity Portfolio as contemplated by this <u>Section 4.3</u>; and

(iii)      the ERS Private Equity Portfolio interests are free and clear of any and all Encumbrances other than (A) Encumbrances arising under the arising under securities laws, (B) Encumbrances arising under the constitutional documents of the Persons to which the ERS Private Equity Portfolio interests relate, including partnership agreements, limited liability

corporation agreements, shareholder agreements, charters and bylaws, and other similar documents, agreements and instruments, and (C) Encumbrances created by, through, or under the Commonwealth.

(b)     Closing.   Purchase of the ERS Private Equity Portfolio pursuant to this Section 4.3 will close on a date no later than the Commonwealth Mandatory Closing Date. The Commonwealth shall pay the ERS Portfolio Price by wire transfer of immediately available funds to the Trustee on the Commonwealth Mandatory Closing Date. At the closing of any purchase consummated pursuant to the Commonwealth Mandatory Election, the Trustee shall deliver to the Commonwealth a certificate or certificates (or other appropriate instruments of transfer) representing the ERS Private Equity Portfolio, accompanied by all necessary stock transfer taxes paid and stamps affixed, if necessary, against receipt of the ERS Portfolio Price. The Trustee also shall cause monies to be paid from the Segregated Account to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Trust that have not been previously reimbursed pursuant to Sections 2.3(c) and (e) herein; provided, however, that no proceeds from the sale of the ERS Private Equity Portfolio shall be used to reimburse the Commonwealth for any funded shortfall amounts.

(c)     Cooperation.   The Trustee shall take all actions as may be reasonably necessary to consummate the purchase of the ERS Private Equity Portfolio contemplated by this Section 4.3, including entering into agreements and delivering certificates and instruments and consents as may be deemed necessary or appropriate.

(d)     Distribution.   The Trustee shall distribute the proceeds from the Commonwealth Mandatory Election, without setoff or deduction for taxes, to the ERS Trust Beneficiaries pro rata in accordance with their respective beneficial interests in the ERS Trust; provided, however, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims.

## ARTICLE V

## DURATION AND TERMINATION OF ERS TRUST

5.1     Duration.   The ERS Trust shall become effective upon the Effective Date of the Plan and shall remain and continue in full force and effect until dissolved.

5.2     Dissolution of the ERS Trust.   The Trustee and the ERS Trust shall be discharged or dissolved, as the case may be, when all distributions required to be made by the Trustee under the Plan and this Trust Agreement have been made.

5.3     Continuance of ERS Trust for Winding Up.   After the dissolution of the ERS Trust and solely for the purpose of the ERS and winding up the affairs of the ERS Trust, the Trustee shall continue to act as such until its duties have been fully performed. Upon purchase of the ERS Private Equity Portfolio as provided in Article IV hereof, the Trustee shall retain the books, records and files that shall have been delivered to or created by the Trustee. At the Trustee's discretion, all of such records and documents may be destroyed at any time following the date that is six (6) years after the final distribution of proceeds from the sale of the ERS Private Equity Portfolio,

subject to any joint prosecution and common interests agreement(s) to which the Trustee may be party.

## ARTICLE VI

## ADMINISTRATION OF ERS TRUST

6.1     Payment of Expenses and Liabilities.   Except as otherwise provided herein, the Trustee shall use the Administrative Funding (i) to pay reasonable costs and expenses of the ERS Trust that are incurred (including taxes imposed on the ERS Trust, if any, the actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and sale of the ERS Private Equity Portfolio, as provided in Section 8.5 hereof, and the preservation of books and records of the ERS Trust), (ii) to satisfy other obligations or other liabilities incurred or assumed by the ERS Trust (or to which the ERS Private Equity Portfolio are otherwise subject) in accordance with the Plan, the ERS Stipulation, the Confirmation Order or this Trust Agreement, including fees and costs incurred in connection with the protection, preservation, sale and distribution of the ERS Private Equity Portfolio and the costs of investigating, prosecuting, resolving and/or settling any Claims, (iii) as reasonably necessary to meet contingent liabilities and to maintain the value of the ERS Private Equity Portfolio during liquidation, and (iv) to satisfy any other obligations of the ERS Trust expressly set forth in the Plan, the ERS Stipulation, this Trust Agreement, and the Confirmation Order.   Under no circumstances shall the Trustee use any amounts of the Administrative Funding to settle capital calls associated with the ERS Private Equity Portfolio.

6.2     Distributions.

(a)     Payment of Distributions.   The Trustee shall distribute the proceeds from the sale of the ERS Private Equity Portfolio arising from the Commonwealth Election, the Beneficiary Election, or the Commonwealth's mandatory purchase in accordance with Article IV hereof to the ERS Trust Beneficiaries (or their designees), without set off or deduction for taxes; provided, however, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims.   Each ERS Trust Beneficiary's share of the ERS Trust Interests as determined pursuant to the Plan (including any Cash to be received on account of any ERS Trust Interests) shall be allocated and distributed in accordance with the terms and provisions of Article LXIX of the Plan.

(b)     De Minimis Distributions.   No Cash payment shall be made to any holder of a ERS Trust Interest until such time, if ever, as the amount payable thereto, in any distribution from the ERS Trust, is equal to or greater than Ten Dollars ($10.00).   Any holder of an ERS Trust Interest on account of which the amount of Cash to be distributed pursuant to any distribution from the ERS Trust is less than Ten Dollars ($10.00) shall be deemed to have no claim for such distribution against the Debtors, the Reorganized Debtors, the ERS Trust or the ERS Private Equity Portfolio.   Any Cash not distributed pursuant to this Section 6.2 shall be the property of the ERS Trust free of any restrictions thereon, and shall be available for distribution to the other ERS Trust Beneficiaries, in accordance with the Plan, the ERS Stipulation, and this Trust Agreement; provided, however, that, in connection with dissolution of the ERS Trust, any amounts remaining

17

and not distributed to ERS Trust Beneficiaries by operation of the second sentence of this paragraph shall be distributed to the Commonwealth.

6.3     Undeliverable Distributions.     For purposes of this Trust Agreement, an "undeliverable" distribution shall include a check that is sent to a holder in respect of a distribution to such holder, which check has not been negotiated within [six (6) months] following the date on which such check was issued. If any distribution to the holder of an ERS Trust Interest is undeliverable, no further distribution shall be made to such holder unless and until the Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address. Undeliverable distributions shall remain in the possession of the Trustee (or its duly authorized agent) until such time as a distribution becomes deliverable or as set forth in Section 6.4 hereof. All Persons ultimately receiving an undeliverable distribution shall not be entitled to any interest or other accruals of any kind on account of the delay in payment resulting from the undeliverable status of such distribution. Except as required by law, the Trustee (or its duly authorized agent) shall not be required to attempt to locate any holder of an ERS Trust Interest.

6.4     Compliance with Laws. Any and all distributions of the ERS Private Equity Portfolio shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

6.5     Fiscal Year. Except for the first and last years of the ERS Trust, the fiscal year of the ERS Trust shall be the calendar year. For the first and last years of the ERS Trust, the fiscal year of the ERS Trust shall be such portion of the calendar year that the ERS Trust is in existence.

6.6     Books and Records. The Trustee shall retain and preserve the Debtors' books, records and files that shall have been delivered to or created by the Trustee. Subject to the terms and provisions of Section 5.3 hereof, the Trustee shall maintain, in respect of the ERS Trust and the ERS Trust Beneficiaries and all others to receive distributions under this Trust Agreement, books and records relating to the assets and the income of the ERS Trust and the payment of expenses of, liabilities of, and claims against or assumed by, the ERS Trust and the Trustee, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and applicable provisions of law, including applicable tax, securities and other federal and state laws. Except as otherwise provided herein or in the Plan, nothing in this Trust Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the ERS Trust, or as a condition for making any payment or distribution out of the ERS Trust Assets. ERS Trust Beneficiaries shall have the right upon thirty (30) days' prior written notice delivered to the Trustee to inspect such books and records; provided, however, that, if so requested, all costs associated with such inspection shall be paid in advance by such requesting ERS Trust Beneficiary and such ERS Trust Beneficiary shall have entered into a confidentiality agreement reasonably satisfactory in form and substance to the Trustee.

6.7     Cash Payments. All distributions required to be made by the Trustee to the ERS Trust Beneficiaries shall be made in Cash denominated in United States dollars by checks drawn on a domestic bank selected by the Trustee or, at the option of the Trustee, by wire transfer from a domestic bank selected by the Trustee or as otherwise required or provided in applicable agreements; provided, however, that Cash payments to foreign holders of ERS Trust Interests may

be made, at the option of the Trustee, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

6.8     Insurance.  The ERS Trust shall maintain customary insurance coverage for the protection of the Trustee, employees and any such other persons serving as administrators and overseers of the ERS Trust on and after the Effective Date.  The Trustee also may obtain insurance coverage it deems necessary and appropriate with respect to real and personal property which may become ERS Private Equity Portfolio, if any.

6.9     Disputes.  To the extent a dispute arises between the Trustee concerning the performance of any of the powers, duties, and/or obligations herein, the Trustee may file a motion and/or other pleadings with the Title III Court and obtain advice and guidance or such other relief as may be appropriate concerning a resolution of the matter(s) in dispute between the parties.  In the event of a dispute, the Trustee shall have the right to engage legal counsel to advise it with respect to the matter(s) in dispute and the reasonable fees and expenses of such legal counsel shall be reimbursed by the Trustee from the Administrative Funding or, in the event the Administrative Funding has been spent, any other unrestricted Cash in the ERS Trust, subject to Section 8.12 hereof.

6.10     Reports.

(a)     From the Effective Date up to, but not including, the sale of the ERS Private Equity Portfolio in accordance with the terms and provisions of Article IV hereof, the Commonwealth shall provide quarterly portfolio summaries to the Trustee and to holders of Allowed ERS Bond Claims that execute and deliver a non-disclosure agreement. Any information provided in such quarterly reports shall not be subject to public disclosure, except as may be required by law.

(b)     The Trustee shall timely prepare, file and distribute such additional statements, reports and submissions as may be necessary to cause the ERS Trust and the Trustee to be in compliance with applicable law.

(c)     Until such time as the ERS Trust is dissolved in accordance with this Agreement, the ERS Trust shall file with (or furnish to, as the case may be) the SEC such periodic reports as the ERS Trust is required to file pursuant to the Exchange Act. In addition, until the Title III cases are closed, the ERS Trust shall file post-confirmation quarterly summary reports for each of the Title III cases with the Title III Court and, thereafter, and until such time as the ERS Trust is dissolved in accordance with this Agreement, the ERS Trust shall file with (or furnish to, as the case may be) the SEC or otherwise make available to the ERS Trust Beneficiaries quarterly reports that are substantially similar to such post-confirmation quarterly summary reports.

## ARTICLE VII

## TAX MATTERS

7.1     ERS Private Equity Portfolio Treated as Owned by ERS.  For all United States federal income tax purposes, all parties (including the Debtors, the Reorganized Debtors, the

19

Trustee, ERS, and the ERS Trust Beneficiaries) shall treat ERS as the owner of the ERS Private Equity Portfolio and the ERS Trust.  No items of taxable income, gain, loss or deduction attributable to the ERS Private Equity Portfolio or the ERS Trust, as the case may be, shall be allocated to the ERS Trust Beneficiaries. The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

7.2    <u>Tax Reporting</u>.  The Trustee shall file tax returns for the ERS Trust treating the ERS Trust as a grantor trust of ERS pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this <u>Article VII</u> and shall take no position inconsistent with the foregoing unless otherwise required by a final determination of a governmental unit; <u>provided</u>, <u>however</u>, that none of the Trustee, ERS and the Commonwealth shall have any obligation (including any indemnification obligation) or liability to any ERS Trust Beneficiary and none of the ERS Trust Beneficiaries shall have any obligation (including any indemnification obligation) or liability to the Trustee, ERS or the Commonwealth, for any costs, expenses, claims, obligations, liabilities or losses incurred as a result of a final determination by a governmental unit contrary to the treatment of the ERS Trust as a grantor trust of ERS.  The Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the ERS Trust that is required by any governmental unit.  The Trustee shall be responsible for payment, out of the Administrative Funding, of any taxes imposed on the ERS Trust or its asset.

7.3    <u>Tax Withholdings by Trustee</u>.  As provided in the Plan, the ERS Stipulation and this Trust Agreement, payments and distributions to the ERS Trust Beneficiaries are to be made without setoff or deduction. The Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the ERS Trust Beneficiaries; provided, however, that the sum payable by the Trustee to the ERS Trust Beneficiaries shall be increased as necessary so that after such deduction or withholding has been made, the ERS Trust Beneficiaries receive an amount equal to the sum they would have received had no such deduction or withholding been made. The Trustee shall be authorized to collect such tax information from the ERS Trust Beneficiaries (including social security numbers or other tax identification numbers) as in its sole discretion the Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the ERS Trust Agreement. In order to receive distributions, all ERS Trust Beneficiaries shall be required to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Trustee for these purposes. This identification requirement generally applies to all ERS Trust Beneficiaries, including those who hold their Claims in "street name." The Trustee may refuse to make a distribution to any ERS Trust Beneficiary that fails to furnish such information in a timely fashion, and until such information is delivered may treat such ERS Trust Beneficiary's interests as disputed; <u>provided</u>, <u>however</u>, that, upon the delivery of such information by an ERS Trust Beneficiary, the Trustee shall make such distribution to which the ERS Trust Beneficiary is entitled, without additional interest occasioned by such beneficiary's delay in providing tax information; and, <u>provided</u>, <u>further</u>, that, if such information is not furnished to the Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to such ERS Trust Beneficiary.

7.4    If the Trustee, acting in its reasonable discretion, determines that the Trust is not eligible to be characterized as a grantor trust, including as a result of a change in law or

20

administrative guidance, the Trustee shall be authorized to take such actions to characterize the Trust as an entity disregarded as separate from ERS or a partnership that does not include any ERS Trust Beneficiary as a partner for U.S. federal, state, and local tax purposes that the Trustee determines are reasonably necessary, including the preparation of any forms and elections, establishment of capital accounts in accordance with the rules of Treasury Regulations Section 1.704 1(b)(2)(iv), and revisions to this Trust Agreement, and any related fees and expenses associated therewith (including reasonable legal and accounting expenses) shall be a cost of the Trust. The Trust shall not elect to be treated as an association taxable as a corporation under Section 301.7701-3(a) of the Treasury Regulations for federal income tax purposes.

## ARTICLE VIII

## THE TRUSTEE

8.1  <u>Trustee</u>.

(a)  Subject to the terms and provisions of <u>Article IX</u> hereof, the Trustee shall hold office until the termination of the ERS Trust in accordance with the terms set forth herein. References herein to the Trustee shall refer to the Person or Persons serving as the Trustee solely in its or their capacity as trustees hereunder.

(b)  Subject to the express limitations set forth herein, any actions of the Trustee contemplated by this Trust Agreement shall be decided and conducted by the Trustee only.

8.2  <u>Powers of the Trustee</u>.

(a)  Pursuant to the terms of the Plan, the Confirmation Order and this Trust Agreement, the Trustee shall have various powers, duties and responsibilities concerning the prosecution of certain litigation claims, the disposition of assets, the resolution of claims, and numerous other obligations relating to the administration of the ERS Trust.

(b)  The Trustee shall have only such rights, powers and privileges expressly set forth in the Confirmation Order, the Plan, the ERS Stipulation and this Trust Agreement and as otherwise provided by applicable law. Subject to the Confirmation Order, the Plan, the ERS Stipulation and the provisions of this Trust Agreement, including the oversight and approvals by and of the Title III Court provided herein, the Trustee shall be expressly authorized to undertake the following actions (and, except with respect to <u>Section 8.2(b)(vi)</u> hereof, to delegate such authority to such representatives or agents of the Trustee as the Trustee may nominate from time to time):

(i)  to open bank accounts, and to hold, manage, convert to Cash, and distribute the ERS Private Equity Portfolio;

(ii)  to hold the ERS Private Equity Portfolio for the benefit of the ERS Trust Beneficiaries, whether their interests are Allowed on or after the Effective Date;

(iii)  to timely notify the Commonwealth of all capital calls related to the ERS Private Equity Portfolio;

(iv)     to monitor and enforce the implementation of the Plan;

(v)      to file all tax and regulatory forms, returns, reports, and other documents required with respect to the ERS Trust;

(vi)     to take all actions and create any document necessary to implement the Plan;

(vii)    to hold, manage, and distribute Cash or non-Cash ERS Private Equity Portfolio interests obtained through the exercise of its power and authority; and

(viii)   to act as a signatory to the Debtors solely with the respect to the ERS Private Equity Portfolio.

(c)      In all circumstances, the Trustee shall comply with applicable law and shall otherwise act in the best interest of all ERS Trust Beneficiaries, and the Trustee shall act in furtherance of the purpose of the ERS Trust.

(d)      Except as otherwise provided in this Trust Agreement, the Trustee will not be required to obtain the order or approval of the Title III Court, or any other court of competent jurisdiction in, or account to the Title III Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder. Notwithstanding the foregoing, where the Trustee determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the Trustee will have the right to submit to the Title III Court any question or questions regarding any specific action proposed to be taken by the Trustee with respect to this Trust Agreement, the ERS Trust, or the ERS Private Equity Portfolio, including the administration and distribution of the ERS Private Equity Portfolio and the termination of the ERS Trust. Pursuant to the Plan, the Title III Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Trustee.

8.3     <u>Limitations on Trustee</u>. The Trustee shall, on behalf of the ERS Trust, hold the ERS Trust out as a trust in the process of liquidation and not as an investment company. The Trustee shall be restricted to holding the ERS Private Equity Portfolio on behalf, and for the benefit, of the ERS Trust Beneficiaries and the distribution and application of proceeds from the sale of the ERS Private Equity Portfolio for the purposes set forth in, and the conservation and protection of the ERS Private Equity Portfolio and the administration thereof in accordance with, the provisions of this Trust Agreement, the ERS Stipulation, the Plan and the Confirmation Order.

8.4     <u>Actions Taken on a Day Other Than A Business Day</u>. In the event that any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

8.5     <u>Agents, Employees and Professionals</u>.

22

(a)     The ERS Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain Trust Professionals, on such terms as the Trustee deems appropriate. None of the professionals that represented parties-in-interest in the Title III Cases shall be precluded from being engaged by the Trustee solely on account of their service as a professional for such parties-in-interest prior to the Effective Date.

(b)     After the Effective Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Trustee, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of such person, plus an itemized statement of expenses. Subject to the approval of the Trustee, the Trustee shall pay such invoices thirty (30) days after such invoices are approved In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the Trustee or the affected party may ask the Title III Court to resolve the dispute.

(c)     All payments to Trust Professionals shall be paid out of the Administrative Funding or, if all of the Administrative Funding has been spent, any unrestricted Cash remaining in the Segregated Account.

8.6     Investment of ERS Trust Monies. All monies and other assets received by the Trustee as ERS Trust Assets (including the proceeds thereof as a result of investment in accordance with this Section 8.6) shall, until distributed or paid over as herein provided, be held in trust for the benefit of the ERS Trust Beneficiaries, in the Segregated Account, unless and to the extent required by the Plan. The Trustee shall promptly invest any such monies (including any earnings thereon or proceeds thereof) as permitted by section 345 of the Bankruptcy Code, in the manner set forth in this Section 8.6, but shall otherwise be under no liability for interest or income on any monies received by the ERS Trust hereunder and held for distribution or payment to the ERS Trust Beneficiaries, except as such interest shall actually be received. Investment of any monies held by the ERS Trust shall be administered in accordance with the general duties and obligations hereunder. The right and power of the Trustee to invest the ERS Trust Assets, the proceeds thereof, or any income earned by the ERS Trust, shall be limited to the right and power to: (a) invest such ERS Trust Assets (pending distributions in accordance with the Plan or this Trust Agreement) in Permissible Investments, or (b) deposit such assets in demand deposits at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000.

8.7     Termination. The duties, responsibilities and powers of the Trustee shall terminate on the date the ERS Trust is wound up and dissolved in accordance with New York law pursuant to Section 5.2 hereof; provided, however, that the duties, responsibilities and powers set forth in Sections 8.8, 8.9, and 8.10 hereof shall survive such termination, dissolution and entry.

8.8     Liability to Third Persons. No ERS Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person in connection with the ERS Trust Assets or the affairs of the Trustee, except to the extent of the ERS Trust Beneficiary's fraud, gross negligence, or willful misconduct. The Trustee and the Trust Professionals shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any Person (including, in the case of the Trustee to any Trust Professionals retained by the Trustee in

23

accordance with this Trust Agreement) in connection with the ERS Trust Assets or the affairs of the ERS Trust (except to the extent of the Trustee's or Trust Professional's fraud, gross negligence, or willful misconduct) and shall not be liable with respect to any action taken or omitted to be taken in good faith, and all such persons shall look solely to the ERS Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the ERS Trust. Other than as set forth in the Plan, the ERS Stipulation or in the Confirmation Order, nothing in this <u>Section 8.8</u> shall be deemed to release any ERS Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

8.9     <u>Nonliability of Trustee for Acts of Others</u>.  Except as provided herein, nothing contained in this Trust Agreement, the ERS Stipulation, the Plan or the Confirmation Order shall be deemed to be an assumption by the Trustee or the Trust Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the Trustee to assume or accept any such liability, obligation or duty. Any successor Trustee may accept and rely upon any accounting made by or on behalf of any predecessor Trustee hereunder, and any statement or representation made as to the assets comprising the ERS Trust Assets or as to any other fact bearing upon the prior administration of the ERS Trust, so long as it has a good faith basis to do so. The Trustee shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue. The Trustee or any successor Trustee shall not be liable for any act or omission of any predecessor Trustee nor have a duty to enforce any claims against any predecessor Trustee on account of any such act or omission. No provision of this Trust Agreement shall require the Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if the Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to the Trustee.

8.10     <u>Exculpation</u>.  As of the Effective Date, the Trustee and the Trust Professionals shall be and hereby are exculpated by all Persons, including ERS Trust Beneficiaries, holders of Claims and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, this Trust Agreement, the ERS Stipulation or any order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by final order of the Title III Court to have arisen out of their own respective intentional fraud, criminal conduct, gross negligence or willful misconduct. No ERS Trust Beneficiary, holder of a Claim or other party-in-interest shall have or be permitted to pursue any claim or cause of action against the Trustee, the ERS Trust, the employees, professionals or representatives of either the Trustee or the ERS Trust (including the Trust Professionals), for making payments in accordance with, or for implementing, the provisions of the Plan, the ERS Stipulation, the Confirmation Order and this Trust Agreement. Any action taken or omitted to be taken with the express approval of the Title III Court shall conclusively be deemed not to constitute gross negligence or willful misconduct.

8.11     <u>Limitation of Liability</u>.  The Trustees and the Trust Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances, except to the extent of the Trustees' or Trust Professionals' fraud, gross negligence, or willful misconduct.

8.12   Indemnity.   Each Indemnified Party shall not be liable to the ERS Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of the Trustee, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the ERS Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of the Trustee, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Trustee and the other parties entitled to indemnification under this subsection shall be satisfied solely from the ERS Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the ERS Trust Interests and any other claim to or interest in such assets. The Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.  The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

8.13   Compensation and Expenses.

(a)   The Trustee (including the Person(s) serving as or comprising the Trustee) shall receive compensation for its services, to be paid out of the Administrative Funding.  In addition, the Trustee shall be entitled, subject to the approval of the Title III Court, to reimburse itself from the Administrative Funding on a monthly basis for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Plan.

(b)   The annual compensation of the Trustee shall be [●].

**ARTICLE IX**

**SUCCESSOR ERS TRUSTEES**

9.1   Resignation.   The Trustee may resign from the ERS Trust by giving at least sixty (60) days' prior written notice thereof to the ERS Trust Beneficiaries.  Such resignation shall become effective on the later to occur of (a) the date specified in such written notice and (b) the effective date of the appointment of a successor Trustee in accordance with Section 9.4 hereof and such successor's acceptance of such appointment in accordance with Section 9.5 hereof.

9.2   Removal.   The Trustee may be removed by a majority vote of the ERS Trust Beneficiaries.  Such removal shall become effective on the date specified in such action.

9.3   Effect of Resignation or Removal.   The resignation, removal, incompetency, bankruptcy or insolvency of the Trustee shall not operate to terminate the ERS Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order or invalidate any action theretofore taken by the Trustee.  All fees and expenses properly incurred by the Trustee prior to the resignation, incompetency or removal of the Trustee shall be paid from the ERS Trust Assets, unless such fees and expenses are disputed by the successor Trustee, in which case the Title III Court shall resolve the dispute and any disputed fees and expenses of the predecessor Trustee that are subsequently allowed by the Title III Court shall be paid from the ERS Trust Assets. In the event of the resignation or removal of the Trustee, such Trustee shall:  (i) promptly execute and deliver such documents, instruments and other

25

writings as may be reasonably requested by the successor Trustee or directed by the Title III Court to effect the termination of such Trustee's capacity under this Trust Agreement; (ii) promptly deliver to the successor Trustee all documents, instruments, records and other writings related to the ERS Trust as may be in the possession of such Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

9.4    Appointment of Successor.   In the event of the death, resignation, removal, incompetency, bankruptcy or insolvency of the Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by a majority of ERS Trust Beneficiaries; provided, however, that, under no circumstance, shall the successor Trustee be a director or officer of any Affiliate of the ERS Trust.  In the event that a successor Trustee is not appointed within thirty (30) days after the date of such vacancy, the Title III Court, upon its own motion or the motion of an ERS Trust Beneficiary, shall appoint a successor Trustee.

9.5    Acceptance of Appointment by Successor Trustee.   Any successor Trustee appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Title III Court for filing and to the ERS Trust Beneficiaries and, in case of the Trustee's resignation, to the resigning Trustee.  Thereupon, such successor Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the ERS Trust with like effect as if originally named Trustee and shall be deemed appointed pursuant to Bankruptcy Code section 1123(b)(3)(B).  The resigning or removed Trustee shall duly assign, transfer and deliver to such successor Trustee all property and money held by such resigning or removed Trustee hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Trustee.

## ARTICLE X

## MISCELLANEOUS PROVISIONS

10.1    Governing Law.  This Trust Agreement shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Agreement; provided, however, that the authorization of this Trust Agreement by Commonwealth shall be governed by the laws of the Commonwealth.

10.2    Jurisdiction.  Subject to the proviso below, the parties agree that the Title III Court shall have exclusive jurisdiction over the ERS Trust and the Trustee, including the administration and activities of the ERS Trust and the Trustee, and, pursuant to the Plan, the Title III Court has retained such jurisdiction; provided, however, that notwithstanding the foregoing, the Trustee shall have power and authority to bring any action in any court of competent jurisdiction (including the Title III Court) to prosecute any causes of action assigned to the ERS Trust.

26

10.3   <u>Severability</u>.  In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

10.4   <u>Notices</u>.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, sent by email, facsimile transmission, nationally recognized overnight delivery service or mailed by first-class mail:

    (i)    if to the Trustee, to:

    [●]

    with a copy to:

    [●]

    (ii)    if to any ERS Trust Beneficiary, to the last known address of such ERS Trust Beneficiary according to the Debtors' Schedules, such ERS Trust Beneficiary's proof of claim or the lists of record holders provided to the Trustee; and

    (iii)    if to the Debtors:

The Commonwealth of Puerto Rico
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Office of the Executive Director

and

The Employees Retirement System of the Government of the Commonwealth of Puerto Rico
PO Box 42003
San Juan, PR 00940-2203
Attn: Cecile Tirado Soto

with a copy to:

O'Melveny & Myers LLP
Seven Times Square
New York, NY 10036
Attn: John Rapisardi, Esq.
Peter Friedman, Esq.

Maria J. DiConza, Esq.
Tel: (212) 326-2000
Fax: (212) 326-2061

and

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel: (212) 969-3000
Fax: (212) 969-2900

10.5   <u>Headings</u>.   The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

10.6   <u>Relationship to the Plan</u>.   The terms of this Trust Agreement are intended to supplement the terms provided by the Plan, the ERS Stipulation, and the Confirmation Order, and therefore this Trust Agreement incorporates the provisions of the Plan, the ERS Stipulation, and the Confirmation Order (which may amend or supplement the Plan). Additionally, the Trustee may seek any orders from the Title III Court, upon notice and a hearing in furtherance of implementation of the Plan, the ERS Stipulation, the Confirmation Order and this Trust Agreement. However, to the extent that there is conflict between the provisions of this Trust Agreement, the provisions of the Plan, the ERS Stipulation or the Plan, the ERS Stipulation, each document shall have controlling effect in the following rank order: (a) *first*, this Trust Agreement, (b) *second*, the Confirmation Order, (c) *third*, the Plan, and (d) *forth*, the ERS Stipulation.

10.7   <u>Entire Trust Agreement</u>.   This Trust Agreement (including the recitals hereto), the Plan and the Confirmation Order constitute the entire agreement and understanding by and among the parties and supersede all prior and contemporaneous agreements or understandings by and among the parties with respect to the subject matter hereof.

10.8   <u>Cooperation</u>.   The Debtors shall turn over or otherwise provide a copy to the Trustee at no cost to the ERS Trust or the Trustee, all books and records reasonably required by the Trustee to carry out its duties hereunder, and agree to otherwise reasonably cooperate with the Trustee in carrying out its duties hereunder, subject to the confidentiality provisions herein to preserve the confidential nature of the Debtors' books and records.

10.9   <u>Amendment and Waiver</u>.   Any provision of this Trust Agreement may be amended or waived by the Trustee. Notwithstanding this <u>Section 10.9</u>, any amendment to this Trust Agreement shall not be inconsistent with the purpose and intention of the ERS Trust.

10.10   <u>Confidentiality</u>.   The Trustee and its employees, members, agents, professionals and advisors, including the Trust Professionals shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their

28

capacity as a Confidential Party, of or pertaining to any Debtor to which any of the ERS Private Equity Portfolio relates; provided, however, that such information may be disclosed if: (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or (b) such disclosure is required of the Confidential Parties pursuant to legal process, including to subpoena or other court order or other applicable laws or regulations. In the event that any Confidential Party is requested to divulge confidential information pursuant to this clause (b), such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Trustee to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Trustee in making any such objection, including appearing in any judicial or administrative proceeding in support of any objection to such disclosure. The Trustee shall not disclose any non-public information to any ERS Trust Beneficiary unless and until such ERS Trust Beneficiary has executed a non-disclosure agreement relating to such information.

10.11   Rules of Construction.   Except where the context otherwise may require, (a) words of any gender include the other gender, and (b) words importing the singular number shall include the plural number and vice versa. All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement. The terms "hereof", "hereto", "herein" and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement. The terms "include", "includes" and "including" shall be construed as if followed by the words "without limitation".

10.12   Counterparts.   This Trust Agreement may be executed with counterpart signature pages or in any number of counterparts, each of which counterparts shall be deemed an original, but all such counterparts shall together constitute but one and the same instrument. A facsimile, portable document file (PDF) or other electronic transmission signature of any party shall be considered to have the same binding legal effect as an original signature.

[Remainder of Page Blank — Signature Page Follows]

29

**IN WITNESS WHEREOF**, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

**THE COMMONWEALTH OF PUERTO RICO**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ _____
     Name:   Natalie Jaresko
     Title:    Executive Director

**EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO**, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ _____
     Name:
     Title:

[●]

By: /s/ _____
     Name:
     Title:

# **<u>EXHIBIT E</u>**

Schedule of Executory Contracts and Unexpired Leases to be Assumed

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2017-DS0239 | 3 Rios LTD Corp | Departamento de Salud | 27 Gonzalez Giusti Ave, Suite 300, Guaynabo, PR 00968 | 117 Eleanor Roosevelt, Hato Rey, PR 00918 | $0.00 |
| 2018-000016 | Administración de la Industria y el Deporte Hípico | Sucesión Díaz Bonet, representada por el Sr. José A. Díaz Dávila | P.O. Box 361887, San Juan,PR 00936 | Avenida 65 de Infantería, Calle Rafael Arcelay, San Juan, P.R. 00924 | $0.00 |
| 2018-000065 | Administración de los Sistemas de Retiro de los Empleados del Gobierno y Judicatura | Atlantic Master Parking Service, Inc. | Urb. Levittown 3407 Paseo Camaron Toa Baja, PR 00949 | Estacionamiento Nuevo Centro Gubernamental de Minillas, Santurce Puerto Rico 00907 | $0.00 |
| 2018-000144 | Administración de Rehabilitación Vocacional (ARV) | Ariel Z. Ortiz Blanco | Villa Alba D-27 CALLE D Villalba, PR 00766-1601 | Edif. Ortiz Burgos Urb. La Vega #205, Villalba, PR 00766 | $0.00 |
| 2004-000002 | Administración de Rehabilitación Vocacional (ARV) | Bienvenido Perez Ramirez | PO BOX 3964 Aguadilla, PR 00605 | Carretera #2 Bo. Corrales de Aguadilla, Aguadilla, PR 00603 | $0.00 |
| 2007-000078 | Administración de Rehabilitación Vocacional (ARV) | Edwin Ramos | PO BOX 197 La Plata, Aibonito,PR 00786 | Edificio Médico Guayacán #217, Aibonito, PR 00705 | $0.00 |
| 2018-000143 | Administración de Rehabilitación Vocacional (ARV) | Fidecomiso Hernández Castrodad | HC 06 BOX 72502 Caguas, PR 00725-9511 | Ave. Angora Solar #4 Secor Bairoa, Caguas, PR 00725 | $0.00 |
| 2006-000097 | Administración de Rehabilitación Vocacional (ARV) | FMA Realty, Inc. | Carr. # 2 km 17.0 Barrio Candelaria Toa Baja, PR 00949 | Carretera #2 KM17.0 Barrio Candelaria, Toa Baja, PR 00949 | $0.00 |
| 2003-000004 | Administración de Rehabilitación Vocacional (ARV) | Hector D. Ríos | PO  Box 403 Barranquitas, PR 00794 | Calle Barceló #9, Guaynabo, PR  00969 | $0.00 |
| N/A | Administración de Rehabilitación Vocacional (ARV) | INTER San Germán | San Germán | N/A | $0.00 |
| N/A | Administración de Rehabilitación Vocacional (ARV) | Jhon Javy Corp. | Boulevard Paza Offices Buildings Po Box 246, Las Piedras, PR 771 | Boulevard del Rio Offices Buildings, Boulevard del Río Ramal #3, Humacao, PR, 00792 | $0.00 |
| 2018-000158 | Administración de Rehabilitación Vocacional (ARV) | Laboratorio Clínico Mercado | PO BOX 1291 Orocovis, PR 00720-1291 | Carretera 155 Ave. Luis Muñoz Marín #12 KM 26.4, Orocovis, PR  00720 | $0.00 |
| 2007-000117 | Administración de Rehabilitación Vocacional (ARV) | Office Park Inc. | 1 Calle 65 Infantería NorteSuite #2 Lajas, PR 00667 | 00681 Cll Providencia Edificio Medical Emporium, Mayaguez, PR  00682 | $0.00 |
| 00-00193 | Administración de Rehabilitación Vocacional (ARV) | PCDM Associates, SE | PO Box 190858 San Juan, PR 00919-0858 | Carretera 167 KM 20.5 Victory Shopping Center, Bayamon, PR  00957 | $0.00 |
| 2017-000080 | Administración de Rehabilitación Vocacional (ARV) | Pjay Investment Corp | Po Box 486 Fajardo, PR 00738-0486 | Calle Jorge Bird #12, Fajardo, PR  00738 | $0.00 |
| 2016-000058 | Administración de Rehabilitación Vocacional (ARV) | RRD CASH & CARRY | PO BOX 140189 Arecibo, PR 00614 | Carretera #2 KM 80.06 Bo Hato Abajo Arecibo, PR 00612 | $0.00 |

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 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 | Administración de Rehabilitación Vocacional (ARV) | S & L DEVELOMENT | PO BOX 29047 Carolina. PR 00927-0047 | Bo. Trujillo Bajo, Carolina, PR 00985 | $0.00 |
| 2017-000001 | Administración de Rehabilitación Vocacional (ARV) | Union Holdings | Mercantil Plaza Oficina 1501 Avenida Ponce de Leon, San Juan, PR 00918 | Ave. Malecón, Esq. Carretera Estatal #2, Finca Multeada Estrella, Bo. San Antón, Ponce, PR 00717 | $0.00 |
| 2017-000001 | Administración de Rehabilitación Vocacional (ARV) | Union Holdings | PO BOX 190858 San Juan, 00918 | Ave. Malecón, Esq. Carretera Estatal #2, Finca Multeada Estrella, Bo. San Antón, Ponce, PR 00717 | $0.00 |
| 2015-000052 2015-000046 2014-000198 2014-000103 2014-000046 | Administración de Rehabilitación Vocacional (ARV) | Universidad Metropolitana | 1399 Av. Ana G. Méndez, San Juan, PR 00926 | N/A | $0.00 |
| 2017-950462 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Buenaventura Morales Santiago | Reparto FlamingoK-8 Calle del Turabo Bayamón, PR 00959 | Solar #1, bloque 41 de la Urb. Sierra de Bayamón Bo Hato Tejas, Bayamón, PR 00961 | $0.00 |
| 2018-950322 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Carlos Martínez Serrano | Urb. Sunny HillsC-01 Calle 1 Bayamón, PR 00956 | Sola #1 del bloque B, Urb Sunny Hills, Bayamón, PR 00956 | $0.00 |
| 2017-950471 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Carlos Rodríguez Rivera | Urb. Lomas Verdes4 S 15 Calle Petrea Bayamón, PR 00956-2937 | #2 de la manzana 4G de la Urb. Lomas Verdes en Bayamón, PR 00956 | $0.00 |
| 2017-950323 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Diego M. Schenquerman | Urb. La Alameda 780 Calle Rubí San Juan, PR 00926 | Solar #200 del bloque M-8, Urb. Reparto Metropolitano, Rio Piedras, PR 00921 | $0.00 |
| 2018-950620 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Fideicomiso Hernández Castrodad | P.O Box 4985 PMB 265 Caguas, PR 00726-4985 | Calle Gautier Benítez 3162, Caguas, PR 00778 | $0.00 |
| 2017-950464 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Johnny Ramos Ortiz | Urb. RexvilleC2-43 Calle 15A Bayamón, PR 00957-3955 | Calle 3-A #159 de la Urb. Hermanos Dávila en Baymón, PR 00961 | $0.00 |
| 2017-950279 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Juan A. Negrón Berrios | P.O. Box 1291 Orocovis, PR 00720-1291 | Calle Jose C. Vázquez #60 Aibonito, PR 00705 | $0.00 |
| 2017-950172 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Juan Lopez Malave | PO Box 246 Las Piedras, PR 00770 | Blvd. del Rio Office Bldg, Ave. Nicanor Ramal #3, Torre 3 4to Piso, Humacao,PR 00791 | $0.00 |
| 2017-950449 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Juanita Rodríguez Noble | P.O Box 673 Bayamón, PR 00960 | N/A | $0.00 |
| 2017-950470 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | La Fondita de Jesús | P.O Box 19384 San Juan, PR 00910-1384 | N/A | $0.00 |
| 2016-950316 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Magaly Rodríguez Hernández | Ave. Sebariano CuevasAnexo Hospital Buen Samaritano Aguadilla, PR 00603 | Ave. Sebariano Cuevas, Anexo Hopital Buen Samaritano de Aguadilla, Aguadilla, PR 00603 | $0.00 |
| 2015-950745 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Maria del C. Torres Calderon | PO BOX 221 Luquillo, PR 00773 | Santiago Veve Calle 26 #179 Fajardo, PR 00738 | $0.00 |

## Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2017-950448 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Mirta R. Lugo | P.O Box 712 Toa Baja, PR 00951 | #1 Bloque BJ de la Urb. Levittown, Bo Sabana Seca Toa Baja, PR 00949 | $0.00 |
| 2016-950102 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | PGY. Inc | P.O. Box 1200 Guayama,PR 00785 | Centro Comercial Galerías Plaza Guayama, Carretera PR-3, Km 135.6 Guayama, PR 00784 | $0.00 |
| 2017-950325 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | PJAY INV. COPR | Calle Jorge Bill León #6P.O. Box 486 Fajardo, PR 00738 | Calle Jorge Bird #6, Fajardo, Puerto Rico 00738 | $0.00 |
| 2013-950831 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Rafael Soto Silva | P.O Box 366795 San Juan, PR 00936-6795 | Avenida Barbosa #599 (Primer Piso) Rio Piedras, PR 00917 | $0.00 |
| 2017-950473 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Robert Deliz Carlo | Santa JuanitaBQ-24 Calle Yokohama Bayamón, PR 00956 | Solar #16 del bloque RR, Urb. Santa Juanita, Bayamón, PR 00956 | $0.00 |
| 2017-950452 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Santiago Ortiz Rodríguez | Urb. Panorama VLG131 Vista de la Bahía Bayamón, PR 00957-4402 | Urb. Lomas Verdes, Bo Mimillas, Bayamón, PR 00956 | $0.00 |
| 2017-950450 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Sucesión Norberto Marrero González | P.O Box 3630 Bayamón, PR 00958 | Solar #52 en la Avenida Santa Juanita, Esquina Avenida Laurel, Urbanización Santa Juanita en Baymón, Bayamon PR 00956 | $0.00 |
| 2015-950840 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | Sucesión Ramón Laureano Rivera | P.O. Box 8830 Carolina, PR 00988-8830 | Carr.853, Km. 0, Hm 3, Carolina ,Puerto Rico 00988 | $0.00 |
| 2012-950775 | Administración de Servicios de Salud y Contra la Adicción (ASSMCA) | The New Ponce Shopping Center | P.O. Box 331943, Ponce, PR 00733 | Santa Maria Shopping Center, Esq. Ferrocarril, Ponce, PR 00780 | $0.00 |
| 2005-000013 | Administracion para el Adiestramiento de Futuros Empresarios y Trbajadores (AAFET) | Guanica 1929, Inc. | Box 1746 Yabucoa, PR 00767 | Bo. Ensenada RD 1116 Km. 2.1 Guanica, PR 00647 | $0.00 |
| 2005-000013A | Administracion para el Adiestramiento de Futuros Empresarios y Trbajadores (AAFET) | Guanica 1929, Inc. | Box 1746 Yabucoa, PR 00767 | Bo. Ensenada RD 1116 Km. 2.1 Guanica, PR 00647 | $0.00 |
| 2005-000013B | Administracion para el Adiestramiento de Futuros Empresarios y Trbajadores (AAFET) | Guanica 1929, Inc. | Box 1746 Yabucoa, PR 00767 | Bo. Ensenada RD 1116 Km. 2.1 Guanica, PR 00647 | $0.00 |
| 2013-000027 | Administracion Rehabilitacion Vocacional | F.M.A. Realty II, LLC | PO Box 363727 San Juan, PR 00936-3227 | Carr. #2 KM 17.0 Bo. Candelaria Toa Baja, PR 00949 | $0.00 |
| 2018-DS0385 | Angel Luis Trinidad Ocasio | Departamento de Salud | PO Box 43, Barceloneta, PR 00617 | Urb Catalana 79-A, Local C-3, Barceloneta, PR 00617 | $0.00 |
| 2020-DS0961 | Banfin Realty, S.E. | Departamento de Salud | Edificio Nacional Plaza, 431 Ave. Ponce de Leon, Suite 702, San Juan PR 00917 | Local 902 & 903, 431 Av. Ponce de Leon, San Juan, 00917 | $0.00 |
| 2014-000282/ 2022-000110 | Bianca Convention | Departamento de la Familia | CRUCE VARIANTE AÑASCO, PR 00610 | Calle Mckinley 190 Mayaguez | $0.00 |

# Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2016-000114 | Bienvenido Sierra Ortiz | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | P O BOX 326, Lares, PR 00669 | 387 Calle Gladiola  Bo Junquito, Humacao PR 00791 | $0.00 |
| 2018-DS0318 | Carmen Victoria Carrasquillo Diaz | Departamento de Salud | URB JARDINES FAGOT 1811 CALLE CASCADA, Ponce, PR 00716-3602 | Calle Comercio #100, Juana Diaz, PR 00795 | $0.00 |
| 2015-000001A | Comisión de Desarrollo Cooperativo de Puerto Rico (CDCOOP) | Cooperativa de Seguros de Vida (COSVI) | Américo Miranda 400 San Juan, PR 00927 | 400 Américo Miranda, San Juan, PR 00927 | $0.00 |
| 2018-DS0716 | Centro de Piezas Patillas Inc | Departamento de Salud | PO BOX 813, Patillas PR 00723 | Carr. #3 km 123, Patillas, PR 00723 | $0.00 |
| 2014-DS0713 | Centro Medico del Turabo Inc | Departamento de Salud | PO BOX 4980, Caguas, PR 00726 | Avenida General Valero #404, Fajardo PR 00738 | $0.00 |
| 2016000014 | CENTRO COMERCIAL JOVE, ARECIBO | Jove | Hato Tejas Ward Road #2 KM 77.2 Miramar Ave., AreciboPO Box 555, Arecibo, PR 00613 | Hato Tejas Ward, Road # 2 KM 77.2 Miramar Arecibo, PR 00612 | $0.00 |
| 2011-000015-A | Comisión de Servicio Público | Adolfo Rosario Quinones | PO Box 487Aguadilla, P.R.,605 | Carr 111, Km 0.1 Barrio Victoria, Aguadilla P.R. 00603 | $0.00 |
| 2013-000023 | Comisión de Servicio Público | David Mercado Montalvo | PO Box 1307Arecibo, PR,688 | Carr 639, Km 1.0 Barrio Sabana Hoyos, Arecibo, P.R. 00688 | $0.00 |
| 2013-000026 | Comisión de Servicio Público | Lu Quing Cheng | Urb. Punto Oro #503, Local #2 Ponce, P.R.,00728-2066 | Ave. Punto Oro #503, Local #2, Ponce, P.R. 00728 | $0.00 |
| 2015-000011 | Comisión Industrial de Puerto Rico | Ángel M. Núñez Vargas | PO Box 1944 Arecibo, PR,00613 | 105 Calle Jesús Cortés, Arecibo, PR 00612 | $0.00 |
| 2014-000038 | Comisión Industrial de Puerto Rico | Dife, Inc. | PO Box 3685 Mayaguez, PR, 00681-3685 | 509-Sur, Calle Ramon E. Betances, Mayaguez, PR 00680 | $0.00 |
| 2016-000046 | Comisión Industrial de Puerto Rico | IR Investment, Corp. | PO Box 19600 San Juan, PR,00909 | San Jorge Commercial & Office Building, Carretera #2, Ponce By Pass, Lote 3, Ponce PR 00731 | $0.00 |
| 2017-000032 | Computer Network Systems CoRp (Computerlink) | Administración para el Sustento de Menores (ASUME) | P.O. Box 70376 San Juan, PR 00936-8376 | N/A | $0.00 |

# Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2020-DS0786 | Concilio de Salud Integral de Loiza | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00917 | Centro de Diagnostico y Tratamiento, Loiza Carr # 188, PR-187, Loíza, PR 00772 | $0.00 |
| 2014-DS0552 | Concilio de Salud Integral de Loiza | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00917 | Centro de Diagnostico y Tratamiento, Loiza Carr # 188, PR-187, Loíza, PR 00772 | $0.00 |
| 2015-000034 | Consejo de Educación | SFIIIPR, LLC | Hato Rey Center Suite 402268 Ave. Ponce de León Hato Rey, PR 00918 | Ave. Ponce de León 268, San Juan, PR 00917 | $0.00 |
| 2017CM0263 | Conservatorio de Música Puerto Rico | Parking Services Company, Inc. | 951 Ave Ponce de León San Juan, PR 00907 | 951 Ave Ponce de León, San Juan, PR 00907 | $0.00 |
| 2017-DS0311 | CP Coppelia Inc | Departamento de Salud | P O BOX 596, Aguada PR 00602 | Plaza Coppelia, Ave Alers, Aguada, PR 00602 | $0.00 |
| 2019-DS0225 | Departamento de Salud | Carolina Shopping Court Inc. | CAROLINA SHOPPING COURT INC. P.O. Box 29112, Carolina P.R. 00929-0112 | 10000 Av. 65 de Infantería, Carolina, PR 00985 | $0.00 |
| 2014-DS0486 | Departamento de Salud | Guaynabo Health Providers Corp. | P.O. Box 70184, San Juan, PR 00936-0184 | 140 Av. Las Cumbres, Guaynabo, PR 00969 | $0.00 |
| 2015-DS0880 | Departamento de Salud | Hector Luis Ortiz Torres y Evelyn Lizzette Rodriguez | P.O. Box 70184, San Juan, PR 00936-0184 | Calle Morse #69, Arroyo, PR 00714 | $0.00 |
| 2015-DS0833 | Departamento de Salud | Ana Eileen Morales Perez | P.O. Box 1903 Arecibo, PR 00613-1903 | Calle Georgetti #104 en Naranjito, PR 00957 | $0.00 |
| 2016-DS0799 | Departamento de Salud | Alberto Luis Cossio Soto | Urb. Altamira #546, Calle Aldebaran, Guaynabo, PR 00921 | Parque Industrial Julio N. Matos, Lote 22 Edificio 28 en Carolina, PR 00985 | $0.00 |
| 2016-DS0633 | Departamento de Salud | Alfredo Rivera Diaz | P.O. Box 835, Gurabo, PR 00778 | Calle Ángel C. Morales #54 Gurabo, PR 00778 | $0.00 |

## Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2015-DS0876 | Departamento de Salud | Angel Manuel Nunez Vargas | P.O. Box 1944, Arecibo, PR 00613-1944 | Calle Jesús Cortés 103 Y 105 en Arecibo, PR 00612 | $0.00 |
| 2013-DS0312 | Departamento de Salud | Antonio Rivera Torres | Estancias Yidomar, Calle Comet #7, Yauco, PR 00698 | N/A | $0.00 |
| 2013-DS0315 | Departamento de Salud | Antonio Rivera Torres | P.O. Box 70184, San Juan, PR 00936-0184 | N/A | $0.00 |
| 2014-DS0430 | Departamento de Salud | Banfin Realty, S.E. | P.O. Box 70184, San Juan, PR 00936-0184 Edif. Nacional Plaza, Suite 702, Ave. Ponce de Leon, San Juan, PR 00917 | N/A | $0.00 |
| 2013-DS0544 | Departamento de Salud | Carolina Shopping Court Inc. | CAROLINA SHOPPING COURT INC. P.O. Box 29112, Carolina, P.R. 00929-0112 | 10000 Av. 65 de Infantería, Carolina, PR 00985 | $0.00 |
| 2015-DS0875 | Departamento de Salud | Centro Falu Inc. | Punta Las Marias #4 Calle Doncella, San Juan, PR 00913 | Parcelas Falú #3338, Calle 8 Esquina 49 en Sabana Llana, Río Piedras, PR 00924 | $0.00 |
| 2015-DS0874 | Departamento de Salud | COEDRO, S.E. | 3203 Carretera 351, Mayagüez, PR 00680 | Edificio Park Plaza, Oficinas 105 Y 106 de la Calle Martínez Nadal #59, Mayagüez, PR 00682 | $0.00 |
| 2015-DS1059 | Departamento de Salud | Concilio de Salud Integral de Loiza | P.O. Box #509, Loiza, PR, 00772 | PR-187, Loíza, 00772 | $0.00 |
| 2015-DS0953 | Departamento de Salud | CP COPPELIA INC | P.O. Box 596, Aguada, PR 00602-0596 | Edificio Plaza Coppelia Ave. Nativo Alers, Aguada P.R 00602 | $0.00 |

## Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2015-DS1115 | Departamento de Salud | CP COPPELIA INC | P.O. Box 596, Aguada, PR 00602-0596 | Edificio Plaza Coppelia<br>Ave. Nativo Alers, Aguada, PR 00602 | $0.00 |
| 2015-DS0975 | Departamento de Salud | Fernando Ortiz Maldonado | P.O. Box 1725, Juncos, PR 00777 | Marifel Plaza, Calle Sánchez López 151, Esquina Zenón Vázquez, Gurabo, PR 00778 | $0.00 |
| 2016-DS0455 | Departamento de Salud | Francisco Jose Rivera Lopez | 27 Calle Correo, Camuy, PR 00627-2343 | Calle San Jose # 3, Camuy PR 00627 | $0.00 |
| 2014-DS0261 | Departamento de Salud | EDIFICIO VICTORIA DE AGUADILLA INC. | PO BOX 6, Aguadilla, PR 00605 | Edificio Victoria de la Calle Mercedes Moreno #17, en Aguadilla, PR 00603 | $0.00 |
| 2015-DS0775 | Departamento de Salud | General Investment, S.E. | P.O. Box 365051, San Juan, PR 00936-0510 | Avenida Ponce de León #1590, Urb El Cerezal en R.ío Piedras, PR 00926 | $0.00 |
| 2015-DS0226 | Departamento de Salud | Hector Luis Ortiz Torres y Evelyn Lizzette Rodriguez | Calle Morse #75, Arroyo, PR 00714 | Calle Morse #69 Arroyo, PR 00714 | $0.00 |
| 2016-DS0903 | Departamento de Salud | Inmobiliaria Witoche, Inc. | PO Box 441 Fajardo, PR 00738-0441 | Centro Comercial Monte Brisas Urbanización Montebrisas Calle E, Falardo, PR 00738 | $0.00 |
| 2016-DS0717 | Departamento de Salud | Inmobiliaria Witoche, Inc. | PO Box 441 Fajardo, PR 00738-0441 | Centro Comercial Monte Brisas Urbanización Montebrisas Calle E, Falardo, PR 00738 | $0.00 |
| 2016-DS0718 | Departamento de Salud | Inmobiliaria Witoche, Inc. | PO Box 441 Fajardo, PR 00738-0441 | Centro Comercial Monte Brisas Urbanización Montebrisas Calle E, Falardo, PR 00738 | $0.00 |
| 2016-DS0700 | Departamento de Salud | Inmobiliaria Witoche, Inc. | PO Box 441 Fajardo, PR 00738-0441 | Centro Comercial Monte Brisas, Urbanización Montebrisas. Calle E, Fajardo, PR 00738 | $0.00 |

## Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2016-DS0771 | Departamento de Salud | Inmobiliaria Witoche, Inc. | PO Box 441 Fajardo, PR 00738-0441 | Centro Comercial Monte Brisas Urbanización Montebrisas Calle E, Falardo, PR 00738 | $0.00 |
| 2019-DS0212 | Departamento de Salud | IP Investment Group LLC | Urb. Paraiso de Coamo, #832 Coamo, PR 00769 | Calle Florencio Santiago, Esquina Carrión Maduro #54, Coamo PR 00769 | $0.00 |
| 2013-DS0562 | Departamento de Salud | JAYVE Development Corp. | P.O. Box 267, Salinas, PR 00751 | Portobello Town Center. Carretera #3. KM 158.4 Intersección Desvío PR 180, Paseo Manuel González Martínez 80. Salinas, PR 00751 | $0.00 |
| 2016-DS0664 | Departamento de Salud | Jesus M. Hernandez Contreras | Urb. Valencia I, Calle Pedro Cruz #155, Juncos, PR 00777 | Urbanización Valencia I Calle Pedro Cruz #156 Juncos, PR 00777 | $0.00 |
| 2018-DS0144 | Departamento de Salud | Jose Alberto Torrado Perez y Blanca Emerita Delgado | P.O. Box 1323, Hatillo, PR 00659-1323 | Carretera #130 KM. 4.8 Bo. Naranjito, Sector Lechuga en Hatillo, Puerto Rico 00659 | $0.00 |
| 2014-DS0294 | Departamento de Salud | Jose Angel Serrano Castro y Maria de los Angeles Ruiz Irizarry | P.O. Box 122, Castaner, PR 00631-0122 | N/A | $0.00 |
| 2015-DS0991 | Departamento de Salud | Jose Luis Cartagena Alcala y Melissa Munoz Rivera | P.O. Box 1267, Orocovis, PR 00720 | Carretera 155 km. 28.3 Calle Ernesto Ramos Antonini en Orocovis, PR 00720 | $0.00 |
| 2016-DS0842 | Departamento de Salud | Jose Uderico Perez Maldonado | P.O. Box 1 Penuelas, PR 00624 | Calle Dr. Loyola #705 Peñuelas, PR 00624 | $0.00 |
| 2017-DS0172 | Departamento de Salud | Juanita Roldan Medina | P.O. Box 1210 Juncos, PR 00777 | Calle Dr. Barreras, Esquina Daniel Flores, Juncos, PR 00777 | $0.00 |

# Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-DS0737 | Departamento de Salud | Lcdo. Jose Luis Collazo y Lcda. Lillian Mojica Rivera | P.O. Box 70184, San Juan, PR 00936-0184 | Calle Ignacio Morales Acosta #43,  Naranjito, PR 00638 | $0.00 |
| 2017-DS0125 | Departamento de Salud | Luis Antonio Colon Perales | Urb. Dos Rios Num. 74, Ciales, PR 00638 | Country Mall, Carretera 149 KM. 12, HM. 1, Barrio Jaguas en Ciales | $0.00 |
| 2015-DS1091 | Departamento de Salud | Luis Hiram Villafane Cruz | P.O. Box 203, Utuado, PR 00641 | Carretera #111, KM.1.1 interior Utuado,Puerto Rico, 00641 | $0.00 |
| 2015-DS0879 | Departamento de Salud | Luis Hiram Villafane Cruz | PO Box 203, Utuado, PR 00641 | Carretera #111, KM.1.1 interior Utuado,Puerto Rico, 00641 | $0.00 |
| 2017-DS0354 | Departamento de Salud | Luz Esther Acevedo Nieves | 2 Muñoz Rivera P.M.B., Lares, PR 00669 | Calle Pedro Albizu Campos Núm. 7 Lares. P R. 00669 | $0.00 |
| 2015-DS0873 | Departamento de Salud | Master's Donuts, Inc. | Villas Buena Vista, Calle Isis J-5 Bayamon, PR 00957 | Barrio Buena Vista, Carretera 167, Km. 15.1 Bayamón, Puerto Rico 00956 | $0.00 |
| 2014-DS0292 | Departamento de Salud | Norman Luis Santiago Gomez | P.O. Box 1316, San German, PR 00683-1316 | Centro Comercial San Germán, Calle Luna, Ave Castro Pérez. San Germán, PR 00683 | $0.00 |
| 2016-DS0454 | Departamento de Salud | One by One Inc. | P.O. Box 441, Fajardo, PR 00738-0441 | Fajardo Market Square, Carretera #3, Fajardo PR 00738 | $0.00 |
| 2016-DS0374 | Departamento de Salud | PEPINO HEALTH GROUP INC | P.O. Box 1537, San Sebastian, PR 00685 | Centro de Salud Calle Pavía Fernández # 120, San Sebastián, PR 00685 | $0.00 |

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2015-DS0886 | Departamento de Salud | San Sebastian Properties LLC | P.O. Box 367849, San Juan, PR 00936-0193 | San Sebastián Gallery Mall. Suite 213. Avenida Arcadio Estrada Rivera #4160, San Sebastián, PR 00685 | $0.00 |
| 2015-DS1107 | Departamento de Salud | Santos Velez Sanchez | Edificio Santos Velez I, 2770 Ave. Hostos, Ste 201, Mayaguez, PR 00682-6384 | Local Comercial #314, Bo. Sabanetas, Carr. 2 KM 149.5, Mayagüez, 00680 | $0.00 |
| 2015-DS1090 | Departamento de Salud | SM Medical Services, C.S.P. | P.O. Box 1649 Canovanas, PR 00729 | Local ubicado en el Centro de Diagnóstico y Tratamiento en Canóvanas | $0.00 |
| 2015-DS0877 | Departamento de Salud | Victor Manuel Varela Berrios | P.O. Box 104, Corozal, PR 00783 | Local ubicado en la Carretera #891 Km.14.7 Barrio Pueblo. Corozal Puerto Rico | $0.00 |
| 2015-DS0878 | Departamento de Salud | Pedro Umpierre Torregrosa | P.O. Box 366892 San Juan, PR 00936 | Luquillo Plaza de la Calle Fernando García #28, Luquillo, PR 00773 | $0.00 |
| 2019-DS0257 | Delia del Valle Diaz | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | P.O. BOX 131, Toa Alta PR 00954 | $0.00 |
| 2018-DS0145 | Delia Pagan Robles | Departamento de Salud (WIC) | Condominio Los Olmos, Apartamento 11-C, Calle Nevarez #36, San Juan, PR 00927 | Calle Muñoz Rivera #24, Patillas, PR 00723 | $0.00 |
| 2016-000044 | Departamento De Corrección y Rehabilitación | Luis A. Rivera Siaca | P.O. Box 190681 SAN JUAN PR,00919-0681 | Ave. Tnte. Cesar Gonzalez, Esq. Calaf. Urb. Industrial Tres Monjitas, Hato Rey PR 00917 | $0.00 |
| 2007-000121 | Departamento De Corrección y Rehabilitación | JOSE E. RIVERA LUPIANEZ | P.O. Box 160 AIBONITO PR,00705 | Ave. San José #51. Aibonito, PR 00705 | $0.00 |
| 2007-000183A | Departamento De Corrección y Rehabilitación | S&L DEVELOPMENT | P.O. Box 29047 SAN JUAN PR,00929-0047 | Edif. 4, Calle Martínez, Bo. Trujillo Alto, Carolina PR 00987 | $0.00 |
| 2004-000045 | Departamento De Corrección y Rehabilitación | ANGEL L. MARTINEZ GONZALEZ | CALLE MANUEL RUIZ GANDIA #102 ARECIBO PR,00612 | CALLE MANUEL RUIZ GANDIA #102 ARECIBO PR, 00612 | $0.00 |
| 2009-000179A | Administración de Corrección | BIENES NIEVES, INC. | P.O. Box 2580 GUAYAMA PR,00785-3858 | CalleDerkes #2, Esq. Calimano, Guayama PR 00784 | $0.00 |

# Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-000109Z | Departamento De Corrección y Rehabilitación | CESAR A. CORTES GARCIA | P.O. BOX 5 UTUADO PR, 00641-0005 | Calle Dr. Cueto # 80 Altos Utuado PR 00641 | $0.00 |
| 2004-000121A | Departamento De Corrección y Rehabilitación | EMPRESAS OMAJEDE | P.O. Box 1641 Cidra, PR,739 | EDIF. LA ELECTRONICA CALLE BORI 1608 SAN JUAN, PR 00927 | $0.00 |
| 2004-000121 | Departamento De Corrección y Rehabilitación | EMPRESAS OMAJEDE | 1608 CALLE BORI  - OFICINA 218 EDIFICIO LA ELECTRONICA SAN JUAN PR, 00927-6112 | EDIF. LA ELECTRONICA CALLE BORI 1608 SAN JUAN, PR 00927 | $0.00 |
| 2009-000196 | Administración de Corrección | ANA RODRÍGUEZ SAINT-FUSSI / FELIX A. LEBRON SALDAÑA | 400 CALLE CALAF PMB 128 SAN JUAN PR, 00918-1314 | 1-1F Villa Blanca, Ave. Muñoz Marín, Caguas PR 00725 | $0.00 |
| 2005-000062 | Departamento De Corrección y Rehabilitación | SUCESION HERIBERTO MARTINEZ | APARTADO 144032 ARECIBO PR,00614 | Ave. Miramar #601, Arecibo PR 006112 | $0.00 |
| 2009-000037-B | Administración De Corrección | VALMEDICAL INC. | 261 Ave, Domenech SAN JUAN, PR,00916 | Calle 11, Parque Industrial Correa, Bayamón, PR 00961 | $0.00 |
| 2011-000477 | Departamento del Trabajo | 577 Headquarters, Corp. | PO Box 486 Fajardo, PR,00738 | Edif. Real Hermanos Ave.Ponce de Leon Hato Rey, PR 00918 | $0.00 |
| 2016-000635 | Departamento del Trabajo | BANFIN REALTY, S.E. | P.O. Box 190858 San Juan, 00919-0858 | 431 de la Avenida Ponce de Le6n en Hato Rey (National Plaza Hato Rey), PR  00919 | $0.00 |
| 2013-000697 | Departamento del Trabajo | BORINQUEN TOWN PLAZA CORP., | PO BOX 3861 Aguadilla, PR 00605 | Carr. 107 Km. 2.9, Bo. Borinquén, Aguadilla, Puerto Rico 00603 | $0.00 |
| 2015-000526 | Departamento del Trabajo | CARIBBEAN CITY BUILDERS, INC. | PO BOX 2399 Toa Baja, PR 00951 | C/ Puerto Viejo, Esq. C/ Santiago de los Caballeros en Playa Ponce, PR  00716 | $0.00 |
| 2012-000382 | Departamento del Trabajo | Colonial Parking Corporation | 65 Calle del Parque Suite 3 Santurce PR, 00909 | Edif. Roberto H Todd 501 Pda,18, Santurce, PR 00908 | $0.00 |
| 2015-000426 | Departamento del Trabajo | EDIFICIO BULA, INC. | P.O. BOX 190525 San Juan, PR 00919-0525 | Carretera #2, Km. 8.3 (Calle Marginal) en Bayamon, PR 00956 | $0.00 |
| 2012-000538 | Departamento del Trabajo | EMPRESAS LOYOLA I, S. EN C-S.E. | PO BOX 366638 San Juan, PR 00936-6638 | Calle Guayama 198 Hato Rey, Puerto Rico 00917 | $0.00 |
| 2017-000490 | Departamento del Trabajo | FISA S.E. | PO BOX 2286 Guayama, PR 00785-2286 | Paseo Pueblo, Carr. 54 Int. Solar 6-A, Segundo Piso, Guayama, PR  00784 | $0.00 |
| 2016-000612 | Departamento del Trabajo | GENERAL INVESTMENT, S.E. | POX BOX 365051, San Juan, PR 00936 | GM Group Plaza, Suite 400 en la Avenida Ponce de Leon Numero 1590, San Juan, PR  00919 | $0.00 |

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2012-000507 | Departamento del Trabajo | IGNACIO RÍOS AGOSTO | HC-01 PO Box 6578 Ciales, PR 00638 | Carr. 615 Km.8.3 Bo. Pozas Ciales, PR 00638 | $0.00 |
| 2018-000079 | Departamento del Trabajo | IGNACIO RÍOS AGOSTO | HC-01 Box 6578 Ciales, PR 00638 | Carr. 615 Km.8.3 Bo. Pozas Ciales, PR  00638 | $0.00 |
| 2017-000480 | Departamento del Trabajo | INMOBILIARIA CRESPO, CORP. | PO BOX 486 Fajardo, PR 00738-0486 | C/Jorge Bird #10 Fajardo PR 00738 | $0.00 |
| 2016-000520 | Departamento del Trabajo | MIGDALIA CASILLAS FERNÁNDEZ (LOCAL HUMACAO) | PO Box 667 HUMACAO, PR 00792-0667 | Calle Noya y Hernandez #2 Humacao, PR  00792 | $0.00 |
| 2013-000713 | Departamento del Trabajo | NORA H. TIRADO MOREIRA | 166 CALLE UNION   FAJARDO, PR, 00738 | Calle Benitez Guzmán #46 Vieques, PR  00765 | $0.00 |
| 2017-000626 | Departamento del Trabajo | OCHOA ROIG, INC. | PO BOX 428 Caguas, PR 00726 | Calle Acosta #1 Caguas, PR 00726 | $0.00 |
| 2016-000634 | Departamento del Trabajo | P.D.C.M. ASSOC., S.E. | PO BOX 190858 San Juan, PR 00919-0858 | Carr. PR 848 Int. PR 887 Carolina, PR 00984 | $0.00 |
| 2016-000634A | Departamento del Trabajo | P.D.C.M. ASSOC., S.E. | PO BOX 190858 San Juan, PR 00919-0858 | Carr. PR 848 Int. PR 887 Carolina, PR 00984 | $0.00 |
| 2011-000333 | Departamento del Trabajo | P.D.C.M. ASSOC., S.E. (LOCAL DE COAMO) | PO BOX 190858 San Juan, PR 00919-0858 | Carr. 153, Plaza Coamo, Coamo, PR 00769 | $0.00 |
| 2017-000471 | Departamento del Trabajo | SSSC, S.E. | 1 C/65 Inf. Norte Suite #2 Lajas, PR 00667 | Edif. Villa Capitan 1 KM 159.6 Bo. Guanajibo Mayaguez, PR  00682 | $0.00 |
| 2017-000627 | Departamento del Trabajo | SSSC, S.E. | 1 C/65 Inf. Norte Suite #2 Lajas, PR 00667 | Carr. 2 Villa Capitán Km 159 Mayaguez, PR 00680 | $0.00 |
| 2014-000129/ 2021-000151 | Des. Inm Hato Tejas | Departamento de Educacion | Desarrollos inmobiliarios de Hato Tejas, Inc. Metro Office Park Guaynabo, Puerto Rico 00968-1705 | Carr 2 Urb Industrial Corujo, Bayamon, PR 00959 | $0.00 |
| 2014-000043 | Departamento de Estado | Empresas Puertorriqueñas de Desarrollo, Inc. | PO BOX 36606 San Juan, PR 00936-6006 | Local #55 1er Nivel Centro Comercial Mayagüez Mall, Mayagüez, PR 00680 | $0.00 |
| 2014-000068 | Departamento de Justicia | AMB INVESTMENT CORP. | PO Box 86, Barranquitas, PR 00794-0086 | Carretera # 152, KM 1.2 , Bo. Quebardillas Barranquitas, PR 00794 | $0.00 |
| AF98-410 | Departamento de Justicia | CARHILL DEVELOPMENT | 1 Ave Marcelito Gotay, Fajardo, Puerto Rico 00738 | Centro Judicial de Fajardo, Calle Marelino Gotay # 458, Fajardo, PR 00738 | $0.00 |

# Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2016-000117 | Departamento de Justicia | CECORT PROPERTIES & SERVICES COPR. | Box 5, Utuado, PR 00641 UTUADO, PR 00641 | Carretera # 111, Intersección Carretera # 611, Bo. Viví Abajo, Utuado, PR 00641 | $0.00 |
| 2016-000129 | Departamento de Justicia | EL CAPITAN INVESTMENT CORP. | Box 107, Arecibo, PR 00613 | Edificio Martínez Umpierre, Ave. Rotarios # 64, Arecibo, PR 00612 | $0.00 |
| 2018-000028 | Departamento de Justicia | EL CAPITAN INVESTMENT CORP. | Box 107, Arecibo, PR 00613 | Edificio Martínez Umpierre, Ave. Rotarios # 64, Arecibo, PR 00738 | $0.00 |
| 2018-000054 | Departamento de Justicia | ESTANCIA AIBONITO, INC | 654 Plaza, Suite 1024, Avenida Muñoz Rivera SAN JUAN, PR 00918 | Carretera # 722, KM 7.3, Bo. Robles Rabanal, Aibonito PR 00705 | $0.00 |
| 2012-000043 | Departamento de Justicia | Horizone Parking | PO Box 143265 Arecibo, PR 00614 | Carretera #129, Ave. San Luis, Arecibo, PR 00614 | $0.00 |
| 2012-000003 | Departamento de Justicia | Horizone Parking | PO Box 143265 Arecibo, PR 00614 | Carretera #129, Ave. San Luis, Arecibo, PR 00738 | $0.00 |
| 2016-000115 | Departamento de Justicia | IR INVESTMENT COPR. | PO Box 19600, San Juan, PR 00910 | Carrtera # 2, KM 23.8, Bo. Canas, Ponce, PR 00731 | $0.00 |
| 2015-000037 | Departamento de Justicia | LCDA. CARMEN M. CORREA | PO Box 8987, Bayamón, PR 00960 | Calle Esteban Padilla # 103, Bayamón, PR 00959 | $0.00 |
| AF98-409 | Departamento de Justicia | LIBRA GOVERNMENT BUILDING, INC. | P.O. BOX 8879 HUMACAO, PR 00792 | Centro judicial de Humacao, Avenida Nicanor Vázquez, Boulevar del Río Humacao, PR 00792 | $0.00 |
| 2000-000152 | Departamento de Justicia | West Coast Development | Ave. Hiram D. Cabassa Interseccion # 2 Km 156.1 Mayaguez, PR 00608 | Centro Judicial de Mayaguez, 91 Av. Hiram David Cabassa, Mayagüez, PR 00680 | $0.00 |
| 2013-000010 | Departamento de Justicia | RAFAEL HERNÁNDEZ BARRERAS | PO Box 4985 PMB 265, Caguas, PR 00726-4985 | Angora Office Park, Avenida Gautier Benitez # 162, Caguas, PR 00727 | $0.00 |
| 2016-000128 | Departamento de Justicia | S&L DEVELOPMENT, SE | PO Box 29047, San Juan, PR 00929-0047 | Carolina Industrial Park, Carretera # 3, KM 12.6, Carolina, PR 00948 | $0.00 |
| 2014-000074 | Departamento de Justicia | VICAR BUILDERS DEVELOPMENT | PO Box 929, Fajardo, PR 00738 | Carretera # 167, KM 18.8, Bo. Pajaros, Bayamón, PR 00957 | $0.00 |
| 2004-000566 | Departamento de Justicia | WEST COAST DEVELOPMENT | PO Box 190917, San Juan, PR 00919-0917 | Centro Judicial de Mayaguez, Avenida hiram david Cabassa, KM 156.5, Bo. Sábalos, Mayaguez, PR 00681 | $0.00 |
| N/A | Departamento de Justicia | WMI, LLC | PO Box 190573 SAN JUAN, PR 00919 | Avenida Cesar Gonzalez # 675, San Juan, PR 00918 | $0.00 |

## Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2018-000085 | Departamento de Justicia | WMI, LLC | PO Box 190573 SAN JUAN, PR 00919 | Avenida Cesar Gonzalez # 675, San Juan, PR 00918 | $0.00 |
| 2003-000204 | Departamento de Justicia | YABUCOA DEVELOPMENT, SE | PO Box 839, San Juan, PR 00919-0839 | San Sebastian Shopping Center, Carretera # 111, Km 18.0, San Sebastián, PR 00685 | $0.00 |
| 2011-000104 | Departamento De Recursos Naturales Y Ambientales (DRNA) | Jennymar Corp | P.O. Box 781 Hormigueros, PR 00660 | Plaza Monserrate  Bo. Lavadero Carretera PR-2 Km 2.0 Inter Carr. 345 Hormigueros, PR 00660 | $0.00 |
| 2016-000059 | Departamento De Recursos Naturales Y Ambientales (DRNA) | Lourdes Vera Roldán | 310 Passaic AvenueApt. 315, Harrison NJ,07029-2837 | Barrio Caimital Alto Carr. 2 Km. 120.6                    Aguadilla, PR 00603 | $0.00 |
| 2016-000007 | Departamento De Recursos Naturales Y Ambientales (DRNA) | V & Q Management Inc | Gardens HillsZ-20 Hasting Guaynabo, PR 00966 | Tuque Industrial Park #25 , Municipio de Ponce, Ponce PR 00716 | $0.00 |
| 2017-000014A | Departamento de Transcportacion y Obras Publicas (DTOP) | Ana E. Roldan Pérez, Regional de Aguadilla | P.O. Box 3148 Aguadilla, PR 00605 | Carr. PR-2 km. 120.3 Bo. Caimital Alto, Aguadilla, PR 00603 | $0.00 |
| 2017-000014A | Departamento de Transcportacion y Obras Publicas (DTOP) | Ana E. Roldan Pérez, Regional de Aguadilla | P.O. Box 3148 Aguadilla, PR 00605 | Carr. PR-2 km. 120.3 Bo. Caimital Alto, Aguadilla, PR 00603 | $0.00 |
| 2015-000014 | Departamento de Transcportacion y Obras Publicas (DTOP) | Corporación Punta Borinquen, CESCO Aguadilla | P.O. Box 250444 Aguadilla, PR 00604-0444 | Punta Borinquen Shopping Center, Calle Belt Edf. 703 Base Ramey, Aguadilla  PR, 00603 | $0.00 |
| 2015-000014 | Departamento de Transcportacion y Obras Publicas (DTOP) | Corporación Punta Borinquen, CESCO Aguadilla | P.O. Box 250444 Aguadilla, PR 00604-0444 | Punta Borinquen Shopping Center, Calle Belt Edf. 703 Base Ramey, Aguadilla  PR, 00603 | $0.00 |
| 2015-000154 | Departamento de Transcportacion y Obras Publicas (DTOP) | Delmar Investment, CESCO Caguas | La Rambla Tower 606 Ave. Tito Castro-Ste 601 Ponce, PR 00716-0218 | km. 34.7 Lote 2 Bairoa Industrial Park, Caguas, PR 00725 | $0.00 |
| 2015-000154 | Departamento de Transcportacion y Obras Publicas (DTOP) | Delmar Investment, CESCO Caguas | La Rambla Tower 606 Ave. Tito Castro-Ste 601 Ponce, PR 00716-0218 | km. 34.7 Lote 2 Bairoa Industrial Park, Caguas, PR 00725 | $0.00 |
| 2018-000024 | Departamento de Transcportacion y Obras Publicas (DTOP) | Delmar Investment, CESCO Ponce | La Rambla Tower 606 Ave. Tito Castro-Ste 601 Ponce, PR 00716-0218 | Lote 19, Calle A. El Tuque Industrial Park, Ponce, PR 00716 | $0.00 |
| 2018-000024 | Departamento de Transcportacion y Obras Publicas (DTOP) | Delmar Investment, CESCO Ponce | La Rambla Tower 606 Ave. Tito Castro-Ste 601 Ponce, PR 00716-0218 | Lote 19, Calle A. El Tuque Industrial Park, Ponce, PR 00716 | $0.00 |
| 2016-000163 | Departamento de Transcportacion y Obras Publicas (DTOP) | Educon Management, Corp., CESCO Metropolitano | Box 3244 Carolina, PR 00984 | Marginal PR-3 km. 12.5, Trujillo Bajo, Carolina, PR 00981 | $0.00 |

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2016-000163 | Departamento de Transcportacion y Obras Publicas (DTOP) | Educon Management, Corp., CESCO Metropolitano | Box 3244 Carolina, PR 00984 | Marginal PR-3 km. 12.5, Trujillo Bajo, Carolina, PR 00981 | $0.00 |
| 2013-000178A | Departamento de Transcportacion y Obras Publicas (DTOP) | Hesan, Inc. CESCO Bayamón | Carr. PR-174 km. 2.6 Parque Industrial Minillas Bayamón, PR 00959 | Carr. PR-174 km. 2.6 Parque IndustrialMinillas, Bayamón PR 00956 | $0.00 |
| 2013-000178A | Departamento de Transcportacion y Obras Publicas (DTOP) | Hesan, Inc. CESCO Bayamón | Carr. PR-174 km. 2.6Parque Industrial Minillas Bayamón, PR 00959 | Carr. PR-174 km. 2.6 Parque IndustrialMinillas, Bayamón PR 00956 | $0.00 |
| 2014-000041A | Departamento de Transcportacion y Obras Publicas (DTOP) | JCH Realty, Corp., CESCO Manati | P.O. Box 848 Manatí, PR 00674 | Centro Comercial Puerta del Sol, Carr. PR-2 km. 49.7 Bo. Tierras Nuevas, Manatí PR 00674 | $0.00 |
| 2014-000041A | Departamento de Transcportacion y Obras Publicas (DTOP) | JCH Realty, Corp., CESCO Manati | P.O. Box 848 Manatí, PR 00674 | Centro Comercial Puerta del Sol, Carr. PR-2 km. 49.7 Bo. Tierras Nuevas, Manatí  PR 00674 | $0.00 |
| 2016-000145 | Departamento de Transcportacion y Obras Publicas (DTOP) | John Javi, Corporation, CESCO Humacao | P.O. Box 246 Boulevard Plaza Office Buldings, Las Piedras, PR 00771 | Buolevard del Rio, Ramal #3, Humacao, PR  00791 | $0.00 |
| 2016-000145 | Departamento de Transcportacion y Obras Publicas (DTOP) | John Javi, Corporation, CESCO Humacao | P.O. Box 246 Boulevard Plaza Office Bulding s Las Piedras, PR 00771 | Buolevard del Rio, Ramal #3, Humacao, PR  00791 | $0.00 |
| 2014-000001A | Departamento de Transcportacion y Obras Publicas (DTOP) | PJAY Investment, CESCO Fajardo | P.O. Box 486 Fajardo, PR 00738 | Edf. Crespo, calle Ruiz Velvis Int. calle Garrido Morales, Centro Urbano, Fajardo, PR  00738 | $0.00 |
| 2014-000001A | Departamento de Transcportacion y Obras Publicas (DTOP) | PJAY Investment, CESCO Fajardo | P.O. Box 486, Fajardo, PR 00738 | Edf. Crespo, calle Ruiz Velvis Int. calle Garrido Morales, Centro Urbano, Fajardo, PR  00738 | $0.00 |
| 2017-000160A | Departamento de Transcportacion y Obras Publicas (DTOP) | Plaza Guayama, SE., CESCO Guayama | Carr. Estatal PR-174 km. 2.6 Guayama, PR 00784 | Carr. PR-3 km. 134.7, Guayama, PR  00784 | $0.00 |
| 2017-000160A | Departamento de Transcportacion y Obras Publicas (DTOP) | Plaza Guayama, SE., CESCO Guayama | Carr. Estatal PR-174 km. 2.6 Guayama, PR 00784 | Carr. PR-3 km. 134.7, Guayama, PR  00784 | $0.00 |
| 2013-000129 | Departamento de Transcportacion y Obras Publicas (DTOP) | Profesional Record & Information Management | P.O. Box 13323 San Juan, PR 00908 | Calle San Marcos #10100 Bo. Sabana Bajo, Carolina, PR 00983 | $0.00 |
| 2013-000129 | Departamento de Transcportacion y Obras Publicas (DTOP) | Profesional Record & Information Management | P.O. Box 13323San Juan, PR 00908 | Calle San Marcos #10100 Bo. Sabana Bajo, Carolina, PR 00983 | $0.00 |

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-000089 | Departamento de Transcportacion y Obras Publicas (DTOP) | Rafael López Pagan, CESCO Barranquitas (falleció) | Box 699 Barranquitas, PR 00794 | Carr. PR-162 km. 10.4, Barranquitas, PR  00794 | $0.00 |
| 2014-000089 | Departamento de Transcportacion y Obras Publicas (DTOP) | Rafael López Pagan, CESCO Barranquitas (falleció) | Box 699 Barranquitas, PR 00794 | Carr. PR-162 km. 10.4, Barranquitas, PR  00794 | $0.00 |
| 2014-000040 | Departamento de Transcportacion y Obras Publicas (DTOP) | Santiago González, CESCO Utuado | P.O.Box  1737 Utuado, PR 00641 | Carr. PR-10 km. 57.4, Utuado, PR  00641 | $0.00 |
| 2014-000040 | Departamento de Transcportacion y Obras Publicas (DTOP) | Santiago González, CESCO Utuado | P.O. Box 1737 Utuado, PR 00641 | Carr. PR-10 km. 57.4, Utuado, PR  00641 | $0.00 |
| 2019-000010 | Electra Corporation | Administración para el Sustento de Menores (ASUME) | P.O. Box 364443, San Juan, Puerto Rico 00936-4443 | 4 Calle Vieques, Hato Rey, PR 00917 | $0.00 |
| 2017-DS0351 | Eliud Soto Alcanzar | Departamento de Salud | PO BOX 441, Florida, PR 00650 | km 55.2 carr PR-140 Barrio Pueblo Sector San Luis, Florida, PR 00650 | $0.00 |
| 2019-DS0117 | Empresas Pucho INC | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | PO BOX 991, Aguada, PR 00602 | $0.00 |
| 2013-DS0545 | Fanovidal SE | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | MSC 6152, Estacion 1, Bayamon, PR 00959 | $0.00 |
| PO# 4771 | Fondo de Innovación para el Desarrollo Agrícola (FIDA) | Extra Space Storage | #227 Calle Betances San Juan, PR 00911 | #227 Calle Betances San Juan, PR  00917 | $0.00 |
| 2015-000205 (A,B,C,D,E) | Fondo de Innovación para el Desarrollo Agrícola (FIDA) | Plaza del Caribe, S.E. | #2050 Ponce By Pass Suite 111 Ponce, PR 00717 | Local #260 en Segundo Nivel Plaza del Caribe #2050 Ponce By Pass Suite 111 Ponce, PR  00717 | $0.00 |
| 2015-000206 (A,B,C,D,E) | Fondo de Innovación para el Desarrollo Agrícola (FIDA) | Plaza las Americas, Inc. | #525 Ave Roosevelt San Juan, PR 00918 | Local #606 en Tercer Nivel Plaza las Americas #525 Ave. Roosevelt, San Juan PR  00918 | $0.00 |
| 2018-000201/ 2020-000080 | Fideicomiso Hernandez Castrodad | Departamento de la Familia | Avenida Luis Muñoz Marín Esquina Georgetti Carr. 183 Caguas, PR 00725 | Edificio Angora Office, Ave Gautier Benitez #162, Caguas, PR 00725 | $0.00 |
| 2015-DS1228 | Francisco Jose Rivera Lopez | Departamento de Salud | 27 CALLE CORREO, Camuy, PR 00627 | Calle San Jose #3, Camuy, PR 00627 | $0.00 |

## Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-000164 | Frank Gregory Santiago | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | 323 Calle Fernandez Garcia, Luquillo, PR 00773 | 323 Calle Fernandez Garcia, Luquillo, PR 00773 | $0.00 |
| 2016-DS0843 | Galeria 100 Estate Corp. | Departamento de Salud | PO BOX 6447, Mayaguez, PR 00681 | Galeria 100 Shopping Center PR 100, Cabo Rojo, PR 00623 | $0.00 |
| 2018-DS0261 | Gerardo Otero Cortes | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | PO BOX 357, Manati PR 00707 | $0.00 |
| 2018-DS0518 | GIB Development | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | PO BOX 2399, Toa Baja, PR 00951 | $0.00 |
| N/A | Hacienda | Intership | PO Box 9022748 San Juan, PR 00902-2748 | Zona Portuaria Avenida Kennedy San Juan PR 00902 | $0.00 |
| 2009-000186 2016-000208 2021-000213 | Hacienda | Inversiones C y A SE | PO Box 1403 Bayamón PR 00960 | Carretera Núm. 2 Km 12.3 Bayamón, PR 00960 | $0.00 |
| N/A | Hacienda | Luis Ayala Colón | Building 1211 Road 28 Port Zone Puerto Nuevo, PR 00920 San Juan, PR 00902 | Zona Portuaria Avenida Kennedy, San Juan, PR 00902 | $0.00 |
| 2018-000170 2019-000085 | Hacienda | Moreda Cabán Investment | Avenida José de Diego 158, Arecibo, PR 00612 | Avenida José de Diego 158 Arecibo, PR 00612 | $0.00 |
| 2012-000167 2017-000195 2018-000141 2019-000045 | Hacienda | Profesional Record & Information Management | PO Box13323 San Juan, PR 00908 | San Marcos St 10100 Sabana Abajo Ward Carolina, PR 00982 | $0.00 |
| 2021-000215 | Hacienda | Punta Borinquen Shopping Center Inc. | P.O. Box 250444 Aguadilla, PR 00604 | Calle Bert Intersección Calle East Parade Bo Maleza Abajo Base Ramey Aguadilla, PR 00604 | $0.00 |
| N/A | Hacienda | TOTE (Sea Star) | San Juan, PR 00902 | Zona Portuaria Avenida Kennedy, San Juan, PR 00902 | $0.00 |

## Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| N/A | Hacienda | Trailer Bridge Inc. | Metro Officce Park Oficina 302 Guaynabo, PR 00968-1705 | Zona Portuaria Avenida Kennedy San Juan, PR, 00902 | $0.00 |
| 2018-DS0377 | Hector David Rios Ortiz | Departamento de Salud | PO BOX 71, Barranquitas, PR 00794 | Carretera 156 Km. 16.9, Barrio Quebrada Grande, Barranquitas, PR 00794 | $0.00 |
| 2018-DS0259 | Hector Manuel Rivera Guzman | Departamento de Salud | Calle Guillermo Esteves 57, Jayuya PR 00664 | Calle Guillermo Esteves 57, Jayuya, PR 00664 | $0.00 |
| 2016-000239/ 2021-000102 | Inmobiliaria Rodmor Inc | Departamento de la Familia | PO BOX 28, Yauco PR 00698 | Carr. 127, Km. 2.3, Yauco, PR 00698 | $0.00 |
| 2018-DS0333 | Inmobiliaria Witoche Inc | Departamento de Salud | PO BOX 441, Fajardo PR 00738 | Calle E Suite 77 Urb Monte Brisas, Fajardo, PR 00738 | $0.00 |
| 2017-DS0121 | Israel Acevedo Barreto | Departamento de Salud | Buzón 4110 Ave. Militar, Isabela P.R. 00662 | Carr #2 km 110 Bo. Mora, Isabela, PR 00662 | $0.00 |
| 2018-DS0475 | Jayve Development | Departamento de Salud | 568 Km 28.8 Bo Padilla, Corozal, Puerto Rico 00783 | Portobello Town Center, Salinas, Puerto Rico 00751 | $0.00 |
| 2017-DS0120 | JF Building Lease and Maintenance Corp | Departamento de Salud | PO BOX 1804, Cidra PR 00739 | Calle Jose de Diego, hacia Comerio en Cidra, PR 00739 | $0.00 |
| 2019-000002 | Johnjavi Corporation | Administración para el Sustento de Menores (ASUME) | PO Box 246 Las Piedras, PR 00771 | Calle Boulevard del Rio, Ramal #3, Humacao, PR 00792 | $0.00 |
| 2018-DS0319 | Jorge Luis Ortiz Morales | Departamento de Salud | PMB 637 HC 01 BOX 29030, Caguas PR 00725 | Calle 5 Numero 33, Bayamon PR, 00959 | $0.00 |
| 2008-000311 | Departamento de Educacion | Jose N Colon | N/A | Barrio Honduras Sector El Porton Carr 156 km 17.7, Barranquitas, PR 00705 | $0.00 |
| 2019-DS0224 | Jose Raul Ortiz Rubio; Nilsa Morales Lehman | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | PASEO ATOCHA #30 SUITE 3 PONCE, PR 00730 | $0.00 |
| 2007-000011F | Junta de Relaciones del Trabajo | Empire Plaza, S.E. | P. O. Box 360983San Juan, P.R.,00936-0983 | 1052 Ave. Muñoz Rivera, Edif. G. A. Plaza Río Piedras, PR  00927 | $0.00 |
| 2016-DS0807/ 2021-DS1218 | Juan Antonio Negron Berrios | Departamento de Salud -WIC | P.O. Box 1095, Barranquitas, P.R. 00794 | Calle San Jose #214, Aibonito PR, 00705 | $0.00 |
| 2018-DS0146 | Juan B Melendez y Carmeno O Melendez | Departamento de la Familia | Box 40 Urb. Villas De las Americas San Juan, PR 00927 | Calle Munoz Rivera  2, Orocovis, PR 00720 | $0.00 |

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 99-081-0004/ 2021-000145 | Departamento de Educacion | Juan I Lopez | Boulevard Plaza Offices Buildings PO Box 246 Las Piedras PR. 00771 | RD 3 km 80.2 Boulevard del Rio, Humacao PR, 00791 | $0.00 |
| 2016-000022 | Junta de Planificación | VIG Leasing LLC. | Oficina GF-3Ave. Ponce de León 1225 Santurce PR, 00907 | Oficina GF-3Ave. Ponce de León 1225 Santurce PR,00907 | $0.00 |
| 2014-DS0751 | Luis Francisco Rodriguez Gotay | Departamento de Salud | EDIF. ORO OFFICE CENTER, SUITE 4 AVE. MUÑOZ MARIN , Orocovis PR 00720 | Ave Luis Muñoz Marin 568, Orocovis, PR 00720 | $0.00 |
| 2017-DS0119 | Luis Oscar Roig Pacheco | Departamento de Salud | P O BOX 3027, Yauco PR 00698 | Calle Munoz Rivera # 47, Guayanilla PR 00656 | $0.00 |
| 200-000150, 2009-000254, 2020-000192, and 2022-000027 | Macam SE | Departamento de Educacion | Departamento de Educació́n P. 0. Box 190759 San Juan, Puerto Rico 00919-0759 | Urb Industrial Tres Monjitas Finca 14743, HaTo Rey, PR 00917 | $0.00 |
| 2018-000209/ 2019-000164 | Manuel Mediavilla Inc | Departamento de la Familia | PO Box 638 Humacao, PR 00792 | carr #189 R914 Tejas Sector Asturiana, Humacao, PR 00791 | $0.00 |
| 2015-DS0526 | Maria Jose Ibanez Sanchez | Departamento de Salud | URB JARD FAGOT C 24 CALLE 3, Ponce PR 00731 | calle Muñoz Rivera #77, Juana Diaz, PR 00795 | $0.00 |
| 2014-000161 | Mario Delgado Miranda | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | 320 Calle Fernandez Garcia Luquillo PR 00773 | 320 calle Fernandez Garcia, Luquillo, PR 00773 | $0.00 |
| 2014-DS0436 | Mennonite General Hospital Inc | Departamento de Salud | PO BOX 373130, Cayey PR 00737 | 80 Calle Luis Munoz Rivera #90, Caguas, Aguas Buenas PR, 00725 | $0.00 |
| 2019-00007 | Metro Center Associates | Administración para el Sustento de Menores (ASUME) | P.O Box 70376 San Juan , PR 00936-8376 | Metro Center, 5 Calle Mayaguez, Hato Rey, P.R 00917 | $0.00 |
| 2018-DS0379 | Miembros Coberge SE | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Carr #154 Barrio Quebrada Grande  Calle Barcelo #10 Barranquitas, PR 00794 | $0.00 |
| 2018-000100/ 2022-000001 | MT Investments SE | Departamento de la Familia | SUITE 112 MSC 370 #100 GRAND BOULEVARD PASEO SAN JUAN, PR 00926 | Ave FD Roosevelt, Esq Trinidad, Hato Rey, PR 00917 | $0.00 |
| 2016-000109 | Negociado de Sistemas de Emergencia 9-1-1 | 3 Ríos LTD | 27 Calle González GiustiSuite 300 Guaynabo, Puerto Rico, 00968-3076 | Edif. 115 Avenida Eleonor Roosevelt Hato Rey, San Juan, P.R. 00918 | $0.00 |

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2013-000011 | Negociado de Sistemas de Emergencia 9-1-1 | Arrivea, Inc. | Garden Hills Plaza PMB 691Ave. Luis Vigoreaux Guaynabo, Puerto Rico,00966 | Carr. 20 k.m. 2.3 Bo. Monacillos Calle Filipo de Plana Rio Piedras, P.R. 00966 | $0.00 |
| 2018-000004 | Negociado de Sistemas de Emergencia 9-1-1 | Electra Corp. | Vieques ST. #4 San Juan, Puerto Rico ,00917 | Royal Industrial Park Carr. 869 k.m. 1.5 Cataño, P.R. 00968 | $0.00 |
| 2018-000021 | Negociado de Sistemas de Emergencia 9-1-1 | Moyba, LLC | P.o. Box 902150 San Juan, Puerto Rico ,00902 | Solar F Corporate Office Park Bo. Monacillos, San Juan P.R. 00966 | $0.00 |
| 2017-000074A | Negociado para el Manejo de Emergencias (NMEAD) | Albors & C Corporation | PO BOX 363041 SAN JUAN PR,00936-3041 | Belmonte Centro Calle Ramón Emiterio Betance Núm. 345 Sur Antigua Calle Pous Mayaguez, PR. 00682 | $0.00 |
| 2017-000072 | Negociado para el Manejo de Emergencias (NMEAD) | Consultec Construction | PO BOX 8627 HUMACAO PR,00792 | 69 Ave. Cruz Ortiz Stella Esq. Curvelo, Humacao, PR. 00791 | $0.00 |
| 2015-00034D | Negociado para el Manejo de Emergencias (NMEAD) | FISA, LLC | PO BOX 2286 GUAYAMA PR,00785-2286 | 1 Edif. FISA II Loca, Ave Paseo del Pueblo Guayama, PR. 00784 | $0.00 |
| 2014-DS0291 | Norman Luis Santiago Gomez | Departamento de Salud | PO BOX 1316, San German PR 00683 | Centro Comercial San German, Calle Luna , San German PR, 00683 | $0.00 |
| 2014-DS0293 | Norman Luis Santiago Gomez | Departamento de Salud | PO BOX 1316, San German PR 00683 | Centro Comercial San German, Calle Luna , San German PR, 00683 | $0.00 |
| 2017-DS0240 | Ochoa Roig, INC. | Departamento de Salud | PO BOX 428, Caguas PR 00726 | Edificio Comercial Calle Acosta #1, Caguas PR 00725 | $0.00 |
| 2017-DS0461 | Office Park Inc. | Departamento de Salud | 1 Calle de 65 de Infanteria Nte. Suite 2, Lajas PR 00667 | Office Park I, Suite 308 Carr. 2 Km 157, Frente centro medico, Mayaguez, PR 00682 | $0.00 |
| 2011-000244 | Oficina de Administracion de los Tribunales | Ramhil Developers, Inc. | PO Box 491, Caguas PR 00726-0491 | Nuevo Centro Judicial de Caguas, Carretera a Estatal PR# 1, Esquina Carretera Estatal PR #189, en el Barrio Bairoa, del Municipio de Caguas, Puerto Rico, 00725 | $0.00 |
| 2018-000005 | Oficina de Ética Gubernamental | EPC Corporation | Roural Route Num 9 Box 1870, San Juan, PR 00926 | Urb. Industrial El Paraíso, Calle Ganges 107, San Juan, Puerto Rico 00907 | $0.00 |
| 2015-000014 | Oficina de Gerencia y Presupuesto (OGP) | Atlantic Ocean View II, LLC | PO Box 140400 Arecibo, PR,00614 | 2do Piso Edificio Galería Norte, Carretera #2 Km. 87.0, Hatillo, PR 00659 | $0.00 |
| 2014000002 | OFICINA DEL COMISIONADO DE INSTITUCIONES FINANCIERAS | BANCO POPULAR DE PR | REAL ESTATE DIVISION (716) BANCO POPULAR DE PUERTO RICO PO BOX 362708 SAN JUAN PR ,00936-2708 | 1492 AVENIDA PONCE DE LEON EDIFICIO CENTRO EUROPA SUITE 600 SAN JUAN PR 00907 | $0.00 |

# Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2018-000020 | Oficina del Comisionado de Seguros de PR (OCS) | Advantage Self Storage, Inc. | PO Box 192153 Guaynabo, PR, 00919-2153 | N/A | $0.00 |
| 2018-000005 | Oficina del Comisionado de Seguros de PR (OCS) | Caparra Hills, LLC | Tabonuco B-5, Galería San Patricio Suite 212 GUAYNABO, PR 00968 Puerto Rico | Edificio GAM TOWER, Calle Tabonuco, Guaynabo, PR 00968 | $0.00 |
| 2016-000033 | Oficina del Comisionado de Seguros de PR (OCS) | GAM Realty, LLC; GAM Realty, Sociedad en Comandita, S.E. | PO Box 363609 San Juan, PR,00936-3609 | Edificio GAM TOWER, Calle Tabonuco, Guaynabo, PR 00968 | $0.00 |
| 2018-000001 | Oficina del Comisionado de Seguros de PR (OCS) | International Safe Deposit & Courier Services, Corp. | B-5 Calle Tabonuco 216, PMB 353 Guaynabo, PR, 00968 | B-5 Calle Tabonuco 216, PMB 353, Guaynabo PR, 00968 | $0.00 |
| 2018-000021 | Oficina del Comisionado de Seguros de PR (OCS) | Ricoh Puerto Rico, Inc. | PO Box 2110 Carolina, PR,00984-2110 | N/A | $0.00 |
| 2016-000022 | Oficina del Procurador de las Personas de Edad Avanzada (O.P.P.E.A) | The New Ponce Shopping Center, LP | P.O. BOX 331943 PONCE, PR 00731 | Santa María Shopping Center, Calle Ferrocarril Esquina Calle Capitán, Ponce, PR  00728 | $0.00 |
| 2009-000027 | Oficina del Procurador de las Personas de Edad Avanzada (O.P.P.E.A) | 1064 Ponce de León | 252 Ponce de León, Suite 700 SAN JUAN, PR 00918 | Ave. Ponce de León, parada 16, Edificio 1064, tercer piso, San Juan, PR 00907 | $0.00 |
| 2018-DS0308 | Olga Rodriguez Negron | Departamento de Salud | P.O. Box 485 Villalba, PR 00766 | Urb La Vega Calle A C-2 Villalba, PR 00766 | $0.00 |

## Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2019-DS0214 | One by One Inc | Departamento de Salud - Medicaid | P.O. Box 441, Fajardo, PR 00738-0441 | Local #10 Fajardo Market square Carr #3,  Fajardo PR, 00738/<br>328 Calle Matadero<br>Puerto Real<br>Fajardo, PR 00738<br>Puerto Rico | $0.00 |
| 961200001 | OPM | KLAP REALTY AND MANAGEMENT | PO BOX 51486, TOA BAJA, PR 00950 | 161 AVE PONCE DE LEON SAN JUAN, PR  00919 | $0.00 |
| 2018-000011 | Oficina del Procurador del Paciente (OPP) | Union Holdings, Inc. | Edificio Mercantil Plaza<br>Ave. Ponce de León Ofic. 1501<br>San Juan, PR 00918 | Ave. Ponce de León Edif. Mercantil Plaza Piso 9, San Juan, PR  00919 | $0.00 |
| 2018-000014 | Oficina del Procurador del Paciente (OPP) | Union Holdings, Inc. | Edificio Mercantil PlazaAve. Ponce de León Ofic. 1501<br>San Juan, PR 00918 | Ave. Ponce de León Edif. Mercantil Plaza Piso 9, San Juan, PR  00919 | $0.00 |
| 2017-DS0242 | Pablo Melendez Burgado | Departamento de Salud | P.O BOX 442, Guaynabo PR, 00970 | Calle jose de Diego 164, Cayey PR 00736 | $0.00 |
| 2014-000163 | Parroquia San Ramon | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | Av. de la Constitución, San Juan, PR 00901 | Calle Muñoz Rivera, Juana Diaz, PR 00795 | $0.00 |
| 2001-000627 | Departamento de Educacion | Pedro Russe Santiago | N/A | Carr Ramal 6622, Morovis, PR, 00687 | $0.00 |
| 2015-DS1104 | Pepino Health Group Inc | Departamento de Salud | PO BOX 1537, San Sebastian PR 00685 | Centro de Salud Calle Pavia Fernandez #120, San Sebastian PR, 00685 | $0.00 |
| 2018-DS0469 | Plaza San Miguel, Inc. | Departamento de Salud | PO BOX 68, Saint Just, Trujillo Alto, PR 00978 | Ave Trujillo Alto, PR  00976 | $0.00 |
| 2017-000062 | Quality Water Services and Distribution, Corp | Oficina Independiente de Proteccion al Consumidor | PO Box 9020096<br>San Juan, PR,902 | Hato Rey Center, 268 Ponce de Leon Suite #524, San Juan, PR 00918 | $0.00 |
| 081-2016-0022/ 2016-000022 | Rafael Hernandez Barreras | Departamento de Educacion | P.O. Box 190759<br>San Juan, PR 00919-0759 | Local  5 Angora Park Plaza,<br>Carretera #1, KM 33.3, Caguas, PR 00726 | $0.00 |
| 2018-000250/ 2020-000025 | Rafael Muratti Pesquera y Teresa Vazquez Rolon | Departamento de la Familia | PO Box 11398<br>San Juan, PR 00910-1398 | Calle Comercio, Sector Hermanas Davila, Bayamon, PR 00959 | $0.00 |
| 2017-DS0275 | REF Realty LLC | Departamento de Salud | PO BOX 361401, San Juan PR 00936-1401 | Ave Barbosa #340, Hato Rey, PR 00917 | $0.00 |

# Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2017-DS0241 | Reinaldo Morales Martinez | Departamento de Salud | PO BOX 361401, San Juan PR 00936-1401 | Carr 111 km 2.1 Ave Rivas Dominichi, Utuado PR, 00641 | $0.00 |
| 2018-000018 | Ricoh PR | Administración para el Sustento de Menores (ASUME) | PO BOX 2110, Carolina, PR 00984-2110 | N/A | $0.00 |
| 2018-00004 | Ricoh PR | Administración para el Sustento de Menores (ASUME) | PO BOX 2110, Carolina, PR 00984-2110 | N/A | $0.00 |
| 2017-000029 | Ricoh PR | Administración para el Sustento de Menores (ASUME) | PO BOX 2110, Carolina, PR 00984-2110 | N/A | $0.00 |
| 2015-000036 | Ricoh PR | Administración para el Sustento de Menores (ASUME) | PO BOX 2110, Carolina, PR 00984-2110 | N/A | $0.00 |
| 2014-DS0297 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de Preparacion y Coordinacion de Respuesta en salud Publica , calle Casia #2 Bo Monacillos Rio Piedras | $0.00 |
| 2014-DS0080 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Hopital Pediatrico  Universitario | $0.00 |
| 2014-DS0212 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | secretaria Auxiliar de Salud Ambiental | $0.00 |
| 2014-DS0210 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de Recursos Humanos , Division de Reclutamiento, Hospital psiquiatrico, Rio Piedras | $0.00 |
| 2014-DS0081 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Hospital Universitario Dr. Ramon Ruiz Arnau, Bayamon | $0.00 |
| 2014-DS0604 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Comision Prevencion del Suicidio | $0.00 |
| 2014-DS0548 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | oficina de Reglamentacion y Certificacion de profesioanles de la salud | $0.00 |
| 2014-DS0687 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de Auditoria Interna | $0.00 |
| 2014-DS0686 | Ricoh PR | departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | OCASET | $0.00 |
| 2014-DS0547 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar de Promocion a la Salud | $0.00 |
| 2014-DS0484 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Region de Salud de Ponce | $0.00 |

## Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-DS0398 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Region de Salud de caguas | $0.00 |
| 2014-DS0298 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar de Salud Familiar y servicios Integrados | $0.00 |
| 2015-DS0714 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar de salud ambiental , oficinas de Guayama, Hato Rey, Rio Piedras, San German y Trujillo Alto | $0.00 |
| 2015-DS0713 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secreataria Auxiliar de Servicios Medicos y Enfermeria | $0.00 |
| 2015-DS0003 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar de Salud Ambiental Division de Agua Potable | $0.00 |
| 2015-DS0002 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Region Oeste de salud | $0.00 |
| 2015-DS1226 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Division de Madres y Niños, Programa Avanzando Juntos | $0.00 |
| 2015-DS1198 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de l secretaria de la Salud | $0.00 |
| 2015-DS1197 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de servicios generales Area de Reproduccion | $0.00 |
| 2015-DS1196 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de comunicaciones | $0.00 |
| 2016-DS0713 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar para la promocion de la salud ( Aguadilla, Arecibo, Las Piedras, mayaguez y ponce) | $0.00 |
| 2016-DS0520 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Secretaria Auxiliar | $0.00 |
| 2016-DS0509 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Servicios a Niños con necesidades especiales | $0.00 |
| 2016-DS0486 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Division de Prevencion ETS/VIH | $0.00 |
| 2016-DS0485 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | oficina de Reglamentacion y Certificacion de profesioanles de la salud | $0.00 |
| 2016-DS0277 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Programa de Retardo Mental (Aibonito, Aguadilla, Bayamon,Cayey,Ponce, Rio Grande, Vega Baja, | $0.00 |
| 2015-DS1260 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina de Enfermedades catastroficas | $0.00 |

# Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2015-DS1234 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Oficina d Recursos Humanos Division de Clasificacion y Retribucion | $0.00 |
| 2016-DS0809 | Ricoh PR | Departamento de Salud | PO BOX 2110, Carolina, PR 00984-2110 | Programa Medicaid Central y Oficinas regionales | $0.00 |
| 09-3C-145 | Ricoh PR | Oficina Independiente de proteccion al Consumidor | PO BOX 2110, Carolina, PR 00984-2110 | Hato Rey Center, 268 Ponce de Leon Suite #524, San Juan, PR 00918 | $0.00 |
| 2016-DS0902 | Salvador Roldan Figueroa | Departamento de Salud | PO BOX 379, San Lorenzo PR 00754 | Calle Munoz Rivera #5, San Lorenzo PR, 00754 | $0.00 |
| 2015-DS1016 | San Sebastian Properties LLC | Departamento de Salud | PO BOX 367849, San Juan, PR 00936 | Oficinas Medicaid San Sebastian, San Sebastián Gallery Mall San Sebastián, Puerto Rico 00685 | $0.00 |
| 2016-000123 | STATE ELECTIONS COMMISSION | Margaro López Inc. | PO BOX 55, Las Piedras PR 00771 | Alheji Plaza Jesús T. Piñero #77 Interior, San Juan PR | $0.00 |
| 2012-000220 | Departamento de la Familia | 65TH INFANTERÍA SHOPPING CENTER, LLC | PO Box 362983, San Juan, PR 00936-2983 | Avenida 65 de Infantería #49, Suite 31, Rio Piedras, PR 00921 | $0.00 |
| 2015-000070 | Administración de Desarrollo Socioeconómico de la Familia | 800 Ponce de León Corp. | PO Box 195192 San Juan, PR 00919-5192 | Ave. Ponce de León #800, Miramar, San Juan PR 00907 | $0.00 |
| 2013-000078 | Departamento de la Familia | AMD DEVELOPMENT, INC. | PO BOX 362588, San Juan PR 00936 | Carretera 848, Km. 3, Hm. 6, Saint Just, frente Expreso Trujillo Alto, 00976 | $0.00 |
| 2009-000150 | Departamento de la Familia | Antonio J. Leal / Mirtha B. Cruz Valladares | Calle Patio Hill M-7 Torrimar GUAYNABO, PR 00969 Puerto Rico | Avenida de Diego 124 Urbanización La Riviera Puerto Nuevo, San Juan, PR  00921 | $0.00 |
| 2016-000239 | Departamento de la Familia | Inmobiliaria Rodmor, Inc. | PO BOX 28, Yauco PR 00698 | Carr. 127, Km. 2.3, Int  Santa Catalina, Int. Yauco, PR 00698 | $0.00 |
| 2015-000296 | Departamento de la Familia | ARJC Realty SE | Urb. Industrial las Flores, Carr. PR #3, Rio Grande, PR  00745 | Urb. Industrial las Flores, Carr. PR #3, Rio Grande, PR  00745 | $0.00 |
| 2013-000315 | Departamento de la Familia | BIANCA CONVENTION CENTER INC | PO BOX 2123 Anasco, PR 00610 | Barrio Caracol, Carr. 2, Km. 143, Marginal, Añasco PR 00610 | $0.00 |
| 2009-000141 | Departamento de la Familia | BIANCA CONVENTION CENTER INC | PO BOX 2123 Anasco, PR 00610 | Calle Mckinley 190 Mayaguez, PR  00680 | $0.00 |

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2015-000305/ 2022-000055 | Departamento de la Familia | Centerplex Inc. | CARR #2 KM 133.5 BO. GUANABANOS EDIF CENTERPLEX AGUADA, PR 00602 | CARR #2 KM 133.5 BO. GUANABANOS EDIF CENTERPLEX AGUADA, PR 00602 | $0.00 |
| 2012-000216 | Departamento de la Familia | Dorado Sales, Corp | MENDEZ VIGO #271 PO BOX 705 DORADO, PR 00646 Puerto Rico | PO BOX 705, Dorado PR 00646 | $0.00 |
| 2013-000264 | Departamento de la Familia | Ernesto Vázquez Gomez | N/A | Calle Ashford, Esquina Calle Pales NE, Guayama, PR 00784 | $0.00 |
| 2018-000140 (127-2018-140)/ 2021-000008 | Administración de Desarrollo Socioeconómico de la Familia | Fideicomiso Hernández Castrodad | Km 33 3, RR 1 Caguas, PR 00726 | Caguas Industrial Park, Carr. #1, Km. 29, Barrio Cañas, Caguas, PR 00727 | $0.00 |
| 2018-000139 (127-2018-139)/ 2021-000009 | Administración de Desarrollo Socioeconómico de la Familia | Fideicomiso Hernández Castrodad | Km 33 3, RR 1 Caguas, PR 00726 | Carr. #1, Km. 33.3, Barrio Bairoa, Ave. Angora, Caguas, PR 00725 | $0.00 |
| 2015-000037/ 2021-000081 | Departamento de la Familia | FISA S.E. | 54 Km 0 9 Bo Pueblo Guayama, PR 0078 | Paseo del Pueblo, Carretera PR 54 frente Hotel El Molino, Guayama, PR 00784 | $0.00 |
| 2014-000272 | Departamento de la Familia | FMA Realty II LLC | Carr. # 2 km 17.0 Barrio Candelaria Toa Baja, PR 00949 | FMA Commercial Park, Edificio A HA-3, Carr. 2, Km. 17.0 , Toa Baja, PR 00949 | $0.00 |
| 2016-000306 | Departamento de la Familia | Gonzalez Padín Realty Santurce, Inc. | EDIFICIO GONZALEZ PADIN SAN JUAN, PR 00902-4076 | Edificio González Padín, Avenida Ponce de León #1400, San Juan, PR 00919 | $0.00 |
| 2016-000307 | Departamento de la Familia | Héctor Cortés Vargas | P.O Box 599 Moca, PR 00676 | Carretera 115, Km. 12.8, Rincón, PR 00677 | $0.00 |
| 2013-000265 | Departamento de la Familia | Héctor L. Rivera | N/A | Avenida Buena Vista #22 Morovis, PR 00687 | $0.00 |
| 2012-000215 | Departamento de la Familia | Jennymar Corp. | PLAZA MONSERRATE CARR. #2 KM 164 INT. HORMIGUEROS, PR 00660 | Local 5, Plaza Monserrate, Carr. 345, Km. 21, Hormigueros, PR 00660 | $0.00 |
| 2013-000266 | Departamento de la Familia | JF BUILDING & MAINTENANCE CORP. | Calle Jose de Diego Final Cidra, PR 00739 | Calle de Diego final 1 salida Comerio a Cidra,Cidra, PR 00739 | $0.00 |
| 2014-000281/ 2020-000094 | Departamento de la Familia | Lorenzo G. Llerandi | 360 AVE JOSE CEDENO, Arecibo, Puerto Rico 00612-4655 | Calle Delfín Olmo #156, Arecibo, PR 00614 | $0.00 |
| 2012-000227 | Departamento de la Familia | Manuel Mediavilla, Inc. | FONT MARTELLO HUMACAO, PR 00971 | Carretera 189 R 914, Barrio Tejas, Sector Asturiana, Humacao, PR 00791 | $0.00 |

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2012-000214 | Departamento de la Familia | MARIA MILAGROS HORMAZABAL RUIBAL | N/A | Edificio Caray #1, Calle Emilio López, Hormazabal, Juncos, PR  00777 | $0.00 |
| 2012-000219 | Departamento de la Familia | Marla D. Quintana | N/A | Carretera 111, Km. 8.2, Barrio Caguana, Utuado, PR  00641 | $0.00 |
| 2013-000080 | Departamento de la Familia | SUCESION OSCAR RODRIGUEZ CRESPO | BOX 441, Patillas, P.R. 00723 | Avenida Antonio R. Barceló, Carretera 14, Km. 72.3, Barrio Montellano, Cayey, PR  00736 | $0.00 |
| 2013-000079 | Departamento de la Familia | SUCESION OSCAR RODRIGUEZ CRESPO | BOX 441, Patillas, P.R. 00723 | Calle 181, Km. 34, salida a San Lorenzo, Trujillo Alto, PR  00976 | $0.00 |
| 2013-000081 | Departamento de la Familia | SUCESION OSCAR RODRIGUEZ CRESPO | BOX 441, Patillas, P.R. 00723 | Urbanización Industrial Sabaneta #210, Barrio Sabaneta, Ponce, PR  00730 | $0.00 |
| 2016-000240/ 2020-000078 | Departamento de la Familia | Puerta del Norte Mall and Parking Systems, Inc. | COND. CARIBBEAN TOWERS, SUITE 17 670 PONCE DE LEON AVE. SAN JUAN, PR 00907 | Calle Socorro 109, Quebradillas, PR  00678 | $0.00 |
| 2012-000229 | Departamento de la Familia | Rafael A. Hernández / LUDOVIGIA CASTRODAD MENENDEZ | N/A | Angora Industrial Park, Sector Bairoa, Caguas, PR  00725 | $0.00 |
| 2012-000213 | Departamento de la Familia | Rafael A. Hernández | N/A | Avenida Gautier Benítez 162 Edificio Angora, Caguas, PR  00725 | $0.00 |
| 2016-000279 | Departamento de la Familia | Rafael A. López Pagán | P.O.Box 699 Barranquitas, PR 00794 | Calle del Parque Final, Sector Luciana, Barranquitas, PR 00794 | $0.00 |
| 2013-000077 | Secretariado del Departamento de la Familia | Rafael A. Soto | P.O. Box 730 Las Piedras, P.R. 00771 | Calle Dr. Vidal, Esquina Georgetti, Humacao, PR  00791 | $0.00 |
| 2012-000218 | Secretariado del Departamento de la Familia | Rafael Muratti | N/A | Calle Comercio, Hermanas Dávila final, Centro Comercial San Fernando, Carolina, PR  00985 | $0.00 |
| 2017-000025 | Departamento de la Familia | RAMOS & RAMOS REALTY, INC. | CALLE DR VEVE # 41 BAYAMON, PR 00960 Puerto Rico | Edificio Ramos (Oriental Bank) Marginal Carr.2, Intersección 167, Bayamon, PR  00959 | $0.00 |
| 2014-000273/ 2020-000187 | Departamento de la Familia | Río del Plata Mall, Inc. | CARR 165 KM 7.4 BO GALATEO TOA ALTA, PR 00953 | Carr. 165, Esquina Calle 1 #S7, Urb. Jardines de Toa Alta, Toa Alta, PR  00953 | $0.00 |
| 2014-000263 | Secretariado del Departamento de la Familia | Roberto Huyke Luigi | 3203 CARR 351 MAYAGUEZ, PR 00682-7817 | Calle Jesús T. Piñeiro #65 San Juan, PR  00920 | $0.00 |
| 2012-000230 | Departamento de la Familia | San Sebastián Properties, LLC | SAN JOSE 252 OFIC 1-B SAN JUAN, PR 00901 | Carretera 111, Km 17.9, Barrio Guatemala, San Sebastián, PR 00965 | $0.00 |

# Schedule of Assumed Unexpired Leases

The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2012-000223 | Departamento de la Familia | Servicentro Ciales, Inc. | Jose De Diego #54 Ciales, PR 00638 | Calle Hernández Userra #18 Ciales, PR  00638 | $0.00 |
| 2014-000295 | Departamento de la Familia | SSSC SE Ellinette Pérez Laracuente | PO BOX 594, Lajas PR 00667 | Avenida 65 de Infantería #49 Interior, Rio Piedras, PR 00927 | $0.00 |
| 2013-000262 | Departamento de la Familia | TAM INVESTMENT GROUP, CORP. | PO BOX 194126, San Juan, PR 00919 | Ave. Barbosa 618, Esq. Mayaguez, Río Piedras, PR 00920 | $0.00 |
| 122-2016-000056 | Secretariado del Departamento de la Familia | Vieques Office Park | PO BOX 275, Vieques PR 00765 | Calle Benítez Castaño, Esquina Carlos Le Brum, San Juan, PR 00911 | $0.00 |
| 2012-000222 | Secretariado del Departamento de la Familia | Virginia Ramirez | N/A | Calle San Benito #14, frente a la Plaza de Recreo Las Marias, PR 00670 | $0.00 |
| 2013-000314 | Secretariado del Departamento de la Familia | Wilfredo Fontanez | N/A | Avenida Betances 464, Esquina Los Millones Urbanización Hermanas Dávila, Bayamon, PR 00959 | $0.00 |
| 2016-000010 | SF III PR, LLC | Oficina Independiente de proteccion al Consumidor | 767 5th Ave 12th Floor NYC, New York, 10153 | Hato Rey Center, 268 Ponce de Leon Suite #524, San Juan, PR 00918 | $0.00 |
| 2017-000001 | Sistema de Retiro para Maestros | La Rambla Plaza Corp, | Suite 131 Ponce, PR, 00716-0218 | 606  Ave Tito Castro  Suite 131, La Rambla, Ponce, PR 00716 | $0.00 |
| 2018-000035 | Sistema de Retiro para Maestros | Vista Verde Shopping, Corporation | PO Box 3065 Mayaguez, PR, 00681-3065 | Carretera # 2, Km. 156.6, Mayaguez, PR  00680 | $0.00 |
| 2014-DS0692 | Sociedad Especial Plaza Hato Arriba | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Local Num 7 Centro Plaza Hato arriba Carr 111 km 14.5, San Sebastian PR, 00685 | $0.00 |
| 2019-DS0210 | Sucesion william Davila Torres | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Carr. #2 km. 11.9 Primer Piso, Bayamon PR, 00959 | $0.00 |
| 2019-DS0227 | Sucn Jose Antonio Hernandez Vibo; Ileana Hernandez Brito y Vivian Hernandez Brito | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Calle Eleanor Roosevelt  #231 Hato Rey, PR 00918 | $0.00 |
| 2021-DS1312 | Sucn Mirta Celeste Ramos Cruz | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Marbella Shopping Center Carr 107 km 1.4, Aguadilla PR, 00603 | $0.00 |

## Schedule of Assumed Unexpired Leases

**The Debtors reserve the right to amend, on or prior to the Effective Date, this schedule to delete any Unexpired Lease therefrom or add any Unexpired Lease, in which event such Unexpired Lease(s) shall be deemed to be, as the case may be, either assumed, or assumed and assigned as of the Effective Date.**

| Contract Number | Lesse | Lessor | Lessor's Address | Address of Property Leased | Cure Amount |
|---|---|---|---|---|---|
| 2014-000154 | Sucn Ortiz Melendez | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | Av. de la Constitución, San Juan, PR, 00901 | carr 155 km 27.4 Bo Pueblo, Orocovis, PR 00720 | $0.00 |
| 2019-000003 | Sucn Rafael Hernandez Barreras | Administración para el Cuidado y Desarrollo Integral de la Niñez (ACUDEN) | Av. de la Constitución, San Juan, PR, 00901 | Edificio Angora Park , Ave Luis Muñoz Marin, Esq Calle Georgetti, Bo Tomas de Castro, Caguas, PR 00970 | $0.00 |
| 2014-DS0260 | Sucn Victor Inocencio Ramirez Ramirez | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR 00921 | Calle Brau # 68, Cabo Rojo, PR 00623 | $0.00 |
| 2017-DS0124 | Supermercado Agueybana, Inc. | Departamento de Salud | PO BOX 3009, Yauco PR 00768 | Calle Buenaventura Quiñones #28, Guanica PR, 00653 | $0.00 |
| 2002-081-0016/ 2021-000179 | TAMM Investment | Departamento de Educacion | P.O. Box 190759 San Juan, PR 00919-0759 | Ave Jose De Diego 181-183, Arecibo PR 00612 | $0.00 |
| 2017-000044 | Union Holdings, Inc. | Panel sobre el FEI | Ave. Ponce de León Edif.Mercantil Plaza Suite 1501 Hato Rey, PR,00918 | Edif. Mercantil Plaza, Piso 10 , Suite 1000, San Juan, PR 00919 | $0.00 |
| 2017-DS0251 | Villa Coop Agustin Burgos rivera | Departamento de Salud | PO BOX 1554, Villalba PR 00766 | Calle Muõz Rivera #39, Villalba PR 00766 | $0.00 |
| 2018-DS0699 | William Fuertes Romeu; Joy Masarovic Espino | Departamento de Salud | 185 Av. Franklin Delano Roosevelt, San Juan, PR, 00918 | East Ocean Drive 10 Urb Bahia , Cataño, PR 00962 | $0.00 |
| 2014-000275/ 2022-000009 | WPR la Ceramica LP SE | Departamento de la Familia | 185 Av. Franklin Delano Roosevelt, San Juan, PR, 00918 | Edificio 1 D-7 calle Rosario y PR 190 Parque Industrial La Ceramica, Carolina PR, 00979 | $0.00 |
| 2014-DS0650 | Xerox Corp | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR | Laboratorio de Salud Publica de PR | $0.00 |
| 2015-DS0934 | Xerox Corp | Departamento de Salud | Centro Médico Norte Calle Periferial Interior, Bo. Monacillos Río Piedras, PR | Programa de Vacunacion Nivel Cetral y Regiones | $0.00 |

# **EXHIBIT F**

Assured Custodial Trust Documents

## SUPPLEMENTAL DISCLOSURES RELATED TO ASSURED BONDHOLDER ELECTION 2

Section 75.1(b) of the Plan provides that each beneficial holder of an Assured Insured Bond identified on Exhibit "A" to the Assured Bondholder Elections Form may elect one of two Assured Bondholder Elections, namely "Assured Bondholder Election 1" and "Assured Bondholder Election 2". Each eligible Assured Insured Bondholder who elects, or is deemed to elect, Assured Bondholder Election 2 will opt into a custodial trust (each such trust, as applicable, an "Assured Trust") on terms substantially similar those reflected in (i) the relevant form "Standard Terms to Trust Agreement" included as an Exhibit in this Plan Supplement, and (ii) the relevant form "Trust Agreement" included as an Exhibit in this Plan Supplement (together, and as they may be modified prior to implementation, the "Trust Agreement"). The Assured Trust will issue Trust Units that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policies, (B) certain Assured New Securities, and (C) certain cash allocable to the Assured Legacy Bondholders under the Plan, in accordance with terms acceptable to Assured.

**Before electing, or being deemed to elect, Assured Bondholder Election 2, eligible Assured Insured Bondholders should carefully consider this supplemental disclosure (the "Supplemental Disclosure") identifying certain risk factors specifically related to Assured Bondholder Election 2. The risk factors identified in this Supplemental Disclosure are not the only risks related to Assured Bondholder Election 2, and do not necessarily reflect the relative importance of various risks. Any one or more of the factors identified in this Supplemental Disclosure, and other factors not described in this Supplemental Disclosure, could affect recoveries under Assured Bondholder Election 2, and there can be no assurance that other risk factors not discussed in this Supplemental Disclosure will not become material in the future. Eligible Assured Insured Bondholders who elect, or are deemed to elect, Assured Bondholder Election 2, will be deemed to have assumed the related risks identified in this Supplemental Disclosure.**

Capitalized terms used in this Supplemental Disclosure, but not defined herein, shall have the meanings given to them in (i) the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03284-LTS, ECF No. 17627 (D.P.R. July 30, 2021) (the "Plan"), (ii) the Trust Agreement, or (iii) the Disclosure Statement, as applicable. This Supplemental Disclosure is subject in all respects to the terms and provisions of the Plan and the Trust Agreement.

**Assured is not providing any tax advice to Assured Insured Bondholders, and Assured makes no representations to Assured Insured Bondholders regarding the tax consequences of electing, or being deemed to elect, Assured Bondholder Election 2, the tax status of the Assured Trust or the tax consequences of owning or disposing of Trust Units. U.S. Holders are strongly urged to consult their own tax advisors regarding the tax consequences of electing, or being deemed to elect, Assured Bondholder Election 2, the tax status of the Assured Trust or the tax consequences of owning or disposing of Trust Units. In no event shall the Trustee for the Assured Trust, the Depositors, or Assured be liable for any liabilities, costs or expenses of the Assured Trust or the Trust Unit Holders arising out of the application of any tax law, including federal, state, foreign or local income or excise**

taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to any act or omission by the Trustee in breach of its obligations under the Trust Agreement.

**I.**     **Risks Related to Assured Bondholder Election 2.**

    **A.**     **The Tax Treatment of the Assured Trust Is Uncertain.**

       The Assured Trust will likely take the position that it is a grantor trust for U.S. federal income tax purposes. To the extent the Assured Trust is treated as a grantor trust, each Trust Unit Holder will be treated as receiving its Trust Unit(s) in exchange of its relevant Allowed Assured Insured Bond Claims and its interest in the Assured Insurance Policies, and as owning a pro rata undivided interest in the Trust Assets held in the Assured Trust, each to the extent of its pro rata interest in the Trust Units. U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax treatment of the Assured Trust.

       To the extent Trust Unit Holders are treated as owning their pro rata share of the Trust Assets under a grantor trust, they will be treated as if they had received distributions under the Plan directly and as owners of their pro-rated portion of the Trust Assets, including the New GO Bonds and the GO CVIs. Interest on a portion of such New GO Bonds is expected to be excluded from gross income for U.S. federal income tax purposes (such interest, the "Assured Trust Tax-Exempt Interest"). There can be no assurance that the Assured Trust Tax-Exempt Interest, to the extent it is generally excluded from gross income for federal income tax purposes, will retain such exclusion in respect of the Trust Unit Holders. No opinion of counsel or IRS ruling has been, or will be, requested regarding whether any payments of Assured Trust Tax-Exempt Interest that are passed through to the Trust Unit Holders will retain their exclusion from gross income for federal income tax purposes. U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax treatment of the Assured Trust Tax-Exempt Interest.

       It is possible that the IRS may assert, and a court may so hold, that the Assured Trust is properly characterized in a manner other than as a grantor trust for U.S. federal income tax purposes. Such alternative characterizations (principally, treating the Trust Units as taxable debt of Assured or treating the Assured Trust as subject to corporate level tax) could result in different (and materially adverse) tax consequences to the Assured Trust and the Trust Unit Holders (including treating all income received with respect to the Trust Units as fully taxable income or possibly imposing a corporate tax on the Assured Trust, thereby reducing distributions to Trust Unit Holders).

       The Assured Trust has not sought and will not seek either a ruling from the IRS or an opinion of counsel with respect to its status as a grantor trust, the nature of the Trust Units issued by the Assured Trust, or the character, timing or exemption from taxable income of any income generated by any asset held by the Assured Trust. As a result, there can be no assurance that the Assured Trust will be treated as a grantor trust, that the Trust Units will be treated as interests in such trust or that any of the Trust Assets will be treated as producing tax-exempt income or the timing of such income.

**U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax classification of the Assured Trust and the Trust Units (particularly the associated tax consequences in case the Assured Trust is not classified as a grantor trust (such that the Trust Units are treated as taxable debt of Assured or the Assured Trust is treated as subject to corporate level tax) for U.S. federal income tax purposes), as well as the character, timing or exemption from taxable income of any income generated by any asset held by the Assured Trust.**

**B.**   **Risks Related to Taxation of Ownership and Sale or Disposition of the Trust Units.**

To the extent that each Trust Unit Holder is treated as owning its pro rata share of the applicable outstanding New GO Bonds, GO CVIs, and other Trust Assets, including the related Assured Insurance Policies, it will be entitled to payments attributable to such Trust Assets. To the extent that each Trust Unit Holder is treated as owning its pro rata share of the New GO Bonds, see "—Taxation of New GO Bonds and CVIs" in the Disclosure Statement for a discussion of the U.S. federal income tax consequences of owning the New GO Bonds. To the extent that each Trust Unit Holder is treated as owning its pro rata share of the GO CVIs, see "—Taxation of New GO Bonds and CVIs" in the Disclosure Statement for a discussion of the U.S. federal income tax consequences of owning the GO CVIs. To the extent that each Trust Unit Holder is treated as owning its pro rata share of the Assured Insurance Policies, the taxation of amounts received by the Assured Trust and passed through to the Trust Unit Holders in respect of payments on the Assured Insurance Policies is uncertain with the potential for materially adverse consequences to Trust Unit Holders. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of payments under the Assured Insurance Policies and the possibility of material adverse tax consequences to the Trust Unit Holders.

Pursuant to Section 75.1(c) of the Plan, the applicable Assured Insurance Policies and the Trust Agreement, Assured will retain the right to pay the Acceleration Price to the Assured Trust and fully satisfy its obligations with respect to the Assured Legacy Bonds held by the Assured Trust and the related Assured Insurance Policies at any time after the Effective Date upon 30 days' notice to the relevant holders and the Assured Trust. To the extent that Assured exercises this option, the Assured Trust will terminate and the Trust Unit Holders will receive only their pro-rata share of the Acceleration Price. As discussed above in respect to payments on the Assured Insurance Policies generally, the taxation of the receipt of the Acceleration Price by the Assured Trust and its distribution to the Trust Unit Holders is uncertain with the potential for materially adverse consequences to Trust Unit Holders. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the receipt of the Acceleration Price by the Assured Trust and the possibility of material adverse tax consequences to the Trust Unit Holders.

Certain aspects of the U.S. federal income tax treatment of owning and disposing of a Trust Unit are uncertain. **U.S. Holders are strongly urged to consult their tax advisors regarding the ownership, sale and disposition of the Trust Units in their individual circumstances.**

### C.   Prepayment and Reinvestment Risks, Including Related to the Assured Advancement Option.

Promptly following receipt thereof by the Trustee for the Assured Trust, and subject to any deductions provided for in the Trust Agreement, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Assured Trust. Each such Distribution made on or prior to the Maturity Date to Trust Unit Holders shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution.

This prompt "pass-through" of Assured Trust income, and the resulting simultaneous reduction of the accrued and unpaid interest on, principal amount of, and/or Compounded Amount of the Assured Legacy Bonds may result in Trust Unit Holders receiving payments on account of such interest, principal, or Compounded Amount prior to the applicable Original Scheduled Interest Payment Dates, Original Scheduled Principal Payment Dates, and/or Maturity Date of the Assured Legacy Bonds.

Pursuant to the Assured Advancement Option, and in accordance with the Assured Insurance Policies and Section(s) 75.1(c) and/or 75.1(d) of the Plan, Assured will also have the option to satisfy its payment obligations with respect to any Assured Legacy Bonds CUSIP by paying the applicable Acceleration Price or redemption price at any time after the Effective Date upon 30 days' notice to the relevant holders and the Assured Trust. Payment of the applicable Acceleration Price or redemption price with respect to any Assured Legacy Bonds CUSIP shall satisfy and discharge all of Assured's obligations under the applicable Assured Insurance Policy with respect to such Assured Legacy Bonds CUSIP.

As a result of any such prepayment(s) of interest, principal, or Compounded Amount, including pursuant to the Assured Advancement Option, Trust Unit Holders may need to reinvest funds at a lower interest rate than that provided for under the Assured Legacy Bonds. Any reinvestment risk will be borne exclusively by the Trust Unit Holders.

**Assured is not providing any tax advice to Assured Insured Bondholders and Assured makes no representations to Assured Insured Bondholders regarding the tax consequences of electing any Assured Bondholder Election or receiving the Acceleration Price. U.S. Holders that elect any Assured Bondholder Election are strongly urged to consult their own tax advisors regarding the tax treatment of such election and the receipt of the Acceleration Price.**

**STANDARD TERMS**

**TO**

**TRUST AGREEMENT**

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH
OF PUERTO RICO, as Depositor,

Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO
RICO PUBLIC BUILDINGS AUTHORITY, as Depositor,

ASSURED GUARANTY CORP.,

ASSURED GUARANTY MUNICIPAL CORP.,

U.S. BANK NATIONAL ASSOCIATION,
as Trustee,

and

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Delaware Trustee,

Custodial Trust Units

Dated as of [●]

**TABLE OF CONTENTS**                                                          **Page**

RECITALS ...........................................................................................................1

STANDARD PROVISIONS.................................................................................1

ARTICLE I  DEFINITIONS.................................................................................1
    Section 1.01.     Defined Terms. .......................................................... 1
    Section 1.02.     Other Definitional Provisions. ................................... 11

ARTICLE II  TRUST ESTATE ......................................................................... 11
    Section 2.01.     Trust Assets................................................................. 11
    Section 2.02.     Acceptance by the Trustee.......................................... 15
    Section 2.03.     Purpose, Activities of the Trust................................... 16
    Section 2.04.     Limitations of the Trust. ............................................. 17
    Section 2.05.     Voting Rights............................................................... 17

ARTICLE III  ADMINISTRATION OF THE TRUST........................................ 18
    Section 3.01.     Accounts....................................................................... 19
    Section 3.02.     Distributions; Prior to Maturity Date or in Connection with
                               Assured Advancement Option.............................................. 19
    Section 3.03.     Assured Advancement Option. .................................... 22
    Section 3.04.     Sale of New Securities. ............................................... 22
    Section 3.05.     Adjustments to Principal Amounts and Compounded
                               Amounts. ............................................................................. 24
    Section 3.06.     Payments on Assured Insurance Policies..................... 26
    Section 3.07.     Exchange of Trust Units for Trust Assets.................... 27
    Section 3.08.     Payments at Maturity Date. ........................................ 28

ARTICLE IV  REPORTING/REMITTING TO TRUST UNIT HOLDERS ................. 29
    Section 4.01.     Statements to Trust Unit Holders. ............................... 29
    Section 4.02.     Compliance with Withholding Requirements. ............. 29

ARTICLE V  TRUST UNITS............................................................................ 29
    Section 5.01.     The Trust Units. .......................................................... 30
    Section 5.02.     Book-Entry Trust Units. .............................................. 30
    Section 5.03.     Registration of and Limitation on Transfers and Exchanges
                               of Units............................................................................... 31
    Section 5.04.     No Obligation to Register............................................ 32
    Section 5.05.     Mutilated, Destroyed, Lost or Stolen Units................. 32
    Section 5.06.     Persons Deemed Owners.............................................. 32
    Section 5.07.     Appointment of Trust Unit Paying Agent. .................. 32

ARTICLE VI  CONCERNING THE TRUSTEE.......................................... 33

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| Section 6.01. | Duties of Trustee................................................... | 33 |
| Section 6.02. | Certain Matters Affecting the Trustee. ....................... | 34 |
| Section 6.03. | Trustee Not Liable for Trust Units or Securities. ........ | 36 |
| Section 6.04. | Trustee May Own Units. ......................................... | 37 |
| Section 6.05. | Trustee's Fees and Expenses. .................................. | 37 |
| Section 6.06. | Eligibility Requirements for Trustee, Successor Trustee, and Trust Unit Paying Agent................................. | 38 |
| Section 6.07. | Resignation and Removal of the Trustee. ................... | 39 |
| Section 6.08. | Successor Trustee. ................................................. | 40 |
| Section 6.09. | Merger or Consolidation of Trustee. ......................... | 40 |
| Section 6.10. | Reserved.............................................................. | 40 |
| Section 6.11. | Appointment of Custodians. .................................... | 40 |
| Section 6.12. | Trustee May Enforce Claims Without Possession of Trust Units. ......................................................... | 41 |
| Section 6.13. | Trustee Indemnity ................................................. | 41 |
| | | |
| ARTICLE VII  TERMINATION OF TRUST................................................ | | 41 |
| Section 7.01. | Termination; No Redemption Rights.......................... | 41 |
| Section 7.02. | Procedure for Termination....................................... | 42 |
| | | |
| ARTICLE VIII  TAX PROVISIONS................................................ | | 42 |
| Section 8.01. | Grantor Trust Provisions. ....................................... | 42 |
| Section 8.02. | Characterization. .................................................. | 43 |
| Section 8.03. | Grantor Trust Administration................................... | 43 |
| Section 8.04. | Reports to Trust Unit Holders and Tax Authorities .................... | 44 |
| | | |
| ARTICLE IX  MISCELLANEOUS PROVISIONS ................................ | | 45 |
| Section 9.01. | Amendment of Trust Agreement................................ | 45 |
| Section 9.02. | Counterparts. ....................................................... | 46 |
| Section 9.03. | Limitation on Rights of Trust Unit Holders. ............... | 47 |
| Section 9.04. | Notices. .............................................................. | 48 |
| Section 9.05. | Severability of Provisions....................................... | 49 |
| Section 9.06. | Third-Party Beneficiaries. ...................................... | 49 |
| Section 9.07. | Acts of Trust Unit Holders. ..................................... | 49 |
| Section 9.08. | Headings.............................................................. | 49 |
| Section 9.09. | No Waiver; Cumulative Remedies. ............................ | 50 |
| Section 9.10. | Merger and Integration. ......................................... | 50 |
| Section 9.11. | The Delaware Trustee ............................................ | 50 |

## RECITALS

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO (the "Commonwealth"), Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY ("PBA", and together with the Commonwealth, the "Depositors"), ASSURED GUARANTY CORP. ("AGC") and ASSURED GUARANTY MUNICIPAL CORP. ("AGM", and AGC and/or AGM, together or individually, as applicable, "Assured") have entered into a Trust Agreement (the "Trust Agreement") with U.S. BANK NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee") and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, the "Trustees"), which Trust Agreement provides for the issuance of trust units ("Trust Units"), each evidencing a beneficial ownership interest in the property owned by the Trust created by the Trust Agreement.  These Standard Terms are a part of, and are incorporated by reference into, the Trust Agreement.

## STANDARD PROVISIONS

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations and warranties made in the Trust Agreement, the Depositors, Assured and the Trustees agree as follows:

## ARTICLE I

## DEFINITIONS

### Section 1.01.  *Defined Terms.*

Except as otherwise specified herein or in the Trust Agreement or as the context may otherwise require, whenever used herein, the following words and phrases shall have the meanings specified in this Article.  Capitalized words and phrases used herein but not defined herein shall, when applied to a Trust, have the meanings set forth in or pursuant to the Trust Agreement.

"**Acceleration Price**": With respect to an Assured Legacy Bond, an amount equal to the outstanding principal amount of such bond plus the accrued and unpaid interest thereon.

"**Accreted Value**": As defined in the New GO Bonds Indenture.

"**Adverse Trust Event**": has the meaning set forth in Section 8.03 hereof.

"**Affiliate**": Any person or entity controlling, controlled by or under common control with the Depositor, Assured or either of the Trustees, as the context may require.  "Control" means the power to direct the management and policies of a person or entity, directly or indirectly, whether through ownership of voting securities, by contract or otherwise. "Controlling" and "controlled" shall have meanings correlative to the foregoing.

"**AGC Insurance Policy**": An Assured Insurance Policy issued by AGC.

1

"**AGC Secondary Market Assured Legacy Bond**": An Assured Legacy Bond insured by AGC in the secondary market.

"**AGC Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGC in the secondary market.

"**AGC Trust**": The Trust for an AGC Secondary Market Assured Legacy Bonds CUSIP.

"**AGC Trustee**": The Trustee for an AGC Trust.

"**AGM Double-Insured Insurance Policy**": An Assured Insurance Policy issued by AGM and insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**AGM Double-Insured Insurance Policy Payments Account**": As defined in Section 3.01(c)(ii) hereof.

"**AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGM in the secondary market that relates to underlying Assured Legacy Bonds that are also insured by AGC in the secondary market, consisting of (i) AGM Secondary Market Assured Legacy Bonds CUSIP 745235YJ4 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745235UX7 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy) and (ii) AGM Secondary Market Assured Legacy Bonds CUSIP 745235YV7 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745235UY5 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy).

"**AGM Double-Insured Trust**": The Trust for an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**AGM Double-Insured Trustee**": The Trustee for an AGM Double-Insured Trust.

"**AGM Double-Insured Trust Unit**": A Trust Unit issued by an AGM Double-Insured Trust.

"**AGM Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGM in the secondary market.

"**Assured Acceleration Option**": Assured's right, in accordance with the terms of the Assured Insurance Policies and Section 75.1(c) of the Commonwealth Plan, to elect to discharge its payment obligations with respect to any Assured Legacy Bonds CUSIP prior to the stated Maturity Date thereof by paying the applicable Acceleration Price to the holders thereof.

"**Assured Advancement Option**": Either (a) the Assured Acceleration Option or (b) the rights assigned by the Commonwealth or PBA to Assured pursuant to Section 75.1(d) of the Commonwealth Plan to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were the Commonwealth or PBA for such purpose, such that any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Acceleration Price.

"**Assured Bondholder Election 2**": As defined in the Commonwealth Plan.

"**Assured Deferred Expenses**": Any Trustee Costs or Trust expenses paid in cash to the Trustee or the Trust by Assured.

"**Assured Insurance Policies**": The insurance policies, including insurance policies issued in the secondary market, pursuant to which Assured insured payments of principal and interest with respect to the Assured Legacy Bonds.

"**Assured Insured Bonds**": As defined in the Commonwealth Plan.

"**Assured Insurer Event**": A default by Assured on its payment obligations under an applicable Assured Insurance Policy, which default is continuing.

"**Assured Legacy Bondholder**": The beneficial holder of an Assured Legacy Bond.

"**Assured Legacy Bond**": Any Assured Insured Bond the beneficial holder of which has validly elected, or is deemed to have elected, Assured Bondholder Election 2.

"**Assured Legacy Bonds CUSIP**": Any maturity of Assured Legacy Bonds that bears a unique CUSIP such that such maturity of Assured Legacy Bonds is separately identifiable from other maturities of Assured Legacy Bonds with unique CUSIPs; provided, however, that for all Secondary Market Assured Legacy Bonds, the "Assured Legacy Bonds CUSIP" for purposes of this Trust Agreement shall be the CUSIP of the related custody receipt evidencing a beneficial interest in such Secondary Market Assured Legacy Bonds and the related Assured Insurance Policy rather than the CUSIP of the underlying Secondary Market Assured Legacy Bonds. For the avoidance of doubt, each Assured Legacy Bonds CUSIP is either a Primary Market Assured Legacy Bonds CUSIP or a Secondary Market Assured Legacy Bonds CUSIP, and the Assured Legacy Bonds CUSIPs consist of (i) Primary Market Assured Legacy Bonds CUSIP 74514LD46 and (ii) Secondary Market Assured Legacy Bonds CUSIPs 74514LWE3, 74514LUW5, 745235YJ4, 745235YV7, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5.

"**Assured Reimbursement Amount**": An amount sufficient to reimburse Assured for all payments made by Assured under an Assured Insurance Policy for a particular Assured Legacy Bonds CUSIP, and payment of which to Assured shall be a requirement of the Unit Exchange Election.

"**Beneficial Owner**": With respect to any Trust Unit, the Person who is registered as owner of that Trust Unit in the books of the Depository for that Trust Unit or in the books of a

Depository Participant, or in the books of an indirect participant for which a Depository Participant acts as agent.

"**Bond Documents**": The bond resolutions, indentures, trust agreements, or similar agreements pursuant to which (i) the Assured Legacy Bonds, (ii) the New GO Bonds, (iii) the GO CVIs, and (iv) the FGIC Certificates, as applicable, were issued.

"**Bond Election**": As defined in Section 3.04(b) hereof.

"**Bond Sale**": As defined in Section 3.04(a) hereof.

"**Book-Entry Trust Units**": All Trust Units, other than the Non-Book-Entry AGC Trust Units.

"**Bonds**": Collectively, (i) the GO Bonds, (ii) the PBA Bonds, and (iii) the New GO Bonds.

"**Business Day**": Any day that is not a Saturday, Sunday, holiday, or other day on which commercial banking institutions in the City of New York, the city of San Juan, Puerto Rico or the State of Delaware or, if different, the city and state in which the Corporate Trust Office is located are authorized or obligated by law or executive order to be closed.

"**Capital Appreciation Bond**": An Assured Legacy Bond that is a capital appreciation bond.

"**Cash Account**": As defined in Section 3.01(a)(iii) hereof.

"**Cash Proceeds**": As defined in Section 3.04(b) hereof.

"**Code**": The Internal Revenue Code of 1986, as amended.

"**Clawback Structuring Fees**": The payments to which Assured is entitled pursuant to Section 86.1(b)(xvi) of the Commonwealth Plan and any related provision of the Confirmation Order.

"**Commonwealth Plan**": The Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03284-LTS, ECF No. 19365, including as amended or superseded, but in all events solely to the extent in form and substance reasonably satisfactory to Assured and otherwise consistent with the Commonwealth PSA and HTA/CCDA PSA.

"**Commonwealth Plan Cash Distributions**": Any cash distributions allocable to Assured Legacy Bondholders on account of Assured Legacy Bonds under the Commonwealth Plan, but, for the avoidance of doubt, excluding any Consummation Costs, PSA Restriction Fees, or Clawback Structuring Fees payable to Assured, each as defined in the Commonwealth Plan or in this Trust Agreement, as applicable.

"**Commonwealth PSA**": That certain Amended and Restated Plan Support agreement, dated as of July 12, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to GO Bonds and PBA Bonds, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**Compounded Amount**": With respect to any Capital Appreciation Bond, the compounded amount thereof.

"**Confirmation Order**": The order of the United States District Court for the District of Puerto Rico confirming the Commonwealth Plan in accordance with Section 314(b) of PROMESA and section 1129 of the Bankruptcy Code.

"**Corporate Trust Office**": The respective principal corporate trust office of the Trustees at which the Trust is administered from time to time.

"**Current Interest Bond**": An Assured Legacy Bond that is a current interest bond.

"**Custodian**": The Trustee or the agent for the Trustee which shall hold all or a portion of the Trust Estate, or documents relating thereto, with respect to a specific Trust.

"**CVI Account**": As defined in Section 3.01(a)(iv) hereof.

"**Depository**": The Depository Trust Company, or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act and the regulations of the SEC thereunder.

"**Depository Participant**": A broker, dealer, bank, other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"**Distribution**": Any distribution to Trust Unit Holders made pursuant to Section 3.02; provided, however, that, for purposes of Section 3.05 hereof, if a Distribution on a Non-Book-Entry Double-Insured AGC Trust Unit is subsequently passed through to an AGM Double-Insured Trust and distributed as a Distribution on an AGM Double-Insured Trust Unit, such Distributions from the applicable AGC Trust and the related AGM Double-Insured Trust shall constitute a single Distribution (with no double counting) for purposes of calculating amounts that remain outstanding with respect to the Assured Legacy Bonds held by the applicable AGC Trust and insured by the related AGM Double-Insured Insurance Policy.

"**Effective Date**": The "Effective Date" as defined in the Commonwealth Plan and identified in a public notice by the Oversight Board; provided, however, that any action required by this Trust Agreement to be taken or event required by this Trust Agreement to have occurred on the Effective Date shall be deemed to have been taken or to have occurred on the Effective Date if such action is taken or such event occurs within ten (10) Business Days of the Effective Date.

**"EMMA"** The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP for each Trust Unit to which such document relates.

**"Extraordinary Expenses"**: As defined in Section 6.05(b) hereof.

**"Fee Agreement"**: The fee and indemnification agreement dated as of the date hereof providing for the Trustees' recovery from or reimbursement by Assured of certain reasonable compensation, certain reasonable expenses, costs, and disbursements, certain Extraordinary Expenses and certain indemnification payments.

**"FGIC"**: Financial Guaranty Insurance Company.

**"FGIC Certificates"**: As defined in the Commonwealth Plan.

**"FGIC Certificates Account"**: As defined in Section 3.01(b)(i) hereof.

**"FGIC Insurance Policies"**: As defined in the Commonwealth Plan.

**"FGIC Insured Bonds"**: As defined in the Commonwealth Plan.

**"FGIC Insured Bonds Insurance Policy Payments Account"**: As defined in Section 3.01(b)(ii) hereof.

**"FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP"**: A Secondary Market Assured Legacy Bonds CUSIP with respect to which the underlying Secondary Market Assured Legacy Bonds are insured by FGIC in the primary market, consisting of (i) Secondary Market Assured Legacy Bonds CUSIP 74514LWE3 (evidencing a beneficial ownership interest in (x) underlying Secondary Market Assured Legacy Bonds with CUSIP number 745145R53 insured by FGIC in the primary market and (y) the related Assured Insurance Policy) and (ii) Secondary Market Assured Legacy Bonds CUSIP 74514LUW5 (evidencing a beneficial ownership interest in (x) underlying Secondary Market Assured Legacy Bonds with CUSIP number 74514LNG8 insured by FGIC in the primary market and (y) the related Assured Insurance Policy).

**"FGIC Plan Consideration"**: As defined in the Commonwealth Plan.

**"FGIC Trust"**: As defined in the Commonwealth Plan.

**"Floor Price"**: The minimum weighted average sale price required to be obtained for the Subject Bonds with respect to any Bond Sale, as determined by Assured.

**"GO CVI"**: As defined in the Commonwealth Plan.

**"GO Bonds"**: As defined in the Commonwealth Plan.

"**GO Payments**": Payments received by the Trustee on account of GO CVI or New GO Bonds.

"**GO Payment Shortfall**":  As defined in Section 3.06(d) hereof.

"**Grantor Trust Provisions**": Subpart E of Subchapter J of Chapter 1 of the Code and Section 7701 of the Code, and final Treasury Regulations, published rulings, notices and announcement, promulgated thereunder, as the foregoing may be in effect from time to time.

"**HTA/CCDA PSA**": That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds, each as defined therein, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**Insurance Policy Account**": As defined in Section 3.01(a)(v) hereof.

"**Insured Amount**": As of any date, (i) in the case of a Current Interest Bond, the accrued and unpaid interest on, and outstanding principal amount of, such Current Interest Bond as of such date, or (ii) in the case of a Capital Appreciation Bond, the Compounded Amount as of such date.

"**Maturity Date**": As defined in the Trust Agreement.

"**Maturity Notice**": As defined in Section 3.08(a) hereof.

"**New GO Bonds**": As defined in the Commonwealth Plan, and including the Taxable New GO Bonds and Tax-Exempt New GO Bonds.

"**New GO Bonds Indenture**": As defined in the Commonwealth Plan.

"**New Securities**": As applicable, New GO Bonds, GO CVIs, and/or FGIC Certificates.

"**Non-Book-Entry AGC Trust Units**": The Non-Book-Entry Double-Insured AGC Trust Units, together with any Trust Units (if any) issued by an AGC Trust in certificated form to Assured Insured Bondholders who, prior to the Effective Date, held custody receipts in certificated form.

"**Non-Book-Entry Double-Insured AGC Trust Units**": Trust Units to be issued in certificated rather than book-entry form by the AGC Trusts for AGC Secondary Market Assured Legacy Bond CUSIPs 745235UX7 and 745235UY5, consisting of the Trust Units to be issued by each such AGC Trust on account of the portion of the Secondary Market Assured Legacy Bonds (and related custody receipts) held by such AGC Trust that also underlies an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**Non-Book-Entry Double-Insured AGC Trust Units Account**": As defined in Section 3.01(c)(i) hereof.

"**Notice of Claim and Certificate**": As defined in Section 3.06(a) hereof.

"**Notional Amount**": The amount of Trust Units issued as provided in the Trust Agreement.

"**Officer**": When used with respect to either of the Trustees, any senior vice president, any vice president, any assistant vice president, any assistant treasurer, any trust officer, any assistant secretary in the Corporate Trust Office of either of the Trustees, or any other officer of the Trustees customarily performing functions similar to those performed by the persons who at the time shall be such officers and who, in each case, shall have direct responsibility for the administration of the Trust Agreement (including these Standard Terms), and also to whom with respect to a particular corporate trust matter such matter is referred because of such officer's knowledge of and familiarity with the particular subject. With respect to any other Person, the chairman of the board, the president, a vice president (however designated), the treasurer or controller.

"**Opinion of Counsel**": A written opinion of either (a) nationally recognized counsel who is reasonably acceptable to the parties to whom it is delivered, or (b) internal counsel to Assured or any of its Affiliates.

"**Original Scheduled Interest Payment Date**": With respect to a Current Interest Bond, a date, other than the Maturity Date, on which a scheduled payment of interest is due in respect of such Current Interest Bond in accordance with the terms of the applicable Assured Insurance Policy.

"**Original Scheduled Payment Date**": An Original Scheduled Interest Payment Date or Original Scheduled Principal Payment Date, as applicable, including, without limitation, the Maturity Date.

"**Original Scheduled Principal Payment Date**": A date on which a scheduled payment of principal or Compounded Amount is due in respect of such Current Interest Bond or Capital Appreciation Bond, as applicable, in accordance with the terms of the applicable Assured Insurance Policy, including, without limitation, the Maturity Date.

"**Oversight Board**" As defined in the Commonwealth Plan.

"**Paying Agent**": The paying agent for the GO Bonds.

"**Payment Shortfall**" As defined in Section 3.06(a) hereof.

"**Person**": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency, instrumentality, or political subdivision thereof.

"**PBA Bonds**": As defined in the Commonwealth Plan.

"**PBA Fiscal Agent**": The fiscal agent for the PBA Bonds.

"**Primary Market Assured Legacy Bonds CUSIP**": Assured Legacy Bonds CUSIP 74514LD46, which is the sole Assured Legacy Bonds CUSIP that is not a Secondary Market Assured Legacy Bonds CUSIP.

"**Principal Amount Reduction**": As defined in Section 3.05(c) hereof.

"**PROMESA**": The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq.

"**pro rata**": Unless otherwise stated, any pro rata payment or distribution made to, or any pro rata allocation of any cost or expense borne by, (i) Holders of Trust Units for a particular Assured Legacy Bonds CUSIP shall be calculated based on the Notional Amount of Trust Units issued with respect to such Assured Legacy Bonds CUSIP, and (ii) all Holders of Trust Units without regard to Assured Legacy Bonds CUSIP shall be calculated based on the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) of the Assured Legacy Bonds underlying such Trust Units.

"**Pro Rata Share**": As defined in the Commonwealth Plan.

"**Reorganized Debtors**": As defined in the Commonwealth Plan.

"**Requisite Trust Unit Holders**": With respect to any Trust, Holders of a majority (measured by outstanding principal amount or, in the case of Capital Appreciation Bonds, the Compounded Amount of the underlying Assured Legacy Bonds CUSIP) of Trust Units.

"**Sale Notice**": As defined in Section 3.04(a) hereof.

"**Sale Notice Period**": As defined in Section 3.04(b) hereof.

"**SEC**": The Securities and Exchange Commission.

"**Secondary Market Assured Legacy Bonds**": The Assured Legacy Bonds that are insured through Assured Insurance Policies issued in the secondary market.

"**Secondary Market Assured Legacy Bonds CUSIP**": The Assured Legacy Bonds CUSIP of a Secondary Market Assured Legacy Bond, consisting of the CUSIP of the related custody receipt evidencing a beneficial interest in such Secondary Market Assured Legacy Bond and the related Assured Insurance Policies. For the avoidance of doubt, the Secondary Market Assured Legacy Bonds CUSIPs consist of Assured Legacy Bonds CUSIPs 74514LWE3, 74514LUW5, 745235YJ4, 745235YV7, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5.

"**Securities**": Collectively, the Assured Legacy Bonds and the New Securities.

"**Securities Act**": The Securities Act of 1933, as amended.

"**Standard Terms**": These Standard Terms, as amended or supplemented, incorporated by reference into the Trust Agreement.

"**Subject Bonds**": As defined in Section 3.04(a) hereof.

"**Target Price**": With respect to any Bond Sale, the then-current trading price of the Subject Bonds, as measured by the most recently available sale price for no less than $1,000,000 of the Subject Bonds, as quoted on a nationally recognized exchange or a "bid" price on an electronic trading system such as Bloomberg L.P. posted within 10 Business Days prior to the date of the Sale Notice, or if no such price is available, a bona fide bid quote provided for no less than $1,000,000 of the Subject Bonds by an independent broker-dealer operating in the over-the-counter market.

"**Tax Costs**": As defined in Section 8.04(c) hereof.

"**Taxable Bond Account**": As defined in Section 3.01(a)(ii) hereof.

"**Taxable GO Bonds**": Any GO Bonds that were taxable bonds.

"**Taxable New GO Bonds**": New GO Bonds that are not initially issued as tax-exempt bonds (if any).

"**Tax-Exempt Bond Account**": As defined in Section 3.01(a)(i) hereof.

"**Tax-Exempt New GO Bonds**": New GO Bonds that are tax-exempt bonds.

"**Termination Notice**": As defined in Section 7.02 hereof.

"**Treasury Regulations**": Regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of regulations, including proposed or temporary regulations shall include analogous provisions of final Treasury Regulations as well as any successor or replacement Treasury Regulations.

"**Trust**": With respect to each Assured Legacy Bonds CUSIP, the separate trust formed pursuant to the applicable Trust Agreement.

"**Trust Assets**": With respect to each Trust that is formed for the benefit of the beneficial holders of an Assured Legacy Bonds CUSIP; (i) the property to be deposited into and/or held by such Trust pursuant to Section 2.01 hereof; (ii) any other property that Assured may determine, in its sole discretion, to deposit in the applicable Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP; and (iii) any proceeds of any of the foregoing.

"**Trust Estate**": Collectively, and with respect to any Trust, (a) the Trust Assets deposited and held in such Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP and (b) any other property deposited and held in such Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP (if any).

"**Trust Unit**": With respect to each Trust that is formed for the benefit of the beneficial holders of an Assured Legacy Bonds CUSIP, the certificated trust unit(s) to be issued by such Trust.

"**Trust Unit Holder**" or "**Holder**": As applicable, (i) a Beneficial Owner of a Trust Unit, or (ii) Assured, to the extent Assured has been subrogated to the rights of a Beneficial Owner of a Trust Unit Holder.

"**Trust Unit Paying Agent**": The paying agent appointed pursuant to Section 5.07 hereof.

"**Trustee Costs**": As defined in Section 6.05(a) hereof.

"**Unit Exchange Election**": As defined in Section 3.07(a) hereof.

"**Unit Register**" and "**Unit Registrar**": The register maintained and the registrar appointed pursuant to Section 5.03 hereof.

"**U.S. Person**": A person who is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Voting Rights**": Any voting or control rights granted to holders of Securities.

"**WHFIT Regulations**": As defined in Section 8.04(a) hereof.

**Section 1.02.** *Other Definitional Provisions.*

The words "hereof," "herein" and "hereunder" and words of similar import when used in these Standard Terms shall refer to these Standard Terms as a whole and not to any particular provision of these Standard Terms, and Section, subsection, Annex and Exhibit references are to these Standard Terms unless otherwise specified. The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation." Any reference to any document in these Standard Terms shall be deemed to include any amendment, restatement, supplement or modification thereto.

## ARTICLE II

## TRUST ESTATE

**Section 2.01.** *Trust Assets.*

Pursuant to and in accordance with the Trust Agreement and the Commonwealth Plan, upon the Effective Date:

(a)   Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section

11

2.01(a) applies solely to Assured Legacy Bonds CUSIPs 74514LD46, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(i)     The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding such Assured Legacy Bonds CUSIP, deposit the New GO Bonds allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP. The Trustee shall establish and maintain in the name of the Trust a Tax-Exempt Bond Account into which any such Tax-Exempt New GO Bonds shall be deposited, and a Taxable Bond Account into which any such Taxable New GO Bonds shall be deposited; provided, however, that the Trustee shall transfer from the Taxable Bond Account to the Tax-Exempt Bond Account any Taxable New GO Bonds which Assured has notified the Trustee in writing have become Tax-Exempt New GO Bonds.

(ii)    The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding such Assured Legacy Bonds CUSIP, deposit the Commonwealth Plan Cash Distributions allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP. The Trustee shall establish and maintain in the name of the Trust a Cash Account into which any such Commonwealth Plan Cash Distributions shall be deposited.

(iii)   The Commonwealth shall, on behalf of each of the Assured Legacy Bondholders holding such Assured Legacy Bonds CUSIP, deposit the GO CVIs allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP. The Trustee shall establish and maintain in the name of the Trust a CVI Account into which any such GO CVIs shall be deposited.

(iv)    The Trustee shall establish and maintain in the name of the Trust an Insurance Policy Account into which such Assured Legacy Bonds CUSIP shall be deposited. Pursuant to Section 77.6 of the Commonwealth Plan, the Assured Legacy Bonds deposited (or deemed deposited) into the Trust shall not be cancelled and all rights and remedies under the existing Assured Legacy Bonds and the applicable Bond Documents (other than payment obligations of the Depositors and the continuation of any lien granted as security for such Assured Legacy Bonds) shall remain in full force and effect solely to the extent necessary to preserve any claims relating to the Assured Legacy Bonds deposited in the Trust under the applicable Assured Insurance Policy. Such existing Assured Legacy Bonds shall not form the basis for the assertion of any claim against the Depositors or the Reorganized Debtors. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(b)     Solely with respect to each Primary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(b) applies solely to Assured Legacy Bonds CUSIP 74514LD46:

(i)     The Paying Agent and the PBA Fiscal Agent shall, on behalf of each of the Assured Legacy Bondholders holding such Primary Market Assured

Legacy Bonds CUSIP, transfer the Assured Insurance Policy for that Primary Market Assured Legacy Bonds CUSIP and any and all agreements, documents and instruments relating to such Assured Insurance Policy that are within their control to the Trustee, who shall be deemed to have deposited all corresponding rights of the applicable Assured Legacy Bondholders into the applicable Trust.

(ii)     The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP, transfer any and all agreements, documents and instruments relating to the Assured Insurance Policy for that Primary Market Assured Legacy Bonds CUSIP that are within their control to the Trustee, who shall be deemed to have deposited all corresponding rights of the applicable Assured Legacy Bondholders into the applicable Trust.

(iii)    The Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP shall deposit their Assured Legacy Bonds into the Trust for the applicable Primary Market Assured Legacy Bonds CUSIP, and, in the event any Assured Legacy Bondholder fails to so deposit its Assured Legacy Bond(s) as of the Effective Date, such Assured Legacy Bondholder's Assured Legacy Bond(s) shall be deemed deposited into the applicable Trust for the relevant Primary Market Assured Legacy Bonds CUSIP as of the Effective Date.

(c)      Solely with respect to each Secondary Market Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(c) applies solely to Assured Legacy Bonds CUSIPs 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(i)      Each Assured Insured Bondholder holding custody receipts of such Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable Trust.

(ii)     The Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement with respect to such Secondary Market Assured Legacy Bonds CUSIP, such that the Trustee will be deemed to hold the related Assured Insured Bonds underlying the applicable custody receipts and the related Assured Insurance Policies, without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one Assured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such Assured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust.

(d)      Solely with respect to each FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(d) applies solely to Assured Legacy Bonds CUSIPs 74514LWE3 and 74514LUW5:

(i)       Each Assured Insured Bondholder holding custody receipts of such FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable Trust.

(ii)      The Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the Trustee will be deemed to hold the Assured Insured Bonds (which also qualify as FGIC Insured Bonds) underlying the applicable custody receipts and the related Assured Insurance Policies, without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one Assured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such Assured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)     Without prejudice to the ability of the Trustee to draw on the applicable Assured Insurance Policy, the Trustee shall be deemed to have deposited such Assured Insured Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and the related FGIC Plan Consideration into the applicable FGIC Trust pursuant to Section 75.4(a) of the Commonwealth Plan.

(iv)      The Trustee shall be deemed to have received the Pro Rata Share of the FGIC Plan Consideration allocable to each Assured Insured Bondholder holding custody receipts of such FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, and shall receive the FGIC Certificates allocable to such Assured Insured Bondholder on account of the applicable custody receipts and Assured Insured Bonds (which also qualify as FGIC Insured Bonds) for deposit in the Trust. The Trustee shall establish and maintain in the name of the Trust a FGIC Certificates Account into which any such FGIC Certificates shall be deposited.

(v)       As a result of the steps described in subsections 2.01(d)(i)-(iv) above, the applicable Trust shall hold the applicable FGIC Certificates and the related Assured Insurance Policies.

(e)       Solely with respect to each AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(e) applies solely to Assured Legacy Bonds CUSIPs 745235YJ4 and 745235YV7:

(i)       Each Assured Insured Bondholder holding custody receipts of such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable AGM Double-Insured Trust.

(ii)      The AGM Double-Insured Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the AGM Double-Insured Trustee will be

deemed to hold (i) custody receipts evidencing a beneficial ownership interest in the underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy, and (ii) the related AGM Double-Insured Insurance Policies, without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one AGM Double-Insured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such AGM Double-Insured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust. The AGM Double-Insured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)     Without prejudice to the ability of the AGM Double-Insured Trustee to draw on the applicable AGM Double-Insured Insurance Policy to the extent authorized under this Trust Agreement, the AGM Double-Insured Trustee shall be deemed to have deposited such custody receipts evidencing a beneficial ownership interest in AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policies into the applicable AGC Trust.

(iv)     The applicable AGC Trustee shall, on behalf of each of the Assured Legacy Bondholders holding such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP into the AGM Double-Insured Trust for that AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP. The AGM Double-Insured Trustee shall establish and maintain in the name of the AGM Double-Insured Trust a Non-Book-Entry Double-Insured AGC Trust Units Account into which such Non-Book-Entry Double-Insured AGC Trust Units shall be deposited.

(v)     As a result of the steps described in Subsections 2.01(e)(i)-(iv), the applicable AGM Double-Insured Trust shall hold the applicable Non-Book-Entry Double-Insured AGC Trust Units and the related AGM Double-Insured Insurance Policies.

**Section 2.02.   *Acceptance by the Trustee.***

(a)     By its execution of the Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all documents, instruments, and other property delivered to it or received by it from time to time with respect to the Trust Assets and all other assets included in the definition of Trust Estate, in each case in trust for the exclusive use and benefit of all present and future Trust Unit Holders and for the purposes of administering the trusts created by the Trust Agreement (including these Standard Terms). The Trustee represents and warrants that, except as expressly permitted by the Trust Agreement, (i) it has not and will not, other than in its capacity as trustee for the benefit of the Trust Unit Holders, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of the Trust Agreement, and (ii) it has not encumbered or transferred, and will not encumber or transfer, its right, title or interest in the Trust Estate.

(b)     With respect to the Securities, the Trustee shall, on the Effective Date, deliver to the applicable Depositor(s) a certification substantially in the form of Exhibit C to the Trust Agreement certifying that it is either (i) in possession of a certificate evidencing the applicable Securities, or (ii) it has received confirmation from a depository of such Securities or a direct or indirect participant thereof that the Securities acquired by the Trust on such Effective Date are legally owned by the Trust for the benefit of the Trust Unit Holders.

(c)     Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

### Section 2.03.  *Purpose, Activities of the Trust.*

It is the intention of the parties hereto that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to the following:

(a)     receiving, accepting, and holding in trust the Trust Estate;

(b)     creating one or more accounts or sub-accounts in accordance with the terms of the Trust Agreement (including these Standard Terms);

(c)     making claims and receiving payments under the Assured Insurance Policies;

(d)     receiving payments pursuant to the Commonwealth Plan and the securities issued thereunder;

(e)     issuing one or more series of Trust Units to holders of Assured Legacy Bonds in accordance with the terms of the Trust Agreement (including these Standard Terms);

(f)     making distributions to the Depository and Trust Unit Holders in accordance with the terms of the Trust Agreement (including these Standard Terms);

(g)     coordinating communications with Trust Unit Holders through the Depository;

(h)     following, accepting or acting upon any instruction or direction from Assured or the Requisite Trust Unit Holders, as applicable, in each case only as expressly permitted in the Trust Agreement;

(i)     making public disclosures on EMMA;

(j)     making payments and distributions as contemplated by the Trust Agreement (including these Standard Terms); and

(k)     engaging in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto.

**Section 2.04.** *Limitations of the Trust.*

(a)     Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee.  None of the Depositors, the Reorganized Debtors, or Assured, or any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee.

(b)     The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust.  Any resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust.

(c)     The Trust will provide for its own operating expenses and liabilities from the Trust Estate.  General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates.

(d)     All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust.

(e)     There will be no guarantees made by the Trust with respect to obligations of the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates.  There will not be any indebtedness relating to borrowings or loans between the Trust, the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates; provided, that, Assured may own Trust Units.

(f)     The Trust will act solely in its own name, or in the Trustee's name on the Trust's behalf, and through its or the Trustee's duly authorized officers or agents in the conduct of its activities.  The Trust will not:  (i) operate or purport to operate as an integrated, single economic unit with respect to the Depositors, the Reorganized Debtors, or Assured or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates; or (iii) induce any such third party to reasonably rely on the creditworthiness of the Depositors, the Reorganized Debtors, or Assured or any other affiliated or unaffiliated entity in its dealings with the Trust.

(g)     The Trust will maintain a Delaware Trustee with an office in the State of Delaware.

(h)     The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

**Section 2.05.** *Voting Rights.*

(a)     Assured shall be deemed the sole holder of the Voting Rights with respect to the Securities held by the Trust.

# ARTICLE III

## ADMINISTRATION OF THE TRUST

**Section 3.01.  *Accounts.***

The Trustee shall establish and maintain in the name of the Trust the following non-interest bearing accounts for the Trust to be held in trust for the benefit of the Trust Unit Holders (all amounts held in these accounts will be uninvested):

(a)      Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(a) applies solely to Assured Legacy Bonds CUSIPs 74514LD46, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(i)      Tax-Exempt Bond Account. An account into which the Trustee shall deposit the Tax-Exempt New GO Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Tax-Exempt Bond Account**"), including any Taxable New GO Bonds that become Tax-Exempt New GO Bonds;

(ii)      Taxable Bond Account. An account into which the Trustee shall deposit Taxable New GO Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Taxable Bond Account**");

(iii)      Cash Account. An account into which the Trustee shall deposit the Commonwealth Plan Cash Distributions allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Cash Account**");

(iv)      CVI Account. An account into which the Trustee shall deposit the GO CVIs allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**CVI Account**"); and

(v)      Insurance Policy Account. An account into which the Trustee shall deposit the applicable Assured Legacy Bonds CUSIP insured by the applicable Assured Insurance Policy (or any other securities, monies, proceeds or property received on account of or in exchange therefor) (the "**Insurance Policy Account**").

(b)      Solely with respect to each FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(b) applies solely to Assured Legacy Bonds CUSIPs 74514LWE3 and 74514LUW5:

(i)      FGIC Certificates Account. An account into which the Trustee shall deposit the FGIC Certificates allocable to the applicable FGIC-Insured

18

Secondary Market Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**FGIC Certificates Account**"); and

(ii)     FGIC Insured Bonds Insurance Policy Payments Account. An account into which the Trustee shall deposit any monies or other property resulting from a draw on the Assured Insurance Policy insuring the appliable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP (the "**FGIC Insured Bonds Insurance Policy Payments Account**").

(c)     Solely with respect to each AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(c) applies solely to Assured Legacy Bonds CUSIPs 745235YJ4 and 745235YV7:

(i)     Non-Book-Entry Double-Insured AGC Trust Units Account. An account into which the AGM Double-Insured Trustee shall deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to the Assured Legacy Bonds underlying the applicable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Non-Book-Entry Double-Insured AGC Trust Units Account**"); and

(ii)     AGM Double-Insured Insurance Policy Payments Account. An account into which the AGM Double-Insured Trustee shall deposit any monies or other property resulting from a draw on the AGM Double-Insured Insurance Policy insuring the appliable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (the "**AGM Double-Insured Insurance Policy Payments Account**").

**Section 3.02.**   *Distributions; Prior to Maturity Date or in Connection with Assured Advancement Option.*

(a)     Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(a) applies solely to Assured Legacy Bonds CUSIPs 74514LD46, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(i)     Tax-Exempt Distributions.   Subject to Section 3.02(a)(vi) below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New GO Bonds deposited in the Tax-Exempt Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)  <u>Taxable Distributions</u>.  Subject to <u>Section 3.02(a)(vi)</u> below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New GO Bonds deposited in the Taxable Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(iii)  <u>CVI Distributions</u>.  Subject to <u>Section 3.02(a)(vi)</u> below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the GO CVIs deposited in the CVI Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(iv)  <u>Insurance Policy Distributions</u>.  Subject to <u>Section 3.02(a)(vi)</u> below, promptly following receipt thereof by the Trustee, the Trustee shall, subject to <u>Section 3.06(d)</u>, be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Tax Costs as of the date of distribution.  Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account.

(v)  <u>Other Cash Distributions</u>.  Subject to <u>Section 3.02(a)(vi)</u> below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including any Commonwealth Plan Cash Distributions deposited in the Cash Account, net of of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(vi)  <u>Distributions on Account of Non-Book-Entry Double-Insured AGC Trust Units</u>.  Notwithstanding any other provision of this Trust Agreement, distributions on account of the Non-Book-Entry Double-Insured AGC Trust Units

20

shall be made directly to the applicable AGM Double-Insured Trustee, on a pro rata "pass-through" basis, rather than to the Depository.

(b)      Solely with respect to any FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(b) applies solely to Assured Legacy Bonds CUSIPs 74514LWE3 and 74514LUW5:

(i)      FGIC Certificate Distributions: Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the FGIC Certificates deposited in the FGIC Certificates Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)      FGIC Insured Bonds Insurance Policy Payments Distributions: Promptly following receipt thereof by the Trustee, the Trustee shall, subject to Section 3.06(d), be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date resulting from a draw on the Assured Insurance Policy insuring the applicable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, net of the allocable portion of any outstanding Tax Costs as of the date of distribution. Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP.

(c)      Solely with respect to any AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(c) applies solely to Assured Legacy Bonds CUSIPs 745235YJ4 and 745235YV7:

(i)      Non-Book-Entry Double-Insured AGC Trust Units Distributions: Promptly following receipt thereof by the AGM Double-Insured Trustee, the AGM Double-Insured Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGM Double-Insured Trust, including payments received by the Trust on or prior to the Maturity Date on account of the Non-Book-Entry Double-Insured AGC Trust Units deposited in the Non-Book-Entry Double-Insured AGC Trust Units Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

21

(ii)    AGM Double-Insured Insurance Policy Payments
Distributions: Promptly following receipt thereof by the AGM Double-Insured
Trustee, the AGM Double-Insured Trustee shall, subject to Section 3.06(d), be
required to and shall distribute to the Depository for distribution to the Trust Unit
Holders on a pro rata "pass-through" basis, all income of the AGM Double-Insured
Trust, including payments received by the AGM Double-Insured Trust on or prior to
the Maturity Date resulting from a draw on the AGM Double-Insured Insurance
Policy insuring the applicable AGM Double-Insured Secondary Market Assured
Legacy Bonds CUSIP, net of the allocable portion of any outstanding Tax Costs as of
the date of distribution.  Notwithstanding anything herein or elsewhere to the
contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions
comprised of payments received by the AGM Double-Insured Trust from Assured on
account of, and in accordance with, an AGM Double-Insured Insurance Policy
insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

**Section 3.03.  *Assured Advancement Option.***

(a)     Assured shall have the right to exercise the Assured Advancement
Option with thirty (30) days' prior written notice to the relevant Assured Legacy Bond
Holders and/or Trust Unit Holders.  Upon the exercise of any Assured Advancement Option
and the payment of the applicable Acceleration Price or redemption price with respect to any
Assured Legacy Bonds CUSIP, the Trustee shall be required to disburse such Acceleration
Price or redemption price to the Trust Unit Holders of the relevant Trust as set forth in
Section 3.02 above, net of the allocable portion of any outstanding Tax Costs as of the date
of distribution, and Assured shall become fully subrogated to all of the rights of such Trust
Unit Holders, including, upon the termination of the relevant Trust, rights to any then
remaining Trust Assets.  Upon the disbursement of such Acceleration Price or redemption
price to the relevant Trust Unit Holders as set forth above, the Trust Units of such Trust shall
be retired, such Trust shall be terminated, and the Trustee shall deliver the remaining Trust
Assets of such Trust, less any outstanding Trustee Costs and other remaining costs of the
Trust, to or at the direction of Assured.  At any time on or after the date of receipt of such
Trust Assets, Assured shall have the right to sell all or certain of the New Securities
constituting part of such Trust Assets for value, including by (i) selling all or certain of the
applicable Tax-Exempt New GO Bonds constituting part of such Trust Assets for value as
tax-exempt bonds, (ii) selling all or certain of the Taxable New GO Bonds constituting part
of such Trust Assets for value as taxable bonds, (iii) selling all or certain of the GO CVIs
constituting part of such Trust Assets, and (iv) selling all or certain of the FGIC Certificates
constituting part of such Trust Assets, as applicable.

(b)     Payment of the applicable Acceleration Price or redemption price with
respect to any Assured Insured Bond shall satisfy and discharge all of Assured's obligations
under the applicable Assured Insurance Policy with respect to such Assured Insured Bond.

**Section 3.04.  *Sale of New Securities.***

(a)     At any time and from time to time prior to the Maturity Date, so long
as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy,

Assured shall have the right to instruct the Trustee to sell any New Securities of any series, in a minimum aggregate principal amount (or, with respect to capital appreciation bonds, a minimum aggregate current Accreted Value) of $1,000,000 (taking into account for such minimum, all concurrent sales of such series of New Securities in the Trusts) (it being understood that such minimum shall not be applicable if all New Securities of such series held as part of the Trust Assets are included in such sale) (or any other securities or property received on account thereof or in exchange therefor) (the "**Subject Bonds**") that are part of the Trust Assets for cash (a "**Bond Sale**"). Assured will direct the Trustee to utilize a specific broker which will arrange the Bond Sale pursuant to the terms set forth in this <u>Section 3.04(a)</u>. The Trustee shall not be responsible for the selection of the broker or for any determination required to be made in connection with the Bond Sale. Prior to any Bond Sale, Assured will notify the Trustee of the intended Bond Sale and will direct the Trustee to promptly distribute through the Depository a sale notice (the "**Sale Notice**") to all applicable Trust Unit Holders.

(b)       The Sale Notice will include (i) a statement identifying the Subject Bonds, the principal amount (or, with respect to capital appreciation bonds, current Accreted Value) of Subject Bonds to be sold, the applicable Target Price and Floor Price, (ii) a statement regarding the right of each applicable Trust Unit Holder to elect to receive in-kind delivery of a pro rata share of the Subject Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs (the "**Bond Election**"), in lieu of receiving a pro rata share of the actual net cash proceeds ("**Cash Proceeds**") from the Bond Sale and (iii) a statement that the Bond Sale will only be executed if the weighted average price obtainable for the Subject Bonds (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) is equal to or greater than the Floor Price. Trust Unit Holders that determine to make a Bond Election must make the election through the Depository within ten (10) Business Days after the Depository receives the Sale Notice (the "**Sale Notice Period**").

(c)       Following the Sale Notice Period,

(i)       If any applicable Trust Unit Holders make valid Bond Elections, an amount of Subject Bonds representing a proportion of the Subject Bonds equivalent to such Trust Unit Holders' aggregate pro rata ownership of all applicable Trust Units shall be reserved from the Bond Sale and shall instead be distributed pro rata to each such Trust Unit Holder making a valid Bond Election (any such distribution to be rounded down to the nearest minimum denomination, with any reduction as a result of such rounding down to be distributed to such Trust Unit Holders in cash). In order to make a valid Bond Election, a Trust Unit Holder shall be required to pay to the Trustee such Trust Unit Holder's allocable portion of any outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period. To the extent a Trust Unit Holder has not paid its allocable portion of any such outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period, the Bond Election will be deemed invalid.

(ii)     Applicable Trust Unit Holders that did not make a valid Bond Election will promptly receive a pro rata share of Cash Proceeds from the sale of Subject Bonds (not subject to a valid Bond Election), net of the allocable portion of any outstanding Trustee Costs and Tax Costs, and less any Cash Proceeds distributed as a result of rounding in accordance with Section 3.04(c)(i) to Trust Unit Holders making valid Bond Elections.

(iii)     If the broker specified in the Sale Notice is unable to arrange the sale of any of the Subject Bonds not subject to a valid Bond Election for a weighted average price (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) equal to or greater than the Floor Price, the Trustee shall not sell or distribute any Subject Bonds, the Bond Sale shall be cancelled, and the Trustee shall send a notice, at the sole cost of Assured, to the applicable Trust Unit Holders through the Depository stating that such Bond Sale was cancelled, after which any future sale of the Subject Bonds shall be required to be made pursuant to a new Sales Notice.

**Section 3.05.   *Adjustments to Principal Amounts and Compounded Amounts.***

(a)     Each Distribution made on or prior to the Maturity Date to Trust Unit Holders shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution.   For the purposes of such reduction, any deduction from any Distribution in respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash as part of the Distribution and shall reduce the applicable accrued and unpaid interst amount, outstanding principal amount, or Compounded Amount accordingly.   For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly.   As set forth in Sections 3.02(a)(iv), 3.02(b)(ii), and 3.02(c)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, or (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.

(b)     Any Bond Sale resulting in a distribution of Cash Proceeds or Subject Bonds to Trust Unit Holders, as the case may be, shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case as of the date the Cash Proceeds of such Bond Sale are distributed by the Trustee to the applicable Trust Unit Holders and in an amount equal to the aggregate Cash Proceeds from such Bond Sale

distributed to the applicable Trust Unit Holders. For the purposes of such reduction, any deduction from the Cash Proceeds in respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash and shall reduce the applicable accrued and unpaid interst amount, outstanding principal amount, or Compounded Amount accordingly. Further, for purposes of this Section 3.05(b), the aggregate Cash Proceeds shall be calculated as if each applicable Trust Unit Holder that took actual delivery of Subject Bonds had received the same amount of cash per Unit as a Trust Unit Holder that did not make a Bond Election, or if all applicable Trust Unit Holders participating in the Bond Sale made a Bond Election, the aggregate Cash Proceeds shall be calculated as if all Subject Bonds were sold at a net price equal to the Target Price. For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly. As set forth in Sections 3.02(a)(iv), 3.02(b)(ii), and 3.02(c)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, or (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.

(c)      If any Assured Legacy Bonds CUSIP is subject to mandatory sinking fund redemptions, any reduction of the outstanding principal amount or Compounded Amount, as applicable, of such Assured Legacy Bonds CUSIP pursuant to Section 3.05(a) or (b) (a "**Principal Amount Reduction**") shall automatically result in the dollar-for-dollar reduction of the mandatory sinking fund redemption obligations for purposes of the Assured Insurance Policy insuring such Assured Legacy Bonds CUSIP, with such reduction to be applied sequentially against such mandatory sinking fund redemptions starting with the first mandatory sinking fund redemption occurring after such Principal Amount Reduction.

(d)      If the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero at any time, Assured shall be entitled to any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the Insurance Policy Account, the FGIC Certificates Account, or the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, and the AGM Double-Insured Insurance Policy Payments Account, as applicable.

(e)      For the avoidance of doubt, it is expressly understood and agreed that to the extent the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero prior to the Maturity Date, as of the date the principal amount (or Compounded Amount, as applicable) is reduced to zero, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled; and (iv) subject to Assured's entitlement to any remaining Trust Assets, the Trust shall terminate in accordance with the provisions of Article VII hereof.

**Section 3.06.   *Payments on Assured Insurance Policies.***

(a)     After taking into account any adjustments made pursuant to Section 3.05, if there are insufficient funds (determined without taking into account any securities or other non-cash Trust Assets) in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the Insurance Policy Account, the FGIC Certificates Account, or the FGIC Insured Bonds Insurance Policy Payments Account, as applicable, to satisfy the accrued and unpaid interest and/or unpaid principal due on an Original Scheduled Payment Date (the amount of any such shortfall, the "**Payment Shortfall**"), then at least five (5) Business Days prior to such Original Scheduled Payment Date, the Trustee shall deliver a notice in substantially the form attached hereto as Exhibit A (a "**Notice of Claim and Certificate**") to Assured. Assured agrees that such notice provided by the Trustee shall constitute a valid notice of the type required under the applicable Assured Insurance Policy in order for the Trustee to draw on the applicable Assured Insurance Policy, and the Trustee shall make draws on the applicable Assured Insurance Policy to make payment, from the Insurance Policy Account or the FGIC Insured Bonds Insurance Policy Payments Account, as applicable, of any accrued and unpaid interest or any unpaid principal due on the Original Scheduled Payment Date. The Trustee is authorized to take all actions necessary to draw on the Assured Insurance Policies for such purposes, including actions that, under the applicable Assured Insurance Policies and related agreements, would otherwise be taken by the Paying Agent or the PBA Fiscal Agent, and the Trustee shall have all powers and authority of the Paying Agent or the PBA Fiscal Agent, as applicable, for such purposes. In the event a particular Trust holds more than one Assured Insurance Policy insuring the same Assured Legacy Bonds CUSIP, the Trustee shall draw pro rata on all such Assured Insurance Policies insuring the same Assured Legacy Bonds CUSIP.

(b)     Notwithstanding any other provision of this Trust Agreement, no AGM Double-Insured Trustee shall make a draw on an AGM Double-Insured Insurance Policy, and Assured shall not be required to make any payment under such AGM Double-Insured Insurance Policy, unless either (i) Assured has confirmed to the AGM Double-Insured Trustee in writing, at least (5) Business Days prior to the relevant Original Scheduled Payment Date, that Assured will not be providing sufficient funds under the AGC Insurance Policy insuring the relevant AGC Secondary Market Assured Legacy Bonds CUSIP to cover any Payment Shortfall with respect to the relevant AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, or (ii) as of the Original Scheduled Payment Date, Assured has not in fact provided sufficient funds under the AGC Insurance Policy insuring the relevant AGC Secondary Market Assured Legacy Bonds CUSIP to cover any Payment Shortfall with respect to the relevant AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

(c)     Subject to Section 3.06(b) above, if and to the extent Assured fails to make any payment at the time, in the amount and in the manner set forth herein, the Trustee shall take, subject to its rights and protections herein, all necessary or desirable actions to enforce the applicable Assured Insurance Policy (including, to the extent applicable, as and when directed by the Requisite Trust Unit Holders as set forth in Section 6.01 hereof).

(d)      If the Trustee receives GO Payments, (i) after the Trustee draws on an Assured Insurance Policy pursuant to Section 3.06(a), but (ii) prior to the Trustee using the amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date, then the Trustee shall (x) distribute and apply the GO Payments received in accordance with Sections 3.02 and 3.05, (y) only apply amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal to the extent the GO Payments received are insufficient (the amount of such insufficiency, the "**GO Payment Shortfall**") to pay the accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date such that the amounts so applied are not in excess of the GO Payment Shortfall and (z) promptly return to Assured any amounts drawn on the Assured Insurance Policy that are in excess of such GO Payment Shortfall.

**Section 3.07.**   *Exchange of Trust Units for Trust Assets.*

(a)      At any time on, or prior to, the Maturity Date, a Trust Unit Holder may exchange its Trust Units for a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Trustee Costs, Tax Costs, and Assured Reimbursement Amount (the "**Unit Exchange Election**"), provided that the Trust Unit Holder must provide thirty (30) days' prior written notice of such Unit Exchange Election by submitting the form attached hereto as Exhibit B to the Trustee.

(b)      Upon a Unit Exchange Election, the expiration of the thirty day (30) notice period set forth in Section 3.07(a) hereof and the presentation and surrender of the applicable Trust Units at the office of the Trustee therein designated on that date, the Trustee shall distribute to such Trust Unit Holder a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, which shall be paid to Assured, the Trustee, or the relevant tax or governmental authority, as applicable (provided that, if cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, each applicable Trust Unit Holder shall pay in cash its applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of its share of remaining Trust Assets. For the avoidance of doubt, the Assured Reimbursement Amount must be paid to Assured prior to the distribution of the applicable Trust Assets to the Trust Unit Holder.

(c)      Upon distribution of such Trust Assets in accordance with Section 3.07(b) hereof, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled

with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

### Section 3.08.   *Payments at Maturity Date.*

(a)      If, (i) in the case of Current Interest Bonds, the outstanding principal amount or accrued and unpaid interest amount, or (ii) in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the Assured Legacy Bonds at the Maturity Date is expected to be greater than zero, no later than thirty (30) calendar days and no earlier than thirty-five (35) calendar days prior to the Maturity Date, Assured shall direct the Trustee to deliver through the Depository a notice of maturity (the "**Maturity Notice**") in substantially the form attached hereto as Exhibit C to all applicable Trust Unit Holders. The Maturity Notice will include (i) a statement identifying the Maturity Date and (ii) a statement regarding the right of each Trust Unit Holder to receive a Distribution (or multiple Distributions) in the aggregate amount of a pro rata share of the Insured Amount corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date, in either case, to be paid to the Trustee by Assured and/or from the other Trust Assets. Notwithstanding anything herein to the contrary, Assured's failure to direct the Trustee to deliver a Maturity Notice or the Trustee's or Depository's failure to deliver a Maturity Notice to Trust Unit Holders in accordance with this Section 3.08 shall not affect or delay the occurrence of the applicable Maturity Date, or affect the amounts to be paid to Trust Unit Holders on the Maturity Date.

(b)      Reserved.

(c)      On the Maturity Date, after giving effect to any Distribution made from other Trust Assets on the Maturity Date, and subject to Assured having received a Notice of Claim and Certificate in accordance with Section 3.06 hereof, Assured shall pay to the Trustee, and the Trustee shall distribute to all Trust Unit Holders, a pro rata share of the Payment Shortfall, if any, net of any Tax Costs, following which Assured shall be entitled to any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, or the AGM Double-Insured Insurance Policy Payments Account, as applicable.

(d)      On the Maturity Date, after giving effect to any Distributions made on the Maturity Date (including the payment and distribution of any Payment Shortfall (in accordance with Section 3.08(c) hereof)), (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled; and (iv) subject to Assured's entitlement to any Remaining Trust Assets following payment of any Trustee Costs and any other remaining Trust expenses, the Trust shall terminate in accordance with the provisions of Article VII hereof.

28

## ARTICLE IV

## REPORTING/REMITTING TO TRUST UNIT HOLDERS

**Section 4.01.  *Statements to Trust Unit Holders.***

No later than three (3) days after the date on which the Trustee makes any Distribution to any Trust Unit Holder, the Trustee shall prepare and post a statement to EMMA, substantially in the form attached hereto as Exhibit D, and upon request, deliver such statement by mail to any Trust Unit Holder, setting forth:

(a)     With respect to the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Acccount, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, and the AGM Double-Insured Insurance Policy Payments Account, as applicable, distributions made from each such account during the month and during the year to date (on an aggregate and per unit basis);

(b)     The accrued and upaid interest on, and principal amount of (or Compounded Amount, as applicable) as of the month end of the relevant Assured Legacy Bonds CUSIP (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per unit basis);

(c)     Any other distributions made to Trust Unit Holders;

(d)     Any required tax reporting for such period (as specified in Section 8.04); and

(e)     All other information required to complete Exhibit D.

**Section 4.02.  *Compliance with Withholding Requirements.***

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depository and Trust Unit Holders that the Trustee reasonably believes are applicable under the Code. The consent of the Depository and Trust Unit Holders shall not be required for such withholding. In the event the Trustee does withhold any amount from payments to the Depository or any Trust Unit Holder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depository or such Trust Unit Holders the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Depository or Trust Unit Holder, as the case may be, in the amount of the withholding and shall thereby reduce amounts otherwise distributable to the Depository or such Trust Unit Holder. If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## TRUST UNITS

29

**Section 5.01.   *The Trust Units.***

Each series of Trust Units shall bear unique CUSIPs and, other than the Non-Book-Entry AGC Trust Units, shall be freely tradable and transferable through The Depository Trust Company.  So long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall be deemed the sole holder of the New Securities deposited in the respective Trusts with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings.  In addition, Assured shall be fully subrogated to the rights of the respective Trust Unit Holders in respect of the New Securities deposited in the respective Trusts.

The Trust Units shall be designated in the Trust Agreement.  Unless otherwise specified in the Trust Agreement, the Trust Units in the aggregate will represent the entire beneficial ownership interest in the Trust Estate.  The Trust Units will be substantially in the forms annexed to the Trust Agreement.  Unless otherwise provided in the Trust Agreement, the Trust Units will be issuable in book-entry form, in denominations equal to the denomination of the applicable underlying Assured Legacy Bonds or any integral multiple of the amount specified therein, subject to the requirements of the Depository; provided, however, that the Non-Book-Entry AGC Trust Units shall be issued in certificated rather than book-entry form.  Each Trust Unit will share ratably in all Trust Assets of the applicable Trust and in all rights of the related Trust Unit Holders.

Upon original issue, the Trust Units shall be executed and delivered by the Trustee and the Trustee shall cause the Trust Units to be authenticated by the Unit Registrar upon receipt by the Trustee of the documents specified in Section 2.02.  The Trust Units shall be executed by manual or electronic signature on behalf of the Trustee by an authorized officer.  Trust Units bearing the manual or electronic signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Trust Units or did not hold such offices at the date of such Trust Units.  No Trust Unit shall be entitled to any benefit under the Trust Agreement or be valid for any purpose, unless there appears on such Trust Unit a certificate of authentication as set forth on such certificate executed by manual or electronic signature on behalf of the Unit Registrar by a duly authorized officer of the Unit Registrar, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Trust Unit has been duly authenticated and delivered hereunder.  All Trust Units shall be dated the date of their execution.

**Section 5.02.   *Book-Entry Trust Units.***

(a)      The Book-Entry Trust Units will be represented initially by one or more global certificates registered in the name designated by the Depository. Notwithstanding anything herein to the contrary, the Trustee may for all intents and purposes (including the making of payments on the Book-Entry Trust Units) deal with the Depository or its nominee as the authorized representative of the Beneficial Owners of the Book-Entry Trust Units as if the Depository were the sole Book-Entry Trust Unit Holder for purposes of the Trust Agreement (including these Standard Terms) for as long as those Book-Entry Trust

Units are registered in the name of the Depository or its nominee. The rights of Beneficial Owners of the Book-Entry Trust Units shall be limited to those established by law, the Trust Agreement and agreements between such Beneficial Owners and the Depository and Depository Participants. Requests and directions from, and votes of, the Depository, as Holder, shall not be deemed to be inconsistent if they are made with respect to different Beneficial Owners. Subject to Section 5.03 below, a Book-Entry Trust Unit may not be transferred by the Depository or its nominee except to another nominee or the Depository, or another Depository or its nominee that agrees to hold the Book-Entry Trust Unit for the account of the respective Depository Participants and Beneficial Owners.

(b)    The Trustee will not have any liability to any person for any aspect of the records relating to or payment made on account of Beneficial Owners of the Book-Entry Trust Units held by the Depository, for monitoring or restricting any transfer of beneficial ownership in a Book-Entry Trust Unit or for maintaining, supervising or reviewing any records relating to such Beneficial Owners.

**Section 5.03.** *Registration of and Limitation on Transfers and Exchanges of Units.*

The Trustee shall cause to be kept at its Corporate Trust Office a Unit Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Trust Units and of transfers and exchanges of Trust Units as provided in the Trust Agreement (including these Standard Terms). The Trustee will initially serve as Unit Registrar for the purpose of registering Trust Units and transfers and exchanges of Trust Units as herein provided.

Subject to Section 5.04, upon surrender for registration of transfer of any Trust Unit at the Corporate Trust Office of the Trustee or at any other office or agency of the Trustee maintained for such purpose, the Trustee shall execute and the Unit Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Trust Units of a like aggregate Notional Amount.

At the option of the Trust Unit Holders, each Trust Unit may be exchanged for other Trust Units with a like aggregate Notional Amount and in authorized denominations, upon surrender of such Trust Unit to be exchanged at any such office or agency. Whenever any Trust Units are so surrendered for exchange, the Trustee shall execute and cause the Unit Registrar to authenticate and deliver the Trust Units which the Trust Unit Holder making the exchange is entitled to receive. Every Trust Unit presented or surrendered for transfer or exchange shall (if so required by the Trustee) be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge to the Trust Unit Holders shall be made for any transfer or exchange of Trust Units, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Trust Units.

All Trust Units surrendered for transfer and exchange shall be disposed of by the Unit Registrar in accordance with its customary procedures.

The Trustee will cause the Unit Registrar (unless the Trustee is acting as Unit Registrar) to provide notice to the Trustee of each transfer of a Trust Unit, and will provide the Trustee with an updated copy of the Unit Register on January 1 of each year.

**Section 5.04.  *No Obligation to Register.***

The Trustee is not obligated to register or qualify any Trust Unit under the Securities Act or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

**Section 5.05.  *Mutilated, Destroyed, Lost or Stolen Units.***

If (a) any mutilated Trust Unit is surrendered to the Trustee or the Unit Registrar, or the Trustee and the Unit Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Trust Unit, and (b) there is delivered to the Trustee and the Unit Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of actual knowledge by the Trustee or the Unit Registrar that such Trust Unit has been acquired by a protected purchaser, the Trustee shall execute and deliver and the Unit Registrar shall authenticate, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Trust Unit, a new Trust Unit of like tenor. Upon the issuance of any new Trust Unit under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trust Unit Registrar) connected therewith. Any replacement Trust Unit issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust, as if originally issued, whether or not the destroyed, lost or stolen Trust Unit shall be found at any time.

**Section 5.06.  *Persons Deemed Owners*.**

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

**Section 5.07.  *Appointment of Trust Unit Paying Agent.***

The Trustee shall serve as the initial Trust Unit Paying Agent hereunder and thereafter, solely in the event that legal or regulatory requirements require the appointment of a different Trust Unit Paying Agent, the Trustee may appoint on behalf of, and as an expense of, the Trust, any other Trust Unit Paying Agent for the purpose of making distributions to Trust Unit Holders; provided, however, that any replacement Trust Unit Paying Agent shall be required to meet the eligibility requirement set forth in <u>Section 6.06</u>. The Trustee shall cause such Trust Unit Paying Agent to execute and deliver to the Trustee an instrument in which such Trust Unit Paying Agent shall agree with the Trustee that such Trust Unit Paying Agent will hold all

sums held by it for the payment to Trust Unit Holders in trust for the benefit of the Trust Unit Holders entitled thereto until such sums shall be paid to the Trust Unit Holders. All funds remitted by the Trustee to any such Trust Unit Paying Agent for the purpose of making distributions shall be paid to Trust Unit Holders as soon as practicable following receipt thereof by the Trust Unit Paying Agent and any amounts not so paid shall be returned as soon as practicable to the Trustee.

## ARTICLE VI

## CONCERNING THE TRUSTEE

**Section 6.01.** *Duties of Trustee.*

Every provision of the Trust Agreement (including these Standard Terms) relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VI.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement and no implied covenants or obligations shall be read into the Trust Agreements against the Trustee.

The Trustee shall (at the direction of the Requisite Trust Unit Holders), subject to its rights and protections herein, take all necessary or desireable actions to enforce the Assured Insurance Policies as set forth herein.

The Trustee shall deliver to all Trust Unit Holders copies of all notices and written communications received from Depositors, the Reorganized Debtors, or the trustee for the FGIC Trust as they relate to the Bonds, the GO CVIs, and/or the FGIC Certificates, as applicable.

Except as provided in Section 6.02 hereof, no provision of the Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act or willful misconduct; *provided, however,* that:

(a) The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(b) The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights (or such other percentage as may be specified herein) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New Securities or exercising any trust or power conferred upon the Trustee with respect to the New Securities, under the Trust Agreement;

(c)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Trust Unit Holders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Assured Insurance Policies or exercising any trust or power conferred upon the Trustee with respect to the Assured Insurance Policies, under the Trust Agreement; and

(d)     Any determination of gross negligence, willful misconduct or bad faith of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

### Section 6.02.  *Certain Matters Affecting the Trustee.*

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties.  Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by the Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of any of the Trust Unit Holders, pursuant to the provisions of the Trust Agreement, unless such Trust Unit Holders shall have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Trust Agreement (including these Standard Terms);

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice,

request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights; *provided, however,* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of the Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)     The Trustee may execute any of the trusts or powers under the Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under the Trust Agreement (including these Standard Terms);

(h)     Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 6.01;

(i)     The Trustee shall not be deemed to have notice of any matter unless one of its Officers has received written notice thereof at the Corporate Trust Office and such notice references the applicable Trust Units generally, the applicable Depositor(s), the Trust or the Trust Agreement;

(j)     None of the provisions of the Trust Agreement or these Standard Terms shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)     Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)     The permissive rights of the Trustee to perform any discretionary act enumerated in the Trust Agreement or these Standard Terms shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence or willful misconduct;

(m)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)     The Trustee shall have no duty (A) to see to any recording, filing, or depositing of the Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to the Trust Agreement (including these Standard Terms) believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of the Trust Agreement, these Standard Terms or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under the Trust Agreement or these Standard Terms, and shall have a duty only to accept such collateral or funds delivered to it in accordance with the Trust Agreement (including these Standard Terms);

(q)     The Trustee may rely conclusively on certification from Assured as to the Compounded Amount;

(r)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(s)     The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Trust Agreement;

(t)     All rights of action under the Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Trust Units, subject to the provisions of the Trust Agreement; and

(u)     The rights, protections, priviledges and immunities granted to the Trustee shall be applicable to the Trustee in its capacity as Unit Registrar and Trust Unit Paying Agent, *mutatis mutandis*.

**Section 6.03.   *Trustee Not Liable for Trust Units or Securities.***

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement and in the Trust Units.  The Trustee makes no representations or warranties as to the validity or sufficiency of the Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Trust Units) or of the Securities or

related documents. The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the Securities or deposited in or withdrawn from the Trust in accordance with the Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Sections 3.01 and 3.02. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the Bond Documents.

### Section 6.04.  *Trustee May Own Units.*

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

### Section 6.05.  *Trustee's Fees and Expenses.*

(a)     Pursuant to the Fee Agreement, each of the Trustee and the Delaware Trustee shall be entitled to receive from Assured, and if not paid by Assured, the Trust, compensation agreed upon in writing (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by it in the execution of the trusts created under the Trust Agreement and in the exercise and performance of any of the powers and duties thereunder of the Trustee. Each of the Trustee and the Delaware Trustee shall be entitled to reimbursement for (x) all reasonable fees, expenses, costs and disbursements (other than Extraordinary Expenses) incurred or made by the Trustee or the Delaware Trustee in accordance with any of the provisions of the Trust Agreement (including these Standard Terms) (including but not limited to the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), in each case to the extent set forth in the Fee Agreement and (y) Extraordinary Expenses reimbursable pursuant to Section 6.05(b). Additionally each of the Trustee and the Delaware Trustee shall be entitled to indemnification as provided in Section 6.13. All such amounts payable to the Trustees, collectively, the "**Trustee Costs**". All such Trustee Costs shall be paid pursuant to the terms of the Fee Agreement and the provisions of this Trust Agreement and may be reimbursed to the Trustee and the Delaware Trustee in accordance with the provisions of the Fee Agreement and the terms of this Trust Agreement, including Section 3.02 hereof. As set forth in the Fee Agreement, Trustee Costs will only be paid by the Trust in the event that Assured fails to do so pursuant to the terms of the Fee Agreement. As set forth in Sections 3.02(a)(iv), 3.02(b)(ii), and 3.02(c)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, or (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable. For the avoidance of doubt, the obligations to the Trustee shall include the Trustee in its capacity as Unit Registar and Trust Unit Paying Agent.

(b)     In furtherance of Section 6.05(a), and subject to the terms of and limitations in the Fee Agreement, each of the Trustee (including in its capacities as the Unit Registrar and Trust Unit Paying Agent) and the Delaware Trustee shall be entitled to receive

reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Trust Unit Holders against the Depositors, the Reorganizd Debtors, the Trust, or each of the Trustees except for proceedings, litigation or enforcement actions that relate to the Trustee's or Delaware Trustee's, as the case may be, own grossly negligent action, grossly negligent failure to act or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review (the "**Extraordinary Expenses**"). Subject to the terms of the Fee Agreement, the Trustee may (i) demand reimbursement from Assured, or (ii) in the event Assured fails to pay in response to such demand, make withdrawals from the Trust, to pay or reimburse itself the amount of any Extraordinary Expenses, up to a payment limit of $150,000 in the aggregate for the Trusts of Extraordinary Expenses in any calendar year or pro rata portion thereof in the case of the initial and the final years of the Trust based upon the portion of the applicable calendar year in which the Trust exists; provided, however, that the Trustee shall not have any obligation to incur additional Extraordinary Expenses in excess of such annual limit unless it has received security or indemnity reasonably satisfactory to it for such additional Extraordinary Expenses; and provided, further, that if the Trustee does incur any additional Extraordinary Expenses in excess of such annual limit in any calendar year, nothing herein shall prohibit it from being reimbursed for such Extraordinary Expenses in any subsequent calendar year, to the extent of funds available for such reimbursement as provided hereunder and subject to the payment limit of $100,000 applicable for each such subsequent calendar year or such pro rata portion thereof in the case of the initial and final years of the Trust and provided further that the foregoing shall not limit the payment of any amounts to which the Trustee is entitled pursuant to its indemnification rights set forth in Section 6.13 and the Fee Agreement with respect to defending the Trustee against any claim asserted by any Person.

(c)     For the avoidance of doubt, the Depositors shall not be liable for any Trustee Costs or Extraordinary Expenses.

**Section 6.06.** *Eligibility Requirements for Trustee, Successor Trustee, and Trust Unit Paying Agent.*

The Trustee, any successor Trustee, and any successor Trust Unit Paying Agent shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the Depositors or Assured; (ii) is neither affiliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is regularly acting as a trustee in the municipal finance market. If such corporation publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee, successor Trustee, or successor Trust Unit Paying Agent shall

cease to be eligible in accordance with the provisions of this Section, such Trustee, successor Trustee, or successor Trust Unit Paying Agent shall resign immediately in the manner and with the effect specified in Section 6.07.

### Section 6.07.   *Resignation and Removal of the Trustee.*

(a)   The Trustee may at any time resign and be discharged from the trusts created pursuant to a Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee. Upon receiving such notice of resignation, Assured shall promptly appoint a successor trustee meeting the requirements set forth in Section 6.06 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Trust Unit Holders and posted to EMMA by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)   If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 6.06 and shall fail to resign after written request therefor by Assured, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then Assured may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)   Assured may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 6.08 hereof. The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of Assured and the Trust, including without limitation, the costs and expenses incurred in connection with any such succession.

Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 6.08 hereof and (ii) payment of all costs, expenses and indemnities (other than Extraordinary Expenses) due and owing to the outgoing Trustee, including without limitation, the costs and expenses incurred in connection with any such succession.

Notwithstanding the replacement of the Trustee pursuant to this Section 6.07, the rights, benefits, protections and indemnities afforded to the Trustee under this Article VI shall continue to the benefit of the retiring Trustee.

**Section 6.08.  *Successor Trustee.***

Any successor trustee appointed as provided in Section 6.07 shall execute, acknowledge and deliver to the Trust Unit Holders and to the predecessor trustee an instrument accepting such appointment under the Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor thereunder, with the like effect as if originally named as trustee therein.  The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under the Trust Agreement and the Trust Unit Holders and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 6.06 hereof.

Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under the Trust Agreement and (b) mail notice of the succession of such trustee under the Trust Agreement to all Holders of Trust Units at their addresses as shown in the Unit Register.

**Section 6.09.  *Merger or Consolidation of Trustee.***

Any Person into which the Trustee may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under the Trust Agreement provided such Person shall be eligible under the provisions of Section 6.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

**Section 6.10.  *Reserved.***

**Section 6.11.  *Appointment of Custodians.***

The Trustee may appoint one or more Custodians to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee.  Subject to Article VI, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Trust Unit Holders. Each Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and

surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Custodian may not be an Affiliate of the Depositors or Assured.

### Section 6.12. *Trustee May Enforce Claims Without Possession of Trust Units.*

All rights of action and claims under the Trust Agreement or the Trust Units may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, indemnities, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Trust Unit Holders in respect of which such judgment has been recovered.

### Section 6.13. *Trustee Indemnity*

The Trustees' rights to claim indemnification for losses that they may incur with respect to the Trust Agreement (incorporating these Standard Terms) and each other document contemplated by the foregoing to which either of the Trustees is a party shall be as set forth in Annex I hereto and the Fee Agreement, subject to, with respect to Extraordinary Expenses, the provisions of Section 6.05(b).

## ARTICLE VII

## TERMINATION OF TRUST

### Section 7.01. *Termination; No Redemption Rights.*

Upon the indefeasible cancellation or other indefeasible termination of the relevant Assured Insurance Policy, the Trust (including the respective obligations and responsibilities under the Trust Agreement of the Trustee and Assured) shall terminate upon (i) the distribution to Assured or to Trust Unit Holders, as applicable, of any remaining Trust Assets held by or on behalf of the Trustee and required hereunder to be so distributed in accordance with the provisions of Section 3.03, 3.04, 3.05 3.07, or 3.08 hereof, (ii) payment in full of any Trustee Costs due and owing to the Trustees under the Trust Agreement (including these Standard Terms), (iii) payment in full of any Assured Deferred Expenses due and owing to Assured under the Trust Agreement (including these Standard Terms), (iv) payment in full of any known Tax Costs due and owing to any tax or governmental authority, and (v) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of the Trust Agreement have been complied with. In no event shall the Trust be terminated or the Securities be redeemed (except in the case of a redemption of the Securities permitted under the terms of the Bond Documents) or otherwise released from the Trust Estate (except pursuant to, and in accordance with, Sections 3.04 and 3.07 hereof) without the prior express written consent of Assured if either (i) the relevant Assured Insurance Policy has not been indefeasibly terminated or (ii) Assured has not been indefeasibly paid in full for any amounts owed pursuant to the Commonwealth Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

### Section 7.02. *Procedure for Termination.*

At least thirty (30) days prior to the date on which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice by letter to the Trust Unit Holders specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of Trust Units at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis to the extent necessary to satisfy the Insured Amount; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "**Termination Notice**"). The Trustee shall provide a copy of the Termination Notice to the Unit Registrar at the time such Termination Notice is given to Trust Unit Holders.

If the Requisite Trust Unit Holders do not object in writing within thirty (30) days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

Upon the dissolution, wind up and termination of the Trust and the Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

## ARTICLE VIII

## TAX PROVISIONS

### Section 8.01. *Grantor Trust Provisions.*

The Trustee, the Depositors, the Trust Unit Holders (by their acceptance of the Trust Units and book-entry beneficial interests therein) and Assured each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (b) the Trust is formed to facilitate direct investment in the Trust Assets, and (c) the Trustee (at the direction of Assured and/or the Requisite Trust Unit Holders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion

of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Trust Unit Holder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and Assured each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

Section 8.02.  *Characterization.*

Each Trust Unit Holder acknowledges and agrees to treat the Trust Units and the book-entry beneficial interests therein as undivided interests in the Trust Estate.

Section 8.03.  *Grantor Trust Administration.*

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Trust Unit Holders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Trust Unit Holders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust under the Grantor Trust Provisions. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Trust Unit Holders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "**Adverse Trust Event**"), unless the Trustee has obtained or received an Opinion of Counsel from counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Trust Unit Holders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

43

### Section 8.04.   *Reports to Trust Unit Holders and Tax Authorities*

(a)       The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for the avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U.S. Treasury Regulations Section 1.671-5, as amended, or any successor provision (the "**WHFIT Regulations**") (including U.S. Treasury Regulations Section 1.671-5(c)(1)).

(b)       Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to the WHFIT Regulations, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustees, the Depositors, or Assured be liable for any liabilities, costs or expenses of the Trust or the Trust Unit Holders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence or willful misconduct.

(c)       If any tax, duty, assessment, or other governmental charge is imposed, levied or assessed on the Trust, or if the Trust becomes subject to deduction, withholding, or other charge or assessment from, or with respect to, any amounts received by the Trust or any distributions made by the Trust, such tax, duty, assessment or other governmental charge, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) (collectively, the "**Tax Costs**") shall be the sole responsibility of, charged to and payable by the Trust Unit Holders on a pro rata basis. To the extent known prior to the termination of the Trust, all Tax Costs that are withheld, collected, charged, assessed, or levied shall be paid by the Trustee from the Trust Assets and income to the applicable taxing or governmental authority and any amounts so withheld, collected and/or paid to the applicable taxing or governmental authority shall be deemed to have been paid as distributions to the applicable Trust Unit Holders and treated in accordance with the provisions of the Trust Agreement applicable to Tax Costs. To the extent any Tax Costs become known after the termination of the Trust, the former Trust Unit Holders of such Trust shall remain responsible for such Tax Costs on a pro rata basis.

(d)       The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)       All taxes due and payable on any amounts payable to a Trust Unit Holder with respect to a Trust Unit shall be that Trust Unit Holder's sole responsibility.

(f)       For the purposes of this Article VIII of these Standard Terms and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to Holder, Trust Unit Holder, or Beneficial Owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Articles, Sections, or provisions hereof.

(g)       Notwithstanding any other provision of the Trust Agreement (including these Standard Terms), Assured makes no representations, warranties, or guarantees, and shall have no liability, with respect to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units. By electing, or being deemed to elect, Assured Bondholder Election 2, all Trust Unit Holders expressly agree to hold Assured harmless, and not to seek to impose any liabiltiy on Assured, related to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.

# ARTICLE IX

## MISCELLANEOUS PROVISIONS

### Section 9.01.   *Amendment of Trust Agreement.*

Promptly following the execution of the Trust Agreement, the Trustee shall post full and complete copies of the Trust Agreement (including these Standard Terms) on EMMA. The Trust Agreement (including these Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured. The Trust Agreement (including these Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

(a)       except as otherwise provided in the Trust Agreement (including these Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

(b)       compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

(c)   alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

(d)   amend this Section 9.01 without the written consent of each Trust Unit Holder;

(e)   adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in (a), (b), or (c) without the written consent of the Trust Unit Holders evidencing at least a majority of such Trust Units in the applicable Trust (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; *provided*, that only Trust Units that an Officer of the Trustee knows are so held shall be so disregarded; or

(f)   reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

Prior to executing any amendment permitted by this Article IX, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of Counsel and a certificate from an Officer of Assured stating that the execution of such amendment is authorized or permitted by the Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under the Trust Agreement, these Standard Terms or otherwise.

Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Trust Unit Holder and shall post a copy of such amendment to EMMA.

The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Trust Unit Holders shall be subject to such reasonable regulations as the Trustee may prescribe.

**Section 9.02.   *Counterparts; Electronic Signatures.***

The Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in the Trust Agreement (including these Standard Terms) or in any other certificate, agreement or document related to the Trust Agreement (including these Standard Terms) shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic

signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures andRecords Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

**Section 9.03.  *Limitation on Rights of Trust Unit Holders.***

The death or incapacity of any Trust Unit Holder shall not operate to terminate the Trust Agreement or the Trust, nor entitle such Trust Unit Holder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Trust Unit Holder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Trust Unit Holders from time to time as partners or members of an association; nor shall any Trust Unit Holder be under any liability to any third person by reason of any action taken by the parties to the Trust Agreement pursuant to any provision hereof.

Except with respect to enforcement of the applicable Assured Insurance Policies in accordance with the terms hereof, no Trust Unit Holder shall have any right by virtue of any provision of the Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to the Trust Agreement, unless the Requisite Trust Unit Holders shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Trust Agreement, and the Trustee, for 15 days after its receipt of such request shall have neglected or refused to institute any such action, suit or proceeding. It is understood and intended, and expressly covenanted by each Trust Unit Holder with every other Trust Unit Holder and the Trustee, that no one or more Holders of Trust Units shall have any right in any manner whatever by virtue of any provision of the Trust Agreement to affect, disturb or prejudice the rights of the Holders of any other Trust Units, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under the Trust Agreement, except in the manner therein provided and for the equal, ratable and common benefit of all Trust Unit Holders. For the protection and enforcement of the provisions of this Section, each and every Trust Unit Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

In the event that an Officer of the Trustee receives a request for its consent to any amendment, modification or waiver of these Standard Terms, the Trust Agreement or any other document thereunder or relating thereto, or receives any other solicitation for any action with respect to the Securities or Assured Insurance Policies, the Trustee shall transmit a notice of such proposed amendment, modification, waiver, solicitation or action to each of the Trust

Unit Holders within five (5) days of receipt thereof. The Trustee shall request instructions from the Trust Unit Holders as to whether or not to consent to or vote to accept such amendment, modification, waiver, solicitation or action.

The Trustee shall consent or vote proportionally in accordance with the written direction of the Trust Unit Holders; provided, however, that the Trustee shall not:

(a)     without the prior written consent of any Trust Unit Holder, consent or affirmatively vote on behalf of such Trust Unit Holder on any matter that would: (i) terminate the Trust, (ii) except as expressly provided herein, sell some or all of the assets of the Trust; (iii) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy; and

(b)     without the prior written consent of Assured, consent or affirmatively vote on any matter that would amend, modify or waive any agreement in such a manner as to adversely impact Assured. Any such determination as to whether any such amendment, modification or waiver adversely impacts Assured shall be made in the sole and absolute discretion of Assured and such determination shall be promptly provided by notice to the Trustee and the Trust Unit Holders. The Trustee shall not be liable to any Trust Unit Holder or any other Person for refusing to consent or affirmatively vote on such a matter in accordance with such written direction of Assured.

**Section 9.04.** *Notices.*

All demands and notices under the Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, or by express delivery service, to:

(a) in the case of the Trustee if the Trustee is U.S. Bank National Association, the notice address for the Trustee is 100 Wall Street, 6th Floor, New York, New York 10005. If the Trustee is not U.S. Bank National Association, the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Trustee,;

(b) in the case of the Delaware Trustee, if the Delaware Trustee is U.S. Bank Trust National Association, the notice address for the Delaware Trustee is 100 Wall Street, 6th Floor, New York, New York 10005. If the Delaware Trustee is not U.S. Bank Trust National Association, the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Delaware Trustee;

(c) in the case of the Depositors, [ ● ], or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Depositors; and

(d) in the case of Assured, 1633 Broadway, New York, NY 10019, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by Assured.

Any notice required or permitted to be mailed to a Trust Unit Holder shall be given by first-class mail, postage prepaid, or by express delivery service, at the address of such Trust Unit Holder as shown in the Unit Register. Notwithstanding the foregoing, so long as the Depository or its nominee is the registered holder of the Trust Units, notice may be given to the Trust Unit Holders by giving notice to the Depository in accordance with its applicable procedures. Notice may also be delivered by email in accordance with a separate side letter agreement entered into between the parties. Any notice so mailed within the time prescribed in the Trust Agreement shall be conclusively presumed to have been duly given, whether or not the Trust Unit Holder receives such notice. A copy of any notice required to be telecopied hereunder also shall be mailed to the appropriate party in the manner set forth above. A copy of any notice given hereunder to any other party shall be delivered to the Trustee.

### Section 9.05.   *Severability of Provisions.*

If any one or more of the covenants, agreements, provisions or terms of the Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of the Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of the Trust Agreement or of the Trust Units or the rights of the Holders thereof.

### Section 9.06.   *Third-Party Beneficiaries.*

The Trust Unit Holders and their successors and assigns shall be third-party beneficiaries of the provisions of the Trust Agreement (inclding these Standard Terms). For the avoidance of doubt, beneficial holders of Trust Units are third party beneficiaries solely to the extent necessary to allow them to enforce the applicable Assured Insurance Policies as set forth herein. Nothing in these Standard Terms or the Trust Agreement, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Trust Unit Holders, any benefit or any legal or equitable right, remedy or claim under the Trust Agreement (including these standard terms).

### Section 9.07.   *Acts of Trust Unit Holders.*

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Trust Agreement (including these Standard Terms) to be given or taken by Trust Unit Holders or a class of Trust Unit Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Trust Unit Holders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of the Trust Agreement (including these Standard Terms) and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Unit Register.

### Section 9.08.   *Headings.*

Section and subsection headings in these Standard Terms are included herein for convenience of reference only and shall not constitute a part of these Standard Terms for any other purpose or be given any substantive effect.

**Section 9.09.  *No Waiver; Cumulative Remedies.***

No failure to exercise and no delay in exercising, on the part of any party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

**Section 9.10.  *Merger and Integration.***

These Standard Terms and the Trust Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by the Trust Agreement (including these Standard Terms).

**Section 9.11.  *The Delaware Trustee***

(a)   The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirement of <u>Section 3807(a)</u> of the Delaware Statutory Trust Act that the Trust have at least one trustee with a principal place of business in the State of Delaware. It is understood and agreed by the parties hereto that the Delaware Trustee shall have none of the duties or liabilities of the Trustee or any other trustees.

(b)   The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under <u>Section 3811</u> of the Delaware Statutory Trust Act. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Trust Unit Holders, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of the Trustee or any other trustees and the Delaware Trustee shall not be liable for supervising or monitoring the performance of the duties of the Trustee, or any other trustees, or the Trust or of any other person or entity under the Trust Agreement or any related document.

(c)   The Delaware Trustee may be removed by Assured upon thirty days prior written notice to the Delaware Trustee. The Delaware Trustee may resign upon thirty days prior written notice to Assured, with a copy to the Trustee. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment by Assured of a successor Delaware Trustee that (i) is reasonably acceptable to Assured, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware. If no successor has been appointed within such thirty (30) day period, the

Delaware Trustee, the Trustee or the Trust Unit Holders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

(d)     Any Person into which the Delaware Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Delaware Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor Delaware Trustee under the Trust Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto, except as may be required by applicable law, provided that such resulting or successor entity otherwise satisfies the requirements set forth herein to serve as Delaware Trustee.

(e)     Assured and the Trust shall be responsible for the payment of any fees or expenses of the Delaware Trustee. The Delaware Trustee shall be entitled to all of the same rights, protections, indemnities and immunities under the Trust Agreement and with respect to the Trust as the Trustee. No amendment or waiver of any provision of the Trust Agreement which adversely affects the Delaware Trustee shall be effective against it without its prior written consent. This provision shall survive the resignation or removal of the Delaware Trustee.

## ANNEX I

INDEMNIFICATION PROVISIONS

(i) The Trust shall indemnify each of the Trustees or any predecessor Trustees and their agents for, and to hold them harmless against, any and all loss, damage, claims, liability or expense, including taxes (other than taxes based upon, measured by or determined by the income of the Trustees), arising out of or in connection with the acceptance or administration of the Trust hereunder, including the costs and expenses of defending itself against any claim asserted by any other Person or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct as determined by a final judgment of a court of a competent jurisdiction no longer subject to appeal or review.

(ii) The Trustees shall have the right to employ separate counsel in any such action or proceeding and participate in the investigation and defense thereof, and the Trust shall pay the reasonable fees and expenses of such separate counsel; provided, however, that the Trustees may only employ separate counsel at the expense of the Trust if in the reasonable judgment of the Trustees (1) a conflict of interest exists by reason of common representation or (2) there are legal defenses available to the Trustees that are different from or are in addition to those available to the Trust or if all parties commonly represented do not agree as to the action (or inaction) of counsel.

## EXHIBIT A

NOTICE OF CLAIM AND CERTIFICATE

[Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.]
1633 Broadway
New York, NY 10019
Attention: [●]
E-Mail: [●]

   Reference is made to the [Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank National Association, (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Notice of Claim and Certificate is delivered pursuant to Section 3.06(a) of the Standard Terms. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement and the Policy (as defined below).

   The undersigned, a duly authorized officer of Trustee, in its capacity as Trustee for the Trust, hereby certifies to Assured, with reference to the Trust Agreement and Municipal Bond Insurance Policy No. [●], dated [●], 20[●] (the "**Policy**"), issued in respect of the [Name of Series of Bonds] (the "**Assured Legacy Bonds CUSIP**") and deposited into the Trust, that:

   (i)  The Trustee is the Trustee under the Trust Agreement.

   (ii)  After taking into account any adjustments made pursuant to Section 3.05 of the Standard Terms, the sum of all amounts on deposit with the Trustee and available for distribution to the Trust Unit Holders pursuant to the Trust Agreement will be $[●] (such amount, the "**Payment Shortfall**") less than the principal and interest of $[●] (the "**Scheduled Payments**") Due for Payment under the Policy and Trust Agreement on [●], 20[●] (the "**Payment Date**").

   (iii)  The Trustee is hereby making a claim under the Policy and Trust Agreement for the Payment Shortfall to be applied to the payment of Scheduled Payments.

   (iv)  The Trustee agrees that, following its receipt of funds from Assured, it shall (a) hold such amounts in trust and, subject to Section 3.06(d) of the Trust Agreement, apply the same directly to the payment of Scheduled Payments when due; (b) not apply such funds for any other purpose; (c) not commingle such funds with other funds held by the Trustee, and (d) maintain an accurate record of such payments with respect to each Trust Unit and the corresponding claim on the Policy.

(v)      The Trustee, on behalf of the Trust Unit Holders, hereby assigns to Assured any rights of the Trust Unit Holders with respect to the Trust Assets to the extent that the principal amount (or Compounded Amount, as applicable) of the Assured Legacy Bonds CUSIP is reduced to zero. The foregoing assignment is in addition to, and not in limitation of, rights of subrogation otherwise available to Assured in respect of such payments. The Trustee shall take such action and deliver such instruments as may be reasonably requested or required by Assured to effectuate the purpose or provisions of this clause (v) and the applicable terms in the Trust Agreement.

(vi)     The Trustee, on behalf of the Trust Unit Holders, hereby acknowledges and agrees that, so long as Assured shall not be in default in its payment obligations under the Policy, Assured may at any time during the continuation of any proceeding by or against the Depositor under the United States Bankruptcy Code (if applicable) or any other applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (an "**Insolvency Proceeding**"), direct all matters with respect to the Trust Units or Trust Assets relating to such Insolvency Proceeding, including without limitation, (A) all matters relating to any claim in connection with an Insolvency Proceeding seeking the avoidance as a preferential transfer of any payment made to the Trust or Trustee or in connection with the Trust Units (a "**Preference Claim**"), (B) the direction of any appeal of any order relating to any Preference Claim at the expense of Assured, and (C) the posting of any surety, supersedeas or performance bond pending any such appeal. In addition, and without limiting the foregoing, the Trustee hereby agrees that Assured shall be subrogated to the rights of each Trust Unit Holder in any Insolvency Proceeding to the extent it is subrogated pursuant to section (vii) below, including, without limitation, all rights of any party to an adversary proceeding action with respect to any court order issued in connection with any such Insolvency Proceeding.

(vii)     Assured shall, to the extent it makes any Scheduled Payments on the Trust Units under the Policy and Trust Agreement, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Policy and the Trust Agreement.

(viii)     The Trustee hereby requests that the Payment Shortfall be deposited into the Insurance Policy Account by bank wire transfer or other immediately available funds using the following wiring instructions:

Correspondent Bank:        [_____]

Fed ABA No:                [_____]

Account Name:              [_____]

Account No:                [_____]

Beneficiary A/C Name:      [_____]

Reference:                 [_____]

This Notice of Claim and Certificate may be revoked at any time by written notice of such revocation by the Trustee to Assured.

IN WITNESS WHEREOF, the Trustee has executed and delivered this Notice of Claim and Certificate as of the [ ● ]th day of [ ● ], 20[ ● ].

U.S. Bank National Association, as Trustee

By: _____
    Name:
    Title:

For Assured or
Trustee Use Only
Wire transfer sent on _____ By _____
Confirmation Number _____

-3-

Appendix I

Debt Service Payment for []/[]/20[]

| Description of Bond Issue | CUSIP | Outstanding Amount | Maturity | Rate | Principal Insured Amount | Principal | Interest | Total | Insurer | Policy No. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | _____ | | | _____ | _____ | _____ | _____ | | |
| | | _____ | | | _____ | _____ | _____ | _____ | | |

A-1

**EXHIBIT B**

FORM UNIT EXCHANGE ELECTION NOTICE
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
Trust Unit Certificate No(s). __
Notional Amount: _____
CUSIP: [●]


[Trustee Name]
[Trustee Address]


Ladies and Gentlemen:

      Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank National Association (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Unit Exchange Election Notice is delivered pursuant to Section 3.07(a) of the Standard Terms. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

      By delivering this Unit Exchange Election Notice, we hereby give [thirty (30)] days' written notice of our exercise of a Unit Exchange Election with respect to [ ] the Trust Unit(s) evidenced by the Trust Unit Certificate No(s). referenced above and direct the Trustee to distribute a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, as applicable, no later than [Date], in accordance with the [delivery] instructions below. We understand that such distribution will not be made until the applicable Trust Units are presented and surrendered at the office of the Trustee therein designated on that date.

      If cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, we shall pay in cash the applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of our share of remaining Trust Assets.

By making a Unit Exchange Election, we acknowledge and agree that upon distribution of the Trust Assets in accordance with Section [3.07(b)] of the Standard Terms, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

[Please include delivery instructions for the distribution of Trust Assets to be receive on account of this Unit Exchange Election]

[Please Include any other relevant information]

[],
as Trust Unit Holder

By:_____
Name:
Title:

**EXHIBIT C**

FORM OF NOTICE OF MATURITY
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
CUSIP No.: [●]

Ladies and Gentlemen:

Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank National Association (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Notice of Maturity is delivered pursuant to Section 3.08(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

1. <u>Maturity Date</u>. Prior to acceleration, the Assured Legacy Bonds were scheduled to mature on [●] (the "**Maturity Date**").

2. <u>Trust Unit Holder Distribution</u>.  As a Trust Unit Holder, you are entitled receive a Distribution (or multiple Distributions) in the amount of a pro rata share of the Insured Amount on the Maturity Date corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date.

3. [Include any other relevant information required by the Depository or otherwise.]

C-1

## EXHIBIT D

FORM OF NOTICE TO TRUST UNIT HOLDERS

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]
STATEMENT FOR THE MONTH ENDED [●], 20__

**POSTED TO EMMA**
**U.S. Bank National Association, as Trustee**

1. **Trust Units**[1]

| | For the month ended [●], 20__ | | Year to date [●], 20__ | | As of [●], 20__ |
|---|---|---|---|---|---|
| | Aggregate distributions | Per Unit distributions | Aggregate distributions | Per Unit distributions | Aggregate principal or Accreted Value of New GO Bonds or GO CVIs (by CUSIP)[2] |
| Tax-Exempt Bond Account | $ | $ | $ | $ | |
| Taxable Bond Account | $ | $ | $ | $ | |
| Cash Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |
| CVI Account | $ | $ | $ | $ | |
| Insurance Policy Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |
| FGIC Certificates Account | $ | $ | $ | $ | |
| FGIC Insured Bonds Insurance Policy | $ | $ | $ | $ | [N/A (cash balance = $ [])] |

---

[1] Trustee to include only portions of table relevant to a particular Trust.
[2] Or any other securities or property received in respect thereof or in exchange therefor.

| | | | | | |
|---|---|---|---|---|---|
| Payments Account | | | | | |
| Non-Book Entry AGC Trust Units Account | $ | $ | $ | $ | |
| AGM Double-Insured Insurance Policy Payments Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |

**Aggregate Payment /Insured Amount Reporting for [Assured Legacy Bonds CUSIP]**

As of [ ● ]

    a.  <u>Current Interest Bonds</u>: Payments Made to Date on [Assured Legacy Bonds CUSIP]

        i.  Aggregate Interest Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

           **Total** _____; **Per Trust Unit** _____

           1.  Aggregate Interest Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

               **Total** _____; **Per Trust Unit** _____

           2.  Aggregate Interest Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]:

               **Total** _____; **Per Trust Unit** _____

        ii.  Aggregate Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

           **Total** _____; **Per Trust Unit** _____

           1.  Aggregate Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

               **Total** _____; **Per Trust Unit** _____

           2.  Aggregate Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]: _____

Total _____; **Per Trust Unit** _____

iii. Aggregate Interest and Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below): _____

1. Aggregate Interest and Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP] (sum of (i)(1) and (ii)(1) above):

Total _____; **Per Trust Unit** _____

2. Aggregate Interest and Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP] (sum of (i)(2) and (ii)(2) above):

Total _____; **Per Trust Unit** _____

b. <u>Capital Appreciation Bonds</u>: Payments Made to Date on [Assured Legacy Bonds CUSIP]

i. Aggregate Compounded Amount Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

Total _____; **Per Trust Unit** _____

1. Aggregate Compounded Amount Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

Total _____; **Per Trust Unit** _____

2. Aggregate Compounded Amount Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]:

Total _____; **Per Trust Unit** _____

c. <u>Insured Amount</u> for [Assured Legacy Bonds CUSIP]: _____

2. **Other distributions to Trust Unit Holders**

[_____]

3. **Tax Reporting**

[_____]

D-3

---

**STANDARD TERMS**

**TO**

**TRUST AGREEMENT**

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO, as Depositor,

Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY, as Depositor,

ASSURED GUARANTY CORP.,

ASSURED GUARANTY MUNICIPAL CORP.,

U.S. BANK NATIONAL ASSOCIATION,
as Trustee,

and

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Delaware Trustee,

Custodial Trust Units

Dated as of [●]

**TABLE OF CONTENTS**                                                      **Page**

RECITALS ........................................................................................................ 1

STANDARD PROVISIONS ............................................................................ 1

ARTICLE I  DEFINITIONS ............................................................................ 1
    Section 1.01.    Defined Terms. ............................................................. 1
    Section 1.02.    Other Definitional Provisions. ................................... 11

ARTICLE II  TRUST ESTATE ...................................................................... 11
    Section 2.01.    Trust Assets. ............................................................... 11
    Section 2.02.    Acceptance by the Trustee ........................................ 15
    Section 2.03.    Purpose, Activities of the Trust. ............................... 16
    Section 2.04.    Limitations of the Trust. ........................................... 17
    Section 2.05.    Voting Rights............................................................. 17

ARTICLE III  ADMINISTRATION OF THE TRUST.................................... 18
    Section 3.01.    Accounts.................................................................... 19
    Section 3.02.    Distributions; Prior to Maturity Date or in Connection with
                         Assured Advancement Option................................. 19
    Section 3.03.    Assured Advancement Option. ................................. 22
    Section 3.04.    Sale of New Securities. ............................................. 22
    Section 3.05.    Adjustments to Principal Amounts and Compounded
                         Amounts. ................................................................. 24
    Section 3.06.    Payments on Assured Insurance Policies. .................. 26
    Section 3.07.    Exchange of Trust Units for Trust Assets. ................. 27
    Section 3.08.    Payments at Maturity Date. ...................................... 28

ARTICLE IV  REPORTING/REMITTING TO TRUST UNIT HOLDERS ................. 29
    Section 4.01.    Statements to Trust Unit Holders. ............................. 29
    Section 4.02.    Compliance with Withholding Requirements. ........... 29

ARTICLE V  TRUST UNITS .......................................................................... 29
    Section 5.01.    The Trust Units. ......................................................... 30
    Section 5.02.    Book-Entry Trust Units. ............................................ 30
    Section 5.03.    Registration of and Limitation on Transfers and Exchanges
                         of Units.................................................................... 31
    Section 5.04.    No Obligation to Register. ......................................... 32
    Section 5.05.    Mutilated, Destroyed, Lost or Stolen Units................ 32
    Section 5.06.    Persons Deemed Owners. .......................................... 32
    Section 5.07.    Appointment of Trust Unit Paying Agent. ................. 32

ARTICLE VI  CONCERNING THE TRUSTEE.............................................. 33

i

# TABLE OF CONTENTS
## (continued)

**Page**

Section 6.01.   Duties of Trustee................................................................ 33
Section 6.02.   Certain Matters Affecting the Trustee. ............................... 34
Section 6.03.   Trustee Not Liable for Trust Units or Securities. .............. 36
Section 6.04.   Trustee May Own Units. ..................................................... 37
Section 6.05.   Trustee's Fees and Expenses. ............................................. 37
Section 6.06.   Eligibility Requirements for Trustee, Successor Trustee,
               and Trust Unit Paying Agent............................................. 38
Section 6.07.   Resignation and Removal of the Trustee. .......................... 39
Section 6.08.   Successor Trustee. ............................................................... 40
Section 6.09.   Merger or Consolidation of Trustee. .................................. 40
Section 6.10.   Reserved................................................................................ 40
Section 6.11.   Appointment of Custodians. ............................................... 40
Section 6.12.   Trustee May Enforce Claims Without Possession of Trust
               Units. .................................................................................. 41
Section 6.13.   Trustee Indemnity ............................................................... 41

ARTICLE VII  TERMINATION OF TRUST............................................... 41
Section 7.01.   Termination; No Redemption Rights................................... 41
Section 7.02.   Procedure for Termination................................................... 42

ARTICLE VIII  TAX PROVISIONS.............................................................. 42
Section 8.01.   Grantor Trust Provisions. ................................................... 42
Section 8.02.   Characterization. ................................................................. 43
Section 8.03.   Grantor Trust Administration.............................................. 43
Section 8.04.   Reports to Trust Unit Holders and Tax Authorities .......... 44

ARTICLE IX  MISCELLANEOUS PROVISIONS ........................................ 45
Section 9.01.   Amendment of Trust Agreement.......................................... 45
Section 9.02.   Counterparts. ....................................................................... 46
Section 9.03.   Limitation on Rights of Trust Unit Holders. ...................... 47
Section 9.04.   Notices. ................................................................................ 48
Section 9.05.   Severability of Provisions.................................................... 49
Section 9.06.   Third-Party Beneficiaries. ................................................... 49
Section 9.07.   Acts of Trust Unit Holders. ................................................ 49
Section 9.08.   Headings............................................................................... 49
Section 9.09.   No Waiver; Cumulative Remedies. ..................................... 50
Section 9.10.   Merger and Integration. ...................................................... 50
Section 9.11.   The Delaware Trustee .......................................................... 50

## RECITALS

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO (the "Commonwealth"), Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY ("PBA", and together with the Commonwealth, the "Depositors"), ASSURED GUARANTY CORP. ("AGC") and ASSURED GUARANTY MUNICIPAL CORP. ("AGM", and AGC and/or AGM, together or individually, as applicable, "Assured") have entered into a Trust Agreement (the "Trust Agreement") with U.S. BANK NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee") and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, the "Trustees"), which Trust Agreement provides for the issuance of trust units ("Trust Units"), each evidencing a beneficial ownership interest in the property owned by the Trust created by the Trust Agreement. These Standard Terms are a part of, and are incorporated by reference into, the Trust Agreement.

## STANDARD PROVISIONS

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations and warranties made in the Trust Agreement, the Depositors, Assured and the Trustees agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01.  *Defined Terms.***

Except as otherwise specified herein or in the Trust Agreement or as the context may otherwise require, whenever used herein, the following words and phrases shall have the meanings specified in this Article. Capitalized words and phrases used herein but not defined herein shall, when applied to a Trust, have the meanings set forth in or pursuant to the Trust Agreement.

"**Acceleration Price**": With respect to an Assured Legacy Bond, an amount equal to the outstanding principal amount of such bond plus the accrued and unpaid interest thereon.

"**Accreted Value**": As defined in the New GO Bonds Indenture.

"**Adverse Trust Event**": has the meaning set forth in <u>Section 8.03</u> hereof.

"**Affiliate**": Any person or entity controlling, controlled by or under common control with the Depositor, Assured or either of the Trustees, as the context may require. "Control" means the power to direct the management and policies of a person or entity, directly or indirectly, whether through ownership of voting securities, by contract or otherwise. "Controlling" and "controlled" shall have meanings correlative to the foregoing.

"**AGC Insurance Policy**": An Assured Insurance Policy issued by AGC.

1

"**AGC Secondary Market Assured Legacy Bond**": An Assured Legacy Bond insured by AGC in the secondary market.

"**AGC Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGC in the secondary market.

"**AGC Trust**": The Trust for an AGC Secondary Market Assured Legacy Bonds CUSIP.

"**AGC Trustee**": The Trustee for an AGC Trust.

"**AGM Double-Insured Insurance Policy**": An Assured Insurance Policy issued by AGM and insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**AGM Double-Insured Insurance Policy Payments Account**": As defined in Section 3.01(c)(ii) hereof.

"**AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGM in the secondary market that relates to underlying Assured Legacy Bonds that are also insured by AGC in the secondary market, consisting of (i) AGM Secondary Market Assured Legacy Bonds CUSIP 745235YJ4 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745235UX7 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy) and (ii) AGM Secondary Market Assured Legacy Bonds CUSIP 745235YV7 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745235UY5 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy).

"**AGM Double-Insured Trust**": The Trust for an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**AGM Double-Insured Trustee**": The Trustee for an AGM Double-Insured Trust.

"**AGM Double-Insured Trust Unit**": A Trust Unit issued by an AGM Double-Insured Trust.

"**AGM Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGM in the secondary market.

"**Assured Acceleration Option**": Assured's right, in accordance with the terms of the Assured Insurance Policies and Section 75.1(c) of the Commonwealth Plan, to elect to discharge its payment obligations with respect to any Assured Legacy Bonds CUSIP prior to the stated Maturity Date thereof by paying the applicable Acceleration Price to the holders thereof.

2

"**Assured Advancement Option**": Either (a) the Assured Acceleration Option or (b) the rights assigned by the Commonwealth or PBA to Assured pursuant to Section 75.1(d) of the Commonwealth Plan to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were the Commonwealth or PBA for such purpose, such that any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Acceleration Price.

"**Assured Bondholder Election 2**": As defined in the Commonwealth Plan.

"**Assured Deferred Expenses**": Any Trustee Costs or Trust expenses paid in cash to the Trustee or the Trust by Assured.

"**Assured Insurance Policies**": The insurance policies, including insurance policies issued in the secondary market, pursuant to which Assured insured payments of principal and interest with respect to the Assured Legacy Bonds.

"**Assured Insured Bonds**": As defined in the Commonwealth Plan.

"**Assured Insurer Event**": A default by Assured on its payment obligations under an applicable Assured Insurance Policy, which default is continuing.

"**Assured Legacy Bondholder**": The beneficial holder of an Assured Legacy Bond.

"**Assured Legacy Bond**": Any Assured Insured Bond the beneficial holder of which has validly elected, or is deemed to have elected, Assured Bondholder Election 2.

"**Assured Legacy Bonds CUSIP**": Any maturity of Assured Legacy Bonds that bears a unique CUSIP such that such maturity of Assured Legacy Bonds is separately identifiable from other maturities of Assured Legacy Bonds with unique CUSIPs; provided, however, that for all Secondary Market Assured Legacy Bonds, the "Assured Legacy Bonds CUSIP" for purposes of this Trust Agreement shall be the CUSIP of the related custody receipt evidencing a beneficial interest in such Secondary Market Assured Legacy Bonds and the related Assured Insurance Policy rather than the CUSIP of the underlying Secondary Market Assured Legacy Bonds. For the avoidance of doubt, each Assured Legacy Bonds CUSIP is either a Primary Market Assured Legacy Bonds CUSIP or a Secondary Market Assured Legacy Bonds CUSIP, and the Assured Legacy Bonds CUSIPs consist of (i) Primary Market Assured Legacy Bonds CUSIP 74514LD46 and (ii) Secondary Market Assured Legacy Bonds CUSIPs 74514LWE3, 74514LUW5, 745235YJ4, 745235YV7, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5.

"**Assured Reimbursement Amount**": An amount sufficient to reimburse Assured for all payments made by Assured under an Assured Insurance Policy for a particular Assured Legacy Bonds CUSIP, and payment of which to Assured shall be a requirement of the Unit Exchange Election.

"**Beneficial Owner**": With respect to any Trust Unit, the Person who is registered as owner of that Trust Unit in the books of the Depository for that Trust Unit or in the books of a

Depository Participant, or in the books of an indirect participant for which a Depository Participant acts as agent.

"**Bond Documents**": The bond resolutions, indentures, trust agreements, or similar agreements pursuant to which (i) the Assured Legacy Bonds, (ii) the New GO Bonds, (iii) the GO CVIs, and (iv) the FGIC Certificates, as applicable, were issued.

"**Bond Election**": As defined in Section 3.04(b) hereof.

"**Bond Sale**": As defined in Section 3.04(a) hereof.

"**Book-Entry Trust Units**": All Trust Units, other than the Non-Book-Entry AGC Trust Units.

"**Bonds**": Collectively, (i) the GO Bonds, (ii) the PBA Bonds, and (iii) the New GO Bonds.

"**Business Day**": Any day that is not a Saturday, Sunday, holiday, or other day on which commercial banking institutions in the City of New York, the city of San Juan, Puerto Rico or the State of Delaware or, if different, the city and state in which the Corporate Trust Office is located are authorized or obligated by law or executive order to be closed.

"**Capital Appreciation Bond**": An Assured Legacy Bond that is a capital appreciation bond.

"**Cash Account**": As defined in Section 3.01(a)(iii) hereof.

"**Cash Proceeds**": As defined in Section 3.04(b) hereof.

"**Code**": The Internal Revenue Code of 1986, as amended.

"**Clawback Structuring Fees**": The payments to which Assured is entitled pursuant to Section 86.1(b)(xvi) of the Commonwealth Plan and any related provision of the Confirmation Order.

"**Commonwealth Plan**": The Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03284-LTS, ECF No. 19365, including as amended or superseded, but in all events solely to the extent in form and substance reasonably satisfactory to Assured and otherwise consistent with the Commonwealth PSA and HTA/CCDA PSA.

"**Commonwealth Plan Cash Distributions**": Any cash distributions allocable to Assured Legacy Bondholders on account of Assured Legacy Bonds under the Commonwealth Plan, but, for the avoidance of doubt, excluding any Consummation Costs, PSA Restriction Fees, or Clawback Structuring Fees payable to Assured, each as defined in the Commonwealth Plan or in this Trust Agreement, as applicable.

4

"**Commonwealth PSA**": That certain Amended and Restated Plan Support agreement, dated as of July 12, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to GO Bonds and PBA Bonds, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**Compounded Amount**": With respect to any Capital Appreciation Bond, the compounded amount thereof.

"**Confirmation Order**": The order of the United States District Court for the District of Puerto Rico confirming the Commonwealth Plan in accordance with Section 314(b) of PROMESA and section 1129 of the Bankruptcy Code.

"**Corporate Trust Office**": The respective principal corporate trust office of the Trustees at which the Trust is administered from time to time.

"**Current Interest Bond**": An Assured Legacy Bond that is a current interest bond.

"**Custodian**": The Trustee or the agent for the Trustee which shall hold all or a portion of the Trust Estate, or documents relating thereto, with respect to a specific Trust.

"**CVI Account**": As defined in Section 3.01(a)(iv) hereof.

"**Depository**": The Depository Trust Company, or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act and the regulations of the SEC thereunder.

"**Depository Participant**": A broker, dealer, bank, other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"**Distribution**": Any distribution to Trust Unit Holders made pursuant to Section 3.02; provided, however, that, for purposes of Section 3.05 hereof, if a Distribution on a Non-Book-Entry Double-Insured AGC Trust Unit is subsequently passed through to an AGM Double-Insured Trust and distributed as a Distribution on an AGM Double-Insured Trust Unit, such Distributions from the applicable AGC Trust and the related AGM Double-Insured Trust shall constitute a single Distribution (with no double counting) for purposes of calculating amounts that remain outstanding with respect to the Assured Legacy Bonds held by the applicable AGC Trust and insured by the related AGM Double-Insured Insurance Policy.

"**Effective Date**": The "Effective Date" as defined in the Commonwealth Plan and identified in a public notice by the Oversight Board; provided, however, that any action required by this Trust Agreement to be taken or event required by this Trust Agreement to have occurred on the Effective Date shall be deemed to have been taken or to have occurred on the Effective Date if such action is taken or such event occurs within ten (10) Business Days of the Effective Date.

**"EMMA"** The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP for each Trust Unit to which such document relates.

**"Extraordinary Expenses"**: As defined in Section 6.05(b) hereof.

**"Fee Agreement"**: The fee and indemnification agreement dated as of the date hereof providing for the Trustees' recovery from or reimbursement by Assured of certain reasonable compensation, certain reasonable expenses, costs, and disbursements, certain Extraordinary Expenses and certain indemnification payments.

**"FGIC"**: Financial Guaranty Insurance Company.

**"FGIC Certificates"**: As defined in the Commonwealth Plan.

**"FGIC Certificates Account"**: As defined in Section 3.01(b)(i) hereof.

**"FGIC Insurance Policies"**: As defined in the Commonwealth Plan.

**"FGIC Insured Bonds"**: As defined in the Commonwealth Plan.

**"FGIC Insured Bonds Insurance Policy Payments Account"**: As defined in Section 3.01(b)(ii) hereof.

**"FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP"**: A Secondary Market Assured Legacy Bonds CUSIP with respect to which the underlying Secondary Market Assured Legacy Bonds are insured by FGIC in the primary market, consisting of (i) Secondary Market Assured Legacy Bonds CUSIP 74514LWE3 (evidencing a beneficial ownership interest in (x) underlying Secondary Market Assured Legacy Bonds with CUSIP number 745145R53 insured by FGIC in the primary market and (y) the related Assured Insurance Policy) and (ii) Secondary Market Assured Legacy Bonds CUSIP 74514LUW5 (evidencing a beneficial ownership interest in (x) underlying Secondary Market Assured Legacy Bonds with CUSIP number 74514LNG8 insured by FGIC in the primary market and (y) the related Assured Insurance Policy).

**"FGIC Plan Consideration"**: As defined in the Commonwealth Plan.

**"FGIC Trust"**: As defined in the Commonwealth Plan.

**"Floor Price"**: The minimum weighted average sale price required to be obtained for the Subject Bonds with respect to any Bond Sale, as determined by Assured.

**"GO CVI"**: As defined in the Commonwealth Plan.

**"GO Bonds"**: As defined in the Commonwealth Plan.

6

"**GO Payments**": Payments received by the Trustee on account of GO CVI or New GO Bonds.

"**GO Payment Shortfall**":  As defined in Section 3.06(d) hereof.

"**Grantor Trust Provisions**": Subpart E of Subchapter J of Chapter 1 of the Code and Section 7701 of the Code, and final Treasury Regulations, published rulings, notices and announcement, promulgated thereunder, as the foregoing may be in effect from time to time.

"**HTA/CCDA PSA**": That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds, each as defined therein, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**Insurance Policy Account**": As defined in Section 3.01(a)(v) hereof.

"**Insured Amount**": As of any date, (i) in the case of a Current Interest Bond, the accrued and unpaid interest on, and outstanding principal amount of, such Current Interest Bond as of such date, or (ii) in the case of a Capital Appreciation Bond, the Compounded Amount as of such date.

"**Maturity Date**": As defined in the Trust Agreement.

"**Maturity Notice**": As defined in Section 3.08(a) hereof.

"**New GO Bonds**": As defined in the Commonwealth Plan, and including the Taxable New GO Bonds and Tax-Exempt New GO Bonds.

"**New GO Bonds Indenture**": As defined in the Commonwealth Plan.

"**New Securities**": As applicable, New GO Bonds, GO CVIs, and/or FGIC Certificates.

"**Non-Book-Entry AGC Trust Units**:" The Non-Book-Entry Double-Insured AGC Trust Units, together with any Trust Units (if any) issued by an AGC Trust in certificated form to Assured Insured Bondholders who, prior to the Effective Date, held custody receipts in certificated form.

"**Non-Book-Entry Double-Insured AGC Trust Units**:" Trust Units to be issued in certificated rather than book-entry form by the AGC Trusts for AGC Secondary Market Assured Legacy Bond CUSIPs 745235UX7 and 745235UY5, consisting of the Trust Units to be issued by each such AGC Trust on account of the portion of the Secondary Market Assured Legacy Bonds (and related custody receipts) held by such AGC Trust that also underlies an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**Non-Book-Entry Double-Insured AGC Trust Units Account**": As defined in Section 3.01(c)(i) hereof.

"**Notice of Claim and Certificate**": As defined in Section 3.06(a) hereof.

"**Notional Amount**": The amount of Trust Units issued as provided in the Trust Agreement.

"**Officer**": When used with respect to either of the Trustees, any senior vice president, any vice president, any assistant vice president, any assistant treasurer, any trust officer, any assistant secretary in the Corporate Trust Office of either of the Trustees, or any other officer of the Trustees customarily performing functions similar to those performed by the persons who at the time shall be such officers and who, in each case, shall have direct responsibility for the administration of the Trust Agreement (including these Standard Terms), and also to whom with respect to a particular corporate trust matter such matter is referred because of such officer's knowledge of and familiarity with the particular subject. With respect to any other Person, the chairman of the board, the president, a vice president (however designated), the treasurer or controller.

"**Opinion of Counsel**": A written opinion of either (a) nationally recognized counsel who is reasonably acceptable to the parties to whom it is delivered, or (b) internal counsel to Assured or any of its Affiliates.

"**Original Scheduled Interest Payment Date**": With respect to a Current Interest Bond, a date, other than the Maturity Date, on which a scheduled payment of interest is due in respect of such Current Interest Bond in accordance with the terms of the applicable Assured Insurance Policy.

"**Original Scheduled Payment Date**": An Original Scheduled Interest Payment Date or Original Scheduled Principal Payment Date, as applicable, including, without limitation, the Maturity Date.

"**Original Scheduled Principal Payment Date**": A date on which a scheduled payment of principal or Compounded Amount is due in respect of such Current Interest Bond or Capital Appreciation Bond, as applicable, in accordance with the terms of the applicable Assured Insurance Policy, including, without limitation, the Maturity Date.

"**Oversight Board**" As defined in the Commonwealth Plan.

"**Paying Agent**": The paying agent for the GO Bonds.

"**Payment Shortfall**" As defined in Section 3.06(a) hereof.

"**Person**": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency, instrumentality, or political subdivision thereof.

"**PBA Bonds**": As defined in the Commonwealth Plan.

"**PBA Fiscal Agent**": The fiscal agent for the PBA Bonds.

"**Primary Market Assured Legacy Bonds CUSIP**": Assured Legacy Bonds CUSIP 74514LD46, which is the sole Assured Legacy Bonds CUSIP that is not a Secondary Market Assured Legacy Bonds CUSIP.

"**Principal Amount Reduction**": As defined in Section 3.05(c) hereof.

"**PROMESA**": The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq.

"**pro rata**": Unless otherwise stated, any pro rata payment or distribution made to, or any pro rata allocation of any cost or expense borne by, (i) Holders of Trust Units for a particular Assured Legacy Bonds CUSIP shall be calculated based on the Notional Amount of Trust Units issued with respect to such Assured Legacy Bonds CUSIP, and (ii) all Holders of Trust Units without regard to Assured Legacy Bonds CUSIP shall be calculated based on the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) of the Assured Legacy Bonds underlying such Trust Units.

"**Pro Rata Share**": As defined in the Commonwealth Plan.

"**Reorganized Debtors**": As defined in the Commonwealth Plan.

"**Requisite Trust Unit Holders**": With respect to any Trust, Holders of a majority (measured by outstanding principal amount or, in the case of Capital Appreciation Bonds, the Compounded Amount of the underlying Assured Legacy Bonds CUSIP) of Trust Units.

"**Sale Notice**": As defined in Section 3.04(a) hereof.

"**Sale Notice Period**": As defined in Section 3.04(b) hereof.

"**SEC**": The Securities and Exchange Commission.

"**Secondary Market Assured Legacy Bonds**": The Assured Legacy Bonds that are insured through Assured Insurance Policies issued in the secondary market.

"**Secondary Market Assured Legacy Bonds CUSIP**": The Assured Legacy Bonds CUSIP of a Secondary Market Assured Legacy Bond, consisting of the CUSIP of the related custody receipt evidencing a beneficial interest in such Secondary Market Assured Legacy Bond and the related Assured Insurance Policies. For the avoidance of doubt, the Secondary Market Assured Legacy Bonds CUSIPs consist of Assured Legacy Bonds CUSIPs 74514LWE3, 74514LUW5, 745235YJ4, 745235YV7, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5.

"**Securities**": Collectively, the Assured Legacy Bonds and the New Securities.

"**Securities Act**": The Securities Act of 1933, as amended.

"**Standard Terms**": These Standard Terms, as amended or supplemented, incorporated by reference into the Trust Agreement.

"**Subject Bonds**": As defined in Section 3.04(a) hereof.

"**Target Price**": With respect to any Bond Sale, the then-current trading price of the Subject Bonds, as measured by the most recently available sale price for no less than $1,000,000 of the Subject Bonds, as quoted on a nationally recognized exchange or a "bid" price on an electronic trading system such as Bloomberg L.P. posted within 10 Business Days prior to the date of the Sale Notice, or if no such price is available, a bona fide bid quote provided for no less than $1,000,000 of the Subject Bonds by an independent broker-dealer operating in the over-the-counter market.

"**Tax Costs**": As defined in Section 8.04(c) hereof.

"**Taxable Bond Account**": As defined in Section 3.01(a)(ii) hereof.

"**Taxable GO Bonds**": Any GO Bonds that were taxable bonds.

"**Taxable New GO Bonds**": New GO Bonds that are not initially issued as tax-exempt bonds (if any).

"**Tax-Exempt Bond Account**": As defined in Section 3.01(a)(i) hereof.

"**Tax-Exempt New GO Bonds**": New GO Bonds that are tax-exempt bonds.

"**Termination Notice**": As defined in Section 7.02 hereof.

"**Treasury Regulations**": Regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of regulations, including proposed or temporary regulations shall include analogous provisions of final Treasury Regulations as well as any successor or replacement Treasury Regulations.

"**Trust**": With respect to each Assured Legacy Bonds CUSIP, the separate trust formed pursuant to the applicable Trust Agreement.

"**Trust Assets**": With respect to each Trust that is formed for the benefit of the beneficial holders of an Assured Legacy Bonds CUSIP; (i) the property to be deposited into and/or held by such Trust pursuant to Section 2.01 hereof; (ii) any other property that Assured may determine, in its sole discretion, to deposit in the applicable Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP; and (iii) any proceeds of any of the foregoing.

"**Trust Estate**": Collectively, and with respect to any Trust, (a) the Trust Assets deposited and held in such Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP and (b) any other property deposited and held in such Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP (if any).

"**Trust Unit**": With respect to each Trust that is formed for the benefit of the beneficial holders of an Assured Legacy Bonds CUSIP, the certificated trust unit(s) to be issued by such Trust.

"**Trust Unit Holder**" or "**Holder**": As applicable, (i) a Beneficial Owner of a Trust Unit, or (ii) Assured, to the extent Assured has been subrogated to the rights of a Beneficial Owner of a Trust Unit Holder.

"**Trust Unit Paying Agent**": The paying agent appointed pursuant to Section 5.07 hereof.

"**Trustee Costs**": As defined in Section 6.05(a) hereof.

"**Unit Exchange Election**": As defined in Section 3.07(a) hereof.

"**Unit Register**" and "**Unit Registrar**": The register maintained and the registrar appointed pursuant to Section 5.03 hereof.

"**U.S. Person**": A person who is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Voting Rights**": Any voting or control rights granted to holders of Securities.

"**WHFIT Regulations**": As defined in Section 8.04(a) hereof.

**Section 1.02.  *Other Definitional Provisions.***

The words "hereof," "herein" and "hereunder" and words of similar import when used in these Standard Terms shall refer to these Standard Terms as a whole and not to any particular provision of these Standard Terms, and Section, subsection, Annex and Exhibit references are to these Standard Terms unless otherwise specified.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.  The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."   Any reference to any document in these Standard Terms shall be deemed to include any amendment, restatement, supplement or modification thereto.

## ARTICLE II

## TRUST ESTATE

**Section 2.01.  *Trust Assets.***

Pursuant to and in accordance with the Trust Agreement and the Commonwealth Plan, upon the Effective Date:

(a)     Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section

2.01(a) applies solely to Assured Legacy Bonds CUSIPs 74514LD46, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

       (i)     The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding such Assured Legacy Bonds CUSIP, deposit the New GO Bonds allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP. The Trustee shall establish and maintain in the name of the Trust a Tax-Exempt Bond Account into which any such Tax-Exempt New GO Bonds shall be deposited, and a Taxable Bond Account into which any such Taxable New GO Bonds shall be deposited; provided, however, that the Trustee shall transfer from the Taxable Bond Account to the Tax-Exempt Bond Account any Taxable New GO Bonds which Assured has notified the Trustee in writing have become Tax-Exempt New GO Bonds.

       (ii)    The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding such Assured Legacy Bonds CUSIP, deposit the Commonwealth Plan Cash Distributions allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP. The Trustee shall establish and maintain in the name of the Trust a Cash Account into which any such Commonwealth Plan Cash Distributions shall be deposited.

       (iii)   The Commonwealth shall, on behalf of each of the Assured Legacy Bondholders holding such Assured Legacy Bonds CUSIP, deposit the GO CVIs allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP. The Trustee shall establish and maintain in the name of the Trust a CVI Account into which any such GO CVIs shall be deposited.

       (iv)   The Trustee shall establish and maintain in the name of the Trust an Insurance Policy Account into which such Assured Legacy Bonds CUSIP shall be deposited. Pursuant to Section 77.6 of the Commonwealth Plan, the Assured Legacy Bonds deposited (or deemed deposited) into the Trust shall not be cancelled and all rights and remedies under the existing Assured Legacy Bonds and the applicable Bond Documents (other than payment obligations of the Depositors and the continuation of any lien granted as security for such Assured Legacy Bonds) shall remain in full force and effect solely to the extent necessary to preserve any claims relating to the Assured Legacy Bonds deposited in the Trust under the applicable Assured Insurance Policy. Such existing Assured Legacy Bonds shall not form the basis for the assertion of any claim against the Depositors or the Reorganized Debtors. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

    (b)     Solely with respect to each Primary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(b) applies solely to Assured Legacy Bonds CUSIP 74514LD46:

       (i)     The Paying Agent and the PBA Fiscal Agent shall, on behalf of each of the Assured Legacy Bondholders holding such Primary Market Assured

Legacy Bonds CUSIP, transfer the Assured Insurance Policy for that Primary Market Assured Legacy Bonds CUSIP and any and all agreements, documents and instruments relating to such Assured Insurance Policy that are within their control to the Trustee, who shall be deemed to have deposited all corresponding rights of the applicable Assured Legacy Bondholders into the applicable Trust.

(ii)      The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP, transfer any and all agreements, documents and instruments relating to the Assured Insurance Policy for that Primary Market Assured Legacy Bonds CUSIP that are within their control to the Trustee, who shall be deemed to have deposited all corresponding rights of the applicable Assured Legacy Bondholders into the applicable Trust.

(iii)     The Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP shall deposit their Assured Legacy Bonds into the Trust for the applicable Primary Market Assured Legacy Bonds CUSIP, and, in the event any Assured Legacy Bondholder fails to so deposit its Assured Legacy Bond(s) as of the Effective Date, such Assured Legacy Bondholder's Assured Legacy Bond(s) shall be deemed deposited into the applicable Trust for the relevant Primary Market Assured Legacy Bonds CUSIP as of the Effective Date.

(c)      Solely with respect to each Secondary Market Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(c) applies solely to Assured Legacy Bonds CUSIPs 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(i)      Each Assured Insured Bondholder holding custody receipts of such Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable Trust.

(ii)     The Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement with respect to such Secondary Market Assured Legacy Bonds CUSIP, such that the Trustee will be deemed to hold the related Assured Insured Bonds underlying the applicable custody receipts and the related Assured Insurance Policies, without any further action on the part of the existing custodian.  In the event a single Assured Legacy Bonds CUSIP is insured by more than one Assured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such Assured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust.

(d)      Solely with respect to each FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(d) applies solely to Assured Legacy Bonds CUSIPs 74514LWE3 and 74514LUW5:

(i)     Each Assured Insured Bondholder holding custody receipts of such FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable Trust.

(ii)     The Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the Trustee will be deemed to hold the Assured Insured Bonds (which also qualify as FGIC Insured Bonds) underlying the applicable custody receipts and the related Assured Insurance Policies, without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one Assured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such Assured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)     Without prejudice to the ability of the Trustee to draw on the applicable Assured Insurance Policy, the Trustee shall be deemed to have deposited such Assured Insured Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and the related FGIC Plan Consideration into the applicable FGIC Trust pursuant to Section 75.4(a) of the Commonwealth Plan.

(iv)     The Trustee shall be deemed to have received the Pro Rata Share of the FGIC Plan Consideration allocable to each Assured Insured Bondholder holding custody receipts of such FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, and shall receive the FGIC Certificates allocable to such Assured Insured Bondholder on account of the applicable custody receipts and Assured Insured Bonds (which also qualify as FGIC Insured Bonds) for deposit in the Trust. The Trustee shall establish and maintain in the name of the Trust a FGIC Certificates Account into which any such FGIC Certificates shall be deposited.

(v)     As a result of the steps described in subsections 2.01(d)(i)-(iv) above, the applicable Trust shall hold the applicable FGIC Certificates and the related Assured Insurance Policies.

(e)     Solely with respect to each AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(e) applies solely to Assured Legacy Bonds CUSIPs 745235YJ4 and 745235YV7:

(i)     Each Assured Insured Bondholder holding custody receipts of such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable AGM Double-Insured Trust.

(ii)     The AGM Double-Insured Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the AGM Double-Insured Trustee will be

deemed to hold (i) custody receipts evidencing a beneficial ownership interest in the underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy, and (ii) the related AGM Double-Insured Insurance Policies, without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one AGM Double-Insured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such AGM Double-Insured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust. The AGM Double-Insured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)     Without prejudice to the ability of the AGM Double-Insured Trustee to draw on the applicable AGM Double-Insured Insurance Policy to the extent authorized under this Trust Agreement, the AGM Double-Insured Trustee shall be deemed to have deposited such custody receipts evidencing a beneficial ownership interest in AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policies into the applicable AGC Trust.

(iv)     The applicable AGC Trustee shall, on behalf of each of the Assured Legacy Bondholders holding such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP into the AGM Double-Insured Trust for that AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP. The AGM Double-Insured Trustee shall establish and maintain in the name of the AGM Double-Insured Trust a Non-Book-Entry Double-Insured AGC Trust Units Account into which such Non-Book-Entry Double-Insured AGC Trust Units shall be deposited.

(v)     As a result of the steps described in Subsections 2.01(e)(i)-(iv), the applicable AGM Double-Insured Trust shall hold the applicable Non-Book-Entry Double-Insured AGC Trust Units and the related AGM Double-Insured Insurance Policies.

**Section 2.02.  *Acceptance by the Trustee.***

(a)     By its execution of the Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all documents, instruments, and other property delivered to it or received by it from time to time with respect to the Trust Assets and all other assets included in the definition of Trust Estate, in each case in trust for the exclusive use and benefit of all present and future Trust Unit Holders and for the purposes of administering the trusts created by the Trust Agreement (including these Standard Terms). The Trustee represents and warrants that, except as expressly permitted by the Trust Agreement, (i) it has not and will not, other than in its capacity as trustee for the benefit of the Trust Unit Holders, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of the Trust Agreement, and (ii) it has not encumbered or transferred, and will not encumber or transfer, its right, title or interest in the Trust Estate.

15

(b)      With respect to the Securities, the Trustee shall, on the Effective Date, deliver to the applicable Depositor(s) a certification substantially in the form of Exhibit C to the Trust Agreement certifying that it is either (i) in possession of a certificate evidencing the applicable Securities, or (ii) it has received confirmation from a depository of such Securities or a direct or indirect participant thereof that the Securities acquired by the Trust on such Effective Date are legally owned by the Trust for the benefit of the Trust Unit Holders.

(c)      Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

**Section 2.03.** *Purpose, Activities of the Trust.*

It is the intention of the parties hereto that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to the following:

(a)      receiving, accepting, and holding in trust the Trust Estate;

(b)      creating one or more accounts or sub-accounts in accordance with the terms of the Trust Agreement (including these Standard Terms);

(c)      making claims and receiving payments under the Assured Insurance Policies;

(d)      receiving payments pursuant to the Commonwealth Plan and the securities issued thereunder;

(e)       issuing one or more series of Trust Units to holders of Assured Legacy Bonds in accordance with the terms of the Trust Agreement (including these Standard Terms);

(f)      making distributions to the Depository and Trust Unit Holders in accordance with the terms of the Trust Agreement (including these Standard Terms);

(g)      coordinating communications with Trust Unit Holders through the Depository;

(h)      following, accepting or acting upon any instruction or direction from Assured or the Requisite Trust Unit Holders, as applicable, in each case only as expressly permitted in the Trust Agreement;

(i)      making public disclosures on EMMA;

(j)      making payments and distributions as contemplated by the Trust Agreement (including these Standard Terms); and

(k)      engaging in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto.

**Section 2.04.  *Limitations of the Trust.***

(a)     Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee.  None of the Depositors, the Reorganized Debtors, or Assured, or any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee.

(b)     The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust.  Any resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust.

(c)     The Trust will provide for its own operating expenses and liabilities from the Trust Estate.  General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates.

(d)     All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust.

(e)     There will be no guarantees made by the Trust with respect to obligations of the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates.  There will not be any indebtedness relating to borrowings or loans between the Trust, the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates; provided, that, Assured may own Trust Units.

(f)     The Trust will act solely in its own name, or in the Trustee's name on the Trust's behalf, and through its or the Trustee's duly authorized officers or agents in the conduct of its activities.  The Trust will not:  (i) operate or purport to operate as an integrated, single economic unit with respect to the Depositors, the Reorganized Debtors, or Assured or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates; or (iii) induce any such third party to reasonably rely on the creditworthiness of the Depositors, the Reorganized Debtors, or Assured or any other affiliated or unaffiliated entity in its dealings with the Trust.

(g)     The Trust will maintain a Delaware Trustee with an office in the State of Delaware.

(h)     The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

**Section 2.05.  *Voting Rights.***

(a)     Assured shall be deemed the sole holder of the Voting Rights with respect to the Securities held by the Trust.

# ARTICLE III

# ADMINISTRATION OF THE TRUST

**Section 3.01.** *Accounts.*

The Trustee shall establish and maintain in the name of the Trust the following non-interest bearing accounts for the Trust to be held in trust for the benefit of the Trust Unit Holders (all amounts held in these accounts will be uninvested):

(a)    Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(a) applies solely to Assured Legacy Bonds CUSIPs 74514LD46, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(i)    Tax-Exempt Bond Account. An account into which the Trustee shall deposit the Tax-Exempt New GO Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Tax-Exempt Bond Account**"), including any Taxable New GO Bonds that become Tax-Exempt New GO Bonds;

(ii)    Taxable Bond Account. An account into which the Trustee shall deposit Taxable New GO Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Taxable Bond Account**");

(iii)    Cash Account. An account into which the Trustee shall deposit the Commonwealth Plan Cash Distributions allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Cash Account**");

(iv)    CVI Account. An account into which the Trustee shall deposit the GO CVIs allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**CVI Account**"); and

(v)    Insurance Policy Account. An account into which the Trustee shall deposit the applicable Assured Legacy Bonds CUSIP insured by the applicable Assured Insurance Policy (or any other securities, monies, proceeds or property received on account of or in exchange therefor) (the "**Insurance Policy Account**").

(b)    Solely with respect to each FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(b) applies solely to Assured Legacy Bonds CUSIPs 74514LWE3 and 74514LUW5:

(i)    FGIC Certificates Account. An account into which the Trustee shall deposit the FGIC Certificates allocable to the applicable FGIC-Insured

18

Secondary Market Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**FGIC Certificates Account**"); and

(ii)     FGIC Insured Bonds Insurance Policy Payments Account. An account into which the Trustee shall deposit any monies or other property resulting from a draw on the Assured Insurance Policy insuring the appliable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP (the "**FGIC Insured Bonds Insurance Policy Payments Account**").

(c)     Solely with respect to each AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(c) applies solely to Assured Legacy Bonds CUSIPs 745235YJ4 and 745235YV7:

(i)     Non-Book-Entry Double-Insured AGC Trust Units Account. An account into which the AGM Double-Insured Trustee shall deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to the Assured Legacy Bonds underlying the applicable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Non-Book-Entry Double-Insured AGC Trust Units Account**"); and

(ii)     AGM Double-Insured Insurance Policy Payments Account. An account into which the AGM Double-Insured Trustee shall deposit any monies or other property resulting from a draw on the AGM Double-Insured Insurance Policy insuring the appliable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (the "**AGM Double-Insured Insurance Policy Payments Account**").

**Section 3.02.** *Distributions; Prior to Maturity Date or in Connection with Assured Advancement Option.*

(a)     Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(a) applies solely to Assured Legacy Bonds CUSIPs 74514LD46, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(i)     Tax-Exempt Distributions.  Subject to Section 3.02(a)(vi) below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New GO Bonds deposited in the Tax-Exempt Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

19

(ii)     <u>Taxable Distributions</u>.  Subject to <u>Section 3.02(a)(vi)</u> below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New GO Bonds deposited in the Taxable Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(iii)     <u>CVI Distributions</u>.   Subject to <u>Section 3.02(a)(vi)</u> below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the GO CVIs deposited in the CVI Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(iv)     <u>Insurance Policy Distributions</u>.   Subject to <u>Section 3.02(a)(vi)</u> below, promptly following receipt thereof by the Trustee, the Trustee shall, subject to <u>Section 3.06(d)</u>, be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Tax Costs as of the date of distribution.   Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account.

(v)     <u>Other Cash Distributions</u>.   Subject to <u>Section 3.02(a)(vi)</u> below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including any Commonwealth Plan Cash Distributions deposited in the Cash Account, net of of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(vi)     <u>Distributions on Account of Non-Book-Entry Double-Insured AGC Trust Units</u>.  Notwithstanding any other provision of this Trust Agreement, distributions on account of the Non-Book-Entry Double-Insured AGC Trust Units

shall be made directly to the applicable AGM Double-Insured Trustee, on a pro rata "pass-through" basis, rather than to the Depository.

(b)      Solely with respect to any FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(b) applies solely to Assured Legacy Bonds CUSIPs 74514LWE3 and 74514LUW5:

(i)      FGIC Certificate Distributions:  Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the FGIC Certificates deposited in the FGIC Certificates Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)     FGIC Insured Bonds Insurance Policy Payments Distributions: Promptly following receipt thereof by the Trustee, the Trustee shall, subject to Section 3.06(d), be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date resulting from a draw on the Assured Insurance Policy insuring the applicable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, net of the allocable portion of any outstanding Tax Costs as of the date of distribution.  Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP.

(c)      Solely with respect to any AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(c) applies solely to Assured Legacy Bonds CUSIPs 745235YJ4 and 745235YV7:

(i)      Non-Book-Entry Double-Insured AGC Trust Units Distributions:  Promptly following receipt thereof by the AGM Double-Insured Trustee, the AGM Double-Insured Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGM Double-Insured Trust, including payments received by the Trust on or prior to the Maturity Date on account of the Non-Book-Entry Double-Insured AGC Trust Units deposited in the Non-Book-Entry Double-Insured AGC Trust Units Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)    AGM Double-Insured Insurance Policy Payments
Distributions:  Promptly  following  receipt thereof by the AGM Double-Insured
Trustee, the AGM Double-Insured Trustee shall, subject to Section 3.06(d), be
required to and shall distribute  to the Depository for distribution  to the Trust Unit
Holders on a pro rata "pass-through" basis, all income of the AGM Double-Insured
Trust, including  payments received by the AGM Double-Insured Trust on or prior to
the Maturity Date resulting  from a draw on the AGM Double-Insured  Insurance
Policy insuring  the applicable  AGM Double-Insured Secondary Market Assured
Legacy Bonds CUSIP, net of the allocable  portion of any outstanding  Tax Costs as of
the date of distribution.  Notwithstanding  anything herein or elsewhere to the
contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions
comprised of payments received by the AGM Double-Insured  Trust from Assured on
account of, and in accordance with, an AGM Double-Insured  Insurance Policy
insuring  an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

**Section 3.03.  *Assured Advancement Option.***

(a)     Assured shall have the right to exercise the Assured Advancement
Option with thirty (30) days' prior written notice to the relevant Assured Legacy Bond
Holders and/or Trust Unit Holders.  Upon the exercise of any Assured Advancement Option
and the payment of the applicable  Acceleration Price or redemption price with respect to any
Assured Legacy Bonds CUSIP, the Trustee shall be required to disburse such Acceleration
Price or redemption price to the Trust Unit Holders of the relevant Trust as set forth in
Section 3.02 above, net of the allocable  portion of any outstanding  Tax Costs as of the date
of distribution,  and Assured shall become fully subrogated to all of the rights of such Trust
Unit Holders, including,  upon the termination  of the relevant Trust, rights to any then
remaining  Trust Assets.  Upon the disbursement  of such Acceleration Price or redemption
price to the relevant Trust Unit Holders as set forth above, the Trust Units of such Trust shall
be retired, such Trust shall be terminated, and the Trustee shall deliver  the remaining  Trust
Assets of such Trust, less any outstanding  Trustee Costs and other remaining  costs of the
Trust, to or at the direction  of Assured. At any time on or after the date of receipt of such
Trust Assets, Assured shall have the right to sell all or certain of the New Securities
constituting  part of such Trust Assets for value, including  by (i) selling  all or certain of the
applicable  Tax-Exempt New GO Bonds constituting  part of such Trust Assets for value as
tax-exempt bonds, (ii) selling all or certain of the Taxable New GO Bonds constituting  part
of such Trust Assets for value as taxable bonds, (iii) selling  all or certain of the GO CVIs
constituting  part of such Trust Assets, and (iv) selling  all or certain of the FGIC Certificates
constituting  part of such Trust Assets, as applicable.

(b)     Payment of the applicable  Acceleration Price or redemption  price with
respect to any Assured Insured Bond shall satisfy and discharge all of Assured's obligations
under the applicable  Assured Insurance Policy with respect to such Assured Insured Bond.

**Section 3.04.  *Sale of New Securities.***

(a)     At any time and from time to time prior to the Maturity Date, so long
as an Assured Insurer Event is not occurring under the applicable  Assured Insurance Policy,

Assured shall have the right to instruct the Trustee to sell any New Securities of any series, in a minimum aggregate principal amount (or, with respect to capital appreciation bonds, a minimum aggregate current Accreted Value) of $1,000,000 (taking into account for such minimum, all concurrent sales of such series of New Securities in the Trusts) (it being understood that such minimum shall not be applicable if all New Securities of such series held as part of the Trust Assets are included in such sale) (or any other securities or property received on account thereof or in exchange therefor) (the "**Subject Bonds**") that are part of the Trust Assets for cash (a "**Bond Sale**"). Assured will direct the Trustee to utilize a specific broker which will arrange the Bond Sale pursuant to the terms set forth in this <u>Section 3.04(a)</u>. The Trustee shall not be responsible for the selection of the broker or for any determination required to be made in connection with the Bond Sale. Prior to any Bond Sale, Assured will notify the Trustee of the intended Bond Sale and will direct the Trustee to promptly distribute through the Depository a sale notice (the "**Sale Notice**") to all applicable Trust Unit Holders.

(b)        The Sale Notice will include (i) a statement identifying the Subject Bonds, the principal amount (or, with respect to capital appreciation bonds, current Accreted Value) of Subject Bonds to be sold, the applicable Target Price and Floor Price, (ii) a statement regarding the right of each applicable Trust Unit Holder to elect to receive in-kind delivery of a pro rata share of the Subject Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs (the "**Bond Election**"), in lieu of receiving a pro rata share of the actual net cash proceeds ("**Cash Proceeds**") from the Bond Sale and (iii) a statement that the Bond Sale will only be executed if the weighted average price obtainable for the Subject Bonds (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) is equal to or greater than the Floor Price. Trust Unit Holders that determine to make a Bond Election must make the election through the Depository within ten (10) Business Days after the Depository receives the Sale Notice (the "**Sale Notice Period**").

(c)        Following the Sale Notice Period,

(i)        If any applicable Trust Unit Holders make valid Bond Elections, an amount of Subject Bonds representing a proportion of the Subject Bonds equivalent to such Trust Unit Holders' aggregate pro rata ownership of all applicable Trust Units shall be reserved from the Bond Sale and shall instead be distributed pro rata to each such Trust Unit Holder making a valid Bond Election (any such distribution to be rounded down to the nearest minimum denomination, with any reduction as a result of such rounding down to be distributed to such Trust Unit Holders in cash). In order to make a valid Bond Election, a Trust Unit Holder shall be required to pay to the Trustee such Trust Unit Holder's allocable portion of any outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period. To the extent a Trust Unit Holder has not paid its allocable portion of any such outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period, the Bond Election will be deemed invalid.

(ii)      Applicable Trust Unit Holders that did not make a valid Bond Election will promptly receive a pro rata share of Cash Proceeds from the sale of Subject Bonds (not subject to a valid Bond Election), net of the allocable portion of any outstanding Trustee Costs and Tax Costs, and less any Cash Proceeds distributed as a result of rounding in accordance with Section 3.04(c)(i) to Trust Unit Holders making valid Bond Elections.

(iii)      If the broker specified in the Sale Notice is unable to arrange the sale of any of the Subject Bonds not subject to a valid Bond Election for a weighted average price (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) equal to or greater than the Floor Price, the Trustee shall not sell or distribute any Subject Bonds, the Bond Sale shall be cancelled, and the Trustee shall send a notice, at the sole cost of Assured, to the applicable Trust Unit Holders through the Depository stating that such Bond Sale was cancelled, after which any future sale of the Subject Bonds shall be required to be made pursuant to a new Sales Notice.

**Section 3.05.   *Adjustments to Principal Amounts and Compounded Amounts.***

(a)      Each Distribution made on or prior to the Maturity Date to Trust Unit Holders shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution. For the purposes of such reduction, any deduction from any Distribution in respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash as part of the Distribution and shall reduce the applicable accrued and unpaid interst amount, outstanding principal amount, or Compounded Amount accordingly. For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly. As set forth in Sections 3.02(a)(iv), 3.02(b)(ii), and 3.02(c)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, or (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.

(b)      Any Bond Sale resulting in a distribution of Cash Proceeds or Subject Bonds to Trust Unit Holders, as the case may be, shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case as of the date the Cash Proceeds of such Bond Sale are distributed by the Trustee to the applicable Trust Unit Holders and in an amount equal to the aggregate Cash Proceeds from such Bond Sale

distributed to the applicable Trust Unit Holders. For the purposes of such reduction, any deduction from the Cash Proceeds in respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable Trust Unit Holders in cash and shall reduce the applicable accrued and unpaid interst amount, outstanding principal amount, or Compounded Amount accordingly. Further, for purposes of this Section 3.05(b), the aggregate Cash Proceeds shall be calculated as if each applicable Trust Unit Holder that took actual delivery of Subject Bonds had received the same amount of cash per Unit as a Trust Unit Holder that did not make a Bond Election, or if all applicable Trust Unit Holders participating in the Bond Sale made a Bond Election, the aggregate Cash Proceeds shall be calculated as if all Subject Bonds were sold at a net price equal to the Target Price. For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly. As set forth in Sections 3.02(a)(iv), 3.02(b)(ii), and 3.02(c)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, or (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.

(c)     If any Assured Legacy Bonds CUSIP is subject to mandatory sinking fund redemptions, any reduction of the outstanding principal amount or Compounded Amount, as applicable, of such Assured Legacy Bonds CUSIP pursuant to Section 3.05(a) or (b) (a "**Principal Amount Reduction**") shall automatically result in the dollar-for-dollar reduction of the mandatory sinking fund redemption obligations for purposes of the Assured Insurance Policy insuring such Assured Legacy Bonds CUSIP, with such reduction to be applied sequentially against such mandatory sinking fund redemptions starting with the first mandatory sinking fund redemption occurring after such Principal Amount Reduction.

(d)     If the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero at any time, Assured shall be entitled to any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the Insurance Policy Account, the FGIC Certificates Account, or the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, and the AGM Double-Insured Insurance Policy Payments Account, as applicable.

(e)     For the avoidance of doubt, it is expressly understood and agreed that to the extent the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero prior to the Maturity Date, as of the date the principal amount (or Compounded Amount, as applicable) is reduced to zero, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled; and (iv) subject to Assured's entitlement to any remaining Trust Assets, the Trust shall terminate in accordance with the provisions of Article VII hereof.

**Section 3.06.  *Payments on Assured Insurance Policies.***

(a)    After taking into account any adjustments made pursuant to Section 3.05, if there are insufficient funds (determined without taking into account any securities or other non-cash Trust Assets) in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the Insurance Policy Account, the FGIC Certificates Account, or the FGIC Insured Bonds Insurance Policy Payments Account, as applicable, to satisfy the accrued and unpaid interest and/or unpaid principal due on an Original Scheduled Payment Date (the amount of any such shortfall, the "**Payment Shortfall**"), then at least five (5) Business Days prior to such Original Scheduled Payment Date, the Trustee shall deliver a notice in substantially the form attached hereto as Exhibit A (a "**Notice of Claim and Certificate**") to Assured. Assured agrees that such notice provided by the Trustee shall constitute a valid notice of the type required under the applicable Assured Insurance Policy in order for the Trustee to draw on the applicable Assured Insurance Policy, and the Trustee shall make draws on the applicable Assured Insurance Policy to make payment, from the Insurance Policy Account or the FGIC Insured Bonds Insurance Policy Payments Account, as applicable, of any accrued and unpaid interest or any unpaid principal due on the Original Scheduled Payment Date. The Trustee is authorized to take all actions necessary to draw on the Assured Insurance Policies for such purposes, including actions that, under the applicable Assured Insurance Policies and related agreements, would otherwise be taken by the Paying Agent or the PBA Fiscal Agent, and the Trustee shall have all powers and authority of the Paying Agent or the PBA Fiscal Agent, as applicable, for such purposes. In the event a particular Trust holds more than one Assured Insurance Policy insuring the same Assured Legacy Bonds CUSIP, the Trustee shall draw pro rata on all such Assured Insurance Policies insuring the same Assured Legacy Bonds CUSIP.

(b)    Notwithstanding any other provision of this Trust Agreement, no AGM Double-Insured Trustee shall make a draw on an AGM Double-Insured Insurance Policy, and Assured shall not be required to make any payment under such AGM Double-Insured Insurance Policy, unless either (i) Assured has confirmed to the AGM Double-Insured Trustee in writing, at least (5) Business Days prior to the relevant Original Scheduled Payment Date, that Assured will not be providing sufficient funds under the AGC Insurance Policy insuring the relevant AGC Secondary Market Assured Legacy Bonds CUSIP to cover any Payment Shortfall with respect to the relevant AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, or (ii) as of the Original Scheduled Payment Date, Assured has not in fact provided sufficient funds under the AGC Insurance Policy insuring the relevant AGC Secondary Market Assured Legacy Bonds CUSIP to cover any Payment Shortfall with respect to the relevant AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

(c)    Subject to Section 3.06(b) above, if and to the extent Assured fails to make any payment at the time, in the amount and in the manner set forth herein, the Trustee shall take, subject to its rights and protections herein, all necessary or desirable actions to enforce the applicable Assured Insurance Policy (including, to the extent applicable, as and when directed by the Requisite Trust Unit Holders as set forth in Section 6.01 hereof).

(d)     If the Trustee receives GO Payments, (i) after the Trustee draws on an Assured Insurance Policy pursuant to Section 3.06(a), but (ii) prior to the Trustee using the amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date, then the Trustee shall (x) distribute and apply the GO Payments received in accordance with Sections 3.02 and 3.05, (y) only apply amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal to the extent the GO Payments received are insufficient (the amount of such insufficiency, the "**GO Payment Shortfall**") to pay the accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date such that the amounts so applied are not in excess of the GO Payment Shortfall and (z) promptly return to Assured any amounts drawn on the Assured Insurance Policy that are in excess of such GO Payment Shortfall.

### Section 3.07.  *Exchange of Trust Units for Trust Assets.*

(a)     At any time on, or prior to, the Maturity Date, a Trust Unit Holder may exchange its Trust Units for a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Trustee Costs, Tax Costs, and Assured Reimbursement Amount (the "**Unit Exchange Election**"), provided that the Trust Unit Holder must provide thirty (30) days' prior written notice of such Unit Exchange Election by submitting the form attached hereto as Exhibit B to the Trustee.

(b)     Upon a Unit Exchange Election, the expiration of the thirty day (30) notice period set forth in Section 3.07(a) hereof and the presentation and surrender of the applicable Trust Units at the office of the Trustee therein designated on that date, the Trustee shall distribute to such Trust Unit Holder a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, which shall be paid to Assured, the Trustee, or the relevant tax or governmental authority, as applicable (provided that, if cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, each applicable Trust Unit Holder shall pay in cash its applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of its share of remaining Trust Assets. For the avoidance of doubt, the Assured Reimbursement Amount must be paid to Assured prior to the distribution of the applicable Trust Assets to the Trust Unit Holder.

(c)     Upon distribution of such Trust Assets in accordance with Section 3.07(b) hereof, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled

27

with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

### Section 3.08.  *Payments at Maturity Date.*

(a)    If, (i) in the case of Current Interest Bonds, the outstanding principal amount or accrued and unpaid interest amount, or (ii) in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the Assured Legacy Bonds at the Maturity Date is expected to be greater than zero, no later than thirty (30) calendar days and no earlier than thirty-five (35) calendar days prior to the Maturity Date, Assured shall direct the Trustee to deliver through the Depository a notice of maturity (the "**Maturity Notice**") in substantially the form attached hereto as Exhibit C to all applicable Trust Unit Holders. The Maturity Notice will include (i) a statement identifying the Maturity Date and (ii) a statement regarding the right of each Trust Unit Holder to receive a Distribution (or multiple Distributions) in the aggregate amount of a pro rata share of the Insured Amount corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date, in either case, to be paid to the Trustee by Assured and/or from the other Trust Assets. Notwithstanding anything herein to the contrary, Assured's failure to direct the Trustee to deliver a Maturity Notice or the Trustee's or Depository's failure to deliver a Maturity Notice to Trust Unit Holders in accordance with this Section 3.08 shall not affect or delay the occurrence of the applicable Maturity Date, or affect the amounts to be paid to Trust Unit Holders on the Maturity Date.

(b)    Reserved.

(c)    On the Maturity Date, after giving effect to any Distribution made from other Trust Assets on the Maturity Date, and subject to Assured having received a Notice of Claim and Certificate in accordance with Section 3.06 hereof, Assured shall pay to the Trustee, and the Trustee shall distribute to all Trust Unit Holders, a pro rata share of the Payment Shortfall, if any, net of any Tax Costs, following which Assured shall be entitled to any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, or the AGM Double-Insured Insurance Policy Payments Account, as applicable.

(d)    On the Maturity Date, after giving effect to any Distributions made on the Maturity Date (including the payment and distribution of any Payment Shortfall (in accordance with Section 3.08(c) hereof)), (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled; and (iv) subject to Assured's entitlement to any Remaining Trust Assets following payment of any Trustee Costs and any other remaining Trust expenses, the Trust shall terminate in accordance with the provisions of Article VII hereof.

# ARTICLE IV

# REPORTING/REMITTING TO TRUST UNIT HOLDERS

**Section 4.01.** *Statements to Trust Unit Holders.*

No later than three (3) days after the date on which the Trustee makes any Distribution to any Trust Unit Holder, the Trustee shall prepare and post a statement to EMMA, substantially in the form attached hereto as Exhibit D, and upon request, deliver such statement by mail to any Trust Unit Holder, setting forth:

(a)     With respect to the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Acccount, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, and the AGM Double-Insured Insurance Policy Payments Account, as applicable, distributions made from each such account during the month and during the year to date (on an aggregate and per unit basis);

(b)     The accrued and upaid interest on, and principal amount of (or Compounded Amount, as applicable) as of the month end of the relevant Assured Legacy Bonds CUSIP (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per unit basis);

(c)     Any other distributions made to Trust Unit Holders;

(d)     Any required tax reporting for such period (as specified in Section 8.04); and

(e)     All other information required to complete Exhibit D.

**Section 4.02.** *Compliance with Withholding Requirements.*

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depository and Trust Unit Holders that the Trustee reasonably believes are applicable under the Code. The consent of the Depository and Trust Unit Holders shall not be required for such withholding. In the event the Trustee does withhold any amount from payments to the Depository or any Trust Unit Holder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depository or such Trust Unit Holders the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Depository or Trust Unit Holder, as the case may be, in the amount of the withholding and shall thereby reduce amounts otherwise distributable to the Depository or such Trust Unit Holder. If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

# ARTICLE V

# TRUST UNITS

29

**Section 5.01.  *The Trust Units.***

Each series of Trust Units shall bear unique CUSIPs and, other than the Non-Book-Entry AGC Trust Units, shall be freely tradable and transferable through The Depository Trust Company.  So long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall be deemed the sole holder of the New Securities deposited in the respective Trusts with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings.  In addition, Assured shall be fully subrogated to the rights of the respective Trust Unit Holders in respect of the New Securities deposited in the respective Trusts.

The Trust Units shall be designated in the Trust Agreement.  Unless otherwise specified in the Trust Agreement, the Trust Units in the aggregate will represent the entire beneficial ownership interest in the Trust Estate.  The Trust Units will be substantially in the forms annexed to the Trust Agreement.  Unless otherwise provided in the Trust Agreement, the Trust Units will be issuable in book-entry form, in denominations equal to the denomination of the applicable underlying Assured Legacy Bonds or any integral multiple of the amount specified therein, subject to the requirements of the Depository; provided, however, that the Non-Book-Entry AGC Trust Units shall be issued in certificated rather than book-entry form.  Each Trust Unit will share ratably in all Trust Assets of the applicable Trust and in all rights of the related Trust Unit Holders.

Upon original issue, the Trust Units shall be executed and delivered by the Trustee and the Trustee shall cause the Trust Units to be authenticated by the Unit Registrar upon receipt by the Trustee of the documents specified in Section 2.02.  The Trust Units shall be executed by manual or electronic signature on behalf of the Trustee by an authorized officer.  Trust Units bearing the manual or electronic signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Trust Units or did not hold such offices at the date of such Trust Units.  No Trust Unit shall be entitled to any benefit under the Trust Agreement or be valid for any purpose, unless there appears on such Trust Unit a certificate of authentication as set forth on such certificate executed by manual or electronic signature on behalf of the Unit Registrar by a duly authorized officer of the Unit Registrar, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Trust Unit has been duly authenticated and delivered hereunder.  All Trust Units shall be dated the date of their execution.

**Section 5.02.  *Book-Entry Trust Units.***

(a)     The Book-Entry Trust Units will be represented initially by one or more global certificates registered in the name designated by the Depository.  Notwithstanding anything herein to the contrary, the Trustee may for all intents and purposes (including the making of payments on the Book-Entry Trust Units) deal with the Depository or its nominee as the authorized representative of the Beneficial Owners of the Book-Entry Trust Units as if the Depository were the sole Book-Entry Trust Unit Holder for purposes of the Trust Agreement (including these Standard Terms) for as long as those Book-Entry Trust

Units are registered in the name of the Depository or its nominee. The rights of Beneficial Owners of the Book-Entry Trust Units shall be limited to those established by law, the Trust Agreement and agreements between such Beneficial Owners and the Depository and Depository Participants. Requests and directions from, and votes of, the Depository, as Holder, shall not be deemed to be inconsistent if they are made with respect to different Beneficial Owners. Subject to Section 5.03 below, a Book-Entry Trust Unit may not be transferred by the Depository or its nominee except to another nominee or the Depository, or another Depository or its nominee that agrees to hold the Book-Entry Trust Unit for the account of the respective Depository Participants and Beneficial Owners.

(b)     The Trustee will not have any liability to any person for any aspect of the records relating to or payment made on account of Beneficial Owners of the Book-Entry Trust Units held by the Depository, for monitoring or restricting any transfer of beneficial ownership in a Book-Entry Trust Unit or for maintaining, supervising or reviewing any records relating to such Beneficial Owners.

**Section 5.03.** *Registration of and Limitation on Transfers and Exchanges of Units.*

The Trustee shall cause to be kept at its Corporate Trust Office a Unit Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Trust Units and of transfers and exchanges of Trust Units as provided in the Trust Agreement (including these Standard Terms). The Trustee will initially serve as Unit Registrar for the purpose of registering Trust Units and transfers and exchanges of Trust Units as herein provided.

Subject to Section 5.04, upon surrender for registration of transfer of any Trust Unit at the Corporate Trust Office of the Trustee or at any other office or agency of the Trustee maintained for such purpose, the Trustee shall execute and the Unit Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Trust Units of a like aggregate Notional Amount.

At the option of the Trust Unit Holders, each Trust Unit may be exchanged for other Trust Units with a like aggregate Notional Amount and in authorized denominations, upon surrender of such Trust Unit to be exchanged at any such office or agency. Whenever any Trust Units are so surrendered for exchange, the Trustee shall execute and cause the Unit Registrar to authenticate and deliver the Trust Units which the Trust Unit Holder making the exchange is entitled to receive. Every Trust Unit presented or surrendered for transfer or exchange shall (if so required by the Trustee) be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge to the Trust Unit Holders shall be made for any transfer or exchange of Trust Units, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Trust Units.

All Trust Units surrendered for transfer and exchange shall be disposed of by the Unit Registrar in accordance with its customary procedures.

The Trustee will cause the Unit Registrar (unless the Trustee is acting as Unit Registrar) to provide notice to the Trustee of each transfer of a Trust Unit, and will provide the Trustee with an updated copy of the Unit Register on January 1 of each year.

**Section 5.04.** *No Obligation to Register.*

The Trustee is not obligated to register or qualify any Trust Unit under the Securities Act or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

**Section 5.05.** *Mutilated, Destroyed, Lost or Stolen Units.*

If (a) any mutilated Trust Unit is surrendered to the Trustee or the Unit Registrar, or the Trustee and the Unit Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Trust Unit, and (b) there is delivered to the Trustee and the Unit Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of actual knowledge by the Trustee or the Unit Registrar that such Trust Unit has been acquired by a protected purchaser, the Trustee shall execute and deliver and the Unit Registrar shall authenticate, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Trust Unit, a new Trust Unit of like tenor. Upon the issuance of any new Trust Unit under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trust Unit Registrar) connected therewith. Any replacement Trust Unit issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust, as if originally issued, whether or not the destroyed, lost or stolen Trust Unit shall be found at any time.

**Section 5.06.** *Persons Deemed Owners.*

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

**Section 5.07.** *Appointment of Trust Unit Paying Agent.*

The Trustee shall serve as the initial Trust Unit Paying Agent hereunder and thereafter, solely in the event that legal or regulatory requirements require the appointment of a different Trust Unit Paying Agent, the Trustee may appoint on behalf of, and as an expense of, the Trust, any other Trust Unit Paying Agent for the purpose of making distributions to Trust Unit Holders; provided, however, that any replacement Trust Unit Paying Agent shall be required to meet the eligibility requirement set forth in Section 6.06. The Trustee shall cause such Trust Unit Paying Agent to execute and deliver to the Trustee an instrument in which such Trust Unit Paying Agent shall agree with the Trustee that such Trust Unit Paying Agent will hold all

sums held by it for the payment to Trust Unit Holders in trust for the benefit of the Trust Unit Holders entitled thereto until such sums shall be paid to the Trust Unit Holders. All funds remitted by the Trustee to any such Trust Unit Paying Agent for the purpose of making distributions shall be paid to Trust Unit Holders as soon as practicable following receipt thereof by the Trust Unit Paying Agent and any amounts not so paid shall be returned as soon as practicable to the Trustee.

## ARTICLE VI

## CONCERNING THE TRUSTEE

**Section 6.01.**  *Duties of Trustee.*

Every provision of the Trust Agreement (including these Standard Terms) relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VI.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement and no implied covenants or obligations shall be read into the Trust Agreements against the Trustee.

The Trustee shall (at the direction of the Requisite Trust Unit Holders), subject to its rights and protections herein, take all necessary or desireable actions to enforce the Assured Insurance Policies as set forth herein.

The Trustee shall deliver to all Trust Unit Holders copies of all notices and written communications received from Depositors, the Reorganized Debtors, or the trustee for the FGIC Trust as they relate to the Bonds, the GO CVIs, and/or the FGIC Certificates, as applicable.

Except as provided in Section 6.02 hereof, no provision of the Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act or willful misconduct; *provided, however,* that:

(a)    The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(b)    The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights (or such other percentage as may be specified herein) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New Securities or exercising any trust or power conferred upon the Trustee with respect to the New Securities, under the Trust Agreement;

33

(c)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Trust Unit Holders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Assured Insurance Policies or exercising any trust or power conferred upon the Trustee with respect to the Assured Insurance Policies, under the Trust Agreement; and

(d)     Any determination of gross negligence, willful misconduct or bad faith of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

### Section 6.02.   *Certain Matters Affecting the Trustee.*

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by the Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of any of the Trust Unit Holders, pursuant to the provisions of the Trust Agreement, unless such Trust Unit Holders shall have offered to the Trustee security or indemnity satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Trust Agreement (including these Standard Terms);

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice,

request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights; *provided, however,* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of the Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)     The Trustee may execute any of the trusts or powers under the Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under the Trust Agreement (including these Standard Terms);

(h)     Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 6.01;

(i)     The Trustee shall not be deemed to have notice of any matter unless one of its Officers has received written notice thereof at the Corporate Trust Office and such notice references the applicable Trust Units generally, the applicable Depositor(s), the Trust or the Trust Agreement;

(j)     None of the provisions of the Trust Agreement or these Standard Terms shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)     Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)     The permissive rights of the Trustee to perform any discretionary act enumerated in the Trust Agreement or these Standard Terms shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence or willful misconduct;

(m)     The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)    The Trustee shall have no duty (A) to see to any recording, filing, or depositing of the Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to the Trust Agreement (including these Standard Terms) believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)    The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of the Trust Agreement, these Standard Terms or any related document;

(p)    The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under the Trust Agreement or these Standard Terms, and shall have a duty only to accept such collateral or funds delivered to it in accordance with the Trust Agreement (including these Standard Terms);

(q)    The Trustee may rely conclusively on certification from Assured as to the Compounded Amount;

(r)    The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(s)    The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Trust Agreement;

(t)    All rights of action under the Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Trust Units, subject to the provisions of the Trust Agreement; and

(u)    The rights, protections, priviledges and immunities granted to the Trustee shall be applicable to the Trustee in its capacity as Unit Registrar and Trust Unit Paying Agent, *mutatis mutandis*.

**Section 6.03.    *Trustee Not Liable for Trust Units or Securities*.**

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement and in the Trust Units. The Trustee makes no representations or warranties as to the validity or sufficiency of the Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Trust Units) or of the Securities or

related documents.  The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the Securities or deposited in or withdrawn from the Trust in accordance with the Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Sections 3.01 and 3.02.  The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the Bond Documents.

Section 6.04.  *Trustee May Own Units.*

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

Section 6.05.  *Trustee's Fees and Expenses.*

(a)   Pursuant to the Fee Agreement, each of the Trustee and the Delaware Trustee shall be entitled to receive from Assured, and if not paid by Assured, the Trust, compensation agreed upon in writing (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by it in the execution of the trusts created under the Trust Agreement and in the exercise and performance of any of the powers and duties thereunder of the Trustee. Each of the Trustee and the Delaware Trustee shall be entitled to reimbursement for (x) all reasonable fees, expenses, costs and disbursements (other than Extraordinary Expenses) incurred or made by the Trustee or the Delaware Trustee in accordance with any of the provisions of the Trust Agreement (including these Standard Terms) (including but not limited to the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), in each case to the extent set forth in the Fee Agreement and (y) Extraordinary Expenses reimbursable pursuant to Section 6.05(b).  Additionally each of the Trustee and the Delaware Trustee shall be entitled to indemnification as provided in Section 6.13.  All such amounts payable to the Trustees, collectively,  the "**Trustee Costs**".  All such Trustee Costs shall be paid pursuant to the terms of the Fee Agreement and the provisions of this Trust Agreement and may be reimbursed to the Trustee and the Delaware Trustee in accordance with the provisions of the Fee Agreement and the terms of this Trust Agreement, including Section 3.02 hereof.  As set forth in the Fee Agreement, Trustee Costs will only be paid by the Trust in the event that Assured fails to do so pursuant to the terms of the Fee Agreement.  As set forth in Sections 3.02(a)(iv), 3.02(b)(ii), and 3.02(c)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, or (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.  For the avoidance of doubt, the obligations to the Trustee shall include the Trustee in its capacity as Unit Registar and Trust Unit Paying Agent.

(b)   In furtherance of Section 6.05(a), and subject to the terms of and limitations in the Fee Agreement, each of the Trustee (including in its capacities as the Unit Registrar and Trust Unit Paying Agent) and the Delaware Trustee shall be entitled to receive

reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Trust Unit Holders against the Depositors, the Reorganizd Debtors, the Trust, or each of the Trustees except for proceedings, litigation or enforcement actions that relate to the Trustee's or Delaware Trustee's, as the case may be, own gross negligent action, grossly negligent failure to act or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review (the "**Extraordinary Expenses**"). Subject to the terms of the Fee Agreement, the Trustee may (i) demand reimbursement from Assured, or (ii) in the event Assured fails to pay in response to such demand, make withdrawals from the Trust, to pay or reimburse itself the amount of any Extraordinary Expenses, up to a payment limit of $150,000 in the aggregate for the Trusts of Extraordinary Expenses in any calendar year or pro rata portion thereof in the case of the initial and the final years of the Trust based upon the portion of the applicable calendar year in which the Trust exists; provided, however, that the Trustee shall not have any obligation to incur additional Extraordinary Expenses in excess of such annual limit unless it has received security or indemnity reasonably satisfactory to it for such additional Extraordinary Expenses; and provided, further, that if the Trustee does incur any additional Extraordinary Expenses in excess of such annual limit in any calendar year, nothing herein shall prohibit it from being reimbursed for such Extraordinary Expenses in any subsequent calendar year, to the extent of funds available for such reimbursement as provided hereunder and subject to the payment limit of $100,000 applicable for each such subsequent calendar year or such pro rata portion thereof in the case of the initial and final years of the Trust and provided further that the foregoing shall not limit the payment of any amounts to which the Trustee is entitled pursuant to its indemnification rights set forth in Section 6.13 and the Fee Agreement with respect to defending the Trustee against any claim asserted by any Person.

(c)     For the avoidance of doubt, the Depositors shall not be liable for any Trustee Costs or Extraordinary Expenses.

**Section 6.06.** *Eligibility Requirements for Trustee, Successor Trustee, and Trust Unit Paying Agent.*

The Trustee, any successor Trustee, and any successor Trust Unit Paying Agent shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the Depositors or Assured; (ii) is neither affiliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is regularly acting as a trustee in the municipal finance market. If such corporation publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee, successor Trustee, or successor Trust Unit Paying Agent shall

cease to be eligible in accordance with the provisions of this Section, such Trustee, successor Trustee, or successor Trust Unit Paying Agent shall resign immediately in the manner and with the effect specified in Section 6.07.

### Section 6.07.   *Resignation and Removal of the Trustee.*

(a)    The Trustee may at any time resign and be discharged from the trusts created pursuant to a Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee. Upon receiving such notice of resignation, Assured shall promptly appoint a successor trustee meeting the requirements set forth in Section 6.06 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Trust Unit Holders and posted to EMMA by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)    If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 6.06 and shall fail to resign after written request therefor by Assured, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then Assured may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)    Assured may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 6.08 hereof. The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of Assured and the Trust, including without limitation, the costs and expenses incurred in connection with any such succession.

Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 6.08 hereof and (ii) payment of all costs, expenses and indemnities (other than Extraordinary Expenses) due and owing to the outgoing Trustee, including without limitation, the costs and expenses incurred in connection with any such succession.

Notwithstanding the replacement of the Trustee pursuant to this <u>Section 6.07,</u> the rights, benefits, protections and indemnities afforded to the Trustee under this <u>Article VI</u> shall continue to the benefit of the retiring Trustee.

**Section 6.08.   *Successor Trustee.***

Any successor trustee appointed as provided in <u>Section 6.07</u> shall execute, acknowledge and deliver to the Trust Unit Holders and to the predecessor trustee an instrument accepting such appointment under the Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor thereunder, with the like effect as if originally named as trustee therein.  The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under the Trust Agreement and the Trust Unit Holders and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of <u>Section 6.06</u> hereof.

Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under the Trust Agreement and (b) mail notice of the succession of such trustee under the Trust Agreement to all Holders of Trust Units at their addresses as shown in the Unit Register.

**Section 6.09.   *Merger or Consolidation of Trustee.***

Any Person into which the Trustee may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under the Trust Agreement provided such Person shall be eligible under the provisions of <u>Section 6.06</u>, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

**Section 6.10.   *Reserved.***

**Section 6.11.   *Appointment of Custodians.***

The Trustee may appoint one or more Custodians to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee.  Subject to <u>Article VI</u>, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Trust Unit Holders. Each Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and

surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Custodian may not be an Affiliate of the Depositors or Assured.

### Section 6.12.  *Trustee May Enforce Claims Without Possession of Trust Units.*

All rights of action and claims under the Trust Agreement or the Trust Units may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, indemnities, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Trust Unit Holders in respect of which such judgment has been recovered.

### Section 6.13.  *Trustee Indemnity*

The Trustees' rights to claim indemnification for losses that they may incur with respect to the Trust Agreement (incorporating these Standard Terms) and each other document contemplated by the foregoing to which either of the Trustees is a party shall be as set forth in Annex I hereto and the Fee Agreement, subject to, with respect to Extraordinary Expenses, the provisions of Section 6.05(b).

## ARTICLE VII

## TERMINATION OF TRUST

### Section 7.01.  *Termination; No Redemption Rights.*

Upon the indefeasible cancellation or other indefeasible termination of the relevant Assured Insurance Policy, the Trust (including the respective obligations and responsibilities under the Trust Agreement of the Trustee and Assured) shall terminate upon (i) the distribution to Assured or to Trust Unit Holders, as applicable, of any remaining Trust Assets held by or on behalf of the Trustee and required hereunder to be so distributed in accordance with the provisions of Section 3.03, 3.04, 3.05 3.07, or 3.08 hereof, (ii) payment in full of any Trustee Costs due and owing to the Trustees under the Trust Agreement (including these Standard Terms), (iii) payment in full of any Assured Deferred Expenses due and owing to Assured under the Trust Agreement (including these Standard Terms), (iv) payment in full of any known Tax Costs due and owing to any tax or governmental authority, and (v) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of the Trust Agreement have been complied with. In no event shall the Trust be terminated or the Securities be redeemed (except in the case of a redemption of the Securities permitted under the terms of the Bond Documents) or otherwise released from the Trust Estate (except pursuant to, and in accordance with, Sections 3.04 and 3.07 hereof) without the prior express written consent of Assured if either (i) the relevant Assured Insurance Policy has not been indefeasibly terminated or (ii) Assured has not been indefeasibly paid in full for any amounts owed pursuant to the Commonwealth Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

### Section 7.02. *Procedure for Termination.*

At least thirty (30) days prior to the date on which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice by letter to the Trust Unit Holders specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of Trust Units at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis to the extent necessary to satisfy the Insured Amount; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "**Termination Notice**"). The Trustee shall provide a copy of the Termination Notice to the Unit Registrar at the time such Termination Notice is given to Trust Unit Holders.

If the Requisite Trust Unit Holders do not object in writing within thirty (30) days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

Upon the dissolution, wind up and termination of the Trust and the Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

## ARTICLE VIII

## TAX PROVISIONS

### Section 8.01. *Grantor Trust Provisions.*

The Trustee, the Depositors, the Trust Unit Holders (by their acceptance of the Trust Units and book-entry beneficial interests therein) and Assured each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (b) the Trust is formed to facilitate direct investment in the Trust Assets, and (c) the Trustee (at the direction of Assured and/or the Requisite Trust Unit Holders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion

of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Trust Unit Holder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and Assured each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

Section 8.02. *Characterization.*

Each Trust Unit Holder acknowledges and agrees to treat the Trust Units and the book-entry beneficial interests therein as undivided interests in the Trust Estate.

Section 8.03. *Grantor Trust Administration.*

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Trust Unit Holders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Trust Unit Holders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust under the Grantor Trust Provisions. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Trust Unit Holders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "**Adverse Trust Event**"), unless the Trustee has obtained or received an Opinion of Counsel from counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Trust Unit Holders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

43

### Section 8.04. *Reports to Trust Unit Holders and Tax Authorities*

(a)     The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for the avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U.S. Treasury Regulations Section 1.671-5, as amended, or any successor provision (the "**WHFIT Regulations**") (including U.S. Treasury Regulations Section 1.671-5(c)(1)).

(b)     Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to the WHFIT Regulations, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustees, the Depositors, or Assured be liable for any liabilities, costs or expenses of the Trust or the Trust Unit Holders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence or willful misconduct.

(c)     If any tax, duty, assessment, or other governmental charge is imposed, levied or assessed on the Trust, or if the Trust becomes subject to deduction, withholding, or other charge or assessment from, or with respect to, any amounts received by the Trust or any distributions made by the Trust, such tax, duty, assessment or other governmental charge, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) (collectively, the "**Tax Costs**") shall be the sole responsibility of, charged to and payable by the Trust Unit Holders on a pro rata basis. To the extent known prior to the termination of the Trust, all Tax Costs that are withheld, collected, charged, assessed, or levied shall be paid by the Trustee from the Trust Assets and income to the applicable taxing or governmental authority and any amounts so withheld, collected and/or paid to the applicable taxing or governmental authority shall be deemed to have been paid as distributions to the applicable Trust Unit Holders and treated in accordance with the provisions of the Trust Agreement applicable to Tax Costs. To the extent any Tax Costs become known after the termination of the Trust, the former Trust Unit Holders of such Trust shall remain responsible for such Tax Costs on a pro rata basis.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)      All taxes due and payable on any amounts payable to a Trust Unit Holder with respect to a Trust Unit shall be that Trust Unit Holder's sole responsibility.

(f)      For the purposes of this Article VIII of these Standard Terms and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to Holder, Trust Unit Holder, or Beneficial Owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Articles, Sections, or provisions hereof.

(g)      Notwithstanding any other provision of the Trust Agreement (including these Standard Terms), Assured makes no representations, warranties, or guarantees, and shall have no liability, with respect to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units. By electing, or being deemed to elect, Assured Bondholder Election 2, all Trust Unit Holders expressly agree to hold Assured harmless, and not to seek to impose any liabiltiy on Assured, related to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

### Section 9.01.   *Amendment of Trust Agreement.*

Promptly following the execution of the Trust Agreement, the Trustee shall post full and complete copies of the Trust Agreement (including these Standard Terms) on EMMA. The Trust Agreement (including these Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured. The Trust Agreement (including these Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

(a)      except as otherwise provided in the Trust Agreement (including these Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

(b)      compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

(c)      alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

(d)      amend this <u>Section 9.01</u> without the written consent of each Trust Unit Holder;

(e)      adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in (a), (b), or (c) without the written consent of the Trust Unit Holders evidencing at least a majority of such Trust Units in the applicable Trust (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; *provided*, that only Trust Units that an Officer of the Trustee knows are so held shall be so disregarded; or

(f)      reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

Prior to executing any amendment permitted by this <u>Article IX,</u> (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of Counsel and a certificate from an Officer of Assured stating that the execution of such amendment is authorized or permitted by the Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under the Trust Agreement, these Standard Terms or otherwise.

Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Trust Unit Holder and shall post a copy of such amendment to EMMA.

The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Trust Unit Holders shall be subject to such reasonable regulations as the Trustee may prescribe.

### Section 9.02.  *Counterparts; Electronic Signatures.*

The Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in the Trust Agreement (including these Standard Terms) or in any other certificate, agreement or document related to the Trust Agreement (including these Standard Terms) shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic

signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures andRecords Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

**Section 9.03.** *Limitation on Rights of Trust Unit Holders.*

The death or incapacity of any Trust Unit Holder shall not operate to terminate the Trust Agreement or the Trust, nor entitle such Trust Unit Holder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Trust Unit Holder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Trust Unit Holders from time to time as partners or members of an association; nor shall any Trust Unit Holder be under any liability to any third person by reason of any action taken by the parties to the Trust Agreement pursuant to any provision hereof.

Except with respect to enforcement of the applicable Assured Insurance Policies in accordance with the terms hereof, no Trust Unit Holder shall have any right by virtue of any provision of the Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to the Trust Agreement, unless the Requisite Trust Unit Holders shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Trust Agreement, and the Trustee, for 15 days after its receipt of such request shall have neglected or refused to institute any such action, suit or proceeding. It is understood and intended, and expressly covenanted by each Trust Unit Holder with every other Trust Unit Holder and the Trustee, that no one or more Holders of Trust Units shall have any right in any manner whatever by virtue of any provision of the Trust Agreement to affect, disturb or prejudice the rights of the Holders of any other Trust Units, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under the Trust Agreement, except in the manner therein provided and for the equal, ratable and common benefit of all Trust Unit Holders. For the protection and enforcement of the provisions of this Section, each and every Trust Unit Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

In the event that an Officer of the Trustee receives a request for its consent to any amendment, modification or waiver of these Standard Terms, the Trust Agreement or any other document thereunder or relating thereto, or receives any other solicitation for any action with respect to the Securities or Assured Insurance Policies, the Trustee shall transmit a notice of such proposed amendment, modification, waiver, solicitation or action to each of the Trust

Unit Holders within five (5) days of receipt thereof. The Trustee shall request instructions from the Trust Unit Holders as to whether or not to consent to or vote to accept such amendment, modification, waiver, solicitation or action.

The Trustee shall consent or vote proportionally in accordance with the written direction of the Trust Unit Holders; provided, however, that the Trustee shall not:

(a)    without the prior written consent of any Trust Unit Holder, consent or affirmatively vote on behalf of such Trust Unit Holder on any matter that would: (i) terminate the Trust, (ii) except as expressly provided herein, sell some or all of the assets of the Trust; (iii) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy; and

(b)    without the prior written consent of Assured, consent or affirmatively vote on any matter that would amend, modify or waive any agreement in such a manner as to adversely impact Assured. Any such determination as to whether any such amendment, modification or waiver adversely impacts Assured shall be made in the sole and absolute discretion of Assured and such determination shall be promptly provided by notice to the Trustee and the Trust Unit Holders. The Trustee shall not be liable to any Trust Unit Holder or any other Person for refusing to consent or affirmatively vote on such a matter in accordance with such written direction of Assured.

**Section 9.04.** *Notices.*

All demands and notices under the Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, or by express delivery service, to:

(a) in the case of the Trustee if the Trustee is U.S. Bank National Association, the notice address for the Trustee is 100 Wall Street, 6th Floor, New York, New York 10005. If the Trustee is not U.S. Bank National Association, the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Trustee,;

(b) in the case of the Delaware Trustee, if the Delaware Trustee is U.S. Bank Trust National Association, the notice address for the Delaware Trustee is 100 Wall Street, 6th Floor, New York, New York 10005. If the Delaware Trustee is not U.S. Bank Trust National Association, the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Delaware Trustee;

(c) in the case of the Depositors, [ ● ], or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Depositors; and

(d) in the case of Assured, 1633 Broadway, New York, NY 10019, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by Assured.

Any notice required or permitted to be mailed to a Trust Unit Holder shall be given by first-class mail, postage prepaid, or by express delivery service, at the address of such Trust Unit Holder as shown in the Unit Register.  Notwithstanding the foregoing, so long as the Depository or its nominee is the registered holder of the Trust Units, notice may be given to the Trust Unit Holders by giving notice to the Depository in accordance with its applicable procedures.  Notice may also be delivered by email in accordance with a separate side letter agreement entered into between the parties.  Any notice so mailed within the time prescribed in the Trust Agreement shall be conclusively presumed to have been duly given, whether or not the Trust Unit Holder receives such notice.  A copy of any notice required to be telecopied hereunder also shall be mailed to the appropriate party in the manner set forth above.  A copy of any notice given hereunder to any other party shall be delivered to the Trustee.

### Section 9.05.  *Severability of Provisions.*

If any one or more of the covenants, agreements, provisions or terms of the Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of the Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of the Trust Agreement or of the Trust Units or the rights of the Holders thereof.

### Section 9.06.  *Third-Party Beneficiaries.*

The Trust Unit Holders and their successors and assigns shall be third-party beneficiaries of the provisions of the Trust Agreement (inclding these Standard Terms).  For the avoidance of doubt, beneficial holders of Trust Units are third party beneficiaries solely to the extent necessary to allow them to enforce the applicable Assured Insurance Policies as set forth herein.  Nothing in these Standard Terms or the Trust Agreement, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, and the Trust Unit Holders, any benefit or any legal or equitable right, remedy or claim under the Trust Agreement (including these standard terms).

### Section 9.07.  *Acts of Trust Unit Holders.*

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Trust Agreement (including these Standard Terms) to be given or taken by Trust Unit Holders or a class of Trust Unit Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Trust Unit Holders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of the Trust Agreement (including these Standard Terms) and conclusive in favor of the Trustee.  The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Unit Register.

### Section 9.08.  *Headings.*

Section and subsection headings in these Standard Terms are included herein for convenience of reference only and shall not constitute a part of these Standard Terms for any other purpose or be given any substantive effect.

**Section 9.09.** *No Waiver; Cumulative Remedies.*

No failure to exercise and no delay in exercising, on the part of any party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

**Section 9.10.** *Merger and Integration.*

These Standard Terms and the Trust Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by the Trust Agreement (including these Standard Terms).

**Section 9.11.** *The Delaware Trustee*

(a)     The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirement of <u>Section 3807(a)</u> of the Delaware Statutory Trust Act that the Trust have at least one trustee with a principal place of business in the State of Delaware. It is understood and agreed by the parties hereto that the Delaware Trustee shall have none of the duties or liabilities of the Trustee or any other trustees.

(b)     The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under <u>Section 3811</u> of the Delaware Statutory Trust Act. To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Trust Unit Holders, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement. The Delaware Trustee shall have no liability for the acts or omissions of the Trustee or any other trustees and the Delaware Trustee shall not be liable for supervising or monitoring the performance of the duties of the Trustee, or any other trustees, or the Trust or of any other person or entity under the Trust Agreement or any related document.

(c)     The Delaware Trustee may be removed by Assured upon thirty days prior written notice to the Delaware Trustee. The Delaware Trustee may resign upon thirty days prior written notice to Assured, with a copy to the Trustee. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment by Assured of a successor Delaware Trustee that (i) is reasonably acceptable to Assured, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware. If no successor has been appointed within such thirty (30) day period, the

Delaware Trustee, the Trustee or the Trust Unit Holders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

(d)      Any Person into which the Delaware Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Delaware Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor Delaware Trustee under the Trust Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto, except as may be required by applicable law, provided that such resulting or successor entity otherwise satisfies the requirements set forth herein to serve as Delaware Trustee.

(e)      Assured and the Trust shall be responsible for the payment of any fees or expenses of the Delaware Trustee. The Delaware Trustee shall be entitled to all of the same rights, protections, indemnities and immunities under the Trust Agreement and with respect to the Trust as the Trustee. No amendment or waiver of any provision of the Trust Agreement which adversely affects the Delaware Trustee shall be effective against it without its prior written consent. This provision shall survive the resignation or removal of the Delaware Trustee.

# ANNEX I

## INDEMNIFICATION PROVISIONS

(i) The Trust shall indemnify each of the Trustees or any predecessor Trustees and their agents for, and to hold them harmless against, any and all loss, damage, claims, liability or expense, including taxes (other than taxes based upon, measured by or determined by the income of the Trustees), arising out of or in connection with the acceptance or administration of the Trust hereunder, including the costs and expenses of defending itself against any claim asserted by any other Person or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct as determined by a final judgment of a court of a competent jurisdiction no longer subject to appeal or review.

(ii) The Trustees shall have the right to employ separate counsel in any such action or proceeding and participate in the investigation and defense thereof, and the Trust shall pay the reasonable fees and expenses of such separate counsel; provided, however, that the Trustees may only employ separate counsel at the expense of the Trust if in the reasonable judgment of the Trustees (1) a conflict of interest exists by reason of common representation or (2) there are legal defenses available to the Trustees that are different from or are in addition to those available to the Trust or if all parties commonly represented do not agree as to the action (or inaction) of counsel.

## EXHIBIT A

NOTICE OF CLAIM AND CERTIFICATE

[Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.]
1633 Broadway
New York, NY 10019
Attention: [●]
E-Mail: [●]

Reference is made to the [Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank National Association, (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Notice of Claim and Certificate is delivered pursuant to Section 3.06(a) of the Standard Terms. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement and the Policy (as defined below).

The undersigned, a duly authorized officer of Trustee, in its capacity as Trustee for the Trust, hereby certifies to Assured, with reference to the Trust Agreement and Municipal Bond Insurance Policy No. [●], dated [●], 20[●] (the "**Policy**"), issued in respect of the [Name of Series of Bonds] (the "**Assured Legacy Bonds CUSIP**") and deposited into the Trust, that:

(i)    The Trustee is the Trustee under the Trust Agreement.

(ii)    After taking into account any adjustments made pursuant to Section 3.05 of the Standard Terms, the sum of all amounts on deposit with the Trustee and available for distribution to the Trust Unit Holders pursuant to the Trust Agreement will be $[●] (such amount, the "**Payment Shortfall**") less than the principal and interest of $[●] (the "**Scheduled Payments**") Due for Payment under the Policy and Trust Agreement on [●], 20[●] (the "**Payment Date**").

(iii)    The Trustee is hereby making a claim under the Policy and Trust Agreement for the Payment Shortfall to be applied to the payment of Scheduled Payments.

(iv)    The Trustee agrees that, following its receipt of funds from Assured, it shall (a) hold such amounts in trust and, subject to Section 3.06(d) of the Trust Agreement, apply the same directly to the payment of Scheduled Payments when due; (b) not apply such funds for any other purpose; (c) not commingle such funds with other funds held by the Trustee, and (d) maintain an accurate record of such payments with respect to each Trust Unit and the corresponding claim on the Policy.

(v)     The Trustee, on behalf of the Trust Unit Holders, hereby assigns to Assured any rights of the Trust Unit Holders with respect to the Trust Assets to the extent that the principal amount (or Compounded Amount, as applicable) of the Assured Legacy Bonds CUSIP is reduced to zero. The foregoing assignment is in addition to, and not in limitation of, rights of subrogation otherwise available to Assured in respect of such payments. The Trustee shall take such action and deliver such instruments as may be reasonably requested or required by Assured to effectuate the purpose or provisions of this clause (v) and the applicable terms in the Trust Agreement.

(vi)    The Trustee, on behalf of the Trust Unit Holders, hereby acknowledges and agrees that, so long as Assured shall not be in default in its payment obligations under the Policy, Assured may at any time during the continuation of any proceeding by or against the Depositor under the United States Bankruptcy Code (if applicable) or any other applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (an "**Insolvency Proceeding**"), direct all matters with respect to the Trust Units or Trust Assets relating to such Insolvency Proceeding, including without limitation, (A) all matters relating to any claim in connection with an Insolvency Proceeding seeking the avoidance as a preferential transfer of any payment made to the Trust or Trustee or in connection with the Trust Units (a "**Preference Claim**"), (B) the direction of any appeal of any order relating to any Preference Claim at the expense of Assured, and (C) the posting of any surety, supersedeas or performance bond pending any such appeal. In addition, and without limiting the foregoing, the Trustee hereby agrees that Assured shall be subrogated to the rights of each Trust Unit Holder in any Insolvency Proceeding to the extent it is subrogated pursuant to section (vii) below, including, without limitation, all rights of any party to an adversary proceeding action with respect to any court order issued in connection with any such Insolvency Proceeding.

(vii)   Assured shall, to the extent it makes any Scheduled Payments on the Trust Units under the Policy and Trust Agreement, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Policy and the Trust Agreement.

(viii)      The Trustee hereby requests that the Payment Shortfall be deposited into the Insurance Policy Account by bank wire transfer or other immediately available funds using the following wiring instructions:

| | |
|---|---|
| Correspondent Bank: | [_____] |
| Fed ABA No: | [_____] |
| Account Name: | [_____] |
| Account No: | [_____] |
| Beneficiary A/C Name: | [_____] |
| Reference: | [_____] |

This Notice of Claim and Certificate may be revoked at any time by written notice of such revocation by the Trustee to Assured.

IN WITNESS WHEREOF, the Trustee has executed and delivered this Notice of Claim and Certificate as of the [ ● ]th day of [ ● ], 20[ ● ].

U.S. Bank National Association, as Trustee

By: _____
    Name:
    Title:

For Assured or
Trustee Use Only
Wire transfer sent on _____ By _____
Confirmation Number _____

-3-

**Appendix I**

**Debt Service Payment for []/[]/20[]**

| Description of Bond Issue | CUSIP | Outstanding Amount | Maturity | Rate | Principal Insured Amount | Principal | Interest | Total | Insurer | Policy No. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

A-1

**EXHIBIT B**

FORM UNIT EXCHANGE ELECTION NOTICE
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
Trust Unit Certificate No(s). __
Notional Amount: _____
CUSIP: [●]

[Trustee Name]
[Trustee Address]

Ladies and Gentlemen:

Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank National Association (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Unit Exchange Election Notice is delivered pursuant to Section 3.07(a) of the Standard Terms. Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

By delivering this Unit Exchange Election Notice, we hereby give [thirty (30)] days' written notice of our exercise of a Unit Exchange Election with respect to [  ] the Trust Unit(s) evidenced by the Trust Unit Certificate No(s). referenced above and direct the Trustee to distribute a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, as applicable, no later than [Date], in accordance with the [delivery] instructions below. We understand that such distribution will not be made until the applicable Trust Units are presented and surrendered at the office of the Trustee therein designated on that date.

If cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, we shall pay in cash the applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of our share of remaining Trust Assets.

By making a Unit Exchange Election, we acknowledge and agree that upon distribution of the Trust Assets in accordance with Section [3.07(b)] of the Standard Terms, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

[Please include delivery instructions for the distribution of Trust Assets to be receive on account of this Unit Exchange Election]

[Please Include any other relevant information]

[],
as Trust Unit Holder


By:_____
Name:
Title:

**EXHIBIT C**

FORM OF NOTICE OF MATURITY
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
CUSIP No.: [●]

Ladies and Gentlemen:

Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank National Association (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Notice of Maturity is delivered pursuant to Section 3.08(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

1. Maturity Date. Prior to acceleration, the Assured Legacy Bonds were scheduled to mature on [●] (the "**Maturity Date**").

2. Trust Unit Holder Distribution.  As a Trust Unit Holder, you are entitled receive a Distribution (or multiple Distributions) in the amount of a pro rata share of the Insured Amount on the Maturity Date corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date.

3. [Include any other relevant information required by the Depository or otherwise.]

## EXHIBIT D

FORM OF NOTICE TO TRUST UNIT HOLDERS

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]
STATEMENT FOR THE MONTH ENDED [●], 20__

**POSTED TO EMMA**
**U.S. Bank National Association, as Trustee**

1. **Trust Units**[1]

| | For the month ended [●], 20__ | | Year to date [●], 20__ | | As of [●], 20__ |
|---|---|---|---|---|---|
| | Aggregate distributions | Per Unit distributions | Aggregate distributions | Per Unit distributions | Aggregate principal or Accreted Value of New GO Bonds or GO CVIs (by CUSIP)[2] |
| Tax-Exempt Bond Account | $ | $ | $ | $ | |
| Taxable Bond Account | $ | $ | $ | $ | |
| Cash Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |
| CVI Account | $ | $ | $ | $ | |
| Insurance Policy Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |
| FGIC Certificates Account | $ | $ | $ | $ | |
| FGIC Insured Bonds Insurance Policy | $ | $ | $ | $ | [N/A (cash balance = $ [])] |

[1] Trustee to include only portions of table relevant to a particular Trust.
[2] Or any other securities or property received in respect thereof or in exchange therefor.

D-1

| Payments Account | | | | | |
|---|---|---|---|---|---|
| Non-Book Entry AGC Trust Units Account | $ | $ | $ | $ | |
| AGM Double-Insured Insurance Policy Payments Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |

### Aggregate Payment /Insured Amount Reporting for [Assured Legacy Bonds CUSIP]

As of [ ● ]

   a. <u>Current Interest Bonds</u>: Payments Made to Date on [Assured Legacy Bonds CUSIP]

     i.  Aggregate Interest Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

**Total** _____; **Per Trust Unit** _____

     1.  Aggregate Interest Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

**Total** _____; **Per Trust Unit** _____

     2.  Aggregate Interest Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]:

**Total** _____; **Per Trust Unit** _____

     ii.  Aggregate Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

**Total** _____; **Per Trust Unit** _____

     1.  Aggregate Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

**Total** _____; **Per Trust Unit** _____

     2.  Aggregate Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]: _____

Total _____; Per Trust Unit _____

    iii.  Aggregate Interest and Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below): _____

        1.  Aggregate Interest and Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP] (sum of (i)(1) and (ii)(1) above):

           Total _____; Per Trust Unit _____

        2.  Aggregate Interest and Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP] (sum of (i)(2) and (ii)(2) above):

           Total _____; Per Trust Unit _____

    b.  <u>Capital Appreciation Bonds</u>: Payments Made to Date on [Assured Legacy Bonds CUSIP]

      i.  Aggregate Compounded Amount Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

        Total _____; Per Trust Unit _____

        1.  Aggregate Compounded Amount Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

           Total _____; Per Trust Unit _____

        2.  Aggregate Compounded Amount Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]:

           Total _____; Per Trust Unit _____

    c.  <u>Insured Amount</u> for [Assured Legacy Bonds CUSIP]: _____

**2.** **Other distributions to Trust Unit Holders**

[_____]

**3.** **Tax Reporting**

[_____]

**<u>Redline of Exhibit F</u>**

### SUPPLEMENTAL  DISCLOSURES RELATED TO ASSURED BONDHOLDER ELECTION 2

Section 75.1(b) of the Plan provides that each beneficial holder of an Assured Insured Bond identified on Exhibit "A" to the Assured Bondholder Elections Form may elect one of two Assured Bondholder Elections, namely "Assured Bondholder Election 1" and "Assured Bondholder Election 2".  Each eligible Assured Insured Bondholder who elects, or is deemed to elect, Assured Bondholder Election 2 will opt into a custodial trust (each such trust, as applicable, an "Assured Trust") on terms substantially similar those reflected in (i) the relevant form "Standard Terms to Trust Agreement" included as an Exhibit in this Plan Supplement, and (ii) the relevant form "Trust Agreement" included as an Exhibit in this Plan Supplement (together, and as they may be modified prior to implementation, the "Trust Agreement").  The Assured Trust will issue Trust Units that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policies, (B) certain Assured New Securities, and (C) certain cash allocable to the Assured Legacy Bondholders under the Plan, in accordance with terms acceptable to Assured.

**Before electing, or being deemed to elect, Assured Bondholder Election 2, eligible Assured Insured Bondholders should carefully consider this supplemental disclosure (the "Supplemental Disclosure") identifying certain risk factors specifically related to Assured Bondholder Election 2.  The risk factors identified in this Supplemental Disclosure are not the only risks related to Assured Bondholder Election 2, and do not necessarily reflect the relative importance of various risks.  Any one or more of the factors identified in this Supplemental Disclosure, and other factors not described in this Supplemental Disclosure, could affect recoveries under Assured Bondholder Election 2, and there can be no assurance that other risk factors not discussed in this Supplemental Disclosure will not become material in the future.  Eligible Assured Insured Bondholders who elect, or are deemed to elect, Assured Bondholder Election 2, will be deemed to have assumed the related risks identified in this Supplemental Disclosure.**

Capitalized terms used in this Supplemental Disclosure, but not defined herein, shall have the meanings given to them in (i) the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03284-LTS, ECF No. 17627 (D.P.R. July 30, 2021) (the "Plan"), (ii) the Trust Agreement, or (iii) the Disclosure Statement, as applicable. This Supplemental Disclosure is subject in all respects to the terms and provisions of the Plan and the Trust Agreement.

**Assured is not providing any tax advice to Assured Insured Bondholders, and Assured makes no representations to Assured Insured Bondholders regarding the tax consequences of electing, or being deemed to elect, Assured Bondholder Election 2, the tax status of the Assured Trust or the tax consequences of owning or disposing of Trust Units. U.S. Holders are strongly urged to consult their own tax advisors regarding the tax consequences of electing, or being deemed to elect, Assured Bondholder Election 2, the tax status of the Assured Trust or the tax consequences of owning or disposing of Trust Units. In no event shall the Trustee for the Assured Trust, the Depositors, or Assured be liable for any liabilities, costs or expenses of the Assured Trust or the Trust Unit Holders arising out**

of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to any act or omission by the Trustee in breach of its obligations under the Trust Agreement.

I.    **Risks Related to Assured Bondholder Election 2.**

A.    **The Tax Treatment of the Assured Trust Is Uncertain.**

The Assured Trust will likely take the position that it is a grantor trust for U.S. federal income tax purposes. To the extent the Assured Trust is treated as a grantor trust, each Trust Unit Holder will be treated as receiving its Trust Unit(s) in exchange of its relevant Allowed Assured Insured Bond Claims and its interest in the Assured Insurance Policies, and as owning a pro rata undivided interest in the Trust Assets held in the Assured Trust, each to the extent of its pro rata interest in the Trust Units.  U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax treatment of the Assured Trust.

To the extent Trust Unit Holders are treated as owning their pro rata share of the Trust Assets under a grantor trust, they will be treated as if they had received distributions under the Plan directly and as owners of their pro-rated portion of the Trust Assets, including the New GO Bonds and the GO CVIs.  Interest on a portion of such New GO Bonds is expected to be excluded from gross income for U.S. federal income tax purposes (such interest, the "Assured Trust Tax-Exempt Interest").  There can be no assurance that the Assured Trust Tax-Exempt Interest, to the extent it is generally excluded from gross income for federal income tax purposes, will retain such exclusion in respect of the Trust Unit Holders.  No opinion of counsel or IRS ruling has been, or will be, requested regarding whether any payments of Assured Trust Tax-Exempt Interest that are passed through to the Trust Unit Holders will retain their exclusion from gross income for federal income tax purposes.  U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax treatment of the Assured Trust Tax-Exempt Interest.

It is possible that the IRS may assert, and a court may so hold, that the Assured Trust is properly characterized in a manner other than as a grantor trust for U.S. federal income tax purposes. Such alternative characterizations (principally, treating the Trust Units as taxable debt of Assured or treating the Assured Trust as subject to corporate level tax) could result in different (and materially adverse) tax consequences to the Assured Trust and the Trust Unit Holders (including treating all income received with respect to the Trust Units as fully taxable income or possibly imposing a corporate tax on the Assured Trust, thereby reducing distributions to Trust Unit Holders).

The Assured Trust has not sought and will not seek either a ruling from the IRS or an opinion of counsel with respect to its status as a grantor trust, the nature of the Trust Units issued by the Assured Trust, or the character, timing or exemption from taxable income of any income generated by any asset held by the Assured Trust.  As a result, there can be no assurance that the Assured Trust will be treated as a grantor trust, that the Trust Units will be treated as interests in

-2-

such trust or that any of the Trust Assets will be treated as producing tax-exempt income or the timing of such income.

**U.S. Holders are strongly urged to consult their own tax advisors regarding the U.S. federal income tax classification of the Assured Trust and the Trust Units (particularly the associated tax consequences in case the Assured Trust is not classified as a grantor trust (such that the Trust Units are treated as taxable debt of Assured or the Assured Trust is treated as subject to corporate level tax) for U.S. federal income tax purposes), as well as the character, timing or exemption from taxable income of any income generated by any asset held by the Assured Trust.**

### B.   Risks Related to Taxation of Ownership and Sale or Disposition of the Trust Units.

To the extent that each Trust Unit Holder is treated as owning its pro rata share of the applicable outstanding New GO Bonds, GO CVIs, and other Trust Assets, including the related Assured Insurance Policies, it will be entitled to payments attributable to such Trust Assets. To the extent that each Trust Unit Holder is treated as owning its pro rata share of the New GO Bonds, see "—Taxation of New GO Bonds and CVIs" in the Disclosure Statement for a discussion of the U.S. federal income tax consequences of owning the New GO Bonds. To the extent that each Trust Unit Holder is treated as owning its pro rata share of the GO CVIs, see "—Taxation of New GO Bonds and CVIs" in the Disclosure Statement for a discussion of the U.S. federal income tax consequences of owning the GO CVIs. To the extent that each Trust Unit Holder is treated as owning its pro rata share of the Assured Insurance Policies, the taxation of amounts received by the Assured Trust and passed through to the Trust Unit Holders in respect of payments on the Assured Insurance Policies is uncertain with the potential for materially adverse consequences to Trust Unit Holders. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of payments under the Assured Insurance Policies and the possibility of material adverse tax consequences to the Trust Unit Holders.

Pursuant to Section 75.1(c) of the Plan, the applicable Assured Insurance Policies and the Trust Agreement, Assured will retain the right to pay the Acceleration Price to the Assured Trust and fully satisfy its obligations with respect to the Assured Legacy Bonds held by the Assured Trust and the related Assured Insurance Policies at any time after the Effective Date upon 30 days' notice to the relevant holders and the Assured Trust. To the extent that Assured exercises this option, the Assured Trust will terminate and the Trust Unit Holders will receive only their pro-rata share of the Acceleration Price. As discussed above in respect to payments on the Assured Insurance Policies generally, the taxation of the receipt of the Acceleration Price by the Assured Trust and its distribution to the Trust Unit Holders is uncertain with the potential for materially adverse consequences to Trust Unit Holders. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of the receipt of the Acceleration Price by the Assured Trust and the possibility of material adverse tax consequences to the Trust Unit Holders.

Certain aspects of the U.S. federal income tax treatment of owning and disposing of a Trust Unit are uncertain. **U.S. Holders are strongly urged to consult their tax advisors regarding the ownership, sale and disposition of the Trust Units in their individual circumstances.**

**C.      Prepayment and Reinvestment Risks, Including Related to the Assured Advancement Option.**

Promptly following receipt thereof by the Trustee for the Assured Trust, and subject to any deductions provided for in the Trust Agreement, the Trustee shall be required to and shall distribute, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Assured Trust.  Each such Distribution made on or prior to the Maturity Date to Trust Unit Holders shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution.

This prompt "pass-through" of Assured Trust income, and the resulting simultaneous reduction of the accrued and unpaid interest on, principal amount of, and/or Compounded Amount of the Assured Legacy Bonds may result in Trust Unit Holders receiving payments on account of such interest, principal, or Compounded Amount prior to the applicable Original Scheduled Interest Payment Dates, Original Scheduled Principal Payment Dates, and/or Maturity Date of the Assured Legacy Bonds.

Pursuant to the Assured Advancement Option, and in accordance with the Assured Insurance Policies and Section(s) 75.1(c) and/or 75.1(d) of the Plan, Assured will also have the option to satisfy its payment obligations with respect to any Assured Legacy Bonds CUSIP by paying the applicable Acceleration Price or redemption price at any time after the Effective Date upon 30 days' notice to the relevant holders and the Assured Trust.  Payment of the applicable Acceleration Price or redemption price with respect to any Assured Legacy Bonds CUSIP shall satisfy and discharge all of Assured's obligations under the applicable Assured Insurance Policy with respect to such Assured Legacy Bonds CUSIP.

As a result of any such prepayment(s) of interest, principal, or Compounded Amount, including pursuant to the Assured Advancement Option, Trust Unit Holders may need to reinvest funds at a lower interest rate than that provided for under the Assured Legacy Bonds.  Any reinvestment risk will be borne exclusively by the Trust Unit Holders.

**Assured is not providing any tax advice to Assured Insured Bondholders and Assured makes no representations to Assured Insured Bondholders regarding the tax consequences of electing any Assured Bondholder Election or receiving the Acceleration Price.  U.S. Holders that elect any Assured Bondholder Election are strongly urged to consult their own tax advisors regarding the tax treatment of such election and the receipt of the Acceleration Price.**

~~Draft 11/21/21~~**DRAFT 2/03/22**

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

_____

TRUST AGREEMENT

among

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO, as Depositor [and]

[Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY, as Depositor],

[ASSURED GUARANTY CORP.] [OR] [ASSURED GUARANTY MUNICIPAL CORP.],

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

and

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Delaware Trustee

DATED AS OF

[●]

_____

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| SECTION 1. | STANDARD TERMS | 1 |
| SECTION 2. | DEFINED TERMS | 1 |
| SECTION 3. | ORGANIZATION OF TRUST | 2 |
| SECTION 4. | NOTIONAL AMOUNT | 3 |
| SECTION 5. | FORMS OF TRUST UNITS | 3 |
| SECTION 6. | SCHEDULES | 3 |
| SECTION 7. | PATRIOT ACT | 3 |
| SECTION 8. | GOVERNING LAW; VENUE; JURY WAIVER | 3 |
| SECTION 9. | FORCE MAJEURE | 4 |
| SECTION 10. | INTENT OF PARTIES | 4 |
| SECTION 11. | NON-PETITION | 7 |
| SECTION 12. | CERTAIN TERMS REGARDING THE DEPOSITOR[S] | 7 |

TRUST AGREEMENT

THIS TRUST AGREEMENT, dated as of [●] (this "Agreement"), is hereby executed by and among Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO (the "Commonwealth" [or the "Depositor"]) [and] [Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY ("PBA", and together with the Commonwealth, the "Depositors")], and [ASSURED GUARANTY CORP. ("Assured")] [OR] [ASSURED GUARANTY MUNICIPAL CORP. ("Assured")], U.S. BANK NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee") and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as Delaware trustee (the "Delaware Trustee", and together with the Trustee, the "Trustees") under this Agreement and the Standard Terms to Trust Agreement, dated as of [●] (the "Standard Terms"), all the provisions of which are incorporated herein and shall be a part of this Agreement as if set forth herein in full (this Agreement with the Standard Terms so incorporated, the "Trust Agreement").

PRELIMINARY STATEMENT

The parties are entering into the Trust Agreement for purposes of forming the [Name of Series] Assured Custodial Trust, a Delaware statutory trust (the "Trust"). In furtherance of the structure approved in the Commonwealth Plan and in order to facilitate the implementation thereof, the Trust is being established by the Depositor[s] and the Trustees solely for the benefit of and on behalf of the applicable Assured Legacy Bondholders holding Assured Legacy Bonds CUSIP [] that elected, or are deemed to have elected, Assured Bondholder Election 2 pursuant to the terms and provisions of the Commonwealth Plan. Except for the establishment of the Trust and the deposit therein pursuant to the Commonwealth Plan at the election (or deemed election) of the applicable Assured Legacy Bondholders, the Depositor[s] shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof. The Trustees shall file a Certificate of Trust of the Trust with the Office of the Secretary of State of the State of Delaware on the date hereof. The Trust shall issue beneficial ownership interests consisting of trust units to be known as the "Trust Units" and each holder of a Trust Unit, a "Trust Unit Holder" or "Holder". Each Trust Unit shall have a separate CUSIP and shall be issued in global form and be transferable through the Depository.

**Section 1.      Standard Terms**.

The Trustees acknowledge that the Standard Terms prescribe certain obligations of the Trustees with respect to the Trust and the Trust Units. The Trustees agree to observe and perform such prescribed duties, responsibilities and obligations, and acknowledge that the Standard Terms (including without limitation, the rights, protections, indemnities and immunities afforded to the Trustees thereunder) are and shall be a part of this Agreement to the same extent as if set forth herein in full.

**Section 2.      Defined Terms**.

With respect to the Trust Units and in addition to the definitions set forth in the Standard Terms, the following provisions shall govern the defined terms set forth below. To the extent the

meanings assigned to the defined terms set forth below are inconsistent with the meanings assigned to such terms in the Standard Terms, the meanings assigned herein shall control. Capitalized terms used herein but not defined herein or in the Standard Terms shall have the meanings ascribed to them in the Commonwealth Plan.

"**Bankruptcy Code**": The Bankruptcy Reform Act of 1978, as amended from time to time, and as codified as 11 U.S.C. Section 101 et seq.

"**Delaware Trust Statute**": Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code § 3801 *et seq.,* as the same may be amended from time to time.

"**Delaware Trustee**":  U.S. Bank Trust National Association, not in its individual capacity but solely in its capacity as Delaware Trustee hereunder, its successor in interest or any successor Delaware Trustee appointed as herein provided.

"**Maturity Date**": [●], the original maturity date of the relevant Assured Legacy Bonds (prior to acceleration).

"**Trustee**":  U.S. Bank National Association, in its capacity as Trustee hereunder, its successor in interest or any successor trustee appointed as herein provided.

"**Trustees**":  The Delaware Trustee and the Trustee.

"**U.S.A. PATRIOT Act**": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

**Section 3.**    **Organization of Trust**.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of a Certificate of Trust of the Trust (the "Certificate of Trust") with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name "[[Name of Series] Assured Custodial Trust]" in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust.  It is the intention of the parties hereto that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that the Trust Agreement (including the Standard Terms) constitutes the governing instrument of the Trust.  Notwithstanding any other provision of this Agreement to the contrary, the Trustees are hereby authorized and directed to, and shall, on the date hereof, execute and file the Certificate of Trust with the Secretary of State in substantially the form attached as Exhibit B hereto.  The Trustee shall have power and authority, and is hereby authorized and empowered to take all actions on behalf of the Trust as set forth in the Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such

2

other address as the Trustee may designate by written notice to the Trust Unit Holders and
Assured.

**Section 4.**      **Notional Amount**.

The aggregate Notional Amount of the Trust Units that may be executed and delivered
under this Agreement is limited to the outstanding principal amount (or, in the case of Capital
Appreciation Bonds, the Compounded Amount) as of the Effective Date of the Assured Legacy
Bonds deposited into the Trust.

**Section 5.**      **Forms of Trust Units**.

The Trust Units shall be substantially in the form attached as Exhibit A hereto.  Each
Trust Unit shall be issued in global form and be transferable through the Depository.

**Section 6.**      **Schedules**.

Schedule I is attached hereto and incorporated herein by reference as contemplated herein
or by the Standard Terms.

**Section 7.**      **Patriot Act**.

The parties hereto acknowledge that in accordance with Section 326 of the U.S.A.
PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding
of terrorism and money laundering, are required to obtain, verify, and record information that
identifies each person or legal entity that establishes a relationship or opens an account with the
Trustees.  The parties to this Trust Agreement agree that they will provide the Trustees with such
information as they may request in order for the Trustees to satisfy the requirements of the
U.S.A. PATRIOT Act.


**Section 8.**      **Governing Law; Venue; Jury Waiver**.

THIS AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER
THIS AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR
INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS AGREEMENT
OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER
BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL
MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE
CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE,
WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE
OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE
DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY
WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM,
COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING
OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT, OR (B) IN ANY WAY IN
CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY
DEALINGS OF THE PARTIES WITH RESPECT TO THIS AGREEMENT OR IN

CONNECTION WITH THIS AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE.  EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**Section 9.** **Force Majeure**.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of its obligations hereunder arising out of or caused by, directly or indirectly, forces beyond its control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustee shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

**Section 10.** **Intent of Parties**.

(a) The parties hereto intend that, for all purposes, the transfer to the Trust of the Trust Estate shall be, and shall be construed as, a transfer of such Trust Estate on behalf of the applicable Assured Legacy Bondholders in lieu of a transfer of such assets to the Trust directly by the applicable Assured Legacy Bondholders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Effective Date, the Depositor[s] will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Depositor[s] or of the [Depositor's estate] [Depositors' respective estates] in the event of a liquidation, reorganization, or similar proceeding of the Depositor[s] and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate.  The parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b) The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Depositor[s].

(c) Notwithstanding anything to the contrary in the Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Trust Unit Holders, Assured, the Trustees, nor

4

any other Person shall authorize, cause or permit the Trust to (and the Trust shall not and neither Trustee shall directly take any action that to its actual knowledge would constitute any of the following):

       (i)     engage in any business or engage in any activity other than those activities expressly permitted under <u>Section 2.03</u> of the Standard Terms and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in the Trust Agreement;

       (ii)    acquire or own any assets other than the Trust Estate or lease (as lessor) any assets;

       (iii)   fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including, but not limited to, in order to perform its obligations under the Trust Agreement;

       (iv)   fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

       (v)    fail to act solely in its own name or in the name of the Trustee on behalf of the Trust through duly authorized agents in the conduct of its activities;

       (vi)   provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

       (vii)   have its debts or other obligations guaranteed by any other person or hold itself out as responsible for the debts or other obligations of any other Person;

       (viii)  commingle its assets or liabilities with those of any other Person;

       (ix)   fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

       (x)    divert funds for any purpose other than as set forth in the Trust Agreement;

       (xi)   enter into any contract, agreement or transaction with any Trust Unit Holders, the Depositor[s], Assured, principal or other affiliate of the Trust, or any shareholder, general partner, member, principal or affiliate thereof, except as expressly authorized in the Trust Agreement;

       (xii)   maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

5

(xiii)   incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by the Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)   perform any duties or obligations of the Depositor[s] or any other Person;

(xv)   make any loans or advances to any third party, including, without limitation, any Trust Unit Holder, Depositor or Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)   fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)   fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)   identify itself as a department or division of any other Person;

(xix)   fail to observe all formalities required of a Delaware statutory trust;

(xx)   fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require the Depositor[s] to sell any assets, or make any capital contribution, to the Trust;

(xxi)   conduct any oral or written communication, including, without limitation, letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee on behalf of the Trust;

(xxii)   (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing;

6

(xxiii) supplement, modify, amend, restate, replace, waive or repeal this Section 10 or Sections 2.03, 2.04, 9.01 or 9.03 of the Standard Terms, or the definitions used in such Sections, in each case except for any supplement, modification, amendment or restatement of any such provision that (x) corrects any error and (y) would not (individually or together with other changes) be reasonably likely to cause the Trust to no longer be a "special purpose entity" in accordance with applicable law and standards; or

(xxiv) supplement, modify, amend, restate, replace, waive or repeal any portion of this Trust Agreement or the Standard Terms except as expressly permitted by Section 9.01 of the Standard Terms.

(d) Failure of the Trust, the Depositor[s], Assured, any Trust Unit Holder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 10 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e) To the extent that any provision of this Section 10 conflicts with, violates or otherwise is in contravention with any other provision of the Trust Agreement or the Standard Terms, the parties hereto and each Trust Unit Holder agree that the terms set forth in this Section 10 shall be controlling as expressly set forth herein.

**Section 11.     Non-Petition**.  The Depositor, Assured, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Trust Unit Holders, by electing (or being deemed to elect) Assured Bondholder Election 2, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another person, the Trustee may file appropriate proofs of claim.  For the avoidance of doubt, no adequate remedy at law exists with respect to any breach this Section 11, and specific performance shall in all circumstances be available as a remedy for the enforcement of this Section 11.

**Section 12.    Certain Terms Regarding the Depositor[s]**.  For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i)     The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Holders of the Trust Units shall be extinguished.  The Trust Units are not obligations of, and are not guaranteed by, the Depositor[s], and no recourse shall be had against any Officer, director, manager, employee, security holder or incorporator of the Depositor[s], or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)     The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Depositor[s] assume[s] no responsibility

7

for their correctness.  The Depositor[s] make[s] no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)     In purchasing any Trust Units in certificated form, the purchaser shall be required to acknowledge, represent to and agree, and in purchasing any book-entry beneficial interests in the Trust Units the purchaser shall be deemed to acknowledge, represent and agree, that none of the Depositor[s] nor any of [its] [their] affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Depositor[s] or any of [its] [their] affiliates.

(iv)     The Depositor[s] shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

**IN WITNESS WHEREOF**, the Depositor[s], Assured, the Trustee and the Delaware Trustee have caused this Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**COMMONWEALTH OF PUERTO RICO,**
As Depositor

By: _____
Name: _____
Its: _____

**[PUERTO RICO PUBLIC BUILDINGS
AUTHORITY,**
As Depositor

By: _____
Name: _____
Its: _____]

**[ASSURED GUARANTY CORP.] [ASSURED
GUARANTY MUNICIPAL CORP.]**

By: _____
Name: _____
Its: _____

**U.S. BANK TRUST NATIONAL
ASSOCIATION,**
As Delaware Trustee

By: _____
Name: _____
Its: _____

**U.S. BANK NATIONAL ASSOCIATION,**
As Trustee

By: _____
Name: _____
Its: _____

9

## <u>SCHEDULE I</u>

**Assured Legacy Bonds Schedule**

| <u>CUSIP</u> | <u>Tax-Exempt/Taxable</u> | <u>Outstanding Principal Amount (or Compounded Amount)  as of the Effective Date</u> | <u>Accrued and Unpaid Interest as of the Effective Date</u> |
|---|---|---|---|
| [●] | [●] | [●] | [●] |

S- 1

## **EXHIBIT A**

FORM OF TRUST UNIT CERTIFICATE

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST, AS DEFINED HEREIN OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THIS CERTIFICATE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE DEPOSITOR[S], THE TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT IN RESPECT OF AN INDIRECT INTEREST IN THE NEW SECURITIES UNDERLYING THE UNITS.

[NAME OF TRUST]

Trust Unit Certificate No. ___

Notional Amount: _____

CUSIP:  [●]

Each Trust Unit represented by this Trust Unit certificate is one of a duly authorized issue of certificates designated as the Trust Units (herein collectively called the "Units"), and representing a beneficial ownership interest in the Trust Estate created by the Trust Agreement referred to below.

This certifies that CEDE & CO. is the registered owner of the Notional Amount of Trust Units evidenced by this certificate.  Capitalized terms used but not defined herein have the meanings assigned to such terms in the Trust Agreement and Standard Terms referred to below and the Trust Agreement contains rules as to construction that shall be applicable herein.

The Trust was created pursuant to a Trust Agreement (the "Trust Agreement") dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "Depositor[s]"), [Assured Guaranty Corp.] [OR] [Assured Guaranty Municipal Corp.] ("Assured"), U.S. Bank National Association, (the "Trustee") and U.S. Bank Trust National Association (the "Delaware Trustee", which term includes any successor under the Trust Agreement, and together with the Trustee, the "Trustees"), and the Standard Terms to Trust Agreement, dated as of [●] (the "Standard Terms"), a summary of certain of the pertinent provisions of which is set forth hereinafter.  This certificate is issued under and is subject to the terms, provisions and conditions of the Trust Agreement, to which Trust Agreement the Holder of this certificate by virtue of its acceptance hereof assents and by which such Holder is bound. Distributions on this certificate shall be made by the Trust Unit Paying Agent under the Trust Agreement.

This certificate is issued under the Trust Agreement to which reference is hereby made for a statement of the respective rights thereunder of the Depositor[s], the Trustees, Assured and the Holder of the certificate and the terms upon which the certificate is executed and delivered.

This certificate does not bear interest.  Distributions on this certificate represent a combination of certain interest and/or principal payments made on the New Securities and certain other payments which derive from the Trust Estate and may vary from period to period. Each such Distribution shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second, of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation Bonds, in either case, as of the date of such Distribution and in an amount equal to such Distribution, as set forth in the Standard Terms.

A- 2

In certain circumstances, Assured may instruct the Trustee in writing to sell the New Securities (the "Subject Bonds") underlying the Units for cash (a "Bond Sale"). The Holder of this certificate shall have the option to elect to receive in-kind delivery of a pro rata share of the Subject Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs and Tax Costs, in lieu of receiving a pro rata share of the actual net cash proceeds from the Bond Sale, as set forth in the Standard Terms.

This certificate is not subject to repurchase by the Trust at the option of the Holder of this certificate.

The Holder, by its acceptance of this certificate, agrees that it will look solely to the funds allocated pursuant to the Trust Agreement for distribution hereunder and that none of the Trustee or the Trust Unit Paying Agent in their individual capacities nor the Depositor[s] [is] [are] personally liable to such Holder for any amount payable under this certificate or the Trust Agreement, subject in the case of the Trustee to any liability under the Trust Agreement, provided that the foregoing shall not prevent the Holder from appearing or litigating any such proceeding after it has been instituted.

The Holder, by its acceptance of this certificate hereby agrees that (i) the Trust Agreement is executed and delivered by U.S. Bank National Association and U.S. Bank Trust National Association, not individually or personally, but solely as Trustee and Delaware Trustee, respectively, in the exercise of the powers and authority conferred upon and vested in it, and pursuant to instructions set forth therein, (ii) each of the representations, undertakings and agreements herein made on the part of the Trustee, the Delaware Trustee or the Trust is made and intended not as personal representations, undertakings or agreements of U.S. Bank National Association or U.S. Bank Trust National Association, (iii) nothing herein contained shall be construed as creating or imposing any liability upon U.S. Bank National Association or U.S. Bank Trust National Association, individually or personally, or the Depositor[s] to perform any covenant, either express or implied, contained herein, all such liability, if any, is hereby expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and such waiver shall bind any third party making a claim by or through one of the parties hereto, and (iv) under no circumstances shall U.S. Bank National Association, U.S. Bank Trust National Association or the Depositor[s] be personally liable for the payment of any indebtedness or expenses of the Trust, or be personally liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under the Trust Agreement.

The Holder, by its acceptance of this certificate, covenants and agrees that it will not at any time institute against the Depositor[s], Assured or the Trust, or join in any institution against the Depositor[s], Assured or the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to this certificate or the Trust Agreement, that no adequate remedy at law exists with respect to any breach of such covenant and agreement, and that specific performance shall in all circumstances be available as a remedy for any breach of such covenant and agreement.

A- 3

Distributions on this certificate will be made as provided in the Trust Agreement by the Trust Unit Paying Agent by wire transfer to such Holder without the presentation or surrender of this certificate or the making of any notation hereon.  Except as otherwise provided in the Trust Agreement and notwithstanding the above, the final distribution on this certificate will be made after due notice by the Trust Unit Paying Agent of the pendency of such distribution and only upon presentation and surrender of this certificate at the office or agency maintained by the Unit Registrar for that purpose.

Reference is hereby made to the further provisions of this certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

Unless this certificate has been executed by the manual or electronic signature of an authorized officer of the Trustee and the certificate of authentication hereon shall have been executed by an authorized officer of the Unit Registrar, or an authenticating agent by manual or electronic signature, this certificate shall not entitle the Holder hereof to any benefit under the Trust Agreement or be valid for any purpose.

THIS CERTIFICATE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAWS PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust and not in its individual capacity, has caused this certificate to be duly executed.

[NAME OF SERIES] ASSURED CUSTODIAL TRUST

By:  U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity, but solely as Trustee

By:_____
    Authorized Signatory

Dated:  _____

CERTIFICATE OF AUTHENTICATION

This is the Trust Unit certificate referred to in the within-mentioned Trust Agreement.

U.S. BANK NATIONAL ASSOCIATION, not in its individual capacity, but solely as Unit Registrar

By:_____
    Authorized Signatory

Dated:  _____

**[TRUST NAME]**

**REVERSE OF TRUST UNIT CERTIFICATE**

This certificate does not represent an obligation of, or an interest in, Assured, the Trustees, or any Affiliates of each of them and no recourse may be had against any such parties or their assets, except as expressly set forth or contemplated herein or in the Trust Agreement.  In addition, this certificate is not guaranteed by any governmental agency or instrumentality and is limited in right of payment to certain collections and recoveries with respect to the Trust Estate, all as more specifically set forth herein and under the Trust Agreement.  A copy of the Trust Agreement may be examined by any Holder upon written request during normal business hours at the principal office of the Trustee and at such other places, if any, designated by the Trustee.

The Trust Agreement (including the Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured.  The Trust Agreement (including the Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

a) except as otherwise provided in the Trust Agreement (including the Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

b) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

c) alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

d) amend Section 9.01 of the Standard Terms without the written consent of each Trust Unit Holder;

e) adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in a), b), or c) without the consent of the Trust Unit Holders evidencing at least a majority of the Trust Units (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; or

f) reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

As provided in the Trust Agreement and subject to certain limitations therein set forth, including the limitations set forth in Article V of the Standard Terms, the transfer of this certificate is

A- 6

registrable in the Unit Register upon the surrendering of this certificate for registration of transfer at the offices or agencies of the Unit Registrar, accompanied by a written instrument of transfer in form satisfactory to the Unit Registrar duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon a new certificate will be issued to the designated transferee.  The initial Unit Registrar appointed under the Trust Agreement is the Trustee.

No service charge will be made for any such registration of transfer or exchange, but the Trustee or the Unit Registrar may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith or any expense incurred thereby.

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

The obligations and responsibilities created by the Trust Agreement and the Trust shall terminate upon the payment to the Holders of the Trust Units of all amounts required to be paid to them pursuant to the Trust Agreement, the disposition of all property held as part of the Trust Estate and payment of any costs, expenses and indemnities due and owing to the Trustees under the Trust Agreement or of any other costs or expenses as provided in the Trust Agreement.

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sell(s) and assign(s) and transfer(s) unto

_____

_____

(Please print or type name and address, including postal zip code, of assignee and social security number or employer identification number)

_____

the within certificate stating in the names of the undersigned in the Unit Register and does hereby irrevocably constitute and appoint

_____

to transfer such Certificate in such Unit Register of the Trust.

I [we] further direct the Unit Registrar to issue a new certificate of like principal to the above-named assignee and deliver such certificate to the following address:

_____

_____

Dated:_____          _____
                                     Signature by or on behalf of Assignor

_____     _____
        Authorized Officer           Signature Guaranteed

_____     _____
        Name of Institution          NOTICE: The signature(s) of this assignment must
                                     correspond with the name(s) on the face of this
                                     certificate without alteration or any change
                                     whatsoever.  The signature must be guaranteed by a
                                     participant in the Securities Transfer Agents
                                     Medallion Program, the New York Stock Exchange
                                     Medallion Signature Program or the Stock
                                     Exchanges Medallion Program.  Notarized or
                                     witnessed signatures are not acceptable as
                                     guaranteed signatures.

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for the information of the Unit Registrar.

Distributions shall be made by wire transfer in immediately available funds to

_____

for the account  of

_____

account number _____ or, if mailed by check, to

_____

_____.

Applicable reports and statements should be mailed to

_____.

This information is provided by _____the

assignee named above, or _____ as its agent.

A- 9

**EXHIBIT B**

FORM OF CERTIFICATE OF TRUST OF
[NAME OF SERIES] ASSURED CUSTODIAL TRUST

THIS Certificate of Trust of [[Name of Series] Assured Custodial Trust (the "Trust"), is being duly executed and filed by the undersigned, as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, Sections 3801 *et seq.*) (the "Act").

1.    NAME.   The name of the statutory trust formed hereby is "[Name of Series] Assured Custodial Trust."

2.    DELAWARE TRUSTEE.   The name and business address of a trustee of the Trust having its principal place of business in the State of Delaware are U.S. Bank Trust National Association, 1011 Centre Road, Suite 203, Wilmington, Delaware 19805.

3.    EFFECTIVE DATE.   This Certificate of Trust shall be effective upon filing.

IN WITNESS WHEREOF, the undersigned, being the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

U.S. BANK TRUST NATIONAL
ASSOCIATION,
as Delaware Trustee


By:_____
Name:
Title:


U.S. BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
Name:
Title:

B- 1

**EXHIBIT C**

FORM OF TRUSTEE CERTIFICATION - UNDERLYING INSURED SECURITY

The undersigned hereby certifies as follows to COMMONWEALTH OF PUERTO RICO [AND PUERTO RICO PUBLIC BUILDINGS AUTHORITY], as depositor[s] (the "Depositor[s]") with respect to the Bonds listed on Schedule I of the applicable Trust Agreement (the "Assured Legacy Bonds"):

(1)  U.S. Bank National Association, as trustee (the "Trustee") of [[Name of Series] Assured Custodial Trust (the "Trust") is in possession of a certificate evidencing the Assured Legacy Bonds; or

(2)  The Trustee has received confirmation from the depository of such Assured Legacy Bonds or a direct or indirect participant thereof that such Assured Legacy Bonds are beneficially owned by the Trust for the benefit of the Trust Unit Holders.

Capitalized terms used but not defined herein have the meanings assigned to such terms in the [Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Depositor[s], [Assured Guaranty Corp.] [OR] [Assured Guaranty Municipal Corp.], the Trustee, and U.S. Bank Trust National Association, as Delaware trustee, which incorporates by reference the Standard Terms to Trust Agreement, dated as of [●].


U.S. BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
Name:
Title:

Date: [insert Effective Date]

C- 1

Document comparison by Workshare 9.5 on Thursday, February 3, 2022 10:23:51 AM

| Input: | |
|---|---|
| Document 1 ID | file://\\na.proskauer.com\firm\Home\CH1\10109\Desktop\ Word Versions of Last Filed Exhibits\Exhibit G (2).DOCX |
| Description | Exhibit G (2) |
| Document 2 ID | \\na.proskauer.com\firm\Home\CH1\10109\Desktop\Plan Supplement 2.1.22\Word Versions\Exhibit F (2).docx |
| Description | \\na.proskauer.com\firm\Home\CH1\10109\Desktop\Plan Supplement 2.1.22\Word Versions\Exhibit F (2).docx |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 1 |
| Deletions | 1 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 2 |

**STANDARD TERMS**

**TO**

**TRUST AGREEMENT**

Estado Libre Asociado de Puerto Rico, whose name in English is
COMONWEALTHCOMMONWEALTH OF PUERTO RICO, as Depositor,

Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO
RICO PUBLIC BUILDINGS AUTHORITY, as Depositor,

ASSURED GUARANTY CORP.,

ASSURED GUARANTY MUNICIPAL CORP.,

U.S. BANK NATIONAL ASSOCIATION,
as Trustee,

and

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Delaware Trustee,

Custodial Trust Units

Dated as of [●]

2

**TABLE OF CONTENTS**                                                    **Page**

RECITALS .................................................................................................. 1

STANDARD PROVISIONS ....................................................................... 1

ARTICLE I  DEFINITIONS ....................................................................... 1
    Section 1.01.    Defined Terms. ................................................... 1
    Section 1.02.    Other Definitional Provisions. ................... ~~9~~11

ARTICLE II  TRUST ESTATE ............................................................... ~~9~~11
    Section 2.01.    Trust Assets. .................................................. ~~9~~11
    Section 2.02.    Acceptance by the Trustee. ....................... ~~11~~15
    Section 2.03.    Purpose, Activities of the Trust. .............. ~~11~~16
    Section 2.04.    Limitations of the Trust. ........................... ~~12~~17
    Section 2.05.    Voting Rights. .............................................. ~~13~~17

ARTICLE III  ADMINISTRATION OF THE TRUST ........................ ~~13~~18
    Section 3.01.    Accounts. ....................................................... ~~13~~19
    Section 3.02.    Distributions; Prior to Maturity Date or in Connection with
                Assured Advancement Option. ............... ~~14~~19
    Section 3.03.    Assured Advancement Option. ................ ~~15~~22
    Section 3.04.    Sale of New Securities. ............................. ~~15~~22
    Section 3.05.    Adjustments to Principal Amounts and Compounded
                Amounts. ....................................................... ~~17~~24
    Section 3.06.    Payments on Assured Insurance Policies. ...... ~~18~~26
    Section 3.07.    Exchange of Trust Units for Trust Assets. ..... ~~19~~27
    Section 3.08.    Payments at Maturity Date. ...................... ~~20~~28

ARTICLE IV  REPORTING/REMITTING TO TRUST UNIT HOLDERS ...... ~~21~~29
    Section 4.01.    Statements to Trust Unit Holders. .......... ~~21~~29
    Section 4.02.    Compliance with Withholding Requirements. ...... ~~21~~29

ARTICLE V  TRUST UNITS ................................................................. ~~22~~29
    Section 5.01.    The Trust Units. .......................................... ~~22~~30
    Section 5.02.    Book-Entry Trust Units. ........................... ~~22~~30
    Section 5.03.    Registration of and Limitation on Transfers and Exchanges
                of Units. ......................................................... ~~23~~31
    Section 5.04.    No Obligation to Register. ........................ ~~24~~32
    Section 5.05.    Mutilated, Destroyed, Lost or Stolen Units. ...... ~~24~~32
    Section 5.06.    Persons Deemed Owners. ......................... ~~24~~32
    Section 5.07.    Appointment of Trust Unit Paying Agent. ...... ~~24~~32

ARTICLE VI  CONCERNING THE TRUSTEE ............................... ~~25~~33

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

Section 6.01.    Duties of Trustee. ......................................................... 2533

Section 6.02.    Certain Matters Affecting the Trustee. .................... 2634

Section 6.03.    Trustee Not Liable for Trust Units or Securities. .... 2836

Section 6.04.    Trustee May Own Units. ........................................... 2937

Section 6.05.    Trustee's Fees and Expenses. ................................... 2937

Section 6.06.    Eligibility Requirements for Trustee, Successor Trustee,
                 and Trust Unit Paying Agent. ................................... 3038

Section 6.07.    Resignation and Removal of the Trustee. ............... 3039

Section 6.08.    Successor Trustee. .................................................... 3140

Section 6.09.    Merger or Consolidation of Trustee. ....................... 3240

Section 6.10.    Reserved. ................................................................... 3240

Section 6.11.    Appointment of Custodians. .................................... 3240

Section 6.12.    Trustee May Enforce Claims Without Possession of Trust
                 Units. ........................................................................ 3241

Section 6.13.    Trustee Indemnity .................................................... 3241


ARTICLE VII  TERMINATION OF TRUST ..................................... 3341

Section 7.01.    Termination; No Redemption Rights. ...................... 3341

Section 7.02.    Procedure for Termination. ...................................... 3342


ARTICLE VIII  TAX PROVISIONS ................................................... 3442

Section 8.01.    Grantor Trust Provisions. ......................................... 3442

Section 8.02.    Characterization. ...................................................... 3443

Section 8.03.    Grantor Trust Administration. .................................. 3543

Section 8.04.    Reports to Trust Unit Holders and Tax Authorities ... 3544


ARTICLE IX  MISCELLANEOUS PROVISIONS ............................. 3745

Section 9.01.    Amendment of Trust Agreement. ............................. 3745

Section 9.02.    Counterparts. ............................................................ 3846

Section 9.03.    Limitation on Rights of Trust Unit Holders. ........... 3847

Section 9.04.    Notices. ..................................................................... 3948

Section 9.05.    Severability of Provisions. ....................................... 4049

Section 9.06.    Third-Party Beneficiaries. ........................................ 4049

Section 9.07.    Acts of Trust Unit Holders. ...................................... 4049

Section 9.08.    Headings. ................................................................... 4049

Section 9.09.    No Waiver; Cumulative Remedies. .......................... 4050

Section 9.10.    Merger and Integration. ........................................... 4150

Section 9.11.    The Delaware Trustee ............................................... 4150

ii

## RECITALS

Estado Libre Asociado de Puerto Rico, whose name in English is COMMONWEALTH OF PUERTO RICO  (the "Commonwealth"), Autoridad de Edificios Publicós de Puerto Rico, whose name in English is PUERTO RICO PUBLIC BUILDINGS AUTHORITY ("PBA", and together with the Commonwealth, the "Depositors"), and ASSURED GUARANTY CORP. ("AGC") and ASSURED GUARANTY MUNICIPAL CORP. ("AGM", and AGC and/or AGM, together or individually, as applicable, "Assured") have entered into a Trust Agreement (the "Trust Agreement") with U.S. BANK NATIONAL ASSOCIATION, a national banking association, as trustee (the "Trustee") and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, the "Trustees"), which Trust Agreement provides for the issuance of trust units ("Trust Units"), each evidencing a beneficial ownership interest in the property owned by the Trust created by the Trust Agreement.  These Standard Terms are a part of, and are incorporated by reference into, the Trust Agreement.

## STANDARD PROVISIONS

NOW, THEREFORE, in consideration of the mutual promises, covenants, representations and warranties made in the Trust Agreement, the Depositors, Assured and the Trustees agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01.  *Defined Terms.***

Except as otherwise specified herein or in the Trust Agreement or as the context may otherwise require, whenever used herein, the following words and phrases shall have the meanings specified in this Article.  Capitalized words and phrases used herein but not defined herein shall, when applied to a Trust, have the meanings set forth in or pursuant to the Trust Agreement.

"**Acceleration Price**": With respect to an Assured Legacy Bond, an amount equal to the outstanding principal amount of such bond plus the accrued and unpaid interest thereon.

"**Accreted Value**": As defined in the New GO Bonds Indenture.

"**Adverse Trust Event**": has the meaning set forth in Section 8.03 hereof.

"**Affiliate**": Any person or entity controlling, controlled by or under common control with the Depositor, Assured or either of the Trustees, as the context may require.  "Control" means the power to direct the management and policies of a person or entity, directly or indirectly, whether through ownership of voting securities, by contract or otherwise. "Controlling" and "controlled" shall have meanings correlative to the foregoing.

1

"**AGC Insurance Policy**": An Assured Insurance Policy issued by AGC.

"**AGC Secondary Market Assured Legacy Bond**": An Assured Legacy Bond insured by AGC in the secondary market.

"**AGC Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGC in the secondary market.

"**AGC Trust**": The Trust for an AGC Secondary Market Assured Legacy Bonds CUSIP.

"**AGC Trustee**": The Trustee for an AGC Trust.

"**AGM Double-Insured Insurance Policy**": An Assured Insurance Policy issued by AGM and insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**AGM Double-Insured Insurance Policy Payments Account**": As defined in Section 3.01(c)(ii) hereof.

"**AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGM in the secondary market that relates to underlying Assured Legacy Bonds that are also insured by AGC in the secondary market, consisting of (i) AGM Secondary Market Assured Legacy Bonds CUSIP 745235YJ4 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745235UX7 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy) and (ii) AGM Secondary Market Assured Legacy Bonds CUSIP 745235YV7 (evidencing a beneficial ownership interest in (x) custody receipts having CUSIP 745235UY5 and evidencing a beneficial ownership interest in underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy and (y) the related AGM Double-Insured Insurance Policy).

"**AGM Double-Insured Trust**": The Trust for an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**AGM Double-Insured Trustee**": The Trustee for an AGM Double-Insured Trust.

"**AGM Double-Insured Trust Unit**": A Trust Unit issued by an AGM Double-Insured Trust.

"**AGM Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP insured by AGM in the secondary market.

"**Assured Acceleration Option**": Assured's right, in accordance with the terms of the Assured Insurance Policies and Section 75.1(c) of the Commonwealth Plan, to elect to discharge its payment obligations with respect to any Assured Legacy Bonds CUSIP prior to

the stated Maturity Date thereof by paying the applicable Acceleration Price to the holders thereof.

"**Assured Advancement Option**": Either (a) the Assured Acceleration Option or (b) the rights assigned by the Commonwealth or PBA to Assured pursuant to Section 75.1(d) of the Commonwealth Plan to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were the Commonwealth or PBA for such purpose, such that any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Acceleration Price.

"**Assured Bondholder Election 2**": As defined in the Commonwealth Plan.

"**Assured Deferred Expenses**": Any Trustee Costs or Trust expenses paid in cash to the Trustee or the Trust by Assured.

"**Assured Insurance Policies**": The insurance policies, including insurance policies issued in the secondary market, pursuant to which Assured insured payments of principal and interest with respect to the Assured Legacy Bonds.

"**Assured Insured Bonds**": As defined in the Commonwealth Plan.

"**Assured Insurer Event**": A default by Assured on its payment obligations under an applicable Assured Insurance Policy, which default is continuing.

"**Assured Legacy Bondholder**": The beneficial holder of an Assured Legacy Bond.

"**Assured Legacy Bond**": Any Assured Insured Bond the beneficial holder of which has validly elected, or is deemed to have elected, Assured Bondholder Election 2.

"**Assured Legacy Bonds CUSIP**": Any maturity of Assured Legacy Bonds that bears a unique CUSIP such that such maturity of Assured Legacy Bonds is separately identifiable from other maturities of Assured Legacy Bonds with unique CUSIPs~~,~~; provided, however, that for all Secondary Market Assured Legacy Bonds, the "Assured Legacy Bonds CUSIP" for purposes of this Trust Agreement shall be the CUSIP of the related custody receipt evidencing a beneficial interest in such Secondary Market Assured Legacy Bonds and the related Assured Insurance Policy rather than the CUSIP of the underlying Secondary Market Assured Legacy Bonds. For the avoidance of doubt, each Assured Legacy Bonds CUSIP is either a Primary Market Assured Legacy Bonds CUSIP or a Secondary Market Assured Legacy Bonds CUSIP, and the Assured Legacy Bonds CUSIPs consist of (i) Primary Market Assured Legacy Bonds CUSIP 74514LD46 and (ii) Secondary Market Assured Legacy Bonds CUSIPs 74514LWE3, 74514LUW5, 745235YJ4, 745235YV7, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5.

~~"**Assured Legacy Bonds Distribution**": The New GO Bonds, [the Commonwealth Plan Cash Distributions], the GO CVIs, and any other property allocable to holders of Assured Legacy Bonds in their capacity as such under the Commonwealth Plan (which, if Assured elects to insure such New GO Bonds, shall include the applicable insurance policy~~

3

~~insuring such New GO Bonds), but excluding (A) New GO Bonds, [Commonwealth Plan Cash Distributions], GO CVIs, and other property allocable to holders of Assured Insured Bonds other than Assured Legacy Bonds under the Commonwealth Plan, (B) New GO Bonds, [Commonwealth Plan Cash Distributions], GO CVIs, and other property allocable to Assured as a beneficial owner of GO Bonds or PBA Bonds under the Commonwealth Plan, or (C) any other consideration that Assured is entitled to receive in accordance with the terms of the Commonwealth Plan (including, without limitation, Consummation Costs, PSA Restriction Fees, or Clawback Structuring Fees, each as defined in the Commonwealth Plan).~~

"**Assured Reimbursement Amount**": An amount sufficient to reimburse Assured for all payments made by Assured under an Assured Insurance Policy for a particular Assured Legacy Bonds CUSIP, and payment of which to Assured shall be a requirement of the Unit Exchange Election.

"**Beneficial Owner**": With respect to any Trust Unit, the Person who is registered as owner of that Trust Unit in the books of the Depository for that Trust Unit or in the books of a Depository Participant, or in the books of an indirect participant for which a Depository Participant acts as agent.

"**Bond Documents**": The bond resolutions, indentures, trust agreements, or similar agreements pursuant to which (i) the Assured Legacy Bonds, (ii) the New GO Bonds, ~~and~~ (iii) the GO CVIs, and (iv) the FGIC Certificates, as applicable, were issued.

"**Bond Election**": As defined in <u>Section 3.04(b)</u> hereof.

"**Bond Sale**": As defined in <u>Section 3.04(a)</u> hereof.

"**Book-Entry Trust Units**": All Trust Units, other than the Non-Book-Entry AGC Trust Units.

"**Bonds**": Collectively, (i) the GO Bonds, (ii) the PBA Bonds, and (iii) the New GO Bonds.

"**Business Day**": Any day that is not a Saturday, Sunday, holiday, or other day on which commercial banking institutions in the City of New York, the city of San Juan, Puerto Rico or the State of Delaware or, if different, the city and state in which the Corporate Trust Office is located are authorized or obligated by law or executive order to be closed.

"**Capital Appreciation Bond**": An Assured Legacy Bond that is a capital appreciation bond.

"**Cash Account**": As defined in <u>Section 3.01(~~ea~~)(iii)</u> hereof.

"**Cash Proceeds**": As defined in <u>Section 3.04(b)</u> hereof.

"**Code**": The Internal Revenue Code of 1986, as amended.

4

"**Clawback Structuring Fees**": The payments to which Assured is entitled pursuant to Section 86.1(b)(xvi) of the Commonwealth Plan and any related provision of the Confirmation Order.

"**Commonwealth Plan**": The ~~Seventh~~Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03284-LTS, ECF No. ~~17627~~,19365, including as amended or superseded, but in all events solely to the extent in form and substance reasonably satisfactory to Assured and otherwise consistent with the Commonwealth PSA and HTA/CCDA PSA.

"**Commonwealth Plan Cash Distributions**": Any cash distributions allocable to Assured Legacy Bondholders on account of Assured Legacy Bonds under the Commonwealth Plan, but, for the avoidance of doubt, excluding any Consummation Costs, PSA Restriction Fees, or Clawback Structuring Fees payable to Assured, each as defined in the Commonwealth Plan or in this Trust Agreement, as applicable.

"**Commonwealth PSA**": That certain Amended and Restated Plan Support agreement, dated as of July 12, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to GO Bonds and PBA Bonds, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**Compounded Amount**": With respect to any Capital Appreciation Bond, the compounded amount thereof.

"**Confirmation Order**": The order of the United States District Court for the District of Puerto Rico confirming the Commonwealth Plan in accordance with Section 314(b) of PROMESA and section 1129 of the Bankruptcy Code.

"**Corporate Trust Office**": The respective principal corporate trust office of the Trustees at which the Trust is administered from time to time.

"**Current Interest Bond**": An Assured Legacy Bond that is a current interest bond.

"**Custodian**": The Trustee or the agent for the Trustee which shall hold all or a portion of the Trust Estate, or documents relating thereto, with respect to a specific Trust.

"**CVI Account**": As defined in Section 3.01(~~d~~a)(iv) hereof.

"**Depository**": The Depository Trust Company, or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act and the regulations of the SEC thereunder.

"**Depository Participant**":  A broker, dealer, bank, other financial institution or other Person for whom from time to time a Depository effects book-entry transfers and pledges of securities deposited with the Depository.

"**Distribution**": Any distribution to Trust Unit Holders made pursuant to Section ~~3.02~~3.02; provided, however, that, for purposes of Section 3.05 hereof, if a Distribution on a Non-Book-Entry Double-Insured AGC Trust Unit is subsequently passed through to an AGM Double-Insured Trust and distributed as a Distribution on an AGM Double-Insured Trust Unit, such Distributions from the applicable AGC Trust and the related AGM Double-Insured Trust shall constitute a single Distribution (with no double counting) for purposes of calculating amounts that remain outstanding with respect to the Assured Legacy Bonds held by the applicable AGC Trust and insured by the related AGM Double-Insured Insurance Policy.

"~~**Effective Date**": The effective date of the Commonwealth Plan.~~  "**Effective Date**": The "Effective Date" as defined in the Commonwealth Plan and identified in a public notice by the Oversight Board; provided, however, that any action required by this Trust Agreement to be taken or event required by this Trust Agreement to have occurred on the Effective Date shall be deemed to have been taken or to have occurred on the Effective Date if such action is taken or such event occurs within ten (10) Business Days of the Effective Date.

"**EMMA**" The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP for each Trust Unit to which such document relates.

"**Extraordinary Expenses**":  As defined in Section 6.05(b) hereof.

"**Fee Agreement**": ~~An~~The fee and indemnification agreement dated as of the date hereof providing for the Trustees' recovery from or reimbursement by Assured of certain reasonable compensation, certain reasonable expenses, costs, and disbursements, ~~and~~ certain Extraordinary Expenses and certain indemnification payments.

"**FGIC**": Financial Guaranty Insurance Company.

"**FGIC Certificates**": As defined in the Commonwealth Plan.

"**FGIC Certificates Account**": As defined in Section 3.01(b)(i) hereof.

"**FGIC Insurance Policies**": As defined in the Commonwealth Plan.

"**FGIC Insured Bonds**": As defined in the Commonwealth Plan.

"**FGIC Insured Bonds Insurance Policy Payments Account**": As defined in Section 3.01(b)(ii) hereof.

"**FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP**": A Secondary Market Assured Legacy Bonds CUSIP with respect to which the underlying Secondary Market Assured Legacy Bonds are insured by FGIC in the primary market, consisting of (i) Secondary Market Assured Legacy Bonds CUSIP 74514LWE3 (evidencing a beneficial ownership interest in (x) underlying Secondary Market Assured Legacy Bonds with CUSIP number 745145R53 insured by FGIC in the primary market and (y) the related Assured Insurance Policy) and (ii) Secondary Market Assured Legacy Bonds CUSIP 74514LUW5 (evidencing a beneficial ownership interest in (x) underlying Secondary Market Assured Legacy Bonds with CUSIP number 74514LNG8 insured by FGIC in the primary market and (y) the related Assured Insurance Policy).

"**FGIC Plan Consideration**": As defined in the Commonwealth Plan.

"**FGIC Trust**": As defined in the Commonwealth Plan.

"**Floor Price**": The minimum weighted average sale price required to be obtained for the Subject Bonds with respect to any Bond Sale, as determined by Assured.

"**GO CVI**": As defined in the Commonwealth Plan.

"**GO Bonds**": As defined in the Commonwealth Plan.

"**GO Payments**": Payments received by the Trustee on account of GO CVI or New GO Bonds.

"**GO Payment Shortfall**":  As defined in Section 3.06(ed) hereof.

"**Grantor Trust Provisions**": Subpart E of Subchapter J of Chapter 1 of the Code and Section 7701 of the Code, and final Treasury Regulations, published rulings, notices and announcement, promulgated thereunder, as the foregoing may be in effect from time to time.

"**HTA/CCDA PSA**": That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among (a) the Financial Oversight and Management Board for Puerto Rico and (b) Assured Guaranty Corp. and Assured Guaranty Municipal Corp., solely in their capacities as insurers, and asserted holders, deemed holders, or subrogees with respect to HTA Bonds and CCDA Bonds, each as defined therein, among other parties, including as amended or superseded, but in all events only to the extent Assured remains a party thereto and has not terminated such agreement.

"**Insurance Policy Account**": As defined in Section 3.01(ea)(v) hereof.

"**Insured Amount**": As of any date, (i) in the case of a Current Interest Bond, the accrued and unpaid interest on, and outstanding principal amount of, such Current Interest Bond as of such date, or (ii) in the case of a Capital Appreciation Bond, the Compounded Amount as of such date.

"**Maturity Date**": As defined in the Trust Agreement.

"**Maturity Notice**": As defined in Section 3.08(a) hereof.

"**New GO Bonds**": As defined in the Commonwealth Plan, and including the Taxable New GO Bonds and Tax-Exempt New GO Bonds.

"**New GO Bonds Indenture**": As defined in the Commonwealth Plan.

"**New Securities**": ~~Collectively, the~~As applicable, New GO Bonds ~~and the~~, GO CVIs, and/or FGIC Certificates.

"**Non-Book-Entry AGC Trust Units**": The Non-Book-Entry Double-Insured AGC Trust Units, together with any Trust Units (if any) issued by an AGC Trust in certificated form to Assured Insured Bondholders who, prior to the Effective Date, held custody receipts in certificated form.

"**Non-Book-Entry Double-Insured AGC Trust Units**": Trust Units to be issued in certificated rather than book-entry form by the AGC Trusts for AGC Secondary Market Assured Legacy Bond CUSIPs 745235UX7 and 745235UY5, consisting of the Trust Units to be issued by each such AGC Trust on account of the portion of the Secondary Market Assured Legacy Bonds (and related custody receipts) held by such AGC Trust that also underlies an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

"**Non-Book-Entry Double-Insured AGC Trust Units Account**": As defined in Section 3.01(c)(i) hereof.

"**Notice of Claim and Certificate**": As defined in Section 3.06(a) hereof.

"**Notional Amount**": The amount of Trust Units issued as provided in the Trust Agreement.

"**Officer**": When used with respect to either of the Trustees, any senior vice president, any vice president, any assistant vice president, any assistant treasurer, any trust officer, any assistant secretary in the Corporate Trust Office of either of the Trustees, or any other officer of the Trustees customarily performing functions similar to those performed by the persons who at the time shall be such officers and who, in each case, shall have direct responsibility for the administration of the Trust Agreement (including these Standard Terms), and also to whom with respect to a particular corporate trust matter such matter is referred because of such officer's knowledge of and familiarity with the particular subject.  With respect to any other Person, the chairman of the board, the president, a vice president (however designated), the treasurer or controller.

"**Opinion of Counsel**": A written opinion of either (a) nationally recognized counsel who is reasonably acceptable to the parties to whom it is delivered, or (b) internal counsel to Assured or any of its Affiliates.

"**Original Scheduled Interest Payment Date**": With respect to a Current Interest Bond, a date, other than the Maturity Date, on which a scheduled payment of interest is due in respect of such Current Interest Bond in accordance with the terms of the applicable Assured Insurance Policy.

"**Original Scheduled Payment Date**": An Original Scheduled Interest Payment Date or Original Scheduled Principal Payment Date, as applicable, including, without limitation, the Maturity Date.

"**Original Scheduled Principal Payment Date**": A date on which a scheduled payment of principal or Compounded Amount is due in respect of such Current Interest Bond or Capital Appreciation Bond, as applicable, in accordance with the terms of the applicable Assured Insurance Policy, including, without limitation, the Maturity Date.

"**Oversight Board**" As defined in the Commonwealth Plan.

"**Paying Agent**": The paying agent for the GO Bonds.

"**Payment Shortfall**" As defined in Section 3.06(a) hereof.

"**Person**": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency, instrumentality, or political subdivision thereof.

"**PBA Bonds**": As defined in the Commonwealth Plan.

"**PBA Fiscal Agent**": The fiscal agent for the PBA Bonds.

"**Primary Market Assured Legacy Bonds CUSIP**": Assured Legacy Bonds CUSIP 74514LD46, which is the sole Assured Legacy Bonds CUSIP that is not a Secondary Market Assured Legacy Bonds CUSIP.

"**Principal Amount Reduction**": As defined in Section 3.05(c) hereof.

"**PROMESA**": The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq.

"**pro rata**": Unless otherwise stated, any pro rata payment or distribution made to, or any pro rata allocation of any cost or expense borne by, (i) Holders of Trust Units for a particular Assured Legacy Bonds CUSIP shall be calculated based on the Notional Amount of Trust Units issued with respect to such Assured Legacy Bonds CUSIP, and (ii) all Holders of Trust Units without regard to Assured Legacy Bonds CUSIP shall be calculated based on the outstanding principal amount (or, in the case of Capital Appreciation Bonds, the Compounded Amount) of the Assured Legacy Bonds underlying such Trust Units.

"**Pro Rata Share**": As defined in the Commonwealth Plan.

"**Reorganized Debtors**": As defined in the Commonwealth Plan.

"**Requisite Trust Unit Holders**": With respect to any Trust, Holders of a majority (measured by outstanding principal amount or, in the case of Capital Appreciation Bonds, the Compounded Amount of the underlying Assured Legacy Bonds CUSIP) of Trust Units.

"**Sale Notice**": As defined in Section 3.04(a) hereof.

"**Sale Notice Period**": As defined in Section 3.04(b) hereof.

"**SEC**": The Securities and Exchange Commission.

"**Secondary Market Assured Legacy Bonds**": The Assured Legacy Bonds that are insured through Assured Insurance Policies issued in the secondary market.

"**Secondary Market Assured Legacy Bonds CUSIP**": The Assured Legacy Bonds CUSIP of a Secondary Market Assured Legacy Bond, consisting of the CUSIP of the related custody receipt evidencing a beneficial interest in such Secondary Market Assured Legacy Bond and the related Assured Insurance Policies.  For the avoidance of doubt, the Secondary Market Assured Legacy Bonds CUSIPs consist of Assured Legacy Bonds CUSIPs 74514LWE3, 74514LUW5, 745235YJ4, 745235YV7, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5.

"**Securities**": Collectively, the Assured Legacy Bonds and the New Securities.

"**Securities Act**": The Securities Act of 1933, as amended.

"**Standard Terms**": These Standard Terms, as amended or supplemented, incorporated by reference into the Trust Agreement.

"**Subject Bonds**": As defined in Section 3.04(a) hereof.

"**Target Price**": With respect to any Bond Sale, the then-current trading price of the Subject Bonds, as measured by the most recently available sale price for no less than $1,000,000 of the Subject Bonds, as quoted on a nationally recognized exchange or a "bid" price on an electronic trading system such as Bloomberg L.P. posted within 10 Business Days prior to the date of the Sale Notice, or if no such price is available, a bona fide bid quote provided for no less than $1,000,000 of the Subject Bonds by an independent broker-dealer operating in the over-the-counter market.

"**Tax Costs**": As defined in Section 8.04(c) hereof.

"**Taxable Bond Account**": As defined in Section 3.01(ba)(ii) hereof.

"**Taxable GO Bonds**": Any GO Bonds that were taxable bonds.

10

"**Taxable New GO Bonds**": New GO Bonds that are not initially issued as tax-exempt bonds (if any).

"**Tax-Exempt Bond Account**": As defined in <u>Section 3.01(a)(i)</u> hereof.

"**Tax-Exempt New GO Bonds**": New GO Bonds that are tax-exempt bonds.

"**Termination Notice**": As defined in <u>Section 7.02</u> hereof.

"**Treasury Regulations**": Regulations, including proposed or temporary regulations, promulgated under the Code.  References herein to specific provisions of regulations, including proposed or temporary regulations shall include analogous provisions of final Treasury Regulations as well as any successor or replacement Treasury Regulations.

"**Trust**": With respect to each Assured Legacy Bonds CUSIP, the separate trust formed pursuant to the applicable Trust Agreement.

"**Trust Assets**"**:** With respect to each Trust that is formed for the benefit of the beneficial holders of an Assured Legacy Bonds CUSIP; (i) ~~such Assured Legacy Bonds CUSIP (including the related rights under the applicable Assured Insurance Policy, or in the case of Secondary Market Assured Legacy Bonds, the custody receipts evidencing a beneficial ownership interest in such Secondary Market Assured Legacy Bonds and the related rights under the applicable Assured Insurance Policy); (ii) the pro rata share of each asset comprising the Assured Legacy Bonds Distribution that is allocable to beneficial holders of such Assured Legacy Bonds CUSIP based on the Acceleration Price of such Assured Legacy Bonds CUSIP as of the Effective Date and the Acceleration Price of all Assured Legacy Bonds as of the Effective Date; (iii~~<u>the property to be deposited into and/or held by such Trust pursuant to Section 2.01 hereof; (ii)</u> any other property that Assured may determine, in its sole discretion, to deposit in the applicable Trust for the benefit of the beneficial holders of the applicable Legacy Bonds CUSIP; and (~~iv~~<u>iii</u>) any proceeds of any of the foregoing.

"**Trust Estate**": Collectively, and with respect to any Trust, (a) the Trust Assets deposited and held in such Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP and (b) any other property deposited and held in such Trust for the benefit of the beneficial holders of the applicable Assured Legacy Bonds CUSIP (if any).

"**Trust Unit**": With respect to each Trust that is formed for the benefit of the beneficial holders of an Assured ~~Insured~~<u>Legacy</u> Bonds CUSIP, the certificated trust unit(s) to be issued by such Trust.

"**Trust Unit Holder**" or "**Holder**": As applicable, (i) a Beneficial Owner of a Trust Unit, or (ii) Assured, to the extent Assured has been subrogated to the rights of a Beneficial Owner of a Trust Unit Holder.

11

"**Trust Unit Paying Agent**": The paying agent appointed pursuant to Section 5.07 hereof.

"**Trustee Costs**": As defined in Section 6.05(a) hereof.

"**Unit Exchange Election**": As defined in Section 3.07(a) hereof.

"**Unit Register**" and "**Unit Registrar**": The register maintained and the registrar appointed pursuant to Section 5.03 hereof.

"**U.S. Person**": A person who is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"**Voting Rights**": Any voting or control rights granted to holders of Securities.

"**WHFIT Regulations**": As defined in Section 8.04(a) hereof.

### Section 1.02.   *Other Definitional Provisions.*

The words "hereof," "herein" and "hereunder" and words of similar import when used in these Standard Terms shall refer to these Standard Terms as a whole and not to any particular provision of these Standard Terms, and Section, subsection, Annex and Exhibit references are to these Standard Terms unless otherwise specified.   The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.   The words "include" and "including" shall be deemed to be followed by the phrase "without limitation."   Any reference to any document in these Standard Terms shall be deemed to include any amendment, restatement, supplement or modification thereto.

## ARTICLE II

## TRUST ESTATE

### Section 2.01.   *Trust Assets.*

Pursuant to and in accordance with the Trust Agreement and the Commonwealth Plan, upon the Effective Date:

(a)     Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(a) applies solely to Assured Legacy Bonds CUSIPs 74514LD46, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(b)     (a) The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding a particularsuch Assured Legacy Bonds CUSIP, deposit the New GO Bonds allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP.   The Trustee shall establish and maintain in the name of the Trust a

Tax-Exempt Bond Account into which any such Tax-Exempt New GO Bonds shall be deposited, and a Taxable Bond Account into which any such Taxable New GO Bonds shall be deposited; provided, however, that the Trustee shall transfer from the Taxable Bond Account to the Tax-Exempt Bond Account any Taxable New GO Bonds which Assured has notified the Trustee in writing have become Tax-Exempt New GO Bonds.[1]

(i)

(ii)     (b) The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding a particular such Assured Legacy Bonds CUSIP, deposit the Commonwealth Plan Cash Distributions allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP.  The Trustee shall establish and maintain in the name of the Trust a Cash Account into which any such Commonwealth Plan Cash Distributions shall be deposited.

(iii)     (c) The Commonwealth shall, on behalf of each of the Assured Legacy Bondholders holding a particular such Assured Legacy Bonds CUSIP, deposit the GO CVIs allocable to such Assured Legacy Bonds CUSIP into the Trust for that Assured Legacy Bonds CUSIP.  The Trustee shall establish and maintain in the name of the Trust a CVI Account into which any such GO CVIs shall be deposited.

[1] ***Secondary Market Assured Legacy Bonds***: This footnote describes how the holders of Secondary Market Assured Legacy Bonds will receive Trust Units under this Agreement and how assets distributed under the Plan on account of such ownership interests will be transferred from the custodian of the existing custodial arrangement to the Trustee under this Agreement. ⬜

⬜

This Agreement will be used to administer assets distributed under the Plan for the beneficial owners of interests in Assured Legacy Bonds (including Secondary Market Assured Legacy Bonds) that elect Assured Bondholder Election 2 under the Plan.  By electing (or being deemed to have elected) Assured Bondholder Election 2, each beneficial holder of custody receipts evidencing a beneficial ownership interest in the Secondary Market Assured Legacy Bonds (including FGIC-insured bonds insured by Assured in the secondary market) and the respective Assured Insurance Policy shall be deemed to have deposited such custody receipts into the respective Trust in exchange for Trust Units evidencing a pro rata beneficial ownership interest in the related Trust Assets, which shall include such custody receipts. ⬜

⬜

The custodian of the existing custodial arrangements will receive the distributions contemplated by the Plan (or in the case of FGIC-insured bonds insured by Assured in the secondary market, the distribution of certificates representing an interest in the newly established FGIC bond trust) on account of the existing custody receipts and will transfer those new assets and the applicable existing insurance policies to the Trustee of the newly created Trusts as part of Assured collapsing the existing custodial arrangement.  The Trustee will then deposit those new assets and existing insurance policies into the appropriate Trust accounts described herein.  The Trustee will then receive payments and administer distributions in connection with the Trust Assets in accordance with this Agreement until the Trust is terminated. ⬜

⬜

The unique characteristics of certain of the Secondary Market Assured Legacy Bonds and the attributes of their current custodial arrangements will require that the documentation establishing and implementing the Trusts for such interests be tailored to the specifics of such bonds/arrangements.  For example, the Trust(s) established to hold trust certificates in the newly created FGIC bond trust(s) will hold those trust certificates and the related Assured Insurance Policy instead of newly issued GO Bonds (and assets distributed in connection therewith) and the Trust documentation will have to be revised accordingly.  Some Secondary Market Assured Legacy Bonds are insured by both Assured Guaranty Corp. and Assured Guaranty Municipal Corp. and will require provisions to address how those policies are to be drawn on in order to make Distributions.

(iv)      The Trustee shall establish and maintain in the name of the Trust an Insurance Policy Account into which such Assured Legacy Bonds CUSIP shall be deposited.  Pursuant to Section 77.6 of the Commonwealth Plan, the Assured Legacy Bonds deposited (or deemed deposited) into the Trust shall not be cancelled and all rights and remedies under the existing Assured Legacy Bonds and the applicable Bond Documents (other than payment obligations of the Depositors and the continuation of any lien granted as security for such Assured Legacy Bonds) shall remain in full force and effect solely to the extent necessary to preserve any claims relating to the Assured Legacy Bonds deposited in the Trust under the applicable Assured Insurance Policy. Such existing Assured Legacy Bonds shall not form the basis for the assertion of any claim against the Depositors or the Reorganized Debtors. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(h)      Solely with respect to each Primary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(b) applies solely to Assured Legacy Bonds CUSIP 74514LD46:

(i)      (d) The Paying Agent and the PBA Fiscal Agent shall, on behalf of each of the Assured Legacy Bondholders holding a particular such Primary Market Assured Legacy Bonds CUSIP, transfer the Assured Insurance Policy for that Primary Market Assured Legacy Bonds CUSIP and any and all agreements, documents and instruments relating to such Assured Insurance Policy that are within their control to the Trustee, who shall be deemed to have deposited all corresponding rights of the applicable Assured Legacy Bondholders into the applicable Trust.

(ii)      (e) The Depositors shall, on behalf of each of the Assured Legacy Bondholders holding a particular such Primary Market Assured Legacy Bonds CUSIP, transfer any and all agreements, documents and instruments relating to the Assured Insurance Policy for that Primary Market Assured Legacy Bonds CUSIP that are within their control to the Trustee, who shall be deemed to have deposited all corresponding rights of the applicable Assured Legacy Bondholders into the applicable Trust.

(iii)      (f) The Assured Legacy Bondholders holding such Primary Market Assured Legacy Bonds CUSIP shall deposit their Assured Legacy Bonds into the Trust for the applicable Primary Market Assured Legacy Bonds CUSIP, and, in the event any Assured Legacy Bondholder fails to so deposit its Assured Legacy Bond(s) as of the Effective Date, such Assured Legacy Bondholder's Assured Legacy Bond(s) shall be deemed deposited into the applicable Trust for the relevant Primary Market Assured Legacy Bonds CUSIP as of the Effective Date. The Trustee shall establish and maintain in the name of the Trust an Insurance Policy Account into which such Assured Legacy Bonds CUSIP shall be deposited.  Pursuant to Section 77.6 of the Plan, the Assured Legacy Bonds deposited (or deemed deposited) into the Trust shall not be cancelled and all rights and remedies under the existing Assured Legacy Bonds and the applicable Bond Documents (other than payment obligations of the Depositors and the continuation of any lien granted as security for such Assured

Legacy Bonds) shall remain in full force and effect solely to the extent necessary to preserve any claims relating to the Assured Legacy Bonds deposited in the Trust under the applicable Assured Insurance Policy. Such existing Assured Legacy Bonds shall not form the basis for the assertion of any claim against the Depositors or the Reorganized Debtors. The Assured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(i)     Solely with respect to each Secondary Market Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(c) applies solely to Assured Legacy Bonds CUSIPs 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(i)     Each Assured Insured Bondholder holding custody receipts of such Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable Trust.

(ii)     The Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement with respect to such Secondary Market Assured Legacy Bonds CUSIP, such that the Trustee will be deemed to hold the related Assured Insured Bonds underlying the applicable custody receipts and the related Assured Insurance Policies, without any further action on the part of the existing custodian.  In the event a single Assured Legacy Bonds CUSIP is insured by more than one Assured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such Assured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust.

(j)     Solely with respect to each FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(d) applies solely to Assured Legacy Bonds CUSIPs 74514LWE3 and 74514LUW5:

(i)     Each Assured Insured Bondholder holding custody receipts of such FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable Trust.

(ii)     The Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the Trustee will be deemed to hold the Assured Insured Bonds (which also qualify as FGIC Insured Bonds) underlying the applicable custody receipts and the related Assured Insurance Policies, without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one Assured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such Assured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust. The Assured Insurance

Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)     Without prejudice to the ability of the Trustee to draw on the applicable Assured Insurance Policy, the Trustee shall be deemed to have deposited such Assured Insured Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and the related FGIC Plan Consideration into the applicable FGIC Trust pursuant to Section 75.4(a) of the Commonwealth Plan.

(iv)     The Trustee shall be deemed to have received the Pro Rata Share of the FGIC Plan Consideration allocable to each Assured Insured Bondholder holding custody receipts of such FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, and shall receive the FGIC Certificates allocable to such Assured Insured Bondholder on account of the applicable custody receipts and Assured Insured Bonds (which also qualify as FGIC Insured Bonds) for deposit in the Trust. The Trustee shall establish and maintain in the name of the Trust a FGIC Certificates Account into which any such FGIC Certificates shall be deposited.

(v)     As a result of the steps described in subsections 2.01(d)(i)-(iv) above, the applicable Trust shall hold the applicable FGIC Certificates and the related Assured Insurance Policies.

(k)     Solely with respect to each AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 2.01(e) applies solely to Assured Legacy Bonds CUSIPs 745235YJ4 and 745235YV7:

(i)     Each Assured Insured Bondholder holding custody receipts of such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP will be deemed to have deposited such custody receipts into the applicable AGM Double-Insured Trust.

(ii)     The AGM Double-Insured Trustee (as the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the existing custodial arrangement, such that the AGM Double-Insured Trustee will be deemed to hold (i) custody receipts evidencing a beneficial ownership interest in the underlying AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policy, and (ii) the related AGM Double-Insured Insurance Policies, without any further action on the part of the existing custodian. In the event a single Assured Legacy Bonds CUSIP is insured by more than one AGM Double-Insured Insurance Policy, the Trust for such Assured Legacy Bonds CUSIP shall be deemed to hold all such AGM Double-Insured Insurance Policies insuring the Assured Legacy Bonds CUSIP corresponding to such Trust. The AGM Double-Insured Insurance Policies (other than as satisfied in accordance with these Standard Terms) shall be preserved and remain in full force and effect.

(iii)     Without prejudice to the ability of the AGM Double-Insured Trustee to draw on the applicable AGM Double-Insured Insurance Policy to the extent

16

authorized under this Trust Agreement, the AGM Double-Insured Trustee shall be deemed to have deposited such custody receipts evidencing a beneficial ownership interest in AGC Secondary Market Assured Legacy Bonds and the related AGC Insurance Policies into the applicable AGC Trust.

(iv)     The applicable AGC Trustee shall, on behalf of each of the Assured Legacy Bondholders holding such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to such AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP into the AGM Double-Insured Trust for that AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.  The AGM Double-Insured Trustee shall establish and maintain in the name of the AGM Double-Insured Trust a Non-Book-Entry Double-Insured AGC Trust Units Account into which such Non-Book-Entry Double-Insured AGC Trust Units shall be deposited.

(v)     As a result of the steps described in Subsections 2.01(e)(i)-(iv), the applicable AGM Double-Insured Trust shall hold the applicable Non-Book-Entry Double-Insured AGC Trust Units and the related AGM Double-Insured Insurance Policies.

**Section 2.02.  *Acceptance by the Trustee.***

(a)     By its execution of the Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all documents, instruments, and other property delivered to it or received by it from time to time with respect to the Trust Assets and all other assets included in the definition of Trust Estate, in each case in trust for the exclusive use and benefit of all present and future Trust Unit Holders and for the purposes of administering the trusts created by the Trust Agreement (including these Standard Terms). The Trustee represents and warrants that, except as expressly permitted by the Trust Agreement, (i) it has not and will not, other than in its capacity as trustee for the benefit of the Trust Unit Holders, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of the Trust Agreement, and (ii) it has not encumbered or transferred, and will not encumber or transfer, its right, title or interest in the Trust Estate.

(b)     With respect to the Securities, the Trustee shall, on the Effective Date, deliver to the applicable Depositor(s) a certification substantially in the form of Exhibit C to the Trust Agreement certifying that it is either (i) in possession of a certificate evidencing the applicable  Securities, or (ii) it has received confirmation from a depository of such Securities or a direct or indirect participant thereof that the Securities acquired by the Trust on such Effective Date are legally owned by the Trust for the benefit of the Trust Unit Holders.

(c)     Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

**Section 2.03.  *Purpose, Activities of the Trust.***

It is the intention of the parties hereto that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to the following:

(a)      receiving, accepting, and holding in trust the Trust Estate;

(b)      creating one or more accounts or sub-accounts in accordance with the terms of the Trust Agreement (including these Standard Terms);

(c)      making claims and receiving payments under the Assured Insurance Policies;

(d)      receiving payments pursuant to the Commonwealth Plan and the securities issued thereunder;

(e)      issuing one or more series of Trust Units to holders of Assured Legacy Bonds in accordance with the terms of the Trust Agreement (including these Standard Terms);

(f)      making distributions to the Depository and Trust Unit Holders in accordance with the terms of the Trust Agreement (including these Standard Terms);

(g)      coordinating communications with Trust Unit Holders through the Depository;

(h)      following, accepting or acting upon any instruction or direction from Assured or the Requisite Trust Unit Holders, as applicable, in each case only as expressly permitted in the Trust Agreement;

(i)      making public disclosures on EMMA;

(j)      making payments and distributions as contemplated by the Trust Agreement (including these Standard Terms); and

(k)      engaging in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto.

**Section 2.04.   *Limitations of the Trust.***

(a)      Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee.  None of the Depositors, the Reorganized Debtors, or Assured, or any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee.

(b)      The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust.  Any resolutions,

18

agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust.

(c)    The Trust will provide for its own operating expenses and liabilities from the Trust Estate.  General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates.

(d)    All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust.

(e)    There will be no guarantees made by the Trust with respect to obligations of the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates.  There will not be any indebtedness relating to borrowings or loans between the Trust, the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates; provided, that, Assured may own Trust Units.

(f)    The Trust will act solely in its own name, or in the Trustee's name on the Trust's behalf, and through its or the Trustee's duly authorized officers or agents in the conduct of its activities.  The Trust will not:  (i) operate or purport to operate as an integrated, single economic unit with respect to the Depositors, the Reorganized Debtors, or Assured or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Depositors, the Reorganized Debtors, or Assured or their respective Affiliates; or (iii) induce any such third party to reasonably rely on the creditworthiness of the Depositors, the Reorganized Debtors, or Assured or any other affiliated or unaffiliated entity in its dealings with the Trust.

(g)    The Trust will maintain a Delaware Trustee with an office in the State of Delaware.

(h)    The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

**Section 2.05.  *Voting Rights.***

(a)    Assured shall be deemed the sole holder of the Voting Rights with respect to the Securities held by the Trust.

# ARTICLE III

## ADMINISTRATION OF THE TRUST

**Section 3.01.  *Accounts.***

The Trustee shall establish and maintain in the name of the Trust the following non-interest bearing accounts for the Trust to be held in trust for the benefit of the Trust Unit Holders (all amounts held in these accounts will be uninvested):

(a)     Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(a) applies solely to Assured Legacy Bonds CUSIPs 74514LD46, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(i)     ~~(a)~~ Tax-Exempt Bond Account. An account into which the Trustee shall deposit the Tax-Exempt New GO Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Tax-Exempt Bond Account**"), including any Taxable New GO Bonds that become Tax-Exempt New GO Bonds;

(ii)     ~~(b)~~ Taxable Bond Account. An account into which the Trustee shall deposit Taxable New GO Bonds allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Taxable Bond Account**");

(iii)     ~~(c)~~ Cash Account. An account into which the Trustee shall deposit the Commonwealth Plan Cash Distributions allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Cash Account**");

(iv)     ~~(d)~~ CVI Account. An account into which the Trustee shall deposit the GO CVIs allocable to the applicable Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**CVI Account**"); and

(v)     ~~(e)~~ Insurance Policy Account. An account into which the Trustee shall deposit the applicable Assured Legacy Bonds CUSIP insured by the applicable Assured Insurance Policy (or any other securities, monies, proceeds or property received on account of or in exchange therefor) (the "**Insurance Policy Account**").

(b)     Solely with respect to each FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(b) applies solely to Assured Legacy Bonds CUSIPs 74514LWE3 and 74514LUW5:

(i)     FGIC Certificates Account. An account into which the Trustee shall deposit the FGIC Certificates allocable to the applicable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**FGIC Certificates Account**"); and

(ii)     FGIC Insured Bonds Insurance Policy Payments Account. An account into which the Trustee shall deposit any monies or other property resulting from a draw on the Assured Insurance Policy insuring the appliable FGIC-Insured

Secondary Market Assured Legacy Bonds CUSIP (the "**FGIC Insured Bonds Insurance Policy Payments Account**").

(c)     Solely with respect to each AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.01(c) applies solely to Assured Legacy Bonds CUSIPs 745235YJ4 and 745235YV7:

(i)     Non-Book-Entry Double-Insured AGC Trust Units Account. An account into which the AGM Double-Insured Trustee shall deposit the Non-Book-Entry Double-Insured AGC Trust Units allocable to the Assured Legacy Bonds underlying the applicable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (or any other securities, monies, proceeds or property received on account thereof or in exchange therefor) (the "**Non-Book-Entry Double-Insured AGC Trust Units Account**"); and

(ii)     AGM Double-Insured Insurance Policy Payments Account. An account into which the AGM Double-Insured Trustee shall deposit any monies or other property resulting from a draw on the AGM Double-Insured Insurance Policy insuring the appliable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP (the "**AGM Double-Insured Insurance Policy Payments Account**").

**Section 3.02.   *Distributions; Prior to Maturity Date or in Connection with Assured Advancement Option.***

(a)     Solely with respect to each Assured Legacy Bonds CUSIP that is not (i) a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP or (ii) an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(a) applies solely to Assured Legacy Bonds CUSIPs 74514LD46, 74514LGL5, 745235UX7, 745235YZ8, and 745235UY5:

(i)     ~~(a)~~ Tax-Exempt Distributions. ~~Promptly~~ Subject to Section 3.02(a)(vi) below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New GO Bonds deposited in the Tax-Exempt Bond Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)     ~~(b)~~ Taxable Distributions. ~~Promptly~~ Subject to Section 3.02(a)(vi) below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments of principal, interest or other cash received by the Trust on or prior to the Maturity Date on account of the New GO Bonds deposited in the Taxable Bond

Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(iii)    (c) CVI Distributions.   Promptly Subject to Section 3.02(a)(vi) below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the GO CVIs deposited in the CVI Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(iv)    (d) Insurance Policy Distributions.   Promptly Subject to Section 3.02(a)(vi) below, promptly following receipt thereof by the Trustee, the Trustee shall, subject to Section 3.06(ed), be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Tax Costs as of the date of distribution. Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account.

(v)    (e) Other Cash Distributions.   Promptly Subject to Section 3.02(a)(vi) below, promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, on a pro rata "pass-through" basis to Trust Unit Holders, all income of the Trust, including any Commonwealth Plan Cash Distributions deposited in the Cash Account, net of of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(vi)    Distributions on Account of Non-Book-Entry Double-Insured AGC Trust Units.  Notwithstanding any other provision of this Trust Agreement, distributions on account of the Non-Book-Entry Double-Insured AGC Trust Units shall be made directly to the applicable AGM Double-Insured Trustee, on a pro rata "pass-through" basis, rather than to the Depository.

22

(b)      Solely with respect to any FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(b) applies solely to Assured Legacy Bonds CUSIPs 74514LWE3 and 74514LUW5:

(i)      FGIC Certificate Distributions:  Promptly following receipt thereof by the Trustee, the Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date on account of the FGIC Certificates deposited in the FGIC Certificates Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)      FGIC Insured Bonds Insurance Policy Payments Distributions:  Promptly following receipt thereof by the Trustee, the Trustee shall, subject to Section 3.06(d), be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the Trust, including payments received by the Trust on or prior to the Maturity Date resulting from a draw on the Assured Insurance Policy insuring the applicable FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, net of the allocable portion of any outstanding Tax Costs as of the date of distribution.  Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP.

(c)      Solely with respect to any AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, such that this Section 3.02(c) applies solely to Assured Legacy Bonds CUSIPs 745235YJ4 and 745235YV7:

(i)      Non-Book-Entry Double-Insured AGC Trust Units Distributions:  Promptly following receipt thereof by the AGM Double-Insured Trustee, the AGM Double-Insured Trustee shall be required to and shall distribute to the Depository for distribution to the Trust Unit Holders on a pro rata "pass-through" basis, all income of the AGM Double-Insured Trust, including payments received by the Trust on or prior to the Maturity Date on account of the Non-Book-Entry Double-Insured AGC Trust Units deposited in the Non-Book-Entry Double-Insured AGC Trust Units Account (or on account of any other securities or property received on account thereof or in exchange therefor), net of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs as of the date of distribution.

(ii)      AGM Double-Insured Insurance Policy Payments Distributions: Promptly following receipt thereof by the AGM Double-Insured Trustee, the AGM Double-Insured Trustee shall, subject to Section 3.06(d), be required to and shall distribute to the Depository for distribution to the Trust Unit

Holders on a pro rata "pass-through" basis, all income of the AGM Double-Insured Trust, including payments received by the AGM Double-Insured Trust on or prior to the Maturity Date resulting from a draw on the AGM Double-Insured Insurance Policy insuring the applicable AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, net of the allocable portion of any outstanding Tax Costs as of the date of distribution.  Notwithstanding anything herein or elsewhere to the contrary, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the AGM Double-Insured Trust from Assured on account of, and in accordance with, an AGM Double-Insured Insurance Policy insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

**Section 3.03.   *Assured Advancement Option.***

(a)      Assured shall have the right to exercise the Assured Advancement Option with thirty (30) days' prior written notice to the relevant Assured Legacy Bond Holders and/or Trust Unit Holders.  Upon the exercise of any Assured Advancement Option and the payment of the applicable Acceleration Price or redemption price with respect to any Assured Legacy Bonds CUSIP, the Trustee shall be required to disburse such Acceleration Price or redemption price to the Trust Unit Holders of the relevant Trust as set forth in Section 3.02 above, net of the allocable portion of any outstanding Tax Costs as of the date of distribution, and Assured shall become fully subrogated to all of the rights of such Trust Unit Holders, including, upon the termination of the relevant Trust, rights to any then remaining Trust Assets.  Upon the disbursement of such Acceleration Price or redemption price to the relevant Trust Unit Holders as set forth above, the Trust Units of such Trust shall be retired, such Trust shall be terminated, and the Trustee shall deliver the remaining Trust Assets of such Trust, less any outstanding Trustee Costs and other remaining costs of the Trust, to or at the direction of Assured.  At any time on or after the date of receipt of such Trust Assets, Assured shall have the right to sell all or certain of the New Securities constituting part of such Trust Assets for value, including by (i) selling all or certain of the applicable Tax-Exempt New GO Bonds constituting part of such Trust Assets for value as tax-exempt bonds, (ii) selling all or certain of the Taxable New GO Bonds constituting part of such Trust Assets for value as taxable bonds, and (iii) selling all or certain of the GO CVIs constituting part of such Trust Assets, and (iv) selling all or certain of the FGIC Certificates constituting part of such Trust Assets, as applicable.

(b)      Payment of the applicable Acceleration Price or redemption price with respect to any Assured Insured Bond shall satisfy and discharge all of Assured's obligations under the applicable Assured Insurance Policy with respect to such Assured Insured Bond.

**Section 3.04.   *Sale of New Securities.***

(a)      At any time and from time to time prior to the Maturity Date, so long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall have the right to instruct the Trustee to sell any New Securities of any series, in a minimum aggregate principal amount (or, with respect to capital appreciation bonds, a minimum aggregate current Accreted Value) of $1,000,000 (taking into account for such minimum, all concurrent sales of such series of New Securities in the Trusts) (it being

24

understood that such minimum shall not be applicable if all New Securities of such series held as part of the Trust Assets are included in such sale) (or any other securities or property received on account thereof or in exchange therefor) (the "**Subject Bonds**") that are part of the Trust Assets for cash (a "**Bond Sale**").  Assured will direct the Trustee to utilize a specific broker which will arrange the Bond Sale pursuant to the terms set forth in this Section 3.04(a).  The Trustee shall not be responsible for the selection of the broker or for any determination required to be made in connection with the Bond Sale.  Prior to any Bond Sale, Assured will notify the Trustee of the intended Bond Sale and will direct the Trustee to promptly distribute through the Depository a sale notice (the "**Sale Notice**") to all applicable Trust Unit Holders.

(b)     The Sale Notice will include (i) a statement identifying the Subject Bonds, the principal amount (or, with respect to capital appreciation bonds, current Accreted Value) of Subject Bonds to be sold, the applicable Target Price and Floor Price, (ii) a statement regarding the right of each applicable Trust Unit Holder to elect to receive in-kind delivery of a pro rata share of the Subject Bonds, subject to payment by such Trust Unit Holder of the allocable portion of any outstanding Trustee Costs (solely to the extent not previously paid by Assured pursuant to the Fee Agreement) and Tax Costs (the "**Bond Election**"), in lieu of receiving a pro rata share of the actual net cash proceeds ("**Cash Proceeds**") from the Bond Sale and (iii) a statement that the Bond Sale will only be executed if the weighted average price obtainable for the Subject Bonds (prior to the deduction of customary commissions and other sales expense of an arm's length transaction) is equal to or greater than the Floor Price.  Trust Unit Holders that determine to make a Bond Election must make the election through the Depository within ~~two~~ten (~~2~~10) Business Days after the Depository receives the Sale Notice (the "**Sale Notice Period**").

(c)     Following the Sale Notice Period,

(i)     If any applicable Trust Unit Holders make valid Bond Elections, an amount of Subject Bonds representing a proportion of the Subject Bonds equivalent to such Trust Unit Holders' aggregate pro rata ownership of all applicable Trust Units shall be reserved from the Bond Sale and shall instead be distributed pro rata to each such Trust Unit Holder making a valid Bond Election (any such distribution to be rounded down to the nearest minimum denomination, with any reduction as a result of such rounding down to be distributed to such Trust Unit Holders in cash).  In order to make a valid Bond Election, a Trust Unit Holder shall be required to pay to the Trustee such Trust Unit Holder's allocable portion of any outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period.  To the extent a Trust Unit Holder has not paid its allocable portion of any such outstanding Trustee Costs and Tax Costs prior to the expiration of the Sale Notice Period, the Bond Election will be deemed invalid.

(ii)     Applicable Trust Unit Holders that did not make a valid Bond Election will promptly receive a pro rata share of Cash Proceeds from the sale of Subject Bonds (not subject to a valid Bond Election), net of the allocable portion of any outstanding Trustee Costs and Tax Costs, and less any Cash Proceeds distributed

as a result of rounding in accordance with Section 3.04(c)(i) to Trust Unit Holders
making valid Bond Elections.

(iii)     If the ~~Trustee~~broker specified in the Sale Notice is unable to
~~agree, prior to executing~~arrange the sale of any of the Subject Bonds~~, to a sale of all
Subject Bonds~~ not subject to a valid Bond Election for a weighted average price (prior
to the deduction of customary commissions and other sales expense of an arm's
length transaction) equal to or greater than the Floor Price, the Trustee shall not sell or
distribute any Subject Bonds, the Bond Sale shall be cancelled, and the Trustee shall
send a notice, at the sole cost of Assured, to the applicable Trust Unit Holders through
the Depository stating that such Bond Sale was cancelled, after which any future sale
of the Subject Bonds shall be required to be made pursuant to a new Sales Notice.

**Section 3.05.   *Adjustments to Principal Amounts and Compounded Amounts.***

(a)     Each Distribution made on or prior to the Maturity Date to Trust Unit
Holders shall result in a deemed simultaneous dollar-for-dollar reduction (i) in the case of
any relevant Current Interest Bonds, first, of any accrued and unpaid interest on, and second,
of the outstanding principal amount of, such Current Interest Bonds or, (ii) in the case of any
relevant Capital Appreciation Bonds, the Compounded Amount of such Capital Appreciation
Bonds, in either case, as of the date of such Distribution and in an amount equal to such
Distribution.  For the purposes of such reduction, any deduction from any Distribution in
respect of Tax Costs shall be treated as if such amounts deducted were paid to the applicable
Trust Unit Holders in cash as part of the Distribution and shall reduce the applicable accrued
and unpaid interst amount, outstanding principal amount, or Compounded Amount
accordingly.  For the avoidance of doubt, any deduction from any Distribution in respect of
Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding
principal amount or Compounded Amount, accordingly.  As set forth in ~~Section~~Sections
3.02(~~d~~a)(iv), 3.02(b)(ii), and 3.02(c)(ii) above, Trustee Costs shall never be paid out of, or
deducted from, Distributions comprised of payments received by the Trust from Assured on
account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured
Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a
FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, or (iii) insuring an AGM
Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.

(b)     Any Bond Sale resulting in a distribution of Cash Proceeds or Subject
Bonds to Trust Unit Holders, as the case may be, shall result in a deemed simultaneous
dollar-for-dollar reduction (i) in the case of any relevant Current Interest Bonds, first, of any
accrued and unpaid interest on, and second, of the outstanding principal amount of, such
Current Interest Bonds or, (ii) in the case of any relevant Capital Appreciation Bonds, the
Compounded Amount of such Capital Appreciation Bonds, in either case as of the date the
Cash Proceeds of such Bond Sale are distributed by the Trustee to the applicable Trust Unit
Holders and in an amount equal to the aggregate Cash Proceeds from such Bond Sale
distributed to the applicable Trust Unit Holders.  For the purposes of such reduction, any
deduction from the Cash Proceeds in respect of Tax Costs shall be treated as if such amounts
deducted were paid to the applicable Trust Unit Holders in cash and shall reduce the
applicable accrued and unpaid interst amount, outstanding principal amount, or Compounded

Amount accordingly.  Further, for purposes of this Section 3.05(b), the aggregate Cash Proceeds shall be calculated as if each applicable Trust Unit Holder that took delivery of Subject Bonds had received the same amount of cash per Unit as a Trust Unit Holder that did not make a Bond Election, or if all applicable Trust Unit Holders participating in the Bond Sale made a Bond Election, the aggregate Cash Proceeds shall be calculated as if all Subject Bonds were sold at a net price equal to the Target Price.  For the avoidance of doubt, any deduction from any Distribution in respect of Trustee Costs shall not reduce the applicable accrued and unpaid interest amount, outstanding principal amount or Compounded Amount, accordingly.  As set forth in ~~Section~~Sections 3.02(~~d~~)a)(iv), 3.02(b)(ii), and 3.02(c)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, or (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.

(c)    If any Assured Legacy Bonds CUSIP is subject to mandatory sinking fund redemptions, any reduction of the outstanding principal amount or Compounded Amount, as applicable, of such Assured Legacy Bonds CUSIP pursuant to Section 3.05(a) or (b) (a "**Principal Amount Reduction**") shall automatically result in the dollar-for-dollar reduction of the mandatory sinking fund redemption obligations for purposes of the Assured Insurance Policy insuring such Assured Legacy Bonds CUSIP, with such reduction to be applied sequentially against such mandatory sinking fund redemptions starting with the first mandatory sinking fund redemption occurring after such Principal Amount Reduction.

(d)    If the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero at any time, Assured shall be entitled to any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, ~~and/or~~ the Insurance Policy Account, ~~as applicable.~~the FGIC Certificates Account, or the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, and the AGM Double-Insured Insurance Policy Payments Account, as applicable.

(e)    For the avoidance of doubt, it is expressly understood and agreed that to the extent the principal amount (or Compounded Amount, as applicable) of the applicable Assured Legacy Bonds CUSIP is reduced to zero prior to the Maturity Date, as of the date the principal amount (or Compounded Amount, as applicable) is reduced to zero, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled; and (iv) subject to Assured's entitlement to any remaining Trust Assets, the Trust shall terminate in accordance with the provisions of Article VII hereof.

**Section 3.06.  *Payments on Assured Insurance Policies.***

(a)    After taking into account any adjustments made pursuant to Section 3.05, if there are insufficient funds (determined without taking into account any securities or

other non-cash Trust Assets) in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account, ~~and~~ the Insurance Policy Account, the FGIC Certificates Account, or the FGIC Insured Bonds Insurance Policy Payments Account, as applicable, to satisfy the accrued and unpaid interest and/or unpaid principal due on an Original Scheduled Payment Date (the amount of any such shortfall, the "**Payment Shortfall**"), then at least five (5) Business Days prior to such Original Scheduled Payment Date, the Trustee shall deliver a notice in substantially the form attached hereto as <u>Exhibit A</u> (a "**Notice of Claim and Certificate**") to Assured.  Assured agrees that such notice provided by the Trustee shall constitute a valid notice of the type required under the applicable Assured Insurance Policy in order for the Trustee to draw on the applicable Assured Insurance Policy, and the Trustee shall make draws on the applicable Assured Insurance Policy to make payment, from the Insurance Policy Account or the FGIC Insured Bonds Insurance Policy Payments Account, as applicable, of any accrued and unpaid interest or any unpaid principal due on the Original Scheduled Payment Date.  The Trustee is authorized to take all actions necessary to draw on the Assured Insurance Policies for such purposes, including actions that, under the applicable Assured Insurance Policies and related agreements, would otherwise be taken by the Paying Agent or the PBA Fiscal Agent, and the Trustee shall have all powers and authority of the Paying Agent or the PBA Fiscal Agent, as applicable, for such purposes. In the event a particular Trust holds more than one Assured Insurance Policy insuring the same Assured Legacy Bonds CUSIP, the Trustee shall draw pro rata on all such Assured Insurance Policies insuring the same Assured Legacy Bonds CUSIP.

> (b)    Notwithstanding any other provision of this Trust Agreement, no AGM Double-Insured Trustee shall make a draw on an AGM Double-Insured Insurance Policy, and Assured shall not be required to make any payment under such AGM Double-Insured Insurance Policy, unless either (i) Assured has confirmed to the AGM Double-Insured Trustee in writing, at least (5) Business Days prior to the relevant Original Scheduled Payment Date, that Assured will not be providing sufficient funds under the AGC Insurance Policy insuring the relevant AGC Secondary Market Assured Legacy Bonds CUSIP to cover any Payment Shortfall with respect to the relevant AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, or (ii) as of the Original Scheduled Payment Date, Assured has not in fact provided sufficient funds under the AGC Insurance Policy insuring the relevant AGC Secondary Market Assured Legacy Bonds CUSIP to cover any Payment Shortfall with respect to the relevant AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP.

> (c)    ~~(b) If~~Subject to Section 3.06(b) above, if and to the extent Assured fails to make any payment at the time, in the amount and in the manner set forth herein, the Trustee shall take, subject to its rights and protections herein,  all necessary or desirable actions to enforce the applicable Assured Insurance Policy (including, to the extent applicable, as and when directed by the Requisite Trust Unit Holders as set forth in <u>Section 6.01</u> hereof).

> (d)    ~~(c)~~If the Trustee receives GO Payments, (i) after the Trustee draws on an Assured Insurance Policy pursuant to <u>Section 3.06(a)</u>, but (ii) prior to the Trustee using the amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date, then the Trustee shall (x)

distribute and apply the GO Payments received in accordance with <u>Sections 3.02</u> and <u>3.05,</u> (y) only apply amounts drawn from the Assured Insurance Policy to pay accrued and unpaid interest and/or unpaid principal to the extent the GO Payments received are insufficient (the amount of such insufficiency, the "**GO Payment Shortfall**") to pay the accrued and unpaid interest and/or unpaid principal due on that Original Scheduled Payment Date such that the amounts so applied are not in excess of the GO Payment Shortfall and (z) promptly return to Assured any amounts drawn on the Assured Insurance Policy that are in excess of such GO Payment Shortfall.

Section 3.07.   *Exchange of Trust Units for Trust Assets.*

(a)    At any time on, or prior to, the Maturity Date, a Trust Unit Holder may exchange its Trust Units for a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, ~~and~~ the CVI Account, the FGIC Certificates Account,  or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Trustee Costs, Tax Costs, and Assured Reimbursement Amount (the "**Unit Exchange Election**"), provided that the Trust Unit Holder must provide thirty (30) days' prior written notice of such Unit Exchange Election by submitting the form attached hereto as <u>Exhibit B</u> to the Trustee.

(b)    Upon a Unit Exchange Election, the expiration of the thirty day (30) notice period set forth in <u>Section 3.07(a)</u> hereof and the presentation and surrender of the applicable Trust Units at the office of the Trustee therein designated on that date, the Trustee shall distribute to such Trust Unit Holder a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, ~~or~~ the CVI Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, which shall be paid to Assured, the Trustee, or the relevant tax or governmental authority, as applicable (provided that, if cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, each applicable Trust Unit Holder shall pay in cash its applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of its share of remaining Trust Assets.  For the avoidance of doubt, the Assured Reimbursement Amount must be paid to Assured prior to the distribution of the applicable Trust Assets to the Trust Unit Holder.

(c)    Upon distribution of such Trust Assets in accordance with <u>Section 3.07(b)</u> hereof, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

Section 3.08.   *Payments at Maturity Date.*

(a)     If, (i) in the case of Current Interest Bonds, the outstanding principal amount or accrued and unpaid interest amount, or (ii) in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the Assured Legacy Bonds at the Maturity Date is expected to be greater than zero, no later than thirty (30) calendar days and no earlier than thirty-five (35) calendar days prior to the Maturity Date, Assured shall direct the Trustee to deliver through the Depository a notice of maturity (the "**Maturity Notice**") in substantially the form attached hereto as <u>Exhibit C</u> to all applicable Trust Unit Holders.  The Maturity Notice will include (i) a statement identifying the Maturity Date and (ii) a statement regarding the right of each Trust Unit Holder to receive a Distribution (or multiple Distributions) in the aggregate amount of a pro rata share of the Insured Amount corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date, in either case, to be paid to the Trustee by Assured and/or from the other Trust Assets.  Notwithstanding anything herein to the contrary, Assured's failure to direct the Trustee to deliver a Maturity Notice or the Trustee's or Depository's failure to deliver a Maturity Notice to Trust Unit Holders in accordance with this <u>Section 3.08</u> shall not affect or delay the occurrence of the applicable Maturity Date, or affect the amounts to be paid to Trust Unit Holders on the Maturity Date.

(b)     Reserved.

(c)     On the Maturity Date, after giving effect to any Distribution made from other Trust Assets on the Maturity Date, and subject to Assured having received a Notice of Claim and Certificate in accordance with <u>Section 3.06</u> hereof, Assured shall pay to the Trustee, and the Trustee shall distribute to all Trust Unit Holders, a pro rata share of the Payment Shortfall, if any, net of any Tax Costs, following which Assured shall be entitled to any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Account ~~and/or the~~, the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, or the AGM Double-Insured Insurance Policy Payments Account, as applicable.

(d)     On the Maturity Date, after giving effect to any Distributions made on the Maturity Date (including the payment and distribution of any Payment Shortfall (in accordance with <u>Section 3.08(c)</u> hereof)), (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies and Assured Legacy Bonds will be satisfied and discharged; (iii) the applicable Assured Insurance Policies shall be indefeasibly cancelled; and (iv) subject to Assured's entitlement to any Remaining Trust Assets following payment of any Trustee Costs and any other remaining Trust expenses, the Trust shall terminate in accordance with the provisions of <u>Article VII</u> hereof.

## ARTICLE IV

## REPORTING/REMITTING TO TRUST UNIT HOLDERS

**Section 4.01.   *Statements to Trust Unit Holders.***

No later than three (3) days after the date on which the Trustee makes any Distribution to any Trust Unit Holder, the Trustee shall prepare and post a statement to EMMA, substantially in the form attached hereto as Exhibit D, and upon request, deliver such statement by mail to any Trust Unit Holder, setting forth:

(a)    With respect to the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, the CVI Acccount, and the the Insurance Policy Account, the FGIC Certificates Account, the FGIC Insured Bonds Insurance Policy Payments Account, the Non-Book-Entry Double-Insured AGC Trust Units Account, and the AGM Double-Insured Insurance Policy Payments Account, as applicable, distributions made from each such account during the month and during the year to date (on an aggregate and per unit basis);

(b)    The accrued and unpaid interest on, and principal amount of (or Compounded Amount, as applicable) as of the month end of the relevant Assured Legacy Bonds CUSIP (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per unit basis);

(c)    Any other distributions made to Trust Unit Holders;

(d)    Any required tax reporting for such period (as specified in Section 8.04); and

(e)    All other information required to complete Exhibit D.

**Section 4.02.   *Compliance with Withholding Requirements.***

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depository and Trust Unit Holders that the Trustee reasonably believes are applicable under the Code. The consent of the Depository and Trust Unit Holders shall not be required for such withholding.  In the event the Trustee does withhold any amount from payments to the Depository or any Trust Unit Holder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depository or such Trust Unit Holders the amount withheld.  Any amounts withheld shall be treated as a distribution of cash to the Depository or Trust Unit Holder, as the case may be, in the amount of the withholding and shall thereby reduce amounts otherwise distributable to the Depository or such Trust Unit Holder.  If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## TRUST UNITS

**Section 5.01.   *The Trust Units.***

Each series of Trust Units shall bear unique CUSIPs and, other than the Non-Book-Entry AGC Trust Units, shall be freely tradable and transferable through The Depository Trust Company.  So long as an Assured Insurer Event is not occurring under the applicable Assured Insurance Policy, Assured shall be deemed the sole holder of the New Securities deposited in the respective Trusts with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings. In addition, Assured shall be fully subrogated to the rights of the respective Trust Unit Holders in respect of the New Securities deposited in the respective Trusts.

The Trust Units shall be designated in the Trust Agreement.  Unless otherwise specified in the Trust Agreement, the Trust Units in the aggregate will represent the entire beneficial ownership interest in the Trust Estate.  The Trust Units will be substantially in the forms annexed to the Trust Agreement.  Unless otherwise provided in the Trust Agreement, the Trust Units will be issuable in book-entry form, in denominations equal to the denomination of the applicable underlying Assured Legacy Bonds or any integral multiple of the amount specified therein, subject to the requirements of the Depository; provided, however, that the Non-Book-Entry AGC Trust Units shall be issued in certificated rather than book-entry form.  Each Trust Unit will share ratably in all Trust Assets of the applicable Trust and in all rights of the related Trust Unit Holders.

Upon original issue, the Trust Units shall be executed and delivered by the Trustee and the Trustee shall cause the Trust Units to be authenticated by the Unit Registrar upon receipt by the Trustee of the documents specified in Section 2.02.  The Trust Units shall be executed by manual or electronic signature on behalf of the Trustee by an authorized officer. Trust Units bearing the manual or electronic signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Trust Units or did not hold such offices at the date of such Trust Units.  No Trust Unit shall be entitled to any benefit under the Trust Agreement or be valid for any purpose, unless there appears on such Trust Unit a certificate of authentication as set forth on such certificate executed by manual or electronic signature on behalf of the Unit Registrar by a duly authorized officer of the Unit Registrar, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Trust Unit has been duly authenticated and delivered hereunder.  All Trust Units shall be dated the date of their execution.

**Section 5.02.   *Book-Entry Trust Units.***

(a)     The Book-Entry Trust Units will be represented initially by one or more global certificates registered in the name designated by the Depository. Notwithstanding anything herein to the contrary, the Trustee may for all intents and purposes (including the making of payments on the Book-Entry Trust Units) deal with the Depository or its nominee as the authorized representative of the Beneficial Owners of the Book-Entry Trust Units as if the Depository were the sole Book-Entry Trust Unit Holder for purposes of the Trust Agreement (including these Standard Terms) for as long as those Book-Entry Trust

Units are registered in the name of the Depository or its nominee. The rights of Beneficial Owners of the Book-Entry Trust Units shall be limited to those established by law, the Trust Agreement and agreements between such Beneficial Owners and the Depository and Depository Participants. Requests and directions from, and votes of, the Depository, as Holder, shall not be deemed to be inconsistent if they are made with respect to different Beneficial Owners. Subject to Section 5.03 below, a Book-Entry Trust Unit may not be transferred by the Depository or its nominee except to another nominee or the Depository, or another Depository or its nominee that agrees to hold the Book-Entry Trust Unit for the account of the respective Depository Participants and Beneficial Owners.

(b)     The Trustee will not have any liability to any person for any aspect of the records relating to or payment made on account of Beneficial Owners of the Book-Entry Trust Units held by the Depository, for monitoring or restricting any transfer of beneficial ownership in a Book-Entry Trust Unit or for maintaining, supervising or reviewing any records relating to such Beneficial Owners.

**Section 5.03.   *Registration of and Limitation on Transfers and Exchanges of Units.***

The Trustee shall cause to be kept at its Corporate Trust Office a Unit Register in which, subject to such reasonable regulations as it may prescribe, the Trustee shall provide for the registration of Trust Units and of transfers and exchanges of Trust Units as provided in the Trust Agreement (including these Standard Terms). The Trustee will initially serve as Unit Registrar for the purpose of registering Trust Units and transfers and exchanges of Trust Units as herein provided.

Subject to Section 5.04, upon surrender for registration of transfer of any Trust Unit at the Corporate Trust Office of the Trustee or at any other office or agency of the Trustee maintained for such purpose, the Trustee shall execute and the Unit Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Trust Units of a like aggregate Notional Amount.

At the option of the Trust Unit Holders, each Trust Unit may be exchanged for other Trust Units with a like aggregate Notional Amount and in authorized denominations, upon surrender of such Trust Unit to be exchanged at any such office or agency. Whenever any Trust Units are so surrendered for exchange, the Trustee shall execute and cause the Unit Registrar to authenticate and deliver the Trust Units which the Trust Unit Holder making the exchange is entitled to receive. Every Trust Unit presented or surrendered for transfer or exchange shall (if so required by the Trustee) be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge to the Trust Unit Holders shall be made for any transfer or exchange of Trust Units, but the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Trust Units.

All Trust Units surrendered for transfer and exchange shall be disposed of by the Unit Registrar in accordance with its customary procedures.

The Trustee will cause the Unit Registrar (unless the Trustee is acting as Unit Registrar) to provide notice to the Trustee of each transfer of a Trust Unit, and will provide the Trustee with an updated copy of the Unit Register on January 1 of each year.

**Section 5.04.   *No Obligation to Register.***

The Trustee is not obligated to register or qualify any Trust Unit under the Securities Act or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

**Section 5.05.   *Mutilated, Destroyed, Lost or Stolen Units.***

If (a) any mutilated Trust Unit is surrendered to the Trustee or the Unit Registrar, or the Trustee and the Unit Registrar receive evidence to their satisfaction of the destruction, loss or theft of any Trust Unit, and (b) there is delivered to the Trustee and the Unit Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of actual knowledge by the Trustee or the Unit Registrar that such Trust Unit has been acquired by a protected purchaser, the Trustee shall execute and deliver and the Unit Registrar shall authenticate, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Trust  Unit, a new Trust Unit of like tenor.  Upon the issuance of any new Trust Unit under this Section, the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Trust Unit Registrar) connected therewith. Any replacement Trust Unit issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust, as if originally issued, whether or not the destroyed, lost or stolen Trust Unit shall be found at any time.

**Section 5.06.   *Persons Deemed Owners*.**

Prior to due presentation of a Trust Unit for registration or transfer, the Trustee, the Unit Registrar and any agent of any of them may treat the person in whose name any Trust Unit is registered as the owner of such Trust Unit for the purpose of receiving distributions, and neither the Trustee, the Unit Registrar nor any agent of any of them shall be affected by notice to the contrary.

**Section 5.07.   *Appointment of Trust Unit Paying Agent.***

The Trustee shall serve as the initial Trust Unit Paying Agent hereunder and thereafter, solely in the event that legal or regulatory requirements require the appointment of a different Trust Unit Paying Agent, the Trustee may appoint on behalf of, and as an expense of, the Trust, any other Trust Unit Paying Agent for the purpose of making distributions to Trust Unit Holders; provided, however, that any replacement Trust Unit Paying Agent shall be required to meet the eligibility requirement set forth in <u>Section 6.06</u>.  The Trustee shall cause such Trust Unit Paying Agent to execute and deliver to the Trustee an instrument in which such Trust Unit Paying Agent shall agree with the Trustee that such Trust Unit Paying

Agent will hold all sums held by it for the payment to Trust Unit Holders in trust for the benefit of the Trust Unit Holders entitled thereto until such sums shall be paid to the Trust Unit Holders.  All funds remitted by the Trustee to any such Trust Unit Paying Agent for the purpose of making distributions shall be paid to Trust Unit Holders as soon as practicable following receipt thereof by the Trust Unit Paying Agent and any amounts not so paid shall be returned as soon as practicable to the Trustee.

## ARTICLE VI

## CONCERNING THE TRUSTEE

**Section 6.01.  *Duties of Trustee.***

Every provision of the Trust Agreement (including these Standard Terms) relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VI.

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement and no implied covenants or obligations shall be read into the Trust Agreements against the Trustee.

The Trustee shall (at the direction of the Requisite Trust Unit Holders), subject to its rights and protections herein, take all necessary or desireable actions to enforce the Assured Insurance Policies as set forth herein.

The Trustee shall deliver to all Trust Unit Holders copies of all notices and written communications received from Depositors ~~or~~, the Reorganized Debtors, or the trustee for the FGIC Trust as they relate to the Bonds ~~and/or~~, the GO CVIs, and/or the FGIC Certificates, as applicable.

Except as provided in Section 6.02 hereof, no provision of the Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act or willful misconduct; *provided, however,* that:

(a)     The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(b)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights (or such other percentage as may be specified herein) relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New Securities or exercising any trust or power conferred upon the Trustee with respect to the New Securities, under the Trust Agreement;

(c)     The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Trust Unit Holders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Assured Insurance Policies or exercising any trust or power conferred upon the Trustee with respect to the Assured Insurance Policies, under the Trust Agreement; and

(d)     Any determination of gross negligence, willful misconduct or bad faith of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

### Section 6.02.  *Certain Matters Affecting the Trustee.*

(a)     The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties.  Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)     The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)     The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)     The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by the Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of any of the Trust Unit Holders, pursuant to the provisions of the Trust Agreement, unless such Trust Unit Holders shall have offered to the Trustee security or indemnity  satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Trust Agreement (including these Standard Terms);

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice,

request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by Assured or, in the event that the Voting Rights are held by a party other than Assured, Trust Unit Holders entitled to a majority of the Voting Rights; *provided, however,* that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of the Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)    The Trustee may execute any of the trusts or powers under the Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under the Trust Agreement (including these Standard Terms);

(h)    Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 6.01;

(i)    The Trustee shall not be deemed to have notice of any matter unless one of its Officers has received written notice thereof at the Corporate Trust Office and such notice references the applicable Trust Units generally, the applicable Depositor(s), the Trust or the Trust Agreement;

(j)    None of the provisions of the Trust Agreement or these Standard Terms shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)    Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)    The permissive rights of the Trustee to perform any discretionary act enumerated in the Trust Agreement or these Standard Terms shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence or willful misconduct;

(m)    The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)     The Trustee shall have no duty (A) to see to any recording, filing, or depositing of the Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to the Trust Agreement (including these Standard Terms) believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of the Trust Agreement, these Standard Terms or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under the Trust Agreement or these Standard Terms, and shall have a duty only to accept such collateral or funds delivered to it in accordance with the Trust Agreement (including these Standard Terms);

(q)     [In connection with its preparation of any required tax reporting for Beneficial Owners of the Trust Units, the Trustee shall, if necessary, (i) on a quarterly basis for each calendar year, request one Depository participant list, (ii) on an annual basis, contact each Depository participant identified on the Depository participant lists and request such Beneficial Owner information as shall be necessary to permit the Trustee to prepare the applicable tax return for such calendar year, and (iii) to the extent that a participant provides partial or incomplete Beneficial Owner information, make a second and final attempt to contact the participant or such Beneficial Owner (to the extent such Beneficial Owner's contact information has been provided to the Trustee) to obtain such additional information in order to permit the Trustee to prepare the applicable tax return for such Beneficial Owner for that calendar year;] The Trustee may rely conclusively on certification from Assured as to the Compounded Amount:

(r)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(s)     The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Trust Agreement;

(t)     All rights of action under the Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Holders of such Trust Units, subject to the provisions of the Trust Agreement; and

(u)      The rights, protections, priviledges and immunities granted to the Trustee shall be applicable to the Trustee in its capacity as Unit Registrar and Trust Unit Paying Agent, *mutatis mutandis*.

**Section 6.03.   *Trustee Not Liable for Trust Units or Securities.***

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement and in the Trust Units.  The Trustee makes no representations or warranties as to the validity or sufficiency of the Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Trust Units) or of the Securities or related documents.  The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the Securities or deposited in or withdrawn from the Trust in accordance with the Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Sections 3.01 and 3.02.  The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the Bond Documents.

**Section 6.04.   *Trustee May Own Units.***

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

**Section 6.05.   *Trustee's Fees and Expenses.***

(a)      Pursuant to the Fee Agreement, each of the Trustee and the Delaware Trustee shall be entitled to receive from Assured, and if not paid by Assured, the Trust, compensation agreed upon in writing (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by it in the execution of the trusts created under the Trust Agreement and in the exercise and performance of any of the powers and duties thereunder of the Trustee.  Each of the Trustee and the Delaware Trustee shall be entitled to reimbursement for (x) all reasonable fees, expenses, costs and disbursements (other than Extraordinary Expenses) incurred or made by the Trustee or the Delaware Trustee in accordance with any of the provisions of the Trust Agreement (including these Standard Terms) (including but not limited to the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), in each case to the extent set forth in the Fee Agreement and (y) Extraordinary Expenses reimbursable pursuant to Section 6.05(b).  Additionally each of the Trustee and the Delaware Trustee shall be entitled to indemnification as provided in Section 6.13.  All such amounts payable to the Trustees, collectively, the "**Trustee Costs**".  All such Trustee Costs shall be paid pursuant to the terms of the Fee Agreement and the provisions of this Trust Agreement and may be reimbursed to the Trustee and the Delaware Trustee in accordance with the provisions of the Fee Agreement and the terms of this Trust Agreement, including Section 3.02 hereof.  As set forth in the Fee Agreement, Trustee Costs will only be paid by the Trust in the event that Assured fails to do so pursuant to the terms of the Fee Agreement.  As set forth in ~~Section 3.02(d),~~ Sections 3.02(a)(iv), 3.02(b)(ii), and 3.02(c)(ii) above, Trustee Costs shall never be paid out of, or deducted from, Distributions comprised of

payments received by the Trust from Assured on account of, and in accordance with, an Assured Insurance Policy (i) insuring the Assured Legacy Bonds CUSIP deposited in the Insurance Policy Account, (ii) insuring a FGIC-Insured Secondary Market Assured Legacy Bonds CUSIP, or (iii) insuring an AGM Double-Insured Secondary Market Assured Legacy Bonds CUSIP, as applicable.  For the avoidance of doubt, the obligations to the Trustee shall include the Trustee in its capacity as Unit Registar and Trust Unit Paying Agent.

(b)     In furtherance of Section 6.05(a), and subject to the terms of and limitations in the Fee Agreement, each of the Trustee (including in its capacities as the Unit Registrar and Trust Unit Paying Agent) and the Delaware Trustee shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Trust Unit Holders against the Depositors, the Reorganizd Debtors, the Trust, or each of the Trustees except for proceedings, litigation or enforcement actions that relate to the Trustee's or Delaware Trustee's, as the case may be, own grossly negligent action, grossly negligent failure to act or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review (the "**Extraordinary Expenses**").  Subject to the terms of the Fee Agreement, the Trustee may (i) demand reimbursement from Assured, or (ii) in the event Assured fails to pay in response to such demand, make withdrawals from the Trust, to pay or reimburse itself the amount of any Extraordinary Expenses, up to a payment limit of $150,000 in the aggregate for the Trusts of Extraordinary Expenses in any calendar year or pro rata portion thereof in the case of the initial and the final years of the Trust based upon the portion of the applicable calendar year in which the Trust exists; provided, however, that the Trustee shall not have any obligation to incur additional Extraordinary Expenses in excess of such annual limit unless it has received security or indemnity reasonably satisfactory to it for such additional Extraordinary Expenses; and provided, further, that if the Trustee does incur any additional Extraordinary Expenses in excess of such annual limit in any calendar year, nothing herein shall prohibit it from being reimbursed for such Extraordinary Expenses in any subsequent calendar year, to the extent of funds available for such reimbursement as provided hereunder and subject to the payment limit of $100,000 applicable for each such subsequent calendar year or such pro rata portion thereof in the case of the initial and final years of the Trust and provided further that the foregoing shall not limit the payment of any amounts to which the Trustee is entitled pursuant to its indemnification rights set forth in Section 6.13 and the Fee Agreement with respect to defending the Trustee against any claim asserted by any Person.

(c)     For the avoidance of doubt, the Depositors shall not be liable for any Trustee Costs or Extraordinary Expenses.

**Section 6.06.   *Eligibility Requirements for Trustee, Successor Trustee, and Trust Unit Paying Agent.***

The Trustee, any successor Trustee, and any successor Trust Unit Paying Agent shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the Depositors or Assured; (ii) is neither affilliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth;

(iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is regularly acting as a trustee in the municipal finance market.  If such corporation publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee, successor Trustee, or successor Trust Unit Paying Agent shall cease to be eligible in accordance with the provisions of this Section, such Trustee, successor Trustee, or successor Trust Unit Paying Agent shall resign immediately in the manner and with the effect specified in Section 6.07.

### Section 6.07.  *Resignation and Removal of the Trustee.*

(a)    The Trustee may at any time resign and be discharged from the trusts created pursuant to a Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee.  Upon receiving such notice of resignation, Assured shall promptly appoint a successor trustee meeting the requirements set forth in Section 6.06 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee.  A copy of such instrument shall be delivered to the Trust Unit Holders and posted to EMMA by the successor trustee.  If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)    If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 6.06 and shall fail to resign after written request therefor by Assured, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then Assured may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)    Assured may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, in triplicate, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 6.08 hereof.  The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of Assured and the Trust,

41

including without limitation, the costs and expenses incurred in connection with any such succession.

Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 6.07 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 6.08 hereof and (ii) payment of all costs, expenses and indemnities (other than Extraordinary Expenses) due and owing to the outgoing Trustee, including without limitation, the costs and expenses incurred in connection with any such succession.

Notwithstanding the replacement of the Trustee pursuant to this Section 6.07, the rights, benefits, protections and indemnities afforded to the Trustee under this Article VI shall continue to the benefit of the retiring Trustee.

### Section 6.08.  *Successor Trustee.*

Any successor trustee appointed as provided in Section 6.07 shall execute, acknowledge and deliver to the Trust Unit Holders and to the predecessor trustee an instrument accepting such appointment under the Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor thereunder, with the like effect as if originally named as trustee therein.  The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under the Trust Agreement and the Trust Unit Holders and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of Section 6.06 hereof.

Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under the Trust Agreement and (b) mail notice of the succession of such trustee under the Trust Agreement to all Holders of Trust Units at their addresses as shown in the Unit Register.

### Section 6.09.  *Merger or Consolidation of Trustee.*

Any Person into which the Trustee may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under the Trust Agreement provided such Person  shall be eligible under the provisions of Section 6.06, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.

**Section 6.10.   *Reserved.***

**Section 6.11.   *Appointment of Custodians.***

The Trustee may appoint one or more Custodians to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement.  The appointment of any Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee.  Subject to Article VI, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Trust Unit Holders.  Each Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate.  Any such Custodian may not be an Affiliate of the Depositors or Assured.

**Section 6.12.   *Trustee May Enforce Claims Without Possession of Trust Units.***

All rights of action and claims under the Trust Agreement or the Trust Units may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee.  Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, indemnities, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Trust Unit Holders in respect of which such judgment has been recovered.

**Section 6.13.   *Trustee Indemnity***

The Trustees' rights to claim indemnification for losses that they may incur with respect to the Trust Agreement (incorporating these Standard Terms) and each other document contemplated by the foregoing to which either of the Trustees is a party shall be as set forth in Annex I hereto and the Fee Agreement, subject to, with respect to Extraordinary Expenses, the provisions of Section 6.05(b).

**ARTICLE VII**

**TERMINATION OF TRUST**

**Section 7.01.   *Termination; No Redemption Rights.***

Upon the indefeasible cancellation or other indefeasible termination of the relevant Assured Insurance Policy, the Trust (including the respective obligations and responsibilities under the Trust Agreement of the Trustee and Assured) shall terminate upon (i) the distribution to Assured or to Trust Unit Holders, as applicable, of any remaining Trust Assets held by or on behalf of the Trustee and required hereunder to be so distributed in accordance with the provisions of Section 3.03, 3.04, 3.05 3.07, or 3.08 hereof, (ii) payment in full of any Trustee Costs due and owing to the Trustees under the Trust Agreement (including these Standard Terms), (iii) payment in full of any Assured Deferred Expenses due and owing to

43

Assured under the Trust Agreement (including these Standard Terms), (iv) payment in full of any known Tax Costs due and owing to any tax or governmental authority, and (v) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of the Trust Agreement have been complied with.  In no event shall the Trust be terminated or the Securities be redeemed (except in the case of a redemption of the Securities permitted under the terms of the Bond Documents) or otherwise released from the Trust Estate (except pursuant to, and in accordance with, Sections 3.04 and 3.07 hereof) without the prior express written consent of Assured if either (i) the relevant Assured Insurance Policy has not been indefeasibly terminated or (ii) Assured has not been indefeasibly paid in full for any amounts owed pursuant to the Commonwealth Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

### Section 7.02.  *Procedure for Termination.*

At least thirty (30) days prior to the date on which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice by letter to the Trust Unit Holders specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of Trust Units at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis to the extent necessary to satisfy the Insured Amount; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "**Termination Notice**").  The Trustee shall provide a copy of the Termination Notice to the Unit Registrar at the time such Termination Notice is given to Trust Unit Holders.

If the Requisite Trust Unit Holders do not object in writing within thirty (30) days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

Upon the dissolution, wind up and termination of the Trust and the Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

## ARTICLE VIII

## TAX PROVISIONS

### Section 8.01.  *Grantor Trust Provisions.*

The Trustee, the Depositors, the Trust Unit Holders (by their acceptance of the Trust Units and book-entry beneficial interests therein) and Assured each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income

44

tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit.  In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (b) the Trust is formed to facilitate direct investment in the Trust Assets, and (c) the Trustee (at the direction of Assured and/or the Requisite Trust Unit Holders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.  The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701-4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Trust Unit Holder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.  The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement.  The Trustee and Assured each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

### Section 8.02.   *Characterization.*

Each Trust Unit Holder acknowledges and agrees to treat the Trust Units and the book-entry beneficial interests therein as undivided interests in the Trust Estate.

### Section 8.03.   *Grantor Trust Administration.*

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Trust Unit Holders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Trust Unit Holders.  The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust under the Grantor Trust Provisions.  The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Trust Unit Holders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an

"**Adverse Trust Event**"), unless the Trustee has obtained or received an Opinion of Counsel from counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Trust Unit Holders) to the effect that the contemplated action will not result in an Adverse Trust Event.  None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act.  The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

### Section 8.04.  *Reports to Trust Unit Holders and Tax Authorities*

(a)     The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for the avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U.S. Treasury Regulations Section 1.671-5, as amended, or any successor provision (the "**WHFIT Regulations**") (including U.S. Treasury Regulations Section 1.671-5(c)(1)).

(b)     Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to the WHFIT Regulations, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust.  In no event shall the Trustees, the Depositors, or Assured be liable for any liabilities, costs or expenses of the Trust or the Trust Unit Holders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence or willful misconduct.

(c)     If any tax, duty, assessment, or other governmental charge is imposed, levied or assessed on the Trust, or if the Trust becomes subject to deduction, withholding, or other charge or assessment from, or with respect to, any amounts received by the Trust or any distributions made by the Trust, such tax, duty, assessment or other governmental charge, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) (collectively, the "**Tax Costs**") shall be the sole responsibility of, charged to and payable by the Trust Unit Holders on a pro rata basis.  To the extent known

prior to the termination of the Trust, all Tax Costs that are withheld, collected, charged, assessed, or levied shall be paid by the Trustee from the Trust Assets and income to the applicable taxing or governmental authority and any amounts so withheld, collected and/or paid to the applicable taxing or governmental authority shall be deemed to have been paid as distributions to the applicable Trust Unit Holders and treated in accordance with the provisions of the Trust Agreement applicable to Tax Costs.  To the extent any Tax Costs become known after the termination of the Trust, the former Trust Unit Holders of such Trust shall remain responsible for such Tax Costs on a pro rata basis.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)     All taxes due and payable on any amounts payable to a Trust Unit Holder with respect to a Trust Unit shall be that Trust Unit Holder's sole responsibility.

(f)     For the purposes of this Article VIII of these Standard Terms and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to Holder, Trust Unit Holder, or Beneficial Owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes.  By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Articles, Sections, or provisions hereof.

(g)     Notwithstanding any other provision of the Trust Agreement (including these Standard Terms), Assured makes no representations, warranties, or guarantees, and shall have no liability, with respect to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.  By electing, or being deemed to elect, Assured Bondholder Election 2, all Trust Unit Holders expressly agree to hold Assured harmless, and not to seek to impose any liabiltiy on Assured, related to the tax treatment of the Trust, the Trust Units, any payments made in connection with the Trust or the Trust Units, any Tax Costs, or any securities or other property held in the Trust or issued in connection with the Trust, including, without limitation, the Trust Units.

## ARTICLE IX

## MISCELLANEOUS PROVISIONS

**Section 9.01.  *Amendment of Trust Agreement.***

Promptly following the execution of the Trust Agreement, the Trustee shall post full and complete copies of the Trust Agreement (including these Standard Terms) on EMMA. The Trust Agreement (including these Standard Terms) may not be amended, waived or supplemented without the prior written consent of Assured.  The Trust Agreement (including

these Standard Terms) may be amended, waived or supplemented from time to time by Assured and the Trustee without the consent of the Trust Unit Holders; provided, however, that no such amendment shall:

      (a)    except as otherwise provided in the Trust Agreement (including these Standard Terms) reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Trust Unit Holder without the written consent of such Trust Unit Holder;

      (b)    compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy without the written consent of each Trust Unit Holder affected;

      (c)    alter in any manner the calculation or treatment of the Compounded Amount without the written consent of each Trust Unit Holder affected;

      (d)    amend this Section 9.01 without the written consent of each Trust Unit Holder;

      (e)    adversely affect in any other material respect the interests of the Trust Unit Holders in any manner other than as described in (a), (b), or (c) without the written consent of the Trust Unit Holders evidencing at least a majority of such Trust Units in the applicable Trust (measured, in the case of Current Interest Bonds, by the outstanding principal amount, or, in the case of Capital Appreciation Bonds, the Compounded Amount, as the case may be, of the underlying Assured Legacy Bonds), excluding, from both the numerator and the denominator, any Trust Units held by Assured; *provided*, that only Trust Units that an Officer of the Trustee knows are so held shall be so disregarded; or

      (f)    reduce the aforesaid percentage of Trust Units the Holders of which are required to consent to any such amendment, without the unanimous written consent of such Holders of all Trust Units then outstanding.

      Prior to executing any amendment permitted by this Article IX, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon an Opinion of Counsel and a certificate from an Officer of Assured stating that the execution of such amendment is authorized or permitted by the Trust Agreement and that all conditions precedent have been met.  The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under the Trust Agreement, these Standard Terms or otherwise.

      Promptly after the execution of any such amendment the Trustee shall furnish a copy of such amendment to each Trust Unit Holder and shall post a copy of such amendment to EMMA.

The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Trust Unit Holders shall be subject to such reasonable regulations as the Trustee may prescribe.

### Section 9.02. *Counterparts; Electronic Signatures.*

The Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in the Trust Agreement (including these Standard Terms) or in any other certificate, agreement or document related to the Trust Agreement (including these Standard Terms)   shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures andRecords Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

### Section 9.03. *Limitation on Rights of Trust Unit Holders.*

The death or incapacity of any Trust Unit Holder shall not operate to terminate the Trust Agreement or the Trust, nor entitle such Trust Unit Holder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the parties hereto or any of them.

No Trust Unit Holder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Trust Unit Holders from time to time as partners or members of an association; nor shall any Trust Unit Holder be under any liability to any third person by reason of any action taken by the parties to the Trust Agreement pursuant to any provision hereof.

Except with respect to enforcement of the applicable Assured Insurance Policies in accordance with the terms hereof, no Trust Unit Holder shall have any right by virtue of any provision of the Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to the Trust Agreement, unless the Requisite Trust Unit Holders shall have made written request upon the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Trust Agreement, and the Trustee, for 15 days after its receipt of such request shall have neglected or refused to institute any such action, suit or proceeding.  It is understood and intended, and expressly covenanted by each

Trust Unit Holder with every other Trust Unit Holder and the Trustee, that no one or more Holders of Trust Units shall have any right in any manner whatever by virtue of any provision of the Trust Agreement to affect, disturb or prejudice the rights of the Holders of any other Trust Units, or to obtain or seek to obtain priority over or preference to any other such Holder, or to enforce any right under the Trust Agreement, except in the manner therein provided and for the equal, ratable and common benefit of all Trust Unit Holders.  For the protection and enforcement of the provisions of this Section, each and every Trust Unit Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

In the event that an Officer of the Trustee receives a request for its consent to any amendment, modification or waiver of these Standard Terms, the Trust Agreement or any other document thereunder or relating thereto, or receives any other solicitation for any action with respect to the Securities or Assured Insurance Policies, the Trustee shall transmit a notice of such proposed amendment, modification, waiver, solicitation or action to each of the Trust Unit Holders within five (5) days of receipt thereof.  The Trustee shall request instructions from the Trust Unit Holders as to whether or not to consent to or vote to accept such amendment, modification, waiver, solicitation or action.

The Trustee shall consent or vote proportionally in accordance with the written direction of the Trust Unit Holders; provided, however, that the Trustee shall not:

(a)     without the prior written consent of any Trust Unit Holder, consent or affirmatively vote on behalf of such Trust Unit Holder on any matter that would: (i) terminate the Trust, (ii) except as expressly provided herein, sell some or all of the assets of the Trust; (iii) compromise, waive, sell, forfeit, or otherwise diminish the rights of the Trust, the Trustee, or the Trust Unit Holders under any Assured Insurance Policy; and

(b)     without the prior written consent of Assured, consent or affirmatively vote on any matter that would amend, modify or waive any agreement in such a manner as to adversely impact Assured.  Any such determination as to whether any such amendment, modification or waiver adversely impacts Assured shall be made in the sole and absolute discretion of Assured and such determination shall be promptly provided by notice to the Trustee and the Trust Unit Holders.  The Trustee shall not be liable to any Trust Unit Holder or any other Person for refusing to consent or affirmatively vote on such a matter in accordance with such written direction of Assured.

**Section 9.04.  *Notices.***

All demands and notices under the Trust Agreement shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by first class mail, postage prepaid, or by express delivery service, to:

(a) in the case of the Trustee if the Trustee is U.S. Bank National Association, the notice address for the Trustee is 100 Wall Street, 6th ~~floor~~Floor, New York, New York 10005.  If the Trustee is not U.S. Bank National Association, the notice address shall be the

50

address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Trustee,;

(b) in the case of the Delaware Trustee, if the Delaware Trustee is U.S. Bank Trust National Association, the notice address for the Delaware Trustee is 100 Wall Street, 6th ~~floor~~Floor, New York, New York 10005.  If the Delaware Trustee is not U.S. Bank Trust National Association, the notice address shall be the address set forth in the Trust Agreement, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Delaware Trustee;

(c) in the case of the Depositors, [●], or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by the Depositors; and

(d) in the case of Assured, [● ],1633 Broadway, New York, NY 10019, or such other address or telecopy number as may hereafter be furnished to each party to the Trust Agreement in writing by Assured.

Any notice required or permitted to be mailed to a Trust Unit Holder shall be given by first-class mail, postage prepaid, or by express delivery service, at the address of such Trust Unit Holder as shown in the Unit Register.  Notwithstanding the foregoing, so long as the Depository or its nominee is the registered holder of the Trust Units, notice may be given to the Trust Unit Holders by giving notice to the Depository in accordance with its applicable procedures.  Notice may also be delivered by email in accordance with a separate side letter agreement entered into between the parties.  Any notice so mailed within the time prescribed in the Trust Agreement shall be conclusively presumed to have been duly given, whether or not the Trust Unit Holder receives such notice.  A copy of any notice required to be telecopied hereunder also shall be mailed to the appropriate party in the manner set forth above.  A copy of any notice given hereunder to any other party shall be delivered to the Trustee.

### Section 9.05.  *Severability of Provisions.*

If any one or more of the covenants, agreements, provisions or terms of the Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of the Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of the Trust Agreement or of the Trust Units or the rights of the Holders thereof.

### Section 9.06.  *Third-Party Beneficiaries.*

The Trust Unit Holders and their successors and assigns shall be third-party beneficiaries of the provisions of the Trust Agreement (inclding these Standard Terms).  For the avoidance of doubt, beneficial holders of Trust Units are third party beneficiaries solely to the extent necessary to allow them to enforce the applicable Assured Insurance Policies as set forth herein.  Nothing in these Standard Terms or the Trust Agreement, express or implied,

shall give to any Person, other than the parties hereto and their successors hereunder, and the Trust Unit Holders, any benefit or any legal or equitable right, remedy or claim under the Trust Agreement (including these standard terms).

### Section 9.07. *Acts of Trust Unit Holders.*

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by the Trust Agreement (including these Standard Terms) to be given or taken by Trust Unit Holders or a class of Trust Unit Holders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Trust Unit Holders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of the Trust Agreement (including these Standard Terms) and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Unit Register.

### Section 9.08. *Headings.*

Section and subsection headings in these Standard Terms are included herein for convenience of reference only and shall not constitute a part of these Standard Terms for any other purpose or be given any substantive effect.

### Section 9.09. *No Waiver; Cumulative Remedies.*

No failure to exercise and no delay in exercising, on the part of any party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

### Section 9.10. *Merger and Integration.*

These Standard Terms and the Trust Agreement sets forth the entire understanding of the parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by the Trust Agreement (including these Standard Terms).

### Section 9.11. *The Delaware Trustee*

(a)     The Delaware Trustee is appointed to serve as the trustee of the Trust in the State of Delaware for the sole purpose of satisfying the requirement of <u>Section 3807(a)</u> of the Delaware Statutory Trust Act that the Trust have at least one trustee with a principal place of business in the State of Delaware. It is understood and agreed by the parties hereto that the Delaware Trustee shall have none of the duties or liabilities of the Trustee or any other trustees.

(b)     The duties of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Delaware Secretary of State which the Delaware Trustee is required to execute under Section 3811 of the Delaware Statutory Trust Act.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating thereto to the Trust or the Trust Unit Holders, it is hereby understood and agreed by the other parties hereto that such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.  The Delaware Trustee shall have no liability for the acts or omissions of the Trustee or any other trustees and the Delaware Trustee shall not be liable for supervising or monitoring the performance of the duties of the Trustee, or any other trustees, or the Trust or of any other person or entity under the Trust Agreement or any related document.

(c)     The Delaware Trustee may be removed by Assured upon thirty days prior written notice to the Delaware Trustee.  The Delaware Trustee may resign upon thirty days prior written notice to Assured, with a copy to the Trustee.  No resignation or removal of the Delaware Trustee shall be effective except upon the appointment by Assured of a successor Delaware Trustee that (i) is reasonably acceptable to Assured, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware.  If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, the Trustee or the Trust Unit Holders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

(d)     Any Person into which the Delaware Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Delaware Trustee shall be a party, or any Person which succeeds to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor Delaware Trustee under the Trust Agreement without the execution, delivery or filing of any paper or instrument or further act to be done on the part of the parties hereto, except as may be required by applicable law, provided that such resulting or successor entity otherwise satisfies the requirements set forth herein to serve as Delaware Trustee.

(e)     Assured and the Trust shall be responsible for the payment of any fees or expenses of the Delaware Trustee.  The Delaware Trustee shall be entitled to all of the same rights, protections, indemnities and immunities under the Trust Agreement and with respect to the Trust as the Trustee.  No amendment or waiver of any provision of the Trust Agreement which adversely affects the Delaware Trustee shall be effective against it without its prior written consent. This provision shall survive the resignation or removal of the Delaware Trustee.

## ANNEX I

INDEMNIFICATION PROVISIONS

(i) The Trust shall indemnify each of the Trustees or any predecessor Trustees and their agents for, and to hold them harmless against, any and all loss, damage, claims, liability or expense, including taxes (other than taxes based upon, measured by or determined by the income of the Trustees), arising out of or in connection with the acceptance or administration of the Trust hereunder, including the costs and expenses of defending itself against any claim asserted by any other Person or liability in connection with the exercise or performance of any of its powers or duties hereunder, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct as determined by a final judgment of a court of a competent jurisdiction no longer subject to appeal or review.

(ii) The Trustees shall have the right to employ separate counsel in any such action or proceeding and participate in the investigation and defense thereof, and the Trust shall pay the reasonable fees and expenses of such separate counsel; provided, however, that the Trustees may only employ separate counsel at the expense of the Trust if in the reasonable judgment of the Trustees (1) a conflict of interest exists by reason of common representation or (2) there are legal defenses available to the Trustees that are different from or are in addition to those available to the Trust or if all parties commonly represented do not agree as to the action (or inaction) of counsel.

## EXHIBIT A

NOTICE OF CLAIM AND CERTIFICATE

[Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.]
1633 Broadway
New York, NY 10019
Attention: [ ● ]
E-Mail: [ ● ]

Reference is made to the [Name of Series] Assured Custodial Trust Agreement, dated as of [ ● ], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank National Association, (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [ ● ] (the "**Standard Terms**"). This Notice of Claim and Certificate is delivered pursuant to Section 3.06(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement and the Policy (as defined below).

The undersigned, a duly authorized officer of Trustee, in its capacity as Trustee for the Trust, hereby certifies to Assured, with reference to the Trust Agreement and Municipal Bond Insurance Policy No. [ ● ], dated [ ● ], 20[ ● ] (the "**Policy**"), issued in respect of the [Name of Series of Bonds] (the "**Assured Legacy Bonds CUSIP**") and deposited into the Trust, that:

(i)      The Trustee is the Trustee under the Trust Agreement.

(ii)      After taking into account any adjustments made pursuant to Section 3.05 of the Standard Terms, the sum of all amounts on deposit with the Trustee and available for distribution to the Trust Unit Holders pursuant to the Trust Agreement will be $[ ● ] (such amount, the "**Payment Shortfall**") less than the principal and interest of $[ ● ] (the "**Scheduled Payments**") Due for Payment under the Policy and Trust Agreement on [ ● ], 20[ ● ] (the "**Payment Date**").

(iii)      The Trustee is hereby making a claim under the Policy and Trust Agreement for the Payment Shortfall to be applied to the payment of Scheduled Payments.

(iv)      The Trustee agrees that, following its receipt of funds from Assured, it shall (a) hold such amounts in trust and, subject to Section 3.06(ed) of the Trust Agreement, apply the same directly to the payment of Scheduled Payments when due; (b) not apply such funds for any other purpose; (c) not commingle such funds with other funds held by the Trustee, and (d) maintain an accurate record of such payments with respect to each Trust Unit and the corresponding claim on the Policy.

(v)      The Trustee, on behalf of the Trust Unit Holders, hereby assigns to Assured any rights of the Trust Unit Holders with respect to the Trust Assets to the extent that the principal amount (or Compounded Amount, as applicable) of the Assured Legacy Bonds CUSIP is reduced to zero.  The foregoing assignment is in addition to, and not in limitation of, rights of subrogation otherwise available to Assured in respect of such payments.  The Trustee shall take such action and deliver such instruments as may be reasonably requested or required by Assured to effectuate the purpose or provisions of this clause (v) and the applicable terms in the Trust Agreement.

(vi)      The Trustee, on behalf of the Trust Unit Holders, hereby acknowledges and agrees that, so long as Assured shall not be in default in its payment obligations under the Policy, Assured may at any time during the continuation of any proceeding by or against the Depositor under the United States Bankruptcy Code (if applicable) or any other applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (an "**Insolvency Proceeding**"), direct all matters with respect to the Trust Units or Trust Assets relating to such Insolvency Proceeding, including without limitation, (A) all matters relating to any claim in connection with an Insolvency Proceeding seeking the avoidance as a preferential transfer of any payment made to the Trust or Trustee or in connection with the Trust Units (a "**Preference Claim**"), (B) the direction of any appeal of any order relating to any Preference Claim at the expense of Assured, and (C) the posting of any surety, supersedeas or performance bond pending any such appeal. In addition, and without limiting the foregoing, the Trustee hereby agrees that Assured shall be subrogated to the rights of each Trust Unit Holder in any Insolvency Proceeding to the extent it is subrogated pursuant to section (vii) below, including, without limitation, all rights of any party to an adversary proceeding action with respect to any court order issued in connection with any such Insolvency Proceeding.

(vii)      Assured shall, to the extent it makes any Scheduled Payments on the Trust Units under the Policy and Trust Agreement, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Policy and the Trust Agreement.

- 2-

(viii)     The Trustee hereby requests that the Payment Shortfall be deposited into the Insurance Policy Account by bank wire transfer or other immediately available funds using the following wiring instructions:

| | |
|---|---|
| Correspondent Bank: | [_____] |
| Fed ABA No: | [_____] |
| Account Name: | [_____] |
| Account  No: | [_____] |
| Beneficiary A/C Name: | [_____] |
| Reference: | [_____] |

This Notice of Claim and Certificate may be revoked at any time by written notice of such revocation by the Trustee to Assured.

IN WITNESS WHEREOF, the Trustee has executed and delivered this Notice of Claim and Certificate as of the [ ● ]th day of [ ● ], 20[ ● ].

U.S. Bank National Association, as Trustee

By: _____
    Name:
    Title:

For Assured or
Trustee Use Only
Wire transfer sent on _____ By _____
Confirmation Number _____

- 3-

**Appendix I**

**Debt Service Payment for [|/[]/20[]**

| Description of Bond Issue | CUSIP | Outstanding Amount | Maturity | Rate | Principal Insured Amount | Principal | Interest | Total | Insurer | Policy No. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | _____ | | | _____ | _____ | _____ | _____ | | |
| | | _____ | | | _____ | _____ | _____ | _____ | | |

A- 1

**EXHIBIT B**

FORM UNIT EXCHANGE ELECTION NOTICE
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
Trust Unit Certificate No(s). __
Notional Amount: _____
CUSIP:  [●]

[Trustee Name]
[Trustee Address]

Ladies and Gentlemen:

Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank National Association (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Unit Exchange Election Notice is delivered pursuant to Section 3.07(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

By delivering this Unit Exchange Election Notice, we hereby give [thirty (30)] days' written notice of our exercise of a Unit Exchange Election with respect to [   ] the Trust Unit(s) evidenced by the Trust Unit Certificate No(s). referenced above and direct the Trustee to distribute a pro rata share of any remaining Trust Assets in the Tax-Exempt Bond Account, the Taxable Bond Account, the Cash Account, or the CVI Account, the FGIC Certificates Account, or the Non-Book-Entry Double-Insured AGC Trust Units Account, as applicable, net of the pro-rata share of any outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, or Tax Costs, as applicable, no later than [Date], in accordance with the [delivery] instructions below.  We understand that such distribution will not be made until the applicable Trust Units are presented and surrendered at the office of the Trustee therein designated on that date.

If cash is not available to satisfy in full such outstanding Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs, we shall pay in cash the applicable pro rata share of such Assured Deferred Expenses, Assured Reimbursement Amount, Trustee Costs, and Tax Costs prior to the receipt of our share of remaining Trust Assets.

B- 1

By making a Unit Exchange Election, we acknowledge and agree that upon distribution of the Trust Assets in accordance with Section [3.07(b)] of the Standard Terms, (i) the applicable Trust Units shall be cancelled; (ii) all of Assured's obligations under the applicable Assured Insurance Policies with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds will be satisfied and discharged; and (iii) the related Assured Insurance Policies shall be indefeasibly cancelled with respect to such Trust Units and the Trust Unit Holder's portion of the Assured Legacy Bonds.

[Please include delivery instructions for the distribution of Trust Assets to be receive on account of this Unit Exchange Election]

[Please Include any other relevant information]


[],
as Trust Unit Holder


By:_____
Name:
Title:

**EXHIBIT C**

FORM OF NOTICE OF MATURITY
[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]

[Date]
CUSIP No.: [●]

Ladies and Gentlemen:

      Reference is made to the [[Name of Series] Assured Custodial Trust Agreement, dated as of [●], by and among the Commonwealth of Puerto Rico[ and the Puerto Rico Public Buildings Authority] (the "**Depositor[s]**"), [Assured Guaranty Corp.] OR [Assured Guaranty Municipal Corp.] ("**Assured**"), U.S. Bank National Association (the "**Trustee**") and U.S. Bank Trust National Association (the "**Delaware Trustee**") (the "**Trust Agreement**"), which incorporates by reference the Standard Terms to the Trust Agreement, dated as of [●] (the "**Standard Terms**"). This Notice of Maturity is delivered pursuant to Section 3.08(a) of the Standard Terms.  Capitalized terms used herein but not otherwise defined shall have the meaning ascribed to such terms in the Trust Agreement.

      1. <u>Maturity Date</u>. Prior to acceleration, the Assured Legacy Bonds were scheduled to mature on [●] (the "**Maturity Date**").

      2. <u>Trust Unit Holder Distribution</u>.  As a Trust Unit Holder, you are entitled receive a Distribution (or multiple Distributions) in the amount of a pro rata share of the Insured Amount on the Maturity Date corresponding (i) in the case of any relevant Current Interest Bonds, to the outstanding principal amount of, and accrued and unpaid interest on, such Current Interest Bonds as of the Maturity Date, or (ii) in the case of any relevant Capital Appreciation Bonds, the Compounded Amount as of the Maturity Date.

      3. [Include any other relevant information required by the Depository or otherwise.]

C- 1

**EXHIBIT D**

FORM OF NOTICE TO TRUST UNIT HOLDERS

[[NAME OF SERIES] ASSURED CUSTODIAL TRUST]
STATEMENT FOR THE MONTH ENDED [●], 20__

**POSTED TO EMMA**
**U.S. Bank National Association, as Trustee**

**1.   Trust Units[1]**

| | For the month ended [●], 20__ | | Year to date [●], 20__ | | As of [●], 20__ |
|---|---|---|---|---|---|
| | Aggregate distributions | Per Unit distributions | Aggregate distributions | Per Unit distributions | Aggregate principal or Accreted Value of New GO Bonds or GO CVIs (by CUSIP)[1][2] |
| Tax-Exempt Bond Account | $ | $ | $ | $ | |
| Taxable Bond Account | $ | $ | $ | $ | |
| Cash Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |
| CVI Account | $ | $ | $ | $ | |
| Insurance Policy Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |
| FGIC Certificates Account | $ | $ | $ | $ | |
| FGIC Insured Bonds Insurance Policy Payments Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |

[1] Trustee to include only portions of table relevant to a particular Trust.
[1] Or any other securities or property received in respect thereof or in exchange therefor.
[2] Or any other securities or property received in respect thereof or in exchange therefor.

D- 1

| | | | | |
|---|---|---|---|---|
| Non-Book Entry AGC Trust Units Account | $ | $ | $ | $ | |
| AGM Double-Insured Insurance Policy Payments Account | $ | $ | $ | $ | [N/A (cash balance = $ [])] |

2.    **Aggregate Payment /Insured Amount Reporting for [Assured Legacy Bonds CUSIP]**

As of [ ● ]_

a.  Current Interest Bonds: Payments Made to Date on [Assured Legacy Bonds CUSIP]

  i.  Aggregate Interest Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

  **Total** _____; **Per Trust Unit** _____

  1.  Aggregate Interest Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

  **Total** _____; **Per Trust Unit** _____

  2.  Aggregate Interest Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]:

  **Total** _____; **Per Trust Unit** _____

  ii.  Aggregate Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

  **Total** _____; **Per Trust Unit** _____

  1.  Aggregate Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

  **Total** _____; **Per Trust Unit** _____

  2.  Aggregate Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]: _____

  **Total** _____; **Per Trust Unit** _____

  iii.  Aggregate Interest and Principal Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below): _____

  1.  Aggregate Interest and Principal Payments made by Assured on account of [Assured Legacy Bonds CUSIP] (sum of (i)(1) and (ii)(1) above):

  **Total** _____; **Per Trust Unit** _____

D- 3

2.  Aggregate Interest and Principal Payments from Other Sources on account of [Assured Legacy Bonds CUSIP] (sum of (i)(2) and (ii)(2) above):

**Total** _____; **Per Trust Unit** _____

b.  <u>Capital Appreciation Bonds</u>: Payments Made to Date on [Assured Legacy Bonds CUSIP]

i.   Aggregate Compounded Amount Payments made on account of [Assured Legacy Bonds CUSIP] (sum of (1) and (2) below):

**Total** _____; **Per Trust Unit** _____

1.  Aggregate Compounded Amount Payments made by Assured on account of [Assured Legacy Bonds CUSIP]:

**Total** _____; **Per Trust Unit** _____

2.  Aggregate Compounded Amount Payments from Other Sources on account of [Assured Legacy Bonds CUSIP]:

**Total** _____; **Per Trust Unit** _____

c.  <u>Insured Amount</u> for [Assured Legacy Bonds CUSIP]: _____

**2.** ~~3.~~ **Other distributions to Trust Unit Holders**

[_____]

**3.** ~~4.~~ **Tax Reporting**

[_____]

D- 4

# **EXHIBIT G**

FGIC Custodial Trust Agreement

**BUTLER SNOW DRAFT**
**AS OF 1/14/2022**

[_____] CUSTODIAL TRUST [1]

TRUST AGREEMENT

among

Commonwealth of Puerto Rico,

Financial Guaranty Insurance Company,

U.S. Bank National Association,
(as Trustee)

and

U.S. Bank Trust National Association,

(as Delaware Trustee)

---

[1] Form of Custodial Trust to be formed for each CUSIP of FGIC Insured Bonds under the Plan.  FGIC reserves the right to form one or more master trusts on a per-policy basis provided that each CUSIP shall be treated substantially the same as provided herein.

**BUTLER SNOW DRAFT
AS OF 1/14/2022**

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; CONSTRUCTION ........................................................... 1
    Section 1.1    Definitions ............................................................. 1
    Section 1.2    Rules of Construction .................................................. 7
    Section 1.3    Article and Section References ...................................... 7

ARTICLE II TRUST ESTATE ................................................................................ 8
    Section 2.1    Creation of Trust. ...................................................... 8
    Section 2.2    Trust Assets. ............................................................. 8
    Section 2.3    Acceptance by Trustee. .............................................. 9
    Section 2.4    Purpose, Activities of the Trust. ................................... 9
    Section 2.5    Limitations of the Trust. ............................................ 10

ARTICLE III ADMINISTRATION OF TRUST ..................................................... 11
    Section 3.1    Accounts. ................................................................ 11
    Section 3.2    Investment of Funds in the Collection Accounts. ............ 12
    Section 3.3    FGIC Insurance Policy and Effect of Distributions. ......... 12
    Section 3.4    Distributions. .......................................................... 14
    Section 3.5    Threshold Event or Permitted Sale Event. .................... 14
    Section 3.6    Surrendered Units. ................................................... 15
    Section 3.7    FGIC Election to Accelerate Policy Payments. .............. 16

ARTICLE IV REPORTING/REMITTING TO UNITHOLDERS ............................ 17
    Section 4.1    Statements to Unitholders and FGIC. .......................... 17
    Section 4.2    Compliance with Withholding Requirements. ............... 17

ARTICLE V THE UNITS ...................................................................................... 18
    Section 5.1    The Units. ............................................................... 18
    Section 5.2    The Certificate; Book-Entry-only System. .................... 18
    Section 5.3    Mutilated, Destroyed, Lost and Stolen Certificate. ......... 19
    Section 5.4    No Obligation to Register. ......................................... 20
    Section 5.5    Persons Deemed Owners. ........................................... 20
    Section 5.6    Cancellation. ........................................................... 20

ARTICLE VI NEW GO BONDS AND GO CVIs ................................................... 21
    Section 6.1    Voting Rights with Respect to New GO Bonds and GO CVIs. ............... 21

ARTICLE VII CONCERNING THE TRUSTEE ..................................................... 21

Section 7.1    Duties of Trustee. .................................................................................. 21

Section 7.2    Certain Matters Affecting the Trustee. ................................................ 22

Section 7.3    Trustee Not Liable for Units or New GO Bonds, GO CVIs, the Covered FGIC Insured Bonds or the Covered FGIC Insurance Policy. ................. 24

Section 7.4    Trustee May Own Units. ...................................................................... 25

Section 7.5    Trustee Costs and Expenses. ................................................................ 25

Section 7.6    Eligibility Requirements for Trustee and Successor Trustee. ................. 26

Section 7.7    Resignation and Removal of the Trustee. ............................................. 26

Section 7.8    Successor Trustee. ............................................................................... 27

Section 7.9    Merger or Consolidation of Trustees. .................................................. 28

Section 7.10   Appointment of Trustee Custodians. ................................................... 28

Section 7.11   Trustee May Enforce Claims Without Possession of Certificate. ............. 28

Section 7.12   Trustee Indemnity. .............................................................................. 29

Section 7.13   Acceptance by Trustees, Representations and Warranties of Trustees. ..... 29

Section 7.14   The Delaware Trustee. ........................................................................ 30

ARTICLE VIII DEFAULT ON NEW GO BONDS OR GO CVIs ............................. 32

Section 8.1    Realization Upon Default. .................................................................... 32

ARTICLE IX TERMINATION OF TRUST .................................................................. 32

Section 9.1    Termination; No Redemption Rights. ................................................... 32

Section 9.2    Procedure for Termination. .................................................................. 33

ARTICLE X TAX PROVISIONS .................................................................................. 33

Section 10.1   Grantor Trust Provisions. .................................................................... 33

Section 10.2   Characterization. ................................................................................. 34

Section 10.3   Grantor Trust Administration. ............................................................. 34

Section 10.4   Reports to Unitholders and Tax Authorities. ....................................... 35

ARTICLE XI MISCELLANEOUS PROVISIONS ........................................................ 36

Section 11.1   Amendment of Trust Agreement .......................................................... 36

Section 11.2   Counterparts. ....................................................................................... 37

Section 11.3   Limitation on Rights of Unitholders. ................................................... 37

Section 11.4   Notices. ............................................................................................... 38

Section 11.5   Severability of Provisions. .................................................................. 38

Section 11.6   Acts of Unitholders. ............................................................................ 38

Section 11.7   Headings. ............................................................................................ 39

Section 11.8   No Waiver; Cumulative Remedies. ...................................................... 39

Section 11.9    Merger and Integration.................................................................. 39

Section 11.10  [Reserved]..................................................................................... 39

Section 11.11  Patriot Act................................................................................... 39

Section 11.12  Governing Law; Venue Jury Waiver. ........................................ 39

Section 11.13  Force Majeure. ............................................................................ 40

Section 11.14  Intent of Parties. ........................................................................ 40

Section 11.15  Non-Petition. .............................................................................. 43

Section 11.16  Certain Terms Regarding the Commonwealth........................... 43

Section 11.17  Certain Terms Regarding FGIC. ............................................... 44

**EXHIBITS**

Exhibit A - Trust Assets.......................................................................................... A-1
Exhibit B - Form of Notice to Unitholder and FGIC............................................B-1
Exhibit C - Form of Certificate...............................................................................C-1
Exhibit D - Form of Certificate of Trust................................................................ D-1
Exhibit E-1 - Form of Notice Relating to Permitted Sale Event.......................... E-1-1
Exhibit E-2 - Form of Notice and Instruction Relating to Threshold Event............................ E-2-1
Exhibit E-3 - Form of Instruction Relating to Permitted Sale Event ..................... E-3-1
Exhibit F - Form of Trustee's Certification of Receipt of Certain Trust Assets ........................F-1
Exhibit G - Form of Assignment ........................................................................... G-1

**SCHEDULES**

Schedule I - Threshold Prices ................................................................................ S-I-1

[_____] CUSTODIAL TRUST

**TRUST AGREEMENT**

**THIS TRUST AGREEMENT**, dated as of _____, 2022 (this "Trust Agreement" or this "Agreement"), with respect to the [_____] Custodial Trust (the "Trust"), by and among the Commonwealth of Puerto Rico (the "Commonwealth"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees", and with the Commonwealth and FGIC, collectively, the "Parties").

**WHEREAS,** in furtherance of the structure approved in the Commonwealth's Plan of Adjustment and in order to facilitate the implementation thereof, the Trust is being established by the Commonwealth and the Trustees solely for the benefit of and on behalf of the Unitholders and FGIC;

**WHEREAS**, except for the establishment of the Trust and the deposits therein pursuant to the Plan of Adjustment or as contemplated hereby, the Commonwealth shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof; and

**WHEREAS**, the Trust is one of the FGIC Trusts contemplated by Section 75.4(a) of the Plan of Adjustment and is being formed for the purposes of (i) holding the Covered FGIC Insured Bonds, (ii) receiving FGIC Plan Consideration allocable or distributable in accordance with Section 24.1 of the Plan to the Original Holders, each component of which is identified on Exhibit A hereto (collectively, the "Allocable Plan Consideration"), (iii) being the sole holder and beneficiary of the Covered FGIC Insurance Policy, and (iv) issuing a single class of beneficial ownership interests consisting of trust units that shall be assigned a CUSIP number, be issued in global form and be registered in the name (or nominee name) of and transferable through the Depositary.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, representations and warranties made in this Trust Agreement, the Parties hereby agree as follows;

## ARTICLE I

## DEFINITIONS; CONSTRUCTION

Section 1.1    Definitions

(a)    Capitalized terms used in this Trust Agreement (including the recitals hereto), and not otherwise defined in this Trust Agreement, shall have the respective meanings assigned to such terms in the Plan.

(b)    Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

1

"Affiliate": With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day": Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Cash Acceleration Payment": The meaning specified in Section 3.7.

"Cash Payment": The meaning specified in Section 3.3(b).

"Certificate": A definitive certificate substantially in the form attached as Exhibit C evidencing the Units and issued by the Trust pursuant to Article V hereof.

"Certificate of Trust":  The Certificate of Trust of the Trust substantially in the form attached as Exhibit D hereto.

"Closing Date": [          ], 2022, the effective date of the Plan.

"Code": The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"Corporate Trust Office": The Trustees' offices at 100 Wall Street, 6th floor, New York, NY 10005, or such other addresses as either of the Trustees' may designate from time to time by notice to the Unitholders , FGIC and the other Trustee.

"Covered FGIC Insured Bonds": The FGIC Insured Bonds held or beneficially owned by the Original Holders in the aggregate principal amount specified on Exhibit A, which are deposited into the Trust on the Closing Date and thereafter held by the Trust (as such bonds may be deemed to be paid, reduced or satisfied in accordance with the terms of this Trust Agreement or the FGIC Insurance Policy).

"Covered FGIC Insurance Policy": The FGIC Insurance Policy solely insofar as it applies and relates to the Covered FGIC Insured Bonds, including, for the avoidance of doubt, all rights relating to payments (if any) required to be made by FGIC in respect of any DPO and DPO Accretion associated with such Covered FGIC Insured Bonds under such FGIC Insurance Policy in accordance with the terms and conditions of the FGIC Rehabilitation Plan.  For the avoidance of doubt, (i) all FGIC Insured Bonds other than the Covered FGIC Insured Bonds shall be deemed no longer covered by the FGIC Insurance Policy as of the Closing Date for all purposes, and (ii) neither the Trust nor the Trustee shall have any rights under the FGIC Insurance Policy except in respect of the Covered FGIC Insured Bonds.

"Delaware Trustee": The meaning specified in the preamble hereto and any successor Delaware Trustee appointed in accordance with Section 11.10.

"Delaware Trust Statute": Chapter 38 of Title 12 of the Delaware Code.

"Depositary": DTC or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"Dollar" or "$": Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DPO": The meaning specified in the FGIC Rehabilitation Plan.

"DPO Accretion": The meaning specified in the FGIC Rehabilitation Plan.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"Eligible Account": A non-interest bearing account, held in the United States in the name of the Trust for the benefit of the Unitholders and FGIC, which is a segregated account maintained with either (1) a Federal or State chartered depository institution that has (x) a short-term deposit or unsecured debt rating of at least "A-1" and "P-1" by S&P and Moody's respectively, (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A" and "A2" by S&P and Moody's, respectively and (z) a combined capital and surplus of at least U.S.$200,000,000 or (2) the corporate trust department of such a Federal or State-chartered deposit institution.

"EMMA": The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP number for the Units.

"Executive Officer": With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof and, as applicable, an authorized signatory.

"Fair Market Value" means, in respect of any New GO Bond or GO CVI as of any date of determination, the lower of (i) the price for such New GO Bond or GO CVI, as applicable, as quoted by Bloomberg L.P. for any trade with total proceeds of at least $1 million as of the close of business on the prior Business Day, if Bloomberg L.P. has quoted a price for such New GO Bond or GO CVI, as applicable, as of such Business Day, and (ii) the fair market price for such New GO Bond or GO CVI, as applicable, including accrued and unpaid interest (if applicable), determined by soliciting bids from at least two broker-dealers of national standing, each of which is independent of each other and unaffiliated with the Trustee, and shall be the average of such bids, provided that, for the avoidance of doubt, there shall be no requirement to solicit such bids, in which case only clause (i) shall apply.

3

"Fee Reserve": Funds held from time to time by the Trustee in the General Collection Account, in an amount up to the Fee Reserve Threshold Amount, to cover payments of Trustee Costs as they arise from time to time.

"Fee Reserve Threshold Amount": The fee reserve threshold amount agreed upon in the Trustee Fee Letter.

"FGIC Insurance Policy": The existing insurance policy issued by FGIC with respect to the FGIC Insured Bonds, which is listed on Exhibit A hereto, as modified by the FGIC Rehabilitation Plan and this Trust Agreement.

"FGIC Insurance Policy Collection Account": The meaning specified in Section 3.1(a).

"FGIC Insured Bonds": The bonds previously issued by the Commonwealth, which are described and the CUSIP number for which is identified on Exhibit A hereto.

"FGIC Rehabilitation Plan": The First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

"General Collection Account": The meaning specified in Section 3.1(a).

"GO CVI Distribution Date": With respect to each series of GO CVIs, each date specified in the GO CVI Indenture or CVI Legislation on which distributions of amounts due on such securities are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Moody's": Moody's Investors Service, Inc.

"New GO Bond Distribution Date": With respect to each series of New GO Bonds, each date specified in the applicable New GO Bonds Indenture or New GO Bonds Legislation on which distributions of principal or interest on such bonds are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Notional Amount": With respect to the Units as of any date of determination, the amount of Trust Units issued as provided in this Trust Agreement on the Closing Date, excluding any Units that may have been surrendered or canceled or otherwise are no longer outstanding on or prior to such date.

"Officer's Certificate": A certificate signed by an Executive Officer of the applicable Person and delivered to the Trustee.

"Opinion of Counsel": A written opinion of counsel, who may be counsel to FGIC.

"Original Holder": Each holder of an Allowed FGIC Insured Bond Claim on the Closing Date arising from FGIC Insured Bonds (other than FGIC), as provided in Section 75.4(a) of the Plan.

4

"Other Trust Costs": Any filing fees or other costs or expenses of the Trust that have not been paid by either of the Trustees or the Trust at the time of any election by FGIC under Section 7.5(c).

"Permitted Sale Event": With respect to any series of New GO Bonds or the GO CVIs, the satisfaction of all of the following requirements:

        (i)     FGIC is not in default under the Covered FGIC Insurance Policy;

        (ii)    FGIC shall have notified the Trustee, by delivering a notice substantially in the form of Exhibit E-1 attached hereto, of its intention to instruct the Trustee to sell some or all of (A) such series of New GO Bonds, or (B) the GO CVIs and setting forth the Permitted Sale Price for such New GO Bonds or such GO CVIs, as applicable.

        (iii)   The Trustee shall have provided notice to Unitholders in accordance with the notice requirements set forth in Section 11.4 hereof (a) notifying Unitholders of the notice of FGIC described in clause (ii) above and the Permitted Sale Price set forth in such notice and (b) requesting that any Unitholders objecting to such proposed sale provide written notice of such objection to the Trustee; and

        (iv)   The Trustee shall not have received a written objection from the Requisite Unitholders (determined as of the date of the notice described in clause (ii) above) with respect to such proposed sale within seven (7) Business Days of the date the notice provided in clause (iii) above is provided.

"Permitted Sale Price": With respect to any Permitted Sale Event regarding some or all of any series of New GO Bonds or the GO CVIs, the price equal to the percentage of the par amount of such New GO Bonds or of the outstanding notional amount of such GO CVIs set forth in the related notice delivered by FGIC to the Trustee.

"Person": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan of Adjustment" or "Plan": The Seventh Amended Joint Plan of Adjustment of the Commonwealth, the Commonwealth's Employees Retirement System and the Puerto Rico Public Buildings Authority, Case No. 17 BK 3283-LTS, filed on July 30, 2021, as amended, modified or supplemented from time to time.

"pro rata": With respect to any payment or distribution, or any allocation of any cost or expense, to Unitholders hereunder, pro rata shall be calculated based on the Notional Amount of the Units then outstanding.

"Proof of Policy Claim Form": The Proof of Policy Claim Form required to be filed in order to submit a policy claim to FGIC in accordance with the FGIC Rehabilitation Plan.

"Record Date": With respect to any distribution to be made to Unitholders: (i) based on the Cash to be deposited into the Trust on the Closing Date, the Closing Date, (ii) based on any

5

scheduled payment of principal or interest in respect of any series of New GO Bonds, the tenth day preceding the related New GO Bond Distribution Date, (iii) based on any scheduled payment of any amount due in respect of GO CVIs, the tenth day preceding the related GO CVI Distribution Date, and (iv) based on any other funds deposited or to be deposited in the General Collection Account or any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, the Record Date established by the Trustee pursuant to Section 3.4(b), provided that if such tenth day under clause (ii) or (iii) above is not a Business Day, the Record Date shall be the preceding Business Day.

"Requisite Unitholders":  As of any date, Unitholders holding more than fifty (50) percent of the Notional Amount of the Trust Units as of such date, excluding from both the numerator and the denominator the Notional Amount of any Trust Units held by FGIC.

"Secretary of State": The meaning specified in Section 2.1.

"State": Any one of the 50 states of the United States, the District of Columbia or its territories.

"S&P": S&P Global Ratings.

"Threshold Price": With respect to the New GO CIBs, the New GO 5.375% CABs, the New GO 5.0% CABs and the GO CVIs, the respective prices set forth on Schedule I.

"Threshold Event": With respect to any series of New GO Bonds or the GO CVIs, the receipt by the Trustee of a notice by FGIC that the current market price of such series of New GO Bonds or the GO CVIs exceeds the Threshold Price for such series of New GO Bonds or the GO CVIs, coupled with a written instruction from FGIC to sell some or all of such series of New GO Bonds or the GO CVIs, such notice and instruction to be substantially in the form of Exhibit E-2 attached hereto.

"Trust": The trust created by this Trust Agreement as specified in the preamble hereto.

"Trust Agreement": The meaning specified in the preamble hereto.

"Trust Assets" or "Trust Estate": The property, assets and rights set forth in clauses (a), (b) and (c) of Section 2.2, and any other  securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as  well as any other rights, benefits, protections, remedies and claims pertaining thereto.

"Trustee": The meaning specified in the preamble hereto and any successor Trustee appointed pursuant to Section 7.6 or Section 7.8.

"Trustee Costs": The meaning specified in Section 7.5(a).

"Trustee Fee Letter": The letter agreement dated on or before the Closing Date setting forth the fees and expenses of the Trustees.

"Trustees": Collectively, the Trustee and the Delaware Trustee.

"United States": The United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"Unitholder": The Person in whose name a Unit is registered in the records of the Depositary on any date of determination.

"Units" or "Trust Units":  The single class of beneficial ownership interests in the Trust evidenced by the Certificate.

"U.S.A. PATRIOT Act": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

Section 1.2   <u>Rules of Construction</u>

Unless the context otherwise requires:

(i)   a term has the meaning assigned to it;

(ii)   an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

(iii)   "or" is not exclusive;

(iv)   the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or other subdivision;

(v)   the words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(vi)   the meanings given to defined terms are applicable to the singular and plural forms thereof as appropriate.

Section 1.3   <u>Article and Section References</u>

All Article and Section references used in this Trust Agreement, unless otherwise provided, are to Articles and Sections in this Trust Agreement. Any reference to "this Article" appearing within a particular Section of an Article is a reference to such Article as a whole. Any reference to "this Section" appearingwithin a particular paragraph of a Section is a reference to such Section as a whole.

# ARTICLE II

# TRUST ESTATE

Section 2.1    Creation of Trust.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of the Certificate of Trust with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name written above the heading of this Trust Agreement, in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the Parties that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that this Trust Agreement constitutes the governing instrument of the Trust. The Trustees are hereby authorized and directed to, and shall, on the date hereof file the Certificate of Trust with the Secretary of State. The Trustee shall have power and authority, and is hereby authorized and empowered, to take all actions on behalf of the Trust as set forth in this Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and FGIC.

Section 2.2    Trust Assets.

Pursuant to and in accordance with this Trust Agreement and the Plan, on the Closing Date:

(a)    The Commonwealth shall, on behalf of the Original Holders and as required by Section 75.4(a) of the Plan, deposit into the Trust (i) the Allocable Plan Consideration comprising Cash, New GO Bonds and GO CVIs as specified on Exhibit A hereto; and (ii) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy;

(b)    All Covered FGIC Insured Bonds shall be deposited, or be deemed to have been deposited, into the Trust by the Depositary on behalf of the Original Holders and as required by Section 75.4(a) of the Plan.  All rights and remedies under or with respect to the Covered FGIC Insured Bonds and the applicable related legislative bond resolutions (other than with respect to the payment obligations of the Commonwealth or its instrumentalities) and the Covered FGIC Insurance Policy (including the rights with respect to any related DPO and DPO Accretion under the FGIC Rehabilitation Plan) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy; and

(c)    Each holder/beneficiary of the Covered FGIC Insurance Policy shall, on behalf of the Original Holders and as required by Section 75.4(a) of the Plan, deposit, or be deemed to have deposited, into the Trust the Covered FGIC Insurance Policy and relinquished all rights thereunder to the Trustee, on the Closing Date and thereafter.

Section 2.3      Acceptance by Trustee.

(a)      By its execution of this Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all Trust Assets, including all documents or instruments delivered to it or received by it from time to time with respect to the Trust Assets, in each case in trust for the exclusive use and benefit of all present and future Unitholders. The Trustee represents and warrants that, except as expressly permitted by this Trust Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of this Trust Agreement, and (ii) it has not encumbered or transferred its right, title or interest in the Trust Estate.

(b)      The Trustee shall, on the Closing Date, deliver to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 a certification substantially in the form of Exhibit F hereto that it (i) is in possession of Allocable Plan Consideration comprising cash in the amount specified on Exhibit A hereto, [(ii) either (x) confirms that the New GO Bonds and the GO CVIs have been deposited to and are being held in the participant account of U.S. Bank National Association at the Depositary for the benefit of the Unitholders and FGIC or (y) has received written statements from the trustees with respect to the New GO Bonds and the GO CVIs, respectively, confirming that the New GO Bonds and the GO CVIs are beneficially owned by the Trust for the benefit of the Unitholders and FGIC and being held by such trustees for the benefit of the Trust until the deposit of the New GO Bonds and the GO CVIs to such account, and (iii) confirms that the Trust Units have been issued to the Original Holders.

(c)      The Trustee shall, on the Closing Date, (i) take such reasonable action as shall be necessary to facilitate or permit the deposit of the New GO Bonds and the GO CVIs to the participant account of U.S. Bank National Association at the Depositary for the benefit of the Unitholders and FGIC, and (ii) assuming that such New GO Bonds and GO CVIs have been so deposited, no later than the Business Day following such action, confirm to the Unitholders and FGIC in writing (to the extent not covered in the certification delivered pursuant to Section 2.3(b) above) that the New GO Bonds and the GO CVIs have been deposited to and are being held in such account][2].

(d)      Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

Section 2.4      Purpose, Activities of the Trust.

It is the intention of the Parties that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to, the following:

(a)      accept the conveyance, assignment and transfer of the Trust Assets pursuant to the Plan or as contemplated by this Trust Agreement;

---

[2] Subsections 2.4(b)(ii) and (iii) and 2.4(c) are to be confirmed by FGIC and Prime Clerk with U.S. Bank.

(b)       create one or more accounts or sub-accounts in accordance with the terms of this Trust Agreement;

(c)       make claims and assignments and receive payments under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and this Trust Agreement;

(d)       receive payments pursuant to the Plan;

(e)       issue the Trust Units to the Original Holders through the issuance of the corresponding Certificate to the Depositary or its nominee in accordance with the terms of this Trust Agreement and take such reasonable action as shall be necessary to facilitate or permit the deposit of the New GO Bonds and the GO CVIs to the participant account of U.S. Bank, National Association at the Depositary for the benefit of the Unitholders and FGIC;

(f)       make distributions to the Depositary and Unitholders in accordance with the terms of this Trust Agreement;

(g)       coordinate Unitholder communications through the Depositary;

(h)       follow, accept or act upon any instruction or direction from FGIC or the Requisite Unitholders, as applicable, in each case only as expressly permitted herein;

(i)       hold the Trust Assets;

(j)       sell or assign New GO Bonds and GO CVIs or portions thereof only as expressly provided in Section 3.5 or 3.6 hereof;

(k)       effectuate Unitholder Elections as provided in Section 3.6 hereof;

(l)       make public disclosures on EMMA as contemplated by this Trust Agreement;

(m)      make payments, reimbursements and distributions as contemplated by this Trust Agreement;

(n)       otherwise perform its obligations in accordance with, and take such other actions as are expressly provided for or permitted under, the terms of this Trust Agreement; and

(o)       engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 2.5     Limitations of the Trust.

(a)       Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee. Neither the Commonwealth or FGIC nor any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee;

10

(b)      The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust. Any such resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust;

(c)      The Trust will provide for its own operating expenses and liabilities from the Trust Assets. General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Commonwealth or FGIC or their respective Affiliates;

(d)      All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust;

(e)      There will be no guarantees made by the Trust with respect to obligations of the Commonwealth or FGIC or their respective Affiliates. There will not be any indebtedness relating to borrowings or loans between the Trust and the Commonwealth or FGIC or their respective Affiliates; provided that FGIC or its Affiliates may own Trust Units;

(f)      The Trust will act solely in its own name or the Trustee's on its behalf and through its or the Trustee's duly authorized officers or agents in the conduct of its activities. The Trust will not: (i) operate or purport to operate as an integrated, single economic unit with respect to the Commonwealth or FGIC or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Commonwealth or FGIC or their respective Affiliates; or (iii) induce any third party to reasonably rely on the creditworthiness of the Commonwealth or FGIC or any other affiliated or unaffiliated entity in its dealings with the Trust;

(g)      The Trust will maintain a Delaware Trustee with its office in the State of Delaware; and

(h)      The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

## ARTICLE III

## ADMINISTRATION OF TRUST

Section 3.1      Accounts.

(a)      The Trustee has established and will maintain Eligible Accounts (i) to hold all amounts received on or in respect of the Trust Assets except the Covered FGIC Insurance Policy (the "General Collection Account") and (ii) to hold all amounts received on account of the Covered FGIC Insurance Policy (including, any amounts received on account of DPO or DPO Accretion) (the "FGIC Insurance Policy Collection Account"), each held in trust for the benefit of the Unitholders and FGIC. The Trustee shall deposit all cash received pursuant to clause (a) of Section 2.2 into the General Collection Account on the Closing Date. U.S. Bank National Association has established and will maintain its participant account at the Depositary into which the New GO Bonds and GO CVIs received pursuant to clause (a) of Section 2.2 shall be deposited and held in trust for the benefit of the Unitholders and FGIC. Each of the General Collection Account and the FGIC Insurance Policy Collection Account and such other accounts shall be under the sole

11

dominion and control of the Trustee, and the Trustee shall be entitled to look solely to the General Collection Account for payment of any Trustee Costs and funding the Fee Reserve from time to time in accordance with the terms of this Trust Agreement. All distributions to Unitholders shall be made only from cash on deposit in either the General Collection Account or the FGIC Insurance Policy Collection Account in accordance with the terms hereof.

(b)    If, at any time, a formerly Eligible Account no longer fulfills the definition of Eligible Account, the Trustee shall within thirty (30) days establish a new General Collection Account or FGIC Insurance Policy Collection Account, as applicable, meeting the conditions specified in such definition and transfer any cash on deposit in the General Collection Account or FGIC Insurance Policy Collection Account to such new General Collection Account or FGIC Insurance Policy Collection Account, and from the date such new General Collection Account or FGIC Insurance Policy Collection Account is established, it shall be the General Collection Account or FGIC Insurance Policy Collection  Account under this Trust Agreement.

(c)    The Trustee shall give notice to FGIC and Unitholders of the location of each Eligible Account and other account and to the proposed new location of any Eligible Account or other account prior to any change thereof.

Section 3.2    <u>Investment of Funds in the Collection Accounts.</u>

Amounts in the General Collection Account and the FGIC Insurance Policy Collection Account shall not be invested.

Section 3.3    <u>FGIC Insurance Policy and Effect of Distributions.</u>

(a)    The Trust is deemed to hold the Covered FGIC Insured Bonds and is the sole Person entitled under the terms of the Covered FGIC Insured Bonds to payment thereof. Accordingly, the Trust is and shall be the sole "Bondholder" entitled to assert claims and receive payments under or with respect to the Covered FGIC Insurance Policy.

(b)    The Trustee shall have the sole authority to assert, and shall assert, subject to its rights and protections herein,  claims under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and to take all actions required to enforce the Covered FGIC Insurance Policy, including in the event that FGIC fails to make any payment when due under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy. The Trustee shall be authorized to take, and shall take, subject to its rights and protections herein, all actions it deems necessary or advisable to satisfy any and all conditions to the obligations to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO or DPO Accretion related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan. The following are conditions to FGIC's obligation to make any such payment, and the Trustee is authorized and directed to satisfy such conditions: (i) the Trustee shall have submitted to FGIC with respect to each claim a fully completed and duly executed Proof of Policy Claim Form in accordance with the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, and (ii) with respect to each such payment (other than on account of DPO Accretion) relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "<u>Cash</u>

12

Payment"), the Trustee shall have executed and delivered on behalf of the Trust to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such actions as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)     All claims that are properly submitted to FGIC by the Trustee under the Covered FGIC Insurance Policy shall be paid to the extent permitted by FGIC under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, subject to satisfaction of any conditions to such payments, including the conditions set forth in this Trust Agreement. All payments to the Trustee under or with respect to the Covered FGIC Insurance Policy shall be deposited into the FGIC Insurance Policy Collection Account on the date received if received prior to 11:00 a.m. New York time, on any Business Day or, if received after such time on any Business Day, on the following Business Day.  In the event that FGIC has defaulted in its payment obligations under the Covered FGIC Insurance Policy, the Requisite Unitholders shall have the right to direct the Trustee in writing to take, and the Trustee is authorized to take, and shall take, subject to its rights and protections herein,  any and all actions necessary or desirable to enforce and recover such payment obligations.

(d)     Each distribution of cash to the Unitholders from the General Collection Account shall automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy.  All payments from the FGIC Insurance Policy Collection Account under or with respect to the Covered FGIC Insurance Policy arising from or related to principal of or interest on the Covered FGIC Insured Bonds (other than on account of DPO Accretion) shall be deemed to automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of or the accrued and unpaid interest on the Covered FGIC Insured Bonds, respectively. For the avoidance of doubt, all payments on account of a claim for accrued and unpaid interest due shall reduce on a dollar-for-dollar basis the outstanding interest amount of the Covered Insured Bonds, and all payments of a claim for principal shall reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds.

(e)     If at any time the principal amount of the Covered FGIC Insured Bonds shall be reduced to zero, then thereafter each distribution of cash to the Unitholders under this Trust Agreement (other than distributions from the FGIC Insurance Policy Collection Account on account of payments made by FGIC under or with respect to the Covered FGIC Insurance Policy) shall automatically and immediately reduce on a dollar-for-dollar basis the accrued and unpaid interest, if any, due on the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy. If at any time the principal amount of and the accrued and unpaid interest on the Covered FGIC Insured Bonds and the DPO Accretion balance under the Covered FGIC Insurance Policy shall be reduced to zero, then (i) the Covered FGIC Insurance Policy shall be indefeasibly canceled, (ii) within three (3) Business Days thereafter, the Trustee shall (x) first, assign to FGIC ownership of the Trust Assets held by the Trust at that time to the extent required to reimburse

FGIC for any unreimbursed payments previously made under the Covered FGIC Insurance Policy and (y) second, distribute to the Unitholders any remaining Trust Assets, and (iii) upon making such assignment and distributions (if any), the Units shall be deemed to be redeemed in full and the Trust shall terminate in accordance with the provisions of Article IX hereof.

(f)    Each of FGIC and each Unitholder shall have and retain all rights set forth in the Plan applicable to it, including those set forth in Section 75.4 of the Plan.

(g)    In addition to any other rights FGIC may have hereunder or otherwise, due to the subrogation rights under the Covered FGIC Insurance Policy, upon making each Cash Payment or Cash Acceleration Payment to the Trust, FGIC shall automatically become the owner of a proportionate share (as described in Section 3.3(b)) of the Trust Assets held by the Trust and shall be fully subrogated to all of the Trust's rights therein, including any payments on or in respect thereof.

Section 3.4    Distributions.

(a)    All cash received by the Trust or the Trustee from any source shall be applied and distributed in accordance with the terms of this Trust Agreement. Within two (2) Business Days of the Trust's receipt of (i) the Cash to be deposited into the Trust pursuant to clause (a) of Section 2.2 on the Closing Date, (ii) any scheduled payment of principal or interest in respect of any series of the New GO Bonds, or (iii) any scheduled payment due on the GO CVIs, the Trustee shall distribute such amounts, net of any outstanding Trustee Costs that are due and payable or to be reimbursed to the Trustees as of the related distribution date, Other Trust Costs to be reimbursed under Section 7.5(c) and amounts necessary to fund the Fee Reserve to the Fee Reserve Threshold Amount, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date. The Trustee shall pay or reimburse such Trustee Costs, reimburse such Other Trust Costs and fund the Fee Reserve at the time of such distribution.

(b)    The Trustee shall establish the Record Date for the distribution of (i) any other funds deposited or to be deposited in the General Collection Account or (ii) any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, and the Trustee shall send notice to the Unitholders of such Record Date and the related anticipated distribution date of such amounts, in accordance with Section 11.4, in each case not later than two (2) Business Days after the Trust's receipt of such funds or payments. Such Record Date shall be at least 10 days and no more than 15 days after the date such notice is posted on EMMA. On such distribution date, the Trustee shall distribute such amounts, in the case of clause (i) net of any outstanding Trustee Costs that are due and payable as of such distribution date, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date.

(c)    Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date in accordance with the procedures of the Depositary.

Section 3.5    Threshold Event or Permitted Sale Event.

(a)    The Trustee shall not sell any New GO Bonds or GO CVIs except upon a Threshold Event or Permitted Sale Event and subject to the terms of Section 3.5(b), provided that

14

the Trustee shall be authorized to make the assignments and transfers contemplated by Sections 3.3 and 3.6. Upon the Trustee's receipt of a notice substantially in the form of Exhibit E-1 attached hereto as contemplated by clause (ii) of the definition of "Permitted Sale Event", the Trustee shall (i) provide the notice to Unitholders contemplated by clause (iii) of such definition (with a copy of such notice to FGIC) as soon as practicable and in any event within three (3) Business Days of receiving FGIC's notice, and (ii) no later than the tenth (10th) Business Day following the date of such notice to Unitholders, notify FGIC in writing whether the Trustee has received a written objection from the Requisite Unitholders as contemplated by clause (iv) of such definition.

(b)     Upon the occurrence of a Threshold Event or Permitted Sale Event with respect to which FGIC has provided written instruction to the Trustee (substantially in the form of Exhibit E-2 hereto, in the case of a Threshold Event, or Exhibit E-3 hereto, in the case of a Permitted Sale Event) to sell some or all of one or more series of New GO Bonds or the GO CVIs, the Trustee shall seek to sell such New GO Bonds or GO CVIs to the person(s) identified to the Trustee by FGIC in such instruction (which instruction shall also include the applicable sale price(s), the information for the account(s) to which such New GO Bonds or GO CVIs shall be transferred by the Trustee and any other details, including relevant broker(s), to be utilized by the Trustee for such sale) as soon as practicable and in any event within one (1) Business Day of receiving such instruction, provided that: (i) any such sale is made at price(s) that equal or exceed the Fair Market Value applicable to such sale, as confirmed to the Trustee by FGIC, (ii) any such sale is made at price(s) that equal or exceed the applicable Threshold Price in the case of a Threshold Event or the applicable Permitted Sale Price in the case of a Permitted Sale Event, and (iii) all proceeds of such sales shall be deposited into the General Collection Account.

Section 3.6     Surrendered Units.

(a)     Subject to satisfaction of the conditions set forth in Section 3.6(b), any Unitholder may, at any time and from time to time, elect to surrender Units held by such Unitholder (as confirmed by the Depositary) to the Trustee for cancellation (the "Surrendered Units") in exchange for a transfer to such Unitholder of its proportional percentage of the New GO Bonds and GO CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, by giving written notice thereof to FGIC and the Trustee (a "Unitholder Election").

(b)     The following conditions must be satisfied to permit and effectuate any Unitholder Election: (i) FGIC shall, in its sole discretion, have consented in writing to such Unitholder Election (other than any Unitholder Election in connection with which FGIC shall not have agreed or otherwise be obligated to pay any consideration for the release set forth in clause (iv) below), (ii) the Surrendered Units shall be cancelled by the Trustee with an automatic and immediate corresponding reduction in the aggregate Notional Amount of the Units and the Trustee shall deliver written notice of such cancellation and reduction to the Depositary, (iii) the outstanding principal amount of the Covered FGIC Insured Bonds shall automatically and immediately be reduced on a proportionate dollar-for-dollar basis (based on the proportion of the Notional Amount of such Surrendered Units to the aggregate Notional Amount of the Units at that time) with an automatic and immediate corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy, which reductions shall be acknowledged by the Trustee, and (iv) such Unitholder shall execute and deliver a release, in form and substance satisfactory to FGIC,

15

releasing all rights and claims of any kind it may have relating to the Surrendered Units or the Covered FGIC Insurance Policy subject to receipt of consideration, if any, that FGIC shall have agreed in writing to pay to such Unitholder in consideration for release.  Upon satisfaction of such conditions, the Trustee shall transfer to the Unitholder ownership of the applicable proportional percentage of the New GO Bonds and GO CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, as directed by FGIC.  FGIC's consent to any Unitholder Election shall not limit its right, in its sole discretion, to deny its consent to any other Unitholder Election.

Section 3.7   <u>FGIC Election to Accelerate Policy Payments.</u>

(a)   Section 3.7(b) shall apply to the Trust and the Covered FGIC Insurance Policy as of the date that is thirty (30) Business Days following the Closing Date unless the Requisite Unitholders notify the Trustee in writing prior to such date of their election that Section 3.7(b) shall not so apply.

(b)   Pursuant to the Plan, the payment of the principal of the Covered FGIC Insured Bonds was accelerated and such Covered FGIC Insured Bonds are due and payable at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon, or 100% of accreted amounts thereon, to the date of payment.  FGIC is not obligated to pay any claims on an accelerated basis under the Covered FGIC Insurance Policy. FGIC shall have the right, in its sole and absolute discretion, to elect at any time to permit a claim under the Covered FGIC Insurance Policy in the amount of such acceleration price at such time (regardless of whether the Trustee shall have submitted a claim therefor to FGIC) and to make payment to the Trustee in respect of such permitted claim under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan; <u>provided</u>, <u>however</u>, that FGIC shall not be obligated to make all or any portion of such payment, unless and until, with respect to the portion of such payment relating to the principal of the Covered FGIC Insured Bonds which will be paid or deemed to be paid by FGIC in cash (the "<u>Cash Acceleration Payment</u>"), the Trustee shall have executed and delivered to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Acceleration Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, as confirmed by FGIC, and taken such action as shall be necessary to transfer such Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)   At any time, Requisite Unitholders can notify the Trustee of an election that Section 3.7(b) shall apply notwithstanding a prior election under Section 3.7(a), and such notice will be effective upon agreement by FGIC within 30 Business Days of such notification.

# ARTICLE IV

## REPORTING/REMITTING TO UNITHOLDERS

Section 4.1     Statements to Unitholders and FGIC.

On a quarterly basis, the Trustee shall prepare and post a statement to EMMA, in the form attached hereto as Exhibit B and provide notice of such statement to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 setting forth:

(a)     all distributions made from the General Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis), identifying the portion thereof attributable to the amount of (i) asset sales; (ii) principal and interest payments; and (iii) CVI payments;

(b)     all distributions made from the FGIC Insurance Policy Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis);

(c)     the principal amount (or accreted amount, as applicable) as of the quarter end of each CUSIP number of New GO Bonds and GO CVI held by the Trust (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per Unit basis);

(d)     the DPO balance and DPO Accretion balance associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy as of the quarter end, to the extent such information has been furnished to the Trustee by FGIC;

(e)     the principal amount of, and the accrued and unpaid interest on, the Covered FGIC Insured Bonds as of the end of the quarter, together with a description of the changes in such amounts during the quarter;

(f)     any notices received by the Trustee from FGIC in connection with any required DPO and DPO Accretion payments associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy;

(g)     (i) the respective amounts paid to the Trustees for trustee fees, other Trustee Costs under Section 7.5(a), Trustee Costs under Section 7.5(b) and indemnification amounts under Section 7.12, a description of such indemnification amounts and Trustee Costs, (ii) the amount of any Other Trust Costs reimbursed under Section 7.5(c), if applicable, and (iii) the ending Fee Reserve balance for each quarter; and

(h)     any required tax reporting for such period.

Section 4.2     Compliance with Withholding Requirements.

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depositary and the Unitholders that the Trustee reasonably believes are applicable under the Code. The consent of the

Depositary and the Unitholders shall not be required for such withholding.  In the event the Trustee does withhold any amount from payments to the Depositary or any Unitholder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depositary or such Unitholder the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Depositary or Unitholder, as the case may be, in the amount of the withholding for all purposes and shall thereby reduce amounts otherwise distributable to the Depositary or such Unitholder.  If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

## ARTICLE V

## THE UNITS

Section 5.1       The Units.

(a)       The Units shall be evidenced by the Certificate issued by the Trustee to the Depositary in accordance with Section 5.2(a).

(b)       The aggregate Notional Amount of the Units issued under this Trust Agreement shall be limited to the aggregate outstanding principal amount of the Covered FGIC Insured Bonds as of the Closing Date that are deposited into the Trust on the Closing Date, as shown on Exhibit A.  The beneficial ownership of the Units as of the Closing Date shall be allocated by the Depositary among the Original Holders on a proportionate basis based on their respective Covered FGIC Insured Bonds that are deposited, or deemed hereunder to have been deposited, into the Trust on the Closing Date.

(c)       All Units issued under this Trust Agreement shall be evidenced by the same Certificate, subject to the requirements of the Depositary, and otherwise identical in all respects. All Units issued under this Trust Agreement shall be in all respects equally and ratably entitled to the benefits hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery, and shall be held and transferable only through the Depositary.

(d)       No additional interests in the Trust other than the Certificate and the Units shall be issued hereunder, except in accordance with Section 5.3.

Section 5.2       The Certificate; Book-Entry-only System.

(a)       On the Closing Date, upon deposit of all of the Trust Assets into the Trust pursuant to the Plan of Adjustment and as provided in Section 2.2, the Trustee shall issue to the Depositary the initial Certificate by executing and delivering the Certificate, on behalf of this Trust, with the manual or facsimile signature of an authorized officer or other agent of the Trustee.

(b)       The Trust shall issue the Certificates to the Depositary.  Consistent with DTC book-entry provisions, one or more typewritten Certificates shall be prepared and registered in the name of the Depositary or its nominee.  There shall be no physical delivery of the Certificate or Units to the Unitholders (other than the Depositary) or other beneficial owners.

(c)     Each of the Trustees is hereby authorized and directed to take all actions required for the global Certificate and Units to be eligible under the rules and regulations of the Depositary for investment and trading as uncertificated securities.[3]  DTC is hereby appointed as the initial Depositary, with Cede & Co., a nominee thereof, being the initial registered owner of the Certificate. In the event that any Depositary resigns or is removed, the Trustee shall select a substitute Depositary. Notwithstanding anything herein to the contrary, the Trust and each of the Trustees, and any agent of the Trust or either of the Trustees, may treat any Depositary in whose name any Certificate is registered as the owner of the Units for all purposes, including for actions by Unitholders. For so long as the Depositary is the registered owner of the Certificate, procedures with respect to the transmission of notices and the transfer of ownership and payment of Units shall be in accordance with arrangements between the Trustee and the Depositary. The Certificate shall be issued in global form and the Units represented thereby shall be freely tradeable and transferable through the Depositary.

(d)     Notwithstanding anything herein to the contrary, so long as the Certificate is registered in the name of the Depositary, the Trust and the Trustee shall have no responsibility or obligation to any Depositary participant, indirect participant or beneficial owner of the Certificate or Units. Without limiting the immediately preceding sentence, the Trust and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of any Depositary or any Depositary participant or indirect participant with respect to any beneficial ownership interest in the Certificate, (ii) the delivery to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any notice with respect to the Certificate or Units, including any notice of Record Date, distribution date, payment, redemption or tender, or (iii) the payment to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any amount with respect to Units or Certificate. The rights of Unitholders shall be limited to those established by law and agreements between the Unitholders and the Depositary and Depositary participants and as provided herein.

(e)     A CUSIP number will be imprinted on the Certificate, but such CUSIP shall not constitute a part of the contract evidenced by the Certificate or Units. As a convenience to the Depositary and Unitholders, the Trust and the Trustees may use such CUSIP numbers in any notices to the Depositary and Unitholders.

Section 5.3     Mutilated, Destroyed, Lost and Stolen Certificate.

(a)     If (i) any mutilated Certificate is presented to the Trustee or (ii) the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Trustee such security or indemnity as it may require to save it harmless, and the Trustee has not received notice that such Certificate (and the Units represented thereby) has been acquired by a protected purchaser, then, in each case, the Trustee shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, form, terms and principal amount, bearing an identifying number not used

---

[3] Being discussed by FGIC and U.S. Bank.

by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

(b)    Upon the issuance of any new Certificate under this Section, the Trustee may require the payment by the Certificate holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(c)    Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Assets to the extent provided herein, whether or not the destroyed, lost or stolen Certificate shall be at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement.

(d)    The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

Section 5.4    No Obligation to Register.

The Trustee is not obligated to register or qualify any Certificate or Unit under the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder, or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

Section 5.5    Persons Deemed Owners.

Subject to Section 5.3, but notwithstanding anything else in this Trust Agreement, the Trustee and any agent of the Trustee may treat the Depositary or its nominee in whose name the Certificate is registered as the owner of the Units on the related distribution date for the purpose of receiving distributions on such Units and for all other purposes whatsoever, including for actions by Unitholders, and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary. All distributions made hereunder to the Depositary or its nominee, or upon its order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability for moneys distributable upon the Units.

Section 5.6    Cancellation.

All Certificates evidencing Units surrendered for payment, redemption, transfer or exchange shall be delivered to the Trustee and shall be promptly canceled by the Trustee. The Trustee and no one else will cancel all such Certificates surrendered for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Certificates in accordance with its customary procedures. No Certificate shall be authenticated in lieu of or in exchange for any Certificates canceled as provided in this Section, except as expressly permitted by this Trust Agreement.

# ARTICLE VI

## NEW GO BONDS AND GO CVIs

Section 6.1     Voting Rights with Respect to New GO Bonds and GO CVIs.

(a)     Within three (3) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the New GO Bonds or the GO CVIs (or any other securities or property received in respect thereof or in exchange therefor), the Trustee shall deliver a copy of such notice to FGIC and the Unitholders.

(b)     The voting and direction rights allocable to the owners of the New GO Bonds and GO CVIs (or any other securities or property received in respect thereof or in exchange therefor) pursuant to the terms thereof (including voting and direction rights in respect of remedies) ("Voting Rights") shall be allocated to FGIC unless FGIC is in default under the Covered FGIC Insurance Policy (a "Voting Rights Condition"). Upon the written request of FGIC, subject to the immediately preceding sentence, the Trustee shall vote in accordance with any instruction set forth in such written request.  Upon the occurrence and continuation of a Voting Rights Condition, the Voting Rights will be deemed to be held on a pro rata basis by the Unitholders, and the Trustee may act at the direction of the Requisite Unitholders.

# ARTICLE VII

## CONCERNING THE TRUSTEE

Section 7.1     Duties of Trustee.

(a)     Every provision of this Trust Agreement relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VII.

(b)     The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee.

(c)     The Trustee shall (at the direction of the Requisite Unitholders) take all necessary or desirable actions to enforce the Covered FGIC Insurance Policy against FGIC as set forth herein.

(d)     The Trustee shall deliver to all Unitholders copies of all notices and written communications received from the Commonwealth as they relate to the New GO Bonds and GO CVIs.

(e)     Except as provided in Section 7.2 hereof, no provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act, bad faith or willful misconduct; provided, however, that:

(i)      The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(ii)      The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of FGIC or the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New GO Bonds or GO CVIs exercising any trust or power conferred upon the Trustee with respect to the New GO Bonds or GO CVIs, under this Trust Agreement;

(iii)      The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Covered FGIC Insurance Policy or exercising any trust or power conferred upon the Trustee with respect to the Covered FGIC Insurance Policy, under this Trust Agreement; and

(iv)      Any determination of gross negligence, bad faith or willful misconduct of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

Section 7.2      Certain Matters Affecting the Trustee.

(a)      The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)      The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of this Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)      The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)      The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of the Requisite

22

Unitholders, pursuant to the provisions of this Trust Agreement, unless such Unitholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Trust Agreement;

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by FGIC or the Requisite Unitholders; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of this Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)     The Trustee may execute any of the trusts or powers under this Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under this Trust Agreement;

(h)     Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 7.1;

(i)     The Trustee shall not be deemed to have notice of any matter unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, the Commonwealth, the Trust or this Trust Agreement;

(j)     None of the provisions of this Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)     Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)     The permissive rights of the Trustee to perform any discretionary act enumerated in this Trust Agreement shall not be construed as a duty or obligation, and the Trustee shall not be answerable in the performance of such act other than for its gross negligence, bad faith or willful misconduct;

(m)     The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)     The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to this Trust Agreement believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)     The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of this Trust Agreement or any related document;

(p)     The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under this Trust Agreement, and shall have a duty only to accept such collateral or funds delivered to it in accordance with this Trust Agreement;

(q)     The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(r)     The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement;

(s)     All rights of action under this Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units or the Certificate, or the production thereof at the trial or other proceeding relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the provisions of this Trust Agreement; and

(t)     The Trustee shall establish a Fee Reserve, which Fee Reserve shall be replenished up to the Fee Reserve Threshold Amount in accordance with Section 3.4(a), and the Trustee shall be permitted to apply the amounts therein to pay Trustee Costs.

Section 7.3     Trustee Not Liable for Units or New GO Bonds, GO CVIs, the Covered FGIC Insured Bonds or the Covered FGIC Insurance Policy.

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement and in the Trust Units or Certificate. The Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Certificate) or of the New GO Bonds, GO CVIs, the Covered FGIC Insured Bonds, the Covered FGIC Insurance Policy or related documents.

The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the New GO Bonds or GO CVIs or deposited in or withdrawn from the Trust in accordance with this Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Article III. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the New GO Bond Legislation or the New GO Bond Indentures.

Section 7.4      Trustee May Own Units.

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

Section 7.5      Trustee Costs and Expenses.

(a)      The Trustees shall each be entitled to receive from the Trust (i) fees agreed upon in writing, including in the Trustee Fee Letter, (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of the Trustees in the execution of the trusts created under this Trust Agreement and in the exercise and performance of any of the powers and duties thereunder or the administration of the Trust, (ii) reimbursement for (x) all reasonable fees, expenses, costs and disbursements incurred or made by either of the Trustees in accordance with any of the provisions of this Trust Agreement, including Section 7.5(b) hereof (including the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), and (y) their indemnities pursuant to Section 7.12 hereof, and (iii) amounts to be promptly used by the Trustee to pay any reasonable fees, expenses or costs then owed by the Trust in accordance with this Trust Agreement and not covered by clause (ii) of this Section 7.5(a) (collectively, the "Trustee Costs"). [For the avoidance of doubt, it is understood and agreed by the Parties that Trustee Costs under clause (ii) or (iii) of this Section 7.5(a) may include amounts of reasonable fees, expenses, costs, disbursements or indemnities that properly relate to the Trust and to one or more other trusts created under other trust agreements to which the Commonwealth, FGIC and the Trustees are party, which amounts have been reasonably and fairly allocated by the Trustee to the Trust in good faith as the Trust's share and are described in each relevant statement prepared and provided by the Trustee pursuant to Section 4.1.][4] All such Trustee Costs shall be paid to the Trustees in accordance with the provisions of Section 3.4 hereof or taken from the Fee Reserve.

(b)      In furtherance of Section 7.5(a), each of the Trustees shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Unitholders against the Commonwealth, the Trust, or such Trustee except for proceedings, litigation or enforcement actions that relate to such Trustee's grossly negligent action, grossly negligent failure to act, bad faith or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

---

[4] Under continuing review by U.S. Bank.

(c)     For the avoidance of doubt, neither the Commonwealth nor FGIC shall be liable for any Trustee Costs or Other Trust Costs.  FGIC may, in its sole discretion, elect to pay any Other Trust Costs, in which case FGIC shall be reimbursed by the Trustee at the time of the next distribution of any amount under Section 3.4(a) hereof upon notifying the Trustee of the amount to be so reimbursed.

Section 7.6     Eligibility Requirements for Trustee and Successor Trustee.

The Trustee and any successor Trustee shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the Commonwealth or FGIC; (ii) is neither affiliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is a nationally recognized financial institution and fiduciary regularly acting as a trustee in the municipal finance market. If such corporation or national banking association publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee or successor Trustee shall cease to be eligible in accordance with the provisions of this Section, such Trustee or successor Trustee shall resign immediately in the manner and with the effect specified in Section 7.7.

Section 7.7     Resignation and Removal of the Trustee.

(a)     The Trustee may at any time resign and be discharged from the trusts created pursuant to this Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee. Upon receiving such notice of resignation, FGIC shall promptly appoint a successor trustee meeting the requirements set forth in Section 7.6 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Unitholders and posted to EMMA by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)     If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 7.6 and shall fail to resign after written request therefor by FGIC or the Requisite Unitholders, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then FGIC or the Requisite Unitholders may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

26

(c)     FGIC, with the written consent of the Requisite Unitholders, may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(d)     The Requisite Unitholders, with the written consent of FGIC (which consent shall not be unreasonably withheld or delayed by FGIC in the event the Trustee is in default of its obligations hereunder to enforce the Covered FGIC Insurance Policy), may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(e)     Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 7.8 hereof. The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the Trust, including the costs and expenses incurred in connection with any such succession.

(f)     Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 7.8 hereof and (ii) payment of all costs, expenses and indemnities due and owing to the outgoing Trustee, including the costs and expenses incurred in connection with any such succession. In the event the Trustee is removed due to a request by the Requisite Unitholders pursuant to Section 7.7(b), then the fees and expenses of the successor trustee incurred in connection with any such succession shall be the sole responsibility of the Unitholders requesting such removal.

(g)     The compensation for any successor trustee shall be paid in substantially the same manner as compensation was paid to the predecessor trustee.

(h)     Notwithstanding the replacement of the Trustee pursuant to this Section 7.7, the rights, benefits, protections and indemnities afforded to the Trustee under this ARTICLE VII shall continue to the benefit of the retiring Trustee.

Section 7.8     Successor Trustee.

(a)     Any successor trustee appointed as provided in Section 7.7 shall execute, acknowledge and deliver to the Unitholders, FGIC and the predecessor trustee an instrument accepting such appointment under this Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein. The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under this Trust Agreement and the predecessor trustee shall execute and

27

deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)      No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of this Section 7.6 hereof.

(c)      Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under this Trust Agreement and (b) provide notice of the succession of such trustee under this Trust Agreement to the Depositary.

Section 7.9    Merger or Consolidation of Trustees.

Any Person into which either of the Trustees may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which such Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of such Trustee, shall be the successor of such Trustee under this Trust Agreement, provided such Person shall be eligible under the provisions of Section 7.6 (as to the Trustee) and 7.14 (as to the Delaware Trustee), without the execution or filing of any paper or any further act on the part of any of the Parties, anything herein to the contrary notwithstanding.

Section 7.10    Appointment of Trustee Custodians.

The Trustee may appoint one or more custodians (each a "Trustee Custodian") to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Trustee Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee. Subject to ARTICLE VII, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Trustee Custodian for the benefit of the Unitholders. Each Trustee Custodian shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Trustee Custodian may not be an Affiliate of the Commonwealth or FGIC. The Trustee is responsible for the fees and expenses of any Trustee Custodian appointed hereunder.

Section 7.11    Trustee May Enforce Claims Without Possession of Certificate.

All rights of action and claims under this Trust Agreement or the Certificate may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Unitholders in respect of which such judgment has been recovered.

Section 7.12   Trustee Indemnity.

The Trust shall indemnify the Trustees for, and hold them harmless against, any loss, liability or expense arising out of or in connection with their acceptance or administration of the Trust, including the reasonable costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their respective powers or duties hereunder, provided in each case that such loss, liability, expense, cost or claim does not relate to or arise out of or in connection with either Trustee's gross negligence, bad faith or willful misconduct.

Section 7.13   Acceptance by Trustees, Representations and Warranties of Trustees.

The Trustees each hereby undertake to perform their respective obligations set forth herein. The Trustee hereby agrees to hold the Trust Assets, as trustee in trust on behalf of the Trust upon the terms and conditions and for the use and benefit of the Unitholders as herein set forth. The Trustees each as to itself hereby represent and warrant to each of the Commonwealth, FGIC, holder of the Certificate and holders of the Units that as of the Closing Date:

(a)   it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(b)   it has full corporate power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance by it of this Trust Agreement, including the execution and delivery of the Certificate on behalf of the Trust;

(c)   the execution and delivery of this Trust Agreement by it and its performance of and compliance with the terms of this Trust Agreement will not violate its certificate of incorporation, association or other constituent documents or by-laws or constitute a default under, or result in the material breach or acceleration of, any material contract, agreement or other instrument to which it is a party or which may be applicable to it or any of its assets;

(d)   as of the Closing Date, this Trust Agreement has been duly executed and delivered by it and, assuming the due authorization, execution and delivery of this Trust Agreement by each of the other parties hereto, constitutes the legal, valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(e)   it is not in violation, and the execution and delivery of this Trust Agreement by it and its performance and compliance with the terms thereof will not constitute a violation, of any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over it or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of it or its properties or on the performance of its duties hereunder;

(f)   there are no actions or proceedings against, or investigations of, it pending, or, to its knowledge, threatened, before any court, administrative agency or other tribunal (i) that

29

could reasonably be expected to prohibit its entering into this Trust Agreement, (ii) seeking to prevent the issuance of the Certificate contemplated by this Trust Agreement or (iii) that could reasonably be expected to materially affect the performance by it of its obligations under, or the validity or enforceability against it of, this Trust Agreement; and

(g)     no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by it of, or compliance by it with, this Trust Agreement, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date, other than the filing of the Certificate of Trust with the Secretary of State.

Section 7.14     The Delaware Trustee.

(a)     There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and acts through one or more persons authorized to bind such entity.  The initial Delaware Trustee shall be U.S. Bank Trust National Association.  The Delaware Trustee shall be entitled to all of the rights, privileges, immunities, indemnities and protections afforded to the Trustee hereunder, but will only have such responsibilities and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)     The Delaware Trustee shall be one of the trustees of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Trust Statute and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Trust Statute. The duties, liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware; and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Delaware Trust Statute (only upon the written direction of the Trustee); and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  With the exception of the express duties set forth in this Section 7.14 (b), and the implied contractual covenant of good faith and fair dealing, all other duties of the Delaware Trustee, including fiduciary duties, are expressly eliminated.  The Delaware Trustee shall have no liability to the Trust, to the Trustee, to any beneficiary, or to any other person that is a party to or is otherwise bound by this Trust Agreement for breach of contract or breach of duties (including fiduciary duties), except for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.  The Delaware Trustee shall not be liable for any acts or omissions, except for such losses, damages or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(c)     The Delaware Trustee shall not be liable for the acts or omissions of the Trust, the Trustee or any other person or entity, nor shall the Delaware Trustee be liable for supervising or

30

monitoring the performance of the duties of the Trustee or the Trust or of any other person or entity under this Trust Agreement or any related document.

(d)      The Delaware Trustee shall not be personally liable for any error of judgment made by an Officer of the Delaware Trustee having direct responsibility for the administration of this Trust Agreement in good faith.

(e)      No provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its duties hereunder.

(f)      Under no circumstance shall the Delaware Trustee, in its individual capacity or in its capacity as Delaware Trustee, or any member, partner, shareholder, director, officer, employee, agent, affiliate or advisor of the Delaware Trustee or their respective affiliates be personally liable for any representation, warranty, covenant, agreement, liability or indebtedness of the Trust, as all such representations, warranties, covenants, agreements, liabilities or indebtedness of the Trust are those of the Trust as an entity.

(g)      The recitals contained herein shall not be taken as the statements of the Delaware Trustee, and the Delaware Trustee does not assume any responsibility for their correctness.  The Delaware Trustee shall not be personally responsible for or in respect of, and the Delaware Trustee makes no representations as to, the title to, or value or condition of, the property of the Trust or any part thereof, including the Trust Assets or Trust Estate, nor as to the validity or sufficiency of this Trust Agreement or any related certificate, instrument or other document.

(h)      The Delaware Trustee may conclusively rely and shall be fully protected, and shall incur no liability to anyone, in acting or refraining from acting in good faith and in reliance upon any signature, instrument, notice, resolution, request, instruction, direction, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties.  The Delaware Trustee may accept a certified copy of a resolution of any governing body of any person as conclusive evidence that such resolution has been duly adopted by such person and that the same is in full force and effect.  As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein or whenever the Delaware Trustee shall deem it desirable that a fact or matter be proved or established prior to taking, suffering or omitting any action hereunder (including, direction by the Trustee with respect to such action), the Delaware Trustee may for all purposes hereof rely on a certificate, signed by any officer of the party delivering the certificate or, in the case of the Trustee, signed by the Trustee, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(i)      In accepting and performing its duties hereunder the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

31

(j)      The Delaware Trustee may be removed by FGIC with the written consent of the Requisite Unitholders upon thirty (30) days prior written notice to the Delaware Trustee, with a copy to the Trustee. The Delaware Trustee may resign upon thirty (30) days prior written notice to FGIC, with a copy to the Trustee. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably acceptable to FGIC, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware and satisfies the requirements of the Delaware Trust Statute. If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, FGIC or the Unitholders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

## ARTICLE VIII

## DEFAULT ON NEW GO BONDS OR GO CVIs

Section 8.1      Realization Upon Default.

(a)      The Trustee shall assert claims under the New GO Bonds or GO CVIs and the Covered FGIC Insurance Policy, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder following any default thereunder, with respect to the Covered FGIC Insurance Policy, in accordance with Section 3.3(b) hereof and, with respect to the New GO Bonds or GO CVIs, in accordance with Section 6.1(b) hereof.

(b)      If there is a breach, a default or an event of default with respect to any New GO Bond or GO CVI and such breach, default or event of default is known to the Trustee in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC as promptly as practicable, and, in any event, within three (3) Business Days after such breach, default or event of default becomes known to the Trustee. If the Trustee receives notice of an anticipated payment default with respect to any New GO Bond or the GO CVIs in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC within three (3) Business Days after receipt of such notice.

(c)      The foregoing provisions of this Section 8.1 shall apply equally to any other securities or property received in respect of the New GO Bonds or GO CVIs or in exchange therefor.

## ARTICLE IX

## TERMINATION OF TRUST

Section 9.1      Termination; No Redemption Rights.

Upon the indefeasible cancellation or other indefeasible termination or discharge of the Covered FGIC Insurance Policy or FGIC's obligations thereunder, the Trust (including the respective obligations and responsibilities under this Trust Agreement of the Trustee and FGIC) shall terminate upon (i) the pro rata payment or distribution to the Unitholders of all amounts or Trust Assets (including the New GO Bonds and GO CVIs) held by or on behalf of the Trustee and

required hereunder to be so paid or distributed, (ii) payment in full of any Trustee Costs due and owing to the Trustee under this Trust Agreement, and (iii) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of this Trust Agreement have been complied with. In no event shall the Trust be terminated or the New GO Bonds or GO CVIs be redeemed (except in the case of a redemption of the New GO Bonds or GO CVIs permitted under the terms of the New GO Bond Indentures or the New GO Bond Legislation) or otherwise released from the Trust Estate without the prior express written consent of FGIC if either (i) the Covered FGIC Insurance Policy or FGIC's obligations thereunder has not been indefeasibly terminated or discharged, or (ii) FGIC has not been indefeasibly paid in full for any amounts owed pursuant to the Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

Section 9.2    Procedure for Termination.

(a)    During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice to the Unitholders in accordance with Section 11.4 specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of the Certificate at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "Termination Notice").

(b)    If the Requisite Unitholders do not object in writing within 30 days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

(c)    Upon the dissolution, wind up and termination of the Trust and this Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

## ARTICLE X

## TAX PROVISIONS

Section 10.1    Grantor Trust Provisions.

The Trustee, the Commonwealth, the Unitholders (by their acceptance of the Trust Units) and FGIC each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve

the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (B) the Trust is formed to facilitate direct investment in the Trust Assets and the existence of multiple classes of ownership interests is incidental to that purpose, and (c) the Trustee (at the direction of FGIC and/or the Requisite Unitholders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701- 4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Unitholder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and FGIC each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

Section 10.2    <u>Characterization.</u>

Each Unitholder acknowledges and agrees to treat the Trust Units as undivided interests in the Trust Estate.

Section 10.3    <u>Grantor Trust Administration.</u>

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Unitholders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Unitholders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust as provided in Section 10.1 hereof. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Unitholders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "<u>Adverse Trust Event</u>"), unless the Trustee has obtained or received an Opinion of Counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Unitholders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received

34

or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

Section 10.4    Reports to Unitholders and Tax Authorities.

(a)    The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U. S. Treasury Regulations Section 1.671-5 (including U.S. Treasury Regulations Section 1.671-5(c)(1)), as amended or any successor provision (the "WHFIT Regulations").

(b)    Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to WHFIT Regulations, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustees, FGIC or the Commonwealth be liable for any liabilities, costs or expenses of the Trust or the Unitholders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence, bad faith or willful misconduct.

(c)    If any tax is imposed on the Trust, such tax, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) shall be charged to and payable by the Unitholders on a pro rata basis; provided that in each case the Trustee shall be authorized to withhold the applicable amounts from Distributions on the applicable Trust Units and pay such amounts to the applicable taxing authority and that any amounts so withheld and paid to the applicable taxing authority shall be deemed to have been paid as a Distribution to the applicable Unitholders.

(d)    The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)    All taxes due and payable on any amounts payable to a Unitholder with respect to a Trust Unit shall be that Unitholder's sole responsibility.

(f)    For the purposes of this ARTICLE X and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes,

35

including definitions, all references to holder, Unitholder, or beneficial owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Article and other provisions hereof.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1    <u>Amendment of Trust Agreement.</u>

(a)    This Trust Agreement may not be amended, waived or supplemented without the prior written consent of FGIC. This Trust Agreement may be amended, waived or supplemented from time to time by FGIC and the Trustee without the consent of any other Party or the Depositary or any Unitholders; <u>provided</u>, <u>however</u>, that no such amendment shall:

(i)    reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Unitholder without the written consent of such Unitholder;

(ii)    alter in any manner the treatment of the Covered FGIC Insurance Policy without the written consent of each Unitholder affected;

(iii)    amend this Section 11.1 without the written consent of each Unitholder; or

(iv)    amend the definition of Requisite Unitholders without the written consent of all Unitholders; or

(v)    adversely affect in any material respect the interests of the Unitholders in any manner other than as described in clause (i), (ii), (iii) or (iv) above without the written consent of the Requisite Unitholders.

(b)    Prior to executing any amendment permitted by this ARTICLE XI, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise. The Delaware Trustee may, but shall not be obligated to, enter into any such amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise.  No amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement shall be effective against the Delaware Trustee unless the Delaware Trustee has consented thereto in writing.  Prior to executing any amendment permitted by this ARTICLE XI, the Delaware Trustee shall be entitled to receive and conclusively and exclusively rely upon

36

written direction from the Trustee that such amendment is authorized and permitted by this Trust Agreement.

(c)     Promptly following the execution of this Trust Agreement, the Trustee shall post full and complete copies of this Trust Agreement on EMMA . Promptly after the execution of any amendment to this Trust Agreement, the Trustee shall furnish a copy of such amendment to the Depositary and shall post a copy of such amendment on EMMA.

(d)     The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Unitholders shall be subject to such reasonable regulations as the Trustee may prescribe in coordination with the Depositary.

Section 11.2    Counterparts.

This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts may be delivered by electronic messaging system and shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records (including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 11.3    Limitation on Rights of Unitholders.

(a)     The death or incapacity of any Unitholder shall not operate to terminate this Trust Agreement or the Trust, nor entitle such Unitholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the Parties or any of them.

(b)     No Unitholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the Parties, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Unitholders from time to time as partners or members of an association; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the Parties pursuant to any provision hereof.

(c)     No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Trust Agreement or any of the Trust Assets. Nothing in this paragraph shall be construed to limit in any manner the ability of any Party (notwithstanding the ownership by such

Party of Trust Units) to institute any suit, action or proceeding upon or under or otherwise with respect to this Trust Agreement or to enforce in any manner its rights as a party hereunder.

Section 11.4    Notices.

All demands, notices and certifications under this Trust Agreement shall be in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to each Party other than FGIC when personally delivered or mailed by first class mail, postage prepaid, or by express delivery service, to such Party at (a) in the case of the Trustee, U.S. Bank National Association,  100 Wall Street, 6th floor, New York, NY 10005, (b) in the case of the Delaware Trustee, U.S. Bank Trust National Association,  100 Wall Street, 6th floor, New York, NY 10005, and (c) in the case of the Commonwealth, _____, or in each of the above cases such other address as may hereafter be furnished by such Party to each other Party in writing. All demands, notices and certifications under this Trust Agreement shall be deemed to have been duly given to FGIC when transmitted by email to FGIC at both of the following email addresses: generalcounsel@fgic.com and edward.turi@fgic.com, or at such other email addresses as may hereafter be furnished by FGIC Party to each other Party in writing.  Unless a different means of giving notice or communication to Unitholders is specified herein, any notice or communication required or permitted to be given to a Unitholder shall be transmitted to the Depositary in accordance with its procedures. Any notice or communication so transmitted to the Depositary within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given to the Unitholders at the time of transmission, whether or not and regardless of when any Unitholder actually receives such notice or communication. A copy of any notice given hereunder to any other Party shall be delivered to the Trustee.  The Trustee shall post all notices delivered hereunder to EMMA within five (5) Business Days of receiving such notice or a copy of such notice, as applicable.

Section 11.5    Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of this Trust Agreement or of the Trust Units or the related rights of the Unitholders.

Section 11.6    Acts of Unitholders.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Trust Agreement to be given or taken by Unitholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Unitholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee and ownership of the Units held by such Unitholders is confirmed by Depositary. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Trust Agreement and conclusive in favor of the Trustee. The fact and date of

38

the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Depositary.

Section 11.7    Headings.

Article and Section headings in this Trust Agreement are included herein for convenience of reference only and shall not constitute a part of this Trust Agreement for any other purpose or be given any substantive effect.

Section 11.8    No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 11.9    Merger and Integration.

This Trust Agreement and the documents and exhibits expressly incorporated herein set forth the entire understanding of the Parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by this Trust Agreement.

Section 11.10  [Reserved].

Section 11.11  Patriot Act.

The Parties acknowledge that in accordance with Section 326 of the U.S.A.PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees. The Parties agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A.PATRIOT Act.

Section 11.12  Governing Law; Venue Jury Waiver.

THIS TRUST AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDERTHIS TRUST AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLYBASED UPON, ARISING OUT OF, OR LEADING TO THIS TRUST AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS TRUST AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY

39

ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS TRUST AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS TRUST AGREEMENT OR IN CONNECTION WITH THIS TRUST AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS TRUST AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS TRUST AGREEMENT. EACH PARTY TO THIS TRUST AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 11.13   <u>Force Majeure.</u>

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forces beyond their control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustees shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 11.14   <u>Intent of Parties.</u>

(a)     The Parties intend that, for all purposes, the transfer to the Trust of the Trust Estate pursuant to Section 2.2 in each case shall be, and shall be construed as, a transfer thereof to the Trust on behalf of the Original Holders in lieu of a transfer thereof to the Trust directly by the Original Holders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Closing Date, the Commonwealth will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Commonwealth or the Commonwealth's estate in the event of a liquidation, reorganization, or similar proceeding of the Commonwealth and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The Parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b)     The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Commonwealth.

(c)      Notwithstanding anything to the contrary in this Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Unitholders, FGIC, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not, and neither Trustee shall directly take any action that to its actual knowledge would, violate any of the following):

(i)      engage in any business or engage in any activity other than those activities expressly permitted in this Trust Agreement and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in this Trust Agreement;

(ii)      acquire or own any assets other than the Trust Estate or lease any assets;

(iii)      fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including in order to perform its obligations under this Trust Agreement;

(iv)      fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)      fail to act solely in its own name or in the name of the Trustee through duly authorized agents in the conduct of its activities;

(vi)      provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)      have its debts or other obligations guaranteed by any other Person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)      commingle its assets or liabilities with those of any other Person;

(ix)      fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)      divert funds for any purpose other than as set forth in this Trust Agreement;

(xi)      enter into any contract, agreement or transaction with any Unitholders, the Commonwealth, FGIC, any principal or other Affiliate of the Trust, or any shareholder, general partner, member, principal or Affiliate thereof, except as expressly authorized herein;

(xii)      maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

41

(xiii)   incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by this Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)   perform any duties or obligations of the Commonwealth or any other Person;

(xv)   make any loans or advances to any third party, including any Unitholder, the Commonwealth or any Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)   fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)   fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)   identify itself as a department or division of any other Person;

(xix)   fail to observe all formalities required of a Delaware statutory trust;

(xx)   fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require the Commonwealth to sell any assets, or make any capital contribution, to the Trust;

(xxi)   conduct any oral or written communication, including letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee; or

(xxii)   (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing.

(d)   Failure of the Trust, the Commonwealth, FGIC, any Unitholder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth

42

in this Section 11.14 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e)     To the extent that any provision of this Section 11.14 conflicts with, violates or otherwise is in contravention with any other provision of this Trust Agreement, the Parties and each Unitholder agree that the terms set forth in this Section 11.14 shall be controlling as expressly set forth herein.

Section 11.15  Non-Petition.

The Commonwealth, FGIC, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Unitholders, by accepting a Trust Unit, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another Person, the Trustee may file appropriate proofs of claim.

Section 11.16  Certain Terms Regarding the Commonwealth.

For the avoidance of doubt andnotwithstanding any terms appearing herein or elsewhere to the contrary:

(i)     The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Unitholders shall be extinguished. The Trust Units are not obligations of, and are not guaranteed by, the Commonwealth, and no recourse shall be had against any officer, director, manager, employee, security holder or incorporator of the Commonwealth, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)     The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Commonwealth assumes no responsibility for their correctness. The Commonwealth makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)     In purchasing any Trust Units the purchaser shall be deemed to acknowledge, represent and agree, that none of the Commonwealth nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Commonwealth or any of its affiliates.

(iv)     The Commonwealth shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

Section 11.17  <u>Certain Terms Regarding FGIC.</u>

(a)     In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly provide notice to FGIC with respect to each of the following:

(i)     any determination or intention of the Trustee or the Delaware Trustee to resign or terminate its duties hereunder;

(ii)     the amount of any cash received by the Trust, and the date on which it was received; and

(iii)     the amount of, and the Record Date and distribution date for, any distributions that the Trust is required to make to Unitholders.

(b)     The Trustee shall promptly furnish FGIC with copies of each report, notice or other communication sent to Unitholders. The Trustee shall seek to discuss and consult with FGIC regarding the same before sending them to Unitholders.

(c)     The Trustee, upon FGIC's request, shall provide additional information with respect to the Trust or the Trust Assets, including requesting from the Commonwealth information concerning the New GO Bonds or the GO CVIs and thereafter providing any such information received to FGIC.

(d)     The Trustee, upon FGIC's request, will discuss and consult with FGIC regarding matters concerning (i) the Covered FGIC Insured Bonds and FGIC's remaining obligations under the Covered FGIC Insurance Policy, including claims that the Trustee intends to assert thereunder, and (ii) the New GO Bonds and the GO CVIs held by the Trust.

**IN WITNESS WHEREOF**, the Parties have caused this Trust Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

**COMMONWEALTH     OF     PUERTO RICO**

By:

_____
Name:
Title:

FINANCIAL  GUARANTY  INSURANCE
COMPANY

By:_____
Name:
Title:

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:_____
Name:
Title:

U.S. BANK TRUST NATIONAL
ASSOCIATION, as Delaware Trustee

By:_____
Name:
Title:

## EXHIBIT A

Trust Assets

FGIC Insurance Policy Number:

FGIC Insured Bonds description and CUSIP number:

Covered FGIC Insured Bond principal amount:  [$_____] in aggregate principal amount

Allocable Plan Consideration:

     Cash:

     New GO CIBs:

     New GO 5.0% CABs:

     New GO 5.375% CABs:

     GO CVIs:

\NY - 021918/000051 - 10385277 v6

<u>**EXHIBIT B**</u>

[Form of Notice to Unitholders and FGIC]

[_____] CUSTODIAL TRUST
STATEMENT OF QUARTER ENDED [_], 20[__]

<u>**POSTED TO EMMA**</u>
U.S. Bank National Association, as Trustee

**1.    <u>Distributions to Unitholders (Sections 4.1(a) and (b))</u>**

|  | For Quarter Ended [_], 20__ | | Year to date, [_], 20[__] | |
|---|---|---|---|---|
| Source of Distributions | Aggregate Distributions | Per Unit Distributions | Aggregate Distributions | Per Unit Distributions |
| Asset Sales (Section 4.1(a)(i)) | $ | $ | $ | $ |
| Principal and interest payments (Section 4.1(a)(ii)) | | | | |
| CVI payments (Section 4.1(a)(iii)) | | | | |
| Policy Claim payments (Section 4.1(b)) | | | | |
| DPO payments (Section 4.1(b)) | | | | |
| DPO Accretion payments (Section 4.1(b)) | | | | |

**2.    <u>Balances of New GO Bonds and GO CVIs (Section 4.1(c))</u>**

|  | As of [_], 20[__] | |
|---|---|---|
|  | Aggregate principal/accreted amount of New GO Bonds/GO CVIs (by CUSIP) | Per Unit principal/accreted amount of New Go Bonds/GO CVIs (by CUSIP) |
| New GO Bonds CUSIP CUSIP CUSIP | $ | $ |
| GO CVIs CUSIP | | |

B-1

**3.**     **DPO and DPO Accretion Balances** **(Section 4.1(d))**

DPO balance as of last day of quarter:  $

DPO Accretion balance as of last day of quarter:  $

**4.**     **Covered FGIC Insured Bonds** **(Section 4.1(e))**

Accrued and unpaid interest on Covered FGIC Insured Bonds as of last day of quarter:  $

Principal amount of Covered FGIC Insured Bonds as of last day of quarter:  $

Description of change(s) in such amounts since prior quarter:


**5.**     **Payments to Trustees for such Quarter** **(Section 4.1(g))**

Fees paid to the Trustee:

Fees paid to the Delaware Trustee:

Trustee Cost amount(s) paid pursuant to Section 7.5(a)(ii) and description:

Trustee Cost amount(s) paid pursuant to Section 7.5(b) and description:

Indemnification amount(s) paid pursuant to Section 7.12 and description:

Ending Fee Reserve Balance:


**6.**     **Notices received by Trustee during such Quarter**
[Copy attached] [Not applicable]


**7.**     **Tax Reporting Required for such [Quarter][Year]**
[Copy attached] [Not applicable[5]]


**[8.**     **Other Trust Costs** **for such Quarter** **(Section 4.1(g)(ii))**

Other Trust Cost amount(s) reimbursed pursuant to Section 7.5(c):][6]

---

[5] May be used for quarterly reporting only.
[6] Include item 8 only if applicable to the Quarter.

B-2

## EXHIBIT C

[Form of Certificate]

[_____] CUSTODIAL TRUST CERTIFICATE

THIS CERTIFICATE IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS CERTIFICATE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT REFERRED TO BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS CERTIFICATE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS CERTIFICATE MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST TO WHICH THIS CERITIFCATE RELATES.

C-1

[_____] CUSTODIAL TRUST

Certificate No.  _____

Initial Notional Amount of Units: $[_____]

CUSIP: [_____]

This certifies that CEDE & CO. is the registered owner of this Certificate and of the [Notional Amount of the] Units evidenced by this Certificate.

The Units evidenced by this Certificate represent a beneficial ownership interest in the Trust created by the Trust Agreement (the "Trust Agreement"), dated as of [        ], 2022, with respect to the [_____] Custodial Trust (the "Trust"), by and among the Commonwealth of Puerto Rico (the "Commonwealth"), Financial Guaranty Insurance Company ("FGIC"), U.S. Bank National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement. This Certificate is issued under and subject to the terms, provisions andconditions of the Trust Agreement. By acceptance of this Certificate, the registered owner of this Certificate and each Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Assets, on the Closing Date, consist of: (i) the Allocable Plan Consideration comprising Cash, New GO Bonds and GO CVIs as specified on Exhibit A to the Trust Agreement; (ii) the Covered FGIC Insured Bonds as specified on Exhibit A to the Trust Agreement; (iii) the Covered FGIC Insurance Policy as specified on Exhibit A to the Trust Agreement; (iv) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (v) and any other  securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as  well as any other rights, benefits, protections, remedies and claims pertaining thereto.

Subject to the terms and conditions of the Trust Agreement and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions to Unitholders shall be distributed on each distribution date to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution and all distributions shall be in accordance with the terms of the Trust Agreement.

Distributions on this Certificate shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution in accordance with the procedures of the Depositary.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and

C-2

duties evidenced thereby. A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by the holder of this Certificate or any Unitholder at a time agreed upon by such holder or Unitholder and the Trustee.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the  holder of this Certificate or any Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust, and not in its individual capacity, has caused this Certificate to be duly executed.

[_____] CUSTODIAL TRUST

CERTIFICATE  NO. _____

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:_____
Name:
Title:

DATED:

Trustee's Certificate of Authentication:

This is the Certificate referred to in the within-mentioned Trust Agreement.

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:_____
Name:
Title:

C-3

## **EXHIBIT D**

[Form of Certificate of Trust]

CERTIFICATE OF TRUST OF
[_____] CUSTODIAL TRUST

THIS Certificate of Trust of [_____] Custodial Trust (the "Trust"), is being executed and filed by the undersigned as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, Sections 3801, *et seq.*) (the "Act").

1.      NAME.  The name of the statutory trust formed hereby is "[_____]
Custodial Trust."

2.      DELAWARE TRUSTEE.  The name and business address of the trustee of the Trust in the State of Delaware are U.S. Bank Trust National Association, 300 Delaware Avenue, 9th Floor, Wilmington, Delaware 19801.

3.      EFFECTIVE   DATE.    This   Certificate   of   Trust   shall   be   effective
[_____].

IN WITNESS WHEREOF, the undersigned, being the trustees of the Trust, have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

U.S.   BANK   TRUST   NATIONAL
ASSOCIATION, as Delaware Trustee


By:_____
Name:
Title:


U.S. BANK NATIONAL ASSOCIATION,
as Trustee


By:_____
Name:
Title:

D-1

**<u>EXHIBIT E-1</u>**

[Form of Notice Relating to Permitted Sale Event]

NOTICE

U.S. Bank National Association
100 Wall Street, Suite 1600
New York, NY 10005

      Re: <u>Permitted Sale Event</u>

Ladies and Gentlemen:

      Reference is made to the Trust Agreement, dated as of [_____], 2022 (as amended and supplemented from time to time, the "<u>Trust Agreement</u>"), with respect to the [_____] Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("<u>FGIC</u>"), U.S. Bank National Association, as trustee (the "<u>Trustee</u>"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

      This notice is being provided to the Trustee, as contemplated by clause (ii) of the definition of "Permitted Sale Event" and Section 3.5(a) of the Trust Agreement.  Accordingly, FGIC hereby notifies the Trustee of its intention to instruct the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [[the][each] series of the New GO Bonds] [and] [the GO CVIs] listed in <u>Annex A</u> in the [respective] amount[s] specified on <u>Annex A</u>, and notifies the Trustee that the [respective] Permitted Sale Price[s] for [such series of New GO Bonds] [and] [the GO CVIs] are as set forth on <u>Annex A</u>.

      **IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

                      **FINANCIAL GUARANTY INSURANCE COMPANY,**


                      By:_____
                      Name:
                      Title:

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice.

U.S. BANK NATIONAL
 ASSOCIATION, as Trustee


By:_____
Name:
Title:

**Annex A**

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

| GO CVIs |
|---|
| CUSIP No. |
| |

Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

**<u>EXHIBIT E-2</u>**

[Form of Notice and Instruction Relating to Threshold Event]

NOTICE AND INSTRUCTION

U.S. Bank National Association
100 Wall Street, Suite 1600
New York, NY 10005
> Re: <u>Threshold Event</u>

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of [_____], 2022 (as amended and supplemented from time to time, the "<u>Trust Agreement</u>"), with respect to the [_____] Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("<u>FGIC</u>"), U.S. Bank National Association, as trustee (the "<u>Trustee</u>"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This notice and instruction is being provided to the Trustee, pursuant to and in accordance with Section 3.5(b) of the Trust Agreement and as contemplated by the definition of "Threshold Event".  Accordingly, FGIC hereby (i) notifies the Trustee that the [respective] current market price[s] of [[the][each] series of New GO Bonds] [and] [the GO CVIs] listed in <u>Annex A</u> exceed[s] the [respective] Threshold Price[s] for [such series of New GO Bonds] [and] [such GO CVIs] specified on Annex A, and (ii) instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [such series of New GO Bonds] [and] [such GO CVIs] in the amount[s], at the sale price[s] and to the person[s] and account[s], and using the broker, if any, specified on <u>Annex A</u>.

**IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

> **FINANCIAL GUARANTY INSURANCE COMPANY,**
>
> By:_____
> Name:
> Title:

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice and Instruction.

U.S. BANK NATIONAL
 ASSOCIATION, as Trustee


By:_____
Name:
Title:

**Annex A**

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

| GO CVIs |
|---|
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

E-2-3

**EXHIBIT E-3**

[Form of Instruction Relating to Permitted Sale Event]

INSTRUCTION

U.S. Bank National Association
100 Wall Street, Suite 1600
New York, NY 10005

      Re: Permitted Sale Event

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of [_____], 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____ _____] Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This instruction is being provided to the Trustee pursuant to and in accordance with Section 3.5(b) of the Trust Agreement, based on FGIC's understanding that a Permitted Sale Event has occurred. Accordingly, as contemplated by its related Notice Relating to Permitted Sale Event dated as of [*] (the "Notice"), FGIC hereby instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, the [respective] amount[s] of [[the][each] series of New GO Bonds] [and] [the GO CVIs] referenced in the Notice, at the sale price[s] (which equal[s] or exceed[s] the [respective] Permitted Sale Price[s]) and to the person[s] and account[s], and utilizing the broker[s], if any, specified in Annex A hereto.

**IN WITNESS WHEREOF,** FGIC has executed and delivered this Instruction as of _____, 20__.

          **FINANCIAL GUARANTY INSURANCE COMPANY,**

          By:_____
          Name:
          Title:

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Instruction.

U.S. BANK NATIONAL
 ASSOCIATION, as Trustee


By:_____
Name:
Title:

**Annex A**

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Sale Price:[_____][7]

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
|  |  |

Principal Amount to be Sold: $[_____]

Sale Price:[_____] [8]

| GO CVIs |
|---|
| CUSIP No. |
|  |

Amount to be Sold: $[_____]

Sale Price:[_____][9]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

---

[7] Equals or exceeds the Permitted Sale Price of [_____].
[8] Equals or exceeds the Permitted Sale Price of [_____].
[9] Equals or exceeds the Permitted Sale Price of [_____].

F-3

## **EXHIBIT F**

Form of Trustee's Certification of Receipt of Certain Trust Assets

CERTIFICATION

To: FGIC and the Unitholders

Re: Receipt of Certain Trust Assets

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of [_____], 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank  National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This certification is being provided to the Unitholders and FGIC, pursuant to and in accordance with Section 2.3(b) of the Trust Agreement. Accordingly, the Trustee hereby certifies that as of the Closing Date, the Trustee (i) is in possession of Allocable Plan Consideration comprising cash in the amount set forth on Exhibit A of the Trust Agreement, (ii) confirms that [the New GO Bonds and the GO CVIs listed on Exhibit A of the Trust Agreement have been deposited to and are being held in the participant account of U.S. Bank National Association at the Depositary for the benefit of the Unitholders and FGIC] [it has received written statements from the trustees with respect to the New GO Bonds and the GO CVIs, respectively, confirming that the New GO Bonds and the GO CVIs listed on Exhibit A of the Trust Agreement are beneficially owned by the Trust for the benefit of the Unitholders and FGIC and being held by such trustees for the benefit of the Trust until the deposit of such New GO Bonds and GO CVIs to such account], and (iii) confirms that the Trust Units have been issued to the Original Holders.

**IN WITNESS WHEREOF,** the Trustee has executed and delivered this Certification as of _____, 2022.

U.S. BANK NATIONAL ASSOCIATION, as Trustee


By:_____
Name:

F-4

Title:

F-2

## EXHIBIT G

[Form of Assignment]

([_____] CUSTODIAL TRUST) ASSIGNMENT

ASSIGNMENT, dated as of _____, [__], 20____(this "Assignment"), by U.S. Bank National Association, as trustee for and on behalf of the Trust listed on Annex A hereto (the "Trust", and such trustee being the "Trustee"), to and for the benefit of Financial Guaranty Insurance Company ("FGIC").

### WITNESSETH:

WHEREAS, reference is made to (a) the Trust Agreement, dated as _____, 2022 (the "Trust Agreement"), with respect to the Trust, by and among the Commonwealth of Puerto Rico, FGIC, the Trustee, and U.S. Bank Trust National Association, as Delaware trustee for and on behalf of the Trust, and (b) the Covered FGIC Insurance Policy listed on Annex A hereto, issued by FGIC with respect to the Covered FGIC Insured Bonds described and the CUSIP for which is identified on Annex A hereto;

WHEREAS, Section 3.3(b) of the Trust Agreement[10] provides, among other things, that the execution and delivery of assignments (in substantially this form) by the Trustee on behalf of the Trust to FGIC (or its fiscal agent) is one of the conditions to FGIC's obligation to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan, in each case relating or with respect to the principal of the Covered FGIC Insured Bonds;

WHEREAS, Section 3.3(b) of the Trust Agreement further provides that, with respect to each such payment relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall execute and deliver on behalf of the Trust to FGIC (or its fiscal agent) assignments (in substantially this form) with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust (the "Proportionate Share")) of the Trust Assets held by the Trust,;

WHEREAS, for purpose of this Assignment, the Cash Payment and Proportional Share are set forth on Annex A hereto;

WHEREAS, in accordance with the terms of the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, FGIC (or its fiscal agent) will pay, or be deemed to have paid, the Cash Payment to the Trust, as the Bondholder under the Covered FGIC Insured Policy,

---

[10] This form of assignment shall also be used for any assignments pursuant to Section 3.7(b) of the Trust Agreement with conforming changes made by FGIC.

only after FGIC (or its fiscal agent) receives this Assignment executed and delivered by the Trustee on behalf of the Trust; and

WHEREAS, in accordance with the provisions of the Trust Agreement, the Trustee intends to effect the assignments and transfers to FGIC contemplated hereby on behalf of the Trust.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

**SECTION 1.   DEFINITIONS. CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE RESPECTIVE MEANINGS SET FORTH IN THE TRUST AGREEMENT.**

**SECTION 2.   ASSIGNMENT.**

(a)     Effective as of the date hereof and pursuant to the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, the Trustee on behalf of the Trust hereby irrevocably sells, assigns, transfers and conveys to FGIC the Proportionate Share of the Trust Assets held by the Trust as set forth in Annex A hereto (the "Assigned Trust Assets"), including all rights to payment under or with respect to the Assigned Trust Assets and all other rights therein or in relation thereto.   The Trustee shall (i) revise its registration books, and any other documents of record for the Trust Assets maintained by it, to reflect that the Assigned Trust Assets are no longer held by the Trust and have been sold, assigned, transferred and conveyed to FGIC hereunder and (ii) take such other actions as shall be necessary to transfer the Assigned Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing.

(b)     The Trustee on behalf of the Trust hereby covenants and agrees to convey to FGIC, if and when received following the date hereof, any amounts related to the Assigned Trust Assets (including any sums payable as interest in respect thereof) paid to or for the benefit of the Trust that, under subsection (a) above, belong to FGIC.

**SECTION 3.   REPRESENTATIONS AND WARRANTIES. THE TRUSTEE HEREBY REPRESENTS AND WARRANTS TO FGIC THAT:**

(a)      The Trust is the holder of the Assigned Trust Assets, and the Trustee has all requisite power and authority to execute, deliver and perform its obligations under this Assignment and to consummate the assignment contemplated herein on behalf of the Trust, and such assignment and execution and delivery of this Assignment by the Trustee  have been duly authorized.

(b)      This Assignment has been duly executed and delivered by the Trustee on behalf of the Trust and constitutes a  legal, valid and binding obligation of the Trust enforceable in accordance with its terms.

(c)      The Assigned Trust Assets are free and clear of all liens and encumbrances.

**SECTION 4.** <u>**GOVERNING LAW**</u>**. THIS ASSIGNMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.**

**SECTION 5.** <u>**COUNTERPARTS**</u>**. THIS ASSIGNMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH MAY BE DELIVERED BY ELECTRONIC MESSAGING SYSTEM AND SHALL BE DEEMED AN ORIGINAL, BUT ALL OF WHICH TOGETHER SHALL CONSTITUTE ONE AND THE SAME ASSIGNMENT.**

IN WITNESS WHEREOF, the Trustee has caused this Assignment to be duly executed and delivered on behalf of the Trust on the date first above written.

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By: _____
      Name:
      Title:

**ANNEX A**

Trust:  [_____] Custodial Trust

Covered FGIC Insurance Policy Number:

Covered FGIC Insured Bonds description and CUSIP number:

Cash Payment:  [$_____]

Total Principal Amount of Covered FGIC Insured Bonds held by the Trust as the date of this Assignment (immediately prior to receiving, or being deemed to have received, the Cash Payment):  [$_____]

Proportionate Share:  [XX.XXXX]% (Cash Payment/Total Principal Amount of Covered FGIC Insured Bonds)

Proportionate Share of the Trust Assets assigned by the Trustee hereunder:

     Cash:

     New GO CIBs:

     New GO 5.0% CABs:

     New GO 5.375% CABs:

     GO CVIs:

## <u>SCHEDULE I</u>

Threshold Prices

With respect to the New GO CIBs, the price equal to 97.5% of the par amount of such bonds, and with respect to the New GO 5.375% CABs and New GO 5.0% CABs, the price equal to 97.5% of the then accreted amount of such bonds, as calculated by FGIC, and with respect to the GO CVIs, the price equal to 35% of the notional amount of such GO CVIs.

61139615.v35

**<u>Redline of Exhibit G</u>**

Butler Snow Draft — 10/30/21**BUTLER SNOW DRAFT
AS OF 1/14/2022**

[_____] CUSTODIAL TRUST [1]

TRUST AGREEMENT

among

Commonwealth of Puerto Rico,

Financial Guaranty Insurance Company,

U.S. Bank National Association,
(as Trustee)

and

U.S. Bank Trust National Association,

(as Delaware Trustee)

---

[1] Form of Custodial Trust to be formed for each CUSIP of FGIC Insured Bonds under the Plan.  FGIC reserves the right to form one or more master trusts on a per-policy basis provided that each CUSIP shall be treated substantially the same as provided herein.

Butler Snow Draft — 10/30/21 BUTLER SNOW DRAFT
AS OF 1/14/2022

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; CONSTRUCTION ........................................................ 1
    Section 1.1   Definitions ......................................................................... 1
    Section 1.2   Rules of Construction ..................................................... 7
    Section 1.3   Article and Section References ...................................... 7

ARTICLE II TRUST ESTATE .............................................................................. 8
    Section 2.1   Creation of Trust. ............................................................ 8
    Section 2.2   Trust Assets. .................................................................... 8
    Section 2.3   Acceptance by Trustee. ................................................... 9
    Section 2.4   Purpose, Activities of the Trust. ..................................... 9
    Section 2.5   Limitations of the Trust. ................................................. 10

ARTICLE III ADMINISTRATION OF TRUST ...................................................... 11
    Section 3.1   Accounts. ........................................................................ 11
    Section 3.2   Investment of Funds in the Collection Accounts. ........... 12
    Section 3.3   FGIC Insurance Policy and Effect of Distributions. ...... 12
    Section 3.4   Distributions. .................................................................. 14
    Section 3.5   Threshold Event or Permitted Sale Event. ..................... 14
    Section 3.6   Surrendered Units. .......................................................... 1415
    Section 3.7   FGIC Election to Accelerate Policy Payments. ............... 1516

ARTICLE IV REPORTING/REMITTING TO UNITHOLDERS ............................... 1617
    Section 4.1   Statements to Unitholders and FGIC. ............................. 1617
    Section 4.2   Compliance with Withholding Requirements. ................. 17

ARTICLE V THE UNITS ..................................................................................... 1718
    Section 5.1   The Units. ........................................................................ 1718
    Section 5.2   The Certificate; Book-Entry-only System. ..................... 1718
    Section 5.3   Mutilated, Destroyed, Lost and Stolen Certificate. ........ 1819
    Section 5.4   No Obligation to Register. .............................................. 1920
    Section 5.5   Persons Deemed Owners. ............................................... 1920
    Section 5.6   Cancellation. ................................................................... 1920

ARTICLE VI NEW GO BONDS AND GO CVIs ................................................... 2021
    Section 6.1   Voting Rights with Respect to New GO Bonds and GO CVIs. ...... 2021

ARTICLE VII CONCERNING THE TRUSTEE ..................................... ~~20~~21

    Section 7.1    Duties of Trustee. ..................................................... ~~20~~21

    Section 7.2    Certain Matters Affecting the Trustee. ..................... ~~21~~22

    Section 7.3    Trustee Not Liable for Units or New GO Bonds ~~or~~, GO CVIs, the Covered
                     FGIC Insured Bonds or the Covered FGIC Insurance Policy. ....... 24

    Section 7.4    Trustee May Own Units. ........................................... ~~24~~25

    Section 7.5    Trustee Costs and Expenses. ................................... ~~24~~25

    Section 7.6    Eligibility Requirements for Trustee and Successor Trustee. ...... ~~25~~26

    Section 7.7    Resignation and Removal of the Trustee. ................ ~~25~~26

    Section 7.8    Successor Trustee. .................................................. 27

    Section 7.9    Merger or Consolidation of ~~Trustee~~Trustees. ............ ~~27~~28

    Section 7.10    Appointment of Trustee Custodians. ..................... ~~27~~28

    Section 7.11    Trustee May Enforce Claims Without Possession of Certificate. ... 28

    Section 7.12    Trustee Indemnity. ................................................ ~~28~~29

    Section 7.13    Acceptance by Trustees, Representations and Warranties of Trustees. ~~28~~29

    Section 7.14    The Delaware Trustee. ......................................... 30

ARTICLE VIII DEFAULT ON NEW GO BONDS OR GO CVI**s** ............... ~~29~~32

    Section 8.1    Realization Upon Default. ....................................... ~~29~~32

ARTICLE IX TERMINATION OF TRUST ............................................ ~~30~~32

    Section 9.1    Termination; No Redemption Rights. ..................... ~~30~~32

    Section 9.2    Procedure for Termination. ..................................... ~~30~~33

ARTICLE X TAX PROVISIONS ......................................................... ~~31~~33

    Section 10.1    Grantor Trust Provisions. ..................................... ~~31~~33

    Section 10.2    Characterization. ................................................... ~~31~~34

    Section 10.3    Grantor Trust Administration. .............................. ~~31~~34

    Section 10.4    Reports to Unitholders and Tax Authorities. .......... ~~32~~35

ARTICLE XI MISCELLANEOUS PROVISIONS .................................. ~~33~~36

    Section 11.1    Amendment of Trust Agreement. .......................... ~~33~~36

    Section 11.2    Counterparts. ....................................................... ~~34~~37

    Section 11.3    Limitation on Rights of Unitholders. ..................... ~~34~~37

    Section 11.4    Notices. ............................................................... ~~35~~38

    Section 11.5    Severability of Provisions. .................................... ~~35~~38

    Section 11.6    Acts of Unitholders. ............................................. ~~35~~38

Section 11.7    Headings. ......................................................................... 3639

Section 11.8    No Waiver; Cumulative Remedies. ............................... 3639

Section 11.9    Merger and Integration. .......................................... 3639

Section 11.10   The Delaware Trustee[Reserved]. .......................... 3639

Section 11.11   Patriot Act. .......................................................... 3739

Section 11.12   Governing Law; Venue Jury Waiver. ......................... 3739

Section 11.13   Force Majeure. .................................................... 3840

Section 11.14   Intent of Parties. ................................................. 3840

Section 11.15   Non-Petition. ...................................................... 4143

Section 11.16   Certain Terms Regarding the Commonwealth. ............. 4143

Section 11.17   Certain Terms Regarding FGIC. ............................... 4244


**EXHIBITS**

Exhibit A ‑‑ Trust Assets ................................................................ A-1
Exhibit B -  Form of Notice to Unitholder and FGIC ........................ B-1
Exhibit C ‑‑ Form of Certificate ..................................................... C-1
Exhibit D ‑‑ Form of Certificate of Trust ....................................... D-1
Exhibit E-1 - Form of Notice and Instruction Relating to Permitted SalesSale Event ..... E-1-1
Exhibit E-2 - Form of Notice and Instruction Relating to Threshold Event ........ E-2-1
Exhibit E-3 - Form of Instruction Relating to Permitted Sale Event ............ E-3-1
Exhibit F ‑‑ Form of Trustee's Certification of Receipt of Certain Trust Assets ..... F-1
Exhibit G ‑‑ Form of Assignment ................................................... G-1

**SCHEDULES**
Schedule I ‑‑ Threshold Prices ...................................................... S-I-1

[_____] CUSTODIAL TRUST

**TRUST AGREEMENT**

**THIS TRUST AGREEMENT**, dated as of _____, ~~2021~~2022 (this "<u>Trust Agreement</u>" or this "<u>Agreement</u>"), with respect to the [_____] Custodial Trust (the "<u>Trust</u>"), by and among the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), Financial Guaranty Insurance Company ("<u>FGIC</u>"), U.S. Bank National Association, as trustee (the "<u>Trustee</u>"), and U.S. Bank Trust National Association, as Delaware trustee (the "<u>Delaware Trustee</u>" and together with the Trustee, collectively the "<u>Trustees</u>", and with the Commonwealth and FGIC, collectively, the "<u>Parties</u>").

~~WHEREAS, in furtherance of the structure approved in the Commonwealth's Plan of Adjustment and in order to facilitate the implementation thereof, the Trust is being established by the Commonwealth and the Trustees solely for the benefit of and on behalf of the Unitholders and FGIC;~~

**WHEREAS**, except for the establishment of the Trust and the deposits therein pursuant to the Plan of Adjustment or as contemplated hereby, the Commonwealth shall have no other rights or obligations with respect to the Trust or with respect to any securities payable from the assets thereof; and

**WHEREAS**, the Trust is one of the FGIC Trusts contemplated by Section 75.4(a) of the Plan of Adjustment and is being formed for the purposes of (i) holding the Covered FGIC Insured Bonds, (ii) receiving FGIC Plan Consideration allocable or distributable in accordance with Section 24.1 of the Plan to the Original Holders, each component of which is identified on Exhibit A hereto (collectively, the "<u>Allocable Plan Consideration</u>"), (iii) being the sole holder and beneficiary of the Covered FGIC Insurance Policy, and (iv) issuing a single class of beneficial ownership interests consisting of trust units that shall be assigned a CUSIP number, be issued in global form and be registered in the name (or nominee name) of and transferable through the Depositary.

**NOW THEREFORE**, in consideration of the mutual promises, covenants, representations and warranties made in this Trust Agreement, the Parties hereby agree as follows;

**ARTICLE I**

**DEFINITIONS; CONSTRUCTION**

Section 1.1    <u>Definitions</u>

    (a)    Capitalized terms used in this Trust Agreement (including the recitals hereto), and not otherwise defined in this Trust Agreement, shall have the respective meanings assigned to such terms in the Plan.

    (b)    Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below:

1

"Affiliate": With respect to any specified Person, any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Business Day": Any day excluding Saturday, Sunday and any day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in San Juan, Puerto Rico or New York, New York are authorized or required by law or other governmental action to close.

"Cash Acceleration Payment": The meaning specified in Section 3.7.

"Cash Payment": The meaning specified in Section 3.3(b).

"Certificate": A definitive certificate substantially in the form attached as Exhibit C evidencing the Units and issued by the Trust pursuant to Article V hereof.

"Certificate of Trust":  The Certificate of Trust of the Trust substantially in the form attached as Exhibit D hereto.

"Closing Date": [          ], ~~2021~~2022, the effective date of the Plan.

"Code": The Internal Revenue Code of 1986, as amended, and Treasury Regulations promulgated thereunder.

"Corporate Trust Office": The Trustees' offices at ~~_____~~100 Wall Street, 6th floor, New York, NY 10005, or such other addresses as either of the Trustees' may designate from time to time by notice to the Unitholders , FGIC and the other Trustee.

"Covered FGIC Insured Bonds": The FGIC Insured Bonds held or beneficially owned by the Original Holders in the aggregate principal amount specified on Exhibit A, which are deposited into the Trust on the Closing Date and thereafter held by the Trust (as such bonds may be deemed to be paid, reduced or satisfied in accordance with the terms of this Trust Agreement or the FGIC Insurance Policy).

"Covered FGIC Insurance Policy": The FGIC Insurance Policy solely insofar as it applies and relates to the Covered FGIC Insured Bonds, including, for the avoidance of doubt, all rights relating to payments (if any) required to be made by FGIC in respect of any DPO and DPO Accretion associated with such Covered FGIC Insured Bonds under such FGIC Insurance Policy in accordance with the terms and conditions of the FGIC Rehabilitation Plan.  For the avoidance of doubt, (i) all FGIC Insured Bonds other than the Covered FGIC Insured Bonds shall be deemed no longer covered by the FGIC Insurance Policy as of the Closing Date for all purposes, and (ii) neither the Trust nor the Trustee shall have any rights under the FGIC Insurance Policy except in respect of the Covered FGIC Insured Bonds.

"Delaware Trustee": The meaning specified in the preamble hereto and any successor Delaware Trustee appointed in accordance with Section 11.10.

"Delaware Trust Statute": Chapter 38 of Title 12 of the Delaware Code.

"Depositary": DTC or any successor organization or any other organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act of 1934, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder.

"Dollar" or "$": Such currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

"DPO": The meaning specified in the FGIC Rehabilitation Plan.

"DPO Accretion": The meaning specified in the FGIC Rehabilitation Plan.

"DTC": The Depository Trust Company, a limited purpose trust company organized under the laws of the State of New York, its successors and assigns.

"Eligible Account": A non-interest bearing account, held in the United States in the name of the Trust for the benefit of the Unitholders and FGIC, which is a segregated account maintained with either (1) a Federal or State chartered depository institution that has (x) a short-term deposit or unsecured debt rating of at least "A-1" and "P-1" by S&P and Moody's respectively, (y) a long-term deposit rating (or, if a deposit rating is unavailable, senior unsecured debt rating) of at least "A" and "A2" by S&P and Moody's, respectively and (z) a combined capital and surplus of at least U.S.$200,000,000 or (2) the corporate trust department of such a Federal or State-chartered deposit institution.

"EMMA": The Electronic Municipal Market Access system operated by the Municipal Securities Rulemaking Board, or, if not available for the purposes provided herein, a website specified by the Trustee. Any obligation to post a document to EMMA shall be understood as an obligation to post such document under the CUSIP number for the Units.

"Executive Officer": With respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, any Vice President, the Secretary, any Assistant Secretary, the Treasurer or any Assistant Treasurer of such corporation and with respect to any partnership, any general partner thereof and, as applicable, an authorized signatory.

"Fair Market Value" means, in respect of any New GO Bond or GO CVI as of any date of determination, the lower of (i) the price for such New GO Bond or GO CVI, as applicable, as quoted by Bloomberg L.P. for any trade with total proceeds of at least $1 million as of the close of business on the prior Business Day, if Bloomberg L.P. has quoted a price for such New GO Bond or GO CVI, as applicable, as of such Business Day, and (ii) the fair market price for such New GO Bond or GO CVI, as applicable, including accrued and unpaid interest (if applicable), determined by soliciting bids from at least two broker-dealers of national standing, each of which is independent of each other and unaffiliated with the Trustee, and shall be the average of such

3

bids, provided that, for the avoidance of doubt, there shall be no requirement to solicit such bids, in which case only clause (i) shall apply.

"Fee Reserve": Funds held from time to time by the Trustee in the General Collection Account, in an amount up to the Fee Reserve Threshold Amount , to cover payments of Trustee Costs as they arise from time to time.

"Fee Reserve Threshold Amount": ~~$5,000~~The fee reserve threshold amount agreed upon in the Trustee Fee Letter.

"FGIC Insurance Policy": The existing insurance policy issued by FGIC with respect to the FGIC Insured Bonds ~~[and other bonds previously issued by the Commonwealth]~~, which is listed on Exhibit A hereto, as modified by the FGIC Rehabilitation Plan and this Trust Agreement.

"FGIC Insurance Policy Collection Account": The meaning specified in Section 3.1(a).

"FGIC Insured Bonds": The bonds previously issued by the Commonwealth, which are described and the CUSIP number for which is identified on Exhibit A hereto.

"FGIC Rehabilitation Plan": The First Amended Plan of Rehabilitation for Financial Guaranty Insurance Company, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

"General Collection Account": The meaning specified in Section 3.1(a).

"GO CVI Distribution Date": With respect to each series of GO CVIs, each date specified in the GO CVI Indenture or CVI Legislation on which distributions of amounts due on such securities are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Moody's": Moody's Investors Service, Inc.

"New GO Bond Distribution Date": With respect to each series of New GO Bonds, each date specified in the applicable New GO Bonds Indenture or New GO Bonds Legislation on which distributions of principal or interest on such bonds are scheduled to be paid, subject to any business day adjustments and conventions specified therein.

"Notional Amount": With respect to the Units as of any date of determination, the amount of Trust Units issued as provided in this Trust Agreement on the Closing Date, excluding any Units that may have been surrendered or canceled or otherwise are no longer outstanding on or prior to such date.

"Officer's Certificate": A certificate signed by an Executive Officer of the applicable Person and delivered to the Trustee.

"Opinion of Counsel": A written opinion of counsel, who may be counsel to FGIC.

"Original Holder": Each holder of an Allowed FGIC Insured Bond Claim on the Closing Date arising from FGIC Insured Bonds (other than FGIC), as provided in Section 75.4(a) of the Plan.

"Other Trust Costs": Any filing fees or other costs or expenses of the Trust that have not been paid by either of the Trustees or the Trust at the time of any election by FGIC under Section 7.5(c).

"Permitted Sale Event": With respect to any series of New GO Bonds or the GO CVIs, the satisfaction of all of the following requirements:

(i)      FGIC is not in default under the Covered FGIC Insurance Policy;

(ii)      FGIC shall have ~~instructed~~notified the Trustee, by delivering a notice ~~and instruction to be~~ substantially in the form of Exhibit E-1 attached hereto, of its intention to instruct the Trustee to sell some or all of (A) such series of New GO Bonds, or (B) the GO CVIs and setting forth the Permitted Sale Price for such New GO Bonds or such GO CVIs, as applicable~~;~~.

(iii)      The Trustee shall have provided notice to Unitholders in accordance with the notice requirements set forth in Section 11.4 hereof (a) notifying Unitholders of the ~~instruction~~notice of FGIC described in clause (ii) above and the Permitted Sale Price set forth in such ~~instruction~~notice and (b) requesting that any Unitholders objecting to such proposed sale provide written notice of such objection to the Trustee; and

(iv)      The Trustee shall not have received a written objection from the Requisite Unitholders (determined as of the date of the notice described in clause (ii) above) with respect to such proposed sale within seven (7) Business Days of the date the notice provided in clause (iii) above is provided.

"Permitted Sale Price": With respect to any Permitted Sale Event regarding some or all of any series of New GO Bonds or the GO CVIs, the price equal to the percentage of the par amount of such New GO Bonds or of the outstanding notional amount of such GO CVIs set forth in the related notice ~~and direction~~ delivered by FGIC to the Trustee.

"Person": Any individual, corporation, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"Plan of Adjustment" or "Plan": The Seventh Amended Joint Plan of Adjustment of the Commonwealth, the Commonwealth's Employees Retirement System and the Puerto Rico Public Buildings Authority, Case No. 17 BK 3283-LTS, filed on July 30, 2021, as amended, modified or supplemented from time to time.

"pro rata": With respect to any payment or distribution, or any allocation of any cost or expense, to Unitholders hereunder, pro rata shall be calculated based on the Notional Amount of the Units then outstanding.

"Proof of Policy Claim Form": The Proof of Policy Claim Form required to be filed in order to submit a policy claim to FGIC in accordance with the FGIC Rehabilitation Plan.

"Record Date":  With respect to any distribution to be made to Unitholders: (i) based on the Cash to be deposited into the Trust on the Closing Date, the Closing Date, (ii) based on any scheduled payment of principal or interest in respect of any series of New GO Bonds, the tenth day preceding the related New GO Bond Distribution Date, (iii) based on any scheduled payment of any amount due in respect of GO CVIs, the tenth day preceding the related GO CVI Distribution Date, and (iv) based on any other funds deposited or to be deposited in the General Collection Account or any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, the Record Date established by the Trustee pursuant to Section 3.4(b), provided that if such tenth day under clause (ii) or (iii) above is not a Business Day, the Record Date shall be the preceding Business Day.

"Requisite Unitholders":  As of any date, Unitholders holding more than fifty (50) percent of the Notional Amount of the Trust Units as of such date, excluding from both the numerator and the denominator the Notional Amount of any Trust Units held by FGIC.

"Secretary of State": The meaning specified in Section 2.1.

"State": Any one of the 50 states of the United States, the District of Columbia or its territories.

"S&P": S&P Global Ratings.

"Threshold Price": With respect to the New GO CIBs, the New GO 5.375% CABs, the New GO 5.0% CABs and the GO CVIs, the respective prices set forth on Schedule I.

"Threshold Event": With respect to any series of New GO Bonds or the GO CVIs, the receipt by the Trustee of a notice by FGIC that the current market price of such series of New GO Bonds or the GO CVIs exceeds the Threshold Price for such series of New GO Bonds or the GO CVIs, coupled with a written instruction from FGIC to sell some or all of such series of New GO Bonds or the GO CVIs, such notice and instruction to be substantially in the form of Exhibit E-2 attached hereto.

"Trust": The trust created by this Trust Agreement as specified in the preamble hereto.

"Trust Agreement": The meaning specified in the preamble hereto.

"Trust Assets" or "Trust Estate": The property, assets and rights set forth in clauses (a), (b) and (c) of Section 2.2, and any other securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

6

"Trustee": The meaning specified in the preamble hereto and any successor Trustee appointed pursuant to Section 7.6 or Section 7.8.

"Trustee Costs": The meaning specified in Section 7.5(a).

"Trustee Fee Letter": The letter agreement dated on or before the Closing Date setting forth the fees and expenses of the Trustees.

"Trustees": Collectively, the Trustee and the Delaware Trustee.

"United States": The United States of America (including the States and the District of Columbia), its territories, its possessions and other areas subject to its jurisdiction.

"Unitholder": The Person in whose name a Unit is registered in the records of the Depositary on any date of determination.

"Units" or "Trust Units": The single class of beneficial ownership interests in the Trust evidenced by the Certificate.

"U.S.A. PATRIOT Act": The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Title III of Pub. L. 107 56 (signed into law October 26, 2001) and its implementing regulations.

Section 1.2    Rules of Construction

Unless the context otherwise requires:

(i)    a term has the meaning assigned to it;

(ii)    an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect in the United States from time to time;

(iii)    "or" is not exclusive;

(iv)    the words "herein", "hereof", "hereunder" and other words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or other subdivision;

(v)    the words "include" and "including" shall be deemed to be followed by the phrase "without limitation"; and

(vi)    the meanings given to defined terms are applicable to the singular and plural forms thereof as appropriate.

Section 1.3    Article and Section References

All Article and Section references used in this Trust Agreement, unless otherwise provided,  are to Articles and Sections in this Trust Agreement. Any reference to "this Article"

7

appearing   within a particular Section of an Article is a reference to such Article as a whole. Any reference to "this Section" appearing within a particular paragraph of a Section is a reference to such Section as a whole.

## ARTICLE II

## TRUST ESTATE

Section 2.1    Creation of Trust.

The Trust is being created on the date hereof pursuant to the execution of this Agreement and the filing by the Trustees of the Certificate of Trust with the Office of the Secretary of State of the State of Delaware (the "Secretary of State"), under the name written above the heading of this Trust Agreement, in which name the Trust shall have power and authority and is hereby authorized and empowered, without the need for further action on the part of the Trust, and the Trustee shall have power and authority, and is hereby authorized and empowered, to conduct the activities of the Trust. It is the intention of the Parties that the Trust hereby created constitutes a statutory trust under the Delaware Trust Statute and that this Trust Agreement constitutes the governing instrument of the Trust. The Trustees are hereby authorized and directed to, and shall, on the date hereof file the Certificate of Trust with the Secretary of State. The Trustee shall have power and authority, and is hereby authorized and empowered, to take all actions on behalf of the Trust as set forth in this Trust Agreement and each of the Trustees is authorized and empowered to execute and file with the Secretary of State any other certificate required or permitted under the Delaware Trust Statute to be filed with the Secretary of State. The office of the Trust shall be in the care of the Trustee at the Corporate Trust Office or at such other address as the Trustee may designate by written notice to the Unitholders and FGIC.

Section 2.2    Trust Assets.

Pursuant to and in accordance with this Trust Agreement and the Plan, on the Closing Date:

(a)    The Commonwealth shall, on behalf of the Original Holders and as required by Section 75.4(a) of the Plan, deposit into the Trust (i) the Allocable Plan Consideration comprising Cash, New GO Bonds and GO CVIs as specified on Exhibit A hereto; and (ii) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy;

(b)    ~~The~~All Covered FGIC Insured Bonds shall be deposited, or be deemed to have been deposited, into the Trust by the Depositary ~~shall,~~ on behalf of the Original Holders and as required by Section 75.4(a) of the Plan~~, deposit all Covered FGIC Insured Bonds into the Trust~~.  All rights and remedies under or with respect to the Covered FGIC Insured Bonds and the applicable related legislative bond resolutions (other than with respect to the payment obligations of the Commonwealth or its instrumentalities) and the Covered FGIC Insurance Policy (including the rights with respect to any related DPO and DPO Accretion under the FGIC Rehabilitation Plan) shall be preserved and remain in full force and effect solely to the extent

8

necessary to preserve any claims relating the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy; and

(c)     Each holder/beneficiary of the Covered FGIC Insurance Policy shall, on behalf of the Original Holders and as required by Section 75.4(a) of the Plan, deposit, or be deemed to have deposited, into the Trust the Covered FGIC Insurance Policy and relinquished all rights thereunder to the Trustee, on the Closing Date and thereafter.

Section 2.3     Acceptance by Trustee.

(a)     By its execution of this Trust Agreement, the Trustee acknowledges and declares that it will hold or has agreed to hold all Trust Assets, including all documents or instruments delivered to it or received by it from time to time with respect to the Trust Assets, in each case in trust for the exclusive use and benefit of all present and future Unitholders. The Trustee represents and warrants that, except as expressly permitted by this Trust Agreement, (i) it has not and will not, in any capacity, assert any claim or interest in the Trust Estate and will hold (or its agent will hold) such Trust Estate and the proceeds thereof in trust pursuant to the terms of this Trust Agreement, and (ii) it has not encumbered or transferred its right, title or interest in the Trust Estate.

(b)     The Trustee shall, on the Closing Date, deliver to the ~~Depositary~~Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 a certification substantially in the form of Exhibit F hereto that~~, with respect to the Covered FGIC Insured Bonds, the New GO Bonds and the GO CVIs, either~~ it (i) ~~it~~ is in possession of ~~a certificate or certification evidencing the Covered FGIC Insured Bonds,~~Allocable Plan Consideration comprising cash in the amount specified on Exhibit A hereto, [(ii) either (x) confirms that the New GO Bonds and the GO CVIs~~,~~ have been deposited to and are being held in the participant account of U.S. Bank National Association at the Depositary for the benefit of the Unitholders and FGIC or ~~(ii) it~~y) has received ~~confirmation from a depository of such Covered FGIC Insured Bonds,~~written statements from the trustees with respect to the New GO Bonds and the GO CVIs~~or a direct or indirect participant thereof that each of the Covered FGIC Insured Bonds,~~, respectively, confirming that the New GO Bonds and the GO CVIs are beneficially owned by the Trust for the benefit of the Unitholders and FGIC and being held by such trustees for the benefit of the Trust until the deposit of the New GO Bonds and the GO CVIs to such account, and (iii) confirms that the Trust Units have been issued to the Original Holders.

(c)     The Trustee shall, on the Closing Date, (i) take such reasonable action as shall be necessary to facilitate or permit the deposit of the New GO Bonds and the GO CVIs to the participant account of U.S. Bank National Association at the Depositary for the benefit of the Unitholders and FGIC, and (ii) assuming that such New GO Bonds and GO CVIs have been so deposited, no later than the Business Day following such action, confirm to the Unitholders and FGIC in writing (to the extent not covered in the certification delivered pursuant to Section 2.3(b) above) that the New GO Bonds and the GO CVIs have been deposited to and are being held in such account][2].

---

[2] Subsections 2.4(b)(ii) and (iii) and 2.4(c) are to be confirmed by FGIC and Prime Clerk with U.S. Bank.

(d)   (c) Except as specifically provided herein, the Trustee shall not sell, pledge or assign any interest in the Trust Estate.

Section 2.4   Purpose, Activities of the Trust.

It is the intention of the Parties that the Trust shall not engage in any business or activities other than certain non-business activities in connection with, or relating to, the following:

(a)   accept the conveyance, assignment and transfer of the Trust Assets pursuant to the Plan or as contemplated by this Trust Agreement;

(b)   create one or more accounts or sub-accounts in accordance with the terms of this Trust Agreement;

(c)   make claims and assignments and receive payments under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and this Trust Agreement;

(d)   receive payments pursuant to the Plan;

(e)   issue the Trust Units to the Original Holders through the issuance of the corresponding Certificate to the Depositary or its nominee in accordance with the terms of this Trust Agreement and take such reasonable action as shall be necessary to facilitate or permit the deposit of the New GO Bonds and the GO CVIs to the participant account of U.S. Bank, National Association at the Depositary for the benefit of the Unitholders and FGIC;

(f)   make distributions to the [Depositary and] Unitholders in accordance with the terms of this Trust Agreement;

(g)   coordinate Unitholder communications through the Depositary;

(h)   follow, accept or act upon any instruction or direction from FGIC or the Requisite Unitholders, as applicable, in each case only as expressly permitted herein;

(i)   hold the Trust Assets;

(j)   sell or assign New GO Bonds and GO CVIs or portions thereof only as expressly provided in Section 3.5 or 3.6 hereof;

(k)   effectuate Unitholder Elections as provided in Section 3.6 hereof;

(l)   make public disclosures on EMMA as contemplated by this Trust Agreement;

(m)   make payments, reimbursements and distributions as contemplated by this Trust Agreement;

10

(n)      otherwise perform its obligations in accordance with, and take such other actions as are expressly provided for or permitted under, the terms of this Trust Agreement; and

(o)      engage in those activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 2.5      Limitations of the Trust.

(a)      Except as otherwise provided herein, the affairs of the Trust will be managed by or under the direction of the Trustee. Neither the Commonwealth or FGIC nor any of their respective Affiliates will have authority to act for, or to assume any obligation or responsibility on behalf of, the Trust or the Trustee in its capacity as Trustee;

(b)      The Trust will keep correct and complete books and records of accounts and minutes of the meetings and other proceedings of the Trust. Any such resolutions, agreements and other instruments will be continuously maintained by the Trustee as official records of the Trust;

(c)      The Trust will provide for its own operating expenses and liabilities from the Trust Assets. General overhead and administrative expenses of the Trust will not be charged or otherwise allocated to the Commonwealth or FGIC or their respective Affiliates;

(d)      All oral and written communications, including letters, invoices, contracts, statements and applications, will be made solely in the name of the Trust if related to the Trust;

(e)      There will be no guarantees made by the Trust with respect to obligations of the Commonwealth or FGIC or their respective Affiliates. There will not be any indebtedness relating to borrowings or loans between the Trust and the Commonwealth or FGIC or their respective Affiliates; provided that FGIC or its Affiliates may own Trust Units;

(f)      The Trust will act solely in its own name or the Trustee's on its behalf and through its or the Trustee's duly authorized officers or agents in the conduct of its activities. The Trust will not: (i) operate or purport to operate as an integrated, single economic unit with respect to the Commonwealth or FGIC or any other affiliated or unaffiliated entity; (ii) seek or obtain credit or incur any obligation to any third party based upon the assets of the Commonwealth or FGIC or their respective Affiliates; or (iii) induce any third party to reasonably rely on the creditworthiness of the Commonwealth or FGIC or any other affiliated or unaffiliated entity in its dealings with the Trust;

(g)      The Trust will maintain a Delaware Trustee with its office in the State of Delaware; and

(h)      The Trust will not engage in any transaction with an Affiliate on any terms other than would be obtained in an arm's-length transaction with a non-Affiliate.

11

## ARTICLE III

## ADMINISTRATION OF TRUST

Section 3.1      Accounts.

(a)      The Trustee has established and will maintain Eligible Accounts (i) to hold all amounts received on or in respect of the Trust Assets except the Covered FGIC Insurance Policy (the "General Collection Account") and (ii) to hold all amounts received on account of the Covered FGIC Insurance Policy (including, any amounts received on account of DPO or DPO Accretion) (the "FGIC Insurance Policy Collection Account"), each held in trust for the benefit of the Unitholders and FGIC. The Trustee shall deposit all cash received pursuant to clause (a) of Section 2.2 into the General Collection Account on the Closing Date. ~~The Trustee~~U.S. Bank National Association has established and will maintain ~~separate custodial accounts~~its participant account at the Depositary into which ~~(i)~~ the New GO Bonds and GO CVIs received pursuant to clause (a) of Section 2.2 shall be deposited ~~on the Closing Date, to be~~and held in trust for the benefit of the Unitholders and FGIC~~, and (ii) the Covered FGIC Insured Bonds and the Covered FGIC Insurance Policy received pursuant to clauses (b) and (c) of Section 2.2 shall be deposited on the Closing Date, to be held in trust for the benefit of the Unitholders~~. Each of the General Collection Account and the FGIC Insurance Policy Collection Account and such other accounts shall be under the sole dominion and control of the Trustee, and the Trustee shall be entitled to look solely to the General Collection Account for payment of any Trustee Costs and funding the Fee Reserve from time to time in accordance with the terms of this Trust Agreement.  All distributions to Unitholders shall be made only from cash on deposit in either the General Collection Account or the FGIC Insurance Policy Collection Account in accordance with the terms hereof.

(b)      If, at any time, a formerly Eligible Account no longer fulfills the definition of Eligible Account, the Trustee shall within ~~five~~thirty (~~5~~30) ~~Business Days~~days establish a new General Collection Account or FGIC Insurance Policy Collection Account, as applicable, meeting the conditions specified in such definition and transfer any cash on deposit in the General Collection Account or FGIC Insurance Policy Collection Account to such new General Collection Account or FGIC Insurance Policy Collection Account, and from the date such new General Collection Account or FGIC Insurance Policy Collection Account is established, it shall be the General Collection Account or FGIC Insurance Policy Collection  Account under this Trust Agreement.

(c)      The Trustee shall give notice to FGIC and Unitholders of the location of each Eligible Account and other account and to the proposed new location of any Eligible Account or other account prior to any change thereof.

Section 3.2      Investment of Funds in the Collection Accounts.

Amounts in the General Collection Account and the FGIC Insurance Policy Collection Account shall not be invested.

12

Section 3.3     FGIC Insurance Policy and Effect of Distributions.

(a)     The Trust ~~holds~~is deemed to hold the Covered FGIC Insured Bonds and is the sole Person entitled under the terms of the Covered FGIC Insured Bonds to payment thereof. Accordingly, the Trust is and shall be the sole "Bondholder" entitled to assert claims and receive payments under or with respect to the Covered FGIC Insurance Policy.

(b)     The Trustee shall have the sole authority to assert, and shall assert, subject to its rights and protections herein,  claims under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and to take all actions required to enforce the Covered FGIC Insurance Policy, including in the event that FGIC fails to make any payment when due under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy. The Trustee shall be authorized to take, and shall take, subject to its rights and protections herein, all actions it deems necessary or advisable to satisfy any and all conditions to the obligations to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO or DPO Accretion related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan. The following are conditions to FGIC's obligation to make any such payment, and the Trustee is authorized and directed to satisfy such conditions: (i) the Trustee shall have submitted to FGIC with respect to each claim a fully completed and duly executed Proof of Policy Claim Form in accordance with the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, and (ii) with respect to each such payment (other than on account of DPO Accretion) relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall have executed and delivered on behalf of the Trust to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, ~~which assignments in each case~~as confirmed by FGIC, and taken such actions as shall be ~~required~~necessary to ~~be acknowledged in writing by the Depositary before delivery to~~transfer such Trust Assets to the account of FGIC (~~or its fiscal agent)~~custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)     All claims that are properly submitted to FGIC by the Trustee under the Covered FGIC Insurance Policy shall be paid to the extent permitted by FGIC under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan, subject to satisfaction of any conditions to such payments, including the conditions set forth in this Trust Agreement. All payments to the Trustee under or with respect to the Covered FGIC Insurance Policy shall be deposited into the FGIC Insurance Policy Collection Account on the date received if received prior to 11:00 a.m. New York time, on any Business Day or, if received after such time on any Business Day, on the following Business Day.  In the event that FGIC has defaulted in its payment obligations under the Covered FGIC Insurance Policy, the Requisite Unitholders shall have the right to direct the Trustee in writing to take, and the Trustee is authorized to take, and shall take, subject to its rights and protections herein,  any and all actions necessary or desirable to enforce and recover such payment obligations.

13

(d)        Each distribution of cash to the Unitholders from the General Collection Account shall automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy.  All payments from the FGIC Insurance Policy Collection Account under or with respect to the Covered FGIC Insurance Policy arising from or related to principal of or interest on the Covered FGIC Insured Bonds (other than on account of DPO Accretion) shall be deemed to automatically and immediately reduce on a dollar-for-dollar basis the outstanding principal amount of or the accrued and unpaid interest on the Covered FGIC Insured Bonds, respectively. For the avoidance of doubt, all payments on account of a claim for accrued and unpaid interest due shall reduce on a dollar-for-dollar basis the outstanding interest amount of the Covered Insured Bonds, and all payments of a claim for principal shall reduce on a dollar-for-dollar basis the outstanding principal amount of the Covered FGIC Insured Bonds.

(e)        If at any time the principal amount of the Covered FGIC Insured Bonds shall be reduced to zero, then thereafter each distribution of cash to the Unitholders under this Trust Agreement (other than distributions from the FGIC Insurance Policy Collection Account on account of payments made by FGIC under or with respect to the Covered FGIC Insurance Policy) shall automatically and immediately reduce on a dollar-for-dollar basis the accrued and unpaid interest, if any, due on the Covered FGIC Insured Bonds and shall automatically and immediately result in a corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy. If at any time the principal amount of and the accrued and unpaid interest on the Covered FGIC Insured Bonds and the DPO Accretion balance under the Covered FGIC Insurance Policy shall be reduced to zero, then (i) the Covered FGIC Insurance Policy shall be indefeasibly canceled, (ii) within three (3) Business Days thereafter, the Trustee shall (x) first, assign to FGIC ownership of the Trust Assets held by the Trust at that time to the extent required to reimburse FGIC for any unreimbursed payments previously made under the Covered FGIC Insurance Policy and (y) second, distribute to the Unitholders any remaining Trust Assets, and (iii) upon making such assignment and distributions (if any), the Units shall be deemed to be redeemed in full and the Trust shall terminate in accordance with the provisions of Article IX hereof.

(f)        Each of FGIC and each Unitholder shall have and retain all rights set forth in the Plan applicable to it, including those set forth in Section 75.4 of the Plan.

(g)        In addition to any other rights FGIC may have hereunder or otherwise, due to the subrogation rights under the Covered FGIC Insurance Policy, upon making each Cash Payment or Cash Acceleration Payment to the Trust, FGIC shall automatically become the owner of a proportionate share (as described in Section 3.3(b)) of the Trust Assets held by the Trust and shall be fully subrogated to all of the Trust's rights therein, including any payments on or in respect thereof.

Section 3.4        Distributions.

(a)        All cash received by the Trust or the Trustee from any source shall be applied and distributed in accordance with the terms of this Trust Agreement. Within [one~~two~~ (~~1~~2) Business ~~Day]~~Days of the Trust's receipt of (i) the Cash to be deposited into the Trust

pursuant to clause (a) of Section 2.2 on the Closing Date, (ii) any scheduled payment of principal or interest in respect of any series of the New GO Bonds, or (iii) any scheduled payment due on the GO CVIs, the Trustee shall distribute such amounts, net of any outstanding Trustee Costs that are due and payable or to be reimbursed to the Trustees as of the related distribution date, Other Trust Costs to be reimbursed under Section 7.5(c) and amounts necessary to fund the Fee Reserve to the Fee Reserve Threshold Amount, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date. The Trustee mayshall pay or reimburse such Trustee Costs, reimburse such Other Trust Costs and fund the Fee Reserve at the time of any such distribution.

(b)     The Trustee shall establish the Record Date for the distribution of (i) any other funds deposited or to be deposited in the General Collection Account or (ii) any payment made or to be made under or with respect to the Covered FGIC Insurance Policy, and the Trustee shall send notice to the Unitholders of such Record Date and the related anticipated distribution date of such amounts, in accordance with Section 11.4, in each case not later than [onetwo (12) Business Day]Days after the Trust's receipt of such funds or payments. Such Record Date shall be at least 10 days and no more than 15 days after the date such notice is posted on EMMA. On such distribution date, the Trustee shall distribute such amounts, in the case of clause (i) net of any outstanding Trustee Costs that are due and payable as of such distribution date, to the Depositary for distribution on a pro rata "pass-through" basis to each Unitholder as of the related Record Date.

(c)     Any distribution to Unitholders shall be made to the Person in whose name such Unit is registered at the close of business on the related Record Date in accordance with the procedures of the Depositary.

Section 3.5     Threshold Event or Permitted Sale Event.

(a)     The Trustee shall not sell any New GO Bonds or GO CVIs except upon a Threshold Event or Permitted Sale Event and subject to the terms of Section 3.5(b), provided that the Trustee shall be authorized to make the assignments and transfers contemplated by Sections 3.3 and 3.6. Upon the Trustee's receipt of a notice substantially in the form of Exhibit E-1 attached hereto as contemplated by clause (ii) of the definition of "Permitted Sale Event", the Trustee shall (i) provide the notice to Unitholders contemplated by clause (iii) of such definition (with a copy of such notice to FGIC) as soon as practicable and in any event within three (3) Business Days of receiving FGIC's notice, and (ii) no later than the tenth (10th) Business Day following the date of such notice to Unitholders, notify FGIC in writing whether the Trustee has received a written objection from the Requisite Unitholders as contemplated by clause (iv) of such definition.

(b)     Upon the occurrence of a Threshold Event or Permitted Sale Event with respect to which FGIC has instructedprovided written instruction to the Trustee in writing(substantially in the form of Exhibit E-2 hereto, in the case of a Threshold Event, or Exhibit E-3 hereto, in the case of a Permitted Sale Event) to sell some or all of one or more series of New GO Bonds or the GO CVIs, the Trustee shall seek to sell such New GO Bonds or GO CVIs to the person(s) identified to the Trustee by FGIC in such instruction (which instruction shall also include the applicable sale price(s), the information for the account(s) to

15

which such New GO Bonds or GO CVIs shall be transferred by the Trustee and any other details, including relevant broker(s), to be utilized by the Trustee for such sale) as soon as practicable and in any event within one (1) Business Day of receiving such instruction, provided that: (i) any such sale is made at price(s) that equal or exceed the Fair Market Value applicable to such sale, as confirmed to the Trustee by FGIC, (ii) any such sale is made at price(s) that equal or exceed the applicable Threshold Price in the case of a Threshold Event or the applicable Permitted Sale Price in the case of a Permitted Sale Event, and (iii) all proceeds of such sales shall be deposited into the General Collection Account.

Section 3.6      Surrendered Units.

(a)      Subject to satisfaction of the conditions set forth in Section 3.6(b), any Unitholder may, at any time and from time to time, elect to surrender Units held by such Unitholder (as confirmed by the Depositary) to the Trustee for cancellation (the "Surrendered Units") in exchange for an assignmenta transfer to such Unitholder of its proportional percentage of the New GO Bonds and GO CVI (or  any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, by giving written notice thereof to FGIC and  the Trustee (a "Unitholder Election").

(b)      The following conditions must be satisfied to permit and effectuate any Unitholder Election: (i) FGIC shall, in its sole discretion, have consented in writing to such Unitholder Election (other than any Unitholder Election in connection with which FGIC shall not have agreed or otherwise be obligated to pay any consideration for the release set forth in clause (iv) below), (ii) the Surrendered Units shall be cancelled by the Trustee with an automatic and immediate corresponding reduction in the aggregate Notional Amount of the Units and the Trustee shall deliver written notice of such cancellation and reduction to the Depositary, (iii) the outstanding principal amount of the Covered FGIC Insured Bonds shall automatically and immediately be reduced on a proportionate dollar-for-dollar basis (based on the proportion of the Notional Amount of such Surrendered Units to the aggregate Notional Amount of the Units at that time) with an automatic and immediate corresponding reduction in FGIC's obligations under the Covered FGIC Insurance Policy, which reductions shall be acknowledged by the Trustee, and (iv) such Unitholder shall execute and deliver a release, in form and substance satisfactory to FGIC, releasing all rights and claims of any kind it may have relating to the Surrendered Units or the Covered FGIC Insurance Policy subject to receipt of consideration, if any, that FGIC shall have agreed in writing to pay to such Unitholder in consideration for release.  Upon satisfaction of such conditions, the Trustee shall assigntransfer to the Unitholder ownership of the applicable proportional percentage of the New GO Bonds and GO CVI (or any other securities or property received in respect thereof or in exchange therefor) held by the Trust at that time, as directed by FGIC.  FGIC's consent to any Unitholder Election shall not limit its right, in its sole discretion, to deny its consent to any other Unitholder Election.

Section 3.7      FGIC Election to Accelerate Policy Payments.

(a)      Section 3.7(b) shall apply to the Trust and the Covered FGIC Insurance Policy as of the date that is thirty (30) Business Days following the Closing Date unless the

Requisite Unitholders notify the Trustee in writing prior to such date of their election that Section 3.7(b) shall not so apply.

(b)     Pursuant to the Plan, the payment of the principal of the Covered FGIC Insured Bonds was accelerated and such Covered FGIC Insured Bonds are due and payable at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon, or 100% of accreted amounts thereon, to the date of payment.  FGIC is not obligated to pay any claims on an accelerated basis under the Covered FGIC Insurance Policy. FGIC shall have the right, in its sole and absolute discretion, to elect at any time to permit a claim under the Covered FGIC Insurance Policy in the amount of such acceleration price at such time (regardless of whether the Trustee shall have submitted a claim therefor to FGIC) and to make payment to the Trustee in respect of such permitted claim under and in accordance with the terms and conditions of the Covered FGIC Insurance Policy and the FGIC Rehabilitation Plan; provided, however, that FGIC shall not be obligated to make all or any portion of such payment, unless and until, with respect to the portion of such payment relating to the principal of the Covered FGIC Insured Bonds which will be paid or deemed to be paid by FGIC in cash (the "Cash Acceleration Payment"), the Trustee shall have executed and delivered to FGIC (or its fiscal agent) assignments in substantially the form of Exhibit G with respect to a proportionate share (based on the proportion of such Cash Acceleration Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust) of the Trust Assets held by the Trust, ~~which assignments in each case~~as confirmed by FGIC, and taken such action as shall be ~~required~~necessary to ~~be acknowledged in writing by the Depositary before delivery to~~transfer such Trust Assets to the account of FGIC (or its ~~fiscal agent)~~custodian, in either case as directed by FGIC in writing, and receipt of such Trust Assets shall have been confirmed by FGIC.

(c)     At any time, Requisite Unitholders can notify the Trustee of an election that Section 3.7(b) shall apply notwithstanding a prior election under Section 3.7(a), and such notice will be effective upon agreement by FGIC within [30] Business Days of such notification.

## ARTICLE IV

### REPORTING/REMITTING TO UNITHOLDERS

Section 4.1     Statements to Unitholders and FGIC.

On a quarterly basis, the Trustee shall prepare and post a statement to EMMA, in the form attached hereto as Exhibit B and provide notice of such statement to the Unitholders and FGIC in accordance with the Notice provisions of Section 11.4 setting forth:

(a)     all distributions made from the General Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis), identifying the portion thereof attributable to the amount of (i) asset sales; (ii) principal and interest payments; and (iii) CVI payments;

(b)     all distributions made from the FGIC Insurance Policy Collection Account during the quarter and during the year to date (on an aggregate and per Unit basis);

17

(c)      the principal amount (or accreted amount, as applicable) as of the quarter end of each CUSIP number of New GO Bonds and GO CVI held by the Trust (or any other securities or property received in respect thereof or in exchange therefor) (on an aggregate and per Unit basis);

(d)      the DPO balance and DPO Accretion balance associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy as of the quarter end, to the extent such information has been furnished to the Trustee by FGIC;

(e)      the principal amount of, and the accrued and unpaid interest on, the Covered FGIC Insured Bonds as of the end of the quarter, together with a description of the changes in such amounts during the quarter;

(f)      any notices received by the Trustee from FGIC in connection with any required DPO and DPO Accretion payments associated with the Covered FGIC Insured Bonds under the Covered FGIC Insurance Policy;

(g)      (i) the respective amounts paid to the Trustees for trustee fees, other Trustee Costs under Section 7.5(a), Trustee Costs under Section 7.5(b) and indemnification amounts under Section 7.12, ~~Trustee Costs under Section 7.5(b) and other Trustee Costs,~~ a description of such indemnification amounts and ~~other~~ Trustee Costs, (ii) the amount of any Other Trust Costs reimbursed under Section 7.5(c), if applicable, and (iii) the ending Fee Reserve balance for each quarter; and

(h)      any required tax reporting for such period.

Section 4.2      Compliance with Withholding Requirements.

Notwithstanding any other provisions of the Trust Agreement, the Trustee shall comply with all federal withholding requirements with respect to payments to the Depositary and the Unitholders that the Trustee reasonably believes are applicable under the Code. The consent of the Depositary and the Unitholders shall not be required for such withholding. In the event the Trustee does withhold any amount from payments to the Depositary or any Unitholder pursuant to federal withholding requirements, the Trustee shall indicate with any payment to the Depositary or such Unitholder the amount withheld. Any amounts withheld shall be treated as a distribution of cash to the Depositary or Unitholder, as the case may be, in the amount of the withholding for all purposes and shall thereby reduce amounts otherwise distributable to the Depositary or such Unitholder. If an amount required to be withheld was not withheld, the Trust may reduce subsequent distributions by the amount of such required withholding.

18

# ARTICLE V

# THE UNITS

Section 5.1     The Units.

(a)     The Units shall be evidenced by the Certificate issued by the Trustee to the Depositary in accordance with Section 5.2(a).

(b)     The aggregate Notional Amount of the Units issued under this Trust Agreement shall be limited to the aggregate outstanding principal amount of the Covered FGIC Insured Bonds as of the Closing Date that are deposited into the Trust on the Closing Date, as shown on Exhibit A.  The beneficial ownership of the Units as of the Closing Date shall be allocated by the Depositary among the Original Holders on a proportionate basis based on their respective Covered FGIC Insured Bonds that are deposited, or deemed hereunder to have been deposited, into the Trust on the Closing Date.

(c)     All Units issued under this Trust Agreement shall be evidenced by the same Certificate, subject to the requirements of the Depositary, and otherwise identical in all respects. All Units issued under this Trust Agreement shall be in all respects equally and ratably entitled to the   benefits hereunder without preference, priority or distinction on account of the actual time or times of authentication and delivery, and shall be held and transferable only through the Depositary.

(d)      No additional interests in the Trust other than the Certificate and the Units shall be issued hereunder, except in accordance with Section 5.3.

Section 5.2     The Certificate; Book-Entry-only System.

(a)     On the Closing Date, upon deposit of all of the Trust Assets into the Trust pursuant to the Plan of Adjustment and as provided in Section 2.2, the Trustee shall issue to the Depositary the initial Certificate by executing and delivering the Certificate, on behalf of this Trust, with the manual or facsimile signature of an authorized officer or other agent of the Trustee.

(b)     The Trust shall issue the Certificates to the Depositary.  Consistent with DTC book-entry provisions, one or more typewritten Certificates shall be prepared and registered in the name of the Depositary or its nominee.  There shall be no physical delivery of the Certificate or Units to the Unitholders (other than the Depositary) or other beneficial owners.

(c)     Each of the Trustees is hereby authorized and directed to take all actions required for the global Certificate and Units to be eligible under the rules and regulations of the Depositary for investment and trading as uncertificated securities.[2][3]  DTC is hereby appointed as the initial Depositary, with Cede & Co., a nominee thereof, being the initial registered owner of the Certificate. In the event that any Depositary resigns or is removed, the Trustee shall select a

---

[2] Coordination of settlement with DTC to be confirmed.[3] Being discussed by FGIC and U.S. Bank.

substitute Depositary. Notwithstanding anything herein to the contrary, the Trust and each of the Trustees, and any agent of the Trust or either of the Trustees, may treat any Depositary in whose name any Certificate is registered as the owner of the Units for all purposes, including for actions by Unitholders. For so long as the Depositary is the registered owner of the Certificate, procedures with respect to the transmission of notices and the, transfer of ownership and payment of Units shall be in accordance with arrangements between the Trustee and the Depositary. The Certificate shall be issued in global form and the Units represented thereby shall be freely tradeable and transferable through the Depositary.

(d)     Notwithstanding anything herein to the contrary, so long as the Certificate is registered in the name of the Depositary, the Trust and the Trustee shall have no responsibility or obligation to any Depositary participant, indirect participant or beneficial owner of the Certificate or Units. Without limiting the immediately preceding sentence, the Trust and the Trustee shall have no responsibility or obligation with respect to (i) the accuracy of the records of any Depositary or any Depositary participant or indirect participant with respect to any beneficial ownership interest in the Certificate, (ii) the delivery to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any notice with respect to the Certificate or Units, including any notice of Record Date, distribution date, payment, redemption or tender, or (iii) the payment to any Depositary participant, indirect participant, beneficial owner or any other person, other than the Depositary, of any amount with respect to Units or Certificate. The rights of Unitholders shall be limited to those established by law and agreements between the Unitholders and the Depositary and Depositary participants and as provided herein.

(e)     A CUSIP number will be imprinted on the Certificate, but such CUSIP shall not constitute a part of the contract evidenced by the Certificate or Units[3]. As a convenience to the Depositary and Unitholders, the Trust and the Trustees may use such CUSIP numbers in any notices to the Depositary and Unitholders.

Section 5.3     Mutilated, Destroyed, Lost and Stolen Certificate.

(a)     If (i) any mutilated Certificate is presented to the Trustee or (ii) the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Certificate, and there is delivered to the Trustee such security or indemnity as it may require to save it harmless, and the Trustee has not received notice that such Certificate (and the Units represented thereby) has been acquired by a protected purchaser, then, in each case, the Trustee shall execute, authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate of like tenor, form, terms and principal amount, bearing an identifying number not used by any contemporaneously existing Certificate, so that neither gain nor loss in interest shall result from such exchange or substitution.

(b)     Upon the issuance of any new Certificate under this Section, the Trustee may require the payment by the Certificate holder of a sum sufficient to cover any tax or other

---

[3] Services by DTC are separate from Trustee services and charged by DTC separately.

governmental charge that may be imposed in respect thereto and any other expenses (including the fees and expenses of the Trustee) connected therewith.

(c)     Every new Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Trust Assets to the extent provided herein, whether or not the destroyed, lost or stolen Certificate shall be at any time enforceable by anyone, and the Units represented thereby shall be entitled to all the benefits of this Trust Agreement.

(d)     The terms of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Units.

Section 5.4     No Obligation to Register.

The Trustee is not obligated to register or qualify any Certificate or Unit under the Securities Act of 1933, as amended, and the rules and regulations promulgated by the Securities and Exchange Commission thereunder, or any other securities laws or to effect any qualification under the Trust Indenture Act of 1939, as amended.

Section 5.5     Persons Deemed Owners.

Subject to Section 5.3, but notwithstanding anything else in this Trust Agreement, the Trustee and any agent of the Trustee may treat the Depositary or its nominee in whose name the Certificate is registered as the owner of the Units on the related distribution date for the purpose of receiving distributions on such Units and for all other purposes whatsoever, including for actions by Unitholders, and neither the Trustee, nor any agent of the Trustee shall be affected by notice to the contrary. All distributions made hereunder to the Depositary or its nominee, or upon its order, shall be valid, and, to the extent of the sum or sums paid, effectual to satisfy and discharge the liability  for moneys distributable upon the Units.

Section 5.6     Cancellation.

All Certificates evidencing Units surrendered for payment, redemption, transfer or exchange shall be delivered to the Trustee and shall be promptly canceled by the Trustee. The Trustee and no one else will cancel all such Certificates surrendered       for registration of transfer, exchange, payment, replacement or cancellation and will dispose of such cancelled Certificates in accordance with its customary procedures. No  Certificate shall be authenticated in lieu of or in exchange for any Certificates canceled as provided in this Section, except as expressly permitted by this Trust Agreement.

## ARTICLE VI

## NEW GO BONDS AND GO CVIs

Section 6.1    Voting Rights with Respect to New GO Bonds and GO CVIs.

(a)    Within ~~two~~three (~~2~~3) Business Days after receipt of notice of any meeting of, or other occasion for the exercise of voting rights or the giving of consents by, owners of any of the New GO Bonds or the GO CVIs (or any other securities or property received in respect thereof or in exchange therefor), the Trustee shall deliver a copy of such notice to FGIC and the Unitholders.

(b)    The voting and direction rights allocable to the owners of the New GO Bonds and GO CVIs (or any other securities or property received in respect thereof or in exchange therefor) pursuant to the terms thereof (including voting and direction rights in respect of remedies) ("Voting Rights") shall be allocated to FGIC unless FGIC is in default under the Covered FGIC Insurance Policy (a "Voting Rights Condition"). Upon the written request of FGIC, subject to the immediately preceding sentence, the Trustee shall vote in accordance with any instruction set forth in such written request. Upon the occurrence and continuation of a Voting Rights Condition, the Voting Rights will be deemed to be held on a pro rata basis by the Unitholders, and the Trustee may act at the direction of the Requisite Unitholders.

## ARTICLE VII

## CONCERNING THE TRUSTEE

Section 7.1    Duties of Trustee.

(a)    Every provision of this Trust Agreement relating to the conduct of, affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VII.

(b)    The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Trust Agreement and no implied covenants or obligations shall be read into this Trust Agreement against the Trustee.

(c)    The Trustee shall (at the direction of the Requisite Unitholders) take all necessary or desirable actions to enforce the Covered FGIC Insurance Policy against FGIC as set forth herein.

(d)    The Trustee shall deliver to all Unitholders copies of all notices and written communications received from the Commonwealth as they relate to the New GO Bonds and GO CVIs.

(e)    Except as provided in Section 7.2 hereof, no provision of this Trust Agreement shall be construed to relieve the Trustee from liability for its own grossly negligent action, grossly negligent failure to act, bad faith or willful misconduct; provided, however, that:

(i)      The Trustee shall not be liable for an error of judgment made in good faith by an Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts;

(ii)      The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of FGIC or the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the New GO Bonds or GO CVIs exercising any trust or power conferred upon the Trustee with respect to the New GO Bonds or GO CVIs, under this Trust Agreement;

(iii)      The Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the direction of the Requisite Unitholders relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Covered FGIC Insurance Policy or exercising any trust or power conferred upon the Trustee with respect to the Covered FGIC Insurance Policy, under this Trust Agreement; and

(iv)      Any determination of gross negligence, bad faith or willful misconduct of the Trustee shall be made only upon the rendering of a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

Section 7.2      Certain Matters Affecting the Trustee.

(a)      The Trustee may conclusively rely and shall be protected in acting or refraining from acting upon any resolution, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties. Further, the Trustee may accept a copy of the vote of the board of directors or equivalent governing body of any party certified by its clerk or assistant clerk or secretary or assistant secretary as conclusive evidence of the authority of any Person to act in accordance with such vote, and such vote may be considered as in full force and effect until receipt by the Trustee of written notice to the contrary;

(b)      The Trustee may, in the absence of bad faith on its part, conclusively rely upon an Opinion of Counsel or certificate of an Officer of the appropriate Person whenever in the administration of this Trust Agreement the Trustee shall deem it desirable that a matter be proved or established (unless other evidence be herein specifically prescribed) prior to taking, suffering or omitting any action hereunder;

(c)      The Trustee may consult with counsel of its own selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in reliance on such advice or Opinion of Counsel;

(d)      The Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Trust Agreement or to institute, conduct, defend or continue any litigation thereunder or in relation thereto at the request, order or direction of the Requisite

23

Unitholders, pursuant to the provisions of this Trust Agreement, unless such Unitholders shall have offered to the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities which may be incurred therein or thereby;

(e)     The Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Trust Agreement;

(f)     The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing to do so by FGIC or the Requisite Unitholders; provided, however, that if the payment within a reasonable time to the Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Trustee, not assured to the Trustee by the security afforded to it by the terms of this Trust Agreement, the Trustee may require indemnity against such expense or liability as a condition to taking any such actions;

(g)     The Trustee may execute any of the trusts or powers under this Trust Agreement or perform any duties hereunder either directly or by or through agents, attorneys, custodians or nominees and the Trustee shall not be responsible for the supervision of or any misconduct or negligence on the part of any agent or attorney appointed with due care by it under this Trust Agreement;

(h)     Whenever the Trustee is authorized herein to require acts or documents in addition to those required to be provided it in any matter, it shall be under no obligation to make any determination whether or not such additional acts or documents should be required unless obligated to do so under Section 7.1;

(i)     The Trustee shall not be deemed to have notice of any matter unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the applicable Trust Units generally, the Commonwealth, the Trust or this Trust Agreement;

(j)     None of the provisions of this Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise to incur any liability, financial or otherwise, in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not assured to it;

(k)     Notwithstanding anything herein to the contrary, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action;

(l)     The permissive rights of the Trustee to perform any discretionary act enumerated in this Trust Agreement shall not be construed as a duty or obligation, and the

24

Trustee shall not be answerable in the performance of such act other than for its gross negligence, bad faith or willful misconduct;

(m)    The rights, privileges, protections, immunities and benefits given to the Trustee, including its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian, co-trustee and other Person employed to act hereunder;

(n)    The Trustee shall have no duty (A) to see to any recording, filing, or depositing of this Trust Agreement or any agreement referred to herein or any financing statement or continuation statement evidencing a security interest, or to see to the maintenance of any such recording or filing or depositing or to any re-recording, re-filing or re-depositing of any thereof, (B) to see to any insurance, (C) to see to the payment or discharge of any tax, assessment, or other governmental charge or any lien or encumbrance of any kind owing with respect to, assessed or levied against, any part of the Trust Estate, or (D) to confirm or verify the contents of any reports or certificates delivered to the Trustee pursuant to this Trust Agreement believed by the Trustee to be genuine and to have been signed or presented by the proper party or parties;

(o)    The Trustee shall have no liability or responsibility for the acts or omissions of any other party to any of this Trust Agreement or any related document;

(p)    The Trustee shall have no duty or obligation to obtain or solicit any collateral or any funds to be remitted in any of the accounts established under this Trust Agreement, and shall have a duty only to accept such collateral or funds delivered to it in accordance with this Trust Agreement;

(q)    In connection with its preparation of any required tax reporting for beneficial owners of the Trust Units, the Trustee shall, if necessary, (i) on a quarterly basis for each calendar year, request one Depositary participant list, (ii) on an annual basis, contact each Depositary participant identified on the Depositary participant lists and request such beneficial owner information as shall be necessary to permit the Trustee to prepare the applicable tax return for such calendar year, and (iii) to the extent that a participant provides partial or incomplete beneficial owner information, make a second and final attempt to contact the participant or such beneficial owner (to the extent such beneficial owner's contact information has been provided to the Trustee) to obtain such additional information in order to permit the Trustee to prepare the applicable tax return for such beneficial owner for that calendar year;

(q)    (r) The Trustee shall not be required to give any bond or surety in respect of the performance of its powers and duties hereunder;

(r)    (s) The Trustee may request the delivery of a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Trust Agreement;

(s)    (t) All rights of action under this Trust Agreement or under any of the Trust Units, enforceable by the Trustee, may be enforced by it without the possession of any of the Trust Units or the Certificate, or the production thereof at the trial or other proceeding

25

relating thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Unitholders, subject to the provisions of this Trust Agreement; and

(t)     (u) The Trustee shall establish a Fee Reserve, which Fee Reserve shall be replenished up to the Fee Reserve Threshold Amount in accordance with Section 3.4(a), and the Trustee shall be permitted to apply the amounts therein to pay Trustee Costs.

Section 7.3     Trustee Not Liable for Units or New GO Bonds, GO CVIs, the Covered FGIC Insured Bonds or the Covered FGIC Insurance Policy.

The Trustee assumes no responsibility for the correctness of the recitals contained in this Trust Agreement and in the Trust Units or Certificate. The Trustee makes no representations or warranties as to the validity or sufficiency of this Trust Agreement or of the Trust Units (other than the signature and authentication of the Trustee on the Certificate) or of the New GO Bonds, GO CVIs, the Covered FGIC Insured Bonds, the Covered FGIC Insurance Policy or related documents. The Trustee shall not be accountable for the use or application of any of the Trust Units, or for the use or application of any funds in respect of the New GO Bonds or GO CVIs or deposited in or withdrawn from the Trust in accordance with this Trust Agreement other than, in each case, any funds held by or on behalf of the Trustee in accordance with Article III. The Trustee, in its capacity as Trustee hereunder, shall have no responsibility or obligation to comply with, or to monitor any other Person's compliance with, the New GO Bond Legislation or the New GO Bond Indentures.

Section 7.4     Trustee May Own Units.

The Trustee in its individual capacity or any other capacity may become the owner or pledgee of Trust Units with the same rights it would have if it were not Trustee.

Section 7.5     Trustee Costs and Expenses.

(a)     The Trustees shall each be entitled to receive from the Trust (i) compensationfees agreed upon in writing, including in the Trustee Fee Letter, (which shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) for all services rendered by each of the Trustees in the execution of the trusts created under this Trust Agreement and in the exercise and performance of any of the powers and duties thereunder or the administration of the Trust and, (ii) reimbursement for (x) all reasonable fees, expenses, costs and disbursements incurred or made by either of the Trustees in accordance with any of the provisions of this Trust Agreement, including Section 7.5(b) hereof (including the fees, expenses and disbursements of their respective counsel and of all persons not regularly in their respective employ), and (y) their indemnities pursuant to Section 7.12 hereof, and (iii) amounts to be promptly used by the Trustee to pay any reasonable fees, expenses or costs then owed by the Trust in accordance with this Trust Agreement and not covered by clause (ii) of this Section 7.5(a) (collectively, the "Trustee Costs"). [For the avoidance of doubt, it is understood and agreed by the Parties that Trustee Costs under clause (ii) or (iii) of this Section 7.5(a) may include amounts of reasonable fees, expenses, costs, disbursements or indemnities that properly relate to the Trust and to one or more other trusts created under other trust agreements to which

26

the Commonwealth, FGIC and the Trustees are party, which amounts have been reasonably and fairly allocated by the Trustee to the Trust in good faith as the Trust's share and are described in each relevant statement prepared and provided by the Trustee pursuant to Section 4.1.][4] All such Trustee Costs shall be paid to the Trustees in accordance with the provisions of Section 3.4 hereof or taken from the Fee Reserve.

(b)     In furtherance of Section 7.5(a), each of the Trustees shall be entitled to receive reimbursement for all reasonable out-of-pocket expenses which are properly documented and incurred or made by it, including costs of collection, payable as a result of or in connection with litigation, enforcement actions or other proceedings brought by Unitholders against the Commonwealth, the Trust, or such Trustee except for proceedings, litigation or enforcement actions that relate to such Trustee's grossly negligent action, grossly negligent failure to act, bad faith or its own willful misconduct as determined by a final judgment of a court of competent jurisdiction no longer subject to appeal or review.

(c)     For the avoidance of doubt, neither the Commonwealth nor FGIC shall be liable for any Trustee Costs or Other Trust Costs.  FGIC may, in its sole discretion, elect to pay any Other Trust Costs, in which case FGIC shall be reimbursed by the Trustee at the time of the next distribution of any amount under Section 3.4(a) hereof upon notifying the Trustee of the amount to be so reimbursed.

Section 7.6     Eligibility Requirements for Trustee and Successor Trustee.

The Trustee and any successor Trustee shall at all times be a corporation or national banking association that: (i) is not an Affiliate of the Commonwealth or FGIC; (ii) is neither affiliated with the Commonwealth or its instrumentalities, public corporations, or municipalities, nor located in the Commonwealth; (iii) is organized and doing business under the laws of any state or the United States of America; (iv) is authorized under such laws to exercise corporate trust powers; (v) is in good standing under the law of the jurisdiction in which it is organized; (vi) has a combined capital and surplus of at least $50,000,000; (vii) is subject to supervision or examination by federal or state authority; and (viii) is a nationally recognized financial institution and fiduciary regularly acting as a trustee in the municipal finance market. If such corporation or national banking association publishes reports of its conditions at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of conditions so published. In case at any time any Trustee or successor Trustee shall cease to be eligible in accordance with the provisions of this Section, such Trustee or successor Trustee shall resign immediately in the manner and with the effect specified in Section 7.7.

Section 7.7     Resignation and Removal of the Trustee.

(a)     The Trustee may at any time resign and be discharged from the trusts created pursuant to this Trust Agreement by giving 60 days written notice, which shall be posted to EMMA by the Trustee. Upon receiving such notice of resignation, FGIC shall promptly

---

[4] Under continuing review by U.S. Bank.

appoint a successor trustee meeting the requirements set forth in Section 7.6 by written instrument, in duplicate, which instrument shall be delivered to the resigning Trustee and to the successor trustee. A copy of such instrument shall be delivered to the Unitholders and posted to EMMA by the successor trustee. If no successor trustee shall have been so appointed and have accepted appointment within 60 days after the giving of such notice of resignation, the resigning Trustee may petition any court of competent jurisdiction for the appointment of a successor trustee at the expense of the Trust.

(b)     If at any time the Trustee shall cease to be eligible in accordance with the provisions of Section 7.6 and shall fail to resign after written request therefor by FGIC or the Requisite Unitholders, or if any time the Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then FGIC or the Requisite Unitholders may remove the Trustee and appoint a successor trustee by written instrument, in duplicate, which instrument shall be delivered to the Trustee so removed and to the successor trustee.

(c)     FGIC, with the written consent of the Requisite Unitholders, may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(d)     The Requisite Unitholders, with the written consent of FGIC (which consent shall not be unreasonably withheld or delayed by FGIC in the event the Trustee is in default of its obligations hereunder to enforce the Covered FGIC Insurance Policy), may at any time remove the Trustee and appoint a successor trustee by written instrument or instruments, signed by such Requisite Unitholders or their attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Trustee so removed and one complete set to the successor trustee so appointed.

(e)     Any resignation of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until the acceptance of appointment by the successor trustee as provided in Section 7.8 hereof. The compensation and reimbursement for fees and expenses of any successor trustee appointed in connection with the resignation of the Trustee shall be the sole responsibility of the Trust, including the costs and expenses incurred in connection with any such succession.

(f)     Any removal of the Trustee and appointment of a successor trustee pursuant to any of the provisions of this Section 7.7 shall not become effective until (i) acceptance of appointment by the successor trustee as provided in Section 7.8 hereof and (ii) payment of all costs, expenses and indemnities due and owing to the outgoing Trustee, including the costs and expenses incurred in connection with any such succession. In the event the Trustee is removed due to a request by the Requisite Unitholders pursuant to Section 7.7(b), then the fees and expenses of the successor trustee incurred in connection with any such succession shall be the sole responsibility of the Unitholders requesting such removal.

28

(g)    The compensation for any successor trustee shall be paid in substantially the same manner as compensation was paid to the predecessor trustee.

(h)    Notwithstanding the replacement of the Trustee pursuant to this Section 7.7, the rights, benefits, protections and indemnities afforded to the Trustee under this ARTICLE VII shall continue to the benefit of the retiring Trustee.

Section 7.8    Successor Trustee.

(a)    Any successor trustee appointed as provided in Section 7.7 shall execute, acknowledge and deliver to the Unitholders, FGIC and the predecessor trustee an instrument accepting such appointment under this Trust Agreement and thereupon the resignation or removal of the predecessor trustee shall become effective and such successor trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as trustee herein. The predecessor trustee shall deliver to the successor trustee all related documents and statements held by it under this Trust Agreement and the predecessor trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor trustee all such rights, powers, duties and obligations.

(b)    No successor trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor trustee shall be eligible under the provisions of this Section 7.6 hereof.

(c)    Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall (a) post to EMMA notice of the succession of such trustee under this Trust Agreement and (b) provide notice of the succession of such trustee under this Trust Agreement to the Depositary.

Section 7.9    Merger or Consolidation of Trustees.

Any Person into which either of the Trustees may be merged or converted or with which it may be consolidated or any Person resulting from any merger, conversion or consolidation to which such Trustee shall be a party, or any Person succeeding to all or substantially all of the corporate trust business of such Trustee, shall be the successor of such Trustee under this Trust Agreement, provided such Person shall be eligible under the provisions of Section 7.6 (as to the Trustee) and 7.14 (as to the Delaware Trustee), without the execution or filing of any paper or any further act on the part of any of the Parties, anything herein to the contrary notwithstanding.

Section 7.10    Appointment of Trustee Custodians.

The Trustee may appoint one or more custodians (each a "Trustee Custodian") to hold all or a portion of the Trust Estate as agent for the Trustee, by entering into a custodial agreement. The appointment of any Trustee Custodian may at any time be terminated and a substitute custodian appointed therefor by the Trustee. Subject to ARTICLE VII, the Trustee agrees to comply with the terms of each custodial agreement and to enforce the terms and provisions thereof against the Trustee Custodian for the benefit of the Unitholders. Each Trustee Custodian

shall be a depository institution or trust company subject to supervision by federal or state authority, shall have combined capital and surplus of at least $10,000,000 and shall be qualified to do business in the jurisdiction in which it holds any asset constituting part of the Trust Estate. Any such Trustee Custodian may not be an Affiliate of the Commonwealth or FGIC. The Trustee is responsible for the fees and expenses of any Trustee Custodian appointed hereunder.

Section 7.11   Trustee May Enforce Claims Without Possession of Certificate.

All rights of action and claims under this Trust Agreement or the Certificate may be prosecuted and enforced by the Trustee without the possession of any of the Trust Units or the production thereof in any proceeding relating thereto and any such proceeding instituted by the Trustee shall be brought in its own name or in its capacity as Trustee. Any recovery of judgment shall, after provision for the payment of the reasonable compensation, fees, expenses, disbursements and advances of the Trustee, its agents and counsel, be for the ratable benefit of the Unitholders in respect of which such judgment has been recovered.

Section 7.12   Trustee Indemnity.

The Trust shall indemnify the Trustees for, and hold them harmless against, any loss, liability or expense arising out of or in connection with their acceptance or administration of the Trust, including the reasonable costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their respective powers or duties hereunder, provided in each case that such loss, liability, expense, cost or claim does not relate to or arise out of or in connection with either Trustee's gross negligence, bad faith or willful misconduct.

Section 7.13   Acceptance by Trustees, Representations and Warranties of Trustees.

The Trustees each hereby undertake to perform their respective obligations set forth herein. The Trustee hereby agrees to hold the Trust Assets, as trustee in trust on behalf of the Trust upon the terms and conditions and for the use and benefit of the Unitholders as herein set forth. The Trustees each as to itself hereby represent and warrant to each of the Commonwealth, FGIC, holder of the Certificate and holders of the Units that as of the Closing Date:

(a)    it is duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation or association;

(b)    it has full corporate power, authority and right to execute, deliver and perform its duties and obligations under this Trust Agreement, and has taken all necessary corporate action to authorize the execution, delivery and performance by it of this Trust Agreement, including the execution and delivery of the Certificate on behalf of the Trust;

(c)    the execution and delivery of this Trust Agreement by it and its performance of and compliance with the terms of this Trust Agreement will not violate its certificate of incorporation, association or other constituent documents or by-laws or constitute a default under, or result in the material breach or acceleration of, any material contract, agreement or other instrument to which it is a party or which may be applicable to it or any of its assets;

(d)     as of the Closing Date, this Trust Agreement has been duly executed and delivered by it and, assuming the due authorization, execution and delivery of this Trust Agreement by each of the other parties hereto, constitutes the legal, valid and binding obligation of it, enforceable in accordance with its terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the rights of creditors generally and general principles of equity;

(e)     it is not in violation, and the execution and delivery of this Trust Agreement by it and its performance and compliance with the terms thereof will not constitute a violation, of any order or decree of any court or any order or regulation of any federal, state, municipal or governmental agency having jurisdiction over it or its properties, which violation would reasonably be expected to have a material adverse effect on the condition (financial or otherwise) or operations of it or its properties or on the performance of its duties hereunder;

(f)     there are no actions or proceedings against, or investigations of, it pending, or, to its knowledge, threatened, before any court, administrative agency or other tribunal (i) that could reasonably be expected to prohibit its entering into this Trust Agreement, (ii) seeking to prevent the issuance of the Certificate contemplated by this Trust Agreement or (iii) that could reasonably be expected to materially affect the performance by it of its obligations under, or the validity or enforceability against it of, this Trust Agreement; and

(g)     no consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by it of, or compliance by it with, this Trust Agreement, or for the consummation of the transactions contemplated by this Trust Agreement, except for such consents, approvals, authorizations and orders, if any, that have been obtained prior to the Closing Date, other than the filing of the Certificate of Trust with the Secretary of State.

Section 7.14   The Delaware Trustee.

(a)     There shall at all times be a Delaware Trustee. The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law and acts through one or more persons authorized to bind such entity.  The initial Delaware Trustee shall be U.S. Bank Trust National Association.  The Delaware Trustee shall be entitled to all of the rights, privileges, immunities, indemnities and protections afforded to the Trustee hereunder, but will only have such responsibilities and obligations as expressly provided by reference to the Delaware Trustee hereunder.

(b)     The Delaware Trustee shall be one of the trustees of the Trust for the sole and limited purpose of fulfilling the requirements of Section 3807 of the Delaware Trust Statute and for taking such actions as are required to be taken by a Delaware Trustee under the Delaware Trust Statute. The duties, liabilities and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the Trust in the State of Delaware; and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the

Delaware Trustee is required to execute under Section 3811 of the Delaware Trust Statute (only upon the written direction of the Trustee); and there shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  With the exception of the express duties set forth in this Section 7.14 (b), and the implied contractual covenant of good faith and fair dealing, all other duties of the Delaware Trustee, including fiduciary duties, are expressly eliminated.  The Delaware Trustee shall have no liability to the Trust, to the Trustee, to any beneficiary, or to any other person that is a party to or is otherwise bound by this Trust Agreement for breach of contract or breach of duties (including fiduciary duties), except for any act or omission that constitutes a bad faith violation of the implied contractual covenant of good faith and fair dealing.  The Delaware Trustee shall not be liable for any acts or omissions, except for such losses, damages or expenses which have been finally adjudicated by a court of competent jurisdiction to have directly resulted from the Delaware Trustee's gross negligence, bad faith or willful misconduct.

(c)     The Delaware Trustee shall not be liable for the acts or omissions of the Trust, the Trustee or any other person or entity, nor shall the Delaware Trustee be liable for supervising or monitoring the performance of the duties of the Trustee or the Trust or of any other person or entity under this Trust Agreement or any related document.

(d)     The Delaware Trustee shall not be personally liable for any error of judgment made by an Officer of the Delaware Trustee having direct responsibility for the administration of this Trust Agreement in good faith.

(e)     No provision of this Trust Agreement shall require the Delaware Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its duties hereunder.

(f)     Under no circumstance shall the Delaware Trustee, in its individual capacity or in its capacity as Delaware Trustee, or any member, partner, shareholder, director, officer, employee, agent, affiliate or advisor of the Delaware Trustee or their respective affiliates be personally liable for any representation, warranty, covenant, agreement, liability or indebtedness of the Trust, as all such representations, warranties, covenants, agreements, liabilities or indebtedness of the Trust are those of the Trust as an entity.

(g)     The recitals contained herein shall not be taken as the statements of the Delaware Trustee, and the Delaware Trustee does not assume any responsibility for their correctness.  The Delaware Trustee shall not be personally responsible for or in respect of, and the Delaware Trustee makes no representations as to, the title to, or value or condition of, the property of the Trust or any part thereof, including the Trust Assets or Trust Estate, nor as to the validity or sufficiency of this Trust Agreement or any related certificate, instrument or other document.

(h)     The Delaware Trustee may conclusively rely and shall be fully protected, and shall incur no liability to anyone, in acting or refraining from acting in good faith and in reliance upon any signature, instrument, notice, resolution, request, instruction, direction, consent, order, certificate, report, opinion, bond or other document or paper believed by it to be genuine and believed by it to be signed by the proper party or parties.  The Delaware Trustee may accept a

certified copy of a resolution of any governing body of any person as conclusive evidence that such resolution has been duly adopted by such person and that the same is in full force and effect.   As to any fact or matter the manner of ascertainment of which is not specifically prescribed herein or whenever the Delaware Trustee shall deem it desirable that a fact or matter be proved or established prior to taking, suffering or omitting any action hereunder (including, direction by the Trustee with respect to such action), the Delaware Trustee may for all purposes hereof rely on a certificate, signed by any officer of the party delivering the certificate or, in the case of the Trustee, signed by the Trustee, as to such fact or matter, and such certificate shall constitute full protection to the Delaware Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

(i)    In accepting and performing its duties hereunder the Delaware Trustee acts solely as Delaware Trustee hereunder and not in its individual capacity, and all persons having any claim against the Delaware Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the Trust Assets for payment or satisfaction thereof.

(j)    The Delaware Trustee may be removed by FGIC with the written consent of the Requisite Unitholders upon thirty (30) days prior written notice to the Delaware Trustee, with a copy to the Trustee. The Delaware Trustee may resign upon thirty (30) days prior written notice to FGIC, with a copy to the Trustee. No resignation or removal of the Delaware Trustee shall be effective except upon the appointment of a successor Delaware Trustee that (i) is reasonably acceptable to FGIC, (ii) has a combined capital and surplus of at least $10,000,000 and (iii) is qualified to do business in the State of Delaware and satisfies the requirements of the Delaware Trust Statute. If no successor has been appointed within such thirty (30) day period, the Delaware Trustee, FGIC or the Unitholders may petition a court to appoint a successor Delaware Trustee, which shall be at the expense of the Trust.

## ARTICLE VIII

## DEFAULT ON NEW GO BONDS OR GO CVIs

Section 8.1    Realization Upon Default.

(a)    The Trustee shall assert claims under the New GO Bonds or GO CVIs and the Covered FGIC Insurance Policy, and shall take such reasonable steps as are necessary to receive payment or to permit recovery thereunder following any default thereunder, with respect to the Covered FGIC Insurance Policy, in accordance with Section 3.3(b) hereof and, with respect to the New GO Bonds or GO CVIs, in accordance with Section 6.1(b) hereof.

(b)    If there is a breach, a default or an event of default with respect to any New GO Bond or GO CVI and such breach, default or event of default is known to the Trustee in accordance with Section 7.2(i), the Trustee shall give notice thereof to the Unitholders (through the Depositary) and FGIC as promptly as practicable, and, in any event, within three (3) Business Days after such breach, default or event of default becomes known to the Trustee. However, ifIf the Trustee receives notice of an anticipated payment default with respect to any New GO Bond or the GO CVIs in accordance with Section 7.2(i), the Trustee shall give notice thereof to the

33

Unitholders (through the Depositary) and FGIC within three (3) Business Days after receipt of such notice.

(c)     The foregoing provisions of this Section 8.1 shall apply equally to any other securities or property received in respect of the New GO Bonds or GO CVIs or in exchange therefor.

## ARTICLE IX

## TERMINATION OF TRUST

Section 9.1     Termination; No Redemption Rights.

Upon the indefeasible cancellation or other indefeasible termination or discharge of the Covered FGIC Insurance Policy or FGIC's obligations thereunder, the Trust (including the respective obligations and responsibilities under this Trust Agreement of the Trustee and FGIC) shall terminate upon (i) the pro rata payment or distribution to the Unitholders of all amounts or Trust Assets (including the New GO Bonds and GO CVIs) held by or on behalf of the Trustee and required hereunder to be so paid or distributed, (ii) payment in full of any Trustee Costs due and owing to the Trustee under this Trust Agreement, and (iii) receipt by the Trustee of an Opinion of Counsel stating that all conditions precedent herein relating to the satisfaction and discharge of this Trust Agreement have been complied with. In no event shall the Trust be terminated or the New GO Bonds or GO CVIs be redeemed (except in the case of a redemption of the New GO Bonds or GO CVIs permitted under the terms of the New GO Bond Indentures or the New GO Bond Legislation) or otherwise released from the Trust Estate without the prior express written consent of FGIC if either (i) the Covered FGIC Insurance Policy or FGIC's obligations thereunder has not been indefeasibly terminated or discharged, or (ii) FGIC has not been indefeasibly paid in full for any amounts owed pursuant to the Plan.

Notwithstanding anything contained herein to the contrary, the merger or consolidation of the Trustee shall not cause a termination of the Trust.

Section 9.2     Procedure for Termination.

(a)     During the month in which the Trustee intends to make the final distribution from the Trust, the Trustee shall give notice to the Unitholders in accordance with Section 11.4 specifying: (a) the anticipated final distribution date; (b) that the final payment with respect to the Trust Units will be made upon presentation and surrender of the Certificate at the office of the Trustee therein designated on that date and the amount of any such final payment; (c) any amounts, or trust assets, remaining on deposit in the Trust will be distributed to the holders of record of the Trust Units on a pro rata basis; and (d) that the Trustee believes that, following the occurrence of such final distributions, the conditions to termination of the Trust have been satisfied and that it intends to terminate the Trust (a "Termination Notice").

(b)     If the Requisite Unitholders do not object in writing within 30 days after the Trustee has provided the Termination Notice as set forth herein then, upon completion of

final distributions as set forth in the Termination Notice, the Trust shall be dissolved, wound up, and terminated.

(c)     Upon the dissolution, wind up and termination of the Trust and this Trust Agreement, the Trustee or Delaware Trustee (acting solely at the written direction of the Trustee) is authorized to file a certificate of cancellation with the Secretary of State.

# ARTICLE X

# TAX PROVISIONS

Section 10.1   <u>Grantor Trust Provisions.</u>

The Trustee, the Commonwealth, the Unitholders (by their acceptance of the Trust Units) and FGIC each agree and acknowledge or have agreed and acknowledged that the Trust is intended to qualify for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust, and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture or association taxable as a corporation or to serve as associates in a joint enterprise for the conduct of business for profit. In furtherance of the foregoing, (a) the purpose of the Trust is and shall be to protect and conserve the assets of the Trust Estate, and the Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity, (B) the Trust is formed to facilitate direct investment in the Trust Assets and the existence of multiple classes of ownership interests is incidental to that purpose, and (c) the Trustee (at the direction of FGIC and/or the Requisite Unitholders), shall take, or refrain from taking, all such action as is necessary to maintain the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not (i) acquire any assets or dispose of any portion of the Trust other than pursuant to the specific provisions of this Trust Agreement, (ii) vary the investment of the Trust within the meaning of Treasury Regulation § 301.7701- 4(c), (iii) substitute new investments or reinvest so as to enable the Trust Estate to take advantage of variations in the market to improve the investment of any Unitholder or (iv) engage in any activity which may directly or indirectly, adversely affect the status of the Trust as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust. The Trustee shall not have any authority to manage, control, use, sell, dispose of or otherwise deal with any part of the Trust Estate except as required by the express terms of this Trust Agreement in accordance with the powers granted to or the authority conferred upon the Trustee pursuant to this Trust Agreement. The Trustee and FGIC each agree that they shall not take any action that would result in the Trust failing to be characterized for U.S. federal income tax purposes as an "investment trust" within the meaning of Treasury Regulation § 301.7701-4(c) that is a grantor trust.

Section 10.2   <u>Characterization.</u>

Each Unitholder acknowledges and agrees to treat the Trust Units as undivided interests in the Trust Estate.

Section 10.3    Grantor Trust Administration.

Notwithstanding anything in this Trust Agreement to the contrary, and notwithstanding any direction or instruction by less than all the Unitholders, the Trustee shall not be authorized to take any action that would cause the Trust not to be treated as a grantor trust under the Code all of the distributions and income from which would be subject to the tax treatment described in Subpart J of Chapter 1 of the Code as to the Unitholders. The Trustee shall perform its duties hereunder so as to maintain the status of the Trust as a grantor trust as provided in Section 10.1 hereof. The Trustee shall not (a) exercise any discretionary rights with respect to the Trust Assets, (b) acquire an interest in any additional Trust Assets (other than proceeds of a sale of Trust Assets permitted under the terms of this Trust Agreement), (c) knowingly take any other action or fail to take (or fail to cause to be taken) any other action that, under the Grantor Trust Provisions, if taken or not taken, as the case may be, could adversely affect the status of (i) the Trust as a grantor trust, (ii) the Trust as a U.S. trust, or (iii) the Unitholders as grantors with respect to the Trust under the Grantor Trust Provisions (any such adverse effect on trust status, an "Adverse Trust Event"), unless the Trustee has obtained or received an Opinion of Counsel nationally recognized as competent in matters relating to the U.S. federal income taxation of organizations such as the Trust (at the expense of the party requesting such action or at the expense of the Trust Estate if the Trustee seeks to take such action or to refrain from taking any action for the benefit of the Unitholders) to the effect that the contemplated action will not result in an Adverse Trust Event. None of the other parties hereto shall take any action or fail to take any action (whether or not authorized hereunder) as to which the Trustee has advised it in writing that the Trustee has received or obtained an Opinion of Counsel to the effect that an Adverse Trust Event could result from such action or failure to act. The Trustee may consult with counsel to make such written advice, and the cost of same shall be borne by the party seeking to take the action not permitted by this Trust Agreement, but in no event at the cost or expense of the Trust Estate or the Trustee.

Section 10.4    Reports to Unitholders and Tax Authorities.

(a)    The Trustee shall perform or cause to be performed on behalf of the Trust all reporting and other tax compliance duties that are required in respect thereof under the Code, the Grantor Trust Provisions or other compliance guidance issued by the Internal Revenue Service or any state or local taxing authority, including for avoidance of doubt the filing of IRS Forms 1099 or providing other information statements to the extent required pursuant to U. S. Treasury Regulations Section 1.671-5 (including U.S. Treasury Regulations Section 1.671-5(c)(1)), as amended or any successor provision (the "WHFIT Regulations").

(b)    Consistent with the Trust's characterization for U.S. federal income tax purposes as a grantor trust, except to the extent required pursuant to WHFIT Regulations, no U.S. federal income tax return shall be filed on behalf of the Trust unless either (i) the Trustee shall receive an Opinion of Counsel that, based on a change in applicable law occurring after the date hereof, the Code requires such a filing or (ii) the Internal Revenue Service shall determine that the Trust is required to file such a return. In the event that the Trust is required to file tax returns, the Trustee shall prepare or cause to be prepared, and sign and file when due with the appropriate tax authorities all of the tax returns in respect of the Trust. In no event shall the Trustees, FGIC or the Commonwealth be liable for any liabilities, costs or expenses of the Trust

or the Unitholders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except, in the case of the Trustee, for any such liability, cost or expense attributable to the Trustee's gross negligence, bad faith or willful misconduct.

(c)     If any tax is imposed on the Trust, such tax, together with all incidental costs and expenses (including, without limitation, penalties and reasonable attorneys' fees) shall be charged to and payable by the Unitholders on a pro rata basis; provided that in each case the Trustee shall be authorized to withhold the applicable amounts from Distributions on the applicable Trust Units and pay such amounts to the applicable taxing authority and that any amounts so withheld and paid to the applicable taxing authority shall be deemed to have been paid as a Distribution to the applicable Unitholders.

(d)     The Trustee shall, for U.S. federal income tax purposes, maintain books and records with respect to the Trust on a calendar year basis or such other basis as may be required under the Code.

(e)     All taxes due and payable on any amounts payable to a Unitholder with respect to a Trust Unit shall be that Unitholder's sole responsibility.

(f)     For the purposes of this ARTICLE X and any other provision of the Trust Agreement relating to the ownership of a Trust Unit for U.S. federal income tax purposes, including definitions, all references to holder, Unitholder, or beneficial owner shall mean the beneficial owner of a Trust Unit for U.S. federal income tax purposes. By acquiring an interest in a Trust Unit, a beneficial owner of the Trust Unit for U.S. federal income tax purposes shall be deemed to consent as a condition of acquiring such interest to comply with any requirements of such Article and other provisions hereof.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1     Amendment of Trust Agreement.

(a)     This Trust Agreement may not be amended, waived or supplemented without the prior written consent of FGIC. This Trust Agreement may be amended, waived or supplemented from time to time by FGIC and the Trustee without the consent of any other Party or the Depositary or any Unitholders; provided, however, that no such amendment shall:

(i)     reduce in any manner the amount of, or delay or accelerate the timing of, required distributions to any Unitholder without the written consent of such Unitholder;

(ii)     alter in any manner the treatment of the Covered FGIC Insurance Policy without the written consent of each Unitholder affected;

(iii)     amend this Section 11.1 without the written consent of each Unitholder; or

(iv)     amend the definition of Requisite Unitholders without the written consent of all Unitholders; or

(v)     adversely affect in any material respect the interests of the Unitholders in any manner other than as described in clause (i), (ii), (iii) or (iv) above without the written consent of the Requisite Unitholders.

(b)     Prior to executing any amendment permitted by this ARTICLE XI, (i) the Trustee shall be required to obtain an Opinion of Counsel that is nationally recognized as competent in matters relating to the federal income taxation of organizations such as the Trust to the effect that such amendment will not result in an Adverse Trust Event and (ii) the Trustee shall be entitled to receive, and shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Trust Agreement and that all conditions precedent have been met. The Trustee may, but shall not be obligated to, enter into any such amendment that affects the Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise. The Delaware Trustee may, but shall not be obligated to, enter into any such amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement or otherwise.  No amendment that affects the Delaware Trustee's own rights, duties, liabilities, indemnities or immunities under this Trust Agreement shall be effective against the Delaware Trustee unless the Delaware Trustee has consented thereto in writing.  Prior to executing any amendment permitted by this ARTICLE XI, the Delaware Trustee shall be entitled to receive and conclusively and exclusively rely upon written direction from the Trustee that such amendment is authorized and permitted by this Trust Agreement.

(c)     Promptly following the execution of this Trust Agreement, the Trustee shall post full and complete copies of this Trust Agreement on EMMA . Promptly after the execution of any amendment to this Trust Agreement, the Trustee shall furnish a copy of such amendment to the Depositary and shall post a copy of such amendment on EMMA.

(d)     The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Unitholders shall be subject to such reasonable regulations as the Trustee may prescribe in coordination with the Depositary.

Section 11.2   Counterparts.

This Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts may be delivered by electronic messaging system and shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement or in any other certificate, agreement or document related to this Agreement shall include images of manually executed signatures transmitted by facsimile or other electronic format (including, without limitation, "pdf", "tif" or "jpg") and other electronic signatures (including, without limitation, DocuSign and Adobe Sign). The use of electronic signatures and electronic records

(including, without limitation, any contract or other record created, generated, sent, communicated, received, or stored by electronic means) shall be of the same legal effect, validity and enforceability as a manually executed signature or use of a paper-based record-keeping system to the fullest extent permitted by applicable law, including the US Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act and any other applicable law, including, without limitation, any state law based on the Uniform Electronic Transactions Act or the Uniform Commercial Code.

Section 11.3   <u>Limitation on Rights of Unitholders.</u>

(a)   The death or incapacity of any Unitholder shall not operate to terminate this Trust Agreement or the Trust, nor entitle such Unitholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Trust, nor otherwise affect the rights, obligations and liabilities of the Parties or any of them.

(b)   No Unitholder shall have any right to vote (except as expressly provided for herein) or in any manner otherwise control the operation and management of the Trust, or the obligations of the Parties, nor shall anything herein set forth, or contained in the terms of the Trust Units, be construed so as to constitute the Unitholders from time to time as partners or members of an association; nor shall any Unitholder be under any liability to any third person by reason of any action taken by the Parties pursuant to any provision hereof.

(c)   No Unitholder shall have any right by virtue of any provision of this Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Trust Agreement or any of the Trust Assets. Nothing in this paragraph shall be construed to limit in any manner the ability of any Party (notwithstanding the ownership by such Party of Trust Units) to institute any suit, action or proceeding upon or under or otherwise with respect to this Trust Agreement or to enforce in any manner its rights as a party hereunder.

Section 11.4   <u>Notices.</u>

All demands ~~and~~, notices <u>and certifications</u> under this Trust Agreement shall be in writing. All demands ~~and~~, notices <u>and certifications</u> under this Trust Agreement shall be deemed to have been duly given to each Party other than FGIC when personally delivered or mailed by first class mail, postage prepaid, or by express delivery service, to such Party at (a) in the case of the Trustee, U.S. Bank National Association,  100 Wall Street, 6th floor, New York, NY 10005, (b) in the case of the Delaware Trustee, ~~_____~~<u>U.S. Bank Trust National Association,  100 Wall Street, 6th floor, New York, NY 10005</u>, and (c) in the case of the Commonwealth, _____ , or in each of the above cases such other address as may hereafter be furnished by such Party to each other Party in writing. All demands ~~and~~, notices <u>and certifications</u> under this Trust Agreement shall be deemed to have been duly given to FGIC when transmitted by email to FGIC at both of the following email addresses: ~~[_____]~~<u>generalcounsel@fgic.com and edward.turi@fgic.com</u>, or at such other email addresses as may hereafter be furnished by FGIC Party to each other Party in writing. Unless a different means of giving notice or communication to Unitholders is specified herein, any notice or communication required or permitted to be given to a Unitholder shall be

transmitted to the Depositary in accordance with its procedures. Any notice or communication so transmitted to the Depositary within the time prescribed in this Trust Agreement shall be conclusively presumed to have been duly given to the Unitholders at the time of transmission, whether or not and regardless of when any Unitholder actually receives such notice or communication. A copy of any notice given hereunder to any other Party shall be delivered to the Trustee.  The Trustee shall post all notices delivered hereunder to EMMA within five (5) Business Days of receiving such notice or a copy of such notice, as applicable.

Section 11.5   Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Trust Agreement shall be for any reason whatsoever held invalid, then to the fullest extent permitted by law such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of this Trust Agreement or of the Trust Units or the related rights of the Unitholders.

Section 11.6   Acts of Unitholders.

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Trust Agreement to be given or taken by Unitholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Unitholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee and ownership of the Units held by such Unitholders is confirmed by Depositary. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Trust Agreement and conclusive in favor of the Trustee. The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient. The ownership of Trust Units shall be proved by the Depositary.

Section 11.7   Headings.

Article and Section headings in this Trust Agreement are included herein for convenience of reference only and shall not constitute a part of this Trust Agreement for any other purpose or be given any substantive effect.

Section 11.8   No Waiver; Cumulative Remedies.

No failure to exercise and no delay in exercising, on the part of any Party of any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by law.

Section 11.9    Merger and Integration.

This Trust Agreement and the documents and exhibits expressly incorporated herein set forth the entire understanding of the Parties relating to the subject matter hereof and thereof, and all prior understandings, written or oral, are superseded by this Trust Agreement.

Section 11.10   [Reserved].

Section 11.11   Patriot Act.

The Parties acknowledge that in accordance with Section 326 of the U.S.A. PATRIOT Act, the Trustees, like all financial institutions and in order to help fight the funding of terrorism and money laundering, are required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or opens an account with the Trustees. The Parties agree that they will provide the Trustees with such information as they may request in order for the Trustees to satisfy the requirements of the U.S.A. PATRIOT Act.

Section 11.12   Governing Law; Venue Jury Waiver.

THIS TRUST AGREEMENT, THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS TRUST AGREEMENT, AND ANY CLAIM OR CONTROVERSY DIRECTLY OR INDIRECTLY BASED UPON, ARISING OUT OF, OR LEADING TO THIS TRUST AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS TRUST AGREEMENT (WHETHER BASED UPON CONTRACT, TORT OR ANY OTHER THEORY), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY OR PERFORMANCE, SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. EACH PARTY HERETO HEREBY WAIVES THE RIGHT IT MAY HAVE TO A TRIAL BY JURY ON ANY CLAIM, COUNTERCLAIM, SETOFF, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING OUT OF OR IN ANY WAY RELATED TO THIS TRUST AGREEMENT, OR (B) IN ANY WAY IN CONNECTION WITH OR PERTAINING TO OR RELATED TO OR INCIDENTAL TO ANY DEALINGS OF THE PARTIES WITH RESPECT TO THIS TRUST AGREEMENT OR IN CONNECTION WITH THIS TRUST AGREEMENT OR THE EXERCISE OF ANY PARTY'S RIGHTS AND REMEDIES UNDER THIS TRUST AGREEMENT OR OTHERWISE, OR THE CONDUCT OR THE RELATIONSHIP OF THE PARTIES HERETO, IN ALL OF THE FOREGOING CASES WHETHER NOW EXISTING OR HEREAFTER ARISING AND WHETHER IN CONTRACT, TORT OR OTHERWISE. EACH OF THE PARTIES IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL OR STATE COURTS SITTING IN THE STATE OF DELAWARE IN RESPECT OF ANY ACTION OR PROCEEDING ARISING OUT OF OR IN CONNECTION WITH THIS TRUST AGREEMENT. EACH PARTY TO THIS TRUST AGREEMENT IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH PROCEEDINGS

IN ANY SUCH COURT AND ANY CLAIM THAT ANY PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 11.13  Force Majeure.

In no event shall the Trustees be responsible or liable for any failure or delay in the performance of their obligations hereunder arising out of or caused by, directly or indirectly, forces  beyond their control, including strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, epidemics, pandemics, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Trustees shall use reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as practicable under the circumstances.

Section 11.14  Intent of Parties.

(a)     The Parties intend that, for all purposes, the transfer to the Trust of the Trust Estate pursuant to Section 2.2 in each case shall be, and shall be construed as, a transfer thereof to the Trust on behalf of the Original Holders in lieu of a transfer thereof to the Trust directly by the Original Holders and shall constitute, in all respects, an absolute, irrevocable transfer, conveyance, and assignment, without recourse, of the Trust Estate to the Trust, and immediately after giving effect to the transfer contemplated hereby on the Closing Date, the Commonwealth will have no further interest (legal or equitable) in the Trust Estate and the Trust Estate will not be property of the Commonwealth or the Commonwealth's estate in the event of a liquidation, reorganization, or similar proceeding of the Commonwealth and the Trust shall have the absolute right to take whatever action it may deem appropriate with respect to the Trust Estate. The Parties agree to treat the transfer contemplated hereby for all purposes (including financial accounting purposes) as an absolute transfer on all relevant books, records, financial statements and other documents.

(b)     The Trust Estate will be held by the Trust free and clear of any lien or encumbrance of any Person claiming through or under the Commonwealth.

(c)     Notwithstanding anything to the contrary in this Trust Agreement or in any other document governing the formation, management, or operation of the Trust, if and for so long as any Trust Unit remains outstanding, none of the Unitholders, FGIC, the Trustees, nor any other Person shall authorize, cause or permit the Trust to (and the Trust shall not, and neither Trustee shall directly take any action that to its actual knowledge would, violate any of the following):

(i)     engage in any business or engage in any activity other than those activities expressly permitted in this Trust Agreement and will not have, incur, guarantee or become liable for any indebtedness or obligations except as expressly contemplated in this Trust Agreement;

(ii)     acquire or own any assets other than the Trust Estate or lease any assets;

(iii)    fail to preserve its existence as an entity duly formed, validly existing and in good standing (if applicable) under the laws of the State of Delaware, or fail to remain qualified to do business in each state in which such qualification is required, for any reason, including in order to perform its obligations under this Trust Agreement;

(iv)    fail to observe at any time any necessary, appropriate and customary corporate, organizational, company and/or other legal formalities to maintain its separate existence;

(v)    fail to act solely in its own name or in the name of the Trustee through duly authorized agents in the conduct of its activities;

(vi)    provide for the payment of its expenses, indebtedness or other obligations other than from its own separate assets;

(vii)    have its debts or other obligations guaranteed by any other Person or hold itself out as responsible for the debts or other obligations of any other Person;

(viii)    commingle its assets or liabilities with those of any other Person;

(ix)    fail to maintain its own records, books of account, bank accounts, accounting records and other entity documents separate and apart from those of any other Person;

(x)    divert funds for any purpose other than as set forth in this Trust Agreement;

(xi)    enter into any contract, agreement or transaction with any Unitholders, the Commonwealth, FGIC, any principal or other Affiliate of the Trust, or any shareholder, general partner, member, principal or Affiliate thereof, except as expressly authorized herein;

(xii)    maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(xiii)    incur, create or assume any indebtedness of or buy or hold evidence of indebtedness issued by any other Person (other than as contemplated by this Trust Agreement); guarantee or hold itself out to be responsible for the debts of another Person or otherwise pledge its assets to secure the obligations of any other Person, or hold out its credit or assets as being available to satisfy the obligations of any other Person or seek to incur, create or assume any indebtedness based upon the assets of any other Person;

(xiv)    perform any duties or obligations of the Commonwealth or any other Person;

(xv)    make any loans or advances to any third party, including any Unitholder, the Commonwealth or any Affiliate of the Trust, or any principal or Affiliate thereof;

(xvi)   fail to file its own tax returns as and if required to do so by applicable law (subject to any permitted extensions and except to the extent the Trust is treated as a grantor trust for tax purposes) and to pay any taxes required to be paid by it under applicable law;

(xvii)   fail to hold itself out to the public as a legal entity separate and distinct from any other Person, fail to conduct its activities solely in its own name or in the name of the Trustee and as a separate and distinct entity, or fail to correct any known misunderstanding regarding its separate identity;

(xviii)  identify itself as a department or division of any other Person;

(xix)   fail to observe all formalities required of a Delaware statutory trust;

(xx)   fail to pay its expenses and liabilities only out of its own funds to the extent such funds are available and fail to hold its assets only in its own name; provided, however, the foregoing shall not require the Commonwealth to sell any assets, or make any capital contribution, to the Trust;

(xxi)   conduct any oral or written communication, including letters, invoices, purchase orders, contracts, statements and applications, other than in its own name or in the name of the Trustee; or

(xxii)  (a) institute proceedings to have the Trust declared or adjudicated a bankrupt or insolvent, (b) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (c) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (d) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (e) make any assignment for the benefit of the Trust's creditors, (f) cause the Trust to admit in writing its inability to pay its debts generally as they become due or (g) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing.

(d)   Failure of the Trust, the Commonwealth, FGIC, any Unitholder, any Trustee or any other Person on behalf of the Trust, to comply with any of the foregoing covenants set forth in this Section 11.14 shall not affect the status of the Trust as a separate legal entity (unless in violation of the Delaware Trust Statute) nor cause the Trust to dissolve or terminate.

(e)   To the extent that any provision of this Section 11.14 conflicts with, violates or otherwise is in contravention with any other provision of this Trust Agreement, the Parties and each Unitholder agree that the terms set forth in this Section 11.14 shall be controlling as expressly set forth herein.

44

Section 11.15  Non-Petition.

The Commonwealth, FGIC, the Trustee and the Delaware Trustee, by entering into this Agreement, and the Unitholders, by accepting a Trust Unit, hereby covenant and agree that they will not at any time institute against the Trust, or join in instituting against the Trust, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any federal or state bankruptcy or similar law; provided, however, that in the event a bankruptcy or similar proceeding is instituted against the Trust by another Person, the Trustee may file appropriate proofs of claim.

Section 11.16  Certain Terms Regarding the Commonwealth.

For the avoidance of doubt and notwithstanding any terms appearing herein or elsewhere to the contrary:

(i)     The obligations of the Trust under the Trust Units and this Trust Agreement are non-recourse obligations of the Trust payable solely from the Trust Estate, and following realization of the Trust Estate, and its reduction to zero, any claims of the Unitholders shall be extinguished. The Trust Units are not obligations of, and are not guaranteed by, the Commonwealth, and no recourse shall be had against any officer, director, manager, employee, security holder or incorporator of the Commonwealth, or its successors or assigns, for the payment of any amounts payable under the Trust Units or the payment or performance of any obligation of the Trust under or pursuant to this Trust Agreement.

(ii)    The recitals contained in this Trust Agreement and in the Trust Units, shall be taken as the statements of the Trust, and the Commonwealth assumes no responsibility for their correctness. The Commonwealth makes no representation as to the validity or sufficiency of this Trust Agreement, of the Trust, or of the Trust Units.

(iii)   In purchasing any Trust Units the purchaser shall be deemed to acknowledge, represent and agree, that none of the Commonwealth nor any of its affiliates, is acting as a fiduciary or a financial or investment advisor for such purchaser, and such purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, representations or recommendations (in each case whether written or oral) of the Commonwealth or any of its affiliates.

(iv)    The Commonwealth shall not be accountable for the use or application by the Trust of the Trust Units or the proceeds thereof or any amounts paid to the Trust pursuant to the provisions of this Trust Agreement.

Section 11.17  Certain Terms Regarding FGIC.

(a)     In addition to notices required to be provided elsewhere under this Trust Agreement, the Trustee shall promptly provide notice to FGIC with respect to each of the following:

(i)      any determination or intention of the Trustee or the Delaware Trustee to resign or terminate its duties hereunder;

(ii)      the amount of any cash received by the Trust, and the date on which it was received; and

(iii)      the amount of, and the Record Date and distribution date for, any distributions that the Trust is required to make to Unitholders.

(b)      The Trustee shall promptly furnish FGIC with copies of each report, notice or other communication sent to Unitholders. The Trustee shall seek to discuss and consult with FGIC regarding the same before sending them to Unitholders.

(c)      The Trustee, upon FGIC's request, shall provide additional information with respect to the Trust or the Trust Assets, including requesting from the Commonwealth information concerning the New GO Bonds or the GO CVIs and thereafter providing any such information received to FGIC.

(d)      The Trustee, upon FGIC's request, will discuss and consult with FGIC regarding matters concerning (i) the Covered FGIC Insured Bonds and FGIC's remaining obligations under the Covered FGIC Insurance Policy, including claims that the Trustee intends to assert thereunder, and (ii) the New GO Bonds and the GO CVIs held by the Trust.

**IN WITNESS WHEREOF**, the Parties have caused this Trust Agreement to be duly executed by their respective officers thereunto duly authorized and all as of the date first set forth above.

[ADD SIGNATURE BLOCKS]

**COMMONWEALTH   OF   PUERTO RICO**

By:_____
Name:_____
Title:_____


**FINANCIAL   GUARANTY   INSURANCE COMPANY**

By:_____
Name:

46

Title:

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By:
Name:
Title:

U.S. BANK TRUST NATIONAL
ASSOCIATION, as Delaware Trustee

By:
Name:
Title:

# EXHIBIT A

Trust Assets

FGIC Insurance Policy Number:

FGIC Insured Bonds description and CUSIP number:

Covered FGIC Insured Bond principal amount: [$_____] in aggregate principal amount

Allocable Plan Consideration:

Cash:

New GO CIBs:

New GO 5.0% CABs:

New GO 5.375% CABs:

GO CVIs:

A-1

## EXHIBIT B

[Form of Notice to Unitholders and FGIC]

[_____] CUSTODIAL TRUST
STATEMENT OF QUARTER ENDED [_], 20[__]

**POSTED TO EMMA**
U.S. Bank [Trust] National Association, as Trustee

## 1.    Distributions to Unitholders (Sections 4.1(a) and (b))

|  | For Quarter Ended [_], 20__ | | Year to date, [_], 20[__] | |
|---|---|---|---|---|
| Source of Distributions | Aggregate Distributions | Per Unit Distributions | Aggregate Distributions | Per Unit Distributions |
| Asset Sales (Section 4.1(a)(i)) | $ | $ | $ | $ |
| Principal and interest payments (Section 4.1(a)(ii)) | | | | |
| CVI payments (Section 4.1(a)(iii)) | | | | |
| Policy Claim payments (Section 4.1(b)) | | | | |
| DPO payments (Section 4.1(b)) | | | | |
| DPO Accretion payments (Section 4.1(b)) | | | | |

## 2.    Balances of New GO Bonds and GO CVIs (Section 4.1(c))

|  | As of [_], 20[_] | |
|---|---|---|
|  | Aggregate principal/accreted amount of New GO Bonds/GO CVIs (by CUSIP) | Per Unit principal/accreted amount of New Go Bonds/GO CVIs (by CUSIP) |
| New GO Bonds CUSIP CUSIP CUSIP | $ | $ |
| GO CVIs CUSIP | | |

B-1

3.      **DPO and DPO Accretion Balances** **(Section 4.1(d))**

DPO balance as of last day of quarter:  $

DPO Accretion balance as of last day of quarter:  $

4.      **Covered FGIC Insured Bonds** **(Section 4.1(e))**

Accrued and unpaid interest on Covered FGIC Insured Bonds as of last day of quarter:  $

Principal amount of Covered FGIC Insured Bonds as of last day of quarter:  $

Description of change(s) in such amounts since prior quarter:

5.      **Payments to Trustees for such Quarter** **(Section 4.1(g))**

Fees paid to the Trustee:

Fees paid to the Delaware Trustee:

Trustee Cost amount(s) paid pursuant to Section 7.5(a)(ii) and description:

Trustee Cost amount(s) paid pursuant to Section 7.5(b) and description:

Indemnification amount(s) paid pursuant to Section 7.12 and description:

~~Trustee Cost amount(s) paid pursuant to Section 7.5(b) and description:~~

~~Other Trustee Cost amount(s) and description:~~

Ending Fee Reserve Balance:

6.      **Notices received by Trustee during such Quarter**
[Copy attached] [Not applicable]

7.      **Tax Reporting Required for such [Quarter][Year]**
[Copy attached] [Not applicable[5]]

---

[5] May be used for quarterly reporting only.

B-2

**[8.      Other Trust Costs for such Quarter (Section 4.1(g)(ii))**

Other Trust Cost amount(s) reimbursed pursuant to Section 7.5(c):][6]

---

[6] Include item 8 only if applicable to the Quarter.

B-3

## EXHIBIT C

[Form of Certificate]

[_____] CUSTODIAL TRUST CERTIFICATE

THIS CERTIFICATE IS REGISTERED IN THE NAME OF A DEPOSITARY OR A NOMINEE OF A DEPOSITARY. THIS CERTIFICATE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY.

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE ~~DEPOSITARY~~ DEPOSITORY TRUST COMPANY ("DTC") TO THE TRUSTEE (AS DEFINED IN THE TRUST AGREEMENT REFERRED TO BELOW) OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST THEREIN.

THIS CERTIFICATE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED ENTIRELY THEREIN WITHOUT REFERENCE TO SUCH STATE'S PRINCIPLES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

THIS CERTIFICATE MAY BE SUBJECT TO ADDITIONAL OBLIGATIONS FOLLOWING TRANSFER AS PROVIDED IN THE TRUST AGREEMENT FOR THE TRUST TO WHICH THIS CERITIFCATE RELATES.

\\NY - 021918/000051 - 10385277 v6

[_____] CUSTODIAL TRUST

Certificate No. _____

Initial Notional Amount of Units: $[_____]

CUSIP: [_____]

This certifies that CEDE & CO. is the registered owner of this Certificate and of the [Notional Amount of the] Units evidenced by this Certificate.

The Units evidenced by this Certificate represent a beneficial ownership interest in the Trust created by the Trust Agreement (the "Trust Agreement"), dated as of [                ], 2021 2022, with respect to the [_____] Custodial Trust (the "Trust"), by and among the Commonwealth of Puerto Rico (the "Commonwealth"), Financial Guaranty Insurance Company ("FGIC"), [U.S. Bank National Association], as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee (the "Delaware Trustee" and together with the Trustee, collectively the "Trustees").

To the extent not defined herein, all capitalized terms shall have the meanings assigned to such terms in the Trust Agreement. This Certificate is issued under and subject to the terms, provisions and conditions of the Trust Agreement. By acceptance of this Certificate, the registered owner of this Certificate and each Unitholder assents to and becomes bound by the Trust Agreement.

The Trust Assets, on the Closing Date, consist of: (i) the Allocable Plan Consideration comprising Cash, New GO Bonds and GO CVIs as specified on Exhibit A to the Trust Agreement; (ii) the Covered FGIC Insured Bonds as specified on Exhibit A to the Trust Agreement; (iii) the Covered FGIC Insurance Policy as specified on Exhibit A to the Trust Agreement; (iv) any and all agreements, documents and instruments relating to the Covered FGIC Insurance Policy; and (v) and any other securities, monies, proceeds or property received on account thereof or exchanged therefor from time to time, as well as any other rights, benefits, protections, remedies and claims pertaining thereto.

Subject to the terms and conditions of the Trust Agreement and until the obligations created by the Trust Agreement shall have terminated in accordance therewith, any distributions to Unitholders shall be distributed on each distribution date to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution and all distributions shall be in accordance with the terms of the Trust Agreement.

Distributions on this Certificate shall be made, in accordance with arrangements satisfactory to the Trustee and subject to the requirements of the Trust Agreement, by wire transfer of immediately available funds to the Person in whose name this Certificate is registered at the close of business on the related Record Date for such distribution in accordance with the procedures of the Depositary.

This Certificate does not purport to summarize the Trust Agreement and reference is hereby made to the Trust Agreement for information with respect to the rights, benefits, obligations and duties evidenced thereby. A copy of the Trust Agreement may be examined during normal business hours at the Corporate Trust Office of the Trustee and at such other places, if any, designated by the Trustee, by the holder of this Certificate or any Unitholder at a time agreed upon ~~request~~ by such holder or Unitholder and the Trustee.

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Trustee, by manual or facsimile signature, this Certificate shall not entitle the holder of this Certificate or any Unitholder hereof to any benefit under the Trust Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Trustee, on behalf of the Trust, and not in its individual capacity, has caused this Certificate to be duly executed.

[_____] CUSTODIAL TRUST

CERTIFICATE NO. _____

U.S. BANK NATIONAL ASSOCIATION, as Trustee

By:_____
Name:
Title:

DATED:

~~[SEAL]~~

Trustee's Certificate of Authentication:

This is the Certificate referred to in the within-mentioned Trust Agreement.

[U.S.    BANK    ~~TRUST~~ NATIONAL ASSOCIATION~~]~~, as Trustee

By:_____
Name:
Title:

C-3

## <u>EXHIBIT D</u>

[Form of Certificate of Trust]

CERTIFICATE OF TRUST OF
[_____] CUSTODIAL TRUST

THIS Certificate of Trust of [_____] Custodial Trust (the "<u>Trust</u>"), is being executed and filed by the undersigned as trustees, to form a statutory trust under the Delaware Statutory Trust Act (12 DEL. CODE, <u>Sections 3801</u>, *et seq.*) (the "<u>Act</u>").

1.     NAME.  The name of the statutory trust formed hereby is "[_____] Custodial Trust."

2.     DELAWARE TRUSTEE.  The name and business address of the trustee of the Trust in the State of Delaware are U.S. Bank Trust National Association, 300 Delaware Avenue, 9th Floor, Wilmington, Delaware 19801.

3.     EFFECTIVE   DATE.   This   Certificate   of   Trust   shall   be   effective [_____].

IN  WITNESS  WHEREOF,  the  undersigned,  being  the  trustees  of  the  Trust,  have executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

[U.S.   BANK   TRUST   NATIONAL ASSOCIATION], as Delaware Trustee

By:_____
Name:
Title:

[U.S.   BANK   ~~TRUST~~   NATIONAL ASSOCIATION],
as Trustee

By:_____
Name:
Title:

**EXHIBIT E-1**

[Form of Notice ~~and Instruction~~ Relating to Permitted Sale Event]

NOTICE ~~AND INSTRUCTION~~

~~U.S. Bank Trust National Association~~
~~100 Wall Street, Suite 1600~~
~~New York, NY 10005~~

~~Re: Threshold Event or Permitted Sale Event~~

~~Ladies and Gentlemen:~~

~~Reference is made to the Trust Agreement, dated as of [_____], 2021 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), [U.S. Bank Trust National Association], as trustee (the "Trustee"), and [U.S. Bank Trust National Association], as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.~~

~~This notice is being provided to the Trustee, pursuant to and in accordance with Section 3.5 of the Trust Agreement and as contemplated by clause (ii) of the definition of "Permitted Sale Event". Accordingly, FGIC hereby instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [[the][each] series of the New GO Bonds] [and] [the GO CVIs] listed in Annex A in the [respective] amount[s] and at the [respective] Permitted Sale Price[s] for [such series of New GO Bonds] [and] [the GO CVIs] specified on Annex A.~~

~~IN WITNESS WHEREOF, FGIC has executed and delivered this Notice and Instruction as of _____, 20__.~~

~~FINANCIAL GUARANTY INSURANCE COMPANY,~~

E-1-1

By: _____
Name:
Title

**ACKNOWLEDGEMENT OF RECEIPT**

    The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice and Instruction.

                        U.S. BANK NATIONAL ASSOCIATION, as Trustee

By: _____

Name: _____

Title: _____

E-1-3

Annex A

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

| GO CVIs |
|---|

E-1-4

CUSIP No.

Amount to be Sold: $[               ]

Permitted Sale Price:[               ]

**~~EXHIBIT E-2~~**

~~Form of Notice and Instruction Relating to Threshold Event~~

~~NOTICE AND INSTRUCTION~~

U.S. Bank National Association
100 Wall Street, Suite 1600
New York, NY 10005

Re: ~~Threshold Event or~~ Permitted Sale Event

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of [_____], ~~2021~~2022 (as amended and supplemented from time to time, the "Trust Agreement") with respect to the [_____] Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), [U.S. Bank ~~Trust~~ National Association], as trustee (the "Trustee"), and [U.S. Bank Trust National Association], as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This notice is being provided to the Trustee, ~~pursuant to and in accordance with Section 3.5 of the Trust Agreement and~~ as contemplated by clause (ii) of the definition of "~~Threshold~~Permitted Sale Event" and Section 3.5(a) of the Trust Agreement. Accordingly, FGIC hereby ~~(i)~~ notifies the Trustee of its intention to instruct the Trustee ~~that the [respective] current market price[s] of~~to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [[the][each] series of the New GO Bonds] [and] [the GO CVIs] listed in Annex A ~~exceed[s]~~in the [respective] amount[s] specified on Annex A, and notifies the Trustee that the [respective] ~~Threshold~~Permitted Sale Price[s] for [such series of New GO Bonds] [and] [~~such~~the GO CVIs] ~~and (ii) instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [such series of New GO Bonds] [and] [such GO CVIs] in the amounts specified~~are as set forth on Annex A.

**IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20__.

**FINANCIAL GUARANTY INSURANCE COMPANY,**

By:_____

E-1-6

Name:
Title:

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice.

U.S. BANK NATIONAL
 ASSOCIATION, as Trustee


By:_____
Name:
Title:

**Annex A**

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

| GO CVIs |
|---|
| CUSIP No. |
| |

Amount to be Sold: $[_____]

Permitted Sale Price:[_____]

**EXHIBIT E-2**

[Form of Notice and Instruction Relating to Threshold Event]

NOTICE AND INSTRUCTION

U.S. Bank National Association
100 Wall Street, Suite 1600
New York, NY 10005

Re: Threshold Event

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of [_____], 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This notice and instruction is being provided to the Trustee, pursuant to and in accordance with Section 3.5(b) of the Trust Agreement and as contemplated by the definition of "Threshold Event".  Accordingly, FGIC hereby (i) notifies the Trustee that the [respective] current market price[s] of [[the][each] series of New GO Bonds] [and] [the GO CVIs] listed in Annex A exceed[s] the [respective] Threshold Price[s] for [such series of New GO Bonds] [and] [such GO CVIs] specified on Annex A, and (ii) instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, [such series of New GO Bonds] [and] [such GO CVIs] in the amount[s], at the sale price[s] and to the person[s] and account[s], and using the broker, if any, specified on Annex A.

**IN WITNESS WHEREOF,** FGIC has executed and delivered this Notice as of _____, 20___.

**FINANCIAL GUARANTY INSURANCE COMPANY,**

By:_____
Name:
Title:

**ACKNOWLEDGEMENT OF RECEIPT**

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Notice and Instruction.

U.S. BANK NATIONAL
 ASSOCIATION, as Trustee


By: _____
Name: _____
Title: _____

**Annex A**

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

| NEW GO BONDS | |
|---|---|
| Series | CUSIP No. |
| | |

Principal Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

| GO CVIs |
|---|
| CUSIP No. |
| |

Amount to be Sold: $[_____]

Threshold Price:[_____]

Sale Price:[_____]

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

## ~~EXHIBIT F~~ EXHIBIT E-3

Form of Trustee's Certification of Receipt of Certain Trust Assets

CERTIFICATION

~~The Depository Company~~

Re: Receipt of Certain Trust Assets

~~Ladies and Gentlemen~~

Reference is made to the Trust Agreement, dated as of [_____], 2021 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), [U.S. Bank Trust National Association], as trustee (the "Trustee"), and [U.S. Bank Trust National Association], as Delaware trustee.  Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This ~~notice~~ is being provided to the ~~Depositary,~~ pursuant to and in accordance with Section 2.3(b) of the Trust Agreement. Accordingly, the Trustee hereby certifies that as of the Closing Date, the Trustee, with respect to the Covered FGIC Insured Bonds, the New GO Bonds and the GO CVIs, [either (i) is in possession of certificates or certifications evidencing the Covered FGIC Insured Bonds, the New GO Bonds and the GO CVIs listed on Annex A, or (ii) has received confirmation from a depository (or its nominee) of such Covered FGIC Insured Bonds, the New GO Bonds and the GO CVIs listed on Annex A or a direct or indirect participant thereof that each of the Covered FGIC Insured Bonds, the New GO Bonds and the GO CVIs are beneficially owned by the Trust for the benefit of the Unitholders and FGIC].

**IN WITNESS WHEREOF,** the Trustee has executed and delivered this Certification as of _____, 20__.

F-1

U.S. BANK NATIONAL ASSOCIATION, as Trustee


By: _____
Name: _____
Title: _____


[Form of Instruction Relating to Permitted Sale Event]


INSTRUCTION


U.S. Bank National Association
100 Wall Street, Suite 1600
New York, NY 10005

   Re: Permitted Sale Event


Ladies and Gentlemen:


   Reference is made to the Trust Agreement, dated as of [_____], 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.


   This instruction is being provided to the Trustee pursuant to and in accordance with Section 3.5(b) of the Trust Agreement, based on FGIC's understanding that a Permitted Sale Event has occurred. Accordingly, as contemplated by its related Notice Relating to Permitted Sale Event dated as of [*] (the "Notice"), FGIC hereby instructs the Trustee to sell, in accordance with the provisions of Section 3.5(b) of the Trust Agreement, the [respective] amount[s] of [[the][each] series of New GO Bonds] [and] [the GO CVIs] referenced in the Notice, at the sale price[s] (which equal[s] or exceed[s] the [respective] Permitted Sale Price[s]) and to the person[s] and account[s], and utilizing the broker[s], if any, specified in Annex A hereto.


F-2

**IN WITNESS WHEREOF,** FGIC has executed and delivered this Instruction as of _____, 20___.

**FINANCIAL GUARANTY INSURANCE COMPANY,**

By: _____

Name: _____

Title: _____

F-3

## ACKNOWLEDGEMENT OF RECEIPT

The undersigned, the appointed Trustee under the Trust Agreement, hereby acknowledges receipt of the foregoing Instruction.

U.S. BANK NATIONAL
 ASSOCIATION, as Trustee

By: _____
Name: _____
Title: _____

**Annex A**

| ~~COVERED FGIC INSURED~~NEW GO BONDS | | |
|---|---|---|
| ~~Description~~ Series | CUSIP No. | ~~Principal Amount Outstanding~~ |
| | | |

Principal Amount to be Sold: $[_____]

Sale Price:[_____][7]

| **NEW GO BONDS** | | |
|---|---|---|
| Series | CUSIP No. | ~~Principal Amount Outstanding~~ |
| | | |

Principal Amount to be Sold: $[_____]

Sale Price:[_____][8]

| **GO CVIs** | |
|---|---|
| CUSIP No. | ~~[Notional] Amount Outstanding~~ |
| | |

Amount to be Sold: $[_____]

Sale Price:[_____][9]

---

[7] Equals or exceeds the Permitted Sale Price of [_____].
[8] Equals or exceeds the Permitted Sale Price of [_____].
[9] Equals or exceeds the Permitted Sale Price of [_____].

F-5

[Insert details of persons/accounts to whom the sale shall be made and any other details, including relevant broker, if any, necessary for such sale.]

## EXHIBIT F

### Form of Trustee's Certification of Receipt of Certain Trust Assets

### CERTIFICATION

To: FGIC and the Unitholders

Re: Receipt of Certain Trust Assets

Ladies and Gentlemen:

Reference is made to the Trust Agreement, dated as of [_____], 2022 (as amended and supplemented from time to time, the "Trust Agreement"), with respect to the [_____] Custodial Trust, by and among the Commonwealth of Puerto Rico, Financial Guaranty Insurance Company ("FGIC"), U.S. Bank National Association, as trustee (the "Trustee"), and U.S. Bank Trust National Association, as Delaware trustee. Capitalized terms used herein but not otherwise defined herein have the meanings assigned to them in the Trust Agreement.

This certification is being provided to the Unitholders and FGIC, pursuant to and in accordance with Section 2.3(b) of the Trust Agreement. Accordingly, the Trustee hereby certifies that as of the Closing Date, the Trustee (i) is in possession of Allocable Plan Consideration comprising cash in the amount set forth on Exhibit A of the Trust Agreement, (ii) confirms that [the New GO Bonds and the GO CVIs listed on Exhibit A of the Trust Agreement have been deposited to and are being held in the participant account of U.S. Bank National Association at the Depositary for the benefit of the Unitholders and FGIC] [it has received written statements from the trustees with respect to the New GO Bonds and the GO CVIs, respectively, confirming that the New GO Bonds and the GO CVIs listed on Exhibit A of the Trust Agreement are beneficially owned by the Trust for the benefit of the Unitholders and FGIC and being held by such trustees for the benefit of the Trust until the deposit of such New GO Bonds and GO CVIs to such account], and (iii) confirms that the Trust Units have been issued to the Original Holders.

**IN WITNESS WHEREOF,** the Trustee has executed and delivered this Certification as of _____, 2022.

U.S. BANK NATIONAL ASSOCIATION,
as Trustee

By: _____
Name: _____
Title: _____

## EXHIBIT G

[Form of Assignment]

([_____] CUSTODIAL TRUST) ASSIGNMENT

ASSIGNMENT, dated as of _____, [__], 20____ (this "Assignment"), by [U.S. Bank Trust National Association], as trustee for and on behalf of the Trust listed on Annex A hereto (the "Trust", and such trustee being the "Trustee"), to and for the benefit of Financial Guaranty Insurance Company ("FGIC").

## WITNESSETH:

WHEREAS, reference is made to (a) the Trust Agreement, dated as _____, 20212022 (the "Trust Agreement"), with respect to the Trust, by and among the Commonwealth of Puerto Rico, FGIC, the Trustee, and [U.S. Bank Trust National Association], as Delaware trustee for and on behalf of the Trust, and (b) the Covered FGIC Insurance Policy listed on Annex A hereto, issued by FGIC with respect to the Covered FGIC Insured Bonds described and the CUSIP for which is identified on Annex A hereto;

WHEREAS, Section 3.3(b) of the Trust Agreement[410] provides, among other things, that the execution and delivery of assignments (in substantially this form) by the Trustee on behalf of the Trust to FGIC (or its fiscal agent) is one of the conditions to FGIC's obligation to make payment of any claim asserted by the Trustee under the Covered FGIC Insurance Policy or any payment in respect of any DPO related to the Covered FGIC Insurance Policy which may become payable in accordance with the FGIC Rehabilitation Plan, in each case relating or with respect to the principal of the Covered FGIC Insured Bonds;

WHEREAS, Section 3.3(b) of the Trust Agreement further provides that, with respect to each such payment relating or with respect to the principal of the Covered FGIC Insured Bonds, which is paid or deemed to be paid by FGIC in cash (each a "Cash Payment"), the Trustee shall execute and deliver on behalf of the Trust to FGIC (or its fiscal agent) assignments (in substantially this form) with respect to a proportionate share (based on the proportion of such Cash Payment compared to the total principal amount of the Covered FGIC Insured Bonds then held by the Trust (the "Proportionate Share")) of the Trust Assets held by the Trust, which assignments in each case shall be required to be acknowledged in writing by the Depositary before delivery to FGIC (or its fiscal agent);

WHEREAS, for purpose of this Assignment, the Cash Payment and Proportional Share are set forth on Annex A hereto;

---

[410] This form of assignment shall also be used for any assignments pursuant to Section 3.7(b) of the Trust Agreement with conforming changes made by FGIC.

WHEREAS, in accordance with the terms of the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, FGIC (or its fiscal agent) will pay, or be deemed to have paid, the Cash Payment to the ~~Trustee~~Trust, as the Bondholder under the Covered FGIC Insured Policy, only after FGIC (or its fiscal agent) receives this Assignment executed and delivered by the Trustee ~~and acknowledged in writing by~~on behalf of the ~~Depositary~~Trust; and

WHEREAS, in accordance with the provisions of the Trust Agreement, the Trustee ~~desires~~intends to effect the assignments and transfers to FGIC contemplated hereby on behalf of the Trust.

NOW THEREFORE, in consideration of the premises and the mutual covenants and agreements herein contained, the parties hereto do hereby agree as follows:

**SECTION 1.   DEFINITIONS. CAPITALIZED TERMS USED HEREIN AND NOT OTHERWISE DEFINED HEREIN SHALL HAVE THE RESPECTIVE MEANINGS SET FORTH IN THE TRUST AGREEMENT.**

**SECTION 2.   ASSIGNMENT.**

(a)   Effective as of the date hereof and pursuant to the Covered FGIC Insurance Policy and Section 3.3(b) of the Trust Agreement, the Trustee on behalf of the Trust hereby irrevocably sells, assigns, transfers and conveys to FGIC the Proportionate Share of the Trust Assets held by the Trust as set forth in Annex A hereto (the "Assigned Trust Assets"), including all rights to payment under or with respect to the Assigned Trust Assets and all other rights therein or in relation thereto.  The Trustee shall (i) revise its registration books, and any other documents of record for the Trust Assets maintained by it, to reflect that the Assigned Trust Assets are no longer held by the Trust and have been sold, assigned, transferred and conveyed to FGIC hereunder and (ii) take such other actions as shall be necessary to transfer the Assigned Trust Assets to the account of FGIC or its custodian, in either case as directed by FGIC in writing.

(b)   The Trustee on behalf of the Trust hereby covenants and agrees to convey to FGIC, if and when received following the date hereof, any amounts related to the Assigned Trust Assets (including any sums payable as interest in respect thereof) paid to or for the benefit of the ~~Trustee~~Trust that, under subsection (a) above, belong to FGIC.

**SECTION 3.   REPRESENTATIONS AND WARRANTIES. THE TRUSTEE HEREBY REPRESENTS AND WARRANTS TO FGIC THAT:**

(a)   The Trust is the holder of the Assigned Trust Assets, and the Trustee has all requisite power and authority to execute, deliver and perform its obligations under this Assignment and to consummate the assignment contemplated herein on behalf of the Trust, and such assignment and

execution and delivery of this Assignment by the Trustee  have been duly authorized.

(b)     This Assignment has been duly executed and delivered by the Trustee on behalf of the Trust and constitutes a  legal, valid and binding obligation of the Trustee and the Trust enforceable in accordance with its terms.

(c)     The Assigned Trust Assets are free and clear of all liens and encumbrances.

**SECTION 4.   <u>GOVERNING LAW</u>. THIS ASSIGNMENT SHALL IN ALL RESPECTS BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF DELAWARE.**

**SECTION 5.   <u>COUNTERPARTS</u>. THIS ASSIGNMENT MAY BE EXECUTED IN ANY NUMBER OF COUNTERPARTS, EACH OF WHICH MAY BE DELIVERED BY ELECTRONIC MESSAGING SYSTEM AND SHALL BE DEEMED AN ORIGINAL, BUT ALL OF WHICH TOGETHER SHALL CONSTITUTE ONE AND THE SAME ASSIGNMENT.**

IN WITNESS WHEREOF, the Trustee has caused this Assignment to be duly executed and delivered on behalf of the Trust on the date first above written.

U.S. BANK NATIONAL ASSOCIATION, as Trustee


By: _____
          Name:
          Title:


As of the date first above written, The Depository Trust Company ("DTC") hereby acknowledges that the Assigned Trust Assets (other than any cash) have been sold, assigned, transferred and conveyed by the Trustee to FGIC and are no longer held by the Trust, and DTC

shall revise its registration books, and any other documents of record for such Assigned Trust Assets maintained by it, accordingly.

CEDE & CO., as nominee of The Depository Trust Company

By: _____

Name:

Title:

**ANNEX A**

Trust:  [_____] Custodial Trust

Covered FGIC Insurance Policy Number:

Covered FGIC Insured Bonds description and CUSIP number:

Cash Payment:  [$_____]

Total Principal Amount of Covered FGIC Insured Bonds held by the Trust as the date of this Assignment (immediately prior to receiving, or being deemed to have received, the Cash Payment):  [$_____]

Proportionate Share:  [XX.XXXX]% (Cash Payment/Total Principal Amount of Covered FGIC Insured Bonds)

Proportionate Share of the Trust Assets assigned by the Trustee hereunder:

      Cash:

      New GO CIBs:

      New GO 5.0% CABs:

      New GO 5.375% CABs:

      GO CVIs:

## SCHEDULE I

Threshold ~~Price~~Prices

    With respect to the New GO CIBs, the price equal to 97.5% of the par amount of such bonds, and with respect to the New GO 5.375% CABs and New GO 5.0% CABs, the price equal to 97.5% of the then accreted amount of such bonds, as calculated by FGIC, and with respect to the GO CVIs, the price equal to 35% of the ~~Notional Amount~~notional amount of such GO CVIs.

~~61139615.v23~~
61139615.v~~24~~35

**<u>EXHIBIT H</u>**

Act 53-2021 approved on October 26, 2021[1]

---

[1] The English version of Act 53-2021 begins on page 36 of Exhibit H.

(P. de la C. 1003)
(Segunda Conferencia)

# LEY

Para crear la "Ley para Ponerle Fin a la Quiebra de Puerto Rico", establecer las disposiciones y condiciones para aprobar la oferta, venta y emisión de los diferentes tipos de Bonos de Obligación General, así como para disponer la creación de los Instrumentos de Valor Contingente; establecer la política pública de apoyo a los municipios afectados; establecer la política pública de apoyo a las pensiones de nuestros retirados; establecer la política pública de apoyo a la Universidad de Puerto Rico; declarar los propósitos del Gobierno sobre temas de educación superior, cubiertas médicas de empleados públicos y los ciudadanos, así como para el desarrollo económico y de establecer un grupo de trabajo conjunto entre la Rama Legislativa y la Rama Ejecutiva; establecer un mecanismo que le permita al Gobierno del Estado Libre Asociado de Puerto Rico adelantar los términos de pagos y cancelación de la deuda de conformidad con la ley aplicable; derogar la Ley Núm. 39 del 13 de mayo de 1976, según enmendada; enmendar el inciso (a) del Artículo 3 de la Ley Núm. 147 de 18 de junio de 1980, según enmendada; enmendar el Artículo 3 y el inciso (m) del Artículo 7, así como derogar los Artículos 25 y 34 y renumerar los Artículos 25-A y 35 como los Artículos 25 y 34, respectivamente, de la Ley Núm. 44 de 21 de junio de 1988, según enmendada; enmendar el Artículo 23.01, derogar el inciso (e) y renumerar los actuales incisos (f) y (g) como los nuevos incisos (e) y (f) del Artículo 23.02 de la Ley 22-2000, según enmendada; derogar el inciso (l) y renumerar los actuales incisos (m), (n), (ñ), (o), y (p) como los nuevos incisos (l), (m), (n), (ñ), y (o), respectivamente, del Artículo 1.03(B), enmendar el inciso (h) del Artículo 2.02 de la Ley 351-2000, según enmendada; enmendar el Artículo 8 de la Ley 179-2002, según enmendada; enmendar el Artículo 31 de la Ley 272-2003, según enmendada; añadir un nuevo Artículo 7A a la Ley 103-2006, según enmendada; enmendar la Sección 3060.11 y eliminar la Sección 3060.11A de la Ley 1-2011, según enmendada; enmendar el Artículo 7.018 y el Artículo 7.027 de la Ley 107-2020, según enmendada; y para derogar el Artículo 3 de la Ley Núm. 9 de 12 de agosto de 1982; a los fines de tomar los pasos afirmativos necesarios para encaminar la salida de Puerto Rico del procedimiento de quiebras creado al amparo del Título III de la Ley PROMESA; cumplir con las disposiciones de la referida ley federal respecto a las condiciones mínimas necesarias para la culminación de la Junta de Supervisión y Administración Financiera; y para otros fines relacionados.

EXPOSICIÓN DE MOTIVOS

En el año 2016, con el objetivo de proveerle un mecanismo al Gobierno de Puerto Rico para renegociar su deuda y controlar la potencial avalancha de reclamaciones por parte de sus acreedores, el Congreso de EE.UU. promulgó la ley federal titulada "Ley de Supervisión, Administración y Estabilidad Económica de Puerto Rico", conocida como PROMESA. Esta Ley estableció, en su Título III, un procedimiento de quiebras que incorporaba una amplia porción de las disposiciones del Código de Quiebras, al cual Puerto Rico tendría acceso en aras de reestructurar su monumental deuda. De igual forma, creó una entidad que tomaría el control de todos los aspectos presupuestarios, financieros y de administración fiscal de Puerto Rico denominada *Financial Oversight and Management Board*, o Junta de Supervisión y Administración Financiera (JSAF o Junta). En efecto, la JSAF pasaría a supervisar y controlar esencialmente todos los aspectos financieros, fiscales y presupuestarios del Gobierno del Estado Libre Asociado de Puerto Rico.

El 3 de mayo de 2017, la JSAF, presentó una petición de reestructuración de deuda al amparo del Título III de PROMESA. La presentación de esta petición ante el Tribunal de Título III dio comienzo al procedimiento de quiebras más grande en la historia de los mercados municipales de EE.UU., al cual pertenecen los bonos y las obligaciones del Estado Libre Asociado de Puerto Rico. Para tener presente la magnitud de este evento debe considerarse que se estima que el Estado Libre Asociado tendría que reestructurar $35 mil millones como parte del mencionado proceso de restructuración.

Tras más de cuatro años después de presentada la petición de quiebras al amparo del Título III de PROMESA, la Junta ha presentado una séptima versión enmendada del Plan de Ajuste o Reestructuración de la Deuda (PDA o el Plan) para Puerto Rico ante el Tribunal de Título III, radicada el 30 de julio del 2021. Este Plan es el resultado de varios años de negociación entre la JSAF, en su calidad de representante exclusivo de los Deudores, incluyendo al Estado Libre Asociado de Puerto Rico ante el Tribunal de Título III, y un sinnúmero de clases de acreedores de obligaciones del Gobierno Central.

Por virtud de esta Ley, el Estado Libre Asociado de Puerto Rico apoya el Plan y la política pública que se expone en esta Ley, que sujeto al mandato de PROMESA de reestablecer la responsabilidad fiscal en Puerto Rico y a las facultades presupuestarias de la Junta bajo PROMESA, incluye cero recortes a las pensiones de los empleados públicos retirados a los beneficios acumulados de los empleados activos y el deseo de promover el bienestar del pueblo de Puerto Rico:

1.   Proteger las pensiones de nuestros retirados. Este objetivo tiene el propósito de evitar recortes a las pensiones del 100% de los retirados. Para lograr ese objetivo, se dispone en esta Ley una cláusula específica sobre este asunto.

2. Asignarle fondos adicionales a la Universidad de Puerto Rico, para ser utilizados para el mejoramiento de la experiencia y el ambiente estudiantil, de modo que las asignaciones para la entidad sean en total $500 millones anuales por un período de cinco (5) años desde el Año Fiscal 2023 al año fiscal 2027. Esta meta tiene el propósito de conservar la capacidad de la UPR para llevar a cabo su vital misión educativa y de asegurar los recursos necesarios para garantizar la acreditación de todos sus programas y lograr un acceso justo para aquellos estudiantes que tengan necesidades económicas, y a la misma vez promover eficiencias.

3. Apoyar la creación de un Fondo Fiduciario de Becas Universitarias. Esta iniciativa tiene el propósito de crear un fideicomiso de inversión para preservar el capital que se otorgaría para las becas de los estudiantes de la UPR.

4. Apoyar planes médicos razonables para los empleados del Gobierno central. Esta medida beneficiaría a más de 60,000 trabajadores y familias puertorriqueñas.

5. Apoyar la asignación de fondos adicionales para los municipios. Este objetivo pretende otorgar estabilidad fiscal a los municipios y la continuidad de los servicios esenciales que ofrecen.

6. Endosar la creación del fondo especial para la igualdad social. Esta propuesta – a ser legislada próximamente – pretende crear un fondo permanente que tenga la encomienda de combatir la pobreza y la desigualdad social; otorgándole prioridad en sus asignaciones a la atención de las necesidades de las comunidades marginadas, el programa de educación especial, los grupos poblacionales más vulnerables, combatir la deserción escolar, establecer un plan integrado para las personas sin hogar e incrementar, de forma gradual, las asignaciones para las entidades sin fines de lucro, de autogestión comunitaria y de base de fe, para ofrecer servicios directos.

7. Establecer la meta de aumentar la población que tiene cubierta médica. El propósito de esta iniciativa es extender y/o facilitar el acceso a cubiertas médicas a unos 225,000 ciudadanos que hoy carecen de planes médicos.

8. Endosar la creación del Fondo de Inversión Estratégico para el Desarrollo Económico que inyecte una inversión continua. Esta iniciativa propone la creación de un Fondo de Inversión Estratégica dividido en cuatro categorías: (1) inversiones para cerrar las brechas de habilidades básicas; (2) programas de capitalización de pequeñas empresas; (3) el desarrollo de

programas de crecimiento empresarial mediante la capitalización empresarial; y (4) capitalización del sector cooperativista de ahorro y crédito.

9.  Establecer un mecanismo que le permita al Gobierno de Puerto Rico adelantar los términos de pagos y cancelación de deuda después que termine la Junta bajo PROMESA. Este mecanismo tiene el único propósito de autorizar al Gobierno de Puerto Rico a refinanciar los acuerdos de pagos de la deuda después que termine la Junta bajo PROMESA, con el único objetivo de acelerar o saldar los pagos acordados, de conformidad a la situación fiscal futura y sin afectar los servicios esenciales y prioritarios del Gobierno de Puerto Rico.

10. Establecer un grupo de trabajo conjunto entre la Rama Legislativa y la Rama Ejecutiva. Esta iniciativa tiene el objetivo de diseñar la legislación que sea necesaria para asegurarnos que, una vez concluya el proceso de reestructuración de la deuda pública, el Gobierno de Puerto Rico no vuelva a endeudarse sin tener los recursos económicos para cumplir sus obligaciones del pago; ni vuelvan a repetirse las prácticas indebidas de aprobar presupuestos desbalanceados, con estimados de ingresos irreales o gastos excesivos.

De ser ratificado por el Gobierno y los acreedores, y posteriormente confirmado por el Tribunal de Título III, el Plan representaría el último peldaño en el proceso de reestructuración de la deuda de Puerto Rico. Este Plan incorpora los acuerdos alcanzados con las diversas clases de acreedores de obligaciones del Gobierno Central. Estas clases incluyen a los bonistas de obligaciones generales, sindicatos de empleados públicos, el Comité de Acreedores No Asegurados y el Comité Oficial de Retirados, entre otros.

En total, los acuerdos incluidos en el PDA reducen la deuda pública del Gobierno Central en aproximadamente un 50%. Es decir, la deuda pública se reduciría de aproximadamente $70 mil millones a $34 mil millones y la deuda de bonos de Obligaciones Generales (GO) y de la Autoridad de Edificios Públicos se reduciría de $18.8 mil millones a $7.4 mil millones. A su vez, el pago anual de la deuda pública de Puerto Rico se reduciría a aproximadamente de $3,300 millones a $1,100 millones. Asimismo el servicio de la deuda del Estado Libre Asociado se reduciría de un 25% a un 7.5%, cifra que representa la mitad del máximo constitucional permitido. En términos prácticos, estas reducciones representan más dinero en las arcas del Gobierno, lo cual implica que Puerto Rico tendrá una nueva oportunidad de invertir en su gente a través de mejoras a la infraestructura, de sufragar los costos de los servicios esenciales que está llamado a ofrecer; y de prepararse para y atender futuras emergencias.

Para alcanzar esta reducción de la deuda gubernamental, el Plan requiere que la Asamblea Legislativa de Puerto Rico apruebe legislación que viabilice la emisión de una serie de bonos de obligaciones generales (GO) y la creación de instrumentos de valor contingente (IVC). Debe destacarse que el Plan también disponen para la creación de un fideicomiso que suplementaría ingresos futuros para el pago de pensiones, el disfrute del Gobierno de hasta $200 millones de fondos generados en exceso a las proyecciones contenidas en los Planes Fiscales de 2020 y 2021, y otros mecanismos de repago.

En esencia, el Gobierno Central debe emitir nuevos bonos de obligaciones generales, y autorizar la creación de los IVC. Los IVC solo serían pagaderos al cumplirse determinadas métricas de recaudos del Impuesto Sobre Ventas y Uso (IVU) y, en el caso de una porción limitada de los IVCs, la porción del arbitrio federal al ron que el Departamento del Tesoro Federal transfiere al Gobierno del Estado Libre Asociado de Puerto Rico. Es decir, solo se pagaría hasta un máximo específico de deuda si ciertas condiciones están presentes.

A tenor con la Sección 314 de PROMESA, el Gobierno de Puerto Rico debe aprobar la presente legislación para facilitar la confirmación del Plan, lo que tiene que ocurrir antes de la salida de la Junta.

Sin embargo, esta Asamblea Legislativa no ha perdido de perspectiva que nuestros pensionados, a diferencia de otros grupos de acreedores, ya sufrieron recortes en sus pensiones como resultado de la aprobación de estatutos que, para prevenir la insolvencia de los sistemas de retiro del Gobierno, redujeron los beneficios de pensión, aumentaron la cantidad de aportaciones de los empleados y elevaron la edad de retiro para los planes de pensión de cada uno de los tres sistemas principales de retiro del Gobierno. A estos fines, esta legislación está condicionada a que la Junta radique para su confirmación por el Tribunal de Título III un Plan enmendado que elimine los recortes contemplados a los pagos mensuales de las pensiones de los empleados del Gobierno del Estado Libre Asociado que están actualmente retirados y de los empleados públicos activos que han acumulado beneficios de pensión. Además, esta legislación provee fondos adicionales para los municipios, y por separado para la Universidad de Puerto Rico.

Los municipios son el ente gubernamental más cercano a nuestra población. La crisis y los planes fiscales han impactado a nuestros ayuntamientos. En la medida en que el Plan logre recortes a la deuda estatal, una porción de estas economías estarán disponibles para medidas de recolección y disposición de residuos, desperdicios y para implementar programas de reciclaje en los municipios, a fin de que estas entidades puedan garantizar estos servicios tan fundamentales e indispensables para garantizar y mejorar la calidad de vida de nuestra ciudadanía.

La Asamblea Legislativa continuará impulsando propuestas que defiendan el mejor interés del pueblo. En esta hazaña, confiamos en que la Rama Legislativa contará

con el apoyo del Ejecutivo para guiar a Puerto Rico en el camino por recorrer. La aprobación del Presupuesto General de Puerto Rico para el Año Fiscal 2021-2022, Res. Conj. 8-2021, fue un paso correcto en esa dirección. También lo es la aprobación de esta medida, que permitirá que el actual Presupuesto General se convierta en el primer presupuesto balanceado de cuatro. Al finalizar este proceso, Puerto Rico habrá cumplido con la mitad de los requisitos dispuestos por PROMESA. La presente Ley cimienta un esfuerzo histórico, multisectorial y de consenso de ponerle fin a la Junta.

DECRÉTASE POR LA ASAMBLEA LEGISLATIVA DE PUERTO RICO:

**CAPÍTULO 1.- DISPOSICIONES GENERALES.**

**ARTÍCULO 101.- TÍTULO.**

Esta Ley se conocerá y podrá ser citada como la "Ley para Ponerle Fin a la Quiebra de Puerto Rico".

**ARTÍCULO 102.- DEFINICIONES.**

(a)    5.5% del IVU:  significa los ingresos y recaudos presentes y futuros generados por la porción del Impuesto Sobre Ventas y Uso establecido bajo las Secciones 4020.01 y 4020.02 del Subcapítulo D del Código de Rentas Internas de Puerto Rico que corresponde a la tasa contributiva del cinco y medio por ciento (5.5%).

(b)    Acuerdos Complementarios: significa el Plan, la Orden de Confirmación, el Contrato de Bonos de Obligación General, la forma de los Bonos de Obligación General, el Contrato de IVC, la forma de los IVCs, y cualquier otro acuerdo o instrumento (incluyendo cualquier fideicomiso) relacionado o suscrito con relación a, o en apoyo de, una Transacción de Reestructuración y de conformidad con, o en apoyo de, el Plan o una Modificación Elegible.

(c)    ACT: significa la Autoridad de Carreteras y Transportación de Puerto Rico, creada en virtud de la Ley Núm. 74 de 23 de junio de 1965, según enmendada o su ley sucesora.

(d)    ADCC: significa la Autoridad del Distrito del Centro de Convenciones de Puerto Rico, creada en virtud de la Ley 351-2000, según enmendada o su ley sucesora.

(e)    AEP: significa la Autoridad de Edificios Públicos de Puerto Rico, creada en virtud de la Ley Núm. 56 de 19 de junio de 1958, según enmendada, o su ley sucesora.

(f)     AFI: significa la Autoridad para el Financiamiento de la Infraestructura de Puerto Rico, creada en virtud de la Ley Núm. 44 de 21 de junio de 1988, según enmendada, o su ley sucesora.

(g)     AMA: significa la Autoridad Metropolitana de Autobuses de Puerto Rico, creada en virtud de la Ley Núm. 5 de 11 de mayo de 1959, según enmendada, o su ley sucesora.

(h)     Año Fiscal:  significa el año fiscal del Estado Libre Asociado, que empieza el 1ro de julio y termina el 30 de junio.

(i)     Bonos de Obligación General: significa los bonos de obligación general emitidos por el Estado Libre Asociado bajo el Contrato de Bonos de Obligación General de conformidad con esta Ley, el Plan y la Orden de Confirmación, y cualesquiera bonos de obligación general emitidos subsiguientemente por el Estado Libre Asociado bajo el Contrato de Bonos de Obligación General de acuerdo a y consistente con los términos del Plan para retirar, refinanciar o cancelar bonos de obligación general originalmente emitidos conforme al Plan y la Orden de Confirmación.

(j)     Código de Puerto Rico: significa la Ley 1-2011, según enmendada, conocida como el "Código de Rentas Internas para Puerto Rico de 2011."

(k)     Condición de Rendimiento Superior del Arbitrio al Ron: significa que los Ingresos del Arbitrio al Ron del Estado Libre Asociado en un año fiscal, calculados conforme a, y neto de, aquellas deducciones permitidas conforme al Plan y establecidas en el Contrato de IVC, exceden los umbrales contemplados en el Plan y establecidos en el Contrato de IVC para dicho año fiscal.

(l)     Condición de Rendimiento Superior del IVU: significa que los recaudos del IVU Medido o del Impuesto Sustituto Medido, según sea el caso, en cualquier año fiscal exceden los umbrales contemplados en el Plan y establecidos en el Contrato de IVC para dicho año fiscal.

(m)     Contrato de Bonos de Obligación General: significa uno o más contratos de fideicomiso, escrituras, resoluciones y cualesquiera suplementos o enmiendas relacionadas, o contratos o acuerdos similares, relacionados a los Bonos de Obligación General a ser otorgados y suscritos por el Representante del Gobernador autorizando: (1) la emisión de los Bonos de Obligación General y describiendo sus términos; y (2) el pago de los Costos de Financiamiento, cada uno de conformidad con los términos del Plan.

(n)     Contrato de IVC: significa uno o más contratos de fideicomiso, escrituras, resoluciones y cualesquiera otros suplementos o enmiendas relacionadas, o contratos o acuerdos similares, relacionados a los IVCs a ser otorgados y suscritos por el Estado Libre

Asociado autorizando: (1) la emisión de los IVCs por el Estado Libre Asociado y la descripción de sus términos; y (2) el pago de los Costos de Financiamiento de los IVCs, cada uno conforme a los términos del Plan.

(o)   Costos de Financiamiento: significa los costos asociados a las Transacciones de Reestructuración, incluyendo, pero sin limitarse a, los costos, honorarios y gastos para (i) emitir, pagar o repagar los Bonos de Obligación General y los IVCs, según aplicable, ya sea que los costos sean incurridos tras la emisión de dichos Bonos de Obligación General o IVCs o durante el término de dichos instrumentos, (ii) efectuar pagos según requeridos por los Acuerdos Complementarios, (iii) pagar cualquier sello, emisión o impuesto similar y otros cargos relacionados a las Transacciones de Reestructuración (si algunas), (iv) prepararse para y efectuar las Transacciones de Reestructuración, y (v) llevar a cabo todas las actividades en curso relacionadas a las Transacciones de Reestructuración. Para evitar dudas, los Costos de Financiamiento también incluyen los honorarios y gastos administrativos previos y posteriores al cierre incurridos con relación a los Acuerdos Complementarios.

(p)   Entidad Gubernamental: significa cualquier agencia, departamento, oficina, corporación pública, fideicomiso, fondo, sistema, instrumentalidad, subdivisión política, autoridad fiscal o municipio del Estado Libre Asociado.

(q)   Estado Libre Asociado: significa el Estado Libre Asociado de Puerto Rico creado en virtud de las disposiciones del Artículo 1 de la Constitución del Estado Libre Asociado de Puerto Rico.

(r)   Fecha de Efectividad: significa la fecha en la que el Plan entre en vigor conforme a sus términos.

(s)   Fiduciario de los Bonos de Obligación General: significa el o los fiduciario(s) o el o los fiduciario(s) sustituto(s), según sea el caso, nombrados de conformidad con los términos y condiciones del Contrato de Bonos de Obligación General.

(t)   Fiduciario de los IVC: significa el o los fiduciario(s) o el o los fiduciario(s) sustituto(s), según sea el caso, nombrados conforme a los términos y condiciones del Contrato de IVC.

(u)   Fondo del Servicio de la Deuda: significa un fondo del servicio de la deuda establecido de conformidad con el Contrato de Bonos de Obligación General.

(v)   Impuesto Sustituto Medido: significa toda o una porción de un impuesto de aplicabilidad general en el Estado Libre Asociado que, mediante un cambio en la ley, sea legislado para sustituir completamente el IVU Medido o que de lo contrario

constituya una medida similar o comparable de actividad económica en el Estado Libre Asociado, en cada caso de conformidad con los términos del Contrato de IVC.

(w)    Ingresos del Arbitrio al Ron del Estado Libre Asociado: significa el total de los recaudos del arbitrio a los licores destilados impuesto bajo el Código de Rentas Internas de los Estados Unidos de 1986 (según enmendado de tiempo en tiempo) recibidos por el Estado Libre Asociado, según documentado en el reporte del Departamento del Tesoro Federal de la actividad mensual del arbitrio neto pagado al Estado Libre Asociado y certificado por el Departamento de Hacienda de Puerto Rico o en cualquier otro reporte análogo según establecido en el Contrato de IVC.

(x)    IVCs o Instrumentos de Valor Contingente: significa, en el colectivo, las notas de obligación general emitidas bajo el Contrato de IVC de conformidad con esta Ley, el Plan y la Orden de Confirmación, que consisten en los IVCs de Obligación General y los IVCs "Clawback".

(y)    IVCs "Clawback": significa una serie de IVCs emitidos bajo el Contrato de IVC relacionados a reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de o se relacionan a la deuda emitida por ACT, ADCC, AFI y AMA. Para evitar dudas, los IVCs "Clawback" podrán emitirse en una o más subseries, incluyendo, pero sin limitarse a, la Subserie de las Reclamaciones del Arbitrio al Ron.

(z)    IVC de Obligación General: significa una serie de IVCs emitidos bajo el Contrato de IVC relacionados a reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de o están relacionadas a la deuda de obligación general del Estado Libre Asociado.

(aa)    IVU Medido: significa el 5.5% del IVU recaudado por el Estado Libre Asociado durante un año fiscal, menos aquellos ingresos transferidos al Fondo para el Desarrollo de la Industria de las Artes, Ciencias y Cinematografía conforme a la Sección Núm. 4050.06 del Código de Puerto Rico (o utilizado para cualquier otro propósito establecido por ley), hasta Tres Millones Doscientos Cuarenta Mil Dólares ($3,240,000.00) por año fiscal.

(bb)    Ley: significa esta "Ley para Ponerle Fin a la Quiebra de Puerto Rico".

(cc)    Máximo Agregado de los IVCs "Clawback": significa, inicialmente a partir de la Fecha de Efectividad, $5,239,002,764. El Máximo Agregado de los IVCs "Clawback" se reducirá cada año fiscal en una cantidad igual a los pagos efectuados bajo los IVCs "Clawback" conforme al Contrato de IVC sujeto a, y como resultado de, que ocurra una Condición de Rendimiento Superior del IVU. En adición, la porción del Máximo Agregado de los IVCs "Clawback" asignados a la Subserie de las Reclamaciones del Arbitrio al Ron se reducirá aún más cada año fiscal en una cantidad igual a los pagos

efectuados bajo la Subserie de Reclamaciones del Arbitrio al Ron conforme al Contrato de IVC sujeto a, y como resultado de, que ocurra una Condición de Rendimiento Superior del Arbitrio al Ron.

(dd)    Máximo Agregado de los IVC de Obligación General: significa, inicialmente desde la Fecha de Efectividad, $3,500,000,000.  El Máximo Agregado de los IVC de Obligación General se reducirá anualmente por una cantidad igual a los pagos efectuados en los IVC de Obligación General conforme al Contrato de IVC.

(ee)    Modificación Elegible: significa una "Modificación Elegible" para ADCC y/o AFI aprobada conforme al Título VI de PROMESA.

(ff)    Orden de Confirmación:  significa la orden del Tribunal de Título III confirmando el Plan.

(gg)    Persona: significa cualquier persona natural o jurídica, incluyendo, pero sin limitarse a, el Estado Libre Asociado, cualquier Entidad Gubernamental, o cualquier firma, sociedad, empresa conjunta, fideicomiso, sucesión, compañía de responsabilidad limitada, corporación de individuos, asociación o corporación pública o privada, organizada o existente bajo las leyes de Puerto Rico, de los Estados Unidos de América, de cualquier estado u otra jurisdicción, o cualquier estado, municipio, subdivisión política, autoridad fiscal, agencia o instrumentalidad de los Estados Unidos de América, cualquier estado o cualquier otra jurisdicción, o cualquier combinación de las anteriores.

(hh)    Plan: significa el Plan de Ajuste conjunto para el Estado Libre Asociado, SRE y AEP (y cualquier otra Entidad Gubernamental incluida en dicho plan) confirmado bajo el Título III de PROMESA, incluyendo los anejos relacionados, según estos puedan ser enmendados, suplementados o modificados de tiempo en tiempo.

(ii)    PROMESA:  significa la Ley de Supervisión, Administración, y Estabilidad Económica de Puerto Rico, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et seq., según enmendada o modificada.

(jj)    Reclamaciones Existentes:  significa las reclamaciones en contra del Estado Libre Asociado, AEP, SRE, ACT, AFI, ADCC y AMA.

(kk)    Representante del Gobernador: significa el Gobernador, el Secretario de Hacienda o cualquier otro oficial de una Entidad Gubernamental designado por el Gobernador mediante Orden Ejecutiva.

(ll)    Secretario de Hacienda: significa el Secretario del Departamento de Hacienda del Estado Libre Asociado.

(mm)  Sistemas de Retiro del Estado Libre Asociado: significa el Sistema de Retiro de Empleados del Gobierno, el Sistema de Retiro de Maestros de Puerto Rico y el Sistema de Retiro de la Judicatura del Estado Libre Asociado de Puerto Rico.

(nn)  SRE: significa el Sistema de Retiro de Empleados del Gobierno del Estado Libre Asociado de Puerto Rico, creado en virtud de la Ley Núm. 447 de 15 de mayo de 1951, según enmendada o su ley sucesora.

(oo)  Subserie de Reclamaciones del Arbitrio al Ron: significa una subserie de los IVCs "Clawback" emitidos bajo el Contrato de IVC con relación a las reclamaciones contra el Estado Libre Asociado permitidas bajo el Plan que surgen de, o están relacionadas a, los Ingresos del Arbitrio al Ron del Estado Libre Asociado retenidos por el Estado Libre Asociado y no transferidos a AFI.

(pp)  Transacciones de Reestructuración: significa cada una de las transacciones contempladas por, o en apoyo a, el Plan o una Modificación Elegible, incluyendo, pero sin limitarse a, la emisión de los Bonos de Obligación General y los IVCs y la cancelación o la extinción de las Reclamaciones Existentes conforme al Plan o una Modificación Elegible, según sea el caso.

(qq)  Modificación del Beneficio Mensual: significa el "Monthly Benefit Modification" según se define en el Plan.

## ARTÍCULO 103. – AUTORIZACIÓN DE ACCIONES POR LAS ENTIDADES GUBERNAMENTALES.

No obstante cualquier disposición, prohibición o restricción establecida en cualquier ley, orden, regla o reglamento del Estado Libre Asociado, cada entidad gubernamental requerida a tomar o llevar a cabo cualquier acción necesaria o conveniente para implementar el Plan y/o las Transacciones de Reestructuración queda por la presente autorizada a llevar a cabo y deberá llevar a cabo todas aquellas acciones necesarias o convenientes para implementar el Plan o las Transacciones de Reestructuración, sin estar sujeta a los requisitos de cualquier disposición, prohibición o restricción establecida en cualquier otra ley, orden, regla o reglamento, incluyendo, pero sin limitarse a, (a) negociar, entrar en y suscribir cualquier acuerdo, escritura, certificado o documento, y (b) desembolsar o transferir fondos según provisto y/o requerido en el Plan. La autorización provista en este Artículo será suficiente para que el Representante del Gobernador, a nombre del Estado Libre Asociado, y cualquier director ejecutivo, presidente u oficial de rango y autoridad similar, a nombre de la Entidad Gubernamental que representa, pueda llevar a cabo cualquier acción contemplada en el Plan y/o en las Transacciones de Reestructuración y ninguna otra autorización será requerida, incluyendo, pero sin limitarse a, la autorización de cualquier junta de directores, comisión, departamento, o regulador de Puerto Rico. Además, la Autoridad de Asesoría

Financiera y Agencia Fiscal de Puerto Rico queda por la presente autorizada a requerirle a cualquier Entidad Gubernamental que cumpla con los requisitos establecidos en este Artículo.

Sin limitar la generalidad de lo anterior y no obstante cualquier disposición de cualquier ley del Estado Libre Asociado, en o antes de la Fecha de Efectividad, el Representante del Gobernador queda por la presente autorizado, en la medida necesaria, si alguna, luego de que se emita la Orden de Confirmación, a: (a) aprobar la oferta, venta y emisión de los Bonos de Obligación General y los IVCs según contemplado en el Plan y dispuesto en los Capítulos 2 y 3 de esta Ley, respectivamente; (b) proveer para la cancelación y extinción de las Reclamaciones Existentes conforme a y de acuerdo con los términos del Plan o de una Modificación Elegible, según aplicable; (c) autorizar el pago de los Costos de Financiamiento de conformidad con los términos del Plan; (d) aprobar la forma del Contrato de los Bonos de Obligación General, del Contrato de IVC, y de los otros Acuerdos Complementarios y otorgar el Contrato de los Bonos de Obligación General, el Contrato de IVC y los otros Acuerdos Complementarios a nombre del Estado Libre Asociado, en la medida en que no haya sido aprobada por la Orden de Confirmación; (e) incluir en los Acuerdos Complementarios cualquier pacto, término u otra condición según pueda ser requerida por el Plan, incluyendo (1) consentir a nombre del Estado Libre Asociado a la aplicación de las leyes del Estado de Nueva York para gobernar e interpretar dichos Acuerdos Complementarios, y la jurisdicción de cualquier tribunal estatal o federal, con relación a cualquier demanda o procedimiento relacionado con los Bonos de Obligación General, los IVCs, los Acuerdos Complementarios y/o cualesquiera otros asuntos relacionados a las Transacciones de Reestructuración, y (2) la creación de gravámenes sobre los dineros, valores y otros activos depositados con el Fiduciario de los Bonos de Obligación General o el Fiduciario de los IVCs a beneficio de los tenedores de los Bonos de Obligación General y los IVCs, respectivamente; y (f) llevar a cabo cualesquiera y todas otras acciones necesarias o convenientes para efectuar las Transacciones de Reestructuración. Para evitar dudas, no obstante la aplicación de las leyes del Estado de Nueva York para gobernar e interpretar los Bonos de Obligación General, los IVCs, Contrato de Bonos de Obligación General, el Contrato de IVC, y cualquier Acuerdo Complementario, los tenedores de los Bonos de Obligación General y de los IVCs tendrán los derechos y remedios de tenedores de deuda pública del Estado Libre Asociado establecidos en las Secciones 2 y 8 del Artículo VI de la Constitución del Estado Libre Asociado.

La autorización para emitir bonos conferida mediante la presente Ley estará limitada únicamente a aquellos bonos contemplados por y requeridos para implementar el Plan, y se hará conforme lo establezcan el propio Plan, los Contratos de Obligación General, la Orden de Confirmación y los demás Acuerdos Complementarios. El Gobernador de Puerto Rico o su Representante deberán solicitar la autorización de la Asamblea Legislativa para cualquier emisión posterior que sea distinta a la aquí permitida.

## ARTÍCULO 104: PROTECCIÓN DE LAS PENSIONES DE LOS RETIRADOS DEL GOBIERNO DEL ESTADO LIBRE ASOCIADO.

El Gobierno del Estado Libre Asociado, por la presente, declara que es la política pública de la más alta prioridad proteger las pensiones acumuladas de sus servidores públicos, que son uno de los grupos más importantes de nuestra sociedad. Como parte esencial de esta política pública, la protección de las pensiones de todos nuestros retirados es un compromiso esencial e inquebrantable. Por lo tanto, en relación a las pensiones acumuladas de los empleados del Gobierno, se dispone lo siguiente: La Asamblea Legislativa por la presente autoriza la emisión de los Bonos de Obligación General y los IVCs, sujeto a que la JSAF radique para su confirmación por el Tribunal del Título III un Plan enmendado que elimine la Modificación del Beneficio Mensual ("Monthly Benefit Modification," según se define en el Plan).

## ARTÍCULO 105: FINANCIAMIENTO DE LA UNIVERSIDAD DE PUERTO RICO.

Con el propósito de adelantar el objetivo del Gobierno del Estado Libre Asociado de Puerto Rico de conservar la capacidad de la Universidad de Puerto Rico de llevar a cabo su vital misión educativa y asegurar los recursos necesarios para garantizar la acreditación de todos sus programas y lograr un acceso justo para aquellos estudiantes que tengan necesidades económicas, los presupuestos que se le sometan a la Junta incluirán una asignación de fondos para la Universidad de Puerto Rico por un total de $500 millones en cada uno de los cinco años fiscales 2023 al 2027, disponiéndose que las asignaciones adicionales por encima de las cantidades asignadas en el plan fiscal del Estado Libre Asociado certificado en abril del 2021 se utilizarán para el mejoramiento de la experiencia y el ambiente estudiantil.

## ARTÍCULO 106: FONDOS PARA ESTUDIO SOBRE SEGURO DE SALUD.

El Departamento de Salud del Estado Libre Asociado de Puerto Rico realizará un estudio sobre la viabilidad de proveer o facilitar acceso a cubierta de seguro médico a aproximadamente 225,000 ciudadanos que hoy carecen de planes médicos. Se le asigna un millón de dólares al Departamento de Salud para dicho estudio.

## ARTÍCULO 107: DECLARACIÓN DE INTENCIÓN Y POLÍTICA PÚBLICA.

Por virtud de esta Ley, el Estado Libre Asociado de Puerto Rico apoya el Plan y la política pública que se expone en esta Ley, sujeto al mandato de PROMESA de reestablecer la responsabilidad fiscal y las facultades presupuestarias en Puerto Rico. De conformidad a ello se expresa como objetivos prioritarios las siguientes acciones:

(a) Apoyar la creación de un Fondo Fiduciario de Becas Universitarias. Esta iniciativa tiene el propósito de crear un fideicomiso de inversión para preservar el capital que se otorgaría para las becas de los estudiantes de la UPR.

(b) Apoyar planes médicos razonables para los empleados del Gobierno Central. Esta medida beneficiaría a más de 60,000 trabajadores y familias puertorriqueñas.

(c) Endosar la creación del Fondo Especial para la Igualdad Social. Esta propuesta – a ser legislada próximamente – pretende crear un fondo permanente que tenga la encomienda de combatir la pobreza y la desigualdad social; otorgándole prioridad en sus asignaciones a la atención de las necesidades de las comunidades marginadas, el programa de educación especial, los grupos poblacionales más vulnerables, combatir la deserción escolar, establecer un plan integrado para las personas sin hogar e incrementar, de forma gradual, las asignaciones para las entidades sin fines de lucro, de autogestión comunitaria y de base de fe, para ofrecer servicios directos.

(d) Endosar la creación del Fondo de Inversión Estratégico para el Desarrollo Económico que inyecte una inversión continua. Esta iniciativa propone la creación de un Fondo de Inversión Estratégica dividido en cuatro categorías: (1) inversiones para cerrar las brechas de habilidades básicas; (2) programas de capitalización de pequeñas empresas; (3) el desarrollo de programas de crecimiento empresarial mediante la capitalización empresarial; y (4) capitalización del sector cooperativista de ahorro y crédito.

(e) Establecer un grupo de trabajo conjunto entre la Rama Legislativa y la Rama Ejecutiva. Esta iniciativa tiene el objetivo de diseñar la legislación que sea necesaria para asegurarnos que, una vez concluya el proceso de reestructuración de la deuda pública, el Gobierno de Puerto Rico no vuelva a endeudarse sin tener los recursos económicos para cumplir sus obligaciones del pago; ni vuelvan a repetirse las prácticas indebidas de aprobar presupuestos desbalanceados, con estimados de ingresos irreales o gastos excesivos.

La implementación de este Artículo estará sujeto a la disponibilidad de fondos y que no sea significativamente inconsistente con el Plan Fiscal.

## CAPÍTULO 2 – LOS BONOS DE OBLIGACIÓN GENERAL

## ARTÍCULO 201.- EMISIÓN DE LOS BONOS DE OBLIGACIÓN GENERAL.

(a)   A partir y luego de la Fecha de Efectividad, el Representante del Gobernador, estará autorizado para aprobar la oferta, venta y emisión de los Bonos de Obligación General, de tiempo en tiempo, de conformidad con las disposiciones del Contrato de Bonos de Obligación General, la Orden de Confirmación, el Plan y de los demás Acuerdos Complementarios, hasta una cantidad agregada inicial de principal de $7,414,063,543.25, y para aprobar la oferta, venta y emisión, de tiempo en tiempo, de Bonos de Obligación General adicionales, sujeto a las limitaciones contempladas en el Plan y establecidas en el Contrato de Bonos de Obligación General para retirar, refinanciar o cancelar (defease) los Bonos de Obligación General originalmente emitidos conforme al Plan y a la Orden de Confirmación.

(b)   Los Bonos de Obligación General incluirán bonos de interés corriente y bonos de revalorización de capital, estarán fechados, devengarán intereses, y vencerán en la fecha o fechas, que no excederán treinta (30) años de su fecha o fechas de emisión, y serán redimibles o podrán ser prepagados, en cada caso, en la medida en que sea aplicable y según sea determinado por el Representante del Gobernador, como representante del Estado Libre Asociado, y autorizado en el Contrato de Bonos de Obligación General de conformidad y consistente con el Plan. En la medida, si alguna, en que no hayan sido determinados por el Plan y los Acuerdos Complementarios aprobados por la Orden de Confirmación, el Representante del Gobernador, como representante del Estado Libre Asociado, determinará la forma de los Bonos de Obligación General y la manera de emitir los Bonos de Obligación General, y establecerá la denominación o denominaciones de los Bonos de Obligación General y el lugar o los lugares de pago de los mismos y sus otros términos, todo de conformidad y consistente con el Plan. A discreción del Representante del Gobernador, los Bonos de Obligación General podrán ser emitidos en una o más series separadas.

(c)   Los Bonos de Obligación General serán obligaciones legales, válidas y vinculantes del Estado Libre Asociado, emitidos conforme al Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, y serán pagaderos conforme a los términos del Contrato de Bonos de Obligación General y de los otros Acuerdos Complementarios.

(d)   Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en cualquier Bono de Obligación General autorizado bajo esta Ley deje de ocupar su cargo previo a la entrega de dichos Bonos de Obligación General, dicha firma o facsímil de la firma será, no obstante, válida y suficiente, y se considerará para todos los propósitos como si dicho oficial hubiese permanecido en su cargo hasta dicha entrega.  Además, cualquier Bono de Obligación General podrá contener la firma o facsímil de la firma de aquellas personas que, al momento de la emisión de dicho bono, sean los oficiales

autorizados a firmarlo, pero que, en la fecha del Bono de Obligación General, no ocupaban su puesto.

(e)    Los Bonos de Obligación General emitidos de conformidad con las disposiciones de esta Ley se considerarán instrumentos negociables bajo las leyes de Puerto Rico.

(f)    Los Bonos de Obligación General autorizados por esta Ley se podrán emitir como bonos de cupón o en forma registrada, o ambos, según se establezca en el Contrato de Bonos de Obligación General.

## ARTÍCULO 202.- COMPROMISO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE IMPONER CONTRIBUCIONES.

La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado quedan por la presente irrevocablemente comprometidos para el pago puntual del principal e interés de los Bonos de Obligación General emitidos bajo las disposiciones de esta Ley, según y cuándo venzan de conformidad con los términos del Contrato de Bonos de Obligación General. El Secretario de Hacienda queda por la presente autorizado y dirigido a pagar el principal e interés de los Bonos de Obligación General según venzan o tras su redención o prepago de conformidad con el Contrato de Bonos de Obligación General, de los recursos disponibles del Estado Libre Asociado en el año fiscal en que dicho pago sea requerido, y las disposiciones de esta Ley con relación al pago de principal e interés en los Bonos de Obligación General se considerarán una obligación continua para que el Secretario de Hacienda haga dichos pagos, aunque no se hayan hecho asignaciones específicas para dichos propósitos. El Representante del Gobernador queda por la presente autorizado y dirigido a incluir en el Contrato de Bonos de Obligación General el compromiso que aquí establece el Estado Libre Asociado de Puerto Rico con relación a los Bonos de Obligación General, y deberá establecerse en dichos Bonos de Obligación General que la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico están comprometidos para el pago de los mismos.

## ARTÍCULO 203.- FONDO DEL SERVICIO DE LA DEUDA; GRAVAMEN ESTATUTARIO.

(a)    Se autoriza al Representante del Gobernador a establecer el Fondo de Servicio de la Deuda con el Fiduciario de los Bonos de Obligación General para el pago de los Bonos de Obligación General. Hasta que los Bonos de Obligación General hayan sido completamente pagados o satisfechos de conformidad con sus términos, mensualmente, el Estado Libre Asociado de Puerto Rico depositará con el Fiduciario de los Bonos de Obligación General una suma en efectivo en la cantidad agregada igual a (i) una sexta parte (1/6) de la obligación semianual del Estado Libre Asociado de Puerto Rico con relación al pago de interés devengado sobre los Bonos de Obligación General y

(ii) una doceava parte (1/12) de la obligación anual del Estado Libre Asociado de Puerto Rico con relación al pago del principal de los Bonos de Obligación General. Dichos fondos deberán mantenerse e invertirse por el Fiduciario de los Bonos de Obligación General de conformidad con las disposiciones del Contrato de Bonos de Obligación General.

(b)  A partir de su emisión, los Bonos de Obligación General estarán garantizados automáticamente por un gravamen estatutario de primer rango sobre los fondos depositados en el Fondo de Servicio de la Deuda, incluyendo cualquier ingreso o recaudos generados de dichos fondos. Dicho gravamen estatutario de primer rango se creará, surtirá efecto y se perfeccionará automáticamente, y será válido y vinculante a partir y luego de la Fecha de Efectividad, sin que sea necesario acto o acuerdo alguno por ninguna otra Persona. No será necesario otorgar, suscribir ni inscribir instrumento alguno en ningún récord oficial ni en registro u oficina del Gobierno alguna para perfeccionar o continuar teniendo dicho gravamen estatutario de primer rango o para establecer o mantener la prioridad aquí establecida. El gravamen establecido en este Artículo será válido, vinculante y ejecutable, y estará perfeccionado contra todas las Personas que tengan reclamaciones de cualquier tipo de daños, contractuales, o de cualquier otro tipo contra el Estado Libre Asociado o sus activos independientemente de si dichas Personas fueron notificadas sobre dicho gravamen.

## ARTÍCULO 204.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.

Los Bonos de Obligación General, incluyendo, pero sin limitarse a, cualesquiera pagos o ingresos con relación a los Bonos de Obligación General y la transferencia de los Bonos de Obligación General, estarán, en todo momento, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse, a contribuciones sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas). Los tenedores y dueños de los Bonos de Obligación General no tendrán que rendir planillas o cualquier otro reporte de contribuciones o requisito similar con relación al Estado Libre Asociado o cualquier Entidad Gubernamental por razón de tener, ser dueño de o transferir Bonos de Obligación General.

## ARTÍCULO 205.- CONVENIOS DEL ESTADO LIBRE ASOCIADO.

El Estado Libre Asociado de Puerto Rico, con la intención de quedar contractualmente obligado, por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y subsiguientes de los Bonos de Obligación General que, hasta que todas las obligaciones relacionadas a dichos bonos hayan sido completamente satisfechas,

de conformidad con sus términos, el Estado Libre Asociado de Puerto Rico se obliga a lo siguiente:

(a)      no llevar a cabo ninguna acción que (1) impida el depósito mensual de los fondos en el Fondo del Servicio de la Deuda conforme al Artículo 203 de esta Ley, (2) limite o altere los derechos del Estado Libre Asociado de Puerto Rico de conformidad con el Plan y la Orden de Confirmación para cumplir con los términos de cualesquiera acuerdos con los tenedores de los Bonos de Obligación General o (3) perjudique los derechos y remedios de los tenedores de los Bonos de Obligación General;

(b)      hacer y llevar a cabo todos los actos permitidos por ley y que sean razonablemente necesarios o deseables para asegurar que el pago de interés a los tenedores de cualesquiera Bonos de Obligación General esté exento de pago de contribuciones federales, y que sea y continúe estando excluido del ingreso bruto para propósitos de contribuciones sobre ingresos federales, en la medida en que aplique; y

(c)      causará que cualquier Plan Fiscal del Estado Libre Asociado de Puerto Rico presentado a la Junta de Supervisión y Administración Financiera para Puerto Rico bajo PROMESA luego de la Fecha de Efectividad incluya disposiciones para el pago en cada año fiscal del principal e intereses sobre los Bonos de Obligación General de conformidad con los términos del Contrato de Bonos de Obligación General; y

(d)      en la medida necesaria para cumplir con sus obligaciones de pagar los Bonos de Obligación General, aplicará (i) el producto del impuesto a la propiedad del 1.03% recaudado conforme a la Ley 107-2020, según enmendada, conocida como "Código Municipal de Puerto Rico", por el Centro de Recaudación de Ingresos Municipales del Estado Libre Asociado de Puerto Rico, (ii) cualquier dinero que surja de la operación del Artículo VI, Sección 8 de la Constitución del Estado Libre Asociado de Puerto Rico y (iii) cualquier otro recurso disponible del Estado Libre Asociado de Puerto Rico para el pago del principal y los intereses (y el valor acumulado) sobre dichos Bonos de Obligación General; disponiéndose que (A) este convenio no le concede a los tenedores de dichos Bonos de Obligación General un gravamen sobre dichos ingresos, dineros y recursos, y (B) para propósitos del cumplimiento con este convenio, en la medida en que dichos ingresos, dineros y recursos se transfieran al Fondo General del Estado Libre Asociado de Puerto Rico, se considerará que los pagos de principal e intereses (y del valor acumulado) realizados a los tenedores de los Bonos de Obligación General provenientes del Fondo General del Estado Libre Asociado de Puerto Rico se han hecho de dichos ingresos, dineros y recursos en el orden establecido anteriormente.

## CAPÍTULO 3 – LOS INSTRUMENTOS DE VALOR CONTINGENTE

## ARTÍCULO 301.- EMISIÓN DE LOS IVCS.

(a)     A partir y luego de la Fecha de Efectividad, el Representante del Gobernador estará autorizado para aprobar la oferta, venta y emisión, conforme a los términos del Contrato de IVC, la Orden de Confirmación, el Plan y los Acuerdos Complementarios, de IVCs en dos subseries – los IVCs de Obligación General y los IVCs "Clawback" – hasta una cantidad agregada de $3,500,000,000 y $5,239,002,764, respectivamente. Cada serie de los IVCs podrá incluir una o más subseries.

(b)     Los IVCs tendrán fecha y vencerán en el tiempo o tiempos que determine el Representante del Gobernador, como representante del Estado Libre Asociado de Puerto Rico, y autorizados en el Contrato de IVC, disponiéndose que los IVCs de Obligación General vencerán no más tarde del Año Fiscal 2044 y que los IVCs "Clawback" vencerán no más tarde del Año Fiscal 2052. Los IVCs no devengarán intereses y estarán sujetos a redención según sea determinado por el Representante del Gobernador y autorizado en el Contrato de IVC de conformidad y consistente con el Plan. El Representante del Gobernador determinará la forma de los IVCs y la manera de emitir los IVCs, y establecerá la denominación o denominaciones de los IVCs y el lugar o los lugares de pago de los mismos y sus otros términos, todo de conformidad y consistente con el Plan.

(c)     Los IVCs serán obligaciones legales, válidas y vinculantes del Estado Libre Asociado de Puerto Rico, emitidos de conformidad con el Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, y pagaderos de conformidad con los términos del Contrato de IVC y de los Acuerdos Complementarios, disponiéndose que, de conformidad con el Contrato de IVC:

(1)   no se hará pago alguno a los tenedores de los IVCs (a menos que sean tenedores de la Subserie de Reclamaciones del Arbitrio al Ron bajo las circunstancias establecidas en el inciso (2) a continuación) en un año fiscal a menos que durante el año fiscal anterior ocurra una Condición de Rendimiento Superior del IVU;

(2)   no se hará pago alguno en un año fiscal a los tenedores de la Subserie de Reclamaciones del Arbitrio al Ron a menos que durante el año fiscal anterior ocurra una Condición de Rendimiento Superior del IVU o una Condición de Rendimiento Superior del Arbitrio al Ron;

(3)   no se hará pago alguno a los tenedores de IVCs de Obligación General o a los IVCs "Clawback" en exceso del Máximo Agregado de los IVCs de Obligación General o del Máximo Agregado de los IVCs "Clawback", respectivamente;

(4)   a partir de la fecha de vencimiento de cada serie de los IVCs, si el Estado Libre Asociado de Puerto Rico ha hecho todos los pagos requeridos bajo dichas

series conforme al Contrato de IVC, se considerará que todas las obligaciones del Estado Libre Asociado de Puerto Rico bajo dichas series han sido satisfechas y que las series no están en circulación, aun si no se llegó al Máximo Agregado de los IVCs de Obligación General o el Máximo Agregado de los IVC "Clawback", según sea el caso, para dicha fecha.

(d)     Cuando cualquier oficial cuya firma o facsímil de la firma aparezca en cualesquiera IVCs autorizados bajo esta Ley deje de ocupar su cargo antes de la entrega de dichos IVCs, dicha firma o facsímil de firma será, no obstante, válida y suficiente, y se considerará para todos los propósitos como si dicho oficial hubiese permanecido en su puesto hasta dicha entrega. Además, cualesquiera IVCs podrán tener la firma o facsímil de firma de aquellas personas que, al momento en que se emitan dichos bonos, sean los oficiales adecuados para firmarlos, pero que, en la fecha de los IVCs, no hayan estado ocupando sus puestos.

(e)     Los IVCs emitidos conforme al Contrato de IVC son pagarés del Estado Libre Asociado de Puerto Rico para todos los propósitos y se considerarán instrumentos negociables bajo las leyes de Puerto Rico.

(f)     Los IVCs autorizados por esta Ley se emitirán de forma registrada.

(g)     Solamente para propósitos de calcular el servicio anual máximo de la deuda pública del Estado Libre Asociado de Puerto Rico conforme al Artículo VI, Sección 2 de la Constitución del Estado Libre Asociado, se asumirá que el servicio de la deuda pagadero bajo los IVCs en cualquier año fiscal será igual a las cantidades máximas que podrían ser pagaderas durante dicho año fiscal bajo los IVCs de conformidad con el Contrato de IVC.

(h)     Se establece que los servicios de la deuda pagadero bajo los IVCs en cualquier año fiscal no menoscabarán bajo concepto alguno las obligaciones y reservas creadas por la Corporación del Fondo de Interés Apremiante (COFINA).

## ARTÍCULO 302.- COMPROMISO DE LA BUENA FE, EL CRÉDITO Y EL PODER DE IMPONER CONTRIBUCIONES.

La buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico quedan por la presente irrevocablemente comprometidos para el pago puntual de los IVCs emitidos bajo las disposiciones de esta Ley según y cuándo venzan de conformidad con los términos del Contrato de IVC. El Secretario de Hacienda queda por la presente autorizado y dirigido a pagar los IVCs según venzan o al momento de ser redimidos de conformidad con el Contrato de IVC, de los recursos disponibles del Estado Libre Asociado de Puerto Rico en el año fiscal en que dicho pago sea requerido, y las disposiciones de esta Ley relacionadas al pago de los IVCs se considerarán una

obligación continua del Secretario de Hacienda para hacer los pagos en el año fiscal en que dicho pago sea requerido, aun si no se han hecho asignaciones específicas para dicho propósito. El Representante del Gobernador queda por la presente autorizado y dirigido a incluir en el Contrato de IVC el compromiso que aquí establece el Estado Libre Asociado de Puerto Rico con relación a los IVCs, y se establecerá en dichos IVCs que la buena fe, el crédito y el poder de imponer contribuciones del Estado Libre Asociado de Puerto Rico están comprometidos para el pago de los mismos.

## ARTÍCULO 303.- EXENCIÓN DEL PAGO DE CONTRIBUCIONES.

Los IVCs, incluyendo, pero sin limitarse a, cualesquiera pagos o ingresos con relación a los IVCs y la transferencia de los IVCs, estarán, en todos momentos, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado o por cualquier Entidad Gubernamental, y de cualesquiera todas las retenciones relacionadas). Si los IVCs se emiten originalmente a un fideicomiso, las distribuciones que haga dicho fideicomiso a sus beneficiarios atribuibles a pagos o ingresos recibidos por el fideicomiso con relación a los IVCs y la transferencia de los IVCs por el fideicomiso, si se permitiera, así como la transferencia del interés en dicho fideicomiso, estarán, en todo momento, totalmente exentos de todo tipo de contribuciones (incluyendo, pero sin limitarse a, contribuciones sobre ingresos, tarifas, licencias, sellos y otros cargos cobrados por el Estado Libre Asociado de Puerto Rico o por cualquier Entidad Gubernamental, y de cualesquiera y todas las retenciones relacionadas). Los tenedores y beneficiarios de los IVCs y/o de un interés en el fideicomiso que sea dueño de los IVCs no tendrán que rendir planillas o cualquier otro reporte de contribuciones o requisito similar con relación al Estado Libre Asociado de Puerto Rico o cualquier Entidad Gubernamental por razón de tener, ser dueño de o transferir IVCs.

## ARTÍCULO 304.- CONVENIOS DEL ESTADO LIBRE ASOCIADO DE PUERTO RICO.

El Estado Libre Asociado de Puerto Rico, con la intención de quedar contractualmente obligado, por la presente acuerda y pacta para el beneficio de todos los tenedores iniciales y subsiguientes de los IVCs que, hasta que todas las obligaciones con relación a dichos bonos hayan sido completamente pagadas o satisfechas de conformidad con sus términos, el Estado Libre Asociado de Puerto Rico:

(a)     no llevará a cabo acción alguna que:

(i)     limite o altere los derechos del Estado Libre Asociado de Puerto Rico de conformidad con el Plan y la Orden de Confirmación para cumplir con los términos de cualesquiera acuerdos con los tenedores de los IVCs;

(ii)     perjudique los derechos y remedios de los tenedores de los IVCs; o

(iii)    limite la habilidad de los tenedores de los IVCs de monitorear el rendimiento del IVU Medido y de los Ingresos del Arbitrio al Ron del Estado Libre Asociado de Puerto Rico disponibles para el pago de los IVCs (de conformidad con el Plan y según establecido en el Contrato de IVC); disponiéndose, sin embargo, que lo anterior no impedirá que el Estado Libre Asociado de Puerto Rico pueda ejercer su poder, mediante un cambio en la ley, de eliminar el IVU Medido, o reemplazar el IVU Medido con un Impuesto Sustituto Medido, cada uno de conformidad con el Contrato de IVC, que protegerá a los tenedores de los IVC de que dicha eliminación o reemplazo reduzca la probabilidad de que la Condición de Rendimiento Superior del IVU se cumpla; y disponiéndose además que el Estado Libre Asociado de Puerto Rico divulgará a tiempo la información que pueda ser requerida bajo el Contrato de IVC con relación al IVU Medido, los recaudos del impuesto sobre ventas y uso, y cualesquiera ajustes a los umbrales base del 5.5% del IVU realizados de conformidad con el Contrato de IVC;

(b)     causará que cualquier Plan Fiscal del Estado Libre Asociado de Puerto Rico presentado a la Junta de Supervisión y Administración Financiera para Puerto Rico bajo PROMESA luego de la Fecha de Efectividad, mientras dicha entidad esté presente y en funciones en Puerto Rico incluya disposiciones para el pago en cada año fiscal de las cantidades adeudadas para los IVCs de conformidad con los términos del Contrato de IVC en la medida en que la Condición de Rendimiento Superior del IVU o la Condición de Rendimiento Superior del Arbitrio al Ron, según sean aplicables, ocurran durante el año fiscal anterior.

## CAPÍTULO 4 – MUNICIPIOS

### ARTÍCULO 401.- FONDO EXTRAORDINARIO.

Se crea el "Fondo Extraordinario para Atender el Recogido y Disposición de Residuos, Desperdicios y para Implementar Programas de Reciclaje en los Municipios", en adelante el "Fondo Extraordinario", el cual estará dentro del "Fondo de Equiparación de los Municipios" dispuesto en el Artículo 7.015 de la Ley 107-2020, según enmendada, pero en una cuenta separada de otros ingresos de dicho fondo, y que se utilizará para los propósitos específicos dispuestos en esta Ley.

### ARTÍCULO 402.- DECLARACIÓN DE POLÍTICA PÚBLICA.

El Gobierno de Puerto Rico por la presente declara que es la política pública del Estado Libre Asociado de Puerto Rico el garantizar a su población el recogido y

disposición eficiente de la basura, desperdicios sólidos, escombros, así como la implementación de programas de reciclaje para atender estos residuos, por lo que en la medida que el Plan de Ajuste de la Deuda incluya reducciones en el monto de la deuda garantizada una porción de estas economías que se generarán deberán hacerse accesibles a los municipios para que puedan brindar estos servicios.

**ARTÍCULO 403.- REMISIÓN DE AHORROS EN EL PAGO DE DEUDA AL FONDO EXTRAORDINARIO.**

El Fondo Extraordinario establecido en el Artículo 401 de esta Ley se nutrirá de una asignación anual del Fondo General, la cual será equivalente en cada año fiscal al 42% de la cantidad cobrada durante el año fiscal anterior por virtud de la contribución sobre la propiedad del 1.03%. Esta asignación solo podrá incluirse en el presupuesto de un año fiscal si la cantidad de fondos Medicaid recibidos durante el año fiscal anterior exceden la cantidad proyectada para el año fiscal anterior en el plan fiscal del Gobierno de Puerto Rico certificado por la Junta de Supervisión y Administración Financiera para Puerto Rico en abril de 2021.

**ARTÍCULO 404.- PROPÓSITOS DEL FONDO EXTRAORDINARIO.**

Los municipios solo podrán acceder a los recursos económicos del Fondo Extraordinario aquí dispuesto, exclusiva y específicamente, para los propósitos descritos a continuación:

(a)     recogido y disposición de basura;

(b)     recogido y disposición desperdicios sólidos;

(c)     recogido y disposición de escombros;

(d)     implementación, recogido y disposición de reciclaje.

**ARTÍCULO 405.- FÓRMULA DE DISTRIBUCIÓN ENTRE MUNICIPIOS.**

A fin de lograr una justa distribución de los recursos del Fondo Extraordinario, se utilizará los siguientes criterios para determinar las cantidades a las que pueden tener acceso los municipios:

(a)     El total de personas beneficiarias del Programa de Asistencia Nutricional, per cápita, según certificación al efecto emitida por el Departamento de la Familia, que sea determinado en el año fiscal inmediatamente anterior o en el año fiscal más próximo que se tenga la información.

(b)     El presupuesto funcional per cápita de cada municipio, del año fiscal inmediatamente anterior o del año fiscal más próximo que se tenga la información.

(c)     El valor tasado de la propiedad tributable per cápita ubicada dentro de los límites territoriales de cada municipio, correspondiente al año fiscal inmediatamente anterior o al año fiscal más próximo que se tenga la información.

(d)     La población del municipio por milla cuadrada, según el último censo decenal.

La metodología para la distribución será determinada por los parámetros dispuestos en este Artículo, pero podrán incorporarse aquellos parámetros existentes para la distribución de los recursos del Fondo de Equiparación de los Municipios, siempre y cuando no sean contrarios a los propósitos y objetivos aquí descritos, por la Junta de Gobierno del CRIM. La aplicación de dicha metodología deberá beneficiar aquellos municipios que reciben el menor ingreso por contribución sobre la propiedad u otras fuentes, así como a los municipios con el mayor número de dependientes del Programa de Asistencia Nutricional y de mayor densidad poblacional.

## CAPÍTULO 5– ENMIENDA Y DEROGACIÓN DE CIERTAS LEYES PARA ALLEGAR FONDOS AL FONDO GENERAL Y GARANTIZAR QUE TODA LEGISLACIÓN CUMPLA CON LA DISPONIBILIDAD DE FONDOS ESTABLECIDOS EN EL PLAN FISCAL.

**ARTÍCULO 501.- SE ENMIENDA EL INCISO (A) DEL ARTÍCULO 3 DE LA LEY NÚM. 147 DE 18 DE JUNIO DE 1980, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 3.- Facultades y Deberes de la Oficina de Gerencia y Presupuesto.

(a)     La Oficina de Gerencia y Presupuesto bajo las reglas, reglamentos, instrucciones y órdenes que el Gobernador prescribiere, asesorará al Primer Ejecutivo, a la Asamblea Legislativa y a los organismos gubernamentales en los asuntos de índole presupuestarios, programáticos y de gerencia administrativa, así como en asuntos de naturaleza fiscal relativos a sus funciones; llevará a cabo las funciones necesarias que permitan al Gobernador someter a la Asamblea Legislativa la propuesta del Presupuesto General del Gobierno, de conformidad con el Artículo 4 de esta Ley, incluyendo las Corporaciones Públicas. A su vez, velará por que la ejecución y administración del presupuesto por parte de los organismos públicos se conduzcan de acuerdo con las leyes y resoluciones de asignaciones, con las más sanas y adecuadas normas de administración fiscal y gerencial, y en armonía con lo dispuesto por el Plan de Crecimiento Económico y Fiscal aprobado de conformidad con la Ley de Responsabilidad Fiscal y de Revitalización Económica de Puerto Rico (el "Plan Fiscal y de Crecimiento Económico") y con los

propósitos programáticos para los cuales se asignan o proveen los fondos públicos. Evaluará los programas y actividades de los organismos públicos en términos de economía, eficiencia y efectividad y le someterá al Gobernador informes con recomendaciones para la implantación de las mismas. Además, preparará y mantendrá el control de todos aquellos documentos fiscales y presupuestarios que sean necesarios para la administración del presupuesto y efectuará los cambios, enmiendas o ajustes que se ameriten, sujeto a las disposiciones legales y normas establecidas por la Asamblea Legislativa, y el Gobernador. A estos fines, y con el propósito de que la Asamblea Legislativa pueda analizar que las medidas legislativas cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de cinco (5) días laborables contados a partir desde que se le son requeridas. Presentará junto al Secretario de Hacienda un informe detallado con respecto a las proyecciones de ingresos y gastos del año fiscal siguiente y correspondiente al Presupuesto General propuesto ante la Asamblea Legislativa en un término que no excederá cinco (5) días calendario luego de la presentación de la propuesta de Presupuesto General del Gobierno del Estado Libre Asociado de Puerto Rico por parte del Gobernador. Se mantendrá atento a las nuevas corrientes y tendencias en el ámbito presupuestario y gerencial de la administración pública para evaluar y adaptar aquellas técnicas, métodos y enfoques que apliquen al campo administrativo local, tanto en la formulación y ejecución del presupuesto como en la evaluación de programas, el análisis gerencial y la auditoría operacional y administrativa. Además, deberá proponer aquella legislación que se considere necesaria y conveniente para incorporar dichos enfoques y tendencias a nuestro proceso presupuestario y administrativo.

(b)     ...”

**ARTÍCULO 502.- SE ENMIENDA EL ARTÍCULO 3 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, CONOCIDA COMO LA LEY DE LA AUTORIDAD PARA EL FINANCIAMIENTO DE LA INFRAESTRUCTURA DE PUERTO RICO, PARA QUE LEA COMO SIGUE:**

“**Artículo 3.- Definiciones**

Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán los significados que se indican a continuación, a no ser que del contexto se entienda claramente otra cosa:

(a) ...

...

(j) Fondo de Desarrollo — Significará el Fondo de Desarrollo de Infraestructura creado bajo el Artículo 25 de esta Ley, conforme a lo dispuesto en la Ley Núm. 54 de 4 de agosto de 1997 (27 L.P.R.A. § 431 et seq.)

(k) …

…

(r) Cuenta del Corpus — Significará la Cuenta del Corpus del Fondo de Desarrollo según se establece en el inciso (a) del Artículo 25 de esta Ley. Los rendimientos de capital que genere esta cuenta deberán utilizarse según se establece en el Artículo 25 de esta Ley.

(s) Cuentas adicionales — Significará cuentas creadas dentro del Fondo de Desarrollo, además de la Cuenta del Corpus, que sean necesarias para llevar a cabo los propósitos de esta Ley, según se establece en el inciso (a) del Artículo 25 de esta Ley."

**ARTÍCULO 503.- SE ENMIENDA EL INCISO (M) DEL ARTÍCULO 7 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7. – Poderes Generales.

La Autoridad tendrá todos los poderes necesarios y convenientes para llevar a cabo y efectuar los propósitos y disposiciones de esta Ley, incluyendo, pero sin que se entienda como limitación, lo siguiente:

(a) …

…

(m) Hipotecar o pignorar cualquier propiedad para el pago del principal de y los intereses sobre cualesquiera bonos emitidos por la Autoridad o bonos emitidos por una entidad beneficiada, y pignorar la totalidad o parte de los ingresos que la Autoridad recibiese.

(n) …

…"

**ARTÍCULO 504.- SE DEROGAN LOS ARTÍCULOS 25 Y 34 DE LA LEY 44 DE 21 DE JUNIO DE 1988, SEGÚN ENMENDADA, Y SE RENUMERAN LOS ARTÍCULOS 25-A y 35 COMO LOS ARTÍCULOS 25 y 34, RESPECTIVAMENTE.**

**ARTÍCULO 505.- SE ENMIENDA EL ARTÍCULO 23.01 DE LA LEY 22-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 23.01. — Procedimiento para el pago de derechos.

Todo dueño de un vehículo de motor, sujeto al pago de derechos anuales de permiso pagará en cualquier colecturía de rentas internas de cualquier municipio, en el lugar que designe el Secretario del Departamento de Hacienda, en las estaciones oficiales de inspección, bancos o en el lugar que designe el Secretario, los derechos que correspondan al vehículo para cada año, según se indican estos en la notificación que al efecto deberá enviarle el Secretario. Los derechos por este concepto se pagarán anticipadamente por todo el año excepto que cuando al momento de pagar los derechos resten menos de seis (6) meses para la próxima renovación, solo se requerirá el pago equivalente a los meses que resten por transcurrir en la fecha en que se devengan, contándose las fracciones de meses como un mes completo. Esta disposición aplicará a todos los vehículos de motor, independientemente de la cantidad que paguen por derecho de licencia por año. Al recibo de los derechos correspondientes, el colector expedirá el permiso para vehículo de motor que consistirá del formulario de notificación emitido por el Secretario, con las debidas anotaciones y firma del colector, indicativas de que se ha efectuado el pago de los derechos. Junto con el permiso, el colector entregará el correspondiente marbete o placas de número, según sea el caso. Solo se exhibirá un (1) marbete del vehículo de motor durante el año de vigencia del pago de derechos. Se autoriza al Secretario a que, previa consulta con el Secretario de Hacienda, adopte un Reglamento a los fines de conceder un descuento de hasta diez por ciento (10%) a aquellos conductores que opten por adquirir y pagar anticipadamente marbetes multianuales para sus vehículos. El dueño de la estación de inspección depositará en una cuenta especial para que el Departamento de Hacienda haga transferencias diarias de los marbetes expedidos. El Departamento de Hacienda aprobará un reglamento para estos fines, en el cual requerirá una fianza y seguros para garantizar que se reciban los recaudos de los marbetes vendidos. El cargo por servicio que cobre la estación de inspección, el banco o cualquier otro lugar que designe el Secretario de Hacienda no será mayor de cinco dólares ($5). En los casos referentes a derechos de exámenes, incluyendo licencias de aprendizaje, expedición de duplicado de licencias, renovación de licencias de conducir, traspaso de vehículos y todo otro cobro de derechos, se utilizarán comprobantes de pago, sellos de rentas internas o cualquier otro mecanismo de pago que establezca el Secretario de Hacienda. El importe de los derechos recaudados de acuerdo con los Artículos 23.01 y 23.02 de esta Ley ingresará en su totalidad en el Fondo General del Estado Libre Asociado de Puerto Rico."

**ARTÍCULO 506. - SE DEROGA EL INCISO (E) Y SE RENUMERAN LOS ACTUALES INCISOS (F) Y (G) COMO LOS NUEVOS INCISOS (E) Y (F) DEL ARTÍCULO 23.02 DE LA LEY 22-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 23.02. — Derechos a pagar.

(a)…

…

(d) …

(e) …

(f) …"

**ARTÍCULO 507. - SE DEROGA EL INCISO (L) Y SE RENUMERAN LOS ACTUALES INCISOS (M), (N), (Ñ), (O), Y (P) COMO LOS NUEVOS INCISOS (L), (M), (N), (Ñ), Y (O), RESPECTIVAMENTE, DEL ARTÍCULO 1.03(B) DE LA LEY 351-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 1.03(b).- Definiciones.

Las siguientes palabras y términos, cuando sean usados o se haga referencia a los mismos en esta Ley, tendrán el significado indicado a continuación, a menos que del contexto surja otro significado:

(a)      …

…

(l) …

(m) …

(n) …

(ñ) …

(o) …"

**ARTÍCULO 508. - SE ENMIENDA EL INCISO (H) DEL ARTÍCULO 2.02 DE LA LEY 351-2000, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"**Artículo 2.02 – Poderes Específicos de la Autoridad.**

La Autoridad tendrá las siguientes facultades y derechos:

(a) ...

(h) Tomar préstamos con el propósito de financiar los costos del Centro, los proyectos de mejoramiento y proyectos en las parcelas privadas o el Distrito y cumplir con cualquiera de sus propósitos y poderes corporativos, a discreción de la Junta; hacer y emitir bonos negociables de la Autoridad; garantizar el pago de dichos bonos, o cualquier parte de los mismos, mediante la prenda, hipoteca, cesión o escritura de fideicomiso de propiedades de la Autoridad localizadas en o fuera del Distrito, cargos por beneficio, otros ingresos, rentas, cuotas, recibos y cualquier interés en contratos, arrendamientos o subarrendamientos; entrar en cualesquiera acuerdos con los compradores o tenedores de dichos bonos o con otras personas con las cuales la Autoridad está obligada con relación a cualquier bono, emitido o por ser emitido, según la Autoridad considere aconsejable, los cuales constituirán contratos con dichos compradores o tenedores; obtener cualquier facilidad que aumente su capacidad para tomar dinero a préstamo o emitir deuda o que aumente su liquidez con relación a cualesquiera bonos en la forma en que la Autoridad determine ventajosa; y, en general, proveer garantías para el pago de los bonos y los derechos de los tenedores de estos."

(i)...

..."

**ARTÍCULO 509.- SE ENMIENDA EL ARTÍCULO 8 DE LA LEY 179-2002, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 8.- Las agencias gubernamentales, los municipios, así como las entidades recipientes de asignaciones de fondos públicos los utilizarán para los fines establecidos en la resolución conjunta correspondiente y de ninguna manera, dispondrán de los mismos para otros propósitos o fines que no estén señalados de manera categórica y específica en la resolución conjunta aprobada.

Cualquier cambio o modificación de los propósitos o fines establecidos en la resolución conjunta original, conllevará el inicio o repetición por la Asamblea Legislativa de todos los procedimientos.

El cumplimiento con estas resoluciones conjuntas, asignando fondos públicos, se hará siguiendo las normas y procedimientos aplicables a los municipios y a las instrumentalidades gubernamentales. Con excepción de las personas naturales, todos los contratos suscritos y cualquiera otro documento legal estarán sujetos a las leyes del Estado Libre Asociado de Puerto Rico y serán interpretados de acuerdo a las mismas.

Con el propósito de que la Asamblea Legislativa pueda analizar que las asignaciones o reasignaciones de fondos públicos dispuestos en esta Ley cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de cinco (5) días laborables contados a partir desde que se le son requeridas."

**ARTÍCULO 510.- SE ENMIENDA EL ARTÍCULO 31 DE LA LEY 272-2003, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 31. — Disposición de Fondos.

La Oficina de Turismo distribuirá las cantidades recaudadas por concepto del Impuesto fijado en el Artículo 24 de esta Ley, luego de transferir al Fondo General del Estado Libre Asociado de Puerto Rico las cantidades que anteriormente se le transferían a la Autoridad (según detallado en el Plan Fiscal del Estado Libre Asociado de Puerto Rico vigente en ese momento, si alguno), de acuerdo con el siguiente orden de prioridad:

(i) dos (2) por ciento del Impuesto total recaudado ingresará mensualmente a los fondos generales de la Oficina de Turismo para cubrir los gastos de operación, manejo y distribución de los recaudos del Impuesto, o para cualquier otro uso que disponga la Oficina de Turismo. (ii) cinco (5) por ciento del Impuesto total recaudado ingresará mensualmente al Fondo General del Departamento de Hacienda para los Años Fiscales 2005-2006 y 2006-2007, a las arcas de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008- 2009, y a partir del Año Fiscal 2009-2010 a las arcas de la Oficina de Turismo. A partir del año en que la Autoridad certifique al Departamento de Hacienda y a la Oficina de Turismo, el inicio de las operaciones del Centro de Convenciones, y durante los diez (10) años subsiguientes, este cinco por ciento (5%) estará disponible para cubrir cualquier déficit, si alguno, que surja de las operaciones de las facilidades que opera la Autoridad del Distrito del Centro de Convenciones, en reserva que mantendrá la Oficina de Turismo. Disponiéndose, sin embargo, que para cada año fiscal y/o cada vez que la Autoridad del Distrito del Centro de Convenciones proponga presentar un presupuesto que exceda el déficit de dos millones quinientos mil (2,500,000) dólares, el presupuesto de la Autoridad del Distrito del Centro de Convenciones deberá ser presentado a la Junta de Directores de la Autoridad a la Oficina de Turismo y al Secretario de Hacienda para los Años Fiscales 2005-2006 y 2006-2007 y a la Junta de Directores de la Compañía de Parques Nacionales para los Años Fiscales 2007-2008 y 2008-2009 en una

reunión específica a estos fines, y a la Junta de Directores de la Autoridad y a la Oficina
de Turismo, comenzando el Año Fiscal 2010-2011 en adelante. Este cinco por ciento (5%)
se mantendrá disponible durante cada año fiscal en una cuenta de reserva especial que
mantendrá la Oficina de Turismo para cubrir cualquier déficit en exceso de dos millones
quinientos mil (2,500,000) dólares, que surja de la operación de las facilidades de la
Autoridad del Distrito del Centro de Convenciones. Para cada año fiscal, cualquier
sobrante, luego de cubrir dicho déficit operacional, si alguno, se liberará de la reserva
especial y estará disponible para el uso del Departamento de Hacienda para los Años
Fiscales 2005-2006 y 2006-2007, de la Compañía de Parques Nacionales para los Años
Fiscales 2007-2008 y 2008-2009 y a partir del Año Fiscal 2010-2011 para el uso de la Oficina
de Turismo. A partir del Año Fiscal 2015-2016, y durante los cinco (5) años subsiguientes,
este cinco por ciento (5%) será transferido mediante aportaciones trimestrales por el
Departamento a la Autoridad para cubrir los costos asociados exclusivamente a la
operación del Centro de Convenciones de Puerto Rico. Disponiéndose, sin embargo, que
para cada año fiscal la Autoridad del Distrito del Centro de Convenciones deberá
presentar sus estados financieros auditados, conjuntamente con un informe evidenciando
el uso de los fondos transferidos según establecido en los incisos (ii) y (iv) de este
apartado a la Junta de Directores de la Autoridad y al Director de la Oficina de Turismo,
en una reunión específica a esos efectos. Si al finalizar algún año fiscal tales estados
financieros auditados reflejan una ganancia neta, la Autoridad del Distrito del Centro de
Convenciones devolverá a la Oficina de Turismo la cantidad generada como ganancia
neta sin exceder el monto total transferido por la Oficina de Turismo a la Autoridad del
Distrito del Centro de Convenciones en ese mismo año fiscal, por virtud de los incisos (ii)
y (iv) de este apartado. (iii) dos millones quinientos mil (2,500,000) dólares serán
transferidos por la Oficina de Turismo a la Autoridad del Distrito del Centro de
Convenciones en aportaciones trimestrales de seiscientos veinticinco mil (625,000.00)
dólares para cubrir los costos asociados exclusivamente a la operación del Distrito del
Centro de Convenciones. Disponiéndose, sin embargo, que para cada año fiscal y/o cada
vez que se proponga presentar un presupuesto modificado, el presupuesto de la
Autoridad del Centro de Convenciones deberá ser presentado a la Junta de Directores de
la Autoridad y Director Ejecutivo de la Oficina de Turismo, en una reunión específica a
esos efectos. Esta cantidad será transferida según establecido en este apartado a partir del
Año Fiscal 2015-2016, y por un período de cinco (5) años. (iv) hasta cuatro millones
(4,000,000) de dólares se mantendrán disponibles durante cada año fiscal, en una cuenta
de reserva especial que mantendrá la Oficina de Turismo para gastos operacionales
dedicados a los asuntos especializado del sector, sus gastos y/o la fiscalización e
implementación por este del Contrato de Servicios de Mercadeo de Destino contemplado
en el Artículo 8 de la "Ley para la Promoción de Puerto Rico como Destino". (v) el
remanente que resulte después de las asignaciones y reservas dispuestas en los incisos
(i), (ii), (iii) y (iv), hasta un tope de veinticinco millones (25,000,000) de dólares, se le
asignarán a la Corporación. Los fondos asignados a la Corporación serán utilizados por
esta para la promoción, mercadeo, desarrollo y fortalecimiento de la industria turística
en Puerto Rico. Si el remanente excediera los veinticinco millones (25,000,000) de dólares,

dicho exceso será utilizado por la Oficina de Turismo para el desempeño de sus funciones dedicados a los asuntos especializado del sector y sus gastos. La Oficina de Turismo del Departamento de Desarrollo Económico y Comercio le someterá mensualmente a la Autoridad y a la Corporación un desglose de los recaudos por concepto del Impuesto."

## ARTÍCULO 511.- SE AÑADE UN NUEVO ARTÍCULO 7A A LA LEY 103-2006, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:

"Artículo 7A.- Deber Ministerial de la Oficina de Gerencia y Presupuesto

Con el propósito de que la Asamblea Legislativa pueda analizar que las medidas legislativas cumplen con el Plan Fiscal Certificado, la Oficina de Gerencia y Presupuesto tendrá el deber ministerial de proveer y enviar una certificación oficial que valide la disponibilidad de fondos respecto a las medidas legislativas que le sean solicitadas por las comisiones legislativas en un plazo de treinta (30) días laborables contados a partir desde que se le son requeridas. Dicha certificación deberá incluir la cantidad exacta disponible, sea mayor o menor a la dispuesta en la medida en consideración.

Al emitir la certificación oficial, la Oficina de Gerencia y Presupuesto garantiza la disponibilidad de dichos fondos. Una certificación oficial en donde se informe que los fondos están comprometidos para una obra o uso específico distinto a lo dispuesto en la medida legislativa que se solicita deberá venir acompañada con la evidencia de la obligación, copia de las facturas y cualquier otra información pertinente que demuestre la no disponibilidad de dichos fondos.

El proceso para requerir las certificaciones oficiales de disponibilidad de fondos por parte de las comisiones legislativas no requerirá de ningún formulario o trámite especial, solo requerirá una misiva de la comisión legislativa solicitando la certificación que se trate.

Cuando cualquier comisión permanente, especial o conjunta de la Asamblea Legislativa de Puerto Rico presente cualquier informe recomendando la aprobación de alguna medida legislativa en la cual se haya solicitado una certificación oficial tendrá que incluir en el referido informe una sección titulada "Deber Ministerial de la Oficina de Gerencia y Presupuesto referente a disponibilidad de fondos". En esta Sección, se aseverará el impacto fiscal, si alguno, que se estime la aprobación de la medida tendría sobre los presupuestos de las agencias, departamentos, organismos, instrumentalidades o corporaciones públicas. Si la Oficina de Gerencia y Presupuesto no emite la correspondiente certificación en el tiempo dispuesto en este Artículo, se incluirá en dicha Sección del informe el siguiente texto: "La Oficina de Gerencia y Presupuesto no suministró la certificación oficial de disponibilidad de fondos en el tiempo dispuesto por ley incumpliendo con el deber ministerial dispuesto en la Ley 103-2006, según

enmendada, mejor conocida como "Ley para la Reforma Fiscal del Gobierno del Estado Libre Asociado de Puerto Rico de 2006".

**ARTÍCULO 512.- SE ENMIENDA LA SECCIÓN 3060.11 DE LA LEY 1-2011, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Sección 3060.11 – Disposición de Fondos.

El producto de los impuestos y derechos de licencia recaudados por virtud de este Subtítulo ingresará en el Fondo General del Tesoro de Puerto Rico."

**ARTÍCULO 513.- SE ELIMINA LA SECCIÓN 3060.11A DE LA LEY 1-2011, SEGÚN ENMENDADA.**

**ARTÍCULO 514.- SE DEROGA LA LEY NÚM. 39 DEL 13 DE MAYO DE 1976, SEGÚN ENMENDADA.**

**ARTÍCULO 515.- SE ENMIENDA EL ARTÍCULO 7.018 DE LA LEY 107-2020, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7.018 – Fondos – Fideicomisos; Distribución

Los fondos en el fideicomiso general que el CRIM establece con el Fiduciario Designado según el inciso (c) del Artículo 7.003 de este Capítulo, serán distribuidos por el CRIM en el orden de prioridad que a continuación se indica:

(a) La cantidad que corresponda a la contribución especial del 1.03% será depositado en el Fondo General.

(b) …

(c) …

…"

**ARTÍCULO 516.- SE ENMIENDA EL ARTÍCULO 7.027 DE LA LEY 107-2020, SEGÚN ENMENDADA, PARA QUE LEA COMO SIGUE:**

"Artículo 7.027 – Recaudación e Ingreso de Contribuciones en Fondos y Aplicación del Producto de las Contribuciones (Fondo de Redención de Bonos)

El producto de las contribuciones que se imponen por los Artículos 7.025 y 7.026 ingresará al fideicomiso general establecido por el CRIM con la Autoridad de Asesoría

Financiera y Agencia Fiscal de Puerto Rico (AAFAF), de conformidad con el Capítulo I de este libro.

    (a)  El producto de las contribuciones especiales sobre la propiedad impuesta por el Artículo 7.026 ingresará al Fondo General.

    (b)  …

    (c)  …

    (d)  …"

**ARTÍCULO 517.- Las transacciones del Plan de Ajuste no se pueden utilizar para mitigar causas de acción al amparo de la Ley 3-2013, según enmendada.**

**ARTÍCULO 518.- DEROGACION DE CIERTAS LEYES O SECCIONES DE ESTAS.**

Se deroga el Artículo 3 de la Ley 9 de 12 de agosto de 1982, disponiéndose que los fondos que se transferían por virtud de dicha Ley a la Autoridad de Transportación y Carreteras ingresarán al Fondo General del Estado Libre Asociado de Puerto Rico.

**CAPÍTULO 6 – DISPOSICIONES MISCELÁNEAS**

**Artículo 601.-Prohibición del menoscabo de las Obligaciones de la Corporación del Fondo de Interés Apremiante (COFINA)**

Se establece que los servicios de la deuda pagadero bajo los IVCs en cualquier Año Fiscal no menoscabarán bajo concepto alguno las obligaciones de la Corporación del Fondo de Interés Apremiante (COFINA), incluyendo las obligaciones y reservas creadas.

**Artículo 602.-Autorización al Representante del Gobernador**

Las responsabilidades, facultades, deberes y autorizaciones concedidas por la presente Ley al Representante del Gobernador, estará limitada exclusivamente a lo dispuesto en esta Ley y no a futuras emisiones de deudas.

**Artículo 603.- Separabilidad.**

Si cualquier cláusula, párrafo, subpárrafo, acápite o parte de esta Ley fuera anulada o declarada inconstitucional, la orden a tal efecto dictada no afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma que así

hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta Ley a aquellas Personas o circunstancias en que se pueda aplicar válidamente. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan cumplir las disposiciones y la aplicación de esta Ley, aunque se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a alguna persona o circunstancia.

Disponiéndose que la separabilidad de este Artículo no será de aplicación al Artículo 605. Es la voluntad expresa e inequívoca de esta Asamblea Legislativa que no se hagan cumplir las Transacciones de Reestructuración y sus respectivas autorizaciones en los Artículos 103, 201 y 301, si se deja sin efecto, invalida o declara inconstitucional la condición suspensiva para evitar cualquier recorte de pensiones a empleados gubernamentales en el Plan de Ajuste, o las disposiciones del Artículo 104 de esta Ley.

**Artículo 604.- Supremacía.**

Las disposiciones de esta Ley prevalecerán sobre cualquier otra disposición general o específica de cualquier otra ley o reglamento del Gobierno (excluyendo leyes y reglamentos federales) que sea inconsistente con esta Ley. Esta Ley está sujeta a PROMESA. Si hubiera conflicto entre las versiones en inglés y en español de esta Ley, prevalecerá la versión en inglés.

Todas las leyes del Estado Libre Asociado de Puerto Rico (i) que son inconsistentes con los términos y disposiciones del Plan, las transacciones contempladas por el Plan, o las disposiciones de PROMESA, o (ii) que transfieren, asignan, o requieren la asignación de fondos del Estado Libre Asociado de Puerto Rico o de alguna de sus instrumentalidades a alguna agencia o instrumentalidad del Estado Libre Asociado de Puerto Rico, incluyendo las leyes enumeradas en el Exhibit K del Plan, en la medida en que dicha transferencia o asignación sea inconsistente con esta Ley, o con PROMESA, o con un presupuesto certificado por la JSAF (en la medida en que dicha certificación sea requerida por PROMESA), quedan por virtud de esta Ley desplazadas y enmendadas para disponer que todos los fondos transferidos o asignados por virtud de dichas leyes (o disposiciones de dichas leyes) inconsistentes, serán transferidos al Fondo General del Estado Libre Asociado de Puerto Rico para ser desembolsados solamente según se disponga en un presupuesto aprobado.

**Artículo 605.- Vigencia.**

Esta Ley comenzará a regir inmediatamente luego de su aprobación, excepto por el Capítulo 5 de esta Ley, el cual comenzará a regir en la Fecha de Efectividad. La vigencia de esta Ley queda condicionada a que la JSAF radique para su confirmación por el Tribunal del Título III un Plan enmendado que elimine la Modificación del Beneficio Mensual ("Monthly Benefit Modification," según se define en el Plan). Para propósitos de claridad, quedará inmediatamente sin vigencia esta Ley y cualquier transacción, emisión o gestión relacionada con la misma será nula si se ordena y se procede con algún recorte a las pensiones de los empleados gubernamentales en el Plan de Ajuste o Reestructuración. La vigencia de esta Ley queda condicionada a cero recortes en las pensiones.

**ENGLISH VERSION OF THIS ACT**

**(H.B. 1003)**
**(Second Conference)**

**LAW**

To create the "Law to End the Bankruptcy of Puerto Rico", to establish the provisions and conditions to approve the offer, sale, and issuance of the different types of General Obligation Bonds, as well as to provide the creation of Contingent Value Instruments; to establish public policy to support affected municipalities; to establish the public policy to support the pensions of our retirees; establish the public policy to support the University of Puerto Rico; declare the Government's purposes on higher education issues, health coverages for public employees and citizens, as well as for economic development and to establish a joint working group between the Legislative Branch and the Executive Branch; to establish a mechanism that allows the Government of the Commonwealth of Puerto Rico to advance the terms of payments and cancellation of the debt subject to controlling law; to repeal Law No. 39 of May 13, 1976, as amended; to amend subsection (a) of Section 3 of Law No. 147 of June 18, 1980, as amended; to amend Article 3 and subsection (m) of Article 7, as well as to repeal Articles 25 and 34 and to renumber Articles 25-A and 35 as Articles 25 and 34, respectively, of Law No. 44 of 21 of June 1988, as amended; to amend Article 23.01, to repeal subsection (e), and current subsections (f) and (g) are renumbered as new subsections (e) and (f), respectively, of Article 23.02 of Law 22-2000, as amended; repeal subsection (l), and renumber current subsections (m), (n), (ñ), (o), y (p) as new subsections (l), (m), (n), (ñ), y (o), respectively, of Article 1.03(B), and to amend subsection (h) of Article 2.02 of Law 351-2000, as amended; to amend Article 8 of Law 179- 2002, as amended; to amend Article 31 of Law 272-2003, as amended; to add a new Article 7A to Law 103-2006, as amended; to amend Section 3060.11 and eliminate Section 3060.11A of Law 1-2011, as amended; to amend Section 7.018 and Article 7.027 of Law 107-2020, as amended; and to repeal Article 3 of Act 9 of August 12, 1982; in order to take the affirmative steps necessary to direct the exit of Puerto Rico from the bankruptcy

proceedings created under Title III of PROMESA; to comply with the provisions of the aforementioned federal law with respect to the minimum conditions necessary for the culmination of the Financial Oversight and Management Board; and for other related purposes.

## STATEMENT OF MOTIVES

In the year 2016, in order to provide a mechanism for the Government of Puerto Rico to renegotiate its debt and to control the potential avalanche of claims by its creditors, the U.S. Congress enacted the federal law entitled "the Puerto Rico Oversight, Management, and Economic Stability Act", known as PROMESA. This law established, in its Title III, a bankruptcy proceeding that incorporated a broad portion of the provisions of the Bankruptcy Code, to which Puerto Rico would have access in order to restructure its monumental debt. Likewise, it created an entity that would take control of all budgetary, financial, and fiscal administration aspects of Puerto Rico called the Financial Oversight and Management Board (FOMB or the Board). In effect, the FOMB would essentially supervise and control all financial, fiscal, and budgetary aspects of the Government of the Commonwealth of Puerto Rico.

On May 3, 2017, the FOMB filed a debt restructuring petition under Title III of PROMESA. The filing of this petition before the Title III Court gave rise to the largest bankruptcy proceeding in the history of the U.S. municipal markets, to which the bonds and obligations of the Commonwealth of Puerto Rico belong. To bear in mind the magnitude of this event, it must be considered that it was estimated that the Commonwealth would have to restructure $35 billion as part of the aforementioned restructuring process.

After more than four years since the filing of the bankruptcy petition under Title III of PROMESA, the Board has presented a seventh amended version of the Debt Adjustment or Restructuring Plan (DAP or the Plan) for Puerto Rico before the Title III Court as filed on July 30, 2021. This Plan is the result of several years of negotiation between the FOMB, in its capacity as the exclusive representative of the Debtors, including the Commonwealth of Puerto Rico, before the Title III Court, and a number of classes of creditors of obligations of the central Government.

Pursuant to this law, the Commonwealth supports the Plan, along with the public policies set forth in this Law which, subject to PROMESA's mandate to restore fiscal responsibility in Puerto Rico and the Oversight Board's fiscal plan and budget powers under PROMESA, includes zero cuts to pensions of current retirees and current accrued benefits of active public employees and a desire to promote the welfare of the people of Puerto Rico:

1.  Protect the pensions of our retirees. This objective is intended to avoid cuts to the pensions of 100% of the retirees. To achieve this objective, a specific clause on this issue is provided in this Law.

2.  Provide additional funding for the University of Puerto Rico to be utilized to improve the student experience and environment, such that appropriations to UPR total $500 million per year, for five (5) years from fiscal year 2023 through fiscal year 2027. This goal is intended to preserve the capacity of the UPR to carry out its vital educational mission and to ensure the necessary resources to guarantee the accreditation of all of its programs and to achieve fair access for those students with financial needs, while also promoting efficiencies.

3.  Support the creation of a University Scholarships Trust Fund. This initiative is intended to create an investment trust to preserve the capital that would be awarded for scholarships for UPR students.

4.  Support reasonable health plans for central government employees. This measure would benefit more than 60,000 Puerto Rican workers and families.

5.  Support additional funding for the municipalities. This objective aims to grant fiscal stability to the municipalities and the continuity of the essential services they offer.

6.  Endorse the creation of the special fund for social equality. This proposal - to be legislated soon - aims to create a permanent fund entrusted with combating poverty and social inequality; giving priority in its allocations to the attention of the needs of marginalized communities, the special education program, the most vulnerable population groups, combating school dropouts, establishing an integrated plan for the homeless, and gradually increasing the allocations for nonprofit, community self-management, and faith-based entities to offer direct services.

7.  Establish the goal of increasing health coverage. The purpose of this initiative is to extend and/or facilitate access to health coverage to some 225,000 citizens who today lack health plans, depending on the availability of funds.

8.  Endorse the creation of the Strategic Investment Fund for Economic Development that injects continuous investments. This initiative proposes the creation of a Strategic Investment Fund divided into four categories: (1) investments to close basic skills gaps; (2) small business capitalization

programs; (3) the development of business growth programs through entrepreneurial capitalization; and (4) capitalization of the savings and credit cooperatives sector.

9. Establish a mechanism that allows the Government of Puerto Rico to advance the terms of payments and debt cancellation, following the termination of the FOMB under PROMESA. The sole purpose of this mechanism is to authorize the Government of Puerto Rico to refinance the debt payment agreements following the termination of the FOMB under PROMESA, with the sole objective of accelerating or paying off the agreed payments, in accordance with the future fiscal situation and without affecting essential and priority services of the Government of Puerto Rico.

10. Establish a joint working group between the Legislative Branch and the Executive Branch. This initiative has the objective of designing the legislation that is necessary to ensure that, once the public debt restructuring process is concluded, the Government of Puerto Rico does not go into debt again without having the economic resources to meet its payment obligations; or repeat the improper practices of approving unbalanced budgets, with estimates of unrealistic income or excessive expenses.

If ratified by the Government and the creditors, and later confirmed by the Title III Court, the Plan would represent the last step in the process of restructuring Puerto Rico's debt. This Plan incorporates the agreements reached with the various classes of creditors of Central Government obligations. These classes include general obligation bondholders, public employee unions, the Non-secured Creditors Committee, and the Official Retirees Committee, among others.

In total, the agreements included in the DAP reduce the Central Government's public debt by approximately 50%. That is, the public debt would be reduced from approximately $70 billion to $34 billion, and the General Obligations (GO) and Public Buildings Authority bonds debt would be reduced from $18.8 billion to $7.4 billion. In turn, the annual payment of Puerto Rico's public debt would be reduced from approximately $3.3 billion to $1.1 billion. Likewise, the Commonwealth's debt service would be reduced from 25% to 7.5%, a figure that represents half the constitutional maximum allowed. In practical terms, these reductions represent more money in the government's coffers, which implies that Puerto Rico will have a new opportunity to invest in its people through improvements to the infrastructure, to defray the costs of the essential services that it is called upon to offer; and to prepare for and deal with future emergencies.

To achieve this reduction in government debt, the Plan requires the Puerto Rico Legislature to enact legislation that makes possible the issuance of a series of general obligation bonds (GO) and the creation of contingent value instruments (CVI). It should be noted that the Plan also provides for the creation of a trust that will supplement future revenues for the payment of pensions, the government's enjoyment of up to $200 million in funds generated in excess of the projections contained in the Fiscal Plans of 2020 and 2021, and other repayment mechanisms.

In essence, the Central government must issue new general obligation bonds, and authorize the creation of the CVIs. The CVIs would only be payable upon meeting certain sales and use tax (SUT) collection metrics and, in the case of a limited portion of CVIs, the portion of the federal tax on rum that the Federal Treasury Department transfers to the Government of the Commonwealth of Puerto Rico. That is, only a specific maximum of debt would be paid if certain conditions are present.

Pursuant to Section 314 of PROMESA, the Government of Puerto Rico must enact this legislation to facilitate confirmation of the Plan, which must occur before the departure of the Board.

However, this Legislature has not lost sight of the fact that our retirees, unlike other groups of creditors, have already suffered cuts in their pensions as a result of the enactment of statutes that, to prevent the insolvency of the government retirement systems, reduced pension benefits, increased the amount of employee contributions, and raised the retirement age for the pension plans of each of the three major government retirement systems. To this end, this legislation is conditioned on the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the contemplated cuts to the monthly pension payments to currently retired employees of the government of the Commonwealth and current public employees who have accrued pension benefits. In addition, this legislation provides additional funding for the municipalities, and separately for the University of Puerto Rico.

Municipalities are our population's closest government entities. The crisis and the fiscal plans have impacted our municipalities. To the extent that the Plan achieves cuts to the state debt, some of these savings will be made available for the collection and disposal of residuals, waste, and to implement recycling programs in the municipalities, so that these entities can guarantee these essential and indispensable services to guarantee and improve the quality of life of our citizens.

The Legislature will continue to promote proposals that defend the best interests of the people. In this feat, we trust that the Legislative Branch will have the support of the Executive to guide Puerto Rico on the road ahead. The approval of the General Budget of Puerto Rico for fiscal year 2021-2022, Jt. Res. 8-2021, was a right step in that direction. So is the approval of this bill, which will allow the current General Budget to become the

first balanced budget of four. At the end of this process, Puerto Rico will have met half of the requirements set forth by PROMESA. This Law establishes a historical, multisectoral, and consensus effort to put an end to the Fiscal Oversight Board.

**BE IT DECREED BY THE PUERTO RICO LEGISLATIVE ASSEMBLY:**

**CHAPTER 1: GENERAL PROVISIONS**

**Article 101.- Title**

This Act shall be known and may be cited as the "Ending Puerto Rico's Bankruptcy Act."

**Article 102.- Definitions.**

(a)     5.5% SUT: means the present and future revenues and collections generated by the portion of the sales and use tax imposed by the Government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of the Puerto Rico Internal Revenue Code that corresponds to a tax rate of five and one-half percent (5.5%).

(b)     Ancillary Agreements: means the Plan, the Confirmation Order, the GO Bond Indenture, the form of the GO Bonds, the CVI Indenture, the form of the CVIs, and any other agreement or instrument (including any trust) related thereto or entered into in connection with, or in furtherance of, a Restructuring Transaction and in accordance with, or in furtherance of, the Plan or a Qualifying Modification.

(c)     HTA: means the Puerto Rico Highways and Transportation Authority, created under Law 74 of June 23, 1965, as amended or its successor law.

(d)     CCDA: means the Puerto Rico Convention Center District Authority, created under Law 351-2000, as amended or its successor law.

(e)     PBA: means the Puerto Rico Public Buildings Authority, created under Law 56 of June 19, 1958, as amended or its successor law.

(f)     PRIFA: means the Puerto Rico Infrastructure Financing Authority, created under Law 44 of June 21, 1988, as amended or its successor law.

(g)     MBA: means the Puerto Rico Metropolitan Bus Authority, created under Law 5 of May 11, 1959, as amended or its successor law.

(h)     Fiscal Year:  means the fiscal year of the Commonwealth, which begins on July 1 and ends on June 30.

(i)      GO Bonds: means the general obligation bonds issued by the Commonwealth under the GO Bond Indenture pursuant to this Act, the Plan, and the Confirmation Order, and any general obligation bonds subsequently issued by the Commonwealth under the GO Bond Indenture in accordance and consistent with the terms of the Plan to retire, refinance or defease general obligation bonds originally issued pursuant to the Plan and the Confirmation Order.

(j)      Puerto Rico Code: means Act No. 1-2011, as amended, and known as the "Internal Revenue Code for a New Puerto Rico."

(k)      Rum Tax Outperformance Condition: means that Commonwealth Rum Tax Revenues in any given Fiscal Year, calculated in accordance with and net of permitted deductions contemplated by the Plan and set forth in the CVI Indenture, exceed the thresholds contemplated by the Plan and set forth in the CVI Indenture for such Fiscal Year.

(l)      SUT Outperformance Condition: means that the Measured SUT or the Substitute Measured Tax collections, as applicable, in any given Fiscal Year exceed the thresholds contemplated by the Plan and set forth in the CVI Indenture for such Fiscal Year.

(m)      GO Bond Indenture: means one or more trust agreements, indentures, resolutions and any supplements or amendments thereto, or similar contracts or agreements, pertaining to the GO Bonds to be executed and delivered by the Governor's Designee authorizing: (1) the issuance of the GO Bonds and describing the terms thereof; and (2) the payment of the Financing Costs, each in accordance with the terms of the Plan.

(n)      CVI Indenture: means one or more trust agreements, indentures, resolutions and any supplements or amendments thereto, or similar contracts or agreements, pertaining to the CVIs to be executed and delivered by the Commonwealth authorizing: (1) the issuance of the CVIs by the Commonwealth and describing the terms thereof; and (2) the payment of the Financing Costs of the CVIs, each in accordance with the terms of the Plan.

(o)      Financing Costs: means the costs associated with the Restructuring Transactions, including, without limitation, the costs, fees and expenses to (i) issue, service or repay the GO Bonds and the CVIs, as applicable, whether such costs are incurred upon issuance of such GO Bonds or CVIs or over the term of such instruments, (ii) make payments as required by the applicable Ancillary Agreements, (iii) pay any stamp, issuance or similar taxes and other charges related to the Restructuring Transactions (if any), (iv) prepare for and enter into the Restructuring Transactions, and (v) perform any ongoing activities relating to the Restructuring Transactions. For the avoidance of doubt, Financing Costs also includes pre-closing and post-closing

administrative fees and expenses incurred in connection with the applicable Ancillary Agreements.

(p)    Government Entity: means any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the Commonwealth.

(q)    Commonwealth: means the Commonwealth of Puerto Rico.

(r)    Effective Date: means the date on which the Plan becomes effective in accordance with its terms.

(s)    GO Bonds Trustee: means the trustee(s) or replacement trustee(s), as the case may be, appointed in accordance with the terms and conditions of the GO Bond Indenture.

(t)    CVI Trustee: means the trustee(s) or replacement trustee(s), as the case may be, appointed in accordance with the terms and conditions of the CVI Indenture.

(u)    Debt Service Fund: shall mean a debt service fund established pursuant to the GO Bond Indenture.

(v)    Substitute Measured Tax: means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Indenture.

(w)    Commonwealth Rum Tax Revenues: means the total collections of the excise tax on distilled spirits imposed under the U.S. Internal Revenue Code of 1986 (as amended from time to time) received by the Commonwealth as documented in the U.S. Department of the Treasury monthly detailed activity report of net excise tax paid to the Commonwealth and certified by the Puerto Rico Department of Treasury or in any other analogous report as established in the CVI Indenture.

(x)    CVIs or Contingent Value Instruments: means, collectively, the general obligation notes issued under the CVI Indenture pursuant to this Act, the Plan, and the Confirmation Order, consisting of the GO CVIs and the Clawback CVIs.

(y)    Clawback CVIs:  means a series of CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to debt issued by HTA, CCDA, PRIFA and MBA. For the avoidance of doubt, the

Clawback CVIs may be issued in one or more subseries, including, without limitation, the Rum Tax Claims Subseries.

(z)    GO CVI: means a series of CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to direct or guaranteed general obligation debt of the Commonwealth.

(aa)    Measured SUT: means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the Puerto Rico Code (or used for any other purpose established by law), up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

(bb)    Act means the "Act to End Puerto Rico's Bankruptcy."

(cc)    Clawback CVI Lifetime Cap: means, initially as of the Effective Date, $5,239,002,764. The Clawback CVI Lifetime Cap shall be reduced each Fiscal Year in an amount equal to payments made on the Clawback CVIs pursuant to the CVI Indenture upon, and as a result of, the occurrence of an SUT Outperformance Condition. In addition, the portion of the Clawback CVI Lifetime Cap allocable to the Rum Tax Claims Subseries shall be further reduced each Fiscal Year in an amount equal to payments made on the Rum Tax Claims Subseries pursuant to the CVI Indenture upon, and as a result of, the occurrence of a Rum Tax Outperformance Condition.

(dd)    GO CVI Lifetime Cap: means, initially as of the Effective Date, $3,500,000,000. The GO CVI Lifetime Cap is reduced annually in an amount equal to payments made on the GO CVIs pursuant to the CVI Indenture.

(ee)    Qualifying Modification: means a "Qualifying Modification" for CCDA and/or PRIFA approved pursuant to Title VI of PROMESA.

(ff)    Confirmation Order: means the order of the Title III Court confirming the Plan.

(gg)    Person: means any natural person or legal entity, including, but not limited to, the Commonwealth, any Government Entity, or any firm, partnership, joint venture, trust, estate, limited liability company, corporation of individuals, association, or public or private corporation, organized or existing under the laws of Puerto Rico, the United States of America, any state or any other jurisdiction, or any state, municipality, political subdivision, taxing authority, agency or instrumentality of the United States of America, any state or any other jurisdiction, or any combination thereof.

(hh)    Plan: means the joint Plan of Adjustment for the Commonwealth, ERS, and PBA (and any other Government Entity included in any such plan) confirmed under Title III of PROMESA, including the exhibits and schedules thereto, as the same may be amended, supplemented, or modified from time to time.

(ii)    PROMESA: means the Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. §2101, et. seq., as it may be amended or modified.

(jj)    Existing Claims:  means claims against the Commonwealth, PBA, ERS, HTA, PRIFA, CCDA, and MBA.

(kk)    Governor's Designee: means the Governor, the Secretary of the Treasury or such other officer of a Government Entity as may be designated by the Governor through Executive Order.

(ll)    Secretary of the Treasury: means the Secretary of the Treasury of the Commonwealth.

(mm) Commonwealth Retirement Systems: means the ERS, the Teacher's Retirement System and the Judiciary Retirement System.

(nn)    ERS: means the Retirement System of the Employees of the Government of the Commonwealth of Puerto Rico, created under Law 447 of May 15, 1951, as amended or its successor law.

(oo)    Rum Tax Claims Subseries: means a subseries of Clawback CVIs issued under the CVI Indenture relating to claims against the Commonwealth allowed under the Plan arising from or relating to Commonwealth Rum Tax Revenues retained by the Commonwealth and not transferred to PRIFA.

(pp)    Restructuring Transactions: means each of the transactions contemplated by, or in furtherance of, the Plan or a Qualifying Modification, including, without limitation, the issuance of the GO Bonds, the CVIs, and any trust related thereto and the cancellation and extinguishment of the Existing Claims pursuant to the Plan or a Qualifying Modification, as applicable.

(qq)    Monthly Benefit Modification: has the meaning ascribed to such term in the Plan.

**Article 103. – Authorization on Actions of Government Entities.**

Notwithstanding any provision, prohibition or restriction of any law, order, rule or regulation of the Commonwealth, each Government Entity required to take or perform any action necessary or convenient to carry out the Plan and/or a Restructuring Transaction is hereby authorized to take and shall take any such actions necessary or convenient to carry out the Plan and/or a Restructuring Transaction, without being subject to the requirements of any provision, prohibition, or restriction of any other law, order, rule or regulation, including, but not limited to, (a) negotiating, entering into and executing any agreement, deed, certificate or document, and (b) disbursing or transferring funds as provided for and/or required by the Plan. The authorization provided by this Article 103 shall be sufficient for the Governor's Designee, on behalf of the Commonwealth, and any executive director, president or officer of similar rank and authority, on behalf of the Government Entity they represent, to take any action contemplated by the Plan and/or a Restructuring Transaction and no other authorization shall be required, including the authorization of any board of directors, commission, department, or Puerto Rico regulator. Moreover, the Puerto Rico Fiscal Agency and Financial Advisory Authority is hereby authorized to require any Government Entity to comply with the requirements of this Article.

Without limiting the generality of the foregoing and notwithstanding any provision of any law of the Commonwealth, on and after the Effective Date, the Governor's Designee shall be authorized, to the extent, if any, required after issuance of the Confirmation Order, to: (a) approve the offering, sale and issuance of the GO Bonds and the CVIs as contemplated by the Plan and provided in Chapters 2 and 3 of this Act, respectively; (b) provide for the cancellation and extinguishment of the Existing Claims pursuant to and in accordance with the terms of the Plan or a Qualifying Modification, as applicable; (c) authorize the payment of the Financing Costs in accordance with the terms of the Plan; (d) approve the form of the GO Bond Indenture, CVI Indenture, and other Ancillary Agreements and enter into the GO Bond Indenture, the CVI Indenture and other Ancillary Agreements on behalf of the Commonwealth, all to the extent not approved by the Confirmation Order; (e) include in the Ancillary Agreements any covenant, term, or other condition as may be required by the Plan, including (1) consenting on behalf of the Commonwealth to the application of the laws of the State of New York to govern and interpret such Ancillary Agreements, and the jurisdiction of any state or federal court with respect to any suit or proceeding related to the GO Bonds, the CVIs, the Ancillary Agreements and/or any other matters related to the Restructuring Transactions, and (2) the creation of liens over the money, securities and other assets on deposit with the GO Bonds Trustee or the CVI Trustee for the benefit of the holders of GO Bonds and CVIs, respectively; and (f) take any and all other actions necessary or convenient to carry out the Restructuring Transactions. For the avoidance of doubt, notwithstanding the application of the laws of the State of New York to govern and interpret the GO Bonds, the CVIs, the GO Bond Indenture, the CVI Indenture and any other Ancillary Agreement, the holders of the GO Bonds and the CVIs shall be entitled to

the rights and remedies of holders of public debt of the Commonwealth established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

The authorization to issue bonds conferred by the Present Act will be limited exclusively to the bonds mentioned and required to implement the Plan and will be done in accordance with the Plan, the GO Indentures, the Confirmation Order, and the other Ancillary Agreements. The Governor of Puerto Rico or his designee must request the authorization of the Legislative Assembly for any future bond issuance that is separate from the one hereby authorized.

## ARTICLE 104 - PUBLIC POLICY; PROTECTION OF THE PENSIONS OF THE RETIREES OF THE GOVERNMENT OF THE COMMONWEALTH.

The Government of the Commonwealth of Puerto Rico hereby declares that it is public policy of the highest priority to protect the accrued pensions of its public servants, who are one of the most important groups in our society. As an essential part of this public policy, the protection of the pensions of all our retirees is an important and unwavering commitment. Therefore, with regard to the accrued pensions of government employees, it is hereby provided as follows: The Legislative Assembly authorizes the issuance of the General Obligation Bonds and CVIs subject to the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification.

## ARTICLE 105 - FUNDING OF THE UNIVERITY OF PUERTO RICO.

In order to advance the goal of the Government of the Commonwealth of Puerto Rico of preserving the capacity of the UPR to carry out its vital educational mission and ensuring the necessary resources to guarantee the accreditation of all its programs, and achieve fair access for those students who have financial needs, the budgets submitted to the Oversight Board will appropriate funding to UPR totaling $500 million for each of the five fiscal years 2023 through 2027, provided that the additional appropriations above the amounts appropriated in the Commonwealth fiscal plan certified in April 2021 and the certified budget for the Commonwealth are to be utilized to improve the student experience and environment.

## ARTICLE 106 – FUNDING OF HEALTH INSURANCE STUDY.

The Puerto Rico Health Department shall conduct a study of the feasibility of extending and/or facilitating access to medical coverage to some 225,000 citizens who currently lack medical plans. The Puerto Rico Health Department is hereby appropriated One Million Dollars ($1,000,000) to fund such a study.

## ARTICLE 107 – PUBLIC POLICY STATEMENT OF THE COMMONWEALTH GOVERNMENT

Pursuant to this law, the Commonwealth supports the Plan, along with the public policies set forth in this Law which, subject to PROMESA's mandate to restore fiscal responsibility and the budget powers in Puerto Rico. We declare that the priority objectives of this legislation are the following actions:

(a) Support the creation of a University Scholarships Trust Fund. This initiative is intended to create an investment trust to preserve the capital that would be awarded for scholarships for UPR students.

(b) Support reasonable health plans for central government employees. This measure would benefit more than 60,000 Puerto Rican workers and families.

(c) Endorse the creation of the special fund for social equality. This proposal - to be legislated soon - aims to create a permanent fund entrusted with combating poverty and social inequality; giving priority in its allocations to the attention of the needs of marginalized communities, the special education program, the most vulnerable population groups, combating school dropouts, establishing an integrated plan for the homeless, and gradually increasing the allocations for nonprofit, community self-management, and faith-based entities to offer direct services.

(d) Endorse the creation of the Strategic Investment Fund for Economic Development that injects continuous investments. This initiative proposes the creation of a Strategic Investment Fund divided into four categories: (1) investments to close basic skills gaps; (2) small business capitalization programs; (3) the development of business growth programs through entrepreneurial capitalization; and (4) capitalization of the savings and credit cooperatives sector.

(e) Establish a joint working group between the Legislative Branch and the Executive Branch. This initiative has the objective of designing the legislation that is necessary to ensure that, once the public debt restructuring process is concluded, the Government of Puerto Rico does not go into debt again without having the economic resources to meet its payment obligations; or repeat the improper practices of approving unbalanced budgets, with estimates of unrealistic income or excessive expenses.

The implementation of the foregoing article shall be contingent upon the availability of funds and to it not being significantly inconsistent with the Fiscal Plan.

## CHAPTER 2 – THE GENERAL OBLIGATION BONDS

**Article 201.- Issuance of the General Obligation Bonds.**

(a)    From and after the Effective Date, the Governor's Designee shall be authorized to approve the offering, sale and issuance of the GO Bonds, from time to time, pursuant to the terms of the GO Bond Indenture, the Confirmation Order, the Plan and the other Ancillary Agreements, up to an aggregate initial principal amount of $7,414,063,543.25, and to approve the offering, sale and issuance, from time to time, of additional GO Bonds, subject to the limitations contemplated by the Plan and set forth in GO Bond Indenture, to retire, refinance or defease GO Bonds originally issued pursuant to the Plan and the Confirmation Order.

(b)    The GO Bonds shall include current interest bonds and capital appreciation bonds, shall be dated, shall bear interest at such rate, shall mature at such time or times, not exceeding thirty (30) years from their date or dates of issuance, and shall be subject to redemption or prepayment, in each case, to the extent applicable and as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the GO Bond Indenture in accordance and consistent with the Plan. To the extent, if any, not already determined by the Plan and Ancillary Documents approved by the Confirmation Order, the Governor's Designee, as representative of the Commonwealth, shall determine the form of the GO Bonds and the manner of execution of the GO Bonds, and shall fix the denomination or denominations of the GO Bonds and the place or places of payment thereon and the other terms thereof, all in accordance and consistent with the Plan. At the discretion of the Governor's Designee, the GO Bonds may be issued in one or more separate series.

(c)    The GO Bonds shall be legal, valid and binding obligations of the Commonwealth, issued pursuant to Article VI, Section 2 of the Commonwealth Constitution, and payable in accordance with the terms of the GO Bond Indenture and the other Ancillary Agreements.

(d)    When any official whose signature or facsimile thereof appears on any GO Bond authorized under this Act ceases to hold office before the delivery of said GO Bonds, said signature or facsimile shall, nevertheless, be valid and sufficient, it being deemed for all purposes as if such official had remained in office until such delivery. Furthermore, any GO Bond may bear the signature or facsimile of those persons who, at the time said bond is executed, are the proper officials to sign it, but who, on the date of the GO Bond, were not holding office.

(e)    The GO Bonds issued pursuant to the provisions of this Act shall be deemed to be negotiable instruments under the laws of Puerto Rico.

(f)      The GO Bonds authorized by this Act may be issued as coupon bonds or in registered form, or both, as determined in the GO Bond Indenture.

## Article 202.- Pledge of Good Faith, Credit and Taxing Power.

The good faith, credit and taxing power of the Commonwealth are hereby irrevocably pledged for the prompt payment of principal and interest on the GO Bonds issued under the provisions of this Act as and when due in accordance with the terms of the GO Bond Indenture. The Secretary of the Treasury is hereby authorized and directed to pay the principal and interest on the GO Bonds as they mature or upon their earlier redemption or prepayment in accordance with the GO Bond Indenture, from available resources (recursos disponibles) of the Commonwealth in the Fiscal Year in which such payment is required, and the provisions of this Act concerning the payment of the principal and interest on the GO Bonds shall be deemed a continuing appropriation for the Secretary of the Treasury to make such payments, even if no specific appropriations are made for such purpose. The Governor's Designee is hereby authorized and directed to include in the GO Bond Indenture the commitment which the Commonwealth hereby enters into with respect to the GO Bonds, and it shall be stated on said GO Bonds that the good faith, credit and taxing power of the Commonwealth are thus pledged.

## Article 203.- Debt Service Fund; Statutory Lien

(a)      The Governor's Designee is hereby authorized to establish the Debt Service Fund with the GO Bonds Trustee for the payment of the GO Bonds. Until the GO Bonds have been paid or satisfied in full in accordance with their terms, on each calendar month, the Commonwealth shall deposit with the GO Bonds Trustee cash in the aggregate amount equal to (i) one-sixth (1/6) of the Commonwealth's semi-annual obligation with respect to the payment of interest to accrue on the GO Bonds and (ii) one twelfth (1/12) of the Commonwealth's annual obligation with respect to the payment of principal on the GO Bonds. Such funds shall be held and invested by the GO Bonds Trustee in accordance with the provisions of the GO Bond Indenture.

(b)      Upon their issuance, the GO Bonds shall automatically be secured by a first priority statutory lien over the funds deposited in the Debt Service Fund, including any income and revenues generated therefrom. Such first priority statutory lien shall occur automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person. No instrument needs to be executed or delivered or recorded in any official record or in any government registry or office in order to perfect or continue such first priority statutory lien or to establish or maintain the priority thereof, and such lien shall be valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against the Commonwealth or its assets irrespective of whether such Persons have notice of such lien.

**Article 204.- Tax Exemption.**

The GO Bonds, including, but not limited to, any payments or income with respect to the GO Bonds and the transfer of the GO Bonds, shall, at all times, be totally exempt from all kinds of taxes (including, without limitation, income taxes, assessments, licenses, stamps, fees and other charges levied by the Commonwealth or any Government Entity, and from any and all withholdings in connection therewith). Holders and beneficial owners of the GO Bonds shall not be subject to any tax return filing or any other tax reporting or similar requirement in respect of the Commonwealth or any Government Entity by reason of holding, owning or transferring the GO Bonds.

**Article 205.- Commonwealth Covenants.**

The Commonwealth, with the intent of being contractually bound, hereby agrees and covenants for the benefit of all initial and subsequent holders of GO Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will:

(a)     take no action that would (1) impair the monthly deposit of funds to the Debt Service Fund pursuant to Article 203 hereof, (2) limit or alter the rights vested in the Commonwealth in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the GO Bonds or (3) impair the rights and remedies of the holders of the GO Bonds;

(b)     do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any federally tax-exempt GO Bonds shall be and remain excludable from gross income for federal income tax purposes, to the extent applicable;

(c)     cause any post-Effective Date Fiscal Plan of the Commonwealth submitted to the Financial Oversight and Management Board for Puerto Rico under PROMESA to include provisions for the payment in each Fiscal Year of the principal of and interest on the GO Bonds in accordance with the terms of the GO Bond Indenture; and

(d)     to the extent necessary to satisfy its obligations to pay the GO Bonds, apply (i) the proceeds of the 1.03% property tax levied pursuant to Act 107-2020, as amended, and collected by the Municipal Revenues Collection Center of the Commonwealth, (ii) any monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution, and (iii) any other available resources of the Commonwealth to the payment of the principal of and interest (and accreted value) on such GO Bonds; provided that (A) this covenant is not intended to grant to the holders of such GO Bonds any lien on such proceeds, monies and resources, and (B) for purposes of compliance

with this covenant, to the extent that such proceeds, monies and resources are transferred to the Commonwealth's General Fund, payments of principal and interest (and accreted value) made to the holders of the GO Bonds from the Commonwealth's General Fund shall be deemed to have been made from such proceeds, monies and resources in the order set forth above.

## CHAPTER 3 – THE CONTINGENT VALUE INSTRUMENTS

### Article 301.- Issuance of the CVIs.

(a)     From and after the Effective Date, the Governor's Designee shall be authorized to approve the offering, sale and issuance, pursuant to the terms of the CVI Indenture, the Confirmation Order, the Plan and the Ancillary Agreements, of CVIs in two subseries – the GO CVIs and the Clawback CVIs – up to an aggregate notional amount of $3,500,000,000 and $5,239,002,764, respectively. Each series of CVIs may include one or more subseries.

(b)     The CVIs shall be dated and mature at such time or times as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the CVI Indenture, provided that the GO CVIs shall mature no later than Fiscal Year 2044 and the Clawback CVIs shall mature no later than Fiscal Year 2052. The CVIs shall not bear interest and shall be subject to redemption as may be determined by the Governor's Designee, as representative of the Commonwealth, and authorized in the CVI Indenture in accordance and consistent with the Plan. The Governor's Designee, as representative of the Commonwealth, shall determine the form of the CVIs and the manner of execution of the CVIs, and shall fix the denomination or denominations of the CVIs and the place or places of payment thereon and the other terms thereof, all in accordance and consistent with the Plan.

(c)     The CVIs shall be legal, valid and binding obligations of the Commonwealth, issued pursuant to Article VI, Section 2 of the Commonwealth Constitution, and payable in accordance with the terms of the CVI Indenture and the other Ancillary Agreements, provided that, pursuant to the CVI Indenture:

(1)     no payments shall be made to the holders of the CVIs (other than the Rum Tax Claims Subseries under the circumstances set forth in clause (2) below) in any given Fiscal Year unless an SUT Outperformance Condition occurred during the prior Fiscal Year;

(2)     no payments shall be made to the holders of the Rum Tax Claims Subseries in any given Fiscal Year unless either an SUT Outperformance Condition or a Rum Tax Outperformance Condition occurred during the prior Fiscal Year

(3)     no payments shall be made to the holders of the GO CVIs or the Clawback CVIs in excess of the GO CVI Lifetime Cap or the Clawback CVI Lifetime Cap, respectively;

(4)     as of the maturity date of each series of CVIs, if the Commonwealth has made all payments required to be made on such series pursuant to the CVI Indenture, all of the obligations of the Commonwealth under such series shall be deemed to have been satisfied and the series shall no longer be deemed to be outstanding, even if the GO CVI Lifetime Cap or the Clawback CVI Lifetime Cap, as applicable, has not been reached as of such date.

(d)     When any official whose signature or facsimile thereof appears on any CVIs authorized under this Act ceases to hold office before the delivery of said CVIs, said signature or facsimile shall, nevertheless, be valid and sufficient, it being deemed for all purposes as if such official had remained in office until such delivery. Furthermore, any CVIs may bear the signature or facsimile of those persons who, at the time said bond is executed, are the proper officials to sign it, but who, on the date of the CVIs, were not holding office.

(e)     The CVIs issued pursuant to the CVI Indenture are notes of the Commonwealth for all purposes and shall be deemed to be negotiable instruments under the laws of Puerto Rico.

(f)     The CVIs authorized by this Act shall be issued in registered form.

(g)     Solely for purposes of calculating the maximum annual debt service payable on the Commonwealth's public debt pursuant to Article VI, Section 2 of the Commonwealth Constitution, the debt service payable on the CVIs in any given Fiscal Year shall be deemed to be equal to the maximum amounts that could be payable with respect to the CVIs during such Fiscal Year in accordance with the CVI Indenture.

(h)     The debt service payable to CVIs in any given Fiscal Year will not impair under any concept the debts, obligations, and reserves created by COFINA.

**Article 302.- Pledge of Good Faith, Credit and Taxing Power.**

The good faith, credit and taxing power of the Commonwealth are hereby irrevocably pledged for the prompt payment of the CVIs issued under the provisions of this Act as and when due in accordance with the terms of the CVI Indenture. The Secretary of the Treasury is hereby authorized and directed to pay the CVIs as they become due or upon their earlier redemption in accordance with the CVI Indenture, from available resources of the Commonwealth in the Fiscal Year in which such payment is

required, and the provisions of this Act concerning the payment of the CVIs shall be deemed a continuing appropriation for the Secretary of the Treasury to make such payments in the Fiscal Year in which such payment is required, even if no specific appropriations are made for such purpose. The Governor's Designee is hereby authorized and directed to include in the CVI Indenture the commitment which the Commonwealth hereby enters into with respect to the CVIs, and it shall be stated on said CVIs that the good faith, credit and taxing power of the Commonwealth are thus pledged.

**Article 303.- Tax Exemption.**

The CVIs, including, but not limited to, any payments or income with respect to the CVIs and the transfer of the CVIs, shall, at all times, be totally exempt from all kinds of taxes (including, without limitation, income taxes, assessments, licenses, stamps, fees and other charges levied by the Commonwealth or any Government Entity, and from any and all withholdings in connection therewith). If the CVIs are originally issued to a trust, the distributions made by said trust to its beneficiaries attributable to payments or income received by the trust in connection with the CVIs and the transfer of the CVIs by the trust, if permitted, as well as the transfer of interest in said trust, will at all times be totally exempt from all types of taxes (including, but not limited to, income taxes, tariffs, licenses, stamps, and other fees charged by the Commonwealth of Puerto Rico or by any Government Entity, and from any and all related withholdings). The holders and beneficial owners of the CVIs and / or an interest in the trust that owns the CVIs shall not be subject to any tax return filing or any other tax reporting or similar requirement in respect of the Commonwealth or any Government Entity by reason of holding, owning or transferring the CVIs.

**Article 304.- Commonwealth Covenants.**

The Commonwealth, with the intent of being contractually bound, hereby agrees and covenants for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect to the CVIs have been paid or satisfied in full in accordance with their terms the Commonwealth will:

(a)     take no action that would:

(i)     limit or alter the rights vested in the Commonwealth in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of the CVIs;

(ii)     impair the rights and remedies of the holders of the CVIs; or

(iii)     impair the ability of the holders of the CVIs to track performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the

payment of the CVIs (in accordance with the Plan and as set forth in the CVI Indenture); provided, however, that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect holders of the CVIs from such elimination or replacement reducing the likelihood that SUT Outperformance Condition will be satisfied; and provided further that the Commonwealth shall provide for the timely disclosure of such information as may be required by the CVI Indenture regarding the Measured SUT, sales and use tax collections, and any adjustments to the 5.5% SUT baseline thresholds made pursuant to the CVI Indenture; and

(b)      cause any post-Effective Date Fiscal Plan of the Commonwealth submitted to the Financial Oversight and Management Board for Puerto Rico while it is present in Puerto Rico pursuant to PROMESA to include provisions for the payment in each Fiscal Year of the amounts due on the CVIs in accordance with the terms of the CVI Indenture to the extent that an SUT Outperformance Condition or a Rum Tax Outperformance Condition, as applicable, occurs during the prior Fiscal Year.

## CHAPTER 4 –MUNICIPALITIES

## ARTICLE 401.-EXTRAORDINARY FUND

The "Extraordinary Fund to Address the Collection and Disposal of Residuals, Wastes, and to Implement Recycling Programs in the Municipalities," hereinafter the "Extraordinary Fund," is created, which will be within the "Municipalities Equalization Fund" provided in Article 7.015 of Law 107-2020, as amended, but in an account separate from other income of said fund, and which will be used for the specific purposes provided in this Law.

## ARTICLE 402.- DECLARATION OF PUBLIC POLICY

The Government of Puerto Rico hereby declares that it is the public policy of the Commonwealth of Puerto Rico to guarantee to its population the efficient collection and disposal of garbage, solid wastes, debris, as well as the implementation of recycling programs to address these residuals, thus to the extent that the Debt Adjustment Plan includes reductions in the amount of guaranteed debt, some portion of these savings that will be generated must be made accessible to the municipalities so that they can provide these services.

## ARTICLE 403.- REMISSION OF SAVINGS IN THE PAYMENT OF DEBT TO THE EXTRAORDINARY FUND

The Extraordinary Fund established in Article 401 of this Law will be funded from an annual allocation from the General Fund, which will be equivalent in each fiscal year to 42% of the amount collected during the prior fiscal year on account of the 1.03% property tax. This appropriation may only be included in the budget for a fiscal year if the amount of Medicaid funds actually received during the prior fiscal year exceeds the projected amount of Medicaid funds for such prior fiscal year as set forth in the fiscal plan of the Commonwealth of Puerto Rico certified by the FOMB in April 2021.

## ARTICLE 404.- PURPOSES OF THE EXTRAORDINARY FUND

The municipalities will only be able to access the economic resources of the Extraordinary Fund provided herein, exclusively and specifically, for the purposes described as follows:

(a)    garbage collection and disposal;

(b)    collection and disposal of solid wastes;

(c)    collection and disposal of debris;

(d)    implementation, collection, and disposal of recycling.

## ARTICLE 405.- FORMULA FOR DISTRIBUTION BETWEEN MUNICIPALITIES

In order to achieve a fair distribution of the resources of the Extraordinary Fund, the following criteria will be used to determine the amounts to which the municipalities may have access:

(a)    The total number of beneficiaries of the Nutritional Assistance Program, per capita, according to the certification to that effect issued by the Department of the Family, which is determined in the immediately preceding fiscal year or in the closest fiscal year for which the information is available.

(b)    The functional budget per capita of each municipality, for the immediately preceding fiscal year or the closest fiscal year for which the information is available.

(c)    The appraised value of taxable property per capita located within the territorial limits of each municipality, corresponding to the immediately preceding fiscal year or to the closest fiscal year for which the information is available.

(d)    The population of the municipality per square mile, according to the last ten-year census.

The methodology for the distribution will be determined by the parameters provided in this Article, but those parameters existing for the distribution of the resources of the Municipalities Equalization Fund may be incorporated, as long as they are not contrary to the purposes and objectives described herein by the Board of Directors of CRIM. The application of this methodology should benefit those municipalities that receive the least income from property taxes or other sources, as well as those municipalities with the largest number of dependents in the Nutritional Assistance Program and with the highest population density.

## CHAPTER 5 – AMENDMENT AND REPEAL OF CERTAIN LAWS FOR THE DEPOSIT OF FUNDS IN THE GENERAL FUND AND GUARANTEE THAT ALL LEGISLATION COMPLIES WITH THE AVAILABILITY OF FUNDS ESTABLISHED IN THE FISCAL PLAN

## ARTICLE 501.- SECTION (A) OF ARTICLE 3 OF LAW NO. 147 OF JUNE 18, 1980, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:

"Article 3.- Authorities and Duties of the Office of Management and Budget.

(a)      The Office of Management and Budget, under the rules, regulations, instructions, and orders that the Governor may prescribe, will advise the Chief Executive, the Legislative Assembly, and the government agencies on matters of a budgetary, programmatical, and administrative management nature, as well as in matters of a fiscal nature related to their functions; it will carry out the necessary functions that allow the Governor to submit to the Legislative Assembly the proposal of the General Government Budget, in accordance with Article 4 of this Law, including the Public Corporations. At the same time, it will ensure that the execution and administration of the budget by the public agencies are conducted in accordance with the laws and allocations resolutions, with the soundest and most appropriate fiscal and managerial administration norms, and in harmony with the provisions of the Economic and Fiscal Growth Plan approved in accordance with the Puerto Rico Fiscal Responsibility and Revitalization Act (the "Fiscal and Economic Growth Plan") and with the programmatical purposes for which public funds are allocated or provided. It will evaluate the programs and activities of public agencies in terms of economy, efficiency, and effectiveness and will submit to the Governor reports with recommendations for the implementation thereof. In addition, it will prepare and maintain control of all of those fiscal and budgetary documents that may be necessary for the administration of the budget and will make the changes, amendments, or adjustments that are warranted, subject to the legal provisions and norms established by the Legislative Assembly, and the Governor. To these ends, and in order for the Legislative Assembly to be able to analyze that the legislative measures comply with the Certified Fiscal Plan, the Office of Management and Budget will have the ministerial duty to provide and send an official certification that validates the

availability of funds regarding the legislative measures that are requested of it by the legislative commissions within a period of five (5) business days from the time they are required. It will present together with the Secretary of the Treasury a detailed report regarding the projections of income and expenses for the following fiscal year and corresponding to the General Budget proposed before the Legislative Assembly within a term that will not exceed five (5) calendar days after the presentation of the proposal of the General Government Budget of the Commonwealth of Puerto Rico by the Governor. It will remain watchful of new tendencies and trends in the budgetary and managerial field of public administration to evaluate and adapt those techniques, methods, and approaches that apply to the local administrative field, both in the formulation and execution of the budget as in program evaluation, management analysis, and operational and administrative auditing. In addition, it must propose the legislation that it considers necessary and convenient to incorporate such approaches and trends into our budgetary and administrative process.

(b)     ..."

**ARTICLE 502.- ARTICLE 3 OF LAW 44 OF JUNE 21, 1988, AS AMENDED, KNOWN AS THE LAW OF THE PUERTO RICO INFRASTRUCTURE FINANCING AUTHORITY, IS AMENDED TO READ AS FOLLOWS:**

"**Article 3.- Definitions**

The following words and terms, when used or referred to in this Law, will have the meanings indicated below, unless otherwise clearly understood from the context:

(a)     ...

...

(j)     Development Fund – Will mean the Infrastructure Development Fund created under Article 25 of this Law, in accordance with the provisions of Law No. 54 of August 4, 1997 (27 L.P.R.A. § 431, et seq.)

(k)     ...

...

(r)     Corpus Account – Will mean the Development Fund Corpus Account as established in subsection (a) of Article 25 of this Law. The capital returns generated by this account must be used as established in Article 25 of this Law.

(s)      Additional accounts – Will mean accounts created within the Development Fund, in addition to the Corpus Account, that are necessary to carry out the purposes of this Law, as established in subsection (a) of Article 25 of this Law."

**ARTICLE 503.- SUBSECTION (M) OF ARTICLE 7 OF LAW 44 OF JUNE 21, 1988, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"Article 7. – General Powers.

The Authority will have all of the necessary and convenient powers to carry out and effect the purposes and provisions of this Law, including, but without it being construed as a limitation, the following:

(a)      …

…

(m)      Mortgage or pledge any property for the payment of the principal and interest on any bonds issued by the Authority or bonds issued by a benefited entity, and pledge all or part of the income that the Authority receives.

(n)      …

…"

**ARTICLE 504.- ARTICLES 25 AND 34 OF LAW 44 OF JUNE 21, 1988, AS AMENDED, ARE REPEALED AND ARTICLES 25-A AND 35 ARE RENUMBERED AS ARTICLES 25 AND 34, RESPECTIVELY.**

**ARTICLE 505.- ARTICLE 23.01 OF LAW 22-2000, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"Article 23.01. – Procedure for the Payment of Fees

Every owner of a motor vehicle, subject to the payment of annual permit fees will pay in any internal revenue collection office of any municipality, in the place designated by the Secretary of the Department of the Treasury, at official inspection stations, banks, or in the place designated by the Secretary, the fees corresponding to the vehicle for each year, as indicated in the notification that to that effect must be sent by the Secretary. The fees for this concept will be paid in advance for the entire year except that when at the time of paying the fees less than six (6) months remain for the next renewal, payment will

only be required equivalent to the remaining months to elapse on the date they accrue, counting the fractions of months as a whole month. This provision will apply to all motor vehicles, regardless of how much they pay for license fee per year. Upon receipt of the corresponding fees, the collector will issue the motor vehicle permit, which will consist of the notification form issued by the Secretary, with the proper annotations and signature of the collector, indicative that the payment of the fees has been made. Together with the permit, the collector will deliver the corresponding tag or number plates, as the case may be. Only one (1) motor vehicle tag will be displayed during the year of validity of the payment of fees. The Secretary is authorized to, after consulting with the Secretary of the Treasury, adopt a Regulation for the purpose of granting a discount of up to ten percent (10%) to those drivers who choose to acquire and prepay multi-year tags for your vehicles. The owner of the inspection station will deposit in a special account for the Department of the Treasury to make daily transfers of the tags issued. The Department of the Treasury will approve a regulation to those ends, in the which he will require a bond and insurance to guarantee that the collections from the tags sold are received. The service fee charged by the inspection station, bank, or any other place designated by the Secretary of the Treasury will not be greater than five dollars ($ 5). In cases relating to examination fees, including learners permits, the issuance of duplicate licenses, driver's license renewals, the transfer of vehicles, and all other collection of fees, payment vouchers, internal revenue stamps, or any other payment mechanism established by the Secretary of the Treasury authorities will be used. The total amount of the proceeds of the fees collected pursuant to Articles 23.01 and 23.02 of this law shall be deposited in the Commonwealth's General Fund."

**ARTICLE 506. - SUBSECTION (E) OF ARTICLE 23.02 OF LAW 22-2000, AS AMENDED, IS REPEALED AND CURRENT SUBSECTIONS (F) AND (G) ARE RENUMBERED AS NEW SUBSECTIONS (E) AND (F), RESPECTIVELY, TO READ AS FOLLOWS:**

"Article 23.02. – Payment of fees.

      (a)    …

    …

      (d)    …

      (e)    …

      (f)    …"

**ARTICLE 507. - SUBSECTION (L) OF ARTICLE 1.03 (B) OF LAW 351-2000, AS AMENDED, IS REPEALED AND CURRENT SUBSECTIONS (M), (N), (Ñ), (O), AND**

**(P), ARE RENUMBERED AS NEW SUBSECTIONS (L), (M), (N), (Ñ), AND (O), RESPECTIVELY, TO READ AS FOLLOWS:**

"Article 1.03(b).- Definitions.

The following words and terms, when used or referred to in this Law, will have the meaning indicated below, unless another meaning arises from the context:

(a)　　…

…

(l)　　…

(m)　　…

(n)　　…

(ñ)　　…

(o)　　…"

**ARTICLE 508. - SUBSECTION (H) OF ARTICLE 2.02 OF LAW 351-2000, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"**Article 2.02 – Specific Powers of the Authority.**

The Authority will have the following authorities and rights:

(a)　　…

(h)　　Take loans for the purpose of financing the costs of the Center, the improvement projects and projects on private parcels or the District and comply with any of its corporate purposes and powers, at the discretion of the Board; prepare and issue negotiable bonds of the Authority; guarantee the payment of such bonds, or any part thereof, through the pledge, mortgage, assignment, or deed of trust of Authority properties located in or outside the District, charges for profit, other income, rents, fees, receipts, and any interest in contracts, leases or subleases; enter into any agreements with buyers or holders of such bonds or with other persons with whom the Authority is obligated in connection with any bond, issued or to be issued, as the Authority deems advisable, which will constitute contracts with such buyers or holders; obtain any facility that increases its ability to take money on loan or to issue debt or that increase its liquidity in connection with any bonds in the manner in which the Authority finds advantageous;

and, in general, provide guarantees for the payment of the bonds and the fees of the holders thereof.

(i)      …

…"

## ARTICLE 509.- ARTICLE 8 OF LAW 179-2002, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:

"Article 8.- The government agencies, municipalities, as well as entities receiving allocations of public funds will use them for the purposes established in the corresponding joint resolution and in no way will they dispose of them for other purposes or ends that are not categorically and specifically indicated in the joint resolution approved.

Any change or modification of the purposes or ends established in the original joint resolution will entail the commencement or repetition by the Legislative Assembly of all of the proceedings.

Compliance with these joint resolutions, allocating public funds, will be done following the rules and procedures applicable to the municipalities and to the government instrumentalities. With the exception of natural persons, all contracts signed and any other legal document will be subject to the laws of the Commonwealth of Puerto Rico and will be interpreted in accordance therewith.

In order for the Legislative Assembly to be able to analyze that the allocations or reallocations of public funds provided in this Law comply with the Certified Fiscal Plan, the Office of Management and Budget will have the ministerial duty to provide and send an official certification that validates the availability of funds with respect to the legislative measures that are requested by the legislative commissions within a period of five (5) business days from when they are required."

## ARTICLE 510.—ARTICLE 31 OF LAW 272-2003, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:

"Article 31. – Disposition of Funds.

The Tourism Office will distribute the amounts collected on account of the Tax established in Article 24 of this Law, after transferring to the General Fund of the Commonwealth the amounts that were previously transferred to the Authority (as set forth in the Fiscal Plan of the Commonwealth, if any, in effect at that time), in the following order of priority:

(i) two (2) percent of the total Tax collected will be paid monthly to the general funds of the Office of Tourism to cover the operating, management, and distribution of tax collections, or for any other use provided by the Office of Tourism. (ii) five (5) percent of the total Tax collected will enter monthly to the General Fund of the Department of the Treasury for Fiscal Years 2005-2006 and 2006-2007, to the coffers of the National Parks Company for Years Fiscal 2007-2008 and 2008-2009, and from Fiscal Year 2009-2010 to the coffers of the Office of Tourism. As of the year in which the Authority certifies to the Department of the Treasury and the Office of Tourism, the start of operations of the Convention Center, and during the subsequent ten (10) years, this five percent (5%) will be available to cover any shortfall, if any, arising from the operations of the facilities that operate the Convention Center District Authority, in reserve that will maintain the Office of Tourism. Provided, however, that for each fiscal year and/or each time the Convention Center District Authority proposes to present a budget that exceeds the two million five hundred thousand dollars ($2,500,000) deficit, the budget of the Convention Center District Authority must be presented to the Board of Directors of the Authority to the Office of Tourism and the Secretary of the Treasury for Fiscal Years 2005-2006 and 2006-2007 and to the Board of Directors of the National Parks Company for Fiscal Years 2007-2008 and 2008-2009 in a specific meeting for these purposes, and the Board of Directors of the Authority and to the Office of Tourism, beginning Fiscal Year 2010-2011 onwards. This five percent (5%) will remain available during each fiscal year in a special reserve account that the Office of Tourism will maintain to cover any deficit in excess of two million five hundred thousand dollars ($2,500,000), arising from the operation of the facilities of the Convention Center District Authority. For each fiscal year, any surplus, after covering said operational deficit, if any, will be released from the special reserve and will be available for use by the Department of the Treasury for the Fiscal Years 2005-2006 and 2006-2007, of the National Parks Company for the Fiscal Years 2007-2008 and 2008-2009, and from Fiscal Year 2010-2011 for use by the Office of Tourism. As of Fiscal Year 2015-2016, and during the subsequent five (5) years, this five percent (5%) will be transferred through quarterly contributions by the Department to the Authority to cover the costs associated exclusively with the operation of the Puerto Rico Convention Center. Provided, however, that for each fiscal year the Convention Center District Authority will present their audited financial statements, together with a report evidencing the use of the transferred funds as established in subsections (ii) and (iv) of this section to the Board of Directors of the Authority and to the Director of the Office of Tourism, at a specific meeting for that purpose. If at the end of a fiscal year such audited financial statements reflect a net profit, the Convention Center District Authority will return to the Office of Tourism the amount generated as net profit without exceeding the total amount transferred by the Office of Tourism to the Convention Center District Authority in that same fiscal year, pursuant to subsections (ii) and (iv) of this section. (iii) two million five hundred thousand dollars ($2,500,000) will be transferred by the Office of Tourism to the Convention Center District Authority in quarterly contributions of six hundred twenty-five thousand dollars ($625,000.00) to cover the costs associated exclusively with the

operation of the Convention Center District. Provided, however, that for each fiscal year and/or each time a modified budget is intended to be presented, the budget of the Convention Center Authority must be presented to the Authority's Board of Directors and the Executive Director of the Office of Tourism, at a specific meeting to those ends. This amount will be transferred as established in this section from Fiscal Year 2015-2016, and for a period of five (5) years. (iv) Up to four million dollars ($4,000,000) will remain available during each fiscal year, in a special reserve account that the Office of Tourism will maintain for operating expenses dedicated to the sector's specialized matters, its expenses and/or the oversight and implementation by the latter of the Destination Marketing Services Contract contemplated in Article 8 of the "Law for the Promotion of Puerto Rico as a Destination." (v) The remainder resulting after the allocations and reserves provided in the subsections (i), (ii), (iii) and (iv), up to a maximum of twenty-five million dollars ($25,000,000), will be allocated to the Corporation. The funds allocated to the Corporation will be used by it for the promotion, marketing, development, and strengthening of the tourism industry in Puerto Rico. If the remainder exceeds twenty-five million dollars ($25,000,000), said surplus will be used by the Office of Tourism for the performance of its functions dedicated to the specialized matters of the sector and its expenses. The Office of Tourism of the Department of Economic Development and Commerce will submit monthly to the Authority and to the Corporation a breakdown of the collections for the concept of tax."

## ARTICLE 511.- A NEW ARTICLE 7A IS ADDED TO LAW 103-2006, AS AMENDED, TO READ AS FOLLOWS:

"Article 7A.- Ministerial Duty of the Office of Management and Budget

In order for the Legislative Assembly to be able to analyze that the Legislative measures comply with the Certified Fiscal Plan, the Office of Management and Budget will have the ministerial duty to provide and send an official certification that validates the availability of funds with respect to the legislative measures that are requested by the legislative committees within a term of thirty (30) business days from the time that they are requested. Said certification must include the exact amount available, whether greater or less than that provided in the measure under consideration.

By issuing the official certification, the Office of Management and Budget guarantees the availability of such funds. An official certification where it is reported that the funds are committed for a specific work or use other than that provided in the legislative measure that is requested must be accompanied by evidence of the obligation, copy of invoices, and any other pertinent information that shows the unavailability of such funds.

The process to request the official certifications of availability of funds by the legislative commissions will not require any special form or procedure, it will only require a letter from the legislative commission requesting the certification in question.

When any permanent, special, or joint committee of the Puerto Rico Legislative Assembly presents any report recommending the approval of any legislative measure in which an official certification has been requested it will have to include in the aforementioned report a section titled "Ministerial Duty of the Office of Management and Budget regarding availability of funds." In this Section, it must assert the fiscal impact, if any, that it is estimated that the approval of the measure would have on the budgets of the agencies, departments, bodies, instrumentalities, or public corporations. If the Office of Management and Budget does not issue the corresponding certification within the time provided in this Article, the following text will be included in said Section of the report: "The Office of Management and Budget did not submit the official certification of availability of funds within the time provided by law breaching the ministerial duty provided in Law 103-2006, as amended, better known as the "Law for the Fiscal Reform of the Government of the Commonwealth of Puerto Rico of 2006."

**ARTICLE 512.- SECTION 3060.11 OF LAW 1-2011, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"Section 3060.11 - Disposition of Funds.

The product of the taxes and license fees collected pursuant to this Subtitle will enter the General Fund of the Puerto Rico Treasury."

**ARTICLE 513.- SECTION 3060.11A OF LAW 1-2011, AS AMENDED, IS ELIMINATED.**

**ARTICLE 514.- LAW NO. 39 OF MAY 13, 1976, AS AMENDED, IS REPEALED.**

**ARTICLE 515.- ARTICLE 7.018 OF LAW 107-2020, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"Article 7.018 - Funds - Trusts; Distribution

The funds in the general trust that the CRIM establishes with the Designated Trustee according to subsection (c) of Article 7.003 of this Chapter, will be distributed by CRIM in the order of priority indicated below:

(a) The amount corresponding to the 1.03% special tax will be deposited in the General Fund.

(b) …

(c) …

…"

**ARTICLE 516.- ARTICLE 7.027 OF LAW 107-2020, AS AMENDED, IS AMENDED TO READ AS FOLLOWS:**

"Article 7.027 - Collection and Entry of Taxes in Funds and Application of the Product of the Taxes (Bond Redemption Fund)

The product of the taxes imposed by Articles 7.025 and 7.026 will enter the general trust established by CRIM with the Puerto Rico Financial Advisory and Fiscal Agency Authority (AAFAF), in accordance with Chapter I of this book.

(a) The product of the special property taxes imposed by Section 7.026 will enter the General Fund.

(b) …

(c) …

(d) …"

**ARTICLE 517.- Adjustment Plan transactions cannot be used to mitigate causes of action under Law 3-2013, as amended.**

**ARTICLE 518.- REPEAL OF CERTAIN LAWS OR PORTIONS THEREOF.**

Article 3 of Act 9 of August 12, 1982, is hereby repealed, provided that the funds that were previously transferred to the Highways and Transportation Authority pursuant to such law shall hereafter be deposited to the Commonwealth's General Fund.

**CHAPTER 6 – MISCELLANEOUS PROVISIONS**

**Article 601.- Prohibition of the Reduction of the Obligations of the Puerto Rico Sales Tax Financing Corporation (COFINA, by its Spanish acronym)**

It is established that the debt services payable under the IVCs in any Fiscal Year will not under any circumstances reduce the obligations of the Puerto Rico Sales Tax Financing Corporation (COFINA), including the obligations and reserves created.

**Article 602.-Authorization to the Governor's Representative**

The responsibilities, powers, duties, and authorizations granted by this Law to the Governor's Representative will be limited exclusively to the provisions of this Law and not to future debt issuances.

**Article 603.- Severability.**

If any clause, paragraph, subparagraph, heading, or part of this Law were annulled or declared unconstitutional, the order issued to that effect will not affect, harm, or invalidate the remainder of this Law. The effect of said order will be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part thereof that has been so annulled or declared unconstitutional. If the application to a Person or to a circumstance of any clause, paragraph, subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter, subchapter, heading, or part of this Law were invalidated or declared unconstitutional, the resolution, opinion, or judgment issued to that effect will not affect or invalidate the application of the remainder of this Law to those Persons or circumstances to which it may be validly applied. It is the express and unequivocal will of this Legislature that the courts enforce the provisions and the application of this Law, even if any of its parts is rendered ineffective, annulled, invalidated, impaired, or declared unconstitutional, or even if it its application to any person or circumstance is left without effect, invalidated, or declared unconstitutional.

The above notwithstanding, it is held that the severability provisions in this article shall not be applicable to Article 605. It is the express and unequivocal will of this Legislative Assembly that the Restructuring Transactions and their respective authorizations in Articles 103, 201 and 301 are not enforced, if the suspensive condition to avoid any cut of pensions to government employees in the Adjustment Plan or the provisions of Article 104 of this Law are left without effect, invalidated or decreed unconstitutional.

**Article 604.- Supremacy.**

The provisions of this Law will prevail over any other general or specific provision of any other non-federal law or Government regulation that is inconsistent with this Law. This Law is subject to PROMESA. If there is a conflict between the English and Spanish versions of this Law, the English version will prevail.

All laws of the Commonwealth of Puerto Rico that (i) are inconsistent with the terms and provisions of the Plan, the transactions contemplated therein, and/or the provisions of PROMESA, or (ii) that transfer, appropriate, or require appropriations of funds from the Commonwealth or one of its instrumentalities to any agency or

instrumentality of the Commonwealth, including the laws listed on Exhibit K of the Plan, to the extent such transfer or appropriation is inconsistent with this Act, or with PROMESA, or with a budget certified by the Board (to the extent such certification is required by PROMESA), are hereby preempted and amended to provided that all funds previously transferred or appropriated pursuant to such inconsistent laws or portions thereof to any agency or instrumentality of the Commonwealth shall hereafter be transferred to the Commonwealth's General Fund for disbursement only in accordance with an approved annual Budget.

**Article 605.- Effectiveness.**

This Law will take effect immediately after its enactment, except for Chapter 5 of this Law, which will take effect on the Date of Effectiveness. The effectiveness of this Law is conditioned to the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification as defined in the Plan. For the sake of clarity, this act shall immediately cease to be in effect and any transactions undertaken pursuant to it if reductions to the pensions of government employees are decreed or implemented under the Debt Adjustment Plan or the restructuring of the debt.  The continued effect of this act is contingent upon cero cuts to pensions.

.......................................................
*Presidente de la Cámara*

.......................................................
*Presidente del Senado*

Aprobada en    26/10/21

Gobernador

## **<u>EXHIBIT I</u>**

Pension Reserve Trust Guidelines

**Draft 2/3/22**

# GUIDELINES FOR THE GOVERNANCE AND ADMINISTRATION OF THE PUERTO RICO PLAN OF ADJUSTMENT PENSION RESERVE TRUST AND MONITORING OF PLAN OF ADJUSTMENT PENSION BENEFITS

## I.   INTRODUCTION; PENSION RESERVE TRUST; PENSION BENEFITS COUNCIL; PENSION RESERVE BOARD

**1.1   Purpose:** The Plan Support Agreement between the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") and the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "**Retiree Committee**"), dated June 7, 2019 (the "**COR PSA**")[1], in connection with the prospective confirmed Plan of Adjustment (the "**Plan of Adjustment**" or "**Plan**") for the Commonwealth of Puerto Rico ("**Puerto Rico**" or the "**Commonwealth**") in its PROMESA Title III case, provides for (among other things) the creation of: (a) a Commonwealth Plan of Adjustment Pension Reserve Trust (the "**Pension Reserve Trust**") to provide financial support for the Commonwealth's pension obligations under the PayGo System (defined below); and (b) a Commonwealth Plan of Adjustment Pension Reserve Board of Trustees (the "**Pension Reserve Board**") that shall be responsible for, among other things, the custody, administration, and investment of the funds held in the Pension Reserve Trust. In accordance with the COR PSA, the guidelines set forth herein (the "**Guidelines**") provide for the creation and governance of the Pension Reserve Trust and Pension Reserve Board, as set forth below. In addition, these Guidelines set forth the basic terms under which a Commonwealth Plan of Adjustment Pension Benefits Council (the "**Pension Benefits Council**") shall be established for the purpose of ensuring the Commonwealth's compliance with certain provisions of the Plan of Adjustment related to the funding of the Pension Reserve Trust and shall administer requests by the Commonwealth to withdraw funds from the Pension Reserve Trust. These Guidelines will be included in the Plan Supplement[2], and the terms and conditions set forth herein shall be incorporated into the Pension Reserve Deed of Trust, which will be executed and put into effect on or before the Plan Effective Date.[3] The Pension Reserve Trust, the Pension Benefits Council, and the Pension Reserve Board shall operate on a July 1 to June 30 fiscal year.

**1.2   Responsibilities of the Pension Benefits Council**

A.   <u>Pension Reserve Trust Funding and Withdrawals</u>.  The Pension Benefits Council shall have responsibility and authority to monitor the proper and timely funding of the Pension Reserve Trust by the Commonwealth in accordance with the terms and conditions of the Plan. The Pension Benefits Council shall also have responsibility and authority, in coordination and consultation with the Pension Reserve Board, to approve the release of funds deposited into the Pension Reserve Trust as necessary

---

[1]   The Oversight Board also entered into a Plan Support Agreement (the "**AFSCME PSA**") with the American Federation of State, County and Municipal Employees ("**AFSCME**"), which also provides (albeit with somewhat different terminology) for the creation of a Pension Reserve Board and a Pension Reserve Trust as reflected in the term sheet annexed to the AFSCME PSA.

[2]   Any capitalized terms not defined herein shall have the meanings ascribed to such terms in the Plan of Adjustment.

for the Commonwealth to satisfy its obligations to Retirees pursuant to the Plan, as further set forth in <u>Article V</u> below. The Oversight Board will establish, in consultation with the Pension Benefits Council and the Pension Reserve Board, a withdrawal review, decision, and dispute resolution policy (the "**Withdrawal Policy**") within six (6) months after the Effective Date that will be incorporated into the bylaws of each of the Pension Benefits Council and the Pension Reserve Board.

B.   <u>PayGo Fees</u>. The Pension Benefits Council shall monitor the calculation and collection of PayGo Fees (as defined in Act 106 of 2017; such act, as it may be amended from time to time or supplanted by subsequent legislation, "**Act 106**") by the pension board created under Act 106 (together with any successor to such board under any supplanting legislation, the "**Act 106 Board**"), consistent with Section 4.3 below, for the purposes of (i) performing its AWM Study pursuant to Section 1.4(B) below and (ii) confirming whether the conditions for withdrawal of funds from the Pension Reserve Trust in Section 5.3.C below have occurred. For the avoidance of doubt, the Pension Benefits Council shall not have any responsibility or authority to administer the calculation and collection of PayGo Fees (such matters being governed, without limitation, by Act 106 and the Act 106 Board).

C.   <u>Enforcement Rights</u>. The Pension Benefits Council's enforcement remedy for a failure to properly and timely fund the Pension Reserve Trust, per subparagraph 1.2.A above, or the failure to return any Advance Withdrawal Amount to the Trust pursuant to Section 5.6 below, shall be limited to seeking in the U.S. District Court for the District of Puerto Rico or any other court having jurisdiction (and any appellate court) to enjoin or compel the Commonwealth, the Act 106 Board, and/or such other entity or entities as may have responsibility for such matters to comply with the Plan and, <u>provided</u> <u>further</u>, that the Pension Benefits Council shall provide the Commonwealth, the Act 106 Board, and/or such other entity or entities with written notice setting forth a description of such failure or issue at least ninety (90) calendar days prior to the Pension Benefits Council bringing an action as described above.

**1.3    Term of the Pension Benefits Council:** Subject to modification of the Pension Reserve Deed of Trust, the Pension Benefits Council shall exist until the earlier of (i) thirty (30) calendar days after the date all funds held in the Pension Reserve Trust are withdrawn in accordance with these Guidelines or (ii) such time when the retirement benefits owed to all Participants and VTP Payroll Participants under the Plan have been fully satisfied.

**1.4    Responsibilities of the Pension Reserve Board**

A.   <u>Management of Funds</u>. The Pension Reserve Board shall have responsibility for the custody, administration, and investment of the funds held in the Pension Reserve Trust.

B.   <u>Asset and Withdrawal Modeling.</u> To prudently invest the assets held in the Pension Reserve Trust in anticipation of future funding levels and withdrawals pursuant to

2

Section V, the Pension Reserve Board shall retain a nationally recognized actuarial firm to perform an asset and withdrawal management study (the "**AWM Study**") every three (3) years, which shall be presented to the Pension Reserve Board for consideration in the evaluation of different investment strategies. The projected cash inflows and related assumptions in the AWM Study shall be based on best estimates of the funding into the Pension Reserve Trust by the Commonwealth and investment returns at the time the AWM Study is being performed. The projected cash outflows and related assumptions in the AWM Study shall be based on best estimates of projected Commonwealth cash flow deficits and projected PayGo payments. The Pension Reserve Board shall consult with the Pension Benefit Council with respect to any withdrawal request in accordance with the Withdrawal Policy.

**1.5    Term of the Pension Reserve Board:** The Pension Reserve Board shall exist until thirty (30) calendar days after the date all funds held in the Pension Reserve Trust are withdrawn in accordance with these Guidelines.

**1.6    Relationship Between the Pension Benefits Council and the Pension Reserve Board:** These Guidelines set forth separate and distinct roles and responsibilities for each of the Pension Benefits Council and the Pension Reserve Board (each, a **"Pension Reserve Trust Entity"**), and are designed to provide each Pension Reserve Trust Entity with sufficient authority to discharge its respective duties independent of the other. Notwithstanding the foregoing, in the event that a Pension Reserve Trust Entity determines that the other Pension Reserve Trust Entity is not complying with its obligations under these Guidelines or applicable law, each Pension Reserve Trust Entity shall attempt to resolve such dispute in good faith. In the event those efforts do not resolve the dispute, either Pension Reserve Trust Entity may commence a lawsuit to resolve the dispute in accordance with Sections 4.4 or 8.4 below, as applicable.

A.    In the development of the separate annual budget limitations for each of the Pension Benefits Council and the Pension Reserve Board set forth in Sections 3.5 and 7.4 below, respectively, it is anticipated that the Pension Reserve Board shall retain an Executive Director and/or other administrative staff. The staff retained by the Pension Reserve Board shall also execute such administrative tasks as requested of it by the Pension Benefits Council consistent with the Pension Benefits Council's duties and authority under these Guidelines. Similarly, for ordinary-course administrative accounting services of the two Pension Reserve Trust Entities, absent any conflict of interest, the Pension Reserve Board shall retain an independent and nationally-recognized accounting firm to render accounting services on behalf of both Pension Reserve Trust Entities and the Pension Reserve Trust itself; provided further, that where there are issues and required analyses (apart from ordinary-course administrative accounting) that touch upon the responsibilities of both Entities, the Entities may (as deemed appropriate in each Entity's judgment), and are encouraged to, jointly engage the requisite professional(s) under a common interest agreement in order to avoid duplication of efforts and unnecessary expenses. For the avoidance of doubt, ordinary-course administrative accounting services would not include, without limitation, any accounting services that the Pension Benefits Council determines are needed in

order to discharge its responsibilities under Sections 1.2A or 1.2B above or Section 2.3E below.

**1.7**   **Account Structure and Initial Funding of the Pension Reserve Trust:**

A.   <u>Account Structure of the Pension Reserve Trust</u>:  The Pension Reserve Trust shall include (i) investment accounts, (ii) an account for administrative and operating expenses of the Pension Reserve Board, and (iii) an account for administrative and operating expenses of the Pension Benefits Council. The Pension Reserve Board shall have the authority to establish additional accounts as deemed necessary in the exercise of the Pension Reserve Board's duties. All such accounts shall be in the name of, and controlled by, the Pension Reserve Board, except that the account for administrative and operating expenses of the Pension Benefits Council shall be in the name of, and controlled by, the Pension Benefits Council. From time to time as appropriate, the Pension Reserve Board shall promptly transfer appropriate sums into the account for administrative and operating expenses of the Pension Benefits Council for the payment of the Pension Benefits Council's expenses.

B.   <u>Initial Funding</u>:  The Commonwealth shall deposit an initial funding of $5,000,000.00 as provided for in the Plan into the Pension Reserve Trust, as follows: (i) $550,000.00 shall be deposited into the administrative and operating account of the Pension Benefits Council immediately after the establishment of said account by the Pension Benefits Council; and (ii) $4,450,000 shall be deposited into the administrative and operating account of the Pension Reserve Board immediately after the establishment of said account by the Pension Reserve Board.

## II.   PENSION BENEFITS COUNCIL MEMBERS & ELECTIONS

**2.1**   **Composition of the Pension Benefits Council Following the Transitional Period:**

A.   <u>Membership</u>: Following the Transitional Period defined in Section 2.2 below, the Pension Benefits Council shall consist of nine (9) members, as follows:

i.   Five (5) members, each of whom as of the date the Election Process Notice is posted pursuant to Section 2.3(B) below (the "**Election Process Notice Date**"), (x) must be receiving a pension or annuity as a Participant or VTP Payroll Participant pursuant to the Plan of Adjustment (but excluding any such person who is receiving such benefits solely as a result of being a participant in the pension contribution system implemented in accordance with Act No. 305-1999, codified at 3 L.P.R.A. §§786-1, et seq. ("**System 2000**") or Act 160-2013), and (y) is not an active employee of Puerto Rico or any of its agencies, instrumentalities, or public corporations (each, an "**Eligible Retiree**"); <u>provided</u>, <u>however</u>, that at all times there shall specifically be two (2) Pension Benefits Council members who were participants in the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**"), two (2) Pension Benefits Council members who were participants in the Teachers Retirement System

4

("**TRS**"), and one (1) Pension Benefits Council member who was a participant in the Judiciary Retirement System ("**JRS**"); and <u>provided further</u>, that if there are insufficient Eligible Retirees who were participants in ERS, JRS or TRS, as the case may be, elected to fill the applicable seat or seats on the Pension Benefits Council, such seat or seats shall then be filled by Eligible Retirees who were not participants in such retirement system receiving the highest number of votes regardless of which retirement system he/she was a participant of, after the other seats have been filled to meet the composition requirements above. In the event an Eligible Retiree receives a pension or annuity as a result of being a participant in more than one of ERS, TRS and JRS, that person shall be deemed to be an Eligible Retiree with respect to the last retirement system as to which he/she accrued any vested pension benefits;

ii.     One (1) member who as of the Election Process Notice Date (x) is a Participant (but excluding any such person who is a Participant solely as a result of being a participant in System 2000 or having made contributions to the pension contribution system under Act 160-2013), and (y) is an active employee of the Commonwealth or any of its agencies, instrumentalities, or public corporations (other than PREPA and UPR) (an "**Eligible Active Employee**"); <u>provided</u>, <u>however</u>, that if an Eligible Active Employee is not elected to fill the seat on the Pension Benefits Council, such seat(s) shall then be filled by the Eligible Retiree receiving the highest number of votes regardless of which retirement system he/she was a participant of, after the other seats have been filled to meet the composition requirements of this Section 2.1;

iii.    One (1) appointee by AFSCME, who may but is not required to meet the qualifications of an Eligible Active Employee;

iv.     One (1) appointee by the Governor of Puerto Rico; and

v.      One (1) member appointed by the Oversight Board, while it is in existence in accordance with the Plan.

Upon termination of the Oversight Board, the Governor of Puerto Rico shall appoint a member to the Pension Benefits Council to fill the seat occupied by the Oversight Board's appointee, as necessary, and shall then have the right on a go-forward basis to appoint two (2) members to the Pension Benefits Council in accordance with these Guidelines.

B.      <u>Eligibility</u>: Each Pension Benefits Council member, other than the appointees of the Governor, the Oversight Board, and AFSCME, must be or have been a participant in ERS, TRS, or JRS, as described above, and individuals who are solely beneficiaries of such participants cannot be members of the Pension Benefits Council. Members of the Pension Benefits Council must be residents of Puerto Rico. Members of the Pension Benefits Council cannot concurrently be members of the Act 106 Board. In addition, each person seeking to be elected to the Pension

Benefits Council must comply with the requirements set forth in Section 2.3(C) below.

C.     Term: Following the Transitional Period, members of the Pension Benefits Council shall serve for terms of four (4) years, beginning on January 1 of the applicable calendar year. If the term of the initial Pension Benefits Council elected during the Transitional Period begins on a date other than January 1, the term of service for the members of that initial Pension Benefits Council shall consist of that partial first year plus three (3) additional years. If a member of the Pension Benefits Council who is an Eligible Retiree does not complete his or her term for any reason, the remaining Eligible Retirees on the Pension Benefits Council, acting through majority vote (or as otherwise provided in the Pension Benefits Council's bylaws), shall promptly appoint a person who is eligible to serve in such position and shall seek to maintain the composition of the Eligible Retiree seats in accordance with Section 2.1(A)(i) above. If a member of the Pension Benefits Council who is an Eligible Active Employee retires, leaves his or her government employment, or otherwise does not complete his or her term for any reason, the Pension Benefits Council, acting through majority vote (or as otherwise provided in the Pension Benefits Council's bylaws), shall promptly appoint a person who is eligible to serve in such position. If the Governor's or the Oversight Board's appointee does not complete his or her term for any reason, then the Governor or the Oversight Board, as applicable, shall promptly appoint a new appointee. The term of any such appointment under this Section 2.1(C) shall be until the next regularly scheduled election for any Pension Benefits Council seat, at which point such position shall be filled in accordance with this Article II. If the member being replaced does not remain on the Pension Benefits Council pending appointment of a replacement member, the Pension Benefits Council shall nonetheless be authorized to conduct business as if it had a full roster of members.

## 2.2   Transitional Period:

A.     Membership During Transitional Period: The Pension Benefits Council shall initially consist of (w) five (5) Eligible Retirees appointed by the Retiree Committee, (x) two (2) appointees by AFSCME who may but are not required to meet the qualifications of an Eligible Active Employee, (y) the Governor's appointee, and (z) the Oversight Board's appointee. The persons described in clauses (w) through (z) shall be appointed or designated no later than the Effective Date of the Plan; provided, however, that in the event any of such persons is not timely appointed or designated, such delay shall not delay or impair the operation of the Pension Benefits Council. The period from the Effective Date to the date of commencement of the terms of the Pension Benefits Council members elected pursuant to Sections 2.1, 2.2(B), and 2.3 shall be referred to herein as the "**Transitional Period**." Each member of the Pension Benefits Council serving during the Transitional Period, other than the appointees of AFSCME, the Governor, and the Oversight Board, shall serve until replaced by the applicable new member elected in accordance with Sections 2.1, 2.2(B), and 2.3. During the Transitional Period, an election shall be conducted as provided in Sections 2.2(B)

and 2.3 below.  The Interim Trustee shall represent the Pension Benefits Council until its first member is appointed and accepts such appointment.

B.     Initial Meeting:  An initial meeting of the Pension Benefits Council shall be scheduled by the Oversight Board's designee for a date, time, and location reasonably convenient to all Pension Benefits Council members for as soon as practicable after the Effective Date (subject to the proviso above that tardy appointment or designation of a member shall not delay or impair the calling of the meeting); provided, however, that if the Oversight Board has failed to designate its member as of the Effective Date, any other Pension Benefits Council member may call the meeting.  This initial meeting shall address, among other potential matters, initiatives for (i) the selection of counsel to the Pension Benefits Council in accordance with Section 4.5 below, (ii) the development of bylaws for the Pension Benefits Council in accordance with Section 3.1 below, and (iii) the creation and conducting of an orientation program for the Pension Benefits Council members in accordance with Section 3.7 below.

C.     Transitional Period Election:  The Pension Benefits Council shall facilitate an election among the Eligible Retirees and the Eligible Active Employees to elect the six (6) new members who will, along with the appointees by the Governor, the Oversight Board, and AFSCME, constitute the Pension Benefits Council in accordance with Section 2.1 above.  Such election shall be completed as soon as practicable after the Effective Date of the Plan, but no later than two (2) years after the Effective Date of the Plan, subject to the requirements of Section 2.1(A) above, as follows:

i.      Two (2) Pension Benefits Council seats shall be designated for Eligible Retirees who shall have been participants in ERS, two (2) Pension Benefits Council seats shall be designated for Eligible Retirees who shall have been participants in TRS, one (1) Pension Benefits Council seat shall be designated for an Eligible Retiree who shall have been a participant in JRS, and one (1) Pension Benefits Council seat shall be designated for Eligible Active Employees.

ii.     Each Eligible Retiree who was a participant in a particular retirement system may only vote for an Eligible Retiree who was a participant in that system and who is a proper candidate pursuant to the procedures set forth in Section 2.3(C) below.  The number of votes cast by an Eligible Retiree in any election shall be equal to the number of Pension Benefits Council seats designated for an Eligible Retiree who was a participant of the voting Eligible Retiree's retirement system (i.e., one or two).  The elected Eligible Retirees shall be those who are proper candidates pursuant to the procedures set forth in Section 2.3(C) below and who garner the highest number of votes in each applicable retirement-system category.  Each Eligible Active Employee may cast one vote for an Eligible Active Employee who is a proper candidate pursuant to the procedures set forth in Section 2.3(C) below for the Pension Benefits Council seat designated for an Eligible

Active Employee. The elected Eligible Active Employee shall be the Eligible Active Employee who is a proper candidate pursuant to the procedures set forth in Section 2.3(C) below and who garners the highest number of votes.

**2.3    Transitional Period Election Process:** The election occurring during the Transitional Period shall follow the process set forth in this Section 2.3.

A.    <u>Election Committee</u>: The Pension Benefits Council shall select an Election Committee comprising at least three (3) members of the Pension Benefits Council, to be responsible for conducting the election process described in this Section 2.3. A member of the Pension Benefits Council who is a candidate for election cannot serve on the Election Committee.

B.    <u>Election Process Notice</u>: A notice of the process for nominating and electing Pension Benefits Council members (the "**Election Process Notice**") will be posted in at least two (2) newspapers of general daily circulation in Puerto Rico, both in print and in any corresponding Internet version of each publication, once in each of two consecutive weeks, at least ninety (90) days prior to the election. The Election Process Notice will also be posted on the website of the Pension Benefits Council no later than the time of the first publication and will remain continuously posted on the website until completion of the election process.

C.    <u>Nomination Process</u>:

i.    *Nomination*: In the Election Process Notice, the Election Committee will give notice of the availability of a nomination form ("**Nomination Form**"), which each Eligible Retiree and Eligible Active Employee may obtain electronically from the Pension Benefits Council's website or by making a written request by mail. Any Eligible Retiree or Eligible Active Employee may nominate him or herself to stand for election to serve on the Pension Benefits Council by submitting a completed Nomination Form to the Election Committee. The Nomination Form will request such information as the Election Committee reasonably determines is required to establish whether a person meets the eligibility requirements set forth in these Guidelines, and such other information as is necessary for a person to stand for election, and shall identify the date by which a completed Nomination Form must be submitted to the Election Committee. Members of the Pension Benefits Council may be a candidate for re-election; <u>provided</u>, <u>however</u>, that members who have served two consecutive terms (with service during the Transitional Period not qualifying as a term for purposes of this provision) may not be a candidate in the election immediately following their second term; <u>provided</u> <u>further</u>, <u>however</u>, that such member may be a candidate in any subsequent election (subject to a new two-consecutive-term limitation).

    ii.      *Candidate Eligibility Determinations*: All Eligible Retirees and Eligible Active Employees are eligible to be a candidate unless such person is disqualified by the express terms of these Guidelines. The Election Committee shall determine the eligibility of all candidates but may not create additional eligibility requirements. Eligible candidates shall be notified by mail (and, to the extent practicable, electronic mail) of their eligibility and mailed a copy of the election rules no later than fifteen (15) calendar days prior to commencement of the Candidate Meetings described in Section 2.3(C)(iii) below. Ineligible nominees shall also be advised by overnight mail (and, to the extent practicable, electronic mail) not later than fifteen (15) calendar days prior to commencement of the Candidate Meetings of the reason(s) they are not eligible. Such nominees shall have ten (10) calendar days from the date of mailing of said notice to appeal the decision to the Pension Benefits Council. If the appeal has not been resolved prior to the Candidate Meetings, the nominee may attend a Candidate Meeting pending resolution of the appeal.

    iii.     *Candidate Meetings*: The Election Committee will hold at least one meeting in San Juan and one meeting in Ponce to provide information about the term of service and responsibilities of the members (each, a "**Candidate Meeting**"). Each candidate who has been notified of their eligibility to serve must attend at least one Candidate Meeting in person. In the event a person who has submitted a Nomination Form does not attend a Candidate Meeting, that person shall not be eligible to stand for election.

    iv.     *Election Notification*: Once a definitive list of candidates is assembled by the Election Committee, the list will be included in an election notice (the "**Election Notice**") posted in the same newspaper(s) as employed in Section 2.3(B) above, both in print and in any corresponding Internet version of each publication, once in each of two consecutive weeks, and on the Pension Benefits Council's website. The Election Notice shall also provide any additional specific information not previously included in the Election Process Notice regarding the manner by which the election shall take place.

D.    <u>Election Process</u>: The Election Committee shall develop procedures for voting in the election after consideration of best practices in order to reasonably meet the specific needs and purposes of the election. Such procedures shall be set forth in the Election Process Notice and/or in the Election Notice.

E.    <u>Tally of Ballots</u>: Ballots shall be tabulated and certified promptly after the deadline for submitting ballots by an independent certified public accountant retained by the Pension Benefits Council. The candidate who receives the highest number of votes cast for each vacant seat (determined pursuant to Section 2.2(B) above) shall be declared elected. Any tie votes shall be decided by a coin toss conducted by the Election Committee, in the presence of the candidates who are tied, and in the presence of and certified by an independent certified public accountant.

F.   <u>Notification of Election Results</u>: Notification of the election results shall be mailed to the candidates, posted on the Pension Benefits Council's website, and concurrently issued by general press release.

G.   <u>Protests and Appeals</u>: Any candidate may challenge an election by delivering a protest in writing to the Pension Benefits Council so that is received by the Council within ten (10) calendar days after the election results are mailed and posted on the Pension Benefits Council's website.

H.   <u>Arbitration</u>: Any request for appeal arising from a decision of the Pension Benefits Council regarding the eligibility of a person to be a candidate or the election result shall be delivered to the Pension Benefits Council so that it is received by the Council within ten (10) calendar days after the decision. The controversy shall be resolved through a mandatory expedited arbitration process to be conducted by an arbitrator licensed by the Supreme Court of Puerto Rico and selected by the Pension Benefits Council. The arbitrator's award and decision shall be final and binding as to all parties. The Pension Reserve Trust shall bear the expenses of the arbitration process incurred by the Pension Benefits Council and the arbitrator.

I.   <u>Commencement of Term</u>: The term of service for the members of the Pension Benefits Council elected during the Transitional Period pursuant to Sections 2.1, 2.2(B), and 2.3 shall begin sixty (60) calendar days following the certification of the results of the election by the Pension Benefits Council; <u>provided</u>, <u>however</u>, that the term of a replacement member appointed pursuant to Section 2.1(C) shall begin immediately upon appointment.

J.   <u>Rules and Procedures for the Election</u>: Except as otherwise provided in Section 2.3(C)(ii) above with respect to establishing additional eligibility criteria, the Pension Benefits Council is authorized to adopt, amend, or supplement all rules and regulations that it deems necessary and prudent to implement the Transitional Period election process established in this Section 2.3.

## 2.4   Elections Following the Transitional Period

A.   <u>Election Cycle</u>: Subject to Section 2.1(C) above, following the Transitional Period, elections of new members shall occur every four (4) years, in the fourth year of the term of the Pension Benefits Council, with the intention to complete the election process and certification of the results on or before November 15 of the fourth year following the prior elections. Subject to Pension Benefits Council bylaws, new member terms shall begin on January 1 of the calendar year following the elections.

B.   <u>Election Policies and Procedures</u>: Subject to the limitation in Section 2.3(C)(ii) above on creating additional eligibility criteria, following the end of the Transitional Period, the Pension Benefits Council may, but is not required to, adopt the Transitional Period election process, as set forth in Section 2.3, for future elections. The Pension Benefits Council may establish at any time and from time to time new election policies and procedures that are designed to create a process

that reasonably promotes accessibility for voters and an efficient and cost-effective process. In designing the election policies and procedures, the Pension Benefits Council will consider the merits of the Transitional Period election process and any voting impediments known to the Pension Benefits Council. These election policies and procedures shall be included in or incorporated by reference into the Pension Benefits Council's bylaws.

### III. PENSION BENEFITS COUNCIL GOVERNANCE

**3.1    Bylaws:** As soon as practicable after formation of the Pension Benefits Council, the Pension Benefits Council shall adopt by a vote of at least six of its members a set of bylaws to govern the Pension Benefits Council's conduct, which shall be consistent with the Plan and these Guidelines.    Such bylaws shall include appropriate provisions regarding fiduciary duties and obligations of the Pension Benefits Council; meetings of the Pension Benefits Council (which shall allow for attendance by videoconference); guidelines for disclosure of conflicts of interest for Pension Benefits Council members; removal and replacement of Pension Benefits Council members; voting on matters by Pension Benefits Council members; and, when adopted, the Withdrawal Policy. In particular, without otherwise limiting the Pension Benefits Council's ability to develop appropriate bylaws, the Pension Benefits Council's bylaws shall provide that each Pension Benefits Council member shall have one vote, subject to any disqualifying conflict of interest, with respect to any matter being voted upon.    The Pension Benefits Council may, from time to time, amend the Pension Benefits Council's bylaws by vote of at least six of its members to facilitate the purposes and functions of the Pension Benefits Council pursuant to the Plan and these Guidelines. The Pension Reserve Deed of Trust shall require that the Pension Benefits Council be subject to provisions consistent with Puerto Rico laws governing ethics, anti-corruption, conflicts of interest, procurement, contracting, use of public funds and public disclosure applicable to instrumentalities of the Commonwealth, and such provisions shall be, and shall be deemed to be, incorporated into the Pension Reserve Deed of Trust and the Pension Benefits Council's bylaws.

**3.2    Code of Conduct and Ethics Policy:** In addition to the Pension Benefits Council's bylaws, the Pension Reserve Deed of Trust shall include a Code of Conduct and Ethics Policy setting forth the Pension Benefits Council members' obligation to act ethically in connection with the use of public funds and in the interest of the Retirees and affirming the Pension Benefits Council's commitment to do so, and such provisions shall be, and shall be deemed to be, incorporated into the Pension Benefits Council's bylaws. The Code of Conduct and Ethics Policy shall include provisions regarding confidentiality, conflicts of interests and self-dealing, as well as a gift policy and an enforcement policy. Specifically, and without limitation, such policy must expressly forbid any Council member or professional employed by it from accepting any payment or other thing of value from any party seeking or having responsibility to invest trust funds or provide services for compensation to the Council.

**3.3    Compensation:** Pension Benefits Council members shall meet as often as is reasonably necessary and prudent to address the business of the Pension Benefits Council. For each meeting of the Pension Benefits Council, the Election Committee, or any other designated sub-committees of the Pension Benefits Council, members shall be entitled to a reasonable stipend. As of the Effective Date of the Plan of Adjustment, the stipend shall be $125 per meeting. The amount of

the stipend may be reviewed and adjusted from time to time by a two-thirds vote of the Pension Benefits Council, consistent with reasonable and customary practice in the market and to reflect regular increases in respect of inflation.   Pension Benefits Council members shall also be reimbursed for their reasonable expenses incurred in attending meetings and otherwise carrying out their responsibilities as Pension Benefits Council members.  The Pension Benefits Council's compensation and travel policy will be incorporated into the Pension Benefits Council's bylaws.

**3.4     Transitional Operating Budget:** For informational purposes, as soon as practicable after its establishment, the Pension Benefits Council shall make public on its website and social media platforms and provide a copy to the Director of the Office of Management & Budget of Puerto Rico, a budget of anticipated expenses to be incurred during the period from the Effective Date through the following June 30 for ordinary and recurring activities of the Pension Benefits Council and for other non-recurring activities reasonably foreseeable to occur during said period; provided, however, that such budget shall not exceed the amount of the initial deposit made into the administrative and operating expense account of the Pension Benefits Council pursuant to Section 1.7B above.

**3.5     Administrative Operating Budget:** For informational purposes, by June 1 of each year, the Pension Benefits Council shall make public on its website and social media platforms and provide a copy to the Director of the Office of Management & Budget of Puerto Rico, a budget of anticipated expenses to be incurred in the forthcoming fiscal year for ordinary and recurring activities of the Pension Benefits Council and for other non-recurring activities reasonably foreseeable to occur in such fiscal year, which budget shall have been approved by a two-thirds vote of the Pension Benefits Council. The annual actual aggregate administrative expenses for the Pension Benefits Council in any given fiscal year shall not be higher than $400,000.00 (adjusted for actual inflation rate); provided that non-ordinary course expenses including, but not limited to, (i) litigation-related fees and expenses, if any, and (ii) election-related expenses are excluded from the calculation of administrative expenses. The Oversight Board, as long as it is in existence, shall review the annual expenditures of the Pension Benefits Council and adjust its budget for ordinary course expenses at its reasonable discretion from time to time based on actual spending requirements; provided, however, that if there is a dispute between the Oversight Board and the Pension Benefits Council regarding the budget, the parties will use good-faith best efforts to resolve it consensually; provided further, however, that if such dispute is not resolved consensually within thirty (30) days of the dispute being identified, either party may seek resolution of the matter in the U.S. District Court for the District of Puerto Rico.  The payment of these administrative expenses shall be made from the account for administrative and operating expenses of the Pension Benefits Council of the Pension Reserve Trust. Additionally, to the extent that legal action is taken against the Pension Benefits Council or other parties which would require funds from the Pension Reserve Trust, the Commonwealth will reimburse the Pension Reserve Trust for such expenses.

**3.6     Annual Report:** Following the end of each fiscal year, the Pension Benefits Council, with the assistance of its retained professionals as described in Section 4.5 below, shall promptly prepare and issue a public report, as of the end of the fiscal year, regarding (x) any projected or actual deposits into, or withdrawals from, the Pension Reserve Trust, (y) an itemized report of all expenditures made to professionals and investment managers and an itemized report of any payments made to Council members, including payments made on behalf of Council members to travel to and attend any meeting, and (z) such other information related to the Pension Benefits

Council's responsibilities and activities that the Pension Benefits Council determines is relevant to Participants, including, for example, a comparison of the Pension Benefits Council's expenses that were actually incurred during such fiscal year to the Pension Benefits Council's budgeted expenses. Each such annual report shall be posted on the Pension Benefits Council's website and social media platforms.

**3.7     Orientation and Continuing Education Policy:** The Pension Benefits Council shall adopt a program for the orientation of new members and the continued education of existing members regarding their duties, relevant provisions of the Plan, financial matters, and governance of the Pension Benefits Council. The goal of the program shall be for the Pension Benefits Council members to maintain the skill and knowledge necessary to meet their obligations and duties. Before any person elected or appointed to serve on the Pension Benefits Council assumes their position on the Pension Benefits Council, such person must attend the introductory orientation course created for new Pension Benefits Council members. With respect to the initial Pension Benefits Council formed on or about the Effective Date of the Plan, the Pension Benefits Council shall use its reasonable best efforts to conduct an orientation program as soon as practicable after the Effective Date.

## IV.     POWERS OF THE PENSION BENEFITS COUNCIL

The Pension Benefits Council shall have the power to take any action reasonably necessary in order to fulfill its responsibilities as set forth in Section 1.2 above, including, but not limited to:

**4.1     Request for Documents and Information:** The Pension Benefits Council shall have the right to request and receive from the Commonwealth (on behalf of itself and any of its agencies and instrumentalities) and the Act 106 Board the following information deemed by the Pension Benefits Council as reasonably necessary to carry out its responsibilities as set forth in Section 1.2 above:

> A.     Contact Information: The Pension Benefits Council shall have the right to request and receive the Commonwealth's most current information regarding the mailing address and such other contact information (e.g., telephone number and electronic mail address, if available) on file for each person who is entitled to cast a ballot in any election to select the members of the Pension Benefits Council, at any time within the six (6) month period preceding such election.

> B.     Actuarial/Valuation Data: In addition to the information and documents above, the Pension Benefits Council shall receive from the Commonwealth, and shall share with the Pension Reserve Board, the most current actuarial and valuation data on an annual basis within a reasonable time after this information is available.

**4.2     Review Regarding Funding of and Withdrawals from Pension Reserve Trust:** Pursuant to Section 1.2(A) above, in addition to the right to request documents and information set forth in Section 4.1 above, the Pension Benefits Council shall have the right, once every fiscal year in which, or in a fiscal year immediately following a fiscal year in which, a Pension Reserve Trust deposit may conceivably be made pursuant to the Plan, to review all records and processes

13

related to the calculation and deposit of funds, or lack of such deposit, into the Pension Reserve Trust by the Commonwealth. The Pension Benefits Council shall also have the right to review the calculation and submission of a request by the Commonwealth for the withdrawal of funds from the Pension Reserve Trust, in accordance with the Withdrawal Policy, as well as all reports of the Commonwealth's independent calculation agent relating to deposits into the Pension Reserve Trust and withdrawal requests. The Pension Benefits Council and Pension Reserve Board shall also be given reasonable access to the independent calculation agent to review such materials.

**4.3     Review of PayGo Fee Collections:** The Pension Benefits Council shall have the right, once every fiscal year, to review the collections of PayGo Fees, in order to assess compliance with Act 106. The Commonwealth shall continue to publish information regarding the calculation and collection of PayGo Fees in accordance with its current practices.

**4.4     Power to Sue and Jurisdiction of U.S. District Court:** Subject to the limitations on scope of authority and responsibility in Sections 1.2 and on remedies in Section 1.2(C) above, the Pension Benefits Council has legal capacity and the power to bring any cause of action against the Commonwealth, or any other appropriate party, regarding: the proper implementation of the Pension Reserve Trust, including deposits into and proper return of any Advance Withdrawal Amount to the Pension Reserve Trust pursuant to Article V below; and the Commonwealth's non-compliance with any Plan provision pertaining to the rights of Retirees, as well as any other dispute in connection with the performance of the Pension Benefits Council's duties under these Guidelines. The Pension Benefits Council also has legal capacity and power to bring any cause of action to resolve a dispute pursuant to Section 1.6 above. Except as provided in Section 2.3(H) above, the U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction over any such causes of action of the Pension Benefits Council described in this paragraph, as well as any causes of action against the Pension Benefits Council. The U.S. District Court for the District of Puerto Rico shall also have original and exclusive jurisdiction to approve or reject any proposed modifications of these Guidelines as incorporated into the Pension Reserve Deed of Trust, and these Guidelines may only be modified pursuant to a final, non-appealable order of that Court. Notwithstanding anything to the contrary in this Section 4.4, the Pension Benefits Council also has the legal capacity to bring any cause of action not otherwise described herein for which it has standing pursuant to applicable law, in a court of competent jurisdiction.

**4.5     Employment of Professionals:** Subject to Section 1.6A above, the Pension Benefits Council shall engage in a public Request for Proposal ("**RFP**") process in order to retain certain service providers, such as legal, insurance, accounting, and actuarial, and whose contract amount is greater than $250,000.00 for a fiscal year (provided that retention of any outside counsel shall require an RFP process regardless of the projected contract amount). Selection of all such providers shall require a positive vote of a 2/3 majority of the Pension Benefits Council members who participate in the vote. The Pension Benefits Council shall have the authority to enter into contracts and incur reasonable fees and expenses in connection with hiring such service providers; provided, however, that (i) while the Oversight Board is in existence with respect to the Commonwealth, all engagement agreements with any such service providers or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts

14

executed by the Pension Benefits Council shall be made public and shall be registered with the Office of the Comptroller of Puerto Rico (the "**Comptroller Office**") pursuant to applicable Puerto Rico laws. All such fees and expenses shall be paid from the Pension Reserve Trust.

**4.6    Independence:** For the avoidance of doubt, the Pension Benefits Council shall not be, and shall not be deemed, an instrumentality of the Commonwealth, nor is it responsible for the obligations of the Commonwealth under the Plan.

## V.    PENSION RESERVE TRUST WITHDRAWALS

**5.1    Scope:** This Article V governs, among other things, withdrawals from the Pension Reserve Trust that shall be made pursuant to the request of the Commonwealth. No provision of these Guidelines modifies the obligation of the Commonwealth to deposit funds into the Pension Reserve Trust pursuant to the Plan of Adjustment. For the avoidance of doubt, any disputes arising in connection with the matters governed by this Article V shall be heard by the U.S. District Court for the District of Puerto Rico, which shall have original and exclusive jurisdiction.

**5.2    Withdrawals:**

A.    Funds may be withdrawn from the Pension Reserve Trust at any time to pay the costs and expenses of the Pension Benefits Council and the Pension Reserve Board, respectively, in each case in accordance with these Guidelines. The Pension Benefits Council and the Pension Reserve Board shall each have the authority to withdraw funds necessary to pay such costs and expenses. Funds cannot be withdrawn for any other purpose during the period beginning as of the Effective Date of the Plan of Adjustment and ending on the last day of the 2031 Fiscal Year, subject to Section 5.2(D) below.

B.    Beginning with the first day of the 2032 Fiscal Year, the Commonwealth may make a request to the Pension Benefits Council ("**Withdrawal Request**") in which it asserts that the conditions set forth in Section 5.3 below were fully satisfied with respect to the prior fiscal year (the "**Applicable Fiscal Year**") and therefore that a lump-sum withdrawal should be made from the Pension Reserve Trust calculated in accordance with Section 5.4 below ("**Withdrawal**"). The Commonwealth shall submit to the Pension Benefits Council all necessary information for the Pension Benefits Council's evaluation of such Withdrawal Request, consistent with the Pension Benefits Council's rights under Section 4.2 above. The Withdrawal Request and all underlying information shall be submitted by the Commonwealth to the Pension Reserve Board concurrently with its submission to the Pension Benefits Council. Within 60 days of receiving the Withdrawal Request and said necessary information, and in the event the Pension Benefits Council determines that each of the conditions set forth in Section 5.3 below is satisfied, the Pension Benefits Council shall authorize and direct the Pension Reserve Board to (i) liquidate such assets of the Pension Reserve Trust as the Pension Reserve Board determines to be necessary or prudent to fund the Withdrawal and (ii) facilitate the Withdrawal and transfer of such sum to the Treasury Single Account (the "**TSA**") or other appropriate account designated by the Commonwealth. Any disagreement

with respect to withdrawals between the Pension Benefits Council and the Pension Reserve Board shall be resolved pursuant to the Withdrawal Policy or, if necessary, submission of the dispute to the U.S. District Court for the District of Puerto Rico.

C.    Beginning with the first day of the 2032 Fiscal Year, the Commonwealth may make a request to the Pension Benefits Council ("**Fully Funded Withdrawal Request**") in which it asserts that the condition set forth in Section 5.5 below was fully satisfied with respect to the prior fiscal year (the "**Fully Funded Fiscal Year**"), and therefore that a lump-sum withdrawal should be made from the Pension Reserve Trust calculated in accordance with Section 5.5 below (the "**Fully Funded Pension Reserve Trust Withdrawal**"). The Commonwealth shall submit to the Pension Benefits Council all necessary information for the Pension Benefits Council's evaluation of such request, consistent with the Pension Benefits Council's rights under Section 4.2 above. The Fully Funded Withdrawal Request and underlying information shall be submitted by the Commonwealth to the Pension Reserve Board concurrently with its submission to the Pension Benefits Council. Within 60 days of receiving the Fully Funded Withdrawal Request and said necessary information, and in the event the Pension Benefits Council determines that the condition set forth in Section 5.5 below is satisfied, the Pension Benefits Council shall authorize and direct the Pension Reserve Board to (i) liquidate such assets of the Pension Reserve Trust as the Pension Reserve Board determines to be necessary or prudent to fund the Fully Funded Pension Reserve Trust Withdrawal and (ii) facilitate the Fully Funded Pension Reserve Trust Withdrawal and transfer of such sum to the TSA or other appropriate account designated by the Commonwealth. Any disagreement with respect to withdrawals under this Section 5.2(C) between the Pension Benefits Council and the Pension Reserve Board shall be resolved pursuant to the Withdrawal Policy or, if necessary, submission of the dispute to the U.S. District Court for the District of Puerto Rico.

D.    The Pension Benefits Council shall not have the authority to approve any withdrawal of funds that is not in compliance with these Guidelines, and may not unilaterally amend or modify the Guidelines with respect to the terms and conditions pursuant to which funds may be withdrawn; provided, however, that from time to time, the Pension Benefits Council and/or the Pension Reserve Board may seek to amend the Pension Reserve Trust governing documents to ensure that the Pension Reserve Trust satisfies its intended purposes and functions pursuant to the Plan of Adjustment; provided, further, that any such amendments are subject to approval by the U.S. District Court for the District of Puerto Rico.

**5.3**    **Conditions for Withdrawals:** The Pension Benefits Council shall approve a Withdrawal Request if the Pension Benefits Council determines that each of the following conditions is satisfied:

A.    Puerto Rico generates an actual cash flow deficit after contractual debt service pursuant to the Certified Fiscal Plan in effect as of the Effective Date of the Plan of Adjustment for the Applicable Fiscal Year (a "**Cash Flow Deficit**"), determined in each case pursuant to the "cash surplus" reported in the Net Cash Flow in the

Treasury Single Account Cash Flow Report issued by the Puerto Rico Fiscal Agency and Financial Advisory Authority. For the avoidance of doubt, the calculation and reporting of the Cash Flow Deficit and the Unrestricted Cash Balance of Puerto Rico, as defined in Section 5.3(B) below, shall remain consistent with the calculation and reporting methodology in effect as of the Effective Date regardless of any subsequent or future changes to the Commonwealth's central cash management system and/or reporting of the TSA.

B.    The sum of the cash balance in all TSA accounts plus the cash balances in the two TSA sweep accounts (the "**Unrestricted Cash Balance of Puerto Rico**") shall be lower than $2.0 billion as of the end of the Applicable Fiscal Year. For the avoidance of doubt, the Unrestricted Cash Balance of Puerto Rico shall exclude any such amounts related to the emergency reserve fund (of up to $1.3 billion) and the revolving facility for reconstruction and capital works (of up to $750 million).

C.    (i) the municipalities and government entities obligated to pay PayGo Fees, as identified in the monthly PayGo reporting package periodically published by AAFAF, have paid at least 75% of their PayGo Fees on an aggregate and cumulative basis during the period beginning as of July 1, 2017 (the inception of the PayGo System) and ending as of the last day of the Applicable Fiscal Year, (ii) the Commonwealth has offset delinquent PayGo Fees against any appropriations from and obligations of the Commonwealth to the delinquent municipalities and government entities, (iii) the Commonwealth and/or ERS have instructed CRIM to withhold amounts from the Basic Tax remittances to satisfy any past due PayGo Fees, (iv) the Commonwealth has instructed AAFAF to withhold amounts to fund any past due PayGo Fees from any request by a municipality for release of any excess Special Additional Tax ("**Excess CAE**"), and (v) the Commonwealth is diligently pursuing payment plans pursuant to ERS Resolution 2019-02 to collect past due PayGo Fees from all municipalities and government entities that were more than six (6) months past due as of the end of the Applicable Fiscal Year.

**5.4    Amount of Withdrawal:**   In the event the Pension Benefits Council, in accordance with the Withdrawal Policy, determines that each of the conditions in Section 5.3 has been satisfied for a Withdrawal, then the Pension Benefits Council shall perform the following calculations to determine the amount of the Withdrawal:

A.    First, determine the present value as of the end of the Applicable Fiscal Year of all projected pension benefits to be paid by the PayGo System based on the most recent actuarial valuation report prepared by the Commonwealth's actuarial advisor, by discounting each projected pension benefit cash flow with the segment rate from the corresponding year of the rates defined by the US Internal Revenue Service under Internal Revenue Code Section 417(e)(3) ("417(e) rates") published for the third month prior to the measurement date used for the present value calculation (the "**Benefits Present Value**"); provided, however, that in the event the measurement date of the most recent valuation report is more than eighteen (18) months old, then the Pension Benefits Council shall use the most recent estimates of the projected pension benefits provided by the Commonwealth to the Pension

Benefits Council or, absent such information, the Pension Benefits Council shall use the projected PayGo liabilities contained in the most recent AWM Study prepared for the Pension Reserve Board if such data is more current than the most recent actuarial valuation report. In the event that the IRS ceases to publish 417(e) rates, the Retirement Board shall implement a new publicly available basis for determining the present value that is market based and reflects a similar level of risk to the rates most recently reflected in the 417(e) rates;

B.    Second, divide the balance of the Pension Reserve Trust as of the end of the Applicable Fiscal Year by the Benefits Present Value, and express the result as a percentage (the "**Funded Percentage**");

C.    Third, determine the product of (x) the Funded Percentage, and (y) the amount of all pension benefits actually paid by the PayGo System during the Applicable Fiscal Year, excluding all administrative and other costs that are not pension benefits (the "**PayGo Benefits Amount**"), with such product expressed as an amount in U.S. dollars (the "**Withdrawal Formula Amount**"); provided, however, that in the event (i) of a federally-declared natural disaster, (ii) of a federally – declared pandemic other than the current Covid-19 pandemic in any FY, or (iii) that the Cash Flow Deficit in any given year is generated by a material negative variance between projected Non-Own Source Revenues and actual Non-Own Source Revenues for such FY, the PayGo Benefits Amount shall be multiplied by two (2) for such FY; and

D.    Fourth, determine the lower of (y) the PayGo Benefits Amount and (z) the Withdrawal Formula Amount (such lower amount defined as the "**Applicable Withdrawal Amount**"); provided, however, that in the event that the Funded Percentage as of the end of any Applicable Fiscal Year is ten (10) percent or lower, then the Applicable Withdrawal Amount shall be equal to (i) the lower of (a) the PayGo Benefits Amount and (b) the balance of the Pension Reserve Trust less (ii) the sum of (A) the amount, if any, that the Pension Benefits Council reasonably determines is necessary and appropriate to satisfy its actual and projected costs and expenses, plus (B) the amount, if any, that the Pension Reserve Board reasonably determines is necessary and appropriate to satisfy its actual and projected costs and expenses.

The amount that shall be withdrawn from the Pension Reserve Trust shall be the lesser of (y) the Applicable Withdrawal Amount and (z) the Cash Flow Deficit for the Applicable Fiscal Year (the "**Pension Reserve Trust Withdrawal Amount**").

**5.5    Fully Funded Pension Reserve Trust Withdrawals**: Subject to the Withdrawal Policy, the Pension Benefits Council shall approve a Fully Funded Withdrawal Request in the event that the Pension Benefits Council determines that the Funded Percentage as of the end of the Fully Funded Fiscal Year is one hundred (100) percent or higher after accounting for any Applicable Withdrawal Amount for such Fully Funded Fiscal Year. In the event that the Pension Benefits Council determines this criterion is satisfied, the amount of the Fully Funded Pension Reserve Trust Withdrawal shall be equal to the amount of the aggregate pension benefits to be paid by the

PayGo System during the following fiscal year. For the avoidance of doubt, the conditions and provisions of Sections 5.3 and Section 5.4 above shall not be applicable with respect to any Fully Funded Withdrawal Request or Fully Funded Pension Reserve Trust Withdrawal.

**5.6** **Timing of Pension Reserve Trust Withdrawals**: Withdrawals from the Pension Reserve Trust, as allowed for an Applicable Fiscal Year pursuant to Sections 5.3, 5.4, and 5.5 above, shall occur within six (6) months after the end of such Applicable Fiscal Year, provided that all requisite information pursuant to Section 5.3 has been provided to the Pension Benefits Council; provided, however, that if at the beginning of an Applicable Fiscal Year the sum of (a) the Unrestricted Cash Balance of Puerto Rico at the beginning of such Applicable Fiscal Year and (b) the projected Net Cash Flow for such Applicable Fiscal Year in the Treasury Single Account Cash Flow Report is less than $500 million, the Commonwealth may request to withdraw funds from the Pension Reserve Trust during the Applicable Fiscal Year (the "**Advance Withdrawal Request**"); provided that the condition pursuant to Section 5.3(C) has been satisfied

    A.    Advance Withdrawal Amount: The allowed withdrawal amount for an Advance Withdrawal Request shall be the product of (a) 50% and (b) the calculation of the Pension Reserve Trust Withdrawal Amount pursuant to Section 5.4 but replacing (x) the actual Cash Flow Deficit for such Applicable Fiscal Year with the projected Cash Flow Deficit for such Applicable Fiscal Year, (y) the Benefits Present Value at the end of the Applicable Fiscal Year with the Benefits Present Value at the beginning of the Applicable Fiscal Year, and (z) the Pension Reserve Trust balance at the end of such Applicable Fiscal Year with the Pension Reserve Trust balance at the beginning of such Applicable Fiscal Year (the "**Advance Withdrawal Amount**").

    B.    True-up of Advance Withdrawal Request: At the end of the Applicable Fiscal Year in which an Advance Withdrawal Request is made, the absolute difference between the Advance Withdrawal Amount and the Pension Reserve Trust Withdrawal Amount pursuant to Section 5.4 shall be calculated (the "**Advance True-up Amount**"). If the Pension Reserve Trust Withdrawal Amount for the Applicable Fiscal Year exceeds the Advance Withdrawal Amount already made during the Applicable Fiscal Year, additional withdrawal in the amount of the Advance True-up Amount shall be permitted. However, if the Advance Withdrawal Amount made during the Applicable Fiscal Year exceeds the Pension Reserve Trust Withdrawal Amount for the Applicable Fiscal Year, the Commonwealth shall deposit the Advance True-up Amount back into the Pension Reserve Trust within six (6) months of the end of the Applicable Fiscal Year. For the avoidance of doubt, if the conditions pursuant to Section 5.3 are not met at the end of the Applicable Fiscal Year, the Commonwealth shall deposit the Advance Withdrawal Amount in its entirety back into the Pension Reserve Trust within six (6) months of the end of the Applicable Fiscal Year.

**5.7** **Power to Sue and Jurisdiction of U.S. District Court:** In addition to any rights under applicable law, the Commonwealth shall have legal capacity and the right to bring any cause of action to resolve any dispute relating to a Withdrawal Request, a Fully Funded Withdrawal Request, or Advance Withdrawal Request. The U.S. District Court for the District of Puerto Rico

shall have original and exclusive jurisdiction over any said causes of action, as well as any other causes of action against the Pension Benefits Council.

**5.8    Taxes:** The funds held in the Pension Reserve Trust shall be exempt from the payment of any taxes to Puerto Rico and its municipalities and instrumentalities to the maximum extent permitted by applicable law (including PROMESA).

## VI.    PENSION RESERVE BOARD MEMBERS

**6.1    Composition of the Pension Reserve Board:**

A.    <u>Membership</u>:  The Pension Reserve Board shall consist of five (5) trustees, to be appointed within three (3) months after the occurrence of the Effective Date. The Pension Benefits Council shall, by a two-thirds vote of the Pension Benefits Council's members, appoint two (2) members, the Governor of Puerto Rico shall appoint two (2) members, and the Oversight Board shall appoint one (1) member; <u>provided</u>, <u>however</u>, that in the event any of such persons are not timely appointed or designated, such delay shall not delay or impair the operation of the Pension Reserve Board, which shall commence its activities on the first business day of the first calendar month following expiration of the six-month period following the Effective Date (the "**Commencement Date**").  As each trustee is appointed, the appointing entity shall certify to the Oversight Board, the Governor's office, and the Pension Benefits Council such appointment and the trustee's specific qualifications that satisfy the criteria in Section 6.1(B) below.  If the Oversight Board no longer exists, the fifth member shall be appointed by the Pension Benefits Council.  A person may not serve more than two (2) terms as a member of the Pension Reserve Board, regardless of whether such person has served consecutive terms.

B.    <u>Eligibility and Qualifications</u>:  No trustee shall be appointed to the Pension Reserve Board who has a known or reasonably perceived conflict of interest.  Except for the Governor's appointee, trustees of the Pension Reserve Board cannot concurrently be active employees of Puerto Rico or any of its agencies, instrumentalities, or public corporations, and for the avoidance of doubt, no trustee (including the Governor's appointee) can concurrently be a member of the Act 106 Board.  In addition, no trustee can be a former member of the boards of ERS, TRS, or JRS. Each trustee of the Pension Reserve Board shall have proven leadership skills and have expert knowledge or extensive experience with respect to either (with at least one Board trustee satisfying each of the two categories of qualifications below):

i.    Economics, finance, or institutional investments, as evidenced by one or more of the following:

(a)    An earned masters or Ph.D. in economics or finance from a doctorate-granting U.S.-accredited institution;

(b)    The Chartered Financial Analyst credential of the CFA Institute; or

(c) A minimum of fifteen (15) years of professional experience as a certified public accountant with audit expertise of financial management, pension, or insurance clients;

*or*

ii. Asset management expertise, as evidenced by one or both of the following:

(a) At least fifteen (15) years of asset management industry experience; and

(b) Technical competencies including investment strategy, investment management across different asset classes, investment risk management, third party management of external asset managers and custodians, corporate governance, financial management, strategic leadership, communication and stakeholder management and networking.

C. <u>Term</u>: Trustees of the Pension Reserve Board shall serve for a term of six (6) years, beginning on January 1 of the relevant year; <u>provided</u>, <u>however</u>, that if the term of the initial Pension Reserve Board begins on a date other than January 1, the term of service for the members of that initial Pension Reserve Board shall consist of that partial first year plus five (5) additional calendar years. If a trustee of the Pension Reserve Board does not complete his or her term for any reason, the entity or person that appointed such person pursuant to Section 6.1(A) above or 6.1(D) below shall appoint a replacement trustee who is eligible to serve in such position. In each case, the replacement trustee shall serve for the remainder of the six-year term.

## VII.   PENSION RESERVE BOARD GOVERNANCE

**7.1   Bylaws:** As soon as practicable after formation of the Pension Reserve Board, the Pension Reserve Board shall by a vote of at least four of its members adopt a set of bylaws to govern the Pension Reserve Board's conduct, which shall be consistent with the Plan and these Guidelines. It shall include appropriate provisions regarding fiduciary duties, obligations of the Pension Reserve Board, meetings of the Pension Reserve Board, removal and replacement of Pension Reserve Board members, and voting on matters by Pension Reserve Board members. In particular, without otherwise limiting the Pension Reserve Board's ability to develop appropriate bylaws, the Pension Reserve Board's bylaws shall provide that each Pension Reserve Board member shall have one vote, subject to any disqualifying conflict of interest, with respect to any matter being voted upon. The Pension Reserve Board may, from time to time, amend its bylaws by vote of at least four of its members to ensure that the Pension Reserve Board satisfies its purposes and functions pursuant to these Guidelines. In addition, the Pension Reserve Board may, from time to time, recommend that the Pension Reserve Board amend the Pension Reserve Trust's governing documents to ensure that the Pension Reserve Trust satisfies its purpose and function pursuant to the Plan, and the Pension Reserve Trust's governing documents may not be amended without the

consent of the Pension Reserve Board, which consent shall not be unreasonably withheld, and such amendment shall further require the approval of the U.S. District Court for the District of Puerto Rico as required by Section 5.2(D). The Pension Reserve Deed of Trust shall require that the Pension Reserve Board shall be subject to provisions consistent with Puerto Rico laws governing ethics, anti-corruption, conflicts of interest, procurement, contracting, use of public funds, and public disclosure applicable to instrumentalities of the Commonwealth, and such provisions shall be, and shall be deemed to be, incorporated into the Pension Reserve Board's bylaws.

**7.2    Code of Conduct and Ethics Policy:** In addition to the Pension Reserve Board's bylaws, the Pension Reserve Deed of Trust shall include a Code of Conduct and Ethics Policy setting forth the Pension Reserve Board's obligation to act ethically in connection with the use of public funds and in the interest of the Retirees and affirming the Pension Reserve Board's commitment to do so, and such provisions shall be, and shall be deemed to be, incorporated into the Pension Reserve Board's bylaws. The Code of Conduct and Ethics Policy shall include provisions regarding confidentiality, conflicts of interests and self-dealing, as well as a gift policy and an enforcement policy. Specifically, and without limitation, such policy must expressly forbid any Board member or professional employed by it from accepting any payment or other thing of value from any party seeking or having responsibility to invest trust funds or provide services for compensation to the Board. The Code of Conduct and Ethics Policy for the Board must also expressly forbid the placement of Pension Reserve Trust assets for investment with any advisor, or the use of a placement agent or similar service provider, who at the individual or entity level, has contributed to a political candidate for any elected office of the Commonwealth government during the preceding five (5) years or contributed towards a Commonwealth plebiscite during the previous five (5) years. Such contributions must be prohibited while providing such services to the Board.

**7.3    Compensation:** Pension Reserve Board members shall be paid an annual compensation in the amount not to exceed $50,000.00 (subject to adjustment for inflation), paid in four equal installments at the end of each calendar quarter; provided, however, that if, in the judgment of the Oversight Board or the Pension Benefits Council, it is determined that this amount is inadequate to attract appropriate and desirable trustees to serve on the Board with the requisite level of skills and qualifications identified in Section 6.1B above, the Oversight Board or Pension Benefits Council, as the case may be, may seek to amend this annual compensation amount upon application to the U.S. District Court for the District of Puerto Rico, in accordance with Section 8.4 below. Compensation for the period from the Commencement Date to the end of the first calendar quarter thereafter shall be prorated and paid on the first business day following said calendar quarter. Pension Reserve Board members shall also be reimbursed for their reasonable expenses incurred in attending meetings and otherwise carrying out their responsibilities as Pension Reserve Board members. The Pension Reserve Board's compensation and travel policy shall be incorporated into the Pension Reserve Board's bylaws. Notwithstanding the foregoing, any Pension Reserve Board member employed by the Government of Puerto Rico or any public corporation or instrumentality shall not receive compensation for his or her service on the Pension Reserve Board while so employed, but may receive reimbursement of expenses as provided in this Section 7.3.

**7.4    Budget:** For informational purposes, by June 1 of each year, the Pension Reserve Board shall make public on its website and provide a copy to the Director of the Office of Management & Budget of Puerto Rico, a budget of anticipated expenses to be incurred in the forthcoming fiscal year for ordinary and recurring activities of the Pension Reserve Board and for other non-recurring

activities reasonably foreseeable to occur in the forthcoming fiscal year. The annual actual aggregate administrative expenses for the Pension Reserve Board in any given fiscal year shall not be higher than $1,400,000.00 (adjusted for actual inflation rate); provided that non-ordinary course expenses including, but not limited to, litigation-related fees and expenses, if any, as well as investment-related expenses are excluded from the calculation of administrative expenses. The Oversight Board, as long as it is in existence, shall review the annual expenditures of the Pension Reserve Board and adjust its budget for ordinary course expenses at its reasonable discretion from time to time based on actual spending requirements; provided, however, that if there is a dispute between the Oversight Board and the Pension Reserve Board regarding the budget, the parties will use good-faith best efforts to resolve it consensually; provided further, however, that if such dispute is not resolved consensually within thirty (30) days of the dispute being identified, either party may seek resolution of the matter in the U.S. District Court for the District of Puerto Rico. The payment of these administrative expenses shall be made from the account for administrative and operating expenses of the Pension Reserve Board within the Pension Reserve Trust.

**7.5     Reports to Pension Benefits Council:** On a quarterly basis, the Pension Reserve Board will participate in a meeting with the Pension Benefits Council and the Act 106 Board to report on (w) the composition of the Pension Reserve Trust assets and investments, and the performance of said investments, (x) all investment management fees, commissions and similar compensation to investment managers and (y) other matters regarding the performance of the Pension Reserve Board pursuant to these Guidelines. Such quarterly reports shall be posted to a website to be maintained by the Pension Reserve Council and its social media platforms.

**7.6     Annual Report**: Following the end of each fiscal year, the Pension Reserve Board, with the assistance of its retained professionals as described in Section 8.1 and Section 8.3 below, shall promptly prepare and issue a public report, as of the end of the fiscal year, regarding (w) the composition of the Pension Reserve Trust assets and investments and the performance of said investments by asset class and by each investment manager during the calendar year just ended, (x) a list of current investment managers and assets under management within the Pension Reserve Trust, (y) an itemized report of all expenditures made to professionals and investment managers and an itemized report of any payments made to Board members, including payments made on behalf of Board members to travel to and attend any meeting, and (z) such other information that the Pension Reserve Board determines is relevant to Participants, including a comparison of the Pension Reserve Board's expenses that were actually incurred during such fiscal year to the Pension Reserve Board's budgeted expenses. Each such annual report shall be posted on the Pension Reserve Council's website and its social media platforms.

## VIII.   POWERS OF THE PENSION RESERVE BOARD

**8.1     Management of Pension Reserve Trust:** The Pension Reserve Board shall be responsible for the management of the Pension Reserve Trust, including, but not limited to, employing staff as needed for the Pension Reserve Trust, selecting a custodian to hold the assets of the Pension Reserve Trust, directing (in consultation with the investment advisor(s) selected pursuant to this Section 8.1) the investment of the assets of the Pension Reserve Trust, and managing the administration of the Pension Reserve Trust. The Pension Reserve Board shall also share responsibilities with respect to withdrawal requests pursuant to Section V of these Guidelines in accordance with the Withdrawal Policy. The Pension Reserve Board will also have the authority

to take any and all steps it determines are necessary or desirable in its discretion to maximize the tax efficiency of the assets and investments of the Pension Reserve Trust.

A. <u>Selection of Investment Advisor(s)</u>: The Pension Reserve Board shall retain one or more qualified investment advisors through a competitive and public process. The Pension Reserve Board shall set minimum qualification requirements, including the following requirements: (i) the investment advisor must be registered as an investment advisor under the Investment Advisers Act of 1940, (ii) the investment advisor and each of its key professionals must not have material conflicts of interest with the Pension Reserve Board, (iii) the investment advisor must agree to serve as a fiduciary, and (iv) the investment advisor must have a verifiable and successful operating history with at least three (3) pension fund clients each of which has a minimum of $5 billion in assets under management. As soon as reasonably practicable following the Effective Date of the Plan, the Pension Reserve Board shall conduct a public RFP process in order to search for such investment advisor(s). The goal of the RFP shall be to solicit and evaluate proposals in a fair and objective manner, and the RFP process shall be documented and public. The Pension Reserve Board may retain a qualified consultant to manage the RFP process. As it determines to be necessary or prudent, the Pension Reserve Board may renew the RFP process from time to time to select one or more additional or replacement investment advisor(s). Provided, however that: (i) while the Oversight Board is in existence with respect to the Commonwealth, any engagement agreements with any such investment advisor(s) or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Benefits Board shall be made public and shall be registered with the Comptroller Office pursuant to applicable Puerto Rico laws.

B. <u>Roles & Responsibilities</u>: The investment advisor(s) shall have the following roles and responsibilities, and the terms of such relationship shall be set forth in a written agreement in which the advisor shall acknowledge its fiduciary status:

i. Advising the Pension Reserve Board on issues concerning the selection of investments for the Pension Reserve Trust;

ii. Assisting in the development and maintenance, and periodic review and modification as appropriate, of an investment policy statement designed to set forth the goals, objectives and risk tolerances of the Pension Reserve Trust's investment program (the "**Investment Policy Statement**"), as described below;

iii. Advising in the development of the Pension Reserve Trust's asset allocation strategy;

iv. Providing investment advice to the Pension Reserve Board with respect to the Pension Reserve Trust;

    v.      Assisting in the analysis, selection, monitoring and replacement of investments and investment managers;

    vi.    Assisting the Pension Reserve Board with the review of the performance and risk of the selected investments, on at least a semi-annual basis, in comparison to their stated objectives and their related performance and pricing as compared to their peers and benchmarks;

    vii.   Bringing information to the Pension Reserve Board, on an ad hoc basis as appropriate, that the investment advisor feels may be relevant to the Pension Reserve Board's assessment of a given investment, asset class or strategy.

The Pension Reserve Board, working with the investment advisor(s), shall select investment manager(s) to manage the investments of the Pension Reserve Trust. The Pension Reserve Board shall conduct a public RFP process in order to search for such investment manager(s). The goal of the RFP shall be to solicit and evaluate proposals in a fair and objective manner, and the RFP process shall be documented and public. The Pension Reserve Board may retain a qualified consultant to manage the RFP process. As it determines to be necessary or prudent, the Pension Reserve Board may renew the RFP process from time to time to select one or more additional or replacement investment manager(s); provided, however that: (i) while the Oversight Board is in existence with respect to the Commonwealth, any engagement agreements with any such investment manager(s) or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Benefits Board shall be made public and shall be registered with the Comptroller Office pursuant to applicable Puerto Rico laws. Subject to the provisions of these Guidelines, the roles and responsibilities of the Pension Reserve Board and any third party shall be set forth in a written agreement and, as appropriate, the Investment Policy Statement.

C.    <u>Development of Investment Policy Statement</u>: The Pension Reserve Board, together with expert assistance from its investment advisor(s), shall develop the Investment Policy Statement. The Investment Policy Statement shall be designed to provide meaningful direction for the Pension Reserve Board, the investment advisor(s), and investment managers in the management of the Pension Reserve Trust. The Investment Policy Statement shall:

    i.      Provide a mechanism to establish and review the Pension Reserve Trust's investment objectives and risk tolerances;

    ii.    Establish the roles, responsibilities and reporting requirements of the Pension Reserve Board, investment advisor(s), investment managers, custodian bank, and any other Pension Reserve Trust service providers;

    iii.   Establish a public RFP process in order to search for investment advisor(s), investment managers, custodian bank, and any other Pension Reserve Trust

service providers with the goal of soliciting and evaluating proposals in a fair and objective manner in a documented and public process;

iv.     Identify appropriate investment asset classes, asset allocation targets and ranges that are designed to facilitate achievement of the Pension Reserve Trust's objectives;

v.     Identify asset class and investment manager guidelines, evaluation, selection and monitoring criteria and performance benchmarks;

vi.     Document a prudent monitoring and measurement process that includes criteria for replacing and retaining investment managers;

vii.     Identify investment constraints and limitations, including any prohibited types of investments and minimum ratings for assets.

viii.     Require any private equity manager with whom the Pension Reserve Board invests to comply with the reporting guidelines developed by the Institutional Limited Partners Association (ILPA) as such guidelines are amended from time to time by the ILPA and require any private equity manager to offer financial terms for any investment placed by the Pension Reserve Board that are no less favorable than the terms offered by that private equity manager to other investors in the same fund or investment.

D.     <u>Investment Objective</u>: The Pension Reserve Board, investment advisor(s), and investment managers shall perform their duties for the exclusive benefit of and in the best economic interest of the Retirees. The objective of the Pension Reserve Trust's investment program is to generate returns within an appropriately risk-constrained framework, net of reasonable investment fees and expenses, in order to serve the intended purposes of the Pension Reserve Trust under the Plan of Adjustment. This will be accomplished through a carefully planned and executed long-term investment program that allocates and manages the assets of the Pension Reserve Trust.

E.     <u>Prudent Management of the Pension Reserve Trust</u>: This Section 8.1 is meant to serve as a general framework for the prudent management of the Pension Reserve Trust. Changing conditions, economic trends or other factors may necessitate modification of this framework. The Investment Policy Statement at all times shall reflect the current objectives and guidelines for the Pension Reserve Board's management of the Pension Reserve Trust, and the Investment Policy Statement may be modified by written approval of the Pension Reserve Board. The Pension Reserve Board shall promptly provide a copy of such modified Investment Policy Statement to the Pension Benefits Council and the Act 106 Board, and shall post that documentation at the Pension Reserve Board website.

**8.2**     **Requests for Documents and Information:** In order to prudently invest the assets held in the Pension Reserve Trust in view of the intended purposes of the Pension Reserve Trust under the Plan of Adjustment, the Pension Reserve Board shall have the right to request and receive, on

an annual basis, such actuarial and pension benefit information regarding Eligible Retirees and Eligible Active Employees, or information related to projections of future Commonwealth surpluses, as it reasonably determines is necessary.

**8.3    Employment of Professionals:** In addition to the investment professionals retained pursuant to Section 8.1 above, the Pension Reserve Board shall engage in a public RFP process in order to retain necessary and desirable service providers whose contract amount is greater than $250,000.00 (provided that retention of any outside counsel shall require an RFP process regardless of the projected contract amount). The Pension Reserve Board shall have the authority to enter into contracts and incur fees and expenses in connection with hiring such service providers. All such fees and expenses shall be paid from the Pension Reserve Trust. Provided, however that: (i) while the Oversight Board is in existence with respect to the Commonwealth, any engagement agreements with any such service providers or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Benefits Board shall be made public and shall be registered with the Comptroller Office pursuant to applicable Puerto Rico laws.

**8.4    Power to Sue and Jurisdiction of U.S. District Court:** The Pension Reserve Board has legal capacity and the power to bring any cause of action in the name of the Pension Reserve Trust against the Commonwealth and/or the Act 106 Board, or any other appropriate party, regarding any matters in connection with the performance of the Pension Reserve Board's duties pursuant to these Guidelines. The Pension Reserve Board has legal capacity and power to bring any cause of action in the name of the Pension Reserve Trust to resolve a dispute pursuant to Section 1.6 above. The U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction over any such causes of action of the Pension Reserve Trust, as well as any causes of action against the Pension Reserve Board or Pension Reserve Trust. The U.S. District Court for the District of Puerto Rico shall also have original and exclusive jurisdiction to approve or reject any proposed modifications of these Guidelines, and these Guidelines may only be modified pursuant to a final, non-appealable order of that Court. In addition to any rights under applicable law, the Commonwealth, as grantor, shall have legal capacity and the right to bring any cause of action to resolve any dispute relating to the performance of the Pension Reserve Board, including and not limited to the administration and investment of the funds held in the Pension Reserve Trust. The U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction over any said causes of action, as well as any causes of action against the Pension Reserve Board.

**8.5    Independence:** For the avoidance of doubt, neither the Pension Reserve Board nor the Pension Reserve Trust shall be an instrumentality of the Commonwealth, nor are they responsible for the obligations of the Commonwealth under the Plan. The Pension Reserve Board from time to time may adopt such rules and regulations as may be necessary or desirable for its proper and efficient administration. All reasonable and proper expenses incurred in the administration of the Pension Reserve Board's responsibilities will be paid out of the Pension Reserve Trust.

**8.6     Interim Trustee**: Upon the execution of the Pension Reserve Deed of Trust, the Oversight Board shall appoint an organization or individual to serve as interim trustee (the "**Interim Trustee**") for the purpose of performing initial tasks to establish and commence administration of the Pension Reserve Trust, for a term commencing upon its appointment and concluding upon the earlier to occur of October 1, 2022 or the day the Pension Reserve Board concludes its inaugural board meeting.

A.     The Interim Trustee shall follow good practice ethic, independence, procurement, documentation and transparency expectations of a leading public pension investor and general guidelines of a pension fund fiduciary and trustee under Federal and Commonwealth of Puerto Rico law. The Interim Trustee shall make any reasonable operational decisions to prepare and support the timely setup of the Pension Reserve Trust and the operational and organizational aspect of the Pension Reserve Board, including, but not limited to:

    i.     Select a banking partner for no more than a 1 year contractual term and set up necessary bank accounts and payment authorization, including the bank accounts required by the Confirmation Order and Section 1.7(B) hereof;

    ii.    Engage in a Request for Proposal (RFP) process to select an investment consultant to establish a proposed investment strategy that will only come into effect subject to a formal Pension Reserve Board review and approval;

    iii.   Engage in an Expression of Interest (EOI) and RFP process to recommend a custodian and third party asset servicer, asset managers and other essential partners. Any formal retention decisions will be subject to formal ratification by the Pension Reserve Board;

    iv.    Conduct reasonable steps to identify and recommend to the Pension Reserve Board suitable Executive Director candidates;

    v.     Accept payments under Section 1.7(B) hereof and reimburse reasonably incurred expenses by the Pension Benefits Council and the Pension Reserve Board from their respective agreed setup budgets. The Interim Trustee shall keep complete records of any such payment and undertake reasonable steps to ascertain the reasonableness of such expenses. The Interim Trustee is required to cease any bank authorization it has with the end of its term and hand over any records and documents as part of its role to the Pension Reserve Board and the Pension Benefits Council, as applicable. The Interim Trustee is required to keep strict confidentiality of all relevant affairs; and

    vi.    Engage, conduct, and instigate any other reasonable measures or initiatives that a prudent board of trustees would undertake to enable governance, operational and organizational readiness of the Pension Reserve Trust, the Pension Benefits Council, and the Pension Reserve Board by October 1, 2022, subject to review and ratification by the Pension Reserve Board or

Pension Benefits Council in accordance with their respective roles as set forth in these Guidelines.

B.    The Interim Trustee shall pay its reasonable expenses and be compensated from the initial funds deposited into the account of the Pension Reserve Board in accordance with Section 1.7(B) of these Guidelines. The Interim Trustee shall only be held accountable for any conduct that intentionally or grossly violates its role as trustee and the tasks outline in this document or any law of the United States or the Commonwealth of Puerto Rico.

## IX.    INDEMNIFICATION & INSURANCE

**9.1    Indemnification:**  Except for acts determined by a final order of the U.S. District Court for the District of Puerto Rico or an appellate court to constitute willful misconduct or fraud, and to the extent not covered by insurance as set forth in Section 9.2, the members of the Pension Benefits Council and the Pension Reserve Board, and the Interim Trustee, shall be indemnified by the Pension Reserve Trust against all expenses (including costs and attorneys' fees) actually and necessarily incurred or payable by the member in connection with the defense of any action, suit or proceeding to which the member may be made a party by reason of the member being or having been so designated as a member of the Pension Benefits Council or the Pension Reserve Board, or serving as Interim Trustee, respectively, or by reason of any action or omission or alleged action or omission by the member in such capacity; provided however, that the members of the Pension Benefits Council and the Pension Reserve Board and the Interim Trustee shall not be indemnified by the Pension Reserve Trust if such action is in violation of the Code of Ethics and Ethics Policy or constitutes fraud, reckless disregard or willful misconduct.

**9.2    Insurance:**  The Pension Benefits Council, the Pension Reserve Board, and the Interim Trustee shall each maintain appropriate amounts of fiduciary liability insurance (as to the Pension Reserve Board) or other professional liability/error and omissions insurance, crime and computer crime insurance covering any loss due to dishonest acts, and any other insurance that the Pension Benefits Council, Pension Reserve Board, and Interim Trustee each reasonably determines is necessary. Such insurance shall be provided by a nationally-recognized insurance carrier. Such insurance policies shall provide for both (i) non-indemnifiable coverage (commonly referred to as "Side A" coverage) pursuant to which the insurer will pay to, or on behalf of, the insured person the applicable amount with respect to any covered loss, except to the extent the Pension Reserve Trust has paid such amount to, or on behalf of, the insured person as indemnification or as an advance, and (ii) indemnification coverage (commonly referred to as "Side B" coverage) pursuant to which the insurer will pay to, or on behalf of, the Pension Reserve Trust the applicable amount with respect to any covered loss arising from claims first made against an insured person, to the extent that the Pension Reserve Trust has paid such amount to, or on behalf of, the insured person as indemnification or advancement. All reasonable insurance costs shall be paid from the Pension Reserve Trust.

**End of Document**

**<u>Redline of Exhibit I</u>**

~~DRAFT 11/21/21~~Draft 2/3/22

## GUIDELINES FOR THE GOVERNANCE AND ADMINISTRATION OF THE PUERTO RICO PLAN OF ADJUSTMENT PENSION RESERVE TRUST AND MONITORING OF PLAN OF ADJUSTMENT PENSION BENEFITS

### I.     INTRODUCTION; PENSION RESERVE TRUST; PENSION BENEFITS COUNCIL; PENSION RESERVE BOARD

**1.1     Purpose:**   The Plan Support Agreement between the Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**") and the Official Committee of Retired Employees of the Commonwealth of Puerto Rico (the "**Retiree Committee**"),  dated June 7, 2019 (the "**COR PSA**")[1], in connection with the prospective confirmed Plan of Adjustment (the "**Plan of Adjustment**" or "**Plan**") for the Commonwealth of Puerto Rico ("**Puerto Rico**" or the "**Commonwealth**") in its PROMESA Title III case, provides for (among other things) the creation of: (a) a Commonwealth Plan of Adjustment Pension Reserve Trust (the "**Pension Reserve Trust**") to provide financial support for the Commonwealth's pension obligations under the PayGo System (defined below); and (b) a Commonwealth Plan of Adjustment Pension Reserve Board of Trustees (the "**Pension Reserve Board**") that shall be responsible for, among other things, the custody, administration, and investment of the funds held in the Pension Reserve Trust.   In accordance with the COR PSA, the guidelines set forth herein (the "**Guidelines**") provide for the creation and governance of the Pension Reserve Trust and Pension Reserve Board, as set forth below. In addition, these Guidelines set forth the basic terms under which a Commonwealth Plan of Adjustment Pension Benefits Council (the "**Pension Benefits Council**") shall be established for the purpose of ensuring the Commonwealth's compliance with certain provisions of the Plan of Adjustment related to the funding of the Pension Reserve Trust and shall administer requests by the Commonwealth to withdraw funds from the Pension Reserve Trust.  These Guidelines will be included in the Plan Supplement[2], and the terms and conditions set forth herein shall be incorporated into the Pension Reserve Deed of Trust, which will be executed and put into effect on or before the Plan Effective Date.[3] The Pension Reserve Trust, the Pension Benefits Council, and the Pension Reserve Board shall operate on a July 1 to June 30 fiscal year.

**1.2     Responsibilities of the Pension Benefits Council**

> A.     <u>Pension Reserve Trust Funding and Withdrawals</u>.  The Pension Benefits Council shall have responsibility and authority to monitor the proper and timely funding of the Pension Reserve Trust by the Commonwealth in accordance with the terms and conditions of the Plan.   The Pension Benefits Council shall also have responsibility and authority, in coordination and consultation with the Pension Reserve Board, to approve the release of funds deposited into the Pension Reserve

---

[1]    The Oversight Board also entered into a Plan Support Agreement (the "**AFSCME PSA**") with the American Federation of State, County and Municipal Employees ("**AFSCME**"), which also provides (albeit with somewhat different terminology) for the creation of a Pension Reserve Board and a Pension Reserve Trust as reflected in the term sheet annexed to the AFSCME PSA.

[2]   Any capitalized terms not defined herein shall have the meanings ascribed to such terms in the Plan of Adjustment.

Trust as necessary for the Commonwealth to satisfy its obligations to Retirees pursuant to the Plan, as further set forth in Article V below. For the avoidance of doubt, The Oversight Board will establish, in consultation with the Pension Benefits Council shall not have any responsibility and authority to administer and the Pension Reserve Board, a withdrawal review, decision, and dispute resolution policy (the "**Withdrawal Policy**") within six (6) months after the Effective Date that will be incorporated into the bylaws of each of the Pension Benefits Council and the Pension Reserve Board.

B. PayGo Fees. The Pension Benefits Council shall monitor the calculation and collection of PayGo Fees (as defined in Act 106 of 2017) pursuant to Act 106 (; such act, as it may be amended from time to time or supplanted by subsequent legislation, "**Act 106**"; such matters being governed, without limitation, by Act 106 and) by the pension board created thereunder under Act 106 (together with any successor to such board under any supplanting legislation, the "~~**Act 106 Board**~~")). B. PayGo Fees. The Pension Benefits Council shall monitor the calculation and collection of PayGo Fees (as defined in Act 106) by the **Act 106 Board**"), pursuant to Act 106, consistent with Section 4.3 below, for the purpose of, among other things, purposes of (i) performing its AWM Study pursuant to Section 1.4(B) below and (ii) confirming whether the conditions for withdrawal of funds from the Pension Reserve Trust in Section 5.3.C below have occurred. For the avoidance of doubt, the Pension Benefits Council shall not have any responsibility or authority to administer the calculation and collection of PayGo Fees (such matters being governed, without limitation, by Act 106 and the Act 106 Board).

C. Enforcement Rights. The Pension Benefits Council's enforcement remedy for a failure to properly and timely fund the Pension Reserve Trust, per subparagraph 1.2.A above, or the failure to return any Advance Withdrawal Amount to the Trust pursuant to Section 5.6 below, shall be limited to seeking in the U.S. District Court for the District of Puerto Rico or any other court having jurisdiction (and any appellate court) to enjoin or compel the Commonwealth, the Act 106 Board, and/or such other entity or entities as may have responsibility for such matters to comply with the Plan and, provided further, that the Pension Benefits Council shall provide the Commonwealth, the Act 106 Board, and/or such other entity or entities with written notice setting forth a description of such failure or issue at least ninety (90) calendar days prior to the Pension Benefits Council bringing an action as described above.

**1.3 Term of the Pension Benefits Council:** Subject to modification of the Pension Reserve Deed of Trust, the Pension Benefits Council shall exist until the earlier of (i) thirty (30) calendar days after the date all funds held in the Pension Reserve Trust are withdrawn in accordance with these Guidelines or (ii) such time when the retirement benefits owed to all Participants and VTP Payroll Participants under the Plan have been fully satisfied.

**1.4 Responsibilities of the Pension Reserve Board**

A.  <u>Management of Funds</u>.  The Pension Reserve Board shall have responsibility for the custody, administration, and investment of the funds held in the Pension Reserve Trust.

B.  <u>Asset and ~~Liability~~Withdrawal Modeling</u>. To prudently invest the assets held in the Pension Reserve Trust in anticipation of future funding levels and ~~PayGo needs~~withdrawals pursuant to Section V, the Pension Reserve Board shall retain a nationally recognized actuarial firm to perform ~~a liability valuation analysis on an annual basis and~~ an asset and ~~liability~~withdrawal management study (the "~~ALM~~**AWM Study**") every three (3) years, which shall be presented to the Pension Reserve Board for consideration in the evaluation of different investment strategies. The projected cash inflows and related assumptions in the AWM Study shall be based on best estimates of the funding into the Pension Reserve Trust by the Commonwealth and investment returns at the time the AWM Study is being performed. The projected cash outflows and related assumptions in the AWM Study shall be based on best estimates of projected Commonwealth cash flow deficits and projected PayGo payments. The Pension Reserve Board shall consult with the Pension Benefit Council with respect to any withdrawal request in accordance with the Withdrawal Policy.

**1.5   Term of the Pension Reserve Board:**  The Pension Reserve Board shall exist until thirty (30) calendar days after the date all funds held in the Pension Reserve Trust are withdrawn in accordance with these Guidelines.

**1.6   Relationship Between the Pension Benefits Council and the Pension Reserve Board:** These Guidelines set forth separate and distinct roles and responsibilities for each of the Pension Benefits Council and the Pension Reserve Board (each, a **"Pension Reserve Trust Entity"**), and are designed to provide each Pension Reserve Trust Entity with sufficient authority to discharge its respective duties independent of the other.  Notwithstanding the foregoing, in the event that a Pension Reserve Trust Entity determines that the other Pension Reserve Trust Entity is not complying with its obligations under these Guidelines or applicable law, each Pension Reserve Trust Entity shall attempt to resolve such dispute in good faith.  In the event those efforts do not resolve the dispute, either Pension Reserve Trust Entity may commence a lawsuit to resolve the dispute in accordance with Sections 4.4 or 8.4 below, as applicable.  ~~Furthermore, notwithstanding the independence of each Pension Reserve Trust Entity,~~

A.  In the development of the separate annual budget limitations for each of the Pension Benefits Council and the Pension Reserve Board set forth in Sections 3.5 and 7.4 below, respectively, it is anticipated that the Pension Reserve Board shall retain an Executive Director and/or other administrative staff.  The staff retained by the Pension Reserve Board shall also execute such administrative tasks as requested of it by the Pension Benefits Council consistent with the Pension Benefits Council's duties and authority under these Guidelines.  Similarly, for ordinary-course administrative accounting services of the two Pension Reserve Trust Entities, absent any conflict of interest, the Pension Reserve Board shall retain an independent and nationally-recognized accounting firm to render accounting services on behalf of both Pension Reserve Trust Entities and the

3

Pension Reserve Trust itself; provided further, that where there are issues and required analyses (apart from ordinary-course administrative accounting) that touch upon the responsibilities of both Entities, the Entities may (as deemed appropriate in each Entity's judgment), and are encouraged to, jointly engage the requisite professional(s) under a common interest agreement in order to avoid duplication of efforts and unnecessary expenses. For the avoidance of doubt, ordinary-course administrative accounting services would not include, without limitation, any accounting services that the Pension Benefits Council determines are needed in order to discharge its responsibilities under Sections 1.2A or 1.2B above or Section 2.3E below.

**1.7**   **Account Structure and Initial Funding of the Pension Reserve Trust:**

A.   Account Structure of the Pension Reserve Trust:  The Pension Reserve Trust shall include (i) investment accounts, (ii) a general account,an account for administrative and operating expenses of the Pension Reserve Board, and (iii) an account for administrative and operating expenses of the Pension Benefits Council, and (iv) an account for administrative and operating expenses of the Pension Reserve Board. The Pension Reserve Board shall have the authority to establish additional accounts as deemed necessary in the exercise of the Pension Reserve Board's duties. All such accounts shall be in the name of, and controlled by, the Pension Reserve Board, except that the account for administrative and operating expenses of the Pension Benefits Council shall be in the name of, and controlled by, the Pension Benefits Council. From time to time as appropriate, the Pension Reserve Board shall promptly transfer appropriate sums into the account for administrative and operating expenses of the Pension Benefits Council for the payment of the Pension Benefits Council's expenses.

B.   Initial Funding:  The Commonwealth shall deposit an initial funding of $5,000,000.00 as provided for in the Plan into the Pension Reserve Trust accounts, as follows: (i) $550,000.00 shall be deposited into the administrative and operating account of the Pension Benefits Council immediately after the establishment of said account by the Pension Benefits Council; and (ii) $4,450,000 shall be deposited into the administrative and operating account of the Pension Reserve Board immediately after the establishment of such accounts by the Pension Benefits Council and Pension Reserve Board, of which $1,000,000.00 shall be deposited into the Pension Reserve Board's general account, $1,000,000.00 shall be deposited into the Pension Benefits Council's administrative and operating account, and $3,000,000.00 shall be deposited into the Pension Reserve Board's administrative and operating accountsaid account by the Pension Reserve Board.

## II.   PENSION BENEFITS COUNCIL MEMBERS & ELECTIONS

**2.1   Composition of the Pension Benefits Council Following the Transitional Period:**

A.   <u>Membership</u>: Following the Transitional Period defined in Section 2.2 below, the Pension Benefits Council shall consist of nine (9) members, as follows:

i.   Five (5) members, each of whom as of the date the Election Process Notice is posted pursuant to Section 2.3(B) below (the "**Election Process Notice Date**"), (x) must be receiving a pension or annuity as a Participant or VTP Payroll Participant pursuant to the Plan of Adjustment (but excluding any such person who is receiving such benefits solely as a result of being a participant in the pension contribution system implemented in accordance with Act No. 305-1999, codified at 3 L.P.R.A. §§786-1, et seq. ("**System 2000**") or Act 160-2013), and (y) is not an active employee of Puerto Rico or any of its agencies, instrumentalities, or public corporations (each, an "**Eligible Retiree**"); provided, however, that at all times there shall specifically be two (2) Pension Benefits Council members who were participants in the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("**ERS**"), two (2) Pension Benefits Council members who were participants in the Teachers Retirement System ("**TRS**"), and one (1) Pension Benefits Council member who was a participant in the Judiciary Retirement System  ("**JRS**"); and provided further, that if there are insufficient Eligible Retirees who were participants in ERS, JRS or TRS, as the case may be, elected to fill the applicable seat or seats on the Pension Benefits Council, such seat or seats shall then be filled by Eligible Retirees who were not participants in such retirement system receiving the highest number of votes regardless of which retirement system he/she was a participant of, after the other seats have been filled to meet the composition requirements above.  In the event an Eligible Retiree receives a pension or annuity as a result of being a participant in more than one of ERS, TRS and JRS, that person shall be deemed to be an Eligible Retiree with respect to the last retirement system as to which he/she accrued any vested pension benefits;

ii.   One (1) member who as of the Election Process Notice Date (x) is a Participant (but excluding any such person who is a Participant solely as a result of being a participant in System 2000 or having made contributions to the pension contribution system under Act 160-2013), and (y) is an active employee of the Commonwealth or any of its agencies, instrumentalities, or public corporations (other than PREPA and UPR) (an "**Eligible Active Employee**"); provided, however, that if an Eligible Active Employee is not elected to fill the seat on the Pension Benefits Council, such seat(s) shall then be filled by the Eligible Retiree receiving the highest number of votes regardless of which retirement system he/she was a participant of, after the other seats have been filled to meet the composition requirements of this Section 2.1;

5

iii.     One (1) appointee by AFSCME, who may but is not required to meet the qualifications of an Eligible Active Employee;

iv.     One (1) appointee by the Governor of Puerto Rico; and

v.     One (1) member appointed by the Oversight Board, while it is in existence in accordance with the Plan.

Upon termination of the Oversight Board, the Governor of Puerto Rico shall appoint a member to the Pension Benefits Council to fill the seat occupied by the Oversight Board's appointee, as necessary, and shall then have the right on a go-forward basis to appoint two (2) members to the Pension Benefits Council in accordance with these Guidelines.

B.     Eligibility: Each Pension Benefits Council member, other than the appointees of the Governor, the Oversight Board, and AFSCME, must be or have been a participant in ERS, TRS, or JRS, as described above, and individuals who are solely beneficiaries of such participants cannot be members of the Pension Benefits Council. Members of the Pension Benefits Council must be residents of Puerto Rico. Members of the Pension Benefits Council cannot concurrently be members of the Act 106 Board. In addition, each person seeking to be elected to the Pension Benefits Council must comply with the requirements set forth in Section 2.3(C) below.

C.     Term: Following the Transitional Period, members of the Pension Benefits Council shall serve for terms of four (4) years, beginning on January 1 of the applicable calendar year. If the term of the initial Pension Benefits Council elected during the Transitional Period begins on a date other than January 1, the term of service for the members of that initial Pension Benefits Council shall consist of that partial first year plus three (3) additional years. If a member of the Pension Benefits Council who is an Eligible Retiree does not complete his or her term for any reason, the remaining Eligible Retirees on the Pension Benefits Council, acting through majority vote (or as otherwise provided in the Pension Benefits Council's bylaws), shall promptly appoint a person who is eligible to serve in such position and shall seek to maintain the composition of the Eligible Retiree seats in accordance with Section 2.1(A)(i) above. If a member of the Pension Benefits Council who is an Eligible Active Employee retires, leaves his or her government employment, or otherwise does not complete his or her term for any reason, the Pension Benefits Council, acting through majority vote (or as otherwise provided in the Pension Benefits Council's bylaws), shall promptly appoint a person who is eligible to serve in such position. If the Governor's or the Oversight Board's appointee does not complete his or her term for any reason, then the Governor or the Oversight Board, as applicable, shall promptly appoint a new appointee. The term of any such appointment under this Section 2.1(C) shall be until the next regularly scheduled election for any Pension Benefits Council seat, at which point such position shall be filled in accordance with this Article II. If the member being replaced does not remain on the Pension Benefits Council pending appointment of a replacement member, the Pension Benefits Council

6

shall nonetheless be authorized to conduct business as if it had a full roster of members.

**2.2**    **Transitional Period:**

A.    <u>Membership During Transitional Period</u>: The Pension Benefits Council shall initially consist of (w) five (5) Eligible Retirees appointed by the Retiree Committee, (x) two (2) ~~members appointed~~appointees by ~~AFSCM,~~AFSCME who may but are not required to meet the qualifications of an Eligible Active Employee, (y) the Governor's appointee, and (z) the Oversight Board's appointee. The persons described in clauses (w) through (z) shall be appointed or designated no later than the Effective Date of the Plan; <u>provided</u>, <u>however</u>, that in the event any of such persons is not timely appointed or designated, such delay shall not delay or impair the operation of the Pension Benefits Council. The period from the Effective Date to the date of commencement of the terms of the Pension Benefits Council members elected pursuant to Sections 2.1, 2.2(B), and 2.3 shall be referred to herein as the "**Transitional Period**." Each member of the Pension Benefits Council serving during the Transitional Period, other than the appointees of AFSCME, the Governor~~'s~~, and the Oversight Board~~'s appointees~~, shall serve until replaced by the applicable new member elected in accordance with Sections 2.1, 2.2(B), and 2.3. During the Transitional Period, an election shall be conducted as provided in Sections 2.2(B) and 2.3 below. The Interim Trustee shall represent the Pension Benefits Council until its first member is appointed and accepts such appointment.

B.    <u>Initial Meeting</u>: An initial meeting of the Pension Benefits Council shall be scheduled by the Oversight Board's designee for a date, time, and location reasonably convenient to all Pension Benefits Council members for as soon as practicable after the Effective Date (subject to the proviso above that tardy appointment or designation of a member shall not delay or impair the calling of the meeting); provided, however, that if the Oversight Board has failed to designate its member as of the Effective Date, any other Pension Benefits Council member may call the meeting. This initial meeting shall address, among other potential matters, initiatives for (i) the selection of counsel to the Pension Benefits Council in accordance with Section 4.5 below, (ii) the development of bylaws for the Pension Benefits Council in accordance with Section 3.1 below, and (iii) the creation and conducting of an orientation program for the Pension Benefits Council members in accordance with Section 3.7 below.

C.    <u>Transitional Period Election</u>: The Pension Benefits Council shall facilitate an election among the Eligible Retirees and the Eligible Active Employees to elect the six (6) new members who will, along with the appointees by the Governor, the Oversight Board, and AFSCME, constitute the Pension Benefits Council in accordance with Section 2.1 above. Such election shall ~~take place~~be completed as soon as practicable after the Effective Date of the Plan, but no later than ~~300 days~~two (2) years after the Effective Date of the Plan, subject to the requirements of Section 2.1(A) above, as follows:

i.      Two (2) Pension Benefits Council seats shall be designated for Eligible Retirees who shall have been participants in ERS, two (2) Pension Benefits Council seats shall be designated for Eligible Retirees who shall have been participants in TRS, one (1) Pension Benefits Council seat shall be designated for an Eligible Retiree who shall have been a participant in JRS, and one (1) Pension Benefits Council seat shall be designated for Eligible Active Employees.

ii.     Each Eligible Retiree who was a participant in a particular retirement system may only vote for an Eligible Retiree who was a participant in that system and who is a proper candidate pursuant to the procedures set forth in Section 2.3(C) below.  The number of votes cast by an Eligible Retiree in any election shall be equal to the number of Pension Benefits Council seats designated for an Eligible Retiree who was a participant of the voting Eligible Retiree's retirement system (i.e., one or two).  The elected Eligible Retirees shall be those who are proper candidates pursuant to the procedures set forth in Section 2.3(C) below and who garner the highest number of votes in each applicable retirement-system category.  Each Eligible Active Employee may cast one vote for an Eligible Active Employee who is a proper candidate pursuant to the procedures set forth in Section 2.3(C) below for the Pension Benefits Council seat designated for an Eligible Active Employee.  The elected Eligible Active Employee shall be the Eligible Active Employee who is a proper candidate pursuant to the procedures set forth in Section 2.3(C) below and who garners the highest number of votes.

**2.3**  **Transitional Period Election Process:** The election occurring during the Transitional Period shall follow the process set forth in this Section 2.3.

A.     <u>Election Committee</u>: The Pension Benefits Council shall select an Election Committee comprising at least three (3) members of the Pension Benefits Council, to be responsible for conducting the election process described in this Section 2.3.  A member of the Pension Benefits Council who is a candidate for election cannot serve on the Election Committee.

B.     <u>Election Process Notice</u>: A notice of the process for nominating and electing Pension Benefits Council members (the "**Election Process Notice**") will be posted in at least two (2) newspapers of general daily circulation in Puerto Rico, both in print and in any corresponding Internet version of each publication, once in each of two consecutive weeks, at least ninety (90) days prior to the election.  The Election Process Notice will also be posted on the website of the Pension Benefits Council no later than the time of the first publication and will remain continuously posted on the website until completion of the election process.

C.     <u>Nomination Process</u>:

i.  *Nomination*: In the Election Process Notice, the Election Committee will give notice of the availability of a nomination form ("**Nomination Form**"), which each Eligible Retiree and Eligible Active Employee may obtain electronically from the Pension Benefits Council's website or by making a written request by mail.  Any Eligible Retiree or Eligible Active Employee may nominate him or herself to stand for election to serve on the Pension Benefits Council by submitting a completed Nomination Form to the Election Committee.  The Nomination Form will request such information as the Election Committee reasonably determines is required to establish whether a person meets the eligibility requirements set forth in these Guidelines, and such other information as is necessary for a person to stand for election, and shall identify the date by which a completed Nomination Form must be submitted to the Election Committee.  Members of the Pension Benefits Council may be a candidate for re-election; provided, however, that members who have served two consecutive terms (with service during the Transitional Period not qualifying as a term for purposes of this provision) may not be a candidate in the election immediately following their second term; provided further, however, that such member may be a candidate in any subsequent election (subject to a new two-consecutive-term limitation).

ii.  *Candidate Eligibility Determinations*: All Eligible Retirees and Eligible Active Employees are eligible to be a candidate unless such person is disqualified by the express terms of these Guidelines. The Election Committee shall determine the eligibility of all candidates but may not create additional eligibility requirements. Eligible candidates shall be notified by mail (and, to the extent practicable, electronic mail) of their eligibility and mailed a copy of the election rules no later than fifteen (15) calendar days prior to commencement of the Candidate Meetings described in Section 2.3(C)(iii) below.  Ineligible nominees shall also be advised by overnight mail (and, to the extent practicable, electronic mail) not later than fifteen (15) calendar days prior to commencement of the Candidate Meetings of the reason(s) they are not eligible. Such nominees shall have ten (10) calendar days from the date of mailing of said notice to appeal the decision to the Pension Benefits Council.  If the appeal has not been resolved prior to the Candidate Meetings, the nominee may attend a Candidate Meeting pending resolution of the appeal.

iii.  *Candidate Meetings*:  The Election Committee will hold at least one meeting in San Juan and one meeting in Ponce to provide information about the term of service and responsibilities of the members (each, a "**Candidate Meeting**").  Each candidate who has been notified of their eligibility to serve must attend at least one Candidate Meeting in person. In the event a person who has submitted a Nomination Form does not attend a Candidate Meeting, that person shall not be eligible to stand for election.

iv.   *Election Notification*: Once a definitive list of candidates is assembled by the Election Committee, the list will be included in an election notice (the "**Election Notice**") posted in the same newspaper(s) as employed in Section 2.3(B) above, both in print and in any corresponding Internet version of each publication, once in each of two consecutive weeks, and on the Pension Benefits Council's website.  The Election Notice shall also provide any additional specific information not previously included in the Election Process Notice regarding the manner by which the election shall take place.

D.   <u>Election Process</u>: The Election Committee shall develop procedures for voting in the election after consideration of best practices in order to reasonably meet the specific needs and purposes of the election.  Such procedures shall be set forth in the Election Process Notice and/or in the Election Notice.

E.   <u>Tally of Ballots</u>: Ballots shall be tabulated and certified promptly after the deadline for submitting ballots by an independent certified public accountant retained by the Pension Benefits Council.  The candidate who receives the highest number of votes cast for each vacant seat (determined pursuant to Section 2.2(B) above) shall be declared elected.  Any tie votes shall be decided by a coin toss conducted by the Election Committee, in the presence of the candidates who are tied, and in the presence of and certified by an independent certified public accountant.

F.   <u>Notification of Election Results</u>: Notification of the election results shall be mailed to the candidates, posted on the Pension Benefits Council's website, and concurrently issued by general press release.

G.   <u>Protests and Appeals</u>: Any candidate may challenge an election by delivering a protest in writing to the Pension Benefits Council so that is received by the Council within ten (10) calendar days after the election results are mailed and posted on the Pension Benefits Council's website.

H.   <u>Arbitration</u>: Any request for appeal arising from a decision of the Pension Benefits Council regarding the eligibility of a person to be a candidate or the election result shall be delivered to the Pension Benefits Council so that it is received by the Council within ten (10) calendar days after the decision. The controversy shall be resolved through a mandatory expedited arbitration process to be conducted by an arbitrator licensed by the Supreme Court of Puerto Rico and selected by the Pension Benefits Council.  The arbitrator's award and decision shall be final and binding as to all parties.  The Pension Reserve Trust shall bear the expenses of the arbitration process incurred by the Pension Benefits Council and the arbitrator.

I.   <u>Commencement of Term</u>:  The term of service for the members of the Pension Benefits Council elected during the Transitional Period pursuant to Sections 2.1, 2.2(B), and 2.3 shall begin sixty (60) calendar days following the certification of

the results of the election by the Pension Benefits Council; provided, however, that the term of a replacement member appointed pursuant to Section 2.1(C) shall begin immediately upon appointment.

J.  Rules and Procedures for the Election: Except as otherwise provided in Section 2.3(C)(ii) above with respect to establishing additional eligibility criteria, the Pension Benefits Council is authorized to adopt, amend, or supplement all rules and regulations that it deems necessary and prudent to implement the Transitional Period election process established in this Section 2.3.

**2.4   Elections Following the Transitional Period**

A.  Election Cycle: Subject to Section 2.1(C) above, following the Transitional Period, elections of new members shall occur every four (4) years, in the fourth year of the term of the Pension Benefits Council, with the intention to complete the election process and certification of the results on or before November 15 of the fourth year following the prior elections.  Subject to Pension Benefits Council bylaws, new member terms shall begin on January 1 of the calendar year following the elections.

B.  Election Policies and Procedures: Subject to the limitation in Section 2.3(C)(ii) above on creating additional eligibility criteria, following the end of the Transitional Period, the Pension Benefits Council may, but is not required to, adopt the Transitional Period election process, as set forth in Section 2.3, for future elections.  The Pension Benefits Council may establish at any time and from time to time new election policies and procedures that are designed to create a process that reasonably promotes accessibility for voters and an efficient and cost-effective process.  In designing the election policies and procedures, the Pension Benefits Council will consider the merits of the Transitional Period election process and any voting impediments known to the Pension Benefits Council.  These election policies and procedures shall be included in or incorporated by reference into the Pension Benefits Council's bylaws.

### III.   PENSION BENEFITS COUNCIL GOVERNANCE

**3.1   Bylaws:**  As soon as practicable after formation of the Pension Benefits Council, the Pension Benefits Council shall adopt by a vote of at least six of its members a set of bylaws to govern the Pension Benefits Council's conduct, which shall be consistent with the Plan and these Guidelines.  Such bylaws shall include appropriate provisions regarding fiduciary duties and obligations of the Pension Benefits Council; meetings of the Pension Benefits Council (which shall allow for attendance by videoconference); guidelines for disclosure of conflicts of interest for Pension Benefits Council members; removal and replacement of Pension Benefits Council members; and voting on matters by Pension Benefits Council members; and, when adopted, the Withdrawal Policy.  In particular, without otherwise limiting the Pension Benefits Council's ability to develop appropriate bylaws, the Pension Benefits Council's bylaws shall provide that each Pension Benefits Council member shall have one vote, subject to any disqualifying conflict of interest, with respect to any matter being voted upon.  The Pension Benefits Council may,

from time to time, amend the Pension Benefits Council's bylaws by vote of at least six of its members to facilitate the purposes and functions of the Pension Benefits Council pursuant to the Plan and these Guidelines. The Pension Reserve Deed of Trust shall require that the Pension Benefits Council be subject to provisions consistent with Puerto Rico laws governing ethics, anti-corruption, conflicts of interest, procurement, contracting, use of public funds and public disclosure applicable to instrumentalities of the Commonwealth, and such provisions shall be, and shall be deemed to be, incorporated into the Pension Reserve Deed of Trust and the Pension Benefits Council's bylaws.

**3.2     Code of Conduct and Ethics Policy:** In addition to the Pension Benefits Council's bylaws, the Pension Reserve Deed of Trust shall include a Code of Conduct and Ethics Policy setting forth the Pension Benefits Council members's obligation to act ethically in connection with the use of public funds and in the interest of the Retirees and affirming the Pension Benefits Council's commitment to do so, and such provisions shall be, and shall be deemed to be, incorporated into the Pension Benefits Council's bylaws.  The Code of Conduct and Ethics Policy shall include provisions regarding confidentiality, conflicts of interests and self-dealing, as well as a gift policy and an enforcement policy.  Specifically, and without limitation, such policy must expressly forbid any Council member or professional employed by it from accepting any payment or other thing of value from any party seeking or having responsibility to invest trust funds or provide services for compensation to the Council.

**3.3     Compensation:** Pension Benefits Council members shall meet as often as is reasonably necessary and prudent to address the business of the Pension Benefits Council.  For each meeting of the Pension Benefits Council, the Election Committee, or any other designated sub-committees of the Pension Benefits Council, members shall be entitled to a reasonable stipend.  As of the Effective Date of the Plan of Adjustment, the stipend shall be $125 per meeting.  The amount of the stipend may be reviewed and adjusted from time to time by a two-thirds vote of the Pension Benefits Council, consistent with reasonable and customary practice in the market and to reflect regular increases in respect of inflation.  Pension Benefits Council members shall also be reimbursed for their reasonable expenses incurred in attending meetings and otherwise carrying out their responsibilities as Pension Benefits Council members.  The Pension Benefits Council's compensation and travel policy will be incorporated into the Pension Benefits Council's bylaws.

**3.4     Transitional Operating Budget:** For informational purposes, as soon as practicable after its establishment, the Pension Benefits Council shall make public on its website and social media platforms and provide a copy to the Director of the Office of Management & Budget of Puerto Rico, a budget of anticipated expenses to be incurred during the Transitional Period period from the Effective Date through the following June 30 for ordinary and recurring activities of the Pension Benefits Council and for other non-recurring activities reasonably foreseeable to occur during the Transitional Period said period; provided, however, that such budget shall not exceed the amount of the initial deposit made into the administrative and operating expense account of the Pension Benefits Council pursuant to Section 1.7B above.

**3.5     Administrative Operating Budget:** For informational purposes, by June 1 of each year, the Pension Benefits Council shall make public on its website and social media platforms and provide a copy to the Director of the Office of Management & Budget of Puerto Rico, a budget

of anticipated expenses to be incurred in the forthcoming fiscal year for ordinary and recurring activities of the Pension Benefits Council and for other non-recurring activities reasonably foreseeable to occur in such fiscal year, which budget shall have been approved by a two-thirds vote of the Pension Benefits Council. The annual actual aggregate administrative expenses for the Pension Benefits Council in any given fiscal year shall not be higher than $~~1,000,000.00~~400,000.00 (adjusted for actual inflation rate); provided that non-ordinary course expenses including, but not limited to, (i) litigation-related fees and expenses, if any, and (ii) election-related expenses are excluded from the calculation of administrative expenses. The Oversight Board, as long as it is in existence, shall review the annual expenditures of the Pension Benefits Council and adjust its budget for ordinary course expenses at its reasonable discretion from time to time based on actual spending requirements; provided, however, that if there is a dispute between the Oversight Board and the Pension Benefits Council regarding the budget, the parties will use good-faith best efforts to resolve it consensually; provided further, however, that if such dispute is not resolved consensually within thirty (30) days of the dispute being identified, either party may seek resolution of the matter in the U.S. District Court for the District of Puerto Rico.   The payment of these administrative expenses shall be made from the account for administrative and operating expenses of the Pension Benefits Council of the Pension Reserve Trust. Additionally, to the extent that legal action is taken against the Pension Benefits Council or other parties which would require funds from the Pension Reserve Trust, the Commonwealth will reimburse the Pension Reserve Trust for such expenses.

**3.6     Annual Report**:  Following the end of each fiscal year, the Pension Benefits Council, with the assistance of its retained professionals as described in Section 4.5 below, shall promptly prepare and issue a public report, as of the end of the fiscal year, regarding (x) any projected or actual deposits into, or withdrawals from, the Pension Reserve Trust, (y) an itemized report of all expenditures made to professionals and investment managers and an itemized report of any payments made to Council members, including payments made on behalf of Council members to travel to and attend any meeting, and (z) such other information related to the Pension Benefits Council's responsibilities and activities that the Pension Benefits Council determines is relevant to Participants, including, for example, a comparison of the Pension Benefits Council's expenses that were actually incurred during such fiscal year to the Pension Benefits Council's budgeted expenses.  Each such annual report shall be posted on the Pension Benefits Council's website and social media platforms.

**3.7     Orientation and Continuing Education Policy:** The Pension Benefits Council shall adopt a program for the orientation of new members and the continued education of existing members regarding their duties, relevant provisions of the Plan, financial matters, and governance of the Pension Benefits Council. The goal of the program shall be for the Pension Benefits Council members to maintain the skill and knowledge necessary to meet their obligations and duties. Before any person elected or appointed to serve on the Pension Benefits Council assumes their position on the Pension Benefits Council, such person must attend the introductory orientation course created for new Pension Benefits Council members.  With respect to the initial Pension Benefits Council formed on or about the Effective Date of the Plan, the Pension Benefits Council shall use its reasonable best efforts to conduct an orientation program as soon as practicable after the Effective Date.

13

## IV.    POWERS OF THE PENSION BENEFITS COUNCIL

The Pension Benefits Council shall have the power to take any action reasonably necessary in order to fulfill its responsibilities as set forth in Section 1.2 above, including, but not limited to:

**4.1    Request for Documents and Information:**  The Pension Benefits Council shall have the right to request and receive from the Commonwealth (on behalf of itself and any of its agencies and instrumentalities) and the Act 106 Board the following information deemed by the Pension Benefits Council as reasonably necessary to carry out its responsibilities as set forth in Section 1.2 above:

A.    <u>Contact Information</u>: The Pension Benefits Council shall have the right to request and receive the Commonwealth's most current information regarding the mailing address and such other contact information (e.g., telephone number and electronic mail address, if available) on file for each person who is entitled to cast a ballot in any election to select the members of the Pension Benefits Council, at any time within the six (6) month period preceding such election.

B.    <u>Actuarial/Valuation Data</u>: In addition to the information and documents above, the Pension Benefits Council shall receive from the Commonwealth, and shall share with the Pension Reserve Board, the most current actuarial and valuation data on an annual basis within a reasonable time after this information is available.

**4.2    Review Regarding Funding of and Withdrawals from Pension Reserve Trust:** Pursuant to Section 1.2(A) above, in addition to the right to request documents and information set forth in Section 4.1 above, the Pension Benefits Council shall have the right, once every fiscal year in which, or in a fiscal year immediately following a fiscal year in which, a Pension Reserve Trust deposit may conceivably be made pursuant to the Plan, to review all records and processes related to the calculation and deposit of funds, or lack of such deposit, into the Pension Reserve Trust by the Commonwealth.  The Pension Benefits Council shall also have the right to review the calculation and submission of a request by the Commonwealth for the withdrawal of funds from the Pension Reserve Trust, in accordance with the Withdrawal Policy, as well as all reports of the Commonwealth's independent calculation agent relating to deposits into the Pension Reserve Trust and withdrawal requests.  The Pension Benefits Council and Pension Reserve Board shall also be given reasonable access to the independent calculation agent to review such materials.

**4.3    Review of PayGo Fee Collections:**  The Pension Benefits Council shall have the right, once every fiscal year, to review the collections of PayGo Fees, in order to assess compliance with Act 106.  The Commonwealth shall continue to publish information regarding the calculation and collection of PayGo Fees in accordance with its current practices.

**4.4**     **Power to Sue and Jurisdiction of U.S. District Court:**  Subject to the limitations on scope of authority and responsibility in Sections 1.2 and on remedies in Section 1.2(C) above, the Pension Benefits Council has legal capacity and the power to bring any cause of action against the Commonwealth, or any other appropriate party, regarding: the proper implementation of the Pension Reserve Trust, including deposits into and proper return of any Advance Withdrawal Amount to the Pension Reserve Trust pursuant to Article V below; and the Commonwealth's non-compliance with any Plan provision pertaining to the rights of Retirees, as well as any other dispute in connection with the performance of the Pension Benefits Council's duties under these Guidelines.  The Pension Benefits Council also has legal capacity and power to bring any cause of action to resolve a dispute pursuant to Section 1.6 above.   Except as provided in Section 2.3(H) above, the U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction over any such causes of action of the Pension Benefits Council described in this paragraph, as well as any causes of action against the Pension Benefits Council.  The U.S. District Court for the District of Puerto Rico shall also have original and exclusive jurisdiction to approve or reject any proposed modifications of these Guidelines as incorporated into the Pension Reserve Deed of Trust, and these Guidelines may only be modified pursuant to a final, non-appealable order of that Court.    Notwithstanding anything to the contrary in this Section 4.4, the Pension Benefits Council also has the legal capacity to bring any cause of action not otherwise described herein for which it has standing pursuant to applicable law, in a court of competent jurisdiction.

**4.5**     **Employment of Professionals:** The Subject to Section 1.6A above, the Pension Benefits Council shall engage in a public Request for Proposal ("**RFP**") process in order to retain certain service providers, such as legal, insurance, accounting, and actuarial, or other expert, and whose contract amount is greater than $250,000.00.  Selection of professionals250,000.00 for a fiscal year (provided that retention of any outside counsel shall require an RFP process regardless of the projected contract amount).  Selection of all such providers shall require a positive vote of a 2/3 majority of the Pension Benefits Council members who participate in the vote.  The Pension Benefits Council shall have the authority to enter into contracts and incur reasonable fees and expenses in connection with hiring such professionalsservice providers; provided, however, that (i) while the Oversight Board is in existence with respect to the Commonwealth, all engagement agreements with any such advisors or expertsservice providers or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Benefits Council shall be made public and shall be registered with the Office of the Comptroller of Puerto Rico (the "**Comptroller Office**") pursuant to applicable Puerto Rico laws.  All such fees and expenses shall be paid from the Pension Reserve Trust.

**4.6**     **Independence:** For the avoidance of doubt, the Pension Benefits Council shall not be, and shall not be deemed, an instrumentality of the Commonwealth, nor is it responsible for the obligations of the Commonwealth under the Plan.

**V.     PENSION RESERVE TRUST WITHDRAWALS**

**5.1**     **Scope:** This Article V governs, among other things, withdrawals from the Pension Reserve Trust that shall be made pursuant to the request of the Commonwealth.  No provision of these Guidelines modifies the obligation of the Commonwealth to deposit funds into the Pension

Reserve Trust pursuant to the Plan of Adjustment.  For the avoidance of doubt, any disputes arising in connection with the matters governed by this Article V shall be heard by the U.S. District Court for the District of Puerto Rico, which shall have original and exclusive jurisdiction.

**5.2**   **Withdrawals:**

A.   Funds may be withdrawn from the Pension Reserve Trust at any time to pay the costs and expenses of the Pension Benefits Council and the Pension Reserve Board, respectively, in each case in accordance with these Guidelines.   The Pension Benefits Council and the Pension Reserve Board shall each have the authority to withdraw funds necessary to pay such costs and expenses.  Funds cannot be withdrawn for any other purpose during the period beginning as of the Effective Date of the Plan of Adjustment and ending on the last day of the 2031 Fiscal Year, subject to Section 5.2(D) below.

B.   Beginning with the first day of the 2032 Fiscal Year, the Commonwealth may make a request to the Pension Benefits Council ("**Withdrawal Request**") in which it asserts that the conditions set forth in Section 5.3 below were fully satisfied with respect to the prior fiscal year (the "**Applicable Fiscal Year**") and therefore that a lump-sum withdrawal should be made from the Pension Reserve Trust calculated in accordance with Section 5.4 below ("**Withdrawal**").   The Commonwealth shall submit to the Pension Benefits Council all necessary information for the Pension Benefits Council's evaluation of such Withdrawal Request, consistent with the Pension Benefits Council's rights under Section 4.2 above.   The Withdrawal Request and all underlying information shall be submitted by the Commonwealth to the Pension Reserve Board concurrently with its submission to the Pension Benefits Council, solely for informational purposes. Within 60 days of receiving the Withdrawal Request and said necessary information, and in the event the Pension Benefits Council determines that each of the conditions set forth in Section 5.3 below is satisfied, the Pension Benefits Council shall authorize and direct the Pension Reserve Board to (i) liquidate such assets of the Pension Reserve Trust as the Pension Reserve Board determines to be necessary or prudent to fund the Withdrawal and (ii) facilitate the Withdrawal and transfer of such sum to the Treasury Single Account (the "**TSA**") or other appropriate account designated by the Commonwealth.  Any disagreement with respect to withdrawals between the Pension Benefits Council and the Pension Reserve Board shall be resolved pursuant to the Withdrawal Policy or, if necessary, submission of the dispute to the U.S. District Court for the District of Puerto Rico.

C.   Beginning with the first day of the 2032 Fiscal Year, the Commonwealth may make a request to the Pension Benefits Council ("**Fully Funded Withdrawal Request**")  in which it asserts that the condition set forth in Section 5.5 below was fully satisfied with respect to the prior fiscal year (the "**Fully Funded Fiscal Year**"), and therefore that a lump-sum withdrawal should be made from the Pension Reserve Trust calculated in accordance with Section 5.5 below (the

"**Fully Funded Pension Reserve Trust Withdrawal**"). The Commonwealth shall submit to the Pension Benefits Council all necessary information for the Pension Benefits Council's evaluation of such request, consistent with the Pension Benefits Council's rights under Section 4.2 above. The Fully Funded Withdrawal Request and underlying information shall be submitted by the Commonwealth to the Pension Reserve Board concurrently with its submission to the Pension Benefits Council, solely for informational purposes. Within 60 days of receiving the Fully Funded Withdrawal Request and said necessary information, and in the event the Pension Benefits Council determines that the condition set forth in Section 5.5 below is satisfied, the Pension Benefits Council shall authorize and direct the Pension Reserve Board to (i) liquidate such assets of the Pension Reserve Trust as the Pension Reserve Board determines to be necessary or prudent to fund the Fully Funded Pension Reserve Trust Withdrawal and (ii) facilitate the Fully Funded Pension Reserve Trust Withdrawal and transfer of such sum to the TSA or other appropriate account designated by the Commonwealth. Any disagreement with respect to withdrawals under this Section 5.2(C) between the Pension Benefits Council and the Pension Reserve Board shall be resolved pursuant to the Withdrawal Policy or, if necessary, submission of the dispute to the U.S. District Court for the District of Puerto Rico.

D. The Pension Benefits Council shall not have the authority to approve any withdrawal of funds that is not in compliance with these Guidelines, and may not unilaterally amend or modify the Guidelines with respect to the terms and conditions pursuant to which funds may be withdrawn; provided, however, that from time to time, the Pension Benefits Council and/or the Pension Reserve Board may seek to amend the Pension Reserve Trust governing documents to ensure that the Pension Reserve Trust satisfies its intended purposes and functions pursuant to the Plan of Adjustment; provided, further, that any such amendments are subject to approval by the U.S. District Court for the District of Puerto Rico.

**5.3    Conditions for Withdrawals:**    The Pension Benefits Council shall approve a Withdrawal Request if the Pension Benefits Council determines that each of the following conditions is satisfied:

A. Puerto Rico generates an actual cash flow deficit after contractual debt service pursuant to the Certified Fiscal Plan in existenceeffect as of the Effective Date of the Plan of Adjustment for the Applicable Fiscal Year (a "**Cash Flow Deficit**"), determined in each case pursuant to the "cash surplus" reported in the Net Cash Flow in the Treasury Single Account Cash Flow Report issued by the Puerto Rico Fiscal Agency and Financial Advisory Authority. For the avoidance of doubt, the calculation and reporting of the Cash Flow Deficit and the Unrestricted Cash Balance of Puerto Rico, as defined in Section 5.3(B) below, shall remain consistent with the calculation and reporting methodology in effect as of the Effective Date regardless of any subsequent or future changes to the Commonwealth's central cash management system and/or reporting of the TSA.

B.  The sum of the cash balance in all TSA accounts plus the cash balances in the two TSA sweep accounts (the "**Unrestricted Cash Balance of Puerto Rico**") shall be lower than $2.0 billion as of the end of the Applicable Fiscal Year. For the avoidance of doubt, the Unrestricted Cash Balance of Puerto Rico shall exclude any such amounts related to the emergency reserve fund (of up to $1.3 billion) and the revolving facility for reconstruction and capital works (of up to $750 million).

C.  (i) the municipalities and government entities obligated to pay PayGo Fees, as identified in the monthly PayGo reporting package periodically published by AAFAF, have paid at least 75% of their PayGo Fees on an aggregate and cumulative basis during the period beginning as of July 1, 2017 (the inception of the PayGo System) and ending as of the last day of the Applicable Fiscal Year, (ii) the Commonwealth has offset delinquent PayGo Fees against any appropriations from and obligations of the Commonwealth to the delinquent municipalities and government entities, (iii) the Commonwealth and/or ERS have instructed CRIM to withhold amounts from the Basic Tax remittances to satisfy any past due PayGo Fees, (iv) the Commonwealth has instructed AAFAF to withhold amounts to fund any past due PayGo Fees from any request by a municipality for release of any excess Special Additional Tax ("**Excess CAE**"), and (v) the Commonwealth is diligently pursuing payment plans pursuant to ERS Resolution 2019-02 to collect past due PayGo Fees from all municipalities and government entities that were more than six (6) months past due as of the end of the Applicable Fiscal Year.

**5.4    Amount of Withdrawal:**  In the event the Pension Benefits Council, in accordance with the Withdrawal Policy, determines that each of the conditions in Section 5.3 has been satisfied for a Withdrawal, then the Pension Benefits Council shall perform the following calculations to determine the amount of the Withdrawal:

A.  First, determine the present value as of the end of the Applicable Fiscal Year of all projected pension benefits to be paid by the PayGo System based on the most recent ~~ALM Study, using the discount rate for pension liabilities set forth in the most recent valuation report for the PayGo System rendered under Government Accounting Standards by a nationally recognized actuarial firm~~actuarial valuation report prepared by the Commonwealth's actuarial advisor, by discounting each projected pension benefit cash flow with the segment rate from the corresponding year of the rates defined by the US Internal Revenue Service under Internal Revenue Code Section 417(e)(3) ("417(e) rates") published for the third month prior to the measurement date used for the present value calculation (the "**Benefits Present Value**"); provided, however, that in the event the measurement date of the most recent valuation report is more than eighteen (18) months old, then the Pension Benefits Council shall use ~~an appropriate discount rate determined by a nationally recognized actuarial firm retained by~~the most recent estimates of the projected pension benefits provided by the Commonwealth to the Pension Benefits Council or, absent such information, the Pension Benefits Council shall use the projected PayGo liabilities contained in the most recent AWM Study prepared for the Pension Reserve Board if such data is more current than the most

recent actuarial valuation report. In the event that the IRS ceases to publish 417(e) rates, the Retirement Board shall implement a new publicly available basis for determining the present value that is market based and reflects a similar level of risk to the rates most recently reflected in the 417(e) rates;

B.     Second, divide the balance of the Pension Reserve Trust as of the end of the Applicable Fiscal Year by the Benefits Present Value, and express the result as a percentage (the "**Funded Percentage")**;

C.     Third, determine the product of (x) ~~two (2), and (y)~~ the Funded Percentage, and (~~z~~y) the amount of all pension benefits actually paid by the PayGo System during the Applicable Fiscal Year, excluding all administrative and other costs that are not pension benefits (the "**PayGo Benefits Amount**"), with such product expressed as an amount in U.S. dollars (the "**Withdrawal Formula Amount**"); provided, however, that in the event (i) of a federally-declared natural disaster, (ii) of a federally – declared pandemic other than the current Covid-19 pandemic in any FY, or (iii) that the Cash Flow Deficit in any given year is generated by a material negative variance between projected Non-Own Source Revenues and actual Non-Own Source Revenues for such FY, the PayGo Benefits Amount shall be multiplied by two (2) for such FY; and

D.     Fourth, determine the lower of (y) the PayGo Benefits Amount and (z) the Withdrawal Formula Amount~~, with~~ (such lower amount defined as ~~the applicable withdrawal amount (~~the "**Applicable Withdrawal Amount**"); provided, however, that in the event that the Funded Percentage as of the end of any Applicable Fiscal Year is ten (10) percent or lower, then the Applicable Withdrawal Amount shall be equal to (i) the lower of (a) the PayGo Benefits Amount and (b) the balance of the Pension Reserve Trust less (ii) the sum of (A) the amount, if any, that the Pension Benefits Council reasonably determines is necessary and appropriate to satisfy its actual and projected costs and expenses, plus (B) the amount, if any, that the Pension Reserve Board reasonably determines is necessary and appropriate to satisfy its actual and projected costs and expenses.

The amount that shall be withdrawn from the Pension Reserve Trust shall be the lesser of (y) the Applicable Withdrawal Amount and (z) the Cash Flow Deficit for the Applicable Fiscal Year (the "**Pension Reserve Trust Withdrawal Amount**").

**5.5     Fully Funded Pension Reserve Trust Withdrawals:** ~~The~~Subject to the Withdrawal Policy, the Pension Benefits Council shall approve a Fully Funded Withdrawal Request in the event that the Pension Benefits Council determines that the Funded Percentage as of the end of the Fully Funded Fiscal Year is one hundred (100) percent or higher after accounting for any Applicable Withdrawal Amount for such Fully Funded Fiscal Year. In the event that the Pension Benefits Council determines this criterion is satisfied, the amount of the Fully Funded Pension Reserve Trust Withdrawal shall be equal to the amount of the aggregate pension benefits to be paid by the PayGo System during the following fiscal year. For the avoidance of doubt, the conditions and provisions of Sections 5.3 and Section 5.4 above shall not be applicable with

respect to any Fully Funded Withdrawal Request or Fully Funded Pension Reserve Trust Withdrawal.

**5.6    Timing of Pension Reserve Trust Withdrawals**: Withdrawals from the Pension Reserve Trust, as allowed for an Applicable Fiscal Year pursuant to Sections 5.3, 5.4, and 5.5 above, shall occur within six (6) months after the end of such Applicable Fiscal Year, provided that all requisite information pursuant to Section 5.3 has been provided to the Pension Benefits Council; provided, however, that if at the beginning of an Applicable Fiscal Year the sum of (a) the Unrestricted Cash Balance of Puerto Rico at the beginning of such Applicable Fiscal Year and (b) the projected Net Cash Flow for such Applicable Fiscal Year in the Treasury Single Account Cash Flow Report is less than $500 million, the Commonwealth may request to withdraw funds from the Pension Reserve Trust during the Applicable Fiscal Year (the "**Advance Withdrawal Request**"); provided that the condition pursuant to Section 5.3(C) has been satisfied

A.    Advance Withdrawal Amount: The allowed withdrawal amount for an Advance Withdrawal Request shall be the product of (a) 50% and (b) the calculation of the Pension Reserve Trust Withdrawal Amount pursuant to Section 5.4 but replacing (x) the actual Cash Flow Deficit for such Applicable Fiscal Year with the projected Cash Flow Deficit for such Applicable Fiscal Year, (y) the Benefits Present Value at the end of the Applicable Fiscal Year with the Benefits Present Value at the beginning of the Applicable Fiscal Year, and (z) the Pension Reserve Trust balance at the end of such Applicable Fiscal Year with the Pension Reserve Trust balance at the beginning of such Applicable Fiscal Year (the "**Advance Withdrawal Amount**").

B.    True-up of Advance Withdrawal Request: At the end of the Applicable Fiscal Year in which an Advance Withdrawal Request is made, the absolute difference between the Advance Withdrawal Amount and the Pension Reserve Trust Withdrawal Amount pursuant to Section 5.4 shall be calculated (the "**Advance True-up Amount**"). If the Pension Reserve Trust Withdrawal Amount for the Applicable Fiscal Year exceeds the Advance Withdrawal Amount already made during the Applicable Fiscal Year, additional withdrawal in the amount of the Advance True-up Amount shall be permitted. However, if the Advance Withdrawal Amount made during the Applicable Fiscal Year exceeds the Pension Reserve Trust Withdrawal Amount for the Applicable Fiscal Year, the Commonwealth shall deposit the Advance True-up Amount back into the Pension Reserve Trust within six (6) months of the end of the Applicable Fiscal Year. For the avoidance of doubt, if the conditions pursuant to Section 5.3 are not met at the end of the Applicable Fiscal Year, the Commonwealth shall deposit the Advance Withdrawal Amount in its entirety back into the Pension Reserve Trust within six (6) months of the end of the Applicable Fiscal Year.

**5.7    Power to Sue and Jurisdiction of U.S. District Court:** In addition to any rights under applicable law, the Commonwealth shall have legal capacity and the right to bring any cause of action to resolve any dispute relating to a Withdrawal Request, a Fully Funded Withdrawal Request, or Advance Withdrawal Request.    The U.S. District Court for the District of Puerto

Rico shall have original and exclusive jurisdiction over any said causes of action, as well as any other causes of action against the Pension Benefits Council.

**5.8    Taxes:** The funds held in the Pension Reserve Trust shall be exempt from the payment of any taxes to Puerto Rico and its municipalities and instrumentalities to the maximum extent permitted by applicable law (including PROMESA)**.**

## VI.    PENSION RESERVE BOARD MEMBERS

**6.1    Composition of the Pension Reserve Board:**

A.    <u>Membership</u>:  The Pension Reserve Board shall consist of five (5) trustees, to be appointed within ~~six~~three (~~6~~3) months after the occurrence of the Effective Date. The Pension Benefits Council shall, by a two-thirds vote of the Pension Benefits Council's members, appoint two (2) members, the Governor of Puerto Rico shall appoint two (2) members, and the Oversight Board shall appoint one (1) member; <u>provided</u>, <u>however</u>, that in the event any of such persons are not timely appointed or designated, such delay shall not delay or impair the operation of the Pension Reserve Board, which shall commence its activities on the first business day of the first calendar month following expiration of the six-month period following the Effective Date (the "**Commencement Date**").  As each trustee is appointed, the appointing entity shall certify to the Oversight Board, the Governor's office, and the Pension Benefits Council such appointment and the trustee's specific qualifications that satisfy the criteria in Section 6.1(B) below.  If the Oversight Board no longer exists, the fifth member shall be appointed by the Pension Benefits Council.  A person may not serve more than two (2) terms as a member of the Pension Reserve Board, regardless of whether such person has served consecutive terms.

B.    <u>Eligibility and Qualifications</u>: No trustee shall be appointed to the Pension Reserve Board who ~~is~~has a known ~~to have a~~or reasonably perceived conflict of interest.  Except for the Governor's appointee, trustees of the Pension Reserve Board cannot concurrently be active employees of Puerto Rico or any of its agencies, instrumentalities, or public corporations, and for the avoidance of doubt, no trustee (including the Governor's appointee) can concurrently be a member of the Act 106 Board.  <u>In addition, no trustee can be a former member of the boards of ERS, TRS, or JRS.</u> Each trustee of the Pension Reserve Board shall have <u>proven leadership skills and have </u>expert knowledge or extensive experience with respect to either (with at least one Board trustee satisfying each of the two categories of qualifications below):

i.    Economics, finance, or institutional investments, as evidenced by one or more of the following:

(a)    An earned masters or Ph.D. in economics or finance from a doctorate-granting U.S.-accredited institution;

(b)  The Chartered Financial Analyst credential of the CFA Institute; or

(c)  A minimum of fifteen (15) years of professional experience as a certified public accountant with audit expertise of financial management, pension, or insurance clients;

*or*

ii.  ~~Administration of public retirement plans, benefits administration, or actuarial science~~<u>Asset management expertise</u>, as evidenced by one or ~~more~~<u>both</u> of the following:

(a)  At least fifteen (15) years of ~~professional actuarial~~<u>asset management industry</u> experience ~~involving public pensions~~; <u>and</u>

(b)  ~~At least fifteen (15) years of experience as a Certified Financial Planner™ credentialed by the Certified Financial Planner Board of Standards; or~~<u>Technical competencies including investment strategy, investment management across different asset classes, investment risk management, third party management of external asset managers and custodians, corporate governance, financial management, strategic leadership, communication and stakeholder management and networking.</u>

(c)  ~~At least fifteen (15) years of professional experience in the financial management of public pensions.~~

C.  <u>Term</u>:  Trustees of the Pension Reserve Board shall serve for a term of six (6) years, beginning on January 1 of the relevant year; <u>provided</u>, <u>however</u>, that if the term of the initial Pension Reserve Board begins on a date other than January 1, the term of service for the members of that initial Pension Reserve Board shall consist of that partial first year plus five (5) additional calendar years.  If a trustee of the Pension Reserve Board does not complete his or her term for any reason, the entity or person that appointed such person pursuant to Section 6.1(A) above or 6.1(D) below shall appoint a replacement trustee who is eligible to serve in such position.  In each case, the replacement trustee shall serve for the remainder of the six-year term.

## VII.   PENSION RESERVE BOARD GOVERNANCE

**7.1   Bylaws:**  As soon as practicable after formation of the Pension Reserve Board, the Pension Reserve Board shall <u>by a vote of at least four of its members</u> adopt a set of bylaws to govern the Pension Reserve Board's conduct<u>, which shall be consistent with the Plan and these Guidelines</u>.  It shall include appropriate provisions regarding fiduciary duties, obligations of the Pension Reserve Board, meetings of the Pension Reserve Board, removal and replacement of

Pension Reserve Board members, and voting on matters by Pension Reserve Board members.  In particular, without otherwise limiting the Pension Reserve Board's ability to develop appropriate bylaws, the Pension Reserve Board's bylaws shall provide that each Pension Reserve Board member shall have one vote, subject to any disqualifying conflict of interest, with respect to any matter being voted upon.   The Pension Reserve Board may, from time to time, amend its bylaws by vote of at least four of its members to ensure that the Pension Reserve Board satisfies its purposes and functions pursuant to these Guidelines.  In addition, the Pension Reserve Board may, from time to time, recommend that the Pension Reserve Board amend the Pension Reserve Trust's governing documents to ensure that the Pension Reserve Trust satisfies its purpose and function pursuant to the Plan, and the Pension Reserve Trust's governing documents may not be amended without the consent of the Pension Reserve Board, which consent shall not be unreasonably withheld, and such amendment shall further require the approval of the U.S. District Court for the District of Puerto Rico as required by Section 5.2(D). The Pension Reserve Deed of Trust shall require that the Pension Reserve Board shall be subject to provisions consistent with Puerto Rico laws governing ethics, anti-corruption, conflicts of interest, procurement, contracting, use of public funds, and public disclosure applicable to instrumentalities of the Commonwealth, and such provisions shall be, and shall be deemed to be, incorporated into the Pension Reserve Board's bylaws.

**7.2    Code of Conduct and Ethics Policy:** In addition to the Pension Reserve Board's bylaws, the Pension Reserve Deed of Trust shall include a Code of Conduct and Ethics Policy setting forth the Pension Reserve Board's obligation to act ethically in connection with the use of public funds and in the interest of the Retirees and affirming the Pension Reserve Board's commitment to do so, and such provisions shall be, and shall be deemed to be, incorporated into the Pension Reserve Board's bylaws.  The Code of Conduct and Ethics Policy shall include provisions regarding confidentiality, conflicts of interests and self-dealing, as well as a gift policy and an enforcement policy.  Specifically, and without limitation, such policy must expressly forbid any Board member or professional employed by it from accepting any payment or other thing of value from any party seeking or having responsibility to invest trust funds or provide services for compensation to the Board.  The Code of Conduct and Ethics Policy for the Board must also expressly forbid the placement of Pension Reserve Trust assets for investment with any advisor, or the use of a placement agent or similar service provider, who at the individual or entity level, has contributed to a political candidate for any elected office of the Commonwealth government during the preceding five (5) years or contributed towards a Commonwealth plebiscite during the previous five (5) years.  Such contributions must be prohibited while providing such services to the Board.

**7.3    Compensation:**  Pension Reserve Board members shall be paid an annual compensation in an amount to be set forth in the Pension Reserve Deed of Trust the amount not to exceed $50,000.00 (subject to adjustment for inflation), paid in four equal installments at the end of each calendar quarter.; provided, however, that if, in the judgment of the Oversight Board or the Pension Benefits Council, it is determined that this amount is inadequate to attract appropriate and desirable trustees to serve on the Board with the requisite level of skills and qualifications identified in Section 6.1B above, the Oversight Board or Pension Benefits Council, as the case may be, may seek to amend this annual compensation amount upon application to the U.S. District Court for the District of Puerto Rico, in accordance with Section 8.4 below.  Compensation for the period from the Commencement Date to the end of the first calendar

quarter thereafter shall be prorated and paid on the first business day following said calendar quarter.  Pension Reserve Board members shall also be reimbursed for their reasonable expenses incurred in attending meetings and otherwise carrying out their responsibilities as Pension Reserve Board members.  The Pension Reserve Board's compensation and travel policy shall be incorporated into the Pension Reserve Board's bylaws.   Notwithstanding the foregoing, any Pension Reserve Board member employed by the Government of Puerto Rico or any public corporation or instrumentality shall not receive compensation for his or her service on the Pension Reserve Board while so employed, but may receive reimbursement of expenses as provided in this Section 7.3.

**7.4** **Budget:**  For informational purposes, by June 1 of each year, the Pension Reserve Board shall make public on its website and provide a copy to the Director of the Office of Management & Budget of Puerto Rico, a budget of anticipated expenses to be incurred in the forthcoming fiscal year for ordinary and recurring activities of the Pension Reserve Board and for other non-recurring activities reasonably foreseeable to occur in the forthcoming fiscal year. The annual actual aggregate administrative expenses for the Pension Reserve Board in any given fiscal year shall not be higher than $1,500,000.001,400,000.00 (adjusted for actual inflation rate); provided that non-ordinary course expenses including, but not limited to, litigation-related fees and expenses, if any, as well as investment-related expenses are excluded from the calculation of administrative expenses.   The Oversight Board, as long as it is in existence, shall review the annual expenditures of the Pension Reserve Board and adjust its budget for ordinary course expenses at its reasonable discretion from time to time based on actual spending requirements; provided, however, that if there is a dispute between the Oversight Board and the Pension Reserve Board regarding the budget, the parties will use good-faith best efforts to resolve it consensually; provided further, however, that if such dispute is not resolved consensually within thirty (30) days of the dispute being identified, either party may seek resolution of the matter in the U.S. District Court for the District of Puerto Rico.   The payment of these administrative expenses shall be made from the account for administrative and operating expenses of the Pension Reserve Board within the Pension Reserve Trust.

**7.5** **Reports to Pension Benefits Council:**  On a quarterly basis, the Pension Reserve Board will participate in a meeting with the Pension Benefits Council and the Act 106 Board to report on (w) the composition of the Pension Reserve Trust assets and investments, and the performance of said investments, (x) all investment management fees, commissions and similar compensation to investment managers and (y) other matters regarding the performance of the Pension Reserve Board pursuant to these Guidelines. Such quarterly reports shall be posted to a website to be maintained by the Pension Reserve Council and its social media platforms.

**7.6** **Annual Report**:  Following the end of each fiscal year, the Pension Reserve Board, with the assistance of its retained professionals as described in Section 8.1 and Section 8.3 below, shall promptly prepare and issue a public report, as of the end of the fiscal year, regarding (w) the composition of the Pension Reserve Trust assets and investments and the performance of said investments by asset class and by each investment manager during the calendar year just ended, (x) a list of current investment managers and assets under management within the Pension Reserve Trust, (y) an itemized report of all expenditures made to professionals and investment managers and an itemized report of any payments made to Board members, including payments made on behalf of Board members to travel to and attend any meeting, and (z) such other

information that the Pension Reserve Board determines is relevant to Participants, including a comparison of the Pension Reserve Board's expenses that were actually incurred during such fiscal year to the Pension Reserve Board's budgeted expenses.  Each such annual report shall be posted on the Pension Reserve Council's website and its social media platforms.

## VIII.   POWERS OF THE PENSION RESERVE BOARD

**8.1    Management of Pension Reserve Trust:**    The Pension Reserve Board shall be responsible for the management of the Pension Reserve Trust, including, but not limited to, employing staff as needed for the Pension Reserve Trust, selecting a custodian to hold the assets of the Pension Reserve Trust, directing (in consultation with the investment advisor(s) selected pursuant to this Section 8.1) the investment of the assets of the Pension Reserve Trust, and managing the administration of the Pension Reserve Trust.  The Pension Reserve Board shall also share responsibilities with respect to withdrawal requests pursuant to Section V of these Guidelines in accordance with the Withdrawal Policy.  The Pension Reserve Board will also have the authority to take any and all steps it determines are necessary or desirable in its discretion to maximize the tax efficiency of the assets and investments of the Pension Reserve Trust.

> A.    Selection of Investment Advisor(s): The Pension Reserve Board shall retain one or more qualified investment advisors through a competitive and public process. The Pension Reserve Board shall set minimum qualification requirements, including the following requirements: (i) the investment advisor must be registered as an investment advisor under the Investment Advisers Act of 1940, (ii) the investment advisor and each of its key professionals must not have material conflicts of interest with the Pension Reserve Board, (iii) the investment advisor must agree to serve as a fiduciary, and (iv) the investment advisor must have a verifiable and successful operating history with at least three (3) pension fund clients each of which has a minimum of $5 billion in assets under management.  As soon as reasonably practicable following the Effective Date of the Plan, the Pension Reserve Board shall conduct a public RFP process in order to search for such investment advisor(s).  The goal of the RFP shall be to solicit and evaluate proposals in a fair and objective manner, and the RFP process shall be documented and public.  The Pension Reserve Board may retain a qualified consultant to manage the RFP process.  As it determines to be necessary or prudent, the Pension Reserve Board may renew the RFP process from time to time to select one or more additional or replacement investment advisor(s).  Provided, however that: (i) while the Oversight Board is in existence with respect to the Commonwealth, any engagement agreements with any such investment advisor(s) or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Benefits Board shall be made public and shall be registered with the Comptroller Office pursuant to applicable Puerto Rico laws.

> B.    Roles & Responsibilities: The investment advisor(s) shall have the following roles and responsibilities, and the terms of such relationship shall be set forth in a written agreement in which the advisor shall acknowledge its fiduciary status:

i.      Advising the Pension Reserve Board on issues concerning the selection of investments for the Pension Reserve Trust;

ii.     Assisting in the development and maintenance, and periodic review and modification as appropriate, of an investment policy statement designed to set forth the goals, objectives and risk tolerances of the Pension Reserve Trust's investment program (the "**Investment Policy Statement**"), as described below;

iii.    Advising in the development of the Pension Reserve Trust's asset allocation strategy;

iv.     Providing investment advice to the Pension Reserve Board with respect to the Pension Reserve Trust;

v.      Assisting in the analysis, selection, monitoring and replacement of investments and investment managers;

vi.     Assisting the Pension Reserve Board with the review of the performance and risk of the selected investments, on at least a semi-annual basis, in comparison to their stated objectives and their related performance and pricing as compared to their peers and benchmarks;

vii.    Bringing information to the Pension Reserve Board, on an ad hoc basis as appropriate, that the investment advisor feels may be relevant to the Pension Reserve Board's assessment of a given investment, asset class or strategy.

The Pension Reserve Board, working with the investment advisor(s), shall select investment manager(s) to manage the investments of the Pension Reserve Trust. The Pension Reserve Board shall conduct a public RFP process in order to search for such investment manager(s).  The goal of the RFP shall be to solicit and evaluate proposals in a fair and objective manner, and the RFP process shall be documented and public.  The Pension Reserve Board may retain a qualified consultant to manage the RFP process.  As it determines to be necessary or prudent, the Pension Reserve Board may renew the RFP process from time to time to select one or more additional or replacement investment manager(s)~~ Provided~~; ~~provided~~, however that: (i) while the Oversight Board is in existence with respect to the Commonwealth, any engagement agreements with any such investment manager(s) or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Benefits Board shall be made public and shall be registered with the Comptroller Office pursuant to applicable Puerto Rico laws. Subject to the provisions of these Guidelines, the roles and responsibilities of the Pension Reserve Board and any third party shall be set forth in a written agreement and, as appropriate, the Investment Policy Statement.

C.      Development of Investment Policy Statement: The Pension Reserve Board, together with expert assistance from its investment advisor(s), shall develop the Investment Policy Statement.  The Investment Policy Statement shall be designed to provide meaningful direction for the Pension Reserve Board, the investment advisor(s), and investment managers in the management of the Pension Reserve Trust.  The Investment Policy Statement shall:

i.      Provide a mechanism to establish and review the Pension Reserve Trust's investment objectives and risk tolerances;

ii.     Establish the roles, responsibilities and reporting requirements of the Pension Reserve Board, investment advisor(s), investment managers, custodian bank, and any other Pension Reserve Trust service providers;

iii.    Establish a public RFP process in order to search for investment advisor(s), investment managers, custodian bank, and any other Pension Reserve Trust service providers with the goal of soliciting and evaluating proposals in a fair and objective manner in a documented and public process;

iv.     Identify appropriate investment asset classes, asset allocation targets and ranges that are designed to facilitate achievement of the Pension Reserve Trust's objectives;

v.      Identify asset class and investment manager guidelines, evaluation, selection and monitoring criteria and performance benchmarks;

vi.     Document a prudent monitoring and measurement process that includes criteria for replacing and retaining investment managers;

vii.    Identify investment constraints and limitations, including any prohibited types of investments and minimum ratings for assets.

viii.   Require any private equity manager with whom the Pension Reserve Board invests to comply with the reporting guidelines developed by the Institutional Limited Partners Association (ILPA) as such guidelines are amended from time to time by the ILPA and require any private equity manager to offer financial terms for any investment placed by the Pension Reserve Board that are no less favorable than the terms offered by that private equity manager to other investors in the same fund or investment.

D.      Investment Objective: The Pension Reserve Board, investment advisor(s), and investment managers shall perform their duties for the exclusive benefit of and in the best economic interest of the Retirees.  The objective of the Pension Reserve Trust's investment program is to generate returns within an appropriately risk-constrained framework, net of reasonable investment fees and expenses, in order to serve the intended purposes of the Pension Reserve Trust under the Plan of Adjustment.  This will be accomplished through a carefully planned and

executed long-term investment program that allocates and manages the assets of the Pension Reserve Trust.

E.  <u>Prudent Management of the Pension Reserve Trust</u>: This Section 8.1 is meant to serve as a general framework for the prudent management of the Pension Reserve Trust.  Changing conditions, economic trends or other factors may necessitate modification of this framework.  The Investment Policy Statement at all times shall reflect the current objectives and guidelines for the Pension Reserve Board's management of the Pension Reserve Trust, and the Investment Policy Statement may be modified by written approval of the Pension Reserve Board.  The Pension Reserve Board shall promptly provide a copy of such modified Investment Policy Statement to the Pension Benefits Council and the Act 106 Board, and shall post that documentation at the Pension Reserve Board website.

**8.2    Requests for Documents and Information:**  In order to prudently invest the assets held in the Pension Reserve Trust in view of the intended purposes of the Pension Reserve Trust under the Plan of Adjustment, the Pension Reserve Board shall have the right to request and receive, on an annual basis, such actuarial and pension benefit information regarding Eligible Retirees and Eligible Active Employees, or information related to projections of future Commonwealth surpluses, as it reasonably determines is necessary.

**8.3    Employment of Professionals:** In addition to the investment professionals retained pursuant to Section 8.1 above, the Pension Reserve Board shall engage in a public RFP process in order to retain necessary and desirable service providers whose contract amount is greater than $~~250,000.00.~~250,000.00 (provided that retention of any outside counsel shall require an RFP process regardless of the projected contract amount).  The Pension Reserve Board shall have the authority to enter into contracts and incur fees and expenses in connection with hiring such ~~professionals~~service providers.  All such fees and expenses shall be paid from the Pension Reserve Trust.  Provided, however that: (i) while the Oversight Board is in existence with respect to the Commonwealth, any engagement agreements with any such ~~professionals~~service providers or any consultant engaged to assist with the RFP process shall be subject to review and approval by the Oversight Board pursuant to its Contract Review Policy as in effect from time to time; and (ii) all contracts executed by the Pension Reserve Board shall be made public and shall be registered with the Comptroller Office pursuant to applicable Puerto Rico laws.

**8.4    Power to Sue and Jurisdiction of U.S. District Court:**  The Pension Reserve Board has legal capacity and the power to bring any cause of action in the name of the Pension Reserve Trust against the Commonwealth and/or the Act 106 Board, or any other appropriate party, regarding any matters in connection with the performance of the Pension Reserve Board's duties pursuant to these Guidelines. The Pension Reserve Board has legal capacity and power to bring any cause of action in the name of the Pension Reserve Trust to resolve a dispute pursuant to Section 1.6 above.  The U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction over any such causes of action of the Pension Reserve Trust, as well as any causes of action against the Pension Reserve Board or Pension Reserve Trust.  The U.S. District Court for the District of Puerto Rico shall also have original and exclusive jurisdiction to approve

or reject any proposed modifications of these Guidelines, and these Guidelines may only be modified pursuant to a final, non-appealable order of that Court. In addition to any rights under applicable law, the Commonwealth, as grantor, shall have legal capacity and the right to bring any cause of action to resolve any dispute relating to the performance of the Pension Reserve Board, including and not limited to the administration and investment of the funds held in the Pension Reserve Trust.   The U.S. District Court for the District of Puerto Rico shall have original and exclusive jurisdiction over any said causes of action, as well as any causes of action against the Pension Reserve Board.

**8.5     Independence:** For the avoidance of doubt, neither the Pension Reserve Board nor the Pension Reserve Trust shall be an instrumentality of the Commonwealth, nor are they responsible for the obligations of the Commonwealth under the Plan. The Pension Reserve Board from time to time may adopt such rules and regulations as may be necessary or desirable for its proper and efficient administration.  All reasonable and proper expenses incurred in the administration of the Pension Reserve Board's responsibilities will be paid out of the Pension Reserve Trust.

**8.6     Interim Trustee**:  Upon the execution of the Pension Reserve Deed of Trust, the Oversight Board shall appoint an organization or individual to serve as interim trustee (the "**Interim Trustee**") for the purpose of performing initial tasks to establish and commence administration of the Pension Reserve Trust, for a term commencing upon its appointment and concluding upon the earlier to occur of October 1, 2022 or the day the Pension Reserve Board concludes its inaugural board meeting.

   A.    The Interim Trustee shall follow good practice ethic, independence, procurement, documentation and transparency expectations of a leading public pension investor and general guidelines of a pension fund fiduciary and trustee under Federal and Commonwealth of Puerto Rico law.  The Interim Trustee shall make any reasonable operational decisions to prepare and support the timely setup of the Pension Reserve Trust and the operational and organizational aspect of the Pension Reserve Board, including, but not limited to:

      i.    Select a banking partner for no more than a 1 year contractual term and set up necessary bank accounts and payment authorization, including the bank accounts required by the Confirmation Order and Section 1.7(B) hereof;

      ii.   Engage in a Request for Proposal (RFP) process to select an investment consultant to establish a proposed investment strategy that will only come into effect subject to a formal Pension Reserve Board review and approval;

      iii.  Engage in an Expression of Interest (EOI) and RFP process to recommend a custodian and third party asset servicer, asset managers and other

essential partners. Any formal retention decisions will be subject to formal ratification by the Pension Reserve Board;

iv.    Conduct reasonable steps to identify and recommend to the Pension Reserve Board suitable Executive Director candidates;

v.    Accept payments under Section 1.7(B) hereof and reimburse reasonably incurred expenses by the Pension Benefits Council and the Pension Reserve Board from their respective agreed setup budgets. The Interim Trustee shall keep complete records of any such payment and undertake reasonable steps to ascertain the reasonableness of such expenses. The Interim Trustee is required to cease any bank authorization it has with the end of its term and hand over any records and documents as part of its role to the Pension Reserve Board and the Pension Benefits Council, as applicable. The Interim Trustee is required to keep strict confidentiality of all relevant affairs; and

vi.    Engage, conduct, and instigate any other reasonable measures or initiatives that a prudent board of trustees would undertake to enable governance, operational and organizational readiness of the Pension Reserve Trust, the Pension Benefits Council, and the Pension Reserve Board by October 1, 2022, subject to review and ratification by the Pension Reserve Board or Pension Benefits Council in accordance with their respective roles as set forth in these Guidelines.

B.    The Interim Trustee shall pay its reasonable expenses and be compensated from the initial funds deposited into the account of the Pension Reserve Board in accordance with Section 1.7(B) of these Guidelines. The Interim Trustee shall only be held accountable for any conduct that intentionally or grossly violates its role as trustee and the tasks outline in this document or any law of the United States or the Commonwealth of Puerto Rico.

## IX.    INDEMNIFICATION & INSURANCE

**9.1    Indemnification:**  Except for acts determined by a final order of the U.S. District Court for the District of Puerto Rico or an appellate court to constitute willful misconduct or fraud, and to the extent not covered by insurance as set forth in Section 9.2, the members of the Pension Benefits Council and the Pension Reserve Board, and the Interim Trustee, shall be indemnified by the Pension Reserve Trust against all expenses (including costs and attorneys' fees) actually and necessarily incurred or payable by the member in connection with the defense of any action, suit or proceeding to which the member may be made a party by reason of the member being or having been so designated as a member of the Pension Benefits Council or the Pension Reserve Board, or serving as Interim Trustee, respectively, or by reason of any action or omission or alleged action or omission by the member in such capacity; provided however, that the members of the Pension Benefits Council and the Pension Reserve Board and the Interim Trustee shall not

be indemnified by the Pension Reserve Trust if such action is in violation of the Code of Ethics and Ethics Policy or constitutes fraud, reckless disregard or willful misconduct.

**9.2**     **Insurance:** The Pension Benefits Council and, the Pension Reserve Board, and the Interim Trustee shall each maintain appropriate amounts of fiduciary liability insurance (as to the Pension Reserve Board) or other professional liability/error and omissions insurance, crime and computer crime insurance covering any loss due to dishonest acts, and any other insurance that the Pension Benefits Council and, Pension Reserve Board, and Interim Trustee each reasonably determines is necessary.  Such insurance shall be provided by a nationally-recognized insurance carrier.   Such  insurance  policies  shall  provide  for  both  (i)  non-indemnifiable  coverage (commonly referred to as "Side A" coverage) pursuant to which the insurer will pay to, or on behalf of, the insured person the applicable amount with respect to any covered loss, except to the extent the Pension Reserve Trust has paid such amount to, or on behalf of, the insured person as indemnification or as an advance, and (ii) indemnification coverage (commonly referred to as "Side B" coverage) pursuant to which the insurer will pay to, or on behalf of, the Pension Reserve Trust the applicable amount with respect to any covered loss arising from claims first made against an insured person, to the extent that the Pension Reserve Trust has paid such amount  to,  or  on  behalf  of,  the  insured  person  as  indemnification  or  advancement.    All reasonable insurance costs shall be paid from the Pension Reserve Trust.

**End of Document**

# **EXHIBIT J**

CVI Calculation Agent Agreement

Draft: 2/03/2022

CALCULATION  AGENT  AGREEMENT

DATED AS OF MARCH 15, 2022

AMONG

COMMONWEALTH OF PUERTO RICO,

THE BANK OF NEW YORK MELLON, AS TRUSTEE

AND

ALIXPARTNERS, LLP, AS CALCULATION  AGENT

**TABLE OF CONTENTS**

**Page**

PART 1 - Definitions and Common Provisions.................................................................................1

    Section 101.    Definitions ...........................................................................1
    Section 102.    Appointment of the Calculation Agent ........................................6
    Section 103.    Rules of Construction .................................................................7

PART 2 - CVIs.............................................................................................................................7

    Section 201.    Duties of Calculation Agent With Respect to CVIs.....................7
    Section 202.    Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition and Supporting Information................................8
    Section 203.    Calculation of Subject to Waterfall Outperformance Amount and Annual Waterfall Payment, Not Subject to Waterfall Outperformance Amount and Rum Tax CVI Annual Payment Amount...........................................................................11
    Section 204.    Challenges to Determinations and Calculations of Amounts .........................12

PART 3 - PENSION RESERVE TRUST CONTRIBUTIONS ............... **Error! Bookmark not defined.**

    Section 301.    Duties of Calculation Agent............................**Error! Bookmark not defined.**

PART 4 - AMPR AND AFSCME FISCAL PLAN SURPLUS SHARING AGREEMENTS........... **Error! Bookmark not defined.**

    Section 401.    Duties of Calculation Agent............................**Error! Bookmark not defined.**

PART 5 - EVENTS OF DEFAULT AND REMEDIES ......................................................................13

    Section 501.    Events of Default .......................................................................13
    Section 502.    Enforcement of Remedies .........................................................13
    Section 503.    Remedies Not Exclusive ............................................................14

PART 6 - MISCELLANEOUS ......................................................................................................14

    Section 601.    Limits of Trustee's and Calculation Agent's Responsibility .............................14
    Section 602.    Indemnification ........................................................................16
    Section 603.    Term of Agreement; Termination ..............................................16
    Section 604.    Fees and Expenses ....................................................................16
    Section 605.    Notices......................................................................................17
    Section 606.    Entire Agreement; Trustee shall be entitled to enforce Agreement .................18
    Section 607.    Amendment ..............................................................................18
    Section 608.    Assignment; Successors and Assigns .........................................18
    Section 609.    Execution, Delivery and Performance by Calculation Agent .........................19
    Section 610.    Governing Law.........................................................................19
    Section 611.    Severability of Invalid Provision ...............................................19
    Section 612.    Parties of Interest......................................................................19
    Section 613.    Headings ..................................................................................20
    Section 614.    Signatures and Counterparts .....................................................20

i

<u>CALCULATION  AGENT  AGREEMENT</u>

This CALCULATION  AGENT  AGREEMENT (this "Calculation Agent Agreement" or this "Agreement") made this 15th day of March, 2022, by and among the Commonwealth of Puerto Rico (together with any successors thereto, the "Commonwealth"), The Bank of New York Mellon, as Trustee (the "Trustee") under the Trust Agreement as herein defined, and AlixPartners, LLP, as calculation agent hereunder and under the Trust Agreement (the "Calculation Agent").

<u>W I T N E S S E T H</u>:

WHEREAS,  the Commonwealth and the Trustee have entered into a Trust Agreement, dated as of March 15, 2022 (the "Trust Agreement"), pursuant to which the Commonwealth has provided for the issuance of two Series of Notes – the GO CVIs and the Clawback CVIs (each as defined herein);

WHEREAS,  the GO CVIs are being issued under the Trust Agreement in eight Subseries relating to certain Allowed  Claims (as defined in the Trust Agreement), as listed in Attachment 3 to the Trust Agreement; and

WHEREAS,  the Clawback CVIs are being issued under the Trust Agreement in four Subseries relating to certain Allowed Claims, as listed in Attachment 4 to the Trust Agreement; and

WHEREAS,  within the Subseries of the Clawback CVIs related to the Allowed CW/HTA Claims, there are being issued four Sub-Subseries to reflect a priority of payments, as listed in Attachment 4 to the Trust Agreement; and

WHEREAS,  on or prior to each CVIs Outperformance Condition Determination Date (as defined herein), the Calculation Agent shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition (each as defined herein) shall have occurred in the prior Fiscal Year; and

WHEREAS,  following a determination that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, the Commonwealth is obligated, depending upon whether either or both of an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition have occurred, to provide for the calculation of certain amounts under the Trust Agreement that are to be paid to the Holders of the GO CVIs and/or the Clawback CVIs;

WHEREAS,  the Commonwealth desires to retain the Calculation Agent to make the determinations and calculations referred to above, and the Calculation Agent is willing to perform such services, subject to and in accordance with the provisions hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter set forth, the parties hereto agree as follows:

**PART 1 - DEFINITIONS  AND  COMMON  PROVISIONS**

Section 101.     **<u>Definitions</u>**

Capitalized  terms used herein, unless otherwise defined herein, shall have the meanings ascribed thereto in the Trust Agreement.

1

"5.5% SUT" means the present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%). In the event a Substitute Measured Tax is substituted for the 5.5% SUT as provided in Section 7.09 of the Trust Agreement, all references herein to 5.5% SUT shall instead refer to the Substitute Measured Tax.

"5.5% SUT Baseline" reflects the baseline projections of the 5.5% SUT set forth in Attachment 1 to the Trust Agreement. Upon the occurrence of a Baseline SUT Reduction, an SUT True-Up or the substitution of a Substitute Measured Tax for the 5.5% SUT, the Commonwealth shall cause the Calculation Agent to prepare a revised Attachment 1 and the Commonwealth will then substitute a revised Attachment 1 to the Trust Agreement for the then applicable Attachment 1 as provided herein and in the Trust Agreement and all references herein to the 5.5% SUT Baseline shall thereafter refer to the amounts set forth in the revised Attachment 1 to the Trust Agreement.

"AAFAF" means the Puerto Rico Fiscal Agency and Financial Advisory Authority and any successors thereto.

"Annual Waterfall Payment" has the meaning ascribed thereto in the Trust Agreement.

"Authorized Officer of the Commonwealth" means the Secretary of Treasury and his or her designees.

"Baseline SUT Reduction" has the meaning ascribed thereto in the Trust Agreement.

"Business Day" has the meaning ascribed thereto in the Trust Agreement.

"Calculation Agent" means the Person serving in such capacity under the Calculation Agent Agreement from time to time. The Calculation Agent must be an Independent Consultant for all purposes of this Calculation Agent Agreement and the Trust Agreement.

"Calculation Agent Agreement" means the Calculation Agent Agreement, dated as of March 15, 2022, by and among the Commonwealth, the Calculation Agent and the Trustee, as amended or supplemented from time to time, including any successor agreements thereto serving substantially the same purposes.

"Clawback CVI Annual Not Subject to Waterfall Payment Amount" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.05 of the Trust Agreement.

"Clawback CVI Annual Payment Amount" means, for each Fiscal Year, the sum of the Clawback CVI Annual Not Subject to Waterfall Payment Amount plus the Clawback CVI Annual Subject to Waterfall Payment Amount.

"Clawback CVI Annual Subject to Waterfall Payment Amount" means, for each Fiscal Year, the amount paid to the Holders of the Clawback CVIs in any Fiscal Year in accordance with Section 5.04 of the Trust Agreement.

"Clawback CVI Lifetime Cap" means a total of $5,239,002,764 paid from both Clawback CVI Annual Not Subject to Waterfall Payment Amounts and Clawback CVI Subject to Waterfall Payment Amounts, and, with respect to the PRIFA Rum Tax Clawback CVIs only, additionally from the Rum Tax CVI Annual Payment Amount, of which (a) $3,697,668,995 is allocable for Allowed CW/HTA Claims; (b) $217,228,391 is allocable for Allowed CW/Convention Center Claims; (c) $22,580,090 is allocable for

Allowed CW/MBA Claims (as of the Effective Date, $4,000,000 of which has been settled by the Commonwealth and is treated for all purposes hereunder and under the Trust Agreement as Deemed Paid CVIs Payments), and (d) $1,301,525,288 is allocable for Allowed CW/PRIFA Rum Tax Claims.

"Clawback CVIs" means, collectively, the general obligation securities, other than the GO CVIs, issued as Notes pursuant to the Trust Agreement, for payment of which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and the Trust Agreement. For the avoidance of doubt, unless otherwise provided in the Trust Agreement, the term "Clawback CVI" as used in this Calculation Agent Agreement and the Trust Agreement refers to the security representing the interests of the Holders thereof to payments from (a) the Subject to Waterfall Outperformance Amounts, (b) the Not Subject to Waterfall Payment Amounts, and (c) solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amounts.

"Commonwealth" has the meaning given to such term in the Recitals.

"Commonwealth Rum Tax Revenues" means the total Rum Tax collections received by the Commonwealth as documented within the U.S. Department of the Treasury monthly detailed activity report of net excise tax due to the Commonwealth and certified by the Puerto Rico Department of Treasury or any equivalent documentation of such collections that the U.S. Department of the Treasury and/or Puerto Rico Department of Treasury may choose to adopt.

"CVIs Annual Payment Amount" means, for each Fiscal Year, an amount equal to the sum of the Clawback CVI Annual Payment Amount plus the GO CVI Annual Payment Amount plus, solely in the case of the Holders of the PRIFA Rum Tax Clawback CVIs, the Rum Tax CVI Annual Payment Amount.

"CVIs Annual Payment Amount Calculation Date" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, September 15 of the next Fiscal Year.

"CVIs Annual Payment Date" means, for each Fiscal Year for which an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, November 1 of the next Fiscal Year.

"CVIs Outperformance Condition Determination Date" means, for each Fiscal Year, September 1 of the next Fiscal Year.

"CVIs Payment Fund" means the fund established in accordance with Section 5.08 of the Trust Agreement.

"Deemed Paid CVIs Payments" means amounts that would otherwise have been payable to the Holders of either (a) Claims settled prior to the Effective Date, which consists as of the Effective Date as a $4,000,000 CW/MBA Claim, or (b) notional amounts of Notes redeemed from time to time pursuant to Sections 4.02 and 4.03 of the Trust Agreement.

"Disputed Payment Amount" has the meaning given to such term in Section 204(c) hereof.

"Electronic Means" means facsimile transmission, email transmission, secure electronic transmission containing applicable authorization codes, passwords and/or authentication keys issued by the Trustee or the Calculation Agent, as applicable, or another electronic method or system specified by the

Trustee or the Calculation Agent, as applicable, as available for use in connection with its services hereunder.

"Event of Default" has the meaning given to such term in Section 301 hereof.

"GO CVI Annual Payment Amount" means the amount due and payable to the Holders of the GO CVIs in any Fiscal Year in accordance with Section 5.04 of the Trust Agreement.

"GO CVI Lifetime Cap" means $3,500,000,000.

"GO CVI Maximum Annual Payment" means the maximum annual payment amount applicable to the GO CVIs, calculated as provided in Section 5.04(b)(iv) of the Trust Agreement.

"GO CVIs" means, collectively, the general obligation securities, other than the Clawback CVIs, issued as Notes pursuant to the Trust Agreement, the payment for which the Commonwealth has pledged its good faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution, the CVI Legislation and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan and the Trust Agreement.

"Holder" or any similar term, when used with reference to a Note or Notes, means the registered owner thereof.

"Measured SUT" means the 5.5% SUT collected by the Commonwealth during a Fiscal Year, less such revenues transferred to the Fund for the Development of the Arts, Science and Cinematography Industry of Puerto Rico pursuant to Section No. 4050.06 of the PR Code (or used for any other purpose established by law) up to Three Million Two Hundred Forty Thousand Dollars ($3,240,000.00) per Fiscal Year.

"Note" means any security of the Commonwealth authorized and issued pursuant to Sections 2.01 and 2.02 of the Trust Agreement to evidence the interests of (a) the Holders of the Clawback CVIs to receive their proportionate shares of the Clawback CVI Annual Payment Amounts and, in the case of the Holders of the PRIFA Rum Tax Clawback CVIs only, to also receive the Rum Tax CVI Annual Payment Amounts, and (b) the Holders of the GO CVIs to receive their proportionate shares of the GO CVI Annual Payment Amounts.

"Not Subject to Waterfall Outperformance Amount" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.05(a) of the Trust Agreement.

"Outperformance Amount" means, for each Fiscal Year in which an SUT Outperformance Condition has occurred, the amount by which the Measured SUT exceeds the 5.5% SUT Baseline reflected in Attachment 1 to the Trust Agreement, as such Attachment 1 to the Trust Agreement may be revised from time to time in accordance with the terms hereof and the Trust Agreement.

"Person" means any individual, corporation, limited liability company, partnership, joint venture, association, joint stock company, trust, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

"PRIFA Rum Tax Clawback CVIs" means the Subseries of Clawback CVIs that are the only Subseries of Clawback CVIs that are the beneficiaries of the Rum Tax CVI Annual Payment Amounts.

4

"Quarter in Interest" means as of any particular date of calculation, the Holders of no less than twenty-five percent (25%) of the Outstanding Notes eligible to act on a matter, measured by the Remaining Clawback CVI Lifetime Cap and Remaining GO CVI Lifetime Cap, in the aggregate or respectively, as the context requires, and, in the case of matters affecting only the Holders of the PRIFA Rum Tax Clawback CVIs, such percentage shall be determined by the percentage of the Remaining Clawback CVI Lifetime Cap that is calculated by dividing the Outstanding notional amount of the PRIFA Rum Tax Clawback CVIs by the Outstanding notional amount of the Clawback CVIs. Subject to the foregoing, in the event that two or more groups of Holders satisfy the percentage requirement set forth in the immediately preceding sentence and act (or direct the Trustee to act) in a conflicting manner, only the group of Holders with the greatest percentage of Outstanding Notes (as measured in accordance with the immediately preceding sentence) shall, to the extent of such conflict, be deemed to satisfy such requirement.

"Remaining Clawback CVI Lifetime Cap" means, as the context requires, (a) the initial Clawback CVI Lifetime Cap as it relates to the Clawback CVIs collectively, or as it relates to the Allowed CW/HTA Claims, Allowed CW/Convention Center Claims, Allowed CW/MBA Claims, and Allowed CW/PRIFA Rum Tax Claims, (b) less the aggregate amounts of the Clawback CVIs settled, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Date or each extraordinary redemption date in accordance with Section 4.03 of the Trust Agreement.

"Remaining GO CVI Lifetime Cap" means (a) the initial GO CVI Lifetime Cap, (b) less the aggregate amounts of the GO CVIs settled, redeemed, or subject to redemption, as the context requires, on each CVIs Annual Payment Date or each extraordinary redemption date in accordance with Section 4.02 of the Trust Agreement.

"Rum Tax" means the federal excise taxes on rum and distilled spirits that are collected by the United States government and remitted to the Puerto Rico Treasury Department pursuant to the U.S. Internal Revenue Code of 1986.

"Rum Tax CVI Annual Payment Amount" means, for each Fiscal Year in which a Rum Tax Outperformance Condition has occurred, the amount calculated as provided in Section 5.06 of the Trust Agreement.

"Rum Tax Outperformance Condition" means that Waterfall General Fund Rum Tax Collections exceed the Rum Tax Outperformance Metric in any given Fiscal Year. A Rum Tax Outperformance Condition may occur in any Fiscal Year even if an SUT Outperformance Condition has not occurred in such Fiscal Year.

"Rum Tax Outperformance Metric" reflects the baseline projections of 100% of the Waterfall General Fund Rum Tax Collections within the Commonwealth's 2021 Fiscal Plan projections set forth in Attachment 2 to the Trust Agreement.

"Sales Tax" means the sales and use tax, including any replacement or similar sales and use tax, imposed by the Commonwealth pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

"Series" means either Clawback CVIs or GO CVIs.

"Subject to Waterfall Outperformance Amount" means, for each Fiscal Year calculated, the amount calculated in accordance with Section 5.04(a) of the Trust Agreement.

"Subseries" means the four categories of Claims against the Commonwealth underlying the Clawback CVIs – the CW/Convention Center Claims Subseries, the CW/HTA Claims Subseries, the CW/MBA Claims Subseries and the CW/PRIFA Rum Tax Claims Subseries.

"Substitute Measured Tax" means all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth as provided in Section 202(c) hereof.

"Sub-Subseries" means, as the context requires, the following four Sub-Subseries of Clawback CVIs within the Subseries relating to CW/HTA Claims: (i) HTA 68 Bond Claims; (ii) HTA 98 Senior Bond Claims; (iii) HTA 98 Sub Bond Claims; and (iv) GDB HTA Loans, which relate to the order of priority of payment within such Subseries relating to CW/HTA Claims.

"SUT Outperformance Condition" means that the 5.5% SUT collected exceeds the 5.5% SUT Baseline (as adjusted or revised in Attachment 1 as herein provided) in any given Fiscal Year. An SUT Outperformance Condition may occur in any Fiscal Year even if a Rum Tax Outperformance Condition has not occurred in such Fiscal Year.

"SUT True-Up" has the meaning set forth in Section 7.08(c) and (d) of the Trust Agreement.

"Trust Agreement" has the meaning given to such term in the recitals of this Calculation Agent Agreement.

"Trustee" means the bank or trust company appointed as Trustee for the Notes pursuant to the Trust Agreement and having the duties, responsibilities and rights provided for herein, and its successor or successors and any other bank or trust company which may at any time be substituted in its place pursuant thereto. The Bank of New York Mellon is the initial Trustee under the Trust Agreement.

Section 102.  **Appointment of the Calculation Agent**

(a)     The Commonwealth hereby appoints the Calculation Agent to perform the services of the Calculation Agent hereunder and under the Trust Agreement.

(b)     The Calculation Agent hereby accepts such appointment and agrees for the term of this Agreement to render such services and to assume the duties and obligations of the Calculation Agent as set forth herein and in the Trust Agreement, including, without limitation, the services, duties and obligations required of the Calculation Agent including, but not limited to, Sections 4.02 and 4.03, Sections 5.02, 5.03 through 5.08 and Sections 7.08 and 7.09 of the Trust Agreement, and the services, duties and obligations required of the Independent Consultant pursuant to Sections 4.02, 4.03 and 7.08 of the Trust Agreement, which such Sections of the Trust Agreement are incorporated by reference herein, together with the relevant Attachments to the Trust Agreement that are necessary to the completion of the duties and obligations required by such Sections.

(c)     The Calculation Agent must at all times be a Person that is an Independent Consultant meeting all of the requirements of the Trust Agreement, organized and doing business under the laws of the United States or of any State or Territory thereof (including the Commonwealth), or the District of Columbia and professionally qualified to perform the services required under the Trust Agreement and hereunder.

Section 103.   **Rules of Construction**

(a)   Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders.  Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa.

(b)   The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms, as used in this Calculation Agent Agreement, refer to this Calculation Agent Agreement.  All references to Parts and Sections in this Calculation Agent Agreement refer to the Parts and Sections hereof unless otherwise expressly stated.  All references to articles and sections of other documents or statutes shall use the numbers of the applicable articles or sections in effect as of the date hereof.

(c)   "$" and "dollars" each refer to United States dollars, or such other money of the United States of America that at the time of payment is legal tender for payment of public and private debts.

## PART 2 - CVIS

Section 201.   **Duties of Calculation Agent With Respect to CVIs**

(a)   The Calculation Agent shall perform the duties of the Calculation Agent contemplated by the Trust Agreement and as provided for in this Calculation Agent Agreement, including the following, in each case based upon the information provided by the Commonwealth and such other information as may be requested from the Commonwealth by the Calculation Agent:

(i)   By no later than each CVIs Outperformance Condition Determination Date, commencing after the end of the Fiscal Year ending on June 30, 2022, the Calculation Agent shall determine if an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, as provided in Section 5.03(a) of the Trust Agreement and Section 202 hereof; and

(ii)   By no later than each CVIs Annual Payment Amount Calculation Date, (A) if an SUT Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent shall calculate the Subject to Waterfall Outperformance Amount as provided in Section 5.04 of the Trust Agreement and Section 203 hereof, and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 of the Trust Agreement and Section 203 hereof, and (B) if a Rum Tax Outperformance Condition has occurred with respect to the prior Fiscal Year, the Calculation Agent shall calculate the Rum Tax CVI Annual Payment Amount, if any, as provided in Section 5.06 of the Trust Agreement and Section 203 hereof.  In each case, the Calculation Agent shall calculate the respective amounts by Series, Subseries and Sub-Subseries and per authorized denomination of $1.00 that will be applied to the redemption of the Notes of each Series, Subseries and Sub-Subseries on the CVIs Annual Payment Date with such amounts to be recorded on a schedule in substantially the form of Attachment 7 to the Trust Agreement, together with such other information required to complete such Attachment 7 including, without limitation, the applicable Remaining Clawback CVI Lifetime Cap and the Remaining GO CVI Lifetime Cap, by Series, Subseries and Sub-Subseries, taking into consideration the amounts to be paid with respect to Clawback CVIs and GO CVIs on such CVIs Annual Payment Date.

(b)      The Calculation Agent shall also perform such other services, duties or obligations as are reasonably related to and necessary, convenient or desirable to perform the Calculation Agent's services, duties and obligations contemplated by the Trust Agreement and this Calculation Agent Agreement, or such other services, duties or obligations as reasonably requested by the Commonwealth in connection therewith and not inconsistent with this Calculation Agent Agreement or the Trust Agreement.

(c)      In the event of a conflict in the description of the services, duties or obligations required of the Calculation Agent hereunder and under the Trust Agreement, the provisions of the Trust Agreement shall apply.

Section 202.      **Determination of Occurrence of an SUT Outperformance Condition and Rum Tax Outperformance Condition and Supporting Information**

(a)      Beginning on the 15th day of the second month following the end of the month of the execution and delivery of this Calculation Agreement, the Commonwealth shall provide to the Calculation Agent the following information:

(i)      no later than the 15th day of the second month following the end of each month, (A) a report setting forth the amount of 5.5% SUT collected in such month and the amount of 5.5% SUT collected on a Fiscal Year-to-date basis including such month, (B) (1) in accordance with Section 7.08 of the Trust Agreement, a statement as to whether or not any events or actions that could result in Baseline SUT Reductions and/or SUT True-Ups that require adjustments to the 5.5% SUT Baseline have occurred within such month and the recommended adjustments to the Baseline SUT Reduction and/or SUT True-Up due to such events or actions reflected in the report prepared by the Calculation Agent in paragraph (b) below; and

(ii)      no later than the 15th day of the second month following the end of each month, a report setting forth the amount of Commonwealth Rum Tax Revenues collected in such month and the amount of Commonwealth Rum Tax Revenues collected on a Fiscal Year-to-date basis.

The first report delivered by the Commonwealth in accordance with this subsection (a) following the effective date of this Calculation Agent Agreement shall include details relating to each month and year-to-date numbers from and including July 2021.

(b)      Promptly upon the occurrence of any events or actions that could result in a Baseline SUT Reduction or SUT True-Up, and in any event within five (5) Business Days of the occurrence thereof, the Commonwealth shall give the Calculation Agent notice of such events or actions and the details relating thereto and provide the Calculation Agent with the information reasonably requested by the Calculation Agent to give the Calculation Agent an opportunity to assess the economic impact of each such event or action and to propose relevant required adjustments to the 5.5% SUT Baseline set forth in the then existing Attachment 1. Promptly upon receipt of the information provided by the Commonwealth in accordance with the first sentence hereof, (i) if any Baseline SUT Reductions and/or SUT True-Ups that require adjustments to the 5.5% SUT Baseline have occurred within the month of occurrence, the Calculation Agent shall prepare in sufficient time for inclusion in the report provided by the Commonwealth described in paragraph (a)(i) above (A) a report detailing each such Baseline SUT Reduction and SUT True-Up and the amount by which the 5.5% SUT Baseline should be adjusted to reflect each such Baseline SUT Reduction and SUT True-Up, and (B) a substitute Attachment 1 to the Trust Agreement reflecting the adjustments to the 5.5% SUT Baseline caused by such Baseline SUT Reductions and SUT True-Ups, and (ii) if during the

8

month of the report the Commonwealth reduced the 5.5% SUT to a lower rate, (A) a report detailing the amount of the adjustment to the Measured SUT for that Fiscal Year and each subsequent Fiscal Year to maintain the same amount of outperformance had the Measured SUT remained at 5.5% by multiplying (x) the projected Measured SUT generated at the lower rate by (y) the fraction equal to 5.5% divided by the lower rate, and (B) a substitute Attachment 1 to the Trust Agreement reflecting the adjustments to the Measured SUT.

(c)     Upon agreement with the Commonwealth of the economic impact of the Baseline SUT Reductions, SUT True-Ups and reductions to the 5.5% SUT to a lower rate as set forth in paragraph (b) above that require adjustments to the then existing Attachment 1, the Calculation Agent shall prepare a final version of the substitute Attachment 1 to the Trust Agreement reflecting the changes required by such Baseline SUT Reductions, SUT True-Ups and adjustments to the Measured SUT. The Calculation Agent shall send a copy of the final substitute Attachment 1 to the Commonwealth and to the Trustee for replacement of the Attachment 1 in the Trust Agreement. The Trustee shall post such final substitute Attachment 1, together with such calculations and supporting narrative, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

(d)     In accordance with Section 7.09 of the Trust Agreement, the Commonwealth may substitute a 5.5% SUT with a Substitute Measured Tax, which Substitute Measured Tax shall be all or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth. The Commonwealth shall provide the Calculation Agent with copies of the change in law or executive or judicial action (or a reference to where versions can be reasonably found) and projections for the remaining Fiscal Years through the Fiscal Year ending June 30, 2051, relating to the expected receipts from the Substitute Measured Tax, which projections shall reflect the receipt of amounts at least equal to the amounts of 5.5% SUT listed on the then existing Attachment 1 to the Trust Agreement. Following receipt of such change in law or executive or judicial action and the Commonwealth's projections relating thereto, the Calculation Agent shall review the basis for such projections and the assumptions relating thereto, and such other information as it shall reasonably request from the Commonwealth, and promptly after receipt either verify that there is a reasonable basis for concluding that the amounts projected by the Commonwealth are likely to result in the collection of the Substitute Measured Tax in amounts at least equal to the amounts of 5.5% SUT listed on the then existing Attachment 1, or prepare its own projections showing that the amounts it projects are likely to result in the collection of the Substitute Measured Tax in amounts at least equal to the amounts of 5.5% listed on the then existing Attachment 1. The Commonwealth shall provide the Calculation Agent with the information reasonably requested by the Calculation Agent to give the Calculation Agent an opportunity to independently verify the economic impact of the Substitute Measured Tax such that there is a reasonable basis to conclude that the amounts projected by the Commonwealth are likely to result in the collection of the Substitute Measured Tax in amounts at least equal to the amounts of 5.5% SUT listed on the then existing Attachment 1, or to prepare its own projections as provided in the preceding sentence. The Calculation Agent shall prepare a summary of the material provisions describing the Substitute Measured Tax and send a copy of the final substitute Attachment 1, reflecting the fact that the substitution of the Substitute Measured Tax has become effective, to the Commonwealth and to the Trustee for replacement of the Attachment 1 in the Trust Agreement. The Trustee shall post such final substitute Attachment 1, together with such projections and supporting summary narrative, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of receipt thereof.

(e)     At least quarterly following each March 31, September 30 and December 31 after the monthly information for the final month of such quarter is available under subsection (a) above, commencing with the quarter ending March 31, 2022, the Commonwealth and the Calculation Agent shall confer to review the results for each such quarter and reconcile any issues relating to the information

theretofore provided to the Calculation Agent. Such quarterly conferences (whether through an exchange of documentation, orally or in person) are intended to finalize and resolve issues, to the greatest extent possible, relating to the information relating to Fiscal Year-to-date collections of the Commonwealth Rum Tax Revenues, the 5.5% SUT, the calculation of the Measured SUT, any Baseline SUT Reductions, any SUT True-Ups and any reduction in the 5.5% SUT, and any other issues raised by the Calculation Agent in connection with the performance of its services hereunder. The conference for the quarter ending March 31, 2022 shall include details relating to year-to-date numbers from and including July 2021.

(f)    By no later than August 15 of each year, beginning on August 15, 2022, the Commonwealth shall provide to the Calculation Agent the information relating to the June monthly and Fiscal Year-end numbers described in subsection (a) above. It is understood among the parties hereto that:

(i)    taxpayers may submit payments relating to their projected 5.5% SUT collections prior to the filing of their tax returns;

(ii)    the Commonwealth cannot determine how much of the payments submitted by a taxpayer is attributable to such taxpayer's 5.5% SUT tax liability until the taxpayer's tax return is received and reviewed and processed;

(iii)    historically, quantification of the June and Fiscal Year-end 5.5% SUT collections cannot be finalized by the Commonwealth until the review of the tax returns received in July following the end of the Fiscal Year;

(iv)    amounts received by the Commonwealth from taxpayers as 5.5% SUT collections through July that represent the payment by such taxpayers of their 5.5% SUT tax liability for the Fiscal Year ended in the preceding month, as reported by the Commonwealth after the processing of tax returns in July, shall be used by the Calculation Agent in its determination as to whether an SUT Outperformance Condition and Rum Tax Outperformance Condition have occurred, and the amounts to be subsequently calculated by the Calculation Agent in accordance with Section 203 hereof; and

(v)    amounts received by the Commonwealth as 5.5% SUT collections that are not subsequently confirmed as attributable to taxpayer liabilities through tax returns are not to be taken into account as 5.5% SUT collections for the preceding Fiscal Year.

(g)    By no later than five (5) Business Days before each CVIs Outperformance Condition Determination Date of each year, beginning with the September 1, 2022 CVI Outperformance Condition Determination Date, and following the delivery of the information provided in subsection (f) above, the Commonwealth and the Calculation Agent shall confer to review the results for such Fiscal Year and reconcile any issues relating to the information theretofore provided to the Calculation Agent. Such conferences (whether through an exchange of documentation, orally or in person) are intended to finalize and resolve issues, to the greatest extent possible, relating to the information relating to Fiscal Year-end collections of the Commonwealth Rum Tax Revenues, the 5.5% SUT, the calculation of the Measured SUT, the Substitute Measured Tax, any Baseline SUT Reductions, any SUT True-Ups and any reduction in the 5.5% SUT, and any other issues raised by the Calculation Agent in connection with the performance of its services hereunder, all to allow the Calculation Agent to calculate the amounts required by Section 203 hereof.

10

(h)     The Calculation Agent shall make its determination as to whether an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred by no later than the CVIs Outperformance Condition Determination Date and provide the Trustee and the Commonwealth with its determinations thereof on or prior to such date, promptly confirmed in writing, together with the calculations used to make such determinations.  The Trustee shall post such determinations, together with the calculations relating thereto provided by the Calculation Agent, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Days of its receipt of the written confirmation of such determinations.

(i)     Within [ten (10)] Business Days of the posting of such determinations on EMMA, the Commonwealth and the Trustee (or the Holders if and to the extent permitted by the Trust Agreement as if the challenge was being made in accordance with the provisions of Article XI of the Trust Agreement) may challenge in accordance with Section 204 hereof (A) adjustments to the Baseline SUT Reductions, SUT True-Ups and Measured SUT determined in accordance with Section 202(b) hereof, (B) the conclusion that there is a reasonable basis to conclude that the amounts projected by the Commonwealth and verified by the Calculation Agent or the amounts projected by the Calculation Agent, as the case may be, due to the substitution of the Substitute Measured Tax are likely to result in the collection of amounts at least equal to the amounts of 5.5% SUT listed on the then existing Attachment 1, all as provided in Section 202(d) hereof, or (C) the determination as to whether an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred as provided in Section 202(h) hereof.

Section 203.   **Calculation of Subject to Waterfall Outperformance Amount and Annual Waterfall Payment, Not Subject to Waterfall Outperformance Amount and Rum Tax CVI Annual Payment Amount**

(a)     In the event the Calculation Agent has determined that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred, the Calculation Agent shall proceed to calculate the following, to the extent that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has occurred:

(i)     if an SUT Outperformance Condition has occurred, the Subject to Waterfall Outperformance Amount and the Annual Waterfall Payment as provided in Section 5.04 of the Trust Agreement and the Not Subject to Waterfall Outperformance Amount, if any, as provided in Section 5.05 of the Trust Agreement;

(ii)    if a Rum Tax Outperformance Condition has occurred, the Rum Tax CVI Annual Payment Amount as provided in Section 5.06 of the Trust Agreement;

(iii)   the deposits and transfers required to be made to the CVIs Payment Fund in accordance with Section 5.08 of the Trust Agreement; and

(iv)    all other amounts necessary to complete a final Attachment 7 to the Trust Agreement.

(b)     The Calculation Agent may request that the Commonwealth provide such additional information as is reasonably necessary for the Calculation Agent to timely finalize the calculations referred to in subsection (a) of this Section 203, and the Commonwealth shall timely provide such information.

(c)     By no later than each CVIs Annual Payment Amount Calculation Date following a determination that an SUT Outperformance Condition and/or a Rum Tax Outperformance Condition has

4839-0097-7915.10

occurred, commencing after the end of the Fiscal Year ending on June 30, 2022, the Calculation Agent shall send written copies of the calculations referred to in subsection (a) of this Section 203 to the Commonwealth and the Trustee. The Trustee shall post such calculations, including a final Attachment 7 to the Trust Agreement, together with supporting narrative, if any, with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of its receipt thereof.

(d)     Within [ten (10)] Business Days of the posting of such notice on EMMA, the Commonwealth and the Trustee (or the Holders if and to the extent permitted by the Trust Agreement as if the challenge was being made in accordance with the provisions of Article XI of the Trust Agreement) may challenge in accordance with Section 204 herein the Determination(s) and calculations referred to in this Section 203.

Section 204.     **Challenges to Determinations and Calculations of Amounts**

(a)     Within [ten (10)] Business Days of the posting of the notice on EMMA pursuant to Section 202(h) hereof, the Commonwealth and the Trustee (or the Holders if and to the extent permitted by the Trust Agreement as if the challenge was being made in accordance with the provisions of Article XI of the Trust Agreement) may challenge any of the matters referred to in Section 202(i)(A), (B) or (C) hereof; provided, however, that any such challenge must be based on a manifest error in any such determination.

(b)     Within [ten (10)] Business Days of the posting of the notice on EMMA pursuant to Section 203(d) hereof, the Commonwealth and the Trustee (or the Holders if and to the extent permitted by the Trust Agreement as if the challenge was being made in accordance with the provisions of Article XI of the Trust Agreement) may challenge the calculations set forth therein; provided, however, that any such challenge must be based on a manifest error in any such calculation. Either the Commonwealth or the Trustee (or the Holders if and to the extent permitted by the Trust Agreement as if the challenge was being made in accordance with the provisions of Article XI of the Trust Agreement) may combine their respective challenges under subsections (a) and (b) of this Section 204.

(c)     Any challenging party must, within the ten [(10)] Business Day time period referenced in subsections (a) and (b), notify in writing the other parties to this Calculation Agent Agreement, of (i) the determination(s) or calculation(s) that it is challenging, (ii) the payment amount calculated by the Calculation Agent, if any, that is in dispute (the "Disputed Payment Amount") and (iii) the manifest error that is the basis for such challenge. The Trustee shall post a copy of the written notice challenging such determination(s) or calculations with EMMA under all of the CUSIP numbers applicable to the Notes within one (1) Business Day of its receipt thereof.

(d)     The Calculation Agent, the Trustee and the Commonwealth shall promptly arrange for a meeting to attempt to resolve such challenge and each party shall use reasonable efforts to resolve such matters in dispute.

(e)     In the event that the Calculation Agent, the Trustee and the Commonwealth are unable to resolve all challenges prior to [October 20], then (i) no later than the CVIs Annual Payment Date, the Commonwealth shall transfer to the Trustee for deposit in the Disputed Payments Account, an amount equal to one-half of the Disputed Payment Amount and (ii) the Trustee shall bring an action in the Title III Court (or such other court with jurisdiction as set forth in Section 411 hereof) for resolution of any unresolved challenges. The failure to resolve any such challenge on or prior to the CVIs Annual Payment Date shall not be an Event of Default hereunder or under the Trust Agreement.

4839-0097-7915.10

## PART 3 - EVENTS OF DEFAULT AND REMEDIES

Section 301.     **Events of Default**

An Event of Default shall exist hereunder if the Commonwealth, the Trustee or the Calculation Agent shall default in the due and punctual performance of any of the covenants, conditions, agreements and provisions contained herein on the part of the Commonwealth, the Trustee or the Calculation Agent to be performed, as applicable, and such default shall continue for [ten (10)] Business Days after written notice specifying such default and requiring same to be remedied shall have been given to the Commonwealth, the Trustee or the Calculation Agent, as applicable, by any of the other parties hereto, each of which may give such notice in its discretion; provided, however, that the Trustee shall give such notice of a default at the written request of the Holders of not less than a Quarter in Interest of the Outstanding Notes to which the Event of Default relates. A copy of any such default notice shall also be provided to the Title III Court (or such other court with jurisdiction as set forth in Section 411 hereof). Notwithstanding the foregoing, no Event of Default shall occur due to a challenge under Section 204 hereof that has not been resolved and is proceeding.

Section 302.     **Enforcement of Remedies**

**[Note: this Article on Events of Default and Enforcement or Remedies to be coordinated with the provisions of Article XI of the Trust Agreement.]**

(a)     If an Event of Default by the Commonwealth occurs under Section 301 hereof and is continuing, the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which an Event of Default relates shall (i) bring an action in the Title III Court (or such other court with jurisdiction as set forth in Section 411 hereof) against the Commonwealth and (ii) seek any other remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(b)     If an Event of Default by the Commonwealth occurs under Section 301 hereof and is continuing, the Calculation Agent may seek any remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(c)     If an Event of Default by the Trustee occurs under Section 301 hereof and is continuing, each of the Commonwealth and the Calculation Agent may seek any remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(d)     If an Event of Default by the Calculation Agent occurs under Section 301 and is continuing, each of the Commonwealth, without any request by, or consent of, any other Person, or the Trustee may, and upon written request of Holders holding not less than a Quarter in Interest of the Outstanding Notes to which such Event of Default relates the Trustee shall, seek any remedies that are available under applicable law or in equity, including specific performance of any relevant provisions of this Calculation Agent Agreement, and it is hereby agreed and acknowledged that specific performance shall be available as a remedy in such circumstances and that no adequate remedy at law exists.

(e)      Subject to Article VIII of the Trust Agreement other than an Event of Default described in clause (c) of this Section 302, if an Event of Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under this Calculation Agent Agreement at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

Section 303.      **Remedies Not Exclusive**

No remedy herein conferred upon or reserved to the Calculation Agent, the Commonwealth or the Trustee is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity, by statute or by contract.

## PART 4 - MISCELLANEOUS

Section 401.      **Limits of Trustee's and Calculation Agent's Responsibility**

(a)      The recitals of fact contained herein shall be taken as the statements of the Commonwealth and neither the Trustee nor the Calculation Agent assumes any responsibility for the correctness of the same.  Neither the Trustee nor the Calculation Agent makes any representations as to the validity or sufficiency hereof or of any Notes, or in respect of the security afforded by the Trust Agreement, and neither the Trustee nor the Calculation Agent shall incur any responsibility in respect thereof.  Neither the Trustee nor the Calculation Agent shall be under any responsibility or duty with respect to the application of any money paid to or by the Commonwealth or others in accordance herewith or in accordance with the Trust Agreement except as to the application of any money paid to the Trustee in its capacity as Trustee under the Trust Agreement.  Neither the Trustee nor the Calculation Agent shall be liable in connection with the performance of or failure to perform its duties hereunder except for its own negligence or willful misconduct.

(b)      The duties and obligations of the Trustee and the Calculation Agent shall be determined by the express provisions hereof and neither the Trustee nor the Calculation Agent shall be liable except for the performance of or failure to perform such duties and obligations as are specifically set forth herein, and no implied covenants or obligations should be read into this Calculation Agent Agreement against the Trustee or the Calculation Agent.  If any Event of Default under this Calculation Agent Agreement shall have occurred and be continuing, the Trustee and the Calculation Agent shall exercise such of the rights and powers vested in it by this Calculation Agent Agreement and shall use the same degree of care as a prudent person, as a trustee under a similar agreement, would exercise or use in the circumstances in the conduct of such prudent person's own affairs.

(c)      The Trustee and the Calculation Agent shall be protected in acting upon any notice, resolution, request, consent, order, certificate, report, opinion, bond or other paper or document reasonably believed by it in good faith to be genuine, and to have been signed or presented by the proper party or parties.  The Trustee and the Calculation Agent may consult with qualified counsel of its selection, who may or may not be of counsel to the Commonwealth, and the opinion of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it in good faith and in accordance therewith.

(d)      Whenever the Trustee or the Calculation Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, such matter (unless other evidence in respect thereof be specifically prescribed hereby) may be deemed to be conclusively proved and established by a certificate signed by an Authorized Officer of the Commonwealth.  Such certificate

14

shall be full warrant for any action taken or suffered in good faith under the provisions hereof upon the faith thereof, but in its reasonable discretion the Trustee or the Calculation Agent, in lieu thereof, may either accept other evidence of such fact or matter or require such further or additional evidence.  Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Commonwealth to the Trustee or the Calculation Agent shall be sufficiently executed if executed in the name of the Commonwealth by an Authorized Officer thereof.

(e)     Neither the Trustee nor the Calculation Agent shall be deemed to have notice of any Event of Default hereunder unless an Authorized Officer of the Trustee or an authorized officer of the Calculation Agent has actual knowledge thereof or unless written notice of any event which is in fact such an Event of Default is received by the Trustee or the Calculation Agent at the designated corporate trust office of the Trustee or the Calculation Agent and such notice references the Notes relative to which an Event of Default has occurred.

(f)     The Trustee and the Calculation Agent may request that the Commonwealth deliver a certificate of an Authorized Officer of the Commonwealth setting forth the names of individuals and their respective titles of officers authorized at such time to take specified actions pursuant to this Calculation Agent Agreement, which certificate may be signed by any Person authorized to sign an officer's certificate, including any Person specified as so authorized in any such certificate previously delivered and not superseded.

(g)     The Trustee shall have no liability for any action or failure to act in good faith in accordance with a direction of the Holders of a Quarter in Interest of Outstanding Notes or Majority in Interest of Outstanding Notes, as applicable, pursuant to the terms hereof and of the Trust Agreement in respect of such action or failure to act, except to the extent of its negligence or willful misconduct in connection therewith.

(h)     The Trustee and the Calculation Agent shall have the right to accept and act upon instructions, including funds transfer instructions given pursuant to this Calculation Agent Agreement and delivered using Electronic Means ("Instructions"); provided, however, that the Commonwealth shall provide to the Trustee and the Calculation Agent an incumbency certificate signed by an Authorized Officer of the Commonwealth listing officers with the authority to provide such Instructions and containing specimen signatures of such officers, which incumbency certificate shall be amended by the Commonwealth whenever a person is to be added or deleted from the listing.  If the Commonwealth elects to give the Trustee or the Calculation Agent Instructions using Electronic Means and the Trustee or the Calculation Agent in its discretion elects to act upon such Instructions, the Trustee's or the Calculation Agent's understanding of such Instructions shall be deemed controlling.  The Commonwealth understands and agrees that the Trustee or the Calculation Agent cannot determine the identity of the actual sender of such Instructions and that the Trustee and the Calculation Agent shall conclusively presume that directions that purport to have been sent by an Authorized Officer of the Commonwealth listed on the incumbency certificate provided to the Trustee or the Calculation Agent have been sent by such Authorized Officer. The Commonwealth shall be responsible for ensuring that only Authorized Officers thereof transmit such Instructions to the Trustee or the Calculation Agent and that the Commonwealth and all Authorized Officers are solely responsible to safeguard the use and confidentiality of applicable user and authorization codes, passwords or authentication keys upon receipt by the Commonwealth.  Neither the Trustee nor the Calculation Agent shall be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's or the Calculation Agent's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction unless due to negligence or willful misconduct of the Trustee or the Calculation Agent.  The Commonwealth agrees: (i) to assume all risks arising out of the use of Electronic Means to submit Instructions to the Trustee or the Calculation

15

Agent, including without limitation the risk of the Trustee or the Calculation Agent acting on unauthorized Instructions, and the risk of interception and misuse by third parties; (ii) that it is fully informed of the protections and risks associated with the various methods of transmitting Instructions to the Trustee or the Calculation Agent and that there may be more secure methods of transmitting Instructions than the method(s) selected by the Commonwealth; (iii) that the security procedures (if any) to be followed in connection with its transmission of Instructions provide to it a commercially reasonable degree of protection in light of its particular needs and circumstances; and (iv) to notify the Trustee and the Calculation Agent immediately upon learning of any breach, compromise or unauthorized use of the security procedures.

Section 402.     **Indemnification of Calculation Agent.**

Without limiting any other rights which the Calculation Agent may have hereunder or under applicable law, the Commonwealth hereby agrees, to indemnify the Calculation Agent and its officers, directors, employees and agents (each, an *"Indemnified Party"*) from and against any and all damages, losses, claims, liabilities and related costs and expenses, including reasonable attorneys' fees and disbursements (all of the foregoing being collectively referred to as *"Indemnified Amounts"*), awarded against or incurred by any of them arising out of or as a result of this Agreement, the Calculation Agent's services hereunder or the Indemnified Party's enforcement of Commonwealth's indemnification commitments, excluding, however, Indemnified Amounts to the extent determined by a court of competent jurisdiction, which determination is not subject to appeal, to have been directly caused predominantly by the gross negligence, bad faith or willful misconduct on the part of an Indemnified Party. The indemnities set forth in this section shall survive the termination of this Agreement.

Section 403.     **Term of Agreement; Termination**

(a)     This Agreement will terminate on the earlier of (i) _____ and (ii) the date on which an optional termination as set forth in Section 403(b) becomes effective; provided, however, that in no event shall this Agreement terminate prior to the date on which a successor Calculation Agent has been appointed and, provided further that this Agreement may not be terminated from the period beginning less than 60 days prior to the end of any Fiscal Year and ending on the day after a CVIs Annual Payment Date. [discuss alternatives to having Commonwealth provide determinations and calculations with review by successor Calculation Agent?]

(b)     The Commonwealth and the Calculation Agent shall have the option to terminate this Agreement at any time upon stating their intention to do so pursuant to this Section 403(b) and which date shall not be less than ninety (90) days from the proposed termination date. Upon any termination, the Commonwealth shall pay to the Calculation Agent compensation through the effective date of such termination, which compensation shall include, but not be limited to, the reasonable compensation, disbursements and expenses of the Calculation Agent's counsel, as described in Section 404.

Section 404.     **Fees and Expenses**

The Commonwealth agrees to pay the reasonable and verified permitted costs, fees and expenses of the Calculation Agent for its services under this Calculation Agent Agreement as Trustee and Independent Consultant Expenses under the Trust Agreement. The Commonwealth and the Calculation Agent shall enter into an agreement to further describe the fees and expenses due and payable hereunder. Such fees and expenses may be payable from amounts on deposit in the Trustee and Independent Consultant Expenses Fund.

16

Section 405.      **Notices**

Any direction, notice, report or other communication required or permitted hereunder shall be furnished or given in English and in writing and such direction, notice, report or other communication may be given by United States mail, reputable overnight courier service, facsimile transmission or electronic mail (confirmed by telephone, United States mail or reputable overnight courier service in the case of notice by facsimile transmission or electronic mail) or any other customary means of communication, and any such direction, notice, report or other communication shall be effective when delivered or transmitted, or if mailed, five days after deposit in the United States mail with proper postage for ordinary mail prepaid:

If to the Commonwealth, to:

Commonwealth of Puerto Rico

_____
San Juan, Puerto Rico _____
Attention: _____
Telephone: (\_\_\_) _____
Telecopy: (\_\_\_) _____
Email: _____

with a copy to AAFAF at:

Puerto Rico Fiscal Agency and Financial Advisory Authority

_____
San Juan, Puerto Rico _____
Attention: _____
Telephone: (\_\_\_) _____
Telecopy: (\_\_\_) _____
Email: _____

If to the Trustee, to:

The Bank of New York Mellon

_____
_____
Attention: _____
Telephone: _____
Telecopy: (\_\_\_) _____
E-mail: _____

If to the Calculation Agent, to:

AlixPartners, LLP

_____

17

Attention: _____

Telephone: _____

Telecopy: (____) _____

E-mail: _____

**Section 406.**   **Entire Agreement; Trustee shall be entitled to enforce Agreement**

This Calculation Agent Agreement, including the provisions of the Trust Agreement incorporated herein by reference, contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.

**Section 407.**   **Amendment**

(a)   In the event that any of the definitions or provisions of the Trust Agreement that are duplicated or incorporated herein are amended or supplemented in compliance with the terms of the Trust Agreement, unless otherwise provided in such amendment or supplement, such amendment or supplement shall automatically amend or supplement the duplicative or incorporated definition or provision herein without further approval, except the consent of the Calculation Agent shall be required to the extent such amendment or supplement affects its duties or obligations hereunder. The parties hereto may not amend any definition or provision of this Calculation Agent Agreement that is duplicated or incorporated herein from the Trust Agreement with the intention of changing the requirements of the Trust Agreement without such definition or provision also being approved or consented to in accordance with the terms of Article IX or X or the Trust Agreement, as applicable.

(b)   Otherwise, this Calculation Agent Agreement may not be modified or amended other than by an agreement in writing signed by each party hereto.

**Section 408.**   **Assignment; Successors and Assigns**

(a)   This Agreement shall inure to the benefit of and bind the parties hereto and their respective successors and assigns; provided that neither the Commonwealth nor the Trustee may assign its rights and delegate its obligations hereunder except as provided in the Trust Agreement and the Calculation Agent may not assign its rights and delegate its obligations hereunder without the prior written consent of the Commonwealth and the Trustee, unless such assignment is to a wholly-owned, direct or indirect subsidiary of the Calculation Agent, which such subsidiary must be an Independent Consultant meeting the requirements of the Trust Agreement, which shall not require the consent of the Commonwealth or the Trustee. No such assignment by the Calculation Agent shall take place from the period beginning less than 60 days prior to the end of any Fiscal Year and ending on the day after a CVIs Annual Payment Date.

(b)   The Commonwealth may remove the Calculation Agent at any time upon thirty (30) days' prior written notice. The Calculation Agent may resign its duties hereunder by providing the Commonwealth and the Trustee with at least ninety (90) days' written notice. Any successor Calculation Agent may be appointed by the Commonwealth and must be an Independent Consultant meeting the requirements of the Trust Agreement. Any successor shall have agreed in writing to assume all of the obligations and duties of the Calculation Agent hereunder, whether as a successor or assign under this

18

Calculation Agent Agreement or a replacement agreement in substantially the form of this Calculation Agent Agreement. In the event that the Calculation Agent should resign or be discharged, the Commonwealth shall take all necessary action to cause a new Calculation Agent to be appointed hereunder prior to the resignation of the current Calculation Agent.

(c)     The Commonwealth shall post notices of resignation, removal and replacement of the Trustee and the Calculation Agent with EMMA under all of the CUSIP numbers applicable to the Notes within ten (10) Business Days of such resignation, removal and replacement.

Section 409.     **Execution, Delivery and Performance by Calculation Agent**

The execution, delivery and performance of this Agreement, to the best of the knowledge of the Calculation Agent, after reasonable investigation, will not conflict with or constitute a default under any order, judgment, decree, agreement, injunction or other instrument binding on or affecting the property or assets of the Calculation Agent.

Section 410.     **Governing Law**

This Calculation Agent Agreement shall be governed by the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction, and the laws of the State of New York, without giving effect to principles of conflicts of laws, shall apply to any action or proceeding arising under this Calculation Agent Agreement; provided, however, that the authorization of this Calculation Agent Agreement by the Commonwealth shall be governed by the laws of the Commonwealth.

Section 411.     **Retention of Jurisdiction of Title III Court.**

The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan and the Confirmation Order, including, without limitation, with respect to the payment of the Notes and the enforcement of the remedies set forth herein to the fullest extent permitted by law. Any disputes, legal action, suit, or proceeding arising from or related to this Calculation Agent Agreement (a) shall be brought in accordance with the terms of this Calculation Agent Agreement in the Title III Court and any appellate court therefrom, or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

Section 412.     **Severability of Invalid Provision.**

If any one or more of the covenants, stipulations, promises, agreements and obligations provided herein on the part of the Commonwealth, the Calculation Agent or the Trustee to be performed should be contrary to law, then such covenant or covenants, stipulation or stipulations, promise or promises, agreement or agreements or obligation or obligations shall be null and void, shall be deemed and construed to be severable from the remaining covenants, stipulations, promises, agreements and obligations herein contained and shall in no way affect the validity of the other provisions hereof or of the Trust Agreement or the Notes.

Section 413.     **Parties of Interest.**

Nothing herein, expressed or implied, is intended to or shall be construed to confer upon or to give to any Person or party other than the Commonwealth, the Trustee, the Calculation Agreement and the

4839-0097-7915.10

Holders any rights, remedies or claims hereunder or by reason hereof or any covenant, condition or stipulation thereof. All covenants, stipulations, promises and agreements herein by or on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Trustee, the Calculation Agent and the Holders, [and each shall be third party beneficiaries hereof].

Section 414.     **Headings.**

Any headings preceding the text of the several Parts and Sections hereof, and any table of contents hereof, shall be solely for convenience of reference and shall not constitute a part hereof nor shall they affect its meaning, construction or effect.

Section 415.     **Signatures and Counterparts.**

This Calculation Agent Agreement may be executed and delivered in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original, but all such counterparts together shall constitute one and the same instrument. Any signature to this Calculation Agent Agreement may be delivered by Electronic Means, facsimile, electronic mail (including pdf) or any electronic signature complying with the U.S. federal ESIGN Act of 2000 or the New York Electronic Signature and Records Act or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes to the fullest extent permitted by applicable law. For the avoidance of doubt, the foregoing also applies to any amendments, extensions or renewals of this Calculation Agent Agreement.

4839-0097-7915.10

IN WITNESS WHEREOF, the parties hereto have caused this Calculation Agent Agreement to be duly executed as of the day and year first above written.

COMMONWEALTH OF PUERTO RICO

By: _____
Name:
Title:


THE BANK OF NEW YORK MELLON, as Trustee

By: _____
Name:
Title:


ALIXPARTNERS, LLP

By: _____
Name:
Title:

21

# **EXHIBIT K**

New GO Bonds Reporting Agreement

*Draft – 2/03/2022*

**REPORTING AGREEMENT**
(*Commonwealth of Puerto Rico*
*General Obligation Restructured Bonds*)

This Reporting Agreement (the "Agreement") is executed and delivered by the Commonwealth of Puerto Rico (the "Commonwealth") as of [●], 2022 (the "Effective Date") in connection with the issuance of its $7,414,063,543.25 aggregate principal amount at issuance of Commonwealth of Puerto Rico General Obligation Restructured Bonds (the "Restructured Bonds"), pursuant to the terms of the Trust Agreement (as defined herein).

**Section 1.   Definitions.**

Capitalized terms not otherwise defined herein shall have the same meanings ascribed thereto in the Trust Agreement.

*"Agreement"* has the meaning set forth in the preamble.

*"Annual Report"* means the report provided by the Commonwealth pursuant to and as specified in Sections 3(b), 3(c) and 4 hereof.

*"Catch Up Period"* means the period between the Effective Date and the earlier of (i) the last day of the Fiscal Year in which audited financial statements for all prior Fiscal Years of the Commonwealth have been completed and made available and (ii) [June 30, 2023].

*"Commonwealth"* has the meaning set forth in the preamble.

*"Dissemination Agent"* means the Puerto Rico Fiscal Agency and Financial Advisory Authority, acting in its capacity as Dissemination Agent hereunder, or any successor Dissemination Agent designated in writing by the Commonwealth and which has filed with the Commonwealth a written acceptance of such designation.

*"Effective Date"* has the meaning set forth in the preamble.

*"EMMA System"* means the MSRB's Electronic Municipal Market Access system or any successor nationally recognized municipal securities information repository.

*"Financial Obligation"* means (i) a debt obligation (including a contingent value instrument); (ii) derivative instrument entered into in connection with, or pledged as a security or a source of payment for, an existing or planned debt obligation; or (iii) guarantee of (i) or (ii). The term "Financial Obligation" shall not include municipal securities as to which a final official statement has been provided to the MSRB.

*"Fiscal Year"* means the twelve-month period at the end of which the financial position of the Commonwealth and results of its operation for such period are determined. Currently, the Commonwealth's Fiscal Year begins July 1 and continues through June 30 of the next year.

*"Holder"* means any registered owner of Restructured Bonds and any beneficial owner of Restructured Bonds within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934, as amended.

*"Listed Events"* means any of the events listed in Section 5(a) hereof.

"*MSRB*" means the Municipal Securities Rulemaking Board established in accordance with the provisions of Section 15B(b)(1) of the Securities Exchange Act of 1934, as amended.

"*Restructured Bonds*" has the meaning set forth in the preamble.

"*Trust Agreement*" means the Trust Agreement related to the Restructured Bonds, as may be amended and supplemented from time to time, dated as of [●], 2022, by and between the Commonwealth and the Trustee.

"*Trustee*" means UMB Bank, N. A., as trustee under the Trust Agreement.

**Section 2.   Purpose of the Agreement.** This Agreement is being executed and delivered by the Commonwealth for the benefit of the Holders of the Restructured Bonds and the Trustee, on behalf of the Holders.

**Section 3.   Provision of Annual Audited Financial Statements and Annual Report.**

(a)     During the Catch Up Period, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, the audited financial statements of the Commonwealth, prepared in accordance with generally accepted accounting principles as in effect from time to time and as applied to governmental units, promptly upon such audited financial statements being available.

(b)     Not later than [_____] days following the date on which the audited financial statements for the Fiscal Year ending June 30, 2022 are provided to the MSRB through the EMMA System pursuant to (a) above, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, an Annual Report relating the Fiscal Year ending June 30, 2022 that is consistent with the requirements of Section 4 hereof, which Annual Report may be submitted as a single document or as separate documents comprising a package, and may cross-reference other information as provided in Section 4 hereof.

(c)     After the Catch Up Period, not later than 305 days following the end of each Fiscal Year, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, an Annual Report relating to the immediately preceding Fiscal Year (commencing with the Annual Report for the last Fiscal Year of the Catch Up Period) that is consistent with the requirements of Section 4 hereof, which Annual Report may be submitted as a single document or as separate documents comprising a package, and may cross-reference other information as provided in Section 4 hereof.

(d)     If in any Fiscal Year, the Commonwealth does not provide the Annual Report to the MSRB by the time specified in subsections (b) or (c) above, the Commonwealth shall, in each case, instead file, or shall cause the Dissemination Agent to file, a notice, substantially in the form of Exhibit A, to the MSRB through the EMMA System stating that the Annual Report has not been timely completed and, if known, stating the date by which the Commonwealth expects to file the Annual Report. For the avoidance of doubt, provision of the notice described in this Section 3(d) will not satisfy the Commonwealth's obligation to file the Annual Reports required by Section 3(b) and 3(c).

### Section 4.   Content of Annual Report.

The Annual Report shall contain or incorporate by reference the following:

(a)      the audited financial statements of the Commonwealth for the prior Fiscal Year, prepared in accordance with generally accepted accounting principles as in effect from time to time and as applied to governmental units;

(b)      a summary of the Commonwealth's budget for the corresponding Fiscal Year;

(c)      other material information related to the Commonwealth's economy, revenues, expenditures, indebtedness, and pending litigation, in each case, to the extent not included in the Commonwealth's audited financial statements;

(d)      illustrative calculations of the Comprehensive Cap and the limitation on the incurrence of public debt established in Article VI, Section 2 of the Constitution of the Commonwealth of Puerto Rico; and

(e)      such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

### Section 5.   Reporting of Listed Events.

(a)      The Commonwealth shall give, or cause to be given, notice of the occurrence of any of the following events with respect to the Restructured Bonds not later than ten (10) business days after the occurrence of the event:

1.   Principal and interest payment delinquencies;

2.   Non-payment related defaults, if material;

3.   Unscheduled draws on debt service reserves reflecting financial difficulties;

4.   Unscheduled draws on credit enhancements reflecting financial difficulties;

5.   Substitution of credit or liquidity providers, or their failure to perform;

6.   Adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Restructured Bonds, or other material events affecting the tax status of the Restructured Bonds;

7.   Modifications to rights of Holders of Restructured Bonds, if material;

8.   Bond calls, if material, and tender offers;

9.   Defeasances;

10.  Release, substitution, or sale of property securing repayment of the Restructured Bonds, if material;

11.  Rating changes;

12.  Bankruptcy, insolvency, receivership or similar event of the Commonwealth; or

13.  The consummation of a merger, consolidation, or acquisition involving the Commonwealth or the sale of all or substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material;

14.  The appointment of a successor or additional trustee or the change of name of a trustee, if material;

15.  Incurrence of a Financial Obligation of the Commonwealth, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a Financial Obligation of the Commonwealth, any of which affect security holders, if material; and

16.  The default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a Financial Obligation of the Commonwealth, any of which reflect financial difficulties.

**Note:** For the purposes of the event identified in subparagraph (12), the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the Commonwealth in a proceeding under the U.S. Bankruptcy Code, PROMESA (or a successor thereof) or in any other proceeding under state, Commonwealth or federal law in which a court (including, but not limited to, the Title III Court) or governmental authority has assumed jurisdiction over substantially all of the assets or business of the Commonwealth, or if such jurisdiction has been assumed by leaving the existing governmental body and officials or officers in possession but subject to the supervision and orders of a court (including, but not limited to, the Title III Court) or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the Commonwealth, other than in connection with the filing of the Plan with the Title III Court and approval of the Plan by the Title III Court or the retention of jurisdiction by the Title III Court in connection with the Plan.

(b)    The Commonwealth shall, within ten (10) business days of occurrence of a Listed Event, file a notice of such occurrence with the MSRB through the EMMA System in electronic format, accompanied by such identifying information as is prescribed by the MSRB. Notwithstanding the foregoing, the Listed Events in subsections (a)(3), (4), and (5) of this Section 5 are not applicable to the Restructured Bonds. For the avoidance of doubt, subsection (a)(3) of this Section 5 is not intended to permit withdrawals from the Debt Service Fund or any other fund or account except as contemplated by the Trust Agreement. Moreover, notice of the Listed Event described in subsection (a)(8) of this Section 5 need not be given (i) in the event of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in the Trust Agreement or the corresponding Supplemental Trust Agreement, the only open issue is which Restructured Bonds will be redeemed in the case of a partial redemption, and the notice of redemption is given to the Holders as required pursuant to Securities Exchange Act of 1934 Release No. 34-23856, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Restructured Bonds or (ii) any earlier than the notice (if any) of the underlying event is given to Holders of affected Restructured Bonds pursuant to the Trust Agreement.

**Section 6.   Remedies.** If the Commonwealth shall fail to comply with any provision of this Agreement, then the Trustee or any Holder may enforce, for the equal benefit and protection of all Holders similarly situated, by mandamus or other suit or proceeding in law or in equity, this Agreement against the Commonwealth and any of the officers, agents and employees of the Commonwealth, and may compel the Commonwealth or any such officers, agents or employees to perform and carry out their duties under this Agreement; provided that the sole and exclusive remedy for breach of this Agreement shall be an action to compel specific performance of the obligations of the Commonwealth hereunder and no person or entity shall be entitled to recover monetary damages hereunder under any circumstances, and, provided further, that any challenge to the adequacy of any information provided pursuant to Section 3, 4 or 5 hereof may be brought only by the Holders holding a Quarter in Interest of the Restructured Bonds at the time outstanding or the Trustee as directed in writing by the Holders of such amount of Restructured Bonds. Provided; however, neither the Trustee nor such Holders may institute any suit, action or proceeding at law or in equity for the enforcement of this Agreement or for any remedy for breach thereof, unless such Trustee or Holders, as the case may be, shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have failed to comply within a reasonable time (and in no event in excess of 60 days after such request). Any action shall be instituted in the Title III Court and any appellate court therefrom or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such court does not have or accept such jurisdiction, a court of Commonwealth of Puerto Rico located in the Municipality of San Juan, Puerto Rico or any appellate court therefrom. A failure by the Commonwealth to comply with the provisions of this Agreement shall not constitute an event of default under the Trust Agreement or any other applicable resolution, trust agreement, indenture or other debt authorization of the Commonwealth.

**Section 7.   Dissemination Agent.** The Commonwealth may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under this Agreement and may discharge any such agent, with or without appointing a successor Dissemination Agent. If at any time there is not any other designated Dissemination Agent, the Commonwealth shall be the Dissemination Agent.

**Section 8.   Parties in Interest.** This Agreement is executed and delivered solely for the benefit of the Holders and the Trustee on behalf of such Holders under the Trust Agreement. No other person shall have any right to enforce the provisions hereof or any other rights hereunder.

**Section 9.   Amendment.** Without the consent of any Holders of Restructured Bonds, the Commonwealth at any time and from time to time may enter into any amendments or changes to this Agreement for any of the following purposes:

(a)    to add a dissemination agent for the information required to be provided hereby and to make any necessary or desirable provisions with respect thereto;

(b)    to add to the covenants of the Commonwealth for the benefit of the Holders, or to surrender any right or power herein conferred upon the Commonwealth; or

(c)    to modify the contents, presentation and format of the Annual Report from time to time as a result of a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature or status of the Commonwealth.

**Section 10.   Additional Information.** Nothing in this Agreement shall be deemed to prevent the Commonwealth from disseminating any other information, using the means of dissemination set forth in this Agreement or any other means of communication, or including any other information in any Annual Report, in addition to that which is required by this Agreement. If the Commonwealth chooses to include any information in any Annual Report not specifically required by this Agreement, the Commonwealth

shall not have any obligation under this Agreement to update such information, and the Commonwealth shall have no obligation to include it in any future Annual Report.

**Section 11.   Termination of Obligation.** This Agreement shall remain in full force and effect until such time as all principal of and interest on the Restructured Bonds shall have been paid in full or legally defeased pursuant to the Trust Agreement. Upon any such legal defeasance, the Commonwealth shall provide notice of such defeasance to the EMMA System. Such notice shall state whether the Restructured Bonds have been defeased to maturity or to redemption and the timing of such maturity or redemption.

**Section 12.   Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PUERTO RICO DETERMINED WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAW.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF,  the undersigned has executed this Reporting Agreement on the date first written above.

**COMMONWEALTH  OF PUERTO  RICO**

By: _____
Name: Francisco Parés Alicea
Title: Secretary of Treasury

**REPORTING  AGREEMENT**
**EXHIBIT  A**

FORM OF NOTICE TO THE  MUNICIPAL  SECURITIES  RULEMAKING  BOARD
OF FAILURE  TO FILE ANNUAL  REPORT

Name of Issuer:            Commonwealth  of Puerto Rico
Name of Bond Issue:        Commonwealth of Puerto Rico, General Obligation  Restructured Bonds
Date of Issuance:          [●], 2022

NOTICE IS HEREBY  GIVEN that the Issuer has not provided  the Annual  Report for fiscal year
[_____] as required  by Section 3(b) or 3(c) of the Reporting  Agreement  of the Issuer, dated the Date of
Issuance. [The Issuer anticipates  that the Annual  Report for fiscal year [_____] will be filed by
_____.]

Dated:

                                      COMMONWEALTH  OF PUERTO RICO


                                      By:  [to be signed  only  if filed]

# **EXHIBIT L**

CVI Reporting Agreement

*Draft – 2/03/2022*

## REPORTING AGREEMENT

(*Commonwealth of Puerto Rico
Contingent Value Instruments*)

This Reporting Agreement (the "Agreement") is executed and delivered by the Commonwealth of Puerto Rico (the "Commonwealth") as of [●], 2022 (the "Effective Date") in connection with the issuance of its $8,739,002,764.00 aggregate nominal amount of contingent value instruments issued as notes of the Commonwealth (the "CVIs"), pursuant to the terms of the Trust Agreement (as defined herein).

### Section 1.   Definitions.

Capitalized terms not otherwise defined herein shall have the same meanings ascribed thereto in the Trust Agreement.

*"Agreement"* has the meaning set forth in the preamble.

*"Annual Report"* means the report provided by the Commonwealth pursuant to and as specified in Sections 3(b), 3(c) and 4 hereof.

*"Catch Up Period"* means the period between the Effective Date and the earlier of (i) the last day of the Fiscal Year in which audited financial statements for all prior Fiscal Years of the Commonwealth have been completed and made available and (ii) [June 30, 2023].

*"Commonwealth"* has the meaning set forth in the preamble.

*"CVIs"* has the meaning set forth in the preamble.

*"Dissemination Agent"* means the Puerto Rico Fiscal Agency and Financial Advisory Authority, acting in its capacity as Dissemination Agent hereunder, or any successor Dissemination Agent designated in writing by the Commonwealth and which has filed with the Commonwealth a written acceptance of such designation.

*"Effective Date"* has the meaning set forth in the preamble.

*"EMMA System"* means the MSRB's Electronic Municipal Market Access system or any successor nationally recognized municipal securities information repository.

"*Financial Obligation*" means (i) a debt obligation (including a contingent value instrument); (ii) derivative instrument entered into in connection with, or pledged as a security or a source of payment for, an existing or planned debt obligation; or (iii) guarantee of (i) or (ii). The term "Financial Obligation" shall not include municipal securities as to which a final official statement has been provided to the MSRB.

*"Fiscal Year"* means the twelve-month period at the end of which the financial position of the Commonwealth and results of its operation for such period are determined. Currently, the Commonwealth's Fiscal Year begins July 1 and continues through June 30 of the next year.

*"Holder"* means any registered owner of CVIs and any beneficial owner of CVIs within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934, as amended.

*"Listed Events"* means any of the events listed in Section 5(a) hereof.

*"MSRB"* means the Municipal Securities Rulemaking Board established in accordance with the provisions of Section 15B(b)(1) of the Securities Exchange Act of 1934, as amended.

*"PR Treasury"* means the Department of Treasury of the Commonwealth.

*"Trust Agreement"* means the Trust Agreement related to the CVIs, as may be amended and supplemented from time to time, dated as of [●], 2022, by and between the Commonwealth and the Trustee.

*"Trustee"* means The Bank of New York Mellon, as trustee under the Trust Agreement.

*"US Treasury"* means the United States Department of Treasury.

**Section 2.   Purpose of the Agreement.** This Agreement is being executed and delivered by the Commonwealth for the benefit of the Holders of the CVIs and the Trustee, on behalf of the Holders.

**Section 3.   Provision of Annual Audited Financial Statements and Annual Report.**

(a)       During the Catch Up Period, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, the audited financial statements of the Commonwealth, prepared in accordance with generally accepted accounting principles as in effect from time to time and as applied to governmental units, promptly upon such audited financial statements being available.

(b)       Not later than [_____] days following the date on which the audited financial statements for the Fiscal Year ending June 30, 2022 are provided to the MSRB through the EMMA System pursuant to (a) above, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, an Annual Report relating the Fiscal Year ending June 30, 2022 that is consistent with the requirements of Section 4 hereof, which Annual Report may be submitted as a single document or as separate documents comprising a package, and may cross-reference other information as provided in Section 4 hereof.

(c)       After the Catch Up Period, not later than 305 days following the end of each Fiscal Year, the Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, an Annual Report relating to the immediately preceding Fiscal Year (commencing with the Annual Report for the last Fiscal Year of the Catch Up Period) that is consistent with the requirements of Section 4 hereof, which Annual Report may be submitted as a single document or as separate documents comprising a package, and may cross-reference other information as provided in Section 4 hereof.

(d)       If in any Fiscal Year, the Commonwealth does not provide the Annual Report to the MSRB by the time specified in subsections (b) or (c) above, the Commonwealth shall, in each case, instead file, or shall cause the Dissemination Agent to file, a notice, substantially in the form of Exhibit A, to the MSRB through the EMMA System stating that the Annual Report has not been timely completed and, if known, stating the date by which the Commonwealth expects to file the Annual Report. For the avoidance of doubt, provision of the notice described in this Section 3(d) will not satisfy the Commonwealth's obligation to file the Annual Reports required by Section 3(b) and 3(c).

### Section 4.   Content of Annual Report.

The Annual Report shall contain or incorporate by reference the following:

(a)      the audited financial statements of the Commonwealth for the prior Fiscal Year, prepared in accordance with generally accepted accounting principles as in effect from time to time and as applied to governmental units;

(b)      a summary of the Commonwealth's budget for the corresponding Fiscal Year;

(c)      other material information related to the Commonwealth's economy, revenues, expenditures, indebtedness, and pending litigation, in each case, to the extent not included in the Commonwealth's audited financial statements;

(d)      illustrative calculations of the Comprehensive Cap and the limitation on the incurrence of public debt established in Article VI, Section 2 of the Constitution of the Commonwealth of Puerto Rico; and

(e)      such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

### Section 5.   Reporting of Listed Events.

(a)      The Commonwealth shall give, or cause to be given, notice of the occurrence of any of the following events with respect to the CVIs not later than ten (10) business days after the occurrence of the event:

1.   Principal and interest payment delinquencies;

2.   Non-payment related defaults, if material;

3.   Unscheduled draws on debt service reserves reflecting financial difficulties;

4.   Unscheduled draws on credit enhancements reflecting financial difficulties;

5.   Substitution of credit or liquidity providers, or their failure to perform;

6.   Adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the CVIs, or other material events affecting the tax status of the CVIs;

7.   Modifications to rights of Holders of CVIs, if material;

8.   Bond calls, if material, and tender offers;

9.   Defeasances;

10.   Release, substitution, or sale of property securing repayment of the CVIs, if material;

11.   Rating changes;

12.    Bankruptcy, insolvency, receivership or similar event of the Commonwealth; or

13.    The consummation of a merger, consolidation, or acquisition involving the Commonwealth or the sale of all or substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material;

14.    The appointment of a successor or additional trustee or the change of name of a trustee, if material;

15.    Incurrence of a Financial Obligation of the Commonwealth, if material, or agreement to covenants, events of default, remedies, priority rights, or other similar terms of a Financial Obligation of the Commonwealth, any of which affect security holders, if material; and

16.    The default, event of acceleration, termination event, modification of terms, or other similar events under the terms of a Financial Obligation of the Commonwealth, any of which reflect financial difficulties.

**Note:** For purposes of the event identified in subparagraph (1), the event is considered to occur if, following the occurrence of an SUT Outperformance Condition or a Rum Tax Outperformance Condition, the Commonwealth shall fail to pay to the Holders of the CVIs the amounts due and payable under the Trust Agreement by the CVIs Annual Payment Date or any applicable extraordinary redemption date. For the purposes of the event identified in subparagraph (12), the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the Commonwealth in a proceeding under the U.S. Bankruptcy Code, PROMESA (or a successor thereof) or in any other proceeding under state, Commonwealth or federal law in which a court (including, but not limited to, the Title III Court) or governmental authority has assumed jurisdiction over substantially all of the assets or business of the Commonwealth, or if such jurisdiction has been assumed by leaving the existing governmental body and officials or officers in possession but subject to the supervision and orders of a court (including, but not limited to, the Title III Court) or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the Commonwealth, other than in connection with the filing of the Plan with the Title III Court and approval of the Plan by the Title III Court or the retention of jurisdiction by the Title III Court in connection with the Plan.

(b)    The Commonwealth shall, within ten (10) business days of occurrence of a Listed Event, file a notice of such occurrence with the MSRB through the EMMA System in electronic format, accompanied by such identifying information as is prescribed by the MSRB. Notwithstanding the foregoing, the Listed Events in subsections (a)(3), (4), and (5) of this Section 5 are not applicable to the CVIs. For the avoidance of doubt, subsection (a)(3) of this Section 5 is not intended to permit withdrawals from the CVIs Payment Fund or any other fund or account except as contemplated by the Trust Agreement. Moreover, notice of the Listed Event described in subsection (a)(8) of this Section 5 need not be given (i) in the event of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in the Trust Agreement or the corresponding Supplemental Trust Agreement, the only open issue is which CVIs will be redeemed in the case of a partial redemption, and the notice of redemption is given to the Holders as required pursuant to Securities Exchange Act of 1934 Release No. 34-23856, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of CVIs or (ii) any earlier than the notice (if any) of the underlying event is given to Holders of affected CVIs pursuant to the Trust Agreement.

**Section 6.   Reporting on Outperformance Metrics**

(a)      The Commonwealth shall, or shall cause the Dissemination Agent (if different from the Commonwealth), to provide to the MSRB through the EMMA System, in an electronic format and accompanied by identifying information all as prescribed by the MSRB, the following reports within the time frames set forth below:

      1.   within forty-five (45) calendar days following the end of each calendar month (other than the last calendar month of a Fiscal Year), a report setting forth the 5.5% SUT or the Substitute Measured Tax, as applicable, collected by the PR Treasury during such month;

      2.   within forty-five (45) calendar days following the end of each Fiscal Year, a report setting forth the 5.5% SUT or the Substitute Measured Tax, as applicable, collected by the PR Treasury during such Fiscal Year and the Measured SUT for such Fiscal Year;

      3.   within forty-five (45) calendar days following the end of each calendar month (other than the last calendar month of a Fiscal Year), a report setting forth the Commonwealth Rum Tax Revenues received by the PR Treasury from the US Treasury during such month; and

      4.   within forty-five (45) calendar days following the end of each Fiscal Year, a report setting forth the Commonwealth Rum Tax Revenues received by the PR Treasury from the US Treasury during such Fiscal Year and the Waterfall General Fund Rum Tax Collections for such Fiscal Year.

(b)      Anything herein to the contrary notwithstanding, the Commonwealth shall not be required to provide the reports required by subsections (a)(3) and (4) above earlier than five (5) business days following the receipt by the PR Treasury from the US Treasury of the monthly detailed activity report of net excise taxes due to the Commonwealth or any equivalent documentation of such collections for the corresponding calendar month or Fiscal Year.

**Section 7.   Remedies.** If the Commonwealth shall fail to comply with any provision of this Agreement, then the Trustee or any Holder may enforce, for the equal benefit and protection of all Holders similarly situated, by mandamus or other suit or proceeding in law or in equity, this Agreement against the Commonwealth and any of the officers, agents and employees of the Commonwealth, and may compel the Commonwealth or any such officers, agents or employees to perform and carry out their duties under this Agreement; provided that the sole and exclusive remedy for breach of this Agreement shall be an action to compel specific performance of the obligations of the Commonwealth hereunder and no person or entity shall be entitled to recover monetary damages hereunder under any circumstances, and, provided further, that any challenge to the adequacy of any information provided pursuant to Section 3, 4 or 5 hereof may be brought only by the Holders holding a Quarter in Interest of the CVIs at the time outstanding or the Trustee as directed in writing by the Holders of such amount of CVIs. Provided; however, neither the Trustee nor such Holders may institute any suit, action or proceeding at law or in equity for the enforcement of this Agreement or for any remedy for breach thereof, unless such Trustee or Holders, as the case may be, shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have failed to comply within a reasonable time (and in no event in excess of 60 days after such request). Any action shall be instituted in the Title III Court and any appellate court therefrom or, in the event such court does not have or accept such jurisdiction, in any federal district court sitting in

Puerto Rico and any appellate court therefrom or, in the event such court does not have or accept such jurisdiction, a court of Commonwealth of Puerto Rico located in the Municipality of San Juan, Puerto Rico or any appellate court therefrom. A failure by the Commonwealth to comply with the provisions of this Agreement shall not constitute an event of default under the Trust Agreement or any other applicable resolution, trust agreement, indenture or other debt authorization of the Commonwealth.

      **Section 8.   Dissemination Agent.** The Commonwealth may, from time to time, appoint or engage a Dissemination Agent to assist it in carrying out its obligations under this Agreement and may discharge any such agent, with or without appointing a successor Dissemination Agent. If at any time there is not any other designated Dissemination Agent, the Commonwealth shall be the Dissemination Agent.

      **Section 9.   Parties in Interest.** This Agreement is executed and delivered solely for the benefit of the Holders and the Trustee on behalf of such Holders under the Trust Agreement. No other person shall have any right to enforce the provisions hereof or any other rights hereunder.

      **Section 10. Amendment.** Without the consent of any Holders of CVIs, the Commonwealth at any time and from time to time may enter into any amendments or changes to this Agreement for any of the following purposes:

      (a)    to add a dissemination agent for the information required to be provided hereby and to make any necessary or desirable provisions with respect thereto;

      (b)    to add to the covenants of the Commonwealth for the benefit of the Holders, or to surrender any right or power herein conferred upon the Commonwealth; or

      (c)    to modify the contents, presentation and format of the Annual Report from time to time as a result of a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature or status of the Commonwealth.

      **Section 11.   Additional Information.** Nothing in this Agreement shall be deemed to prevent the Commonwealth from disseminating any other information, using the means of dissemination set forth in this Agreement or any other means of communication, or including any other information in any Annual Report, in addition to that which is required by this Agreement. If the Commonwealth chooses to include any information in any Annual Report not specifically required by this Agreement, the Commonwealth shall not have any obligation under this Agreement to update such information, and the Commonwealth shall have no obligation to include it in any future Annual Report.

      **Section 12.   Termination of Obligation.** This Agreement shall remain in full force and effect until the later of the Clawback CVI Final Maturity Date and the GO CVI Final Maturity Date, or any earlier date on which all CVIs shall have been legally defeased pursuant to the Trust Agreement. Upon any such legal defeasance, the Commonwealth shall provide notice of such defeasance to the EMMA System. Such notice shall state whether the CVIs have been defeased to maturity or to redemption and the timing of such maturity or redemption.

      **Section 13.   Governing Law.** THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE COMMONWEALTH OF PUERTO RICO DETERMINED WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAW.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF,  the undersigned has executed this Reporting Agreement on the date first written above.

**COMMONWEALTH  OF PUERTO  RICO**

By: _____
Name: Francisco Parés Alicea
Title: Secretary of Treasury

**REPORTING  AGREEMENT**
**EXHIBIT  A**

FORM OF NOTICE TO THE MUNICIPAL  SECURITIES  RULEMAKING  BOARD
OF FAILURE  TO FILE ANNUAL  REPORT

Name of Issuer:          Commonwealth  of Puerto Rico
Name of Bond Issue:    Commonwealth of Puerto Rico, Contingent Value Instruments
Date of Issuance:       [●], 2022

NOTICE IS HEREBY  GIVEN that the Issuer has not provided  the Annual Report for fiscal year
[_____] as required  by Section 3(b) or 3(c) of the Reporting  Agreement  of the Issuer, dated the Date of
Issuance. [The Issuer anticipates  that the Annual Report for fiscal year [_____] will be filed by
_____.]

Dated:

                                 COMMONWEALTH OF PUERTO RICO


                                 By:  [to be signed  only  if filed]