UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO et al.,<br><br>                Debtors.[1] | PROMESA<br><br>Title III<br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

---

[1]      The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

APPEARANCES:

O'NEILL & BORGES LLC
By: Hermann D. Bauer
250 Muñoz Rivera Avenue, Suite 800
San Juan, PR 00918-1813

OF COUNSEL FOR
A&S LEGAL STUDIO, PSC
By: Luis F. del Valle-Emmanuelli
434 Avenida Hostos
San Juan, PR 00918

PROSKAUER ROSE LLP
By: Martin J. Bienenstock
Brian S. Rosen
Jeffrey W. Levitan
Ehud Barak
Timothy W. Mungovan
Joshua A. Esses
Eleven Times Square
New York, NY 10036

*Attorneys for the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico*

MARINI PIETRANTONI MUÑIZ LLC
By: Luis C. Marini-Biaggi
Carolina Velaz-Rivero
MCS Plaza, Suite 500
255 Ponce de León Ave.
San Juan, Puerto Rico 00917

O'MELVENY & MYERS LLP
By: John J. Rapisardi
Maria J. DiConza
Matthew P. Kremer
7 Times Square
New York, New York 10036

and

Peter Friedman
1625 Eye Street, NW
Washington, DC 20006

PETER C. HEIN
By: Peter C. Hein
101 Central Park W # 14E
New York, NY 10023-4250

*Pro Se*

SALDAÑA, CARVAJAL, & VÉLEZ-RIVÉ, P.S.C.
By: José A. Sánchez Girona
166 Avenida de la Constitución
San Juan, Puerto Rico 00901

DAVID CARRION BARALT
By: David Carrion Baralt
P.O. Box 364463
San Juan, PR 00936-4463

and

RUSSELL A. DEL TORO SOSA
By: Russell A. Del Toro Sosa
Cond. Condado Princess
#2 Calle Washington 304
San Juan, Puerto Rico 00907

and

JOSE ÁNGEL REY
By: Jose Ángel Rey
P.O. Box 10127
San Juan, PR 00908-1127

*Attorneys for PFZ Properties, Inc.*

CHARLES A. CUPRILL, P.S.C. LAW OFFICES
By: Charles A. Cuprill-Hernández
356 Fortaleza Street, Second Floor
San Juan, PR 00901

*Counsel for Sucesión Pastor Mandry Mercado*

GODREAU & GONZALEZ LAW, LLC

*Attorneys for Hon. Pedro R. Pierluisi and the*
*Puerto Rico Fiscal Agency and Financial*
*Advisory Authority*

CASILLAS, SANTIAGO & TORRES LLC
By:     Juan J. Casillas Ayala
        Israel Fernández Rodríguez
        Juan C. Nieves González
        Cristina B. Fernández Niggemann
PO Box 195075
San Juan, Puerto Rico 00919-5075

PAUL HASTINGS LLP
By:     Luc A. Despins
        G. Alexander Bongartz
200 Park Avenue
New York, New York 10166

*Counsel to the Official Committee of*
*Unsecured Creditors*

BENNAZAR, GARCÍA & MILIÁN, C.S.P.
By:     A.J. Bennazar-Zequeira
        Héctor M. Mayol Kauffmann
        Francisco del Castillo Orozco
Edificio Union Plaza,
1701 Avenida Ponce de León #416
Hato Rey, San Juan
Puerto Rico 00918

JENNER & BLOCK LLP
By:     Robert Gordon
        Richard Levin
919 Third Ave
New York, NY 10022-3908

        *and*

        Catherine Steege
        Melissa Root
        Landon Raiford
353 N. Clark Street
Chicago, IL 60654

*Counsel for The Official Committee of Retired*
*Employees of Puerto Rico*

DELGADO & FERNÁNDEZ, LLC

By:     Rafael A. Gonzalez Valiente
PO Box 9024176
San Juan, PR 00902-4176

*Counsel for Suiza Dairy*

ISABEL FULLANA-FRATICELLI &
ASSOCS., P.S.C.
By:     Isabel M. Fullana
        Eduardo J. Capdevila
The Hato Rey Center Bldg.
268 Ave. Ponce de León Ste. 1002
San Juan, Puerto Rico 00918

*Counsel to Finca Matilde, Inc.*

IVERA, TULLA AND FERRER, LLC
By:     Eric A. Tulla
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212

HOGAN LOVELLS US LLP
By:     Robin E. Keller
        Ronald J. Silverman
        Pieter Van Tol
390 Madison Avenue
New York, NY 10017

*Counsel to the Trustee*

MONSERRATE SIMONET & GIERBOLINI
By:     Miguel Simonet Sierra
101 San Patricio Ave., Suite 1120
Guaynabo, PR 00968

COHEN, WEISS AND SIMON LLP
By:     Peter D. DeChiara
        Richard M. Seltzer
        Marie B. Hahn
900 Third Avenue, Suite 2100
New York, NY 10022-4869

*Counsel to Service Employees International*
*Union*

ALMEIDA AND DAVILA
By:     Enrique M. Almeida

By:    Alfredo Fernández-Martínez
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750

JONES DAY
By:    Bruce Bennett
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071

        *and*

        Benjamin Rosenblum
250 Vesey Street
New York, New York 10281

        *and*

        Matthew E. Papez
51 Louisiana Ave. N.W.
Washington, DC 20001

*Counsel for Andalusian Global Designated
Activity Company, Crown Managed Accounts
for and on behalf of Crown/PW SP, LMA SPC
for and on behalf of Map 98 Segregated
Portfolio, Mason Capital Master Fund LP,
Oaktree-Forrest Multi-Strategy, LLC (Series B),
Oaktree Opportunities Fund IX, L.P., Oaktree
Opportunities Fund IX (Parallel), L.P., Oaktree
Opportunities Fund IX (Parallel 2), L.P.,
Oaktree Huntington Investment Fund II, L.P.,
Oaktree Opportunities Fund X, L.P., Oaktree
Opportunities Fund X (Parallel), L.P., Oaktree
Opportunities Fund X (Parallel 2), L.P.,
Oaktree Value Opportunities Fund Holdings,
L.P., Oceana Master Fund Ltd., Ocher Rose,
L.L.C., Pentwater Merger Arbitrage Master
Fund Ltd., PWCM Master Fund Ltd., and
Redwood Master Fund, Ltd.*

ADSUAR MUÑIZ GOYCO
SEDA &PEREZ-OCHOA PSC
By:    Eric Pérez-Ochoa
        Luis A. Oliver-Fraticelli
PO Box 70294
San Juan, PR 00936

PO Box 191757
San Juan, PR 00919-1757

*Attorneys for Credit Unions*

SALDAÑA, CARVAJAL, & VÉLEZ-RIVÉ,
P.S.C.
By:    José A. Sánchez Girona
166 Avenida de la Constitución
San Juan, Puerto Rico 00901

*Counsel for Mapfre PRAICO Insurance Company*

ANTONETTI MONTALVO & RAMIREZ
COLL
By:    José L. Ramírez-Coll
        Carolina V. Cabrera Bou
P.O. Box 13128
San Juan, PR 00908

*Counsel for J.P. Morgan Securities LLC*

McCONNELL VALDÉS LLC
By:    Roberto C. Quiñones-Rivera
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918

*Counsel for Samuel A. Ramirez & Co., Inc.,
Barclays Capital Inc., RBC Capital Markets, LLC
and Raymond James & Associates, Inc.*

MORELL, CARTAGENA & DAPENA LLC
By:    Ramón E. Dapena
        Iván Lladó
PO Box 13399
San Juan, Puerto Rico 00908

*Counsel for Goldman Sachs & Co. LLC and
Citigroup Global Markets Inc.*

COTO & ASSOCIATES
By:    Ramón Coto-Ojeda
MCS Plaza, Suite 800
255 Ponce de León Avenue
San Juan, Puerto Rico 00917

*Counsel to Mesirow Financial, Inc.*

WEIL, GOTSHAL &MANGES LLP
By:     Jonathan D. Polkes
        Gregory Silbert
        Robert S. Berezin
        Kelly DiBlasi
        Gabriel A. Morgan
767 Fifth Avenue
New York, NY 10153

*Attorneys for National Public Finance
Guarantee Corp.*

CASELLAS ALCOVER & BURGOS P.S.C.
By:     Heriberto Burgos Pérez
        Ricardo F. Casellas-Sánchez
        Diana Pérez-Seda
P.O. Box 364924
San Juan, PR 00936-4924

CADWALADER, WICKERSHAM &
TAFT LLP
By:     Howard R. Hawkins, Jr.
        Mark C. Ellenberg
        William J. Natbony
        Thomas J. Curtin
        Casey J. Servais
200 Liberty Street
New York, New York 10281

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

REXACH & PICÓ, CSP
By:     María E. Picó
802 Ave. Fernández Juncos
San Juan, PR 00907-4315

BUTLER SNOW LLP
By:     Martin A. Sosland
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219

        *and*

        James E. Bailey III
        Adam M. Langley

SARLAW LLC
By:     Sergio A. Ramírez de Arellano
Banco Popular Center, Suite 1022
209 Muñoz Rivera Ave.
San Juan, PR 00918-1009

*Counsel for Sidley Austin LLP*

NELSON ROBLES-DIAZ LAW OFFICES,
P.S.C.
By:     Nelson Robles-Díaz
P. O. Box 192302
San Juan, Puerto Rico 00919-2302

*Counsel for Santander Securities LLC*

BOBONIS, BOBONIS & RODRIGUEZ
POVENTUD
By:     Enrique G. Figueroa-Llinás
129 de Diego Ave.
San Juan, Puerto Rico 00911-1927

*Counsel for Merrill Lynch, Pierce, Fenner &
Smith Inc. and Merrill Lynch Capital Services,
Inc.*

NAVARRO-CABRER LAW OFFICES
By:     Nilda M. Navarro-Cabrer
El Centro I, Suite 206
500 Muñoz Rivera Ave.
San Juan, Puerto Rico 00918

*Counsel to BMO Capital Markets GKST, Inc.*

SALDAÑA, CARVAJAL & VÉLEZ-RIVÉ,
P.S.C.
By:     Luis N. Saldaña-Román
        Ángel E. Rotger-Sabat
166 Avenida de la Constitución
San Juan, Puerto Rico 00901

*Counsel for Morgan Stanley & Co. LLC*

GOODWIN PROCTER LLP
By:     Douglas H. Flaum
        Charles A. Brown
        Howard S. Steel
        Stacy A. Dasaro

6075 Poplar Ave., Suite 500
Memphis, TN 38119

*Counsel for Financial Guaranty Insurance Company*

CÓRDOVA & DICK, LLC
By:      Brian M. Dick Biascoechea
#403 Calle 12 de Octubre Urb. El Vedado
San Juan, PR 00918

*Local Counsel to the Ad Hoc Group of FGIC Noteholders*

SHEPPARD MULLIN RICHTER & HAMPTON LLP
By:      Lawrence A. Larose
30 Rockefeller Plaza New York, New York 10112

*Counsel to the Ad Hoc Group of FGIC Noteholders*

FERRAIUOLI LLC
By:      Roberto Cámara-Fuertes
         Sonia Colón
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917

MILBANK LLP
By:      Dennis F. Dunne
         Atara Miller
         Grant R. Mainland
         John J. Hughes, III
         Jonathan Ohring
55 Hudson Yards
New York, NY 10001

*Attorneys for Ambac Assurance Corporation*

MCCONNELL VALDÉS LLC
By:      Arturo J. García-Solá
         Nayuan Zouairabani
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225

The New York Times Building
620 Eighth Avenue
New York, NY 10018

*Counsel for Goldman Sachs & Co. LLC*
*Counsel for Citigroup Global Markets Inc.*

SIMPSON THACHER & BARTLETT LLP
By:      John K. Youngwood
         David Elbaum
425 Lexington Avenue
New York, NY 10017

*Counsel to J.P. Morgan Securities LLC*

FRIEDMAN KAPLAN SEILER & ADELMAN LLP
By:      Eric Seiler
         Anne E. Beaumont
         Danielle E. Tepper
7 Times Square
New York, NY 10036

*Counsel for Sidley Austin LLP*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
By:      Julie E. Cohen
Four Times Square
New York, NY 10018

*Counsel for Morgan Stanley & Co. LLC*

CROWELL & MORING LLP
By:      Daniel L. Zelenko
         Sarah M. Gilbert
590 Madison Avenue, 20th Floor
New York, NY 10022

*Counsel for Santander Securities LLC*

McGUIREWOODS LLP
By:      E. Andrew Southerling
2001 K Street N.W., Suite 400
Washington, DC 20006-1040

         *and*

San Juan, PR 00936-4225

*Attorneys for AmeriNational Community Services,
LLC, as Servicer for the GDB Debt Recovery
Authority*

C. CONDE & ASSOC. LAW OFFICES
By:     Carmen D. Conde Torres
           Luisa S. Valle Castro
254 San José Street
Suite 5
San Juan, PR 00901-1523

*Counsel for Santander Securities LLC*

SCHULTE ROTH & ZABEL LLP
By:     Douglas S. Mintz
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005

           *and*

           Douglas Koff
           Adam C. Harris
           Taleah Jennings
           Abbey Walsh
           Peter J. Amend
919 Third Avenue
New York, NY 10022

*Attorneys for Cantor-Katz Collateral
Monitor LLC, as Collateral Monitor
for the GDB Debt Recovery Authority*

G. CARLO-ALTIERI LAW OFFICES,
LLC
By:     Gerardo A. Carlo-Altieri
254 Calle San José
Third Floor
San Juan, PR 00901

EPSTEIN BECKER & GREEN, P.C.
By:     Wendy G. Marcari
875 Third Avenue
New York, NY 10022

*Attorneys for Vaquería Tres Monjitas, Inc.*

Aaron G. McCollough
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818

*Counsel for BMO Capital Markets GKST, Inc.*

KAYSER & REDFERN, LLP
By:     Leo Kayser III
515 Madison Avenue
New York, NY 10022

*Counsel for Samuel A. Ramirez & Co., Inc.*

CHAPMAN AND CUTLER LLP
By:     James M. Heiser
111 West Monroe Street
Chicago, IL 60603-4080

*Counsel to Mesirow Financial, Inc.*

ORRICK, HERRINGTON & SUTCLIFFE LLP
By:     Robert Stern
           Tiffany Row
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005-1706

*Counsel for RBC Capital Markets, LLC*

ARTHUR SAMODOVITZ
By:     Arthur Samodovitz
140 Lasa Dr. Apt 204,
St. Augustine, FL 32084

*Pro Se*

PRESTIGE LEGAL SERVICES, LLC
By:     José Luis Barrios-Ramos
278 Ave. César González
San Juan, Puerto Rico 00918

*Counsel to Asociacion de Maestros de Puerto
Rico and Asociacion de Maestros de Puerto
Rico -Local Sindical*

MERCEDES FIGUEROA Y MORGADE
By:     Mercedes Figueroa y Morgade
3415 Alejandrino Ave.,

G. CARLO-ALTIERI LAW OFFICES, LLC
By: Gerardo A. Carlo-Altieri
254 Calle San José
Third Floor
San Juan, PR 00901

MORRISON & FOERSTER LLP
By: James M. Peck
Gary S. Lee
James A. Newton
Andrew R. Kissner
250 West 55th Street
New York, New York 10019

*Counsel for the Ad Hoc Group of Constitutional Debtholders*

REICHARD & ESCALERA
By: Rafael Escalera
Sylvia M. Arizmendi
Carlos R. Rivera-Ortiz
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART & SULLIVAN, LLP
By: Susheel Kirpalani
Daniel Salinas
Eric Kay
Zachary Russell
51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

*Co-Counsel for the Lawful Constitutional Debt Coalition*

JIMÉNEZ, GRAFFAM & LAUSELL
By: J. Ramón Rivera Morales
Andrés F. Picó Ramírez
P.O. Box 366104
San Juan, PR 00936

WILLKIE FARR & GALLAGHER LLP
By: Mark T. Stancil
1875 K Street, N.W.

Apt. 703,
Guaynabo, PR 00969-4856

*Counsel for Amador*

FUENTES LAW OFFICES, LLC
By: Alexis Fuentes-Hernández
P.O. Box 9022726
San Juan, PR 00902-2726

*Counsel for Maruz Real Estate Corp.*

IVONNE GONZALEZ-MORALES
By: Ivonne Gonzalez-Morales
PO BOX 9021828
San Juan, PR 00902-1828

*Counsel for Group Wage Creditors*

MENDOZA LAW OFFICES
By: Enrique J. Mendoza Méndez
P.O. Box 9282
San Juan, PR 00908-0282

*Counsel to Asociación de Jubilados de la Judicatura de Puerto Rico*

CARLOS A. QUILICHINI PAZ
By: Carlos A. Quilichini Paz
Jessica M. Quilichini Ortiz
Post Office Box 9020895
San Juan, PR 00902

*Attorneys for Cooperativa de Ahorro y Crédito Vegabajeña*

DLA PIPER (PUERTO RICO) LLC
By: Mariana Muñiz Lara
Calle de la Tanca #500, Suite 401
San Juan, PR 00901-1969

*Counsel to Quest Diagnostics of Puerto Rico, Inc.*

BEATRIZ HERNÁNDEZ TORO LAW
By: Beatriz Hernández Toro
PO Box 190291

Washington, DC 20006

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
By:      Andrew N. Rosenberg
           Karen R. Zeituni
1285 Avenue of the Americas
New York, NY 10019

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
By:      Lawrence S. Robbins
           Gary A. Orseck
           Donald Burke
2000 K Street, N.W., 4th Floor
Washington, DC 20006

*Co-Counsel for the Ad Hoc Group of
General Obligation Bondholders*

CORREA-ACEVEDO & ABESADA LAW
OFFICES, PSC
By:      Sergio Criado
           Roberto Abesada-Agüet
Centro Internacional de Mercadeo, Torre II
# 90 Carr. 165, Suite 407
Guaynabo, PR 00968

MORGAN, LEWIS & BOCKIUS LLP
By:      Kurt A. Mayr
           David L. Lawton
           David K. Shim
One State Street
Hartford, CT 06103-3178

*Co-Counsel for the QTCB Noteholder
Group*

U.S. DEPARTMENT OF JUSTICE
By:      David A. Hubbert
           Ward W. Benson
Post Office Box 227
Washington, DC 20044

*The United States of America,
on behalf of the Internal Revenue
Service*

San Juan, PR 00919-0291

*Attorneys for Community Health Foundation of
P.R.*

CHARLES A. CUPRILL, P.S.C. LAW
OFFICES
By:      Charles A. Cuprill Hernández
356 Fortaleza Street, Second Floor
San Juan, PR 00901

*Counsel for Med Centro, Inc., formerly
Consejo de Salud de la Comunidad de la
Playa de Ponce, Inc.*

FUENTES LAW OFFICES, LLC
By:      Alexis Fuentes-Hernández
P.O. Box 9022726
San Juan, PR 00902-2726

*Counsel for Lortu-Ta LTD, Inc.; La
Cuarterola, Inc.; Juaza, Inc.; and The
Conjugal Partnership Composed of
Juan Zalduondo Viera And Magdalena
Machicote Ramery*

*Counsel for Sucn. De Frank Torres Ortiz &
Aurea Rodriguez Composed by Frank E.
Torres Rodriguez & Eva Torres Rodríguez*

CARLOS FERNANDEZ-NADAL
By:      Carlos Fernandez-Nadal
818 Hostos Ave. Ste. B
Ponce, PR 00716

*Counsel for Jorge Rafael Eduardo Collazo
Quinones*

BUFETE FERNÁNDEZ & ALCARAZ CSP
By:      Ignacio Fernández De Lahongrais
Capital Center Sur, Suite 202
Avenida Arterial Hostos #239
San Juan, PR 00918-1475

BUFETE DÍAZ-FERRER
By:      Marvin Díaz Ferrer
Cond. Vick Center Ste. C-202
867 Ave. Muñoz Rivera

SEPULVADO, MALDONADO & COURET
By: Albéniz Couret-Fuentes
304 Ponce de León Ave. – Suite 990
San Juan, PR 00918

REED SMITH LLP
By: Luke Sizemore
Jared S. Roach
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222

*Counsel to The Bank of New York Mellon*

ANTONETTI MONTALVO & RAMIREZ COLL
By: José L. Ramírez-Coll
Carolina V. Cabrera Bou
P.O. Box 13128
San Juan, PR 00908

*Counsel to University of Puerto Rico Retirement System Trust*

San Juan, PR 00925

*Counsel for Miriam E. Lima Colón, Betzaida Feliciano Concepción and Angel L. Méndez González*

ANTONIO MARTIN CERVERA
By: Antonio Martin Cervera
H-22 Yagrumo, Caparra Hills
Guaynabo, PR 00968

*Pro Se*

MARIA TERESITA MARTIN
By: Maria Teresita Martin
H-22 Yagrumo, Caparra Hills
Guaynabo, PR 00968

*Pro Se*

WANDA I. ORTIZ SANTIAGO
By: Wanda I. Ortiz Santiago
Urb. Las Leandras
JJ-5 Calle 21
Humacao, PR 00791

*Pro Se*

NANCY I. NEGRON-LÓPEZ
By: Nancy I. Negron-López
HC 3 Box 34941
San Sebastián, PR 00685

*Pro Se*

YASHEI ROSARIO
By: Yashei Rosario
HC 2 Box 12914
Vieques, PR 00765

*Pro Se*

ANA A. NUÑEZ VELÁQUEZ
By: Ana A. Nuñez Veláquez
19 Res. Veillanueva Apto 170
Aguadilla, PR 00603

*Pro Se*

EDGARDO MÁRQUEZ LIZARDI
By:     Edgardo Márquez Lizardi
Cond. El Monte Sur
190 Ave. Hostos Apt. 9399
San Juan, PR 00918

*Pro Se*

MIGUEL LUNA DE JESUS
By:     Miguel Luna De Jesus
Villa Del Monte 1
Calle Monte Alto
Toa Alta, PR 00953

*Pro Se*

ISMAEL L. PURCELL SOLER
By:     Ismael L. Purcell
Urb. Jacaranda
35271 Calle Clavelina
Ponce, PR 00730

*Pro Se*

MILDRED BATISTA DE LEON
By:     Mildred Batista De Leon
PO Box 1259
Saint Just, PR 00978

*Pro Se*

JAVIER ALEJANDRINO OSORIO
By:     Javier Alejandrino Osorio
PO Box 1259
Saint Just, PR 00978

*Pro Se*

NILSA CANDELARIO
By:     Nilsa Candelario
405 Ave. Esmeralda Ste. 2-559
Guaynabo, PR 00969

*Pro Se*

FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH
CONFIRMATION OF THE MODIFIED EIGHTH AMENDED TITLE III JOINT
PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO,
THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY

LAURA TAYLOR SWAIN, United States District Judge

The motion of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") for confirmation of a proposed Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico and the Puerto Rico Public Buildings Authority is now before the Court pursuant to Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").[2]  The Court has jurisdiction of this matter pursuant to section 306(a) of PROMESA.  This Court hereby makes its findings of fact and conclusions of law, pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and section 310 of PROMESA, with respect to the confirmation motion.

## Introduction

In 2017, the Commonwealth of Puerto Rico (the "Commonwealth"), through the Oversight Board, initiated unprecedented proceedings pursuant to PROMESA to restructure the debts of the Commonwealth and certain of its instrumentalities and to find a path forward for Puerto Rico, its citizens, and other stakeholders.  (See May 22, 2017, Hr'g Tr. 6:9-8:12.)  During the pendency of the Title III cases, Puerto Rico has endured the disastrous effects of hurricanes, earthquakes, and the COVID-19 pandemic.  These events have not only made day to day life far

---

[2]     PROMESA is codified at 48 U.S.C. § 2101 et seq.  References to "PROMESA" section numbers in the remainder of this FFCL (defined below) are to the uncodified version of the legislation, unless otherwise indicated.

more challenging for the residents of Puerto Rico, but they have exacerbated the financial difficulties of the Commonwealth and made the already complex circumstances more challenging for those involved in the resolution of these Title III cases.  Nonetheless, the Oversight Board, representatives of many creditor constituencies, including retirees, the government of Puerto Rico and other parties-in-interest have persevered, with the help and guidance of an extraordinary team of skilled judicial mediators (the "Mediation Team"), in working toward a resolution intended to allow the Commonwealth and two of its instrumentalities to exit these PROMESA Title III cases.

### Prior Restructurings under PROMESA

On November 7, 2018, this Court approved a qualifying modification for the Government Development Bank for Puerto Rico ("GDB"), which restructured approximately $4.5 billion of claims against GDB (Docket Entry No. 270 in Case No. 18-1561.)  On February 4, 2019, this Court confirmed the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated January 9, 2019 (Docket Entry Nos. 5047 and 5048 in Case No. 17-3283,[3] as amended by Docket Entry Nos. 5053 and 5055 on February 5, 2019), for the Puerto Rico Sales Tax Financing Corporation ("COFINA") and approved the settlement between the Commonwealth and COFINA (Docket Entry No. 5045).   The settlement divides rights to a significant flow of tax revenues between the two debtors that were involved in complex litigation regarding the ownership of such tax revenues.  The resolution of the GDB and COFINA disputes marked important first steps towards Puerto Rico's financial recovery, economic stability, and prosperity.

---

[3]      All docket references are to entries in Case No. 17-3283 unless otherwise indicated.

**Proposed Plan of Adjustment for the Commonwealth of Puerto Rico,
the Employees Retirement System and the Public Buildings Authority**

The Debtors have now brought before the Court for confirmation the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2022 (Docket Entry No. 19784) (as modified pursuant to any revisions made at or subsequent to the Confirmation Hearing, including the Plan Supplement, and as may be modified pursuant to section 313 of PROMESA, the "Plan").[4]  The Plan[5] required extraordinary work over the course of several years to negotiate the terms of various plan support agreements and resolve disputes arising throughout the pendency of these Title III Cases.  The Mediation Team has served a critical role in facilitating navigation of complicated negotiations between parties-in-interest that have spanned several years and involved complex issues.  In response to requests of this Court, the Mediation Team has filed certifications of the good faith participation of parties in confidential negotiations at key points during these cases.  (See, e.g., Docket Entry Nos. 17314 and 18885.)  The motion to confirm the Plan before this Court constitutes a crucial step in the effort to achieve the economic recovery of the Commonwealth of Puerto Rico and its instrumentalities.

The Plan has broad but not universal support.  Objections by creditors, and the case put forward by the Debtors, are discussed in detail in the findings of fact and conclusion of

---

[4]    Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

[5]    The use of the term "Plan" herein, unless otherwise indicated by context, refers to the confirmable final version filed at Docket Entry No. 19784, as described herein.  The penultimate version of the plan, which required final modifications to be confirmable, was filed as the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated December 20, 2021 (Docket Entry No. 19568 in Case No. 17-3283) (the "Fifth Modified Eighth Amended Plan").

law that follow (the "Findings of Fact and Conclusions of Law" or "FFCL").  In addition to

formal filings by parties, the Court has received thousands of letters and email communications

from citizens and others who live in Puerto Rico and are concerned about Puerto Rico's future

and their own.  Within the past few months in particular, government workers and retirees have

written with passion and sadness about their anxieties concerning their ability to support their

families and live in a dignified way in retirement.  Many have also protested that the past

government borrowings and the disposition of borrowed funds were improper and that ordinary

citizens should not have to bear the economic consequences of alleged past wrongs; many such

communications demanded that the Court order a full audit of the past borrowings and

dispositions before considering any proposed plan of adjustment.  Many of the writers express

frustration with the economic measures developed by the Oversight Board and also, sadly,

express lack of confidence in elected leaders' willingness and ability to manage responsibly the

resources that will be available to the government following the confirmation of a plan of

adjustment.  They are understandably concerned about the provision of services that residents

consider essential.  Pride in and concern for the University of Puerto Rico were prominent

features of many of the communications.

    In evaluating whether the proposed plan of adjustment should be confirmed, the

Court considered the legal and evidentiary submissions of the parties in interest, and the larger

context of pain and hope in which Puerto Rico moves forward.  The Court's authority is

significant but is exercised within boundaries set by the Constitution and laws of the United

States.  In this connection, Congress has conferred powers on the Oversight Board to develop

fiscal plans and budgets in collaboration with the elected government, and has given the

Oversight Board the sole power to formulate and propose plans of adjustment.  The Court must

determine whether the proposed plan of adjustment meets the requirements of the laws passed by Congress and, where objections based on the Constitution of the United States have been raised, the requirements of the Constitution.  It is not for the Court to determine whether particular policies, asset allocations, or settlements of disputed issues are optimal; the Court determines whether the proposed Plan meets the legal requirements for confirmation of a plan of adjustment. This process is largely forward-looking.  The applicable legal standards do not require an audit of the creation and disposition of past borrowings.

For the reasons explained in the following Findings of Fact and Conclusions of Law, the Court finds that, with the incorporation of certain specified revisions, the Plan proposed by the Oversight Board meets the confirmation requirements of PROMESA and does not violate the Constitution.  The Court has also determined that PROMESA itself does not violate the Constitution.  In moving forward following confirmation, the Court urges the people of Puerto Rico to use their resources and voices well, and urges those who govern and those who oversee Puerto Rico to listen to those voices, to make wise choices and explain them well, and to lead Puerto Rico to a better, brighter, and more vibrant future of growth and economic stability.[6]

### **The Motion and Submissions Considered**

Before the Court is the Plan filed by the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), and together with the Commonwealth and ERS, the "Debtors"), by and through the Oversight Board, as

---

[6]     While the legal standards governing the confirmation determination did not require the Court to consider an audit of the creation and disposition of past borrowings, confirmation of the Plan does not foreclose further investigation, whether through regulatory, law enforcement, or civil litigation channels, into the origins of Puerto Rico's debt crisis and the application of the proceeds of the pre-PROMESA borrowings.

representative of the Debtors pursuant to section 315(b) of PROMESA.[7] The following documents have been filed by the Debtors in connection with confirmation of the Plan:

(a) *Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18470) (as the same may be amended, supplemented, or modified, the "Plan Supplement");

(b) *Certificates of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9) (Debtors Exs. 138-40) (the "Mailing Affidavits");

(c) *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4) (Debtors Ex. 141) (the "Publication Affidavit" and, together with the Mailing Affidavits, the "Service Affidavits");

(d) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18874);

(e) *Memorandum of Law in Support of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18869);

(f) *Certificate of Service* (Docket Entry No. 19182);

(g) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Requested Rulings Regarding Act 53-2021 Relating to the Modified Eighth Amended Joint Plan of Adjustment* (Docket Entry No. 19249);

(h) *Response of the Financial Oversight and Management Board in Accordance with the Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19567)

---

[7] The Court previously entered, pursuant to, underline inter alia, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, submission, and tabulation of votes and elections with respect to the Plan, approving the forms of ballots, master ballots, and election notices in connection therewith, and approving the form of notice of the Confirmation Hearing. The Court also entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640.)

(i)  *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18729 and 19054-4) (the "Jaresko Decl.");

(j)  *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18731 and 19054-9) (the "Skeel Decl.");

(k)  *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18726 and 19054-1) (the "Brownstein Decl.");

(l)  *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18734 and 19054-10) (the "Zelin Decl.");

(m)  *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18730 and 19054-8) (the "Shah Decl.");

(n)  *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18738 and 19054-6) (the "Malhotra Decl.");

(o)  *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18736 and 19054-7) (the "Santambrogio Decl.");

(p)  *Declaration of Adam Chepenik in Respect of the Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18735 and 19054-2) (the "Chepenik Decl.");

(q)  *Declaration of Sheva R. Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18737 and 19054-5) (the "Levy Decl.");

(r)  *Declaration of Jay Herriman in Respect of Confirmation of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18732 and 19054-3) (the "Herriman Decl.");

(s)  *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19056) (the "Pullo Decl.");

(t)  *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725) (the "Wolfe Decl.");

(u)  *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724) (the "Murray Decl.");

(v)  *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057) (the "Malhotra Sup. Decl.");

(w) *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058) (the "Jaresko Sup. Decl.");

(x)  *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19059) (the "Levy Sup. Decl.");

(y)  *Supplemental Declaration of Juan Santambrogio in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19060) (the "Santambrogio Sup. Decl.");

(z)  *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115) (the "Pullo Sup. Decl."); and

(aa) *Supplemental Declaration of Jay Herriman in Respect of Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19329) (the "Herriman Sup. Decl.").

Submissions in opposition to confirmation of the Plan were filed by the following parties: (i) PFZ Properties, Inc. (Docket Entry Nos. 9223 and 18418); (ii) Sucesión Pastor Mandry Mercado (Docket Entry Nos. 12701, 16481, 17062, 17998, and 19605); (iii) Vicente Pérez Acevedo and Corporación Marcaribe Investment (Docket Entry No. 16668); (iv) Antonio Martin Cervera (Docket Entry No. 16871); (v) Maria Teresita Martin (Docket Entry No. 16872); (vi) Wanda Ortiz Santiago (Docket Entry Nos. 16939 and 17175); (vii) Nancy I. Negron-Lopez

(Docket Entry No. 16955); (viii) Demetrio Amador Inc. (Docket Entry Nos. 17005 and 18582);

(ix) Suiza Dairy Corp. (Docket Entry Nos. 17013, 17526, 18593, and 19601); (x) Maruz Real

Estate Corp. (Docket Entry No. 17016); (xi) Group Wage Creditors (Docket Entry No. 17021);

(xii) Yashei Rosario (Docket Entry Nos. 17047 and 17116); (xiii) Ana A. Núñez Velázquez

(Docket Entry Nos. 17436, 17438, and 18529); (xiv) Edgardo Marquez Lizardi (Docket Entry

Nos. 18111 and 18249); (xv) Maria M. Ortiz Morales (Docket Entry No. 18396); (xvi) Arthur

Samodovitz (Docket Entry No. 18433); (xvii) Miguel Luna de Jesus (Docket Entry No. 18485);

(xviii) Ismael L. Purcell Soler and Alys Collazo Bougeois (Docket Entry No. 18504); (xix)

Mildred Batista De León (Docket Entry Nos. 18505 and 19010); (xx) Javier Alejandrino Osorio

(Docket Entry Nos. 18506 and 19008); (xxi) Service Employees International Union (the

"SEIU") and International Union, United Automobile, Aerospace and Agricultural Implement

Workers of America (Docket Entry Nos. 18511 and 19349); (xxii) Mapfre PRAICO Insurance

Company (Docket Entry Nos. 18512 and 18513); (xxiii) certain creditors who filed actions in the

United States District Court for the District of Puerto Rico (Docket Entry No. 18535); (xxiv)

Med Centro, Inc. (Docket Entry No. 18538); (xxv) Asociación de Jubilados de la Judicatura de

Puerto Rico (Docket Entry Nos. 18548 and 18549); (xxvi) Cooperativa de Ahorro y Crédito

Vegabajeña (Docket Entry No. 18551); (xxvii) International Union, UAW (Docket Entry No.

18558); (xxviii) Maruz Real Estate Corp. (Docket Entry No. 18563); (xxix) LORTU-TA Ltd,

Inc., La Cuarterola, Inc., Juaza, Inc., and the Conjugal Partnership Composed of Juan Zalduondo

Viera and Magdalena Machicote Ramery (Docket Entry No. 18564); (xxx) Sucn. De Frank

Torres Ortiz & Aurea Rodriguez (Docket Entry No. 18565); (xxxi) Finca Matilde, Inc. (Docket

Entry Nos. 18566 and 19608); (xxxii) the University of Puerto Rico Retirement System Trust

(Docket Entry No. 18573); (xxxiii) Peter C. Hein (Docket Entry No. 18575); (xxxiv) Miriam E.

Lima Colón, Betzaida Feliciano Concepción, and Angel L. Méndez González (Docket Entry No. 18583); (xxxv) Asociación de Maestros Puerto Rico and Asociación de Maestros de Puerto Rico-Local Sindical (Docket Entry No. 18585) (the "AMPR Objection"); (xxxvi) the Underwriter Defendants (Docket Entry No. 18587); (xxxvii) certain credit unions (Docket Entry No. 18594); (xxxviii) Community Health Foundation of P.R. Inc. (Docket Entry No. 18604); (xxxix) Quest Diagnostics of Puerto Rico, Inc. (Docket Entry No. 18560); (xl) U.S. Bank Trust Association and U.S. Bank National Association (Docket Entry Nos. 18631 and 18634); and (xli) Nilsa Candelario (Docket Entry No. 18663); (xlii) Jorge Rafael Eduardo Collazo Quinones (Docket Entry No. 19311), (xliii) El Ojo de Agua Development, Inc. (Docket Entry No. 19610); (xliv) Demetrio Amador Inc. (Docket Entry No. 19611); (xlv) Maruz Real Estate Corp. (Docket Entry No. 19612); and (xlvi) certain plaintiffs in the case captioned <u>Administración de los Sistemas de Retiro de Empleados del Gobierno y la Judicatura de Puerto Rico v. UBS Fin. Servs. Inc. of P.R.</u>, Civ. No. KCA-2011-1067 (Docket Entry No. 19766) (the "Nazario Serrano et al. Objection").[8] In addition, the Debtors have received letters in opposition to confirmation of the Plan, which were not filed with the Court, from: (a) Luiz Roldan Ruiz; (b) Antonia Medina Rodriquez; and (c) Aida Iris Santiago Torres.  The Court received numerous letters regarding the confirmation motion and the Plan, which were filed on the docket with Notices of Correspondence.

Reservations of rights or limited objections raising discrete issues but generally supporting the Plan were filed by the following parties: (i) the Ad Hoc Group of FGIC

---

[8]    Replies to the Nazario Serrano et al. Objection were filed by UBS Financial Services Incorporated of Puerto Rico (Docket Entry No. 19782) and the Oversight Board (Docket Entry No. 19791).

Noteholders (Docket Entry No. 17001); (ii) AAFAF (Docket Entry Nos. 17202 and 18592);[9] (iii) Vaquería Tres Monjitas, Inc. (Docket Entry No. 18637); (iv) the Constitutional Debt Group, GO Group, LCDC, and QTCB Group (Docket Entry No. 18453); (v) Ambac (Docket Entry No. 18479); (vi) the Internal Revenue Service (Docket Entry No. 18567); (vii) certain ERS bondholders (Docket Entry No. 18569); (viii) Bank of New York Mellon (Docket Entry No. 18588); (ix) the Creditors' Committee (Docket Entry Nos. 18589 and 19609); and (x) the University of Puerto Rico Retirement System Trust (Docket Entry No. 19048).

Further, submissions in opposition to the proposed confirmation order (Docket Entry No. 18447) were filed by the following parties: (i) Peter C. Hein (Docket Entry No. 18647); (ii) Suiza Dairy Corp. (Docket Entry Nos. 18651 and 19602); (iii) Finca Matilde, Inc. (Docket Entry No. 18670); and (iv) AAFAF (Docket Entry Nos. 18742 and 19495).[10] Oppositions to the revised proposed confirmation orders (Docket Entry Nos. 19061, 19118, 19188, 19325, 19368, and 19571) were filed by the following parties: (a) International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Service Employees International Union (Docket Entry Nos. 19162, 19204 and 19349);[11] (b) PFZ

---

[9]    AAFAF's additional limited objection to confirmation of the Plan, Docket Entry No. 18742, was withdrawn prior to the Confirmation Hearing.  (Docket Entry No. 19109.)

[10]    "DRA Parties" means AmeriNational Community Services, LLC, as servicer for the GDB Debt Recovery Authority, and Cantor-Katz Collateral Monitor LLC, which serves as the collateral monitor for Wilmington Trust, N.A.  The DRA Parties' objections to confirmation of the Plan, Docket Entry Nos. 18590 and 18636, and objection to the initial proposed confirmation order, Docket Entry No. 18685, were withdrawn prior to the Confirmation Hearing.  (Docket Entry No. 19121.)

[11]    International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Service Employees International Union's objections to the proposed confirmation order were partially withdrawn after the Confirmation Hearing.  (Docket Entry No. 19349.)

Properties, Inc. (Docket Entry Nos. 19212 and 19597); (c) Finca Matilde, Inc. (Docket Entry

Nos. 19214 and 19608); (d) Peter C. Hein (Docket Entry Nos. 19218, 19446, and 19599); (e)

certain credit unions (Docket Entry No. 19221); (f) Demetrio Amador, Inc. (Docket Entry No.

19228); (g) Suiza Dairy Corp. (Docket Entry Nos. 19279 and 19398); and (h) AAFAF (Docket

Entry No. 19319).

   Reservations of rights with respect to the proposed confirmation orders were filed

by the following parties: (i) Assured (Docket Entry Nos. 18645 and 19217); (ii) the Creditors'

Committee (Docket Entry Nos. 18658 and 19225); (iii) Bank of New York Mellon (Docket

Entry No. 18662); (iv) the Retiree Committee (Docket Entry Nos. 18679 and 19248) (v) Ambac

(Docket Entry No. 18694); and (vi) the Ad Hoc Group of Constitutional Debtholders, the Ad

Hoc Group of General Obligation Bondholders, the LCDC, and the QTCB Noteholder Group

(Docket Entry No. 19281).  A statement in response to the proposed confirmation order was filed

by the International Union, UAW and Service Employees International Union (Docket Entry No.

19388).  The Court has also received and reviewed carefully submissions in connection with

each version of the Oversight Boards' submissions in connection with its Proposed Findings of

Facts and Conclusion of Law (Docket Entry Nos. 18739, 19366, 19427, and 19570).

   Statements in support of confirmation of the Plan were filed by the following

parties: (i) the Retiree Committee (Docket Entry No. 18562); (ii) National (Docket Entry No.

18574); (iii) Assured (Docket Entry No. 18584); (iv) FGIC (Docket Entry No. 18595); (v)

Ambac (Docket Entry No. 18601); and (vi) the Puerto Rico Funds (Docket Entry No. 18848).[12]

---

[12]  The Puerto Rico Funds are: GNMA & US Government Target Maturity Fund for Puerto
Rico Residents, Inc. (f/k/a Puerto Rico GNMA & U.S. Government Target Maturity
Fund, Inc.), Mortgage-Backed & US Government Securities Fund for Puerto Rico
Residents, Inc. (f/k/a Puerto Rico Mortgage-Backed & U.S. Government Securities Fund,
Inc.), Puerto Rico Residents Bond Fund I (f/k/a Puerto Rico Investors Bond Fund I),

   VERSION JANUARY 18, 2022     23

Further, pursuant to the *Urgent Motion of the Financial Oversight and Management Board of Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021* (Docket Entry No. 19002), the Oversight Board requested Court approval of certain rulings related to Act 53-2021 ("Act 53") in connection with confirmation of the Plan.  Oppositions to such rulings were filed by the following parties: (i) Asociación Puertorriqueña de la Judicatura, Inc. (Docket Entry No. 19161); (ii) Asociación de Jubilados de la Judicatura de Puerto Rico and Hon. Hector Urgell Cuebas, Former Judge of the Puerto Rico Court of Appeals (Docket Entry No. 19175); (iii) Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc. (Docket Entry No. 19180); (iv) Asociación de

---

Puerto Rico Residents Tax-Free Fund, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund, Inc.), Puerto Rico Residents Tax-Free Fund II, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund II), Inc., Puerto Rico Residents Tax-Free Fund III, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund III, Inc.), Puerto Rico Residents Tax-Free Fund IV, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund IV, Inc.), Puerto Rico Residents Tax-Free Fund V, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund V, Inc.), Puerto Rico Residents Tax-Free Fund VI, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund VI, Inc.), Tax-Free Fixed Income Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund, Inc.), Tax-Free Fixed Income Fund II for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund II, Inc.), Tax-Free Fixed Income Fund III for Puerto Rico Residents, Inc. (Puerto Rico Fixed Income Fund III, Inc.), Tax-Free Fixed Income Fund IV for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund IV, Inc.), Tax-Free Fixed Income Fund V for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund V, Inc.), Tax-Free Fixed Income Fund VI for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund VI, Inc.), Tax Free Fund for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Fund, Inc.), Tax Free Fund II for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Fund II, Inc.), Tax-Free High Grade Portfolio Bond Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Bond Fund, Inc.), Tax-Free High Grade Portfolio Bond Fund II for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Bond Fund II, Inc.), Tax-Free High Grade Portfolio Target Maturity Fund for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Target Maturity Fund, Inc.), Tax Free Target Maturity Fund for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Target Maturity Fund, Inc.), and UBS IRA Select Growth & Income Puerto Rico Fund.

VERSION JANUARY 18, 2022

Maestros de Puerto Rico and Asociacón de Maestros de Puerto Rico-Local Sindical (Docket Entry No. 19181); and (v) Maria A. Clemente Rosa (Docket Entry No. 19254).  A joinder in support of the Oversight Board's requested rulings was filed by the LCDC (Docket Entry No. 19252).

Further, pursuant to the *Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et. al.* (Docket Entry No. 19517), the Oversight Board filed a *Response of the Financial Oversight and Management Board in Accordance with Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et. al.* (Docket Entry No. 19567). Responses were filed by the following parties: (i) International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Service Employees International Union (Docket Entry No. 19586); (ii) PFZ Properties, Inc. (Docket Entry No. 19597); (iii) Peter Hein (Docket Entry Nos. 19599 and 19616), (iv) Cooperativa de Ahorro y Crédito Vegabajeña (Docket Entry No. 19600); (v) Suiza Dairy Corp. (Docket Entry No. 19603); (vi) Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc. (Docket Entry No. 19606) (the "Teachers' Associations Sup. Obj."); (vii) AAFAF (Docket Entry No. 19607); (viii) Finca Matilde, Inc. (Docket Entry No. 19608); (ix) El Ojo de Agua Development, Inc. (Docket Entry No. 19610); (x) Demetrio Amador Inc. (Docket Entry No. 19611); and (xi) Maruz Real Estate Corp. (Docket Entry No. 19612).

The Court heard argument and statements by members of the public, and received evidence, in connection with confirmation of the Plan at a hearing held on November 8, 9, 10, 12, 15, 17, 22, and 23, 2021 (the "Confirmation Hearing").[13]   The Court has carefully considered the Plan, as well as the supporting and opposing submissions, and the witness testimony and voluminous briefing and written evidence submitted by the parties.   The Court has also reviewed and carefully considered hundreds of letters and email messages submitted by members of the public and listened carefully to the oral remarks made on the record at the Confirmation Hearing by members of the public.

On January 10, 2022, the Court entered its *Order Regarding Plan Modifications Necessary to the Entry of an Order Confirming Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19721) (the "January Order").   In response, the Oversight Board filed the Plan.   In response to the Plan and associated filings, PFZ Properties, Inc. filed the *Response to Informative Motion at Docket 19787* (Docket Entry No. 19804).

For the following reasons, the Plan is hereby confirmed, and any remaining objections are overruled except to the extent expressly stated herein.   For the avoidance of doubt, to the extent that a particular objection or issue is not specifically addressed in these Findings of Fact and Conclusions of Law, it has been considered thoroughly and is overruled.   The overruled objections, and the Oversight Board's positions as to the proper scope of preemption and the proper treatment of Eminent Domain/Inverse Condemnation Claims, are preserved for appeal.

---

[13]     Following the Confirmation Hearing, the Court also considered and reserved decision on approval of the *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Infrastructure Financing Authority* (Docket Entry No. 1 Ex. A in Case No. 21-1492) and *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Convention Center District Authority* (Docket Entry No. 1 Ex. A in Case No. 21-1493.)

The Court turns now to its analysis and decision on the motion for confirmation of the plan of adjustment that the Oversight Board has proposed for the Commonwealth of Puerto Rico, the Employees Retirement System and the Public Buildings Authority, and the reasons for that decision.

## Findings of Fact and Conclusions of Law

1.      <u>Findings and Conclusions</u>.  What follows constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and section 310 of PROMESA.  To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such.  Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of the Findings of Fact and Conclusions of Law set forth herein or the Plan.

2.      <u>Jurisdiction</u>.  This Court has exclusive jurisdiction over the Title III Cases pursuant to PROMESA section 306(a).  Venue is proper before this Court pursuant to PROMESA section 307(a).  Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercised, and continues to exercise, exclusive jurisdiction over all property of the Debtors, wherever located.  To the extent necessary, pursuant to PROMESA section 305, the Oversight Board has granted consent to, and the Plan provides for, this Court's exercise of jurisdiction over the property and revenues of the Debtors as necessary to approve and authorize the implementation of the Findings of Fact and Conclusions of Law and the Plan.

3.     <u>Judicial Notice</u>.  The Court takes judicial notice of the dockets of the Title III

Cases, the appellate court dockets of any and all appeals taken from any order entered or opinion

issued by the Court in the Title III Cases, and the following litigation and adversary proceedings,

each as defined in the Plan, including all pleadings and other documents filed, all orders entered,

and all evidence and arguments made, proffered, or adduced at hearings related thereto: (a) the

Ambac Action, (b) the Appointments Related Litigation, (c) the Clawback Actions, (d) the ERS

Litigation, (e) the ERS Recovery Actions, (f) the ERS Takings Action, (g) the FGIC Action, (h)

the Gracia Gracia CW Action, (i) the Gracia Gracia Federal Action, (j) the Lift Stay Motions, (k)

the Med Center Litigation, (l) the Med DC Action, (m) the National Action, (n) the PBA

Litigation, (o) the PRIFA BANs Litigation, (p) the SCC Action, (q) the Uniformity Litigation, (r)

the Invalidity Actions, (s) the Lien Challenge Actions, (t) the Debt Related Objections, and (u)

the Avoidance Actions listed in Exhibits A and B to the Plan.

4.     <u>Burden of Proof</u>.  The Debtors have the burden of proving satisfaction of the

requirements of section 314 of PROMESA and, to the extent applicable to consideration of

confirmation of the Plan, Rule 9019 of the Bankruptcy Rules, by a preponderance of the

evidence.  As explained below, the Plan, which has been amended to incorporate the Debtors'

Full-Payment Proposal (defined below) for Eminent Domain/Inverse Condemnation Claims to

the extent they are Allowed Claims for just compensation, meets the applicable requirements of

section 314 of PROMESA and, to the extent applicable to consideration of confirmation of the

Plan, Bankruptcy Rule 9019.

**General Background**

### I.    The Oversight Board and Title III Cases

5.      For more than a decade, Puerto Rico has faced an unprecedented fiscal and economic crisis.  Actions taken in the past caused Puerto Rico to lose access to capital markets and precipitated the collapse of Puerto Rico's public finance system.  (See PROMESA § 405(m).)  These actions accelerated the contraction of Puerto Rico's economy and increased the out-migration of its residents.  (See Murray Decl. Ex. A ¶¶ 20-22.)[14]  The situation has been further exacerbated by the devastation caused to Puerto Rico by Hurricanes Irma and Maria in 2017, the earthquakes that occurred in early 2020, and the COVID-19 pandemic.  (Jaresko Decl. ¶¶ 20, 22-23.)

6.      On June 30, 2016, the United States enacted PROMESA, and the Oversight Board was established pursuant to section 101(b) of PROMESA.  (Jaresko Decl. ¶ 7.)  Pursuant to section 4 of PROMESA and Article VI of the Constitution of the United States, the provisions of

---

[14]     Consistent with the investigative authority granted to the Oversight Board by section 104 of PROMESA, the Oversight Board commissioned a report on the origins of the Commonwealth's financial crisis.  The report was prepared by Kobre & Kim LLP, and it was published on the Oversight Board's website on August 20, 2018.  (See Docket Entry No. 3774.)  Many residents of Puerto Rico, political leaders, and investors have called for specific auditing of the bond issues and the application of the proceeds of certain bond issues and/or prosecution of individuals or entities that may have misapplied bond proceeds.  Such inquiries could be helpful to Puerto Rico as it grapples with its past and moves toward the future.  The Court understands, however, that in the context of these Title III restructuring proceedings the Oversight Board, in its capacity as the Debtors' representative, has focused on the identification of resources that can be marshaled for application to outstanding debts, and on reaching agreements to reduce outstanding debts without extensive further litigation.  Those are reasonable and prudent decisions, and remedial measures that are not inconsistent with the Plan can be pursued by appropriate authorities.  As noted above (see supra n.5), confirmation of the Plan does not preclude further investigations or law enforcement activity with respect to conduct in connection with the past issuance of debt and application of debt proceeds.

PROMESA prevail over any inconsistent general or specific provisions of territory law, State law, or regulation.  See PROMESA § 4.

7.     On August 31, 2016, President Obama appointed the Oversight Board's original seven voting members.  (Jaresko Decl. ¶ 8.)  The Oversight Board currently has its full complement of seven members.  (Id.)

8.     The Oversight Board designated ERS and PBA as "covered instrumentalities" pursuant to PROMESA Section 101(d).  (Jaresko Decl. ¶ 15.)  The Commonwealth is a "covered territory" pursuant to PROMESA Sections 5(8) and 101(b)(1).

9.     On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA Section 304(a), thereby commencing the Commonwealth Title III Case.  (See Docket Entry No. 1.)

10.     On May 21, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for ERS pursuant to PROMESA Section 304(a), thereby commencing the ERS Title III Case.  (Docket Entry No. 1 in Case No. 17-3566.)

11.     On June 15, 2017, the U.S. Trustee appointed the Creditors' Committee in the Commonwealth Title III Case (Docket Entry No. 338) and, on August 25, 2017, the U.S. Trustee amended that appointment to provide that the Creditors' Committee would also serve in the ERS Title III Case (Docket Entry No. 1171).  On June 15, 2017, the U.S. Trustee appointed the Retiree Committee in the Commonwealth Title III Case.  (Docket Entry No. 340.)

12.     On June 23, 2017, the Court entered an order appointing the Mediation Team, led by Chief Bankruptcy Judge Barbara Houser.  (Docket Entry No. 430.)

13.     On June 29, 2017, the Court entered an order providing for the joint administration of the Commonwealth Title III Case and the ERS Title III Case, for procedural purposes only.  (Docket Entry No. 156 in Case No. 17-3566.)

14.     On September 27, 2019, the Oversight Board issued a restructuring certification, pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for PBA pursuant to PROMESA Section 304(a), thereby commencing the PBA Title III Case.  (Docket Entry No. 1 in Case No. 19-5523.)

15.     On October 9, 2019, the Court entered an order providing for the joint administration of the PBA Title III Case with the existing Title III Cases.  (Docket Entry No. 13 in Case No. 19-5523.)

## II.     The Plan Support Agreements, Plan, and Disclosure Statement

16.     The Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team, and negotiated directly with various constituencies, in an effort to build support for the restructuring of, among other indebtedness, the Commonwealth, ERS, and PBA's debt.  Those negotiations culminated in certain agreements with various stakeholders in furtherance of the successful implementation of the Plan.  (Jaresko Decl. ¶ 29; Skeel Decl. ¶ 17; Zelin Decl. ¶ 13; Debtors Exs. 16-19, 23.)

17.     On May 31, 2019, the Oversight Board entered into a plan support agreement (the "2019 PSA") with certain holders of approximately $3 billion of GO Bond Claims and PBA Bond Claims regarding the framework of a plan of adjustment to resolve (i) disputes regarding the validity and related rights of the GO Bonds and PBA Bonds, and (ii) disputes between the Commonwealth and PBA regarding the characterization of certain purported leases, the amount of any administrative rent that may be owed by the Commonwealth for the use of PBA facilities

following the commencement of the Commonwealth Title III Case, and the ownership of certain PBA facilities. Following entry into the 2019 PSA, the Oversight Board, under the guidance of the Mediation Team, continued to negotiate with its creditors to generate further consensus among the parties, including, but not limited to, other holders and insurers of GO Bonds and PBA Bonds. (Jaresko Decl. ¶ 30; Skeel Decl. ¶ 18; Zelin Decl. ¶¶ 14-15.)

18.     On June 7, 2019, the Oversight Board (i) reached an agreement with the Retiree Committee regarding, among other things, the treatment of accrued ERS, JRS, and TRS benefits pursuant to the Plan, and (ii) entered into the AFSCME Plan Support Agreement regarding, among other things, the return of contributions of all public employees to ERS under the System 2000 plan, and modifications to a collective bargaining agreement and AFSCME's consent to the treatment of ERS benefits pursuant to the Plan. (Jaresko Decl. ¶ 31; Santambrogio Decl. ¶ 12; Skeel Decl. ¶ 19; Debtors Ex. 21.) The AFSCME Plan Support Agreement provides for AFSCME's support for modified terms of collective bargaining agreements, along with its consent to the restructuring of the Commonwealth's pension obligations, pursuant to the Plan. (Jaresko Decl. ¶ 31; Santambrogio Decl. ¶ 12; Debtors Ex. 21.)

19.     On September 27, 2019, the Debtors filed the Original Plan (as defined below), containing the material terms outlined in the 2019 PSA. The Oversight Board thereafter continued to negotiate with various stakeholders to generate further support for a plan of adjustment. On February 9, 2020, the Oversight Board and certain holders of GO Bonds and PBA Bonds holding over $8 billion in Claims (and, inclusive of Claims held by parties who executed joinders thereto, over $10 billion), terminated the 2019 PSA, and disclosed they had reached a global settlement in principle outlined in a plan support agreement (the "2020 PSA"). (Jaresko Decl. ¶¶ 18, 33; Skeel Decl. ¶ 21; Zelin Decl. ¶ 16.) On February 28, 2020, in

furtherance of the 2020 PSA, the Oversight Board filed the First Amended Plan (as defined

below), a disclosure statement in connection with the First Amended Plan (Docket Entry No.

11947) (the "2020 Disclosure Statement"), and a motion seeking approval of the 2020 Disclosure

Statement (Docket Entry No. 11950).  (Jaresko Decl. ¶ 34.)

20.     On March 10, 2020, the Court entered an order scheduling a hearing to consider

the adequacy of information contained in the 2020 Disclosure Statement and setting related

deadlines.  (Docket Entry No. 12187.)  Shortly thereafter, in response to the COVID-19

pandemic and its effects on the people and economy of Puerto Rico, the Oversight Board filed a

motion (Docket Entry No. 12485) seeking to adjourn the hearing to consider approval of the

2020 Disclosure Statement and related deadlines, which the Court granted on March 27, 2020

(Docket Entry No. 12549).  (Skeel Decl. ¶ 23.)

21.     Following the adjournment, the Oversight Board re-engaged with the parties to

the 2020 PSA and entered into further mediation sessions with the assistance and guidance of the

Mediation Team.  (Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24; Zelin Decl. ¶ 17.)  However, the parties

were unable to reach a consensus and, on October 6, 2020, the PSA Creditors filed a motion

(Docket Entry No. 14478) seeking to impose deadlines for confirmation of a plan of adjustment.

On October 29, 2020, the Court entered the *Order on Joint Motion of PSA Creditors Pursuant to*

*Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan*

*of Adjustment* (Docket Entry No. 14987) (the "Plan Scheduling Order") directing the Oversight

Board to file, on or before February 10, 2021, the proposed terms of a plan of adjustment and a

motion for approval of a proposed timetable for filing an amended plan and proposed disclosure

statement, among other things.  (Id.)

22.     The Oversight Board continued to engage in discussions with the guidance of the

Mediation Team and, on February 9, 2021, reached an agreement in principle with the parties to

the 2020 PSA regarding the terms of an amended plan of adjustment, subject to execution of a

plan support agreement. (Zelin Decl. ¶¶ 20, 22.)  Accordingly, the Oversight Board requested an

extension of the February 10, 2021 deadline set forth in the Plan Scheduling Order.  (Docket

Entry No. 15821.)  On February 16, 2021, the Court entered the *Order Granting Urgent Motion

of the Financial Oversight and Management Board for Puerto Rico Requesting Extension of

Deadlines for Submission of Plan of Adjustment or Term Sheet with Respect Thereto* (Docket

Entry No. 15849), extending the February 10, 2021 deadline to March 8, 2021.

23.     On February 23, 2021, the Oversight Board announced the termination of the

2020 PSA and the execution of the Initial PSA, dated as of February 22, 2021, among the

Oversight Board, as representative of the Debtors, and the Initial GO/PBA PSA Creditors.

(Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24; Zelin Decl. ¶ 22; Debtors Ex. 16.)  On March 8, 2021, in

furtherance of the Initial PSA, the Oversight Board filed the Second Amended Plan (as defined

below) and a disclosure statement in connection with the Second Amended Plan.

24.     Following entry into the Initial PSA, the Oversight Board continued to work to

develop additional consensual resolutions and engaged with objecting parties under the guidance

of the Mediation Team.  (Jaresko Decl. ¶ 38; Zelin Decl. ¶ 26.)  On March 9, 2021, the Oversight

Board entered into the ERS Stipulation (amended on April 2, 2021) which, among other things,

(i) provides a global resolution of disputes regarding the validity and related rights of ERS Bonds

and the extent of the alleged liens supporting the obligations thereunder, (ii) resolves the

administrative expense claims filed by certain ERS Bondholders, (iii) provides a resolution of

disputes regarding certain legal challenges to the Commonwealth's post-petition enactment of a

"pay as you go" system for payment of pension benefits to retirees, (iv) provides for the payment of $373 million in cash to the holders of ERS Bonds, as well as the proceeds from the sale of certain ERS assets to the Commonwealth, and (v) provides for the disposition of the ERS Private Equity Portfolio.  (Jaresko Decl. ¶¶ 38-39; Skeel Decl. ¶¶ 26-27; Zelin Decl. ¶ 27; Debtors Ex. 19.)

25.     On May 5, 2021, the Oversight Board entered into the HTA/CCDA Plan Support Agreement with certain holders and insurers of bonds issued by HTA and CCDA which, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the HTA/CCDA Plan Support Agreement, (iv) provides for the bondholders and insurers party thereto to support the Plan, and (v) provides an agreement regarding the structure of a potential plan of adjustment for HTA. (Jaresko Decl. ¶ 40; Skeel Decl. ¶ 28; Zelin Decl. ¶ 34; Debtors Ex. 17.)

26.     On May 11, 2021, in furtherance of the HTA/CCDA Plan Support Agreement, the Debtors filed the Third Amended Plan (as defined below) and a disclosure statement in connection with the Third Amended Plan (Docket Entry No. 16741).  On May 13, 2021, the Debtors filed a motion seeking approval of such disclosure statement (Docket Entry No. 16756). On June 29, 2021, the Debtors filed the Fourth Amended Plan (as defined below), reflecting additional terms negotiated with certain creditors, and a disclosure statement in connection with the Fourth Amended Plan (Docket Entry No. 17192.)

27.     On July 12, 2021, the Oversight Board (i) entered into the GO/PBA Plan Support Agreement, which amended and restated the Initial PSA (Jaresko Decl. ¶ 122; Debtors Ex. 16) and (ii) reached an agreement in principle with the Creditors' Committee, which proposed recoveries for Classes of unsecured claimholders and resolved the Creditors' Committee's objections to the Plan, subject to the terms of the Committee Agreement.  (Jaresko Decl. ¶ 41; Zelin Decl. ¶ 38; Debtors Ex. 23.)  The GO/PBA Plan Support Agreement, together with the restructuring of COFINA's debt, contemplates the reduction of the Commonwealth's debt (including principal and interest from restructured COFINA bonds) by approximately 62%, from $90.4 billion to $34.1 billion.  (Jaresko Decl. ¶ 37; Zelin Decl. ¶ 38.)  The GO/PBA Plan Support Agreement also (i) provides for a proposed global resolution of disputes regarding the validity and related rights of GO Bonds that may have been issued in violation of the Puerto Rico Constitutional debt limit, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and PBA, and (iv) provides for the resolution of disputes regarding the PRIFA BANs pursuant to a stipulation dated February 22, 2021 (the "PRIFA BANs Stipulation") (Debtors Ex. 22).  (Jaresko Decl. ¶ 37.)  Also on July 12, 2021, in furtherance of the GO/PBA Plan Support Agreement, the Debtors filed the Fifth Amended Plan (as defined below) and a disclosure statement in connection with the Fifth Amended Plan (Docket Entry No. 17308.)

28.     On July 27, 2021, the Oversight Board entered into the PRIFA Plan Support Agreement, which, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new CVIs, along with the

payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the PRIFA PSA, (iv) provides for the bondholders and insurers party thereto to support the Plan, and (v) presents the foundation for a restructuring of the PRIFA Bonds pursuant to Title VI of PROMESA.  (Jaresko Decl. ¶ 42; Skeel Decl. ¶ 30; Zelin Decl. ¶ 41; Debtors Ex. 18.) Also on July 27, 2021, in furtherance of the PRIFA Plan Support Agreement, the Debtors filed the Sixth Amended Plan (as defined below) and a disclosure statement in connection with the Sixth Amended Plan.  (Docket Entry No. 17516.)

29.     On July 30, 2021, the Debtors filed the Seventh Amended Plan and an updated disclosure statement in connection with the Seventh Amended Plan (Docket Entry No. 17628) (the "Disclosure Statement").  (Debtors Ex. 2.)

30.     On August 2, 2021, the Court entered the Disclosure Statement Order which, among other things (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, (b) established (1) October 19, 2021 at 5:00 p.m. (Atlantic Standard Time) as the Confirmation Objection Deadline, (2) October 4, 2021 at 5:00 p.m. (Atlantic Standard Time) as the deadline by which (i) ballots to accept or reject the Plan were required to be received by the Solicitation Agent (the "Voting Deadline") and (ii) elections regarding the form of distributions were required to be effectuated through the Automated Tender Offer Program ("ATOP") (the "Election Deadline"), and (c) scheduled a hearing on November 8-10, 12, 15-18, and 22-23, 2021, to consider confirmation of the Plan. (Docket Entry No. 17639.)  On September 27, 2021, the Court entered an order (Docket Entry No. 18258) extending the Voting Deadline to October 18, 2021, at 5:00 p.m. (Atlantic Standard

Time) and, on October 1, 2021, the Court entered an order (Docket Entry No. 18360) extending the Election Deadline to October 18, 2021, at 5:00 p.m. (Atlantic Standard Time).

31.    Consistent with the Disclosure Statement Order, the Debtors caused the Solicitation Agent to distribute Solicitation Packages to all holders of Claims entitled to vote. (Mailing Affidavits; Pullo Decl. ¶ 4.)  The Solicitation Packages contained, among other things: (a) the Confirmation Hearing Notice setting forth the time, date, and place of the Confirmation Hearing, (b) the Disclosure Statement Order (without the exhibits thereto) and the Disclosure Statement (together with all exhibits thereto, including the Plan), (c) the appropriate form of Ballot or Notice, if any, with instructions for voting and/or making any applicable election and, as applicable, a pre-addressed, pre-paid return envelope, (d) with respect to Class 51, the Retiree Committee Letter and Information Guide, and (e) with respect to Classes 54, 58, and 66, the Creditors' Committee Letter.  (Id. ¶ 4.)  The Debtors also caused the Solicitation Agent to publish the Confirmation Hearing Notice and place radio advertisements providing, among other things, information regarding the solicitation of votes to accept or reject the Plan and deadlines associated therewith.  (Publication Affidavit; Pullo Decl. ¶ 7.)

32.    The Court now turns to a review of the legal and factual issues raised in connection with the motion to confirm the Plan, beginning with an objection to the constitutionality of PROMESA itself.

### **PROMESA's Consistency with the Constitution of the United States**[15]

33.    Challenges to PROMESA itself, primarily by bondholder Peter Hein, assert, but fail as a matter of law to show, that PROMESA is unconstitutional.

---

[15]    The Court has received and reviewed the *Notice of Appearance and Request for Service of Papers* (Docket Entry No. 19647), as well as the *Notice of Participation by the United States of America* (Docket Entry No. 19710), filed by the United States Department of

34.   **The Bankruptcy Clause**:  Objections by pro se claimants Peter Hein (Docket

Entry No. 18575) (the "Hein Objection") and Arthur Samodovitz (Docket Entry No. 18433) (the

"Samodovitz Objection") assert that PROMESA violates the Bankruptcy Clause of the

Constitution of the United States because it is not uniform with Chapter 9, which requires, as a

predicate to filing a petition, a showing of insolvency.  (Samodovitz Obj. at 11-12; Hein Obj. at

33-34 (discussing 11 U.S.C. § 109(c)(3)).  See also Nov. 22, 2021, Hr'g Tr. 140:5-21 ("Chapter

9 . . . applies throughout the country, except for Puerto Rico, [and] Chapter 9 requires proof of

insolvency. . . .  But in this PROMESA proceeding, proof of insolvency is not being imposed as

a requirement for a discharge.").)

35.   PROMESA does not violate the uniformity requirement of the Bankruptcy Clause

of the Constitution of the United States, which empowers Congress to "establish . . . uniform

Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. art. I, § 8, cl. 4

(the "Bankruptcy Clause").  U.S. Const., Art. IV, § 3, cl. 2.  The reason for this broad grant of

authority to Congress is that our Constitution "envisions a federalist structure, with the National

Government exercising limited federal power and other, local governments—usually state

---

Justice, Civil Division, notifying the Court that the United States intends to "participate
in the above-captioned proceeding for the purpose of defending the constitutionality of
PROMESA as it applies to the proposed approval of the Plan of Adjustment."  (Docket
Entry No. 19710 at 2.)  The Court has also received and reviewed the *Response of the
United States of America to Order Regarding Plan Modification Necessary to the Entry
of an Order Confirming Plan of Adjustment for the Commonwealth of Puerto Rico, the
Employees Retirement System of the Government of the Commonwealth of Puerto Rico,
and the Puerto Rico Public Buildings Authority* (Docket Entry No. 19774).  The Court
proceeds to enter its Findings of Fact and Conclusions of Law because Rule 5.1(c) of the
Federal Rules of Civil Procedure provides that "[b]efore the time to intervene expires, the
court may reject the constitutional challenge, but may not enter a final judgment holding
the statute unconstitutional."  Fed. R. Civ. P. 5.1(c).  That is to say, "[t]he court may
reject a constitutional challenge at any time[.]"  Fed. R. Civ. P. 5.1 advisory committee's
note.  The Court herein rejects constitutional challenges to PROMESA.

governments—exercising more expansive power." <u>Fin. Oversight & Mgmt. Bd. for P.R. v. Aurelius Inv., LLC</u>, 140 S. Ct. 1649, 1658 (2020) (hereinafter, "<u>Aurelius</u>").  In legislating with respect to territories, however, Congress has authority to act like a state legislature, with sovereign authority unconstrained by certain of the restrictions that limit Congress's authority to enact laws for the United States "as a political body of states in union."  <u>Cincinnati Soap Co. v. United States</u>, 301 U.S. 308, 323 (1937) ("In dealing with the territories, possessions and dependencies of the United States, this nation has all the powers of other sovereign nations, and Congress in legislating is not subject to the same restrictions which are imposed in respect of laws for the United States considered as a political body of states in union."); <u>Palmore v. United States</u>, 411 U.S. 389, 397 (1973) ("Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may also exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes.").  Congress's authority to govern territories is "general and plenary, arising from and incidental to the right to acquire the territory itself, and from the power given by the constitution to make all needful rules and regulations respecting the territory or other property belonging to the United States."  <u>Late Corp. of the Church of Jesus Christ of Latter-Day Saints v. United States</u>, 136 U.S. 1, 42 (1890); <u>see Palmore</u>, 411 U.S. at 398 (noting that Congress's authority to legislate with respect to the District of Columbia "permits it to legislate for the District in a manner with respect to subjects that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it").[16]

---

[16]     Nor would a contrary holding necessarily prove fatal to PROMESA or to the Plan. Congress expressly provided in the legislation's severability clause (section 3(b) of PROMESA) that the solution to any uniformity problem would not be to strike down

36.     Congress unambiguously invoked its Article IV authority when it enacted
PROMESA.  See Aurelius, 140 S. Ct. 1649, 1664-65 ("Congress expressly invoked a
constitutional provision allowing it to make local debt-related law (Article IV).").  The
uniformity requirement is, by the Bankruptcy Clause's plain text, a limitation on a specific
enumerated power within Article I, not a generally applicable limitation that restricts the exercise
of legislative power where it would otherwise be proper under Article IV.  Accordingly, the
Bankruptcy Clause-related objections of Mr. Samodovitz and Mr. Hein are overruled.

37.     **Substantive Due Process and the Ex Post Facto Clause**: Mr. Hein argues that
the retroactive application of PROMESA to pre-enactment debts violates substantive due process
and that the Ex Post Facto Clause prohibits the retroactive application of a statute (such as
PROMESA) to impair his prepetition bonds (Hein Obj. at 17).  The Supreme Court opinion on
which Mr. Hein relies, Eastern Enterprises v. Apfel, 524 U.S. 498, 537-38 (1998), is inapposite
because it does not support the theories Mr. Hein purports to derive from it.  In deciding that the
Coal Industry Retiree Health Benefit Act of 1992 imposed severe retroactive liability on a
limited class of parties that could not have anticipated the liability (and that the liability was
substantially disproportionate to the parties' past experience), thereby violating the Takings
Clause of the Constitution of the United States, 524 U.S. at 528-29, the Supreme Court expressed
reservations about applying the doctrine of substantive due process to economic legislation and,
in light of its determination that a taking had occurred, did not base its decision on the doctrine
of substantive due process, 524 U.S. at 537-38.  It likewise declined to extend the Ex Post Facto

---

PROMESA, but rather to extend it to any similarly situated territory, "provided that the
legislature of that territory adopts a resolution signed by the territory's governor
requesting the establishment and organization of a Financial Oversight and Management
Board pursuant to section 101."  48 U.S.C.A. § 2102(b) (Westlaw through P.L. 117-80).

Clause, which is "directed at the retroactivity of penal legislation," to legislation affecting property and for which the jurisprudence of the Takings Clause is more appropriate, 524 U.S. 533-34.  Accordingly, Mr. Hein fails to demonstrate that substantive due process analysis is appropriate, that the Ex Post Facto Clause of the Constitution is applicable to PROMESA, or that PROMESA violates such constitutional principles.  See U.S. Const. art. I, § 9, cl. 3.  The Court now turns to PROMESA's plan confirmation requirements.

## Compliance with PROMESA Sections 104(j) and 313

38.     The Oversight Board must certify the submission or modification of a plan of adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or modifying such plan of adjustment.  See PROMESA § 104(j)(1)-(2).  The Oversight Board may certify a plan of adjustment only if it determines, in its sole discretion, that the Plan is consistent with the applicable certified fiscal plan.  See id. § 104(j)(3).  The Oversight Board, after the issuance of a certification pursuant to PROMESA Section 104(j), may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of PROMESA Title III.  See id. § 313.  After the Oversight Board files a modification, "the plan as modified becomes the plan."  Id.

39.     The Oversight Board has complied with its obligations pursuant to PROMESA Sections 104(j) and 313.  On April 23, 2021, the Oversight Board certified the Commonwealth's current fiscal plan, which also covers ERS and PBA (the "Fiscal Plan").  (Jaresko Decl. ¶ 28; Debtors Ex. 10.)

40.     On September 26, 2019, the Oversight Board certified the submission of the *Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18806-5) (the "Certification of the Submission of the Original Plan").  (Debtors Ex. 122.)  The

Oversight Board subsequently filed the *Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 8765) (the "Original Plan").

41.      On February 28, 2020, the Oversight Board certified the modification of the Original Plan (Docket Entry No. 18807-1) (the "Certification of the Submission of the Amended Plan"). (Debtors Ex. 123.) The Oversight Board subsequently filed the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 11946) (the "First Amended Plan").

42.      On March 8, 2021, the Oversight Board certified the modification of the First Amended Plan (Docket Entry No. 18807-2) (the "Certification of the Submission of the Second Amended Plan"). (Debtors Ex. 124.) The Oversight Board subsequently filed the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 15976) (the "Second Amended Plan").

43.      On May 11, 2021, the Oversight Board certified the modification of the Second Amended Plan (Docket Entry No. 18807-3) (the "Certification of the Submission of the Third Amended Plan"). (Debtors Ex. 125.) The Oversight Board subsequently filed the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 16740) (the "Third Amended Plan").

44.      On June 29, 2021, the Oversight Board certified the modification of the Third Amended Plan (Docket Entry No. 18807-4) (the "Certification of the Submission of the Fourth Amended Plan"). (Debtors Ex. 126.) The Oversight Board subsequently filed the *Fourth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17194) (the "Fourth Amended Plan").

45.     On July 12, 2021, the Oversight Board certified the modification of the Fourth Amended Plan (Docket Entry No. 19569 Ex. A) (the "Certification of the Submission of the Fifth Amended Plan).  (Debtors Ex. 127.)  The Oversight Board subsequently filed the *Fifth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17306) (the "Fifth Amended Plan").

46.     On July 26, 2021, the Oversight Board certified the modification of the Fifth Amended Plan (Docket Entry No 19569 Ex. B) (the "Certification of the Submission of the Sixth Amended Plan").  (Debtors Ex. 128.)  The Oversight Board subsequently filed the *Sixth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17516) (the "Sixth Amended Plan").

47.     On July 30, 2021, the Oversight Board certified the modification of the Sixth Amended Plan (Docket Entry No. 18807-7) (the "Certification of the Submission of the Seventh Amended Plan").  (Debtors Ex. 129.)  The Oversight Board subsequently filed the *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17627) (the "Seventh Amended Plan").  (Debtors Ex. 1.)

48.     On November 3, 2021, the Oversight Board certified the modification of the Seventh Amended Plan (Docket Entry No. 19106-4) (the "Certification of the Submission of the Eighth Amended Plan").  (Debtors Ex. 137.)  The Oversight Board subsequently filed the *Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19053) (the "Eighth Amended Plan").  (Debtors Ex. 136.)

49.     On November 7, 2021, the Oversight Board certified the modification of the Eighth Amended Plan (Docket Entry No. 19119-2) (the "Certification of the Submission of the First Modified Eighth Amended Plan").  (Debtors Ex. 144.)  The Oversight Board subsequently

filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19114) (the "First Modified Eighth Amended Plan"). (Debtors Ex. 143.)

50.     On November 12, 2021, the Oversight Board certified the modification of the First Modified Eighth Amended Plan (Docket Entry No. 19327-1) (the "Certification of the Submission of the Second Modified Eighth Amended Plan"). (Debtors Ex. 147.)  The Oversight Board subsequently filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19184) (the "Second Modified Eighth Amended Plan").

51.     On November 21, 2021, the Oversight Board certified the modification of the Second Modified Eighth Amended Plan (Docket Entry No. 19327-2) (the "Certification of the Submission of the Third Modified Eighth Amended Plan"). (Debtors Ex. 148.)  The Oversight Board subsequently filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19323) (the "Third Modified Eighth Amended Plan"). (Debtors Ex. 149.)

52.     On November 24, 2021, the Oversight Board certified the modification of the Third Modified Eighth Amended Plan (Docket Entry No. 19569 Ex. C) (the "Certification of the Submission of the Fourth Modified Eighth Amended Plan").  The Oversight Board subsequently filed, on November 28, 2021, the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19367) (the "Fourth Modified Eighth Amended Plan").

53.     On December 20, 2021, the Oversight Board certified the modification of the Fourth Modified Eighth Amended Plan (Docket Entry No. 19569 Ex. D) (the "Certification of

the Submission of the Fifth Modified Eighth Amended Plan").  The Oversight Board

subsequently filed, on December 21, 2021, the *Modified Eighth Amended Title III Joint Plan of*

*Adjustment of the Commonwealth of Puerto Rico, et al.*, (Docket Entry No. 19568) (the "Fifth

Modified Eighth Amended Plan").

54.     On January 14, 2022, the Oversight Board certified the sixth modification of the

Modified Eighth Amended Plan and the submission of the Plan upon a determination, in the

Oversight Board's sole discretion, that the Plan was consistent with the Fiscal Plan.  (Docket

Entry No. 19786 Ex. A) (the "Certification of the Submission of the Plan").  Accordingly, the

Oversight Board submitted the modification and the Plan described in the following paragraph in

compliance with section 104(j) of PROMESA.

55.     On January 14, 2022, the Oversight Board filed the *Modified Eighth Amended*

*Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No.

19784) (as already defined herein, the "Plan").  The Oversight Board submitted the Plan in

accordance with section 313 of PROMESA.  For the reasons explained herein, the Court

confirms the Plan and holds that it meets the requirements of PROMESA and that the Oversight

Board has complied with all provisions of PROMESA applicable to confirmation of the Plan.

## Compliance with PROMESA Section 314(b)

**A. PROMESA § 314(b)(1):** *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301.*

56.     As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the

Debtors as the proponents.  (Plan at 1.)  In addition, as detailed below, the Plan satisfies the

requirements of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5),

1123(b), and 1123(d) of the Bankruptcy Code.

      **i.**    **Bankruptcy Code Section 1122(a)**

57.    With the exception of Administrative Expense Claims and Professional Claims, which need not be classified, Article IV of the Plan designates the classification of Claims.  The Plan's classification of Claims complies with section 1122(a) of the Bankruptcy Code because each Class contains only claims that are either all unsecured Claims or are all secured Claims secured by the same collateral, or are otherwise substantially similar to the other claims in the class.  (Jaresko Decl. ¶ 47.)  The Plan designates the following sixty-nine (69) Classes of Claims:

| Claim | Class | Debtor(s) |
|---|---|---|
| Vintage PBA Bond Claims | Class 1 | PBA |
| Vintage PBA Bond Claims (Assured) | Class 2 | PBA |
| Vintage PBA Bond Claims (National) | Class 3 | PBA |
| Vintage PBA Bond Claims (Ambac) | Class 4 | PBA |
| Vintage PBA Bond Claims (FGIC) | Class 5 | PBA |
| Vintage PBA Bond Claims (Syncora) | Class 6 | PBA |
| Retail Vintage PBA Bond Claims | Class 7 | PBA |
| 2011 PBA Bond Claims | Class 8 | PBA |
| Retail 2011 PBA Bond Claims | Class 9 | PBA |
| 2012 PBA Bond Claims | Class 10 | PBA |
| Retail 2012 PBA Bond Claims | Class 11 | PBA |
| PBA/DRA Secured Claim | Class 12 | PBA |
| PBA General Unsecured Claims | Class 13 | PBA |
| PBA/DRA Unsecured Claim | Class 14 | PBA |
| Vintage CW Bond Claims | Class 15 | Commonwealth |
| Retail Vintage CW Bond Claims | Class 16 | Commonwealth |
| Vintage CW Bond Claims (Assured) | Class 17 | Commonwealth |
| Vintage CW Bond Claims (National) | Class 18 | Commonwealth |
| Vintage CW Bond Claims (Ambac) | Class 19 | Commonwealth |
| Vintage CW Bond Claims (FGIC) | Class 20 | Commonwealth |
| Vintage CW Bond Claims (Syncora) | Class 21 | Commonwealth |
| Vintage CW Bond Claims (Taxable Election) | Class 22 | Commonwealth |
| Vintage CW Guarantee Bond Claims | Class 23 | Commonwealth |

| Claim | Class | Debtor(s) |
|---|---|---|
| Vintage CW Guarantee Bond Claims (Assured) | Class 24 | Commonwealth |
| Vintage CW Guarantee Bond Claims (National) | Class 25 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Ambac) | Class 26 | Commonwealth |
| Vintage CW Guarantee Bond Claims (FGIC) | Class 27 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Syncora) | Class 28 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 29 | Commonwealth |
| 2011 CW Bond Claims | Class 30 | Commonwealth |
| Retail 2011 CW Bond Claims | Class 31 | Commonwealth |
| 2011 CW Bond Claims (Assured) | Class 32 | Commonwealth |
| 2011 CW Bond Claims (Taxable Election) | Class 33 | Commonwealth |
| 2011 CW Guarantee Bond Claims | Class 34 | Commonwealth |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 35 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims | Class 36 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Assured) | Class 37 | Commonwealth |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 38 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 39 | Commonwealth |
| 2012 CW Bond Claims | Class 40 | Commonwealth |
| Retail 2012 CW Bond Claims | Class 41 | Commonwealth |
| 2012 CW Bond Claims (Assured) | Class 42 | Commonwealth |
| 2012 CW Bond Claims (Taxable Election) | Class 43 | Commonwealth |
| 2012 CW Guarantee Bond Claims | Class 44 | Commonwealth |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 45 | Commonwealth |
| 2014 CW Bond Claims | Class 46 | Commonwealth |
| Retail 2014 CW Bond Claims | Class 47 | Commonwealth |
| 2014 CW Bond Claims (Taxable Election) | Class 48 | Commonwealth |
| 2014 CW Guarantee Bond Claims | Class 49 | Commonwealth |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 50 | Commonwealth |
| Retired ERS Participant Below-Threshold Claims | Class 51A | Commonwealth |

| Claim | Class | Debtor(s) |
|---|---|---|
| Retired JRS Participant Below-Threshold Claims | Class 51B | Commonwealth |
| Retired TRS Participant Below-Threshold Claims | Class 51C | Commonwealth |
| Retired ERS Participant Above-Threshold Claims | Class 51D | Commonwealth |
| Retired JRS Participant Above-Threshold Claims | Class 51E | Commonwealth |
| Retired TRS Participant Above-Threshold Claims | Class 51F | Commonwealth |
| Active ERS Participant Claims | Class 51G | Commonwealth |
| Active JRS Participant Claims | Class 51H | Commonwealth |
| Active TRS Participant Claims | Class 51I | Commonwealth |
| System 2000 Participant Claims | Class 51J | Commonwealth |
| VTP Payroll Participant Below-Threshold Claims | Class 51K | Commonwealth |
| VTP Payroll Participant Above-Threshold Claims | Class 51L | Commonwealth |
| AFSCME Claims | Class 52 | Commonwealth |
| Dairy Producer Claims | Class 53 | Commonwealth |
| Eminent Domain/Inverse Condemnation Claims | Class 54 | Commonwealth |
| Energy Incentive Claims | Class 55 | Commonwealth |
| Med Center Claims | Class 56 | Commonwealth |
| Tax Credit Claims | Class 57 | Commonwealth |
| CW General Unsecured Claims | Class 58 | Commonwealth |
| GDB/PET Claim | Class 58A | Commonwealth |
| CW/HTA Claims | Class 59 | Commonwealth |
| CW/Convention Center Claims | Class 60 | Commonwealth |
| CW/PRIFA Rum Tax Claims | Class 61 | Commonwealth |
| CW/MBA Claims | Class 62 | Commonwealth |
| CW Appropriations Claims | Class 63 | Commonwealth |
| Section 510(b) Subordinated Claims | Class 64 | Commonwealth, ERS, and PBA |
| ERS Bond Claims | Class 65 | ERS |
| ERS General Unsecured Claims | Class 66 | ERS |

| Claim | Class | Debtor(s) |
|---|---|---|
| Gracia-Gracia Claims | Class 67 | Commonwealth |
| Convenience Claims | Class 68 | Commonwealth and ERS |
| Federal Claims | Class 69 | Commonwealth |

(Jaresko Decl. ¶ 47.)

58.     The classification of Claims set forth in the Plan is reasonable and was not done to control the outcome of voting to accept or reject the Plan, as the classification is based upon differences in the legal nature and/or priority of such Claims in accordance with applicable law. To the extent unsecured Claims are separately classified from the Commonwealth's general unsecured claims (Class 58),[17] it is not to gerrymander an accepting Class, as proven by there being several impaired accepting Classes for each Debtor.  Rather, separate classification is used for governmental or business reasons usually requiring different treatment of separate Classes' Claims.  (Jaresko Decl. ¶ 48.)

59.     All holders of Claims in Classes 1-11 hold PBA Bonds and allege the same guarantee against the Commonwealth, but are separately classified based on three factors: the year in which the bonds were issued; whether the bonds are insured and, if so, the insurer; and whether the bondholder is a retail investor.  Classification depending on year of issuance is based on differences in the risk profile associated with each issuance potentially having violated the debt service limit set forth in Article VI, section 2 of the Commonwealth Constitution, with the treatment of Classes varying based on how much risk of disallowance of the Claims existed for

---

[17]     Class 58A consists of the GDB/PET Claim, which will receive payments from the Commonwealth equal to, and on the same timeframe as, the pro rata payments to be made to holders of Allowed CW General Unsecured Claims (Class 58) pursuant to the Plan.  (Plan § 62.4.)

each Class.  Holders of insured bonds issued the same year are separately classified because the insurance agreements provide bondholders different rights.  Claims of Retail Investors are separately classified because such Claims are smaller in dollar amount and the holders' rights differ from those of holders of GO Bonds and PBA Bonds who are parties to the GO/PBA Plan Support Agreement, and holders of bonds insured by the Monolines.  Thus, the holders of Claims in Classes 1-11 are classified by whether the PBA Bonds they hold: (a) were issued prior to 2011 and are (i) uninsured (Class 1), (ii) uninsured and held by a Retail Investor (Class 7), (iii) insured by Assured (Class 2), National (Class 3), Ambac (Class 4), FGIC (Class 5), or Syncora (Class 6); (b) were issued in 2011 and are (i) uninsured (Class 8), or (ii) uninsured and held by a Retail Investor (Class 9); or (c) were issued in 2012 and are (i) uninsured (Class 10), or (ii) uninsured and held by a Retail Investor (Class 11).  (Jaresko Decl. ¶ 48.)

60.     Bond Claims against the Commonwealth in Classes 15-50 are classified separately based on the date of bond issuance, whether the bonds are insured and, if so, the insurer, and whether the bondholder is a retail investor as follows: (a) whether the bonds were issued prior to March 2011 (Classes 15-29), March or later in 2011 (Classes 30-39), in 2012 (Classes 40-45), or 2014 (Classes 46-50), and (b) whether the bonds are (i) uninsured (Classes 15, 23, 30, 34, 36, 40, 44, 46, and 49) and held by Retail Investors (Classes 16, 31, 38, 41, and 47), or (ii) insured by Assured (Classes 17, 24, 32, and 42), National (Classes 18 and 25), Ambac (Classes 19 and 26), FGIC (Classes 20 and 27), or Syncora (Classes 21 and 28).  (Jaresko Decl. ¶ 49.)

61.     Based on the elections offered pursuant to the Plan, certain Vintage CW Bond Claims, Vintage CW Guarantee Bond Claims, 2011 CW Bond Claims, 2011 CW Guarantee Bond Claims, 2011 CW Series D/E/PIB Bond Claims, 2012 CW Bond Claims, 2014 CW Bond

Claims, and 2014 CW Guarantee Bond Claims, to the extent elections were made, were shifted to other Classes (Classes 22, 29, 33, 35 39, 43, 48, and 50, respectively) to denote the election made by holders of such Claims to receive taxable distributions on account of their bonds, and the alternative form of distribution elected.  (Jaresko Decl. ¶ 49.)  Only Puerto Rico Investors could elect to receive taxable bonds because, unlike mainland U.S. investors, Puerto Rico Investors are generally not subject to U.S. federal income taxation.  (Brownstein Decl. ¶ 16.)  When Puerto Rico Investors elect taxable treatment, it increases the likelihood that a greater amount of tax-exempt bonds will be available for mainland U.S. bondholders.  (Id.)  The taxable election for on-island bondholders benefits mainland U.S. bondholders because, as a result of on-island bondholders taking the taxable election, mainland investors receive a higher amount of tax-exempt bonds affording a greater after-tax gain.[18]  (See Nov. 12, 2021, Hr'g Tr. 112:5-15.)

62.     Active and retired employees holding pension Claims comprise Classes 51A-51L. The services that are and have been performed by these current and retired employees are integral to the basic provision of governmental services to the Commonwealth's residents and the Government could not function without them.  Moreover, the best interests of the Commonwealth and all of its stakeholders are served by ensuring that pensioners receive monthly benefits to maintain the ability to support themselves without requiring additional future

---

[18]     On cross-examination, the Debtors' witness, David M. Brownstein, Managing Director in the Municipal Finance Department at Citigroup Global Markets Inc., testified that an individual mainland bondholder in a 35 percent tax bracket would benefit by a 14 percent after-tax gain: "Clearly, if you're a taxpayer who pays state and local taxes, you're higher than that, but in a 35 percent tax bracket, you, as an U.S. holder, mainland holder of these bonds, for the 49 million in bonds that the local on-island holders took taxable instead of you, you have a 14 percent after-tax gain.  That is what was provided to you by giving the on-island investors the right to elect taxable bonds, which meant that your portfolio would have a higher amount of tax[-]exempt bonds."  (Nov. 12, 2021, Hr'g Tr. 112:8-15.)

support from the Commonwealth.  These pension Claims are further classified separately based on whether the pensioners (a) are retired (Classes 51A-F, K, and L) or active (Classes 51G-J), (b) are participants in ERS (Classes 51A, 51D, and 51G), JRS (Classes 51B, 51E, and 51H), TRS (Classes 51C, 51F, and 51I), System 2000 (51J), or participated in a voluntary termination program (Classes 51K and 51L), because each program had different funding sources as of the Commonwealth Petition Date, with different levels of underfunding, and (c) receive total monthly pension benefits above (Classes 51D-F and 51L) or below (Classes 51A-C and 51K) $1,500.[19]  (Jaresko Decl. ¶¶ 50-51.)

63.    The separate classification of Claims for retirement benefits from the claims of other creditors is justified.  Unlike the Claims of commercial creditors, who contracted to be paid a fixed sum at a fixed time, retirees agreed to defer their compensation with the expectation that the deferred compensation, i.e., their pension, would be paid in periodic payments over the balance of their life (and that of any surviving spouse), based on formulas established when they worked for the Commonwealth or other governmental entities.  Accordingly, the Plan proposes to make payments to retirees over the life of the retiree and any eligible spouse through the PayGo system and specified statutory rules established before the Commonwealth's Title III case began, as modified pursuant to the Plan, including through the "freeze" of TRS and JRS and elimination of cost of living adjustments ("COLAs").

64.    Claims held by AFSCME, related to certain collective bargaining agreements between AFSCME affiliates and the Commonwealth that will occur pursuant to the Plan, are

---

[19]    As set forth below, in light of the passage of Act 53 and modifications to the proposed plan after the classes were established and votes were solicited, the Plan was modified to remove the Monthly Benefit Modification feature of the Seventh Amended Plan, and the $1,500 threshold no longer affects the treatment of pensioners' claims.

classified in Class 52, separately from general unsecured claims.  The separate classification is

necessary because the treatment of these claims is the result of the adoption of a new collective

bargaining agreement.  This treatment is inapplicable to other Classes of unsecured Claims and it

is beneficial to the Commonwealth and all its stakeholders to provide such treatment as opposed

to the potential litigation and treatment of any rejection damages Claims relating to these

collective bargaining agreements.  AFSCME and its local affiliates collectively constitute one of

Puerto Rico's primary public employee unions and an important bargaining unit whose members

provide the Commonwealth's public services.  (Jaresko Decl. ¶ 52.)  Separate classification of

these Claims is reasonable, justified, and supported by a governmental purpose.  The Plan

provides that all other collective bargaining agreements are neither being rejected nor assumed.

65.     The Claims held by Suiza Dairy, Inc. and Vaqueria Tres Monjitas, Inc.—the

Commonwealth's primary producers and sources of dairy for the population—are classified

separately in Class 53, which rejected the Plan.  The Plan may nonetheless be confirmed

pursuant to Bankruptcy Code section 1129(b)(2)(B) because no Claims junior to the Claims in

Class 53 receive or retain any property and there is no contention the Plan unfairly discriminates

against Class 53.  Moreover, if there were such a contention it would be overruled because the

Allowed Claims in Class 53 receive more than CW General Unsecured Claims in Class 58.  The

separate classification of these unsecured claims is justified by the particular importance of the

milk industry in Puerto Rico.  It is very costly and difficult for Puerto Rico to consistently import

dairy, which has a short shelf life—a fact underscoring the importance of the domestic dairy

industry to the Commonwealth and its residents.  Dairy production is one of the key issues of

food security on the Island.  The dairy industry also is one of the Commonwealth's largest

agricultural industries and employs a significant number of Puerto Rico's residents.  It is

reasonable and justified to classify such dairy producers' Claims separately and provide such Class with a fifty percent (50%) recovery,[20] ensuring that such integral Claimants do not suffer further financial hardship and impair an industry that is vital to the health of the Commonwealth's citizens.  (Jaresko Decl. ¶ 53.)  Further, the dairy producers' claims arose from the prepetition Dairy Producer Settlement (see Jaresko Decl. ¶ 53; Plan §§ 1.190, 1.191; Debtors Ex. 26 (the "Dairy Producer Settlement")), and the Commonwealth obligation to pay certain fees to protect consumers (see Debtors Ex. 26 ¶ 14).  Accordingly, the separate classification of claims held by large dairy producers is reasonable, justified, and supported by a governmental purpose.

66.    Eminent Domain/Inverse Condemnation Claims (as that term is defined in section 1.212 of the Plan) are separately classified in Class 54 of the Plan.  The holders of such Claims assert that they hold prepetition constitutional Claims based on seizures or the inverse condemnation of real property pursuant to the Commonwealth's eminent domain power.  The Debtors allege that the Eminent Domain Claims are partially secured by funds deposited by the Commonwealth with the Clerk of the Court of First Instance in connection with condemnation proceedings underlying such Claims in accordance with Puerto Rico law, 32 L.P.R.A. § 2907.  In accordance with applicable Puerto Rico law, upon commencement of a condemnation proceeding, title to a subject property is transferred to the Commonwealth and funds on deposit become available to the former title holder.[21]  32 L.P.R.A. § 2907.  The Fifth Modified Eighth

---

[20]    The objection of Suiza Dairy is discussed and resolved infra, at paragraphs 175-77.

[21]    If the Commonwealth does not initiate a condemnation proceeding following applicable eminent domain procedures, or if the taking is the result of the diminution of the property's use or value resulting from government conduct, the former owner of property may initiate a claim for inverse condemnation for the taking of property for public use

Amended Plan filed with the Court on December 21, 2021 (Docket Entry No. 19568) treats the

Eminent Domain/Inverse Condemnation Claims as secured Claims to the extent the Claims are

allowable and there is cash on deposit for them.  It further provides that the Eminent

Domain/Inverse Condemnation Claims will be treated as Class 58 CW General Unsecured

Claims entitled to the same treatment as other holders of CW General Unsecured Claims to the

extent each allowable Claim exceeds the cash on deposit for it (Jaresko Decl. ¶ 54.)  That

proposed Plan further provides, however, that if the Court determines that such Claims must be

paid in full to the extent they are Allowed Claims for just compensation, they will be so paid.

(See Plan §§ 58.1, 77.1(e) (the "Full-Payment Proposal").)  The claimants, opposing the

proposed treatment of their claims as partially secured and partially unsecured (or, in the case of

Inverse Condemnation claimants, entirely unsecured), dispute the classification of any portion of

their claims as general unsecured claims and argue that, even to the extent their claims are

unsecured, they are nonetheless entitled to payment in full of their allowable unsecured Claims

because the Claims are based on the Fifth Amendment of the U.S. Constitution.  The issue

presented by the Fifth Modified Eighth Amended Plan and the pertinent objections is whether the

Eminent Domain/Inverse Condemnation claimants are entitled to have the unsecured portions of

their Claims (i.e., those portions that the Debtors do not already propose to pay in full)

designated as nondischargeable or otherwise required to be paid in full.  The Eminent

Domain/Inverse Condemnation Claims are prepetition Claims arising from the Commonwealth's

alleged taking of title to the claimants' real properties, or deprivation of the claimants of use of

such properties, prior to commencement of the Commonwealth Title III case.  It is undisputed

---

without just compensation.  See, e.g., Filler v. United States, 116 Fed. Cl. 123, 127 n.2
(Fed. Cl. 2014).

that the Fifth Modified Eighth Amended Plan does not currently except the Eminent

Domain/Inverse Condemnation Claims from discharge.  The Debtors and claimants disagree as

to whether the Court can and should except them from discharge.  Because the Fifth Amendment

of the U.S. Constitution provides that "private property [shall not] be taken for public use,

without just compensation," the claimants assert that Congress lacks power to legislate the

discharge of the Eminent Domain/Inverse Condemnation Claims for less than payment in full of

just compensation.  Conversely, the Debtors contend that article I, section 8, clause 4 of the U.S.

Constitution, which grants Congress the power to pass uniform laws on the subject of

bankruptcies, empowers Congress to provide for the discharge of such claims for less than

payment in full as Debtors have done in the Fifth Modified Eighth Amended Plan.  As set forth

more fully below, the Court concludes that the Eminent Domain/Inverse Condemnation Claims

identified in Class 54 are not subject to impairment and discharge.  Accordingly, the Class 54

claimants' assertions that their Claims should be paid in full or deemed nondischargeable are

sustained and such Allowed Claims must be paid in accordance with Debtors' Full-Payment

Proposal in connection with Eminent Domain/Inverse Condemnation Claims (as set forth in Plan

§§ 58.1, 77.1(e)).  The Court's January Order conditioned entry of this FFCL on the Debtors'

revision of the Plan to incorporate the treatment of Allowed Eminent Domain/Inverse

Condemnation Claims as set forth in the Full-Payment Proposal.

67.     Claims in Class 55 arise from, or relate to, the Energy Incentive Act, which

provides tax incentives for citizens who undertake certain clean-energy projects to reduce their

household's energy use.  Pursuant to the Plan, such Claims are not paid in cash or other monies

in the Debtors' Title III Cases, but rather, are satisfied through reductions in tax revenue.

(Jaresko Decl. ¶ 55.)  It is in the Commonwealth's best interests to promote the reasonable

governmental purpose of supporting residents who are taking steps to address climate change and who took those steps in reliance upon the availability of such tax deductions under the Energy Incentive Act.  Accordingly, separate classification of such Claims is reasonable and justified.

68.      Class 56 consists of all Claims of certain federally qualified health centers arising from or relating to the Medicaid Act.  Separate classification of such Claims is reasonable and justified because such Claims are held by entities that provide critical medical treatment to Commonwealth residents, particularly in a global pandemic, and are payable through Medicare/Medicaid funds from the federal government that are earmarked for the payment of such claims and not available to other general unsecured claimholders.  Separate classification of such Class and enhanced treatment on account of its Claims through the receipt of a fifty percent (50%) recovery is reasonable and justified to support such critical services and ensure that medical providers on the Island are not underfunded.  (Jaresko Decl. ¶ 56.)  42 U.S.C. § 1396a(bb).  Class 56 also exempts the litigation styled <u>Rio Grande Cmty. Health Ctr. Inc., et al. v. Commonwealth of Puerto Rico, et al.</u>, Case No. 03-1640 (GAG), currently pending in the United States District Court for the District of Puerto Rico, from dismissal under section 60.2 of the Plan, and provides separate treatment for the manner in which that litigation shall be pursued and resolved by the parties thereto.  (Plan § 60.2.)

69.      Class 57 consists of Claims (other than Energy Incentive Claims) relating to refunds or credits for the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, or an economic incentive law, in each case resulting in income tax credits, deductions, or carryforwards.  Such Tax Credit Claims were designed and implemented by the Government of the Commonwealth to incentivize certain behavior and to

benefit the Commonwealth and support the economy as a whole.  Pursuant to the Plan, such

Claims are not paid in cash or other monies in the Debtors' Title III Cases, but rather, are

satisfied through reductions in tax revenue.  (Jaresko Decl. ¶ 57.)  Accordingly, it is reasonable

and in the best interests of the Commonwealth and its economy to continue to honor such tax

incentives upon which residents and local businesses have relied, and to separately classify such

Claims.

70.    Class 63 consists of Claims arising from or related to indebtedness only payable

from appropriations of the Commonwealth Legislature.  Such claimants, significantly, have

fewer rights than holders of CW General Unsecured Claims, as they have no ability to compel

payment of their Claims and hold only contingent rights to payment to the extent appropriated by

the Government of the Commonwealth.  (Jaresko Decl. ¶ 58.)  It is therefore reasonable and

appropriate to separately classify such claims.

71.    Class 64 consists of Claims determined pursuant to a Final Order to be subject to

section 510(b) of the Bankruptcy Code.  (Jaresko Decl. ¶ 59.)  Section 510(b) of the Bankruptcy

Code subordinates such Claims to other general unsecured claims, and provides that such Claims

are only eligible to receive a recovery pursuant to the Plan once all other unsecured creditors

have been paid in full.  Because these Claims have a lower priority than general unsecured

claims, they are sufficiently dissimilar to general unsecured claims to warrant separate

classification and treatment.

72.    As each Class contains Claims substantially similar to each other, the Plan

satisfies the requirements of section 1122(a) of the Bankruptcy Code.[22]

---

[22]    Mapfre PRAICO Insurance Company ("Mapfre PRAICO") contends that the Plan
violates section 1122(a) because it places Mapfre PRAICO's claims against the
Commonwealth and against PBA into Class 58 and Class 13, respectively,

73.     The Plan separately classifies Claims not similarly situated to other Claims based upon differences in the legal nature and/or priority of such Claims or because they are asserted against a different Debtor than other Claims with the same priority, including secured and unsecured Claims against PBA (Classes 12-14), CW/HTA Claims (Class 59), CW/Convention Center Claims (Class 60), CW/PRIFA Rum Tax Claims (Class 61), CW/MBA Claims (Class 62), ERS Bond Claims and ERS General Unsecured Claims (Classes 65 and 66), Gracia Gracia Claims (Class 67), and Federal Claims (Class 69).

### ii.     Bankruptcy Code Section 1122(b)

74.     Class 68 consists of Convenience Claims, comprising Claims equal to or less than $20,000, or Claims which the holder elects to reduce to $20,000 pursuant to the Plan.  (Plan § 1.162.)  Any holder of multiple Claims in an aggregate amount of $40,000 or more may elect to reduce all such Claims to an aggregate amount of $40,000 and be treated within Class 68.

---

notwithstanding Mapfre PRAICO's assertion that those claims are secured.  The Confirmation Order, however, provides that, to the extent Mapfre PRAICO's claims are determined to be secured claims, they will be unimpaired and not subject to treatment as general unsecured claims.  See Confirmation Order ¶ 86 ("Notwithstanding anything contained in the Plan to the contrary, to the extent that the Claim of a surety against any of the Debtors is determined to be a secured claim and allowed in whole or in part, by Final Order, or by operation of section 502(a) of the Bankruptcy Code following the expiration of the period to object to any such Claim in accordance with the provisions of Section 82.1 of the Plan, such Claim shall be paid in full, in Cash; provided, however, that, in the event some or all of any such Claim is determined to be an unsecured claim and allowed in whole or in part, by Final Order, such Claim shall be treated in accordance with the provisions of Section 17.1, 62.1 or 70.1 of the Plan, as the case may be.").)  Accordingly, as modified by the Confirmation Order, to the extent that Mapfre PRAICO's claims are determined to be secured claims, such claims will not be treated as general unsecured claims.  Mapfre PRAICO has not objected to the treatment that would be provided by paragraph 87 of the Confirmation Order.  Moreover, the classification did not affect voting because any separate, unimpaired class of secured claims would have been deemed to accept the Plan, see 11 U.S.C. § 1126(f), and Class 13 and Class 58 did not vote to accept the Plan.

(Plan §-1.163, art. LXXII.) The separate classification of Convenience Claims is reasonable and necessary to ease the administrative burden on the Debtors. (See Jaresko Decl. ¶ 60.)

75. The Plan satisfies the requirements of section 1122(b) of the Bankruptcy Code.

### iii. Bankruptcy Code Section 1123(a)(1)

76. Section 4.1 of the Plan designates sixty-nine (69) separate Classes of Claims for the Debtors, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code.

77. The Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### iv. Bankruptcy Code Section 1123(a)(2)

78. Section 84.1 of the Plan specifies that Claims in Classes 1 through 50, 51B, 51E, 51G through 51I, 52 through 53, 56, 58 through 66 and 69 are impaired. Section 84.2 of the Plan specifies that Claims in Classes 51A, 51C, 51D, 51F, 51J through 51L, 54, 55, 57, 67, and 68 are unimpaired.

79. Since the Plan has been modified to exclude Class 54 from the list of impaired Classes and add it to the list of unimpaired Classes, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### v. Bankruptcy Code Section 1123(a)(3)

80. Articles V through LIV, sections 55.2, 55.5, 55.7 through 55.9, articles LVI through LVII, LX, LXII through LXX and LXXIII of the Plan identify the treatment of each Class of Claims impaired by the Plan. Sections 62.2 and 62.3 have been revised to remove any reference to Eminent Domain Claims from the category of CW General Unsecured Claims and treatment thereunder.

81. The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### vi.     Bankruptcy Code Section 1123(a)(4)

82.     Articles V through LXXIII of the Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim. (Jaresko Decl. ¶ 65.)

83.     Mr. Hein objects to the payment of certain costs and fees to some, but not all bondholders, arguing that such payments render the treatment of the bondholders' respective claims different, violating section 1123(a)(4) of the Bankruptcy Code (Hein Obj. at 17). Consummation Costs, Restriction Fees, or Retail Support Fees are being paid to certain parties pursuant to the Plan and in accordance with the plan support agreements negotiated by the Oversight Board.  (See Zelin Decl. ¶¶ 80, 84, 85; Debtors Exs. 16, 17.)  Hein's objection is unfounded because these costs are not awarded on account of the creditors' Claims but, rather, as consideration for the creditors' actions in facilitating the settlements embodied in the Plan.  (See Nov. 10, 2021, Hr'g Tr. 63:24-64:5, 72:23-73:6; Zelin Decl. ¶ 78; Jaresko Decl. ¶ 66.) Commitments to pay Consummation Costs and Restriction Fees were essential to incentivize parties to engage in continued negotiations over an extended period of time, and to incentivize parties to the plan support agreements to support confirmation of the Plan.  (Zelin Decl. ¶ 91.) Without such fees, building consensus and encouraging parties to engage in negotiations and ultimately document their agreements would have been significantly more difficult, and Plan confirmation would have been less likely or substantially prolonged.  (Id. ¶¶ 91-92.)  The Oversight Board has determined that it is fair and reasonable for the PSA Creditors to be paid Consummation Costs as consideration for their efforts in assisting in the formulation of the Plan that has garnered significant creditor support, and to compensate the PSA Creditors for fees and

expenses incurred in connection with the negotiation and execution of the GO/PBA PSA and HTA/CCDA PSA.   (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 80, 84, 88, 91-93; Debtors Exs. 16, 17.) During the lengthy and complex negotiation process led by the Mediation Team, PSA Creditors agreed to various conditions and covenants set forth in plan support agreements, including, among other things, a pledge to support the Plan, the imposition of restrictions on the transfer of their bonds, and a waiver of their right to seek reimbursement of expenses through other means. (Zelin Decl. ¶ 93, Debtors Exs. 16, 17.)  The Consummation Costs are not paid on account of creditors' Claims.  (See Jaresko Decl. ¶ 66.)  Rather, the Consummation Costs are paid to reimburse expenses incurred in negotiating plan support agreements that enabled the Plan to move forward.  (See Nov. 10, 2021, Hr'g Tr. 63:24-64:5; Zelin Decl. ¶¶ 80, 84, 88, 92.)  Thus, the Oversight Board has determined, and this Court finds that, the 1.5% Consummation Cost expense is reasonable.  (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 91-93; Nov. 10, 2021, Hr'g Tr. 91:17-25.)

84.     Additionally, in exchange for agreeing to support the Plan and tender or "lock up," as applicable, the parties' bonds in accordance with each of the GO/PBA PSA and HTA/CCDA PSA, it is fair and reasonable to make PSA Restriction Fees available to holders of bonds issued by such entities.  (Zelin Decl. ¶¶ 80, 84, 85, 89, 91-93; Jaresko Decl. ¶¶ 127, 178.) Similarly, in exchange for executing the ERS Stipulation and agreeing to all of its terms and conditions, including agreeing to support the Plan and "lock up" their ERS Bonds in connection with the ERS Stipulation, it is fair and reasonable to make an ERS Restriction Fee available to each ERS bondholder party to the ERS Stipulation.  (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 83, 91-93; Debtors Ex. 19.)

85.     As a product of the negotiations culminating in the GO/PBA PSA, a similar Retail

Support Fee (i.e., a form of "restriction fee") will be available to Retail Investors who did not

tender and exchange their bonds to join the GO/PBA PSA.  (Zelin Decl. ¶¶ 81, 82; Debtors Ex.

16.)  The Oversight Board determined that providing Retail Investors an opportunity to receive

similar payments is fair and reasonable, and balances the interests of various creditor

constituencies.  (Jaresko Decl. ¶¶ 128, 216.)  Moreover, the Oversight Board has agreed to

provide bondholders with an additional opportunity to certify that they are Retail Investors and

receive their Pro Rata Share of the GO/PBA Restriction Fee Percentage.  (See Nov. 22, 2021,

Hr'g Tr. 44:1-45:4.)  The Retail Support Fee payments are reasonable and appropriate, and will

not be paid on account of Claims.

86.     The provisions for payment of Consummation Costs, Restriction Fees, and Retail

Support Fees are critical components of the plan support agreements that made development of

the Plan possible.  (See Jaresko Decl. ¶ 66.)  The payment of Consummation Costs, Restriction

Fees, and Retail Support Fees to certain parties does not violate section 1123(a)(4) of the

Bankruptcy Code, which mandates that "a plan shall . . . provide the same treatment for each

claim or interest of a particular class . . . ." 11 U.S.C.A. § 1123(a)(4) (Westlaw through P.L. 117-

80).  While it is true that all claims must be treated equally, the same is not true for all claimants.

See 7 Collier on Bankruptcy ¶ 1123.01 (16th ed. 2021) ("The equality addressed by section

1123(a)(4) extends only to the treatment of members of the same class of claims and interests,

and not to the plan's overall treatment of the creditors holding such claims or interests . . . .

Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'");

see also Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody

Energy Corp.), 582 B.R. 771, 781 (E.D. Mo. 2017) (same); In re Adelphia Commc'ns Corp., 368

B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) ("[C]ourts have held that the statute does not require

identical treatment for all class members in all respects under a plan, and that the requirements of

section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in

a specific class—not the treatment that members of the class may separately receive under a plan

on account of the class members' other rights or contributions.") (emphasis in original).

Accordingly, the payment of these fees is consistent with section 1123(a)(4) of the Bankruptcy

Code and the Hein Objection and the Samodovitz Objection on this ground are overruled.[23]

### vii.    Bankruptcy Code Section 1123(a)(5)

87.    Various provisions of the Plan provide adequate and proper means for its

implementation:

- Article III provides for the payment of Administrative Expense Claims required to be paid on the Effective Date;

- Section 74.1 provides for the issuance and distribution of the New GO Bonds;

- Section 74.2 provides for the issuance and distribution of the CVIs;

- Section 74.5 ensures the feasibility of the Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated";

- Section 76.1 provides, subject to Sections 76.5, 76.7, and 76.10 of the Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the

---

[23]    Mr. Hein and Mr. Samodovitz further contend that Retail Investor bondholders should also be entitled to the 1.5% Consummation Cost in addition to a Retail Support Fee. While Mr. Hein and Mr. Samodovitz assert that they should be accorded a larger payment under the plan support agreements, they do not argue that their Claims have been treated differently (or impaired) as a result of the payment of a Consummation Cost to certain PSA creditors, and the Court finds that there is no such prohibited differential treatment by reason of the payment of Consummation Costs.  Rather, as explained above, Consummation Costs are not awarded on account of the individual creditors' Claims. (Zelin Decl. ¶ 78; Jaresko Decl. ¶ 66.)   As noted above, section 1123(a)(4) of the Bankruptcy Code does not require identical treatment of all claimants.

Effective Date, shall be rejected by the Debtors as of the Effective Date, except for any Executory Contract or Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Government of the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party) . . . .";

- Article LXXVII provides for distributions to be made to holders of all Allowed Claims under the Plan;

- Article LXXVIII provides for the Avoidance Actions Trust Assets to vest in the Avoidance Actions Trust, to be administered by the Avoidance Actions Trustee, and provides for the semi-annual distribution of liquidated Avoidance Actions Trust Assets to the beneficiaries thereof;

- Section 81.2 vests in the Disbursing Agent, among other things, the power and authority to make distributions contemplated by the Plan;

- Article LXXXII provides for the Debtors to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

- Article LXXXIII provides for the funding and administration of the Pension Reserve Trust under the Plan;

- Article LXXXVIII provides that, "[o]n the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule";

- Section 92.1 provides for the re-vesting of assets: "Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order)";

- Articles II and LXIX provide for the sale of all ERS assets to the Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private Equity Portfolio; and

- Articles VI through XV provide for approximately $1.1 billion to be paid by the Commonwealth to holders of PBA Bond Claims in satisfaction of their claims.

(See Jaresko Decl. ¶ 67; Shah Decl. ¶ 59; see generally Plan.)

88.     The Plan Supplement contains, among other things, the forms of (a) the New GO Bond Trust Agreement, (b) the CVI Trust Agreement, (c) the Avoidance Actions Trust Agreement, (d) the ERS Trust Agreement, (e) the Schedule of Executory Contracts and Unexpired Leases to be Assumed, (f) the Supplemental Ambac Election Notice, (g) the Assured Custodial Trust Documents, (h) the FGIC Custodial Trust Agreement, (i) Act 53-2021, and (j) the Pension Reserve Trust Guidelines (each as defined in the Plan Supplement).  (See generally Plan Sup.)  The Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.

89.     The Confirmation Order further provides adequate means for the Plan's implementation including, but not limited to, paragraph 62 thereof which provides: "Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living

adjustments for government employees; provided, however, that the Governor and Legislature, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans, under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan."  (Confirmation Ord. ¶ 62.)  This provision is appropriate and necessary for the implementation and feasibility of the Plan.[24]

---

[24]    Section 1142(b) of the Bankruptcy Code provides that the "court may direct the debtor and any other necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act, including the satisfaction of any lien, that is necessary for the consummation of the plan."  11 U.S.C. § 1142(b); see In re Riverside Nursing Home, 137 B.R. 134, 138 (Bankr. S.D.N.Y. 1992) ("Subsection (b) of § 1142 expressly authorizes the court to direct a recalcitrant debtor or other party to perform acts necessary to consummate the plan. . . .  [A] court may direct a confirmed debtor to retain professional management, order payments to creditors from specific accounts and direct that funds be held so as to implement the plan."); In re Coral Air, Inc., 21 V.I. 7, 12 (D.V.I. 1984) (noting that section 1142(b) permits a court "to enter appropriate orders to enforce the intent and specific provisions of the plan").  The Debtors have proffered evidence that the Commonwealth's pension obligations have been and, absent modification, would continue to be a significant source of debt for Puerto Rico (Jaresko Decl. ¶ 15), and that provisions that conflict with the treatment of retirees put forth in the Plan may undermine the goals of PROMESA and the feasibility of the Plan. (See Jaresko Decl. ¶ 235; see also Jaresko Sup. Decl. ¶ 13 (discussing similar need to ensure

90.     The Court's conclusion under Bankruptcy Code section 1123(a)(5), made applicable by PROMESA section 301(a), that there are adequate means to implement the Plan rests on, among other things, Act 53 (Debtors Ex. 134), which authorizes the new debt to be issued pursuant to the Plan with the support of the full faith and credit of the Commonwealth, as long as the Plan does not include Monthly Benefit Modifications to pension payments.  (See generally id.)  The freezes in the accruals of pension benefits and the elimination of cost of living adjustments do not affect the authorization of the new debt.  The plain and unambiguous terms of the statute provide that the debt authorization in Act 53 is conditioned only on the Plan's removal of the Monthly Benefit Modification provision that was included in the proposed Seventh Amended Plan, and Act 53 does not require satisfaction of any other conditions to the authorization of new debt, such as removal of Plan provisions concerning (a) the elimination of cost of living adjustments and/or (b) the freeze or termination of accrual of defined benefits

---

consistency between treatment of retirees in Plan with respect to the Freeze and COLAs to protect Plan's feasibility.)  The record adequately demonstrates that the "freeze" of certain defined benefit obligations is essential to the Plan's feasibility, and the prohibition of the re-creation or enhancement of existing defined benefit plans is therefore a necessary and appropriate means to ensure the viability of the Plan and implement the discharge of the Commonwealth's prepetition pension obligations.  (See Malhotra Sup. Decl. ¶¶ 16-21.)

Although early versions of the Plan and proposed confirmation order did not include the provision restricting the re-creation or enhancement of existing defined benefit plans (the "DB Increase Restriction"), parties in interest have been given adequate notice of the relief sought with respect to pension programs, including Plan provisions affecting future rights under existing pension plans (in particular, the defined benefit "freeze" and the restriction on cost of living adjustments), and of this request for a restriction on the government's power to restore defined benefit arrangements.  The DB Increase Restriction is a restriction on the exercise of governmental powers, not an impairment of existing vested rights held by any person.  Accordingly, the notice provided is sufficient under the circumstances.  The inclusion of the provision in the proposed confirmation order thus will not violate the due process rights of retirement plan participants who did not receive individualized notice of the Debtors' intention to request that the provision be included in the Plan and the Confirmation Order.

under TRS or JRS from and after the Effective Date.[25]  The Plan cancels and eliminates the

Monthly Benefit Modification previously included in the proposed Seventh Amended Plan,

thereby satisfying the condition in Act 53 for authorization of the new debt to be issued pursuant

to the Plan.  (See, e.g., Plan § 55.7(a).)  Accordingly, Act 53 provides adequate means for

implementation of the Plan.  In this connection, the Court also concludes that PROMESA's

preemption provisions and Title III's debt adjustment and plan confirmation provisions are

sufficient to enable the Commonwealth to implement the defined benefit and COLA freeze

---

[25]     Courts "interpret a Puerto Rico statute according to its plain meaning." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 59 (1st Cir. 2000).  "We first determine whether the statutory language is unambiguous.  In the absence of ambiguity, we generally do not look beyond the plain meaning of the statutory language." Herman v. Hector I. Nieves Transp., Inc., 244 F.3d 32, 34 (1st Cir. 2001) (citations omitted).  Here, article 104 of Act 53 declares that it is the public policy of Puerto Rico "to protect the accrued pensions of its public servants."  Article 104 provides that, "[t]herefore, with regard to the accrued pensions of government employees, it is hereby provided as follows: The Legislative Assembly authorizes the issuance of the General Obligation Bonds and CVIs subject to the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification."  Article 605 of Act 53 further provides that "[t]he effectiveness of [Act 53] is conditioned to the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification as defined in the Plan."  These operative provisions establish that the conditions put in place by Act 53 concern the protection of accrued pension rights and, in particular, the elimination of the Monthly Benefit Modification from the Plan.  No language in Act 53 indicates a legislative intent to preclude the defined benefit accrual "freeze" or the elimination of COLAs, each of which operates prospectively and does not affect accrued pension rights.  Notwithstanding arguments to the contrary that were raised in certain objections, Article 104's references to protecting "accrued pensions of . . . public servants" and "the pensions of all of our retirees" confirm that Act 53's conditions are met by a Plan that affects only the accrual of future pension benefits rather than those already earned.  Article 605's references to "reductions to . . . pensions" and "[z]ero cuts to pensions" arise in the context of a provision that expressly provides "clarity" to prior provisions and does not establish additional conditions.  Like the reference to "avoid[ing] any cut of pensions" in Article 603, those phrases are merely restatements of the policy of protecting accrued pension rights announced in Article 104 of Act 53, and they are consistent with the sufficiency of a plan that eliminates a cut to accrued current monthly pension payments and precludes further defined benefit accruals and cost of living increases to those monthly benefits.

provisions of the Plan without further legislative action. The Court's Confirmation Order, which provides detailed terms for the implementation of the defined benefit and COLA freeze aspects of the Plan, approves the freezes, which are economic measures consistent with the fiscal plan and within the scope of the Oversight Board's powers under PROMESA. The Plan and Confirmation Order are enforceable against the Commonwealth, its officials and other interested parties, and any Commonwealth law provisions contrary to their terms are preempted.

91. The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.[26]

### viii. Bankruptcy Code Section 1123(b)(1)

92. Article LXXXIV of the Plan identifies which Classes of Claims are impaired and which Classes of Claims are left unimpaired. Article LXXXIV has been modified to reflect that Class 54 is unimpaired rather than impaired.

93. The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### ix. Bankruptcy Code Section 1123(b)(2)

94. Subject to section 76.10 of the Plan, section 76.1 of the Plan provides that, as of the Effective Date, all Executory Contracts and Unexpired Leases to which any Debtor is a party are rejected, "except for any Executory Contract or Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective

---

[26] The Asociación de Maestros Puerto Rico and the Asociación de Maestros de Puerto Rico-Local Sindical (together, "AMPR") contend that the accrual of post-Effective Date benefits and cost of living adjustments cannot be preempted by the Plan or rejected by the Debtors. AMPR does not, however, dispute that the Supreme Court of Puerto Rico has characterized such obligations as contractual in nature. (See, e.g., AMPR Obj. ¶¶ 2, 21 (citing Asociación de Maestros de P.R. v. Sistema de Retiro para Maestros de P.R., 190 DPR 854 (P.R. 2014)).) Such rights are therefore ultimately subject to impairment and discharge like other general unsecured obligations.

Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtors reserve the right to amend, on or prior to the Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date."  (Plan § 76.1; see also Plan Sup. Ex. E.)

95.     The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

**x.     Bankruptcy Code Section 1123(b)(3)(A)**

96.     The Plan incorporates, among other things, the settlements and compromises set forth in the AFSCME Plan Support Agreement (Debtors Ex. 21), the GO/PBA Plan Support Agreement (Debtors Ex. 16), the HTA/CCDA Plan Support Agreement (Debtors Ex. 17), the PRIFA Plan Support Agreement (Debtors Ex. 18), the Retiree Committee Plan Support Agreement (Debtors Ex. 20), the Committee Agreement (Debtors Ex. 23), the ERS Stipulation

(Debtors Ex. 19), the PRIFA BANs Stipulation (Debtors Ex. 22), and the *Stipulation in Connection with DRA Related Disputes* (Docket Entry No. 19100 Ex. A) (Debtors Ex. 146). Further, the Plan sets forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, including the disputes: (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, MBA, and PRIFA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the

CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation.  (Jaresko Decl. ¶¶ 71, 114-87.)  The Plan also incorporates the terms of a global settlement and compromise of all pending disputes involving the DRA Parties.  (See Docket Entry No. 19100, ¶¶ 9-12.)  As explained in the paragraphs that follow, such settlements and compromises are in the best interests of the Debtors and their creditors, and within the range of reasonableness.  (Murray Decl. Ex. A ¶¶ 119-36; Zelin Decl. ¶¶ 13, 24, 29, 36, 43; Jaresko Decl. ¶¶ 201-16; Skeel Decl. ¶¶ 32-46.)

97.     Each of the plan support agreements was reached following months of negotiations directed by the Mediation Team and/or other informal discussions that included party representatives, legal and financial advisors, and involved vigorous debate and discussion on both sides.  (Zelin Decl. ¶¶ 18-20, 21-22, 26-28, 32-33, 38, 40-41; Jaresko Decl. ¶¶ 202-16.)  Those negotiations were conducted at arms' length and in good faith.  (Id.; Skeel Decl. ¶ 33; Jaresko Decl. ¶ 202.)  The litigation resolved by the plan support agreements involves extraordinarily complex, high-stake disputes and, because these are the first Title III cases litigated under PROMESA, novel legal issues.  Collectively, billions of dollars were at stake. (Jaresko Decl. ¶ 203.)  The consequence of the GO Bondholders prevailing on their priority argument, or the HTA, PRIFA, or CCDA bondholders prevailing on their property interest contentions, would have inflicted grave harm on the Commonwealth and its residents because the Commonwealth, in either situation, would have lost control of billions of dollars of revenues needed to sustain the Commonwealth.  This would have prevented the Oversight Board from developing fiscal plans and budgets necessary to carry out its statutory mission.  A small risk of a negative and grave outcome was imprudent to undertake once settlement was possible on the terms in the Plan.  (Skeel Decl. ¶ 34; Jaresko Decl. ¶¶ 203-13.)  The settlements embodied in the

Plan also avoid the uncertainty, delay, and significant expense that would result from continued litigation.  (Skeel Decl. ¶ 44; Jaresko Decl. ¶ 214.)

98.     The Plan is the result of extensive arms' length negotiations among the Government Parties and significant creditor constituencies, including the PSA Creditors, each of which was represented by sophisticated counsel, and the compromises and settlements among the Government Parties and various PSA Creditors form the very foundation of the Plan.  In the absence of such compromises and settlements, the Debtors' emergence from Title III would likely be significantly delayed by further litigation and burdened by additional expense, which could impair the Debtors' ability to successfully adjust their debts, thereby prejudicing recovery for all creditors and raising further uncertainties regarding the Debtors' financial condition.  (See Jaresko Decl. ¶¶ 81-82, 201-04, 214-215; Skeel Decl. ¶¶ 43-46.)

99.     Each of the compromises and settlements incorporated into the Plan (a) is made in good faith, furthers the policies and purposes of PROMESA, and is fair, equitable, and reasonable; (b) is in the best interests of the Debtors, their creditors, and all other affected Persons with respect to the Claims, Causes of Action, and other matters resolved by such compromises and settlements; (c) is within the range of reasonable results if the issues were litigated; (d) falls above the lowest point in the range of reasonableness; and (e) meets the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a), and other applicable law.  Further, the Plan will fairly and consensually resolve numerous pending adversary proceedings and appeals, each of which raises difficult and complex issues.  The Plan thus incorporates a complex series of compromises and settlements that resolve the most significant potential obstacles to confirmation of a plan of adjustment.  (See Skeel Decl. ¶¶ 33-34; Jaresko Decl. ¶¶ 201-05.)  The settlements resolve billions of dollars of

claims against the Debtors.  (Skeel Decl. ¶ 46.)  Each of the settlements is consistent with what would be expected as a result of negotiations in a complex debt restructuring and is reasonable. In addition, the ability to achieve consensus from at least 15 major parties is evidence the settlements are reasonable.  (Murray Decl. Ex. A ¶¶ 115-37; Zelin Decl. ¶¶ 24, 29, 36, 43.)  For these reasons, the negotiated settlements provide an appropriate and reasonable basis for the adjustment of all affected Claims, including those of dissenting Creditors in the accepting Classes, as well as claims and interests belonging to the Debtors.

100.    Accordingly, the Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

### xi.    Bankruptcy Code Section 1123(b)(3)(B)

101.    Article LXXVIII of the Plan provides for, among other things, the transfer of the Avoidance Actions to the Avoidance Actions Trust.  Section 79.1 of the Plan provides: "Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court."  (Plan § 79.1.)

102.    Further, Section 82.1(a) of the Plan states: "[e]xcept with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses

and counterclaims shall be litigated to Final Order; provided, however, that Reorganized

Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall have the

authority to file, settle, compromise, or withdraw any objections to Claims, without approval of

the Title III Court." For the avoidance of doubt, the foregoing is subject to the rights of the two

(2) Creditors' Committee appointees to the Avoidance Action Trust Board pursuant to section

82.1(b) of the Plan. (Plan § 82.1(a).)

103.     The Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

**xii.     Bankruptcy Code Section 1123(b)(4)**

104.     Article LXIX of the Plan provides for the sale of all ERS assets to the

Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private

Equity Portfolio, subject to certain conditions. (Jaresko Decl. ¶ 76.) Specifically, section 69.2 of

the Plan provides that the Commonwealth, up to and including April 10, 2023, "shall have the

option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . . In the

event that the Commonwealth declines to exercise the option or fails to provide notice of its

exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond

Claims shall have the option to exercise the Bondholder Election and purchase all of the interests

in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse

the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity

Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant

to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by

providing written notice thereof to the Commonwealth on or prior to April 15, 2023." However,

"[i]n the event that neither the Commonwealth Election nor the Bondholder Election shall have

been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity

Portfolio for the ERS Portfolio Price . . . ."  Pursuant to section 69.1 of the Plan, in either

scenario, the proceeds of the purchase of the ERS Private Equity Portfolio, along with the $373

million in cash, shall be distributed to holders of Allowed ERS Bond Claims.  (Plan § 69.1.)

105.    The Plan is consistent with section 1123(b)(4) of the Bankruptcy Code.

**xiii.    Bankruptcy Code Section 1123(b)(5)**

106.    Articles V through LIV, sections 55.2, 55.5, 55.7 through 55.9, articles LVI

through LVII, LX, LXII through LXX, and LXXIII of the Plan modify the rights of holders of

Claims in the impaired Classes.  Sections 55.1, 55.3, 55.4, 55.6, 55.10 through 55.12, articles

LVIII through LIX, LXI, LXXI, and LXXII of the Plan leave the rights of holders of unimpaired

Claims unaffected.  Sections 62.2 and 62.3 have been revised to remove any reference to

Eminent Domain Claims from the category of CW General Unsecured Claims and treatment

thereunder.

107.    The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

**xiv.    Bankruptcy Code Section 1123(b)(6)**

108.    Article XCII of the Plan provides for, among other things, (a) certain releases,

injunctions, and exculpations described below in paragraphs 233–242 and (b) an exemption from

registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of New

GO Bonds and CVIs.  (Jaresko Decl. ¶ 78; Zelin Decl. ¶¶ 94, 96, 97, 99, 107-10.)

109.    The Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

**xv.    Bankruptcy Code Section 1123(d)**

110.    Section 76.4 of the Plan provides for the payment of cure amounts required to be

paid to the counterparties of Executory Contracts and Unexpired Leases assumed, or assumed

and assigned, pursuant to the Plan.  All cure amounts will be determined in accordance with the

underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures

established by the Plan. (Jaresko Decl. ¶ 79.)  On November 23, 2021, the Oversight Board filed

and caused to be served the *Notice of Executory Contracts and Unexpired Leases to be Assumed

Pursuant to Title III Plan of Adjustment* (Docket Entry No. 19353), (i) setting forth the cure

amounts for each assumed Executory Contract and Unexpired Lease based on a review of the

Debtors' books and records, and (ii) establishing a deadline for parties to object to the proposed

cure amounts for an Executory Contract or Unexpired Lease to which they are a party or to the

assumption of such Executory Contract or Unexpired Lease.  Within ten (10) Business Days of

entry of a Final Order setting forth the cure amount as to each Executory Contract or Unexpired

Lease to be assumed or assumed and assigned, the Debtors or the Reorganized Debtors, as the

case may be, shall pay or otherwise satisfy such cure amount.

111.    The Plan is consistent with section 1123(d) of the Bankruptcy Code.

**xvi.    Bankruptcy Code Section 1129(a)(2)**

112.    The Debtors have (i) complied with provisions of the Bankruptcy Code and

PROMESA applicable to confirmation of the Plan, except as otherwise provided or permitted by

orders of this Court, and (ii) complied with the applicable provisions of the Bankruptcy Code,

PROMESA, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in

transmitting the Disclosure Statement, the Plan, the Ballots, the Election Notices, and related

documents, and in soliciting and tabulating votes on the Plan.

113.    The Oversight Board, with the assistance of its professionals, and in coordination

with AAFAF, expended significant time and effort preparing the Disclosure Statement (Debtors

Ex. 2), and sought and received input and comment thereon from other parties in interest.  This

Court approved the Disclosure Statement as containing adequate information and meeting the

requirements of sections 1125 and 1126 of the Bankruptcy Code.  (Jaresko Decl. ¶ 80.)  The

Debtors have properly solicited and tabulated votes on the Plan.  (Jaresko Decl ¶ 80; <u>see</u>

<u>generally</u> Pullo Decl.; <u>see</u> <u>generally</u> Pullo Sup. Decl.)

114.    The Oversight Board, as proponent of the Plan, is the duly-appointed

representative of the Debtors in their Title III Cases as provided pursuant to PROMESA and has

acted in accordance with applicable law in proposing the Plan.

115.    The Debtors have complied with section 1129(a)(2) of the Bankruptcy Code.

**xvii.    Bankruptcy Code Section 1129(a)(3)**

116.    The Plan was proposed in good faith with the legitimate purpose to provide a

means for the Debtors to achieve fiscal responsibility and access to capital markets, consistent

with the purposes of PROMESA.  (Jaresko Decl. ¶ 81.)  In determining that the Plan has been

proposed in good faith, the Court has examined the totality of the circumstances surrounding the

filing of the Title III Cases, the Plan itself, the lengthy process leading to the Plan's formulation

(including the compromises, settlements, and releases incorporated therein), and the process

associated with the Plan's prosecution.  The Debtors' good faith is evident from the facts and

records of the Title III Cases, the Disclosure Statement and the hearing thereon, and the record of

the Confirmation Hearing and other proceedings held in the Title III Cases, including related

adversary proceedings.  The Plan (including the settlements and compromises contained therein)

is the result of extensive arm's length negotiations among the parties, including through

mediation led by former Chief Bankruptcy Judge Barbara Houser.

117.    The Oversight Board has worked to develop consensus with creditors and to

evaluate the Commonwealth's and its instrumentalities' current and future financial

circumstances.  These circumstances have been subject to constant change as the Oversight

Board, the Commonwealth, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic.  (Jaresko Decl. ¶ 82.)  The Plan and Disclosure Statement represent the culmination of those efforts and the substantial input of each key stakeholder.

118.    The Plan (including all other agreements, documents, and instruments necessary to effectuate the Plan) achieves a rational adjustment of the Debtors' debts, and properly distributes value to creditors, including through the implementation of (a) parties' elections with respect to distributions and/or (b) the settlements pursuant to the Plan.  The Plan was proposed with the legitimate and honest purpose of implementing the settlements and compromises of numerous risky and costly disputes, while avoiding protracted litigation that could delay distributions to creditors.  (Jaresko Decl. ¶ 83.)

119.    The Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**xviii.    Bankruptcy Code Section 1129(a)(6)**

120.    The Plan does not provide for any rate changes by the Debtors and, accordingly, section 1129(a)(6) of the Bankruptcy Code does not apply.

**xix.    Bankruptcy Code Section 1129(a)(8)**

121.    Pursuant to the Disclosure Statement Order, the Title III Court approved the Disclosure Statement (Debtors Ex. 2) and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and directed the Debtors to solicit acceptances and rejections of the Plan, as well as certain elections with respect thereto.  (Disclosure Statement Ord. ¶¶ B, 7-19.)  Prior to

the transmission of the Disclosure Statement, the Debtors did not solicit acceptances of the Plan from any holders of Claims.[27]

122.    The Solicitation Packages were served in compliance with the Bankruptcy Code, Bankruptcy Rules, Local Rules, and the Disclosure Statement Order.  (See generally Mailing Affidavits.)

123.    The (a) service of the Solicitation Packages, (b) publication of the Confirmation Hearing Notice, and (c) airing of radio advertisements regarding the approval of the Disclosure Statement, Confirmation Hearing dates, Confirmation Objection Deadline, Voting Deadline, and Election Deadline: (i) were adequate and sufficient under the circumstances of the Title III Cases; (ii) provided adequate and sufficient notice of such deadlines, the method of voting or making an election of distribution pursuant to the Plan; and the date, time, and location of the Confirmation Hearing; (iii) provided holders of Claims with a reasonable period of time to make an informed decision to accept or reject the Plan and to make any election provided thereunder; (iv) were in compliance with PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Disclosure Statement Order, and any other applicable orders and rulings of the Court; and (v) provided due process to all parties in interest in the Title III Cases.  (See Service Affidavits; see also generally Pullo Decl.)

124.    No other or further notice with respect to the Plan or the Confirmation Hearing is required.  Based upon the foregoing, the Debtors and their successors, predecessors, control persons, representatives, officers, directors, employees, agents, attorneys, financial advisors, investment bankers, accountants, and other retained professionals, and any and all affiliates, managers, employees, attorneys, and advisors of the foregoing (i) have acted in "good faith"

---

[27]      See infra ¶¶ 136-60, 147-49.

within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with all their activities relating to the solicitation of acceptances of the Plan or elections thereunder and their participation in the activities described in section 1125 of the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer and issuance of securities pursuant to the Plan and, therefore, are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or elections thereunder or the offer and issuance of securities pursuant to the Plan, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such parties are listed therein, the exculpation provisions set forth in section 92.7 of the Plan.

125.    Votes to accept or reject the Plan were solicited and tabulated fairly, in good faith, and in a manner consistent with the Disclosure Statement Order, PROMESA, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  (See Pullo Decl. ¶ 8.)

126.    Certain Classes either voted to reject, or were deemed to reject, the Plan (the "Rejecting Classes").  (See Pullo Decl. Ex. A; Pullo Sup. Decl. Ex. A.)[28]  Notwithstanding such rejection and deemed rejection, the Plan (which has been revised in compliance with the Court's

---

[28]    Classes 51D, 51F, and 51L voted to reject the Plan, but subsequently were rendered unimpaired and deemed to have accepted the Plan by the modifications made in the Eighth Amended Plan.  Accordingly, such classes are not Rejecting Classes.  See Pullo Sup. Decl. Ex. A.  Moreover, because holders of Allowed Claims under Class 54 are entitled to payment in full under the Full-Payment Proposal, Allowed Eminent Domain/Inverse Condemnation Claims are unimpaired.

order rejecting the unsecured claim treatment of Eminent Domain/Inverse Condemnation Claims and directing the Debtors to incorporate their Full-Payment Proposal for the payment of Allowed Eminent Domain/Inverse Condemnation Claims (see Docket Entry No. 19517 at 6-15, 17-18)) satisfies sections 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code with respect to the Rejecting Classes.

### xx.   Bankruptcy Code Section 1129(a)(10)

127.   At least one Class of each of the Commonwealth creditors' impaired Claims, PBA creditors' impaired Claims, and ERS creditors' impaired Claims has accepted the Plan.  (See Pullo Decl. Ex. A.)  Accordingly, the Plan complies with section 1129(a)(10) of the Bankruptcy Code.

### xxi.   Bankruptcy Code Section 1129(b)(1)

128.   The Plan's treatment of Claims in the Rejecting Classes is proper because, as is described further below, the Plan does not discriminate unfairly and is fair and equitable with respect to such Claims.  (Jaresko Decl. ¶ 87.)  Unfair discrimination applies only to rejecting classes of creditors, not individual creditors within a class.  See Bankruptcy Code §§ 1129(b)(1), 1123(a)(4).  "Thus, a disapproving creditor within a class that approves a plan cannot claim unfair discrimination."  In re Nuverra Envtl. Sols., Inc., 834 F. App'x 729, 734-35 (3d Cir. 2021).  As a preliminary matter, the Court notes that no Rejecting Class has objected to confirmation of the Plan on the basis that the Plan discriminates unfairly.

129.   The treatment afforded to retirees classified in Classes 51A through 51F, 51K, and 51L, and active employees classified in Classes 51G through 51J pursuant to the Plan is fair and equitable and does not discriminate unfairly against other creditors in the Title III cases. Any cut to pensions of retired government employees would have a negative impact on Puerto

Rico's economy because retirees comprise a significant component of local demand in Puerto Rico.  (*Amended Declaration of Simon Johnson* (Docket Entry No. 19014-1) (the "Johnson Decl.") ¶ 6; Retiree Committee Ex. A § 2.17.)  Cutting pensions actually could destabilize Puerto Rico's economic prospects, lead to greater out-migration, and make it harder for Puerto Rico to obtain credit in the future, and the savings from pension cuts do not justify the damage those cuts would cause to the economy.  (Johnson Decl. ¶ 6; Retiree Committee Ex. A §§ 2.6; 2.13; 2.22.)  Roughly half of the retirees have pensions that place them below the federal poverty level of $11,880 per year for a single person household.  (Retiree Committee Ex. A § 4.5.)  Further, retirees have also already experienced substantial reductions in pensions, and, except for judges, government retirees have not received cost of living increases since 2008.  (Retiree Committee Ex. A §§ 4.11; 4.12.)  Many retirees, such as retired police, teachers, and judges, do not receive federal social security payments. (Retiree Committee Ex. A §§ 4.3; 4.16.)  The gross income of the approximately 167,000 government retirees represents 6.4% of the total household expenditures on the Island and 5.8% of Puerto Rico's gross national income. (Retiree Committee Ex. A §§ 4.1, 4.4.)

130.    The macroeconomic impact of reducing the pensions of retirees on the overall Puerto Rican economy is significant.  (Retiree Committee Ex. A § 5.)  Because each dollar that is not spent by a retiree has a ripple effect throughout the economy, the loss of $1.00 of retiree income impacts overall spending at a higher rate, known as the fiscal multiplier.  (Retiree Committee Ex. A § 5.2.)  Applying the Oversight Board's fiscal multiplier, reducing the monthly benefits would result in the loss of 1,600 jobs on the island and a 0.2% reduction in GNP in the near term.  (Retiree Committee Ex. A § 2.9.)  A higher fiscal multiplier would indicate a greater negative impact on the economy of a loss of 6,300 jobs on the island and a reduction in GNP of

0.6%.  (Retiree Committee Ex. A §§ 2.9, 5.)  Given Puerto Rico's high level of out-migration, including the increase in out-migration of retirees since 2016, pension cuts may force many more retirees to move to the states to be with family members if they can no longer support themselves living in Puerto Rico.  Increased out-migration will have a further negative impact on the economy as pension dollars are then spent outside of Puerto Rico.  (Retiree Committee Ex. A §§ 5.21-5.28.)

131.    The Plan, which eliminates any reductions in accrued pensions and certain other retiree benefits for retired and active employees and provides for the creation of the Pension Reserve Trust, is better than further pension and benefit cuts for Puerto Rico's economy and for other creditors and justifies the treatment that Claimants for retirement benefits are receiving pursuant to the Plan.  See, e.g., In re Creekstone Apartments Assocs., L.P., 168 B.R. 639, 644 (Bankr. M.D. Tenn. 1994) (disparate treatment between classes is not unfair if it "protect[s] a relationship with specific creditors that the debtor need[s] to reorganize successfully.").  The treatment of Classes 51A through 51L does not unfairly discriminate in favor of holders of Claims for retirement benefits and is fair and equitable.

132.    The Plan does not unfairly discriminate against holders of Claims in Class 58 (CW General Unsecured Claims), Class 66 (ERS General Unsecured Claims), or Class 13 (PBA General Unsecured Claims).  For the reasons set forth above in paragraphs 62–70, certain Classes of unsecured Claims have been separately classified to ensure that the Commonwealth is best able to provide critical government services to its residents, and that certain claimants are able to continue providing such services in an efficient, reliable, and sustainable manner.  For these reasons, it is important that certain Classes of unsecured Claims receive superior treatment to Claims in Classes 58, 66, and 13.  Further, for the reasons set forth above in paragraph 66,

separate classification and treatment of Claims in Class 54 (Eminent Domain/Inverse Condemnation Claims) is necessary because such claimants assert Fifth Amendment rights, and the Plan does not discriminate unfairly with respect to that Class.  Separate classification and treatment of such Claims is reasonable and justified by a governmental purpose, and does not constitute unfair discrimination.

133.     Accordingly, the Plan complies with section 1129(b)(1) of the Bankruptcy Code.

**xxii.     Bankruptcy Code Section 1129(b)(2)**

134.     The Plan's treatment of Claims in the Rejecting Classes is proper because the Plan provides all holders of Claims in the Rejecting Classes with what they can reasonably expect to receive under the circumstances of the Title III Cases.  Because there are no equity holders in chapter 9 cases, the requirement under Bankruptcy Code section 1129(b)(2)(B) (incorporated by PROMESA section 301(a)) that a plan be "fair and equitable" requires that, where a debtor seeks nonconsensual confirmation of a plan over one or more rejecting classes, no claim junior to any of the claims in the rejecting classes of the relevant debtor may receive any property.  Under the Plan, the Class holding Claims junior to the unsecured Rejecting Classes (Section 510(b) Subordinated Claims) receives no property.  The commencement of the Title III Cases was precipitated by the Debtors' untenable debt burden, a severe cash shortage, and the economic decline and out-migration eroding the Debtors' revenues.  The creditor recoveries in the Plan were calculated or negotiated to reasonably compensate holders of Claims while enabling the Debtors to avoid a recurrence of these financial difficulties and to institute necessary reforms to ensure the Debtors' fiscal responsibility and access to capital markets.  (See Jaresko Decl. ¶ 81; Murray Decl. Ex. A ¶¶ 20, 139.)

135.     Class 54 is the only Rejecting Class of Claims characterized as secured in the Plan, and section 1129(b)(2)(A) is satisfied with respect to such Class.  Consistent with these Findings of Fact and Conclusions of Law, holders of Claims in Class 54 will receive payment in full to the extent they are Allowed Claims.  (Jaresko Decl. ¶ 88.)

136.     Accordingly, the Plan complies with section 1129(b)(2) of the Bankruptcy Code with respect to Claims in the Rejecting Classes.

**B.   PROMESA § 314(b)(2):** *The Plan Fully Complies with the Applicable Provisions of Title III of PROMESA.*

137.     Except as otherwise provided for or permitted by orders of the Title III Court, the Oversight Board has complied with Section 1125(b) of the Bankruptcy Code and Section 314(b)(2) of PROMESA, including the solicitation and tabulation of votes consistent with the Disclosure Statement Order.  (See generally Jaresko Decl. and Pullo Decl.)

138.     The Disclosure Statement Order established the procedures for the solicitation of votes on the Plan.  The Solicitation Agent complied with the procedures established in the Disclosure Statement Order.  (Mailing Affidavits; Pullo Decl. ¶ 4.)  Specifically, the Solicitation Agent determined which creditors were entitled to vote on the Plan by following the instructions in the Disclosure Statement Order, by Class, and by applying the Voting Record Dates set forth in the Disclosure Statement Order.  The Solicitation Agent then coordinated the distribution of solicitation materials to holders of Claims entitled to vote.  (Pullo Decl. ¶¶ 5-6.)  The Solicitation Agent coordinated publication of the confirmation hearing notices as set forth in the Disclosure Statement Order.  (Id. ¶ 7; see also Publication Affidavit.)  The solicitation materials were properly distributed to the appropriate parties, including brokers and nominees.  (See Mailing Affidavits.)

139.     The Solicitation Agent received, reviewed, determined the validity of, and tabulated the Ballots submitted.  (Pullo Decl. ¶ 8.)  The Solicitation Agent also worked with the Depository Trust Company ("DTC") to count votes from the Bond Classes tendered through DTC's ATOP.  (Id. ¶ 9.)

**Plan Support Agreements**

140.     Section 1125(b) of the Bankruptcy Code requires that "[a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."  11 U.S.C. § 1125(b).   Congress intended debtors and creditors be afforded flexibility to resolve disputes, and where possible, reach a consensual resolution of issues in contemplation of the development of a plan of adjustment.  See In re Indianapolis Downs, LLC., 486 B.R. 286, 295 (Bankr. D. Del. 2013) ("[A] narrow construction of 'solicitation' affords [] parties the opportunity to memorialize their agreements in a way that allows a […] case to move forward.")

141.     Here, the Plan was made possible by the Debtors' extensive negotiations with numerous claimholder constituencies and the Plan Support Agreements that resulted from the negotiations.  (Jaresko Decl. ¶ 14.)  These agreements include the GO/PBA Plan Support Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support Agreement, and agreement with the UCC.  (Zelin Decl. ¶ 13.)  The process of negotiation and solicitation of assent to the plan support agreements prior to the approval and distribution of the disclosure statement did not constitute improper solicitation of votes with respect to the Plan.

"An agreement to accept the Debtor's plan, made post-petition but before approval of the

disclosure statement, remained executory until [the creditor] actually filed its accepting ballot . . .

Neither the recitation in the disclosure statement, nor the parties' execution of the written

memorandum, constituted an acceptance of the plan as such." In re Heritage Org., L.L.C., 376

B.R. 783, 793 (Bankr. N.D. Tex. 2007).

### Debtors' "Notice to Holders of Uninsured Bonds" dated July 27, 2021

142.     On or about July 27, 2021, the Debtors published a Notice to Holders of

Uninsured Bonds[29] that provided an exchange opportunity to all beneficial owners of Uninsured

Bonds to become party to the amended plan support agreement.  Acceptance of the opportunity

would render the bondholder a party to the GO/PBA PSA, entitle the bondholder to a Restriction

Fee pursuant to the PSA, and constitute consent to the change of the CUSIP number assigned to

the existing bondholding.  (See Docket Entry No. 18761-8) (the "Exchange Offer") (Hein Ex.

FFF at 2.)[30]  The Exchange Offer was open to "all beneficial owners of Uninsured Bonds,

including retail beneficial holders."  (Id. at 4.)  Importantly, the bondholders' right to the PSA

Restriction Fee Claim "travels" with the Uninsured Bond.  (Id.)  Thus, "in order to separately

identify the Uninsured Bonds that fall into this category, the PSA provides for the assignment of

alternative identifying CUSIPs to track beneficial interests in Uninsured Bonds that become

---

[29]     The term "Uninsured Bonds" is designated the meaning provided in the Exchange Offer.

[30]     An "Amended Notice to Holders of Uninsured Bonds" was published on or about July
         30, 2021 (Docket Entry No. 18761-9) (the "Amended Exchange Offer").  (Hein Ex.
         GGG.)

subject to the PSA […]." (Id.; see also GO/PBA Plan Support Agreement § 2.2.) (Debtors Ex. 16.)

143.    Mr. Hein and Mr. Samodovitz argue that the Exchange Offer was an improper solicitation designed to procure votes in favor of the Plan.  (Hein Obj. at 23).  In response, the Debtors explain that the Exchange Offer provided a procedural mechanism for all uninsured bondholders to "deal with the tender and exchange [of bonds]" through the creation of alternative CUSIPS.  (Nov. 15, 2021, Hr'g. Tr. 140:1-2.)   Mr. Hein further argues that the August 13, 2021 participation deadline (the "Participation Deadline") for retail bondholders to join to the PSA was unreasonable because the participation deadline only permitted 17 days to consider the offer (and review the accompanying material) before electing to participate. (Hein Obj. at 23.) However, the Exchange Offer did not require retail bondholders to take immediate action before the Participation Deadline to become entitled to a support fee.  All beneficial owners who tendered their Uninsured Bonds by the Participation Deadline were entitled to receive a PSA Restriction Fee.  (Hein Ex. FFF at 3.)  The Exchange Offer also disclosed that, after August 13, 2021, retail bondholders who did not tender their bonds by the Participation Deadline remain entitled to a Retail Support Fee (in the same amount as the PSA Restriction Fee), so long as their Class of retail bondholders approves the Plan and the retail bondholder certifies their retail investor status.  (Id. at 5.)  The ballots were not distributed by the Solicitation Agent until August 30, 2021, after the Participation Deadline had passed.  (Debtors Ex. 138.)  The Court finds that the Exchange Offer was not a solicitation of votes and that the Participation Deadline was reasonable.  The Debtors have proffered a good faith basis for the development of a procedural mechanism to track all retail bondholders' entitlement to the PSA Restriction Fee and Retail Support Fee.  Thus, the objections are overruled.

**Entitlement to the Retail Support Fee**

144.    The Plan provides "in the event that a Class of Retail Investors […] votes to accept the Plan, the members of such Class shall be entitled to receive their Pro Rata Share of such Class's allocable share of the aggregate Retail Support Fee […]." (Plan § 3.6.) The Retail Support Fee will thus be available to each member of a class of Retail Investors that votes, as a class, to accept the Plan. (Jaresko Decl. ¶ 128.) Additionally, the Debtors represent that a retail bondholder who voted and certified his status as a retail investor would be entitled to receive the Retail Support Fee, so long as the class voted to accept the Plan, whether or not the bondholder voted in favor of the Plan. (Nov. 15, 2021, Hr'g Tr. 139:9-15, 166:16-20.)

145.    The Retail Support Fee was designed to deliver the same amount of fee consideration, as a percentage of claim amount held, to Retail Investors as to recipients of the GO/PBA Restriction Fee. (Zelin Decl. ¶ 81.) Thus, the Retail Support Fee was designed to achieve economic parity for Retail Investors vis-à-vis the recipients of the GO/PBA Restriction Fee without requiring Retail Investors to sign the GO/PBA PSA and agree to its terms and conditions, including the obligation to support the Plan and the "lock up" provisions. (Id.)

146.    Retail bondholders were provided the option to either (i) participate in the Exchange Offer with all other bondholders, thereby receiving the same PSA fee as other Restriction Fee parties, or (ii) as originally contemplated, receive the Retail Support Fee if the creditor identifies as a retail investor and the retail class votes to accept the Plan. (Id. ¶ 82.)

147.    The Debtors have represented that "all retail investor classes voted to accept the Plan […], and all members of the retail classes shall receive the restriction fee." (Nov. 15, 2021, Hr'g. Tr. 142: 20-21; 23-24.) The tabulation summary shows that the retail classes voted to accept the Plan. (See Pullo Decl. Ex. A; see also Pullo Sup. Decl. Ex. A.)

**Voting on the Plan of Adjustment**

148.    Pursuant to the Disclosure Statement Order, the Debtors, or their Solicitation Agent, distributed materials needed for voting on the Plan or making elections on distributions thereunder (the "Solicitation Package") to bondholders in various voting classes.  (See Disclosure Statement Ord. ¶¶ 9, 14, 32.)  The Court approved the procedures for voting to accept or reject the Plan, including the use of DTC's ATOP process for bondholder votes, in the Disclosure Statement Order.  (See id. at ¶¶ 9, 14, 32.)  The Solicitation Agent distributed the Solicitation Package to appropriate parties, including brokers and nominees.  (See Mailing Affidavits.) (See also Debtors Ex. 138.)

149.    Mr. Hein and Mr. Samodovitz argue that the complexity of the voting process may have impaired retail bondholders' ability to cast timely ballots and/or certify themselves as retail investors for purposes of establishing entitlement to a Retail Support Fee if a class voted to accept the Plan.  (Nov. 15, 2021, Hr'g Tr. 149:1-14; id. at 159: 19-25.)  To vote to accept or reject the Plan, GO/PBA PSA Creditors were required to instruct their nominee or broker to tender their bonds utilizing ATOP before the voting deadline under the Disclosure Statement Order.  (Disclosure Statement Ord. ¶ 32, Sched. 2.)  Mr. Hein and Mr. Samodovitz have not proffered credible evidence that retail bondholders, as a whole, were unable to vote on the Plan. Rather, the voting summary includes a tabulation of all votes cast in support of and opposition to the Plan and indicates that retail bondholders from each retail class successfully voted.  (See Pullo Decl. Ex. A; see also Pullo Sup. Decl. Ex. A.)  To the extent the objections are challenges to the Disclosure Statement Order and the voting process outlined therein, the objections are overruled.

150.    The Plan complies with PROMESA Section 314(b)(2).

C.  **PROMESA § 314(b)(3):** *The Debtors Are Not Prohibited by Law from Taking any Action Necessary to Carry Out the Plan.*

151.    The Plan contains no provisions which would require the Debtors to violate the law, including Commonwealth law that is not preempted.

152.    Act 53, enacted on October 26, 2021, authorizes the issuance of CVIs and New GO Bonds, consistent with the terms set forth in the Plan and the plan support agreements. (Jaresko Decl. ¶ 92; Debtors Ex. 134.)  Act 53's effectiveness is conditioned only on the elimination of the Monthly Benefit Modification (as defined in the Seventh Amended Plan) from the Plan.  The Monthly Benefit Modification is not included in the Plan, and accordingly Act 53 is effective and the Commonwealth's issuance of the CVIs and New GO Bonds is consistent with applicable Commonwealth law.  Furthermore, by reason of the Plan's provisions freezing defined benefit accruals and future costs of living adjustments, upon the Plan's Effective Date, PROMESA preempts Acts 91-2004 (establishing TRS) and 12-1954 (establishing JRS), each as amended, providing for the future accrual of defined benefits and future cost of living adjustments, to the extent set forth in **Exhibit A** hereto.  Absent preemption, the amount of Commonwealth revenues that would need to be spent on TRS and JRS pension benefits in fiscal year 2022 is $984 million.  (Malhotra Decl. ¶ 65.)  Absent preemption, these inconsistent statutes would undermine the restructuring contemplated by the Plan.  (Jaresko Decl. ¶ 235.)

153.    Enabling legislation is not required to establish the freeze of defined benefits or the elimination of COLAs.  Obligations arising from Commonwealth statutes, including statutes providing employees the right to accrue pension or other retirement benefits, give rise to claims which can be impaired and discharged pursuant to the Plan.  See 11 U.S.C. § 101(5)(A) (defining claim as "right to payment, whether or not such right is . . . contingent, matured, [or] unmatured"); Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35-36 (1st Cir. 2009) ("The

definition of claim . . . defines what is discharged by the proceeding. In enacting this language, Congress gave the term 'claim' the 'broadest available definition.'") (quoting Johnson v. Home State Bank, 501 U.S. 78, 83 (1991)); In re Fin. Oversight & Mgmt. Bd. for P.R., Case No. 17 BK-3283-LTS, 2021 WL 5024287, at *8-9 (D.P.R. Oct. 29, 2021). The discharge of prepetition obligations does not need to be approved pursuant to, or consistent with, Commonwealth law. See, e.g., Order Confirming Debtor's Sixth Amended Plan of Adjustment of Debts Pursuant to Chapter 9 of the Bankruptcy Code, In re City of Prichard, No. 09-15000, at 7 (Bankr. S.D. Ala. July 8, 2014) ("The Court . . . finds and concludes that the City's actions under the Plan are not prohibited by law, and the treatment of the Classes who formerly had an interest in the City's pension plan is lawful under the Bankruptcy Code."); In re Sanitary & Improvement Dist. No. 7, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("If a municipality were required to pay prepetition bondholders the full amount of their claim with interest as contained on the face of the bonds and the [municipality] had no ability to impair the bondholder claims over objection, the whole purpose and structure of chapter 9 would be of little value. . . . To create a federal statute [chapter 9 of the Bankruptcy Code] based upon the theory that federal intervention was necessary to permit adjustment of a municipality's debts and then to prohibit the municipality from adjusting such debts is not, in the point of view of this Court, a logical or necessary result.").

154. The Debtors have sufficiently demonstrated that express recognition of the preemptive effect of section 4 of PROMESA is crucial to accomplishing the Plan's goals and ensuring its feasibility. However, as set forth in the Court's *Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19517) (the "Clarification Order"), the

broad language of the preemption provisions of the Plan as previously proposed by the Debtors

were overly broad and vague.  Accordingly, the Court memorializes its conclusions concerning

preemption here and, in light of the Debtors' modification of the preemption provisions, will

enter an order confirming the Plan.

155.    Provisions of Commonwealth laws that are inconsistent with PROMESA are

preempted for the reasons, and to the extent, set forth in **Exhibit A** hereto.[31]  Such preempted

provisions include, without limitation: (i) pursuant to section 4 of PROMESA, all laws, rules,

and regulations, to the extent they give rise to obligations of the Debtors discharged by the Plan

and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any

general or specific provisions of territory laws, rules, and regulations and (ii) laws enacted prior

to June 30, 2016, to the extent they provide for transfers or other appropriations after the

enactment of PROMESA, including transfers from the Commonwealth or one of its

instrumentalities to any agency or instrumentality, whether to enable such agency or

instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted to the

extent inconsistent with the Plan's discharge of the Debtors' obligations.  Through modifications

to the proposed Plan and related documents, the Oversight Board previously requested judicial

---

[31]    The Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por
la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión
Nacional de Educadores y Trabajadores de la Educación, Inc., (collectively, the
"Teachers' Associations") contend that the scope of preemption set forth in the Plan is
overly broad because certain sections and subsections of Act 106-2017 and Act 160-2013
govern all Commonwealth public retirement systems, not just TRS and JRS, and include
provisions essential to the functioning of the government's retirement systems.  (See
Teachers' Associations Sup. Obj. ¶¶ 5-72.)  Exhibit A, however, does not contemplate
the preemption of the entirety of every statutory section or subsection set forth in the
"Specific Provisions Preempted" column; rather, any such section or subsection is
preempted only to the extent its operative provisions are both described in the "Specific
Provisions Preempted" column and a basis for the preemption thereof is listed in the
"Basis for Preemption" column.

acknowledgement that Act 80-2020, Act 81-2020, and Act 82-2020 are preempted by

PROMESA.  That request has been mooted by the Court's approval of the *Stipulation and Order*

*Resolving Oversight Board Complaint Dated December 20, 2021 Concerning Acts 80-2020, 81-*

*2020, and 82-2020 and Joint Resolution 33-2021* (Docket Entry No. 6 in Adv. Proc. No. 21-

00119), pursuant to which the Puerto Rico Fiscal Agency and Financial Advisory Authority, the

Office of Management and Budget, and the Honorable Pedro Pierluisi Urrutia, the Governor of

the Commonwealth of Puerto Rico, resolved litigation concerning the validity of Acts 80-2020,

81-2020, and 82-2020 and Joint Resolution 33-2021 and agreed that they are significantly

inconsistent with the relevant certified fiscal plan.[32]

156.    Many of the preempted statutes would require the Commonwealth to use its

revenues to repay its general obligation and guaranteed debt in full.  The amount of debt service

necessary for fiscal year 2022 would be $1.7 billion.  (Malhotra Decl. ¶ 63.)  These statutes are

inconsistent with PROMESA to the extent they are inconsistent with the discharge of

outstanding claims and the treatment provided for such claims by the Plan under Title III of

---

[32]    Asociación Puertorriqueña de la Judicatura, Inc. and Asociación de Jubilados de la
Judicatura de Puerto Rico object to the impairment of any obligations to the Judicial
Retirement System and contend that any such impairment would be inconsistent with
rights under the Puerto Rico Constitution and principles of separation of powers and
judicial independence that are embedded in that document.  However, PROMESA
permits the impairment and discharge of prepetition debts where, as here, the
requirements for confirmation of a plan of adjustment are satisfied.  See 11 U.S.C.
§ 944(b).  To the extent that Commonwealth law is inconsistent with such impairment
and discharge, it is preempted by PROMESA.  See Commonwealth of Mass. Div. of
Employment and Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l Med. Ctr., Inc.),
291 F.3d 111, 126 (1st Cir. 2002) ("[T]o the extent that we were to read the Employment
and Training Law to require that the Division receive administrative expense priority for
a claim that the Bankruptcy Code would assign general unsecured status, the state law
would then be inconsistent with federal law and so preempted.  The application of the
doctrine of preemption is often complex, but in such a case would be clear-cut." (citations
omitted)); In re Sanitary & Imp. Dist., No. 7, 98 B.R. at 974.

PROMESA and would undermine the restructuring contemplated by the Plan and Puerto Rico's return to fiscal responsibility and access to capital markets.  (Jaresko Decl. ¶¶ 230-33.)  Further, certain preempted statutes require the appropriation of Commonwealth revenues and would require more than $3 billion in Commonwealth revenues to be transferred in fiscal year 2022. (Malhotra Decl. ¶ 64.)  In addition, certain preempted statutes require the Commonwealth to provide pension and other benefits or payments to retirees who participated in the ERS, TRS, or JRS retirement systems at statutorily specified rates; the amount of Commonwealth revenues that would need to be spent on TRS and JRS benefits or payments in fiscal year 2022 pursuant to these statutes would be $984 million.  (Malhotra Decl. ¶ 65.)  Such statutes are inconsistent with PROMESA to the extent they are inconsistent with the discharge of claims and treatment provided for pension benefits and payments by the Plan under Title III of PROMESA and would undermine the restructuring contemplated by the Plan and the Plan's contemplated repayment of claims from such revenues.  (Jaresko Decl. ¶ 234.)  For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis for disallowance and discharge of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.[33]

---

[33]     Mr. Hein objects to the scope of the preemption provisions of the Plan and this analysis and contends that the statutes authorizing the bonds that he holds, which commit the full faith and credit of the Commonwealth to repayment of the bonds, cannot be preempted. His argument is contrary to the provisions of PROMESA, which permit the impairment and discharge of prepetition debts such as Mr. Hein's.  To the extent that Commonwealth law requires the payment of such debts in full, it is inconsistent with the discharge of such debts and therefore subject to preemption.  To the extent that Mr. Hein's objection is that other creditors are being treated favorably notwithstanding Commonwealth law that provides his claims with an entitlement to certain streams of revenues or priority treatment over other debts, such arguments are precluded by the acceptance of the Plan by each class of bonds, including the bondholder classes of which Mr. Hein is a member.

**Constitutional Challenges to the Plan**

157. Several creditors, including Mr. Hein, object to the Plan on the grounds that it allegedly violates the Contracts Clause or the Takings Clause of the Constitution of the United States. Having considered carefully the parties' submissions and arguments on these issues, the objections are overruled, with the exception of the objections concerning Eminent Domain/Inverse Condemnation Claims. The objections concerning Eminent Domain/Inverse Condemnation Claims are sustained, and such Allowed Claims must be paid in accordance with Debtors' Full-Payment Proposal (as set forth in Plan §§ 58.1, 77.1(e)).

**Contracts Clause**

158. The Plan contains no provision that would constitute or create a violation of the Contracts Clause of the Constitution of the United States. The Contracts Clause provides that no state shall pass any law impairing the obligation of contracts. U.S. Const. art. I, § 10, cl. 1. Although the Constitution prohibits a state or territory from impairing contractual obligations

---

The Bankruptcy Code's requirements that a plan "not discriminate unfairly, and [be] fair and equitable" are applicable only as "to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1); see 7 Collier on Bankruptcy ¶ 1129.03 (16th 2021) ("[S]ection 1129(b)(1) requires that the plan proponent prove, *as to the dissenting class*, that the plan is both fair and equitable and not unfairly discriminatory.") (emphasis added). Those requirements of section 1129(b) are applied on a class-wide basis, not on a creditor-by-creditor basis, and "a disapproving creditor within a class that approves a plan [therefore] cannot claim unfair discrimination" or a lack of fair and equitable treatment. In re Nuverra Envtl. Sols., Inc., 834 F. App'x 729, 735 (3d Cir. 2021), as amended (Feb. 2, 2021), cert. denied, No. 21-17, 2021 WL 4733333 (U.S. Oct. 12, 2021); In re W.R. Grace & Co., 475 B.R. 34, 175 (D. Del. 2012) ("It is a well-known legal rule in Chapter 11 reorganization litigation that '[u]nder § 1129(b), a finding that a plan is 'fair and equitable' is required only in the context of a cramdown.'") (quoting In re Dow Corning Corp., 244 B.R. 678, 693 (Bankr. E.D. Mich. 1999)), aff'd, 729 F.3d 332 (3d Cir. 2013). Finally, to the extent that Mr. Hein contends that the Plan fails to meet the "best interests" test due to such treatment, the Court will address his argument in connection with its discussion below of section 314(b)(6) of PROMESA.

---

through legislative action, it imposes no such prohibition on Congress and, indeed, empowers

Congress to impair contractual obligations through article I, section 8 of the Constitution, which

provides that Congress shall have the power to establish uniform laws on the subject of

bankruptcies throughout the United States.  U.S. Const. art. I, § 8, cl. 4.  It has long been

recognized that one of the fundamental goals of bankruptcy law is to adjust the debtor-creditor

relationship, that is, to alter contract rights.  See Ass'n of Retired Emps. of Stockton v. City of

Stockton (In re City of Stockton), 478 B.R. 8, 14-15 (Bankr. E.D. Cal. 2012).  "While

bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of

parties whose contracts are impaired, that does not change the starring role of contract

impairment in bankruptcy."  Id. at 16.  Congress is, therefore, "'expressly vested with the power

of passing [bankruptcy] laws, and is not prohibited from passing laws impairing the obligation of

contracts. . . .'"  Id. at 15 (citing Sturges v. Crowninshield, 17 U.S. 122, 191 (1819)).  Further,

the Plan does not implicate the Contracts Clause because it is not a legislative action.  A federal

court's confirmation of a reorganization plan under federal law cannot violate the Contracts

Clause.  See Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 732 n.9 (1984)

(holding that the Contracts Clause does not apply to federal government actions).  It follows that

this Court may approve the Plan under PROMESA, a federal law enacted by Congress pursuant

to the Territories Clause of the Constitution that incorporates key bankruptcy concepts and

provisions,[34] with the express purpose of allowing Puerto Rico to achieve fiscal responsibility

and access to the capital markets through, inter alia, adjustment of its debts and those of its

instrumentalities, without violating the Contracts Clause.[35]

---

[34]　　See ¶¶ 6, 35-36 supra.

[35]　　To the extent the objection of the Asociación de Jubilados de la Judicatura de Puerto Rico
(the "AJJPR") may construed as objecting to the Plan on the basis of the Contracts

　　　　　VERSION JANUARY 18, 2022

159.   Mr. Hein has also failed to demonstrate that the fiscal plans constitute territorial

laws subject to the restrictions of the Contracts Clause, and his Contracts Clause objection with

respect to the fiscal plans is therefore overruled.  To the extent that Mr. Hein argues that the

Commonwealth's Act 53 (the "New Bond Legislation") authorizing the issuance of new bonds

and contemplating the cancellation of currently outstanding bonds is within the scope of the

Contracts Clause, the Court concludes, as explained below, that such legislation does not violate

the Contracts Clause because the record establishes that it is reasonable and necessary in light of

the surrounding circumstances.  Although the language of the Contracts Clause is "unequivocal,"

it "'does not make unlawful every state law that conflicts with any contract.'"  United Auto.,

Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 41 (1st Cir. 2011)

(quoting Loc. Div. 589, Amalgamated Transit Union v. Massachusetts, 666 F.2d 618, 638 (1st

Cir. 1981)).  In considering claims brought under the Contracts Clause, courts must "'reconcile

the strictures of the Contract[s] Clause with the essential attributes of sovereign power

necessarily reserved by the States to safeguard the welfare of their citizens.'"  Id. (quoting

Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente, 125 F.3d 9, 14 (1st

Cir. 1997)).  In doing so, courts apply a two-pronged test: they examine first "'whether the state

law has . . . operated as a substantial impairment of a contractual relationship,'" id. (quoting

Energy Rsrv. Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 411 (1983)), and then, if the

law has, "whether the impairment was 'reasonable and necessary to serve an important

government purpose.'"  Id. (quoting U.S. Tr. Co. of N.Y. v. New Jersey, 431 U.S. 1, 20 (1977).)

Assuming arguendo that New Bond Legislation will substantially impair contractual obligations,

---

Clause, that aspect of the AJJPR's objection is overruled for the same reasons.  (See
Docket Entry No. 18549 ¶ 10.)

the Court examines its reasonableness and necessity.  The First Circuit considers "the reasonableness inquiry" to "ask[ ] whether the law is 'reasonable in light of the surrounding circumstances,'" while "the necessity inquiry focuses on 'whether [Puerto Rico] 'imposed a drastic impairment when an evident and more moderate course would serve its purposes equally well.'''"  Id. at 45-46 (quoting Mercado Boneta, 125 F. 3d at 15.)  In analyzing these questions, courts may consider "whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency."  Id. at 46 (quoting Energy Rsrv. Grp., 459 U.S. at 410 n.11.)

160.    The circumstances surrounding the enactment of the New Bond Legislation are clear: the Commonwealth Legislature enacted the New Bond Legislation in response to the Commonwealth's unprecedented fiscal and economic crisis, the need to resolve litigation concerning the Commonwealth's bond obligations, and the need to enable the Commonwealth to effectuate the Plan so that it can regain access to capital markets.  The Legislature's decision is a reasonable one under the surrounding circumstances.  The legislation, which provides for the cancellation of instruments representing restructured debts and eliminates potential disputes regarding the validity of the issuance of new bonds that could affect the marketability of those bonds, is also necessary in light of the ongoing fiscal emergency in Puerto Rico.  The Court concludes that the Contracts Clause does not prohibit confirmation of the Plan, and Mr. Hein's objections invoking the Contracts Clause are therefore overruled.

### **Takings Clause**

161.    For the reasons that follow, confirmation objections invoking the Takings Clause of the Constitution of the United States are overruled, with the exception of certain objections to

the Debtors' proposed treatment of Eminent Domain/Inverse Condemnation Claims.  With respect to those Claims, the Debtors' Full-Payment Proposal would provide sufficient treatment and payment in the event the Court finds their original proposal to pay only a portion of Allowed Eminent Domain Claims violative of the Takings Clause.  As explained below, the Court finds that the original proposal for such Claims does not comport with the requirements of the Takings Clause and the Court has directed the Debtors to revise the Fifth Modified Eighth Amended Plan, to ensure consistency and compliance with the treatment contemplated by the Debtors' Full-Payment Proposal.  The Debtors have done so, and the Court finds that the further revised Plan (Docket Entry No. 19784) meets the requirements of section 314(b)(3) of PROMESA.  For the avoidance of doubt, the provisions of this FFCL are incorporated by reference in the Confirmation Order, and so the Debtors' position that their original proposal does not violate the Takings Clause is preserved for purposes of appeal.

162.    Various claimants have objected to the Plan, arguing that the treatment of their claims violates the Fifth Amendment's Takings Clause.  Generally, these objectors fall into three categories: (1) those asserting that they hold Eminent Domain/Inverse Condemnation Claims that may not be impaired by the Plan; (2) bondholders who argue that the Plan takes their property interest in bonds—specifically, the alleged lien on revenues that they claim secures repayment of the bonds issued by the Commonwealth—without just compensation; and (3) Suiza Dairy, which argues that the Plan authorizes a regulatory taking without just compensation.[36]

---

[36]    The Court here does not address the objection filed by Ismael L. Purcell Soler and Alys Collazo Bougeois concerning their inverse condemnation claim.  (See Docket Entry No. 18504.)  The substance of the objection makes clear that Mr. Purcell Soler's and Ms. Collazo Bougeois' inverse condemnation claim concerns actions by PREPA.  (See, e.g., id. at 4.)  Mr. Purcell Soler and Ms. Collazo Bougeois are therefore creditors of PREPA, not of the Title III debtors currently before this Court.  The Plan does not adjust PREPA's debts or provide for any releases or exculpations of

163.     Federal statutes, such as the Bankruptcy Code and PROMESA, are subject to the strictures of the Constitution, including the Fifth Amendment's requirement that government takings of property for public use be justly compensated.  Indeed, the bankruptcy power conferred by article I, section 8 of the Constitution of the United States is itself subject to the Fifth Amendment.  See Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589 (1935) ("The bankruptcy power, like the other great substantive powers of Congress, is subject to the Fifth Amendment.").  This principle was reaffirmed and extended by the Supreme Court in Security Industrial Bank, where the Court cautioned that, "however 'rational' the exercise of the bankruptcy power may be, that inquiry is quite separate from the question whether the enactment takes property within the prohibition of the Fifth Amendment."  United States v. Sec. Indus. Bank, 459 U.S. 70, 75 (1982).  In keeping with traditional takings jurisprudence, the predicate

---

PREPA.  Accordingly, Mr. Purcell Soler and Ms. Collazo Bougeois have no standing to challenge the Plan and their objection is overruled.  See Bank of N.Y. Mellon v. P.R. Sales Tax Fin. Corp. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 301 F. Supp. 3d 306, 312 (D.P.R. 2017) (finding that creditors of Commonwealth lacked standing in adversary proceeding concerning COFINA bonds).

Additionally, for the reasons set forth in this Court's *Memorandum Opinion Granting Defendants' Motions to Dismiss Second Amended Complaint* (Docket Entry No. 192 in Adv. Proc. No. 18-00028), the Court overrules the objection of Cooperativa de Ahorro y Crédito Abraham Rosa, Cooperativa de Ahorro y Crédito de Ciales, Cooperative de Ahorro y Crédito de Rincón, Cooperativa de Ahorro y Crédito Vega Alta, Cooperativa de Ahorro y Credito Dr. Manuel Zeno Gandía, and Cooperativa de Ahorro y Crédito de Juana Díaz (the "Credit Unions") to the extent it incorporates the allegations set forth in their adversary complaint, which has now been dismissed without leave to amend, alleging that their claims are protected by the Takings Clause.  Because the Court has concluded that the Credit Unions have not stated a claim upon which relief could be granted under the Takings Clause, the Court finds that their claims for payment concerning that alleged taking are not protected by the Fifth Amendment and may be impaired and discharged by the Plan.  Moreover, to the extent the Credit Unions have asserted a claim that approval of the Plan itself would constitute a taking, the Credit Unions' objection is also overruled for the reasons discussed in connection with the objections of other bondholders (see infra ¶¶ 170-73).

inquiry must concern the nature of the property at issue and whether a taking occurred.  See also id. at 76-77 (classifying secured interests in contract rights as properly analyzed under the factors set forth in Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978), as distinguished from jurisprudence governing fee simple interests in real property).

164.    Throughout the confirmation process, the Debtors have argued that, while Supreme Court decisions have recognized that the Fifth Amendment restricts the Bankruptcy Code, it does so only to the extent that property interests are secured.  See Sec. Indus. Bank, 459 U.S. at 75-76, 78; Wright v. Union Cent. Life Ins. Co., 311 U.S. 273, 278 (1940) (the constitution protects "the rights of secured creditors, throughout the proceedings, to the extent of the value" of the creditors' collateral).  See also Cobb v. City of Stockton (In re City of Stockton), 909 F.3d 1256 (2018); Poinsett Lumber Mfg. v. Drainage Dist. No. 7, 119 F.2d 270 (8th Cir. 1941).  This conclusion is inconsistent with the Fifth Amendment, which is implicated by a governmental act—the taking of private property for public use—and whose just compensation requirement is not conditioned on whether the government gives security for a compensation obligation that is not satisfied immediately.  While a security interest is a type of property that can be protected by both the Fifth Amendment and the Bankruptcy Code, its absence is not determinative of Fifth Amendment protection.

165.    The Supreme Court's takings jurisprudence requires evaluation of whether the real property was subject to a physical invasion (implicating per se takings analysis) or whether, for example, it was subjected to a use restriction (in which case the Penn Central factors are applied to determine whether a regulatory taking occurred).  Cedar Point Nursery v. Hassid, 141 S. Ct. 2063, 2071-72 (2021).

166.   **Eminent Domain/Inverse Condemnation Objections**: With respect to the objections raised by holders of alleged Eminent Domain/Inverse Condemnation Claims, the creditors assert, and the Debtors do not dispute, that their Claims arise from the physical invasion by the Commonwealth of privately owned real property.  The objectors aptly rely on Supreme Court decisions for the propositions that a physical invasion of property constitutes a per se taking (Cedar Point Nursery, 141 S. Ct. at 2071), for which an irreducible entitlement to just compensation immediately ripens under the Takings Clause (Knick v. Twp. of Scott, 139 S. Ct. 2162, 2171 (2019); Blanchette v. Conn. Gen. Ins. Corp., 419 U.S. 102, 155 (1974) ("[A]ny deficiency of constitutional magnitude in the compensation [of seized property] . . . will indeed be a taking of private property for public use.")), and that the Bankruptcy Code is subject to the Takings Clause (see Radford, 295 U.S. at 589, 601-02; Sec. Indus. Bank, 459 U.S. at 75, 78, 80, 82). See also In re City of Detroit, 524 B.R. 147, 304-07 (Bankr. E.D. Mich. 2014).[37]  The Court therefore confines its examination of these Claims to a per se takings analysis.  "These sorts of

---

[37]   The Debtors respond that, to the extent portions of these Eminent Domain/Inverse Condemnation Claims are not "secured" by deposits of funds with a Clerk of Court, they are simply unsecured claims that are subject to impairment and discharge under the Bankruptcy Code and that, while Supreme Court decisions have recognized that the Fifth Amendment restricts the Bankruptcy Code, it does so only to the extent that property interests are secured.  See Sec. Indus. Bank, 459 U.S. at 75-76, 78; Wright v. Union Cent. Life Ins. Co., 311 U.S. 273, 278 (1940) (the constitution protects "the rights of secured creditors, throughout the proceedings, to the extent of the value" of the creditors' collateral).  See also Cobb v. City of Stockton (In re City of Stockton), 909 F.3d 1256 (2018); Poinsett Lumber Mfg. v. Drainage Dist. No. 7, 119 F.2d 270 (8th Cir. 1941).  The Debtors' application of the distinction, however, between secured and unsecured interests under the Bankruptcy Code to determine whether a Takings Clause-related obligation can be impaired is inconsistent with the Fifth Amendment, which requires first assessing the origin of the payment obligation: whether it arises from a government taking of private property for public use.  As explained further below, while a security interest is a type of property that can be protected by both the Fifth Amendment and the Bankruptcy Code, a physical invasion (in this case, of real property) falls squarely within the ambit of Fifth Amendment protection, whether or not the government entity has provided any security for its obligation to pay just compensation.

physical appropriations constitute the 'clearest sort of taking,' and we assess them using a

simple, per se rule: The government must pay for what it takes."  Cedar Point Nursery, at 2071

(emphasis in original) (internal citation omitted).  The Court now turns to the question of just

compensation and whether valid claims for just compensation can be impaired in bankruptcy.

For the reasons set forth below, and for materially the same reasons set forth in this Court's order

of December 14, 2021 (Docket Entry No. 19517 at 6-15), the Court finds that such claims may

not be impaired.

167.     Unlike other constitutional prohibitions of government conduct, in connection

with which the Framers did not specify remedies, the Takings Clause of the Constitution of the

United States itself mandates the provision of "just compensation" in the event that "private

property [is] taken for public use."  U.S. Const. am. V.  The Supreme Court has recently and

expressly recognized the unique status of cases involving the governmental takings of real

property.  In Knick, the Supreme Court stated that "[t]he Fifth Amendment right to full

compensation arises at the time of the taking, regardless of post-taking remedies that may be

available to the property owner," a principle derived from Jacobs v. United States, 290 U.S. 13,

17 (1933), in which the Court stressed that the owner of a "valid takings claim is entitled to

compensation as if it had been 'paid contemporaneously with the taking'—that is, the

compensation must generally consist of the total value of the property when taken, plus interest

from that time."  Knick, 139 S. Ct. at 2170.  See also Cedar Point Nursery, 141 S. Ct. at 2071-72

("When the government physically acquires private property for a public use, the Takings Clause

imposes a clear and categorical obligation to provide the owner with just compensation.").  Thus,

unlike judgment creditors whose statutory remedies for violations of other constitutional

provisions are dischargeable, holders of takings claims have a constitutional right to just

compensation that is not subject to impairment or discharge under a plan of adjustment.  See Blanchette, 419 U.S. at 155 ("[A]ny deficiency of constitutional magnitude in the compensation [of seized property] . . . will indeed be a taking of private property for public use."); see also In re City of Detroit, 524 B.R. at 268-70.  Put differently, "just compensation" is not a statutory damages remedy for a constitutional violation but is instead a necessary condition to the exercise of government power to take private property for public use.[38]

168.    The federal appellate cases cited by the Debtors are inapposite, both because they are materially distinguishable and because they do not support an alternative interpretation of the Supreme Court's clear jurisprudence distinguishing the Takings Clause from other constitutional provisions.  First, the case of Poinsett Lumber does not purport to directly address the issue before this Court, and the Oversight Board places more weight on it than it will support.  Unlike the instant matter, in which claimants have timely filed proofs of Claim and objected to the treatment of their Claims under the Plan, the claimant in Poinsett Lumber had failed to timely preserve its right to object to the readjustment until after the plan had been confirmed.  Poinsett Lumber Mfg., 119 F.2d at 274 ("Appellant could not remain silent until the proceedings had advanced to the stage of a final decree and then, in a collateral attack, make the claim successfully that its cause of action is not included in the plan of composition, nor affected by it, nor dealt with therein.").  Moreover, although the Eighth Circuit did reject the creditor's

---

[38]    The Oversight Board argues, without citation, that the only reason the Takings Clause specifies the need for "just compensation" is that, unlike in other constitutional provisions, the government action is permitted rather than prohibited, and that Eminent Domain/Inverse Condemnation Claims are therefore not otherwise entitled to preferential treatment when damages for other constitutional violations are subject to impairment and discharge.  (See Docket Entry No. 19574 ¶ 22.)  Such an argument itself acknowledges, however, that the Takings Clause is, in fact, unique in requiring just compensation as the condition for taking private property for public use.  The conclusion is textually inescapable, and accordingly inflexible.

argument that the Takings Clause protected its claim from discharge, Poinsett Lumber concerned

a challenge to the constitutionality of a federal bankruptcy statute, the validity of which

apparently hinged on the determination that the drainage district was "not a governmental

agency," making that case dissimilar from the instant dispute, which concerns whether a plan of

adjustment is unconstitutional because it authorizes a government actor to withhold just

compensation owed for the taking of private property for public use.  119 F.2d at 272 (citing

Luehrmann v. Drainage Dist. No. 7 of Poinsett Cnty., 104 F.2d 696, 703 (8th Cir. 1939) ("the

Act of August 16, 1937, is valid as applied to this drainage district, which is not a governmental

agency.")).  Indeed, Poinsett Lumber's narrow reliance on Luehrmann appears to be for the

limited purpose of determining that the federal bankruptcy statute was valid.  Poinsett Lumber,

119 F.2d at 272-73.[39]  Here, by contrast, the question is whether government action under the

Plan (rather than the proper interpretation of a federal statute) permits a taking in violation of the

Fifth Amendment by impairing the constitutional right of just compensation.  Id. at 272-73.

---

[39]     It apparently mattered to the Poinsett Lumber court that the federal bankruptcy statute
was previously deemed valid in light of the fact that drainage districts were not
government agencies.  See id. at 272-73 (citing Luehrmann, 104 F.2d at 703)).
Nevertheless, even if the 1941 decision of Poinsett Lumber does not refute the Oversight
Board's position that Arkansas law recognized drainage districts as potentially liable for
Takings Clause claims (see Docket Entry No. 19574 ¶¶ 31-32 (citing St. Francis
Drainage Dist. v. Austin, 296 S.W.2d 668, 668-69 (Ark. 1956)), and that therefore
Poinsett Lumber assumes the dischargeability of Takings Clause claims, it is at best
unclear whether the Poinsett Lumber court squarely considered that precise question and
whether it factored into the decision it reached.  See Poinsett Lumber, 119 F.2d at 272-
73.  It is therefore inappropriate to infer from silence that the Poinsett Lumber court
maintained or even acknowledged the Oversight Board's theory.  Moreover, the general
dicta of Luehrmann at pages 702 and 703 (on which Poinsett Lumber relies) largely did
not concern any prepetition per se taking, and to the extent it upheld the lower court's
disallowance of an unliquidated claim for alleged overflow damage, it did so for the
limited purpose of acknowledging that the lower courts rightly overruled the objection
that the debtor was not insolvent.  As such, Luehrmann does not even establish a thin
reed of support for the Oversight Board's theory.  104 F.2d at 702-03.

Poinsett Lumber does not clearly support the Debtors' theory that a government debtor may impair and discharge a valid Takings Clause Claim for just compensation, let alone for the reason that the claim for just compensation is unsecured rather than secured.

169.    The Debtors' reliance on In re City of Stockton is likewise unavailing.  First, the creditor in that Ninth Circuit case had slept on his rights to oppose the discharge of his claim under the plan of adjustment.  The majority determined that the creditor, a Mr. Cobb, had not sought any stay relief, that the plan had already been substantially consummated, that reversal of the confirmation order would have threatened the settlements underlying the plan to the prejudice of settlement participants, and that the relief sought required dismantling the plan, and so his claim was deemed equitably moot.  In re City of Stockton, 909 F.3d at 1263-65.  Such questions of equitable mootness are simply not present at this pre-confirmation stage in the instant proceeding.  Second, and more importantly, the Debtors' reliance on the Ninth Circuit's alternate finding that Mr. Cobb's claim was dischargeable because his interest was unsecured rather than secured, not only lacks any clear basis in Supreme Court jurisprudence, but it appears to derive from a conflation of the constitutional guarantee of just compensation under the Takings Clause with statutory remedies for other constitutional violations.  See id. at 1268 ("[O]ther constitutionally based lawsuits seeking money damages, such as § 1983 claims, are routinely adjusted in bankruptcy[.]").  See also id. at 1278 (Friedland, J. dissenting) ("[T]he Constitution's mandate that takings claims be excepted from discharge does not depend on whether those claims were initially classified in any bankruptcy proceeding as secured or unsecured; the whole point of nondischargeability is that nondischargeable claims pass through

bankruptcy unaffected[.]").[40]  The Court declines any invitation to overlook the unique nature of

the Takings Clause here by conditioning the Fifth Amendment requirement of just compensation

on the existence of security for the obligation.  To hold otherwise would be to make the Takings

Clause subject to federal bankruptcy law, which is precisely the opposite of what the Supreme

Court has done.[41]

---

[40]    Despite the Oversight Board's argument that Judge Friedland's dissent distinguished
between pre-petition and post-petition transfers of title (Docket Entry No. 19574 ¶ 33
(discussing In re City of Stockton, 909 F.3d at 1276)), it does not support the Oversight
Board's theory.  The dissent made that distinction for the purpose of disputing the
procedural posture of Mr. Cobb's claim under California law and is a far cry from
constituting support for the Oversight Board's generalized theory that only post-petition
condemnations are not subject to impairment, let alone that they (and they alone) should
be treated as administrative expenses.  The Oversight Board obscures the relevance of
Judge Friedland's dissent, which reached the conclusion that this Court announces today.
Id. at 1278.

[41]    The Oversight Board also contended, for the first time, at oral argument that the
Court should allow the impairment and discharge of per se takings Claims because (i)
Congress can otherwise bar Takings Clause claims through the operation of statutes of
limitations, just like any other claim  (see, e.g., Nov. 22, 2021, Hr'g Tr. 60:10-25
(discussing Block v. North Dakota, 461 U.S. 273, 292 (1983))), and (ii) "the
bankruptcy power is not always subject to the Fifth Amendment when it comes to
discharge and avoidance of property interests," such that "if you can avoid a property
interest under Bankruptcy Code section 544, surely you can discharge an unsecured
claim to just compensation under section 944."  (Nov. 23, 2021, Hr'g Tr. 26:20-27:5.
See also Docket Entry No. 19574 ¶¶ 35-36.)  The first argument fails because (a) the
cases cited by the Oversight Board (including Block) are distinguishable, because none
of them directly involved any limitation periods for raising Takings Clause claims in
federal district courts, nor does any of them provide an analytical basis for determining
that Congress can statutorily limit a constitutional claim to which sovereign immunity
is not a barrier (cf. Soriano v. United States, 352 U.S. 270, 273-77 (1957) (statute of
limitations pertaining to claim for just compensation before Court of Federal Claims));
(b) statutes of limitations concern the procedural bounds of litigation decisions over
which claimants have control, such as the timing of filing a claim, and therefore they
do not support by analogy the Oversight Board's argument that PROMESA or the
Bankruptcy Code can substantively affect Takings Clause claims in a manner beyond
the control of the claimants; and, relatedly, (c) whereas statutes of limitations serve as
a procedural bar to claims and may therefore be harmonized with the Takings Clause
without impairing the substance of a litigant's right to just compensation, the Oversight
Board's theory would affect the substance of Takings Clause claims in a manner that
appears to abridge litigants' rights to just compensation itself, regardless of when their

170.    Accordingly, the Court concludes that the per se claims asserted by the holders of alleged Eminent Domain/Inverse Condemnation Claims, to the extent they are ultimately allowed, are not subject to impairment or discharge, and that such creditors' objections to confirmation are hereby sustained to the extent the provisions of the Fifth Modified Eighth Amended Plan (dated December 21, 2021) would treat such allowed claims as general unsecured claims.  The Debtors have proffered the Full-Payment Proposal for the treatment of the Claims in the event the Court, as it has done here, rejects the proposal to treat unfunded portions of Eminent Domain/Inverse Condemnation Claims on parity with general unsecured claims.  That Full-Payment Proposal provides for full satisfaction of Allowed Eminent Domain/Inverse Condemnation Claims when this decision and determinations allowing such Claims become final.  The Court directed the Debtors to revise the Fifth Modified Eighth Amended Plan to

---

claims are brought.  Ultimately, the Court need not, and does not, express any opinion here as to the application of statutes of limitation to Takings Clause claims.

The Oversight Board's second argument fares no better: 11 U.S.C. § 544(b)(1) only allows for the avoidance of transfers that would be voidable under applicable law.  Section 544(b)(1) is thus already restricted to transfers that are "voidable under applicable law," which accommodates restrictions imposed by non-bankruptcy law, including the Takings Clause.  11 U.S.C. § 544(b)(1).  Further, the Takings Clause serves only as a narrow boundary to the Debtors' avoidance powers, particularly with respect to per se takings.  In situations where regulatory takings are potentially at issue, the authority under section 544(b)(1) to avoid transfers may still be exercised in cases where the Penn Central analysis permits.  See also 11 U.S.C. §§ 544(a), 547(b), 548(a).  The Oversight Board essentially posits that, because it can conceive of a highly fact-specific hypothetical in which an attempt to avoid an unrecorded transfer of real property under section 544(a) might constitute a taking under this Court's analysis, the avoidance provisions of the Bankruptcy Code would be broadly endangered if the Takings Clause could preclude such avoidances.  (See Docket Entry No. 19574 ¶ 26.)  Not only does the Court decline to decide hypothetical cases not before it, but the Oversight Board's argument is self-defeating.  It does not follow that, because the Takings Clause could conceivably preclude a debtor's exercise of avoidance powers in a highly specific set of circumstances, the Bankruptcy Code is endangered root and branch.

provide solely for such treatment of the Claims (although the Debtors' original position that the

Claims are dischargeable and may be treated as general unsecured claims to the extent they are

unfunded is preserved for appeal) and the Debtors have done so.[42] The Court, accordingly, finds

that the Plan's treatment of Eminent Domain/Inverse Condemnation Claims is not a barrier to

confirmation.

171. **Bondholders' Objections**: With respect to the objectors who have raised Takings

Clause arguments with respect to their status as bondholders (see Samodovitz Obj.; Hein Obj.),

the proper analytical framework for addressing these claims is set forth in Penn Central. 438

U.S. at 124; see Patriot Portfolio, LLC v. Weinstein (In re Weinstein), 164 F.3d 677, 685 (1st

Cir. 1999) (applying Penn Central analysis to constitutional challenge to lien avoidance pursuant

to section 522(f) of the Bankruptcy Code). Pursuant to that test, courts consider three factors:

"(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation

interferes with the claimant's reasonable investment-backed expectations; and (3) the character

of the governmental action." Patriot Portfolio, 164 F.3d at 685.

172. Considering the first factor, the Court notes that the actions challenged by the

Bondholders will not result in the total destruction of the value of the liens allegedly securing the

existing bonds. Pursuant to the terms of the Plan (see Plan §§ 1.199, 1.359, 74.1), bondholders

---

[42] The Court's analysis should not be construed to prejudge whether particular Eminent Domain/Inverse Condemnation creditors must receive "full" compensation for their Takings Clause Claims. The Fifth Amendment mandates that a meritorious takings claimant receive just compensation, as determined by the court. See In re City of Stockton, 909 F.3d at 1279 (Friedland, J. dissenting). The Court does not decide or prejudge today the meaning or quantum of just compensation for any particular claimant. For some claimants, that amount has already been adjudicated. For others, that determination has not yet been made. Rather, the Court's limited determination here is that the Fifth Amendment prohibits the Plan from providing less than just compensation for allowed Eminent Domain/Inverse Condemnation Claims by way of impairment and discharge through bankruptcy.

will receive substantial value in new secured bonds and, in some cases, cash.  (See also

Disclosure Statement, Docket Entry No. 17628 at 61 ("The New GO Bonds will be secured by a

statutory first lien and pledge of the amounts on deposit in the Debt Service Fund and a pledge of

the Commonwealth's full faith, credit and taxing power[.]").)

173.    Second, although the proposed treatment of bondholders' claims may interfere

with certain bondholders' subjective investment expectations, a proper assessment of

bondholders' reasonable expectations must take account of the general risk that a government

issuer may have higher payment priorities in the event of a reorganization or economic crisis,

and the more specific risks of potential economic instability resulting from the indebtedness of

the Commonwealth, at the time they made their bond investments.  Cf. New Haven Inclusion

Cases, 399 U.S. 392, 491-92 (1970) (noting that security holders "invested their capital in a

public utility that does owe an obligation to the public . . . [and thereby] assumed the risk that in

any depression or any reorganization the interests of the public would be considered as well as

theirs") (citation and quotation marks omitted)).

174.    Third, the character of the governmental action strongly indicates that the Plan

does not result in an unconstitutional taking.  The challenged proposals are not physical

invasions of property by the government.  Rather, the restructuring of the relationships between

the Commonwealth and its bondholders, using the powers established by Congress in

PROMESA, is a quintessential example of a "public program adjusting the benefits and burdens

of economic life to promote the common good."  Penn Cent. Transp. Co., 438 U.S. at 124.  The

Takings Claim aspect of the Bondholders' objections is therefore overruled.

175.    **Suiza Dairy Objection**:  Unlike the objecting holders of Eminent

Domain/Inverse Condemnation Claims, Suiza Dairy ("Suiza") has not demonstrated that it has a

factual or legal basis for its assertion that it holds a valid Takings Clause Claim that is protected

by the Fifth Amendment.  Suiza objects to the Plan, asserting, on the basis of a preliminary

injunction it had obtained prepetition in the District of Puerto Rico against the Milk Industry

Regulatory Office of Puerto Rico, that it has an adjudicated regulatory taking claim against the

Commonwealth (Docket Entry No. 18594) (the "Suiza Objection").  See Vaqueria Tres

Monjitas, Inc. v. Laboy, Civil No. 04-1840 (DRD), 2007 WL 7733665 (D.P.R. July 13, 2007).

The Plan's impairment of Suiza's claim does not violate the Takings Clause of the Constitution

of the United States for the simple reason that, prior to receiving a final judgment on its Takings

Clause claim, see Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 484 (1st Cir. 2009),

Suiza (and other plaintiffs) entered into a stipulation (Docket Entry No. 2322 in Civil Case No.

04-1840 and Docket Entry No. 19361-6 in Case No. 17-3283) (the "Dairy Producer Settlement"),

under which the parties agreed to abide by certain regulatory accrual formulae set forth therein

(Dairy Producer Settlement ¶ 14.)  The Dairy Producer Settlement made no concession of the

plaintiffs' claims, made no concession of the validity of any of the prior district and circuit court

determinations, and provided that entry of court approval would operate as a final and

unappealable judgment dismissing the action with prejudice (Dairy Producer Settlement ¶¶ 1-2.)

In assessing the nature of the regulatory accrual which the preliminary injunction required (and

the Dairy Producer Settlement would thereafter incorporate), the First Circuit determined that it

was not just compensation for a taking, but instead resembled an equitable remedy.  See Irizarry,

587 F.3d at 479-80.  The court's judgment was thereafter entered on November 6, 2013,

incorporating the terms of the Dairy Producer Settlement.  (Docket Entry No. 2347 in Civil Case

No. 04-1840 and Docket Entry No. 19361-7 in Case No. 17-3283.)  Thus, there was no favorable

adjudication of Suiza's Takings Clause claim, which was dismissed with prejudice by the order

entered in 2013.  See Irizarry, 587 F.3d at 479-80 ("[H]ere there has been no award of damages that the state must pay.  That an equitable remedy results in the payment of monies to plaintiff does not, in itself, render the relief monetary compensation for a taking."), rh'g denied, 600 F.3d 1 (1st Cir. 2010).  Accordingly, it follows that Suiza merely has a contract-based claim for payment pursuant to the Dairy Producer Settlement.

176.    The Court looks to the three factors of Penn Central to determine whether the impairment of Suiza's property interest in its settlement agreement rises to the level of a taking. Concerning the first factor, the Plan's treatment of Suiza's claim will not result in the total destruction of the value of Suiza's interest in the Dairy Producer Settlement.  Rather, to the extent the Plan's treatment of Class 53 affects Suiza's claim, the plan provides for the payment of 50% of the Allowed Dairy Producer Claim and preserves other rights under the Dairy Producer Settlement.  (Plan § 57.1.)

177.    Second, notwithstanding Suiza's subjective economic expectations at the time the Dairy Producer Settlement was executed, any assessment of its reasonable expectations must account for an awareness of the Commonwealth's indebtedness, as well as the general risk that the Commonwealth might have higher payment priorities in the event of a reorganization or economic crisis.  See New Haven Inclusion Cases, 399 U.S. at 492.

178.    Third, the character of the governmental action strongly supports the Court's determination that the Plan's treatment of Suiza's claim does not result in an unconstitutional taking.  Rather, the restructuring of the relationships between the Commonwealth and its creditors under the powers established by PROMESA is a prime example of a "public program adjusting the benefits and burdens of economic life to promote the common good."  Penn Cent. Transp. Co., 438 U.S. at 124.  Accordingly, the Plan's treatment of Suiza's claim does not

constitute a taking without just compensation in violation of the Takings Clause of the

Constitution of the United States.  Suiza's objection is therefore overruled.

## Discrimination Provisions: Due Process, Equal Protection, and Privileges and Immunities Clauses

179.     Objector Peter Hein contends that the Plan's different treatment of mainland

investors from Puerto Rico-resident investors violates discrimination provisions of the

Constitution of the United States, to the extent the Plan makes distinctions based on investors'

geographic location.  (Hein Obj. at 26.)[43]  Such discrimination, he argues, violates the Due

Process, Equal Protection, and Privileges and Immunities Clauses of the Constitution of the

United States.  U.S. Const. art. IV, § 2, cl.1; am. V; am. XIV § 1.  The Plan does not, however,

violate any of these provisions of the Constitution.

180.     Regarding the Privileges and Immunities Clause, not only are the

Court's decisions concerning the confirmability of the Plan not limited by the Clause, Hawes v.

Club Ecuestre El Comandante, 535 F.2d 140, 145 (1st Cir. 1976) ("Article IV, s 2 is a limitation

on powers of states and in no way affects the powers of a federal district court."), the Plan's

taxable bond election provision does not fall within the purview of the Privileges and Immunities

Clause because it does not burden an activity that is sufficiently basic to the "vitality of the

nation as a single entity," Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. 371, 383 (1978);

see also id. at 388, and it is closely related to the advancement of a substantial state interest,

namely, the reorganization of the Commonwealth's debts.  Supreme Court of Va. v. Friedman,

487 U.S. 59, 65 (1988).

---

[43]     Specifically, Mr. Hein argues that all bondholders of a particular bond series, and not just
Puerto Rico investors, should be given the option to elect to receive a single maturity of
potentially taxable higher coupon bonds, and that failure to do so causes discrimination
based on place of residence.  (Hein Obj. at 26.)

181.     As for the Due Process and Equal Protection Clauses of the Fifth and Fourteenth

Amendments, Mr. Hein has exercised his right to challenge the differential treatment before this

tribunal, he has cited no fundamental right as being impaired, and has not identified any

discrimination based on any constitutionally protected class or status.  His objections citing these

constitutional amendments thus have no factual basis. Mr. Hein's argument that due process

prevents the Court from merely deferring to the Oversight Board's determinations and

certifications (see Hein Obj. at 18), is beside the point because the Court has indeed undertaken

an independent review of the Plan, in accordance with the legal standards applicable under

PROMESA, which do not authorize the Oversight Board to act as a judge in its own case, nor to

discharge or impair claims unilaterally.  See In re Fin. Oversight & Mgmt. Bd. for P.R. 583 B.R.

626, 632-33 (D.P.R. 2017).  Moreover, the Plan's taxable election provision is supported by a

rational basis because it seeks, by providing an opportunity to maximize the availability of non-

taxable bonds for mainland investors who pay federal taxes, to enhance recoveries for mainland

investors without harming local investors.  See United States v. Kras, 409 U.S. 434, 446 (1973).

182.     Mr. Hein's objections are therefore overruled.

183.     The Plan complies with PROMESA section 314(b)(3).

**D.  PROMESA § 314(b)(4):** *The Plan Provides Each Holder of an Administrative Claim
Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date.*

184.     Section 3.1 of the Plan states: "On the later to occur of (a) the Effective Date and

(b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the

Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim,

in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such

Allowed Administrative Expense Claim in accordance with such other terms no more favorable

to the claimant than as may be agreed upon by and between the holder thereof and the

Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan."

185.    Consummation Costs, Restriction Fees, and Retail Support Fees will be paid in Cash on the Effective Date.  All other Allowed Administrative Expense Claims, if any, will likewise be paid pursuant to section 3.1 of the Plan.

186.    The Plan complies with section 314(b)(4) of PROMESA.

**E.   PROMESA § 314(b)(5):** *The Plan Has Obtained all Necessary Legislative, Regulatory, and Electoral Approvals*.

187.    The Plan has obtained all necessary legislative, regulatory, and electoral approvals.  Further, by approving and certifying the Fiscal Plan, the Oversight Board provided approval for the issuance of securities contemplated by the Plan as required by section 207 of PROMESA.  The debt authorization in Act 53 is conditioned only on the Plan's removal of the Monthly Benefit Modification that was provided for in the Seventh Amended Plan and does not require removal of the pension freezes or the elimination of COLAs from the Plan.  Act 53 (Debtors Ex. 134), arts. 104, 605.  Pursuant to Puerto Rico law, legislation of the Commonwealth is presumed to be valid if enacted by the Legislative Assembly of Puerto Rico and signed into law by the Governor.  See, e.g., Brau v. ELA, 190 D.P.R. 315, 337 (P.R. 2014); Partido Socialista Puertorriqueño v. Puerto Rico, 107 D.P.R. 590, 609 n.11 (P.R. 1978), holding

modified by <u>Partido Independentista Puertorriqueño v. Comisión Estatal de Elecciones y Ostros</u>,

120 D.P.R. 580 (P.R. 1988) ("To begin with, laws are presumed to be constitutional and the

movant [objector] should place the courts in a position to decide by introducing evidence to

sustain the facts alleged, and then stating the legal arguments on which its assignment of

unconstitutionality is based, specifically mentioning the constitutional provisions involved and

the legal precedents supporting its assignment.

### F.   PROMESA § 314(b)(6): *The Plan Is Feasible and in the Best Interests of Creditors*.

188.    The Plan complies with section 314(b)(6) of PROMESA because it is feasible and

in the best interests of creditors.

#### i.    Feasibility

"[T]he Court has an independent duty to determine [feasibility] and to make specific

findings of fact." <u>In re City of Detroit</u>, 524 B.R. 147, 220 (Bankr. E.D. Mich. 2014).  Under

PROMESA, a plan of adjustment must be supported by financial projections that are "reasonable

and demonstrate a probability that [the debtor] will be able to satisfy its obligations under the

Plan." <u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>, 361 F. Supp. 3d 203, 246 (D.P.R. 2019).

Additionally, as in chapter 9, a PROMESA debtor, as a government entity, must show that it is

"probable that [the] debtor can both pay post-petition debt and provide future public services at

the level necessary to its viability as a [territory]."   <u>In re Mount Carbon Metro. Dist.</u>, 242 B.R.

18, 35 (Bank. D. Colo. 1999).  The core inquiry has been articulated as follows: "Is it likely that

the [debtor], after the confirmation of the Plan of Adjustment, will be able to sustainably provide

basic municipal services to the citizens of [the debtor] and to meet the obligations contemplated

in the Plan without the significant probability of a default?" <u>In re City of Detroit</u>, 524 B.R. at

222.

### a. The Plan is Feasible as to ERS

189.    The Plan is feasible with respect to ERS.  ERS no longer has pension and other obligations to beneficiaries, those obligations having been assumed by the Commonwealth upon the enactment of Act 106.  Pursuant to the Plan, ERS's assets are being sold and transferred to the Commonwealth in exchange for $373 million and the agreement to purchase the ERS Private Equity Portfolio for $70,750,000, subject to certain conditions.  ERS's obligations pursuant to the Plan include distributing the $373 million in cash received from the Commonwealth to the holders of Allowed ERS Bond Claims, as well as payments to holders of Allowed ERS General Unsecured Claims in a *de minimis* amount.  (Jaresko Decl. ¶ 98; Plan §§ 2.4, 69.2, 77.1(c).)

190.    Pursuant to the Plan, ERS will place the ERS Private Equity Portfolio in the ERS Trust, which will then be purchased by either the Commonwealth or holder(s) of Allowed ERS Bond Claims on or before April 25, 2023 for no less than $70,750,000, which funds will be distributed to holders of Allowed ERS Bond Claims.  (Jaresko Decl. ¶ 99; Plan §§ 2.4, 69.2, 77.1(c).)  Further, on the Effective Date, each holder of an ERS General Unsecured Claim will receive such holder's Pro Rata Share of the ERS GUC Pool, which is comprised of $500,000 plus the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests, capped at $5 million.  (Plan §§ 70.1, 1.223.)  ERS will dissolve after the Effective Date of the Plan and all remaining assets of ERS will be deemed sold and transferred to the Commonwealth.  (Jaresko Decl. ¶ 99; Plan § 88.2.)  Any excess amount in the ERS GUC Pool will be reallocated, on a pro rata basis, to holders of Allowed CW General Unsecured Claims. (Plan § 1.223.)  ERS will therefore have no material obligations after the Effective Date. (Jaresko Decl. ¶ 99.)  Accordingly, the Plan is feasible with respect to ERS and is not likely to result in the need for a further restructuring of ERS.

### b. The Plan is Feasible as to PBA

191.    The Plan is feasible with respect to PBA, as PBA holds sufficient cash to pay its obligations to all of its creditors pursuant to the Plan, including any Allowed Claims on account of loans made by GDB to PBA.  (Jaresko Decl. ¶ 100.)  Holders of PBA Bond Claims will receive their Pro Rata Share of the Vintage PBA Bond Recovery, 2011 PBA Bond Recovery, or 2012 PBA Bond Recovery, as applicable, in the aggregate amount of approximately $1.1 billion to be paid by the Commonwealth.  (Shah Decl. ¶ 59; Plan arts. V-XV.)  Holders of Claims in Classes 12 (PBA/DRA Secured Claims), 13 (PBA General Unsecured Claims), and 14 (PBA/DRA Unsecured Claims) will each receive Cash in an amount equal to ten percent (10%) of such Claims.  (Plan arts. XVI-XVIII.)

192.    The Debtors seek an order providing that each of the Unexpired Leases to which PBA is a party (collectively, the "PBA Leases") will be deemed rejected upon the earliest to occur of (a) June 30, 2022, (b) the date upon which such PBA Lease expires in accordance with its terms, (c) the date upon which PBA enters into a new or amended lease with respect to the leased property subject to such PBA Lease, (d) such other date of which PBA, as lessor, provides written notice to the counterparty to a PBA Lease, and (e) the date upon which AAFAF provides written notice to PBA that such PBA Lease is rejected; provided, however, that during the period from the Effective Date up to the date of such rejection, with respect to any PBA Lease between PBA as lessor and the Commonwealth or any Commonwealth agency, public corporation, or instrumentality, as lessee, monthly lease payments shall be limited to the lower of (y) the amount budgeted and approved pursuant to a certified fiscal plan and (z) the monthly costs and expenses associated with the applicable leased property; and provided, further, that any accruals on the books of PBA or any of the Commonwealth or an agency, public corporation, or instrumentality

of the Commonwealth as counterparty to a PBA Lease for the unpaid debt service component of rent under any PBA Lease shall be deemed released, settled, and discharged as of the rejection date.  (See Confirmation Ord. ¶ 84.) The treatment of PBA Leases has been consented to by the Oversight Board, on behalf of the Debtors.  The Oversight Board represents, and AAFAF has not denied, that AAFAF, on behalf of the agencies, instrumentalities, and public corporations, has also consented to the treatment of the PBA Leases set forth in the Plan.

193.    Accordingly, the Plan is feasible with respect to PBA and is not likely to result in the need for a further restructuring of PBA.

### c.  The Plan is Feasible as to the Commonwealth

194.    The Plan is feasible with respect to the Commonwealth.  The Plan provides for the following types of payments to financial creditors: (1) cash on the Effective Date, (2) new debt issued by the Commonwealth in the form of New GO Bonds, and (3) CVIs.  (Zelin Decl. ¶ 47; Malhotra Decl. ¶ 9.)  In addition, the Plan contemplates payments to retirees of pensions and other benefits, without adjustment for any Monthly Benefit Modification, as well as additional payments to Commonwealth employees.  (Malhotra Decl. ¶ 9.)

195.    The Plan provides for the payment of Cash on the Effective Date and over time, in the aggregate amount of approximately $8 billion, plus up to $801 million in consummation costs, restriction fees, and retail support fees.  (See Malhotra Decl. ¶ 10; Zelin Decl. ¶¶ 48, 86.)

196.    The Plan provides that the Reorganized Commonwealth will issue New GO Bonds on the Effective Date with different maturity dates, having an aggregate original principal amount of $7,414,063,543.25.  (Malhotra Decl. ¶ 11; Zelin Decl. ¶ 49; Plan art. LXXIV.)  All holders of general obligation debt and general obligation guaranteed debt will receive New GO Bonds having thirteen (13) CUSIP numbers, which distribution was calculated to provide each

holder with incremental value of 2.25% of their par claims, which increment exceeds any liquidity charge by approximately 1.75% of their par claims.  (<u>See</u> Nov. 12, 2021, Hr'g Tr. 108:15-111:1.)  Minimizing the number of CUSIPs would not be in the interest of bondholders as a whole; rather, the issuance pursuant to the Plan of thirteen (13) CUSIPs to each bondholder provides each holder with as significant a recovery as possible within the boundaries of the municipal bond market and the need to keep annual debt service sustainable, and a significantly greater total amount of value.  (<u>See</u> Nov. 12, 2021, Hr'g Tr. 105:11-106:4; 108:18-111:4.)  The aggregate amount owed, including all principal and interest over the life of the New GO Bonds from the Deemed Issuance Date of July 1, 2021 to the maturity of the final New GO Bond on July 1, 2046, is $10,914,969,303.20.  (Malhotra Decl. ¶ 12; Zelin Decl. ¶ 49.)  The Plan provides for a Debt Service Fund to be established.  On the first business day of each month after the Effective Date until the obligations of the applicable New GO Bonds are satisfied, the Commonwealth will deposit the portion of principal and accrued interest for that month into the Debt Service Fund.  (Malhotra Decl. ¶ 16; Plan § 74.1(f).)  The Plan also provides that, on the Effective Date, the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional amounts necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.  (Plan § 74.1(f).)

197.    The Plan provides for the issuance of (i) GO CVIs in the aggregate original notional amount of $3.5 billion, having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and (ii) Clawback CVIs in the aggregate original notional amount of $5.239 billion, having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051.  (Malhotra Decl. ¶ 19; Zelin Decl. ¶ 54; Plan § 74.2.)  The Commonwealth's obligation to pay under the CVIs arises only if certain outperformance

conditions specified in the Plan and the CVI indentures occur.  Specifically, the Plan provides for the establishment of threshold metrics based on tax revenue projections contained in certified fiscal plans.  Only if actual revenues exceed the established threshold at the end of a given fiscal year will an obligation to pay come into being, subject to certain caps.  (Malhotra Decl. ¶ 20; Zelin Decl. ¶ 55; Plan Ex. J.)  Further, payments on the CVIs are triggered only when both cumulative and annual outperformance occurs, which protects the Commonwealth from making substantial CVI payouts when it experiences one year of outperformance after experiencing several years of underperformance.  (Malhotra Decl. ¶¶ 35-37; Zelin Decl. ¶¶ 60-65.)

198.   In addition, the Plan provides for (i) payments of pension and other post-employment benefits to retired Commonwealth employees, without adjustment for any Monthly Benefit Modification, (ii) the restoration of contributions made by Commonwealth employees to the System 2000 program, and (iii) payments to the Pension Reserve Trust.  (Malhotra Decl. ¶ 21; Plan art. LV.)  Participants in System 2000 will not be subject to benefit reductions, but instead will receive the amount of their contributions to System 2000 from its enactment until June 30, 2017.  (Plan § 55.1.)  The aggregate sum of such contributions plus interest accrued thereon is approximately $1.2 billion.  (Malhotra Decl. ¶ 23.)  The Pension Reserve Trust will receive an initial contribution of $5 million on the Effective Date and, for the next ten (10) fiscal years, the Commonwealth will make a contribution in an amount equal to (1) the Base Contribution, $175 million or, for any fiscal year in which the projected Fiscal Plan Surplus set forth in the Fiscal Plan is equal to or greater than $1.75 billion, an amount equal to fifty percent (50%) of that amount, plus (2) an additional amount calculated as (i) the lower of the actual primary surplus for such fiscal year and the projected Fiscal Plan surplus for such fiscal year, minus (ii) the sum of the Base Contribution, plus the Commonwealth's debt service obligations

pursuant to the Plan for such fiscal year, plus $200 million.  (Plan art. LXXXIII; Malhotra Decl.

¶ 24; Malhotra Sup. Decl. ¶¶ 12-13; Jaresko Sup. Decl. ¶¶ 10-11; Santambrogio Sup. Decl. ¶¶ 8-

9.)  The Commonwealth's contributions to the Pension Reserve Trust are estimated to total

approximately $2.4 billion during the ten years of funding based on the Fiscal Plan, all of which

will be paid during the time period in which the Fiscal Plan projects surpluses.  The Pension

Reserve Trust is projected to have a balance of $3.1 billion through the end of fiscal year 2031

based on the Fiscal Plan.  (Malhotra Sup. Decl. ¶ 14; Santambrogio Sup. Decl. ¶ 10.)  Further,

the Pension Reserve Trust will be professionally and independently managed to insulate the

funding available to pay pensions from political or economic influences.  (Malhotra Decl.

¶ 34.)[44]

199.    The Seventh Amended Plan contained a Monthly Benefit Modification pursuant

to which reductions to monthly pension payments would be made.  The New GO Bond

Legislation and CVI Legislation, Act 53, is conditioned on the removal of the Monthly Benefit

Modification from the Plan and so, consistent with Act 53, the Plan no longer contains a Monthly

Benefit Modification provision.  (See Plan art. LV.)  The Plan nevertheless remains feasible,

provided there are no other modifications to the Plan involving pensions.  The elimination of the

Monthly Benefit Modification is estimated to add an average of approximately $87 million

annually to the cost of the Commonwealth's PayGo obligations for the first ten years, which

---

[44]     AAFAF objects to portions of this finding, and to similar conclusions in ¶ 224 concerning
the Pension Reserve Trust, arguing the factual evidence supporting the funding details is
based on declarations that were submitted prior to changes made to the funding
provisions during the Confirmation Hearing.  (See Docket Entry No. 19402 at 12; see
also Docket Entry No. 19173; Docket Entry No. 19320).  The Debtors have, however,
provided an explanation of the need for such changes and the factual support for the
feasibility of the new provisions in the supplemental declarations of Ms. Jaresko, Mr.
Malhotra, and Mr. Santambrogio.  (See Jaresko Sup. Decl. ¶¶ 9-11; Malhotra Sup. Decl.
¶¶ 12-13; Santambrogio Sup. Decl. ¶¶ 8-9.)  AAFAF's objection is therefore overruled.

represents less than five percent (5%) of the Commonwealth's estimated PayGo expenses for this period, and less than one percent (1%) of the Commonwealth's overall budget for this period. The additional cost will be payable from the surpluses projected in the Fiscal Plan during this period.  Over the thirty-year period of Fiscal Plan projections, the aggregate cost of eliminating the Monthly Benefit Modification is approximately $1.9 billion.  (Malhotra Sup. Decl. ¶ 9, Ex. 1; Levy Sup. Decl. ¶ 10; Jaresko Sup. Decl. ¶ 8.)  The elimination of the Monthly Benefit Modification does not materially affect the feasibility of the Plan.  (Malhotra Sup. Decl. ¶ 10; Jaresko Sup. Decl. ¶¶ 8-12.)

200.    If the Plan were modified to (i) eliminate the freeze of JRS and TRS pension benefit accruals and (ii) retain any future pension benefit cost of living adjustments, the Plan would be at risk of not being feasible.  (Malhotra Sup. Decl. ¶ 8; Jaresko Sup. Decl. ¶ 13.) Specifically, the PayGo impact of eliminating the pension freeze and reinstating COLAs relative to the Fiscal Plan is estimated to be approximately $5.6 billion over thirty (30) years, or approximately $4.7 billion after taking into account social security costs.  (Levy Sup. Decl. ¶ 14.) By 2047, the incremental PayGo cost associated with eliminating the pension freeze and maintaining COLAs is estimated to increase the annual PayGo obligation by twenty-five percent (25%).  Unlike the elimination of the Monthly Benefit Modification, the incremental cost of which decreases as the Commonwealth approaches the deficits projected by the Fiscal Plan, the incremental costs associated with eliminating the pension freeze and reinstating any COLAs are projected to grow larger as the Commonwealth approaches the deficits projected by the Fiscal Plan, thus presenting the risk that the Plan may not be feasible.[45]  (Malhotra Sup. Decl. ¶¶ 17-18;

---

[45]    AMPR objects that, even with the inclusion of the JRS and TRS benefit freeze, the Plan may not be feasible because the employees whose benefits are frozen will have a damages claim based on the loss of their future accruals that is not provided for in the

Levy Sup. Decl. ¶¶ 9-17.)  Absent the Pension Freeze, TRS and JRS pension liabilities will continue to increase relative to the Fiscal Plan.  Eliminating the pension freeze would create an open-ended incremental defined benefit liability because TRS and JRS participants would continue to accrue new benefits for as long as they continue to work for the Commonwealth. (Malhotra Sup. Decl. ¶ 18.)  Moreover, not implementing the pension freeze and the reinstatement of COLAs would increase the likelihood of needing to rely on the Pension Reserve Trust for payment of the Commonwealth's PayGo obligations, and increase the risk of completely exhausting the Pension Reserve Trust during the Fiscal Plan projection period. (Malhotra Sup. Decl. ¶ 18; Levy Sup. Decl. ¶ 16.)

201.    Section 83.4 of the Plan ensures that pension-related provisions contained in the Plan will not be undone in the short term such that pension payments become unaffordable, providing that: "Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of

---

Plan. (See Docket Entry No. 18585 at 16 n.12).  AMPR does not proffer any evidence concerning the potential cost of such claims to the Commonwealth.  The Debtors proffer that the Plan already provides for the treatment of these claims by ensuring the payment of any defined benefits accrued up to the Effective Date, providing a tax deferred defined contribution account, and providing matching contributions to Social Security for those who opt in. (Nov. 15, 2021, Hr'g Tr. 51:2 - 51:7.)  To the extent AMPR would be able to assert a rejection damages claim, the Court finds that the Plan anticipates any such claim from the employees subject to the freeze of their benefits, (see Plan § 1.487 (defining "TRS Participant Claim" to include "any right to accrue additional retiree benefits in TRS from and after the Effective Date")) and provides a treatment for such claims (see Plan §§ 55.3, 55.9) that is accounted for in the Debtors' feasibility demonstration.  AMPR has not provided any evidence showing that prospective claims from its members would render the Plan infeasible.  AMPR's feasibility objection is therefore overruled.

funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature of the Commonwealth of Puerto Rico, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan." (Plan § 83.4.)  This prohibition on new defined benefits for a ten (10) year period is enforceable and is essential to the Plan's continued feasibility.[46] (See Nov. 15, 2021, Hr'g Tr. 181:16-182:14; see also Malhotra Sup. Decl. ¶ 20 (explaining the costs of pension-related laws proposed by the government would increase the risk the Plan will not be feasible).)

      202.    The Plan also provides for additional payments to be made to current employees who are members of certain public employee unions affiliated with AFSCME and non-union rank and file employees.  Pursuant to the Plan, the Commonwealth's monthly contribution for

---

[46]    See supra n.23.

healthcare benefits to Commonwealth employees who are members of AFSCME-affiliated unions will increase from $125 per employee per month to $170 per employee per month.  (See Santambrogio Decl. ¶ 31; Malhotra Decl. ¶ 26.)  In addition, the Plan provides for $500 signing bonuses to each member of an AFSCME-affiliated union and, if the Commonwealth has an excess cash surplus after CVI payments that is greater than $100 million, 25% of that surplus will be allocated to a bonus pool for the benefit of members of the AFSCME-affiliated unions and other non-union rank and file employees.  (Plan art. LVI; Plan Ex. G; Malhotra Decl. ¶¶ 25-26, 29 & n.6; Santambrogio Decl. ¶¶ 22-23.)  Subject to a minimum cash bonus of $2,000 per year per AFSCME-represented employee for the five-year term of the amended collective bargaining agreement, such employees only receive the cash surplus bonuses if the government outperforms the Fiscal Plan, so employees are incentivized to ensure that the government is operating efficiently.  (Nov. 10, 2021, Hr'g Tr. 62:25-63:4; Santambrogio Sup. Decl. ¶ 11.)

203.    The Plan also provides that the Debtors shall transfer ACR-eligible claims pursuant to the ACR Order, which claims shall be reconciled and paid in the ordinary course of business.  The Commonwealth has reserved $229 million for payment of such claims.  (Plan § 82.7; Malhotra Decl. ¶¶ 27, 29.)

204.    Further, the Plan provides ERS Bondholders a right to receive a future payment of $70.75 million from the purchase of the ERS Private Equity Portfolio.  (Plan § 69.2; Malhotra Decl. ¶¶ 27, 29.)

205.    The Plan, including each of these provisions, is feasible with respect to the Commonwealth.[47]  (Malhotra Decl. ¶ 29.)  Confirmation of the Plan is not likely to be followed

---

[47]    The Plan remains feasible even accounting for the payment in full of the total of Eminent Domain/Inverse Condemnation Claims asserted to arise out of the Takings Clause.  See supra ¶¶ 65, 160, 169.  Based on a review and reconciliation of claims to date, the cost of

by the need for further financial reorganization not contemplated in the Plan, and will enable the Commonwealth to provide future public services and remain a viable public entity. That is true notwithstanding the fact that, based on the 2021 Fiscal Plan (Debtors Ex. 10) projections, deficits after debt service are projected to reemerge in approximately FY 2035. (Malhotra Decl. ¶ 29.) By the time deficits are projected to emerge, the amount of Commonwealth general obligation debt outstanding will only be $2.1 billion, as compared to pre-petition debt liabilities of $30.5 billion. (Id.) The Commonwealth will not likely need further reorganization notwithstanding projected deficits due to a number of factors, including the following: (i) the Plan reduces the Commonwealth's overall debt; (ii) the Plan includes multiple provisions designed to insulate the Commonwealth from downside risks; (iii) the Commonwealth can implement certain reforms the Oversight Board identified that could result in additional liquidity, which could eliminate the projected deficit;[48] and (iv) the Plan does not take into account potential upside factors which, if they materialize, would result in additional liquidity. (See id.)

---

such Claims is currently estimated to be approximately $390 million. (See Herriman Sup. Decl. ¶ 11.) The Debtors have proffered credible evidence to support the conclusion that the Plan would still be feasible because the Commonwealth will have sufficient cash remaining after fulfilling its Effective Date obligations under the Plan to pay such Eminent Domain/Inverse Condemnation Claims, to the extent they are Allowed, in full. Additionally, not all Allowed Eminent Domain/Inverse Condemnation Claims will need to be paid out immediately on the Effective Date, as some have not yet been adjudicated. (See Debtors Ex. 30 at 3; Malhotra Sup. Decl. Ex. 1; Herriman Sup. Decl.; Nov. 22, 2021, Hr'g Tr. 15:11-17:20.)

[48]     Mr. Hein argues that the Commonwealth has previously failed to implement structural reforms put forth by the Oversight Board and that there is no evidence that the Commonwealth government would now adopt such proposals, such that the Debtors' representation that the Plan is feasible is unpersuasive. (See, e.g., Docket Entry No. 19400 at 41-42.) The Commonwealth government's commitment to implementing proposed structural changes cannot be guaranteed, but the Plan provides incentives for the Commonwealth and interested parties to ensure that the government pursues policies to achieve strong fiscal performance. (See, e.g., Malhotra Decl. ¶ 26 (describing Upside Bonus Participation pool for certain public employees if the Commonwealth has an Excess Cash Surplus); Zelin Decl. ¶¶ 60-66 (explaining alignment of incentives between

206.     The Plan also reduces the Debtors' debt significantly.  After confirmation, the Commonwealth's general obligation and guaranteed debt will be approximately $7.4 billion, considerably lower than the $30.5 billion pre-restructuring total, and all ERS and PBA debt will be eliminated.  (Malhotra Decl. ¶ 31; Jaresko Decl. ¶¶ 98-100.)  Prior to the commencement of the Title III Cases, annual Commonwealth debt service was approximately $2.1 billion, and post-Effective Date, the Commonwealth's average annual debt service during the first ten years will be approximately $666 million.[49]  (Malhotra Decl. ¶¶ 30-31.)  Over 50% of the newly issued debt under the Plan will have amortized within 10 years of its issuance date.  (Id. ¶ 32.)  Debt levels will continuously decline and remain low until full repayment of the Commonwealth's general obligation and guaranteed debt, which is projected to occur in fiscal year 2046.  (Id.)

---

the Commonwealth and CVI holders to achieve outperformance).)  Furthermore, as set forth supra, the proposed structural reforms are not the only protections the Plan offers to combat projected deficits starting in FY 2035.  The Plan also provides mechanisms such as the Pension Reserve Trust, the CVI structure, and the Debt Management Policy to ensure obligations are met even if the Commonwealth begins to run deficits.  (See Malhotra Decl. ¶ 33.)  The projections underlying the Fiscal Plan and the Plan also do not account for potential upsides that could increase the Commonwealth's liquidity in the future.  (Id. ¶¶ 41-51.)  Thus, the uncertainty of the Commonwealth's support for proposed structural changes does not render the Plan infeasible.

[49]     The Service Employees International Union ("SEIU") argues in its objection that the Plan leaves the Commonwealth with an unaffordable debt burden that renders the Plan infeasible.  (See Docket Entry No. 18511 ¶¶ 23-25; Docket Entry No. 19386 ¶ 13.)  The SEIU relies on a study by economist Joseph Stiglitz, which was not proffered into evidence, in arguing that the economic and social needs of Puerto Rico are far greater than those of mainland U.S. states and therefore that Puerto Rico should not have a larger debt load than the average U.S. state.  (See Docket Entry No. 18511 ¶ 23.)  Based on the metric of net tax-supported debt per capita, the SEIU argues that, under the Plan, Puerto Rico would rank ninth from the top in the rankings of most indebted states in the United States.  (See id. ¶ 25.)  The Court is not persuaded that this sole metric, net tax-supported debt per capita, is the proper standard by which to judge whether the Plan is feasible.  The Debtors have put forth persuasive evidence that the Plan will allow the Debtors to meet their obligations and is not likely to be followed by the need for further reorganization (Malhotra Decl. ¶ 29), and the SEIU has not proffered any evidence to the contrary.  Thus, the SEIU's objection with respect to the Plan's feasibility is overruled.

Thereafter, the only commitments that will remain outstanding will be the CVIs and COFINA debt. The CVIs are paid only if specific revenues outperform projections, and COFINA debt is serviced via a pledged portion of sales and use tax. (Id.) The Commonwealth will have the ability to pay debt service pursuant to the Plan through at least 2034, and the Plan proposes additional reforms and potential factors that could increase the Commonwealth's resources and create surpluses that could extend this projection. (Wolfe Decl. Ex. 1 ¶¶ 12, 13, 15-27.)

207. In addition, several Plan provisions—the Pension Reserve Trust, the CVI structures, the Debt Management Policy, and the Comprehensive Cap—mitigate the impact of potential financial underperformance and the effects of projected deficits. (See Malhotra Decl. ¶¶ 33-40.) The Commonwealth will also establish an emergency reserve and a certain level of unrestricted cash, and the Oversight Board has agreed to fund a temporary disaster aid revolving line of credit, which mitigate against potential downside risks. (Id. ¶¶ 49-51; Chepenik Decl. ¶¶ 9, 28, 30, 36, 38.) The Commonwealth will retain an unrestricted cash balance of $1 billion to help maintain uninterrupted government operations when unforeseen fiscal challenges emerge. (Malhotra Decl. ¶ 49; Chepenik Decl. ¶ 28; Nov. 12, 2021, Hr'g Tr. 50:21-51:5.) The emergency fund will be funded with $130 million annually for a period of ten years, until the reserve balance reaches $1.3 billion, or 2% of Puerto Rico's Fiscal Year 2018 Gross National Product, in line with International Monetary Fund guidance. (Malhotra Decl. ¶ 51; Chepenik Decl. ¶ 38.)

208. The Plan is not dependent on new borrowings that would impede the Debtors' ability to achieve compliance with the Fiscal Plan. The Fiscal Plan (Debtors Ex. 10) does not show a need for incremental borrowing, and therefore the Plan's borrowing restrictions will not impede the Commonwealth's ability to implement the Fiscal Plan. (Murray Decl. Ex. 1 ¶¶ 99-

102.)  The Plan will leave the Debtors with a level of cash consistent with the cash necessary to implement the undertakings referenced in the Fiscal Plan.  (Murray Decl. Ex. A ¶ 65.)  In addition, the Plan imposes a comprehensive cap on net tax-supported debt equal to 7.94% of debt policy revenues, and the expected level of net tax supported debt service is projected to be 7.6% of debt policy revenues.  (Murray Decl. Ex. A ¶¶ 100-01; Plan § 74.4.)

209.    The Commonwealth has sufficient resources to pay debt service pursuant to the Plan until 2034, through annual surpluses.  (Wolfe Decl. Ex. 1 ¶ 12.)  Additional options for payment of debt service will become available in later years because the Commonwealth can implement structural reforms to increase the Commonwealth's resources and create surpluses. (Wolfe Decl. ¶¶ 13, 15-27.)  Proactively implementing structural reforms would create a stream of fiscal surpluses sufficient to cover the Commonwealth's debt service obligations pursuant to the Plan and could build cumulative surpluses not incorporated into the Fiscal Plan totaling $32.4 billion for fiscal years 2022 through 2046, well above the cumulative debt service over that same period of $10.9 billion.  (Wolfe Decl. Ex. 1 ¶¶ 13, 27.)  There are additional potential upside factors not incorporated into the Plan which, if they occur, will produce additional revenues. These factors include a potential increase in federal Medicaid funding, and potential provision of Social Security Income to Puerto Rico residents that could increase economic activity.  (See Malhotra Decl. ¶¶ 44-48.)

210.    Accordingly, the Plan is feasible with respect to the Commonwealth and is not likely to result in the need for a further restructuring of the Commonwealth.

### ii.    Best Interests Test

211.    As in chapter 9 of the Bankruptcy Code, PROMESA's "best interests" test differs substantially from the chapter 11 "best interests" requirement.  In chapter 11, the test requires a

court to determine whether an individual creditor would receive more if the chapter 11 debtor were to liquidate its assets.  In contrast, the chapter 9 test is not a liquidation test (because municipalities cannot be liquidated) and is focused on the ***collective*** recovery of creditors in the aggregate.  Cf. In re City of Detroit, 524 B.R. at 212-13 (comparing the "best interests" tests in chapter 9 and chapter 11 of the Bankruptcy Code); see also In re Fin. Oversight & Mgmt. Bd. for P.R., 361 F. Supp. 3d 203, 250-51 (D.P.R. 2019).  The PROMESA best interests test additionally modifies the chapter 9 best interests test, only requiring the Court "to ***consider*** whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by [the] plan."[50]  48 U.S.C.A. § 2174(b)(6) (Westlaw through P.L. 117-80) (emphasis added).  Thus, the PROMESA best interests test does not impose a litmus test or establish a floor for creditor recoveries.  See id.

212.    Accordingly, PROMESA's best interests test requires the Court only to *consider* whether creditors of each Debtor *in the aggregate* receive an equal or greater recovery on their Claims pursuant to the Plan than they would outside of Title III if the Debtor's Title III case were dismissed and creditors exercised their remedies.  An analysis of creditor recoveries in such hypothetical circumstances requires the application of a number of assumptions, including (i) estimates of the resources that would be available for debt service, which requires an assessment of available cash, revenues, and operating expenses in the absence of a confirmed plan of adjustment; (ii) the outstanding creditor obligations due and payable that would exist outside of Title III; and (iii) the priority in which creditor claims would be paid outside of Title III, which

---

[50]    Notably, Section 314(b)(6) speaks in terms of a single "recovery" for "creditors" (plural). 48 U.S.C.A. § 2174(b)(6) (Westlaw through P.L. 117-80)

in certain circumstances requires consideration of assumptions regarding the potential outcome of litigation matters.  (Shah Decl. ¶ 8.)

213.    The Debtors have met their burden of showing that recoveries for claimholders of each Debtor pursuant to the Plan, in the aggregate, are within the range or greater than the range of the projected recoveries for such claimholders in the aggregate if the Title III Cases were dismissed for each of the Debtors, as demonstrated by the best interest test reports attached to the Shah Declaration as Exhibits A, B, and C.  (Shah Decl. ¶ 35, Exs. A, B, and C; Debtors Exs. 130, 131.)  Additionally, the recovery pursuant to the Plan for holders of GO Bonds is within the range of the projected recoveries for such claimholders pursuant to the Oversight Board's best interest test analysis if the Commonwealth's Title III case were dismissed, assuming all GO Bonds were validly issued.  (See Shah Decl. ¶ 45; Shah Decl. Ex. 7 to Ex. A.)

214.    In the aggregate, excluding the payment of Restriction Fees or Consummation Costs (which are not being paid on account of Claims), and excluding Federal Claims,[51] there are an estimated $22.8 billion in Claims asserted against the Commonwealth, which are projected to receive $15.7 billion pursuant to the Plan, for an aggregate recovery for all claimholders of 69%, exclusive of any payments to be made with respect to CVIs or payments from the Avoidance Actions Trust.  (Id. ¶ 48.)  This compares favorably to the projected range of recoveries pursuant to the Oversight Board's best interest test analysis if the Commonwealth's Title III case is dismissed: $9.3-15.3 billion (34%-62%).  (Id. ¶ 35.)  Realized Commonwealth creditor recoveries could be even higher pursuant to the Plan, as the 69% estimated recovery excludes

---

[51]    Federal Claims are excluded from the aggregate recovery computation because they are being paid at 100% and would artificially inflate the demonstration as to other claims. (See Plan § 73.1; Shah Decl. ¶ 35 n.3.)

any additional recoveries available on account of payments from the Avoidance Action Trust or CVIs.  (Id. ¶ 48.)

215.    Pursuant to the Plan, exclusive of the payment of the ERS Restriction Fee (which is not being paid on account of Claims), ERS Bondholders are projected to receive a recovery of approximately $444 million on $3.169 billion of Claims, and ERS General Unsecured Claims are projected to receive a recovery of 100% on approximately $300,000 of Claims, for an implied aggregate recovery of 14%.  (Shah Decl. ¶ 54.)  This is within the range of projected recoveries pursuant to the Oversight Board's best interest test analysis if ERS's Title III case is dismissed: $0.2-3.7 billion (5%-100%).  (Id. ¶ 35.)[52]

216.    Pursuant to the Plan, PBA Bondholders are projected to receive a recovery of $1.1 billion against PBA.  (Id. ¶ 59.)  The Plan provides that the PBA/DRA Secured Claim, PBA General Unsecured Claims, and PBA/DRA Unsecured Claims, will receive recoveries of approximately $6.6 million, $41.0 million, and $13.4 million, respectively.  (Id.)  Accordingly, holders of Claims against PBA are projected to receive an implied aggregate recovery of $1.1 billion, or 21%.  (Id.)  This compares favorably to the projected recoveries pursuant to the Oversight Board's best interest test analysis if PBA's Title III case is dismissed: $0.3 billion (5%).  (Id. ¶ 35.)

---

[52]    While it is theoretically possible there would be a 100% recovery on ERS Claims outside of Title III, that result is very unlikely because it would require a court to rule that ERS Bondholders hold liens on PayGo payments.  Notably, the First Circuit has already determined that the ERS Bondholders' collateral, which consists of statutory employer contributions to ERS, was subject to material impairment by legislative action, stating: "Importantly, the Bond Resolution explicitly states that the legislature of the Commonwealth might reduce (or, by implication, eliminate) Employers' Contributions, and so 'adversely affect[]' the Bondholders."  Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Global Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 948 F.3d 457, 468-69 (1st Cir. 2020).

217.    Accordingly, for each Debtor, creditors in the aggregate will receive a percentage recovery on their Claims pursuant to the Plan that is within the range of or greater than projected recoveries outside of Title III.[53]  (Id. ¶ 13.)

218.    These results are unsurprising.  Absent a mechanism to restructure the Debtors' outstanding debt and pension liabilities, the Commonwealth would face great uncertainty, financial and political instability, and significant lawsuits.  In such an environment, the Government would face significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms.  Without the benefit of the uptick in growth from such reforms, overall economic growth and tax revenue would be lower, reducing the amounts available to pay all creditors.  (Id. ¶ 12.)  Outside of Title III and without a confirmed plan of adjustment, creditors would race to the courthouse to recover on their claims.  "Clearly, such a result is chaos . . . ."  6 Collier on Bankruptcy § 943.03 (16th ed. 2021).

219.    Accordingly, the Court finds that the Plan is in the best interests of creditors within the meaning of Section 314(b)(6) of PROMESA.

---

[53]    Several creditors have argued that the Plan is not in their best interests because they would, individually, receive better recoveries under non-bankruptcy laws. (See Samodovitz Obj.; Docket Entry No. 18551 (Ahorro Objection); Docket Entry No. 18585 (AMPR Objection); Docket Entry No. 18566 (Finca Matilde Objection); Hein Obj.). These creditors do not appropriately apply the "best interest" standard under PROMESA. Under the PROMESA standard, as explained above, the Court does not assess each individual creditor's recovery.  Furthermore, these objectors have provided no alternative best interest analysis or evidence to suggest that the Plan as a whole is not in the best interests of creditors in the aggregate.  Many of these objectors also assume in their analysis of their recovery under non-bankruptcy laws that they would prevail in litigation of hotly contested issues that will be settled by the Plan.  Thus, such objections are overruled.

**G. PROMESA § 314(b)(7):** *Fiscal Plan Consistency*.

220.    Section 314(b)(7) of PROMESA requires that the Plan merely be consistent with, not identical to, the applicable certified fiscal plan.  (Jaresko Decl. ¶ 103; Murray Decl. Ex. A ¶ 62.)  The Plan is consistent in all respects with the Fiscal Plan—nothing contained in the Plan would violate or otherwise interfere with the Fiscal Plan.  (Jaresko Decl. ¶ 103; see Debtors Ex. 10.)

221.    The Fiscal Plan provides a blueprint for the Commonwealth to achieve, among other things, fiscal responsibility and access to capital markets, and contains a debt sustainability analysis ("DSA"), which creates a range established by the Oversight Board as the amount of debt and long-term capacity of the Government to pay debt service on its debt.  (Zelin Decl. ¶ 57; Malhotra Decl. ¶¶ 55-56; Debtors Ex. 10.)  The aggregate principal and total debt service of the New GO Bonds falls within the bounds of the debt range implied by the DSA.  (Zelin Decl. ¶ 57; Malhotra Decl. ¶¶ 58-59, 61.)  The cash payments due on the Effective Date do not count as debt for purposes of the DSA because the cash payments do not create a debt obligation after the Effective Date.  (Malhotra Decl. ¶ 60.)  Any cash payments under the CVIs do not count as debt for purposes of the DSA because the CVIs are only payable out of outperformance.  (Id.)  The CVI payments are contingent in nature and are, by definition, paid from excess cash available relative to baseline Fiscal Plan projections.  (Zelin Decl. ¶ 58; Malhotra Decl. ¶ 60.)  The debt levels under the Plan are consistent with the debt levels set forth in the Fiscal Plan, and the debt proposed to be issued pursuant to the Plan is consistent with the DSA.  (Skeel Decl. ¶ 52; Murray Decl. Ex. A ¶¶ 72, 78; Malhotra Decl. ¶ 61.)

222.    The Plan is also consistent with the Fiscal Plan because it includes the freeze of accruing pension benefits and elimination of all COLAs under Act 91-2004, amended by 160-

2013 for TRS, and under Act 12-1954, amended by 162-2013, for JRS.  (See Plan §§ 55.8, 55.9, Exs. E, F.)  The Fiscal Plan requires the pension freeze and the elimination of COLAs, and the failure to include the pension freeze and elimination of future COLAs in the Plan would cause it to be materially inconsistent with the Fiscal Plan due to the significant additional spending and unpredictable costs that would result from the exclusion of the pension freeze and COLA elimination provisions.  (Jaresko Sup. Decl. ¶ 13; see Debtors Ex. 10.)  Moreover, the costs of removing the pension freeze and elimination of COLAs would increase over time and grow larger during periods in which deficits are projected by the Fiscal Plan.  (Jaresko Sup. Decl. ¶¶ 8, 13; Malhotra Sup. Decl. ¶ 17.)

223.    If Act 53 were interpreted to require the removal of the freeze and COLA elimination, and the Plan were modified to implement such changes, the Plan would not be consistent with the Fiscal Plan.  (Jaresko Sup. Decl. ¶ 13.)  The Court's conclusion that the Plan is consistent with the Fiscal Plan is dependent on, among other things, the Plan's inclusion of the pension freeze and elimination of COLAs.

224.    The Plan remains consistent with the Fiscal Plan notwithstanding the elimination of the Monthly Benefit Modification.  The Fiscal Plan contemplates the possibility that pensioners would be restored to the full amount of their accrued pension benefits under certain circumstances.  (Debtors Ex. 10 at 279.)  Unlike the costs of removing the pension freeze and elimination of COLAs, the majority of the costs associated with removal of the Monthly Benefit Modification will be incurred during periods of budget surplus.  (Jaresko Sup. Decl. ¶ 12; Santambrogio Sup. Decl. ¶ 10; Malhotra Sup. Decl. ¶ 9; Debtors Ex. 10 at 59.)

225.    The Fiscal Plan explicitly provides for the establishment of the Pension Reserve Trust to ensure that the future pension benefits contemplated by the Plan will be supported

regardless of the future economic or political circumstances of the Commonwealth.  (Jaresko Decl. ¶ 103.)  To ensure adequate funding to cover the increased costs resulting from the elimination of the Monthly Benefit Modification, additional funds will be set aside in the Pension Reserve Trust during years in which the Fiscal Plan projects a surplus.  (Jaresko Sup. Decl. ¶ 9.)  An increase to the funding amounts for the Pension Reserve Trust using a surplus-based funding mechanism does not render the Plan inconsistent with the Fiscal Plan because such increased funding levels come out of projected surpluses and do not impose additional obligations on the Commonwealth that would interfere with carrying out the Fiscal Plan.  (See Jaresko Decl. ¶ 103; Jaresko Sup. Decl. ¶¶ 9-12.)

226.    In addition, the Plan modifies the Seventh Amended Plan to provide that the Upside Participation Bonus pursuant to the AFSCME Plan Support Agreement (Debtors Ex. 21) will be a minimum of $2,000 for each AFSCME-represented employee during the five-year term of the new AFSCME collective bargaining agreement.  (See Plan App'x II.)  The additional cost of this modification is only an incremental cost of approximately $18.3 million per year for the five years beginning in fiscal year 2022 as compared to the lower Upside Participation Bonus contemplated in the Seventh Amended Plan.  (Santambrogio Sup. Decl. ¶ 11.)

227.    Accordingly, the Plan complies with PROMESA section 314(b)(7).  The Court's determination sustaining objections that allowed Eminent Domain/Inverse Condemnation Claims are protected by the Fifth Amendment's Takings Clause and, accordingly, may not be impaired by the Plan, does not vitiate the Plan's compliance with PROMESA section 314(b)(7) because there are sufficient uncommitted funds to satisfy Takings Clause Claim obligations without requiring modification of the certified fiscal plan.  (See supra ¶ 204 n.47.)

**H. Bankruptcy Rule 3019:** *The Plan Does Not Adversely Change the Treatment of Claims of Creditors*.

228.    The Oversight Board filed the Eighth Amended Plan after the Voting Deadline had passed.  The Eighth Amended Plan eliminated the Monthly Benefit Modification that was contained in the Seventh Amended Plan and makes minor revisions to address concerns raised by certain parties.  None of the modifications adversely changes the treatment of the Claims of any Creditor that accepted the Seventh Amended Plan.  To the contrary, the Plan was amended to enhance the treatment of the pension Claims in Classes 51A through 51I, 51K, and 51L through the removal of the Monthly Benefit Modification (see Malhotra Sup. Decl. ¶¶ 8-9). Treatment of Claims in other Classes is not affected in any way by this change.

229.    In addition, following the passage of the Voting Deadline, the Oversight Board filed the First Modified Eighth Amended Plan, which separately classified the GDB/PET Claim in Class 58A.  (See First Modified Eighth Amended Plan art. LXII.)  The GDB/PET Claim was previously classified as a CW General Unsecured Claim in Class 58.  Pursuant to section 62.4 of the Plan, the holder of the GDB/PET Claim will receive "payments from the Commonwealth equal to, and on the same timeframe, as the pro rata payments to be made to holders of Allowed CW General Unsecured Claims pursuant to the terms and provisions [governing treatment of CW General Unsecured Claims]," (Plan § 62.4), but Debtors represent that the GDB/PET Claim is not intended, nor shall it be construed, as a CW General Unsecured Claim pursuant to the Plan. The GDB/PET Claim is treated in the same manner as it would have been treated pursuant to the Seventh Amended Plan.  (See id.)  Accordingly, this modification does not adversely change the treatment of the Claims of any Creditor that accepted the Seventh Amended Plan.

230.    The Oversight Board subsequently filed the Plan, which contains additional technical changes from intermediate amended versions that do not adversely affect the treatment

of any Claims, as well as modifications to comply with this Court's determination regarding the proper treatment of Allowed Eminent Domain/Inverse Condemnation Claims and the proper scope of the preemption provision.

231.    The modifications do not materially or adversely modify the treatment to be afforded to creditors pursuant to the Plan and do not require the resolicitation of acceptances or rejections thereof.  Accordingly, the Plan can be confirmed without the filing of a new disclosure statement and resolicitation with respect to the Plan.  See Bankr. R. 3019.

### I.   Nullification of Laws Conditioning Debt Authorization on Elimination of Freeze of Accruing Pension Benefits and Cost of Living Adjustments.

232.    The Debtors represent that all parties in interest, including, without limitation, the Governor and the Legislature, know that the Plan's consistency with the Fiscal Plan, feasibility, and implementation are each dependent on the freezes in the accruals of future pension benefits under TRS and JRS and elimination of cost of living adjustments.  (See supra n.23.)  All objections that suggest that Act 53 or any other law causes the new debt issued under the Plan to be unauthorized by Act 53 due to the freezes in the accruals of future pension benefits under TRS and JRS and elimination of cost of living adjustments have been overruled as set forth in the Confirmation Order.  To the extent any law is interpreted to mean such freezes and eliminations cause the new debt issuable under the Plan to be unauthorized, Act 53 and such other laws, if any, may not be enforced pursuant to section 108 of PROMESA to the limited extent of eliminating such impact on the debt's authorization.  The Debtors have proven to the Court's satisfaction that the unambiguous language of Act 53 does not provide that such freezes and eliminations cause the new debt issuable under the Plan to be unauthorized. Notice of the request for such determination was adequately provided to all former and present governmental employees. (See Docket Entry No. 19182.)

## The Releases, Exculpations, and Injunctions Pursuant to the Plan

233.    The Plan includes certain discharge, release, exculpation, and injunction

provisions, which are essential to the Debtors' restructuring, and without which a consensual

restructuring could not be successfully accomplished.  (Jaresko Decl. ¶ 217; Zelin Decl. ¶ 95.)

234.    A critical element of the Plan is the complete resolution of the Commonwealth

Title III Case, the ERS Title III Case, and the PBA Title III Case.  To achieve this, the Debtors

and certain claimholders agreed to a mutual release of all Claims and Causes of Action arising,

in whole or in part, prior to the Effective Date.  (Jaresko Decl. ¶ 218.)  The Debtors' releases

incentivized claimholders to support, and undertake actions to support, the Plan and its

confirmation, without fear of lawsuits in the future.  Certain creditors would not have supported

the Plan absent its release provisions.  (Jaresko Decl. ¶ 219; Zelin Decl. ¶ 100.)  Further, the

releases of claims by the Debtors affect only those parties that made a significant contribution to

the negotiation and development of the Plan and incurred cost and expense during their essential

participation in negotiations.  (Jaresko Decl. ¶ 221; Zelin Decl. ¶¶ 102, 106.)  The Plan's

discharges and releases likewise provide the Debtors and Reorganized Debtors with assurance

that the restructuring balance struck by the Plan will not be upset by further claims against the

Reorganized Debtors after the Effective Date.  (Jaresko Decl. ¶ 220; Zelin Decl. ¶ 106.)

### A.  Releases

235.    The Plan's release provisions include, among other provisions, subject to certain

exclusions as set forth in the Plan: (i) a release by the GO/PBA PSA Creditors (solely in their

capacity as Creditors of the Debtors), which includes the Monolines, against certain government

parties, including the Oversight Board, AAFAF, and the Debtors, of certain Claims and Causes

of Action arising prior to the Plan Effective Date, including the Revenue Bond Claims litigation

and the Lift Stay Motions, and (ii) a release by the Debtors and Reorganized Debtors of Claims

and Causes of Action related to the Debtors and their assets in the Title III Cases.  (Zelin Decl.

¶ 96.)

236.    The Plan's release of Claims or Causes of Action by the GO/PBA PSA Creditors

against the Oversight Board, its committees and subcommittees, AAFAF, and the Debtors, of

certain Claims and Causes of Action, including those related to the Revenue Bond Claims

Litigation and Lift Stay Motions, is a key component of the Plan.  (Id. ¶ 97.)  Litigation over

such Claims and Causes of Action was hard-fought and remained active as between the

Commonwealth, on the one hand, and the Monolines (who would ultimately become GO/PBA

PSA Creditors) on the other.  (Id.)  By agreeing to settle these disputes, the GO/PBA PSA

Creditors provided a clear benefit to the Debtors by eliminating the need to incur additional costs

for, and mitigating the substantial risk associated with, further litigation.  (Id.)  To create global

peace upon the effectiveness of the Plan, the Debtors and Reorganized Debtors agreed to release

Claims and Causes of Action against, among other entities, the Government Parties, official

committees, and PSA Creditors.  (Id. ¶ 99.)  The Plan's release provisions were essential to get

the key stakeholders to engage in negotiations over a potential consensual release of claims

against the Commonwealth.  (Id. ¶ 100.)

237.    The parties receiving releases all made significant contributions to the negotiation

and development of the Plan and incurred costs and expenses during the course of their essential

participation in the negotiations.  (Id. ¶ 102.)  The releases were a product of robust, mediator-

supervised negotiations and the stakeholders had an opportunity to be heard as to the scope and

content of the releases.  (Id. ¶ 105.)  To incentivize the PSA Creditors to grant the concessions

outlined above, and in consideration of the substantial benefits provided by the Released Parties,

the Debtors agreed that the Debtors and Reorganized Debtors would prosecute and pursue the releases, exculpation, and injunction provisions set forth in the Plan.  The Oversight Board has determined that the releases are fair, reasonable, and in the best interests of the Debtors.  (Id. ¶ 103.)

238.    The Plan does not provide for non-consensual third-party releases; the Plan's releases are limited to those necessary to effectuate the Debtors' successful restructuring.  Except as explicitly agreed to by the creditors in their respective plan support agreements, the Plan does not release any claims of a creditor of the Debtors, in its capacity as such, against a party that is not a Debtor.  (Jaresko Decl. ¶ 223; Zelin Decl. ¶ 107.)  Specifically, section 92.2(a) of the Plan provides that "without prejudice to the exculpation rights set forth in Section 92.7 [of the Plan], nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors."  (Plan § 92.2(a).)  Further, sections 92.2(d), (e), and (f) of the Plan carve out from the Released Claims certain claims, causes of action, or other rights or powers that are held by the Securities and Exchange Commission, the United States, and parties to certain Underwriter Actions.  Likewise, as confirmed by the definitions of Related Persons (see id. § 1.420) and Released Claims (see id. § 1.421), claims against AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA, which are or may be subject to their own restructuring proceedings, are not released pursuant to the Plan and such entities are not "Related Persons" of the Released Parties or Releasing Parties.  Further, Avoidance Actions generally are not released under the Plan.  (See id. § 1.421.)  These carve-outs ensure that only those releases that are reasonable and necessary to Plan confirmation are being provided.  (Jaresko Decl. ¶ 224; Zelin Decl. ¶¶ 108-09.)

239.     For these reasons, the Court finds that the releases contemplated by the Plan are reasonable, necessary, and appropriate to implementation of the Plan and, therefore, the consensual releases are hereby approved.

## B.  Exculpation

240.     Section 92.7 of the Plan provides for exculpation of the Government Parties, PSA Creditors, Retiree Committee, Creditors' Committee, AFSCME, and the Monolines for, among other things, any acts taken consistent with the Plan or in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan and the settlements contained therein (including, but not limited to, the Plan Support Agreements).  (Jaresko Decl. ¶ 225; Zelin Decl. ¶ 110.)  The expectation that parties would be exculpated incentivized them to participate in the negotiations and support confirmation of the Plan without fear of future lawsuits.  Without the Plan's exculpation provisions, parties would likely be exposed to litigation after extensive good-faith negotiations.  (Zelin Decl. ¶ 111.)  The Plan's exculpation provisions are narrowly tailored to the exculpated parties' efforts related to the formulation of the Plan.  All of the parties being exculpated in the Plan played key roles in the negotiation of the Plan and the settlements that enabled the Plan, including through their participation in mediation.  The Plan's exculpation provisions do not alter the liability of any entity that is determined to have acted or failed to act in a manner that constitutes intentional fraud or willful misconduct.  (Jaresko Decl. ¶ 226; Zelin Decl. ¶¶ 110, 112.)  In addition, decretal paragraph 61(g) of the Confirmation Order provides for exculpation of the DRA Parties, which is substantially the same as the exculpation provided pursuant to the Plan and is appropriate in light of the Stipulation in Connection with DRA Related Disputes, dated as of November 5, 2021, by and among the Oversight Board, as representative of the Debtors and HTA, and the DRA Parties.

(See Confirmation Ord. ¶ 61(g); Debtors Ex. 146.)  Exculpation provisions are appropriate for

parties' acts or omissions in connection with or related to the "pursuit of confirmation of a plan."

See In re Montreal Me. & Atl. Ry, Ltd., Bk. No. 13-10670, 2015 WL 7431192, at *9 (Bankr. D.

Me. Oct. 9, 2015) (approving exculpation provisions "as appropriate under applicable law

because it is part of a Plan proposed in good faith, was vital to the Plan formulation process and

is appropriately limited in scope . . ., including its carve-out for gross negligence and willful

misconduct").[54]

### C. Injunction

241.    The Plan's injunction provisions (sections 92.3, 92.6, and 92.11) are necessary to

the reorganization and are fair to those parties involved.  The injunctions ensure that the releases

and exculpations discussed above are preserved and enforced by prohibiting legal action

concerning the Released Claims, avoiding the time, burden and expense that could be incurred if

parties were permitted to pursue Released Claims.  The Plan's injunction provisions are narrowly

tailored to serve that purpose.  (Zelin Decl. ¶ 113; Jaresko Decl. ¶ 227.)

242.    The releases, exculpation provisions, and injunctions pursuant to the Plan are

integral and critical parts of the Plan and the compromises and settlements implemented pursuant

to the Plan.  (Plan §§ 2.3, 92.4.)  The approval of such releases is a condition to the occurrence of

the Effective Date, and all Released Parties have relied on the efficacy and conclusive effects of

---

[54]    Mr. Hein contends that the exculpation provision should not extend to acts or omissions
by the PSA Creditors in connection with their role in negotiating plan support
agreements.  Exculpation provisions are, however, appropriate when narrowly tailored to
the acts or omissions of a party in the pursuit of confirmation of a Plan.  See In re
Montreal Me. & Atl. Ry., Ltd., 2015 WL 7431192, at *9.  Mr. Hein does not allege any
facts suggesting willful misconduct or gross negligence of a PSA Creditor.  Thus, the
exculpation provision as crafted is appropriate and Mr. Hein's objection thereto is
overruled.

such releases and injunctions and on the Title III Court's retention of jurisdiction to enforce such releases and injunctions when making concessions pursuant to the Plan and by agreeing to, accepting, and supporting the settlement and treatment of their respective Claims, Causes of Action, and other rights pursuant to the Plan. (Zelin Decl. ¶¶ 96, 98, 100-04, 106, 110-12; Plan § 86.1.) Accordingly, such provisions are justified and warranted based upon the circumstances of the Title III Cases and the consideration being provided by all Released Parties in connection with the Plan.

243. To maintain and protect the integrity and feasibility of the Plan, while the Oversight Board is in existence, any and all governmental units and any officer or employee thereof shall neither recreate by statute, regulation, rule, policy, or executive order nor repay by any means, any debt discharged by the Plan without the Oversight Board's express prior written consent or except as may otherwise be provided by a certified fiscal plan or budget. Without limitation, the debt referred to herein includes any and all pension obligations frozen and cost of living adjustments in amount such that they shall not increase from their levels in existence on the Effective Date of the Plan.

### Validity of Bonds and CVIs

244. Pursuant to section 4 of PROMESA, as well as sections 944[55] and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Court

---

[55] Section 944(b)(3) of the Bankruptcy Code the requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations. 11 U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws" (citing Ass'n of Retired Emps. of the

determines that the New GO Bonds and CVIs, and the covenants by the Commonwealth for the

benefit of the holders of the New GO Bonds and CIVs, are legal, valid, binding, and enforceable

obligations of the Reorganized Debtors benefitting from the following protections, each of which

is legal, valid, binding, and enforceable against the Reorganized Debtors, the Commonwealth,

and other persons and entities, as applicable, under Puerto Rico, New York, and federal law:

a. The Confirmation Order is full, final, complete, conclusive, and binding and shall
not be subject to collateral attack or other challenge in any court or other forum,
except as permitted under applicable law.

b. The New GO Bond Legislation and the CVI Legislation are incorporated into Act
53-2021, which has been validly enacted by the Commonwealth and is valid and
effective in accordance with its terms.

c. The New GO Bonds and the CVIs are bonds or notes within the meaning of
Section 2 of Article VI of the Commonwealth Constitution to which the
Commonwealth may legally pledge its full faith, credit and taxing power under
the Commonwealth Constitution and applicable Puerto Rico law for the payment
of principal and interest.

d. Pursuant to the New GO Bond Legislation and the CVI Legislation, the
Commonwealth has validly pledged its full faith, credit and taxing power under

---

City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-
16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local
2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D.
Cal. 2010) (additional citations omitted)).  As set forth in the leading bankruptcy treatise,
"[t]he requirement of a court determination of validity is extra assurance for those who
might be skittish about the nature of the bonds being issued . . . . It has the added feature
of removing any doubt concerning the matter, because the determination of the court on
that issue should be binding in the future."  6 Alan N. Resnick & Henry J. Sommer,
Collier on Bankruptcy § 944.03[1][b] (16th ed. 2013).

the Commonwealth Constitution and applicable Puerto Rico law for the payment
of principal and interest with respect to the New GO Bonds and payment with
respect to the CVIs.

e.   Subject to the occurrence of the Effective Date and as of the date of issuance of
the New GO Bonds and CVIs, the Commonwealth is in compliance with any
applicable debt limits, including the Comprehensive Cap and any applicable debt
limit (if any) contained in the Commonwealth Constitution.

f.   Pursuant to the New GO Bonds Legislation and other applicable law, upon the
issuance of the New GO Bonds, the New GO Bonds shall be secured by a first
priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53)) over
the funds deposited in the Debt Service Fund, including any revenues generated
therefrom, which statutory first lien shall occur automatically and shall
automatically attach and be perfected, valid and binding from and after the
Effective Date, without any further act or agreement by any Person, and shall
remain in full force and effect until the New GO Bonds have been paid or
satisfied in full in accordance with their terms.

g.   The statutory first lien on funds deposited into the Debt Service Fund, as provided
for in the New GO Bonds Legislation, and all other provisions to pay the New GO
Bonds are valid, binding, legal and enforceable, including, without limitation,
covenants not to impair such property, maintain available tax exemption and
provide for the conditions regarding substitution of collateral (including, without
limitation, the statutory lien thereon as adequate protection for the property rights
in the Plan and in the Confirmation Order).

h.  The statutory first lien on funds deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, creates the valid pledge and the valid lien upon the right, title and interest of the Commonwealth in such funds in favor of the Trustee (for the benefit of the holders of the New GO Bonds) which it purports to create, subject only to the provisions of the New GO Bonds Indenture permitting the withdrawal, payment, setting apart or appropriation thereof for the purposes and on the terms and conditions set forth in the New GO Bonds Indenture and each applicable supplemental indenture.

i.  The Commonwealth has waived, and shall be deemed to have waived, the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) with respect to monies on deposit in the Debt Service Fund as of the commencement thereof.

j.  The Plan meets all conditions set forth in the New GO Bond Legislation and the CVI Legislation for issuance of the New GO Bonds and CVIs.

k.  In light of the enactment of the New GO Bond Legislation and the CVI Legislation, and upon execution by all parties thereto, the New GO Bonds Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

l.    At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the

Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to

be stamped or written on each of the New GO Bonds, the GO CVIs, and the

Clawback CVIs, a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT
> FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11
> U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY
> BINDING, AND ENFORCEABLE PURSUANT TO THE
> JUDGMENT AND CONFIRMATION ORDER, ENTERED ON
> THE 18TH DAY OF JANUARY, 2022.

### GDB Loan Priority Determination

245.    The Plan provides for the issuance of the HTA Clawback CVI as consideration

for the settlement of CW/HTA Claims under the HTA/CCDA Plan Support Agreement.  The

CVI Indenture provides for four separate Sub-Subseries of such HTA Clawback CVI to be

issued, and for payments on such Sub-Subseries of the HTA Clawback CVI to be made first, on

account of CW/HTA Claims related to the HTA 68 Bonds; second, on account of CW/HTA

Claims related to the HTA 98 Senior Bonds; third, on account of CW/HTA Claims related to the

HTA 98 Sub Bonds; and fourth, subject to the GDB Loan Priority Determination, on account of

either CW/HTA Claims related to the GDB HTA Loans or CW/HTA Claims related to the HTA

Bonds.  (CVI Indenture §§ 2.01(c)(i), 5.07(c); see also Plan at J-12, §§ 1.172, 63.2, Ex. J at

Annex 6.)

246.    Certain disbursements under the "CVI Payment Reserve" are dependent on the

"GDB Loan Priority Determination," (Plan § 1.172), which is defined as "[t]he determination, in

either the Commonwealth Title III Case or the HTA Title III Case, (a) with respect to the relative

rights of recovery and priority of payment of the [19]68 Bonds and the [19]98 Bonds to the

rights of GDB with respect to the GDB HTA Loans, and/or (b) that the [DRA] does not possess

an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such GDB HTA Loans."  (Plan § 1.259.)

247.    On June 26, 2021, the DRA Parties filed a complaint initiating an adversary proceeding against the Defendants,[56] with the stated purpose of "provid[ing] a means to resolve the priority question with respect to the payments made by the Commonwealth on account of the clawback claims, and any payments that may be made on account of the Loan Claims and the HTA Bonds under a future plan for HTA."  (Docket Entry No. 1 in Adv. Proc. No. 21-00068-LTS ¶ 101.)

248.    The complaint sought declaratory relief on four counts: (i) Count 1, "that the DRA is the only party with (i) a valid, perfected, first-priority lien on the Act 30-31 Revenues and (ii) a right to collect from the Act 30-31 Revenues;" (ii) Count 2, "that the HTA Bondholders have limited collateral to secure the bonds, that the HTA Bonds are limited recourse obligations, and neither the collateral pledged to secure the bonds, nor the bond revenues to which the bondholders have recourse, includes the Act 30-31 Revenues;" (iii) Count 3, "that the DRA's Loans are not subordinate to the bonds;" and (iv) Count 4, "that the DRA's Loans are entitled to collect on the loan claims from the bond revenues not deposited in the bond revenue accounts." (Docket Entry No. 1 in Adv. Proc. No. 21-00068-LTS.)

249.    On August 26, 2021, the Defendants moved to dismiss all four counts (Docket Entry No. 44 in Adv. Proc. No. 21-00068-LTS ¶¶ 2-6) (the "Motion to Dismiss").  On September 23, 2021, the DRA Parties filed an opposition to the Motion to Dismiss and on October 8, 2021,

---

[56]    "Defendants" means Ambac Assurance Corporation, Assured Guaranty Corp., Assured Guaranty Municipal Corp., Financial Guaranty Insurance Company, National Public Finance Guarantee Corporation, Peaje Investments LLC, and The Bank of New York Mellon.

Defendants filed their reply in support of the Motion to Dismiss, which concluded briefing on the motion.[57]

250.     On October 29, 2021, the Court entered an opinion and order dismissing all four counts of the DRA Parties' complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief could be granted (Docket Entry No. 83 in Adv. Proc. No. 21-00068-LTS at 27) (the "GDB Loan Priority Determination Opinion").

251.     As to Count 1, the Court held that the plain language of Acts 30 and 31[58] and the Assignment and Security Agreement[59] make clear that the HTA Bonds are payable from Act 30-31 Revenues.[60]  (GDB Loan Priority Determination Op. at 18-20.)

252.     As to Count 3, the Court held that HTA Bondholders had standing to enforce the subordination provisions of the Assignment and Security Agreement and Loan Agreements[61] under 3 L.P.R.A. § 2013(a)(3).  The Court further held that the Assignment and Security Agreement unambiguously subordinates the GDB HTA Loans to the HTA Bonds (including, for the avoidance of doubt, the HTA 68 Bonds and the HTA 98 Bonds), a conclusion that was

---

[57]     The Oversight Board and AAFAF were granted full intervention rights in Counts 1, 2, and 4 of Adversary Proceeding No. 21-00068-LTS and moved to dismiss those counts, but their motion was denied as moot in light of the order granting the Defendants' Motion to Dismiss.

[58]     "Acts 30 and 31" means Commonwealth Act 30-2013 and Act 31-2013, both approved on June 25, 2013.

[59]     "Assignment and Security Agreement" means the agreement between HTA and GDB executed on August 28, 2013.

[60]     "Act 30-31 Revenues" means certain crude oil taxes, motor vehicle license fees, and other excise taxes levied pursuant to Acts 30 and 31.

[61]     "GDB HTA Loan Agreements" means the loan agreements between GDB and HTA that were executed between 2008 and 2014.

reinforced by the GDB HTA Loan Agreement attached to the Complaint. (GDB Loan Priority Determination Op. at 21-23.)

253. The Court dismissed Counts 2 and 4 because they "logically depend[ed]" on the Court granting Counts 1 and 3, because the Assignment and Security Agreement "unambiguously compels the conclusion that, before any funds are paid toward the Loans, Bond payment obligations must first be satisfied." (GDB Loan Priority Determination Op. at 25.)

254. In the GDB Loan Priority Determination Opinion, the Court directed the Clerk of Court to enter judgment consistent therewith, and a final judgment dismissing Counts 1, 2, 3, and 4 was entered thereafter. (GDB Loan Priority Determination Op. at 27; Docket Entry No. 86 in Adv. Proc. No. 21-00068-LTS.)

255. The Court's rulings in the GDB Loan Priority Determination Opinion are incorporated by reference herein.

256. The Court's ruling that the GDB HTA Loans and any liens securing such GDB HTA Loans are subordinated to the HTA Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.[62]

**Miscellaneous Provisions**

257. <u>Plan Supplement</u>. All materials contained in the Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is or shall be required. (<u>See</u> Service Affidavits; Plan Sup.)

---

[62] Pursuant to section 1.172 of the Plan, Cash payable from the HTA Clawback CVI in the CVI Payment Reserve will be distributed upon entry of a Final Order with respect to the GDB Loan Priority Determination.

258.    <u>Satisfaction of Confirmation Requirements</u>.  Based on the foregoing, the Plan satisfies the requirements for confirmation set forth in section 314 of PROMESA.

259.    <u>Oversight Board Certification</u>.  For purposes of section 209 of PROMESA, the discharge of debt to occur as of the Effective Date pursuant to the Plan and the Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth, as determined in accordance with modified accrual accounting standards.

260.    <u>Implementation</u>.  All documents necessary to implement the Plan, including those contained in the Plan Supplement and all other relevant and necessary documents, have been negotiated in good faith and at arm's length and shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.  Without limiting the generality of the foregoing, the Debtors, prior to the Effective Date, and Reorganized Debtors, from and after the Effective Date, are authorized to consummate the transactions contemplated in the Plan and Plan Supplement.  The execution, delivery, or performance by the Debtors or Reorganized Debtors, as the case may be, of any documents in connection with the Plan Supplement, and compliance by the Debtors or Reorganized Debtors, as the case may be, with the terms thereof, is hereby authorized by, and will not conflict with, the terms of the Plan or the Confirmation Order.

261.    <u>Good Faith</u>.  The Debtors will be acting in good faith if they proceed to (i) consummate the Plan and the agreements, settlements, transactions, and transfers contemplated thereby and (ii) take the actions authorized and directed by the Confirmation Order.

262.    <u>Retention of Jurisdiction</u>.  This Court may properly and, upon the Effective Date shall, subject to the terms and provisions of article XCI of the Plan, and except as otherwise

provided in the Plan or Confirmation Order, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the Plan, retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the matters set forth in article XCI of the Plan.

263.    Without limiting the generality of any of the foregoing, the Court shall retain jurisdiction to (i) enter appropriate orders with respect to the payment, enforcement, and remedies of the bonds and any other instruments issued pursuant to the plan, (ii) enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, (iii) adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any action taken by any entity pursuant to or in furtherance of the Plan or the Confirmation Order including, without limitation, issuance of bonds, and (iv) to enforce prohibitions against any subsequent collateral attack on provisions contained in the Plan and the Confirmation Order.

264.    <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document entered into in connection with the Plan or Plan Supplement provides otherwise, the rights, duties, and obligations arising pursuant to the Plan shall be governed by, and construed in accordance with, PROMESA (including the provisions of the Bankruptcy Code make applicable pursuant to section 301 of PROMESA), and to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

265.  <u>Enforceability</u>.  Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a) as well as general principles of federal supremacy, the provisions of this Memorandum, the Confirmation Order, and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.  The documents contained in the Plan Supplement (as such documents may be further modified and filed with the Court prior to the Effective Date) provide adequate means for implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall constitute valid legal obligations of the Debtors and valid provisions to pay or secure payment of the bonds pursuant to section 944(b)(3) of the Bankruptcy Code, and shall be enforceable in accordance with their terms.

266.  <u>No Precedential Effect</u>.  The findings of fact and conclusions of law herein concerning the separate classification of certain Claims from Class 58 CW General Unsecured Claims, including the governmental or business reasons for such classifications, are made with respect to the Title III cases of the Commonwealth, ERS, and PBA, and shall not have any precedential effect for other Title III cases.

## **<u>Conclusion</u>**

For the foregoing reasons, the Debtors' motion to confirm the Plan is granted and a Confirmation Order will be entered contemporaneously herewith.

SO ORDERED.

Dated: January 18, 2022

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge