# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>                Debtors.[1] | PROMESA<br><br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## DECLARATION OF CHRISTINE SONG IN SUPPORT OF OPPOSITION OF PSA CREDITORS TO TEACHERS' ASSOCIATIONS' MOTION FOR STAY PENDING APPEAL

I, Christine Song, declare as follows:

1.      I am a Director at Miller Buckfire, an advisory firm that has been retained by the Lawful Constitutional Debt Coalition (the "LCDC")[2] as financial advisor in connection with the restructuring of the Commonwealth and certain of its instrumentalities.  Miller Buckfire has also been retained by the Ad Hoc Group of FGIC-Insured Noteholders in connection with the creation of the FGIC Trust Certificates and other FGIC-related matters.  Prior to its retention by the LCDC,

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] *See Thirteenth Supplemental Verified Statement of the Lawful Constitutional Debt Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Dkt. No. 19128].

Miller Buckfire served as financial advisor to a group of holders of COFINA's senior secured bonds in connection with COFINA's restructuring.

2.      I am familiar with the Commonwealth's financial affairs, the terms of the proposed restructuring of the Commonwealth's debt obligations, the general market for trading of the Commonwealth's securities, and other matters that concern the Commonwealth's restructuring. Including my work on COFINA, I have been involved for approximately six years with the efforts of the Commonwealth and certain of its instrumentalities to address their fiscal situation and restructure their obligations.

3.      I have extensive experience in providing financial restructuring services to companies, governments, and creditors in connection with both in-court and out-of-court restructurings, including the City of Detroit in its reorganization under chapter 9 of the United States Bankruptcy Code, and creditors of COFINA in connection with its successful reorganization pursuant to Title III of PROMESA.  Before joining Miller Buckfire in 2014, I was Vice President of Alternative Investments Research from 2009 to 2012 at Morgan Stanley Smith Barney.  Before that I was a research associate at Citi Global Wealth Management from 2006 to 2009 and an analyst at Goldman Sachs from 2004 to 2006.  I earned a B.A. in economics from Georgetown University and an M.B.A. from the NYU Stern School of Business.  I am also a CFA charterholder.

4.      I submit this declaration (the "Declaration") in support of the *Opposition of PSA Creditors to Teachers' Associations' Motion for Stay Pending Appeal* (the "Opposition"),[3] filed contemporaneously herewith.  I have reviewed the Motion and the Opposition, and am familiar with the Plan, the Confirmation Order, the FFCL, and other filings relating thereto.

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Opposition.

ny-2330776

5.      All matters set forth in this Declaration are based on: (a) my personal knowledge; (b) my review of relevant documents; (c) my experience with and knowledge of the Commonwealth's financial affairs and the Title III cases; (d) my knowledge of the Plan and filings relating thereto; (e) information supplied to me by the LCDC and its counsel; and (f) analysis prepared by Miller Buckfire in support of this Declaration.  If called upon to testify, I could and would testify to the facts set forth herein.

6.      The Debtors; the holders of the Commonwealth's general obligation bonds ("GO Bonds"), bonds issued by PBA ("PBA Bonds"), and other debt backed by a guarantee of the Commonwealth's full faith and credit (such holders, collectively, "GO/PBA Creditors"); and other stakeholders would incur substantial harm if the Court were to grant the Teachers' Associations' Motion for a stay pending appeal.  In this Declaration, I focus particularly on quantifying three types of discrete harms to GO/PBA Creditors, consisting of: (a) approximately $635 million of lost opportunity cost incurred by GO/PBA Creditors due to a delay in receiving cash consideration beyond March 15, 2022, the currently assumed Effective Date of the Plan; (b) an implied reduction in the value of the New GO Bonds to be issued under the Plan of approximately $61 million due to projected increases in interest rates; and (c) the incurrence of approximately $26 million in incremental professional fees by certain creditor signatories to the GO/PBA Plan Support Agreement.  These amounts total, in the aggregate, approximately $722 million of harm to GO/PBA Creditors.

7.      These totals are based on a hypothetical delay in the occurrence of the Effective Date of 13 months (the "Stay Period"), which I understand from counsel to be the median time period for the resolution of an appeal of a district court order to the United States Court of Appeals for the First Circuit (the "First Circuit").  I have also provided a sensitivity analysis showing the

potential harm to GO/PBA Creditors based on a Stay Period of six months, which I understand to be the time period in which recent expedited appeals to the First Circuit (including prior appeals in connection with the Title III Cases) have been resolved, and twenty months, as set forth throughout the Declaration and in Table 1 below.[4]

**Table 1**

| Summary of Impact to GO / PBA Creditors | | | |
|---|---|---|---|
| | 6 Mo. Delay 9/15/2022 | 13 Mo. Delay 4/15/2023 | 20 Mo. Delay 11/15/2023 |
| Opportunity Cost of Not Receiving Cash on 3/15/2022[(1)] | $279 | $635 | $1,016 |
| NPV Impact on New GO Bonds from Rate Hikes | 40 | 61 | 63 |
| Cost of Additional Professional Fees | 12 | 26 | 40 |
| **Total Cost to GO / PBA Creditors** | **$331** | **$722** | **$1,118** |

(1) Six month delay includes January and July 2022 principal and interest payments and November 2022 CVI payment. 13 month delay includes January 2022 through January 2023 principal and interest payments and November 2022 CVI payment. 20 month delay includes January 2022 through July 2023 principal and interest payments and November 2022 and November 2023 CVI payments.

8. In addition to the foregoing harms to GO/PBA Creditors in particular, there are a number of additional harms the Debtors, GO/PBA Creditors, and other stakeholders generally may suffer as a result of the stay, including: (a) negative impacts on the Commonwealth's economy due to continued bankruptcy overhang; (b) delays in progress on the restructuring of other Title III Debtors, including PREPA and HTA; (c) opportunity cost for other Puerto Rico creditors, including ERS, PRIFA and CCDA, who are anticipated to receive cash distributions on the Effective Date of the Plan, (d) an inability to achieve credit ratings on COFINA bonds and New GO Bonds, and delay in market acceptance of the New GO Bonds and CVIs; (e) risks due to the breach of contractual deadlines for the Commonwealth's emergence from Title III; and (f) increased political risk. Although this Declaration does not attempt to quantify the dollar value of such harm with any particularity, I understand that such harm is likely to be substantial.

---

[4] Unless otherwise indicated, all dollar amounts in Tables 1 - 4 herein are stated in millions of dollars. Further, any discrepancies between the individual line items and the sum totals set forth in Tables 1 - 4 herein are due to rounding.

4

ny-2330776

### A.     Lost Opportunity Cost for Cash Consideration

9.      During the Stay Period, GO/PBA Creditors will be unable to access or reinvest the roughly $7.1 billion of cash consideration (the "Distributable Cash") to be distributed to GO/PBA Creditors under the Plan.  The Plan does not provide for the accrual or payment to creditors of any interest on the Distributable Cash during any Stay Period.

10.      As set forth in Table 2 below, the Plan provides for payments of principal and interest (such payments, "Debt Service") on account of certain of the New GO Bonds on January 1, 2022, July 1, 2022, January 1, 2023, and July 1, 2023, in the aggregate amount of approximately $1.561 billion.  Further, the projections set forth in the Commonwealth Fiscal Plan certified on January 27, 2022 (the "Fiscal Plan") imply payments on the GO CVIs (such payments, "CVI Payments," and together with the Distributable Cash and the Debt Service, the "Plan Consideration") on November 1, 2022 and November 1, 2023 in the amount of $112 million and $138 million, respectively.  During the Stay Period, GO/PBA Creditors will be unable to access or reinvest any Debt Service or CVI Payments received, and the Plan does not provide for the accrual or payment to creditors of interest on the Debt Service or CVI Payments during the Stay Period.

11.      Accordingly, the amount of lost opportunity costs associated with a Stay Period can be estimated conservatively by calculating the anticipated rates of return that could reasonably be earned with respect to the Plan Consideration if such consideration were distributed in accordance with the terms of the Plan on the currently-anticipated timeline (which in the case of the Distributable Cash would be on an assumed Effective Date of March 15, 2022, and in the case of the Debt Service and CVI Payments, would be on the dates set forth in Table 2).

ny-2330776

12.     I believe that a reasonable and extremely conservative estimate of the potential rate of return on the Plan Consideration is represented by the 4.63% duration weighted average yield of the New GO Bonds to be issued under the plan, tax-adjusted by applying the Bloomberg Municipal YAS screen default tax rate as of February 8, 2022 to 7.382%.  The average yield of New GO Bonds issued under the Plan represents a conservative after-tax minimum rate of return an investor would require to extend a loan to the Commonwealth in an amount equal to any Plan Consideration that would otherwise be distributed during the Stay Period.[5]   I believe it is appropriate to use a tax-adjusted weighted average yield here because the payment of interest on the majority (if not all)[6] of the New GO Bonds will be excluded from gross income for federal income tax purposes under section 103 of the Internal Revenue Code; that means that the yield on an otherwise equivalent instrument that is not structured as tax-exempt would need to be considerably higher than that on the New GO Bonds in order to provide an economically equivalent return on investment.  In addition, in the event the Teachers' Associations' appeal is unsuccessful and the proceeds of a supersedeas bond are distributed to GO/PBA Bondholders (the vast majority of which I understand to be directly or indirectly subject to U.S. income taxes), I am advised by counsel that such proceeds likely would be taxed at ordinary income tax levels.

13.     Based upon these assumptions, GO/PBA Creditors would likely be able to earn approximately $635 million of additional investment income on the foregone Plan Consideration during a Stay Period of 13 months.

---

[5] In reality, the proper rate of return is likely much higher than the tax-adjusted weighted average yield of 7.382%, given that many of the GO/PBA Creditors have higher costs of capital and investment return targets (some of whom, in the case of alternative asset managers that hold a significant amount of the outstanding GO and PBA Bonds, regularly target returns in excess of 20%).

[6] *See* Additional / Voluntary Event-Based Disclosure (Feb. 8, 2022), available at https://emma.msrb.org/P21547619-P21196105-P21615284.pdf (disclosure of favorable determination by IRS that will help "maximize the amount of the New GO Bonds the interest on which (other than pre-issuance accrued interest), subject to customary qualifications, would be excluded from gross income for federal income tax purposes").

ny-2330776

**Table 2**

| Opportunity Cost of Cash Distributions to GO/PBA Creditors | | | | | | |
|---|---|---|---|---|---|---|
| | 3/15/2022 | 7/1/2022 | 11/1/2022 | 1/1/2023 | 7/1/2023 | 11/1/2023 |
| Cash Consideration[1] | $7,085 | $7,085 | $7,085 | $7,085 | $7,085 | $7,085 |
| January 1, 2022 Interest Payment | 156 | 156 | 156 | 156 | 156 | 156 |
| July 1, 2022 Interest Payment | N/A | 156 | 156 | 156 | 156 | 156 |
| July 1, 2022 CIB Principal Payment | N/A | 373 | 373 | 373 | 373 | 373 |
| July 1, 2022 CAB Principal Payment | N/A | 106 | 106 | 106 | 106 | 106 |
| November 1, 2022 CVI Payment | N/A | N/A | 112 | 112 | 112 | 112 |
| January 1, 2023 Interest Payment | N/A | N/A | N/A | 146 | 146 | 146 |
| July 1, 2023 Interest Payment | N/A | N/A | N/A | N/A | 146 | 146 |
| July 1, 2023 CIB Principal Payment | N/A | N/A | N/A | N/A | 372 | 372 |
| July 1, 2023 CAB Principal Payment | N/A | N/A | N/A | N/A | 106 | 106 |
| November 1, 2023 CVI Payment | N/A | N/A | N/A | N/A | N/A | 138 |
| **Total Cash as of Date** | **$7,240** | **$7,875** | **$7,987** | **$8,133** | **$8,758** | **$8,896** |
| Reinvested Interest on January and July | N/A | 157 | 157 | 298 | 311 | 311 |
| **Total Cash and Reinvested Interest** | **$7,240** | **$8,032** | **$8,144** | **$8,431** | **$9,069** | **$9,207** |

| | Expected 3/15/2022 | 6 Mo. Delay 9/15/2022 | 13 Mo. Delay 4/15/2023 | 20 Mo. Delay 11/15/2023 |
|---|---|---|---|---|
| **Opportunity Cost Based on** | | | | |
| Weighted Average Yield of New GO Bonds[2] | N/A | $279 | $635 | $1,016 |

(1) Includes $234 million for PSA fee, $177 million for Consummation Costs and $50 million for Retail Support Fee.
(2) Weighted average tax-equivalent yield of New GO Bonds. Tax rate based on the Bloomberg Municipal YAS screen default tax rate of 40.8% per Bloomberg as of February 8, 2022.

### B.  Reduction in Value of New GO Bonds Due to Interest Rate Increases

14.  During the Stay Period, GO/PBA Creditors will also be harmed by any increase in generally prevailing interest rates, which will reduce the net present value of the Plan Consideration.

15.  The net present value of a series of cash flows is calculated by adding up the discounted future cash flows at an assumed discount rate (or rate of return).  The three principal variables needed to calculate net present value are (i) all cash flows to be received, (ii) the time at which such cash flows are to be received, and (iii) the discount rate, which is the rate of return that could be earned on an investment with similar risk.  Due to the time value of money, cash received in the present is worth substantially more than cash received in the future; that is because cash received today can be reinvested immediately and begin earning a return on investment, while cash to be received in the future cannot.  As a result, a relatively short delay in the receipt of cash results in a comparatively large reduction in net present value.  In this regard, I understand that the Teachers' Associations have asserted that creditors will not be harmed by a stay because it will

7

simply preserve the status quo; however, even setting aside the quantification of harm set forth

herein, all else being equal the present value of the Plan Consideration to creditors generally

decreases every day that there is a delay in its distribution, based on the time value of money.

16.     In addition, a minor increase in the assumed discount rate (which is dependent on,

among other things, generally prevailing interest rates) can also lead to a dramatic decrease in net

present value.  I believe that it is likely that interest rates will rise during any Stay Period, due to,

among other factors, relatively high levels of inflation experienced in the U.S. and Commonwealth

economies.  The projected increase in interest rates can be inferred from the overnight swap rate,

which reflects the market's perception of the current and future interest rate environment.

17.     As set forth in Table 3 below, based on the like-duration overnight index swap rate

reported by Bloomberg as of February 8, 2022, if the Commonwealth's emergence from Title III

were delayed by the imposition of a 13 month Stay Period, the value of the New GO Bonds and

CVIs would decrease by approximately $61 million.

**Table 3**

| Implied NPV Impact from Rising Interest Rates | | | |
|---|---|---|---|
| **As of Date** | 9/15/2022 | 4/15/2023 | 11/15/2023 |
| **Months Delayed** | **6 Months** | **13 Months** | **20 Months** |
| NPV of New GO Bonds at Weighted Average Rate | $6,873 | $6,732 | $6,143 |
| NPV of New GO Bonds at Higher Rate | 6,834 | 6,671 | 6,080 |
| **NPV Reduction** | **($40)** | **($61)** | **($63)** |

### C.     Additional Professional Fees to Be Incurred by PSA Creditors

18.     Further, the PSA Creditors will continue to incur substantial additional professional

fees and expenses during the Stay Period.  Based upon information provided by counsel, I have

assumed for the purposes of this Declaration that the major creditor constituencies that are

signatory to the GO/PBA Plan Support Agreement—which are the Constitutional Debt Group, the

LCDC, the QTCB Group, the GO Group, Assured, National, and Syncora—will collectively incur

ny-2330776

approximately $2 million per month in professional fees during the Stay Period that would not

otherwise have been incurred if the Effective Date were to occur on March 15, 2022.  This is, in

my view, a conservative estimate.  In reality, the amount of professional fees may be significantly

higher in the event that the PSA Creditors must incur costs and expenses of defending appeals filed

by other parties in interest[7] during the pendency of the Stay Period or in connection with

negotiating further amendments to the GO/PBA Plan Support Agreement, the Plan, and other

related documents necessitated by the delay in the Effective Date.

19.      As set forth in Table 4 below, based upon these assumptions, I estimate that the

creditor signatories to the GO/PBA Plan Support Agreement will incur approximately $26 million

in additional professional fees during a 13 month Stay Period.

**Table 4**

| Additional Professional Fees | | | |
|---|---|---|---|
| | 6 Mo. Delay 9/15/2022 | 13 Mo. Delay 4/15/2023 | 20 Mo. Delay 11/15/2023 |
| Incremental Monthly Professional Fees | $2 | $2 | $2 |
| Total Additional Professional Fees | $12 | $26 | $40 |

### D.      Other Harms

20.      As noted above, in addition to the specific, quantifiable harms to GO/PBA

Creditors discussed herein, a Stay Period is likely to cause additional harm to the Debtors,

GO/PBA Creditors, and other stakeholders.  Such risks include but are not limited to the following:

    (a) negative impacts on the Commonwealth's economy due to its continued
    status as a bankruptcy debtor, which adversely affects the ability of the
    Commonwealth to attract and maintain new and existing business
    investment, grow its tax base, and access the capital markets;

---

[7] And in that respect, I note that at least three other parties have filed a notice of their intent to appeal the entry of the Confirmation Order, including Suiza Dairy Corp., a group of "Cooperativas" (or credit unions), and an association representing retired judges.

ny-2330776

(b) uncertainty relating to (i) the FOMB's ability to engage in any additional negotiations regarding the Plan necessitated by the delay introduced by a Stay Period, (ii) its ability to execute in a timely manner the transactions underlying the Plan, and (iii) the timing and feasibility of proposed restructurings for other Title III Debtors and Commonwealth instrumentalities, particularly in light of the imminent departure of the FOMB's Executive Director effective April 1, 2022;

(c) increased costs relating to the Commonwealth, PBA, and ERS restructurings, as well as the ongoing HTA and PREPA Title III Cases, including both (i) the imposition of additional professional fees to be paid by the Title III Debtors (which I understand routinely total tens of millions of dollars per month in the aggregate) as well as (ii) increased foregone opportunity costs to the Commonwealth, its instrumentalities, and their respective creditors;

(d) a delay in the ability of COFINA and other instrumentalities to obtain credit ratings on their restructured bonds (which would likely decrease their respective costs of capital), as ratings are tied to the Commonwealth's issuer rating, which cannot be determined until the Commonwealth exits bankruptcy;

(e) a delay in the market's acceptance of the New GO Bonds and CVIs, the latter of which are a novel instrument in the municipal market, which will hinder their value;

(f) risks arising from the breach of contractual deadlines for the Commonwealth's emergence from Title III, including but not limited to the GO/PBA Plan Support Agreement, which provides creditors with the right to terminate their support for the Plan if the Effective Date does not occur by March 15, 2022; and

(g) increased political risk and uncertainty, as the imposition of a stay may delay the emergence of the Commonwealth into the 2022 midterm election season and beyond, which will increase (i) the volatility of statements and sentiment directed to the Commonwealth restructuring in connection with political campaigns and (ii) uncertainty following such elections due to potential new members of government.

21.     Although I do not endeavor to quantify such risks in terms of dollar value, I understand such risks to be real and substantial.

ny-2330776

I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 9, 2022                    /s/ Christine Song
                                           Christine Song
                                           Director
                                           Miller Buckfire

ny-2330776