# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative of THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| FEDERACIÓN DE MAESTROS DE PUERTO RICO, INC., GRUPO MAGISTERIAL EDUCADORES(AS) POR LA DEMOCRACIA, UNIDAD, CAMBIO, MILITANCIA Y ORGANIZACIÓN SINDICAL, INC. AND UNIÓN NACIONAL DE EDUCADORES Y TRABAJADORES DE LA EDUCACIÓN, INC.,<br><br>Movants,<br><br>v.<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative of THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY<br><br>Respondents. | **Re: ECF No. 19969** |

---

[1] The Debtors in the Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**OPPOSITION OF THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES
RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY
<u>TO MOTION DATED FEBRUARY 1, 2022, FOR STAY PENDING APPEAL</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

RELEVANT BACKGROUND ............................................................................... 4

    A.    Puerto Rico's Fiscal Crisis and PROMESA ....................................... 4

    B.    The Plan Support Agreement and the Seventh Plan of Adjustment ................ 6

    C.    Act 53 and Confirmation of the Eighth Plan of Adjustment ........................... 7

ARGUMENT ...................................................................................................... 9

   I.    THE ASSOCIATIONS DO NOT SATISFY ANY OF THE CRITERIA FOR A STAY PENDING APPEAL ....................................................................... 9

    A.    The Associations Are Exceedingly Unlikely to Prevail on Their Appeal…... 10

        1.    The Associations Have Not Raised a Serious Question Concerning the Court's Preemption Analysis………………………………………11

        2.    The Associations Have Not Shown that the Plan Lacks Enabling Legislation………………………………………………………………16

        3.    The Associations Have Not Raised a Serious Question Concerning the Court's Act 53 Analysis…………………………………….…………20

        4.    The Associations Have Not Shown that the Plan Is Not Feasible………………………………………………………………24

    B.    The Associations Fail to Establish Irreparable Harm Absent a Stay ............. 24

    C.    A Stay Would Substantially Harm the Commonwealth and Other Interested Parties...................................................................................................... 27

    D.    The Public Interest Strongly Disfavors a Stay ................................................ 30

  II.    ANY STAY MUST BE CONDITIONED ON A SUBSTANTIAL APPELLATE BOND. ............................................................................................................ 30

CONCLUSION...................................................................................................... 35

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns
   Corp.)*,
   361 B.R. 337 (Bankr. S.D.N.Y. 2007) ........................................................................29, 31, 32

*Al Otro Lado v. Wolf*,
   952 F.3d 999 (9th Cir. 2020) ...............................................................................................27

*Asociación de Maestros de P.R. v. Sistema de Retiro Maestros de P.R.*,
   190 P.R. 854 (2014) ..............................................................................................................12

*Bayrón Toro v. Serra*,
   119 P.R. Dec. 605, 19 P.R. Offic. Trans. 646 (1987) ..........................................................11

*BDC Capital, Inc. v. Thoburn Ltd. P'ship*,
   508 B.R. 633 (E.D. Va. 2014) ..............................................................................................25

*Beecham v. United States*,
   511 U.S. 368 (1994) ..............................................................................................................22

*Betterecycling Corp. v. Firstbank Puerto Rico (In re Betteroads Asphalt, LLC)*,
   2020 WL 3125274 (D.P.R. Jun. 12, 2020) ...........................................................................25

*Chevron Corp. v. Donziger*,
   37 F. Supp. 3d 653 (S.D.N.Y. 2014) .....................................................................................27

*Common Cause R.I. v. Gorbea*,
   970 F.3d 11 (1st Cir. 2020) .....................................................................................................9

*CoxCom, Inc. v. Chaffee*,
   536 F.3d 101 (1st Cir. 2008) .................................................................................................26

*Doe v. Trump*,
   957 F.3d 1050 (9th Cir. 2020) ..............................................................................................25

*Eagle Ins. Co. & Newark Ins. Co. v. BankVest Capital Corp. (In re BankVest Cap.
   Corp.)*,
   360 F.3d 291 (1st Cir. 2004) .................................................................................................12

*Fraterfood Serv. v. DDR Del Sol, LLC (In re Fraterfood Serv.)*,
   2015 Bankr. Lexis 3081 (Bankr. D.P.R. Sept. 11, 2015) .....................................................29

*In re 203 N. LaSalle P'ship,*
190 B.R. 595 (N.D. Ill. 1995) ...................................................................25

*In re Abengoa Bioenergy Biomass of Kan., LLC,*
2018 WL 1613667 (D. Kan. Mar. 29, 2018) .........................................29

*In re Betteroads Asphalt, LLC,*
610 B.R. 28 (Bankr. D.P.R. 2019) ....................................................25, 26

*In re Calpine Corp.,*
2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008)...................25, 31, 32

*In re City of Detroit,*
504 B.R. 97 (Bankr. E.D. Mich. 2013) ..................................................17

*In re City of Stockton,*
526 B.R. 35 (Bankr. E.D. Cal. 2015) .....................................................15

*In re Convenience USA, Inc.,*
290 B.R. 558 (M.D.N.C. 2003)...............................................................25

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
361 F. Supp. 3d 203 (D.P.R. 2019)........................................................16

*In re Fin. Oversight & Mgmt. Bd. for P.R.,*
2021 WL 5024287 (D.P.R. Oct. 29, 2021) ............................................13

*In re Gen. Motors,*
409 B.R. 24 (Bankr. S.D.N.Y. 2009) .....................................................32

*In re Great Barrington Fair & Amusement, Inc.,*
53 B.R. 237 (Bankr. D. Mass. 1985) .....................................................29

*In re Int'l Home Prods.,*
2012 WL 6708431 (Bankr. D.P.R. Dec. 26, 2012)................................25

*In re Irving Tanning Co.,*
496 B.R. 644 (B.A.P. 1st Cir. 2013) ......................................................16

*In re MEDSCI Diagnostics, Inc.,*
2011 WL 280866 (Bankr. D.P.R. Jan. 25, 2011).....................................9

*In re Miraj & Sons, Inc.,*
201 B.R. 23 (Bankr. D. Mass. 1996) .....................................................31

*In re MJS Las Croabas Props.,*
2015 Bankr. Lexis 2147 (Bankr. D.P.R. June 30, 2015) .......................26

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 124 (S.D.N.Y. 1999) ....................................................34

*In re Public Serv. Co.*,
    116 B.R. 347 (Bankr. D.N.H. 1990) ...............................................28

*In re Revel AC, Inc.*,
    802 F.3d 558 (3d Cir. 2015)..........................................................25

*In re Roussos*,
    2017 WL 766897 (Bankr. C.D. Cal. Feb. 27, 2017)..............................31

*In re Sabine Oil & Gas Corp.*,
    548 B.R. 674 (Bankr. S.D.N.Y. 2016)............................................25

*In re Sanitary & Improvement Dist. No. 7*,
    98 B.R. 970 (Bankr. D. Neb. 1989) ...............................................13

*In re Scrub Island Dev. Grp. Ltd.*,
    523 B.R. 862 (Bankr. M.D. Fla. 2015) ...........................................28

*In re Tribune*,
    477 B.R. 465 (Bankr. D. Del. 2012) ..............................31, 32, 33, 34

*In re VVF Comms. Corp.*,
    41 B.R. 546 (Bankr. D.D.C. 1984) ................................................31

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012)......................................................25, 31

*In re Weinhold*,
    389 B.R. 783 (Bankr. M.D. Fla. 2008) ...........................................31

*In re Yellowstone Mt. Club, LLC*,
    2009 Bankr. Lexis 4625 (Bankr. D. Mont. Jul. 16, 2009) .....................28

*Iverson v. City of Bos.*,
    452 F.3d 94 (1st Cir. 2006)..........................................................24

*Mass. Div. of Emp. & Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l
Med. Ctr., Inc.)*,
    291 F.3d 111 (1st Cir. 2002) .......................................................15

*Metrophones Telecomms., Inc. v. Glob. Crossing Telecomms., Inc.*,
    423 F.3d 1056 (9th Cir. 2005) .....................................................14

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
    287 F.3d 1 (1st Cir. 2002)...........................................................24

iv

*Nken v. Holder,*
    556 U.S. 418 (2009)..................................................................................9, 25

*NLRB v. Bildisco & Bildisco,*
    465 U.S. 513 (1984)........................................................................................12

*Ohanian v. Irwin (In re Irwin),*
    338 B.R. 839 (E.D. Cal. 2006)......................................................................25

*Ohio v. Kovacs,*
    469 U.S. 274 (1985)................................................................................. 12-13

*Patriot Portfolio, LLC v. Weinstein (In re Weinstein),*
    164 F.3d 677 (1st Cir. 1999).........................................................................15

*Pinto-Lugo v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt.*
    *Bd. for P.R.),*
    987 F.3d 173 (1st Cir. 2021).........................................................................26

*Porter v. NationsCredit Consumer Disc. Co.,*
    2007 WL 674709 (E.D. Pa. Feb. 28, 2007) ................................................35

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
    579 U.S. 115 (2016).......................................................................................14

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
    566 U.S. 639 (2012).......................................................................................23

*Ratcliff v. Rancher's Legacy Meat Co.,*
    2020 WL 4048509 (D. Minn. July 20, 2020) ..............................................31

*Rederford v. U.S. Airways, Inc.,*
    589 F.3d 30 (1st Cir. 2009)...........................................................................13

*Respect Maine PAC v. McKee,*
    622 F.3d 13 (1st Cir. 2010).............................................................................9

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
    217 F.3d 8 (1st Cir. 2000).............................................................................26

*Scotiabank de P.R. v. Burgos (In re Plaza Resort at Palmas, Inc.),*
    741 F.3d 269 (1st Cir. 2014).........................................................................23

*Sindicato Puertorriqueno de Trabajadores v. Fortuno,*
    699 F.3d 1 (1st Cir. 2012).............................................................................10

*SPGGC, LLC v. Ayotte,*
    488 F.3d 525 (1st Cir. 2007).........................................................................14

*Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC),*
　　2008 WL 650389 (S.D.N.Y. Mar. 7, 2008) ....................................................32, 35

*Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.),*
　　388 B.R. 619 (Bankr. E.D. Pa. 2008) ....................................................................25

*Vázquez-Garced v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight &*
　　*Mgmt. Bd. for P.R.),*
　　945 F.3d 3 (1st Cir. 2019)....................................................................................14

STATUTES

11 U.S.C. § 365..........................................................................................11, 12, 17,

11 U.S.C. § 1123..........................................................................12, 15, 16, 18

48 U.S.C. §§ 2101–2241........................................................................................1

PROMESA § 101..........................................................................................5, 13, 15

PROMESA § 106....................................................................................................24

PROMESA § 201....................................................................................................24

PROMESA § 204....................................................................................................19

PROMESA § 301..........................................................................................11, 12, 13, 15

PROMESA § 314..........................................................................................16, 18, 20

PROMESA § 315..........................................................................................1, 5

PROMESA § 405..........................................................................................5, 29

Puerto Rico Recovery Accuracy in Disclosures Act of 2021, Pub. L. No. 117-82 ......................28

OTHER AUTHORITIES

Fed. R. Bankr. P. 8007(c) ....................................................................................4, 31

10 Collier on Bankruptcy ¶ 8007.09[1] (16th ed. 2020)....................................................31

Letter from David A. Skeel, Jr., Chairman, Fin. Oversight and Mgmt. Bd. for
　　P.R., to Governor Pedro Pierluisi (Oct. 14, 2021),
　　https://oversightboard.pr.gov/documents/..............................................................7

Nicole Acevedo & Gabe Gutierrez, *Will Puerto Rico's Debt-restructuring Deal End the Largest Bankruptcy in U.S. History?* NBC News (Oct. 29, 2021, 2:21PM), https://www.nbcnews.com/news/latino/will-puerto-ricos-debt-restructuring-deal-end-largest-bankruptcy-us-hi-rcna4051 ....................................................30

United States Courts for the First Circuit 2018 Annual Report, https://www.ca1.uscourts.gov/ sites/ca1/files/2018%20Annual%20Report.pdf .....................35

**To the Honorable United States District Court Judge Laura Taylor Swain:**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the sole Title III representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA") (collectively, the "Debtors"), pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[1] respectfully submits this opposition to the motion for a stay pending appeal [ECF No. 19969][2] filed by Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc. (collectively, the "Associations").  In their motion, the Associations ask the Court to stay the Order and Judgment [ECF No. 19813] (the "Confirmation Order") confirming the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [ECF No. 19784] (as it may be amended, modified, or supplemented, the "Plan").[3]  The Associations do not offer to post a bond to protect the Debtors against the expenses they will unnecessarily incur if the Confirmation Order is sustained.

## PRELIMINARY STATEMENT

1.      After nearly five years of extraordinary effort by countless stakeholders and decisions from this Court determining and narrowing myriad legal issues, and after extensive mediation, the Court confirmed the Plan, setting Puerto Rico on the path to emerge from Title III

---

[1] PROMESA is codified at 48 U.S.C. §§ 2101–2241.
[2] All ECF No. references are to Case No. 17-bk-3283-LTS, unless otherwise indicated.
[3] All capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

and towards financial recovery.  Among other things, the Plan reduces the Commonwealth's debt by 80%, saves the Commonwealth more than $50 billion in debt-service payments, and addresses the Commonwealth's $55 billion in unfunded pension liabilities.  The significance of Plan confirmation cannot be overstated.  As the Court described it, the Plan is "a crucial step in the effort to achieve the economic recovery of the Commonwealth of Puerto Rico and its instrumentalities."  Findings of Fact[4] at 14.

2.    The Associations are among a small minority of stakeholders that opposed the Plan.  Unlike the stakeholders incurring substantial losses who accepted the Plan, the Associations' members are paid in full all the pension benefits they will have earned through the effective date of the Plan.  They are appealing because the Plan discharges their statutory and contractual rights to earn larger defined pension benefits for future services they voluntarily render after the effective date.  For those services, the Plan substitutes defined contribution plans and other pension benefits such as social security contributions because the defined benefit plans were the primary cause of the financial distress in the magnitude of $55 billion.  The Associations now ask the Court to stay the Plan's implementation for the duration of their appeal of the Confirmation Order.  Any delay in the Plan's implementation could imperil Puerto Rico's successful restructuring, which is indispensable to the Commonwealth's fiscal recovery.

3.    A stay pending appeal should be denied because the Associations have not established any of the four prerequisites for such extraordinary relief.  First and foremost, the Associations have not shown that they are likely to succeed in their appeal.  This Court previously considered and rejected each of the arguments that the Associations intend to press on appeal.  The Court's prior rulings were correct and will not be overturned on appeal.

---

[4] As defined *infra*.

4.      The Associations argue PROMESA does not preempt certain Puerto Rico statutes imposing pension-related obligations on the Commonwealth.  While the Associations are wrong, it does not matter.  Regardless of whether the statutes are preempted, the obligations they create are dischargeable and are treated under the Plan.  While preemption might affect whether the Associations' members have allowable claims entitled to distributions under the Plan, the Plan gives them the benefit of those claims anyway.  Moreover, the Associations are wrong about preemption.  PROMESA expressly provides all laws inconsistent with it are preempted.  Laws creating higher and higher defined-benefit obligations are patently inconsistent with PROMESA Title III, which discharges all claims (including claims contingent on future services), and with all the provisions in PROMESA Titles I and II calling for fiscal responsibility and debt market access.  The Associations also argue the Plan should not have been confirmed because it violates Puerto Rico's Act 53, but that argument fails under a plain reading of the Act, as this Court previously held, and the Associations lack any likelihood of success because they failed to demonstrate any plausible contrary reading of Act 53.

5.      In addition to failing to show a likelihood of success, the Associations also fail to show that they will be irreparably harmed absent a stay.  In their motion, the Associations contend that, without a stay, they will suffer financial harm and their appeal may become moot before it is resolved.  It is well established, however, that a potential for mootness and a loss of money alone do not constitute irreparable harm.

6.      Conversely, a stay would inflict serious harm on the Commonwealth, its creditors, and other stakeholders.  Most importantly, a stay would imperil Puerto Rico's successful restructuring and risk unraveling the carefully negotiated Plan, which would plunge the Commonwealth into financial chaos, inflict immeasurable harm on the Commonwealth's

3

residents and creditors, and send the Title III cases back to square one.  A stay would needlessly delay the Commonwealth's economic recovery and the benefits the residents of Puerto Rico will receive under the Plan.  Delaying the Plan's effective date and implementation would also impose monetary harms on various parties:  Creditors would lose interest on the approximately $10.8 billion in cash that will be distributed under the Plan, the Pension Reserve Trust established by the Plan would lose hundreds of millions of dollars in funding, and the Commonwealth would incur millions in new pension liabilities that would have been frozen under the Plan because pension benefits continue to accrue up to the Plan's effective date.

7.    Finally, a stay would undermine the significant public interest in putting Puerto Rico on an immediate path to fiscal recovery.  In addition to costing the Commonwealth and others tens of millions of dollars by delaying the Plan's effective date, new investments in Puerto Rico by those who would not invest while it was in default with an uncertain outcome would be further delayed along with the jobs and value-creation the investments would potentially create.

8.    Even if a stay were somehow warranted, the Associations should be required to post a substantial bond in accordance with Fed. R. Bankr. P. 8007(c).  As explained below, that bond should be set at no less than $1.5 billion to compensate for the losses created by delay.

9.    Because all four stay factors strongly militate against a stay, the motion for a stay should be denied, and, if granted, the Court should require a bond to protect the Debtors and their stakeholders from further losses.

## **RELEVANT BACKGROUND**

### A.    **Puerto Rico's Fiscal Crisis and PROMESA**

10.    Congress found Puerto Rico is in the midst of a "fiscal emergency" resulting from a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of

financial transparency, management inefficiencies, and excessive borrowing."  PROMESA
§ 405(m)(1).  To address that emergency, Congress enacted PROMESA and established the
Oversight Board to develop a method for the Commonwealth to "achieve fiscal responsibility
and access to the capital markets."  *Id.* § 101(a).  PROMESA Title III authorized the Oversight
Board to commence debt-restructuring cases on behalf of the Commonwealth and its covered
instrumentalities.  *Id.* § 315.  The Oversight Board filed the first Title III case in May 2017.

11.     Central to the Oversight Board's mission is reforming the Commonwealth's three
severely underfunded and insolvent pension systems:  the Employees' Retirement System
("ERS"); the Teachers' Retirement System ("TRS"); and the Judiciary Retirement System
("JRS").  Those systems were initially structured as defined-benefit plans primarily funded by
contributions from employers with benefits payable upon retirement.  That structure proved
unsustainable for numerous reasons, including inadequate employer-contribution levels, the
enactment of laws granting additional benefits without sufficient funding, early-retirement
programs, and unsupported debt issuance.  *See* ECF No. 16741-9 at 1–29.  Recognizing the
urgent need for reform, the Puerto Rico government enacted legislation in 2013 freezing defined-
benefit accruals for ERS participants and TRS participants hired after 2014.  *See* Act 3-2013; Act
160-2013.[5]  TRS participants hired before 2014 and all JRS participants continued to accrue
defined benefits.  Separately, the government eliminated cost-of-living adjustments ("COLAs")
for all ERS and TRS participants.

12.     When Congress enacted PROMESA, the Commonwealth's pension systems were
virtually unfunded with approximately $55 billion in unfunded liabilities.  The Commonwealth's

---

[5] TRS reform initially applied to all teachers but was overturned by the Puerto Rico Supreme Court as to
teachers hired before 2014.  A further attempt at freezing benefits for JRS employees was invalidated by
the Puerto Rico Supreme Court.  *See* Act 162-2013.

March 2017 fiscal plan proposed various pension reforms, including changing from defined-benefit plans to defined-contribution plans funded by automatic withholdings from employees' paychecks and adopting a pay-as-you-go ("PayGo") system whereby the Commonwealth would pay retirement benefits directly to all participants as they come due and the employers would reimburse the Commonwealth for payments made to their former employees.  ECF No. 1-3 at 22. The Puerto Rico government subsequently adopted the PayGo system and established go-forward defined-contribution accounts for active workers not currently accruing pensions under defined-benefit plans—*i.e.*, ERS participants and TRS participants hired after 2014.  Absent restructuring of these pension systems, retirees may not have received their monthly benefits.

> **B.    The Plan Support Agreement and the Seventh Plan of Adjustment**

13.    The Oversight Board and relevant stakeholders, including representatives of retirees, engaged in extensive mediations and negotiations over several years to build support for various agreements supporting a plan of adjustment for the Debtors, including a plan-support agreement dated February 22, 2021 (the "PSA") with certain holders of GO and PBA bonds.

14.    In accordance with PROMESA's mandate, the Oversight Board filed a seventh amended plan of adjustment on July 30, 2021 (the "Seventh Plan").  ECF No. 17627.  Claims arising out of the Commonwealth's pension obligations were placed in various classes and treated under the Seventh Plan through maintenance of pension benefits subject to:  (*i*) a reduction of up to 8.5% of monthly pension payments in excess of $1,500 for both active and retired employees (the "Monthly Benefit Modification"); (*ii*) a freeze of future defined-benefit accruals for TRS participants hired before 2014 and all JRS participants, and their enrollment in defined-contribution plans; and (*iii*) the elimination of COLAs for JRS participants.  Seventh Plan Art. LV.  Because defined-benefit accruals had previously been frozen for ERS participants

6

and for TRS participants hired after 2014 and COLAs had previously been eliminated for ERS and TRS participants, the Seventh Plan would result in a uniform system of retirement benefits for all governmental employees.

15.    The Seventh Plan provided for the issuance of new GO bonds and contingent-value instruments to certain creditors.  In accordance with the terms of the PSA, the Oversight Board requested the Puerto Rico Legislature to enact legislation authorizing the issuance of these instruments.  Legislative leaders made clear that they would not pass the requested legislation unless the Monthly Benefit Modification was eliminated from the Seventh Plan.  The Oversight Board agreed to that condition but emphasized that for the Commonwealth to be able to service its restructured debt, the plan of adjustment must—at a minimum—eliminate COLAs for JRS participants and freeze defined-benefit accruals for active TRS and JRS participants.[6]

16.    At an emergency status conference before this Court on October 25, 2021, the Oversight Board made clear that, absent the freeze of defined-benefit accruals and the elimination of COLAs, it would withdraw the Seventh Plan and pursue a plan of adjustment not requiring bond-enabling legislation.  Oct. 25, 2021 Status Conf. Tr. at 18:17–19.  The Senate President responded that the legislative process should continue.  *Id*. at 42:17–25.  The status conference concluded with the Court directing mediation.  *See* ECF No. 18719.

C.    **Act 53 and Confirmation of the Eighth Plan of Adjustment**

17.    Against that backdrop, on October 26, 2021, the Legislature passed and the Governor signed into law Act 53-2021, which authorizes the issuance of new debt pursuant to the plan of adjustment.  In its Statement of Motives, Act 53 noted that the Plan would enable the

---

[6] *See* Letter from David A. Skeel, Jr., Chairman, Fin. Oversight and Mgmt. Bd. for P.R., to Governor Pedro Pierluisi (Oct. 14, 2021), https://oversightboard.pr.gov/documents.

Puerto Rico government to save money and "invest in its people" through infrastructure improvements, "defray the costs of . . . essential services," and "prepare for and deal with future emergencies." Act 53, Statement of Motives. The law's sole condition for the debt issuance was that the Oversight Board submit an "amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification." Act 53, Art. 104; *see also id.*, Art. 605.

18. Consistent with Act 53, on November 3, 2021, the Oversight Board filed an eighth amended plan of adjustment (the "Plan") eliminating the Monthly Benefit Modification. The Plan continues to provide for the elimination of COLAs for JRS participants and for the freeze of defined-benefit accruals for active TRS and JRS participants. Because the Plan freezes only accruals of defined-pension benefits after the effective date of the Plan (the "Effective Date"), it has no effect on pension benefits accruing through the Effective Date.

19. On January 18, 2022, this Court entered the Confirmation Order, finding, among other things, that, by eliminating the Monthly Benefit Modification upon which Act 53 is conditioned, the Plan had obtained all necessary legislative, regulatory, and electoral approvals. Confirmation Order at 15. In its *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [ECF No. 19812] ("Findings of Fact"), the Court concluded that confirmation is "a crucial step in the effort to achieve the economic recovery of the Commonwealth of Puerto Rico and its instrumentalities." Findings of Fact at 14. The Court also found the Plan necessary for "the Commonwealth to provide future public services and remain a viable public entity." *Id.* at 131. Further, the Court found that, absent the Plan, the Commonwealth would "face great uncertainty,

8

financial and political instability, and significant lawsuits," all of which would impede economic

growth and tax revenue, thus "reducing the amounts available to pay all creditors." *Id.* at 138.

In confirming the Plan, the Court rejected all objections raised by the Association, including their

argument that the Plan violates Act 53. *Id.* at 69–71.

20.     On January 28, 2022, the Associations took an appeal from the Confirmation

Order and the Findings of Fact. They now request that the Confirmation Order—and

implementation of the Plan—be stayed pending the outcome of their appeal.

## ARGUMENT

## I.     THE ASSOCIATIONS DO NOT SATISFY ANY OF THE CRITERIA FOR A STAY PENDING APPEAL.

21.     A stay pending appeal is an "extraordinary remedy" that "requires a substantial

showing." *In re MEDSCI Diagnostics, Inc.*, 2011 WL 280866, at *3 (Bankr. D.P.R. Jan. 25,

2011). Because a stay pending appeal is "an intrusion into the ordinary processes of

administration and judicial review," it is "not a matter of right, even if irreparable injury might

otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009).

22.     A party seeking a stay pending appeal must demonstrate: (*i*) a "strong showing"

of likelihood of success on the merits on appeal; (*ii*) irreparable injury absent a stay; (*iii*) the

issuance of a stay will not injure other interested parties; and (*iv*) a stay is in the public interest.

*Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020). The first two factors are the

most critical and require more than a "mere possibility" of success and irreparable injury. *Nken*,

556 U.S. at 434; *see also Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010). Both

factors are independent predicates for a stay, and a strong showing on one "cannot dispense with

the required showing of" the other. *Nken*, 556 U.S. at 438 (Kennedy, J., concurring).

9

23.     Here, the Associations have not established any of the prerequisites for the
extraordinary relief they seek.  *First*, their arguments on appeal are meritless and have already
been considered and rejected by this Court.  *Second*, they have not shown that they will be
irreparably harmed absent a stay.  *Third*, a stay would imperil Puerto Rico's successful
restructuring, which would inflict immeasurable harm on the Commonwealth, its residents, and
its creditors.  *Fourth*, the significant public interest in putting Puerto Rico on an immediate path
to fiscal recovery disfavors any delay in the Plan's implementation.  Because all four factors
strongly militate against a stay, the Associations' motion should be denied.

### A.     The Associations Are Exceedingly Unlikely to Prevail on Their Appeal.

24.     The stay motion fails at step one because the Associations have not shown they
are likely to succeed in their appeal of the Confirmation Order.  "To demonstrate likelihood of
success on the merits, [a movant] must show 'more than mere possibility' of success."  *Sindicato
Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012).  "[R]ather, they must
establish a 'strong likelihood' that they will ultimately prevail."  *Id.*  Here, there is no strong
likelihood—indeed, no likelihood whatsoever—the Associations will prevail in their appeal.

25.     In their stay motion, the Associations advance four arguments they intend to press
on appeal.  *First*, they challenge the Court's holding that PROMESA preempts certain
Commonwealth statutes providing for the accrual of pension benefits.  Stay Mot. 12–19.  *Second*,
the Associations contend the Plan lacks necessary enabling legislation and certain provisions of
the Plan—which they argue are "equivalent to legislation"—are improper because the Oversight
Board has no authority to legislate.  *Id.* at 15–17.  *Third*, the Associations challenge the Court's
holding that Act 53 does not preclude the Plan from providing for the freeze of defined-benefit
accruals and the elimination of COLAs.  *Id.* at 20–23.  *Fourth*, they argue the Plan is not

10

feasible. *Id.* at 25–26.  Each argument was already considered and squarely rejected by this

Court in its Confirmation Order and Findings of Fact.  The Court's prior analysis of these issues

is unassailable and is unlikely to be reversed on appeal.

### 1. The Associations Have Not Raised a Serious Question Concerning the Court's Preemption Analysis.

26.     The Associations first attack the Confirmation Order's holding that PROMESA

preempts certain Puerto Rico statutes providing that teachers accrue pension benefits.  Stay Mot.

12–19.  According to the Associations, PROMESA contains no provision discussing "the nature

or structure of the public retirement systems," and therefore PROMESA cannot preempt the

pension laws at issue.  *Id.* ¶ 40.  In so arguing, the Associations ignore the Court's cogent

preemption analysis.  In its Findings of Fact, the Court explained that the pension laws at issue

are preempted by the discharge provisions of the Bankruptcy Code incorporated into

PROMESA.  Findings of Fact ¶¶ 152–56.  The stay motion contains no response on this point.

27.     The Court's analysis was correct and will not be overturned on appeal.  The

Associations do not attempt to explain how any restructuring can be accomplished and feasible

under PROMESA if Commonwealth laws creating financial obligations must survive unscathed.

28.     As the Puerto Rico Supreme Court explained, and the Associations concede, any

statutory obligation of the Commonwealth to pay pension benefits is contractual in nature.  *See*

*Bayrón Toro v. Serra*, 119 P.R. Dec. 605, 19 P.R. Offic. Trans. 646, 649, 663 (1987); *see also*

ECF No. 19180 at 10 (Associations' objection to the Oversight Board's motion concerning

Act 53) (citing *Asociación de Maestros de P.R. v. Sistema de Retiro para Maestros de P.R.*, 190

P.R. Dec. 854 (2014)).  Section 365(a) of the Bankruptcy Code provides that (with certain

exceptions inapplicable here) the trustee—or, in this case, the Oversight Board, *see* PROMESA

§ 301(c)(7)—may assume or reject any executory contract of the debtor, subject to the court's

11

approval.  *See* 11 U.S.C. § 365(a) (incorporated into Title III by PROMESA § 301(a)).  "This is

one of the basic reorganizational tools available to debtors under the Bankruptcy Code."  *Eagle*

*Ins. Co. v. BankVest Cap. Corp. (In re BankVest Cap. Corp.)*, 360 F.3d 291, 296 (1st Cir. 2004);

*see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984) ("[T]he authority to reject an

executory contract is vital . . . because [it] can release the debtor's estate from burdensome

obligations that can impede a successful reorganization.").  A rejected contract is considered to

have been breached prior to the bankruptcy case and leaves the counterparty a creditor with a

general unsecured claim for contract damages.  *BankVest*, 360 F.3d at 296.

29.  Here, acting pursuant to §§ 1123(b)(2) and 365(a), the Oversight Board rejected

the Commonwealth's prepetition obligation to allow certain pension benefits to accrue in the

future.  *See* Plan §§ 55.8, 55.9, Exs. E, F.  As the Court explained, that rejection "g[a]ve rise to

claims" on the part of pensioners, which are being treated under the Plan and "which can be

impaired and discharged pursuant to the Plan."  Findings of Fact ¶ 153.  The Plan treated those

claims by (*i*) ensuring full payment of any defined benefits accrued up to the Effective Date,

(*ii*) providing new tax-deferred defined contribution accounts, and (*iii*) enrolling pensioners in

the federal Social Security system with contributions to be made by the Commonwealth.  *See*

Plan § 55.9 & Ex. F-1.  The Associations do not assert the treatment of the teachers' claims

under the Plan is inadequate or fails the requirements of PROMESA or the Bankruptcy Code,

including the best-interests test.  That is because pensioners never objected to confirmation based

on any best-interest or unfair discrimination standard, perhaps because they receive among the

most favorable recoveries under the Plan on account of their rejection damages claim.

30.  Even putting aside principles of contract rejection, the Plan properly discharged

the Commonwealth's pension obligations.  As the Supreme Court explained in *Ohio v. Kovacs*, a

12

right arising under a State statute that can be reduced to payment is a claim that can be

discharged under the Bankruptcy Code.  469 U.S. 274, 278–83 (1985); *see also Rederford v. U.S.*

*Airways, Inc.*, 589 F.3d 30, 35–36 (1st Cir. 2009) (explaining a "claim" subject to discharge in

bankruptcy is given "the broadest available definition").  Indeed, this Court has previously

explained that "although [certain] claims are based on statutory provisions rather than on a

contract, [such claimants have] no basis for differentiating obligations arising out of statutes

from obligations arising out of nonexecutory contracts," which are subject to discharge.  *In re*

*Fin. Oversight & Mgmt. Bd. for P.R.*, 2021 WL 5024287, at *9 (D.P.R. Oct. 29, 2021).

Bankruptcy Code § 101(5), made applicable by PROMESA § 301(a), defines "claim" as a right

to payment.  The rights of the Associations' members to accrue future pension benefits are

plainly reducible to a monetary payment.  Indeed, the Associations themselves quantify the

amounts some of their members would have received under the statute.  *See* Stay Mot., Exs. 1–8.

Those statutory obligations are thus claims that can be discharged, which the Plan accomplishes.

31.    Because the Commonwealth's statutory obligations to permit the accrual of future

pension benefits and COLAs were rejected and discharged under the Plan as authorized by

PROMESA, any Commonwealth statute requiring the full payment of such obligations is

inconsistent with PROMESA and thus preempted.  All jurisdictions include statutes requiring

payment of debt in full; if such obligations cannot be impaired and discharged and such statutes

preempted by the Bankruptcy Code, no municipal debtor could confirm a plan of adjustment.  As

the Court explained, it would be illogical for Congress "[t]o create a federal statute based upon

the theory that federal intervention was necessary to permit adjustment of a municipality's debts

and then to prohibit the municipality from adjusting such debts."  Findings of Fact ¶ 153 (citing

*In re Sanitary & Improvement Dist. No. 7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989)); *see also In*

*re City of Prichard*, No. 1:09-bk-15000, ECF No. 442 at 7 (Bankr. S.D. Ala. July 8, 2014)

(confirming municipal plan of adjustment that "eliminate[d] the obligation to fund a pension plan

for its employees" embodied in an Alabama statute; concluding the plan's "treatment of the

classes who formerly had an interest in the [municipality's] pension plan is lawful").

32.     The preemption analysis here is straightforward, as the Court recognized.  *See*

Findings of Fact ¶¶ 154–56.  PROMESA contains an express preemption clause, § 4, providing

PROMESA "shall prevail over any general or specific provisions of territory law, State law, or

regulation that is inconsistent with [the statute]."[7]  The term "inconsistent," at the very least,

incorporates the concept of conflict preemption.  *See Metrophones Telecomms., Inc. v. Glob.*

*Crossing Telecomms., Inc.*, 423 F.3d 1056, 1072–73 (9th Cir. 2005) (construing similar

preemption provision in Communications Act of 1934); *see also Vázquez-Garced v. Fin.*

*Oversight & Mgmt. Bd. for P.R.*, 945 F.3d 3, 8 (1st Cir. 2019).  In other words, PROMESA

preempts a Commonwealth statute if compliance with that statute would either make compliance

with PROMESA impossible or "frustrate the purposes of the federal scheme."  *SPGGC, LLC v.*

*Ayotte*, 488 F.3d 525, 531 (1st Cir. 2007).  Here, compliance with Commonwealth statutes

mandating the accrual of future pension benefits and COLAs would do both.

33.     There is a direct conflict between the Puerto Rico statutes imposing obligations on

the Commonwealth to accrue pension benefits and PROMESA's discharge of those same

obligations.  The two are mutually exclusive.  In the face of that inconsistency, PROMESA's

discharge provision prevails.  PROMESA § 4.  The Associations provide no rationale to the

contrary and therefore have shown no likelihood of success.

---

[7] Because PROMESA contains an express preemption provision, the Associations are wrong that there is
a presumption against preemption.  *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125
(2016).

14

34.     Moreover, allowing local statutes to remain in effect notwithstanding PROMESA's discharge of the Commonwealth's obligations under those statutes would frustrate PROMESA's purpose of restoring Puerto Rico to "fiscal responsibility and access to the capital markets." *Id.* § 101(a).  Many of the Commonwealth's most crippling obligations—such as its obligations to pay principal and interest on its outstanding bonds and its obligations to pay pension benefits—arise under Commonwealth statutes.  Unless such obligations can be impaired and discharged in Title III, a restructuring would be impossible, which would undermine the goals of PROMESA.[8]

35.     That a state or territory cannot evade the preemptive force of federal law by resorting to local legislation is well established.  For instance, the First Circuit has held that a Massachusetts law "requir[ing] that [a state agency] receive administrative expense priority for a claim that the Bankruptcy Code would assign general unsecured status," is " inconsistent with federal law and so preempted."  *See Mass. Div. of Emp. & Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l Med. Ctr., Inc.)*, 291 F.3d 111, 126 (1st Cir. 2002); *see also Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677, 682–83 (1st Cir. 1999) ("[S]tates may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations."); *In re City of Stockton*, 526 B.R. 35, 49–50 (Bankr. E.D. Cal. 2015).

36.     The Commonwealth pension statutes at issue are additionally preempted by 11 U.S.C. § 1123(a)(5), incorporated into the Title III cases by PROMESA § 301(a).  That

---

[8] This is confirmed by evidence presented at the confirmation hearing, which the Associations did not contest, demonstrating that:  (*i*) "[i]nstituting the [freeze] and eliminating future COLAs is critical to . . . achieving [the Commonwealth's] fiscal responsibility," ECF No. 19057 ¶ 16, and (*ii*) if the Commonwealth statutes requiring accrual of pension benefits and COLAs were to continue in force, they would effectively nullify the Plan's restructuring and undermine the Oversight Board's mission to ensure Puerto Rico achieves fiscal responsibility and access to capital markets, ECF No. 19054-4 ¶ 235.

section preempts any "otherwise applicable Commonwealth law" that prevents a plan's

proponent—here, the Oversight Board—from providing adequate means for the plan's

implementation. *In re Fin. Oversight & Mgmt. Bd. for P.R.*, 361 F. Supp. 3d 203, 257 (D.P.R.

2019). As one court explained, § 1123(a)(5) "gives preemptive effect not to a specified

provision of federal law but instead to whatever means of implementation a plan proponent

builds into its plan." *Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning

Co.)*, 496 B.R. 644, 662 (B.A.P. 1st Cir. 2013). Without even assigning preemptive effect to a

means of implementation, the Commonwealth defined-benefit statute at issue is preempted by

Title III's discharge provisions, among others. Such "preemption is necessary" and must "be one

of considerable breadth and flexibility" because "routine and unobjectionable features of chapter

11 plans—among others, the curing of defaults, extension of payment periods, and payment of

claims less than in full—all would be impossible without preemption of state laws." *Id.* at 662–

63. Section 1123(a)(5)'s language is "accordingly broad," applying to "any otherwise applicable

nonbankruptcy law." *Id.* at 663. Here, the Plan's pension-benefit provisions—including Exhibit

F-1, providing for a freeze of pension accruals, the elimination of COLAs, and the treatment of

the Associations' claims—are all made possible by the preemptive impact of the federal

discharge. In confirming the Plan and rejecting the Associations' arguments, the Court thus

correctly held that "[t]he Plan satisfies the requirements of section 1123(a)(5)" and that "any

Commonwealth law provisions contrary to [the Plan's and the Confirmation Order's] terms are

preempted." Findings of Fact ¶¶ 90–91.

### 2. *The Associations Have Not Shown that the Plan Lacks Enabling Legislation.*

37.     The Associations next challenge the Plan's compliance with PROMESA

§ 314(b)(5), arguing that: (*i*) the Plan's pension provisions in Exhibit F-1 "are equivalent to

16

legislation" and are thus improper because the Oversight Board has no authority to legislate, Stay

Mot. 16–17, and, relatedly, (*ii*) the Plan should not have been confirmed absent "necessary

enabling legislation" "to change the nature of the retirement systems" in Puerto Rico, *id.* at 23.

Those arguments ignore that when PROMESA preempts territorial law, it would be the reverse

of preemption to require territorial law permission or authorization to bless the treatment of

claims under a Title III plan.  Put differently, preemption would have no impact if a new

territorial law were required because then territorial law would control, not federal law.

38.      The Plan's provisions relating to pension benefits in Exhibit F-1, including the

terms of the freeze of pension accruals and the elimination of COLAs, are not legislation.

Rather, those provisions merely default the obligations under Commonwealth law.  Any notion

that a debtor requires local legislation to default under a federal restructuring law is contradiction

in terms.  The treatment of those claims and the means of implementation are well "within the

scope of the Oversight Board's powers under PROMESA."[9]  Findings of Fact ¶ 90; *see also In

re City of Detroit*, 504 B.R. 97, 154 (Bankr. E.D. Mich. 2013) (finding that contractual pension

liabilities are "subject to impairment in a federal bankruptcy proceeding").[10]  As explained

above, any statutory obligation of the Commonwealth to pay pension benefits is contractual in

nature and may be impaired through outright default or rejection under § 365(a), with the

resulting claim discharged under § 944(b).  There was no need for territorial legislation to

---

[9] Regardless, the Plan's means of implementation with respect to the treatment of claims resulting from
the freezes involves enrolling the affected individuals into the existing Act 106 plan, and thus relies on
existing legislation.  *See* Plan ¶ 55.9(d) ("Participants shall have his, her or their payroll deductions for
contributions to the Participant's individual accounts under Act 106 deposited into such accounts as soon
as reasonably possible.").

[10] The Associations' repeated attempts to compare this case to Detroit's restructuring are misguided.  *See,
e.g.*, Stay Mot. 25.  Detroit's plan of adjustment contained provisions materially reforming the city's
pension system, *see In re City of Detroit*, No. 13-bk-53846, ECF No. 8045-1 (Bankr. E.D. Mich. Oct. 22,
2014), which is unlike the limited treatment of retiree claims in Exhibit F-1 to the Plan.

17

discharge the Commonwealth's pension-related obligations; a discharge is explicitly permitted

by, and indeed is fundamental to, the Bankruptcy Code. *See* Findings of Fact ¶ 90; Confirmation

Order ¶ 55. Moreover, the provisions of Exhibit F-1 provide the details of the treatment of these

discharged claims as they relate to TRS participants at different ages and years of service.

Treatment of claims is a necessary component of any plan under Title III. *See* 11 U.S.C.

§ 1123(a)(3).

39.     The Associations' argument the Plan lacks enabling legislation also falls short for

the foregoing reasons. Stay Mot. 23–25. Pursuant to PROMESA § 314(b)(5), a debtor must

obtain legislative approval for a plan provision only when such legislative approval is "necessary

under applicable law." Applicable law means law not preempted. Otherwise, restructurings

would be impossible without local law authorization. The Associations point to no authority

requiring legislative approval to default on claims, such as claims for accrual of defined benefits

or claims to COLAs. Indeed, in the context of chapter 9 restructurings, municipalities have

routinely adjusted and discharged their pension obligations without the need to obtain any

legislative permission from local government. *See, e.g.*, *City of Prichard*, No. 09-bk-15000,

ECF No. 442 at 7 (confirming a municipal plan of adjustment that "eliminate[d] the

[municipality's] obligation to fund a pension plan for its employees" embodied in an Alabama

statute). Nor was legislation necessary to implement the Plan's other provisions relating to the

TRS freeze, which detail the treatment of claims arising from the freeze of the TRS plan.[11]

---

[11] The Associations argue that cases from the chapter 9 context are inapposite because in a chapter 9 restructuring, unlike here, "the filer of the plan has the power to legislate." *See* Stay Mot. 17. That is incorrect. The municipalities in the cases cited above had no authority to enact or modify state legislation providing for the discharged pension benefits. Conversely, the Oversight Board is the Title III representative of the Commonwealth. The Commonwealth has as much power to legislate, or more, than any chapter 9 municipality.

40.   The Associations' contention that enabling legislation was necessary because the Plan preempted all the Commonwealth's pension laws mischaracterizes the scope of the preemptions described in the Confirmation Order.  *See* Stay Mot. 24.  As the Court explained, the Commonwealth's pension laws are preempted only "to the extent they give rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA." Findings of Fact ¶ 155; *see also id.* n.31.  All other provisions of the pension laws governing the Associations' retirement system and benefits remain in effect or are otherwise not affected by the Plan.[12]

41.   Finally, the Associations argue the Oversight Board may only "invalidate" legislation—including the pension laws at issue—using PROMESA § 204(a).  Stay Mot. 17–18. That argument misses the mark for at least two reasons.  First, the Plan does not "invalidate" any legislation; rather, it preempts specific provisions of pension-benefit laws that are inconsistent with PROMESA's discharge provisions.  Second, PROMESA § 204(a) has no bearing on plan confirmation and adjustment of debts, which are governed by Title III of PROMESA, not Title II where Congress placed § 204(a).  Section 204(a) establishes an interactive process between the Commonwealth government and the Oversight Board to ensure that new Commonwealth legislation will not adversely affect the government's compliance with certified fiscal plans. Section 204(a) says nothing about plans of adjustment, discharge of claims, or preemption.

---

[12] The Associations' argument that the Court's preemption ruling "allow[s] the Oversight Board to subvert the reality of its inability to legislate" and gives the Oversight Board "legislative power to repeal existing statutes and enact legislation through the Plan" likewise fails for the same reasons.  *See* Stay Mot. 15–16.  As mentioned, the Plan merely compels default and provides treatment for retiree claims—the very things a plan is empowered to do under PROMESA and the Bankruptcy Code—which does not require enabling or implementing legislation.

### 3. *The Associations Have Not Raised a Serious Question Concerning the Court's Act 53 Analysis.*

42.     The Associations next argue the Confirmation Order should be overturned on appeal because the Plan fails to satisfy PROMESA § 314(b)(3)'s requirement that the debtor not be "prohibited by law from taking any action necessary to carry out the plan."  Stay Mot. 20–23. According to the Associations, the Plan "would force the Commonwealth to violate" Act 53, "which makes the Plan unconfirmable."  *Id.* at 22.  Thus, the Associations argue the Plan is not feasible because Act 53 does not authorize the new debt if the defined-benefit plans are frozen. To warrant a stay pending appeal, the Associations must show why Act 53 was wrongly interpreted by the Court.  They fail to do so.  As the Court previously held, there is no conflict between the Plan and Act 53.  Findings of Fact ¶ 90 & n.25; ¶ 152.

43.     By its plain terms, Act 53 authorizes the issuance of new debt under the Plan upon a single condition:  the elimination from the Plan of the "Monthly Benefit Modification."  *See* Act 53, Art. 104 ("The Legislative Assembly authorizes the issuance of [new debt] subject to the [Oversight Board] filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification."); Act 53, Art. 605 ("The effectiveness of [Act 53] is conditioned to the [Oversight Board] filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification as defined in the Plan.").  "Monthly Benefit Modification" is a defined term in the Seventh Plan.  It imposed an 8.5% reduction to monthly benefits that certain pensioners in the Commonwealth had already accrued.  *See* ECF No. 19249 at 7.[13]

---

[13] Specifically, the Monthly Benefit Modification provided for the reduction of up to 8.5% of monthly pension payments in excess of $1,500.  ECF No. 19249 at 7.  Such reduction was to be accomplished first through the reduction of bonus payments, and then through the reduction of a participant's monthly base

44.     In response to Act 53, the Oversight Board amended the Plan prior to confirmation to eliminate the Monthly Benefit Modification.  The confirmed Plan thus satisfies Act 53's sole condition—the elimination of the Monthly Benefit Modification.  The Associations' argument that the Plan violates Act 53 fails under a plain reading of the statute.

45.     The Associations nevertheless argue that Act 53 imposed additional conditions on the Plan beyond the elimination of the Monthly Benefit Modification.  Stay Mot. 20–22.  In their view, Act 53 also precludes the Plan from freezing the accrual of future pension benefits or eliminating COLAs.  The Court has already correctly rejected that argument because Act 53 by its terms merely prevents the Plan from cutting *accrued* benefits, but it does not preclude Plan provisions that act prospectively to prevent future defined benefits from accruing and to prevent future increases to pension benefits.  Findings of Fact at 70 n.25.

46.     The Associations' argument relies on Article 605 of Act 53, which provides:

> The effectiveness of this Law is conditioned to the [Oversight Board] filing an amended Plan for confirmation in the Title III court that eliminates the Monthly Benefit Modification as defined in the Plan. For the sake of clarity, this act shall immediately cease to be in effect and any transactions undertaken pursuant to it if reductions to the pensions of government employees are decreed or implemented under the Debt Adjustment Plan or the restructuring of the debt.  The continued effect of this act is contingent upon cero [*sic*] cuts to pensions.[14]

47.     Article 605 supports the Oversight Board, not the Associations, because it expressly conditions Act 53 on the elimination of the Monthly Benefit Modification alone.  The Associations contend that Article 605's reference to "[z]ero cuts to pensions" prohibits the Plan

---

pension in the event the participant's total monthly benefits were still in excess of $1,500 following the bonus reductions.  *Id.*

[14] The official English translation of Act 53 refers to "cero cuts to pensions."  "Cero" is Spanish for "zero" and was erroneously left in its Spanish form in the English translation of Act 53.

21

from freezing the accrual of additional defined benefits and eliminating COLAs in the future.

Stay Mot. 20–21.  But the phrase "[z]ero cuts to pensions" refers to reductions to pensions that

have already accrued.  The Puerto Rico Legislature said so when it explained the policy of Act

53 is "to protect the *accrued* pensions of [Puerto Rico's] public servants."  Act 53, Art. 104

(emphasis added).  Neither the Plan's freeze nor its COLA elimination "cut" anyone's accrued

pension benefits; they merely prevent certain pensioners from accruing additional benefits in the

future.  As the Court explained, "[n]o language in Act 53 indicates a legislative intent to

preclude" provisions that "operate[] prospectively," such as "the defined benefit accrual 'freeze'

or the elimination of COLAs[.]"  Findings of Fact at 70 n.25.[15]

48.     The Associations' reliance on the phrase "[z]ero cuts to pensions" in Article 605

divorces it from its statutory context.  *See Beecham v. United States*, 511 U.S. 368, 372 (1994)

(courts look to "plain meaning of the whole statute, not of isolated sentences.").  As mentioned,

Article 605 begins by providing Act 53 is conditioned solely on the elimination of the Monthly

Benefit Modification.  The remainder of the Article begins with the phrase "For the sake of

clarity . . . ," meaning that the balance of Article 605 (including the phrase "[z]ero cuts to

pensions") does not impose any additional conditions but rather "merely restate[s] . . . the policy

of protecting accrued pension rights."  Findings of Fact at 70 n.25.  The Associations fail to

explain why the legislature would specify elimination of Monthly Benefit Modifications but not

specify the elimination of the freeze, when the freeze dwarfs the economic impact of the

Monthly Benefit Modifications.  When appellants fail to show how their position comports with

common sense and logic, they do not raise a serious question or show a likelihood of success.

---

[15] Further, the Plan's COLA elimination does not even affect the Associations' constituents.  COLAs
were eliminated for TRS participants at least 14 years ago.  *See* ECF No. 19057 ¶ 19.

49.     The Associations' position also violates the canon that a specific statutory

provision must prevail over a general one.  *See RadLAX Gateway Hotel, LLC v. Amalgamated

Bank*, 566 U.S. 639, 645 (2012).  Act 53 imposes a specific requirement:  the elimination of the

Monthly Benefit Modification.  It would be improper to infer additional requirements from a

general provision—"[z]ero cuts to pensions"—which is intended merely to emphasize, "[f]or the

sake of clarity," the importance of eliminating the Monthly Benefit Modification.

50.     Because the text of Act 53 is unambiguous, there is no need to reference

legislative history or other extrinsic evidence.  *See Scotiabank de P.R. v. Burgos (In re Plaza

Resort at Palmas, Inc.)*, 741 F.3d 269, 274 (1st Cir. 2014) ("Statutory construction in Puerto

Rico begins with the text of the underlying statute, and ends there as well if the text is

unambiguous.").  The legislative history nevertheless confirms the plain reading of the Act.  As

the Associations previously conceded, earlier versions of Act 53 specifically addressed the freeze

of defined-benefit accruals and the elimination of future COLAs.  *See* ECF No. 19180 at 27.  All

references to the freeze and COLAs were eliminated from the final legislation, however.  That is

clear evidence that the Puerto Rico Legislature considered—and decided against—conditioning

the issuance of new debt on the elimination of the freeze and COLA provisions from the Plan.

51.     Similarly, the Statement of Motives upon which the Associations rely (*see* Stay

Mot. 21) confirms the Oversight Board's interpretation when it declares "the Commonwealth

supports the Plan, along with the public policies set forth in this Law which . . . includes zero

cuts to pensions of current retirees and current *accrued* benefits of active public employees . . . ."

*See* Act 53-2021, Statement of Motives at 37 (emphasis added).  The Associations' contention

that the freeze and COLA elimination violate Act 53 is thus contradicted not only by the plain

text of the Act but also by its legislative history and Statement of Motives, which explain the

legislation is focused on "accrued" benefits.[16]

### 4. The Associations Have Not Shown that the Plan Is Not Feasible.

52. The Associations' final argument—that the Plan is not feasible—turns on its prior

three arguments and thus fails for the same reasons. Stay Mot. 25–26. According to the

Associations, the freeze and the elimination of future COLAs were improper, and the Plan is not

feasible without them. *Id.* While the Associations are correct that the Plan is not feasible

without them, for all the reasons above, the Associations have failed to raise a serious issue as to

whether Act 53 requires elimination of the freeze and reinstatement of COLAs. The Plan is

therefore feasible, as the Court correctly found. Findings of Fact ¶¶ 188–210.

53. Each of the four arguments advanced by the Associations fails to raise a serious

legal issue, let alone establish a likelihood of success. Therefore, their request for a stay should

be denied. *See New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)

("The sine qua non of this four-part inquiry is likelihood of success on the merits."). To the

extent the Court considers the other stay factors, they likewise militate against the requested stay.

### B. The Associations Fail to Establish Irreparable Harm Absent a Stay.

54. A movant seeking the extraordinary remedy of a stay pending appeal bears the

burden of showing "irreparable injury is likely to occur during the period before the appeal is

decided." *Doe v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020). A mere "possibility of

---

[16] In their stay motion, the Associations argue for the first time that the Plan should not have been
confirmed because it fails to provide adequate funding for public pensions. Stay Mot. 23. Because the
Associations did not raise that argument in their objections to confirmation, they cannot raise it on appeal.
*See Iverson v. City of Bos.*, 452 F.3d 94, 102 (1st Cir. 2006). Moreover, the requirement of adequate
funding for pensions applies to fiscal plans, not plans of adjustment. *See* PROMESA § 201(b)(1)(C).
The Court found that the Plan is consistent with the fiscal plan, and the Associations make no argument
that such finding was clearly erroneous. In any event, a determination that a fiscal plan provides adequate
funding for pensions is in the Oversight Board's sole discretion and not reviewable. *Id.* § 106(e).

irreparable injury" pending review is insufficient. *See Nken*, 556 U.S. at 434–35 (quotation marks omitted). The risk of irreparable injury must be "neither remote nor speculative, but actual and imminent." *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015).

55. The Associations argue that, absent a stay, they will be irreparably harmed because their appeal may become equitably moot before it is resolved. Stay Mot. 26–30. That argument fails as a matter of law because "the potential mootness of matters on appeal is not sufficient to demonstrate 'irreparable harm.'" *Betterecycling Corp. v. Firstbank Puerto Rico (In re Betteroads Asphalt, LLC)*, No. 19-2019, 2020 WL 3125274, at *10 (D.P.R. Jun. 12, 2020); *see also In re Betteroads Asphalt, LLC*, 610 B.R. 28, 49 (Bankr. D.P.R. 2019) (siding with the "majority of courts" that deem "a risk of mootness" insufficient to justify a stay); *In re Int'l Home Prods.*, No. 12-2997, 2012 WL 6708431, at *7 (Bankr. D.P.R. Dec. 26, 2012).[17] That rule makes eminent sense. The risk of equitable mootness is "present in any post-confirmation appeal of a [reorganization] plan." *In re Calpine Corp.*, No. 05-60200, 2008 WL 207841, at *4 (Bankr. S.D.N.Y. Jan. 24, 2008). If the risk that an appeal could become moot alone were sufficient to justify a stay pending appeal, "a stay would be issued in every case." *In re W.R. Grace & Co.*, 475 B.R. 34, 207 (D. Del. 2012). Such a rule would transform a stay pending appeal from "extraordinary" to commonplace. *In re MJS Las Croabas Props.*, No. 12–5710, 2015 WL 4039393, at *2 (Bankr. D.P.R. Jun. 30, 2015).

---

[17] The overwhelming weight of authority outside this district is in accord. *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 682 (Bankr. S.D.N.Y. 2016) ("A majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm."); *Ohanian v. Irwin (In re Irwin)*, 338 B.R. 839, 853 (E.D. Cal. 2006) ("It is well settled that an appeal being rendered moot does not itself constitute irreparable harm."); *In re Convenience USA, Inc.*, 290 B.R. 558, 563 (Bankr. M.D.N.C. 2003) ("[A] majority of the cases . . . have found that the risk that an appeal may become moot does not, standing alone, constitute irreparable injury."); *see also BDC Cap., Inc. v. Thoburn Ltd. P'ship*, 508 B.R. 633, 639 (E.D. Va. 2014); *Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.)*, 388 B.R. 619, 627 (Bankr. E.D. Pa. 2008); *In re 203 N. LaSalle St. P'ship*, 190 B.R. 595, 598 (N.D. Ill. 1995).

56.     Further, the Associations do not meet their burden to show why their particular appeal would be equitably moot absent a stay.  Instead, they speculate that, because the First Circuit found another appeal involving different facts equitably moot, it could find equitable mootness here.  Stay Mot. 26.  Equitable mootness turns on the specific equities of a case, including the appellants' degree of diligence and the extent to which appellate relief would be inequitable.  *See Pinto-Lugo v. Fin. Oversight & Mgmt. Bd. for P.R. (In re Fin. Oversight & Mgmt. Bd. for P.R.)*, 987 F.3d 173, 181 (1st Cir. 2021).  Although the Oversight Board reserves the right to argue that the Associations' appeal may become moot depending on future events, for purposes of this stay motion the Associations have made no showing that mootness is likely to occur.  *See Betteroads Asphalt, LLC*, 610 B.R. at 48 ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

57.     Beyond unsupported arguments about equitable mootness, the only "harm" identified in the stay motion is a loss of money.  Stay Mot. 26–30 & Exs. 1–8.  The Oversight Board understands that these amounts are crucial for the retirees' daily livelihood.  That is part of the reason why the Oversight Board insisted that the retirees receive the highest recovery of any class of creditors under the Plan.  Nevertheless, as a general matter, harm that is "adequately compensable by money damages" is not irreparable.  *See CoxCom, Inc. v. Chaffee*, 536 F.3d 101, 112 (1st Cir. 2008) (quoting *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000)).  The Oversight Board also understands the assertions of the Associations' declarants that expected future pension benefits will decline as a result of the freeze.  The reduction of future pension obligations of the Commonwealth through the freeze of its remaining defined benefit systems, such that all accrued benefits through the Effective Date will be affordable, is

26

indeed a central and essential feature of the Commonwealth's debt restructuring and fiscal

reform.[18]  But, for the reasons explained above, the employees' claims for loss of future

increased defined benefits are treated under the Plan and the Associations failed to allege or

prove the treatments are inadequate under Title III.  They are not entitled to a stay when they

never raised or proved inadequate treatment.

>    **C.    A Stay Would Substantially Harm the Commonwealth and Other Interested
>           Parties.**

58.    Because the Associations have not satisfied either of the first two factors of the

test for a stay, the Court "need not dwell on the final two factors—harm to the opposing party

and the public interest."  *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1014 (9th Cir. 2020) (quotation

marks omitted); *see also Chevron Corp. v. Donziger*, 37 F. Supp. 3d 653, 671 (S.D.N.Y. 2014).

In any event, the final two factors likewise strongly militate against a stay.

59.    The harm a stay would inflict on the Commonwealth, its creditors, and other

stakeholders cannot be overstated.  For one thing, a stay would be potentially catastrophic to the

Debtors' reorganization efforts.  As the Court recognized, the Plan is "a crucial step in the effort

to achieve the economic recovery of the Commonwealth of Puerto Rico and its

instrumentalities."  Findings of Fact at 14.  Delaying the Plan's implementation by imposing a

stay that would likely persist for at least several months while an appeal is litigated creates a

significant risk of undermining the Plan and all the benefits the residents of Puerto Rico will

---

[18] Many of the declarants assert that their participation in the Act 106 plan will only provide them the
amount of the contributions they make, without any acknowledgement or calculation of the offsetting
benefit of the tax-deferred investment income and returns they would realize if the funds are invested with
reasonable prudence, and none quantify the amount of Social Security benefits most of them could accrue
from the Commonwealth's contributions for the remainder of their careers.  Additionally, the
circumstances of teachers on the verge of retirement who did not opt to take advantage of service
purchase rights in applying for retirement raises the question of why the Associations did not educate
their members of the Plan's provisions to better plan for the freeze's implementation.

receive thereunder.  The Plan took years to negotiate and has the overwhelming support of the

Commonwealth's creditors.  If the Plan were to unravel during the stay, the Commonwealth and

its creditors would be back where they started at the outset of these Title III cases five years ago.

*Cf. In re Scrub Island Dev. Grp. Ltd.*, 523 B.R. 862, 878–79 (Bankr. M.D. Fla. 2015) (denying

stay because "every day that passes without the Debtors being able to" obtain capital "materially

diminishes the likelihood that the Debtors' reorganization efforts will be successful"); *In re*

*Yellowstone Mt. Club, LLC*, No. 08-61570, 2009 WL 2163528, at *4 (Bankr. D. Mont. Jul. 16,

2009) (holding that even a partial stay "may very likely . . . derail[]" a sale of the debtors' assets,

causing the debtors to cease operations and frustrating the confirmed plan); *In re Public Serv.*

*Co.*, 116 B.R. 347, 350 (Bankr. D.N.H. 1990) ("[T]he huge financing required by this plan would

be severely jeopardized by a stay . . . [, and] the possible failure of any plan of reorganization as

a consequence of a stay [is] a significant injury.").  Securing supporting legislation for the Plan

required extensive negotiations with Puerto Rico's Governor and Legislature.  The more time

that passes, the greater the probability that interest groups disapproving of the restructuring will

seek new legislation to undermine it.

60.    A stay would also needlessly delay the Commonwealth's financial recovery.  The

Associations argue a stay would merely "preserve the status quo" (Stay Mot. ¶ 89), but that is

precisely the point.  The status quo in Puerto Rico is a fiscal emergency.  PROMESA

§ 405(m)(1).  Preserving the status quo and extending that fiscal emergency would delay new

investment by investors who will not invest until the Commonwealth's debt is resolved.  Delayed

investment means delayed creation of jobs and value.

61.    In addition to putting the Commonwealth's restructuring at risk, a stay would

impose significant financial harm on the Commonwealth, its creditors, and other stakeholders.

28

For example, a stay would delay the distribution of approximately $10.8 billion to creditors under the Plan, causing creditors to lose vast amounts of interest.  Santambrogio Decl.[19] ¶ 21. "[D]elay caused to creditors receiving their payment is . . . a significant harm warranting denial of a stay" pending appeal.  *Fraterfood Serv. v. DDR Del Sol, LLC (In re Fraterfood Serv.)*, No. 14-bk-00002, 2015 Bankr. LEXIS 3081, at *6 (Bankr. D.P.R. Sept. 11, 2015); *see also In re Abengoa Bioenergy Biomass of Kan., LLC*, No. 16-10446, 2018 WL 1613667, at *9 (D. Kan. Mar. 29, 2018) ("Significant delay in the distribution to creditors under a plan constitutes substantial harm."); *ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 342 (Bankr. S.D.N.Y. 2007) (noting the "weighty interest[]" of "the right of the majority of creditors to receive their distributions"); *In re Great Barrington Fair & Amusement, Inc.*, 53 B.R. 237, 240 (Bankr. D. Mass. 1985) ("The chief harm which will be caused by a stay is the delay which will be suffered by the other creditors.").  The Associations dismiss that harm by noting creditors have already waited five years to get paid.  Stay Mot. ¶ 89. But the fact creditors have already had to wait several years to have their debts satisfied is all the more reason not to impose any additional needless delays.

62.    Below, in the context of its discussion of an appellate bond, the Oversight Board describes other financial harms that a stay would impose on the Commonwealth, its creditors, and other stakeholders.  *See* Point II, *infra*.  Needless to say, those harms are significant and counsel strongly against imposing a stay.[20]

---

[19] As defined *infra*.

[20] The Associations' contention that there would be no harm to other parties because the Plan has not received proper enabling legislation conflates the merits and harm prongs of the stay analysis and fails in any event for the reasons already discussed.

29

**D.    The Public Interest Strongly Disfavors a Stay.**

63.    The Associations' contention that the public interest is "not affected by the proposed stay" is disingenuous.  Stay Mot. 31.  Nothing is more significant to the public interest of Puerto Rico than the Plan's prompt implementation.  In the Court's words, Plan confirmation is "crucial" to the Commonwealth's economic recovery.  Findings of Fact at 14.  The Plan is necessary both for the Commonwealth to "provide future public services" and to "remain a viable public entity."  *Id.* at ¶ 205.  Absent the Plan, the Commonwealth would face tremendous uncertainty, instability, and litigation.  *Id.* at ¶ 218.  The Plan restructures $33 billion in bond debt and has put Puerto Rico on the path to fiscal responsibility and access to the capital markets. Any delay of the Effective Date, which could imperil the Plan and the Commonwealth's, ERS's, and PBA's restructuring is strongly against the public interest.

64.    Putting aside the Associations and a handful of other dissenters, the vast majority of stakeholders in Puerto Rico approved the Plan and want to see it implemented expeditiously. Given that strong public support, the Associations' contention that stay does not affect the public interest rings hollow.  Notably, the Governor, who represents the public interest far better than the Association, has stated it is in Puerto Rico's best interest to quickly emerge from Title III.[21]

**II.    ANY STAY MUST BE CONDITIONED ON A SUBSTANTIAL APPELLATE BOND.**

65.    If the Court were to grant a stay, it should order the Associations to post a supersedeas bond in the amount of at least $1.5 billion in accordance with Federal Rule of Bankruptcy Procedure 8007(c).

---

[21] *See, e.g.*, Nicole Acevedo & Gabe Gutierrez, *Will Puerto Rico's Debt-restructuring Deal End the Largest Bankruptcy in U.S. History?* NBC News (Oct. 29, 2021, 2:21 PM), https://www.nbcnews.com/ news/latino/will-puerto-ricos-debt-restructuring-deal-end-largest-bankruptcy-us-hi-rcna4051.

66.     A bond is a "standard requirement of granting a stay." *Adelphia Commc'ns Corp.*, 361 B.R. at 350.  It protects the prevailing party from any losses resulting from the stay in the event the appeal is unsuccessful, including interest on amounts withheld during the stay period.  *See In re Roussos*, 2017 WL 766897, at *1 (Bankr. C.D. Cal. Feb. 27, 2017); *In re Miraj & Sons, Inc.*, 201 B.R. 23, 28 (Bankr. D. Mass. 1996); 10 Collier on Bankruptcy ¶ 8007.09[1] (16th ed. 2020).  A bond also protects third parties, including creditors and other stakeholders, from losses they may incur as a result of the stay.  *In re Tribune*, 477 B.R. 465, 478 (Bankr. D. Del. 2012); *In re Calpine*, 2008 WL 207841, at *7.

67.     There is a strong policy in favor of securing a prevailing party against losses arising during a stay pending appeal.  *Ratcliff v. Rancher's Legacy Meat Co.*, 2020 WL 4048509, at *14 (D. Minn. July 20, 2020).  Accordingly, any departure from the bond requirement represents "a truly extraordinary exercise of discretion," *In re VVF Comms. Corp.*, 41 B.R. 546, 550 (Bankr. D.D.C. 1984), warranted only where there are "exceptional circumstances" and an alternative means of securing the prevailing party's interests, *In re Weinhold*, 389 B.R. 783, 788–89 (Bankr. M.D. Fla. 2008).  A movant seeking a stay without posting a bond bears "the burden of demonstrating why the court should deviate from the ordinary full security requirement." *W.R. Grace & Co.*, 475 B.R. at 209.

68.     In their stay motion, the Associations make no attempt to show that extraordinary circumstances warrant a departure from the requirement that they post a bond in support of any stay that might issue.

69.     With respect to the bond amount, "the court should set a bond at or near the full amount of the potential harm to the non-moving parties." *Adelphia Commc'ns Corp.*, 361 B.R. at 368; *see also Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC)*,

31

2008 WL 650389, at \*5 (S.D.N.Y. Mar. 7, 2008) (a bond should be "commensurate with the threatened loss to the non-moving parties").  To determine an appropriate bond amount in a bankruptcy case, courts consider the cash distributions creditors would have received but for the stay, incremental administrative expense costs including payments to professional advisors, and other foreseeable costs arising from a delay in implementing the restructuring.  *See, e.g.*, *In re Tribune Co.*, 477 B.R. at 480–81.  Because the stay of an order confirming a reorganization plan typically affects many parties, courts have imposed sizable bonds in the rare bankruptcy cases where a stay has been granted.  *See, e.g.*, *In re Gen. Motors*, 409 B.R. 24, 34 (Bankr. S.D.N.Y. 2009) (denying stay but noting that stay would have required $7.4 billion bond); *In re Tribune Co.*, 477 B.R. at 483 ($1.5 billion bond); *In re Adelphia*, 361 B.R. at 368 ($1.3 billion bond, later reduced); *In re Calpine*, 2008 WL 207841, at \*7 ($900 million bond).

70.     Here, a bond should be set at an amount that covers the enormous harm a stay would inflict on the non-moving parties.  If the Effective Date is delayed, the Commonwealth, its creditors, and other stakeholders stand to lose hundreds of millions of dollars.  Those potential losses fall within at least four categories.

71.     *First*, the Commonwealth would incur tens of millions of dollars in additional pension liability if the Plan's implementation is delayed.  Under the Plan, all active TRS and JRS participants will cease accruing new benefits on the Effective Date.  *See* Plan §§ 55.8, 55.9, Exs. E, F.  If the Effective Date is delayed, those pensioners would continue to accrue new benefits during the stay period, which will irrevocably increase the Commonwealth's long-term PayGo obligations to those participants.  As set forth in the attached *Declaration of Sheva R. Levy* ("Levy Decl."), the magnitude of the additional pension obligations the Commonwealth would incur depends on the length of the stay.  If a stay were in place for three months, the

Commonwealth would incur an additional $65 million in pension liabilities.  Levy Decl. ¶ 23.  A

stay would cost the Commonwealth an additional $185 million over six months, $281 million

over nine months, and $408 million if the stay were to remain in place for a year.  *Id.*

72.    *Second*, a stay would cost the Debtors millions of dollars in administrative fees.

During the Title III case, the Debtors have on average incurred more than $14 million per month

in professionals' fees, including fees paid to the legal and financial advisors of the Debtors, the

Retiree Committee, and the Creditors' Committee.[22]  The Debtors will need to retain most of

those professionals through the Plan's implementation.  Any delay in the Plan's implementation

would therefore require the Debtors to retain these professionals for additional time and incur

additional professional fees.  *See In re Tribune Co.*, 477 B.R. at 480 (factoring into bond amount

the incremental administrative and professional costs of stay); *In re NASDAQ Mkt.-Makers*

*Antitrust Litig.*, 187 F.R.D. 124, 129 (S.D.N.Y. 1999) (requiring a bond to include "damages

resulting from the delay and/or disruption of settlement administration caused by his appeal").

---

[22] This estimate is based on the most recent fee applications covering at least 8 months for the following
service providers:  Alvarez & Marsal (ECF Nos. 17343, 17345, 17355, 19239, 19241, 19245), Ankura
Consulting Group, LLC (ECF Nos. 18168 & 19634), Brattle Group, Inc. (ECF Nos. 15347, 16074,
17393, 19275), Casillas, Santiago, & Torres LLC (16064 & 19229), Epiq Corporate Restructuring, LLC
and Epiq eDiscovery Solutions (ECF Nos. 18293 & 18296), Ernst & Young (ECF Nos. 18494 & 19849),
Estrella, LLC (ECF Nos. 16317 & 18130), FTI Consulting, Inc. (ECF Nos. 17364 & 19224), Genovese
Joblove & Battista, P.A. (ECF Nos. 17365 & 19219), Ileana Cardona Fernandez Esq. (ECF Nos. 17346 &
19191), Jenner & Block LLP (ECF Nos. 17363 & 19230), Kroma Advertising, Inc. (ECF Nos. 17377 &
19236), Luskin, Stern & Eisler LLP (ECF Nos. 17396 & 19215), Marchand ICS Group (ECF Nos. 17371
& 19226), Marini Pietrantoni Muniz LLC (ECF Nos. 17357 & 19223), McKinsey & Co. (ECF Nos.
16446 & 18003), Munger, Tolles & Olson LLP (ECF No. 17553), O'Melveny & Myers LLP (ECF Nos.
15477 & 16768), O'Neill & Borges LLC (ECF Nos. 18127 & 19412), Paul Hastings LLP (ECF Nos.
17380 & 19238), PJT Partners LP (ECF Nos. 19494 & 19805), Proskauer Rose LLP (ECF Nos. 17587,
17589, 17596, 19689, 19692, 19696), Segal Consulting (ECF Nos. 17369 & 19227), Zolfo Cooper, LLC
(ECF Nos. 17378 & 19237), Brown Rudnick LLP (ECF Nos. 17740 & 19321; Case No. 17-BK-3566-
LTS, ECF Nos. 1208, 1263), and DiCiccio, Gulman & Co., LLP (ECF Nos. 17349 & 19195; Case No.
19-BK-5523-LTS, ECF No. 225).  This figure represents a conservative estimate, computed using only
those providers who have submitted at least one fee application in 2021 or later, and only factoring in
consecutive fee periods.

73.     *Third*, a stay would have a substantial impact on the funding of the pension

reserve fund established under the Plan to protect retirees in the Commonwealth.  *See* Plan art.

83.  As explained in the attached *Declaration of Juan Santambrogio* ("Santambrogio Decl."), the

Plan creates a Pension Reserve Trust ("PRT") for the benefit of retirees, which is funded through

contributions of at least 50% of the Commonwealth's Projected Fiscal Plan Surplus each fiscal

year for ten years following Plan's implementation.  Plan § 83.2.  The Commonwealth's largest

surplus is projected to occur during the 2022 Fiscal Year, which ends June 30, 2022.

Santambrogio Decl. ¶¶ 18–20.  If the Effective Date is delayed beyond June 30, the

Commonwealth would not contribute surpluses to the PRT until FY2023, which would result in

a total reduction of the PRT's funding over ten years by $960 million.  *Id.*

74.     *Fourth*, delaying the Plan's implementation would deprive creditors of significant

interest payments on distributions.  Under the Plan, approximately $10.8 billion in cash is to be

distributed to creditors after the Effective Date.  *Id.* ¶ 21.  Assuming a reasonable rate of return

of 5%[23], creditors would lose approximately $45 million per month in investment earnings if

distributions are delayed.  *See In re Tex. Equip. Co., Inc.*, 283 B.R. 222, 230 (Bankr. N.D. Tex.

2002) (including in bond "the time value of the money"); *Tribune*, 477 B.R. at 480–81 (same).

75.     The median time for an appeal to be resolved by the First Circuit is 13.6

months.[24]  Even if the Associations' appeal is expedited, it is unlikely to be resolved less than six

months after the Plan's Effective Date.  Accordingly, as a prerequisite to any stay, the

---

[23] The Debtors used an assumed discount rate of 5.00% as the rate of return on investment in the best
interests of creditors tests reports.  *See* Disclosure Statement, ECF No. 17628, Ex. P.

[24] *See* United States Courts for the First Circuit 2018 Annual Report at 18, https://www.ca1.uscourts.gov/
sites/ca1/files/2018%20Annual%20Report.pdf.  Notably, this data is pre-pandemic, and administrative
delays associated COVID-19 have likely extended the time for appeals to be resolved.

Associations should at a minimum be required to post a bond covering the harm to other parties if a stay of Plan implementation were to remain in place for six months.

76.     A six-month stay would cost creditors $270 million in interest, cause the Commonwealth to incur $185 million in additional pension liabilities, cost the PRT $960 million, and result in the debtors incurring approximately $84 million in additional professional fees.  Therefore, at the least, an appellate bond should be set at $1.5 billion.  That amount does not account for the risk that the stay might undermine the Commonwealth's entire restructuring.

77.     To the extent the Associations complain they cannot afford to post a bond in that amount, it is not a reason for lifting the bond requirement.  To the contrary, an inability "to post a bond commensurate with the threatened loss to the non-moving parties . . . only serves to highlight the substantial risk of dramatic injury to Debtors and other creditors if the Bankruptcy Court's orders [are] erroneously stayed."  *DJK Residential, LLC*, 2008 WL 650389, at *5; *cf. Porter v. NationsCredit Consumer Discount Co.*, 2007 WL 674709, at *1–2 (E.D. Pa. Feb. 28, 2007) (holding that inability to post bond without alternative proposal to secure judgment is insufficient to justify departure from bond requirement), *aff'd*, 285 F. App'x 871 (3d Cir. 2008).

## CONCLUSION

78.     The Debtors respectfully request the Court deny the Stay Motion.  If the Court grants the stay, it should require the Associations to post a bond of at least $1.5 billion.

Dated: February 9, 2022
     San Juan, Puerto Rico

Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*Pro Hac Vice*)
Jeffrey W. Levitan (*Pro Hac Vice*)
Ehud Barak (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

Paul V. Possinger (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, IL 60602
Tel:  (312) 962-3550
Fax:  (312) 962-3551

Timothy W. Mungovan (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
One International Place
Boston, MA 02110
Tel:  (617) 526-9600
Fax:  (617) 526-9899

Michael A. Firestein (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel:  (310) 557-2900
Fax:  (310) 557-2193

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico as
representative for the Debtors*

*/s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel: (787) 647-3503

**OF COUNSEL FOR
A&S LEGAL STUDIO, PSC**
434 Avenida Hostos
San Juan, PR 00918

36

Tel: (787) 751-6764 / 763-0565
Fax: (787) 763-8260

*Co-Attorneys for the Financial Oversight and Management Board for Puerto Rico as representative for the Debtors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 9, 2022, I caused the foregoing document to be

electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all CM/ECF participants in this case.

<u>/s/ *Luis F. del Valle-Emmanuelli*</u>
Luis F. del Valle-Emmanuelli

38