# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative of THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br><div align="right">Debtors.[1]</div> | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| COOPERATIVA DE AHORRO Y CRÉDITO ABRAHAM ROSA, COOPERATIVA DE AHORRO Y CRÉDITO DE CIALES, COOPERATIVA DE AHORRO Y CRÉDITO DE RINCÓN, COOPERATIVA DE AHORRO Y CRÉDITO VEGA ALTA, COOPERATIVA DE AHORRO Y CRÉDITO DR. MANUEL ZENO GANDÍA, AND COOPERATIVA DE AHORRO Y CRÉDITO DE JUANA DÍAZ,<br><br><div align="right">Movants,</div><br><div align="center">v.</div><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative of THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH | **Re: ECF No. 20035** |

---

[1] The Debtors in the Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

OF PUERTO RICO, AND THE PUERTO RICO
PUBLIC BUILDINGS AUTHORITY,

                              Respondents.

**OPPOSITION OF THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES
RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF
PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY TO
THE FEBRUARY 4, 2022 MOTION FOR STAY PENDING APPEAL**

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

PRELIMINARY STATEMENT ................................................................................. 1

RELEVANT BACKGROUND ................................................................................. 4
    A.    PROMESA and the Oversight Board ................................................... 4
    B.    The Cooperativas' Adversary Proceeding ........................................... 4
    C.    The Plan of Adjustment ...................................................................... 5

ARGUMENT ......................................................................................................... 7
I.    THE COOPERATIVAS DO NOT SATISFY ANY OF THE CRITERIA FOR A
    STAY PENDING APPEAL. ............................................................................ 7
    A.    The Cooperativas Are Exceedingly Unlikely to Prevail on Their Appeal.............. 8
        1.    The Cooperativas Fail to Show a Likelihood of Success Based on
            Their Takings Claims........................................................... 11
        2.    The Cooperativas Fail to Show a Likelihood of Success on Appeal
            Based on Their Fraud Claims. ................................................... 13
    B.    The Cooperativas Fail to Establish Irreparable Harm Absent a Stay. ................. 16
    C.    A Stay Would Substantially Harm the Commonwealth and Other Interested
        Parties.................................................................................................. 18
    D.    The Public Interest Strongly Disfavors a Stay.................................... 20
II.    ANY STAY MUST BE CONDITIONED ON A SUBSTANTIAL APPELLATE
    BOND. ....................................................................................................... 21

CONCLUSION...................................................................................................... 26

CERTIFICATE OF SERVICE ............................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*A&D Auto Sales, Inc. v. United States*,
    748 F.3d 1142 (Fed. Cir. 2014)................................................................11

*ACC Bondholder Grp. V. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns
    Corp.)*,
    361 B.R. 337 (Bankr. S.D.N.Y. 2007).................................................19, 21, 22

*Al Otro Lado v. Wolf*,
    952 F.3d 999 (9th Cir. 2020) .............................................................18

*BDC Cap., Inc. v. Thoburn Ltd. P'ship*,
    508 B.R. 633 (E.D. Va. 2014)............................................................17

*Betterecycling Corp. v. Firstbank Puerto Rico (In re Betteroads Asphalt, LLC)*,
    2020 WL 3125274 (D.P.R. Jun. 12, 2020) .............................................17

*Chevron Corp. v. Donziger*,
    37 F. Supp. 3d 653 (S.D.N.Y. 2014)....................................................18

*Common Cause R.I. v. Gorbea*,
    970 F.3d 11 (1st Cir. 2020)..............................................................7

*Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
    508 U.S. 602 (1993) .....................................................................12

*Doe v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ..........................................................16

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005).....................................................................12

*Fraterfood Serv. v. DDR Del Sol, LLC (In re Fraterfood Serv.)*,
    2015 Bankr. LEXIS 3081 (Bankr. D.P.R. Sept. 11, 2015)..........................19

*HSBC Bank USA v. Branch (In re Bank of New England Corp.)*,
    364 F.3d 355 (1st Cir. 2004)............................................................15

*In re 203 N LaSalle P'ship*,
    190 B.R. 595 (N.D. Ill. 1995) ...........................................................17

*In re Abengoa Bioenergy Biomass of Kan., LLC*,
    2018 WL 1613667 (D. Kan. Mar. 29, 2018) .........................................19

*In re Betteroads Asphalt, LLC*,
610 B.R. 28 (Bankr. D.P.R. 2019) ......................................................... 17

*In re Calpine Corp.*,
2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008) .................................... 17, 21, 22

*In re Convenience USA, Inc.*,
290 B.R. 558 (Bankr. M.D.N.C. 2003) ................................................... 17

*In re Gen. Motors*,
409 B.R. 24 (Bankr. S.D.N.Y. 2009) ..................................................... 22

*In re Great Barrington Fair and Amusement, Inc.*,
53 B.R. 237 (Bankr. D. Mass. 1985) ..................................................... 19

*In re Int'l Home Prods.*,
2012 WL 6708431 (Bankr. D.P.R. Dec. 26, 2012) ................................... 17

*In re Miraj & Sons, Inc.*,
201 B.R. 23 (Bankr. D. Mass. 1996) ..................................................... 21

*In re MJS Las Croabas Props.*,
2015 Bankr. LEXIS 2147 (Bankr. D.P.R. Jun. 30, 2015) ......................... 17

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 124 (S.D.N.Y. 1999) ......................................................... 24

*In re Pub. Serv. Co.*,
116 B.R. 347 (Bankr. D.N.H. 1990) ..................................................... 18

*In re Revel AC, Inc.*,
802 F.3d 558 (3d Cir. 2015)................................................................ 16

*In re Roussos*,
2017 WL 766897 (Bankr. C.D. Cal. Feb. 27, 2017)................................. 21

*In re Sabine Oil & Gas Corp.*,
548 B.R. 674 (Bankr. S.D.N.Y. 2016) ................................................... 17

*In re Scrub Island Dev. Grp. Ltd.*,
523 B.R. 862 (Bankr. M.D. Fla. 2015) ................................................. 18

*In re Texas Equip. Co., Inc.*,
283 B.R. 222 (Bankr. N.D. Tex. 2002)................................................. 25

*In re Tribune, Co.*,
447 B.R. 465 (Bankr. D. Del. 2012) ............................................. 21, 22, 24, 25

iii

*In re VVF Comms. Corp.*,
 41 B.R. 546 (Bankr. D.D.C. 1984) ....................................................................21

*In re W.R. Grace & Co.*,
 475 B.R. 34 (D. Del. 2012) ......................................................................17, 22

*In re Weinhold*,
 389 B.R. 783 (Bankr. M.D. Fla. 2008) ..........................................................22

*MEDSCI Diagnostics, Inc. v. State Ins. Fund Corp (In re MEDSCI Diagnostics, Inc.)*, 2011 WL 280866 (Bankr. D.P.R. Jan. 25, 2011) ...............................7

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
 287 F.3d 1 (1st Cir. 2002) .............................................................................16

*New Haven Inclusion Cases*,
 399 U.S. 392 (1970)..........................................................................................9

*Nken v. Holder*,
 556 U.S. 418 (2009)..................................................................................7, 16

*Ohanian v. Irwin (In re Irwin)*,
 338 B.R. 839 (E.D. Cal. 2006)........................................................................17

*Penn Central Transp. Co. v. New York City*,
 438 U.S. 104 (1978)......................................................................................8, 9

*Porter v. NationsCredit Consumer Disc. Co.*,
 2007 WL 674709 (E.D. Pa. Feb. 28, 2007) ...................................................26

*Ratcliff v. Rancher's Legacy Meat Co.*,
 2020 WL 4048509 (D. Minn. July 20, 2020) .................................................21

*Respect Maine PAC v. McKee*,
 622 F.3d 13 (1st Cir. 2010)...............................................................................7

*Shields v. Amoskeag Bank Shares, Inc.*,
 766 F. Supp. 32 (D.N.H. 1991).......................................................................13

*Sindicato Puertorriqueno de Trabajadores v. Fortuno*,
 699 F.3d 1 (1st Cir. 2012).................................................................................8

*Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC)*,
 2008 WL 650389 (S.D.N.Y. Mar. 7, 2008) ..............................................22, 26

*Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.)*,
 388 B.R. 619 (Bankr. E.D. Pa. 2008) ............................................................17

iv

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................................................7

**STATUTES**

11 U.S.C. § 105(a) ...............................................................................................................15

11 U.S.C. § 510(b) ...............................................................................................................16

11 U.S.C. § 523 ...............................................................................................................15, 16

11 U.S.C. § 523(a)(2) ...........................................................................................................15

11 U.S.C. § 944 .....................................................................................................................15

PROMESA § 101(a) ...............................................................................................................4

PROMESA § 301(a) .............................................................................................................15

PROMESA § 304(h) .............................................................................................................15

PROMESA § 315 ....................................................................................................................4

PROMESA § 405(m)(1) ....................................................................................................4, 19

**OTHER AUTHORITIES**

3 Moore's Manual, Federal Practice and Procedure § 30.53 (2021) ...........................10

Fed. R. Bankr. P. 8007(c) ................................................................................................4, 21

Fed. R. Civ. P. 9(b) ....................................................................................................5, 13, 14

Fed. R. Civ. P. 12(b)(6) ..........................................................................................................5

United States Courts for the First Circuit 2018 Annual Report,
    https://www.ca1.uscourts.gov/ sites/ca1/files/2018%20Annual%20Report.pdf ..................25

**To the Honorable United States District Court Judge Laura Taylor Swain:**

The Financial Oversight and Management Board for Puerto Rico (the "Oversight
Board"), as the sole Title III representative of the Commonwealth of Puerto Rico (the
"Commonwealth"), the Employees Retirement System of the Government of the Commonwealth
of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA") (collectively,
the "Debtors"), pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and
Economic Stability Act* ("PROMESA"),[1] respectfully submits this opposition to the motion for a
stay pending appeal [ECF No. 20035][2] filed by Cooperativa de Ahorro y Crédito Abraham Rosa,
Cooperativa de Ahorro y Crédito de Ciales, Cooperativa de Ahorro y Crédito de Rincón,
Cooperativa de Ahorro y Crédito Vega Alta, Cooperativa de Ahorro y Crédito Dr. Manuel Zeno
Gandía, and Cooperativa de Ahorro y Crédito de Juana Díaz (collectively, the "Cooperativas")
("Stay Mot."). The Cooperativas ask the Court to stay the Order and Judgment [ECF No. 19813]
(the "Confirmation Order") confirming the *Modified Eighth Amended Title III Joint Plan of
Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the
Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings
Authority* [ECF No. 19784] (as it may be amended, modified, or supplemented, the "Plan").[3]

## PRELIMINARY STATEMENT

1.      After nearly five years of extraordinary effort by countless stakeholders and
decisions from this Court determining myriad legal issues, and after extensive mediation, the
Court confirmed the Plan, setting Puerto Rico on the path to emerge from Title III and towards
financial recovery. Among other things, the Plan reduces the Commonwealth's debt by 80%,

---

[1] PROMESA is codified at 48 U.S.C. §§ 2101–2241.
[2] All ECF No. references are to Case No. 17-bk-3283-LTS, unless otherwise indicated.
[3] All capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

saves the Commonwealth more than $50 billion in debt-service payments, and addresses the

Commonwealth's $55 billion in unfunded pension liabilities.  The significance of Plan

confirmation cannot be overstated.  As the Court described it, the Plan is "a crucial step in the

effort to achieve the economic recovery of the Commonwealth of Puerto Rico and its

instrumentalities."  Findings of Fact[4] at 14.

2.      The Cooperativas are among a small minority of stakeholders that opposed the

Plan.  They now ask the Court to stay the Plan's implementation for the duration of their appeal

of the Confirmation Order.  Any delay in the Plan's implementation could imperil Puerto Rico's

successful restructuring, however, which is indispensable to the Commonwealth's fiscal

recovery.  That recovery, in turn, will enable the Commonwealth to make PayGo payments of

over $2 billion annually and to balance its budget, as well as provide recoveries on account of

claims such as those of the Cooperativas.

3.      A stay pending appeal should be denied because the Cooperativas have not

established any of the four prerequisites for such extraordinary relief.

4.      First and foremost, the Cooperativas have not shown that they are likely to

succeed on appeal.  This Court previously considered and rejected each of the arguments the

Cooperativas intend to press on appeal. The Court's prior rulings and reasoning were correct and

demonstrated there are no serious questions raised by the Cooperativas' position.  The

Cooperativas challenge the Plan's discharge of their asserted fraud and Takings claims.  In

dismissing the Cooperativas' adversary proceeding, this Court previously held they have no

viable fraud or Takings claims, and the stay motion provides no reason why the Court's prior

---

[4] As defined *infra*.

ruling is subject to a serious question, let alone erroneous.  And even if the Cooperativas had a

viable fraud claim, PROMESA is clear that fraud claims are dischargeable.

5.     The Cooperativas also fail to show they would be irreparably harmed absent a

stay.  In their motion, they contend that, without a stay, they would suffer financial harm and

their appeal might become moot before it is resolved.  It is well established, however, that a

potential for mootness and a loss of money alone do not constitute irreparable harm.

6.     Conversely, a stay would inflict serious harm on the Commonwealth, its creditors,

and other stakeholders.  Most importantly, a stay would imperil Puerto Rico's successful

restructuring and risk unraveling the carefully negotiated Plan, an outcome that would plunge the

Commonwealth into financial chaos and inflict immeasurable harm on the Commonwealth's

residents and creditors.  A stay would needlessly delay the Commonwealth's economic recovery

and the benefits the residents of Puerto Rico receive from the Plan's implementation.  Delaying

the Plan's effective date and implementation would impose monetary harms on many

stakeholders:  The Commonwealth would incur millions in new pension liabilities that otherwise

would have been frozen under the Plan; the Pension Reserve Trust established by the Plan would

lose hundreds of millions of dollars in funding; creditors would lose interest on the $10.8 billion

in cash that will be distributed under the Plan; and all residents would lose from the delay.

7.     A stay would undermine the significant public interest in putting Puerto Rico on

an immediate path to fiscal recovery, with the ability to balance budgets and honor pension

payments.  In addition to costing the Commonwealth and others tens of millions of dollars by

delaying the Plan's effective date, new investments in Puerto Rico by those who would not

invest while it was in default with an uncertain outcome would be further delayed, along with all

the jobs and value the investments would create.

3

8.      For all those reasons, a stay is not warranted.  But should the Court determine otherwise, it should require the Cooperativas to post a substantial supersedeas bond in accordance with Federal Rule of Bankruptcy Procedure 8007(c).  As explained below, the bond would need to be set at no less than $1.5 billion to compensate the Debtors and others for the losses created by delay.

9.      Because all four stay factors strongly militate against a stay, the stay motion should be denied, but, if it is granted, the Court should require a bond to protect the Debtors and their stakeholders from further losses.

## RELEVANT BACKGROUND

### A.      PROMESA and the Oversight Board

10.      Congress found Puerto Rico is in the midst of a "fiscal emergency" resulting from a "combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing."  PROMESA § 405(m)(1).  To address that emergency, Congress enacted PROMESA and created the Oversight Board to help the Commonwealth "achieve fiscal responsibility and access to the capital markets."  *Id.* § 101(a).  Under Title III of PROMESA, the Oversight Board is authorized to file debt-restructuring cases on behalf of the Commonwealth and its covered instrumentalities. *Id.* § 315.  The Oversight Board commenced the first of these Title III cases in May 2017.

### B.      The Cooperativas' Adversary Proceeding

11.      In March 2018, the Cooperativas—a group of state-chartered credit unions with investments that included government bonds—commenced an adversary proceeding within the Debtors' Title III cases claiming that the Commonwealth, its instrumentalities, and other governmental parties had fraudulently induced them into purchasing bonds despite knowing the bonds would decline in value as a result of the Commonwealth's insolvency.  *See* Adv. Proc. No.

4

18-0028-LTS, ECF No. 116-1, Second Am. Compl. at 8–10 (D.P.R. Dec. 6, 2019) ("SAC").[5]

The Cooperativas alleged the fraudulent inducement amounted to an unconstitutional taking

without just compensation. *See id.* at 81–84. Among other relief, the Cooperativas sought a

declaration excepting their claims from discharge in any plan of adjustment. *See id.* at 68–73.

12.     In December 2021, this Court dismissed the Cooperativas' complaint under

Federal Rules of Civil Procedure 9(b) and 12(b)(6), holding, among other things, they had failed

to plead fraud with the requisite particularity or to allege a violation of the Takings Clauses of

the United States or Puerto Rico Constitutions. Adv. Proc. No. 18-0028-LTS, ECF No. 192 at

20–22, 37–42 (D.P.R. Dec. 27, 2021) ("Cooperativas Dismissal Op."). The Court also held the

Cooperativas' claims were not excepted from discharge. *See id.* at 26–31. The Cooperativas'

appeal of that ruling is pending at the First Circuit.

**C.     The Plan of Adjustment**

13.     After several years of mediation and negotiations, the Oversight Board and

relevant stakeholders, including bondholders, reached a comprehensive agreement concerning a

plan of adjustment that would restructure a significant portion of the Commonwealth's debt. *See*

ECF No. 18791-6. The terms of such agreements are incorporated into the Plan, which provides

for the restructuring and discharge of the Commonwealth's bond debt.

14.     The Cooperativas objected to confirmation of the Plan, arguing their fraud and

takings claims in their then-pending adversary proceeding should be excepted from discharge

and that the Plan itself would effect a taking by impairing their existing claims. *See* ECF No.

18594.

---

[5] The Cooperativas also filed proofs of claim in connection with their claims asserted in the adversary
proceeding. *See, e.g.*, Proof of Claim No. 53780.

15.     On January 18, 2022, this Court overruled all objections to the Plan—including those asserted by the Cooperativas—and confirmed the Plan. *See* Confirmation Order at 5; *see also Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [ECF No. 19812] ("Findings of Fact").  Having already dismissed the Cooperativas' adversary complaint for failure to state a claim, the Court found no basis to except the Cooperativas' dismissed claims from discharge.  Findings of Fact ¶ 162 n.36. The Court further found the Cooperativas' allegation that the Plan effectuated a taking meritless. *Id.* ¶¶ 171–74.  The Cooperativas' appeal does not change anything.  The order dismissing their suit has not been stayed.

16.     The Court found confirmation is "a crucial step in the effort to achieve the economic recovery of the Commonwealth of Puerto Rico and its instrumentalities." *Id.* at 14.  It further found the Plan necessary for "the Commonwealth to provide future public services and remain a viable public entity." *Id.* ¶ 205.  And the Court found that, absent the Plan, the Commonwealth would "face great uncertainty, financial and political instability, and significant lawsuits," all of which would impede economic growth and tax revenue, thus "reducing the amounts available to pay all creditors." *Id.* ¶ 218.  The Cooperativas do not challenge those findings as clearly erroneous.

17.     On January 28, 2022, the Cooperativas appealed from the Confirmation Order and the Findings of Fact.  The Cooperativas now seek a stay of the Confirmation Order and implementation of the Plan pending the outcome of their appeal.

## ARGUMENT

### I.   THE COOPERATIVAS DO NOT SATISFY ANY OF THE CRITERIA FOR A STAY PENDING APPEAL.

18.    A stay pending appeal is an "extraordinary remedy" that "requires a substantial showing." *MEDSCI Diagnostics, Inc. v. State Ins. Fund Corp (In re MEDSCI Diagnostics, Inc.)*, 2011 WL 280866, at *3 (Bankr. D.P.R. Jan. 25, 2011). Because a stay pending appeal is "an intrusion into the ordinary processes of administration and judicial review," it is "not a matter of right, even if irreparable injury might otherwise result to the appellant." *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citations omitted).

19.    A party seeking a stay pending appeal must demonstrate: (*i*) a "strong showing" of likelihood of success on the merits on appeal; (*ii*) irreparable injury absent a stay; (*iii*) the issuance of a stay will not injure other interested parties; and (*iv*) a stay is in the public interest. *Common Cause R.I. v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020). The first two factors are the most critical and require more than a "mere possibility" of success and irreparable injury. *Nken*, 556 U.S. at 434; *see also Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010) ("[Movants] must show a strong likelihood of success, and they must demonstrate that irreparable injury will be likely . . . ."). Both factors are independent, necessary predicates for a stay, and a strong showing on one "cannot dispense with the required showing of" the other. *Nken*, 556 U.S. at 438 (Kennedy, J., concurring).[6]

---

[6] The Cooperativas argue that "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury movants will suffer absent the stay." Stay Mot. ¶ 16 (emendation omitted). But that relationship is not without its limits. As the Supreme Court has made clear, a party seeking a stay must demonstrate a "strong showing" of likelihood of success on the merits no matter the magnitude of irreparable harm shown. *See Nken*, 556 U.S. at 434. Likewise, a party seeking a stay must show more than a "mere possibility" of harm, regardless of the certainty of success on the merits. *Id.*; s*ee also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

20.     Here, the Cooperativas have not established any of the prerequisites for the extraordinary relief they seek. *First*, their arguments on appeal do not even raise serious questions for the reasons explained below, and have already been considered and rejected by this Court. *Second*, they have not shown they would be irreparably harmed absent a stay. *Third*, a stay would imperil Puerto Rico's successful restructuring, thereby inflicting immeasurable harm on the Commonwealth, its residents, and its creditors. *Fourth*, the significant public interest in putting Puerto Rico on an immediate path to fiscal recovery disfavors any delay in the Plan's implementation. Because all four factors strongly militate against a stay, the Cooperativas' motion should be denied.

### A.     The Cooperativas Are Exceedingly Unlikely to Prevail on Their Appeal.

21.     The Cooperativas' stay motion fails at step one because they have not shown that they are likely to succeed in their appeal of the Confirmation Order. "To demonstrate likelihood of success on the merits, [a movant] must show 'more than mere possibility' of success." *Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012). "[R]ather, they must establish a 'strong likelihood' that they will ultimately prevail." *Id.*

22.     The Cooperativas have not demonstrated the strong likelihood of success on appeal necessary for a stay, or even a serious question. The Cooperativas make two general claims of error with respect to the Confirmation Order. Each fails to raise any serious question as to why the Court was wrong in confirming the Plan. *First,* the Cooperativas broadly assert confirmation of the Plan itself violated the Takings Clause by depriving them of their claims for the full value of their bonds. Stay Mot. ¶¶ 8–9. They are mistaken. As the Court ruled in connection with confirming the Plan, none of the three factors in *Penn Central Transport Co. v. New York City*, 438 U.S. 104, 124 (1978)—(*i*) loss of the value of the bonds, (*ii*) violation of the Cooperativas' reasonable investment-backed expectations, and (*iii*) the character of the

8

government action—supports a finding that any taking occurred.  *See* Findings of Fact at 103–

104 n.36.  Nothing in the Cooperativas' stay motion shows the Court erroneously relied on the

*Penn Central* framework to analyze this takings claim or incorrectly applied that framework to

that claim.  The Cooperativas have not experienced total destruction of the value of their bonds

because they will receive substantial value through Plan treatment, and the bonds themselves still

have significant value.[7]  *Penn Central*, 438 U.S. at 124.  Nor have the Cooperativas' reasonable

investment-backed expectations been violated, because those expectations must account (and

should have accounted) for the general risk that a governmental issuer might have higher

payment priorities in the event of a reorganization or economic crisis.  *Cf. New Haven Inclusion*

*Cases*, 399 U.S. 392, 491–92 (1970) (investors in public utility "assumed the risk that in any

depression or any reorganization the interests of the public would be considered as well as

theirs") (citation omitted).  Furthermore, the government action in question was not a traditional

"physical invasion of property by the government," but rather the restructuring of the

relationship between the Commonwealth and its bondholders by way of PROMESA—a

paradigmatic example of "a public program adjusting the benefits and burdens of economic life

to promote the common good."  *Penn Central*, 438 U.S. at 124.  This also strongly indicates no

taking occurred.  The Cooperativas do not establish any likelihood of success on appeal by,

---

[7] Indeed, in the underlying adversary proceeding, the Cooperativas abandoned their position in their First Amended Complaint that the bonds were "valueless"; the Second Amended Complaint asserted only that the bonds were "materially diminished and value impaired."  *Compare* First Am. Compl., ECF No. 79 ¶ 223, Adv. Proc. No. 18-00028-LTS *with* Second Am. Compl. ("SAC"), ECF No. 126 ¶ 76, Adv. Proc. No. 18-00028-LTS.  Likewise, in their objection to Plan confirmation, the Cooperativas admit that all but two of their claims will receive distribution under the Plan.  *See* No. 17 BK 03283-LTS, ECF No. 18594 at 9 ("Cooperativas Objection").  The Cooperativas mistakenly assert the remaining two claims fall into Class 63, *id.*, which covers Commonwealth appropriations to other entities that issued bonds, *see* Plan §§ 1.174, 67.1.  With respect to any such bonds the Cooperativas might hold, they are not a creditor of the Commonwealth.  Furthermore, the Plan does not affect the Cooperativas' claims, if any, against such other issuers.  *See* Plan § 1.277.

without authority, calling an alleged tort of fraudulent inducement a "taking," or labelling
confirmation as an unconstitutional taking.

23.     *Second*, the Cooperativas suggest the Court should not have considered within its
Findings of Fact its dismissal of the Adversary Proceeding because that dismissal is subject to
appeal.  *See* Stay Mot. ¶ 12.  The Cooperativas ignore the Court's dismissal order is in effect and
not stayed.  The Court's confirmation decision relied on the determinations the Court reached in
dismissing the Adversary Proceeding.  *See* Findings of Fact at 103–104 n.36.  The Cooperativas
cite no authority stating such reliance was improper or requiring this Court to disregard its prior
findings simply because a notice of appeal has been filed.  Nor does the appeal render the
Court's prior judgment non-final or deprive it of its preclusive effect.  *See* 3 Moore's Manual,
Federal Practice and Procedure § 30.53 (2021) (judgment has preclusive effect while appeal is
pending).

24.     Moreover, the Cooperativas assert in their motion that if they prevail in the appeal
and Adversary Proceeding, the non-dischargeability of their asserted claim would have no
impact on Plan implementation.  Stay Mot. at 10 n.3 (adopting position that, "from a feasibility
point of view, the debtors would be able to handle the takings claims if these were to be
determined non-dischargeable").  Thus, according to the Cooperativas, the Court's reliance on its
decision in the Adversary Proceeding to overrule the Cooperativas' confirmation objection will
not prejudice the Cooperativas if the dismissal decision is ultimately reversed.  The Cooperativas
therefore demonstrate neither a likelihood of success on appeal nor prejudice from the lack of a
stay, based on this argument.

25.     The Cooperativas recycle their rejected arguments from their adversary
proceeding by maintaining their contention here that their claims were non-dischargeable.  But

they still fail to demonstrate any likelihood of prevailing on appeal.  The Cooperativas argue this
Court erred in dismissing the Adversary Proceeding, and erred again here when it (a) refused to
exempt their claims from discharge, notwithstanding their alleged status as non-dischargeable
Takings Clause claims under the Fifth Amendment and (b) declined to exempt the Cooperativas'
claims from discharge as fraud claims.  These arguments have no support.

### 1.     *The Cooperativas Fail to Show a Likelihood of Success Based on Their Takings Claims.*

26.     The Court correctly determined the Cooperativas' asserted claims could be
impaired and discharged pursuant to the Plan because no taking occurred.  The Cooperativas
argue they were fraudulently compelled to purchase government bonds that were doomed to fail
and the Commonwealth therefore "took" plaintiffs' money in violation of the Takings Clause.
But, as the Court correctly held when it dismissed their takings claim, the Cooperativas could not
allege a direct taking because the Commonwealth did not do anything to forcibly deprive them of
their property.  *See* Cooperativas Dismissal Op. at 39–40 (citing *Yee v. City of Escondido, Cal.*,
504 U.S. 519, 539 (1992); *Franklin Mem'l Hosp. v. Harvey*, 575 F.3d 121, 129 (1st Cir. 2009)).
The Commonwealth did not order the Cooperativas to purchase the bonds.  The Cooperativas did
not allege or produce any such order.  The Cooperativas made their own investment decisions to
buy the securities, and they could have refused to do so.  Nor did the Cooperativas adequately
allege a regulatory taking, as they did not plead conduct rising to the level of "irresistible
pressure" necessary to demonstrate the requisite government coercion and did not allege any
facts supporting the inference that they were forced in any way to purchase government bonds.
*See* Cooperativas Dismissal Op. at 40–42; *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142,

11

1154–55 (Fed. Cir. 2014).[8]  Indeed, there would have been an evidentiary hearing on such

allegations, but the Cooperativas pled no evidence even though they had three chances to do so.

Though the Cooperativas express general disagreement with the Court's determinations by

continually insisting their claims are constitutional in nature, nothing in their stay motion

challenges any of the Court's reasoning or shows the Commonwealth had somehow forced the

Cooperativas to buy the bonds they chose to buy.  The Cooperativas therefore fail to carry their

burden of demonstrating a strong likelihood of success on this point.

27.     The Cooperativas additionally failed to plead a cognizable taking because a post-

purchase decline in the value of government bonds is not a "taking" of property without just

compensation.  When the Cooperativas bought the bonds in question, they were worth what the

Cooperativas paid for them, and the Cooperativas could have promptly resold them for the same

value.  *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("[A]t the moment the

transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset

by ownership of a [security] that *at that instant* possesses equivalent value.").  The Cooperativas

thus cannot point to any deprivation in just compensation, nor can they state a regulatory taking

claim based on the "mere diminution in the value of property," which, "however serious, is

insufficient to demonstrate a taking."  *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers*

*Pension Tr. for S. Cal.*, 508 U.S. 602, 645 (1993) (citations omitted).  If a post-purchase drop in

the value of government bonds could constitute a "taking" as of the time of purchase, every

---

[8] Moreover, the only supposed compulsion the Cooperativas cite came from Circular Letters issued by the
Public Corporation for the Supervision and Insurance of Cooperatives in Puerto Rico ("COSSEC"), the
Cooperativas' regulator.  *See* SAC ¶¶ 105, 195–96, 275–277.  As the Court held, the Circular Letters did
not require the Cooperativas to buy the bonds.  Cooperativas Dismissal Op. at 40–42 (noting the Circular
Letters used "permissive, not mandatory language" that "ma[d]e it plain that the ultimate decision
whether to invest in these bonds was left to" the Cooperativas).

issuer of government bonds would be subject to Takings Clause litigation any time the value of those bonds declines.

### 2. The Cooperativas Fail to Show a Likelihood of Success on Appeal Based on Their Fraud Claims.

28.     The Court also correctly determined the Cooperativas' fraud claims could be impaired and discharged pursuant to the Plan because the Cooperativas failed to state a claim for fraud and because fraud claims are dischargeable under PROMESA in any event.  Once again, the Cooperativas do not identify any errors in the Court's reasoning, thereby failing to establish a strong (or any) likelihood of success on appeal of their claims.

29.     In dismissing the SAC, the Court correctly concluded the Cooperativas failed to plead facts showing fraud with the required particularity under Federal Rule of Civil Procedure 9(b).  With respect to many of the Cooperativas' allegations of fraudulent conduct, the Court held the SAC consisted merely of "conclusory assertions that fraud occurred at unspecified meetings attended by unspecified individuals over a four-year period" without alleging "precisely what was said or omitted at these meetings that constituted fraud."  Cooperativas Dismissal Op. at 24 (citation omitted).[9]  Even with respect to the few instances where the Court

---

[9] The Cooperativas suggest the Court ignored the Oversight Board's pleadings in another adversary proceeding, Adv. Proc. No. 19-00280, which they claim establish the Commonwealth's knowledge of its insolvency before selling bonds to the Cooperativas.  Stay Mot. ¶ 12(b).  The Cooperativas failed to cite or present those pleadings in the SAC, however.  *See Shields v. Amoskeag Bank Shares, Inc.*, 766 F. Supp. 32, 39 (D.N.H. 1991) (holding plaintiffs cannot rely on allegations in a separate complaint to fix defects in their own).  Those pleadings also fail to establish the Commonwealth's knowledge of fraud.  They allege the GDB and various bond underwriters violated their fiduciary duties *to* the Commonwealth by profiting from a 2014 bond issuance that deepened the Commonwealth's financial issues.  *See generally* ECF No. 28, Adv. Proc. No. 19-00280.  The GDB is a separate entity not dealt with in the Plan, however, and whatever knowledge it allegedly did or did not have cannot be imputed to the Commonwealth.  Moreover, even setting aside these issues, the allegations in Adversary Proceeding No. 19-00280 do not cure the numerous other pleading deficiencies that required dismissal of the SAC.  Though the Cooperativas now argue this Court "ignored various well-pleaded averments about the misuse of regulatory power to seize resources from the cooperatives," Stay Mot. ¶ 12(a), they do not say what those allegations are.  The Cooperativas' reliance on conclusory claims of error to defend conclusory allegations does not bode well for their likelihood of success on appeal.

held the Cooperativas alleged specific false statements—*e.g.*, their allegations relating to the

Circular Letters issued by COSSEC, *see* SAC ¶¶ 98–100—the Court held the Cooperativas did

not allege any facts sufficient to support an inference that the Commonwealth (or any other

party) knew the statements were false at the time they were issued.  Cooperativas Dismissal Op.

at 24–25.  Nothing in the Cooperativas' stay motion refutes the Court's analysis.  Though the

Cooperativas complain here that "additional information regarding the Government's conduct is

under the defendants' control" and "discovery proceedings [were] precluded and prevented by a

premature conclusion of the judicial process in the early pleading stages," Stay Mot. ¶ 12(a),

these complaints do not rectify the Cooperativas' failure to meet the applicable pleading burden

under Rule 9(b), a prerequisite to obtaining discovery.

30.     The Court also accurately determined the Cooperativas' fraud claims under

Commonwealth law are time barred.  As the Court noted, the Adversary Proceeding was initiated

in March 2018, more than two years after the Cooperativas' alleged discovery of the fraudulent

conduct in December 2015 at the latest, and therefore outside all applicable statutory limitations

periods.  Cooperativas Dismissal Op. at 34–37.  Again, the Cooperativas' stay motion says

nothing to suggest the Court's ruling was wrong.[10]

---

[10] The Cooperativas assert the Court's "hasty opinion precluded the production of" written
communications tolling the statutes of limitations which would have been produced "during an ordinary
discovery proceeding."  Stay Mot. ¶ 12(c).  But the Cooperativas fail to challenge the thrust of the Court's
statute of limitations holdings, which rely on the Cooperativas' own representations in their pleadings.
*See* Cooperativas Dismissal Op. at 34 (citing SAC ¶ 126).  The Cooperativas also fail to state what
evidence or communications they believe would toll the statute of limitations.  To the extent they are
claiming communications between them and the government might create tolling, they should already
possess such communications and could have incorporated them into their three rounds of pleadings.
Regardless, in the unlikely event the Cooperativas prevailed on this point, it would make no difference
because their failure to plead fraudulent conduct with adequate specificity—an independent ground for
dismissal and affirmance—would remain undisturbed.  *See id.* at 32–33.

14

31.     In addition, regardless of whether the Cooperativas pled cognizable fraud claims, the Court correctly ruled those claims are fully dischargeable under PROMESA.  *See* Cooperativas Dismissal Op. at 28–31.  As the Cooperativas acknowledge, Bankruptcy Code § 523(a)(2)—which excepts from discharge certain fraud claims—is inapplicable in Title III, as it applies only to individuals and is not incorporated into PROMESA.  *See* 11 U.S.C. § 523(a)(2) (applying only to individuals); PROMESA § 301(a) (incorporating various Bankruptcy Code provisions into PROMESA but excluding § 523); Adv. Proc. No. 18-00028-LTS, ECF No. 172 at 34 (Cooperativas acknowledging PROMESA declined to adopt § 523).

32.     The Cooperativas' reliance on a blanket invocation of equitable principles fares no better.  *See* Cooperativas' Stay Mot. ¶ 14.  The Court correctly held a bankruptcy court's equitable powers "must and can only be exercised within the confines of the Bankruptcy Code." Cooperativas Dismissal Op. at 29 (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)); *see also HSBC Bank USA v. Branch (In re Bank of New England Corp.)*, 364 F.3d 355, 362 (1st Cir. 2004).  The Court also determined "there is nothing in the Bankruptcy Code or PROMESA providing for an exception to discharge for dishonest debtors in proceedings involving entity debtors."  Cooperativas Dismissal Op. at 29.  The Cooperativas do not identify any error in the Court's determination and have cited no valid, substantive basis under PROMESA Title III or the Bankruptcy Code (as applicable in a Title III case) for the Court to exercise its equitable powers pursuant to Bankruptcy Code § 105(a)[11] to create an exception to

---

[11] The other statutory exceptions to dischargeability the Cooperativas have previously cited also do not apply.  *See* 11 U.S.C. § 944 (providing only a mechanism for excepting claims from Plan discharge, but no substantive right to non-discharge); PROMESA § 304(h) (applying only to obligations under federal "police or regulatory laws," and failing to provide cause of action for challenging dischargeability); *see also* Cooperativas Dismissal Op. at 28–30.

discharge, especially where such exception would contravene Congress's intent in excluding

§ 523 from those Bankruptcy Code provisions incorporated into PROMESA.[12]

33.      Each of the arguments advanced by the Cooperativas fails.  Because they fail to

establish a strong likelihood of success on appeal, their motion for a stay should be denied.  *See*

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) (citation

omitted) ("The sine qua non of this four-part inquiry is likelihood of success on the merits:  if the

moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors

become matters of idle curiosity.").  To the extent the Court considers the other stay factors, they

likewise strongly militate against the requested stay.

### B.      The Cooperativas Fail to Establish Irreparable Harm Absent a Stay.

34.      A movant seeking the extraordinary remedy of a stay pending appeal bears the

burden of establishing "irreparable injury is likely to occur during the period before the appeal is

decided."  *Doe v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020).  A mere "possibility of

irreparable injury" pending review is insufficient.  *See Nken*, 556 U.S. at 434–35 (citation

omitted).  The risk of irreparable injury must be "neither remote nor speculative, but actual and

imminent."  *In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015) (citation omitted).

35.      The Cooperativas argue that, absent a stay, they would be irreparably harmed

because their appeal might become equitably moot before being resolved.  *See* Stay Mot. ¶¶ 20–

21.  That argument fails as a matter of law because "the potential mootness of matters on appeal

---

[12] In addition, even if the Cooperativas' fraud-based claims had merit, they would be subordinated to the
bond claims under Bankruptcy Code § 510(b).  Under that section, a claim "for damages arising from the
purchase or sale of [a security of the debtor or an affiliate] . . . shall be subordinated to all claims or
interests that are senior to or equal the claim or interest represented by such security . . . ."  If the
Cooperativas' claims were nondischargeable and thus unimpaired in the Title III restructuring, they would
take *de facto* priority over claims impaired and discharged, including claims asserted by other
bondholders.  Such an outcome would create an untenable end-run around § 510(b), a proposition for
which no statutory or precedential support exists.

is not sufficient to demonstrate 'irreparable harm.'" *Betterecycling Corp. v. Firstbank P.R. (In re Betteroads Asphalt, LLC)*, 2020 WL 3125274, at \*10 (D.P.R. Jun. 12, 2020); *see also In re Betteroads Asphalt, LLC*, 610 B.R. 28, 38 (Bankr. D.P.R. 2019) (siding with the "majority of courts" that find "a risk of mootness" insufficient to justify a stay); *In re Int'l Home Prods.*, 2012 WL 6708431, at \*7 (Bankr. D.P.R. Dec. 26, 2012) ("[I]nvoking that an appeal will turn moot by the denial of a stay[] is not sufficient by itself to demonstrate irreparable harm.").[13]   That rule makes eminent sense because the risk of equitable mootness is "present in any post-confirmation appeal of a [reorganization] plan." *In re Calpine Corp.*, 2008 WL 207841, at \*4 (Bankr. S.D.N.Y. Jan. 24, 2008).  If the risk that an appeal could become moot were itself sufficient to justify a stay pending appeal, "a stay would be issued in every case." *In re W.R. Grace & Co.*, 475 B.R. 34, 207 (D. Del. 2012).  Such a rule would transform a stay pending appeal from "extraordinary" to commonplace. *In re MJS Las Croabas Props.*, 2015 Bankr. LEXIS 2147, at \*2 (Bankr. D.P.R. Jun. 30, 2015).

36.     The Cooperativas also vaguely argue they will be "expose[d] . . . to the irreparable harm of financial and regulatory distress" if the Plan is not stayed.  Stay Mot. ¶ 21.  It is unclear what that means because the Cooperativas fail to elaborate on this argument.

---

[13] The overwhelming weight of authority outside this district is in accord.  *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 682 (Bankr. S.D.N.Y. 2016) ("A majority of courts have held that a risk of mootness, standing alone, does not constitute irreparable harm."); *BDC Cap., Inc. v. Thoburn Ltd. P'ship*, 508 B.R. 633, 639 (E.D. Va. 2014) ("[T]he possibility that the appeal would become equitably moot does not constitute irreparable injury."); *Turner v. Frascella Enters., Inc. (In re Frascella Enters., Inc.)*, 388 B.R. 619, 627 (Bankr. E.D. Pa. 2008) (finding "potential of mootness insufficient"); *Ohanian v. Irwin (In re Irwin)*, 338 B.R. 839, 853 (E.D. Cal. 2006) ("It is well settled that an appeal being rendered moot does not itself constitute irreparable harm."); *In re Convenience USA, Inc.*, 290 B.R. 558, 563 (Bankr. M.D.N.C. 2003) ("[A] majority of the cases . . . have found that the risk that an appeal may become moot does not, standing alone, constitute irreparable injury."); *In re 203 N. LaSalle St. P'ship*, 190 B.R. 595, 598 (N.D. Ill. 1995) (finding the issue "well settled").

### C.     A Stay Would Substantially Harm the Commonwealth and Other Interested Parties.

37.     Because the Cooperativas have not satisfied either of the first two factors of the test for a stay, the Court "need not dwell on the final two factors—harm to the opposing party and the public interest." *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1014 (9th Cir. 2020) (citation omitted); *see also Chevron Corp. v. Donziger*, 37 F. Supp. 3d 653, 671 (S.D.N.Y. 2014).  In any event, the final two factors likewise strongly militate against a stay.

38.     The harm a stay would inflict on the Commonwealth, its creditors, and other stakeholders cannot be overstated.  For one thing, a stay would be potentially catastrophic to the Debtors' reorganization efforts.  As the Court recognized, the Plan is "a crucial step in the effort to achieve the economic recovery of the Commonwealth of Puerto Rico and its instrumentalities."  Findings of Fact at 14.  Delaying the Plan's implementation by imposing a stay that would likely persist for at least several months while an appeal is litigated creates a significant risk of undermining the Plan and the benefits the residents of Puerto Rico will receive thereunder.  The Plan took years to negotiate and has the overwhelming support of the Commonwealth's creditors.  *Cf. In re Scrub Island Dev. Grp. Ltd.*, 523 B.R. 862, 878–79 (Bankr. M.D. Fla. 2015) (denying stay because "every day that passes without the Debtors being able to" obtain capital "materially diminishes the likelihood that the Debtors' reorganization efforts will be successful"); *In re Pub. Serv. Co.*, 116 B.R. 347, 350 (Bankr. D.N.H. 1990) ("[T]he huge financing required by this plan would be severely jeopardized by a stay . . . [, and] the possible failure of any plan of reorganization as a consequence of a stay [is] a significant injury.").

39.     A stay would also needlessly delay the Commonwealth's financial recovery and its ability to balance budgets and honor pension payments.  The Cooperativas argue a stay would merely preserve the status quo.  Stay Mot. ¶ 24 ("[The Debtors'] financial and operational

18

condition will remain unaffected by a stay pending the appeal, as that would be the same condition under which the government has operated since 2017.").  But that is precisely the point.  The status quo in Puerto Rico is a fiscal emergency.  PROMESA § 405(m)(1).  Preserving the status quo and extending that fiscal emergency would delay new investment by investors who will not invest until the Commonwealth's debt is resolved.  Delayed investment means delayed creation of jobs and value.

40.     In addition to putting the Commonwealth's restructuring at risk, a stay would impose significant financial harms on the Commonwealth, its creditors, and other stakeholders. For example, as discussed below, a stay would cause the Commonwealth to incur tens of millions of dollars in additional pension obligations and would have a devastating effect on the pension trust fund established by the Plan.  *See* Point II, *infra*.  A stay would also delay the distribution of $10.8 billion to creditors under the Plan, causing creditors to lose vast amounts of interest.  Santambrogio Decl.[14] ¶ 21.  "Delay caused to creditors receiving their payment is . . . a significant harm warranting denial of a stay" pending appeal.  *Fraterfood Serv. v. DDR Del Sol, LLC (In re Fraterfood Serv.)*, 2015 Bankr. LEXIS 3081, at *6 (Bankr. D.P.R. Sept. 11, 2015); *see also In re Abengoa Bioenergy Biomass of Kan., LLC*, 2018 WL 1613667, at *9 (D. Kan. Mar. 29, 2018) ("Significant delay in the distribution to creditors under a plan constitutes substantial harm."); *ACC Bondholder Grp. V. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns Corp.)*, 361 B.R. 337, 342 (Bankr. S.D.N.Y. 2007) (noting the "weighty interest[]" of "the right of the majority of creditors to receive their distributions"); *In re Great Barrington Fair & Amusement, Inc.*, 53 B.R. 237, 240 (Bankr. D. Mass. 1985) ("The chief harm which will be caused by a stay is the delay which will be suffered by the other creditors.").

---

[14] As defined *infra*.

41.     The Cooperativas dismiss the financial impact of the stay arguing without any support that a stay would not cause "the Debtors [to] deplete or loose [*sic*] the sources from which payment will be made pursuant to the plan."  *See* Stay Mot. ¶ 24.  They are wrong. Below, in the context of its discussion of an appellate bond, the Oversight Board describes other financial harms that a stay would impose on the Commonwealth, its creditors, and other stakeholders.  *See* Point II, *infra*.  Needless to say, those harms are significant and counsel strongly against imposing a stay.[15]

**D.     The Public Interest Strongly Disfavors a Stay.**

42.     The Cooperativas completely ignore the public interest in implementing the historic Plan and setting the Commonwealth on the path to emerge from Title III and towards financial recovery.  Instead, the Cooperativas try to recast their own interests as public interests, arguing that "[p]reservation of [their] claims is . . . required pursuant to the public interest, as it pertains to the protection of the capital and resources of depository institutions."  Stay Mot. ¶ 25. That contention is disingenuous.  Nothing is more significant to the public interest of Puerto Rico than the Plan's prompt implementation.  In the Court's words, Plan confirmation is "crucial" to the Commonwealth's economic recovery.  Findings of Fact at 14.  The Plan is necessary both for the Commonwealth to "provide future public services" and to "remain a viable public entity." *Id.* at ¶ 205.  The Plan has put Puerto Rico on the path to fiscal responsibility and access to the capital markets.  Any delay of the Effective Date would be strongly against the public interest.

43.     Putting aside the Cooperativas and a handful of other dissenters, the vast majority of stakeholders in Puerto Rico approved the Plan and want to see it implemented expeditiously.

---

[15] The Cooperativas' argument that the stay "will not affect the Debtors [or] other Creditors" because the Cooperativas' claim "entails a minimal amount" is nonsensical.  *See* Stay Mot. ¶ 22.  The financial harm resulting from halting the entire Plan in no way depends on the amount of the Cooperativas' claim.

Given that strong public support, the Cooperativas' contention that a stay would not affect the

public interest—and, in fact, would somehow further that interest—rings hollow.[16]

## II.   ANY STAY MUST BE CONDITIONED ON A SUBSTANTIAL APPELLATE BOND.

44.     If the Court were to grant a stay, it should order the Cooperativas to post a

supersedeas bond in the amount of $1.5 billion in accordance with Federal Rule of Bankruptcy

Procedure 8007(c).

45.     A bond is a "standard requirement of granting a stay." *In re Adelphia Commc'ns

Corp.*, 361 B.R. at 350.  It protects the prevailing party from any losses resulting from the stay in

the event the appeal is unsuccessful, including interest on amounts withheld during the stay

period.  *See In re Roussos*, 2017 WL 766897, at *1 (Bankr. C.D. Cal. Feb. 27, 2017); *In re Miraj

& Sons, Inc.*, 201 B.R. 23, 28 (Bankr. D. Mass. 1996); 10 Collier on Bankruptcy ¶ 8007.09[1]

(16th ed. 2020).  A bond may also protect third parties, including creditors and other

stakeholders, from losses they may incur as a result of the stay.  *In re Tribune*, 477 B.R. 465, 478

(Bankr. D. Del. 2012); *In re Calpine*, 2008 WL 207841, at *7.

46.     There is a strong policy in favor of securing a prevailing party against losses

arising during a stay pending appeal.  *Ratcliff v. Rancher's Legacy Meat Co.*, 2020 WL 4048509,

at *14 (D. Minn. July 20, 2020).  Accordingly, any departure from the bond requirement would

represent "a truly extraordinary exercise of discretion," *In re VVF Commc. Corp.*, 41 B.R. 546,

550 (Bankr. D.D.C. 1984), warranted only where there are "exceptional circumstances" and an

alternative means of securing the prevailing party's interests, *In re Weinhold*, 389 B.R. 783, 788–

89 (Bankr. M.D. Fla. 2008).  A movant seeking a stay without posting a bond bears "the burden

---

[16] It is again beside the point that, according to the Cooperativas, their claims are "not material . . . as compared to the [a]djusted debts under the Plan."  *See* Stay Mot. ¶ 26.  The public interest strongly disfavors a stay of the historic Plan irrespective of the amount of the Cooperativas' claims.

of demonstrating why the court should deviate from the ordinary full security requirement." *In re W.R. Grace & Co.*, 475 B.R. at 209.

47.     The Cooperativas make no attempt in their stay motion to show extraordinary circumstances warranting a departure from the requirement that they post a bond in support of any stay that might issue.

48.     With respect to the bond amount, "the court should set a bond at or near the full amount of the potential harm to the non-moving parties." *In re Adelphia Commc'ns Corp.*, 361 B.R. at 368; *see also Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC)*, 2008 WL 650389, at *5 (S.D.N.Y. Mar. 7, 2008) (a bond should be "commensurate with the threatened loss to the non-moving parties"). To determine an appropriate bond amount in a bankruptcy case, courts consider the cash distributions creditors would have received but for the stay, incremental administrative expense costs including payments to professional advisors, and other foreseeable costs arising from a delay in implementing the restructuring. *See, e.g.*, *In re Tribune Co.*, 477 B.R. at 480–81. Because the stay of an order confirming a reorganization plan typically affects many parties, courts have imposed sizable bonds in the rare bankruptcy cases where a stay has been granted. *See, e.g.*, *In re Gen. Motors*, 409 B.R. 24, 34 (Bankr. S.D.N.Y. 2009) (denying stay but noting that stay would have required $7.4 billion bond); *In re Tribune Co.*, 477 B.R. at 483 ($1.5 billion bond); *In re Adelphia Commc'ns Corp.*, 361 B.R. at 368 (bond set at $1.3 billion, later reduced); *In re Calpine*, 2008 WL 207841, at *7 ($900 million bond).

49.     Here, a bond should be set at an amount that covers the enormous harm that a stay would inflict on the non-moving parties. If the Effective Date is delayed, the Commonwealth, its creditors, and other stakeholders stand to lose hundreds of millions of dollars. Those potential losses fall within at least four categories.

22

50.    *First*, the Commonwealth would incur tens of millions of dollars in additional

pension liability if the Plan's implementation is delayed.  Under the Plan, all active Teachers'

Retirement System and Judiciary Retirement System participants will cease accruing new

benefits on the Effective Date.  *See* Plan §§ 55.8, 55.9, Exs. E, F.  If the Effective Date is

delayed, those pensioners would continue to accrue new benefits during the stay period, which

would irrevocably increase the Commonwealth's long-term PayGo obligations to those

participants.  As set forth in the attached *Declaration of Sheva R. Levy* ("Levy Decl."), the

magnitude of the additional pension obligations the Commonwealth would incur depends on the

length of the stay.  If a stay were in place for three months, the Commonwealth would incur an

additional $65 million in pension liabilities.  Levy Decl. ¶ 23.  A stay would cost the

Commonwealth an additional $185 million over six months, $281 million over nine months, and

$408 million if the stay were to remain in place for a year.  *Id.*

51.    *Second*, a stay would cost the Debtors millions of dollars in administrative fees.

During the Title III case, the Debtors have on average incurred more than $14 million per month

in professionals' fees, including fees paid to the legal and financial advisors of the Debtors, the

Retiree Committee, and the Creditors' Committee.[17]  The Debtors will need to retain most of

---

[17] This estimate is based on the most recent fee applications covering at least 8 months for the following
service providers:  Alvarez & Marsal (ECF Nos. 17343, 17345, 17355, 19239, 19241, 19245), Ankura
Consulting Group, LLC (ECF Nos. 18168 & 19634), Brattle Group, Inc. (ECF Nos. 15347, 16074,
17393, 19275), Casillas, Santiago, & Torres LLC (16064 & 19229), Epiq Corporate Restructuring, LLC
and Epiq eDiscovery Solutions (ECF Nos. 18293 & 18296), Ernst & Young (ECF Nos. 18494 & 19849),
Estrella, LLC (ECF Nos. 16317 & 18130), FTI Consulting, Inc. (ECF Nos. 17364 & 19224), Genovese
Joblove & Battista, P.A. (ECF Nos. 17365 & 19219), Ileana Cardona Fernandez Esq. (ECF Nos. 17346 &
19191), Jenner & Block LLP (ECF Nos. 17363 & 19230), Kroma Advertising, Inc. (ECF Nos. 17377 &
19236), Luskin, Stern & Eisler LLP (ECF Nos. 17396 & 19215), Marchand ICS Group (ECF Nos. 17371
& 19226), Marini Pietrantoni Muniz LLC (ECF Nos. 17357 & 19223), McKinsey & Co. (ECF Nos.
16446 & 18003), Munger, Tolles & Olson LLP (ECF No. 17553), O'Melveny & Myers LLP (ECF Nos.
15477 & 16768), O'Neill & Borges LLC (ECF Nos. 18127 & 19412), Paul Hastings LLP (ECF Nos.
17380 & 19238), PJT Partners LP (ECF Nos. 19494 & 19805), Proskauer Rose LLP (ECF Nos. 17587,
17589, 17596, 19689, 19692, 19696), Segal Consulting (ECF Nos. 17369 & 19227), Zolfo Cooper, LLC
(ECF Nos. 17378 & 19237), Brown Rudnick LLP (ECF Nos. 17740 & 19321; Case No. 17-BK-3566-

those professionals through the Plan's implementation.  Any delay in the Plan's implementation

would therefore require the Debtors to retain these professionals for additional time and incur

additional professional fees.  *See In re Tribune Co.*, 477 B.R. at 480 (factoring into bond amount

the incremental administrative and professional costs of stay); *In re NASDAQ Mkt.-Makers*

*Antitrust Litig.*, 187 F.R.D. 124, 129 (S.D.N.Y. 1999) (requiring a bond to include "damages

resulting from the delay and/or disruption of settlement administration caused by his appeal").

52.      *Third*, a stay would have a substantial impact on the funding of the pension

reserve fund established under the Plan to protect retirees in the Commonwealth.  *See* Plan

art. 83.  As explained in the attached *Declaration of Juan Santambrogio* ("Santambrogio Decl."),

the Plan creates a Pension Reserve Trust ("PRT") for the benefit of retirees, which is funded

through contributions of at least 50% of the Commonwealth's Projected Fiscal Plan Surplus each

fiscal year for ten years following Plan's implementation.  Plan § 83.2.  The Commonwealth's

largest surplus is projected to occur during the 2022 Fiscal Year, which ends June 30, 2022.

Santambrogio Decl. ¶¶ 18–20.  As the Santambrogio declaration explains, if the Effective Date is

delayed beyond June 30, the Commonwealth would not contribute surpluses to the PRT until

FY2023, which would result in a total reduction of the PRT's funding over ten years by $960

million.  *Id.*

53.      *Fourth*, delaying the Plan's implementation would deprive creditors of significant

interest payments on distributions.  Under the Plan, approximately $10.8 billion in cash is to be

distributed to creditors after the Effective Date.  *Id.* ¶ 21.  Assuming a reasonable rate of return

LTS, ECF Nos. 1208, 1263), and DiCiccio, Gulman & Co., LLP (ECF Nos. 17349 & 19195; Case No.
19-BK-5523-LTS, ECF No. 225).  This figure represents a conservative estimate, computed using only
those providers who have submitted at least one fee application in 2021 or later, and only factoring in
consecutive fee periods.

of 5%[18], creditors would lose approximately $45 million per month in investment earnings if those distributions are delayed.  *See In re Texas Equip. Co., Inc.*, 283 B.R. 222, 230 (Bankr. N.D. Tex. 2002) (including in an appeal bond "the time value of the money"); *In re Tribune*, 447 B.R. at 480–81 (same).

54.     The median time for an appeal to be resolved by the First Circuit is 13.6 months.[19]  Even if the Cooperativas' appeal is expedited, it is unlikely to be resolved less than six months after the Plan's Effective Date.  Accordingly, as a prerequisite to any stay, the Cooperativas should at a minimum be required to post a bond covering the harm to other parties if a stay of Plan implementation were to remain in place for six months.

55.     A six-month stay would cost creditors $270 million in interest, cause the Commonwealth to incur $185 in additional pension liabilities, cost the PRT $960 million, and result in the debtors incurring approximately $84 million in additional professional fees.  An appellate bond should therefore be set at $1.5 billion, subject to increase if delays are longer. That amount is in addition to, and does not account for, the risk that the stay might undermine the Commonwealth's entire restructuring.

56.     To the extent that the Cooperativas complain that they cannot afford to post a bond in that amount, it is not a reason for lifting the bond requirement.  To the contrary, an inability "to post a bond commensurate with the threatened loss to the non-moving parties . . . only serves to highlight the substantial risk of dramatic injury to Debtors and other creditors if the Bankruptcy Court's orders [are] erroneously stayed."  *In re DJK Residential, LLC*, 2008 WL

---

[18] The Debtors used an assumed discount rate of 5.00% as the rate of return on investment in the best interests of creditors tests reports.  *See* Disclosure Statement, ECF No. 17628, Ex. P.

[19] *See* United States Courts for the First Circuit 2018 Annual Report at 18, https://www.ca1.uscourts.gov/ sites/ca1/files/2018%20Annual%20Report.pdf.  Notably, this data is pre-pandemic, and administrative delays associated COVID-19 have likely extended the time for appeals to be resolved.

650389, at *5; *cf. Porter v. NationsCredit Consumer Discount Co.*, 2007 WL 674709, at *1–2

(E.D. Pa. Feb. 28, 2007) (holding, under Fed. R. Civ. P. 62(b), that inability to post a supersedeas

bond without alternative proposal to secure judgment is insufficient to justify departure from

bond requirement), *aff'd Porter v. NationsCredit Consumer Discount Co.*, 285 F. App'x 871 (3d

Cir. 2008).

## **CONCLUSION**

57.    **WHEREFORE** the Debtors respectfully request the Court (*i*) deny the

Cooperativas' stay motion (or, in the alternative, condition the issuance of a stay on the

Cooperativas' posting of a supersedeas bond in the amount of $1.5 billion, subject to increase)

and (*ii*) and grant the Debtors such other and further relief as is just and proper.

Dated: February 11, 2022
      San Juan, Puerto Rico

Respectfully submitted,

*/s/Martin J. Bienenstock*
Martin J. Bienenstock (*Pro Hac Vice*)
Jeffrey W. Levitan (*Pro Hac Vice*)
Ehud Barak (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

Paul V. Possinger (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
70 West Madison, Suite 3800
Chicago, IL 60602
Tel:  (312) 962-3550
Fax:  (312) 962-3551

Timothy W. Mungovan (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
One International Place
Boston, MA 02110
Tel:  (617) 526-9600
Fax:  (617) 526-9899

26

Michael A. Firestein (*Pro Hac Vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East, Suite 2400
Los Angeles, CA 90067
Tel:  (310) 557-2900
Fax:  (310) 557-2193

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico as
representative for the Debtors*


*/s/ Ricardo Burgos Vargas*
Ricardo Burgos Vargas
USDC núm. 218210
**A&S LEGAL STUDIO, PSC**
434 Ave. Hostos
San Juan, PR 00918
Tel.: (787) 751-6764
Fax: (787) 763-8260

*Co-Attorneys for the Financial Oversight and
Management Board for Puerto Rico as
representative for the Debtors*

27

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 11, 2022, I caused the foregoing document to be

electronically filed with the Clerk of the Court using the CM/ECF system, which will send

notification of such filing to all CM/ECF participants in this case.

<div align="right">

*/s/ Ricardo Burgos Vargas, Esq.*
Ricardo Burgos Vargas, Esq.

</div>