# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br>*et al.*,<br><br>                   Debtors.[1] | PROMESA<br><br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## OPPOSITION OF PSA CREDITORS TO TEACHERS' ASSOCIATIONS' MOTION FOR STAY PENDING APPEAL

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 2

BACKGROUND ........................................................................................................ 3

    A.    The Commonwealth Seeks To Restructure Its Debt ................................. 3

    B.    The Commonwealth's Initial Plans Stall .................................................. 3

    C.    The Commonwealth Files A Plan With Broad Creditor Support ............. 4

    D.    Facing Potential Dismissal Of Its Title III Case, The
            Commonwealth Enacts Debt-Authorizing Legislation ............................ 5

    E.    This Court Holds Confirmation Proceedings And Confirms The
            Plan .......................................................................................................... 6

ARGUMENT .............................................................................................................. 9

  I.    NO STAY PENDING APPEAL IS WARRANTED ............................................ 9

    A.    Granting A Stay Will Inflict Substantial Harm On Other Interested
            Parties .................................................................................................... 10

    B.    A Stay Will Jeopardize The Public's Interest In The
            Commonwealth's Emergence From Bankruptcy ................................... 15

  II.    ANY STAY SHOULD BE CONDITIONED ON A SIGNIFICANT
      BOND ...................................................................................................... 16

CONCLUSION .......................................................................................................... 19

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acevedo-Garcia v. Vera-Monroig*,
296 F.3d 13 (1st Cir. 2002)...................................................................................9

*In re Adelphia Commc'ns. Corp.*,
361 B.R. 337 (Bankr. S.D.N.Y. 2007) ...............................................................17

*In re Breland*,
No. 16-2272-JCO, 2021 WL 2099206 (Bankr. S.D. Ala. May 24, 2021)............16

*Cassell v. Snyders*,
990 F.3d 539 (7th Cir. 2021) .............................................................................10

*Citizens for Resp.& Ethics in Washington v. FEC*,
904 F.3d 1014 (D.C. Cir. 2018) ....................................................................9, 15

*Common Cause Rhode Island v. Gorbea*,
970 F.3d 11 (1st Cir. 2020)..........................................................................10, 15

*In re DJK Residential, LLC*,
Nos. 08-10375 (LMP), M-47 (GEL), 2008 WL 650389 (S.D.N.Y. Mar. 7,
2008)...................................................................................................................17

*In re Gen. Motors Corp.*,
409 B.R. 24 (Bankr. S.D.N.Y. 2009) ...........................................................14, 17

*N.Y. Skyline, Inc. v. Empire State Bldg. Co., LLC*,
520 B.R. 1 (S.D.N.Y. 2014)...............................................................................16

*Nken v. Holder*,
556 U.S. 418 (2009) ...........................................................................................15

*In re Retail Grp., Inc.*,
2021 WL 2188929 (Bankr. E.D. Va. May 28, 2021).........................................10

*Rio Grande Cmty. Health Ctr., Inc. v. Armendariz*,
792 F.3d 229 (1st Cir. 2015)................................................................................9

*In re Sabine Oil & Gas Corp.*,
548 B.R. 674 (Bankr. S.D.N.Y. 2016) ...............................................................11

*In re Tribune Co.*,
477 B.R. 465 (Bankr. D. Del. 2012) ............................................................14, 17

*In re Tribune Media Co.*,
   799 F.3d 272 (3d Cir. 2015) ............................................................... 16, 17

*Virginian Ry. Co. v. United States*,
   272 U.S. 658 (1926) ............................................................................... 9

*In re W.R. Grace & Co.*,
   475 B.R. 34 (D. Del. 2012) .................................................................. 16

*In re Yellowstone Mt. Club, LLC*,
   2009 WL 2163528 (Bankr. D. Mont. July 16, 2009) ........................... 12

**Other Authorities**

Fed. R. Bankr. P. 8007(a) ........................................................................ 16

Fed. R. Civ. Proc. 62 ............................................................................... 16

FOMB Executive Director: Section 209, Requirements for Termination of the
   Oversight Board (Oct. 30, 2020), available at https://ntc-prod-public-pdfs.s
   Statement 3.us-east-2.amazonaws.com/zo90fRdyj5-
   QXQO7mfFthKsZqOI.pdf ................................................................. 16

Statement, FOMB (Jan. 18, 2022), available at
   https://oversightboard.pr.gov/press/ ................................................. 4, 15

United States Courts for the First Circuit, 2019 Annual Report (2020),
   https://www.ca1.uscourts.gov/sites/ca1/files/2019%20Annual%20Report%20
   Final.pdf ............................................................................................. 12

**Statutes**

Act 53, art. 104 ......................................................................................... 6

Act 53, art. 605 ......................................................................................... 6

PROMESA § 101(a) ................................................................................. 15

PROMESA § 209 ................................................................................. 15, 16

PROMESA Title III ............................................................................ *passim*

To the Honorable United States District Court Judge Laura Taylor Swain:

The Ad Hoc Group of Constitutional Debtholders (the "Constitutional Debt Group"),[2] the Lawful Constitutional Debt Coalition (the "LCDC"),[3] the QTCB Noteholder Group (the "QTCB Group"),[4] the Ad Hoc Group of General Obligation Bondholders (the "GO Group"),[5] Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (together, "Assured"), and National Public Finance Guarantee Corporation ("National"), Financial Guaranty Insurance Company ("FGIC"), and Ambac Assurance Corporation ("Ambac") (collectively the "PSA Creditors")[6] respectfully submit this joint opposition (the "Opposition") to the *Motion for Stay Pending Appeal Regarding Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority [Dkt. No. 19813]* (the "Motion") [Dkt No. 19969] filed by Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc. (collectively, the "Teachers' Associations"). In support of the Opposition, the PSA Creditors rely on and incorporate by reference a declaration of Christine Song (the "Song Declaration"),[7]

---

[2] The members of the Constitutional Debt Group and their respective holdings are set forth in the Twelfth Supplemental Verified Statement of the Ad Hoc Group of Constitutional Debtholders Pursuant to Federal Rule of Bankruptcy Procedure 2019 [Dkt No. 18491].

[3] The members of the LCDC and their respective holdings are set forth in the Thirteenth Supplemental Verified Statement of the Lawful Constitutional Debt Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019 [Dkt. No. 19128].

[4] The members of the QTCB Group and their respective holdings are set forth in the *Eleventh Supplemental Verified Statement of the QTCB Noteholder Group Pursuant to Bankruptcy Rule 2019* [Dkt. No. 19145].

[5] The members of the GO Group and their respective holdings are set forth in the *Thirteenth Supplemental Verified Statement of the Ad Hoc Group of General Obligation Bondholders Pursuant to Bankruptcy Rule 2019* [Dkt. No. 17397].

[6] The PSA Creditors do not assume any fiduciary or other duties to each other or to any other entity or individual.

[7] References to the Song Declaration are cited as "Decl. of C. Song."

attached as **Exhibit A**, and respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Teachers' Associations' extraordinary request to delay the Commonwealth of
Puerto Rico's historic emergence from bankruptcy should be denied.  After years of litigation,
hundreds of millions of dollars of corresponding expenses, and untold hours invested by this Court,
the mediation team, and the parties, the Commonwealth is finally on the threshold of exiting
bankruptcy and generating essential momentum to extricate other Title III debtors as well.  The
Plan (as defined below) is the Commonwealth's best (and perhaps only) opportunity to restructure
its debt and to pave a new path to economic prosperity.

2.      The Motion's extraordinary request to put the Commonwealth's emergence from
Title III on hold necessarily demands an equally extraordinary showing.  But the Teachers'
Associations have not even begun to make any such showing.  They cannot show any likelihood
of success on the merits.  And they cannot show that any harm they might suffer would outweigh
the irreparable injuries that delay would inflict on the Commonwealth, its non-moving creditors,
and its people.  Even if only quantifiable damages are considered, and then only those of
bondholders, the requested stay will inflict hundreds of millions of dollars in losses.  As a result,
even if the Teachers' Associations could show that a stay was warranted, they would necessarily
need to post a bond in at least that amount to protect affected parties in the (likely) event that their
appeal is unsuccessful.  But their Motion does not even mention that fundamental requirement, let
alone explain, as they must, how they can satisfy it.

3.      The Motion should be denied so that the Plan can become effective on schedule.

## BACKGROUND

### A. The Commonwealth Seeks To Restructure Its Debt

4.      Nearly five years ago, the Commonwealth of Puerto Rico, through the Financial Oversight and Management Board for Puerto Rico (the "FOMB"), filed a petition to adjust its debts and the debts of several of its instrumentalities under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). *See* Findings of Fact and Conclusions of Law, Dkt. No 19812 ("FFCL") ¶¶ 9-10.  At the time, the Commonwealth was in dire financial straits.  FFCL ¶ 5.  For the previous year, it had ceased making debt-service payments on its full faith and credit general obligation bonds and Commonwealth-guaranteed bonds (collectively, the "Constitutional Debt"), which amounted to approximately $18 billion of claims.    The Commonwealth had consequently lost access to capital markets, and its public finance system had collapsed.  FFCL ¶ 5.

### B. The Commonwealth's Initial Plans Stall

5.      Two years into its Title III proceedings, in September 2019, the FOMB proposed its first plan of adjustment for the Commonwealth and certain of its instrumentalities after reaching a plan support agreement with certain creditors.  FFCL ¶¶ 17-20; Dkt. No. 8765.  But the plan garnered only limited creditor support, and the FOMB and creditor groups soon undertook renewed mediation efforts.  FFCL ¶ 19; Oct. 28, 2020, Tr. 24-25.  In the interim, major litigation ensued on several fronts with respect to the rights of general obligation, PBA, Commonwealth guaranteed bondholders asserting claims against the Commonwealth, and clawback creditor bondholders of HTA and other instrumentalities.

6.      By February 2020, the FOMB had moved on to the first amended plan of adjustment for the Commonwealth, PBA, and ERS, with another plan support agreement in place. FFCL ¶ 19.  But then, in March 2020, the global pandemic caused the FOMB to seek to adjourn

plan deadlines. FFCL ¶ 20. And after the FOMB certified a new fiscal plan in May 2020 that relied on drastically reduced cash-flow projections, the first amended plan and its related plan support agreement (like the ones before it) fell apart. FFCL ¶¶ 21-23.

### C. The Commonwealth Files A Plan With Broad Creditor Support

7. A year and a half, five plans, several plan support agreements, and hundreds of millions in professional fees later, the Commonwealth filed its seventh amended plan of adjustment. FFCL ¶¶ 22-29; *Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, Dkt. No. 17627 (the "Seventh Amended Plan"). The Seventh Amended Plan incorporated the terms of, among other agreements, a plan support agreement (as amended from time to time, the "GO/PBA Plan Support Agreement") with holders and insurers of the Commonwealth's general obligation bonds, PBA bonds, and other bonds guaranteed by the Commonwealth's full faith and credit (such holders, collectively, "GO/PBA Creditors"). FFCL ¶¶ 27-29. According to the Board, the Plan, together with the restructuring of COFINA's debt, reduces the Commonwealth's debt by approximately 80%. *See* Statement, FOMB (Jan. 18, 2022), available at https://oversightboard.pr.gov/press/. And in exchange for resolving the bondholders' and insurers' claims against the Commonwealth, the GO/PBA Plan Support Agreement provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash upon the effective date of the plan. FFCL ¶ 27. Among other things, the GO/PBA Plan Support Agreement is conditioned on the Commonwealth passing legislation authorizing the issuance of new general obligation bonds (the "New GO Bonds") and certain "contingent value instruments" ("CVIs"). Dkt. No. 17628-2 at § 7.1.

8. The Seventh Amended Plan also addressed claims arising on account of the Commonwealth's public pension systems. Although it provided for the vast majority of retired government employees to receive their full pensions at current levels, it would have reduced

already-accrued monthly pension payments over $1,500 by up to 8.5% (such reduction, the "Monthly Benefit Modification"). Seventh Amended Plan § 1.337. In addition, the Seventh Amended Plan provided for the elimination of *future* benefit accruals under the Commonwealth's remaining defined benefits plans for certain active employees (the "Freeze"). Seventh Amended Plan §§ 55.8, 55.9. And the Seventh Amended Plan also eliminated cost of living adjustments going forward for certain active and retired government employees (the "COLA Elimination"). Seventh Amended Plan §§ 55.1-55.9.

9. This Court scheduled a hearing to consider confirmation of the Seventh Amended Plan commencing on November 8, 2021.

10. As of October 21, 2021, the Legislature had yet to pass debt-authorizing legislation. Accordingly, that day, the FOMB issued a public statement indicating that if the required legislation were not enacted by the following day, the FOMB would seek to adjourn the confirmation hearing. Dkt. No. 18681-2. When the Legislature still did not act, the FOMB filed an informative motion seeking to suspend the confirmation schedule. Dkt. No. 18681.

      **D.**    **Facing Potential Dismissal Of Its Title III Case, The Commonwealth Enacts Debt-Authorizing Legislation**

11. On October 25, 2021, this Court held an emergency status conference with representatives of the FOMB, the Puerto Rico Financial Advisory and Fiscal Agency Authority, and the PSA Creditors, as well as Governor Pedro Pierluisi and the leaders of the House and Senate, to address whether confirmation proceedings would need to be delayed due to the absence of enabling legislation. At the conference, this Court was "frank." Oct. 25, 2021 Tr. 10:3. It explained that "Puerto Rico is at the risk of losing an opportunity to cut its debts under the protection of Title III and build a road forward." Oct. 25, 2021 Tr. 10:5-7. Already, "[h]undreds of millions of dollars of Puerto Rico's money, and probably tens of millions of hours of the time

of the Court, the mediation team, and the parties [had] been invested in getting to this point." Oct.
25, 2021 Tr. 9:18-21. No one "ha[d] another four or five years for a do-over, . . . least of all the
people of Puerto Rico." Oct. 25, 2021 Tr. 10:7-9. "If there are no prospects for prompt
consideration of the Plan with a viable mechanism for implementation in the near term," this Court
warned, "the Court may be forced to consider whether the Title III PROMESA proceedings for
the Commonwealth, ERS, and the PBA, and . . . the Title VI proceedings that have been filed for
[the Puerto Rico Infrastructure Financing Authority] and [the Convention Center District
Authority] should be dismissed." Oct. 25, 2021 Tr. 12-16.

12.     The following day, the Commonwealth enacted Act 53, entitled the "Law to End
the Bankruptcy of Puerto Rico," which provides legislative authorization for the issuance of the
New GO Bonds and CVIs. The law provides that "[t]he Legislative Assembly authorizes the
issuance of the General Obligation Bonds and CVIs subject to the FOMB filing an amended Plan
for confirmation by the Title III Court that eliminates the Monthly Benefit Modification." Act 53,
art. 104. In another section, Act 53 reiterates that "[t]he continued effect of this act is contingent
upon [z]ero cuts to pensions." Act 53, art. 605.

**E.      This Court Holds Confirmation Proceedings And Confirms The Plan**

13.     The following month, the Commonwealth filed an eighth amended plan of
adjustment. Dkt. No. 19053. That plan was modified several times and, on January 14, 2022, the
FOMB filed the operative plan of adjustment—the sixth modified version of the eighth amended
plan of adjustment. *See Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth
of Puerto Rico, et al.*, Dkt. No. 19784 (the "Plan"). The Plan eliminates the Monthly Benefit
Reduction for current retirees, but maintains the Freeze and COLA Elimination on a prospective
basis. Dkt. No. 19784 at 93-99 (Art. LV).

14. In connection with confirmation, the FOMB sought a ruling from this Court that Act 53 conditions the issuance of the New GO Bonds and CVIs solely on the elimination of the Monthly Benefit Modification, and not on the removal of the Freeze or COLA Elimination. Dkt. No. 19002. The Teachers' Associations objected, claiming that the legislation's requirement that the Plan make "zero cuts" to pensions prohibited not just the Monthly Benefit Modification, but the Freeze and COLA Elimination too, and that enabling legislation would be necessary to implement the Freeze and COLA Elimination. Dkt. No. 19180 at 15-29.

15. Between November 8 and November 23, this Court held an eight-day confirmation hearing.

16. Shortly thereafter, the Court issued an order directing the FOMB to address "certain materially problematic aspects" of the Commonwealth's proposed Plan materials. Dkt. No. 19517 at 2. In particular, the Court directed the FOMB to clarify the intended scope of provisions in the Plan recognizing the preemption of Commonwealth statutes and the basis for such preemption. Dkt. No. 19517 at 3-4.

17. The FOMB responded with a chart showing "the statutory provisions the Debtors contend are preempted, the basis for and duration of the preemption, and record citations supporting the projected costs and inconsistencies between the statutes and the certified budgets, fiscal plan, and Plan." Dkt. No. 19567 at 11, 36-108. The FOMB noted that "many of the statutes, on their faces, are preempted because . . . they either mandate appropriations without Oversight Board certification, transfer funds to repay discharged debt, create or modify debt, including pension debt, without Oversight Board approval, re-create discharged debt, or violate other aspects of PROMESA." Dkt. No. 19567 at 11. The Teachers' Associations contended that the preemption

provisions were "overly broad" and would preempt "provisions essential to the functioning of the government's retirement system."  FFCL ¶ 155 n.31 (citing Dkt. No. 19606 ¶¶ 5-72).

18.    On January 18, 2022, the Court confirmed the Plan.  Dkt. No. 19813 (the "Confirmation Order").  Among other things, the Court found that "[t]he Plan has obtained all necessary legislative, regulatory, and electoral approvals" and that the "Debtors are not prohibited by law from taking any action necessary to carry out the Plan."  Dkt. No. 19812 at 94, 119.  With respect to Act 53, the Court concluded that it "authorizes the issuance of CVIs and New GO Bonds" and that its "effectiveness is conditioned only on the elimination of the Monthly Benefit Modification . . . from the Plan."  Dkt. No. 19812 at 94.  The Court also concluded that "by reason of the Plan's provisions freezing defined benefit accruals and future costs of living adjustments, upon the Plan's Effective Date, PROMESA preempts Acts 91-2004 (establishing TRS) and 12-1954 (establishing JRS), each as amended, providing for the future accrual of defined benefits and future cost of living adjustments, to the extent set forth" in an exhibit.  Id.  The Court further explained that "[e]nabling legislation is not required to establish the freeze of defined benefits or elimination of COLAs" because "[o]bligations arising from Commonwealth statutes . . . give rise to claims which can be impaired and discharged pursuant to the Plan."  Id. (citing 11 U.S.C. § 101(5)(A)).  The Court also rejected the Teachers' Associations' contention that the Plan's preemption provisions were overly broad in that they preempted statutory provisions essential to the functioning of the government's retirement systems, explaining that any identified statutory provision is not preempted in its entirety, but "only to the extent its operative provisions are both described in the 'Specific Provisions Preempted' column and a basis for the preemption thereof is listed in the 'Basis for Preemption' column."  Dkt. No. 19812 at 96 n.31.

19.     On January 28, 2022, the Teachers' Associations filed a notice of appeal.  Dkt. No. 19941.  On February 1, 2022, the Teachers' Associations moved to stay the implementation of the Plan pending appeal.  Dkt. No. 19969 at 32.  Absent a stay, the Commonwealth is expected to emerge from Title III no later than March 15, 2022 (the "Effective Date").  *See* Amendment to Amended and Restated Plan Support Agreement ¶ 2, available at https://emma.msrb.org/P21611467.pdf.

## ARGUMENT

20.     The Teachers' Associations' Motion to stay implementation of the Plan pending their appeal should be denied.  Among other reasons, a stay will inflict grave harm on other parties, including the PSA Creditors, and disserve the public's interest by jeopardizing Puerto Rico's emergence from bankruptcy.  Even were this Court to enter a stay, it should condition any such stay on a sizeable bond to minimize the untold harm to third-parties flowing from a stay.

## I.     NO STAY PENDING APPEAL IS WARRANTED

21.     The Teachers' Associations have a heavy burden to obtain a stay pending their appeal.  They "must make the following four showings to secure a stay: (1) a strong showing that it is likely to succeed on the merits; (2) a showing that unless a stay is granted, it will suffer irreparable injury; (3) a showing that no substantial harm will come to the other interested parties; and (4) a showing that a stay will do no harm to the public interest." *Rio Grande Cmty. Health Ctr., Inc. v. Armendariz*, 792 F.3d 229, 231 (1st Cir. 2015) (internal quotation marks and alterations omitted).  A stay pending appeal is an "extraordinary" remedy. *Citizens for Resp. & Ethics in Washington v. FEC*, 904 F.3d 1014, 1017 (D.C. Cir. 2018).  It "is not a matter of right, even if irreparable injury might otherwise result." *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926).

22.     The Teachers' Associations have not proven that a stay is warranted here.  For the reasons discussed in the FOMB's opposition filed contemporaneously herewith, the Teachers' Associations are unlikely to succeed on the merits of their appeal, and their stay request may be denied on that ground alone.  *See Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002) ("The sine qua non of the stay pending appeal standard is whether the movants are likely to succeed on the merits." (brackets omitted)).  But a stay should also be denied because it would inflict serious harm on other parties, like the PSA Creditors, and disserve the public's interest in having the Commonwealth finally emerge from bankruptcy.  *See, e.g., Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (assuming likelihood of success and risk of irreparable harm but finding district court "did not abuse his discretion in concluding that the equitable balance of harms weighs against granting a preliminary injunction").

### A.     Granting A Stay Will Inflict Substantial Harm On Other Interested Parties

23.     To warrant a stay, the Teachers' Association must address "whether [the] issuance of the stay will substantially injure the other parties interested in the proceeding."  *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 14 (1st Cir. 2020).  And the Teachers' Associations bear the burden of proving that a stay will not harm other parties.  *See In re Retail Grp., Inc.*, 2021 WL 2188929, at *10 (Bankr. E.D. Va. May 28, 2021) ("[N]on-moving parties do not bear the burden of proving the potential harm.  Rather, the movant has the burden of showing the absence of substantial harm."  (internal quotation marks and brackets omitted)).  The Teachers' Associations do not do so.  Instead, they cursorily assert that "the issuance of a stay does not have an adverse effect on other parties."  Motion at 30.  That does not suffice.  Having made no genuine attempt to meet their burden, their stay request should be denied on this ground alone.

24.     In reality, a stay of the Plan's implementation will inflict enormous and varied harm on other interested parties, including the PSA Creditors.  "Courts have recognized numerous harms resulting from the postponement of reorganization proceedings," including "lost strategic opportunity," "incurrence of administrative and professional expenses," "placing plan settlements in jeopardy," and "exposing the equity to be granted to non-moving creditors to market volatility and other risks."  *In re Sabine Oil & Gas Corp.*, 548 B.R. 674, 683 (Bankr. S.D.N.Y. 2016). Unsurprisingly, a stay delaying the Commonwealth's emergence from Title III will cause all of these harms, and more.

25.     Three of the most obvious, and quantifiable, harms that the PSA Creditors (along with other GO/PBA Creditors) will suffer are (1) the lost opportunity to invest cash that would otherwise be distributed to them under the Plan; (2) the reduction in value to consideration that would otherwise be distributed to them under the Plan; and (3) additional professional fees.  As detailed in the Song Declaration, each of these separate harms is substantial, and in combination they amount to hundreds of millions of dollars to over a billion dollars depending on the length of the stay.  *See* Decl. of C. Song, Ex. A to the Opposition.

26.     If an appeal is expedited and delays the Commonwealth's emergence from Title III by only six months (the period of delay, the "Stay Period"), GO/PBA Creditors will lose out on at least $279 million in foregone income.  Decl. of C. Song, Tables 1-2.  That is because, during the Stay Period, creditors will be unable to access or reinvest approximately $7.1 billion of cash consideration (the "Distributable Cash"), the principal and interest (such payments, "Debt Service") on account of certain of the New GO Bonds, and the payments on the GO CVIs (such payments, "CVI Payments," and together with the Distributable Cash and the Debt Service, the

"Plan Consideration") that would otherwise be distributed or paid to GO/PBA Creditors under the Plan. Decl. of C. Song ¶¶ 9-12, Table 2.

27. GO/PBA Creditors will also suffer reduced value of their Plan Consideration. Decl. of C. Song ¶¶ 14-17, Tables 1, 3. A majority of the New GO Bonds are fixed rate bonds, and interest rates are expected to rise in the near future. Decl. of C. Song ¶ 16. A six-month delay thus can be expected to reduce the value of the New GO Bonds by about $40 million. Decl. of C. Song, Table 3.

28. Finally, it is estimated that the major creditor constituencies that are signatories to the GO/PBA Plan Support Agreement are likely to collectively incur at least an additional $12 million in professional fees during a six-month delay as a result of the appeal and expenses in renegotiating the terms of a revised plan with a delayed effective date. Decl. of C. Song, Table 4.

29. In the scenario where the Commonwealth's emergence is delayed by 13 months— the median timeframe for the resolution of an appeal in the United States Court of Appeals for the First Circuit (the "First Circuit")—these figures, in total, exceed $700 million. Decl. of C. Song ¶¶ 6, 13, 17, 19.[8] That total includes $635 million in lost-opportunity costs, $61 million in reduced value of Plan Consideration, and $26 million in additional professional fees. Decl. of C. Song ¶¶ 6, 13, 17, 19.[9]

---

[8] *See* United States Courts for the First Circuit, 2019 Annual Report (2020), at 20, available at https://www.ca1.uscourts.gov/sites/ca1/files/2019%20Annual%20Report%20Final.pdf.

[9] Nor would a stay threaten only the Commonwealth plan or harm only GO-PBA Creditors. Creditors of HTA, the Puerto Rico Infrastructure Financing Authority, and other instrumentalities of the Commonwealth (the "Clawback Creditors") agreed to resolve their claims against the Commonwealth as part of an integrated settlement that resulted in plan support agreements for HTA and other debtor instrumentalities. The HTA plan support agreement (the "HTA PSA") was negotiated on the basis that the HTA plan of adjustment (the "HTA Plan") and related documentation would be negotiated and finalized in tandem with Plan confirmation, and would be proposed by the FOMB shortly after the Plan became effective. In fact, the "Distributions Conditions" (as defined in the Plan) provide that before certain CVIs and cash will be distributed to HTA Clawback Creditors under the Plan, the terms of the HTA Plan, confirmation order, and toll revenue bonds to be issued by reorganized HTA, among other documents, are to be agreed on. Further, to the extent the GO/PBA Plan Support Agreement is terminated, parties to the HTA PSA have the right to terminate the HTA PSA. Accordingly, in addition to depriving GO/PBA Creditors of significant consideration, a stay will also deprive HTA Clawback Creditors of significant consideration, could negatively impact the HTA Plan

30.     A stay pending appeal will also jeopardize the viability of the Plan itself.  If the effectiveness of the Plan is delayed for six months or more, there is a genuine possibility that it will fall apart.  *See In re Yellowstone Mt. Club, LLC*, 2009 WL 2163528, at *4 (Bankr. D. Mont. July 16, 2009) ("[T]he possible failure of any plan of reorganization as a consequence of a stay constitutes significant injury to creditors.").  That is not mere speculation—it is what history tells us.  After the disclosure hearing on the Commonwealth's first amended plan of adjustment was delayed, the plan and its supporting agreements crumbled, leading to another *two years* of bankruptcy proceedings.  *Supra* pp. 3-4.  Delay is especially likely to scramble the Plan because certain of the foundational settlements underlying it are conditioned on the timely occurrence of the Plan's Effective Date.  *See, e.g.*, GO/PBA Plan Support Agreement, §§ 7.1(a)(v), 7.1(b)(viii) (plan support agreement may be terminated if Effective Date not achieved by March 15, 2022). At a minimum, then, the Commonwealth will be obliged to remain in bankruptcy while a new plan is negotiated, drafted, proposed, and confirmed.[10]  Assuming that could be accomplished in two years, that is another two years of lost investment income and added professional fees that PSA Creditors (along with other GO/PBA Creditors) will suffer.  And creditors would not be the only ones harmed.  The Commonwealth, too, would be expected to incur tens, if not hundreds, of millions of dollars in additional professional fees.  And that's to say nothing of the harm the Commonwealth will continue to suffer due to its inability to access the capital markets during that time.  *See* Decl. of C. Song ¶¶ 8, 20.

31.     A stay could also cause the failure of the Commonwealth's Title III case altogether. This case has been pending for nearly five years.  There have been at least nine proposed plans,

---

process, and could, in turn, impede HTA's economic rehabilitation and hinder HTA and other instrumentalities in providing and maintaining critical infrastructure for the Commonwealth.

[10] In fact, a new mediation team would likely need to be established, since the current one has been dissolved.  Dkt. No. 19833.

numerous plan support agreements, and countless mediation sessions. As this Court is aware, had

the Commonwealth not timely proceeded with the Plan, "the Court may [have been] forced to

consider whether the Title III PROMESA proceedings for the Commonwealth, ERS, and the PBA

. . . should be dismissed." Oct. 25, 2021 Tr. 10:12-16. The harm to the Commonwealth, its

creditors, and its people in that scenario cannot be overstated. "[T]he Oversight Board would not

go away, but the protection of the automatic stay would be lost." Oct. 25, 2021 Tr. 10:16-18.

"Creditors could commence proceedings in countless courts, in chaotic efforts to collect on monies

that have not been paid, and the Commonwealth would be facing hundreds of millions more in

lawyers' fees and other expenses." Oct. 25, 2021 Tr. 10:18-21. As this Court recognized, it is

hard "to see how that situation could benefit Puerto Rico's citizens and retirees." Oct. 25, 2021

Tr. 10:22-24. Yet that is the very situation a stay could bring about—further delay could lead to

the ultimate failure of agreement on a new plan and the end of Title III proceedings.

      32.     No bond could adequately protect against the risk that a stay would doom the Title

III proceedings. That itself is a reason to deny a stay outright. *Cf. In re Gen. Motors Corp.*, 409

B.R. 24, 34 (Bankr. S.D.N.Y. 2009) ("A bond may sometimes be a practical alternative where the

injury to the estate from delay is merely a matter of money, and the injury to the estate caused by

delay, while serious, would not be irreparable.").

      33.     The Teachers' Association's cursory counterarguments as to injury are

unpersuasive. Their argument that "mere delay of the Effective Date" of the plan cannot be

considered an injury because the "debt has not been paid for five years now" is baseless. Motion

at 30-31; *In re Tribune Co.*, 477 B.R. 465, 478 (Bankr. D. Del. 2012) (rejecting argument that "a

stay maintaining the status quo would not harm the non-moving parties because this bankruptcy

case has already been pending for years"). Without a stay pending appeal, the Plan will go

effective no later than March 15, 2022, and creditors—some of whom have waited nearly six years since the Commonwealth's default—will finally be paid. The incremental harm they would suffer from a delay of the Effective Date during an appeal would be directly attributable to the stay now requested.[11] Nor are the Teachers' Associations correct that interested parties must have expected the Effective Date to be delayed. Motion at 31. Even if appeals "are part of the procedures before this Court," Motion at 31, it hardly follows that *stays* pending appeal are routine. To the contrary, a stay pending appeal is an "extraordinary" remedy. *Citizens for Responsibility & Ethics*, 904 F.3d at 1017. And that is so even if—as the Teachers' Associations say—their appeal would become equitably moot without one. Motion at 26. As the Supreme Court has emphasized, "[a] stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009). Nor is the possibility of an expedited appeal any answer. *Contra* Motion at 31. Even assuming an appeal could be resolved by September 2022, that delay will cause GO/PBA Creditors to suffer at least $279 million in foregone investment income, $40 million in reduced value to their Plan Contribution, and $12 million in additional professional fees. Decl. of C. Song, Tables 1-4.

### B. A Stay Will Jeopardize The Public's Interest In The Commonwealth's Emergence From Bankruptcy

34. If ever there were a case where the public interest called for denial of a stay pending appeal, it is this one. *See Common Cause Rhode Island*, 970 F.3d at 14 (directing courts to consider "where the public interest lies" in stay analysis). Absent a stay, the Commonwealth will make a historic emergence from bankruptcy. It will cut its bond debt from $33 billion to $7 billion and reduce its overall debt by 80%. *See* Statement, FOMB (Jan. 18, 2022), available at

---

[11] The Teachers' Associations are wrong that the Effective Date will be stalled due to the lack of enabling legislation, a condition precedent of the Effective Date. Motion at 31. This Court has held that any legislation required to implement the Plan has been obtained. Findings of Fact and Conclusions of Law ¶¶ 153, 187. Absent a stay, the Plan will go effective no later than March 15, 2022.

https://oversightboard.pr.gov/press/; Plan, § 74.1 (describing New GO Bonds to be issued under Plan). It will be well on its way to achieving fiscal responsibility and regaining access to the capital markets—the twin goals of PROMESA. PROMESA § 101(a). And it will be one giant leap closer to ending the FOMB's oversight. PROMESA § 209.[12] A stay pending appeal will jeopardize all of that—putting at risk not just the success of this Plan, but the Commonwealth's Title III case itself. *Supra* pp. 13-14. The Commonwealth will be at "risk of losing an opportunity to cut its debts under the protection of Title III and build a road forward." Oct. 25, 2021 Tr. 10:5-7. While it is often said that "the timely and efficient administration of bankruptcy estates serves the public interest," *In re Breland*, No. 16-2272-JCO, 2021 WL 2099206, at *4 (Bankr. S.D. Ala. May 24, 2021), in this case, Puerto Rico's prosperity depends on it.

## II.    ANY STAY SHOULD BE CONDITIONED ON A SUBSTANTIAL BOND

35.    "Courts may condition stays of plan confirmation orders pending appeal on the posting of a supersedeas bond." *In re Tribune Media Co.*, 799 F.3d 272, 281-282 (3d Cir. 2015); *see* Fed. R. Bankr. P. 8007(a); Fed. R. Civ. Proc. 62. "The purpose of requiring such a bond in a bankruptcy court is to indemnify the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court." *In re Tribune Media Co.*, 799 F.3d at 282. "If the movant seeks the imposition of a stay without a bond, the applicant has the burden of demonstrating why the court should deviate from the ordinary full security requirement." *In re W.R. Grace & Co.*, 475 B.R. 34, 209 (D. Del. 2012).

---

[12] Under PROMESA section 209, the FOMB shall terminate only upon the FOMB's certification that, *inter alia*, the "applicable territorial government has adequate access to short-term and long-term credit markets at reasonable interest rates to meet the borrowing needs of the territorial government." PROMESA § 209(a). As the FOMB has explained, this requires the Commonwealth to have completed a "sustainable debt restructuring." *See* Update from FOMB Executive Director: Section 209 Requirements for Termination of the Oversight Board (Oct. 30, 2020), available at https://ntc-prod-public-pdfs.s3.us-east-2.amazonaws.com/zo90fRdyj5-QXQO7mfFthKsZqOI.pdf.

36. The Teachers' Associations do not even attempt to propose a satisfactory bond, or attempt to explain why the full security bond requirement should not apply here. Tellingly, they ignore the issue completely. That is despite the fact that the FOMB expressly stated at a meet-and-confer before the filing of the Motion that it would insist on the posting of a substantial bond if a stay were granted. The stay request should be denied for this reason alone. *See N.Y. Skyline, Inc. v. Empire State Bldg. Co., LLC*, 520 B.R. 1, 14 (S.D.N.Y. 2014) ("[T]he failure of a party to address its burden with respect to a bond may weigh against granting a stay.").

37. But even were this Court to enter a stay, it should condition the stay on a bond of at least $722 million to address PSA Creditor harm. *See* Decl. of C. Song ¶ 6. That figure represents additional professional fees, lost opportunity costs, and loss in market value to Plan Consideration the PSA Creditors will incur if a stay pending appeal delays the Commonwealth's emergence from bankruptcy by 13 months (the First Circuit's average time to decide an appeal). *See* Decl. of C. Song ¶¶ 6, 9-19; *see In re Tribune*, 799 F.3d at 281-282 (approving bond valuation based on "additional professional fees, opportunity costs to creditors who would receive delayed distributions . . . or delayed interest and principal payments . . ., and a loss in market value to equity investors caused by the delayed emergence" as "well-considered"). Although there is no guarantee the First Circuit would expedite the Teachers' Associations' appeal, the Court should, at a minimum, require a bond of $331 million if it assumes expedition and final resolution of the appeal in six months. *See* Decl. of C. Song, Tables 1-4.

38. These proposed bond amounts cover anticipated harm to PSA Creditors alone. As the FOMB explains in its opposition, a bond covering anticipated harms to the Commonwealth and other creditors as well would exceed $1 billion. These proposed bond amounts are less than or comparable to bonds set in bankruptcies with fewer complexities and lower stakes than this one.

See, e.g., *In re Tribune Co.*, 477 B.R. at 478 ($1.5 billion); *In re Adelphia Commc'ns. Corp.*, 361 B.R. 337, 350 (Bankr. S.D.N.Y. 2007) ($1.3 billion, later reduced); *In re Gen. Motors Corp.*, 409 B.R. at 34 ("I find that a bond would have to be posted in an amount no less than $ 7.4 billion, even if any and all other concerns could be addressed."). Nonetheless, the Teachers' Associations may object that the proposed bond amounts are too high. In fact, the amounts proposed are based on extremely conservative estimates of the harm a stay would inflict. If even that conservative figure is high, that only proves the enormity of the harm that would follow from granting the Teachers' Associations' request. *See In re DJK Residential, LLC*, Nos. 08-10375 (LMP), M-47 (GEL), 2008 WL 650389, at *5 (S.D.N.Y. Mar. 7, 2008) (movant's argument that bond would be prohibitively expensive "only serves to highlight the substantial risk of dramatic injury to Debtors and other creditors if the Bankruptcy Court's orders were erroneously stayed."). Staying the Commonwealth's emergence from bankruptcy will cause hundreds of millions, if not billions, of dollars in harm. These costs will have to be borne by someone. Without a sizeable bond, they will be borne entirely by the Commonwealth, its non-moving creditors, and its people. That should not be. As the parties asking the Court to grant them extraordinary relief, the Teachers' Associations should shoulder the costs that relief entails in the event their appeal is unsuccessful.

39. Finally, in the event this Court denies the requested stay pending appeal, it should consider specifying the size of a bond it would impose if it were to grant a stay. If this Court denies a stay, the Teachers' Associations will presumably make a stay request to the First Circuit. The appellate court would benefit from this Court's views on the appropriate size of a bond, given this Court's intimate familiarity with these proceedings.

[*Remainder of page intentionally left blank*]

## CONCLUSION

The Teachers' Associations' Motion to stay implementation of the Plan pending their appeal should be denied. In the alternative, this Court should condition any stay on the Teachers' Associations posting a bond of at least $722 million.

Dated: February 9, 2022
      San Juan, Puerto Rico

Respectfully submitted,

**G. CARLO-ALTIERI LAW OFFICES, LLC**

By: */s/ Gerardo A. Carlo*
Gerardo A. Carlo
USDC PR No. 112009
Telephone: (787) 247-6680
gacarlo@carlo-altierilaw.com

254 San Jose St., Third Floor
San Juan, Puerto Rico 00901
Telephone: (787) 247-6680
Facsimile: (787) 919-0527

**MORRISON & FOERSTER LLP**

By: */s/ Gary S. Lee*
James M. Peck (admitted *pro hac vice*)
Gary S. Lee (admitted *pro hac vice*)
James A. Newton (admitted *pro hac vice*)
Lena H. Hughes
Andrew R. Kissner (admitted *pro hac vice*)
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
Facsimile: (212) 468-7900
jpeck@mofo.com
glee@mofo.com
jnewton@mofo.com
lhughes@mofo.com
akissner@mofo.com

-and-

Joseph R. Palmore (admitted *pro hac vice*)
2100 L Street, NW, Suite 900
Washington, D.C. 20037
Telephone: (202) 887-6940
Facsimile: (202) 887-0763
jpalmore@mofo.com

*Counsel for Ad Hoc Group of Constitutional Debtholders*

**REICHARD & ESCALERA**

By: */s/ Rafael Escalera*
Rafael Escalera
USDC No. 122609
escalera@reichardescalera.com

Sylvia M. Arizmendi
USDC-PR 210714
arizmendis@reichardescalera.com

Carlos R. Rivera-Ortiz
USDC-PR 303409
riverac@reichardescalera.com

255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913
Telephone:  (787) 777-8888

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Susheel Kirpalani (admitted *pro hac vice*)
susheelkirpalani@quinnemanuel.com

Daniel Salinas
USDC-PR 224006
danielsalinas@quinnemanuel.com

Eric Kay (admitted *pro hac vice*)
erickay@quinnemanuel.com

Zachary Russell (admitted *pro hac vice*)
zacharyrussell@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603
Telephone:  (212) 849-7000

*Co-Counsel for the Lawful Constitutional Debt Coalition*

**WILLKIE FARR & GALLAGHER LLP**

By: */s/ Mark T. Stancil*
Mark T. Stancil (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, DC 20006
Telephone: (202) 303-1133
Facsimile: (202) 303-2133
Email: mstancil@willkie.com

*Counsel for the Ad Hoc Group of General Obligation Bondholders*

21

**MORGAN, LEWIS & BOCKIUS LLP**

*/s/* Kurt A. Mayr
Kurt A. Mayr (admitted *pro hac vice*)
David L. Lawton (admitted *pro hac vice*)
David K. Shim (admitted *pro hac vice*)
One State Street
Hartford, CT 06103-3178
Tel. (860) 240-2700
Fax: (860) 240-2701
kurt.mayr@morganlewis.com
david.lawton@morganlewis.com
david.shim@morganlewis.com

Sabin Willett (admitted *pro hac vice*)
One Federal Street
Boston, MA 02110-1726
Tel: (617) 951-8775
sabin.willett@morganlewis.com

**CORREA-ACEVEDO & ABESADA LAW OFFICES, PSC**

Sergio Criado
USDC-PR No. 226307
Roberto Abesada-Agüet
USDC-PR No. 216706
Centro Internacional de Mercadeo, Torre II
# 90 Carr. 165, Suite 407
Guaynabo, P.R.  00968
Tel. (787) 273-8300
Fax (787) 273-8379
ra@calopsc.com
scriado@calopsc.com

*Co-Counsel for the QTCB Noteholder Group*

**CASELLAS ALCOVER & BURGOS P.S.C.**

By: /s/ *Heriberto Burgos Pérez*
    Heriberto Burgos Pérez
    USDC-PR No. 204,809
    Ricardo F. Casellas-Sánchez
    USDC-PR No. 203,114
    Diana Pérez-Seda
    USDC–PR No. 232,014
    P.O. Box 364924
    San Juan, PR 00936-4924
    Tel.: (787) 756-1400
    Fax: (787) 756-1401
    E-mail:  hburgos@cabprlaw.com
              rcasellas@cabprlaw.com
              dperez@cabprlaw.com

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

**CADWALADER, WICKERSHAM & TAFT LLP**

By: /s/ *Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr.*
    Mark C. Ellenberg*
    Casey J. Servais*
    William J. Natbony*
    Thomas J. Curtin*
    200 Liberty Street
    New York, New York 10281
    Tel.: (212) 504-6000
    Fax: (212) 406-6666
    Email:  howard.hawkins@cwt.com
             mark.ellenberg@cwt.com
             casey.servais@cwt.com
             bill.natbony@cwt.com
             thomas.curtin@cwt.com

* Admitted pro hac vice

*Counsel for Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*

23

**ADSUAR MUÑIZ GOYCO**
**SEDA & PÉREZ-OCHOA, P.S.C.**

By: */s/ Eric Pérez-Ochoa*
    Eric Pérez-Ochoa
    USDC-PR No. 206,314
    Email: epo@amgprlaw.com

    */s/ Luis A. Oliver-Fraticelli*
    Luis A. Oliver-Fraticelli
    USDC-PR No. 209,204]
    Email: loliver@amgprlaw.com

    208 Ponce de León Avenue, Suite 1600
    San Juan, PR 00936
    Telephone: (787) 756-9000
    Facsimile: (787) 756-9010

*Attorneys for National Public Finance*
*Guarantee Corp.*

**WEIL, GOTSHAL & MANGES LLP**

By: */s/ Robert Berezin*
    Jonathan Polkes*
    Gregory Silbert*
    Robert Berezin*
    Kelly DiBlasi*
    Gabriel A. Morgan*
    767 Fifth Avenue
    New York, NY 10153
    Tel.: (212) 310-8000
    Fax: (212) 310-8007
    Email: jonathan.polkes@weil.com
          gregory.silbert@weil.com
          robert.berezin@weil.com
          kelly.diblasi@weil.com
          gabriel.morgan@weil.com

*Admitted *pro hac vice*

*Attorneys for National Public Finance Guarantee Corp.*

**REXACH & PICÓ, CSP**

By: /s/ *María E. Picó*
María E. Picó

USDC-PR 123214
802 Ave. Fernández Juncos
San Juan PR 00907-4315
Telephone: (787) 723-8520
Facsimile: (787) 724-7844
E-mail: mpico@rexachpico.com
Attorneys for Financial Guaranty
Insurance Company

**BUTLER SNOW LLP**

By: /s/ *Martin A. Sosland*
Martin A. Sosland
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219
Telephone: (469) 680-5502
Facsimile: (469) 680-5501
Email: martin.sosland@butlersnow.com

James E. Bailey III
Adam M. Langley
6075 Poplar Ave., Suite 500
Memphis, TN 38119
Telephone: (901) 680-7200
Facsimile: (901) 680-7201
Email: jeb.bailey@butlersnow.com
adam.langley@butlersnow.com

*Counsel for Financial Guaranty Insurance Company*

**FERRAIUOLI LLC**

By: /s/ *Roberto Cámara-Fuertes*
     Roberto Cámara-Fuertes (USDC-PR No. 219002)
     Sonia Colón (USDC-PR No. 213809)
     221 Ponce de León Avenue, 5th Floor
     San Juan, PR 00917
     Telephone: (787) 766-7000
     Facsimile:  (787) 766-7001
     Email:  rcamara@ferraiuoli.com
           scolon@ferraiuoli.com

**MILBANK LLP**

By: /s/ *Atara Miller*
     Dennis F. Dunne (admitted *pro hac vice*)
     Atara Miller (admitted *pro hac vice*)
     Grant R. Mainland (admitted *pro hac vice*)
     John J. Hughes, III (admitted *pro hac vice*)
     Jonathan Ohring (admitted *pro hac vice*)
     55 Hudson Yards
     New York, NY 10001
     Telephone: (212) 530-5000
     Facsimile:  (212) 530-5219
     Email: ddunne@milbank.com
           amiller@milbank.com
           gmainland@milbank.com
           jhughes2@milbank.com
           johring@milbank.com

*Attorneys for Ambac Assurance Corporation*