# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## TEACHERS' ASSOCIATIONS' OMNIBUS REPLY TO OBJECTIONS TO MOTION FOR STAY PENDING APPEAL [DOCKET NO. 19969]

*[Space left blank intentionally.]*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** .................................................................... 1

**I.       SUMMARY OF PROCEDURAL BACKGROUND** ......................................... 3

**II.      STANDARD OF REVIEW** ..................................................... 9

**III.     ARGUMENT** ...................................................... 12

A.   THE PROPOSED APPEAL OF THE CONFIRMATION ORDER IS LIKELY TO SUCCEED ON THE MERITS. ................................................. 13

B.   THE TEACHERS' ASSOCIATIONS WILL SUFFER IRREPARABLE HARM. ...... 29

C.   THE POTENTIAL INJURY CAUSED BY THE STAY TO OTHER PARTIES DOES NOT OUTWEIGH THE NEED FOR THE STAY. .................................. 35

D.   PUBLIC INTEREST IS NOT DISSERVED BY THE REQUESTED STAY. ............ 41

E.   THE IMPOSITION OF A SUBSTANTIAL BOND IS UNWARRANTED AND WOULD EFFECTIVELY DENY THE RIGHT TO APPEAL. ............................ 45

**CONCLUSION** ........................................................... 53

**RELIEF REQUESTED** .......................................................... 53

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Baker & Drake, Inc. v. Pub. Serv. Comm'n (In re Baker & Drake, Inc.),*
   35 F.3d 1348, (9th Cir. 1994 ........................................................................................... 31

*Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos. ,*
   996 F.3d 37 (1st Cir. 2021)............................................................................................. 10

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC,*
   752 F.3d 82 (1st Cir. 2014).............................................................................................. 51

*Charlesbank Equity Fund II, Ltd. P'ship v. Blinds to Go, Inc.,*
   370 F.3d 151 (1st Cir. 2004)............................................................................................ 11

*Clark v. Takata Corp.,*
   192 F.3d 750, (7th Cir. 1999). ........................................................................................ 52

*Cooperativa de Ahorro y Credito v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt.
   Bd.) ,*
   989 F.3d 123 (1st Cir. 2021)............................................................................................ 10

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993). ................................................................................................. 51, 52

*Drivetrain, LLC v. Kozel (In re Abengoa Bioenergy Biomass of Kan., LLC),*
   589 B.R. 731,  (D. Kan. 2018)......................................................................................... 39

*Fin. Oversight & Mgmt. Bd. For P.R. v. Pierluisi Urrutia (In re Fin. Oversight & Mgmt. Bd. For
   P.R.),*
   Nos. 17-BK-3283-LTS, 21-00072-LTS, 2021 U.S. Dist. LEXIS 197292 (D.P.R. 2021)......... 46

*In re Betteroads Asphalt, LLC,*
   610 B.R. 28 (Bankr. D.P.R. 2019).................................................................................... 11

*In re City of Prichard,*
   No. 1:09-bk-15000 (Bankr. S.D. Ala. 2014). .............................................................. 21, 23

*In re Dyanmic Brokers, Inc.,*
   293 B.R. 489 (BAP 9th Cir. 2003) ................................................................................... 31

*In Re Federal Mogul Glob.,*
   684 F.3d 355 (3d Cir. 2012) ............................................................................................ 20

*In re Fin. Oversight & Mgmt. Bd. for P.R.*,
 987 F.3d 173 (1st Cir. 2021) ........................................................................ 10, 12

*In re Howley*,
 38 B.R. 314 (Bankr. D. Minn. 1984) ...................................................................... 46

*In re Juarez*,
 No. 0:17-bk-06277-BMW, 2019 Bankr. LEXIS 623 (Bankr. D. Ariz. 2019) ........................ 31

*In re Scrub Island Dev. Grp. Ltd*.,
 523 B.R. 862 (Bankr. M.D. Fla. 2015) ............................................................... 41, 42

*In re Tribune Co.*,
 477 B.R. 465 (Bankr. D. Del. 2012 ...................................................................... 44

*In re Weinhold*,
 389 B.R. 783 (Bankr. M.D. Fla. 2008) ............................................................... 10, 11

*In re Yormak*,
 No. 2:15-bk-04241-FMD, 2021 Bankr. LEXIS 3089 (Bankr. M.D. Fla. 2021). ...................... 47

*Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning Co.)*,
 496 B.R. 644 (B.A.P. 1st Cir. 2013) .............................................................. 18, 19, 20

*Kumho Tire Co., Ltd. V. Carmichael*,
 526 U.S. 137 (1999). ................................................................................. 52

*Lyman v. St. Jude Medical S.C. Inc.*,
 580 F. Supp.2d 719 (E.D. Wisc. 2008) .................................................................. 52

*Malcolm v. Nat'l Gypsum Co.*,
 995 F.2d 346 (2d Cir. 1993). ........................................................................... 43

*Mathews v. Eldrige*,
 424 U.S. 319 (1976) .................................................................................... 31

*Mitchell v. Gencorp Inc*.,
 165 F.3d 778 (10th Cir. 1999). ......................................................................... 53

*Montefiore Med.Ctr. v. Am. Prot.Ins. Co.*,
 No. 00-CV-3235, 2003 WL 21108232 (S.D.N.Y. 2003) ................................................ 52

*N.Y. Skyline, Inc. v. Empire State Bldg. Co., LLC*,
 520 B.R. 1 (S.D.N.Y. 2014). ........................................................................... 47

*Ochadleus v. City of Detroit (In re City of Detroit),*
   838 F.3d 792 (6th Cir. 2016). ....................................................................... 30

*Pacific Gas & Elec. Co. v. California ex rel. Cal. Dep't of Toxic Substances Control*,
   350 F.3d 932 (9th Cir. 2003) ........................................................................ 20

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan,*
   397 F.3d 56 (1st Cir. 2005)........................................................................... 29

*Rivera v. Lake Berkley Resort Master Ass'n (In re Rivera),*
   532 B.R. 425 (Bankr. D.P.R. 2015)............................................................... 11

*Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. For P.R. (In re Fin. Oversight & Mgmt. Bd. For P.R.),*
   330 F. Supp. 3d 685, 701 (D.P.R. 2018) ...................................................... 46

*State Indus., Inc. v. Mor-Flo Indus., Inc.,*
   24 F.R.D. 613 (E.D. Tenn. 1988) ................................................................. 48

*Townsend v. Holman Consulting Corp.,*
   881 F.2d 788 (9th Cir. 1989). ...................................................................... 11

*Vadala v. Teledyne Indus., Inc.*,
   44 F.3d 36 (1st Cir. 1995)............................................................................ 52

**Statutes**

48 U.S.C. §2103 ................................................................................................. 16

   § 2126(d)...................................................................................................... 45

   § 2174(b).................................................................................................. passim

Act No. 53-2021........................................................................................... passim

Act No. 106-2017 .............................................................................................. 24

**Rules**

Fed. R. App. P. Rule 8(a)(1)(A)........................................................................ 10

Fed. R. Bankr. P. 8007(a)(1)(A) ....................................................................... 10

Federal Rule of Evidence 702............................................................................ 51

## Other Authorities

Cassandra Burke Robertson, *The Right to Appeal*, 91 N.C. L. REV. 1219 (2013)........................ 32

COMBINED PLAN FOR THE GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN, Amendment and Restatement, Effective July 1, 2014.............................................................. 21

CONGRESSIONAL RESEARCH SERVICE, SOCIAL SECURITY: THE WINDFALL ELIMINATION PROVISION (WEP)................................................................................................................. 34

Cristina Corujo, *Public employees in Puerto Rico protest over wages as frustration with governor grows* ABC NEWS (February 9, 2022) .......................................................................... 2

Javier Colón Dávila, *Aprueban en comisión la resolución para el pago a bonistas y crear un barril de $50 millones a ser repartidos entre legisladores,* ENDI.COM (February 10, 2022),... 32

Joanisabel González, *Organizations seek to stop the Plan of Adjustment*, ENDI.COM (February 9, 2022),........................................................................................................................................ 2

Legislative History of H.B. 1003............................................................................................... 25

Letter from Governor Pierluisi to Mr. David A. Skeel and response. ......................................... 27

Pierluisi: *"There is no ambiance to reform the pension systems"* Noticel. November 9, 2021... 29

Rivera Clemente, Yaritza. *In Debate the Position of the Fiscal Control Board on Law 53.* El Vocero. November 3, 2021.......................................................................................................... 28

*Zero.* Oxford Learner's Dictionaries............................................................................................ 29

COME NOW, Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc., (collectively "Teachers' Associations"), as a creditors and parties in interest, by and through the undersigned counsel, and hereby submit this *Teachers' Associations Omnibus Reply to Objections to Motion for Stay Pending Appeal [Docket No. 19969]* and, in support thereof, respectfully state as follows:

## PRELIMINARY STATEMENT

1. Parallel to the captioned proceedings, many parties have been forced to sit by while their fate is decided by an unelected board over the objections of the elected Commonwealth Government. In the throes of disenfranchisement, many groups have pleaded before this Court in the hopes of restraining the unbridled power of the Oversight Board. The Teachers' Associations are just one of the many public servants that have been pushed between a rock and a hard place, with little to no say in the outcome.

2. For many, there was hope that, although the Oversight Board has unbelievably broad powers, there were some reserved to the Commonwealth's governing bodies, pursuant to PROMESA. One such power was the exclusive power to legislate, which, until now, the Oversight Board was denied. We have heard repeatedly like a familiar axiom: the Oversight Board cannot legislate. It is only with that caveat to the Oversight Board's power that the Commonwealth's Government has been capable of forcing negotiation and mutual understanding. However, with the recent confirmation of the plan of adjustment, we are stunned to see that even PROMESA's own provisions were insufficient to contain the will of the Oversight Board to legislate. By placing the Teachers' Associations in a position of precarity and substituting their retirement legislation, the Oversight Board usurps the few remaining powers of the Commonwealth Government. If the people of Puerto Rico cannot rely even on the few weak restraints

1

PROMESA places on the Oversight Board nor on this Court to reel it in, then what choice is left to us?[2]

3. The previous paragraphs may read as lofty postulations, but they are necessary context to the present filing. This reply is filed in support of a stay of the Court's confirmation of the Plan of Adjustment, while the Teachers' Associations' appeal is pending before the First Circuit.[3] Nonetheless, this is not a clear cut case of a commercial bankruptcy where the mechanic application of factors in dollars and cents will be enough to reach an equitable decision. This is a case where the Court's use of its powers in equity is needed and warranted. The Teachers' Associations understand that the Court's decision to confirm the Plan was not taken lightly and that the Court is undoubtedly aware of the massive impact of the confirmed plan of adjustment on the people of Puerto Rico. The Court itself attests to the panic caused by the Plan in its Findings of Fact and Conclusions of Law:

> In addition to formal filings by parties, the Court has received thousands of letters and email communications from citizens and others who live in Puerto Rico and are concerned about Puerto Rico's future and their own. Within the past few months in particular, government workers and retirees have written with passion and sadness about their anxieties concerning their ability to support their families and live in a dignified way in retirement. **[Docket No. 19812 at 18]**

4. Nevertheless, the Teachers' Associations request the Court to really account for the impact of its decision on the human and civil rights if said decision is not considered carefully and subjected to the right to an appeal. The Oversight Board has assumed a legislative power that

---

[2] This frustration explains the wave of protest among public servants claiming their rights to better work conditions, fair salary, and humane retirement. Just this past week protests have included teachers, the police force, firefighters, paramedics, nursing staff, etc. *See* Cristina Corujo, *Public employees in Puerto Rico protest over wages as frustration with governor grows* ABC NEWS (February 9, 2022), https://abcnews.go.com/US/public-employees-puerto-rico-protest-wages-frustration-governor/story?id=82774827 ; Joanisabel González, *Organizations seek to stop the Plan of Adjustment*, ENDI.COM (February 9, 2022), https://www.elnuevodia.com/english/news/story/organizations-seek-to-stop-the-plan-of-adjustment/.

[3] Though it should be noted that the Teachers' Associations are not the only appealing parties, and the rights of those others should also be considered.

it is not entitled to. The potential repercussions of that alone are enough to make jaws drop. Nonetheless, the core issue here is that this assumption of power is a legal error that will otherwise go uncorrected without the issuance of a stay and the opportunity for the Teachers' Associations to have a meaningful appellate procedure.

5.  As such, in this filing the Teachers' Association will respond to the objections presented against the stay, thereby requesting that this Court grant the stay pending appeal. The Teachers' Associations will also request that this Court reject the imposition of a bond to condition the stay. If the stay is denied, the Teachers' Associations will be left with no other remedies. Meanwhile, if the stay is granted with the condition of the requested bond, the practical effect will be the denial of the stay and deprivation of the right to appeal. Thus, only by granting the stay pending appeal without the imposition of a bond can this Court do the Teachers' Associations justice and preserve their right to appeal.

## I.    SUMMARY OF PROCEDURAL BACKGROUND

6.  On January 10, 2022, the Court issued an *Order Regarding Plan Modifications Necessary to the Entry of an Order Confirming Plan of Adjustment for the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority*, where it set out additional modifications to be made. **[Docket No. 19721]** The Court also stated: "**Overruled objections and the Oversight Board's positions as to the proper scope of preemption and the proper treatment of Eminent Domain/Inverse Condemnation Claims are preserved for appeal**." **[Docket No. 19721 at 4]** (emphasis added).[4]

---

[4] It should be noted that prior to the filing of the Plan, the Teachers' Associations filed an *Objection to Urgent Motion of the Financial Oversight and Management Board for Puerto Rico for Order (I) Approving Form of Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021 at Docket No. 19002 and Request to be Heard*, **[Docket No. 19180]**, and an *Opposition to Response of the Financial Oversight and Management Board in Accordance with Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III*

7. On January 14, 2022, the Financial Oversight and Management Board for Puerto Rico ("Oversight Board"), as Title III representative of the Commonwealth of Puerto Rico ("Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA") (collectively "Debtors") filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al* **[Docket No. 19784]** (hereafter the "Plan"). Shortly after, on January 18, 2022, the Court issued *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* **[Docket No. 19813]** ("Confirmation Order") and its *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* **[Docket No. 19812]** (*"*Findings of Fact and Conclusions of Law"). The Court determined that the Plan met PROMESA's requirements and, therefore, was confirmed.

8. Consequently, on January 28, 2022, the Teachers' Associations filed a *Notice of Appeal*. **[Docket No. 19941]** On the same date, Cooperativa de Ahorro y Crédito Abraham Rosa, Cooperativa de Ahorro y Crédito de Ciales, Cooperativa de Ahorro y Crédito de Juana Díaz, Cooperativa de Ahorro y Crédito de Rincón, Cooperativa de Ahorro y Crédito de Vega Alta,

---

*Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al, ECF No. 19567 (corrected at ECF No. 19574)* **[Docket No. 19606]**, regarding these issues that are preserved for appeal.

and Cooperativa de Ahorro Crédito Dr. Manuel Zeno Gandía (collectively "Credit Unions"),
filed their own notice of appeal. **[Docket No. 19938]**

9.  In light of the First Circuit's decrees in *In re Fin. Oversight & Mgmt. Bd. for P.R.* , 987 F.3d
173 (1st Cir. 2021) and *Cooperativa de Ahorro y Credito v. Fin. Oversight & Mgmt. Bd. (In
re Fin. Oversight & Mgmt. Bd.)* , 989 F.3d 123 (1st Cir. 2021), on February 1st, 2022, the
Teachers' Associations filed their *Motion for Stay Pending Appeal Regarding: Order and
Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the
Commonwealth of Puerto Rico, the Employee Retirement System of the Government of the
Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority [Docket No.
19813]* **[Docket No. 19969]** ("Motion for Stay). On the same date, an *Urgent Joint Motion to
Propose Order on Briefing Schedule Concerning Teachers' Associations' Motion for Stay
Pending Appeal Regarding: Order and Judgment Confirming Modified Eighth Amended Title
III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employee Retirement
System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public
Buildings Authority* ("Proposed Briefing Schedule") was filed. **[Docket No. 19972]**

10. On February 2nd, 2022, the Court issued the *Order Scheduling Briefing of 19972 on Joint
Urgent Motion to Propose Order on Briefing Schedule Concerning Teachers' Associations'
Motion for Stay Pending Appeal Regarding: Order and Judgment Confirming Modified Eighth
Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employee
Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto
Rico Public Buildings Authority*, setting the deadline for objections to the Motion for Stay on
February 9, 2022 at 5:00 pm and replies on February 15, 2022 at 5:00pm. **[Docket No. 19978]**
("Briefing Order").

11. On February 3, 2022, Suiza Dairy Corp. ("Suiza") filed a notice of appeal. **[Docket No. 20016]**
Likewise, on February 4, 2022, Asociación Puertorriqueña de la Judicatura Inc. ("Judges'
Association") filed its own notice of appeal. **[Docket No. 20031]** On the same date, they filed
a motion for stay pending appeal. **[Docket No. 20033]** Likewise, the Credit Unions filed their
motion for stay pending appeal. **[Docket No. 20035]**

12. In view of these filings, the Court ordered a separate briefing schedule, where the responses
would be due on February 11, 2022, by 5:00pm, and the replies must be filed within six days
after the date the Oversight Board files its response by 5:00pm. **[Docket No. 20037-20038]**

13. On February 9, 2022, Salud Integral de la Montaña, Inc. ("SIM") filed an *Opposition to
Teachers' Associations' Motion for Stay Pending Appeal* **[Docket No. 20077]** ("SIM
Objection"). In its filing, SIM argued that all four factors of the standard for a stay pending
appeal weighed against the Teachers' Associations' requested stay. Regarding the first two
factors, SIM argued that the proposed appeal does not have a likelihood of success on the
merits and that the irreparable injury alleged by the Teachers' Associations was not properly
shown. **[Docket No. 20077 at 3-6]** Moreover, SIM argued that the issuance of the stay would
injure its interests because it stands to receive payment on the effective date and, also, continue
its litigation against the Commonwealth in case of future payment defaults. **[Docket No. 20077
at 7]** Finally, SIM argued that public interest favors continuing with the confirmed Plan.
**[Docket No. 20077 at 8]**

14. On the other hand, Finca Matilde, Inc. ("Finca Matilde") filed a *Qualified objection to Motion
for Stay Pending Appeal* **[Docket No. 20079]** ("Finca Matilde Objection"). Finca Matilde
specifically objected to the stay based on the last two factors of the standard for stay pending
appeal. First, Finca Matilde alleged that maintaining the *status quo*, as the Teachers'

Associations characterized the stay, burdens creditors who have not been paid. **[Docket No. 20079 at 3]** With regard to its own Eminent Domain/Inverse Condemnation Claim, Finca Matilde expressed that it will be paid on the effective date, according to the Plan. **[Docket No. 20079 at 2]** Second, Finca Matilde argued that public interest is served best by allowing the ordinary course of the proceedings to continue. **[Docket No. 20079 at 3-4]** Nonetheless, Finca Matilde suggested that if an equitable remedy were provided by the Court to stay the Plan but allow the payment of Eminent Domain/Inverse Condemnation Claims, it would be amenable to that. **[Docket No. 20079 at 4]**

15. On the same date, the Ad Hoc Group of Constitutional Debtholders, the Lawful Constitutional Debt Coalition, the QTCB Noteholder Group,  the Ad Hoc Group of General Obligation Bondholders, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., and National Public Finance Guarantee Corporation, Financial Guaranty Insurance Company, and Ambac Assurance Corporation (collectively "PSA Creditors") filed *Opposition of PSA Creditors to Teachers' Associations' Motion for Stay Pending Appeal* **[Docket No. 20081]** ("PSA Creditors Objection"). The PSA Creditors relied on the Oversight Board's arguments regarding the first prong of the standard for stay pending appeal **[Docket No. 20081 at 14]** and focused their filing on the last two factors, as well. That is, the PSA Creditors argued that the stay should be denied because it will inflict substantial harm on other interested parties, **[Docket No. 20081 at 14-19]** and jeopardize the public's interest in the Commonwealth's emergence from the Title III. **[Docket No. 20081 at 19-20]** Specifically, regarding their own quantifiable injuries, the PSA Creditors declared that this would come in the form of lost opportunity to invest; reduction in value of their distribution under the Plan; and additional professional fees, which in total would constitute in excess of $700 million. **[Docket No. 20081 at 15-16]** The PSA Creditors

7

also alleged that the stay would jeopardize the viability of the Plan. **[Docket No. 20081 at 17]** Finally, the PSA Creditors requested that, should the stay be granted, it be conditioned a substantial bond of at least $722 million to address the PSA Creditors' potential injury. **[Docket No. 20081 at 21]** The PSA Creditors went as far as to suggest that the Court set an amount for the bond even if it denies the stay, so the First Circuit will have those criteria available if the Teachers' Associations exercise their right to request the stay there as well. **[Docket No. 20081 at 22]**

16. Finally, the Oversight Board filed its *Opposition of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Motion Dated February 1, 2022, for Stay Pending Appeal* **[Docket No. 20083, as corrected at Docket No. 20085]** ("Oversight Board Objection"). The Oversight Board argued that the proposed appeal lacked merit and, therefore, was unlikely to succeed. **[Docket No. 20083, as corrected at Docket No. 20085 at 24-38]** Additionally, the Oversight Board suggested that the Teachers' Associations have not established irreparable harm. **[Docket No. 20083, as corrected at Docket No. 20085 at 39-49]** On the other hand, the Oversight Board alleged that the stay would cause injury because it would delay the distribution to creditors and keep the Commonwealth in a state of fiscal emergency. **[Docket No. 20083, as corrected at Docket No. 20085 at 41-44]** The Oversight Board also argued that public interest disfavors the stay. **[Docket No. 20083, as corrected at Docket No. 20085 at 45]** Additionally, the Oversight Board requested the imposition of a bond in the amount of at least $1.5 billion. **[Docket No. 20083, as corrected at Docket No. 20085 at 49]**

17. Soon after, AmeriNational Community Services, LLC (hereafter "AmeriNat") as servicer for the GDB Debt Recovery Authority (the "DRA") filed *Amerinat's Joinder and Reservation of Rights in Support of the Corrected Opposition of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Motion Dated February 1, 2022, for Stay Pending Appeal [Dkt No. 20085]* **[Docket No. 20087]** ("Amerinat Joinder"). On February 10, 2022, the Official Committee of Unsecured Creditors ("UCC") filed its *Limited Joinder of Official Committee of Unsecured Creditors in Support of the Corrected Opposition of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Motion Dated February 1, 2022, for Stay Pending Appeal* **[Docket No. 20088]** ("UCC Joinder"). On the same date, the Judges' Association filed a *Motion for Voluntary Dismissal* to withdraw their appeal. **[Docket No. 20093]**[5]

18. On February 12, 2022, the Teachers' Associations requested leave to file  an omnibus reply and exceed the page limit. **[Docket No. 20120]** The Court granted the request on February 14, 2022. **[Docket No. 20122]**

19. Pursuant to the Scheduling Order, the Teachers' Associations appear for their reply and address all the Objecting Parties simultaneously for the sake of judicial economy.

## II.    STANDARD OF REVIEW

20. The First Circuit has cautioned the need for a stay pending appeal of a confirmed plan of adjustment, due to the risk of equitable mootness caused by the distribution of payments and the impossibility of achieving meaningful review on a consummated plan. *See In re Fin.*

---

[5] The same parties filed objections to the Credit Unions' request for stay on February 11, 2022. **[Docket No. 20112, 20115, 20116, 20118, 20119]**

*Oversight & Mgmt. Bd. for P.R.* , 987 F.3d 173 (1st Cir. 2021); *Cooperativa de Ahorro y Credito v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd.)* , 989 F.3d 123 (1st Cir. 2021).

21. While the subject was discussed in our initial filing, it bears repeating that pursuant to the Bankruptcy Rules of Procedure, "a party must move first in the bankruptcy court for . . . a stay of a judgment, order, or decree of the bankruptcy court pending appeal . . . ." Fed. R. Bankr. P. 8007(a)(1)(A). This rule establishes other available forms of relief that may be sought, such as: "(B) the approval of a bond or other security provided to obtain a stay of judgment; (C) an order suspending, modifying, restoring, or granting an injunction while an appeal is pending; **or** (D) the suspension or continuation of proceedings in a case or other relief permitted by subdivision (e)." Fed. R. Bankr. P. 8007(a)(1)(B)-(D)(emphasis added). Likewise, under the Federal Rules of Appellate Procedure, "[a] party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal . . . ." Fed. R. App. P. Rule 8(a)(1)(A). This rule, also, provides to seek "(B) approval of a bond or other security provided to obtain a stay of judgment; **or** (C) an order suspending, modifying, restoring, or granting an injunction while an appeal is pending." Fed. R. App. P. Rule 8(a)(1)(B)-(C) (emphasis added). Thus, the imposition of a bond pending appeal is not a prerequisite for the issuance of a stay. *See In re Weinhold,* 389 B.R. 783, 787 (Bankr. M.D. Fla. 2008).

22. In the evaluation of a request for a stay pending appeal, the following factors should be considered:

> (1) Whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. The first two factors are the most critical. *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of Bos.* , 996 F.3d 37, 44 (1st Cir. 2021) (brackets, citations and quotation

marks omitted).

23. Thus, the first factor to consider is likelihood of success on the merits. Nonetheless, likelihood of success is not determinative; it must be balanced with the strong probability of injury in absence of the stay. *See Rivera v. Lake Berkley Resort Master Ass'n (In re Rivera),* 532 B.R. 425, 427 (Bankr. D.P.R. 2015). **While pecuniary injury is usually not considered irreparable, due to the possibility of reparation through money damages, it is indubitable that "[i]rreparable harm most often exists where a party has no adequate remedy at law**." *Charlesbank Equity Fund II, Ltd. P'ship v. Blinds to Go, Inc.,* 370 F.3d 151, 162 (1st Cir. 2004)(emphasis added). *See, also, In re Betteroads Asphalt, LLC,* 610 B.R. 28, 48 (Bankr. D.P.R. 2019). Thus, though all four factors must be present and considered, the first two factors carry the most weight in this decision and, in this case, they favor a stay pending appeal.

24. **The applicable law vests "Bankruptcy Courts with the discretion to grant a stay pending appeal without requiring the appellant to post a bond. The decision regarding whether or not to require a bond under Rule 8005 is discretionary with the Bankruptcy Court."** *In re Weinhold,* 389 B.R. 783, 787 (Bankr. M.D. Fla. 2008)(citations omitted)(emphasis added). This discretion allows the Court to grant a stay based on the factors previously described, without the imposition of a supersedeas bond. While the supersedeas bond's purpose is to protect the non-appealing parties from injury caused by the stay, it is the discretion of the Court omit one where the circumstances merit it and, particularly, when the financial hardship it would place on the appealing party would be overwhelming and disrupt the balance of equities in play. *See Townsend v. Holman Consulting Corp.,* 881 F.2d 788, 796-97 (9th Cir. 1989).

25. In the context of Title III, the First Circuit has already expressed that the principles of equity are applicable, if not central, to the confirmation of a Plan:

[C]onsiderations of equity play a role in reviewing challenges to the confirmation of plans of reorganization in bankruptcy courts. **At their core, bankruptcy are courts of equity and apply the principles and rules of equity jurisprudence.** One of the Bankruptcy Code's central provisions, 11 U.S.C. § 105(a), which grants bankruptcy courts broad authority to exercise their equitable powers -- where necessary or appropriate -- to facilitate the implementation of other Bankruptcy Code provisions, makes clear that equity's role in facilitating implementation of the Code survives in its present iteration. The entry of a plan of adjustment is inherently such an equitable proceeding. *In re Fin. Oversight & Mgmt. Bd. for P.R.,* 987 F.3d 173, 181 (1st Cir. 2021) (citations, quotations marks, brackets and ellipsis omitted)(emphasis added).

26. Therefore, this Court has considerable powers in equity under Section 105 of the Bankruptcy Code, as incorporated in PROMESA, which should be exercised in extraordinary cases such as this one.

### III.    ARGUMENT

27. The Objecting Parties argue that the factors for the issuance of a stay pending appeal are not present in this case. The Teachers' Associations request that this Court consider the four factors in balance, as the standard requires. The existence of potential harm to other parties does not automatically result in denial of the stay, rather it is taken as a factor to balance against the others. Additionally, the principles of equity applicable to this and any bankruptcy proceeding advise the distinction between this case and other restructurings, particularly commercial reorganizations where the consequences do not ripple over entire generations of people.

28. On all fronts, this case is different. PROMESA is the direct result of the colonial and racist interpretation given by the infamous *Insular Cases* to the Article IV Territorial Clause. It lacks the uniformity of the Bankruptcy Code and imposes an additional figure that is unheard of in any other context. The Plan confirmed by this Court was not submitted by the Debtor, a democratically elected government with accountability to its people and to the various constraints that accountability involves, it was prepared and submitted by a board of seven unelected officials who have no personal stake in the consummation of the Plan or its

aftereffects. This case is more than a transactional restructuring, it is the disenfranchisement of a peoples that results in nefarious conditions for them.

29. The Teachers' Associations are among those disenfranchised and have only this opportunity to vindicate their rights. That is the context of the decision the Court will make in this instance. It is not just dollars and cents, but the usurpation of political powers, the disenfranchisement of a people and the closing of doors that the Court itself guaranteed would be open by preserving the rights of appeal to the parties who presented objections, including the Teachers' Associations.

## A. THE PROPOSED APPEAL OF THE CONFIRMATION ORDER IS LIKELY TO SUCCEED ON THE MERITS.

30. The Oversight Board and SIM argue that the Teachers' Associations' appeal is unlikely to succeed in the First Circuit. In their filings, these parties argue that the preemption analysis provided by the Oversight Board and adopted by this Court is straightforward and, therefore, has no probability of being overturned. On this point, the Teachers' Associations respectfully disagree.

31. The Teachers' Associations have presented a solid case against the preemption analysis that warrants consideration, especially given the novel nature of PROMESA and the Oversight Board's extraordinary powers. Additionally, because of the novel controversies that arise under PROMESA and the awkward power sharing agreement it created, neither the Bankruptcy Code nor its interpretative case law address the delicate issues before this Court. For instance, there are no established parameters for analyzing whether a plan can preempt laws themselves, and not just the claims arising from them. Moreover, there is no guidance as to whether the requirements of Section 314(b)(5) of PROMESA can be met when a party that is not the Debtor proposes legislative changes through the plan. Therefore, there are open questions of law that

require consideration and cannot be considered unless the Teachers' Associations' appeal is allowed to proceed unobstructed by the expedite consummation of the Plan or the imposition of a bond.

32. The question remains up to what extent the Oversight Board can override the Commonwealth's statutes and legislative powers through the Plan. If the appeal of that issue is heard, there is a substantial possibility that the Teachers' Associations will succeed in their argument due to the unique awkward power sharing agreement that arises from PROMESA and the fact that the Oversight Board lacks the power to legislate the enabling legislation required to implement the Plan.

### i.   On the issue of Preemption

33. SIM argues that "it was the Financial Oversight's Board opinion that the parts of the Retirement law that were preempted conflicted with PROMESA" and, therefore, the supremacy of Section 4 of PROMESA preempted the statutes. **[Docket No. 20077 at 4]** Nonetheless, as argued in the Motion for Stay, there is no indication of any section of PROMESA that is in conflict with the Retirement Laws. The Oversight Board is not qualified to determine that conflict preemption exists in absence of a judicial declaration that identifies that conflict. The opinion of the Oversight Board is not a federal law. PROMESA's supremacy clause states "[t]he provisions of this chapter shall prevail over any general or specific provisions of territory law, State law, or regulation **that is inconsistent with this chapter.**" 48 U.S.C. § 2103 (emphasis added). This is a case of conflict preemption, where there must be inconsistency between the preempted law and PROMESA, and only with PROMESA.

34. On the other hand, the Oversight Board does not argue that Section 4 is the sole nor direct source of preemption in this case. According to the Oversight Board's novel interpretation,

14

preemption here is the result of three different mechanisms that have not been discussed previously and seem less than straightforward: (1) the rejection of executory contracts; (2) the discharge provisions; and (3) the requirements of a plan of adjustment. **[Docket No. 20085 at 25-29]**

35. First, the Oversight Board states that pension obligations are contractual in nature. **[Docket No. 20085 at 25]** Therefore, these obligations are subject to Section 365 of the Bankruptcy Code which allows the trustee, a figure that here is read to mean the Oversight Board, to reject those obligations and, essentially, turn them into damage claims that may be asserted in the bankruptcy. **[Docket No. 20085 at 26]** Therefore, the Oversight Board now says, through the Plan, "acting pursuant to §§ 1123(b)(2) and 365(a), the Oversight Board rejected the Commonwealth's prepetition obligation to allow certain pension benefits to accrue in the future." **[Docket No. 20085 at 26]**[6]

36. To begin with, throughout this case there has not been a request to reject pension obligations under Section 365 of the Bankruptcy Code pursuant to Rule 6006 and 9014 of Bankruptcy Procedure. Had there been such a request, the interested parties would have been heard on the matter and the Court would have issued an order to that effect, under the appropriate legal standard. Moreover, the retirees whose pensions were subject to rejection would have had a claim of damages as creditors.

---

[6] To support its argument, the Oversight Board claims that "[a]s the Court explained, that rejection 'g[a]ve rise to claims' on the part of pensioners, which are being treated under the Plan and 'which can be impaired and discharged pursuant to the Plan.'" **[Docket No. 20085 at 26]** However, this is a mischaracterization of the Court's finding, which only stated that "[o]bligations arising from Commonwealth statutes, including statutes providing employees the right to accrue pension or other retirement benefits, give rise to claims which can be impaired and discharged pursuant to the Plan" and did not mention rejection at all. **[Docket No. 19812 at 94]** For that reason we find the Oversight Board's interpretation misguided.

Case:17-03283-LTS    Doc#:20145    Filed:02/15/22    Entered:02/15/22 16:08:32    Desc: Main
Document    Page 22 of 60

37. Nonetheless, even under the assumption that pension claims were rejected by the Oversight Board, the contractual nature of a single pension claim does not extend the definition of an executory contract to the Retirement Laws. Laws are not up for rejection under Section 365.

38. Second, the Oversight Board argues that "[e]ven putting aside principles of contract rejection, the Plan properly discharged the Commonwealth's pension obligations." **[Docket No. 20085 at 27]** That is, the Oversight Board argues that pension rights were discharged by the Plan. To support this contention, the Oversight Board declares that "this Court has previously explained that although certain claims are based on statutory provisions rather than on a contract, such claimants have no basis for differentiating obligations arising out of statutes from obligations arising out of nonexecutory contracts, which are subject to discharge." **[Docket No. 20085 at 27]** (quotation marks and brackets omitted).

39. On this count, we must reiterate that the Teachers' Associations are not appealing the discharge or impairment of individual pension obligations in the Plan, but rather the sweeping declaration that the Plan is able to preempt statutory provisions and change the nature of the TRS without legislation to that effect. The lack of distinction between obligations arising from contracts and obligations arising from laws is inapposite here, because the distinction the Teachers' Associations are highlighting is between obligations, regardless of their source, and the laws themselves, as they apply to present and future teachers and pensioners.

40. It is only after the Oversight Board leaps through the argument of rejection of executory contracts and discharge of claims that it mentions PROMESA's supremacy clause as the source of preemption: "**Because** the Commonwealth's statutory obligations to permit the accrual of future pension benefits and COLAs **were rejected and discharged under the Plan** as authorized by PROMESA, **any Commonwealth statute requiring the full payment of such**

**obligations is inconsistent with PROMESA and thus preempted.**" **[Docket No. 20085 at 27]** (emphasis added). Thus, it is not PROMESA that conflicts with the Retirement Laws, but the Plan.[7] Therefore, PROMESA's supremacy clause does not come into effect.

41. The Oversight Board intends to establish that

> [t]here is a direct conflict between the Puerto Rico statutes imposing obligations on the Commonwealth to accrue pension benefits and PROMESA's discharge of those same obligations. The two are mutually exclusive. In the face of that inconsistency, PROMESA's discharge provision prevails. PROMESA § 4. The Associations provide no rationale to the contrary and therefore have shown no likelihood of success. **[Docket No. 20085 at 29]**

42. But we must reiterate, there is a difference between the discharge of a claim or obligation and the displacement and amendment of the legislation it is based on to change the nature of the retirement system, for which new legislation would be required according to Section 314(b)(5) and accommodate other provisions of the Plan. PROMESA's discharge provisions can certainly eliminate future monetary responsibility for prepetition obligations, but not eliminate or amend the statute to accommodate the Plan, affecting all current and potential obligations that stem from that statute. That statute must be amended, repealed, or replaced for such a

---

[7] This is different from the First Circuit case law cited by the Oversight Board, for example. The Oversight Board states:

> That a state or territory cannot evade the preemptive force of federal law by resorting to local legislation is well established. For instance, the First Circuit has held that **a Massachusetts law "requir[ing] that [a state agency] receive administrative expense priority for a claim that the Bankruptcy Code would assign general unsecured status," is " inconsistent with federal law** and so preempted." *See Mass. Div. of Emp. & Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l Med. Ctr., Inc.)*, 291 F.3d 111, 126 (1st Cir. 2002); *see also Patriot Portfolio, LLC v. Weinstein (In re Weinstein)*, 164 F.3d 677, 682–83 (1st Cir. 1999) ("[S]tates may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations."); *In re City of Stockton*, 526 B.R. 35, 49–50 (Bankr. E.D. Cal. 2015). **[Docket No. 20085 at 29-30]**(emphasis added).

The very text quoted by the Oversight Board clearly indicates that in these cases preemption occurs because there is a conflict directly with the Bankruptcy Code, in addition to the fact that federal law occupies the field of debt restructuring in this manner. This is not the same as the Retirement Laws. The Retirement Laws do no establish priorities or in any way address issues that are occupied by PROMESA. They are merely local statutes from which certain rights arose before they landed before this Court. But it should be noted that the laws themselves are not before this Court.

result, which can only be done through legislation.

43. Finally, the Oversight Board reaches the conclusion that the Retirement Laws are otherwise preempted by 11 U.S.C. § 1123(a)(5), as incorporated into the Title III Section 301(a) of PROMESA. As the argument goes, this section preempts otherwise applicable non-bankruptcy law if it "prevents a plan's proponent—here, the Oversight Board—from providing adequate means for the plan's implementation." **[Docket No. 20085 at 30]** (citation omitted). To this end, the Oversight Board cites *Irving Tanning Co. v. Me. Superintendent of Ins. (In re Irving Tanning Co.)*, 496 B.R. 644 (B.A.P. 1st Cir. 2013). However, the case does not stand for the sweeping declaration the Oversight Board hopes to support.

44. In this case, while the First Circuit BAP adopted the position that 11 U.S.C. § 1123(a)(5) can preempt state law, it concluded that the preemptive scope of this section did not extend to the laws in question. Therefore, it held that the Plan violated applicable non-bankruptcy law and could not be confirmed. *See In re Irving Tanning Co.*, 496 B.R. at 666.

45. The First Circuit BAP recognized that "**a plan must comply with those applicable nonbankruptcy laws that are not preempted by the Bankruptcy Code**." *Id.* at 660 (emphasis added). However, as the Oversight Board cites, the court agreed that there is a preemptive effect, as "§ 1123(a) preempts any nonbankruptcy law that, but for the preemption, would prevent a proponent from employing such adequate means of implementation as the proponent incorporates into its plan." *Id.* at 662. **Nonetheless, the BAP expressed concern that this "reads like a debtor's license to rewrite the law to its liking—in ways far outside the comfort zone inhabited by the unobjectionable staples of chapter 11 plans and, more to the point, beyond what Congress can plausibly have intended**". *Id.* at 663 (citation omitted)(emphasis added). "Therefore, when they have acknowledged the preemptive effect

of § 1123(a)(5), courts have routinely hastened to add, as do we, that **it is not unbounded**". *Id.* (citation omitted)(emphasis added). Therefore, "[t]he challenge in each case is to determine preemption's scope and limits. Even where, as here, there is a finding of express preemption, the court must identify the domain expressly pre-empted by the statutory language" and "**the presumption in favor of state law applies, requiring us to accept a plausible alternative reading that disfavors preemption**." *Id.* at 663-64 (citations and quotation marks omitted)(emphasis added).

46. In that case, the BAP identified three limits to the preemptive effect of the section, while expressing that the list was not exhaustive: (1) state law can only be preempted as to those specified means that are adequate for the plan's implementation; (2) state law cannot be preempted if it is concerned with protecting public health, safety or welfare; and (3) state law preemption cannot extend to laws that define and protect the property rights of third parties. *Id.* at 64. Here, the BAP read the first limit to mean that "only those means may preempt state law that are sufficient for the implementation of the plan: they must be sufficient to implement the plan, equal to what is required, but also not more than is required." *Id.* "The requirement of adequacy denies preemptive effect not only to those means that are insufficient but also to those that are superfluous or unnecessary." *Id.*

47. In view of the foregoing, the Oversight Board's own citations show that the preemptive effect of the Plan is not the broad and unlimited one that they hope for. Moreover, the usual preemption analysis applies, along with the presumption against preemption.

48. Pursuant to that analysis, it is clear that the scope of preemption applied in this case extends beyond the permissible. For one thing, state law can only be preempted where it is necessary for the implementation of the Plan, which implies that obligations that arise from those laws

can be preempted with respect to the debtor to the extent necessary to carry out the plan. **This is not equivalent to changing the terms of the law.** Therefore, the Plan transgresses this limit to preemption. Moreover, the Retirement Laws are welfare laws that cannot be preempted by the Plan. Lastly, the preemption extended to laws that defined property interests of present and future retirees. As such, all three limits were transgressed here, when the Oversight Board preempted the Retirement Laws by amending them and their retirement system through Exhibit F-1 of the Plan.

49. Similarly, SIM overstates the preemptive effect of this section, as follows:

> In addition, a plan of reorganization preempts non-bankruptcy laws, see, *Pacific Gas & Elec. Co. v. California ex rel. Cal. Dep't of Toxic Substances Control*, 350 F.3d 932 (9th Cir. 2003), cert denied, 543 U.S. 956 (2004); *In Re Federal Mogul Glob.*, 684 F.3d 355 (3d Cir. 2012) and *Irving Tanning Co. v. Me. Superintendent of Ins.*, 496 B.R. 644 (B.A.P. 1st Cir. 2013). Hence, movants arguments do not present the "strong likelihood of success" required by the Supreme Court. **[Docket No. 20077 at 4]**

50. Nevertheless, as previously discussed, this preemptive effect is not absolute or automatic. It requires the same showing as any preemption analysis. Additionally, the end result in these cases is dissimilar to what the Oversight Board hopes to accomplish in this case.[8] In those cases, the issue was the proper scope of preemption and, always, to the end of allowing a debtor a kind of exemption from complying with non-bankruptcy law, never for the purpose of amending the law or effectively repealing its provisions.

---

[8] In *In re Fed.-Mogul Glob.*, the Third Circuit's holding was only "that the anti-assignment provisions in the relevant insurance policies are preempted by § 1123(a)(5)(B) to the extent they prohibit transfer to a § 524(g) trust." 684 F.3d 355, 382 (3d Cir. 2012). This "preemption" does not eliminate the law nor replace its content, it only allows the individual debtor to disregard the prohibitions contained in the law because they were directly in conflict with Bankruptcy Law. On the other hand, in *Irving Tanning Co. v. Me. Superintendent of Ins.*, the First Circuit denied the confirmation of a plan because it violated applicable non-bankruptcy law, given that the proposed "preemption" was beyond the scope of the bankruptcy provision. 496 B.R. 644, 666 (B.A.P. 1st Cir. 2013). Moreover, in *Pacific Gas & Elec. Co. v. California ex rel. Cal. Dep't of Toxic Substances Control*, the Ninth Circuit remanded the case to the lower court because it had not properly implemented the preemption analysis when the debtor attempted to preempt state regulation of public utilities by disaggregating. 350 F.3d 932, 937 (9th Cir. 2003).

51. Moreover, the Oversight Board frames the Teachers' Associations appeal as suggesting that pension obligations can never be impaired or discharged, which to their mind would mean that "no municipal debtor could confirm a plan of adjustment." **[Docket No. 20085 at 28]** Once again, this is not the case. Surely a municipal debtor can impair and discharge obligations through a Plan, even if they are rooted in state law. Going further, a municipal debtor might also be able to preempt its own retirement statutes, but only through the obtainment of legislation to that effect, as was the case of the City of Detroit,[9] or the condition of enabling legislative efforts, such as the case cited by the Oversight Board *In re City of Prichard*, No. 1:09-bk-15000, ECF No. 442 at 7 (Bankr. S.D. Ala. 2014). In this case, it is true that the confirmation order states:

> The Plan **eliminates the City's obligation to fund a pension plan** for its employees which had previously been embodied in <u>Alabama Act</u> No. 107 (1956), as amended. The Court adopts the authorities set forth by the City in its response in Documents 311 and 325, and therefore finds and concludes that the City's actions under the Plan are not prohibited by law, and the treatment of the Classes who formerly had an interest in the City's pension plan is lawful under the Bankruptcy Code.[10] (emphasis added).

52. However, this does not declare the preemption of the cited act. Additionally, if the confirmed plan is examined, it is clear that it also does not preempt the act but rather conditions the plan to future legislative action. Specifically, the plan that the City or Prichard presented stated that:

> On the effective date of the Plan, the City will pay to each employee the amount contributed to the existing pension plan by each such employee from the Petition date to the Effective Date. **The City will establish a pension Plan pursuant to Section 457(b) of the Internal Revenue Code** in which the current employees may participate at their election.[11] (emphasis added).

---

[9] *See* COMBINED PLAN FOR THE GENERAL RETIREMENT SYSTEM OF THE CITY OF DETROIT, MICHIGAN, Amendment and Restatement, Effective July 1, 2014. p. 378 (available at https://www.michigan.gov/documents/treasury/Detroit_-_Eighth_Amended_Plan_of_Adjustment_476086_7.pdf )(Last visited January 25, 2022).

[10] *See* Exhibit 1, *Docket of In re City of Prichard, Alabama,* Bankruptcy Case No. 09-15000, at 7. We include this docket entry as an exhibit because we were unable to locate the cited case in the usual research databases.

[11] *See Id.* at 15.

53. While the Oversight Board attempts to justify its own actions with reference to this case, the case of the City of Prichard truly demonstrates the distinction between Chapter 9 and Title III, because the Debtor, who has the ability to make such determinations, incorporated into the Plan the future pension plan. On the other hand, the Oversight Board was unable to obtain that pension plan from the Commonwealth's governing bodies as required by Section 314(b)(5) of PROMESA. In the context of PROMESA, where the Debtor does not propose the Plan and the people of Puerto Rico are not given a say in the proceedings as to the preemption of their laws, the distinction is particularly important.

54. Aside from the above, it is clear that both the Oversight Board and SIM hope to convince this Court to see the preemption analysis for its result rather than its legal justification. They see preemption as a simple means to their end rather than a doctrine with requirements and political and democratic consequences beyond the elimination of pension debt.

55. To this point, SIM argues that "[e]vidence was presented **for the need to eliminate** the provisions pertaining to future benefits and the Puerto Rico legislature agreed, passing law 53-2021." **[Docket No. 20077 at 4]** (emphasis added). Likewise, the Oversight Board argues that:

> **[a]llowing local statutes to remain in effect notwithstanding PROMESA's discharge of the Commonwealth's obligations under those statutes would frustrate PROMESA's purpose of restoring Puerto Rico to fiscal responsibility and access to the capital markets**. **Many of the Commonwealth's most crippling obligations**—such as its obligations to pay principal and interest on its outstanding bonds and its obligations to pay pension benefits—**arise under Commonwealth statutes.** Unless such obligations can be impaired and discharged in Title III, a restructuring would be impossible, which would undermine the goals of PROMESA. **[Docket No. 20085 at 29]** (citations and quotation marks omitted)(emphasis added).

56. The language used by both parties shows that their arguments are not based on the doctrine of

preemption but on the inconvenience of these statutes for their proposed restructuring.[12] With due respect, it is not the role of this Court to mold existing law for the convenience of parties by preempting statutory provisions. Preempting every statute that frustrates the purpose of PROMESA, by the Oversight Board's arbitrary and unquestionable definition, would leave us with nothing but PROMESA and the word of the Oversight Board to live by, a crude return to the time of law by decree.

57. That the Oversight Board is unable to obtain the necessary legislative action to change the nature of the TSR is not grounds to enter into a preemption analysis. It reflects the failure of this Plan to comply with the necessary requirements, as detailed in the Motion for Stay regarding Section 314(b) of PROMESA.

## ii.    On Section 314(b) of PROMESA

58. Both SIM and Oversight Board's arguments in response to the Teachers' Associations' view that the requirements of Section 314(b) are not met rely heavily on the preemption of the Retirement Laws, which the Teachers' Associations maintain was improper. For instance, the Teachers' Associations' contention that the Plan is unfeasible is based on the fact that, without the improper preemption of the Retirement Laws, the Oversight Board and the Court agree that the Plan is not feasible.

59.  The Oversight Board declares that "[t]he Plan's provisions relating to pension benefits in Exhibit F-1, including the terms of the freeze of pension accruals and the elimination of COLAs, are not legislation. Rather, those provisions merely default the obligations under

---

[12] The Oversight Board declares that "[t]he Associations do not attempt to explain how any restructuring can be accomplished and feasible under PROMESA if Commonwealth laws creating financial obligations must survive unscathed." **[Docket No. 20085 at 25]** But it is not the Teachers' Associations burden to make the plan feasible, it is the Oversight Board's burden to do so. Moreover, the Teachers' Associations never suggest in their filings that all laws creating financial obligations for the Commonwealth must remain unscathed, they argue that the proper channel to replace those laws is the democratic process embodied by the Legislative Assembly and not the unilateral decree of the Oversight Board through an exhibit to a Plan.

Commonwealth law." **[Docket No. 20085 at 31]** However, upon the examination of the provisions of Exhibit F-1 it is impossible to see how it can be qualified as a mere "default," when it changes the very nature of the TRS, lengthens service requirements and extends the retirement age, all of which is instituted by law. A default is a failure to fulfill an obligation, not an effort to reform legislation, such as the Oversight Board has done. To say that "the provisions of Exhibit F-1 provide the details of the treatment of these discharged claims as they relate to TRS participants at different ages and years of service" **[Docket No. 20085 at 32]** is to completely ignore the fact that the TRS is not a claim, but a law.

60. Additionally, the Oversight Board's own words indicate that it has altered legislation through the Plan, where it should have obtained enabling legislation. When the Oversight Board declares: "Regardless, the Plan's means of implementation with respect to the treatment of claims resulting from the freezes **involves enrolling the affected individuals into the existing Act 106 plan**, and thus relies on existing legislation." **[Docket No. 20085 at 31 f.n. 9]** (emphasis added). *See, also,* **[Docket No. 20085 at 41 f.n. 18]**("Many of the declarants assert that **their participation in the Act 106 plan** will only provide them the amount of the contributions they make . . . ."(emphasis added)). By admitting that the effect of the Plan is to enroll teachers in Act 106 where they previously were not, the Oversight Board admits that it has altered legislation through the Plan.[13]

61. On the other hand, the Oversight Board once more argues against the interpretation of Act 53 that requires zero cuts to pensions by stating that it only applies to accrued pensions. But, as

---

[13] In 2017, Act No. 106-2017 changed the nature of the government pension system from a defined benefit to a defined contribution system. Nonetheless, this law expressly exempted teachers that were enrolled in the TRS from this new system, unless they voluntarily applied for it. *See* P.R. Laws ann. tit. 3 § 9546.

argued in the Motion for Stay, that interpretation narrows the scope of the law against the legislative intention to protect 100% of pension rights.

62. There is no doubt that when enacting Act 53 the legislative intent has always been to protect the pensions of teachers and judges. For instance, the first version of the bill, H.B. 1003, that was submitted for the vote of the House of Representatives on September 27, 2021, actually considered cuts of 8.5% to those pensioners that receive more than $2,000.00 per month.[14] However, the bill was rejected by the Legislative Assembly, and it suffered substantial amendments that ending with a clear public policy of "zero cuts".[15]

63. The text of Act 53 as enacted, undoubtedly establishes a public policy of "zero cuts" which cannot be interpreted as some cuts are allowed and some not. The Statement of Motives, for example, clearly shows an intention to protect 100% of the retirees:

> Pursuant to this law, the Commonwealth supports the Plan, along with the public policies set forth in this Law which, subject to PROMESA's mandate to restore fiscal responsibility in Puerto Rico and the Oversight Board's fiscal plan and budget powers under PROMESA, includes **zero cuts to pensions of current retirees and current accrued benefits of active public employees and a desire to promote the welfare of the people of Puerto Rico:**
>
> 1. **Protect the pensions of our retirees. This objective is intended to <u>avoid cuts to the pensions of 100% of the retirees.</u>** To achieve this objective, a specific clause on this issue is provided in this Law. (emphasis added).

64. When enacting Act 53, the Legislative Assembly was conscious that the retirees have already suffered cuts in their pensions and that such vulnerable sector of the population needed to be protected.

> However, **this Legislature has not lost sight of the fact that our retirees, unlike other groups of creditors, have already suffered cuts in their pensions** as a

---

[14] The Statement of Motives of the first version of H.B. 1003 explained that the Plan of Adjustment stated that the cuts to pensions applied to those pensioners that received more than $1,500.00 per month but that the Legislative Assembly was proposing the Oversight Board to restore 100% of the pensions with resources from the General Fund and for the cuts to apply to pensions of more than $2,000.00 instead of the $1,500.00 established in the Plan.

[15] *See* Legislative History of H.B. 1003, available at the Office of Legislative Services website, https://sutra.oslpr.org/osl/esutra/MedidaReg.aspx?rid=139840. (Last visited November 9, 2021)

result of the enactment of statutes that, to prevent the insolvency of the government retirement systems, reduced pension benefits, increased the amount of employee contributions, and raised the retirement age for the pension plans of each of the three major government retirement systems. **To this end, this legislation is conditioned on the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the contemplated cuts to the monthly pension payments to currently retired employees of the government of the Commonwealth and current public employees who have accrued pension benefits.** In addition, this legislation provides additional funding for the municipalities, and separately for the University of Puerto Rico. (emphasis added).

65. Specifically, the Legislature recognized the nature of the Government's commitment with *all* retirees and the protection of their pension systems as an "unwavering commitment":

> ARTICLE 104 - PUBLIC POLICY; PROTECTION OF THE PENSIONS OF THE RETIREES OF THE GOVERNMENT OF THE COMMONWEALTH.
>
> The Government of the Commonwealth of Puerto Rico hereby declares that it is **public policy of the highest priority to protect the accrued pensions of its public servants, who are one of the most important groups in our society. As an essential part of this public policy, the protection of the pensions of all our retirees is an important and unwavering commitment.** Therefore, with regard to the accrued pensions of government employees, it is hereby provided as follows: The Legislative Assembly authorizes the issuance of the General Obligation Bonds and CVIs subject to the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification. (emphasis added).

66. More enlightening is Article 603 that states in its relevant part the following:

> […] It is the **express and unequivocal will of this Legislative Assembly** that the Restructuring Transactions and their respective authorizations in Articles 103, 201 and 301 **are not enforced**, **if the suspensive condition to avoid any cut of pensions to government employees in the Adjustment Plan or the provisions of Article 104 of this Law are left without effect, invalidated or decreed unconstitutional.** (emphasis added).

67. Article 603 leads to the inevitable conclusion that the Legislative Assembly aimed to protect the pensions of government employees from **any cut,** not just the Monthly Benefit Modification. This is so because Article 603 mandates that the restructuring transactions authorized in the Act cannot be enforced if the suspensive condition to avoid "**any cut of pensions**" in the Plan of Adjustment **or** Article 104 (which refers to the Monthly Benefit

Modification) are left without effect, invalidated or decreed unconstitutional.

68. Moreover, Article 605 also states the legislative intent to not allow any cuts to pensions of government employees and reiterates such public policy "for the sake of clarity":

> ARTICLE 605.- EFFECTIVENESS.
>
> This Law will take effect immediately after its enactment, except for Chapter 5 of this Law, which will take effect on the Date of Effectiveness. **The effectiveness of this Law is conditioned to the FOMB filing an amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit Modification as defined in the Plan. For the sake of clarity, this act shall immediately cease to be in effect and any transactions undertaken pursuant to it if reductions to the pensions of government employees are decreed or implemented under the Debt Adjustment Plan or the restructuring of the debt. The continued effect of this act is contingent upon cero cuts to pensions.** (emphasis added).

69. The day after the enactment of Act 53, Governor Pierluisi issued a letter to Mr. David A. Skeel, Jr., Chairman of the Oversight Board, in which Governor Pierluisi squarely states the following:

> **With respect to the proposed freeze** of the defined benefit plans for Puerto Rico's teachers and judges, **this is an issue separate from Act 53-2021. To be clear, Act 53-2021 does not implement the freeze nor prevents a freeze from occurring;** the issue of any freeze will be addressed in connection with already filed objections to the Plan. (emphasis added).[16]

70. As for this, the Oversight Board in fact agreed with Governor Pierluisi's position on Act 53-2021 by stating in Mr. Skeel's letter in response dated October 29, 2021 that:

> **The Oversight Board Agrees with your assessment of the Act.** As you note, the freeze 'is an issue separate from Act 53-2021' as **the Act 'does not implement the freeze** nor prevents the freeze from occurring'. It is based on that assessment that on November 8, 2021 the Oversight Board is willing to proceed with the confirmation hearing to request confirmation of the 7th Amended Plan of Adjustment (the "Plan").[17] (emphasis added).

---

[16] *See* Letter from Governor Pierluisi to Mr. David A. Skeel dated October 27, 2021, and Mr. Skeel's response letter. Available at: https://ntc-prod-public-pdfs.s3.us-east-2.amazonaws.com/prlO6QfmbjNsIkdaDdj8s-UHCk4.pdf. (Last visited November 9, 2021).
[17] *Id.*

71. As such, the Oversight Board has already admitted that the issue of the proposed freeze is **separate** from Act 53 and that "the Act does not implement the freeze". Thus, it only follows that Act 53 conditioned the issuance of the bonds to "zero cuts" on the teachers' and judges' pensions and the law does not authorize freezes or further cuts, such as the elimination of the COLAs. In other words, that issue has not been legislated. Consequently, the Plan of Adjustment lacks the enabling legislation that Section 314(b)(5) of PROMESA requires and the Plan is not confirmable, nor can any pension system reform can without legislation to that effect.

72. Moreover, to the Legislative Assembly it is clear that Act 53 does not allow any cuts to the TRS as part of the public policy of "zero cuts" and that the reforms to the retirement system have to be addressed with separate legislation. As to this, the President of the House of Representatives, Hon. Rafael Hernández, has stated to the press that:

> With great respect and deference, I support the determination of both the judiciary and the teachers to continue their lawsuit in court. We reaffirm our commitment to resolve the situation of teachers and judges **through legislation when they are willing to sit with us in a responsible manner**. They requested, first - by direct voting in a consultation - not to modify their retirement system and then in the public hearings they requested that the (language included in the) project that included the solution to the teachers' retirement system be withdrawn for them to continue their litigation.[18]

73. Likewise, Governor Pierluisi's position on what Act 53 really intended with "zero cuts" has been consistent after the Act's enactment. Recently the Governor stated that there is no ambiance in the legislature to reform the pension systems in Puerto Rico. Particularly, with respect to the TRS, Governor Pierluisi stated the following to the press:

> First of all, the so-called freeze, which [has been] a requirement of the [Oversight] Board for more than five years to reform the retirement systems for **teachers and**

---

[18] Yaritza Rivera Clemente, *In Debate the Position of the Fiscal Control Board on Law 53*, EL VOCERO (November 3, 2021) (*available at*: https://www.elvocero.com/gobierno/legislatura/en-debate-la-postura-de-la-junta-de-control-fiscal-sobre-la-ley-53/article_78119e14-3c53-11ec-bf0b-a3835ec86b0d.html). (our translation).

**judges**, the [Oversight] Board has included it in all fiscal plans certified to this day. So, it should come as no surprise that it is included in the Plan of Adjustment. **That has not been legislated**. **Despite the [Oversight] Board's request, the legislature has not given way. And it has never given way**, if something like this were to be done and it reaches the hands of the Legislative Assembly, I am sure that we will enter into a negotiation process, of conversations to be fair with the teachers and the judges. (emphasis added, our translation).[19]

74. It would be illogical to interpret the Act as if the Legislative Assembly only intended to condition the issuance of new debt to the elimination of the Monthly Benefit Modification and still allow the Oversight Board to implement a plan of adjustment that imposes other cuts and freezes to pensions. As shown here, the Legislative Assembly never intended to authorize any cuts to pensions. Zero means zero; nothing at all.[20]

## B.  THE TEACHERS' ASSOCIATIONS WILL SUFFER IRREPARABLE HARM.

75. The Oversight Board and SIM also make light of the irreparable injury at issue in this case. Specifically, SIM argues that the claim of equitable mootness was an insufficient showing of irreparable injury.

76. Irreparable injury "means an injury that **cannot adequately be compensated for** either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005)(emphasis added). "Courts have found that irreparable injury may occur in the absence

---

[19] *Pierluisi: "There is no ambiance to reform the pension systems"*, NOTICEL (November 9, 2021)(*available at*: https://www.noticel.com/gobierno/ahora/legislatura/top-stories/20211109/pierluisi-no-hay-ambiente-para-reformar-sistemas-de-pensiones/) (our translation).

Governor Pierluisi added that "[w]hat Law 53 demanded is that there be zero cuts to pensions and that has materialized. The Board has already eliminated the pension cuts. There is not a pensioner in Puerto Rico who is receiving a cut. So, the Board insists that these systems must be reformed. The Teachers Association objected. The Court Administration Office objected. Now the matter is in the hands of the court, in the hands of Judge Taylor Swain**. She is the one who is going to decide whether to proceed with this reform of the retirement systems without legislation.**" *Id* (Emphasis added).

[20] *Zero,* OXFORD LEARNER'S DICTIONARIES (*available at*: https://www.oxfordlearnersdictionaries.com/definition/english/zero_1?q=zero) (Last visited November 9, 2021).

of a stay when the passage of time may render the appeal meaningless". *In re Taub,* No. 08-44210-ess, 2010 Bankr. LEXIS 3458, at *7 (Bankr. E.D.N.Y. 2010).

77. **Some Courts have found that "where the denial of a stay pending appeal risks mooting *any* appeal of *significant* claims of error, the irreparable harm requirement is satisfied."** *Beeman v. BGI Creditors' Liquidating Tr. (In re BGI, Inc.),* 504 B.R. 754, 763 (S.D.N.Y. 2014)(emphasis added). "Thus, the irreparable harm factor requires consideration of the doctrine of equitable mootness." *Id.*

78. Undoubtedly, the risk of equitable mootness in absence of the stay is much more than probable. Equitable mootness responds to "the need for finality in bankruptcy proceedings and allows third parties to rely on that finality by preventing a court from unscrambling complex bankruptcy reorganizations . . . ." *Ochadleus v. City of Detroit (In re City of Detroit),* 838 F.3d 792, 798 (6th Cir. 2016). "Stated bluntly, equitable mootness negates appellate review of the confirmation order or the underlying plan, regardless of the problems therein or the merits of the appellant's challenge." *Id.* (citation omitted). To that effect, the First Circuit will find itself evaluating whether the Plan has been substantially consummated and whether the relief requested by the Teachers' Associations "would irrevocably disrupt the implementation of the plan or disproportionately harm the reliance interest of other parties not before the court." *Id.* In that sense, substantial consummation depends on "the extent of the debtor's transfer of property, assumption of responsibilities, and distribution of assets as prescribed by the plan." *Id.* at 799 (citation omitted). "This requires a case-by-case assessment of the feasibility and effect of the relief requested . . . ." *Id.*

79. **Both the Court and the Oversight Board have stated that in absence of "preemption" of the Retirement Laws, which is the determination the Teachers' Association wish to**

**overturn, the Plan is not feasible**. Therefore, the relief requested by the Teachers' Associations would undoubtedly unravel the Plan if it were consummated while the appeal is pending. This denotes the extreme likelihood that the First Circuit will declare this case equitably moot in absence of a stay, because this is a case of "complex reorganization where it would be impossible to 'unscramble the eggs.'" *In re Juarez,* No. 0:17-bk-06277-BMW, 2019 Bankr. LEXIS 623, at *9 (Bankr. D. Ariz. 2019)(*citing In re Dyanmic Brokers, Inc.,* 293 B.R. 489, 494 (BAP 9th Cir. 2003)(*quoting Baker & Drake, Inc. v. Pub. Serv. Comm'n (In re Baker & Drake, Inc.),*35 F.3d 1348, 1351 (9th Cir. 1994))). Were that to occur, the Teachers' Associations would literally be left with no remedy. Thus, their damages are irreparable.

80. This Court's Confirmation Order expressly prohibits action from the Commonwealth's Government that may directly or indirectly affect the Plan. The Plan itself includes a provision to bind the Government of the Commonwealth for ten years before it can make changes to the pension system, unless, after the Oversight Board is terminated, it makes the corresponding request to the Title III Court and meets a host of requirements. In this way, it is clear that there is no further course of action for the Teachers' Associations but to appeal and, without a stay, that right is infringed. Under these circumstances, the denial of the stay and the loss of opportunity to appeal will amount to a constitutional due process violation. *See Mathews v. Eldrige,* 424 U.S. 319 (1976).[21] The particularities of this case make it impossible for the injured parties to turn to other remedial mechanisms. The political process will be closed to

---

[21] While it is not the focus of this filing, the Teacher's Associations reserve the right to further argue this due process violation in the future, in the event that a stay is denied or conditioned by the imposition of a bond. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldrige,* 424 U.S. 319, 333 (1976). In this case, without a stay to ensure time for the First Circuit to hear and consider the appeal, the Teachers' Associations are deprived of that opportunity. Moreover, the private interest of the members of the Teachers' Associations and the risk of erroneous deprivation of that interest through a legally infirm Plan far outweigh the costs of recognizing their right to appeal, pursuant to the existing test for due process violations. *Id.* at 335.

them, as well as any contractual or judicial remedy.[22] Moreover, this case would set precedent for future Title III cases and deprive further parties of their right to appeal where a confirmation order has been entered.

81. This consummation of the Plan is also likely in absence of the stay, given the insistence of government entities in authorizing expedited payments of the Plan before the Confirmation Order is even final and unappealable.[23] Without a doubt, their intent is to moot the Teachers' Associations' appeal.

82. On the other hand, the Oversight Board also argues that the Teachers' Associations have not shown irreparable harm because their only injury is monetary. This is a gross oversimplification of the issue. While many of the interested parties are appearing in this case to case to claim purely monetary one-time claims, the Teachers' Associations are fighting for their livelihoods and for the successful continuity of the public education system. The changes instituted in the Plan condemn a whole generation of teachers to misery in their old age, threaten recruitment efforts and will provoke a mass exodus of teachers from our public school system, probably contributing to outmigration as well.

83. The impending implementation of the Plan has already begun to provoke an exodus of teachers from the public school system, whom the Teachers' Associations have the honor to represent. Additionally, going forward with the Plan implies the immediate and permanent displacement of the Retirement Laws which would bring chaos and disarray to public employee pensions.[24]

---

[22] *See* Cassandra Burke Robertson, *The Right to Appeal*, 91 N.C. L. REV. 1219, 1241-45 (2013).
[23] *See* Javier Colón Dávila, *Aprueban en comisión la resolución para el pago a bonistas y crear un barril de $50 millones a ser repartidos entre legisladores,* ENDI.COM (February 10, 2022), https://www.elnuevodia.com/noticias/legislatura/notas/aprueban-en-comision-la-resolucion-para-el-pago-a-bonistas-y-crear-un-barril-de-50-millones-a-ser-repartidos-entre-legisladores/.
[24] *See Opposition to Response of the Financial Oversight and Management Board in Accordance with Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al, ECF No. 19567 (corrected at ECF No. 19574)* **[Docket No. 19606 at 16-22]**(explaining the affected provisions).

84. Moreover, if the pension freeze goes into effect on March 15, 2022, in a month, over a thousand teachers who have already applied would be excluded from opting to purchase the remaining months of their service and advance their retirement.[25] Additionally, the change in the nature of the retirement system cuts these teachers' monthly pensions in some cases hundreds and in other thousands of dollars, reducing their retirement income to poverty levels.[26] To avoid this, an exorbitant number of teachers will opt to resign as public school teachers halfway through the semester, leaving the Department of Education with a mass exodus, tons of vacancies and no resources to teach their students, who have already suffered through many interruptions to their education.

85. Freezing teachers' pensions, establishing the concept of defined contributions, and increasing the retirement age to 63 years, as the Plan states, has the effect of applying a cut between 35% to 40% to future teachers' pensions.[27] Simply put, the Plan will reduce teachers to poverty and unable to provide for themselves and their families, should they choose to remain committed to our public school system. While we cite to individual cases, these are not isolated incidents of injury. The Plan will affect all the teachers in the public school system, and while their stories may differ in color, the end result is the same. Either they leave the public school system, or they condemn themselves to poverty in their retirement. Moreover, this scenario will be unchanged for at least a decade, given the constraints the Plan places on the Commonwealth's government.

86. On that note, these pension reforms will destabilize Puerto Rico's education system, because

---

[25] *See* Motion for Stay, Exhibit 7: *Declaration of Nancy Meléndez Soberal* ¶ 6; Exhibit 8: *Declaration of Mildred Fraticelli Torres* ¶ 4.

[26] *See, for example,* Motion for Stay, Exhibit 4: *Declaration of Jocelyn Villanueva Rodríguez* ¶¶ 3-5 (monthly pension will be reduced from $1,456.25 to $355.26); Exhibit 5: *Declaration of Noelanie Fuentes Cardona* ¶¶ 2-4(monthly pension will be reduced from $1,437 to $455.55). Although all the declarations contain similar reductions, these individuals best represent the gravity of the situation.

[27] *See* Motion for Stay, Exhibit 6: *Declaration of Miguel Rivera Gonzalez* ¶ 6.

not many will choose to stay.[28]  The news of the Plan's confirmation already threatens to cause a stampede of thousands of teachers retiring earlier than planned or resign immediately and search for better opportunities outside the territorial limits of the Commonwealth, leaving our Department of Education without experienced teachers and completely unprepared to offer classes, in these already troubled times for our students.[29]

87. On the other hand, the Oversight Board suggests that:

> Many of the declarants assert that their participation in the Act 106 plan will only provide them the amount of the contributions they make, without any acknowledgement or calculation of the offsetting benefit of the tax-deferred investment income and returns they would realize if the funds are invested with reasonable prudence, and **none quantify the amount of Social Security benefits most of them could accrue from the Commonwealth's contributions for the remainder of their careers.** Additionally, the circumstances of teachers on the verge of retirement who did not opt to take advantage of service purchase rights in applying for retirement raises the question of why the Associations did not educate their members of the Plan's provisions to better plan for the freeze's implementation. **[Docket No. 20085 at 41 f.n. 18]**

88. Regarding the point on social security, the Oversight Board omits that the teachers' pensions are subject to substantial limitations due to the Windfall Elimination Provision. Even with Federal Social Security, these pensions will be miserable. Said program establishes:

> The windfall elimination provision (WEP) is a modified benefit formula that reduces the Social Security benefits of certain retired or disabled workers who are also entitled to pension benefits based on earnings from jobs that were not covered by Social Security and thus not subject to the Social Security. Security payroll tax. Its purpose is to remove an unintended advantage or "windfall" that these workers would otherwise receive as a result of the interaction between the regular Social Security benefit formula and the workers' relatively short careers in Social Security-covered employment.[30]

---

[28] *See* Motion for Stay, Exhibit 4: *Declaration of Jocelyn Villanueva Rodríguez* ¶ 9; Exhibit 4: *Declaration of Jocelyn Villanueva Rodríguez* ¶ 7.

[29] *See* Exhibit 2, *Declaration of Eva L. Ayala Reyes* ¶ 21. *See, also,* Motion for Stay Exhibit 1: *Declaration of Mercedes Martinez Padilla* ¶¶ 7-8; Exhibit 2: *Declaration of Migdalia Santiago Negrón* ¶¶ 7-8; Exhibit 3: *Declaration of Liza Fournier Córdova* ¶¶ 7-8.

[30] CONGRESSIONAL RESEARCH SERVICE, SOCIAL SECURITY: THE WINDFALL ELIMINATION PROVISION (WEP) at 1 (*available at* https://sgp.fas.org/crs/misc/98-35.pdf).

89. Under the circumstances the Oversight Board has created, teachers will need to work an additional ten years to be eligible for social security, since they were not previously enrolled. This is particularly onerous for those who are currently close to their retirement age, which was raised to 63.

90. Another issue that the Oversight Board does not mention is that pensions, as frozen, will be undermined over time due to inflation. There is no doubt that inflation reduces the value of benefits by lowering the purchasing power of the dollar. Therefore, if the pensions modified by the Plan are pitiful, inflation will undermine them even more, driving teachers well below the poverty levels of the United States.[31]

91. To fully understand the gravity and the truth of the irreparable injury that the Teachers' Associations will suffer, the Court needs to keep in mind that while other creditors are only affected by the Plan to the extent that they have a right to payment, the members of the Teachers' Associations, who are also residents and taxpayers in Puerto Rico, will continue to suffer the effects of the Plan in their quality of life long after the bondholders and creditors have received their payment and lost interest in Puerto Rico. When the Plan is consummated and the bondholders are satisfied, the Teachers' Associations are among the many that will be left to pick up the pieces of Puerto Rico.

### C. THE POTENTIAL INJURY CAUSED BY THE STAY TO OTHER PARTIES DOES NOT OUTWEIGH THE NEED FOR THE STAY.

92. While the objecting parties present arguments regarding the harm they would suffer as a result of the requested stay pending appeal, the Teachers' Associations do not believe these are

---

[31] *See, for example,  United States Inflation Rate,* TRADING ECONOMICS, https://tradingeconomics.com/united-states/inflation-cpi (last visited February 15, 2022); Robert L. Clark & Ann Archibald McDermed, *Inflation, Pension Benefits, and Retirement,* THE JOURNAL OF RISK AND INSURANCE, vol. 49, no. 1, at 19-38 (1982)(*available at* https://doi.org/10.2307/252574).

sufficient to tip the balance of equities in their favor when the denial of the stay would cause irreparable harm to the Teachers' Associations and their rights.

93. The Confirmation Order has not vested the Objecting Parties with the right to the amounts to be disbursed in the Plan yet, and some parties are already claiming injury based on the inability to reinvest it. Moreover, the appellate procedure may be expedited upon request of the parties. In fact, Section 106(d) of PROMESA states that "[i]t shall be the **duty** of the applicable United States District Court, the applicable United States Court of Appeals, and, as applicable, the Supreme Court of the United States to advance on the docket and to **expedite** to the greatest possible extent the disposition of any matter brought under this Act." 48 U.S.C. § 2126. (emphasis added)

### i.   Finca Matilde

94. On its part, Finca Matilde argues that it will come to harm if the Plan is stayed because its payment will be delayed. The Finca Matilde Objection states the following:

> Finca Matilde is an inverse condemnation creditor whose condemnation judgment remains unpaid since 2011. Finca Matilde has a strong interest in the quick implementation of the Plan **since, pursuant to the confirmed Plan, Finca Matilde will be paid on the effective date**. If the execution of the Plan is stayed Finca will be prejudiced, as well as the public in general because all Eminent Domain and Inverse Condemnation claims will continue to accrue post-petition interests. **Therefore, unless an equitable remedy can be furnished, Finca Matilde opposes to any request for stay on appeal for the reasons expressed below**. **[Docket No. 20079 at 2]** (emphasis added).

95. However, this is not quite the case. According to the Findings of Fact and Conclusions of Law, the Court concluded that the eminent domain claims "are not subject to impairment and discharge." **[Docket No. 19812 at 57]** Nonetheless, the Court specifically declared:

> **The Court's analysis should not be construed to prejudge whether particular Eminent Domain/Inverse Condemnation creditors must receive "full" compensation** for their Taking Clause Claims. The Fifth Amendment mandates that a meritorious takings claimant receive just compensation, as

determined by the court. **The Court does not decide or prejudge today the meaning or quantum of just compensation for any particular claimant.** For some claimants, the amount has already been adjudicated. For others, that determination has not yet been made. Rather, the Court's limited determination here is that the Fifth Amendment prohibits the Plan from providing less than just compensation for allowed Eminent Domain/Inverse Condemnation Claims by way of impairment and discharge through bankruptcy. **[Docket No. 19812 at 113 f.n. 42]** (emphasis added).

96. The Court's only determination is that eminent domain claims, to the extent they were later found to be allowed, would not be subject to impairment in the Plan. However, neither the Confirmation Order, the Findings of Fact and Conclusions of Law, nor the Plan provide an immediate right to payment upon the effective date.

97. Pursuant to the Plan, eminent domain claims are treated as follows:

58.1 Treatment of Eminent Domain/Inverse Condemnation Claims: From and after the Effective Date, **(a)** to the extent not modified prior thereto, **the automatic stay extant pursuant to section 362 of the Bankruptcy Code shall be deemed modified in order to permit the holder of an Eminent Domain/Inverse Condemnation Claim to (i) liquidate** such Eminent Domain/Inverse Condemnation Claim in such holder's Eminent Domain Proceeding and **(ii) cause the Clerk of the Court of First Instance to distribute** to such holder the amount of monies on deposit with the Court of First Instance with respect to the condemned property, and **(b) subject to** the entry of the Confirmation Order or the Findings of Fact and Conclusions of Law in respect of the Plan providing such Claims must be paid in full to the extent they are Allowed Claims for just compensation, upon each such order becoming a Final Order**, and upon the occurrence of another Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim**, the holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one hundred percent (100%) of such Allowed Eminent Domain/Inverse Condemnation Claim; provided, however, that, in the event that (x) the Oversight Board appeals from the Confirmation Order and the Findings of Fact and Conclusions of Law regarding the Title III Court's ruling that Allowed Eminent Domain/Inverse Condemnation Claims must be paid in full or otherwise be rendered unimpaired pursuant to the Plan, (y) such appeal is successful, and (z) a Final Order is entered holding that Allowed Eminent Domain/Inverse Condemnation Claims may be impaired, subject to the terms and provisions of Articles LXXVII and LXXXII of the Plan, each holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange

of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, and the Reorganized Commonwealth shall make, payments, in Cash, in an amount equal to the pro rata payments to be made to holders of Allowed CW General Unsecured Claims up to the GUC Recovery Cap. **[Docket No. 19813-1 Exhibit A at 131-32]** (emphasis added).

98. In sum, the Plan does not order the immediate payment of the eminent domain claims upon the effective date. On the contrary, it provides a modification of the stay so that the claimants can pursue those claims. Nonetheless, since the Court has already determined that that just compensation must be paid in full, to the extent allowable, and the Teachers' Associations' appeal does not affect that finding, the Court can fashion a modification of the stay that is protecting the Commonwealth, rather than deny the stay pending appeal. Finca Matilde has also expressed that it is amenable to this remedy. Thus, Finca Matilde's alleged injury should not weigh against the requested stay, because there is a readily available alternative.

### ii.   SIM

99. SIM alleges that it will receive payment upon the effective date, based on claims of lack of payment by the Commonwealth for Medicaid Services. **[Docket No. 20077 at 7]** Additionally, SIM argues that in addition to that payment, it will be able to continue the Med DC Action against the Commonwealth.

> This litigation began 20 years ago and the [sic] it is likely to continue for 20 more years since the Commonwealth is wrought in making timely and correct payments on this obligation. A stay could mean not being able to continue said litigation. Hence, it will be prejudiced by the stay. **[Docket No. 20077 at 7]**

100.   Regarding the continuity of litigation, the injury is not very weighty, given that the Plan provides the following:

> 60.2 Dismissal of Med Center Litigation: **On the Effective Date, the Med Center Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice**, and each of the Commonwealth and the respective Med Centers shall take such action as is necessary to notify the applicable court of such dismissal, including, without limitation, within ten (10) Business Days of the Effective Date,

filing notices with the clerk of such court setting forth the resolution of the Med
Center Litigation and the dismissal thereof (except the Med DC Action), with
prejudice; provided, however, that **all appeals taken from the Med DC Action
shall be dismissed, with prejudice,** and each of the Commonwealth and the Med
Centers party to such appeals shall take such action as is necessary to notify such
appellate courts of appeal of such dismissal; and, provided, further, that the
Commonwealth and the Med Centers shall file a notice with the clerk of the court
in connection with the Med DC Action that (a) **all actions in connection with the
Med DC Action shall be stayed; provided, however, that any claims and causes
of action relating to the period up to and including the Effective Date shall be
deemed dismissed, with prejudice,** (b) in the event that, from and after July 1,
2022, the Commonwealth defaults on its obligations arising from or relating to the
Medicaid Act, 42 U.S.C. § 139 6a(bb), such stay shall be lifted and the Med Centers
may pursue relief and the Commonwealth may present any and all defenses with
respect to such alleged defaults, and (c) any Med Center claims for injunctive relief
relating to the period from and after July 1, 2022 shall be brought in the Med DC
Action and shall proceed in the ordinary course upon the expiration or the lifting of
the automatic stay, subject to the reservation of all rights, claims, and defenses of
the Med Centers and the Commonwealth with respect to any such claims. **[Docket
No. 19813-1 Exhibit A at 133]** (emphasis added).

101.    According to the text of the Plan, the Med DC Action litigation will continue to be stayed,

and prior claims will be dismissed. Therefore, the requested stay does not affect this litigation.

It only delays payment of their claim. While it may be **a** harm to a certain extent, it is not a

**substantial harm** that far outweighs the injury of the Teachers' Associations. If anything, this

factor should be treated as neutral. *See, for example,  Drivetrain, LLC v. Kozel (In re Abengoa

Bioenergy Biomass of Kan., LLC),* 589 B.R. 731, 749 (D. Kan. 2018)("While third-

party creditors will clearly suffer some level of harm based on a continued delay in receiving

payment, the extent of such harm is unclear. Accordingly, while this factor does not

weigh in favor of a stay, it also does not clearly weigh against a stay. The Court treats this

factor as neutral.") The Court has already ruled that SIM has right to payment, as such, the

delay will not cause a substantial harm.

### iii.    PSA Creditors

102.    In their filing, the PSA Creditors declare their harm as follows:

Three of the most obvious, and quantifiable, harms that the PSA Creditors (along with other GO/PBA Creditors) will suffer are (1) the lost opportunity to invest cash that would otherwise be distributed to them under the Plan; (2) the reduction in value to consideration that would otherwise be distributed to them under the Plan; and (3) additional professional fees. As detailed in the Song Declaration, each of these separate harms is substantial, and in combination they amount to hundreds of millions of dollars to over a billion dollars depending on the length of the stay. *See* Decl. of C. Song, Ex. A to the Opposition. **[Docket No. 20081 at 15]**

103.   The PSA Creditors allege that "the scenario where the Commonwealth's emergence is delayed by 13 months . . . these figures, in total, exceed $700 million." **[Docket No. 20081 at 16]** "That total includes $635 million in lost-opportunity costs, $61 million in reduced value of Plan Consideration, and $26 million in additional professional fees." **[Docket No. 20081 at 16]**

104.   These amounts are based on the Declaration of Christine Song. Nonetheless, upon examination, it is clear that:

Song's conclusions as stated in the Declaration are highly speculative since they are based on assumptions and premises not well defined under a probability density functions. Average, yield returns, interest rates at future should be framed into probability. However, Song did not perform such analyses. The Declaration is not framed into a risk and volatile economy and market. Moreover, the conclusions are not the product of sufficient facts or data and the methodology, if any, is not the product of reliable principles and methods. Moreover, the methodology was not applied reliably to the facts at issue in this case. Song also overlooks that Section 106(d) of PROMESA mandates an expedite dispositions of matters under PROMESA.[32]

105.   Therefore, **these amounts are completely speculative, baseless and are not so much an injury as a frustration of expectations.** The PSA creditors have not been vested with the amounts of disbursements they would reinvest nor can the reduction in value be considered a loss when they do not currently have the right to that money anyway, because the Plan's effective date has not accrued.

---

[32] *See* Exhibit 3, *Declaration of Dr. José I. Alameda-Lozada* ¶ 31.

106.     Additionally, the PSA Creditors argue that the stay will jeopardize the viability of the Plan

and doom the Title III case. Because these and the Oversight Board's arguments regarding the

injury the stay will cause the Commonwealth is intimately intertwined with all the arguments

under the public interest prong, we will discuss them under that heading for better

comprehension of the issue.

### D.  PUBLIC INTEREST IS NOT DISSERVED BY THE REQUESTED STAY.

107.     While the picture painted by the Oversight Board is surely bleak, as bleak as the current

reality that the Teachers' Associations live in while the Oversight Board takes over the

functions of the Commonwealth's government, what is alleged is not truly an injury but rather

the frustration of the expectations of the parties that stand to gain something from this

restructuring. In truth, the Oversight Board's arguments, while cogent, demonstrate why this

stay is necessary and why the appeal is meritorious. The consummation of the Plan is a blow

to the democratic powers of the Commonwealth government and the livelihood of thousands

of present and future teachers and retirees who make up the public education system, not to

mention countless other workers and individuals.

108.     For one thing, the Oversight Board argues that:

> Delaying the Plan's implementation by imposing a stay that would likely persist for
> at least several months while an appeal is litigated creates a significant risk of
> undermining the Plan and all the benefits the residents of Puerto Rico will receive
> thereunder. The Plan took years to negotiate and has the overwhelming support of
> the Commonwealth's creditors. If the Plan were to unravel during the stay, the
> Commonwealth and its creditors would be back where they started at the outset of
> these Title III cases five years ago. *Cf. In re Scrub Island Dev. Grp. Ltd.*, 523 B.R.
> 862, 878–79 (Bankr. M.D. Fla. 2015) (denying stay because "every day that passes
> without the Debtors being able to" obtain capital "materially diminishes the
> likelihood that the Debtors' reorganization efforts will be successful"); *In re
> Yellowstone Mt. Club, LLC*, No. 08-61570, 2009 WL 2163528, at *4 (Bankr. D.
> Mont. Jul. 16, 2009) (holding that even a partial stay "may very likely . . . derail[]"
> a sale of the debtors' assets, causing the debtors to cease operations and frustrating
> the confirmed plan); *In re Public Serv. Co.*, 116 B.R. 347, 350 (Bankr. D.N.H.

1990) ("[T]he huge financing required by this plan would be severely jeopardized by a stay . . . [, and] the possible failure of any plan of reorganization as a consequence of a stay [is] a significant injury."). **[Docket No. 20085 at 42]**

109.    It should be noted that the cited cases relate to Chapter 11 debtors that are unable to operate

without the reorganization. For example, the full quote in *In re Scrub Island Dev. Grp. Ltd.,*

reads as follows:

> This Court plainly stated in its confirmation ruling that, based on the evidence, **it is essential for the Debtors to launch its reorganized operations** at the beginning of 2015. In order for that to happen, the confirmation order needs to become effective **so that the Debtors can obtain an $18.5 million capital infusion**— $12.5 million coming from the plan funder (RCB Equities) and the remaining from the Debtors' shareholders. That money will immediately be used to acquire the partially constructed villas and desalinization plant, make capital improvements to the resort, and refinance its current DIP loans. **Without the capital infusion, the Debtors' resort cannot survive, and every day that passes without the Debtors being able to essentially relaunch their resort materially diminishes the likelihood that the Debtors' reorganization efforts will be successful.** 523 B.R. 862, 878 (Bankr. M.D. Fla. 2015)(emphasis added).

110.    Thus, the quote as used is misleading and the court in that case determined that without the

confirmation the Chapter 11 debtor would simply be unable to launch the operations that

accrue its income. That is not the case here, where the income of the Commonwealth is not

solely dependent on operations, given the presence of tax income, federal funding, etc.

Moreover, the Commonwealth is not reorganizing its operations, only restructuring debt.

111.    Additionally, the idea that a stay would unravel the Plan and leave the negotiating parties

in the same place they were five years ago rings untrue. The Oversight Board has already

obtained the Confirmation Order and, unless the First Circuit repeals it due to the legal errors

raised on appeal, the threat is empty. Moreover, if the decision were reversed on appeal, the

Oversight Board's task would be to file an amended Plan as it has done before at this Court's

request.

112.    The Oversight Board also argues that "[s]ecuring supporting legislation for the Plan

required extensive negotiations with Puerto Rico's Governor and Legislature. The more time

that passes, the greater the probability that interest groups disapproving of the restructuring

will seek new legislation to undermine it." **[Docket No. 20085 at 42]** In true colonial fashion,

the Oversight Board is worried that democracy will prevail over financial interests. For

example, the Oversight Board states:

> A stay would also needlessly delay the Commonwealth's financial recovery,
> including its ability to balance budgets and honor pensions. The Associations argue
> a stay would merely "preserve the status quo" (Stay Mot. ¶ 89), but that is precisely
> the point. The status quo in Puerto Rico is a fiscal emergency. PROMESA §
> 405(m)(1). Preserving the status quo and extending that fiscal emergency would
> delay new investment by investors who will not invest until the Commonwealth's
> debt is resolved. Delayed investment means delayed creation of jobs and value. In
> addition to putting the Commonwealth's restructuring at risk, a stay would impose
> significant financial harm on the Commonwealth, its creditors, and other
> stakeholders. For example, a stay would delay the distribution of approximately
> $10.8 billion to creditors under the Plan, causing creditors to lose vast amounts of
> interest. **[Docket No. 20085 at 42]**

113.    To begin with, the arguments that focus on the delay of Title III proceedings should be

considered within the context of the seriousness of what the Plan represents. "[I]t is possible

to go too far in the interests of expediency and to sacrifice basic fairness in the process."

*Malcolm v. Nat'l Gypsum Co.,* 995 F.2d 346, 354 (2d Cir. 1993). "The benefits of efficiency

can never be purchased at the cost of fairness." *Id.* at 350.

114.    While it is worth repeating that the loss of potential interests should not outweigh the injury

suffered by the Teachers' Associations and the merits of the appeal, what the expressions

transcribed show is that the Oversight Board sees the Commonwealth's restructuring as a

transactional proceeding. The merits of the Teachers' Associations appeal go to the crux of the

problem with the imposition of the Oversight Board on Puerto Rico. This unelected body is

running the Commonwealth from purely financial perspectives, expecting the payment of debt

to solve the financial crisis, without considering the detrimental effect of austerity measures

on the financial recovery of the Commonwealth and the people. The financial recovery of the Commonwealth does not rely solely on its ability to pay the exorbitant unaudited debt that the Oversight Board has managed to restructure through negotiation, it also depends on the possibility of creating a healthy economy where workers and retirees are able to sustain themselves and continue to contribute to the economy. The narrow view of financial recovery adopted in these proceedings has led to the improper preemption of the Retirement Laws and the impairment of democratic processes as well as the livelihood of the individuals that will be left with a barebones government once the Oversight Board and the creditors have taken their victory lap over the consummation of the Plan.

115.   The arguments raised in the proposed appeal relate to issues of great importance for the future of the Commonwealth and its people, especially as it relates to the impairment of their political powers and disenfranchisement.

116.   Thus, while the Teachers' Associations believe that public interest favors the issuance of a stay, in the alternative, at the most, this factor can be considered neutral:

> There are public considerations on both sides of this dispute. **On the one hand, there is a significant public interest in vindicating the rights of the minority and preventing the will of the majority to go unchecked by appellate review**. A plan of reorganization which is unfair to some persons may not be approved by the court even though the vast majority of creditors have approved it. **On the other hand, there is also a strong public interest in the swift and efficient resolution of bankruptcy proceedings.** Indeed, compromises are favored in bankruptcy precisely for the reason that they minimize litigation and expedite the administration of a bankruptcy estate. **On balance however, the public interest does not favor either side and thus, does not affect the Court's determination on the stay.** The same reasoning with respect to the public interest applies here. *In re Tribune Co.,* 477 B.R. 465, 475 (Bankr. D. Del. 2012)(citations omitted)(emphasis added).

117.   As such, if it were considered a neutral factor, it does not weigh against the issuance of the requested stay.

## E. THE IMPOSITION OF A SUBSTANTIAL BOND IS UNWARRANTED AND WOULD EFFECTIVELY DENY THE RIGHT TO APPEAL.

118.    As previously mentioned, the imposition of a bond is optional and discretionary when a stay pending appeal is requested. The Court must balance the equities in play before deciding to impose a bond, particularly a bond of the magnitude requested by the PSA Creditors and the Oversight Board. It seems inconceivable that a party at such an economic disadvantage and who would otherwise have no liability or obligation of payment in this case should be required to post a multibillion dollar bond. Despite the Objecting Parties' arguments to support the imposition of a bond, the Court must not lose perspective of the extraordinary circumstances that surround this case that the Court to exercise its powers of equity and discretion to waive the imposition of the bond.

119.    The Oversight Board and PSA Creditors argue that any stay must be conditioned on a substantial bond. Both parties proposed a bond of not less than $331 million to cover alleged damages to the PSA Creditors and of $1.5 billion for the damages claimed by Oversight Board in representation of the Debtors. Under the circumstances of this case, an imposition of a bond, particularly a bond in this amount, is tantamount to a declaration that a confirmation order is unappealable in Title III.

120.    Under PROMESA, the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure and the Federal Rules of Appellate Procedure, parties are recognized the right to appeal to the applicable court of appeals. Additionally, Section 106(d) of PROMESA states:

> (d) Expedited Consideration.--It shall be **the duty** of the applicable United States District Court, the applicable **United States Court of Appeals**, and, as applicable, the Supreme Court of the United States **to advance on the docket and to expedite to the greatest possible extent the disposition of any matter brought under this Act.** 48 U.S.C. § 2126(d) (emphasis Added).

121.    Imposing a bond in this case, would deprive the Teachers' Associations of their appellate

rights, render the Court of Appeals' appellate jurisdiction spurious and violate basic due process rights. Thus, causing irreparable damage to the Teachers' Associations and their members. Precisely, courts have held that the factors considered by courts in determining whether to issue a stay pending appeal "are not to be applied in a vacuum but instead must be viewed in light of the importance of the right of appeal and preservation of the status quo during the appeal." *In re Howley*, 38 B.R. 314, 315 (Bankr. D. Minn. 1984).

122.    This is of unsurmountable importance in this Title III case since PROMESA impaired unilaterally most of the democratic provisions of the Constitution of the Commonwealth of Puerto Rico. Particularly, when the crux of the Teachers' Associations appeal is the annulment of the teachers' retirement system act by improperly applying the preemption doctrine and the lack of enabling legislation as required by PROMESA under the "awkward power sharing agreement" described by this Court in *Fin. Oversight & Mgmt. Bd. For P.R. v. Pierluisi Urrutia (In re Fin. Oversight & Mgmt. Bd. For P.R.),* Nos. 17-BK-3283-LTS, 21-00072-LTS, 2021 U.S. Dist. LEXIS 197292, at *11-12 (D.P.R. Oct. 13, 2021)(emphasis added)(quotation marks, ellipsis and citations omitted). *See, also, Rosselló Nevares v. Fin. Oversight & Mgmt. Bd. For P.R. (In re Fin. Oversight & Mgmt. Bd. For P.R.)*, 330 F. Supp. 3d 685, 701 (D.P.R. 2018). Besides, as already discussed, the Teachers' Associations have met the requirement for this Court to issue the stay and the irreparable damages that they would suffer permanently and immediately in the effective date, shift the balance of equities to move this Court's discretion to exempt them of the bond.

123.    Moreover, given that the imposition of a bond is not a prerequisite for the issuance of a stay, the Objecting Parties argument that the request for stay should be denied for the sole reason that the Teachers' Associations do not propose a bond in the Motion for Stay is

frivolous. *See* **[Docket No. 20085 at 46] [Docket No. 20081 at 21]**. *See, also, N.Y. Skyline, Inc. v. Empire State Bldg. Co., LLC*, 520 B.R. 1, 14 (S.D.N.Y. 2014). Yet, the cases cited to establish that the Motion for Stay can be denied on that reason alone do not support the proposition that the Teachers' Associations had to argue the bond issue in conjunction with the request for stay, especially when the imposition of a bond is discretionary of the court. *See In re Yormak,* No. 2:15-bk-04241-FMD, 2021 Bankr. LEXIS 3089, at *9 (Bankr. M.D. Fla. 2021).

124.    Moreover, the fact that the Teachers' Association did not address the bond in their Motion for Stay does not mean that the Teachers' Association waived the argument. According to the parties' agreement on the briefing for this matter, that was adopted by this Court in its Briefing Order, the Teachers' Associations can reply to the Opposing Parties' arguments, including the issue of the bond. Thus, pursuant to this Courts' Briefing Order, after the replies are filed, "[t]he Court will thereafter take the Motion for Stay Pending Appeal on submission." **[Docket No. 19978]** Thus, the arguments set forth in this Reply Motion address the Objecting Parties' bond arguments and complies with the Teachers' Associations burden of demonstrating why the court should deviate from requiring a bond in the instant matter.

125.    The Teachers' Associations claims embody different and meritorious circumstances that warrant the exercise of discretion to stay the Plan without requiring a bond. The Confirmation Order is not final and, given the effective date, it does not create an immediate vested right that requires posting a bond. The Teachers' Associations are small organizations that lack the resources to post a bond. Even in the event that they prevail on appeal, the Teachers' Associations would not receive payment or be saved costs. The Objecting Parties contend that if the proposed bond is too high for the Teacher's Associations to post it, this "only serves to

highlight the substantial risk of dramatic injury to Debtors and other creditors if the Bankruptcy Court's orders were erroneously stayed." **[Docket No. 20085 at 49] [Docket No. 20081 at 22]**. However, this argument is misguided.

126.   First of all, upon the effective date of the Plan, regardless of the result of their appeal, the Teachers' Associations would not pay or receive a penny. Their interest in this case transcends monetary damages, it is an issue of legislative action and statutory rights. Thus, the inequitable result that imposing a multibillion dollar bond on the Teachers' Associations exemplifies the exceptional circumstances, undue financial burden and hardship that exempts certain appellants from posting a bond, even when doing so was mandatory, as it is not here. *See, for example, State Indus., Inc. v. Mor-Flo Indus., Inc.*, 124 F.R.D. 613, 614 (E.D. Tenn. 1988). The Court cannot evaluate this case as if it were the run of the mill case where a money judgment was entered against the appellants and the bond were necessary to assure its payment upon the issuance of a stay pending appeal. The Teachers' Associations are claiming their members' rights to a dignified life and minimum economic welfare after their retirement, which will be dramatically affected by the Plan. Life as a teacher in Puerto Rio is already extremely difficult, as has been covered by the local press in the preceding weeks. Their daily sacrifice is inestimable, but their low wages and lack of benefits and resources do nothing to match that effort. Now, the Plan eliminates their remaining economic safety net and disincentivizes their service for the public school system. The irreparable, permanent, and incalculable damage that the more than 20,000 teachers will suffer exceeds any strictly economic consideration of the privileges established by the Plan in favor of creditors.  Contrary to the Teachers' Associations, most of these creditors are speculators, with practically unlimited economic resources and clear knowledge of the risks that these proceedings

comprise and the availability of appellate procedures including the requirement of a stay. [33]

127.    Second of all, most of the potential damages claimed in support of the bond requirement
are speculative, temporary, and purely monetary. The PSA Creditors argue that the bond
should cover "additional professional fees, lost opportunity costs, and loss in market value to
Plan Consideration the PSA Creditors will incur if a stay pending appeal delays the
Commonwealth's emergence from bankruptcy . . . ." **[Docket No. 20081 at 21]**. Meanwhile,
the Oversight Board argues that (1) the Commonwealth would incur tens of millions of dollars
in additional pension liability if the Plan's implementation is delayed; (2) a stay would cost the
Debtors millions of dollars in administrative fees; (3) a stay would have a substantial impact
on the funding of the pension reserve fund established under the Plan to protect retirees in the
Commonwealth; and (4) delaying the Plan's implementation would deprive creditors of
significant interest payments on distributions. **[Docket No. 20085 at 46-48]** While the numbers
could be shocking when they are listed out, it is important to consider whether they are
substantial in the context of those who allege them. The loss of millions of dollars in interest
to parties that handle billions of dollars is not substantial compared to how substantial the loss
of livelihood is for individuals of poor means. That is to say, the substantiality of the harm
alleged should not be seen out of context. However, it is also essential to consider that these
arguments are based on expert declarations that are unreliable.[34]

128.    These expert declarations lack sufficient facts or data and are not the product of reliable
principles and methods. Moreover, the experts did not reliably apply the principles and
methods to the facts of the case. The declarations are speculative and unreliable, which
undermines the alleged damages to the PSA Creditors and the Oversight Board and makes the

---

[33] *See* Exhibit 2, *Declaration of Eva L. Ayala Reyes* ¶¶ 14-26.
[34] *See* Exhibit 3, *Declaration of Dr. José I. Alameda-Lozada* ¶ 8.

imposition of a bond unmeritorious.[35]

129.    For instance, Juan Santambrogio's Declaration and conclusions relied solely on the Fiscal

Plan and the provisions of the Plan of Adjustment and failed to perform an independent

analysis that would award reliability to his conclusions. The underlying data of the Fiscal Plan

is unpredictable and uncertain. Moreover, Santambrogio's conclusions are based on an

incorrect premise, that the stay will cause the Pension Reserve Trust to have less funds. This

conclusion ignores that the Commonwealth will still generate the surplus that can then be used

to fund the PRT; the stay of the proceedings would not affect this. Finally, the delay in cash

payments does not represent a harm and Santambrogio does not attempt to calculate such

damages.[36]

130.    Moreover, Sheva R. Levy states conclusions without basis on fact or data, without

independent analysis and the testimony omits the methodology performed to sustain such

conclusions.[37] Christine Song, on the other hand, relies only on data provided by counsel

without any independent verification. To establish the alleged damages stated in her

Declaration, the calculations focus on an alleged average time period for resolutions of appeals

that is taken arbitrarily and does not consider the particular circumstances that arise in cases

under PROMESA.[38] Moreover, Song does not state the basis for the assumptions on the

calculations for the alleged lost opportunity cost for cash and did not perform a profitability

analysis when discussing the alleged reduction in value of the bonds due to supposed interest

rates increases.[39] Finally, Song's Declaration also establishes purely speculative  conclusions

---

[35] See Exhibit 3, *Declaration of Dr. José I. Alameda-Lozada* ¶¶ 8-11.
[36] See Exhibit 3, *Declaration of Dr. José I. Alameda-Lozada* ¶¶ 32-39
[37] See Exhibit 3, *Declaration of Dr. José I. Alameda-Lozada* ¶¶ 43-44.
[38] See Exhibit 3, *Declaration of Dr. José I. Alameda-Lozada* ¶ 15.
[39] See Exhibit 3, *Declaration of Dr. José I. Alameda-Lozada* ¶¶ 16-24.

of additional harms without any data, facts and methodology applied to reach such
conclusions.[40] Thus, the Court should exclude or at the very least refuse to consider the expert
testimony offered by the Oversight Board and the PSA Creditors, due to its lack of reliability.

131.    The proponent of expert testimony bears the burden of establishing its admissibility under
Federal Rule of Evidence 702 and applicable case law. *Bricklayers & Trowel Trades Int'l
Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 96 (1st Cir. 2014). The Oversight
Board and the PSA Creditors cannot meet their burden because the experts' testimonies are
inadmissible on several grounds. Their conclusions are not based on sufficient facts or data
and the testimonies are not the product of reliable principles and methods applied to the facts
of this case.

132.    The principal rule of admission of expert testimony is Rule 702 of the Federal Rules of
Evidence. A witness who is qualified as an expert by knowledge, education, training, skill or
experience may testify in the form of an opinion or otherwise if: (1) the expert's scientific,
technical, or other specialized knowledge will assist the trier of fact to understand the evidence
or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the
testimony is the product of reliable principles and methods; and (4) the expert has reliably
applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The overarching
subject of Rule 702 is the scientific validity, and thus the evidentiary relevance and reliability,
of the principles that underlie a proposed submission. *See Daubert v. Merrell Dow
Pharmaceuticals, Inc.*, 509 U.S. 579, 594 (1993). Likewise, the focus under Rule 702 must be
solely on principles and methodology, rather than the conclusions they generate. *Id.* The
Supreme Court extended the trial court's "gatekeeping" role to "technical" and "other

---

[40] *See* Exhibit 3, *Declaration of Dr. José I. Alameda-Lozada,* ¶¶ 29-30.

specialized knowledge" in *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 141 (1999).

133.    Moreover, "[i]f the proffered expert testimony is not based on independent research, the party proffering it must come forward with other objective, verifiable evidence that the testimony is based on scientifically valid principles." *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 434 (6th Cir. 2007) (*quoting Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1317-18 (9th Cir. 1995)). Additionally, opinion testimony based on materials provided by counsel, without independent verification, subjects such testimony to exclusion. *Lyman v. St. Jude Medical S.C. Inc.*, 580 F. Supp.2d 719, 726-27 (E.D. Wisc. 2008). Furthermore, an unreliable expert testimony is subjective and unsupported speculation. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993). To satisfy the reliability requirement, the expert's report must expressly "include the factual basis and the process of reasoning which makes the conclusion viable." *Vadala v. Teledyne Indus., Inc.*, 44 F.3d 36, 38(1st Cir. 1995). An expert's opinion does not satisfy the reliability requirement if it is based on no more than her own "ipse dixit," *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146(1997), or, put differently, nothing more than her "subjective belief or unsupported speculation." *Montefiore Med.Ctr. v. Am. Prot.Ins. Co.*, No. 00-CV-3235, 2003 WL 21108232, at *2 (S.D.N.Y. May 14, 2003)(Swain, J.). Even "[a] supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable and relevant under the test set forth by Daubert." *Clark v. Takata Corp.*, 192 F.3d 750,759, f.n. 5 (7th Cir. 1999). Likewise, "[a]t minimum, the expert testimony should include a description of the method used to arrive at the level of exposure and scientific data supporting the determination. The expert's assurance that the methodology and supporting data is reliable will not suffice." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781

(10th Cir. 1999).

134.    In view of the foregoing, and because the expert testimony has no real value, the Oversight

Board and PSA Creditors have not managed to show the injury they would suffer as a result of

the stay nor that the delay of implementation would cause a harm that outweighs the other

factors of the standard for a stay pending appeal.

135.    Lastly, this prohibitive bond requirement would be a *de facto* denial of the stay pending

appeal requested by the Teachers' Associations. The Objecting Parties know that the Teachers'

Associations lack the means to post such a bond, given that their appeal is premised partially

on the fact that they have been condemned to poverty, and, thus, are using the bond as a means

to eliminate the possibility of a stay and, therefore, block the appeal. As previously discussed,

the probability of equitable mootness due to the consummation of the Plan is high. Thus, the

absence of the stay will close the door to the merits of the Teachers' Associations' claims, the

quintessential form of prejudice.

## CONCLUSION

136.    In view of the foregoing, the Teachers' Associations respectfully request that this Court

use its considerable powers of equity to stay the Confirmation Order without the imposition of

a bond. A contrary decision would only further the disenfranchisement of the people of Puerto

Rico by solidifying a precedent that allows the Oversight Board to legislate through the Plan

and disregard the awkward power sharing it has with the Government of the Commonwealth.

The one power left to the Legislative Assembly is to legislate or hold out legislative action to

force negotiation. Without this stay, that power is practically nullified, and the Teachers'

Associations suffer the consequences.

## RELIEF REQUESTED

WHEREFORE, pursuant to the arguments previously stated, it is respectfully requested

from this Honorable Court to stay the implementation of the confirmed Eighth Amended Plan of Adjustment pursuant to Rule 8007 of Bankruptcy Procedure while the Teachers' Associations' appeal to the First Circuit Court of Appeals is pending. In the alternative, we request that only the preemption of the Retirement Laws be stayed pending the result of the appellate proceeding.

RESPECTFULLY SUBMITTED.

In Ponce, Puerto Rico, this 15th day of February 2022.

**WE HEREBY CERTIFY** that on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and attorneys of record.

*/s/Rolando Emmanuelli-Jiménez*
Rolando Emmanuelli-Jiménez, Esq.
USDC: 214105

*/s/Jessica E. Méndez-Colberg*
Jessica E. Méndez-Colberg, Esq.
USDC: 302108

BUFETE EMMANUELLI, C.S.P.
P.O. Box 10779
Ponce, Puerto Rico 00732
Tel.: 787-848-0666
Fax: 1-787-841-1435
E-mail: rolando@emmanuelli.law
            jessica@emmanuelli.law

*Counsel to Federación de Maestros de Puerto Rico, Inc.; Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc.; Unión Nacional de Educadores y Trabajadores de la Educación, Inc.*