# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                  Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>                  Appellant,<br><br>v.<br><br>DESARROLLADORA ORAMA, S.E., C.O.D. TIRE DISTRIBUTORS IMPORTS ASIA, INC., CORREA TIRE DISTRIBUTOR INC., WORLD WIDE TIRE, INC., SEQUERIA TRADING CORPORATION, SABATIER TIRE CENTER, INC., VICTOR LOPEZ CORTES, INC., MULTI GOMAS, INC., JOSÉ COLLAZO PEREZ Y IVELISSE TAVARES MARRERO, MANUEL PEREZ ORTIZ, FINCA MATILDE, INC., THE ESTATE OF PASTOR | |

---

[1]   The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

MANDRY MERCADO, SUCN. ANGEL ALVAREZ
PEREZ, CORAL COVE, INC., COOPERATIVA DE
AHORRO Y CRÉDITO DE AGUADA, ANTONIO
COLON SANTIAGO, VILMA TERESA TORRES
LOPEZ, VIVIANA ORTIZ MERCADO, ORLANDO
TORRES BERRIOS, GERMAN TORRES BERRIOS,
JUAN ALBERTO TORRES BERRIOS,
VHERMANOS TORRES TORRES, INC., SUCN. DE
FRANK TORRES ORTIZ Y AUREA RODRIGUEZ,
COMPUESTA POR FRANK E. TORRES
RODRIGUEZ Y EVA TORRES RODRIGUEZ,
LORTU-TA LTD, INC., LA CUARTEROLA, INC.,
JUAZA, INC., THE CONJUGAL PARTNERSHIP
COMPOSED OF JUAN R. ZALDUONDO VIERA
AND MAGDALENA MACHIOTE RAMERY,
MARUZ REAL ESTATE CORP., ATTORNEY FOR
PFZ PROPERTIES, INC., RAMON MORAN
LOUBRIEL, RAFAEL MORAN LOUBRIEL, ANA
MORAN LOUBRIEL, CORPORACION PLAYA
INDIA, S.E., MARIANO RAMOS GONZALEZ, SAN
GERONIMO CARIBE PROJECT, INC., VICENTE
PEREZ ACEVEDO, MARCARIBE INVESTMENT
CORPORATION, ESTATE OF RAÚL DE PEDRO
AND DIANA MARTINEZ, CARIBBEAN AIRPORT
FACILITIES, INC., SUN AND SAND
INVESTMENTS, CORP., ALFONSO FERNANDEZ
CRUZ, DEMETRIO AMADOR, INC., FDR1500,
CORP., SUIZA DAIRY CORP., MANUEL A.
RIVERA-SANTOS, ET AL., MARGARETA
BLONDET, SUCESION COMPUESTO POR MARIA
I. RUBERT BLONDET, SONIA RUBERT BLONDET,
MARGARITA RUBERT BLONDET, SONIA
RUBERT, ADMINISTRADORA, JORGE RAFAEL
EDUARDO COLLAZO QUINONEZ, PABLO
MELENDEZ BRULLA, GLORIA M. ESTEVA
MARQUES, SUCN. AGUSTIN RODRIGUEZ
COLON, LUIS REYES FEIKERT, SUCN. MANUEL
MARTINEZ RODRIGUEZ, JORGE RAMÓN POZAS,
JUAN A. TAPIA ORTIZ, MIRIAM SÁNCHEZ
LEBRON, AND ANTONIO PEREZ COLON,

Appellees.

## NOTICE OF APPEAL

**PLEASE TAKE NOTICE** the Financial Oversight and Management Board for Puerto Rico, as the sole Title III representative of the Commonwealth of Puerto Rico and the Puerto Rico Public Buildings Authority pursuant to § 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), codified at 48 U.S.C. §§ 2101–2241, hereby appeals to the United States Court of Appeals for the First Circuit, pursuant to 28 U.S.C. § 1291 and 48 U.S.C. § 2162(b), from the portions of (i) the *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [ECF No. 19812], attached hereto as **Exhibit A** (the "Findings and Conclusions"), and (ii) the *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* [ECF No. 19813], attached hereto as **Exhibit B** (the "Confirmation Order"), holding that claims arising under the Takings Clause of the United States Constitution are nondischargeable or must be paid in full.

The (i) parties asserting claims under the Takings Clause, and (ii) additional parties to the Findings and Conclusions and the Confirmation Order, and the names and addresses of their respective attorneys, are as follows:

3

## I.    Takings Clause Claimants and their Attorneys

| Claimants | Attorneys |
|---|---|
| Desarrolladora Orama, S.E. | C. CONDE & ASSOC.<br>Carmen Conde<br>Suite 5<br>254 De San José Street<br>San Juan, PR 00901-1523 |
| C.O.D. Tire Distributors Imports Asia, Inc.<br><br>Correa Tire Distributor Inc.<br><br>World Wide Tire, Inc.<br><br>Sequeria Trading Corporation<br><br>Sabatier Tire Center, Inc.<br><br>Victor Lopez Cortes, Inc.<br><br>Multi Gomas, Inc. | FUERTES & FUERTES LAW OFFICES, CSP<br>Shirley S. Vokac<br>ME-51 Bahia San Juan St.<br>Catano, PR 00962 |
| José Collazo Perez y Ivelisse Tavares Marrero<br>Manuel Perez Ortiz | CARLOS J. CENTENO ABAGADO-NOTARIO<br>Carlos J. Centeno-Rossy<br>P.O. Box 367106<br>San Juan, PR 00936-7106 |
| The Estate of Pastor Mandry Mercado | CHARLES A. CUPRILL P.S.C. LAW OFFICES<br>Charles A. Cuprill<br>Calle Fortaleza 356<br>San Juan, PR 00901-1717 |
| Finca Matilde, Inc. | GARCIA-ARREGUI & FULLANA P.S.C.<br>Isabel M. Fullana<br>252 Ponce de Leon Ave. Suite 1101<br>San Juan, PR 00918 |
| Coral Cove, Inc. | DUBON GROUP<br>Luis E. Dubon III<br>P.O. Box 366123<br>San Juan, PR 00936 |
| Sucn. Angel Alvarez Perez | GODREAU & CONZALEZ LAW LLC |

| | Eausto David Godreau<br>1806 McLeary Street, Suite 1B<br>San Juan, PR 00906 |
|---|---|
| Antonio Colon Santiago | FRANCIS & GUEITS LAW OFFICES<br>Christian Francis Martinez<br>P.O. Box 267<br>Caguas, PR 00726 |
| Cooperativa de Ahorro y Crédito de Aguada | HARRY ANDUZE MONTAÑO LAW OFFICES<br>Diego Rafael Corral<br>1454 Fernández Juncos Ave.<br>San Juan, PR 00909 |
| Sucn. de Frank Torres Ortiz y Aurea Rodriguez, Compuesta por Frank E. Torres Rodriguez y Eva Torres Rodriguez<br><br>Lortu-ta LTD, Inc., La Cuarterola, Inc., Juaza, Inc., and the Conjugal Partnership Composed of Juan R. Zalduondo Viera and Magdalena Machiote Ramery<br><br>Maruz Real Estate Corp. | FUENTES LAW OFFICES, LLC<br>Alexis Fuentes-Hernandez<br>P.O. Box 9022726<br>San Juan, PR 00902-2726 |
| Vilma Teresa Torres Lopez<br><br>Viviana Ortiz Mercado<br><br>Orlando Torres Berrios<br><br>German Torres Berrios<br><br>Juan Alberto Torres Berrios<br><br>Vhermanos Torres Torres, Inc. | HERNANDEZ RIVERA ABOGADOS NOTARIOS<br>Juan A. Hernandez Rivera<br>PMB 108 HC 72 Box 3766<br>Naranjito, PR 00719 |
| Corporacion Playa India, S.E.<br><br>Mariano Ramos Gonzalez | LAW OFFICE OF LOPEZ SANTIAGO<br>Ivette López Santiago<br>Cond. Darlington – Ofic. 1103<br>Ave. Muñoz Rivera #1007<br>San Juan, PR 00925-2725 |
| PFZ Properties, Inc. | LAW OFFICE OF DAVID CARRIÓN BARALT<br>David Carrión Baralt<br>P.O. Box 364463 |

| | San Juan, PR 00936-4463 |
|---|---|
| | **RUSSELL A. DEL TORO SOSA**<br>Russell A. Del Toro Sosa<br>Cond. Condado Princess<br>#2 Calle Washington 304<br>San Juan, Puerto Rico 00907 |
| | **JOSE ÁNGEL REY**<br>Jose Ángel Rey<br>P.O. Box 10127<br>San Juan, PR 00908-1127 |
| Ramon Moran Loubriel<br><br>Rafael Moran Loubriel<br><br>Ana Moran Loubriel | **LAW OFFICE OF DAVID CARRIÓN BARALT**<br>David Carrión Baralt<br>P.O. Box 364463<br>San Juan, PR 00936-4463 |
| Vicente Perez Acevedo<br><br>Marcaribe Investment Corporation | **PEREZ-KUDZMA LAW OFFICE, P.C.**<br>Carmenelisa Peres-Kudzma<br>413 Boston Post Road<br>Weston, MA 02493 |
| San Geronimo Caribe Project, Inc. | **ORLANDO FERNANDEZ LAW OFFICES, P.S.C.**<br>Orlando Fernandez<br>27 Calle Gonzalez Giusti Ste 300<br>Guaynabo, PR 00968-3076 |
| Caribbean Airport Facilities, Inc. | **RIVERA COLON, RIVERA TORRES & RIOS BERLY**<br>Victor Manuel Rivera-Rios<br>1420 Fernandez Juncos Ave.<br>San Juan, PR 00909 |
| Estate of Raúl de Pedro and Diana Martinez | **POLO & POLO, LLC**<br>Carlos E. Polo<br>623 Ponce de León, Ste. 705-A<br>San Juan, PR 00917-4827 |
| Alfonso Fernandez Cruz | **IVYPORT LOGISTICAL SERVICES, INC.**<br>Alfonso Fernandez, Jr.<br>P.O. Box 902-3479<br>San Juan, PR 00902 |
| Sun and Sand Investments, Corp. | **TORO COLÓN MULLET, P.S.C.**<br>Rafael E. Mullet-Sánchez |

| | P.O. Box 195383<br>San Juan, PR 00919-5383 |
|---|---|
| Demetrio Amador, Inc. | MERCEDES FIGUEROA Y MORGADE<br>Mercedes Figueroa y Morgade<br>3415 Alejandrino Ave., Apt. 703<br>Guaynabo, PR 00969-4856 |
| Suiza Dairy Corp. | GODREAU & GONZALEZ LAW, LLC<br>Rafael A. Gonzalez Valiente<br>PO Box 9024176<br>San Juan, PR 00902-4176 |
| FDR1500, Corp. | Rosendo E. Miranda Lopez<br>PO Box 190006<br>San Juan, PR 00919-006 |
| Margareta Blondet, Sucesion Compuesto por Maria I. Rubert Blondet, Sonia Rubert Blondet, Margarita Rubert Blondet, Sonia Rubert, Administradora | Luis Pablo Costas Elena<br>34 Orquides, Unb. Santa Maria<br>San Juan, PR 00927 |
| Manuel A. Rivera-Santos, et al. | Maximiliano Trujillo-González<br>PMB 429 100 Grand Paseos Blvd. Suite 112<br>San Juan, PR 00926-5995 |
| Pablo Melendez Brulla | Antonio Bauza-Torres<br>90 W. Rivera 603<br>Hato Rey, PR 00918 |
| Jorge Rafael Eduardo Collazo Quinonez | Salvador Márquez-Colón<br>485 Tito Castro Ave. Suite 102<br>Ponce, PR 00716-0209 |
| Sucn. Agustin Rodriguez Colon | Wilfredo Rodriguez-Figueroa<br>P.O. Box 366796<br>San Juan, PR 00936 |
| Gloria M. Esteva Marques | María E. Vicéns Rivera<br>9140 Calle Marina, Suite 801<br>Ponce, PR 00717 |
| Sucn. Manuel Martinez Rodriguez | Julio M. Santiago Rodriguez<br>1511 Encina, Caparra Heights<br>San Juan, PR 00920 |
| Luis Reyes Feikert | Cesar Enrique Molina Aponte<br>P.O. Box 334254 |

7

| | |
|---|---|
| | Ponce, PR 00733 |
| Jorge Ramón Pozas | Pro Se<br>P.O. Box 8986<br>Ponce, PR 00732 |
| Miriam Sánchez Lebron | Pro Se<br>HC-04 Box 4001<br>Humacao, PR 00791 |
| Juan A. Tapia Ortiz | Pro Se<br>5014 3rd Ave.<br>Brooklyn, NY 11220 |
| Antonio Perez Colon | Pro Se<br>7809 Lobelia Ln.<br>Springfield, VA 22152-3136 |

## II.   Additional Parties to Findings and Conclusions and Confirmation Order and their Attorneys

| Parties | Attorneys |
|---|---|
| Hon. Pedro R. Pierluisi and the Puerto Rico Fiscal Agency and Financial Advisory Authority | MARINI PIETRANTONI MUÑIZ LLC<br>Luis C. Marini-Biaggi<br>Carolina Velaz-Rivero<br>MCS Plaza, Suite 500<br>255 Ponce de León Ave.<br>San Juan, Puerto Rico 00917<br><br>O'MELVENY & MYERS LLP<br>John J. Rapisardi<br>Maria J. DiConza<br>Matthew P. Kremer<br>7 Times Square<br>New York, New York 10036<br><br>and<br><br>Peter Friedman<br>1625 Eye Street, NW<br>Washington, DC 20006 |
| Official Committee of Unsecured Creditors | CASILLAS, SANTIAGO & TORRES LLC<br>Juan J. Casillas Ayala<br>Israel Fernández Rodríguez |

|  | Juan C. Nieves González<br>Cristina B. Fernández Niggemann<br>PO Box 195075<br>San Juan, Puerto Rico 00919-5075<br><br>PAUL HASTINGS LLP<br>Luc A. Despins<br>G. Alexander Bongartz<br>200 Park Avenue<br>New York, New York 10166 |
|---|---|
| Official Committee of Retired Employees of Puerto Rico | BENNAZAR, GARCÍA & MILIÁN, C.S.P.<br>A.J. Bennazar-Zequeira<br>Héctor M. Mayol Kauffmann<br>Francisco del Castillo Orozco<br>Edificio Union Plaza,<br>1701 Avenida Ponce de León #416<br>Hato Rey, San Juan<br>Puerto Rico 00918<br><br>JENNER & BLOCK LLP<br>Robert Gordon<br>Richard Levin<br>919 Third Ave<br>New York, NY 10022-3908<br><br>and<br><br>Catherine Steege<br>Melissa Root<br>Landon Raiford<br>353 N. Clark Street<br>Chicago, IL 60654 |
| Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund LP, Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund | DELGADO & FERNÁNDEZ, LLC<br>Alfredo Fernández-Martínez<br>PO Box 11750<br>Fernández Juncos Station<br>San Juan, Puerto Rico 00910-1750<br><br>JONES DAY<br>Bruce Bennett<br>555 South Flower Street<br>Fiftieth Floor<br>Los Angeles, CA 90071<br><br>and |

| | |
|---|---|
| Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., and Redwood Master Fund, Ltd. | Benjamin Rosenblum<br>250 Vesey Street<br>New York, New York 10281<br>and<br><br>Matthew E. Papez<br>51 Louisiana Ave. N.W.<br>Washington, DC 20001 |
| National Public Finance Guarantee Corp. | ADSUAR MUÑIZ GOYCO SEDA &PEREZ-OCHOA PSC<br>Eric Pérez-Ochoa<br>Luis A. Oliver-Fraticelli<br>PO Box 70294<br>San Juan, PR 00936<br><br>WEIL, GOTSHAL &MANGES LLP<br>Jonathan D. Polkes<br>Gregory Silbert<br>Robert S. Berezin<br>Kelly DiBlasi<br>Gabriel A. Morgan<br>767 Fifth Avenue<br>New York, NY 10153 |
| Assured Guaranty Corp. and Assured Guaranty Municipal Corp. | CASELLAS ALCOVER & BURGOS P.S.C.<br>Heriberto Burgos Pérez<br>Ricardo F. Casellas-Sánchez<br>Diana Pérez-Seda<br>P.O. Box 364924<br>San Juan, PR 00936-4924<br><br>CADWALADER, WICKERSHAM & TAFT LLP<br>Howard R. Hawkins, Jr.<br>Mark C. Ellenberg<br>William J. Natbony<br>Thomas J. Curtin<br>Casey J. Servais<br>200 Liberty Street<br>New York, New York 10281 |
| Financial Guaranty Insurance Company | REXACH & PICÓ, CSP<br>María E. Picó<br>802 Ave. Fernández Juncos<br>San Juan, PR 00907-4315<br><br>BUTLER SNOW LLP<br>Martin A. Sosland |

| | 2911 Turtle Creek Blvd., Suite 1400<br>Dallas, TX 75219<br><br>and<br><br>James E. Bailey III<br>Adam M. Langley<br>6075 Poplar Ave., Suite 500<br>Memphis, TN 38119 |
|---|---|
| Ad Hoc Group of FGIC Noteholders | CÓRDOVA & DICK, LLC<br>Brian M. Dick Biascoechea<br>#403 Calle 12 de Octubre Urb. El Vedado<br>San Juan, PR 00918<br><br>SHEPPARD MULLIN RICHTER &<br>HAMPTON LLP<br>Lawrence A. Larose<br>30 Rockefeller Plaza<br>New York, New York 10112 |
| Ambac Assurance Corporation | FERRAIUOLI LLC<br>Roberto Cámara-Fuertes<br>Sonia Colón<br>221 Ponce de León Avenue, 5th Floor<br>San Juan, PR 00917<br><br>MILBANK LLP<br>Dennis F. Dunne<br>Atara Miller<br>Grant R. Mainland<br>John J. Hughes, III<br>Jonathan Ohring<br>55 Hudson Yards<br>New York, NY 10001 |
| AmeriNational Community Services, LLC, as Servicer for the GDB Debt Recovery Authority | MCCONNELL VALDÉS LLC<br>Arturo J. García-Solá<br>Nayuan Zouairabani<br>270 Muñoz Rivera Avenue, Suite 7<br>Hato Rey, Puerto Rico 00918<br>P.O. Box 364225<br>San Juan, PR 00936-4225 |
| Cantor-Katz Collateral Monitor LLC, as Collateral Monitor for the GDB Debt Recovery Authority | SCHULTE ROTH & ZABEL LLP<br>Douglas S. Mintz<br>901 Fifteenth Street, NW, Suite 800<br>Washington, DC 20005 |

11

| | |
|---|---|
| | and |
| | Douglas Koff |
| | Adam C. Harris |
| | Taleah Jennings |
| | Abbey Walsh |
| | Peter J. Amend |
| | 919 Third Avenue |
| | New York, NY 10022 |
| Santander Securities LLC | C. CONDE & ASSOC. LAW OFFICES |
| | Carmen D. Conde Torres |
| | Luisa S. Valle Castro |
| | 254 San José Street |
| | Suite 5 |
| | San Juan, PR 00901-1523 |
| | NELSON ROBLES-DIAZ LAW OFFICES, P.S.C. |
| | Nelson Robles-Díaz |
| | P. O. Box 192302 |
| | San Juan, Puerto Rico 00919-2302 |
| | CROWELL & MORING LLP |
| | Daniel L. Zelenko |
| | Sarah M. Gilbert |
| | 590 Madison Avenue, 20th Floor |
| | New York, NY 10022 |
| Vaquería Tres Monjitas, Inc. | G. CARLO-ALTIERI LAW OFFICES, LLC |
| | Gerardo A. Carlo-Altieri |
| | 254 Calle San José |
| | Third Floor |
| | San Juan, PR 00901 |
| | EPSTEIN BECKER & GREEN, P.C. |
| | Wendy G. Marcari |
| | 875 Third Avenue |
| | New York, NY 10022 |
| Counsel for the Ad Hoc Group of Constitutional Debtholders | G. CARLO-ALTIERI LAW OFFICES, LLC |
| | Gerardo A. Carlo-Altieri |
| | 254 Calle San José |
| | Third Floor |
| | San Juan, PR 00901 |
| | MORRISON & FOERSTER LLP |
| | James M. Peck |
| | Gary S. Lee |

| | |
|---|---|
| | James A. Newton<br>Andrew R. Kissner<br>250 West 55th Street<br>New York, New York 10019 |
| | REICHARD & ESCALERA<br>Rafael Escalera<br>Sylvia M. Arizmendi<br>Carlos R. Rivera-Ortiz<br>255 Ponce de León Avenue<br>MCS Plaza, 10th Floor<br>San Juan, Puerto Rico 00917-1913<br><br>QUINN EMANUEL URQUHART &<br>SULLIVAN, LLP<br>Susheel Kirpalani<br>Daniel Salinas<br>Eric Kay<br>Zachary Russell<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010-1603 |
| Ad Hoc Group of General Obligation Bondholders | JIMÉNEZ, GRAFFAM & LAUSELL<br>J. Ramón Rivera Morales<br>Andrés F. Picó Ramírez<br>P.O. Box 366104<br>San Juan, PR 00936<br><br>WILLKIE FARR & GALLAGHER LLP<br>Mark T. Stancil<br>1875 K Street, N.W.<br>Washington, DC 20006<br><br>PAUL, WEISS, RIFKIND, WHARTON &<br>GARRISON LLP<br>Andrew N. Rosenberg<br>Karen R. Zeituni<br>1285 Avenue of the Americas<br>New York, NY 10019<br><br>ROBBINS, RUSSELL, ENGLERT,<br>ORSECK,<br>UNTEREINER & SAUBER LLP<br>Lawrence S. Robbins<br>Gary A. Orseck<br>Donald Burke<br>2000 K Street, N.W., 4th Floor<br>Washington, DC 20006 |

| Co-Counsel for the QTCB Noteholder Group | CORREA-ACEVEDO & ABESADA LAW OFFICES, PSC<br>Sergio Criado<br>Roberto Abesada-Agüet<br>Centro Internacional de Mercadeo, Torre II<br># 90 Carr. 165, Suite 407<br>Guaynabo, PR 00968<br><br>MORGAN, LEWIS & BOCKIUS LLP<br>Kurt A. Mayr<br>David L. Lawton<br>David K. Shim<br>One State Street<br>Hartford, CT 06103-3178 |
|---|---|
| U.S. Bank Trust National Association, Trustee | IVERA, TULLA AND FERRER, LLC<br>Eric A. Tulla<br>Rivera Tulla & Ferrer Building<br>50 Quisqueya Street<br>San Juan, PR 00917-1212<br><br>HOGAN LOVELLS US LLP<br>Robin E. Keller<br>Ronald J. Silverman<br>Pieter Van Tol<br>390 Madison Avenue<br>New York, NY 10017 |
| Service Employees International Union | MONSERRATE SIMONET & GIERBOLINI<br>Miguel Simonet Sierra<br>101 San Patricio Ave., Suite 1120<br>Guaynabo, PR 00968<br><br>COHEN, WEISS AND SIMON LLP<br>Peter D. DeChiara<br>Richard M. Seltzer<br>Marie B. Hahn<br>900 Third Avenue, Suite 2100<br>New York, NY 10022-4869 |
| Attorneys for Credit Unions | ALMEIDA AND DAVILA<br>Enrique M. Almeida<br>PO Box 191757<br>San Juan, PR 00919-1757 |
| Mapfre PRAICO Insurance Company | SALDAÑA, CARVAJAL, & VÉLEZ-RIVÉ, P.S.C.<br>José A. Sánchez Girona<br>166 Avenida de la Constitución |

| | San Juan, Puerto Rico 00901 |
|---|---|
| J.P. Morgan Securities LLC | ANTONETTI MONTALVO & RAMIREZ COLL<br>José L. Ramírez-Coll<br>Carolina V. Cabrera Bou<br>P.O. Box 13128<br>San Juan, PR 00908<br><br>SIMPSON THACHER & BARTLETT LLP<br>John K. Youngwood<br>David Elbaum<br>425 Lexington Avenue<br>New York, NY 10017 |
| Samuel A. Ramirez & Co., Inc., Barclays Capital Inc., RBC Capital Markets, LLC, and Raymond James & Associates, Inc. | McCONNELL VALDÉS LLC<br>Roberto C. Quiñones-Rivera<br>270 Muñoz Rivera Avenue<br>Hato Rey, Puerto Rico 00918 |
| Counsel for Goldman Sachs & Co. LLC and Citigroup Global Markets Inc. | MORELL, CARTAGENA & DAPENA LLC<br>Ramón E. Dapena<br>Iván Lladó<br>PO Box 13399<br>San Juan, Puerto Rico 00908<br><br>GOODWIN PROCTER LLP<br>Douglas H. Flaum<br>Charles A. Brown<br>Howard S. Steel<br>Stacy A. Dasaro<br>The New York Times Building<br>620 Eighth Avenue<br>New York, NY 10018 |
| Mesirow Financial, Inc. | COTO & ASSOCIATES<br>Ramón Coto-Ojeda<br>MCS Plaza, Suite 800<br>255 Ponce de León Avenue<br>San Juan, Puerto Rico 00917<br><br>CHAPMAN AND CUTLER LLP<br>James M. Heiser<br>111 West Monroe Street<br>Chicago, IL 60603-4080 |
| Sidley Austin LLP | SARLAW LLC<br>Sergio A. Ramírez de Arellano<br>Banco Popular Center, Suite 1022 |

| | 209 Muñoz Rivera Ave.<br>San Juan, PR 00918-1009<br><br>FRIEDMAN KAPLAN SEILER &<br>ADELMAN LLP<br>Eric Seiler<br>Anne E. Beaumont<br>Danielle E. Tepper<br>7 Times Square<br>New York, NY 10036 |
|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Inc.<br>and Merrill Lynch Capital Services, Inc. | BOBONIS, BOBONIS & RODRIGUEZ<br>POVENTUD<br>Enrique G. Figueroa-Llinás<br>129 de Diego Ave.<br>San Juan, Puerto Rico 00911-1927 |
| BMO Capital Markets GKST, Inc. | NAVARRO-CABRER LAW OFFICES<br>Nilda M. Navarro-Cabrer<br>El Centro I, Suite 206<br>500 Muñoz Rivera Ave.<br>San Juan, Puerto Rico 00918<br><br>McGUIREWOODS LLP<br>E. Andrew Southerling<br>2001 K Street N.W., Suite 400<br>Washington, DC 20006-1040<br><br>and<br><br>Aaron G. McCollough<br>77 West Wacker Drive, Suite 4100<br>Chicago, IL 60601-1818 |
| Morgan Stanley & Co. LLC | SALDAÑA, CARVAJAL & VÉLEZ-RIVÉ,<br>P.S.C.<br>Luis N. Saldaña-Román<br>Ángel E. Rotger-Sabat<br>166 Avenida de la Constitución<br>San Juan, Puerto Rico 00901<br><br>SKADDEN, ARPS, SLATE, MEAGHER &<br>FLOM LLP<br>Julie E. Cohen<br>Four Times Square<br>New York, NY 10018 |
| Samuel A. Ramirez & Co., Inc. | KAYSER & REDFERN, LLP<br>Leo Kayser III<br>515 Madison Avenue |

| | New York, NY 10022 |
|---|---|
| RBC Capital Markets, LLC | ORRICK, HERRINGTON & SUTCLIFFE LLP<br>Robert Stern<br>Tiffany Row<br>Columbia Center<br>1152 15th Street, N.W.<br>Washington, DC 20005-1706 |
| Asociacion de Maestros de Puerto Rico and Asociacion de Maestros de Puerto Rico - Local Sindical | PRESTIGE LEGAL SERVICES, LLC<br>Jośe Luis Barrios-Ramos<br>278 Ave. César González<br>San Juan, Puerto Rico 00918 |
| Group Wage Creditors | IVONNE GONZALEZ-MORALES<br>Ivonne Gonzalez-Morales<br>PO BOX 9021828<br>San Juan, PR 00902-1828 |
| Cooperativa de Ahorro y Crédito Vegabajeña | CARLOS A. QUILICHINI PAZ<br>Carlos A. Quilichini Paz<br>Jessica M. Quilichini Ortiz<br>Post Office Box 9020895<br>San Juan, PR 00902 |
| Asociación de Jubilados de la Judicatura de Puerto Rico | MENDOZA LAW OFFICES<br>Enrique J. Mendoza Méndez<br>P.O. Box 9282<br>San Juan, PR 00908-0282 |
| Quest Diagnostics of Puerto Rico, Inc. | DLA PIPER (PUERTO RICO) LLC<br>Mariana Muñiz Lara<br>Calle de la Tanca #500, Suite 401<br>San Juan, PR 00901-1969 |
| Community Health Foundation of P.R. | BEATRIZ HERNÁNDEZ TORO LAW<br>Beatriz Hernández Toro<br>PO Box 190291<br>San Juan, PR 00919-0291 |
| Med Centro, Inc., formerly Consejo de Salud de la Comunidad de la Playa de Ponce, Inc. | CHARLES A. CUPRILL, P.S.C. LAW OFFICES<br>Charles A. Cuprill Hernández<br>356 Fortaleza Street, Second Floor<br>San Juan, PR 00901 |
| Miriam E. Lima Colón, Betzaida Feliciano Concepción and Angel L. Méndez González | BUFETE FERNÁNDEZ & ALCARAZ CSP<br>Ignacio Fernández De Lahongrais<br>Capital Center Sur, Suite 202<br>Avenida Arterial Hostos #239<br>San Juan, PR 00918-1475<br><br>BUFETE DÍAZ-FERRER |

|  | Marvin Díaz Ferrer<br>Cond. Vick Center Ste. C-202<br>867 Ave. Muñoz Rivera<br>San Juan, PR 00925 |
|---|---|
| The United States of America, on behalf of the Internal Revenue Service | U.S. DEPARTMENT OF JUSTICE<br>David A. Hubbert<br>Ward W. Benson<br>Post Office Box 227<br>Washington, DC 20044 |
| The Bank of New York Mellon | SEPULVADO, MALDONADO & COURET<br>Albéniz Couret-Fuentes<br>304 Ponce de León Ave. – Suite 990<br>San Juan, PR 00918<br><br>REED SMITH LLP<br>Luke Sizemore<br>Jared S. Roach<br>225 Fifth Avenue, Suite 1200<br>Pittsburgh, PA 15222 |
| University of Puerto Rico Retirement System Trust | ANTONETTI MONTALVO & RAMIREZ COLL<br>José L. Ramírez-Coll<br>Carolina V. Cabrera Bou<br>P.O. Box 13128<br>San Juan, PR 00908 |
| Peter C. Hein | Pro Se<br>101 Central Park W # 14E<br>New York, NY 10023-4250 |
| Arthur Samodovitz | Pro Se<br>140 Lasa Dr. Apt 204,<br>St. Augustine, FL 32084 |
| Edgardo Márquez Lizardi | Pro Se<br>Cond. El Monte Sur<br>190 Ave. Hostos Apt. 9399<br>San Juan, PR 00918 |
| Antonio Martin Cervera | Pro Se<br>H-22 Yagrumo, Caparra Hills<br>Guaynabo, PR 00968 |
| Miguel Luna De Jesus | Pro Se<br>Villa Del Monte 1<br>Calle Monte Alto<br>Toa Alta, PR 00953 |
| Ismael L. Purcell | Pro Se<br>Urb. Jacaranda |

|  | 35271 Calle Clavelina<br>Ponce, PR 00730 |
|---|---|
| Maria Teresita Martin | Pro Se<br>Maria Teresita Martin<br>H-22 Yagrumo, Caparra Hills<br>Guaynabo, PR 00968 |
| Mildred Batista De Leon | Pro Se<br>PO Box 1259<br>Saint Just, PR 00978 |
| Javier Alejandrino Osorio | Pro Se<br>PO Box 1259<br>Saint Just, PR 00978 |
| Ana A. Nuñez Veláquez | Pro Se<br>19 Res. Veillanueva Apto 170<br>Aguadilla, PR 00603 |
| Nilsa Candelario | Pro Se<br>405 Ave. Esmeralda Ste. 2-559<br>Guaynabo, PR 00969 |
| Wanda I. Ortiz Santiago | Pro Se<br>Urb. Las Leandras<br>JJ-5 Calle 21<br>Humacao, PR 00791 |
| Nancy I. Negron-López | Pro Se<br>HC 3 Box 34941<br>San Sebastián, PR 00685 |
| Yashei Rosario | Pro Se<br>HC 2 Box 12914<br>Vieques, PR 00765 |

Dated: February 17, 2022
     San Juan, Puerto Rico

Respectfully submitted,

*/s/  Martin J. Bienenstock*
Martin J. Bienenstock
Brian. S. Rosen
Jeffrey W. Levitan
Ehud Barak
(Admission *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

*/s/ Luis F. del Valle-Emmanuelli*
Luis F. del Valle-Emmanuelli
USDC-PR No. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.647.3503
dvelawoffices@gmail.com

**OF COUNSEL FOR
A&S LEGAL STUDIO, PSC**
434 Avenida Hostos
San Juan, PR 00918
Tel. (787) 751-6764/763-0565
Fax (787) 763-8260

*Co-Attorney for the Financial Oversight and Management Board as representative for the Debtors*

**<u>Exhibit A</u>**

**Findings and Conclusions**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Title III No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO et al., | |
| Debtors.[1] | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

APPEARANCES:

O'NEILL & BORGES LLC
By:    Hermann D. Bauer
250 Muñoz Rivera Avenue, Suite 800
San Juan, PR 00918-1813

OF COUNSEL FOR
A&S LEGAL STUDIO, PSC
By:    Luis F. del Valle-Emmanuelli
434 Avenida Hostos
San Juan, PR 00918

PROSKAUER ROSE LLP
By:    Martin J. Bienenstock
       Brian S. Rosen
       Jeffrey W. Levitan
       Ehud Barak
       Timothy W. Mungovan
       Joshua A. Esses
Eleven Times Square
New York, NY 10036

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico, as
representative of the Commonwealth of Puerto
Rico*

MARINI PIETRANTONI MUÑIZ LLC
By:    Luis C. Marini-Biaggi
       Carolina Velaz-Rivero
MCS Plaza, Suite 500
255 Ponce de León Ave.
San Juan, Puerto Rico 00917

O'MELVENY & MYERS LLP
By:    John J. Rapisardi
       Maria J. DiConza
       Matthew P. Kremer
7 Times Square
New York, New York 10036

       *and*

       Peter Friedman
1625 Eye Street, NW
Washington, DC 20006

PETER C. HEIN
By:    Peter C. Hein
101 Central Park W # 14E
New York, NY 10023-4250

*Pro Se*

SALDAÑA, CARVAJAL, & VÉLEZ-RIVÉ,
P.S.C.
By:    José A. Sánchez Girona
166 Avenida de la Constitución
San Juan, Puerto Rico 00901

DAVID CARRION BARALT
By:    David Carrion Baralt
P.O. Box 364463
San Juan, PR 00936-4463

       *and*

RUSSELL A. DEL TORO SOSA
By:    Russell A. Del Toro Sosa
Cond. Condado Princess
#2 Calle Washington 304
San Juan, Puerto Rico 00907

       *and*

JOSE ÁNGEL REY
By:    Jose Ángel Rey
P.O. Box 10127
San Juan, PR 00908-1127

*Attorneys for PFZ Properties, Inc.*

CHARLES A. CUPRILL, P.S.C. LAW
OFFICES
By:    Charles A. Cuprill-Hernández
356 Fortaleza Street, Second Floor
San Juan, PR 00901

*Counsel for Sucesión Pastor Mandry
Mercado*

GODREAU & GONZALEZ LAW, LLC

*Attorneys for Hon. Pedro R. Pierluisi and the
Puerto Rico Fiscal Agency and Financial
Advisory Authority*

CASILLAS, SANTIAGO & TORRES LLC
By:      Juan J. Casillas Ayala
          Israel Fernández Rodríguez
          Juan C. Nieves González
          Cristina B. Fernández Niggemann
PO Box 195075
San Juan, Puerto Rico 00919-5075

PAUL HASTINGS LLP
By:      Luc A. Despins
          G. Alexander Bongartz
200 Park Avenue
New York, New York 10166

*Counsel to the Official Committee of
Unsecured Creditors*

BENNAZAR, GARCÍA & MILIÁN, C.S.P.
By:      A.J. Bennazar-Zequeira
          Héctor M. Mayol Kauffmann
          Francisco del Castillo Orozco
Edificio Union Plaza,
1701 Avenida Ponce de León #416
Hato Rey, San Juan
Puerto Rico 00918

JENNER & BLOCK LLP
By:      Robert Gordon
          Richard Levin
919 Third Ave
New York, NY 10022-3908

          *and*

          Catherine Steege
          Melissa Root
          Landon Raiford
353 N. Clark Street
Chicago, IL 60654

*Counsel for The Official Committee of Retired
Employees of Puerto Rico*

DELGADO & FERNÁNDEZ, LLC

By:      Rafael A. Gonzalez Valiente
PO Box 9024176
San Juan, PR 00902-4176

*Counsel for Suiza Dairy*

ISABEL FULLANA-FRATICELLI &
ASSOCS., P.S.C.
By:      Isabel M. Fullana
          Eduardo J. Capdevila
The Hato Rey Center Bldg.
268 Ave. Ponce de León Ste. 1002
San Juan, Puerto Rico 00918

*Counsel to Finca Matilde, Inc.*

IVERA, TULLA AND FERRER, LLC
By:      Eric A. Tulla
Rivera Tulla & Ferrer Building
50 Quisqueya Street
San Juan, PR 00917-1212

HOGAN LOVELLS US LLP
By:      Robin E. Keller
          Ronald J. Silverman
          Pieter Van Tol
390 Madison Avenue
New York, NY 10017

*Counsel to the Trustee*

MONSERRATE SIMONET & GIERBOLINI
By:      Miguel Simonet Sierra
101 San Patricio Ave., Suite 1120
Guaynabo, PR 00968

COHEN, WEISS AND SIMON LLP
By:      Peter D. DeChiara
          Richard M. Seltzer
          Marie B. Hahn
900 Third Avenue, Suite 2100
New York, NY 10022-4869

*Counsel to Service Employees International
Union*

ALMEIDA AND DAVILA
By:      Enrique M. Almeida

By:    Alfredo Fernández-Martínez
PO Box 11750
Fernández Juncos Station
San Juan, Puerto Rico 00910-1750

JONES DAY
By:    Bruce Bennett
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071

     *and*

     Benjamin Rosenblum
250 Vesey Street
New York, New York 10281

     *and*

     Matthew E. Papez
51 Louisiana Ave. N.W.
Washington, DC 20001

*Counsel for Andalusian Global Designated Activity Company, Crown Managed Accounts for and on behalf of Crown/PW SP, LMA SPC for and on behalf of Map 98 Segregated Portfolio, Mason Capital Master Fund LP, Oaktree-Forrest Multi-Strategy, LLC (Series B), Oaktree Opportunities Fund IX, L.P., Oaktree Opportunities Fund IX (Parallel), L.P., Oaktree Opportunities Fund IX (Parallel 2), L.P., Oaktree Huntington Investment Fund II, L.P., Oaktree Opportunities Fund X, L.P., Oaktree Opportunities Fund X (Parallel), L.P., Oaktree Opportunities Fund X (Parallel 2), L.P., Oaktree Value Opportunities Fund Holdings, L.P., Oceana Master Fund Ltd., Ocher Rose, L.L.C., Pentwater Merger Arbitrage Master Fund Ltd., PWCM Master Fund Ltd., and Redwood Master Fund, Ltd.*

ADSUAR MUÑIZ GOYCO
SEDA &PEREZ-OCHOA PSC
By:    Eric Pérez-Ochoa
     Luis A. Oliver-Fraticelli
PO Box 70294
San Juan, PR 00936

PO Box 191757
San Juan, PR 00919-1757

*Attorneys for Credit Unions*

SALDAÑA, CARVAJAL, & VÉLEZ-RIVÉ, P.S.C.
By:    José A. Sánchez Girona
166 Avenida de la Constitución
San Juan, Puerto Rico 00901

*Counsel for Mapfre PRAICO Insurance Company*

ANTONETTI MONTALVO & RAMIREZ COLL
By:    José L. Ramírez-Coll
     Carolina V. Cabrera Bou
P.O. Box 13128
San Juan, PR 00908

*Counsel for J.P. Morgan Securities LLC*

McCONNELL VALDÉS LLC
By:    Roberto C. Quiñones-Rivera
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918

*Counsel for Samuel A. Ramirez & Co., Inc., Barclays Capital Inc., RBC Capital Markets, LLC and Raymond James & Associates, Inc.*

MORELL, CARTAGENA & DAPENA LLC
By:    Ramón E. Dapena
     Iván Lladó
PO Box 13399
San Juan, Puerto Rico 00908

*Counsel for Goldman Sachs & Co. LLC and Citigroup Global Markets Inc.*

COTO & ASSOCIATES
By:    Ramón Coto-Ojeda
MCS Plaza, Suite 800
255 Ponce de León Avenue
San Juan, Puerto Rico 00917

*Counsel to Mesirow Financial, Inc.*

WEIL, GOTSHAL &MANGES LLP
By:    Jonathan D. Polkes
       Gregory Silbert
       Robert S. Berezin
       Kelly DiBlasi
       Gabriel A. Morgan
767 Fifth Avenue
New York, NY 10153

*Attorneys for National Public Finance
Guarantee Corp.*

CASELLAS ALCOVER & BURGOS P.S.C.
By:    Heriberto Burgos Pérez
       Ricardo F. Casellas-Sánchez
       Diana Pérez-Seda
P.O. Box 364924
San Juan, PR 00936-4924

CADWALADER, WICKERSHAM &
TAFT LLP
By:    Howard R. Hawkins, Jr.
       Mark C. Ellenberg
       William J. Natbony
       Thomas J. Curtin
       Casey J. Servais
200 Liberty Street
New York, New York 10281

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

REXACH & PICÓ, CSP
By:    María E. Picó
802 Ave. Fernández Juncos
San Juan, PR 00907-4315

BUTLER SNOW LLP
By:    Martin A. Sosland
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219

        *and*

       James E. Bailey III
       Adam M. Langley

SARLAW LLC
By:    Sergio A. Ramírez de Arellano
Banco Popular Center, Suite 1022
209 Muñoz Rivera Ave.
San Juan, PR 00918-1009

*Counsel for Sidley Austin LLP*

NELSON ROBLES-DIAZ LAW OFFICES,
P.S.C.
By:    Nelson Robles-Díaz
P. O. Box 192302
San Juan, Puerto Rico 00919-2302

*Counsel for Santander Securities LLC*

BOBONIS, BOBONIS & RODRIGUEZ
POVENTUD
By:    Enrique G. Figueroa-Llinás
129 de Diego Ave.
San Juan, Puerto Rico 00911-1927

*Counsel for Merrill Lynch, Pierce, Fenner &
Smith Inc. and Merrill Lynch Capital Services,
Inc.*

NAVARRO-CABRER LAW OFFICES
By:    Nilda M. Navarro-Cabrer
El Centro I, Suite 206
500 Muñoz Rivera Ave.
San Juan, Puerto Rico 00918

*Counsel to BMO Capital Markets GKST, Inc.*

SALDAÑA, CARVAJAL & VÉLEZ-RIVÉ,
P.S.C.
By:    Luis N. Saldaña-Román
       Ángel E. Rotger-Sabat
166 Avenida de la Constitución
San Juan, Puerto Rico 00901

*Counsel for Morgan Stanley & Co. LLC*

GOODWIN PROCTER LLP
By:    Douglas H. Flaum
       Charles A. Brown
       Howard S. Steel
       Stacy A. Dasaro

6075 Poplar Ave., Suite 500
Memphis, TN 38119

*Counsel for Financial Guaranty Insurance
Company*

CÓRDOVA & DICK, LLC
By:      Brian M. Dick Biascoechea
#403 Calle 12 de Octubre Urb. El Vedado
San Juan, PR 00918

*Local Counsel to the Ad Hoc Group of FGIC
Noteholders*

SHEPPARD MULLIN RICHTER &
HAMPTON LLP
By:      Lawrence A. Larose
30 Rockefeller Plaza New York, New York
10112

*Counsel to the Ad Hoc Group of FGIC
Noteholders*

FERRAIUOLI LLC
By:      Roberto Cámara-Fuertes
           Sonia Colón
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917

MILBANK LLP
By:      Dennis F. Dunne
           Atara Miller
           Grant R. Mainland
           John J. Hughes, III
           Jonathan Ohring
55 Hudson Yards
New York, NY 10001

*Attorneys for Ambac Assurance
Corporation*

MCCONNELL VALDÉS LLC
By:      Arturo J. García-Solá
           Nayuan Zouairabani
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918
P.O. Box 364225

The New York Times Building
620 Eighth Avenue
New York, NY 10018

*Counsel for Goldman Sachs & Co. LLC
Counsel for Citigroup Global Markets Inc.*

SIMPSON THACHER & BARTLETT LLP
By:      John K. Youngwood
           David Elbaum
425 Lexington Avenue
New York, NY 10017

*Counsel to J.P. Morgan Securities LLC*

FRIEDMAN KAPLAN SEILER &
ADELMAN LLP
By:      Eric Seiler
           Anne E. Beaumont
           Danielle E. Tepper
7 Times Square
New York, NY 10036

*Counsel for Sidley Austin LLP*

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
By:      Julie E. Cohen
Four Times Square
New York, NY 10018

*Counsel for Morgan Stanley & Co. LLC*

CROWELL & MORING LLP
By:      Daniel L. Zelenko
           Sarah M. Gilbert
590 Madison Avenue, 20th Floor
New York, NY 10022

*Counsel for Santander Securities LLC*

McGUIREWOODS LLP
By:      E. Andrew Southerling
2001 K Street N.W., Suite 400
Washington, DC 20006-1040

           *and*

San Juan, PR 00936-4225

*Attorneys for AmeriNational Community Services, LLC, as Servicer for the GDB Debt Recovery Authority*

C. CONDE & ASSOC. LAW OFFICES
By:      Carmen D. Conde Torres
          Luisa S. Valle Castro
254 San José Street
Suite 5
San Juan, PR 00901-1523

*Counsel for Santander Securities LLC*

SCHULTE ROTH & ZABEL LLP
By:      Douglas S. Mintz
901 Fifteenth Street, NW, Suite 800
Washington, DC 20005

          *and*

          Douglas Koff
          Adam C. Harris
          Taleah Jennings
          Abbey Walsh
          Peter J. Amend
919 Third Avenue
New York, NY 10022

*Attorneys for Cantor-Katz Collateral Monitor LLC, as Collateral Monitor for the GDB Debt Recovery Authority*

G. CARLO-ALTIERI LAW OFFICES, LLC
By:      Gerardo A. Carlo-Altieri
254 Calle San José
Third Floor
San Juan, PR 00901

EPSTEIN BECKER & GREEN, P.C.
By:      Wendy G. Marcari
875 Third Avenue
New York, NY 10022

*Attorneys for Vaquería Tres Monjitas, Inc.*

Aaron G. McCollough
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818

*Counsel for BMO Capital Markets GKST, Inc.*

KAYSER & REDFERN, LLP
By:      Leo Kayser III
515 Madison Avenue
New York, NY 10022

*Counsel for Samuel A. Ramirez & Co., Inc.*

CHAPMAN AND CUTLER LLP
By:      James M. Heiser
111 West Monroe Street
Chicago, IL 60603-4080

*Counsel to Mesirow Financial, Inc.*

ORRICK, HERRINGTON & SUTCLIFFE LLP
By:      Robert Stern
          Tiffany Row
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005-1706

*Counsel for RBC Capital Markets, LLC*

ARTHUR SAMODOVITZ
By:      Arthur Samodovitz
140 Lasa Dr. Apt 204,
St. Augustine, FL 32084

*Pro Se*

PRESTIGE LEGAL SERVICES, LLC
By:      José Luis Barrios-Ramos
278 Ave. César González
San Juan, Puerto Rico 00918

*Counsel to Asociacion de Maestros de Puerto Rico and Asociacion de Maestros de Puerto Rico -Local Sindical*

MERCEDES FIGUEROA Y MORGADE
By:      Mercedes Figueroa y Morgade
3415 Alejandrino Ave.,

G. CARLO-ALTIERI LAW OFFICES,
LLC
By:     Gerardo A. Carlo-Altieri
254 Calle San José
Third Floor
San Juan, PR 00901

MORRISON & FOERSTER LLP
By:     James M. Peck
        Gary S. Lee
        James A. Newton
        Andrew R. Kissner
250 West 55th Street
New York, New York 10019

*Counsel for the Ad Hoc Group of
Constitutional Debtholders*

REICHARD & ESCALERA
By:     Rafael Escalera
        Sylvia M. Arizmendi
        Carlos R. Rivera-Ortiz
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
By:     Susheel Kirpalani
        Daniel Salinas
        Eric Kay
        Zachary Russell
51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

*Co-Counsel for the Lawful Constitutional
Debt Coalition*

JIMÉNEZ, GRAFFAM & LAUSELL
By:     J. Ramón Rivera Morales
        Andrés F. Picó Ramírez
P.O. Box 366104
San Juan, PR 00936

WILLKIE FARR & GALLAGHER LLP
By:     Mark T. Stancil
1875 K Street, N.W.

Apt. 703,
Guaynabo, PR 00969-4856

*Counsel for Amador*

FUENTES LAW OFFICES, LLC
By:     Alexis Fuentes-Hernández
P.O. Box 9022726
San Juan, PR 00902-2726

*Counsel for Maruz Real Estate Corp.*

IVONNE GONZALEZ-MORALES
By:     Ivonne Gonzalez-Morales
PO BOX 9021828
San Juan, PR 00902-1828

*Counsel for Group Wage Creditors*

MENDOZA LAW OFFICES
By:     Enrique J. Mendoza Méndez
P.O. Box 9282
San Juan, PR 00908-0282

*Counsel to Asociación de Jubilados de la
Judicatura de Puerto Rico*

CARLOS A. QUILICHINI PAZ
By:     Carlos A. Quilichini Paz
        Jessica M. Quilichini Ortiz
Post Office Box 9020895
San Juan, PR 00902

*Attorneys for Cooperativa de Ahorro y
Crédito Vegabajeña*

DLA PIPER (PUERTO RICO) LLC
By:     Mariana Muñiz Lara
Calle de la Tanca #500, Suite 401
San Juan, PR 00901-1969

*Counsel to Quest Diagnostics of Puerto Rico,
Inc.*

BEATRIZ HERNÁNDEZ TORO LAW
By:     Beatriz Hernández Toro
PO Box 190291

Washington, DC 20006

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
By:      Andrew N. Rosenberg
         Karen R. Zeituni
1285 Avenue of the Americas
New York, NY 10019

ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
By:      Lawrence S. Robbins
         Gary A. Orseck
         Donald Burke
2000 K Street, N.W., 4th Floor
Washington, DC 20006

*Co-Counsel for the Ad Hoc Group of
General Obligation Bondholders*

CORREA-ACEVEDO & ABESADA LAW
OFFICES, PSC
By:      Sergio Criado
         Roberto Abesada-Agüet
Centro Internacional de Mercadeo, Torre II
# 90 Carr. 165, Suite 407
Guaynabo, PR 00968

MORGAN, LEWIS & BOCKIUS LLP
By:      Kurt A. Mayr
         David L. Lawton
         David K. Shim
One State Street
Hartford, CT 06103-3178

*Co-Counsel for the QTCB Noteholder
Group*

U.S. DEPARTMENT OF JUSTICE
By:      David A. Hubbert
         Ward W. Benson
Post Office Box 227
Washington, DC 20044

*The United States of America,
on behalf of the Internal Revenue
Service*

San Juan, PR 00919-0291

*Attorneys for Community Health Foundation of
P.R.*

CHARLES A. CUPRILL, P.S.C. LAW
OFFICES
By:      Charles A. Cuprill Hernández
356 Fortaleza Street, Second Floor
San Juan, PR 00901

*Counsel for Med Centro, Inc., formerly
Consejo de Salud de la Comunidad de la
Playa de Ponce, Inc.*

FUENTES LAW OFFICES, LLC
By:      Alexis Fuentes-Hernández
P.O. Box 9022726
San Juan, PR 00902-2726

*Counsel for Lortu-Ta LTD, Inc.; La
Cuarterola, Inc.; Juaza, Inc.; and The
Conjugal Partnership Composed of
Juan Zalduondo Viera And Magdalena
Machicote Ramery*

*Counsel for Sucn. De Frank Torres Ortiz &
Aurea Rodriguez Composed by Frank E.
Torres Rodriguez & Eva Torres Rodríguez*

CARLOS FERNANDEZ-NADAL
By:      Carlos Fernandez-Nadal
818 Hostos Ave. Ste. B
Ponce, PR 00716

*Counsel for Jorge Rafael Eduardo Collazo
Quinones*

BUFETE FERNÁNDEZ & ALCARAZ CSP
By:      Ignacio Fernández De Lahongrais
Capital Center Sur, Suite 202
Avenida Arterial Hostos #239
San Juan, PR 00918-1475

BUFETE DÍAZ-FERRER
By:      Marvin Díaz Ferrer
Cond. Vick Center Ste. C-202
867 Ave. Muñoz Rivera

SEPULVADO, MALDONADO & COURET
By:      Albéniz Couret-Fuentes
304 Ponce de León Ave. – Suite 990
San Juan, PR 00918

REED SMITH LLP
By:      Luke Sizemore
         Jared S. Roach
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222

*Counsel to The Bank of New
York Mellon*

ANTONETTI MONTALVO & RAMIREZ
COLL
By:      José L. Ramírez-Coll
         Carolina V. Cabrera Bou
P.O. Box 13128
San Juan, PR 00908

*Counsel to University of Puerto Rico
Retirement System Trust*

San Juan, PR 00925

*Counsel for Miriam E. Lima Colón, Betzaida
Feliciano Concepción and Angel L.
Méndez González*

ANTONIO MARTIN CERVERA
By:      Antonio Martin Cervera
H-22 Yagrumo, Caparra Hills
Guaynabo, PR 00968

*Pro Se*

MARIA TERESITA MARTIN
By:      Maria Teresita Martin
H-22 Yagrumo, Caparra Hills
Guaynabo, PR 00968

*Pro Se*

WANDA I. ORTIZ SANTIAGO
By:      Wanda I. Ortiz Santiago
Urb. Las Leandras
JJ-5 Calle 21
Humacao, PR 00791

*Pro Se*

NANCY I. NEGRON-LÓPEZ
By:      Nancy I. Negron-López
HC 3 Box 34941
San Sebastián, PR 00685

*Pro Se*

YASHEI ROSARIO
By:      Yashei Rosario
HC 2 Box 12914
Vieques, PR 00765

*Pro Se*

ANA A. NUÑEZ VELÁQUEZ
By:      Ana A. Nuñez Veláquez
19 Res. Veillanueva Apto 170
Aguadilla, PR 00603

*Pro Se*

EDGARDO MÁRQUEZ LIZARDI
By:    Edgardo Márquez Lizardi
Cond. El Monte Sur
190 Ave. Hostos Apt. 9399
San Juan, PR 00918

*Pro Se*

MIGUEL LUNA DE JESUS
By:    Miguel Luna De Jesus
Villa Del Monte 1
Calle Monte Alto
Toa Alta, PR 00953

*Pro Se*

ISMAEL L. PURCELL SOLER
By:    Ismael L. Purcell
Urb. Jacaranda
35271 Calle Clavelina
Ponce, PR 00730

*Pro Se*

MILDRED BATISTA DE LEON
By:    Mildred Batista De Leon
PO Box 1259
Saint Just, PR 00978

*Pro Se*

JAVIER ALEJANDRINO OSORIO
By:    Javier Alejandrino Osorio
PO Box 1259
Saint Just, PR 00978

*Pro Se*

NILSA CANDELARIO
By:    Nilsa Candelario
405 Ave. Esmeralda Ste. 2-559
Guaynabo, PR 00969

*Pro Se*

FINDINGS OF FACT AND CONCLUSIONS OF LAW IN CONNECTION WITH
CONFIRMATION OF THE MODIFIED EIGHTH AMENDED TITLE III JOINT
PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO,
THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY

LAURA TAYLOR SWAIN, United States District Judge

The motion of the Financial Oversight and Management Board for Puerto Rico

(the "Oversight Board") for confirmation of a proposed Plan of Adjustment for the

Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the

Commonwealth of Puerto Rico and the Puerto Rico Public Buildings Authority is now before the

Court pursuant to Title III of the Puerto Rico Oversight, Management, and Economic Stability

Act ("PROMESA").[2] The Court has jurisdiction of this matter pursuant to section 306(a) of

PROMESA. This Court hereby makes its findings of fact and conclusions of law, pursuant to

Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of

Bankruptcy Procedure 7052 and 9014 and section 310 of PROMESA, with respect to the

confirmation motion.

## Introduction

In 2017, the Commonwealth of Puerto Rico (the "Commonwealth"), through the

Oversight Board, initiated unprecedented proceedings pursuant to PROMESA to restructure the

debts of the Commonwealth and certain of its instrumentalities and to find a path forward for

Puerto Rico, its citizens, and other stakeholders. (See May 22, 2017, Hr'g Tr. 6:9-8:12.) During

the pendency of the Title III cases, Puerto Rico has endured the disastrous effects of hurricanes,

earthquakes, and the COVID-19 pandemic. These events have not only made day to day life far

---

[2] PROMESA is codified at 48 U.S.C. § 2101 et seq. References to "PROMESA" section
numbers in the remainder of this FFCL (defined below) are to the uncodified version of
the legislation, unless otherwise indicated.

more challenging for the residents of Puerto Rico, but they have exacerbated the financial difficulties of the Commonwealth and made the already complex circumstances more challenging for those involved in the resolution of these Title III cases.  Nonetheless, the Oversight Board, representatives of many creditor constituencies, including retirees, the government of Puerto Rico and other parties-in-interest have persevered, with the help and guidance of an extraordinary team of skilled judicial mediators (the "Mediation Team"), in working toward a resolution intended to allow the Commonwealth and two of its instrumentalities to exit these PROMESA Title III cases.

### Prior Restructurings under PROMESA

On November 7, 2018, this Court approved a qualifying modification for the Government Development Bank for Puerto Rico ("GDB"), which restructured approximately $4.5 billion of claims against GDB (Docket Entry No. 270 in Case No. 18-1561.)  On February 4, 2019, this Court confirmed the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation*, dated January 9, 2019 (Docket Entry Nos. 5047 and 5048 in Case No. 17-3283,[3] as amended by Docket Entry Nos. 5053 and 5055 on February 5, 2019), for the Puerto Rico Sales Tax Financing Corporation ("COFINA") and approved the settlement between the Commonwealth and COFINA (Docket Entry No. 5045).   The settlement divides rights to a significant flow of tax revenues between the two debtors that were involved in complex litigation regarding the ownership of such tax revenues.  The resolution of the GDB and COFINA disputes marked important first steps towards Puerto Rico's financial recovery, economic stability, and prosperity.

---

[3]      All docket references are to entries in Case No. 17-3283 unless otherwise indicated.

**Proposed Plan of Adjustment for the Commonwealth of Puerto Rico,
the Employees Retirement System and the Public Buildings Authority**

The Debtors have now brought before the Court for confirmation the *Modified
Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*,
dated January 14, 2022 (Docket Entry No. 19784) (as modified pursuant to any revisions made at
or subsequent to the Confirmation Hearing, including the Plan Supplement, and as may be
modified pursuant to section 313 of PROMESA, the "Plan").[4]  The Plan[5] required extraordinary
work over the course of several years to negotiate the terms of various plan support agreements
and resolve disputes arising throughout the pendency of these Title III Cases.  The Mediation
Team has served a critical role in facilitating navigation of complicated negotiations between
parties-in-interest that have spanned several years and involved complex issues.  In response to
requests of this Court, the Mediation Team has filed certifications of the good faith participation
of parties in confidential negotiations at key points during these cases.  (See, e.g., Docket Entry
Nos. 17314 and 18885.)  The motion to confirm the Plan before this Court constitutes a crucial
step in the effort to achieve the economic recovery of the Commonwealth of Puerto Rico and its
instrumentalities.

The Plan has broad but not universal support.  Objections by creditors, and the
case put forward by the Debtors, are discussed in detail in the findings of fact and conclusion of

---

[4]     Capitalized terms used but not defined herein shall have the meanings given to them in
the Plan.

[5]     The use of the term "Plan" herein, unless otherwise indicated by context, refers to the
confirmable final version filed at Docket Entry No. 19784, as described herein.  The
penultimate version of the plan, which required final modifications to be confirmable,
was filed as the *Modified Eighth Amended Title III Joint Plan of Adjustment of the
Commonwealth of Puerto Rico, et al.*, dated December 20, 2021 (Docket Entry No.
19568 in Case No. 17-3283) (the "Fifth Modified Eighth Amended Plan").

law that follow (the "Findings of Fact and Conclusions of Law" or "FFCL").  In addition to

formal filings by parties, the Court has received thousands of letters and email communications

from citizens and others who live in Puerto Rico and are concerned about Puerto Rico's future

and their own.  Within the past few months in particular, government workers and retirees have

written with passion and sadness about their anxieties concerning their ability to support their

families and live in a dignified way in retirement.  Many have also protested that the past

government borrowings and the disposition of borrowed funds were improper and that ordinary

citizens should not have to bear the economic consequences of alleged past wrongs; many such

communications demanded that the Court order a full audit of the past borrowings and

dispositions before considering any proposed plan of adjustment.  Many of the writers express

frustration with the economic measures developed by the Oversight Board and also, sadly,

express lack of confidence in elected leaders' willingness and ability to manage responsibly the

resources that will be available to the government following the confirmation of a plan of

adjustment.  They are understandably concerned about the provision of services that residents

consider essential.  Pride in and concern for the University of Puerto Rico were prominent

features of many of the communications.

> In evaluating whether the proposed plan of adjustment should be confirmed, the

Court considered the legal and evidentiary submissions of the parties in interest, and the larger

context of pain and hope in which Puerto Rico moves forward.  The Court's authority is

significant but is exercised within boundaries set by the Constitution and laws of the United

States.  In this connection, Congress has conferred powers on the Oversight Board to develop

fiscal plans and budgets in collaboration with the elected government, and has given the

Oversight Board the sole power to formulate and propose plans of adjustment.  The Court must

determine whether the proposed plan of adjustment meets the requirements of the laws passed by Congress and, where objections based on the Constitution of the United States have been raised, the requirements of the Constitution.  It is not for the Court to determine whether particular policies, asset allocations, or settlements of disputed issues are optimal; the Court determines whether the proposed Plan meets the legal requirements for confirmation of a plan of adjustment. This process is largely forward-looking.  The applicable legal standards do not require an audit of the creation and disposition of past borrowings.

For the reasons explained in the following Findings of Fact and Conclusions of Law, the Court finds that, with the incorporation of certain specified revisions, the Plan proposed by the Oversight Board meets the confirmation requirements of PROMESA and does not violate the Constitution.  The Court has also determined that PROMESA itself does not violate the Constitution.  In moving forward following confirmation, the Court urges the people of Puerto Rico to use their resources and voices well, and urges those who govern and those who oversee Puerto Rico to listen to those voices, to make wise choices and explain them well, and to lead Puerto Rico to a better, brighter, and more vibrant future of growth and economic stability.[6]

### **The Motion and Submissions Considered**

Before the Court is the Plan filed by the Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA"), and together with the Commonwealth and ERS, the "Debtors"), by and through the Oversight Board, as

---

[6]    While the legal standards governing the confirmation determination did not require the Court to consider an audit of the creation and disposition of past borrowings, confirmation of the Plan does not foreclose further investigation, whether through regulatory, law enforcement, or civil litigation channels, into the origins of Puerto Rico's debt crisis and the application of the proceeds of the pre-PROMESA borrowings.

representative of the Debtors pursuant to section 315(b) of PROMESA.[7]  The following

documents have been filed by the Debtors in connection with confirmation of the Plan:

(a) *Plan Supplement and Plan Related Documents of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18470) (as the same may be amended, supplemented, or modified, the "Plan Supplement");

(b) *Certificates of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9) (Debtors Exs. 138-40) (the "Mailing Affidavits");

(c) *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4) (Debtors Ex. 141) (the "Publication Affidavit" and, together with the Mailing Affidavits, the "Service Affidavits");

(d) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18874);

(e) *Memorandum of Law in Support of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18869);

(f) *Certificate of Service* (Docket Entry No. 19182);

(g) *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Requested Rulings Regarding Act 53-2021 Relating to the Modified Eighth Amended Joint Plan of Adjustment* (Docket Entry No. 19249);

(h) *Response of the Financial Oversight and Management Board in Accordance with the Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19567)

---

[7]   The Court previously entered, pursuant to, <u>inter alia</u>, section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), approving the Disclosure Statement, establishing procedures for the solicitation, submission, and tabulation of votes and elections with respect to the Plan, approving the forms of ballots, master ballots, and election notices in connection therewith, and approving the form of notice of the Confirmation Hearing.  The Court also entered the *Order Establishing Procedures and Deadlines Concerning Objections to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640.)

(i)  *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18729 and 19054-4) (the "Jaresko Decl.");

(j)  *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18731 and 19054-9) (the "Skeel Decl.");

(k)  *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18726 and 19054-1) (the "Brownstein Decl.");

(l)  *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18734 and 19054-10) (the "Zelin Decl.");

(m)  *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18730 and 19054-8) (the "Shah Decl.");

(n)  *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18738 and 19054-6) (the "Malhotra Decl.");

(o)  *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18736 and 19054-7) (the "Santambrogio Decl.");

(p)  *Declaration of Adam Chepenik in Respect of the Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18735 and 19054-2) (the "Chepenik Decl.");

(q)  *Declaration of Sheva R. Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18737 and 19054-5) (the "Levy Decl.");

(r)  *Declaration of Jay Herriman in Respect of Confirmation of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18732 and 19054-3) (the "Herriman Decl.");

(s)  *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19056) (the "Pullo Decl.");

(t) *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725) (the "Wolfe Decl.");

(u) *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724) (the "Murray Decl.");

(v) *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057) (the "Malhotra Sup. Decl.");

(w) *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058) (the "Jaresko Sup. Decl.");

(x) *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19059) (the "Levy Sup. Decl.");

(y) *Supplemental Declaration of Juan Santambrogio in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19060) (the "Santambrogio Sup. Decl.");

(z) *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115) (the "Pullo Sup. Decl."); and

(aa) *Supplemental Declaration of Jay Herriman in Respect of Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19329) (the "Herriman Sup. Decl.").

Submissions in opposition to confirmation of the Plan were filed by the following parties: (i) PFZ Properties, Inc. (Docket Entry Nos. 9223 and 18418); (ii) Sucesión Pastor Mandry Mercado (Docket Entry Nos. 12701, 16481, 17062, 17998, and 19605); (iii) Vicente Pérez Acevedo and Corporación Marcaribe Investment (Docket Entry No. 16668); (iv) Antonio Martin Cervera (Docket Entry No. 16871); (v) Maria Teresita Martin (Docket Entry No. 16872); (vi) Wanda Ortiz Santiago (Docket Entry Nos. 16939 and 17175); (vii) Nancy I. Negron-Lopez

(Docket Entry No. 16955); (viii) Demetrio Amador Inc. (Docket Entry Nos. 17005 and 18582);

(ix) Suiza Dairy Corp. (Docket Entry Nos. 17013, 17526, 18593, and 19601); (x) Maruz Real

Estate Corp. (Docket Entry No. 17016); (xi) Group Wage Creditors (Docket Entry No. 17021);

(xii) Yashei Rosario (Docket Entry Nos. 17047 and 17116); (xiii) Ana A. Núñez Velázquez

(Docket Entry Nos. 17436, 17438, and 18529); (xiv) Edgardo Marquez Lizardi (Docket Entry

Nos. 18111 and 18249); (xv) Maria M. Ortiz Morales (Docket Entry No. 18396); (xvi) Arthur

Samodovitz (Docket Entry No. 18433); (xvii) Miguel Luna de Jesus (Docket Entry No. 18485);

(xviii) Ismael L. Purcell Soler and Alys Collazo Bougeois (Docket Entry No. 18504); (xix)

Mildred Batista De León (Docket Entry Nos. 18505 and 19010); (xx) Javier Alejandrino Osorio

(Docket Entry Nos. 18506 and 19008); (xxi) Service Employees International Union (the

"SEIU") and International Union, United Automobile, Aerospace and Agricultural Implement

Workers of America (Docket Entry Nos. 18511 and 19349); (xxii) Mapfre PRAICO Insurance

Company (Docket Entry Nos. 18512 and 18513); (xxiii) certain creditors who filed actions in the

United States District Court for the District of Puerto Rico (Docket Entry No. 18535); (xxiv)

Med Centro, Inc. (Docket Entry No. 18538); (xxv) Asociación de Jubilados de la Judicatura de

Puerto Rico (Docket Entry Nos. 18548 and 18549); (xxvi) Cooperativa de Ahorro y Crédito

Vegabajeña (Docket Entry No. 18551); (xxvii) International Union, UAW (Docket Entry No.

18558); (xxviii) Maruz Real Estate Corp. (Docket Entry No. 18563); (xxix) LORTU-TA Ltd,

Inc., La Cuarterola, Inc., Juaza, Inc., and the Conjugal Partnership Composed of Juan Zalduondo

Viera and Magdalena Machicote Ramery (Docket Entry No. 18564); (xxx) Sucn. De Frank

Torres Ortiz & Aurea Rodriguez (Docket Entry No. 18565); (xxxi) Finca Matilde, Inc. (Docket

Entry Nos. 18566 and 19608); (xxxii) the University of Puerto Rico Retirement System Trust

(Docket Entry No. 18573); (xxxiii) Peter C. Hein (Docket Entry No. 18575); (xxxiv) Miriam E.

Lima Colón, Betzaida Feliciano Concepción, and Angel L. Méndez González (Docket Entry No.

18583); (xxxv) Asociación de Maestros Puerto Rico and Asociación de Maestros de Puerto Rico-

Local Sindical (Docket Entry No. 18585) (the "AMPR Objection"); (xxxvi) the Underwriter

Defendants (Docket Entry No. 18587); (xxxvii) certain credit unions (Docket Entry No. 18594);

(xxxviii) Community Health Foundation of P.R. Inc. (Docket Entry No. 18604); (xxxix) Quest

Diagnostics of Puerto Rico, Inc. (Docket Entry No. 18560); (xl) U.S. Bank Trust Association and

U.S. Bank National Association (Docket Entry Nos. 18631 and 18634); and (xli) Nilsa

Candelario (Docket Entry No. 18663); (xlii) Jorge Rafael Eduardo Collazo Quinones (Docket

Entry No. 19311), (xliii) El Ojo de Agua Development, Inc. (Docket Entry No. 19610); (xliv)

Demetrio Amador Inc. (Docket Entry No. 19611); (xlv) Maruz Real Estate Corp. (Docket Entry

No. 19612); and (xlvi) certain plaintiffs in the case captioned <u>Administración de los Sistemas de</u>

<u>Retiro de Empleados del Gobierno y la Judicatura de Puerto Rico v. UBS Fin. Servs. Inc. of P.R.</u>,

Civ. No. KCA-2011-1067 (Docket Entry No. 19766) (the "Nazario Serrano et al. Objection").[8]

In addition, the Debtors have received letters in opposition to confirmation of the Plan, which

were not filed with the Court, from: (a) Luiz Roldan Ruiz; (b) Antonia Medina Rodriquez; and

(c) Aida Iris Santiago Torres.  The Court received numerous letters regarding the confirmation

motion and the Plan, which were filed on the docket with Notices of Correspondence.

Reservations of rights or limited objections raising discrete issues but generally

supporting the Plan were filed by the following parties: (i) the Ad Hoc Group of FGIC

---

[8]     Replies to the Nazario Serrano et al. Objection were filed by UBS Financial Services
Incorporated of Puerto Rico (Docket Entry No. 19782) and the Oversight Board (Docket
Entry No. 19791).

Noteholders (Docket Entry No. 17001); (ii) AAFAF (Docket Entry Nos. 17202 and 18592);[9] (iii)

Vaquería Tres Monjitas, Inc. (Docket Entry No. 18637); (iv) the Constitutional Debt Group, GO

Group, LCDC, and QTCB Group (Docket Entry No. 18453); (v) Ambac (Docket Entry No.

18479); (vi) the Internal Revenue Service (Docket Entry No. 18567); (vii) certain ERS

bondholders (Docket Entry No. 18569); (viii) Bank of New York Mellon (Docket Entry No.

18588); (ix) the Creditors' Committee (Docket Entry Nos. 18589 and 19609); and (x) the

University of Puerto Rico Retirement System Trust (Docket Entry No. 19048).

Further, submissions in opposition to the proposed confirmation order (Docket

Entry No. 18447) were filed by the following parties: (i) Peter C. Hein (Docket Entry No.

18647); (ii) Suiza Dairy Corp. (Docket Entry Nos. 18651 and 19602); (iii) Finca Matilde, Inc.

(Docket Entry No. 18670); and (iv) AAFAF (Docket Entry Nos. 18742 and 19495).[10]

Oppositions to the revised proposed confirmation orders (Docket Entry Nos. 19061, 19118,

19188, 19325, 19368, and 19571) were filed by the following parties: (a) International Union,

United Automobile, Aerospace and Agricultural Implement Workers of America and Service

Employees International Union (Docket Entry Nos. 19162, 19204 and 19349);[11] (b) PFZ

---

[9]    AAFAF's additional limited objection to confirmation of the Plan, Docket Entry No. 18742, was withdrawn prior to the Confirmation Hearing. (Docket Entry No. 19109.)

[10]    "DRA Parties" means AmeriNational Community Services, LLC, as servicer for the GDB Debt Recovery Authority, and Cantor-Katz Collateral Monitor LLC, which serves as the collateral monitor for Wilmington Trust, N.A. The DRA Parties' objections to confirmation of the Plan, Docket Entry Nos. 18590 and 18636, and objection to the initial proposed confirmation order, Docket Entry No. 18685, were withdrawn prior to the Confirmation Hearing. (Docket Entry No. 19121.)

[11]    International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and Service Employees International Union's objections to the proposed confirmation order were partially withdrawn after the Confirmation Hearing. (Docket Entry No. 19349.)

Properties, Inc. (Docket Entry Nos. 19212 and 19597); (c) Finca Matilde, Inc. (Docket Entry

Nos. 19214 and 19608); (d) Peter C. Hein (Docket Entry Nos. 19218, 19446, and 19599); (e)

certain credit unions (Docket Entry No. 19221); (f) Demetrio Amador, Inc. (Docket Entry No.

19228); (g) Suiza Dairy Corp. (Docket Entry Nos. 19279 and 19398); and (h) AAFAF (Docket

Entry No. 19319).

Reservations of rights with respect to the proposed confirmation orders were filed

by the following parties: (i) Assured (Docket Entry Nos. 18645 and 19217); (ii) the Creditors'

Committee (Docket Entry Nos. 18658 and 19225); (iii) Bank of New York Mellon (Docket

Entry No. 18662); (iv) the Retiree Committee (Docket Entry Nos. 18679 and 19248) (v) Ambac

(Docket Entry No. 18694); and (vi) the Ad Hoc Group of Constitutional Debtholders, the Ad

Hoc Group of General Obligation Bondholders, the LCDC, and the QTCB Noteholder Group

(Docket Entry No. 19281). A statement in response to the proposed confirmation order was filed

by the International Union, UAW and Service Employees International Union (Docket Entry No.

19388). The Court has also received and reviewed carefully submissions in connection with

each version of the Oversight Boards' submissions in connection with its Proposed Findings of

Facts and Conclusion of Law (Docket Entry Nos. 18739, 19366, 19427, and 19570).

Statements in support of confirmation of the Plan were filed by the following

parties: (i) the Retiree Committee (Docket Entry No. 18562); (ii) National (Docket Entry No.

18574); (iii) Assured (Docket Entry No. 18584); (iv) FGIC (Docket Entry No. 18595); (v)

Ambac (Docket Entry No. 18601); and (vi) the Puerto Rico Funds (Docket Entry No. 18848).[12]

---

[12]     The Puerto Rico Funds are: GNMA & US Government Target Maturity Fund for Puerto
         Rico Residents, Inc. (f/k/a Puerto Rico GNMA & U.S. Government Target Maturity
         Fund, Inc.), Mortgage-Backed & US Government Securities Fund for Puerto
         Rico Residents, Inc. (f/k/a Puerto Rico Mortgage-Backed & U.S. Government Securities Fund,
         Inc.), Puerto Rico Residents Bond Fund I (f/k/a Puerto Rico Investors Bond Fund I),

Further, pursuant to the *Urgent Motion of the Financial Oversight and
Management Board of Puerto Rico for Order (I) Approving Form of Notice of Rulings the
Oversight Board Requests at Confirmation Hearing Regarding Act 53-2021* (Docket Entry No.
19002), the Oversight Board requested Court approval of certain rulings related to Act 53-2021
("Act 53") in connection with confirmation of the Plan. Oppositions to such rulings were filed
by the following parties: (i) Asociación Puertorriqueña de la Judicatura, Inc. (Docket Entry No.
19161); (ii) Asociación de Jubilados de la Judicatura de Puerto Rico and Hon. Hector Urgell
Cuebas, Former Judge of the Puerto Rico Court of Appeals (Docket Entry No. 19175); (iii)
Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la
Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de
Educadores y Trabajadores de la Educación, Inc. (Docket Entry No. 19180); (iv) Asociación de

---

Puerto Rico Residents Tax-Free Fund, Inc. (f/k/a Puerto Rico Investors Tax-Free Fund,
Inc.), Puerto Rico Residents Tax-Free Fund II, Inc. (f/k/a Puerto Rico Investors Tax-Free
Fund II), Inc., Puerto Rico Residents Tax-Free Fund III, Inc. (f/k/a Puerto Rico Investors
Tax-Free Fund III, Inc.), Puerto Rico Residents Tax-Free Fund IV, Inc. (f/k/a Puerto Rico
Investors Tax-Free Fund IV, Inc.), Puerto Rico Residents Tax-Free Fund V, Inc. (f/k/a
Puerto Rico Investors Tax-Free Fund V, Inc.), Puerto Rico Residents Tax-Free Fund VI,
Inc. (f/k/a Puerto Rico Investors Tax-Free Fund VI, Inc.), Tax-Free Fixed Income Fund
for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund, Inc.), Tax-Free
Fixed Income Fund II for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income
Fund II, Inc.), Tax-Free Fixed Income Fund III for Puerto Rico Residents, Inc. (Puerto
Rico Fixed Income Fund III, Inc.), Tax-Free Fixed Income Fund IV for Puerto Rico
Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund IV, Inc.), Tax-Free Fixed Income
Fund V for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed Income Fund V, Inc.),
Tax-Free Fixed Income Fund VI for Puerto Rico Residents, Inc. (f/k/a Puerto Rico Fixed
Income Fund VI, Inc.), Tax Free Fund for Puerto Rico Residents, Inc. (f/k/a Tax-Free
Puerto Rico Fund, Inc.), Tax Free Fund II for Puerto Rico Residents, Inc. (f/k/a Tax-Free
Puerto Rico Fund II, Inc.), Tax-Free High Grade Portfolio Bond Fund for Puerto Rico
Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Bond Fund, Inc.), Tax-Free High Grade
Portfolio Bond Fund II for Puerto Rico Residents, Inc. (f/k/a Puerto Rico AAA Portfolio
Bond Fund II, Inc.), Tax-Free High Grade Portfolio Target Maturity Fund for Puerto Rico
Residents, Inc. (f/k/a Puerto Rico AAA Portfolio Target Maturity Fund, Inc.), Tax Free
Target Maturity Fund for Puerto Rico Residents, Inc. (f/k/a Tax-Free Puerto Rico Target
Maturity Fund, Inc.), and UBS IRA Select Growth & Income Puerto Rico Fund.

Maestros de Puerto Rico and Asociacón de Maestros de Puerto Rico-Local Sindical (Docket

Entry No. 19181); and (v) Maria A. Clemente Rosa (Docket Entry No. 19254).  A joinder in

support of the Oversight Board's requested rulings was filed by the LCDC (Docket Entry No.

19252).

    Further, pursuant to the *Order Regarding Certain Aspects of Motion for*

*Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the*

*Commonwealth of Puerto Rico, et. al.* (Docket Entry No. 19517), the Oversight Board filed a

*Response of the Financial Oversight and Management Board in Accordance with Order*

*Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III*

*Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et. al.* (Docket Entry No. 19567).

Responses were filed by the following parties: (i) International Union, United Automobile,

Aerospace and Agricultural Implement Workers of America and Service Employees

International Union (Docket Entry No. 19586); (ii) PFZ Properties, Inc. (Docket Entry No.

19597); (iii) Peter Hein (Docket Entry Nos. 19599 and 19616), (iv) Cooperativa de Ahorro y

Crédito Vegabajeña (Docket Entry No. 19600); (v) Suiza Dairy Corp. (Docket Entry No. 19603);

(vi) Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la

Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de

Educadores y Trabajadores de la Educación, Inc. (Docket Entry No. 19606) (the "Teachers'

Associations Sup. Obj."); (vii) AAFAF (Docket Entry No. 19607); (viii) Finca Matilde, Inc.

(Docket Entry No. 19608); (ix) El Ojo de Agua Development, Inc. (Docket Entry No. 19610);

(x) Demetrio Amador Inc. (Docket Entry No. 19611); and (xi) Maruz Real Estate Corp. (Docket

Entry No. 19612).

The Court heard argument and statements by members of the public, and received evidence, in connection with confirmation of the Plan at a hearing held on November 8, 9, 10, 12, 15, 17, 22, and 23, 2021 (the "Confirmation Hearing").[13]  The Court has carefully considered the Plan, as well as the supporting and opposing submissions, and the witness testimony and voluminous briefing and written evidence submitted by the parties.  The Court has also reviewed and carefully considered hundreds of letters and email messages submitted by members of the public and listened carefully to the oral remarks made on the record at the Confirmation Hearing by members of the public.

On January 10, 2022, the Court entered its *Order Regarding Plan Modifications Necessary to the Entry of an Order Confirming Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19721) (the "January Order").  In response, the Oversight Board filed the Plan.  In response to the Plan and associated filings, PFZ Properties, Inc. filed the *Response to Informative Motion at Docket 19787* (Docket Entry No. 19804).

For the following reasons, the Plan is hereby confirmed, and any remaining objections are overruled except to the extent expressly stated herein.  For the avoidance of doubt, to the extent that a particular objection or issue is not specifically addressed in these Findings of Fact and Conclusions of Law, it has been considered thoroughly and is overruled.  The overruled objections, and the Oversight Board's positions as to the proper scope of preemption and the proper treatment of Eminent Domain/Inverse Condemnation Claims, are preserved for appeal.

---

[13]    Following the Confirmation Hearing, the Court also considered and reserved decision on approval of the *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Infrastructure Financing Authority* (Docket Entry No. 1 Ex. A in Case No. 21-1492) and *Qualifying Modification Pursuant to PROMESA Title VI for the Puerto Rico Convention Center District Authority* (Docket Entry No. 1 Ex. A in Case No. 21-1493.)

The Court turns now to its analysis and decision on the motion for confirmation of the plan of adjustment that the Oversight Board has proposed for the Commonwealth of Puerto Rico, the Employees Retirement System and the Public Buildings Authority, and the reasons for that decision.

## **Findings of Fact and Conclusions of Law**

1. <u>Findings and Conclusions</u>. What follows constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Federal Rules of Bankruptcy Procedure 7052 and 9014 and section 310 of PROMESA. To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such. Any headings or sub-headings used herein are for reference purposes only and shall not affect in any way the meaning or interpretation of the Findings of Fact and Conclusions of Law set forth herein or the Plan.

2. <u>Jurisdiction</u>. This Court has exclusive jurisdiction over the Title III Cases pursuant to PROMESA section 306(a). Venue is proper before this Court pursuant to PROMESA section 307(a). Pursuant to section 306(b) of PROMESA, upon commencement of the Title III Cases, the Title III Court exercised, and continues to exercise, exclusive jurisdiction over all property of the Debtors, wherever located. To the extent necessary, pursuant to PROMESA section 305, the Oversight Board has granted consent to, and the Plan provides for, this Court's exercise of jurisdiction over the property and revenues of the Debtors as necessary to approve and authorize the implementation of the Findings of Fact and Conclusions of Law and the Plan.

3.      <u>Judicial Notice</u>.  The Court takes judicial notice of the dockets of the Title III

Cases, the appellate court dockets of any and all appeals taken from any order entered or opinion

issued by the Court in the Title III Cases, and the following litigation and adversary proceedings,

each as defined in the Plan, including all pleadings and other documents filed, all orders entered,

and all evidence and arguments made, proffered, or adduced at hearings related thereto: (a) the

Ambac Action, (b) the Appointments Related Litigation, (c) the Clawback Actions, (d) the ERS

Litigation, (e) the ERS Recovery Actions, (f) the ERS Takings Action, (g) the FGIC Action, (h)

the Gracia Gracia CW Action, (i) the Gracia Gracia Federal Action, (j) the Lift Stay Motions, (k)

the Med Center Litigation, (l) the Med DC Action, (m) the National Action, (n) the PBA

Litigation, (o) the PRIFA BANs Litigation, (p) the SCC Action, (q) the Uniformity Litigation, (r)

the Invalidity Actions, (s) the Lien Challenge Actions, (t) the Debt Related Objections, and (u)

the Avoidance Actions listed in Exhibits A and B to the Plan.

4.      <u>Burden of Proof</u>.  The Debtors have the burden of proving satisfaction of the

requirements of section 314 of PROMESA and, to the extent applicable to consideration of

confirmation of the Plan, Rule 9019 of the Bankruptcy Rules, by a preponderance of the

evidence.  As explained below, the Plan, which has been amended to incorporate the Debtors'

Full-Payment Proposal (defined below) for Eminent Domain/Inverse Condemnation Claims to

the extent they are Allowed Claims for just compensation, meets the applicable requirements of

section 314 of PROMESA and, to the extent applicable to consideration of confirmation of the

Plan, Bankruptcy Rule 9019.

## General Background

**I.    The Oversight Board and Title III Cases**

5.    For more than a decade, Puerto Rico has faced an unprecedented fiscal and economic crisis.  Actions taken in the past caused Puerto Rico to lose access to capital markets and precipitated the collapse of Puerto Rico's public finance system.  (See PROMESA § 405(m).)  These actions accelerated the contraction of Puerto Rico's economy and increased the out-migration of its residents.  (See Murray Decl. Ex. A ¶¶ 20-22.)[14]  The situation has been further exacerbated by the devastation caused to Puerto Rico by Hurricanes Irma and Maria in 2017, the earthquakes that occurred in early 2020, and the COVID-19 pandemic.  (Jaresko Decl. ¶¶ 20, 22-23.)

6.    On June 30, 2016, the United States enacted PROMESA, and the Oversight Board was established pursuant to section 101(b) of PROMESA.  (Jaresko Decl. ¶ 7.)  Pursuant to section 4 of PROMESA and Article VI of the Constitution of the United States, the provisions of

---

[14]    Consistent with the investigative authority granted to the Oversight Board by section 104 of PROMESA, the Oversight Board commissioned a report on the origins of the Commonwealth's financial crisis.  The report was prepared by Kobre & Kim LLP, and it was published on the Oversight Board's website on August 20, 2018.  (See Docket Entry No. 3774.)  Many residents of Puerto Rico, political leaders, and investors have called for specific auditing of the bond issues and the application of the proceeds of certain bond issues and/or prosecution of individuals or entities that may have misapplied bond proceeds.  Such inquiries could be helpful to Puerto Rico as it grapples with its past and moves toward the future.  The Court understands, however, that in the context of these Title III restructuring proceedings the Oversight Board, in its capacity as the Debtors' representative, has focused on the identification of resources that can be marshaled for application to outstanding debts, and on reaching agreements to reduce outstanding debts without extensive further litigation.  Those are reasonable and prudent decisions, and remedial measures that are not inconsistent with the Plan can be pursued by appropriate authorities.  As noted above (see supra n.5), confirmation of the Plan does not preclude further investigations or law enforcement activity with respect to conduct in connection with the past issuance of debt and application of debt proceeds.

PROMESA prevail over any inconsistent general or specific provisions of territory law, State

law, or regulation.  See PROMESA § 4.

7.      On August 31, 2016, President Obama appointed the Oversight Board's original

seven voting members.  (Jaresko Decl. ¶ 8.)  The Oversight Board currently has its full

complement of seven members.  (Id.)

8.      The Oversight Board designated ERS and PBA as "covered instrumentalities"

pursuant to PROMESA Section 101(d).  (Jaresko Decl. ¶ 15.)  The Commonwealth is a "covered

territory" pursuant to PROMESA Sections 5(8) and 101(b)(1).

9.      On May 3, 2017, the Oversight Board issued a restructuring certification pursuant

to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for the

Commonwealth pursuant to PROMESA Section 304(a), thereby commencing the

Commonwealth Title III Case.  (See Docket Entry No. 1.)

10.     On May 21, 2017, the Oversight Board issued a restructuring certification

pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for ERS

pursuant to PROMESA Section 304(a), thereby commencing the ERS Title III Case.  (Docket

Entry No. 1 in Case No. 17-3566.)

11.     On June 15, 2017, the U.S. Trustee appointed the Creditors' Committee in the

Commonwealth Title III Case (Docket Entry No. 338) and, on August 25, 2017, the U.S. Trustee

amended that appointment to provide that the Creditors' Committee would also serve in the ERS

Title III Case (Docket Entry No. 1171).  On June 15, 2017, the U.S. Trustee appointed the

Retiree Committee in the Commonwealth Title III Case.  (Docket Entry No. 340.)

12.     On June 23, 2017, the Court entered an order appointing the Mediation Team, led

by Chief Bankruptcy Judge Barbara Houser.  (Docket Entry No. 430.)

13.     On June 29, 2017, the Court entered an order providing for the joint administration of the Commonwealth Title III Case and the ERS Title III Case, for procedural purposes only.  (Docket Entry No. 156 in Case No. 17-3566.)

14.     On September 27, 2019, the Oversight Board issued a restructuring certification, pursuant to PROMESA Sections 104(j) and 206, and filed a voluntary petition for relief for PBA pursuant to PROMESA Section 304(a), thereby commencing the PBA Title III Case.  (Docket Entry No. 1 in Case No. 19-5523.)

15.     On October 9, 2019, the Court entered an order providing for the joint administration of the PBA Title III Case with the existing Title III Cases.  (Docket Entry No. 13 in Case No. 19-5523.)

## II.     The Plan Support Agreements, Plan, and Disclosure Statement

16.     The Oversight Board, either directly or through its advisors, engaged in extensive mediation sessions under the guidance and direction of the Mediation Team, and negotiated directly with various constituencies, in an effort to build support for the restructuring of, among other indebtedness, the Commonwealth, ERS, and PBA's debt.  Those negotiations culminated in certain agreements with various stakeholders in furtherance of the successful implementation of the Plan.  (Jaresko Decl. ¶ 29; Skeel Decl. ¶ 17; Zelin Decl. ¶ 13; Debtors Exs. 16-19, 23.)

17.     On May 31, 2019, the Oversight Board entered into a plan support agreement (the "2019 PSA") with certain holders of approximately $3 billion of GO Bond Claims and PBA Bond Claims regarding the framework of a plan of adjustment to resolve (i) disputes regarding the validity and related rights of the GO Bonds and PBA Bonds, and (ii) disputes between the Commonwealth and PBA regarding the characterization of certain purported leases, the amount of any administrative rent that may be owed by the Commonwealth for the use of PBA facilities

following the commencement of the Commonwealth Title III Case, and the ownership of certain

PBA facilities.  Following entry into the 2019 PSA, the Oversight Board, under the guidance of

the Mediation Team, continued to negotiate with its creditors to generate further consensus

among the parties, including, but not limited to, other holders and insurers of GO Bonds and

PBA Bonds.  (Jaresko Decl. ¶ 30; Skeel Decl. ¶ 18; Zelin Decl. ¶¶ 14-15.)

18.     On June 7, 2019, the Oversight Board (i) reached an agreement with the Retiree

Committee regarding, among other things, the treatment of accrued ERS, JRS, and TRS benefits

pursuant to the Plan, and (ii) entered into the AFSCME Plan Support Agreement regarding,

among other things, the return of contributions of all public employees to ERS under the System

2000 plan, and modifications to a collective bargaining agreement and AFSCME's consent to the

treatment of ERS benefits pursuant to the Plan.  (Jaresko Decl. ¶ 31; Santambrogio Decl. ¶ 12;

Skeel Decl. ¶ 19; Debtors Ex. 21.)  The AFSCME Plan Support Agreement provides for

AFSCME's support for modified terms of collective bargaining agreements, along with its

consent to the restructuring of the Commonwealth's pension obligations, pursuant to the Plan.

(Jaresko Decl. ¶ 31; Santambrogio Decl. ¶ 12; Debtors Ex. 21.)

19.     On September 27, 2019, the Debtors filed the Original Plan (as defined below),

containing the material terms outlined in the 2019 PSA.  The Oversight Board thereafter

continued to negotiate with various stakeholders to generate further support for a plan of

adjustment.  On February 9, 2020, the Oversight Board and certain holders of GO Bonds and

PBA Bonds holding over $8 billion in Claims (and, inclusive of Claims held by parties who

executed joinders thereto, over $10 billion), terminated the 2019 PSA, and disclosed they had

reached a global settlement in principle outlined in a plan support agreement (the "2020 PSA").

(Jaresko Decl. ¶¶ 18, 33; Skeel Decl. ¶ 21; Zelin Decl. ¶ 16.)  On February 28, 2020, in

furtherance of the 2020 PSA, the Oversight Board filed the First Amended Plan (as defined

below), a disclosure statement in connection with the First Amended Plan (Docket Entry No.

11947) (the "2020 Disclosure Statement"), and a motion seeking approval of the 2020 Disclosure

Statement (Docket Entry No. 11950).  (Jaresko Decl. ¶ 34.)

       20.     On March 10, 2020, the Court entered an order scheduling a hearing to consider

the adequacy of information contained in the 2020 Disclosure Statement and setting related

deadlines.  (Docket Entry No. 12187.)  Shortly thereafter, in response to the COVID-19

pandemic and its effects on the people and economy of Puerto Rico, the Oversight Board filed a

motion (Docket Entry No. 12485) seeking to adjourn the hearing to consider approval of the

2020 Disclosure Statement and related deadlines, which the Court granted on March 27, 2020

(Docket Entry No. 12549).  (Skeel Decl. ¶ 23.)

       21.     Following the adjournment, the Oversight Board re-engaged with the parties to

the 2020 PSA and entered into further mediation sessions with the assistance and guidance of the

Mediation Team.  (Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24; Zelin Decl. ¶ 17.)  However, the parties

were unable to reach a consensus and, on October 6, 2020, the PSA Creditors filed a motion

(Docket Entry No. 14478) seeking to impose deadlines for confirmation of a plan of adjustment.

On October 29, 2020, the Court entered the *Order on Joint Motion of PSA Creditors Pursuant to*

*Section 312 of PROMESA and Section 105 of the Bankruptcy Code to Impose Deadlines for Plan*

*of Adjustment* (Docket Entry No. 14987) (the "Plan Scheduling Order") directing the Oversight

Board to file, on or before February 10, 2021, the proposed terms of a plan of adjustment and a

motion for approval of a proposed timetable for filing an amended plan and proposed disclosure

statement, among other things.  (Id.)

22.     The Oversight Board continued to engage in discussions with the guidance of the

Mediation Team and, on February 9, 2021, reached an agreement in principle with the parties to

the 2020 PSA regarding the terms of an amended plan of adjustment, subject to execution of a

plan support agreement. (Zelin Decl. ¶¶ 20, 22.)  Accordingly, the Oversight Board requested an

extension of the February 10, 2021 deadline set forth in the Plan Scheduling Order.  (Docket

Entry No. 15821.)  On February 16, 2021, the Court entered the *Order Granting Urgent Motion*

*of the Financial Oversight and Management Board for Puerto Rico Requesting Extension of*

*Deadlines for Submission of Plan of Adjustment or Term Sheet with Respect Thereto* (Docket

Entry No. 15849), extending the February 10, 2021 deadline to March 8, 2021.

23.     On February 23, 2021, the Oversight Board announced the termination of the

2020 PSA and the execution of the Initial PSA, dated as of February 22, 2021, among the

Oversight Board, as representative of the Debtors, and the Initial GO/PBA PSA Creditors.

(Jaresko Decl. ¶ 36; Skeel Decl. ¶ 24; Zelin Decl. ¶ 22; Debtors Ex. 16.)  On March 8, 2021, in

furtherance of the Initial PSA, the Oversight Board filed the Second Amended Plan (as defined

below) and a disclosure statement in connection with the Second Amended Plan.

24.     Following entry into the Initial PSA, the Oversight Board continued to work to

develop additional consensual resolutions and engaged with objecting parties under the guidance

of the Mediation Team.  (Jaresko Decl. ¶ 38; Zelin Decl. ¶ 26.)  On March 9, 2021, the Oversight

Board entered into the ERS Stipulation (amended on April 2, 2021) which, among other things,

(i) provides a global resolution of disputes regarding the validity and related rights of ERS Bonds

and the extent of the alleged liens supporting the obligations thereunder, (ii) resolves the

administrative expense claims filed by certain ERS Bondholders, (iii) provides a resolution of

disputes regarding certain legal challenges to the Commonwealth's post-petition enactment of a

"pay as you go" system for payment of pension benefits to retirees, (iv) provides for the payment of $373 million in cash to the holders of ERS Bonds, as well as the proceeds from the sale of certain ERS assets to the Commonwealth, and (v) provides for the disposition of the ERS Private Equity Portfolio.  (Jaresko Decl. ¶¶ 38-39; Skeel Decl. ¶¶ 26-27; Zelin Decl. ¶ 27; Debtors Ex. 19.)

25.     On May 5, 2021, the Oversight Board entered into the HTA/CCDA Plan Support Agreement with certain holders and insurers of bonds issued by HTA and CCDA which, among other things, (i) provides for a global resolution of disputes regarding the bondholders' rights and alleged property interests in certain allocable "clawed back" revenues of the Commonwealth, (ii) provides for the issuance of new bonds and CVIs, along with the payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the HTA/CCDA Plan Support Agreement, (iv) provides for the bondholders and insurers party thereto to support the Plan, and (v) provides an agreement regarding the structure of a potential plan of adjustment for HTA. (Jaresko Decl. ¶ 40; Skeel Decl. ¶ 28; Zelin Decl. ¶ 34; Debtors Ex. 17.)

26.     On May 11, 2021, in furtherance of the HTA/CCDA Plan Support Agreement, the Debtors filed the Third Amended Plan (as defined below) and a disclosure statement in connection with the Third Amended Plan (Docket Entry No. 16741).  On May 13, 2021, the Debtors filed a motion seeking approval of such disclosure statement (Docket Entry No. 16756). On June 29, 2021, the Debtors filed the Fourth Amended Plan (as defined below), reflecting additional terms negotiated with certain creditors, and a disclosure statement in connection with the Fourth Amended Plan (Docket Entry No. 17192.)

27.     On July 12, 2021, the Oversight Board (i) entered into the GO/PBA Plan Support

Agreement, which amended and restated the Initial PSA (Jaresko Decl. ¶ 122; Debtors Ex. 16)

and (ii) reached an agreement in principle with the Creditors' Committee, which proposed

recoveries for Classes of unsecured claimholders and resolved the Creditors' Committee's

objections to the Plan, subject to the terms of the Committee Agreement.  (Jaresko Decl. ¶ 41;

Zelin Decl. ¶ 38; Debtors Ex. 23.)  The GO/PBA Plan Support Agreement, together with the

restructuring of COFINA's debt, contemplates the reduction of the Commonwealth's debt

(including principal and interest from restructured COFINA bonds) by approximately 62%, from

$90.4 billion to $34.1 billion.  (Jaresko Decl. ¶ 37; Zelin Decl. ¶ 38.)  The GO/PBA Plan Support

Agreement also (i) provides for a proposed global resolution of disputes regarding the validity

and related rights of GO Bonds that may have been issued in violation of the Puerto Rico

Constitutional debt limit, (ii) provides for the issuance of new bonds and CVIs, along with the

payment of certain amounts in cash, resolving the bondholders' claims against the

Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and PBA,

and (iv) provides for the resolution of disputes regarding the PRIFA BANs pursuant to a

stipulation dated February 22, 2021 (the "PRIFA BANs Stipulation") (Debtors Ex. 22).  (Jaresko

Decl. ¶ 37.)  Also on July 12, 2021, in furtherance of the GO/PBA Plan Support Agreement, the

Debtors filed the Fifth Amended Plan (as defined below) and a disclosure statement in

connection with the Fifth Amended Plan (Docket Entry No. 17308.)

28.     On July 27, 2021, the Oversight Board entered into the PRIFA Plan Support

Agreement, which, among other things, (i) provides for a global resolution of disputes regarding

the bondholders' rights and alleged property interests in certain allocable "clawed back"

revenues of the Commonwealth, (ii) provides for the issuance of new CVIs, along with the

payment of certain amounts in cash, resolving the bondholders' claims against the Commonwealth, (iii) resolves the outstanding disputes between the Commonwealth and the other parties to the PRIFA PSA, (iv) provides for the bondholders and insurers party thereto to support the Plan, and (v) presents the foundation for a restructuring of the PRIFA Bonds pursuant to Title VI of PROMESA.  (Jaresko Decl. ¶ 42; Skeel Decl. ¶ 30; Zelin Decl. ¶ 41; Debtors Ex. 18.) Also on July 27, 2021, in furtherance of the PRIFA Plan Support Agreement, the Debtors filed the Sixth Amended Plan (as defined below) and a disclosure statement in connection with the Sixth Amended Plan.  (Docket Entry No. 17516.)

29.     On July 30, 2021, the Debtors filed the Seventh Amended Plan and an updated disclosure statement in connection with the Seventh Amended Plan (Docket Entry No. 17628) (the "Disclosure Statement").  (Debtors Ex. 2.)

30.     On August 2, 2021, the Court entered the Disclosure Statement Order which, among other things (a) approved the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code, (b) established (1) October 19, 2021 at 5:00 p.m. (Atlantic Standard Time) as the Confirmation Objection Deadline, (2) October 4, 2021 at 5:00 p.m. (Atlantic Standard Time) as the deadline by which (i) ballots to accept or reject the Plan were required to be received by the Solicitation Agent (the "Voting Deadline") and (ii) elections regarding the form of distributions were required to be effectuated through the Automated Tender Offer Program ("ATOP") (the "Election Deadline"), and (c) scheduled a hearing on November 8-10, 12, 15-18, and 22-23, 2021, to consider confirmation of the Plan. (Docket Entry No. 17639.)  On September 27, 2021, the Court entered an order (Docket Entry No. 18258) extending the Voting Deadline to October 18, 2021, at 5:00 p.m. (Atlantic Standard

Time) and, on October 1, 2021, the Court entered an order (Docket Entry No. 18360) extending

the Election Deadline to October 18, 2021, at 5:00 p.m. (Atlantic Standard Time).

31.     Consistent with the Disclosure Statement Order, the Debtors caused the

Solicitation Agent to distribute Solicitation Packages to all holders of Claims entitled to vote.

(Mailing Affidavits; Pullo Decl. ¶ 4.)  The Solicitation Packages contained, among other things:

(a) the Confirmation Hearing Notice setting forth the time, date, and place of the Confirmation

Hearing, (b) the Disclosure Statement Order (without the exhibits thereto) and the Disclosure

Statement (together with all exhibits thereto, including the Plan), (c) the appropriate form of

Ballot or Notice, if any, with instructions for voting and/or making any applicable election and,

as applicable, a pre-addressed, pre-paid return envelope, (d) with respect to Class 51, the Retiree

Committee Letter and Information Guide, and (e) with respect to Classes 54, 58, and 66, the

Creditors' Committee Letter.  (Id. ¶ 4.)  The Debtors also caused the Solicitation Agent to

publish the Confirmation Hearing Notice and place radio advertisements providing, among other

things, information regarding the solicitation of votes to accept or reject the Plan and deadlines

associated therewith.  (Publication Affidavit; Pullo Decl. ¶ 7.)

32.     The Court now turns to a review of the legal and factual issues raised in

connection with the motion to confirm the Plan, beginning with an objection to the

constitutionality of PROMESA itself.

## **PROMESA's Consistency with the Constitution of the United States**[15]

33.     Challenges to PROMESA itself, primarily by bondholder Peter Hein, assert, but

fail as a matter of law to show, that PROMESA is unconstitutional.

---

[15]     The Court has received and reviewed the *Notice of Appearance and Request for Service
of Papers* (Docket Entry No. 19647), as well as the *Notice of Participation by the United
States of America* (Docket Entry No. 19710), filed by the United States Department of

34.   **The Bankruptcy Clause**:  Objections by pro se claimants Peter Hein (Docket

Entry No. 18575) (the "Hein Objection") and Arthur Samodovitz (Docket Entry No. 18433) (the

"Samodovitz Objection") assert that PROMESA violates the Bankruptcy Clause of the

Constitution of the United States because it is not uniform with Chapter 9, which requires, as a

predicate to filing a petition, a showing of insolvency.  (Samodovitz Obj. at 11-12; Hein Obj. at

33-34 (discussing 11 U.S.C. § 109(c)(3)).  <u>See also</u> Nov. 22, 2021, Hr'g Tr. 140:5-21 ("Chapter

9 . . . applies throughout the country, except for Puerto Rico, [and] Chapter 9 requires proof of

insolvency. . . .  But in this PROMESA proceeding, proof of insolvency is not being imposed as

a requirement for a discharge.").)

35.   PROMESA does not violate the uniformity requirement of the Bankruptcy Clause

of the Constitution of the United States, which empowers Congress to "establish . . . uniform

Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. art. I, § 8, cl. 4

(the "Bankruptcy Clause").  U.S. Const., Art. IV, § 3, cl. 2.  The reason for this broad grant of

authority to Congress is that our Constitution "envisions a federalist structure, with the National

Government exercising limited federal power and other, local governments—usually state

---

Justice, Civil Division, notifying the Court that the United States intends to "participate
in the above-captioned proceeding for the purpose of defending the constitutionality of
PROMESA as it applies to the proposed approval of the Plan of Adjustment."  (Docket
Entry No. 19710 at 2.)  The Court has also received and reviewed the *Response of the
United States of America to Order Regarding Plan Modification Necessary to the Entry
of an Order Confirming Plan of Adjustment for the Commonwealth of Puerto Rico, the
Employees Retirement System of the Government of the Commonwealth of Puerto Rico,
and the Puerto Rico Public Buildings Authority* (Docket Entry No. 19774).  The Court
proceeds to enter its Findings of Fact and Conclusions of Law because Rule 5.1(c) of the
Federal Rules of Civil Procedure provides that "[b]efore the time to intervene expires, the
court may reject the constitutional challenge, but may not enter a final judgment holding
the statute unconstitutional."  Fed. R. Civ. P. 5.1(c).  That is to say, "[t]he court may
reject a constitutional challenge at any time[.]"  Fed. R. Civ. P. 5.1 advisory committee's
note.  The Court herein <u>rejects</u> constitutional challenges to PROMESA.

governments—exercising more expansive power." <u>Fin. Oversight & Mgmt. Bd. for P.R. v.</u> <u>Aurelius Inv., LLC</u>, 140 S. Ct. 1649, 1658 (2020) (hereinafter, "<u>Aurelius</u>"). In legislating with respect to territories, however, Congress has authority to act like a state legislature, with sovereign authority unconstrained by certain of the restrictions that limit Congress's authority to enact laws for the United States "as a political body of states in union." <u>Cincinnati Soap Co. v.</u> <u>United States</u>, 301 U.S. 308, 323 (1937) ("In dealing with the territories, possessions and dependencies of the United States, this nation has all the powers of other sovereign nations, and Congress in legislating is not subject to the same restrictions which are imposed in respect of laws for the United States considered as a political body of states in union."); <u>Palmore v. United</u> <u>States</u>, 411 U.S. 389, 397 (1973) ("Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may also exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes."). Congress's authority to govern territories is "general and plenary, arising from and incidental to the right to acquire the territory itself, and from the power given by the constitution to make all needful rules and regulations respecting the territory or other property belonging to the United States." <u>Late Corp. of the Church of Jesus Christ of</u> <u>Latter-Day Saints v. United States</u>, 136 U.S. 1, 42 (1890); <u>see Palmore</u>, 411 U.S. at 398 (noting that Congress's authority to legislate with respect to the District of Columbia "permits it to legislate for the District in a manner with respect to subjects that would exceed its powers, or at least would be very unusual, in the context of national legislation enacted under other powers delegated to it").[16]

---

[16]     Nor would a contrary holding necessarily prove fatal to PROMESA or to the Plan. Congress expressly provided in the legislation's severability clause (section 3(b) of PROMESA) that the solution to any uniformity problem would not be to strike down

36.     Congress unambiguously invoked its Article IV authority when it enacted
PROMESA.  See Aurelius, 140 S. Ct. 1649, 1664-65 ("Congress expressly invoked a
constitutional provision allowing it to make local debt-related law (Article IV).").  The
uniformity requirement is, by the Bankruptcy Clause's plain text, a limitation on a specific
enumerated power within Article I, not a generally applicable limitation that restricts the exercise
of legislative power where it would otherwise be proper under Article IV.  Accordingly, the
Bankruptcy Clause-related objections of Mr. Samodovitz and Mr. Hein are overruled.

37.     **Substantive Due Process and the Ex Post Facto Clause**: Mr. Hein argues that
the retroactive application of PROMESA to pre-enactment debts violates substantive due process
and that the Ex Post Facto Clause prohibits the retroactive application of a statute (such as
PROMESA) to impair his prepetition bonds (Hein Obj. at 17).  The Supreme Court opinion on
which Mr. Hein relies, Eastern Enterprises v. Apfel, 524 U.S. 498, 537-38 (1998), is inapposite
because it does not support the theories Mr. Hein purports to derive from it.  In deciding that the
Coal Industry Retiree Health Benefit Act of 1992 imposed severe retroactive liability on a
limited class of parties that could not have anticipated the liability (and that the liability was
substantially disproportionate to the parties' past experience), thereby violating the Takings
Clause of the Constitution of the United States, 524 U.S. at 528-29, the Supreme Court expressed
reservations about applying the doctrine of substantive due process to economic legislation and,
in light of its determination that a taking had occurred, did not base its decision on the doctrine
of substantive due process, 524 U.S. at 537-38.  It likewise declined to extend the Ex Post Facto

---

PROMESA, but rather to extend it to any similarly situated territory, "provided that the
legislature of that territory adopts a resolution signed by the territory's governor
requesting the establishment and organization of a Financial Oversight and Management
Board pursuant to section 101."  48 U.S.C.A. § 2102(b) (Westlaw through P.L. 117-80).

Clause, which is "directed at the retroactivity of penal legislation," to legislation affecting

property and for which the jurisprudence of the Takings Clause is more appropriate, 524 U.S.

533-34. Accordingly, Mr. Hein fails to demonstrate that substantive due process analysis is

appropriate, that the Ex Post Facto Clause of the Constitution is applicable to PROMESA, or that

PROMESA violates such constitutional principles. See U.S. Const. art. I, § 9, cl. 3. The Court

now turns to PROMESA's plan confirmation requirements.

### Compliance with PROMESA Sections 104(j) and 313

38. The Oversight Board must certify the submission or modification of a plan of

adjustment on behalf of a debtor in a case under Title III of PROMESA before submitting or

modifying such plan of adjustment. See PROMESA § 104(j)(1)-(2). The Oversight Board may

certify a plan of adjustment only if it determines, in its sole discretion, that the Plan is consistent

with the applicable certified fiscal plan. See id. § 104(j)(3). The Oversight Board, after the

issuance of a certification pursuant to PROMESA Section 104(j), may modify the plan at any

time before confirmation, but may not modify the plan so that the plan as modified fails to meet

the requirements of PROMESA Title III. See id. § 313. After the Oversight Board files a

modification, "the plan as modified becomes the plan." Id.

39. The Oversight Board has complied with its obligations pursuant to PROMESA

Sections 104(j) and 313. On April 23, 2021, the Oversight Board certified the Commonwealth's

current fiscal plan, which also covers ERS and PBA (the "Fiscal Plan"). (Jaresko Decl. ¶ 28;

Debtors Ex. 10.)

40. On September 26, 2019, the Oversight Board certified the submission of the *Title

III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No.

18806-5) (the "Certification of the Submission of the Original Plan"). (Debtors Ex. 122.) The

Oversight Board subsequently filed the *Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al*. (Docket Entry No. 8765) (the "Original Plan").

41.     On February 28, 2020, the Oversight Board certified the modification of the Original Plan (Docket Entry No. 18807-1) (the "Certification of the Submission of the Amended Plan").  (Debtors Ex. 123.)  The Oversight Board subsequently filed the *Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 11946) (the "First Amended Plan").

42.     On March 8, 2021, the Oversight Board certified the modification of the First Amended Plan (Docket Entry No. 18807-2) (the "Certification of the Submission of the Second Amended Plan").  (Debtors Ex. 124.)  The Oversight Board subsequently filed the *Second Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 15976) (the "Second Amended Plan").

43.     On May 11, 2021, the Oversight Board certified the modification of the Second Amended Plan (Docket Entry No. 18807-3) (the "Certification of the Submission of the Third Amended Plan").  (Debtors Ex. 125.)  The Oversight Board subsequently filed the *Third Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 16740) (the "Third Amended Plan").

44.     On June 29, 2021, the Oversight Board certified the modification of the Third Amended Plan (Docket Entry No. 18807-4) (the "Certification of the Submission of the Fourth Amended Plan").  (Debtors Ex. 126.)  The Oversight Board subsequently filed the *Fourth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17194) (the "Fourth Amended Plan").

45.     On July 12, 2021, the Oversight Board certified the modification of the Fourth

Amended Plan (Docket Entry No. 19569 Ex. A) (the "Certification of the Submission of the

Fifth Amended Plan).  (Debtors Ex. 127.)  The Oversight Board subsequently filed the *Fifth*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket

Entry No. 17306) (the "Fifth Amended Plan").

46.     On July 26, 2021, the Oversight Board certified the modification of the Fifth

Amended Plan (Docket Entry No 19569 Ex. B) (the "Certification of the Submission of the Sixth

Amended Plan").  (Debtors Ex. 128.)  The Oversight Board subsequently filed the *Sixth*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket

Entry No. 17516) (the "Sixth Amended Plan").

47.     On July 30, 2021, the Oversight Board certified the modification of the Sixth

Amended Plan (Docket Entry No. 18807-7) (the "Certification of the Submission of the Seventh

Amended Plan").  (Debtors Ex. 129.)  The Oversight Board subsequently filed the *Seventh*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket

Entry No. 17627) (the "Seventh Amended Plan").  (Debtors Ex. 1.)

48.     On November 3, 2021, the Oversight Board certified the modification of the

Seventh Amended Plan (Docket Entry No. 19106-4) (the "Certification of the Submission of the

Eighth Amended Plan").  (Debtors Ex. 137.)  The Oversight Board subsequently filed the *Eighth*

*Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket

Entry No. 19053) (the "Eighth Amended Plan").  (Debtors Ex. 136.)

49.     On November 7, 2021, the Oversight Board certified the modification of the

Eighth Amended Plan (Docket Entry No. 19119-2) (the "Certification of the Submission of the

First Modified Eighth Amended Plan").  (Debtors Ex. 144.)  The Oversight Board subsequently

filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19114) (the "First Modified Eighth Amended Plan"). (Debtors Ex. 143.)

50.   On November 12, 2021, the Oversight Board certified the modification of the First Modified Eighth Amended Plan (Docket Entry No. 19327-1) (the "Certification of the Submission of the Second Modified Eighth Amended Plan"). (Debtors Ex. 147.) The Oversight Board subsequently filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19184) (the "Second Modified Eighth Amended Plan").

51.   On November 21, 2021, the Oversight Board certified the modification of the Second Modified Eighth Amended Plan (Docket Entry No. 19327-2) (the "Certification of the Submission of the Third Modified Eighth Amended Plan"). (Debtors Ex. 148.) The Oversight Board subsequently filed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19323) (the "Third Modified Eighth Amended Plan"). (Debtors Ex. 149.)

52.   On November 24, 2021, the Oversight Board certified the modification of the Third Modified Eighth Amended Plan (Docket Entry No. 19569 Ex. C) (the "Certification of the Submission of the Fourth Modified Eighth Amended Plan"). The Oversight Board subsequently filed, on November 28, 2021, the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19367) (the "Fourth Modified Eighth Amended Plan").

53.   On December 20, 2021, the Oversight Board certified the modification of the Fourth Modified Eighth Amended Plan (Docket Entry No. 19569 Ex. D) (the "Certification of

the Submission of the Fifth Modified Eighth Amended Plan").  The Oversight Board

subsequently filed, on December 21, 2021, the *Modified Eighth Amended Title III Joint Plan of*

*Adjustment of the Commonwealth of Puerto Rico, et al.*, (Docket Entry No. 19568) (the "Fifth

Modified Eighth Amended Plan").

54.     On January 14, 2022, the Oversight Board certified the sixth modification of the

Modified Eighth Amended Plan and the submission of the Plan upon a determination, in the

Oversight Board's sole discretion, that the Plan was consistent with the Fiscal Plan.  (Docket

Entry No. 19786 Ex. A) (the "Certification of the Submission of the Plan").  Accordingly, the

Oversight Board submitted the modification and the Plan described in the following paragraph in

compliance with section 104(j) of PROMESA.

55.     On January 14, 2022, the Oversight Board filed the *Modified Eighth Amended*

*Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No.

19784) (as already defined herein, the "Plan").  The Oversight Board submitted the Plan in

accordance with section 313 of PROMESA.  For the reasons explained herein, the Court

confirms the Plan and holds that it meets the requirements of PROMESA and that the Oversight

Board has complied with all provisions of PROMESA applicable to confirmation of the Plan.

**<u>Compliance with PROMESA Section 314(b)</u>**

   **A. PROMESA § 314(b)(1):** *The Plan Fully Complies with the Provisions of the Bankruptcy*
   *Code Made Applicable by PROMESA § 301.*

56.     As required by Bankruptcy Rule 3016(a), the Plan is dated and identifies the

Debtors as the proponents.  (Plan at 1.)  In addition, as detailed below, the Plan satisfies the

requirements of sections 1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4), 1123(a)(5),

1123(b), and 1123(d) of the Bankruptcy Code.

i.    **Bankruptcy Code Section 1122(a)**

57.    With the exception of Administrative Expense Claims and Professional Claims,

which need not be classified, Article IV of the Plan designates the classification of Claims.  The

Plan's classification of Claims complies with section 1122(a) of the Bankruptcy Code because

each Class contains only claims that are either all unsecured Claims or are all secured Claims

secured by the same collateral, or are otherwise substantially similar to the other claims in the

class.  (Jaresko Decl. ¶ 47.)  The Plan designates the following sixty-nine (69) Classes of Claims:

| Claim | Class | Debtor(s) |
|---|---|---|
| Vintage PBA Bond Claims | Class 1 | PBA |
| Vintage PBA Bond Claims (Assured) | Class 2 | PBA |
| Vintage PBA Bond Claims (National) | Class 3 | PBA |
| Vintage PBA Bond Claims (Ambac) | Class 4 | PBA |
| Vintage PBA Bond Claims (FGIC) | Class 5 | PBA |
| Vintage PBA Bond Claims (Syncora) | Class 6 | PBA |
| Retail Vintage PBA Bond Claims | Class 7 | PBA |
| 2011 PBA Bond Claims | Class 8 | PBA |
| Retail 2011 PBA Bond Claims | Class 9 | PBA |
| 2012 PBA Bond Claims | Class 10 | PBA |
| Retail 2012 PBA Bond Claims | Class 11 | PBA |
| PBA/DRA Secured Claim | Class 12 | PBA |
| PBA General Unsecured Claims | Class 13 | PBA |
| PBA/DRA Unsecured Claim | Class 14 | PBA |
| Vintage CW Bond Claims | Class 15 | Commonwealth |
| Retail Vintage CW Bond Claims | Class 16 | Commonwealth |
| Vintage CW Bond Claims (Assured) | Class 17 | Commonwealth |
| Vintage CW Bond Claims (National) | Class 18 | Commonwealth |
| Vintage CW Bond Claims (Ambac) | Class 19 | Commonwealth |
| Vintage CW Bond Claims (FGIC) | Class 20 | Commonwealth |
| Vintage CW Bond Claims (Syncora) | Class 21 | Commonwealth |
| Vintage CW Bond Claims (Taxable Election) | Class 22 | Commonwealth |
| Vintage CW Guarantee Bond Claims | Class 23 | Commonwealth |

| Claim | Class | Debtor(s) |
|---|---|---|
| Vintage CW Guarantee Bond Claims (Assured) | Class 24 | Commonwealth |
| Vintage CW Guarantee Bond Claims (National) | Class 25 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Ambac) | Class 26 | Commonwealth |
| Vintage CW Guarantee Bond Claims (FGIC) | Class 27 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Syncora) | Class 28 | Commonwealth |
| Vintage CW Guarantee Bond Claims (Taxable Election) | Class 29 | Commonwealth |
| 2011 CW Bond Claims | Class 30 | Commonwealth |
| Retail 2011 CW Bond Claims | Class 31 | Commonwealth |
| 2011 CW Bond Claims (Assured) | Class 32 | Commonwealth |
| 2011 CW Bond Claims (Taxable Election) | Class 33 | Commonwealth |
| 2011 CW Guarantee Bond Claims | Class 34 | Commonwealth |
| 2011 CW Guarantee Bond Claims (Taxable Election) | Class 35 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims | Class 36 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Assured) | Class 37 | Commonwealth |
| Retail 2011 CW Series D/E/PIB Bond Claims | Class 38 | Commonwealth |
| 2011 CW Series D/E/PIB Bond Claims (Taxable Election) | Class 39 | Commonwealth |
| 2012 CW Bond Claims | Class 40 | Commonwealth |
| Retail 2012 CW Bond Claims | Class 41 | Commonwealth |
| 2012 CW Bond Claims (Assured) | Class 42 | Commonwealth |
| 2012 CW Bond Claims (Taxable Election) | Class 43 | Commonwealth |
| 2012 CW Guarantee Bond Claims | Class 44 | Commonwealth |
| 2012 CW Guarantee Bond Claims (Taxable Election) | Class 45 | Commonwealth |
| 2014 CW Bond Claims | Class 46 | Commonwealth |
| Retail 2014 CW Bond Claims | Class 47 | Commonwealth |
| 2014 CW Bond Claims (Taxable Election) | Class 48 | Commonwealth |
| 2014 CW Guarantee Bond Claims | Class 49 | Commonwealth |
| 2014 CW Guarantee Bond Claims (Taxable Election) | Class 50 | Commonwealth |
| Retired ERS Participant Below-Threshold Claims | Class 51A | Commonwealth |

| Claim | Class | Debtor(s) |
|---|---|---|
| Retired JRS Participant Below-Threshold Claims | Class 51B | Commonwealth |
| Retired TRS Participant Below-Threshold Claims | Class 51C | Commonwealth |
| Retired ERS Participant Above-Threshold Claims | Class 51D | Commonwealth |
| Retired JRS Participant Above-Threshold Claims | Class 51E | Commonwealth |
| Retired TRS Participant Above-Threshold Claims | Class 51F | Commonwealth |
| Active ERS Participant Claims | Class 51G | Commonwealth |
| Active JRS Participant Claims | Class 51H | Commonwealth |
| Active TRS Participant Claims | Class 51I | Commonwealth |
| System 2000 Participant Claims | Class 51J | Commonwealth |
| VTP Payroll Participant Below-Threshold Claims | Class 51K | Commonwealth |
| VTP Payroll Participant Above-Threshold Claims | Class 51L | Commonwealth |
| AFSCME Claims | Class 52 | Commonwealth |
| Dairy Producer Claims | Class 53 | Commonwealth |
| Eminent Domain/Inverse Condemnation Claims | Class 54 | Commonwealth |
| Energy Incentive Claims | Class 55 | Commonwealth |
| Med Center Claims | Class 56 | Commonwealth |
| Tax Credit Claims | Class 57 | Commonwealth |
| CW General Unsecured Claims | Class 58 | Commonwealth |
| GDB/PET Claim | Class 58A | Commonwealth |
| CW/HTA Claims | Class 59 | Commonwealth |
| CW/Convention Center Claims | Class 60 | Commonwealth |
| CW/PRIFA Rum Tax Claims | Class 61 | Commonwealth |
| CW/MBA Claims | Class 62 | Commonwealth |
| CW Appropriations Claims | Class 63 | Commonwealth |
| Section 510(b) Subordinated Claims | Class 64 | Commonwealth, ERS, and PBA |
| ERS Bond Claims | Class 65 | ERS |
| ERS General Unsecured Claims | Class 66 | ERS |

| Claim | Class | Debtor(s) |
|---|---|---|
| Gracia-Gracia Claims | Class 67 | Commonwealth |
| Convenience Claims | Class 68 | Commonwealth and ERS |
| Federal Claims | Class 69 | Commonwealth |

(Jaresko Decl. ¶ 47.)

58.     The classification of Claims set forth in the Plan is reasonable and was not done to control the outcome of voting to accept or reject the Plan, as the classification is based upon differences in the legal nature and/or priority of such Claims in accordance with applicable law. To the extent unsecured Claims are separately classified from the Commonwealth's general unsecured claims (Class 58),[17] it is not to gerrymander an accepting Class, as proven by there being several impaired accepting Classes for each Debtor.  Rather, separate classification is used for governmental or business reasons usually requiring different treatment of separate Classes' Claims.  (Jaresko Decl. ¶ 48.)

59.     All holders of Claims in Classes 1-11 hold PBA Bonds and allege the same guarantee against the Commonwealth, but are separately classified based on three factors: the year in which the bonds were issued; whether the bonds are insured and, if so, the insurer; and whether the bondholder is a retail investor.  Classification depending on year of issuance is based on differences in the risk profile associated with each issuance potentially having violated the debt service limit set forth in Article VI, section 2 of the Commonwealth Constitution, with the treatment of Classes varying based on how much risk of disallowance of the Claims existed for

---

[17]     Class 58A consists of the GDB/PET Claim, which will receive payments from the Commonwealth equal to, and on the same timeframe as, the pro rata payments to be made to holders of Allowed CW General Unsecured Claims (Class 58) pursuant to the Plan.  (Plan § 62.4.)

each Class.  Holders of insured bonds issued the same year are separately classified because the

insurance agreements provide bondholders different rights.  Claims of Retail Investors are

separately classified because such Claims are smaller in dollar amount and the holders' rights

differ from those of holders of GO Bonds and PBA Bonds who are parties to the GO/PBA Plan

Support Agreement, and holders of bonds insured by the Monolines.  Thus, the holders of Claims

in Classes 1-11 are classified by whether the PBA Bonds they hold: (a) were issued prior to 2011

and are (i) uninsured (Class 1), (ii) uninsured and held by a Retail Investor (Class 7), (iii) insured

by Assured (Class 2), National (Class 3), Ambac (Class 4), FGIC (Class 5), or Syncora (Class 6);

(b) were issued in 2011 and are (i) uninsured (Class 8), or (ii) uninsured and held by a Retail

Investor (Class 9); or (c) were issued in 2012 and are (i) uninsured (Class 10), or (ii) uninsured

and held by a Retail Investor (Class 11).  (Jaresko Decl. ¶ 48.)

60.     Bond Claims against the Commonwealth in Classes 15-50 are classified

separately based on the date of bond issuance, whether the bonds are insured and, if so, the

insurer, and whether the bondholder is a retail investor as follows: (a) whether the bonds were

issued prior to March 2011 (Classes 15-29), March or later in 2011 (Classes 30-39), in 2012

(Classes 40-45), or 2014 (Classes 46-50), and (b) whether the bonds are (i) uninsured (Classes

15, 23, 30, 34, 36, 40, 44, 46, and 49) and held by Retail Investors (Classes 16, 31, 38, 41, and

47), or (ii) insured by Assured (Classes 17, 24, 32, and 42), National (Classes 18 and 25), Ambac

(Classes 19 and 26), FGIC (Classes 20 and 27), or Syncora (Classes 21 and 28).  (Jaresko Decl.

¶ 49.)

61.     Based on the elections offered pursuant to the Plan, certain Vintage CW Bond

Claims, Vintage CW Guarantee Bond Claims, 2011 CW Bond Claims, 2011 CW Guarantee

Bond Claims, 2011 CW Series D/E/PIB Bond Claims, 2012 CW Bond Claims, 2014 CW Bond

Claims, and 2014 CW Guarantee Bond Claims, to the extent elections were made, were shifted

to other Classes (Classes 22, 29, 33, 35 39, 43, 48, and 50, respectively) to denote the election

made by holders of such Claims to receive taxable distributions on account of their bonds, and

the alternative form of distribution elected.  (Jaresko Decl. ¶ 49.)  Only Puerto Rico Investors

could elect to receive taxable bonds because, unlike mainland U.S. investors, Puerto Rico

Investors are generally not subject to U.S. federal income taxation.  (Brownstein Decl. ¶ 16.)

When Puerto Rico Investors elect taxable treatment, it increases the likelihood that a greater

amount of tax-exempt bonds will be available for mainland U.S. bondholders.  (Id.)  The taxable

election for on-island bondholders benefits mainland U.S. bondholders because, as a result of on-

island bondholders taking the taxable election, mainland investors receive a higher amount of

tax-exempt bonds affording a greater after-tax gain.[18]  (See Nov. 12, 2021, Hr'g Tr. 112:5-15.)

     62.    Active and retired employees holding pension Claims comprise Classes 51A-51L.

The services that are and have been performed by these current and retired employees are

integral to the basic provision of governmental services to the Commonwealth's residents and

the Government could not function without them.  Moreover, the best interests of the

Commonwealth and all of its stakeholders are served by ensuring that pensioners receive

monthly benefits to maintain the ability to support themselves without requiring additional future

---

[18]     On cross-examination, the Debtors' witness, David M. Brownstein, Managing Director in the Municipal Finance Department at Citigroup Global Markets Inc., testified that an individual mainland bondholder in a 35 percent tax bracket would benefit by a 14 percent after-tax gain: "Clearly, if you're a taxpayer who pays state and local taxes, you're higher than that, but in a 35 percent tax bracket, you, as an U.S. holder, mainland holder of these bonds, for the 49 million in bonds that the local on-island holders took taxable instead of you, you have a 14 percent after-tax gain.  That is what was provided to you by giving the on-island investors the right to elect taxable bonds, which meant that your portfolio would have a higher amount of tax[-]exempt bonds."  (Nov. 12, 2021, Hr'g Tr. 112:8-15.)

support from the Commonwealth.  These pension Claims are further classified separately based

on whether the pensioners (a) are retired (Classes 51A-F, K, and L) or active (Classes 51G-J), (b)

are participants in ERS (Classes 51A, 51D, and 51G), JRS (Classes 51B, 51E, and 51H), TRS

(Classes 51C, 51F, and 51I), System 2000 (51J), or participated in a voluntary termination

program (Classes 51K and 51L), because each program had different funding sources as of the

Commonwealth Petition Date, with different levels of underfunding, and (c) receive total

monthly pension benefits above (Classes 51D-F and 51L) or below (Classes 51A-C and 51K)

$1,500.[19]  (Jaresko Decl. ¶¶ 50-51.)

63.    The separate classification of Claims for retirement benefits from the claims of

other creditors is justified.  Unlike the Claims of commercial creditors, who contracted to be paid

a fixed sum at a fixed time, retirees agreed to defer their compensation with the expectation that

the deferred compensation, i.e., their pension, would be paid in periodic payments over the

balance of their life (and that of any surviving spouse), based on formulas established when they

worked for the Commonwealth or other governmental entities.  Accordingly, the Plan proposes

to make payments to retirees over the life of the retiree and any eligible spouse through the

PayGo system and specified statutory rules established before the Commonwealth's Title III case

began, as modified pursuant to the Plan, including through the "freeze" of TRS and JRS and

elimination of cost of living adjustments ("COLAs").

64.    Claims held by AFSCME, related to certain collective bargaining agreements

between AFSCME affiliates and the Commonwealth that will occur pursuant to the Plan, are

---

[19]    As set forth below, in light of the passage of Act 53 and modifications to the proposed
plan after the classes were established and votes were solicited, the Plan was modified to
remove the Monthly Benefit Modification feature of the Seventh Amended Plan, and the
$1,500 threshold no longer affects the treatment of pensioners' claims.

classified in Class 52, separately from general unsecured claims.  The separate classification is

necessary because the treatment of these claims is the result of the adoption of a new collective

bargaining agreement.  This treatment is inapplicable to other Classes of unsecured Claims and it

is beneficial to the Commonwealth and all its stakeholders to provide such treatment as opposed

to the potential litigation and treatment of any rejection damages Claims relating to these

collective bargaining agreements.  AFSCME and its local affiliates collectively constitute one of

Puerto Rico's primary public employee unions and an important bargaining unit whose members

provide the Commonwealth's public services.  (Jaresko Decl. ¶ 52.)  Separate classification of

these Claims is reasonable, justified, and supported by a governmental purpose.  The Plan

provides that all other collective bargaining agreements are neither being rejected nor assumed.

65.     The Claims held by Suiza Dairy, Inc. and Vaqueria Tres Monjitas, Inc.—the

Commonwealth's primary producers and sources of dairy for the population—are classified

separately in Class 53, which rejected the Plan.  The Plan may nonetheless be confirmed

pursuant to Bankruptcy Code section 1129(b)(2)(B) because no Claims junior to the Claims in

Class 53 receive or retain any property and there is no contention the Plan unfairly discriminates

against Class 53.  Moreover, if there were such a contention it would be overruled because the

Allowed Claims in Class 53 receive more than CW General Unsecured Claims in Class 58.  The

separate classification of these unsecured claims is justified by the particular importance of the

milk industry in Puerto Rico.  It is very costly and difficult for Puerto Rico to consistently import

dairy, which has a short shelf life—a fact underscoring the importance of the domestic dairy

industry to the Commonwealth and its residents.  Dairy production is one of the key issues of

food security on the Island.  The dairy industry also is one of the Commonwealth's largest

agricultural industries and employs a significant number of Puerto Rico's residents.  It is

reasonable and justified to classify such dairy producers' Claims separately and provide such

Class with a fifty percent (50%) recovery,[20] ensuring that such integral Claimants do not suffer

further financial hardship and impair an industry that is vital to the health of the

Commonwealth's citizens.  (Jaresko Decl. ¶ 53.)  Further, the dairy producers' claims arose from

the prepetition Dairy Producer Settlement (see Jaresko Decl. ¶ 53; Plan §§ 1.190, 1.191; Debtors

Ex. 26 (the "Dairy Producer Settlement")), and the Commonwealth obligation to pay certain fees

to protect consumers (see Debtors Ex. 26 ¶ 14).  Accordingly, the separate classification of

claims held by large dairy producers is reasonable, justified, and supported by a governmental

purpose.

66.     Eminent Domain/Inverse Condemnation Claims (as that term is defined in section

1.212 of the Plan) are separately classified in Class 54 of the Plan.  The holders of such Claims

assert that they hold prepetition constitutional Claims based on seizures or the inverse

condemnation of real property pursuant to the Commonwealth's eminent domain power.  The

Debtors allege that the Eminent Domain Claims are partially secured by funds deposited by the

Commonwealth with the Clerk of the Court of First Instance in connection with condemnation

proceedings underlying such Claims in accordance with Puerto Rico law, 32 L.P.R.A. § 2907.  In

accordance with applicable Puerto Rico law, upon commencement of a condemnation

proceeding, title to a subject property is transferred to the Commonwealth and funds on deposit

become available to the former title holder.[21]  32 L.P.R.A. § 2907.  The Fifth Modified Eighth

---

[20]     The objection of Suiza Dairy is discussed and resolved infra, at paragraphs 175-77.

[21]     If the Commonwealth does not initiate a condemnation proceeding following applicable
eminent domain procedures, or if the taking is the result of the diminution of the
property's use or value resulting from government conduct, the former owner of property
may initiate a claim for inverse condemnation for the taking of property for public use

Amended Plan filed with the Court on December 21, 2021 (Docket Entry No. 19568) treats the

Eminent Domain/Inverse Condemnation Claims as secured Claims to the extent the Claims are

allowable and there is cash on deposit for them.  It further provides that the Eminent

Domain/Inverse Condemnation Claims will be treated as Class 58 CW General Unsecured

Claims entitled to the same treatment as other holders of CW General Unsecured Claims to the

extent each allowable Claim exceeds the cash on deposit for it (Jaresko Decl. ¶ 54.)  That

proposed Plan further provides, however, that if the Court determines that such Claims must be

paid in full to the extent they are Allowed Claims for just compensation, they will be so paid.

(See Plan §§ 58.1, 77.1(e) (the "Full-Payment Proposal").)  The claimants, opposing the

proposed treatment of their claims as partially secured and partially unsecured (or, in the case of

Inverse Condemnation claimants, entirely unsecured), dispute the classification of any portion of

their claims as general unsecured claims and argue that, even to the extent their claims are

unsecured, they are nonetheless entitled to payment in full of their allowable unsecured Claims

because the Claims are based on the Fifth Amendment of the U.S. Constitution.  The issue

presented by the Fifth Modified Eighth Amended Plan and the pertinent objections is whether the

Eminent Domain/Inverse Condemnation claimants are entitled to have the unsecured portions of

their Claims (i.e., those portions that the Debtors do not already propose to pay in full)

designated as nondischargeable or otherwise required to be paid in full.  The Eminent

Domain/Inverse Condemnation Claims are prepetition Claims arising from the Commonwealth's

alleged taking of title to the claimants' real properties, or deprivation of the claimants of use of

such properties, prior to commencement of the Commonwealth Title III case.  It is undisputed

---

without just compensation.  See, e.g., Filler v. United States, 116 Fed. Cl. 123, 127 n.2
(Fed. Cl. 2014).

that the Fifth Modified Eighth Amended Plan does not currently except the Eminent

Domain/Inverse Condemnation Claims from discharge. The Debtors and claimants disagree as

to whether the Court can and should except them from discharge. Because the Fifth Amendment

of the U.S. Constitution provides that "private property [shall not] be taken for public use,

without just compensation," the claimants assert that Congress lacks power to legislate the

discharge of the Eminent Domain/Inverse Condemnation Claims for less than payment in full of

just compensation. Conversely, the Debtors contend that article I, section 8, clause 4 of the U.S.

Constitution, which grants Congress the power to pass uniform laws on the subject of

bankruptcies, empowers Congress to provide for the discharge of such claims for less than

payment in full as Debtors have done in the Fifth Modified Eighth Amended Plan. As set forth

more fully below, the Court concludes that the Eminent Domain/Inverse Condemnation Claims

identified in Class 54 are not subject to impairment and discharge. Accordingly, the Class 54

claimants' assertions that their Claims should be paid in full or deemed nondischargeable are

sustained and such Allowed Claims must be paid in accordance with Debtors' Full-Payment

Proposal in connection with Eminent Domain/Inverse Condemnation Claims (as set forth in Plan

§§ 58.1, 77.1(e)). The Court's January Order conditioned entry of this FFCL on the Debtors'

revision of the Plan to incorporate the treatment of Allowed Eminent Domain/Inverse

Condemnation Claims as set forth in the Full-Payment Proposal.

67.    Claims in Class 55 arise from, or relate to, the Energy Incentive Act, which

provides tax incentives for citizens who undertake certain clean-energy projects to reduce their

household's energy use. Pursuant to the Plan, such Claims are not paid in cash or other monies

in the Debtors' Title III Cases, but rather, are satisfied through reductions in tax revenue.

(Jaresko Decl. ¶ 55.) It is in the Commonwealth's best interests to promote the reasonable

governmental purpose of supporting residents who are taking steps to address climate change

and who took those steps in reliance upon the availability of such tax deductions under the

Energy Incentive Act.  Accordingly, separate classification of such Claims is reasonable and

justified.

68.     Class 56 consists of all Claims of certain federally qualified health centers arising

from or relating to the Medicaid Act.  Separate classification of such Claims is reasonable and

justified because such Claims are held by entities that provide critical medical treatment to

Commonwealth residents, particularly in a global pandemic, and are payable through

Medicare/Medicaid funds from the federal government that are earmarked for the payment of

such claims and not available to other general unsecured claimholders.  Separate classification of

such Class and enhanced treatment on account of its Claims through the receipt of a fifty percent

(50%) recovery is reasonable and justified to support such critical services and ensure that

medical providers on the Island are not underfunded.  (Jaresko Decl. ¶ 56.)  42 U.S.C. §

1396a(bb).  Class 56 also exempts the litigation styled Rio Grande Cmty. Health Ctr. Inc., et al.

v. Commonwealth of Puerto Rico, et al., Case No. 03-1640 (GAG), currently pending in the

United States District Court for the District of Puerto Rico, from dismissal under section 60.2 of

the Plan, and provides separate treatment for the manner in which that litigation shall be pursued

and resolved by the parties thereto.  (Plan § 60.2.)

69.     Class 57 consists of Claims (other than Energy Incentive Claims) relating to

refunds or credits for the payment of personal income taxes, arising under the Puerto Rico

Internal Revenue Code of 2011, or an economic incentive law, in each case resulting in income

tax credits, deductions, or carryforwards.  Such Tax Credit Claims were designed and

implemented by the Government of the Commonwealth to incentivize certain behavior and to

benefit the Commonwealth and support the economy as a whole. Pursuant to the Plan, such

Claims are not paid in cash or other monies in the Debtors' Title III Cases, but rather, are

satisfied through reductions in tax revenue. (Jaresko Decl. ¶ 57.) Accordingly, it is reasonable

and in the best interests of the Commonwealth and its economy to continue to honor such tax

incentives upon which residents and local businesses have relied, and to separately classify such

Claims.

70.     Class 63 consists of Claims arising from or related to indebtedness only payable

from appropriations of the Commonwealth Legislature. Such claimants, significantly, have

fewer rights than holders of CW General Unsecured Claims, as they have no ability to compel

payment of their Claims and hold only contingent rights to payment to the extent appropriated by

the Government of the Commonwealth. (Jaresko Decl. ¶ 58.) It is therefore reasonable and

appropriate to separately classify such claims.

71.     Class 64 consists of Claims determined pursuant to a Final Order to be subject to

section 510(b) of the Bankruptcy Code. (Jaresko Decl. ¶ 59.) Section 510(b) of the Bankruptcy

Code subordinates such Claims to other general unsecured claims, and provides that such Claims

are only eligible to receive a recovery pursuant to the Plan once all other unsecured creditors

have been paid in full. Because these Claims have a lower priority than general unsecured

claims, they are sufficiently dissimilar to general unsecured claims to warrant separate

classification and treatment.

72.     As each Class contains Claims substantially similar to each other, the Plan

satisfies the requirements of section 1122(a) of the Bankruptcy Code.[22]

---

[22]     Mapfre PRAICO Insurance Company ("Mapfre PRAICO") contends that the Plan violates section 1122(a) because it places Mapfre PRAICO's claims against the Commonwealth and against PBA into Class 58 and Class 13, respectively,

73.     The Plan separately classifies Claims not similarly situated to other Claims based

upon differences in the legal nature and/or priority of such Claims or because they are asserted

against a different Debtor than other Claims with the same priority, including secured and

unsecured Claims against PBA (Classes 12-14), CW/HTA Claims (Class 59), CW/Convention

Center Claims (Class 60), CW/PRIFA Rum Tax Claims (Class 61), CW/MBA Claims (Class

62), ERS Bond Claims and ERS General Unsecured Claims (Classes 65 and 66), Gracia Gracia

Claims (Class 67), and Federal Claims (Class 69).

### ii.     Bankruptcy Code Section 1122(b)

74.     Class 68 consists of Convenience Claims, comprising Claims equal to or less than

$20,000, or Claims which the holder elects to reduce to $20,000 pursuant to the Plan.  (Plan

§ 1.162.)  Any holder of multiple Claims in an aggregate amount of $40,000 or more may elect

to reduce all such Claims to an aggregate amount of $40,000 and be treated within Class 68.

---

notwithstanding Mapfre PRAICO's assertion that those claims are secured.  The
Confirmation Order, however, provides that, to the extent Mapfre PRAICO's claims are
determined to be secured claims, they will be unimpaired and not subject to treatment as
general unsecured claims.  See Confirmation Order ¶ 86 ("Notwithstanding anything
contained in the Plan to the contrary, to the extent that the Claim of a surety against any
of the Debtors is determined to be a secured claim and allowed in whole or in part, by
Final Order, or by operation of section 502(a) of the Bankruptcy Code following the
expiration of the period to object to any such Claim in accordance with the provisions of
Section 82.1 of the Plan, such Claim shall be paid in full, in Cash; provided, however,
that, in the event some or all of any such Claim is determined to be an unsecured claim
and allowed in whole or in part, by Final Order, such Claim shall be treated in accordance
with the provisions of Section 17.1, 62.1 or 70.1 of the Plan, as the case may be.").)
Accordingly, as modified by the Confirmation Order, to the extent that Mapfre
PRAICO's claims are determined to be secured claims, such claims will not be treated as
general unsecured claims.  Mapfre PRAICO has not objected to the treatment that would
be provided by paragraph 87 of the Confirmation Order.  Moreover, the classification did
not affect voting because any separate, unimpaired class of secured claims would have
been deemed to accept the Plan, see 11 U.S.C. § 1126(f), and Class 13 and Class 58 did
not vote to accept the Plan.

(Plan §-1.163, art. LXXII.)  The separate classification of Convenience Claims is reasonable and necessary to ease the administrative burden on the Debtors.  (See Jaresko Decl. ¶ 60.)

75.     The Plan satisfies the requirements of section 1122(b) of the Bankruptcy Code.

### iii.     Bankruptcy Code Section 1123(a)(1)

76.     Section 4.1 of the Plan designates sixty-nine (69) separate Classes of Claims for the Debtors, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code.

77.     The Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### iv.     Bankruptcy Code Section 1123(a)(2)

78.     Section 84.1 of the Plan specifies that Claims in Classes 1 through 50, 51B, 51E, 51G through 51I, 52 through 53, 56, 58 through 66 and 69 are impaired.  Section 84.2 of the Plan specifies that Claims in Classes 51A, 51C, 51D, 51F, 51J through 51L, 54, 55, 57, 67, and 68 are unimpaired.

79.     Since the Plan has been modified to exclude Class 54 from the list of impaired Classes and add it to the list of unimpaired Classes, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### v.     Bankruptcy Code Section 1123(a)(3)

80.     Articles V through LIV, sections 55.2, 55.5, 55.7 through 55.9, articles LVI through LVII, LX, LXII through LXX and LXXIII of the Plan identify the treatment of each Class of Claims impaired by the Plan.  Sections 62.2 and 62.3 have been revised to remove any reference to Eminent Domain Claims from the category of CW General Unsecured Claims and treatment thereunder.

81.     The Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

vi. **Bankruptcy Code Section 1123(a)(4)**

82.     Articles V through LXXIII of the Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim. (Jaresko Decl. ¶ 65.)

83.     Mr. Hein objects to the payment of certain costs and fees to some, but not all bondholders, arguing that such payments render the treatment of the bondholders' respective claims different, violating section 1123(a)(4) of the Bankruptcy Code (Hein Obj. at 17). Consummation Costs, Restriction Fees, or Retail Support Fees are being paid to certain parties pursuant to the Plan and in accordance with the plan support agreements negotiated by the Oversight Board.  (See Zelin Decl. ¶¶ 80, 84, 85; Debtors Exs. 16, 17.)  Hein's objection is unfounded because these costs are not awarded on account of the creditors' Claims but, rather, as consideration for the creditors' actions in facilitating the settlements embodied in the Plan.  (See Nov. 10, 2021, Hr'g Tr. 63:24-64:5, 72:23-73:6; Zelin Decl. ¶ 78; Jaresko Decl. ¶ 66.) Commitments to pay Consummation Costs and Restriction Fees were essential to incentivize parties to engage in continued negotiations over an extended period of time, and to incentivize parties to the plan support agreements to support confirmation of the Plan.  (Zelin Decl. ¶ 91.) Without such fees, building consensus and encouraging parties to engage in negotiations and ultimately document their agreements would have been significantly more difficult, and Plan confirmation would have been less likely or substantially prolonged.  (Id. ¶¶ 91-92.)  The Oversight Board has determined that it is fair and reasonable for the PSA Creditors to be paid Consummation Costs as consideration for their efforts in assisting in the formulation of the Plan that has garnered significant creditor support, and to compensate the PSA Creditors for fees and

expenses incurred in connection with the negotiation and execution of the GO/PBA PSA and

HTA/CCDA PSA. (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 80, 84, 88, 91-93; Debtors Exs. 16, 17.)

During the lengthy and complex negotiation process led by the Mediation Team, PSA Creditors

agreed to various conditions and covenants set forth in plan support agreements, including,

among other things, a pledge to support the Plan, the imposition of restrictions on the transfer of

their bonds, and a waiver of their right to seek reimbursement of expenses through other means.

(Zelin Decl. ¶ 93, Debtors Exs. 16, 17.) The Consummation Costs are not paid on account of

creditors' Claims. (See Jaresko Decl. ¶ 66.) Rather, the Consummation Costs are paid to

reimburse expenses incurred in negotiating plan support agreements that enabled the Plan to

move forward. (See Nov. 10, 2021, Hr'g Tr. 63:24-64:5; Zelin Decl. ¶¶ 80, 84, 88, 92.) Thus,

the Oversight Board has determined, and this Court finds that, the 1.5% Consummation Cost

expense is reasonable. (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 91-93; Nov. 10, 2021, Hr'g Tr.

91:17-25.)

       84. Additionally, in exchange for agreeing to support the Plan and tender or "lock

up," as applicable, the parties' bonds in accordance with each of the GO/PBA PSA and

HTA/CCDA PSA, it is fair and reasonable to make PSA Restriction Fees available to holders of

bonds issued by such entities. (Zelin Decl. ¶¶ 80, 84, 85, 89, 91-93; Jaresko Decl. ¶¶ 127, 178.)

Similarly, in exchange for executing the ERS Stipulation and agreeing to all of its terms and

conditions, including agreeing to support the Plan and "lock up" their ERS Bonds in connection

with the ERS Stipulation, it is fair and reasonable to make an ERS Restriction Fee available to

each ERS bondholder party to the ERS Stipulation. (Jaresko Decl. ¶ 216; Zelin Decl. ¶¶ 83, 91-

93; Debtors Ex. 19.)

85.     As a product of the negotiations culminating in the GO/PBA PSA, a similar Retail

Support Fee (i.e., a form of "restriction fee") will be available to Retail Investors who did not

tender and exchange their bonds to join the GO/PBA PSA.  (Zelin Decl. ¶¶ 81, 82; Debtors Ex.

16.)  The Oversight Board determined that providing Retail Investors an opportunity to receive

similar payments is fair and reasonable, and balances the interests of various creditor

constituencies.  (Jaresko Decl. ¶¶ 128, 216.)  Moreover, the Oversight Board has agreed to

provide bondholders with an additional opportunity to certify that they are Retail Investors and

receive their Pro Rata Share of the GO/PBA Restriction Fee Percentage.  (See Nov. 22, 2021,

Hr'g Tr. 44:1-45:4.)  The Retail Support Fee payments are reasonable and appropriate, and will

not be paid on account of Claims.

86.     The provisions for payment of Consummation Costs, Restriction Fees, and Retail

Support Fees are critical components of the plan support agreements that made development of

the Plan possible.  (See Jaresko Decl. ¶ 66.)  The payment of Consummation Costs, Restriction

Fees, and Retail Support Fees to certain parties does not violate section 1123(a)(4) of the

Bankruptcy Code, which mandates that "a plan shall . . . provide the same treatment for each

claim or interest of a particular class . . . ." 11 U.S.C.A. § 1123(a)(4) (Westlaw through P.L. 117-

80).  While it is true that all claims must be treated equally, the same is not true for all claimants.

See 7 Collier on Bankruptcy ¶ 1123.01 (16th ed. 2021) ("The equality addressed by section

1123(a)(4) extends only to the treatment of members of the same class of claims and interests,

and not to the plan's overall treatment of the creditors holding such claims or interests . . . .

Creditors should not confuse 'equal treatment of claims with equal treatment of claimants.'");

see also Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody

Energy Corp.), 582 B.R. 771, 781 (E.D. Mo. 2017) (same); In re Adelphia Commc'ns Corp., 368

B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) ("[C]ourts have held that the statute does not require

identical treatment for all class members in all respects under a plan, and that the requirements of

section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in

a specific class—not the treatment that members of the class may separately receive under a plan

on account of the class members' other rights or contributions.") (emphasis in original).

Accordingly, the payment of these fees is consistent with section 1123(a)(4) of the Bankruptcy

Code and the Hein Objection and the Samodovitz Objection on this ground are overruled.[23]

### vii. Bankruptcy Code Section 1123(a)(5)

87.     Various provisions of the Plan provide adequate and proper means for its

implementation:

- Article III provides for the payment of Administrative Expense Claims required to be paid on the Effective Date;

- Section 74.1 provides for the issuance and distribution of the New GO Bonds;

- Section 74.2 provides for the issuance and distribution of the CVIs;

- Section 74.5 ensures the feasibility of the Plan by providing for the adoption and maintenance of a debt management policy "designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated";

- Section 76.1 provides, subject to Sections 76.5, 76.7, and 76.10 of the Plan, that "all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the

---

[23]     Mr. Hein and Mr. Samodovitz further contend that Retail Investor bondholders should also be entitled to the 1.5% Consummation Cost in addition to a Retail Support Fee. While Mr. Hein and Mr. Samodovitz assert that they should be accorded a larger payment under the plan support agreements, they do not argue that their Claims have been treated differently (or impaired) as a result of the payment of a Consummation Cost to certain PSA creditors, and the Court finds that there is no such prohibited differential treatment by reason of the payment of Consummation Costs.  Rather, as explained above, Consummation Costs are not awarded on account of the individual creditors' Claims. (Zelin Decl. ¶ 78; Jaresko Decl. ¶ 66.)   As noted above, section 1123(a)(4) of the Bankruptcy Code does not require identical treatment of all claimants.

Effective Date, shall be rejected by the Debtors as of the Effective Date, except for any Executory Contract or Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Government of the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party) . . . .";

- Article LXXVII provides for distributions to be made to holders of all Allowed Claims under the Plan;

- Article LXXVIII provides for the Avoidance Actions Trust Assets to vest in the Avoidance Actions Trust, to be administered by the Avoidance Actions Trustee, and provides for the semi-annual distribution of liquidated Avoidance Actions Trust Assets to the beneficiaries thereof;

- Section 81.2 vests in the Disbursing Agent, among other things, the power and authority to make distributions contemplated by the Plan;

- Article LXXXII provides for the Debtors to reconcile, and to the extent ultimately allowed, pay, any and all Disputed Claims;

- Article LXXXIII provides for the funding and administration of the Pension Reserve Trust under the Plan;

- Article LXXXVIII provides that, "[o]n the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule";

- Section 92.1 provides for the re-vesting of assets: "Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order)";

- Articles II and LXIX provide for the sale of all ERS assets to the Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private Equity Portfolio; and

- Articles VI through XV provide for approximately $1.1 billion to be paid by the Commonwealth to holders of PBA Bond Claims in satisfaction of their claims.

(See Jaresko Decl. ¶ 67; Shah Decl. ¶ 59; see generally Plan.)

88.     The Plan Supplement contains, among other things, the forms of (a) the New GO Bond Trust Agreement, (b) the CVI Trust Agreement, (c) the Avoidance Actions Trust Agreement, (d) the ERS Trust Agreement, (e) the Schedule of Executory Contracts and Unexpired Leases to be Assumed, (f) the Supplemental Ambac Election Notice, (g) the Assured Custodial Trust Documents, (h) the FGIC Custodial Trust Agreement, (i) Act 53-2021, and (j) the Pension Reserve Trust Guidelines (each as defined in the Plan Supplement).  (See generally Plan Sup.)  The Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.

89.     The Confirmation Order further provides adequate means for the Plan's implementation including, but not limited to, paragraph 62 thereof which provides: "Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living

adjustments for government employees; <u>provided</u>, <u>however</u>, that the Governor and Legislature,

subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from

this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes,

(iii) the reasons why the requested changes will not create a risk of the financial distress caused

by the Commonwealth's prior defined benefit plans, under which the Commonwealth and other

governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the

means of funding the requested changes and reasons why there is little risk of such funding not

being carried out, (v) the reasons why the requested changes will not create a material risk of

defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why

the defined contribution plans are insufficient and defined benefit plans are both prudent and

required; and, <u>provided</u>, <u>however</u>, that, prior to the termination of the Oversight Board, the

Oversight Board shall not reduce any defined benefit pension payment or obligation to current or

future retirees from the benefits provided by the Plan."  (Confirmation Ord. ¶ 62.)  This

provision is appropriate and necessary for the implementation and feasibility of the Plan.[24]

---

[24]     Section 1142(b) of the Bankruptcy Code provides that the "court may direct the debtor
and any other necessary party to execute or deliver or to join in the execution or delivery
of any instrument required to effect a transfer of property dealt with by a confirmed plan,
and to perform any other act, including the satisfaction of any lien, that is necessary for
the consummation of the plan."  11 U.S.C. § 1142(b); <u>see</u> In re Riverside Nursing Home,
137 B.R. 134, 138 (Bankr. S.D.N.Y. 1992) ("Subsection (b) of § 1142 expressly
authorizes the court to direct a recalcitrant debtor or other party to perform acts necessary
to consummate the plan. . . .  [A] court may direct a confirmed debtor to retain
professional management, order payments to creditors from specific accounts and direct
that funds be held so as to implement the plan."); <u>In re Coral Air, Inc.</u>, 21 V.I. 7, 12
(D.V.I. 1984) (noting that section 1142(b) permits a court "to enter appropriate orders to
enforce the intent and specific provisions of the plan").  The Debtors have proffered
evidence that the Commonwealth's pension obligations have been and, absent
modification, would continue to be a significant source of debt for Puerto Rico (Jaresko
Decl. ¶ 15), and that provisions that conflict with the treatment of retirees put forth in the
Plan may undermine the goals of PROMESA and the feasibility of the Plan. (See Jaresko
Decl. ¶ 235; <u>see also</u> Jaresko Sup. Decl. ¶ 13 (discussing similar need to ensure

90.     The Court's conclusion under Bankruptcy Code section 1123(a)(5), made applicable by PROMESA section 301(a), that there are adequate means to implement the Plan rests on, among other things, Act 53 (Debtors Ex. 134), which authorizes the new debt to be issued pursuant to the Plan with the support of the full faith and credit of the Commonwealth, as long as the Plan does not include Monthly Benefit Modifications to pension payments.  (See generally id.)  The freezes in the accruals of pension benefits and the elimination of cost of living adjustments do not affect the authorization of the new debt.  The plain and unambiguous terms of the statute provide that the debt authorization in Act 53 is conditioned only on the Plan's removal of the Monthly Benefit Modification provision that was included in the proposed Seventh Amended Plan, and Act 53 does not require satisfaction of any other conditions to the authorization of new debt, such as removal of Plan provisions concerning (a) the elimination of cost of living adjustments and/or (b) the freeze or termination of accrual of defined benefits

---

consistency between treatment of retirees in Plan with respect to the Freeze and COLAs to protect Plan's feasibility).)  The record adequately demonstrates that the "freeze" of certain defined benefit obligations is essential to the Plan's feasibility, and the prohibition of the re-creation or enhancement of existing defined benefit plans is therefore a necessary and appropriate means to ensure the viability of the Plan and implement the discharge of the Commonwealth's prepetition pension obligations.  (See Malhotra Sup. Decl. ¶¶ 16-21.)

Although early versions of the Plan and proposed confirmation order did not include the provision restricting the re-creation or enhancement of existing defined benefit plans (the "DB Increase Restriction"), parties in interest have been given adequate notice of the relief sought with respect to pension programs, including Plan provisions affecting future rights under existing pension plans (in particular, the defined benefit "freeze" and the restriction on cost of living adjustments), and of this request for a restriction on the government's power to restore defined benefit arrangements.  The DB Increase Restriction is a restriction on the exercise of governmental powers, not an impairment of existing vested rights held by any person.  Accordingly, the notice provided is sufficient under the circumstances.  The inclusion of the provision in the proposed confirmation order thus will not violate the due process rights of retirement plan participants who did not receive individualized notice of the Debtors' intention to request that the provision be included in the Plan and the Confirmation Order.

under TRS or JRS from and after the Effective Date.[25]   The Plan cancels and eliminates the

Monthly Benefit Modification previously included in the proposed Seventh Amended Plan,

thereby satisfying the condition in Act 53 for authorization of the new debt to be issued pursuant

to the Plan.  (See, e.g., Plan § 55.7(a).)  Accordingly, Act 53 provides adequate means for

implementation of the Plan.  In this connection, the Court also concludes that PROMESA's

preemption provisions and Title III's debt adjustment and plan confirmation provisions are

sufficient to enable the Commonwealth to implement the defined benefit and COLA freeze

---

[25]   Courts "interpret a Puerto Rico statute according to its plain meaning." Santiago-Ramos
v. Centennial P.R. Wireless Corp., 217 F.3d 46, 59 (1st Cir. 2000).  "We first determine
whether the statutory language is unambiguous.  In the absence of ambiguity, we
generally do not look beyond the plain meaning of the statutory language." Herman v.
Hector I. Nieves Transp., Inc., 244 F.3d 32, 34 (1st Cir. 2001) (citations omitted).  Here,
article 104 of Act 53 declares that it is the public policy of Puerto Rico "to protect the
accrued pensions of its public servants."   Article 104 provides that, "[t]herefore, with
regard to the accrued pensions of government employees, it is hereby provided as
follows: The Legislative Assembly authorizes the issuance of the General Obligation
Bonds and CVIs subject to the FOMB filing an amended Plan for confirmation by the
Title III Court that eliminates the Monthly Benefit Modification."  Article 605 of Act 53
further provides that "[t]he effectiveness of [Act 53] is conditioned to the FOMB filing an
amended Plan for confirmation by the Title III Court that eliminates the Monthly Benefit
Modification as defined in the Plan."  These operative provisions establish that the
conditions put in place by Act 53 concern the protection of accrued pension rights and, in
particular, the elimination of the Monthly Benefit Modification from the Plan.  No
language in Act 53 indicates a legislative intent to preclude the defined benefit accrual
"freeze" or the elimination of COLAs, each of which operates prospectively and does not
affect accrued pension rights.  Notwithstanding arguments to the contrary that were
raised in certain objections, Article 104's references to protecting "accrued pensions of
. . . public servants" and "the pensions of all of our retirees" confirm that Act 53's
conditions are met by a Plan that affects only the accrual of future pension benefits rather
than those already earned.  Article 605's references to "reductions to . . . pensions" and
"[z]ero cuts to pensions" arise in the context of a provision that expressly provides
"clarity" to prior provisions and does not establish additional conditions.  Like the
reference to "avoid[ing] any cut of pensions" in Article 603, those phrases are merely
restatements of the policy of protecting accrued pension rights announced in Article 104
of Act 53, and they are consistent with the sufficiency of a plan that eliminates a cut to
accrued current monthly pension payments and precludes further defined benefit accruals
and cost of living increases to those monthly benefits.

provisions of the Plan without further legislative action. The Court's Confirmation Order, which

provides detailed terms for the implementation of the defined benefit and COLA freeze aspects

of the Plan, approves the freezes, which are economic measures consistent with the fiscal plan

and within the scope of the Oversight Board's powers under PROMESA. The Plan and

Confirmation Order are enforceable against the Commonwealth, its officials and other interested

parties, and any Commonwealth law provisions contrary to their terms are preempted.

91. The Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.[26]

### viii.   Bankruptcy Code Section 1123(b)(1)

92. Article LXXXIV of the Plan identifies which Classes of Claims are impaired and which Classes of Claims are left unimpaired. Article LXXXIV has been modified to reflect that Class 54 is unimpaired rather than impaired.

93. The Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### ix.   Bankruptcy Code Section 1123(b)(2)

94. Subject to section 76.10 of the Plan, section 76.1 of the Plan provides that, as of the Effective Date, all Executory Contracts and Unexpired Leases to which any Debtor is a party are rejected, "except for any Executory Contract or Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective

---

[26]   The Asociación de Maestros Puerto Rico and the Asociación de Maestros de Puerto Rico-Local Sindical (together, "AMPR") contend that the accrual of post-Effective Date benefits and cost of living adjustments cannot be preempted by the Plan or rejected by the Debtors. AMPR does not, however, dispute that the Supreme Court of Puerto Rico has characterized such obligations as contractual in nature. (See, e.g., AMPR Obj. ¶¶ 2, 21 (citing Asociación de Maestros de P.R. v. Sistema de Retiro para Maestros de P.R., 190 DPR 854 (P.R. 2014)).) Such rights are therefore ultimately subject to impairment and discharge like other general unsecured obligations.

Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to

the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto

Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto

Rico pursuant to 2 L.P.R.A. § 97 and regulations promulgated pursuant thereto, (e) that has been

approved by the Oversight Board or authorized by the Title III Court unless specifically

designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of

its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive

agreement between the Commonwealth of Puerto Rico and rum producers with respect to rum

excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico

agencies, departments, municipalities, public corporations, or instrumentalities (other than leases

to which PBA is a party); provided, however, that the Debtors reserve the right to amend, on or

prior to the Effective Date, such schedules to delete any Executory Contract and Unexpired

Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event

such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be,

either rejected, assumed, or assumed and assigned as of the Effective Date."  (Plan § 76.1; see

also Plan Sup. Ex. E.)

     95.     The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

     **x.**     **Bankruptcy Code Section 1123(b)(3)(A)**

     96.     The Plan incorporates, among other things, the settlements and compromises set

forth in the AFSCME Plan Support Agreement (Debtors Ex. 21), the GO/PBA Plan Support

Agreement (Debtors Ex. 16), the HTA/CCDA Plan Support Agreement (Debtors Ex. 17), the

PRIFA Plan Support Agreement (Debtors Ex. 18), the Retiree Committee Plan Support

Agreement (Debtors Ex. 20), the Committee Agreement (Debtors Ex. 23), the ERS Stipulation

(Debtors Ex. 19), the PRIFA BANs Stipulation (Debtors Ex. 22), and the *Stipulation in Connection with DRA Related Disputes* (Docket Entry No. 19100 Ex. A) (Debtors Ex. 146). Further, the Plan sets forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, including the disputes: (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, MBA, and PRIFA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the

CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs

Litigation.  (Jaresko Decl. ¶¶ 71, 114-87.)  The Plan also incorporates the terms of a global

settlement and compromise of all pending disputes involving the DRA Parties.  (See Docket

Entry No. 19100, ¶¶ 9-12.)  As explained in the paragraphs that follow, such settlements and

compromises are in the best interests of the Debtors and their creditors, and within the range of

reasonableness.  (Murray Decl. Ex. A ¶¶ 119-36; Zelin Decl. ¶¶ 13, 24, 29, 36, 43; Jaresko Decl.

¶¶ 201-16; Skeel Decl. ¶¶ 32-46.)

97.     Each of the plan support agreements was reached following months of

negotiations directed by the Mediation Team and/or other informal discussions that included

party representatives, legal and financial advisors, and involved vigorous debate and discussion

on both sides.  (Zelin Decl. ¶¶ 18-20, 21-22, 26-28, 32-33, 38, 40-41; Jaresko Decl. ¶¶ 202-16.)

Those negotiations were conducted at arms' length and in good faith.  (Id.; Skeel Decl. ¶ 33;

Jaresko Decl. ¶ 202.)  The litigation resolved by the plan support agreements involves

extraordinarily complex, high-stake disputes and, because these are the first Title III cases

litigated under PROMESA, novel legal issues.  Collectively, billions of dollars were at stake.

(Jaresko Decl. ¶ 203.)  The consequence of the GO Bondholders prevailing on their priority

argument, or the HTA, PRIFA, or CCDA bondholders prevailing on their property interest

contentions, would have inflicted grave harm on the Commonwealth and its residents because

the Commonwealth, in either situation, would have lost control of billions of dollars of revenues

needed to sustain the Commonwealth.  This would have prevented the Oversight Board from

developing fiscal plans and budgets necessary to carry out its statutory mission.  A small risk of a

negative and grave outcome was imprudent to undertake once settlement was possible on the

terms in the Plan.  (Skeel Decl. ¶ 34; Jaresko Decl. ¶¶ 203-13.)  The settlements embodied in the

Plan also avoid the uncertainty, delay, and significant expense that would result from continued litigation.  (Skeel Decl. ¶ 44; Jaresko Decl. ¶ 214.)

98.    The Plan is the result of extensive arms' length negotiations among the Government Parties and significant creditor constituencies, including the PSA Creditors, each of which was represented by sophisticated counsel, and the compromises and settlements among the Government Parties and various PSA Creditors form the very foundation of the Plan.  In the absence of such compromises and settlements, the Debtors' emergence from Title III would likely be significantly delayed by further litigation and burdened by additional expense, which could impair the Debtors' ability to successfully adjust their debts, thereby prejudicing recovery for all creditors and raising further uncertainties regarding the Debtors' financial condition.  (See Jaresko Decl. ¶¶ 81-82, 201-04, 214-215; Skeel Decl. ¶¶ 43-46.)

99.    Each of the compromises and settlements incorporated into the Plan (a) is made in good faith, furthers the policies and purposes of PROMESA, and is fair, equitable, and reasonable; (b) is in the best interests of the Debtors, their creditors, and all other affected Persons with respect to the Claims, Causes of Action, and other matters resolved by such compromises and settlements; (c) is within the range of reasonable results if the issues were litigated; (d) falls above the lowest point in the range of reasonableness; and (e) meets the standards for approval under sections 105(a) and 1123(b) of the Bankruptcy Code, Bankruptcy Rule 9019(a), and other applicable law.  Further, the Plan will fairly and consensually resolve numerous pending adversary proceedings and appeals, each of which raises difficult and complex issues.  The Plan thus incorporates a complex series of compromises and settlements that resolve the most significant potential obstacles to confirmation of a plan of adjustment.  (See Skeel Decl. ¶¶ 33-34; Jaresko Decl. ¶¶ 201-05.)  The settlements resolve billions of dollars of

claims against the Debtors.  (Skeel Decl. ¶ 46.)  Each of the settlements is consistent with what would be expected as a result of negotiations in a complex debt restructuring and is reasonable. In addition, the ability to achieve consensus from at least 15 major parties is evidence the settlements are reasonable.  (Murray Decl. Ex. A ¶¶ 115-37; Zelin Decl. ¶¶ 24, 29, 36, 43.)  For these reasons, the negotiated settlements provide an appropriate and reasonable basis for the adjustment of all affected Claims, including those of dissenting Creditors in the accepting Classes, as well as claims and interests belonging to the Debtors.

100.    Accordingly, the Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

### xi.    Bankruptcy Code Section 1123(b)(3)(B)

101.    Article LXXVIII of the Plan provides for, among other things, the transfer of the Avoidance Actions to the Avoidance Actions Trust.  Section 79.1 of the Plan provides: "Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court."  (Plan § 79.1.)

102.    Further, Section 82.1(a) of the Plan states: "[e]xcept with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses

and counterclaims shall be litigated to Final Order; provided, however, that Reorganized

Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall have the

authority to file, settle, compromise, or withdraw any objections to Claims, without approval of

the Title III Court." For the avoidance of doubt, the foregoing is subject to the rights of the two

(2) Creditors' Committee appointees to the Avoidance Action Trust Board pursuant to section

82.1(b) of the Plan. (Plan § 82.1(a).)

103.    The Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

**xii.    Bankruptcy Code Section 1123(b)(4)**

104.    Article LXIX of the Plan provides for the sale of all ERS assets to the

Commonwealth in exchange for $373 million in cash and the option to purchase the ERS Private

Equity Portfolio, subject to certain conditions. (Jaresko Decl. ¶ 76.) Specifically, section 69.2 of

the Plan provides that the Commonwealth, up to and including April 10, 2023, "shall have the

option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price . . . . In the

event that the Commonwealth declines to exercise the option or fails to provide notice of its

exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond

Claims shall have the option to exercise the Bondholder Election and purchase all of the interests

in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse

the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity

Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant

to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by

providing written notice thereof to the Commonwealth on or prior to April 15, 2023." However,

"[i]n the event that neither the Commonwealth Election nor the Bondholder Election shall have

been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity

Portfolio for the ERS Portfolio Price . . . ."  Pursuant to section 69.1 of the Plan, in either

scenario, the proceeds of the purchase of the ERS Private Equity Portfolio, along with the $373

million in cash, shall be distributed to holders of Allowed ERS Bond Claims.  (Plan § 69.1.)

105.    The Plan is consistent with section 1123(b)(4) of the Bankruptcy Code.

**xiii.    Bankruptcy Code Section 1123(b)(5)**

106.    Articles V through LIV, sections 55.2, 55.5, 55.7 through 55.9, articles LVI

through LVII, LX, LXII through LXX, and LXXIII of the Plan modify the rights of holders of

Claims in the impaired Classes.  Sections 55.1, 55.3, 55.4, 55.6, 55.10 through 55.12, articles

LVIII through LIX, LXI, LXXI, and LXXII of the Plan leave the rights of holders of unimpaired

Claims unaffected.  Sections 62.2 and 62.3 have been revised to remove any reference to

Eminent Domain Claims from the category of CW General Unsecured Claims and treatment

thereunder.

107.    The Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

**xiv.    Bankruptcy Code Section 1123(b)(6)**

108.    Article XCII of the Plan provides for, among other things, (a) certain releases,

injunctions, and exculpations described below in paragraphs 233–242 and (b) an exemption from

registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of New

GO Bonds and CVIs.  (Jaresko Decl. ¶ 78; Zelin Decl. ¶¶ 94, 96, 97, 99, 107-10.)

109.    The Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

**xv.    Bankruptcy Code Section 1123(d)**

110.    Section 76.4 of the Plan provides for the payment of cure amounts required to be

paid to the counterparties of Executory Contracts and Unexpired Leases assumed, or assumed

and assigned, pursuant to the Plan.  All cure amounts will be determined in accordance with the

underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures

established by the Plan. (Jaresko Decl. ¶ 79.) On November 23, 2021, the Oversight Board filed

and caused to be served the *Notice of Executory Contracts and Unexpired Leases to be Assumed*

*Pursuant to Title III Plan of Adjustment* (Docket Entry No. 19353), (i) setting forth the cure

amounts for each assumed Executory Contract and Unexpired Lease based on a review of the

Debtors' books and records, and (ii) establishing a deadline for parties to object to the proposed

cure amounts for an Executory Contract or Unexpired Lease to which they are a party or to the

assumption of such Executory Contract or Unexpired Lease. Within ten (10) Business Days of

entry of a Final Order setting forth the cure amount as to each Executory Contract or Unexpired

Lease to be assumed or assumed and assigned, the Debtors or the Reorganized Debtors, as the

case may be, shall pay or otherwise satisfy such cure amount.

111. The Plan is consistent with section 1123(d) of the Bankruptcy Code.

**xvi.    Bankruptcy Code Section 1129(a)(2)**

112. The Debtors have (i) complied with provisions of the Bankruptcy Code and

PROMESA applicable to confirmation of the Plan, except as otherwise provided or permitted by

orders of this Court, and (ii) complied with the applicable provisions of the Bankruptcy Code,

PROMESA, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in

transmitting the Disclosure Statement, the Plan, the Ballots, the Election Notices, and related

documents, and in soliciting and tabulating votes on the Plan.

113. The Oversight Board, with the assistance of its professionals, and in coordination

with AAFAF, expended significant time and effort preparing the Disclosure Statement (Debtors

Ex. 2), and sought and received input and comment thereon from other parties in interest. This

Court approved the Disclosure Statement as containing adequate information and meeting the

requirements of sections 1125 and 1126 of the Bankruptcy Code. (Jaresko Decl. ¶ 80.) The

Debtors have properly solicited and tabulated votes on the Plan. (Jaresko Decl ¶ 80; see

generally Pullo Decl.; see generally Pullo Sup. Decl.)

114.    The Oversight Board, as proponent of the Plan, is the duly-appointed

representative of the Debtors in their Title III Cases as provided pursuant to PROMESA and has

acted in accordance with applicable law in proposing the Plan.

115.    The Debtors have complied with section 1129(a)(2) of the Bankruptcy Code.

**xvii.    Bankruptcy Code Section 1129(a)(3)**

116.    The Plan was proposed in good faith with the legitimate purpose to provide a

means for the Debtors to achieve fiscal responsibility and access to capital markets, consistent

with the purposes of PROMESA. (Jaresko Decl. ¶ 81.) In determining that the Plan has been

proposed in good faith, the Court has examined the totality of the circumstances surrounding the

filing of the Title III Cases, the Plan itself, the lengthy process leading to the Plan's formulation

(including the compromises, settlements, and releases incorporated therein), and the process

associated with the Plan's prosecution. The Debtors' good faith is evident from the facts and

records of the Title III Cases, the Disclosure Statement and the hearing thereon, and the record of

the Confirmation Hearing and other proceedings held in the Title III Cases, including related

adversary proceedings. The Plan (including the settlements and compromises contained therein)

is the result of extensive arm's length negotiations among the parties, including through

mediation led by former Chief Bankruptcy Judge Barbara Houser.

117.    The Oversight Board has worked to develop consensus with creditors and to

evaluate the Commonwealth's and its instrumentalities' current and future financial

circumstances. These circumstances have been subject to constant change as the Oversight

Board, the Commonwealth, creditors, and the people of Puerto Rico have fought to address the Island's needs and develop a path to fiscal responsibility in the midst of multiple major hurricanes, earthquakes, and other natural disasters, as well as the impact of the global COVID-19 pandemic. (Jaresko Decl. ¶ 82.) The Plan and Disclosure Statement represent the culmination of those efforts and the substantial input of each key stakeholder.

118. The Plan (including all other agreements, documents, and instruments necessary to effectuate the Plan) achieves a rational adjustment of the Debtors' debts, and properly distributes value to creditors, including through the implementation of (a) parties' elections with respect to distributions and/or (b) the settlements pursuant to the Plan. The Plan was proposed with the legitimate and honest purpose of implementing the settlements and compromises of numerous risky and costly disputes, while avoiding protracted litigation that could delay distributions to creditors. (Jaresko Decl. ¶ 83.)

119. The Plan complies with section 1129(a)(3) of the Bankruptcy Code.

**xviii. Bankruptcy Code Section 1129(a)(6)**

120. The Plan does not provide for any rate changes by the Debtors and, accordingly, section 1129(a)(6) of the Bankruptcy Code does not apply.

**xix. Bankruptcy Code Section 1129(a)(8)**

121. Pursuant to the Disclosure Statement Order, the Title III Court approved the Disclosure Statement (Debtors Ex. 2) and found, among other things, that the Disclosure Statement contained "adequate information" within the meaning of section 1125 of the Bankruptcy Code and directed the Debtors to solicit acceptances and rejections of the Plan, as well as certain elections with respect thereto. (Disclosure Statement Ord. ¶¶ B, 7-19.) Prior to

the transmission of the Disclosure Statement, the Debtors did not solicit acceptances of the Plan

from any holders of Claims.[27]

122.    The Solicitation Packages were served in compliance with the Bankruptcy Code,

Bankruptcy Rules, Local Rules, and the Disclosure Statement Order.  (See generally Mailing

Affidavits.)

123.    The (a) service of the Solicitation Packages, (b) publication of the Confirmation

Hearing Notice, and (c) airing of radio advertisements regarding the approval of the Disclosure

Statement, Confirmation Hearing dates, Confirmation Objection Deadline, Voting Deadline, and

Election Deadline: (i) were adequate and sufficient under the circumstances of the Title III

Cases; (ii) provided adequate and sufficient notice of such deadlines, the method of voting or

making an election of distribution pursuant to the Plan; and the date, time, and location of the

Confirmation Hearing; (iii) provided holders of Claims with a reasonable period of time to make

an informed decision to accept or reject the Plan and to make any election provided thereunder;

(iv) were in compliance with PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local

Rules, the Disclosure Statement Order, and any other applicable orders and rulings of the Court;

and (v) provided due process to all parties in interest in the Title III Cases.  (See Service

Affidavits; see also generally Pullo Decl.)

124.    No other or further notice with respect to the Plan or the Confirmation Hearing is

required.  Based upon the foregoing, the Debtors and their successors, predecessors, control

persons, representatives, officers, directors, employees, agents, attorneys, financial advisors,

investment bankers, accountants, and other retained professionals, and any and all affiliates,

managers, employees, attorneys, and advisors of the foregoing (i) have acted in "good faith"

---

[27]    See infra ¶¶ 136-60, 147-49.

within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the

applicable provisions of PROMESA, the Bankruptcy Code, the Bankruptcy Rules, the Local

Rules, and any applicable nonbankruptcy law, rule, or regulation governing the adequacy of

disclosure in connection with all their activities relating to the solicitation of acceptances of the

Plan or elections thereunder and their participation in the activities described in section 1125 of

the Bankruptcy Code and (ii) shall be deemed to have participated in good faith and in

compliance with the applicable provisions of PROMESA and the Bankruptcy Code in the offer

and issuance of securities pursuant to the Plan and, therefore, are not, and on account of such

offer, issuance, and solicitation will not be, liable at any time for the violation of any applicable

law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or

elections thereunder or the offer and issuance of securities pursuant to the Plan, and are entitled

to the protections afforded by section 1125(e) of the Bankruptcy Code and, to the extent such

parties are listed therein, the exculpation provisions set forth in section 92.7 of the Plan.

125.    Votes to accept or reject the Plan were solicited and tabulated fairly, in good faith,

and in a manner consistent with the Disclosure Statement Order, PROMESA, the Bankruptcy

Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.  (See Pullo Decl. ¶ 8.)

126.    Certain Classes either voted to reject, or were deemed to reject, the Plan (the

"Rejecting Classes").  (See Pullo Decl. Ex. A; Pullo Sup. Decl. Ex. A.)[28]  Notwithstanding such

rejection and deemed rejection, the Plan (which has been revised in compliance with the Court's

---

[28]    Classes 51D, 51F, and 51L voted to reject the Plan, but subsequently were rendered
unimpaired and deemed to have accepted the Plan by the modifications made in the
Eighth Amended Plan.  Accordingly, such classes are not Rejecting Classes.  See Pullo
Sup. Decl. Ex. A.  Moreover, because holders of Allowed Claims under Class 54 are
entitled to payment in full under the Full-Payment Proposal, Allowed Eminent
Domain/Inverse Condemnation Claims are unimpaired.

order rejecting the unsecured claim treatment of Eminent Domain/Inverse Condemnation Claims

and directing the Debtors to incorporate their Full-Payment Proposal for the payment of Allowed

Eminent Domain/Inverse Condemnation Claims (see Docket Entry No. 19517 at 6-15, 17-18))

satisfies sections 1129(b)(2)(A) and 1129(b)(2)(B) of the Bankruptcy Code with respect to the

Rejecting Classes.

### xx. Bankruptcy Code Section 1129(a)(10)

127.    At least one Class of each of the Commonwealth creditors' impaired Claims, PBA

creditors' impaired Claims, and ERS creditors' impaired Claims has accepted the Plan.  (See

Pullo Decl. Ex. A.)  Accordingly, the Plan complies with section 1129(a)(10) of the Bankruptcy

Code.

### xxi. Bankruptcy Code Section 1129(b)(1)

128.    The Plan's treatment of Claims in the Rejecting Classes is proper because, as is

described further below, the Plan does not discriminate unfairly and is fair and equitable with

respect to such Claims.  (Jaresko Decl. ¶ 87.)  Unfair discrimination applies only to rejecting

classes of creditors, not individual creditors within a class.  See Bankruptcy Code §§ 1129(b)(1),

1123(a)(4).  "Thus, a disapproving creditor within a class that approves a plan cannot claim

unfair discrimination."  In re Nuverra Envtl. Sols., Inc., 834 F. App'x 729, 734-35 (3d Cir.

2021).  As a preliminary matter, the Court notes that no Rejecting Class has objected to

confirmation of the Plan on the basis that the Plan discriminates unfairly.

129.    The treatment afforded to retirees classified in Classes 51A through 51F, 51K,

and 51L, and active employees classified in Classes 51G through 51J pursuant to the Plan is fair

and equitable and does not discriminate unfairly against other creditors in the Title III cases.

Any cut to pensions of retired government employees would have a negative impact on Puerto

Rico's economy because retirees comprise a significant component of local demand in Puerto
Rico. (*Amended Declaration of Simon Johnson* (Docket Entry No. 19014-1) (the "Johnson
Decl.") ¶ 6; Retiree Committee Ex. A § 2.17.) Cutting pensions actually could destabilize Puerto
Rico's economic prospects, lead to greater out-migration, and make it harder for Puerto Rico to
obtain credit in the future, and the savings from pension cuts do not justify the damage those cuts
would cause to the economy. (Johnson Decl. ¶ 6; Retiree Committee Ex. A §§ 2.6; 2.13; 2.22.)
Roughly half of the retirees have pensions that place them below the federal poverty level of
$11,880 per year for a single person household. (Retiree Committee Ex. A § 4.5.) Further,
retirees have also already experienced substantial reductions in pensions, and, except for judges,
government retirees have not received cost of living increases since 2008. (Retiree Committee
Ex. A §§ 4.11; 4.12.) Many retirees, such as retired police, teachers, and judges, do not receive
federal social security payments. (Retiree Committee Ex. A §§ 4.3; 4.16.) The gross income of
the approximately 167,000 government retirees represents 6.4% of the total household
expenditures on the Island and 5.8% of Puerto Rico's gross national income. (Retiree Committee
Ex. A §§ 4.1, 4.4.)

130.     The macroeconomic impact of reducing the pensions of retirees on the overall
Puerto Rican economy is significant. (Retiree Committee Ex. A § 5.) Because each dollar that is
not spent by a retiree has a ripple effect throughout the economy, the loss of $1.00 of retiree
income impacts overall spending at a higher rate, known as the fiscal multiplier. (Retiree
Committee Ex. A § 5.2.) Applying the Oversight Board's fiscal multiplier, reducing the monthly
benefits would result in the loss of 1,600 jobs on the island and a 0.2% reduction in GNP in the
near term. (Retiree Committee Ex. A § 2.9.) A higher fiscal multiplier would indicate a greater
negative impact on the economy of a loss of 6,300 jobs on the island and a reduction in GNP of

0.6%.  (Retiree Committee Ex. A §§ 2.9, 5.)  Given Puerto Rico's high level of out-migration, including the increase in out-migration of retirees since 2016, pension cuts may force many more retirees to move to the states to be with family members if they can no longer support themselves living in Puerto Rico.  Increased out-migration will have a further negative impact on the economy as pension dollars are then spent outside of Puerto Rico.  (Retiree Committee Ex. A §§ 5.21-5.28.)

131.    The Plan, which eliminates any reductions in accrued pensions and certain other retiree benefits for retired and active employees and provides for the creation of the Pension Reserve Trust, is better than further pension and benefit cuts for Puerto Rico's economy and for other creditors and justifies the treatment that Claimants for retirement benefits are receiving pursuant to the Plan.  See, e.g., In re Creekstone Apartments Assocs., L.P., 168 B.R. 639, 644 (Bankr. M.D. Tenn. 1994) (disparate treatment between classes is not unfair if it "protect[s] a relationship with specific creditors that the debtor need[s] to reorganize successfully.").  The treatment of Classes 51A through 51L does not unfairly discriminate in favor of holders of Claims for retirement benefits and is fair and equitable.

132.    The Plan does not unfairly discriminate against holders of Claims in Class 58 (CW General Unsecured Claims), Class 66 (ERS General Unsecured Claims), or Class 13 (PBA General Unsecured Claims).  For the reasons set forth above in paragraphs 62–70, certain Classes of unsecured Claims have been separately classified to ensure that the Commonwealth is best able to provide critical government services to its residents, and that certain claimants are able to continue providing such services in an efficient, reliable, and sustainable manner.  For these reasons, it is important that certain Classes of unsecured Claims receive superior treatment to Claims in Classes 58, 66, and 13.  Further, for the reasons set forth above in paragraph 66,

separate classification and treatment of Claims in Class 54 (Eminent Domain/Inverse

Condemnation Claims) is necessary because such claimants assert Fifth Amendment rights, and

the Plan does not discriminate unfairly with respect to that Class. Separate classification and

treatment of such Claims is reasonable and justified by a governmental purpose, and does not

constitute unfair discrimination.

133.    Accordingly, the Plan complies with section 1129(b)(1) of the Bankruptcy Code.

**xxii.    Bankruptcy Code Section 1129(b)(2)**

134.    The Plan's treatment of Claims in the Rejecting Classes is proper because the

Plan provides all holders of Claims in the Rejecting Classes with what they can reasonably

expect to receive under the circumstances of the Title III Cases. Because there are no equity

holders in chapter 9 cases, the requirement under Bankruptcy Code section 1129(b)(2)(B)

(incorporated by PROMESA section 301(a)) that a plan be "fair and equitable" requires that,

where a debtor seeks nonconsensual confirmation of a plan over one or more rejecting classes,

no claim junior to any of the claims in the rejecting classes of the relevant debtor may receive

any property. Under the Plan, the Class holding Claims junior to the unsecured Rejecting

Classes (Section 510(b) Subordinated Claims) receives no property. The commencement of the

Title III Cases was precipitated by the Debtors' untenable debt burden, a severe cash shortage,

and the economic decline and out-migration eroding the Debtors' revenues. The creditor

recoveries in the Plan were calculated or negotiated to reasonably compensate holders of Claims

while enabling the Debtors to avoid a recurrence of these financial difficulties and to institute

necessary reforms to ensure the Debtors' fiscal responsibility and access to capital markets. (See

Jaresko Decl. ¶ 81; Murray Decl. Ex. A ¶¶ 20, 139.)

135. Class 54 is the only Rejecting Class of Claims characterized as secured in the Plan, and section 1129(b)(2)(A) is satisfied with respect to such Class. Consistent with these Findings of Fact and Conclusions of Law, holders of Claims in Class 54 will receive payment in full to the extent they are Allowed Claims. (Jaresko Decl. ¶ 88.)

136. Accordingly, the Plan complies with section 1129(b)(2) of the Bankruptcy Code with respect to Claims in the Rejecting Classes.

**B. PROMESA § 314(b)(2):** *The Plan Fully Complies with the Applicable Provisions of Title III of PROMESA.*

137. Except as otherwise provided for or permitted by orders of the Title III Court, the Oversight Board has complied with Section 1125(b) of the Bankruptcy Code and Section 314(b)(2) of PROMESA, including the solicitation and tabulation of votes consistent with the Disclosure Statement Order. (See generally Jaresko Decl. and Pullo Decl.)

138. The Disclosure Statement Order established the procedures for the solicitation of votes on the Plan. The Solicitation Agent complied with the procedures established in the Disclosure Statement Order. (Mailing Affidavits; Pullo Decl. ¶ 4.) Specifically, the Solicitation Agent determined which creditors were entitled to vote on the Plan by following the instructions in the Disclosure Statement Order, by Class, and by applying the Voting Record Dates set forth in the Disclosure Statement Order. The Solicitation Agent then coordinated the distribution of solicitation materials to holders of Claims entitled to vote. (Pullo Decl. ¶¶ 5-6.) The Solicitation Agent coordinated publication of the confirmation hearing notices as set forth in the Disclosure Statement Order. (Id. ¶ 7; see also Publication Affidavit.) The solicitation materials were properly distributed to the appropriate parties, including brokers and nominees. (See Mailing Affidavits.)

139.     The Solicitation Agent received, reviewed, determined the validity of, and

tabulated the Ballots submitted.  (Pullo Decl. ¶ 8.)  The Solicitation Agent also worked with the

Depository Trust Company ("DTC") to count votes from the Bond Classes tendered through

DTC's ATOP.  (Id. ¶ 9.)

**Plan Support Agreements**

140.     Section 1125(b) of the Bankruptcy Code requires that "[a]n acceptance or

rejection of a plan may not be solicited after the commencement of the case under this title from

a holder of a claim or interest with respect to such claim or interest, unless, at the time of or

before such solicitation, there is transmitted to such holder the plan or a summary of the plan,

and a written disclosure statement approved, after notice and a hearing, by the court as

containing adequate information."  11 U.S.C. § 1125(b).   Congress intended debtors and

creditors be afforded flexibility to resolve disputes, and where possible, reach a consensual

resolution of issues in contemplation of the development of a plan of adjustment.  See In re

Indianapolis Downs, LLC., 486 B.R. 286, 295 (Bankr. D. Del. 2013) ("[A] narrow construction

of 'solicitation' affords [] parties the opportunity to memorialize their agreements in a way that

allows a […] case to move forward.")

141.     Here, the Plan was made possible by the Debtors' extensive negotiations with

numerous claimholder constituencies and the Plan Support Agreements that resulted from the

negotiations.  (Jaresko Decl. ¶ 14.)  These agreements include the GO/PBA Plan Support

Agreement, ERS Stipulation, HTA/CCDA Plan Support Agreement, PRIFA Plan Support

Agreement, and agreement with the UCC.  (Zelin Decl. ¶ 13.)  The process of negotiation and

solicitation of assent to the plan support agreements prior to the approval and distribution of the

disclosure statement did not constitute improper solicitation of votes with respect to the Plan.

"An agreement to accept the Debtor's plan, made post-petition but before approval of the

disclosure statement, remained executory until [the creditor] actually filed its accepting ballot . . .

Neither the recitation in the disclosure statement, nor the parties' execution of the written

memorandum, constituted an acceptance of the plan as such." In re Heritage Org., L.L.C., 376

B.R. 783, 793 (Bankr. N.D. Tex. 2007).

### Debtors' "Notice to Holders of Uninsured Bonds" dated July 27, 2021

142.    On or about July 27, 2021, the Debtors published a Notice to Holders of

Uninsured Bonds[29] that provided an exchange opportunity to all beneficial owners of Uninsured

Bonds to become party to the amended plan support agreement.  Acceptance of the opportunity

would render the bondholder a party to the GO/PBA PSA, entitle the bondholder to a Restriction

Fee pursuant to the PSA, and constitute consent to the change of the CUSIP number assigned to

the existing bondholding.  (See Docket Entry No. 18761-8) (the "Exchange Offer") (Hein Ex.

FFF at 2.)[30]  The Exchange Offer was open to "all beneficial owners of Uninsured Bonds,

including retail beneficial holders."  (Id. at 4.)  Importantly, the bondholders' right to the PSA

Restriction Fee Claim "travels" with the Uninsured Bond.  (Id.)  Thus, "in order to separately

identify the Uninsured Bonds that fall into this category, the PSA provides for the assignment of

alternative identifying CUSIPs to track beneficial interests in Uninsured Bonds that become

---

[29]    The term "Uninsured Bonds" is designated the meaning provided in the Exchange Offer.

[30]    An "Amended Notice to Holders of Uninsured Bonds" was published on or about July
30, 2021 (Docket Entry No. 18761-9) (the "Amended Exchange Offer").  (Hein Ex.
GGG.)

subject to the PSA […].” (Id.; see also GO/PBA Plan Support Agreement § 2.2.) (Debtors Ex. 16.)

143.    Mr. Hein and Mr. Samodovitz argue that the Exchange Offer was an improper solicitation designed to procure votes in favor of the Plan.  (Hein Obj. at 23).  In response, the Debtors explain that the Exchange Offer provided a procedural mechanism for all uninsured bondholders to “deal with the tender and exchange [of bonds]” through the creation of alternative CUSIPS.  (Nov. 15, 2021, Hr’g. Tr. 140:1-2.)   Mr. Hein further argues that the August 13, 2021 participation deadline (the “Participation Deadline”) for retail bondholders to join to the PSA was unreasonable because the participation deadline only permitted 17 days to consider the offer (and review the accompanying material) before electing to participate. (Hein Obj. at 23.) However, the Exchange Offer did not require retail bondholders to take immediate action before the Participation Deadline to become entitled to a support fee.  All beneficial owners who tendered their Uninsured Bonds by the Participation Deadline were entitled to receive a PSA Restriction Fee.  (Hein Ex. FFF at 3.)  The Exchange Offer also disclosed that, after August 13, 2021, retail bondholders who did not tender their bonds by the Participation Deadline remain entitled to a Retail Support Fee (in the same amount as the PSA Restriction Fee), so long as their Class of retail bondholders approves the Plan and the retail bondholder certifies their retail investor status.  (Id. at 5.)  The ballots were not distributed by the Solicitation Agent until August 30, 2021, after the Participation Deadline had passed.  (Debtors Ex. 138.)  The Court finds that the Exchange Offer was not a solicitation of votes and that the Participation Deadline was reasonable.  The Debtors have proffered a good faith basis for the development of a procedural mechanism to track all retail bondholders’ entitlement to the PSA Restriction Fee and Retail Support Fee.  Thus, the objections are overruled.

### Entitlement to the Retail Support Fee

144. The Plan provides "in the event that a Class of Retail Investors […] votes to accept the Plan, the members of such Class shall be entitled to receive their Pro Rata Share of such Class's allocable share of the aggregate Retail Support Fee […]." (Plan § 3.6.)  The Retail Support Fee will thus be available to each member of a class of Retail Investors that votes, as a class, to accept the Plan.  (Jaresko Decl. ¶ 128.)  Additionally, the Debtors represent that a retail bondholder who voted and certified his status as a retail investor would be entitled to receive the Retail Support Fee, so long as the class voted to accept the Plan, whether or not the bondholder voted in favor of the Plan.  (Nov. 15, 2021, Hr'g Tr. 139:9-15, 166:16-20.)

145. The Retail Support Fee was designed to deliver the same amount of fee consideration, as a percentage of claim amount held, to Retail Investors as to recipients of the GO/PBA Restriction Fee.  (Zelin Decl. ¶ 81.)  Thus, the Retail Support Fee was designed to achieve economic parity for Retail Investors vis-à-vis the recipients of the GO/PBA Restriction Fee without requiring Retail Investors to sign the GO/PBA PSA and agree to its terms and conditions, including the obligation to support the Plan and the "lock up" provisions.  (Id.)

146. Retail bondholders were provided the option to either (i) participate in the Exchange Offer with all other bondholders, thereby receiving the same PSA fee as other Restriction Fee parties, or (ii) as originally contemplated, receive the Retail Support Fee if the creditor identifies as a retail investor and the retail class votes to accept the Plan.  (Id. ¶ 82.)

147. The Debtors have represented that "all retail investor classes voted to accept the Plan […], and all members of the retail classes shall receive the restriction fee." (Nov. 15, 2021, Hr'g. Tr. 142: 20-21; 23-24.)  The tabulation summary shows that the retail classes voted to accept the Plan.  (See Pullo Decl. Ex. A; see also Pullo Sup. Decl. Ex. A.)

**Voting on the Plan of Adjustment**

148.     Pursuant to the Disclosure Statement Order, the Debtors, or their Solicitation

Agent, distributed materials needed for voting on the Plan or making elections on distributions

thereunder (the "Solicitation Package") to bondholders in various voting classes.  (See

Disclosure Statement Ord. ¶¶ 9, 14, 32.)  The Court approved the procedures for voting to accept

or reject the Plan, including the use of DTC's ATOP process for bondholder votes, in the

Disclosure Statement Order.  (See id. at ¶¶ 9, 14, 32.)  The Solicitation Agent distributed the

Solicitation Package to appropriate parties, including brokers and nominees.  (See Mailing

Affidavits.) (See also Debtors Ex. 138.)

149.     Mr. Hein and Mr. Samodovitz argue that the complexity of the voting process

may have impaired retail bondholders' ability to cast timely ballots and/or certify themselves as

retail investors for purposes of establishing entitlement to a Retail Support Fee if a class voted to

accept the Plan.  (Nov. 15, 2021, Hr'g Tr. 149:1-14; id. at 159: 19-25.)  To vote to accept or

reject the Plan, GO/PBA PSA Creditors were required to instruct their nominee or broker to

tender their bonds utilizing ATOP before the voting deadline under the Disclosure Statement

Order.  (Disclosure Statement Ord. ¶ 32, Sched. 2.)  Mr. Hein and Mr. Samodovitz have not

proffered credible evidence that retail bondholders, as a whole, were unable to vote on the Plan.

Rather, the voting summary includes a tabulation of all votes cast in support of and opposition to

the Plan and indicates that retail bondholders from each retail class successfully voted.  (See

Pullo Decl. Ex. A; see also Pullo Sup. Decl. Ex. A.)  To the extent the objections are challenges

to the Disclosure Statement Order and the voting process outlined therein, the objections are

overruled.

150.     The Plan complies with PROMESA Section 314(b)(2).

C. **PROMESA § 314(b)(3):** *The Debtors Are Not Prohibited by Law from Taking any
Action Necessary to Carry Out the Plan.*

151.    The Plan contains no provisions which would require the Debtors to violate the

law, including Commonwealth law that is not preempted.

152.    Act 53, enacted on October 26, 2021, authorizes the issuance of CVIs and New

GO Bonds, consistent with the terms set forth in the Plan and the plan support agreements.

(Jaresko Decl. ¶ 92; Debtors Ex. 134.)  Act 53's effectiveness is conditioned only on the

elimination of the Monthly Benefit Modification (as defined in the Seventh Amended Plan) from

the Plan.  The Monthly Benefit Modification is not included in the Plan, and accordingly Act 53

is effective and the Commonwealth's issuance of the CVIs and New GO Bonds is consistent

with applicable Commonwealth law.  Furthermore, by reason of the Plan's provisions freezing

defined benefit accruals and future costs of living adjustments, upon the Plan's Effective Date,

PROMESA preempts Acts 91-2004 (establishing TRS) and 12-1954 (establishing JRS), each as

amended, providing for the future accrual of defined benefits and future cost of living

adjustments, to the extent set forth in **Exhibit A** hereto.  Absent preemption, the amount of

Commonwealth revenues that would need to be spent on TRS and JRS pension benefits in fiscal

year 2022 is $984 million.  (Malhotra Decl. ¶ 65.)  Absent preemption, these inconsistent statutes

would undermine the restructuring contemplated by the Plan.  (Jaresko Decl. ¶ 235.)

153.    Enabling legislation is not required to establish the freeze of defined benefits or

the elimination of COLAs.  Obligations arising from Commonwealth statutes, including statutes

providing employees the right to accrue pension or other retirement benefits, give rise to claims

which can be impaired and discharged pursuant to the Plan.  See 11 U.S.C. § 101(5)(A) (defining

claim as "right to payment, whether or not such right is . . . contingent, matured, [or]

unmatured"); Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35-36 (1st Cir. 2009) ("The

definition of claim . . . defines what is discharged by the proceeding.  In enacting this language,

Congress gave the term 'claim' the 'broadest available definition.'") (quoting <u>Johnson v. Home</u>

<u>State Bank</u>, 501 U.S. 78, 83 (1991)); <u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>, Case No. 17

BK-3283-LTS, 2021 WL 5024287, at *8-9 (D.P.R. Oct. 29, 2021).  The discharge of prepetition

obligations does not need to be approved pursuant to, or consistent with, Commonwealth law.

<u>See</u>, <u>e.g.</u>, *Order Confirming Debtor's Sixth Amended Plan of Adjustment of Debts Pursuant to*

*Chapter 9 of the Bankruptcy Code*, <u>In re City of Prichard</u>, No. 09-15000, at 7 (Bankr. S.D. Ala.

July 8, 2014) ("The Court . . . finds and concludes that the City's actions under the Plan are not

prohibited by law, and the treatment of the Classes who formerly had an interest in the City's

pension plan is lawful under the Bankruptcy Code."); <u>In re Sanitary & Improvement Dist. No. 7</u>,

98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("If a municipality were required to pay prepetition

bondholders the full amount of their claim with interest as contained on the face of the bonds and

the [municipality] had no ability to impair the bondholder claims over objection, the whole

purpose and structure of chapter 9 would be of little value. . . . To create a federal statute

[chapter 9 of the Bankruptcy Code] based upon the theory that federal intervention was

necessary to permit adjustment of a municipality's debts and then to prohibit the municipality

from adjusting such debts is not, in the point of view of this Court, a logical or necessary

result.").

154.    The Debtors have sufficiently demonstrated that express recognition of the

preemptive effect of section 4 of PROMESA is crucial to accomplishing the Plan's goals and

ensuring its feasibility.  However, as set forth in the Court's *Order Regarding Certain Aspects of*

*Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the*

*Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19517) (the "Clarification Order"), the

broad language of the preemption provisions of the Plan as previously proposed by the Debtors

were overly broad and vague. Accordingly, the Court memorializes its conclusions concerning

preemption here and, in light of the Debtors' modification of the preemption provisions, will

enter an order confirming the Plan.

155. Provisions of Commonwealth laws that are inconsistent with PROMESA are

preempted for the reasons, and to the extent, set forth in **Exhibit A** hereto.[31] Such preempted

provisions include, without limitation: (i) pursuant to section 4 of PROMESA, all laws, rules,

and regulations, to the extent they give rise to obligations of the Debtors discharged by the Plan

and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any

general or specific provisions of territory laws, rules, and regulations and (ii) laws enacted prior

to June 30, 2016, to the extent they provide for transfers or other appropriations after the

enactment of PROMESA, including transfers from the Commonwealth or one of its

instrumentalities to any agency or instrumentality, whether to enable such agency or

instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted to the

extent inconsistent with the Plan's discharge of the Debtors' obligations. Through modifications

to the proposed Plan and related documents, the Oversight Board previously requested judicial

---

[31] The Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc., (collectively, the "Teachers' Associations") contend that the scope of preemption set forth in the Plan is overly broad because certain sections and subsections of Act 106-2017 and Act 160-2013 govern all Commonwealth public retirement systems, not just TRS and JRS, and include provisions essential to the functioning of the government's retirement systems. (See Teachers' Associations Sup. Obj. ¶¶ 5-72.) Exhibit A, however, does not contemplate the preemption of the entirety of every statutory section or subsection set forth in the "Specific Provisions Preempted" column; rather, any such section or subsection is preempted only to the extent its operative provisions are both described in the "Specific Provisions Preempted" column and a basis for the preemption thereof is listed in the "Basis for Preemption" column.

acknowledgement that Act 80-2020, Act 81-2020, and Act 82-2020 are preempted by PROMESA. That request has been mooted by the Court's approval of the *Stipulation and Order Resolving Oversight Board Complaint Dated December 20, 2021 Concerning Acts 80-2020, 81-2020, and 82-2020 and Joint Resolution 33-2021* (Docket Entry No. 6 in Adv. Proc. No. 21-00119), pursuant to which the Puerto Rico Fiscal Agency and Financial Advisory Authority, the Office of Management and Budget, and the Honorable Pedro Pierluisi Urrutia, the Governor of the Commonwealth of Puerto Rico, resolved litigation concerning the validity of Acts 80-2020, 81-2020, and 82-2020 and Joint Resolution 33-2021 and agreed that they are significantly inconsistent with the relevant certified fiscal plan.[32]

156. Many of the preempted statutes would require the Commonwealth to use its revenues to repay its general obligation and guaranteed debt in full. The amount of debt service necessary for fiscal year 2022 would be $1.7 billion. (Malhotra Decl. ¶ 63.) These statutes are inconsistent with PROMESA to the extent they are inconsistent with the discharge of outstanding claims and the treatment provided for such claims by the Plan under Title III of

---

[32] Asociación Puertorriqueña de la Judicatura, Inc. and Asociación de Jubilados de la Judicatura de Puerto Rico object to the impairment of any obligations to the Judicial Retirement System and contend that any such impairment would be inconsistent with rights under the Puerto Rico Constitution and principles of separation of powers and judicial independence that are embedded in that document. However, PROMESA permits the impairment and discharge of prepetition debts where, as here, the requirements for confirmation of a plan of adjustment are satisfied. See 11 U.S.C. § 944(b). To the extent that Commonwealth law is inconsistent with such impairment and discharge, it is preempted by PROMESA. See Commonwealth of Mass. Div. of Employment and Training v. Bos. Reg'l Med. Ctr., Inc. (In re Bos. Reg'l Med. Ctr., Inc.), 291 F.3d 111, 126 (1st Cir. 2002) ("[T]o the extent that we were to read the Employment and Training Law to require that the Division receive administrative expense priority for a claim that the Bankruptcy Code would assign general unsecured status, the state law would then be inconsistent with federal law and so preempted. The application of the doctrine of preemption is often complex, but in such a case would be clear-cut." (citations omitted)); In re Sanitary & Imp. Dist., No. 7, 98 B.R. at 974.

PROMESA and would undermine the restructuring contemplated by the Plan and Puerto Rico's return to fiscal responsibility and access to capital markets. (Jaresko Decl. ¶¶ 230-33.) Further, certain preempted statutes require the appropriation of Commonwealth revenues and would require more than $3 billion in Commonwealth revenues to be transferred in fiscal year 2022. (Malhotra Decl. ¶ 64.) In addition, certain preempted statutes require the Commonwealth to provide pension and other benefits or payments to retirees who participated in the ERS, TRS, or JRS retirement systems at statutorily specified rates; the amount of Commonwealth revenues that would need to be spent on TRS and JRS benefits or payments in fiscal year 2022 pursuant to these statutes would be $984 million. (Malhotra Decl. ¶ 65.) Such statutes are inconsistent with PROMESA to the extent they are inconsistent with the discharge of claims and treatment provided for pension benefits and payments by the Plan under Title III of PROMESA and would undermine the restructuring contemplated by the Plan and the Plan's contemplated repayment of claims from such revenues. (Jaresko Decl. ¶ 234.) For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis for disallowance and discharge of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.[33]

---

[33]     Mr. Hein objects to the scope of the preemption provisions of the Plan and this analysis and contends that the statutes authorizing the bonds that he holds, which commit the full faith and credit of the Commonwealth to repayment of the bonds, cannot be preempted. His argument is contrary to the provisions of PROMESA, which permit the impairment and discharge of prepetition debts such as Mr. Hein's. To the extent that Commonwealth law requires the payment of such debts in full, it is inconsistent with the discharge of such debts and therefore subject to preemption. To the extent that Mr. Hein's objection is that other creditors are being treated favorably notwithstanding Commonwealth law that provides his claims with an entitlement to certain streams of revenues or priority treatment over other debts, such arguments are precluded by the acceptance of the Plan by each class of bonds, including the bondholder classes of which Mr. Hein is a member.

**Constitutional Challenges to the Plan**

157.    Several creditors, including Mr. Hein, object to the Plan on the grounds that it allegedly violates the Contracts Clause or the Takings Clause of the Constitution of the United States.  Having considered carefully the parties' submissions and arguments on these issues, the objections are overruled, with the exception of the objections concerning Eminent Domain/Inverse Condemnation Claims.  The objections concerning Eminent Domain/Inverse Condemnation Claims are sustained, and such Allowed Claims must be paid in accordance with Debtors' Full-Payment Proposal (as set forth in Plan §§ 58.1, 77.1(e)).

**Contracts Clause**

158.    The Plan contains no provision that would constitute or create a violation of the Contracts Clause of the Constitution of the United States.  The Contracts Clause provides that no state shall pass any law impairing the obligation of contracts.  U.S. Const. art. I, § 10, cl. 1. Although the Constitution prohibits a state or territory from impairing contractual obligations

---

The Bankruptcy Code's requirements that a plan "not discriminate unfairly, and [be] fair and equitable" are applicable only as "to each class of claims or interests that is impaired under, and has not accepted, the plan."  11 U.S.C. § 1129(b)(1); see 7 Collier on Bankruptcy ¶ 1129.03 (16th 2021) ("[S]ection 1129(b)(1) requires that the plan proponent prove, *as to the dissenting class*, that the plan is both fair and equitable and not unfairly discriminatory.") (emphasis added).  Those requirements of section 1129(b) are applied on a class-wide basis, not on a creditor-by-creditor basis, and "a disapproving creditor within a class that approves a plan [therefore] cannot claim unfair discrimination" or a lack of fair and equitable treatment.  In re Nuverra Envtl. Sols., Inc., 834 F. App'x 729, 735 (3d Cir. 2021), as amended (Feb. 2, 2021), cert. denied, No. 21-17, 2021 WL 4733333 (U.S. Oct. 12, 2021); In re W.R. Grace & Co., 475 B.R. 34, 175 (D. Del. 2012) ("It is a well-known legal rule in Chapter 11 reorganization litigation that '[u]nder § 1129(b), a finding that a plan is 'fair and equitable' is required only in the context of a cramdown.'") (quoting In re Dow Corning Corp., 244 B.R. 678, 693 (Bankr. E.D. Mich. 1999)), aff'd, 729 F.3d 332 (3d Cir. 2013).  Finally, to the extent that Mr. Hein contends that the Plan fails to meet the "best interests" test due to such treatment, the Court will address his argument in connection with its discussion below of section 314(b)(6) of PROMESA.

through legislative action, it imposes no such prohibition on Congress and, indeed, empowers

Congress to impair contractual obligations through article I, section 8 of the Constitution, which

provides that Congress shall have the power to establish uniform laws on the subject of

bankruptcies throughout the United States.  U.S. Const. art. I, § 8, cl. 4.  It has long been

recognized that one of the fundamental goals of bankruptcy law is to adjust the debtor-creditor

relationship, that is, to alter contract rights.  See Ass'n of Retired Emps. of Stockton v. City of

Stockton (In re City of Stockton), 478 B.R. 8, 14-15 (Bankr. E.D. Cal. 2012).  "While

bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of

parties whose contracts are impaired, that does not change the starring role of contract

impairment in bankruptcy."  Id. at 16.  Congress is, therefore, "'expressly vested with the power

of passing [bankruptcy] laws, and is not prohibited from passing laws impairing the obligation of

contracts. . . .'"  Id. at 15 (citing Sturges v. Crowninshield, 17 U.S. 122, 191 (1819)).  Further,

the Plan does not implicate the Contracts Clause because it is not a legislative action.  A federal

court's confirmation of a reorganization plan under federal law cannot violate the Contracts

Clause.  See Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 732 n.9 (1984)

(holding that the Contracts Clause does not apply to federal government actions).  It follows that

this Court may approve the Plan under PROMESA, a federal law enacted by Congress pursuant

to the Territories Clause of the Constitution that incorporates key bankruptcy concepts and

provisions,[34] with the express purpose of allowing Puerto Rico to achieve fiscal responsibility

and access to the capital markets through, inter alia, adjustment of its debts and those of its

instrumentalities, without violating the Contracts Clause.[35]

---

[34]    See ¶¶ 6, 35-36 supra.

[35]    To the extent the objection of the Asociación de Jubilados de la Judicatura de Puerto Rico
        (the "AJJPR") may construed as objecting to the Plan on the basis of the Contracts

159.    Mr. Hein has also failed to demonstrate that the fiscal plans constitute territorial laws subject to the restrictions of the Contracts Clause, and his Contracts Clause objection with respect to the fiscal plans is therefore overruled.  To the extent that Mr. Hein argues that the Commonwealth's Act 53 (the "New Bond Legislation") authorizing the issuance of new bonds and contemplating the cancellation of currently outstanding bonds is within the scope of the Contracts Clause, the Court concludes, as explained below, that such legislation does not violate the Contracts Clause because the record establishes that it is reasonable and necessary in light of the surrounding circumstances.  Although the language of the Contracts Clause is "unequivocal," it "'does not make unlawful every state law that conflicts with any contract.'"  United Auto., Aero., Agric. Impl. Workers of Am. Int'l Union v. Fortuño, 633 F.3d 37, 41 (1st Cir. 2011) (quoting Loc. Div. 589, Amalgamated Transit Union v. Massachusetts, 666 F.2d 618, 638 (1st Cir. 1981)).  In considering claims brought under the Contracts Clause, courts must "'reconcile the strictures of the Contract[s] Clause with the essential attributes of sovereign power necessarily reserved by the States to safeguard the welfare of their citizens.'"  Id. (quoting Mercado-Boneta v. Administracion del Fondo de Compensacion al Paciente, 125 F.3d 9, 14 (1st Cir. 1997)).  In doing so, courts apply a two-pronged test: they examine first "'whether the state law has . . . operated as a substantial impairment of a contractual relationship,'" id. (quoting Energy Rsrv. Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 411 (1983)), and then, if the law has, "whether the impairment was 'reasonable and necessary to serve an important government purpose.'"  Id. (quoting U.S. Tr. Co. of N.Y. v. New Jersey, 431 U.S. 1, 20 (1977).)  Assuming arguendo that New Bond Legislation will substantially impair contractual obligations,

---

Clause, that aspect of the AJJPR's objection is overruled for the same reasons.  (See Docket Entry No. 18549 ¶ 10.)

the Court examines its reasonableness and necessity.  The First Circuit considers "the reasonableness inquiry" to "ask[ ] whether the law is 'reasonable in light of the surrounding circumstances,'" while "the necessity inquiry focuses on 'whether [Puerto Rico] 'imposed a drastic impairment when an evident and more moderate course would serve its purposes equally well.'"  Id. at 45-46 (quoting Mercado Boneta, 125 F. 3d at 15.)  In analyzing these questions, courts may consider "whether the act (1) was an emergency measure; (2) was one to protect a basic societal interest, rather than particular individuals; (3) was tailored appropriately to its purpose; (4) imposed reasonable conditions; and (5) was limited to the duration of the emergency."  Id. at 46 (quoting Energy Rsrv. Grp., 459 U.S. at 410 n.11.)

160.     The circumstances surrounding the enactment of the New Bond Legislation are clear: the Commonwealth Legislature enacted the New Bond Legislation in response to the Commonwealth's unprecedented fiscal and economic crisis, the need to resolve litigation concerning the Commonwealth's bond obligations, and the need to enable the Commonwealth to effectuate the Plan so that it can regain access to capital markets.  The Legislature's decision is a reasonable one under the surrounding circumstances.  The legislation, which provides for the cancellation of instruments representing restructured debts and eliminates potential disputes regarding the validity of the issuance of new bonds that could affect the marketability of those bonds, is also necessary in light of the ongoing fiscal emergency in Puerto Rico.  The Court concludes that the Contracts Clause does not prohibit confirmation of the Plan, and Mr. Hein's objections invoking the Contracts Clause are therefore overruled.

**Takings Clause**

161.     For the reasons that follow, confirmation objections invoking the Takings Clause of the Constitution of the United States are overruled, with the exception of certain objections to

the Debtors' proposed treatment of Eminent Domain/Inverse Condemnation Claims.  With
respect to those Claims, the Debtors' Full-Payment Proposal would provide sufficient treatment
and payment in the event the Court finds their original proposal to pay only a portion of Allowed
Eminent Domain Claims violative of the Takings Clause.  As explained below, the Court finds
that the original proposal for such Claims does not comport with the requirements of the Takings
Clause and the Court has directed the Debtors to revise the Fifth Modified Eighth Amended Plan,
to ensure consistency and compliance with the treatment contemplated by the Debtors' Full-
Payment Proposal.  The Debtors have done so, and the Court finds that the further revised Plan
(Docket Entry No. 19784) meets the requirements of section 314(b)(3) of PROMESA.  For the
avoidance of doubt, the provisions of this FFCL are incorporated by reference in the
Confirmation Order, and so the Debtors' position that their original proposal does not violate the
Takings Clause is preserved for purposes of appeal.

162.    Various claimants have objected to the Plan, arguing that the treatment of their
claims violates the Fifth Amendment's Takings Clause.  Generally, these objectors fall into three
categories: (1) those asserting that they hold Eminent Domain/Inverse Condemnation Claims that
may not be impaired by the Plan; (2) bondholders who argue that the Plan takes their property
interest in bonds—specifically, the alleged lien on revenues that they claim secures repayment of
the bonds issued by the Commonwealth—without just compensation; and (3) Suiza Dairy, which
argues that the Plan authorizes a regulatory taking without just compensation.[36]

---

[36]    The Court here does not address the objection filed by Ismael L. Purcell Soler
and Alys Collazo Bougeois concerning their inverse condemnation claim.  (See Docket
Entry No. 18504.)  The substance of the objection makes clear that Mr. Purcell Soler's
and Ms. Collazo Bougeois' inverse condemnation claim concerns actions by
PREPA.  (See, e.g., id. at 4.)  Mr. Purcell Soler and Ms. Collazo Bougeois are therefore
creditors of PREPA, not of the Title III debtors currently before this Court.  The Plan
does not adjust PREPA's debts or provide for any releases or exculpations of

163.    Federal statutes, such as the Bankruptcy Code and PROMESA, are subject to the

strictures of the Constitution, including the Fifth Amendment's requirement that government

takings of property for public use be justly compensated.  Indeed, the bankruptcy power

conferred by article I, section 8 of the Constitution of the United States is itself subject to the

Fifth Amendment.  See Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 589 (1935)

("The bankruptcy power, like the other great substantive powers of Congress, is subject to the

Fifth Amendment.").  This principle was reaffirmed and extended by the Supreme Court in

Security Industrial Bank, where the Court cautioned that, "however 'rational' the exercise of the

bankruptcy power may be, that inquiry is quite separate from the question whether the enactment

takes property within the prohibition of the Fifth Amendment."  United States v. Sec. Indus.

Bank, 459 U.S. 70, 75 (1982).  In keeping with traditional takings jurisprudence, the predicate

---

PREPA.  Accordingly, Mr. Purcell Soler and Ms. Collazo Bougeois have no standing to
challenge the Plan and their objection is overruled.  See Bank of N.Y. Mellon v. P.R.
Sales Tax Fin. Corp. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 301 F. Supp. 3d 306,
312 (D.P.R. 2017) (finding that creditors of Commonwealth lacked standing in adversary
proceeding concerning COFINA bonds).

Additionally, for the reasons set forth in this Court's *Memorandum Opinion Granting
Defendants' Motions to Dismiss Second Amended Complaint* (Docket Entry No. 192 in
Adv. Proc. No. 18-00028), the Court overrules the objection of Cooperativa de Ahorro y
Crédito Abraham Rosa, Cooperativa de Ahorro y Crédito de Ciales, Cooperative de
Ahorro y Crédito de Rincón, Cooperativa de Ahorro y Crédito Vega Alta, Cooperativa de
Ahorro y Credito Dr. Manuel Zeno Gandía, and Cooperativa de Ahorro y Crédito de
Juana Díaz (the "Credit Unions") to the extent it incorporates the allegations set forth in
their adversary complaint, which has now been dismissed without leave to amend,
alleging that their claims are protected by the Takings Clause.  Because the Court has
concluded that the Credit Unions have not stated a claim upon which relief could be
granted under the Takings Clause, the Court finds that their claims for payment
concerning that alleged taking are not protected by the Fifth Amendment and may be
impaired and discharged by the Plan.  Moreover, to the extent the Credit Unions have
asserted a claim that approval of the Plan itself would constitute a taking, the Credit
Unions' objection is also overruled for the reasons discussed in connection with the
objections of other bondholders (see infra ¶¶ 170-73).

inquiry must concern the nature of the property at issue and whether a taking occurred.  See also
id. at 76-77 (classifying secured interests in contract rights as properly analyzed under the factors
set forth in Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 124 (1978), as
distinguished from jurisprudence governing fee simple interests in real property).

164.    Throughout the confirmation process, the Debtors have argued that, while
Supreme Court decisions have recognized that the Fifth Amendment restricts the Bankruptcy
Code, it does so only to the extent that property interests are secured.  See Sec. Indus. Bank, 459
U.S. at 75-76, 78; Wright v. Union Cent. Life Ins. Co., 311 U.S. 273, 278 (1940) (the
constitution protects "the rights of secured creditors, throughout the proceedings, to the extent of
the value" of the creditors' collateral).  See also Cobb v. City of Stockton (In re City of
Stockton), 909 F.3d 1256 (2018); Poinsett Lumber Mfg. v. Drainage Dist. No. 7, 119 F.2d 270
(8th Cir. 1941).  This conclusion is inconsistent with the Fifth Amendment, which is implicated
by a governmental act—the taking of private property for public use—and whose just
compensation requirement is not conditioned on whether the government gives security for a
compensation obligation that is not satisfied immediately.  While a security interest is a type of
property that can be protected by both the Fifth Amendment and the Bankruptcy Code, its
absence is not determinative of Fifth Amendment protection.

165.    The Supreme Court's takings jurisprudence requires evaluation of whether the
real property was subject to a physical invasion (implicating per se takings analysis) or whether,
for example, it was subjected to a use restriction (in which case the Penn Central factors are
applied to determine whether a regulatory taking occurred).  Cedar Point Nursery v. Hassid, 141
S. Ct. 2063, 2071-72 (2021).

166. **Eminent Domain/Inverse Condemnation Objections**: With respect to the objections raised by holders of alleged Eminent Domain/Inverse Condemnation Claims, the creditors assert, and the Debtors do not dispute, that their Claims arise from the physical invasion by the Commonwealth of privately owned real property. The objectors aptly rely on Supreme Court decisions for the propositions that a physical invasion of property constitutes a per se taking (Cedar Point Nursery, 141 S. Ct. at 2071), for which an irreducible entitlement to just compensation immediately ripens under the Takings Clause (Knick v. Twp. of Scott, 139 S. Ct. 2162, 2171 (2019); Blanchette v. Conn. Gen. Ins. Corp., 419 U.S. 102, 155 (1974) ("[A]ny deficiency of constitutional magnitude in the compensation [of seized property] . . . will indeed be a taking of private property for public use.")), and that the Bankruptcy Code is subject to the Takings Clause (see Radford, 295 U.S. at 589, 601-02; Sec. Indus. Bank, 459 U.S. at 75, 78, 80, 82). See also In re City of Detroit, 524 B.R. 147, 304-07 (Bankr. E.D. Mich. 2014).[37] The Court therefore confines its examination of these Claims to a per se takings analysis. "These sorts of

---

[37] The Debtors respond that, to the extent portions of these Eminent Domain/Inverse Condemnation Claims are not "secured" by deposits of funds with a Clerk of Court, they are simply unsecured claims that are subject to impairment and discharge under the Bankruptcy Code and that, while Supreme Court decisions have recognized that the Fifth Amendment restricts the Bankruptcy Code, it does so only to the extent that property interests are secured. See Sec. Indus. Bank, 459 U.S. at 75-76, 78; Wright v. Union Cent. Life Ins. Co., 311 U.S. 273, 278 (1940) (the constitution protects "the rights of secured creditors, throughout the proceedings, to the extent of the value" of the creditors' collateral). See also Cobb v. City of Stockton (In re City of Stockton), 909 F.3d 1256 (2018); Poinsett Lumber Mfg. v. Drainage Dist. No. 7, 119 F.2d 270 (8th Cir. 1941). The Debtors' application of the distinction, however, between secured and unsecured interests under the Bankruptcy Code to determine whether a Takings Clause-related obligation can be impaired is inconsistent with the Fifth Amendment, which requires first assessing the origin of the payment obligation: whether it arises from a government taking of private property for public use. As explained further below, while a security interest is a type of property that can be protected by both the Fifth Amendment and the Bankruptcy Code, a physical invasion (in this case, of real property) falls squarely within the ambit of Fifth Amendment protection, whether or not the government entity has provided any security for its obligation to pay just compensation.

physical appropriations constitute the 'clearest sort of taking,' and we assess them using a

simple, per se rule: The government must pay for what it takes."  <u>Cedar Point Nursery</u>, at 2071

(emphasis in original) (internal citation omitted).  The Court now turns to the question of just

compensation and whether valid claims for just compensation can be impaired in bankruptcy.

For the reasons set forth below, and for materially the same reasons set forth in this Court's order

of December 14, 2021 (Docket Entry No. 19517 at 6-15), the Court finds that such claims may

not be impaired.

167.     Unlike other constitutional prohibitions of government conduct, in connection

with which the Framers did not specify remedies, the Takings Clause of the Constitution of the

United States itself mandates the provision of "just compensation" in the event that "private

property [is] taken for public use."  U.S. Const. am. V.  The Supreme Court has recently and

expressly recognized the unique status of cases involving the governmental takings of real

property.  In <u>Knick</u>, the Supreme Court stated that "[t]he Fifth Amendment right to full

compensation arises at the time of the taking, regardless of post-taking remedies that may be

available to the property owner," a principle derived from <u>Jacobs v. United States</u>, 290 U.S. 13,

17 (1933), in which the Court stressed that the owner of a "valid takings claim is entitled to

compensation as if it had been 'paid contemporaneously with the taking'—that is, the

compensation must generally consist of the total value of the property when taken, plus interest

from that time."  <u>Knick</u>, 139 S. Ct. at 2170.  <u>See also</u> <u>Cedar Point Nursery</u>, 141 S. Ct. at 2071-72

("When the government physically acquires private property for a public use, the Takings Clause

imposes a clear and categorical obligation to provide the owner with just compensation.").  Thus,

unlike judgment creditors whose statutory remedies for violations of other constitutional

provisions are dischargeable, holders of takings claims have a constitutional right to just

compensation that is not subject to impairment or discharge under a plan of adjustment.  See

Blanchette, 419 U.S. at 155 ("[A]ny deficiency of constitutional magnitude in the compensation

[of seized property] . . . will indeed be a taking of private property for public use."); see also In

re City of Detroit, 524 B.R. at 268-70.  Put differently, "just compensation" is not a statutory

damages remedy for a constitutional violation but is instead a necessary condition to the exercise

of government power to take private property for public use.[38]

168.     The federal appellate cases cited by the Debtors are inapposite, both because they

are materially distinguishable and because they do not support an alternative interpretation of the

Supreme Court's clear jurisprudence distinguishing the Takings Clause from other constitutional

provisions.  First, the case of Poinsett Lumber does not purport to directly address the issue

before this Court, and the Oversight Board places more weight on it than it will support.  Unlike

the instant matter, in which claimants have timely filed proofs of Claim and objected to the

treatment of their Claims under the Plan, the claimant in Poinsett Lumber had failed to timely

preserve its right to object to the readjustment until after the plan had been confirmed.  Poinsett

Lumber Mfg., 119 F.2d at 274 ("Appellant could not remain silent until the proceedings had

advanced to the stage of a final decree and then, in a collateral attack, make the claim

successfully that its cause of action is not included in the plan of composition, nor affected by it,

nor dealt with therein.").  Moreover, although the Eighth Circuit did reject the creditor's

---

[38]     The Oversight Board argues, without citation, that the only reason the Takings Clause
specifies the need for "just compensation" is that, unlike in other constitutional
provisions, the government action is permitted rather than prohibited, and that Eminent
Domain/Inverse Condemnation Claims are therefore not otherwise entitled to preferential
treatment when damages for other constitutional violations are subject to impairment and
discharge.  (See Docket Entry No. 19574 ¶ 22.)  Such an argument itself acknowledges,
however, that the Takings Clause is, in fact, unique in requiring just compensation as the
condition for taking private property for public use.  The conclusion is textually
inescapable, and accordingly inflexible.

argument that the Takings Clause protected its claim from discharge, <u>Poinsett Lumber</u> concerned a challenge to the constitutionality of a federal bankruptcy statute, the validity of which apparently hinged on the determination that the drainage district was "not a governmental agency," making that case dissimilar from the instant dispute, which concerns whether a plan of adjustment is unconstitutional because it authorizes a government actor to withhold just compensation owed for the taking of private property for public use.  119 F.2d at 272 (citing <u>Luehrmann v. Drainage Dist. No. 7 of Poinsett Cnty.</u>, 104 F.2d 696, 703 (8th Cir. 1939) ("the Act of August 16, 1937, is valid as applied to this drainage district, which is not a governmental agency.")).  Indeed, <u>Poinsett Lumber</u>'s narrow reliance on <u>Luehrmann</u> appears to be for the limited purpose of determining that the federal bankruptcy statute was valid.  <u>Poinsett Lumber</u>, 119 F.2d at 272-73.[39]  Here, by contrast, the question is whether government action under the Plan (rather than the proper interpretation of a federal statute) permits a taking in violation of the Fifth Amendment by impairing the constitutional right of just compensation.  <u>Id.</u> at 272-73.

---

[39]  It apparently mattered to the <u>Poinsett Lumber</u> court that the federal bankruptcy statute was previously deemed valid in light of the fact that drainage districts were not government agencies.  <u>See id.</u> at 272-73 (citing <u>Luehrmann</u>, 104 F.2d at 703)).  Nevertheless, even if the 1941 decision of <u>Poinsett Lumber</u> does not refute the Oversight Board's position that Arkansas law recognized drainage districts as potentially liable for Takings Clause claims (<u>see</u> Docket Entry No. 19574 ¶¶ 31-32 (citing <u>St. Francis Drainage Dist. v. Austin</u>, 296 S.W.2d 668, 668-69 (Ark. 1956))), and that therefore <u>Poinsett Lumber</u> assumes the dischargeability of Takings Clause claims, it is at best unclear whether the <u>Poinsett Lumber</u> court squarely considered that precise question and whether it factored into the decision it reached.  <u>See Poinsett Lumber</u>, 119 F.2d at 272-73.  It is therefore inappropriate to infer from silence that the <u>Poinsett Lumber</u> court maintained or even acknowledged the Oversight Board's theory.  Moreover, the general dicta of <u>Luehrmann</u> at pages 702 and 703 (on which <u>Poinsett Lumber</u> relies) largely did not concern any prepetition per se taking, and to the extent it upheld the lower court's disallowance of an unliquidated claim for alleged overflow damage, it did so for the limited purpose of acknowledging that the lower courts rightly overruled the objection that the debtor was not insolvent.  As such, <u>Luehrmann</u> does not even establish a thin reed of support for the Oversight Board's theory.  104 F.2d at 702-03.

Poinsett Lumber does not clearly support the Debtors' theory that a government debtor may impair and discharge a valid Takings Clause Claim for just compensation, let alone for the reason that the claim for just compensation is unsecured rather than secured.

169.    The Debtors' reliance on In re City of Stockton is likewise unavailing.  First, the creditor in that Ninth Circuit case had slept on his rights to oppose the discharge of his claim under the plan of adjustment.  The majority determined that the creditor, a Mr. Cobb, had not sought any stay relief, that the plan had already been substantially consummated, that reversal of the confirmation order would have threatened the settlements underlying the plan to the prejudice of settlement participants, and that the relief sought required dismantling the plan, and so his claim was deemed equitably moot.  In re City of Stockton, 909 F.3d at 1263-65.  Such questions of equitable mootness are simply not present at this pre-confirmation stage in the instant proceeding.  Second, and more importantly, the Debtors' reliance on the Ninth Circuit's alternate finding that Mr. Cobb's claim was dischargeable because his interest was unsecured rather than secured, not only lacks any clear basis in Supreme Court jurisprudence, but it appears to derive from a conflation of the constitutional guarantee of just compensation under the Takings Clause with statutory remedies for other constitutional violations.  See id. at 1268 ("[O]ther constitutionally based lawsuits seeking money damages, such as § 1983 claims, are routinely adjusted in bankruptcy[.]").  See also id. at 1278 (Friedland, J. dissenting) ("[T]he Constitution's mandate that takings claims be excepted from discharge does not depend on whether those claims were initially classified in any bankruptcy proceeding as secured or unsecured; the whole point of nondischargeability is that nondischargeable claims pass through

bankruptcy unaffected[.]").[40]  The Court declines any invitation to overlook the unique nature of

the Takings Clause here by conditioning the Fifth Amendment requirement of just compensation

on the existence of security for the obligation.  To hold otherwise would be to make the Takings

Clause subject to federal bankruptcy law, which is precisely the opposite of what the Supreme

Court has done.[41]

---

[40]     Despite the Oversight Board's argument that Judge Friedland's dissent distinguished
between pre-petition and post-petition transfers of title (Docket Entry No. 19574 ¶ 33
(discussing In re City of Stockton, 909 F.3d at 1276)), it does not support the Oversight
Board's theory.  The dissent made that distinction for the purpose of disputing the
procedural posture of Mr. Cobb's claim under California law and is a far cry from
constituting support for the Oversight Board's generalized theory that only post-petition
condemnations are not subject to impairment, let alone that they (and they alone) should
be treated as administrative expenses.  The Oversight Board obscures the relevance of
Judge Friedland's dissent, which reached the conclusion that this Court announces today.
Id. at 1278.

[41]     The Oversight Board also contended, for the first time, at oral argument that the
Court should allow the impairment and discharge of per se takings Claims because (i)
Congress can otherwise bar Takings Clause claims through the operation of statutes of
limitations, just like any other claim  (see, e.g., Nov. 22, 2021, Hr'g Tr. 60:10-25
(discussing Block v. North Dakota, 461 U.S. 273, 292 (1983))), and (ii) "the
bankruptcy power is not always subject to the Fifth Amendment when it comes to
discharge and avoidance of property interests," such that "if you can avoid a property
interest under Bankruptcy Code section 544, surely you can discharge an unsecured
claim to just compensation under section 944."  (Nov. 23, 2021, Hr'g Tr. 26:20-27:5.
See also Docket Entry No. 19574 ¶¶ 35-36.)  The first argument fails because (a) the
cases cited by the Oversight Board (including Block) are distinguishable, because none
of them directly involved any limitation periods for raising Takings Clause claims in
federal district courts, nor does any of them provide an analytical basis for determining
that Congress can statutorily limit a constitutional claim to which sovereign immunity
is not a barrier (cf. Soriano v. United States, 352 U.S. 270, 273-77 (1957) (statute of
limitations pertaining to claim for just compensation before Court of Federal Claims));
(b) statutes of limitations concern the procedural bounds of litigation decisions over
which claimants have control, such as the timing of filing a claim, and therefore they
do not support by analogy the Oversight Board's argument that PROMESA or the
Bankruptcy Code can substantively affect Takings Clause claims in a manner beyond
the control of the claimants; and, relatedly, (c) whereas statutes of limitations serve as
a procedural bar to claims and may therefore be harmonized with the Takings Clause
without impairing the substance of a litigant's right to just compensation, the Oversight
Board's theory would affect the substance of Takings Clause claims in a manner that
appears to abridge litigants' rights to just compensation itself, regardless of when their

170.    Accordingly, the Court concludes that the per se claims asserted by the holders of alleged Eminent Domain/Inverse Condemnation Claims, to the extent they are ultimately allowed, are not subject to impairment or discharge, and that such creditors' objections to confirmation are hereby sustained to the extent the provisions of the Fifth Modified Eighth Amended Plan (dated December 21, 2021) would treat such allowed claims as general unsecured claims.  The Debtors have proffered the Full-Payment Proposal for the treatment of the Claims in the event the Court, as it has done here, rejects the proposal to treat unfunded portions of Eminent Domain/Inverse Condemnation Claims on parity with general unsecured claims.  That Full-Payment Proposal provides for full satisfaction of Allowed Eminent Domain/Inverse Condemnation Claims when this decision and determinations allowing such Claims become final.  The Court directed the Debtors to revise the Fifth Modified Eighth Amended Plan to

---

claims are brought.  Ultimately, the Court need not, and does not, express any opinion here as to the application of statutes of limitation to Takings Clause claims.

The Oversight Board's second argument fares no better: 11 U.S.C. § 544(b)(1) only allows for the avoidance of transfers that would be voidable under applicable law. Section 544(b)(1) is thus already restricted to transfers that are "voidable under applicable law," which accommodates restrictions imposed by non-bankruptcy law, including the Takings Clause.  11 U.S.C. § 544(b)(1).  Further, the Takings Clause serves only as a narrow boundary to the Debtors' avoidance powers, particularly with respect to per se takings.  In situations where regulatory takings are potentially at issue, the authority under section 544(b)(1) to avoid transfers may still be exercised in cases where the Penn Central analysis permits.  See also 11 U.S.C. §§ 544(a), 547(b), 548(a). The Oversight Board essentially posits that, because it can conceive of a highly fact-specific hypothetical in which an attempt to avoid an unrecorded transfer of real property under section 544(a) might constitute a taking under this Court's analysis, the avoidance provisions of the Bankruptcy Code would be broadly endangered if the Takings Clause could preclude such avoidances.  (See Docket Entry No. 19574 ¶ 26.) Not only does the Court decline to decide hypothetical cases not before it, but the Oversight Board's argument is self-defeating.  It does not follow that, because the Takings Clause could conceivably preclude a debtor's exercise of avoidance powers in a highly specific set of circumstances, the Bankruptcy Code is endangered root and branch.

provide solely for such treatment of the Claims (although the Debtors' original position that the Claims are dischargeable and may be treated as general unsecured claims to the extent they are unfunded is preserved for appeal) and the Debtors have done so.[42] The Court, accordingly, finds that the Plan's treatment of Eminent Domain/Inverse Condemnation Claims is not a barrier to confirmation.

171. **Bondholders' Objections**: With respect to the objectors who have raised Takings Clause arguments with respect to their status as bondholders (see Samodovitz Obj.; Hein Obj.), the proper analytical framework for addressing these claims is set forth in Penn Central. 438 U.S. at 124; see Patriot Portfolio, LLC v. Weinstein (In re Weinstein), 164 F.3d 677, 685 (1st Cir. 1999) (applying Penn Central analysis to constitutional challenge to lien avoidance pursuant to section 522(f) of the Bankruptcy Code). Pursuant to that test, courts consider three factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation interferes with the claimant's reasonable investment-backed expectations; and (3) the character of the governmental action." Patriot Portfolio, 164 F.3d at 685.

172. Considering the first factor, the Court notes that the actions challenged by the Bondholders will not result in the total destruction of the value of the liens allegedly securing the existing bonds. Pursuant to the terms of the Plan (see Plan §§ 1.199, 1.359, 74.1), bondholders

---

[42] The Court's analysis should not be construed to prejudge whether particular Eminent Domain/Inverse Condemnation creditors must receive "full" compensation for their Takings Clause Claims. The Fifth Amendment mandates that a meritorious takings claimant receive just compensation, as determined by the court. See In re City of Stockton, 909 F.3d at 1279 (Friedland, J. dissenting). The Court does not decide or prejudge today the meaning or quantum of just compensation for any particular claimant. For some claimants, that amount has already been adjudicated. For others, that determination has not yet been made. Rather, the Court's limited determination here is that the Fifth Amendment prohibits the Plan from providing less than just compensation for allowed Eminent Domain/Inverse Condemnation Claims by way of impairment and discharge through bankruptcy.

will receive substantial value in new secured bonds and, in some cases, cash.  (See also Disclosure Statement, Docket Entry No. 17628 at 61 ("The New GO Bonds will be secured by a statutory first lien and pledge of the amounts on deposit in the Debt Service Fund and a pledge of the Commonwealth's full faith, credit and taxing power[.]").)

173.    Second, although the proposed treatment of bondholders' claims may interfere with certain bondholders' subjective investment expectations, a proper assessment of bondholders' reasonable expectations must take account of the general risk that a government issuer may have higher payment priorities in the event of a reorganization or economic crisis, and the more specific risks of potential economic instability resulting from the indebtedness of the Commonwealth, at the time they made their bond investments.  Cf. New Haven Inclusion Cases, 399 U.S. 392, 491-92 (1970) (noting that security holders "invested their capital in a public utility that does owe an obligation to the public . . . [and thereby] assumed the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs") (citation and quotation marks omitted)).

174.    Third, the character of the governmental action strongly indicates that the Plan does not result in an unconstitutional taking.  The challenged proposals are not physical invasions of property by the government.  Rather, the restructuring of the relationships between the Commonwealth and its bondholders, using the powers established by Congress in PROMESA, is a quintessential example of a "public program adjusting the benefits and burdens of economic life to promote the common good."  Penn Cent. Transp. Co., 438 U.S. at 124.  The Takings Claim aspect of the Bondholders' objections is therefore overruled.

175.    **Suiza Dairy Objection**:  Unlike the objecting holders of Eminent Domain/Inverse Condemnation Claims, Suiza Dairy ("Suiza") has not demonstrated that it has a

factual or legal basis for its assertion that it holds a valid Takings Clause Claim that is protected

by the Fifth Amendment.  Suiza objects to the Plan, asserting, on the basis of a preliminary

injunction it had obtained prepetition in the District of Puerto Rico against the Milk Industry

Regulatory Office of Puerto Rico, that it has an adjudicated regulatory taking claim against the

Commonwealth (Docket Entry No. 18594) (the "Suiza Objection").  See Vaqueria Tres

Monjitas, Inc. v. Laboy, Civil No. 04-1840 (DRD), 2007 WL 7733665 (D.P.R. July 13, 2007).

The Plan's impairment of Suiza's claim does not violate the Takings Clause of the Constitution

of the United States for the simple reason that, prior to receiving a final judgment on its Takings

Clause claim, see Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 484 (1st Cir. 2009),

Suiza (and other plaintiffs) entered into a stipulation (Docket Entry No. 2322 in Civil Case No.

04-1840 and Docket Entry No. 19361-6 in Case No. 17-3283) (the "Dairy Producer Settlement"),

under which the parties agreed to abide by certain regulatory accrual formulae set forth therein

(Dairy Producer Settlement ¶ 14.)  The Dairy Producer Settlement made no concession of the

plaintiffs' claims, made no concession of the validity of any of the prior district and circuit court

determinations, and provided that entry of court approval would operate as a final and

unappealable judgment dismissing the action with prejudice (Dairy Producer Settlement ¶¶ 1-2.)

In assessing the nature of the regulatory accrual which the preliminary injunction required (and

the Dairy Producer Settlement would thereafter incorporate), the First Circuit determined that it

was not just compensation for a taking, but instead resembled an equitable remedy.  See Irizarry,

587 F.3d at 479-80.  The court's judgment was thereafter entered on November 6, 2013,

incorporating the terms of the Dairy Producer Settlement.  (Docket Entry No. 2347 in Civil Case

No. 04-1840 and Docket Entry No. 19361-7 in Case No. 17-3283.)  Thus, there was no favorable

adjudication of Suiza's Takings Clause claim, which was dismissed with prejudice by the order

entered in 2013. See Irizarry, 587 F.3d at 479-80 ("[H]ere there has been no award of damages that the state must pay. That an equitable remedy results in the payment of monies to plaintiff does not, in itself, render the relief monetary compensation for a taking."), rh'g denied, 600 F.3d 1 (1st Cir. 2010). Accordingly, it follows that Suiza merely has a contract-based claim for payment pursuant to the Dairy Producer Settlement.

176. The Court looks to the three factors of Penn Central to determine whether the impairment of Suiza's property interest in its settlement agreement rises to the level of a taking. Concerning the first factor, the Plan's treatment of Suiza's claim will not result in the total destruction of the value of Suiza's interest in the Dairy Producer Settlement. Rather, to the extent the Plan's treatment of Class 53 affects Suiza's claim, the plan provides for the payment of 50% of the Allowed Dairy Producer Claim and preserves other rights under the Dairy Producer Settlement. (Plan § 57.1.)

177. Second, notwithstanding Suiza's subjective economic expectations at the time the Dairy Producer Settlement was executed, any assessment of its reasonable expectations must account for an awareness of the Commonwealth's indebtedness, as well as the general risk that the Commonwealth might have higher payment priorities in the event of a reorganization or economic crisis. See New Haven Inclusion Cases, 399 U.S. at 492.

178. Third, the character of the governmental action strongly supports the Court's determination that the Plan's treatment of Suiza's claim does not result in an unconstitutional taking. Rather, the restructuring of the relationships between the Commonwealth and its creditors under the powers established by PROMESA is a prime example of a "public program adjusting the benefits and burdens of economic life to promote the common good." Penn Cent. Transp. Co., 438 U.S. at 124. Accordingly, the Plan's treatment of Suiza's claim does not

constitute a taking without just compensation in violation of the Takings Clause of the

Constitution of the United States.  Suiza's objection is therefore overruled.

**Discrimination Provisions: Due Process, Equal Protection, and Privileges and Immunities Clauses**

179.   Objector Peter Hein contends that the Plan's different treatment of mainland

investors from Puerto Rico-resident investors violates discrimination provisions of the

Constitution of the United States, to the extent the Plan makes distinctions based on investors'

geographic location.  (Hein Obj. at 26.)[43]  Such discrimination, he argues, violates the Due

Process, Equal Protection, and Privileges and Immunities Clauses of the Constitution of the

United States.  U.S. Const. art. IV, § 2, cl.1; am. V; am. XIV § 1.  The Plan does not, however,

violate any of these provisions of the Constitution.

180.   Regarding the Privileges and Immunities Clause, not only are the

Court's decisions concerning the confirmability of the Plan not limited by the Clause, Hawes v.

Club Ecuestre El Comandante, 535 F.2d 140, 145 (1st Cir. 1976) ("Article IV, s 2 is a limitation

on powers of states and in no way affects the powers of a federal district court."), the Plan's

taxable bond election provision does not fall within the purview of the Privileges and Immunities

Clause because it does not burden an activity that is sufficiently basic to the "vitality of the

nation as a single entity," Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. 371, 383 (1978);

see also id. at 388, and it is closely related to the advancement of a substantial state interest,

namely, the reorganization of the Commonwealth's debts.  Supreme Court of Va. v. Friedman,

487 U.S. 59, 65 (1988).

---

[43]   Specifically, Mr. Hein argues that all bondholders of a particular bond series, and not just Puerto Rico investors, should be given the option to elect to receive a single maturity of potentially taxable higher coupon bonds, and that failure to do so causes discrimination based on place of residence.  (Hein Obj. at 26.)

181.    As for the Due Process and Equal Protection Clauses of the Fifth and Fourteenth

Amendments, Mr. Hein has exercised his right to challenge the differential treatment before this

tribunal, he has cited no fundamental right as being impaired, and has not identified any

discrimination based on any constitutionally protected class or status.  His objections citing these

constitutional amendments thus have no factual basis. Mr. Hein's argument that due process

prevents the Court from merely deferring to the Oversight Board's determinations and

certifications (see Hein Obj. at 18), is beside the point because the Court has indeed undertaken

an independent review of the Plan, in accordance with the legal standards applicable under

PROMESA, which do not authorize the Oversight Board to act as a judge in its own case, nor to

discharge or impair claims unilaterally.  See In re Fin. Oversight & Mgmt. Bd. for P.R. 583 B.R.

626, 632-33 (D.P.R. 2017).  Moreover, the Plan's taxable election provision is supported by a

rational basis because it seeks, by providing an opportunity to maximize the availability of non-

taxable bonds for mainland investors who pay federal taxes, to enhance recoveries for mainland

investors without harming local investors.  See United States v. Kras, 409 U.S. 434, 446 (1973).

182.    Mr. Hein's objections are therefore overruled.

183.    The Plan complies with PROMESA section 314(b)(3).

**D. PROMESA § 314(b)(4):** *The Plan Provides Each Holder of an Administrative Claim
Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date.*

184.    Section 3.1 of the Plan states: "On the later to occur of (a) the Effective Date and

(b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the

Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim,

in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such

Allowed Administrative Expense Claim in accordance with such other terms no more favorable

to the claimant than as may be agreed upon by and between the holder thereof and the

Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan."

185.    Consummation Costs, Restriction Fees, and Retail Support Fees will be paid in Cash on the Effective Date. All other Allowed Administrative Expense Claims, if any, will likewise be paid pursuant to section 3.1 of the Plan.

186.    The Plan complies with section 314(b)(4) of PROMESA.

**E. PROMESA § 314(b)(5):** *The Plan Has Obtained all Necessary Legislative, Regulatory, and Electoral Approvals*.

187.    The Plan has obtained all necessary legislative, regulatory, and electoral approvals. Further, by approving and certifying the Fiscal Plan, the Oversight Board provided approval for the issuance of securities contemplated by the Plan as required by section 207 of PROMESA. The debt authorization in Act 53 is conditioned only on the Plan's removal of the Monthly Benefit Modification that was provided for in the Seventh Amended Plan and does not require removal of the pension freezes or the elimination of COLAs from the Plan. Act 53 (Debtors Ex. 134), arts. 104, 605. Pursuant to Puerto Rico law, legislation of the Commonwealth is presumed to be valid if enacted by the Legislative Assembly of Puerto Rico and signed into law by the Governor. See, e.g., Brau v. ELA, 190 D.P.R. 315, 337 (P.R. 2014); Partido Socialista Puertorriqueño v. Puerto Rico, 107 D.P.R. 590, 609 n.11 (P.R. 1978), holding

modified by <u>Partido Independentista Puertorriqueño v. Comisión Estatal de Elecciones y Ostros</u>,

120 D.P.R. 580 (P.R. 1988) ("To begin with, laws are presumed to be constitutional and the

movant [objector] should place the courts in a position to decide by introducing evidence to

sustain the facts alleged, and then stating the legal arguments on which its assignment of

unconstitutionality is based, specifically mentioning the constitutional provisions involved and

the legal precedents supporting its assignment.

    **F.  PROMESA § 314(b)(6):** *The Plan Is Feasible and in the Best Interests of Creditors*.

    188.    The Plan complies with section 314(b)(6) of PROMESA because it is feasible and

in the best interests of creditors.

    **i.  Feasibility**

    "[T]he Court has an independent duty to determine [feasibility] and to make specific

findings of fact." <u>In re City of Detroit</u>, 524 B.R. 147, 220 (Bankr. E.D. Mich. 2014).  Under

PROMESA, a plan of adjustment must be supported by financial projections that are "reasonable

and demonstrate a probability that [the debtor] will be able to satisfy its obligations under the

Plan." <u>In re Fin. Oversight & Mgmt. Bd. for P.R.</u>, 361 F. Supp. 3d 203, 246 (D.P.R. 2019).

Additionally, as in chapter 9, a PROMESA debtor, as a government entity, must show that it is

"probable that [the] debtor can both pay post-petition debt and provide future public services at

the level necessary to its viability as a [territory]."  <u>In re Mount Carbon Metro. Dist.</u>, 242 B.R.

18, 35 (Bank. D. Colo. 1999).  The core inquiry has been articulated as follows: "Is it likely that

the [debtor], after the confirmation of the Plan of Adjustment, will be able to sustainably provide

basic municipal services to the citizens of [the debtor] and to meet the obligations contemplated

in the Plan without the significant probability of a default?" <u>In re City of Detroit</u>, 524 B.R. at

222.

### a. The Plan is Feasible as to ERS

189.    The Plan is feasible with respect to ERS.  ERS no longer has pension and other obligations to beneficiaries, those obligations having been assumed by the Commonwealth upon the enactment of Act 106.  Pursuant to the Plan, ERS's assets are being sold and transferred to the Commonwealth in exchange for $373 million and the agreement to purchase the ERS Private Equity Portfolio for $70,750,000, subject to certain conditions.  ERS's obligations pursuant to the Plan include distributing the $373 million in cash received from the Commonwealth to the holders of Allowed ERS Bond Claims, as well as payments to holders of Allowed ERS General Unsecured Claims in a *de minimis* amount.  (Jaresko Decl. ¶ 98; Plan §§ 2.4, 69.2, 77.1(c).)

190.    Pursuant to the Plan, ERS will place the ERS Private Equity Portfolio in the ERS Trust, which will then be purchased by either the Commonwealth or holder(s) of Allowed ERS Bond Claims on or before April 25, 2023 for no less than $70,750,000, which funds will be distributed to holders of Allowed ERS Bond Claims.  (Jaresko Decl. ¶ 99; Plan §§ 2.4, 69.2, 77.1(c).)  Further, on the Effective Date, each holder of an ERS General Unsecured Claim will receive such holder's Pro Rata Share of the ERS GUC Pool, which is comprised of $500,000 plus the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests, capped at $5 million.  (Plan §§ 70.1, 1.223.)  ERS will dissolve after the Effective Date of the Plan and all remaining assets of ERS will be deemed sold and transferred to the Commonwealth.  (Jaresko Decl. ¶ 99; Plan § 88.2.)  Any excess amount in the ERS GUC Pool will be reallocated, on a pro rata basis, to holders of Allowed CW General Unsecured Claims. (Plan § 1.223.)  ERS will therefore have no material obligations after the Effective Date. (Jaresko Decl. ¶ 99.)  Accordingly, the Plan is feasible with respect to ERS and is not likely to result in the need for a further restructuring of ERS.

### b.  The Plan is Feasible as to PBA

191.    The Plan is feasible with respect to PBA, as PBA holds sufficient cash to pay its

obligations to all of its creditors pursuant to the Plan, including any Allowed Claims on account

of loans made by GDB to PBA.  (Jaresko Decl. ¶ 100.)  Holders of PBA Bond Claims will

receive their Pro Rata Share of the Vintage PBA Bond Recovery, 2011 PBA Bond Recovery, or

2012 PBA Bond Recovery, as applicable, in the aggregate amount of approximately $1.1 billion

to be paid by the Commonwealth.  (Shah Decl. ¶ 59; Plan arts. V-XV.)  Holders of Claims in

Classes 12 (PBA/DRA Secured Claims), 13 (PBA General Unsecured Claims), and 14

(PBA/DRA Unsecured Claims) will each receive Cash in an amount equal to ten percent (10%)

of such Claims.  (Plan arts. XVI-XVIII.)

192.    The Debtors seek an order providing that each of the Unexpired Leases to which

PBA is a party (collectively, the "PBA Leases") will be deemed rejected upon the earliest to

occur of (a) June 30, 2022, (b) the date upon which such PBA Lease expires in accordance with

its terms, (c) the date upon which PBA enters into a new or amended lease with respect to the

leased property subject to such PBA Lease, (d) such other date of which PBA, as lessor, provides

written notice to the counterparty to a PBA Lease, and (e) the date upon which AAFAF provides

written notice to PBA that such PBA Lease is rejected; provided, however, that during the period

from the Effective Date up to the date of such rejection, with respect to any PBA Lease between

PBA as lessor and the Commonwealth or any Commonwealth agency, public corporation, or

instrumentality, as lessee, monthly lease payments shall be limited to the lower of (y) the amount

budgeted and approved pursuant to a certified fiscal plan and (z) the monthly costs and expenses

associated with the applicable leased property; and provided, further, that any accruals on the

books of PBA or any of the Commonwealth or an agency, public corporation, or instrumentality

of the Commonwealth as counterparty to a PBA Lease for the unpaid debt service component of

rent under any PBA Lease shall be deemed released, settled, and discharged as of the rejection

date.  (See Confirmation Ord. ¶ 84.) The treatment of PBA Leases has been consented to by the

Oversight Board, on behalf of the Debtors.  The Oversight Board represents, and AAFAF has not

denied, that AAFAF, on behalf of the agencies, instrumentalities, and public corporations, has

also consented to the treatment of the PBA Leases set forth in the Plan.

193.    Accordingly, the Plan is feasible with respect to PBA and is not likely to result in

the need for a further restructuring of PBA.

### c.  The Plan is Feasible as to the Commonwealth

194.    The Plan is feasible with respect to the Commonwealth.  The Plan provides for

the following types of payments to financial creditors: (1) cash on the Effective Date, (2) new

debt issued by the Commonwealth in the form of New GO Bonds, and (3) CVIs.  (Zelin Decl. ¶

47; Malhotra Decl. ¶ 9.)  In addition, the Plan contemplates payments to retirees of pensions and

other benefits, without adjustment for any Monthly Benefit Modification, as well as additional

payments to Commonwealth employees.  (Malhotra Decl. ¶ 9.)

195.    The Plan provides for the payment of Cash on the Effective Date and over time, in

the aggregate amount of approximately $8 billion, plus up to $801 million in consummation

costs, restriction fees, and retail support fees.  (See Malhotra Decl. ¶ 10; Zelin Decl. ¶¶ 48, 86.)

196.    The Plan provides that the Reorganized Commonwealth will issue New GO

Bonds on the Effective Date with different maturity dates, having an aggregate original principal

amount of $7,414,063,543.25.  (Malhotra Decl. ¶ 11; Zelin Decl. ¶ 49; Plan art. LXXIV.)  All

holders of general obligation debt and general obligation guaranteed debt will receive New GO

Bonds having thirteen (13) CUSIP numbers, which distribution was calculated to provide each

holder with incremental value of 2.25% of their par claims, which increment exceeds any liquidity charge by approximately 1.75% of their par claims.  (See Nov. 12, 2021, Hr'g Tr. 108:15-111:1.)  Minimizing the number of CUSIPs would not be in the interest of bondholders as a whole; rather, the issuance pursuant to the Plan of thirteen (13) CUSIPs to each bondholder provides each holder with as significant a recovery as possible within the boundaries of the municipal bond market and the need to keep annual debt service sustainable, and a significantly greater total amount of value.  (See Nov. 12, 2021, Hr'g Tr. 105:11-106:4; 108:18-111:4.)  The aggregate amount owed, including all principal and interest over the life of the New GO Bonds from the Deemed Issuance Date of July 1, 2021 to the maturity of the final New GO Bond on July 1, 2046, is $10,914,969,303.20.  (Malhotra Decl. ¶ 12; Zelin Decl. ¶ 49.)  The Plan provides for a Debt Service Fund to be established.  On the first business day of each month after the Effective Date until the obligations of the applicable New GO Bonds are satisfied, the Commonwealth will deposit the portion of principal and accrued interest for that month into the Debt Service Fund.  (Malhotra Decl. ¶ 16; Plan § 74.1(f).)  The Plan also provides that, on the Effective Date, the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional amounts necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.  (Plan § 74.1(f).)

197.    The Plan provides for the issuance of (i) GO CVIs in the aggregate original notional amount of $3.5 billion, having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and (ii) Clawback CVIs in the aggregate original notional amount of $5.239 billion, having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051.  (Malhotra Decl. ¶ 19; Zelin Decl. ¶ 54; Plan § 74.2.)  The Commonwealth's obligation to pay under the CVIs arises only if certain outperformance

conditions specified in the Plan and the CVI indentures occur.  Specifically, the Plan provides for

the establishment of threshold metrics based on tax revenue projections contained in certified

fiscal plans.  Only if actual revenues exceed the established threshold at the end of a given fiscal

year will an obligation to pay come into being, subject to certain caps.  (Malhotra Decl. ¶ 20;

Zelin Decl. ¶ 55; Plan Ex. J.)  Further, payments on the CVIs are triggered only when both

cumulative and annual outperformance occurs, which protects the Commonwealth from making

substantial CVI payouts when it experiences one year of outperformance after experiencing

several years of underperformance.  (Malhotra Decl. ¶¶ 35-37; Zelin Decl. ¶¶ 60-65.)

198.    In addition, the Plan provides for (i) payments of pension and other post-

employment benefits to retired Commonwealth employees, without adjustment for any Monthly

Benefit Modification, (ii) the restoration of contributions made by Commonwealth employees to

the System 2000 program, and (iii) payments to the Pension Reserve Trust.  (Malhotra Decl.

¶ 21; Plan art. LV.)  Participants in System 2000 will not be subject to benefit reductions, but

instead will receive the amount of their contributions to System 2000 from its enactment until

June 30, 2017.  (Plan § 55.1.)  The aggregate sum of such contributions plus interest accrued

thereon is approximately $1.2 billion.  (Malhotra Decl. ¶ 23.)  The Pension Reserve Trust will

receive an initial contribution of $5 million on the Effective Date and, for the next ten (10) fiscal

years, the Commonwealth will make a contribution in an amount equal to (1) the Base

Contribution, $175 million or, for any fiscal year in which the projected Fiscal Plan Surplus set

forth in the Fiscal Plan is equal to or greater than $1.75 billion, an amount equal to fifty percent

(50%) of that amount, plus (2) an additional amount calculated as (i) the lower of the actual

primary surplus for such fiscal year and the projected Fiscal Plan surplus for such fiscal year,

minus (ii) the sum of the Base Contribution, plus the Commonwealth's debt service obligations

pursuant to the Plan for such fiscal year, plus $200 million.  (Plan art. LXXXIII; Malhotra Decl.

¶ 24; Malhotra Sup. Decl. ¶¶ 12-13; Jaresko Sup. Decl. ¶¶ 10-11; Santambrogio Sup. Decl. ¶¶ 8-

9.)  The Commonwealth's contributions to the Pension Reserve Trust are estimated to total

approximately $2.4 billion during the ten years of funding based on the Fiscal Plan, all of which

will be paid during the time period in which the Fiscal Plan projects surpluses.  The Pension

Reserve Trust is projected to have a balance of $3.1 billion through the end of fiscal year 2031

based on the Fiscal Plan.  (Malhotra Sup. Decl. ¶ 14; Santambrogio Sup. Decl. ¶ 10.)  Further,

the Pension Reserve Trust will be professionally and independently managed to insulate the

funding available to pay pensions from political or economic influences.  (Malhotra Decl.

¶ 34.)[44]

199.    The Seventh Amended Plan contained a Monthly Benefit Modification pursuant

to which reductions to monthly pension payments would be made.  The New GO Bond

Legislation and CVI Legislation, Act 53, is conditioned on the removal of the Monthly Benefit

Modification from the Plan and so, consistent with Act 53, the Plan no longer contains a Monthly

Benefit Modification provision.  (See Plan art. LV.)  The Plan nevertheless remains feasible,

provided there are no other modifications to the Plan involving pensions.  The elimination of the

Monthly Benefit Modification is estimated to add an average of approximately $87 million

annually to the cost of the Commonwealth's PayGo obligations for the first ten years, which

---

[44]    AAFAF objects to portions of this finding, and to similar conclusions in ¶ 224 concerning
the Pension Reserve Trust, arguing the factual evidence supporting the funding details is
based on declarations that were submitted prior to changes made to the funding
provisions during the Confirmation Hearing.  (See Docket Entry No. 19402 at 12; see
also Docket Entry No. 19173; Docket Entry No. 19320).  The Debtors have, however,
provided an explanation of the need for such changes and the factual support for the
feasibility of the new provisions in the supplemental declarations of Ms. Jaresko, Mr.
Malhotra, and Mr. Santambrogio.  (See Jaresko Sup. Decl. ¶¶ 9-11; Malhotra Sup. Decl.
¶¶ 12-13; Santambrogio Sup. Decl. ¶¶ 8-9.)  AAFAF's objection is therefore overruled.

represents less than five percent (5%) of the Commonwealth's estimated PayGo expenses for this period, and less than one percent (1%) of the Commonwealth's overall budget for this period. The additional cost will be payable from the surpluses projected in the Fiscal Plan during this period.  Over the thirty-year period of Fiscal Plan projections, the aggregate cost of eliminating the Monthly Benefit Modification is approximately $1.9 billion.  (Malhotra Sup. Decl. ¶ 9, Ex. 1; Levy Sup. Decl. ¶ 10; Jaresko Sup. Decl. ¶ 8.)  The elimination of the Monthly Benefit Modification does not materially affect the feasibility of the Plan.  (Malhotra Sup. Decl. ¶ 10; Jaresko Sup. Decl. ¶¶ 8-12.)

200.    If the Plan were modified to (i) eliminate the freeze of JRS and TRS pension benefit accruals and (ii) retain any future pension benefit cost of living adjustments, the Plan would be at risk of not being feasible.  (Malhotra Sup. Decl. ¶ 8; Jaresko Sup. Decl. ¶ 13.) Specifically, the PayGo impact of eliminating the pension freeze and reinstating COLAs relative to the Fiscal Plan is estimated to be approximately $5.6 billion over thirty (30) years, or approximately $4.7 billion after taking into account social security costs.  (Levy Sup. Decl. ¶ 14.) By 2047, the incremental PayGo cost associated with eliminating the pension freeze and maintaining COLAs is estimated to increase the annual PayGo obligation by twenty-five percent (25%).  Unlike the elimination of the Monthly Benefit Modification, the incremental cost of which decreases as the Commonwealth approaches the deficits projected by the Fiscal Plan, the incremental costs associated with eliminating the pension freeze and reinstating any COLAs are projected to grow larger as the Commonwealth approaches the deficits projected by the Fiscal Plan, thus presenting the risk that the Plan may not be feasible.[45]  (Malhotra Sup. Decl. ¶¶ 17-18;

---

[45]    AMPR objects that, even with the inclusion of the JRS and TRS benefit freeze, the Plan may not be feasible because the employees whose benefits are frozen will have a damages claim based on the loss of their future accruals that is not provided for in the

Levy Sup. Decl. ¶¶ 9-17.)  Absent the Pension Freeze, TRS and JRS pension liabilities will

continue to increase relative to the Fiscal Plan.  Eliminating the pension freeze would create an

open-ended incremental defined benefit liability because TRS and JRS participants would

continue to accrue new benefits for as long as they continue to work for the Commonwealth.

(Malhotra Sup. Decl. ¶ 18.)  Moreover, not implementing the pension freeze and the

reinstatement of COLAs would increase the likelihood of needing to rely on the Pension Reserve

Trust for payment of the Commonwealth's PayGo obligations, and increase the risk of

completely exhausting the Pension Reserve Trust during the Fiscal Plan projection period.

(Malhotra Sup. Decl. ¶ 18; Levy Sup. Decl. ¶ 16.)

     201.    Section 83.4 of the Plan ensures that pension-related provisions contained in the

Plan will not be undone in the short term such that pension payments become unaffordable,

providing that: "Before the tenth (10th) anniversary of the Effective Date, the Government of the

Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for

or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create

or increase any defined benefit pension payment or obligation to current or future retirees from

or related to any defined benefit plans over the benefits provided by the Plan, regardless of

---

Plan. (See Docket Entry No. 18585 at 16 n.12).  AMPR does not proffer any evidence
concerning the potential cost of such claims to the Commonwealth.  The Debtors proffer
that the Plan already provides for the treatment of these claims by ensuring the payment
of any defined benefits accrued up to the Effective Date, providing a tax deferred defined
contribution account, and providing matching contributions to Social Security for those
who opt in. (Nov. 15, 2021, Hr'g Tr. 51:2 - 51:7.)  To the extent AMPR would be able to
assert a rejection damages claim, the Court finds that the Plan anticipates any such claim
from the employees subject to the freeze of their benefits, (see Plan § 1.487 (defining
"TRS Participant Claim" to include "any right to accrue additional retiree benefits in TRS
from and after the Effective Date")) and provides a treatment for such claims (see Plan §§
55.3, 55.9) that is accounted for in the Debtors' feasibility demonstration.  AMPR has not
provided any evidence showing that prospective claims from its members would render
the Plan infeasible.  AMPR's feasibility objection is therefore overruled.

funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; <u>provided</u>, <u>however</u>, that the Governor and Legislature of the Commonwealth of Puerto Rico, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, <u>provided</u>, <u>however</u>, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan." (Plan § 83.4.) This prohibition on new defined benefits for a ten (10) year period is enforceable and is essential to the Plan's continued feasibility.[46] (<u>See</u> Nov. 15, 2021, Hr'g Tr. 181:16-182:14; <u>see also</u> Malhotra Sup. Decl. ¶ 20 (explaining the costs of pension-related laws proposed by the government would increase the risk the Plan will not be feasible).)

202.    The Plan also provides for additional payments to be made to current employees who are members of certain public employee unions affiliated with AFSCME and non-union rank and file employees. Pursuant to the Plan, the Commonwealth's monthly contribution for

---

[46]    <u>See</u> <u>supra</u> n.23.

healthcare benefits to Commonwealth employees who are members of AFSCME-affiliated

unions will increase from $125 per employee per month to $170 per employee per month. (See

Santambrogio Decl. ¶ 31; Malhotra Decl. ¶ 26.) In addition, the Plan provides for $500 signing

bonuses to each member of an AFSCME-affiliated union and, if the Commonwealth has an

excess cash surplus after CVI payments that is greater than $100 million, 25% of that surplus

will be allocated to a bonus pool for the benefit of members of the AFSCME-affiliated unions

and other non-union rank and file employees. (Plan art. LVI; Plan Ex. G; Malhotra Decl. ¶¶ 25-

26, 29 & n.6; Santambrogio Decl. ¶¶ 22-23.) Subject to a minimum cash bonus of $2,000 per

year per AFSCME-represented employee for the five-year term of the amended collective

bargaining agreement, such employees only receive the cash surplus bonuses if the government

outperforms the Fiscal Plan, so employees are incentivized to ensure that the government is

operating efficiently. (Nov. 10, 2021, Hr'g Tr. 62:25-63:4; Santambrogio Sup. Decl. ¶ 11.)

203. The Plan also provides that the Debtors shall transfer ACR-eligible claims

pursuant to the ACR Order, which claims shall be reconciled and paid in the ordinary course of

business. The Commonwealth has reserved $229 million for payment of such claims. (Plan

§ 82.7; Malhotra Decl. ¶¶ 27, 29.)

204. Further, the Plan provides ERS Bondholders a right to receive a future payment of

$70.75 million from the purchase of the ERS Private Equity Portfolio. (Plan § 69.2; Malhotra

Decl. ¶¶ 27, 29.)

205. The Plan, including each of these provisions, is feasible with respect to the

Commonwealth.[47] (Malhotra Decl. ¶ 29.) Confirmation of the Plan is not likely to be followed

---

[47] The Plan remains feasible even accounting for the payment in full of the total of Eminent
Domain/Inverse Condemnation Claims asserted to arise out of the Takings Clause. See
supra ¶¶ 65, 160, 169. Based on a review and reconciliation of claims to date, the cost of

by the need for further financial reorganization not contemplated in the Plan, and will enable the

Commonwealth to provide future public services and remain a viable public entity.  That is true

notwithstanding the fact that, based on the 2021 Fiscal Plan (Debtors Ex. 10) projections, deficits

after debt service are projected to reemerge in approximately FY 2035.  (Malhotra Decl. ¶ 29.)

By the time deficits are projected to emerge, the amount of Commonwealth general obligation

debt outstanding will only be $2.1 billion, as compared to pre-petition debt liabilities of $30.5

billion.  (Id.)  The Commonwealth will not likely need further reorganization notwithstanding

projected deficits due to a number of factors, including the following: (i) the Plan reduces the

Commonwealth's overall debt; (ii) the Plan includes multiple provisions designed to insulate the

Commonwealth from downside risks; (iii) the Commonwealth can implement certain reforms the

Oversight Board identified that could result in additional liquidity, which could eliminate the

projected deficit;[48] and (iv) the Plan does not take into account potential upside factors which, if

they materialize, would result in additional liquidity.  (See id.)

---

such Claims is currently estimated to be approximately $390 million. (See Herriman Sup. Decl. ¶ 11.)  The Debtors have proffered credible evidence to support the conclusion that the Plan would still be feasible because the Commonwealth will have sufficient cash remaining after fulfilling its Effective Date obligations under the Plan to pay such Eminent Domain/Inverse Condemnation Claims, to the extent they are Allowed, in full. Additionally, not all Allowed Eminent Domain/Inverse Condemnation Claims will need to be paid out immediately on the Effective Date, as some have not yet been adjudicated. (See Debtors Ex. 30 at 3; Malhotra Sup. Decl. Ex. 1; Herriman Sup. Decl.; Nov. 22, 2021, Hr'g Tr. 15:11-17:20.)

[48]    Mr. Hein argues that the Commonwealth has previously failed to implement structural reforms put forth by the Oversight Board and that there is no evidence that the Commonwealth government would now adopt such proposals, such that the Debtors' representation that the Plan is feasible is unpersuasive.  (See, e.g., Docket Entry No. 19400 at 41-42.)  The Commonwealth government's commitment to implementing proposed structural changes cannot be guaranteed, but the Plan provides incentives for the Commonwealth and interested parties to ensure that the government pursues policies to achieve strong fiscal performance.  (See, e.g., Malhotra Decl. ¶ 26 (describing Upside Bonus Participation pool for certain public employees if the Commonwealth has an Excess Cash Surplus); Zelin Decl. ¶¶ 60-66 (explaining alignment of incentives between

206.    The Plan also reduces the Debtors' debt significantly.  After confirmation, the Commonwealth's general obligation and guaranteed debt will be approximately $7.4 billion, considerably lower than the $30.5 billion pre-restructuring total, and all ERS and PBA debt will be eliminated.  (Malhotra Decl. ¶ 31; Jaresko Decl. ¶¶ 98-100.)  Prior to the commencement of the Title III Cases, annual Commonwealth debt service was approximately $2.1 billion, and post-Effective Date, the Commonwealth's average annual debt service during the first ten years will be approximately $666 million.[49]  (Malhotra Decl. ¶¶ 30-31.)  Over 50% of the newly issued debt under the Plan will have amortized within 10 years of its issuance date.  (Id. ¶ 32.)  Debt levels will continuously decline and remain low until full repayment of the Commonwealth's general obligation and guaranteed debt, which is projected to occur in fiscal year 2046.  (Id.)

---

the Commonwealth and CVI holders to achieve outperformance).)  Furthermore, as set forth supra, the proposed structural reforms are not the only protections the Plan offers to combat projected deficits starting in FY 2035.  The Plan also provides mechanisms such as the Pension Reserve Trust, the CVI structure, and the Debt Management Policy to ensure obligations are met even if the Commonwealth begins to run deficits.  (See Malhotra Decl. ¶ 33.)  The projections underlying the Fiscal Plan and the Plan also do not account for potential upsides that could increase the Commonwealth's liquidity in the future.  (Id. ¶¶ 41-51.)  Thus, the uncertainty of the Commonwealth's support for proposed structural changes does not render the Plan infeasible.

[49]    The Service Employees International Union ("SEIU") argues in its objection that the Plan leaves the Commonwealth with an unaffordable debt burden that renders the Plan infeasible.  (See Docket Entry No. 18511 ¶¶ 23-25; Docket Entry No. 19386 ¶ 13.)  The SEIU relies on a study by economist Joseph Stiglitz, which was not proffered into evidence, in arguing that the economic and social needs of Puerto Rico are far greater than those of mainland U.S. states and therefore that Puerto Rico should not have a larger debt load than the average U.S. state.  (See Docket Entry No. 18511 ¶ 23.)  Based on the metric of net tax-supported debt per capita, the SEIU argues that, under the Plan, Puerto Rico would rank ninth from the top in the rankings of most indebted states in the United States.  (See id. ¶ 25.)  The Court is not persuaded that this sole metric, net tax-supported debt per capita, is the proper standard by which to judge whether the Plan is feasible.  The Debtors have put forth persuasive evidence that the Plan will allow the Debtors to meet their obligations and is not likely to be followed by the need for further reorganization (Malhotra Decl. ¶ 29), and the SEIU has not proffered any evidence to the contrary.  Thus, the SEIU's objection with respect to the Plan's feasibility is overruled.

Thereafter, the only commitments that will remain outstanding will be the CVIs and COFINA debt. The CVIs are paid only if specific revenues outperform projections, and COFINA debt is serviced via a pledged portion of sales and use tax. (Id.) The Commonwealth will have the ability to pay debt service pursuant to the Plan through at least 2034, and the Plan proposes additional reforms and potential factors that could increase the Commonwealth's resources and create surpluses that could extend this projection. (Wolfe Decl. Ex. 1 ¶¶ 12, 13, 15-27.)

207. In addition, several Plan provisions—the Pension Reserve Trust, the CVI structures, the Debt Management Policy, and the Comprehensive Cap—mitigate the impact of potential financial underperformance and the effects of projected deficits. (See Malhotra Decl. ¶¶ 33-40.) The Commonwealth will also establish an emergency reserve and a certain level of unrestricted cash, and the Oversight Board has agreed to fund a temporary disaster aid revolving line of credit, which mitigate against potential downside risks. (Id. ¶¶ 49-51; Chepenik Decl. ¶¶ 9, 28, 30, 36, 38.) The Commonwealth will retain an unrestricted cash balance of $1 billion to help maintain uninterrupted government operations when unforeseen fiscal challenges emerge. (Malhotra Decl. ¶ 49; Chepenik Decl. ¶ 28; Nov. 12, 2021, Hr'g Tr. 50:21-51:5.) The emergency fund will be funded with $130 million annually for a period of ten years, until the reserve balance reaches $1.3 billion, or 2% of Puerto Rico's Fiscal Year 2018 Gross National Product, in line with International Monetary Fund guidance. (Malhotra Decl. ¶ 51; Chepenik Decl. ¶ 38.)

208. The Plan is not dependent on new borrowings that would impede the Debtors' ability to achieve compliance with the Fiscal Plan. The Fiscal Plan (Debtors Ex. 10) does not show a need for incremental borrowing, and therefore the Plan's borrowing restrictions will not impede the Commonwealth's ability to implement the Fiscal Plan. (Murray Decl. Ex. 1 ¶¶ 99-

102.)  The Plan will leave the Debtors with a level of cash consistent with the cash necessary to implement the undertakings referenced in the Fiscal Plan.  (Murray Decl. Ex. A ¶ 65.)  In addition, the Plan imposes a comprehensive cap on net tax-supported debt equal to 7.94% of debt policy revenues, and the expected level of net tax supported debt service is projected to be 7.6% of debt policy revenues.  (Murray Decl. Ex. A ¶¶ 100-01; Plan § 74.4.)

209.    The Commonwealth has sufficient resources to pay debt service pursuant to the Plan until 2034, through annual surpluses.  (Wolfe Decl. Ex. 1 ¶ 12.)  Additional options for payment of debt service will become available in later years because the Commonwealth can implement structural reforms to increase the Commonwealth's resources and create surpluses.  (Wolfe Decl. ¶¶ 13, 15-27.)  Proactively implementing structural reforms would create a stream of fiscal surpluses sufficient to cover the Commonwealth's debt service obligations pursuant to the Plan and could build cumulative surpluses not incorporated into the Fiscal Plan totaling $32.4 billion for fiscal years 2022 through 2046, well above the cumulative debt service over that same period of $10.9 billion.  (Wolfe Decl. Ex. 1 ¶¶ 13, 27.)  There are additional potential upside factors not incorporated into the Plan which, if they occur, will produce additional revenues.  These factors include a potential increase in federal Medicaid funding, and potential provision of Social Security Income to Puerto Rico residents that could increase economic activity.  (See Malhotra Decl. ¶¶ 44-48.)

210.    Accordingly, the Plan is feasible with respect to the Commonwealth and is not likely to result in the need for a further restructuring of the Commonwealth.

**ii.    Best Interests Test**

211.    As in chapter 9 of the Bankruptcy Code, PROMESA's "best interests" test differs substantially from the chapter 11 "best interests" requirement.  In chapter 11, the test requires a

court to determine whether an individual creditor would receive more if the chapter 11 debtor

were to liquidate its assets.  In contrast, the chapter 9 test is not a liquidation test (because

municipalities cannot be liquidated) and is focused on the *collective* recovery of creditors in the

aggregate.  Cf. In re City of Detroit, 524 B.R. at 212-13 (comparing the "best interests" tests in

chapter 9 and chapter 11 of the Bankruptcy Code); see also In re Fin. Oversight & Mgmt. Bd. for

P.R., 361 F. Supp. 3d 203, 250-51 (D.P.R. 2019).  The PROMESA best interests test additionally

modifies the chapter 9 best interests test, only requiring the Court "to *consider* whether available

remedies under the non-bankruptcy laws and constitution of the territory would result in a greater

recovery for the creditors than is provided by [the] plan."[50]  48 U.S.C.A. § 2174(b)(6) (Westlaw

through P.L. 117-80) (emphasis added).  Thus, the PROMESA best interests test does not impose

a litmus test or establish a floor for creditor recoveries.  See id.

212.     Accordingly, PROMESA's best interests test requires the Court only to *consider*

whether creditors of each Debtor *in the aggregate* receive an equal or greater recovery on their

Claims pursuant to the Plan than they would outside of Title III if the Debtor's Title III case were

dismissed and creditors exercised their remedies.  An analysis of creditor recoveries in such

hypothetical circumstances requires the application of a number of assumptions, including (i)

estimates of the resources that would be available for debt service, which requires an assessment

of available cash, revenues, and operating expenses in the absence of a confirmed plan of

adjustment; (ii) the outstanding creditor obligations due and payable that would exist outside of

Title III; and (iii) the priority in which creditor claims would be paid outside of Title III, which

---

[50]     Notably, Section 314(b)(6) speaks in terms of a single "recovery" for "creditors" (plural).
48 U.S.C.A. § 2174(b)(6) (Westlaw through P.L. 117-80)

in certain circumstances requires consideration of assumptions regarding the potential outcome of litigation matters.  (Shah Decl. ¶ 8.)

213.    The Debtors have met their burden of showing that recoveries for claimholders of each Debtor pursuant to the Plan, in the aggregate, are within the range or greater than the range of the projected recoveries for such claimholders in the aggregate if the Title III Cases were dismissed for each of the Debtors, as demonstrated by the best interest test reports attached to the Shah Declaration as Exhibits A, B, and C.  (Shah Decl. ¶ 35, Exs. A, B, and C; Debtors Exs. 130, 131.)  Additionally, the recovery pursuant to the Plan for holders of GO Bonds is within the range of the projected recoveries for such claimholders pursuant to the Oversight Board's best interest test analysis if the Commonwealth's Title III case were dismissed, assuming all GO Bonds were validly issued.  (See Shah Decl. ¶ 45; Shah Decl. Ex. 7 to Ex. A.)

214.    In the aggregate, excluding the payment of Restriction Fees or Consummation Costs (which are not being paid on account of Claims), and excluding Federal Claims,[51] there are an estimated $22.8 billion in Claims asserted against the Commonwealth, which are projected to receive $15.7 billion pursuant to the Plan, for an aggregate recovery for all claimholders of 69%, exclusive of any payments to be made with respect to CVIs or payments from the Avoidance Actions Trust.  (Id. ¶ 48.)  This compares favorably to the projected range of recoveries pursuant to the Oversight Board's best interest test analysis if the Commonwealth's Title III case is dismissed: $9.3-15.3 billion (34%-62%).  (Id. ¶ 35.)  Realized Commonwealth creditor recoveries could be even higher pursuant to the Plan, as the 69% estimated recovery excludes

---

[51]    Federal Claims are excluded from the aggregate recovery computation because they are being paid at 100% and would artificially inflate the demonstration as to other claims. (See Plan § 73.1; Shah Decl. ¶ 35 n.3.)

any additional recoveries available on account of payments from the Avoidance Action Trust or CVIs.  (Id. ¶ 48.)

215.    Pursuant to the Plan, exclusive of the payment of the ERS Restriction Fee (which is not being paid on account of Claims), ERS Bondholders are projected to receive a recovery of approximately $444 million on $3.169 billion of Claims, and ERS General Unsecured Claims are projected to receive a recovery of 100% on approximately $300,000 of Claims, for an implied aggregate recovery of 14%.  (Shah Decl. ¶ 54.)  This is within the range of projected recoveries pursuant to the Oversight Board's best interest test analysis if ERS's Title III case is dismissed: $0.2-3.7 billion (5%-100%).  (Id. ¶ 35.)[52]

216.    Pursuant to the Plan, PBA Bondholders are projected to receive a recovery of $1.1 billion against PBA.  (Id. ¶ 59.)  The Plan provides that the PBA/DRA Secured Claim, PBA General Unsecured Claims, and PBA/DRA Unsecured Claims, will receive recoveries of approximately $6.6 million, $41.0 million, and $13.4 million, respectively.  (Id.)  Accordingly, holders of Claims against PBA are projected to receive an implied aggregate recovery of $1.1 billion, or 21%.  (Id.)  This compares favorably to the projected recoveries pursuant to the Oversight Board's best interest test analysis if PBA's Title III case is dismissed: $0.3 billion (5%).  (Id. ¶ 35.)

---

[52]    While it is theoretically possible there would be a 100% recovery on ERS Claims outside of Title III, that result is very unlikely because it would require a court to rule that ERS Bondholders hold liens on PayGo payments.  Notably, the First Circuit has already determined that the ERS Bondholders' collateral, which consists of statutory employer contributions to ERS, was subject to material impairment by legislative action, stating: "Importantly, the Bond Resolution explicitly states that the legislature of the Commonwealth might reduce (or, by implication, eliminate) Employers' Contributions, and so 'adversely affect[]' the Bondholders."  Fin. Oversight & Mgmt. Bd. for P.R. v. Andalusian Global Designated Activity Co. (In re Fin. Oversight & Mgmt. Bd. for P.R.), 948 F.3d 457, 468-69 (1st Cir. 2020).

217.    Accordingly, for each Debtor, creditors in the aggregate will receive a percentage recovery on their Claims pursuant to the Plan that is within the range of or greater than projected recoveries outside of Title III.[53]  (Id. ¶ 13.)

218.    These results are unsurprising.  Absent a mechanism to restructure the Debtors' outstanding debt and pension liabilities, the Commonwealth would face great uncertainty, financial and political instability, and significant lawsuits.  In such an environment, the Government would face significant challenges to enact legislation and enforce cooperation among agencies to institute structural reforms.  Without the benefit of the uptick in growth from such reforms, overall economic growth and tax revenue would be lower, reducing the amounts available to pay all creditors.  (Id. ¶ 12.)  Outside of Title III and without a confirmed plan of adjustment, creditors would race to the courthouse to recover on their claims.  "Clearly, such a result is chaos . . . ."  6 Collier on Bankruptcy § 943.03 (16th ed. 2021).

219.    Accordingly, the Court finds that the Plan is in the best interests of creditors within the meaning of Section 314(b)(6) of PROMESA.

---

[53]    Several creditors have argued that the Plan is not in their best interests because they would, individually, receive better recoveries under non-bankruptcy laws. (See Samodovitz Obj.; Docket Entry No. 18551 (Ahorro Objection); Docket Entry No. 18585 (AMPR Objection); Docket Entry No. 18566 (Finca Matilde Objection); Hein Obj.). These creditors do not appropriately apply the "best interest" standard under PROMESA. Under the PROMESA standard, as explained above, the Court does not assess each individual creditor's recovery.  Furthermore, these objectors have provided no alternative best interest analysis or evidence to suggest that the Plan as a whole is not in the best interests of creditors in the aggregate.  Many of these objectors also assume in their analysis of their recovery under non-bankruptcy laws that they would prevail in litigation of hotly contested issues that will be settled by the Plan.  Thus, such objections are overruled.

**G. PROMESA § 314(b)(7):** *Fiscal Plan Consistency*.

220.     Section 314(b)(7) of PROMESA requires that the Plan merely be consistent with, not identical to, the applicable certified fiscal plan.  (Jaresko Decl. ¶ 103; Murray Decl. Ex. A ¶ 62.)  The Plan is consistent in all respects with the Fiscal Plan—nothing contained in the Plan would violate or otherwise interfere with the Fiscal Plan.  (Jaresko Decl. ¶ 103; see Debtors Ex. 10.)

221.     The Fiscal Plan provides a blueprint for the Commonwealth to achieve, among other things, fiscal responsibility and access to capital markets, and contains a debt sustainability analysis ("DSA"), which creates a range established by the Oversight Board as the amount of debt and long-term capacity of the Government to pay debt service on its debt.  (Zelin Decl. ¶ 57; Malhotra Decl. ¶¶ 55-56; Debtors Ex. 10.)  The aggregate principal and total debt service of the New GO Bonds falls within the bounds of the debt range implied by the DSA.  (Zelin Decl. ¶ 57; Malhotra Decl. ¶¶ 58-59, 61.)  The cash payments due on the Effective Date do not count as debt for purposes of the DSA because the cash payments do not create a debt obligation after the Effective Date.  (Malhotra Decl. ¶ 60.)  Any cash payments under the CVIs do not count as debt for purposes of the DSA because the CVIs are only payable out of outperformance.  (Id.)  The CVI payments are contingent in nature and are, by definition, paid from excess cash available relative to baseline Fiscal Plan projections.  (Zelin Decl. ¶ 58; Malhotra Decl. ¶ 60.)  The debt levels under the Plan are consistent with the debt levels set forth in the Fiscal Plan, and the debt proposed to be issued pursuant to the Plan is consistent with the DSA.  (Skeel Decl. ¶ 52; Murray Decl. Ex. A ¶¶ 72, 78; Malhotra Decl. ¶ 61.)

222.     The Plan is also consistent with the Fiscal Plan because it includes the freeze of accruing pension benefits and elimination of all COLAs under Act 91-2004, amended by 160-

2013 for TRS, and under Act 12-1954, amended by 162-2013, for JRS. (See Plan §§ 55.8, 55.9, Exs. E, F.) The Fiscal Plan requires the pension freeze and the elimination of COLAs, and the failure to include the pension freeze and elimination of future COLAs in the Plan would cause it to be materially inconsistent with the Fiscal Plan due to the significant additional spending and unpredictable costs that would result from the exclusion of the pension freeze and COLA elimination provisions. (Jaresko Sup. Decl. ¶ 13; see Debtors Ex. 10.) Moreover, the costs of removing the pension freeze and elimination of COLAs would increase over time and grow larger during periods in which deficits are projected by the Fiscal Plan. (Jaresko Sup. Decl. ¶¶ 8, 13; Malhotra Sup. Decl. ¶ 17.)

223. If Act 53 were interpreted to require the removal of the freeze and COLA elimination, and the Plan were modified to implement such changes, the Plan would not be consistent with the Fiscal Plan. (Jaresko Sup. Decl. ¶ 13.) The Court's conclusion that the Plan is consistent with the Fiscal Plan is dependent on, among other things, the Plan's inclusion of the pension freeze and elimination of COLAs.

224. The Plan remains consistent with the Fiscal Plan notwithstanding the elimination of the Monthly Benefit Modification. The Fiscal Plan contemplates the possibility that pensioners would be restored to the full amount of their accrued pension benefits under certain circumstances. (Debtors Ex. 10 at 279.) Unlike the costs of removing the pension freeze and elimination of COLAs, the majority of the costs associated with removal of the Monthly Benefit Modification will be incurred during periods of budget surplus. (Jaresko Sup. Decl. ¶ 12; Santambrogio Sup. Decl. ¶ 10; Malhotra Sup. Decl. ¶ 9; Debtors Ex. 10 at 59.)

225. The Fiscal Plan explicitly provides for the establishment of the Pension Reserve Trust to ensure that the future pension benefits contemplated by the Plan will be supported

regardless of the future economic or political circumstances of the Commonwealth.  (Jaresko Decl. ¶ 103.)  To ensure adequate funding to cover the increased costs resulting from the elimination of the Monthly Benefit Modification, additional funds will be set aside in the Pension Reserve Trust during years in which the Fiscal Plan projects a surplus.  (Jaresko Sup. Decl. ¶ 9.)  An increase to the funding amounts for the Pension Reserve Trust using a surplus-based funding mechanism does not render the Plan inconsistent with the Fiscal Plan because such increased funding levels come out of projected surpluses and do not impose additional obligations on the Commonwealth that would interfere with carrying out the Fiscal Plan.  (See Jaresko Decl. ¶ 103; Jaresko Sup. Decl. ¶¶ 9-12.)

226.     In addition, the Plan modifies the Seventh Amended Plan to provide that the Upside Participation Bonus pursuant to the AFSCME Plan Support Agreement (Debtors Ex. 21) will be a minimum of $2,000 for each AFSCME-represented employee during the five-year term of the new AFSCME collective bargaining agreement.  (See Plan App'x II.)  The additional cost of this modification is only an incremental cost of approximately $18.3 million per year for the five years beginning in fiscal year 2022 as compared to the lower Upside Participation Bonus contemplated in the Seventh Amended Plan.  (Santambrogio Sup. Decl. ¶ 11.)

227.     Accordingly, the Plan complies with PROMESA section 314(b)(7).  The Court's determination sustaining objections that allowed Eminent Domain/Inverse Condemnation Claims are protected by the Fifth Amendment's Takings Clause and, accordingly, may not be impaired by the Plan, does not vitiate the Plan's compliance with PROMESA section 314(b)(7) because there are sufficient uncommitted funds to satisfy Takings Clause Claim obligations without requiring modification of the certified fiscal plan.  (See supra ¶ 204 n.47.)

**H. Bankruptcy Rule 3019:**  *The Plan Does Not Adversely Change the Treatment of Claims of Creditors*.

228.  The Oversight Board filed the Eighth Amended Plan after the Voting Deadline had passed.  The Eighth Amended Plan eliminated the Monthly Benefit Modification that was contained in the Seventh Amended Plan and makes minor revisions to address concerns raised by certain parties.  None of the modifications adversely changes the treatment of the Claims of any Creditor that accepted the Seventh Amended Plan.  To the contrary, the Plan was amended to enhance the treatment of the pension Claims in Classes 51A through 51I, 51K, and 51L through the removal of the Monthly Benefit Modification (see Malhotra Sup. Decl. ¶¶ 8-9). Treatment of Claims in other Classes is not affected in any way by this change.

229.  In addition, following the passage of the Voting Deadline, the Oversight Board filed the First Modified Eighth Amended Plan, which separately classified the GDB/PET Claim in Class 58A.  (See First Modified Eighth Amended Plan art. LXII.)  The GDB/PET Claim was previously classified as a CW General Unsecured Claim in Class 58.  Pursuant to section 62.4 of the Plan, the holder of the GDB/PET Claim will receive "payments from the Commonwealth equal to, and on the same timeframe, as the pro rata payments to be made to holders of Allowed CW General Unsecured Claims pursuant to the terms and provisions [governing treatment of CW General Unsecured Claims]," (Plan § 62.4), but Debtors represent that the GDB/PET Claim is not intended, nor shall it be construed, as a CW General Unsecured Claim pursuant to the Plan. The GDB/PET Claim is treated in the same manner as it would have been treated pursuant to the Seventh Amended Plan.  (See id.)  Accordingly, this modification does not adversely change the treatment of the Claims of any Creditor that accepted the Seventh Amended Plan.

230.  The Oversight Board subsequently filed the Plan, which contains additional technical changes from intermediate amended versions that do not adversely affect the treatment

of any Claims, as well as modifications to comply with this Court's determination regarding the proper treatment of Allowed Eminent Domain/Inverse Condemnation Claims and the proper scope of the preemption provision.

231.    The modifications do not materially or adversely modify the treatment to be afforded to creditors pursuant to the Plan and do not require the resolicitation of acceptances or rejections thereof.  Accordingly, the Plan can be confirmed without the filing of a new disclosure statement and resolicitation with respect to the Plan.  See Bankr. R. 3019.

**I.   Nullification of Laws Conditioning Debt Authorization on Elimination of Freeze of Accruing Pension Benefits and Cost of Living Adjustments.**

232.    The Debtors represent that all parties in interest, including, without limitation, the Governor and the Legislature, know that the Plan's consistency with the Fiscal Plan, feasibility, and implementation are each dependent on the freezes in the accruals of future pension benefits under TRS and JRS and elimination of cost of living adjustments.  (See supra n.23.)  All objections that suggest that Act 53 or any other law causes the new debt issued under the Plan to be unauthorized by Act 53 due to the freezes in the accruals of future pension benefits under TRS and JRS and elimination of cost of living adjustments have been overruled as set forth in the Confirmation Order.  To the extent any law is interpreted to mean such freezes and eliminations cause the new debt issuable under the Plan to be unauthorized, Act 53 and such other laws, if any, may not be enforced pursuant to section 108 of PROMESA to the limited extent of eliminating such impact on the debt's authorization.  The Debtors have proven to the Court's satisfaction that the unambiguous language of Act 53 does not provide that such freezes and eliminations cause the new debt issuable under the Plan to be unauthorized. Notice of the request for such determination was adequately provided to all former and present governmental employees. (See Docket Entry No. 19182.)

**The Releases, Exculpations, and Injunctions Pursuant to the Plan**

233.    The Plan includes certain discharge, release, exculpation, and injunction

provisions, which are essential to the Debtors' restructuring, and without which a consensual

restructuring could not be successfully accomplished.  (Jaresko Decl. ¶ 217; Zelin Decl. ¶ 95.)

234.    A critical element of the Plan is the complete resolution of the Commonwealth

Title III Case, the ERS Title III Case, and the PBA Title III Case.  To achieve this, the Debtors

and certain claimholders agreed to a mutual release of all Claims and Causes of Action arising,

in whole or in part, prior to the Effective Date.  (Jaresko Decl. ¶ 218.)  The Debtors' releases

incentivized claimholders to support, and undertake actions to support, the Plan and its

confirmation, without fear of lawsuits in the future.  Certain creditors would not have supported

the Plan absent its release provisions.  (Jaresko Decl. ¶ 219; Zelin Decl. ¶ 100.)  Further, the

releases of claims by the Debtors affect only those parties that made a significant contribution to

the negotiation and development of the Plan and incurred cost and expense during their essential

participation in negotiations.  (Jaresko Decl. ¶ 221; Zelin Decl. ¶¶ 102, 106.)  The Plan's

discharges and releases likewise provide the Debtors and Reorganized Debtors with assurance

that the restructuring balance struck by the Plan will not be upset by further claims against the

Reorganized Debtors after the Effective Date.  (Jaresko Decl. ¶ 220; Zelin Decl. ¶ 106.)

**A.  Releases**

235.    The Plan's release provisions include, among other provisions, subject to certain

exclusions as set forth in the Plan: (i) a release by the GO/PBA PSA Creditors (solely in their

capacity as Creditors of the Debtors), which includes the Monolines, against certain government

parties, including the Oversight Board, AAFAF, and the Debtors, of certain Claims and Causes

of Action arising prior to the Plan Effective Date, including the Revenue Bond Claims litigation

and the Lift Stay Motions, and (ii) a release by the Debtors and Reorganized Debtors of Claims and Causes of Action related to the Debtors and their assets in the Title III Cases.  (Zelin Decl. ¶ 96.)

236.     The Plan's release of Claims or Causes of Action by the GO/PBA PSA Creditors against the Oversight Board, its committees and subcommittees, AAFAF, and the Debtors, of certain Claims and Causes of Action, including those related to the Revenue Bond Claims Litigation and Lift Stay Motions, is a key component of the Plan.  (Id. ¶ 97.)  Litigation over such Claims and Causes of Action was hard-fought and remained active as between the Commonwealth, on the one hand, and the Monolines (who would ultimately become GO/PBA PSA Creditors) on the other.  (Id.)  By agreeing to settle these disputes, the GO/PBA PSA Creditors provided a clear benefit to the Debtors by eliminating the need to incur additional costs for, and mitigating the substantial risk associated with, further litigation.  (Id.)  To create global peace upon the effectiveness of the Plan, the Debtors and Reorganized Debtors agreed to release Claims and Causes of Action against, among other entities, the Government Parties, official committees, and PSA Creditors.  (Id. ¶ 99.)  The Plan's release provisions were essential to get the key stakeholders to engage in negotiations over a potential consensual release of claims against the Commonwealth.  (Id. ¶ 100.)

237.     The parties receiving releases all made significant contributions to the negotiation and development of the Plan and incurred costs and expenses during the course of their essential participation in the negotiations.  (Id. ¶ 102.)  The releases were a product of robust, mediator-supervised negotiations and the stakeholders had an opportunity to be heard as to the scope and content of the releases.  (Id. ¶ 105.)  To incentivize the PSA Creditors to grant the concessions outlined above, and in consideration of the substantial benefits provided by the Released Parties,

the Debtors agreed that the Debtors and Reorganized Debtors would prosecute and pursue the

releases, exculpation, and injunction provisions set forth in the Plan.  The Oversight Board has

determined that the releases are fair, reasonable, and in the best interests of the Debtors.  (Id. ¶

103.)

238.    The Plan does not provide for non-consensual third-party releases; the Plan's

releases are limited to those necessary to effectuate the Debtors' successful restructuring.  Except

as explicitly agreed to by the creditors in their respective plan support agreements, the Plan does

not release any claims of a creditor of the Debtors, in its capacity as such, against a party that is

not a Debtor.  (Jaresko Decl. ¶ 223; Zelin Decl. ¶ 107.)  Specifically, section 92.2(a) of the Plan

provides that "without prejudice to the exculpation rights set forth in Section 92.7 [of the Plan],

nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to

be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their

respective Related Persons by Creditors of the Debtors."  (Plan § 92.2(a).)  Further, sections

92.2(d), (e), and (f) of the Plan carve out from the Released Claims certain claims, causes of

action, or other rights or powers that are held by the Securities and Exchange Commission, the

United States, and parties to certain Underwriter Actions.  Likewise, as confirmed by the

definitions of Related Persons (see id. § 1.420) and Released Claims (see id. § 1.421), claims

against AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA, PRIDCO,

PRIFA, UPR, and PREPA, which are or may be subject to their own restructuring proceedings,

are not released pursuant to the Plan and such entities are not "Related Persons" of the Released

Parties or Releasing Parties.  Further, Avoidance Actions generally are not released under the

Plan.  (See id. § 1.421.)  These carve-outs ensure that only those releases that are reasonable and

necessary to Plan confirmation are being provided.  (Jaresko Decl. ¶ 224; Zelin Decl. ¶¶ 108-09.)

239.    For these reasons, the Court finds that the releases contemplated by the Plan are

reasonable, necessary, and appropriate to implementation of the Plan and, therefore, the

consensual releases are hereby approved.

**B.  Exculpation**

240.    Section 92.7 of the Plan provides for exculpation of the Government Parties, PSA

Creditors, Retiree Committee, Creditors' Committee, AFSCME, and the Monolines for, among

other things, any acts taken consistent with the Plan or in connection with the formulation,

preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan

and the settlements contained therein (including, but not limited to, the Plan Support

Agreements).  (Jaresko Decl. ¶ 225; Zelin Decl. ¶ 110.)  The expectation that parties would be

exculpated incentivized them to participate in the negotiations and support confirmation of the

Plan without fear of future lawsuits.  Without the Plan's exculpation provisions, parties would

likely be exposed to litigation after extensive good-faith negotiations.  (Zelin Decl. ¶ 111.)  The

Plan's exculpation provisions are narrowly tailored to the exculpated parties' efforts related to

the formulation of the Plan.  All of the parties being exculpated in the Plan played key roles in

the negotiation of the Plan and the settlements that enabled the Plan, including through their

participation in mediation.  The Plan's exculpation provisions do not alter the liability of any

entity that is determined to have acted or failed to act in a manner that constitutes intentional

fraud or willful misconduct.  (Jaresko Decl. ¶ 226; Zelin Decl. ¶¶ 110, 112.)  In addition, decretal

paragraph 61(g) of the Confirmation Order provides for exculpation of the DRA Parties, which is

substantially the same as the exculpation provided pursuant to the Plan and is appropriate in light

of the Stipulation in Connection with DRA Related Disputes, dated as of November 5, 2021, by

and among the Oversight Board, as representative of the Debtors and HTA, and the DRA Parties.

(See Confirmation Ord. ¶ 61(g); Debtors Ex. 146.) Exculpation provisions are appropriate for

parties' acts or omissions in connection with or related to the "pursuit of confirmation of a plan."

See In re Montreal Me. & Atl. Ry, Ltd., Bk. No. 13-10670, 2015 WL 7431192, at *9 (Bankr. D.

Me. Oct. 9, 2015) (approving exculpation provisions "as appropriate under applicable law

because it is part of a Plan proposed in good faith, was vital to the Plan formulation process and

is appropriately limited in scope . . ., including its carve-out for gross negligence and willful

misconduct").[54]

### C. Injunction

241.    The Plan's injunction provisions (sections 92.3, 92.6, and 92.11) are necessary to

the reorganization and are fair to those parties involved. The injunctions ensure that the releases

and exculpations discussed above are preserved and enforced by prohibiting legal action

concerning the Released Claims, avoiding the time, burden and expense that could be incurred if

parties were permitted to pursue Released Claims. The Plan's injunction provisions are narrowly

tailored to serve that purpose. (Zelin Decl. ¶ 113; Jaresko Decl. ¶ 227.)

242.    The releases, exculpation provisions, and injunctions pursuant to the Plan are

integral and critical parts of the Plan and the compromises and settlements implemented pursuant

to the Plan. (Plan §§ 2.3, 92.4.) The approval of such releases is a condition to the occurrence of

the Effective Date, and all Released Parties have relied on the efficacy and conclusive effects of

---

[54]    Mr. Hein contends that the exculpation provision should not extend to acts or omissions
by the PSA Creditors in connection with their role in negotiating plan support
agreements. Exculpation provisions are, however, appropriate when narrowly tailored to
the acts or omissions of a party in the pursuit of confirmation of a Plan. See In re
Montreal Me. & Atl. Ry., Ltd., 2015 WL 7431192, at *9. Mr. Hein does not allege any
facts suggesting willful misconduct or gross negligence of a PSA Creditor. Thus, the
exculpation provision as crafted is appropriate and Mr. Hein's objection thereto is
overruled.

such releases and injunctions and on the Title III Court's retention of jurisdiction to enforce such

releases and injunctions when making concessions pursuant to the Plan and by agreeing to,

accepting, and supporting the settlement and treatment of their respective Claims, Causes of

Action, and other rights pursuant to the Plan.  (Zelin Decl. ¶¶ 96, 98, 100-04, 106, 110-12; Plan §

86.1.)  Accordingly, such provisions are justified and warranted based upon the circumstances of

the Title III Cases and the consideration being provided by all Released Parties in connection

with the Plan.

243.     To maintain and protect the integrity and feasibility of the Plan, while the

Oversight Board is in existence, any and all governmental units and any officer or employee

thereof shall neither recreate by statute, regulation, rule, policy, or executive order nor repay by

any means, any debt discharged by the Plan without the Oversight Board's express prior written

consent or except as may otherwise be provided by a certified fiscal plan or budget.  Without

limitation, the debt referred to herein includes any and all pension obligations frozen and cost of

living adjustments in amount such that they shall not increase from their levels in existence on

the Effective Date of the Plan.

### Validity of Bonds and CVIs

244.     Pursuant to section 4 of PROMESA, as well as sections 944[55] and 1123 of the

Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Court

---

[55]     Section 944(b)(3) of the Bankruptcy Code the requires the Court, as a condition to
providing a discharge, to determine the validity of obligations imposed under a plan of
the debtor and of any provision made to pay or secure payment of such obligations. 11
U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr.
E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding
restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy
Clause operates to cause federal bankruptcy law to trump state laws, including state
constitutional provisions, that are inconsistent with the exercise by Congress of its
exclusive power to enact uniform bankruptcy laws" (citing Ass'n of Retired Emps. of the

determines that the New GO Bonds and CVIs, and the covenants by the Commonwealth for the

benefit of the holders of the New GO Bonds and CIVs, are legal, valid, binding, and enforceable

obligations of the Reorganized Debtors benefitting from the following protections, each of which

is legal, valid, binding, and enforceable against the Reorganized Debtors, the Commonwealth,

and other persons and entities, as applicable, under Puerto Rico, New York, and federal law:

    a.   The Confirmation Order is full, final, complete, conclusive, and binding and shall
not be subject to collateral attack or other challenge in any court or other forum,
except as permitted under applicable law.

    b.   The New GO Bond Legislation and the CVI Legislation are incorporated into Act
53-2021, which has been validly enacted by the Commonwealth and is valid and
effective in accordance with its terms.

    c.   The New GO Bonds and the CVIs are bonds or notes within the meaning of
Section 2 of Article VI of the Commonwealth Constitution to which the
Commonwealth may legally pledge its full faith, credit and taxing power under
the Commonwealth Constitution and applicable Puerto Rico law for the payment
of principal and interest.

    d.   Pursuant to the New GO Bond Legislation and the CVI Legislation, the
Commonwealth has validly pledged its full faith, credit and taxing power under

---

City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-
16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local
2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D.
Cal. 2010) (additional citations omitted)).  As set forth in the leading bankruptcy treatise,
"[t]he requirement of a court determination of validity is extra assurance for those who
might be skittish about the nature of the bonds being issued . . . . It has the added feature
of removing any doubt concerning the matter, because the determination of the court on
that issue should be binding in the future."  6 Alan N. Resnick & Henry J. Sommer,
Collier on Bankruptcy § 944.03[1][b] (16th ed. 2013).

the Commonwealth Constitution and applicable Puerto Rico law for the payment

of principal and interest with respect to the New GO Bonds and payment with

respect to the CVIs.

e.   Subject to the occurrence of the Effective Date and as of the date of issuance of

the New GO Bonds and CVIs, the Commonwealth is in compliance with any

applicable debt limits, including the Comprehensive Cap and any applicable debt

limit (if any) contained in the Commonwealth Constitution.

f.   Pursuant to the New GO Bonds Legislation and other applicable law, upon the

issuance of the New GO Bonds, the New GO Bonds shall be secured by a first

priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53)) over

the funds deposited in the Debt Service Fund, including any revenues generated

therefrom, which statutory first lien shall occur automatically and shall

automatically attach and be perfected, valid and binding from and after the

Effective Date, without any further act or agreement by any Person, and shall

remain in full force and effect until the New GO Bonds have been paid or

satisfied in full in accordance with their terms.

g.   The statutory first lien on funds deposited into the Debt Service Fund, as provided

for in the New GO Bonds Legislation, and all other provisions to pay the New GO

Bonds are valid, binding, legal and enforceable, including, without limitation,

covenants not to impair such property, maintain available tax exemption and

provide for the conditions regarding substitution of collateral (including, without

limitation, the statutory lien thereon as adequate protection for the property rights

in the Plan and in the Confirmation Order).

h.   The statutory first lien on funds deposited into the Debt Service Fund, as provided

for in the New GO Bonds Legislation, creates the valid pledge and the valid lien

upon the right, title and interest of the Commonwealth in such funds in favor of

the Trustee (for the benefit of the holders of the New GO Bonds) which it

purports to create, subject only to the provisions of the New GO Bonds Indenture

permitting the withdrawal, payment, setting apart or appropriation thereof for the

purposes and on the terms and conditions set forth in the New GO Bonds

Indenture and each applicable supplemental indenture.

i.   The Commonwealth has waived, and shall be deemed to have waived, the

automatic stay in any future insolvency proceeding commenced on behalf of the

Commonwealth (whether under Title III of PROMESA or otherwise) with respect

to monies on deposit in the Debt Service Fund as of the commencement thereof.

j.   The Plan meets all conditions set forth in the New GO Bond Legislation and the

CVI Legislation for issuance of the New GO Bonds and CVIs.

k.   In light of the enactment of the New GO Bond Legislation and the CVI

Legislation, and upon execution by all parties thereto, the New GO Bonds

Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized

by the Commonwealth, and (ii) be in full force and effect and valid and binding

upon the Commonwealth and enforceable in accordance with their terms, except

that enforceability of rights and remedies may be limited by bankruptcy,

insolvency, reorganization, moratorium or other laws affecting creditors' rights

generally or as to the availability of any particular remedy.

l.   At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the

Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to

be stamped or written on each of the New GO Bonds, the GO CVIs, and the

Clawback CVIs, a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT
> FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11
> U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY
> BINDING, AND ENFORCEABLE PURSUANT TO THE
> JUDGMENT AND CONFIRMATION ORDER, ENTERED ON
> THE 18TH DAY OF JANUARY, 2022.

### GDB Loan Priority Determination

245.   The Plan provides for the issuance of the HTA Clawback CVI as consideration

for the settlement of CW/HTA Claims under the HTA/CCDA Plan Support Agreement.  The

CVI Indenture provides for four separate Sub-Subseries of such HTA Clawback CVI to be

issued, and for payments on such Sub-Subseries of the HTA Clawback CVI to be made first, on

account of CW/HTA Claims related to the HTA 68 Bonds; second, on account of CW/HTA

Claims related to the HTA 98 Senior Bonds; third, on account of CW/HTA Claims related to the

HTA 98 Sub Bonds; and fourth, subject to the GDB Loan Priority Determination, on account of

either CW/HTA Claims related to the GDB HTA Loans or CW/HTA Claims related to the HTA

Bonds.  (CVI Indenture §§ 2.01(c)(i), 5.07(c); see also Plan at J-12, §§ 1.172, 63.2, Ex. J at

Annex 6.)

246.   Certain disbursements under the "CVI Payment Reserve" are dependent on the

"GDB Loan Priority Determination," (Plan § 1.172), which is defined as "[t]he determination, in

either the Commonwealth Title III Case or the HTA Title III Case, (a) with respect to the relative

rights of recovery and priority of payment of the [19]68 Bonds and the [19]98 Bonds to the

rights of GDB with respect to the GDB HTA Loans, and/or (b) that the [DRA] does not possess

an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon

such GDB HTA Loans."  (Plan § 1.259.)

247.    On June 26, 2021, the DRA Parties filed a complaint initiating an adversary

proceeding against the Defendants,[56] with the stated purpose of "provid[ing] a means to resolve

the priority question with respect to the payments made by the Commonwealth on account of the

clawback claims, and any payments that may be made on account of the Loan Claims and the

HTA Bonds under a future plan for HTA."  (Docket Entry No. 1 in Adv. Proc. No. 21-00068-

LTS ¶ 101.)

248.    The complaint sought declaratory relief on four counts: (i) Count 1, "that the

DRA is the only party with (i) a valid, perfected, first-priority lien on the Act 30-31 Revenues

and (ii) a right to collect from the Act 30-31 Revenues;" (ii) Count 2, "that the HTA Bondholders

have limited collateral to secure the bonds, that the HTA Bonds are limited recourse obligations,

and neither the collateral pledged to secure the bonds, nor the bond revenues to which the

bondholders have recourse, includes the Act 30-31 Revenues;" (iii) Count 3, "that the DRA's

Loans are not subordinate to the bonds;" and (iv) Count 4, "that the DRA's Loans are entitled to

collect on the loan claims from the bond revenues not deposited in the bond revenue accounts."

(Docket Entry No. 1 in Adv. Proc. No. 21-00068-LTS.)

249.    On August 26, 2021, the Defendants moved to dismiss all four counts (Docket

Entry No. 44 in Adv. Proc. No. 21-00068-LTS ¶¶ 2-6) (the "Motion to Dismiss").  On September

23, 2021, the DRA Parties filed an opposition to the Motion to Dismiss and on October 8, 2021,

---

[56]    "Defendants" means Ambac Assurance Corporation, Assured Guaranty Corp., Assured
Guaranty Municipal Corp., Financial Guaranty Insurance Company, National Public
Finance Guarantee Corporation, Peaje Investments LLC, and The Bank of New York
Mellon.

Defendants filed their reply in support of the Motion to Dismiss, which concluded briefing on the motion.[57]

250.    On October 29, 2021, the Court entered an opinion and order dismissing all four counts of the DRA Parties' complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief could be granted (Docket Entry No. 83 in Adv. Proc. No. 21-00068-LTS at 27) (the "GDB Loan Priority Determination Opinion").

251.    As to Count 1, the Court held that the plain language of Acts 30 and 31[58] and the Assignment and Security Agreement[59] make clear that the HTA Bonds are payable from Act 30-31 Revenues.[60]  (GDB Loan Priority Determination Op. at 18-20.)

252.    As to Count 3, the Court held that HTA Bondholders had standing to enforce the subordination provisions of the Assignment and Security Agreement and Loan Agreements[61] under 3 L.P.R.A. § 2013(a)(3).  The Court further held that the Assignment and Security Agreement unambiguously subordinates the GDB HTA Loans to the HTA Bonds (including, for the avoidance of doubt, the HTA 68 Bonds and the HTA 98 Bonds), a conclusion that was

---

[57]    The Oversight Board and AAFAF were granted full intervention rights in Counts 1, 2, and 4 of Adversary Proceeding No. 21-00068-LTS and moved to dismiss those counts, but their motion was denied as moot in light of the order granting the Defendants' Motion to Dismiss.

[58]    "Acts 30 and 31" means Commonwealth Act 30-2013 and Act 31-2013, both approved on June 25, 2013.

[59]    "Assignment and Security Agreement" means the agreement between HTA and GDB executed on August 28, 2013.

[60]    "Act 30-31 Revenues" means certain crude oil taxes, motor vehicle license fees, and other excise taxes levied pursuant to Acts 30 and 31.

[61]    "GDB HTA Loan Agreements" means the loan agreements between GDB and HTA that were executed between 2008 and 2014.

reinforced by the GDB HTA Loan Agreement attached to the Complaint. (GDB Loan Priority Determination Op. at 21-23.)

253. The Court dismissed Counts 2 and 4 because they "logically depend[ed]" on the Court granting Counts 1 and 3, because the Assignment and Security Agreement "unambiguously compels the conclusion that, before any funds are paid toward the Loans, Bond payment obligations must first be satisfied." (GDB Loan Priority Determination Op. at 25.)

254. In the GDB Loan Priority Determination Opinion, the Court directed the Clerk of Court to enter judgment consistent therewith, and a final judgment dismissing Counts 1, 2, 3, and 4 was entered thereafter. (GDB Loan Priority Determination Op. at 27; Docket Entry No. 86 in Adv. Proc. No. 21-00068-LTS.)

255. The Court's rulings in the GDB Loan Priority Determination Opinion are incorporated by reference herein.

256. The Court's ruling that the GDB HTA Loans and any liens securing such GDB HTA Loans are subordinated to the HTA Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.[62]

### **Miscellaneous Provisions**

257. <u>Plan Supplement</u>. All materials contained in the Plan Supplement comply with the terms of the Plan, and the filing, notice, and service of such documents were done in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and no other or further notice is or shall be required. (<u>See</u> Service Affidavits; Plan Sup.)

---

[62] Pursuant to section 1.172 of the Plan, Cash payable from the HTA Clawback CVI in the CVI Payment Reserve will be distributed upon entry of a Final Order with respect to the GDB Loan Priority Determination.

258.   <u>Satisfaction of Confirmation Requirements</u>.  Based on the foregoing, the Plan

satisfies the requirements for confirmation set forth in section 314 of PROMESA.

259.   <u>Oversight Board Certification</u>.  For purposes of section 209 of PROMESA, the

discharge of debt to occur as of the Effective Date pursuant to the Plan and the Confirmation

Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues

for the Commonwealth, as determined in accordance with modified accrual accounting

standards.

260.   <u>Implementation</u>.  All documents necessary to implement the Plan, including those

contained in the Plan Supplement and all other relevant and necessary documents, have been

negotiated in good faith and at arm's length and shall, upon completion of documentation and

execution, be valid, binding, and enforceable agreements and not be in conflict with any federal

or state law.  Without limiting the generality of the foregoing, the Debtors, prior to the Effective

Date, and Reorganized Debtors, from and after the Effective Date, are authorized to consummate

the transactions contemplated in the Plan and Plan Supplement.  The execution, delivery, or

performance by the Debtors or Reorganized Debtors, as the case may be, of any documents in

connection with the Plan Supplement, and compliance by the Debtors or Reorganized Debtors,

as the case may be, with the terms thereof, is hereby authorized by, and will not conflict with, the

terms of the Plan or the Confirmation Order.

261.   <u>Good Faith</u>.  The Debtors will be acting in good faith if they proceed to (i)

consummate the Plan and the agreements, settlements, transactions, and transfers contemplated

thereby and (ii) take the actions authorized and directed by the Confirmation Order.

262.   <u>Retention of Jurisdiction</u>.  This Court may properly and, upon the Effective Date

shall, subject to the terms and provisions of article XCI of the Plan, and except as otherwise

provided in the Plan or Confirmation Order, pursuant to sections 105, 945(a), and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of the Plan, retain exclusive jurisdiction to the extent it has exclusive subject matter jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction, over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over the matters set forth in article XCI of the Plan.

263.   Without limiting the generality of any of the foregoing, the Court shall retain jurisdiction to (i) enter appropriate orders with respect to the payment, enforcement, and remedies of the bonds and any other instruments issued pursuant to the plan, (ii) enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, (iii) adjudicate any and all controversies, suits, or issues that may arise regarding the validity of any action taken by any entity pursuant to or in furtherance of the Plan or the Confirmation Order including, without limitation, issuance of bonds, and (iv) to enforce prohibitions against any subsequent collateral attack on provisions contained in the Plan and the Confirmation Order.

264.   Governing Law.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document entered into in connection with the Plan or Plan Supplement provides otherwise, the rights, duties, and obligations arising pursuant to the Plan shall be governed by, and construed in accordance with, PROMESA (including the provisions of the Bankruptcy Code make applicable pursuant to section 301 of PROMESA), and to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

265. <u>Enforceability</u>. Pursuant to Bankruptcy Code sections 1123(a), 1123(b), and 944(a) as well as general principles of federal supremacy, the provisions of this Memorandum, the Confirmation Order, and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law. The documents contained in the Plan Supplement (as such documents may be further modified and filed with the Court prior to the Effective Date) provide adequate means for implementation of the Plan pursuant to section 1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall constitute valid legal obligations of the Debtors and valid provisions to pay or secure payment of the bonds pursuant to section 944(b)(3) of the Bankruptcy Code, and shall be enforceable in accordance with their terms.

266. <u>No Precedential Effect</u>. The findings of fact and conclusions of law herein concerning the separate classification of certain Claims from Class 58 CW General Unsecured Claims, including the governmental or business reasons for such classifications, are made with respect to the Title III cases of the Commonwealth, ERS, and PBA, and shall not have any precedential effect for other Title III cases.

## **<u>Conclusion</u>**

For the foregoing reasons, the Debtors' motion to confirm the Plan is granted and a Confirmation Order will be entered contemporaneously herewith.

SO ORDERED.

Dated: January 18, 2022

/s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge

## Exhibit A

**Preempted Statutes**

## I.  Commonwealth good faith and credit pledge statutes

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 2 approved October 10, 1985 13 L.P.R.A. § 141–141m** | Authorizes the issue of refinancing bonds to refinance all or any part of any public improvement bonds, provides for payment of principal and interest on such refinancing bonds, provides for the use of proceeds of such bonds, and exempts such bonds from the payment of taxes | **Section 1** – Authorizes issuance of refinancing bonds and payment of costs related to the sale and issuance of such refinancing bonds<br><br>**Section 3(f)** – Provides refinancing bonds may be issued subject to certain conditions<br><br>**Section 5** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the refinancing bonds; authorizes and directs the Secretary of the Treasury to make such payments<br><br>**Sections 6(a) and (c)** – Provides that proceeds of bond issuances shall be held in trust solely for the payment of principal and interest on bonds being refinanced | **Sections 1, 3(f)** – The Act does not authorize the issuance of specific bonds, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Section 5** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Sections 6(a) and (c)** – The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds will be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.<br><br>Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | During the term of the Oversight Board |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 1 approved June 26, 1987, as amended 13 L.P.R.A. § 63–63h** | Authorizes the issuance of notes, in a principal amount that shall not exceed $800 million, in advance of taxes and revenues of the Commonwealth to be collected in cash during such fiscal year, and creates a Special Fund for the Redemption of Notes in Advance of Taxes and Revenues | **Section 1** – Authorizes the issuance of notes and payment of expenses related to the sale and issuance of such notes <br><br> **Section 4** – Provides that all specified taxes and revenues received after the notes are issued and before the close of the fiscal year in which the notes are issued be deposited in a special fund, and that the money in such fund shall be used to pay the principal, redemption premium, and interest on the notes and shall not be used for any other purpose | **Section 1** – The Act does not authorize the issuance of specific bonds, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). <br><br> To the extent the statute is interpreted not to require approval pursuant to PROMESA section 207, the Act would be inconsistent with PROMESA and is therefore preempted. <br><br> **Section 4** – The Act requires certain taxes and revenues to be used solely for bond payments, which are not provided for in the Fiscal Plan or Plan, and which bonds will be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | PROMESA section 207 requires that, for so long as the Oversight Board remains in operation, "no territorial government may, without the prior approval of the Oversight Board, issue debt or guarantee exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt." Additionally, the Plan provides, at paragraph 74.5, limitations on future debt which supports feasibility. *See* Plan § 74.5. <br><br> To the extent the Act is interpreted or applied to permit the Commonwealth to "issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt" without the prior approval of the Oversight Board as required by PROMESA section 207, and/or without compliance with | During the term of the Oversight Board |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | paragraph 74.5 of the Plan, the Act is preempted.<br><br>Such an interpretation or application of the Act would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | |
| **Act 34 approved March 4, 2014** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $3.5 billion to pay or refinance debt and other obligations of the Commonwealth or public corporations, pay rent to PBA, other uses authorized pursuant to previous legislation, establish reserves associated with the bond issuance, and provide for payment of principal and | **Sections 1, 1(i)–(iv), and 1(vii)** – Authorizes the issuance of bonds, the proceeds of which shall be used for the payment of bonds and other debt of the Commonwealth and its instrumentalities and to establish related reserves in connection with the issuance of the bonds, and authorizes the payment of costs incurred in connection with the issuance of the bonds. | **Sections 1, 1(i)–(iv), 1(vii), 5** – The Act authorizes the issuance of bonds in an amount not to exceed $3.5 billion, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds and notes priority not otherwise provided | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | interest on the bonds, among other purposes | **Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of bond anticipation notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 7** – Authorizes the use of money appropriated under the Act for payment of other Commonwealth debt or obligations, or any other use approved by the Legislative Assembly, to the extent not needed for | for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Section 7** – The Act authorizes the use of funds for the payment of any debt of the Commonwealth or any unspecified "other use," which may not be provided for in the Fiscal Plan or the Plan, and may be restructured pursuant to the Plan. (PROMESA § 202, 314). | Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | the purposes stated in the Act. | | | |
| **Act 79** approved **June 1, 2011** | Authorizes the issuance of Commonwealth bonds in a principal amount that shall not exceed $304 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds, and provides that $34 million of proceeds be reserved for payment of interest on bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments. | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $304 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 13** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Section 1** – The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.<br><br>Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 13** – Appropriates $8.5 million of bond proceeds for payment of expenses incurred in connection with the bond issuance. | | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 243 approved August 9, 2008** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $250 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds. <br><br> **Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments. <br><br> **Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds. <br><br> **Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $250 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). <br><br> **Sections 4, 5, 6, 13** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. <br><br> Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | Secretary of the Treasury to make such payments.<br><br>**Section 13** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | | with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 43 approved August 1, 2005, as amended** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $575 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $575 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 13** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 13** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | | Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 216 approved August 19, 2004** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $550 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds. | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $550 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted | Permanent |

8

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | restructured pursuant to the Plan. (PROMESA §§ 202, 314). | by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 100 approved July 12, 2002, as amended** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $500 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $500 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 161 approved July 5, 2003** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $540 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $540 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | **Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 149 approved August 9, 2002, as amended** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $110 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Establishes a special fund to which an amount equal to or greater than $110 million must be deposited by the Secretary | **Section 1** – The Act authorizes the issuance of bonds in an amount not to exceed $110 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | of Treasury for the payment of principal, redemption premium, and interest on the bonds.<br><br>**Section 5** - Authorizes and directs the Secretary of the Treasury to make bond payments. | provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Joint Resolution No. 57** | Authorizes the Secretary of the Treasury to issue, from time to time, refinancing bonds of the | **Section 1** – Authorizes the issuance of bonds. | **Section 1** – The Act does not authorize the issuance of specific bonds, and could be used to issue additional debt in the future which is | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and | For so long as the Oversight Board |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|------------------------|
| approved July 12, 1993 | Commonwealth with the purpose or refinancing, completely or partially, any expenses related to the sale and issue of said Refinancing Bonds | | not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). | the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. | remains in place |
| Act 54 approved July 6, 2001 | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $475 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of interest on the notes; | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $475 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring | Permanent |

13

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates bond proceeds necessary for payment of expenses incurred in connection with the bond issuance. | | the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 118 approved July 13, 2000** | Authorizes the issue of bonds of the Commonwealth in a principal amount that shall not exceed $425 million to cover the costs of public improvements | **Section 1** – Authorizes the issuance of bonds.<br><br>**Section 4** – Provides the good faith, credit, and taxing power of the Commonwealth are pledged for payment of principal and interest on the bonds; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 5** – Authorizes the borrowing of money and issuance of notes, payable from the proceeds of the bonds.<br><br>**Section 6** – Provides the good faith, credit, and | **Sections 1, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $425 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 4, 5, 6, 12** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over | Permanent |

14

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | taxing power of the Commonwealth are pledged for payment of interest on the notes; authorizes and directs the Secretary of the Treasury to make such payments.<br><br>**Section 12** – Appropriates $3.25 million of bond proceeds for payment of expenses incurred in connection with the bond issuance. | | $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 153 approved July 19, 1999** | Act 153-1999, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes in an amount not to exceed $475,000,000; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Section 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Section 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes.<br><br>**Section 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Section 4** – Directs payment of principal and | **Sections 1 (para. 1), 3, 5** – The Act authorizes the issuance of bonds in an amount not to exceed $475 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 1 (para. 3), 4, 6** – The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

15

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Section 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Section 6** – Pledges good faith, credit, and taxing power and directs payment of interest on notes as it comes due. Directs issuance of bonds to pay said notes.<br><br>**Section 7** – Proceeds shall be covered into "Public Improvements Fund of 2000" and disbursed according to unspecified statutory provisions<br><br>**Section 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the Public Improvements Fund of 2000.<br><br>**Section 12** – Appropriates $3.25 million to expenses of issuing bonds. | Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Sections 7, 8, 12, 13** – The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 12** – The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Proposed Plan. (PROMESA §§ 202, 314). | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 13** – Appropriates $23.75 million to the Aqueduct and Sewer Authority. | | | |
| **Act 219** approved August 9, 1998 | Act 219-1998, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Article 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Article 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes.<br><br>**Article 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Article 4** – Directs payment of principal and interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Article 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Article 6** – Provides for pledge of good faith, credit, and taxing power and directs payment of interest on notes as it | **Article 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $475 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Articles 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Articles 7, 8, 12, 13** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Article 12** - The Act requires certain proceeds to be used solely for bond | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | comes due. Directs issuance of bonds to pay said notes.<br><br>**Article 7** – Proceeds shall be covered into "1999 Public Improvement Fund" and disbursed pursuant to unspecified statutes.<br><br>**Article 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the 1999 Public Improvement Fund.<br><br>**Article 12** – Appropriates $3.25 million to expenses of issuing bonds.<br><br>**Article 13** – Appropriates $23.75 million to the Infrastructure Financing Authority (AFI). | payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 81 approved August 14, 1997** | Act 81-1997, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; | **Section 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Section 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes. | **Sections 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $500 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Section 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Section 4** – Directs payment of principal and interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Section 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Section 6** – Provides for pledge of good faith, credit, and taxing power and directs payment of interest on notes as it comes due. Directs issuance of bonds to pay said notes.<br><br>**Section 7** – Proceeds shall be covered into "1998 Public Improvements Fund" and disbursed pursuant to unspecified statutes.<br><br>**Section 8** – Secretary of the Treasury shall reimburse any provisional | limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Sections 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Sections 7, 8, 12, 13** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 12** - The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | advance made, out of the first moneys available in the 1998 Public Improvements Fund.<br><br>**Section 12** – Appropriates $3.25 million to expenses of issuing bonds.<br><br>**Section 13** – Appropriates $25 million to the Office of the Management and Budget until the Special Maintenance Proposals Inter Agency Evaluating and Approval Committee claims the deposit thereof in the Special Maintenance Fund. | | | |
| **Act 119 approved August 9, 1995** | Act 119-1995, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Article 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.<br><br>**Article 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes.<br><br>**Article 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.<br><br>**Article 4** – Directs payment of principal and | **Articles 1 (para. 1), 3, 5** - The Act authorizes the issuance of bonds in an amount not to exceed $355 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Articles 1 (para. 3), 4, 6** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | interest on bonds as they fall due and to commit good faith, credit, and taxing power.<br><br>**Article 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.<br><br>**Article 6** – Provides for pledge of good faith, credit, and taxing power and directs payment of interest on notes as it comes due. Directs issuance of bonds to pay said notes.<br><br>**Article 7** – Proceeds shall be covered into "1996 Public Improvements Fund" and disbursed pursuant to unspecified statutes.<br><br>**Article 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the 1996 Public Improvements Fund.<br><br>**Article 12** – Appropriates $3.5 million to expenses of issuing bonds. | Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Articles 7, 8, 12** - The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Article 12** - The Act requires certain proceeds to be used solely for bond payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | | |
| **Act 46 approved July 28, 1994** | Act 46-1994, among other things, (i) authorizes the Secretary of Treasury to issue certain bonds and notes; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds or notes through a continuing appropriation; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the bonds and notes. | **Article 1 (para. 1)** – Authorizes issuance of Commonwealth bonds.  **Article 1 (para. 3)** – Authorizes payment of all costs incurred in connection with the issue of bonds and notes.  **Article 3** – Authorizes Secretary of Treasury to negotiate and execute financing agreements in connection with issuance.  **Article 4** – Directs payment of principal and interest on bonds as they fall due and to commit good faith, credit, and taxing power.  **Article 5** – Authorizes borrowing money and issuing notes in advance of bond issuance.  **Article 6** – Pledge of good faith, credit, and taxing power and directs payment of interest on notes as it comes due. | **Articles 1 (para. 1), 3, 5 -** The Act authorizes the issuance of bonds in an amount not to exceed $325 million, and provides for the borrowing of money and issuance of notes, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).  **Articles 1 (para. 3), 4, 6 -** The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).  **Articles 7, 8, 12, 13 -** The Act requires the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).  **Articles 12 -** The Act requires certain proceeds to be used solely for bond | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.  Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | Directs issuance of bonds to pay said notes.<br><br>**Article 7** – Proceeds shall be covered into "1995 Public Improvements Fund" and disbursed pursuant to unspecified statutes.<br><br>**Article 8** – Secretary of the Treasury shall reimburse any provisional advance made, out of the first moneys available in the 1995 Public Improvements Fund.<br><br>**Article 12** – Appropriates $3.5 million to expenses of issuing bonds.<br><br>**Article 13** – Appropriates $16.25 million to the Budget and Management Office, until the Interagency Committee for Evaluation and Approval of Extraordinary Maintenance Proposals orders its allocation to the Extraordinary Maintenance Fund. | payments or related costs, which are not provided for in the Fiscal Plan or the Plan, and which bonds may be restructured pursuant to the Plan. (PROMESA §§ 202, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 39 approved May 13, 1976, as** | Act 39-1976, among other things, provides for the continuing monthly transfer of certain funds | **Section 1** – Requires transfer of funds to a sinking fund for the payment of bonds on a | **Section 1** - The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the | If these statutes have to be complied with, they would undermine the restructuring of Commonwealth debt | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| amended | for the payment of certain bonds and promissory notes issued by the Commonwealth of Puerto Rico. The Act provides the funds so transferred are to be kept in trust for the purpose of paying bonds and notes. | specified schedule; requires transfer of interest on proceeds to the sinking fund.<br><br>**Section 2** – requires use of funds in sinking fund only for payment of bonds. | Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 2** - The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds will be restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>**Section 2** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | contemplated in the Plan. Amended Jaresko Decl. ¶ 233.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 83 approved August 30, 1991** | Act 83-1991, among other things, provides for certain tax proceeds and appropriations for payment of the Commonwealth's general obligation bonds or notes. | **Article 2.02** – Imposes special tax of 1.03% on the appraised value of all non-exempt personal and real property in Puerto Rico for the amortization and redemption of the general obligations of the Commonwealth. | **Articles 2.02, 2.04 and 2.05** – The act is preempted to the extent Articles 2.02 and 2.04 would impose payment obligations outside of any Oversight Board-certified budget or fiscal plan, or would require payment in full of prepetition obligations. (PROMESA §§ 202, 314). | If these statutes have to be complied with, they would undermine the restructuring of Commonwealth debt contemplated in the Plan. Amended Jaresko Decl. ¶ 233.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Article 2.04** – Provides that proceeds from taxes imposed by Article 2.02 shall be applied for payment of the principal and interest on the general obligations of the Commonwealth of Puerto Rico, or the early redemption of such obligations.<br><br>**Article 2.05** – Provides that Articles 2.02 and 2.08 shall be considered a preferential obligation and authorization for distributions to be made pursuant to the Act. | For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted. | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Joint Resolution No. 99-2013 approved December 12, 2013** | Joint Resolution No. 99-2013, among other things, (i) authorizes the General Services Administration to take money on loan; (ii) establishes the method of repayment for the loan; and (iii) pledges the good faith, credit, and taxing power of the Commonwealth of Puerto Rico for payment of the loan. | **Section 1** – Provides for a line of credit.<br><br>**Section 3** – Pledge of good faith, credit and taxing power and directs payment of principal and interest. | **Section 1 -** The Act authorizes the borrowing of money in an amount not to exceed $34 million, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Section 3 -** The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | |
| **Joint Resolution No. 104 approved December 13, 2013** | Joint Resolution No. 104-2013, among other things, authorizes the Office of the Superintendent of the Capitol to take money on loan and establishes the method of repayment for the loan to be through annual budgetary allocations from the General Fund. | **Section 1** – Authorizes line of credit.<br><br>**Section 2** – Requires honoring of payment and allocation of funds from the general fund for payment of line of credit. | **Section 1** - The Act authorizes the borrowing of money in an amount not to exceed $15 million, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>**Section 2** - The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>Statutes authorizing payment in full of debt service on existing | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | restructured pursuant to the Plan. (PROMESA §§ 202, 314). | general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63. Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan. Amended Jaresko Decl. ¶ 231. | |
| **Joint Resolution No. 96 approved November 27, 2013** | Joint Resolution No. 96-2013, among other things, (i) allocates funds from the Public Improvements Fund; (ii) authorizes remaining funds to be distributed according to a Joint Resolution; and (iii) authorizes the Government Development Bank for Puerto Rico to advance the Secretary of the Treasury a loan to address work determined by the Governor. | **Section 1** – Allocates specific funds to agencies and municipalities for specified purposes.<br><br>**Section 2** – Allocates funds in a way to be determined.<br><br>**Section 3** – Arranges for a line of credit | **Sections 1, 2** - The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202).<br><br>**Section 3** - The Act authorizes the borrowing of money in an amount not to exceed $30 million, and could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | restructurings. Amended Jaresko Decl. ¶ 230. | |
| **Act 17** approved April 11, 1968 | Act 17-1968, among other things, (i) authorizes the Public Buildings Authority to issue certain bonds; (ii) directs the Secretary of the Treasury to pay the principal and interest on any such bonds through a continuing appropriation; and (iii) pledges the good faith and credit of the Commonwealth of Puerto Rico for payment of the bonds. | **Section 1** – Provides for guarantee of Public Buildings Authority Bonds; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | **Section 1** - The Act provides for a guarantee of indebtedness in an amount not to exceed \$27 million, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan, and which bonds will be restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202). | | |
| **Act 409 approved September 22, 2004** | Act 409-2004, among other things, provides that the Commonwealth of Puerto Rico guarantees the payment of principal and interest on outstanding bonds that are issued by the Port of Americas Authority, and directs the Secretary of the Treasury to make payments of principal and interest on bonds issued by the Port of Americas Authority whenever the Port of Americas Authority lacks the funds to make such payments. | <u>**Section 1**</u> – Provides for guarantee of debt of Port of Americas Authority; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | <u>**Section 1**</u> - The Act provides for a guarantee of indebtedness in an amount not to exceed \$250 million, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan.  Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314). <br><br> The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan.  (PROMESA §§ 202, 314). <br><br> The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan.  (PROMESA §§ 202, 314). <br><br> The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget.  (PROMESA § 202). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232. <br><br> The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| Act 1 approved January 15, 2015 | Act 1-2015, among other things, (i) allows PRIFA to assume or repay certain debts of HTA; (ii) creates the Infrastructure Financing Authority Special Economic Assistance Fund; (iii) authorizes PRIFA to issue bonds to finance the assumed debts of HTA; (iv) provides guarantees for the payment of the bonds issued under the act; (v) authorizes the Secretary of the Treasury to pay outstanding obligations from the bonds as necessary; and (vi) pledges the full faith and credit and the taxing power of the Commonwealth of Puerto Rico to guarantee the repayment of the bonds or notes to be paid from the Infrastructure Financing Authority Special Economic Assistance Fund. | **Section 2.02 (Amended Section 34(h)) – Provides for Commonwealth guarantee of agency bonds; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power.** | **Section 2.02 (Amended Section 34(h)) -** The Act provides for a guarantee of indebtedness of an unspecified amount, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan. (PROMESA §§ 202, 314).<br><br>The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202). | Continued operation of these provisions would significantly detract from PROMESA's and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 45** approved **July 28, 1994** | Act 45-1994, among other things, (i) guarantees the payment of principal and interest on outstanding and future bonds issued by the Aqueducts and Sewers Authority of Puerto Rico; (ii) directs the Secretary of the Treasury to cosign or advance funds to cover payments on bonds guaranteed under the Act; and (iii) pledges the good faith and credit of the Commonwealth of Puerto Rico for payment of the bonds. | **Section 1** – Provides for Commonwealth guarantee of Water and Sewage Authority of unspecified amount; requires the allocation and payment of guaranteed bonds; pledges the good faith, credit and taxing power. | **Section 1** - The Act provides for a guarantee of indebtedness of an unspecified amount, which could be used to issue additional debt in the future which is not provided for in the Plan or Fiscal Plan. Section 74.5 of the Plan also provides limitations on future debt. (PROMESA §§ 202, 314).<br><br>The Act provides for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314).<br><br>The Act requires certain proceeds to be used solely for bond payments, which are not provided for in the Fiscal Plan or the Plan. (PROMESA §§ 202, 314).<br><br>The Act requires or prohibits the transfer or disbursement of funds without Oversight Board authorization in conflict with the Board's sole power to approve a Fiscal Plan and Certified Budget. (PROMESA § 202). | Continued operation of these provisions would significantly detract from PROMESA's requirement in section 207 and the Oversight Board's mission by allowing the Commonwealth to incur debt without Oversight Board approval, without regard to whether such debt would impair or interfere with a confirmed Plan, and potentially in an amount greater than is authorized by the certified fiscal plans or budgets. Amended Jaresko Decl. ¶ 232.<br><br>The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | Permanent |

## II.   Statutes appropriating Commonwealth revenues

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| **Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021** | Appropriates automobile license fees to HTA, which HTA may pledge to the repayment of principal and interest on bonds and other obligations of HTA. | **Section 2021** – Appropriates increase in automobile license fees to HTA for its corporate purposes and for the repayment of HTA's bonds or other obligations | **Section 2021** – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations.  (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA § 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion[1] at 16, 19, PROMESA § 314.<br><br>The obligations under the Act were made so that HTA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating.  Upon the effectiveness of HTA's plan of adjustment such debt obligations will no longer be in effect.  Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Title III of | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified | Permanent |

[1]    "DRA Opinion" refers to the *Opinion and Order Denying the DRA Parties' Motion for Allowance of an Administrative Expense Claim*, ECF No. 18892, dated October 29, 2021.

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314). | budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| 13 L.P.R.A. § 31751(a)(1) | Appropriates certain revenues to HTA, which HTA may pledge to the repayment of principal and interest on bonds and other obligations of HTA. | **Section 31751(a)(1)** – Appropriates gasoline and oil taxes to HTA<br><br>**Section 31751(a)(1) (A, B)** – Such appropriated funds shall be covered into a special deposit in favor of HTA and paid on a monthly basis<br><br>**Section 31751(a)(1) (C, E)** – Such appropriated funds shall be pledged to the repayment of HTA's | **Section 31751(a)(1)** – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | bonds and other obligations, subject to Section 8 Article VI of the Puerto Rico Constitution and the Commonwealth committed not to reduce the amount of funds appropriated | Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMEA § 314.<br><br>The obligations under the Act were made so that HTA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of HTA's plan of adjustment such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Title III of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| 13 L.P.R.A. § 31751(a)(3) | Appropriates revenues derived from cigarette excise taxes to HTA, which HTA may pledge to the repayment of principal and interest on bonds and other obligations of HTA. | Section 31751(a)(3) – Appropriates up to $20 million in cigarette excise taxes to HTA for its corporate powers and purposes<br><br>Section 31751(a)(3)(A) – Provides that appropriated funds shall be covered into a special deposit account for HTA<br><br>Section 31751(a)(3)(C) – Provides that appropriated funds shall be used for repayment of HTA's bonds and other obligations, subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution | Section 31751(a)(3) – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. See DRA Opinion at 16, 19; PROMESA § 314.<br><br>The obligations under the Act were made so that HTA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of HTA's plan of adjustment such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Title III of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. Id.<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | its current form, which is expected to take place on the effective date of the Plan. | amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| **Act 44** approved **June 21, 1988, as amended; 3 L.P.R.A. § 1914** | Appropriates revenues derived from rum taxes to PRIFA, which PRIFA may pledge to the repayment of principal and interest on bonds and other obligations of PRIFA. | <u>Section 1914</u> – Appropriates $117 million annually of rum taxes to PRIFA for its corporate purposes, which PRIFA may pledge to the repayment of its bonds or other obligations subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution | <u>Section 1914</u> – The appropriation provisions to PRIFA are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.<br><br>The obligations under the Act were made so that PRIFA will have sufficient moneys to | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of PRIFA's qualifying modification such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to the Plan and the qualifying modification under Title VI of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314).

Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*

These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a) | Appropriates certain excise tax revenue to PRIFA and HTA for the purpose of repaying debts and obligations of HTA. | Section 31751a(a) – Appropriates funds to Infrastructure Financing Authority Special Economic Assistance Fund and such funds are to be used by PRIFA for | Section 31751a(a) – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | repayment of HTA debts and obligations | These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.<br><br>The obligations under the Act were made so that HTA or PRIFA have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of the relevant plan of adjustment or qualifying modification such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to the Plan and the qualifying modification pursuant to Title VI of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| 13 L.P.R.A. § 31751(a)(4) | Appropriates revenues derived from cigarette excise taxes to the MBA, which the MBA may pledge to the repayment of principal and interest on bonds and other obligations of the MBA. | **Section 31751(a)(4)** – Appropriates up to $10 million in cigarette excise taxes to the MBA for its corporate powers and purposes

**Section 31751(a)(4)(A)** – Provides that appropriated funds shall be covered into a special deposit account for the MBA

**Section 31751(a)(4)(C)** – Provides that appropriated funds shall be used for repayment of the MBA's bonds and other obligations, subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution | **Section 31751(a)(4)** – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314).

These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).

Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.

The obligations under the Act were made so that MBA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to Plan conflicts with the discharge provisions of PROMESA. The Plan provides for a clawback claim for MBA, once the debt is | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.

If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.

The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | discharged pursuant to PROMESA the appropriation is preempted. (PROMESA § 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| 13 L.P.R.A. § 31751(a)(5) | Appropriates revenues derived from cigarette excise taxes to PRITA, which PRITA may transfer to the Infrastructure Financing Authority for the debt or other obligation of the Infrastructure Financing Authority. | **Section 31751(a)(5)** – Appropriates up to $36 million in cigarette excise taxes to PRITA for its corporate powers and purposes<br><br>**Section 31751(a)(5)(A, B)** – Provides that appropriated funds shall be covered into a special deposit account for PRITA and specifies amount appropriated | **Section 31751(a)(5)** – The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan. (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims | **Section 31751(a)(5) (A, B)** – During the term of the Oversight Board.<br><br>**Section 31751(a)(5) (C, D)** – Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 31751(a)(5)(C)** – Provides that appropriated funds are subject to the provisions of Section 8 of Article VI of the Puerto Rico Constitution<br><br>**Section 31751(a)(5)(D)** – Provides that PRITA shall transfer funds to PRIFA for repayment of PRIFA's debts or obligations when its funds are insufficient to cover such debts or obligations | its current form, which is expected to take place on the effective date of the Plan. | contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| 13 L.P.R.A. § 2271v(a) | Appropriates certain excise tax revenue to CCDA, which CCDA may pledge to the repayment of principal and interest on its bonds and other obligations. | **Section 2271v(a)** – Appropriates room occupancy taxes to CCDA, which CCDA may pledge to the repayment of bonds and other obligations of CCDA, subject to Section 8 Article VI of the Puerto Rico Constitution. | **Section 2271v(a)** –The appropriation provisions are preempted since they impose payment obligations outside of any Oversight Board-certified budget or fiscal plan or the Plan and require payment in full of prepetition obligations. (PROMESA §§ 202, 314).<br><br>These appropriation provisions also conflict with the purpose of PROMESA; a restructuring of the Commonwealth's obligations will be impossible if all of these appropriations remain enforceable. (PROMESA §§ 108, 314).<br><br>Any obligations that the Act created are prepetition obligations that are being discharged pursuant to the Bankruptcy Code and PROMESA. *See* DRA Opinion at 16, 19; PROMESA § 314.<br><br>The obligations under the Act were made so that CCDA will have sufficient moneys to repay its debt obligations to Bondholders and continue operating. Upon the effectiveness of CCDA's Title VI qualifying modification such debt obligations will no longer be in effect. Continuing to send the moneys and appropriate despite the debts being discharged pursuant to the Qualified Modification pursuant to Title IV of PROMESA conflicts with the discharge provisions of the Bankruptcy Code as incorporated into PROMESA. (PROMESA § 314). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 | During the term of the Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | | Further, this statute may be repealed by Act 53-2021 if and when it becomes effective in its current form, which is expected to take place on the effective date of the Plan. | Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| **Act 147 enacted June 18, 1980, 23 L.P.R.A. § 104** | Appropriates 4.0% of the annual General Fund revenue to the Judicial Branch. In addition, establishes the priorities of payment for "when the available funds for a specific fiscal year are not sufficient to cover the appropriations approved for that year." | **Section 104(a)(7)** – Appropriates funds from the General Fund of the Treasury to the Judicial Branch for operating expenses.<br><br>**Section 104(c)** – Sets priority guidelines for the disbursement of public funds. | **Section 104(a)(7)** – The act imposes payment obligations and appropriations outside of any Oversight Board-certified budget or fiscal plan. (PROMESA § 202).<br><br>**Section 104(c)** – The act requires payment of prepetition debt of the Commonwealth claims discharged upon effectiveness of the Plan of Adjustment and creates payment priorities that conflict with Section 314(b)(4) of PROMESA. (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes | **Section 104(a)(7)**: During the term of the Oversight Board. Section.<br><br>**Section 104(c)**: Permanent. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| 18 L.P.R.A. § 621-1 | Appropriates certain funds to the University of Puerto Rico. | **Section 621-1(a)** – Appropriates 9.60% of the annual General Fund budget to the University of Puerto Rico. | **Section 621-1(a)** – The act imposes payment obligations and appropriations outside of any Oversight Board-certified budget or fiscal plan. (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and | Until the debt issued pursuant to the Plan is paid in full. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|------------------------|
| | | | | debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| **Act 83 approved August 30, 1991, as amended, 21 L.P.R.A. §§ 5002, 5004, 5006, 5815.12** | Appropriates special tax revenue for the amortization and redemption of Commonwealth obligations, compensate municipalities for certain uncollected property taxes, and appropriates certain Commonwealth funds to municipalities. | **Section 5002 (para. 1)** – Authorizes revenues of a special tax of 1.03% per annum on the appraised value of all personal and real property not exempted from taxes for the amortization and redemption of the Commonwealth general obligations. **Section 5004(a), (c)** – Directs the product and proceeds from the taxes levied under § 5002 to the payment of principal on existing and future general obligation bonds and notes. **Section 5006 (para. 1–2)** – Authorizes the transfer of funds for compensation of municipalities for uncollected property taxes resulting from tax exemptions. | **Section 5002 (para. 1)** – This act is preempted to the extent it requires transfers of money independent of their inclusion in an Oversight Board-certified fiscal plan or budget. (The provisions authorizing municipalities to levy an additional surtax and empowering the Municipal Revenues Collection Center to collect such taxes are not preempted.) (PROMESA § 202). **Section 5004(a), (c)** – This act requires payment of prepetition debt of the Commonwealth claims discharged upon effectiveness of the Plan of Adjustment, creates payment priorities that conflict with Section 314(b)(4) of PROMESA, and requires transfers of money independent of their inclusion in an Oversight Board–certified fiscal plan or budget. (PROMESA §§ 202, 314). **Section 5006 (para. 1–2)** – This act requires transfers of monies independent of their inclusion in an Oversight Board-certified fiscal plan or budget. (PROMESA § 202). **Section 5815(a)–(d)** – This act requires transfers of money independent of their | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234. The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified | **Section 5002 (para. 1)** – Permanent **Section 5004** – Permanent. **Section 5006 (para. 1–2)** – Until the debt issued pursuant to the Plan has been paid in full. **Section 5815(a)–(d)** – During the term of the Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | **Section 5815(a)–(d)** – Authorizes the transfer of funds from taxes, the Additional Lottery System, the net internal revenues of the General Fund, and fines to municipalities. | inclusion in an Oversight Board-certified fiscal plan or budget. (PROMESA § 202). For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted. | budget, fiscal plan, and the Plan. *Id.* These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. | |
| **Act 221 approved May 15, 1948, as amended, 15 L.P.R.A. § 74** | The statute provides for the calculation of the annual net income from slot machines and distributes those incomes to slot machine operators, the Gaming Commission, and government funds including the General Fund. | **Section 74** – Calculates slot machine license fees and taxes and authorizes the distribution of the annual net income from slot machines. The collection of the taxes are not preempted. | **Section 74** – This act is preempted to the extent it requires transfers of net slot machine income independent of their inclusion in an Oversight Board-certified fiscal plan or budget. (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. If they remain intact, the appropriation statutes will undermine Puerto Rico's | During term of Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | | | restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234. | |
| | | | | The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.* | |
| | | | | These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|------------------------|
| | | | | billion. Amended Malhotra Decl. ¶ 64. | |
| **Act 18 approved January 24, 2014, as amended, 21 L.P.R.A. § 6742** | The statute provides for varying percentages of the Sales and Use Tax ("IVU" by Spanish acronym) to be distributed to the Municipal Administration Fund which has a waterfall distribution to the Municipal Development Fund, the Municipal Redemption Fund, and the Municipal Improvement Fund. | **Section 6742(a)(1)–(3)** – Provides for the distribution of funds from the Municipal Administration Fund to municipalities. | **Section 6742(a)(1)–(3)** – This act requires transfers of money independent of their inclusion in an Oversight Board-certified fiscal plan or budget. (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.<br><br>If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234.<br><br>The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the | During term of Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
| | | | | amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than \$3.0 billion.  Amended Malhotra Decl. ¶ 64. | |
| **Act 41 approved July 22, 2011, as amended, 12 L.P.R.A. §8105** | The statute establishes a fund to collect fees on all new tires (imported or manufactured locally) to facilitate the disposal of unusable tires from the island and provides that resources of the fund shall be allocated through regulations. | Section 8105(g) and (h) – Appropriates funds gathered from the Scrap Tire Management and Disposal Fee as provided for in regulations. | Section 8105(g) and (h) – This act authorizes transfers of money independent of their inclusion in an Oversight Board-certified fiscal plan or budget.  (PROMESA § 202). | The preempted statutes require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230.

If they remain intact, the appropriation statutes will undermine Puerto Rico's restructuring and limit allowance of claims contemplated by the Oversight Board's proposed Plan. Amended Jaresko Decl. ¶ 234. | During the term of the Oversight Board. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration of Preemption |
|---|---|---|---|---|---|
|  |  |  |  | The continued enforcement of the appropriation statutes would also substantially hamper the Oversight Board's ability to provide a method for Puerto Rico to achieve fiscal responsibility and access to capital markets, as they provide spending inconsistent with the certified budget, fiscal plan, and the Plan. *Id.*<br><br>These statutes contain formulas explaining the amount of revenues to be transferred. I used the 2021 Fiscal Plan to identify the amount of revenues to be transferred and in certain cases applied formulas in accordance with the statutes using estimates from the 2021 Fiscal Plan. The amount of Commonwealth revenues that would need to be transferred in FY 2022, if permitted by a certified budget of the Oversight Board, is more than $3.0 billion. Amended Malhotra Decl. ¶ 64. |  |

## III.  TRS and JRS Statutes

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|----------------------------------------|----------|
| **Act 106 approved August 23, 2017** | Act 106-2017 ("Act 106") provides for the liquidation of the then-remaining assets of the three public retirement systems (ERS, TRS, and JRS), the transfer of their assets (with specified exceptions) to the Commonwealth, and the Commonwealth's assumption of payment of all pensions to retired participants in the three systems, subject to reimbursement by other employers who participated in these systems of pensions paid to their respective retirees.

Act 106 also provides for the establishment of a new defined contribution plan, pursuant to which employees will contribute 8.5% of | **Section 2.3** – Provides for the continued accrual of defined benefit pension obligations under TRS and JRS

**Section 2.4(a)** – Provides for the continued accrual of defined benefit pension obligations under TRS and JRS

**Section 2.4(b)** – Provides for the continued accrual of defined benefit pension obligations

**Section 2.6** – Provides for the continued accrual of defined benefit pension obligations under TRS and JRS

**Section 3.1(b)(1)** – Excepts judges and certain teachers from participation in the defined contribution accounts and provides for continued participation for | **Section 2.3** – The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).

**Section 2.4(a)** - The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).

**Section 2.4(b)** - The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).

**Section 2.6** - The Act provides for the continued accrual and payment of defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan Art. LV) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).

**Section 3.1(b)(1)** – The Act requires minimum mandatory individual contributions to the defined contribution accounts in | The Oversight Board has determined the freeze of the TRS and JRS pension plans is essential to achieving the goals of PROMESA, as it will result in net savings of $4.7 billion over the next 30 years. Supplemental Levy Decl. [ECF No. 19059], ¶ 14.

Each of the cited sections, other than Section 3.6(a)(2), is inconsistent either with the freeze of JRS and TRS, or with the treatment the Plan proposes to provide affected participants on account of the freeze.

With respect to Section 3.6(a)(2), AFSCME has requested, and the Oversight Board has agreed, a default investment for Commonwealth contributions under Sections 55.7 and 55.10 of the Plan that will provide an opportunity for investment return that is better for participants than an investment that merely preserves the principal contributions. This will further the Oversight Board's goal, consistent with PROMESA, of enhancing retirement funding for current government employees. | The preemption of Section 3.6(a)(2) only applies to the one-time contributions to be made to active ERS and System 2000 participants under Sections 55.7 and 55.10.

Because the Oversight Board requires the permanent freeze of TRS and JRS and conversion of the retirement plans of participants to the Act 106 defined contribution plan, the preemption of the remaining implicated sections of Act 106 must be permanent. |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | their salaries to individual retirement accounts. All ERS participants, and all TRS participants hired after July 31, 2014 are required to participate in this new defined contribution plan, and teachers hired before August 1, 2014, plus all JRS participants, may participate but are not required. Act 106 further provides that the default investment option for deposits into the defined contribution plan shall include a guarantee of the principal amount of contributions, which implicitly means there will be little or no return on investment. Act 106 further provides that TRS and JRS shall remain unfrozen, and participants in these systems shall | these participants in the defined benefit plans **Section 3.4** – Requires participants to contribute a minimum of 8.5% of such participants' monthly salary to their defined contribution accounts each month. **Section 3.6(a)(2)** – Establishes as a default investment for Act 106 contributions an instrument that guarantees the return of principal. | the amount of 8.5% of the subject participant's monthly salary in violation of the Plan. This minimum contribution shall continue to apply to all Act 106 plan participants except for TRS and JRS pension plan participants who will be enrolled in social security under the Plan, whose minimum contribution is reduced to 2.3% under the Plan, as they will be making payments to social security of 6.2% (for a total of the 8.5% Act 106 requires to be paid to the defined contribution plan). Plan § 55.9. (PROMESA § 314). **Section 3.4** – The Act requires minimum mandatory individual contributions to the defined contribution accounts in the amount of 8.5% of the subject participant's monthly salary in violation of the Plan which provides for certain participants to be able to reduce their contribution to 2.3% as they will be making payments to social security of 6.2% (for a total of the 8.5% Act 106 requires to be paid to the defined contribution plan). Plan § 55.9. (PROMESA § 314). **Section 3.6(a)(2)** – Establishes s a default investment for Act 106 contributions an instrument that guarantees the return of principal. This section is inconsistent with | | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|----------|
| | continue to make contributions to and accrue benefits under these systems in accordance with their enabling acts. | | the Plan, and is therefore preempted, only with respect to the contributions to be made by the Commonwealth to the Act 106 accounts for active ERS participants in Classes 51G and 51J under the Plan (sections 55.7 and 55.10 of the Plan), which will be subject to a default investment in target retirement date funds unless the participants chooses otherwise. (PROMESA § 314). All other contributions by employees to the Act 106 accounts shall be subject to the default investment set forth in Section 3.6(a)(2).<br><br>The Plan provides for the freeze of the defined benefit plans of TRS and JRS. In consideration for the freeze of these plans, affected participants will be required to enroll in the Act 106 defined contribution plan, such that enrollment in this plan will no longer be voluntary for any participants in the TRS and JRS systems. In addition, any TRS or JRS participant to be enrolled in social security under the Plan will be subject to a reduced contribution requirement of 2.3% of salary, as they will be making payments to social security of 6.2% (for a total of the 8.5% Act 106 requires to be paid to the defined contribution plan). | | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | Finally, the treatment of active ERS participants in Classes G and J of the Plan require certain contributions into the Act 106 accounts by the Commonwealth, with a default investment of these funds in target retirement date funds closest to the year in which each participant will reach age 65 applicable to each participant. (PROMESA § 314). | | |
| **Act 160** approved **December 24, 2013**<br><br>**18 L.P.R.A. § 393-399d** | Act 160-2013 creates a new teachers' retirement system ("TRS"), and repeals Act 91-2004. Among other things, the act provides a framework to determine payments into and from the retirement system. The act indicates that the retirement system will receive additional Commonwealth funds to make up a deficit in the system. | **Section 3.11** – Provides for a minimum pension benefit for certain participants<br><br>**Section 4.1** - Establishes the Commonwealth's responsibility to appropriate funds to finance pensions<br><br>**Section 4.3(b)** – Establishes employer contributions of up to 20.25% of monthly salary obligations to participants<br><br>**Section 4.4** – Establishes defined benefit pension obligations | **Section 3.11** – The Act requires the payment of minimum pension benefits for certain participants in violation of the Fiscal Plan (Fiscal Plan at 275) and the treatment of pensions under the Plan (Plan Art. LV). (PROMESA §§ 202, 314).<br><br>**Section 4.1** – The Act provides for the appropriation of funds to TRS that are not provided for in the budget or Fiscal Plan, and which conflict with the Plan's provisions freezing TRS pension benefit accruals and transferring all participants to the defined contribution plans established under Act 106. Plan § 55.9. (PROMESA §§ 202, 314).<br><br>**Section 4.3(b)** – The Act requires employers, including covered instrumentalities, to make payments not accounted for in the Fiscal Plan and budget. (PROMESA § 202). | Absent the freeze of the TRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13. | Permanent |

55

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | **Section 4.5(b)** – Establishes disability pension benefits for certain participants, calculated using a defined benefit formula<br><br>**Section 4.6** – Sets forth the method of calculating the disability pensions provided in § 4.5 using a defined benefit formula<br><br>**Section 4.9(b)** – Requires the Commonwealth to make an annual contribution to TRS in the amount of $1,675 per participant<br><br>**Section 5.6** – Requires employer contributions to be paid in accordance with § 4.3(b).<br><br>**Section 7.1** – Establishes appropriations from the Commonwealth to TRS to fund pension obligations | **Section 4.4** – The Act creates defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 4.5(b)** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 4.6** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284).<br><br>**Section 4.9(b)** – The Act requires the Commonwealth to make contributions to TRS without Oversight Board approval and which contributions are not provided in the budget, and conflict with the Fiscal Plan, and the freeze of TRS under the Plan. Post-Effective Date, all teachers' pensions will be administered on a "PayGo" basis as established under Act 106. Plan § 55.9. (PROMESA §§ 202, 314).<br><br>**Section 5.6** – The Act requires employers, including covered | "[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment. If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether." Jaresko Decl. [ECF No. 18729], ¶ 235.<br><br>"Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination of COLAs, is approximately $5.6 billion." Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | instrumentalities, to make payments not accounted for in the Fiscal Plan and budget. (PROMESA § 202).<br><br>**Section 7.1** – The Act requires hundreds of millions of dollars to be appropriated to TRS annually without Oversight Board approval and in violation of the budget, Fiscal Plan, and the Plan's freeze of TRS. Plan § 55.9. (PROMESA §§ 202, 314). | Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%". Supplemental Levy Decl. [ECF No. 19059], ¶ 15.<br><br>"The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations." Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |
| Act 91 of March 29, 2004<br><br>18 L.P.R.A. § 391-392w<br><br>Repealed by Act 160 | Act 91-2004, the prior act governing the TRS, required (among other things) the Commonwealth to contribute funds to the retirement system for each teacher employed by the Commonwealth. | **Section 14** – Establishes the Commonwealth's responsibility to appropriate funds to finance pensions<br><br>**Section 20** – Authorizes certain government employees to | **Section 14** – The Act provides for the appropriation of funds to TRS that are not provided for in the budget or Fiscal Plan, and which conflict with the Plan's provisions freezing TRS pension benefit accruals and transferring all participants to the defined contribution plans established under Act 106. Plan § 55.9. (PROMESA §§ 202, 314). | Absent the freeze of the TRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13. | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | participate in TRS, subject to withholding 9% of their salary<br><br>**Section 25** – Establishes a minimum pension benefit<br><br>**Section 29** – Establishes disability pension benefits for certain participants, calculated using a defined benefit formula<br><br>**Section 35** – Establishes certain death benefits for pensioners' beneficiaries and heirs, including benefits for school-age children<br><br>**Section 40** – Establishes defined benefit pension obligations<br><br>**Section 47** – Establishes appropriations from the Commonwealth | **Section 20** – The Act provides certain education-related government employees to participate in the TRS defined benefit pension plans in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 25** – The Act requires the payment of minimum pension benefits for certain participants in violation of the Fiscal Plan (Fiscal Plan at 275) and the treatment of pensions under the Plan (Plan Art. LV). (PROMESA §§ 202, 314).<br><br>**Section 29** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 35** – The Act creates death benefits for pensioners' beneficiaries, including providing children enrolled in school with shares of their deceased parent's defined benefit pensions in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314). | "According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment. If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether." Jaresko Decl. [ECF No. 18729], ¶ 235. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | to TRS to fund pension obligations<br><br>**Section 48** – Establishes appropriations from the Commonwealth to TRS to fund pension obligations<br><br>**Section 49** – Requires the Secretary of Treasury to apply Commonwealth revenues to fund pension obligations | **Section 40** – The Act creates defined benefit pension obligations in violation of the TRS freeze in the Plan (Plan § 55.9) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 47** – The Act requires hundreds of millions of dollars to be appropriated to TRS annually without Oversight Board approval and in violation of the budget, Fiscal Plan, and the Plan's freeze of TRS. Plan § 55.9. (PROMESA §§ 202, 314).<br><br>**Section 48** – The Act requires hundreds of millions of dollars to be appropriated to TRS annually without Oversight Board approval and in violation of the budget, Fiscal Plan, and the Plan's freeze of TRS. Plan § 55.9. (PROMESA §§ 202, 314).<br><br>**Section 49** – The Act requires the Secretary of Treasury to transfer certain surplus funds to TRS in violation of the budget, Fiscal Plan, and Plan provisions which allocate surplus funds to, among other things, the Pension Reserve Trust. (PROMESA §§ 202, 314). | "Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination of COLAs, is approximately $5.6 billion." Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%". Supplemental Levy Decl. [ECF No. 19059], ¶ 15.<br><br>"The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations." Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | | transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |
| **Act 12 approved October 19, 1954**<br><br>**4 L.P.R.A. § 233-246** | Act 12-1954 creates JRS. The act, in relevant part, provides the structure of the retirement system and the amount of funds the Commonwealth is required to contribute as well as the purpose for those Commonwealth contributions. | **Article 4** – Establishes defined benefit pension for judges<br><br>**Article 6** – Establishes disability pension benefits for certain participants, calculated using a defined benefit formula<br><br>**Article 8** – Establishes certain death benefits for pensioners' beneficiaries and heirs | **Article 4** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Article 6** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Article 8** – The Act creates additional death benefits in violation of the JRS freeze in the Plan (Plan § 55.8, Exhibit E) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314). | Absent the freeze of the JRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|------------------------------|-------------------------------|----------------------|---------------------------------------|----------|
| | | | | other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment. If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether." Jaresko Decl. [ECF No. 18729], ¶ 235.<br><br>"Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination of COLAs, is approximately $5.6 billion." Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%". Supplemental Levy Decl. [ECF No. 19059], ¶ 15. | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | | | "The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations." Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |
| Act 162 approved on December 24, 2013 | Act 162-2013 amends the retirement system for the Commonwealth's judiciary ("JRS") and creates a new defined benefit and defined contribution Hybrid Program applicable to future Commonwealth judges. The act, among other things, amends pension calculations, amends the contribution amount of system | Section 2 – Establishes defined benefit pension for judges<br><br>Section 3 – Establishes certain increased defined benefit pensions for certain judges<br><br>Section 5 – Establishes the defined benefit portion of the hybrid system pension obligations for | Section 2 – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>Section 3 – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>Section 5 – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal | Absent the freeze of the JRS defined benefit pension system, "the Plan would not be consistent with the Fiscal Plan which provides for the Pension Freeze . . . and, in my view, the Plan would be at risk of not being feasible or capable of being implemented." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"According to the Plan, the Pension Freeze . . . will be implemented on the Plan Effective Date, and pursuant to the Fiscal Plan, will produce significant savings over time | Permanent |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | participants, establishes contribution accounts for the Hybrid Program of the Commonwealth's new JRS, and amends summer and Christmas bonus provisions. | judges hired after July 1, 2014<br><br>**Section 6** – Establishes certain disability pension benefits for participants hired after July 1, 2014, calculated using a defined benefit formula<br><br>**Section 11** – Establishes the defined contribution portion of the hybrid pension system for judges hired after July 1, 2014, including a guaranteed return on investment and employer contributions<br><br>**Section 12** – Provides for defined benefit pension obligations for certain participants<br><br>**Section 13** – Establishes a Christmas bonus for participants | Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 6** – The Act creates defined benefit pension obligations for certain disabled participants in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 11** – The Act creates a hybrid system, whereby certain judges are entitled to defined benefits in the form of lifetime annuities and defined contributions. The rights created under the Act, including the guaranteed return on investment, conflict with the treatment of pension obligations under the Plan whereby participants will be enrolled in the Act 106 defined contribution accounts that do not include such rights. (PROMESA § 314).<br><br>**Section 12** – The Act creates defined benefit pension obligations in violation of the JRS freeze in the Plan (Plan § 55.8) and Fiscal Plan (Fiscal Plan at 284). (PROMESA §§ 202, 314).<br><br>**Section 13** – The Act entitles participants to receive a Christmas bonus in the annual amount of up to $600 per participant in violation | (growing to over $300 million per year by FY2046), and these savings play a major role in restoring long-term adequate funding of pensions." Supplemental Jaresko Decl. [ECF No. 19058], ¶ 13.<br><br>"[I]t is my understanding that the statutes listed in Section III of Exhibit K require the Commonwealth to provide pension and other benefits or payments to various retirees at specified rates without regard to whether such pensions and other benefits are provided for in a certified budget or fiscal plan or Title III plan of adjustment. If these statutes were to continue to operate or otherwise had to be complied with in full, they would undermine the restructuring contemplated by the present Plan, which [among other things] eliminate[s] future accruals of pension benefits altogether." Jaresko Decl. [ECF No. 18729], ¶ 235.<br><br>"Based on the estimated savings identified in [the Levy Decl. [ECF No. 18737]], the aggregate cost to the Fiscal Plan of eliminating the pension freezes, which includes the Pension Freeze and elimination | |

| Statute | Brief Description of Statute | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| | | **Section 14** – Establishes a Summer bonus for participants | of the Plan, which eliminates such benefit (Plan, Exhibit E). (PROMESA § 314).<br><br>**Section 14** – The Act entitles participants to receive a Summer bonus in the annual amount of up to $100 per participant in violation of the Plan, which eliminates such benefit (Plan, Exhibit E). (PROMESA § 314). | of COLAs, is approximately $5.6 billion." Supplemental Levy Decl. [ECF No. 19059], ¶ 13.<br><br>"By 2047, the incremental cost associated with not implementing the Pension Freeze and maintaining COLAs is estimated to increase the annual PayGo costs in the Fiscal Plan projections by 25%". Supplemental Levy Decl. [ECF No. 19059], ¶ 15.<br><br>"The 2021 Fiscal Plan reflects freeze provisions that are comparable to the ERS freeze that was implemented in 2013, with the following key aspects: . . . Minimum benefits and bonuses will be eliminated for future retirements . . . and future terminations due to disability will be entitled to the same benefits as regular terminations." Fiscal Plan at 275.<br><br>The Fiscal Plan requires the freeze of JRS and TRS and the transition of all judges and pre-2014 teachers to the segregated defined contribution accounts. Fiscal Plan at 284. | |

## IV.    Article VI of the Puerto Rico Constitution

| Article | Brief Description of Article | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---|---|---|---|---|---|
| **Article VI, Sections 6 and 8** | These provisions of the Puerto Rico Constitution require the Commonwealth to appropriate any pay certain operating expenses and payments on "public debt," and provide the order in which disbursements are to be made if available revenues for any fiscal year are insufficient to meet the appropriations for that year. | **Article VI, Section 6** – States that, if at the end of any fiscal year, the appropriations necessary for the ordinary operating expenses of the Government and for the payment of debt service on public debt for the ensuing fiscal year shall not have been made, the amounts appropriated in the last appropriation acts for such operating expenses and debt service shall continue in effect, and the Governor shall authorize payments necessary for such purpose until further appropriations are made.  **Article VI, Section 8** – Provides that, if available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, debt service on the public debt shall be paid first, and other disbursements shall | Whether the rights provided by Article VI, Sections 6 and 8 of the Puerto Rico Constitution to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant to the Plan are preempted by PROMESA is settled by the treatment of such bonds and indebtedness pursuant to the provisions of the Plan.  Nothing in the Plan affects or determines whether Article VI, Sections 6 and 8 of the Puerto Rico Constitutions is preempted for any future purpose.  These sections provide for payment of debt service that is not provided for in the Fiscal Plan or the Plan, and may give certain bonds priority not otherwise provided for in PROMESA, the Plan, or the Fiscal Plan that may require payment in full of prepetition obligations being restructured pursuant to the Plan. (PROMESA §§ 202, 314). | Statutes or other laws authorizing payment in full of debt service on existing general obligation bonds and guaranteed loans, if permitted by a certified budget of the Oversight Board, would be over $1.7 billion for fiscal year 2022 alone. *See* Amended Malhotra Decl. ¶ 63.  Any Puerto Rico statute or other law requiring the Commonwealth to pay claims in full is inconsistent with Title III of PROMESA as manifested by the restructuring contained in the Plan.  Amended Jaresko Decl. ¶ 231.  The preempted statutes and laws require appropriations, transfers, or debt payments inconsistent with the Oversight Board's powers under PROMESA to control fiscal plans, budgets, and debt restructurings. Amended Jaresko Decl. ¶ 230. | To the extent it authorizes payment in full of pre-petition obligations, permanent. |

| Article | Brief Description of Article | Specific Provisions Preempted | Basis for Preemption | Record Evidence Supporting Preemption | Duration |
|---------|-----------------------------|-------------------------------|----------------------|----------------------------------------|----------|
|         |                             | thereafter be made in accordance with the order of priorities established by law. |                      |                                        |          |

**<u>Exhibit B</u>**

**Confirmation Order**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | PROMESA Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO et al., | (Jointly Administered) |
| Debtors.[1] | |

ORDER AND JUDGMENT CONFIRMING MODIFIED EIGHTH AMENDED TITLE III
JOINT PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO,
THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE
COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**Page**

1. Confirmation of the Plan .................................................................................. 5
2. Objections ....................................................................................................... 5
3. Findings/Conclusions ...................................................................................... 5
4. Litigation Resolution ...................................................................................... 9
5. Plan Settlements Approved ........................................................................... 10
6. Dismissal of Med Center Litigation............................................................. 11
7. Dismissal of ERS Litigation ........................................................................ 12
8. Dismissal of GO/Clawback Litigation ......................................................... 13
9. Dismissal of PRIFA BANs Litigation ......................................................... 13
10. Dismissal of the PBA Litigation .................................................................. 13
11. Implementation of the Plan........................................................................... 14
12. Enforceability of New Debt Instruments ...................................................... 15
13. Authorization of New GO Bonds and CVIs and Injunction ......................... 15
14. Purchase and Sale of Certain ERS Assets.................................................... 16
15. Monthly Deposits of Interest and Principal ................................................. 16
16. Comprehensive Cap on All Net Tax-Supported Debt .................................. 17
17. Adoption and Maintenance of a Debt Management Policy .......................... 18
18. Creation of Avoidance Actions Trust ........................................................... 18
19. Avoidance Actions Trust Assets ................................................................... 19
20. Funding, Costs, and Expenses of the Avoidance Actions Trust ................... 19
21. Indemnification of Avoidance Actions Trustee and Board .......................... 20
22. Creation of Pension Reserve Trust ............................................................... 20
23. Funding of the Pension Reserve Trust .......................................................... 21
24. No Action ...................................................................................................... 22
25. Government Action........................................................................................ 22
26. Oversight Board Consent Pursuant to PROMESA Section 305 ................... 23
27. Binding Effect ............................................................................................... 23
28. Cancellation of Notes, Instruments, Certificates, and Other Documents ......................... 24
29. Rejection or Assumption of Remaining Executory Contracts and Unexpired
   Leases........................................................................................................... 26
30. Insurance Policies ......................................................................................... 27

| 31. | Rejection Damages Claims | 28 |
|---|---|---|
| 32. | Payment of Cure Amounts | 28 |
| 33. | Setoff | 28 |
| 34. | Delivery of Distributions | 29 |
| 35. | Disbursing Agent | 37 |
| 36. | Payment of Trustee Fees and Expenses | 37 |
| 37. | Securities Laws Exemption | 38 |
| 38. | Acceleration of Insured Bonds | 39 |
| 39. | Disputed Claims Reconciliation | 40 |
| 40. | Disputed Claims Holdback | 42 |
| 41. | National Action Claims | 43 |
| 42. | No Amendments to Proofs of Claim | 44 |
| 43. | Conditions to Effective Date | 45 |
| 44. | Administrative Claim Bar Date | 45 |
| 45. | Professional Compensation and Reimbursement Claims | 46 |
| 46. | GO/PBA Consummation Costs | 47 |
| 47. | AFSCME Professional Fees | 47 |
| 48. | GO/PBA PSA Restriction Fee | 48 |
| 49. | ERS Restriction Fee | 50 |
| 50. | CCDA Consummation Costs | 50 |
| 51. | CCDA Restriction Fee | 51 |
| 52. | HTA Bond Claims | 53 |
| 53. | System 2000 Obligations | 53 |
| 54. | HTA/CCDA Clawback Structuring Fees | 53 |
| 55. | Active JRS Participants and Active TRS Participants | 54 |
| 56. | Discharge and Release of Claims and Causes of Action | 56 |
| 57. | Releases by the Debtors and Reorganized Debtors | 62 |
| 58. | Release and Exculpation Provisions | 63 |
| 59. | **Injunction on Claims** | 63 |
| 60. | **Injunction Related to Releases** | 64 |
| 61. | Exculpation | 65 |
| 62. | Maintenance of Pension System | 71 |
| 63. | Appointments Related Litigation | 72 |

| 64. | **Bar Order** | 72 |
|---|---|---|
| 65. | **Supplemental Injunction** | 73 |
| 66. | Term of Existing Injunctions or Stays | 75 |
| 67. | Prosecution of Claims | 75 |
| 68. | Indemnification and Reimbursement Obligations | 75 |
| 69. | Compliance with Tax Requirements | 76 |
| 70. | Documents and Instruments | 77 |
| 71. | Fiscal Plan | 77 |
| 72. | Claims | 77 |
| 73. | GUC Reserve | 78 |
| 74. | PROMESA 407 Claims | 78 |
| 75. | Dairy Producer Claims | 78 |
| 76. | Eminent Domain/Inverse Condemnation Claims. | 79 |
| 77. | Oversight Board Termination and Post-Confirmation Powers | 80 |
| 78. | Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's Sole Discretion | 80 |
| 79. | Government Post-Confirmation Powers and Duties | 81 |
| 80. | Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated | 81 |
| 81. | Non-Impairment of CVIs, SUT | 81 |
| 82. | Reversal/Stay/Modification/Vacatur of Order | 82 |
| 83. | Retention of Jurisdiction | 82 |
| 84. | Conflicts Among Documents | 83 |
| 85. | PBA Leases | 83 |
| 86. | Modifications | 84 |
| 87. | Asserted Surety Claims | 85 |
| 88. | Identification of Additional Retail Investors / Retail Support Fee | 85 |
| 89. | Provisions of Plan and Order Nonseverable and Mutually Dependent | 87 |
| 90. | Governing Law | 87 |
| 91. | PFC Reservation | 87 |
| 92. | Applicable Nonbankruptcy Law | 87 |
| 93. | Waiver of Filings | 88 |
| 94. | Notice of Order | 88 |
| 95. | No Waiver | 89 |

The Commonwealth of Puerto Rico (the "Commonwealth"), the Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS"), and the Puerto Rico Public Buildings Authority ("PBA" and, collectively with the Commonwealth and ERS, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as Title III representative of the Debtors under section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),[1] having proposed and filed with the United States District Court for the District of Puerto Rico (the "Court") the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2022 (Docket Entry No. 19784 in Case No. 17-3283)[2] (as amended, supplemented, or modified prior, at, or subsequent to the Confirmation Hearing as set forth in this Confirmation Order through the date hereof, including the Plan Supplement, and as may be amended, supplemented, or modified pursuant to section 313 of PROMESA, the "Plan")[3] through the date hereof);[4] and the Court having entered, pursuant to, inter alia, section

---

[1]   PROMESA is codified at 48 U.S.C. § 2101 et seq. References to "PROMESA" section numbers in the remainder of this Confirmation Order are to the uncodified version of the legislation.

[2]   All docket entry references are to entries in Case No. 17-3283 unless otherwise indicated.

[3]   The use of the term "Plan" herein, unless otherwise indicated by context, refers to the confirmable final version filed at Docket Entry No. 19784, as described herein. The penultimate version of the plan, which required final modifications to be confirmable, was filed as the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated December 20, 2021 (Docket Entry No. 19568 in Case No. 17-3283) (the "Fifth Modified Eighth Amended Plan").

[4]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan, the Disclosure Statement Order, the Confirmation Brief (each as defined herein), or the *Findings of Fact and Conclusions of Law Regarding Confirmation of Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (the "Findings of Fact and Conclusions of Law"), entered contemporaneously herewith, as applicable. A composite copy of the Plan is annexed hereto as **Exhibit A**.

1125 of the Bankruptcy Code and Bankruptcy Rule 3017(b), after due notice and a hearing, an

order, dated August 2, 2021 (Docket Entry No. 17639) (the "Disclosure Statement Order"), (i)

approving the adequacy of the information set forth in the Disclosure Statement, (ii) establishing

procedures for the solicitation, voting, and tabulation of votes on and elections with respect to

the Plan, (iii) approving the forms of ballots, master ballots, and election notices used in

connection therewith, and (iv) approving the form of notice of the Confirmation Hearing; and the

Court having entered the *Order Establishing Procedures and Deadlines Concerning Objections*

*to Confirmation and Discovery in Connection Therewith* (Docket Entry No. 17640); and the

following documents having been filed by the Debtors or the PSA Creditors in support of or in

connection with confirmation of the Plan:

(a)     Plan Supplement (Docket Entry No. 18470);

(b)     *Certificate of Service of Solicitation Materials* (Docket Entry Nos. 19107-1 through 19107-9);

(c)     *Affidavit of Publication and Radio Advertisements* (Docket Entry Nos. 19108-1 through 19108-4);

(d)     *Omnibus Reply of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority to Objections to Seventh Amended Title III Plan of Adjustment* (Docket Entry No. 18874);

(e)     *Memorandum of Law in Support of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 18869) (the "Confirmation Brief");

(f)     *Declaration of Natalie Jaresko in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18729 and 19054-4);

(g)     *Declaration of David M. Brownstein in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of Commonwealth of Puerto Rico et al.* (Docket Entry Nos. 18726 and 19054-1);

(h)     *Declaration of David Skeel in Respect of Confirmation of Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18731 and 19054-9);

(i)     *Declaration of Steven Zelin of PJT Partners LP on Behalf of the Financial Oversight and Management Board for Puerto Rico in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18734 and 19054-10);

(j)     *Declaration of Ojas N. Shah in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18730 and 19054-8);

(k)     *Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18738 and 19054-6);

(l)     *Declaration of Juan Santambrogio in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18736 and 19054-7);

(m)     *Declaration of Adam Chepenik in Respect of the Confirmation of Seventh Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry Nos. 18735 and 19054-2);

(n)     *Declaration of Sheva R. Levy in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18737 and 19054-5);

(o)     *Declaration of Jay Herriman in Respect of Confirmation of Seventh Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry Nos. 18732 and 19054-3);

(p)     *Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19056. See also Docket Entry No. 19144);

(q)     *Declaration of Andrew Wolfe in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18725);

(r)     *Declaration of Marti P. Murray in Respect of Confirmation of Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 18724);

(s)     *Supplemental Declaration of Gaurav Malhotra of Ernst & Young LLP in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19057);

(t)     *Supplemental Declaration of Natalie Jaresko in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment for the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19058);

(u)     *Supplemental Declaration of Sheva R. Levy in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19059);

(v)     *Supplemental Declaration of Juan Santambrogio in Respect of Confirmation of Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19060);

(w)     *Supplemental Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 19115); and

(x)     *Supplemental Declaration of Jay Herriman in Respect of Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico,* et al. (Docket Entry No. 19329);

and objections to confirmation of the Plan having been interposed by certain parties, as reflected on the docket of the Title III Cases and on the record of the Confirmation Hearing; and, except to the extent otherwise provided herein, each of the objections having been resolved, overruled, sustained, or withdrawn at, prior to, or subsequent to the Confirmation Hearing;[5] and the Court having held the Confirmation Hearing commencing on November 8, 2021; and the appearances of all interested parties, including members of the public selected by the Court, having been noted in the record of the Confirmation Hearing; and after full consideration of the record of the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case, including, without limitation, motions, applications and orders in each of such cases, the foregoing

---

[5]     All opposition submissions are also listed as part of the Court's Findings of Fact and Conclusions of Law.

documents, and the evidence admitted and arguments of counsel presented at the Confirmation

Hearing; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, DECREED, AND DETERMINED THAT**:

1.  <u>Confirmation of the Plan</u>.  The Plan and each of its provisions shall be, and

hereby are, CONFIRMED pursuant to section 314(b) of PROMESA.  The documents contained

in the Plan Supplement are authorized and approved.  The terms of the Plan, as amended,

supplemented, or modified by the revisions made prior, at, or subsequent to the Confirmation

Hearing, as set forth in this Confirmation Order as well as in the revised composite copy attached

hereto as **<u>Exhibit A</u>**, include the Plan Supplement, as amended, supplemented, or modified on or

prior to the date hereof, and are incorporated by reference into and are an integral part of this

Confirmation Order.

2.  <u>Objections</u>.  With the narrow exception of the objections of holders of alleged

Eminent Domain/Inverse Condemnation Claims, which are hereby SUSTAINED to the extent

that such Claims are ultimately Allowed Claims, all objections, responses to, and statements and

comments, if any, in opposition to or inconsistent with the Plan shall be and hereby are,

OVERRULED and DENIED in their entirety.  All withdrawn objections are deemed withdrawn

with prejudice.

3.  <u>Findings/Conclusions</u>.  The findings of fact and conclusions of law set forth in the

Court's Findings of Fact and Conclusions of Law are incorporated herein as though set forth in

full.  Notwithstanding such incorporation, the following summarizes certain of the Court's

determinations:

      (A)    Pursuant to PROMESA, on May 3, 2017, May 21, 2017, and September 27,
2019, the Commonwealth, ERS, and PBA, respectively, each commenced a
case before the Court in accordance with the requirements of Title III of
PROMESA.  The commencement of these cases vested the Court with

exclusive jurisdiction over the cases and all respective property of the Commonwealth, ERS, and PBA, wherever located.  As a result of the consensual agreement among the Debtors and their respective creditor representatives, the Debtors formulated, duly solicited, and now seek confirmation of a plan of adjustment in accordance with federal law.

(B)     This Confirmation Order is a final order intended to be binding on all parties in interest, and shall not be subject to collateral attack or other challenge in any other court or other forum, except as permitted under applicable law. Confirmation of the Plan constitutes a judicial determination, pursuant to section 4 of PROMESA, that all laws, rules, and regulations giving rise to obligations of the Debtors discharged by the Plan and this Confirmation Order pursuant to PROMESA are preempted by PROMESA and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations.  Pursuant to section 4 of PROMESA, to the extent not previously ruled preempted pursuant to an order of the Title III Court, all laws (or such portions thereof) of the Commonwealth of Puerto Rico, other than budgets certified by the Oversight Board, inconsistent with PROMESA, have been preempted to the extent set forth in Exhibit A to the Findings of Fact and Conclusions of Law.  Such preempted laws include, without limitation, laws enacted prior to June 30, 2016, that provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, to the extent inconsistent with the Plan's discharge of the Debtors' obligations.  Such laws shall not be enforceable to the extent they are inconsistent with the Plan's discharge of the Debtors' obligations.  All laws enacted from and after the commencement of the Title III Cases to the extent they are inconsistent with the transactions contemplated by the Plan are also unenforceable.  Without in any way limiting the foregoing, (a) the Commonwealth laws preempted by PROMESA include, without limitation, those listed on **Exhibit C** hereto for the reasons, and to the extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law, and (b) all litigation in which any Government Party is a defendant, over whether any Commonwealth law listed on **Exhibit C** hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal.   For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

(C)     The Court shall retain jurisdiction to enforce the terms hereof and of the Plan, the New GO Bonds, the GO CVIs, and the Clawback CVIs in accordance with their terms to ensure compliance with the Plan and to adjudicate claims arising therefrom, including rights to specific performance.

(D)    At the time of issuance and delivery of the New GO Bonds, the GO CVIs, and the Clawback CVIs, the Reorganized Commonwealth is hereby directed to cause to be stamped or written on each of the New GO Bonds, the GO CVIs, the Clawback CVIs, and the Rum Tax CVI a legend substantially as follows:

> DETERMINED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO PURSUANT TO 11 U.S.C. §§ 944(b) AND 1123 TO BE VALID, LEGALLY BINDING, AND ENFORCEABLE PURSUANT TO THE JUDGMENT AND CONFIRMATION ORDER, ENTERED ON THE 18TH DAY OF JANUARY, 2022.

(E)    The New GO Bonds Legislation and the CVI Legislation are incorporated into Act No. 53-2021, which has been validly enacted by the Commonwealth and is valid and effective in accordance with its terms.

(F)    Pursuant to PROMESA, including section 4 thereof, as well as sections 944[6] and 1123 of the Bankruptcy Code, and in accordance with the Confirmation Order and the Plan, the Court determines that the New GO Bonds and the CVIs, and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds, and the CVIs as provided in the New GO Bonds Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York, and federal law.

---

[6]    Section 944(b)(3) requires the Court, as a condition to providing a discharge, to determine the validity of obligations imposed under a plan of the debtor and of any provision made to pay or secure payment of such obligations. 11 U.S.C. § 944(b)(3). See generally In re City of Stockton, Cal., 526 B.R. 35, 49-50 (Bankr. E.D. Cal. 2015) ("The structure of the federal-state relationship . . . regarding restructuring of municipal debt is dictated by the U.S. Constitution. . . . [T]he Supremacy Clause operates to cause federal bankruptcy law to trump state laws, including state constitutional provisions, that are inconsistent with the exercise by Congress of its exclusive power to enact uniform bankruptcy laws.") (citing Ass'n of Retired Emps. of the City of Stockton v. City of Stockton, Cal. (In re City of Stockton, Cal.), 478 B.R. 8, 14-16 (Bankr. E.D. Cal. 2012); U.S. Const. art. VI, cl. 2; Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo, Cal. (In re City of Vallejo, Cal.), 432 B.R. 262, 268-70 (E.D. Cal. 2010)) (additional citations omitted). As set forth in the leading bankruptcy treatise, "[t]he requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future." 6 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy § 944.03[1][b] (16th ed. 2013).

(G)     The New GO Bonds and the CVIs are bonds or notes within the meaning of
        Section 2 of Article VI of the Commonwealth Constitution to which the
        Commonwealth may legally pledge its full faith, credit and taxing power
        under the Commonwealth Constitution and applicable Puerto Rico law for the
        payment of principal and interest.

(H)     Pursuant to the New GO Bonds Legislation and the CVI Legislation, the
        Commonwealth has validly pledged its full faith, credit and taxing power
        under the Commonwealth Constitution and applicable Puerto Rico law for the
        payment of principal and interest with respect to the New GO Bonds and
        payment with respect to the CVIs.

(I)     Subject to the occurrence of the Effective Date and as of the date of issuance
        of the New GO Bonds and CVIs, the Commonwealth is in compliance with
        any applicable debt limits, including the Comprehensive Cap and any
        applicable debt limit (if any) contained in the Commonwealth Constitution.

(J)     Pursuant to the New GO Bonds Legislation and other applicable law, upon the
        issuance of the New GO Bonds, the New GO Bonds shall be secured by a first
        priority statutory lien (statutory lien being defined in 11 U.S.C. § 101(53))
        over the funds deposited in the Debt Service Fund, including any revenues
        generated therefrom, which statutory first lien shall occur automatically and
        shall automatically attach and be perfected, valid, and binding from and after
        the Effective Date, without any further act or agreement by any Person, and
        shall remain in full force and effect until the New GO Bonds have been paid
        or satisfied in full in accordance with their terms.

(K)     The statutory first lien on funds deposited into the Debt Service Fund, as
        provided for in the New GO Bonds Legislation, and all other provisions to pay
        the New GO Bonds are valid, binding, legal, and enforceable, including,
        without limitation, covenants not to impair such property, maintain available
        tax exemption and provide for the conditions regarding substitution of
        collateral (including, without limitation, the statutory lien thereon as adequate
        protection for the property rights in the Plan and in the Confirmation Order).

(L)     The statutory first lien on funds deposited into the Debt Service Fund, as
        provided for in the New GO Bonds Legislation, creates the valid pledge and
        the valid lien upon the right, title and interest of the Commonwealth in such
        funds in favor of the Trustee (for the benefit of the holders of the New GO
        Bonds) which it purports to create, subject only to the provisions of the New
        GO Bonds Indenture permitting the withdrawal, payment, setting apart or
        appropriation thereof for the purposes and on the terms and conditions set
        forth in the New GO Bonds Indenture and each applicable supplemental
        indenture.

(M)     The Commonwealth has waived, and shall be deemed to have waived, the
        automatic stay in any future insolvency proceeding commenced on behalf of

the Commonwealth (whether under Title III of PROMESA or otherwise) with respect to monies on deposit in the Debt Service Fund as of the commencement thereof.

(N) In light of the enactment of the New GO Bonds Legislation and the CVI Legislation, upon execution by all parties thereto, the New GO Bonds Indenture and the CVI Indenture shall (i) have been duly and lawfully authorized by the Commonwealth, and (ii) be in full force and effect and valid and binding upon the Commonwealth and enforceable in accordance with their terms, except that enforceability of rights and remedies may be limited by bankruptcy, insolvency, reorganization, moratorium, or other laws affecting creditors' rights generally or as to the availability of any particular remedy.

(O) For purposes of section 209 of PROMESA, the discharge of debt to occur as of the Effective Date pursuant to the Plan and the Confirmation Order is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth, as determined in accordance with modified accrual accounting standards.

(P) The Court's *Opinion and Order Granting Defendants' Motion to Dismiss the Complaint* (Docket Entry No. 83 in Adv. Proc. No. 21-00068), including, without limitation, that the GDB HTA Loans are subject to subordination to the HTA 68 Bonds and the HTA 98 Bonds qualifies as the "GDB Loan Priority Determination" for purposes of the Plan.

4. <u>Litigation Resolution</u>. For the reasons stated herein and in the Findings of Fact and Conclusions of Law, the provisions of the Plan constitute a good faith, reasonable, fair, and equitable compromise and settlement of all Claims and controversies resolved pursuant to the Plan, including, without limitation, the compromise and settlement of asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, and disputes (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status, and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the

Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of
CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive
revenues historically conditionally appropriated to CCDA, HTA, the MBA, and PRIFA, as
applicable, and subject to "clawback" by the Commonwealth pursuant to the provisions of the
Commonwealth Constitution, (e) relating to the validity, priority, secured status, and related
rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery
Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including,
without limitation, the resolution of (i) the claims and Causes of Action currently being litigated
in the PBA Litigation, (ii) the amount, if any, of the PBA Administrative Expense Claim, and
(iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims
that PBA may assert against the Commonwealth under leases, agreements, and applicable law,
(h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention
Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in
the PRIFA BANs Litigation, each as incorporated into the Plan, and the entry of this
Confirmation Order constitutes, if required, approval of all such compromises and settlements
pursuant to Bankruptcy Rule 9019 and sections 105(a) and 1123(b)(5) of the Bankruptcy Code.
Pursuant to this Confirmation Order, and to the extent provided in the Plan, on the Effective
Date, such compromises and settlements shall be binding upon the Debtors, all Creditors of the
Debtors, and all other Entities and, to the fullest extent permitted by applicable law, shall not be
subject to collateral attack or other challenge (other than appeals) in any other court or forum.

5.    <u>Plan Settlements Approved</u>.  The Court hereby approves the compromises and
settlements embodied in the Plan as fair and reasonable and, as of the Effective Date of the Plan,
authorizes and directs the consummation thereof.

6.      <u>Dismissal of Med Center Litigation</u>.  On the Effective Date, the Med Center

Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice, and each of

the Commonwealth and the respective Med Centers shall take such action as is necessary to

notify the applicable court of such dismissal, including, without limitation, within ten (10)

Business Days of the Effective Date, filing notices with the clerk of such court setting forth the

resolution of the Med Center Litigation and the dismissal thereof (except the Med DC Action),

with prejudice; <u>provided</u>, <u>however</u>, that all appeals taken from the Med DC Action shall be

dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such

appeals shall take such action as is necessary to notify such appellate courts of appeal of such

dismissal, with prejudice; and, <u>provided</u>, <u>further</u>, that the Commonwealth and the Med Centers

shall file a notice with the clerk of the court in connection with the Med DC Action that (a) all

actions in connection with the Med DC Action shall be stayed, and (b) in the event that, from and

after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the

Medicaid Act, 42 U.S.C. § 1396a(bb), such stay shall be lifted and the Med Centers may pursue

relief and the Commonwealth may present any and all defenses with respect to such alleged

future defaults, with all existing defaults as of the date hereof having been waived by the Med

Centers.  Without in any way limiting the foregoing, from and after the earlier to occur of (y)

July 1, 2022 and (z) the Effective Date (the "Med Center Outside Date"), and until otherwise

ordered or agreed upon, the parties shall continue to adhere to and comply with the terms and

provisions of that certain *Stipulation Modifying the Automatic Stay Between the Commonwealth*

*and Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud Familiar Dr.*

*Julio Palmieri Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. De Serv. Médicos*

*Primarios y Prevención de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc.,*

*Centro de Servicios Primarios de Salud de Patillas, Inc., and Hospital General Castañer, Inc.*,
dated July 12, 2019 (the "Med Center Stipulation") (see Docket Entry Nos. 8499 and 12918-14),
including, without limitation, the making of quarterly payments to certain Med Centers in
accordance therewith. Payments made by the Commonwealth, either directly or indirectly
through contractors or subcontractors, to any Med Center prior to modification of the Med
Center Stipulation or such other agreement between the applicable Med Centers and the
Commonwealth shall not be subject to setoff or recoupment on account of any claims or causes
of action arising during the period up to and including the Effective Date; provided, however,
that, in the event that the Commonwealth or any Med Center determines that any payments made
pursuant to the Med Center Stipulation from and after the Med Center Outside Date constitute an
overpayment or an underpayment, as the case may be, based upon services provided by the Med
Centers from and after the Med Center Outside Date, the Commonwealth or such Med Center
shall submit such issue for a determination in connection with the Med DC Action, with all
parties reserving all rights, defenses, and counterclaims with respect to such overpayments or
underpayments, as the case may be, notwithstanding the imposition of any stay.

7.     Dismissal of ERS Litigation. On the Effective Date, (a) the ERS Litigation and
the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the
Oversight Board, by itself or through its committees, the Creditors' Committee, and the ERS
Bondholders (on their own account or on behalf of affiliates or related funds or accounts
managed by affiliates) shall take any and all action reasonably necessary, including, without
limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to
effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions,

with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate

the dismissal and/or denial of the ERS Takings Action, with prejudice.

8.     <u>Dismissal of GO/Clawback Litigation</u>.  On the Effective Date, (a) to the extent

extant, the Debt Related Objections, the Invalidity Actions, the Lien Challenge Actions, the Lift

Stay Motions, the Clawback Actions, and the Section 926 Motion shall be dismissed and/or

denied, with prejudice, (b) the Oversight Board, by itself or through its committees, the

Creditors' Committee, the Monolines and the PSA Creditors (on their own account or on behalf

of affiliates or related funds or accounts managed by affiliates) shall take any and all action

reasonably necessary, including, without limitation, filing such notices, stipulations or other

pleadings in the Title III Court, the United States Court of Appeals for the First Circuit and the

courts of the Commonwealth of Puerto Rico, as applicable, to effectuate the dismissal of the

aforementioned litigations and motions, with prejudice.

9.     <u>Dismissal of PRIFA BANs Litigation</u>.  On the Effective Date, (a) the PRIFA

BANs Litigation and the PRIFA BANs Takings Litigation shall be dismissed and/or denied, with

prejudice, and (b) the Oversight Board, by itself or through its committees, and the plaintiffs

therein (on their own account or on behalf of affiliates or related funds or accounts managed by

affiliates) shall take any and all action necessary, including, without limitation, filing such

notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal

and/or denial of the PRIFA BANs Litigation, with prejudice, and (ii) in the United States Court

of Federal Claims to effectuate the dismissal and/or denial of the PRIFA BANs Takings

Litigation, with prejudice.

10.     <u>Dismissal of the PBA Litigation</u>.  On the Effective Date, (a) the PBA Litigation

shall be dismissed, with prejudice, and (b) the Oversight Board, by itself or through its

committees, and the plaintiffs therein (on their own account or on behalf of affiliates or related

funds or accounts managed by affiliates) shall take any and all action necessary, including,

without limitation, filing such notices, stipulations or other pleadings in the Title III Court to

effectuate such dismissal and/or denial of the PBA Litigation, with prejudice.

11.     Implementation of the Plan.  On and after the Effective Date, the Debtors, the

Reorganized Debtors, and each of their respective authorized agents and representatives are

authorized and directed to (a) execute, deliver, file, or record such documents, contracts,

instruments, releases, and other agreements including, without limitation, those contained in the

Plan Supplement, (b) make any and all distributions and transfers contemplated pursuant to, and

as provided for in, the Plan and the Plan Supplement, (c) take such other actions as may be

necessary to effectuate, implement, and further evidence the terms and conditions of the Plan,

including, among other things, all such actions delineated in article LXXXIX of the Plan,[7] and

(d) direct or instruct The Depository Trust Company, or such other person or entity necessary to

implement or effectuate the terms of (i) any custodial trust, escrow arrangement, or similar

structure established pursuant to section 75.5(b) of the Plan and facilitated by Ambac (an

"Ambac Trust"), (ii) the FGIC Trust, (iii) the Syncora Trust, (iv) any custodial trust, escrow

arrangement, or similar structure established pursuant to section 75.1(b)(ii) of the Plan (an

"Assured Trust"), and (v) the Avoidance Actions Trust (collectively, the "Trusts"), and (vi) the

related Trust documentation.  Without in any way limiting the foregoing, on the Effective Date,

the appropriate officers or representatives of the Debtors and Reorganized Debtors, as the case

may be, and members of the boards of directors of the same, as applicable, are authorized,

---

[7]     Article LXXXIV has been amended to reflect that Class 54 is among the Unimpaired
Classes (§ 84.2), rather than among the Impaired Classes (§ 84.1.)

empowered, and directed to issue, execute, file, and deliver or record such documents, contracts,
instruments, releases, and other agreements, including those contained in the Plan Supplement,
contemplated by the Plan, and make, or cause to be made, any and all distributions and transfers
contemplated pursuant to, and as provided for in, the Plan and the Plan Supplement, in the name
of and on behalf of the Debtors and Reorganized Debtors, as applicable.

12.     <u>Enforceability of New Debt Instruments</u>.  Pursuant to each of Bankruptcy Code
section 944(b)(3), the New GO Bonds Legislation, the CVI Legislation, and all debt instruments
to be issued pursuant to the Plan will constitute, upon distribution thereof, valid legal obligations
of the Debtor or the Reorganized Debtor, as the case may be, that issues them, and any provision
made to pay or secure payment of such obligation is valid.

13.     <u>Authorization of New GO Bonds and CVIs and Injunction</u>.  The debt
authorization in Act 53-2021 is conditioned only on the Plan's cancellation of the Monthly
Benefit Modification provided for in the proposed *Seventh Amended Title III Joint Plan of
Adjustment of the Commonwealth of Puerto Rico, et al.* (Docket Entry No. 17627) (the "Seventh
Amended Plan"), and does not require satisfaction of any other conditions including cancellation
of (a) the elimination of cost of living adjustments and/or (b) freeze or terminations of accrual of
defined benefits under the Teachers Retirement System or the Judiciary Retirement System from
and after the Effective Date.  The Plan cancels and eliminates the Monthly Benefit Modification
previously included in the proposed Seventh Amended Plan, thereby satisfying the condition in
Act 53-2021 for its debt authorization.  The Commonwealth government shall not repeal such
debt authorization prior to all such indebtedness issued pursuant to the Plan being satisfied in
accordance with the terms thereof.  For avoidance of doubt, the Plan does not modify benefits

comprised of the "Monthly Base Pension," "Christmas Bonus," "Summer Bonus," "Medicine

Bonus," and "Medical Insurance Benefit," each as defined in the Seventh Amended Plan.

14.    <u>Purchase and Sale of Certain ERS Assets</u>.  On the Effective Date, (a) the

Commonwealth shall purchase, and ERS shall sell, assign, transfer, and convey to the

Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without

limitation, such Assets subject to a valid and perfected lien or security interest (other than liens

or claims discharged pursuant to the Plan and this Confirmation Order) for an aggregate purchase

price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and

(b) in accordance with the terms and provisions of section 69.2 of the Plan, (i) the

Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the

interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option,

pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS

Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy

Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be

necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with

the ERS Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not

exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy

Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

15.    <u>Monthly Deposits of Interest and Principal</u>.  Pursuant to the New GO Bonds

Legislation and the New GO Bonds Indenture, from and after the Effective Date, until the New

GO Bonds have been paid or satisfied in full in accordance with their terms, on the first (1st)

Business Day of each calendar month, the Reorganized Commonwealth shall deposit Cash in the

Debt Service Fund with the New GO Bonds Trustee in the aggregate amount equal to (i) one-

sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation with respect to the payment of interest to accrue on the New GO Bonds through the next interest payment date, and (ii) one twelfth (1/12) of the Reorganized Commonwealth's then annual obligation with respect to the payment of principal (or accreted value) on the New GO Bonds. On the Effective Date, the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional amounts as may be necessary to account for the New GO Bonds being issued as of the Deemed Issuance Date.

16. <u>Comprehensive Cap on All Net Tax-Supported Debt</u>. During the Debt Policy Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive Cap on all Net Tax-Supported Debt of article IV of the Debt Responsibility Act, which cap shall be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds outstanding as of the Effective Date. Debt service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO Bonds and PBA Bonds, and payments on CVIs to be issued pursuant to the Plan or other contingent value instruments that may be issued pursuant to or in connection with a Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA, CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the

Comprehensive Cap.  For the avoidance of doubt, any capital appreciation general obligation
bonds or similar tax supported debt obligations issued to anyone other than the holders or
insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value
instruments or similar tax supported debt obligations issued other than pursuant to or in
connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the
Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date.  The
Secretary of Treasury's certification of compliance with the Debt limit pursuant to section 74.4
of the Plan shall be conclusive and binding absent manifest error; provided, however, that, in
issuing such certification, with respect to the calculation of the revenues of public corporations
included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from
officers of such public corporations.

      17.    <u>Adoption and Maintenance of a Debt Management Policy</u>.  During the Debt
Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt
Management Policy designed to ensure that certain past Debt issuance practices of the
Commonwealth are not repeated.  The Debt Management Policy shall, unless otherwise
approved, in writing, by the Oversight Board (to the extent exercising authority in accordance
with the provisions of PROMESA), at all times include the principles and limitations provided in
section 74.5 of the Plan.

      18.    <u>Creation of Avoidance Actions Trust</u>.  Upon the execution of the Avoidance
Actions Trust Agreement pursuant to section 78.1 of the Plan, the Avoidance Actions Trust shall
be established and validly created pursuant to the terms of the Avoidance Actions Trust
Agreement, with no further authorization or legislative action being required, and the Avoidance
Actions Trustee shall be selected in accordance with the terms and provisions of the Avoidance

Actions Trust Agreement.  This Court shall retain jurisdiction to enforce the terms and

provisions of the Avoidance Actions Trust Agreement.

19.     <u>Avoidance Actions Trust Assets</u>.  The Avoidance Actions Trust shall consist of

the Avoidance Actions Trust Assets.  On the Effective Date, the Debtors shall transfer all of the

Avoidance Actions Trust Assets to the Avoidance Actions Trust and, in accordance with section

1123(b)(3)(B) of the Bankruptcy Code, the Avoidance Actions Trust shall have the sole right,

authority, and standing to prosecute, settle or otherwise dispose of all Avoidance Actions,

including, without limitation, those set forth on Exhibits A and B to the Plan, as of the Effective

Date.  The Avoidance Actions Trust Assets may be transferred subject to certain liabilities,

including, without limitation, all counterclaims and defenses to any such Avoidance Actions

Trust Assets, as provided in the Plan or the Avoidance Actions Trust Agreement.  Such transfer

shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other

similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the

Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors, the Reorganized

Debtors, and their predecessors, successors and assigns, and each other Entity released pursuant

to section 88.2 of the Plan shall be discharged and released from all liability with respect to the

delivery of such distributions.

20.     <u>Funding, Costs, and Expenses of the Avoidance Actions Trust</u>.  On the Effective

Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to

Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior

to the Confirmation Hearing.  The reasonable costs and expenses of the Avoidance Actions

Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained

professionals, shall be paid out of the Avoidance Actions Trust Assets.  Fees and expenses

incurred in connection with the prosecution and settlement of any Claims shall be considered
costs and expenses of the Avoidance Actions Trust.

       21.    <u>Indemnification of Avoidance Actions Trustee and Board</u>.  The Avoidance
Actions Trustee, the Trust Advisory Board (as defined in the Avoidance Actions Trust
Agreement), and their respective firms, companies, affiliates, partners, officers, directors,
members, employees, professionals, advisors, attorneys, financial advisors, investment bankers,
disbursing agents and agents, and any of such Person's successors and assigns (each, an
"Indemnified Party"), shall not be liable to the Avoidance Actions Trust Beneficiaries (as
defined in the Avoidance Actions Trust Agreement) for actions taken or omitted in their capacity
as, or on behalf of, the Avoidance Actions Trustee or the Trust Advisory Board, as applicable,
except those acts arising from their own fraud, willful misconduct or gross negligence, and each
shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees
and expenses in defending any and all actions or inactions in their capacity as, or on behalf of,
the Avoidance Actions Trustee or the Trust Advisory Board, as applicable, except for any actions
or inactions involving fraud, willful misconduct or gross negligence.  Any indemnification claim
of an Indemnified Party pursuant to section 7.5 of the Avoidance Actions Trust Agreement shall
be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority
distribution therefrom.  The Indemnified Parties shall be entitled to rely, in good faith, on the
advice of their retained professionals.  The foregoing indemnity in respect of any Indemnified
Party shall survive the termination of such Indemnified Party from the capacity for which they
are indemnified.

       22.    <u>Creation of Pension Reserve Trust</u>.  Upon the execution of the Pension Reserve
Deed of Trust pursuant to section 83.1 of the Plan, the Pension Reserve Trust shall be established

and validly created pursuant to the terms of the Pension Reserve Deed of Trust, with no further

authorization or legislative action being required, and shall not be subject to taxation by the

Commonwealth.  This Court's retention of jurisdiction includes jurisdiction over actions to

enforce the terms and provisions of the Pension Reserve Deed of Trust.

23.  <u>Funding of the Pension Reserve Trust</u>.  On the Effective Date, the Commonwealth

shall contribute, or cause to be contributed, to the Pension Reserve Five Million Dollars

($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension Reserve

Trust, of which One Million Dollars ($1,000,000.00) shall be deposited into the Pension Reserve

Board's general account, Two Million Five Hundred Thousand Dollars ($2,500,000.00) shall be

deposited into the Pension Benefits Council's administrative and operating account, and One

Million Five Hundred Thousand Dollars ($1,500,000.00) shall be deposited into the Pension

Reserve Board's administrative and operating account.  From and after the FY in which the

Effective Date occurs up to and including the conclusion of the ninth (9th) FY following the FY

in which the Effective Date occurs, the Reorganized Commonwealth shall make, or cause to be

made, annual (but in no event later than October 1st following the conclusion of each FY)

contributions to the Pension Reserve Trust in an amount equal to (a) the Base Contribution, (b)

such additional amount calculated as the lower of the actual primary surplus for such FY and the

projected Fiscal Plan primary surplus for such FY, minus the sum of (i) the Base Contribution

for such FY, plus (ii) the  Commonwealth debt service obligation pursuant to the Fiscal Plan for

such FY, plus (iii) Two Hundred Million Dollars ($200,000,000.00); <u>provided</u>, <u>however</u>, that, in

all instances, such additional amount cannot be lower than zero dollars ($0.00), and (c) subject to

applicable laws, including, without limitation, Titles I and II of PROMESA, such additional

amounts as the Reorganized Commonwealth may deposit into the Pension Reserve Trust.  The

Pension Reserve Trust shall be managed by an independent entity whose members shall meet the independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics, and conflicts of interest laws and regulations.

24.     No Action.  Pursuant to section 1142(b) of the Bankruptcy Code, the Debtors are directed to, and no further action of the directors or officers of the Debtors shall be required to authorize the Debtors to, enter into, execute, deliver, file, adopt, amend, restate, consummate, or effectuate, as the case may be, the Plan, and any contract, instrument, or other document to be executed, delivered, adopted, or amended in connection with the implementation of the Plan, including, without limitation, the Plan Supplement.

25.     Government Action.  From the Effective Date up to and including the satisfaction of the New GO Bonds and the CVIs in accordance with their respective terms, (a) pursuant to Bankruptcy Code section 1142(b), the Government of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof, shall take any and all actions necessary to consummate the transactions contemplated by the Plan, (b) the Puerto Rico Department of Treasury and AAFAF, as applicable, are authorized and directed, notwithstanding any requirements of Puerto Rico law, to execute any and all agreements necessary for the implementation of the Plan and to make any payments required thereunder,  and (c) pursuant to section 108(a)(2) of PROMESA, no party, individual, official, or officer (elected or appointed), agency, or Entity shall enact, adopt, or implement any law, rule, regulation, or policy that (i) impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan, including, but not limited to, those contemplated pursuant to the New GO Bonds Indenture and the CVI Indenture, or (ii) creates any inconsistency in any manner,

amount, or event between the terms and provisions of the Plan or a Fiscal Plan certified by the Oversight Board, each of which actions has been determined by the Oversight Board to impair or defeat the purposes of PROMESA. To the maximum extent permitted by law, the Government of Puerto Rico, including, without limitation, any Entity or Person acting for or on behalf thereof, is directed to take any and all actions necessary to consummate the transactions contemplated by the Plan. Without in any way limiting the foregoing, on the earlier to occur of (y) the Effective Date and (z) within forty-five (45) days from and after the date hereof, the agencies and instrumentalities set forth on **Exhibit D** hereto are directed to transfer the funds and the proceeds of liquid securities held on account and set forth on **Exhibit D** hereto to the Puerto Rico Treasury Single Account; provided, however, that **Exhibit D** hereto may be amended during the period up to and including thirty (30) days from the date hereof upon the agreement of the Oversight Board and AAFAF and, to the extent amended, the Oversight Board shall file an informative motion with the Title III Court with respect thereto.

26. <u>Oversight Board Consent Pursuant to PROMESA Section 305</u>. Pursuant to section 305 of PROMESA, with the consent of the Oversight Board and consistent with the Plan, using all their political and governmental powers, the Governor and Legislature are directed to take all acts necessary to carry out and satisfy all obligations and distributions set forth in the Plan.

27. <u>Binding Effect</u>. This is a full and complete Final Order intended to be conclusive and binding on all parties in interest, is not intended to be subject to collateral attack in any other forum, and may only be challenged in accordance with applicable rules in this Court and appealed as provided in PROMESA and other applicable federal laws, rules, and jurisprudence, by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its

instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or

any other Commonwealth instrumentality, including each holder of a bond claim and each holder

of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer

or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with

respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank

that receives or holds funds related to such bonds, whether or not such claim or other rights of

such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity

accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs,

successors, assigns, trustees, executors, administrators, officers, directors, agents,

representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises

and settlements set forth in the Plan and this Confirmation Order with respect to the priority of

the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other

applicable law shall not be binding on any party in interest (including any successor to the

Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

        28.     <u>Cancellation of Notes, Instruments, Certificates, and Other Documents</u>.  Pursuant

to section 77.6 of the Plan, and except (a) as provided in any contract, instrument or other

agreement or document entered into or delivered in connection with the Plan, (b) for purposes of

evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the

Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to section

76.1 of the Plan), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all

instruments and documents related thereto will be deemed automatically cancelled, terminated

and of no further force or effect against the Debtors without any further act or action under any

applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee,

paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and

responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under

the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto

shall be discharged; provided, however, that, notwithstanding anything contained in the Plan or

herein to the contrary, the PBA Bonds, ERS Bonds and GO Bonds and such other instruments

and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any

distributions as set forth in the Plan and to perform such other necessary administrative or other

functions with respect thereto, (ii) to allow holders of Allowed Bond Claims and Allowed

Insured Bond Claims to receive distributions in accordance with the terms and provisions of the

Plan, (iii) to allow any trustee, fiscal agent, agent, contract administrator or similar entity under

all instruments and documents related thereto, to perform necessary functions, including making

distributions, in accordance with the Plan, and to have the benefit of all the rights and protections

and other provisions of such instruments and documents, as applicable, and all other related

agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and

instruments other than the Debtors, (v) to allow a Monoline to exercise the redemption or call

rights assigned to such Monoline pursuant to the provisions of article LXXV of the Plan, (vi) to

allow the applicable trustee or fiscal agent, as the case may be, to appear in any proceeding in

which such trustee or fiscal agent is or becomes a party with respect to clauses (i) through (iv)

above, or (vii) as may be necessary to preserve any claims under the respective insurance

policies and related documents issued by a Monoline and the Oversight Board shall request that

the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP

numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such

other reasonable steps as may be necessary to preserve and effectuate such Claims.

Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such

bonds or bond documents that remain outstanding shall not form the basis for the assertion of

any Claim against the Debtors or Reorganized Debtors, as the case may be.

29.     Rejection or Assumption of Remaining Executory Contracts and Unexpired

Leases.  Pursuant to section 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case

pursuant to section 301 of PROMESA, and subject to the provisions of sections 76.5 and 76.7 of

the Plan, all Executory Contracts and Unexpired Leases that exist between the Debtors and any

Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall

be deemed rejected by the Debtors as of the Effective Date, except for any Executory Contract

and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of

the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a

contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been

registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from

registration with the Office of the Comptroller of Puerto Rico pursuant to 2 L.P.R.A. § 97 and

regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or

authorized by the Title III Court, unless specifically designated a contract to be rejected in the

Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or

pursuant to any federal program, (g) that is an incentive agreement between the Government of

the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover

Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments,

municipalities, public corporations, or instrumentalities (other than leases to which PBA is a

party); provided, however, that the Debtors reserve the right to amend, on or prior to the

Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom

or add any Executory Contract and Unexpired Lease thereto, in which event such Executory

Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected,

assumed, or assumed and assigned as of the Effective Date. The Debtors shall serve (y) notice of

any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through

the operation of section 76.1 of the Plan, by including a schedule of such contracts and leases in

the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be

rejected through the operation of section 76.1 of the Plan, by serving a separate notice to the

relevant counterparties to such agreements. To the extent there are any amendments to such

schedules, the Debtors shall provide notice of any such amendments to the parties to the

Executory Contract and Unexpired Lease affected thereby. The listing of a document on the

schedules to the Plan Supplement or in any separate notice shall not constitute an admission by

the Debtors that such document is an Executory Contract and Unexpired Lease or that the

Debtors have any liability thereunder. Except as provided in articles LV and LVI of the Plan,

none of the Debtors' collective bargaining agreements shall be treated as Executory Contracts

and none shall be assumed or rejected or otherwise treated pursuant to the Plan, but shall remain

in effect subject, in all instances, to Puerto Rico law and articles LV and LVI of the Plan

regarding the payment and ongoing treatment of pension and related claims obligations.

30.    Insurance Policies.  Subject to the terms and provisions of section 76.7 of the

Plan, each of the Debtors' insurance policies and any agreements, documents, or instruments

relating thereto, are treated as Executory Contracts under the Plan; provided, however, that, such

treatment shall not, and shall not be construed to, discharge or relieve any Monoline with respect

to its respective obligations to holders of Claims under policies of insurance and applicable law

and governing documents with respect thereto.

31.     <u>Rejection Damages Claims</u>.  If the rejection of an Executory Contract and

Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to

such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof

of Claim, shall be forever barred and shall not be enforceable against the Debtors, or its

properties or agents, successors, or assigns, including, without limitation, Reorganized Debtors,

unless a proof of Claim is filed with the Title III Court and served upon attorneys for the

Oversight Board and Reorganized Debtors, as the case may be, on or before thirty (30) days after

the later to occur of (i) the Effective Date, and (ii) the date of entry of an order by the Title III

Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

32.     <u>Payment of Cure Amounts</u>.  Any monetary amount required as a cure payment

with respect to each prepetition executory contract and unexpired lease to be assumed pursuant

to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment

of the cure amount in Cash on the later to occur of (a) the Effective Date and (b) within ten (10)

Business Days of the occurrence of a Final Order setting forth the cure amount as to each

executory contract or unexpired ease to be assumed or assumed and assigned, or upon such other

terms and dates as the parties to such executory contracts or unexpired leases and the Debtor

otherwise agree.

33.     <u>Setoffs</u>.  Except as otherwise provided in the Plan or in this Confirmation Order,

the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off

against any Allowed Claim and the distributions to be made pursuant to the Plan on account

thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the

claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors may

hold against the holder of such Allowed Claim; <u>provided</u>, <u>however</u>, that neither the failure to

effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release

by the Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the

Debtors or the Reorganized Debtors possess against such holder; and, <u>provided</u>, <u>further</u>, that

nothing contained herein is intended to limit the ability of any Creditor to effectuate rights of

setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560

of the Bankruptcy Code or pursuant to the common law right of recoupment; and, <u>provided</u>,

<u>further</u>, that nothing in this decretal paragraph or section 77.11 of the Plan shall affect the

releases and injunctions provided in article XCII of the Plan or this Confirmation Order.

  34. <u>Delivery of Distributions</u>.

   (a) <u>Delivery of Distributions Generally</u>.  Subject to the provisions of Rule

9010 of the Bankruptcy Rules, and except as provided in the Plan or herein, distributions and

deliveries to holders of Allowed Claims shall be made through The Depository Trust Company

or at the address of each such holder as set forth on the Schedules filed with the Court, unless

superseded by the address set forth on proofs of Claim filed by such holders, or at the last known

address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing

of a change of address; <u>provided</u>, <u>however</u>, that, except as otherwise provided herein,

distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be

made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the

respective governing documents for such obligations; and, <u>provided</u>, <u>further</u>, that, except as

otherwise provided herein, the Disbursing Agent may make distributions of PSA Restriction

Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto

in a manner mutually agreed upon between such party and the Disbursing Agent.  The trustee or

fiscal agent for each such obligation (or such trustee's or fiscal agent's designee) shall, in turn,

deliver the distribution to holders in the manner provided for in the applicable governing

documents.  Each trustee or fiscal agent may conclusively rely upon the distribution instructions

received from the Debtors or their agents with respect to the delivery of distributions in

accordance with the terms and provisions of the Plan, including the contra-CUSIP positions and

escrow positions established by the Debtors or their agents with The Depository Trust Company,

and each trustee or fiscal agent shall close and terminate the original CUSIPs after making

distributions in accordance with the terms and provisions of the Plan and shall have no further

distribution obligations thereunder.  No trustee or fiscal agent shall be required to post any bond

or surety or other security for the performance of its duties, unless otherwise ordered or directed

by the Title III Court.  Subject to any agreements to the contrary, each trustee or fiscal agent

shall only be required to make the distributions and deliveries described in this decretal

paragraph and the Plan and in accordance with the terms of this Confirmation Order, the Plan

and such other governing document, and shall have no liability for actions reasonably taken in

accordance with the terms of this Confirmation Order, the Plan and such other governing

document, or in reasonable reliance upon information provided to such trustee or fiscal agent by

the Debtors or their agents in accordance with the terms of this Confirmation Order, the Plan or

in connection with distributions to be made hereunder or thereunder, except for liabilities

resulting from the gross negligence or willful misconduct of such trustee or fiscal agent.  The

New GO Bonds and the CVIs shall be transferable and recognized if made in accordance with

the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

    (b)  <u>Delivery of Distributions with Respect to Assured Insured Bonds</u>.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) to the extent

an Assured Insured Bondholder holding the Assured Insured Bond with CUSIP number

74514LD46  validly elects (or is deemed to elect) Assured Bondholder Election 2, the

Disbursing Agent will deposit the Assured New Securities and Cash allocable to such Assured

Insured Bondholder in the applicable Assured Trust in accordance with the applicable trust

agreement; (ii) to the extent an Assured Insured Bondholder holding the custody receipt with

CUSIP number 74514LGL5 evidencing a beneficial ownership interest in the Assured Insured

Bond with CUSIP number 745145XZ0, the custody receipt with CUSIP number 745235UX7

evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number

745235SA0, the custody receipt with CUSIP number 745235YJ4 or 745235UX7 evidencing a

beneficial ownership interest in the Assured Insured Bond with CUSIP number 745235SA0, the

custody receipt with CUSIP number 745235YZ8 evidencing a beneficial ownership interest in

the Assured Insured Bond with CUSIP number 745235SA0, the custody receipt with CUSIP

number 745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond

with CUSIP number 745235SC6, or the custody receipt with CUSIP number 745235YV7 or

745235UY5 evidencing a beneficial ownership interest in the Assured Insured Bond with

CUSIP number 745235SC6 validly elects (or is deemed to elect) Assured Bondholder Election

2, such Assured Insured Bondholder will be deemed to have deposited such custody receipts

into the applicable Assured Trust; the trustee (the "Assured Trustee") of the Assured Trusts (as

the holder of the applicable custody receipts) and Assured will be deemed to have collapsed the

existing custodial arrangement, such that the Assured Trustee will be deemed to hold the

Assured Insured Bonds underlying the applicable custody receipts and the related Assured

Insurance Policies as provided in the applicable trust agreement, without any further action on

the part of the existing custodian, provided, however, that the existing custodian is also hereby

authorized and ordered to take any further actions that may be necessary to confirm the collapse

of the existing custodial arrangement as provided herein; and the Disbursing Agent will transfer

the Assured New Securities and Cash allocable to such Assured Insured Bondholder to the

Assured Trustee for deposit in the applicable Assured Trust on account of such custody receipts

and Assured Insured Bonds in accordance with the applicable trust agreement; (iii) to the extent

an Assured Insured Bondholder holding the custody receipt with CUSIP number 74514LWE3

evidencing a beneficial ownership interest in the Assured Insured Bond with CUSIP number

745145R53 or holding the custody receipt with CUSIP number 74514LUW5 evidencing a

beneficial ownership interest in the Assured Insured Bond with CUSIP number 74514LNG8

validly elects (or is deemed to elect) Assured Bondholder Election 2, such Assured Insured

Bondholder will be deemed to have deposited such custody receipts into the applicable Assured

Trust; the Assured Trustee (as the holder of the applicable custody receipts) and Assured will be

deemed to have collapsed the existing custodial arrangement, such that the Assured Trustee will

be deemed to hold the Assured Insured Bonds underlying the applicable custody receipts and

the related Assured Insurance Policies as provided in the applicable trust agreement, without

any further action on the part of the existing custodian, provided, however, that the existing

custodian is also hereby authorized and ordered to take any further actions that may be

necessary to confirm the collapse of the existing custodial arrangement as provided herein, and,

without prejudice to the ability of the Assured Trustee to draw on the applicable Assured

Insurance Policy, the Assured Trustee shall be deemed to have deposited such Assured Insured

Bonds (which also qualify as FGIC Insured Bonds), the related FGIC Insurance Policies, and

the related FGIC Plan Consideration into the applicable FGIC Trust pursuant to section 75.4(a)

of the Plan; and the trustee for the Assured Trust related to such Assured Insured Bonds shall be

deemed to have received its Pro Rata Share of the FGIC Plan Consideration, and shall receive

the FGIC Certificates allocable to such Assured Insured Bondholder on account of the custody

receipts referred to in this subsection (iii) above and Assured Insured Bonds (which also qualify

as FGIC Insured Bonds) referred to in this subsection (iii) above for deposit in the relevant

Assured Trust in accordance with the applicable trust agreement; (iv) pursuant to section

75.1(a) of the Plan, Assured is hereby deemed to have exercised the Assured Acceleration Price

Payment Option with respect to all Assured Insured Bonds with respect to which Assured has

exercised the Assured Election, and the Disbursing Agent shall disburse the Assured New

Securities and Cash on account of any Assured Insured Bonds with respect to which Assured

has exercised the Assured Election or with respect to which an Assured Insured Bondholder has

validly elected Assured Bondholder Election 1 to Assured in a manner mutually agreed upon

between the Disbursing Agent and Assured; and (v) on or prior to the Effective Date, the

Disbursing Agent and the Debtors shall disclose to Assured the Acceleration Price to be paid

with respect to any Assured Insured Bonds with respect to which Assured has exercised the

Assured Election or with respect to which an Assured Insured Bondholder has validly elected

Assured Bondholder Election 1, and on the Effective Date (1) with respect to such Assured

Insured Bonds insured in the primary market, the paying agent for the GO Bonds or the fiscal

agent for the PBA Bonds, as applicable, shall draw down on the applicable Assured Insurance

Policies to pay the applicable Assured Acceleration Price to the beneficial holders of such

Assured Insured Bonds insured in the primary market in accordance with sections 75.1(a) and

75.1(b)(i) of the Plan, as applicable, and (2) with respect to such Assured Insured Bonds insured

in the secondary market, Assured shall, or shall cause the applicable custodian of custody

receipts evidencing the beneficial ownership interest of the holders thereof in such Assured

Insured Bonds and the related Assured Insurance Policies to draw on the applicable Assured

Insurance Policies in order to pay the applicable Assured Acceleration Price to the beneficial holders of such Assured Insured Bonds insured in the secondary market in accordance with sections 75.1(a) and 75.1(b)(i) of the Plan, as applicable; provided, however, that, for the avoidance of doubt, Assured shall not in any circumstance be required to pay itself an Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise.

(c)     Delivery of Distributions with Respect to National Insured Bonds. Notwithstanding any other provision of the Plan or of this Confirmation Order, on the Effective Date, National shall receive, and the Disbursing Agent shall disburse to National in a manner mutually agreed upon by the Disbursing Agent and National, the National Plan Consideration that would otherwise be allocable to holders of Allowed National Insured Bond Claims that elected to receive the National Non-Commutation Treatment by electing such treatment in accordance with the Election Notice for National Bond Holders with Claims in Classes 3 and 25 (Docket Entry No. 17639-30) or the Election Notice for National Bond Holders with Claims in Class 18 (Docket Entry No. 17639-31); provided, however, that, for the avoidance of doubt, National shall not in any circumstance be required to pay itself the National Acceleration Price with respect to any National Insured Bonds owned by National, by subrogation or otherwise.

(d)     Delivery of Distributions to FGIC.  Notwithstanding any other provision of the Plan or of this Confirmation Order, on the Effective Date, the Disbursing Agent shall distribute to FGIC FGIC's share of the Vintage CW Bond Recovery, the Vintage CW Guarantee Bond Recovery, and the Vintage PBA Bond Recovery in accordance with the terms and provisions of section 75.4(b) of the Plan in a manner mutually agreed upon between the Disbursing Agent and FGIC.

               (e)      <u>Delivery of Distributions with Respect to Ambac Insured Bonds</u>.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) to the extent

a holder of any Ambac Insured Bonds with CUSIP numbers 745235D32,745235D40, or

745235B75 validly elects to receive the Ambac Non-Commutation Treatment, the Disbursing

Agent shall, on the Effective Date or as soon as reasonably practicable thereafter, distribute to

Ambac the Ambac Plan Consideration payable to such holder on account of its Allowed Claims

in Classes 4 and 26; (ii) to the extent a holder of any Ambac Insured Bonds with CUSIP

numbers 745235D32, 745235D40, or 745235B75 validly elects to receive the Ambac

Commutation Treatment or otherwise fails to validly elect to receive the Ambac Non-

Commutation Treatment (including submitting an election for less than all of its Claims in

Classes 4 or 26), on the Effective Date or as soon as reasonably practicable thereafter, the

Disbursing Agent shall distribute the Ambac Commutation Consideration payable on account of

its Allowed Claims in Class 4 and/or 26 under the Plan to the applicable indenture trustee,

which shall in turn distribute such consideration to the applicable bondholders, except that

Ambac may direct the applicable indenture trustee to reduce the distribution to any holder to

account for any payments that Ambac has made, or for any other consideration that Ambac has

made available or will make available, to such holder (collectively, the "Prior Payments"), and

the applicable indenture trustee shall then pay the portion of the Ambac Commutation

Consideration equal to the applicable Prior Payment to Ambac; (iii) to the extent a holder of

any Ambac Insured Bonds with CUSIP number 745145AX0 validly elects to receive the

Ambac Non-Commutation Treatment, on the Effective Date or as soon as reasonably

practicable thereafter, the Disbursing Agent shall distribute to Ambac the Ambac Plan

Consideration payable to such holder on account of its Allowed Claims in Class 19; (iv) to the

extent a holder of any Ambac Insured Bonds with CUSIP number 745145AX0 fails to validly

elect to receive the Ambac Non-Commutation Treatment (including by submitting an election

for less than all of its Claims), on the Effective Date or as soon as reasonably practicable

thereafter, the Disbursing Agent shall distribute the Ambac Commutation Consideration

payable on account of its Allowed Claims in Class 19 under the Plan to the applicable indenture

trustee, which shall in turn distribute such consideration to the applicable bondholders, except

that Ambac may direct the applicable indenture trustee to reduce the distribution to any holder

to account for any Prior Payments that Ambac has made, or for any other consideration that

Ambac has made available or will make available, to such holder and the applicable indenture

trustee shall then pay the portion of the Ambac Commutation Consideration equal to the

applicable Prior Payment to Ambac; and (v) with respect to Ambac Insured Bonds with CUSIP

numbers 745145GB2, 745145A3, 745145YY2, 745235KT7, 745235TH4, 745235TJ0,

745235TK7, 745235TL5, which are fully matured, on the Effective Date or as soon as

reasonably practicable thereafter, the Disbursing Agent shall distribute the Ambac Plan

Consideration distributable on account of Allowed Claims in Classes 4, 19, or 26 to Ambac.

       (f)   <u>Delivery of Distributions with Respect to Clawback Recoveries</u>.

Notwithstanding any other provision of the Plan or of this Confirmation Order, (i) on the

Effective Date, or, in the event the HTA Distribution Conditions have not been satisfied as of

the Effective Date, upon satisfaction of the HTA Distribution Conditions, the Disbursing Agent

shall distribute to each applicable Monoline its share of the CW/HTA Clawback Recovery in

accordance with the terms and provisions of section 63.1 of the Plan in a manner mutually

agreed upon between the Disbursing Agent and such Monoline; (ii) on the Effective Date, the

Disbursing Agent shall distribute to each applicable Monoline its share of the CW/Convention

Center Clawback Recovery in accordance with the terms and provisions of section 64.1 of the

Plan in a manner mutually agreed upon between the Disbursing Agent and such Monoline; and

(iii) on the Effective Date, or, in the event the PRIFA Distribution Conditions have not been

satisfied as of the Effective Date, upon satisfaction of the PRIFA Distribution Conditions, the

Disbursing Agent shall distribute to each applicable Monoline its share of the CW/PRIFA Rum

Tax Recovery in accordance with the terms and provision of section 65.1 of the Plan in a

manner mutually agreed upon between the Disbursing Agent and such Monoline and (iv) on the

later to occur of (A) the Effective Date and (B) satisfaction of the HTA Distribution Conditions,

the Disbursing Agent shall distribute to National National's share of the CW/HTA Clawback

Recovery in accordance with the terms and provisions of section 63.2 of the Plan in a manner

mutually agreed upon by the Disbursing Agent and National.  Upon satisfaction of the HTA

Distribution Conditions, DRA shall be entitled to receive its share of the CW/HTA Clawback

Recovery, as delineated in the Priority Distribution Waterfall from Clawback CVI Allocation to

Allowed CWHTA Claims set forth in Exhibit J to the Plan.

35.    <u>Disbursing Agent</u>.  Pursuant to section 1.204 of the Plan, the Disbursing Agent

shall be, as applicable, such Entity or Entities designated by the Oversight Board, upon

consultation with AAFAF, on or prior to the Effective Date to make or to facilitate distributions

in accordance with the provisions of the Plan and this Confirmation Order.  Upon designation

thereof, the Oversight Board shall file an informative motion with the Title III Court setting forth

the name of the Disbursing Agent designated.

36.    <u>Payment of Trustee Fees and Expenses</u>.  The distributions to be made pursuant to

the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses

allegedly due and owing by the Commonwealth, ERS, and PBA with respect to amounts

discharged pursuant to the Plan.  The Plan does not, nor shall it be construed to, limit the rights

of each Trustee/Fiscal Agent to payment of such amounts (a) from the distributions to be made

hereunder, including, without limitation, the imposition of any valid Charging Lien, or (b)

pursuant to a contractual fee agreement entered into by the Debtors, or on their behalf, during the

period from and after the Commonwealth Petition Date, including, without limitation, that

certain Settlement Agreement and Invoice Instructions (the "Settlement Agreement"), dated as of

December 21, 2018, by and between, among others, AAFAF, U.S. Bank Trust National

Association, and U.S. Bank National Association (collectively, the "USB Entities"); provided,

however, that (a) with respect to PBA, the Effective Date, and (b) with respect to PRIFA, the

later of (i) the Effective Date and (ii) effectiveness of the PRIFA Qualified Modification

pursuant to Title VI of PROMESA, (the "PRIFA Effective Date") in the event that, following

application of fees and expenses in accordance with the terms and provisions of the Settlement

Agreement, the USB Entities retain any monies deposited by PBA or PRIFA, as the case may be,

pursuant to the terms thereof, the USB Entities shall remit such excess funds to PBA or PRIFA,

as the case may be, or such other Entity as may be designated by PBA or PRIFA, as the case may

be, within fifteen (15) Business Days following the Effective Date or the PRIFA Effective Date,

as applicable, by wire transfer of immediately available funds.

      37.   <u>Securities Laws Exemption</u>.  Pursuant to section 1145 of the Bankruptcy Code

and/or section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New

GO Bonds, the CVIs, and interests in the ERS Trust pursuant to the terms of the Plan and this

Confirmation Order (and any subsequent offering of such securities, including, without

limitation, pursuant to a case under Title VI of PROMESA), or the custodial trusts created in

accordance with articles LXIII, LXIV, LXV, and LXXV of the Plan shall be exempt from

registration under the Securities Act and any state or local law requiring registration for the offer,

issuance or distribution of securities, including, but not limited to, the registration requirements

of section 5 of the Securities Act and any other applicable state or federal law requiring

registration and/or prospectus delivery or qualification prior to the offering, issuance,

distribution, or sale of securities, and, pursuant to section 2(b) of the Investment Company Act of

1940, as amended (the "Investment Company Act"), such custodial trusts, securities and interests

shall be exempt from the provisions of the Investment Company Act.

       38.   <u>Acceleration of Insured Bonds</u>.  Notwithstanding any other provision of the Plan

or this Confirmation Order:

(a)   <u>Assured Insured Bonds</u>: To the extent there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(b)   <u>National Insured Bonds</u>:  To the extent there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

(c)   <u>Syncora Insured Bonds</u>:  To the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

(d)   <u>FGIC Insured Bonds</u>:  Notwithstanding the terms and conditions of the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be

accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(e)     Ambac Insured Bonds:  To the extent that there are no outstanding payment defaults by Ambac with respect to Ambac Insured Bonds up to and including the Effective Date, the principal amount (or compounded amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the Effective Date.  Ambac shall have the right to pay such accelerated amounts and unpaid interest accrued to the date of payment at any time, regardless of which Ambac Non-Commutation Treatment (sections 75.5(b)(i)-(iv) of the Plan) applies to a particular holder of Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the Ambac Insurance Policy or other documents related to the Ambac Insured Bonds.  For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

39.     Disputed Claims Reconciliation.  In accordance with the terms and provisions of section 82.1(b) of the Plan and the Committee Agreement:

(a)     The two (2) Creditors Committee appointees to the Avoidance Actions Trust Board (collectively, the "Creditor Appointees") shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, ERS General Unsecured Claims, Convenience Claims, and, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, Eminent Domain/Inverse Condemnation Claims regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such

appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, an Eminent Domain/Inverse Condemnation Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019.  To facilitate the exercise of the settlement review process, the Oversight Board or AAFAF, as the case may be, shall inform the Creditor Appointees, in writing, five (5) days prior to making or accepting a settlement proposal for the resolution of a CW General Unsecured Claim, an ERS General Unsecured Claim, or an Eminent Domain Claim where the proposed allowed amount exceeds Five Hundred Thousand Dollars ($500,000.00).[8]

(b)     With respect to the obligations and responsibilities set forth in this decretal paragraph 39, the Creditor Appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), inclusive of reimbursement of their reasonable out-of-pocket expenses incurred in furtherance of discharging such obligations and responsibilities, which amounts shall be funded from the GUC Reserve.  All such compensation and reimbursements shall be paid by the Entity selected pursuant to section 1.285 of the Plan to hold the GUC Reserve within thirty (30) days of such Entity's receipt of a request for such payment.  To the extent the Oversight Board or, in the event the Oversight Board terminates, AAFAF, disputes the validity or amount of any reimbursement request, it shall inform such Entity and, in the event the parties are unable to resolve such dispute, the Title III Court shall retain jurisdiction to resolve any such dispute.

(c)     Without limiting the foregoing, (i) within sixty (60) days after the Effective Date, the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide the Creditor Appointees with a report (the "Initial Claims Report") containing (1) a register setting forth all CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims that have not been reconciled and which are being evaluated for possible objection, (2) the status of any pending objections to CW General Unsecured Claims, Eminent Domain Claims, ERS General Unsecured Claims, and Convenience Claims, and (3) information illustrating which Claims are subject to the ACR Procedures and are to be excluded from CW General Unsecured Claims pursuant to section 82.7

---

[8]     Notwithstanding any reference to Eminent Domain Claims in this subparagraph or any report rendered pursuant thereto, the treatment of such Claims is governed by sections 58.1 and 77.1(e) of the Plan.

of the Plan, and (ii) within ten (10) days of the end of each month (the "Monthly Claims Report"), the Oversight Board or AAFAF, as the case may be, through its advisors, shall provide a report containing material updates to information contained in the Initial Claims Report or a previous Monthly Claims Report, as applicable, as well as any material information omitted from such prior reports. In addition, the Oversight Board or AAFAF, as the case may be, through its advisors, shall, upon reasonable request, periodically supply the Creditor Appointees with any other information the Creditor Appointees may reasonably request related to the claims reconciliation process.[9]

(d)     In connection with the foregoing, the Creditor Appointees, together with their counsel and advisors in such capacity, shall not be liable to any Person for actions taken or omitted in connection with the exercise of their rights hereunder except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement from the GUC Reserve for fees and expenses in defending any and all actions or inaction in their capacity as Creditor Appointees, except for any actions or inactions involving willful misconduct or gross negligence. The foregoing indemnity in respect of any Creditor Appointee shall survive and termination of such Creditor Appointee from the capacity for which they are indemnified.

40.     <u>Disputed Claims Holdback</u>.  From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of the Title III Court, Reorganized Debtors or the Disbursing Agent, as applicable, shall retain, for the benefit of each holder of a Disputed Claim, the distributions that would have been made to such holder if it were an Allowed Claim in an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims have been estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the

---

[9]     Notwithstanding any reference to Eminent Domain Claims in this subparagraph or any report rendered pursuant thereto, the treatment of such Claims is governed by sections 58.1 and 77.1(e) of the Plan.

holder of such Disputed Claim and Reorganized Debtors; provided, however, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii), and (iii) above. To the extent the Disbursing Agent or any of the Reorganized Debtors, as the case may be, retains any New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or CVIs are distributed, the Disbursing Agent or such Reorganized Debtors, as the case may be, shall exercise voting or consent rights with respect to such obligations.

41.     National Action Claims. Notwithstanding anything contained herein, in the GO/PBA Plan Support Agreement, or the HTA/CCDA Plan Support Agreement to the contrary, National may continue to litigate to final judgment or settlement all claims and causes of action asserted in the National Action; provided, however, that, in the event that notwithstanding the application and effectiveness of the Bar Date Orders, the Plan, and the Confirmation Order, the defendants and, to the extent named, third-party defendants in the National Action assert against the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth (collectively, the "CW Entities") claims or counterclaims for indemnification, contribution, reimbursement, setoff or similar theories of recovery based on, arising from or related to the National Action (collectively, the "CW Entities' Claims"), (i) the CW Entities agree (A) to vigorously defend against any such CW Entities' Claims, including, without limitation, invoking the Bar Date Orders and discharge provisions set forth in article XCII of the Plan and this Confirmation Order, objecting to any proof of claim, and prosecuting available appeals, based upon, arising from, or related to the National Action, (B) to allow National, at its option, to participate in or undertake such defense to such action in its sole discretion, and (C) not to settle any CW Entities' Claims without National's written consent, which consent shall not be unreasonably withheld, and (ii) National agrees to (A) indemnify and

hold the CW Entities harmless to the extent of the CW Entities' liability for the payment of

monies or the delivery of property, pursuant to a Final Order or settlement as a result of the

National Action, and (B) reimburse the relevant CW Entities for all documented fees and

expenses incurred in connection with the defense against such CW Entities' Claims, including,

without limitation, attorneys' fees and expenses incurred (amounts pursuant to clauses (ii)(A)

and (B) collectively, the "Total Reimbursement"), but in no event may the Total Reimbursement

exceed any recovery realized by National in connection with the National Action; provided,

however, that National shall have no obligation pursuant to this Confirmation Order, the Plan or

otherwise to indemnify and hold the CW Entities harmless for any claims based upon, arising

from or related to the Underwriter Actions that are not based upon, arising from, or related to the

National Action or in which National is not involved.  For the avoidance of doubt, CW Entities'

Claims shall not constitute CW General Unsecured Claims.

42.    No Amendments to Proofs of Claim/Objections to Claims.  As of the

commencement of the Confirmation Hearing, a proof of Claim may not be amended without the

approval of the Title III Court.  With the exception of proofs of Claim timely filed hereafter in

respect of executory contracts and unexpired leases rejected pursuant to this Confirmation Order,

any proof of Claim filed on or after the commencement of the Confirmation Hearing is hereby

barred, and the Clerk of the Court and the Debtors' Claims Agent are authorized to remove such

proofs of Claims from the claims registry in the Title III Cases.  Notwithstanding the provisions

of section 82.1 of the Plan, in the event that (a) a Claim that has been transferred pursuant to the

terms and provisions of either the ACR Order or the ADR Order is subsequently transferred back

to the claims registry for determination by the Title III Court, the period in which the

Reorganized Debtors shall file and serve any objections to the Claim, by and through the

Oversight Board, or AAFAF, as the case may be, shall be extended up to and including one

hundred eighty (180) days from and after the date of such notice transferring any such Claim

back to the claims registry, and (b) within thirty (30) days of the date hereof, in accordance with

section 204 of PROMESA, the Government of the Commonwealth of Puerto Rico shall deliver,

or cause applicable agencies, instrumentalities, or Commonwealth of Puerto Rico public

corporations to deliver, to the Oversight Board a copy of all files, documents, instruments and, to

the extent applicable, pleadings requested by the Oversight Board in connection with the

reconciliation of Claims, including, without limitation, Disputed Claims.  Without in any way

limiting the foregoing or the terms and provisions of the Plan or the ACR Order, to the extent a

Claim subject to the terms and provisions of the ACR Order, including, without limitation,

"grievance claims" subject to the provisions of collective bargaining agreements, remain subject

to the ACR Order, upon resolution thereof, such Claims shall be satisfied by the Debtors in the

ordinary course.

43.     Conditions to Effective Date.  The Plan shall not become effective unless and

until the conditions set forth in section 86.1 of the Plan have been satisfied or waived in

accordance with the provisions set forth in section 86.2 of the Plan.

44.     Administrative Claim Bar Date.  The last day to file proof of Administrative

Expense Claims shall be ninety (90) days after the Effective Date, after which date, any

Administrative Expense Claim, proof of which has not been filed, shall be deemed forever

barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto;

provided, however, that no proof of Administrative Expense Claim shall be required to be filed if

such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order

of the Court or (ii) with the written consent of the applicable Government Parties expressly

granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an

intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of

taxes incurred by any of the Debtors during the period from and after the Commonwealth

Petition Date, the ERS Petition Date, or the PBA Petition Date, as applicable, (e) relates to

actions occurring in the ordinary course during the period from and after the respective Debtor's

petition date up to and including the Effective Date, (f) relates to a Claim that is subject to the

provisions of the ACR Order, including, without limitation, "grievance claims" relating to any of

the Debtor's collective bargaining agreements, or (g) is the subject of a pending motion seeking

allowance of an administrative expense pursuant to section 503(b) of the Bankruptcy Code as of

the entry of this Confirmation Order; and, provided, further, that any such proof of

Administrative Expense Claim by a governmental unit shall remain subject to the rights and

interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in

interest to interpose an objection or other defense to the allowance or payment thereof.

45.    Professional Compensation and Reimbursement Claims.  All Entities awarded

compensation, including, without limitation, to the fullest extent provided in respective letters of

engagement or similar instruments or agreements, or reimbursement of expenses by the Title III

Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court, including,

without limitation, all amounts previously awarded subject to holdbacks pursuant to orders of the

Title III Court, (a) no later than the tenth (10th) calendar day (or the first Business Day to occur

thereafter) after the later to occur of (i) the Effective Date and (ii) the date upon which the Title

III Court order allowing such Claims is deemed to be a Final Order, or (b) upon such other terms

no more favorable to the claimant as may be mutually agreed upon between such claimant and

the Government Parties; provided, however, that, except as provided herein or in the Plan, each

Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date.  The Reorganized Debtors shall pay compensation for professional services extended and reimbursement of expenses incurred by their respective Professionals from and after the Effective Date in the ordinary course and without the need for Title III Court approval.

46.    <u>GO/PBA Consummation Costs</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, to compensate certain parties for the cost of negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the Plan, and in consideration of (a) the negotiation, execution and delivery of the GO/PBA Plan Support Agreement by each Initial GO/PBA PSA Creditor and (b) the obligations and covenants contained in the GO/PBA Plan Support Agreement, each Initial GO/PBA PSA Creditor shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to each of Assured, Syncora, and National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (Eastern Standard Time) on February 22, 2021.

47.    <u>AFSCME Professional Fees</u>.  Notwithstanding anything contained in the Plan or this Confirmation Order to the contrary, on the Effective Date, AFSCME shall be reimbursed its reasonable professional fees and expenses incurred to compensate AFSCME for the cost of

negotiation, confirmation, and consummation of the AFSCME Term Sheet and the Plan, and the

resolution of issues pertaining to pensions.

48.     GO/PBA PSA Restriction Fee.  Notwithstanding anything contained in the Plan or

this Confirmation Order to the contrary, in exchange for (a) executing and delivering the

GO/PBA Plan Support Agreement or (b) if applicable, tendering and exchanging GO Bonds or

PBA Bonds in accordance with the terms and conditions of the GO/PBA Plan Support

Agreement and notices posted on EMMA, and agreeing to all of its terms and conditions,

including support of the Plan and  the "lock-up" of GO Bonds and PBA Bonds in accordance

with the terms of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors

(including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-

insured GO Bond or PBA Bond insured by Ambac, Assured, Syncora, or National, as the case

may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the

Claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with section

301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac,

Assured, FGIC, Syncora, and National, to the extent Ambac, Assured, FGIC, Syncora, or

National, as the case may be, is authorized to vote such Claims in accordance with section

301(c)(3) of PROMESA definitive insurance documents and applicable law) shall be entitled to

receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten

(10) Business Days following the Effective Date, the GO/PBA PSA Restriction Fee, in the form

of an Allowed Administrative Expense Claim, payable in Cash, at the time of consummation of

the Plan equal to the GO/PBA Restriction Fee Percentage multiplied by the aggregate amount of

PBA Bond Claims, CW Bond Claims, and CW Guarantee Bond Claims (without duplication

and, to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA

Creditor is authorized to vote any such Claim in accordance with section 301(c)(3) of

PROMESA, definitive insurance documents and applicable law) held or, in the case of Ambac,

Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor as of the

Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond Claims,

CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims are

Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such

Claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance documents

and applicable law) for which it would have been entitled to receive the GO/PBA PSA

Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive on the

Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business

Days following the Effective Date, the GO/PBA PSA Restriction Fee on account thereof; and,

provided, further, that, in the event the GO/PBA Plan Support Agreement has been terminated

pursuant to the terms of sections 7.1(b)(iii) (subject to the extension provided for in section

7.1(b) thereof), (c)(i), or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA Plan

Support Agreement for any reason other than a breach of the GO/PBA Plan Support Agreement

by a non-Government Party, the aggregate GO/PBA PSA Restriction Fee and Consummation

Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be paid, ratably, in

Cash, as an allowed administrative expense claim under a plan of adjustment for the

Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and,

provided, further, that, in all other circumstances, upon termination of the GO/PBA Plan Support

Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and

payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan

Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the

GO/PBA Plan Support Agreement is terminated.

49.     <u>ERS Restriction Fee</u>.  Notwithstanding anything contained in the Plan or this

Confirmation Order to the contrary, (a) in exchange for executing and delivering the ERS

Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in

accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS

Stipulation (or their designee), shall be entitled to receive, and, on the Effective Date, ERS shall

pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such

parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars

($75,000,000.00), and (b) in accordance with the terms and conditions of the GO/PBA Plan

Support Agreement, the Commonwealth shall pay to First Ballantyne, LLC, Monarch Alternative

Capital LP, Moore Global Investments, LLC, Two Seas Capital LP, and Verition Multi-Strategy

Master Fund, Ltd. their Pro Rata Share of Two Million Two Hundred Fifty Thousand Dollars

($2,250,000.00), as agreed to among such parties.

50.     <u>CCDA Consummation Costs</u>.  Notwithstanding anything contained in the Plan or

this Confirmation Order to the contrary, in order to compensate certain parties for the cost of

negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and

the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA

Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable,

but in no event later than ten (10) Business Days following the Effective Date, an amount equal

to one percent (1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA

Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate
amount not greater than Fifteen Million Dollars ($15,000,000.00).

    51.   <u>CCDA Restriction Fee</u>.  Notwithstanding anything contained in the Plan or this
Confirmation Order to the contrary, in exchange for executing the HTA/CCDA Plan Support
Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up"
its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to
the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring
CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a
Monoline-insured CCDA Bond insured by Ambac, Assured, or FGIC, as the case may be) to the
extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such
Monoline-insured CCDA Bond in accordance with section 301(c)(3) of PROMESA, definitive
insurance documents and applicable law, and (ii) Ambac, Assured, and FGIC, to the extent
Ambac, Assured, or FGIC, as applicable, is authorized to vote such Insured CCDA Bond Claims
in accordance with section 301(c)(3) of PROMESA, definitive insurance documents and
applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed
administrative expense claim, payable in Cash, at the time of consummation of the Plan in an
amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of
CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-
insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such
claim in accordance with section 301(c)(3) of PROMESA, the definitive insurance documents
and applicable law) held or, in the case of Assured held or insured, by such CCDA Restriction
Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period;
<u>provided</u>, <u>however</u>, that each CCDA Restriction Fee Creditor who acquires any CCDA Bonds

after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than

a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC, or National, as the case

may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with

respect to such Monoline-insured CCDA Bond in accordance with section 301(c)(3) of

PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC,

and National, to the extent Ambac, Assured or National, as applicable, is authorized to vote such

Insured CCDA Bond Claims in accordance with section 301(c)(3) of PROMESA, definitive

insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee

equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA

Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured,

solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in

accordance with section 301(c)(3) of PROMESA, the definitive insurance documents and

applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the

HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and, provided,

further, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have

been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to

receive the CCDA Restriction Fee on account thereof and such entitlement shall remain with the

selling party; and, provided, further, that, in all circumstances, the sum of the aggregate CCDA

Restriction Fees plus the CCDA Consummation Costs attributable to a holder's CCDA Bond

Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided, further, that, in

the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of section

7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be due and payable
to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond Claims.

52.    <u>HTA Bond Claims</u>.  In consideration for the agreements set forth in the
HTA/CCDA Plan Support Agreement, and within ten (10) Business Days following satisfaction
of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA
68 Bond Claims and HTA 98 Senior Bond Claims in the amounts of One Hundred Eighty-Four
Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two
Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall
reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and
the corresponding HTA Bond Claims; <u>provided</u>, <u>however</u>, that, for purposes of this decretal
paragraph 52, the applicable Monolines shall constitute the holders of the HTA 68 Bond Claims
and the HTA 98 Senior Bond Claims arising from the HTA Bonds insured by any such
Monoline, if any, in accordance with section 301(c)(3) of PROMESA, applicable law and
governing insurance and other documents applicable to such HTA Bonds; and, <u>provided</u>, <u>further</u>,
that, notwithstanding the foregoing, (a) with respect to any HTA 98 Senior Bonds owned by
FGIC, HTA shall make such interim distribution to FGIC, and (b) with respect to any HTA 98
Senior Bonds insured by FGIC, but not owned by FGIC, HTA shall make such interim
distribution to the owners of such HTA 98 Senior Bonds.

53.    <u>System 2000 Obligations</u>.  Pursuant to the terms and provisions of section 55.10
of the Plan, the Commonwealth shall satisfy all obligations associated with Allowed System
2000 Participant Claims in the timeframes set forth therein.

54.    <u>HTA/CCDA Clawback Structuring Fees</u>.  In consideration for the structuring of
payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims,

CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution Conditions, and in accordance with the terms and provisions of section 6.1(d) of the HTA/CCDA Plan Support Agreement, on the HTA Effective Date, or as soon as practicable thereafter in accordance with the terms of the HTA Plan, but in no event later than ten (10) Business Days following such date, the Commonwealth shall make payments to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively.

55.    <u>Active JRS Participants and Active TRS Participants</u>.  In connection with the treatment of Active JRS Participant Claims and Active TRS Participant Claims pursuant to sections 55.8 and 55.9 of the Plan:

(a)    <u>Act 106 Defined Contribution Accounts</u>.  Notwithstanding any provision of Act 106 to the contrary (including, without limitation, sections 1.4, 1.6, 2.1, 2.6, and 3.1 thereof), on or prior to the Effective Date, the Commonwealth shall establish defined contribution accounts (the "Defined Contribution Accounts") pursuant to chapter 3 of Act 106 for all holders of such Active JRS Participant Claims and Active TRS Participant Claims who do not have such accounts as the Effective Date and who, prior to the Effective Date, were making contributions to JRS  in accordance with the provisions of Act No. 12 of October 19, 1954, as amended, known as the "Judiciary Retirement Act," or to TRS in accordance with the provisions of Act No. 91-2004, as amended, known as the "Commonwealth of Puerto Rico Teachers' Retirement System Act," as applicable.  Without in any way limiting the foregoing, in connection with the modification of the Commonwealth's obligations under any laws establishing or enabling TRS or JRS, the Commonwealth shall enroll teachers, judges, and all other employees that would have

otherwise been enrolled in TRS, hired from and after the Effective Date in the Act 106 Defined

Contribution Plan and establish Defined Contribution Accounts for such individuals.

(b)    Eligibility for and Enrollment in Federal Social Security.  From and after the

Effective Date, and notwithstanding any provision of Act 106 to the contrary (including, without

limitation, section 3.4 thereof), every (i) Active JRS Participant, (ii) teacher who is an Active

TRS Participant, and (iii) teacher and judge hired from and after the Effective Date shall

mandatorily make contributions to his or her Defined Contribution Account at a minimum rate of

two and three-tenths percent (2.3%) of his or her monthly compensation, up to the limit

established in section 1081.01(d)(7) of Act 1-2011; provided, however, that each teacher and

judge who is forty-five (45) years of age or older as of the Effective Date shall contribute to his

or her Defined Contribution Account at a minimum rate of eight and one-half percent (8.5%) of

his or her monthly compensation, up to the limited established in section 1081.01(d)(7) of Act

No. 1-2011, as amended, known as the "Internal Revenue Code for a New Puerto Rico," or any

successor law thereof, and, therefore, fail to be eligible to contribute to the Federal Social

Security system, unless any such teacher or judge shall have irrevocably elected within sixty (60)

days of the Effective Date to reduce their contributions to a minimum of two and three-tenths

percent (2.3%) and be enrolled in the Federal Social Security system.  For teachers who are

Active TRS Participants, Active JRS Participants, and teachers and judges first hired after the

Effective Date who contribute two and three-tenths percent (2.3%) of their monthly

compensation as set forth above, including those aged 45 and older who have elected to do so,

the Employer, in coordination with the Retirement Board and/or Secretary of Treasury, shall

withhold the minimum amount of six and two-tenths percent (6.2%) of their applicable monthly

compensation and remit such amount to the appropriate authority as required by the applicable

provisions of the Federal Social Security Act and other applicable Federal law to enable the

inclusion of the Participant in the Federal Social Security system. Teachers who are Active TRS

Participants, Active JRS Participants, and teachers and judges first hired after the Effective Date

may voluntarily contribute to their Defined Contribution Accounts additional amounts to those

established as allowed under section 1081.01 of Act No. 1-2011, provided, however, that in no

case may those increased contribution rates and additional amounts exceed the applicable limits

to be eligible, and affect the eligibility of these Participants, for coverage under the Federal

Social Security system, unless such Participants are aged 45 and older and do not participate in

the Federal Social Security system. In accordance with the foregoing, the Government of the

Commonwealth of Puerto Rico, including, without limitation, any Entity or Person acting for or

on behalf thereof, shall implement all reasonably necessary or advisable policies, procedures, or

mechanisms to provide for all payroll deduction or transmittal required by federal law to ensure

eligibility for and enrollment of Participants in the Federal Social Security system and

effectuating the Federal Insurance Contributions Act remittances.

      56.    <u>Discharge and Release of Claims and Causes of Action.</u>

      (a)    Except as expressly provided in the Plan or herein, all distributions and rights

afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete

satisfaction, settlement, discharge, and release of, all Claims or Causes of Action against the

Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date,

relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective

Assets, property, or interests of any nature whatsoever, including any interest accrued on such

Claims from and after the Petition Date, and regardless of whether any property will have been

distributed or retained pursuant to the Plan on account of each of the Claims or Causes of Action;

provided, however, that, without prejudice to the exculpation rights set forth in section 92.7 of

the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this Confirmation

Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release

of the PSA Creditors, AFSCME, and each of their respective Related Persons by any Creditors

of the Debtors.  Upon the Effective Date and independent of the distributions provided for under

the Plan, the Debtors and Reorganized Debtors shall be discharged and released from any and all

Claims, Causes of Action, and any other debts that arose, in whole or in part, prior to the

Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections

502(g), 502(h), or 502(i) of the Bankruptcy Code and section 407 of PROMESA, whether or not

(a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the

Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and

section 407 of PROMESA (or is otherwise resolved), or (c) the holder of a Claim based upon

such debt voted to accept the Plan.  For the avoidance of doubt, nothing contained in the Plan or

herein shall release, discharge, or enjoin any claims or causes of action against PREPA arising

from or related to PREPA-issued bonds, including, without limitation, Monoline-issued

insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against

any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to

PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's

Title III case, including, without limitation, any plan of adjustment therein.

        (b)      Except as expressly provided in the Plan or herein, all Entities shall be precluded

from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of

their respective employees, officials, Assets, property, rights, remedies, Claims, or Causes of

Action of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized

Debtors or any of their respective Assets and property, including any and all interest accrued on

such Claims, and regardless of whether any property will have been distributed or retained

pursuant to the Plan on account of each of the Claims or other obligations, suits, judgments,

damages, debts, rights, remedies, causes of action, or liabilities.  In accordance with the

foregoing, except as expressly provided in the Plan or herein, this Confirmation Order shall

constitute a judicial determination, as of the Effective Date, of the discharge and release of all

such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors

pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case

pursuant to section 301 of PROMESA, and such discharge shall void and extinguish any

judgment obtained against the Debtors or Reorganized Debtors and their respective Assets, and

property at any time, to the extent such judgment is related to a discharged Claim, debt, or

liability.  As of the Effective Date, and in consideration for the distributions or other value

provided pursuant to the Plan, each holder of a Claim in any Class under the Plan shall be and

hereby is deemed to release and forever waive and discharge as against the Debtors and

Reorganized Debtors, and their respective Assets and property, all such Claims.

(c)      Notwithstanding any other provisions of decretal paragraph 56 of this

Confirmation Order or section 92.2 of the Plan, in accordance with the provisions of the

GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective

Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have

released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek

any other type of relief against any of the Government Releasees based upon, arising from or

relating to the Government Released Claims or any of the Claims or Causes of Action asserted or

which could have been asserted, including, without limitation, in the Clawback Actions and the

Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with
respect to the Government Released Claims that is prohibited by decretal paragraph 56 of this
Confirmation Order and section 92.2 of the Plan.

(d)     SEC Limitation.  Notwithstanding anything contained herein or in the Plan to the
contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers,
or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes
of action, proceedings or investigations against any non-debtor person or non-debtor entity in
any forum.

(e)     United States Limitation.  Notwithstanding anything contained herein or in the
Plan to the contrary, no provision shall (i) impair the United States, its agencies, departments, or
agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be,
from compliance with federal laws or territorial laws and requirements implementing a federally
authorized or federally delegated program protecting the health, safety, and environment of
persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which
the Debtors or the Reorganized Debtors are entitled under Title III, and (iii) discharge, release,
enjoin, or otherwise bar (A) any liability of the Debtors or the Reorganized Debtors to the United
States arising from and after the Effective Date, (B) any liability to the United States that is not a
Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the
Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and
recoupment of such parties are expressly preserved, (D) the continued validity of the obligations
of the United States, the Debtors, or the Reorganized Debtors, as the case may be, under any
United States grant or cooperative assistance agreement, (E) the Debtors' or the Reorganized
Debtors' obligations arising under federal police or regulatory laws, including, but not limited to,

laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, and (F) any liability to the United States on the part of any non-debtor. Without limiting the foregoing, nothing contained herein or in the Plan shall be deemed (i) to determine the tax liability of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors and any obligation of the Debtors to pay post-petition interest on any such tax liability, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv) to grant any relief to any Entity that the Court is prohibited from granting by the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

(f)     <u>Underwriter Actions</u>.  Notwithstanding anything contained herein or in the Plan to the contrary, including, without limitation, sections 92.2, 92.3, and 92.11 of the Plan, except as may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the Confirmation Order, or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate, or limit the rights of the plaintiffs and defendants, including, without limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit

against) any judgment in connection with the Underwriter Actions (collectively, the "Defensive

Rights"); provided, however, that, for the avoidance of doubt, in no event shall any Defensive

Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery

of property to any plaintiff, defendant and, to the extent named, third-party defendant by any of

the CW Entities in connection with an Underwriter Action; and, provided, further, that, no party

in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the

extent named, third-party defendants, shall be permitted to assert: (i) against the Debtors or the

Reorganized Debtors any Claim or Cause of Action for purposes of obtaining an affirmative

monetary recovery that otherwise is barred or discharged pursuant to the Bar Date Orders, the

Plan, and/or this Confirmation Order; and/or (ii) against any of the CW Entities any Claims or

counterclaims for purposes of obtaining an affirmative monetary recovery, including, without

limitation, for indemnification, contribution, reimbursement, setoff, or similar theories to the

extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or

counterclaims shall be deemed disallowed, barred, released, and discharged in accordance with

the terms and provisions of the Plan and the Confirmation Order; and provided, further, that, for

the avoidance of doubt, nothing in this decretal paragraph 56(f) is intended, nor shall it be

construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in

any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or

limiting the amount of any liability or judgment in any Underwriter Action.  The parties in the

Underwriter Actions shall be permanently barred, enjoined, and restrained from commencing,

prosecuting, or asserting against any of the CW Entities any Claims or counterclaims for

purposes of obtaining an affirmative monetary recovery, including, without limitation,

indemnification, contribution, reimbursement, setoff or similar theories, to the extent asserted for

purposes of obtaining an affirmative monetary recovery, based upon, arising from, or related to
the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a
court, an arbitration, an administrative agency or forum, or in any other manner.

(g)     Quest Litigation.  Notwithstanding anything contained herein or in the Plan to the
contrary, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in
the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish,
prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the right of the Quest
Diagnostics of Puerto Rico, Inc. ("Quest") (1) from asserting its respective rights, claims, causes
of action and defenses in the avoidance action brought against it, including, but not limited to,
any Claims, defenses, Causes of Action, and rights of setoff or recoupment, or any rights to
allocate responsibility or liability or any other basis for the reduction of (or credit against) any
judgment (the "Quest Rights"); provided, however, that, for the avoidance of doubt, in no event
shall any Quest Rights be used to obtain or result in the affirmative payment of money or the
affirmative delivery of property by any of the Debtors to Quest in connection with the merits of
its avoidance action, and (2) to file and receive payment on any Claim it has pursuant to section
502(h) of the Bankruptcy Code and Bankruptcy Rule 3002(c)(3); provided, however, that any
such Claims would constitute a CW General Unsecured Claim and be treated in accordance with
the terms and provisions of article LXII of the Plan.

57.     Releases by the Debtors and Reorganized Debtors.  Except as otherwise expressly
provided in the Plan or this Confirmation Order, on the Effective Date, and for good and
valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and
each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and
hereby does irrevocably and unconditionally, fully, finally, and forever waive, release, acquit,

and discharge the Released Parties from any and all Claims or Causes of Action that the Debtors,

Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through

them, on their behalf or for their benefit, have or may have or claim to have, now or in the future,

against any Released Party that are Released Claims.

58.     <u>Release and Exculpation Provisions</u>.  Except as otherwise provided in this

Confirmation Order, all release and exculpation provisions, including, but not limited to, those

contained in article XCII of the Plan, are approved and shall be effective and binding on all

Entities, to the extent provided therein.

59.     **<u>Injunction on Claims</u>**.  **Except as otherwise expressly provided in section**

**92.11 of the Plan, this Confirmation Order, or such other Final Order of the Title III Court**

**that is applicable, all Entities who have held, hold, or in the future hold Claims or any**

**other debt or liability that is discharged or released pursuant to section 92.2 of the Plan or**

**who have held, hold, or in the future hold Claims or any other debt or liability discharged**

**or released pursuant to section 92.2 of the Plan are permanently enjoined, from and after**

**the Effective Date, from (a) commencing or continuing, directly or indirectly, in any**

**manner, any action or other proceeding (including, without limitation, any judicial,**

**arbitral, administrative, or other proceeding) of any kind on any such Claim or other debt**

**or liability discharged pursuant to the Plan against any of the Released Parties or any of**

**their respective assets or property, (b) the enforcement, attachment, collection or recovery**

**by any manner or means of any judgment, award, decree, or order against any of the**

**Released Parties or any of their respective assets or property on account of any Claim or**

**other debt or liability discharged pursuant to the Plan, (c) creating, perfecting, or enforcing**

**any encumbrance of any kind against any of the Released Parties or any of their respective**

assets or property on account of any Claim or other debt or liability discharged pursuant

to the Plan, and (d) except to the extent provided, permitted or preserved by sections 553,

555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of

recoupment, asserting any right of setoff, subrogation, or recoupment of any kind against

any obligation due from any of the Released Parties or any of their respective assets or

property, with respect to any such Claim or other debt or liability discharged pursuant to

the Plan.  Such injunction shall extend to all successors and assigns of the Released Parties

and their respective assets and property.  Notwithstanding the foregoing, without prejudice

to the exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61

hereof, nothing contained in the Plan or this Confirmation Order is intended, nor shall it

be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME,

and of their respective Related Persons by Creditors of the Debtors.

      60.    **Injunction Related to Releases**.  As of the Effective Date, all Entities that

hold, have held, or in the future hold a Released Claim released pursuant to section 92.5 of

the Plan, are, and shall be, permanently, forever and completely stayed, restrained,

prohibited, barred, and enjoined from taking any of the following actions, whether directly

or indirectly, derivatively or otherwise, on account of or based on the subject matter of

such discharged Released Claims: (i) commencing, conducting or continuing in any

manner, directly or indirectly, any suit, action, or other proceeding (including, without

limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii)

enforcing, attaching (including, without limitation any prejudgment attachment),

collecting, or in any way seeking to recover any judgment, award, decree, or other order;

(iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any

Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against,

or otherwise recouping in any manner, directly or indirectly, any amount against any

liability or obligation owed to any Entity released under decretal paragraph 57 of this

Confirmation Order and section 92.5 of the Plan; and (v) commencing or continuing in any

manner, in any place or any judicial, arbitration, or administrative proceeding in any

forum, that does not comply with or is inconsistent with the provisions of the Plan or this

Confirmation Order.  For the avoidance of doubt, the following stipulations will terminate

upon the entry of this Confirmation Order: the *Fourth Amended Stipulation Between the*

*Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority*

*Regarding the Tolling of Statute of Limitations and Consent Order* (Docket Entry No. 15854),

as amended; and the *Fourth Amended Stipulation and Consent Order Between Title III*

*Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory*

*Authority Acting on Behalf of the Governmental Entities Listed on Exhibit "B" Regarding the*

*Tolling of Statute of Limitations* (Docket Entry No. 17394), as amended.

      61.    Exculpation.

      (a)    Government Parties:  The Oversight Board, AAFAF, the Debtors, and each of

their respective Related Persons, solely acting in its capacity as such at any time up to and

including the Effective Date, shall not have or incur through the Effective Date any liability to

any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the

formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or

any compromises or settlements contained therein, the Disclosure Statement, or any contract,

instrument, release or other agreement or document provided for or contemplated in connection

with the consummation of the transactions set forth in the Plan; provided, however, that the

foregoing provisions of this subparagraph (a) or section 92.7 of the Plan shall not affect the

liability of any Entity that otherwise would result from any such act or omission to the extent that

such act or omission is determined in a Final Order to have constituted intentional fraud or

willful misconduct.  Nothing in this subparagraph (a) or section 92.7(a) of the Plan shall

prejudice the right of any of the Government Parties, and the Government Parties' officers and

directors serving at any time up to and including the Effective Date, and each of their respective

professionals to assert reliance upon advice of counsel as a defense with respect to their duties

and responsibilities under the Plan.

      (b)    <u>PSA Creditors</u>:  Each of the PSA Creditors solely in its capacity as a party to the

GO/PBA Plan Support Agreement, the PRIFA Plan Support Agreement, and/or the HTA/CCDA

Plan Support Agreement and a Creditor and/or insurer, as applicable, from the relevant Petition

Date up to and including the Effective Date and each of their respective Related Persons shall not

have or incur any liability to any Entity for any act taken or omitted to be taken in connection

with the Title III Cases, or the mediation, negotiation, formation, preparation, dissemination,

implementation, acceptance, confirmation or approval of the Plan or any compromises or

settlements contained therein, the Disclosure Statement, the GO/PBA Plan Support Agreement,

the PRIFA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the Definitive

Documents, or any other contract, instrument, release or other agreement or document provided

for or contemplated in connection with the consummation of the transactions set forth in the

Plan; <u>provided</u>, <u>however</u>, that the foregoing provisions of this subparagraph (b) and section

92.7(b) of the Plan shall not affect the liability of any Entity that otherwise would result from any

such act or omission to the extent that such act or omission is determined in a Final Order to

have constituted intentional fraud or willful misconduct.

(c)   <u>Retiree Committee</u>:  Each of the members of the Retiree Committee, solely in its

capacity as a member of the Retiree Committee and a Creditor, as applicable, from the relevant

Petition Date up to and including the Effective Date and each of the Retiree Committee's Related

Persons shall not have or incur through the Effective Date any liability to any Entity for any act

taken or omitted to be taken in connection with the Title III Cases, the formation, preparation,

dissemination, implementation, confirmation, or approval of the Plan or any compromises or

settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support

Agreement, or any contract, instrument, release or other agreement or document provided for or

contemplated in connection with the consummation of the transactions set forth in the Plan and

the Retiree Committee Plan Support Agreement; <u>provided</u>, <u>however</u>, that, notwithstanding the

foregoing exculpation, in the event that litigation is commenced against a member of the Retiree

Committee with respect to the aforementioned actions, such member shall be reimbursed for

reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any

damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, <u>provided</u>,

<u>however</u>, that, the foregoing provisions of this subparagraph (c) and section 92.7(c) of the Plan

shall not affect the liability of any Entity that otherwise would result from any such act or

omission to the extent that such act or omission is determined in a Final Order to have

constituted intentional fraud or willful misconduct.

(d)   <u>Creditors' Committee</u>:  Each of the members of the Creditors' Committee, solely

in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the

relevant Petition Date up to and including the Effective Date and each of the Creditors'

Committee's Related Persons shall not have or incur any liability to any Entity for any act taken

or omitted to be taken in connection with the Title III Cases, the formation, preparation,

dissemination, implementation, confirmation, or approval of the Plan or any compromises or

settlements contained therein, the Disclosure Statement, or any contract, instrument, release, or

other agreement or document provided for or contemplated in connection with the consummation

of the transactions set forth in the Plan; provided, however, that, notwithstanding the foregoing

exculpation, in the event that litigation is commenced against a member of the Creditors

Committee with respect to the aforementioned actions, such member shall be reimbursed for

reasonable attorneys' fees and expenses incurred in defense thereof and indemnified for any

damages awarded, in each case, by the Commonwealth, pursuant to a Final Order; and, provided,

however, that, the foregoing provisions of this subparagraph (d) and section 92.7(d) of the Plan

shall not affect the liability of any Entity that would otherwise result from any such act or

omission to the extent such act or omission is determined in a Final Order to have constituted

intentional fraud or willful misconduct.

      (e)      AFSCME:  AFSCME, solely in its capacity as a party to the AFSCME Plan

Support Agreement and a Creditor, as applicable, from the relevant Petition Date up to and

including the Effective Date, and each of its respective Related Persons shall not have or incur

through the Effective Date any liability to any Entity for any act taken or omitted to be taken in

connection with the Title III Cases, the formation, preparation, dissemination, implementation,

confirmation, or approval of the Plan or any compromises or settlements contained therein, the

Disclosure Statement, the AFSCME Plan Support Agreement, or any contract, instrument,

release or other agreement or document provided for or contemplated in connection with the

consummation of the transaction set forth in the Plan and the AFSCME Plan Support Agreement;

provided, however, that, the foregoing provisions of this subparagraph (e) and section 92.7(e) of

the Plan shall not affect the liability of any Entity that otherwise would result from any such act

or omission to the extent that such act or omission is determined in a Final Order to have

constituted intentional fraud or willful misconduct.

      (f)    <u>Monoline Insurers</u>:  Ambac, Assured, FGIC, National, Syncora, and their Related

Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken

consistent with the Plan or in connection with the formulation, preparation, dissemination,

implementation, acceptance, confirmation, or approval of the Plan, including, without limitation,

in connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims,

FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims,

the voting procedures, the election procedures, and any release of obligations under the

applicable Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies,

National Insurance Policies, or Syncora Insurance Policies: <u>provided</u>, <u>however</u>, that,

notwithstanding anything contained in this Confirmation Order or the Plan to the contrary, the

terms and provisions of the Plan and this Confirmation Order shall not, and shall not be

construed to, release or exculpate, with respect to any beneficial holder of Ambac Insured Bonds,

Assured Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured

Bonds any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance

Policy, FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in

accordance with its terms solely to the extent of any failure of such holder to receive the Ambac

Commutation Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora

Treatment, as applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may

have against a beneficial holder of respective insured bonds with respect to Ambac's, Assured's,

FGIC's, National's or Syncora's applicable obligations under the Ambac Insurance Policies,

Assured Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as

applicable); provided, however, that the foregoing provisions of this subparagraph (f) and section

92.7(f) of the Plan shall not affect the liability of any Entity that otherwise would result from any

such act or omission to the extent that such act or omission is determined, pursuant to a Final

Order, to have constituted intentional fraud or willful misconduct.

(g)      The DRA Parties:  Each of the GDB Debt Recovery Authority ("DRA"),

AmeriNational Community Services LLC (the "Servicer"), as servicer for the DRA, and Cantor-

Katz Collateral Monitor LLC (the "Collateral Monitor"), as collateral monitor for Wilmington

Trust N.A. (collectively, the "DRA Parties"), from the Petition Date up to and including the

Effective Date and each of the DRA Parties, respective predecessors, successors and assigns

(whether by operation of law or otherwise), and their respective financial advisors, attorneys,

accountants, consultants, agents, and professionals, or other representatives, each acting in such

capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent

acting in such capacity, shall not have or incur any liability to any Entity for any act taken or

omitted to be taken in connection with the Title III Cases, mediation, the negotiation, formation,

preparation, dissemination, implementation, confirmation or approval of the Plan or any

compromises or settlements contained therein, the Disclosure Statement, the Stipulation in

Connection with DRA Related Disputes, dated as of November 5, 2021, by and among the

Oversight Board, as representative of the Debtors and HTA, the Servicer, and the Collateral

Monitor (Docket Entry No. 19100 Ex. A), or any contract, instrument, release or other agreement

or document provided for or contemplated in connection with the consummation of the

transactions set forth in the Plan; provided, however, that, the foregoing provisions of this

subparagraph (g) shall not affect the liability of any Entity that would otherwise result from any

such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

62. <u>Maintenance of Pension System</u>.  Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; <u>provided</u>, <u>however</u>, that the Governor and Legislature, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, <u>provided</u>, <u>however</u>, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan.

63.     <u>Appointments Related Litigation/Uniformity Litigation</u>.  Notwithstanding

anything contained herein or the Plan to the contrary, in the event that a Final Order is entered in

connection with the Appointments Related Litigation or the Uniformity Litigation subsequent to

entry of this Confirmation Order, in consideration of the distributions made, to be made, or

deemed to be made in accordance with the terms and provisions of the Plan and documents and

instruments related hereto, and all Creditors or such other Entities receiving, or deemed to have

received, distributions pursuant to or as a result of the Plan or this Confirmation Order having

consented and agreed, such Final Order shall not in any way or manner reverse, affect or

otherwise modify the transactions contemplated in the Plan and this Confirmation Order,

including, without limitation, the releases, exculpations and injunctions provided pursuant to

article XCII of the Plan and herein; <u>provided</u>, <u>however</u>, that, to the extent that a plaintiff in the

Appointments Related Litigation or the Uniformity Litigation is a party to any of the GO/PBA

Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support

Agreement, or the ERS Stipulation, within five (5) Business Days of the Effective Date, such

plaintiff shall take any and all actions to dismiss, with prejudice or, in the event other plaintiffs

are party to such litigations, withdraw from, with prejudice, such Appointments Related

Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing

notices with the clerk of the court having jurisdiction thereof.

64.     **<u>Bar Order</u>.  To the limited extent provided in the Plan, each and every Entity**

**is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing, or**

**litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action**

**of any and every kind, character or nature whatsoever, in law or in equity, known or**

**unknown, direct or derivative, whether asserted or unasserted, against any of the Released**

Parties, based upon, related to, or arising out of or in connection with any of the Released

Claims, confirmation and consummation of the Plan, the negotiation and consummation of

the GO/PBA Plan Support Agreement, HTA/CCDA Plan Support Agreement, PRIFA Plan

Support Agreement, AFSCME Plan Support Agreement, the Retiree Committee Plan

Support Agreement, or any claim, act, fact, transaction, occurrence, statement, or omission

in connection with or alleged or that could have been alleged in the Title III Cases,

including, without limitation, any such claim, demand, right, liability, or cause of action for

indemnification, contribution, or any other basis in law or equity for damages, costs, or fees

incurred arising directly or indirectly from or otherwise relating to the Title III Cases,

either directly or indirectly by any Person for the direct or indirect benefit of any Released

Party arising from or related to the claims, acts, facts, transactions, occurrences,

statements, or omissions that are, could have been or may be alleged in the related actions

or any other action brought or that might be brought by, through, on behalf of, or for the

benefit of any of the Released Parties (whether arising under federal, state, or foreign law,

and regardless of where asserted); *provided*, *however*, that, without prejudice to the

exculpation rights set forth in section 92.7 of the Plan and decretal paragraph 61 hereof,

nothing contained in the Plan or this Confirmation Order is intended, nor shall it be

construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and

of their respective Related Persons by Creditors of the Debtors.

      65.    **Supplemental Injunction**.  Notwithstanding anything contained herein or in

the Plan to the contrary, except to the limited extent provided in the Plan, all Entities,

including Entities acting on their behalf, who currently hold or assert, have held or

asserted, or may hold or assert, or may control by enacting legislation, any Released

Claims against any of the Released Parties based upon, attributable to, arising out of or

relating to the Title III Cases or any Claim against the Debtors, whenever and wherever

arising or asserted, whether in the United States or anywhere else in the world, whether

sounding in tort, contract, warranty, statute, or any other theory of law, equity, or

otherwise, shall be, and shall be deemed to be, permanently stayed, restrained, and

enjoined from taking any action including enacting legislation against any of the Released

Parties for the purpose of directly or indirectly collecting, recovering, or receiving any

payment or recovery with respect to any Released Claims for themselves or other entities,

arising prior to the Effective Date (including prior to the Petition Date), including, but not

limited to:

(a)     Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b)     Enforcing, attaching, collecting, or recovering, by any manner or means, any judgment, award, decree, or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)     Creating, perfecting, or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)     Except as otherwise expressly provided in the Plan or this Confirmation Order, asserting, implementing, or effectuating any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim;

(e)     Enacting or adopting any statute, law, rule, resolution, or policy to cause, directly or indirectly, any Released Party to have liability for any Released Claims; and

(f)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or this Confirmation Order; provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code;

**provided, however, that, without prejudice to the exculpation rights set forth in section 92.7
of the Plan and decretal paragraph 61 hereof, nothing contained in the Plan or this
Confirmation Order is intended, nor shall it be construed, to be a non-consensual third-
party release of the PSA Creditors, AFSCME, and of their respective Related Persons by
Creditors of the Debtors.**

66.    Term of Existing Injunctions or Stays.  Unless otherwise provided in the Plan or

this Confirmation Order, all injunctions or stays in effect in the Title III Cases (pursuant to

sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing

on the Confirmation Date (excluding any injunctions or stays contained in the Plan or this

Confirmation Order) shall remain in full force and effect through the Effective Date, except that

each injunction imposed by a Court order shall remain in effect permanently unless the order

specifies a termination date or event, in which case, the specification set forth in such order shall

govern.  All injunctions or stays contained in the Plan or this Confirmation Order shall remain in

full force and effect in accordance with their terms.

67.    Prosecution of Claims.  Except as settled and released herein, from and after the

Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a)

litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance

Actions, upon approval of the Title III Court.  The net proceeds of any such litigation or

settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be

transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the

Avoidance Actions Trust Agreement.

68.    Indemnification and Reimbursement Obligations.  For purposes of the Plan, (i) to

the extent executory in nature, the obligations of the Debtors, including, without limitation,

directors and officers insurance policies, to indemnify and reimburse its directors or officers that

were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS

Petition Date, or the PBA Petition Date, as applicable, shall be deemed assumed as of the

Effective Date and (ii) indemnification obligations of the Debtors arising from conduct of

officers and directors during the period from and after the Commonwealth Petition Date, the

ERS Petition Date, or the PBA Petition Date, as applicable, shall be Administrative Expense

Claims.

       69.    <u>Compliance with Tax Requirements</u>.  Any party issuing any instrument or making

any distribution under the Plan shall comply with all applicable withholding and reporting

requirements imposed by any United States federal, state, or local tax law or Tax Authority, and

all distributions under the Plan shall be subject to any such withholding or reporting

requirements; <u>provided</u>, <u>however</u>, that payments or redemptions made with respect to the CVIs

shall not be subject to any Commonwealth tax or withholding obligation imposed by the

Commonwealth now or in the future regardless of whether such payments or redemptions with

respect to the CVIs may be exempt from the payment of federal or state taxes, including, without

limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may

otherwise be applicable to such payments or redemptions.  Except as provided above, each

holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and

exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by

any governmental unit, including income, withholding and other tax obligations, on account of

such distribution.  Any party issuing any instrument or making any distribution under the Plan

has the right, but not the obligation, to not make a distribution until such holder has made

arrangements satisfactory to such issuing or disbursing party for payment of any such

withholding tax obligations and, if any party issuing any instrument or making any distribution

under the Plan fails to withhold with respect to any such holder's distribution, and is later held

liable for the amount of such withholding, the holder shall reimburse such party.  The Disbursing

Agent or the trustee of the applicable trust may require, as a condition to the receipt of a distribution (including the applicable trust certificates), that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

70.     <u>Documents and Instruments</u>.  Each federal, state, commonwealth, local, foreign, or other governmental agency is hereby authorized to accept any and all documents and instruments necessary or appropriate to effectuate, implement or consummate the transactions contemplated by the Plan and this Confirmation Order.

71.     <u>Fiscal Plan</u>.  For so long as the Oversight Board is in existence, the Oversight Board shall cause the Fiscal Plan in effect on the Effective Date, and any post-Effective Date Fiscal Plan certified by the Oversight Board to include provisions requiring the certified budget to provide for the payment in each FY of (a) principal and interest payable on the New GO Bonds, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

72.     <u>Claims Against the Commonwealth Based on Debt Issued by HTA, CCDA, PRIFA, and MBA</u>.  The Claims asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall, to the extent allowed, be allowed as a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and are hereby discharged and the Debtors and the Reorganized Debtors have no further liability on account of such Claims.

73.    <u>GUC Reserve</u>.  On and after the Effective Date, the Debtors' and Reorganized

Debtors' liability to holders of Allowed CW General Unsecured Claims shall be limited to

funding the GUC Reserve in accordance with section 62.3 of the Plan as follows: subject to the

reductions provided therein, (a) Two Hundred Million Dollars ($200,000,000.00) on the

Effective Date; (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31,

2022; (c) One Hundred Million Dollars ($100,000,000,00) on or prior to December 31, 2023; (d)

One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2024; and (e)

Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025.  Upon the

GUC Reserve being funded by the Commonwealth in accordance with section 62.3 of the Plan,

the Debtors and Reorganized Debtors shall have no further liability on account of such Allowed

CW General Unsecured Claims.

74.    <u>PROMESA 407 Claims</u>.  All Claims reserved by holders of bonds issued by

HTA, CCDA, PRIFA, or MBA under that certain *Findings of Fact, Conclusions of Law, and*

*Order Approving the Qualifying Modification for the Government Development Bank for Puerto*

*Rico Pursuant to Section 601(m)(1)(D) of the Puerto Rico Oversight, Management, and*

*Economic Stability Act*, including, without limitation, any claim under section 407 of

PROMESA, shall be automatically released on the Effective Date with no further notice or

action.

75.    <u>Dairy Producer Claims</u>.  Notwithstanding anything contained in the Plan or this

Confirmation Order to the contrary, (a) nothing contained herein shall adjust, enlarge,

compromise discharge or otherwise affect the respective parties' rights or obligations pursuant to

the Dairy Producer Settlement except with respect to the Commonwealth's payment obligation

under the Dairy Producer Settlement, (b) the Commonwealth's obligation for the regulatory

approval accrual set forth decretal paragraph 14 of the Dairy Producer Settlement shall be treated

and discharged in accordance with the Plan and shall not be recouped by a holder of a Dairy

Producer Claim from any other source, and (c) the Plan shall not affect the regulatory accrual

charge being assessed on and paid from the cost of milk pursuant to the Dairy Producer

Settlement.

76.    Eminent Domain/Inverse Condemnation Claims.  Notwithstanding anything

contained in the Plan or this Confirmation Order to the contrary, (a) nothing contained in the

Plan or this Confirmation Order shall impair or otherwise affect the treatment provided in Class

54 to holders of Allowed Eminent Domain/Inverse Condemnation Claims, (b) as of the Effective

Date, and upon the effective date of a Final Order of a court of competent jurisdiction

determining the validity of and amount of just compensation attributable to an Allowed Eminent

Domain Claim or Allowed Inverse Condemnation Claim, the holder of such a Claim shall be

entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's

unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one

hundred percent (100%) of such Allowed Eminent Domain/Inverse Condemnation Claim, and

(c) Allowed Eminent Domain/Inverse Condemnation Claims shall not be treated in any way as

CW General Unsecured Claims for purposes of distribution.  Nothing in the Plan or this

Confirmation Order shall be construed to prevent any determination of just compensation from

including, if and to the extent the tribunal deems appropriate, interest on an Allowed Eminent

Domain/Inverse Condemnation Claim.  Notwithstanding the foregoing, in the event that (x) the

Oversight Board appeals from the Confirmation Order and the Findings of Fact and Conclusions

of Law regarding the Title III Court's ruling that Allowed Eminent Domain/Inverse

Condemnation Claims must be paid in full or otherwise be rendered unimpaired pursuant to the

Plan, (y) such appeal is successful, and (z) a Final Order is entered holding that Allowed

Eminent Domain/Inverse Condemnation Claims may be impaired, subject to the terms and

provisions of Articles LXXVII and LXXXII of the Plan, each holder of an Allowed Eminent

Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration,

satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent

Domain/Inverse Condemnation Claim, and the Reorganized Commonwealth shall make,

payments, in Cash, in an amount equal to the pro rata payments to be made to holders of

Allowed CW General Unsecured Claims up to the GUC Recovery Cap.

77.     <u>Oversight Board Termination and Post-Confirmation Powers</u>.  Neither the Plan

nor this Confirmation Order shall change the duration of the Oversight Board's existence set

forth in section 209 of PROMESA, and neither the Plan nor this Confirmation Order shall alter

any of the Oversight Board's powers and duties under each title of PROMESA.  Until

termination of the Oversight Board pursuant to section 209 of PROMESA, the Oversight Board

may enforce the Plan.  At all times, each party in interest may enforce Plan provisions directly

affecting the party in interest.

78.     <u>Post-Confirmation Fiscal Plans and Budgets Remain Subject to Oversight Board's</u>
<u>Sole Discretion</u>.  Nothing in the Plan and nothing in this Confirmation Order (a) alters the

powers of the Oversight Board granted by Titles I and II of PROMESA, including its rights in its

sole discretion, to amend the certified Fiscal Plan and budget in effect on the Effective Date and

to develop and certify new fiscal plans and budgets at any times, (b) grants the government of

Puerto Rico any entitlement to any provisions in certified fiscal plans and budgets, and (c) grants

the government of Puerto Rico any rights and powers barred by section 108(a) of PROMESA.

79.   <u>Government Post-Confirmation Powers and Duties</u>.  Upon termination of the
Oversight Board pursuant to section 209 of PROMESA, the Governor shall enforce the Plan.  If
the Governor fails to enforce a Plan provision directly or indirectly impacting a party in interest
after being requested to do so by a party in interest, each party in interest that would reasonably
be prejudiced or injured by lack of enforcement may enforce the Plan provision.  At no time
prior or subsequent to the termination of the Oversight Board shall the Governor or Legislature
enact, implement, or enforce any statute, resolution, policy, or rule reasonably likely, directly or
indirectly, to impair the carrying out of the Plan's payment provisions, covenants, and other
obligations.  Pursuant to section 1142(b) of the Bankruptcy Code, the Governor shall cause the
executive branch of the Commonwealth government to take all acts necessary for the
consummation of the Plan.

80.   <u>Legislation Authorizing Plan Debt Shall Not Be Repealed, Changed, Or Negated</u>.
The Government of Puerto Rico, including without limitation, any Entity or Person acting for or
on behalf thereof, shall not enact any statute, resolution, policy, or rule that would repeal,
change, or negate any law currently existing that authorizes debt issued pursuant to the Plan or
any law pledging the full faith, credit, and taxing power of the Commonwealth to secure debt
issued pursuant to the Plan.

81.   <u>Non-Impairment of CVIs, SUT</u>.  Until all obligations with respect to the CVIs
have been paid or otherwise satisfied in accordance with their terms, the Commonwealth, or any
Entity or Person acting for or on behalf thereof, shall take no action that would: (a) limit or alter
the rights vested in the Commonwealth in accordance with the Plan and this Confirmation Order
to fulfill the terms of any agreements with the holders of CVIs; (b) impair the rights and
remedies of the holders of the CVIs; or (c) impair the ability of the holders of the CVIs to track

performance of the Measured SUT and the Commonwealth Rum Tax Revenues available for the

payment of the CVIs in accordance with the terms and provisions of the Plan and as set forth in

the CVI Indenture; provided, however, that the foregoing shall not preclude the Commonwealth

from exercising its power, through a valid change in law, to eliminate the Measured SUT, or

replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI

Indenture.

      82.    <u>Reversal/Stay/Modification/Vacatur of Order</u>.  Except as otherwise provided in

this Confirmation Order or a subsequent order issued by this Court or a higher court having

jurisdiction over an appeal of this Confirmation Order or over a <u>certiorari</u> proceeding in respect

of this Confirmation Order, if any or all of the provisions of this Confirmation Order are

hereafter reversed, modified, vacated, or stayed by subsequent order of this Court, or any other

court, such reversal, stay, modification, or vacatur shall not affect the validity or enforceability of

any act, obligation, indebtedness, liability, priority, or lien incurred or undertaken by the Debtors

or the Reorganized Debtors, as applicable, prior to the effective date of such reversal, stay,

modification, or vacatur.  Notwithstanding any such reversal, stay, modification, or vacatur of

this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, or in

reliance on, this Confirmation Order prior to the effective date of such reversal, stay,

modification, or vacatur shall be governed in all respect by the provisions of this Confirmation

Order and the Plan.  To the extent not specifically reversed, modified, vacated, or stayed by an

order of this Court or an appellate court, all existing orders entered in the Title III Cases remain

in full force and effect.

      83.    <u>Retention of Jurisdiction</u>.  Notwithstanding the entry of this Confirmation Order

or the occurrence of the Effective Date, subject to the terms and provisions of article XCI of the

Plan, and except as otherwise provided in the Plan or herein, pursuant to sections 105, 945(a),

and 1142(b) of the Bankruptcy Code, for the time necessary for the successful implementation of

the Plan, this Court shall retain exclusive jurisdiction to the extent it has exclusive subject matter

jurisdiction, and concurrent jurisdiction to the extent it has concurrent subject matter jurisdiction,

over all matters arising under PROMESA, arising out of, and related to, the Title III Cases to the

fullest extent legally permissible, including, but not limited to, subject matter jurisdiction over

the matters set forth in article XCI of the Plan.

84.     <u>Conflicts Among Documents</u>.  The provisions of the Plan and this Confirmation

Order shall be construed in a manner consistent with each other so as to effect the purpose of

each; <u>provided</u>, <u>however</u>, that, in the event of any inconsistency between (a) the Plan or this

Confirmation Order and (b) the New GO Bond Legislation, the CVI Legislation, or any other

legislation implementing the Plan or otherwise in any manner, the terms and provisions of the

Plan or this Confirmation Order, as applicable, shall prevail; and, <u>provided</u>, <u>further</u>, that, in the

event of any irreconcilable inconsistency between the Plan and this Confirmation Order, the

documents shall control in the following order of priority: (i) this Confirmation Order, and (ii)

the Plan; and, <u>provided</u>, <u>further</u>, that, in the event of any inconsistency between this

Confirmation Order and any other order in the Commonwealth Title III Case, the ERS Title III

Case, the PBA Title III Case, the terms and provisions of this Confirmation Order shall control;

and, <u>provided</u>, <u>further</u>, that nothing contained herein is intended, nor shall be construed, to

modify the economic terms of the Plan.

85.     <u>PBA Leases</u>.  Notwithstanding anything contained herein or in the Plan to the

contrary, each of the Unexpired Leases to which PBA is a party (collectively, the "PBA Leases")

shall be deemed rejected effective upon the earliest to occur of (a) June 30, 2022, (b) the date

upon which such PBA Lease expires in accordance with its terms, (c) the date upon which PBA

enters into a new or amended lease with respect to the leased property subject to such PBA

Lease, (d) such other date of which PBA, as lessor, provides written notice to the counterparty to

a PBA Lease, and (e) the date upon which AAFAF, on behalf of the Commonwealth or any

Commonwealth agency, public corporation or instrumentality, that is a counterparty, as lessee,

with respect to a PBA Lease, provides written notice to PBA that such PBA Lease is rejected (in

each case, the earliest of (a) through (e), the "PBA Rejection Date"); provided, however, that,

during the period from the Effective Date up to, but not including, the applicable PBA Rejection

Date, with respect to any PBA Lease between PBA, as lessor, and the Commonwealth or any

Commonwealth agency, public corporation or instrumentality, as lessee, monthly lease payments

shall be limited to the lower of (y) the amount budgeted and approved pursuant to a certified

Fiscal Plan and (z) the monthly costs and expenses associated with the applicable leased

property; and, provided, further, that any accruals on the books of PBA or any of the

Commonwealth or an agency, public corporation, or instrumentality of the Commonwealth as

counterparty to a PBA Lease for the unpaid debt service component of rent under any PBA

Lease shall be deemed released, settled, and discharged as of the PBA Rejection Date.

86.     Modifications.  The modifications to the Seventh Amended Plan, as set forth in

the Plan, do not adversely change the treatment of the Claim of any Creditor that accepted the

Seventh Amended Plan and all such Creditors shall be deemed to have accepted the Plan.  Before

substantial consummation of the Plan, the Oversight Board may modify the Plan at any time after

entry of this Confirmation Order, subject to any limitations set forth in the Plan (including

consent rights) and any stipulation approved by this Court in connection with the Plan; provided,

however, that the circumstances warrant such modification and the Court, after notice and a

hearing, confirms such modified plan under the applicable legal requirements. For the avoidance

of doubt, the Plan shall not be modified except in accordance with Bankruptcy Code section 942

and the terms of this Confirmation Order.

87. <u>Asserted Surety Claims</u>. Notwithstanding anything contained in the Plan to the

contrary, to the extent that the Claim of a surety against any of the Debtors is determined to be a

secured claim and allowed in whole or in part, by Final Order, or by operation of section 502(a)

of the Bankruptcy Code following the expiration of the period to object to any such Claim in

accordance with the provisions of section 82.1 of the Plan, such Claim shall be paid in full, in

Cash; <u>provided</u>, <u>however</u>, that, in the event some or all of any such Claim is determined to be an

unsecured claim and allowed in whole or in part, by Final Order, such Claim shall be treated in

accordance with the provisions of section 17.1, 62.1 or 70.1 of the Plan, as the case may be.

88. <u>Identification of Additional Retail Investors / Retail Support Fee</u>. Within five (5)

Business Days of the date hereof, the Oversight Board shall cause the Balloting Agent to

distribute, by mail, electronic mail, or such other means customary, the form of Certification

Notice annexed hereto as **<u>Exhibit E</u>** (the "Certification Notice") to all known holders, by and

through their respective Nominee(s), of (a) Vintage PBA Bond Claims, (b) 2011 PBA Bond

Claims, (c) 2012 PBA Bond Claims, (d) Vintage CW Bond Claims, (e) 2011 CW Bond Claims,

(f) 2011 CW Series D/E/PIB Bond Claims, (g) 2012 CW Bond Claims, and (h) 2014 CW Bond

Claims (collectively, the "Bonds") who did <u>not</u> submit a vote that was not otherwise revoked by

such holder pursuant to the procedures set forth in the Disclosure Statement Order on or before

6:00 p.m. (Atlantic Standard Time) on October 18, 2021.

       a. The record date to determine which beneficial owners of the Bonds (collectively, the "Beneficial Owners") are entitled to receive the Certification Notice and make the Certification (as defined below) shall be 6:00 p.m. (Atlantic Standard Time) on October 18, 2021 (the "Certification Record Date").

b.   Promptly upon receipt of a Certification Notice, each Nominee (or such Nominee's agent) shall distribute such Certification Notice to the Beneficial Owners eligible as of the Certification Record Date pursuant to such Nominee's (or such Nominee's agent's) customary practices for conveying such information.

c.   If it is a Nominee's (or such Nominee's agent's) customary and accepted business practice to forward the Certification Notice to (and collect Certifications from) Beneficial Owners by information form, email, telephone, or other customary means of communications, as applicable, the Nominee (or such Nominee's agent) shall employ such method of communication in lieu of sending a paper copy of the Certification Notice to Beneficial Owners; provided, however, that if the Nominee's (or such Nominee's agent's) customary internal practice is to provide to Beneficial Owners an electronic link to the Certification Notice, the Nominee (or such Nominee's agent) may follow such customary practice in lieu of forwarding paper copies of the Certification Notice to Beneficial Owners.

d.   The Oversight Board shall cause the Balloting Agent to provide Beneficial Owners of the Bonds as of the Certification Record Date a frozen "user CUSIP" (or similarly appropriate non-tradeable identifier) for the purpose of making the Certification.

e.   Each Beneficial Owner of the Bonds who certifies that it is an individual who held the Bonds as of the Certification Record Date in the aggregate outstanding principal amount of One Million Dollars ($1,000,000.00) or less in one or more brokerage account(s), trust account(s), custodial account(s), or separately managed account(s) (the "Certification") pursuant to the procedures set forth in this decretal paragraph 88 hereof shall be deemed a Retail Investor for purposes of distributions to be made pursuant to the Plan, and shall receive a distribution of the Retail Support Fee through the "user CUSIP" in accordance with the terms and provisions of the Plan.

f.   Beneficial Owners of the Bonds must deliver their certification instructions to (or otherwise coordinate with) their Nominee according to the instructions in the Certification Notice in sufficient time for the Nominee to effectuate the Beneficial Owner's Certification through The Depository Trust Company's ("DTC") Automated Tender Offer Program ("ATOP") in accordance with the procedures of DTC and be received on ATOP by 6:00 p.m. (Atlantic Standard Time) on the first Business Day thirty (30) days from and after the date hereof (the "Certification Deadline");[10] provided, however, that any holder who has executed, completed, and delivered through ATOP in accordance with the procedures of DTC its Certification may revoke such Certification and withdraw any securities that have been tendered with respect to a Certification through ATOP in accordance with the procedures of DTC on or before the Certification Deadline.

---

[10]      6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

      g.  All securities that are tendered with respect to a Certification shall be restricted from further trading or transfer through the Effective Date of the Plan.

89.    <u>Provisions of Plan and Order Nonseverable and Mutually Dependent</u>.  The provisions of the Plan and this Confirmation Order, including the findings of fact and conclusions of law set forth in the Findings of Fact and Conclusions of Law, are nonseverable and mutually dependent.

90.    <u>Governing Law</u>.  Except to the extent that other federal law is applicable, or to the extent that an exhibit to the Plan or any document to be entered into in connection with the Plan provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

91.    <u>PFC Reservation</u>.  Neither the Plan nor this Confirmation Order determine, affect, or limit any claims or rights U.S. Bank Trust National Association and U.S. Bank National Association, as Trustee for bonds issued by PFC, may have against GDB, DRA, or the GDB/PET, including, without limitation, claims and rights in respect of letters of credit.

92.    <u>Applicable Nonbankruptcy Law</u>.  Pursuant to section 1123(a) of the Bankruptcy Code, as applicable to the Title III Cases pursuant to section 301(a) of PROMESA, the provisions of this Confirmation Order and the Plan shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.  The documents contained in the Plan Supplement and such other documents necessary or convenient to implement the provisions of this Confirmation Order and the Plan (as such documents may be further, amended, supplemented, or modified and filed with the Court on or prior to the Effective Date), including,

without limitation, the New GO Bonds, the New GO Bonds Indenture, the GO CVIs, the GO

CVI Indenture, the Clawback CVIs, the Clawback CVI Indenture, and the Avoidance Actions

Trust Agreement, provide adequate means for implementation of the Plan pursuant to section

1123(a)(5) of the Bankruptcy Code and, as of the occurrence of the Effective Date, shall

constitute legal, valid, and binding obligations of the Debtors, as applicable, and valid provisions

to pay and to secure payment of the New GO Bonds, the GO CVIs, and the Clawback CVIs, as

applicable, pursuant to section 944(b)(3) of the Bankruptcy Code, and be enforceable in

accordance with their terms.

93.     <u>Waiver of Filings</u>.  Any requirement pursuant to Bankruptcy Rule 1007 obligating

the Debtors to file any list, schedule, or statement with the Court or the Office of the U.S.

Trustee is hereby waived as to any such list, schedule, or statement not filed as of the Effective

Date.

94.     <u>Notice of Order</u>.  In accordance with Bankruptcy Rules 2002 and 3020(c), as soon

as reasonably practicable after the Effective Date, the Debtors shall serve notice of the entry of

this Confirmation Order and the occurrence of the Effective Date, substantially in the form

attached as **Exhibit B** hereto, to all parties who hold a Claim in the Commonwealth Title III

Case, the ERS Title III Case, the HTA Title III Case, and the PBA Title III Case, as well as the

Creditors' Committee, the Retiree Committee, the U.S. Trustee, any party filing a notice

pursuant to Bankruptcy Rule 2002, the Securities and Exchange Commission, the Internal

Revenue Service, and the United States Attorney for the District of Puerto Rico.  Such notice is

hereby approved in all respects and shall be deemed good and sufficient notice of entry of this

Confirmation Order.

95.     <u>No Waiver</u>.  The failure to specifically include any particular provision of the

Plan in this Confirmation Order shall not diminish the effectiveness of such provision nor

constitute a waiver thereof, it being the intent of this Court that the Plan is confirmed in its

entirety and incorporated herein by this reference.


        SO ORDERED.

Dated: January 18, 2022

                                                 /s/ Laura Taylor Swain
                                                LAURA TAYLOR SWAIN
                                                United States District Judge

**Exhibit A**

**Plan**

UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, THE<br>EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO, AND THE PUERTO RICO PUBLIC<br>BUILDINGS AUTHORITY, | |
| Debtors. | |

**MODIFIED EIGHTH AMENDED TITLE III JOINT PLAN OF ADJUSTMENT
OF THE COMMONWEALTH OF PUERTO RICO, ET AL.**

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944

*Attorneys for the Financial Oversight and Management Board
as Representative for the Debtors in their Title III Cases*

Dated: January 14, 2022

# **TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS .................................................................................................................1

| | | |
|---|---|---|
| 1.1 | 2011 CW Bond Claim ........................................................................................1 |
| 1.2 | 2011 CW Bond Claim (Assured)........................................................................1 |
| 1.3 | 2011 CW Bond Claim (Taxable Election) ..........................................................1 |
| 1.4 | 2011 CW Bond Recovery ...................................................................................1 |
| 1.5 | 2011 CW Bonds ..................................................................................................1 |
| 1.6 | 2011 CW Guarantee Bond Claim .......................................................................2 |
| 1.7 | 2011 CW Guarantee Bond Claim (Taxable Election) ........................................2 |
| 1.8 | 2011 CW Guarantee Bond Recovery ..................................................................2 |
| 1.9 | 2011 CW Guarantee Taxable Bond Distribution ...............................................2 |
| 1.10 | 2011 CW Series D/E/PIB Bond Claim ...............................................................2 |
| 1.11 | 2011 CW Series D/E/PIB Bond Claim (Assured) ..............................................2 |
| 1.12 | 2011 CW Series D/E/PIB Bond Claim (Taxable Election) ................................2 |
| 1.13 | 2011 CW Series D/E/PIB Bond Recovery .........................................................3 |
| 1.14 | 2011 CW Series D/E/PIB Bonds ........................................................................3 |
| 1.15 | 2011 CW Series D/E/PIB Taxable Bond Distribution........................................3 |
| 1.16 | 2011 CW Taxable Bond Distribution .................................................................3 |
| 1.17 | 2011 PBA Bond Claim .......................................................................................3 |
| 1.18 | 2011 PBA Bond Recovery..................................................................................3 |
| 1.19 | 2011 PBA Bonds.................................................................................................4 |
| 1.20 | 2012 CW Bond Claim.........................................................................................4 |
| 1.21 | 2012 CW Bond Claim (Assured).........................................................................4 |
| 1.22 | 2012 CW Bond Claim (Taxable Election)...........................................................4 |
| 1.23 | 2012 CW Bond Recovery ...................................................................................4 |
| 1.24 | 2012 CW Bonds..................................................................................................4 |
| 1.25 | 2012 CW Guarantee Bond Claim .......................................................................5 |
| 1.26 | 2012 CW Guarantee Bond Claim (Taxable Election) ........................................5 |
| 1.27 | 2012 CW Guarantee Bond Recovery ..................................................................5 |
| 1.28 | 2012 CW Guarantee Taxable Bond Distribution ...............................................5 |
| 1.29 | 2012 CW Taxable Bond Distribution .................................................................5 |
| 1.30 | 2012 PBA Bond Claim .......................................................................................5 |
| 1.31 | 2012 PBA Bond Recovery..................................................................................6 |
| 1.32 | 2012 PBA Bonds.................................................................................................6 |
| 1.33 | 2014 CW Bond Claim.........................................................................................6 |
| 1.34 | 2014 CW Bond Claim (Taxable Election)...........................................................6 |
| 1.35 | 2014 CW Bond Recovery ...................................................................................6 |
| 1.36 | 2014 CW Bonds..................................................................................................6 |
| 1.37 | 2014 CW Guarantee Bond Claim .......................................................................6 |
| 1.38 | 2014 CW Guarantee Bond Claim (Taxable Election)........................................7 |
| 1.39 | 2014 CW Guarantee Taxable Bond Distribution...............................................7 |
| 1.40 | 2014 CW Taxable Bond Distribution .................................................................7 |
| 1.41 | 5.5% SUT.............................................................................................................7 |

# Table of Contents
## (Cont'd)

| | | |
|---|---|---|
| 1.42 | AAFAF | 7 |
| 1.43 | ACR Order | 7 |
| 1.44 | Act 106 | 7 |
| 1.45 | Act 106 Board | 7 |
| 1.46 | Active and Retired Employee Benefit Claim | 7 |
| 1.47 | Active ERS Participant Claim | 8 |
| 1.48 | Active JRS Participant Claim | 8 |
| 1.49 | Active Participant | 8 |
| 1.50 | Active TRS Participant Claim | 8 |
| 1.51 | Administrative Claim Bar Date | 8 |
| 1.52 | Administrative Expense Claim | 8 |
| 1.53 | ADR Order | 8 |
| 1.54 | ADR Procedures | 8 |
| 1.55 | Affiliate | 8 |
| 1.56 | AFICA | 9 |
| 1.57 | AFSCME | 9 |
| 1.58 | AFSCME CBAs | 9 |
| 1.59 | AFSCME Claims | 9 |
| 1.60 | AFSCME Plan Support Agreement | 9 |
| 1.61 | AFSCME Term Sheet | 9 |
| 1.62 | Allowed | 9 |
| 1.63 | Allowed Claim | 9 |
| 1.64 | Ambac | 9 |
| 1.65 | Ambac Acceleration Price | 10 |
| 1.66 | Ambac Action | 10 |
| 1.67 | Ambac Certificates | 10 |
| 1.68 | Ambac Commutation Consideration | 10 |
| 1.69 | Ambac Commutation Treatment | 10 |
| 1.70 | Ambac CW/HTA Bond Claims | 10 |
| 1.71 | Ambac Escrow Account | 10 |
| 1.72 | Ambac Insured Bond Claims | 10 |
| 1.73 | Ambac Insured Bonds | 10 |
| 1.74 | Ambac Insurance Policies | 10 |
| 1.75 | Ambac Plan Consideration | 10 |
| 1.76 | Ambac Trust | 11 |
| 1.77 | Ambac Trust Assets | 11 |
| 1.78 | Ambac CW/Convention Center Claims | 11 |
| 1.79 | Ambac CW/HTA Bond Claims | 11 |
| 1.80 | Ambac CW/PRIFA Rum Tax Claims | 11 |
| 1.81 | AMPR | 11 |
| 1.82 | Appointments Related Litigation | 11 |
| 1.83 | Assets | 11 |
| 1.84 | Assured | 11 |
| 1.85 | Assured Acceleration Price | 12 |

## Table of Contents
### (Cont'd)

| | | |
|---|---|---|
| 1.86 | Assured Acceleration Price Payment Option | 12 |
| 1.87 | Assured Bondholder Elections | 12 |
| 1.88 | Assured Bondholder Elections Form | 12 |
| 1.89 | Assured CVIs | 12 |
| 1.90 | Assured CW/Convention Center Claims | 12 |
| 1.91 | Assured CW/HTA Bond Claims | 12 |
| 1.92 | Assured CW/PRIFA Rum Tax Claims | 12 |
| 1.93 | Assured Election | 12 |
| 1.94 | Assured Election Notice | 13 |
| 1.95 | Assured Insurance Policies | 13 |
| 1.96 | Assured Insured Bond Claim | 13 |
| 1.97 | Assured Insured Bondholder | 13 |
| 1.98 | Assured Insured Bonds | 13 |
| 1.99 | Assured New GO Bonds | 13 |
| 1.100 | Assured New Securities | 13 |
| 1.101 | Assured Plan Consideration | 13 |
| 1.102 | Assured Treatment | 13 |
| 1.103 | Avoidance Actions | 13 |
| 1.104 | Avoidance Actions CW Interests | 14 |
| 1.105 | Avoidance Actions ERS Interests | 14 |
| 1.106 | Avoidance Actions Trust | 14 |
| 1.107 | Avoidance Actions Trust Agreement | 14 |
| 1.108 | Avoidance Actions Trust Assets | 14 |
| 1.109 | Avoidance Actions Trust Beneficiaries | 15 |
| 1.110 | Avoidance Actions Trust Board | 15 |
| 1.111 | Avoidance Actions Trust Interests | 15 |
| 1.112 | Avoidance Actions Trustee | 15 |
| 1.113 | Ballot Date | 15 |
| 1.114 | Ballot/Election Form | 15 |
| 1.115 | Bankruptcy Code | 15 |
| 1.116 | Bankruptcy Rules | 15 |
| 1.117 | Bar Date | 15 |
| 1.118 | Bar Date Orders | 15 |
| 1.119 | Base Contribution | 16 |
| 1.120 | Bond Claim | 16 |
| 1.121 | Bond Recovery Category | 16 |
| 1.122 | Bondholder Election | 16 |
| 1.123 | Business Day | 16 |
| 1.124 | Capital Improvements | 16 |
| 1.125 | Cash | 16 |
| 1.126 | Causes of Action | 16 |
| 1.127 | CCDA | 17 |
| 1.128 | CCDA Bonds | 17 |
| 1.129 | CCDA Bond Claims | 17 |

### Table of Contents
### (Cont'd)

| | | |
|---|---|---|
| 1.130 | CCDA Consummation Costs | 17 |
| 1.131 | CCDA Restriction Fee Creditors | 17 |
| 1.132 | CCDA Restriction Fee Percentage | 17 |
| 1.133 | CCDA Trustee | 17 |
| 1.134 | Charging Lien | 17 |
| 1.135 | Claim | 18 |
| 1.136 | Class | 18 |
| 1.137 | Clawback Actions | 18 |
| 1.138 | Clawback CVI Indenture | 18 |
| 1.139 | Clawback CVIs | 18 |
| 1.140 | Clawback Recovery | 18 |
| 1.141 | COFINA | 18 |
| 1.142 | COFINA Bonds | 19 |
| 1.143 | COFINA Bonds Indenture | 19 |
| 1.144 | COFINA Bonds Legislation | 19 |
| 1.145 | COFINA Confirmation Order | 19 |
| 1.146 | COFINA Plan | 19 |
| 1.147 | Committee Agreement | 19 |
| 1.148 | Commonwealth | 19 |
| 1.149 | Commonwealth Constitution | 19 |
| 1.150 | Commonwealth Election | 19 |
| 1.151 | Commonwealth Instrumentality Plan | 19 |
| 1.152 | Commonwealth Legislature | 19 |
| 1.153 | Commonwealth Petition Date | 19 |
| 1.154 | Commonwealth Title III Case | 19 |
| 1.155 | Comprehensive Cap | 19 |
| 1.156 | Confirmation Date | 20 |
| 1.157 | Confirmation Hearing | 20 |
| 1.158 | Confirmation Order | 20 |
| 1.159 | Constitutional Debt Group | 20 |
| 1.160 | Constitutional Debt Group Members | 20 |
| 1.161 | Consummation Costs | 20 |
| 1.162 | Convenience Cap | 20 |
| 1.163 | Convenience Claim | 20 |
| 1.164 | Creditor | 21 |
| 1.165 | Creditors' Committee | 21 |
| 1.166 | CRIM | 21 |
| 1.167 | CUSIP | 21 |
| 1.168 | Custodial Trust Documents | 21 |
| 1.169 | CVIs | 21 |
| 1.170 | CVI Indenture | 21 |
| 1.171 | CVI Legislation | 21 |
| 1.172 | CVI Payment Reserve | 21 |
| 1.173 | CVI Trustee | 22 |

**Table of Contents**
**(Cont'd)**

1.174  CW Appropriations Claims..............................................................22
1.175  CW Bond Claims...............................................................................22
1.176  CW Bond Claims (Insured)..............................................................22
1.177  CW Fiscal Plan..................................................................................22
1.178  CW General Unsecured Claim.........................................................22
1.179  CW Guarantee Bond Claims............................................................23
1.180  CW Guarantee Bond Claims (Insured)...........................................23
1.181  CW GUC Recovery...........................................................................23
1.182  CW/Convention Center Claim.........................................................23
1.183  CW/Convention Center Clawback Recovery...................................24
1.184  CW/HTA Claim..................................................................................24
1.185  CW/HTA Clawback Recovery..........................................................24
1.186  CW/MBA Claim..................................................................................24
1.187  CW/MBA Clawback Recovery.........................................................24
1.188  CW/PRIFA Rum Tax Claim..............................................................24
1.189  CW/PRIFA Rum Tax Clawback Recovery......................................24
1.190  Dairy Producer Claim.......................................................................24
1.191  Dairy Producer Settlement..............................................................25
1.192  Debt....................................................................................................25
1.193  Debt Management Policy..................................................................25
1.194  Debtors...............................................................................................25
1.195  Debt Policy Period............................................................................25
1.196  Debt Policy Revenues.......................................................................25
1.197  Debt Related Objections...................................................................25
1.198  Debt Responsibility Act....................................................................26
1.199  Debt Service Fund.............................................................................26
1.200  Debtors...............................................................................................27
1.201  Deemed Issuance Date......................................................................27
1.202  Definitive Documents........................................................................27
1.203  Disallowed..........................................................................................27
1.204  Disbursing Agent...............................................................................27
1.205  Disclosure Statement........................................................................27
1.206  Disclosure Statement Hearing.........................................................27
1.207  Disclosure Statement Order.............................................................27
1.208  Disputed Claim..................................................................................28
1.209  Distribution Date...............................................................................28
1.210  Distribution Record Date..................................................................28
1.211  Effective Date....................................................................................28
1.212  Eminent Domain/Inverse Condemnation Claim.............................28
1.213  Eminent Domain Proceeding............................................................28
1.214  Energy Incentive Act.........................................................................28
1.215  Energy Incentive Claims...................................................................29
1.216  Entity..................................................................................................29
1.217  ERS......................................................................................................29

## Table of Contents
### (Cont'd)

| | | |
|---|---|---|
| 1.218 | ERS Bond Claim | 29 |
| 1.219 | ERS Bond Recovery | 29 |
| 1.220 | ERS Bonds | 29 |
| 1.221 | ERS Fiscal Agent | 29 |
| 1.222 | ERS General Unsecured Claim | 30 |
| 1.223 | ERS GUC Pool | 30 |
| 1.224 | ERS Litigation | 30 |
| 1.225 | ERS Participant Claim | 31 |
| 1.226 | ERS Petition Date | 31 |
| 1.227 | ERS Portfolio Price | 31 |
| 1.228 | ERS Private Equity Portfolio | 31 |
| 1.229 | ERS Recovery Actions | 31 |
| 1.230 | ERS Resolution | 31 |
| 1.231 | ERS Stipulation | 31 |
| 1.232 | ERS Takings Action | 31 |
| 1.233 | ERS Title III Case | 32 |
| 1.234 | ERS Trust | 32 |
| 1.235 | Excess Cash Surplus | 32 |
| 1.236 | Executory Contract | 32 |
| 1.237 | Federal Claims | 32 |
| 1.238 | FGIC | 32 |
| 1.239 | FGIC Action | 32 |
| 1.240 | FGIC Certificates | 32 |
| 1.241 | FGIC CW/Convention Center Claims | 32 |
| 1.242 | FGIC CW/HTA Bond Claims | 32 |
| 1.243 | FGIC CW/PRIFA Rum Tax Claims | 32 |
| 1.244 | FGIC Escrow Account | 32 |
| 1.245 | FGIC Insured Bond Claims | 33 |
| 1.246 | FGIC Insured Bonds | 33 |
| 1.247 | FGIC Insured PRIFA Bond Claims | 33 |
| 1.248 | FGIC Insurance Policies | 33 |
| 1.249 | FGIC Plan Consideration | 33 |
| 1.250 | FGIC Rehabilitation Plan | 33 |
| 1.251 | FGIC Treatment | 33 |
| 1.252 | FGIC Trust | 33 |
| 1.253 | Final Order | 33 |
| 1.254 | Fiscal Plan | 34 |
| 1.255 | Fiscal Plan Surplus | 34 |
| 1.256 | FY | 34 |
| 1.257 | GDB | 34 |
| 1.258 | GDB HTA Loans | 34 |
| 1.259 | GDB Loan Priority Determination | 34 |
| 1.260 | General Fund | 34 |
| 1.261 | General Unsecured Claims | 34 |

**Table of Contents**
**(Cont'd)**

1.262  GO Bonds ..............................................................................................34
1.263  GO CVIs ...............................................................................................34
1.264  GO CVI Indenture ..................................................................................35
1.265  GO Group ..............................................................................................35
1.266  GO/PBA Annex Agreement ...................................................................35
1.267  GO/PBA Consummation Costs ..............................................................35
1.268  GO/PBA Joinder Agreement ..................................................................35
1.269  GO/PBA Joinder Creditors .....................................................................35
1.270  GO/PBA Joinder Deadline ......................................................................35
1.271  GO/PBA Plan Support Agreement ..........................................................35
1.272  GO/PBA PSA Creditors ..........................................................................35
1.273  GO/PBA PSA Restriction Fee .................................................................35
1.274  GO/PBA Restriction Fee Percentage .......................................................36
1.275  Government Entity ...................................................................................36
1.276  Government Parties ..................................................................................36
1.277  Government Released Claims ...................................................................36
1.278  Government Releasees ..............................................................................36
1.279  Gracia Gracia Claim ................................................................................37
1.280  Gracia Gracia CW Action .......................................................................37
1.281  Gracia Gracia Federal Action ..................................................................37
1.282  Gracia Gracia Settlement .........................................................................37
1.283  GSA Helicopter Loan ..............................................................................37
1.284  GUC Recovery Cap ..................................................................................37
1.285  GUC Reserve ...........................................................................................37
1.286  HTA .........................................................................................................37
1.287  HTA 68 Bonds .........................................................................................37
1.288  HTA 98 Bonds .........................................................................................38
1.289  HTA 98 Senior Bonds ..............................................................................38
1.290  HTA 98 Sub Bonds ..................................................................................39
1.291  HTA Bonds ..............................................................................................39
1.292  HTA/CCDA Annex Agreement ...............................................................39
1.293  HTA/CCDA Joinder Agreement ..............................................................39
1.294  HTA/CCDA Joinder Deadline .................................................................39
1.295  HTA/CCDA Joinder Creditors .................................................................39
1.296  HTA/CCDA Plan Support Agreement ......................................................39
1.297  HTA/CCDA PSA Creditors .....................................................................39
1.298  HTA/CCDA PSA Restriction Fee Period .................................................40
1.299  HTA/CCDA PSA Threshold Attainment ..................................................40
1.300  HTA Clawback CVI ................................................................................40
1.301  HTA Confirmation Order .........................................................................40
1.302  HTA Distribution Conditions ...................................................................40
1.303  HTA Effective Date .................................................................................40
1.304  HTA Fiscal Agent ....................................................................................41
1.305  HTA Petition Date ...................................................................................41

### Table of Contents
### (Cont'd)

|  |  | **Page** |
|---|---|---|
| 1.306 | HTA Plan | 41 |
| 1.307 | HTA Title III Case | 41 |
| 1.308 | Initial PSA Creditors | 41 |
| 1.309 | Initial GO/PBA PSA Creditors | 41 |
| 1.310 | Initial GO/PBA PSA Restriction Fee Creditors | 41 |
| 1.311 | Initial HTA/CCDA PSA Creditors | 41 |
| 1.312 | Initial PSA | 41 |
| 1.313 | Initial PSA Joinder Creditors | 41 |
| 1.314 | Initial PSA Threshold Attainment | 41 |
| 1.315 | Insured Bond Claim | 42 |
| 1.316 | Invalidity Actions | 42 |
| 1.317 | IRC | 42 |
| 1.318 | IRS | 42 |
| 1.319 | JRS | 42 |
| 1.320 | JRS Participant Claim | 42 |
| 1.321 | LCDC | 42 |
| 1.322 | LCDC Holders | 42 |
| 1.323 | Lien | 42 |
| 1.324 | Lien Challenge Actions | 42 |
| 1.325 | Lift Stay Motions | 42 |
| 1.326 | List of Creditors | 43 |
| 1.327 | Local Bankruptcy Rules | 43 |
| 1.328 | Maximum Annual Debt Service | 43 |
| 1.329 | Maximum Taxable Bond Election Amount | 43 |
| 1.330 | Measured SUT | 43 |
| 1.331 | Med Centers | 43 |
| 1.332 | Med Center Claims | 44 |
| 1.333 | Med Center Litigation | 44 |
| 1.334 | Med DC Action | 45 |
| 1.335 | MFA | 45 |
| 1.336 | Monolines | 45 |
| 1.337 | Monthly Benefit Modification | 45 |
| 1.338 | National | 45 |
| 1.339 | National Action | 45 |
| 1.340 | National Acceleration Price | 45 |
| 1.341 | National Certificates | 45 |
| 1.342 | National Commutation Consideration | 45 |
| 1.343 | National Commutation Treatment | 45 |
| 1.344 | National CW/HTA Bond Claims | 46 |
| 1.345 | National Escrow Account | 46 |
| 1.346 | National Insurance Policies | 46 |
| 1.347 | National Insured Bond Claims | 46 |
| 1.348 | National Insured Bonds | 46 |
| 1.349 | National Non-Commutation Treatment | 46 |

## Table of Contents
## (Cont'd)

| | | |
|---|---|---|
| 1.350 | National Plan Consideration | 46 |
| 1.351 | National Treatment | 46 |
| 1.352 | National Trust | 46 |
| 1.353 | Net Allowed ERS Bond Claims | 46 |
| 1.354 | Net CW Cash Consideration | 46 |
| 1.355 | Net Tax-Supported Debt | 47 |
| 1.356 | New GO 5.0% CABs | 47 |
| 1.357 | New GO 5.375% CABs | 47 |
| 1.358 | New GO Bonds | 47 |
| 1.359 | New GO Bonds Indenture | 47 |
| 1.360 | New GO Bonds Legislation | 47 |
| 1.361 | New GO Bonds Trustee | 47 |
| 1.362 | New GO CIBs | 48 |
| 1.363 | New GO Refunding Bonds | 48 |
| 1.364 | New HTA Bonds | 48 |
| 1.365 | New HTA Bonds Indenture | 48 |
| 1.366 | Non-Own Source Revenues | 48 |
| 1.367 | Notas de Ahorro | 48 |
| 1.368 | OGP | 48 |
| 1.369 | Ordinary Course Employee Claim | 48 |
| 1.370 | Outperformance Condition | 48 |
| 1.371 | Outstanding | 49 |
| 1.372 | Oversight Board | 49 |
| 1.373 | Participant | 49 |
| 1.374 | PayGo | 49 |
| 1.375 | PBA | 49 |
| 1.376 | PBA Administrative Expense Claim | 49 |
| 1.377 | PBA Bond Claims | 49 |
| 1.378 | PBA Bond Distribution | 49 |
| 1.379 | PBA Bonds | 49 |
| 1.380 | PBA Cash | 49 |
| 1.381 | PBA/DRA Secured Claim | 49 |
| 1.382 | PBA/DRA Unsecured Claim | 49 |
| 1.383 | PBA General Unsecured Claim | 50 |
| 1.384 | PBA Litigation | 50 |
| 1.385 | PBA Petition Date | 50 |
| 1.386 | PBA Property | 50 |
| 1.387 | PBA Title III Case | 50 |
| 1.388 | Pension Reserve Deed of Trust | 50 |
| 1.389 | Pension Reserve Trust | 50 |
| 1.390 | Person | 50 |
| 1.391 | PFC | 50 |
| 1.392 | Plan | 50 |
| 1.393 | Plan Supplement | 50 |

### Table of Contents
### (Cont'd)

Page

1.394  Ports ...................................................................................................51
1.395  PRASA ...............................................................................................51
1.396  PREPA ...............................................................................................51
1.397  PRIDCO .............................................................................................51
1.398  PRIFA ................................................................................................51
1.399  PRIFA BANs ......................................................................................51
1.400  PRIFA BANs Commonwealth Guaranty .............................................51
1.401  PRIFA BANs Litigation ......................................................................51
1.402  PRIFA BANs Trustee ..........................................................................51
1.403  PRIFA Bond Claims ...........................................................................51
1.404  PRIFA Bonds .....................................................................................51
1.405  PRIFA Clawback CVI .........................................................................52
1.406  PRIFA Distribution Conditions ...........................................................52
1.407  PRIFA Order ......................................................................................52
1.408  PRIFA Plan ........................................................................................52
1.409  PRIFA Plan Support Agreement ..........................................................52
1.410  PRIFA PSA Creditors .........................................................................52
1.411  Professional .......................................................................................52
1.412  Professional Claim .............................................................................53
1.413  Projected Fiscal Plan Surplus .............................................................53
1.414  PROMESA .........................................................................................53
1.415  Pro Rata Share....................................................................................53
1.416  PSA Creditors ....................................................................................53
1.417  PSA Restriction Fees ..........................................................................53
1.418  Puerto Rico Investor ...........................................................................53
1.419  QTCB Group.......................................................................................54
1.420  Related Persons ..................................................................................54
1.421  Released Claims ..................................................................................54
1.422  Released Parties ..................................................................................55
1.423  Releasing Parties ................................................................................55
1.424  Reorganized Commonwealth ...............................................................55
1.425  Reorganized Debtors ...........................................................................55
1.426  Reorganized Debtors' By-Laws ...........................................................55
1.427  Restriction Fee Creditors ....................................................................55
1.428  Retail 2011 CW Bond Claim ...............................................................56
1.429  Retail 2011 CW Series D/E/PIB Bond Claim .......................................56
1.430  Retail 2011 PBA Bond Claim ..............................................................56
1.431  Retail 2012 CW Bond Claim ...............................................................56
1.432  Retail 2012 PBA Bond Claim ..............................................................56
1.433  Retail 2014 CW Bond Claim ...............................................................56
1.434  Retail CW Bond Claims.......................................................................56
1.435  Retail Investor ....................................................................................56
1.436  Retail PBA Bond Claims .....................................................................56
1.437  Retail Support Fee...............................................................................56

x

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 1.438 | Retail Support Fee Return | 57 |
| 1.439 | Retail Vintage CW Bond Claim | 57 |
| 1.440 | Retail Vintage PBA Bond Claim | 57 |
| 1.441 | Retired ERS Participant Above-Threshold Claim | 57 |
| 1.442 | Retired ERS Participant Below-Threshold Claim | 57 |
| 1.443 | Retired JRS Participant Above-Threshold Claim | 57 |
| 1.444 | Retired JRS Participant Below-Threshold Claim | 57 |
| 1.445 | Retired TRS Participant Above-Threshold Claim | 57 |
| 1.446 | Retired TRS Participant Below-Threshold Claim | 57 |
| 1.447 | Retiree | 58 |
| 1.448 | Retiree Claim | 58 |
| 1.449 | Retiree Committee | 58 |
| 1.450 | Retiree Committee Plan Support Agreement | 58 |
| 1.451 | Rum Tax CVI | 58 |
| 1.452 | Rum Tax CVI Indenture | 58 |
| 1.453 | Sales Tax | 58 |
| 1.454 | SCC Action | 58 |
| 1.455 | SEC | 58 |
| 1.456 | Section 510(b) Subordinated Claim | 58 |
| 1.457 | Securities Act | 59 |
| 1.458 | Solicitation Agent | 59 |
| 1.459 | SPU | 59 |
| 1.460 | Substitute Measured Tax | 59 |
| 1.461 | Syncora | 59 |
| 1.462 | Syncora Acceleration Price | 59 |
| 1.463 | Syncora Certificates | 59 |
| 1.464 | Syncora Commutation Consideration | 59 |
| 1.465 | Syncora Commutation Treatment | 59 |
| 1.466 | Syncora Escrow Account | 59 |
| 1.467 | Syncora Insured Bond Claims | 59 |
| 1.468 | Syncora Insured Bonds | 60 |
| 1.469 | Syncora Insurance Policies | 60 |
| 1.470 | Syncora Non-Commutation Treatment | 60 |
| 1.471 | Syncora Plan Consideration | 60 |
| 1.472 | Syncora Treatment | 60 |
| 1.473 | Syncora Trust | 60 |
| 1.474 | System 2000 | 60 |
| 1.475 | System 2000 Participant Claim | 60 |
| 1.476 | Taxable Bond Distributions | 60 |
| 1.477 | Taxable Election CW Claims | 60 |
| 1.478 | Taxable New GO Bonds | 60 |
| 1.479 | Tax Credit Claims | 61 |
| 1.480 | Tax-Supported Debt | 61 |
| 1.481 | Threshold | 61 |

**Table of Contents**
**(Cont'd)**

| | | |
|---|---|---|
| 1.482 | Title III | 61 |
| 1.483 | Title III Cases | 61 |
| 1.484 | Title III Court | 61 |
| 1.485 | TRS | 61 |
| 1.486 | Trustee Fiscal Agent | 62 |
| 1.487 | TRS Participant Claim | 62 |
| 1.488 | Trust Documentation | 62 |
| 1.489 | Unclaimed Distribution | 62 |
| 1.490 | Underwriter Actions | 62 |
| 1.491 | Unexpired Lease | 62 |
| 1.492 | Uniformity Litigation | 62 |
| 1.493 | UPR | 62 |
| 1.494 | Vintage CW Bond Claim | 62 |
| 1.495 | Vintage CW Bond Claim (Ambac) | 63 |
| 1.496 | Vintage CW Bond Claim (Assured) | 63 |
| 1.497 | Vintage CW Bond Claim (FGIC) | 63 |
| 1.498 | Vintage CW Bond Claim (National) | 63 |
| 1.499 | Vintage CW Bond Claim (Syncora) | 63 |
| 1.500 | Vintage CW Bond Claim (Taxable Election) | 63 |
| 1.501 | Vintage CW Bond Recovery | 63 |
| 1.502 | Vintage CW Bonds | 63 |
| 1.503 | Vintage CW Guarantee Bond Claim | 65 |
| 1.504 | Vintage CW Guarantee Bond Claim (Ambac) | 65 |
| 1.505 | Vintage CW Guarantee Bond Claim (Assured) | 65 |
| 1.506 | Vintage CW Guarantee Bond Claim (FGIC) | 65 |
| 1.507 | Vintage CW Guarantee Bond Claim (National) | 65 |
| 1.508 | Vintage CW Guarantee Bond Claim (Syncora) | 65 |
| 1.509 | Vintage CW Guarantee Bond Claim (Taxable Election) | 65 |
| 1.510 | Vintage CW Guarantee Bond Recovery | 66 |
| 1.511 | Vintage CW Guarantee Taxable Bond Distribution | 66 |
| 1.512 | Vintage PBA Bond Claim | 66 |
| 1.513 | Vintage PBA Bond Claim (Ambac) | 66 |
| 1.514 | Vintage PBA Bond Claim (Assured) | 66 |
| 1.515 | Vintage PBA Bond Claim (FGIC) | 66 |
| 1.516 | Vintage PBA Bond Claim (National) | 66 |
| 1.517 | Vintage PBA Bond Claim (Syncora) | 67 |
| 1.518 | Vintage PBA Bond Recovery | 67 |
| 1.519 | Vintage PBA Bonds | 67 |
| 1.520 | Vintage Taxable Bond Distribution | 68 |
| 1.521 | Voting Record Date | 68 |
| 1.522 | VTP Payroll Participant | 68 |
| 1.523 | VTP Payroll Participant Claim | 68 |
| 1.524 | VTP Payroll Participant Above-Threshold Claims | 68 |
| 1.525 | VTP Payroll Participant Below-Threshold Claims | 68 |

**Table of Contents**
**(Cont'd)**

1.526   GDB/PET ...................................................................................68
1.527   GDB/PET Claim ........................................................................68
1.528   COSSEC ...................................................................................68
1.529   Other Definitions .....................................................................69
1.530   Rules of Interpretation ............................................................69

ARTICLE II COMPROMISE AND SETTLEMENT OF
            DISPUTES/RESTRUCTURING OF ENTITIES ...............................69

2.1   Litigation Resolution ....................................................................69
2.2   Allowance of Bond Claims ...........................................................70
2.3   Releases, Injunctions and Exculpation ........................................71
2.4   Purchase and Sale of Certain ERS Assets....................................71

ARTICLE III PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE
             CLAIMS .........................................................................................71

3.1    Administrative Expense Claims....................................................71
3.2    Professional Compensation and Reimbursement Claims .............72
3.3    GO/PBA Consummation Costs .....................................................72
3.4    AFSCME and AMPR Professional Fees .......................................72
3.5    GO/PBA PSA Restriction Fee ......................................................72
3.6    Retail Support Fee .......................................................................74
3.7    ERS Restriction Fee.....................................................................74
3.8    CCDA Consummation Costs ........................................................74
3.9    CCDA Restriction Fee ..................................................................75
3.10   Non-Severability ..........................................................................76

ARTICLE IV CLASSIFICATION OF CLAIMS ................................................76

4.1   Claims are classified as follows...................................................76

ARTICLE V PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
            CLAIMS (CLASS 1) .......................................................................79

5.1   Treatment of Vintage PBA Bond Claims ....................................79

ARTICLE VI PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
             CLAIMS (ASSURED) (CLASS 2) ..................................................79

6.1   Treatment of Vintage PBA Bond Claims (Assured)....................79

ARTICLE VII PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
              CLAIMS (NATIONAL) (CLASS 3) ................................................80

7.1   Treatment of Vintage PBA Bond Claims (National)....................80

## Table of Contents
### (Cont'd)

ARTICLE VIII PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (AMBAC) (CLASS 4) ...........................................................................80

8.1    Treatment of Vintage PBA Bond Claims (Ambac) .................................80

ARTICLE IX PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (FGIC) (CLASS 5).............................................................................80

9.1    Treatment of Vintage PBA Bond Claims (FGIC)..................................80

ARTICLE X PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (SYNCORA) (CLASS 6)...................................................................80

10.1    Treatment of Vintage PBA Bond Claims (Syncora)..............................80

ARTICLE XI PROVISIONS FOR TREATMENT OF RETAIL  VINTAGE PBA BOND CLAIMS (CLASS 7)......................................................................81

11.1    Treatment of Retail Vintage PBA Bond Claims ...................................81

ARTICLE XII PROVISIONS FOR TREATMENT OF 2011 PBA BOND CLAIMS (CLASS 8) .............................................................................................81

12.1    Treatment of 2011 PBA Bond Claims ..................................................81

ARTICLE XIII PROVISIONS FOR TREATMENT OF RETAIL 2011  PBA BOND CLAIMS (CLASS 9) .......................................................................81

13.1    Treatment of Retail 2011 PBA Bond Claims .......................................81

ARTICLE XIV PROVISIONS FOR TREATMENT OF 2012 PBA BOND CLAIMS (CLASS 10) ...........................................................................................82

14.1    Treatment of 2012 PBA Bond Claims ..................................................82

ARTICLE XV PROVISIONS FOR TREATMENT OF RETAIL 2012 PBA BOND CLAIMS (CLASS 11) ...............................................................................82

15.1    Treatment of Retail 2012 PBA Bond Claims .......................................82

ARTICLE XVI PROVISIONS FOR TREATMENT OF  PBA/DRA SECURED CLAIMS (CLASS 12) ...............................................................................82

16.1    Treatment of PBA/DRA Secured Claims .............................................82

ARTICLE XVII PROVISIONS FOR TREATMENT OF PBA GENERAL UNSECURED CLAIMS (CLASS 13) ....................................................................82

17.1    Treatment of PBA General Unsecured Claims ......................................82

**Table of Contents**
**(Cont'd)**

ARTICLE XVIII PROVISIONS FOR TREATMENT OF PBA/DRA UNSECURED CLAIMS (CLASS 14) ...................................................................83

18.1     Treatment of PBA/DRA Unsecured Claims ...................................83

ARTICLE XIX PROVISIONS FOR TREATMENT OF VINTAGE CW BOND CLAIMS (CLASS 15) .............................................................................83

19.1     Treatment of Vintage CW Bond Claims ......................................83
19.2     Right of Election to Vintage CW Bond Claims (Taxable Election) ....................83

ARTICLE XX PROVISIONS FOR TREATMENT OF RETAIL VINTAGE CW BOND CLAIMS (CLASS 16) .......................................................84

20.1     Treatment of Retail Vintage CW Bond Claims ...........................84
20.2     Right of Election to Retail Vintage CW Bond Claims (Taxable Election) ...................................................................................84

ARTICLE XXI PROVISIONS FOR TREATMENT OF VINTAGE CW BOND CLAIMS (ASSURED) (CLASS 17) ............................................84

21.1     Treatment of Vintage CW Bond Claims (Assured) ....................84

ARTICLE XXII PROVISIONS FOR TREATMENT OF VINTAGE CW BOND CLAIMS (NATIONAL) (CLASS 18) .......................................85

22.1     Treatment of Vintage CW Bond Claims (National) ....................85

ARTICLE XXIII PROVISIONS FOR TREATMENT OF VINTAGE CW BOND CLAIMS (AMBAC) (CLASS 19) ...........................................85

23.1     Treatment of Vintage CW Bond Claims (Ambac) ......................85

ARTICLE XXIV PROVISIONS FOR TREATMENT OF VINTAGE CW BOND CLAIMS (FGIC) (CLASS 20) .............................................85

24.1     Treatment of Vintage CW Bond Claims (FGIC) .........................85

ARTICLE XXV PROVISIONS FOR TREATMENT OF VINTAGE CW BOND CLAIMS (SYNCORA) (CLASS 21) ........................................85

25.1     Treatment of Vintage CW Bond Claims (Syncora) .....................85

ARTICLE XXVI PROVISIONS FOR TREATMENT OF VINTAGE CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 22) .......................86

26.1     Treatment of Vintage CW Bond Claims (Taxable Election) ...............86

ARTICLE XXVII PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (CLASS 23) ....................................86

**Table of Contents**
**(Cont'd)**

| | | Page |
|---|---|---|
| 27.1 | Treatment of Vintage CW Guarantee Bond Claims | 86 |
| 27.2 | Right of Election to Vintage CW Guarantee Bond Claims (Taxable Election) | 86 |
| | **ARTICLE XXVIII PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (ASSURED) (CLASS 24)** | 86 |
| 28.1 | Treatment of Vintage CW Guarantee Bond Claims (Assured) | 86 |
| | **ARTICLE XXIX PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (NATIONAL) (CLASS 25)** | 87 |
| 29.1 | Treatment of Vintage CW Guarantee Bond Claims (National) | 87 |
| | **ARTICLE XXX PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (AMBAC) (CLASS 26)** | 87 |
| 30.1 | Treatment of Vintage CW Guarantee Bond Claims (Ambac) | 87 |
| | **ARTICLE XXXI PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (FGIC) (CLASS 27)** | 87 |
| 31.1 | Treatment of Vintage CW Guarantee Bond Claims (FGIC) | 87 |
| | **ARTICLE XXXII PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (SYNCORA) (CLASS 28)** | 87 |
| 32.1 | Treatment of Vintage CW Guarantee Bond Claims (Syncora) | 87 |
| | **ARTICLE XXXIII PROVISIONS FOR TREATMENT OF VINTAGE CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 29)** | 88 |
| 33.1 | Treatment of Vintage CW Guarantee Bond Claims (Taxable Election) | 88 |
| | **ARTICLE XXXIV PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (CLASS 30)** | 88 |
| 34.1 | Treatment of 2011 CW Bond Claims | 88 |
| 34.2 | Right of Election to 2011 CW Bond Claims (Taxable Election) | 88 |
| | **ARTICLE XXXV PROVISIONS FOR TREATMENT OF RETAIL 2011 CW BOND CLAIMS (CLASS 31)** | 88 |
| 35.1 | Treatment of Retail 2011 CW Bond Claims | 88 |
| 35.2 | Right of Election to Retail 2011 CW Bond Claims (Taxable Election) | 89 |

**Table of Contents**
**(Cont'd)**

| | | Page |
|---|---|---|

ARTICLE XXXVI PROVISIONS FOR TREATMENT OF 2011 CW  BOND CLAIMS (ASSURED) (CLASS 32) ....................................................89

    36.1   Treatment of 2011 CW Bond Claims (Assured)......................................89

ARTICLE XXXVII PROVISIONS FOR TREATMENT OF 2011 CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 33) ...............................................89

    37.1   Treatment of 2011 CW Bond Claims (Taxable Election) ....................89

ARTICLE XXXVIII PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE BOND CLAIMS (CLASS 34) ...................................................90

    38.1   Treatment of 2011 CW Guarantee Bond Claims................................90
    38.2   Right of Election to 2011 CW Guarantee Bond Claims (Taxable Election)............................................................................................90

ARTICLE XXXIX PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 35) ...................................90

    39.1   Treatment of 2011 CW Guarantee Bond Claims (Taxable Election)...................90

ARTICLE XL PROVISIONS FOR TREATMENT OF 2011  CW SERIES D/E/PIB BOND CLAIMS (CLASS 36)..............................................................90

    40.1   Treatment of 2011 CW Series D/E/PIB Bond Claims...........................90
    40.2   Right of Election to 2011 CW Series D/E/PIB Bond Claims (Taxable Election)...................................................................................91

ARTICLE XLI PROVISIONS FOR TREATMENT OF 2011 CW SERIES  D/E/PIB BOND CLAIMS  (ASSURED) (CLASS 37) ..........................................91

    41.1   Treatment of 2011 CW Series D/E/PIB Bond Claims (Assured).........................91

ARTICLE XLII PROVISIONS FOR TREATMENT OF RETAIL 2011  CW SERIES D/E/PIB BOND CLAIMS (CLASS 38) ...............................................91

    42.1   Treatment of Retail 2011 CW Series D/E/PIB Bond Claims ...............................91
    42.2   Right of Election to Retail 2011 CW Series D/E/PIB Bond Claims (Taxable Election)..................................................................................91

ARTICLE XLIII PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND  CLAIMS (TAXABLE ELECTION) (CLASS 39) ...................................92

    43.1   Treatment of 2011 CW Series D/E/PIB Bond Claims (Taxable Election)................................................................................................92

ARTICLE XLIV PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (CLASS 40) ..........................................................................................92

**Table of Contents**
**(Cont'd)**

                                                                                                      **Page**

44.1    Treatment of 2012 CW Bond Claims ................................................................. 92
44.2    Right of Election to 2012 CW Bond Claims (Taxable Election) ........................ 92

ARTICLE XLV PROVISIONS FOR TREATMENT OF RETAIL 2012  CW BOND
              CLAIMS (CLASS 41) ...................................................................... 93

45.1    Treatment of Retail 2012 CW Bond Claims ...................................................... 93
45.2    Right of Election to Retail 2012 CW Bond Claims (Taxable
              Election) ......................................................................................... 93

ARTICLE XLVI PROVISIONS FOR TREATMENT OF 2012  CW BOND
              CLAIMS (ASSURED) (CLASS 42) ................................................. 93

46.1    Treatment of 2012 CW Bond Claims (Assured) ................................................ 93

ARTICLE XLVII PROVISIONS FOR TREATMENT OF 2012 CW BOND
              CLAIMS (TAXABLE ELECTION) (CLASS 43) ............................. 94

47.1    Provisions for Treatment of 2012 CW Bond Claims (Taxable
              Election) ......................................................................................... 94

ARTICLE XLVIII PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE
              BOND CLAIMS (CLASS 44) .......................................................... 94

48.1    Treatment of 2012 CW Guarantee Bond Claims ............................................... 94
48.2    Right of Election to 2012 CW Guarantee Bond Claims (Taxable
              Election) ......................................................................................... 94

ARTICLE XLIX PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE
              BOND CLAIMS (TAXABLE ELECTION) (CLASS 45) ................. 94

49.1    Treatment of 2012 CW Guarantee Bond Claims (Taxable Election) ................. 94

ARTICLE L PROVISIONS FOR TREATMENT OF 2014  CW BOND CLAIMS
              (CLASS 46) ..................................................................................... 95

50.1    Treatment of 2014 CW Bond Claims ................................................................. 95
50.2    Right of Election to 2014 CW Bond Claims (Taxable Election) ........................ 95

ARTICLE LI PROVISIONS FOR TREATMENT OF  RETAIL 2014  CW BOND
              CLAIMS (CLASS 47) ...................................................................... 95

51.1    Treatment of Retail 2014 Bond Claims .............................................................. 95
51.2    Right of Election to Retail 2014 CW Bond Claims (Taxable
              Election) ......................................................................................... 95

ARTICLE LII PROVISIONS FOR TREATMENT OF 2014  CW BOND CLAIMS
              (TAXABLE ELECTION) (CLASS 48) ............................................. 96

**Table of Contents**
**(Cont'd)**

52.1 Provisions for Treatment of 2014 CW Bond Claims (Taxable Election)........................................................................................96

ARTICLE LIII PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE BOND CLAIMS (CLASS 49)..................................................96

53.1 Treatment of 2014 CW Guarantee Bond Claims.....................................96
53.2 Right of Election to 2014 CW Guarantee Bond Claims (Taxable Election)........................................................................................96

ARTICLE LIV PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 50).....................96

54.1 Treatment of 2014 CW Guarantee Bond Claims (Taxable Election)..................96

ARTICLE LV PROVISIONS FOR TREATMENT OF ACTIVE AND RETIRED EMPLOYEE RETIREMENT BENEFIT CLAIMS (CLASS 51A THROUGH 51L)..................................................................97

55.1 Treatment of Retired ERS Participant Below-Threshold Claims (Class 51A)........................................................................................97
55.2 Treatment of Retired JRS Participant Below-Threshold Claims (Class 51B)........................................................................................97
55.3 Treatment of Retired TRS Participant Below-Threshold Claims (Class 51C)........................................................................................97
55.4 Treatment of Retired ERS Participant Above-Threshold Claims (Class 51D)........................................................................................98
55.5 Treatment of Retired JRS Participant Above-Threshold Claims (Class 51E)........................................................................................98
55.6 Treatment of Retired TRS Participant Above-Threshold Claims (Class 51F)........................................................................................98
55.7 Treatment of Active ERS Participant Claims (Class 51G).....................99
55.8 Treatment of Active JRS Participant Claims (Class 51H)......................99
55.9 Treatment of Active TRS Participant Claims (Class 51I)......................100
55.10 Treatment of System 2000 Participant Claims (Class 51J)...................101
55.11 Treatment of VTP Payroll Participant Below-Threshold Claims (Class 51K):........................................................................................102
55.12 Treatment of VTP Payroll Participant Above-Threshold Claims (Class 51L):........................................................................................102

ARTICLE LVI PROVISIONS FOR TREATMENT OF AFSCME CLAIMS (CLASS 52)........................................................................................103

56.1 Treatment of AFSCME Claims .......................................................103

ARTICLE LVII PROVISIONS FOR TREATMENT OF DAIRY PRODUCER CLAIMS (CLASS 53)..................................................................104

**Table of Contents**
**(Cont'd)**

57.1  Treatment of Dairy Producer Claims .................................................104

ARTICLE LVIII PROVISIONS FOR TREATMENT OF CW EMINENT
DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 54) ...................104

58.1  Treatment of Eminent/Inverse Condemnation Domain Claims........................104

ARTICLE LIX PROVISIONS FOR TREATMENT OF  ENERGY INCENTIVE
CLAIMS (CLASS 55) ...........................................................105

59.1  Treatment of Energy Incentive Claims ................................................105

ARTICLE LX PROVISIONS FOR TREATMENT OF  MED CENTER CLAIMS
(CLASS 56) ..................................................................105

60.1  Treatment of Med Center Claims ......................................................105
60.2  Dismissal of Med Center Litigation..................................................106

ARTICLE LXI PROVISIONS FOR TREATMENT OF  TAX CREDIT CLAIMS
(CLASS 57) ..................................................................106

61.1  Treatment of Tax Credit Claims ......................................................106

ARTICLE LXII PROVISIONS FOR TREATMENT OF CW GENERAL
UNSECURED  CLAIMS AND GDB/PET CLAIM (CLASSES 58
AND 58A)..................................................................106

62.1  Treatment of CW General Unsecured Claims .....................................106
62.2  Limitation on Recovery .............................................................107
62.3  GUC Reserve .......................................................................107
62.4  Treatment of GDB/PET Claims .....................................................108

ARTICLE LXIII PROVISIONS FOR TREATMENT  OF CW/HTA CLAIMS
(CLASS 59) ..................................................................108

63.1  Treatment of CW/HTA Claims.........................................................108
63.2  Distribution of the CW/HTA Clawback Recovery............................108

ARTICLE LXIV PROVISIONS FOR TREATMENT OF CW/CONVENTION
CENTER CLAIMS (CLASS 60)...............................................109

64.1  Treatment of CW/Convention Center Claims....................................109

ARTICLE LXV PROVISIONS FOR TREATMENT OF CW/PRIFA RUM TAX
CLAIMS (CLASS 61) ........................................................109

65.1  Treatment of CW/PRIFA Rum Tax Claims...........................................109
65.2  Distribution of the Beneficial Interests in the PRIFA Trust ................110

**Table of Contents**
**(Cont'd)**

Page

ARTICLE LXVI PROVISIONS FOR TREATMENT OF  CW/MBA CLAIMS
(CLASS 62) ...............................................................................................110

66.1    Treatment of CW/MBA Claims ......................................................110

ARTICLE LXVII PROVISIONS FOR TREATMENT OF CW APPROPRIATIONS
CLAIMS (CLASS 63) ...............................................................................110

67.1    Treatment of CW Appropriations Claims .....................................110

ARTICLE LXVIII PROVISIONS FOR TREATMENT OF SECTION 510(b)
SUBORDINATED CLAIMS (CLASS 64) ...............................................110

68.1    Treatment of Section 510(b) Subordinated Claims ......................110

ARTICLE LXIX PROVISIONS FOR TREATMENT OF ERS BOND CLAIMS
(CLASS 65) ...............................................................................................111

69.1    Treatment of ERS Bond Claims ...................................................111
69.2    ERS Private Equity Portfolio ........................................................111
69.3    Dismissal of Litigation .................................................................112

ARTICLE LXX PROVISIONS FOR TREATMENT OF ERS GENERAL
UNSECURED CLAIMS (CLASS 66) ......................................................112

70.1    Treatment of ERS General Unsecured Claims .............................112
70.2    Limitation on Recovery ................................................................113

ARTICLE LXXI PROVISIONS FOR TREATMENT OF GRACIA GRACIA
CLAIMS (CLASS 67) ...............................................................................113

71.1    Treatment of Gracia Gracia Claims ..............................................113

ARTICLE LXXII PROVISIONS FOR TREATMENT OF CONVENIENCE
CLAIMS (CLASS 68) ...............................................................................113

72.1    Treatment of Convenience Claims ................................................113

ARTICLE LXXIII PROVISIONS FOR TREATMENT  OF FEDERAL CLAIMS
(CLASS 69) ...............................................................................................114

73.1    Treatment of Federal Claims: .......................................................114

ARTICLE LXXIV PROVISIONS REGARDING NEW GO BONDS,  CVIS AND
ADDITIONAL INDEBTEDNESS ............................................................114

74.1    Issuance and Distribution of the New GO Bonds ........................114
74.2    Issuance and Distribution of the CVIs ..........................................118
74.3    Tax-Exempt Treatment of the New GO Bonds .............................119
74.4    Comprehensive Cap on All Net Tax-Supported Debt ..................120

**Table of Contents**
**(Cont'd)**

74.5    Adoption and Maintenance of a Debt Management Policy ...................................121

ARTICLE LXXV PROVISIONS REGARDING ASSURED INSURED BONDS,
           NATIONAL INSURED BONDS, SYNCORA INSURED BONDS,
           AMBAC INSURED BONDS AND FGIC INSURED BONDS .......................122

75.1    Treatment of Assured Insured Bond Claims...............................................122
75.2    Treatment of National Insured Bond Claims..............................................125
75.3    Treatment of Syncora Insured Bond Claims..............................................127
75.4    Treatment of FGIC Insured Bond Claims..................................................129
(a)    FGIC Insured Bond Claims Treatment:.....................................................129
75.5    Treatment of Ambac Insured Bond Claims ...............................................131

ARTICLE LXXVI TREATMENT OF EXECUTORY CONTRACTS AND
           UNEXPIRED LEASES ...................................................................................134

76.1    Rejection or Assumption of Remaining Executory Contracts and
         Unexpired Leases.........................................................................................134
76.2    Approval of Rejection or Assumption of Executory Contracts and
         Unexpired Leases.........................................................................................134
76.3    Inclusiveness................................................................................................134
76.4    Cure of Defaults...........................................................................................135
76.5    Insurance Policies ........................................................................................135
76.6    Rejection Damage Claims............................................................................135
76.7    Indemnification and Reimbursement Obligations .......................................135
76.8    Nonoccurrence of Effective Date.................................................................136
76.9    Reservation of Rights...................................................................................136
76.10  Collective Bargaining Agreements ..............................................................136

ARTICLE LXXVII PROVISIONS GOVERNING DISTRIBUTIONS .........................136

77.1    Time and Manner of Distribution ................................................................136
77.2    Timeliness of Payments...............................................................................137
77.3    Distributions by the Disbursing Agent .......................................................137
77.4    Manner of Payment under the Plan..............................................................138
77.5    Delivery of Distributions .............................................................................138
77.6    Cancellation of Notes, Instruments, Certificates, and Other
         Documents....................................................................................................138
77.7    Undeliverable/Reserved Distributions ........................................................139
77.8    Withholding and Reporting Requirements ..................................................140
77.9    Time Bar to Cash Payments.........................................................................140
77.10  Distributions After Effective Date ..............................................................140
77.11  Setoffs .........................................................................................................140
77.12  Allocation of Plan Distributions Between Principal and Interest .....................141
77.13  Payment of Trustee Fees and Expenses.......................................................141
77.14  Beneficial Owner ........................................................................................141

77.15  Value of Distributions .................................................................142

ARTICLE LXXVIII AVOIDANCE ACTIONS TRUST .......................................142

78.1  Execution of Avoidance Actions Trust Agreement .............................142
78.2  Purpose of the Avoidance Actions Trust ..........................................142
78.3  Avoidance Actions Trust Assets .....................................................142
78.4  Administration of the Avoidance Actions Trust .................................143
78.5  The Avoidance Actions Trustee .......................................................143
78.6  Role of the Avoidance Actions Trustee ............................................143
78.7  Avoidance Actions Trustee's Tax Power for Debtors .........................143
78.8  Transferability of Avoidance Actions Trust Interests ........................143
78.9  Cash .........................................................................................143
78.10  Distribution of Avoidance Actions Trust Assets ..............................144
78.11  Funding, Costs and Expenses of the Avoidance Actions Trust ...........144
78.12  Compensation of the Avoidance Actions Trustee .............................144
78.13  Retention of Professionals/Employees by the Avoidance Actions
Trustee ....................................................................................144
78.14  Federal Income Tax Treatment of the Avoidance Actions Trust .........144
78.15  Indemnification of Avoidance Actions Trustee and Members of
Avoidance Actions Trust Bond ....................................................147

ARTICLE LXXIX PROSECUTION AND EXTINGUISHMENT OF CLAIMS
HELD BY THE DEBTORS ....................................................................148

79.1  Prosecution of Claims .................................................................148

ARTICLE LXXX ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
REJECTION BY ONE OR MORE CLASSES OF CLAIMS ...........................148

80.1  Impaired Classes to Vote .............................................................148
80.2  Acceptance by Class of Creditors ..................................................148
80.3  Cramdown .................................................................................148

ARTICLE LXXXI RIGHTS AND POWERS OF DISBURSING AGENT ...............149

81.1  Exculpation ...............................................................................149
81.2  Powers of the Disbursing Agent ....................................................149
81.3  Fees and Expenses Incurred From and After the Effective Date ..........149

ARTICLE LXXXII PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS
AND CLAIMS SUBJECT TO ACR PROCEDURES .....................................149

82.1  Objections to Claims; Prosecution of Disputed Claims ......................149
82.2  Estimation of Claims ...................................................................150
82.3  Payments and Distributions on Disputed Claims ..............................151
82.4  Authority to Amend Lists of Creditors ...........................................151

**Table of Contents**
**(Cont'd)**

                                                                                                              **Page**

82.5     Non-Accrual of Interest ...................................................................152
82.6     Disallowance of Claims ...................................................................152
82.7     Claims Subject to ACR Procedures ..................................................152
82.8     National Action Claims.....................................................................152

ARTICLE LXXXIII GOVERNANCE AND PROVISIONS REGARDING
            PENSION RESERVE AND PENSION SYSTEM..............................153

83.1     Formation and Responsibilities of the Pension Reserve....................153
83.2     Funding of the Pension Reserve Trust ..............................................153
83.3     Non-Impairment Covenant ...............................................................154
83.4     Maintenance of Pension ...................................................................154

ARTICLE LXXXIV IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN
            AND NOT IMPAIRED BY THE PLAN...........................................155

84.1     Impaired Classes ..............................................................................155
84.2     Unimpaired Classes ..........................................................................155

ARTICLE LXXXV CONDITIONS PRECEDENT TO CONFIRMATION OF THE
            PLAN .............................................................................................155

85.1     Conditions Precedent to Confirmation of the Plan ..........................155
85.2     Waiver of Conditions Precedent to Confirmation ............................156

ARTICLE LXXXVI CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.................157

86.1     Conditions Precedent to the Effective Date ......................................157
86.2     Waiver of Conditions Precedent .......................................................160
86.3     Effect of Non-Occurrence of Conditions to Effective Date..............161

ARTICLE LXXXVII MODIFICATION, REVOCATION, OR WITHDRAWAL OF
            THE PLAN .....................................................................................161

87.1     Modification of Plan .........................................................................161
87.2     Revocation or Withdrawal ................................................................161
87.3     Amendment of Plan Documents .......................................................161
87.4     No Admission of Liability .................................................................161

ARTICLE LXXXVIII CORPORATE GOVERNANCE AND  MANAGEMENT OF
            REORGANIZED DEBTORS ..........................................................162

88.1     Corporate Action...............................................................................162
88.2     Dissolution of ERS ...........................................................................163
88.3     Officers of Reorganized Debtors ......................................................163
88.4     PBA and CCDA Governance Structure.............................................163

xxiv

**Table of Contents**
**(Cont'd)**

ARTICLE LXXXIX PROVISIONS REGARDING OVERSIGHT BOARD AND COMPLIANCE WITH PROMESA .............................................163

89.1    Effect of Confirmation ................................................................163
89.2    Ongoing Role of the Oversight Board .........................................163
89.3    Preemption of Laws .....................................................................163

ARTICLE XC PROVISIONS REGARDING COMMITTEES ....................................164

90.1    Dissolution of Committees ..........................................................164

ARTICLE XCI RETENTION OF JURISDICTION ....................................................164

91.1    Retention of Jurisdiction .............................................................164

ARTICLE XCII MISCELLANEOUS PROVISIONS..................................................166

92.1    Title to Assets ..............................................................................166
92.2    Discharge and Release of Claims and Causes of Action ............167
92.3    Injunction on Claims....................................................................170
92.4    Integral to Plan ............................................................................170
92.5    Releases by the Debtors and Reorganized Debtors .....................170
92.6    Injunction Related to Releases .....................................................170
92.7    Exculpation ..................................................................................171
92.8    Appointments Related Litigation/Uniformity Litigation .............173
92.9    Bar Order......................................................................................174
92.10   No Waiver.....................................................................................174
92.11   Supplemental Injunction .............................................................174
92.12   Post-Effective Date Fees and Expenses ......................................175
92.13   Securities Act Exemption ............................................................175
92.14   Severability ..................................................................................176
92.15   Governing Law .............................................................................176
92.16   Closing Case ................................................................................176
92.17   Section Headings .........................................................................176
92.18   Inconsistencies ............................................................................176
92.19   Document Retention .....................................................................176
92.20   Immediate Binding Effect............................................................176
92.21   Additional Documents .................................................................177
92.22   Reservation of Rights...................................................................177
92.23   Successors and Assigns................................................................177
92.24   Notices .........................................................................................177
92.25   Term of Injunctions or Stays.......................................................180
92.26   Entire Agreement .........................................................................180
92.27   Plan Supplement ..........................................................................180

The Financial Oversight and Management Board for Puerto Rico, as Title III representative of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority pursuant to Section 315(b) of the *Puerto Rico Oversight, Management and Economic Stability Act*, hereby proposes the following joint plan of adjustment.

# ARTICLE I

# DEFINITIONS

As used in the Plan, the following terms have the respective meanings set forth below and are equally applicable to the singular and plural of the terms defined:

1.1 **2011 CW Bond Claim:** A Claim against the Commonwealth on account of 2011 CW Bonds, other than a 2011 CW Bond Claim (Assured) or a Retail 2011 CW Bond Claim.

1.2 **2011 CW Bond Claim (Assured):** A Claim against the Commonwealth on account of 2011 CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.3 **2011 CW Bond Claim (Taxable Election):** A 2011 CW Bond Claim or Retail 2011 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Bond Claim shall be a 2011 CW Bond Claim (Taxable Election) up to such 2011 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 CW Bond Claim.

1.4 **2011 CW Bond Recovery:** The aggregate recovery by holders of Allowed 2011 CW Bond Claims, Allowed 2011 CW Bond Claims (Assured), and Allowed Retail 2011 CW Bond Claims on account of any such Claims, consisting of (a) One Hundred Forty-Eight Million Eight Hundred Thirty-Three Thousand Seven Hundred Thirty Dollars and Ninety-Five Cents ($148,833,730.95) in Cash, (b) One Hundred Seventy-Nine Million One Hundred Ninety-Three Thousand Four Hundred Twenty-Five Dollars ($179,193,425.00) in original principal amount of New GO CIBs, (c) Eleven Million Eight Hundred Sixty-Four Thousand Five Hundred Ten Dollars and Ninety-Five Cents ($11,864,510.95) in original principal amount of New GO 5.375% CABs, (d) Seven Million Seven Hundred Twenty-Eight Thousand Three Hundred Sixty Dollars and Thirty-Five Cents ($7,728,360.35) in original principal amount of New GO 5.0% CABs, and (e) two and four hundred seventy-nine one thousandths percent (2.479%) of the GO CVIs.

1.5 **2011 CW Bonds:** Collectively, (a) the Public Improvement Refunding Bonds, Series 2011 C, issued by the Commonwealth in the original principal amount of Four Hundred Forty-Two Million Fifteen Thousand Dollars ($442,015,000.00), and (b) Notas de Ahorro issued in 2011 in the aggregate outstanding principal amount of Fifty-Three Thousand Eight Hundred Dollars ($53,800.00).

1.6  **2011 CW Guarantee Bond Claim:**  A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation, or resolution of the Commonwealth Legislature, of (a) an affiliate, agency, or instrumentality indebtedness, which guarantee was executed, delivered or enacted pursuant to legislation or resolution during the period from January 1, 2011 up to and including December 31, 2011, and (b) the 2011 PBA Bonds; provided, however, that, solely for purposes of distribution in accordance with, but not voting with respect to, the Plan, the amount of a holder's 2011 CW Guarantee Bond Claim with respect to the Commonwealth's guarantee of such 2011 PBA Bond Claim shall be calculated as the amount of such holder's 2011 PBA Bond Claim minus the amount of such holder's 2011 PBA Bond Recovery.

1.7  **2011 CW Guarantee Bond Claim (Taxable Election):**  A 2011 CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Guarantee Bond Claim shall be a 2011 CW Guarantee Bond Claim (Taxable Election) up to such 2011 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 CW Guarantee Bond Claim.

1.8  **2011 CW Guarantee Bond Recovery:**  The aggregate recovery by holders of Allowed 2011 CW Guarantee Bond Claims, consisting of (a) Three Hundred Twenty-Three Million Five Hundred Twenty-Three Thousand Nine Hundred Two Dollars and Fifty Cents ($323,523,902.50) in Cash, (b) Three Hundred Eighty-Nine Million Five Hundred Seventeen Thousand Five Hundred Ninety-Two Dollars ($389,517,592.00) in original principal amount of New GO CIBs, (c) Twenty-Five Million Seven Hundred Ninety Thousand Two Hundred Eight Dollars and Forty-Six Cents ($25,790,208.46) in original principal amount of New GO 5.375% CABs, (d) Sixteen Million Seven Hundred Ninety-Nine Thousand Three Hundred Forty-Six Dollars and Seventy-Seven Cents ($16,799,346.77) in original principal amount of New GO 5.0% CABs, and (e) seven and five hundred fifty-two one thousandths percent (7.552%) of the GO CVIs.

1.9  **2011 CW Guarantee Taxable Bond Distribution:**  The distribution to be made to each holder of an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 39.1 hereof.

1.10  **2011 CW Series D/E/PIB Bond Claim:**  A Claim against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds, other than a 2011 CW Series D/E/PIB Bond Claim (Assured) or a Retail 2011 CW Series D/E/PIB Bond Claim.

1.11  **2011 CW Series D/E/PIB Bond Claim (Assured):**  A Claim against the Commonwealth on account of 2011 CW Series D/E/PIB Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market policy.

1.12  **2011 CW Series D/E/PIB Bond Claim (Taxable Election):**  A 2011 CW Series D/E/PIB Bond Claim or Retail 2011 CW Series D/E/PIB Bond Claim, the holder of which is a

2

Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2011 CW Series D/E/PIB Bond Claim shall be a 2011 CW Series D/E/PIB Bond Claim (Taxable Election) up to such 2011 CW Series D/E/PIB Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2011 Series CW D/E/PIB CW Bond Claim.

1.13 **2011 CW Series D/E/PIB Bond Recovery:** The aggregate recovery by holders of Allowed 2011 CW Series D/E/PIB Bond Claims, Allowed 2011 CW Series D/E/PIB Bond Claims (Assured) and Allowed Retail 2011 CW Series D/E/PIB Bond Claims on account of such Claims, consisting of (a) Two Hundred Eleven Million Three Hundred Fifty-Five Thousand Thirty-Five Dollars and Seventy-Four Cents ($211,355,035.74) in Cash, (b) Two Hundred Fifty-Four Million Four Hundred Sixty-Eight Thousand Seventy-Four Dollars ($254,468,074.00) in original principal amount of New GO CIBs, (c) Sixteen Million Eight Hundred Forty-Eight Thousand Four Hundred Ninety-Three Dollars and Eighty-Four Cents ($16,848,493.84) in original principal amount of New GO 5.375% CABs, (d) Ten Million Nine Hundred Seventy-Four Thousand Eight Hundred Fifty Dollars and Thirty Cents ($10,974,850.30) in original principal amount of New GO 5.0% CABs, and (e) three and five hundred fourteen one thousandths percent (3.514%) of the GO CVIs.

1.14 **2011 CW Series D/E/PIB Bonds:** Collectively, (a) the Public Improvement Bonds of 2011, issued by the Commonwealth in the original principal amount of Three Hundred Four Million Dollars ($304,000,000.00), (b) the Public Improvement Refunding Bonds, Series 2011D, issued by the Commonwealth in the original principal amount of Fifty-Two Million One Hundred Ninety Thousand Dollars ($52,190,000.00), and (c) the Public Improvement Refunding Bonds, Series 2011E, issued by the Commonwealth in the original principal amount of Two Hundred Forty-Five Million Nine Hundred Fifteen Thousand Dollars ($245,915,000.00).

1.15 **2011 CW Series D/E/PIB Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 43.1 hereof.

1.16 **2011 CW Taxable Bond Distribution:** The distribution to be made to each holder of an Allowed 2011 CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 37.1 hereof.

1.17 **2011 PBA Bond Claim:** A Claim against PBA on account of the 2011 PBA Bonds, other than a Retail 2011 PBA Bond Claim.

1.18 **2011 PBA Bond Recovery:** The aggregate recovery by holders of Allowed 2011 PBA Bond Claims and Allowed Retail 2011 PBA Bond Claims totaling Three Hundred Six Million Seven Hundred Sixty-Eight Thousand Nine Hundred Eleven Dollars and Seventy-Two Cents ($306,768,911.72) in Cash.

1.19     **2011 PBA Bonds:**  Collectively, (a) the Government Facilities Revenue Bonds, Series R, (Qualified School Construction Bonds), issued by PBA in the original principal amount of Seven Hundred Fifty-Six Million Four Hundred Forty-Nine Thousand Dollars ($756,449,000.00), (b) the Government Facilities Revenue Bonds, Series S, issued by PBA in the original principal amount of Three Hundred Three Million Nine Hundred Forty-Five Thousand Dollars ($303,945,000.00), and (c) the Government Facilities Revenue Bonds, Series T (Qualified Zone Academy Bonds), issued by PBA in the original principal amount of One Hundred Twenty-One Million Five Hundred Twenty-Eight Thousand Dollars ($121,528,000.00), the repayment of which is guaranteed by the Commonwealth.

1.20     **2012 CW Bond Claim:**  A Claim against the Commonwealth on account of 2012 CW Bonds, other than a 2012 CW Bond Claim (Assured) or a Retail 2012 CW Bond Claim.

1.21     **2012 CW Bond Claim (Assured):**  A Claim against the Commonwealth on account of 2012 CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy**.**

1.22     **2012 CW Bond Claim (Taxable Election):**  A 2012 CW Bond Claim and Retail 2012 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; <u>provided</u>, <u>however</u>, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2012 CW Bond Claim shall be a 2012 CW Bond Claim (Taxable Election) up to such 2012 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2012 CW Bond Claim.

1.23     **2012 CW Bond Recovery**:  The aggregate recovery by holders of Allowed 2012 CW Bond Claims, Allowed 2012 CW Bond Claims (Assured), and Allowed Retail 2012 CW Bond Claims on account of any such Claims, consisting of (a) Nine Hundred Nine Million Nine Hundred Twelve Thousand Six Hundred Seventy-Nine Dollars and Seventy-Three Cents ($909,912,679.73) in Cash, (b) One Billion Ninety-Five Million Five Hundred Twenty Thousand Two Hundred Seventy-Seven Dollars ($1,095,520,277.00) in original principal amount of New GO CIBs, (c) Seventy-Two Million Five Hundred Thirty-Five Thousand Ninety-Six Dollars and Ninety-Six Cents ($72,535,096.96) in original principal amount of New GO 5.375% CABs, (d) Forty-Seven Million Two Hundred Forty-Eight Thousand Two Hundred Fifty-One Dollars ($47,248,251.00) in original principal amount of New GO 5.0% CABs, and (e) fifteen and one hundred fifty-seven one thousandths percent (15.157%) of the GO CVIs.

1.24     **2012 CW Bonds:**  Collectively, (a) the Public Improvement Refunding Bonds, Series 2012 A, issued by the Commonwealth in the original principal amount of Two Billion Three Hundred Eighteen Million One Hundred Ninety Thousand Dollars ($2,318,190,000.00), (b) the Public Improvement Refunding Bonds, Series 2012 B, issued by the Commonwealth in the original principal amount of Four Hundred Fifteen Million Two Hundred Seventy Thousand Dollars ($415,270,000.00), (c) the GSA Helicopter Loan, (d) Hacienda loans (Loan ID Nos. 200017-215-001-003-47, 200017-215-001-003-48, 200017-215-001-003-53 and 200017-215-001-003-56), which, as of the Commonwealth Petition Date, were in the aggregate outstanding

principal amount of One Hundred Sixty-Nine Million Four Hundred Thirty-Eight Thousand
Thirty-Seven Dollars and Seventy-Six Cents ($169,438,037.76) and (e) Notas de Ahorro issued in
2012 in the outstanding principal amount of Two Million Five Hundred Thirty-Three Thousand
Fifty Dollars ($2,533,050.00).

1.25    **2012 CW Guarantee Bond Claim:** A Claim against the Commonwealth on
account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by
action, legislation or resolution of the Commonwealth Legislature, of (a) an affiliate, agency or
instrumentality indebtedness, which guarantee was executed, delivered or enacted pursuant to
legislation or resolution during the period from January 1, 2012 up to and including December 31,
2013, and (b) the 2012 PBA Bonds; provided, however, that, solely for purposes of distribution
under, but not voting with respect to, the Plan, the amount of a holder's 2012 CW Guarantee Bond
Claim in respect of the Commonwealth's guarantee of such 2012 PBA Bonds shall be measured as
the amount of such holder's 2012 PBA Bond Claim minus the amount of such holder's PBA Bond
Distribution on account of 2012 PBA Bonds.

1.26    **2012 CW Guarantee Bond Claim (Taxable Election):** A 2012 CW Guarantee
Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive
a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions
are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in
excess of the Maximum Taxable Bond Election Amount, such 2012 CW Guarantee Bond Claim
shall be a 2012 CW Guarantee Bond Claim (Taxable Election) up to such 2012 CW Guarantee
Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder
thereof shall be a 2012 CW Guarantee Bond Claim.

1.27    **2012 CW Guarantee Bond Recovery:** The aggregate recovery by holders of
Allowed 2012 CW Guarantee Bond Claims, consisting of (a) One Hundred Forty-Nine Million
Seven Hundred Thousand Twenty-Seven Dollars and Twenty-Four Cents ($149,700,027.24) in
Cash, (b) One Hundred Eighty Million Two Hundred Thirty-Six Thousand Four Hundred Thirty-
Four Dollars ($180,236,434.00) in original principal amount of New GO CIBs, (c) Eleven Million
Nine Hundred Thirty-Three Thousand Five Hundred Sixty-Nine Dollars and Fifty-Four Cents
($11,933,569.54) in original principal amount of New GO 5.375% CABs, (d) Seven Million Seven
Hundred Seventy-Three Thousand Three Hundred Forty-Four Dollars and Thirty Cents
($7,773,344.30) in original principal amount of New GO 5.0% CABs, and (e) three and five
hundred ninety-four one thousandths percent (3.594%) of the GO CVIs.

1.28    **2012 CW Guarantee Taxable Bond Distribution:** The distribution to be made
to each holder of an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) in accordance
with the terms and provisions of Section 49.1 hereof.

1.29    **2012 CW Taxable Bond Distribution:** The distribution to be made to each
holder of an Allowed 2012 CW Bond Claim (Taxable Election) in accordance with the terms and
provisions of Section 47.1 hereof.

1.30    **2012 PBA Bond Claim:** A Claim against PBA on account of 2012 PBA Bonds,
other than a Retail 2012 PBA Bond Claim.

1.31     **2012 PBA Bond Recovery:**  The aggregate recovery by holders of Allowed 2012 PBA Bond Claims, and Allowed Retail 2012 PBA Bond Claims on account of such Claims, One Hundred Fifty-Four Million Eight Hundred Ninety-Nine Thousand Nine Hundred Two Dollars and Twenty-Three Cents ($154,899,902.23) in Cash.

1.32     **2012 PBA Bonds:**  Collectively, the Government Facilities Revenue Refunding Bonds, Series U, issued by PBA in the original principal amount of Five Hundred Eighty-Two Million Three Hundred Forty-Five Thousand Dollars ($582,345,000.00).

1.33     **2014 CW Bond Claim:**  A Claim against the Commonwealth on account of the 2014 CW Bonds, other than a Retail 2014 CW Bond Claim.

1.34     **2014 CW Bond Claim (Taxable Election):**  A 2014 CW Bond Claim and Retail 2014 CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2014 CW Bond Claim shall be a 2014 CW Bond Claim (Taxable Election) up to such 2014 CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2014 CW Bond Claim.

1.35     **2014 CW Bond Recovery:**  The aggregate recovery by holders of Allowed 2014 CW Bond Claims, Allowed 2014 CW Guarantee Bond Claims and Allowed Retail 2014 CW Bond Claims on account of any such Claims, consisting of (a) One Billion Two Hundred Thirteen Million Four Hundred Seventy-Eight Thousand Eight Hundred Seventy-Seven Dollars and Thirty-Five Cents ($1,213,478,877.35) in Cash, (b) One Billion Four Hundred Sixty-One Million Nine Thousand One Hundred Twelve Dollars ($1,461,009,112.00) in original principal amount of New GO CIBs, (c) Ninety-Six Million Seven Hundred Thirty-Four Thousand Three Hundred Forty-Six Dollars ($96,734,346.00) in original principal amount of New GO 5.375% CABs, (d) Sixty-Three Million Eleven Thousand Two Hundred Seventy Dollars and Ninety-One Cents ($63,011,270.91) in original principal amount of New GO 5.0% CABs, and (e) twenty and two hundred sixty-six one thousandths percent (20.266%) of the GO CVIs.

1.36     **2014 CW Bonds:**  Collectively, the General Obligation Bonds of 2014, Series A, issued by the Commonwealth in the original principal amount of Three Billion Five Hundred Million Dollars ($3,500,000,000.00).

1.37     **2014 CW Guarantee Bond Claim:**  A Claim against the Commonwealth on account of the Commonwealth's full faith, credit and taxing power guarantee, as authorized by action, legislation or resolution of the Commonwealth Legislature, of (a) an affiliate, agency or instrumentality, which guarantee was executed, delivered or enacted during the period from January 1, 2014 up to, but not including, the Commonwealth Petition Date, (b) the Ports bond, which, as of the Commonwealth Petition Date, was in the outstanding principal amount of Two Hundred Twenty-Five Million Five Hundred Thirty-Three Thousand Seven Hundred Dollars and Forty-Five Cents ($225,533,700.45), and (c) PRIFA BANs, Series 2015, which, as of the

Commonwealth Petition Date, were in the outstanding principal amount of Seventy-Eight Million One Hundred Forty-Five Thousand Dollars ($78,145,000.00).

1.38     **2014 CW Guarantee Bond Claim (Taxable Election):**  A 2014 CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such 2014 CW Guarantee Bond Claim shall be a 2014 CW Guarantee Bond Claim (Taxable Election) up to such 2014 CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a 2014 CW Guarantee Bond Claim.

1.39     **2014 CW Guarantee Taxable Bond Distribution:**  The distribution to be made to each holder of an Allowed 2014 CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 54.1 hereof.

1.40     **2014 CW Taxable Bond Distribution:**  The distribution to be made to each holder of an Allowed 2014 CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 52.1 hereof.

1.41     **5.5% SUT:**  The present and future revenues and collections generated by the portion of the Sales Tax that corresponds to a tax rate of five and one-half percent (5.5%).

1.42     **AAFAF:**  Autoridad de Asesoría Financiera y Agencia Fiscal, a public corporation and instrumentality of the Commonwealth, whose name in English is the Puerto Rico Fiscal Agency and Financial Advisory Authority.

1.43     **ACR Order:**  That certain Order (A) Authorizing Administrative Reconciliation of Claims, (B) Approving Additional Form of Notice and (C) Granting Related Relief, dated March 12, 2020 [Case. No. 17-3283-LTS, ECF No. 12274].

1.44     **Act 106:**  Act 106 of 2017, which created the pay-as-you-go pension system known as "PayGo" and established a defined contribution retirement system to replace the retirement benefit plan pursuant to Act No. 12 of October 19, 1954, as amended, Act 3-2013, as amended, and Act 160-2013, as amended.

1.45     **Act 106 Board:**  The board created in accordance with Act 106.

1.46     **Active and Retired Employee Benefit Claim:**  A Retired ERS Participant Below-Threshold Claim, a Retired JRS Participant Below-Threshold Claim, a Retired TRS Participant Below-Threshold Claim, a Retired ERS Participant Above-Threshold Claim, a Retired JRS Participant Above-Threshold Claim, a Retired TRS Participant Above-Threshold Claim, an Active ERS Participant Claim, an Active JRS Participant Claim, an Active TRS Participant Claim, a System 2000 Participant Claim, a VTP Payroll Participant Below-Threshold Claim, and a VTP Payroll Participant Above-Threshold Claim.

1.47 **Active ERS Participant Claim:** An ERS Participant Claim held by an Active Participant, expressly excluding, however, any Participant benefitting from the provisions of either Act 70-2010 or Act 211-2015.

1.48 **Active JRS Participant Claim:** A JRS Participant Claim held by an Active Participant.

1.49 **Active Participant:** A Participant that is not a Retiree.

1.50 **Active TRS Participant Claim:** A TRS Participant Claim held by an Active Participant.

1.51 **Administrative Claim Bar Date:** Unless otherwise ordered by the Title III Court, the date established by the Title III Court and set forth in the Confirmation Order as the last day to file proof of Administrative Expense Claims, which date shall be no more than ninety (90) days after the Effective Date, after which date, any Administrative Expense Claim, proof of which has not been filed, shall be deemed forever barred, and the Debtors and Reorganized Debtors shall have no obligation with respect thereto; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Title III Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by any of the Debtors during the period from and after the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, or (e) is the subject of a pending motion seeking allowance of an administrative expense pursuant to Bankruptcy Code section 503(b) as of the entry of the Confirmation Order.

1.52 **Administrative Expense Claim:** A Claim against the Debtors or their Assets constituting a cost or expense of administration of the Title III Cases asserted or authorized to be asserted, on or prior to the Administrative Claim Bar Date, in accordance with sections 503(b) and 507(a)(2) of the Bankruptcy Code arising during the period up to and including the Effective Date, and otherwise complying with applicable Puerto Rico law, including, without limitation, subject to the occurrence of the Effective Date, and except as provided in Section 3.5 hereof, Consummation Costs and PSA Restriction Fees; provided, however, that, under no circumstances shall an Administrative Expense Claim include the PBA Administrative Expense Claim.

1.53 **ADR Order:** That certain Order (A) Authorizing Alternative Dispute Resolution Procedures, (B) Approving Additional Forms of Notice, (C) Approving Proposed Mailing, and (D) Granting Related Relief, dated April 1, 2020 [Case. No. 17-3283-LTS, ECF No. 12576].

1.54 **ADR Procedures:** The alternative dispute resolution procedures authorized pursuant to the ADR Order.

1.55 **Affiliate:** With respect to any specified Entity, any other Entity that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Entity.

8

1.56 **AFICA:** Puerto Rico Industrial, Tourist, Educational, Medical, and Environmental Control Facilities Financing Authority.

1.57 **AFSCME:** American Federation of State, County and Municipal Employees, for itself and on behalf of its two local chapters, SPU, AFSCME Council 95 and Capitulo de Retirados de SPU and their fourteen affiliated local unions in Puerto Rico.

1.58 **AFSCME CBAs:** Those certain collective bargaining agreements between AFSCME and the Commonwealth, and listed on Exhibit "G" hereto.

1.59 **AFSCME Claims:** A Claim arising from or related to the AFSCME CBAs.

1.60 **AFSCME Plan Support Agreement:** That certain Plan Support Agreement, dated as of June 7, 2019, by and among the Oversight Board, the Commonwealth and AFSCME, as may be amended from time to time.

1.61 **AFSCME Term Sheet:** The term sheet annexed as Exhibit "A" to the AFSCME Plan Support Agreement.

1.62 **Allowed:** With respect to any Claim, such Claim or portion thereof (a) proof of which was filed on or before the applicable Bar Date or (b) if no proof of Claim has been timely filed, which has been or hereafter is listed by the Debtors in the List of Creditors and is not listed thereon as "disputed", "contingent", or "unliquidated" or (c) allowed pursuant to (i) section 502(h) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, (ii) the terms of the Plan or (iii) a Final Order; provided, however, that, with respect to any Claim described in clause (a) or (b) above, such Claim shall be considered Allowed only if, and to the extent that, no objection to the allowance thereof, or action to equitably subordinate or otherwise limit recovery with respect thereto, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or a Final Order, or as to which an objection has been interposed and such Claim has been allowed in whole or in part by a Final Order. For purposes of determining the amount of an "Allowed Claim" with respect to distributions within a Class, there shall be deducted therefrom an amount equal to the amount of any, original issue discount not accrued as of the date immediately prior to the Commonwealth Petition Date and any Claim that the Debtors may hold against the holder thereof, to the extent such Claim may be set off pursuant to applicable bankruptcy and non-bankruptcy law. Notwithstanding anything to the contrary herein (x) Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Title III Court shall not be considered "Allowed" hereunder unless otherwise specified herein or by order of the Title III Court, (y) for any purpose under the Plan, "Allowed" shall not include interest, penalties, or late charges arising from or relating to the period from and after the Petition Date, and (z) "Allowed" shall not include any Claim subject to disallowance in accordance with section 502(d) of the Bankruptcy Code.

1.63 **Allowed Claim:** A Claim, to the extent it is or has become Allowed.

1.64 **Ambac:** Ambac Assurance Corporation or its successor or designee.

1.65     **Ambac Acceleration Price:**  A price equal to the outstanding principal amount of an Ambac Insured Bond plus accrued and unpaid interest thereon, or, in the case of any capital appreciation bonds, the compounded amount thereof.

1.66     **Ambac Action:**  The litigation styled <u>Ambac Assurance Corp. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.</u>, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV01505.

1.67     **Ambac Certificates:**  The certificate(s) or receipt(s) to be issued by Ambac to beneficial holders of GO Bonds which are deposited into the Ambac Trust.

1.68     **Ambac Commutation Consideration:**  A combination of some or all of the following selected at Ambac's sole discretion no later than twenty-one (21) days prior to the Ballot Date: (a) some or all of a holder's Pro Rata Share of the Ambac Plan Consideration; (b) a percentage, to be determined at Ambac's sole discretion, of the Consummation Costs and/or the PSA Restriction Fee allocable to Ambac in accordance with the terms and provisions of Article III hereof; and (c) Cash in an amount to be determined by Ambac in its sole discretion.

1.69     **Ambac Commutation Treatment:**  The treatment set forth in Section 75.5(a) hereof.

1.70     **Ambac CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from the HTA Bonds insured by Ambac.

1.71     **Ambac Escrow Account:**  A single escrow account that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, as the case may be, for the benefit of the beneficial holders of Ambac Insured Bonds whose Ambac Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.72     **Ambac Insured Bond Claims:**  Collectively, the Claims against the Commonwealth or PBA, as applicable, arising from the Ambac Insured Bonds, including, any Vintage CW Bond Claims (Ambac), Vintage CW Guarantee Bond Claims (Ambac), and Vintage PBA Bond Claims (Ambac).

1.73     **Ambac Insured Bonds:**  Collectively, the Vintage CW Bonds and the Vintage PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by Ambac, including, without limitation, pursuant to a secondary market insurance policy.

1.74     **Ambac Insurance Policies:**  The existing insurance policies issued by Ambac (or a predecessor in interest thereof) relating to the Ambac Insured Bonds, together with any and all agreements and other documents related thereto.

1.75     **Ambac Plan Consideration:**  The consideration allocable or distributable to holders of Allowed Ambac Insured Bond Claims, the CW/HTA Clawback Recovery allocable to holders of the Allowed Ambac CW/HTA Claims, the CW/CCDA Clawback Recovery allocable to holders of Allowed Ambac CW/CCDA Claims, and the CW/PRIFA Clawback Recovery allocable to holders of Allowed Ambac CW/PRIFA Rum Tax Claims, as the case may be.

10

1.76     **Ambac Trust:** With respect to each class of Ambac Insured Bonds, a separate trust or custodial arrangement that will be formed, on or prior to the Effective Date, by the Commonwealth, at the sole cost and expense of Ambac and for the benefit of the beneficial holders of such Ambac Insured Bonds.

1.77     **Ambac Trust Assets:** Collectively, the assets to be deposited into the Ambac Trust(s), consisting of (a) the Ambac Insured Bonds, (b) distributions to be made in respect of such Ambac Insured Bonds, and (c) the Ambac Insurance Policies.

1.78     **Ambac CW/Convention Center Claims:** Collectively, the CW/Convention Center Claims arising from CCDA Bonds insured or otherwise owned (by subrogation or otherwise) by Ambac, including pursuant to a secondary market insurance policy.

1.79     **Ambac CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from HTA Bonds insured or otherwise owned (by subrogation or otherwise) by Ambac, including pursuant to a secondary market insurance policy.

1.80     **Ambac CW/PRIFA Rum Tax Claims:** Collectively, the CW/PRIFA Rum Tax Claims arising from PRIFA Bonds insured or otherwise owned (by subrogation or otherwise by Ambac including pursuant to a secondary market insurance policy.

1.81     **AMPR:** Collectively, the American Federation of Teachers, Asociacion de Maestros de Puerto Rico, and Asociacion de Maestros de Puerto Rico – Local Sindical.

1.82     **Appointments Related Litigation:** Collectively, the litigation styled (a) Pinto Lugo, et al. v. United States Adv. Proc. No. 18-00041-LTS, currently pending in the United States Court of Appeals for the First Circuit, (b) Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al. v. United States, Case No. 19-2243 (appealed from Adv. Proc. No. 18-00066), currently pending in the United States Court of Appeals for the First Circuit, (c) Hernandez-Montanez, et al. v. Financial Oversight & Management Board for Puerto Rico, Adv. Proc. No. 18-00090, currently pending in the Title III Court, and (d) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the Effective Date wherein claims or Causes of Action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

1.83     **Assets:** With respect to the Debtors, (i) all "property" of the Debtors, including, without limitation, such property as it may be reflected on the Debtors' books and records and the Confirmation Order as of the Effective Date and (ii) all Causes of Action, and any subsequent proceeds thereof, that have been or may be commenced by the Debtors or other authorized representative for the benefit of the Debtors and its Creditors, unless modified or released pursuant to the Plan or a Final Order, including, without limitation, any Avoidance Action.

1.84     **Assured:** Assured Guaranty Corp. and Assured Guaranty Municipal Corp., together with their respective successors or designees.

1.85    **Assured Acceleration Price:**  A price equal to the outstanding principal amount of an Assured Insured Bond plus accrued and unpaid interest thereon, or, in the case of any capital appreciation bonds, the compounded amount thereof.

1.86    **Assured Acceleration Price Payment Option:**  Assured's option in accordance with Section 75.1 hereof, if either (a) at or prior to the time of pricing of Assured New GO Bonds with respect to which Assured has exercised the Assured Election, Assured determines, based on its good faith evaluation of the circumstances, that Assured New GO Bonds cannot be sold into the market on terms acceptable to Assured, or (b) such Assured New GO Bonds are not issued to the underwriter(s) for any reason, to elect, in its sole discretion, to pay the applicable Assured Acceleration Price to the holders of any Assured Insured Bonds with respect to which Assured has exercised the Assured Election and to receive, on the Effective Date, the Assured New GO Bonds in respect of which the Assured Acceleration Price Payment Option is exercised and any Cash or other Assured New Securities allocable to the relevant Assured Insured Bonds, which Assured New GO Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it.

1.87    **Assured Bondholder Elections:**  Collectively, the elections provided to Assured Insured Bondholders pursuant to Section 75.1 hereof in the event Assured does not exercise the Assured Election.

1.88    **Assured Bondholder Elections Form:**  The "Form of Election Notice for Certain Bondholders with Respect to Classes 2, 17, 24 and 42" attached as Schedule 5(a) to the Disclosure Statement Order.

1.89    **Assured CVIs:**  Collectively, the CVIs allocable to holders of Assured Insured Bond Claims.

1.90    **Assured CW/Convention Center Claims:**  Collectively, the CW/Convention Center Claims arising from CCDA Bonds insured by Assured, including pursuant to a secondary market insurance policy.

1.91    **Assured CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from HTA Bonds insured by Assured, including pursuant to a secondary market insurance policy.

1.92    **Assured CW/PRIFA Rum Tax Claims:**  Collectively, the CW/PRIFA Rum Tax Claims arising from PRIFA Bonds insured by Assured including pursuant to a secondary market insurance policy.

1.93    **Assured Election:**  Assured's rights, as set forth in Section 75.1 hereof, to receive the Cash and the CVIs allocable to holders of Assured Insured Bonds, and to cause all or any portion of the Assured Insured Bonds selected by Assured to be paid, in full, on the Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date from (a) the proceeds of all or any portion of the Assured New GO Bonds allocable to holders of Assured

12

Insured Bonds, which Assured New GO Bonds shall be (i) insured, at Assured's election, in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12 and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of the Assured New GO Bonds are not sufficient to pay the Acceleration Price, cause amounts equal to such deficiency to be paid by Assured in accordance with the Assured Insurance Policies insuring the Assured Insured Bonds.

1.94    **Assured Election Notice:**  The "Assured Election Notice" attached as Schedule 5(b) to the Disclosure Statement Order.

1.95    **Assured Insurance Policies:**  The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with any and all agreements and other documents related thereto.

1.96    **Assured Insured Bond Claim:**  A Claim against the Commonwealth or the PBA, as applicable, on account of an Assured Insured Bond, including a Vintage CW Bond Claim (Assured), 2011 CW Bond Claim (Assured), 2011 CW Series D/E/PIB Bond Claim (Assured) 2012 CW Bond Claim (Assured), Vintage CW Guarantee Bond Claim (Assured), or a Vintage PBA Bond Claim (Assured).

1.97    **Assured Insured Bondholder:**  The beneficial holder of an Assured Insured Bond.

1.98    **Assured Insured Bonds:**  Collectively, the GO Bonds and the PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by Assured, including, without limitation, pursuant to a secondary market insurance policy; provided, however, that, for the avoidance of doubt, "Assured Insured Bonds" shall include the bonds identified on Exhibit "A" to the Assured Election Notice and Exhibit "A" to the Assured Bondholder Elections Form

1.99    **Assured New GO Bonds:**  The New GO Bonds allocable to holders of Assured Insured Bond Claims.

1.100    **Assured New Securities:**  Collectively, the Assured New GO Bonds and the Assured CVIs.

1.101    **Assured Plan Consideration:**  The consideration allocable or distributable to holders of Allowed Assured Insured Bond Claims.

1.102    **Assured Treatment:**  The treatment of Assured Insured Bond Claims set forth in Section 75.1 hereof.

1.103    **Avoidance Actions:**  Collectively, (a) those avoidance, recovery, subordination or other actions or remedies identified on Exhibit "A" hereto, as such Exhibit "A" may be amended or modified up to and including the Effective Date in accordance with the terms and conditions of the Committee Agreement, against any Entity that have been brought by or on behalf of the Debtors against an Entity under sections 510, 544, 545, 547, 548, 549, 550, 551, 552 and

13

553 of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of
PROMESA, or applicable non-bankruptcy law, (b) such other actions that have been brought by or
on behalf of the  Debtors seeking affirmative recoveries, and which actions are set forth on Exhibit
"B" hereto, as such Exhibit "B" may be amended or modified up to and including the Effective
Date in accordance with the terms and conditions of the Committee Agreement, and (c) all similar
Causes of Action that are currently subject to tolling agreements with the Commonwealth and/or
ERS; provided, however, that under no circumstances shall "Avoidance Actions" include (x) any
Claim or Cause of Action against any Entity relating to CW Bond Claims, PBA Bond Claims, CW
Guarantee Bond Claims, or PRIFA BANs (other than the Claims and Causes of Action in the SCC
Action and the related tolling agreements), (y) any Claim or Cause of Action related to the Fourth
Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways
and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order
[Case No. 17-3283-LTS, ECF No. 15854], as amended, which shall terminate upon entry of the
Confirmation Order, or (z) any Claim or Cause of Action related to the Fourth Amended
Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto
Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental
Entitles Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-
3283-LTS, ECF No. 17394], as amended, which shall terminate upon entry of the Confirmation
Order.

1.104    **Avoidance Actions CW Interests**:  The tranche of beneficial interests in the
Avoidance Actions Trust allocated in accordance with the terms and provisions of the Plan to the
CW GUC Recovery and relating only to net recoveries attributable to Avoidance Actions relating
to the Commonwealth Title III Case.

1.105    **Avoidance Actions ERS Interests**:  The tranche of beneficial interests in the
Avoidance Actions Trust allocated in accordance with the terms and provisions of the Plan to the
ERS GUC Pool and relating only to net recoveries attributable to Avoidance Actions relating to the
ERS Title III Case.

1.106    **Avoidance Actions Trust**:  The trust to be created on or prior to the Effective
Date into which on the Effective Date shall be transferred the authority to litigate or compromise
and settle the Avoidance Actions.

1.107    **Avoidance Actions Trust Agreement**:  The agreement to be executed and
delivered on or prior to the Effective Date providing for, among other things, the ongoing litigation
of the Avoidance Actions, which agreement shall be in form and substance reasonably acceptable
to the Creditors' Committee.

1.108    **Avoidance Actions Trust Assets**:  Collectively, (a) the Avoidance Actions, (b)
funds held in escrow as of the Effective Date relating to the compromise and settlement of certain
avoidance actions prior to the Effective Date (net of expenses incurred by the escrow agent with
respect thereto), and (c) such other actions that have been brought by or on behalf of the Debtors
seeking affirmative recoveries, and which actions are set forth in the respective litigations listed on
Exhibit "B" hereto.

     1.109    **Avoidance Actions Trust Beneficiaries:**  Collectively, the holders of Avoidance Actions CW Interests and Avoidance Actions ERS Interests.

     1.110    **Avoidance Actions Trust Board:**  The three (3) member board appointed as of the Effective Date to govern the Avoidance Actions Trust, with (a) two (2) directors selected by the Creditors' Committee and (b) one (1) director selected by the Oversight Board.

     1.111    **Avoidance Actions Trust Interests:**  Collectively, the Avoidance Actions CW Trust Interests and the Avoidance Actions ERS Trust Interests.

     1.112    **Avoidance Actions Trustee:**  The trustee appointed by the Avoidance Actions Trust Board, by a simple majority vote of such board, on or prior to the Effective Date in accordance with the terms and provisions of the Avoidance Actions Trust Agreement, including, without limitation, any successor thereto.

     1.113    **Ballot Date:**  The deadline(s) established by the Title III Court and set forth in the Disclosure Statement Order for the submission of Ballots/Election Forms and the election of alternative treatments pursuant to the terms and provisions of the Plan.

     1.114    **Ballot/Election Form:**  The ballot and election form, the form of which is approved by the Title III Court, distributed to each holder or insurer, as the case may be, of an impaired Claim entitled to vote on, or otherwise make an election with respect to, the Plan, on which form is to be indicated, among other things, (a) acceptance or rejection of the Plan and/or (b) to the extent applicable, an election of distribution and treatment which may be required in accordance with the provisions of the Plan.

     1.115    **Bankruptcy Code:**  The Bankruptcy Reform Act of 1978, as amended, to the extent codified in Title 11, United States Code, and made applicable to the Title III Cases.

     1.116    **Bankruptcy Rules:**  The Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of Title 28 of the United States Code, as applicable to the Title III Cases.

     1.117    **Bar Date:**  The respective dates established by the Title III Court by which proofs of Claim must have been filed with respect to such Claims against a Debtor, pursuant to (a) the Bar Date Orders, (b) a Final Order of the Title III Court, or (c) the Plan.

     1.118    **Bar Date Orders:**  The orders of the Title III Court establishing the dates by which proofs of Claim against the Debtors or their Assets must have been filed, including, but not limited to, that certain (a) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 17-3283-LTS, ECF No. 2521], (b) Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof  [Case No. 17-3283-LTS, ECF No. 3160], and (c) Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof [Case No. 19-5523-LTS, ECF No. 55].

1.119    **Base Contribution:**  One Hundred Seventy-Five Million Dollars ($175,000,000.00), the amount the Commonwealth shall contribute, or cause to be contributed, to the Pension Reserve in accordance with the terms and provisions of Section 83.2 of the Plan; provided, however, that, in the event that, for any of (a) the  FY in which the Effective Date occurs and (b) the following nine (9) FYs, the Projected Fiscal Plan Surplus is equal to or greater than One Billion Seven Hundred Fifty Million Dollars ($1,750,000,000.00), such contribution amount shall increase to an amount equal to fifty percent (50%) of the Projected Fiscal Plan Surplus.

1.120    **Bond Claim:**  A Claim on account of a GO Bond, a PBA Bond, a CW Guarantee Bond Claim, or an ERS Bond with the amount of such Claim being calculated as the outstanding principal amount of such bonds plus any, accrued and unpaid interest thereon, up to, but not including, the respective Petition Date for (a) a GO Bond, the Commonwealth Petition Date, (b) a PBA Bond, the PBA Petition Date, (c) a CW Guarantee Bond Claim, the Commonwealth Petition Date, and (d) an ERS Bond, the ERS Petition Date.

1.121    **Bond Recovery Category:**  Collectively, the categories set forth on Exhibit "L" hereto relating to the respective Classes of Claims and the distributions to be made thereto pursuant to the terms and provisions of the Plan.

1.122    **Bondholder Election:**  The right of holders of Allowed ERS Bond Claims to purchase the ERS Private Equity Portfolio and the interests in the ERS Trust in accordance with the provisions of Section 69.2(b) hereof.

1.123    **Business Day:**  A day other than a Saturday, Sunday, or any other day on which commercial banking institutions in New York, New York and San Juan, Puerto Rico are required to close by law or executive order.

1.124    **Capital Improvements:**  Any project or projects funded, or proposed to be funded, in whole or in part, by or through public monies, to construct, reconstruct, restore, rehabilitate or purchase any equipment, property or facilities, including, without limitation, buildings, park facilities, infrastructure, information technology systems or other equipment that is funded on a necessarily non-repeating basis that is to be used as a public asset or for the public benefit.

1.125    **Cash:**  Lawful currency of the United States, including, but not limited to, bank deposits, checks representing good funds, and legal equivalents thereof.

1.126    **Causes of Action:**  All claims, actions, causes of action, rights to payment, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross claims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) that are pending or may be asserted against any Entity whether arising on or before the Effective Date, based in law or equity, including, but not limited to, under the Bankruptcy Code,

whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether asserted or unasserted as of the Effective Date.

1.127    **CCDA:**  Puerto Rico Convention Center District Authority.

1.128    **CCDA Bonds:**  Collectively, the non-recourse bonds issued by CCDA, in the original principal amount of Four Hundred Sixty-Eight Million Eight Hundred Thousand Dollars ($468,800,000.00), in accordance with the terms of that certain Trust Agreement, dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee, as supplemented and amended from time to time.

1.129    **CCDA Bond Claims:**  Collectively, the Claims against CCDA arising from or relating to the CCDA Bonds.

1.130    **CCDA Consummation Costs:**  Collectively, the amounts set forth in Section 3.8 hereof to be paid, in Cash, on the Effective Date, or as soon as practicable thereafter, but in no event later than ten (10) Business Days following the Effective Date, to the applicable Initial HTA/CCDA PSA Creditors in accordance with the terms and conditions of the HTA/CCDA Plan Support Agreement, Article III hereof and the Confirmation Order.

1.131    **CCDA Restriction Fee Creditors:**  Collectively, the Initial HTA/CCDA PSA Creditors and the HTA/CCDA Joinder Creditors holding and/or insuring (without duplication) CCDA Bond Claims that execute, or have executed, the HTA/CCDA Plan Support Agreement, the HTA/CCDA Joinder Agreement or the HTA/CCDA Annex Agreement relating thereto at or prior to the expiration of the HTA/CCDA PSA Restriction Fee Period; provided, however, that all entities executing an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement on the date the HTA/CCDA Threshold Attainment is reached with respect to CCDA Bond Claims shall be considered CCDA Restriction Fee Creditors.

1.132    **CCDA Restriction Fee Percentage:**  The percentage equal to (a) Fifteen Million Dollars ($15,000,000.00) minus such amount as may be payable on account of CCDA Consummation Costs divided by (b) the aggregate amount of CCDA Bond Claims held, or in the case of Assured, holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, governing documents and applicable law, by CCDA Restriction Fee Creditors.

1.133    **CCDA Trustee:**  The Bank of New York Mellon, solely in its capacity as successor trustee with respect to the CCDA Bonds.

1.134    **Charging Lien:**  A lien or right to priority of payment to which any Trustee/Fiscal Agent may be entitled pursuant to an applicable governing resolution, trust agreement, or other document or instrument against distributions to be made in accordance with the terms and provisions of the Plan for payment of reasonable compensation, indemnification, fees, expenses and disbursements incurred prior or subsequent to the Effective Date.

1.135     **Claim:**  Any right to payment or performance, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, known or unknown or asserted or unasserted; or any right to an equitable remedy for breach or enforcement of performance, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, and all debts, suits, damages, rights, remedies, losses, liabilities, obligations, judgments, actions, Causes of Action, demands, or claims of every kind or nature whatsoever, in law, at equity, or otherwise.

1.136     **Class:**  A category of holders of Claims set forth in Article IV of the Plan.

1.137     **Clawback Actions:**  Collectively, the litigation styled (a) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00005-LTS, currently pending in the Title III Court, (b) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00004-LTS, currently pending in the Title III Court, (c) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00003-LTS, currently pending in the Title III Court, and (d) The Financial Oversight and Management Board for Puerto Rico v. Ambac Assurance Corporation, et al., Adv. Pro. No. 20-00007-LTS, currently pending in the Title III Court.

1.138     **Clawback CVI Indenture:**  The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the Clawback CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions, which indenture may be part of, or included in, the CVI Indenture.

1.139     **Clawback CVIs:**  Collectively, the general obligation securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, including, without limitation, Exhibit "J" hereto, the Confirmation Order, the Clawback CVI Indenture and the CVI Legislation.

1.140     **Clawback Recovery:**  The aggregate recovery by holders of Allowed CW/Convention Center Claims, Allowed CW/HTA Claims, Allowed CW/MBA Claims, and Allowed CW/PRIFA Rum Tax Claims, consisting of Clawback CVIs distributed to holders of such Claims hereunder and subject to the Annual Payment Waterfall, as defined in Exhibit "J" hereto and as set forth in Section 74.2(a) hereof and Exhibit "J" hereto.

1.141     **COFINA:**  Puerto Rico Sales Tax Financing Corporation, a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth.

1.142     **COFINA Bonds:**  Collectively, the securities issued by COFINA pursuant to the COFINA Plan, the COFINA Confirmation Order, the COFINA Bonds Legislation and the COFINA Bonds Indenture.

1.143     **COFINA Bonds Indenture:**  The trust indenture pursuant to which COFINA issued the COFINA Bonds, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions.

1.144     **COFINA Bonds Legislation:**  Act 241 of the Legislative Assembly of Puerto Rico, approved November 15, 2018, amending Act 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended.

1.145     **COFINA Confirmation Order:**  That certain Amended Order and Judgment Confirming the Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated February 5, 2019 [Case No. 17-3284-LTS, ECF. No. 561].

1.146     **COFINA Plan:**  That certain Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation, dated January 9, 2019 [Case No. 17-3284-LTS, ECF. No. 436].

1.147     **Committee Agreement:**  That certain letter agreement, dated July 12, 2021, between the Creditors' Committee and the Oversight Board.

1.148     **Commonwealth:**  The Commonwealth of Puerto Rico.

1.149     **Commonwealth Constitution:**  The Constitution of the Commonwealth of Puerto Rico.

1.150     **Commonwealth Election:**  The right of the Commonwealth to purchase the Private Equity Portfolio and the interest in the ERS Trust in accordance with the provisions of Section 66.2(a) hereof.

1.151     **Commonwealth Instrumentality Plan:**  A plan of adjustment or Title VI Qualifying Modification for an instrumentality of the Commonwealth, including any plan of adjustment or Title VI Qualifying Modification for HTA, CCDA, or PRIFA.

1.152     **Commonwealth Legislature:**  The Legislative Assembly of Puerto Rico.

1.153     **Commonwealth Petition Date:**  May 3, 2017.

1.154     **Commonwealth Title III Case:**  The Title III case under PROMESA pending for the Commonwealth in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico, et al., Case No. 17-3283-LTS (D.P.R.).

1.155     **Comprehensive Cap:**  The limitation on Maximum Annual Debt Service payable on Net Tax-Supported Debt, established pursuant to the Debt Responsibility Act and the Debt

Management Policy, which shall apply in addition to the limitation imposed on the incurrence of public Debt established pursuant to the Article VI, Section 2 of the Commonwealth Constitution.

1.156     **Confirmation Date:**  The date on which the Clerk of the Title III Court enters the Confirmation Order on the docket.

1.157     **Confirmation Hearing:**  The hearing conducted by the Title III Court pursuant to section 1128(a) of the Bankruptcy Code and Section 314 of PROMESA to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.158     **Confirmation Order:**  The order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 the Bankruptcy Code, made applicable in the Title III cases in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to the Initial PSA Creditors.

1.159     **Constitutional Debt Group:**  The Ad Hoc Group of Constitutional Debtholders consisting of the Constitutional Debt Group Members, as such membership may change from time to time.

1.160     **Constitutional Debt Group Members:**  BlackRock Financial Management Inc., Brigade Capital Management, EMSO Asset Management Limited, Mason Capital Management, LLC, Silver Point Capital, L.P., and VR Advisory Services Ltd., each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.161     **Consummation Costs:**  Collectively, the CCDA Consummation Costs and the GO/PBA Consummation Costs.

1.162     **Convenience Cap:**  Sixty-Five Million Dollars ($65,000,000.00), the aggregate amount of consideration to be made available to holders of Allowed Convenience Claims (whether against the Commonwealth or ERS), unless such limitation is otherwise waived by the Creditors' Committee at or prior to the commencement of the Confirmation Hearing.

1.163     **Convenience Claim:**  An Allowed CW General Unsecured Claim or Allowed ERS General Unsecured Claim (a) that is equal to or less than Twenty Thousand Dollars ($20,000.00) or (b) the holder of which, at such holder's option, has elected to reduce the amount of such Allowed CW General Unsecured Claim or Allowed ERS General Unsecured Claim, as the case may be, to Twenty Thousand Dollars ($20,000.00) in accordance with terms and provisions set forth in Section 72.1 hereof; provided, however, that, notwithstanding the foregoing, a holder of multiple Allowed CW General Unsecured Claims or Allowed ERS General Unsecured Claims that are greater than Forty Thousand Dollars ($40,000.00) may elect to reduce all such Claims to an aggregate amount of Forty Thousand Dollars ($40,000.00); and, provided, further, that the aggregate amount of consideration to be made available to Convenience Claims (whether against the Commonwealth or ERS) shall be Sixty-Five Million Dollars ($65,000,000.00), which Convenience Cap may be waived by the Creditors' Committee at or prior to the commencement of

20

the Confirmation Hearing in its sole and absolute discretion; and, provided, further, that, in the event that such Convenience Cap is exceeded and not waived by the Creditors' Committee at or prior to the commencement of the Confirmation Hearing, holders of Allowed Convenience Claims shall receive a Pro Rata Share of the Convenience Cap.

1.164    **Creditor:**  Any Entity holding a Claim against the Debtors or any Debtor's Assets or, pursuant to section 102(2) of the Bankruptcy Code, against any other property of the Debtors, including, without limitation, a Claim against the Debtors of a kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case, solely in such Entity's capacity as such.

1.165    **Creditors' Committee:**  The statutory committee of unsecured claimholders appointed in, among other cases, the Commonwealth Title III Case, the ERS Title III Case and the HTA Title III Case.

1.166    **CRIM:**  Centro de Recaudacion de Ingresos Municipales or Municipal Revenue Collection Center.

1.167    **CUSIP:**  The Committee on Uniform Securities Identification procedures nine-digit numeric or nine-digit character alphanumeric code.

1.168    **Custodial Trust Documents:**  Collectively, the trust agreements and other documents and instruments attendant to the custodial trusts to be created as of (a) the HTA Effective Date and relating to (i) the HTA Bonds insured by Assured and National, if applicable, and the distributions to be made in accordance with the HTA Plan and the Plan, which trust agreements shall be in form and substance reasonably satisfactory to the Oversight Board, Assured, and National, as the case may be, and (ii) the HTA Bonds insured by FGIC and Ambac and the distributions to be made in accordance with the HTA Plan and the Plan, which trust agreements shall be in form and substance satisfactory to the Oversight Board, FGIC, and Ambac, as the case may be, and (b) the PRIFA Effective Date and relating to (i) the PRIFA Bonds insured by Ambac, Assured and FGIC, if applicable, and the distributions to be made in accordance with the PRIFA Plan and the Plan, which trust agreements shall be in form and substance reasonably satisfactory to the Oversight Board, Ambac, and FGIC.

1.169    **CVIs:**  Collectively, GO CVIs and the Clawback CVIs.

1.170    **CVI Indenture:**  Collectively, the GO CVI Indenture and the Clawback CVI Indenture.

1.171    **CVI Legislation:**  Act 53-2021, the legislation enacted authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the GO CVIs and the Clawback CVIs, which legislation may be part of, or included in, the New GO Bonds Legislation.

1.172    **CVI Payment Reserve:**  To the extent payments become due to holders and insurers of HTA 98 Senior Bond Claims and/or HTA 98 Sub Bond Claims in accordance with the

21

terms and provisions of the Plan, the Clawback CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall of the Settlement Summary annexed to the HTA/CCDA Plan Support Agreement as Exhibit "J", pending entry of a Final Order with respect to the GDB Loan Priority Determination, Cash payable from the HTA Clawback CVI to be held in reserve by the Clawback CVI paying agent or the CVI Trustee, as the case may be, pursuant to the Trust Documentation and the Clawback CVI Indenture in an amount equal to the difference of (a) the amount of Cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is subordinated to payment with respect to the HTA 98 Bonds <u>minus</u> (b) the amount of Cash that would be due to holders and insurers of HTA 98 Senior Bond Claims and HTA 98 Sub Bond Claims to the extent that payment with respect to the GDB HTA Loans is *pari passu* with respect to payment on account of the HTA 98 Bonds.

1.173    **CVI Trustee:**  The trustee or replacement trustee, as the case may be, appointed in accordance with the terms and conditions of the CVI Indenture.

1.174    **CW Appropriations Claims:**  Collectively, the Claims against the Commonwealth arising from or related to indebtedness only payable from appropriations of the Commonwealth Legislature under existing loans or legislative resolutions, including, without limitation, (a) notes from the Commonwealth or its agencies or instrumentalities held by PFC for the repayment of PFC indebtedness and (b) loans only payable from appropriations by the Commonwealth Legislature under existing laws or legislative resolutions held by the GDB Debt Recovery Authority or the GDB Public Entity Trust; <u>provided</u>, <u>however</u>, that "CW Appropriations Claims" shall not include the PBA Administrative Expense Claim.

1.175    **CW Bond Claims:**  Collectively, the Claims against the Commonwealth arising from or relating to the GO Bonds, including the Vintage CW Bond Claims, the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the CW Bond Claims (Insured), and the Retail CW Bond Claims.

1.176    **CW Bond Claims (Insured):**  Collectively, the Vintage CW Bond Claims (Ambac), the Vintage CW Bond Claims (Assured), the Vintage CW Bond Claims (National), the Vintage CW Bond Claims (FGIC), the Vintage CW Bond Claims (Syncora), the 2011 CW Bond Claims (Assured), the 2011 CW Series D/E/PIB Bond Claims (Assured), and the 2012 CW Bond Claims (Assured).

1.177    **CW Fiscal Plan:**  That certain Fiscal Plan of the Commonwealth, certified by the Oversight Board on May 27, 2020.

1.178    **CW General Unsecured Claim:**  A Claim against the Commonwealth; <u>provided</u>, <u>however</u>, that, under all circumstances, "CW General Unsecured Claim" shall not include (a) a PBA Bond Claim, (b) a CW Bond Claim, (c) a CW Guarantee Bond Claim, (d) an Active and Retired Employee Benefits Claim, (e) an AFSCME Claim, (f) a CW/HTA Claim, (g) a CW/Convention Center Claim, (h) a CW/PRIFA Rum Tax Claim, (i) a CW/MBA Claim, (j) an Energy Incentive Claim, (k) an Eminent Domain/Inverse Condemnation Claim, (l) a Med Center Claim, (m) a Dairy Producer Claim, (n) a Tax Credit Claim, (o) a CW Appropriations Claim, (p) a

Section 510(b) Subordinated Claim, (q) a Gracia Gracia Claim, (r) a Late-Filed Claim, (s) a
Convenience Claim, (t) a Federal Claim, (u) any Claim that is eligible to be transferred into or
administered through the ACR process, (v) the Proof of Claim No. 161091 filed by Concilio
Nacional de Policias Inc. and any related proofs of claim asserting claims related to the litigation
styled <u>Frente Unido de Policias Organizados, et al. v. Puerto Rico Police Department</u>, Case No.
KAC-2007-4170, (w) all claims for retiree benefits (including, without limitation, those portions
of Proofs of Claim Nos. 93199, 103072, 104127, 130077, 103035, 106588, 115276, 104175 and
130091), regardless of whether such claims are asserted by retirees or active employees and
regardless of whether of such claims are asserted through litigation or administrative proceedings,
but excluding claims for any increased pension payments that would have been payable prior to
adjudication of such claims (<u>i.e.</u>, pension "back pay") and only up to the amount related to unpaid
pensions, (x) all Claims against the Commonwealth by any Governmental Unit (as defined in
section 101 of the Bankruptcy Code), including the United States government, any State
government, foreign government, any municipality (whether of the Commonwealth or otherwise),
the Commonwealth, any instrumentality of the Commonwealth (including GDB), whether asserted
directly by such Governmental Unit or indirectly or derivatively by any other entity, including,
without limitation, any Claims by the GDB asserted by or though the GDB Debt Recovery
Authority, (y) any unsecured deficiency claims with respect to asserted priority and/or secured
claims, or (z) such other Claim determined by the Title III Court not to be a CW General
Unsecured Claim.

       1.179    **CW Guarantee Bond Claims**:  Collectively, the Vintage CW Guarantee Bond
Claims, the 2011 CW Guarantee Bond Claims, the 2012 CW Guarantee Bond Claims, the 2014
CW Guarantee Bond Claims and the CW Guarantee Bond Claims (Insured).

       1.180    **CW Guarantee Bond Claims (Insured)**:  Collectively, the Vintage CW
Guarantee Bond Claims (Ambac), the Vintage CW Guarantee Bond Claims (Assured), the Vintage
CW Guarantee Bond Claims (National), the Vintage CW Guarantee Bond Claims (FGIC), and the
Vintage CW Guarantee Bond Claims (Syncora).

       1.181    **CW GUC Recovery**:  The aggregate recovery available to holders of Allowed
CW General Unsecured Claims, consisting of (a) Net CW Cash Consideration (funded in
accordance with the terms and provisions of Section 62.3 hereof, including, without limitation, any
adjustments in accordance with the terms of the final proviso thereof) plus (b) the net recoveries by
the Avoidance Actions Trust allocable to the Avoidance Actions CW Interests.

       1.182    **CW/Convention Center Claim**:  The Claim against the Commonwealth arising
from or related to the Commonwealth's retention of certain funds historically transferred to CCDA
pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive
order including claims related to the rights or obligations arising under (a) Section 8 of Article VI
of the Commonwealth Constitution, 13 L.P.R.A. §2271v, 23 L.P.R.A. §104(c), and the
Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, and OE-
2016-31, and (b) the indebtedness issued by CCDA pursuant to that certain Trust Agreement,
dated as of March 24, 2006, between CCDA and JPMorgan Chase Bank, N.A., as trustee.

1.183    **CW/Convention Center Clawback Recovery:** The aggregate recovery by holders or insurers of Allowed CW/Convention Center Claims, consisting of four percent (4.0%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.184    **CW/HTA Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to HTA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including, without limitation, claims asserted on account of the GDB HTA Loans and claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 9 L.P.R.A. §2021, 13 L.P.R.A. §31751 (a)(3)(C), 23 L.P.R.A. §104(c), and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-14, OE-2016-18, OE-2016-30, and OE-2016-31 and (b) the indebtedness issued by HTA pursuant to that certain (i) Resolution No. 68-18, adopted June 13, 1968, and (ii) Resolution No. 98-06, adopted February 26, 1998.

1.185    **CW/HTA Clawback Recovery:** The aggregate recovery by holders or insurers of Allowed CW/HTA Claims, consisting of sixty-eight and six tenths percent (68.6%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.186    **CW/MBA Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to MBA related to the rights or obligations arising under the provisions of the Commonwealth Constitution, any statute, regulation, or executive order.

1.187    **CW/MBA Clawback Recovery:** The aggregate recovery by holders of Allowed CW/MBA Claims, consisting of four-tenths of one percent (0.4%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto.

1.188    **CW/PRIFA Rum Tax Claim:** The Claim against the Commonwealth arising from or related to the Commonwealth's retention of certain funds historically transferred to PRIFA pursuant to the provisions of the Commonwealth Constitution, any statute, regulation, or executive order, including Claims related to the rights or obligations arising under (a) Section 8 of Article VI of the Commonwealth Constitution, 3 L.P.R.A. §1914, and Commonwealth of Puerto Rico Administrative Bulletin Nos. OE-2015-46, OE-2016-27, and OE-2016-30, and (b) the indebtedness issued by PRIFA pursuant to that certain Trust Agreement, dated as of October 1, 1988, between PRIFA and U.S. Bank Trust National Association, as successor trustee.

1.189    **CW/PRIFA Rum Tax Clawback Recovery:** The aggregate recovery by holders or insurers of Allowed CW/PRIFA Rum Tax Claims, consisting of twenty-seven percent (27.0%) of the Clawback CVIs, as presented within Annex 4 of Exhibit "J" annexed hereto, as may be adjusted in accordance with the Rum Tax CVI pursuant to the terms and conditions of the CVI Indenture.

1.190    **Dairy Producer Claim:** Collectively, the Claims of Suiza Dairy, Inc. and Vaquería Tres Monjitas, Inc. arising from and relating to the Dairy Producer Settlement, which, as of the Effective Date, shall be (a) allowed in the aggregate amount of Sixty-Two Million Three

Hundred Twenty-Three Thousand Six Hundred Thirty-Nine Dollars and Twenty-Two Cents ($62,323,639.22), and (b) allocated to Suiza Dairy, Inc. and Vaquería Tres Monjitas, Inc. in the amounts of Forty-Five Million Three Hundred Twenty-Five Thousand One Hundred Fifty-One Dollars and Twenty-Two Cents ($45,325,151.22) and Sixteen Million Nine Hundred Ninety-Eight Thousand Four Hundred Eighty-Eight Dollars ($16,998,488.00), respectively.

1.191 **Dairy Producer Settlement:** The Final Settlement Agreement and Memorandum of Understanding Between the Parties, filed October 29, 2013, in the litigation styled Vaquería Tres Monjitas, Inc. and Suiza Dairy, Inc. v. Naftali Soto Santiago, et al., Civil Case No.: 04-1840 (DRD), then pending in the United States District Court for the District of Puerto Rico.

1.192 **Debt:** Collectively, bonds, notes, loans and other evidences of indebtedness for borrowed money.

1.193 **Debt Management Policy:** The policy developed by AAFAF, relating to the issuance of indebtedness, as more fully described in the Debt Responsibility Act and herein.

1.194 **Debtors:** Collectively, the Commonwealth, ERS and PBA.

1.195 **Debt Policy Period:** The period commencing on the first (1st) calendar day immediately following the Effective Date and ending on the date on which there are no New GO Bonds Outstanding.

1.196 **Debt Policy Revenues:** Collectively, without duplication, (a) revenues derived from taxes, fees, permits, licenses, fines or other charges imposed, approved or authorized by the Commonwealth Legislature, including, without limitation, any such revenue assigned to, or owned by, COFINA or any other instrumentality of the Commonwealth, (b) all other revenues or monies deposited in the General Fund or any debt service or other governmental fund of the Commonwealth, and (c) all other revenues or funds identified as "Debt Policy Revenues" in the Debt Management Policy; provided, however, that, "Debt Policy Revenues" shall exclude (x) revenues and funds of (i) the Entities listed on Exhibit 132 to the CW Fiscal Plan, (ii) Commonwealth municipalities, and (iii) the Puerto Rico Municipal Finance Corporation, (y) proceeds from the issuance of bonds and other borrowings permitted under applicable law, and (z) funds transferred or received from the federal government other than federal excise tax revenues from rum produced in the Commonwealth and covered over to the General Fund; and, provided, further, that the Debt Management Policy may establish additional provisions or clarifications regarding which revenues constitute Debt Policy Revenues consistent with the principles and objectives set forth therein, and which provisions or clarifications shall be consistent with the terms and provisions of the GO/PBA Plan Support Agreement; and, provided, further, that, for purposes of illustration, with respect to FY2020, and as reflected in the CW Fiscal Plan, "Debt Policy Revenues" were Fifteen Billion One Hundred Forty-Six Million Six Hundred Thousand Dollars ($15,146,600,000.00).

1.197 **Debt Related Objections:** Collectively, that certain (a) Omnibus Objection of (I) Financial Oversight and Management Board, Acting through Its Special Claims Committee,

and (II) Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section 502 and
Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain Commonwealth General
Obligation Bonds, dated January 14, 2019 [Case No. 17-3283-LTS, ECF No. 4784], (b) Omnibus
Objections of Official Committee of Unsecured Creditors, Pursuant to Bankruptcy Code Section
502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of Certain 2011
Commonwealth General Obligation Bonds, dated May 21, 2019 [Case No. 17-3283-LTS, ECF No.
7057], (c) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to
Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against
Commonwealth by Holders of Certain Puerto Rico Public Buildings Authority Bonds, dated July
18, 2019 [Case No. 17-3283-LTS, ECF No. 8141], (d) Omnibus Objection of the Lawful
Constitutional Debt Coalition, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule
3007, to Claims Filed or Asserted by Holders of Certain Bonds Issued or Guaranteed by the
Commonwealth, dated January 8, 2020 [Case No. 17-3283-LTS, ECF. No. 9730], (e) Official
Committee of Unsecured Creditors Omnibus Objection on Constitutional Debt Limit Grounds to
(I) Claim of Government Development Bank for Puerto Rico [Claim Number 29485] Based on
Certain Commonwealth-Issued Notes and on Commonwealth Guaranty of Certain Bonds Issued by
Port of Americas Authority, (II) Claim of ScotiaBank de Puerto Rico [Claim Number 47658]
Based on Full Faith and Credit Note Issued by Puerto Rico General Services Administration, and
(III) Claims filed or Asserted Against Commonwealth Based on Commonwealth Guaranty of
Certain Notes Issued by Puerto Rico Infrastructure Authority, dated January 8, 2020 [Case No. 17-
3283-LTS, ECF No. 9735], solely as it relates to the CW Bond Claims and the CW Guarantee
Bond Claims, (f) Omnibus Objection of Official Committee of Unsecured Creditors, Pursuant to
Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against
Commonwealth by Holders of General Obligation Bonds Asserting Priority Over Other
Commonwealth Unsecured Creditors, dated February 3, 2020 [Case No. 17-3283-LTS, ECF No.
10638], (g) Objection of Official Committee of Unsecured Creditors to Claim of Government
Development Bank for Puerto Rico Against Commonwealth of Puerto Rico (Claim Number
29,485) [Case No. 17-3283-LTS, ECF No. 8000], solely as it relates to the CW Bond Claims and
the CW Guarantee Bond Claims, and (h) any other (i) litigations or actions, including, without
limitation, litigations or actions commenced to recover principal and/or interest with respect to the
GO Bonds, the PBA Bonds and/or the PRIFA BANs, and (ii) any other objections or joinders to
these or other such objections or joinders to these or such other objections or notices of
participation that support the relief requested in such objections filed pertaining to the same form
and counts of requested relief challenging, among other things, the validity and related rights of the
GO Bonds, the PBA Bonds, the PRIFA BANs, the CW Bond Claims, the CW Guarantee Bond
Claims, and the PBA Bond Claims.

      1.198      **Debt Responsibility Act:**  Act No. 101-2020, as the same may be amended,
modified or supplemented to the extent necessary to provide, among other things, for a
Comprehensive Cap consistent with the terms of the GO/PBA Plan Support Agreement.

      1.199      **Debt Service Fund:**  The fund to be created pursuant to the New GO Bonds
Indenture, and held by the New GO Bonds Trustee in trust for the benefit of the holders of the
New GO Bonds, into which the Commonwealth shall deposit monthly such amounts equal to (a)
one-sixth (1/6) of the semi-annual obligation with respect to the payment of interest to accrue on

the New GO Bonds through the next interest payment date, and (b) one-twelfth (1/12) of the annual obligation with respect to the payment of principal and accreted value on the New GO Bonds.

    1.200   **Debtors:**  Collectively, the Commonwealth, ERS and PBA.

    1.201   **Deemed Issuance Date:**  The earlier to occur of (a) July 1, 2021 and (b) the Effective Date.

    1.202   **Definitive Documents:**  Collectively, the definitive documents and agreements contemplated by the Plan, including, without limitation, (a) the Plan (including any amendments, modifications and supplements thereto) and any documentation or agreements related thereto, (b) the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, and pleadings in support of entry thereof, (c) the New GO Bonds Indenture and documents or agreements related thereto, (d) the form of bonds for the New GO Bonds, (e) the CVI Indenture and documents or agreements related thereto, (f) the form of the CVIs, (g) the documents or agreements related to the Pension Reserve and the governance thereof, and (h) each other document that will comprise the Plan Supplement, in all cases, the form and substance of which shall be acceptable to the Oversight Board in its sole and absolute discretion, and reasonably acceptable to AAFAF, the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Assured, National, Ambac, FGIC, and Syncora, and, in the case of clauses (a) and (b) above, reasonably acceptable to the Creditors' Committee.

    1.203   **Disallowed:**  With respect to any Claim, a Claim or any portion thereof that is not Allowed and (a) has been disallowed by a Final Order, (b) is zero, contingent, disputed, or undisputed and as to which no proof of claim or request for payment of an Administrative Expense Claim has been timely filed or deemed timely filed with the Title III Court, (c) has been withdrawn by agreement of the applicable Debtor and the holder thereof, or (d) has been withdrawn by the holder thereof.

    1.204   **Disbursing Agent:**  Such Entity or Entities designated by the Oversight Board, upon consultation with AAFAF, on or prior to the Effective Date to make or to facilitate distributions in accordance with the provisions of the Plan.

    1.205   **Disclosure Statement:**  The disclosure statement relating to the Plan and approved by the Title III Court pursuant to section 1125 of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA.

    1.206   **Disclosure Statement Hearing:**  The hearing held by the Title III Court to consider the adequacy of the information contained in the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA.

    1.207   **Disclosure Statement Order:**  The order of the Title III Court (a) approving the form of the Disclosure Statement as containing adequate information in accordance with the provisions of section 1125 of the Bankruptcy Code, applicable to the Title III Cases pursuant to

Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptances and rejections to the Plan, and (ii) elections, if applicable, of distributions hereunder, which order shall be in form and substance reasonably satisfactory to the Initial PSA Creditors.

1.208    **Disputed Claim:**  A Claim against the Debtors or their Assets, to the extent the allowance of such Claim is the subject of a timely objection or request for estimation in accordance with the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Confirmation Order, or is otherwise disputed by the Debtors in accordance with applicable law, and which objection, request for estimation, or dispute has not been withdrawn, with prejudice, or determined by a Final Order.

1.209    **Distribution Date:**  Except as otherwise set forth herein, the date or dates determined by the Commonwealth, on or after the Effective Date, upon which the Disbursing Agent shall make distributions to holders of Allowed Claims entitled to receive distributions under the Plan.

1.210    **Distribution Record Date:**  The Ballot Date or such other date as may be established by a separate order of the Title III Court, including the Confirmation Order; provided, however, that the "Distribution Record Date" shall not apply to any publicly held securities that will receive a distribution pursuant to the Plan through The Depository Trust Company.

1.211    **Effective Date:**  The first (1st) Business Day on which (i) all the conditions precedent to confirmation of the Plan specified in Section 85.1 of the Plan shall have been satisfied or waived, as provided in Section 85.2 of the Plan, and (ii) all the conditions precedent to the substantial consummation of the Plan and occurrence of the Effective Date specified in Section 86.1 of the Plan shall have been satisfied or waived as provided in Section 86.2 of the Plan.

1.212    **Eminent Domain/Inverse Condemnation Claim:**  A Claim arising from or related to (a) an Eminent Domain Proceeding and a Final Order entered therein for an amount in excess of the amount deposited by the condemnor in accordance with the terms and provisions of 32 L.P.R.A. §2907, including, without limitation, interest accrued with respect thereto, or (b) an asserted inverse condemnation of property caused by an asserted taking of property for public use by one of the Debtors without due process of law and without having received just compensation, including, without limitation, through the imposition of development restrictions or use limitations.

1.213    **Eminent Domain Proceeding:**  A condemnation action or proceeding commenced by the Commonwealth or an agency or entity thereof in the Court of First Instance in accordance with the terms and provisions of 32 L.P.R.A §2905 to obtain title to real property located on Puerto Rico.

1.214    **Energy Incentive Act:**  The Puerto Rico Green Energy Incentives Act, Act No. 83-2010, as incorporated under the New Incentives Code, Act 60-2019.

1.215    **Energy Incentive Claims:**  Collectively, any and all Claims arising from or related to the Energy Incentive Act, also known as the Puerto Rico Green Energy Incentives Act, in connection with promoting the production of the renewable energy.

1.216    **Entity:**  A Person, a corporation, a general partnership, a limited partnership, a limited liability company, a limited liability partnership, an association, a joint stock company, a joint venture, an estate, a trust, an unincorporated organization, a governmental unit or any subdivision thereof, including, without limitation, the office of the United States Trustee, or any other entity.

1.217    **ERS:**  Employees Retirement System of the Government of the Commonwealth of Puerto Rico.

1.218    **ERS Bond Claim:**  A Claim arising from or related to the ERS Bonds, including, without limitation, interest accrued thereon during the period up to, but not including, the ERS Petition Date.

1.219    **ERS Bond Recovery:**  The aggregate recovery by holders of Allowed ERS Bond Claims, consisting of (a) Three Hundred Seventy-Three Million Dollars ($373,000,000.00), (b) the right to receive the proceeds of the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, in the event the Commonwealth or one or more holders of Allowed ERS Bond Claims purchases the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, in accordance with the terms and provisions of Section 69.2 hereof, and (c) in the event the Commonwealth does not elect to purchase such assets in accordance with Section 69.2(a) hereof, the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio.

1.220    **ERS Bonds:**  Collectively, (a) the non-recourse Senior Pension Funding Bonds, Series A, issued by ERS in the original principal amount of One Billion Five Hundred Eighty-Eight Million Eight Hundred Ten Thousand Seven Hundred Ninety-Nine Dollars and Sixty Cents ($1,588,810,799.60), (b) the non-recourse Senior Pension Funding Bonds, Series B, issued by ERS in the original principal amount of One Billion Fifty-Eight Million Six Hundred Thirty-Four Thousand Six Hundred Thirteen Dollars and Five Cents ($1,058,634,613.05) and (c) the non-recourse Senior Pension Funding Bonds, Series C, issued by ERS in the original principal amount of Three Hundred Million Two Hundred Two Thousand Nine Hundred Thirty Dollars ($300,202,930.00), which, as of the ERS Petition Date, inclusive of compounded amounts, were in the aggregate outstanding principal amount of Three Billion One Hundred Sixty-Eight Million Six Hundred Ninety-Eight  Thousand Seven Hundred Seventy-Six Dollars and Fifty-Five Cents ($3,168,698,776.55).

1.221    **ERS Fiscal Agent:**  The Bank of New York Mellon, solely in its capacity as fiscal agent with respect to the ERS Bonds.

1.222    **ERS General Unsecured Claim:**  A Claim against ERS other than an ERS Bond Claim.

1.223    **ERS GUC Pool:**  The sum of (a) Five Hundred Thousand Dollars ($500,000.00) in Cash plus (b) the net recoveries by the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests; provided, however, that, under no circumstances, shall such aggregate amount of consideration, including, without limitation, net recoveries from the Avoidance Actions Trust allocable to the Avoidance Actions ERS Interests, exceed Five Million Dollars ($5,000,000.00); and, provided, further, that, in the event that the aggregate amount of the ERS GUC Pool (y) exceeds the aggregate amount of Allowed ERS General Unsecured Claims or (z) would exceed Five Million Dollars ($5,000,000.00) but for the limitation on recovery above, such excess amount or Avoidance Actions ERS Interests, as the case may be, shall be reallocated, on a pro rata basis, for the benefit of holders of Allowed CW General Unsecured Claims.

1.224    **ERS Litigation:**  Collectively, the litigation styled (a) Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico v. Andalusian Global Designated Activity Co., et al., Case Nos. 19-1699, 19-1700 (appealed from Adv. Proc. No. 17-00213), currently pending in the United States Court of Appeals for the First Circuit, (b) Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, et al. v. Andalusian Global Designated Activity Co., et al., Adv. Proc. No. 19-00366, currently pending in the Title III Court, (c) Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employees Retirement System of Government of Puerto Rico, dated March 12, 2019 [Case No. 17-3283-LTS, ECF No. 5580], currently pending in the Title III Court, (d) Omnibus Objection of the Official Committee of Retired Employees of the Commonwealth of Puerto Rico, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted by Holders of ERS Bonds Against ERS and the Commonwealth, dated April 23, 2019 [Case No. 17-3283-LTS, ECF No. 6482], currently pending in the Title III Court, (e) Special Claims Committee of the Financial Oversight & Management Board for Puerto Rico, et al., v. Jefferies, LLC, et al., Adv. Proc. No. 19-00355, currently pending in the Title III Court, (f) Objection of Financial Oversight and Management Board, Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007, to Claims Filed or Asserted Against the Commonwealth by the Bank of New York Mellon, as Fiscal Agent (Claim No. 16775), dated May 22, 2019, and as supplemental on January 6, 2020 [Case No. 17-3283-LTS, ECF Nos. 7075 and 9700], currently pending in the Title III Court, (g) Andalusian Global Designated Activity Co., et al., v. Financial Oversight & Management Board for Puerto Rico, et al., Case No. 20-1065, currently pending in the United States Court of Appeals for the First Circuit, (h) Financial Oversight & Management Board for Puerto Rico, as representative of the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, et al. v. Glendon Opportunities Fund, L.P. et al., Adv. Proc. No. 19-00367, currently pending in the Title III Court, (i) Objection of Financial Oversight and Management Board Pursuant to Bankruptcy Code Section 502 and Bankruptcy Rule 3007 to Proof of Claim Against ERS by The Bank of New York Mellon, as Fiscal Agent (Claim No. 16777), dated January 6, 2020 [Case No. 17-3283-LTS, ECF No. 9701], currently pending in the Title III Court, (j) Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00219, currently pending in

the Title III Court, (k) <u>Andalusian Global Designated Activity Co., et al. v. Commonwealth of Puerto Rico, et al.</u>, Adv. Proc. No. 17-00220, currently pending in the Title III Court, and (l) ERS Bondholders' Motion and Request for Allowance and Payment of Post-Petition and Administrative Expense Claims, dated November 21, 2019, as joined by The Bank of New York Mellon [Case No. 17-3283-LTS, ECF Nos. 9285, 9294, and 9298], currently pending the Title III Court.

1.225    **ERS Participant Claim:**  A Claim on account of being or having been a participant in ERS for retiree benefits that accrued through the date of implementation of Act 106; <u>provided</u>, <u>however</u>, that "ERS Participant Claim" shall not include Claims held by a Participant in ERS, whose hire date was on or after January 1, 2000, based on participation in System 2000.

1.226    **ERS Petition Date:**  May 21, 2017, the date on which the ERS Title III Case was commenced.

1.227    **ERS Portfolio Price:**  Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), the base price to be paid for the ERS Private Equity Portfolio.

1.228    **ERS Private Equity Portfolio:**  Collectively, the portfolio of private equity interests held by ERS as of the Effective Date.

1.229    **ERS Recovery Actions:**  Collectively, the litigations styled: (a) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Jefferies LLC, et al.</u>, Adv. Proc. No. 19-00355; (b) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1M, et al.</u>, Adv., Proc. No. 19-00356; (c) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Stoever Glass & Co., et al.</u>, Adv. Proc. No. 19-00357; (d) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1F et al.</u>, Adv. Proc. No. 19-00358; (e) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1H et al.</u>, Adv. Proc. No. 19-00359; (f) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Wells Fargo Securities, LLC et al.</u>, Adv. Proc. No. 19-00360; and (g) <u>Special Claims Committee of The Financial Oversight & Management Board for Puerto Rico, et al. v. Defendant 1G, et al.</u>, Adv. Proc. No. 19-00361 each pending in the Title III Court.

1.230    **ERS Resolution:**  That certain Pension Funding Bond Resolution, adopted January 24, 2008, relating to the issuance of the ERS Bonds.

1.231    **ERS Stipulation:**  That certain Amended and Restated Stipulation (A) Allowing Claims of ERS Bondholders, (B) Staying Pending Litigation, and (C) Providing for Treatment of Claims of ERS Bondholders and Dismissal of Pending Litigation Pursuant to a Plan of Adjustment, dated April 2, 2021.

1.232    **ERS Takings Action:**  The litigation styled <u>Altair Global Credit Opportunities Fund (A) LLC v. United States</u>, Case No. 21-1577, currently pending in the United States Court of Appeals for the Federal Circuit.

1.233 **ERS Title III Case:** The Title III case under PROMESA pending for ERS in the Title III Court, captioned as <u>In re Financial Oversight & Management Board for Puerto Rico, as representative of the Employee Retirement System of the Government of the Commonwealth of Puerto Rico</u>, Case No. 17 3566-LTS (D.P.R.).

1.234 **ERS Trust:** The trust created in accordance with the terms and provisions of the ERS Stipulation to hold ERS' interests in the ERS Private Equity Portfolio and pursuant to which ERS shall continue to manage such assets up to and including the purchase thereof in accordance with the terms and provisions of Section 69.2 hereof.

1.235 **Excess Cash Surplus**: The amount of actual cash surplus above and beyond the projected Fiscal Plan Surplus contained in the Fiscal Plan for the Commonwealth certified by the Oversight Board and being in effect as of the Effective Date.

1.236 **Executory Contract:** A contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection in accordance with section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.237 **Federal Claims:** Collectively, any and all Claims of the United States of America, its agencies, departments or agents, including, without limitation, the United States Department Housing and Urban Development, the United States Department of Homeland Security and the United States Department of Labor.

1.238 **FGIC:** Financial Guaranty Insurance Company or its successor or designee.

1.239 **FGIC Action:** The litigation styled <u>Financial Guaranty Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc., et al.</u>, currently pending in the Estado Libre Asociado de Puerto Rico, Sala Superior de San Juan, Civil No. SJ2020CV06383.

1.240 **FGIC Certificates:** With respect to each FGIC Trust, the certificate(s) or receipt(s) to be issued by such FGIC Trust to the beneficial holders of the FGIC Insured Bonds which are deposited into the FGIC Trust.

1.241 **FGIC CW/Convention Center Claims:** Collectively, the CW/Convention Center Claims arising from the CCDA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.242 **FGIC CW/HTA Bond Claims:** Collectively, the CW/HTA Claims arising from the HTA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.243 **FGIC CW/PRIFA Rum Tax Claims:** Collectively, the CW/PRIFA Rum Tax Claims arising from the PRIFA Bonds insured by FGIC, including pursuant to a secondary market insurance policy.

1.244 **FGIC Escrow Account:** The escrow account(s) that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, for the benefit of the beneficial holders of

32

FGIC Insured Bonds whose FGIC Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.245 **FGIC Insured Bond Claims**:  Collectively, the Claims arising from the FGIC Insured Bonds, including, for the avoidance of doubt, any Vintage CW Bond Claims (FGIC), Vintage CW Guarantee Claims (FGIC), and Vintage PBA Bond Claims (FGIC).

1.246 **FGIC Insured Bonds**:  Collectively, the GO Bonds and the PBA Bonds that have been insured by FGIC, including, without limitation, pursuant to a secondary market insurance policy.

1.247 **FGIC Insured PRIFA Bond Claims**:  Collectively, the Claims, arising from the PRIFA Bonds that have been insured by FGIC, including, without limitation, pursuant to a secondary market insurance policy.

1.248 **FGIC Insurance Policies**:  The existing insurance policies issued by FGIC (or a predecessor in interest thereof) relating to the FGIC Insured Bonds, together with any and all agreements and other documents related thereto, in each case as the same may have been modified by the FGIC Rehabilitation Plan.

1.249 **FGIC Plan Consideration**:  The consideration allocable or distributable in accordance with Sections 9.1, 24.1 and 31.1 of the Plan to holders of Allowed FGIC Insured Bond Claims.

1.250 **FGIC Rehabilitation Plan**:  The First Amended Plan of Rehabilitation for FGIC, dated June 4, 2013, together with all exhibits thereto and the documents contained in the plan supplement thereto, in each case as the same may be amended, revised, supplemented or otherwise modified from time to time.

1.251 **FGIC Treatment**:  The treatment of FGIC Insured Bond Claims set forth in Section 75.4(a) hereof.

1.252 **FGIC Trust**:  With respect to each FGIC Insured Bond, the trust(s) which may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, the sole cost and expense of which, including, without limitation, the formation and maintenance thereof (including trustee fees and expenses), shall be satisfied from the assets of the respective trust(s), and for the benefit of the beneficial holders of the FGIC Insured Bonds that are deposited in each trust and FGIC, the terms of which shall be set forth in the Plan Supplement.

1.253 **Final Order**:  An order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing has expired and as to which no appeal, petition for certiorari, remand proceeding, or other proceedings for a new trial, re-argument, or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, re-argument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed, reversed or remanded in part or in

full, with no further proceedings on remand, by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, re-argument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, re-argument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the Local Bankruptcy Rules.

1.254    **Fiscal Plan:**  A "Fiscal Plan" as defined by Section 5(10) of PROMESA.

1.255    **Fiscal Plan Surplus:**  The amount set forth on the line entitled **"Surplus/ (Deficit) Post Measures (excl. Debt Payments)"** of the Fiscal Plan for the Commonwealth certified by the Oversight Board and being in effect as of the Effective Date.

1.256    **FY:**  A fiscal year of the Commonwealth, commencing on July 1st and concluding on June 30th of the following calendar year.

1.257    **GDB:**  The Government Development Bank for Puerto Rico.

1.258    **GDB HTA Loans:**  Collectively, the loans, if any, made to HTA by GDB and now held by the Governmental Development Bank Debt Recovery Authority in accordance with the qualifying modification consummated under Title VI of PROMESA, but expressly excluding from "GDB HTA Loans" any HTA Bonds.

1.259    **GDB Loan Priority Determination:**  The determination, in either the Commonwealth Title III Case or the HTA Tile III Case, (a) with respect to the relative rights of recovery and priority of payment of the HTA 68 Bonds and the HTA 98 Bonds to the rights of GDB with respect to the GDB HTA Loans, and/or (b) that the Government Development Bank Debt Recovery Authority does not possess an allowable claim or entitlement to recover with respect to the HTA Clawback CVI based upon such GDB HTA Loans.

1.260    **General Fund:**  The Commonwealth's primary operating fund.

1.261    **General Unsecured Claims:**  Collectively, CW General Unsecured Claims and ERS General Unsecured Claims.

1.262    **GO Bonds:**  Collectively, the currently outstanding general obligation bonds issued by the Commonwealth.

1.263    **GO CVIs:**  Collectively, the general obligation securities, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the GO CVI Indenture and the CVI Legislation.

1.264 **GO CVI Indenture:** The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the GO CVIs, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions, which indenture may be part of, or included in, the CVI Indenture.

1.265 **GO Group:** The Ad Hoc Group of General Obligation Bondholders consisting of Aurelius Capital Management, LP, and Autonomy Capital (Jersey) L.P., each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the Plan Support Agreement.

1.266 **GO/PBA Annex Agreement:** That certain Annex Agreement annexed as Exhibit "G" to the GO/PBA Plan Support Agreement pursuant to which certain holders of CW Bond Claims, CW Guarantee Bond Claims, and PBA Bond Claims may become GO/PBA PSA Creditors.

1.267 **GO/PBA Consummation Costs:** Collectively, the amounts set forth in Section 3.3 hereof to be paid, in Cash, on the Effective Date, or as soon as practicable thereafter, but in no event later than ten (10) Business Days following the Effective Date, to the Initial GO/PBA PSA Creditors in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, Article III hereof and the Confirmation Order.

1.268 **GO/PBA Joinder Agreement:** That certain Joinder Agreement annexed as Exhibit "F" to the GO/PBA Plan Support Agreement pursuant to which certain holders of CW Bond Claims, CW Guarantee Bond Claims and PBA Bond Claims may become GO/PBA PSA Creditors.

1.269 **GO/PBA Joinder Creditors:** Collectively, those GO/PBA PSA Creditors that executed and delivered either the GO/PBA Joinder Agreement or the GO/PBA Annex Agreement prior to the GO/PBA Joinder Deadline.

1.270 **GO/PBA Joinder Deadline:** July 30, 2021.

1.271 **GO/PBA Plan Support Agreement:** That certain Amended and Restated Plan Support Agreement, dated as of July 12, 2021, by and among the Oversight Board and the GO/PBA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.272 **GO/PBA PSA Creditors:** Collectively, the parties to the GO/PBA Plan Support Agreement, other than the Government Parties.

1.273 **GO/PBA PSA Restriction Fee:** Collectively, the fee to be paid, in Cash, on the Effective Date in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, Section 3.5 hereof and the Confirmation Order, in an amount equal to the product of (a) the Restriction Fee Percentage _times_ (b) the outstanding principal amount of GO Bonds and

Exhibit A

PBA Bonds, plus interest accrued thereon during the period up to, but not including the Commonwealth Petition Date and the PBA Petition Date, respectively, (i) tendered for exchange in accordance with the terms and provisions of Section 2.2 of the GO/PBA Plan Support Agreement, in the case of GO/PBA PSA Creditors required to tender and exchange their bonds pursuant to the terms and provisions of Section 2.2 of the GO/PBA Plan Support Agreement, (ii) constituting Assured Insured Bonds, in the case of Assured, and (iii) constituting National Insured Bonds, in the case of National.

1.274 **GO/PBA Restriction Fee Percentage:** One and three hundred twenty-one thousandths percent (1.321%).

1.275 **Government Entity:** Any agency, department, office, public corporation, trust, fund, system, instrumentality, political subdivision, taxing authority, or municipality of the Government of Puerto Rico.

1.276 **Government Parties:** Collectively, (a) the Oversight Board, as the representative of the Debtors, (b) committees and subcommittees of the Oversight Board, including, without limitation, the Special Claims Committee of the Oversight Board, (c) the Debtors, including, without limitation, any of its agencies, and (d) AAFAF; provided, however, that, notwithstanding the foregoing, for the avoidance of doubt, "Government Parties" shall not include AFICA, CCDA, COFINA, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities.

1.277 **Government Released Claims:** Collectively, any and all Claims, demands, rights, liabilities, or Causes of Action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Person, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with the Debtors, Claims (including, without limitation, Claims arising from or relating to the PBA Bonds and the GO Bonds), the Debt Related Objections, the PBA Litigation, and the ERS Litigation, and arising prior to the Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, Claims, demands, liabilities, or Causes of Action of any and every kind, character or nature whatsoever (a) against (i) the Debtors (or their successors, including Reorganized Commonwealth) or COFINA arising from or relating to the Debtors' obligations pursuant to the Plan or the securities to be issued pursuant to the Plan or that were issued pursuant to the COFINA Plan, or (ii) a Government Releasee unrelated to the Debtors or the Claims discharged pursuant to the terms and provisions of the Plan, (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct or (c) arising from or related to claims or bonds issued, or contracts or leases entered into, by AFICA, CCDA, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA, other than CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and the CW Appropriations Claims.

1.278 **Government Releasees:** Collectively, the Government Parties and the Debtors, including all instrumentalities, municipalities, public corporations and public agencies of the Commonwealth, together with their respective current or former board members, directors,

principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Cases in their capacities as such; provided, however, that, notwithstanding the foregoing, "Government Releasees" shall not include AFICA, CCDA, COFINA, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA solely with respect to any Claims against or bonds issued by such Entities, other than CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and related to the CW Appropriations Claims.

1.279    **Gracia Gracia Claim:**  A Claim of a member of the class of vehicle owners who purchased private insurance after paying the compulsory insurance premium, certified in the Gracia Gracia CW Action and Gracia Gracia Federal Action.

1.280    **Gracia Gracia CW Action:**  The litigation styled García Rubiera, et al. v. Asociación de Subcripcion Conjunta del Seguro de Responsabilidad Obligatorio, et al., Civil Núm.: KDP2001-1441(801), currently pending in the Puerto Rico Court of First Instance.

1.281    **Gracia Gracia Federal Action:**  The litigation styled García Rubiera, et al. v. Fortuño, et al., Case No.: 02-1179-GAG, currently pending in the United States District Court for the District of Puerto Rico.

1.282    **Gracia Gracia Settlement:**  Collectively, the settlement reached and approved in (a) the Gracia Gracia CW Action pursuant to that certain Joint Motion on Partial Agreement and Stipulation, dated March 29, 2016, as approved pursuant to that certain Partial Judgment, dated July 8, 2016 and (b) the Gracia Gracia Federal Action pursuant to that certain Stipulation for Permanent Injunction, dated February 29, 2016, as approved pursuant to that certain Judgment, dated March 1, 2016.

1.283    **GSA Helicopter Loan:**  The loan extended pursuant to that certain Credit Agreement, dated as of December 26, 2013, between the General Services Administration of the Commonwealth and Scotiabank de Puerto Rico, which, as of the Commonwealth Petition Date, was in the outstanding principal amount of approximately Twenty-Three Million Seven Hundred Sixty-Four Thousand Six Hundred Seven Dollars ($23,764,607.00).

1.284    **GUC Recovery Cap:**  Forty percent (40%); provided, however, that, for purposes of calculation, any net recoveries by the Avoidance Actions Trust shall not count towards attaining the forty percent (40%) cap.

1.285    **GUC Reserve:**  The reserve to be created on or prior to the Effective Date, and held by an independent, non-Commonwealth government entity selected jointly by the Oversight Board and the Creditors' Committee, solely for the benefit of holders of Allowed CW General Unsecured Claims.

1.286    **HTA:**  Puerto Rico Highways and Transportation Authority.

1.287    **HTA 68 Bonds:**  Collectively, the following bonds issued by HTA pursuant to Resolution No. 68-18, adopted June 13, 1968, as amended and supplemented thereafter: (a) the

Highway Revenue Bonds, Series Y, issued by HTA in the original principal amount of Eight
Hundred Ninety Million Two Hundred Thirty-Five Thousand Dollars ($890,235,000.00), (b) the
Highway Refunding Bonds, Series Z, issued by HTA in the original principal amount of One
Hundred Eighty-Five Million Forty Thousand Dollars ($185,040,000.00), (c) the 2003 Highway
Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount of One
Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars ($188,395,000.00),
(d) the 2003 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA in the original
principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand Dollars
($65,275,000.00), (e) the 2005 Highway Revenue Refunding Bonds, Series BB, issued by HTA in
the original principal amount of One Hundred One Million Six Hundred Twenty-Five Thousand
Dollars ($101,625,000.00), (f) the 2007 Highway Revenue Refunding Bonds, Series CC, issued by
HTA in the original principal amount of Four Hundred Thirty-One Million Nine Hundred Fifty-
Five Thousand Six Hundred Nine Dollars and Five Cents ($431,955,609.05), (g) the 2010
Highway Revenue Refunding Bonds, Series AA-1, issued by HTA in the original principal amount
of One Hundred Eighty-Eight Million Three Hundred Ninety-Five Thousand Dollars
($188,395,000.00), (h)the 2010 Highway Revenue Refunding Bonds, Series AA-2, issued by HTA
in the original principal amount of Sixty-Five Million Two Hundred Seventy-Five Thousand
Dollars ($65,275,000.00), and (i) the Series FHA Bonds issued by HTA in the original principal
amount of Nine Hundred Forty-Five Thousand Dollars ($945,000.00).

1.288    **HTA 98 Bonds:**  Collectively, the HTA 98 Senior Bonds and the HTA 98 Sub
Bonds.

1.289    **HTA 98 Senior Bonds:**  Collectively, the following bonds issued by HTA
pursuant to Resolution 98-06, adopted February 26, 1998: (a) the 1998 Transportation Revenue
Bonds, Series A, issued by HTA in the original principal amount of One Billion One Hundred
Twenty-Nine Million Six Hundred Forty-Three Thousand Seven Hundred Forty Dollars
($1,129,643,740.00), (b) the 2002 Transportation Revenue Bonds, Series D, issued by HTA in the
original principal amount of Seven Hundred Million Eight Hundred Fifty-Five Thousand Dollars
($700,855,000.00), (c) the 2002 Transportation Revenue Refunding Bonds, Series E, issued by
HTA in the original principal amount of Two Hundred Eighty-Four Million Four Hundred Five
Thousand Dollars ($284,405,000.00), (d) the 2003 Transportation Revenue Bonds, Series G,
issued by HTA in the original principal amount of Five Hundred Sixty-Three Million Six Hundred
Fifty Thousand Dollars($563,650,000), (e) the 2003 Transportation Revenue Refunding Bonds,
Series H, issued by HTA in the original principal amount of Seventy-Two Million Thirty-Five
Thousand Dollars ($72,035,000.00), (f) the 2004 Transportation Revenue Refunding Bonds, Series
I, issued by HTA in the original principal amount of Eighty-Two Million Three Hundred Forty
Thousand Dollars ($82,340,000.00), (g) the 2004 Transportation Revenue Refunding Bonds,
Series J, issued by HTA in the original principal amount of Four Hundred Five Million Nine
Hundred Eighty-Five Thousand Dollars ($405,985,000.00), (h) the 2005Transportation Revenue
Refunding Bonds, Series K, issued by HTA in the original principal amount of Eight Hundred
Million Dollars ($800,000,000.00), (i) the 2005 Transportation Revenue Refunding Bonds, Series
L, issued by HTA in the original principal amount of Five Hundred Ninety-Eight Million Two
Hundred Eighty-Five Thousand Dollars ($598,285,000.00), (j) the 2007 Transportation Revenue
Refunding Bonds, Series M, issued by HTA in the original principal amount of Two Hundred Fifty

Million Dollars ($250,000,000.00), (k) the 2007 Transportation Revenue Refunding Bonds, Series N, issued by the HTA in the original principal amount of One Billion Five Hundred Two Million Nine Hundred Four Thousand Nine Hundred Fifty-Three Dollars and Ninety-Five Cents ($1,502,904,953.95), and (l) the 2010 Transportation Revenue Refunding Bonds, Series H, issued by HTA in the original principal amount of Forty-Four Million Two Hundred Seventy-Five Thousand Dollars ($44,275,000.00).

1.290    **HTA 98 Sub Bonds:**  Collectively, the following subordinated bonds issued by HTA pursuant to Resolution 98-06, adopted February 26, 1998, as amended and supplemented thereafter: (a) the Subordinated Transportation Revenue Bonds, Series 1998, issued by HTA in the original principal amount of Seventy-Five Million Fifty Thousand Dollars ($75,050,000.00), and (b) the Subordinated Transportation Revenue Bonds, Series 2003, issued by HTA in the original principal amount of Three Hundred Twenty Million Five Hundred Forty-Five Thousand Dollars ($320,545,000.00).

1.291    **HTA Bonds:**  Collectively, the HTA 68 Bonds, the HTA 98 Senior Bonds, and the HTA 98 Sub Bonds.

1.292    **HTA/CCDA Annex Agreement:**  That certain Annex Agreement annexed as Exhibit "I" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds may become HTA/CCDA PSA Creditors.

1.293    **HTA/CCDA Joinder Agreement:**  That certain Joinder Agreement annexed as Exhibit "H" to the HTA/CCDA Plan Support Agreement pursuant to which certain holders of HTA Bonds and CCDA Bonds may become HTA/CCDA PSA Creditors.

1.294    **HTA/CCDA Joinder Deadline:**  With respect to (a) HTA 68 Bond Claims and CCDA Bond Claims, May 17, 2021, at 11:59 p.m. (Eastern Daylight Time), and (b) HTA 98 Senior Bond Claims, July 15, 2021, at 11:59 p.m. (Eastern Daylight Time), or in either case, such later date and time as may be requested by Assured and National, but in no event later than the commencement of the hearing to consider confirmation of the Plan.

1.295    **HTA/CCDA Joinder Creditors:**  Collectively, those entities holding HTA Bonds or CCDA Bonds that execute and deliver either the HTA/CCDA Joinder Agreement or the HTA/CCDA Annex Agreement, the forms of which are annexed to the HTA/CCDA Plan Support Agreement as Exhibits "H" and "I", respectively, prior to the HTA/CCDA Joinder Deadline.

1.296    **HTA/CCDA Plan Support Agreement:**  That certain HTA/CCDA Related Plan Support Agreement, dated as of May 5, 2021, by and among the Oversight Board and the HTA/CCDA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.297    **HTA/CCDA PSA Creditors:**  Collectively, the parties to the HTA/CCDA Plan Support Agreement, other than the Oversight Board.

1.298    **HTA/CCDA PSA Restriction Fee Period:**  The period from May 5, 2021 up to and including the earlier to occur of (a) the HTA/CCDA PSA Threshold Attainment and (b) the applicable HTA/CCDA Joinder Deadline.

1.299    **HTA/CCDA PSA Threshold Attainment:**  The date on which HTA/CCDA PSA Restriction Fee Creditors own or have due investment management responsibility and authority for funds or accounts which own, or, with respect to Assured and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, (a) with respect to HTA 68 Bonds, eighty-five percent of the aggregate amount of HTA 68 Bond Claims, inclusive of principal and interest as of the HTA Petition Date, (b) with respect to HTA 98 Senior Bonds, sixty-seven percent (67%) of the aggregate amount of HTA 98 Senior Bond Claims, inclusive of principal and interest as of the HTA Petition Date, and (c) with respect to CCDA Bonds, seventy percent (70%) of the aggregate amount of CCDA Bond Claims, and in each case, without duplication and, to the extent any such claims are insured, to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law.

1.300    **HTA Clawback CVI:**  The CVI to be issued on account of Allowed CW/HTA Claims in accordance with the terms and provisions of the Plan, the CVI Indenture, the HTA/CCDA Plan Support Agreement and the Settlement Summary annexed thereto as Exhibit "J".

1.301    **HTA Confirmation Order:**  The order of the Title III Court confirming the HTA Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable in the HTA Title III Case in accordance with Section 301 of PROMESA.

1.302    **HTA Distribution Conditions:**  Collectively, (a) the Effective Date shall have occurred, (b) the documentation of the HTA Plan, the HTA Confirmation Order, the New HTA Bonds Indenture, the Trust Documentation (if any), and the Custodial Trust Documents (solely as they relate to Assured and National) shall have been agreed upon by the Oversight Board, Assured and National, (c) holders of, or insurers entitled to vote with respect to, HTA 68 Bonds, holding or insuring, as the case may be, at least sixty-seven percent (67%) of the outstanding principal amount of HTA 68 Bonds shall have executed the HTA/CCDA Plan Support Agreement (or an HTA/CCDA Joinder Agreement or an HTA/CCDA Annex Agreement with respect thereto), and (d) holders of, or insurers entitled to vote with respect to, HTA 98 Senior Bonds, holding or insuring, as the case may be, at least sixty-seven (67%) of the outstanding principal amount of HTA 98 Senior Bonds shall have executed the HTA/CCDA Plan Support Agreement (or a Joinder Agreement or an Annex Agreement with respect thereto); provided, however, that, upon entry of a Final Order with respect to the HTA Confirmation Order, the conditions set forth in subsections (c) and (d) above shall be deemed satisfied.

1.303    **HTA Effective Date:**  The date on which the transactions contemplated by the HTA Plan and authorized by the Title III Court pursuant to the HTA Confirmation Order have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the HTA Plan have been satisfied or waived in accordance with its terms.

1.304 **HTA Fiscal Agent:** The Bank of New York Mellon, solely in its capacity as fiscal agent with respect to the HTA Bonds.

1.305 **HTA Petition Date:** May 21, 2017.

1.306 **HTA Plan:** The plan of adjustment to be filed by the Oversight Board, as representative of HTA in the HTA Title III Case, in form and substance reasonably acceptable to Assured and National, and consistent with the terms of the Settlement Summary annexed to the HTA/CCDA Plan Support Agreement as Exhibit "J", and, with respect to HTA Bonds insured by FGIC and Ambac, containing provisions consistent with the terms and provisions set forth in Sections 74.4 and 74.5 hereof, respectively.

1.307 **HTA Title III Case:** The Title III case under PROMESA pending in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico as representative of the Puerto Rico Highways & Transportation Authority, Case No. 17-3567-LTS (D.P.R.).

1.308 **Initial PSA Creditors:** Collectively, the Initial GO/PBA PSA Creditors and the Initial HTA/CCDA PSA Creditors.

1.309 **Initial GO/PBA PSA Creditors:** Collectively, those creditors that executed the Initial PSA on February 22, 2021.

1.310 **Initial GO/PBA PSA Restriction Fee Creditors:** Collectively, the Initial GO/PBA PSA Creditors and the Initial GO/PBA PSA Joinder Creditors that executed and delivered the Initial PSA, a joinder or annex agreement, as applicable, at or prior to the Initial PSA Threshold Attainment.

1.311 **Initial HTA/CCDA PSA Creditors:** The "Initial PSA Creditors" as defined in the HTA/CCDA Plan Support Agreement.

1.312 **Initial PSA:** That certain Plan Support Agreement, dated as of February 22, 2021, by and among the Oversight Board and the Initial GO/PBA PSA Creditors.

1.313 **Initial PSA Joinder Creditors:** Collectively, those Entities holding GO Bonds or PBA Bonds, that executed and delivered a Joinder Agreement or an Annex Agreement to the Initial PSA, the forms of which were annexed to the Initial PSA as Exhibits "F" and "G", respectively, prior to the Initial PSA Threshold Attainment.

1.314 **Initial PSA Threshold Attainment:** The date and time which the Initial GO/PBA PSA Restriction Fee Creditors owned or had due investment management responsibility and authority for funds or accounts which owned, or, with respect to Assured, Syncora and National, either holds or insures and is authorized to vote in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, seventy percent (70%) of the aggregate amount of CW Bond Claims, CW Guarantee Bond Claims, and PBA Bond Claims (without duplication and, to the extent such claims are Insured Bond Claims, to the extent a PSA

Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law).

1.315    **Insured Bond Claim:** Collectively, the Bond Claims, the principal and interest payments of which have been insured by a Monoline, including, without limitation, pursuant to a secondary market insurance policy.

1.316    **Invalidity Actions:** Collectively, the adversary proceedings challenging the validity of certain GO Bonds, PBA Bonds, and PRIFA BANs listed on Exhibit "C" hereto.

1.317    **IRC:** The United States Internal Revenue Code of 1986, as amended from time to time.

1.318    **IRS:** The Internal Revenue Service, an agency of the United States Department of Treasury.

1.319    **JRS:** Judiciary Retirement System.

1.320    **JRS Participant Claim:** A Claim on account of being or having been a Participant in JRS for (a) retiree benefits accrued as of May 3, 2017, and (b) any right to accrue additional retiree benefits in JRS from and after the Effective Date.

1.321    **LCDC:** The LCDC Holders, as such membership may change from time to time.

1.322    **LCDC Holders:** The Lawful Constitutional Debt Coalition consisting of Aristeia Capital, LLC, Farmstead Capital Management, FCO Advisors LP, GoldenTree Asset Management LP, Monarch Alternative Capital LP, Taconic Capital Advisors L.P., and Whitebox Advisors L.L.C., each on behalf of itself or certain of its respective managed funds and, in each case, their respective successors GO/PBA and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.323    **Lien:** Any charge against or interest in property to secure payment of a debt or performance on an obligation.

1.324    **Lien Challenge Actions:** Collectively, the adversary proceedings listed on Exhibit "D" hereto.

1.325    **Lift Stay Motions:** Collectively, the litigation styled (a) Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico, filed in the HTA Title III Case [Dkt. No. 673], (b) Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10104], (c) Ambac Assurance Corporation, et al. v. The Financial Oversight and Management Board, filed in the Commonwealth PROMESA Proceeding [Dkt. No. 10602], (d) AmeriNational Community Services, LLC, et al. v. The Financial Oversight Management Board of Puerto Rico, filed in the HTA Title III Case [Dkt. No. 591], (e) Assured Guaranty Corp., et al. v. Commonwealth of Puerto Rico, et al., Case No. 20-1930, currently pending in the United States Court of Appeals for the First Circuit, (f) Ambac Assurance Corporation, et al, v. Commonwealth of Puerto Rico, et al.,

Case No. 2—1931, currently pending in the United States Court of Appeals for the First Circuit,
(g) <u>Peaje Investments LLC v. Puerto Rico Highways & Transportation Authority, et al.</u>, Adv. Pro.
No. 17-00152-LTS, filed in the HTA Title III Case [Dkt. No. 1], as amended, and (i) any motion or
adversary proceeding seeking to lift the automatic stay provided for in accordance with section 362
and 922 of the Bankruptcy Code (to the extent applicable) with respect to revenues similar to those
at issue in the above-referenced Lift Stay Motions.

1.326    **List of Creditors:**  The Creditor List (together with all summaries, notes, and
schedules) attached as Exhibit A to the (a) *Notice of Filing of Creditor List for the Commonwealth
of Puerto Rico* filed in the Commonwealth Title III Case [Case No. 17-3283-LTS, ECF No. 1215],
(b) *Notice of Filing of Creditor List for the Employees Retirement System of the Government of the
Commonwealth of Puerto Rico* filed in the ERS Title III Case [Case No. 17-3566-LTS, ECF No.
207], and (c) *Notice of Filing of Creditor List for The Puerto Rico Public Buildings Authority* filed
in the PBA Title III Case [Case No. 19-5523-LTS, ECF No. 34] pursuant to sections 924 and 925
of the Bankruptcy Code, as such lists, summaries, notes, or schedules have been or may be
amended, restated, supplemented or otherwise modified by the Debtors.

1.327    **Local Bankruptcy Rules:**  The Local Bankruptcy Rules of the United States
Bankruptcy Court for the District of Puerto Rico and, to the extent applicable to the Title III Case,
the Local District Court Rules for the District of Puerto Rico, each as amended from time to time.

1.328    **Maximum Annual Debt Service:**  The maximum scheduled annual debt service
(including principal and interest payments due and payable on bonds bearing current interest and,
in the case of capital appreciation bonds or similar instruments, the maturity value due and payable
on such instruments) for any FY on Net Tax-Supported Debt; <u>provided</u>, <u>however</u>, that, in the case
of variable rate Debt, the calculation shall assume that such Debt bears interest at the maximum
annual rate permitted by law; and, <u>provided</u>, <u>further</u>, that, to the extent no provision or clarification
increases the Comprehensive Cap, including the secured and/or securitized debt sublimit above the
levels set forth in Section 74.4 hereof, the Debt Management Policy may establish additional
provisions or clarifications regarding the calculation of the Maximum Annual Debt Service
consistent with the principles and objectives set forth therein.

1.329    **Maximum Taxable Bond Election Amount:**  The amount of New GO Bonds
required, after consultation with Section 103 tax counsel and determination by Internal Revenue
Service, to be issued as non-exempt for federal income tax purposes.

1.330    **Measured SUT:**  The 5.5% SUT, <u>less</u> CINE funds of Three Million Two
Hundred Forty Thousand Dollars ($3,240,000.00), as set forth in the Settlement Summary annexed
as Exhibit "I" to the GO/PBA Plan Support Agreement.

1.331    **Med Centers:**  Collectively, the following federally qualified health centers: (a)
Atlantic Medical Center, Inc.; (b) Camuy Health Services, Inc.; (c) HPM Foundation, Inc.; (d)
Centro de Salud de Lares, Inc.; (e) Centro de Salud Familiar Dr. Julio Palmieri Ferri, Inc.; (f)
Ciales Pumay Health Care Services, Inc.; (g) Concilio de Salud Integral de Loiza, Inc.; (h)
Corporacion de Servicios Medicos Primarios Prevencion de Hatillo, Inc.; (i) Corporacion de
Servicios de Salud y Medicina de Avandaza; (j) NeoMed Center, Inc.; (k) Hospital Center

Castaner, Inc.; (l) Migrant Health Center, Inc.; (m) Morovis Community Health Center, Inc.; (n) Centro de Servicios Primarios de Salud de Patillas, Inc.; (o) Costa Salud, Inc.; (p) Salud Integral en la Montana, Inc. (SIM), f/k/a Corporacion de Servicios Integrales de Salud del Area de Barranquitas, Comerro, Corozal, Narajoti y Orocovis; (q) Corporacion SANOS; (r) San Juan Comprehensive Health Care for the Homeless Program; (s) Centro de Servicios Primarios de Salud de Florida; (t) Puerto Rico Community Network for Clinical Research (CONCRA); and (u) Rio Grande Community Health Center, Inc.

1.332    **Med Center Claims:**  Collectively, any and all Claims of the Med Centers arising from or relating to the Medicaid Act, 42 U.S.C. § 139 6a(bb), including, without limitation, (a) any claims and causes of action asserted or which could have been asserted in the Med Center Litigation against the Commonwealth, (b) any amounts asserted to be due and owing by the Commonwealth, or which could have been asserted as due and owing by the Commonwealth, in the Med Center proofs of claim, and (c) any amounts asserted to be owing by the Commonwealth and relating to the period from the Commonwealth Petition Date up to and including the Effective Date; provided, however, that "Med Center Claims" expressly excludes any claims asserted by any Med Center against the Municipality of San Juan in the litigation styled Asociacion de Salud Primaria de Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico, et al., Civil No. KPE02-1037 (2002), currently pending in the Commonwealth of First Instance.

1.333    **Med Center Litigation:**  Collectively, the litigation styled (a) Asociacion de Salud Primaria de Puerto Rico, Inc. v. Estado Libre Asociado de Puerto Rico, et al., Civil No. KPE02-1037 (2002), currently pending in the Commonwealth Court of First Instance, together with the following appeals therefrom: (i) Appeal No. KLCE2017-0147; (ii) Appeal No. KLCE2017-00094; and (iii) Appeal No. KLCE2017-00105, but, expressly excluding therefrom any claims asserted in the foregoing litigation by any Med Centers against the Municipality of San Juan, (b) Rio Grande Cmty. Health Ctr. Inc., et al. v. Commonwealth of Puerto Rico, et al., Case No. 03-1640(GAG), currently pending in the United States District Court for the District of Puerto Rico, together with following appeals therefrom: (i) Case No. 17-1731; (ii) Case No. 17-1812; (iii) Case No. 17-1822; (iv) Case No. 18-1083; and (v) Case No. 19-1336, (c) Atlantic Medical Center Inc. et al. v. The Commonwealth of Puerto Rico, et al., Case No. 06-1291, currently pending in the United States District Court for the District of Puerto Rico, (d) Asociacion de Salud Primaria de P.R., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00227, currently pending in the Title III Court, (e) Atlantic Med. Ctr., Inc., et al. v. Commonwealth of Puerto Rico, et al., Adv. Proc. No. 17-00278, currently pending in the Title III Court, (f) Corporacion de Servicios Integrales de Salud del Area de Barranquitas, Comerio, Corozal, Naranjito y Orocovis v. Commonwealth of Puerto Rico, Adv. Pro. No. 17-00292, currently pending in the Title III Court, (g) Corporacion de Servicios Integrals de Salud del Area de Barranquitas, Comerio, Corozal, Naanjito y Orocovis v. Commonwealth of Puerto Rico, Adv. Pro. No. 17-00298, currently pending in the Title III Court, (h) Motion of Salud Integral en la Montana, Corporacion de Servicios de Salud y Medicina Avanzada, Neomed Center, Mgmt. Health Center, HPM Foundation, Morovis Community Health Center and Concilio de Salud Integral de Loiza for Allowance and Payment of Administrative Expense Claim, or in the Alternative, Relief from the Automatic Stay, filed in the Commonwealth Title III Case [ECF No. 13582], (i) Motion of Atlantic Medical Center, Inc., Camuy Health Services, Inc., Centro de Salud familiar Dr. Julio Palmieri

Ferri, Inc., Ciales Primary Health Care Services, Inc., Corp. de Serv. Medicos Primarios y
Prevencion de Hatillo, Inc., Costa Salud, Inc., Centro de Salud de Lares, Inc., Centro de Servicios
Primarios de Salud de Patillas, Inc. and Hospital General Costoner, Inc. Seeking (I) Enforcement
of the Court's Prior Order and (II) Relief from the Automatic Stay, filed in the Commonwealth
Title III Case [ECF. No. 12918], (j) Motion for Relief from Stay, filed in the Commonwealth Title
III Case [ECF No. 13748], and (k) any litigation, adversary proceeding or motion with respect to
the Med Center Claims at issue in the Commonwealth Title III Case or any of the above-
referenced Med Center Litigations.

1.334    **Med DC Action:**  The litigation styled <u>Rio Grande Cmty. Health Ctr. Inc., et al.
v. Commonwealth of Puerto Rico, et al.</u>, Case No. 03-1640 (GAG), currently pending in the
United States District Court for the District of Puerto Rico.

1.335    **MFA:**  Puerto Rico Municipal Finance Agency.

1.336    **Monolines:**  Collectively, Ambac, Assured, FGIC, National and Syncora, as
insurers of GO Bonds, PBA Bonds, HTA Bonds, CCDA Bonds, PRIFA Bonds or other Claims or
securities issued by the Debtors, as applicable.

1.337    **Monthly Benefit Modification:**  Zero Dollars ($0.00).

1.338    **National:**  National Public Finance Guarantee Corporation.

1.339    **National Action:**  The litigation styled <u>National Public Finance Guarantee Corp.,
et al. v. UBS Financial Services, Inc., et al.</u>, currently pending in the Estado Libre Asociado de
Puerto Rico, Sala Superior de San Juan, Civil No. SJ2019CV07932.

1.340    **National Acceleration Price:**  With respect to any National Insured Bonds, an
amount equal to the outstanding principal amount of such National Insured Bonds plus the accrued
and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded
amount thereof) as of the Effective Date.

1.341    **National Certificates:**  With respect to each National Trust that is formed for the
benefit of the beneficial holders of National Insured Bonds, the certificate(s) or receipt(s) to be
issued by such National Trust to beneficial holders of such National Insured Bonds that are
deposited into the National Trust.

1.342    **National Commutation Consideration:**  A combination of some or all of the
following, to be selected at National's sole discretion prior to the commencement of the
Disclosure Statement Hearing: (i) some or all of a holder's Pro Rata Share of the National Plan
Consideration; (ii) a percentage, to be determined at National's sole discretion, of the
Consummation Costs and/or the PSA Restriction Fee allocable to National in accordance with the
terms and provisions of Article III hereof; and (iii) Cash in an amount to be determined by
National in its sole discretion.

1.343    **National Commutation Treatment:**  The treatment set forth in Section 72.2(a)
hereof.

45

1.344    **National CW/HTA Bond Claims:**  Collectively, the CW/HTA Claims arising from HTA Bonds insured by National.

1.345    **National Escrow Account:**  A single escrow account that may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, for the benefit of the beneficial holders of National Insured Bonds whose National Plan Consideration is deposited therein, the terms of which shall be set forth in the Plan Supplement.

1.346    **National Insurance Policies:**  The existing insurance policies, including secondary market insurance policies, initially issued by (a) MBIA Insurance Corporation and subsequently novated to National or (b) FGIC and subsequently novated to National, and relating to the National Insured Bonds, together with any and all agreements and other documents related thereto.

1.347    **National Insured Bond Claims:**  Collectively, the Claims arising from the National Insured Bonds, including any Vintage CW Guarantee Bond Claims (National).

1.348    **National Insured Bonds:**  Collectively, the GO Bonds and the PBA Bonds that have been insured or are otherwise owned (by subrogation or otherwise) by National, including, without limitation, pursuant to a secondary market insurance policy.

1.349    **National Non-Commutation Treatment:**  The treatment set forth in Article 72.2(b) hereof.

1.350    **National Plan Consideration:**  The consideration allocable or distributable to holders of Allowed Vintage PBA Bond Claims (National), Allowed Vintage CW Bond Claims (National), and Allowed Vintage CW Guarantee Bond Claims (National), as the case may be.

1.351    **National Treatment:**  With respect to each Class of National Insured Bond Claims, the treatment set forth in Article LXXV hereof.

1.352    **National Trust:**  The trust(s) which may be formed, on or prior to the Effective Date, by the Commonwealth or PBA, the sole cost and expense of which, including, but not limited to, the formation and maintenance of the trust(s) (including trustee fees and expenses), shall be satisfied from the assets of the National Trust, and for the benefit of beneficial holders of such National Insured Bonds, the terms of which shall be set forth in the Plan Supplement.

1.353    **Net Allowed ERS Bond Claims:**  Collectively, (a) Allowed ERS Bond Claims minus (b) the amount of adequate protection payments received by a holder of such Allowed ERS Bond Claims from and after the ERS Petition Date, calculated on a CUSIP-by-CUSIP basis.

1.354    **Net CW Cash Consideration:**  The amount of Cash equal to Five Hundred Seventy-Five Million Dollars ($575,000,000.00) in Cash, minus (a) up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing in its sole and absolute discretion, as necessary to fund the administration and operation of the Avoidance Actions Trust, (b) such amounts paid to compensate the Creditors' Committee appointees to the Avoidance Actions Trust Board and their counsel in connection with their review

and analysis of the claims reconciliation process in accordance with Article LXXXII of the Plan, which under all circumstances shall not exceed, on an annual basis, Three Million Dollars ($3,000,000.00), and (c) such amount of Cash as is necessary to satisfy the payment of Allowed Convenience Claims in accordance with Article LXXII of the Plan,

1.355    **Net Tax-Supported Debt:**  Any Tax-Supported Debt, excluding any (a) Debt guaranteed by the full faith, credit and taxing power of the Commonwealth that is not payable from or secured by Debt Policy Revenues requiring its continued payment from non-Debt Policy Revenues, to the extent that the Commonwealth's guarantee has not been drawn upon in the five (5) most recently completed FYs, (b) Debt being refinanced through the proceeds of the proposed bond or note issuance, and (c) Debt and obligations expressly excluded from the calculation of the Comprehensive Cap in Section 74.4 hereof.

1.356    **New GO 5.0% CABs:**  Collectively, the series of general obligation capital appreciation bonds, accreting interest at the rate of five percent (5%) per annum, to be issued pursuant to the Plan as components of New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.357    **New GO 5.375% CABs:**  Collectively, the series of general obligation capital appreciation bonds, accreting interest at the rate of five and three hundred seventy-five one thousandths percent (5.375%) per annum, to be issued pursuant to the Plan as components of New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.358    **New GO Bonds:**  Collectively, (a) New GO CIBs, (b) New GO 5.375% CABs, and (c) New GO 5.0% CABs, issued as general obligation bonds, the payment for which the Commonwealth has pledged its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the Confirmation Order, the New GO Bonds Indenture, and the New GO Bonds Legislation, including, without limitation, any refunding bonds which may be issued in accordance with the New GO Bonds Indenture and the New GO Bonds Legislation.

1.359    **New GO Bonds Indenture:**  The indenture to be executed and delivered as of the Effective Date pursuant to which the Commonwealth shall issue the New GO Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions.

1.360    **New GO Bonds Legislation:**  Act 53-2021, the legislation enacted authorizing certain transactions contemplated by, and consistent with, the Plan, including, without limitation, legislation authorizing the issuance of the New GO Bonds consistent with the terms set forth herein and in the GO/PBA Plan Support Agreement.

1.361    **New GO Bonds Trustee:**  The trustee or replacement trustee, as the case may be, appointed in accordance with the terms and conditions of the New GO Bonds Indenture.

1.362 **New GO CIBs:** Collectively, the series of general obligation current interest bonds to be issued pursuant to the Plan as components of the New GO Bonds and to be distributed pursuant to the terms and provisions of the Plan.

1.363 **New GO Refunding Bonds:** The securities which may be issued by Reorganized Commonwealth from and after the Effective Date, for the purpose of refinancing, in whole or in part, New GO Bonds or securities previously issued to refinance New GO Bonds, provided that, (a) the final maturity date on any such refinancing securities shall not be later than thirty (30) years from the original scheduled final maturity date of the New GO Bonds, and (b) upon the issuance of any such securities, the annual debt service due in the then-current and each future fiscal year on all New GO Bonds and New GO Refunding Bonds outstanding after the issuance of the New GO Refunding Bonds shall be equal to or less than the annual debt service due in the then-current and each future fiscal year through FY 2046, respectively, on all New GO Bonds and New GO Refunding Bonds outstanding prior to such issuance.

1.364 **New HTA Bonds:** Collectively, the bonds to be issued on the HTA Effective Date by HTA in accordance with the terms and conditions of the HTA Plan, the HTA Confirmation Order, and the New HTA Bonds Indenture, including, without limitation, any refunding bonds which may be issued in accordance with the New HTA Bonds Indenture.

1.365 **New HTA Bonds Indenture:** The indenture or resolution to be executed and delivered as of the HTA Effective Date pursuant to which HTA shall issue the New HTA Bonds, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time, in accordance with its terms and conditions, which indenture or resolution shall be reasonably satisfactory to Assured and National. .

1.366 **Non-Own Source Revenues:** Collectively, the revenues of the Commonwealth received from the United States government or any agencies or instrumentalities thereof.

1.367 **Notas de Ahorro:** Collectively, savings notes issued by the Commonwealth pursuant to Act No. 7 of the Legislature of Puerto Rico, the payment of which is backed by the full faith and credit of the Commonwealth.

1.368 **OGP:** The Office of Management and Budget of the Commonwealth.

1.369 **Ordinary Course Employee Claim:** A Claim held by an employee of the Debtors related to ordinary course employment matters, including, without limitation, a Claim related to termination, holiday pay, vacation, sick leave, back-pay, or other similar Claims; provided, however, that, an "Ordinary Course Employee Claim" shall not include Claims related to retiree benefits.

1.370 **Outperformance Condition:** The amount that Measured SUT exceeds the "Outperformance Metric", as defined in the Settlement Summary annexed as Exhibit "I" to the GO/PBA Plan Support Agreement, in any FY.

1.371 **Outstanding:** Debt that (i) has not been paid in full in accordance with its terms or (ii) has not been legally defeased in accordance with the defeasance requirements set forth in the applicable definitive issuance documents.

1.372 **Oversight Board:** The Financial Oversight and Management Board for Puerto Rico established pursuant to Section 101 of PROMESA, as the Debtors' representative in their respective Title III Cases pursuant to Section 315(b) of PROMESA.

1.373 **Participant:** A current, former, active, inactive, or disabled employee who holds an accrued claim for one or more retirement benefits on account of being or having been a participant in ERS, JRS, or TRS, together with its beneficiaries, if any.

1.374 **PayGo:** The pay-as-you-go pension system created in accordance with Act 106 of 2017.

1.375 **PBA:** Puerto Rico Public Buildings Authority.

1.376 **PBA Administrative Expense Claim:** The Claim of PBA against the Commonwealth relating to the Commonwealth's use and occupancy of PBA Property during the period from the commencement of the Commonwealth's Title III Case up to and including the Effective Date.

1.377 **PBA Bond Claims:** Collectively, the Claims against PBA arising from or relating to the PBA Bonds, including the Vintage PBA Bond Claims, the Vintage PBA Bond Claims (Ambac), the Vintage PBA Bond Claims (Assured), the Vintage PBA Bond Claims (National), the Vintage PBA Bond Claims (FGIC), the Vintage Bond Claims (Syncora), the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the Retail PBA Bond Claims.

1.378 **PBA Bond Distribution:** The distribution of Cash to holders of Allowed PBA Bond Claims in an amount equal to the Allowed PBA Administrative Expense Claim.

1.379 **PBA Bonds:** Collectively, the 2011 PBA Bonds, the 2012 PBA Bonds and the Vintage PBA Bonds.

1.380 **PBA Cash:** One Billion Seventy-Three Million Dollars ($1,073,000,000.00), the amount paid by the Commonwealth in connection with the compromise and settlement of the Allowed PBA Administrative Expense Claim.

1.381 **PBA/DRA Secured Claim:** Collectively, the loans allegedly made by GDB to PBA, which, as of the PBA Petition Date, were in the outstanding principal amount of Sixty-Eight Million Six Hundred Fifty-Three Thousand Two Hundred Ninety-Seven Dollars and Sixty-Nine Cents ($68,653,297.69), the repayment of which is asserted to be secured by the proceeds of the sale or disposition of certain PBA Property and subordinated to all rights and recoveries with respect to the PBA Bonds.

1.382 **PBA/DRA Unsecured Claim:** Collectively, the subordinated loans allegedly made by GDB, to PBA, which, as of the PBA Petition Date, were in the outstanding principal

amount of One Hundred Thirty-Eight Million Six Hundred Seventy-Eight Thousand Nine Hundred Thirty-Five Dollars and Seventy-One Cents ($138,678,935.71).

1.383 **PBA General Unsecured Claim:** A Claim against PBA, other than a PBA Bond Claim, a PBA/DRA Secured Claim and a PBA/DRA Unsecured Claim, but including Ordinary Course Employee Claims against PBA.

1.384 **PBA Litigation:** The adversary proceeding styled The Financial Oversight & Management Board of Puerto Rico v. Puerto Rico Public Buildings Authority, Adv. Proc. No. 18-00149, currently pending in the Title III Court.

1.385 **PBA Petition Date:** September 27, 2019, the date on which the PBA Title III Case was commenced.

1.386 **PBA Property:** All property for which any right, title or interest currently resides in PBA, including, without limitation, the buildings and other facilities owned or leased by PBA.

1.387 **PBA Title III Case:** The Title III case under PROMESA pending in the Title III Court, captioned as In re Financial Oversight & Management Board for Puerto Rico as representative of Puerto Rico Public Buildings Authority, Case No. 19-5523-LTS (D.P.R).

1.388 **Pension Reserve Deed of Trust:** The deed of trust to be executed and delivered on or prior to the Effective Date, reasonably acceptable to the Government of Puerto Rico, the Retiree Committee, and labor organizations party to plan support agreements for the Plan, substantially in the form included in the Plan Supplement, providing for, among other things, creating the Pension Reserve Trust and providing for the terms for the deposit and withdrawal of monies in the Pension Reserve Trust for the benefit of the Retirees.

1.389 **Pension Reserve Trust:** The reserve trust to be created in accordance with the terms and conditions of Article LXXXIII hereof, which reserve trust shall be utilized for payment of the Commonwealth's pension obligations under Act 106 and which shall not be subject to taxation by the Commonwealth.

1.390 **Person:** An individual, general partnership, limited partnership, corporation, limited liability company, limited liability partnership, cooperative, trust, unincorporated organization, association, joint stock company, joint venture, estate, government, or agency or political subdivision thereof, or any other form of legal entity.

1.391 **PFC:** Puerto Rico Public Finance Corporation.

1.392 **Plan:** This Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., including, without limitation, the exhibits and schedules hereto, as the same is amended, supplemented, or modified from time to time in accordance with the provisions of PROMESA, the Bankruptcy Code and the terms hereof.

1.393 **Plan Supplement:** A separate volume, to be filed with the Clerk of the Title III Court, including, among other documents, forms of the New GO Bonds and the CVIs and, if not

previously enacted, the draft of the New GO Bonds Legislation and the CVI Legislation, respectively, which, in each case, shall be in form and substance reasonably satisfactory to AAFAF, the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Ambac, Assured, FGIC, National, and Syncora, and, solely with respect to the provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee. The Plan Supplement (containing draft or final versions of the foregoing documents) shall be filed with the Clerk of the Title III Court as soon as practicable (but in no event later than seven (7) days) prior to the Ballot Date, or on such other date as the Title III Court establishes. The Plan Supplement shall be deemed incorporated into and part of the Plan as if set forth herein in full.

1.394 **Ports:** Ports of the Americas Authority.

1.395 **PRASA:** Puerto Rico Aqueduct and Sewer Authority.

1.396 **PREPA:** The Puerto Rico Electric Power Authority.

1.397 **PRIDCO:** Puerto Rico Industrial Development Company.

1.398 **PRIFA:** Puerto Rico Infrastructure Financing Authority.

1.399 **PRIFA BANs:** Collectively, the PRIFA Bond Anticipation Notes, Series 2015, issued pursuant to that certain Trust Agreement dated March 2015, between PRIFA and the PRIFA BANs Trustee.

1.400 **PRIFA BANs Commonwealth Guaranty:** That certain Guaranty Agreement, dated as of March 1, 2015, made by the Commonwealth to and for the benefit of RBC Municipal Products, LLC, as initial purchaser, and for the benefit of the PRIFA BANs Trustee.

1.401 **PRIFA BANs Litigation:** The litigation styled The Financial Oversight and Management Board for Puerto Rico v. The Bank of New York Mellon, et al., Adv. Pro. No. 19-AP-269-LTS, currently pending in the Title III Court.

1.402 **PRIFA BANs Trustee:** The Bank of New York Mellon, solely in its capacity as trustee, paying agent, and registrar with respect to the PRIFA BANs.

1.403 **PRIFA Bond Claims:** Collectively, the Claims against PRIFA arising from or relating to the PRIFA Bonds.

1.404 **PRIFA Bonds:** Collectively, the following bonds issued by PRIFA: (a) Special Tax Revenue Bonds, Section 2005A, issued in the original principal amount of Three Hundred Nine Million One Hundred Two Thousand Five Hundred Seventy-Seven Dollars and Thirty-Five Cents ($309,102,577.35), (b) Special Tax Revenue Bonds, Series 2005B, issued in the original principal amount of Three Hundred Twenty-Four Million Six Hundred Twenty-Five Thousand Dollars ($324,625,000.00), (c) Special Tax Revenue Refunding Bonds, Series 2005C, issued in the original principal amount of Six Hundred Ninety-Nine Million Two Hundred Thirty-Five Thousand Three Hundred Thirty-Eight Dollars and Eighty Cents ($699,235,338.80), and (d)

Special Tax Revenue Bonds, Series 2006, issued in the original principal amount of Four Hundred Sixty-Nine Million Seven Hundred Seventy Thousand Dollars ($469,770,000.00).

1.405 **PRIFA Clawback CVI:** The series or subseries of contingent value instrument, the payment for which the Commonwealth shall have pledged its full faith, credit and taxing power pursuant to Article VI of the Puerto Rico Constitution and applicable Puerto Rico law, as more fully described in (a) Annex 4 of Exhibit "J" annexed hereto as twenty-seven percent (27%) of the Clawback CVIs and (b) the Settlement Summary annexed hereto as Exhibit "M" including the Rum Tax CVI to be issued on the Effective Date by the Commonwealth to the holders of PRIFA Bond Claims in accordance with the terms and conditions hereof, the Plan, the Confirmation Order, the PRIFA Order, the CVI Legislation, and the Clawback CVI Indenture.

1.406 **PRIFA Distribution Conditions:** Collectively, (a) the Effective Date shall have occurred, (b) the documentation of the PRIFA Plan, the PRIFA Order, the CVI Indenture, and the Custodial Trust Documents, as applicable, shall have been agreed upon by the Oversight Board, Ambac, and FGIC, and (c) holders of, or insurers entitled to vote with respect to the PRIFA Bonds, holding or insuring, as the case may be, at least seventy percent (70%) of the outstanding principal amount of the PRIFA Bonds shall have executed the PRIFA Plan Support Agreement or a Joinder Agreement or an Annex Agreement with respect thereto; provided, however, that, upon entry of a Final Order with respect to the PRIFA Order, the condition set forth in subsection (c) shall be deemed satisfied.

1.407 **PRIFA Order:** The order of the Title III Court either (a) confirming a plan of adjustment for PRIFA in the event a Title III case is commenced by the Oversight Board on behalf of PRIFA in the Title III Court, or (b) approving a qualifying modification under Title VI of PROMESA on behalf of PRIFA.

1.408 **PRIFA Plan:** As determined by the Oversight Board, upon consultation with AAFAF, either (a) in the event that a Title III case is commenced by the Oversight Board on behalf of PRIFA in the Title III Court, the plan of adjustment filed by the Oversight Board and confirmed by the Title III Court pursuant to the PRIFA Order, or (b) in the event that Ambac or FGIC propose to the Oversight Board a modification of the PRIFA Bonds under Title VI of PROMESA consistent with the terms and conditions set forth in the Settlement Summary annexed as Exhibit "F" to the PRIFA Plan Support Agreement, the application to approve such qualifying modification filed by the Oversight Board.

1.409 **PRIFA Plan Support Agreement:** That certain PRIFA Related Plan Support Agreement, dated as of July 27, 2021, by and among the Oversight Board and the PRIFA PSA Creditors, as it may be amended, modified, or supplemented in accordance with the terms thereof.

1.410 **PRIFA PSA Creditors:** Collectively, the parties to the PRIFA Plan Support Agreement, other than the Oversight Board.

1.411 **Professional:** An Entity (a) to be compensated for services rendered prior to or on the Effective Date pursuant to Sections 316 and 317 of PROMESA, and (i) employed in the Title III Cases by the Government Parties (in the Government Parties' sole discretion); (ii)

employed in the Title III Cases by the Oversight Board (in the Oversight Board's sole discretion); or (iii) a committee appointed in accordance with section 1103 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been Allowed by the Title III Court pursuant to section 503(b)(4) of the Bankruptcy Code.

1.412    **Professional Claim:**  A Claim by a Professional seeking an award by the Title III Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Sections 316 and 317 of PROMESA.

1.413    **Projected Fiscal Plan Surplus:**  The projected primary unrestricted Fiscal Plan Surplus as set forth in the Fiscal Plan as in effect as of the Effective Date <u>minus</u> the sum of (a) projected CVI payments for such FY and (b) the positive difference, if any, of projected Non-Own Source Revenues <u>minus</u> actual Non-Own Source Revenues for such FY; <u>provided</u>, <u>however</u>, that, in the event of (i) a federally-declared natural disaster, or (ii) a federally – declared pandemic other than the current Covid-19 pandemic in any FY, upon the filing of a motion by the Government of the Commonwealth of Puerto Rico, and upon notice and a hearing, "Projected Fiscal Plan Surplus" shall be reduced by the amount of any actual reduction in revenues for such FY as compared to projected revenues for such FY as set forth in the Fiscal Plan in effect on the Effective Date, whether or not the council acting on behalf of the Pension Reserve Trust agrees to such reduction, in the event that the Title III Court determines, by entry of a Final Order, that the amount of such reduction is directly attributable to such natural disaster or pandemic.

1.414    **PROMESA:**  The Puerto Rico Oversight, Management, and Economic Stability Act, Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C. § 2101, et. seq., as it may be amended or modified.

1.415    **Pro Rata Share:**  With respect to Allowed Claims (a) among and within Classes within the same Bond Recovery Category set forth in Exhibit "L" hereto, the proportion that an Allowed Claim bears to the sum of all Allowed Claims within such Class (or within all Classes within such Bond Recovery Category, as applicable), taking into account, and reducing for, unmatured interest thereon as of the Commonwealth Petition Date or the PBA Petition Date, as the case may be, with respect to individual bonds within such Class, and (b) among more than one Class, but not within the same Bond Recovery Category, the proportion that Allowed Claims within such Class of Claims receive in consideration bears to the sum of consideration received by all Claims within all applicable Classes.

1.416    **PSA Creditors:**  Collectively, the GO/PBA PSA Creditors and the HTA/CCDA PSA Creditors.

1.417    **PSA Restriction Fees:**  Collectively, the GO/PBA Restriction Fee and the CCDA Restriction Fee.

1.418    **Puerto Rico Investor:**  A holder of a CW Bond Claim, a PBA Bond Claim, or a CW Guarantee Bond Claim that is, or that is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth of Puerto Rico for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board in its sole

and absolute discretion); provided, however, that "Puerto Rico Investor" shall not include any holder of a GO Bond or a PBA Bond, the payment of principal and interest of which is insured by Ambac, Assured, FGIC, National, or Syncora.

1.419    **QTCB Group:**  The QTCB Noteholder Group consisting of Canyon Capital Advisors LLC, Sculptor Capital LP, and Davidson Kempner Capital Management LP, each on behalf of itself or on behalf of its participating clients or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms and conditions of the GO/PBA Plan Support Agreement.

1.420    **Related Persons:**  With respect to (a) any of the Debtors (including for the avoidance of doubt, the Commonwealth and the Government Parties), including, without limitation, its predecessors, successors and assigns (whether by operation of law or otherwise) and any and all Professionals retained by the Debtors and AAFAF), or other representatives, nominees or investment managers, each acting in such capacity, and any Entity claiming by or through any of them each in its respective capacity as such, (b) with respect to each of the Creditors' Committee and the Retiree Committee, its successors and assigns (whether by operation of law or otherwise) and their respective current and former members, financial advisors, attorneys, accountants, consultants, agents and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, including their respective counsel and advisors, in each case, solely to the extent acting in such capacity, and (c) solely in connection with (i) the releases given by the Debtors pursuant to the terms and provisions of Sections 92.2 and 92.5 of the Plan, and (ii) the exculpation provided pursuant to the terms and provisions of Sections 92.7(b) and 92.7(f) of the Plan, with respect to each of the PSA Creditors, AFSCME, Ambac, Assured, FGIC, National, and Syncora, their respective predecessors, successors and assigns (whether by operation of law or otherwise), and their respective financial advisors, attorneys, accountants, consultants, agents, and professionals, or other representatives, each acting in such capacity, and any Entity acting for or on behalf of any of them, in each case, solely to the extent acting in such capacity; provided, however, that "Related Persons" is not intended, nor shall it be construed, to include AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR and PREPA.

1.421    **Released Claims:**  Collectively, (a) with respect to those Entities party to the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, and the PRIFA Plan Support Agreement, Claims and Causes of Action released hereunder and in accordance with the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, and the PRIFA Plan Support Agreement, respectively, (b) Claims and Causes of Action that arise in, are related to or have been or could have been asserted against the Debtors or their Assets in the Title III Cases, (c) Claims and Causes of Action that have been or could have been asserted by the Debtors (with respect to releases given by the Debtors) or the Government Parties relating to Claims they have against the Released Parties (with respect to releases given by Releasing Parties), (d) Claims and Causes of Action related to the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 17-3283-LTS, ECF No. 15854], as amended, and Claims and Causes of Action related to the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial

Advisory Authority Acting on Behalf of the Government Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended, and (e) Claims that otherwise arise from or relate to the Title III Cases, the Plan, the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan Support Agreement, Retiree Committee Plan Support Agreement, the AFSCME Plan Support Agreement, any plan support agreement with AMPR, the ERS Stipulation, the Committee Agreement, and the compromises set forth herein, including, without limitation, in connection with or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities, operations, or property; provided, however, that, "Released Claims" is not intended to include, nor shall it have the effect of including, Claims or Causes of Action unrelated to the Debtors or Claims or Causes of Action for gross negligence, willful misconduct or intentional fraud asserted, or that could have been asserted, whether sounding in contract or tort; and, provided, further, that "Released Claims: is not intended to release, nor shall it have the effect of releasing, any Entity in its capacity as a defendant in any Avoidance Action, including a party to a tolling agreement with the Commonwealth and/or ERS related to such Cause of Action; and, provided, further, that "Released Claims" is not intended to release, nor shall it have the effect of releasing, any party from the performance of its obligations in accordance with the Confirmation Order or the Plan, including, without limitation, performance of obligations arising from or related to New GO Bonds, the New Refunding Bonds, the CVIs or under any policy of insurance or related documents issued by a Monoline; and, provided, further, that "Released Claims" shall not include claims against AFICA, CCDA, COFINA, COSSEC, HTA, MBA, MFA, PFC, PRASA, PRIDCO, PRIFA, UPR, and PREPA.

1.422    **Released Parties:**  Collectively, solely to the extent provided in the Plan or the Confirmation Order, (a) the Government Parties, (b) the PSA Creditors, (c) the Retiree Committee, (d) the Creditors' Committee, (e) AFSCME, and (f) with respect to the foregoing clauses (a) through (e), each of their respective Related Persons.

1.423    **Releasing Parties:**  Collectively, solely to the extent provided in the Plan, (a) all holders of Claims against the Debtors or their Assets; (b) such holders' current and former Affiliates and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former Related Persons.

1.424    **Reorganized Commonwealth:**  The Commonwealth, from and after the Effective Date.

1.425    **Reorganized Debtors:**  The Debtors, from and after the Effective Date.

1.426    **Reorganized Debtors' By-Laws:**  The by-laws of the Debtors, to the extent applicable, from and after the Effective Date.

1.427    **Restriction Fee Creditors:**  Collectively, the CCDA Restriction Fee Creditors and the Initial GO/PBA PSA Restriction Fee Creditors or the GO/PBA Joinder Creditors, as applicable.

1.428     **Retail 2011 CW Bond Claim:** A 2011 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.429     **Retail 2011 CW Series D/E/PIB Bond Claim:** A Claim of 2011 CW Series D/E/PIB Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.430     **Retail 2011 PBA Bond Claim:** A 2011 PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.431     **Retail 2012 CW Bond Claim:** A 2012 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.432     **Retail 2012 PBA Bond Claim:** A 2012 PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.433     **Retail 2014 CW Bond Claim:** A 2014 CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.434     **Retail CW Bond Claims:** Collectively, the Retail Vintage CW Bond Claims, the Retail 2011 CW Bond Claims, the Retail CW Series 2011 D/E/PIB Bond Claims, the Retail 2012 CW Bond Claims and the Retail 2014 CW Bond Claims.

1.435     **Retail Investor:** An individual who purchased GO Bonds, PBA Bonds and/or CW Guarantee Bond Claims for his or her own brokerage account, trust account, custodial account or in a separately managed account, with aggregate holdings in an amount less than One Million Dollars ($1,000,000.00); provided, however, that "Retail Investor" shall not include any individual in his or her capacity as a holder of a GO Bond or a PBA Bond (a) the payment of principal and interest of which is insured by Ambac, Assured, FGIC, National or Syncora, or (b) who tendered for exchange such GO Bond or PBA Bond, as the case may be, in accordance with the terms and provisions of Article II of the GO/PBA Plan Support Agreement, in which case, such individual shall be deemed a holder of GO Bonds or PBA Bonds in the applicable Class of GO Bonds or PBA Bonds, as the case may be, not held by Retail Investors.

1.436     **Retail PBA Bond Claims:** Collectively, the Retail Vintage PBA Bond Claims, the Retail 2011 PBA Bond Claims, and the Retail 2012 PBA Bond Claims.

1.437     **Retail Support Fee:** Collectively, that portion of the fees to be made available to Retail Investors, in accordance with the terms and provisions of the GO/PBA Plan Support Agreement, the Plan, and the Confirmation Order, which fees, in the aggregate, shall not exceed Fifty Million Dollars ($50,000,000.00); provided, however, that, notwithstanding the foregoing, in

accordance with the provisions of the GO/PBA Plan Support Agreement, Section 3.6 hereof and the Confirmation Order, such aggregate amount may be decreased on account of the Retail Support Fee Return, with the aggregate amount of the Retail Support Fee Return being redistributed in accordance with the provisions of the GO/PBA Plan Support Agreement, Section 3.6 hereof and the Confirmation Order.

1.438 **Retail Support Fee Return:** Collectively, that portion of the Retail Support Fee not allocated to classes of Retail Investors, which portion is then payable and reallocated to Initial GO/PBA PSA Restriction Fee Creditors and members of Retail Investor Classes that voted to accept the Plan in accordance with the provisions of Section 3.6 hereof and the Confirmation Order.

1.439 **Retail Vintage CW Bond Claim:** A Vintage CW Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's GO Bonds is equal to or less than One Million Dollars ($1,000,000.00).

1.440 **Retail Vintage PBA Bond Claim:** A Vintage PBA Bond Claim held by a Retail Investor, provided that the aggregate amount of such holder's PBA Bonds is equal to be less than One Million Dollars ($1,000,000.00).

1.441 **Retired ERS Participant Above-Threshold Claim:** An ERS Participant Claim held by a Retiree (a) with respect to whom (i) the total monthly benefit as of April 1, 2021 or (ii) the future benefit payable under Act 70-2010 or Act 211-2015 is greater than the Threshold, or (b) who benefits from Act 127-1958.

1.442 **Retired ERS Participant Below-Threshold Claim:** An ERS Participant Claim held by a Retiree (a) with respect to whom (i)the total monthly benefit as of April 1, 2021 or (ii) the future benefit payable under Act 70-2010 or Act 211-2015 is equal to or less than the Threshold, or (b) who does not benefit from Act 127-1950.

1.443 **Retired JRS Participant Above-Threshold Claim:** A JRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is greater than the Threshold.

1.444 **Retired JRS Participant Below-Threshold Claim:** A JRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is equal to or less than the Threshold.

1.445 **Retired TRS Participant Above-Threshold Claim:** A TRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is greater than the Threshold.

1.446 **Retired TRS Participant Below-Threshold Claim:** A TRS Participant Claim held by a Retiree with respect to whom the total monthly benefit as of April 1, 2021 is equal to or less than the Threshold.

1.447    **Retiree:**  A person who, as reflected in the records of ERS, JRS, or TRS, as applicable, as of April 1, 2021, receives a pension or annuity as a Participant in ERS, JRS or TRS; provided, however, that, under no circumstances shall a "Retiree" include a former employee of the Government of Puerto Rico who left public service before vesting in any pension benefits and who was not reimbursed for such person's contributions to ERS, JRS or TRS up to and including the date of separation.

1.448    **Retiree Claim:**  An ERS Participant Claim, a JRS Participant Claim or a TRS Participant Claim held by a Retiree.

1.449    **Retiree Committee:**  The committee of retired former employees of the Commonwealth, its agencies and instrumentalities appointed by the Office of the United States Trustee in the Commonwealth Title III Case.

1.450    **Retiree Committee Plan Support Agreement:**  That certain Plan Support Agreement, dated as of June 7, 2019, by and between the Debtor, by and through the Oversight Board, pursuant to Section 315(b) of PROMESA, and the Retiree Committee, as may be amended or supplemented by the parties thereto.

1.451    **Rum Tax CVI:**  The contingent value instrument, as more fully described in the Settlement Summary annexed as Exhibit "M" annexed hereto, to be issued on the Effective Date by the Commonwealth in accordance with the terms and conditions of the Plan, the PRIFA Plan, the Confirmation Order, the PRIFA Order, and the Rum Tax CVI Indenture.

1.452    **Rum Tax CVI Indenture:**  The indenture to be executed and delivered on or prior to the Effective Date pursuant to which the Commonwealth shall issue the Rum Tax CVI, and including all of the terms and provisions in connection therewith, as it may be amended, supplemented or modified from time to time in accordance with its terms and conditions, which indenture may be part of, or included in, the CVI Indenture.

1.453    **Sales Tax:**  The sales and use tax, including any replacement or similar sales and use tax, imposed by the government of Puerto Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended, and known as the Internal Revenue Code for a New Puerto Rico.

1.454    **SCC Action:**  The litigation styled Special Claims Committee v. Barclays Capital, et al., Adv. Proc. No. 19-00280-LTS, currently pending in the Title III Court.

1.455    **SEC:**  The United States Securities and Exchange Commission,

1.456    **Section 510(b) Subordinated Claim:**  Any Claim, to the extent determined pursuant to a Final Order, against the Debtors' or their Assets arising from or relating to (a) rescission of a purchase or sale of an existing security of a Debtor or an Affiliate of a Debtor, (b) purchase, sale or retention of such a security, or (c) reimbursement, indemnification or contribution allowed under section 502 of the Bankruptcy Code on account of such Claim.

1.457    **Securities Act:** The Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state, or local law.

1.458    **Solicitation Agent:** Prime Clerk LLC, the notice, claims, and solicitation agent retained by the Debtors in the Title III Cases by Title III Court order.

1.459    **SPU:** Servidores Publicos Unidos.

1.460    **Substitute Measured Tax:** All or a portion of a tax of general applicability throughout the Commonwealth that, through a change in law or through executive or judicial action, is designated or enacted in full substitution of the Measured SUT or otherwise constitutes like or comparable measure of economic activity within the Commonwealth, in each case in accordance with the terms of the CVI Legislation and the CVI Indenture.

1.461    **Syncora:** Syncora Guarantee Inc., or its successor or designee.

1.462    **Syncora Acceleration Price:** With respect to any Syncora Insured Bonds, an amount equal to the outstanding principal amount of such Syncora Insured Bonds plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date.

1.463    **Syncora Certificates:** With respect to each Syncora Trust that is formed for the benefit of the beneficial holders of a Syncora Insured Bonds CUSIP, the certificate(s) or receipt(s) to be issued by such Syncora Trust to beneficial holders of such Syncora Insured Bonds CUSIP that are deposited into such Syncora Trust.

1.464    **Syncora Commutation Consideration:** A combination of some or all of the following, to be selected at Syncora's sole discretion prior to the commencement of the Disclosure Statement Hearing: (i) some or all of a holder's Pro Rata Share of the Plan Consideration; (ii) a percentage, to be determined at Syncora's sole discretion, of the Consummation Costs and/or the PSA Restriction Fees allocable to Syncora; and (iii) Cash in an amount to be determined by Syncora in its sole discretion.

1.465    **Syncora Commutation Treatment:** The treatment set forth in Section 75.3(a) hereof.

1.466    **Syncora Escrow Account:** A single escrow account that will be formed, on or prior to the Effective Date by the Commonwealth or PBA, at the sole cost and expense of Syncora, and for the benefit of the beneficial holders of Syncora Insured Bonds whose Plan Consideration is deposited therein.

1.467    **Syncora Insured Bond Claims:** Collectively, the Bond Claims arising from the Syncora Insured Bonds, including, for the avoidance of doubt, any Vintage CW Guarantee Bond Claims (Syncora).

59

1.468　**Syncora Insured Bonds:**  Collectively, the GO Bonds and the PBA Bonds that have been insured by Syncora, including, without limitation, pursuant to a secondary market insurance policy.

1.469　**Syncora Insurance Policies:**  The existing insurance policies issued by Syncora relating to the Syncora Insured Bonds, together with any and all agreements and other documents related thereto.

1.470　**Syncora Non-Commutation Treatment:**  The treatment set forth in Section 75.3(b) hereof.

1.471　**Syncora Plan Consideration:**  The consideration allocable or distributable to holders of Allowed Vintage PBA Bond Claims (Syncora), Allowed Vintage CW Bond Claims (Syncora), and Allowed Vintage CW Guarantee Bond Claims (Syncora), as the case may be.

1.472　**Syncora Treatment:**  With respect to each Class of Syncora Insured Bond Claims, the treatment set forth in Article LXXV hereof.

1.473　**Syncora Trust:**  With respect to each Syncora Insured Bonds CUSIP, a separate trust or custodial arrangement that will be formed, on or prior to the Effective Date, by the Commonwealth or PBA, at the sole cost and expense of Syncora and for the benefit of the beneficial holders of such Syncora Insured Bonds CUSIP.

1.474　**System 2000:**  The pension contribution system implemented in accordance with Act No. 305-1999, codified at 3 L.P.R.A. §§786-1, et seq, or Act 3-2013.

1.475　**System 2000 Participant Claim:**  A Claim that accrued under System 2000 or Act 3, by a Participant whose hire date was on or after January 1, 2000.

1.476　**Taxable Bond Distributions:**  Collectively, the Vintage Taxable Bond Distribution, the 2011 CW Taxable Bond Distribution, the 2011 CW Series D/E/PIB Taxable Bond Distribution, the 2012 CW Taxable Bond Distribution, the 2014 CW Taxable Bond Distribution, the Vintage CW Guarantee Taxable Bond Distributions, the 2011 CW Guarantee Taxable Bond Distribution, the 2012 CW Guarantee Taxable Bond Distribution, and the 2014 CW Guarantee Taxable Bond Distribution.

1.477　**Taxable Election CW Claims:**  Collectively, the Vintage CW Bond Claims (Taxable Election), the Vintage CW Guarantee Bond Claims (Taxable Election), the 2011 CW Bond Claims (Taxable Election), the 2011 CW Guarantee Bond Claims (Taxable Election), the 2011 CW Series D/E/PIB Bond Claims (Taxable Election), the 2012 CW Bond Claims (Taxable Election), the 2012 CW Guarantee Bond Claims (Taxable Election), the 2014 CW Bond Claims (Taxable Election) and the 2014 CW Guarantee Bond Claims (Taxable Election).

1.478　**Taxable New GO Bonds:**  Collectively, the portion of the New GO Bonds in the aggregate amount deemed necessary by the Oversight Board, after consultation with Section 103 tax counsel, to be issued as tax exempt under Puerto Rico law, but taxable in accordance with Section 103 of the IRC, which New GO Bonds shall be issued as CIBs with an interest rate of five

percent (5.0%), payable semi-annually in arrears, and having a maturity of July 1, 2041 and be made available to Puerto Rico Investors with respect to the first One Million Dollars ($1,000,000.00) of aggregate holdings of (a) PBA Bond Claims, (b) CW Bond Claims, and (c) CW Guarantee Bond Claims (without duplication).

1.479 **Tax Credit Claims:** Collectively, Claims or rights, other than Energy Incentive Claims and Claims related to the payment of personal income taxes, arising under the Puerto Rico Internal Revenue Code of 2011, as amended, or an economic incentive law, concession, or decree, in each case, resulting in corporate income tax credits, deductions, exemptions or carryforwards.

1.480 **Tax-Supported Debt:** Collectively, without duplication, (a) direct Debt of the Commonwealth for the payment of which the full faith, credit and taxing power of the Commonwealth has been pledged (including the New GO Bonds and CVIs), (b) Debt issued by any Entity and guaranteed by the full faith, credit and taxing power of the Commonwealth, (c) Debt issued by any Entity (including the COFINA Bonds), whether or not guaranteed by the Commonwealth, that is secured by or payable from (i) Debt Policy Revenues or (ii) lease agreements with the Commonwealth or any agency thereof, whether or not subject to annual or periodic legislative appropriations, and (d) any other Debt identified as Tax-Supported Debt in the Debt Management Policy; provided, however, that the following shall not be considered Tax Supported Debt: (1) tax and revenue anticipation notes with a final maturity occurring within the same FY of their issuance; and (2) Debt issued to respond directly to damage or destruction and associated risks to the health, safety and welfare of the people of Puerto Rico caused by hurricanes, earthquakes or other natural disasters, pandemics, terrorism and similar emergencies; and, provided, further, and without limiting the foregoing, "Tax-Supported Debt" excludes (y) revenue bonds of an Entity payable solely from user charges or securitization and transition charges imposed upon customers or former customers of a utility or transportation system, including, without limitation, the self-supporting Debt of PRASA, PREPA, HTA or any related securitization entity, (z) any other Debt that is not payable from Debt Policy Revenues, pursuant to the Debt Management Policy, in each case, to the extent such Debt is not guaranteed by the full faith, credit and taxing power of the Commonwealth; and, provided, further, that, to the extent no provision or clarification increases the Comprehensive Cap, including the secured and/or securitized debt sublimit above the levels set forth in Section 74.4 hereof, the Debt Management Policy may contain additional provisions and clarifications regarding which Debt is considered Tax-Supported Debt consistent with the principles and objectives set forth therein.

1.481 **Threshold:** One Thousand Five Hundred Dollars ($1,500.00) per month.

1.482 **Title III:** Title III of PROMESA.

1.483 **Title III Cases:** Collectively, the Commonwealth Title III Case, the ERS Title III Case, and the PBA Title III Case.

1.484 **Title III Court:** The United States District Court of the District of Puerto Rico or such other court having jurisdiction over the Title III Cases.

1.485 **TRS:** Teachers Retirement System.

1.486 **Trustee Fiscal Agent:** Each of the CCDA Trustee, the ERS Fiscal Agent, the HTA Fiscal Agent, and the PRIFA BANs Trustee.

1.487 **TRS Participant Claim:** A Claim on account of being or having been a Participant in TRS for (a) retiree benefits accrued as of May 3, 2017, and (b) any right to accrue additional retiree benefits in TRS from and after the Effective Date.

1.488 **Trust Documentation:** Collectively, the documentation required, if necessary, to establish and maintain the trust into which with respect to HTA, the HTA Clawback CVI shall be deposited pending, and which shall provide for, the distribution thereof to holders of Allowed CW/HTA Claims (including the applicable Monolines) pursuant to the terms of the HTA/CCDA Plan Support Agreement, which documentation in all cases shall be agreed upon by the Oversight Board and the applicable Monolines.

1.489 **Unclaimed Distribution:** Any distribution to a Creditor that has not (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check, (b) given notice to the Debtors of an intent to accept a particular distribution, (c) responded to the Debtors' requests for information necessary to facilitate a particular distribution or (d) taken any other action necessary to facilitate such distribution.

1.490 **Underwriter Actions:** Collectively, the Ambac Action, the FGIC Action, the National Action, and the SCC Action, or any action brought in the future in any state, federal or Commonwealth court, agency or tribunal against any of the defendants named in such litigations concerning or relating to indebtedness or bonds issued by a Debtor, any of the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth.

1.491 **Unexpired Lease:** A lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under section 365 of the Bankruptcy Code, except as provided in Section 311 of PROMESA.

1.492 **Uniformity Litigation:** Collectively, (a) the litigation styled <u>Ambac Assurance Corporation v. The Financial Oversight and Management Board for Puerto Rico, et al.</u>, Adv. Pro. No. 20-000068-LTS, currently pending in the Title III Court, and (b) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigation have been asserted.

1.493 **UPR:** Universidad de Puerto Rico.

1.494 **Vintage CW Bond Claim:** A Claim against the Commonwealth on account of Vintage CW Bonds, other than a Vintage CW Bond Claim (Ambac), a Vintage CW Bond Claim (Assured), a Vintage CW Bond Claim (FGIC), a Vintage CW Bond Claim (National), a Vintage CW Bond Claim (Syncora), or a Retail Vintage CW Bond Claim.

1.495    **Vintage CW Bond Claim (Ambac):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Ambac.

1.496    **Vintage CW Bond Claim (Assured):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.497    **Vintage CW Bond Claim (FGIC):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by FGIC, including pursuant to a secondary market insurance policy.

1.498    **Vintage CW Bond Claim (National):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by National.

1.499    **Vintage CW Bond Claim (Syncora):**  A Claim against the Commonwealth on account of Vintage CW Bonds, the payment of principal and interest of which has been insured by Syncora.

1.500    **Vintage CW Bond Claim (Taxable Election):**  A Vintage CW Bond Claim or a Retail Vintage CW Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such Vintage CW Bond Claim shall be a Vintage CW Bond Claim (Taxable Election) up to such Vintage CW Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Vintage CW Bond Claim.

1.501    **Vintage CW Bond Recovery:**  The aggregate recovery by holders of Allowed Vintage CW Bond Claims, Allowed Vintage CW Bond Claims (Ambac), Allowed Vintage CW Bond Claims (Assured), Allowed Vintage CW Bond Claims (National), Allowed Vintage CW Bond Claims (FGIC), Allowed Vintage CW Bond Claims (Syncora), and Allowed Retail Vintage CW Bond Claims, consisting of (a) One Billion Nine Hundred Forty Million Four Hundred Thirteen Thousand Five Hundred Seventy-Two Dollars and Sixty-Eight Cents ($1,940,413,572.68) in Cash, (b) Two Billion Three Hundred Thirty-Six Million Two Hundred Twenty-Six Thousand Eight Hundred Thirty Dollars ($2,336,226,830.00) in original principal amount of New GO CIBs, (c) One Hundred Fifty-Four Million Six Hundred Eighty-Three Thousand Seventy Dollars and Twenty-Five Cents ($154,683,070.25) in original principal amount of New GO 5.375% CABs, (d) One Hundred Million Seven Hundred Fifty-Eight Thousand One Hundred Eighty-Two Dollars and Ninety-Five Cents ($100,758,182.95) in original principal amount of New GO 5.0% CABs, and (e) thirty-two and two hundred forty-four one thousandths percent (32.244%) of the GO CVIs.

1.502    **Vintage CW Bonds:**  Collectively, the following bonds issued by the Commonwealth: (a) the Public Improvement Bonds of 1998, issued in the original principal amount of Five Hundred Million Dollars ($500,000,000.00); (b) the Public Improvement Bonds of

63

1999, issued in the original principal amount of Four Hundred Seventy-Five Million Dollars ($475,000,000.00); (c) the Public Improvement Bonds of 2001, Series A, issued in the original principal amount of Two Hundred Seventy-Four Million One Hundred Thirty-Five Thousand Dollars ($274,135,000.00); (d) the Public Improvement Bonds of 2002, Series A, issued in the original principal amount of Four Hundred Fifty-Five Million Dollars ($455,000,000.00); (e) the Public Improvement Bonds of 2003, Series A, issued in the original principal amount of Four Hundred Sixty Million Dollars ($460,000,000.00); (f) the Public Improvement Bonds of 2004, Series A, issued in the original principal amount of Four Hundred Fifty-Seven Million One Hundred Seventy-Five Thousand Dollars ($457,175,000.00); (g) the Public Improvement Bonds of 2005, Series A, issued in the original principal amount of Four Hundred Forty Million Four Hundred Sixty Thousand Dollars ($440,460,000.00); (h) the Public Improvement Bonds of 2006, Series A, issued in the original principal amount of Five Hundred Million Dollars ($500,000,000.00); (i) the Public Improvement Bonds of 2006, Series B, issued in the original principal amount of Thirty-Nine Million Three Hundred Eighty Thousand Dollars ($39,380,000.00); (j) the Public Improvement Bonds of 2007, Series A, issued in the original principal amount of Four Hundred Eight Million Eight Hundred Thousand Dollars ($408,800,000.00); (k) the Public Improvement Bonds of 2008, Series A, issued in the original principal amount of Two Hundred Fifty Million Dollars ($250,000,000.00); (l) the Public Improvement Refunding Bonds, Series 2011A, issued in the original principal amount of Three Hundred Fifty-Six Million Five Hundred Twenty Thousand Dollars ($356,520,000.00); (m) the Public Improvement Refunding Bonds, Series 1998, issued in the original principal amount of Five Hundred Three Million Nine Hundred Sixty-Three Thousand Two Hundred Sixty-Four Dollars ($503,963,264.00); (n) the Public Improvement Refunding Bonds, Series 2000, issued in the original principal amount of Fifty-Five Million Nine Hundred Ten Thousand Nine Hundred Ninety-Three Dollars ($55,910,993.00); (o) the Public Improvement Refunding Bonds, Series 2001, issued in the original principal amount of Three Hundred Thirty-Seven Million Two Hundred Thirty-Five Thousand Dollars ($337,235,000.00); (p) the Public Improvement Refunding Bonds, Series 2002A, issued in the original principal amount of Eight Hundred Thirty-Seven Million Nine Hundred Sixty Thousand Dollars ($837,960,000.00); (q) the Public Improvement Refunding Bonds, Series 2003A, issued in the original principal amount of Eighty-Nine Million Six Hundred Ten Thousand Dollars ($89,610,000.00); (r) the Public Improvement Refunding Bonds, Series 2003C-7, issued in the original principal amount of One Hundred Ninety-Four Million Six Hundred Ten Thousand Dollars ($194,610,000.00); (s) the Public Improvement Refunding Bonds, Series 2006A, issued in the original principal amount of One Hundred One Million Six Hundred Ninety-Five Thousand Dollars ($101,695,000.00); (t) the Public Improvement Refunding Bonds, Series 2006B, issued in the original principal amount of Three Hundred Thirty-Five Million Six Hundred Fifty Thousand Dollars ($335,650,000.00); (u) the Public Improvement Refunding Bonds, Series 2007A, issued in the original principal amount of Nine Hundred Twenty-Six Million Five Hundred Seventy Thousand Dollars ($926,570,000.00); (v) the Public Improvement Refunding Bonds, Series 2007A-4, issued in the original principal amount of Ninety-Three Million Eight Hundred Thirty-Five Thousand Dollars ($93,835,000.00); (w) the Public Improvement Refunding Bonds, Series 2008A, issued in the original principal amount of Seven Hundred Thirty-Five Million Fifteen Thousand Dollars ($735,015,000.00); (x) the Public Improvement Refunding Bonds, Series 2008C, issued in the original principal amount of One Hundred Ninety Million One Hundred Thirty-Five Thousand Dollars ($190,135,000.00);

64

(y) the Public Improvement Refunding Bonds, Series 2009A, issued in the original principal amount of Three Million Four Hundred Twenty-Five Thousand Dollars ($3,425,000.00); (z) the Public Improvement Refunding Bonds, Series 2009B, issued in the original principal amount of Three Hundred Seventy-Two Million Six Hundred Eighty-Five Thousand Dollars ($372,685,000.00); (aa) the Public Improvement Refunding Bonds, Series 2009C, issued in the original principal amount of Two Hundred Ten Million Two Hundred Fifty Thousand Dollars ($210,250,000.00), and (bb) Notas de Ahorro issued prior to 2011 in the outstanding principal amount of Two Hundred Forty-Two Thousand Six Hundred Fifty Dollars ($242,650.00).

1.503    **Vintage CW Guarantee Bond Claim:** A Claim, other than a Vintage CW Guarantee Bond Claim (Ambac), a Vintage CW Guarantee Bond Claim (Assured), a Vintage CW Guarantee Bond Claim (National), a Vintage CW Guarantee Bond Claim (FGIC), and Vintage CW Guarantee Bond Claim (Syncora) on account of the Commonwealth's guarantee of Vintage PBA Bonds; provided, however, that, solely for purposes of distribution under the Plan, the amount of a holder's Vintage CW Guarantee Bond Claim in respect of the Commonwealth's guarantee of Vintage PBA Bonds shall be measured as the amount of such holder's Vintage PBA Bond Claim minus the amount of such holder's PBA Bond Distribution on account of Vintage PBA Bonds; and, provided, further, that Vintage CW Guarantee Claims may include an obligation, other than a Vintage PBA Bond Claim, for which the Commonwealth has pledged its good faith, credit and taxing power as authorized by the Commonwealth Legislature on or prior to December 31, 2012.

1.504    **Vintage CW Guarantee Bond Claim (Ambac):** A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which has been insured by Ambac.

1.505    **Vintage CW Guarantee Bond Claim (Assured):** A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.506    **Vintage CW Guarantee Bond Claim (FGIC):** A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which have been insured by FGIC, including pursuant to a secondary market insurance policy.

1.507    **Vintage CW Guarantee Bond Claim (National):** A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, the payment of principal and interest of which have been insured by National.

1.508    **Vintage CW Guarantee Bond Claim (Syncora):** A Claim against the Commonwealth on account of the Commonwealth's guarantee of Vintage PBA Bond Claims, of the payment of principal and interest of which has been insured by Syncora, including pursuant to a secondary market insurance policy.

1.509    **Vintage CW Guarantee Bond Claim (Taxable Election):** A Vintage CW Guarantee Bond Claim, the holder of which is a Puerto Rico Investor and has affirmatively elected

to receive a Taxable Bond Distribution; provided, however, that, in the event that Taxable Bond Distributions are elected by Puerto Rico Investors holding CW Bond Claims and CW Guarantee Bond Claims in excess of the Maximum Taxable Bond Election Amount, such Vintage CW Guarantee Bond Claim shall be a Vintage CW Guarantee Bond Claim (Taxable Election) up to such Vintage CW Guarantee Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Vintage CW Guarantee Bond Claim.

1.510 **Vintage CW Guarantee Bond Recovery**: The aggregate recovery by holders of Allowed Vintage CW Guarantee Bond Claims, Allowed Vintage CW Guarantee Bond Claims (Ambac), Allowed Vintage CW Guarantee Bond Claims (Assured), Allowed Vintage CW Guarantee Bond Claims (National), Allowed Vintage CW Guarantee Bond Claims (FGIC), and Allowed Vintage CW Guarantee Bond Claims (Syncora), consisting of (a) Six Hundred Fifty-Three Million Seven Hundred Eighty-Two Thousand One Hundred Seventy-Three Dollars and Eighty-One Cents ($653,782,173.81) in Cash, (b) Seven Hundred Eighty-Seven Million One Hundred Forty-Three Thousand Two Hundred Fifty-Six Dollars ($787,143,256.00) in original principal amount of New GO CIBs, (c) Fifty-Two Million One Hundred Seventeen Thousand Two Hundred Fifty-Seven Dollars and Fifty Cents ($52,117,257.50) in original principal amount of New GO 5.375% CABs, (d) Thirty-Three Million Nine Hundred Forty-Eight Thousand Three Hundred Eighty-Three Dollars and Seventeen Cents ($33,948,383.17) in original principal amount of New GO 5.0% CABs, and (e) fifteen and one hundred ninety-four one thousandths percent (15.194%) of the GO CVIs.

1.511 **Vintage CW Guarantee Taxable Bond Distribution**: The distribution to be made to such holder of an Allowed Vintage CW Guarantee Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 30.1 hereof.

1.512 **Vintage PBA Bond Claim**: A Claim against PBA on account of Vintage PBA Bonds, other than a Vintage PBA Bond Claim (Ambac), a Vintage PBA Bond Claim (Assured), a Vintage PBA Bond Claim (National), a Vintage PBA Bond Claim (FGIC), a Vintage PBA Bond Claim (Syncora) or a Retail Vintage PBA Bond Claim.

1.513 **Vintage PBA Bond Claim (Ambac)**: A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Ambac.

1.514 **Vintage PBA Bond Claim (Assured)**: A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Assured, including pursuant to a secondary market insurance policy.

1.515 **Vintage PBA Bond Claim (FGIC)**: A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by FGIC, including pursuant to a secondary market insurance policy.

1.516 **Vintage PBA Bond Claim (National)**: A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by National.

     1.517    **Vintage PBA Bond Claim (Syncora):**  A Claim against PBA on account of Vintage PBA Bonds, the payment of principal and interest of which has been insured by Syncora, including pursuant to a secondary market insurance policy.

     1.518    **Vintage PBA Bond Recovery**:  The aggregate recovery by holders of Allowed Vintage PBA Bond Claims, Allowed Vintage PBA Bond Claims (Ambac), Allowed Vintage PBA Bond Claims (Assured), Allowed Vintage PBA Bond Claims (National), Allowed Vintage PBA Bond Claims (FGIC), Allowed Vintage PBA Bond Claims (Syncora), and Allowed Retail Vintage PBA Bond Claims on account of such Claims, consisting of Six Hundred Eleven Million Three Hundred Thirty-One Thousand One Hundred Eighty-Six Dollars and Five Cents ($611,331,186.05) in Cash.

     1.519    **Vintage PBA Bonds:**  Collectively, (a) the Government Facilities Revenue Refunding Bonds, Series C, issued by PBA in the original principal amount of One Hundred Eighty-Five Million Two Hundred Ninety Thousand Dollars ($185,290,000.00), (b) the Government Facilities Revenue Bonds, Series D, issued by PBA in the original principal amount of Five Hundred Fifty-Three Million Seven Hundred Thirty-Three Thousand Seven Hundred Ninety-Four Dollars and Ninety Cents ($553,733,794.90), (c) the Government Facilities Revenue Refunding Bonds, Series F, issued by PBA in the original principal amount of One Hundred Thirty-One Million Four Hundred Forty-Five Thousand Dollars ($131,445,000.00), (d) the Government Facilities Revenue Bonds, Series G, issued by PBA in the original principal amount of Sixty-Two Million Dollars ($62,000,000.00), (e) the Government Facilities Revenue Refunding Bonds, Series H, issued by PBA in the original principal amount of Two Hundred Seventy-Two Million Seven Hundred Seventeen Thousand Four Hundred Eighteen Dollars and Ten Cents ($272,717,418.10), (f) the Government Facilities Revenue Bonds, Series I, issued by PBA in the original principal amount of Eight Hundred Thirty-Two Million Three Hundred Eighty-Five Thousand Dollars ($832,385,000.00), (g) the Government Facilities Revenue Refunding Bonds, Series J, issued by PBA in the original principal amount of Three Hundred Thirty-Five Million Five Hundred Eighty Thousand Dollars ($335,580,000.00), (h) the Government Facilities Revenue Refunding Bonds, Series K, issued by PBA in the original principal amount of Three Hundred Forty-Seven Million Sixty-Five Thousand Dollars ($347,065,000.00), (i) the Government Facilities Revenue Bonds, Series L, issued by PBA in the original principal amount of Six Million Seven Hundred Ninety-Five Thousand Dollars ($6,795,000.00), (j) the Government Facilities Revenue Refunding Bonds, Series M-1, issued by PBA in the original principal amount of Two Hundred Eighty-Three Million Five Hundred Fifty Thousand Dollars ($283,550,000.00), (k) the Government Facilities Revenue Refunding Bonds, Series M-2, issued by PBA in the original principal amount of One Hundred Twenty-Nine Million Three Hundred Thousand Dollars ($129,300,000.00), (l) the Government Facilities Revenue Refunding Bonds Series M-3, issued by PBA in the original principal amount of One Hundred Fifty Million Dollars ($150,000,000.00), (m) the Government Facilities Revenue Bonds, Series N, issued by PBA in the original principal amount of Three Hundred Twenty-Nine Million Four Hundred Fifteen Thousand Dollars ($329,415,000.00), (n) the Government Facilities Revenue Bonds, Series O, issued by PBA in the original principal amount of Three Million Twenty-Five Thousand Dollars ($3,025,000.00), (o) the Government Facilities Revenue Refunding Bonds, Series P, issued by PBA in the original principal amount of Three Hundred Thirty Million Nine Hundred Thirty-Five Thousand Dollars

($330,935,000.00), and (p) the Government Facilities Revenue Refunding Bonds Series Q, issued by PBA in the original principal amount of One Hundred Fifty-Two Million Five Hundred Forty Thousand Dollars ($152,540,000.00), the repayment of which is guaranteed by the Commonwealth.

1.520 **Vintage Taxable Bond Distribution**: The distribution to be made to each holder of an Allowed Vintage CW Bond Claim (Taxable Election) in accordance with the terms and provisions of Section 26.1 hereof.

1.521 **Voting Record Date**: The date(s) established by the Title III Court with respect to an entitlement to vote to accept or reject the Plan and set forth in the Disclosure Statement Order.

1.522 **VTP Payroll Participant**: A person who, based on the current records of ERS and OGP, is receiving payment through the payroll of the Commonwealth or its agencies arising from participation in the Voluntary Transition Programs under Act 70-2010 or Act 211-2015 which allowed certain members to receive pensions or other forms of payment through their former employer's payroll, subject to transition to PayGo upon satisfying necessary age and service eligibility requirements.

1.523 **VTP Payroll Participant Claim**: A Claim on account of being a VTP Payroll Participant for payments arising through Act 70-2010 or Act 211-2015 through the payroll of the Commonwealth or its agencies.

1.524 **VTP Payroll Participant Above-Threshold Claims**: A VTP Payroll Participant Claim held by a VTP Participant with respect to whom the total monthly payroll benefit received as of April 1, 2021 is greater than the Threshold.

1.525 **VTP Payroll Participant Below-Threshold Claims**: A VTP Payroll Participant Claim held by a VTP Participant with respect to whom the total monthly payroll benefit received as of April 1, 2021 is less than or equal to the Threshold.

1.526 **GDB/PET**: The Public Entity Trust created pursuant to that certain GDB Restructuring Act enacted on August 24, 2017 and amended on July 18, 2018, in order to address GDB's deposit liabilities to non-municipal government entities, including federal funds, and the municipalities having claims in respect of federal funds on deposit with GDB, which assets mainly consist of loans to public agencies and departments of the Commonwealth and funds sufficient to restore certain federal funds deposited at GDB for certain municipalities and non-municipal government entities.

1.527 **GDB/PET Claim**: The Claim of the GDB/PET against the Commonwealth arising from or related to the restructuring of the GDB and the assets contributed to the GDB/PET.

1.528 **COSSEC**: Public Corporation for Supervision and Insurance of Cooperatives.

1.529 **Findings of Fact and Conclusions of Law**: The findings of fact and conclusions of law of the Title III Court entered in the Title III Cases in connection with confirmation of the

Plan in accordance with Section 314 of PROMESA and section 1129 the Bankruptcy Code, made applicable in the Title III cases in accordance with Section 301 of PROMESA.

1.530 **Other Definitions:** Unless the context otherwise requires, any capitalized term used and not defined herein or elsewhere in the Plan that is defined in PROMESA or the Bankruptcy Code shall, if defined in PROMESA, have the meaning assigned to that term in PROMESA or, if not defined in PROMESA, but defined in the Bankruptcy Code, shall have the meaning ascribed thereto in the Bankruptcy Code. Unless otherwise specified, (a) all section, schedule, or exhibit references in the Plan are to the respective section in, article of, or schedule or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time and (b) all references to dollars are to the lawful currency of the United States of America. The words, "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan. In computing any period prescribed or allowed by the Plan, unless otherwise expressly provided, the provisions of Bankruptcy Rule 9006(a) shall apply.

1.531 **Rules of Interpretation:** For purposes of the Plan, (a) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (b) unless otherwise specified, any reference herein to a definition, an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it was, or is amended, modified, or supplemented, including, without limitation, updated to conform to the Definitive Documents; (c) unless otherwise specified, all references herein to distributions being made in an "amount" shall be calculated using the principal amount of any bonds issued on the Effective Date pursuant to the Plan plus the amount, if any, of Cash so distributed; (d) unless otherwise specified, all references herein to "Articles" and "Sections" are references to Articles and Sections, respectively, hereof or hereto; (e) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (f) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (g) unless otherwise specified, references to docket numbers of documents filed in the Title III Cases are references to the docket numbers under the Title III Court's CM/ECF system; (h) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; and (i) any immaterial effectuating provisions may be interpreted by the Oversight Board in such a manner consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Title III Court or any other Entity.

## ARTICLE II

## COMPROMISE AND SETTLEMENT OF DISPUTES/RESTRUCTURING OF ENTITIES

2.1 **Litigation Resolution:** The Plan sets forth the terms and conditions for a global compromise and integrated settlement of, among other issues, asserted and unasserted disputes concerning the rights of holders of CW Bond Claims, CW Guarantee Bond Claims, ERS Bond

Claims, PBA Bond Claims, CW/Convention Center Claims, CW/HTA Claims, CW/MBA Claims, CW/PRIFA Rum Tax Claims, and PRIFA BANs, including the disputes (a) set forth in the Debt Related Objections challenging, among other things, the validity, priority, secured status and related rights of the 2011 CW Bond Claims, the 2011 CW Series D/E/PIB Bond Claims, the 2012 CW Bond Claims, the 2014 CW Bond Claims, the 2014 CW Guarantee Bond Claims, the 2011 PBA Bond Claims, the 2012 PBA Bond Claims, and the PRIFA BANs, (b) set forth in the Invalidity Actions, (c) set forth in the Lien Challenge Actions, (d) raised by certain holders of CW Bond Claims, CW Guarantee Bond Claims, and GDB HTA Loans asserting rights to receive revenues historically conditionally appropriated to CCDA, HTA, Puerto Rico Metropolitan Bus Authority ("MBA") and PRIFA, as applicable, and "clawed back" by the Commonwealth pursuant to the provisions of the Commonwealth Constitution, (e) relating to the validity, priority, secured status and related rights attendant to the GDB HTA Loans, (f) set forth in the ERS Litigation, the ERS Recovery Actions, and the ERS Takings Action, (g) between the Commonwealth and PBA, including, without limitation, the resolution of (i) the claims and Causes of Action currently being litigated in the PBA Litigation (ii) the amount, if any, of the PBA Administrative Expense Claim, and (iii) the ownership of the PBA Property, between the Commonwealth and PBA and the claims that PBA may assert against the Commonwealth under leases, agreements and applicable law, (h) set forth in the Lift Stay Motions and the Clawback Actions relating to the CW/Convention Center Claims, the CW/HTA Claims, and the CW/PRIFA Rum Tax Claims, and (i) set forth in the PRIFA BANs Litigation.

2.2 **Allowance of Bond Claims:** For purposes of confirmation and consummation of the Plan and distributions to be made hereunder, unless otherwise allowed pursuant to an order of the Title III Court, on the Effective Date, among other Claims, (a) the Vintage PBA Bond Claims, the Vintage PBA Bond Claims (Ambac), the Vintage PBA Bond Claims (Assured), the Vintage PBA Bond Claims (National), the Vintage PBA Bond Claims (FGIC), and the Vintage PBA Bond Claims (Syncora) shall be deemed allowed in the aggregate amount of $2,661,243,754.21, (b) the 2011 PBA Bond Claims shall be deemed allowed in the aggregate amount of $1,335,422,892.78, (c) the 2012 PBA Bond Claims shall be deemed allowed in the aggregate amount of $674,308,470.06, (d) the Vintage CW Bond Claims, the Vintage CW Bond Claims (Ambac), the Vintage CW Bond Claims (Assured), Vintage CW Bond Claims (National), Vintage CW Bond Claims (FGIC), and Vintage CW Bond Claims (Syncora) shall be deemed allowed in the aggregate amount of $5,843,252,912.91, (e) the ERS Bond Claims shall be deemed allowed in the aggregate amount of $3,168,698,776.55, (f) the 2011 CW Bond Claims and the 2011 CW Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $476,498,325.06, (g) the 2011 CW Series D/E/PIB Bond Claims and the 2011 CW Series D/E/PIB Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $645,673,111.48, (h) the 2012 CW Bond Claims and the 2012 CW Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $2,934,427,459.40, (i) the 2014 CW Bond Claims shall be deemed allowed in the amount of $3,836,611,111.11, and (j) the 2014 CW Guarantee Bond Claims shall be deemed allowed in the amount of $346,242,219.86.

(a) Solely for purposes of confirmation and consummation of the Plan and the distributions to be made hereunder, unless otherwise allowed pursuant to a Final Order of the Title III Court, on the Effective Date, the CW/Convention Center Claims, the CW/HTA Claims, the

CW/MBA Claim and the CW/PRIFA Rum Tax Claims shall be deemed allowed in the amounts of $383,862,878.90, $6,377,335,459.34, $30,106,786.87, and $1,928,867,051.00, respectively.

2.3 **Releases, Injunctions and Exculpation:** The releases, injunctions and exculpation provided in Article XCII herein are integral to obtaining the value provided hereunder and constitute an essential component of the compromises reached and are not severable from the other provisions of this Plan.

2.4 **Purchase and Sale of Certain ERS Assets:** On the Effective Date, (a) the Commonwealth shall purchase, and ERS shall sell, assign, transfer and convey to the Commonwealth, all of ERS's right, title and interest in ERS's Assets, including, without limitation, such Assets subject to a valid and perfected lien or security interest for an aggregate purchase price equal to the sum of Three Hundred Seventy-Three Million Dollars ($373,000,000.00), and (b) in accordance with the terms and provisions of Section 69.2 hereof, (i) the Commonwealth shall be granted an option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, (ii) in the event the Commonwealth declines to exercise such option, pursuant to the Bondholder Election, ERS bondholders shall have the option to purchase the ERS Private Equity Portfolio or the interests of the ERS Trust, as the case may be, for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00), <u>plus</u> such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio, and (iii) in the event that the Bondholder Election is not exercised, the Commonwealth shall purchase the ERS Private Equity Portfolio for Seventy Million Seven Hundred Fifty Thousand Dollars ($70,750,000.00).

## ARTICLE III

## PROVISIONS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, made applicable to the Title III Case pursuant to Section 301(a) of PROMESA, Administrative Expense Claims and Professional Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article IV of the Plan.

3.1 **Administrative Expense Claims:** On the later to occur of (a) the Effective Date and (b) the date on which an Administrative Expense Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (ii) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and the Reorganized Debtors; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course prior to the Effective Date by the Debtors shall be paid in full and performed by the Reorganized Debtors in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within one hundred fifty (150) days after the Effective

Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan.

3.2 **Professional Compensation and Reimbursement Claims**: All Entities awarded compensation, including, without limitation, to the fullest extent provided in respective letters of engagement or similar instruments or agreements, or reimbursement of expenses by the Title III Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court (a) as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order or (b) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Government Parties; provided, however, that, except as provided herein, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the date that is one hundred twenty (120) days following the Effective Date. The Reorganized Debtors shall pay compensation for professional services extended and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

3.3 **GO/PBA Consummation Costs**: Notwithstanding anything contained in the Plan to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the GO/PBA Plan Support Agreement and the Plan, each Initial GO/PBA PSA Creditor shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable but in no event later than ten (10) Business Days following the Effective Date, a pro rata share of Cash, in the form of an Allowed Administrative Expense Claim, in an amount equal to one and five tenths percent (1.50%), truncated to two decimal points, of the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (insured or otherwise and, with respect to each of Assured, Syncora and National, including positions that it holds or has insured), without duplication, held and/or insured by such Initial GO/PBA PSA Creditor as of 5:00 p.m. (EST) on February 22, 2021.

3.4 **AFSCME and AMPR Professional Fees**: Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, (a) AFSCME shall be reimbursed its reasonable professional fees and expenses incurred in order to compensate AFSCME for the cost of negotiation, confirmation and consummation of the AFSCME Term Sheet and the Plan, and the resolution of issues pertaining to pensions, and (b) in the event that, on or prior to September 30, 2021, (i) AMPR notifies the Oversight Board, in writing, that the Active TRS Participants have ratified the terms set forth in the term sheet annexed hereto as Exhibit "F-2", and (ii) AMPR executes an agreement with the Oversight Board wherein AMPR agrees to, among other things, support confirmation and consummation of the Plan, AMPR shall be reimbursed its reasonable professional fees and expenses incurred with respect to confirmation and consummation of such plan support agreement, including any term sheets, and the resolution of issues pertaining to pensions.

3.5 **GO/PBA PSA Restriction Fee**: Notwithstanding anything contained in the Plan to the contrary, in exchange for executing and delivering the GO/PBA Plan Support Agreement (or the GO/PBA Joinder Agreement or GO/PBA Annex Agreement, as applicable, in connection therewith) on or prior to the GO/PBA Joinder Deadline, and, agreeing to all of its terms and

conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the GO/PBA Plan Support Agreement, subject to the entry of the Confirmation Order, each of the GO/PBA PSA Creditors (including (i) a holder of a Monoline-insured GO Bond or PBA Bond, (other than a Monoline-insured GO Bond or PBA Bond insured by Ambac, Assured, FGIC, Syncora or National, as the case may be) to the extent that such GO/PBA PSA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured GO Bond or PBA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC, Syncora and National, to the extent Ambac, Assured, FGIC, Syncora or National, as the case may be, is authorized to vote such Claims in accordance with Section 301(c)(3) of PROMESA definitive insurance documents and applicable law) shall be entitled to receive the GO/PBA PSA Restriction Fee, in the form of an Allowed Administrative Expense Claim, payable in Cash, at the time of consummation of the Plan equal to the GO/PBA Restriction Fee Percentage multiplied by the aggregate amount of PBA Bond Claims, CW Bond Claims and CW Guarantee Bond Claims (without duplication and, to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) held or, in the case of Ambac, Assured, FGIC, Syncora, or National, held or insured by such GO/PBA PSA Creditor as of the Effective Date; provided, however, that, if a GO/PBA PSA Creditor sold any PBA Bond Claims, CW Bond Claims, or PRIFA BANs (without duplication, and to the extent such Claims are Monoline-insured, solely to the extent a GO/PBA PSA Creditor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) for which it would have been entitled to receive the GO/PBA PSA Restriction Fee, the purchasing party, and not the selling party, shall be entitled to receive the GO/PBA PSA Restriction Fee on account thereof; and, provided, further, that, in the event the GO/PBA Plan Support Agreement has been terminated pursuant to the terms of Sections 7.1(b)(iii) (subject to the extension provided for in Section 7.1(b) thereof), (c)(i) or (c)(ii) thereof, or the Oversight Board terminated the GO/PBA Plan Support Agreement for any reason other than (i) a breach of the GO/PBA Plan Support Agreement by a non-Government Party, (ii) the denial of confirmation of the Plan by the Title III Court (or the Title III Court renders a decision or states its position that it will deny confirmation absent modification of the Plan, and such modification would have a material adverse effect on the Oversight Board and the GO/PBA PSA Creditors' ability to consummate the Plan on terms consistent with the GO/PBA Plan Support Agreement, including, but not limited to, the terms set forth in the Settlement Summary annexed thereto as Exhibit "I"), (iii) the New GO Bonds Legislation, the CVI Legislation, and the Debt Responsibility Act are not enacted prior to the commencement of the Confirmation Hearing, or (iv) the entry of an order with respect to one or more of the matters set forth in Section 7.1(b)(ii) of the GO/PBA Plan Support Agreement, the aggregate GO/PBA PSA Restriction Fee and Consummation Costs in the amount of One Hundred Million Dollars ($100,000,000.00) shall be paid, ratably, in Cash, as an allowed administrative expense claim under a plan of adjustment for the Commonwealth to the Initial GO/PBA PSA Creditors as of the date of termination; and, provided, further, that, in all other circumstances, upon termination of the GO/PBA Plan Support Agreement, no GO/PBA Consummation Costs or GO/PBA PSA Restriction Fee shall be due and payable to the party to the GO/PBA Plan Support Agreement terminating the GO/PBA Plan Support Agreement or against the party to the GO/PBA Plan Support Agreement as to which the GO/PBA Plan Support Agreement is terminated.

3.6     **Retail Support Fee:**  In accordance with the terms and provisions set forth herein, in the event that a Class of Retail Investors (Classes 7, 9, 11, 16, 31, 38, 41, and 47) votes to accept the Plan, the members of such Class shall be entitled to receive their Pro Rata Share of such Class's allocable share of the aggregate Retail Support Fee of up to Fifty Million Dollars ($50,000,000.00) in an amount equal to the GO/PBA Restriction Fee Percentage times the aggregate amount of CW Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims without duplication and, to the extent any such Claims are Monoline-insured, solely to the extent a Retail Investor is authorized to vote any such Claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law, held by such accepting Class of Retail Investors, as the case may be, as of the date the Title III Court enters the Confirmation Order; provided, however, that, (a) in the event that, after allocating the Retail Support Fee to Retail Investors in the Classes that voted to accept the Plan, the entire Fifty Million Dollars ($50,000,000.00) is not fully allocated, the balance of the Retail Support Fee shall be reallocated and distributed on a pro rata basis to (i) Initial GO/PBA PSA Restriction Fee Creditors and (ii) those Retail Investors that are members of Classes that voted to accept the Plan based upon the aggregate amount of GO Bond Claims, PBA Bond Claims, and CW Guarantee Bond Claims (without duplication) held by such Initial GO/PBA PSA Restriction Fee Creditor and Retail Investor as of the date the Title III Court enters the Confirmation Order, and (b) the Retail Support Fee allocated to any Class of Retail Investors that fails to vote to accept the Plan shall be reallocated and distributed on a pro rata basis to (i) Initial GO/PBA PSA Restriction Fee Creditors and (ii) those Retail Investors that are members of Classes that voted to accept the Plan.

3.7     **ERS Restriction Fee:**  Notwithstanding anything contained in the Plan to the contrary, (a) in exchange for executing and delivering the ERS Stipulation, and agreeing to all of its terms and conditions, including to "lock-up" ERS Bonds in accordance with the terms of the ERS Stipulation, each of the ERS bondholders party to the ERS Stipulation (or their designee), shall be entitled to receive, and, on the Effective Date, ERS shall pay to such parties, without setoff or deduction for taxes, their Pro Rata Share (based upon such parties' Net Allowed ERS Bond Claims as of April 2, 2021) of Seventy-Five Million Dollars ($75,000,000.00), and (b) in accordance with the terms and conditions of the GO/PBA Plan Support Agreement, the Commonwealth shall pay to First Ballantyne, LLC, Monarch Alternative Capital LP, Moore Global Investments, LLC, Two Seas Capital LP, and Verition Multi-Strategy Master Fund, Ltd. their Pro Rata Share of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00), as agreed to among such parties.

3.8     **CCDA Consummation Costs:**  Notwithstanding anything contained in the Plan to the contrary, in order to compensate certain parties for the cost of negotiation, confirmation and consummation of the HTA/CCDA Plan Support Agreement and the Plan, each Initial HTA/CCDA PSA Creditor, to the extent a holder or insurer of CCDA Bonds, shall be entitled to receive on the Effective Date, or as soon thereafter as is practicable, but in no event later than ten (10) Business Days following the Effective Date, an amount equal to one percent (1.00%), truncated to two decimal points, of such Initial HTA/CCDA PSA Creditor's CCDA Bond Claims, payable as an administrative expense claim, in an aggregate amount not greater than Fifteen Million Dollars ($15,000,000.00).

3.9 **CCDA Restriction Fee:** Notwithstanding anything contained in the Plan to the contrary, in exchange for executing the HTA/CCDA Plan Support Agreement, and agreeing to all of its terms and conditions, including the agreement to "lock-up" its bonds in accordance with the terms of the HTA/CCDA Plan Support Agreement, subject to the entry of the Confirmation Order, each CCDA Restriction Fee Creditor holding or insuring CCDA Bonds (including (i) a holder of a Monoline-insured CCDA Bond, (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC or National, as the case may be) to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC and National, to the extent Ambac, Assured, FGIC or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive the CCDA Restriction Fee in the form of an allowed administrative expense claim, payable in cash, at the time of consummation of the Plan in an amount equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent a CCDA Restriction Fee Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA, the definitive insurance documents and applicable law) held or, in the case of Assured or National held or insured, by such CCDA Restriction Fee Creditor as of the expiration of the applicable HTA/CCDA PSA Restriction Fee Period; provided, however, that each CCDA Restriction Fee Creditor who acquires any CCDA Bonds after the Joinder Deadline (including (i) a holder of a Monoline-insured CCDA Bond (other than a Monoline-insured CCDA Bond insured by Ambac, Assured, FGIC or National, as the case may be), to the extent such CCDA Restriction Fee Creditor is authorized to vote the claim with respect to such Monoline-insured CCDA Bond in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law, and (ii) Ambac, Assured, FGIC and National, to the extent Ambac, Assured or National, as applicable, is authorized to vote such Insured CCDA Bond Claims in accordance with Section 301(c)(3) of PROMESA, definitive insurance documents and applicable law) shall be entitled to receive such CCDA Restriction Fee equal to the CCDA Restriction Fee Percentage multiplied by the aggregate amount of CCDA Bond Claims, (without duplication and, to the extent any such claims are Monoline-insured, solely to the extent an HTA/CCDA PSA Creditor is authorized to vote any such claim in accordance with Section 301(c)(3) of PROMESA the definitive insurance documents and applicable law) held by such CCDA Restriction Fee Creditor as of the earlier to occur of the HTA/CCDA Threshold Attainment and the entry of the Confirmation Order; and, provided, further, that, if a CCDA Restriction Fee Creditor sells any CCDA Bonds for which it would have been entitled to receive the CCDA Restriction Fee, the purchasing party shall not be entitled to receive the CCDA Restriction Fee on account thereof and such entitlement shall remain with the selling party; and, provided, further, that, in all circumstances, the sum of the aggregate CCDA Restriction Fees plus the CCDA Consummation Costs attributable to a holder's CCDA Bond Claims shall not exceed Fifteen Million Dollars ($15,000,000.00); and, provided, further, that, in the event the HTA/CCDA Plan Support Agreement is terminated pursuant to the terms of Section 7.1 thereof, no CCDA Consummation Costs or CCDA Restriction Fees shall be due and payable to a holder of CCDA Bonds, Ambac or Assured with respect to CCDA Bond Claims.

3.10 **Non-Severability**: The allowance and payment of the Consummation Costs and PSA Restriction Fees as set forth in this Article III compensate the Restriction Fee Creditors for value received and constitute an essential component of the compromises and settlements embodied herein and are not severable from the other terms and provisions set forth herein.

# ARTICLE IV

# CLASSIFICATION OF CLAIMS

4.1 **Claims are classified as follows:**

| | | | |
|---|---|---|---|
| (a) | **Class 1:** | Vintage PBA Bond Claims |
| (b) | **Class 2:** | Vintage PBA Bond Claims (Assured) |
| (c) | **Class 3:** | Vintage PBA Bond Claims (National) |
| (d) | **Class 4:** | Vintage PBA Bond Claims (Ambac) |
| (e) | **Class 5:** | Vintage PBA Bond Claims (FGIC) |
| (f) | **Class 6:** | Vintage PBA Bond Claims (Syncora) |
| (g) | **Class 7:** | Retail Vintage PBA Bond Claims |
| (h) | **Class 8:** | 2011 PBA Bond Claims |
| (i) | **Class 9:** | Retail 2011 PBA Bond Claims |
| (j) | **Class 10:** | 2012 PBA Bond Claims |
| (k) | **Class 11:** | Retail 2012 PBA Bond Claims |
| (l) | **Class 12:** | PBA/DRA Secured Claims |
| (m) | **Class 13:** | PBA General Unsecured Claims |
| (n) | **Class 14:** | PBA/DRA Unsecured Claims |
| (o) | **Class 15:** | Vintage CW Bond Claims |
| (p) | **Class 16:** | Retail Vintage CW Bond Claims |
| (q) | **Class 17:** | Vintage CW Bond Claims (Assured) |
| (r) | **Class 18:** | Vintage CW Bond Claims (National) |
| (s) | **Class 19:** | Vintage CW Bond Claims (Ambac) |

| (t) | **Class 20:** | Vintage CW Bond Claims (FGIC) |
| (u) | **Class 21:** | Vintage CW Bond Claims (Syncora) |
| (v) | **Class 22:** | Vintage CW Bond Claims (Taxable Election) |
| (w) | **Class 23:** | Vintage CW Guarantee Bond Claims |
| (x) | **Class 24:** | Vintage CW Guarantee Bond Claims (Assured) |
| (y) | **Class 25:** | Vintage CW Guarantee Bond Claims (National) |
| (z) | **Class 26:** | Vintage CW Guarantee Bond Claims (Ambac) |
| (aa) | **Class 27:** | Vintage CW Guarantee Bond Claims (FGIC) |
| (bb) | **Class 28:** | Vintage CW Guarantee Bond Claims (Syncora) |
| (cc) | **Class 29:** | Vintage CW Guarantee Bond Claims (Taxable Election) |
| (dd) | **Class 30:** | 2011 CW Bond Claims |
| (ee) | **Class 31:** | Retail 2011 CW Bond Claims |
| (ff) | **Class 32:** | 2011 CW Bond Claims (Assured) |
| (gg) | **Class 33:** | 2011 CW Bond Claims (Taxable Election) |
| (hh) | **Class 34:** | 2011 CW Guarantee Bond Claims |
| (ii) | **Class 35:** | 2011 CW Guarantee Bond Claims (Taxable Election) |
| (jj) | **Class 36:** | 2011 CW Series D/E/PIB Bond Claims |
| (kk) | **Class 37:** | 2011 CW Series D/E/PIB Bond Claims (Assured) |
| (ll) | **Class 38:** | Retail 2011 CW Series P/E/PIB Bond Claims |
| (mm) | **Class 39:** | 2011 CW Series D/E/PIB Bond Claims (Taxable Election) |
| (nn) | **Class 40:** | 2012 CW Bond Claims |
| (oo) | **Class 41:** | Retail 2012 CW Bond Claims |
| (pp) | **Class 42:** | 2012 CW Bond Claims (Assured) |
| (qq) | **Class 43:** | 2012 CW Bond Claims (Taxable Election) |

(rr)                  **Class 44:**       2012 CW Guarantee Bond Claims

(ss)                  **Class 45:**       2012 CW Guarantee Bond Claims (Taxable Election)

(tt)                  **Class 46:**       2014 CW Bond Claims

(uu)                  **Class 47:**       Retail 2014 CW Bond Claims

(vv)                  **Class 48:**       2014 CW Bond Claims (Taxable Election)

(ww)                  **Class 49:**       2014 CW Guarantee Bond Claims

(xx)                  **Class 50:**       2014 CW Guarantee Bond Claims (Taxable Election)

(yy)                  **Class 51:**       Active and Retired Employee Benefits Claims

        (i)           **Class 51A:**      Retired ERS Participant Below-Threshold Claims

        (ii)          **Class 51B:**      Retired JRS Participant Below-Threshold Claims

        (iii)        **Class 51C:**      Retired TRS Participant Below-Threshold Claims

        (iv)        **Class 51D:**      Retired ERS Participant Above-Threshold Claims

        (v)          **Class 51E:**      Retired JRS Participant Above-Threshold Claims

        (vi)        **Class 51F:**      Retired TRS Participant Above-Threshold Claims

        (vii)       **Class 51G:**      Active ERS Participant Claims

        (viii)      **Class 51H:**      Active JRS Participant Claims

        (ix)        **Class 51I:**      Active TRS Participant Claims

        (x)          **Class 51J:**      System 2000 Participant Claims

        (xi)        **Class 51K:**      VTP Payroll Participant Below-Threshold Claims

        (xii)       **Class 51L:**      VTP Payroll Participant Above-Threshold Claims

(zz)                  **Class 52:**       AFSCME Claims

(aaa)                  **Class 53:**       Dairy Producer Claims

(bbb)                  **Class 54:**       Eminent Domain/Inverse Condemnation Claims

(ccc)                  **Class 55:**       Energy Incentive Claims

| (ddd) | **Class 56:** | Med Center Claims |
| (eee) | **Class 57:** | Tax Credit Claims |
| (fff) | **Class 58:** | CW General Unsecured Claims |
| (ggg) | **Class 58A:** | GDB/PET Claim |
| (hhh) | **Class 59:** | CW/HTA Claims |
| (iii) | **Class 60:** | CW/Convention Center Claims |
| (jjj) | **Class 61:** | CW/PRIFA Rum Tax Claims |
| (kkk) | **Class 62:** | CW/MBA Claims |
| (lll) | **Class 63:** | CW Appropriations Claims |
| (mmm) | **Class 64:** | Section 510(b) Subordinated Claims |
| (nnn) | **Class 65:** | ERS Bond Claims |
| (ooo) | **Class 66:** | ERS General Unsecured Claims |
| (ppp) | **Class 67:** | Gracia Gracia Claims |
| (qqq) | **Class 68:** | Convenience Claims |
| (rrr) | **Class 69:** | Federal Claims |

## ARTICLE V

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND CLAIMS (CLASS 1)

5.1     **Treatment of Vintage PBA Bond Claims:**  On the Effective Date, each holder of an Allowed Vintage PBA Bond Claim shall be entitled to receive in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim, such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE VI

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
## CLAIMS (ASSURED) (CLASS 2)

6.1     **Treatment of Vintage PBA Bond Claims (Assured)**:  Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Assured) shall be entitled to receive in full consideration, satisfaction, release and

exchange of such holder's Allowed Vintage PBA Bond Claim (Assured), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE VII

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
## CLAIMS (NATIONAL) (CLASS 3)

7.1 **Treatment of Vintage PBA Bond Claims (National)**: Subject to the terms and provisions of Section 75.2 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (National), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE VIII

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
## CLAIMS (AMBAC) (CLASS 4)

8.1 **Treatment of Vintage PBA Bond Claims (Ambac)**: Subject to the terms and provisions of Section 75.5 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (Ambac), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE IX

## PROVISIONS FOR TREATMENT OF VINTAGE PBA BOND
## CLAIMS (FGIC) (CLASS 5)

9.1 **Treatment of Vintage PBA Bond Claims (FGIC)**: Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (FGIC) shall be entiled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (FGIC), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE X

## PROVISIONS FOR TREATMENT OF VINTAGE
## PBA BOND CLAIMS (SYNCORA) (CLASS 6)

10.1 **Treatment of Vintage PBA Bond Claims (Syncora)**: Subject to the terms and provisions of Section 75.3 hereof, on the Effective Date, each holder of an Allowed Vintage PBA Bond Claim (Syncora) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage PBA Bond Claim (Syncora), such holder's Pro Rata Share of the Vintage PBA Bond Recovery.

## ARTICLE XI

### PROVISIONS FOR TREATMENT OF RETAIL
### VINTAGE PBA BOND CLAIMS (CLASS 7)

11.1    **Treatment of Retail Vintage PBA Bond Claims**:  On the Effective Date, each
holder of an Allowed Retail Vintage PBA Bond Claim shall be entitled to receive, in full
consideration, satisfaction, release and exchange of such holder's Allowed Retail Vintage PBA
Bond Claim, such holder's Pro Rata Share of (a) the Vintage PBA Bond Recovery and (b) the
Retail Support Fee allocable to holders of Allowed Retail Vintage PBA Bond Claims; provided,
however, that, in the event that Class 7 votes to reject the Plan in accordance with section 1126 of
the Bankruptcy Code, (y) each holder of an Allowed Retail Vintage PBA Bond Claim shall be
entitled to receive such holder's Pro Rata Share of the Vintage PBA Bond Recovery and (z) the
Retail Support Fee otherwise allocable to holders of Allowed Retail Vintage PBA Bond Claims
shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are
members of Classes that voted to accept the Plan and be distributed in accordance with the terms
and provisions of Section 3.6 hereof.

## ARTICLE XII

### PROVISIONS FOR TREATMENT OF 2011 PBA BOND CLAIMS (CLASS 8)

12.1    **Treatment of 2011 PBA Bond Claims**:  On the Effective Date, each holder of an
Allowed 2011 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction,
release and exchange of such holder's Allowed 2011 PBA Bond Claim, such holder's Pro Rata
Share of the 2011 PBA Bond Recovery.

## ARTICLE XIII

### PROVISIONS FOR TREATMENT OF RETAIL 2011
### PBA BOND CLAIMS (CLASS 9)

13.1    **Treatment of Retail 2011 PBA Bond Claims**:  On the Effective Date, each
holder of an Allowed Retail 2011 PBA Bond Claim shall be entitled to receive, in full
consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 PBA Bond
Claim, such holder's Pro Rata Share of (a) the 2011 PBA Bond Recovery and (b) the Retail
Support Fee allocable to holders of Allowed Retail 2011 PBA Bond Claims; provided, however,
that, in the event that Class 9 votes to reject the Plan in accordance with the provisions of section
1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail PBA Bond Claim shall be
entitled to receive such holder's Pro Rata Share of the 2011 PBA Bond Recovery and (z) the Retail
Support Fee otherwise allocable to holders of Allowed Retail 2011 PBA Bond Claims shall be
reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members
of Classes that voted to accept the Plan and be distributed in accordance with the terms and
provisions of Section 3.6 hereof.

## ARTICLE XIV

### PROVISIONS FOR TREATMENT OF 2012 PBA BOND CLAIMS (CLASS 10)

14.1    **Treatment of 2012 PBA Bond Claims:**  On the Effective Date, each holder of an Allowed 2012 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 PBA Bond Claim, such holder's Pro Rata Share of the 2012 PBA Bond Recovery.

## ARTICLE XV

### PROVISIONS FOR TREATMENT OF RETAIL 2012 PBA BOND CLAIMS (CLASS 11)

15.1    **Treatment of Retail 2012 PBA Bond Claims:**  On the Effective Date, each holder of an Allowed Retail 2012 PBA Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2012 PBA Bond Claim, such holder's Pro Rata Share of (a) the 2012 PBA Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2012 PBA Bond Claims; provided, however, that, in the event that Class 11 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2012 Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2012 PBA Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2012 Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

## ARTICLE XVI

### PROVISIONS FOR TREATMENT OF
### PBA/DRA SECURED CLAIMS (CLASS 12)

16.1    **Treatment of PBA/DRA Secured Claims:**  On the Effective Date, each holder of an PBA/DRA Secured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA/DRA Secured Claim, payment, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA/DRA Secured Claim.

## ARTICLE XVII

### PROVISIONS FOR TREATMENT OF PBA GENERAL UNSECURED
### CLAIMS (CLASS 13)

17.1    **Treatment of PBA General Unsecured Claims:**  On the Effective Date, each holder of an Allowed PBA General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed PBA General Unsecured Claim, (a) payment of the Allowed amount of such holder's Claim, in Cash, in an amount equal to ten percent (10%) of such holder's Allowed PBA General Unsecured Claim, on,

82

or as soon as practicable after the latest to occur of (1) the Effective Date, (2) the date on which
such PBA General Unsecured Claim becomes Allowed, (3) the date on which such Allowed PBA
General Unsecured Claim is otherwise due and payable, and (4) such other date as may be
mutually agreed to by such holder of such PBA General Unsecured Claim and the Debtor or the
Reorganized Debtor, as the case may be, or (b) such other treatment as may be mutually agreed to
by and among such holder of a PBA General Unsecured Claim and the Debtor or the Reorganized
Debtor, as the case may be.

**ARTICLE XVIII**

**PROVISIONS FOR TREATMENT OF PBA/DRA
UNSECURED CLAIMS (CLASS 14)**

18.1     **Treatment of PBA/DRA Unsecured Claims:**  On the Effective Date, each
holder of an PBA/DRA Unsecured Claim shall be entitled to, in full consideration, satisfaction,
release, and exchange of such holder's Allowed PBA/DRA Unsecured Claim, payment, in Cash, in
an amount equal to ten percent (10%) of such holder's Allowed PBA/DRA Unsecured Claim.

**ARTICLE XIX**

**PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
CLAIMS (CLASS 15)**

19.1     **Treatment of Vintage CW Bond Claims:**  On the Effective Date, and subject to
the right of election set forth in Section 19.2 hereof, each holder of an Allowed Vintage CW Bond
Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such
holder's Allowed Vintage CW Bond Claim, such holder's Pro Rata Share of the Vintage CW Bond
Recovery.

19.2     **Right of Election to Vintage CW Bond Claims (Taxable Election):**
Notwithstanding the provisions of Section 19.1 of the Plan, each holder of an Allowed Vintage
CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to
receive distributions pursuant to the terms and provisions of Sections 26.1 and 77.1 hereof.  Such
election must be made on the Ballot/Election Form, be received by the Oversight Board, or its
designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by
such holder.  Any election made after the Ballot Date shall not be binding upon the
Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board;
provided, however, that under no circumstance may such waiver by the Oversight Board occur on
or after the Effective Date.

83

## ARTICLE XX

### PROVISIONS FOR TREATMENT OF RETAIL VINTAGE
### CW BOND CLAIMS (CLASS 16)

20.1     **Treatment of Retail Vintage CW Bond Claims**:  On the Effective Date, each
holder of an Allowed Retail Vintage CW Bond Claim shall be entitled to receive, in full
consideration, satisfaction, release and exchange of such holder's Allowed Retail Vintage CW
Bond Claim, such holder's Pro Rata Share of (a) the Vintage CW Bond Recovery and (b) the
Retail Support Fee allocable to holders of Allowed Retail Vintage CW Bond Claims; provided,
however, that, in the event that Class 16 votes to reject the Plan in accordance with the provisions
of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail Vintage CW Bond
Claim shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Bond Recovery
and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail Vintage CW Bond
Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors
that are members of Classes that voted to accept the Plan and be distributed in accordance with the
terms and provisions of Section 3.6 hereof.

20.2     **Right of Election to Retail Vintage CW Bond Claims (Taxable Election)**:
Notwithstanding the provisions of Section 20.1 of the Plan, each holder of an Allowed Retail
Vintage CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to
elect to receive distributions pursuant to the terms and provisions of Sections 26.1 and 77.1 hereof.
Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or
its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan
by such holder.  Any election made after the Ballot Date shall not be binding upon the
Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board;
provided, however, that under no circumstance may such waiver by the Oversight Board occur on
or after the Effective Date.

## ARTICLE XXI

### PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
### CLAIMS (ASSURED) (CLASS 17)

21.1     **Treatment of Vintage CW Bond Claims (Assured)**:  Subject to the terms and
provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed Vintage CW
Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and
exchange of such holder's Allowed Vintage CW Bond Claim (Assured), such holder's Pro Rata
Share of the Vintage CW Bond Recovery.

## ARTICLE XXII

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (NATIONAL) (CLASS 18)

22.1    **Treatment of Vintage CW Bond Claims (National)**:  Subject to the terms and
provisions of Section 75.2 hereof, on the Effective Date, each holder of an Allowed Vintage CW
Bond Claim (National) shall be entitled to receive, in full consideration, satisfaction, release, and
exchange of such holder's Allowed Vintage CW Bond Claim (National), such holder's Pro Rata
Share of the Vintage CW Bond Recovery.

## ARTICLE XXIII

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (AMBAC) (CLASS 19)

23.1    **Treatment of Vintage CW Bond Claims (Ambac)**:  Subject to the terms and
provisions of Section 75.5 hereof, on the Effective Date, each holder of an Allowed Vintage CW
Bond Claim (Ambac) shall be entitled to receive, in full consideration, satisfaction, release, and
exchange of such holder's Allowed Vintage CW Bond Claim (Ambac), such holder's Pro Rata
Share of the Vintage CW Bond Recovery.

## ARTICLE XXIV

## PROVISIONS FOR TREATMENT OF VINTAGE
## CW BOND CLAIMS (FGIC) (CLASS 20)

24.1    **Treatment of Vintage CW Bond Claims (FGIC)**:  Subject to the terms and
provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed Vintage CW
Bond Claim (FGIC) shall be entitled to receive, in full consideration, satisfaction, release and
exchange of such holder's Allowed Vintage CW Bond Claim (FGIC), such holder's Pro Rata
Share of the Vintage CW Bond Recovery.

## ARTICLE XXV

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (SYNCORA) (CLASS 21)

25.1    **Treatment of Vintage CW Bond Claims (Syncora):**  Subject to the terms and
provisions of Section 75.3 hereof, on the Effective Date, each holder of an Allowed Vintage CW
Bond Claim (Syncora) shall be entitled to receive, in full consideration, satisfaction, release, and
exchange of such holder's Allowed Vintage CW Bond Claim (Syncora), such holder's Pro Rata
Share of the Vintage CW Bond Recovery.

# ARTICLE XXVI

## PROVISIONS FOR TREATMENT OF VINTAGE CW BOND
## CLAIMS (TAXABLE ELECTION) (CLASS 22)

26.1 **Treatment of Vintage CW Bond Claims (Taxable Election):** On the Effective
Date, each holder of an Allowed Vintage CW Bond Claim (Taxable Election) shall be entitled to
receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Vintage
CW Bond Claim (Taxable Election), its Pro Rata Share of the Vintage CW Bond Recovery, as
modified by its Pro Rata Share of the Vintage Taxable Bond Distribution.

# ARTICLE XXVII

## PROVISIONS FOR TREATMENT OF VINTAGE CW
## GUARANTEE BOND CLAIMS (CLASS 23)

27.1 **Treatment of Vintage CW Guarantee Bond Claims:** On the Effective Date,
and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee
Bond Claim, each holder of an Allowed Vintage CW Guarantee Bond Claim shall receive such
holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

27.2 **Right of Election to Vintage CW Guarantee Bond Claims (Taxable Election):**
Notwithstanding the provisions of Section 27.1 of the Plan, each holder of an Allowed Vintage
CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled
to elect to receive distributions pursuant to the terms and provisions of Sections 33.1 and 77.1
hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight
Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of
the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the
Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board;
provided, however, that under no circumstance may such waiver by the Oversight Board occur on
or after the Effective Date.

# ARTICLE XXVIII

## PROVISIONS FOR TREATMENT OF VINTAGE CW
## GUARANTEE BOND CLAIMS (ASSURED) (CLASS 24)

28.1 **Treatment of Vintage CW Guarantee Bond Claims (Assured)**: Subject to the
terms and provisions of Section 75.1 hereof, on the Effective Date, and in full consideration,
satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Assured),
each holder of an Allowed Vintage CW Guarantee Bond Claim (Assured) shall be entitled to
receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXIX

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (NATIONAL) (CLASS 25)

29.1     **Treatment of Vintage CW Guarantee Bond Claims (National)**:  Subject to the terms and provisions of Section 75.2 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its allowed Vintage CW Guarantee Bond Claim (National), each holder of an Allowed Vintage CW Guarantee Bond Claim (National) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXX

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (AMBAC) (CLASS 26)

30.1     **Treatment of Vintage CW Guarantee Bond Claims (Ambac)**:  Subject to the terms and provisions of Section 75.5 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Ambac), each holder of an Allowed Vintage CW Guarantee Bond Claim (Ambac) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXXI

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (FGIC) (CLASS 27)

31.1     **Treatment of Vintage CW Guarantee Bond Claims (FGIC)**:  Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (FGIC), each holder of an Allowed Vintage CW Guarantee Bond Claim (FGIC) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

## ARTICLE XXXII

### PROVISIONS FOR TREATMENT OF VINTAGE CW
### GUARANTEE BOND CLAIMS (SYNCORA) (CLASS 28)

32.1     **Treatment of Vintage CW Guarantee Bond Claims (Syncora)**:  Subject to the terms and provisions of Section 75.3 hereof, on the Effective Date, and in full consideration, satisfaction, release, and exchange of its Allowed Vintage CW Guarantee Bond Claim (Syncora), each holder of an Allowed Vintage CW Guarantee Bond Claim (Syncora) shall be entitled to receive such holder's Pro Rata Share of the Vintage CW Guarantee Bond Recovery.

# ARTICLE XXXIII

## PROVISIONS FOR TREATMENT OF VINTAGE CW
## GUARANTEE BOND CLAIMS (TAXABLE ELECTION) (CLASS 29)

33.1    **Treatment of Vintage CW Guarantee Bond Claims (Taxable Election):** On
the Effective Date, each holder of an Allowed Vintage CW Guarantee Bond Claim (Taxable
Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of
such holder's Allowed Vintage CW Guarantee Bond Claim (Taxable Election), such holder's Pro
Rata Share of the Vintage CW Guarantee Bond Recovery, as modified by such holder's Pro Rata
Share of the Vintage Taxable Bond Distribution.

# ARTICLE XXXIV

## PROVISIONS FOR TREATMENT OF 2011
## CW BOND CLAIMS (CLASS 30)

34.1    **Treatment of 2011 CW Bond Claims**:  On the Effective Date, and subject to the
right of election set forth in Section 34.2 hereof, each holder of an Allowed 2011 CW Bond Claim
shall be entitled to receive, in full consideration, satisfaction, release and exchange of such
holder's Allowed 2011 CW Bond Claim, such holder's Pro Rata Share of the 2011 CW Bond
Recovery.

34.2    **Right of Election to 2011 CW Bond Claims (Taxable Election)**:
Notwithstanding the provisions of Section 34.1 of the Plan, each holder of an Allowed 2011 CW
Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to
receive distributions pursuant to the terms and provisions of Sections 37.1 and 77.1 hereof.  Such
election must be made on the Ballot/Election Form, be received by the Oversight Board, or its
designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by
such holder.  Any election made after the Ballot Date shall not be binding upon the
Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board;
provided, however, that under no circumstances may such waiver by the Oversight Board occur on
or after the Effective Date.

# ARTICLE XXXV

## PROVISIONS FOR TREATMENT OF RETAIL 2011
## CW BOND CLAIMS (CLASS 31)

35.1    **Treatment of Retail 2011 CW Bond Claims**:  On the Effective Date, each
holder of an Allowed Retail 2011 CW Bond Claim shall be entitled to receive, in full
consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 CW Bond
Claim, such holder's Pro Rata Share of (a) the 2011 CW Bond Recovery and (b) the Retail Support
Fee allocable to holders of Allowed Retail 2011 CW Bond Claims; provided, however, that, in the
event that Class 31 votes to reject the Plan in accordance with the provisions of section 1126 of the
Bankruptcy Code, (y) each holder of an Allowed Retail 2011 CW Bond Claim shall be entitled to

receive such holder's Pro Rata Share of the 2011 CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2011 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

35.2 **Right of Election to Retail 2011 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 35.1 of the Plan, each holder of an Allowed Retail 2011 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 37.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XXXVI

## PROVISIONS FOR TREATMENT OF 2011 CW
## BOND CLAIMS (ASSURED) (CLASS 32)

36.1 **Treatment of 2011 CW Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed 2011 CW Bond Claim (Assured), such holder's Pro Rata Share of the 2011 CW Bond Recovery.

## ARTICLE XXXVII

## PROVISIONS FOR TREATMENT OF 2011 CW BOND
## CLAIMS (TAXABLE ELECTION) (CLASS 33)

37.1 **Treatment of 2011 CW Bond Claims (Taxable Election)**: On the Effective Date, each holder of an Allowed 2011 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Taxable Bond Distribution.

# ARTICLE XXXVIII

## PROVISIONS FOR TREATMENT OF
## 2011 CW GUARANTEE BOND CLAIMS (CLASS 34)

38.1 **Treatment of 2011 CW Guarantee Bond Claims:** On the Effective Date, and subject to the right of election set forth in Section 38.2 hereof, each holder of an Allowed 2011 CW Guarantee Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2011 CW Guarantee Bond Recovery.

38.2 **Right of Election to 2011 CW Guarantee Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 38.1 of the Plan, each holder of an Allowed 2011 CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 39.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

# ARTICLE XXXIX

## PROVISIONS FOR TREATMENT OF 2011 CW GUARANTEE
## BOND CLAIMS (TAXABLE ELECTION) (CLASS 35)

39.1 **Treatment of 2011 CW Guarantee Bond Claims (Taxable Election)**: On the Effective Date, each holder of an Allowed 2011 CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Guarantee Taxable Bond Distribution.

# ARTICLE XL

## PROVISIONS FOR TREATMENT OF 2011
## CW SERIES D/E/PIB BOND CLAIMS (CLASS 36)

40.1 **Treatment of 2011 CW Series D/E/PIB Bond Claims**: On the Effective Date, and subject to the right of election set forth in Section 40.2 hereof, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim, such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery.

40.2 **Right of Election to 2011 CW Series D/E/PIB Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 40.1 of the Plan, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 43.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLI

## PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (ASSURED) (CLASS 37)

41.1 **Treatment of 2011 CW Series D/E/PIB Bond Claims (Assured)**: Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Assured) shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim (Assured), such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery.

## ARTICLE XLII

## PROVISIONS FOR TREATMENT OF RETAIL 2011 CW SERIES D/E/PIB BOND CLAIMS (CLASS 38)

42.1 **Treatment of Retail 2011 CW Series D/E/PIB Bond Claims:** On the Effective Date, each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2011 CW Series D/E/PIB Bond Claim, such holder's Pro Rata Share of (a) the 2011 CW Series D/E/PIB Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2011 CW Series D/E/PIB Bond Claims; provided, however, that, in the event that Class 38 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2011 CW Series D/E/PIB Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

42.2 **Right of Election to Retail 2011 CW Series D/E/PIB Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 42.1 of the Plan, each holder of an Allowed Retail 2011 CW Series D/E/PIB Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 43.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the

Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLIII

## PROVISIONS FOR TREATMENT OF 2011 CW SERIES D/E/PIB BOND CLAIMS (TAXABLE ELECTION) (CLASS 39)

43.1     **Treatment of 2011 CW Series D/E/PIB Bond Claims (Taxable Election):**     On the Effective Date, each holder of an Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2011 CW Series D/E/PIB Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Bond Recovery, as modified by such holder's Pro Rata Share of the 2011 CW Series D/E/PIB Taxable Bond Distribution.

## ARTICLE XLIV

## PROVISIONS FOR TREATMENT OF 2012 CW BOND CLAIMS (CLASS 40)

44.1     **Treatment of 2012 CW Bond Claims:**  On the Effective Date, and subject to the right of election set forth in Section 44.2 hereof, each holder of an Allowed 2012 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim, such holder's Pro Rata Share of the 2012 CW Bond Recovery.

44.2     **Right of Election to 2012 CW Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 44.1 of the Plan, each holder of an Allowed 2012 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 47.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLV

### PROVISIONS FOR TREATMENT OF RETAIL 2012
### CW BOND CLAIMS (CLASS 41)

45.1     **Treatment of Retail 2012 CW Bond Claims**:    On the Effective Date, each holder of an Allowed Retail 2012 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2012 CW Bond Claim, such holder's Pro Rata Share of (a) the 2012 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2012 CW Bond Claims; provided, however, that, in the event that Class 41 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2012 CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2012 CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2012 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

45.2     **Right of Election to Retail 2012 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 45.1 of the Plan, each holder of an Allowed Retail 2012 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 47.1 and 77.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

### ARTICLE XLVI

### PROVISIONS FOR TREATMENT OF 2012
### CW BOND CLAIMS (ASSURED) (CLASS 42)

46.1     **Treatment of 2012 CW Bond Claims (Assured)**:  Subject to the terms and provisions of Section 75.1 hereof, on the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Assured) shall be entitled to received, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim (Assured), such holder's Pro Rata Share of the 2012 CW Bond Recovery.

## ARTICLE XLVII

### PROVISIONS FOR TREATMENT OF 2012 CW BOND
### CLAIMS (TAXABLE ELECTION) (CLASS 43)

47.1 **Provisions for Treatment of 2012 CW Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed 2012 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2012 CW Bond Recovery, as modified by its Pro Rata Share of the 2012 CW Taxable Bond Distribution.

## ARTICLE XLVIII

### PROVISIONS FOR TREATMENT OF
### 2012 CW GUARANTEE BOND CLAIMS (CLASS 44)

48.1 **Treatment of 2012 CW Guarantee Bond Claims:** On the Effective Date, and subject to the right of election set forth in Section 48.2 hereof, each holder of an Allowed 2012 CW Guarantee Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2012 CW Guarantee Bond Recovery.

48.2 **Right of Election to 2012 CW Guarantee Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 48.1 of the Plan, each holder of an Allowed 2012 CW Guarantee Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 49.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE XLIX

### PROVISIONS FOR TREATMENT OF 2012 CW GUARANTEE
### BOND CLAIMS (TAXABLE ELECTION) (CLASS 45)

49.1 **Treatment of 2012 CW Guarantee Bond Claims (Taxable Election)**: On the Effective Date, each holder of an Allowed 2012 CW Guarantee Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2012 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2012 CW Guarantee Bond Recovery, as modified by such holder's Pro Rata Share of the 2012 CW Guarantee Taxable Bond Distribution.

94

## ARTICLE L

## PROVISIONS FOR TREATMENT OF 2014
## CW BOND CLAIMS (CLASS 46)

50.1    **Treatment of 2014 CW Bond Claims**:  On the Effective Date, and subject to the right of election set forth in Section 50.2 hereof, each holder of an Allowed 2014 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Bond Claim, such holder's Pro Rata Share of the 2014 CW Bond Recovery.

50.2    **Right of Election to 2014 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 50.1 of the Plan, each holder of an Allowed 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 52.1 and 77.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder.  Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE LI

## PROVISIONS FOR TREATMENT OF  RETAIL 2014
## CW BOND CLAIMS (CLASS 47)

51.1    **Treatment of Retail 2014 Bond Claims**:  On the Effective Date, each holder of an Allowed Retail 2014 CW Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Retail 2014 CW Bond Claim, such holder's Pro Rata Share of (a) the 2014 CW Bond Recovery and (b) the Retail Support Fee allocable to holders of Allowed Retail 2014 CW Bond Claims; provided, however, that, in the event that Class 47 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, (y) each holder of an Allowed Retail 2014 CW Bond Claim shall be entitled to receive such holder's Pro Rata Share of the 2014 CW Bond Recovery and (z) the Retail Support Fee otherwise allocable to holders of Allowed Retail 2014 CW Bond Claims shall be reallocated to Initial GO/PBA PSA Restriction Fee Creditors and Retail Investors that are members of Classes that voted to accept the Plan and be distributed in accordance with the terms and provisions of Section 3.6 hereof.

51.2    **Right of Election to Retail 2014 CW Bond Claims (Taxable Election)**: Notwithstanding the provisions of Section 51.1 of the Plan, each holder of an Allowed Retail 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 52.1 and 77.1 hereof.  Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by

such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE LII

## PROVISIONS FOR TREATMENT OF 2014
## CW BOND CLAIMS (TAXABLE ELECTION) (CLASS 48)

52.1 **Provisions for Treatment of 2014 CW Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed 2014 CW Bond Claim (Taxable Election) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2014 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2014 CW Taxable Bond Distribution.

## ARTICLE LIII

## PROVISIONS FOR TREATMENT OF
## 2014 CW GUARANTEE BOND CLAIMS (CLASS 49)

53.1 **Treatment of 2014 CW Guarantee Bond Claims:** On the Effective Date, subject to the right of election set forth in Section 53.2 hereof, each holder of an Allowed 2014 CW Guarantee Bond claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Guarantee Bond Claim, such holder's Pro Rata Share of the 2014 CW Bond Recovery.

53.2 **Right of Election to 2014 CW Guarantee Bond Claims (Taxable Election):** Notwithstanding the provisions of Section 53.1 of the Plan, each holder of an Allowed 2014 CW Bond Claim that is a Puerto Rico Investor shall, at such holder's option, be entitled to elect to receive distributions pursuant to the terms and provisions of Sections 54.1 and 77.1 hereof. Such election must be made on the Ballot/Election Form, be received by the Oversight Board, or its designee, on or prior to the Ballot Date and, if elected, shall be deemed acceptance of the Plan by such holder. Any election made after the Ballot Date shall not be binding upon the Commonwealth unless the Ballot Date is expressly waived, in writing, by the Oversight Board; provided, however, that under no circumstances may such waiver by the Oversight Board occur on or after the Effective Date.

## ARTICLE LIV

## PROVISIONS FOR TREATMENT OF 2014 CW GUARANTEE
## BOND CLAIMS (TAXABLE ELECTION) (CLASS 50)

54.1 **Treatment of 2014 CW Guarantee Bond Claims (Taxable Election):** On the Effective Date, each holder of an Allowed 2014 CW Guarantee Bond Claim (Taxable Election)

96

shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed 2014 CW Guarantee Bond Claim (Taxable Election), such holder's Pro Rata Share of the 2014 CW Bond Recovery, as modified by such holder's Pro Rata Share of the 2014 CW Guarantee Taxable Bond Distribution.

## ARTICLE LV

## PROVISIONS FOR TREATMENT OF ACTIVE AND RETIRED
## EMPLOYEE RETIREMENT BENEFIT CLAIMS (CLASS 51A THROUGH 51L)

### 55.1 <u>Treatment of Retired ERS Participant Below-Threshold Claims (Class 51A)</u>:

(a) <u>Treatment</u>. Each holder of an Allowed Retired ERS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired ERS Participant Below-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b) <u>Preemption</u>. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired ERS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.2 <u>Treatment of Retired JRS Participant Below-Threshold Claims (Class 51B)</u>:

(a) <u>Treatment</u>. Each holder of an Allowed Retired JRS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired JRS Participant Below-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b) <u>Preemption</u>. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired JRS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.3 <u>Treatment of Retired TRS Participant Below-Threshold Claims (Class 51C)</u>:

(a) <u>Treatment</u>. Each holder of an Allowed Retired TRS Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed Retired TRS Participant Below-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)     <u>Preemption</u>.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired TRS Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.4     <u>Treatment of Retired ERS Participant Above-Threshold Claims (Class 51D)</u>:

(a)     <u>Treatment</u>.  Each holder of an Allowed Retired ERS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired ERS Participant Above-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)     <u>Preemption</u>.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired ERS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.5     <u>Treatment of Retired JRS Participant Above-Threshold Claims (Class 51E)</u>:

(a)     <u>Treatment</u>.  Each holder of an Allowed Retired JRS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired JRS Participant Above-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)     <u>Preemption</u>.  All provisions of the Commonwealth Constitution, Commonwealth statues, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Retired JRS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.6     <u>Treatment of Retired TRS Participant Above-Threshold Claims (Class 51F)</u>:

(a)     <u>Treatment</u>.  Each holder of an Allowed Retired TRS Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed Retired TRS Participant Above-Threshold Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date.

(b)     <u>Preemption</u>.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive order, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part

herein, to the extent inconsistent with the treatment of Allowed Retired TRS Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

### 55.7    Treatment of Active ERS Participant Claims (Class 51G):

(a)    Treatment.  Each holder of an Allowed Active ERS Participant Claim shall be entitled to receive on account of such Allowed Active ERS Participant Claim his or her benefits without adjustment for any Monthly Benefit Modification, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date; provided, however, that, notwithstanding the foregoing, Active ERS Participant Claims of Active ERS Participants hired prior to January 1, 2000, but which accrued after June 30, 2013 pursuant to Act 3-2013, shall not be subject to reduction in accordance with the Plan.  Benefits which accrued after June 30, 2013 pursuant to Act 3-2013 for Active ERS Participants hired prior to January 1, 2000 shall include the full accumulated contribution value with interest up to, but not including, the Commonwealth Petition Date and such Participants' balances shall have a four percent (4%) interest rate applied to them upon conversion of the balances to an annuity.  Each holder of an Active ERS Participant Claim (who is actively employed by an employer within the ERS as of the Effective Date) shall also receive a one-time payment in the amount of Two Thousand Six Hundred Dollars ($2,600.00), to be deposited into the defined contribution accounts established under Act 106, and the administrator of the Act 106 defined contribution plan shall direct all such deposits to be invested in target retirement date funds closest to the year in which each Participant will reach age 65, unless any such Participant has affirmatively elected different investment options.  Holders of Allowed Active ERS Participant Claims who have already retired as of April 1, 2021 and who have converted their contributions to a system paid annuity, either through PayGo or through the payroll of the Commonwealth or its agencies under a Voluntary Transition Program (e.g. Act 211-2015 or 70-2016), are not eligible for the treatment described in this Section 55.7(a) and shall not receive a cash payment, and will be subject to the pension reduction applicable to other Participants in accordance with the terms and provisions of Section 55.1, 55.4, 55.11, or 55.12 of the Plan, as applicable.

(b)    Preemption:  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active ERS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

(c)    Payroll Deductions:  As further consideration to assure active Participants' future contributions and benefits, an active employee working for the central government of the Commonwealth shall have his, her or their payroll deductions for contributions to their individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deducted from such Participant's payroll distribution.

### 55.8    Treatment of Active JRS Participant Claims (Class 51H):

99

(a)     Treatment.  Each holder of an Allowed JRS Participant Claim shall be entitled to receive on account of such Allowed Active JRS Participant Claim (i) his or her benefits that accrued as of May 3, 2017, without adjustment for any Monthly Benefit Modification and the terms set forth on Exhibit "E" hereto, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date, and (ii) such additional benefits for service on or after May 4, 2017, frozen as of the date as set forth on the term sheet attached as Exhibit "E" hereto, as applicable, to such holder of an Allowed Active JRS Participant Claim, including the social security benefits defined therein.

(b)     Rejection.  To effectuate the freeze of contractual rights of Active JRS Participants to accrue pension benefits under Puerto Rico law as set forth on Exhibit "E" hereto, the contractual obligations of the Commonwealth to accrue such benefits, including, without limitation, pursuant to the statutes set forth in Part III of Exhibit "K" hereto, shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code.

(c)     Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, including, without limitation, statutes set forth in Part III of Exhibit "K" hereto, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active JRS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

55.9     **Treatment of Active TRS Participant Claims (Class 51I):**

(a)     Treatment.

(i)     Each holder of an Allowed Active TRS Participant Claim shall be entitled to receive on account of such Allowed Active TRS Participant Claim (i) his or her, as applicable, benefits that accrued as of May 3, 2017, without adjustment for any Monthly Benefit Modification, as applicable, and the terms set forth on Exhibit "F-1" hereto, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date, and (ii) such additional benefits for service on or after May 4, 2017, in respect of a freeze of pension benefits to be imposed as of the Effective Date as set forth on the term sheet attached as Exhibit "F-1" hereto, as applicable, to such holder of an Allowed Active TRS Participant Claim, including the social security benefits defined therein; provided, however, that, notwithstanding the foregoing, retirement benefits of teachers hired on or after August 1, 2014 shall not be subject to freeze or reduction in accordance with the terms and provisions of the Plan.

(ii)     Notwithstanding the terms and provisions of Section 55.9(a)(i) hereof, in the event that, on or prior to September 30, 2021, AMPR (A) notifies the Oversight Board, in writing, that the terms set forth in the term sheets annexed hereto as Exhibit "F-2" have been ratified, and (B) executes a plan support agreement with, among others, the Oversight Board, on behalf of the Commonwealth, that incorporates the terms set forth on Exhibit "F-2" hereto, each holder of an Allowed Active TRS Participant Claim shall be entitled to receive on account of such Allowed Active TRS Participant Claim (1) his or her benefits that accrued as of May 3, 2017, without adjustment for any Monthly Benefit Modification and the terms set forth on Exhibit "F-2"

100

hereto, but shall be subject to the elimination of any cost of living adjustments from and after the Effective Date, (2) such additional benefits for service during the period from and after May 4, 2017, in respect of a freeze of pension benefits to be imposed as of the six (6) month anniversary of the Effective Date as set forth on the term sheet attached as Exhibit "F-2" hereto, as applicable, to such holder of an Allowed Active TRS Participant Claim, including the social security benefits defined therein, and (3) the benefits of the terms of a new collective bargaining agreement and all other terms as set forth on the term sheet attached hereto as Exhibit "F-2", in which case any existing collective bargaining agreement(s) with AMPR shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code. Without limiting the foregoing, on or as soon as reasonably practicable from and after the Effective Date, the Active TRS Participants shall receive the additional payments and distributions as set forth on Appendix II to Exhibit "F-2" hereto. Notwithstanding the forgoing, retirement benefits of teachers hired on or after August 1, 2014 shall not be subject to freeze or reduction in accordance with the terms and provisions of the Plan.

        (b)    <u>Rejection</u>. To effectuate the freeze of the contractual rights of Active TRS Participants to accrue pension benefits under Puerto Rico law as set forth on Exhibit "F-1"or "F-2" hereto, as applicable, the contractual obligations of the Commonwealth to accrue such benefits, including, without limitation, pursuant to the statutes set forth in Part III of Exhibit "K" hereto, shall be deemed rejected pursuant to section 365(a) of the Bankruptcy Code.

        (c)    <u>Preemption</u>. All provisions of the Commonwealth Constitution, Commonwealth statutes, including, without limitation, the statutes set forth in Part III of Exhibit "K" hereto, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed Active TRS Participant Claims hereunder, are preempted as inconsistent with PROMESA.

        (d)    <u>Payroll Deductions</u>. As further consideration to assure Active TRS Participants' future contributions and benefits, such Participants shall have his, her or their payroll deductions for contributions to the Participant's individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deducted from such Participant's payroll distribution.

    55.10    <u>**Treatment of System 2000 Participant Claims (Class 51J)**</u>:

        (a)    <u>System 2000 Benefits</u>: Except as set forth in Sections 55.7(b), 55.8(c) and 55.9(c) hereof, holders of Allowed System 2000 Participant Claims shall receive the amount of their contributions to these plans from 2000 through June 30, 2017, plus interest accrued thereon pursuant to applicable law for the period up to, but not including, the Commonwealth Petition Date, which amount shall be deposited into the defined contribution accounts established under Act 106, and the administrator of the Act 106 defined contribution plan shall direct all such deposits to be invested in target retirement date funds closest to the year in which each participant will reach age 65 applicable to each participant unless any such participant has affirmatively elected different investment options. If the total amount of contributions, plus accrued interest thereon as described above, is less than or equal to One Billion Five Hundred Million Dollars

($1,500,000,000.00), on the Effective Date, each holder of an Allowed System 2000 Participant Claim shall receive such holder's Pro Rata Share of such aggregate amount. If the total amount of contributions described in this Section 55.10(a), plus accrued interest thereon as described above, exceeds One Billion Five Hundred Million Dollars ($1,500,000,000.00), the Oversight Board and AFSCME shall develop a payment plan mutually acceptable to both parties to pay out the remaining balance of the contributions (for the avoidance of doubt, the amount in excess of One Billion Five Hundred Million Dollars ($1,500,000,000.00)) described in this Section 55.5(a). In all events, the full amount of contributions described in this Section 55.5(a) will be paid to all holders of Allowed System 2000 Participant Claims not later than December 31, 2025. As of the Effective Date, holders of Allowed System 2000 Participant Claims with System 2000 contributions from 2000 through June 30, 2017 who are ineligible for benefits under Act 1 and Act 447 will no longer be entitled to future system administered benefits, such as death and disability benefits. Holders of Allowed System 2000 Participant Claims who have already retired and converted their contributions to a system paid annuity, either through PayGo or through the payroll of the Commonwealth or its agencies under a Voluntary Transition Program (e.g., Act 211-2015 or Act 70-2010) are not eligible for the treatment described in this Section 55.5(a) and shall not receive a cash payment, but will be subject to the pension reduction applicable to other Participants in accordance with the terms and provisions of Section 55.1 of the Plan.

(b)     Preemption: All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment afforded pursuant to Section 55.5(a) hereof, are preempted as inconsistent with PROMESA.

(c)     Payroll Deductions: As further consideration to assure active participant's future contributions and benefits, an active employee working for the central government of the Commonwealth shall have his, her or their payroll deductions for contributions to a participant's individual accounts under Act 106 deposited into such accounts as soon as reasonably possible, but in no event later than the fifteenth (15th) day of the month following the month in which the contributions were deposited from such participant's payroll distribution.

55.11   **Treatment of VTP Payroll Participant Below-Threshold Claims (Class 51K):**

(a)     Treatment. Each holder of a VTP Payroll Participant Below-Threshold Claim shall be entitled to receive on account of such Allowed VTP Participant Claim his or her benefits without adjustment for any Monthly Benefit Modification.

(b)     Preemption. All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed VTP Payroll Participant Below-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

55.12   **Treatment of VTP Payroll Participant Above-Threshold Claims (Class 51L):**

(a)    Treatment.  Each holder of a VTP Payroll Participant Above-Threshold Claim shall be entitled to receive on account of such Allowed VTP Participant Claim his or her benefits without adjustment for any Monthly Benefit Modification.

(b)    Preemption.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies that create, require, or enforce employee pension and other benefits that are modified and/or preserved in whole or in part herein, to the extent inconsistent with the treatment of Allowed VTP Payroll Participant Above-Threshold Claims hereunder, are preempted as inconsistent with PROMESA.

## ARTICLE LVI

## PROVISIONS FOR TREATMENT OF
## AFSCME CLAIMS (CLASS 52)

### 56.1    Treatment of AFSCME Claims:

(a)    Modified AFSCME Collective Bargaining Agreements:  The existing collective bargaining agreements between the Commonwealth, its applicable agencies and instrumentalities, on the one hand, and AFSCME and its related union affiliates, on the other hand, shall be deemed rejected pursuant to section 365 of the Bankruptcy Code and replaced  with modified collective bargaining agreements to be entered into in accordance with the terms and conditions agreed to by AFSCME and the Oversight Board, as set forth on Exhibit "G" hereto. Without limiting the foregoing, such modifications shall include, among other matters, (a) a term of five (5) years, commencing as of the Effective Date, (b) provisions regarding layoffs and downsizing, (c) terms regarding System 2000 and (d) provisions for sharing Excess Cash Surplus. Each holder of an Allowed AFSCME Claim shall be entitled to receive the treatment set forth in Sections 56.1(a), (b), (c) and (d) hereof in full consideration, satisfaction, release, and exchange of such holder's Allowed AFSCME Claim resulting from such rejection.  The Commonwealth shall have no obligation to bargain with AFSCME over terms of a new or modified collective bargaining agreements throughout the term of such modified collective bargaining agreements and the failure to bargain during such period shall not constitute, nor shall it be construed to be, an unfair labor practice under any Puerto Rico law.  No adjudicative forum shall take into consideration prior practices or bargaining history when interpreting the terms of the modified collective bargaining agreements set forth on Exhibit "G" hereto.

(b)    Additional AFSCME Distribution.  On or as soon as reasonably practicable after the Effective Date, AFSCME and its member employees, as applicable, shall receive the additional payments and distributions as set forth on Appendix II to Exhibit "G" hereto.

(c)    Pre-Petition Arbitration and Grievance Claims.  Any distributions on account of Claims for liquidated damage amounts resulting from the disposition of pre-petition actions brought pursuant to the grievance and arbitration procedures arising under the collective bargaining agreements between the Commonwealth and AFSCME shall be made by the Commonwealth to the claimant in each instance on such date that is the later of (i) thirty (30) days after such disposition and (ii) sixty (60) days after the Effective Date.

103

(d)      <u>Preemption</u>.  All provisions of the Commonwealth Constitution, Commonwealth statutes, executive orders, rules, regulations, and policies in effect as of the Confirmation Date that create, require, or enforce employee pension and other benefits that are modified herein, to the extent inconsistent with the treatment afforded in this Section 56.1, are preempted as inconsistent with PROMESA and shall be of no further force or effect.

## ARTICLE LVII

## PROVISIONS FOR TREATMENT OF
## DAIRY PRODUCER CLAIMS (CLASS 53)

57.1      **Treatment of Dairy Producer Claims:**  On the Effective Date, each holder of a Dairy Producer Claim be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Dairy Producer Claim, an amount equal to fifty percent (50%) of such Allowed Dairy Producer Claim, with such amount being payable by the Commonwealth in three (3) equal installments commencing on the Effective Date and each subsequent payment thereof being made on July 1st of each FY.  Notwithstanding anything contained in the Plan to the contrary, (a) nothing contained herein shall adjust, enlarge, compromise, discharge or otherwise affect the respective parties' rights or obligations pursuant to the Dairy Producer Settlement except with respect to the Commonwealth's payment obligation under the Dairy Producer Settlement, (b) the Commonwealth's obligation for the regulatory approval accrual set forth in decretal paragraph 14 of the Dairy Producer Settlement shall be treated and discharged in accordance with the Plan and shall not be recouped by a holder of a Dairy Produce Claim from any other source, and (c) the Plan shall not affect the regulatory accrual charge being assessed on and paid from the cost of milk pursuant to the Dairy Producer Settlement.

## ARTICLE LVIII

## PROVISIONS FOR TREATMENT OF CW EMINENT
## DOMAIN/INVERSE CONDEMNATION CLAIMS (CLASS 54)

58.1      **Treatment of Eminent Domain/Inverse Condemnation Claims:**  From and after the Effective Date, (a) to the extent not modified prior thereto, the automatic stay extant pursuant to section 362 of the Bankruptcy Code shall be deemed modified in order to permit the holder of an Eminent Domain/Inverse Condemnation Claim to (i) liquidate such Eminent Domain/Inverse Condemnation Claim in such holder's Eminent Domain Proceeding and (ii) cause the Clerk of the Court of First Instance to distribute to such holder the amount of monies on deposit with the Court of First Instance with respect to the condemned property, and (b) subject to the entry of the Confirmation Order or the Findings of Fact and Conclusions of Law in respect of the Plan providing such Claims must be paid in full to the extent they are Allowed Claims for just compensation, upon each such order becoming a Final Order, and upon the occurrence of another Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, in Cash, one hundred percent (100%) of such Allowed Eminent Domain/Inverse

Condemnation Claim; provided, however, that, in the event that (x) the Oversight Board appeals from the Confirmation Order and the Findings of Fact and Conclusions of Law regarding the Title III Court's ruling that Allowed Eminent Domain/Inverse Condemnation Claims must be paid in full or otherwise be rendered unimpaired pursuant to the Plan, (y) such appeal is successful, and (z) a Final Order is entered holding that Allowed Eminent Domain/Inverse Condemnation Claims may be impaired, subject to the terms and provisions of Articles LXXVII and LXXXII of the Plan, each holder of an Allowed Eminent Domain/Inverse Condemnation Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of such holder's unpaid balance of its Allowed Eminent Domain/Inverse Condemnation Claim, and the Reorganized Commonwealth shall make, payments, in Cash, in an amount equal to the pro rata payments to be made to holders of Allowed CW General Unsecured Claims up to the GUC Recovery Cap.

## ARTICLE LIX

## PROVISIONS FOR TREATMENT OF
## ENERGY INCENTIVE CLAIMS (CLASS 55)

59.1 **Treatment of Energy Incentive Claims:** From and after the Effective Date, (a) the Commonwealth shall (i) continue the energy incentive program set forth in the Energy Incentive Act, and (ii) in connection therewith, assume Allowed Energy Incentive Claims and the instruments and reservation agreements in existence as of the Effective Date, and, consistent with the terms of the Energy Incentive Act, and (b) to the extent that respective projects have been completed in accordance with the Energy Incentive Act and terms and provisions of the instruments and reservation agreements entered into in connection therewith, the holders of Allowed Energy Incentive Claims shall be permitted to exercise and claim the tax incentives created thereunder.

## ARTICLE LX

## PROVISIONS FOR TREATMENT OF
## MED CENTER CLAIMS (CLASS 56)

60.1 **Treatment of Med Center Claims:** On the Effective Date, and provided that Class 56 votes to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, each holder of a Med Center Claim shall (a) receive an Allowed Med Center Claim in the amount set forth in Column "A" set forth on Exhibit "H" hereto, and (b) be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Med Center Claim, an amount equal to fifty percent (50%) of such Allowed Med Center Claim; provided, however, that, in the event that Class 56 votes to reject the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, each holder of a Med Center Claim shall (y) receive an Allowed Med Center Claim in the amount set forth in Column "B" set forth on Exhibit "H" hereto, and (z) be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed Med Center Claim, an amount equal to fifty percent (50%) of such Allowed Med Center Claim set forth in Column "B" set forth on Exhibit "H" hereto, with either such amount being payable by the Commonwealth in three (3) equal annual installments,

commencing on the Effective Date and each subsequent payment thereof being made on the anniversary thereof.

60.2    **Dismissal of Med Center Litigation**:  On the Effective Date, the Med Center Litigation, except the Med DC Action, shall be deemed dismissed, with prejudice, and each of the Commonwealth and the respective Med Centers shall take such action as is necessary to notify the applicable court of such dismissal, including, without limitation, within ten (10) Business Days of the Effective Date, filing notices with the clerk of such court setting forth the resolution of the Med Center Litigation and the dismissal thereof (except the Med DC Action), with prejudice; provided, however, that all appeals taken from the Med DC Action shall be dismissed, with prejudice, and each of the Commonwealth and the Med Centers party to such appeals shall take such action as is necessary to notify such appellate courts of appeal of such dismissal; and, provided, further, that the Commonwealth and the Med Centers shall file a notice with the clerk of the court in connection with the Med DC Action that (a) all actions in connection with the Med DC Action shall be stayed; provided, however, that any claims and causes of action relating to the period up to and including the Effective Date shall be deemed dismissed, with prejudice, (b) in the event that, from and after July 1, 2022, the Commonwealth defaults on its obligations arising from or relating to the Medicaid Act, 42 U.S.C. § 139 6a(bb), such stay shall be lifted and the Med Centers may pursue relief and the Commonwealth may present any and all defenses with respect to such alleged defaults, and (c) any Med Center claims for injunctive relief relating to the period from and after July 1, 2022 shall be brought in the Med DC Action and shall proceed in the ordinary course upon the expiration or the lifting of the automatic stay, subject to the reservation of all rights, claims, and defenses of the Med Centers and the Commonwealth with respect to any such claims.

## ARTICLE LXI

## PROVISIONS FOR TREATMENT OF
## TAX CREDIT CLAIMS (CLASS 57)

61.1    **Treatment of Tax Credit Claims:**  From and after the Effective Date, the Commonwealth shall assume Allowed Tax Credit Claims and the instruments and agreements in existence as of the Effective Date with respect thereto and the holders of Allowed Tax Credit Claims shall be permitted to exercise and claim the tax benefits and entitlements with respect thereto in accordance with the terms and provisions of such documents, instruments, and applicable law.

## ARTICLE LXII

## PROVISIONS FOR TREATMENT OF CW GENERAL
## UNSECURED  CLAIMS AND GDB/PET CLAIM (CLASSES 58 AND 58A)

62.1    **Treatment of CW General Unsecured Claims:**

(a)    Treatment of CW General Unsecured Claims.  Subject to the election set forth in Section 62.1(b) hereof, on the Effective Date, each holder of an Allowed CW General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release, and

exchange of such holder's Allowed CW General Unsecured Claim, such holder's Pro Rata Share of the CW GUC Recovery up to the GUC Recovery Cap.

            (b)    <u>Election to be Treated as Convenience Claim</u>.  Notwithstanding the provisions of Section 62.1(a) of the Plan, any holder of an Allowed CW General Unsecured Claim, other than a CW General Unsecured Claim that is a component of a larger CW General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, may elect to be treated as the holder of an Allowed Convenience Claim.  Such election must be made on Ballot and be received by the Debtors on or prior to the Ballot Date.  Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; <u>provided</u>, <u>however</u>, that, under no circumstances may such waiver by the Debtors occur on or after the Effective Date.

      62.2    <u>**Limitation on Recovery:**</u>  Notwithstanding anything contained herein to the contrary, in the event that distributions with respect to Allowed CW General Unsecured Claims from the Net CW Cash Consideration equal the GUC Recovery Cap, without consideration of any net recoveries by the Avoidance Actions Trust, any funds (other than any net recoveries by the Avoidance Actions Trust) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to the Commonwealth for general purposes.

      62.3    <u>**GUC Reserve:**</u>  The GUC Reserve shall be funded as follows: (a) Two Hundred Million Dollars ($200,000,000.00) on the Effective Date, (b) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2022, (c) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2023, (d) One Hundred Million Dollars ($100,000,000.00) on or prior to December 31, 2024, and (e) Seventy-Five Million Dollars ($75,000,000.00) on or prior to December 31, 2025; <u>provided</u>, <u>however</u>, that amounts necessary (a) to fund the Avoidance Actions Trust in accordance with Section 78.11 hereof shall be funded directly to the Avoidance Actions Trust and not into the GUC Reserve, and (b) to satisfy Allowed Convenience Claims shall be funded directly to the Disbursing Agent and not into the GUC Reserve; and <u>provided</u>, <u>further</u>, that, in the event that the Avoidance Actions Trust ceases pursuit of Avoidance Actions, including, without limitation, pursuant to settlement or dismissal of all Avoidance Actions, all funds in the Avoidance Actions Trust (including amounts necessary to fund the administration and operation of the Avoidance Action Trust) shall be transferred to the GUC Reserve for distribution to holders of Allowed CW General Unsecured Claims; and, <u>provided</u>, <u>further</u>, that, in accordance with Section 62.2 hereof, in the event recoveries on account of Allowed CW General Unsecured Claims from the Net CW Cash Consideration equal the GUC Recovery Cap, (a) any funds (other than any net recoveries by the Avoidance Actions Trust) remaining in the GUC Reserve following attainment of the GUC Recovery Cap and distributions made or reserved on account thereof shall be turned over to the Commonwealth for general purposes, or (b) to the extent such GUC Recovery Cap is reached prior to a future funding obligation, the Commonwealth shall be relieved of such future funding obligation; and, <u>provided</u>, <u>further</u>, that, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and such Claims for just compensation must be paid in full and the Oversight Board prosecutes such appeal in good faith, the GUC Reserve shall be reduced as follows: (a) in the event such appeal is successful and a Final Order is entered holding that the

Eminent Domain/Inverse Condemnation Claims are dischargeable and may be impaired, the GUC Reserve shall be reduced by the lesser of (i) Thirty Million Dollars ($30,000,000.00) and (ii) ten percent (10%) of the aggregate amount of all Allowed Eminent Domain/Inverse Condemnation Claims, or (b) in the event such appeal is not successful and a Final Order is entered holding that Eminent Domain/Inverse Condemnation Claims are non-dischargeable or may not be impaired, the GUC Reserve shall be reduced by the lesser of (i) Fifteen Million Dollars ($15,000,000.00) and (ii) five percent (5%) of the aggregate amount of all Allowed Eminent Domain/Inverse Condemnation Claims. For the avoidance of doubt, regardless of whether or not such appeal is successful, Eminent Domain/Inverse Condemnation Claims shall not be deemed CW General Unsecured Claims.

62.4 **Treatment of GDB/PET Claims:** On the Effective Date, the holder of the GDB/PET Claim shall be entitled to receive, in full consideration, satisfaction, release, and exchange of the Allowed GDB/PET Claim, payments from the Commonwealth equal to, and on the same timeframe, as the pro rata payments to be made to holders of Allowed CW General Unsecured Claims pursuant to the terms and provisions of Sections 62.1, 62.2 and 62.3 hereof.

## ARTICLE LXIII

## PROVISIONS FOR TREATMENT
## OF CW/HTA CLAIMS (CLASS 59)

63.1 **Treatment of CW/HTA Claims:** On the Effective Date, and subject to the satisfaction of the HTA Distribution Conditions, each holder of an Allowed CW/HTA Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/HTA Claim, such holder's Pro Rata Share of the CW/HTA Clawback Recovery; provided, however, that, upon satisfaction of the HTA Distribution Conditions, Ambac, Assured, and National shall receive their respective shares of the CW/HTA Clawback Recovery on account of the Ambac CW/HTA Bond Claims, Assured CW/HTA Bond Claims, and National CW/HTA Bond Claims, respectively; and provided, further, that, upon satisfaction of the HTA Distribution Conditions, the CW/HTA Clawback Recovery allocable to the FGIC CW/HTA Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

63.2 **Distribution of the CW/HTA Clawback Recovery**: Notwithstanding anything contained in the Plan to the contrary, upon satisfaction of the HTA Distribution Conditions, the Commonwealth shall take such actions as are necessary to distribute the CW/HTA Clawback Recovery to holders of Allowed CW/HTA Claims (including the Monolines) and to make payments on account thereof in accordance with the terms and provisions of the Plan, the Clawback CVI Indenture and the HTA Clawback CVI Priority Distribution Waterfall section set forth on Exhibit "J" annexed hereto; provided, however, that, until receipt of the GDB Loan Priority Determination, (a) Cash payable with respect to the HTA Clawback CVI and allocable to the HTA 98 Bonds shall be subject to the CVI Payment Reserve, and (b) the CW/HTA Clawback Recovery otherwise allocable to holders of Allowed CW/HTA Claims relating to the GDB HTA Loans shall not be distributed to holders of the GDB HTA Loans; and, provided, further, that, upon receipt of the GDB Loan Priority Determination, funds in the CVI Payment Reserve and any

undistributed CW/HTA Clawback Recovery shall be released to holders of HTA Bonds and GDB HTA Loans, as the case may be, based upon (y) as between holders of HTA 98 Bonds and holders of GDB HTA Loans, the terms of such GDB Loan Priority Determination, and (z) as between holders of HTA 68 Bonds and holders of HTA 98 Bonds, the HTA Clawback CVI Priority Distribution Waterfall section set forth on Exhibit "J" annexed hereto. Notwithstanding the foregoing, the HTA Clawback CVI to be issued and distributed pursuant to this Article LXIII and any payments made thereunder shall be held in a reserve or trust, the form and substance of which shall be reasonably acceptable to Assured and National, up to and including the date on which the HTA Distribution Conditions are satisfied, and, in the event the HTA/CCDA Plan Support Agreement is terminated by the Oversight Board, Assured and/or National, the HTA Clawback CVI and any distributions on account thereof shall be released from such reserve or trust as the case may be, and distributed to creditors in accordance with the terms set forth on Exhibit "J" annexed hereto.

**ARTICLE LXIV**

**PROVISIONS FOR TREATMENT OF
CW/CONVENTION CENTER CLAIMS (CLASS 60)**

64.1      **Treatment of CW/Convention Center Claims:** Subject to the terms and provisions of Section 75.4 hereof, on the Effective Date, each holder of an Allowed CW/Convention Center Claim (including the Monolines) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/Convention Center Claim, such holder's Pro Rata Share of the CW/Convention Center Clawback Recovery; provided, however, that Ambac and Assured shall receive their respective share of the CW/Convention Center Clawback Recovery on account of the Allowed Ambac CW/Convention Center Claims and the Allowed Assured CW/Convention Center Claims, respectively; and, provided, further, that the CW/Convention Center Clawback Recovery on account of the Allowed FGIC CW/Convention Center Claims shall be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

**ARTICLE LXV**

**PROVISIONS FOR TREATMENT OF
CW/PRIFA RUM TAX CLAIMS (CLASS 61)**

65.1      **Treatment of CW/PRIFA Rum Tax Claims:** On the Effective Date, subject to the satisfaction of the PRIFA Distribution Conditions, each holder of an Allowed CW/PRIFA Rum Tax Claim (including the Monolines) shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/PRIFA Rum Tax Claim, such holder's Pro Rata Share of the CW/PRIFA Clawback Recovery; provided, however that, upon satisfaction of the PRIFA Distribution Conditions, Ambac and Assured shall receive their respective share of the CW/PRIFA Clawback Recovery on account of Allowed Ambac CW/PRIFA Rum Tax Claims and the Allowed Assured CW/PRIFA Rum Tax Claims, respectively; and, provided, further, that the CW/PRIFA Clawback Recovery on account of the Allowed FGIC PRIFA Rum Tax Claims shall

be treated in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

65.2 **Distribution of the Beneficial Interests in the PRIFA Trust:** Notwithstanding anything contained in the Plan to the contrary, (a) on the Effective Date, the Commonwealth shall take such actions as are necessary to deposit (i) the PRIFA Clawback CVI and the Rum Tax CVI, and all payments to be made in connection therewith, and (ii) One Hundred Ninety-Three Million Five Hundred Thousand Dollars ($193,500,000.00) into the PRIFA Trust, each for the benefit of holders of PRIFA Bond Claims (including the Monolines), and (b) upon satisfaction of the PRIFA Distribution Conditions, cause the distribution of the beneficial interests of the PRIFA Trust to holders of PRIFA Bond Claims (including the Monolines); provided, however, that the beneficial interests in the PRIFA Trust on account of the FGIC Insured PRIFA Bond Claims shall be treated and distributed in a manner consistent with the treatment of Allowed FGIC Insured Bond Claims pursuant to Section 75.4 hereof, as applicable.

# ARTICLE LXVI

## PROVISIONS FOR TREATMENT OF
## CW/MBA CLAIMS (CLASS 62)

66.1 **Treatment of CW/MBA Claims:** On the Effective Date, each holder of an Allowed CW/MBA Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed CW/MBA Claim, such holder's Pro Rata Share of the CW/MBA Clawback Recovery.

# ARTICLE LXVII

## PROVISIONS FOR TREATMENT OF
## CW APPROPRIATIONS CLAIMS (CLASS 63)

67.1 **Treatment of CW Appropriations Claims:** CW Appropriations Claims shall not receive a distribution pursuant to the Plan and each holder of a CW Appropriations Claim shall be deemed to have rejected the Plan with respect to such CW Appropriations Claim.

# ARTICLE LXVIII

## PROVISIONS FOR TREATMENT OF
## SECTION 510(b) SUBORDINATED CLAIMS (CLASS 64)

68.1 **Treatment of Section 510(b) Subordinated Claims:** Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan and each holder of an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the Plan with respect to such Section 510(b) Subordinated Claims.

## ARTICLE LXIX

## PROVISIONS FOR TREATMENT OF
## ERS BOND CLAIMS (CLASS 65)

69.1    **Treatment of ERS Bond Claims:**  On the Effective Date, each holder of an Allowed ERS Bond Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed ERS Bond Claim, such holder's Pro Rata Share of the ERS Bond Recovery, without setoff or deduction for taxes; provided, however, that, for purposes of distribution, calculations shall be based upon the amount of Net Allowed ERS Bond Claims.

69.2    **ERS Private Equity Portfolio:**

(a)    Commonwealth Election to Purchase.  From the Effective Date up to and including April 10, 2023, the Commonwealth shall have the option to purchase the ERS Private Equity Portfolio for the ERS Portfolio Price.  In the event the Commonwealth determines to the exercise the Commonwealth Election, the Commonwealth shall provide notice thereof by publication to holders of Allowed ERS Bond Claims on or prior April 10, 2023, and shall consummate the purchase thereof on or prior to April 25, 2023, with the proceeds thereof being distributed, without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(b)    Bondholder Election to Purchase.  In the event that the Commonwealth declines to exercise the option or fails to provide notice of its exercise of the Commonwealth Election by April 10, 2023, any holder(s) of Allowed ERS Bond Claims shall have the option to exercise the Bondholder Election and purchase all of the interests in the ERS Trust for the ERS Portfolio Price plus such amount as may be necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio during the period from April 2, 2021 up to and including the purchase thereof pursuant to the Bondholder Election that have not been previously reimbursed to the Commonwealth, by providing written notice thereof to the Commonwealth on or prior to April 15, 2023.  In the event that one or more holders of Allowed ERS Bond Claims determine to exercise the Bondholder Election, such electing holder(s) shall pay such purchase price, on a pro rata basis calculated with respect to the amount of such holders' Allowed ERS Bond Claims, to the Commonwealth no later than April 20, 2023.  Upon payment thereof, the Commonwealth shall distribute such proceeds, net of the amounts necessary to reimburse the Commonwealth for any funded shortfall amounts in connection with the ERS Private Equity Portfolio that have not been previously reimbursed to the Commonwealth, and without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(c)    Commonwealth Obligation to Purchase.  In the event that neither the Commonwealth Election nor the Bondholder Election shall have been exercised, on April 25, 2023, (i) the Commonwealth shall purchase the ERS Private Equity Portfolio for the ERS Portfolio Price, and (ii) the Commonwealth shall distribute the proceeds thereof, without setoff or deduction for taxes, to holders of Allowed ERS Bond Claims in accordance with the terms and provisions of Section 69.1 hereof.

(d)     *Quarterly Reporting.*  From the Effective Date up to, but not including, the sale of ERS Private Equity Portfolio in accordance with the terms and provisions of this Section 69.2, the Commonwealth shall provide quarterly portfolio summaries to holders of Allowed ERS Bond Claims that execute and deliver a non-disclosure agreement, with the understanding that any information provided thereto shall not be subject to public disclosure.

(e)     *Tax Accounting.*  From the Effective Date up to, but not including, the sale of the ERS Private Equity Portfolio in accordance with the terms and provisions of this Section 69.2, ERS shall be deemed the owner of the ERS Private Equity Portfolio and the ERS Trust for all applicable tax purposes, and that no items of taxable income, gain, loss or deduction attributable to the ERS Private Equity Portfolio or the ERS Trust, as the case may be, shall be allocated to holders of Allowed ERS Bond Claims unless and until such holder(s) have purchased the interests in the ERS Trust pursuant to the Bondholder Election and Section 69.2(b) hereof.

69.3     **Dismissal of Litigation:**  On the Effective Date, (a) the ERS Litigation and the ERS Recovery Actions shall be dismissed and/or denied, with prejudice, and (b) the Oversight Board, by itself or through its committees, the Creditors Committee, and the ERS Bondholders (on their own account or on behalf of affiliates or related funds or accounts managed by affiliates) shall take any and all action as may be reasonably necessary, including, without limitation, filing such notices, stipulations or other pleadings (i) in the Title III Court to effectuate such dismissal and/or denial of the ERS Litigation and the ERS Recovery Actions, with prejudice, and (ii) in the United States Court of Appeals for the Federal Circuit to effectuate the dismissal and/or denial of the ERS Takings Action, with prejudice.

## ARTICLE LXX

## PROVISIONS FOR TREATMENT OF
## ERS GENERAL UNSECURED CLAIMS (CLASS 66)

70.1     **Treatment of ERS General Unsecured Claims:**

(a)     *Treatment of ERS General Unsecured Claims.*  On the Effective Date, and subject to the election set forth in Section 70.1(b) hereof, each holder of an Allowed ERS General Unsecured Claim shall be entitled to receive, in full consideration, satisfaction, release and exchange of such holder's Allowed ERS General Unsecured Claim, such holder's Pro Rata Share of the ERS GUC Pool.

(b)     *Allowed Claims of Twenty Thousand Dollars ($20,000.00) or More/Election to be Treated as a Convenience Claim.*  Notwithstanding the provisions of Section 70.1(a) of the Plan, any holder of an Allowed ERS General Unsecured Claim, other than an ERS General Unsecured Claim that is a component of a larger ERS General Unsecured Claim, portions of which may be held by such or any other holder of an Allowed Claim, whose Allowed ERS General Unsecured Claim is more than Twenty Thousand Dollars ($20,000.00), and who elects to reduce the amount of such Allowed ERS General Unsecured Claim to Twenty Thousand Dollars ($20,000.00), or, if a holder of multiple Allowed ERS General Unsecured Claims, elects to reduce the amount of such multiple Allowed ERS General Unsecured Claims to an aggregate amount of

Forty Thousand Dollars ($40,000.00), shall, at such holder's option, be entitled to receive, based on such Allowed ERS General Unsecured Claim as so reduced, distributions pursuant to Section 72.1 hereof. Such election must be made on Ballot/Election Form and be received by the Debtors on or prior to the Ballot Date. Any election made after the Ballot Date shall not be binding upon the Debtors unless the Ballot Date is expressly waived, in writing, by the Debtors; provided, however, that, under no circumstances may such waiver by the Debtors occur on or after the Effective Date.

70.2 **Limitation on Recovery**: Notwithstanding anything contained herein to the contrary, including, without limitation, the distributions to be made to holders of an Allowed ERS General Unsecured Claim in accordance with the provisions of Section 70.1 hereof, in the event that the sum of the distributions of Cash and Cash received on account of Avoidance Actions net recoveries are equal to or in excess of one hundred percent (100%) of such holder's Allowed ERS General Unsecured Claim, the Avoidance Actions Trust Interests allocable to the ERS GUC Pool and Cash otherwise distributable to such holder on account of net recoveries from the Avoidance Actions Trust shall be deemed redistributed, on a pro rata basis, to the benefit of holders of Allowed CW General Unsecured Claims.

# ARTICLE LXXI

## PROVISIONS FOR TREATMENT OF
## GRACIA GRACIA CLAIMS (CLASS 67)

71.1 **Treatment of Gracia Gracia Claims:** On the Effective Date, the Gracia Gracia Settlement shall be deemed assumed and (a) the members of the class certified in the Gracia Gracia CW Action and the Gracia Gracia Federal Action and the counsel to such classes shall be entitled to receive funds in accordance with the terms and provisions of the Gracia Gracia Settlement and (b) pursuant to the Confirmation Order, all pending motions, applications, litigations and appeals with respect to the Gracia Gracia CW Action and the Gracia Gracia Federal Action shall be deemed withdrawn with prejudice.

# ARTICLE LXXII

## PROVISIONS FOR TREATMENT OF
## CONVENIENCE CLAIMS (CLASS 68)

72.1 **Treatment of Convenience Claims:** On the later of the Effective Date and the date such Allowed Convenience Claim becomes an Allowed Claim, or as soon thereafter as is practicable, the Disbursing Agent shall pay to each holder of an Allowed Convenience Claim, in Cash, the full amount of such Allowed Convenience Claim, in full satisfaction, settlement, release, and discharge of, and in exchange for such Allowed Convenience Claim.

## ARTICLE LXXIII

### PROVISIONS FOR TREATMENT
### OF FEDERAL CLAIMS (CLASS 69)

73.1 **Treatment of Federal Claims:** On the later to occur of (a) the Effective Date and (b) the date on which a Federal Claim shall become an Allowed Claim, the Reorganized Debtors shall (i) in their sole and absolute discretion, and in full consideration, satisfaction, release and exchange of an Allowed Federal Claim, (1) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim, (2) satisfy and discharge such Allowed Federal Claim in accordance with the terms and conditions of such documents evidencing such Allowed Federal Claims or (3) pay to each holder of an Allowed Federal Claim, in Cash, the full amount of such Allowed Federal Claim in forty (40) equal amount installments, with such payments commencing on the third (3rd) anniversary of the Effective Date and continuing on each anniversary thereafter, or (ii) satisfy and discharge such allowed Federal Claims on such terms as the Reorganized Debtors and the holder of any such Allowed Federal Claim shall agree.

### ARTICLE LXXIV

### PROVISIONS REGARDING NEW GO BONDS,
### CVIS AND ADDITIONAL INDEBTEDNESS

74.1 **Issuance and Distribution of the New GO Bonds:** On the Effective Date, Reorganized Commonwealth shall issue the New GO Bonds, consisting of New GO CIBs, New GO 5.375% CABs and New GO 5.0% CABs, as more particularly described herein. The maturities, interest rates and amortization schedules for the New GO Bonds are annexed hereto as Exhibit "I". All debt service on the New GO Bonds which is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid. Interest shall accrue on such overdue debt service at the regular coupon rate (accretion rate for CABs), compounding semiannually, until the applicable New GO Bonds are paid or satisfied in full in accordance with their terms. Interest on the New GO Bonds shall be calculated on a 30/360 basis. To the extent the Government Parties, each acting in its sole and absolute discretion, determine to apply for ratings on the New GO Bonds, the Government Parties shall use their commercially reasonable best efforts to obtain ratings on the New GO Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties, following consultation with up to two (2) Initial GO/PBA PSA Creditors, jointly designated by the Constitutional Debt Group, the GO Group, the LCDC, the QTCB Group, Syncora, Assured (solely to the extent that it has not terminated the GO/PBA Plan Support Agreement as to itself), and National (solely to the extent that it has not terminated the GO/PBA Plan Support Agreement as to itself), each of which shall have executed a confidentiality agreement, in form and substance satisfactory to the Oversight Board and restricting such Initial GO/PBA PSA Creditors from trading New GO Bonds, including based upon the Government Parties' judgment with respect to expected benefits. After the Government Parties determine which rating agencies to apply for ratings from, the Government Parties shall use their commercially reasonable best efforts to obtain the best possible ratings. Notwithstanding anything contained in the Plan to the contrary, to the extent that Taxable New GO Bonds are issued, such

114

Taxable New GO Bonds shall be distributed to holders of Allowed Claims in the following order of priority: (1) first, to holders of Allowed Taxable Election CW Claims and (2) second, pro rata to all other holders of Allowed Claims and recipients of New GO Bonds, without duplication.

       (a)    **New GO CIBs:**  Subject to any adjustments provided for herein, the New GO CIBs shall have the original principal amount, interest rate, maturity date and taxable status as follows: (a) Seven Hundred Forty-Five Million Fifty Thousand Dollars ($745,050,000.00), five percent (5.0%), July 1, 2023, and tax exempt, (b) Seven Hundred Forty Million Eight Hundred Twenty Thousand Dollars ($740,820,000.00), five percent (5.0%), July 1, 2025, and tax-exempt, (c) Seven Hundred Twenty-Nine Million Five Hundred Sixty-Five Thousand Dollars ($729,565,000.00), five percent (5.0%), July 1, 2027, and tax exempt, (d) Seven Hundred Ten Million Forty Thousand Dollars ($710,040,000.00), five percent (5.0%), July 1, 2029, and tax-exempt, (e) Six Hundred Eighty Million Eight Hundred Thirty-Five Thousand ($680,835,000.00), five percent (5.0%), July 1, 2031, and tax-exempt, (f) Six Hundred Thirty-Seven Million Forty Thousand Dollars ($637,040,000.00), four percent (4.0%), July 1, 2033, and tax-exempt, (g) Four Hundred Forty-Eight Million Five Hundred Eighty Thousand Dollars ($448,580,000.00), four percent (4.0%), July 1, 2035, and tax-exempt, (h) Two Hundred Fifty-Five Million Six Hundred Sixty Thousand Dollars ($255,660,000.00), four percent (4.0%), July 1, 2037, and tax-exempt, (i) Two Hundred Four Million Six Hundred Thousand Dollars ($204,600,000.00), four percent (4.0%), July 1, 2041, and tax-exempt, (j) Eight Hundred Twenty-Two Million Two Hundred Sixty Thousand Dollars ($822,260,000.00), five percent (5.0%), July 1, 2041, and taxable, and (k) Seven Hundred Eight Million Eight Hundred Sixty-Five Thousand Dollars ($708,865,000.00), four percent (4.0%), July 1, 2046, and tax-exempt.  New GO CIBs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrue on all overdue debt service, at the regular coupon rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

       (b)    **New GO CABs:**  Subject to any adjustments provided for herein, the New GO CABs shall have the original principal amount, accretion yield, maturity date and taxable status as follows: (a) Two Hundred Eighty-Eight Million Two Hundred Forty-One Thousand Nine Hundred Eighty-Nine Dollars and Seventy-Five Cents ($288,241,989.75), five percent (5.0%), July 1, 2024, and tax-exempt, and (b) Four Hundred Forty-Two Million Five Hundred Six Thousand Five Hundred Fifty-Three Dollars and Fifty Cents ($442,506,553.50), five and three hundred seventy-five one thousandths percent (5.375%), July 1, 2033, and tax-exempt.  New GO CABs shall not carry any default rate of interest; provided, however, that the interest shall continue to accrete on all overdue debt service, at the regular accretion rate, compounding semi-annually, until paid or satisfied in full in accordance with their terms.

       (c)    **Deemed Issuance Date:**  Notwithstanding the timing of the Effective Date, interest on the New GO Bonds shall commence to accrue or accrete, as applicable on the earlier to occur of (i) July 1, 2021 and (ii) the Effective Date, which date shall be designated as the "dated" date of the New GO Bonds.

       (d)    **Call Provisions/Optional Redemption:**  The New GO Bonds shall be callable, in whole or in part, in any order of maturity, at par (or at the accreted value for the 2033 CABs) plus accrued interest thereon, upon thirty (30) day's prior written notice as follows:

2023 CIBS:   Non-Callable
2024 CABS: Non-Callable
2025 CIBS:   Non-Callable
2027 CIBS:   Non-Callable
2029 CIBS:   Non-Callable
2031 CIBS:   Non-Callable
2033 CIBS:   Callable as follows:

| **Date** | **Price** |
|---|---|
| July 1, 2031 through June 30, 2032 | 103% of Par |
| July 1, 2032 through June 30, 2033 | 102% of Par |

2035, 2037, 2041 and 2046 CIBS (Taxable and Tax-Exempt): Callable as follows:

| **Date** | **Price** |
|---|---|
| July 1, 2031 through June 30, 2032 | 103% of Par |
| July 1, 2032 through June 30, 2033 | 102% of Par |
| July 1, 2033 through June 30, 2034 | 101% of Par |
| July 1, 2034 and thereafter | 100% of Par |

2033 CABS: Callable as follows:

| **Date** | **Price** |
|---|---|
| July 1, 2031 and thereafter | 100% of Accreted Value |

If less than all of the New GO Bonds of a particular series are called for prior redemption, Reorganized Commonwealth will select the maturity or maturities of such series of the New GO Bonds to be redeemed, and, if less than all of the New GO Bonds within a maturity have been called for redemption, the Depository Trust Company, on behalf of the New GO Bonds Trustee, will select the New GO Bonds within the same maturity of such series to be redeemed by means of a random lottery.

(e)     **Deemed Annual Allocation:**  Pursuant to the New GO Bonds Legislation, the Reorganized Commonwealth shall covenant that, until the New GO Bonds have been paid or satisfied in full in accordance with their terms, each FY, the Reorganized Commonwealth shall satisfy its obligations to holders of New GO Bonds, by allocating to the payment of principal and interest (and accreted value) with respect to the New GO Bonds issued to such holders, first, the 1.03% property tax levied pursuant to Act 83-1991 and collected by CRIM with respect to the New GO Bonds until the total amount of such property taxes shall have been paid to holders of the New GO Bonds, second, the monies arising from the operation of Article VI, Section 8 of the Commonwealth Constitution until the total amount of such monies shall have been paid to holders of the New GO Bonds, and third other resources of the Reorganized Commonwealth.  Without limiting the foregoing, within thirty (30) days following the conclusion of each quarter of each FY, CRIM shall pay to the Commonwealth amounts collected by CRIM in connection with the 1.03% property tax levied pursuant to Act 83-1991 and which are due and owing to the Commonwealth.

(f)     **Monthly Deposits of Interest and Principal:**  From and after the Effective Date, until the New GO Bonds have been paid or satisfied in full in accordance with their

116

terms, on the first (1st) Business Day of each calendar month, the Reorganized Commonwealth
shall deposit Cash in the Debt Service Fund with the New GO Bonds Trustee in the aggregate
amount equal to (i) one-sixth (1/6) of the Reorganized Commonwealth's semi-annual obligation
with respect to the payment of interest to accrue on the New GO Bonds through the next interest
payment date, and (ii) one twelfth (1/12) of the Reorganized Commonwealth's annual obligation
with respect to the payment of principal (or accreted value) on the New GO Bonds.  Upon deposit
thereof, pursuant to the New GO Bonds Legislation, the New GO Bonds Trustee, on behalf of the
holders of New GO Bonds, shall have a valid and perfected statutory lien and security interest on
such monies deposited with the New GO Bond Trustee, which monies shall be held in trust for the
benefit of holders of the New GO Bonds.  Without limiting the foregoing, on the Effective Date,
the Reorganized Commonwealth shall deposit into the Debt Service Fund such additional amounts
as may be necessary to account for the New GO Bonds being issued as of the Deemed Issuance
Date.

        (g)      **Covenants for New GO Bonds**:  On the Effective Date, the Definitive
Documents, including the New GO Bonds Indenture, New GO Bonds Legislation and/or the
Confirmation Order, will contain customary terms, conditions and covenants for similarly
structured and supported bonds, including, without limitation, the following covenants and other
provisions with respect to New GO Bonds:

        (i)      **Non-Impairment Covenant**:  Pursuant to the New GO Bonds
Legislation and the New GO Bonds Indenture, the Reorganized Commonwealth shall covenant for
the benefit of all initial and subsequent holders of New GO Bonds that, until all obligations with
respect thereto have been paid or satisfied in full in accordance with their terms, the Reorganized
Commonwealth will take no action that would (1) impair the monthly deposits of interest and
principal referred to in Section 74.1(f) hereof,  (2) limit or alter the rights vested in the Debtors or
Reorganized Debtors in accordance with the Plan and the Confirmation Order to fulfill the terms of
any agreements with the holders of the New GO Bonds or (3) impair the rights and remedies of the
holders of the New GO Bonds.

        (ii)      **Tax-Exemption Covenant**:  Pursuant to the New GO Bonds
Indenture, the Reorganized Commonwealth shall covenant for the benefit of all initial and
subsequent holders of federally tax-exempt New GO Bonds that, until all obligations with respect
thereto have been paid or satisfied in full in accordance with their terms, Reorganized
Commonwealth will do and perform all acts and things permitted by law and reasonably necessary
or desirable to assure that interest paid to the holders of any federally tax-exempt New GO Bonds
shall be and remain excludable from gross income for federal income tax purposes.

        (h)      **Rights of Acceleration**:  The New GO Bonds shall not have rights of
acceleration.

        (i)      **Residual Interest of the Commonwealth**:  Pursuant to the New GO
Bonds Indenture, and subject to such additional rights and obligations as provided therein, any
funds held by the New GO Bonds Trustee in excess of the required deposits pursuant to the New
GO Bonds Indenture shall be released by the New GO Bonds Trustee to, or at the direction of, the
Reorganized Commonwealth, upon payment or satisfaction in full of the New GO Bonds in

accordance with their terms, such amounts shall revert and be distributed to, or at the direction of, the Reorganized Commonwealth.

(j) **Direct Right of Action**:  Pursuant to the New GO Bonds Indenture, and subject to such additional rights as provided therein, the New GO Bonds Trustee shall have a direct right of action to enforce the terms of the New GO Bonds Indenture, including, without limitation, with respect to funding deposits in the Debt Service Fund and seeking specific performance and other available remedies for any breach of covenants in the New GO Bonds Indenture.

(k) **Governing Law**:  The New GO Bonds Indenture and the New GO Bonds issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of law; provided, however, that, notwithstanding the application of the laws of the State of New York to govern the New GO Bonds Indenture and the New GO Bonds, the holders of New GO Bonds  shall be entitled to the rights and remedies of holders of public debt of the Commonwealth established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

74.2    **Issuance and Distribution of the CVIs:**

(a) **Issuance of GO CVIs**:  On the Effective Date, Reorganized Commonwealth shall issue the GO CVIs, in the aggregate original notional amount of Three Billion Five Hundred Million Dollars ($3,500,000,000.00), having a maturity date of July 1, 2043 and a final redemption payment date of November 1, 2043, and, subject to the provisions set forth in the CVI Indenture, the CVI Legislation, the Confirmation Order, and as more fully set forth on Exhibit "J" hereto.

(b) **Issuance of Clawback CVIs**:  On the Effective Date, Reorganized Commonwealth shall issue the Clawback CVIs, in the aggregate original notional amount equal to Five Billion Three Hundred Eighty-Four Million One Hundred Twenty-Seven Thousand Seven Hundred Sixty-Four Dollars ($5,384,127,764.00), having a maturity date of July 1, 2051 and a final redemption payment date of November 1, 2051, and, subject to the provisions set forth in the CVI Indenture, the CVI Legislation, the Confirmation Order, and as more fully set forth on Exhibit "J" hereto.

(c) **Payment Waterfall and Redemption Provisions**:  The GO CVIs shall be subject to mandatory redemption in accordance with priorities set forth in the "Subject to Waterfall Annual Mandatory Redemption Payments" provisions set forth on Exhibit "J" annexed hereto, subject to the provisions set forth in Annex 1 thereto and the allocation set forth in Annex 3 thereto.  The Clawback CVIs shall be subject to mandatory redemption in accordance with the "Mandatory Redemption Payments to Subject to Waterfall Clawback CVI" and "Mandatory Redemption Payments to Not Subject to Waterfall Clawback CVI" provisions set forth on Exhibit "J" annexed hereto, subject to provisions set forth in Annex 2 thereto, the allocation set forth in Annex 4 thereto and the priorities set forth in Annex 6 thereto.

(d) **Direct Right of Action**:  Pursuant to the CVI Indenture, and subject to such additional rights as provided therein, the CVI Trustee shall have a direct right of action to

enforce the terms of the CVI Indenture, including, without limitation, with respect to payments in respect of the CVIs and seeking specific performance and other available remedies for any breach of covenants in the CVI Indenture.

(e) **Full Faith and Credit**: For payment of the CVIs, the Commonwealth shall pledge its full faith, credit and taxing power pursuant to Article VI of the Commonwealth Constitution and applicable Puerto Rico law.

(f) **Non-Impairment Covenant**: The Reorganized Commonwealth shall covenant for the benefit of all initial and subsequent holders of CVIs that, until all obligations with respect thereto have been paid or otherwise satisfied in accordance with their terms, the Reorganized Commonwealth will not: (a) take any action that would impair the rights and remedies of the holders of the CVIs; (b) limit or restrict the rights or powers of the appropriate officers of the Reorganized Commonwealth to fulfill the terms of any agreements made with respect to the CVIs; (c) impair the ability of the holders of the CVIs to track performance of the Measured SUT; provided, however, that the foregoing shall not preclude the Reorganized Commonwealth from exercising its power, through a change in law, to eliminate the Measured SUT, or replace the Measured SUT with a Substitute Measured Tax, each in accordance with the CVI Indenture, which shall protect holders of CVIs from such elimination or replacement reducing the likelihood that Outperformance Condition will be satisfied; and, provided, further, that the CVI Indenture shall include a mechanism for public disclosure by the Reorganized Commonwealth of (x) the amounts of Measured SUT, (y) the SUT collections, and (z) the calculation of any SUT True-Up or Baseline SUT Reduction, as defined and reflected in Exhibit "J" annexed hereto or (d) not now or in the future, subject payments or redemptions made with respect to the CVIs to any Commonwealth tax or withholding obligation imposed by the Commonwealth regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions.

(g) **Governing Law**: The CVI Indenture and the CVIs issued thereunder shall be governed by the laws of the State of New York, without giving effect to principles of conflicts of laws; provided, however, that, notwithstanding the application of the laws of the State of New York to govern the CVI Indenture and the CVIs, the holders of CVIs shall be entitled to the rights and remedies of holders of public debt of the Commonwealth established in Sections 2 and 8 of Article VI of the Commonwealth Constitution.

74.3 **Tax-Exempt Treatment of the New GO Bonds:** Notwithstanding the terms and provisions of Sections 74.1 and 74.2 hereof, in the event that the Government Parties obtain a determination from the IRS or an opinion from Section 103 Bond Counsel (collectively, a "Favorable Determination") that the ratio of the aggregate amount of all taxable New GO Bonds to be issued on the Effective Date (the "New Ratio") to the total aggregate amount of all New GO Bonds is less than thirteen percent (13%) (the "Existing Ratio"), (i) in the event that the Favorable Determination is obtained on or prior to the Effective Date, the holders of any Claims receiving New GO Bonds pursuant to the Plan shall receive the benefit of such Favorable Determination in the form of tax-exempt New GO Bonds issued pursuant to the Plan with coupons for all maturities

119

equal to the coupons on the tax-exempt New GO Bonds set forth on Exhibit "I" hereto, and, to the extent that the Government Parties and the Initial GO/PBA PSA Creditors determine during the period up to and including the Effective Date to modify the coupons set forth on Exhibit "I" hereto, the amount of par New GO Bonds will either increase or decrease, on a dollar-for-dollar basis, depending upon the coupon structure, subject to the amount of the maximum annual debt service provided for in Exhibit "I" hereto, and any such modification being applied to creditors pro rata on a post-application of GO/PBA PSA Restriction Fee and GO/PBA Consummation Costs recovery basis as described in footnote 8 to Annex 2-A to Exhibit "I" of the GO/PBA Plan Support Agreement, (ii) in the event that the Favorable Determination is obtained subsequent to the Effective Date and the New Ratio is less than the Existing Ratio, then the holders of the Taxable Bonds affected by such determination (the "Invited Bonds") shall be invited to exchange such bonds for converted bonds (the "Exchange Offer") and, subject to the application of all reasonable expenses incurred by the Government Parties in connection with such Exchange Offer, the interest rate on the converted bonds shall be the same as the interest on Invited Bonds of the same type, interest rate, series and maturity; provided, however, that, such converted bonds shall be accompanied by the favorable opinion of Section 103 Bond Counsel that the interest, other than pre-issuance accrued interest, on such converted bonds, and on the Invited Bonds exchanged for such converted bonds from the original date of delivery of such Invited Bonds so exchanged, is, in such counsel's opinion, excluded from gross income for federal income tax purposes and from U.S., state, Commonwealth and local income taxation; and (iii) in the event that neither of the foregoing determinations are obtained, the covenants to seek such determinations shall terminate upon the earlier to occur of (1) December 15, 2021, (2) notification by the IRS to the Commonwealth that IRS is unable to issue a favorable private letter ruling, closing agreement or other type of IRS determination with respect to the matters addressed by this subsection, and (3) the amendment of the New GO Bonds Indenture following receipt of a favorable determination and consummation of an Exchange Offer.

74.4    **Comprehensive Cap on All Net Tax-Supported Debt:** During the Debt Policy Period, pursuant to the Debt Responsibility Act and in accordance with the New GO Bonds Indenture and the CVI Indenture, the Commonwealth and the Reorganized Commonwealth, as applicable, shall adopt and maintain a Debt Management Policy that includes a Comprehensive Cap on all Net Tax-Supported Debt of Article IV of the Debt Responsibility Act, which cap shall be set at seven and ninety-four one hundredths percent (7.94%) of Debt Policy Revenues as and when measured in accordance with the Debt Responsibility Act, including a secured and/or securitized debt sublimit of twenty-five one hundredths percent (0.25%) of Debt Policy Revenues above and beyond the percentage of Debt Policy Revenues required to pay the maximum annual debt service on the COFINA Bonds outstanding as of the Effective Date. Debt service payments on New GO CABs issued pursuant to the Plan to holders or insurers of GO Bonds and PBA Bonds, and payments on CVIs that may be issued pursuant to the Plan or other contingent value instruments issued pursuant to or in connection with a Commonwealth Instrumentality Plan, including a Commonwealth Instrumentality Plan for HTA, CCDA, or PRIFA, in satisfaction of claims asserted by (a) holders or insurers of bonds issued by such instrumentality or (b) other creditors of such instrumentality, will not apply towards the Comprehensive Cap. For the avoidance of doubt, any capital appreciation general obligation bonds or similar tax supported debt obligations issued to anyone other than

the holders or insurers of GO Bonds and PBA Bonds pursuant to the Plan, and any contingent value instruments or similar tax supported debt obligations issued other than pursuant to or in connection with the Plan or any Commonwealth Instrumentality Plan, shall count towards the Comprehensive Cap, irrespective of whether issued prior to or after the Effective Date. The Secretary of Treasury's certification of compliance with the Debt limit pursuant to this Section 74.4 shall be conclusive and binding absent manifest error; provided, however, that, in issuing such certification, with respect to the calculation of the revenues of public corporations included as Debt Policy Revenues, the Secretary of Treasury may rely on certifications from officers of such public corporations.

74.5 **Adoption and Maintenance of a Debt Management Policy**: During the Debt Policy Period, the Reorganized Commonwealth shall maintain and comply with a Debt Management Policy designed to ensure that certain past Debt issuance practices of the Commonwealth are not repeated. While the Reorganized Commonwealth may revise and update its Debt Management Policy to reflect changing bond market conditions and standards, the Debt Management Policy shall, unless otherwise approved, in writing, by the Oversight Board, at all times include the following principles and limitations:

(a) **Long-Term Borrowing for Capital Improvements Only**: To ensure the Reorganized Commonwealth achieves and maintains a structurally balanced budget consistent with PROMESA's requirement that Puerto Rico return to fiscal responsibility, Tax-Supported Debt issued after the Effective Date may only be incurred to finance Capital Improvements, as determined by the issuer of such Debt and approved by AAFAF, or to refinance Tax-Supported Debt in accordance with the terms and provisions of Section 74.5(d) hereof. Proceeds derived from any such issuance may be used to cover any and all direct and indirect expenses that, in the issuer's reasonable discretion, are necessary to carry out such Capital Improvements, including, without limitation, any and all expenses incurred in connection with the issuance itself.

(b) **30-Year Maturity Limitation on All Tax-Supported Borrowing**: No Tax-Supported Debt issued on or after the Effective Date may have a legal final maturity later than thirty (30) years from the date of its original issuance, and no such Debt may be refinanced by any Debt extending such legal final maturity date beyond such original thirty (30)-year maturity date limitation; provided, however, that, the foregoing shall not apply to (a) Tax-Supported Debt issued to finance public housing facilities, subject to the limitation established in the Commonwealth Constitution or (b) Tax-Supported Debt issued to refinance Debt that was Outstanding prior to the Effective Date and had a legal maturity of more than thirty (30) years, subject to terms and provisions of Section 74.5(d) hereof.

(c) **Required Principal Amortization**: No series of Tax-Supported Debt issued from and after the Effective Date may be issued unless its principal commences to amortize within two (2) years of its original issuance date, or such other period not to exceed five (5) years from original issuance as may be permitted under the U.S. Internal Revenue Code for tax exempt financings of new construction or reconstruction of Capital Improvements, and continues amortizing in each and every year until such Debt is no longer outstanding.

       (d)      **Refinancings Permitted only for Cash Flow Savings in Every Fiscal Year:** Refinancings of Tax-Supported Debt are permitted only if (i) there is no increase in the amount of bond principal and interest payable in any fiscal year and (ii) such refinancing produces positive present value savings, after taking into consideration transaction expenses, at the levels specified by the Reorganized Commonwealth in its Debt Management Policies; provided, however, that, refinancings without cash flow savings in every FY are permitted if the refinancing is completed in direct response to a hurricane, earthquake, pandemic, terrorism or other natural disaster and similar emergencies and the debt service due in any future FY does not increase by more than ten percent (10%) and the financing is required by its terms to be repaid in full within ten (10) years.

       (e)      **Fiscal Plan Debt Service:** Any post-Effective Date Fiscal Plan shall include provisions for the payment, in each FY of (a) principal and interest (and accreted value) with respect to the New GO Bonds, including, without limitation, sinking fund payments due in such FY and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture.

Notwithstanding the foregoing, nothing contained herein shall prohibit the Reorganized Commonwealth from adopting, maintaining and complying with a Debt Management Policy that is more restrictive than the requirements set forth above. The Debt Management Policy shall be in addition to any other limitations imposed by law and nothing contained herein shall be construed as superseding, amending, or repealing any additional restrictions imposed by the Commonwealth Constitution.

## ARTICLE LXXV

## PROVISIONS REGARDING ASSURED INSURED BONDS, NATIONAL INSURED BONDS, SYNCORA INSURED BONDS, AMBAC INSURED BONDS AND FGIC INSURED BONDS

    75.1    **Treatment of Assured Insured Bond Claims:** In the event that Classes 2, 17, 24, 32, 37, and 42 vote to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all Assured Insurance Policies and related agreements relating to Assured Insured Bonds are in full force and effect or have otherwise been fully performed by Assured, with no outstanding payment defaults by Assured with respect to such Assured Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, holders of Assured Insured Bond Claims shall receive the following treatments:

       (a)      **Assured Election:** With respect to the Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice, Assured shall receive the Cash and CVIs allocable to holders of such Assured Insured Bonds, and such Assured Insured Bonds selected by Assured shall be paid, in full, on the Effective Date, at an Assured Acceleration Price equal to the outstanding principal amount of such Assured Insured Bonds, plus the accrued and unpaid interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) as of the Effective Date from (a) the proceeds of all or any portion of the Assured New GO Bonds allocable to holders of such Assured Insured Bonds, which Assured New GO Bonds shall be (i)

insured, at Assured's election, in accordance with a new insurance policy issued by Assured on terms acceptable to Assured, (ii) underwritten in an "offering" within the meaning of SEC Rule 15c2-12, and (iii) sold into the market such that they are issued and delivered to such underwriter(s) on the Effective Date, and (b) to the extent such proceeds of the Assured New GO Bonds are not sufficient to pay the Assured Acceleration Price, amounts equal to such deficiency paid by Assured in accordance with the Assured Insurance Policies insuring the relevant Assured Insured Bonds; provided, however, that, for the avoidance of doubt, Assured shall not be required to pay itself any such deficiency amount with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise, and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds owned by Assured. The principal amounts, maturities and interest rates on such Assured New GO Bonds allocated on account of the Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice shall be determined by Assured in consultation with applicable underwriter(s), such that the interest rates on such Assured New GO Bonds shall be the lowest interest rates necessary for such Assured New GO Bonds to be issued with increased par amounts relative to other New GO Bonds and otherwise result in the Assured New GO Bonds being issued at the lowest aggregate yield; provided, however, that the annual debt service on the Assured New GO Bonds due in any FY shall not be greater than the annual debt service that would have been due in such FY if such Assured New GO Bonds had the same terms as the other New GO Bonds. If either (i) at or prior to the time of pricing of Assured New GO Bonds, Assured determines, based on its good faith evaluation of the circumstances, that Assured New GO Bonds cannot be sold into the market on terms acceptable to Assured, or (ii) such Assured New GO Bonds are not issued to the underwriter(s) for any reason, then, in either case, Assured (A) may elect, in its sole discretion, to exercise the Assured Acceleration Price Payment Option by paying the applicable Assured Acceleration Price to the holders of any Assured Insured Bonds identified on Exhibit "A" to the Assured Election Notice; provided, however, that, for the avoidance of doubt, Assured shall not be required to pay itself the Assured Acceleration Price with respect to any Assured Insured Bonds owned by Assured, by subrogation or otherwise, and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds owned by Assured, and (B) shall receive, on the Effective Date the Assured New GO Bonds in respect of which the Assured Acceleration Price Payment Option is exercised and any Cash and other Assured New Securities allocable to the relevant Assured Insured Bonds, which Assured New GO Bonds may, at Assured's election, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it. Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond, including in accordance with the Assured Election or the Assured Acceleration Price Payment Option, shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

(b) **Assured Insured Bondholder Elections:** Each beneficial holder of an Assured Insured Bond identified on Exhibit "A" to the Assured Bondholder Elections Form may elect one of the following two Assured Bondholder Elections, in each case on terms acceptable to Assured; provided, however, that, in the event that an Assured Insured Bondholder eligible to make an Assured Bondholder Election fails to make such an Assured Bondholder Election, such Assured Insured Bondholder shall be deemed to have elected Assured Bondholder Election 2; and, provided, further, that, for the avoidance of doubt, Assured Insured Bonds owned by Assured (by subrogation or otherwise) shall not be subject to the Assured Bondholder Elections set forth in this

Section 75.1(b), and Assured shall receive the Assured Plan Consideration on account of such Assured Insured Bonds.

              (i)          **Assured Bondholder Election 1:**  Each Assured Insured Bondholder who elects Assured Bondholder Election 1 shall receive from Assured the applicable Assured Acceleration Price on the Effective Date in full satisfaction and discharge of Assured's obligations with respect to such holder under the applicable Assured Insurance Policies, and Assured shall receive the Cash and Assured New Securities allocable to such holder under the Plan, which Assured New Securities, in the case of Assured New GO Bonds, may, at Assured's selection, be insured in accordance with a new insurance policy issued by Assured on terms acceptable to it, but at no cost or premium to the Commonwealth; or

              (ii)         **Assured Bondholder Election 2:**  Each Assured Insured Bondholder who elects Assured Bondholder Election 2 will opt into a custodial trust, escrow arrangement, or similar structure established by Assured that will provide such Assured Insured Bondholder with an interest in (A) the applicable Assured Insurance Policy and (B) certain Assured New Securities in accordance with terms acceptable to Assured.  The interests granted in a custodial trust, escrow arrangement, or similar structure established in connection with Assured Bondholder Election 2 must be DTC eligible.

Pursuant to the terms and provisions of Section 75.1(c) hereof, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof, plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.  Without limiting the foregoing, pursuant to the applicable Assured Insurance Policies, (A) Assured may elect, in its sole and absolute discretion, to make any principal payment, in whole or in part, on any date on which such principal payment is due by reason of acceleration or other advancement of maturity, and (B) in the case of any Assured Insured Bonds the holders of which have elected (or are deemed to have elected) Assured Bondholder Election 2, Assured will retain the right to pay the Assured Acceleration Price and fully satisfy its obligations with respect to such bonds and the applicable Assured Insurance Policies at any time after the Effective Date upon thirty (30) days' prior written notice to the relevant holders.  Assured's retention of this right will be reflected in the applicable custodial trust or escrow documentation.  From and after payment of the Assured Acceleration Price on the Effective Date or other date of payment selected by Assured, with thirty (30) days' prior written notice, interest on such Assured Insured Bonds shall cease to accrue and be payable.  Payment of the applicable Assured Acceleration Price with respect to any Assured Insured Bond in accordance with any of the provisions above shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

              (c)       **Acceleration of Assured Insured Bonds:**  Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by Assured with respect to Assured Insured Bonds up to and including the Effective Date, the payment of the principal of the Assured Insured Bonds shall be accelerated from and after the Effective Date, and such Assured Insured Bonds shall be due and payable from and after the Effective Date at the

Assured Acceleration Price of one hundred percent (100%) of the principal amount thereof plus accrued interest thereon (or, in the case of any capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d)     **Assignment of Redemption Rights:**  Notwithstanding any other provision of the Plan, on the Effective Date, the Commonwealth, PBA and CCDA shall be deemed to have assigned to Assured any rights to redeem and call the Assured Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Assured as if it were the Commonwealth, PBA and CCDA for such purpose, and any amounts due in connection with such redemption shall be equal to the lesser of the applicable redemption price and the Assured Acceleration Price.

(e)     **Entitlement to Vote:**  Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the Plan by holders of Assured Insured Bond Claims shall be made by the Oversight Board to Assured in accordance with the provisions of Section 301(c)(3) of PROMESA.

75.2     **Treatment of National Insured Bond Claims:**  In the event that Classes 3, 18, and 25 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all National Insurance Policies and related agreements related to National Insured Bonds are in full force and effect or have otherwise been fully performed by National, with no outstanding payment defaults by National with respect to such National Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, holders of National Insured Bond Claims shall receive the following treatments, which treatments shall be selected by National, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing; provided, however, that, for the avoidance of doubt, National Insured Bonds owned or held by National (by subrogation or otherwise) shall not be subject to the treatment elections set forth in this Section 75.2 and National shall receive the National Plan Consideration on account of such bonds:

(a)     **National Commutation Treatment:**  Each holder of an Allowed National Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the National Commutation Consideration, distributable by or at the direction of National, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable National Insurance Policy or any National Trust or National Escrow Account, and (ii) National shall receive the National Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed National Insured Bond Claim.  If a holder of an Allowed National Insured Bond Claim (1) fails to timely and validly elect the National Non-Commutation Treatment or (2) submits an election for less than all of its National Insured Bond Claims (in which case, such election shall be void and of no force or effect), such holder shall be deemed to have elected to receive the National Commutation Treatment set forth in this subsection (a), to commute the National Insurance Policies, to release and discharge National's obligations under the National Insurance Policies, and to receive distributions in accordance with this subsection (a).  A holder of an Allowed National Insured Bond Claim that does not validly elect to receive the National Non-Commutation Treatment shall be deemed to have had, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the

125

related National Insurance Policies, underlying such holder's Allowed National Insured Bond Claim cancelled.

(b) **National Non-Commutation Treatment**: In the event that a holder of an Allowed National Insured Bond Claim timely and validly elects not to receive the National Commutation Treatment in accordance with the provisions Section 75.2(a) hereof, such holder of an Allowed National Insured Bond Claim shall receive one or more of the following treatments, at National's election, which election shall be exercised by National at or prior to the commencement of the Disclosure Statement Hearing:

(i) **Custodial Trusts**: Such holder of an Allowed National Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Plan Consideration and the National Insured Bonds allocable to such electing holder into the applicable National Trust, (B) be deemed to have received its Pro Rata Share of the National Plan Consideration and National Certificates in consideration therefor and (C) have no recourse to National or the National Insurance Policies other than as provided for under the terms of the National Trust.

(ii) **Escrow**: Such holder of an Allowed National Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the National Plan Consideration in the National Escrow Account and such deposited National Plan Consideration shall be held as security for National's obligations to the holders of the National Insured Bonds whose National Plan Consideration was deposited in the National Escrow Account under the National Insurance Policies.

(iii) **Payment of Accelerated Amounts**: National shall receive the National Plan Consideration that would be otherwise allocable to such holder of an Allowed National Insured Bond Claim and National shall fully and completely discharge its obligation to such holder of an Allowed National Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the National Acceleration Price.

(iv) **Alternative Treatment**: The Oversight Board and National reserve the right to formulate an alternative election or implementation option with respect to the National Insured Bonds that is mutually acceptable to the Oversight Board and National, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

Notwithstanding the foregoing, and for the avoidance of doubt, National may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of National Insured Bonds.

(c) **Acceleration of National Insured Bonds**: Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by National with respect to National Insured Bonds up to and including the Effective Date, the payment of the principal of the National Insured Bonds shall be accelerated as of the Effective Date, and the

126

National Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment.

(d)     **Assignment of Redemption Rights:**  Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive documents and not inconsistent with the rights provided in accordance with the applicable National Insurance Policy, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to National any and all rights to redeem and call the National Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by National as if it were the Commonwealth or PBA, as applicable, for such purpose.  Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the National Acceleration Price.

(e)     **Entitlement to Vote:**  Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of National Insured Bond Claims and National CW/HTA Bond Claims shall be made by the Oversight Board to National in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing documents, and (b) the election to choose between the National Commutation Treatment and the National Non-Commutation Treatment as set forth in Section 75.2(a) hereof shall be made by the beneficial holders of National Insured Bonds; provided, however, that the form of the National Non-Commutation Treatment shall be selected by National in accordance with Section 75.2(b) hereof.

(f)     **Deemed Election**:  Each holder of an Allowed Vintage PBA Bond Claim (National) and an Allowed Vintage CW Guarantee Bond Claim (National) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.2 as described above; provided, however, that holders making an election pursuant to Section 75.2 with respect to such holders' Allowed Vintage PBA Bond Claim (National) shall be deemed to have made the same election with respect to such holders' corresponding Allowed Vintage CW Guarantee Bond Claim (National) pursuant to Section 75.2 hereof.

75.3     **Treatment of Syncora Insured Bond Claims:**  In the event that Classes 6, 21, and 28 vote to accept the Plan in accordance with Section 1126 of the Bankruptcy Code, on the Effective Date, notwithstanding any other provision of the Plan, Syncora Insured Bond Claims shall receive the following treatments, which treatments shall be selected by Syncora, in its sole and absolute discretion, at or prior to the commencement of the Disclosure Statement Hearing:

(a)     **Syncora Commutation Treatment:**  Each holder of an Allowed Syncora Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the Syncora Commutation Consideration, distributable by or at the direction of Syncora, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable Syncora Insurance Policy or any Syncora Trust or Syncora Escrow Account and (ii) Syncora shall receive the Syncora Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed Syncora Insured Bond Claim. If a

holder of an Allowed Syncora Insured Bond Claim (1) fails to timely and validly elect the Syncora Non-Commutation Treatment or (2) submits an election for less than all of its Syncora Insured Bond Claims (in which case, such election shall be void and of no force of effect), such holder shall be deemed to have elected to receive the Syncora Commutation Treatment set forth in this subsection (a), to commute the Syncora Insurance Policies, to release and discharge Syncora's obligations under the Syncora Insurance Policies, and to receive distributions in accordance with this subsection (a). A holder of an Allowed Syncora Insured Bond Claim that does not validly elect to receive the Syncora Non-Commutation Treatment shall be deemed to have had, on or after the Effective Date, the Syncora Insured Bonds, including the obligations of Syncora under the related Syncora Insurance Policies, underlying such holder's Allowed Syncora Insured Bond Claim cancelled.

(b)     **Syncora Non-Commutation Treatment**:  In the event that a holder of an Allowed Syncora Insured Bond Claim timely and validly elects not to receive the Syncora Commutation Treatment in accordance with the provisions Section 75.3(a) hereof, such holder of an Allowed Syncora Insured Bond Claim shall receive one or more of the following treatments, at Syncora's election, which election shall be exercised by Syncora at or prior to the commencement of the Disclosure Statement Hearing.

(i)     **Custodial Trusts**:  Such holder of an Allowed Syncora Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Syncora Plan Consideration and the Syncora Insured Bonds allocable to such electing holder into the applicable Syncora Trust, (B) be deemed to have received its Pro Rata Share of the Syncora Plan Consideration and Syncora Certificates in consideration therefor, and (C) have no recourse to Syncora or the Syncora Insurance Policies other than as provided for under the terms of the Syncora Trust.

(ii)     **Escrow**:  Such holder of an Allowed Syncora Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Syncora Plan Consideration in the Syncora Escrow Account and such deposited Syncora Plan Consideration shall be held as security for Syncora's obligations to the holders of the Syncora Insured Bonds whose Syncora Plan Consideration was deposited in the Syncora Escrow Account under the Syncora Insurance Policies.

(iii)     **Payment of Accelerated Amounts**:  Syncora shall receive the Syncora Plan Consideration that would be otherwise allocable to such holder of an Allowed Syncora Insured Bond Claim and Syncora shall fully and completely discharge its obligation to such holder of an Allowed Syncora Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the Syncora Acceleration Price.

(iv)     **Alternative Treatment**:  The Oversight Board and Syncora reserve the right to formulate an alternative election or implementation option with respect to the Syncora Insured Bonds that is mutually acceptable to the Oversight Board and Syncora, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing.

128

Notwithstanding the foregoing, and for the avoidance of doubt, Syncora may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of Syncora Insured Bonds.

(c) **Acceleration of Syncora Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent pursuant to applicable definitive documents and not inconsistent with the respective rights provided in accordance with the applicable Syncora Insurance Policy, the payment of the principal of the Syncora Insured Bonds shall be deemed accelerated as of the Effective Date, and the Syncora Insured Bonds shall be deemed payable from and after the Effective Date at an acceleration price equal to the principal amount thereof as of the Effective Date plus accrued interest to the date of payment.

(d) **Assignment of Redemption Rights:** Notwithstanding any other provision of the Plan, on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to Syncora any and all rights to redeem and call the Syncora Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by Syncora as if it were the Commonwealth or PBA, as applicable, for such purpose. Any amounts due in connection with any such redemption shall be equal to the lesser of the applicable redemption price and the Syncora Acceleration Price.

(e) **Entitlement to Vote:** Subject to the terms and provisions of the Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by holders of Syncora Insured Bond Claims shall be made by the Oversight Board to Syncora in accordance with the provisions of Section 301(c)(3) of PROMESA, and (b) the election to choose between the Syncora Commutation Treatment and the Syncora Non-Commutation Treatment as set forth in Section 75.3(a) hereof shall be made by the beneficial holders of Syncora Insured Bonds; provided, however, that the form of the Syncora Non-Commutation Treatment shall be selected by Syncora in accordance with Section 75.3(b) hereof.

(f) **Deemed Election:** Each holder of an Allowed Vintage PBA Bond Claim (Syncora) and an Allowed Vintage CW Guarantee Bond Claim (Syncora) shall have the option to elect on the Ballot/Election Form between options (a) or (b) in Section 75.3 as described above; provided, however, that holders making an election pursuant to Section 75.3 with respect to Allowed Vintage PBA Bond Claim (Syncora) shall be deemed to have made the same election with respect to corresponding Allowed Vintage CW Guarantee Bond Claim (Syncora) pursuant to Section 75.3 hereof.

75.4 **Treatment of FGIC Insured Bond Claims**: In the event that Classes 5, 20, and 27 vote to accept the Plan in accordance with the provisions of section 1126 of the Bankruptcy Code, and all FGIC Insurance Policies and related agreements relating to FGIC Insured Bonds are in full force and effect, as may have been modified pursuant to the FGIC Rehabilitation Plan, then, notwithstanding any other provision of the Plan, holders of FGIC Insured Bond Claims shall receive the following treatments:

(a) **FGIC Insured Bond Claims Treatment:** Each holder of an Allowed FGIC Insured Bond Claim (except as provided in Section 75.4(b) hereof) shall (A) deposit, or be

deemed to have deposited, among other things, such holder's Pro Rata Share of the FGIC Plan Consideration and the FGIC Insured Bonds and related FGIC Insurance Policies allocable to such holder into the applicable FGIC Trust, and (B) be deemed to have received its Pro Rata Share of the FGIC Plan Consideration and FGIC Certificates in consideration therefor. All rights and remedies under and in accordance with FGIC Insured Bonds deposited into a FGIC Trust and the applicable related legislative bond resolutions (other than with respect to the payment obligations of the Commonwealth or its instrumentalities) and the applicable FGIC Insurance Policies (solely as they apply and relate to such FGIC Insured Bonds) shall be preserved and remain in full force and effect solely to the extent necessary to preserve any claims relating to such FGIC Insured Bonds under the applicable FGIC Insurance Policy. For the avoidance of doubt, each distribution of cash made by a FGIC Trust to the holders of interests therein shall automatically and simultaneously reduce on a dollar-for-dollar basis the outstanding principal amount of the FGIC Insured Bonds held in such FGIC Trust and shall result in a corresponding reduction in FGIC's obligations under the applicable Insurance Policies.

(b) **FGIC Insured Bond Claims Owned By FGIC**: With respect to all Allowed FGIC Insured Bond Claims owned by FGIC, on the Effective Date, FGIC shall be entitled to receive, in full consideration, satisfaction, release and exchange of such Allowed FGIC Insured Bond Claims, its Pro Rata Share of the FGIC Plan Consideration allocable to such Allowed FGIC Insured Bond Claims.

(c) **Acceleration of FGIC Insured Bonds**: Notwithstanding any other provision of the Plan or the FGIC Insured Bonds, the payment of the principal of the FGIC Insured Bonds shall be accelerated as of the Effective Date, and the FGIC Insured Bonds shall be due and payable from and after the Effective Date at an "acceleration price" of one hundred percent (100%) of the principal amount thereof, plus interest accrued thereon (or, in the case of capital appreciation bonds, the compounded amount thereof) to the date of payment; provided, however, that for the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made by FGIC under a FGIC Insurance Policy, unless FGIC elects, in its sole and absolute discretion, to make such payment(s) on an accelerated basis and FGIC has the express right to accelerate any such payment under the applicable FGIC Insurance Policy or the related agreements relating to the applicable FGIC Insured Bonds.

(d) **Assignment of Redemption Rights**: Notwithstanding any other provision of the Plan, to the extent permitted pursuant to applicable definitive insurance documents and the applicable FGIC Insurance Policy, on the Effective Date, the Commonwealth and PBA, shall be deemed to have assigned to FGIC any and all rights to redeem and call the FGIC Insured Bonds and any related rights such that such rights may be exercised directly and exclusively by FGIC as if it were the Commonwealth or PBA, as applicable, for such purpose.

(e) **Entitlement to Vote**: Subject to the terms and provisions of the Disclosure Statement Order, the solicitation of acceptances and rejections to the Plan by holders of FGIC Insured Bond Claims and FGIC CW/HTA Bond Claims shall be made by the Oversight Board to FGIC in accordance with the provisions of Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents.

130

75.5     **Treatment of Ambac Insured Bond Claims**:  In the even that Classes 4, 19, and 26 vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code, and all Ambac Insurance Policies and related agreements related to Ambac Insured Bonds are in full force and effect, with no outstanding payments defaults by Ambac with respect to such Ambac Insured Bonds up to and including the Effective Date, then, notwithstanding any other provision of the Plan, on the Effective Date, holders of Ambac Insured Bond Claims shall receive the following treatments, which treatments shall be selected by the Ambac, in its sole and absolute discretion, not later than twenty-one (21) days prior to the Ballot Date:

(a)     **Ambac Commutation Treatment:**  Each holder of an Allowed Ambac Insured Bond Claim shall have the option to elect on the Ballot/Election Form to receive, on the Effective Date, the Ambac Commutation Consideration, distributable by or at the direction of Ambac, and, if elected, (i) the beneficial holder thereof shall have no other or further rights under or with respect to the applicable Ambac Insurance Policy or any Ambac Trust(s) or Ambac Escrow Account(s), and (ii) Ambac shall receive the Ambac Plan Consideration that otherwise would be allocable or distributable to such holder of an Allowed Ambac Insured Bond Claim.  A holder of an Allowed Ambac Insured Bond Claim that validly elects to receive the Ambac Commutation Treatment, or makes an improper election as described in Section 75.5(f) hereof, shall be deemed to have had, on or after Effective Date, the applicable Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policies, underlying such holder's Allowed Ambac Insured Bond Claims cancelled.

(b)     **Ambac Non-Commutation Treatment:**  In the event that a holder of an Allowed Ambac Insured Bond Claim timely and validly elects to receive the Ambac Non-Commutation Treatement, such holder of an Allowed Ambac Insured Bond Claim shall receive one or more of the following treatments, at Ambac's election, which election shall be exercised by Ambac not later than twenty-one (21) days prior to the Ballot Date;

(i)     **Custodial Trusts:**  Such holder of an Allowed Ambac Insured Bond Claim shall (A) deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Ambac Plan Consideration and the Ambac Insured Bonds allocable to such electing holder into the applicable Ambac Trust(s), (B) be deemed to have received its Pro Rata Share of the Ambac Plan Consideration and Ambac Certificates in consideration therefor, and (C) have no recourse to Ambac or the Ambac Insurance Policies other than as provided for under the terms of the Ambac Trust(s).  The terms of the Ambac Trust(s) shall be set forth in a trust agreement or trust agreements which shall be filed as part of the Plan Supplement, but shall include the following terms, without limitation: (i) Ambac shall not insure any payments on the Ambac Certificates, shall not be required to pay any default or other interest amounts with respect to the Ambac Insured Bonds, and is only required to pay its obligations under the applicable Ambac Insurance Policy as provided therein and in the agreement governing the Ambac Trust(s); (ii) Ambac shall be deemed the sole holder of the Ambac Insured Bonds in the Ambac Trust(s) with respect to voting, amendment, acceleration, events of default, and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings; and (iii) the agreement governing the Ambac Trust(s) will provide that (a) all rights of a holder of Ambac Insured Bonds held by the Ambac Trust(s) (whether as to amendments and consents, direction of remedies or otherwise) shall be exercisable solely by Ambac and no holder of the

Ambac Certificates shall be entitled to any right with respect to the Ambac Insured Bonds (other than as otherwise described in the Ambac Trust(s)), and (b) Ambac may, at its option, elect to direct a distribution of a proportional percentage of the underlying Ambac Insured Bonds to individual holders of Ambac Certificates upon the release of such holder's claims on the related Ambac Insurance Policy and against the Ambac Trust(s); such distribution and release shall not give rise to any other holder of Ambac Certificates asserting a right to receive the same treatment.

(ii) **Escrow:** Such holder of an Allowed Ambac Insured Bond Claim shall deposit, or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Ambac Plan Consideration in the applicable Ambac Escrow Account(s) and such deposited Ambac Plan Consideration shall be held as security for Ambac's obligations to the holders of the Ambac Insured Bonds whose Ambac Plan Consideration was deposited in the applicable Ambac Escrow Account(s) under the Ambac Insurance Policies.

(iii) **Payment of Accelerated Amounts:** Ambac shall receive the Ambac Plan Consideration that would be otherwise allocable to such holder of an Allowed Ambac Insured Bond Claim and Ambac shall fully and completely discharge its obligation to such holder of an Allowed Ambac Insured Bond Claim by paying on the Effective Date, in Cash, the amount thereof at the Ambac Acceleration Price.

(iv) **Alternative Treatment:** The Oversight Board and Ambac reserve the right to formulate an alternative election or implementation option with respect to the Ambac Insured Bonds that is mutually acceptable to the Oversight Board and Ambac, each in their respective sole discretion; provided, however, that any such alternative election or implementation option must be proposed, in writing, not later than twenty-one (21) days prior to the Ballot Date.

Notwithstanding the foregoing and for the avoidance of doubt, Ambac may make different elections, selecting among options (i) through (iv) above, with respect to different CUSIPs and different holders of Ambac Insured Bonds.

(c) **Deemed Acceleration of Ambac Insured Bonds:** Notwithstanding any other provision of the Plan, to the extent that there are no outstanding payment defaults by Ambac with respect to Ambac Insured Bonds up to and including the Effective Date, the principal amount (or compounded amount in the case of capital appreciation bonds) of the Ambac Insured Bonds shall be deemed accelerated and immediately due and payable as of the Effective Date. Ambac shall have the right to pay such accelerated amounts and unpaid interest accrued to the date of payment at any time, regardless of which Ambac Non-Commutation Treatment (Sections 75.5(b)(i)-(iv)) applies to a particular holder of Ambac Insured Bonds, and the holder of the Ambac Insured Bonds and the trustee or fiscal agent (as applicable) shall be required to accept the same in satisfaction of Ambac's obligations under the applicable Ambac Insurance Policy with respect to such bonds, and, upon such payment, Ambac's obligations under the applicable Ambac Insurance Policy shall be fully satisfied and extinguished, notwithstanding any provision of the Ambac Insurance Policy or other documents related to the Ambac Insured Bonds. For the avoidance of doubt, notwithstanding such acceleration, there shall be no acceleration of any payment required to be made under any Ambac Insurance Policy unless Ambac elects, in its sole and absolute discretion to make such payment(s) on an accelerated basis.

(d)     **Assignment of Redemption Rights:**  Notwithstanding any other
provision of the Plan, to the extent permitted pursuant to applicable definitive documents and not
inconsistent with the rights provided in accordance with the applicable Ambac Insurance Policy,
on the Effective Date, the Commonwealth and PBA shall be deemed to have assigned to Ambac
any and all rights to redeem and call the Ambac Insured Bonds and any related rights such that
such rights may be exercised directly and exclusively by Ambac as if it were the Commonwealth
or PBA, as applicable, for such purpose.  Any amounts due in connection with any such
redemption shall be equal to the lesser of the applicable redemption price and the Ambac
Acceleration Price.

(e)     **Entitlement to Vote:**  Subject to the terms and provisions of the
Disclosure Statement Order, (a) the solicitation of acceptances and rejections to the Plan by
holders of Ambac Insured Bond Claims and Ambac CW/HTA Bond Claims shall be made by the
Oversight Board to Ambac in accordance with the provisions of Section 301(c)(3) of PROMESA,
applicable law and governing insurance and other documents, and (b) the election to choose
between the Ambac Commutation Treatment as set forth in Section 75.5(a) hereof and the Ambac
Non-Commutation Treatment as set forth in Section 75.5(b) hereof shall be made by the beneficial
holders of Ambac Insured Bonds; provided, however, that the form of the Ambac Non-
Commutation Treatment shall be selected by Ambac in accordance with Section 75.5(b) hereof.

(f)     **Improper Election:**  If a holder of an Allowed Ambac Insured Bond
Claim (1) fails to timely and validly elect either the Ambac Commutation Treatment or the Ambac
Non-Commutation Treatment pursuant to Section 75.5(a) or 75.5(b) hereof, or (2) submits an
election for less than all of its Ambac Insured Bond Claims in a particular class (in which case,
such election shall be void and of no force or effect), such holder shall be deemed to have elected
to receive the Ambac Commutation Treatment set forth in Section 75.5(a) hereof with respect to
such Ambac Insured Bond Claims, to commute the applicable Ambac Insurance Policies, to
release and discharge Ambac's obligations under such Ambac Insurance Policies, and to receive
distributions in accordance with Section 75.5(a) hereof.  In addition, a holder of an Allowed
Ambac Insured Bond claim that does not validly elect to receive either the Ambac Commutation
Treatment or the Ambac Non-Commutation Treatment pursuant to clauses (1) or (2) above shall be
deemed to have had, on or after the Effective Date, the applicable Ambac Insured Bonds, including
the obligations of Ambac under the related Ambac Insurance Policies underlying such holder's
Allowed Ambac Insured Bond Claim, cancelled.

(g)     **Deemed Election:**  Each holder of an Allowed Vintage PBA Bond Claim
(Ambac) and an Allowed Vintage CW Guarantee Bond Claim (Ambac) shall have the option to
elect on the Ballot/Election Form between options (a) or (b) in Section 75.5 as described above;
provided, however, that holders making an election pursuant to Section 75.5 with respect to such
holder's Allowed Vintage PBA Bond Claim (Ambac) shall be deemed to have made the same
election with respect to such holders' corresponding Allowed Vintage CW Guarantee Bond Claim
(Ambac) pursuant to Section 75.5 hereof.

## ARTICLE LXXVI

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

76.1 **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases**:  Pursuant to sections 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and subject to the provisions of Section 76.5 and 76.7 hereof, all Executory Contracts and Unexpired Leases that exist between the Debtors and any Entity, and which have not expired by their own terms on or prior to the Effective Date, shall be rejected by the Debtors as of the Effective Date, except for any Executory Contract and Unexpired Lease (a) that has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date, (b) that is specifically designated as a contract or lease to be assumed on the schedules to the Plan Supplement, (c) that has been registered with the Office of the Comptroller of Puerto Rico, (d) that has been exempt from registration with the Office of the Comptroller of Puerto Rico Pursuant to 2 L.P.R.A § 97 and regulations promulgated pursuant thereto, (e) that has been approved by the Oversight Board or authorized by the Title III Court, unless specifically designated a contract to be rejected in the Plan Supplement, (f) with the United States, or any of its agencies, departments or agents or pursuant to any federal program, (g) that is an incentive agreement between the Government of the Commonwealth of Puerto Rico and rum producers with respect to rum excise tax "Cover Over" revenues, or (h) by or between any Commonwealth of Puerto Rico agencies, departments, municipalities, public corporations, or instrumentalities (other than leases to which PBA is a party); provided, however, that the Debtors reserve the right to amend, on or prior to the Effective Date, such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date.  The Debtors shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of this Section 76.1, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of this Section 76.1, by serving a separate notice to the relevant counterparties to such agreements.  To the extent there are any amendments to such schedules, the Debtors shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby.  The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtors that such document is an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder.

76.2 **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases**:  Entry of the Confirmation Order by the Title III Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to Section 76.1 of the Plan.

76.3 **Inclusiveness**:  Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements

134

made directly or indirectly by any agreement, instrument, or other document that in any manner
affects such Executory Contract and Unexpired Lease, without regard to whether such agreement,
instrument, or other document is listed on such schedule.

76.4    **Cure of Defaults**:  Except to the extent that different treatment has been agreed to
by the non-debtor party or parties to any Executory Contract and Unexpired Lease to be assumed
or assumed and assigned pursuant to Section 76.1 of the Plan, the Debtors shall, pursuant to the
provisions of section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with
the requirements of section 365 of the Bankruptcy Code, within ten (10) Business Days of entry of
a Final Order setting forth the cure amount as to each Executory Contract or Unexpired Lease to be
assumed or assumed and assigned, the Debtors or the Reorganized Debtors, as the case may be,
shall pay or otherwise satisfy such cure amount.  Notwithstanding the terms and provisions of
Section 76.1 of the Plan, each of the Debtors shall retain its rights to reject any of its Executory
Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure
any defaults through the Effective Date.

76.5    **Insurance Policies**:  Subject to the terms and provisions of Section 76.7 hereof,
each of the Debtors' insurance policies and any agreements, documents, or instruments relating
thereto, are treated as Executory Contracts under the Plan; <u>provided</u>, <u>however</u>, that, such treatment
shall not, and shall not be construed to, discharge or relieve any Monoline with respect to its
respective obligations to holders of Claims under policies of insurance and applicable law and
governing documents with respect thereto.

76.6    **Rejection Damage Claims**:  If the rejection of an Executory Contract and
Unexpired Lease by the Debtors hereunder results in damages to the other party or parties to such
contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of
Claim, shall be forever barred and shall not be enforceable against the Debtors, or its properties or
agents, successors, or assigns, including, without limitation, Reorganized Debtors, unless a proof
of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and
Reorganized Debtors, as the case may be, on or before thirty (30) days after the later to occur of (i)
the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing
rejection of a particular Executory Contract and Unexpired Lease.

76.7    **Indemnification and Reimbursement Obligations**:  For purposes of the Plan,
(i) to the extent executory in nature, the obligations of the Debtors, including, without limitation,
directors and officers insurance policies, to indemnify and reimburse its directors or officers that
were directors or officers, respectively, on or prior to the Commonwealth Petition Date, the ERS
Petition Date or the PBA Petition Date, as the case may be, shall be deemed assumed as of the
Effective Date and (ii) indemnification obligations of the Debtors arising from conduct of officers
and directors during the period from and after Commonwealth Petition Date, the ERS Petition Date
or the PBA Petition Date, as the case may be, shall be Administrative Expense Claims; <u>provided</u>,
<u>however</u>, that, under no circumstances shall the Debtors or the Reorganized Debtors, as the case
may be, be responsible for any indemnification obligation, cost, or expense associated with the
gross negligence, intentional fraud or willful misconduct of their respective officers or directors.

76.8    **Nonoccurrence of Effective Date**:  In the event that the Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

76.9    **Reservation of Rights**:  Nothing contained in the Plan or the Plan Supplement shall constitute an admission by the Debtors, Reorganized Debtors or any other party that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that the Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

76.10    **Collective Bargaining Agreements**:  Except as provided in Articles LV and LVI hereof, none of the Debtors' collective bargaining agreements shall be treated as Executory Contracts and none shall be assumed or rejected or otherwise treated pursuant to the Plan, but shall remain in effect subject, in all instances, to Puerto Rico law and Articles LV and LVI regarding the payment and ongoing treatment of pension and related claims and obligations.

## ARTICLE LXXVII

## PROVISIONS GOVERNING DISTRIBUTIONS

77.1    **Time and Manner of Distribution**:  Except as otherwise provided herein, distributions under the Plan shall be made to each holder of an Allowed Claim as follows:

(a)    **Distributions to Holders of PBA Bond Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed PBA Bond Claim, and in each case consistent with the terms hereof, such Creditor's Pro Rata Share, if any, of the PBA Bond Distribution, GO/PBA PSA Restriction Fee, Retail Support Fee, Retail Support Fee Return, and GO/PBA Consummation Costs, if applicable; provided, however, that, distribution of the Retail Support Fee, if any, to a holder of an Allowed PBA Bond Claim is subject to the delivery, on the prior to the Ballot Date or such other date as may be established pursuant to the Confirmation Order, of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor.

(b)    **Distributions to Holders of CW Bond Claims and CW Guarantee Bond Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed CW Bond Claim or an Allowed CW Guarantee Bond Claim, such Creditor's (i) applicable recovery provided hereunder, (ii) the GO/PBA PSA Restriction Fee, (iii) the Retail Support Fee, (iv) the Retail Support Fee Return, and (v) the GO/PBA Consummation Costs, in each case, to the extent applicable; provided, however, that, distribution of the Retail Support Fee, if any, to a holder of an Allowed CW Bond Claim is subject to the delivery, on or prior to the

Ballot Date or such other date as may be established pursuant to the Confirmation Order, of such holder's applicable bonds through the Automatic Tender Offer Program at The Depository Trust Company with a certification that such holder is a Retail Investor.

(c)     **Distributions to Holders of ERS Bond Claims:**  Except as otherwise provided herein, (i) within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed ERS Bond Claim, such Creditor's Pro Rata Share of the ERS Bond Recovery, calculated based upon the amount of Net Allowed ERS Bond Claims, and (ii) upon making distributions in accordance with the provisions of this Section 77.1(c), including, without limitation, the distribution of any proceeds from the sale of the ERS Private Equity Portfolio and the interests in the ERS Trust in accordance with the terms and provisions of Section 69.2 hereof, the ERS Fiscal Agent shall close and terminate the original CUSIPs with respect to the ERS Bonds and shall have no further distribution obligations thereafter.

(d)     **Distributions with Respect to General Unsecured Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the Effective Date, the Disbursing Agent shall distribute, or cause to be distributed, (i) to each holder of an Allowed CW General Unsecured Claim and Allowed ERS General Unsecured Claim such Creditor's Pro Rata Share, if any, of the CW GUC Recovery and the ERS GUC Pool, respectively, and (ii) to each holder of an Allowed PBA General Unsecured Claim distributions in accordance with the terms and provisions of Section 17.1 hereof.

(e)     **Distributions with respect to Eminent Domain/Inverse Condemnation Claims:**  Except as otherwise provided herein, within ten (10) Business Days following the occurrence of a Final Order determining the validity and amount of just compensation attributable to an Eminent Domain/Inverse Condemnation Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Eminent Domain/Inverse Condemnation Claim, Cash in the amount of such Allowed Claim.

(f)     **Distribution of Cash to Holders of Allowed Administrative Expense Claims:**  Except as otherwise provided herein, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Administrative Expense Claim, Cash in the amount of such Allowed Claim.

77.2     **Timeliness of Payments**:  Any payment or distribution to be made pursuant to the Plan shall be deemed to be timely made if made within ten (10) Business Days after the date specified in the Plan.  Whenever any distribution to be made under this Plan shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due, including, without limitation, deeming distributions made pursuant to Section 77.1(a) hereof to have been made on the Effective Date.

77.3     **Distributions by the Disbursing Agent**:  Except as otherwise provided herein or in the Confirmation Order, and except to the extent the Avoidance Actions Trustee selects a

137

different disbursing agent pursuant to the terms of the Avoidance Actions Trust Agreement, all distributions to be made pursuant to the Plan, including, without limitation, distributions to be made pursuant to the Avoidance Actions Trust Agreement, shall be made by the Disbursing Agent. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property.

77.4    **Manner of Payment under the Plan**:  Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made, at the election of the payor, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payment shall be made to a holder of an Allowed Claim until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

77.5    **Delivery of Distributions**:  Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the Confirmation Order or herein, distributions and deliveries to holders of Allowed Claims shall be made through The Depository Trust Company or at the address of each such holder as set forth on the Schedules filed with the Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if the Debtors have been notified in writing of a change of address; provided, however, that initial distributions by the Disbursing Agent for the benefit of holders of Allowed Bond Claims shall be made to the trustee or fiscal agent, as applicable, for such obligation in accordance with the respective governing documents for such obligations; and, provided, further, that the Disbursing Agent may make distributions of PSA Restriction Fees, the Retail Support Fee Return, and Consummation Costs in Cash to a party entitled thereto in a manner mutually agreed upon between such party and the Disbursing Agent. The trustee or fiscal agent for each such obligation shall, in turn, deliver the distribution to holders in the manner provided for in the applicable governing documents.  The Debtors, its agents and servicers, and the Disbursing Agent shall have no obligation to recognize any transfer of Bond Claims after the Distribution Record Date; provided, however, that the New GO Bonds and the CVIs will be transferable and recognized if made in accordance with the terms and conditions of the New GO Bonds Indenture and the CVI Indenture, respectively.

77.6    **Cancellation of Notes, Instruments, Certificates, and Other Documents**: Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan, (b) for purposes of evidencing a right to distribution under the Plan, or (c) as specifically provided otherwise in the Plan (including any rejection of Executory Contracts or Unexpired Leases pursuant to Section 76.1 hereof), on the Effective Date, the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against the Debtors without any further act or action under any applicable agreement, law, regulation, order or rule, with the Debtors and the applicable trustee, paying agent or fiscal agent, as the case may be, having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to the Debtors, as applicable, under the PBA Bonds, ERS Bonds and GO Bonds and all instruments and documents related thereto shall be discharged; provided, however, that, notwithstanding anything contained herein to the contrary, the PBA Bonds, ERS Bonds and GO

Bonds and such other instruments and documents shall continue in effect solely (i) to allow the Disbursing Agent to make any distributions as set forth in the Plan and to perform such other necessary administrative or other functions with respect thereto, (ii) to allow holders of Allowed Bond Claims and Allowed Insured Bond Claims to receive distributions in accordance with the terms and provisions of the Plan, (iii) for any trustee, agent, contract administrator or similar entity under all instruments and documents related thereto, to perform necessary functions, including making distributions, in accordance with the Plan and to have the benefit of all the rights and protections and other provisions of such instruments and documents, as applicable, and all other related agreements, (iv) to set forth the terms and conditions applicable to parties to such documents and instruments other than the Debtors, (v) to allow Assured and National to exercise the redemption or call rights assigned to Assured and National pursuant to the provisions of Sections 75.1 and 75.2 hereof, respectively, or (vi) as may be necessary to preserve any claims under the respective insurance policies and related documents issued by a Monoline and the Oversight Board shall request that the Commonwealth and PBA use their reasonable efforts to (1) maintain the existing CUSIP numbers for the Monoline-insured GO Bonds and PBA Bonds, respectively, and (2) take such other reasonable steps as may be necessary to preserve and effectuate such Claims. Notwithstanding the foregoing, and except as otherwise expressly provided in the Plan, such bonds or bond documents that remain outstanding shall not form the basis for the assertion of any Claim against the Debtors or Reorganized Debtors, as the case may be.

77.7    **Undeliverable/Reserved Distributions**:

(a)    **Holding of Undeliverable Distributions by the Disbursing Agent:** If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address. Subject to the terms and provision of Section 77.7(b) hereof, undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable. All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals thereon of any kind. Nothing contained in the Plan shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

(b)    **Failure to Claim Undeliverable Distributions:** If (i) a check is sent, by the Disbursing Agent to a holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof. Any holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the Plan to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan, against

Reorganized Debtors, the trustees, or their respective professionals, agents, or property, and any (1) Cash in the possession of the Disbursing Agent or the trustee with respect to existing securities, as the case may be, shall be released to Reorganized Debtors for use to discharge operating expenses of Reorganized Debtors and (2) the New GO Bonds and the CVIs in the possession of the Disbursing Agent or trustee with respect to existing securities shall be released to Reorganized Debtors for cancellation or deposit into the treasury of Reorganized Debtors, as determined by Reorganized Debtors in their sole and absolute discretion.

77.8    **Withholding and Reporting Requirements**:  Any party issuing any instrument or making any distribution under the Plan shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or tax authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.  Any party issuing any instrument or making any distribution under the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party.  The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder.  If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

77.9    **Time Bar to Cash Payments**:  Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim.  After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

77.10    **Distributions After Effective Date**:  Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XCII of the Plan.

77.11    **Setoffs**:  Except as otherwise provided in the Plan or in the Confirmation Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account

thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the
claims, rights, and Causes of Action of any nature that the Debtors or Reorganized Debtors
may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect
such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the
Debtors or Reorganized Debtors of any such claims, rights, and Causes of Action that the Debtors
or the Reorganized Debtors may possess against such holder; and, provided, further, that nothing
contained herein is intended to limit the ability of any Creditor to effectuate rights of setoff or
recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the
Bankruptcy Code or pursuant to the common law right of recoupment; and, provided, further, that
nothing in this Section 77.11 shall affect the releases and injunctions provided in Article XCII of
the Plan.

77.12 **Allocation of Plan Distributions Between Principal and Interest**: Unless
otherwise specified herein, to the extent that any Allowed Claim entitled to a distribution under the
Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon),
such distribution shall be allocated first, to interest accrued and unpaid as of the date immediately
preceding the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as
applicable, second, to the principal amount of the Claim (as determined for federal income tax
purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to
such other amounts; provided, however, that the Debtors or Reorganized Debtors' treatment of any
distributions for its tax purposes will not be binding on any Creditor as to the treatment of such
distributions for any regulatory, tax or other purposes.

77.13 **Payment of Trustee Fees and Expenses**: The distributions to be made pursuant
to the Plan are intended to be inclusive of any and all Trustee/Fiscal Agent fees and expenses
which may be allegedly due and owing by the Commonwealth, ERS and PBA with respect to
amounts discharged pursuant to the Plan. The Plan does not, nor shall it be construed to, limit the
rights of each Trustee/Fiscal Agent to payment of such amounts from the distributions to be made
hereunder, including, without limitation, the imposition of any Charging Lien.

77.14 **Beneficial Owner**: For all purposes of the Plan, including, without limitation, for
purposes of distributions pursuant to the terms and provisions of this Article LXXVII, except with
respect to Claims arising from bonds insured by Syncora, the "holder" of a Claim shall mean any
Entity who, directly or indirectly, has investment power with respect to any Claim, which includes
the power to dispose or to direct the disposition of such Claim; provided, however, that, for
purposes of Article LXXV hereof and section 1126 of the Bankruptcy Code, (a) National shall
constitute the "holder" of any National Insured Bond Claims and any National CW/HTA Bond
Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing
insurance and other documents applicable to the National Insured Bond Claims and the National
CW/HTA Bond Claims, (b) Assured shall constitute the "holder" of any Assured Insured Bond
Claims, any Assured CW/Convention Center Claims, any Assured CW/HTA Bond Claims, and
any Assured CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA,
applicable law and governing insurance and other documents applicable to the Assured Insured
Bond Claims, the Assured CW/Convention Center Claims, the Assured CW/HTA Bond Claims,
and the Assured CW/PRIFA Rum Tax Claims, (c) Ambac shall constitute the "holder" of any
Ambac Insured Bond Claims, any Ambac CW/Convention Center Claims, any Ambac CW/HTA

Bond Claims, and any Ambac CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the Ambac Insured Bond Claims, the Ambac CW/Convention Center Claims, the Ambac CW/HTA Bond Claims, and the Ambac CW/PRIFA Rum Tax Claims, (d) FGIC shall constitute the "holder" of and FGIC Insured Bond Claims any FGIC CW/Convention Center Claims, and FGIC CW/HTA Bond Claims, and any CW/PRIFA Rum Tax Claims in accordance with Section 301(c)(3) of PROMESA, applicable law and governing insurance and other documents applicable to the FGIC Insured Bond Claims, the FGIC CW/Convention Center Claims, the FGIC CW/HTA Bond Claims, and the FGIC CW/PRIFA Rum Tax Claims, and (e) the "holder" of any other Insured Bond Claims shall be determined in accordance with Section 301(c)(3) of PROMESA and any law or governing documents applicable to such Insured Bond Claims.

77.15    **Value of Distributions**:  For purposes of calculating the value of distributions made to holders of Allowed Claims, (a) Cash shall be valued in the amount distributed and (b) the New GO Bonds and CVIs shall be valued at the original principal amount thereof.

## ARTICLE LXXVIII

## AVOIDANCE ACTIONS TRUST

78.1    **Execution of Avoidance Actions Trust Agreement**:  On or before the Effective Date, the Debtors and the Avoidance Actions Trustee shall execute the Avoidance Actions Trust Agreement, and shall take all other necessary steps to establish the Avoidance Actions Trust and the Avoidance Actions Trust Interests therein, which shall be for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed before, on or after the Effective Date.  The Avoidance Actions Trust Agreement may provide powers, duties, and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Avoidance Actions Trust as a "liquidating trust" for United States federal income tax purposes.

78.2    **Purpose of the Avoidance Actions Trust**:  The Avoidance Actions Trust shall be established for the sole purpose of Avoidance Actions and distributing its assets, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Avoidance Actions Trust.

78.3    **Avoidance Actions Trust Assets**:  The Avoidance Actions Trust shall consist of the Avoidance Actions Trust Assets.  On the Effective Date, the Debtors shall transfer all of the Avoidance Actions Trust Assets to the Avoidance Actions Trust. The Avoidance Actions Trust Assets may be transferred subject to certain liabilities, as provided in the Plan or the Avoidance Actions Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of the Avoidance Actions Trust Assets to the Avoidance Actions Trust, the Debtors and their predecessors, successors and assigns, and each other Entity released pursuant to Section 88.2 hereof shall be discharged and released from all liability with respect to the delivery of such distributions.

78.4    **Administration of the Avoidance Actions Trust**:  The Avoidance Actions Trust shall be administered by the Avoidance Actions Trustee according to the Avoidance Actions Trust Agreement and the Plan.  In the event of any inconsistency between the Plan and the Avoidance Actions Trust Agreement, the Avoidance Actions Trust Agreement shall govern.

78.5    **The Avoidance Actions Trustee**:  In the event the Avoidance Actions Trustee dies, becomes incapacitated, is terminated, or resigns for any reason, the Avoidance Actions Trust Board shall designate a successor; provided, however, that under no circumstance shall the Avoidance Actions Trustee be a director or officer with respect to any Affiliate of the Avoidance Actions Trust.

78.6    **Role of the Avoidance Actions Trustee**:  In furtherance of and consistent with the purpose of the Avoidance Actions Trust and the Plan, and subject to the terms of the Confirmation Order, the Plan and the Avoidance Actions Trust Agreement, and the oversight of the Avoidance Actions Trust Board, the Avoidance Actions Trustee shall, among other things, have the following rights, powers and duties, (i) to hold, manage, convert to Cash, and timely distribute the Avoidance Actions Trust Assets, including prosecuting and resolving the Claims belonging to the Avoidance Actions Trust, (ii) to hold the Avoidance Actions Trust Assets for the benefit of the Avoidance Actions Trust Beneficiaries, whether their Claims are Allowed on or after the Effective Date, (iii) in the Avoidance Actions Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action, or litigation of the Avoidance Actions Trust, (iv) to prepare and file (or cause to be prepared and filed), from and after the Effective Date, all tax and regulatory forms, returns, reports, and other documents required, or that the Avoidance actions Trustee otherwise deems appropriate with respect to the Avoidance Actions Trust, (v) in the Avoidance Actions Trustee's reasonable business judgment, to control, prosecute, and/or settle on behalf of the Avoidance Actions Trust, objections to Claims on account of which the Avoidance Actions Trustee will be responsible, (vi) to hold, manage, and timely distribute Cash or non-Cash Avoidance Actions Trust Assets obtained through the exercise of its power and authority and (vii) to not unduly prolong the duration of the Avoidance Actions Trust. In all circumstances, the Avoidance Actions Trustee shall act in the best interests of all Avoidance Actions Trust Beneficiaries and in furtherance of the purpose of the Avoidance Actions Trust.

78.7    **Avoidance Actions Trustee's Tax Power for Debtors**:  From and after the Effective Date, the Avoidance Actions Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all tax returns or other tax information statements required to be filed or that the Avoidance Actions Trustee otherwise deems appropriate.

78.8    **Transferability of Avoidance Actions Trust Interests**:  The Avoidance Actions Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law

78.9    **Cash**:  The Avoidance Actions Trustee may invest Cash (including any earnings thereon or proceeds therefrom) as permitted by section 345 of the Bankruptcy Code; provided, however, that such investments are investments permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings, or other controlling authorities.

78.10    **Distribution of Avoidance Actions Trust Assets**:  The Avoidance Actions Trustee shall distribute to the holders of Allowed Claims on account of their Avoidance Actions Trust Interests, on a semi-annual basis, all unrestricted Cash on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this Section 78.10), except (i) Cash reserved pursuant to the Avoidance Actions Trust Agreement to fund the activities of the Avoidance Actions Trust, (ii) such amounts' as are allocable to or retained on account of Disputed Claims in accordance with Section 82.3 hereof to pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Avoidance Actions Trust in respect of the Avoidance Actions Trust Assets); provided, however, that the Avoidance Actions Trustee shall not be required to make a distribution pursuant to this Section 78.10 if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such that it would make the distribution impracticable as reasonably determined by the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, in accordance with applicable law, and so long as such aggregate amount is less than Twenty-Five Million Dollars ($25,000,000.00); and, provided, further, that the Avoidance Actions Trustee, with the consent of the Avoidance Actions Trust Board, may decide to forego the first quarterly distribution to those holders of Avoidance Actions Trust Interests with respect to which the Avoidance Actions Trustee, in its reasonable judgment, is not administratively prepared to make such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Avoidance Actions Trustee is administratively prepared to do so.

78.11    **Funding, Costs and Expenses of the Avoidance Actions Trust**:  On the Effective Date, the Avoidance Actions Trust shall be funded on a one-time basis in an amount up to Fifteen Million Dollars ($15,000,000.00), as determined by the Creditors' Committee at or prior to the Confirmation Hearing.  The reasonable costs and expenses of the Avoidance Actions Trust, including the fees and expenses of the Avoidance Actions Trustee and its retained professionals, shall be paid out of the Avoidance Actions Trust Assets.  Fees and expenses incurred in connection with the prosecution and settlement of any Claims shall be considered costs and expenses of the Avoidance Actions Trust.

78.12    **Compensation of the Avoidance Actions Trustee**:  The individual(s) serving as or comprising the Avoidance Actions Trustee shall be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar roles, the payment of which shall be subject to the approval of the Title III Court.

78.13    **Retention of Professionals/Employees by the Avoidance Actions Trustee**: Subject to the approval and consent of the Avoidance Actions Trust Board, the Avoidance Actions Trust may retain and compensate attorneys, other professionals, and employees to assist the Avoidance Actions Trust Board on such terms as the Avoidance Actions Trustee deems appropriate without Title III Court approval.

78.14    **Federal Income Tax Treatment of the Avoidance Actions Trust:**

(a)    Avoidance Actions Trust Assets Treated as Owned by Creditors.  For all United States federal income tax purposes, all parties (including, without limitation, the Debtors,

144

the Avoidance Actions Trustee, and the Avoidance Actions Trust Beneficiaries) shall treat the
transfer of the Avoidance Actions Trust Assets to the Avoidance Actions Trust as (1) a transfer of
the Avoidance Actions Trust Assets (subject to any obligations relating to those assets) directly to
the Avoidance Actions Trust Beneficiaries and, to the extent Avoidance Actions Trust Assets are
allocable to Disputed Claims, to the Avoidance Actions Trust Claims Reserve, followed by (2) the
transfer by such beneficiaries to the Avoidance Actions Trust of the Avoidance Actions Trust
Assets (other than the Avoidance Actions Trust Assets allocable to the Avoidance Actions Trust
Claims Reserve) in exchange for Avoidance Actions Trust Interests. Accordingly, the Avoidance
Actions Trust Beneficiaries shall be treated for United States federal income tax purposes as the
deemed grantors and owners of their respective share of the Avoidance Actions Trust Assets (other
than such Avoidance Actions Trust Assets as are allocable to the Avoidance Actions Trust Claims
Reserve, discussed below).  The foregoing treatment shall also apply, to the extent permitted by
applicable law, for state and local income tax purposes.

     (b)    <u>Tax Reporting</u>.

     (i)    The Avoidance Actions Trustee shall prepare and file (or cause to
be prepared and filed) tax returns for the Avoidance Actions Trust treating the Avoidance Actions
Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with
this Section 78.14.  The Avoidance Actions Trustee also will annually send to each holder of an
Avoidance Actions Trust Interest a separate statement regarding the receipts and expenditures of
the Avoidance Actions Trust as relevant for U.S. federal income tax purposes and will instruct all
such holders to use such information in preparing their U.S. federal income tax returns or to
forward the appropriate information to such holder's underlying beneficial holders with
instructions to utilize such information in preparing their U.S. federal income tax returns.  The
Avoidance Actions Trustee shall also file (or cause to be filed) any other statement, return or
disclosure relating to the Avoidance Actions Trust that is required by any governmental unit.

     (ii)    The Avoidance Actions Trustee will then in good faith value all
other Avoidance Actions Trust Assets, and shall make all such values available from time to time,
to the extent relevant, and such values shall be used consistently by all parties to the Avoidance
Actions Trust (including, without limitation, the Debtors, the Avoidance Actions Trustee, and
Avoidance Actions Trust Beneficiaries) for all United States federal income tax purposes.

     (iii)    Allocations of Avoidance Actions Trust taxable income among the
Avoidance Actions Trust Beneficiaries (other than taxable income allocable to the Avoidance
Actions Trust Claims Reserve) shall be determined by reference to the manner in which an amount
of cash representing such taxable income would be distributed (were such cash permitted to be
distributed at such time) if, immediately prior to such deemed distribution, the Avoidance Actions
Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to
the Avoidance Actions Trust Claims Reserve) to the holders of the Avoidance Actions Trust
Interests, adjusted for prior taxable income and loss and taking into account all prior and
concurrent distributions from the Avoidance Actions Trust.  Similarly, taxable loss of the
Avoidance Actions Trust shall be allocated by reference to the manner in which an economic loss
would be borne immediately after a hypothetical liquidating distribution of the remaining
Avoidance Actions Trust Assets.  The tax book value of the Avoidance Actions Trust Assets for

145

purpose of this paragraph shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(iv)  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Avoidance Actions Trustee of a private letter ruling if the Avoidance Actions Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Avoidance Actions Trustee), the Avoidance Actions Trustee shall (A) timely elect to treat any Avoidance Actions Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including the Avoidance Actions Trustee and the Avoidance Actions Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(v)  The Avoidance Actions Trustee shall be responsible for payment, out of the Avoidance Actions Trust Assets, of any taxes imposed on the trust or its assets, including the Avoidance Actions Trust Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the Avoidance Actions Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets of the Avoidance Actions Trust Claims Reserve), such taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Avoidance Actions Trustee as a result of the resolution of such Disputed Claims.

(c)  Tax Withholdings by Avoidance Actions Trustee.  The Avoidance Actions Trustee may withhold and pay to the appropriate tax authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Avoidance Actions Trust Interests.  All such amounts withheld and paid to the appropriate tax authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Avoidance Actions Trust Interests for all purposes of the Avoidance Actions Trust Agreement, and it being understood that any such amount withheld shall reduce the amount actually realized by the applicable holder upon distribution.  The Avoidance Actions Trustee shall be authorized to collect such tax information from the holders of Avoidance Actions Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion the Avoidance Actions Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Avoidance Actions Trust Agreement.  In order to receive distributions under the Plan, all holders of Avoidance Actions Trust Interests shall be required to identify themselves to the Avoidance Actions Trustee and provide tax information and the specifics of their holdings, to the extent the Avoidance Actions Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Avoidance Actions Trustee for these purposes.  This identification requirement generally applies to all holders of Avoidance Actions Trust Interests, including those who hold their securities in street name.  The Avoidance Actions Trustee

146

may refuse to make a distribution to any holder of a Avoidance Actions Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered, and may treat such holder's Avoidance Actions Trust Interests as disputed; provided, however, that, if such information is not furnished to the Avoidance Actions Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Avoidance Actions Trust Interest; and, provided, further, that, upon the delivery of such information  by a holder of a Avoidance Actions Trust Interest, the Avoidance Actions Trustee shall make such distribution to which the holder of the Avoidance Actions Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, provided, further, that, if the Avoidance Actions Trustee fails to withhold in respect of amounts received or distributable with respect to any such holder and the Avoidance Actions Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Avoidance Actions Trustee for such liability (to the extent such amounts were actually distributed to such holder).

(d)     The Avoidance Actions Trustee and the Avoidance Actions Trust shall be discharged or dissolved, as the case may be, upon the earlier to occur of (i) all of the Avoidance Actions Trust Assets have been distributed pursuant to the Plan and the Avoidance Actions Trust Agreement, (ii) the Avoidance Actions Trustee determines, with the consent of the Avoidance Actions Trust Board, that the administration of any remaining Avoidance Actions Trust Assets is not likely to yield sufficient additional Avoidance Actions Trust proceeds to justify further pursuit, and (iii) all distributions required to be made by the Avoidance Actions Trustee under the Plan and the Avoidance Actions Trust Agreement have been made; provided, however, in no event shall the Avoidance Actions Trust be dissolved later than three (3) years from the Effective Date unless the Title III Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Avoidance Actions Trustee and the Avoidance Actions Trust Board that any further extension would not adversely affect the status of the trust as an Avoidance Actions Trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Avoidance Actions Trust Assets.  If at any time the Avoidance Actions Trustee determines, in reliance upon such professionals as the Avoidance Actions Trustee may retain, that the expense of administering the Avoidance Actions Trust so as to make a final distribution to its beneficiaries is likely to exceed the value of the assets remaining in the Avoidance Actions Trust, the Avoidance Actions Trustee may apply to the Title III Court for authority to (i) reserve any amount necessary to dissolve the Avoidance Actions Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, and (D) that is unrelated to the Debtors, the Reorganized Debtors, the Avoidance Actions Trust, and any insider of the Avoidance Actions Trustee, and (iii) dissolve the Avoidance Actions Trust.

78.15   **Indemnification of Avoidance Actions Trustee and Members of Avoidance Actions Trust Bond**:  The Avoidance Actions Trustee or the individual(s) comprising the Avoidance Actions Trustee, as the case may be, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board and their respective employees, agents and professionals,

shall not be liable to the Avoidance Actions Trust Beneficiaries for actions taken or omitted in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except those acts arising out of their own willful misconduct or gross negligence, and each shall be entitled to indemnification and reimbursement by the Avoidance Actions Trust for fees and expenses in defending any and all actions or inactions in their capacity as, or on behalf of, the Avoidance Actions Trustee or the Avoidance Actions Trust Board, as applicable, except for any actions or inactions involving willful misconduct or gross negligence. Any indemnification claim of the Avoidance Actions Trustee, the Avoidance Actions Trust Board, the members of the Avoidance Actions Trust Board and the other parties entitled to indemnification under this subsection shall be satisfied solely from the Avoidance Actions Trust Assets and shall be entitled to a priority distribution therefrom, ahead of the Avoidance Actions Trust Interests and any other claim to or interest in such assets. The Avoidance Actions Trustee, the Avoidance Actions Trust Board, and the members of the Avoidance Actions Trust Board shall be entitled to rely, in good faith, on the advice of their retained professionals.

# ARTICLE LXXIX

## PROSECUTION AND EXTINGUISHMENT OF CLAIMS HELD BY THE DEBTORS

79.1 **Prosecution of Claims**: Except as settled and released herein, from and after the Effective Date, the Avoidance Actions Trustee shall have the exclusive right and power to (a) litigate any and all of the Avoidance Actions and (b) compromise and settle such Avoidance Actions, upon approval of the Title III Court. The net proceeds of any such litigation or settlement (after satisfaction of all costs and expenses incurred in connection therewith) shall be transferred to the Avoidance Actions Trust for distribution in accordance with the Plan and the Avoidance Actions Trust Agreement.

# ARTICLE LXXX

## ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS

80.1 **Impaired Classes to Vote**: Each holder, as of the Voting Record Date, of a Claim in an impaired Class not otherwise deemed to have rejected or accepted the Plan in accordance with Sections 26.1, 33.1, 37.1, 39.1, 43.1, 47.1, 49.1, 52.1, 54.1, 58.1, 59.1, 61.1, 67.1, 68.1, and 71.1 of the Plan, shall be entitled to vote separately to accept or reject the Plan.

80.2 **Acceptance by Class of Creditors**: An impaired Class of holders of Claims shall have accepted the Plan if the Plan is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have voted to accept or reject the Plan.

80.3 **Cramdown**: In the event that any impaired Class of Claims shall fail to accept, or be deemed to reject, the Plan in accordance with section 1129(a) of the Bankruptcy Code, the Debtors reserve the right to (i) request that the Title III Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code or (ii) subject to the consent of the GO/PBA PSA

148

Creditors, in accordance with the provisions of the GO/PBA Plan Support Agreement, amend the Plan.

## ARTICLE LXXXI

## RIGHTS AND POWERS OF DISBURSING AGENT

81.1     **Exculpation**:  From and after the Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Title III Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent.  No holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan or for implementing the provisions of the Plan.

81.2     **Powers of the Disbursing Agent**:  Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan, (b) make distributions contemplated by the Plan, (c) comply with the Plan and the obligations thereunder, and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Title III Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

81.3     **Fees and Expenses Incurred From and After the Effective Date**:  Except as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Title III Court.

## ARTICLE LXXXII

## PROCEDURES FOR TREATMENT OF DISPUTED CLAIMS
## AND CLAIMS SUBJECT TO ACR PROCEDURES

82.1     **Objections to Claims; Prosecution of Disputed Claims**:

(a)     Except with respect to Allowed Claims, and subject to the terms and conditions of the ADR Procedures and the ADR Order, Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall object to, and shall assume any pending objection filed by the Debtors to, the allowance of Claims filed with the Title III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto.  All objections, affirmative defenses and counterclaims shall be litigated to Final

149

Order; provided, however, that Reorganized Debtors, by and through the Oversight Board, and in consultation with AAFAF, shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court. Unless otherwise ordered by the Title III Court, to the extent not already objected to by the Debtors, Reorganized Debtors shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than one hundred eighty (180) days following the Effective Date or such later date as may be approved by the Title III Court. Notwithstanding anything contained in the Plan to the contrary, on the Effective Date, any Bond Claim filed by any Entity, for amounts due under existing securities, shall be deemed satisfied and expunged and the Oversight Board shall instruct Prime Clerk LLC, its court-appointed representative, to remove such Bond Claims from the claims registry maintained for the benefit of the Title III Court; provided, however, that, in the event that an order reversing or vacating the Confirmation Order with respect to Bond Claims becomes a Final Order, such Bond Claims shall be reinstated on the claims registry.

(b) The two (2) Creditors' Committee appointees to the Avoidance Actions Trust Board shall (i) receive monthly updates to the claims reconciliation process, which process shall continue to be administered by the Oversight Board, with the assistance of AAFAF, (ii) have the right to (A) review the claims objections and reconciliation process, including the ADR Procedures, as it relates to CW General Unsecured Claims, ERS General Unsecured Claims, Convenience Claims, and, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, Eminent Domain/Inverse Condemnation Claims regardless of the size of the asserted Claim amount, (B) ensure compliance with the exclusions from CW General Unsecured Claims as provided in the Plan, and (C) in the event that such appointees disagree with any settlement of a CW General Unsecured Claim, an ERS General Unsecured Claim, or, in the event that the Oversight Board appeals the Title III Court's ruling that Eminent Domain/Inverse Condemnation Claims are non-dischargeable and must be paid in full, an Eminent Domain/Inverse Condemnation Claim (by the Oversight Board or AAFAF, as the case may be) for an allowed amount in excess of Five Hundred Thousand Dollars ($500,000.00), such appointees may seek relief from the Title III Court to cause (upon a showing that such settlement is not in the best interest of, as applicable, the Commonwealth, ERS, and their respective creditors) the Oversight Board or AAFAF, as the case may be, to obtain approval of the Title III Court for any such settlement in accordance with the standard for approval under Bankruptcy Rule 9019. With respect to the foregoing obligations and responsibilities, such appointees and their advisors shall be entitled to be compensated, subject to an annual aggregate cap of Three Million Dollars ($3,000,000.00), which amounts shall be funded from the GUC Reserve.

82.2 **Estimation of Claims**: Except with respect to Allowed Claims, on and after the Effective Date, and unless otherwise limited by an order of the Title III Court, including, without limitation, the ACR Order, and the ADR Order, Reorganized Debtors, by and through the Oversight Board, may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to or sought to estimate such Claim, and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without

150

limitation, during the pendency of any appeal relating to any such objection. Unless otherwise
provided in an order of the Title III Court, in the event that the Title III Court estimates any
contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the
allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title
III Court; provided, however, that, if the estimate constitutes the maximum limitation on such
Claim, Reorganized Debtors, by and through the Oversight Board, may elect to pursue
supplemental proceedings to object to any ultimate allowance of such Claim; and, provided,
further, that the foregoing is not intended to limit the rights granted by section 502(j) of the
Bankruptcy Code. All of the aforementioned Claims objection, estimation and resolution
procedures are cumulative and not necessarily exclusive of one another.

      82.3      **Payments and Distributions on Disputed Claims**:

      (a)      **Disputed Claims Holdback:** From and after the Effective Date, and until
such time as each Disputed Claim has been compromised and settled, estimated by the Title III
Court in an amount constituting the allowed amount, or Allowed or Disallowed by Final Order of
the Title III Court, Reorganized Debtors shall retain, for the benefit of each holder of a Disputed
Claim, the distributions that would have been made to such holder if it were an Allowed Claim in
an amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim
relating to such Disputed Claim, (ii) the amount in which the Disputed Claims shall be estimated
by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the
maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such
other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized
Debtors; provided, however, that the recovery by any holder of a Disputed Claim shall not exceed
the lesser of (i), (ii) and (iii) above. To the extent that any of the Reorganized Debtors retains any
New GO Bonds or CVIs on behalf of Disputed Claims holders, until such New GO Bonds or CVIs
are distributed, such Reorganized Debtors shall exercise voting or consent rights with respect to
such obligations.

      (b)      **Allowance of Disputed Claims:** At such time as a Disputed Claim
becomes, in whole or in part, an Allowed Claim, Reorganized Debtors shall distribute to the holder
thereof the distributions, if any, to which such holder is then entitled under the Plan, together with
any earnings that have accrued thereon (net of any expenses, including any taxes, relating thereto),
but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such
distribution, if any, shall be made as soon as practicable after the date that the order or judgement
of the Title III Court allowing such Disputed Claim becomes a Final Order, but in no event more
than ninety (90) days thereafter.

      82.4      **Authority to Amend Lists of Creditors**: Except with respect to Bond Claims,
and subject to the limitations in Section 82.1(b) hereof, the Debtors shall have the authority to
amend the List of Creditors with respect to any Claim and to make distributions based on such
amended List of Creditors without approval of the Title III Court. If any such amendment to the
List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the
Debtors will provide the holder of such Claim with notice of such amendment and such holder will
have twenty (20) days to file an objection to such amendment with the Title III Court. If no such

objection is filed, the Disbursing Agent may proceed with distributions based on such amended List of Creditors without approval of the Title III Court.

82.5     **Non-Accrual of Interest**:  Unless otherwise specifically provided for herein or by order of the Title III Court, post-petition interest shall not accrue or be paid on Claims, Allowed or otherwise, and no holder of a Claim, Allowed or otherwise, shall be entitled to interest accruing on or after the Commonwealth Petition Date, the ERS Petition Date, or the PBA Petition Date, as the case may be, on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

82.6     **Disallowance of Claims**:  All Claims of any Entity from which property is sought by the Debtors under sections 550, or 553 of the Bankruptcy Code or that the Debtors alleges is a transferee of a transfer that is avoidable under sections 544, 545, 547, 548, or 549 of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtors, on the other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

82.7     **Claims Subject to ACR Procedures**:  To the extent not already transferred as of the Effective Date in accordance with the terms and conditions of the ACR Order, the Debtors or the Reorganized Debtors, as the case may be, shall transfer Claims in accordance with the terms and conditions of the ACR Order, and, upon transfer, all such Claims shall (a) be reconciled pursuant to the applicable regulatory and administrative procedures of the Debtors and the Reorganized Debtors, as the case may be, (b) be paid in full in the ordinary course of business, and (c) except as otherwise provided in the Plan, shall not be included in CW General Unsecured Claims to be satisfied from the CW GUC Recovery or Convenience Claims.  Notwithstanding the foregoing, (y) the Oversight Board may remove a claim from the ACR process in the event that it was improperly transferred into the ACR process because it did not qualify in accordance with the terms and provisions of the ACR Order, including, without limitation, bond claims or "child" claims relating to a "parent" class action proofs of claim (in which case, such claims may be transferred into the appropriate Class under the Plan) and (z) claims that are eligible to be transferred to or administered through the ACR process and for which no proof of claim was required to be filed (whether or not a proof of claim was filed) shall not be transferred into Class 54, Class 58, Class 66, or Class 68 under the Plan and shall be administered through the ACR process, in accordance with the terms of the ACR Order and subsections (a) and (b) of this Section 82.7.

82.8     **National Action Claims**:  Notwithstanding anything contained herein, in the GO/PBA Plan Support Agreement, or the HTA/CCDA Plan Support Agreement to the contrary, National may continue to litigate to final judgment or settlement all claims and causes of action asserted in the National Action; provided, however, that, in the event that notwithstanding the application and effectiveness of the Bar Date Orders, the Plan, and the Confirmation Order, the defendants and, to the extent named, third-party defendants in the National Action assert against

the Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth
(collectively, the "CW Entities") claims or counterclaims for indemnification, contribution,
reimbursement, setoff or similar theories of recovery based on, arising from or relating to the
National Action (collectively, the "CW Entities' Claims"), (i) the CW Entities agree (A) to
vigorously defend against any such CW Entities' Claims, including, without limitation, invoking
the Bar Date Orders and discharge provisions set forth in Article XCII of the Plan and the
Confirmation Order, objecting to any proof of claim, and prosecuting available appeals based
upon, arising from or related to the National Action, (B) to allow National, at its option, to
participate in or undertake such defense and to settle such action in its sole discretion, and (C) not
to settle any such CW Entities' Claims without National's written consent, which consent shall not
be unreasonably withheld, and (ii) National agrees to (A) indemnify and hold the CW Entities
harmless to the extent of the CW Entities' liability pursuant to a Final Order or settlement as a
result of the National Action, and (B) reimburse the relevant CW Entities for all documented fees
and expenses incurred in connection with the defense against any such CW Entities' Claims,
including, without limitation, attorneys' fees and expenses incurred (amounts pursuant to clauses
(ii)(A) and (B) collectively, the "Total Reimbursement"), but in no event may the Total
Reimbursement exceed any recovery realized by National in connection with the National Action;
provided, however, that National shall have no obligation pursuant to the Plan or the Confirmation
Order to indemnify and hold the CW Entities harmless for claims based upon, arising from or
related to the Underwriter Actions that are not the National Action or in which National is not
involved.  For the avoidance of doubt, any CW Entities' Claims shall not constitute CW General
Unsecured Claims.

## ARTICLE LXXXIII

## GOVERNANCE AND PROVISIONS REGARDING PENSION RESERVE AND PENSION SYSTEM

83.1    **Formation and Responsibilities of the Pension Reserve**:  On or prior to the
Effective Date, the Commonwealth shall take all necessary steps to establish the Pension Reserve
Trust, including, without limitation, by execution and delivery of the Pension Reserve Deed of
Trust.

83.2    **Funding of the Pension Reserve Trust**:  On the Effective Date, the
Commonwealth shall contribute, or cause to be contributed, to the Pension Reserve Five Million
Dollars ($5,000,000.00) to fund the initial administrative fees, costs and expenses of the Pension
Reserve Trust.  From and after the FY in which the Effective Date occurs up to and including the
conclusion of the ninth (9th) FY following the FY in which the Effective Date occurs, the
Reorganized Commonwealth shall make, or cause to be made, annual (but in no event later than
October 1st following the conclusion of each FY) contributions to the Pension Reserve Trust in an
amount equal to  (a) the Base Contribution, (b) such additional amount calculated as the lower of
the actual unrestricted primary surplus minus the actual CVI payments for such FY and the
Projected Fiscal Plan Surplus for such FY, minus the sum of (i) the Base Contribution for such FY,
plus (ii) the  Commonwealth debt service obligation pursuant to the plan for such FY, plus (iii)
Two Hundred Million Dollars ($200,000,000.00); provided, however, that, in all instances, such
additional amount cannot be lower than zero dollars ($0.00), and (c) subject to applicable laws,

including, without limitation, Titles I and II of PROMESA, such additional amounts as the Reorganized Commonwealth, in its discretion, elects to deposit into the Pension Reserve Trust. The Pension Reserve Trust will be managed by an independent entity whose members shall meet the independence, professionalism, experience and qualification standards set forth in the Pension Reserve Deed of Trust and shall be subject to all Commonwealth contracting, ethics and conflicts of interest laws and regulations.

83.3    **Non-Impairment Covenant**:  The Commonwealth covenants herein, and will covenant in the Pension Reserve Deed of Trust, for the benefit of all Participants that, with respect to payments and other obligations owed to Participants pursuant to the Plan, including, without limitation, PayGo obligations and all components of the Total Monthly Retirement Benefit after any adjustment pursuant to the Plan, all such obligations shall remain in place and not otherwise be altered, modified or amended until all such obligations have been satisfied in full in accordance with the provisions of the Plan and the Definitive Documents and the New GO Bonds Legislation, enforceable by any and each of the Oversight Board, and any affected Retirees and, with respect to any such provision, the Pension Reserve Deed of Trust shall not be amended or modified by the Commonwealth except (i) with the express prior written consent of the Oversight Board (if in existence), and a majority in number of the Retirees receiving benefits pursuant to the Plan who are affected by such amendment or modification, or (ii) pursuant to a new or re-opened Title III case for the Commonwealth and a confirmed new or modified, and effective, plan of adjustment.

83.4    **Maintenance of Pension**:  Before the tenth (10th) anniversary of the Effective Date, the Government of the Commonwealth of Puerto Rico, including, without limitation, by any Entity or Person acting for or on behalf thereof, shall not (a) implement existing legislation or enact new legislation to create or increase any defined benefit pension payment or obligation to current or future retirees from or related to any defined benefit plans over the benefits provided by the Plan, regardless of funding source, or (b) undo (in whole or part) the Plan's eliminations of defined benefit plan accruals and cost of living adjustments for government employees; provided, however, that the Governor and Legislature of the Commonwealth of Puerto Rico, subsequent to termination of the Oversight Board, may apply to the Title III Court for relief from this provision upon showing (i) the need therefor, (ii) the affordability of the requested changes, (iii) the reasons why the requested changes will not create a risk of the financial distress caused by the Commonwealth's prior defined benefit plans under which the Commonwealth and other governmental employers accrued nearly $55 billion of unfunded pension obligations, (iv) the means of funding the requested changes and reasons why there is little risk of such funding not being carried out, (v) the reasons why the requested changes will not create a material risk of defaults on any of the then outstanding obligations pursuant to the Plan, and (vi) the reasons why the defined contribution plans are insufficient and defined benefit plans are both prudent and required; and, provided, however, that, prior to the termination of the Oversight Board, the Oversight Board shall not reduce any defined benefit pension payment or obligation to current or future retirees from the benefits provided by the Plan.

## ARTICLE LXXXIV

### IDENTIFICATION OF CLAIMS IMPAIRED BY THE PLAN
### AND NOT IMPAIRED BY THE PLAN

84.1     **Impaired Classes**:  The Claims in Classes 1 through 50, 51B, 51E, 51G through 51I, 52 through 53, 56, 58 through 62, 65, 66 and 69 are impaired and receiving distributions pursuant to the Plan, and are therefore entitled to vote to accept or reject the Plan; provided, however, that, based upon the elections made on the Ballot/Election Form, Classes 22, 29, 33, 35, 39, 43, 45, 48, 50, and 68 are deemed to have accepted the Plan.  The Claims in Classes 63 and 64 are impaired and not receiving a distribution pursuant to the Plan and, therefore, Classes 63 and 64 are deemed to have rejected the Plan.

84.2     **Unimpaired Classes**:  Claims in Classes 51A, 51C, 51D, 51F, 51J through 51L, 54, 55, 57, 67, and 68 are unimpaired pursuant to the Plan, are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

## ARTICLE LXXXV

### CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN

85.1     **Conditions Precedent to Confirmation of the Plan**:  Confirmation of the Plan is subject to satisfaction of the following conditions precedent:

    (a)     **Fiscal Plan Certification:**  The Oversight Board shall have certified a Fiscal Plan consistent with the Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA.

    (b)     **Required Orders:**  The Clerk of the Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order and the Confirmation Order providing for the following:

        (i)     Approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

        (ii)     Authorizing the solicitation of votes and elections with respect to the Plan;

        (iii)     Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

        (iv)     Confirming and giving effect to the terms and provisions of the Plan, including the releases set forth in Article XCII of the Plan;

155

            (v)      Determining that the compromises and settlements set forth in the Plan are appropriate, reasonable and approved and authorizing the transactions contemplated therein;

            (vi)      Determining that all applicable tests, standards and burdens in connection with the Plan have been duly satisfied and met by the Oversight Board, the Debtors and the Plan;

            (vii)      Approving the documents in the Plan Supplement, other than the New GO Bonds Legislation and the CVI Legislation (to the extent included in the Plan Supplement) and the Reorganized Debtors By-Laws, and determining that such documents are valid and binding on parties with respect thereto;

            (viii)      Determining that the New GO Bonds Legislation and the CVI Legislation, to the extent enacted, are a valid means for the implementation of the Plan and the issuance of the New GO Bonds and the CVIs, respectively; and

            (ix)      Authorizing the Reorganized Debtors to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan, and the documents in the Plan Supplement.

      (c)      **Form of Orders:**  The Confirmation Order and the Plan are each in form and substance reasonably acceptable to the Oversight Board, the Debtors, the Initial GO/PBA PSA Creditors and, solely with respect to provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee.

      (d)      **Confirmation Order:**  The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations and injunctions set forth in Article XCII of the Plan and (iii) the applicable provisions set forth in Section 85.2 (b) hereof.

    85.2     **Waiver of Conditions Precedent to Confirmation**:  Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, and the Committee Agreement, and to the extent practicable and legally permissible, each of the conditions precedent in Section 85.1 hereof may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of the Debtors, the Initial PSA Creditors and, solely with respect to provisions affecting Classes 54, 58, 66, and 68, the Creditors' Committee, which consent shall not be unreasonably withheld.  Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

# ARTICLE LXXXVI

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

86.1 **Conditions Precedent to the Effective Date**: The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent:

(a) **Fiscal Plan Certification:** The Oversight Board shall have determined that the Plan is consistent with the Debtors' Fiscal Plan and shall have certified the submission of the Plan, and any modifications to the Plan through the Confirmation Date, in accordance with Sections 104(j) and 313 of PROMESA. The Fiscal Plan certified as of the Effective Date shall include provisions for the payment of principal and interest with respect to the New GO Bonds, including, without limitation, sinking fund payments and the mechanisms and procedures for payment of the CVIs in the event that the Outperformance Condition is satisfied and payment is due in accordance with the CVI Indenture.

(b) **Entry of the Confirmation Order:** The Clerk of the Title III Court shall have entered the Confirmation Order in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable to the Title III Cases pursuant to Section 301 of PROMESA, which shall be in form and substance reasonably acceptable to the Oversight Board, the Initial PSA Creditors, and the Creditors' Committee and the Confirmation Order shall provide for the following:

(i) Authorize the Debtors and the Reorganized Debtors, as the case may be, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii) Decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(iii) Authorize the Debtors and Reorganized Debtors, as the case may be, to (1) make all distributions and issuances as required under the Plan and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

(iv) Authorize the implementation of the Plan in accordance with its terms;

(v) Determine the New GO Bonds and the CVIs, and the covenants by the Commonwealth, for the benefit of the holders of the New GO Bonds, and the CVIs as provided in the New GO Bonds Legislation, the New GO Bonds Indenture, the CVI Legislation, the CVI Indenture or the Confirmation Order, as applicable, constitute valid, binding, legal and enforceable obligations of the Commonwealth, under Puerto Rico, New York and federal law;

157

(vi)    Determine that, the Commonwealth shall have pledged its full faith, credit and taxing power under the Commonwealth Constitution and applicable Puerto Rico law for the payment of principal and interest on the New GO Bonds and payment on the CVIs;

(vii)    Determine that, pursuant to the New GO Bonds Legislation and other applicable law, upon deposit of monies in the Debt Service Fund, there shall be statutory first liens on such monies for the purposes of securing payment of the New GO Bonds, which statutory first liens on such monies shall remain in full force and effect until the New GO Bonds have been paid or satisfied in full in accordance with their terms;

(viii)    Determine the Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) the Debtors, (2) Reorganized Debtors, (3) the Commonwealth and its instrumentalities, (4) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (5) any other Entity, and (6) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians;

(ix)    Provide that the Fiscal Plan, certified as of the Effective Date, and any post-Effective Date Fiscal Plan include provisions for the payment in each FY of (a) principal and interest payable on the New GO, including, without limitation, sinking fund payments due in such FY, and (b) to the extent that the Outperformance Condition is satisfied in the prior FY, any amounts due and owing on the CVIs in accordance with the terms of the CVI Indenture;

(x)    Determine that the statutory first lien on funds once deposited into the Debt Service Fund, as provided for in the New GO Bonds Legislation, and all other provisions to pay the New GO Bonds are valid, binding, legal and enforceable, including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of collateral (including, without limitation, the statutory lien thereon as adequate protection for the property rights herein and in the Confirmation Order);

(xi)    Provide that the automatic stay in any future insolvency proceeding commenced on behalf of the Commonwealth (whether under Title III of PROMESA or otherwise) shall be deemed waived with respect to monies on deposit in the Debt Service Fund as of the commencement thereof;

(xii)    Determine that, for purposes of Section 209 of PROMESA, the discharge of debt to occur as of the Effective Date is necessary for the Oversight Board to certify that expenditures do not exceed revenues for the Commonwealth as determined in accordance with modified accrual accounting standards;

(xiii)    Provide that the compromises and settlements set forth in the Plan and the Confirmation Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding;

(xiv)    Determine that the Plan is consistent with the Debtors' Fiscal Plans and satisfies Section 314(b)(7) of PROMESA;

(xv)    Provide that, in consideration for the agreements set forth in the HTA/CCDA Plan Support Agreement, and upon satisfaction of the HTA Distribution Conditions, HTA shall make an interim distribution to holders of HTA 68 Bonds and HTA 98 Senior Bonds in the amounts of One Hundred Eighty-Four Million Eight Hundred Thousand Dollars ($184,800,000.00) and Seventy-Nine Million Two Hundred Thousand Dollars ($79,200,000.00), respectively, in Cash, which distributions shall reduce the principal amount of such HTA 68 Bonds and HTA 98 Senior Bonds, respectively, and the corresponding HTA Bond Claims;

(xvi)    Provide that, in consideration for the structuring of payments to be made to holders of CW/HTA Claims, CW/Convention Center Claims, CW/PRIFA Tax Claims and CW/MBA Claims, upon satisfaction of the HTA Distribution Conditions, and in accordance with the terms and provisions of Section 6.1(d) of the HTA/CCDA Plan Support Agreement, the Commonwealth shall make payments to Assured and National in the amounts of Thirty-Nine Million Three Hundred Thousand Dollars ($39,300,000.00) and Nineteen Million Three Hundred Thousand Dollars ($19,300,000.00), respectively;

(xvii)    Provide that neither the Governor nor the Legislature shall enact, adopt, or implement any law, rule, regulation, or policy that impedes, financially or otherwise, consummation and implementation of the transactions contemplated by the Plan;

(xviii)    Provide that the Governor and the Legislature, individually and jointly, as appropriate, shall take any and all actions necessary to consummate the transactions contemplated by the Plan; and

(xix)    Provide that payments or redemptions made with respect to the CVIs shall not be subject to any Commonwealth tax or withholding obligation imposed by the Commonwealth now or in the future regardless of whether such payments or redemptions with respect to the CVIs may be exempt from the payment of federal or state taxes, including, without limitation, the twenty-nine percent (29%) Puerto Rico income tax withholding at source that may otherwise be applicable to such payments or redemptions.

(c)    **No Injunction:**  The Confirmation Order shall not be stayed in any respect.

(d)    **Authorizations:**  All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan, including, without limitation, the New GO Bonds Legislation and the CVI Legislation, have been obtained or enacted or entered and not revoked or reversed, and (2) except to the extent expressly provided herein and

159

not inconsistent with any other provision of the Plan, unless otherwise permitted or required by PROMESA or similar authority, completion of any other required legislative or other governmental action required to consummate the Plan.

      (e)    **Execution of Documents; Other Actions:**  All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents, the New GO Bonds Legislation and the CVI Legislation, necessary to implement the terms and provisions of the Plan, including the Definitive Documents, the New GO Bonds Legislation and the CVI Legislation, are effected or executed and delivered, as applicable, and are in full force and effect.

      (f)    **Opinions:**  Usual and customary legal opinions for issuances of the type similar to the New GO Bonds and the CVIs by outside counsel to the Debtors covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the Initial GO/PBA PSA Creditors, have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the Plan.

      (g)    **Constitutional Claims:**  The Title III Court shall have entered an order finding that any Claim asserted against the Debtors or the Reorganized Debtors based on any bonds issued or guaranteed by or loans made to or guaranteed by HTA, CCDA, PRIFA, or MBA shall be determined to be a Claim arising prior to the Petition Date and classified in Classes 59 through 62 (except Allowed ERS Bond Claims to the extent secured) and shall be dischargeable and discharged pursuant to the Plan or Confirmation Order and the Debtors and the Reorganized Debtors shall have no liability on account of such Claims.

      (h)    **Lift Stay Motions and Clawback Actions:**  The clawback funds at issue in the Lift Stay Motions and the Clawback Actions have been determined by the Title III Court to constitute property of the Commonwealth.

      (i)    **Preemption**:  The Title III Court shall have entered an order finding or determining that (1) Act 80, Act 81, and Act 82, each enacted on August 3, 2020, and (2) Joint Resolution 33-2021, signed into law on December 16, 2021 and requiring the partial implementation of Act 80, are either preempted by the provisions of PROMESA or nullified or unenforceable pursuant to PROMESA, including, without limitation, Sections 104(k), 108, 201, 202, and 204 thereof.

      86.2    **Waiver of Conditions Precedent**:  Subject to the provisions of the GO/PBA Plan Support Agreement, the Oversight Board may waive any of the conditions to the Effective Date set forth in Section 86.1 hereof at any time without any notice to any other parties in interest, other than the Initial GO/PBA PSA Creditors, the Creditors' Committee and the Government Parties, and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the Plan; provided, however, that, subject to the terms and provisions of Committee Agreement, each of the conditions precedent in Section 86.1 hereof with respect to provisions affecting Classes 54, 58, 66 and 68 may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of the Creditors' Committee, which consent shall not be unreasonably withheld.

86.3     **Effect of Non-Occurrence of Conditions to Effective Date**: If prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in any order of the Title III Court vacating the Confirmation Order, the Plan will be null and void in all respects, and nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, or Causes of Action; (b) prejudice in any manner the rights of the Debtors, the Oversight Board, the Creditor's Committee, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by the Debtors, the Oversight Board, the Creditor's Committee, or any other Entity.

# ARTICLE LXXXVII

## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

87.1     **Modification of Plan**: Subject to (a) Sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA, and (b) the terms and provisions of the GO/PBA Plan Support Agreement, the AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, the Committee Agreement, and the HTA/CCDA Plan Support Agreement, the Oversight Board may alter, amend or modify the Plan or the Exhibits at any time prior to or after the Confirmation Date but prior to the Effective Date. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

87.2     **Revocation or Withdrawal**:

        (a)     Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the AFSCME Plan Support Agreement, the Retiree Committee Plan Support Agreement, the Committee Agreement, and the HTA/CCDA Plan Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Oversight Board.

        (b)     If the Plan is revoked or withdrawn prior to the Confirmation Date, or if the Plan does not become effective for any reason whatsoever, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claim by the Debtors or any other Entity, or to prejudice in any manner the rights of the Debtors or any other Entity in any further proceeding involving the Debtors.

87.3     **Amendment of Plan Documents**: From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the Plan and their respective attachments, as the case may be.

87.4     **No Admission of Liability**:

(a)     The submission of this Plan is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in this Plan.

(b)     None of this Plan (including, without limitation, the Exhibits hereto), or any settlement entered, act performed or document executed in connection with this Plan: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized Debtors, the Debtors, or any other Entity with respect to the validity of any Claim. None of this Plan or any settlement entered, act performed or document executed in connection with this Plan shall be admissible in any proceeding for any purposes, except to carry out the terms of this Plan, and except that, once confirmed, any Entity may file this Plan in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

# ARTICLE LXXXVIII

## CORPORATE GOVERNANCE AND
## MANAGEMENT OF REORGANIZED DEBTORS

88.1     **Corporate Action**:  On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of the Debtors or Reorganized Debtors, including, without limitation, to the extent applicable, the authorization to issue or cause to be issued the New GO Bonds, the CVIs, the authorization to enter into the Definitive Documents, the adoption of Reorganized Debtors By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized Debtors pursuant to the Plan, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without further action by any Entity under any other applicable law, regulation, order, or rule. Other matters provided under the Plan involving the corporate structure of the Reorganized Debtors or corporate action by Reorganized Debtors, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable, and without requiring further action by any Entity under any other applicable law, regulation, order, or rule. Without limiting the foregoing, from and after the Confirmation Date, the Debtors and Reorganized Debtors shall take any and all actions deemed appropriate in order to consummate the transactions contemplated herein in accordance with the New GO Bonds Legislation, the CVI Legislation, and the new corporate governance documents, as applicable.

162

88.2     **Dissolution of ERS**:  On or as soon as practicable subsequent to the Effective Date, ERS shall be dissolved and all existing directors and officers of ERS shall be relieved of any further duties and obligations.  Upon such dissolution, all remaining assets of ERS shall be transferred to the Commonwealth.

88.3     **Officers of Reorganized Debtors**:  To the extent applicable, the board of directors of Reorganized Debtors shall elect officers of Reorganized Debtors as of or after the Effective Date.

88.4     **PBA and CCDA Governance Structure**:  No changes to the PBA governance structure or PBA collective bargaining agreements will be implemented during or following the PBA Title III Case, unless any such changes are approved by the Oversight Board and AAFAF.

## ARTICLE LXXXIX

## PROVISIONS REGARDING OVERSIGHT BOARD AND COMPLIANCE WITH PROMESA

89.1     **Effect of Confirmation**:  Nothing in this Plan or the Confirmation Order shall discharge, substitute, alter or otherwise modify the powers and responsibilities of the Oversight Board pursuant to PROMESA or the obligations of each Reorganized Debtor under PROMESA. From and after the Effective Date, the Reorganized Debtors shall continue to have all of their obligations pursuant to PROMESA, including, without limitation, the terms and conditions of Titles I and II thereof.

89.2     **Ongoing Role of the Oversight Board**:  Nothing in the Plan or the Confirmation Order shall discharge any or all obligations of each Debtor under PROMESA and, from and after the Effective Date, the Oversight Board's powers and responsibilities under PROMESA shall continue, and the Debtors' duties and obligations shall continue and be unaffected by the Plan and the consummation thereof.

89.3     **Preemption of Laws**:  As of the Effective Date, and to the extent not previously preempted pursuant to an order of the Title III Court, provisions of Commonwealth laws that are inconsistent with PROMESA shall be preempted for the reasons, and to the extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law, such preempted provisions include, without limitation, (a) pursuant to section 4 of PROMESA, all laws, rules, and regulations, to the extent they give rise to obligations of the Debtors discharged by the Plan and the Confirmation Order pursuant to PROMESA, and such discharge shall prevail over any general or specific provisions of territory laws, rules, and regulations, and (b) laws enacted prior to June 30, 2016, to the extent they provide for transfers or other appropriations after the enactment of PROMESA, including transfers from the Commonwealth or one of its instrumentalities to any agency or instrumentality, whether to enable such agency or instrumentality to pay or satisfy indebtedness or for any other purpose, are preempted to the extent inconsistent with the Plan's discharge of the Debtors' obligations, and all such laws shall not be enforceable to the extent they are inconsistent with the Plan's discharge of the Debtors' obligations or any of the transactions contemplated by the Plan.  Without in any way limiting the foregoing, (y) the Commonwealth laws preempted by

163

PROMESA include, without limitation, those listed on Exhibit "K" hereto for the reasons, and to the extent, set forth in Exhibit A to the Findings of Fact and Conclusions of Law and (z) all litigation in which any Government Party is a defendant, over whether any Commonwealth law listed on Exhibit "K" hereto is preempted by PROMESA shall be dismissed, with prejudice, as of the Effective Date and the parties thereto shall provide the Oversight Board prompt notice of such dismissal. For the avoidance of doubt, the non-inclusion of a payment obligation arising from a valid law in a certified fiscal plan or budget is not a basis for disallowance of such obligation to the extent the claim arising therefrom otherwise satisfies the requirements for allowance of a claim under the relevant provisions of the Bankruptcy Code.

## ARTICLE XC

## PROVISIONS REGARDING COMMITTEES

90.1    **Dissolution of Committees**:  On the Effective Date, each of the Creditors' Committee and the Retiree Committee shall be (a) dissolved and be deemed to have satisfied all of its respective duties and obligations, and (b) released and discharged from any action or activity taken, or required to be taken, in connection with the Title III Cases; provided, however, that (x) in the event that an appeal of the Confirmation Order is taken, neither the Creditors' Committee nor the Retiree Committee shall be dissolved until the Confirmation Order becomes a Final Order, (y) the Creditors' Committee shall not be dissolved with respect to its duties and obligations in connection with the HTA and PREPA Title III cases, and (z) each of the Creditors' Committee and the Retiree Committee shall be entitled to defend applications for allowance of compensation and reimbursement of expenses of their respective professionals.  To the extent that, as of the date immediately prior to the Effective Date, either the Creditors' Committee or the Retiree Committee was a party to a contested matter or adversary proceeding in connection with the Title III Cases, including, without limitation, the Debt Related Objections, the PBA Litigation, the Invalidity Actions, the Lien Challenge Actions, the ERS Litigation, the Appointments Clause Litigation, the Uniformity Litigation, the Clawback Actions, the Lift Stay Motions, and any objection to claim, from and after the Effective Date and to the extent not already a party thereto, the Reorganized Debtors or the Avoidance Actions Trustee shall be deemed to have assumed such role and responsibility in connection with such contested matter and, upon such assumption, the Creditors' Committee or the Retiree Committee, as the case may be, shall be relieved of any role, responsibility or obligation with respect thereto; provided, however, and, for the avoidance of doubt, in no event shall the Avoidance Actions Trustee assume any role with respect to the Debt Related Objections, the PBA Litigation, the Invalidity Actions or the Lien Challenge Actions, which litigation shall be settled as set forth in Section 2.1 hereof and the Confirmation Order.

## ARTICLE XCI

## RETENTION OF JURISDICTION

91.1    **Retention of Jurisdiction**:  The Title III Court shall retain and have exclusive jurisdiction over any matter arising under PROMESA, arising in or related to, the Title III Cases and the Plan, or that relates to the following:

(a)        to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim not compromised or settled hereby, including, without limitation, the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims not compromised or settled hereby;

(b)        to resolve any matters related to Executory Contracts or Unexpired Leases, including, without limitation, (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(c)        to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan and adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)        to adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving the Debtors or Reorganized Debtors that may be pending on the Effective Date or brought thereafter;

(e)        to decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to PROMESA, the Plan or orders entered by the Title III Court;

(f)        to enter and implement such orders as may be necessary or appropriate to execute, implement, consummate or enforce the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Cases and (b) the Plan, the Confirmation Order, Definitive Documents and any other contracts, instruments, securities, releases, indentures, and other agreements or documents created in connection with the Plan,

(g)        to resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Confirmation Order, Definitive Documents or any other contract, instrument, security, release or other agreement or document that is entered into or delivered pursuant to the Plan or any Entity's rights arising from or obligations incurred in connection with the Plan or such documents;

(h)        to approve any modification of the Plan or approve any modification of the Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the Plan or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan, the Confirmation Order or any contract, instrument, security, release or other agreement or document created in connection with the Plan or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections

945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan;

(i)     to adjudicate, decide or resolve any matters relating to the Debtors' compliance with the Plan and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

(j)     to determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, Definitive Documents, or any contract, instrument, security, release or other agreement or document created, entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

(k)     to enter and implement other orders, or take such other actions as may be necessary or appropriate to enforce or restrain interference by any Entity with consummation or enforcement of the Plan or the Confirmation Order, including, without limitation, the provisions of Section 92.2 and 92.3 hereof;

(l)     to adjudicate any and all controversies, suits or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the Plan or Confirmation Order, including, without limitation, issuance of the New GO Bonds and the CVIs, and enter any necessary or appropriate orders or relief in connection with such adjudication;

(m)     to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(n)     to enter an order or final decree concluding or closing the Title III Cases pursuant to section 945(b) of the Bankruptcy Code;

(o)     to resolve disputes that may arise between the Oversight Board or AAFAF, as the case may be, and the two (2) Creditors' Committee's appointees to the Avoidance Actions Trust Board in connection with the settlement of Claims in accordance with the provisions of Section 82.1(b) of the Plan;

(p)     to enforce and clarify any orders previously entered by the Title III Court in the Title III Cases; and

(q)     to hear any other matter over which the Title III Court has jurisdiction under Sections 305 and 306 of PROMESA.

## ARTICLE XCII

## MISCELLANEOUS PROVISIONS

92.1     **Title to Assets**:  Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of the Debtors encompassed by the Plan shall vest in

Reorganized Debtors, free and clear of all Liens (except the Liens granted pursuant to the Plan and Confirmation Order).

92.2    **Discharge and Release of Claims and Causes of Action:**

(a)    Except as expressly provided in the Plan or the Confirmation Order, all distributions and rights afforded under the Plan shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against the Debtors and Reorganized Debtors that arose, in whole or in part, prior to the Effective Date, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Causes of Action; provided, however, that, without prejudice to the exculpation rights set forth in Section 92.7 hereof, nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.  Upon the Effective Date, the Debtors and Reorganized Debtors shall be deemed discharged and released from any and all Claims, Causes of Action and any other debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and Claims of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code and PROMESA Section 407, whether or not (a) a proof of claim based upon such Claim is filed or deemed filed under section 501 of the Bankruptcy Code, (b) such Claim is allowed under section 502 of the Bankruptcy Code and PROMESA Section 407 (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan.  For the avoidance of doubt, nothing contained herein or in the Confirmation Order shall release, discharge or enjoin any claims or causes of action against PREPA arising from or related to PREPA-issued bonds, including, without limitation, Monoline-issued insurance pertaining thereto, and PREPA is not releasing any claims or causes of action against any non-Debtor Entity.  Claims and causes of action against PREPA arising from or related to PREPA-issued bonds, and releases against PREPA and its assets shall be addressed in PREPA's Title III case, including, without limitation, any plan of adjustment therein.

(b)    Except as expressly provided in the Plan or the Confirmation Order, all Entities shall be precluded from asserting any and all Claims against the Debtors and Reorganized Debtors, and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to the Title III Cases, the Debtors or Reorganized Debtors or any of their respective Assets and property, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities.  In accordance with the foregoing, except as expressly provided in the Plan or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action or debt of or against the Debtors and the Reorganized Debtors pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to Section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against the Debtors or Reorganized Debtors and their respective

Assets, and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability. As of the Effective Date, and in consideration for the value provided under the Plan, each holder of a Claim in any Class under this Plan shall be and hereby is deemed to release and forever waive and discharge as against the Debtors and Reorganized Debtors, and their respective Assets and property and all such Claims.

(c) Notwithstanding any other provisions of this Section 92.2, in accordance with the provisions of the GO/PBA Plan Support Agreement, each of the GO/PBA PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of the Debtors, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the Claims or Causes of Action asserted or which could have been asserted, including, without limitation, in the Clawback Actions and the Lift Stay Motions, and (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 92.2.

(d) <u>SEC Limitation</u>. Notwithstanding anything contained herein or in the Confirmation Order to the contrary, no provision shall (i) preclude the SEC from enforcing its police or regulatory powers, or (ii) enjoin, limit, impair or delay the SEC from commencing or continuing any claims, causes of action, proceedings or investigations against any non-debtor person or non-debtor entity in any forum.

(e) <u>United States Limitation</u>. Notwithstanding anything contained herein or in the Confirmation Order to the contrary, no provision shall (i) impair the United States, its agencies, departments, or agents, or in any manner relieve the Debtors or the Reorganized Debtors, as the case may be, from compliance with federal laws or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory, (ii) expand the scope of any discharge, release, or injunction to which the Debtors or the Reorganized Debtors are entitled under Title III, and (iii) discharge, release, enjoin, or otherwise bar (A) any liability of the Debtors or the Reorganized Debtors to the United States arising from and after the Effective Date, (B) any liability to the United States that is not a Claim, (C) any affirmative defense or any right of setoff or recoupment of the United States, the Debtors or the Reorganized Debtors, as the case may be, and such rights of setoff and recoupment of such parties are expressly preserved, (D) the continued validity of the obligations of the United States, the Debtors or the Reorganized Debtors, as the case may be, under any United States grant or cooperative assistance agreement, (E) the Debtors' or the Reorganized Debtors' obligations arising under federal police or regulatory laws, including, but not limited to, laws relating to the environment, public health or safety, or territorial laws implementing such federal legal provisions, including, but not limited to, compliance obligations, requirements under consent decrees or judicial orders, and obligations to pay associated administrative, civil, or other penalties, and (F) any liability to the United States on the part of any non-debtor. Without limiting the foregoing, nothing contained herein or in the Confirmation Order shall be deemed (i) to determine the tax liability of any Entity, including, but not limited to, the Debtors and the Reorganized Debtors and any obligation of the Debtors to pay post-petition interest on any such tax liability, (ii) to be binding on the IRS with regard to the federal tax liabilities, tax status, or tax filing and withholding obligations of any Entity, including, but not limited to, the Debtors and the

Reorganized Debtors, (iii) to release, satisfy, discharge, or enjoin the collection of any claim of the IRS against any Entity other than the Debtors and the Reorganized Debtors, and (iv) to grant any relief to any Entity that the Court is prohibited from granting the Declaratory Judgment Act, 28 U.S.C. § 2201(a), or the Tax Anti-Injunction Act, 26 U.S.C. § 7421(a).

        (f)      <u>Underwriter Actions</u>. Notwithstanding anything contained herein or in the Confirmation Order to the contrary, including, without limitation, Sections 92.2, 92.3 and 92.11 of the Plan, except as may be precluded pursuant to the provisions of PROMESA, nothing in the Plan, the Confirmation Order or any Plan-related document set forth in the Plan Supplement is intended, nor shall it be construed, to impair, alter, modify, diminish, prohibit, bar, restrain, enjoin, release, reduce, eliminate or limit the rights of the plaintiffs and defendants, including, without limitation, the parties to the Underwriter Actions, from asserting their respective rights, claims, causes of action and defenses in the Underwriter Actions, including, but not limited to, any Claims, defenses, Causes of Action, and rights of setoff or recoupment (to the extent available), or any rights to allocate responsibility or liability or any other basis for the reduction of (or credit against) any judgment in connection with the Underwriter Actions (collectively, the "<u>Defensive Rights</u>"); <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, in no event shall any Defensive Rights be used to obtain or result in the affirmative payment of money or the affirmative delivery of property to any plaintiff, defendant and, to the extent named, third party defendant by any of the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth in connection with an Underwriter Action; and <u>provided</u>, <u>further</u>, that, no party in the Underwriter Actions, including, without limitation, plaintiffs, defendants, and, to the extent named, third-party defendants, shall be permitted to assert: (i) against the Debtors or the Reorganized Debtors any Claim or Cause of Action for purposes of obtaining an affirmative monetary recovery that otherwise is barred or discharged pursuant to the Bar Date Orders, the Plan, and/or the Confirmation Order; and/or (ii) against the Debtors, the Reorganized Debtors, PREPA, HTA, or any other agency or instrumentality of the Commonwealth any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, for indemnification, contribution, reimbursement, setoff or similar theories, to the extent asserted for purposes of obtaining an affirmative monetary recovery, which Claims or counterclaims shall be deemed disallowed, barred, released and discharged in accordance with the terms and provisions of the Plan and the Confirmation Order; and <u>provided</u>, <u>further</u>, that nothing herein or in the Confirmation Order is intended, nor shall it be construed, to prohibit, preclude, bar, modify, or limit in any way the ability of any defendant in any Underwriter Action to assert Defensive Rights for the purpose of reducing, eliminating, or limiting the amount of any liability or judgment in any Underwriter Action. The parties in the Underwriter Actions shall be permanently barred, enjoined and restrained from commencing, prosecuting, or asserting, against the Debtors, the Reorganized Debtors, PREPA, HTA or any other agency or instrumentality of the Commonwealth any Claims or counterclaims for purposes of obtaining an affirmative monetary recovery, including, without limitation, indemnification, contribution, reimbursement, setoff or similar theories, to the extent asserted for purposes of obtaining an affirmative monetary recovery based upon, arising from or related to the Underwriter Actions, whether or not such Claim or counterclaim is or can be asserted in a court, an arbitration, an administrative agency or forum or in any other manner.

92.3     **Injunction on Claims**:  Except as otherwise expressly provided in the Plan, the
Confirmation Order or such other Final Order of the Title III Court that is applicable, all Entities
who have held, hold or in the future hold Claims or any other debt or liability that is discharged or
released pursuant to Section 92.2 hereof or who have held, hold or in the future hold Claims or any
other debt or liability discharged or released pursuant to Section 92.2 of the Plan are permanently
enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or
indirectly, in any manner, any action or other proceeding (including, without limitation, any
judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt
or liability that is discharged pursuant to the Plan against any of the Released Parties or any of
their respective assets or property, (b) the enforcement, attachment, collection or recovery by any
manner or means of any judgment, award, decree or order against any of the Released Parties or
any of their respective assets or property on account of any Claim or other debt or liability that is
discharged pursuant to the Plan, (c) creating, perfecting, or enforcing any encumbrance of any kind
against any of the Released Parties or any of their respective assets or property on account of any
Claim or other debt or liability that is discharged pursuant to the Plan, and (d) except to the extent
provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or
pursuant to the common law right of recoupment, asserting any right of setoff, subrogation or
recoupment of any kind against any obligation due from any of the Released Parties or any of their
respective assets or property, with respect to any such Claim or other debt or liability that is
discharged pursuant to the Plan.  Such injunction shall extend to all successors and assigns of the
Released Parties and their respective assets and property.  Notwithstanding the foregoing, without
prejudice to the exculpation rights set forth in Section 92.7 hereof and the Confirmation Order,
nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be
a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective
Related Persons by Creditors of Debtors.

92.4     **Integral to Plan**:  Each of the discharge, injunction, exculpation and release
provisions provided in this Article XCII is an integral part of the Plan and is essential to its
implementation.  Each of the Released Parties shall have the right to independently seek the
enforcement of the discharge, injunction and release provisions set forth in this Article XCII.

92.5     **Releases by the Debtors and Reorganized Debtors**:  Except as otherwise
expressly provided in the Plan or the Confirmation Order, on the Effective Date, and for good and
valuable consideration, each of the Debtors and Reorganized Debtors, the Disbursing Agent and
each of the Debtors' and Reorganized Debtors' Related Persons shall be deemed to have and
hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and
discharge the Released Parties from any and all Claims or Causes of Action that the Debtors,
Reorganized Debtors, and the Disbursing Agent, or any of them, or anyone claiming through them,
on their behalf or for their benefit, have or may have or claim to have, now or in the future, against
any Released Party that are Released Claims.

92.6     **Injunction Related to Releases**:  As of the Effective Date, all Entities that hold,
have held, or in the future hold a Released Claim that is released pursuant to Section 92.2 of the
Plan, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred
and enjoined from taking any of the following actions, whether directly or indirectly, derivatively
or otherwise, on account of or based on the subject matter of such discharged Released Claims:

170

(i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under Section 92.5 hereof; and (v) commencing or continuing in any manner, in any place or any judicial, arbitration or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.  For the avoidance of doubt, the following stipulations will terminate upon the entry of the Confirmation Order: the Fourth Amended Stipulation Between the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority Regarding the Tolling of Statute of Limitations and Consent Order [Case No. 173283-LTS, ECF No. 15854], as amended; and the Fourth Amended Stipulation and Consent Order Between Title III Debtors (Other Than COFINA) and the Puerto Rico Fiscal Agency and Financial Advisory Authority Acting on Behalf of the Governmental Entities Listed on Appendix "B" Regarding the Tolling of Statute of Limitations [Case No. 17-3283-LTS, ECF No. 17394], as amended.

> 92.7 **Exculpation:**

>> (a) **Government Parties**:  The Oversight Board, AAFAF, the Debtors, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 92.7 shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.  Nothing in the foregoing provisions of this Section 92.7(a) shall prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each of their respective professionals to assert reliance upon advice of counsel as a defense with respect to their duties and responsibilities under the Plan.

>> (b) **PSA Creditors:**  Each of the PSA Creditors solely in its capacity as a party to the GO/PBA Plan Support Agreement and/or the HTA/CCDA Plan Support Agreement and a Creditor and/or insurer, as applicable, from the relevant Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, or the mediation, negotiation, formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the Definitive Documents, or any other contract, instrument, release or other agreement or document

provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that the foregoing provisions of this Section 92.7(b) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(c)     **Retiree Committee:**  Each of the members of the Retiree Committee, solely in its capacity as a member of the Retiree Committee and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date and each of the Retiree Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, the Retiree Committee Plan Support Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan and the Retiree Committee Plan Support Agreement; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Retiree Committee with respect to the aforementioned actions, such member shall be entitled to be reimbursed for reasonable attorneys' fees and expenses incurred and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order, and, provided, further, that, the foregoing provisions of this Section 92.7(c) shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(d)     **Creditors' Committee:**  Each of the members of the Creditors' Committee, solely in its capacity as a member of the Creditors' Committee, and the Creditors' Committee, from the relevant Petition Date up to and including the Effective Date and each of the Creditors' Committee's Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan or any compromises or settlements contained therein, the Disclosure Statement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan; provided, however, that, notwithstanding the foregoing exculpation, in the event that litigation is commenced against a member of the Creditors' Committee with respect to the aforementioned actions, such member shall be entitled to be reimbursed for reasonable attorneys' fees and expenses incurred and indemnified for any damages awarded, in each case, by the Commonwealth, pursuant to a Final Order, and, provided, further, that, the foregoing provisions of this Section 92.7(d) shall not affect the liability of any Entity that would otherwise result from any such act or omission to the extent such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

(e)     **AFSCME:**  AFSCME, solely in its capacity as a party to the AFSCME Plan Support Agreement and a Creditor, as applicable, from the relevant Petition Date up to and including the Effective Date, and each of its respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Cases, the formation, preparation, dissemination, implementation, confirmation or approval of the

172

Plan or any compromises or settlements contained therein, the Disclosure Statement, the AFSCME
Plan Support Agreement, or any contract, instrument, release or other agreement or document
provided for or contemplated in connection with the consummation of the transaction set forth in
the Plan and the AFSCME Plan Support Agreement; provided, however, that, the foregoing
provisions of this Section 92.7(e) shall not affect the liability of any Entity that otherwise would
result from any such act or omission to the extent that such act or omission is determined in a Final
Order to have constituted intentional fraud or willful misconduct.

(f)      **Monoline Insurers:**  Ambac, Assured, FGIC, National, Syncora, and their
Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be
taken consistent with the Plan or in connection with the formulation, preparation, dissemination,
implementation, acceptance, confirmation, or approval of the Plan, including, without limitation, in
connection with the treatment of Ambac Insured Bond Claims, Assured Insured Bond Claims,
FGIC Insured Bond Claims, National Insured Bond Claims, or Syncora Insured Bond Claims, the
voting procedures, the election procedures, and any release of obligations under the applicable
Ambac Insurance Policies, Assured Insurance Policies, FGIC Insurance Policies, National
Insurance Policies, or Syncora Insurance Policies: provided, however, that, notwithstanding
anything contained herein to the contrary, the terms and provisions of the Plan shall not, and shall
not be construed to, release or exculpate, with respect to any beneficial holder of Ambac Insured
Bonds, Assured Insured Bonds, FGIC Insured Bonds, National Insured Bonds, or Syncora Insured
Bonds any payment obligation under the applicable Ambac Insurance Policy, Assured Insurance
Policy, FGIC Insurance Policy, National Insurance Policy, or Syncora Insurance Policy in
accordance with its terms solely to the extent of any failure of such holder to receive the Ambac
Treatment, Assured Treatment, FGIC Treatment, National Treatment, or Syncora Treatment, as
applicable (or any claims that Ambac, Assured, FGIC, National, or Syncora may have against a
beneficial holder of respective insured bonds with respect to Ambac's, Assured's, FGIC's,
National's or Syncora's applicable obligations under the Ambac Insurance Policies, Assured
Insurance Policies, National Insurance Policies, or Syncora Insurance Policies, as applicable).

92.8      **Appointments Related Litigation/Uniformity Litigation**:  Notwithstanding
anything contained herein to the contrary, in the event that a Final Order is entered in connection
with the Appointments Related Litigation or the Uniformity Litigation subsequent to entry of the
Confirmation Order, in consideration of the distributions made, to be made, or deemed to be made
in accordance with the terms and provisions of the Plan and documents and instruments related
hereto, all Creditors or such other Entities receiving, or deemed to have received, distributions
pursuant to or as a result of the Plan, consent and agree that such Final Order shall not in any way
or manner reverse, affect or otherwise modify the transactions contemplated in the Plan and the
Confirmation Order, including, without limitation, the releases, exculpations and injunctions
provided pursuant to Article XCII of the Plan; provided, however, that, to the extent that a plaintiff
in the Appointments Related Litigation or the Uniformity Litigation is a party to any of the
GO/PBA Plan Support Agreement, the HTA/CCDA Plan Support Agreement, the PRIFA Plan
Support Agreement or the ERS Stipulation, within five (5) Business Days of the Effective Date,
such plaintiff shall take any and all actions to dismiss, with prejudice, or, in the event other
plaintiffs are party to such litigations, withdraw from, with prejudice, such Appointments Related

Litigation or Uniformity Litigation, as the case may be, including, without limitation, filing notices of dismissal or withdrawal with the clerk of court having jurisdiction thereof.

92.9     **Bar Order**:  To the limited extent provided in the Plan, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all Claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the Plan, the negotiation and consummation of the GO/PBA Plan Support Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Title III Cases, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Title III Cases, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted); provided, however, that, without prejudice to the exculpation rights set forth in Section 92.7 hereof and the Confirmation Order, nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.

92.10     **No Waiver**:  Notwithstanding anything to the contrary contained in Sections 92.5 and 92.6 hereof, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized Debtors, the PSA Creditors or the Avoidance Actions Trust to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

92.11     **Supplemental Injunction**:  Notwithstanding anything contained herein to the contrary, except to the limited extent provided in the Plan, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to the Title III Cases or any Claim against the Debtors, whenever and wherever arising or asserted, whether in the United States or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a)     Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

174

(b)     Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)     Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)     Except as otherwise expressly provided in the Plan or the Confirmation Order, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

(e)     Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan or the Confirmation Order, provided, however, that the Debtors' compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code;

provided, however, that, without prejudice to the exculpation rights set forth in Section 92.7 hereof and the Confirmation Order, nothing contained in the Plan or the Confirmation Order is intended, nor shall it be construed, to be a grant of a non-consensual third-party release of the PSA Creditors, AFSCME, and of their respective Related Persons by Creditors of the Debtors.

92.12     **Post-Effective Date Fees and Expenses**:  From and after the Effective Date, Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by Reorganized Debtors related to implementation and consummation of the Plan without further approval from the Title III Court.  Without limiting the foregoing, from and after the Effective Date, Reorganized Debtors shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, but in no event later than forty-five (45) days following the submission of invoices or statements with respect to the incurrence of fees and expenses to the Reorganized Debtors, pay the reasonable and documented fees and reimburse the expenses of the Oversight Board and its professionals related to the implementation and consummation of the Plan and in connection with its duties and responsibilities pursuant to PROMESA and the terms and provisions of the Plan.

92.13     **Securities Act Exemption**:  Pursuant to section 1145 of the Bankruptcy Code and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the New GO Bonds and the CVIs pursuant to the terms hereof shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

175

92.14    **Severability**:  Subject to the terms and provisions of the GO/PBA Plan Support Agreement, the Committee Agreement, and Section 3.7 hereof, if, prior to the Confirmation Date, (a) any term or provision of the Plan shall be held by the Title III Court to be invalid, void or unenforceable, the Title III Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted or (b) the Oversight Board determines to modify or amend the Plan, including, without limitation, to remove a Debtor (other than the Commonwealth and PBA) from the treatments set forth in the Plan, the Plan provisions applicable thereto shall be deemed severed and to be of no force or effect.

92.15    **Governing Law**:  Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under Section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

92.16    **Closing Case**:  The Oversight Board shall, promptly upon the full administration of the Title III Cases, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court.  Notwithstanding the closing of the Title III Cases, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XCI of the Plan.

92.17    **Section Headings**:  The section headings contained in this Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

92.18    **Inconsistencies**:  To the extent of any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the Plan, the terms and provisions contained herein shall govern and (b) the terms and provisions of the Plan and the terms and provisions of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and be deemed a modification of the Plan; provided, however, that under no circumstances shall the Confirmation Order modify the economic terms set forth herein absent consent of the Oversight Board.

92.19    **Document Retention**:  From and after the Effective Date, the Debtors may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors.

92.20    **Immediate Binding Effect**:  Pursuant to section 944(a) of the Bankruptcy Code, applicable to the Title III Cases pursuant to Section 301 of PROMESA, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all holders of Claims and their respective successors and assigns, whether or not the Claim of any such holder is impaired under the Plan and whether or not such holder has accepted the Plan.  The releases, exculpations, and settlements effected under the Plan shall be operative, and subject to enforcement by the Title III Court, from and after the

Effective Date, including pursuant to the injunctive provisions of the Plan. Once approved, the compromises and settlements embodied in the Plan, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan must (a) challenge such compromise and settlement prior to confirmation of the Plan and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

92.21 **Additional Documents**: On or before the Effective Date, the Oversight Board may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all holders of Claims receiving distributions pursuant to the Plan and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

92.22 **Reservation of Rights**: Except as expressly set forth herein, the Plan shall have no force or effect unless the Title III Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims prior to the Effective Date. Except as expressly set forth herein, the rights and powers of the government of Puerto Rico under the Commonwealth Constitution and PROMESA, including, without limitation, under Sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation thereon imposed by the Commonwealth Constitution, the U.S. Constitution or PROMESA), and nothing herein shall be deemed a waiver of any such rights and powers.

92.23 **Successors and Assigns**: Except as expressly provided otherwise in the Plan, the rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

92.24 **Notices**: All notices, requests to, demands or other document(s) required by the Plan or the Confirmation Order to be served on or delivered to the Oversight Board, the Debtors or AAFAF to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:


If to the Oversight Board, to:       Financial Oversight and Management Board for Puerto Rico
                                     268 Muñoz Rivera Ave, Suite 1107

San Juan, PR 00918-1813
Attn:  Natalie A. Jaresko, Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:  Martin J. Bienenstock, Esq.
        Brian S. Rosen, Esq.
Tel:  (212) 969-3000
Fax:  (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn:  Hermann Bauer, Esq.
Tel:  (787) 764-8181
Fax:  (212) 753-8944

If to the Debtors, to:               The Commonwealth of Puerto Rico
c/o Fiscal Agency and Financial Advisory Authority
Roberto Sánchez Vilella (Minillas) Government Center
De Diego Ave. Stop 22
San Juan, Puerto Rico 00907
Attn: Office of the Executive Director

– with a copy to –

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:  Martin J. Bienenstock, Esq.
         Brian S. Rosen, Esq.
Tel:  (212) 969-3000
Fax:  (212) 969-2900

– and –

O'NEILL & BORGES LLC
250 Muñoz Rivera Ave, Suite 800
San Juan, PR 00918-1813
Attn:  Hermann Bauer, Esq.
Tel:  (787) 764-8181
Fax:  (212) 753-8944

– and –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn:  John Rapisardi, Esq.
        Peter Friedman, Esq.
        Maria J. DiConza, Esq.
Tel:  (212) 326-2000
Fax:  (212) 326-2061

If to AAFAF, to:                Fiscal Agency and Financial Advisory Authority
                                Roberto Sánchez Vilella (Minillas) Government Center
                                De Diego Ave. Stop 22
                                San Juan, Puerto Rico 00907

                                – with a copy to –

                                O'MELVENY & MYERS LLP
                                Seven Times Square
                                New York, NY 10036
                                Attn:  John Rapisardi, Esq.
                                        Peter Friedman, Esq.
                                        Maria J. DiConza, Esq.
                                Tel:  (212) 326-2000
                                Fax:  (212) 326-2061

92.25    **Term of Injunctions or Stays**:  Unless otherwise provided herein or in the
Confirmation Order, all injunctions or stays in effect in the Title III Cases (pursuant to
sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing
on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the
Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions
or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in
accordance with their terms.

92.26    **Entire Agreement**:  Except as otherwise indicated, the Plan supersedes all
previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and
representations on such subjects, all of which have become merged and integrated into the Plan.

92.27    **Plan Supplement**:  All documents included in the Plan Supplement are
incorporated into and are a part of the Plan as if set forth in full in the Plan.  Upon the filing of the
Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein
shall be made available upon written request to the Oversight Board's counsel at the address above
or by downloading such documents from https://cases.primeclerk.com/ puertorico/ or the Title III
Court's website, available via PACER.  Unless otherwise ordered by the Title III Court, to the
extent any document in the Plan Supplement is inconsistent with the terms of any part of the Plan
that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan
Supplement shall control; provided, however, that, with respect to matters governed by the New
GO Bonds Indenture or the CVI Indenture, to the extent that any provisions of the Plan are
inconsistent with the New GO Bonds Indenture or the CVI Indenture, the New GO Bonds
Indenture or the CVI Indenture, as the case may be, shall control.

Dated: San Juan, Puerto Rico
January 14, 2021

THE COMMONWEALTH OF PUERTO RICO, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ Natalie A. Jaresko
  Name: Natalie A. Jaresko
  Title: Executive Director

EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ Natalie A. Jaresko
  Name: Natalie A. Jaresko
  Title: Executive Director

PUERTO RICO PUBLIC BUILDINGS AUTHORITY, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By: /s/ Natalie A. Jaresko
  Name: Natalie A. Jaresko
  Title: Executive Director

**EXHIBIT A**

SCHEDULE OF AVOIDANCE ACTIONS

Remaining Adversary Vendors

| Vendor Name | Vendor Type | Adversary Proceeding No. |
|---|---|---|
| ALEJANDRO ESTRADA MAISONET | Adversary | 19-00059 |
| AMBASSADOR VETERANS SERVICES OF PR LLC | Adversary | 19-00048 |
| APEX GENERAL CONTRACTORS | Adversary | 19-00062 |
| BIO NUCLEAR OF P R INC | Adversary | 19-00091 |
| BRISTOL /MYERS SQUIBB P R INC | Adversary | 19-00042 |
| CARIBBEAN EDUCATIONAL SERVICES INC | Adversary | 19-00098 |
| CARIBE GROLIER INC | Adversary | 19-00051 |
| CCHPR HOSPITALITY, INC | Adversary | 19-00116 |
| CENTRO DE DESARROLLO ACADEMICO INC. | Adversary | 19-00053 |
| CITIBANK N A | Adversary | 19-00265 |
| CLINICA DE TERAPIAS PEDIATRICA | Adversary | 19-00054 |
| COMMUNITY CORNESTONE OF P R | Adversary | 19-00043 |
| COMPUTER LEARNING CENTERS, INC. | Adversary | 19-00055 |
| COMPUTER NETWORK SYSTEMS CORP | Adversary | 19-00150 |
| Core Laboratories N.V. d/b/a Saybolt | Adversary | 19-00381 |
| CREATIVE EDUCATIONAL & PSYCHOLOGICAL SER | Adversary | 19-00152 |
| DIDACTICOS, INC. | Adversary | 19-00161 |
| DISTRIBUIDORA LEBRON | Adversary | 19-00167 |
| Ecolift Corp. | Adversary | 19-00172 |
| EDWIN CARDONA & ASOC | Adversary | 19-00056 |
| EMPRESAS ARR INC | Adversary | 19-00084 |
| ENTERPRISE SERVICES CARIBE LLC | Adversary | 19-00060 |
| EVERTEC INC | Adversary | 19-00044 |
| EXPLORA CENTRO ACADEMICO Y TERAPEUTICO | Adversary | 19-00143 |
| FACSIMILE PAPER CONNECTION CORP | Adversary | 19-00092 |
| FAST ENTERPRISES LLC | Adversary | 19-00266 |
| FIRST HOSPITAL PANAMERICANO | Adversary | 19-00093 |
| FP+1,LLC | Adversary | 19-00148 |
| GF SOLUTIONS, INC. | Adversary | 19-00063 |
| GIRARD MANUFACTURING INC DBA/BANCO DE | Adversary | 19-00103 |
| GM SECURITY TECHNOLOGIES | Adversary | 19-00273 |
| GREAT EDUCATIONAL SERVICE, CORP. | Adversary | 19-00277 |
| GUIMERFE INC | Adversary | 19-00182 |
| HEWLETT PACKARD PR BV | Adversary | 19-00183 |
| HOSPIRA | Adversary | 19-00186 |
| I.D.E.A. INC. | Adversary | 19-00268 |
| INSTITUCION EDUCATIVA NETS, LLC | Adversary | 19-00067 |
| INTERNATIONAL SURVEILLANCE SERV CORP | Adversary | 19-00202 |
| INTERVOICE COMMUNICATIONS OF PR INC | Adversary | 19-00068 |
| JOSE SANTIAGO INC | Adversary | 19-00075 |
| JUNIOR BUS LINE, INC. | Adversary | 19-00229 |

A-2

| L.L.A.C., INC. | Adversary | 19-00122 |
|---|---|---|
| LAW OFFICES WOLF POPPER, INC | Adversary | 19-00236 |
| MACAM S.E. | Adversary | 19-00255 |
| MANAGEMENT, CONSULTANT & COMPUTER SERV | Adversary | 19-00081 |
| MANPOWER | Adversary | 19-00088 |
| MERCK SHARP & DOHME | Adversary | 19-00276 |

Remaining Adversary Vendors

| Vendor Name | Vendor Type | Adversary Proceeding No. |
|---|---|---|
| MICHICA INTERNATIONAL CO INC | Adversary | 19-00238 |
| MICROSOFT CORPORATION | Adversary | 19-00290 |
| N. HARRIS COMPUTER CORPORATION | Adversary | 19-00102 |
| NATIONAL COPIER | Adversary | 19-00251 |
| NELSON D. ROSARIO GARCIA | Adversary | 19-00125 |
| NETWAVE EQUIPMENT CORP | Adversary | 19-00253 |
| NEXT LEVEL LEARNING, INC | Adversary | 19-00129 |
| ORACLE CARIBBEAN INC | Adversary | 19-00112 |
| PCPS - Professional Consulting Psychoeducational Services, LLC | Adversary | 19-00188 |
| PERFECT CLEANING SERVICES INC | Adversary | 19-00249 |
| POSTAGE BY PHONE RESERVE ACCOUNT | Adversary | 19-00181 |
| PROSPERO TIRE EXPORT INC | Adversary | 19-00196 |
| Puerto Nuevo Security Guard | Adversary | 19-00384 |
| PUERTO RICO SUPPLIES GROUP INC | Adversary | 19-00199 |
| PUERTO RICO TELEPHONE COMPANY | Adversary | 19-00127 |
| QUEST DIAGNOSTICS | Adversary | 19-00440 |
| Ready & Responsible Security, Inc | Adversary | 19-00387 |
| REYES CONTRACTOR GROUP | Adversary | 19-00220 |
| RICARDO ESTRADA MAISONET | Adversary | 19-00227 |
| ROCK SOLID TECHNOLOGIES INC | Adversary | 19-00230 |
| ROCKET LEARNING INC | Adversary | 19-00232 |
| ROCKET TEACHER TRAINING | Adversary | 19-00235 |
| RODRIGUEZ PARISSI VAZQUEZ & CO PCS | Adversary | 19-00155 |
| ROSSO GROUP INC | Adversary | 19-00239 |
| S H V P MOTOR CORP | Adversary | 19-00134 |
| SEGUROS COLON INC | Adversary | 19-00130 |
| SESCO TECHNOLOGY SOLUTIONS LLC | Adversary | 19-00162 |
| ST. JAMES SECURITY SERVICES, INC. | Adversary | 19-00145 |
| TACTICAL EQUIPMENT CONSULTANTS INC | Adversary | 19-00222 |
| TALLER DESARROLLO INFANTIL CHIQUIRIMUNDI | Adversary | 19-00049 |
| Total Petroleum Puerto Rico Corp. | Adversary | 19-00114 |
| TRANSPORTES SONNEL INC | Adversary | 19-00149 |
| TRINITY METAL ROOF AND STEEL STRUC CO | Adversary | 19-00187 |
| TRUENORTH CORP | Adversary | 19-00160 |
| WF COMPUTER SERVICES | Adversary | 19-00200 |
| XEROX CORPORATION | Adversary | 19-00218 |

A-4

# EXHIBIT B

SCHEDULE OF AFFIRMATIVE RECOVERY ACTIONS

Special Claims Committee v. Barclays Capital, et al., Adv. Proc. No. 19-00280-LTS, currently pending in the Title III Court

# EXHIBIT C

SCHEDULE OF INVALIDITY ACTIONS

**Invalidity Actions**

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the
Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Jefferies LLC,
Adv. Proc. No. 19-00281

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the
Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. BNY
Mellon/POP Sec, Adv. Proc. No. 19-00282

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the
Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. First Southwest
Co., Adv. Proc. No. 19-00283

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the
Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1E-
59E , Adv. Proc. No. 19-00284

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the
Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1A-
100A, Adv. Proc. No. 19-00285

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the
Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1B-
100B, Adv. Proc. No. 19-00286

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the
Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1C-
53C, Adv. Proc. No. 19-00287

The Special Claims Comm. Of the Fin. Oversight and Mgmt Board of for Puerto Rico and the
Official Comm. of Unsecured Creditors of the Commonwealth of Puerto Rico v. Defendants 1D-
73D, Adv. Proc. No. 19-00288

**EXHIBIT D**

SCHEDULE OF LIEN CHALLENGE ACTIONS

**Lien Challenge Actions**

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Autonomy Master Fund Ltd., Adv. Proc. No. 19-00291

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Cooperativa de Ahorro t Credito de Rincon, Adv. Proc. No. 19-00292

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Ortiz de la Renta, Adv. Proc. No. 19-00293

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Martinez Sanchez, Adv. Proc. No. 19-00294

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Valdivieso, Adv. Proc. No. 19-00295

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Friedman, Adv. Proc. No. 19-00296

The Financial Oversight and Management Board of Puerto Rico, as Representative of Commonwealth of Puerto Rico, et al., and the Official Committee of Unsecured Creditors of All Title III Debtors (Other Than COFINA) v. Blackrock Fin. Mgmt., Adv. Proc. No. 19-00297

**EXHIBIT E**

MODIFICATIONS TO JRS PENSION BENEFITS

## MODIFICATIONS FOR JRS CLAIMS

The following is a summary of modifications with respect to outstanding benefits of the Judiciary Retirement System for the Commonwealth of Puerto Rico ("JRS") as it applies to judges serving without a fixed tenure. The modifications listed herein modify the benefits provided by JRS as established in Act 12-2954 and all subsequent amendments through the Plan Effective Date and are to be adhered to in the administration of JRS benefits by the Retirement Board. Administrative procedures not addressed below (such as rounding procedures in determining ages and service of participants) should be consistent with past practices.

JRS members hired (a) prior to July 1, 2014 are currently accruing benefits under a defined benefit ("DB") formula and (b) on or after July 1, 2014 are currently accruing benefits pursuant to an alternative DB formula and paired with a hybrid formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the JRS plan benefit accrual shall be modified. In doing so, JRS members will retain the benefits they have accrued up to and including the Effective Date, as defined in the Plan; provided, however, that any future cost of living adjustments are eliminated pursuant to the Plan, as any right to such future adjustments is not an accrued benefit and will not be an accrued benefit as of the Effective Date. Benefits accrued from and after the Effective Date shall be based on contributions and earnings in new segregated DC retirement accounts funded by employee contributions. As a result, employees will have the certainty that their contributions and investment returns will be safeguarded for the future, ensuring retirement security.

| Definitions | |
|---|---|
| **Pension System** | The terms of this document and references to Pension System pertain to the freeze of pension obligations of JRS members. |
| **Retirement Eligibility Age** | The age at which a member may commence receipt of a monthly pension benefit. |
| **Freeze Date** | The Effective Date. |
| **Retirement Benefit** | The amount of benefit payable to a JRS member each month. |
| **Creditable Service** | For purposes of calculating Creditable Service, the years and months (where fractional months are counted as full months of service) begin on the Credit Date. Years and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |
| **Credit Date** | The Credit Date for JRS members hired on or after July 1, 2014, is the date of appointment as a judge, and for all other JRS members shall be the date first employed by the Government of Puerto Rico (provided that |

| Definitions | |
|---|---|
| | accumulated contributions for prior government service are transferred to the Pension System). |
| **Highest Salary** | The highest salary received as a judge. Compensation earned after the effective date of the freeze will not be considered. (Applicable for JRS members hired prior to July 1, 2014) |
| **Average Compensation** | The average of the last sixty (60) months of salary that a JRS member has received for Creditable Service. (Applicable for JRS members hired on or after July 1, 2014) |
| **Hybrid Account** | The notional individual account established for each new JRS member on or after July 1, 2014. Such accounts shall be credited with JRS member contributions and interest through the Freeze Date. |
| **Defined Contribution Account** | New accounts to be credited with JRS member contributions and interest in conjunction with the Act 106-2017 defined contribution ("DC") plan, to be established effective as of the Effective Date for JRS members, in connection with the freeze of the JRS pension. |
| **Basic Retirement Eligibility Age** | Age at which the JRS member attains age sixty (60) and ten (10) years of Creditable Service. (Applicable for JRS members hired prior to July 1, 2014) |
| **Optional Retirement Eligibility Age** | For judges with at least eight (8) years of Creditable Service as a judge, the attainment of either: <br><br> a.  Thirty (30) years of total Creditable Service, or <br><br> b.  Age fifty-five (55) with eighty-two (82) combined years of age plus Creditable Service ("Points") <br><br> (Applicable for JRS members hired prior to July 1, 2014) |

| Timing | |
|---|---|
| **Pension Freeze** | JRS pension benefit accrual freeze becomes effective as of the Effective Date. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits that would have been earned under and paid by the plan on or after the Freeze Date. |

E-3

| Provisions of the Modification | |
|---|---|
| **Freeze of Benefit Accruals and Implementation of DC Account** | Accrued benefits frozen as of Freeze Date. New DC account balances shall be funded with employee contributions to be established in connection with the freeze. The minimum employee contribution shall be eight and one-half percent (8.5%), as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Retirement Eligibility Enhancement If Within Six (6) Months of Unreduced Retirement Eligibility** | For JRS members hired prior to July 1, 2014, if not already eligible for retirement as of the freeze, JRS members hired prior to July 1, 2014 will be permitted to grow into eligibility for retirement provided the JRS member reaches any of the following within six (6) months of the Freeze Date:<br><br>a.    Basic Retirement Eligibility Age,<br>b.    Optional Retirement Eligibility Age, or<br>c.    Attainment of 20 years of creditable service |
| **Delay in Retirement Eligibility for All Others** | For individuals hired prior to July 1, 2014 who do not meet the criteria listed above, retirement eligibility is delayed up to three (3) years. Retirement is also delayed for terminated JRS members that have not yet commenced. Specific implications on retirement eligibility is described in detail below in the "More detailed provisions of the Modifications" section. |
| **Elimination of Cost-of-Living Adjustment (COLA)** | The statutory three percent (3%) COLA which has been granted every three (3) years since 2002 will be eliminated for all JRS members effective as of the Freeze Date. |
| **Freezing of Certain Bonuses** | Christmas, Summer and Medicine bonus will no longer be paid to JRS members who retire after the Freeze Date. Further, the Medical Insurance Plan contribution will also be eliminated for retirements taken after the Freeze Date. |
| **Elimination of Enhanced Disability Benefits** | JRS members terminating due to disability on or after the Freeze Date will be eligible for the same benefits as other terminated JRS members. |
| **Elimination of Occupational and One Year of Salary Death Benefits for** | Terminations due to death would be eligible for a refund of accumulated contributions. |

| Provisions of the Modification | |
|---|---|
| **Future in-Service Deaths** | |
| **Elimination of Free Post-Retirement Death Benefit** | The normal form of payment for annuity benefit provided for future retirements will be a single life annuity. JRS members will be able to elect a joint and survivor benefit that will be the actuarial equivalent benefit to the normal form of payment. |

| More detailed provisions of the Modifications | |
|---|---|
| **Specific Implications on Retirement Eligibility Age if Hired Prior to July 1, 2014** | A. JRS members who are eligible to retire prior to the Freeze Date will continue to be eligible to retire at any time.<br><br>B. JRS members who would attain either any of the following on or prior to the date that is six (6) months following the Freeze Date had service continued to accrue past the Freeze Date will continue to be eligible to retire at any time:<br><br>a. Basic Retirement Eligibility Age<br>b. Optional Retirement Eligibility Age<br>c. Attainment of 20 years of Creditable Service<br><br>C. JRS members who are not eligible to retire as of the Freeze Date and will not meet the criterion listed in B. above as of six (6) months after the Freeze Date will be eligible to retire upon the date the JRS member would have attained ten (10) years of Creditable Service had the freeze not occurred and reaching the ages shown in the following table:<br><br><table><tr><th>Attained Age as of the Freeze Date</th><th>Retirement Eligibility Age Six Months After the Freeze Date</th></tr><tr><td>57 and up</td><td>61</td></tr><tr><td>56</td><td>62</td></tr><tr><td>55 or under</td><td>63</td></tr></table> |
| **Specific Implications on Retirement Benefit if Hired Prior to July 1, 2014** | **Retirements on or before the date that is six (6) months following the Freeze Date:**<br><br>A. If a JRS member attains the Optional Retirement Eligibility Age, the benefit payable will be equal to seventy-five percent (75%) of Highest Salary (sixty percent (60%) of Highest Salary if hired after December 24, 2013).<br><br>B. If a JRS member attains the Basic Retirement Eligibility Age, but has not yet attained the Optional Retirement Eligibility Age, the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five |

| More detailed provisions of the Modifications |
|---|

percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

C.  If a JRS member has attained age seventy (70) with fewer than ten (10) years of Creditable Service at retirement, the benefit payable is twenty-five percent (25%) of Highest Salary, pro-rated for each year of Creditable Service less than ten (10).

D.  If a JRS member has attained at least twenty (20) years of Creditable Service, but has not attained either the Basic Retirement Eligibility Age or the Optional Retirement Eligibility Age, the benefit payable is twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary sixty percent (60%) of highest salary if hired after December 24, 2013), actuarially reduced to current retirement age from the earlier of the date the JRS member would have attained either age sixty (60) or the Optional Retirement Eligibility age based on their service at retirement.

**Retirements after Six Months After the Freeze Date:**

A.  If a JRS member has attained Optional Retirement Eligibility as of the Freeze Date (or would have attained Optional Retirement Eligibility by the date that is six (6) months after the Freeze Date), the benefit payable equals seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

B.  If a JRS member has attained Basic Retirement Eligibility as of the Freeze Date (or would have attained Basic Retirement Eligibility as of the six (6) month anniversary of the Freeze Date), the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).

C.  If a JRS member has attained at least twenty (20) years of Creditable Service as of the Freeze Date (or would have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date) and the JRS member has attained at least seven and one-half years (7.5) of Creditable Service as a judge on the Freeze Date, the benefit payable equals seventy five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013) actuarially reduced to the benefit commencement date from the earlier of the date the JRS member would have attained

| More detailed provisions of the Modifications | |
|---|---|
| | either age sixty (60) and the Optional Retirement Eligibility Age based on their service as of the Freeze Date.<br><br>D.    If a JRS member has attained at least twenty (20) years of Creditable Service as of the Freeze Date (or would have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date) and the JRS member has not attained at least seven and one-half years (7.5) of Creditable Service as a judge on the Freeze Date, the benefit payable equals seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013) actuarially reduced to the benefit commencement date from age sixty (60).<br><br>E.    If a JRS member has attained at least ten (10) years of Creditable Service as of the Freeze Date and would not have attained at least twenty (20) years of Creditable Service as of the six (6) month anniversary of the Freeze Date, the benefit payable equals twenty-five percent (25%) of Highest Salary, plus five percent (5%) of Highest Salary for each year of Creditable Service above ten (10) with a maximum of seventy-five percent (75%) of Highest Salary (sixty percent (60%) of highest salary if hired after December 24, 2013).<br><br>F.    If a JRS member has not attained at least ten (10) years of Creditable Service at the Freeze Date, and retires after the date the participant would have earned ten (10) years of service had the freeze not occurred the benefit payable equals twenty-five percent (25%) of Highest Salary, pro-rated for each year of Creditable Service less than ten (10). |
| **Specific Implications on Retirement Eligibility Age if Hired on or After July 1, 2014** | A.    JRS members that are eligible to retire or would have been eligible to retire prior to the date six (6) months after the Freeze Date will remain eligible to retire at any time.  Current eligibility is attainment of age fifty-five (55) with twelve (12) years of Creditable Service.<br><br>B.    JRS members who would not meet retirement eligibility by the date six (6) months after the Freeze Date will become retirement eligible upon attainment of age sixty-five (65) with twelve (12) years of Creditable Service. |
| **Specific Implications on Retirement Benefit Amount if Hired on or After July 1, 2014** | A.    JRS members will continue to receive a benefit of one and one-half percent (1.5%) of Average Compensation plus the annuitized value of the balance of the Hybrid Account at the time of retirement.<br><br>B.    JRS members who would have attained retirement eligibility prior to the date six (6) months after the Freeze Date and who have not yet attained age sixty (60) will receive a benefit of one and one-half |

| More detailed provisions of the Modifications | |
|---|---|
| | percent (1.5%) of Average Compensation reduced by 1/180 for each of the first sixty months (60) months and by 1/360 for each of the next sixty (60) months by which the retirement date precedes age sixty-five (65), plus the annuitized value of the Hybrid Account. |
| **Implications for Judges serving without fixed tenure and appointed prior to June 28, 2007** | Judges serving without a fixed tenure and appointed prior to June 28, 2007 will receive the benefit they had accrued as of the Freeze Date, calculated based on the Creditable Service and Salary earned prior to the Plan Effective Date and otherwise under the provisions in effect prior to the Freeze Date. As these judges have been identified as having been eligible for retirement and are fully accrued in their plan benefit as of the Freeze Date, the only limitation will be that the Salary used for calculating the benefit will be limited to those earnings prior to the Plan Effective Date. |
| **Social Security** | The Oversight Board and the Government will take appropriate actions to provide that all members hired after the Freeze Date and all judges under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current judges 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis, and will use reasonable efforts to provide that such enrollment in Social Security for such members will be effective as of the Freeze Date or as soon as practicable thereafter. Enrollment in Social Security is defined as the remittance of employee and employer Social Security payroll taxes such that they are reported and creditable to Social Security.

Elections by current judges 45 and older to enroll must be completed within the sixty (60) days after the Effective Date. By default, current judges age 45 or older will be assumed to have opted out of Social Security coverage.

For JRS members enrolled in Social Security, the minimum employee contribution of 8.5% to the DC Accounts will be reduced to 2.3%, to adjust for the 6.2% Social Security withholding. |

**EXHIBIT F-1**

MODIFICATIONS TO TRS PENSION BENEFITS
(WITHOUT AMPR PSA)

## MODIFICATIONS FOR FREEZE OF TRS BENEFIT OBLIGATIONS[1]

The following is a summary of modifications with respect to a freeze of pension benefits accrued under the TRS. The modifications listed herein modify the benefits provided by TRS as established in Act 218-1951 and all subsequent amendments through the Plan Effective Date (including but not limited to Act 91-2004, Act 160-2013, and Act 106-2017) and are to be adhered to in the administration of TRS benefits by the Retirement Board. Administrative procedures not addressed below (such as rounding procedures in determining ages and service of participants) should be consistent with past practices.

TRS members hired prior to August 1, 2014, are currently accruing benefits under a defined benefit ("DB") formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the TRS plan benefit accrual shall be frozen as of the Effective Date of the Plan (the "Freeze Date") Such freeze shall apply to all members of TRS, regardless of title or job classification. TRS members will retain the benefits they have accrued to date, provided that any future cost of living adjustments, which are not accrued benefits and will not be accrued benefits as of the Effective Date, shall be eliminated as of the Effective Date. Future benefits shall be based on contributions and earnings in new segregated defined contribution ("DC") retirement accounts funded by employee contributions. As a result, employees will have the certainty that their contributions and investment returns will be safeguarded for the future, ensuring retirement security.

| Definitions | |
|---|---|
| **Pension System** | The terms of this document and references to Pension System pertain to the freeze of pension obligations of TRS members. |
| **Retirement Eligibility Age** | The age at which a member may commence receipt of a monthly pension benefit. |
| **Retirement Benefit** | The amount of benefit payable to a member each month. |
| **Creditable Service** | The years and months of plan participation, during which contributions have been made, beginning on the date of the first original appointment for rendering services. For purposes of calculating Creditable Service, fifteen (15) calendar days of a school year month shall be equal to one (1) calendar month worked during the school year for teachers; and twenty-one (21) calendar days of a month shall be equal to one (1) calendar month worked for all other members. Days and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |

---

[1] Milliman actuarial valuation report as of June 30, 2017, using July 1, 2016, Census data collection, which is the latest dataset currently available. If a new dataset from 2017 or 2018 becomes available, the values will be updated accordingly.

| Definitions | |
|---|---|
| **Average Compensation** | The average of the thirty-six (36) highest months of compensation that the member has received for Creditable Service. Compensation earned after the effective date of the freeze will not be considered. |
| **Defined Contribution Account** | New accounts to be established as soon as administratively feasible and effective after the Freeze Date for members hired prior to August 1, 2014, in connection with the freeze of the DB formula. |

| Timing | |
|---|---|
| **Pension Freeze** | TRS pension benefit accrual freeze shall become effective on the Freeze Date. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits that would have been earned under and paid by the plan on or after the Freeze Date. |

| Provisions of the Modification | |
|---|---|
| **Freeze of Benefit Accruals and Implementation of DC Account** | Accrued benefit frozen as of Freeze Date, as noted below. New DC account balances to be funded with employee contributions will be established in connection with the freeze. The minimum employee contribution shall be 8.5%, as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Delay in Retirement Eligibility for Members not yet Eligible** | For members hired prior to August 1, 2014, who are not eligible for retirement at the Freeze Date, retirement eligibility is delayed three (3) years. Retirement is also delayed for terminated members that have not yet commenced. Specific implications on retirement eligibility is described in detail below in the "More detailed provisions of the Modifications" section. |
| **Elimination of Minimum Benefit** | The $400 monthly minimum benefit for members hired before August 1, 2014, will be eliminated for members retiring on or after the Freeze Date. |
| **Elimination of Service Purchase** | Active members hired prior to August 1, 2014, with eligible service from prior employment have been able elect to purchase service in TRS. This has been accomplished via transfer of assets or through contributions payable by the member. This provision will eliminate future service purchases on or after the Freeze Date. Service purchased through a payment plan will be granted for payments made up to the Freeze Date. |

F-2

| Provisions of the Modification | |
|---|---|
| **Elimination of Enhanced Disability Benefits** | Active members hired prior to August 1, 2014 who terminate employment due to disability have been able to receive an immediate monthly benefit equal to the unreduced accrued benefit of 1.8% of Average Compensation per year of Creditable Service. Terminations due to disability on or after the Freeze Date will be eligible for the same benefits as other terminated participants (i.e., deferred retirement benefits without enhancement). |
| **Suspension of Benefits** | Retirees from TRS who are in receipt of pension benefits that return to the Department of Education or a charter school as a teacher will have their pension benefits suspended during their reemployment. |
| **Defined Contribution Transfer from Prior Plans** | After the Freeze Date, active new hires with pension benefits eligible for rollover from a previous employer will be subject to the provisions of the Act 106 DC plan regarding the to transfer these amounts to their DC Account.. |

| More Detailed Provisions of the Modification | |
|---|---|
| **Specific Implications on Retirement Eligibility Age if Hired Prior to August 1, 2014** | A.     Members who meet the following age and service combinations prior to the Freeze Date, will continue to be eligible to retire at any time:<br><br>a.     At least age 60 with at least ten (10) years of Creditable Service<br>b.     At least age 47 with at least twenty-five (25) years of Creditable Service<br><br>B.     Members who are not eligible to retire as of the Freeze Date, will be eligible to retire upon attaining ten (10) years of Creditable Service and reaching the age 63. |
| **Specific Implications on Retirement Benefit if Hired Prior to August 1, 2014** | **Retirements on or after the Freeze Date:**<br><br>Minimum benefits will no longer apply to future retirees.<br><br>The freeze also eliminates accelerated payment of benefits due to future disabilities and the ability to purchase additional service.<br><br>A.     If a member is at least age 50 and has attained at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals seventy-five percent (75%) of Average Compensation as of the Freeze Date. |

F-3

| More Detailed Provisions of the Modification | |
|---|---|
| | B.     If a member is under age 50 and has attained at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals sixty-five percent (65%) of Average Compensation as of the Freeze Date.<br><br>C.     If a member is at least age 50 as of the Freeze Date and does not attain at least thirty (30) years of Creditable Service as of the Freeze Date, the accrued benefit equals 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date.<br><br>D.     If a member is under age 50 as of the Freeze Date and does not attain at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals ninety-five percent (95%) of 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |

| Miscellaneous | |
|---|---|
| **Social Security** | The Oversight Board and Government will take appropriate actions to provide that all members hired after the Freeze Date and all teachers under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current teachers 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis, and will use reasonable efforts to provide that such enrollment in Social Security for such members will be effective as of the Freeze Date or as soon as practicable thereafter. Enrollment in Social Security is defined as the remittance of employee and employer Social Security payroll taxes such that they are reported and creditable to Social Security. AFT, AMPR and AMPR-LS will take appropriate actions to support efforts by the Commonwealth and its agents to enroll in Social Security within sixty (60) days of the Effective Date all members who are eligible to accrue Social Security credits; those members age 45 and older may choose whether to enroll.<br><br>Elections by current teachers 45 and older to enroll must be completed within the 60 days after the Effective Date of the Plan of Adjustment. By default, current teachers age 45 or older will be assumed to have opted out of Social Security coverage.<br><br>For TRS members enrolled in Social Security, the minimum employee contribution of 8.5% to the DC Accounts will be reduced to 2.3%, to adjust for the 6.2% Social Security withholding. |

F-4

Case 17-03283-LTS Doc#20955-13 Filed 02/07/23 Entered 02/07/22 18:56:41 Desc Main
Document Plan Page 572 of 665

## EXHIBIT F-2

**SUMMARY OF SUPPLEMENTAL MODIFICATIONS TO TRS PENSION BENEFITS
AND COLLECTIVE BARGANING AGREEMENT WITH AMPR PSA**

# APPENDIX I

## MODIFICATIONS TO AFT COLLECTIVE BARGAINING AGREEMENTS

The following is a summary of material terms included in the new collective bargaining agreement (the "AFT Operative CBA") between AFT and the Commonwealth. For the duration of the AFT Operative CBA, there shall be no changes in base pay, other compensation, leaves, holidays, or benefits without the express written agreement of AFT, AMPR and AMPR-LS. Nothing contained herein shall prohibit changes to the AFT Operative CBA by mutual written agreement of the unions, the FOMB, and the Department.

| Definitions | |
| --- | --- |
| Administration | The management for the division (agency/grouping) in which the employee is assigned. |
| Department | The division (agency/grouping) in which the employee is assigned (Department of Education). |
| Union Affiliates | ▪ American Federation of Teachers ("AFT"),<br>▪ Asociacion de Maestros de Puerto Rico ("AMPR"),<br>▪ Asociacion de Maestros de Puerto Rico -Local Sindical ("AMPR-LS") |

| Timing | |
| --- | --- |
| Terms | Five (5) year CBA effective as of the effective date of the Commonwealth Plan. AFT Operative CBA start date will be retroactive to the beginning (i.e. July 1) of the Commonwealth Fiscal Year in which the POA becomes effective. Final version of the AFT Operative CBA will be attached to the contemplated plan support agreement among AFT, AMPR, AMPR-LS, and the Oversight Board.. |
| Implementation | Commonwealth Plan of Adjustment |

| More Detailed Provisions of the Proposal | |
| --- | --- |
| Healthcare plan / Medical services | The Administration shall cover the cost of Basic Coverage, equal to $170.00 per month or such greater amount that the Administration may lawfully authorize, including Pharmacy services and all employees, including transitory employees, regardless of marital status or relationship, shall be entitled to the contribution. The Administration shall recognize a single employer contribution per employee. |

F-6

| More Detailed Provisions of the Proposal | |
|---|---|
| Sick leave | **Section 1** When a member of the Appropriate Unit covered by the Operative CBA is using his / her sick leave, he / she shall be entitled to the accrual of regular and sick leave for the time that he / she is enjoying sick leave, as long as he / she is reinstated to his / her job once such enjoyment is finished.

**Section 2**

    A.  **Leave for Parents with Children with Physical and / or Mental Disabilities.** In an effort to project itself as an exemplary agency in the treatment of persons with disabilities, the Administration will authorize as official time one (1) day per month to the parents of children with disabilities in order for them to take their children to their appointments and treatments. The parents must notify the date of the appointment or treatment as soon as they become aware of it and in turn must provide a certificate from the health and / or therapeutic services provider of the minor who officially classifies him as a person with disabilities.

        They must also submit a medical certificate that proves that the employee accompanied their child to the appointment or medical treatment. In case both parents or custodians are members of the Appropriate Unit, the license shall be shared between both, in the way that they prefer to do it.

    B.  **Leave for Elderly Persons.** In the same way, the Administration shall authorize that this same day can be used for appointments and treatments for Elderly Persons. The person in charge must notify the date of the appointment or treatment as soon as he / she becomes aware. The employee in turn must provide a certificate of birth of the elderly person evidencing that he / she is sixty (60) years or more. They must comply with Section 3's provisions.

**Section 3** The Administration shall authorize the father or mother of children with disabilities to stay with them when they are hospitalized. The father or mother must submit evidence of the hospitalization and the duration of the hospitalization. The Administration shall authorize that the days that the employee takes to take care of his / her sick child are discounted from his / her sick leave. So that the licenses are not affected in a dangerous manner, the member of the Appropriate Unit that requests |

F-7

| More Detailed Provisions of the Proposal | |
|---|---|
| | this special license must leave accrue fifteen (15) or more days due to illness. |
| **Additional Language for Holidays, Sick and Vacation Leaves** | **Section 1** For the avoidance of doubt, to the extent there are inconsistencies between this Agreement and the provisions of Act 26-2017 regarding Holidays, Vacation Leave, Sick Leave and other Leaves, the provisions of Act 26 as enacted in 2017 shall apply for the duration of this Agreement, except that Union members shall retain Funeral Leave and Teachers' Day as provided in the existing CBA. Amendments to Act 26-2017 to improve Holidays, Sick, Vacation and other leaves leave benefits shall be incorporated into this Agreement if lawfully adopted by the Government. |
| **Bonuses** | To comply with the Fiscal Plan in force and during the term of this Agreement, employees shall be entitled to those bonuses that are provided for in the certified Budget for the Commonwealth or otherwise lawfully granted by the Administration. |
| **Institutional representation** | **Section 1** The Administration will provide for appointment of a Union labor representation board, consisting of 4 individual members, appointed by the Union to represent labor. |
| | **Section 2** The members may be appointed for terms of 12 months, and may be reappointed by the Union. |
| | **Section 3** The members will meet with representatives of the Department management three (3) times a year to discuss and share perspectives on Department status, actions and proposed future plans, to include school closures, restructuring actions and future identification and development of new schools and transition plans. |
| | **Section 4** For the avoidance of doubt, these three (3) meetings a year with the Department are not a substitution for collective bargaining. |
| | **Section 5** The members will meet with representatives of the Financial Oversight and Management Board on an annual basis to discuss and share perspectives on the Commonwealth fiscal plan and budget. |
| | **Section 6** The three (3) meetings with the Department and annual meeting with representatives of the Oversight Board will be provided for members by allowing members to attend with a half day of paid time off, in addition to their normal vacation time. |

| More Detailed Provisions of the Proposal | |
|---|---|
| | |
| **Medicare** | The oversight board and the government will take appropriate actions with the social security administration to facilitate access and enrollment into Medicare for those members who are eligible. |
| **Dues Deduction, Charges** | **Section 1** The Department shall inform new employees of the right conferred by Act No. 45-1998 as amended at the moment the employee is named to a position included in the Appropriate Unit and shall provide the union with an opportunity to meet with new employees or, at the union's option, with a welcome document prepared by the Union in which are explained the rights of union members under Act 45-1998, as amended. The Administration shall not discourage union membership. |
| | **Section 2** In the event the Union ceases to be the exclusive representative of the Appropriate Unit, the deductions withheld from employees for dues shall automatically stop on the date the Union is no longer the exclusive representative. |
| | **Section 3** The Department shall resume the deduction of dues for employees whose positions are included in the Appropriate Unit once they return from their unpaid leave and notify the Human Resources Office so that it can make the change in payroll and include said deduction within a period not greater than thirty (30) working days from the employee's return date. |
| | **Section 4** In the event the Union requests the deduction of dues and it is determined that the dues are unlawfully set and/or deducted, the Union shall relieve the Department of any liability and make any orderly refund as soon as it is required. If it is determined that the error is attributable to the Department, the Union shall only reimburse what is erroneously deducted and will not be responsible for expenses and fees incurred. |
| **Improvement of terms** | If the Commonwealth government proposes more beneficial economic terms of employment for unrepresented employees, or employees represented by an exclusive representative certified in accordance with Act 45, and such more beneficial economic terms are lawfully implemented, expressly including but not limited to more beneficial pension terms or benefits, such more beneficial economic terms shall be provided to AFT, AMPR, and AMPR-LS bargaining unit employees. |

F-9

**APPENDIX II**

## PROPOSED TERMS FOR TRS SYSTEM BENEFITS

This is a summary of proposed indicative terms for a freeze of the outstanding benefits of the Teachers Retirement System for the Commonwealth of Puerto Rico ("TRS").

TRS members hired prior to August 1, 2014, are currently accruing benefits under a defined benefit ("DB") formula. To avoid creating future pension liabilities and to stabilize the system for the benefit of both taxpayers and future retirees, the TRS plan benefit accrual will be frozen upon the six (6) month anniversary of the Effective Date of the Plan of Adjustment (the "Freeze Date")

| Definitions | |
|---|---|
| Pension System | The terms of this document and references to Pension System pertain to the freeze of pension obligations of the Teachers Retirement System (TRS). |
| Eligibility for Membership | This applies to all active participants of TRS ("Member" or "Members"), regardless of title or job classification. Members will retain the benefits they have accrued to date, subject to the benefit reduction formula. |
| Retirement eligibility age | Retirement Eligibility Age is the age at which a member may commence receipt of a monthly pension benefit. |
| Retirement benefit | The Retirement Benefit is the amount of benefit payable to a member each month. |
| Creditable service | The years and months of plan participation, during which contributions have been made, beginning on the date of the first original appointment for rendering services. For purposes of calculating Creditable Service, 15 calendar days of a school year month shall be equal to 1 calendar month worked during the school year for teachers; and 21 calendar days of a month shall be equal to 1 calendar month worked for all other members. Days and months worked after the effective date of the freeze will not be considered except as noted below under "Provisions of the Proposal." |
| Average compensation | The average of the 36 highest months of compensation that the member has received for Creditable Service. Compensation earned after the effective date of the freeze will not be considered. |
| Defined contribution account | The individual account established under Act 106-2017 for each new member hired on or after August 1, 2014. These accounts have been credited with member contributions to the prior hybrid benefit plan in which they were enrolled, with interest. New accounts will be established for members hired prior to August 1, 2014, in connection with the freeze of the DB formula, and in accordance with the provisions of Appendix IV. |

F-11

| Timing | |
|---|---|
| **Pension freeze** | TRS pension benefit accrual freeze becomes effective upon the Freeze Date. |
| **Pension benefits date** | The data set used to calculate the freeze of pension benefits required is based on the July 1, 2017 dataset provided by the Pension System actuary, which is the latest dataset currently available. If a new dataset becomes available, the values will be updated accordingly. |
| **Implementation** | The freeze in the benefit amount described below will apply to benefits earned under and paid by the plan on or after the Freeze Date, also subject to the benefit reduction formula discussed in the separate benefit cut term sheet and as clarified in this document. |

| Provisions of the proposal | |
|---|---|
| **Freeze of benefit accruals and implementation of DC account** | Accrued benefit frozen as of the Freeze Date. New DC account balances to be funded with employee contributions will be established in connection with the freeze. The minimum employee contribution will be 8.5%, as defined by Article 3.4 of Act 106-2017, adjusted for any withholdings for Social Security, if applicable. |
| **Maintaining retirement eligibility for individuals over age 50** | Members hired prior to August 1, 2014 who were over age 50 as of the Freeze Date, but not eligible for retirement at the Freeze Date will have the opportunity to achieve the previous milestones for retirement eligibility (i.e. age 60 with 10 years of service, age 47 with 25 years of service or 30 years of service) and then would be eligible to retire upon achieving those milestones. The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service as of the Freeze Date, not inclusive of service after the freeze. |
| **Maintaining retirement eligibility for individuals under age 50 and within 3 years of retirement eligibility** | Members hired prior to August 1, 2014 who were under age 50 and within 3 years of achieving the age 47 and 25 years of service milestone for retirement eligibility will have an opportunity to achieve the milestone for retirement eligibility. Members who achieve that milestone would then be eligible to retire such that they will not be subject to any delay in retirement eligibility and corresponding early retirement benefit reduction. The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service at the Freeze Date, not inclusive of service after the freeze. |

| Delay in retirement eligibility for all others | For members hired prior to August 1, 2014, who are not eligible for retirement at the Freeze Date, not within 3 years of retirement eligibility as of the Freeze Date, and were under age 50 at the Freeze Date, retirement eligibility is delayed to age 63 (or later upon completion of 10 years of service). Retirement is also delayed for terminated members that have not yet commenced.<br><br>For members whose retirement eligibility was delayed as a result of this proposal, an "Early Retirement Option" will be added that allows the member to commence their benefit at their original eligibility date; however that benefit will be reduced by 7.00% per year (0.5833% per month) in which their commencement date under this option precedes their revised retirement eligibility date. |
|---|---|
| Benefit formula upon achieving 30 years of service | Members hired prior to August 1, 2014 who had not earned 30 years of service as of the Freeze Date will be eligible to receive a modified benefit enhancement upon reaching 30 years of service regardless of the Creditable Service at the Freeze Date. The enhancement will provide members the following:<br>    a. Members age 50 and over at the Freeze Date: Benefit multiplier will be increased from 1.8% to 2.0%<br>    b. Members under age 50 at the Freeze Date: Benefit multiplier will be increased from 1.8% to 2.0% but will continue to be reduced by a 95% factor.<br>The benefit payable upon commencement would be determined based on Average Compensation and Creditable Service at the Freeze Date.<br><br>Under no circumstances shall any member who is not subject to the benefit reduction formula trigger a benefit cut by virtue of achieving 30 years of service and the corresponding benefit enhancement described in this section. This provision is an explicit modification to any pension benefit reductions provisions of the Commonwealth Plan of Adjustment, as applicable. |
| Elimination of minimum benefit | The $400 monthly minimum benefit for members hired before August 1, 2014, will be eliminated for members retiring on or after the Freeze Date. |
| Elimination of service purchase | Active members hired prior to August 1, 2014, with eligible service from prior employment have been able elect to purchase service in TRS. This has been accomplished via transfer of assets or through contributions payable by the member. This provision will eliminate future service purchases on or after the Freeze Date. Service purchased through a payment plan will be granted for payments made up to the Freeze Date. |

| Elimination of continued contributions under age 55 | Employee contributions that were required of pensioners under age 55 will be eliminated after the Freeze Date. |
|---|---|
| Separation from service | The Oversight Board and Government will take appropriate actions to support efforts to afford teachers with frozen defined benefits access to their defined contribution plan accounts upon early retirement or separation of service at age 55 or over under the same conditions as if distributions were taken at age 62. |
| Suspension of benefits | Retirees from TRS who are in receipt of pension benefits that return to the Department of Education or a charter school as a teacher will have their pension benefits suspended during their reemployment. |
| Defined contribution transfer from prior plans | After the Freeze Date, active new hires with pension benefits eligible for rollover from a previous employer will be eligible to transfer these amounts to their DC account, either as a single transfer upon enrolling in the plan or through an initial election to defer compensation through payroll, subject to tax considerations. |
| Disability benefits for DB plan participants | Active members hired prior to August 1, 2014 who terminate employment due to disability will continue to be eligible to receive an immediate monthly benefit equal to the unreduced accrued benefit of 1.8 percent of Average Compensation per year of Creditable Service with both determined as of the Freeze Date.  Eligibility requirements and compensation averaging periods for Occupational and Non-Occupational disabilities will also be preserved. |

**More detailed provisions of the proposal**

| Specific implications on retirement eligibility age if hired prior to August 1, 2014 | **Retirements after the Freeze Date**:<br><br>A. Members who meet the following age and service combinations as of the Freeze Date, will continue to be eligible to retire at any time and members age 50 or older as of the Freeze Date, will become eligible once they meet the following age and service combinations:<br>  a. At least age 60 with at least 10 years of Creditable Service<br>  b. At least age 47 with at least 25 years of Creditable Service<br>  c. At least 30 years of Creditable Service |

F-14

| | |
|---|---|
| | B. Members under age 50 as of the Freeze Date who will attain any of the age/service conditions listed below within 3 years of the Freeze Date will become eligible to retire once they meet the age/service criterion listed below:<br><br>    a. At least age 47 with at least 25 years of Creditable Service<br>    b. At least 30 years of Creditable Service<br><br>C. Members under age 50 as of the Freeze Date who are not eligible to retire within 3 years of the Freeze Date will be eligible to retire upon attaining 10 years of Creditable Service and reaching the age 63.<br><br>For members whose retirement eligibility was delayed as a result of this proposal, an "Early Retirement Option" will be added that allows the member to commence their benefit at their original eligibility date, however that benefit will be reduced by 7.00% per year (0.5833% per month) in which their commencement date under this option precedes their revised retirement eligibility date. |
| **Specific implications on Retirement Benefit if hired prior to August 1, 2014** | **Retirements after the Freeze Date**:<br><br>A. Minimum benefits will no longer apply to future retirees.<br><br>B. The freeze also eliminates the ability to purchase additional service.<br><br>C. If a member is at least age 50 as of the Freeze Date and has attained at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals 75 percent of Average Compensation as of the Freeze Date.<br><br>D. If a member is under age 50 as of the Freeze Date and has attained at least 30 years of Creditable Service as of the Freeze Date, the accrued benefit equals 65 percent of Average Compensation as of the Freeze Date.<br><br>E. If a member is at least age 50 as of the Freeze Date, has not attained 30 years of Creditable Service as of the Freeze Date, and would not have attained 30 years of Creditable Service absent the freeze, the accrued benefit equals 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. |

|  |  |
|---|---|
|  | F. If a member is under age 50 as of the Freeze Date, has not attained 30 years of Creditable Service as of the Freeze Date, and would not have attained 30 years of Creditable Service absent the freeze, the accrued benefit equals 95 percent of 1.8 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date.<br><br>G. If a member is at least age 50 with less than 30 years of Creditable Service as of the Freeze Date and continues to work and has attained 30 years of Creditable Service by retirement, the accrued benefit equals 2.0 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. The amount of benefit subject to the benefit reduction formula (the "cut") will be determined utilizing a 2.0 percent multiplier as if it had been in place on the PROMESA filing date, with the exception that members not subject to the cut prior to the utilization of the 2.0 percent multiplier shall remain unaffected by the cut.<br><br>H. If a member is under age 50 with less than 30 years of Creditable Service as of the Freeze Date and continues to work and has attained 30 years of Creditable Service by retirement, the accrued benefit equals 95 percent of 2.0 percent of Average Compensation as of the Freeze Date multiplied by years of Creditable Service as of the Freeze Date. The amount of benefit subject to the benefit reduction formula (the "cut") will be determined utilizing a 2.0 percent multiplier as if it had been in place on the PROMESA filing date, with the exception that members not subject to the cut prior to the utilization of the 2.0 percent multiplier shall remain unaffected by the cut. |
| **Implications if hired on or after August 1, 2014** | These members have been enrolled in the new defined contribution accounts under Act 106-2017. Any balances from the prior hybrid benefit plan have been deposited in these teachers' Act 106 accounts and will not be impacted by the Pension Freeze. |
| **Miscellaneous** |  |
| *Asociacion de Maestros de Puerto Rico v. Sistema de Retiro de Maestros de* | Nothing in this term sheet or the Plan of Adjustment shall impact the precedential effect of this decision. |

F-16

| **Puerto Rico** 190 **D.P.R. 854 (2014)** | |
|---|---|
| **Recognition Payment** | One-time payment of $3,000 to each of the Union represented participants (expressly including Transitory Participants) to be made upon the effective date of a confirmed Plan of Adjustment for the purpose of recognizing the outstanding service of the teachers of Puerto Rico and their importance to Puerto Rico's future, and of acknowledging the challenges resulting from the freeze of the teachers' TRS defined benefit accruals.<br><br>Payable 60 days after the Effective Date of the Plan of Adjustment. |
| **Social Security** | The Oversight Board and Government will take appropriate actions to provide that all teachers hired after the Freeze Date and all current teachers under the age of 45 as of the Freeze Date will be enrolled in Social Security on a mandatory basis and all current teachers 45 and older as of the Freeze Date may choose to be enrolled in Social Security on a voluntary basis. Alternatively, current teachers 45 and older may choose not to be enrolled in Social Security by electing to contribute 8.5% of compensation to the defined contribution plan. Enrollment in Social Security will be effective in accordance with Appendix IV. Teachers enrolled in Social Security will contribute 2.3% of compensation to the defined contribution plan and will have elective deferrals capped so that the total contribution made to the defined contribution plan remains below 7.5%. AFT, AMPR and AMPR-LS will take appropriate actions to support efforts by the Commonwealth and its agents to enroll in Social Security all teachers who are eligible to accrue Social Security credits in accordance with Appendix IV; those members age 45 and older may choose whether to enroll.<br><br>Elections by current teachers 45 and older to enroll must be completed within the 60 days after the Effective Date of the Plan of Adjustment. By default, current teachers age 45 or older will be assumed to have elected to contribute 8.5% to the defined contribution plan and thus opted out of Social Security coverage. |
| **Law 160** | For the avoidance of doubt, any contributions made to Law 160 accounts will not be subject to any pension benefit cut. |
| **JRS Defined Benefit Plan** | The Oversight Board will not propose a plan or enter into agreements that would impose a freeze of the TRS defined benefit plan but not of the JRS defined benefit plan. |

# APPENDIX III

**PROPOSED TERMS FOR UPSIDE FISCAL PLAN SURPLUS SHARING AGREEMENT**

Below is a summary of proposed indicative terms for AFT, AMPR and AMPR-LS Upside Fiscal Plan Surplus Sharing Agreement.

| Definitions | |
|---|---|
| **Fiscal Plan Surplus Sharing Agreement** | Agreement with AMPR and AMPR member participants (expressly including participants with transitory status in the same status as other participants (the "Transitory Participants")) for each fiscal year of the AFT Operative CBA to provide participation of AMPR in sharing of any excess surplus above and beyond the Certified Fiscal Plan in effect as of the effective date for the Plan of Adjustment for the Commonwealth. |
| **Unions** | AFT, AMPR and AMPR-LS ("Union") |
| **Union Member Participants** | All active Union members and employees in union represented bargaining units on record at the beginning of the fiscal year with continued employment and active status at the time of payment. |
| **Independent Agent** | Certified Public Accounting firm licensed to provide accounting services. |
| **Cash Basis** | Fiscal Plan surplus calculation will use recorded income and expenses as received or paid. |
| **Excess Cash Surplus Formula** | Excess Cash Surplus is defined as excess cash surplus above and beyond the projected Fiscal Plan surplus contained in the Certified Fiscal Plan in effect as of the Effective Date for the Plan of Adjustment for the Commonwealth.

If the Excess Cash Surplus is lower than One Hundred Million Dollars ($100,000,000.00), no amounts will be distributed. If the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00) twenty-five percent (25%) of such Excess Cash Surplus will be allocated to the Upside Participation Bonus pool. |

| Timing | |
|---|---|
| **Implementation** | To be aligned with the implementation of the AFT Operative CBA, currently targeted for implementation with the Effective Date of the Plan of Adjustment. |

| Timing | |
|---|---|
| **Annual Measurement** | Fiscal Plan surplus to be calculated on a cash basis no later than September 30th of each fiscal year by an Independent Agent. |
| **Payment Period** | **For Upside Participation Bonus:** Payable December 1st to Union represented participants, based upon calculations from the prior period and completed by the Annual Measurement date. |

| Provisions of the proposal | |
|---|---|
| **Upside Participation Bonus** | For the term of the AFT Operative CBA, if Excess Cash Surplus formula is met or exceeded, a distribution will be made to all Union represented participants (expressly including Transitory Participants) and all rank-and-file Commonwealth employees each year from the Upside Participation Bonus pool. All recipients of this Upside Participation Bonus will have the choice to allocate any portion of their Upside Participation Bonus, up to a 7.5% total Defined Contribution cap in total for the year, to their Defined Contribution account; any remainder will be distributed in cash. The 7.5% cap is a requirement to ensure participants maintain continued enrollment in Social Security. |

**APPENDIX IV**
**SOCIAL SECURITY/DEFINED CONTRIBUTION PLAN IMPLEMENTATION**

Below is a summary of procedures for enrollment of teachers into Social Security and, as applicable, defined contribution accounts under Act 106-2017 (the "Defined Contribution Plan"), and enforcement thereof.

| Provisions of the proposal | |
|---|---|
| **Timing of Pension Freeze** | a. The Pension Freeze will take effect six (6) months following the Effective Date of the Commonwealth Plan of Adjustment. |
| | b. The order confirming the Plan (the "Confirmation Order") will provide that the Commonwealth will fully implement enrollment in Social Security and the Defined Contribution Plan such that in the first full pay period following the Pension Freeze, the Commonwealth will withhold payroll contributions and remit said contributions to Social Security and the Defined Contribution Plan in a timely manner. |
| |   i. With respect to the Defined Contribution Plan, full implementation includes the transfer of funds in a timely manner, as described in Section (b)(iii)(1) in "Penalties for Noncompliance" below, from withholding of payroll contribution to individual accounts over which participants have investment direction rights. |
| |   ii. Failure by the Commonwealth to act in accordance with this section (b) will be deemed a violation of the provisions of the Plan and the Confirmation Order and will give rise to enforcement remedies set forth herein but will not affect the Freeze Date noted above. |
| |   iii. If timing is not met, penalties for noncompliance, as described in the next section, "Penalties for Noncompliance," will apply. |
| | c. Prior to the Freeze Date, the Commonwealth will provide notice to the Puerto Rico Social Security State Administrator and the applicable administrator of the New York Region of the Social Security Administration that teachers will no longer be covered by a qualified replacement plan as of the Pension Freeze effective date. At that time, the Commonwealth will send such parties a data file containing a list of all affected teachers who will be eligible for Social Security coverage as of the Pension Freeze effective date. |

| Penalties for Noncompliance | a. Three Groups |
|---|---|
| |     i. Group 1 – Members who experience a delay in the withholding and remittance of their Social Security contributions |
| |     ii. Group 2 – Members who experience a delay in the withholding and remittance of their Social Security contributions and suffer a loss of benefits as a result of delay upon applying for Social Security benefits.  For avoidance of doubt, these are members who retire prior to full implementation of Social Security and are otherwise eligible to retire under Social Security (whether: (a) they have enough quarters of prior Social Security service without counting post-freeze service; or (b) they only have enough Social Security creditable service on account of post-freeze service  . |
| |     iii. Group 3 – Members who experience a delay in the withholding and remittance of defined contributions. |
| | b. Remedies |
| |     i. Group 1 – Members will be held harmless for the failure of the Commonwealth to contribute Social Security taxes by retroactively making contributions to Social Security on behalf of affected members to the extent necessary. |
| |         1. Will include tax gross up on contributions so member earnings net of taxes is not impacted |
| |     ii. Group 2 – In addition to Group 1 remedy, the Commonwealth will pay reconciliation damages to members whose actual Social Security benefits are affected in an amount to be determined as follows: |
| |         1. Payment will be in the form of one-time cash damages payment |
| |         2. No payment shall be less than $1,500 |
| |         3. Payment is based on two (2) key tiers impacting the size of lost income |
| |             a. Whether or not individuals have enough quarters of prior Social Security service (i.e., with another employer) to qualify for Social Security benefits without counting post-freeze service |

b. Proximity of retirement date to Freeze Date based on the assumption, for the sole purpose of calculating payments, of a 3-year assumed delay period.

c. Schedule is as follows (single one-time payment only):

**40 or more quarters from previous employer**

|  | <u>Yes</u> | <u>No</u> |
|---|---|---|
| Year 1 | $1,500 | $9,000 |
| Year 2 | $1,500 | $7,200 |
| Year 3 | $1,500 | $3,600 |

4. Will include tax gross up on damages payment, if any, so member earnings net of taxes is not impacted

5. One-time payments will no longer be made for any future Social Security retirements once Social Security recognizes post-freeze service for determining retirement benefits

iii. All Groups – Members will be held harmless for the failure of the Commonwealth to contribute defined contributions in a timely manner by the Commonwealth retroactively making contributions and compensatory earnings to Defined Contribution Plan on behalf of affected members.

1. Timely manner defined as within 30 days of the payroll withholding date when funds are taken out of the employee payroll and held by employer, unless otherwise defined by Alight agreement

2. Compensatory earnings to be calculated using the greater of 0% or the return on the T. Rowe Price Retirement Blend 2045 (Tr-B) fund.

3. Compensatory earnings to be calculated from Freeze Date for pre-2014 hires, to the month end prior to full Defined Contribution Plan implementation.

4. Members who are enrolled in Defined Contribution Plan prior to the Freeze Date

F-23

| | |
|---|---|
| | will not be covered under this remedy. |
| **Enforcement Incentive** | a. This Section will take effect immediately upon the Plan Effective Date.<br>b. FOMB will establish a budget appropriation under the custody of Hacienda immediately following the Plan effective date.  If the Commonwealth does not fully implement either Social Security or the Defined Contribution Plan by the Freeze Date, as determined by the Funds Committee, then the appropriated funds will be segregated into a separate account at Hacienda to be administered by the Funds Committee.<br>   i.  Appropriation will be held in place with initial funding until Commonwealth has withheld and remitted funds on behalf of Social Security and/or defined contribution accounts as described in (III)(d)(ii) below.<br>   ii.  Social Security withholding defined as Commonwealth withholding 6.2% from teacher payroll<br>   iii. Defined contribution withholding defined as Commonwealth withholding 2.3% or 8.5% from teacher payroll, dependent on applicable plan selected by a teacher.<br>c. Hacienda will support the Funds Committee (see Section (h)(i) below) to use funds to address penalties for noncompliance and pay Group 1, Group 2, and Group 3 remedies.<br>d.  Agreement will include required Appropriation level based upon meeting Social Security and defined contribution milestones. The Appropriation shall be replenished as described in section (d)(iii) below.<br>   i.  The Commonwealth will make an initial appropriation of $77 million<br>   1.  $77 million protects employee Social Security and defined contribution amounts for approximately 1 year ($900m payroll * 8.5% = $77m)<br>   2.  Commonwealth will appropriate employer 6.2% Social Security   contribution for exclusive use in PRDE budget<br>   ii.  Staggered release of appropriated funds<br>     1.  Upon Commonwealth withholding and transferring funds to Social Security Administration, the fund balance will be reduced to no more than $50 million ($27 million released). |

2. Upon Commonwealth withholding and transferring 95% of defined contributions to individual accounts, the fund balance will be reduced to no more than $30 million ($20 million released). When 100% of teachers are properly enrolled, the fund balance will be no more than $25 million ($5 million released).

3. A minimum amount of $25 million will be held in the segregated account for a period of two (2) years following the release of 100% of the defined contribution portion of funds or of 100% of the Social Security portion of the fund, whichever is later, for the exclusive purpose of settling outstanding noncompliance claims. Once the two (2) year period ends, the remaining balance will be released out of the segregated account.

    iii. Replenishment of budget appropriation

1. For each year of delay following the Pension Freeze date in which the Commonwealth fails to fully implement Social Security and/or the Defined Contribution Plan, the Commonwealth will make an annual additional appropriation to maintain a balance of $77m (as modified by (3)(d)(ii) above) in the segregated account.

2. The appropriation shall not affect funding levels available to the Department of Education or any other program for targeted for public education or students.

e. In addition to appropriation, FOMB will use the Confirmation Order, Fiscal Plan and all legal actions available to reasonably enforce timely implementation of both Social Security and Defined Contribution accounts for members. In addition, all parties in interest, including AMPR/AFT, retain their rights to seek enforcement of the timely implementation of both Social Security and the Defined Contribution accounts whether by seeking enforcement of the provisions of the Confirmation Order and/or by exercising any other available legal remedies.

f. Commonwealth will also face federal liability to the extent the new Defined Contribution plan is not a qualified retirement replacement plan and Social Security is not implemented.

g. The Commonwealth/FOMB will provide a monthly written report to AMPR/AFT on progress made toward implementation of Social Security and DC plan enrollment that details the status of payroll withholdings, remittances to Social Security and the DC plan, and the

F-25

funding of individual defined contribution accounts until enrollment is fully implemented.

h. Appropriation would be administered with support of a Funds Committee

    i. Funds Committee will be comprised of five (5) members to include two (2) appointees by FOMB, two (2) appointees by AMPR, one of which will serve as Committee Chair, and one appointee by AAFAF.

    ii. The Commonwealth will establish a recurring annual budget appropriation for the Funds Committee in the amount of $300,000 until such time as the Commonwealth has satisfied the conditions set forth in Section (d)(ii)(2) above. Initial funding will be made available at the Plan Effective Date. For the next two years after satisfaction of the conditions set forth in Section (d)(ii)(2) above, the Commonwealth will establish a $150,000 annual budget for the Funds Committee. At the end of any fiscal year, unspent funds will carry over into the next fiscal year, except in the second year following satisfaction of the conditions set forth in Section (d)(ii)(2) above.

    iii. A portion of the Funds Committee appropriation will be used to create a teacher-facing Ombudsman with responsibility for educating teachers about noncompliance issues and shepherding teachers with individual claims through the Funds Committee claims process.

    iv. Funds Committee structure to be further detailed, with dispute resolution options

    v. Funds Committee would be charged with:

        1. Determining if the Commonwealth has fully implemented Social Security and the Defined Contribution Plan prior to the Freeze Date in accordance with Section (b) of "Timing of Pension Freeze" above.

        2. Determining when the Commonwealth has satisfied the aforementioned conditions for the incremental release or increase of the Enforcement Incentive funds. The Funds Committee will be entitled to such documentation as requested to validate compliance, including without limitation payroll records, defined contribution account records, and

F-26

| | | |
|---|---|---|
| | forms submitted to Social Security/IRS. Documentation will not contain personal identifiable information. To the extent the Funds Committee requires any documentation containing personal identifiable information, the Funds Committee must obtain waivers from each individual and present those to the Commonwealth prior to receipt of personal identifiable information. | |
| | 3. Reviewing claims and approving/disallowing claims for damages | |
| | 4. Determining compensatory earnings as a result of any delay in the funding of individual Defined Contribution Plan accounts | |
| | 5. Identifying and pursuing resolution of issues and communicating same with Commonwealth, FOMB, AMPR and Social Security/defined contribution Implementation team, including an Ombudsman if appointed | |
| | vi. FOMB will use best efforts to bind Hacienda to the decisions of the Funds Committee through the Plan. | |
| **Group Annuity Contracts** | The FOMB will use best efforts to require the Commonwealth to adhere to ERISA/U.S. Department of Labor fiduciary requirements when entering into any annuity contracts in the future through language in the Plan | |

# EXHIBIT G

SUMMARY TERMS OF AFSCME COLLECTIVE BARGAINING AGREEMENT

## MODIFICATIONS TO AFSCME COLLECTIVE BARGAINING AGREEMENTS

The following is a summary of agreed upon modifications to the collective bargaining agreements (collectively, the "AFSCME CBAs") between AFSCME and the Commonwealth. Provisions of existing AFSCME CBAs not in conflict with terms and conditions set forth below shall remain unchanged and remain in full force and effect in the new AFSCME CBAs. Only those AFSCME CBAs listed below shall be modified at this time[2].

| Definitions | |
|---|---|
| **Administration** | The management for the division (agency/grouping) in which the employee is assigned. |
| **Department** | The division (agency/grouping) in which the employee is assigned. |
| **Union Affiliates** | ▪ Parole Board and Local 3584 / United Public Servants<br>▪ Department of Consumer Affairs and Local 3986 / United Public Servants<br>▪ Department of Correction and Rehabilitation and Local 3500-Unit B Correctional Officers (ACU) / United Public Servants<br>▪ Department of Correction and Rehabilitation / Bureau of Juvenile Institutions and Local 3559 (ACU) / United Public Servants<br>▪ Department of Education and Local 3840 covering only employees within the AFSCME jurisdiction of PASO<br>▪ Department of Natural and Environmental Resources and Local 2082-Unit A / United Public Servants<br>▪ Department of Natural and Environmental Resources and Local 3647 (Ranger Corps) / United Public Servants<br>▪ Department of Transportation and Public Works and Local 3889 / United Public Servants<br>▪ Department of Labor and Human Resources / Vocational Rehabilitation Administration and Local 3251 / United Public Servants<br>▪ Department of the Family and Local 3227-Unit A / United Public Servants<br>▪ Department of the Family and Local 3234-Unit B (UPETEC) / United Public Servants<br>▪ Bureau of Forensic Sciences and Local 2099 / United Public Servants<br>▪ Department of Correction and Rehabilitation / Pretrial Services Program and Local 3573 (ACU) / United Public Servants |

---

[2] If the Government proposes more beneficial economic terms of employment for unrepresented employees, or employees represented by an exclusive representative certified in accordance with Act 45 with the exception of members of the Teachers Retirement System (TRS) (or employees who would have been eligible for membership in TRS but for the adoption of Act 3-2013), and such more beneficial economic terms are lawfully implemented, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees.

| | ▪ Bureau of Transport and Other Public Services and Local 3897 / United Public Servants |
|---|---|

| **Timing** | |
|---|---|
| **Terms** | Five (5) year CBAs effective as of the effective date of the Commonwealth Plan. |
| **Implementation** | The Plan. |

| **More detailed provisions of the proposal** | |
|---|---|
| **Terminations / Layoffs** | **Section 1** In order to avoid the involuntary layoff of personnel and to give personnel adequate notice of reassignments or relocations, the Union and the Oversight Board agree to discuss modifying the regulations implementing Act 8-2017 with the Government. |
| | **Section 2** In the event that the Administration needs to carry out downsizing of personnel (layoffs) to comply with the provisions of the approved Fiscal Plan, the parties agree to the following: |
| | A. **Temporary Suspension.** The immediate commencement of the layoff plan will entail the automatic suspension of any clause, precept and/or provision applicable to employees and/or positions covered by this agreement, contained in laws, collective bargaining agreements, agreements, supplementary agreements, policies, employment handbooks, circulars, contract letters, certifications, regulations, rules and conditions of employment, regulatory letters, classification plans and/or retribution plans that conflict with this Article |
| | The suspension of the clauses and provisions provided herein will be for a term of five (5) years, and the Administration may reduce this period after the Oversight Board certifies compliance with the objectives of the Administration and/or Department's Fiscal Plan. |
| | B. **Reassignment and Relocation.** The Administration may implement any reassignment of positions and relocation of personnel when its budgetary interests so require to avoid layoffs. If reassignments and/or relocations are necessary and budgetary feasible, the Administration shall reassign/relocate the most qualified volunteer(s) who would otherwise be subject to layoff. If there are insufficient qualified volunteers, the least senior qualified employee will be involuntary reassigned/relocated. An employee who has been involuntarily relocated because her/his position has been eliminated may request the position she/he previously held, if the Administration creates it again within the term of two (2) years following the relocation. The employee must make the corresponding request to the |

| More detailed provisions of the proposal |
| --- |

Human Resources Division.  Seniority shall be the determining criteria to the extent that the position is requested by more than one relocated employee.  This provision shall establish the order of voluntary and involuntary employee reassignment, relocation and mobility but shall not be interpreted as a limitation to the Administration's right to implement mobility plans pursuant to Act 8-2017.

C.    **Layoffs.**

a.    In view of the state of fiscal emergency, the scarcity of fiscal resources, the gravity of the problems that the Administration faces, and the urgency required to correct the fiscal problems, it is exempted from exhausting measures such as retraining employees, the enjoyment of accrued vacations, the enjoyment of unpaid leave, a reduction in work hours, or demotions, prior to implementing the layoffs.

b.    The Administration will notify in the first place the termination to all employees of the appropriate unit who as of the date of effectiveness of this Agreement have a temporary or irregular appointment, so that it will not be necessary to observe, with respect to these employees, the criterion of seniority.  The notification will be made by hand delivery or by certified mail, return receipt requested, to the address that appears in the Administration's files.

c.    The layoffs of employees with permanent or career appointment will be carried out observing exclusively the criterion of seniority by occupational classification affected by the layoff and consonant with the need to ensure the continuity and quality of Administration services, so that those who have less seniority in each affected occupational classification will be laid off in the first place.

d.    In order to determine the seniority of affected employees, all of the services provided by the employees affected in the public service will be considered, regardless of the provisions of the collective bargaining agreements, regulations, circulars, and other normative documents.

e.    The Administration will notify the layoffs at least thirty (30) calendar days in advance of the date of effectiveness, through written communication addressed to the employee and to the Union, indicating the date of effectiveness thereof.

f.    The affected employee and Union may request a review of the final determination made by the Administration, only as to their seniority and

| More detailed provisions of the proposal | |
|---|---|
| | the occupational classification, within a period no greater than thirty (30) calendar days from receipt of the notification from the Administration. |
| **Healthcare plan / Medical services** | **Section 1** The Administration shall cover the cost of Basic Coverage, equal to $170.00 per month or such greater amount that the Administration may lawfully authorize, including Pharmacy services and all employees, regardless of marital status or relationship, shall be entitled to the contribution. The Administration shall recognize a single employer contribution per employee. |
| | **Section 2** Employees have opted for syndication and shall be entitled to have an exclusive representative negotiate on their behalf regarding all matters concerning health benefits and the contracting of a health plan. The exclusive representative shall designate a Health Plans Evaluating Committee to represent the different sectors and interests of the members. Such committee shall be responsible for the analysis and evaluation of all health plans in the market in order to select those that offer the lowest and most reasonable premiums, the best coverage and health services benefits and the best medication coverage. |
| | **Section 3** The exclusive representative shall call the members to an Assembly in which he/she shall present the health plans selected by the Committee, so that the Assembly, by the express vote of the majority constituting quorum to such effects, selected the health plan that better suits its needs. Once the health plan has been selected in a legally convened Assembly, it shall be compulsory for all the members represented by said exclusive representative, except as provided by Act 95-1963, as amended. |
| **Holidays** | **Section 1** Holidays shall include all twenty-four (24) hours, after midnight, of the calendar day in question. |
| | **Section 2** The Administration recognizes that the days listed below shall be paid holidays for employees covered by the AFSCME CBAs; provided, however, that the Administration shall have the right to assign work to the members of the Appropriate Unit in any of them, when the need for service so requires. The time worked shall be compensated in time and a half (1½) of the time worked. On years where general elections shall be held, Election Day shall be considered as included among the holidays listed below. |

|   | **Date** | **Holiday** |
|---|---|---|
| 1 | January 1st | New Year's Day |
| 2 | January 6th | Three Kings' Day |

G-5

| | | | |
|---|---|---|---|
| **More detailed provisions of the proposal** | | | |
| | 3 | Third Monday of January | Dr. Martin Luther King Day |
| | 4 | Third Monday of February | George Washington / Presidents' Day |
| | 5 | March 2nd | American Citizenship Day |
| | 6 | March 22nd | Abolition of Slavery Day |
| | 7 | Movable | Good Friday |
| | 8 | Last Monday of May | Memorial Day |
| | 9 | July 4th | Independence Day |
| | 10 | First Monday of September | Labor Day |
| | 11 | October 12th | Race Day (Discovery of America) |
| | 12 | November 11th | Veteran's Day |
| | 13 | November 19th | Discovery of Puerto Rico |
| | 14 | Fourth Thursday of November | Thanksgiving |
| | 15 | December 25th | Christmas |

**Section 3** The Administration recognizes that holidays that fall on a Sunday shall be enjoyed during the next day and holidays that fall on a Saturday shall be enjoyed on the previous business day.

**Section 4** Days or half days that by proclamations of the Governor of Puerto Rico or the President of the United States are declared as holidays to be observed in Puerto Rico, shall also be considered paid holidays and included as part of the previous list, as long as they are not discounted from ordinary leave.

| | |
|---|---|
| **Sick leave** | **Section 1** All members of the Appropriate Unit covered by the AFSCME CBAs, which were hired prior to February 4, 2017 shall have the right to accrue sick leave at the rate of one and a half days ($1\frac{1}{2}$) for each month of service. Members hired on or after February 4, 2017 shall accrue at the rate of one (1) day for each month of service.

**Section 2** Sick leave may be accrued up to a maximum of ninety (90) business days at the end of each calendar year. Accrual shall commence once the employee has provided services for a period of three (3) months, and will be effective retroactively until the date when the employee began in the public service. |

| | |
|---|---|
| **More detailed provisions of the proposal** | |
| | **Section 3** Accrued sick leave days that have not been enjoyed shall not be liquidated in any way.

**Section 4** Sick leave shall be used:

A.      When the employee is sick, physically or mentally incapacitated, or exposed to a contagious disease which requires his/her absence from work to protect his/her or other persons' health.

B.      A maximum of five (5) days a year may also be used for the following, provided that the employee has accrued a minimum balance of twelve (12) days:

a.      The care and attention of his/her sick children.

b.      Management of sick, elderly or disabled persons within his/her familial nucleus, within the fourth degree of consanguinity, second of affinity, persons that live within the same household, persons over which employee has legal custody or guardianship.

c.      First appearance of any petitioner, victim or complainant before the Department, Agency, Corporation or Public Instrumentality of the Commonwealth of Puerto Rico, in matters regarding alimonies, domestic violence, sexual harassment in the workplace or gender-based discrimination.

C.      The employee shall present evidence issued by the competent authority which credits such appearance.

D.      For the purposes of this Section, the following definitions shall apply:

a.      "Elderly person":  any person sixty (60) years or older.

b.      "Person with disabilities":  any person with a physical, mental or sensory disability that substantially limits one (1) or more essential activities in his/her life.

**Section 5** Only in sickness absences for more than three (3) consecutive days shall the employee submit a medical certificate justifying such absences. Notwithstanding, the employee or any of his/her relatives must notify his/her immediate supervisor of his absence.  This shall be applied or interpreted in a manner consistent with the Americans with Disabilities Act, better known as ADA, the Family Medical Leave Act of 1993, or any other applicable law. |

| More detailed provisions of the proposal |
|---|

**Section 6** In the event that the employee exhausts his/her sick leave and remains ill, he/she may use the leave he/she has accrued, in accordance with the provisions of this Collective Agreement.

**Section 7** Sick leave charges shall be made on the basis of the working day's daily work assigned to the employee, it being understood that it shall not be charged for days off in cases where the employee works rotating shifts or for holidays.

**Section 8** When a member of the Appropriate Unit covered by the AFSCME CBAs is using his / her sick leave, he / she shall be entitled to the accrual of regular and sick leave for the time that he / she is enjoying sick leave, as long as he / she is reinstated to his / her job once such enjoyment is finished.

**Section 9** The Administration may advance sick leave up to a maximum of eighteen (18) working days, to any member of the Appropriate Unit covered by these CBAs which requests it by presenting proper justification. He/she must have worked for the Administration for one (1) year or more. Advanced leave may only be granted after the accrued sick and regular leave have been exhausted.

**Section 10**

A.     **Leave for Parents with Children with Physical and / or Mental Disabilities**.  In an effort to project itself as an exemplary agency in the treatment of persons with disabilities, the Administration will authorize as official time one (1) day per month to the parents of children with disabilities in order for them to take their children to their appointments and treatments.  The parents must notify the date of the appointment or treatment as soon as they become aware of it and in turn must provide a certificate from the health and / or therapeutic services provider of the minor who officially classifies him/her as a person with disabilities.

They must also submit a medical certificate that proves that the employee accompanied their child to the appointment or medical treatment.  In case both parents or custodians are members of the Appropriate Unit, the license shall be shared between both, in the way that they prefer to do it.

B.     **Leave for Elderly Persons**.  In the same way, the Administration shall authorize that this same day can be used for appointments and treatments for Elderly Persons.  The person in charge must notify the date of the appointment or treatment as soon as he / she becomes aware.  The employee in turn must provide a certificate of birth of the elderly person

G-8

| More detailed provisions of the proposal | |
|---|---|
| | evidencing that he / she is sixty (60) years or more.  They must comply with Section 11's provisions.

**Section 11** The Administration shall authorize the father or mother of children to stay with them when they are hospitalized.  The father or mother must submit evidence of the hospitalization and the duration of the hospitalization.  The Administration shall authorize that the days that the employee takes to take care of his / her sick child are discounted from his / her sick leave.  An employee that requests this leave must have an accrued sick leave balance of fifteen (15) or more days. |
| **Vacation Leave** | **Section 1** All members of the Appropriate Unit covered by the AFSCME CBAs shall have the right to accrue regular vacation leave at the rate of one and a quarter (1¼) days for each month of service.  Employees with reduced or part-time regular working hours will accumulate vacation leave proportionally to the number of hours they regularly provide service in.  Accrual shall commence once the employee has provided services for a period of three (3) months, and will be effective retroactively until the date when the employee began in the public service.

**Section 2** Regular vacation leave shall be accrued up to a maximum of sixty (60) business days at the end of each calendar year.

**Section 3** Every employee shall have the right to enjoy his accrued vacation leave for a period of fifteen (15) business days during each calendar year, of which no less than ten (10) days shall be consecutive.  By agreement between the Director and / or Supervisor and the employee, he may be granted periods of less than ten (10) business vacation days, but never less than five (5) days.

Employees, who, due to the need for service and at the request of the Administration, cannot enjoy their vacation leave during a specific calendar year, shall be exempt from this provision.  In this case, the Department is required to make the necessary adjustments so that the employee is able to enjoy at least leave accrued in excess of the sixty (60)-day limit at the earliest date possible within the first three (3) months of the following calendar year.

**Section 4** The enjoyment of regular vacation leave shall not be interrupted nor rescheduled for any member of the Appropriate Unit covered by these CBAs.  The only exceptions are clear and unavoidable emergencies related to the need for the service.  The Administration shall replenish the time used by the employee. |

| More detailed provisions of the proposal |
| --- |
| **Section 5** The Administration shall formulate a Vacation Plan each calendar year, according to the need of service and in coordination with the employees of the Appropriate Unit covered by this Collective Agreement and their respective supervisors, which establishes the period (s) within of which each employee shall enjoy their vacations. The Plan must be established by December 31st of each year so that it becomes effective the first (1st) of January of each year. Both parties agree to comply with the Plan. By agreement between the Director and / or Supervisor and the employee, he / she may enjoy a maximum of two (2) vacation periods per calendar year.<br><br>**Section 6** The Administration shall formulate and administer the Vacation Plan harmonizing the observations, recommendations and preferences of the employees with the needs of service, so that they do not lose their vacation leave at the end of the calendar year and enjoy their regular vacation leave annually without affecting the service.<br><br>If there is a conflict between two (2) or more employees regarding the date to take vacations, the Director and / or Supervisor shall determine, according to the need of service, which employee shall leave first. In case the only conflict is that both chose the same date and cannot leave at the same time, the employee with the most seniority will leave first and from then on it will be done alternately.<br><br>**Section 7** The Administration shall inform the accrued vacation leave balance to all Appropriate Unit members covered by these CBAs, a total of three (3) times a year. In case of any calculation error, the information may be corrected at the initiative of any of the Parties. Any request for review by the employee must be made in writing within fifteen (15) working days before the Director of the Human Resources Division of the Administration. The Director shall have fifteen (15) working days to answer the request. If the employee is not satisfied, he/she may use the Complaint and Grievance Procedure established in this Collective Agreement.<br><br>**Section 8** The Administration shall evaluate, if so requested by the employee, granting regular leave in excess of fifteen (15) days in a calendar year, up to a maximum of fifty (50) days in any calendar year to those employees who have accrued leave. The employee shall maintain a minimum of five (5) days of regular vacation leave. When granting said leave, the Administration shall consider the needs of service and any other factor established in applicable law.<br><br>**Section 9** When a member of the Appropriate Unit covered by CBAs is using his / her regular leave, he / she shall be entitled to the accrual of |

| More detailed provisions of the proposal | |
|---|---|
| | regular and sick leave, for the time that he / she is enjoying said leave, as long as he / she is reinstated to his work when he / she finishes such enjoyment. |
| | **Section 10** Due to special circumstances, the Administration may advance regular leave to any member of the Appropriate Unit covered by CBAs who requests it and has worked for the Administration for more than one (1) year, up to a maximum of fifteen (15) work days, provided that the employee shall return to service. The Administration shall evaluate said request according to the needs of service. |
| | **Section 11** Any employee who has been granted advanced vacation leave and separates from service, voluntarily or involuntarily, before rendering services for the period needed to accrue the full amount of unearned advanced leave thus granted shall be required to refund the Government of Puerto Rico any amount paid to him/her for said advanced leave. |
| | **Section 12** At the option of the Appropriate Unit member covered by CBAs, the payment of regular scheduled vacations shall be effective before beginning to enjoy them. Said request must be submitted forty-five (45) calendar days in advance of the date on which the vacation begins. |
| | **Section 13** In those cases in which a proclamation or administrative order of the Governor of Puerto Rico is issued, granting official time without charge to vacations, the same shall be applicable to all members of the Appropriate Unit covered by CBAs who are in use of regular leave. When the employee is enjoying his/her regular vacation leave, the period of his/her vacation will be extended for the official time granted. |
| | **Section 14** Any member of the Appropriate Unit covered by CBAs who becomes ill while enjoying regular leave may request that the period of illness be credited to his / her accrued sick leave. The employee must certify his/her illness in conjunction with his/her request. |
| | **Section 15** The members of the Appropriate Unit covered by CBAs shall have the right to authorize the Administration to assign five (5) days per month of their accumulated vacation license, in favor of other employees of the agency. It shall be in accordance with the provisions established by Act No. 44 of May 22, 1996, as amended, known as the "Holiday License Assignment Act". |
| **Additional Language for Holidays, Sick** | **Section 1** For the avoidance of doubt, to the extent there are inconsistencies between this Agreement and the provisions of Act 26-2017 regarding Holidays, Vacation Leave, Sick Leave and other Leaves, the |

| More detailed provisions of the proposal | |
|---|---|
| **and Vacation Leaves** | provisions of Act 26 as enacted in 2017 shall apply for the duration of this Agreement. Amendments to Act 26-2017 to improve Holidays, Sick, Vacation and other leaves leave benefits shall be incorporated into this Agreement if lawfully adopted by the Government. |
| **Bonuses** | **Section 1** To the extent that bonuses not otherwise provided for in CBAs are lawfully provided to similarly situated Commonwealth employees, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees. |
| **Institutional Representation** | **Section 1** The Administration will provide for appointment of a Union labor representation board, consisting of four (4) individual members, appointed by the Union to represent labor.<br><br>**Section 2** The members may be appointed for terms of twelve (12) months, and may be reappointed by the Union.<br><br>**Section 3** The members will meet with representatives of the Oversight Board on an annual basis to discuss and share perspectives on the Commonwealth fiscal plan and budget.<br><br>**Section 4** Annual meetings with representatives of the Oversight Board will be provided for members by allowing members to attend with a half day of paid time off, in addition to their normal vacation time. |
| **Full Agreement** | **Section 1** The provisions of this term sheet, combined with the most recent CBAs, shall constitute the CBAs commencing on the effective date of the Commonwealth Plan; provided, however, that the provisions of this term sheet control if there is any conflict with the most recent CBAs. For the duration of the Agreement, there shall be no changes in base pay, other compensation, leaves, holidays, or benefits without the express agreement of the Union. In addition, no other changes inconsistent with the terms of the term sheet shall be implemented without the express agreement of the Union. Nothing in this Agreement shall be interpreted in a manner to preclude employees represented by the Union from receiving any benefit that is lawfully granted by the Governor or Administration to other employees of the Government. |
| **Dues Deduction, Charges** | **Section 1** During the term of these agreements and during any extension thereof, the Department shall deduct from the salary of each bargaining unit employee who authorizes payroll deduction of union dues or payments on a form provided by the union the regular dues that the Union certifies in accordance with its regulations and the applicable provisions |

| More detailed provisions of the proposal |
| --- |

of Act 45 as amended. The dues amount shall be reported to the Department by the Union. For such purposes, the Department shall notify the Department of the Treasury of dues charges to be deducted from employees included in the Appropriate Unit within thirty (30) working days from the date on which the Union informs the Department regarding the amount to be deducted.

**Section 2** The Department shall send a copy to the Union on a monthly basis of the list provided by the Department of the Treasury, reflecting the name of each employee included in the Appropriate Unit, with Social Security number and amount deducted for dues charges.

**Section 3** The Department shall inform new employees of the right conferred by Act No. 45 as amended at the moment the employee is named to a position included in the Appropriate Unit and shall provide the union with an opportunity to meet with new employees or, at the union's option, with a welcome document prepared by the Union in which are explained the rights of union members under Act 45 of February 25, 1998, as amended. The Administration shall not discourage union membership

**Section 4** The Department shall have fifteen (15) working days to inform the Union in writing of the name, Social Security number, position, date of employment and salary of newly recruited employees and that come to occupy positions included in the Appropriate Unit.

**Section 5** The authorization to deduct membership dues is in effect and irrevocable pursuant to the terms stated on the employee authorization, but employees must be permitted to rescind their authorization prior to any renewal at least annually.

**Section 6** In the event the Union ceases to be the exclusive representative of the Appropriate Unit, the deductions withheld from employees for dues shall automatically stop on the date the Union is no longer the exclusive representative.

**Section 7** The Department shall resume the deduction of dues for employees whose positions are included in the Appropriate Unit once they return from their unpaid leave and notify the Human Resources Office so that it can make the change in payroll and include said deduction within a period not greater than thirty (30) working days from the employee's return date.

**Section 8** In the event the Union requests the deduction of dues and it is determined that the dues are unlawfully set and/or deducted, the Union shall relieve the Department of any liability and make any orderly refund

| More detailed provisions of the proposal | |
|---|---|
| | as soon as it is required.  If it is determined that the error is attributable to the Department, the Union shall only reimburse what is erroneously deducted and will not be responsible for expenses and fees incurred. |

**APPENDIX I**

## PROPOSED TERMS FOR ERS SYSTEM BENEFITS

The following is a summary of indicative terms for the Puerto Rico Government Employees Retirement System ("ERS") for:

1.      System 2000 members;

2.      participants who participated exclusively in the Act 3 benefit but not in Act 1 or Act 447 benefit tiers; and

3.      Act 3 participants who participated in Act 1 or Act 447 benefit tiers.

These terms do not address benefits earned under Act 1 and Act 447.

| Definitions | |
|---|---|
| Pension System | The Puerto Rico Government Employees Retirement System (ERS). |
| System 2000 Members | Generally, those members hired on or after January 1, 2000 and on or before June 30, 2013.  In addition, for purposes of this Agreement, employees hired on or after July 1, 2013 and on or before June 30, 2017 shall be treated the same as System 2000 members. |
| Type of Plan | System 2000 and Act 3 plans are contributory, hybrid defined benefit plans. |
| Effective date of the Plan | The Pension System was established in 1951 by Act 447 to be effective January 1, 1952.  The Plan was last amended under Act 3, approved April 4, 2013. |
| Eligibility for Membership | Members of the ERS and its Instrumentalities include all regular full-time and non-municipal temporary employees who are not contributing to other Retirement Systems (Articles 1-104 and 1-105). |
| Contributions | Contributions to System 2000 and Act 3 benefits are made exclusively from mandatory employee payroll deductions of 8.275 percent until 2013 and 10 percent of pay thereafter (starting with the passage of Act 3-2013). |

| Timing | |
|---|---|
| Effective date | Commonwealth Plan Effective Date. |
| Implementation | Applies to benefits earned under the Plan on or before June 30, 2017. |

| Provisions of the proposal |
|---|

| Segregate cash upfront | Segregate full System 2000 contributions from 2000 through 2013 (no reduction ), full System 2000 participant Act 3-2013 contributions, and full Act 3 participant (who had not participated in either Act 1 or Act 447) contributions through 2017 (no reduction), with interest through the Commonwealth Petition Date.  Roll balances into Defined Contribution accounts currently being set up under Act 106-2017 and invested by default into a target date life-cycle fund.  As of the Effective Date, participants with System 2000 contributions from 2000 through 2013, and Act 3-2013 contributions through 2017 who are ineligible for benefits under Act 1 and Act 447 will no longer be entitled to future system administered benefits, such as death and disability provisions, etc.

Participants who had not participated in either Act 1 or Act 447 retirement plans and who have already retired and converted their System 2000 or Act 3 contributions to a system paid annuity are not eligible for the treatment described in this section and will not receive a cash payment. |
| **Exempt from Reduction Formula** | Pay up to full accumulated contributions value, with interest up to, but not including, the Commonwealth Petition Date, for all Act 1 and Act 447 contributions made in Act 3 after July 1, 2013 annuitized upon retirement in accordance with applicable law. |

## More detailed Provisions of the Proposal as of July 1, 2015

| | System 2000 | | | |
| --- | --- | --- | --- | --- |
| | Active members | Retired members | Disabled members | Beneficiaries in payment |
| Count | 65,605 | 273 | 72 | 81 |
| Average age | 42.7 | 67.8 | 54.2 | 62.5 |
| Average salary | $24,891 | | | |
| Average creditable service | 9.5 | | | |
| Average monthly basic system benefit | | $758 | $853 | $997 |
| Average monthly system administered benefit | | $16 | $9 | $8 |

G-17

**APPENDIX II**

**PROPOSED TERMS FOR UPSIDE FISCAL PLAN SURPLUS SHARING AGREEMENT**

Below is a summary of proposed indicative terms for AFSCME Upside Fiscal Plan Surplus
Sharing Agreement.

| Definitions | |
|---|---|
| **Fiscal Plan Surplus Sharing Agreement** | Agreement with Unions and Union member participants for each fiscal year of this Agreement to provide participation of Unions on sharing of any excess surplus above and beyond the Certified Fiscal Plan in effect as of the effective date for the Plan of Adjustment for the Commonwealth. |
| **Unions** | AFSCME |
| **Union Member Participants** | All active Union members and employees in union represented bargaining units on record at the beginning of the fiscal year with continued employment and active status at the time of payment. |
| **Independent Agent** | Certified Public Accounting firm licensed to provide accounting services. |
| **Cash Basis** | Fiscal Plan surplus calculation will use recorded income and expenses as received or paid. |
| **Excess Cash Surplus Formula** | If the Excess Cash Surplus is lower than One Hundred Million Dollars ($100,000,000.00), no amounts will be distributed. If the Excess Cash Surplus is equal to or greater than One Hundred Million Dollars ($100,000,000.00) twenty-five percent (25%) of such Excess Cash Surplus will be allocated to the Upside Participation Bonus pool. Notwithstanding the foregoing, the Upside Participation Bonus to be paid to AFSCME-represented employees for each of the five fiscal years of the Agreement shall be no less than $2,000 per employee per year regardless of the amount of the Excess Cash Surplus. |

| Timing | |
|---|---|
| **Implementation** | To be aligned with the implementation of proposed changes to CBAs, as well as the overall agreement with AFSCME, currently targeted for the Effective Date. |
| **Annual Measurement** | Fiscal Plan surplus to be calculated on a Cash basis no later than September 30th of each fiscal year by an Independent Agent. |
| **Payment Period** | **For signing bonus:** Payable to Union represented participants upon the Effective Date of the Plan of Adjustment. |

| Timing | |
|---|---|
| | **For Upside Participation Bonus:**  Payable December 1st to Union represented participants, based upon calculations from the prior period and completed by the Annual Measurement date.

**For Support Fee:**  Payable to Union on the Effective Date of the Commonwealth Plan of Adjustment.

**For Additional Fee:**  Payable to Union on the Effective Date of the Commonwealth Plan of Adjustment. |

| Provisions of the proposal | |
|---|---|
| **Signing Bonus (see Summary of bonuses)** | Upon the Effective Date, a one-time signing bonus of Five Hundred Dollars ($500.00) to each of the Union represented participants. |
| **Upside Participation Bonus** | For the term of the CBA, if Excess Cash Surplus formula is met or exceeded, a distribution will be made to all Union represented participants and all other eligible Commonwealth employees designated by the Oversight Board each year from the Upside Participation Bonus pool. All recipients of this Upside Participation Bonus will have the choice to allocate any portion of their Upside Participation Bonus to their Defined Contribution account and any remainder will be distributed in cash. |
| **Support Fee** | One-time payment of Five Million Dollars ($5,000,000.00) to the Union, as compensation for its efforts serving as the lead negotiator of and as a signatory to this Agreement. |
| **Additional Fee** | One-time payment of Five Million Dollars ($5,000,000.00) to the Union, to be disbursed as a cash bonus to its represented participants. Accordingly, the bonuses that Union represented participants are receiving pursuant to this Agreement are a one-time $1000 bonus (approximate) and any Upside Participation Bonus. In addition, to the extent that similarly situated Commonwealth employees lawfully receive a bonus, such as a Christmas bonus, such more beneficial economic terms shall be provided to AFSCME/SPU bargaining unit employees. |
| **Payment of Pre-petition** | Any distributions under and pursuant to the Plan on account of claims for liquidated damage amounts resulting from the disposition of pre-petition actions brought pursuant to the grievance and arbitration procedures |

G-20

| Arbitration and Grievance Claims | arising under the CBAs between the Commonwealth and AFSCME's local affiliate(s) in Puerto Rico shall be made by the Commonwealth to the claimant in each instance on such date that is the later of (i) 30 days after such disposition or (ii) 60 days after the Effective Date of the Plan. |
|---|---|

## EXHIBIT H

SCHEDULE OF MED CENTER CLAIMS

| Claim Numbers | Facility | Group | Column "A" | Column "B" |
|---|---|---|---|---|
| 27630, 30530, 166265 | Centro De Salud Familiar Dr. Julio Palmieri Ferri Claims: 166265 Facility: Arroyo | AMC Group | $12,639,331.92 | $11,871,346.29 |
| 158091 | Atlantic Medical Center, Inc. Claims: 158091 Facility: Barceloneta | AMC Group | $11,518,922.99 | $3,030,376.45 |
| 167114 | Camuy Health Services, Inc. Claims: 167114 Facility: Camuy | AMC Group | $31,349,345.60 | $13,470,273.43 |
| 146462 | Hospital General Castaner, Inc. Claims: 146462 Facility: Castaner | AMC Group | $5,489,636.26 | $1,506,047.44 |
| 137070 | Ciales Primary Health Care Services, Inc. Claims: 137070 Facility: Ciales | AMC Group | $6,155,787.47 | $3,036,743.77 |
| 167361 | Corporacion De Servicios Medicos De Hatillo Claims: 167361 Facility: Hatillo | AMC Group | $11,948,076.45 | $4,507,785.17 |
| 166254 | Centro De Salud De Lares, Inc. Claims: 166254 Facility: Lares | AMC Group | $28,276,675.12 | $10,296,151.19 |
| 158138 | Centro De Servicios Primarios De Salud De Patillas Claims: 158138 Facility: Patillas | AMC Group | $19,497,267.19 | $19,596,454.39 |
| 157161 | Costa Salud Community Health Center Claims: 157161 Facility: Rincon | AMC Group | $12,310,505.80 | $5,931,865.47 |
| 93971 | Rio Grande Community Health Center Claims: 93971 Facility: Rio Grande (1) | AMC Group | $9,949,732.57 | $1,735,779.32 |
| 114996, 176157 | Migrant Health Center, Inc. Claims: 114996,176157 Facility: Migrant | Migrant Group | $17,691,291.17 | $9,772,993.70 |
| 98437, 108527 | HPM Foundation Inc. Claims: 98437,108527 Facility: Belaval | Morovis Group | $4,918,873.90 | $(2,405,967.79) |
| 34436, 122862 | Corporacion De Servicios De Salud Y Medicina Avanzada Claims: 34436,122862 Facility: Cossma | Morovis Group | $25,655,184.64 | $5,737,364.38 |
| 20254, 20301, 20392, 52387, 111373 | NeoMed Center, Inc Claims: 20254, 20301, 20392, 52387, 111373 Facility: Gurabo | Morovis Group | $29,258,557.90 | $36,253,807.51 |
| 101569, 108464, 139655 | Salud Integral De La Montana Inc. Claims: 101569,108464,139655 Facility: La Montana | Morovis Group | $33,906,988.74 | $2,525,918.30 |
| 20756, 20794, 39401, 130107 | Concilio De Salud Integral De Loiza, Inc Claims: 20756, 20794, 39401, 130107 Facility: Loiza | Morovis Group | $27,119,329.96 | $16,658,798.02 |
| 34431, 110999 | Morovis Community Health Center Claims: 34431,110999 Facility: Morovis | Morovis Group | $5,898,265.08 | $2,456,721.37 |
| | | Total | $293,583,772.78 | $145,982,458.41 |

(1) – Rio Grande Community Health Center provided actual data for period 1997 – 2000 asserting liabilities of approximately $7.6 m. They asserted additional liabilities related to 2001 which does not provide sufficient data to determine averages. A&M is not able to validate the asserted amounts and recommends further discussions with the FQHC related to this period.

H-2

**EXHIBIT I**

SCHEDULE OF CASH FLOWS OF NEW GO BONDS

Tax-Exempt and Taxable Current Interest Bonds Debt Service

| Fiscal Year (7/1) | Tax-Exempt Annual Debt Service Cash Flows | | | Taxable Annual Debt Service Cash Flows | | | Aggregate Annual Debt Service Cash Flows | | |
|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest | Total Debt Service | Principal | Interest | Total Debt Service | Principal | Interest | Total Debt Service |
| Total | $5,861,055,000 | $2,465,605,650 | $8,326,660,650 | $822,260,000 | $698,096,750 | $1,520,356,750 | $6,683,315,000 | $3,163,702,400 | $9,847,017,400 |
| 2022 | $372,660,000 | $270,505,300 | $643,165,300 | | $41,113,000 | $41,113,000 | $372,660,000 | $311,618,300 | $684,278,300 |
| 2023 | 372,390,000 | 251,872,300 | 624,262,300 | | 41,113,000 | 41,113,000 | 372,390,000 | 292,985,300 | 665,375,300 |
| 2024 | 371,350,000 | 233,252,800 | 604,602,800 | | 41,113,000 | 41,113,000 | 371,350,000 | 274,365,800 | 645,715,800 |
| 2025 | 369,470,000 | 214,685,300 | 584,155,300 | | 41,113,000 | 41,113,000 | 369,470,000 | 255,798,300 | 625,268,300 |
| 2026 | 366,675,000 | 196,211,800 | 562,886,800 | | 41,113,000 | 41,113,000 | 366,675,000 | 237,324,800 | 603,999,800 |
| 2027 | 362,890,000 | 177,878,050 | 540,768,050 | | 41,113,000 | 41,113,000 | 362,890,000 | 218,991,050 | 581,881,050 |
| 2028 | 358,030,000 | 159,733,550 | 517,763,550 | | 41,113,000 | 41,113,000 | 358,030,000 | 200,846,550 | 558,876,550 |
| 2029 | 352,010,000 | 141,832,050 | 493,842,050 | | 41,113,000 | 41,113,000 | 352,010,000 | 182,945,050 | 534,955,050 |
| 2030 | 344,740,000 | 124,231,550 | 468,971,550 | | 41,113,000 | 41,113,000 | 344,740,000 | 165,344,550 | 510,084,550 |
| 2031 | 336,095,000 | 106,994,550 | 443,089,550 | | 41,113,000 | 41,113,000 | 336,095,000 | 148,107,550 | 484,202,550 |
| 2032 | 325,990,000 | 90,189,800 | 416,179,800 | | 41,113,000 | 41,113,000 | 325,990,000 | 131,302,800 | 457,292,800 |
| 2033 | 311,050,000 | 77,150,200 | 388,200,200 | | 41,113,000 | 41,113,000 | 311,050,000 | 118,263,200 | 429,313,200 |
| 2034 | 294,385,000 | 64,708,200 | 359,093,200 | | 41,113,000 | 41,113,000 | 294,385,000 | 105,821,200 | 400,206,200 |
| 2035 | 154,195,000 | 52,932,800 | 207,127,800 | $121,695,000 | 41,113,000 | 162,808,000 | 275,890,000 | 94,045,800 | 369,935,800 |
| 2036 | 137,290,000 | 46,765,000 | 184,055,000 | 118,735,000 | 35,028,250 | 153,763,250 | 256,025,000 | 81,793,250 | 337,818,250 |
| 2037 | 118,370,000 | 41,273,400 | 159,643,400 | 115,625,000 | 29,091,500 | 144,716,500 | 233,995,000 | 70,364,900 | 304,359,900 |
| 2038 | 97,300,000 | 36,538,600 | 133,838,600 | 112,360,000 | 23,310,250 | 135,670,250 | 209,660,000 | 59,848,850 | 269,508,850 |
| 2039 | 64,880,000 | 32,646,600 | 97,526,600 | 117,980,000 | 17,692,250 | 135,672,250 | 182,860,000 | 50,338,850 | 233,198,850 |
| 2040 | 29,640,000 | 30,051,400 | 59,691,400 | 123,880,000 | 11,793,250 | 135,673,250 | 153,520,000 | 41,844,650 | 195,364,650 |
| 2041 | 12,780,000 | 28,865,800 | 41,645,800 | 111,985,000 | 5,599,250 | 117,584,250 | 124,765,000 | 34,465,050 | 159,230,050 |
| 2042 | 130,875,000 | 28,354,600 | 159,229,600 | | | | 130,875,000 | 28,354,600 | 159,229,600 |
| 2043 | 136,110,000 | 23,119,600 | 159,229,600 | | | | 136,110,000 | 23,119,600 | 159,229,600 |
| 2044 | 141,555,000 | 17,675,200 | 159,230,200 | | | | 141,555,000 | 17,675,200 | 159,230,200 |
| 2045 | 147,220,000 | 12,013,000 | 159,233,000 | | | | 147,220,000 | 12,013,000 | 159,233,000 |
| 2046 | 153,105,000 | 6,124,200 | 159,229,200 | | | | 153,105,000 | 6,124,200 | 159,229,200 |

*Deemed Issuance Date is 7/1/2021.

Detail on Tax-Exempt Current Interest Bonds

| | | | Detailed Summary of Tax-Exempt Term Bonds | | | | Tax-Exempt Annual Debt Service Cash Flows | | |
|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year (7/1) | Maturity | Term Maturity | Mandatory Sinking Fund Amortization | Term Principal | Coupon | 1st Call Date** | Fiscal Year (7/1) | Principal | Interest | Total Debt Service |
| Total | | | $5,861,055,000 | $5,861,055,000 | | | | $5,861,055,000 | $2,465,605,650 | $8,326,660,650 |
| 2022 | 7/1/22 | 2023 | 372,660,000 | | 5.000% | | 2022 | $372,660,000 | $270,505,300 | $643,165,300 |
| 2023 | 7/1/23 | 2023 | 372,390,000 | $745,050,000 | 5.000% | | 2023 | 372,390,000 | 251,872,300 | 624,262,300 |
| 2024 | 7/1/24 | 2025 | 371,350,000 | | 5.000% | | 2024 | 371,350,000 | 233,252,800 | 604,602,800 |
| 2025 | 7/1/25 | 2025 | 369,470,000 | $740,820,000 | 5.000% | | 2025 | 369,470,000 | 214,685,300 | 584,155,300 |
| 2026 | 7/1/26 | 2027 | 366,675,000 | | 5.000% | | 2026 | 366,675,000 | 196,211,800 | 562,886,800 |
| 2027 | 7/1/27 | 2027 | 362,890,000 | $729,565,000 | 5.000% | | 2027 | 362,890,000 | 177,878,050 | 540,768,050 |
| 2028 | 7/1/28 | 2029 | 358,030,000 | | 5.000% | | 2028 | 358,030,000 | 159,733,550 | 517,763,550 |
| 2029 | 7/1/29 | 2029 | 352,010,000 | $710,040,000 | 5.000% | | 2029 | 352,010,000 | 141,832,050 | 493,842,050 |
| 2030 | 7/1/30 | 2031 | 344,740,000 | | 5.000% | | 2030 | 344,740,000 | 124,231,550 | 468,971,550 |
| 2031 | 7/1/31 | 2031 | 336,095,000 | $680,835,000 | 5.000% | | 2031 | 336,095,000 | 106,994,550 | 443,089,550 |
| 2032 | 7/1/32 | 2033 | 325,990,000 | | 4.000% | 7/1/31 | 2032 | 325,990,000 | 90,189,800 | 416,179,800 |
| 2033 | 7/1/33 | 2033 | 311,050,000 | $637,040,000 | 4.000% | 7/1/31 | 2033 | 311,050,000 | 77,150,200 | 388,200,200 |
| 2034 | 7/1/34 | 2035 | 294,385,000 | | 4.000% | 7/1/31 | 2034 | 294,385,000 | 64,708,200 | 359,093,200 |
| 2035 | 7/1/35 | 2035 | 154,195,000 | $448,580,000 | 4.000% | 7/1/31 | 2035 | 154,195,000 | 52,932,800 | 207,127,800 |
| 2036 | 7/1/36 | 2037 | 137,290,000 | | 4.000% | 7/1/31 | 2036 | 137,290,000 | 46,765,000 | 184,055,000 |
| 2037 | 7/1/37 | 2037 | 118,370,000 | $255,660,000 | 4.000% | 7/1/31 | 2037 | 118,370,000 | 41,273,400 | 159,643,400 |
| 2038 | 7/1/38 | 2041 | 97,300,000 | | 4.000% | 7/1/31 | 2038 | 97,300,000 | 36,538,600 | 133,838,600 |
| 2039 | 7/1/39 | 2041 | 64,880,000 | | 4.000% | 7/1/31 | 2039 | 64,880,000 | 32,646,600 | 97,526,600 |
| 2040 | 7/1/40 | 2041 | 29,640,000 | | 4.000% | 7/1/31 | 2040 | 29,640,000 | 30,051,400 | 59,691,400 |
| 2041 | 7/1/41 | 2041 | 12,780,000 | $204,600,000 | 4.000% | 7/1/31 | 2041 | 12,780,000 | 28,865,800 | 41,645,800 |
| 2042 | 7/1/42 | 2046 | 130,875,000 | | 4.000% | 7/1/31 | 2042 | 130,875,000 | 28,354,600 | 159,229,600 |
| 2043 | 7/1/43 | 2046 | 136,110,000 | | 4.000% | 7/1/31 | 2043 | 136,110,000 | 23,119,600 | 159,229,600 |
| 2044 | 7/1/44 | 2046 | 141,555,000 | | 4.000% | 7/1/31 | 2044 | 141,555,000 | 17,675,200 | 159,230,200 |
| 2045 | 7/1/45 | 2046 | 147,220,000 | | 4.000% | 7/1/31 | 2045 | 147,220,000 | 12,013,000 | 159,233,000 |
| 2046 | 7/1/46 | 2046 | 153,105,000 | $708,865,000 | 4.000% | 7/1/31 | 2046 | 153,105,000 | 6,124,200 | 159,229,200 |

*Deemed Issuance Date is 7/1/2021.

**Callable on 7/1/2031 @ 103; Callable on 7/1/2032 @ 102; Callable on 7/1/2033 @ 101; Callable on 7/1/2034 @ 100

I-3

Detail on Taxable Current Interest Bonds

| | | | Detailed Summary of Taxable Term Bonds | | | | | Taxable Annual Debt Service Cash Flows | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal Year (7/1) | Maturity | Term Maturity | Mandatory Sinking Fund Amortization | Term Principal | Coupon | 1st Call Date** | Fiscal Year (7/1) | Principal | Interest | Total Debt Service |
| Total | | | $822,260,000 | $822,260,000 | | | Total | $822,260,000 | $698,096,750 | $1,520,356,750 |
| 2022 | 7/1/22 | | | | | | 2022 | | $41,113,000 | $41,113,000 |
| 2023 | 7/1/23 | | | | | | 2023 | | 41,113,000 | 41,113,000 |
| 2024 | 7/1/24 | | | | | | 2024 | | 41,113,000 | 41,113,000 |
| 2025 | 7/1/25 | | | | | | 2025 | | 41,113,000 | 41,113,000 |
| 2026 | 7/1/26 | | | | | | 2026 | | 41,113,000 | 41,113,000 |
| 2027 | 7/1/27 | | | | | | 2027 | | 41,113,000 | 41,113,000 |
| 2028 | 7/1/28 | | | | | | 2028 | | 41,113,000 | 41,113,000 |
| 2029 | 7/1/29 | | | | | | 2029 | | 41,113,000 | 41,113,000 |
| 2030 | 7/1/30 | | | | | | 2030 | | 41,113,000 | 41,113,000 |
| 2031 | 7/1/31 | | | | | | 2031 | | 41,113,000 | 41,113,000 |
| 2032 | 7/1/32 | | | | | | 2032 | | 41,113,000 | 41,113,000 |
| 2033 | 7/1/33 | | | | | | 2033 | | 41,113,000 | 41,113,000 |
| 2034 | 7/1/34 | | | | | | 2034 | | 41,113,000 | 41,113,000 |
| 2035 | 7/1/35 | 2041 | $121,695,000 | | 5.000% | 7/1/31 | 2035 | $121,695,000 | 41,113,000 | 162,808,000 |
| 2036 | 7/1/36 | 2041 | 118,735,000 | | 5.000% | 7/1/31 | 2036 | 118,735,000 | 35,028,250 | 153,763,250 |
| 2037 | 7/1/37 | 2041 | 115,625,000 | | 5.000% | 7/1/31 | 2037 | 115,625,000 | 29,091,500 | 144,716,500 |
| 2038 | 7/1/38 | 2041 | 112,360,000 | | 5.000% | 7/1/31 | 2038 | 112,360,000 | 23,310,250 | 135,670,250 |
| 2039 | 7/1/39 | 2041 | 117,980,000 | | 5.000% | 7/1/31 | 2039 | 117,980,000 | 17,692,250 | 135,672,250 |
| 2040 | 7/1/40 | 2041 | 123,880,000 | | 5.000% | 7/1/31 | 2040 | 123,880,000 | 11,793,250 | 135,673,250 |
| 2041 | 7/1/41 | 2041 | 111,985,000 | $822,260,000 | 5.000% | 7/1/31 | 2041 | 111,985,000 | 5,599,250 | 117,584,250 |

*Deemed Issuance Date is 7/1/2021.

**Callable on 7/1/2031 @ 103; Callable on 7/1/2032 @ 102; Callable on 7/1/2033 @ 101; Callable on 7/1/2034 @ 100

Capital Appreciation Bonds: 5.000% July 1, 2024 Maturity

| Date | Initial Principal | Accreted Value at each Redemption Date (2) | Maturity Value (3) |
|---|---|---|---|
| 7/1/22 | $100,862,061.30 | $105,968,971.50 | $116,970,000.00 |
| 7/1/23 | 96,003,057.15 | 105,969,766.35 | 111,335,000.00 |
| 7/1/24 (1) | 91,376,871.30 | 105,970,000.00 | 105,970,000.00 |
| Total | $288,241,989.75 | $317,908,737.85 | $334,275,000.00 |

(1) Stated maturity; not a sinking fund redemption
(2) Equals the initial principal amount plus accreted interest to each sinking fund redemption date
(3) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity.

Capital Appreciation Bonds: 5.375% July 1, 2033 Maturity*

| Date | Initial Principal | Accreted Value at each Redemption Date (2) | Maturity Value (3) |
|---|---|---|---|
| 7/1/29 | $98,129,013.00 | $149,997,523.50 | $185,450,000.00 |
| 7/1/30 | 93,059,851.80 | 149,997,764.30 | 175,870,000.00 |
| 7/1/31 | 88,252,614.90 | 149,998,089.75 | 166,785,000.00 |
| 7/1/32 | 83,694,073.80 | 149,998,937.80 | 158,170,000.00 |
| 7/1/33 (1) | 79,371,000.00 | 150,000,000.00 | 150,000,000.00 |
| Total | $442,506,553.50 | $749,992,315.35 | $836,275,000.00 |

(1) Stated maturity; not a sinking fund redemption
(2) Equals the initial principal amount plus accreted interest to each sinking fund redemption date
(3) Equals the total accreted value that would be represented by the portion of the bonds being redeemed if held to maturity.
*Callable on 7/1/2031 and thereafter at accreted value.

I-5

# EXHIBIT J

DESCRIPTION OF CVI TERMS AND WATERFALL PROVISIONS

**Exhibit J**
**General Terms Applicable to Both GO CVI and Subject to Waterfall Clawback CVI**

| TERM | DESCRIPTION |
|---|---|
| **Outperformance Metric** | ▪ See Annex 5 |
| **Structure** | ▪ Attachment Point: 100% of CW Fiscal Plan projections as included in Annex 5 (the "Baseline SUT") of this exhibit<br>▪ The Commonwealth shall pledge its full faith, credit and taxing power under the Puerto Rico Constitution and applicable Puerto Rico law for payment of the GO CVI, Subject to Waterfall Clawback CVI, and Not Subject to Waterfall Clawback CVI<br>   ○ See Annex 1 for terms specific to GO CVI<br>   ○ See Annex 2 for terms specific to Clawback CVI<br>▪ For the avoidance of doubt, when the term "Clawback CVI" is used on its own throughout this exhibit, the term encompasses both the Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI, defined as follows<br>   ○ **Subject to Waterfall Clawback CVI**: Represents portion of payments to Clawback CVI made from the Subject to Waterfall Outperformance Amount,<br>   ○ **Not Subject to Waterfall Clawback CVI**: Represents portion of payments to Clawback CVI made from the Not Subject to Waterfall Outperformance Amount<br>▪ Security provisions as described in Section 4.10 (b) of the CW Plan Support Agreement<br>▪ Amounts paid to various CVI instruments are subject to applicable caps, including GO CVI Maximum Annual Payment, GO CVI Lifetime Cap, Clawback CVI Maximum Annual Payment, and Clawback CVI Lifetime Cap (as defined throughout this exhibit) |
| **Measurement Date** | ▪ Measured as of the end of each Fiscal Year, beginning FY22<br>▪ Payment and measurement mechanics to be determined |
| **Subject to Waterfall Outperformance Amount** | ▪ Lesser of, on an annual basis (the "Subject to Waterfall Outperformance Amount"):<br>   ○ (i) 50% of cumulative outperformance relative to the 5.5% SUT Baseline in Annex 5 (which, for the avoidance of doubt, includes both overperformance and underperformance), starting on July 1, 2021, less payments previously made to GO CVI and Subject to Waterfall Clawback CVI<br>       ▪ For the avoidance of doubt, amounts paid to Clawback CVI will first be allocated to Subject to Waterfall Clawback CVI (from Subject to Waterfall Annual |

J-2

| TERM | DESCRIPTION |
|---|---|
| | Payments, as defined below) for purposes of calculation of payments previously made<br>  o (ii) 75% of annual outperformance (which, for the avoidance of doubt, includes both outperformance and underperformance)<br>▪ For the avoidance of doubt, the Subject to Waterfall Outperformance Amount may not be less than $0 in a given year |
| **Subject to Waterfall Annual Mandatory Redemption Payments** | ▪ <u>Years 1-22</u>: From the Subject to Waterfall Outperformance Amount, annual payment waterfall is as follows (the "Annual Payment Waterfall"):<br>  o (a) First $100,000,000 to GO CVI<br>  o (b) Next $11,111,111 to Subject to Waterfall Clawback CVI<br>  o (c) Thereafter, pro rata sharing as follows:<br>    ▪ 90% to GO CVI<br>    ▪ 10% to Subject to Waterfall Clawback CVI<br>▪ To the extent that the GO CVI Lifetime Cap (as defined below) is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, 100% of the Subject to Waterfall Outperformance Amount would accrue to the Subject to Waterfall Clawback CVI beginning in the following year<br>▪ <u>Years 23-30</u>: 100% of Subject to Waterfall Outperformance Amount to Subject to Waterfall Clawback CVI |
| **SUT True-Up** | ▪ No adjustment required:<br>  o Exemptions / holidays included in the Puerto Rico Internal Revenue Code as of the date of the Plan Support Agreement (sections 4030.01 through 4030.27)<br>▪ Baseline SUT Reduced (the "Baseline SUT Reduction"):<br>  o Exemptions/Holiday during U.S. Presidential Declaration of Disaster for a period not to exceed 30 days and only for emergency-related categories of spend. If Exemptions/Holiday exceed 30 day period, the amount of any exemptions beyond such 30 day period will be included under the SUT True-Up mechanism defined below<br>▪ In-Year SUT Revenue Increased ("SUT True-Up"):<br>  o Any other exemption implemented by the Government under applicable law<br>▪ For the calculation of either the Baseline SUT Reduction or SUT True-Up, the calculation will be determined by the Treasury Secretary and validated by an independent third party and will be publicly disclosed. Validation of independent third party binding on both the Government and Creditors |

| TERM | DESCRIPTION |
|---|---|
|  | <ul><li>Documentation in a separate agreement on the methodology the independent third party will use to verify the Treasury Secretary's calculation</li><li>To the extent the Commonwealth reduces the 5.5% SUT to a lower rate, a formulaic adjustment to be agreed upon by the Board and Initial PSA Creditors to maintain the same amount of outperformance had the Measured SUT remained at 5.5%. Further protections provided in Section 4.10 (b)(xi) of the CW Plan Support Agreement</li></ul> |

## ANNEX 1: GO CVI-SPECIFIC TERMS

| TERM | DESCRIPTION |
|---|---|
| **GO CVI Lifetime Cap** | ▪ $3,500 million (the "GO CVI Lifetime Cap") |
| **GO CVI Term** | ▪ 22 years (FY2043)<br>▪ Deemed issuance date of July 1, 2021 |
| **Payments to GO CVI** | ▪ As referenced within (a) and (c) of Annual Payment Waterfall, subject to the GO CVI Maximum Annual Payment and the GO CVI Lifetime Cap |
| **GO CVI Maximum Annual Payment** | ▪ Maximum annual payment of $200 million for the GO CVI plus any unused amounts from previous years, subject to annual payment not being greater than $400 million for the GO CVI. For the avoidance of doubt, the GO CVI Maximum Annual Payment is calculated as the lesser of the (i) the sum of GO CVI Carryforward Balance (see below) and $200 million and (ii) $400 million<br>▪ The GO CVI Carryforward Balance shall be calculated as follows:<br>   ○ (a) In year 1, an amount equal to $0<br>   ○ (b) For each year thereafter, the Annual GO CVI Carryforward Amount (see below) shall be added to (if positive) or subtracted from (if negative) the GO CVI Carryforward Balance.<br>       ▪ The Annual GO CVI Carryforward Amount shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $200 million and (z) CVI payments (if any) made to the GO CVI in the prior fiscal year<br>▪ To the extent there is a positive GO CVI Carryforward Balance remaining at the end of the 22-year term, the Commonwealth will not owe any further amount to GO CVI |
| **GO CVI Call Structure** | ▪ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the GO CVI |
| **GO CVI Allocation** | ▪ See Annex 3 |

## ANNEX 2: CLAWBACK CVI-SPECIFIC TERMS

| TERM | DESCRIPTION |
|---|---|
| **Clawback CVI Lifetime Cap** | ▪ $3,697,668,995 for Allowed CW/HTA Claims, $217,228,391 for Allowed CW/Convention Claims, $22,580,090 for Allowed CW/MBA Claim, and $1,301,525,288 for Allowed CW/PRIFA Rum Tax Claims[3] (in total, $5,239,002,764)<br>    ○ Applies to aggregate Clawback CVI payments, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI |
| **Clawback CVI Term** | ▪ 30 years (FY2051)<br>▪ Deemed issuance date of July 1, 2021 |
| **Mandatory Redemption Payments to Subject to Waterfall Clawback CVI** | ▪ Years 1-22: As referenced within (b) and (c) of Annual Payment Waterfall, subject to the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap<br>▪ Years 23-30: From 100% of the Subject to Waterfall Outperformance Amount, subject to the Clawback CVI Maximum Annual Payment and the Clawback CVI Lifetime Cap<br>    ○ To the extent that GO CVI Lifetime Cap (as defined above) is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, 100% of the Subject to Waterfall Outperformance Amount would accrue to the Clawback CVI beginning in the following year subject to applicable Clawback CVI Maximum Annual Mandatory Redemption Payment (as specified below) and Clawback CVI Lifetime Cap |
| **Not Subject to Waterfall Outperformance Amount** | ▪ Lesser of, on an annual basis (the "Not Subject to Waterfall Outperformance Amount"):<br>    ○ (i) 40% of cumulative outperformance relative to the 5.5% SUT Baseline in Annex 5 (which, for the avoidance of doubt, includes both overperformance and underperformance), starting on July 1, 2021, less payments previously made to Not Subject to Waterfall Clawback CVI<br>    ○ (ii) 95% of annual outperformance (which, for the avoidance of doubt, includes both outperformance and underperformance), less amounts paid to GO CVI and Subject to Waterfall Clawback CVI for the corresponding fiscal year<br>▪ For the avoidance of doubt, the Not Subject to Waterfall Outperformance Amount may not be less than $0 in a given year |

---

[3] Both (i) Clawback CVI Payments on account of Allowed CW/PRIFA Rum Tax Claims and (ii) Rum Tax CVI Annual Payments (as defined in Exhibit "F" to the PRIFA Plan Support Agreement) to holders of Allowed CW/PRIFA Rum Tax Claims will be subject to an aggregate $1,301,525,288.00 lifetime cap.

| TERM | DESCRIPTION |
|---|---|
| **Mandatory Redemption Payments Not Subject to Waterfall Clawback CVI** | ▪ 100% of Not Subject to Waterfall Outperformance Amount, subject to any applicable caps, including both Clawback CVI Maximum Annual Payment and Clawback CVI Lifetime Cap |
| **Clawback CVI Maximum Annual Payment** | ▪ Years 1-22: Maximum annual payment of $175 million plus any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $350 million) for the Clawback CVI, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI. For the avoidance of doubt, the Clawback CVI Maximum Annual Payment during this period is calculated as the lesser of (i) the sum of Clawback CVI Carryforward Balance (see below) and $175 million and (ii) $350 million<br>    ○ The Clawback CVI Carryforward Balance shall be calculated as follows:<br>        ▪ (a) In year 1, an amount equal to $0<br>        ▪ (b) For each year thereafter, the Annual Clawback CVI Carryforward Amount shall be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance. The Annual Clawback CVI Carryforward Amount during this period shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $175 million and (z) aggregate CVI payments made to the Subject to Waterfall Clawback CVI (if any) and the Not Subject to Waterfall Clawback CVI (if any) in the prior fiscal year<br>▪ Years 23-30: Maximum annual payment of $375 million plus any unused amounts from previous years, subject to a cap in any one year of twice the applicable annual cap (i.e., $750 million) for the Clawback CVI, including payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI. For the avoidance of doubt, the Clawback CVI Maximum Annual Payment during this period is calculated as the lesser of (i) the sum of the Clawback CVI Carryforward Balance (see below) and $375 million and (ii) $750 million.<br>    ○ The Annual Clawback CVI Carryforward Amount during this period shall be calculated as the difference between (which, for the avoidance of doubt, may be a positive or negative number) (y) $375 million and (z) aggregate CVI payments made (if any) to the Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI in the prior fiscal year<br>    ○ Such Annual Clawback CVI Carryforward Amount will be added to (if positive) or subtracted from (if negative) the Clawback CVI Carryforward Balance<br>▪ To the extent that GO CVI Lifetime Cap is met (i.e., aggregate $3,500 million paid to GO CVI) in year 21 or prior, the $375 million annual payment cap – and annual payment cap up to $750 |

J-8

| TERM | DESCRIPTION |
|---|---|
| | million to the extent sufficient Clawback CVI Carryforward Balance is available – for the Clawback CVI, including CVI payments to both Subject to Waterfall Clawback CVI and Not Subject to Waterfall Clawback CVI, would begin in the following year<br>▪ To the extent there is a positive Clawback CVI Carryforward Balance remaining at the end of the 30-year term, the Commonwealth will not owe any further amount to Clawback CVI<br>▪ For the avoidance of doubt, when calculating whether aggregate payments to Clawback CVI are limited by the Clawback CVI Maximum Annual Payment, payments to Subject to Waterfall Clawback CVI are counted first against the Clawback CVI Maximum Annual Payment before payments to Not Subject to Waterfall Clawback CVI are counted |
| **Clawback CVI Call Structure** | ▪ Callable on any date at an aggregate value equal to the maximum amount of future payments present valued at an uncapped discount rate of the Treasury Rate + 100 basis points, wherein the Treasury Rate means the yield (or interpolated yield) of the comparable U.S. treasury security (or securities) that has an actual maturity (or interpolated maturity) that is closest to the remaining average life of the remaining maximum payments of the Clawback CVI |
| **Clawback CVI Allocation** | ▪ See Annex 4 |

## ANNEX 3: GO CVI ALLOCATION SUMMARY

| Claim | GO CVI Allocation % |
|---|---:|
| Vintage CW Bond Claim | 32.244% |
| 2011 CW Series D/E/PIB Bond Claim | 3.514% |
| 2011 CW Bond Claim | 2.479% |
| 2012 CW Bond Claim[4] | 15.157% |
| 2014 CW Bond Claim[5] | 20.266% |
| Vintage CW Guarantee Claim | 15.194% |
| 2011 CW Guarantee Bond Claim | 7.552% |
| 2012 CW Guarantee Bond Claim | 3.594% |

---

[4] 2012 CW Bond Claim amount includes $198 million of the Hacienda loans and $25 million of the GSA Helicopter Loan.

[5] 2014 CW Bond Claim amount includes $84 million of the PRIFA BANs and $263 million of the Ports bonds.

## ANNEX 4: CLAWBACK CVI ALLOCATION SUMMARY

| Claim | Clawback CVI Allocation % |
|---|---|
| Allowed CW/HTA Claims[6] | 68.6% |
| Allowed CW/Convention Claims | 4.0% |
| Allowed CW/PRIFA Rum Tax Claims | 27.0% |
| Allowed CW/MBA Claims | 0.4% |

---

[6] See Annex 6 for details of priority distribution waterfall of CVI payments from Clawback CVI allocation to Allowed CW/HTA Claims.

## ANNEX 5: 5.5% SUT BASELINE[7]

*($ USD)*

| | 5.5% SUT Baseline | | |
|---|---|---|---|
| **Fiscal Year** | **Amount** | **Fiscal Year** | **Amount** |
| 2022 | $1,282,901,069.30 | 2037 | $1,452,657,050.02 |
| 2023 | 1,279,617,661.88 | 2038 | 1,477,755,111.63 |
| 2024 | 1,301,220,703.34 | 2039 | 1,495,355,971.13 |
| 2025 | 1,315,295,083.41 | 2040 | 1,518,089,898.19 |
| 2026 | 1,345,037,783.09 | 2041 | 1,541,405,892.18 |
| 2027 | 1,377,398,882.61 | 2042 | 1,565,457,864.38 |
| 2028 | 1,403,141,426.98 | 2043 | 1,590,148,747.39 |
| 2029 | 1,414,785,980.78 | 2044 | 1,616,252,365.93 |
| 2030 | 1,427,393,695.32 | 2045 | 1,642,150,220.79 |
| 2031 | 1,437,998,166.98 | 2046 | 1,668,748,988.64 |
| 2032 | 1,447,406,781.79 | 2047 | 1,696,060,240.60 |
| 2033 | 1,428,210,572.57 | 2048 | 1,724,082,302.73 |
| 2034 | 1,426,102,595.91 | 2049 | 1,752,859,808.94 |
| 2035 | 1,429,798,842.15 | 2050[(4)] | 1,781,536,796.27 |
| 2036 | 1,438,540,327.00 | 2051[(4)] | 1,810,682,942.40 |

---

[7] May 2020 Fiscal Plan contains projections through FY2049. FY2050 and FY2051 baseline calculated using FY2049 projections and the average growth rate from FY2045-FY2049.

**ANNEX 6: PRIORITY DISTRIBUTION WATERFALL FROM CLAWBACK CVI ALLOCATION TO ALLOWED CW/HTA CLAIMS**

| TERM | DESCRIPTION |
|---|---|
| **HTA Clawback CVI Priority Distribution Waterfall[8]** | ■ <u>First</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, Clawback CVI payments, if any, to the HTA 68 Bond Claims up to $179,462,539<br>■ <u>Second</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to HTA 98 Senior Bond Claims up to $1,833,405,578<br>■ <u>Third</u>, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to HTA 98 Sub Bond Claims up to $207,294,178<br>■ <u>Fourth</u>, after paying the permitted amounts above in full, from the Clawback CVI allocated to Allowed CW/HTA Claims, remaining Clawback CVI payments, if any, to the GDB HTA Loans up to $1,477,506,700<br>■ Waterfall implemented to the maximum extent allowable against the Commonwealth and subject to judicial determination |

---

[8] Capitalized terms used but not otherwise defined within Annex 6 shall have the meanings ascribed to them in the HTA/CCDA Related Plan Support Agreement.

Case 17-03283-LTS Doc 2195513 Filed 02/07/23 Entered 02/07/23 22:45:54 Desc Certain Exhibit Amended Plan Page 395 of 635

# **EXHIBIT K**

SCHEDULE OF PREEMPTED STATUTES

## List of Main Statutes Preempted by PROMESA[9]

I. **Commonwealth good faith and credit pledge statutes**
   A. General Obligation Bonds
      1. Act 2 approved October 10, 1985.
      2. Act 1 approved June 26, 1987, as amended.
      3. Act 34 approved March 4, 2014.
      4. Act 79 approved June 1, 2011.
      5. Act 243 approved August 9, 2008.
      6. Act 43 approved August 1, 2005, as amended.
      7. Act 216 approved August 19, 2004.
      8. Act 100 approved July 12, 2002, as amended.
      9. Act 161 approved July 5, 2003.
      10. Act 149 approved August 9, 2002, as amended.
      11. Joint Resolution No. 57 approved July 12, 1993.
      12. Act 54 approved July 6, 2001.
      13. Act 118 approved July 13, 2000.
      14. Act 153 approved July 16, 1999.
      15. Act 219 approved August 9, 1998.
      16. Act 81 approved August 14, 1997.
      17. Act 119 approved August 9, 1995.
      18. Act 46 approved July 28, 1994.
      19. Act 39 approved May 13, 1976, as amended.
      20. Act 83 approved August 30, 1991.[10]

   B. General Obligation Loans
      1. GSA Police Helicopters Loan – Joint Resolution No. 99-2013 approved December 9, 2013.
      2. GDB Loans to the Commonwealth
         1. Joint Resolution No. 104 approved December 13, 2013. [$15 million line of credit for the Legislature's Capitol District.]
         2. Joint Resolution No. 96 approved November 27, 2013.  [$30 million line of credit].

   C. Commonwealth Guaranty – Public Buildings Authority Bonds
      1. Act 17 approved April 11, 1968, as amended.

   D. Commonwealth Guaranty – APLA
      1. Act 409 approved September 22, 2004.

   E. Commonwealth Guaranty – PRIFA-BANs
      1. Act 1 approved January 1, 2015.

   F. [Commonwealth Guaranty – PRASA

---

[9] Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted.
[10] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

K-2

        1. Act 45 approved July 28, 1994.]

**II.   Statutes appropriating Commonwealth revenues**
    A. HTA
        1. Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021 [motor vehicle license fees]
        2. 13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]
        3. 13 L.P.R.A. § 31751(a)(3). [cigarette tax]
    B. PRIFA
        1. Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914. [rum cover over]
    C. PRIFA BANs
        1. Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a). [petroleum products]
    D. MBA
        1. 13 L.P.R.A. § 31751(a)(4). [cigarette tax]
    E. PRITA
        1. 13 L.P.R.A. § 31751(a)(5). [cigarette tax]

    F. CCDA
        1. 13 L.P.R.A. § 2271v(a). [hotel room tax]
    G. Act 147 enacted June 18, 1980, as amended
        1. 23 L.P.R.A. § 104.[11] [judiciary appropriation]
    H. UPR
        1. 18 L.P.R.A. § 621-1.[12]
    I. Act 83 approved August 30, 1991, as amended[13]
        1. 21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[14]
    J. Act 221 approved May 15, 1948, as amended
        1. 15 L.P.R.A. § 74(d).[15]
    K. Act 18 approved January 24, 2014, as amended
        1. 21 L.P.R.A. § 6742.[16]
    L. Act 41 approved July 22, 2011, as amended
        1. 12 L.P.R.A. §8105

---

[11] In Fiscal Year 2019, appropriations under 23 L.P.R.A. § 104 would amount to more than $250 million, if not preempted.

[12] In Fiscal Year 2019, appropriations under 18 L.P.R.A. § 621-1 would amount to more than $750 million, if not preempted.

[13] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

[14] In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5002, 5004 would amount to more than $100 million, if not preempted. In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5006, 5815 would amount to more than $200 million, if not preempted.

[15] In Fiscal Year 2019, appropriations under 15 L.P.R.A. § 74(d) would amount to more than $250 million, if not preempted.

[16] In Fiscal Year 2019, appropriations under 21 L.P.R.A. § 6742 would amount to more than $120 million, if not preempted.

III. **TRS and JRS Statutes**
      A. Act 106 approved August 23, 2017
      B. Act 160 approved December 24, 2013
      C. Act 91 of March 24, 2004
      D. Act 12 approved October 19, 1954
      E. Act 162 approved December 24, 2013

IV. **Article VI of the Puerto Rico Constitution**
      A. Whether the rights provided by Article VI, Sections 6 and 8 of the Puerto Rico Constitution to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant to the Plan are Preempted by PROMESA is settled by the treatment of such bonds and indebtedness pursuant to the provisions of the Plan. Nothing in the Plan affects or determines whether Article VI, Sections 6 and 8 of the Puerto Rico Constitution is preempted for any future purpose.

K-4

**EXHIBIT L**

BOND RECOVERY CATEGORIES

| Bond Recovery Category | Classes Included |
| --- | --- |
| **Vintage PBA Bond Claims** | 1, 2, 3, 4, 5, 6 and 7 |
| **2011 PBA Bond Claims** | 8 and 9 |
| **2012 PBA Bond Claims** | 10 and 11 |
| **Vintage CW Bond Claims** | 15, 16, 17, 18, 19, 20, 21, and 22 |
| **2011 CW Series D/E/PIB Bond Claims** | 36, 37, 38, and 39 |
| **2011 CW Bond Claims** | 30, 31, 32, and 33 |
| **2012 CW Bond Claims** | 40, 41, 42, and 43 |
| **2014 CW Bond Claims** | 46, 47, 48, 49 and 50 |
| **Vintage CW Guarantee Bond Claims** | 23, 24, 25, 26, 27, 28, and 29 |
| **2011 CW Guarantee Bond Claims** | 34 and 35 |
| **2012 CW Guarantee Bond Claims** | 44 and 45 |

# **EXHIBIT M**

DESCRIPTION OF RUM TAX CVI ANNUAL PAYMENT TERMS

**Exhibit M**
**Terms Applicable to Rum Tax CVI Annual Payment**

| TERM | DESCRIPTION |
|---|---|
| **1) Rum Tax CVI Annual Payment** | |
| **a) Outperformance Metric** | ▪ See Annex 1, which is equivalent to 100% of general fund rum tax collections (i.e., aggregation of Items B, E, and I in Annex 2) per Rum Tax Waterfall (see Annex 2) within CW 2021 Fiscal Plan projections (the "Outperformance Metric") |
| **b) Measurement Date** | ▪ Measured as of the end of each Fiscal Year, beginning FY22<br>▪ Payment and measurement mechanics to be determined |
| **c) Rum Tax CVI Notional / Lifetime Cap** | ▪ Clawback CVI Payments on account of Allowed CW/PRIFA Rum Tax Claims and Rum Tax CVI Annual Payments to holders of Allowed CW/PRIFA Rum Tax Claims subject to an aggregate $1,301,525,288 lifetime cap. |
| **d) Rum Tax CVI Term** | ▪ 30 years (FY2051)<br>▪ Deemed issuance date of July 1, 2021 |
| **e) Supplemental Cover Over** | ▪ Amount per proof-gallon that the U.S. Treasury can cover-over to the Commonwealth of Puerto Rico on account of rum taxes, less $10.50, for the applicable fiscal year |
| **f) Supplemental Cover Over Revenues** | ▪ The amount of Supplemental Cover Over Revenues is calculated as the product of (i) the ratio of Supplemental Cover Over divided by the sum of (a) the Supplemental Cover Over and (b) $10.50 (the "Base Cover Over") and (ii) total rum tax collections received by the Commonwealth as documented within the U.S. Department of Treasury monthly detailed activity report of net excise tax due to the Government of Puerto Rico and certified by Hacienda ("Commonwealth Rum Tax Revenues")<br>  ○ For purposes of calculating the Rum Tax CVI Annual Payment based on outperformance of Waterfall General Fund Rum Tax Collections (as defined below) relative to the Outperformance Metric, the maximum amount of Supplemental Cover Over Revenues in each applicable fiscal year is $88,000,000 ("Supplemental Cover Over Revenues Cap") |

M-2

| TERM | DESCRIPTION |
|---|---|
| g) **Waterfall Supplemental Cover Over Revenues** | ▪ The amount of Waterfall Supplemental Cover Over Revenues is calculated as the lesser of (i) Supplemental Cover Over Revenues and (ii) Supplemental Cover Over Revenues Cap |
| h) **Base Cover Over Revenues** | ▪ The amount of Base Cover Over Revenues is calculated as the product of (i) the ratio of the Base Cover Over divided by the sum of (a) the Supplemental Cover Over and (b) the Base Cover Over and (ii) Commonwealth Rum Tax Revenues |
| i) **Waterfall Cover Over Revenues** | ▪ The amount of Waterfall Cover Over Revenues is calculated as the sum of (i) Waterfall Supplemental Cover Over Revenues and (ii) Base Cover Over Revenues |
| j) **Rum Producer Incentive** | ▪ The permitted incentive percentage ("Rum Producer Incentive Percentage", included in calculations of Items D and H in Annex 2) that is utilized in calculating amounts paid to rum producers ("Rum Producer Incentive Payments") is subject to the following constraints:<br> ○ For the first 10 years (i.e. FY2022-2031), maximum of 46%<br> ○ For the next 5 years (i.e. FY2032-2036), maximum of 48%<br> ○ For the following 15 years (i.e. FY2037-2051), maximum of 50%<br>▪ For the avoidance of doubt, any increase in Rum Producer Incentive Percentage within the limits set forth above will not affect the Outperformance Metric<br>▪ Notwithstanding the limits for the purposes of the Rum Tax Waterfall calculation as set forth in this section 1(k), the Rum Producer Incentive Percentage may be increased beyond the limits set forth above at the Commonwealth's discretion, subject to those increases not impacting the Outperformance Condition calculation and payment |
| k) **Permitted Rum Tax Waterfall Deductions** | Permitted Rum Tax Waterfall Deductions are calculated as the sum of the following:<br>▪ Science and Technology Trust (i.e., Item C in Annex 2)<br> ○ $5 million transferred to the Puerto Rico Science, Research, and Technology Trust Fund account<br>▪ Rum Producer Incentive Payments (i.e., Items D and H in Annex 2)<br> ○ As described above in section 1(k)<br>▪ Conservation Trust (i.e., Item F in Annex 2) |

| TERM | DESCRIPTION |
|------|-------------|
| | ○ Calculated as the product of (a) Supplemental Cover Over Revenues and (b) 1/6th <br> ○ Amount transferred to Puerto Rico Conservation Trust account <br> ▪ PRIDCO (i.e., Item G in Annex 2) <br>    ○ Calculated as the lesser of (i) $5 million and (ii) (a) 2.5% multiplied by (b) Commonwealth Rum Tax Revenues <br>    ○ Amount transferred to Puerto Rico Industrial Development Company account |
| **l) Waterfall General Fund Rum Tax Collections** | ▪ Waterfall General Fund Rum Tax Collections are calculated as (i) Waterfall Cover Over Revenues less (ii) Permitted Rum Tax Waterfall Deductions |
| **m) Rum Tax CVI Annual Payment** | ▪ On an annual basis, the lesser of the following: <br> ○ (i) 40% of cumulative outperformance of Waterfall General Fund Rum Tax Collections above the Outperformance Metric, starting on July 1, 2021, less the aggregate amount of previous Rum Tax CVI Annual Payments <br> ○ (ii) 50% of annual outperformance of Waterfall General Fund Rum Tax Collections above the Outperformance Metric, measured at the conclusion of each fiscal year <br> ○ (iii) $30 million |
| **n) Reporting** | ▪ Reporting obligations and audit rights related to the Rum Tax Revenues and calculation of the Rum Tax CVI Annual Payment to be agreed upon by no later than the PRIFA Effective Date (as defined within the PRIFA Related Plan Support Agreement) |

M-4

**ANNEX 1: OUTPERFORMANCE METRIC**
*($ in USD)*

| Outperformance Metric | | | |
|---|---|---|---|
| **Fiscal Year** | **Amount** | **Fiscal Year** | **Amount** |
| 2022 | $208,569,215.76 | 2037 | $208,781,748.91 |
| 2023 | 200,354,469.05 | 2038 | 209,289,240.57 |
| 2024 | 201,031,406.80 | 2039 | 209,788,269.00 |
| 2025 | 201,692,902.40 | 2040 | 210,278,694.61 |
| 2026 | 202,348,675.07 | 2041 | 210,749,432.35 |
| 2027 | 202,998,555.87 | 2042 | 211,211,199.81 |
| 2028 | 203,632,157.16 | 2043 | 211,674,906.69 |
| 2029 | 204,259,404.03 | 2044 | 212,129,474.13 |
| 2030 | 204,869,786.20 | 2045 | 212,574,772.82 |
| 2031 | 205,473,363.12 | 2046 | 213,021,852.71 |
| 2032 | 206,059,507.07 | 2047 | 213,459,499.22 |
| 2033 | 206,627,882.49 | 2048 | 213,898,852.55 |
| 2034 | 207,188,744.83 | 2049 | 214,339,919.35 |
| 2035 | 207,731,302.94 | 2050 | 214,782,706.32 |
| 2036 | 208,265,935.46 | 2051 | 215,227,220.15 |

## ANNEX 2: RUM TAX WATERFALL[17]

($ in USD millions)

| Fiscal Year | Item | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Projected Rum Tax** | A | $383 | $341 | $344 | $346 | $348 | $350 | $353 | $355 | $357 | $359 | $361 | $363 | $365 | $367 | $369 |
| General Fund | B | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) |
| Remaining | | $266 | $224 | $227 | $229 | $231 | $233 | $236 | $238 | $240 | $242 | $244 | $246 | $248 | $250 | $252 |
| Science and Technology Trust | C | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $261 | $219 | $222 | $224 | $226 | $228 | $231 | $233 | $235 | $237 | $239 | $241 | $243 | $245 | $247 |
| Incentive Pay. to Rum Producers | D | (120) | (101) | (102) | (103) | (104) | (105) | (106) | (107) | (108) | (109) | (110) | (111) | (112) | (113) | (113) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $141 | $118 | $120 | $121 | $122 | $123 | $125 | $126 | $127 | $128 | $129 | $130 | $131 | $132 | $133 |
| General Fund | E | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) |
| Remaining | | $93 | $70 | $72 | $73 | $74 | $75 | $77 | $78 | $79 | $80 | $81 | $82 | $83 | $84 | $85 |
| Conservation Trust | F | (8) | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Remaining | | $86 | $70 | $72 | $73 | $74 | $75 | $77 | $78 | $79 | $80 | $81 | $82 | $83 | $84 | $85 |
| PRIDCO | G | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $81 | $65 | $67 | $68 | $69 | $70 | $72 | $73 | $74 | $75 | $76 | $77 | $78 | $79 | $80 |
| Rum Producers | H | (37) | (30) | (31) | (31) | (32) | (32) | (33) | (33) | (34) | (34) | (35) | (35) | (36) | (36) | (37) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $44 | $35 | $36 | $37 | $37 | $38 | $39 | $39 | $40 | $40 | $41 | $42 | $42 | $43 | $43 |
| General Fund | I | (44) | (35) | (36) | (37) | (37) | (38) | (39) | (39) | (40) | (40) | (41) | (42) | (42) | (43) | (43) |
| Remaining | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Outperformance Metric** | | $209 | $200 | $201 | $202 | $202 | $203 | $204 | $204 | $205 | $205 | $206 | $207 | $207 | $208 | $208 |

| Fiscal Year | Item | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total Projected Rum Tax** | A | $370 | $372 | $374 | $375 | $377 | $379 | $380 | $382 | $383 | $385 | $386 | $388 | $389 | $391 | $392 |
| General Fund | B | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) | (117) |
| Remaining | | $253 | $255 | $257 | $258 | $260 | $262 | $263 | $265 | $266 | $268 | $269 | $271 | $272 | $274 | $275 |
| Science and Technology Trust | C | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $248 | $250 | $252 | $253 | $255 | $257 | $258 | $260 | $261 | $263 | $264 | $266 | $267 | $269 | $270 |
| Incentive Pay. to Rum Producers | D | (114) | (115) | (116) | (117) | (117) | (118) | (119) | (119) | (120) | (121) | (122) | (123) | (123) | (124) | (124) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $134 | $135 | $136 | $137 | $138 | $139 | $139 | $140 | $141 | $142 | $143 | $144 | $144 | $145 | $146 |
| General Fund | E | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) | (48) |
| Remaining | | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 | $94 | $95 | $96 | $96 | $97 | $98 |
| Conservation Trust | F | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Remaining | | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 | $94 | $95 | $96 | $96 | $97 | $98 |
| PRIDCO | G | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) | (5) |
| Remaining | | $81 | $82 | $83 | $84 | $85 | $86 | $86 | $87 | $88 | $89 | $90 | $91 | $91 | $92 | $93 |
| Rum Producers | H | (37) | (38) | (38) | (39) | (39) | (39) | (40) | (40) | (41) | (41) | (41) | (42) | (42) | (42) | (43) |
| *Incentive %* | | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* | *46%* |
| Remaining | | $44 | $44 | $45 | $45 | $46 | $46 | $47 | $47 | $48 | $48 | $48 | $49 | $49 | $50 | $50 |
| General Fund | I | (44) | (44) | (45) | (45) | (46) | (46) | (47) | (47) | (48) | (48) | (48) | (49) | (49) | (50) | (50) |
| Remaining | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Outperformance Metric** | | $209 | $209 | $210 | $210 | $211 | $211 | $212 | $212 | $213 | $213 | $213 | $214 | $214 | $215 | $215 |

---

[17] For the avoidance of doubt, to the extent the Supplemental Cover Over is extended, payments to annual Conservation Trust will be calculated as set forth in section 1(l) above.

**Exhibit B**

**Form of Notice**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUERTO RICO PUBLIC BUILDINGS AUTHORITY,<br><br>             Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## NOTICE OF (A) ENTRY OF ORDER CONFIRMING MODIFIED EIGHTH AMENDED TITLE III PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET AL. PURSUANT TO TITLE III OF PROMESA AND (B) OCCURRENCE OF THE EFFECTIVE DATE

**TO CREDITORS AND OTHER PARTIES IN INTEREST:**

PLEASE TAKE NOTICE that, pursuant to an order, dated _____ [ECF No. ____] (the "Confirmation Order"), the *Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.,* dated January 14, 2022 (as amended, supplemented, or modified, the "Plan"), was confirmed by the United States District Court for the District of Puerto Rico (the "Court"). Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings ascribed to them in the Plan and the Confirmation Order.

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

PLEASE TAKE FURTHER NOTICE that the Effective Date of the Plan occurred on _____ and the Plan was substantially consummated.

PLEASE TAKE FURTHER NOTICE that any party in interest wishing to obtain copies of the Confirmation Order, the Plan, and related documents should contact Prime Clerk LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com, or may view such documents by accessing either https://cases.primeclerk.com/puertorico/ or the Court's website, https://www.prd.uscourts.gov/. Please note that a Public Access to Court Electronic Records ("PACER") (http://www.pacer.psc.uscourts.gov) password and login are needed to access documents on the Court's website.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 1.51 and Article III of the Plan and decretal paragraph 44 of the Confirmation Order, the deadline for filing proofs of or requests for payment of Administrative Expense Claims ("Administrative Expense Requests") is [_____], 2022; provided, however, that no proof of Administrative Expense Claim shall be required to be filed if such Administrative Expense Claim (a) shall have been incurred (i) in accordance with an order of the Court or (ii) with the written consent of the applicable Government Parties expressly granting such Administrative Expense Claim, (b) is a Professional Claim, (c) is an intergovernmental Claim, (d) is an Administrative Expense Claim of the IRS for the payment of taxes incurred by any of the Debtors during the period from and after the Commonwealth Petition Date, the ERS Petition Date or the PBA Petition Date, as applicable, (e) relates to actions occurring from and after the respective Debtor's petition date, (f) relates to a Claim that is subject to the provisions of the ACR Order, including, without limitation, "grievance claims" relating to any of the Debtor's collective bargaining agreements, or (g) is the subject of a pending motion seeking allowance of any administrative expense pursuant to Bankruptcy Code section 503(b) as of the entry of the Confirmation Order; and, provided, further, that any such proof of Administrative Expense Claim by a governmental unit shall remain subject to the rights and interests of the Debtors and Reorganized Debtors, as the case may be, and any other party in interest to interpose an objection or other defense to the allowance or payment thereof.

PLEASE TAKE FURTHER NOTICE that, all Administrative Expense Requests should be sent to the following:

[_____]

Administrative Expense Requests will be deemed timely filed only if **actually received** by Prime Clerk by **5:00 p.m. (prevailing Atlantic Time)** on [_____], 2022 (the "Administrative Deadline"). The Administrative Expense Requests may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

**PLEASE TAKE FURTHER NOTICE that, if you are required to file an Administrative Expense Request pursuant to Section 1.51 and Article III of the Plan and decretal paragraph 44 of the Confirmation Order and fail to do so by the Administrative Deadline, you will be forever barred, estopped, and enjoined from asserting such Administrative Expense Claim (and from filing an Administrative Expense Request with**

respect to such Administrative Expense Claim) against the Debtors and their property, and the Debtors and Reorganized Debtors will be forever discharged from any and all indebtedness or liability with respect to such Administrative Expense Claim.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 76.6 of the Plan and decretal paragraph 31 of the Confirmation Order, if the rejection of an Executory Contract and Unexpired Lease by the Debtors results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against the Debtors, or their properties or agents, successors, or assigns, including, without limitation, the Reorganized Debtors, unless a proof of Claim is filed with the Court on or before thirty (30) days after the later to occur of (i) the Effective Date, and (ii) the date of entry of an order by the Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

PLEASE TAKE FURTHER NOTICE that the Confirmation Order is a full, final, and complete order, intended to be, conclusive and binding upon all parties in interest, is not intended to be subject to collateral attack in any other forum, and may only be challenged in accordance with applicable rules in the Court and appealed as provided in PROMESA and other applicable federal laws, rules and jurisprudence, by (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Commonwealth and its instrumentalities, (iv) each Entity asserting claims or other rights against the Commonwealth or any other Commonwealth instrumentality, including each holder of a bond claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by the Debtors or any Commonwealth agency or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such Entity are impaired pursuant to the Plan and, if impaired, whether or not such Entity accepted the Plan, (v) any other Entity, and (vi) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representatives, attorneys, beneficiaries or guardians; provided, however, that the compromises and settlements set forth in the Plan and the Confirmation Order with respect to the priority of the New GO Bonds and the CVIs under PROMESA, the Commonwealth Constitution, or other applicable law shall not be binding on any party in interest (including any successor to the Oversight Board) in a subsequent Title III (or other insolvency) proceeding.

Dated: _____

San Juan, Puerto Rico

/s/ _____

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

/s/_____

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

**Exhibit C**

**Preempted Laws**

# List of Main Statutes Preempted by PROMESA[8]

## I. Commonwealth good faith and credit pledge statutes

### A. General Obligation Bonds
1. Act 2 approved October 10, 1985.
2. Act 1 approved June 26, 1987, as amended.
3. Act 34 approved March 4, 2014.
4. Act 79 approved June 1, 2011.
5. Act 243 approved August 9, 2008.
6. Act 43 approved August 1, 2005, as amended.
7. Act 216 approved August 19, 2004.
8. Act 100 approved July 12, 2002, as amended.
9. Act 161 approved July 5, 2003.
10. Act 149 approved August 9, 2002, as amended.
11. Joint Resolution No. 57 approved July 12, 1993.
12. Act 54 approved July 6, 2001.
13. Act 118 approved July 13, 2000.
14. Act 153 approved July 16, 1999.
15. Act 219 approved August 9, 1998.
16. Act 81 approved August 14, 1997.
17. Act 119 approved August 9, 1995.
18. Act 46 approved July 28, 1994.
19. Act 39 approved May 13, 1976, as amended.
20. Act 83 approved August 30, 1991.[9]

### B. General Obligation Loans
1. GSA Police Helicopters Loan – Joint Resolution No. 99-2013 approved December 9, 2013.
2. GDB Loans to the Commonwealth
   1. Joint Resolution No. 104 approved December 13, 2013. [$15 million line of credit for the Legislature's Capitol District.]
   2. Joint Resolution No. 96 approved November 27, 2013. [$30 million line of credit].

### C. Commonwealth Guaranty – Public Buildings Authority Bonds
1. Act 17 approved April 11, 1968, as amended.

### D. Commonwealth Guaranty – APLA
1. Act 409 approved September 22, 2004.

### E. Commonwealth Guaranty – PRIFA-BANs
1. Act 1 approved January 1, 2015.

---

[8] Any statute providing for an appropriation not included in the budget certified by the FOMB is preempted.

[9] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

F.  [Commonwealth Guaranty – PRASA
    1.  Act 45 approved July 28, 1994.]


**II.  Statutes appropriating Commonwealth revenues**
    A.  HTA
        1.  Act 9 approved August 12, 1982; 9 L.P.R.A. § 2021; 9 L.P.R.A. § 5681
            [motor vehicle license fees]
        2.  13 L.P.R.A. § 31751(a)(1). [gas oil, diesel oil and petroleum products.]
        3.  13 L.P.R.A. § 31751(a)(3). [cigarette tax]
    B.  PRIFA
        1.  Act 44 approved June 21, 1988, as amended; 3 L.P.R.A. § 1914. [rum
            cover over]
    C.  PRIFA BANs
        1.  Act 1 approved January 1, 2015; 13 L.P.R.A. § 31751a(a). [petroleum
            products]
    D.  MBA
        1.  13 L.P.R.A. § 31751(a)(4). [cigarette tax]
    E.  PRITA
        1.  13 L.P.R.A. § 31751(a)(5). [cigarette tax]

    F.  CCDA
        1.  13 L.P.R.A. § 2271v(a). [hotel room tax]
    G.  Act 147 enacted June 18, 1980, as amended
        1. 23 L.P.R.A. § 104.[10] [judiciary appropriation]
    H.  UPR
        1. 18 L.P.R.A. § 621-1.[11]
    I.  Act 83 approved August 30, 1991, as amended[12]
        1. 21 L.P.R.A. §§ 5002, 5004, 5006, 5815.[13]
    J.  Act 221 approved May 15, 1948, as amended
        1. 15 L.P.R.A. § 74(d).[14]
    K.  Act 18 approved January 24, 2014, as amended

---

[10] In Fiscal Year 2019, appropriations under 23 L.P.R.A. § 104 would amount to more than $250 million, if not
    preempted.

[11] In Fiscal Year 2019, appropriations under 18 L.P.R.A. § 621-1 would amount to more than $750 million, if not
    preempted.

[12] For the avoidance of doubt, the statute's provisions regarding collection of the tax are not preempted.

[13] In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5002, 5004 would amount to more than $100 million, if
    not preempted.  In Fiscal Year 2019, appropriations under 21 L.P.R.A. §§ 5006, 5815 would amount to
    more than $200 million, if not preempted.

[14] In Fiscal Year 2019, appropriations under 15 L.P.R.A. § 74(d) would amount to more than $250 million, if
    preempted.

1. 21 L.P.R.A. § 6742.[15]
   L.  Act 41 approved July 22, 2011, as amended
      1. 12 L.P.R.A. §8105

**III.   TRS and JRS Statutes**
   A.  Act 106 approved August 23, 2017
   B.  Act 160 approved December 24, 2013
   C.  Act 91 of March 24, 2004
   D.  Act 12 approved October 19, 1954
   E.  Act 162 approved December 24, 2013

**IV.   Article VI of the Puerto Rico Constitution**
   A.  Whether the rights provided by Article VI, Sections 6 and 8 of the Puerto Rico Constitution to General Obligation bonds and Commonwealth-guaranteed bonds or indebtedness restructured pursuant to the Plan are preempted by PROMESA is settled by the treatment of such bonds and indebtedness pursuant to the provisions of the Plan. Nothing in the Plan affects or determines whether Article VI, Sections 6 and 8 of the Puerto Rico Constitution is preempted for any future purpose.

---

[15] In Fiscal Year 2019, appropriations under 21 L.P.R.A. § 6742 would amount to more than $120 million, if not preempted.

# **Exhibit D**

## **List of Agencies and Amounts to be Transferred**

| Sources | | | | $ millions | | 30-Jun-21 |
|---|---|---|---|---|---|---|
| **TSA Bank Account Balances** | | | | | | |
| **Account Description** | | **Account Number** | **Bank Name** | | | |
| TSA Operational | | X9458 | Banco Popular | $ | | 2,000 |
| TSA Reserve (Per Fiscal Plan) | | X1012 | Banco Popular | | | 304 |
| TSA Cash Concentration | | X1020 | Banco Popular | | | 5,742 |
| TSA Overnight Sweep (Repos) | | X9036 | Citibank | | | 3,624 |
| TSA Accumulation Account | | X2463 | Banco Santander | | | - |
| | | | | | | 11,671 |
| | | | | | | |
| **TSA Cash Adjustments** | | | | | | |
| | | | | | | |
| Federal Funds in the TSA | | | | | | (76) |
| | | | | | | |
| **TSA Bank Accounts** | | | | | $ | 11,595 |
| | | | | | | |
| **Sweep Account Balances** | | | | | | |
| **Account Description** | | **Account Number** | **Bank Name** | | | |
| Excise, Inheritance, Gifts, and Licenses | | X3630 | Banco Popular | $ | | 158 |
| Sales & Use Tax (SUT/IVU) | | X4406 | Banco Popular | | | 54 |
| | | | | | | 212 |

| Sources | | | | $ millions | | 30-Jun-21 |
|---|---|---|---|---|---|---|
| **Cash at Commonwealth Agencies** | | | | | | |
| **Account Holder** | | **Account Number** | **Bank Name** | | | |
| Hacienda | | X7205 | Banco Popular | $ | | 46 |
| Hacienda | | X7044 | Banco Popular | | | 339 |
| Hacienda | | X9038 | Banco Popular | | | 556 |
| Hacienda | | X9857 | Banco Popular | | | 147 |
| Controller's Office | | X0251 | Banco Popular | | | 11 |
| Department of Economic Development and Commerce | | X4551 | Banco Popular | | | 22 |
| Department of Economic Development and Commerce | | X4527 | Banco Popular | | | 6 |
| Department of Economic Development and Commerce | | X4519 | Banco Popular | | | 4 |
| Department of Economic Development and Commerce | | X1301 | Banco Popular | | | 10 |
| Department of Economic Development and Commerce | | X5730 | Banco Popular | | | 50 |
| Department of Housing | | X5636 | Banco Popular | | | 8 |
| Department of Housing | | X5571 | Banco Popular | | | 5 |
| Department of Housing | | X0037 | Banco Popular | | | 0 |
| Department of Education | | X3706 | Banco Popular | | | 13 |
| Department of Labor | | X0308 | Banco Popular | | | 178 |

| | | | | |
|---|---|---|---|---|
| Department of Labor | X0286 | Banco Popular | | 13 |
| Environmental Quality Board | X0316 | Banco Popular | | 10 |
| Office of Court Administration | X9562 | First Bank | | 102 |
| Office of Court Administration | X1022 | Citibank | | 6 |
| Office of Court Administration | X0974 | First Bank | | 10 |
| Puerto Rico Energy Commission | X3064 | Banco Popular | | 7 |
| Puerto Rico Energy Commission | X3056 | Banco Popular | | 33 |
| Puerto Rico Police Bureau | X9598 | Banco Popular | | 30 |
| Senate | X2665 | First Bank | | 8 |
| Senate | X2687 | First Bank | | 1 |
| Statistics Institute of PR | X7055 | Banco Popular | | 4 |
| Superintendent of the Capitol | X2775 | First Bank | | 1 |
| Superintendent of the Capitol | X2764 | First Bank | | 1 |
| Department of Justice – Office of Inspector General | X6054 | Banco Popular | | 3 |
| Forensics Science Bureau | X4496 | Banco Popular | | - |
| Forensics Science Bureau | X1681 | Banco Popular | | 3 |
| Government Ethics Office | X0828 | First Bank | | 0 |
| Government Ethics Office | X1067 | Banco Popular | | 4 |
| Government Ethics Office | X1059 | Banco Popular | | 0 |
| Government Ethics Office | X2001 | Banco Popular | | 3 |
| House of Representatives | X2610 | First Bank | | 5 |
| Office of Legislative Services | X2819 | First Bank | | 3 |
| Office of Legislative Services | X2808 | First Bank | | - |
| Office of Legislative Services | X2797 | First Bank | | - |
| Office of Legislative Services | X2786 | First Bank | | 6 |
| PR Federal Affairs Administration | X3037 | Citibank | | 0 |
| PR Federal Affairs Administration | X9332 | Citibank | | 1 |
| PR Federal Affairs Administration | X9316 | Citibank | | 0 |
| Electric Lottery | X5328 | First Bank | | 20 |
| | | | | 1,668 |

| Sources | | $ millions | | 30-Jun-21 |
|---|---|---|---|---|
| **Cash from ERS and PBA** | | | | |
| **Account Holder** | **Account Number** | **Bank Name** | | |
| Employee Retirement System | X0514 | BNY Mellon | $ | 141 |
| Employee Retirement System | X8059 | Banco Popular | | 95 |
| Employee Retirement System | X4554 | Banco Popular | | 30 |
| Employee Retirement System | X4546 | Banco Popular | | 111 |
| Employee Retirement System | X1185 | Banco Popular | | 3 |
| Employee Retirement System | X1177 | Banco Popular | | 10 |
| Public Building Authority | X2002 | US Bank | | 3 |
| Public Building Authority | X9006 | US Bank | | 4 |
| Public Building Authority | X7589 | Oriental Bank | | 16 |
| Public Building Authority | X4707 | Oriental Bank | | 13 |

| | | | |
|---|---|---|---:|
| Public Building Authority | X1571 | Oriental Bank | 5 |
| Public Building Authority | X5578 | Oriental Bank | 10 |
| Public Building Authority | X4128 | Banco Popular | 62 |
| Public Building Authority | X5019 | Banco Popular | 9 |
| | | | 512 |

| Sources | | $ millions | 30-Jun-21 |
|---|---|---|---|

**Cash from TRS and JRS**

| Account Holder | Account Number | Bank Name | |
|---|---|---|---:|
| Teacher Retirement System | X7036 | Banco Popular | 116 |
| Teacher Retirement System | X0244 | Banco Popular | 13 |
| Teacher Retirement System | X8820 | Banco Popular | 0 |
| Retirement System of Puerto Rico Judiciary | X1223 | Banco Popular | 0 |
| Retirement System of Puerto Rico Judiciary | X5199 | Banco Popular | 0 |
| Retirement System of Puerto Rico Judiciary | X4538 | Banco Popular | 35 |
| | | | 164 |

**Exhibit E**

**Certification Notice**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE<br>EMPLOYEES RETIREMENT SYSTEM OF THE<br>GOVERNMENT OF THE COMMONWEALTH OF<br>PUERTO RICO, AND THE PUERTO RICO PUBLIC<br>BUILDINGS AUTHORITY,<br><br>                Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |

## NOTICE OF RETAIL INVESTOR CERTIFICATION

On [ _____ ], the United States District Court for the District of Puerto Rico (the "Court") entered an order confirming the *Modified Eight Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, dated January 14, 2022 (as amended, supplemented, or modified, the "Plan").[2] The Plan provides for certain distributions to be made to "Retail Investors."

A "Retail Investor" is an individual who holds **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** in the aggregate outstanding principal amount of <u>One Million Dollars ($1,000,000.00) or less</u> in one or more brokerage account(s), trust account(s), custodial account(s), or in separately managed account(s).

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17- BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

[2] Unless otherwise defined in this Notice, capitalized terms used herein shall have the meanings given to them in the Plan.

If you are a "Retail Investor" and did <u>not</u> submit a vote to accept or reject the Plan on or before 5:00 p.m. (Atlantic Standard Time) on October 18, 2021 (or submitted such vote, which you timely revoked), you must identify yourself to be eligible to receive the appropriate distributions as a "Retail Investor" pursuant to the Plan. Instructions to identify yourself and certify (the "<u>Certification</u>") that you meet the requirements to be a "Retail Investor" are provided below.

For the avoidance of doubt, if you submitted a valid vote into ATOP on or before October 18, 2021, and your bonds were subsequently released from ATOP after October 18, 2021 in accordance with the Disclosure Statement Order, you are not eligible to submit a Certification.

The deadline for your broker or nominee to submit your certification as a Retail Investor is **[        ], 2022 at 6:00 p.m. (Atlantic Standard Time)** (the "<u>Certification Deadline</u>").[3]  **Note that your broker or nominee may set an earlier deadline to provide it sufficient time to submit your certification before the Certification Deadline.**

The record date to determine holders of **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** eligible to receive this Certification Notice and make the Certification is 5:00 p.m. (Atlantic Standard Time) on October 18, 2021, which coincides with the conclusion of the original voting and distribution election events for the Plan.

For the avoidance of doubt, if you traded the bonds associated with the **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** after the Certification Record Date, but submit a valid Certification into ATOP pursuant to these instructions, only you will receive the Retail Support Fee based on the Certification. Any other entitlement or distribution pursuant to the terms of the Plan will be made to the holder of such bonds at the time of distribution.

### How to Submit a Valid Certification

If you wish to certify that, as of 5:00 p.m. (Atlantic Standard Time) on October 18, 2021, you were:

an individual who holds **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** in the aggregate outstanding principal amount of <u>One Million Dollars ($1,000,000.00) or less</u> in one or more brokerage account(s), trust account(s), custodial account(s), or in separately managed account(s)

---

[3] 6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

you must instruct your broker or nominee (each, a "**Nominee**") to electronically deliver all of your aforementioned bonds via the Automated Tender Offer Program ("**ATOP**") at The Depository Trust Company ("**DTC**") in accordance with your desire to instruct on the above certification.

**If you and/or your Nominee do not electronically deliver your bonds via ATOP (i.e., take no action), you will be deemed not to be a Retail Investor.**

\* \* \* \* \*

In addition, by delivering your bonds via ATOP, you are certifying that:

1. either (a) your certification is the only certification by you on account of a **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]**, or (b) in addition to the certification, one or more additional certifications ("**Additional Certifications**") on account of other bonds have been submitted by one or more Nominees, and you have provided (or coordinated with your Nominee to provide) the Numerosity Spreadsheet (as defined below) to the Balloting Agent by the Certification Deadline;

2. you have submitted a Certification for all of your Claims on account of the bonds to which this Notice pertains and acknowledge that no split Certifications will be permitted;

3. you are the holder of the Claims on account of bonds to which this Notice pertains or is an authorized signatory of such holder, and has full power and authority to make the Certification; and

4. your Certification is subject to all the terms and conditions set forth in the Plan, Disclosure Statement, and Disclosure Statement Order.

No paperwork is required to be delivered to Prime Clerk LLC to effectuate the Certification (except in the limited circumstance noted below in the section titled "*Numerosity Information Request – Applicable Only for Beneficial Holders Submitting More Than One Instruction Through ATOP*"). The sole means of effectuating this Certification is to (i) validly tender your bonds into the proper ATOP envelope at DTC, and (ii) make the required certification set forth above, each as described on DTC's ATOP system.

---

**THE CERTIFICATION DEADLINE IS
6:00 P.M. (ATLANTIC STANDARD TIME) ON [_____], 2022.[4]**

This date and time is referred to as the "**Certification Deadline**."

---

[4] 6:00 PM (Atlantic Standard Time) is equivalent to 5:00 PM (Eastern Standard Time).

**PLEASE TAKE NOTICE THAT IF YOU TENDER YOUR BONDS THROUGH ATOP, YOU WILL BE RESTRICTED FROM TRANSFERRING YOUR BONDS THROUGH THE EFFECTIVE DATE.**

**YOU MAY REVOKE YOUR CERTIFICATION AND WITHDRAW ANY TENDERED BONDS AT ANY TIME BEFORE THE CERTIFICATION DEADLINE.**

\*    \*    \*    \*    \*

### How to Revoke a Valid Certification

You may revoke your Certification and withdraw your bonds tendered through DTC's ATOP at any time on or before the Certification Deadline.

If you wish to revoke your Certification, you must instruct your Nominee to revoke your Certification and withdraw your bonds via ATOP at DTC (which withdrawal will be confirmed by Prime Clerk LLC once notified by DTC of the withdrawal request). No paperwork is required to be delivered to Prime Clerk LLC to effectuate the revocation.

If you revoke your Certification any time before the Certification Deadline, you may make a Certification again at any time before the Certification Deadline, in accordance with the instructions to submit a valid Certification above.

\*    \*    \*    \*    \*

### Numerosity Information Submission
### (Applicable Only for Beneficial Holders Submitting More than One Certification Through ATOP)

Any beneficial holder of **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** that holds multiple CUSIPs of **[Vintage PBA Bond Claims / 2011 PBA Bond Claims / 2012 PBA Bond Claims / Vintage CW Bond Claims / 2011 CW Bond Claims / 2011 CW Series D/E/PIB Bond Claims / 2012 CW Bond Claims / 2014 CW Bond Claims]** and submits more than one certification through one or more Nominees, MUST submit (or coordinate with your Nominee(s) to submit) a list of all such ATOP instruction confirmation numbers (also referred to as ATOP voluntary offer instructions or "**VOIs**"). The Balloting Agent has made available a template electronic spreadsheet (the "**Numerosity Spreadsheet**") on its website at: https://cases.primeclerk.com/puertorico (click on the link titled "Numerosity Spreadsheet").

Please return (or coordinate with your Nominee to return) the Numerosity Spreadsheet to the Balloting Agent in excel format via email to puertoricoinfo@primeclerk.com. If you anticipate any difficulty in submitting your Numerosity Spreadsheet in excel format, please contact Prime Clerk at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international

callers) or by e-mail at [puertoricoballots@primeclerk.com](mailto:puertoricoballots@primeclerk.com) .

*   *   *   *   *

If you have any questions about your holdings, please contact your Nominee. Additionally, you must contact your Nominee to take any action described above.

**IF YOU HAVE ANY QUESTIONS REGARDING THIS NOTICE, PLEASE CONTACT THE BALLOTING AGENT, PRIME CLERK, LLC, BY TELEPHONE AT (844) 822-9231 (TOLL FREE FOR U.S. AND PUERTO RICO) OR (646) 486-7944 (FOR INTERNATIONAL CALLERS), AVAILABLE 10:00 A.M. TO 7:00 P.M. (ATLANTIC STANDARD TIME) (SPANISH AVAILABLE), OR BY EMAIL AT PUERTORICOINFO@PRIMECLERK.COM AND REFERENCE "RETAIL INVESTOR SOLICITATION" IN THE SUBJECT LINE. PLEASE NOTE THAT PRIME CLERK LLC IS NOT AUTHORIZED TO PROVIDE, AND WILL NOT PROVIDE, LEGAL ADVICE.**