## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUBLIC BUILDINGS AUTHORITY<br><br>*Debtors[1]* | PROMESA<br><br>Title III<br><br>Case No. 17 BK 3283 – LTS<br><br>(Jointly Administered) |

**CREDIT UNIONS' JOINT REPLY TO THE OVERSIGHT BOARD'S OBJECTION TO OUR MOTION FOR STAY PENDING APPEAL OF ORDER AND JUDGMENT CONFIRMING MODIFIED EIGHTH AMENDED TITLE III PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET. ALS.**

---

[1] The Debtors in these Title III Cases, along with each debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of federal Tax ID: 3481); (ii) Puerto Rico Sales tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# TABLE OF CONTENTS

**I. RELEVANT PROCEDURAL BACKGROUND** ...................................................... 5

**II. ARGUMENTS IN REPLY** ....................................................................................... 6

    **A.** **The Oversight Board's self-congratulatory portrayal of the Plan of Adjustment omits and/or misrepresents major issues that should not be ignored by this Honorable Court** 6

    **B.** **Arguments as to the Credit Unions' Claims and their Likelihood of Success** .......... 8

    **C.** **The Debtors' alleged injuries to be caused by the Stay are unsubstantiated and do not outbalance the request of a stay** ..................................................................................... 11

    **D.** **Irreparable Harm to the Credit Unions. Stay is Warranted in Favor of the Public Interest** ...................................................................................................................... 14

    **E.** **The Appeal Bond Requested is Not Warranted, Is Extremely Onerous, Excessive and Serves to Thwart the Right To Appellate Review** ......................................................... 15

**III.** **REMEDY IN THE ALTERNATIVE: THE CREDIT UNIONS REQUEST A STAY OF THE EFFECTS OF DISCHARGE ON THEIR CLAIMS WHILE THE APPEAL IS PENDING** ................................................................................................................. 19

**CERTIFICATE OF SERVICE** ............................................................................. 21

## TABLE OF AUTHORITIES

Cases

Cooperativa de Ahorro y Crédito v. Oversight & Mgmt. Bd., 989 F.3d 123 (1st Cir. 2021)........ 14

Damaskos v. Board of Appeal of Boston, 359 Mass. 55, 64 (1971) ........................................... 16

In re Adelphia Commc'n Corp., 361 B.R. 337, 347-48 ............................................................... 14

In re Byrd, 172 B.R. 970, 974 (Bankr. W.D. Wash. 1994) .......................................................... 17

In re Fin. Oversight & Mgmt. Bd. for P.R., 987 F.3d 173, 181 (1st Cir. 2021) .......................... 10

In Re Proposed Amendment to the Appeal Bond Requirements in Illinois Supreme Court Rule
    305, 2003 WL 22340460 (Ill. May 12, 2003) ...................................................................... 18

In re Swift Aire Lines, Inc., 21 B.R. at 14-16 .............................................................................. 17

In re Weinhold, 389 B.R. 783 at 787 (Bankr. M. D. Fla. 2008) .................................................. 16

President Casinos, Inc. v. Columbia Sussex Corp. (In re President Casinos, Inc. v. Columbia
    Sussex Corp (In re President Casinos, Inc.), 360 B.R. 262, 266-67 ..................................... 18

Pyke v. Funnel Sci. Internet Mktg. , LLC (In re Funnel Sci. Internet Mktg, LLC), 551 B.R. 262,
    274, 2016 U.S. Dist. LEXIS 36470 *24-25 ......................................................................... 17

Zamora v. Virtue (In re Cont't Coin Corp.), 2009 Dist. LEXIS 74392, *30-31 ......................... 17

Statutes

11 U.S.C. § 105(a) ...................................................................................................................... 10

Fed. R. Bankr. P. 7004(b) ........................................................................................................... 21

Fed. R. Bankr. P. 9014(b) ........................................................................................................... 21

Rule 9 of the Federal Rules of Civil Procedure ........................................................................... 9

Other Authorities

Rendleman, A Cap on Defendants' Appeal Bond? Punitive Damages Tort Reform, Akron Law
    Review, 2006 ...................................................................................................................... 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, THE EMPLOYEES RETIREMENT SYSTEM OF THE GOVERNMENT OF THE COMMONWEALTH OF PUERTO RICO, AND THE PUBLIC BUILDINGS AUTHORITY<br><br>*Debtors*[2] | PROMESA<br><br>Title III<br><br><br><br>Case No. 17 BK 3283 – LTS<br><br>(Jointly Administered) |

**CREDIT UNIONS' JOINT REPLY TO THE OVERSIGHT BOARD'S OBJECTION TO OUR MOTION FOR STAY PENDING APPEAL OF ORDER AND JUDGMENT CONFIRMING MODIFIED EIGHTH AMENDED TITLE III PLAN OF ADJUSTMENT OF THE COMMONWEALTH OF PUERTO RICO, ET. ALS.**

**TO THE HONORABLE JUDGE LAURA TAYLOR SWAIN**:

COME NOW, Cooperativa de Ahorro y Crédito Abraham Rosa, Cooperativa de Ahorro y Crédito de Ciales, Cooperativa de Ahorro y Crédito de Rincón, Cooperativa de Ahorro y Crédito Vega Alta, Cooperativa de Ahorro y Crédito Dr. Manuel Zeno Gandía, and Cooperativa de Ahorro y Crédito de Juana Díaz, through the undersigned attorneys, (hereinafter, "the Credit Unions" or

---

[2] The Debtors in these Title III Cases, along with each debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of federal Tax ID: 3481); (ii) Puerto Rico Sales tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

"the Cooperatives") and hereby file this joint reply to the objection to our motion for stay pending appeal of the (i) "Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority" (Dkt. No. 19813), and of the (ii) implementation of the "Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico et als.", dated January 14, 2022. (Dkt. No. 19813-1) filed by the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Building Authority.

## I. RELEVANT PROCEDURAL BACKGROUND

1.      On January 14, 2022, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") filed the *Modified Eight Amended Title III Joint Plan of the Commonwealth of Puerto Rico et al.* (Dkt. No. 19784) (hereinafter, the "Plan of Adjustment").

2.      On January 18, 2022, this Honorable Court entered *the Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (Dkt. No. 19813) ("Order Confirming Plan") and the *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (Dkt. No. 19812) ("Findings of Fact and Conclusions of Law").

3.      On January 28, 2022 the Credit Unions filed a *Notice of Appeal* regarding the Order Confirming Plan and the Findings of Fact and Conclusions of Law. (Dkt. No. 19938), [USCA Case Number 22-01079].

4.      On February 4, 2022, the Credit Unions filed *Joint Motion for Stay pending Appeal or Order and Judgement confirming Modified Eight Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et. Als*. (Dkt. No. 20035).

5.      On February 4, 2022, this Honorable Court entered an Order setting the briefing schedule as to the Credit Unions' motion for stay pending appeal. The Court granted until February 11, 2022 at 5:00 PM for objections and until February 17, 2022 at 5:00 PM for any replies. (Dkt. No. 20038).

6.      On February 11, 2022, the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Building Authority represented by the Oversight Board (hereinafter, collectively denominated as "the Debtors", or "the Government" or individually referred to as "Debtor" or "the Commonwealth") filed an Objection to our motion for stay pending appeal. (Dkt. No. 20115) ("the Oversight Board's Objection" or "the Objection").

7.      The Credit Unions hereby reply to the Oversight Board's Objection as follows:

## II. ARGUMENTS IN REPLY

###   A. The Oversight Board's self-congratulatory portrayal of the Plan of Adjustment omits and/or misrepresents major issues that should not be ignored by this Honorable Court

8.      Contrary to the image of a consensus-based agreement presented by the Oversight Board, the Plan of Adjustment poses two conflicting blocs. On one hand, the support for the Plan of Adjustment is mainly driven by hedge funds that acquired significant amounts of bonds at deep discounts after the Commonwealth defaulted.  These bondholders stand to make huge profits from

the Plan of Adjustment. On the other hand, the Plan of Adjustment has been strongly objected by public employees that render essential services, by pensioners, by various non-creditor parties, and even world renown economists that have raised its adverse financial, economic and social implications, and by the Credit Unions, which are key to Puerto Rico's economic development. These objectors are crucial to the Commonwealth's ability to render essential services and, in the case of the Credit Unions, serve one third of the population, especially the most vulnerable.

9.      As we can see, the Plan of Adjustment that was "achieved" by the Oversight Board sets a chasm between speculative non- resident investors that will profit from the Plan's distributions and the resident populations and institutions upon which Puerto Rico's public services and economy depend, for whom the Plan implies losses and hardship.

10.     This chasm shows that the Oversight Board did not drive a good and hard negotiation with the hedge funds to cap their windfall profits to reasonable levels to ensure the adequate funding of essential government services.  Accordingly, the Plan of Adjustment does not really address the needs of those served by the Commonwealth, that is the needs of the residents of Puerto Rico. It is important to point out that the Plan of Adjustment does not reorganize the operations of the Commonwealth; it only restructures its debt.

11.     Due to the confidentiality of the negotiations, as reinforced by the very limited and curtailed discovery procedures established for confirmation of the Plan, the true scope of the agreements reached between the Oversight Board and the Hedge Funds will only be known after the implementation of the Plan of Adjustment. Worse yet, in light of the "equitable mootness" doctrine, the implementation of the Plan of Adjustment and its consequences would be irreversible to the Credit Unions and other objectors.

12.     Having stated the above, we must also stress that, even if the Plan of Adjustment is important for the government's finances, it itself is not a tool for Puerto Rico's economic recovery, which depends on the economic development and activities of the private sector, not on the government's debt restructuring.

13.     In this regard, undermining the Credit Unions hinders that economic recovery. This point is supported by the Oversight Board's acknowledgement of the importance of the Cooperatives for Puerto Rico's economy. See the Oversight Board's certified 2020 and 2021 Fiscal Plans for COSSEC. See also the averments presented by the Credit Unions before this Honorable Court in Adversary Proceeding 18-00028, averments which the Credit Unions have always been ready to demonstrate through evidence duly presented in the context of a trial on the merits, something that has been prematurely curtailed.

**B.     Arguments as to the Credit Unions' Claims and their Likelihood of Success**

14.     The Oversight Board asserts that the arguments of the Cooperatives were "considered and rejected".  However, the arguments and averments of the Credit Unions were never considered and adjudicated on their merits.  Also, this Honorable Court's Opinion and Judgment in adversary case 18-00028 is under appeal and the finality of these issues is to be decided by the Court of Appeals.  This Honorable Court should bear in mind and not forget that the Credit Unions' claims present multiple substantial factual controversies that warrant an adjudication by trial and not just during the pleadings stage.  The Oversight Board just wishes a "free ticket" to avoid the scrutiny that comes with an adjudication on the merits.

15.     The Oversight Board even goes to the extreme of asserting that "*fraud claims are dischargeable*" under PROMESA, without providing any statutory basis for that assertion.

8

This runs counter to the letter of the exculpation clauses included in the Plan of Adjustment as well as excluding COSSEC altogether from the Plan's releases.  More important, the Oversight Board's position regarding the claims of the Credit Unions[3] would defeat the express purposes of PROMESA, which was enacted, *inter alia*, to address the Commonwealth's lack of transparency and its financial mismanagement of prior years.  If fraud claims are to be discharged under PROMESA, the Plan of Adjustment would be rewarding the governmental misconduct that is at the heart of the Cooperatives' claims.  The lack of attention and dismissiveness of the Oversight Board and the government with respect to these claims does nothing but reward those that incurred in this lack of transparency.

16.     In the Objection, the Oversight Board also seeks to minimize this Court's authority to grant remedies under equitable principles. That judicial power is not constrained by the lack of precedents, especially considering the extraordinary circumstance posed by the Credit Unions' claims of a government harming the financial stability of depository institutions that are under its care and supervision and considering the nature of the instant case.  Certainly, we will not find statutory provisions expressly adopted to remedy such unconscionable dereliction of public duty.  Therefore, to achieve the transparency and fiscal responsibility sought by PROMESA the determination from this Honorable Court warrant and require the application of equitable principles and remedies.

17.     The First Circuit Court of Appeals has already resolved in regards to Title III proceedings that the principles of equity are applicable and crucial to the confirmation of a Plan. [C]onsiderations of equity play a role in reviewing challenges to the confirmation of plans of

---

[3] The claims of the Credit Unions are not based solely on fraud.  Non-fraud claims, including those based on the violation of the "Takings" Clause are not subject to the additional particularity requirements of Rule 9 of the Federal Rules of Civil Procedure.

reorganization in bankruptcy courts. Bankruptcy Courts are courts of equity and apply the principles and rules of equity jurisprudence. One of the Bankruptcy Code's most important provisions, 11 U.S.C. § 105(a), which grants bankruptcy courts broad authority to exercise their equitable powers -- where necessary or appropriate -- to facilitate the implementation of other Bankruptcy Code provisions, makes clear that equity's role in facilitating implementation of the Code survives in its present iteration. The entry of a plan of adjustment is inherently such an equitable proceeding. In re Fin. Oversight & Mgmt. Bd. for P.R., 987 F.3d 173, 181 (1st Cir. 2021) In light of the above, this Honorable Court has powers in equity under Section 105 of the Bankruptcy Code, as incorporated to PROMESA, which may be exercised in the instant case.

18.    Equitable remedies under Section 105 of the Bankruptcy Code are not limited to matters already addressed by the Code (in which case equitable remedies would not be needed).  What the Court cannot do is grant a remedy that is forbidden by the Code, which is not the case regarding non-dischargeability of the Credit Unions' constitutional claims and for the debtors' lack of honesty.  In addition, we respectfully submit that this Court being a "district court" and not a bankruptcy court, has powers to grant equitable remedies that are not limited to section 105 of the Bankruptcy Code.

19.    In regards to the likelihood of success of the Credit Unions' claims, our case presents a special situation, caused: by the timing of the dismissal of Adversary Proceeding 18-00028 right before the final steps towards confirmation of the Plan, and by the Court's overrule of the Credit Unions' objections to the confirmation of the Plan of Adjustment based on that prior but immediately close dismissal.

20.    These coincidences inexorably tie the Credit Unions' appeal of the Order Confirming Plan and their request for a stay of the Plan, together with the appeal of the Order and Judgment

Dismissing case in Adversary Proceeding 18-00028 [USCA Case Number 22-1048]. Accordingly, likelihood of success for all these three issues turns on the appellate process under way regarding Adversary Proceeding 18-00028, for which the Court of Appeals has already issued a briefing schedule.

21.     Contrary to the Oversight Board's allegations, the Credit Unions' motion requesting stay of the Plan of Adjustment does in fact discuss the errors incurred by the Honorable Court in the dismissal of Adversary Proceeding 18-00028. In the particular circumstances of the Credit Unions' claims, said errors are also relevant to the Court's rejection of their objections to the confirmation of the Plan of Adjustment. See paragraphs 8 to 15 of the Credit Unions motion requesting stay pending appeal of order and judgment confirming modified eight amended title III Plan of adjustment. (Dkt. No. 20035). Having stated these errors, the "likelihood of success" requirement does not entail presenting their full discussion to the appealed Court. That full argumentation is to be filed before the Court of Appeals in the corresponding Appellants' brief within the term already set by the Appellate Court. The Credit Unions reiterate to have a high likelihood of success on the merits of their appeals.

### C.    The Debtors' alleged injuries to be caused by the Stay are unsubstantiated and do not outbalance the request of a stay

22.     The Oversight Board posits that the stay requested by the Credit Unions to preserve their rights upon appeal will cause:

- an alleged chaos and damages to the economy (which are not defined),

- loss of projects and investments (which are not identified),

- loss of benefits to Puerto Rico residents (whose benefits are mentioned nowhere),[4] and

---

[4] The implementation of the Plan of Adjustment does not offer any benefit for any resident of Puerto Rico. Payment of a fraction of the debt owed by the Commonwealth constitutes a "benefit" only for hedge funds that acquired their

- adverse effects on "stakeholders" (which, other than the Hedge Funds that led the negotiations, are not known nor mentioned)

23.     All of these alarmist forecasts were made by the Debtors and the Oversight Board without being substantiated by corroborating evidence or independent information to support them.  These self-serving declarations submitted by the Oversight Board do not constitute evidence, have not been subjected to actual discovery, nor to cross-examinations. Accordingly, the Court should not entertain them.  Notwithstanding the broad powers granted by PROMESA, the Oversight Board is not empowered to adjudicate factual matters through their issuance of bare statements.

24.     The submission of the affidavits of actuaries warrant the following arguments, which demonstrate their inaccuracy and unsubstantiality. First, the alleged adverse future effects of the stay are estimates calculated on the basis of thirty years, a period that exceeds by far the expected appellate procedures. Second, as indicated in the disclaimers included in the "supporting" affidavits, "*[t]he accuracy of the estimates contained in the Fiscal Plan is dependent on the accuracy of the underlying data and the choice of assumptions. Data to further assess the reasonableness of certain demographic assumptions was not available, although I am unaware of any information indicating that the assumptions are not reasonable representations of long-term expectations*."  Furthermore, the disclaimer acknowledges that the assumptions upon which they are based were selected by the Oversight Board.  The specific assumptions were not included in the affidavits.

25.     The self-serving and limited statements contained in these affidavits lack the sufficient support, information, and validation required from expert opinions.  Moreover, the time constraints and the limitations placed upon the Credit Unions and upon other objecting parties on the access

---

bonds at a discount, which is not the case of the residents of Puerto Rico.  Not acknowledging this difference hides the Oversight Board's poor job as "negotiator" in favor of the People of Puerto Rico.

to the information controlled by the Commonwealth and by the Oversight Board do not allow a

real opportunity to contest these factual allegations that are now presented in the Oversight Board's

Objection. Under these circumstances, this information should not be accepted by this Honorable

Court as an adequate basis for its judicial decisions.

25.     The Oversight Board requests from this Honorable Court to apply a double standard when

evaluating the assertions of the Credit Unions as opposed to those it makes. According to the

Oversight Board, strict scrutiny must be applied to the allegations of the Credit Unions while the

Oversight Board's self-serving opinions and conclusions are to be taken by the Court without being

supported by corroborating evidence, independent information, nor being subject to the strictures

of a truly adversarial judicial process. This is simply not acceptable.

26.     Taking into consideration that it took the government several years and more than eight

versions of the Plan of Adjustment to reach the confirmation stage, a period of months for the

current appeals on record filed by the Credit Unions is not excessive or unreasonable.

27.     Moreover, the controversial nature of the Plan of Adjustment, the many parties adversely

affected by it, and the experience of the COFINA Plan of Adjustment clearly made an appeal

unavoidable. If, as proposed by the Oversight Board, the Credit Unions were to foresee the risks

of a bankruptcy adjustment of debts back when there was no law providing for it, then the

proposition that the parties that designed and negotiated the Plan of Adjustment could not foresee

that the confirmation order would be appealed is just not credible.

28.     On the other hand, if the requested stay pending appeal is not granted, the Credit Unions

will suffer irreparable harm and their appeal will be doom to fail.

29.     In the instant case, the Order Confirming Plan discharges the Credit Unions' constitutional

claims exposing their members to the irreparable harm of financial and regulatory distress that the

Commonwealth caused. As precedent has shown, if the stay requested by the Credit Unions as to the implementation of the plan or its discharging effects is not granted, the equitable mootness doctrine will come into place and truncate their opportunity to appeal this Honorable Court's decisions on the merits. Cooperativa de Ahorro y Crédito v. Oversight & Mgmt. Bd., 989 F.3d 123 (1st Cir. 2021). Being this the situation, the irreparable harm requirement to be suffered by the Credit Unions is satisfied (*see* In re Adelphia Commc'n Corp., 361 B.R. 337, 347-48) and certainly outweighs the Debtors unsubstantiated injuries of a stay. A stay pending appeal in the instant situation is thus warranted.

**D.   Irreparable Harm to the Credit Unions. Stay is Warranted in Favor of the Public Interest**

30.    The Board neither denies nor refutes the high public interest of the Credit Unions as depository institutions in Puerto Rico, nor does it challenge the protection to be afforded to the hundreds of thousands of their members by the government. As a matter of fact the Oversight Board itself recognized these public interests in its Fiscal Plans for COSSEC.

31.    As it is well known by the Oversight Board, the irreparable harm to the Credit Unions and to their members and depositors stemming from the government-caused impairment to their capital reserves is real, concrete, and material.  In dire contrast to the alarmist outlook painted by the Board regarding the "harm" to be suffered by the creditors that favor the Plan of Adjustment, the Oversight Board tries to minimize the damages and losses suffered by the Credit Unions by circumscribing their claims to the value of the bonds.

32.    As averred in the complaints, motions, and objections filed by the Credit Unions before this Honorable Court, their claims pertain to the portion of value that was "destroyed" by the state's action, and that has impaired and continues to impair their capital reserves. Such financial harm and distress are broadly discussed in all previous allegations, all of which have been incorporated

by reference in our submissions objecting the Plan of Adjustment and are herein incorporated by reference as well.  As can be seen, the Credit Unions irreparable harm is not limited to the risk of equitable mootness.

33.      Furthermore, the "irreparable harm" of the impairment to the capital reserves of the Credit Unions entails the risks of regulatory interventions.  Contrary to the Oversight Board's feigned lack of knowledge (see paragraph 36 of the Objection), its own fiscal plans for COSSEC shows that they are fully aware of the regulatory implications of the capital impairments.  Moreover, this risk has already materialized in the undue intervention with Cooperativa de Ahorro y Crédito de Ciales ("Ciales Coop") by COSSEC, an action that is currently being contested in state courts and in the regulatory agency itself.  This reprisal intervention to place Ciales Coop in receivership was informed to this Honorable Court in the Urgent Informative Motion filed by the Credit Unions in Adversary Case 19-00389-LTS (Dkt. No. 89). Therefore, the preservation of the Credit Unions' claims in this case by the stay of the confirmation order pending appeal is also required pursuant to the public interest.

### E.  The Appeal Bond Requested is Not Warranted, Is Extremely Onerous, Excessive and Serves to Thwart the Right To Appellate Review

34.      We start by saying that the imposition of a bond on a stay pending appeal is not a requirement for the issuance of a stay. It is a discretionary matter. "Bankruptcy Courts [have] the discretion to grant a stay pending appeal without requiring the appellant to post a bond. The decision regarding whether or not to require a bond under Rule 8005 is discretionary with the Bankruptcy Court." See In re Weinhold, 389 B.R. 783 at 787 (Bankr. M. D. Fla. 2008). Accordingly, although the bond serves to protect the non-appealing parties from injuries that the

stay might cause, the Court has the discretion not to impose the bond when the circumstances are merited.

35.     In the instant case the bond requested by the Oversight Board amounting to $1,500 million is onerous and excessive in the true context of this case and considering the financial situation of appellants Cooperatives.  "An excessive appeal bond may not, of course, be employed to deny a meritorious appeal to a person of modest means." Damaskos v. Board of Appeal of Boston, 359 Mass. 55, 64 (1971).

36.     Clearly, the scope of an appeal bond must be logically related to its purpose or the right which the bond is meant to protect:  its object is to preserve the rights of the appellee while at the same time allow adequate opportunity for the appellant to request judicial review of the matters it deems erroneous or mistaken.  It is certainly not intended as an additional security for the Appellee and should not be imposed as a punitive measure to effectively thwart judicial review.

37.     The Cooperatives do not question the need to protect the rights of the Debtors during a stay, should there be a real risk, but evidently the government's rights and interests to be allegedly "affected" by the stay are, at best, speculative.  We respectfully submit that appellee's have not met the required burden to justify their $1,500 million bond request.  If anything, such a request is intended to hinder the Cooperatives' right to a stay pending appeal by forcing them to pay an excessive, unnecessary amount that is clearly inaccessible to them.

38.     In any event, Bankruptcy courts cannot use the Federal Rules of Bankruptcy Procedure to preclude appellate review.  For example, in Pyke v. Funnel Sci. Internet Mktg. , LLC (In re Funnel Sci. Internet Mktg, LLC), 551 B.R. 262, 274, 2016 U.S. Dist. LEXIS 36470 *24-25, the Court properly exercised its discretion in not granting the request for a bond considering that the appellee had not given proper justification for the requested bond and concluded that the requested amount

was "grossly in excess of any amount needed" to secure the risk it intended to protect.  Moreover, the court confirmed the established legal principle that "imposition of a bond is permissive under the statute, not mandatory."

39.     In another relevant case, the Bankruptcy Court properly held that the appellant need not post a bond as a condition of a stay: "[a] bankruptcy court issuing a stay under Rule 8005 need not require the posting of a bond, In re Byrd, 172 B.R. 970, 974 (Bankr. W.D. Wash. 1994), and "its decision whether or not to require a bond is reviewed for abuse of discretion." In re Swift Aire Lines, Inc., 21 B.R. at 14-16 (stating that court abuses its discretion when refusing to approve supersedeas bond when stay as a matter of right exists for appeal from money judgment, but implying that bonds in other cases are discretionary).  In this case, the bankruptcy court denied appellee's request for the posting of a bond because it was already bonded and there was no indication that a future judgment would be uncollectible.  In those circumstances, the Court found that the bankruptcy court did not abuse its discretion in denying the request for a bond.  Zamora v. Virtue (In re Cont't Coin Corp.), 2009 Dist. LEXIS 74392, *30-31.

40.     In the event the Court deems necessary for the Cooperatives to post a bond during stay, the bond ordered must bear a rational relationship to the Government's probable damages in the event the cooperatives do not prevail.  President Casinos, Inc. v. Columbia Sussex Corp. (In re President Casinos, Inc. v. Columbia Sussex Corp (In re President Casinos, Inc.), 360 B.R. 262, 266-67.  The burden to establish the rational basis for the bond request, including the amount requested, rests on the Appellee.  Id.  We respectfully submit that the Government has failed to offer rational evidence to justify the request of a $1,500 million bond.  A court is not required to order a bond to protect a party from economic damages that are speculative. Id.   And the damages the Government claims would occur are purely speculative.

17

41.    Evidently, it will be impossible for the Cooperatives to post an appeal's bond in the full titanic amount of $1,500 million, especially when such amount is neither reasonable nor supported by evidence.

42.    If the effect of ordering an appeal bond such as the one requested by the Government is that the Cooperatives cannot appeal -- due to the enormity of the bond established by the Court -- the inevitable consequence is that the trial court's error for which the cooperatives seek review will not be identified and corrected.  In that sense, the party effectively denied an appeal, will be denied due process." See, Rendleman, A Cap on Defendants' Appeal Bond? Punitive Damages Tort Reform, Akron Law Review, 2006.  "Limiting meaningful appellate review by establishing an appellate bond that is impossible for the appellant to comply with perpetuates error."   "A litigant's right to appeal from an adverse judgment is a bedrock principle in our system of justice." In Re Proposed Amendment to the Appeal Bond Requirements in Illinois Supreme Court Rule 305, 2003 WL 22340460 (Ill. May 12, 2003).

43.    If this Honorable Court imposes a bond pending appeal in this case it would certainly thwart the Credit Unions' rights to appeal, and diminish the First Circuit Court of Appeals' jurisdiction, which in turn would violate the Credit Unions' due process rights. It would also cause additional irreparable harm to the Credit Union, its members, and depositors because they would not be able to properly vindicate their rights. It would be an ipso facto denial of the stay pending appeal and most probably a dismissal of the appeal itself. In view of the forgoing, the appeal bond should not be imposed and the Oversight Board's request for a bond should be denied.

**III.     REMEDY IN THE ALTERNATIVE: THE CREDIT UNIONS REQUEST A STAY
OF THE EFFECTS OF DISCHARGE ON THEIR CLAIMS WHILE THE APPEAL IS
PENDING**

44.     In their motion at docket no. 20035 the Credit Unions requested a stay of the order
confirming plan and its implementation while the appeal filed at USCA 22-1079 is pending.
Considering the fact that the Debtor/Commonwealth in the instant case has sufficient funding in
remaining cash and reserves after making the cash disbursements contemplated in the Plan of
Adjustment, the Credit Unions request in the alternative: a stay of the discharge provisions over
their claims. This alternative remedy would not cause any disruption to the plan's execution and
would allow the Credit Unions to properly litigate their claims on appeal, without the effects of
equitable mootness.

The Oversight Board deliberately misconstrues the arguments of the Credit Unions
regarding the capacity of the Commonwealth under the Plan of Adjustment to be able to pay the
Credit Unions' claims if their claims are declared non-dischargeable in appeal or when finally
adjudicated.  That capacity of the Commonwealth is demonstrated as follows:

The Oversight Board itself acknowledged that the Plan would not be rendered unfeasible
if the takings claims were declared non dischargeable. In its demonstrative presentation filed on
November 22, 2021 at Docket No.19328, the Oversight Board submitted that on the effective date
of the plan of adjustment there would be $532 million in remaining cash after making the plan's
disbursements. See page 2 of Exhibit A, Response to Court's Inquiries, page 2 of the Debtors'
Demonstrative Presentations in Connection with Closing Arguments. Docket No. 19328. This was
also backed and supported by the representations of the Oversight Board's counsel in open court
at closing argument stating that, from a feasibility point of view, the debtors would be able to
handle the takings claims if these were to be determined non-dischargeable. These representations

and presentations made by the Oversight Board bind the Commonwealth before this Honorable
Court. The evidence submitted and argued by the Oversight Board showed that there is a remaining
cash of $532 million on the effective date of the plan, which would enable the Commonwealth to
sustain feasibility in the event of a non-dischargeability determination by any appellate court of
the taking claimants' claims.

Additionally, the Oversight Board's certified Fiscal Plan upon which the Plan of
Adjustment is based projects the availability of substantial surpluses during the coming years.
These surpluses will be higher, considering additional Medicaid funding that will be received by
the Commonwealth.

In these circumstances, the Commonwealth will have the financial capacity to pay the
claims of the Credit Unions, if after a trial on the merits they are declared non-dischargeable.

Preservation of Credit Unions' rights and claims does not impede implementation of a feasible
Plan of Adjustment and any financial contingency resulting from that preservation does not
adversely affect third parties, as the Credit Unions' claims are not material amounts as compared
to the Adjusted debts under the Plan, not even reaching seven tenths of one percent (0.658%) of
the restructured debt. Accordingly, contrary to the Board's arguments, neither debtors nor creditors
will be affected by preserving the rights and claims of the Credit Unions filed in their proof of
claims and under Adversary Case 18-00028 by the requested stay.

Under these circumstances, preservation of the Credit Unions' claims and rights while their
appeal in case USCA 22-1079 is pending does not require a complete stay of the Plan of
Adjustment. Accordingly, the Credit Unions hereby respectfully request in the alternative from
this Honorable Court to issue a stay pending the Credit Unions' appeals that only paralyzes those
provisions of the Plan of Adjustment that curtail, dismiss, enjoin or in any other way limits the

20

Credit Unions' claims and rights, particularly the discharge provisions of the Plan of Adjustment. A Stay of the discharge provisions of the Plan of Adjustment as to the Credit Unions claims would allow them the opportunity to fully exercise their rights on appeal by not being submitted to the equitable mootness doctrine.

WHEREFORE, the appearing Credit Unions respectfully request from this Honorable Court to enter an Order of Stay of the Order Confirming Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico entered on January 18, 2022 entered at docket 19813, while the appeal of this Order is entertained by the United States Court of Appeals for the First Circuit without the imposition of bond. In the alternative, the Credit Unions request to stay the discharge provisions of the Order Confirming Plan as to their claims pending the resolution of the appellate proceeding.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY**, in accordance with Fed. R. Bankr. P. 9014(b), Fed. R. Bankr. P. 7004(b), and the Court's Fifteenth Amended Notice, Case Management and Administrative Procedures Order [ECF#17127 ] (the "CMP Order"), that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to the parties appearing in said system including the US Trustee and to all those parties registered to receive notice within the electronic notification service.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico this 17th day of February, 2022.



*Attorneys for Credit Unions*
*PO Box 191757*
*San Juan, PR 00919-1757*
*Tel. (787) 722-2500*
*Fax (787) 777-1376*


*/s/ Enrique M. Almeida, Esq.*
**Enrique M. Almeida, Esq.**
*USDC-PR 217701*
*enrique.almeida@almeidadavila.com*