CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
<u>Recommended</u> Dec / 6/ 10 [initials]]

Commonwealth of Puerto Rico
General Court of Justice
Office of Courts Administration
San Juan, Puerto Rico

DEVELOPMENT AGREEMENT AND LEASE AGREEMENT
CAGUAS JUDICIAL CENTER

COME NOW

THE FIRST PARTY: The Office of Courts Administration, a department of the General Court of Justice of the Commonwealth of Puerto Rico, created in accordance with Law No. 201 enacted on August 22, 2003, employer's identification number 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, represented in this transaction by Hon. Sonia Ivette Vélez Colón, of legal age, married, Appellate Judge with administrative duties by delegation, resident of Guaynabo, Puerto Rico, as Administrative Director of the Courts (hereinafter "OCA, acronym in Spanish").

THE SECOND PARTY: Ramhil Developers, Inc., a corporation created under the laws of the Commonwealth of Puerto Rico, employer's identification number 35-2239827, represented in this transaction by its President, Hilda Rodríguez Forteza, of legal age, married, an executive residing in San Juan, Puerto Rico, whose authorization to appear in this transaction is reflected in the Corporate Resolution Certificate which is incorporated into this contract as its Appendix A (hereinafter "Ramhil").----------------

BOTH PARTIES certify and warrant that they have the necessary legal capacity to execute this Development Agreement and Lease Agreement (hereinafter "Development Agreement"), as well as to perform what is indicated herein, and therefore:

THEY STATE

FIRST: Through a Request for Proposals ("RFP"), published on December 26, 2006, OCA initiated a selection and negotiation process for the development, design, financing, construction, lease with option to buy, administration, and operation of the New Judicial Center of the Caguas Region (hereinafter

1

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

"Project"). After receiving and evaluating the different proposals, OCA selected and established the order of preference for negotiating with the different bidders. This order of preference for negotiations was notified to the bidders on December 28, 2007.

SECOND: On April 7, 2010, after several steps were taken, OCA notified Ramhil that, in accordance with the order of preference notified to the bidders for negotiation, it would begin to negotiate with Ramhil the development of the Project.

THIRD: In accordance with the terms and conditions negotiated and agreed upon, OCA and Ramhil wish to and proceed to execute this Development Agreement to establish the terms and conditions applicable to the planning, development, design, financing and construction of the Project, as well as the main terms and conditions that shall be incorporated into the lease agreement (hereinafter "Lease Agreement") that shall be executed subsequently between the appearing parties for the lease with option to buy, administration, operation and maintenance of the New Judicial Center for the Caguas Region. The Lease Agreement shall contain all of the clauses and conditions contained in this Development Agreement, other than any that are superfluous.

FOURTH: In consideration of the above, OCA and Ramhil, freely and voluntarily execute this Development Agreement in accordance with the following:

CLAUSES AND CONDITIONS

ARTICLE 1
CONDITIONS PRECEDENT

1.1    Conditions precedent for Execution of Lease Agreement. The execution of the Lease Agreement between OCA and Ramhil shall be expressly subject and conditional to the prior performance by Ramhil, within the timeframe established in this Development Agreement, of the following conditions precedent (hereinafter "Conditions Precedent"):

1.1.1 Survey. Within thirty (30) working days, starting from the execution of this Development Agreement, Ramhil shall submit to OCA a

2

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Two sets of initials on left-hand margin. In the lower portion of the page:
<u>Recommended</u> Dec / 6/ 10 [initials]]

revised survey establishing the boundaries and surrounding properties of the premises proposed for development of the Project. The Survey shall illustrate the following: (a) the boundaries and surrounding properties (including the name of the known owners) of the plots of land belonging to Ramhil that shall be used in whole or in part for development of the Project; (b) the proposed boundaries and surrounding properties (including the name of known owners) of the plot of land proposed to be segregated for development of the Project (hereinafter "Judicial Center Plot"); (c) the proposed boundaries and surrounding properties (including the names of known owners) of the plot of land considered for potential placement of certain facilities of the Department of Justice (hereinafter "Department of Justice Plot") and (d) the proposed access to the Judicial Center Plot. The Survey shall be prepared and certified by a professional authorized to conduct surveys in Puerto Rico, complying in a substantial and reasonable manner with the requirements established by the "Manual of Professional Practice and Guidelines for Professional Service Compensation" of the Association of Engineers and Surveyors of Puerto Rico. The Survey shall also include the area of the different plots indicated above and a table of directions and distances using the NAD83 system of coordinates. Ramhil shall also include and mark monuments that mark the boundaries and surrounding properties of the plots of land it owns that shall be used for development of the Project.

1.1.2 Final Economic Proposal. During a meeting held on October 20, 2010 at OCA's offices, OCA formally requested that Ramhil submit its best final economic proposal for development of the Project (hereinafter "Final Economic Proposal"). Through a letter from December 2, 2010, Ramhil submitted to OCA its Final Economic Proposal, which was similar to the economic proposal submitted by Ramhil as part of its Proposal for Construction of the Caguas Judicial Center from March 26, 2007 (hereinafter "Ramhil's Proposal"). The aforementioned Final Economic Proposal is incorporated by the parties into this Development Agreement and made into an integral part thereof as Appendix B.

1.1.3  Design, plans and construction documents. On or before a period of one hundred and fifty (150) working days from the date of execution of this Development

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
<u>Recommended </u>Dec / 6/ 10 [initials]]

Agreement, Ramhil shall carry out, subject to the requirements established in the RFP and the terms and conditions and review and approval processes established under Article 3 (Design and Construction of the Project) of this Development Agreement, the design, plans, specifications and other construction documents of the first phase necessary to start construction of the Project completed up to seventy-five percent (75%), it being understood that the first phase necessary to start construction of the Project is earthwork.

1.1.4   Permits, authorizations and approvals. Within a period of one hundred and fifty (150) working days from the execution of this Development Agreement, Ramhil shall obtain all of the governmental authorizations, permits, and approvals necessary for development and construction of the Project. Notwithstanding the above, it is provided that Ramhill may, at its discretion and risk, obtain all of the construction permits of the Project in stages ("fast track" or "design-build"). In the event that Ramhil decides to obtain the permits for construction of the Project in stages, the governmental authorizations, permits, and approval necessary to sign the Lease Agreement shall be as required to start or begin the first phase of construction. It is understood that the first phase of construction of the Project is the construction stage of the earthwork.

1.1.5   Finance. Within a period of one hundred and fifty (150) working days from the execution of this Development Agreement, Ramhil shall obtain, formalize and reasonably demonstrate to OCA the funding necessary and appropriate for development and construction of the entire Project (hereinafter "Financing Agreement"). OCA and Ramhil acknowledge that, as a requirement for the financial institution to execute the final Lease Agreement, the Lease Agreement must be submitted to said financial institution appropriately executed by OCA and Ramhil. Therefore, OCA and Ramhil agree that Ramhil shall schedule the execution of the Lease Agreement and Financing Agreement on the same day, so that immediately after executing the Lease Agreement, the Financing Agreement can be executed. Once the aforementioned mechanism has been complied with as to execution of the Lease Agreement and the Finance

4

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
<u>Recommended</u> Dec / 6/ 10 [initials]]

Contract, the Condition Precedent shall be deemed complied with as to obtaining funding for the Project.

1.1.6  Construction Contract. Within a period of one hundred and fifty (150) working days from the execution of this Development Agreement Ramhil will have executed and reasonably demonstrated to OCA a construction contract (hereinafter "Construction Contract") with an entity duly qualified for appropriate construction of the Project, as defined and described in Article 3, Design and Construction of the Project, of this Development Agreement.

1.1.7  Insurance, Performance and Payment Bonds. Within a period of one hundred and fifty (150) working days from the execution of this Development Agreement, Ramhil shall reasonably demonstrate to OCA that the contractor selected for construction of the Project obtained the appropriate payment and performance bonds to guarantee construction of the Project as well as the insurance required to start the construction work.

1.2  <u>Period to comply with the Conditions Precedent</u>. It is expressly acknowledged by OCA and Ramhil that it is not the intention of the parties to make the development of the Project indefinitely subject to compliance with the Conditions Precedent and, therefore, other than as provided below, each of said Conditions Precedent shall be  satisfied within the periods established in this Development Agreement.

1.2.1  Termination of the Development Agreement. If Ramhil does not comply with each of the Conditions Precedent established in this Development Agreement within the period or term established for each of these, OCA may terminate this Development Agreement.

1.2.2  Period of time to comply with the Conditions Precedent. On request of Ramhil, OCA may, at its discretion, extend the period established for compliance with the Conditions Precedent. The period to perform the Conditions Precedent shall be extended for the period of time that OCA deems fair and reasonable, as established by Ramhil in its request to extend said period. Nothing contained in this Development Agreement

5

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

is an impediment to OCA, at its sole discretion, deeming any Condition Precedent complied with, as long as it believes that said determination is consistent with the purposes and objectives of the Development Agreement.

1.3 Conditions Precedent Bond. Within a period of no more than thirty (30) working days from the execution of this Development Agreement, Ramhil shall demonstrate to OCA that it obtained a bond in the amount of fifty thousand dollars ($50,000.00) suitable to guarantee Ramhil's compliance with the Conditions Precedent (hereinafter "Conditions Precedent Bond.")

ARTICLE 2
LAND OR PROPERTY

2.1 Description, Ownership and Segregation of the Property. The Project shall be developed in a plot of land designated Judicial Center Plot, which shall be segregated from a larger plot of land, owned by Ramhil, located in State Road PR #189 in the Bairoa Neighborhood of the Municipality of Caguas, Puerto Rico (hereinafter "Ramhil A Plot"). Ramhil acquired the Ramhil-A Plot through Deed Number 27 of Segregation Sale, Purchase and Area Rectification executed on May 24, 2006 in the presence of Notary Public Rebeca Caquías Mejías, pending registration under Entry 261 of Journal 980 Caguas Property Registry, First Section.

If necessary for purposes of installation of the Electrical Substation of 38 KVA required for development of the Project by the Electrical Power Authority (hereinafter "PREPA"), a portion of approximately one hundred and eighty-five square meters (185 m$^2$) of another plot of land owned by Ramhil also located in PR State Road #1, Cross Street PR State Road #189, in the Bairoa neighborhood of the Municipality of Caguas, Puerto Rico (hereinafter "Ramhil-B Plot") shall be used. Ramhil acquired Ramhil-B Plot through Deed Number 42 as to Consolidation, Segregation, Purchase and Sale, executed on June 28, 2007 in the presence of Notary Public Rebeca Caquías Mejías, which is pending registration under Entry 1,131 of Journal 1,134 of the Caguas Property Registry, First Section. If said portion of

6

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

approximately one hundred and eighty-five square meters (185 m$^2$) of the Ramhil-B plot is used for the development of the Project, it shall be a part of the Judicial Center Plot.

2.1.1  Segregation of the Judicial Center Plot. Ramhil shall segregate the Judicial Center Plot from the plots or property described in Article 2.1. It shall have an approximate area of 29,301.2377 square meters. The parties agree and clarify that, if it is more convenient to install the 38 KVA Electrical Substation required by PREPA inside of the Ramhil-A Plot, no portion of the Ramhil-B Plot shall be used for the development of the Project, even if the area of the Judicial Center Plot is smaller than the approximate area (29,301.2377 m$^2$) previously stated in this Section.

2.1.2  Department of Justice Plot. Ramhil shall consider using the remainder of the Ramhil-A Plot, once it is segregated from the Judicial Center Plot, for the potential development of certain facilities of the Department of Justice.

2.1.3  Surveys. The Ramhil-A Plot, Ramhil-B Plot, Judicial Center Plot and Department of Justice Plot are included to illustrate the approximate survey that is incorporated into this Development Agreement as Appendix C. Said approximate survey shall be substituted by the Survey that Ramhil shall submit to OCA, as established in Article 1 (Conditions Precedent) of this Development Agreement. Additionally, once the construction of the Project is concluded, Ramhil shall submit a new updated and corrected survey. The parties acknowledge that the areas of the land plots mentioned in the Development Agreement can vary moderately in each of the surveys that shall be submitted to OCA and that said moderate variations are typical and acceptable in a development of the magnitude of the Project, and therefore they do not constitute nor shall they constitute a breach of the terms and conditions of the RFP, the Development Agreement or the Lease Agreement.

2.2  Access to the Project. Ramhil agrees to build access to the Project (hereinafter "Access to the Project"), substantially as illustrated in the survey that forms a part of this Development Agreement as Appendix C, so that it can be given public use through a corresponding assignment to the Municipality of Caguas.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

2.2.1  Access Design. Access to the Project shall be built in accordance with the parameters and requirements that from time to time may be imposed by the Autonomous Municipality of Caguas, the Highway and Transportation Authority and/or any other agency with jurisdiction over the work related to construction of Access to the Project. The design of the proposed Access to the Project shall be submitted to OCA for its review and approval, in conjunction with the design of the Project in accordance with the provisions of Article 3 (Project Design and Construction). Additionally, Ramhil agrees to acquire rights over any additional territory required for construction of Access to the Project and/or to carry out any other improvement to existing roads that surround it, as required by the Autonomous Municipality of Caguas, the Highway and Transportation Authority, and any other agency with jurisdiction.

2.2.2  Access easement and public use of access. Ramhil shall obtain rights through in-perpetuity access easements and/or devote to public use (through the appropriate assignment to the Autonomous Municipality of Caguas) as to any property necessary for construction of Access to the Project.

2.2.3  Access to Department of Justice Plot. Access to the Department of Justice Plot, which is thought to be segregated for potential development of certain facilities of the Department of Justice shall be located outside of the Judicial Center Plot. It is clarified that contrary to what is illustrated in Appendix B, said access to the Department of Justice Plot shall not be through an easement in which the Judicial Center Plot is the servient estate.

2.3  Special Flood Risk Areas. The parties reasonably believe that, in accordance with current regulations, the property or land that is proposed to be used in the development of the Project is located in an area that does not prevent, with the appropriate improvements and design, the development and construction of the Project.

2.4  Infrastructure Improvements. Ramhil shall be responsible for design and construction of all improvements to existing infrastructure required by the appropriate governmental agencies for development of the Project.

8

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

2.5   Restrictive Construction Condition. The Project described in Article 3 (Project Design and Construction) of this Development Agreement, and in accordance with the final plans it shall be the only project or improvements that may be built in the Judicial Center Plot, unless OCA expressly authorizes any variation in writing and in advance.

2.6   Toxic, Dangerous or Contaminating Substances. During construction and operation of the Project, Ramhil shall not incur nor allow that anyone else incur in any violation of laws related to the environmental conditions in the Judicial Center Plot, including, but not limited to, the surface, the soil, the subsoil, underground water, storage, or disposal of any toxic, dangerous or contaminating substance over, under or in the immediacy of the Judicial Center Plot, and shall immediately take any remedial actions necessary in that event, as required by law. Ramhil shall deliver to OCA a copy of any report, project, study or environmental assessment carried out in the Judicial Center Plot. Ramhil shall not deliver any agreement, arrangement or commitment related to the laws related to environmental conditions that could affect OCA's interests in the Judicial Center Plot, in the Project or in this Development Agreement and/or in the Lease Agreement, without the prior written consent of OCA, which shall not be unreasonably denied.

2.7   Right of Entry. During the stage of development and construction of the Project the employees, agents or representatives authorized by OCA shall have the right to enter the Judicial Center Plot and/or the Project to inspect it. Said entry to the Project shall be done upon prior coordination with Ramhil representatives.

## ARTICLE 3
## DESIGN AND CONSTRUCTION OF THE PROJECT

3.1   Description of the Project. Ramhil agrees to develop, design and build the Project, which consists of a nine (9) story building for the area of rooms, offices and other uses related to having an approximately three hundred and forty-two thousand one hundred and eighty-seven point zero three (342,187.03) square feet Judicial Center (hereinafter "Judicial Center Building") and a five (5) level approximately three hundred and twenty-four thousand four hundred and fifty-two point fifty-five (324,452.55)

9

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

square feet (hereinafter "Parking Building"). The Project shall be designed and built in accordance with the conceptual design proposed by Ramhil to OCA (hereinafter "Conceptual Design"), which is incorporated into this Development Agreement as Appendix D, and subject to the design revisions and approvals carried out by OCA, according to the design review process established below in this Article 3 (Project Construction and Design).

3.2  Development Schedule. Ramhil agrees to design and build the Project, in a diligent, continuous and reasonable manner and in accordance with all of the laws, regulations and any other applicable governmental requirement, and in accordance with the terms and conditions of this Development Agreement, until its final acceptance and delivery. The Project shall be designed and built in accordance, substantially, with the development schedule that is incorporated into this contract as Appendix E (hereinafter "Development Schedule"), as it is modified from time to time by consent or mutual agreement of the parties. The Development Schedule shall include all of the main activities necessary for development of the Project including planning, design, the process of obtaining permits, authorization and approval, financing, construction and delivery of the Project.

3.3  Project Design. OCA shall have the right to review and approve of the design of the Project in each of its stages, including the schematic design, in the form and extent established in this Development Agreement. This approval or disapproval shall be provided in writing and shall not be denied, retained, conditions or delayed in an unreasonable manner.

3.3.1  Design Review Process. OCA shall designate a representative or committee (hereinafter "Design Representative") who shall be given the opportunity to provide comments to Ramhil and other members of Ramhil's development team in each stage of the design process. The Design Representative shall be invited to participate in periodical meetings with Ramhil and its development team where Project planning and design matters are discussed. Review and approval of the design and plans of the Project, as established in this Article, as well as OCA's participation in said design process shall not constitute a review of Ramhil's compliance with technical and/or professional and/or legal requirements that are necessary and applicable to the Project, nor shall it constitute

10

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

judgment as to whether or not they are correct, which is the sole and absolute responsibility of Ramhil.

OCA shall have the right to review and approve any and all changes to the conceptual design and revise and approve of the schematic design as well as the final plans, specifications and final construction documents of the Project (hereinafter "Final Plans"). Once completed, the Final Plans shall be incorporated by reference and shall be an integral part of the Lease Agreement.

The review of the conceptual and schematic design and the Final Plans of the Project by OCA shall be focused on their compliance with Ramhil's proposal, the conceptual design submitted by Ramhil, with the requirements established in the RFP and with the terms and conditions established in this Development Agreement. If OCA does not send or notify Ramhil of its approval or objection in writing within fifteen (15) working days from receipt of written notice from Ramhil accompanied by a complete copy, as appropriate, of the conceptual design, schematic design, or Final Plans, it shall be deemed that OCA has approved of the design or plans of the appropriate stage, including Final Plans. If OCA notifies any objection in writing within the period of fifteen
(15) working days indicated, Ramhil shall consider it and if deemed necessary shall carry out any appropriate modifications of the conceptual design, schematic design or Final Plans, as appropriate. Ramhil shall notify OCA in a timely manner in writing as to the modifications carried out, only attaching a copy of such documents that were subject to modification (parts of conceptual design, schematic design or Final Plans, as appropriate). After that OCA shall have a period of five (5) working days indicated, it shall be understood that OCA has approved of the modification notified by Ramhil of the design or plans of the appropriate stage. If OCA makes an objection, the parties, in good faith and considering their common interest that the Project be completed within the Development Schedule, shall meet and resolve any existing discrepancy as to the proposed modifications

11

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

to the conceptual design, schematic design or Final Plans, as appropriate, within a period not to exceed five (5) working days. As long as they do not constitute a material modification to the terms of Ramhil's Proposal, the changes, modifications or objections submitted by OCA during this design review process shall not be considered a change order. As to the Final Plans, once Ramhil has evaluated the changes, comments, modifications or objections presented by OCA to said Final Plans, Ramhil shall have a period of fifteen (15) working days from receipt thereof to notify OCA as to its intention to consider them to be a change order as well as the proposed cost with regards to said change order. Then the parties shall use the procedure provided in Article 3.4.6 (Changes Requested by OCA) of this Development Agreement to negotiate a change order, following the Puerto Rico construction industry practices if it is concluded that the changes, comments, modifications or objections of OCA constitute a change order. For purposes of this Development Agreement, one working day means a day that is not a Saturday, Sunday or legally established holiday in the Commonwealth of Puerto Rico. The parties also agree that any change, amendment, revision or update of the Final Plans including but not limited to all change orders to the Construction Contract or to the Final Plans submitted, originated or proposed by Ramhil, shall be in accordance with the conceptual design and schematic design that was submitted and approved and that shall be submitted to OCA for their review and approval in accordance with the procedures established in this Article.

3.3.2   Permits, authorizations and approvals. From the execution of this Development Agreement, Ramhil shall obtain, in a commercially reasonable manner and at its own expense and risk, all of the permits, authorizations, approvals and other governmental authorization (hereinafter, "Required Authorization" or "Required Permits") necessary for development, construction and use of the Project. The Required Permits shall include, but not be limited to, and if not previously obtained, all of the location permits, soil classification or land zoning, urbanization and development permits, construction permits, use permits and permits for operation of the Project. It shall also include all of the authorizations and approval

12

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

necessary for development and construction of the Project such as environmental, access, entry, exit, and road authorization or approval, availability of all water infrastructure, rain and sewage drainage, power, gas, telecommunications facilities as well as facilities necessary for construction and operation of the Project. Ramhil states to OCA that it shall not initiate any development, construction or operation activity without having previously obtained the Required Permits. Furthermore, Ramhil shall certify to OCA that it has executed the Construction Contract and/or any other construction contract necessary for construction of all work of the Project.

3.3.3 OCA Release. Ramhil expressly releases OCA, its agents, officers, directors, employees and/or consultants and holds them harmless from any and all liability of any nature related to the design and the Final Plans of the Project, including any claim, action or complaint that may arise with regards thereto, either for defects therein or claiming the cost of producing them or their value, in the event that Ramhil withdraws from the Project or does not obtain within the period indicated herein the approvals from the state or federal governmental agencies required by law or regulation that is currently in effect, or even for a cause of action arising subsequent to the approval or for the implementation or failure to implement any maintenance requirement of the property or similar requirements imposed on Ramhil for any contractual or extra-contractual damages, costs, expenses, fees or penalties that may arise with regards to that aspect.

3.4 Construction of the Project. Ramhil shall build and manage the Project in a constant, diligent and reasonable manner until it is completed and delivered, in accordance with what is established and required by regulatory agencies in the process of obtaining the Required Permits and in accordance with the terms and conditions established in this Development Agreement.

3.4.1 Construction and Development Costs and Expenses. Ramhil shall be the only party responsible for payment of all of the costs and expenses of development, design and construction of the Project, without any limitations, of any nature, regardless of whether they are expressly mentioned in this Development Agreement.

3.4.2 Credit for Construction/ Installation of Security Systems. If the cost

13

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: <u>Recommended</u> Dec / 6/ 10 [initials]]

of the Project is lowered as a result of the installation and maintenance by OCA of any of the components of the security system required as part of the RFP, Ramhil shall grant credit to OCA equivalent to: (a) the total of the reduction of cost for Ramhil specifically attributable to the cost of the security equipment to be paid by OCA (cameras, monitors, access control, barrier gates, transformers directly associated to the security system, digital recorders, etc. as provided in the RFP and Ramhil's Proposal, and (b) the total of the reduction in maintenance cost for Ramhil specifically attributable to the security equipment to be maintained by OCA during the term of the Lease Agreement. The parties acknowledge and clarify that some of the components required for construction and/or installation of the security system of the Project are so intrinsically related to the other construction of the Project that it prevents them from being built and/or installed by OCA. Therefore, the parties agree, within a period no greater than forty-five (45) working days from the execution of the Development Agreement, to establish accurately and in detail the components of the security system to be built by Ramhil.

3.4.3  Compliance with laws. Ramhil shall carry out the construction of the Project in compliance with all provisions of this Development Agreement and all of the laws, ordinances, decrees, regulations, orders, approvals, permits, authorizations, requirements and any other legal provision applicable to the development and construction of the Project of all of the agencies and federal, state, and municipal governmental instrumentalities of the Commonwealth of Puerto Rico and the United States of America and any other appropriate public authority that has jurisdiction including but not limited to the Puerto Rico Construction Code. This provision shall be complied with without undermining Ramhil's rights to challenge using the required legal methods the application of such laws, regulations, ordinances or decrees to the Project.

3.4.4  Certification of performance guarantee and delivery of construction. Within five (5) working days from performance of the Financing Agreement, Ramhil and its principal shareholders shall certify to OCA that Ramhil's principal shareholders, along with Ramhil, have obtained performance bonds as to financing of the Project on behalf of the entity that provides financing

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

thereof and shall submit copies of the finance documents and/or guarantees that demonstrate this.

3.4.5 Start and End of Construction. Ramhil agrees to complete substantial construction of the Project within a period of thirty (30) months from the date in which the Financing Agreement is executed, according to the Final Plans reviewed and approved by OCA, unless a force majeure event occurs as provided in this Development Agreement. Ramhil agrees to start construction of the Project within five (5) working days from the date of execution of the Financing Agreement or May 1, 2011, whichever occurs first (hereinafter "Start Date"). For purposes of this Development Agreement, the start of construction is defined as the start of the physical activities in the plot related to earthwork. The parties agree that even if Ramhil starts construction without the Financing Agreement having been executed, the Start Date shall continue to be considered, for purposes of the available period to complete construction, the date in which the Financing Agreement is executed or May 1, 2011, whichever occurs first.

3.4.6 Inspection of the Construction. Both Ramhil and OCA shall each appoint a representative for construction and, after notice of said appointment, until it is changed or revoked, those construction representatives shall process, send, and receive all notices, approvals, communications, plans, specifications and other materials and documents required or permitted to be sent and received in accordance with this Development Agreement.

OCA shall be represented in the construction by the Inspection Office, led by an engineer selected by Ramhil and approved by OCA, who shall provide updates through progress and performance reports for said Office. The Inspection Office shall also operate as Ramhil's representative with the contractor. The Inspection Office shall ensure that construction of the Project is carried out through the Final Plans and the terms and conditions of this Development Agreement. The main contact or liaison of this Inspection Office with OCA shall be the appointed construction representative. Ramhil shall pay the services to be provided by the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: <u>Recommended</u> Dec / 6/ 10 [initials]]

Inspection Office.

3.4.7  Changes requested by OCA. If OCA requests changes or modifications of the Final Plans after the terms and processes of review and approval of the design and final plans of the Project have elapsed, as provided in this Development Agreement, said changes or modifications shall be submitted in writing as a "Change Order," following the construction industry practices in Puerto Rico.

For purposes of this Development Agreement a change order shall be considered any requirement or request from OCA entailing a change in the Final Project Plans appropriately approved by OCA as provided in this Development Agreement, and which in turn entails an increase in construction costs for the Project (hereinafter "Change Order").

All Change Orders shall be prepared and recommended by the Inspection Office and recommended and processed by OCA's construction representative and signed and authorized by the Administrative Director of the Courts or the person delegated by her. Any changes or modifications requested, for any reason, by Ramhil, which shall be reviewed and approved by OCA, shall not be considered change orders as established in this Development Agreement.

In the event that OCA requests a Change Order as established in this Development Agreement, both parties shall determine of common accord the additional construction period, if necessary, to carry out the requested changes. OCA shall assume additional costs incurred by Ramhil due to the change orders requested by OCA, paying the cost based on certifications that are appropriately issued by the contractor and approved by the Inspection Office.

3.4.8  Air Conditioning System. Ramhil agrees to design and build and/or install an air conditioning system that complies with the requirements established by OCA in the RFP and that is reviewed and approved by OCA as part of the design review process established in this Development Agreement.

16

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

3.4.9  Electrical Substation. Ramhil agrees to design, build, and install a 38 KVA electrical substation of the Project within the Judicial Center Plot in a location mutually agreed upon by the parties and in accordance with PREPA's requirements.

3.4.10  Force Majeure. A delay or non-compliance by Ramhil in the Project design and construction obligations established in this Development Agreement shall not constitute default under this contract to the extent that said delay or non-compliance may not be foreseen through an exercise of reasonable diligence by Ramhil, results from "an act of God", a force majeure event, act of terrorism, bioterrorism, acts of war (declared or not declared), revolts or revolutions, acts of a public enemy, civil disobedience and insurrections, fire, natural disasters, shortage of materials or labor, strikes or labor conflicts not attributable to Ramhil's non-compliance with any contract or work agreement or any applicable law or regulation and that directly affects Ramhil, OCA's events of default, interruption of construction of the Project by judicial order or action or by order of any governmental entity that has not been caused by action or omission of Ramhil or its affiliates, agents, contractors, or any other individual or entity acting on its behalf, rain the magnitude of which prevents advancing the critical rate of construction or the period of thirty (30) days is extended as a consequence of Change Orders requested by OCA, as established in this Development Agreement.

In no case shall any of the following be considered force majeure events: the inability of obtain financing, Required Permits or delays due to governmental closing, soil conditions or delays or changes in highway construction, transportation infrastructure and related improvements that do not directly affect construction of the Project.

Ramhil agrees to carry out any necessary efforts in a diligent manner to minimize delays and any other adverse affect caused by any force majeure event. Non-compliance with this agreement shall be considered an event of default.

Ramhil shall notify OCA in writing as to any force majeure event or any event of default alleged by OCA, excusing its delay or

17

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

non-compliance. Ramhil shall maintain OCA reasonably informed as to any development related to the force majeure event or the alleged breach.

3.4.11 Prevailing Wages. To the extent applicable to Ramhil's business and the construction of the project, all of the contracts for construction of any improvement and any other development work shall require that Ramhil's contractors and subcontractors pay the level of wages prevailing (the so called federal minimum wage) as established by the government of the United States of America. These contracts shall also contain provisions as to insurance for protection of OCA, workers or employees, suppliers, subcontractors and the public.

3.4.12 No Consent. Nothing contained in this Development Agreement shall be interpreted or understood in any way as explicit or implicit consent or requirement of OCA, by inference or otherwise, to any contractor, subcontractor, worker or supplier to carry out any work or supply any material for any improvement, construction, alteration or repair of the Project.

3.4.13 Payment and Performance Bonds. Prior to the start of development work for any component of the Project, Ramhil shall ensure and certify to OCA that the contractors and/or subcontractors process and obtain the Payment and Performance Bonds (hereinafter "Payment and Performance Bonds"), on behalf of Ramhil and/or the entity that provides financing for the Project, with the amounts and in the manner and substance and guarantees that are satisfactory to Ramhil and/or the entity that provides financing for the Project, with respect to the work of the specific component of the Project that shall be carried out by the contractor or contractors.

3.4.14 Release. OCA shall not be liable in damages (either direct, indirect, or otherwise) to Ramhil, its affiliates, successors, assigns, agents, employees, contractors, dealers and any other invitee or user of the Project to any other party in connection with approval or rejection of designs or plans, the implementation or non-compliance in implementing any act of maintenance of the plot or any similar

18

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec / 6/ 10 [initials]]

requirement imposed on Ramhil or defects in the approved design and plans. Furthermore, Ramhil, its successors and assigns shall offer compensation, defend OCA, its officers, directors, employees and agents and hold them harmless from any and all liability, including attorney's fees and legal costs incurred, regardless of the fact that the complaint or judicial action or any challenge or appeal is a result of an OCA approval or rejection of Ramhil, as established in this Development Agreement or failure to maintain the plot as required. This hold harmless applies solely to any liability that arises from the review and approval processes established in this Article and does not extend to other actions or omissions of OCA or any other third party.

3.4.15  Termination acceptance and delivery of the Project. The Project shall be built, finished or completed and ready for acceptance and delivery to OCA within a period of thirty (30) months from execution of the Financing Agreement or on September 15, 2013, whichever occurs first.

3.4.16  Liquid Damages for Delay in Delivery. If after Ramhil starts construction of the Project it is not able to deliver it to be accepted and delivered to OCA within the period provided in this Development Agreement without a justification for its delay for any of the reasons established in this Development Agreement and without submitting evidence and documentation to that effect, Ramhil shall pay OCA as liquid damages due solely and exclusively to said delay in delivery the stipulated amount of one thousand dollars ($1,000.00) per day (hereinafter "Liquid Damages"). Liquid Damages are in addition to any other non-monetary remedy that OCA has at its disposal under this Development Agreement for Ramhil's delay in delivery of the Project.

3.4.17 Termination of Construction. The Project shall be completed when it is demonstrated that there has been substantial completion and that it is ready to be occupied by OCA through the appropriate certification by professionals in charge of construction and issuance of the use permit by regulatory agencies with jurisdiction. Issuance and delivery to OCA of the use permit gives rise to OCA's obligation

19

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

to pay monthly rent agreed in the Lease Agreement.

3.4.18 Final Inspection. After Ramhil requests approval of the certificate that there has been substantial completion of construction of the Project, the Inspection Office shall carry out the final inspection of the Project. The request for final approval of the certificate that substantial completion of construction of the project has been achieved shall be notified to the Inspection Office in writing and by certified mail with return receipt. The Inspection Office shall have fifteen (15) working days from receipt of said notice to submit a written report and send it via certified mail with return receipt to OCA and Ramhil recommending acceptance or rejection as to substantial completion of construction of the Project.

If the Inspection Office recommends acceptance of the Project, OCA may issue the Certificate of Acceptance of the Project. If acceptance of the Project is not recommended and the period to complete or terminate construction expires, the Inspection Office shall define a reasonable period for correction of defects indicated by said office preventing acceptance of the project by OCA. Once the period established in this Development Agreement to complete construction of the Project expires without having completed it, payment of Liquid Damages to OCA established for delay in this Development Agreement shall be applied.

It is provided that any defects identified in the Punch List that do not prevent use of the Project and which are appropriately identified by the Inspection Office in the substantial termination certificate shall not be considered defects that prevent acceptance of the Project. The Inspection Office shall define the reasonable period or periods for correction of said defects. In the event that Ramhil does not correct said defects, OCA shall proceed, in its discretion, to correct the deficiencies and deduct the cost of corrections, as reasonable, from the rental payment.

3.4.19 "As Built" Construction Plans or Documents. Ramhil shall prepare at its cost and deliver to OCA a set of Final Plans of the Project ("As

20

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
<u>Recommended</u> Dec / 6/ 10 [initials]]

Built") and of the survey of the Judicial Center Plot, as established in this Development Agreement, in writing and in digital format, within a period of (30) working days from the issuance of the corresponding use permit.

ARTICLE 4
<u>LEASE TERMS</u>

4.1   <u>Lease Term</u>. After Ramhil satisfied all of the Conditions Precedent established in this Development Agreement in their entirety, unless OCA deems completed any that have not been satisfied, in accordance with the provisions of Article 1.2.2, OCA agrees to execute a Lease Agreement in accordance with the terms and conditions established in this Article. The area to be leased and sold at the end of the term of the Lease Agreement includes the Judicial Center Plot, the Project, any easement or right that benefits OCA over adjacent properties due to ownership of the leased area and any right, title and proprietary interest that Ramhil may have over equipment, movable assets or accessions used for use and occupation of the leased area, as well as changes, additions and improvements made on the leased areas, excluding solely the telephone equipment and any equipment, movable assets or accessions that are owned by or installed by OCA (hereinafter "Area to be Leased.")

The period of effect of the Lease Agreement shall be thirty (30) years from the date of issuance of the use permit, as established in this Development Agreement. It is established that "lease year" shall consist of twelve (12) consecutive calendar months.

4.2   <u>Transfer of the Project to OCA</u>. At the end of the term of the Lease Agreement, Ramhil shall sell and OCA shall buy the Area to be Leased for the nominal price of one dollar ($1.00), in accordance with the laws and current procedures as of the date said transaction will be carried out. The Lease Agreement shall establish the terms, conditions, and procedures of this transfer and shall also include the right of First Refusal and the processes for OCA to acquire the Area to be Leased prior to the expiration of the term of the Lease Agreement.

21

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

4.2.1 Transfer free of encumbrances. Upon transferring to OCA the Area to be Leased, Ramhil agrees that said property be free of liens and encumbrances. The Area to be Leased shall be also free from any lien or registry entry or any judicial or extrajudicial claim that involves it, including but not limited to mortgage(s) constituted to guarantee the financing loans for construction of the Project.

4.3 Lease Payment. The lease payment for the Area to be Leased and used shall be thirty-two dollars with eighty-five cents ($32.85) per square feet for the Judicial Center Building (with an area of 342,187.03 square feet) and nineteen dollars and thirty cents ($19.30) per square feet for the Parking Building (with an area of 324,452.55 square feet). This lease payment shall be paid according to the terms and conditions of the Lease Contract to be signed by the parties. This lease payment shall also include the costs of the insurance of the Area to be Leased, property tax and maintenance for the Area to be Leased. After a period of ten (10) years from the date of the start of the Lease Agreement, the parties shall renegotiate an increase in the lease payment that shall not exceed ten percent (10%). After a period of twenty (20) years from the date of the start of the Lease Agreement has elapsed, the parties shall renegotiate a second increase in the lease payment that shall not exceed ten percent (10%). The lease payment agreed shall remain unaltered for each period of ten (10) years other than adjustments in the amount of the operational component due to increases in the federal minimum wage and/or any municipal, state or federal legislation. The lease payment includes expenses related to the following items: (a) insurance for the Judicial Center Building; (b) property tax based on the first receipt issued to that effect, simultaneous with the issuance of the use permit (any increase in this item shall be paid by OCA) and
(c) maintenance of the public areas and the Judicial Center Building, as described in the Ramhil's Proposal.

4.3.1 Obligation to Make the Lease Payment. OCA agrees to include in their annual budget a specific item to cover the

22

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
<u>Recommended </u>Dec / 6/ 10 [initials]]

obligations under the Lease Agreement and annually request sufficient funds to that end.

4.4 <u>Maintenance of the Project</u>. Ramhil agrees during the term of the Lease Agreement to provide, install, maintain and repair the Area to be Leased in order to keep it in usable conditions and maintain all services, equipment, and accessories operational. Ramhil shall comply with all applicable laws, regulations, ordinances and legal provisions for preservation, security, and maintenance of the Area to be Leased. The terms and conditions for adequate maintenance to the Area to be Leased shall be established in greater detail in the Lease Agreement.

4.4.1 Public Health and Security Measures. On the date of issuance of the use permit, Ramhil shall be obligated to comply with the security and public health measures recommended by the Puerto Rico Fire Department, the Department of Health, the Labor Department, as well as all laws, ordinances, requirements and provisions that apply to the Area to be Leased.

4.5 <u>Registration of the Lease Agreement</u>. OCA reserves the right to register in the Property Registry the lease right established under the Lease Agreement through conversion of the Lease Agreement into a public deed. Said public deed shall be executed and filed in the Property Registry at OCA's request. OCA shall select the notary and pay his or her fees, as well as the stamps and receipts to be cancelled for registration of the lease right.

ARTICLE 5
<u>FINANCING AND RIGHTS OF THE MORTGAGE CREDITOR</u>

5.1  Financing. Ramhil shall search for and obtain adequate financing for development and construction of the Project.

5.1.1  Financing Agreements. Once financing has been obtained, Ramhil shall certify the main terms thereof to OCA. If substantial changes in the main terms of the financing due to subsequent financing are verified, Ramhil shall be obligated to once again certify the main terms of said subsequent financing to OCA.

23

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

5.2   Payment of Mortgage Debts. OCA shall not be required to pay for Ramhil's debts that are secured through mortgages on the Area to be Leased, regardless of why such secured sums are owed. It is further agreed that said mortgages or documents that secure such debts shall not contain any agreement that allows collection of the amount owed or part thereof from OCA.

5.3   Rights of Mortgage Creditors. Notice. The mortgage creditor(s) shall be notified simultaneously to Ramhil as to any proceedings or action to terminate or otherwise affect this Development Agreement and the Lease Agreement, including any notice of event of default, any matter as to an event of default, notice of termination of the Development Agreement or a condition that could lead to termination of the Development Agreement and/or the Lease Agreement. Notice to the mortgage creditor(s) shall be via certified mail with return receipt and no notice or process to Ramhil shall be effective unless a copy of the notice is sent to the mortgage creditors.

5.3.1   Right to remedy. The mortgage creditor(s) may, at their discretion, remedy any breach by Ramhil. To remedy the breach they shall have the same time, terms and conditions that Ramhil shall have to remedy a specific breach, as established in this Development Agreement and in the Lease Agreement.

5.3.2   Assignment of rights to the lease payment. Ramhil may assign its rights to receive the lease payments owed and payable, as established in this Development Agreement and in the Lease Agreement, on behalf of the mortgage creditors that grant the loan(s) for development and construction of the Project. Said assignment shall not be construed as a release of any of Ramhil's obligations, unless otherwise agreed by the parties.

5.4   Obligations of the Mortgage Creditors. Notice. During the term of the Lease Agreement, Ramhil shall notify OCA as to any breach of the terms of the agreements signed by Ramhil for financing of the Project. Furthermore, the mortgages shall provide that

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
<u>Recommended</u> Dec / 6/ 10 [initials]]

the creditor, mortgage creditor and/or fiduciary acting on their behalf, notify OCA as to any default by Ramhil of the financing and/or mortgage terms.

5.4.1 Right to remedy. OCA shall have thirty (30) working days, from receipt of notice of the financial entity to, at its discretion, remedy the default and proceed to discount it from the lease payment.

5.5 <u>Non-Disturbance Agreement</u>. Ramhil shall obtain from its mortgage creditors a written agreement on behalf of OCA in which they agree to respect the lease of the Area to be Leased in the event of foreclosure or any other proceeding to enforce compliance with any current or future mortgage. Through this agreement, any mortgage creditor of Ramhil shall agree to guarantee that OCA's possession shall not be disturbed as long as it, at the moment of foreclosure of the legal proceedings involved, has not defaulted on the obligations under this Development Agreement and the Lease Agreement.

ARTICLE 6
<u>TAXES AND CONTRIBUTIONS</u>

6.1  <u>Taxes</u>. Ramhil shall pay or obtain payment of, before any fine, penalty or interest is imposed due to payment default, and shall be responsible for any taxes of any sort, charges or fees imposed and corresponding to the Project and/or the Area to be Leased and/or any other assets, operations and/or services related to the Project and/or the Area to be Leased.

6.1.1  Property Taxes. During the term of the Lease Agreement, and if property taxes are imposed on the Area to be Leased, Ramhil shall be responsible for paying them and shall submit to OCA and its mortgage creditor a certification from the appropriate governmental authority or any other evidence to demonstrate that it has paid the taxes on the Area to be Leased, as required. It is agreed and clarified that Ramhil's responsibility as to payment of property taxes is limited to the laws and taxes applicable at the

25

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

moment of issuance of the use permit; after that, any increase in said property taxes shall be borne by OCA.

6.1.2   Infrastructure or Utility Payments. OCA shall be responsible for payments for power, water, sewer, gas, telephone, solid waste collection, cleaning, pest control in private areas and other similar services, including payment of any deposit required for the above. OCA shall also be responsible for payment of fuel to operate the emergency power plant, as long as the power failure is not attributable to Ramhil.

6.1.3 Income Tax, Social Security Payments. Ramhil is responsible for making payments to Federal Social Security and the Income Tax Bureau of the Treasury Department for any taxable amount as a result of the income accrued under this Development Agreement and under the Lease Agreement. OCA shall notify the Income Tax Bureau as to payments and reimbursements made to Ramhil.

6.1.4 Receipts. Ramhil, at OCA's request, shall provide within thirty (30) working days from the date in which tax payment, as described in this Article, is due, a copy of the official receipts and any other evidence that is reasonably satisfactory to OCA demonstrating payment of said tax.

ARTICLE 7
INSURANCE AND COMPENSATION

7.1   Insurance. Ramhil and/or contractors to which construction of any part of the Project is awarded, at their sole expense, shall obtain and maintain the insurance listed in this Article, which shall comply with what is indicated in the Development Agreement and the Lease Agreement.

7.1.1   Property Insurance. During the stage of construction of the Project, Builder's Risk coverage shall be obtained which covers, with no limitation, one hundred percent (100%) of the structures against risk of loss, damage or destruction for

26

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

any reason, including the cost of removal of debris. Once construction is completed, the Builder's Risk policy shall be replaced by a Special Form, All Risk Form property policy which covers the buildings against any risk of loss, damage or destruction for any reason in an amount no lesser than one hundred percent (100%) of the replacement value of the property, including the Project and/or personal or movable property therein. The property policy shall include an eight percent (8%) inflation guard and shall include OCA as "Loss Payee." Ramhil shall increase the coverage of the value of the insured property each year in an amount of at least two percent (2%). It is further provided that every four (4) years after the start of the period of the Lease Agreement, Ramhil shall assess the Value to be Leased, at its expense, to determine the corresponding replacement value at that time, and adjust coverage so that it is equal to said value at that moment. The year the Area to be Leased is assessed, the coverage shall not be increased by the two percent (2%), and the adjustment made as a result of the aforementioned assessment shall be the only adjustment carried out that year. Ramhil shall deliver to OCA a copy of the assessment of the Area to be Leased every four (4) years.

7.1.2  Public Liability Insurance. A general policy and public liability policy  against claims for personal injuries, death and/or property shall be obtained to cover the Project, the plot and other components of the Area to be Leased. Said insurance shall provide a principal policy with a limit of one million dollars ($1,000,000.00) per occurrence and an aggregate annual limit of two million dollars ($2,000,000.00) as well as an additional umbrella policy with a limit of at least five million dollars ($5,000,000.00). These policies shall include OCA as additional co-insured and include a Hold Harmless Agreement on behalf of OCA and be in effect during construction and to continue, once it is finalized, during the operation of the Project.

7.1.3  Flood insurance. Flood insurance shall be obtained in the event that it applies to the zone of the Area to be Leased.

7.1.4  Employer's liability insurance. State Insurance Fund insurance shall be obtained, as required by law. Furthermore, insurance with a coverage of at least five hundred thousand dollars ($500,000.00) per person and per

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

event shall be obtained that covers liability not covered by the State Insurance Fund in the event of gross negligence.

7.1.5   Other Insurance. Any other insurance required by law or recommended by the specific uses of the Project shall be obtained.

7.2   Insurance Certificates. As of the start of construction of the Project, Ramhil shall deliver to OCA the appropriate insurance certificates and a copy of each policy. Similarly, Ramhil shall annually deliver certificates of renewal of said policies prior to the date of expiration thereof.

7.3   Insurers. The above insurance policies shall have to be issued by companies that are authorized to do business in the Commonwealth of Puerto Rico and that are reasonably acceptable to OCA and for any other governmental entity with jurisdiction to authorize and approve insurance.

7.4   Additional Named Insured. The above policies shall include OCA as additional named insured and a hold harmless agreement against all risks insured thereby. Said policies shall provide that they shall not undergo any substantial change or cancellation without the insurance company notifying OCA at least thirty (30) days prior to said change or termination.

7.5   Use of Product. Subject to the rights of the mortgage creditor, the proceeds of the policies shall be paid and used in accordance with the provisions of this Development Agreement and Lease Agreement.

7.6   Obligations of Ramhil. Ramhil's obligations under this Development Agreement and under the Lease Agreement shall not be deemed diminished or released in any form or manner, unless otherwise provided under this Development Agreement or in the Lease Agreement, regardless of payment or sufficiency of the amount of the proceeds of the policy/policies.

7.7   Compensation. Ramhil shall compensate and release OCA and hold it harmless from any liability, loss, damage, cost, penalty, fines and/or fees and any actions, claims, or complaints as to said items, that

28

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

may arise related to performance of the obligations under this Development Agreement; with the development, construction, use, operation, preservation and maintenance of the Judicial Center Plot and/or the Project and/or any other improvement carried out as part of the development of the Project inside and outside of the Judicial Center Plot and for any claim resulting from construction or structural defects in the Area to be Leased; with any act, omission or negligence by Ramhil, or its agents, employees, representatives, consultants, guests, users, occupants or tenants; with any breach by Ramhil, including related to environmental conditions and [remedial] actions; with any use, non-use, possession, occupation, operation, maintenance or administration of the Leased Area and outside of the Leased Area but under Ramhil's control, by Ramhil or its agents, employees, representatives, consultants, guests, users, occupants or tenants, unless it results from the negligence and acts or omissions of OCA, its employees, contractors or agents and with any accident, injury or damage to any person or property that occurs in and in the surroundings of the leased area and outside of the leased area but under the control of Ramhil, unless it occurs solely as a result of the negligence or the acts or omissions of OCA, its employees, contractors or agents.

7.7.1  Costs, Expenses and Attorney's fees. In the event that OCA is included as a party in any dispute related to the aforementioned in this Article, Ramhil shall hold OCA harmless and cover all costs, expenses and reasonable attorney's fees for OCA's defense.

7.7.2  No Limit as to Compensation. The obligation to compensate provided in this Article shall not be interpreted or considered to deny, reduce or modify any other obligation of compensation to OCA existing in the current law and any other provision of this Development Agreement and the scope of this obligation to compensate shall not be limited by any provision of this Development Agreement related to insurance. The provisions of this Article shall survive termination or expiration of this Development Agreement.

ARTICLE 8
EMINENT DOMAIN

29

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

8.1  Eminent Domain of the Area to be Leased. If during the term and effect of the lease agreement the entirety of the Area to be Leased is subject to eminent domain proceedings initiated by a public entity based on current legislation to that effect, said appropriation shall terminate the Lease Agreement and the rights and obligations established thereunder. The lease payment to be paid by OCA shall be adjusted to the date of said termination.

8.2  Partial Appropriation of the Area to be Leased. The parties agree that if eminent domain proceedings are initiated as to a part of the Area to be Leased which does not prevent OCA's use of the rest of said area, the Lease Agreement shall continue in effect. It is provided, however, that on the date OCA no longer has effective use of the area subject to appropriation, the lease payment to be paid to Ramhil shall be reduced proportionally to the ratio of the appropriated area with regards to the total Area to be Leased prior to initiating the eminent domain proceedings.

Ramhil shall use any compensation received due to the partial eminent domain proceedings to supplement the adjusted rental payment in order to carry out payments related to financing of the Area to be Leased.

8.3  Notice to OCA. In the event that any of the two proceedings contemplated in this Article, total or partial eminent domain of the area to be leased, is initiated, OCA shall be notified and shall be entitled to participate in the proceedings in order to protect its interests and accurately value them when just compensation under the Law is granted.

ARTICLE 9

DAMAGE AND DESTRUCTION

9.1  Notice of Damages. OCA shall notify Ramhil as soon as possible in the event of damage, fire, or any emergency that occurs in the Area to be Leased.

9.2  Damage or Destruction to Property. No loss, damage or destruction to the Area to be Leased for any reason shall have the effect of terminating this Development

30

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

Agreement and/or the Lease Agreement, other than as stated below, or release OCA from making the lease payment.

9.3   Proof of Loss. In the event that all or part of the Area to be Leased incurs damage or loss, Ramhil shall promptly notify the insurance company and OCA and shall proceed with the appropriate claims in accordance with the terms of the policies in effect.

9.4   Partial Destruction, Repair of Area to be Leased. If the cost to repair the Area to be Leased affected by any damage or destruction, caused by fire or any other risk covered by Ramhil's policy is less than fifty percent (50%) of the value thereof, as determined by the appropriate insurance company, Ramhil shall proceed to repair the Area to be Leased. Repairs shall restore the affected area and its accessions to the same condition they were in prior to incurring the damage or destruction, so that all of the Area to be Leased can continue to be used.

9.4.1   Start of Repairs. The start of repairs shall not take more than ninety (90) working days from the date Ramhil becomes aware of the damage or receives notice of the damage, whichever occurs first, unless Ramhil justifies in writing an extension of said period. Said extension shall never exceed thirty (30) working days from approval by OCA thereof. It is further provided that said periods shall be suspended while there are orders or restrictions imposed by authorized governmental agencies or by the insurance companies in effect which prevent the start of repairs.

9.4.2   Repairs by OCA. The Lease Agreement shall include the terms and conditions under which repairs shall be carried out, including repairs of damage that  requires immediate repairs and OCA's authority to carry out said repairs.

9.4.3   Lease Payment. If the damage or destruction of the Area to be Leased is partial, the lease payment to be made by OCA shall be reduced in proportion to the leased part that unusable, as determined by the appropriate insurance company. Said reduction shall remain in effect until OCA accepts the affected area after it has been repaired.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
<u>Recommended</u> Dec / 6/ 10 [initials]]

9.5  <u>Substantial or Total Destruction or Damage</u>. In the event that the cost of restoring the affected area is fifty percent (50%) or more of the value thereof, as determined by the appropriate insurance company and the damage caused does not allow the use for which the Area to be Leased has been planned or the damage is substantial, as determined by the appropriate insurance company and not one of the risks covered by the policy maintained by Ramhil, it may repair the damage as established in this Article or terminate the Lease Agreement.

9.5.1  Notice. Ramhil shall notify OCA as to the grounds for its decision to terminate the Lease Agreement within a period of forty-five (45) working days from the moment the damage was caused.

9.5.2  Lease Payment. In the event that the Lease Agreement terminates as established in this Article, OCA's obligation to pay the lease payment agreed shall cease from the date in which Ramhil was notified or had knowledge of the damage or destruction of the Area to be Leased.

9.6  <u>Release of OCA</u>. Ramhil hereby releases OCA and holds it harmless from any liability and/or claim, cause of action or action against OCA, its agents, officers, directors, employees and/or consultants for any death, damage to persons or property that may occur in the Area to be Leased for any reason, unless it occurs solely as a result of the negligence or acts or omissions by OCA, its employees, contractors or agents.

## ARTICLE 10
## <u>TRANSFER OR ASSIGNMENT OF RIGHTS OR INTERESTS OF THE DEVELOPER</u>

10.1  <u>Transfers or Assignments</u>. Ramhil may not transfer or assign, directly or indirectly or otherwise transfer, partially or totally, the Area to be Leased and the rights and interests granted through this Development Agreement and Lease Agreement without the prior consent of OCA, which may be granted or rejected by OCA at its sole and absolute

32

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
<u>Recommended</u> Dec / 6/ 10 [initials]]

discretion. Nevertheless, Ramhil may transfer, assign, or otherwise dispose of the Area to be Leased and its rights and interests under this Development Agreement and Lease Agreement with the prior written consent of OCA, which may not be unreasonably delayed, conditioned or rejected, if the current main partners of Ramhil continue to hold at least a majority of the proprietary interest in Ramhil and in the entity to which the rights and the Area to be Leased would be transferred or assigned or disposed of, such that Ramhil can maintain the effective control of administration of Ramhil and the assignee and that said proposed assignee have the same or better financial and operational capacity as Ramhil and complies with all of the requirements established in this Development Agreement and in the Lease Agreement.

10.1.1  Reasons to Deny Approval. It shall be considered reasonable, but shall not be limited to that, for OCA to refuse or not grant its consent if the proposed assignee does not have the financial and operational capacity and the experience necessary to comply with the obligations of this Development Agreement and of the Lease Agreement or if OCA as public entity has concerns regarding the character and reputation in the community of the proposed assignee, regardless of whether or not said concerns are important in a commercial company. In conjunction with the request for approval of the transfer or assignment, Ramhil shall provide OCA the bank and financial information necessary for OCA to be able to assess the proposed entity and any other information that OCA believes is reasonable necessary to assess the request for approval of transfer or assignment.

10.1.2  Copy of the Assignment or Transfer Agreements. Once the transfer or assignment is carried out in accordance with the provisions of this Article, Ramhil shall provide to OCA a copy of the agreements or documents executed to carry out said transfer or assignment in which the assignee shall assume and agree to observe and comply with all agreements, conditions, statements and provisions by Ramhil established in this Development Agreement and in the Lease Agreement.

10.2  Right of First Refusal. Ramhil may not sell the Area to be leased without complying with the provisions of this Article and without first offering it

33

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page:
Recommended Dec / 6/ 10 [initials]]

preferentially for sale to OCA. The terms and conditions of this right of first refusal and the form and manner in which OCA would acquire the Area to be Leased, if it exercised said preferential right, shall be established in the Lease Agreement.

10.3    Prohibited Transfers. Ramhil shall not be able to transfer or assign, directly or indirectly, completely or partially, the Leased Area or the rights established in the present Development Agreement and in the Lease Agreement to any person or entity which Ramhil knows has been convicted or found guilty in criminal proceedings of a crime or which is the subject of an investigation by a grand jury regarding organized crime before the date of the proposed transfer or assignment; to any person or entity from a country whose activities are regulated or controlled by the following laws and regulations and orders promulgated under the same, of the United States of America, as amended: "The Trading and Enemy Act of 1917," "The International Emergency Economic Powers Act of 1976," and "The Anti-Terrorism and Arms Export Amendments Act of 1989; or to a person designated as a "Special Designated National or Blocked Person" by the Department of the Treasury of the United States of America.

## ARTICLE 11

## EVENTS OF DEFAULT AND CONTRACT TERMINATION

11.1    Events of Default by Ramhil. The following shall constitute events of default by Ramhil:

11.1.1 Conditions Precedent and signing of the Lease Agreement. Failure to comply with the Conditions Precedent established in this Development Agreement for signing the Lease Agreement.

11.1.2 Insurance. Failure to comply with the obligations entered into related to obtaining the necessary insurance, as established in this Development Agreement, following thirty (30) business days after notice in writing by OCA.

11.1.3 Development Agreement and Lease Agreement Obligations. Failure to comply with any of the obligations

34

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: <u>Recommended</u> Dec/6/10 [initials]]

established in this Development Agreement and the Lease Agreement, including the obligation to maintain the Area to be Leased in a proper and safe condition for the established purpose, excluding situations caused by events of force majeure, as defined in this Development Agreement and whose repairs are done in the time and manner stipulated in the present contract. It shall not be considered a breach by Ramhil if, after receiving the written notice from OCA requiring compliance with the obligations provided in this Development Agreement or the Lease Agreement, Ramhil begins to comply with its obligations diligently, carrying out the necessary repairs or activities within the following thirty (30) business days from receipt of said notice. In the event of a breach related to maintaining, conserving, repairing the Area to be Leased, the period to begin complying with the obligations shall be three (3) business days. It is provided, however, that if said breach is of such a nature that it cannot be reasonably corrected within said thirty (30) business days, and within said period Ramhil begins and diligently continues to take the necessary steps to correct it, said event shall not constitute a breach while said situation is still present; it is provided that no failure to comply with a monetary obligation shall be considered as a breach that may not be corrected within thirty (30) business days.

11.1.4 Obligations to mortgage creditors. Any failure to comply with the terms of any financing agreement or mortgage loan for development and construction and/or which encumbers the Area to be Leased.

11.1.5 Beginning of construction, development schedule, date of conclusion and delivery. Failure to begin building the Project within the period established in this contract, follow the development schedule and conclude construction and deliver the Project within the period established in the present Development Agreement.

11.1.6 Interrupting construction. Failure to comply by abandoning the Project during construction of the same for more than thirty (30) consecutive business

35

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec/6/10 [initials]]

days, excluding as a result of events of force majeure, as established in this Development Agreement and the Lease Agreement.

11.1.7 Transfer or assignment. Failure to comply by transferring, assigning or otherwise disposing of the Area to be Leased and/or the rights under this Development Agreement and the Lease Agreement without complying with the provisions established in the same.

11.2   Events of Default by OCA. The following shall constitute events of default by OCA:

11.2.1 Rent payment. Failure to comply with payment of rent or any other payment for which OCA is responsible, under this Development Agreement and the Lease Agreement, following thirty (30) business days from receipt by OCA of the written notice. Withholdings or deductions from the rent payment shall be exempted from this breach, as authorized and provided in this Development Agreement and the Lease Agreement.

11.2.2 Contractual Obligations. A failure to comply by OCA with any agreement, obligation, term or condition in accordance with this Development Agreement and/or the Lease Agreement and remaining in breach for thirty (30) business days after receiving notice of said breach by Ramhil. It is provided, however, that if said breach is of such a nature that it cannot be reasonably corrected within said thirty (30) business days, and within said period OCA begins and diligently continues to take the necessary steps to correct it, said event shall not constitute a breach while said situation is still present.

11.3   Breach Relief. In the event of any breach, as provided in this Development Agreement and/or the Lease Agreement, the parties, to the greatest extent possible, shall be able to exercise any and all actions available and/or provided by law (subject to the rights of the Mortgage Creditor under this Development Agreement and the Lease Agreement), including, but not limited to, the right to any and/or all of the following:

36

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec/6/10 [initials]]

11.3.1 Withholding Rent Payment. In the event of a breach by Ramhil, OCA shall be able to withhold the rent payment, in accordance with the provisions of this Article. OCA shall notify Ramhil, by certified mail with acknowledgment of receipt or personally, of its failure to comply, establishing the nature of the breach. Ramhil shall have the opportunity to correct its breach within a period of thirty (30) business days, except in cases in which a different period was established, from receipt of the notice. Following the expiration of the period provided, if Ramhil has not corrected the breach, OCA shall notify it in writing, by certified mail with acknowledgment of receipt, of its intention to exercise its right to withhold the rent payment. Following fifteen (15) business days from receipt of said notice, if Ramhil has not corrected the breach, OCA shall withhold the rent payments until the breach is corrected, except when an event of force majeure prevents correcting the breach.

11.3.2 Tort Claim. Filing a claim for damages caused by a breach by the relevant party.

11.3.3 Contract Termination. Terminating the present contract and/or the Lease Agreement.

11.3.4 Remedy for Breach of Conditions Precedent. If Ramhil fails to comply with each and every one of the Conditions Precedent established in the Development Agreement within the period established for each of them, OCA shall be able to terminate it and file a claim against the Conditions Precedent Bond.

11.3.5 Specific Performance. Requesting specific performance of any obligation of the parties and/or that any act by the parties in contravention of this Development Agreement and/or the Lease Agreement be stayed.

11.3.6 Other Remedies. Any other remedy available in law or equity.

11.4 Reimbursement of Expenses and Attorney's Fees. In the event that any of the parties fails to comply with its obligations and the affected party pays for attorney's fees and/or reasonable expenses for collection of money or compliance with

37

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec/6/10 [initials]]

the obligations and agreements contained herein, the breaching party shall pay, at the request of the affected party or its designated agents, the attorney's fees and reasonable expenses incurred by the same to carry out said process.

11.5 Cumulative Remedies. The parties' remedies shall be cumulative remedies, in other words, exercising any of said remedies shall not prevent exercising any other remedy, or the same remedy, at any other time or event of default. No waiver or release by any of the parties following any breach shall constitute a waiver or release by the parties as to other obligations or conditions stipulated, or as to other obligations of the parties at any other time during the effective term of the Lease Agreement.

11.6 Noncompliance Release. The inaction of any of the parties in notifying noncompliance shall not be interpreted as a release or waiver by the relevant party as to notification of said noncompliance, unless they specifically stipulate otherwise in writing.

ARTICLE12
DISPUTE RESOLUTION PROCESS

12.1 Mediation and Arbitration. The parties agree to submit, any and all disputes stemming from or related to this Development Agreement, first to mediation and, in the event that the parties are not able to solve their dispute via mediation, to arbitration to be carried out in the city of San Juan, Puerto Rico, in accordance with the procedural rules of the "American Arbitration Association" and in compliance with the provisions applicable to the Puerto Rico Arbitration Act, as amended, and with the provisions detailed below:

12.1.1 Arbitration Request. Any of the parties may request in writing to the opposing party that a controversy as to which they have not been able to reach an agreement be submitted to arbitration. It must precisely identify the controversy to be submitted to the arbitration in question.

12.1.2 Arbitration Panel. The arbitration panel shall be composed of three arbitrators. Each of the parties shall appoint an arbitrator, which shall be part of the arbitration panel, and said

38

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: <u>Recommended</u> Dec/6/10 [initials]]

arbitrators shall in turn appoint a third arbitrator by agreement of the same. If the parties do not appoint an arbitrator within the first thirty (30) business days following the arbitration request, or if the arbitrators appointed by said parties do not reach an agreement as to the third arbitrator within the first thirty (30) business days following the appointment of the first two arbitrators, any of the parties shall be able to request that the Court of First Instance, Superior Court of San Juan, appoint the necessary arbitrators to complete the arbitration panel.

12.1.3 Arbitration Process. The arbitration panel shall establish the proceedings to consider the controversy submitted by the parties and shall be able to use the applicable Rules of Civil Procedure as a guide.

The arbitration panel must keep a record of the arbitration proceedings that may be used for judicial review if it is requested by any of the parties.

The interlocutory decisions of the arbitration panel shall not be subject to judicial review in an interlocutory manner, but they may be invoked to question the final decision of the panel, if said interlocutory decision is erroneous and prejudicial to any of the parties.

The hearing on the merits before the arbitration panel shall be held in an informal manner. At its discretion, the arbitration panel may use the fundamental principles of the Rules of Evidence as a guide to the extent that it deems it necessary.

The arbitration panel shall issue a decision based on the facts and the applicable law and shall notify it to the parties' representatives.

12.2 <u>Judicial Review</u>. Any party adversely affected by an arbitration award may request judicial review by filing a civil action in the Court of First Instance, Superior Court of San Juan, within a period of thirty (30) days from notice of the award. The term to request judicial review shall be an expiration term; therefore, it may not be interrupted via motions following the notice of award.

39

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: <u>Recommended </u>Dec/6/10 [initials]]

The Court shall review the award based on the record before the arbitration panel in order to determine whether it is in accordance with the law as to its findings of fact, conclusions of law and remedy granted.

The court shall issue a judgment totally or partially affirming or revoking the award, and it shall also be able to modify the award or return the matter to the arbitration panel for subsequent proceedings.

The decision of the court shall be subject to judicial review just like other judgments of the Court of First Instance.

12.3 <u>Costs and Fees</u>. The arbitration panel shall impose costs on the losing party and may impose reasonable attorney's fees on a party that has been frivolous.

ARTICLE 13
<u>NON-DISCRIMINATION AND EQUAL OPPORTUNITY AGREEMENTS</u>

13.1 <u>Discrimination Prohibited</u>. As to the exercise of all rights, privileges and obligations established in this Development Agreement and in any agreement or contract executed under the provisions of this contract, Ramhil agrees that Ramhil, its successors, contractors, agents, operators and assignees shall not discriminate against any person, employee or job applicant on the basis of race, color, religion, national origin, sex, gender, sexual orientation, disability or veteran status. Ramhil, and all other persons authorized in accordance with this agreement, shall comply with all laws of the Commonwealth of Puerto Rico and of the United States of America regarding civil rights and equal opportunity.

13.2 <u>Posting of Labor Laws</u>. It shall also have to post notices for employees and potential employees about the applicable fair employment laws.

13.3 <u>Event of Default</u>. A breach of the provisions of this Article shall be considered an event of default as to the present Development Agreement. Ramhil shall offer indemnification to and shall release OCA from any and all

40

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec/6/10 [initials]]

liability for any claim or complaints from third parties related to the provisions of this Article.

## ARTICLE14
## REPRESENTATIONS AND WARRANTIES

14.1 Representations by Ramhil. In order to induce OCA to execute the present Development Agreement, Ramhil makes the following representations and warranties, which shall remain in effect at all times during the term of the Lease Agreement and shall survive the expiration of the same:

14.1.1 Existence and Capacity. Ramhil is a small for-profit corporation duly created under the laws of Puerto Rico and has full power and capacity to execute the present Development Agreement and the Lease Agreement, as well as to operate its business.

14.1.2 Authorization and Non-infringement. Ramhil is duly authorized to execute and comply with the present Development Agreement, and it does not enter into conflict with or violate any agreement or obligation of Ramhil.

14.1.3 Compliance. Ramhil shall be at all times in full compliance with its obligations and with the agreements, terms and conditions of the present Development Agreement and the Lease Agreement, as well as with the laws, regulations, ordinances and any applicable legal provisions. Ramhil shall have the right to question, via the applicable judicial or administrative process, any action, request, fine, order or investigation initiated, issued or imposed by the relevant government agencies.

14.1.4 Valid Obligation. This Development Agreement constitutes a valid obligation for Ramhil and, if applicable, for its authorized successors, subject to compliance as appropriate with bankruptcy laws and rights of creditors.

14.1.5 Litigation/Arbitration. Except as otherwise notified to OCA previously in writing, there are no: (a) actions, complaints or proceedings pending before the courts or administrative, quasi-judicial or government bodies; (b) arbitration proceedings; or (c) mediation or dispute resolution

41

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec/6/10 [initials]]

proceedings against Ramhil affecting its capacity to comply with its obligations under the present Development Agreement or the Lease Agreement.

14.2 Representations by OCA. OCA makes the following representations and warranties to Ramhil, which shall remain in effect at all times during the term of the Lease Agreement and shall survive the expiration of the same.

14.2.1 Authorization and Non-infringement. OCA is duly authorized to execute and comply with the present Development Agreement, and it does not enter into conflict with or violate any agreement or obligation of OCA.

14.2.2 Compliance. OCA shall be at all times in full compliance with its obligations and with the agreements, terms and conditions of the present Development Agreement and the Lease Agreement, as well as with the laws, regulations, ordinances and any applicable legal provisions. OCA shall have the right to question, via the applicable judicial or administrative process, any action, request, fine, order or investigation initiated, issued or imposed by the relevant government agencies.

14.2.3 Valid Obligation. This Development Agreement constitutes a valid obligation of OCA and, if applicable, for its authorized successors.

ARTICLE 15
GENERAL PROVISIONS

15.1 Inexistence of Partnership or Joint Venture. Nothing in this Development Agreement shall constitute or be interpreted as constituting a partnership or joint venture between OCA and Ramhil, or as turning each party respectively into the agent or representative of the other.

15.2 Applicability of Laws of Puerto Rico, Severability. This Development Agreement and/or its provisions shall be governed and interpreted in accordance with the laws of the Commonwealth of Puerto Rico. If any term, clause, agreement or condition, or its application, is declared illegal or ineffective by the competent authority, then the remaining terms, clauses, agreement or conditions

42

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec/6/10 [initials]]

of this contract, or their application, shall not be affected and shall remain in full force and effect. In this regard, it is stipulated that the clauses and conditions of the present contract are independent and that the voidness of one or more clauses shall not affect the validity of the remaining clauses.

15.3    Conflict of Interests. No member, representative, employee or consultant of OCA shall have a personal direct or indirect interest in this Development Agreement, nor shall they participate in any decision related to this contract that is in any way related to their personal interests or to the interest of any entity in which said persons have a direct or indirect interest.

15.4 Successors and/or Assignees. All of the agreements, terms, obligations and/or conditions in this agreement shall be compulsory and/or benefit the successors or assignees as appropriate, of OCA, and the authorized successors of Ramhil.

15.5 Notices. Any communication or notice under this Development Agreement must be given as follows: (a) personally, or (b) by certified mail with acknowledgment of receipt. Notices shall be considered received, if given personally, when they are actually delivered; if given by certified mail with acknowledgment of receipt, no later than on the fifth (5th) day from the moment that they are sent.

Notices to OCA shall be sent to the following address:

Sonia Ivette Vélez Colón
Administrative Director
Court Administration Office
PO Box 190917
San Juan, Puerto Rico, 00919-0917

Notices to Ramhil shall be sent to the following address:

Hilda Rodríguez Forteza
President
Ramhil Developers, Inc.
PO Box 190573
San Juan, Puerto Rico 00919-0573

15.6 Term. The present Development Agreement shall be in effect from December 6, 2010 to December 5, 2015. However, said term shall in no way alter the terms established for compliance with the different obligations entered into by the parties under this Development

43


I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec/6/10 [initials]]

Contract. If, as of the expiration date of this contract, neither of the parties has notified in writing to the other party of its intention to amend or terminate the same, or if the Development Agreement has not expired in accordance with its own terms and conditions, the Development Agreement shall be automatically renewed without needing prior notice. Renewal shall be for subsequent month to month periods under the same clauses and conditions established in the present Development Agreement.

15.7 Special Government Requirements.

15.7.1 Litigation with the Commonwealth. Ramhil certifies that, at the time of execution of this Development Agreement, it is not in any litigation with OCA, the Commonwealth, its agencies or instrumentalities.

15.7.2 Financial Interests of Government Employees. Ramhil certifies that, at the time of execution of this Development Agreement, it does not have any particular interest in any case or matter involving a conflict of interests or of public policy, and shall not enter into any agreement of any kind that could cause a conflict of interests or of public policy with OCA.

Ramhil certifies that, at the time of execution of the present Contract, no public employee or official with authority to evaluate, consider, approve, authorize or execute the present contract on behalf of OCA, or member of their family unit, has or has had during the past four (4) years before taking their position, a direct or indirect pecuniary interest with Ramhil or in any of its subsidiaries, parent entity or officers.

Ramhil certifies personally, and on behalf of its partners, agents or employees, or any member of their family unit, as defined by Law No. 12 enacted on July 24, 1985, as amended, that at the time of execution of the present Contract, they were not occupying any position as employees of OCA during the two (2) years preceding the signing of the present Development Agreement.

Ramhil certifies personally, and on behalf of its partners, agents or employees, that at the time of execution of the present Development Agreement, no public employee or official of the Administration, or member of their family unit, as defined in Law No. 12 enacted on July 24, 1985, as amended, has or has had during

44

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin. In the lower portion of the page: <u>Recommended</u> Dec/6/10 [initials]]

the past four (4) years before occupying the position, a direct or indirect pecuniary interest with Ramhil, and that it does not have knowledge of any employee of the Commonwealth that is part of or has any interest in the profits or benefits of this Development Agreement.

15.7.3 Criminal Convictions. Ramhil certifies and guarantees that, at the time of execution of the present Development Agreement, neither Ramhil, nor any of its partners, directors, officers, or managerial employees, have been convicted, and Ramhil does not have knowledge of this or of any of said persons having been investigated, accused or convicted in criminal proceedings in state or federal court of criminal charges related to the treasury, public trust, public duty, or an offense involving the real use of public property or funds, or of any of the felonies or misdemeanors mentioned in Law No. 428 enacted on September 22, 2004. It is specifically acknowledged that this certification is an essential condition of this contract. If the certification is false, it shall constitute sufficient cause to give OCA the authority to terminate this contract immediately, and, if said conviction is related to this transaction in particular, OCA shall have a right to require that Ramhil reimburse it any amount of money received from OCA under this contract.

If Ramhil's condition or the condition of its partners, directors, officers or managerial employees in relation to the criminal convictions mentioned above in this clause changes at any point during the term of this contract, OCA shall be immediately notified. Failure to comply with said obligation to notify shall constitute a violation of this clause and result in termination of the contract.

15.7.4 Income Tax Return. Ramhil certifies that, at the time of execution of the present Development Agreement, it has filed all of the income tax returns required in Puerto Rico during the past five (5) years, and neither Ramhil nor its principals have any Tax Debt (as defined here) with the Commonwealth or, if said debt exists, it is subject to a payment plan approved by the relevant government agency and Ramhil or its principals, as applicable, is up to date under the terms of said payment plan. For purposes of the present Development Agreement, a Tax Debt is any debt in respect of income, excise taxes,

45

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

[Two sets of initials on left-hand margin. In the lower portion of the page: Recommended Dec/6/10 [initials]]

(movable or immovable) property taxes, special assessments, licensing fees, and withheld tax as required by law, unemployment, disability and driver's insurance (if applicable).

15.7.5 Submission of Certificates. Ramhil agrees, personally and on behalf of its principals, to submit to OCA simultaneously with the execution of the present Contract, the Tax Return Filing Certification for the past five (5) years, a No-debt Certification, and the relevant no-debt certifications issued by the Municipal Income Collection Center (CRIM, acronym in Spanish), with respect to the Developer from the Department of Labor and Human Resources related to unemployment, disability and driver's insurance, State Insurance Fund, Administration for Child Support Enforcement (ASUME, acronym in Spanish), and by the relevant Municipality, as applicable.

15.7.6 Tax debt under review or subject to adjustment. Ramhil certifies that neither the corporation nor its principals currently have any Tax Debt under review or subject to adjustment by the Treasury Department of the Commonwealth. In the event that, at any time during the term of this Development Agreement, Ramhil or any of its principals has a Tax Debt under review or subject to adjustment by the Department of the Treasury, Ramhil shall submit quarterly reports certified by said Department describing the status of the process; it is also provided that Ramhil agrees that if, within thirty (30) business days from a final administrative decision, Ramhil has not paid any Tax Debt administratively determined as owed, OCA may terminate the present Development Agreement.

15.8 Entity Documents. Ramhil shall submit the articles of incorporation and the By-Laws of the corporation, as well as a certificate of Good Standing issued by the State Department of the Commonwealth of Puerto Rico.

15.9 Complete Agreement. The present Development Agreement and the documents mentioned in it contain all of the agreements between the parties, which are the only current and valid agreements. The agreements, terms or conditions of

46

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Two sets of initials on left-hand margin.]

this Contract may only be amended or modified with the explicit and written consent of the parties.

15.10 <u>Registration in the Office of the Comptroller</u>. No obligation under this Contract shall be enforceable until the same has been submitted for Registration in the Office of the Comptroller, in accordance with Law No. 18 enacted on October 30, 1975, as amended. OCA agrees to submit this Contract for Registration in the Office of the Comptroller within fifteen (15) days from execution of the same.

## ACCEPTANCE AND SIGNING

BOTH PARTIES state that they have read and understand the contents of the present Development Agreement and agree to the same since it is written to their full satisfaction and faithfully establishes the reached agreements.

WHEREFORE, the parties sign the present contract, including their signature and initials on the left-hand margin of each of its pages.

In San Juan, Puerto Rico, December <u>6</u>, 2010.

[signature]                                   [signature]
Sonia Ivette Velez Colon                      Hilda Rodriguez Forteza
Administrative Director                        President
Courts Administration                          Ramhil Developers, Inc.
Office                                         By Ramhil
By OCA

APPENDIX A: Certificate of Ramhil's Corporate Resolution

APPENDIX B: Final Financial Proposal

APPENDIX C: Survey APPENDIX

D: Conceptual Design

APPENDIX E: Development Schedule

> I certify that the contract complies with the formal legal requirements and recommend that it be signed.
> [signature]
> Signature
> *December 6, 2010*
> Date

47

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Appendix A

# RAMHIL DEVELOPERS, INC.
## CORPORATE RESOLUTION CERTIFICATE

I, CARLOS RAMÓN GONZÁLEZ MORALES, in my capacity as Secretary of Ramhil Developers Inc., a corporation organized under the Commonwealth of Puerto Rico, CERTIFY:

That during an extraordinary meeting of the Board of Directors of Ramhil Developers Inc., duly convened and held on December 3, 2010 at the main offices of the Corporation, with the applicable quorum present, the following Resolution was unanimously approved.

BE IT RESOLVED to authorize HILDA RODRÍGUEZ FORTEZA, in her capacity as President of Ramhil Developers, Inc., who is of legal age, married, an attorney and resident of San Juan, Puerto Rico, to sign the Development Agreement and Lease Agreement for the Caguas Judicial Center under the terms and conditions that she may deem reasonable and advisable.

In my capacity as Secretary, I also certify that the above-transcribed Resolution has not been revoked, nullified, altered or amended in any way, remains in full force and effect, and was adopted in accordance with the statutory provisions of the Corporation, the Certificate of Incorporation and the Law.

WHEREFORE, I sign it and stamp the seal of the Corporation, in San Juan, Puerto Rico, on December    , 2010.
[Seal of RAMHIL DEVELOPERS, INC.]

[signature]
CARLOS RAMÓN GONZÁLEZ MORALES

AFFIDAVIT NO.: *431 (original copy)*

Sworn to and signed in my presence by CARLOS RAMÓN GONZÁLEZ MORALES, in his capacity as Secretary of Ramhil Developers, Inc., who is of legal age, married, a developer and resident of San Juan, Puerto Rico, whom I know personally. In San Juan, Puerto Rico, on December *6*, 2010.
[Notary seal of Yarymar González Carrasquillo]

[signature]
NOTARY PUBLIC

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Appendix B

Ramhil Developers, Inc.
PO Box 190573 San
Juan, P.R. 00919-0573
Tel. 787-277-2854

December 2, 2010

<u>PERSONALLY DELIVERED</u>
Hon. Sonia Ivette Vélez Colón
Court Administration Director
César González Street #677
San Juan, PR 00918-3920

RE:   <u>Negotiation between Ramhil Developers, Inc. and the Court Administration Office</u>
<u>in relation to Construction of New Caguas Judicial Center</u>

Hon. Sonia Ivette Vélez Colón:

I am writing you on behalf of Ramhil Developers, Inc. (hereinafter "Ramhil") in relation to the above-referenced matter. During a meeting held on October 20, 2010, at the main offices of the Court Administration Office (hereinafter "OCA," acronym in Spanish), OCA formally requested that Ramhil submit its best final financial proposal (hereinafter the "Final Financial Proposal") for development, construction, lease, operation and transfer of the New Caguas Judicial Center (hereinafter the "Project").

Following the applicable analysis, we have concluded that our Final Financial Proposal is similar to the financial proposal submitted by Ramhil as part of its *Proposal for Construction of the Caguas Judicial Center* dated March 26, 2007. Therefore, we reiterate and incorporate said proposal by reference here as our Final Financial Proposal. Our determination is mainly based on the aspects discussed below.

The determination as to construction costs that was made when Ramhil's Proposal was submitted in 2007 was made taking into account the prevailing costs in 2006 and 2007. Said construction costs, particularly steel, have substantially increased since 2007. Furthermore, the minimum salary increase shall also have an effect on the cost of construction, since as a result of the almost three years that have elapsed since the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Hon. Sonia Ivette Vélez Colón
Court Administration Director
December 2, 2010
Page 2

initial proposal, the most recent increases in said item shall apply to the totality of the Project construction.

Furthermore, financing for the Project is currently more expensive than expected. This is partly so because the current requirements of financing entities in Puerto Rico are much more rigorous than the requirements in 2007. Complying with said requirements has the effect of increasing the Project financing costs even more. Additionally, since three of the main financial institutions in Puerto Rico closed their operations in 2009, there are less financing alternatives, which to a certain degree does not allow obtaining a more attractive financing offer.

Also, as a result of the time that has elapsed since the beginning of the negotiations with Ramhil, the latter has incurred additional costs in respect of financing of the land to be used for the development of the Project. This has also increased the total Project development cost.

Taking into account the foregoing, we believe that maintaining the offer submitted by Ramhil on March 26, 2007 is actually a better offer for OCA, since the effects of the increase in Project costs mentioned above are entirely assumed by Ramhil. Therefore, Ramhil hereby reiterates its financial proposal dated March 26, 2007, which it incorporates by reference by way of this letter as the Final Financial Proposal of Ramhil.

Once again, we thank OCA for the opportunity offered to Ramhil to participate in the development of the Project and we are at your disposal to clarify any doubts that may arise in relation to the Project.

Cordially,
[signature]
Hilda Rodríguez Forteza

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Appendix C

[Translator's note: SEGREGATION PLAN in English. Handwritten note in Spanish is translated below:]

This signed original plan is a copy of the plan delivered and certified on July 23, 2010. This plan has been revised and amended by a new plan dated September 3, 2010 because of a correction in the coordinates of the lot proposed for the electrical substation. The signature and seal are included in this plan, as requested by the client, for the sole purpose of showing that this plan had been prepared and certified previously. 3 copies of the amended plan are enclosed.

[signature]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: SEGREGATION PLAN in English.]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Appendix D

[Translator's note: Page in English, except for:]

COURT ADMINISTRATION
COMMONWEALTH OF PUERTO RICO

CAGUAS JUDICIAL CENTER
STATE ROAD PR 1, CORNER OF PR 189, CAGUAS, PR

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: Page in English.]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: COURTHOUSE BUILDING GROUND LEVEL – FLOOR PLAN in English, except for:]

ALMACEN DE SUMINISTRO REGIONAL = REGIONAL SUPPLY WAREHOUSE
ARCHIVO DE EXPEDIENTES INACTIVOS = INACTIVE RECORDS
ARCHIVO DE EXPEDIENTES ACTIVOS = ACTIVE RECORDS
ESTACIONAMIENTO DE JUECES = JUDGES' PARKING AREA
SECRETARIA = CLERK'S OFFICE
AREA VEHICULAR (CONFINADOS) = VEHICLE AREA (INMATES)
ALGUACILES = BAILIFFS
VESTIBULO DE ASCENSORES = ELEVATOR LOBBY
SALA DE INVESTIGACIONES = INVESTIGATIONS COURTROOM

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: COURTHOUSE BUILDING SECOND LEVEL – FLOOR PLAN in English, except for:]

EXAMINADORES DE PENSIONES = PENSION EXAMINERS
MENORES & RELACIONES DE FAMILIA: MINORS & FAMILY RELATIONS
SALAS MENORES & FAMILIA = MINOR & FAMILY COURTROOMS

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: COURTHOUSE BUILDING THIRD LEVEL – FLOOR PLAN in English, except for:]

TRABAJO SOCIAL = SOCIAL WORK
SALAS MENORES & FAMILIA = MINOR & FAMILY COURTROOMS

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: COURTHOUSE BUILDING FOURTH LEVEL – FLOOR PLAN in English, except for:]

ASISTENCIA LEGAL = LEGAL AID
SALAS CRIMINALES = CRIMINAL COURTROOMS

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: COURTHOUSE BUILDING FIFTH LEVEL – FLOOR PLAN in English, except for:]

BIBLIOTECA JURIDICA = LEGAL LIBRARY
SALAS CRIMINALES = CRIMINAL COURTROOMS

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: COURTHOUSE BUILDING SIXTH LEVEL – FLOOR PLAN in English, except for:]

GIMNASIO = GYMNASIUM
SALAS CIVILES = CIVIL COURTROOMS

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: COURTHOUSE BUILDING SEVENTH LEVEL – FLOOR PLAN in English, except for:]

CENTRO MEDIACION DE CONFLICTOS = CONFLICT RESOLUTION CENTER
SALAS CIVILES = CIVIL COURTROOMS

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: COURTHOUSE BUILDING EIGHTH LEVEL – FLOOR PLAN in English, except for:]

VISTAS PRELIMINARES = PRELIMINARY HEARINGS

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: COURTHOUSE BUILDING NINTH LEVEL – FLOOR PLAN in English, except for:]

OFICINAS ADMINISTRATIVAS = ADMINISTRATIVE OFFICES

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: PARKING BUILDING GROUND LEVEL – FLOOR PLAN in English.]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: PARKING BUILDING TYPICAL LEVEL – FLOOR PLAN in English.]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

[Translator's note: PARKING BUILDING SECTION VIEW in English.]

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Appendix E

| Activity ID | Activity Name | Original Duration | Activity % Complete | Free Float | Start | Finish |
|---|---|---|---|---|---|---|
| | CAGUAS JUDICIAL CENTER | 682d | | 0d | 06-Dec-10 | 15-Oct-13 |
| | Development Agreement Phase | 44d | | 0d | 06-Dec-10 | 05-Mar-11 |
| DIS0120 | Development Agreement Signing | 0d | 0% | 0d | 06-Dec-10 | 06-Dec-10 |
| DIS1030 | Lease Agreement Signing | 90d | 0% | 0d | 06-Dec-10 | 05-Mar-11 |
| | Design & Financing | 92d | | 0d | 06-Dec-10 | 16-May-11 |
| DIS0170 | Financing | 90d | 0% | 0d | 06-Dec-10 | 05-Mar-11 |
| DIS0130 | Review conceptual design by Ramhil | 10d | 0% | 0d | 06-Dec-10 | 17-Dec-10 |
| DIS0140 | Presentation reviewed conceptual design to OCA | 5d | 0% | 0d | 17-Dec-10 | 24-Dec-10 |
| DIS0110 | Presentation schematic design to OCA | 15d | 0% | 0d | 24-Dec-10 | 14-Jan-11 |
| DIS0100 | Comments to schematic design by OCA | 15d | 0% | 0d | 14-Jan-11 | 04-Feb-11 |
| DIS0180 | Review schematic design by Ramhil | 10d | 0% | 0d | 04-Feb-11 | 18-Feb-11 |
| DIS0190 | Presentation reviewed schematic design to | 5d | 0% | 0d | 18-Feb-11 | 25-Feb-11 |
| DIS0120 | Final Construction Plans by Ramhil | 30d | 0% | 0d | 25-Feb-11 | 08-Apr-11 |
| DIS0160 | Comments Final Plans by OCA | 15d | 0% | 0d | 08-Apr-11 | 29-Apr-11 |
| DIS0200 | Final Construction Plans by Ramhil | 10d | 0% | 0d | 02-May-11 | 16-May-11 |
| DIS0150 | Drawings Submitted at 100% | 0d | 0% | 631d | | 16-May-11 |
| | Studies | 30d | | 0d | 06-Dec-10 | 04-Feb-11 |
| EST1100 | Soil Study | 30d | 0% | 5d | 06-Dec-10 | 04-Feb-11 |
| EST0140 | Traffic Study | 30d | 0% | 45d | 06-Dec-10 | 04-Feb-11 |
| | Government Agency Comments | 5d | | 0d | 06-Dec-10 | 10-Dec-10 |
| | Pre-construction | 5d | | 0d | 06-Dec-10 | 10-Dec-10 |
| AGE0100 | AEE Comments | 5d | 0% | 0d | 06-Dec-10 | 10-Dec-10 |
| AGE0110 | AAA Comments | 5d | 0% | 0d | 06-Dec-10 | 10-Dec-10 |
| AGE0120 | Highway Authority Comments | 5d | 0% | 0d | 06-Dec-10 | 10-Dec-10 |
| AGE0130 | Municipality Comments | 5d | 0% | 0d | 06-Dec-10 | 10-Dec-10 |
| AGE0140 | Fire Department Comments | 5d | 0% | 0d | 06-Dec-10 | 10-Dec-10 |
| AGE0150 | DRNA Comments | 5d | 0% | 0d | 06-Dec-10 | 10-Dec-10 |
| AGE0160 | Pre-construction Comments | 0d | 0% | 692d | | 10-Dec-10 |
| | Permits | 660d | | 0d | 06-Dec-10 | 16-Sep-13 |
| PER0100 | JCA Preparation and Filing | 20d | 0% | 113d | 06-Dec-10 | 31-Dec-10 |
| PER0110 | SWPP (EPA) Preparation | 20d | 0% | 113d | 06-Dec-10 | 31-Dec-10 |
| PER0140 | Earthwork | 0d | 0% | 54d | 06-Dec-10 | 06-Dec-10 |
| PER0120 | Construction Permit | 10d | 0% | 0d | 11-Apr-11 | 26-Apr-11 |
| PER0150 | Obtaining Construction Permit | 0d | 0% | 31d | | 26-Apr-11 |
| PER0130 | Use Permit | 20d | 0% | 0d | 19-Aug-13 | 16-Sep-13 |
| PER0160 | Obtaining Use Permit | 0d | 0% | 0d | | 16-Sep-13 |
| | Construction | 638d | | 0d | 06-Mar-11 | 15-Oct-13 |
| CONS0150 | Order to Proceed (Financing) | 5d | 0% | 0d | 06-Mar-11 | 10-Mar-11 |
| CONS0130 | Earthwork | 90d | 0% | 0d | 11-Mar-11 | 08-Jun-11 |
| CONS0110 | Construction | 830d | 0% | 0d | 09-Jun-11 | 15-Sep-13 |
| CONS0120 | Puch List | 30d | 0% | 0d | 16-Sep-13 | 15-Oct-13 |
| CONS0160 | Substantial Completion | 0d | 0% | 30d | 16-Sep-13 | |
| CONS0140 | Final Completion and Acceptance | 0d | 0% | 0d | | 15-Oct-13 |

Page 1 of 1 Printed On:06-Dec-10 12:51

Timeline annotations:
- 05-Mar-11, Development Agreement Phase
- Development Agreement Signing
- Lease Agreement Signing
- 16-May-11, Design & Financing
- Financing
- Review conceptual design by Ramhil Presentation
- reviewed conceptual design to OCA Presentation
- schematic design to OCA
- Comments to schematic design by OCA
- Review schematic design by Ramhil
- Presentation reviewed schematic design to OCA
- Final Construction Plans by Ramhil Comments
- Final Plans by OCA
- Final Construction Plans by Ramhil
- Drawings Submitted at 100%
- 04-Feb-11, Studies
- Soil Study
- Traffic Study
- 10-Dec-10, Government Agency Comments
- 10-Dec-10, Pre-construction
- AEE Comments
- AAA Comments
- Highway Authority Comments
- Municipality Comments
- Fire Department Comments
- DRNA Comments
- Pre-construction Comments — 16-Sep-13
- JCA Preparation and Filing
- SWPP (EPA) Preparation
- Earthwork
- Construction Permit Obtaining
- Construction Permit
- Permit of Obtaining 15-O
- Order to Proceed (Financing)
- Earthwork
- Construc Puch Substantia Fina

| | 2011 | 2012 | 2013 |
|---|---|---|---|
| Oct Nov Dec | Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec | Jan Feb Mar Apr May Jun Jul Aug Sep Oct Nov Dec | Jan Feb Mar Apr May Jun Jul Aug Sep Oct ov |

[legend icon] Actual Work
[legend icon] Remaining Work
[legend icon] Critical Remaining Work
[legend icon] Milestone
[legend icon] Summary

CAGUAS JUDICIAL CENTER

Appendix E: Development Schedule

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.