UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO
et al.,

          Debtors.[1]

---------------------------------------------------------------x

PROMESA
Title III

Case No. 17-3283-LTS

(Jointly Administered)

OPINION AND ORDER DENYING MOTIONS FOR A STAY PENDING APPEAL FILED BY (I)
FEDERACIÓN DE MAESTROS DE PUERTO RICO, INC., GRUPO MAGISTERIAL EDUCADORES(AS)
POR LA DEMOCRACIA, UNIDAD, CAMBIO, MILITANCIA Y ORGANIZACIÓN SINDICAL, INC., AND
UNIÓN NACIONAL DE EDUCADORES Y TRABAJADORES DE LA EDUCACIÓN, INC., AND
(II) COOPERATIVA DE AHORRO Y CRÉDITO ABRAHAM ROSA, COOPERATIVA DE AHORRO Y
CRÉDITO DE CIALES, COOPERATIVA DE AHORRO Y CRÉDITO DE RINCÓN, COOPERATIVA
DE AHORRO Y CRÉDITO VEGA ALTA, COOPERATIVA DE AHORRO Y CRÉDITO
DR. MANUEL ZENO GANDÍA, AND COOPERATIVA DE AHORRO Y CRÉDITO DE JUANA DÍAZ

---

[1]     The Debtors in these Title III cases, along with each Debtor's respective bankruptcy case
number and the last four (4) digits of each Debtor's federal tax identification number, as
applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth")
(Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii)
Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-
BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement
System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy
Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico
Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-
LTS) (Last Four Digits of Federal Tax ID: 3808); (v) Puerto Rico Electric Power
Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of
Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA")
(Bankruptcy Case No. 19-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).
(Title III case numbers are listed as Bankruptcy Case numbers due to software
limitations).

APPEARANCES:

BUFETE EMMANUELLI, C.S.P.
By:      Jessica E. Méndez-Colberg
            Rolando Emmanuelli-Jiménez
P.O. Box 10779
Ponce, Puerto Rico 00732

*Counsel for the Federación de Maestros de
Puerto Rico, Inc.; Grupo Magisterial
Educadores(as) por la Democracia, Unidad,
Cambio, Militancia y Organización Sindical,
Inc.; Unión Nacional de Educadores y
Trabajadores de la Educación, Inc.*

ALMEIDA & DÁVILA
By:      Enrique M. Almeida
PO Box 191757
San Juan, PR 00919-1757

*Attorneys for Credit Unions*

PROSKAUER ROSE LLP
By:      Martin J. Bienenstock
            Jeffrey W. Levitan
            Ehud Barak
Eleven Times Square
New York, NY 10036

*and*

      Paul V. Possinger
70 West Madison, Suite 3800
Chicago, IL 60602

*and*

      Timothy W. Mungovan
One International Place
Boston, MA 02110

*and*

      Michael A. Firestein
2029 Century Park East, Suite 2400
Los Angeles, CA 90067

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico as
representative for the Debtors*

A&S LEGAL STUDIO, PSC
By:      Luis F. del Valle-Emmanuelli
434 Avenida Hostos
San Juan, PR 00918

*Co-Attorneys for the Financial Oversight and
Management Board for Puerto Rico as
representative for the Debtors*

LAW OFFICES JOHN E. MUDD
By:      John E. Mudd
P. O. BOX 194134
SAN JUAN, P.R. 00919

*Counsel for Salud Integral de la Montaña, Inc.*

ISABEL FULLANA-FRATICELLI &
ASSOCS., P.S.C.
By:    Isabel M. Fullana
           Eduardo J. Capdevila
The Hato Rey Center Bldg.
268 Ave. Ponce de León Ste. 1002
San Juan, Puerto Rico 00918

*Counsel for Finca Matilde, Inc.*

G. CARLO-ALTIERI LAW OFFICES,
LLC
By:    Gerardo A. Carlo
254 San Jose St., Third Floor
San Juan, Puerto Rico 00901

MORRISON & FOERSTER LLP
By:    James M. Peck
           Gary S. Lee
           James A. Newton
           Lena H. Hughes
           Andrew R. Kissner
250 West 55th Street
New York, New York 10019

       *and*

       Joseph R. Palmore
2100 L Street, NW, Suite 900
Washington, D.C. 20037

*Counsel for Ad Hoc Group of Constitutional
Debtholders*

REICHARD & ESCALERA
By:    Rafael Escalera
           Sylvia M. Arizmendi
           Carlos R. Rivera-Ortiz
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
By:    Susheel Kirpalani
           Daniel Salinas
           Eric Kay
           Zachary Russell
51 Madison Avenue, 22nd Floor

New York, New York 10010-1603

*Co-Counsel for the Lawful Constitutional Debt
Coalition*

WILLKIE FARR & GALLAGHER LLP
By:     Mark T. Stancil
1875 K Street, N.W.
Washington, DC 20006

*Counsel for the Ad Hoc Group of General
Obligation Bondholders*

CORREA-ACEVEDO & ABESADA LAW
OFFICES, PSC
By:     Sergio Criado
Centro Internacional de Mercadeo, Torre II
# 90 Carr. 165, Suite 407
Guaynabo, P.R. 00968

MORGAN, LEWIS & BOCKIUS LLP
By:     Kurt A. Mayr
        David L. Lawton
        David K. Shim
One State Street
Hartford, CT 06103-3178

        *and*

        Sabin Willett
One Federal Street
Boston, MA 02110-1726

*Co-Counsel for the QTCB Noteholder Group*

CASELLAS ALCOVER & BURGOS P.S.C.
By:     Heriberto Burgos Pérez
        Ricardo F. Casellas-Sánchez
        Diana Pérez-Seda
P.O. Box 364924
San Juan, PR 00936-4924

CADWALADER, WICKERSHAM &
TAFT LLP
By:     Howard R. Hawkins, Jr.
        Mark C. Ellenberg
        Casey J. Servais
        William J. Natbony
        Thomas J. Curtin

200 Liberty Street
New York, New York 10281

*Counsel for Assured Guaranty Corp. and
Assured Guaranty Municipal Corp.*

ADSUAR MUÑIZ GOYCO
SEDA & PÉREZ-OCHOA, P.S.C.
By:    Eric Pérez-Ochoa
       Luis A. Oliver-Fraticelli
208 Ponce de León Avenue, Suite 1600
San Juan, PR 00936

WEIL, GOTSHAL & MANGES LLP
By:    Jonathan Polkes
       Gregory Silbert
       Robert Berezin
       Kelly DiBlasi
       Gabriel A. Morgan
767 Fifth Avenue
New York, NY 10153

*Attorneys for National Public Finance
Guarantee Corp.*

REXACH & PICÓ, CSP
By:    Maria E. Picó
802 Ave. Fernández Juncos
San Juan PR 00907-4315

BUTLER SNOW LLP
By:    Martin A. Sosland
2911 Turtle Creek Blvd., Suite 1400
Dallas, TX 75219

       *and*

       James E. Bailey III
       Adam M. Langley
6075 Poplar Ave., Suite 500
Memphis, TN 38119

*Counsel for Financial Guaranty Insurance
Company*

FERRAIUOLI LLC
By:    Roberto Cámara-Fuertes
       Sonia Colón
221 Ponce de León Avenue, 5th Floor

San Juan, PR 00917

MILBANK LLP
By:    Dennis F. Dunne
         Atara Miller
         Grant R. Mainland
         John J. Hughes, III
         Jonathan Ohring
55 Hudson Yards
New York, NY 10001

*Attorneys for Ambac Assurance Corporation*

MCCONNELL VALDÉS LLC
By:    Arturo J. García-Solá
         Nayuan Zouairabani
270 Muñoz Rivera Avenue, Suite 7
Hato Rey, Puerto Rico 00918

*Attorneys for AmeriNational Community
Services, LLC*

CASILLAS, SANTIAGO & TORRES LLC
By:    Juan J. Casillas Ayala
         Israel Fernández Rodríguez
         Juan C. Nieves González
         Cristina B. Fernández Niggemann
PO Box 195075
San Juan, Puerto Rico 00919-5075

PAUL HASTINGS LLP
By:    Luc A. Despins
         Nicholas A. Bassett
         G. Alexander Bongartz
200 Park Avenue
New York, New York 10166

*Counsel to the Official Committee of Unsecured
Creditors*

LAURA TAYLOR SWAIN, United States District Judge

Before the Court are the *Teachers' Associations' Motion for Stay Pending Appeal Regarding: Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (Docket Entry No. 19969 in Case No. 17-3283)[2] (the "Associations Motion"), filed by Federación de Maestros de Puerto Rico, Inc., Grupo Magisterial Educadores(as) por la Democracia, Unidad, Cambio, Militancia y Organización Sindical, Inc., and Unión Nacional de Educadores y Trabajadores de la Educación, Inc. (collectively, the "Associations"), and the *Credit Unions' Joint Motion for Stay Pending Appeal of Order and Judgment Confirming Modified Eighth Amended Title III Plan of Adjustment of the Commonwealth of Puerto Rico, et. al.* (Docket Entry No. 20035) (the "Cooperativas Motion" and, together with the Associations Motion, the "Motions"), filed by Cooperativa de Ahorro y Crédito Abraham Rosa, Cooperativa de Ahorro y Crédito de Ciales, Cooperativa de Ahorro y Crédito de Rincón, Cooperativa de Ahorro y Crédito Vega Alta, Cooperativa de Ahorro y Crédito Dr. Manuel Zeno Gandía, and Cooperativa de Ahorro y Crédito de Juana Díaz (the "Cooperativas" and, together with the Associations, the "Movants"). The Motions each request entry of an order staying the *Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (Docket Entry

---

[2]    All docket entry references herein are to entries in Case No. 17-3283, unless otherwise specified.

No. 19813) (the "Confirmation Order"),[3] pursuant to which the Court confirmed the *Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al.*, (Docket Entry No. 19784) (the "Plan of Adjustment" or "Plan"), pending Movants' respective appeals (the "Appeals").

Oppositions to the Motions have been filed by Salud Integral de la Montaña, Inc. (Docket Entry Nos. 20077, 20112), Finca Matilde, Inc. (Docket Entry No. 20079), the PSA Creditors (Docket Entry Nos. 20081, 20116),[4] and the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") as the sole Title III representative of the Commonwealth of Puerto Rico ("Puerto Rico" or the "Commonwealth") (Docket Entry No. 20085 (the "Oversight Board Response to Associations"); Docket Entry No. 20115 (the "Oversight Board Response to Cooperativas")).[5]  Replies in further support of the Motions were filed by the Associations (Docket Entry No. 20145) (the "Associations Reply") on February 15,

---

[3]    The Confirmation Order incorporates by reference the *Findings of Fact and Conclusions of Law in Connection with Confirmation of the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority* (Docket Entry No. 19812) (the "Findings of Fact and Conclusions of Law" or "FFCL"), entered contemporaneously with the Confirmation Order.  (See Confirmation Ord. ¶ 3.)

[4]    The "PSA Creditors," as that term is defined in their opposition brief, refers collectively to the Ad Hoc Group of Constitutional Debtholders, the Lawful Constitutional Debt Coalition, the QTCB Noteholder Group, the Ad Hoc Group of General Obligation Bondholders, Assured Guaranty Corp. and Assured Guaranty Municipal Corp., National Public Finance Guarantee Corporation, Financial Guaranty Insurance Company, and Ambac Assurance Corporation.

[5]    Joinders in opposition to the Motions have been filed by AmeriNational Community Services, LLC as servicer for the GDB Debt Recovery Authority (Docket Entry Nos. 20087, 20118), and the Official Committee of Unsecured Creditors (the "UCC") (Docket Entry Nos. 20088, 20119).

2022, and the Cooperativas (Docket Entry No. 20159 (the "Cooperativas Reply to Oversight

Board") and Docket Entry No. 20161), on February 17, 2022.

The Court has considered carefully all of the arguments and submissions made in

connection with the Motions.  This Court has jurisdiction of these matters pursuant to 48 U.S.C.

§ 2166.  For the following reasons, the Motions are denied.

I.

BACKGROUND[6]

A.      The Plan of Adjustment

On January 18, 2022, the Court approved the Plan of Adjustment for the

Commonwealth, the Puerto Rico Public Buildings Authority ("PBA"), and the Employees

Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS" and,

together with the Commonwealth and PBA, the "Debtors").  The Plan, which is the culmination

of years of litigation, negotiation, and mediation, reflects negotiated resolutions of disputes with

numerous key creditor constituencies.  It resolves tens of billions of dollars in debt, deals with

sixty-nine classes (not counting sub-classes) of claims including claims based on bonds, public

pension liabilities, claims stemming from various lawsuits against the Debtors, claims arising

under federal law, and many others.  The Plan also includes settlements of a broad range of

disputes, including claims about the validity of bonds issued by the Commonwealth and its

instrumentalities.  If the Plan is implemented, the Commonwealth's general obligation and

---

[6]      The Court assumes general familiarity with the factual and procedural background
leading up to confirmation of the Plan of Adjustment.  (See generally FFCL.)  Capitalized
terms used but not defined herein have the meanings assigned to them in the FFCL or in
the Plan.

guaranteed debt will total about $7.4 billion, which represents a substantial and meaningful

reduction of the Commonwealth's approximately $30.5 billion of prepetition debt associated

with those borrowings.  Further, implementation of the Plan will eliminate all ERS and PBA

debt.  (See FFCL ¶ 206.)  The Plan also preserves the accrued pension rights of Puerto Rico's

current and former public servants and seeks to ensure the funding of ongoing pension liabilities

through the creation of a pension reserve trust.  (Id. ¶ 131.)  The herculean task of the

formulation of the confirmable Plan of Adjustment was accomplished with the substantial aid of

the extraordinary efforts of the team of judicial mediators who facilitated negotiations among

key stakeholders to resolve numerous complex disputes.  (Id. ¶ 16.)

On May 31, 2019, the Oversight Board entered into a plan support agreement

with holders of about $3 billion of General Obligation ("GO") and PBA Bond Claims, which

was later replaced on February 9, 2020, with an agreement encompassing over $10 billion in

Claims (the "2020 PSA").  (See id. ¶¶ 17, 19.)  On June 7, 2019, the Oversight Board reached an

agreement with the Retiree Committee regarding the treatment of accrued retirement system

benefits under the Plan, as well as a plan support agreement with the American Federation of

State, County and Municipal Employees regarding the return of contributions of all public

employees to the ERS and modifications to a collective bargaining agreement pursuant to the

Plan.  (See id. ¶ 18.)  After further negotiations with PSA Creditors, on February 23, 2021, the

Oversight Board announced the termination of the 2020 PSA and the execution of an initial 2021

plan support agreement (the "Initial PSA") dated February 22, 2021, between the Oversight

Board (on behalf of the Debtors), and the initial GO/PBA PSA Creditors.  (See id. ¶¶ 20-23.)

Building on the progress achieved by the Initial PSA, the Oversight Board entered

into a stipulation with certain ERS bondholders on March 9, 2021 (id. ¶ 24), and a separate plan

support agreement with the holders and insurers of bonds issued by the Puerto Rico Highways

and Transportation Authority ("HTA") and the Puerto Rico Convention Center District Authority

("CCDA") on May 5, 2021 (the "HTA/CCDA PSA").  (Id. ¶ 25.)  The Initial PSA was then

amended on July 12, 2021, to include the UCC, culminating in a plan support agreement that

contemplated, among other things, the reduction of Commonwealth's debt by approximately

62%, from $90.4 billion to $34.1 billion (the "GO/PBA PSA").  (Id. ¶ 27.)  The gains achieved

by the HTA/CCDA PSA and the GO/PBA PSA were further augmented when, on July 27, 2021,

the Oversight Board entered into a plan support agreement concerning the Puerto Rico

Infrastructure Financing Authority ("PRIFA") and the claims and disputes of creditors in

connection with PRIFA (the "PRIFA PSA").  (Id. ¶ 28.)  Together, these agreements were

reflected in the terms of the Plan that was ultimately confirmed by the Court.

      B.     <u>Treatment of Pension Rights under the Plan</u>

         Under the Plan, retirees (who are receiving pensions or annuities) and other

participants who have accrued rights to receive future pensions or annuities in the ERS, Judiciary

Retirement System ("JRS"), or Teachers Retirement System ("TRS") are entitled to receive their

full pension benefits on account of their allowed pension claims, subject to a "freeze" of any

existing right to accrue post-Effective Date defined benefit pension benefits and the elimination

of post-Effective Date cost of living adjustments ("COLAs").  (See Plan §§ 55.1-55.9.)  For each

such class of creditors in the Plan, the Plan recognizes that all Commonwealth laws concerning

employee pension and other benefits are preempted by PROMESA to the extent they are

inconsistent with the treatment of the relevant claims under the Plan.  (See Plan §§ 55.1(b),

55.2(b), 55.3(b), 55.4(b), 55.5(b), 55.6(b), 55.7(b), 55.8(c), 55.9(c).)  The Plan provides that the

contractual rights of such TRS and JRS participants to accrue post-Effective Date pension are

"deemed rejected pursuant to section 365(a) of the Bankruptcy Code."  (Plan §§ 55.8(b),

55.9(b).)  For the claims of active TRS participants, the Plan provides applicable pension

benefits on account of service before May 3, 2017 (the commencement date of the

Commonwealth's Title III case), and after May 3, 2017, on the terms set forth in Exhibit F-1 to

the Plan.  (Plan § 55.9(a)(i).)

      C.     <u>The Court's Rulings Concerning Act 53-2021</u>

        Act 53-2021 ("Act 53") was enacted by the Commonwealth to permit the issuance

of the securities contemplated by the Plan, but the authority provided by Act 53 was expressly

conditioned on elimination of a provision (the "Monthly Benefit Modification") of the then-

existing version of the proposed Plan that would have reduced pension payments for retirees who

receive pension benefits in excess of $1500 per month.  The Oversight Board eliminated the

Monthly Benefit Modification from the proposed Plan, and it requested rulings from the Court

confirming that elimination of the Monthly Benefit Modification satisfied Act 53's conditions

and permitted the issuance of the securities pursuant to the Plan.  (<u>See</u> *Urgent Motion of the*

*Financial Oversight and Management Board for Puerto Rico for Order (i) Approving Form of*

*Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-*

*2021 and (ii) Scheduling Objection Deadline*, Docket Entry No. 19002.)

        Several parties objected to those proposed rulings and argued, among other

things, that the Plan's "freeze" of pension accruals and its elimination of COLAs were

inconsistent with Act 53 and that Act 53 therefore proscribed issuance of the securities unless

those provisions were eliminated from the Plan.  (<u>See</u>, <u>e.g.</u>, *Objection to Urgent Motion of the*

*Financial Oversight and Management Board for Puerto Rico for Order (i) Approving Form of*

*Notice of Rulings the Oversight Board Requests at Confirmation Hearing Regarding Act 53-*

*2021 at Docket No. 19002 and Request to Be Heard* ¶ 49, Docket Entry No. 19180 (the

"Associations Objection") ("It would be illogical to interpret [Act 53] as if the Legislative

Assembly only intended to condition the issuance of new debt to the elimination of the Monthly

Benefit Modification and still allow the [Oversight Board] to implement a Plan of Adjustment

that imposes other cuts and freezes to pensions.")).  The Court ultimately overruled all such

objections and held that Act 53's plain text did not prohibit the Plan's "freeze" of pension

accruals and elimination of COLAs, and Act 53 therefore authorized the Commonwealth to issue

the bonds and contingent value instruments contemplated in the Plan.  (See FFCL ¶ 90 & n. 25.)

II.

DISCUSSION

The Motions each request entry of an order staying the effectiveness of the

Confirmation Order pending resolution of Movants' respective Appeals.  In reviewing an

application for a stay pending appeal, a court must consider the following four factors:

> (1) [W]hether the stay applicant has made a strong showing that [it]
> is likely to succeed on the merits; (2) whether the applicant will be
> irreparably injured absent a stay; (3) whether issuance of the stay
> will substantially injure the other parties interested in the
> proceeding; and (4) where the public interest lies.

Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. of City of Bos., 996 F.3d 37, 44

(1st Cir. 2021) (quoting Hilton v. Braunskill, 481 U.S. 770, 776 (1987)).  "The party requesting a

stay bears the burden of showing that the circumstances justify an exercise of that discretion."

Nken v. Holder, 556 U.S. 418, 433–34 (2009).  The first two of the applicable factors are the

"most critical."  Id. at 434-35 ("It is not enough that the chance of success on the merits be

'better than negligible.' . . .  By the same token, simply showing some 'possibility of irreparable

injury,' . . . fails to satisfy the second factor." (citations omitted)).  However, "'[t]he sine qua non

[of the applicable standard] is whether the [movants] are likely to succeed on the merits.'"
Acevedo–García v. Vera–Monroig, 296 F.3d 13, 16 (1st Cir. 2002) (quoting Weaver v.
Henderson, 984 F.2d 11, 12 (1st Cir. 1993)).

        1.   Whether Movants Are Likely to Succeed on Appeal

           i.   Associations

      The Associations Motion identifies three bases for objecting to the Confirmation
Order.  First, the Associations contend that the Court erred in determining that Act 53 authorizes
the issuance of securities by the Plan.  Second, the Associations argue that the Court erred in
determining that the Plan provides a basis for the preemption of certain Commonwealth statutes
that impose pension-related obligations on the Commonwealth, and that the Plan therefore
cannot freeze pension accruals under public employees' defined benefit plans and prospectively
eliminate COLAs.  Third, the Associations contend that the Plan lacks essential enabling
legislation that is required to implement a defined contribution retirement plan for those
employees.

      With respect to Act 53, the plain meaning of that statute was addressed
thoroughly in the Findings of Fact and Conclusions of Law issued in connection with the
Confirmation Order, and the Court declines to repeat its analysis here.  (See FFCL ¶ 90 & n. 25.)
In short, the operative provisions of Act 53 condition authority to issue securities under the Plan
on the elimination of the Monthly Benefit Modification.  The Monthly Benefit Obligation was
eliminated from the version of the Plan that was ultimately confirmed.  Moreover, Act 53 only
concerns accrued pension rights of pension plan participants and retirees; Act 53's plain text is
clear that the statute does not prohibit the Plan's defined benefit "freeze" and the prospective
elimination of COLAs.  (Id.)

As to the preemption of pension-related Commonwealth laws that provide for
continued accruals under Commonwealth defined benefit plans, the Associations contend that the
Court improperly concluded that Commonwealth laws that provide for continued accruals under
Commonwealth defined benefit plans are preempted by the confirmation of the Plan.  (See
generally Assocs. Mot. ¶¶ 32-54.)  The Associations argue that the Commonwealth pension laws
are not inconsistent with PROMESA or with the Plan (id. ¶¶ 38-41), and that the recognition of
the laws' preemption in the Plan and the Confirmation Order is, in essence, an unauthorized
usurpation of the power of Puerto Rico's legislative assembly to repeal existing laws.  (Id. ¶¶ 49,
53.)  The Associations argue that the Plan is thus inconsistent with Commonwealth law and is
not feasible, and that it therefore fails to meet the PROMESA requirements that a debtor "not
[be] prohibited by law from taking any action necessary to carry out the plan," that the debtor
obtain "any legislative, regulatory, or electoral approval necessary under applicable law in order
to carry out any provision of the plan," and that the plan be feasible.[7]  48 U.S.C.A. § 2174(b)(3),
(5), (6) (Westlaw through P.L. 117-80).

The Associations' argument that the Plan cannot preempt otherwise valid
Commonwealth laws misconceives the role of section 4 of PROMESA, which provides that the
"provisions of this chapter shall prevail over any general or specific provisions of territory law,
State law, or regulation that is inconsistent with this chapter."  48 U.S.C.A. § 2103 (Westlaw
through P.L. 117-80).  While the Associations correctly note that the Plan is not a "provision[] of

_____

[7]     In a single two-sentence paragraph, the Associations also argue that the Plan violates
section 201(b)(1)(C) of PROMESA because it does not preserve adequate funding for the
public pension system.  That argument was not raised by the Associations in a timely
objection prior to confirmation of the Plan, and it therefore has been forfeited.  See
Iverson v. City of Bos., 452 F.3d 94, 102 (1st Cir. 2006) ("We have held, with echolalic
regularity, that theories not squarely and timely raised in the trial court cannot be pursued
for the first time on appeal.").

[PROMESA]" and that the text of PROMESA does not specifically speak to the validity of the government's pension obligations, PROMESA operationalizes aspects of the Plan in a manner that prevails over inconsistent Commonwealth laws pursuant to section 4.  See 48 U.S.C. § 2161(a) (incorporating certain provisions of the Bankruptcy Code, including, inter alia, sections 365, 944, 1123(a)(5), and 1123(b) of the Bankruptcy Code, into PROMESA); 11 U.S.C. §§ 365(a) (authorizing the rejection of executory contracts); 944(b) (declaring that confirmation of a plan results in the discharge of debts); 1123(a)(5) (authorizing a plan to include "adequate means for the plan's implementation" notwithstanding "otherwise applicable nonbankruptcy law"); 1123(b)(2) (stating that a plan may provide for the rejection of executory contracts). Accordingly, under certain conditions, PROMESA permits debtors to reject contracts and discharge debts, and section 4 of PROMESA provides that the exercise of those statutory powers provided by federal law prevails over inconsistent territorial and state laws.

The Plan contemplates that any post-Effective Date rights to accrue additional defined benefits under the TRS are rejected pursuant to the Bankruptcy Code.  (See Plan § 55.9(b).)  Prior to entry of the Confirmation Order, the Associations did not address the legal significance of or authority for that rejection of expected future pension rights, other than to "reserve the right to file proofs of claim on behalf of [their] members for any damages arising from the rejection of their contractual right to pension benefits and to fully litigate such claims to their conclusion." (Assocs. Obj. at 30.)[8]  In fact, the Associations' objections to the Plan and

---

[8]     At the hearing concerning Act 53 and the Associations Objection, the Associations'
response to the Oversight Board's arguments concerning rejection of pension rights did
not meaningfully address the issue either.  (See Nov. 17, 2021, Hr'g Tr. 45:22-46:2
("Finally, Your Honor, the Board also states that there is no need for the enabling
legislation, because section 365 of PROMESA allows the [rejection] of future obligations
to teachers, but here the issue is whether the Plan of Adjustment meets the enabling
legislation to implement the provisions of the Plan.").)

Confirmation Order appeared to agree that the pension obligations are contractual obligations under Commonwealth law. (See Assocs. Obj. ¶ 20; *Objection to Response of the Financial Oversight and Management Board In Accordance with Order Regarding Certain Aspects of Motion for Confirmation of Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., at Docket No. 19567 (Corrected at Docket No. 19574)* ¶¶ 41, 48, Docket Entry No. 19606 (stating that <u>Asociación de Maestros de P.R. v. Sistema de Retiro para Maestros de P.R.</u>, 190 DPR 854 (P.R. 2014) held that the alteration of pension rights was prohibited by "Article II, Sec. 7 of the Commonwealth Constitution that bars the impairment of contractual obligations").)

In the Associations Reply, the Associations now contend that "there has not been a request to reject pension obligations under Section 365 of the Bankruptcy Code pursuant to Rule 6006 and 9014 of Bankruptcy Procedure." (Assocs. Reply ¶ 36.) That argument ignores the plain text of the Code and the Federal Rules of Bankruptcy Procedure, which permit a plan to provide for the rejection of executory contracts without a separate motion. See 11 U.S.C. § 1123(b)(2) (stating that a plan may, "subject to section 365 of this title, provide for the assumption, rejection, or assignment of any executory contract or unexpired lease of the debtor not previously rejected under such section"); Fed. R. Bankr. P. 6006(a) (providing that "[a] proceeding to assume, reject, or assign an executory contract or unexpired lease, *other than as part of a plan*, is governed by Rule 9014" (emphasis added)); <u>see also</u> 10 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 6006.01[2][a] (16th ed. 2021) ("[T]he overwhelming majority, and better reasoned, view is that, *except for assumption or rejection as part of a plan*, the trustee can manifest the intention to assume or reject an executory contract or unexpired lease only by formal motion filed in accordance with the requirements of Rules 6006(a), 9014 and

9013." (emphasis added)).  The Plan and the Disclosure Statement made it clear that the Plan

provides for the rejection of the Commonwealth's contractual obligations to permit further

accruals under the TRS defined benefit plan.  (See Plan § 55.9(b).)  The Plan explicitly provides

for the cessation of rights to accruals under the TRS defined benefit plan.  (See Plan § 55.9.)

Interested parties therefore had notice of those terms of the Debtors' proposed plan.

Furthermore, as set forth in the FFCL, "[o]bligations arising from Commonwealth

statutes, including statutes providing employees the right to accrue pension or other retirement

benefits, give rise to claims which can be impaired and discharged pursuant to the Plan."  (FFCL

¶ 153 (citing 11 U.S.C. § 101(5)(A); Rederford v. U.S. Airways, Inc., 589 F.3d 30, 35-36 (1st

Cir. 2009); In re Fin. Oversight & Mgmt. Bd. for P.R., Case No. 17 BK 3283-LTS, 2021 WL

5024287, at *8-9 (D.P.R. Oct. 29, 2021)).)  The disposition of these claims is set forth in the Plan

and Confirmation Order, and any Commonwealth obligations to recognize the further accrual of

statutory pension obligations are preempted to the extent they are inconsistent with the relevant

provisions of the Plan.  Notwithstanding the Associations' arguments to the contrary, the

foregoing treatment of pension obligations does not require reference to or use of the mechanism

for the review of Commonwealth legislation set forth in section 204(a) of PROMESA, 48 U.S.C.

§ 2144(a).

As to the Associations' argument that enabling legislation is required to "change

the nature of the [Commonwealth's] retirement systems" (Assocs. Mot. ¶ 66), the prospective

elimination of defined benefit accruals and cost of living adjustments are, consistent with the

preemption rationale explained above and in the Confirmation Order and FFCL, logical results of

the rejection and discharge of ongoing obligations under federal law.  The establishment of

provisions detailing how such claims are to be treated and handled following the Effective Date

is authorized by section 1123(a) of the Bankruptcy Code.  See 11 U.S.C. § 1123(a)(3) (providing

that a plan "shall . . . specify the treatment of any class of claims or interests that is impaired

under the plan"); 1123(a)(5) (providing that a plan "shall . . . provide adequate means for the

plan's implementation").

The Associations are thus unlikely to prevail on appeal.

        ii.   Cooperativas

The Cooperativas assert that the Court erred in confirming the Plan over their

objection for three reasons.  First, the Cooperativas argue that the impairment and discharge of

their claims arising from their purchase and ownership of bonds issued by the Debtors violates

the Takings Clause of the United States Constitution.  (Cooperativas Mot. ¶¶ 8-10, 13 ("The gist

of the takings claim of the Credit Unions . . . is the government['s] regulatory compulsion over

the Credit Unions of value impaired investments that were knowingly issued by the

Commonwealth while in insolvency.  This is a per se or physical taking that cannot be erased or

discharged in a bankruptcy proceeding . . . .").)  Second, the Cooperativas argue that a discharge

of the Commonwealth's debts is inequitable due to the Commonwealth's alleged "dishonesty,

fraud and disregard of [its] fiduciary duties."  (Id. ¶ 14 ("Discharge, its legal principles and

factual surroundings are equitable in nature.  The Order Confirming the Plan should not foster

debtor's dishonesty and fraud.").)  Third, the Cooperativas argue that the Court's dismissal of the

Cooperativas' claims in the case captioned Cooperativa de Ahorro y Crédito Abraham Rosa v.

Commonwealth of Puerto Rico, Adv. Proc. No. 18-00028 (the "Cooperativas Adversary

Proceeding")[9] is not a final and unappealable judgment, and the Court therefore should not have

---

[9]     In the Cooperativas Adversary Proceeding, the Cooperativas asserted several claims
arising from their allegations that the Commonwealth and others unlawfully induced and
compelled the Cooperativas to purchase government-issued bonds, thereby appropriating

referenced that dismissal as a basis for rejecting the Cooperativas' claims.  (Cooperativas Mot. ¶¶ 11-13 (asserting that, due to the appeal of the dismissal of the Cooperativas Adversary Proceeding, "the basis used by this Honorable Court to overrule the Credit Unions' objections to the Plan is legally contested, and subject to review").)

        The Cooperativas Motion largely reiterates the basic arguments made by the Cooperativas in their objections to confirmation of the Plan of Adjustment and in support of their claims in the Cooperativas Adversary Proceeding.  As set forth in the FFCL, the Court thoroughly considered and addressed the dischargeability of claims arising from the Takings Clause that were asserted by numerous parties.  (See FFCL ¶¶ 161-78.)  That analysis included consideration of the proper framework for evaluating such claims, which, in the context of claims by bondholders, included application of the factors set forth in Penn Central Transport Co. v. New York City, 438 U.S. 104 (1978).  (See FFCL ¶¶ 172-74.)  The Court determined that all of the Penn Central factors supported the conclusion that discharge of those claims pursuant to the Plan does not violate the Takings Clause.  (See id. ¶ 174.)  The Court has also already considered and rejected the Cooperativas' arguments that the Plan was proposed in bad faith and that the discharge of liabilities in the Plan is precluded by the Debtors' allegedly inequitable and fraudulent conduct.  (See id. ¶¶ 116-18, 261; Adv. Proc. Dismissal Ord. at 28-31.)  The Cooperativas have advanced no new arguments here that lead the Court to conclude that there is more than a negligible likelihood that the Cooperativas will prevail on appeal with respect to those arguments.

---

the Cooperativas' capital reserves in violation of constitutional, statutory, and common law duties.  See Cooperativa de Ahorro y Crédito Abraham Rosa v. Commonwealth of Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for P.R.), Case No. 17 BK 3283 (LTS), 2021 WL 7162427 (D.P.R. Dec. 27, 2021) ("Adversary Proceeding Dismissal Order").

Finally, the Cooperativas' argument concerning the Court's reference to the

Adversary Proceeding Dismissal Order is unavailing.  In the Cooperativas Adversary

Proceeding, the Cooperativas argued that their claims against the Debtors could not be

discharged.  In the Adversary Proceeding Dismissal Order, the Court concluded that those

arguments were without merit, and the Court properly incorporated the reasoning set forth in that

order into the FFCL "to the extent [the Cooperativas' objection to confirmation of the Plan]

incorporates the allegations set forth in their adversary complaint."  (FFCL ¶ 162 n.36.)  While

the Cooperativas contend that the Court erred in dismissing the Cooperativas Adversary

Proceeding, the Court issued a thorough and reasoned opinion concerning the alleged merits of

those claims, and the Cooperativas' generalized and conclusory assertions of errors all either lack

legal or factual support or merely reiterate arguments considered and rejected by the Court.  (See

Cooperativas Mot. ¶¶ 12.a (asserting that the allegations in the Cooperativas Adversary

Proceeding were "more than plausible" and the Court should have allowed litigation to continue

through discovery); 12.b (asserting that the Cooperativas' complaint included "various factual

averments" of the Commonwealth's knowing misrepresentations); 12.c (asserting that statutes of

limitations were tolled by "plaintiffs' written communications" that would be "produc[ed] . . .

during an ordinary discovery proceeding"); 12.d (asserting that the Court's conclusion that

plaintiffs failed to plead coercion "erroneously adjudicated factual disputes"); 12.e (asserting that

the Court's "premature determination . . . undermines . . . constitutional checks and balances"

and intimating that the Court "den[ied] the plaintiffs their constitutional right to ask the

government to redress grievances" to hide "inconvenient truths" about government misconduct).

The fact that the Cooperativas disagree with and have appealed the Court's determination does

not in and of itself improve their chance of success on the merits of their appeal, nor does the

pending appeal render wrongful the Court's reliance on its reasoning as set forth in the

Cooperativas Dismissal Order.

Accordingly, neither the Cooperativas nor the Associations have demonstrated

that there is a better than negligible chance that their respective Appeals will succeed on the

merits, and this factor therefore weighs against granting their Motions.

2.   Whether Movants Have Established Irreparable Injury

Movants contend that the irreparable injury requirement for granting a stay

pending appeal is satisfied here because, absent a stay, their appeals are likely to be determined

to be equitably moot.  (Assocs. Mot. ¶ 77; Cooperativas Mot. ¶ 20.)  The Associations further

assert that implementation of the Plan will result in unspecified "chaos and disarray," cause an

"exodus of teachers from the public school system," and result in materially smaller pensions

that will make it difficult for teachers to support themselves.  (Assocs. Mot. ¶¶ 84-85, 86, 87.)

They also contend that the teachers who have already applied to retire will be "excluded from

opting to purchase the remaining months of their service and advance their retirement."[10]  (Id.

¶ 85.)  Furthermore, the Cooperativas argue that the absence of a stay pending appeal will

"expose[] them and their members to the irreparable harm of financial and regulatory distress

caused by the bankrupt government in contravention to the duties that same government has to

safeguard the credit unions and their members."  (Cooperativas Mot. ¶ 17.)

Movants' primary claim of irreparable harm arising from implementation of the

---

[10]     In an informative motion filed after the Oversight Board Response to Associations, the
Oversight Board stated that it "agrees that people who applied for retirement by the
January 31, 2022 deadline may apply to purchase service credit until the freeze date and
receive the benefits of such purchased credit when they retire at the end of the current
semester."  (*Informative Motion of Financial Oversight and Management Board
Regarding Status of Plan Implementation* ¶ 17, Docket Entry No. 20165.)

Plan is pecuniary in nature; the Associations and the Cooperativas argue that the claims of

teachers (for pension benefits) and credit unions (for damages arising from their purchases of

government bonds)[11] should not be impaired and discharged by the Plan.  Such grievances are

clearly remediable through payment of money and therefore do not, in and of themselves,

support a finding of irreparable harm arising from implementation of the Plan.  See CoxCom,

Inc. v. Chaffee, 536 F.3d 101, 112 (1st Cir. 2008).  To circumvent that issue, Movants contend

that the impact of implementation of the Plan constitutes irreparable harm because the Appeals

are likely to be determined by the First Circuit to be equitably moot absent imposition of a stay,

thereby preventing Movants from being made whole if they prevail in the Appeals.  Neither the

Associations Motion nor the Cooperativas Motion, however, provide substantial analysis of the

application of the doctrine of equitable mootness to their appeals.  (See, e.g., Assocs. Mot. ¶ 77

(asserting, with no further explanation, that "the lack of a stay will likely render the Teachers'

Associations' appeal equitably moot, pursuant to the First Circuit's recent decisions" (citing

Pinto-Lugo v. Fin. Oversight & Mgmt. Bd. for P.R (In re Fin. Oversight & Mgmt. Bd. for P.R.),

987 F.3d 173 (1st Cir. 2021) ("Pinto-Lugo"); Cooperativa de Ahorro y Credito Dr. Manuel Zeno

Gandia v. Fin. Oversight & Mgmt. Bd. (In re Fin. Oversight & Mgmt. Bd.), 989 F.3d 123 (1st

Cir. 2021) ("Cooperativa de Ahorro y Credito Dr. Manuel Zeno Gandia")); Cooperativas Mot.

¶¶ 20-21 (noting "the risk" of mootness and citing, inter alia, Cooperativa de Ahorro y Credito

---

[11]     The Cooperativas' allegations of "financial and regulatory distress" in the event of
implementation of the Plan, which provides for less than full payment of the
Cooperativas' bond claims, is not stayed are not factually supported in the Cooperativas
Motion.  The Debtors have not been making payments on account of any government
bonds held by the Cooperativas during the course of these Title III cases; accordingly,
there is no apparent basis to conclude that staying implementation of the Plan (and
prolonging complete non-payment of bond obligations) would protect or improve the
Cooperativas' financial or regulatory condition.

Dr. Manuel Zeno Gandia, 989 F.3d 123).)  Furthermore, the brief discussion of equitable

mootness in the Associations Reply (see Assocs. Reply ¶¶ 77-79) does not include any reference

to First Circuit case law, and instead cites most substantially to case law from the Sixth Circuit

applying an equitable mootness test that appears materially different than the one applicable in

this Circuit, with no discussion of the apparent discrepancy.  Compare Ochadleus v. City of

Detroit (In re City of Detroit), 838 F.3d 792, 798 (6th Cir. 2016) (stating that the first equitable

mootness factor is "whether a stay has been obtained") with Pinto-Lugo, 987 F.3d at 180 (stating

that the first equitable mootness factor is "whether the appellant pursued with diligence all

available remedies to obtain a stay of execution of the objectionable order").

    That discrepancy may well be significant here because, while the First Circuit

denied certain appeals of this Court's confirmation of a plan of adjustment for the Puerto Rico

Sales Tax Financing Corporation ("COFINA") on the basis of equitable mootness, the

procedural history and facts of those cases showed a pervasive failure of the appellants to

diligently protect their rights by, among other things, seeking a stay of the confirmation order.

The First Circuit repeatedly emphasized in those cases that the appellants had failed to be

diligent in pursuing available remedies at practically every opportunity.  See Pinto-Lugo, 987

F.3d at 183-85 ("The Pinto-Lugo objectors . . . have done anything but diligently seek to prevent

third parties from building reliance interests in the confirmation of the Plan. . . .  Like the Pinto-

Lugo objectors, the Elliott objectors failed to object to the waiver of the automatic stay of

confirmation, did not seek any stay pending appeal, neither sought to expedite the appeal nor

objected to requests for extension, and in fact sought to extend the briefing schedule

themselves."); Cooperativa de Ahorro y Credito Dr. Manuel Zeno Gandia, 989 F.3d at 130

("[Appellants] were anything but diligent in seeking to obtain a stay or prevent delay.  They

failed to object to the waiver of the automatic stay of confirmation, to seek any stay pending

appeal, to request to expedite the appeal, or to object to requests for extension. In fact, on

multiple occasions the [Cooperativas] sought to extend the briefing schedule themselves.").  That

does not appear to be the case here, but Movants have not put forward any explanation of why

their apparent diligence would not materially distinguish their Appeals from the appeals with

respect to the COFINA plan of adjustment.

    The Cooperativas also contend that, even after the Effective Date of the Plan, the

Commonwealth will retain sufficient cash and capacity in its fiscal plan so as to be able to pay

the Cooperativas' claims in the event that they prevail on their Appeal.  (See Cooperativas Mot.

¶ 23 & n.3 ("The evidence submitted and argued by the Oversight Board showed that there is a

remaining cash of $532 million on the effective date of the plan, which would enable the

Commonwealth to sustain feasibility in the event of a non-dischargeability determination by any

appellate court of the taking claimants' claims.").)  That assertion, if true, may aid the

Cooperativas in establishing that success on appeal would not require the unwinding of complex

transactions or otherwise affect reliance interests created by confirmation and implementation of

the Plan.  Cf. Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber

Network, Inc.), 416 F.3d 136, 144 (2d Cir. 2005) ("If a stay was sought, we will provide relief if

it is at all feasible, that is, unless relief would 'knock the props out from under the authorization

for every transaction that has taken place and create an unmanageable, uncontrollable situation

for the Bankruptcy Court.'"); Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.),

293 B.R. 489, 494 (B.A.P. 9th Cir. 2003) ("Even assuming that debtor's plan is substantially

consummated, debtor has not demonstrated that we cannot provide effective relief if the

confirmation order were to be reversed. . . .  [The] debtor [does not] assert that the plan would be

infeasible if it were required to pay Varela.").

In the near-total absence of any discussion of these issues by the parties, it suffices to say that Movants have relied upon the prospect of equitable mootness as a basis for finding that denial of the Motions presents an "actual and imminent" risk of irreparable injury, P.R. Asphalt, LLC v. Betteroads Asphalt, LLC, Civ. No. 19-1661 (ADC), 2020 WL 698249, at *7 (D.P.R. Feb. 11, 2020), without providing any reasoned analysis as to why the doctrine would apply.  It is Movants' burden to demonstrate that there is more than "some possibility of irreparable injury," Nken, 556 U.S. at 434, and their failure to do so, in combination with their low probability of success on the merits, counsels strongly against imposing the "extraordinary remedy" that they have requested.  MEDSCI Diagnostics, Inc. v. State Ins. Fund Corp. (In re MEDSCI Diagnostics, Inc.), Adv. No. 10-0094, 2011 WL 280866, at *3 (Bankr. D.P.R. Jan. 25, 2011); Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004) ("A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.").

Because it is Movants' burden to demonstrate the basis for imposing the "extraordinary remedy" of a stay pending appeal, In re MEDSCI Diagnostics, Inc., 2011 WL 280866, at *3, their failure to put flesh on their analysis of the probability and effect of equitable mootness provides the Court with no grounds upon which to determine there is more than "some possibility of irreparable injury" in the absence of a stay.  Nken, 556 U.S. at 434.

3.   Whether Granting the Stay Will Substantially Injure Other Interested Parties

Regarding the effect of a stay on other interested parties, the Cooperativas argue that the Debtors and other creditors would not be affected by a stay, "especially considering that preservation of the rights and claims" of the Cooperativas in the Cooperativas Adversary

Proceeding, their proof of claim, and any financial contingency required for that preservation,

"entails a minimal amount (not even reaching seven tenths of one percent) when compared to"

the Plan's scope.  (Cooperativas Mot. ¶ 22; see also Assocs. Mot. ¶ 88.)  The Cooperativas argue

that the Oversight Board has already admitted that making takings claims non-dischargeable

would not render the plan infeasible, given the availability of $532 million in remaining cash

after making disbursements under the Plan (Cooperativas Mot. ¶ 23 & n.3), and that the Debtors'

financial and operational condition would not be affected by a stay (which would simply extend

the financial condition of the Commonwealth that has been in place since 2017).  (Id. ¶ 24.)  As

the Associations put it, "the issuance of the stay would merely preserve the status quo, which

would not affect any interests involved here because the Confirmation Order is not final and the

rights in the Plan are not vested."  (Assocs. Mot. ¶ 89.)  The Associations add that the appellate

procedure may be expedited upon request, and "the First Circuit has cautioned that a stay

pending appeal is indispensable for that to progress."  (Id.)

Movants' interests are, however, outweighed by the potential harm resulting from

a delay in the effective date, which could, at the very worst, undermine the Plan and cause it to

unravel, undoing five years of extensive negotiations, because each day the effective date is

delayed, the probability increases that opponents of the restructuring will seek new legislation to

undermine it, and there is less ground for certainty that the supporting parties will further extend

key deadlines.  ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (In re Adelphia Commc'ns

Corp.), 361 B.R. 337, 354 (S.D.N.Y. 2007) ("[T]here are additional harms that are substantial

but not easily quantifiable, such as the risk that the Plan will fall apart and that the parties will

fail to reach a new agreement given the uncertainty associated with what could be a [several]-

month stay."); In re Sabine Oil & Gas Corp., 548 B.R. 674, 683 (Bankr. S.D.N.Y. 2016)

("Courts have recognized numerous harms resulting from the postponement of reorganization

proceedings, including . . . placing plan settlements in jeopardy[.]")[12]   (See Oversight Bd. Resp.

to Assocs. ¶ 59; Oversight Bd. Resp. to Cooperativas ¶ 38.)  That danger is further compounded

by the fact that several settlements underlying the Plan are conditioned on the timely occurrence

of the Plan's effective date.  (See, e.g., Docket Entry No. 20116-1 ¶ 30; Docket Entry No. 18791-

6 §§ 7.1(a)(v), 7.1(b)(viii).)  Failure to permit consummation of this long-sought Plan could

condemn the Commonwealth to a prolonged and injurious search for other solutions while its

economic prospects deteriorate. To call such a risk to the Plan a potential setback would be a

gross understatement.

Even if the only consequence of the stay were a delay in the Plan's

implementation, such a delay in the Commonwealth's financial recovery would not be

inconsequential: preserving the "status quo" would prolong the state of emergency that the Plan

addresses and delay new investments in the Commonwealth and the access of the

Commonwealth to capital markets, stunting economic growth for as long as appeals remained

pending.  (Oversight Bd. Resp. to Assocs. ¶ 60; Oversight Bd. Resp. to Cooperativas ¶ 39.)

As to other creditors, the Cooperativas argue that there is no risk that the Debtors

will deplete or lose any sources of payment under the Plan if a stay is imposed pending appeal,

and that the payments to be paid in cash are already segregated from the Debtors' operational

---

[12]      Most of the other risks identified in In re Sabine Oil & Gas Corp. are also at play here.
These include "lost strategic opportunities," "incurrence of administrative and
professional expenses," and "exposing the equity to be granted to non-moving creditors
to market volatility and other risks."  548 B.R. at 683.

accounts, with remaining payments to be made through the issuance of newly authorized bonds, none of which would be affected by a stay.  (Cooperativas Mot. ¶ 24.)[13]

The fact remains, however, that a stay would delay the distribution of about $10.8 billion to creditors and the debt instruments that will replace the currently-outstanding bonds, causing creditors to lose the opportunity to earn investment income on cash that would otherwise be distributed to them under the Plan, and accruals of income on the new instruments.  (See Docket Entry No. 20085-1 ¶ 7.)  The sheer amount of expected interest at stake in any further delay is sufficient to outweigh the benefit gained by Movants from a stay of the entire Plan pending appeal.  See In re Efron, 535 B.R. 516, 520 (Bankr. D.P.R. 2014) ("Delay caused to creditors receiving their payment is also a significant harm warranting denial of a stay.") (quoting In re Public Serv. Co., 116 B.R. 347, 350 (Bankr. D.N.H. 1990); see also In re Adelphia Commc'ns Corp., 361 B.R. at 342 (noting the "weighty interest[]" of "the right of the majority of creditors to receive their distributions."); In re Great Barrington Fair & Amusement, Inc., 53 B.R. 237, 240 (Bankr. D. Mass. 1985) ("The chief harm which will be caused by a stay is the delay which will be suffered by the other creditors.").  That it has taken five years from the date of the Debtors' petition for them to be in a position to pay financial creditors accentuates (rather than minimizes) the harm of additional delay: the Debtors, the other creditors, and the people of Puerto Rico have suffered long enough.[14]

---

[13]   The Associations also reiterate their argument that the Plan depends on enabling legislation as a sort of condition precedent to the viability of the effective date, and since the Plan lacks enabling legislation for changes to the TRS, the effective date should be stalled on that basis.  (Assocs. Mot. ¶¶ 3, 5, 12, 16-17, 20, 25, 41, 44, 64-73, 90.  See also Docket Entry Nos. 19969-1 ¶ 6; 19969-2 ¶ 6; 19969-3 ¶ 6.)  In light of this Court's determination under the first factor, however, this argument is unpersuasive.

[14]   The burden that a stay would impose on the Debtors and other creditors would be further magnified, as the PSA Creditors rightly point out (Docket Entry No. 20116 ¶ 2), by causing delays to the Title VI restructurings of the Puerto Rico Convention Center

Although it is unnecessary to determine whether a supersedeas bond would be appropriate because Movants have failed to carry their burden of demonstrating that a stay is justified, the harm that would be suffered by the Debtors and other creditors in the event of a stay is underscored by the magnitude of the potential losses—running into hundreds of millions of dollars—that would have to be covered by an appellate bond.  In re Adelphia Commc'ns Corp., 361 B.R. at 368; see also Triple Net Invs. IX, LP v. DJK Residential, LLC (In re DJK Residential, LLC), 2008 WL 650389, at *5 (S.D.N.Y. Mar. 7, 2008).

As the Debtors' experts have indicated in their declarations, based on the conservative assumption that an appeal would be resolved quickly, the value of a bond would have to cover (i) tens of millions of dollars in additional pension liability to active TRS and JRS participants if the Plan's implementation is delayed (Docket Entry No. 20085-2 ¶ 23); (ii) millions of dollars in administrative fees owed to professionals, who would be retained beyond the projected effective date until the Plan's implementation (see, e.g., Oversight Bd. Resp. to Assocs. ¶ 72 & n.22 (basing estimate on recent past fee applications)); (iii) the net loss to the Pension Reserve Trust ("PRT") which, in the event of a delayed effective date beyond June 30, 2022, would result in a total reduction of the PRT's funding over ten years by $960 million (see Docket Entry No. 20085-1 ¶¶ 18-20); and (iv) the net deprivation to creditors of interest

---

District Authority and the Puerto Rico Infrastructure Financing Authority, because those restructurings cannot become effective until the effective date of the Plan.  (See *Findings of Fact, Conclusions of Law, and Order Approving Qualifying Modification for the Puerto Rico Infrastructure Financing Authority Pursuant to Section 601(M)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act* § 10.1(e), Docket Entry No. 82-1 in Civ. Case No. 21-1492 (LTS); *Findings of Fact, Conclusions of Law, and Order Approving Qualifying Modification for the Puerto Rico Convention Center District Authority Pursuant to Section 601(M)(1)(D) of the Puerto Rico Oversight, Management, and Economic Stability Act* § 10.1(e), Docket Entry No. 72-1 in Civ. Case No. 21-1493 (LTS).)

payments on distributions, in the amount of approximately $45 million per month of delay.  (Id. ¶ 21; see also Docket Entry No. 17628-16 at 5).

The Oversight Board argues, based on these estimates, that an appellate bond in anticipation of a six-month stay should be set in the amount of $1.5 billion, an amount that still would not account for the risk that delay would pose to the viability of the entire Plan.  (See, e.g., Oversight Bd. Resp. to Assocs. ¶ 76.)  Even if, as the Movants argue, the proffered declarations and estimations are not admissible as expert testimony (see Assocs. Reply ¶¶ 127-35; Cooperativas Reply to Oversight Bd. ¶¶ 23-24), the basic logic identifying the categories of harms that would result from a stay, and which would factor into the calculation of potential losses, is sound, and the Court is familiar enough with the magnitude and scope of creditors' claims in these cases (as well as the fact that creditors have waited years to receive any recovery on their claims) to conclude that, regardless of the precise figures, the dollar amounts involved would be substantial.

Therefore, while it is unnecessary to impose or even determine the precise amount of a potential bond at this juncture, considerations that would underpin the computation of a bond demonstrate that the balance of interests tips dramatically against the Movants.[15]

---

[15]  The Cooperativas argue for the first time in their reply brief that they should, in the alternative, be afforded a stay of the effects of discharge on their claims while the appeal is pending.  (Cooperativas Reply to Oversight Bd. ¶ 44.)  They argue that, because the Oversight board admits it has $532 million in remaining cash after making the Plan's disbursements, the Commonwealth will have the financial capacity to pay the claims of the Cooperativas if, after a trial on the merits, they are declared non-dischargeable.  (Id.)  Not only is this argument untimely raised, their argument that the Commonwealth can afford to pay them cuts against their request for a limited stay.  Having failed to show any irreparable harm, moreover, it is unclear what a stay would accomplish that could not otherwise be accomplished by a successful appeal in the absence of a stay.

4.   <u>Where the Public Interest Lies</u>

Regarding the effect of a stay on the public interest, the Cooperativas argue that
the preservation of their claims is required for the protection of the capital and resources of
depository institutions and is thus aligned with the Commonwealth's policy objectives of
protecting and serving citizens, particularly a constituency of over 1.3 million credit union
members and depositors who rely on the preservation of the Cooperativas' rights and claims.
(Cooperativas Mot. ¶ 25.)  They argue that protecting such rights does not impede the
formulation and confirmation of a feasible plan, and "any financial contingency resulting from
that preservation does not adversely affect third parties, as the [Cooperativas'] claims are not
material amounts as compared to the" debts adjusted under the Plan, "not even reaching seven
tenths of one percent (0.658%) of the restructured debt."  (<u>Id.</u> ¶ 26.)

The Associations argue that the rights of retirees are a matter of public interest
that would not be addressed absent a stay, they argue, with the consequence that the balance of
equities favors the rights of the retirees over the desire to expedite the effective date.  (Assocs.
Mot. ¶ 91.)  The Associations also argue that one benefit of staying the proceedings is that more
certainty can be provided concerning the terms to be implemented, allowing public officials to
prepare for any impending changes.  (<u>Id.</u>)

These arguments fail for several reasons.  First, the total values of the Movants'
interests are but satellites, dwarfed by the central interests of the public in the prompt recovery of
Puerto Rico's economy.  Any delays in implementing the widely supported Plan, which would
allow the Commonwealth to restructure tens of billions in bond debt, regain access to capital
markets more rapidly, grow economically, and create many new jobs, would be gravely
detrimental, to say nothing of the catastrophic effects that could result from unravelling the Plan
altogether.

Second, the Movants' attempts to cast their interests as public interests depend on the untenable assumption that the general public's interest in having appeals resolved outweighs the general public's interest in having the Plan promptly implemented.  To formulate that argument is to refute it: the groundswell of stakeholders in Puerto Rico that approved the Plan have no interest in seeing the effective date of the Plan delayed and they only stand to suffer from any such delay.  This conclusion is underscored by the unlikelihood of the Movants' success on appeal.

Third, in light of the Court's conclusions regarding Movants' unlikelihood of success on the merits of their Appeals, it must be further concluded that the unlikely benefit of a different outcome on appeal does not justify the imposition of a stay.

III.

CONCLUSION

For the foregoing reasons, the Motions are denied.  This Opinion and Order resolves Docket Entry Nos. 19969 and 20035 in Case No. 17-3283.


SO ORDERED.

Dated: March 3, 2022

 /s/ Laura Taylor Swain
LAURA TAYLOR SWAIN
United States District Judge